UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CIVIL ACTION NO. 2:11-CV-00084

6-26-2022

M.D.; bnf STUKENBERG, *et al.,* Plaintiffs, v. GREG ABBOTT, *et al.,* Defendants.

Hon. Janis Graham Jack, Senior United States District Judge

**Sixth Report of the Monitors: Remedial Orders 4, 12 to 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, A7, and A8**

Deborah Fowler and Kevin Ryan, Monitors

# Table of Contents

**Introduction and Executive Summary** ....................................................... **5**

Introduction ............................................................................. 5

Executive Summary ....................................................................... 8

Summary of Monitors' Findings ......................................................... 17

Summary of Findings by Remedial Order ................................................. 17

**Demographics in PMC Care** ................................................................ **25**

Age, Gender, and Race ................................................................. 26

Living Arrangements and Length of Time in Care ........................................ 27

Out of State Placement ................................................................. 31

Level of Care .......................................................................... 33

Geographic Location .................................................................... 34

Single Source Continuum Contractor Presence and Placement Oversight .................... 34

**Preventing Sexual Abuse and Child-on-Child Sexual Aggression** ................. **35**

Data Related to PMC Children Flagged with an Indicator for Sexual Aggression or
Sexual Victimization ................................................................... 35

Number of Placements and Runaway Incidents for PMC Children with and without
a Sexual Characteristics Flag, January – December 2022 ................................ 38

Remedial Order 32: Policy Creation and Training of Staff Responsible for Making
Determinations ......................................................................... 39

Background ............................................................................. 39

Performance Validation ................................................................. 39

Remedial Order 32 Summary .............................................................. 40

Remedial Order 4: Caseworker and Caregiver Training on Sexual Abuse .................... 41

Background and Updates ................................................................. 41

Caseworker Training Performance Validation Results ..................................... 42

Caregiver Child Sexual Abuse Training ................................................. 43

Summary of Caseworker and Caregiver Sexual Abuse Training Performance
Validation .............................................................................. 44

Remedial Orders 23, 24, 28, and 30: Tracking and Documenting Sexual Abuse and
Child-on-Child Sexual Aggression ....................................................... 45

Background ............................................................................. 45

Case Review of Sexual Victimization History in RCCI Maltreatment in Care
Investigations ......................................................................... 47

Performance Validation: Case Record Review for Children Identified with an Indicator of Victim of Sexual Abuse or with an Indicator for Sexual Aggression ... 47

Remedial Orders 23, 24, 28, and 30 Summary ............................................................ 58

Remedial Orders 25, 26, 27, 29 & 31: Caregiver Notification ....................................... 58

Background ................................................................................................................ 59

Performance Validation .............................................................................................. 59

Summary: Remedial Orders 25, 26, 27, 29, and 31 .................................................... 74

Remedial Orders A7 and A8: Awake-Night Supervision .............................................. 74

Background ................................................................................................................ 75

Performance Validation .............................................................................................. 76

Summary: Remedial Orders A7 and A8 ...................................................................... 93

**Regulatory Monitoring and Oversight of Licensed Placements ................. 94**

Analysis of HHSC Investigations ................................................................................. 94

Assessment of Investigation Classification ................................................................. 95

Incongruent Priority Levels ........................................................................................ 98

Assessment of Investigation Activities and Outcomes .............................................. 109

Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment and Obligation to Report Suspected Abuse or Neglect ..................................................... 110

Remedial Order 22 ................................................................................................... 110

Background .............................................................................................................. 111

Performance Validation ............................................................................................ 112

Monitoring Team Evaluation of Inspector's Consideration of Patterns/Trends at Operations and Agency Homes ................................................................................. 130

Remedial Order 22 Summary ................................................................................... 143

Remedial Orders 12-19: Timeliness of Minimum Standards Investigations .............. 143

Background .............................................................................................................. 143

Performance Validation (HHSC) ............................................................................... 144

Remedial Orders 12-19 Summary ............................................................................ 152

Remedial Order 20: Heightened Monitoring .............................................................. 153

Remedial Order 20 ................................................................................................... 153

Overview of Operations Placed Under Heightened Monitoring ................................. 154

Operations Placed on Heightened Monitoring in 2022 .............................................. 156

Heightened Monitoring Plans .................................................................................... 158

Review of Placements of PMC Children Made to Operations Under Heightened Monitoring, January 1, 2022, through December 31, 2022 ......................................... 165

Analysis of Heightened Monitoring Quarterly Reports and Data ............................... 173

Compliance with Heightened Monitoring Plan Tasks ................................................ 177

Consistency between Quarterly Reports and Monthly Files ....................................... 186

Follow-Up Analysis: Operations on Heightened Monitoring in 2021 and Reviewed in Fourth Report ..................................................................................... 187

Analysis of Waiver and Variance Requests made by Heightened Monitoring Operations ........................................................................................................ 189

Abuse, Neglect, and Exploitation Investigations, Substantiated Findings of Abuse, Neglect, and Exploitation, and Minimum Standards Deficiencies Cited for Operations Placed Under Heightened Monitoring ...................................... 191

Operations Placed on Heightened Monitoring in 2022 ................................ 193

Operations Placed on Heightened Monitoring in 2020 or 2021 and Still Under Heightened Monitoring ................................................................................. 199

Operations Placed on Heightened Monitoring Between 2020 and 2022 That Closed or Terminated their Contract as of March 1, 2023 ............................ 215

Administrative Reviews for Citations ........................................................... 215

Administrative Review Trends by Heightened Monitoring Status at Time of Citation, 2020 to 2022 ................................................................................... 217

Update Regarding Emerging Issues Identified in Fourth Report ............... 218

Remedial Order 20 Summary ........................................................................ 231

Remedial Order 21: Revocation of Licenses ...................................................... 233

Remedial Order 21: *Effective immediately, RCCL and/or its successor entity shall have the right to directly suspend or revoke the license of a placement in order to protect the children in the PMC class* ....................................................... 233

Background ..................................................................................................... 233

Methodology and Performance Validation Results ..................................... 233

Approved HHSC Closure Recommendations .............................................. 233

Pending HHSC Closure Recommendations ................................................. 267

Denied HHSC Closure Recommendations .................................................. 275

DFPS List of Disallowed Homes ................................................................... 278

Closure of Congregate Care Operations and Child Placing Agencies ....... 311

Summary of Remedial Order 21 ................................................................... 313

List of Tables ...................................................................................................... 314

List of Figures ..................................................................................................... 315

# Introduction and Executive Summary

## Introduction

This is the Monitors' sixth comprehensive report to the United States District Court ("Court") in *M.D. by Stukenberg v. Abbott* following the mandate issued by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") implementing the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship ("PMC") of the Texas Department of Family and Protective Services ("DFPS") who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission ("HHSC").[2] DFPS is now an independent State agency reporting directly to the Governor.[3]

Following a bench trial in 2014, in December 2015 the Court published a Memorandum Opinion and Verdict finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[4] The Court issued a Final Order on January 15, 2018, and following a stay order, the Fifth Circuit adopted in part and reversed and in part modified the remedial orders, remanding to the Court, which issued a modified Order on November 20, 2018.[5] The Fifth Circuit again adopted in part and reversed in part the Court's Order and issued its Judgment as Mandate on July 31, 2019.[6] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[7] specifies numerous remedial orders that implement the Court's injunction as detailed below, charging the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[8]

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] Effective February 2021, HHSC changed the name of its child care regulation unit, Residential Child Care Licensing ("RCCL"), to Residential Child Care Regulation ("RCCR"). This report uses RCCR to describe this division of HHSC even when referring to historic work done by the unit under its previous name.

[3] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent state agency reporting directly to the Governor, H.B. 5 (TX 2017), 85th Leg., R.S.

[4] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[5] *Id.*

[6] *M.D. ex rel. Stukenberg*, 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[7] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[8] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 16 (S.D. Tex. Nov. 20, 2018), ECF No. 606. ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. To avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall consider the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order. The Monitors shall provide a written report to the Court every six months. The Monitors' reports

On June 16, 2020, the Monitors filed the first comprehensive report ("First Report") with the Court, concluding that "the Texas child welfare system continues to expose children in permanent managing conservatorship ('PMC') to an unreasonable risk of serious harm."

On July 2, 2020, Plaintiffs filed a Motion to Show Cause Why Defendants Should Not Be Held in Contempt for their failure to comply with Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5 ("July 2, 2020, Show Cause Motion"). The State filed written objections to the Monitors' First Report on July 6, 2020[9] and a Response in Opposition to the Motion to Show Cause on July 24, 2020.

On September 3 and 4, 2020, the Court held a hearing on Plaintiffs' July 2, 2020, Show Cause Motion, and on December 18, 2020, found Defendants to be in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37, and B5, but not in contempt of Remedial Orders 24, 28, or 30.[10]

On May 4, 2021, the Monitors filed the second comprehensive report ("Second Report") with the Court, concluding that the State made progress toward eliminating some of the "substantial threats to children's safety" that surfaced in the Monitors' First Report; but the Monitors also concluded the State's performance in some areas, including its oversight of the care of children by the Single Source Continuum Contractors ("SSCC") and certain general residential operations ("GRO"), was contrary to the Court's remedial orders.[11]

---

shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.") *Id.* at 17.

[9] Defendants' Verified Objections to Monitors' Report, ECF No. 903.

[10] The Court held: "Defendants are ORDERED to file with the Court a sworn certification of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 within thirty (30) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021, and continuing thereafter until the compliance hearing concludes. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing. No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing. To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing."

[11] Deborah Fowler & Kevin Ryan, Second Report, ECF No. 1079.

Following discussions with the Court and parties in 2021, the Monitors developed a report schedule which divided the third report to the Court, filed on January 10, 2022 ("Third Report"), covering Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6, and B1 to B5, from the fourth report to the Court  ("Fourth Report"), filed June 2, 2022,[12] assessing the balance of the Remedial Orders addressing Preventing Sexual Abuse and Child-on-Child Sexual Aggression, Remedial Orders 32, 4, 23, 24, 28, and 30, 25, 26, 27, 29, and 31, A7 and A8 and Regulatory Monitoring and Oversight of Licensed Placement, Remedial Orders 22, 12, 13, 14, 15, 16, 17, 18, and 19, 20, and 21. Similarly, the report filed January 20, 2023 covering Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6, and B1 to B5 ("Fifth Report"), is divided from this report addressing Preventing Sexual Abuse and Child-on-Child Sexual Aggression, Remedial Orders 32, 4, 23, 24, 28, and 30, 25, 26, 27, 29, and 31, A7 and A8 and Regulatory Monitoring and Oversight of Licensed Placement, Remedial Orders 22, 12, 13, 14, 15, 16, 17, 18, and 19, 20, and 21.

In preparing this Sixth Report, the Monitors, and their staff ("the monitoring team") undertook a broad set of activities to validate the State's performance and adherence to the Remedial Orders. The Monitors requested data and information from both DFPS and HHSC to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. In this Sixth Report, the Monitors adhered to the methodology for validating and reporting as set forth in Reports 1-5 unless otherwise noted in this section of the report.[13] The Monitors also requested data and information from the SSCCs with which DFPS contracts to provide case management and placement services to foster children in DFPS regions that have transitioned to the Community Based Care ("CBC") model.[14]

The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical

---

[12] Fourth Report of the Monitors, ECF No. 1248.

[13] On December 17, 2021, the Monitors sent the State a supplemental data and information request. E-mail from Deborah Fowler and Kevin Ryan, re: December 2021 Supplemental Data & Information Request, December 17, 2021 (on file with the Monitors). The Monitors requested data associated with gaps in reporting or data across several of the Court's remedial orders. After a conversation with the State about the data requested, the Monitors clarified their request and reached a preliminary agreement about the content and timing of additional data requested. Some data requested is still pending.

[14] CBC was formerly known as Foster Care Redesign. There are currently four regions that have transitioned to the CBC model (excluding the failed transition in Region 8a): Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); and, most recently effective October 2021, Region 8b (26 counties surrounding Bexar County). Region 8a, which previously was operating under the CBC model, has transitioned back to DFPS management. There are three stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services. The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families." DFPS, *Community-Based Care*, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services. Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.* Two SSCCs – OCOK and 2INgage – moved to Stage II of the CBC model in 2020. Stage II includes shifting case management services from DFPS to the SSCC. Stage III involves performance assessment and financial incentives for achievement of permanency for children. *Id.*

incidents; restraint log entries; witness statements; interviews; policies; resource materials such as handbooks; plans; guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake ("SWI"), including E-Reports and recorded phone calls when available; and an array of employee and caregiver human resources and training records and certifications. The monitoring team made 13 site visits to licensed operations. The monitoring team also made one-day visits to five operations that the State placed under Heightened Monitoring pursuant to Remedial Order 20.

## Executive Summary

The introduction and summary in the Monitors' First Report to the Court, filed June 16, 2020, outlined five broad areas of non-compliance with the Court's remedial orders in this matter. Of those, three are relevant to the State's implementation of the remedial orders covered by this Sixth Report:

- The State's bifurcated approach to oversight of PMC children in case and data management contributes to a risk of harm for PMC children and limits the State's ability to provide data and information necessary to evaluate compliance with the Court's orders.

- The State's failure to fully comply with remedial orders related to licensing and oversight of children's residential operations places children at risk of harm due to repeated failures to identify and address clear indicators of safety concerns.

- The State's failure to fully comply with remedial orders associated with preventing sexual abuse leaves children at an unreasonable risk of serious harm.

In addition, the State's continued reliance on unlicensed, unregulated settings, such as hotels and congregate facilities, to house children poses an ongoing risk to children's safety. This housing issue is discussed in a separately filed report.

Though the State has made progress in areas of non-compliance identified in the Monitors' First Report, in many cases, substantial gaps remain. The gaps in progress on some remedial orders, as set forth in this report, are because the State appears to have implemented the remedial order in a way that undermines child safety. One remedial order (Remedial Order 4) has been implemented in a way that does not allow the Monitors to validate compliance.

The State's bifurcated approach to oversight of PMC children in case and data management contributes to risk of harm for PMC children and limits the State's ability to provide data and information necessary to evaluate compliance with the Court's orders.

The Monitors' First Report detailed problems caused by the fragmented method of oversight, with DFPS mostly responsible for reports of abuse, neglect, or exploitation and HHSC responsible for licensing oversight and monitoring of minimum standards.

The Monitors identified gaps created using two different systems for data keeping and case management (CLASS and IMPACT), with no bridge between the two.

In the three years Since the Monitors filed their first report to the Court, the State has improved system access: due to the Monitors' findings that children's caseworkers did not have access to CLASS and could not review information related to placement histories and safety risks, HHSC provided access to CLASS for DFPS CVS and SSCC caseworkers. Similarly, HHSC inspectors have access to IMPACT for purposes of reviewing abuse, neglect, and exploitation cases when doing so will aid them in their investigations or inspections. This access is particularly important because DFPS no longer includes all the contact notes associated with its investigations of abuse, neglect, and exploitation in HHSC's CLASS records, opting instead to record those only in IMPACT. HHSC recently implemented a change that is expected, for the first time since monitoring started, to allow the State to disaggregate data related to HHSC investigations pertaining only to the PMC class. The first data sets responsive to the Monitors' data and information requests have been provided, and the State advised the Monitors they will be able to pull data going forward that is specific to children in the PMC class.

Significant gaps in system interplay remain, however. Even though DFPS and HHSC now have access to each agency's data and case management systems, it is not clear that they are using the access to inform decision making about child safety. The Monitors' findings in a case read of HHSC investigations of minimum standards violations for this Sixth Report revealed instances in which HHSC and DFPS investigations overlapped, but the two agencies did not appear to have communicated about the information each gleaned during their investigations, or even reviewed the work of the other investigation in the other agency's case management systems. In some cases, it was unclear whether the HHSC investigator was even aware of the DFPS investigation. The Monitors' case record review identified instances where HHSC investigators missed critical safety-related information that should have informed the outcome. This issue is not raised for the first time here in the Sixth Report: the Monitors made similar observations in a report filed March 27, 2023, documenting findings associated with the Monitors' site visits made between December 13, 2021, and December 31, 2022.

Even HHSC's internal communication around simultaneous investigations involving the same home or operation appeared to be lacking. For some of the cases reviewed by the monitoring team (described in this report and appendices) different HHSC investigators were assigned to intakes for the same operation, involving similar allegations (or even allegations related to the same children for incidents that occurred within the same 24-hour period), but it did not appear that the investigators conferred or reviewed the CLASS chronology for the other investigation when that occurred.

Additionally, gaps persist in the ability of the two agencies to produce a cohesive picture of the safety violations for licensed operations. For example, when the State produces data for the Heightened Monitoring analysis to the Monitors, contract violations are reported in broad categories with little detail related to the violations. In the counting of contract violations for the Heightened Monitoring pattern analysis, violations occurring

on the same date or monitoring visit are categorized by type and counted as a single violation regardless of the number of instances that occurred. Thus, an operation with 100 "instances" of contract violations associated with "behavioral health/health care services" under a single DFPS residential contracts monitoring finding would be considered to have one contract violation. The limitations in the DFPS data system for reporting contract violations results in this inconsistency in categorization. To maintain consistency for counting violations administered by DFPS and SSCCs, violations are combined in a similar manner for SSCC contract violations, despite a greater level of detail being available for SSCCs.

Inconsistencies between the State's data systems also make it difficult to accurately identify all the operations that are housing a PMC child, and (due to data entry lags) children's placement information. Information on operations in DFPS's data system is tied to a child-specific contract while in HHSC's data system it is tied to the operation's license. A single operation, particularly those operating various levels of service, may contain multiple contracts and thus can be associated with multiple ID numbers in the DFPS system. Because of theses inconsistencies, the State is unable to readily track and produce both an accurate and complete list of operations and foster homes that house PMC children on any given day, and the number of PMC children placed at each operation and foster home on that day. The Monitors are therefore limited in their ability to validate the number of operations requiring 24-hour awake-night supervision (pursuant to Remedial Order A7) due to difficulties in identifying the number and legal status of children placed in operations during the month.

In addition, due to data lag and entry issues, the point-in-time PMC child and PMC placement data that the Monitors receive monthly is often inaccurate. These data issues negatively impact the State's ability to accurately identify in real time all PMC children's placements on a given date. To correct these inaccuracies, twice a year, the State provides the Monitors with additional data files retroactively updating the PMC child and placement data for the previous six months, but the data gaps continue to complicate the Monitors' work to assess the State's compliance with the remedial orders through real time site visits and record reviews.

The State's failure to fully comply with the Court's remedial orders related to licensing and oversight of children's residential operations places children at risk of harm due to repeated failures to identify and address clear indicators of safety concerns.

The Monitors' First Report documented the State's failure to take meaningful enforcement action for operations with high rates of substantiated child abuse, neglect, or exploitation and medium-high or high standard violations. The Monitors note improvement in this area: today, the State is using the enforcement mechanisms available to it more often than in June of 2020.

However, this report describes ongoing risks to child safety resulting from the State's approach to certain remedial orders. For example, the State's implementation of Remedial Order 22 often missed risks to child safety that left PMC children vulnerable. The State has implemented the requirements of Remedial Order 22 by requiring HHSC

inspectors to conduct an "Extended Compliance History Review" (ECHR) prior to or on the day of their site inspection. Per the Court's instructions, the ECHR includes a five-year review of the number of intakes for and substantiated findings of abuse, neglect, or exploitation, and the number of citations issued to the operation for violations of minimum standards associated with corporal punishment and requires the inspector to describe in CLASS how the data and information was considered during the inspection.

The ECHRs reviewed by the monitoring team for this report showed the HHSC inspector almost always included accurate information in the ECHR. Inspectors also discussed similarities between the intakes, substantiated findings, and corporal punishment citations in more than two-thirds of the investigation inspections reviewed. This process is an improvement over the results discussed in the Monitors' First Report, when the monitoring team rarely found an ECHR completed prior to an inspection.

Yet, the Monitors' most recent case record review showed that HHSC inspectors often did not connect ECHR information to an assessment of safety risks for children placed in operations or foster homes. Inspectors' ECHRs failed to document a safety risk in more than one-quarter of the operations for which the monitoring team found that a risk to child safety existed. The monitoring team found risks to children's safety existed for 365 of the foster homes or operations reviewed; HHSC inspectors documented that no safety risk existed in 100 of these. Approximately half of these operations (51 of 100) involved operations on Heightened Monitoring. Thus, while the State has operationalized a methodology for implementing Remedial Order 22, a gap remains between the State's implementation of its methodology and inspectors' consideration of this information to protect children from an unreasonable risk of harm. This gap represents a common theme here in the Sixth Report: though the State's implementation of the Court's remedial orders has improved, a gulf remains between the State's implementation efforts and effective correction of the constitutional harms identified by the Court in 2015 and affirmed by the Fifth Circuit.

The Monitors identified several examples in their findings related to Remedial Order 20 and Heightened Monitoring. Operations placed under Heightened Monitoring have documented histories of serious child safety problems. The operations that qualified for Heightened Monitoring between 2020 and 2022 accounted for 712 substantiated findings of abuse, neglect, or exploitation in the five-year periods used to determine their eligibility. They were cited for a total of 15,375 minimum standards deficiencies, of which 13,542 were for standards weighted by the State as high, medium-high, or medium. As was true in 2020 and 2021, the most common violations for the 13 operations placed under Heightened Monitoring in 2022, were related to medication management/medical care, discipline, and records management. In this report, the Monitors identify instances in which these patterns persisted even after operations were placed on Heightened Monitoring and after they moved to post-plan monitoring and did not prevent them from moving off Heightened Monitoring altogether.

Another example of the gap between the State's implementation of the Court's orders related to Heightened Monitoring and the harms the orders were intended to address is related to the method the State identified for complying with the Court's requirement

that a DFPS leadership-level supervisor review requests to place children in Heightened Monitoring operations. The underlying reasoning for the Court's requirement seems obvious: operations that are on Heightened Monitoring are those the State has determined have repeatedly violated the State's policies related to child safety. The Court ruled that children should only be placed in these operations after a careful review of both the operation's safety problems and the child's strengths and needs, and a determination by DFPS leadership that the child's safety will not be compromised. In response to the parties' agreed motion, the Court modified its original March 18, 2020, order, adopting the State's own policies and procedures for approving these placements and relaxing the rule for the level of DFPS leadership required to approve placements (allowing it to be done by a Regional Director rather than the Associate Commissioner of CPS).

Of the 1,422 documented requests for a PMC child to be placed in an operation or home under Heightened Monitoring in 2022, 99% (1,402) were approved. Of these, the monitoring team found documentation of both the approver's justification for the PMC child's placement and a review of the operation's five-year safety history (both required by DFPS policy and the modified order) in only 17% (233 of 1,402) of placements. Often, both the caseworker making the request and the approver simply copied and pasted statements between requests and approvals, resulting in generic approvals that did not appear to consider a child's individual needs. Approximately 20% of the approvals (258 of 1,402) simply stated "approved" or "reviewed" in the narrative box. In other words, the State almost always approved a request to place a child in an operation that is on Heightened Monitoring and rarely documented consideration of the operation's history and child-specific justification (though DFPS policy and the Court's order require it). When the State did document it, the State often did so using a "cut-and-paste" approach, recycling language between the request and the approval, between siblings, and in some cases, between completely unrelated children.

During the review of operations that have moved to post-plan monitoring or off Heightened Monitoring entirely, the Monitors found that operations were released from Heightened Monitoring entirely, even after a substantiated finding of abuse, neglect, or exploitation during the six-month post-plan monitoring phase. The Court's orders require the Heightened Monitoring Plan to remain in place for at least one year and until: the operation satisfies the conditions of the Plan; at least six months' successive unannounced visits indicate the operation is in compliance with the standards and contract requirements that led to heightened monitoring; and the operation is not out of compliance on any medium-high or high weighted licensing standards.[15] The Court specified that, after the operation is released from the plan, DFPS and HHSC were required to make at least three unannounced visits in the three months following the release from the plan, and the Heightened Monitoring team is required to continue to track intake data for the operation for six months to ensure "it does not lose progress made during monitoring."[16]

---

[15] Order, ECF No. 837.

[16] *Id.*

For two of the operations released from Heightened Monitoring entirely, even after a substantiated finding of abuse, neglect, or exploitation during the six-month post-plan monitoring phase, the substantiated finding occurred approximately five months prior to being released from Heightened Monitoring, and for three operations, the substantiated finding occurred three months prior to being released. Operations that were released from Heightened Monitoring also continued to receive citations for minimum standards deficiencies after moving to the post-plan stage (and prior to being released from Heightened Monitoring entirely). Almost half of the operations (12 of 25, 48%) the State released from Heightened Monitoring had more deficiencies cited while in post-plan monitoring than they did in the six months prior to moving to post-plan monitoring, including citations for high-weighted standards.

In addition, more than half of the operations (25 of 37, 68%) that moved to post-plan monitoring were cited for high or medium-high weighted standards in the last six months of their time on active Heightened Monitoring. Some operations were moved to post-plan monitoring within days of having been cited for a high or medium-high weighted deficiency. The most frequently cited standard in the six months prior to operations moving to the post-plan stage were related to medication management/medical care. Operations continued to receive citations (and substantiated findings of abuse, neglect, or exploitation) during post-plan monitoring. Some operations received more citations while they were on post-plan monitoring than they received while they were on active Heightened Monitoring.

The State sent the Monitors guidance that it released on June 9, 2023. The guidance indicates that when the State is making determinations about whether an operation has had six-months of successive compliance, it post-dates any citations issued to the date that the intake was received for the investigation. This approach is inconsistent with HHSC's own practice. When HHSC issues a citation, it sets a compliance date for the minimum standard cited. The compliance date is most often in the future, though in some cases, it can be the day the citation was issued. In other words, the operation is out-of-compliance the day the citation is issued – not the day the report was made to SWI.

The State's guidance indicates that it does not look to the most recent six-month period that the operation is on Heightened Monitoring for determining whether it has achieved six successive months without receiving a citation for noncompliance with a standard associated with a pattern identified in the operation's Heightened Monitoring Plan. Rather, the State looks back over the year that the operation was on Heightened Monitoring to determine whether *any* successive six-month period can be identified during which the operation did not receive a citation associated with the pattern or trend that led to its placement on Heightened Monitoring. Therefore, an operation may be issued more than one citation related to the problems that led to Heightened Monitoring in the last six months of Heightened Monitoring and still be moved to post-plan monitoring if there was an earlier six-month period without a citation.

The guidance also allows an operation to move to post-plan monitoring or off Heightened Monitoring entirely even if there is a substantiated finding of abuse, neglect,

13

or exploitation. If an operation receives a Reason to Believe finding, the guidance indicates that the State will conduct an "assessment of the operation's response and ability to mitigate future risk" before determining whether it will affect an operation's status on Heightened Monitoring.

As of March 1, 2023, 24 of the 86 operations that were placed on Heightened Monitoring in 2020 remained on Heightened Monitoring. Since being placed on Heightened Monitoring, these operations have been responsible for an additional 127 substantiated findings of abuse, neglect, or exploitation and 1,813 minimum standards deficiencies, of which 1,652 were weighted high, medium-high, or medium. Though DFPS has suspended placements to some of these operations (in some cases, more than once), they remain open and continue to serve children. The most common sanction the State has imposed on these operations for failing to come into compliance with Heightened Monitoring is a fine of $100 to $500. Some operations have been fined repeatedly.

The Fifth Circuit validated Remedial Order 20 to rectify lax public oversight of placements where PMC children were exposed to significant safety risks. Describing the State's "collaborative approach" to enforcement, the Fifth Circuit found:

> RCCL enforcement practices are also problematic. RCCL issues thousands of citations for violations per year. Of the 6,050 violations cited in 2013, however, only 12 resulted in corrective action and only one resulted in adverse action.[17]

The Fifth Circuit decried the State's "very high rate of repeat violations, as licensees do not perceive they will be held accountable for their malfeasance," stating:

> Repeat violators are not a new phenomenon. n 2011, PMU found that 65.6% of residential care facilities had been cited for repeat deficiencies. By 2012, that number had leapt to 77.6%. And the collaborative approach can take up to a year or longer to achieve compliance. As a result, children are left in facilities that repeatedly violate standard while the state attempts to "collaborate" with the facility. As the Sunset Commission explained, "to go slow on enforcing regulations designed to protect children from safety risks out of concern that some providers may have trouble meeting such protective standards is essentially to accept a level of risk to the children simply because the state needs providers, regardless of their quality." Most of the repeat violations occurred on the highest-risk standards, such as criminal history check requirements.[18]

The State's implementation of Remedial Order 20 perpetuates many of the same problems identified by the opinion.

---

[17] M.D. by Stukenberg v. Abbott, 907 F. 3d 237, 267 (5th Cir. 2018)
[18] *Id.*

Finally, this Sixth Report identifies problems with HHSC minimum standards investigations that affect all the remedial orders related to the State's regulatory monitoring and oversight of licensed placements. These investigations are an essential accountability mechanism to monitor operations' compliance with State regulations, many of which go to the heart of child safety. The outcomes of these investigations can determine whether an operation should be subject to Heightened Monitoring by the State due to risks to child safety, as set forth in Remedial Order 20. The monitoring team's case record review found 25% (70 of 285) of these HHSC investigations so deficient that the appropriate outcome could not be determined or disagreed with the outcome based on the collected evidence. In addition, the Monitors disagreed with the priority level assigned to these investigations almost half of the time (138 of 285, 48%). Priority level impacts the quality of an investigation because it dictates the timeline for initiation: the lower the priority, the later the required initiation, making it more difficult to gather evidence such as video footage, find and interview witnesses and obtain their fresh recollection of events.

The State's failure to fully comply with remedial orders associated with preventing sexual abuse leaves children at an unreasonable risk of serious harm and suggests the State may be prioritizing identification of victims and aggressors but not prevention of sexual abuse.

The Court's remedial orders related to identifying children who are victims of sexual abuse refer to children who are "confirmed to be sexually abused by an adult or another youth," and require DFPS to document "all confirmed allegations of sexual abuse" in the child's electronic record. The intent of the remedial order is to ensure that children who are victims of sexual abuse are identified to caseworkers and caregivers who are then better able to protect them from revictimization and ensure that they do not themselves engage in problematic sexualized behavior with other children. Even if caseworkers and caregivers receive appropriate training in child sexual abuse (and the State is still unable to demonstrate its total compliance with Remedial Order 4, related to caregiver training), PMC children face an unreasonable risk of harm if those children who have been victims and those children who engaged in sexually aggressive behavior are not identified to their caregivers and caseworkers.

The Monitors' case reads for this report and previous reports (and the State's own policies) show that the State does not consistently identify a child as a victim if DFPS (or a law enforcement entity) has not investigated and substantiated allegations of Sexual Abuse, or DFPS has not completed a review to determine whether the child who was alleged to be the aggressor should be flagged with an indicator for sexual aggression. In a case read conducted for this report, the Monitors discovered that the State removed flags from 30 children's IMPACT records during a quality assurance review because DFPS determined the cases were "unconfirmed."[19]  These included instances of child-on-child Sexual Abuse, allegations that resulted in an "Unable to Determine" finding

---

[19] In comments to the draft report, the State reported that it "deletes around 100 incidents and errors a year" from children's IMPACT records. DFPS & HHSC, Defendants' Comments on the June 17, 2023, Drafts of Monitors' Reports (on file with the Monitors). It then cited 35 of 53 "total deletions" (presumably for children with a flag for sexual abuse) were due to "unconfirmed victimization. *Id.*

(even in a case involving a registered sex offender who admitted to bathing the children), allegations of abuse that preceded the child's entry into care that were never investigated, and unconfirmed outcries of sex trafficking that occurred while a child was on runaway status.

Additionally, when DFPS determined that a child sexually abused another child in care, the monitoring team found the incident was not consistently documented on the Sexual Incident History page for the foster child who was the aggressor. Of the 51 children in the Monitors' case read who suffered 65 instances of child-on-child sexual abuse and were subsequently identified in their IMPACT records as victims of sexual abuse, the monitoring team found no information related to the incident in IMPACT for the child who was identified in the victim's record as the aggressor in 17% (11 of 65). In another 11% (7 of 65), the information found in IMPACT for the child who was the aggressor was inconsistent with that found in the victim's IMPACT records.

Though the monitoring team was able to validate that caseworkers are completing Child Sexual Abuse training, the monitoring team could not validate that all caregivers of PMC children received the training. Similarly, because of flaws in the data produced by the State, the Monitors were unable to validate training for the staff responsible for determining whether a child's IMPACT records should include an indicator for sexual aggression.

The monitoring team's case record review again showed gaps in compliance with the Court's remedial orders related to caregiver notification: just more than half of PMC children's placements reviewed by the monitoring team had a Placement Summary that correctly indicated the child's sexual history status, and an Attachment A that included all of the child's known sexual history, that were signed by the caregiver on or before the child's placement.[20] Results were worse for children with a history of sexual abuse (49%) than for those who had an indicator for sexual aggression (59%).

Finally, the State's records and data revealed ongoing gaps in the awake-night supervision required by Remedial Orders A7 and A8 for operations that house more than six children. The Fifth Circuit referred to the lack of awake-night supervision as the "most egregious" problem with foster group homes and validated the Court's order requiring awake-night supervision as the remedy that "hews...closely to the violation identified in *Stukenberg I*: the lack of proper supervision."[21] In a subsequent opinion, the Fifth Circuit noted, the "rationale for this requirement is simple: The more unrelated foster children living in the same home at the same time, the greater the risk of harm."[22]

---

[20] When the monitoring team conducts case record reviews to validate compliance with the remedial orders related to providing notification to caregivers of a child's history of sexual victimization or aggression, they identify whether the correct box is checked on the Placement Summary and review the Attachment A to determine whether it includes the child's complete sexual history. In its comments on the draft report, DFPS noted that it gives caseworkers 72 hours from the date the child is placed to obtain caregiver signatures. *Id.*

[21] *M.D. by Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019).

[22] *M.D. by Stukenberg v. Abbott*, 977 F.3d 479, 482 (5th Cir. 2020).

The Fifth Circuit repeatedly validated the Court's finding that a lack of awake-night supervision unconstitutionally amplifies the risk of harm to children.

Despite consistent validation by the Fifth Circuit, the Monitors repeatedly found examples of DFPS investigations that failed to substantiate a finding of Neglectful Supervision, even when it was clear that a staff member slept during an awake-night shift. DFPS's representations of the State's near total compliance with awake-night supervision conflicts with the monitoring team's own findings during awake-night visits. The Monitors' review identified a total of 29 State citations related to problems associate with awake-night supervision. The Monitors' review of Neglectful Supervision investigations by DFPS showed the agency appears to require a finding of actual harm to substantiate neglect.[23]   In two cases, Neglectful Supervision was Ruled Out despite a child's death during an overnight shift, though DFPS found that the staff who were responsible for providing overnight supervision did not do so. In other cases, children were able to self-harm while staff slept. In some cases, DFPS screened out an intake for Neglectful Supervision and referred the case to HHSC for investigation of a minimum standards violation. Even when DFPS found the staff person's actions to be "negligent," Neglectful Supervision was Ruled Out because the investigation did not identify actual harm to any of the children.

## Summary of Monitors' Findings

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[24]

The Monitors' investigation, analysis, interviews, and site visits in preparation for this report identified areas in which the State made progress toward eliminating "substantial threats to children's safety" by preventing sexual abuse and child-on-child sexual aggression, and through improved regulatory monitoring of licensed placements. The report also identified areas in which the State continues to struggle with implementation of the Court's remedial orders.

## Summary of Findings by Remedial Order

### Preventing Sexual Abuse and Child-on-Child Sexual Aggression

**Remedial Order 32:** *Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS*

---

[23] This is at odds with the definition of neglect included in the Texas Family Code and Administrative Code for investigations of child care operations, which define neglect for purposes of investigations of child care operations as "a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program…that causes ***or may cause*** substantial emotional harm or physical injury to, or the death of, a child served by the facility or program."  Tex. Family Code §261.001; 40 Tex. Admin. Code §707.801 (emphasis added).

[24] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

*shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

- State system data flaws prevented the Monitors from validating the State's performance in training staff on the policy for child-on-child sexual abuse. The State failed to correct inconsistencies in the data provided regarding staff number, staff transfers, staff titles, mistakes in record keeping, and staff training over two fiscal Quarters in 2022.

**Remedial Order 4:** *Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

- DFPS's data shows that 100% of caseworkers who carried at least one case from June 1, 2022, to November 30, 2022, completed the training required by Remedial Order 4 regardless of where employed.

- A random sample of 314 caseworkers interviewed by the monitoring team between February 2022 and December 2022 resulted in all 314 caseworkers confirming their completion of child sexual abuse training.

- The Monitors cannot validate that all or most caregivers completed the child sexual abuse training required by Remedial Order 4 based upon the current submissions from DFPS.

- The monitoring team interviewed caregivers and reviewed their records to validate the data reporting completion of the training required by Remedial Order 4 and found that of the 242 staff records the team reviewed, 41 (17%) did not include documentation showing the staff person had completed CSA training, though only 8% of staff interviewed (9 of 117) reported that they had not completed the training. Another 5% (6 of 117) were unsure whether they had completed the training.

**Remedial Order 23:** *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order 24:** *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order 28:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order 30:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

18

- In the case record review of a random sample of 786 PMC children who had a sexual characteristic indicator documented in their IMPACT records in 2022, 24% of children identified as victims of sexual abuse suffered abuse that occurred after the child entered care. Of that 24%, 16% suffered sexual abuse only after entering foster care; the remaining 8% were sexually abused both before and after entering foster care. Approximately one-third of children (45 of 132 or 34%) who were victimized after entering care experience two or more incidents of sexual abuse while in foster care.

- Of the 132 PMC children included in the case read sample who suffered sexual abuse after entering foster care, 51 (39%) were sexually abused by another foster child. When DFPS determined that a foster child sexually abused another child in care, the incident was not consistently documented on the Sexual Incident History page for the foster child who was the aggressor.

- Of children flagged for sexual abuse after entering foster care, 39% survived one or more sex trafficking incidents after entering care. Almost all these incidents occurred while the child was on runaway status.

**Remedial Order 25:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order 26:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 27:** *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order 29:** *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 31:** *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor*.

- The monitoring team located Common Applications for all but one of the placements reviewed in a case record review of 242 placements of PMC children. Of the placements for which a Common Application was located, 90% identified a child as a victim of sexual abuse. In 91% of placements involving a child who had an indicator for sexual aggression the child's sexual history information was included. However, the Monitor's case record review found that a child's Placement Summary and Attachment A did not always include the child's

complete history of sexual abuse or aggression, or the caregiver's signature at the time of placement. Overall, just more than half of the placements reviewed by the monitoring team had a Placement Summary indicating the child was a victim of sexual abuse or had an indicator for child sexual aggression, and an Attachment A that included all the child's known sexual history, which were signed by a caregiver on or before the child's placement.

▪ During each of the monitoring team's 13 site visits, the team reviewed children's records for a Common Application, Attachment A, and Placement Summary. Almost all the records reviewed included a Common Application, Attachment A, and Placement Summary. However, these documents were missing from records for some of the children who were flagged with an indicator for sexual abuse or sexual aggression. A Common Application was missing for six of the 38 children (16%) who had an indicator for sexual abuse and one of the 11 (9%) children who had an indicator for aggression. A Placement Summary was missing for seven children (7 of 38 or 18%) who had an indicator for sexual abuse, and one child (1 of 11 or 9%) who had an indicator for sexual aggression. An Attachment A was missing for two children (2 of 38 or 5%) who had an indicator for sexual abuse. When the documents were found, information was not always consistent with the sexual characteristic indicators found in the PMC placement data at the time of the site visit.

▪ Some program administrators who were interviewed during site visits reported that they did not always receive an Attachment A. Seventy-six percent (16 of 21) of program administrators said they always received an Attachment A when a child with an indicator for sexual aggression or victimization is placed in their operation. However, only 52% (61 of 117) of the direct-care staff interviewed reported that they are always asked to sign an Attachment A.

**Remedial Order A7:** *The Defendants shall immediately cease placing PMC children in licensed foster care (LFC) placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A8:** *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children*

▪ Operations continue to struggle with compliance, despite DFPS's routine unannounced awake-night visits to operations requiring awake-night supervision. Moreover, the DFPS finding of near total compliance with awake-night supervision conflicted with the monitoring team's findings related to awake-night visits. The monitoring team documented a total of 29 citations

issued for violation of minimum standards due to staff sleeping or because of a significant problem with awake-night supervision.

**Regulatory Monitoring and Oversight of Licensed Placements**

▪ Of the 285 HHSC minimum standards investigations reviewed by the monitoring team, the reviewer disagreed with the priority level assigned in nearly half (138 of 285, or 48%), the reviewer determined that the investigation was so deficient that an appropriate outcome could not be determined in 48 of the investigations reviewed, and disagreed with the outcome in 22, for a total disagreement rate of 25% (70 of 285).

**Remedial Order 22:** *Effective immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment in the placements. During inspections, RCCL, and any successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

▪ The data elements reported in ECHRs by inspectors regarding intakes, findings, and citations were found to be largely consistent with the aggregate data provided by the State to the Monitors. The Monitors' identified risks to children's safety in connection with 365 of the 526 inspections, however, that the State did not identify in 100 cases, significantly undermining the effectiveness of the ECHR process and the purpose of Remedial Order 22.

▪ The accuracy of reported ANE intakes and ANE findings in the ECHR improved from 2021. In 2022, 96% of inspections contained the exact number of ANE findings as the aggregate data for the month, compared to 93% in 2021. Similarly, 60% of inspections contained the exact number of ANE intakes in 2022 compared to 57% in 2021. For both years, 95% of inspections contained the exact number of corporal punishment citations. The discrepancies are likely explained by the timing of the inspection.

▪ The State's review and the Monitors' findings differed regarding compliance history. In 42% of cases in which the inspector documented no risk, the monitoring team assessed that there was a safety risk present.

▪ HHSC's review found between 80% and 85% of cases took steps to address all risk identified in the assessment (including taking no steps when no risk was present) across the four case reads in 2022. The monitoring team assessed that, of inspections where there was a safety risk, the inspector documented how the

operation's history or safety risk was taken into consideration in just over 60% of inspections between July and December 2022.

- Twenty-two operations were responsible for the 24 deficiencies cited in 2022 for failure to report abuse, neglect, or exploitation. Some operations were cited more than once. Four of the 22 operations that were cited for failure to report in 2022 were on Heightened Monitoring when they were cited for the violation.

- Finally, a small gap persisted in 2022 in communication between HHSC and DFPS related to failure to report. Two citations were not found in either the HHSC report to DFPS, and two were found in the HHSC report, but not in the DFPS report. The two citations that were not included in the DFPS report were for citations associated with child-on-child abuse.

**Remedial Order 12:** *Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

- There were no Priority One RCCR investigations during this reporting period.

**Remedial Order 14:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

- 96% (335) of Priority One and Two RCCR investigations were completed within 30 days of intake.

**Remedial Order 15:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

- 98% (2,488) of Priority Three, Four, and Five RCCR investigations were completed within 60 days of intake.

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- In 96% (335) of Priority One and Two RCCR investigations, documentation was completed on the same day the investigation was completed.

**Remedial Order 17:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- In 98% (2,482) of Priority Three, Four, and Five RCCR investigations, documentation was completed within 60 days of intake.

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

- 93% (326) of Priority One and Two RCCR investigations included notification to the referent (or a letter was not required) and notification to the provider within five days of completion.
- 7% (23) of Priority One and Two RCCR investigations did not require notification.

**Remedial Order 19:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- 92% (2,343) of Priority Three, Four, and Five RCCR investigations included notification to the referent (or a letter was not required) and to the provider within 60 days of intake.
- 4% (92) of Priority Three, Four, and Five RCCR investigations did not require notification.

**Remedial Order 20:** *Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions, and, as appropriate, other remedial actions under DFPS' enforcement framework.[25]*

- Thirteen operations were newly placed on Heightened Monitoring 2022, with most having a Heightened Monitoring plan start date in September 2022. Between 2017 and 2021, these 13 operations accounted for 70 substantiated findings of abuse, neglect, or exploitation, and 980 citations for minimum standards violations. For these 13 operations, the most common problem areas risking children's safety were related to medication management/medical care,

---

[25] Two subsequent orders further described the methodology for identifying operations subject to Heightened Monitoring, the method for developing a Heightened Monitoring plan and what is required to be included, the cadence of monitoring visits by the State, requirements for placement of PMC children in operations under Heightened Monitoring, the length of time operations are to stay on Heightened Monitoring and the requirements an operation must meet to exit Heightened Monitoring. Order, March 18, 2020, ECF 837; Order Modifying Order Regarding Heightened Monitoring, December 7, 2020, ECF No. 1012.

discipline, and records management, with 62% of operations having these issue areas identified. Similarly, the most frequently cited standards violations for all deficiencies cited in the six months prior to operations moving to graduate from Heightened Monitoring in their post-plan stage were related to medicine management/medical care (19%). Five of the 13 operations were also subject to another type of enforcement action (probation, a Plan of Action, or monetary penalty) in 2022.

- The monitoring team also compared each operation's historical trends to the problem areas identified in the operation's Heightened Monitoring Plan, and identified one or more problem areas that were not included in the operation's Heightened Monitoring Plan for two-thirds of the operations reviewed (69%). Problem areas identified by the monitoring team that were not found in Heightened Monitoring Plans included physical plant issues, child rights, emergency behavioral interventions (EBIs), supervision, and staff oversight. Two Heightened Monitoring operations had two problem areas that were not identified in their Heighted Monitoring Plan, and three of the 13 operations placed under Heightened Monitoring had three or more problem areas that were not addressed in their Plans.

- During 2022, 1,422 placements of PMC children were made to operations under Heightened Monitoring. Nearly all (99%) requests to approve placements received approval by a Regional Director or Associate Commissioner. The monitoring team found documentation of the justification for the child's placement and the approver's review of the operation's safety history in only 17% (235 of 1402) of the placements. Staff that approved placement requests often copied and pasted statements across placement requests, resulting in generic approvals that did not appear to a consider a child's individual needs. Only 16% (225 of 1422) of placements received prior approval meeting all the requirements of the Court's order.

- Many operations placed under Heightened Monitoring continued to struggle with safety problems. DFPS suspended placements to nine Heightened Monitoring operations in 2022 due to safety concerns. Five of these operations subsequently closed.

- Twenty-four operations have been under Heightened Monitoring for more than two years and have yet to come into compliance with the Plans intended to address significant safety concerns. These operations have had 127 Reason to Believe findings and have received 1,813 citations for minimum standards deficiencies since being placed on Heightened Monitoring. Six of these operations have each had more than 10 RTB findings since being placed under Heightened Monitoring. Some of these operations have active contracts with DFPS with a value of tens of millions of dollars. Some operate hundreds of foster homes. The State's inaction to meaningfully hold operations accountable for their failure to come into compliance with their Heightened Monitoring Plans puts the safety of a significant number of PMC children at risk.

24

- Since the concerns raised in the Fourth Report related to the lack of meaningful guidance or technical assistance to operations placed under Heightened Monitoring, the Monitors' anecdotal review of technical assistance provided in conjunction with, or instead of, a minimum standards citation appears to show that (at least in some instances) HHSC inspectors are providing more meaningful guidance and feedback rather than simply reciting the minimum standard. However, the technical assistance that is being provided (which often appears to consist of little more than a written statement explaining the reason for the minimum standard) still falls short of the type of technical assistance providers have expressed an interest in receiving. The State issued a final version of the Provider Working Group report without including all the Expert Panel's recommendations related to technical assistance.

**Remedial Order 21:** *Effective immediately, RCCL and/or its successor entity shall have the right to directly suspend or revoke the license of a placement in order to protect the children in the PMC class.*

- In 2022, HHSC recommended 13 agency homes for closure. HHSC leadership denied one closure recommendation, one operation was approved for recommended closure but was not closed by the CPA. One home recommended for closure was closed, but then re-verified and re-opened by another CPA, and then approved for closure a second time by HHSC, then ultimately closed by the CPA. HHSC also denied one operation license for a history of lack of compliance with minimum standards.

- In addition, to the HHSC closure recommendations, DFPS placed 13 foster homes on a list of disallowed placements in 2022. One of the disallowed homes was closed by the CPA. The home was then verified under a different CPA, and children continue to be placed in the home. The home remains on the DFPS Disallowance List.

## Demographics in PMC Care

According to DFPS data, there were 9,222 children in PMC status as of December 31, 2022,[26] a decrease of 923 children from the 10,145 children in PMC status on June 30, 2022, according to DFPS's corrected data.[27] DFPS cared for 12,692 PMC children

---

[26] Analyses in this section for July 1, 2022, to December 31, 2022, are based on a comprehensive data file reflective of the reporting period. *See* DFPS, *RO.Inj_PMC_Children_List_070122_123122d2023_03_01_log108791,* (Mar. 1, 2023) (on file with the Monitors). The Monitors removed two children who appeared twice in the data. As per DFPS response to the Monitors on March 9, 2023, from Valarie Campbell, Program Specialist at DFPS, "For each of these instances there was only one removal per child. The correct row to use is the one which has a removal date."

[27] DFPS provided to the Monitors a comprehensive data file reflective of the reporting period (July 1, 2022, to December 31, 2022) to address data lag issues that occurred in the monthly data reports. As a result, DFPS reported an additional 21 children were in PMC status on July 1, 2022, but were not included

between July 1, 2022, and December 31, 2022. During this period, 2,526 children entered PMC status and 3,449 children exited PMC status. Of the 9,222 children in PMC status on December 31, 2022, 2,309 (25%) children first entered PMC status after July 1, 2022.[28] The total number of children in PMC status on December 31, 2022 (9,222) is a significant decrease from December 31, 2019 (12,707).[29]

## Age, Gender, and Race

As of December 31, 2022, 37% of children with PMC status were age zero to six years old (3,419); 22% were seven to 11 years old (2,074); and 40% were 12 to 17 years old (3,728).[30]

### Figure 1: Age of Children in PMC on December 31, 2022

Source:  PMC Child List
n=9,222 children



■ Ages 0-6   ■ Ages 7-11   ■ Ages 12-17

Note: One child was 18 years old at the time of analysis; this child is not included in the chart. Percentages may not add to 100 due to rounding.

Forty-eight percent of children in PMC status were reported as female and 52% were reported as male.

The race of non-Hispanic children in PMC status breaks down as follows: 27% (2,486) of children in PMC on December 31, 2022, were White; 23% (2,164) were Black/African American; <1% (31) were Asian; <1% (15) were Native American; and 6% (555) were

---

in the data that DFPS submitted to the Monitors at the time of the Fifth Report. *See also* Deborah Fowler and Kevin Ryan, Fifth Report 18, ECF No. 1318.

[28] Twenty-one children of the 10,145 children in care on June 30, 2022, exited care on July 1, 2022, and are therefore, excluded from the July 1, 2022, cohort.

[29] Analyses in this section for December 31, 2019, are based on a comprehensive data file reflective of the December 1, 2019, through February 29, 2020. *See* DFPS, *RO. Inj - List of Placements for Children in PMC Q2 FY 20 - Apr 15-20 - 97298 (002),* (April 16, 2020) (on file with the Monitors).

[30] One child was in care after their 18th birthday.

categorized as "Other." Additionally, 43% (3,971) of children in PMC on December 31, 2022, were of Hispanic ethnicity. Non-Hispanic Black/African American children in PMC status are overrepresented and non-Hispanic Other are also overrepresented compared to the racial category totals for Texas's population of all children ages zero to 17 years in the 2020 census.

Table 1: Race for Children in PMC on December 31, 2022, and Estimates of Total Child Population in Texas by Race, August 12, 2021[31,32]

n=9,222 children

| Race/Ethnicity | Children in PMC on December 31, 2022 | | Estimates of Total Population of Children Less than 18 in Texas by Race | |
|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent |
| Non-Hispanic White | 2,486 | 27.0% | 2,146,604 | 29.5% |
| Non-Hispanic Black/African American | 2,164 | 23.5% | 869,455 | 12.0% |
| Non-Hispanic Other | 555 | 6.0% | 346,518 | 4.8% |
| Non-Hispanic Native American | 15 | 0.2% | 25,890 | 0.4% |
| Non-Hispanic Asian | 31 | 0.3% | 355,940 | 4.9% |
| Hispanic (of any race) | 3,971 | 43.1% | 3,534,398 | 48.6% |
| Total | 9,222 | 100% | 7,278,805 | 100% |

Note: Percentages may not add to 100 due to rounding.

## Living Arrangements and Length of Time in Care

Based on information provided by DFPS, 79% (7,331) of children in PMC on December 31, 2022 lived in family settings, including 27% (2,512) living with relatives or fictive kin and 3% (299) living in adoptive homes; 15% (1,403) of children in PMC lived in

[31] See UNITED STATES CENSUS BUREAU, Table IDs P2 & P4, Product: 2020: DEC Redistricting Data (PL 94-171) (August 2021), available at https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity&tid=DECENNIALPL2020.P2, and https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity%20&tid=DECENNIALPL2020.P4. These totals were derived by subtracting Table P4 totals (population over 18) from Table P2 totals (total population). The categories used by the Census Bureau and Texas DFPS do not match exactly. The Census data were aggregated as follows: the Non-Hispanic Other category includes all children in the Non-Hispanic Other category with one race and all non-Hispanic children with more than one race; the Non-Hispanic Native American totals combine the American Indian Alaska Native category with the Native Hawaiian and Pacific Islander category.
[32] The format of the data provided by DFPS to the Monitors does not provide the ability to identify the racial categories for any child of Hispanic ethnicity.

congregate care; and 447 (5%) children lived in other types of living arrangements.[33]
The remaining 41 (<1%) PMC youth were without an authorized placement on
December 31, 2022.

Figure 2: Living Arrangements for Children in PMC on December 31, 2022[34]



Source:  PMC Child File
n = 9,222 children

Note: Percentages may not add to 100% due to rounding.

PMC children who were identified as non-Hispanic Other (84%) were most likely to live
in family settings, followed by Hispanic (of any race) (82%), non-Hispanic
Black/African American (80%), and non-Hispanic White (75%), while PMC youth
identified as non-Hispanic Asian (71%), and non-Hispanic Native American (60%) were
less likely to live in family settings.

Table 2: Living Arrangement by Race, Children in PMC on December 31, 2022

n=9,222 children

---

[33] The 447 children in the "Other" living arrangement category in this figure include those identified by
DFPS as: "Unauthorized Placement" (23%, 103), "HCS Group 1-4" (20%, 88), "Runaway" (19%, 86), "City
County Jail/Other Juv. Det" (Incarcerated) (13%, 60), "Psychiatric Hospital" (6%, 25), "Own-home/Non-
Custodial Care" (5%, 21), "Independent Living" (<1%, 4), and nine other living arrangement types (13%,
60). The monitoring team cross checked the children identified in unlicensed CWOP with the ongoing e-
mail notifications from DFPS to the Monitors about children without placements and were able to
substantially validate the information.
[34] Of the 1,403 children living in congregate care settings, 6% (81) were placed out of state.

| Race/Ethnicity | Living Arrangement | | | | | |
|---|---|---|---|---|---|---|
| | Foster Home | Adoptive Home | Congregate Care | Relative/ Fictive Kin | Other | Total |
| Non-Hispanic White | 48% 1,205 | 3% 82 | 19% 482 | 24% 589 | 5% 128 | 100% 2,486 |
| Non-Hispanic Black/African American | 50% 1,084 | 3% 66 | 14% 303 | 26% 572 | 6% 139 | 100% 2,164 |
| Non-Hispanic Other | 56% 309 | 4% 22 | 13% 70 | 24% 133 | 4% 21 | 100% 555 |
| Non-Hispanic Native American | 40% 6 | 13% 2 | 40% 6 | 7% 1 | 0% 0 | 100% 15 |
| Non-Hispanic Asian | 52% 16 | 0% 0 | 23% 7 | 19% 6 | 6% 2 | 100% 31 |
| Hispanic (of any race) | 48% 1,900 | 3% 127 | 13% 535 | 30% 1,211 | 5% 198 | 100% 3,971 |

Note: Columns may not add to 100% due to rounding.

Based on information provided by DFPS, 82% (10,459) of children in PMC on December 31, 2019, lived in family settings, including 49% (6,262) living in foster homes, 27% (3,401) living with relatives or fictive kin and 6% (796) living in adoptive homes; 14% (1,758) of children in PMC lived in congregate care; and 490 (4%) children lived in other types of living arrangements.[35] Overall, the percentage of children in the different living arrangements in December 2019 and December 2022 has not changed. The exception is the decrease in the percentage of children in adoptive homes which dropped from 6% (796) on December 31, 2019, to 3% (299) on December 31, 2022.

Table 3: Living Arrangement for Children in PMC on December 31, 2019, and December 31, 2022

n= 12,707 and 9,222 children respectively

---

[35] The 490 children in the "Other" living arrangement category in this figure include those identified by DFPS as: "Own Home/Non-Custodial Care" (9%, 43), "Runaway" (21%, 104), "Incarcerated" (13%, 66), "Independent Living" (5%, 24), and "Other" (52%, 253). (DFPS did not further define Other).

| Living Arrangement | December 31, 2019 | December 31, 2022 |
|---|---|---|
| Foster Home | 6,262 (49%) | 4,520 (49%) |
| Adoptive Home | 796 (6%) | 299 (3%) |
| Congregate Care | 1,758 (14%) | 1,403 (15%) |
| Relative/Fictive Kin | 3,401 (27%) | 2,512 (27%) |
| Other | 490 (4%) | 488 (5%)[36] |
| Total | 12,707 | 9,222 |

Of the children in PMC status on December 31, 2022, 3% (270) were in care for less than one year; 37% (3,451) were in care for one to two years; 26% (2,356) were in care for two to three years; and 34% (3,145) were in care for more than three years.

Figure 3: Length of Stay in Care of Children in PMC on December 31, 2022



Source: PMC Child File
n=9,222

Of the children in PMC status on December 31, 2019, 10% (1,273) were in care for less than one year; 45% (5,747) were in care for one to two years; 21% (2,673) were in care for two to three years; and 23% (2,981) were in care for more than three years. There has been a decrease from 55% (7,020) of children in care for less than two years on December 31, 2019, to 40% (3,721) on December 31, 2022. Conversely, there has been an increase of children in care for more than two years, from 44% (5,654) of children in care on December 31, 2019, to 60% (5,501) on December 31, 2022.

---

[36] This includes the 41 children who were housed in unlicensed CWOP settings on December 31, 2023.

Table 4: Length of Stay in Care of Children in PMC on December 31, 2019, and December 31, 2022

n=12,707 and 9,222 children respectively

| Length of Stay | December 31, 2019 | December 31, 2022 |
|---|---|---|
| Less than one year | 1,273 (10%) | 270 (3%) |
| 1 to 2 years | 5,747 (45%) | 3,451 (37%) |
| 2 to 3 years | 2,673 (21%) | 2,356 (26%) |
| 3 to 6 years | 2,077 (16%) | 2,321 (25%) |
| 6 years plus | 904 (7%) | 824 (9%) |
| Unable to Determine[37] | 33 (<1%) | 0 (0%) |
| Total | 12,707 | 9,222 |

Children exited from PMC status primarily through adoption; reunification with family; having custody transferred to relatives; or by aging out of care. Of the 3,449 children's exits from PMC status that DFPS reported between July 1, 2022, and December 31, 2022, the most frequent reason for exit was adoption, with more adoptions by non-relatives (1,317) than relatives (1,039). The breakdown of exit reasons is as follows: 68% (2,356) of children were adopted; 16% (556) of children had custody transferred to a relative; and 12% (428) of children aged out of foster care. Finally, a small number of children were reunified with their families (3%, 96) or had other outcomes (<1%, 13).

Table 5: Exits from PMC by Exit Outcome between July 1 and December 31, 2022

n=3,449 exits from foster care

| Exit Outcome | Frequency | Percent |
|---|---|---|
| Adoption | 2,356 | 68% |
| Custody to Relative | 556 | 16% |
| Emancipation | 428 | 12% |
| Reunification | 96 | 3% |
| Other | 13 | <1% |
| Total | 3,449 | 100% |

Note: Percentages may not add to 100 due to rounding.

## Out of State Placement

---

[37] The relevant data report for this information was received in 2020 reporting the list of children in PMC as of December 31, 2019, and had minor data issues for 33 children. For this period, the Monitors were able to calculate length of time since removal for all children.

Of the 9,222 children in PMC status on December 31, 2022, 474 (5%) children were placed in living arrangements that were located out of state. Of the PMC children placed out of state, 381 (80%) lived in family settings, including 30% (143) living with relatives or fictive kin and 16% (77) living in adoptive homes; and 17% (81) of children in PMC lived in congregate care out of state, a 26% decrease from June 30, 2022.

Table 6: Out of State Living Arrangement Type for Children in PMC, June 30, 2022, and December 31, 2022

n=505 and 474 children respectively

| Living Arrangement Type | June 30, 2022 | December 31, 2022 | Percent Change |
|---|---|---|---|
| Congregate Care | 110 | 81 | -26% |
| Foster Home | 186 | 161 | -13% |
| Relative/Fictive Kin | 120 | 143 | 19% |
| Adoptive Home | 68 | 77 | 13% |
| Other | 12 | 11 | -8% |
| Own Home/Non-Custodial Care | 3 | 1 | -67% |
| Data Entry Error | 5 | 0 | -100% |
| Independent Living | 0 | 0 | N/A |
| Incarcerated | 1 | 0 | -100% |
| Total | 505 | 474 | -6% |

Of the 474 children who were placed out of state, 164 (35%) were non-Hispanic White, 152 (32%) were Hispanic (of any race), 118 (25%) were non-Hispanic Black/African American, 36 (8%) were non-Hispanic Other, less than one percent (3) were non-Hispanic Native American, and the remaining child (<1%) was non-Hispanic Asian.

Table 7: Children in PMC Placed Out of State by Race on December 31, 2022

n = 474 children

| Race/Ethnicity | Frequency | Percent |
|---|---|---|
| Non-Hispanic White | 164 | 35% |
| Non-Hispanic Black/African American | 118 | 25% |
| Non-Hispanic Other | 36 | 8% |
| Non-Hispanic Native American | 3 | <1% |
| Non-Hispanic Asian | 1 | <1% |
| Hispanic (of any race) | 152 | 32% |
| Total | 474 | 100% |

Note: Percentages may not add to 100% due to rounding

Of the 12,707 children in PMC status on December 31, 2019, 519 (4%) children were placed in living arrangements that were located out of state. Of the PMC children placed out of state, 475 (92%) lived in family settings, including 41% (215) living with relatives or fictive kin and 23% (118) living in adoptive homes; and 5% (26) of children in PMC lived in congregate care out of state. There has been a decrease in the number of children placed in relative/fictive kin homes from 41% (215) on December 31, 2019, to 30% (143) on December 31, 2022, and in adoptive homes from 23% (118) on December 31, 2019, to 16% (77) on December 31, 2022. Additionally, there has been an increase in out of state placements in congregate care from 5% (26) to 17% (81) and in foster homes from 27% (142) to 34% (161) on December 31, 2019, to December 31, 2022, respectively.

Table 8: Out of State Living Arrangement Type for Children in PMC, December 31, 2019, and December 31, 2022

n=519 and 474 children respectively

| Living Arrangement Type | December 31, 2019 | December 31, 2022 |
| --- | --- | --- |
| Congregate Care | 26 (5%) | 81 (17%) |
| Foster Home | 142 (27%) | 161 (34%) |
| Relative/Fictive Kin | 215 (41%) | 143 (30%) |
| Adoptive Home | 118 (23%) | 77 (16%) |
| Other | 12 (2%) | 11 (2%) |
| Own Home/Non-Custodial Care | 6 (1%) | 1 (<1%) |
| Total | 519 | 474 |

Note: Columns may not add to 100% due to rounding.

## Level of Care

Of the 9,222 children in PMC status on December 31, 2022, 5,463 (59%) children were in a Basic level of care.[38] Of the remaining 3,759 PMC children, 1,377 (15%) were in a Specialized level of care; 1,191 (13%) were in a Moderate level of care; and 369 (4%) were in an Intense level of care. The data included 748 (8%) PMC children with no authorized level of care recorded.[39]

---

[38] The number of children identified in a Basic level of care is overrepresented. The Monitors recently learned that the SSCCs' current recorded levels of care for children are not stored in IMPACT, and therefore, are not reflected in the data reports to the Monitors. The State will address the issue in future reporting.

[39] The Monitors found that for most of those children lacking identification of an authorized level of care (637 or 85% of children with no authorized level of care recorded), the placement type in the data was identified as "kin only (non-licensed)." The Monitors inquired with DFPS for insight into the circumstances when the data indicate "no authorized level of care" recorded. The State reported that when a child is in "a fictive kin, non-custodial parent, unauthorized, return home, relative home placement, juvenile detention/adult jail, unauthorized placement or any placement that DFPS does not pay, the service level is not assessed as this is not a licensed placement and there is no rate of reimbursement." E-mail from Ingrid Vogel, Program Specialist, DFPS, to Megan Annitto (April 20, 2023).

Table 9: Authorized Level of Care for Children in PMC as Reported by DFPS as of December 31, 2022

n=9,222 children

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 5,463 | 59% |
| Specialized | 1,377 | 15% |
| Moderate | 1,191 | 13% |
| No Authorized Level of Care Recorded | 748 | 8% |
| Intense | 369 | 4% |
| (TFC) Treatment Foster Care | 70 | 1% |
| Intense Plus | 1 | <1% |
| Psychiatric Transition | 3 | <1% |
| Total | 9,222 | 100% |

Note: Columns may not add to 100% due to rounding.

## Geographic Location

For 39% (3,639) of the 9,222 children with PMC status on December 31, 2022, the county of removal was one of five Texas counties: Bexar, Harris, Tarrant, Dallas, or Bell.

Table 10: Top Five Counties of Removal for Children in PMC on December 31, 2022[40]

n=3,639 of 9,222 children in care

| County Name | Frequency | Percent |
|---|---|---|
| Bexar | 1,223 | 13% |
| Harris | 976 | 11% |
| Tarrant | 608 | 7% |
| Dallas | 585 | 6% |
| Bell | 247 | 3% |
| Total | 3,639 | 39% |

## Single Source Continuum Contractor Presence and Placement Oversight

As of December 31, 2022, 25% (2,350) of children in PMC status were from regions where SSCCs operated in the first two stages of implementation.[41]

---

[40] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the corresponding IMPACT data. Total does not equal 39% due to rounding.
[41] DFPS reports to the Monitors both the Legal Region and the Placement Region of children; here, the Monitors are referring to Legal Region for ease of reference. However, the children may be placed in and therefore, currently living in another region.

Table 11: Children in PMC by Regions on December 31, 2022

n=9,222 children

| Regions | PMC Children | Percent |
|---|---|---|
| SSCC Regions | 2,350 | 25% |
| DFPS Regions | 6,872 | 75% |
| All Regions | 9,222 | 100% |

As shown in the table below, Region 3b, where OCOK was responsible for placement, had the greatest number of PMC children from a region that has SSCC placement oversight.

Table 12: Children in PMC from Regions with Single Source Continuum Contractor Presence by Region on December 31, 2022[42]

n=9,222 children

| SSCC Name | Legal Region | PMC Children | Percent |
|---|---|---|---|
| St. Francis Ministries | 1 | 670 | 29% |
| 2INgage | 2 | 532 | 23% |
| Our Community Our Kids (OCOK) | 3b | 774 | 33% |
| Belong | 8b | 374 | 16% |
| Total | | 2,350 | 100% |

# Preventing Sexual Abuse and Child-on-Child Sexual Aggression

This section discusses the remedial orders related to identifying, documenting, and notifying caregivers of a child's history of sexual abuse, sexual aggression, or sexual behavior issues, and to preventing child-on-child sexual abuse.

## Data Related to PMC Children Flagged with an Indicator for Sexual Aggression or Sexual Victimization

### Number of PMC Children Flagged with an Indicator for Sexual Aggression or Sexual Victimization

---

[42] The 3b catchment area is comprised of Tarrant, Erath, Hood, Johnson, Palo Pinto, Parker, and Somervell counties in DFPS Region 3W. The 8b catchment area is comprised of all counties in DFPS Region 8 excluding Bexar County. *See* DFPS, *Quarterly Report on Community Based Care Implementation Status*, 4-5 (December 2021). Total does not equal 100% due to rounding.

As of December 31, 2022, the most recent point-in-time data the Monitors analyzed for this report, DFPS had identified 1,243 PMC children with a confirmed history of either sexual abuse or an indicator for sexual aggression or both. These children represented approximately 14% of the 9,222 children in placement on that day:

- 185 children (2%) had an indicator for sexual aggression;
- 988 children (11%) had an indicator for sexual victimization; and
- 70 children (1%) had both indicators.

An additional 132 children had an indicator for a sexual behavior problem, bringing the total to 1,375 (15% of children in placement) with a sexual characteristic flag.

The number of PMC children in placement who had a sexual aggression and/or sexual victimization indicator increased in 2022, then declined slightly at the end of the year (see chart below). The number of PMC children who had a sexual victimization indicator increased by 3%, from 1,026 on December 31, 2021, to 1,058 on December 31, 2022.[43] The number of PMC children who had an indicator for sexual aggression increased 7% during the same period, from 238 on December 31, 2021, to 255 on December 31, 2022.

**Figure 4: Children in PMC Placement with a Sexual Characteristic Flag (Aggressor or Victim) December 31, 2021, to December 31, 2022**



Source: PMC child placement data

The Monitors compared children who had either an indicator for sexual victimization or for sexual aggression on January 31, 2022, and again on December 31, 2022, to

---

[43] Children with both a sexual victimization and sexual aggression indicator are counted in both categories. In December 2021, 54 children had both sexual victimization and sexual aggression indicators and in December 2022, 70 children had both indicators.

determine whether any changes had been made to a child's indicators during the year. Of the children who were in PMC on December 31, 2022, 4,772 had been in PMC on January 31, 2022. Of the 640 PMC children who had an indicator for sexual victimization on January 31, 2022, 611 (95%) still had an indicator for victimization on December 31, 2022. All 161 children (100%) who had an indicator for sexual aggression on January 31, 2022, still had an indicator for aggression on December 31, 2022. One child who had both an indicator for sexual victimization and for aggression on January 31, 2022, had only an indicator for aggression on the last day of the year.

The Monitors reviewed the IMPACT records for the 30 children who had an indicator for sexual victimization on January 31, 2022, but not on December 31, 2022. DFPS reported removing from IMPACT the sexual victimization indicators for all 30 children during a "quality assurance" process because the agency determined the underlying incident was unconfirmed. The unconfirmed incidents include:

- Allegations of child-on-child sexual contact that resulted in a Ruled Out finding for Neglectful Supervision by a child's caregiver. In one case, the child alleged sexual abuse by the foster parent's older nephew, and the nephew admitted to inappropriately touching the foster child. However, because Neglectful Supervision was not substantiated for the caregiver and the nephew was not charged with a crime, the allegation was considered unconfirmed.

- Allegations of child-on-child sexual contact that did not result in an indicator for sexual aggression for one of the children. This included an instance in which the notes in IMPACT indicated that the alleged aggressor "is no longer in FPS custody so unable to have CSA staffing completed at this time." It also included instances in which the alleged aggressor was determined to have a sexual behavior problem but was not determined to be sexually aggressive.

- Allegations that resulted in a UTD finding by DFPS. In one case, a child reported sexual abuse by her biological mother's boyfriend, a registered sex offender, before entering care. The boyfriend admitted to bathing the children, and DFPS substantiated an allegation made by the child's sibling but was not able to substantiate the outcry made by the child.

- Allegations of abuse that preceded a child's entry into foster care, which were never investigated. Two siblings were among the children whose sexual victimization flags were removed; both children made outcries regarding abuse by their mother's boyfriend, but the allegations were never confirmed.

- Unconfirmed outcries of sex trafficking that occurred while a child was on runaway status. Some of these outcries appeared as "suspected-unconfirmed" incidents on the sex trafficking tab in the child's IMPACT record.[44]

---

[44] A "suspected-unconfirmed" incident of sex trafficking will not appear in the automatically generated information in a child's Attachment A.

### Number of Placements and Runaway Incidents for PMC Children with and without a Sexual Characteristics Flag, January – December 2022

Children with a history of sexual abuse or an indicator for sexual aggression were more likely to reside in a congregate care (GRO or RTC) placement than children with no sexual characteristic indicator. Of the 1,243 children with a sexual characteristic indicator in placement on December 31, 2022, 35% (429) were in a congregate care placement and 32% (401) were in a foster home. By comparison, of the 7,979 children who did not have a sexual characteristic indicator on the same date, 12% (974) were in a congregate care placement, and 52% (4,119) were in a foster home.

Children who had an indicator for sexual aggression or sexual victimization[45] also changed placements[46] more frequently than children who did not have a sexual characteristic indicator. Of the total 15,818 PMC children in placements between January 1, 2022, and December 31, 2022, 1,506 (10%) were identified as victims of sexual abuse, and 252 (2%) had an indicator for sexual aggression. Less than 1% (93) had both indicators. Children with an indicator for sexual aggression had, on average, 3.60 placements during that period, compared to 3.16 placements for children identified as victims of sexual abuse, and 1.71 placements for children with no sexual characteristic indicator.

Table 13: Number of Placements for PMC Children by Sexual Indicator Type, January to December 2022[47]

| Number of Placements | Sexual Abuse Indicator (n = 1,599) | | Sexual Aggression Indicator (n = 345) | | No Sexual Indicator (n = 13,967) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| One Placement | 685 | 43% | 108 | 31% | 9,585 | 69% |
| Two to Three | 518 | 32% | 134 | 39% | 3,398 | 24% |
| Four to Six | 231 | 15% | 59 | 17% | 681 | 5% |
| Seven or More | 165 | 10% | 44 | 13% | 303 | 2% |

In addition to more frequent placement moves, the data show that runaway incidents are more likely among children who had a sexual characteristic indicator.[48]

---

[45] Children were considered to have a sexual victimization/aggression indicator if there was an indicator at any time between January 1, 2022, and December 31, 2022. For example, if they did not have an indicator in January but had an indicator in December, they would be considered to have a sexual characteristic indicator.

[46] For this analysis, placements are defined as any change in a child's living arrangement that results in a new placement record for the child, including hospital stays, stays in a juvenile justice facility or jail, and runaway episodes.

[47] 93 children with both sexual characteristic indicators are included in both categories.

[48] PMC placement data was used for the analysis. As a result, only runaway incidents contained in the placement data are counted. Children may be absent as long as 14 days before a runaway designation is

Table 14: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, January to December 2022

| Number of Runaway Incidents | Sexual Abuse Indicator (n = 1,599) | | Sexual Aggression Indicator (n = 345) | | No Sexual Indicator (n = 13,967) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| None | 1,421 | 89% | 311 | 90% | 13,681 | 98% |
| One | 103 | 6% | 19 | 6% | 185 | 1% |
| Two or more | 75 | 5% | 15 | 4% | 101 | 0.7% |

## Remedial Order 32: Policy Creation and Training of Staff Responsible for Making Determinations

*Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

## Background

As discussed in the Monitors' previous reports, DFPS policy sets a protocol to determine whether a child's behavior meets the definition of sexually aggressive. If the alleged sexual aggression occurred in an unlicensed setting, whether an incident meets the definition of sexually aggressive behavior is determined by the conservatorship (CVS) program administrator.[49] If the alleged behavior occurred in a licensed setting, the DFPS - RCCI program administrator confers with the CVS program administrator and if they reach a consensus, marks the indicator in IMPACT.[50] If there is no agreement, the decision is elevated to the RCCI division administrator and CPS regional director, and, if necessary, to the RCCI director and CPS director of field.[51]

## Performance Validation

---

included in the placement data. Data source: DFPS written response to December 2021 Supplemental Data & Information Request, January 2022. The Monitors requested information on all SWI intakes for a runaway and DFPS responded that IMPACT does not presently include data fields that would enable DFPS to provide a monthly listing of all Statewide Intakes for a runaway. DFPS is evaluating how best to incorporate runaway indicators into existing reports.

[49] DFPS, *Sexual Incident History Resource Guide* (Updated April 2023) 11-14, *available at* https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/Sexual_Incident.pdf

[50] *Id* at 15-16.

[51] *Id.* at 16.

The Monitors were not able to validate the State's performance related to this remedial order due to flaws in the data produced by the State. Quarterly, the State provides CSA training data to the Monitors for all staff working at least one day during the quarter in a decision-making role. The data used to validate the remedial order includes "Date in Current Position," "Job Title," "Job Code," "Date CBT Completed," and notes indicating case assignable status. The Monitors' analyzed the data the State provided detailing the number of staff working in Quarter 4, Fiscal Year 2022, and Quarter 1, Fiscal Year 2023,[52] and identified inconsistencies in the data points used to validate the order.

The Monitors checked for consistency and reasonableness in analyzing data provided by the State for staff working in Quarter 4, Fiscal Year 2022, and Quarter 1, Fiscal Year 2023, to verify the following: Dates of CBT training for a given employee in Quarter 1 were the same or more recent than the dates found in Quarter 4; the date in current position changed between Quarter 4 and Quarter 1 if the job title changed between quarters; the job title changed between Quarter 4 and Quarter 1 if the date in current position changed between quarters; and for staff who were not found in Quarter 4, FY 2022 but found in Quarter 1, FY2023, that the date in position began in Quarter 1, FY 2023.

The Monitors identified inconsistencies in the data that included CBT training dates in Quarter 1, Fiscal Year 2023 data that preceded the date provided for Quarter 4, Fiscal Year 2022; CBT training dates provided in Quarter 4, Fiscal Year 2022 but no date provided in Quarter 1, Fiscal Year 2023; staff whose current position occurred in or before Quarter 4, Fiscal Year 2022 but were not found in the Quarter 4 data; staff whose position title changed but their date in current position did not change; and staff whose date in current position changed but their position/title remained the same. These inconsistencies were not identified in previous data used to validate this Remedial Order.

The State responded to a request for clarification by the Monitors,[53] identifying data inconsistencies resulting from numerous factors including a mistake by DFPS made in the data file provided by CLOE (the training platform); DFPS's failure to update the CAPPS HR system after staff changed positions; staff that transferred from one unit to another but remained in the same job title with a new position number; staff for whom multiple personnel actions occurred on the same day and the first action was included in the data rather than the most recent; and manual data entry errors.

## Remedial Order 32 Summary

State system data flaws prevented the Monitors from validating the State's performance in training staff on the policy for child-on-child sexual abuse. The State failed to correct inconsistencies in the data provided regarding staff number, staff transfers, staff titles, mistakes in record keeping, and staff training over two fiscal Quarters in 2022.

---

[52] Quarter 4, Fiscal Year 2022 includes the period July 1, 2022, through August 31, 2022. Quarter 1, Fiscal Year 2023 includes the period September 1, 2022, through November 30, 2022.
[53] Email from DFPS FCL Compliance to Nancy Arrigona, re: CSA Training Data, March 23, 2023 (on file with the Monitors).

## Remedial Order 4: Caseworker and Caregiver Training on Sexual Abuse

*Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

### Background and Updates

Remedial Order 4 requires caseworkers and caregivers to complete training on recognizing and reporting child sexual abuse. For its caseworkers, the State[54] implemented the child sexual abuse training requirement in Remedial Order 4 by providing a Child Sexual Aggression course and through pre-service training for new caseworkers. As to the caregiver training requirement in Remedial Order 4, beginning this reporting period, DFPS requires caregivers to complete an online training module through the Caregiver Training Hub and tracks caregivers' completion of the training through the Provider Portal; both online systems became operational in January 2022.[55]

According to DPFS's website, on January 1, 2022, it instructed all providers to register all caregivers in the Provider Portal and to ensure that all caregivers completed the required training in the new Caregiver Training Hub.[56] DFPS provided the Monitors its caregiver training completion data reports pursuant to its new data tracking system for this reporting period.[57] The Monitors' update on the data DFPS provided in this reporting period is below.

During this reporting period, DFPS also informed the Monitors that it updated its curriculum content for both caseworkers and caregivers. On July 20, 2022, the State provided to the Monitors updated curriculum for its module for caregivers.[58] On September 2, 2022, and September 20, 2022, DFPS provided to the Monitors the updated curriculum for all caseworkers, including those working at the SSCCs. The modules were entitled "Preventing and Recognizing Sexual Abuse and Victimization"[59] and "Caseworker Refresher Training."[60]

---

[54] This reference to the State refers to DFPS and the SSCCs—2Ingage, OCOK, St. Francis, and Belong—administering case management in their respective regions.

[55] DFPS, *Caregiver Training,* available at https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/Training. *See* Deborah Fowler & Kevin Ryan, Fourth Report 35, ECF No. 1248.

[56] *See* Deborah Fowler & Kevin Ryan, Fourth Report 35, ECF No. 1248.

[57] In the prior period, DFPS reported to the Monitors that it was working to provide a comprehensive list of all caregivers in its reporting for this area of Remedial Order 4 and that its new technology would allow it to do so. *See* Deborah Fowler & Kevin Ryan, Fourth Report 35, ECF No. 1248; E-mail from Michelle Mattalino, former Director of Project Management, DFPS, to Kevin Ryan, Deborah Fowler, and Timothy Ross (November 10, 2021) (on file with the Monitors).

[58] E-mail from Valarie Campbell, Program Specialist, DFPS, to Kevin Ryan and Deborah Fowler (July 20, 2022) (on file with the Monitors).

[59] E-mail from Valarie Campbell to Kevin Ryan and Deborah Fowler (September 2, 2022) (on file with the Monitors).

[60] E-mail from Valarie Campbell to Kevin Ryan and Deborah Fowler (September 20, 2022) (on file with the Monitors).

### Caseworker Training Performance Validation Results

The Monitors determined that between June 1, 2022, and November 30, 2022, 2,369 case-carrying caseworkers were listed in the caseload data. Of those workers, 100% (2,369) completed the child sexual abuse training.[61] In the previous reporting period, 99% of caseworkers completed the training.[62]

Table 15: Child Sexual Abuse Training Completion by Caseworker Type, June 1, 2022, to November 30, 2022

| Caseworker Type | Child Sexual Abuse Training Completion | | Total Caseworkers | Percent Compliant |
|---|---|---|---|---|
| | Completed | Not Completed | | |
| DFPS CVS[63] | 1,985[64] | 0 | 1,985 | 100% |
| OCOK[65] | 140 | 0 | 140 | 100% |
| 2INgage[66] | 100 | 0 | 100 | 100% |

---

[61] The Monitors used the following data submissions received in this reporting period to validate caseworker training:  DFPS, *RO4_DFPSCaseworkerTraining_FY22Q4d2022_10_03_log106583* (October 3, 2022);  DFPS, *RO4_OCOKPermSpecTraining_FY22Q4d2022_10_03* (October 3, 2022); DFPS, *RO4_2INgagePermSpecTraining_FY22Q4d2022_10_03* (October 3, 2022); DFPS, RO4_*StFrancisPermSpecTraining_FY22Q4d2022_10_03* (October 3, 2022); DFPS, RO4_*DFPS_Caseworker_Training_FY23Q1d2023_01_03_log10734* (January 2, 2023); DFPS, RO4_*OCOKPermSpecTraining_FY23Q1d2023_01_02* (January 2, 2023); DFPS, RO4_*2INgagePermSpecTraining_FY23Q1d2023_01_02* (January 2, 2023); DFPS, RO4_*StFrancisPermSpecTraining_FY23Q1d2023_01_02* (January 2, 2023); DFPS, RO4_*BelongPermSpecTraining_FY23Q1d2023_01_02* (January 2, 2023) (on file with the Monitors).

[62] *See* Deborah Fowler & Kevin Ryan, Fourth Report 35 ECF No. 1248.

[63] Compliance was calculated for all 1,985 DFPS CVS caseworkers listed in the DFPS caseload data who carried at least one case between June 1, 2022 and November 30, 2022 and who had one of the following job titles in the caseload data: CPS CVS SPEC I - 5023X, CPS CVS SPEC II - 5024X, CPS CVS SPEC III - 5025X, CPS CVS SPEC IV - 5026X, CPS CVS SPEC V - 5027X, CPS CVS SPECIALIST V - 1574CX, CPS CVS Spec I, CPS CVS Spec II, CPS CVS Spec III, CPS CVS Spec IV, or CPS CVS Spec V. The use of these job titles is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[64] This calculation includes 23 DFPS CVS caseworkers who became compliant after November 30, 2022, but who appeared in DFPS's quarterly report submitted in January 2023. The dates on which these caseworkers became compliant ranged from December 1, 2022, to December 16, 2022. DFPS, *RO4_DFPS_Caseworker_Training_FY23Q1d2023_01_03_log10734* (January 2, 2023) (on file with the Monitors).

[65] Compliance was calculated for all 140 OCOK caseworkers listed in the OCOK caseload data who carried at least one case between June 1, 2022, and November 30, 2022, and who had one of the following job titles in the caseload data: "OCOK Permanency Speclst" or "OCOK Local Permanency Spe." The use of these job titles is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[66] Compliance was calculated for all 100 2INgage caseworkers listed in the 2INgage caseload data who carried at least one case between June 1, 2022, and November 30, 2022, and who had one of the following job titles in the caseload data: PCM, Intake Placement Specialist, Intake and Placement Specialist II, or Intake and Placement Specialist I. The use of these job titles is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

| | | | | |
|---|---|---|---|---|
| St. Francis[67] | 108 | 0 | 108 | 100% |
| Belong[68] | 36 | 0 | 36 | 100% |
| Total | 2,369 | 0 | 2,369 | 100% |

The monitoring team compared the caseworkers listed in the data report provided by the State with caseloads for DFPS, OCOK, 2INgage, and St. Francis caseworkers between June 2022 and November 2022 and for Belong caseworkers in its caseload data report for November 2022[69] with the list of all caseworkers in the data provided by the State regarding completion of child sexual abuse training.[70] Using the corresponding caseload files, the Monitors matched all DFPS, OCOK, 2INgage, Belong and St. Francis caseworkers found in the caseload reports with the training reports.[71]

Finally, the Monitors interviewed a random sample of 314 caseworkers between February 2022 and December 2022 to further verify caseworker completion of sexual abuse training. Through individual interviews with each caseworker, the Monitors found that all 314 (100%) caseworkers reported having completed training about child sexual abuse.[72]

## Caregiver Child Sexual Abuse Training

As described in the Monitors' prior reporting, the State has been unable to produce a comprehensive list of all caregivers and, therefore, the Monitors have been unable to validate the State's performance in this area. In this reporting period, DFPS used its new

---

[67] Compliance was calculated for all 108 St. Francis caseworkers listed in the St. Francis caseload data who carried at least one case between June 1, 2022, and November 30, 2022, and who had the following job title in the caseload data: Permanency Specialist. The use of this job title is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[68] Compliance was calculated for all 36 Belong caseworkers listed in the Belong caseload data who carried at least one case between November 1, 2022, and November 30, 2022, and who had the following job title in the caseload data: Permanency Specialist. The use of this job title is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[69] Belong assumed responsibility for cases in October 2022. Belong's caseload data report for October 2022 contained data quality challenges that did not meet data sufficiency standards; therefore, the monitoring team assessed Belong's performance starting with the caseload data report for November 2022.

[70] DFPS, *RO2.1_CVS_Caseloads_2022_06d2022_08_01_log106687* (August 2, 2022); DFPS, *RO2.1_CVS_Caseloads_2022_07d2022_09_01_log106828* (September 1, 2022); DFPS, *RO2.1_CVS_Caseloads_2022_08d2022_10_03_log107268* (October 3, 2022); DFPS, *RO2.1_CVS_Caseloads_2022_09d2022_11_01_log107611* (November 1, 2022); DFPS, *RO2.1_CVS_Caseloads_2022_10d2022_12_01_log108021* (December 1, 2022); DFPS, *RO2.1_CVS_Caseloads_2022_11d2023_01_02_log108319* (January 2, 2023) (on file with the Monitors).

[71] A small number of workers (19) were not included in the State's original data reports for Remedial Order 4; however, when the Monitors identified those workers to DFPS, it submitted a supplemental data report with those workers' training completion dates. *See* E-mail from Valarie Campbell, to Megan Annitto, Monitoring Team (April 17, 2023) (on file with the Monitors).

[72] In addition, each caseworker provided the dates on which they completed the child sexual abuse trainings. Of these 314 caseworkers, 94.3% provided the same date for completion of the computer-based component on child sexual aggression in their interview as was documented in the data file produced by the State for RO 4 training completion.

Provider Portal to produce quarterly data files that included all individuals who were registered in the Portal and were active during the period from January 1, 2022 through November 30, 2022, a total of 47,372 unique individuals.[73] The data included a list of caregivers who completed the child sexual abuse training, a total of 46,750 (98.7%) during January 1, 2022 through November 30, 2022; the remaining caregivers listed had no course completion information provided (622 or 1.3%). Despite DFPS's implementation of the Provider Portal, the Monitors cannot determine whether the data included an exhaustive list of all caregivers. The monitoring team requested that DFPS provide a list of all active caregivers and a unique identifier for each caregiver who is listed in its quarterly data report (derived from the Provider Portal); DFPS was unable to fulfill the request.[74, 75]  Therefore, the Monitors remain unable to validate the State's performance in this area.

During the monitoring team's site visits to 13 congregate care facilities, the monitoring team reviewed caregiver records for information related to the child sexual abuse training required by Remedial Order 4. Of the 242 staff records the team reviewed, 41 (17%) did not include documentation showing the staff person had completed CSA training. Of these 41 staff, 27 were direct caregivers, 3[76] were supervisors for direct caregivers, and 11 were case managers or treatment staff.[77]

The monitoring team interviewed 117 staff members during the 13 site visits and questioned them about completion of the training. Of those interviewed, 102 (87%) reported having completed the training, 9 (8%) reported not having completed the training, and 6 (5%) were unsure whether they had completed the training.

### Summary of Caseworker and Caregiver Sexual Abuse Training Performance Validation

- DFPS's data shows that 100% of caseworkers who carried at least one case from June 1, 2022, to November 30, 2022, completed the training required by Remedial Order 4 regardless of where employed.

---

[73] DFPS, *RO4_ExternalLMS_Caregiver_Trng_FY22Q4d2022_10_03_log106524* (October 4, 2022); DFPS, *RO4_ExternalLMS_Caregiver_Trng_FY23Q1d2022_01_02_log107384* (January 2, 2023) (on file with the Monitors).

[74] E-mail from Michelle Mattalino to Kevin Ryan, Deborah Fowler, and Timothy Ross  (November 10, 2021) (explaining that DFPS does not have its own list of all active caregivers) (on file with the Monitors); E-mail from Valarie Campbell to Jill Lefkowitz, Monitoring Team (January 24, 2023) (confirming that DFPS was not able to provide unique identifiers for caregivers that would allow for cross referencing between relevant data reports) (on file with the Monitors).

[75] The data reports do not include a unique caregiver identification number that would allow the Monitors to cross reference between the DFPS data reports listing caregiver training completion and those listing child placement location; while such an identifier would not permit validation of all caregivers, if the Monitors received matching unique identifiers for foster parents in both data reports, it would, for example, allow them to partially verify Remedial Order 4 with respect to caregivers in foster homes caring for PMC children.

[76] Includes two caregiver supervisors and one unit manager.

[77] Includes five treatment staff/directors, three case managers, and three mental health technicians.

- A random sample of 314 caseworkers interviewed by the monitoring team between February 2022 and December 2022 resulted in all 314 caseworkers confirming their completion of child sexual abuse training.

- The Monitors cannot validate that all or most caregivers completed the child sexual abuse training required by Remedial Order 4 based upon the current submissions from DFPS.

- The monitoring team interviewed caregivers and reviewed their records to validate the data reporting completion of the training required by Remedial Order 4 and found that of the 242 staff records the team reviewed, 41 (17%) did not include documentation showing the staff person had completed CSA training, though only 8% of staff interviewed (9 of 117) reported that they had not completed the training. Another 5% (6 of 117) were unsure whether they had completed the training.

## Remedial Orders 23, 24, 28, and 30: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression

**Remedial Order 23**: *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order 24:** *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order 28:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order 30:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

### Background

The Monitors' First Report validated the State's compliance with Remedial Orders 23 and 28, requiring the creation of profile characteristics in IMPACT that would allow DFPS to document a child's history of sexual abuse or an indicator for sexual aggression.[78] To validate the State's performance regarding Remedial Orders 24 and 30, the Monitors conducted a case read for a random sample of children who were in PMC status in July 2022 or December 2022 and had an indicator for sexual victimization or sexual abuse. [79]

---

[78] *See* Deborah Fowler & Kevin Ryan, First Report 216 ECF No. 869.

[79] The sample included 543 children who were identified as confirmed victims of sexual abuse, and 243 children identified with an indicator for sexual aggression (with a confidence interval of 95%). The monitoring team reviewed children's IMPACT records, including the child's Sexual Incident History page

and Attachment A to identify the timing and details of the child's confirmed sexual abuse or sexual aggression incident.

The monitoring team identified discrepancies in the data provided to the Monitors. Several indicators are used in the data provided by the State to identify children who have a history of sexual victimization or aggression. The sexual history indicators are defined in the data dictionary attached to the PMC child list and PMC placement files provided by the State, and include:

- Ever a confirmed victim of sexual abuse – an indicator for whether a child was a confirmed victim of sexual abuse in an RCCI or CPI investigation.
- Ever a confirmed victim of sex trafficking – an indicator for whether the child was a confirmed victim of sexual trafficking in an RCCI or CPI investigation.
- Sexual victimization history –whether the indicator for sexual victimization history on the child's sexual victimization history page in IMPACT is active.
- Confirmed RCI victim of sex abuse/sex trafficking after removal – an indicator for whether the child was a confirmed victim of sexual abuse or trafficking in an RCCI investigation that started after their removal date.
- Sexual victimization after removal date – for children with a history of sexual victimization per the sexual victimization history page in IMPACT, an indicator identifying whether any of the sexual victimization incidents occurred after the child's most recent removal date.
- Child sexual aggression incident – an indicator (Y/N) on whether the child has a child sexual aggression incident in IMPACT.

The Monitors used the "ever a confirmed victim of sexual abuse" indicator and the "child sexual aggression" indicator to identify children included in the sample for the case read.

In theory, some children should be flagged with several indicators, based on the definitions provided by the State.

The Monitors compared children flagged with the "sexual victimization history" indicator to determine if they were identified with the indicators "ever a confirmed victim of sexual abuse" or the "ever a confirmed victim of sex trafficking." Of the 12,693 children in PMC from July 1, 2022, to December 31, 2022, 1,329 had indicators for "sexual victimization history" and 1,069 had indicators for "ever confirmed victim of sexual abuse." Thirty-one children had an indicator as a confirmed victim of sex trafficking.

Of the 1,329 PMC children with a "sexual victimization history" indicator, 1,050 also had the "ever a confirmed victim of sexual abuse" indicator. Of the 1,069 PMC children with an "ever a confirmed victim of sexual abuse" indicator, 19 did not have an indicator for "sexual victimization history." When asked about the discrepancy, DFPS indicated that it could be the result of data entry issues, or instances where an RTB was overturned as the result of an administrative review.

Of the 132 victims of sexual abuse who were determined by the monitoring team's case read to have been abused after entering care, only six (6) had the "sexual victimization after removal date" indicator. Of all children included in the case read sample (either as victims of sexual abuse or as having an indicator for aggression) 46 were found to have the "sexual victimization after removal" indicator in data provided by the State. The monitoring team found that the IMPACT Sexual Incident History page for 40 of these children did not include an incident that occurred after the child entered care. Fifteen (15) of the children included in the case read sample (both as victims and children with an indicator for aggression) were identified with the "Confirmed RCI victim of sex abuse/sex trafficking after removal" indicator in data provided by the State; the monitoring team found a corresponding incident on the children's IMPACT Sexual Incident History page for 14 of these children.

The discrepancies in the data make it impossible for the Monitors to rely on the data alone to identify children who are sexually abused in foster care.

## Case Review of Sexual Victimization History in RCCI Maltreatment in Care Investigations

To validate performance associated with Remedial Order 24, the Monitors reviewed a random sample of 140 RCCI investigations with allegations of Sexual Abuse or Neglectful Supervision involving child-on-child sexual contact that were closed between January 1, 2022, and August 31, 2022. The Monitors assessed whether the sexual victimization history pages for the associated alleged victims should have been positively indicated consistent with DFPS policy when appropriate. Because DFPS is unable to separately identify in its data reports which Neglectful Supervision investigations involve child-on-child sexual contact, the Monitors first reviewed 348 investigations with allegations of Neglectful Supervision to first determine whether the allegations involved child-on-child contact. In all relevant investigations, they then reviewed the investigative record to examine the sexual aggression staffing conclusion to determine whether it involved a confirmed incident and the associated documentation in the children's records. (Remedial Orders 23 and 24).

Of the 140 investigations involving Sexual Abuse or relevant Neglectful Supervision allegations that the monitoring team reviewed, 139 included allegations of Neglectful Supervision and one included allegations of Sexual Abuse only. The monitoring team reviewed the documentation in those investigations and found no instances of confirmed sexual victimization for which DFPS failed to appropriately indicate the child as a confirmed victim of sexual abuse on their sexual victimization history page in IMPACT.

## Performance Validation: Case Record Review for Children Identified with an Indicator of Victim of Sexual Abuse or with an Indicator for Sexual Aggression

The Monitors confirmed PMC children were victimized or revictimized while living in foster care, including one child who was trafficked by a caregiver at an RTC where she had been placed.[80] The Monitors conducted a case record review to determine how many of the children identified with a sexual characteristic indicator had incidents of abuse or aggression that occurred after the child entered foster care. Almost one-fourth (132 of 548 or 24%) of children identified as victims of sexual abuse suffered abuse that occurred after the child entered care.[81] Of those, 66% (87 of 132) suffered sexual abuse only after entering foster care; the remaining 34% (45 of 132) were sexually abused both before and after entering foster care. Seventy-six percent (416 of 548) of children with

---

[80] Law enforcement found that a child placed at Unity RTC was allegedly trafficked by a staff member and was victimized in a human trafficking ring that also involved other children in care.

[81] This finding is consistent with the findings reported in the Monitors' Fourth Report, which concluded that 25% of PMC children included in the case record review who were identified as victims of sexual abuse had suffered an incident of abuse after entering foster care. Deborah Fowler & Kevin Ryan, Fourth Report 41 ECF No. 1248 *supra* note 69.

confirmed sexual abuse suffered abuse only before entering care according to their IMPACT records.

Figure 5: Timing of Sexual Abuse, PMC Children with Confirmed Sexual Abuse

Source: List of PMC Children, IMPACT Sexual
History Case Review Data
n=548



■ Abuse prior to entering care only
■ Abuse after entering care only
■ Abuse prior to and after entering care

One-third of children who were victimized after entering care experienced two or more incidents of abuse while in foster care.

48

Figure 6: Number of Incidents of Sexual Abuse While in Care, PMC Children with Confirmed Sexual Abuse in Care



Source: IMPACT Sexual History Case Review Data
n = 132

The monitoring team identified 132 children who were sexually abused after entering care, and a total of 221 incidents of sexual abuse in care. The length of time a child was in foster care[82] did not appear to affect the number of incidents of sexual abuse. PMC children with one confirmed incident of sexual abuse while in foster care had been in care for an average of 57.1 months compared to 46.1 months for children who had experienced two incidents of sexual abuse after entering foster care, and 50.8 months for children who experienced three or more confirmed incidents of sexual abuse after

---

[82] Time in care was calculated using the "removal date" found in the PMC child list file provided by DFPS. For children with multiple removals, the date contained in the PMC child file represents the child's latest removal date.

entering foster care. For PMC children who were sexually abused after entering foster care, many of the incidents of abuse (106 of 221, or 48%) occurred during a child's runaway from a placement.

Figure 7: Location of Sexual Abuse While in Care Incidents for PMC Children with Confirmed Sexual Abuse in Care



Most incidents that occurred while a child was on runaway status were related to sex trafficking. Of PMC children included in the case read who had a runaway incident resulting in sexual abuse, 102 of the 106 runaway incidents (96%) were confirmed as sex trafficking incidents.

The monitoring team identified 221 confirmed incidents of sexual abuse involving 366 perpetrators or aggressors. An adult not associated with the child's foster care placement was the perpetrator in two-thirds of sexual abuse incidents for PMC children. Foster children represented 18% (65 of 366) of the aggressors identified by the case read.

Figure 8: Perpetrators Identified in Sexual Abuse Incidents Occurring While in Care for PMC Children with Confirmed Sexual Abuse in Care



Source: IMPACT Sexual History Case Review Data
n = 366

When DFPS determined that a foster child sexually abused another child in care, the incident was not consistently documented on the Sexual Incident History page for the foster child who was the aggressor. Of the 132 PMC children included in the case review sample who suffered sexual abuse after entering foster care, 51 (39%) were sexually abused by another foster child. These 51 children suffered 65 instances of child-on-child sexual abuse.

The monitoring team reviewed the IMPACT Sexual Incident History page and Attachment A for the child identified in the victim's IMPACT records as the aggressor and found no information related to the incident in 17% (11 of 65) of cases. In another 11% (7 of 65), the information found in the IMPACT records for the child who was identified as the aggressor was not consistent with that found in the victim's IMPACT records. Inconsistencies included: different dates for the incident (with dates sometimes as much as six months different); differences in the number of incidents described and the location of the incident(s); differences in the level of detail in the narrative; differences in information related to charges filed or an investigation; and instances in

which both the Attachment A and IMPACT records identified the same children but differed in identifying the victim or aggressor.

**Figure 9: Sexual Abuse Incident Documented in DFPS Child Perpetrator's Sexual Incident History**



Source: IMPACT Sexual History Case Review Data
n=65

- Information Consistent
- Information Not Consistent
- No Information

Of the 243 PMC children included in the case record review who had an indicator for sexual aggression, 122 (50%) had an indicator only due to an incident that occurred before the child entered into foster care.[83] The remaining 50% of children had an indicator for sexual aggression due to incidents that occurred only after entry into care (94 or 39%), or due to incidents that occurred both before and after entering foster care (27 or 11%).

---

[83] This represents a slight decrease in the number of children identified in the Monitors' Fourth Report as having had aggression incident prior to entering care only. Deborah Fowler & Kevin Ryan, Fourth Report, 43 ECF No. 1248. The Fourth Report found that 53% of the children included in the case record review who were identified as aggressors had an incident that occurred only prior to entering care. *Id.*

**Figure 10: Timing of Sexual Aggression for PMC Children
with Confirmed Sexual Aggression**

Source: IMPACT Sexual History Case Review Data
n=243



- Aggression prior to entering care only
- Aggression after entering care only
- Aggression prior to and after entering care

PMC children who had an indicator for sexual aggression due to an incident occurring after entering foster care had been in care longer than the children who had an indicator due only to an incident that occurred prior to entering foster care. PMC children whose sexual histories recorded an aggression incident occurring after the child entered care had been in foster care for an average of 57.5 months, compared to 33.4 months for PMC children with aggression incidences occurring only prior to entering foster care.

Almost half (55 of 121 or 45%) of the children who had an indicator due to an incident that occurred after the child had entered care had engaged in two or more incidents[84] of sexual aggression while in care.

---

[84] The number of incidents is based on those documented in the child's Attachment A and IMPACT Sexual Incident History page. If the narrative clearly described multiple incidents of sexual aggression, each incident was counted. If details were lacking in the incident was only counted once, even if the narrative appeared to be describing multiple incidents or incidents that occurred over time.

Figure 11: Number of Sexual Aggression Incidents While in Care, PMC Children with Confirmed Sexual Aggression in Care



Source: IMPACT Sexual History Case Review Data
n = 121

Incidents of sexual aggression that occurred in foster care most often occurred in a foster home. The 121 PMC children who had an indicator for sexual aggression due to one or more incidents occurring after the child entered foster care had engaged in 233 incidents of sexual aggression. The 55 PMC children whose IMPACT records documented multiple incidents of sexual aggression had engaged in 167 incidents of aggression as of the date of the case record review.

Figure 12: Location of Sexual Aggression While in Care Incidents, PMC Children with Confirmed Sexual Aggression in Care



For nearly three-quarters (90 of 121 or 74%) of the children who had incidents of sexual aggression that occurred in foster care, the victim of the child's aggression was another foster child.[85] The monitoring team reviewed the victim's IMPACT Sexual Incident History page in the 137 cases in which the victim could be identified from the information included in the IMPACT records for the child aggressor. Of those 137 children, the information included on their IMPACT Sexual Incident History page was consistent with the information found on the aggressor's Sexual Incident History page in 83% (114) of cases.

---

[85] The narrative in the PMC child's Sexual Incident History page included identifying information for the victim in 137 of 147 incidents.

**Figure 13: Sexual Aggression Incident Documented in DFPS Child Victim's Sexual Incident History**



Source: IMPACT Sexual History Case Review Data
n = 137

Almost half (120 of 243 or 49%) of the PMC children included in the sample with an indicator for sexual aggression also had a confirmed or unconfirmed history of sexual abuse.

**Figure 14: Sexual Abuse History of Children Sampled as Sexual Aggressors**



Source: IMPACT Sexual History Case Review Data
n=243

Of the 56 children who had an indicator for sexual aggression and a confirmed history of sexual abuse, the abuse occurred before the child entered foster care for most (44 or 79%).

Figure 15: Timing of Abuse for Children with Confirmed Abuse Sampled as Sexual Aggressors



Source: IMPACT Sexual History Case Review Data
n=56

The 12 PMC children with an indicator for aggression who suffered sexual abuse after entering care experienced 21 incidents of sexual abuse in foster care, most of which (13 of 21 or 62%) occurred while the child was on runaway from placement. There were 36 perpetrators associated with the 21 incidents of sexual abuse; seven of the aggressors (19%) were other foster children.

Of 140 PMC children[86] included in the case read sample (both victims and children flagged as aggressors) who had suffered sexual abuse after entering foster care, 39% (54) had survived one or more sex trafficking incidents after entering care. Most children who were victims of sex trafficking after entering foster care had survived two or more incidents of trafficking. The 54 PMC children included in the case read who had survived sex trafficking had suffered 115 incidents of trafficking involving 266 perpetrators.

All but two of the trafficking incidents occurred while the PMC children were on runaway status. In the other two incidents, one child was trafficked by a caregiver at an RTC where she had been placed,[87] and the other child was trafficked by her sister's "boyfriend" while living in an unauthorized placement with her sister.

---

[86] Children that suffered from abuse while in foster care include 128 children sampled as sexual abuse victims only and eight children sampled as sexual aggressors only and four children sampled both a victim and as an aggressor.

[87] This child was also flagged as a victim of sexual abuse, due to abuse perpetrated by her paternal grandmother prior to entering care. The trafficking incident is included on the trafficking detail page in the child's IMPACT record. The perpetrators are listed as former Unity RTC staff and the narrative states

## Remedial Orders 23, 24, 28, and 30 Summary

In the case record review of a random sample of 786 PMC children who had a sexual characteristic indicator documented in their IMPACT records in 2022, 24% of children identified as victims of sexual abuse suffered abuse that occurred after the child entered care. Of that 24%, 16% suffered sexual abuse only after entering foster care; the remaining 8% were sexually abused both before and after entering foster care. Approximately one-third of children (45 of 132 or 34%) who were victimized after entering care experience two or more incidents of sexual abuse while in foster care.

Of the 132 PMC children included in the case read sample who suffered sexual abuse after entering foster care, 51 (39%) were sexually abused by another foster child. When DFPS determined that a foster child sexually abused another child in care, the incident was not consistently documented on the Sexual Incident History page for the foster child who was the aggressor.

Of children flagged for sexual abuse after entering foster care, 39% survived one or more sex trafficking incidents after entering care. Almost all these incidents occurred while the child was on runaway status.

## Remedial Orders 25, 26, 27, 29 & 31: Caregiver Notification

**Remedial Order 25:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order 26:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application.*

**Remedial Order 27:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order 29:** *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form and common application.*

**Remedial Order 31:** *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

---

that law enforcement discovered that the child appeared to be "connected to a human trafficking ring involving two other CPS youth and a male perpetrator in a possible criminal case."

## Background

After the Court held the State in contempt due, in part, to its failure to comply with Remedial Orders 25, 26, 27, 29, and 31, the State made several changes to its process for notifying caregivers of a child's history of sexual abuse or indicator for sexual aggression.[88] The changes clarified the definition of a "caregiver" and defined "apprised" so that, going forward, DFPS required notification to individual foster parents, and in GROs, the administrator, receiving intake staff, and child's case manager.[89] Through contract enforcement, DFPS is obligated to monitor contractual requirements and agency expectations that the information will be shared by GRO staff with all of a child's caregivers.[90] DFPS also changed its policy to require notification to caregivers in juvenile justice and hospital settings.[91]

The monitoring team conducted three case record reviews to validate the State's compliance with the remedial orders related to caregiver notification.[92] The monitoring team also collected information related to caregiver notification through record reviews and interviews during 13 site visits to congregate care facilities in 2022.[93] All of these visits were to facilities in Texas.

## Performance Validation

### Case Record Reviews

The monitoring team analyzed 242 placements to assess the documentation of the child's sexual victimization history or history of sexual aggression on the Common Application.[94] The monitoring team found a Common Application in IMPACT for all but one of the placements reviewed.[95] Of the 241 placements for which a Common

---

[88] Deborah Fowler & Kevin Ryan, Second Report, 205 – 219 ECF No. 1079.

[89] *Id.* at 214.

[90] *Id.*

[91] *Id.*

[92] The Monitors' case reads sampled placement data for three months in 2022: July, September, and December. The Monitors randomly selected 358 unique placements (with a confidence interval of 95%), involving 284 children (some children started more than one new placement during the months reviewed). Of the 358 placements, 76 involved a child who had an indicator for sexual aggression, and 282 involved a child who had an indicator for sexual abuse. Of the 76 placements involving a child who had an indicator for sexual aggression, 45 were made to a congregate care facility, 16 were made to a kinship or adoptive home, and 15 were made to a juvenile justice facility or hospital. Of the 282 placements involving a child flagged as a victim of sexual abuse, 197 of the placements were made to a congregate care facility, 46 were made to a kinship or adoptive home, and 39 were made to a juvenile justice facility or hospital.

[93] These site visits, as well as a visit made to Promise House in December 2021, were discussed more fully in the Monitors' Update to the Court Regarding Site Visits, ECF No. 1337.

[94] DFPS requires completion of a Common Application, Placement Summary, and Attachment A for foster care and congregate placements. It requires only a Placement Summary and Attachment A for kinship and adoptive placements and requires only an Attachment A for juvenile justice and hospital placements. The monitoring team reviewed IMPACT records to assess whether the required documentation for the placement under review included the child's history of sexual victimization or aggression. Of the 358 total placements included in the case read, only 242 required a Common Application to be completed.

[95] The Monitors have previously noted the limitations associated with validating caregiver notification for a specific placement with a Common Application. A single Common Application for a child may be

Application could be found, 90% of those involving a child identified as a victim of sexual abuse (177 of 196) and 91% of placements involving a child who had an indicator for sexual aggression (41 of 45) included all of the child's sexual history information.[96]



Figure 16: Completeness of Sexual History Information on the Common Application

These findings are consistent with the State's case record reviews for the third and fourth quarters of fiscal year 2022, and the first quarter of fiscal year 2023.[97]

---

updated over months and/or years and used for multiple placements. A copy of the Common Application provided to each placement is not uploaded to One Case, as is the Placement Summary and Attachment A. The form is stored in a child's IMPACT record and may be altered from one placement to the next. If more than one Common Application was found, the monitoring team reviewed the Common Application with the most proximate date to the placement under review. In 16 percent (7 of 45) of placements involving a child with a history of sexual aggression, and 23 percent (45 of 196) of placements involving a victim of sexual abuse, the reviewed Common Application had been updated more than 30 days after the placement in the sample started.

[96] Information was considered complete if it is consistent with the information found in the child's IMPACT Sexual Victimization and Sexual Aggression pages. Incidents of aggression or victimization that occurred after the sample placement were not considered.

[97] DFPS, Child Sexual History Case Review Results, Quarter 3 - Fiscal Year 2022 (on file with the Monitors)(Common Application contained all known history of sexual aggression in 90% (70 of 78) of cases reviewed, and all known information regarding history of sexual abuse in 96% (220 of 230) of cases reviewed); DFPS, Child Sexual History Case Review Results, Quarter 4 – Fiscal Year 2022 (on file with the Monitors)(Common Application contained all known history of sexual aggression in 87% (60 of 69) of cases reviewed, and all known information regarding history of sexual abuse in 92% (215 of 233) of all cases reviewed); DFPS, Child Sexual History Case Review Results, Quarter 1 – 2023 (on file with the Monitors)(Common Application included all known history of sexual aggression in 91% (59 of 65) of cases reviewed, and all known history of sexual victimization in 93% (225 of 243) of cases reviewed).

The monitoring team analyzed 304 placements to assess documentation of the child's history of sexual aggression or abuse in the corresponding Placement Summary and Attachment A, and signatures on the forms by the receiving caregivers at the time of placement.

Overall, the monitoring team found both an Attachment A and Placement Summary for 90% (55 of 61) of the placements involving a child who had a history of sexual aggression, and 93% (227 of 243) of placements involving a child who had a history of sexual abuse. The rate of compliance improved over time.

Figure 17: Both Attachment A and Placement Summary Found
by Time Period



Results were similar across all placement types: the monitoring team found both a Placement Summary and Attachment A for 91% of placements in a foster home (72 of 79), 93% (152 of 163) of placements in a congregate setting, and 94% (58 of 62) of placements in an adoptive or kinship home.[98]

---

[98] Across all placement types, the monitoring team found an Attachment A more consistently than a Placement Summary for placements involving children flagged for a history of sexual aggression and those who had a history of sexual victimization. The Placement Summary and Attachment A are supposed to be discussed and signed by the receiving caregiver at the same time (*see* DFPS, CPS Handbook, Section 4133 Provide and Discuss the Placement Summary Form (requiring the caseworker to complete, discuss, and obtain caregiver signatures on the Placement Summary and Attachment A within 72 hours of placement). Attachment A was designed as an attachment to the Placement Summary.

The monitoring team did not always find that the Placement Summary and Attachment A included the child's complete history, or that the documents were signed by the caregiver at the time of placement. Overall, just more than half of the placements reviewed by the monitoring team had a Placement Summary and Attachment A that were signed by a caregiver on or before the child's placement and that included all the child's known sexual history. Results were worse for placements involving a child who had a history of sexual abuse.[99]

---

[99] The monitoring team found an Attachment A that was signed and included a child's complete history of sexual victimization more often than it found a signed Placement Summary with the child's complete history. The opposite was true for placements involving a child who was flagged with an indicator for sexual aggression.

In the case record review of placements for children flagged with an indicator for sexual aggression, the monitoring team found a signed Placement Summary that included the child's complete history in 72% (44 of 61) of cases reviewed, compared to 70% (43 of 61) for Attachment A. In its review of placements of children flagged with an indicator for sexual victimization, the monitoring team found a signed Placement Summary that included the child's complete history of sexual victimization in 57% (138 of 243) of placements reviewed, compared to 78% (190 of 243) for Attachment A.

Figure 18: Percent of Records with Placement Summary and Attachment A Forms
Found with Complete History and Caregiver Signature on or Before Placement Start

Source:  Case review data



Total sexual aggression sample — 61

Both Placement Summary and Attachment A — 55 (90%)

Both forms include complete sexual history information — 46 (75%)

Includes complete sexual history and signed by receiving caregiver — 45 (74%)

Includes complete history and signed on or before placement start — 36 (59%)

Total sexual abuse sample — 243

Both Placement Summary and Attachment A — 227 (93%)

Both forms include complete sexual history information — 161 (66%)

Includes complete sexual history and signed by receiving caregiver — 159 (65%)

Includes complete history and signed on or before placement start — 120 (49%)

Though the case read showed ongoing problems related to compliance, the State's performance improved between July 1, 2022, and December 31, 2022. The monitoring team's review of all July 2022 placements (for children who had an indicator for sexual aggression and children who had an indicator for sexual abuse) found that both forms included the child's complete history and were signed on or before the child's placement in 47% (53 of 113) of placements reviewed; the rate improved to 54% (47 of 87) for December 2022 placements.

The monitoring team's review also documented improvements over the 2021 results reported in the Monitors' Fourth Report. In the Fourth Report, the Monitors reported that both forms included a child's complete sexual history and were signed by the receiving caregiver on or before the placement start date in 45% (73 of 163) of placements involving a child who had an indicator for aggression, and 41% (204 of 493) of placements involving a child identified as a victim of sexual abuse.[100]

**Figure 19: Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature on or Before Placement Start in 2021 and 2022**



A comparison between SSCC and DFPS placements showed that SSCCs had a higher compliance rate for placements involving children who had an indicator for sexual aggression, but a lower compliance rate for placements involving children who were identified as victims of sexual abuse.

---

[100] Deborah Fowler & Kevin Ryan, Fourth Report, 51 ECF No. 1248.

Figure 20: Records with Placement Summary and Attachment A Forms with Complete History and Caregiver Signature on or Before Placement Start by Placement Entity



IMPACT includes a field that requires the child's CVS caseworker to record the date that the caregiver provided the child's Attachment A before the placement information can be saved. During the case reads, the monitoring team compared the date the child's CVS caseworker entered in IMPACT as the date that the child's Attachment A was signed to the date recorded on the Attachment A itself. The date entered in IMPACT matched the date recorded on the Attachment A in most of the placements reviewed. However, the Attachment A was signed after the date entered in IMPACT in 21% (12 of 57) of the placements involving a child who had a history of sexual aggression, and in 12% (28 of 232) of the placements involving a child who had a history of sexual abuse.

Figure 21: Timing from Date Caregiver Signed Attachment A to Date Caseworker
Indicated Caregiver Signed in IMPACT



Of the placements that the monitoring team reviewed that involved the child's entry into
a juvenile justice or hospital setting, the monitoring team found a signed Attachment A
that included a child's complete history of aggression or victimization in less than half.

Figure 22: Records with Attachment A Found, Signed, and Includes
Complete History for Hospital and Juvenile Justice Placements



The child's caseworker documented the receiving caregiver's refusal to sign the Attachment A in only one case involving a juvenile justice facility, and in three cases involving a hospital placement.

Differences between the Monitors' case record reviews and the State's quarterly case record reviews make it difficult to compare outcomes between the two.[101] The State's case reads in the third and fourth quarter of 2022 and the first quarter of 2023 showed that reviewers were able to find both a Placement Summary and Attachment A signed by the receiving caregiver in most placements reviewed.[102]

### Information Collected During Site Visits

During each of the 13 site visits made in 2022, the monitoring team reviewed site records for all PMC children, reviewed a random sample of records for staff, and interviewed children and staff. The record reviews and interviews included a review of information related to a child's status as flagged with a sexual characteristic indicator. The monitoring team reviewed a total of 152 children's records, and 244 staff records. The monitoring team interviewed 115 children and 200 staff members. The monitoring team interviewed the following staff members:

- 118 direct care staff
- 40 treatment staff
- 21 program administrators
- 12 case managers
- Four mental health technicians
- Two daytime supervisors
- One crisis/trauma team member
- One program staff
- One activities coordinator

---

[101] For example, in addition to reviewing adoptive, kinship, foster home, GRO, juvenile justice and hospital placements, the State's case read samples include unauthorized placements.

[102] For placements involving a child flagged with an indicator for sexual aggression, a signed Placement Summary was found in 72% (78 of 109) of placements in the third quarter of fiscal year (FY) 2022, 79% (87 of 110) of placements reviewed in the fourth quarter of FY 2022, and 75% (70 of 93) of placements reviewed in the first quarter of FY 2023. A signed Attachment A was found in 71% (77 of 109) of placements reviewed in the third quarter of FY 2022, 80% (88 of 110) of placements reviewed in the fourth quarter of FY 2022, and 76% (71 of 93) of placements reviewed in the first quarter of FY 2023.

For placements involving a child flagged with an indicator for sexual victimization, a signed Placement Summary was found in 72% (250 of 345) of placements reviewed in the third quarter of FY 2022, 77% (278 of 359) of placements reviewed in the fourth quarter of FY 2022, and 74% (248 of 337) of placements reviewed in the first quarter of FY 2023. A signed Attachment A was found in 77% (267 of 345) of placements reviewed in the third quarter of FY 2022, 80% (287 of 359) of placements reviewed in the fourth quarter of FY 2022, and 78% (264 of 337) of placements reviewed in the first quarter of FY 2023.

Table 16: Site Visit Data Collection, January to December, 2022

| Location | Child Records Reviewed | Staff Records Reviewed | Staff Interviewed | Treatment and Admin Interviewed |
|---|---|---|---|---|
| ACH Child and Family Services RTC | 10 | 23 | 14 | 8 |
| Camp Worth | 10 | 11 | 9 | 6 |
| Dallas Behavioral Health | 5 | 13 | 9 | 1 |
| DePelchin Children's Center | 9 | 20 | 11 | 2 |
| Gold Star Academy | 9 | 16 | 12 | 4 |
| Guiding Light RTC | 25 | 11 | 12 | 5 |
| Helping Hand Home for Children | 19 | 69 | 17 | 4 |
| Moving Forward RTC | 4 | 10 | 9 | 7 |
| Open Arms Open Heart RTC | 9 | 12 | 8 | 5 |
| Paloma Place | 12 | 16 | 7 | 3 |
| Roy Maas Youth Alternative | 27 | 22 | 17 | 8 |
| Silver Lining RTC | 9 | 12 | 8 | 3 |
| Whispering Hills RTC | 4 | 9 | 6 | 5 |
| Total | 152 | 244 | 139 | 61 |

Whispering Hills RTC was the only site visited not housing a child flagged with an indicator for sexual aggression or victimization at the time of the site visit. All other sites were housing at least one child flagged with a sexual characteristic at the time of the visit.

Almost all the children's site records included a Common Application, Attachment A, and Placement Summary. Ninety-four percent of the Placement Summary forms (120 of 128) and 99% of the Attachment A forms in child files (141 of 143) had been signed by either a placement administrator, receiving intake staff, case manager, or receiving caregiver. A placement administrator's signature was included in 48% of signed Placement Summary forms (57 of 120) and in more than two-thirds of signed Attachment A forms (96 of 141, 68%).[103] The monitoring team found a signed Placement Summary and Attachment A in just over three-quarters of all the children's records (117 of 152, 77%).

---

[103] DFPS policy requires a child's CVS caseworker to obtain the signature of the program administrator, receiving intake staff (if applicable), and the child's case manager on the Placement Summary and Attachment A when the child is placed. DFPS, CPS Handbook, Section 4133 Provide and Discuss the Placement Summary (Form 2279).

Figure 23: Forms Found and Signed in Children's Site Records, 2022

Source: Monitoring team site visit data, Child File Review
n=152



Multiple staff signatures were found in more than half of signed Placement Summary forms (62 of 120 or 52%) and more than two-thirds of signed Attachment A forms (97 of 141 or 69%).

Of the 152 children whose files were reviewed, 38 (25%) were flagged with an indicator for sexual abuse and 11 (7%) with an indicator for sexual aggression.[104] Of these children, the following documents were missing from site records:

- A Common Application was missing for six children (6 of 38, 16%) with an indicator for sexual abuse, and one child (1 of 11, 9%) with an indicator for sexual aggression;
- A Placement Summary was missing for seven children (7 of 38, 18%) with an indicator for sexual abuse, and one child (1 of 11, 9%) with an indicator for sexual aggression;
- An Attachment A was missing for two children (2 of 38, 5%) with an indicator for sexual abuse.

The monitoring team reviewed the sexual history information contained in the Common Application, Placement Summary, and Attachment A forms found in the children's site records to determine whether the information in the forms was consistent with the sexual characteristic indicators found in PMC placement data at the time of the site visit. The monitoring team found:

---

[104] Four children had both sexual abuse and sexual aggression indicators and are counted in both categories.

- Consistent information in a Common Application in the site records for 74% (28 of 38) of children with an indicator for sexual abuse and for 73% (8 of 11) of children with an indicator for sexual aggression.
- Consistent information in the Placement Summary in site records for 55% (21 of 38) of children with an indicator for sexual abuse and for 64% (7 of 11) of children with an indicator for sexual aggression.
- Consistent information in the Attachment A in site records for 87% (33 of 38) of children with an indicator for sexual abuse and for 91% (10 of 11) of children with an indicator for sexual aggression.

The monitoring team also reviewed the records for children who did not have an indicator for sexual aggression or victimization at the time of the visit to determine whether the records included information showing the child should have had a sexual characteristic indicator. The monitoring team found information in 14 of 152 children's site records (9%) that indicated the child was a confirmed victim of sexual abuse though the child did not have an indicator for sexual abuse at the time of the visit. The monitoring team did not find information in any of the children's site records that indicated that a child who did not have an indicator for sexual aggression should have had an indicator.

During interviews, some program administrators reported that they did not always receive an Attachment A. This reporting is consistent with the monitoring team's finding that not all children's site records included a Placement Summary and Attachment A signed by the administrator. Most program administrators interviewed (16 of 21, 76%) said they always receive an Attachment A when a child with an indicator for sexual aggression or victimization is placed in their operation.[105] Three (14%) program administrators said they sometimes receive an Attachment A, one (5%) reported that they do not receive it, and one (5%) did not know if they receive an Attachment A. Nearly all program administrators reported that they sign the Attachment A once they receive it (18 of 19, 95%).

While more than three-quarters of program administrators reported receiving information on a child's sexual abuse or aggression history through the Attachment A (76% or 16 of 21) and/or the Common Application, and 57% (12 of 21) reported receiving both, only 10 of 21 program administrators (47%) reported feeling they always receive proper notice of a child's sexual history prior to or upon a child's placement. Another 43% (9 of 21) reported they sometimes receive proper notice and 10% (2 of 21) reported they do not receive proper notice of a child's sexual history prior to or at operation entry.

---

[105] More than one administrator may have been interviewed on site.



Figure 24: Program Administrators Reporting They Receive Proper Notice of Children with Sexual Characteristics Prior to or at Entry

Source: Monitoring team site visit data, Program Administrator Interview
n=21



Almost all program administrators (19 of 21 or 90%) reported they always communicate a child's history to staff when they receive information that a child at the operation is a victim of sexual abuse or is sexually aggressive, while one (5%) reported they sometimes communicate this information and one of 21 (5%) did not know if the information was communicated. However, only 52% (61 of 117)[106] of the direct-care staff interviewed by the monitoring team reported that they are always asked to sign the Attachment A. Six (5%) reported they are sometimes asked to sign an Attachment A for children with a sexual history (abuse or aggression). Fifty of 117 direct care staff (43%) reported they are not asked to sign the Attachment A for children with a history of sexual aggression or sexual abuse.

[106] One direct care staff member who was interviewed did not answer the question.



**Figure 25: Direct Care Staff Asked to Sign
Attachment A for Children with Sexual History**

Source: Monitoring team site visit data, Caregiver
Interview
n = 117

When the monitoring team asked staff what documents are provided to them when they are supervising a child for the first time, 16 of 117 direct staff (14%) reported that they receive the Common Application, 40 of 117 (34%) reported that they receive the Attachment A, and 11 of 117 (9%) reported that they receive the Placement Summary. Of the 67 direct care staff who reported that they were "always" or "sometimes" asked to sign the Attachment A, only 33 (49%) reported receiving an Attachment A when they were supervising a child for the first time.[107]

**Figure 26: Documents Direct Care Staff Report Receiving When
Supervising a Child for the First Time**



---

[107] In the interview tool, the question related to which documents the caregiver receives when supervising a child for the first time precedes the question asking whether the caregiver is asked to sign the Attachment A form.

Though direct care staff did not consistently report receiving the Attachment A, they did report being informed of a child's history of aggression or victimization at higher rates. Eighty-nine of 117 direct care staff (76%) reported they are always informed if a child they supervise is a victim of sexual abuse or is sexually aggressive. Another 11 of 117 staff (9%) reported they are sometimes informed if a child they supervise is a victim of sexual abuse and 13 of 117 direct staff (11%) reported that they are sometimes informed if a child they supervise is sexually aggressive. Seventeen of 117 direct care staff (15%) reported they are not informed if a child they supervise is a victim of sexual abuse and 15 of 117 direct care staff (13%) reported not being informed if a child is sexually aggressive.



**Figure 27: Direct Care Staff Informed if a Child They Supervise is a Victim of Sexual Abuse or is Sexually Aggressive**

Source: Monitoring team site visit data, Caregiver Interview
n = 117

Legend: ■ Yes, always   ■ Yes, sometimes   ■ No

Victim of sexual abuse: 89 (76%); 11 (9%); 17 (15%)
Sexually aggressive: 89 (76%); 13 (11%); 15 (13%)

Many direct care staff reported that they received only verbal information about a child's history. Forty-four percent of direct care staff who reported they are informed if a child they supervise is a victim of sexual abuse or is sexually aggressive (45 of 102) reported they are informed of this fact by receiving or seeing a copy of the child's Attachment A while 53% (54 of 102) reported being informed verbally. Twelve percent of direct care staff (12 of 102) reported they are only informed through written communication (in the form of e-mail) if a child they supervise is a victim of sexual abuse or is sexually aggressive.

Some of the direct caregivers' responses to interview questions were inconsistent. For example, of the 45 staff who reported being informed of sexual abuse or aggression by receiving a copy of the child's Attachment A, 15 (33%) also reported they do not receive the Attachment A when supervising a child for the first time. And of the 60 direct care staff who reported that at the time of the interview, they supervised a child who had a history of sexual aggression or sexual abuse, 35% (21 of 60) were not able to identify the child.

## Summary: Remedial Orders 25, 26, 27, 29, and 31

The monitoring team located Common Applications for all but one of the placements reviewed. Of the placements for which a Common Application was located, 90% identified a child as a victim of sexual abuse. In 91% of placements involving a child who had an indicator for sexual aggression the child's sexual history information was included. However, the Monitor's case record review found that a child's Placement Summary and Attachment A did not always include the child's complete history of sexual abuse or aggression, or the caregiver's signature at the time of placement. Overall, just more than half of the placements reviewed by the monitoring team had a Placement Summary and Attachment A that were signed by a caregiver on or before the child's placement and that included all the child's known sexual history.

During each of the 13 site visits, the monitoring team reviewed children's records for a Common Application, Attachment A, and Placement Summary. Almost all the records reviewed included a Common Application, Attachment A, and Placement Summary. However, these documents were missing from records for some of the children who were flagged with an indicator for sexual abuse or sexual aggression. A Common Application was missing for six of the 38 children (16%) who had an indicator for sexual abuse and one of the 11 (9%) children who had an indicator for aggression. A Placement Summary was missing for seven children (7 of 38 or 18%) who had an indicator for sexual abuse, and one child (1 of 11 or 9%) who had an indicator for sexual aggression. An Attachment A was missing for two children (2 of 38 or 5%) who had an indicator for sexual abuse. When the documents were found, information was not always consistent with the sexual characteristic indicators found in the PMC placement data at the time of the site visit.

Some program administrators who were interviewed reported that they did not always receive an Attachment A. Seventy-six percent (16 of 21) of program administrators said they always received an Attachment A when a child with an indicator for sexual aggression or victimization is placed in their operation. However, only 52% (61 of 117) of the direct-care staff interviewed reported that they are always asked to sign an Attachment A.

## Remedial Orders A7 and A8: Awake-Night Supervision

Remedial Order A7: *The Defendants shall immediately cease placing PMC children in placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

Remedial Order A8: *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the*

*operation of placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.*

## Background

Based on data provided by DFPS,[108] 275 unique placements required awake-night supervision in at least one month during 2022. Of the 275 placements, 263 (96%) were GROs and 12 (4%) were foster homes. Forty placements (15%) were located outside of Texas.

Table 17: Number of Operation Locations Requiring Awake-Night Supervision, January 1 to December 31, 2022

Source: DFPS, RO A7 List of Operations with More Than Six Children

| Month | Operation Locations Requiring Awake-Night Supervision |
|---|---|
| January | 220 |
| February | 232 |
| March | 222 |
| April | 222 |
| May | 218 |
| June | 214 |
| July | 207 |
| August | 210 |
| September | 213 |
| October | 207 |
| November | 208 |
| December | 204 |

The Monitors validated the State's compliance with these remedial orders through three methods: (1) reviewing the awake-night certifications completed by DFPS staff during unannounced visits to operations;[109] (2) reviewing data sources used to report

[108] Each month, DFPS provides the Monitors with a list of GROs, and foster homes flagged as eligible for awake-night supervision. The monitoring team compiled the lists of eligible locations for each month of 2022.
[109] Awake-night certification documents are provided to the Monitors monthly. The monitoring team reviewed the certification documents and entered information into an Excel spreadsheet, capturing the number of times a location was visited in the month and the details of the visits.

75

noncompliance with awake-night supervision requirements, including violations that were self-reported by placements themselves, violations identified during DFPS's unannounced visits, and deficiencies cited by HHSC for violation of awake-night requirements; and (3) unannounced visits to operations requiring awake-night supervision. These visits and the problems discovered by the monitoring team related to nighttime supervision are discussed in a report filed by the Monitors on March 27, 2023.[110]

### Performance Validation

The Monitors reviewed 2,672 awake-night certifications completed during an unannounced visit by DFPS staff from January 2022 through December 2022, and found DFPS made overnight, unannounced visits to almost all operations requiring awake-night supervision each month.[111]

Figure 28: Number of Operation Locations Requiring Awake-Night Supervision Visited, January 1 to December 31, 2022

Source: DFPS, RO A7 List of Operations with More than Six Children and Awake Night Verification Documents



The Monitors also found that 84% of operations that were eligible in more than one month were visited in each month that they were eligible.

---

[110] Deborah Fowler & Kevin Ryan, Update to the Court Regarding Site Visits, ECF 1337.
[111] DFPS also made visits each month to a small number of operations that did not require awake-night supervision at the time of the visit, because there were not PMC children placed at the operation on the date of the visit.



Figure 29: Months with Visits to Operation Locations When Required, January 1 to December 31, 2022

Some placements received more than one awake-night visit from DFPS in a single month: 31 placements received two visits in a single month, and four received three or more visits in a single month. DFPS may make multiple visits during a single month if there are no PMC children housed at the location at the time of an unannounced visit, or if DFPS staff have difficulty gaining access to the location during an unannounced visit. Only three of the 35 placements with multiple visits were visited more than once in a single month because DFPS staff were unable to gain access to the placement when it was first visited, or otherwise could not certify awake-night supervision. DFPS staff certified awake-night supervision for these three locations later in the same month.

Figure 30: Awake-Night Certification Visits, January 1 to
December 31, 2022

Source: DFPS, Awake Night Verification Documents

2,672 DFPS awake-night monitoring visits in 2022

2,632 monthly visits to locations
 (one visit per location per month)

| 2,628 monthly visits completed | 4 monthly visits not completed* |
|---|---|

| 2,625 No issues documented – awake night supervision was certified by DFPS. | 3 Narrative indicated an issue with staff appearing asleep or were otherwise not present, but ultimately supervision was certified by |
|---|---|

*In four locations visited, there were no children in placement at the

DFPS certified awake-night supervision for every operation visited. DFPS found that operation staff appeared to be asleep, were asleep upon arrival, or were otherwise not present during only three unannounced visits. This finding of near total compliance with awake-night supervision conflicts with the monitoring team's findings related to awake-night visits.[112]

Of the three unannounced visits where DFPS identified an issue related to awake-night supervision, DFPS made two visits to the same operation (Central Texas Children's Home); however, fewer than six children lived in this placement at the time of each visit. The third visit revealed a more problematic incident. DFPS conducted an unannounced awake-night visit to Garden of Hope of Central Texas on June 3, 2022. The awake-night

---

[112] *See* Deborah Fowler & Kevin Ryan, Update to the Court Regarding Site Visits, ECF No. 1337 (the monitoring team found staff sleeping, or suspected staff were sleeping, at 4 of 33 (12%) site visits between December 1, 2021, and December 31, 2022).

certification form for the visit indicates that on the night of the visit, the operation housed 32 children, four of whom were in PMC. The form notes that there are five cabins at the operation, and that bed logs were "viewed and verified" at four out of the five cabins. The entry form for the fifth cabin provides these notes:

> Frio cabin has 4 children with one awake staff. Bed checks are being conducted every 30 minutes. Bed log was viewed and noticed the log was not up to date. The last log was at 12:30 AM. The time of the visit was 2:10 AM. The employee [name omitted] was observed to be asleep. I and lead supervisor [name omitted] knocked and noticed the cabin lights were turned off. A minute passed, and [the staff person] opened the door. [The staff person] was asked if she was asleep and she stated "No, my head hurts." She had a folded blanket placed on the table and a chair were [she] sits. I asked [the staff person] about the logs and she stated she forgot to document. [The supervisor] quickly stepped outside and called for another caregiver to come replace [the staff person]. [The supervisor] also called the director and decided to send [the staff person] home. Employee [name omitted] replaced [the staff person]. [The supervisor] stated that [the staff person] will be written up and given a letter of warning.

Despite finding the awake-night staff person asleep and the bed check log incomplete, the DFPS staff person who conducted the visit checked the "Yes" next to the sentence "All PMC children in placement are provided with 24-hour awake-night supervision," and signed the form.[113] DFPS made a second awake-night visit to the facility six days later, on June 9, 2022, and did not document any problems and again certified the operation as compliant with awake-night requirements.

The DFPS staff person who discovered the sleeping awake-night staff on June 3, 2022, reported the incident to SWI, and DFPS opened an investigation. During her interview with the DFPS investigator, the staff person acknowledged having fallen asleep for 55 minutes. However, since there were no injuries associated with the staff person's lapse in supervision, Neglectful Supervision was Ruled Out.[114]

Problems with nighttime supervision at Garden of Hope were more recently reviewed as part of an investigation into a foster child's fatality at the facility. On November 7, 2022, a two-year-old TMC child[115] was found dead in his bed by a staff person who conducted a 7:00 a.m. bed check. When the paramedics arrived, they observed that rigor mortis had already set in, indicating the child may been dead for several hours. Video obtained by DFPS showed that the awake-night staff failed to conduct 30-minute room checks

---

[113] While the DFPS staff person certified compliance on the form, a report was made to SWI and the incident was reported to the Monitors in the quarterly reports discussed, *infra*.

[114] DFPS found, "Although, there are concerns for [the staff person] sleeping while on duty, there were no injuries or incidents that occurred while she was asleep. Therefore, the allegations of Neglectful Supervision of [the four children she was supervising] are ruled out."

[115] The child re-entered foster care and was placed at Garden of Hope on September 23, 2022. The child first entered foster care in 2020 after his mother tested positive for THC at the hospital when the child was born. He was returned to his mother's care five months later after his mother complied with services required by DFPS.

and that staff did not check on the infant for approximately three hours. An autopsy found that the child tested positive for RSV, Parainfluenza 3, and COVID-19 and died from "multiple respiratory viral infections complicated by acute bronchopneumonia." The investigation into the child's death resulted in UTD findings for the two awake-night staff because DFPS determined that it was "unknown if [the child's] death could have been prevented if he was being checked on every 30 minutes," and "unknown if medical care could have prevented his death" and "unknown if [the child] died during [the three hours that staff did not check on him] or before." HHSC issued two citations, one for violation of a minimum standard (748.685(a)(4)) associated with caregiver responsibility, based on the video footage that confirmed staff did not complete 30-minute bed checks, and a second for violation of operational responsibilities because HHSC found that staff falsified documentation by pre-filling the night-time bed check logs.[116]

In addition to sending the Monitors awake-night certifications, DFPS also submits quarterly reports to the Monitors that include information regarding violations that operations self-report to DFPS and those identified by DFPS staff, and any corrective actions taken related to the violations. According to these quarterly reports, self-reports and DFPS-identified instances of noncompliance declined by nearly 50% in 2022.

Figure 31: Reports of Noncompliance with 24-Hour Awake-Night Supervision Requirements, January to November 2021 and 2022



---

[116] The log found in One Case shows that staff had completely prefilled the logs, which included an "S" for "sleeping" or an "A" for "awake" under the name of each of the children housed in the cabin and next to the time that staff should have been checking on the children. In fact, on the morning of the date that the child died, the prefilled log shows "A" from 6:00 a.m. to 8:00 a.m. under the child's name.

All the incidents included in the quarterly reports that were identified by DFPS staff were consistent with the awake-night certification forms submitted to the Monitors, except for the form submitted for Garden of Hope.

Of the 11 incidents included in the quarterly reports submitted to the Monitors, only four were subsequently reported to SWI, despite DFPS's instructions to its staff to report all incidents of noncompliance to SWI.[117] Three of the incidents of noncompliance resulted only in an unannounced awake-night visit, without any other action being taken.

Figure 32: Actions Taken Due to Noncompliance with Requirements of 24-Hour Awake-Night Supervision, January to November 2022

Source: DFPS Noncompliance Reports
n = 12



Twelve actions were taken in the 11 incidents of self-reported and RCCR identified noncompliance with awake-night requirements. The 11 incidents included in the quarterly reports were as follows:

Kensley Care LLC

On March 16, 2022, a DFPS awake-night monitor was not able to gain access to the operation during an unannounced visit. A follow-up visit was made on March 22, 2022, at 11:00 p.m. and the facility was determined to comply with awake-night requirements.

Ray of Hope Center for Children

The quarterly report submitted to the Monitors (which is submitted in an Excel spreadsheet) recorded that on March 23, 2022, an unannounced visit resulted in an "infraction" recorded by the DFPS contract monitoring staff. The "description of the

---

[117] *See* Deborah Fowler & Kevin Ryan, Second Report, 239 ECF No. 1079.

issue" on the spreadsheet stated, "failure to provide supervision." The corrective action information included in the spreadsheet documented, "A follow-up visit was made on March 29, 2022, at 1:12 a.m., the facility was compliant."

The certification of awake night supervision form submitted to the Monitors by DFPS for March 23, 2022, documents the total child population on the date of the visit as "5." However, the Monitors review of a CLASS inspection conducted on the same date shows there were seven children in the operation's care. The narrative description on the certification form states:

> Ray of Hope Center for Children has three awake night staff providing awake night supervision for 5 children.
>
> [Staff 1] and [Staff 2] were awake, and [Staff 3] was sleep [sic] on the couch. [Staff 2] wake [sic] [Staff 3] up, when I walked in the room. [Staff 3] stated he had a long week. [Staff 3] stated he was aware that he is supposed to be awake his whole shift.

The Monitors included this "infraction" based on the information provided by the State. It is not clear that this represents a violation of the operation's awake-night obligations. The monitoring team attempted to verify whether any of the PMC children who were placed in the facility on the date of the visit were subject to heightened supervision that would have necessitated more than one awake-night staff, but could not find a service plan in IMPACT for two of the children listed on the certification form.

Though a service plan could not be located, one of the four children listed in the DFPS certification form had an indicator for sexual aggression, based on a 2018 substantiated finding of sexual abuse involving a sibling. The service plan for another child (who had a history of physical aggression), in effect on the data of the visit, required staff to provide "24 hour supervision" and "actively supervise" the child and "be aware of [his] location at all times." Another child's service plan required 1:1 supervision "as needed" for physical aggression.

Minola's Place of Texas

On May 10, 2022, a DFPS awake-night monitor was not able to gain access to the operation during an unannounced visit. A follow-up visit was made on May 19, 2022, at 3:00 a.m. and the facility was determined to comply with awake-night requirements.

Garden of Hope of Central Texas

June 3, 2022, incident, discussed above.

Paloma Place LLC

On June 24, 2022, a DFPS awake-night monitor had difficulty gaining access to the operation during an unannounced visit. Notes indicate that it took close to an hour to gain access. A follow-up visit was made June 28, 2022. Notes indicate the operation was already under a Corrective Action Plan at the time of the visit, and that staff was "monitoring the facility to ensure the CAP is being followed."

### Boys & Girls Country of Houston, Inc.

On January 25, 2022, the operation self-reported that, "There was a miscommunication about a change in the overnight monitors' schedule and because of the miscommunication there was not an awake staff monitor in the cottage where the one CPS youth [sic] we have in care lives. (The houseparent couple were on duty and present in the cottage, but it is the responsibility of the awake staff monitor to be on duty during the sleeping hours.) Overnight monitors are now required to send a text to their supervisor and Director of Residential each night when they arrive at the cottage noting they have arrived and the time." DFPS followed up by making an unannounced visit on January 28, 2022, and the operation was found to comply.

### A Pathway to New Beginnings LLC

On March 14, 2022, the operation self-reported that "Staff fell asleep and a resident inappropriately touched her." DFPS conducted follow-up unannounced visits on March 14, 2022, at 12:00 a.m. and March 18, 2022, at 2:01 a.m. and found the operation in compliance. Law enforcement and operation staff each reported this incident to SWI (the two intakes were linked) because law enforcement was called when the staff person woke up and found the child touching her. DFPS opened an investigation and Ruled Out Neglectful Supervision, because though the staff person admitted to "dozing off" and waking up to find a resident inappropriately touching her under her clothing, residents and staff did not report having seen the staff person sleep on other occasions, the child who engaged in the behavior did not have a history of sexualized behaviors and was not on any type of hieghted supervision, and DFPS did not find any substantial harm was caused to any resident in the facility. HHSC did not issue any citations.

### Guiding Light RTC

On March 25, 2022, the operation self-reported, "an alleged report by a child that one staff 'closes his eyes' during shift." DFPS electronically reported the incident to SWI on April 1, 2022, and made an unannounced visit to the facility on March 31, 2022, at 12:00 a.m. DFPS issued a Corrective Action Plan to the facility. Neglectful Supervision was Ruled Out because the allegations, as reported, could not be substantiated (no staff person or child with the names reported working or living at the facility).

### New Horizons Ranch RTC

On March 29, 2022, the operation self-reported that a staff-person reported an awake-night staff sleeping. The staff had taken photos of the sleeping staff person. DFPS reported the incident to SWI on April 8, 2022, and it is discussed below.

## Bluebonnet Haven LLC

On February 28, 2022, the operation self-reported, "As our night supervisor was making her rounds, she noted that a night staff has fallen asleep. The night supervisor woke her up. The employee was written up for this and then quit." DFPS reported the incident to SWI on March 2, 2022, and it is discussed below.

## Kensley Care LLC

On April 24, 2022, the operation self-reported that "Staff admitted to dozing off during her shift which could have been directly related to the unauthorized absence of two clients." DFPS reported this incident to SWI on May 7, 2022, and it is discussed below.

The monitoring team also reviewed citations issued for violations of minimum standards associated with awake-night supervision. No minimum standard specifies that awake-night supervision is required. The monitoring team found citations issued in 2022 for violation of three minimum standards due to problems associated with awake-night supervision as follows:

- 748.685(a)(3) – Caregiver Responsibility – Being aware of and accountable for each child's on-going activity.
- 748.685(a)(4) – Caregiver Responsibility – Providing the level of supervision necessary to ensure each child's safety and well-being.
- 748.125(b) – All employees and caregivers must be aware of and follow your operation's policies and procedures.

A total of 29 citations were issued for violation of one of these minimum standards due to staff sleeping or a significant problem with awake-night supervision.

84

Figure 33: Deficiencies for Standards Reviewed by Monitors for Issues Related to Awake-Night Supervision, January to November 2022

Source: HHSC, Monthly deficiencies
n = 91



The 29 citations included the following citations associated with sleeping staff:

Bethel Residential Treatment Center (1718606), CLASS Inv. #2825379

On December 11, 2021, a staff person for the operation reported that a child stole a car from the operation and fled during the overnight shift. The reporter did not know when the child took the staff person's car keys. DFPS screened out the intake for an investigation by DFPS, and HHSC opened a Priority 2 minimum standards investigation. The child told the investigator that she took the car keys off a table downstairs, jumped out of her second story bedroom window, and took the car.[118] The staff person who was supposed to be supervising the child was not aware that this incident occurred. During the investigation, the staff member on duty admitted not performing bed checks until the early morning. Two of the three collateral children interviewed stated they witnessed the staff member asleep during her night shift. The

---

[118] A subsequent intake reported to SWI on February 22, 2022, also involved children running from the facility by jumping out of a second story window. This report does not appear to have occurred during nighttime hours. The operation received three citations related to this investigation, including a citation related to appropriate supervision – the investigator found that the supervising caregiver failed to abide by the Service Plan for one of the children, who required close supervision. Another intake alleging staff slept at night was reported on March 1, 2022. DFPS Ruled Out Neglectful Supervision, but the operation was cited because one of the children reported staff "are around sometimes" and staff said children are checked on at regular intervals – but a child's Service Plan required the child to be kept within eyesight and earshot except in moments of "reasonable privacy." The license for this operation was denied on January 3, 2023, due to the operation's history of minimum standards violations.

HHSC investigator reviewed the victim's Service Plan, which indicated the resident needed to be under "constant and direct supervision" and specified the child needed to be within listening distance and line-of-sight of staff because of her intense level-of-care and history of vehicle theft, self-harm, and suicidal threats. The supervision requirement was not followed the night of the incident. In addition, during the investigation the inspector walked into a closed room at the facility and found two residents in a bedroom closet together, on the telephone. The operation was cited for noncompliance with high-weighted standard 748.685(a)(4) and medium-weighted standard 748.685(c)(6) due to staff not completing nightly checks and not following the supervision requirements specified in the child's service plan.

## Bluebonnet Haven, LLC (1680842), CLASS Inv. #2865597, IMPACT Inv. #49046722

On March 2, 2022, a DFPS investigator reported that during an interview for another investigation, a child reported that an employee was observed on multiple occasions to be sleeping during the overnight shift. DFPS opened an investigation for Neglectful Supervision. During the investigation, the alleged perpetrator admitted to falling asleep often while on duty. The overnight supervisor reported that she had written up the alleged perpetrator for sleeping on two separate occasions. The staff member left the operation before the report to SWI was made, and no Safety Plan was put in place. A second employee admitted to "nodding off" during his day shift and said that he had seen other staff "doze off." A third employee admitted to "dozing off" while working a double shift.

The Investigation also noted that the Service Plan for the child who observed the awake-night staff sleeping required that the child be under "close proximity" supervision, due to the child's history of self-harm, suicidal ideations, physical aggression, and running away. The Service Plan defined "close proximity" supervision as, "Assigned staff observes and documents the youth's status at least once every hour and performs continual activity checks at least once every 20-30 minutes." Neglectful Supervision was Ruled Out because, though the staff person admitted to sleeping while she was on duty, "she didn't place the residents in a situation that resulted in bodily injury or an immediate danger of harm." HHSC cited the operation for noncompliance with medium-weighted standard 748.125(b), for failure to follow operation policies and procedures due to three staff admitting sleeping during their shifts.

## Camp Worth, LLC (1699024), CLASS Inv. #2878163, IMPACT Inv. #49125686

On April 26, 2022, a DFPS investigator reported to SWI that during an interview for another investigation, a child alleged a staff member at Camp Worth slept during her awake-night shift. During the investigation, the staff member initially denied sleeping but later admitted to falling asleep briefly during one of her night shifts. She also stated that on some occasions, it might have looked like she was sleeping because she would pull the covers over her head while looking at her phone. A collateral child interviewed recounted seeing the staff member sleeping several times during her night shifts. Several collateral staff corroborated seeing the staff member sleeping. Video footage showed the staff member sleeping and inattentive during her night shifts. The staff

member reported receiving disciplinary actions from the Administrator, and was no longer employed by the operation, although she reported resigning for personal reasons. DFPS Ruled Out Neglectful Supervision, describing the staff member's actions as "negligent," but concluding "none of the residents [were] harmed or abused as a result" of the staff member sleeping during her awake-night shifts. HHSC cited the operation for noncompliance with medium-weighted standard 748.125(b).

## Cumberland Presbyterian Children's Home (114), CLASS Inv. #2808225, IMPACT Inv. #48860065

On October 13, 2021, a supervisor at Cumberland Presbyterian Children's Home reported to SWI that an employee was captured on video asleep during an overnight shift. When the supervisor called the employee on the phone there was no response. The supervisor reported that the employee called back and sounded sleepy on the phone. After talking to the management, the supervisor asked the employee to leave and took over their shift. The overnight staff was terminated the next day. DFPS Ruled Out Neglectful Supervision, finding that the children supervised by the staff person "were consistent stating they were not aware [the staff person] was [a]sleep during her shift." HHSC issued a citation for noncompliance with high-weighted standard 748.685(a)(4), after reporting that a caregiver was sleeping while on duty supervising children.

## East Texas Open Door Inc (228620), CLASS Inv. #2863491

On February 18, 2022, a DFPS investigator reported to SWI that during another investigation, children reported that they observed two staff members sleeping during the overnight shift. DFPS screened out the case for an investigation for Neglectful Supervision, and HHSC opened a Priority 3 minimum standards investigation. One of the staff members admitted to nodding off. The investigator and the administrator reviewed security footage and saw another staff member covering her head with a hood and putting her head down on the desk. The staff member claimed she wasn't sleeping but did this to protect her eyes from the glare of the television. The investigator said they could not determine from the video whether the staff member was sleeping because it appeared she was still moving her body around. During the investigation, a staff member stated in an interview that another staff was previously fired for sleeping during her shift; she stated the staff member would come into work and make a bed for herself. HHSC issued the operation a citation for violation of high-weighted standard 748.685(a)(4).

## High Plain's Children's Home (18027), CLASS Inv. #2915946, IMPACT Inv. #49262815

On August 1, 2022, a caseworker reported to SWI that on separate occasions, two children observed a staff member sleep during an overnight shift. DFPS opened an investigation for Neglectful Supervision. During an interview, one of the children reported they were sick during the night and had to wake up the overnight staff to receive medical care. Other staff corroborated seeing this staff member sleeping repeatedly. According to the allegation narrative, this staff member was observed sleeping on security camera footage, and the staff member was terminated from the

operation on July 24, 2022. Another child reported that a relief house parent fell asleep while watching a movie with residents and another staff member during the day shift. The investigation conclusion noted that the operation was still in compliance with their 1:5 ratio when one of the staff members fell asleep.

At the time of the investigation, the operation was under a Safety Plan that had an effective date of July 27, 2022, requiring reminders to check on children to be sent to awake-night staff three times nightly, installation of a camera to ensure night checks are being completed (and requiring the administrator to check on night staff every night until cameras were installed), and staff to be retrained on policy regarding night-time checks. The Safety Plan was put into place after a child (in a private placement, not state care) died during the night a few days prior to implementation of the Safety Plan. When the fatality was investigated, it was determined that the staff person on duty the night the child died remained on the couch and did not check on any of the children during her awake-night shift.[119] DFPS Ruled Out Neglectful Supervision, finding that though "there are concerns for caregiver responsibilities in regard to staff staying awake while on duty," the investigator determined there "was no known incident that occurred with the children during the time frame that [the two staff were asleep]." HHSC issued two citations: one for violation of medium-weighted standard 748.125(b), and the second citation for violation of high-weighted standard 748.685(a)(4) due to a child having to wake up a staff member to receive medical care.

## Hill Country Youth Ranch (813238), CLASS Inv. #288311, IMPACT Inv. #49155591

An intake alleged that a day shift employee of Hill Country Youth Ranch observed an awake-night shift employee asleep. DFPS opened an investigation for Neglectful Supervision. The violation was confirmed during the review of surveillance camera footage, showing the employee asleep on the sofa. DFPS Ruled Out Neglectful Supervision because "there were no emergencies at the cottage" and the children "were never in any danger." A citation was issued for high-weighted standard 748.685(a)(4) related to the employee sleeping during an overnight shift.

## Jonathan's Place GRO (538034), CLASS Inv. #2877297, IMPACT Inv. #49120945

On April 22, 2022, a DFPS investigator reported that during an interview for another investigation, two children reported seeing an awake-night staff person sleep. DFPS opened an investigation for Neglectful Supervision. During the investigation, three other children reported seeing this staff person sleep. Though DFPS acknowledged "great concern" regarding the allegations that the staff person slept because "youth place[d] in the emergency shelter are often those difficult to find placement [due to being] new to care, high risk, or those with behavioral concerns," Neglectful Supervision was Ruled

---

[119] Despite this evidence of neglect, Neglectful Supervision was ruled out in the fatality investigation, because the child's death was determined to have been caused sudden by cardiac death caused by a congenital cardiac condition. Investigators found that "it was determined the [nighttime] checks would not have prevented [the child's] death as the staff members are only required to open the child's bedroom door to ensure the child is prevent in their room three to four times per night." When the child was found the next morning, she was cold to the touch, "pale in color" and had blue lips.

Out because none of the children reported "incidents of concern" occurring while the staff person slept. HHSC issued a citation for violation of high-weighted standard 748.685(a)(3) associated with caregiver responsibility because a "caregiver slept while being counted in ratio."

Kensley Care LLC (1714091), CLASS Inv. #2832165

On January 2, 2022, a Kensley Care staff member reported that a child at the facility was not supervised properly and had to be taken to the hospital after being found with marks on their arms and the hip area, a broken pen, and the cover over the sprinkler system, which was used to self-harm. The intake was screened out for an investigation by DFPS, and HHSC opened a Priority 3 minimum standards investigation. The child was on "line of sight supervision" due to the child's history of high-risk behavior. The investigation found that while the staff member responsible for the child's one-to-one supervision was in the child's room, the child was in bed, self-harming, unbeknownst to the staff. Another staff member reported that while conducting night checks on the same night of this incident, they observed the awake night staff member sleeping in a chair in the child's bedroom. The operation was cited for noncompliance with high-weighted standard 748.685(a)(4), for failing to properly supervise a child who was placed on close supervision, leading to a child self-harming.

Kensley Care LLC (1714091), CLASS Inv. #2881368, IMPACT Inv. #49146023

On May 7, 2022, a caseworker reported to SWI that awake-night staff admitted to "dozing off" during an awake-night shift when two children ran away from the facility. Other staff members stated that children had reported overnight staff sleeping on shift. DFPS Ruled Out Neglectful Supervision, because though the staff person admitted having fallen asleep during her shift, she claimed the children were still there when she awoke and checked on them, and although the children were able to leave the property without the staff person noticing, "the operation's policy would only allow for [the staff person] to keep a visual on them and is not allowed to restrain or prevent them from leaving." The operation was cited for noncompliance with high weight standard 748.685(a)(4) when it was confirmed that a caregiver fell asleep when they were supposed to be supervising children in care.

Kensley Care LLC (1714091), CLASS Inv. #2922398, IMPACT Inv. #49284812

On August 18, 2022, four children ran away from the facility. The law enforcement officer who reported the incident returned the children to the facility, but responded to a second call made after the children were returned, related to a fight between two children. DFPS opened an investigation for Neglectful Supervision. During the investigation, two children reported seeing awake-night staff sleep at night. The operation was issued a citation for 748.685(a)(4) for a staff member sleeping during the overnight shift. On October 11, 2022, the operation agreed to a voluntary suspension of their license.

New Horizons Ranch Residential Treatment Center (40724), CLASS Inv. #2873416, IMPACT Inv. #49099004

On April 8, 2022, the operation reported to SWI that an overnight staff member at New Horizons Ranch RTC was photographed by another staff member while the overnight staff member slept during their awake-night shift on March 29, 2022. DFPS opened an investigation for Neglectful Supervision. A risk assessment conducted for the investigation noted that the last time a staff member was found sleeping was in the summer of 2021, and it involved the same alleged perpetrator. Three children were interviewed, and they all denied seeing the alleged perpetrator asleep. However, they reported seeing another staff member asleep.

The alleged perpetrator admitted to sleeping on his shift for 45 minutes to an hour, and that he was trained that all night staff took naps. He also stated he was told "the office was aware staff took naps but kept a blind eye to it," but mentioned being written up for sleeping during his first or second week on the job. The other staff member denied sleeping while at work, but indicated she would "nod off," and when this happened, she would get up and move around. Both staff members were terminated from the operation.

The operation received two citations: one for noncompliance with a medium-high weighted minimum standard related to child caregiver ratios (748.1007(b)(1)), because the sleeping staff member left one staff member supervising more than 15 children. This citation was overturned after an administrative review because the reviewer found that there was "inconclusive evidence to determine how many children were being cared for by these staff met treatment services." The operation also received a citation for violation a medium-weighted standard (748.125(b)) associated with the staff person's failure to follow the operation's policy that required awake-night staff to stay awake. This citation was upheld on administrative review.

North Texas Youth Connection (66610), CLASS Inv. #2910102, IMPACT Inv. # 49244984

This investigation originated in DFPS for Physical Neglect following a report to SWI July 18, 2022, that children's basic needs were not being met by the operation. During interviews, the children disclosed that a staff member was sleeping during the overnight shift. The male staff admitted to sleeping during his overnight shift due to feeling ill and said that he would set an alarm to wake him up every 30 minutes; he was the only staff at night after the 2:00 a.m. staff person left. DFPS Ruled Out Physical Neglect, however, the following citations were issued:

- A citation for violation of a medium-high weighted standard (748.3301(h)) associated with physical site, because "staff and children reported seeing insects inside the facility."
- A citation for violation of a medium-high weighted standard (748.2307(8)) associated with prohibited punishment because a staff person yelled at children.

- A citation for violation of a medium-low weighted standard (748.2307(3)) associated with prohibited punishment because a staff member threatened children with loss of placement as punishment.
- A citation for violation of a high-weighted standard (748.685(a)(4)) associated with caregiver responsibility, because a caregiver who was alone on duty fell asleep during a nighttime shift.
- A citation for violation of a medium-weighted standard (748.303(a)(11)(A) associated with serious incident reporting because staff and children tested positive for COVID, but it was not reported.

Another report was made to SWI on January 2, 2023, alleging nighttime staff were seen sleeping, and the operation was again cited after a staff member "admitted to dozing off on shift due to her medication." Other staff acknowledged seeing her sleep. DFPS Ruled Out Neglectful Supervision because "there were no children physically harmed and there were no serious incidents."

Pegasus Schools, Inc. (844396), CLASS Inv. #2933699, IMPACT Inv. #49332794

A September 22, 2022, report to SWI alleged that a child observed a Pegasus Schools staff member asleep during the night shift and had to alert another staff member to wake the sleeping staff member. During the investigation, the child reported that the staff fell asleep for about 40 minutes. He alerted another staff member, who reported that she observed the staff member sleeping and had to shake the table and "jiggle his belly" to get him to wake up. She indicated that this staff member was not the only one she had observed sleeping. She said she had alerted employees on the day shift but "usually nothing is done about it." The staff reported she had never completed a report or written anything regarding observing staff asleep. DFPS Ruled Out Neglectful Supervision because there was no harm or injury associated with the lack of supervision. The operation was cited for noncompliance with high weighted standard 748.685(a)(4) due to a staff member sleeping while being counted in ratio.

Roy Maas Youth Alternative - Girlsville/Junction (251707), CLASS Inv. #2831472, IMPACT #48963521

An anonymous report to SWI was made on December 31, 2021, alleging that a staff member fell asleep during the overnight shift, showed signs of being under the influence while on shift, and talked openly about smoking and was seen smoking with a pen or vape. The reporter alleged the sleeping staff member positioned herself under a camera blind spot. DFPS opened an investigation for Neglectful Supervision. One child stated that the staff member slept during her shift and would set an alarm so that she could do room checks in between naps. Video footage showed the staff person was not doing room regular checks on the night reviewed, and that she stepped out of the cabin for nine minutes. The reviewer noted that it was not possible to determine whether the staff person was asleep because of the way she was positioned. The staff member said she stepped out of the cabin to turn off her car alarm. The staff member was drug tested, and the results were negative. DFPS Ruled Out Neglectful Supervision, but HHSC cited the operation for violation of a high-weighted standard (748.685(a)(4)) associated with

91

caregiver responsibility because "According to video footage, a staff member left children in care unattended for approximately 9 minutes and in addition, did not complete their 30-minute checks on the children."

Thompson Emergency Shelter (516810), CLASS Inv. #2885666, IMPACT Inv. #49171046 dated May 24, 2022

On May 24, 2022, a DFPS staff made a report to SWI they found a Thompson Emergency Shelter staff member asleep during an unannounced awake-night visit. The DFPS staff that conducted the unannounced nighttime visit observed the employee asleep with "a bed comforter as a blanket." The state employee contacted staff from a different cottage so that she could gain entry, because there was no other staff on duty in the cottage where the staff member was sleeping. The staff member was sent home, and the operation director monitored that cottage for the remainder of the shift. During her interview, the perpetrator stated she was in a car accident and attempted to contact management staff before starting her shift. She also stated that she took Tylenol and placed an ice bag on her chest to lower her blood pressure, then fell asleep. DFPS Ruled Out Neglectful Supervision because "no reported injuries or incidents" occurred while the staff member was asleep. The operation was cited for noncompliance with high-weighted standard 748.685(a)(4) because the only awake-night caregiver on shift in the cottage admitted to sleeping. The operation was also cited for noncompliance with high-weighted standard 748.1101(b)(7) due to an unrelated incident involving staff refusing to allow a child to contact their caseworker.

Yellow Canyon Academy 1726382, CLASS Inv. #2857981, IMPACT Inv. #490006037

On February 3, 2022, SWI received a report that two children engaged in inappropriate physical contact and had a "sleepover" with each other while living at Yellow Canyon. DFPS opened an investigation for Neglectful Supervision. Neglectful Supervision was ruled out because neither child could tell the investigator when the contact occurred, and video footage showed staff redirecting the children when they attempted to show or receive inappropriate physical affection. Video footage for one of the nights reviewed showed a staff person sleeping and failing to conduct regular room checks. The operation was cited for noncompliance with high-weighted standard 748.685(a)(4) because "staff failed to provide visual supervision of three children occupying a single resident's bedroom for more than 2 hours during overnight hours."

In addition to citations associated with sleeping staff, operations were also cited for other awake-night supervision problems:

Connections (181054), CLASS Inv. #2895064, IMPACT Inv. #49206402

On June 14, 2022, a CVS caseworker reported that a 12-year-old boy and 13-year-old girl were "having sex...at the facility." The reporter alleged that this incident occurred at night during the previous week, and that she did not know how many times it had happened. DFPS opened a Neglectful Supervision investigation, but Ruled Out even though video confirmed the 12-year-old was in the 13-year-olds room for 6.5 hours

undetected, and the awake-night staff failed to conduct room checks at 15-minute intervals, because "she was not negligent at the time that [the 12-year-old] walked into [the 13-year-old's] room." HHSC issued a citation for violation of high-weighted standard 748.685(a)(3) associated with caregiver responsibility because "[s]upervision was not appropriate when a staff member did not physically check on a child during the night."

Pegasus Schools, Inc. (844396), CLASS Inv. #2869401, IMPACT Inv. #49073911

Pegasus Schools is an RTC that specializes in treating children who have sexual behavior problems. On, March 22, 2022, a staff member at Pegasus Schools reported that two children engaged in inappropriate sexual behaviors by exposing themselves to each other and masturbating during nighttime hours. The investigation revealed that the children's bunk beds were across the room from each other, and they would use hand gestures to communicate before exposing themselves and engaging in inappropriate sexual behaviors. Although the investigation revealed that several incidents occurred over multiple days without the staff noticing, DFPS Ruled Out the allegation of Neglectful Supervision.

Children did not report seeing staff sleeping but said staff were distracted with paperwork during the night shift and did not get up much from the desk where they sat. The operation was cited for noncompliance with high-weighted standard 748.685(a)(4), because night staff were not providing an appropriate level of supervision and were distracted by paperwork.

Serving Children and Adults GRO (522278), CLASS Inv. #2859630, IMPACT Inv. #49012482

On February 9, 2022, a CVS caseworker reported that a child told her that the child had consensual sex with another child at the facility. DFPS opened an investigation and substantiated Neglectful Supervision. Video confirmed that the child sneaked into the other child's bedroom and was there for four hours between 12:58 a.m. and 5:19 a.m. Staff did not check the children's bedrooms during that time. HHSC issued five citations, including a citation for violation of high-weighted standard 748.685(a)(3) associated with caregiver responsibility, because the caregiver "failed to perform after hours supervision checks as required in the child service plan." There does not appear to have been any evidence of staff sleeping when the incident occurred. At the time, the operation had only two children in its care, and would not have been subject to the Court's awake-night requirements.

## Summary: Remedial Orders A7 and A8

Operations continue to struggle with compliance, despite DFPS's routine unannounced awake-night visits to operations requiring awake-night supervision. Moreover, the DFPS finding of near total compliance with awake-night supervision conflicted with the monitoring team's findings related to awake-night visits. The monitoring team

documented a total of 29 citations issued for violation of minimum standards due to staff sleeping or because of a significant problem with awake-night supervision.

## Regulatory Monitoring and Oversight of Licensed Placements

### Analysis of HHSC Investigations

HHSC investigates allegations of violations of statutes, administrative rules, or minimum standards. These investigations play a critical role in the safety of children in care. According to the Texas Administrative Code, HHSC investigations are dual-purposed, designed to "[r]educe the risk of abuse and neglect to children and to protect them in out-of-home care, and to "[o]btain sufficient information to make a fair, accurate, and impartial decision regarding the report, allegation, situation, and/or conditions."[120] When an investigation is initiated, the investigator is required to assess the immediate safety of both the children involved in the investigation and collateral children being cared for by the operation.[121] The Court's remedial orders related to monitoring and oversight of licensed placements recognize the important role that HHSC plays in ensuring child safety.

Validating Remedial Orders included in the Regulatory Monitoring and Oversight section of the Monitors' reports is largely determined by the appropriateness of an HHSC investigation's assigned priority level and the quality of minimum standards investigations involving PMC children.

The priority level assigned to an investigation is tied to the timeliness requirements of Remedial Orders 12 through 19. Priority level also represents a critical safety issue; the lower the priority level, the longer the timeline for initiating the investigation and interviewing the child. A longer timeline may affect the investigator's ability to ensure safety of children's placements, because it may be more difficult to obtain important evidence, like video recordings, associated with the allegations. The longer the timeline for initiating the investigation, the higher the likelihood that evidence associated with the allegations is unavailable, and witness memories may have faded.

In completing an ECHR, inspectors/investigators are guided by the quality of HHSC investigations and the enforcement of minimum standards through citations. When validating Remedial Order 22, the Monitors assess whether investigators correctly identify instances where operations failed to report to SWI abuse, neglect, or exploitation. The quality of investigations affects the accuracy of information in the ECHRs five-year review of corporal punishment violations associated. The quality of HHSCs investigations also has an impact on whether an operation is eligible for Heightened Monitoring. Similarly, an operation's history of citations is one measure that HHSC evaluates when it makes a recommendation for closure of an operation pursuant to Remedial Order 21.

---

[120] 40 Tex. Admin. Code §745.8405.
[121] *Id.* at §6330 Assessing the Immediate Safety of Children.

If HHSC fails to enforce minimum standards by issuing warranted citations, more meaningful potential agency enforcement actions (a POA, probation, Heightened Monitoring, denial of a license, or license suspension) and enforcement actions that DFPS may take (placing a home on its disallowance list, or contractual remedies) are less likely. Enforcement of minimum standards through investigations is critical to child safety.[122]

For this report, the Monitors conducted a case record review of two random samples[123] totaling 285 HHSC minimum standards investigations classified as Priority Level 1, 2, or 3 investigations that closed in 2022. The monitoring team's review included: (1) the appropriateness of the assigned priority level for the investigation; (2) the quality of the investigation; and (3) the investigation outcome.

The monitoring team also assessed instances in which an investigator or operation failed to report abuse, neglect, or exploitation, relevant to Remedial Order 22.

Overall, the case record review revealed significant deficiencies with intake and investigation of minimum standard deficiencies, particularly associated with the priority level assigned by HHSC to the investigations reviewed. Of the 285 investigations included in the sample, the monitoring team disagreed with the assigned priority level in almost half (138 or 48%) based on applicable Texas law and policy. In addition, the monitoring team found investigations so deficient that an appropriate outcome could not be determined in 48 (17%) cases and disagreed with the outcome in 22 (22 of 237 or 9%), for a total disagreement rate of 25% (70 of 285).

### Assessment of Investigation Classification

When SWI screens out an intake for an investigation of abuse, neglect, or exploitation and routes it to HHSC, the intake is assigned a priority level by HHSC for its handling.[124] According to HHSC, intake reports are assigned priorities based on: (i) information available at the time of intake; (ii) the presence of current threats to the child's immediate safety; (iii) the degree of harm the child has sustained or may sustain in the next 12 months; and (iv) the allegation that presents the greatest risk to the child if multiple allegations are reported.[125]

HHSC uses five priority levels:

**Priority 1**: A report of a violation of a law or minimum standard that places children in care at immediate risk of serious or substantial harm.

---

[122] HHSC acknowledges this, stating, "The investigator must complete an investigation of a report alleging possible risk to children promptly and thoroughly to ensure that children who are or will be in care at the operation are protected." HHSC, Child Care Regulation Handbook, § 6100 Overview of Investigations.
[123] The first random sample of 223 minimum standards investigations was taken from the 535 total investigations (for a confidence interval of 95/5) completed between January 1, 2022, and March 31, 2022. The second random sample of 62 investigations was taken from the 676 (for a confidence interval of 90/10) completed between September 1, 2022, and November 30,2022.
[124] *Id.* at § 6240 Assessing an Intake Report for Priority.
[125] *Id.*

**Priority 2**: *Injury or serious mistreatment of a child*. A report that a child in care is disciplined, punished, or physically restrained in a manner that is prohibited by minimum standards, including a report that a child in care sustained a serious injury because of discipline, punishment, physical restraint, or other type of mistreatment prohibited by minimum standards.

**Priority 2**: *Serious Accidental Injury*. A report that a child suffered a serious accidental injury (i.e., a serious injury that is the result of an accident) and the injury may be a result of a violation of minimum standards.

**Priority 2**: *Serious safety or health hazards*. A report of a violation of the minimum standards related to safety or health that may pose a risk of substantial harm to children in care.

> **OR.** A report that a person who is present at the operation has criminal or Central Registry history that may expose children in care to risk of harm. This includes:

- a person who has recent arrest history that poses a risk of harm to children and whose arrest has not gone through the justice system;
- a person who has recent Central Registry history and the person has not gone through due process; and
- a person on the sexual offender registry whose address is an exact match of the operation's address.

> **OR.** A report that an unregulated operation:

- meets any of the criteria above;
- has a history of being investigated for operating without a permit;
- was previously listed, licensed, or registered and closed voluntarily or by adverse action; or
- is care for more than 12 unrelated and related children.

**Priority 2**: *Serious supervision problems*. A report of a violation of the minimum standards related to supervision that may pose a risk of substantial harm to children in care.

**Priority 3**: *Illegal operations with no other allegations*. A report that care is being provided to children by a residential care operation that does not have a permit, may be subject to regulation, and there are no other allegations.

**Priority 3**: *Minor violation of the law or minimum standards that involve low risk to children*. A report of a violation of a law or minimum standard that poses low risk of harm to the health or safety of children in care.

**OR**. Risk factors exist that indicate children may be at risk of harm. Risk factors include, but are not limited to:

- Minor injuries that are accidental in nature and may indicate supervision problems; and
- A pattern of incidents that normally do not require an investigation (such as repeated runaways).

**OR.** A report of a serious injury or medical incident that:

- Contains information in the intake report that the parent or guardian has concerns regarding supervision or safety; and
- Is not a self-report; and
- Does not indicate the serious injury or medical incident is the result of a minimum standards violation.[126]

Priority 5 investigations are desk reviews, or cases assigned to a CPA for internal investigation.[127] The Priority 4 designation is used to reclassify a Priority 5 when the investigation requires an inspection.[128] Priority 4 and 5 investigations were not included in the sample of cases reviewed by the Monitors for this report.

The assigned priority level dictates key events in the timeline of an investigation:[129]

A Priority 1 investigation must be initiated with face-to-face contact with an alleged victim(s) within 24 hours of intake. An inspection of the operation must be completed within 15 days, and the investigation must be completed within 30 days. Notification of HHSC's findings must be mailed the same day the investigation is completed.

A Priority 2 investigation must be initiated with face-to-face contact with an alleged victim(s) within 72 hours of intake. The operation must be inspected within 15 days, and the investigation completed within 30 days. Notification must be mailed the same day the investigation is completed.

A Priority 3 investigation must be initiated with face-to-face contact with the alleged victim(s) within 15 days of intake. An inspection must be completed within 30 days, and the investigation must be completed within 60 days. Notification must be mailed within 60 days of the investigation's completion.

A Priority 5 investigation is a desk review and does not include face-to-face contract with an alleged victim or an inspection of the operation. A Priority 5 review must be initiated within five days of intake. The investigation must be completed within 60 days, and notification mailed within 60 of completion.

---

[126] *Id.* at § 6241.
[127] *Id.*
[128] *Id.* at § 6243.
[129] *Id.* at Appendix 6000-1 Investigator Time Frames for Investigations.

One-quarter of the investigations included in the sample of cases reviewed by the monitoring team (74 of 285, or 26%) were classified as Priority 2 and three-quarters (211 of 285, or 74%) were Priority 3. There were no Priority Level 1 investigations completed during the sample periods.

### Figure 34: Priority Level of HHSC Investigations

Source: HHSC Investigation case read
n = 285



### Incongruent Priority Levels

The monitoring team reviewed allegation information documented at intake and used by HHSC to assign the priority level of the investigations sampled. In nearly half of investigations (138 of 285, or 48%), the monitoring team disagreed with HHSC's priority level assignment. [130]

---

[130] HHSC defines Priority Levels in the Child Care Regulation Handbook as: Priority Level 1 – violation of law or minimum standards that pose an immediate risk to children; Priority Level 2 – injury or serious mistreatment of a child, serious accidental injury, serious safety or health hazards, or serious supervision problems; Priority Level 3 – minor violation of law or minimum standards that involve low risk to children.

Figure 35: Monitoring Team Agreement with Priority Level Assignment of HHSC Investigations



Source: HHSC Investigation case read
n = 285

The monitoring team disagreed with the priority level in a higher percentage of investigations at operations under Heightened Monitoring. The monitoring team disagreed with the assigned priority level in 54% (38 of 71) of the sampled investigations that were conducted at Heightened Monitoring operations, compared to 47% of sampled investigations (100 of 214) at operations that were not under Heightened Monitoring. The monitoring team most often disagreed with the assigned priority level in investigations assigned a Priority 3 level.

**Figure 36: Monitoring Team Agreement with Assigned Priority Level of HHSC Investigations by Priority Level**

Source: HHSC Investigation case read
n = 285



In addition to identifying intakes in which the allegations themselves were incongruent with the priority level assigned to the investigation, the monitoring team also found many instances in which HHSC assigned a Priority 3 level, though the minimum standards that were flagged for investigation at initiation were high-weighted standards.

Examples of intakes that should have been assigned a higher priority level include those reported out of the following operations:

Aspire 2 Dream GRO (1704643), CLASS Inv. # 2814586

A staff person for the GRO made a report to SWI on November 4, 2021, that 12-year-old Child A was taken to a behavioral hospital for "explosive behaviors" after breaking "phones, chairs, iPad and other items." The day of the intake, an HHSC supervisor called the reporter to clarify the information received during the intake. During that interview, the reporter said that the child had assaulted a staff member and hit 14-year-old Child B at the GRO. The reporter also said that the operation's administrator would not allow staff to call law enforcement the night that Child A was "out of control," and that the incident was not reported to the hotline. The reporter said the administrator wrote the SIR for the incident herself "in an effort to minimize the incident." The reporter noted that staff were upset they were not allowed to call law enforcement and that they could not control Child A. The reporter also said that Child B "had a knot on her head" and "did not receive medical attention" because staff said Child B "was just milking it." The reporter said Child B had complained of a headache but that the administrator would not take her to the doctor.

100

The allegation narrative in CLASS states, "It is alleged children are inappropriately supervised. It is alleged a child sustained injuries during a fight and did not receive medical treatment." Three minimum standards were flagged for investigation, including two high-weighted standards:

> 748.685(c)(6) – Implement and follow the children's service plans. (Medium)
> 748.1531(a)(2) – Medical care – a child in care must receive medical care as needed for injury, illness, and pain. (High)
> 748.685(a)(4) – Caregiver responsibility – providing the level of supervision necessary to ensure each child's safety and well-being. (High)

The investigation was assigned as a Priority 3 for investigation of "minor violations of the law or minimum standards that involve low risk to children," a designation at odds with both the very serious allegations the reporter made at intake and the two high-weighted standards flagged for investigation.

## Renewed Strength (RTC), CLASS Inv. #2815922

SWI received a report on November 6, 2021, from a DFPS staff conducting an awake-night visit that "No staff at the RTC answered the door nor did they answer the phone. Worker called their phone three times." When interviewed, the DPFS staff said that she was at the operation "around 12am" but did not remember the exact time. The only additional information she provided when interviewed was that there was a car parked outside.

The allegation narrative in CLASS states, "It is alleged that children in care may not have been properly supervised." Two minimum standards were flagged for investigation, a high-weighted standard associated with caregiver responsibility (748.685(a)(4)) and a medium-weighted standard associated with an operation's duty to make records available for licensing.

The investigation was opened as a Priority 3 for investigation of "minor violations of the law or minimum standards that involve low risk to children."

The allegations made by the reporter at intake – that she arrived for an awake-night visit and was not able to complete it because nobody answered the door – were associated with a high-weighted standard and presented serious safety risks to children inconsistent with the Priority 3 designation.

## ACH Child and Family Services GRO (1545), CLASS Inv. #2816633

> A November 10, 2021, report to SWI alleged a child was taken to the hospital for cutting. The 17-year-old allegedly snuck a razor into the facility then used it over a three-day period to "cut her ankle, arms, thighs, and body over 100 times." The intake alleged she "covered up the cuts with long sleeves and other clothing" and that staff became aware of the cuts "when they noticed blood on sock at ankle area." The child was admitted to a psychiatric hospital.

A Priority 3 investigation was opened for "minor violation of the law or minimum standards involving low risk to children." HHSC's investigation included the following minimum standards:

> 748.1531(a)(2) Medical care – A child in care must receive medical care as needed for injury, illness, and pain (High);
> 748.1337(b)(1)(H)(ii) Initial Service Plan – child w/high risk behaviors, include specific safety contract developed between child & staff to ensure safety (Med-High);
> 748.685(a)(4) Caregiver responsibility – providing the level of supervision necessary to ensure each child's safety and well-being (High); and
> 748.1337(b)(2)(D)(ii) Initial Service Plan – Include instructions to caregivers about level of supervision required (High).

The three high-weighted standards flagged for investigation and the allegations that the child snuck a razor into the facility, then cut herself more than 100 times over a period of three days without staff noticing, is at odds with HHSC's designation the referral for a Priority 3 investigation.

Adiee Emergency Shelter (1675992), CLASS Inv. #2824830

On December 10, 2021, an educator with the local school district reported to SWI that the alleged victim "told me when he tries to sleep at night another 13-year-old male is going around touching on the rear ends of other males sharing that same room & he cannot get any sleep because he is worried about someone messing with him." The reporter alleged that the incident occurred on December 6, 2021. In response to the intake question "Why do you think the child has been sexually abused or is at risk of sexual abuse?" the reporter responded, "The child has been abused in this way in the past" and indicated that she had concerns about the child "maybe possibly getting beat up" for reporting the abuse to the teacher. The intake was assigned a Priority 3 for investigation of "minor violations of the law or minimum standards that involve low risk to children." The allegation narrative states "It is alleged that a child in care is being inadequately supervised and may be engaging in inappropriate touching," and two standards were flagged for investigation:

> 748.303(a)(5)(A) – Serious Incident – Report to Licensing as soon as aware of an incident of sexual abuse of a child against another child. Weight: Medium High
> 748.685(a)(4) – Caregiver responsibility – providing the level of supervision necessary to ensure each child's safety and well-being. Weight: High

The Monitors disagree with the Priority 3 designation. Allegations of child-on-child sexual abuse and investigation of a high-weighted standard are inconsistent with a "low risk" to children. This should have been assigned at least a Priority 2 if not higher.

Agape Manor Home Child Placing Agency (860964-1306-1), CLASS Inv. #2825403

On December 11, 2021, a report to SWI alleged that a foster parent physically abused her two adopted children, and that one of the two foster children residing in the home witnessed the physical abuse and made an outcry to her DFPS caseworker. The intake alleges that the foster parent "got mad and hit [her adopted daughter] hard across her head with her open hand" and "then pushed her down on the floor." The intake alleged, "This has happened on more than one occasion and sometimes [the adopted child] falls down and sometimes she doesn't." The intake says that the foster parent abuses her adopted children, but not the foster children. In addition to the Physical Abuse of the adopted daughter, the intake alleges, "It was reported [the adopted son] lit a fire in the house and [the foster parent] got upset and beat him with a paddle until it broke. She hit him all over his body including his back, legs and arms and bruises were everywhere. The paddle broke and she got a belt and continued whipping him all over." The reporter alleged the 10-year-old foster child observed this abuse. The foster children were removed from the home shortly after the intake.

Despite the obvious concerns regarding safety, this intake was assigned a priority level of 3, for investigation of minor violations of the law or minimum standards that involve low risk to children. The CLASS allegation description is also at odds with the very serious allegations, stating "There may be concerns regarding discipline." The sole minimum standard flagged for the investigation:

> 749.1957(1) – Other Prohibited Discipline – Any harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline or punishment. Weight: High.

Though the abuse allegations are related to an adopted child and do not include allegations that the foster children were abused (there was a separate investigation for the allegations of Physical Abuse of the adopted children), the allegations raise very serious safety concerns. This should have been assigned a Priority Level of 1 when investigated for minimum standards violations. Allegations that foster children witnessed the physical abuse of other children in the home should also have led HHSC to include the minimum standard associated with child rights in the investigation.

## Arrow Child and Family Ministries of Texas CPA (856145-58-10), CLASS Inv.# 2840700

Two identical reports were made to SWI (both by the child's foster mother) on January 12, 2022. The foster parent reported that the 3-month-old foster child was placed with them five days earlier, on January 5, 2022. The baby takes medication for seizures (Kepra – Levetiracetam). According to the foster mother's report, the baby's last known seizure was in November.

When placed with the reporter, the baby was "extremely lethargic, not laughing, cooing, was underweight." Since being in their care, the foster mother reported that the baby is no longer lethargic, is holding her head up, laughing, and cooing. The baby had a doctor's appointment on the day the report was made and the doctor reported being surprised by the baby's improvement. The foster mother reported concern that the baby may have been overmedicated by the previous foster parents, based on the change in her behavior and appearance. The foster mother also reported that the child had a

prescription bottle, filled 11/25/21 with 120 doses, which should not have run out until 1/25/22. However, when the foster father measured out the remaining doses, there were only enough doses to last until 1/14/22. The foster father tried to call in a refill and was told it could not be filled until 1/15/22 per Medicaid.

The case was opened as a Priority 3 investigation for "minor violations of the law or minimum standards." The short allegation description states, "It is alleged a child may have been overmedicated or medication was not given as prescribed." Three minimum standards were assigned to be investigated:

> 749.1301(a) – Preliminary Service Planning – Complete a preliminary service plan that addresses child's immediate needs within 72 hours of admission (Medium)
> 749.1541(a) – Medication Record – Maintain cumulative record of prescription medications dispensed to child, include nonprescription meds for child under five yrs. old (Medium High)
> 749.1463(b)(5) – Administration of Medication – Ensure the child has taken the medication as prescribed (High)

One of the minimum standards flagged for investigation was weighted medium-high and another is weighted high, contradicting the Priority 3 designation. Moreover, this investigation involved a three-month old infant and allegations of overmedication. This should have at least been designated as Priority 2 for serious safety or health concerns (or higher).

## Angelheart Inc (868615-2574), CLASS Inv. #2843166

On January 14, 2022, a foster parent to SWI that a six-year-old child placed in the foster parent's home was acting out sexually (reported "sexually acting out behaviors" since the child had been placed in the home), and that the child had a history of sexual abuse prior to entering care but that the foster parent was not notified of the information when the child was placed. The foster parent also alleged that a service plan noted bed bugs in the home the child was removed from and was also upset that he was not advised of the bed bugs when the child was placed.

The intake was assigned a priority level of 3 for investigation of "minor violations of the law or minimum standards that involve low risk to children." The investigation reviewed three minimum standards:

> 749.2593(c)(1) – Supervision – Caregivers counted in child/caregiver ratio must be aware of children's habits, interests & any special needs including supervision. (Weight: Medium High).
> 749.2591(a)(3) – Supervision – Child placement management staff ensures supervision accounts for child's history, include. abuse/neglect, fire-setting, suicide, run-away. (Weight: Medium High).

749.1115(b) – Information to provide caregivers – By child's admission, inform caregivers of any special needs, such as medical, dietary, supervision needs/condition. (Weight: Medium-High).

All these minimum standards carry a "medium-high" weight and pose more than a "low risk" to children, if violated. Failing to report a child's history of sexual abuse is a violation of the Court's remedial orders due to the safety concerns associated with failing to advise caregivers of a child's history of sexual abuse. This, coupled with the allegation that the child was acting out sexually, represents a safety risk that should have required a priority level of at least 2 for serious safety or health hazards. If HHSC determined that another child was placed in the home, the referral should have been considered for a priority 1 investigation related to the safety risks that the child's sexualized behavior could have posed to the other child.

Kinder Emergency Shelter, CLASS Inv. #2856393

Two reports were made to SWI: The first, made January 31, 2022, was made by the local police department, which received a call from the 15-year-old victim child saying he was in the bathroom and "had a plan to slit his wrists and something was in his hand." The reporter said the child "was unable to tell law enforcement where he was located but [said he] had been dropped off by a CPS worker." The police were given the most recent placement information for the child by the SWI worker and contacted Kinder Emergency Shelter. The next day, a staff person for the facility made the second report to SWI. The staff person reported that when the police called the facility at 11:20 p.m. the night before, the police told the staff person who answered the phone that the child had called them and the police indicated "the [child] told the police that he needed help so that staff went back to his room." The staff found the child in the bathroom, "yelling and screaming" and with "a toothbrush to his throat" and "said he was going to kill himself." A minimum standard and a statutory requirement were flagged for investigation:

748.685(a)(4) – Caregiver responsibility – providing the level of supervision necessary to ensure each child's safety and well-being. (Weight: High).
Tex. Hum. Res. Code § 42.063(a)(1) – Reporting incidents and violations – arrest, abuse, neglect, exploitation, running away, attempted suicide, or death of a child. (Weight: High).

The investigation was opened as a Priority 3 for "minor violations of the law or minimum standards that involve low risk to children." The intake allegations raise the possibility of serious supervision problems: a suicidal child received attention only after he called 911 and the police called the facility to alert them, though the child was in a restroom at the facility. The two high-weighted standards associated with the investigation are at odds with designation as a Priority 3.

Hill Country Youth Ranch RTC (215752), CLASS Inv. #2868916

SWI received an intake on March 20, 2022, that alleged a child in care was injured and required medical attention. A 14-year-old child was admitted to the hospital because she fell off her bike and hit her stomach. The 14-year-old told staff that she had a bump and swelling on her vagina and was bleeding. The child was seen by an OBGYN, and x-rays showed hemorrhaging, swelling, bleeding, and bruising to her vaginal area. The intake stated the child would receive surgery. HHSC opened a Priority 3 minimum standards investigation for "minor violations of the law or minimum standards that involve low risk to children." The following minimum standards were flagged for investigation:

> 748.303(a)(2)(A) -- Serious Incident – Report to Licensing no later than 24 hours after injury/illness that warrants treatment by a medical professional or hospitalization. (Weight: Medium-High)
> 748.1531(a)(2) -- Medical Care – A child in care must receive medical care as soon as needed for injury, illness, and pain. (Weight: High)
> 748.685(a)(4) -- Caregiver Responsibility – providing the level of supervision necessary to ensure each child's safety and well-being. (Weight: High)

The Monitors disagree with the priority level assigned to the investigation. This should have been assigned a Priority 2 as a serious accidental injury, or given the location of the child's injuries, as a Priority 1 to assess whether the intake should be screened in for an investigation of abuse, neglect, or exploitation.

## Camp Worth, LLC, GRO (1699024), CLASS Inv.# 2922928

Two linked intakes were received; both involved the same allegations. The first report, made on August 20, 2022, by a staff person for the operation, alleged that a 17-year-old child made an outcry that a Camp Worth staff member "beat him up" while he was in his room. The alleged perpetrator, as well as another staff member, who allegedly witnessed the incident, were no longer employed by the operation by the time the investigation started.

HHSC opened a Priority 3 investigation for "minor violation of the law or minimum standards involving low risk to the children." The investigation included the following minimum standards:

> 748.1101 (b)(1)(c) -- Children's right - Adhere to the children's right to receive fair treatment. (Weight: Medium High).
> 748.930(b)(1)(a) -- Annual Training - Caregivers in operations, other than cottage homes, must have 4 hours of EBI every 6 months. (Weight: Medium High).
> 748.2303(a) -- Corporal punishment – May not use/threaten corporal punishment, such as hitting/spanking, forced exercise, holding physical position, unproductive work. (Weight: High).

Given the very serious allegation that a former staff member "beat up" a child, designation as a Priority 3 was inappropriate.

**Unity Children's Home – Girls (1594840), CLASS Inv. #2931766**

On September 16, 2022, a DFPS staff person reported residents went into each other's rooms at night while staff slept. HHSC assigned the case as a Priority 3 for investigation of "minor violations of the law or minimum standards that involve low risk to children." The following minimum standards were associated with the investigation:

> 785.507(1) – Employee general responsibilities – Demonstrate competency, prudent judgment, self-control in presence of children when performing assigned tasks. (Weight: Medium High)
> 748.685(a)(3) – Caregiver responsibility – being aware of and accountable for each child's ongoing activity. (Weight: High)

Though the intake was vague, based on the allegations this should have been designated a Priority 2 (or higher) for serious supervision issues. Staff sleeping during night shifts, which allows children into each other's rooms, places the children at significant risk and concerns a serious supervision issue.

**Texas Dep't of FPS Region 5, CLASS Inv. #: 2932807**

On September 16, 2022, a child advocacy center staff person who interviewed the foster children for an unrelated investigation reported that during the interviews the children reported that after the six-year-old child urinated on a Teddy bear, the foster parent picked him up with his feet "hanging above the ground" and purposefully dropped him. The seven-year-old reported he "was scared and peed on himself." The children also reported that the foster parent forced them to do leg lifts, run laps outside, stand in the corner on their tiptoes, and "sit in the bathtub, naked, without water." The foster parent also allegedly made the children "sit with the teddy bear in front of them so that they could smell the urine." A Priority 3 investigation for "minor violations of the law or minimum standards that involve low risk to children" was opened, and the following minimum standards were assigned:

> 749.1951((b)(2) – Disciplinary Measures – Must not be physically or emotionally damaging to the child. (Weight: High)
> 749.1957(10) – Other Prohibited Discipline – Placing a child in a dark room, bathroom, or closet. (Weight: High)
> 749.1957(1) – Other Prohibited Discipline – Any harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline or punishment. (Weight: High)
> 749.1953(a) – Corporal Punishment – May not use/threaten corporal punishment, such as hitting/spanking, forced exercise, holding physical position, unproductive work. (Weight: High)

The Monitors disagree with the decision to designate this investigation as a Priority 3, given the serious allegations and high-weighted standards assigned for investigation.

107

**Guardian's Promise (1667145-12651), CLASS Inv. #2941148**

A report was made to SWI on October 21, 2022, by a doctor's office regarding a nine-year-old girl who presented at a medical clinic because her vagina was "white and raw." The reporter stated it was possibly an infection and that the child was given cream to administer as a treatment. The reporter stated the child might be seen the following week by the clinic, and that the guardian who brought her to the medical clinic "didn't present well." A Priority 2 investigation for "serious safety or health hazards" was opened, and the following minimum standards were assigned:

> 749.1401(a)(2) – General medical requirements – A child in care must receive medical care as needed for injury, illness, and pain. (Weight: High)
> 749.503(a)(2)(A) – Serious Incident – Report to Licensing critical injury or illness that warrants treatment by a medical professional/hospitalization. (Weight: Medium High)

The Monitors disagree with the assigned priority level. The child was sexually abused by a 16-year-old cousin in May 2021 while she was living with her maternal aunt (who dropped the child and her sibling off at a CPS office after she told her aunt about the abuse), prior to being placed with her maternal uncle. Particularly given the child's abuse history, this should have been considered for a Priority 1 designation with instructions to assess whether the matter should be screened in for an investigation of Sexual Abuse.

All the investigations detailed above are discussed in full Appendix B, as the investigations were found to have been either conducted so deficiently that an appropriate outcome could not be determined by the Monitors, or the Monitors disagreed with the outcome.

After a priority level is assigned and the investigation is routed to an investigator, the investigator defines the scope of the investigation by reviewing the allegation narrative in the CLASS intake report to identify each allegation of a violation of law, administrative rule, or minimum standard.[131] After reviewing the allegation narrative, the investigator enters a summary of the allegations (the allegation description) and the specific statutes, administrative rules, and minimum standards that will be evaluated during the investigation.[132] The investigator also chooses statutes, administrative rules, and minimum standards for evaluation based on the alleged violation in the intake narrative and "other laws, rules, or minimum standards related to the allegations."[133] An investigator may not delete a law, administrative rule, or minimum standard after the investigation is initiated, but may add to them during the course of the investigation if the investigator obtains new information about violations.[134] During the case record review, in addition to identifying investigations that were assigned an inappropriate

---

[131] HHSC, Child Care Regulation Handbook §6312 Reviewing the Intake Report Narrative and Determining the Allegations.
[132] *Id.*
[133] *Id.* at §6312.2 Determining Which Minimum Standards to Evaluate.
[134] *Id.*

priority level, the monitoring team also identified instances in which the investigator incorrectly failed to include a relevant minimum standard. Examples are included among the 70 investigations summarized in Appendix A.

### Assessment of Investigation Activities and Outcomes

Operations received a citation in only 25% (71 of 285) of the HHSC investigations sampled. Investigations involving operations under Heightened Monitoring were cited at a much lower rate than those involving operations not on Heightened Monitoring: 18% (13 of 71) compared to 27% (58 of 214). Priority Level 2 investigations resulted in a citation at a similar rate as Priority Level 3 investigations (26% and 25%, respectively).

As part of its record review, the monitoring team reviewed the information documented over the course of the investigation, including interviews and document reviews conducted by the investigator. When the investigation was sufficiently conducted to assess outcome, the monitoring team generally agreed with the outcome in 91% (215 of 237) of HHSC investigations reviewed. Agreement with the outcome was slightly higher for Priority 3 investigations than for Priority 2 investigations, 92% (161 of 175) compared to 87% (54 of 62). The monitoring team agreed with the outcome in a similar percentage of investigations regardless of an operation's status on Heightened Monitoring. Of the 285 investigations reviewed, the monitoring team found the investigation so deficient that an appropriate outcome could not be determined, or disagreed with the outcome, in 70, or 25%. The Monitors included summaries of these 70 investigations in Appendix A.

Figure 37: HHSC Investigations Considered Deficient by The Monitoring Team



Source: HHSC Investigation case read
n = 285

- Adequate and Agree
- Inadequate or Disagree

70
25%

215
75%

Investigations at operations under Heightened Monitoring were more often found deficient than investigations at other operations. Of the 71 investigations at Heightened Monitoring operations, 23% (16) were found to be deficient compared to 15% (32 of 214) of investigations at operations not under Heightened Monitoring at the time of the

intake. There were no differences in the percentage of investigations considered deficient by Priority Level (16% of Priority 2 investigations and 17% of Priority 3 investigations were considered inadequate).

In several investigations (all included in the summary in Appendix A), the monitoring team either determined HHSC should have evaluated whether the operation should have been cited for failure to report allegations of abuse, neglect, or exploitation or determined that a citation for failure to report should have been issued. The case record review also identified additional examples of problems associated with awake-night monitoring.

The findings of the monitoring team's case read are consistent with the very high rate of citations overturned by HHSC after an administrative review. The monitoring team's analysis of administrative reviews, discussed *infra*, showed that in 2022, 35% (325 of 928) were overturned after an administrative review. This high reversal rate reflects a systemic problem associated with HHSC investigations.

## Summary: Analysis of HHSC Investigations

Of the 285 investigations reviewed by the monitoring team, the reviewer disagreed with the priority level assigned in nearly half (138 of 285, or 48%), and the reviewer determined that the investigations were so deficient that an appropriate outcome could not be determined or disagreed with the outcome, for a total disagreement rate of 25% (70 of 285).

## Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment and Obligation to Report Suspected Abuse or Neglect

*Remedial Order 22: Effective immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment in the placements.[135] During inspections, RCCL, and any successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS,*

---

[135] In response to the State's request for clarification regarding the timeframe for review and how to document RCCR's consideration of the required elements during inspections, on October 7, 2019, the Monitors advised HHSC that the Court, "directs with respect to the look-back period for consideration all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, RCCL inspectors should assess the previous 5 years. With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient. The Court directs the agency to have inspectors document in CLASS (1) the number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered." E-mail from Kevin Ryan and Deborah Fowler to Andrew Stephens, et al., re: Responses to State's Requests, October 7, 2019 (on file with the Monitors).

*which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

## Background

Remedial Order 22 includes two distinct requirements: First, RCCR must consider referrals and confirmed findings of abuse or neglect and corporal punishment during inspections (which the State documents in CLASS in a field for "Extended Compliance History Reviews," or ECHRs (RO 22A)). Second, RCCR must monitor and report to DFPS lapses in placements' obligations to report abuse or neglect (RO 22B).

As to the first requirement, the Monitors validated the State's compliance through independent case record reviews.[136] For the second requirement, the Monitors analyzed citations issued to operations by RCCR for violations of minimum standards associated with the reporting of abuse, neglect, or exploitation. The Monitors also reviewed and compared two reports provided by the State to the Monitors: (1) a list of deficiencies cited for failure to report abuse, neglect, or exploitation, provided each month to DFPS by RCCR; and (2) a DFPS report on the failure to report notifications the agency receives from RCCR in each period. The Monitors cross-matched these two reports with the data for citations issued due to failure to report. The Monitors also reviewed the circumstances leading to each of the citations issued during the period reviewed.

---

[136] Consistent with the methodology used in the Monitors' previous case record reviews for Remedial Order 22, the Monitors completed three case record reviews for a random sample of 526 inspections, with a 95/5 confidence interval. The first sample, in July 2022 consisting of 179 inspections; the second sample, in September 2022, consisting of 177 inspections; and the third sample, consisting of 170 inspections, covered December 2022. All RCCR inspections except for attempted, application, initial, follow-up, and sampling inspections were included in the sample.

All case reads included the following components:

(1) The total number of ANE intakes, findings, and corporal punishment citations provided in the inspection Extended Compliance History Report (ECHR);

(2) Items documented in the *Assessment of Information Reviewed* (e.g., details of RTBs and/or citations for corporal punishment, other deficiencies cited, corrective action/Heightened Monitoring, areas where the operation has historically had safety or compliance issues);

(3) An assessment of the quality of documentation in the Assessment and determination of the presence of risk at the time of inspection based on the information provided;

(4) The items documented in the *Steps Taken to Mitigate Risk* which reflect the activities conducted during the inspection (also referred to as inspection activities);

(5) A determination that the inspector documented how the operation or agency home's history was taken into consideration prior to or during the inspection.

The narrative format of the ECHR makes validation difficult as it lacks a standardized way to assess whether the inspector determined there was risk and/or considered risk during inspection. This assessment is greatly impacted by the quality of documentation.

## Performance Validation

### Case Record Review of Extended Compliance History Reports

The inspections included in the case record review sample included monitoring inspections and inspections associated with an investigation (investigation inspections). Of the 526 inspections included in the Monitors' case record review sample, most were investigation inspections. As discussed later in this section, the Monitors' identified risks to children's safety in connection with 365 of the 526 inspections, but the State did not identify these threats in 100 cases, significantly undermining the effectiveness of the ECHR process and the purpose of Remedial Order 22

Figure 38: Number of Inspections Sampled by Inspection Type, 2022



Source: Case review data
n = 526

■ Monitoring inspections   ■ Investigation inspections

Just more than half of all inspections in the sample were conducted at GROs (53% or 280 of 526). The remainder were conducted at foster homes or CPAs (47%, or 246 of 526).

Investigation inspections at operations include GROs, RTCs, and CPA main or branch offices. There were fewer investigation inspections for foster homes and CPAs in the sample than for GROs: Forty-two percent of investigation inspections (155 of 368) were associated with a foster home while 57% (208 of 368) were associated with a GRO/RTC and one percent (5 of 368) with a CPA branch or main office.



Figure 39: Investigation Inspections Sampled by Type, 2022

Many foster home investigation inspections included in the sample examined homes affiliated with a CPA under Heightened Monitoring. Of the investigation inspections associated with an investigation of a foster home, 37% (58 of 155) were homes under a CPA or CPA branch that was on Heightened Monitoring, while 17% of the investigation inspections of GROs and RTCs (37 of 213) were for operations on Heightened Monitoring.

All ECHRs reviewed by the monitoring team were completed prior to the date of inspection.[137]

---

[137] ECHR completion is defined as the date the Assessment of Information Reviewed (operation's history) is completed in CLASS. Inspectors are required to complete the Assessment prior to the inspection. Inspectors have up to one calendar day after the inspection to complete the Steps Taken to Mitigate Risk, but the date this is entered is not captured in CLASS and cannot be verified.

Figure 40: Days from ECHR Completion Data to Inspection
Begin Date for Inspections with an ECHR, 2022



Source: Case review data
n = 526

In 2022, ECHRs were completed a maximum of 24 days prior to inspection.[138] There were no ECHRs completed after inspection, and 436 of 526 inspections sampled (83%) had an ECHR completed the same day or the day before the inspection, a lower percentage than in 2021 (93%).

As 2022 progressed, inspectors completed more ECHRs prior to the date of the inspection.

---

[138] When ECHRs are completed too far in advance of the inspection, there is a risk of missing substantiated abuse, neglect, or exploitation findings or corporal punishment citations issued prior to the inspection that could inform the inspector's work.



Figure 41: Timing of ECHR by Sample Period, 2022

Inspections conducted in July had ECHRs completed closer to the inspection date than those conducted in December. For inspections conducted in July, only eight percent of ECHRs (14 of 179) were completed two or more days prior to inspection compared to 16% (29 of 177) in September and 28% (47 of 170) in December. ECHRs were completed on average 0.68 days prior to the inspection date for inspections conducted in July compared to 1.03 days in September and 1.45 days in December.

The data elements reported in ECHRs by inspectors regarding intakes, findings, and citations were found to be largely consistent with the aggregate data provided by the State to the Monitors.[139]

---

[139] The State provides aggregate data to the Monitors on the number of ANE intakes, confirmed findings, and corporal punishment citations for each operation as of the first day of each month. This data was matched to the case read data by operation to compare the numbers included in ECHRs to state data as of the first day of the month.



Figure 42: Comparison of ANE/Corporal Punishment Data Found in ECHRs and State Aggregate Data as of the First Day of the Month, 2022



All ECHRs reviewed by the monitoring team included information on the operation's prior number of abuse, neglect, or exploitation (ANE) intakes, ANE findings, and corporal punishment citations. The accuracy of reported ANE intakes and ANE findings in the ECHR improved from 2021. In 2022, 96% of inspections (504 of 526) contained the exact number of ANE findings as the aggregate data for the month, compared to 93% (880 of 943) in 2021. Similarly, 60% of inspections (315 of 526) contained the exact number of ANE intakes in 2022 compared to 57% (533 of 943) in 2021. For both years, 95% of inspections contained the exact number of corporal punishment citations. Discrepancies are likely explained by the timing of the inspection.

In 43% of the inspections reviewed by the monitoring team, the ECHR documented 50 or more abuse, neglect, or exploitation intakes; more than half the ECHRs documented at least one substantiated finding of abuse, neglect, or exploitation during the five-year review period.[140]

---

[140] Analysis is based on inspections, not unique operations. Operations with a higher number of intakes, confirmed findings, and corporal punishment citations likely had a higher number of inspections throughout the year and an ECHR is required for each inspection.

Figure 43: Number of ANE Intakes, Findings, and Corporal Punishment Citations
Reported in ECHRs, 2022



Source: Case review data
n = 526

## Inspector Discussion of Operation and Foster Home History

The remedial order requires that an inspector consider the history of referrals and findings of child abuse, neglect, and exploitation during the inspection of the operation. Determination of whether an inspector considered an operation's history is based on the narrative description provided by the inspector in the ECHR.

Of the 526 inspections included in the sample, 403 (77%) of the operations or foster homes had one or more substantiated findings of abuse, neglect, or exploitation and/or a citation for corporal punishment. Inspectors discussed substantiated findings of abuse, neglect, or exploitation and/or corporal punishment citations in 380 of the 403 (94%) ECHRs with one or more substantiated abuse, neglect, or exploitation findings and/or corporal punishment citations.[141]

---

[141] If the operation had both findings and citations, reviewers counted discussion of findings or citations as having discussed either one.

117

Figure 44: Investigation and Monitoring Inspections

Source: Case review data
n = 526



The percentage of ECHRs that included a discussion of the operation's ANE findings or corporal punishment citations, where present, increased from 87% in 2021[142] to 94% in 2022.

Other than ANE findings and citations, corrective actions were the most frequently discussed item in the ECHRs reviewed by the Monitors. The ECHR failed to include any discussion of the operation's history in only nine of 526 (2%) inspections.

---

[142] Fourth Report, 72 ECF No. 1248.

Figure 45: Items Discussed in the ECHR Assessment of Risk, 2022



Source: Case review data
n = 526

Note: More than one item may have been discussed by the inspector in the ECHR.

Inspectors' discussion of history in the ECHR has improved over time. In the Fourth Report, the Monitors found that seven percent of inspections conducted during 2021 had no discussion in the assessment,[143] compared to three percent of ECHRs in July 2022 (5 of 179) and less than one percent of ECHRs in December 2022 (1 of 170).

More than a quarter of inspections (144 of 526 or 27%) occurred at an operation that was under Heightened Monitoring at the time of inspection. Operations on Heightened Monitoring include GROs, RTCs, and CPAs. Of inspections at operations on Heightened Monitoring, the inspector mentioned the operation's status on Heightened Monitoring in 70% of ECHRs (101 of 144). This was an increase from 58% of ECHRs in 2021.

---

[143] Id.

Figure 46: Investigation and Monitoring Inspections
Source: Case review data
n = 526

Investigation and Monitoring Inspections
N = 526

Inspection at Operation on Heightened Monitoring?

| Yes 144 (27%) | No 382 (73%) |

Status on Heightened Monitoring mentioned in ECHR?

| Yes 101 (70%) | No 43 (30%) |

As of October 1, 2022, HHSC transitioned the responsibility to complete all monitoring inspections at operations on Heightened Monitoring to the HM team.[144] The percentage of inspections at Heightened Monitoring operations where the operation's status on Heightened Monitoring was mentioned in the ECHR increased from 67% (29 of 43) in July 2022 to 75% (39 of 52) in December 2022.

Most investigation inspections that took place at an agency foster home included a discussion of the foster home's history in the ECHR, rather than including only the history of the CPA that verified the home.

---

[144] *See* HHSC, Streamline & Aline Oversight of Facilities on Heightened Monitoring & Provide Meaningful Technical Assistance, July 6, 2022 (on file with the Monitors).

**Figure 47: Foster Home History Discussed in ECHR, 2022**

Source: Case review data
n = 155



Just under 30% (155 of 526 or 29%) of the investigation inspections reviewed involved an investigation of a foster home. Of these, 143 (92%) included a discussion of the foster home history in the ECHR. This percentage increase is substantial since 2021, when only 42% of ECHRs involving a foster home included that home's history in the discussion.[145]

The discussion of foster home history also improved as the year progressed: In December 2022, 98% (54 of 55) investigation inspections at foster homes included a discussion of the foster home history in the ECHR compared to 91% (38 of 42) in September 2022 and 88% (51 of 58) in July 2022.

As part of the discussion of an operation's history, the monitoring team found that inspectors discussed similarities between current and prior investigations in more than two-thirds of investigation inspections in which a similarity existed.[146]

---

[145] Fourth Report, 73 ECF No 1248.

[146] An allegation was determined to be "similar" by the monitoring team by the type of issue being investigated including, but not limited to, inadequate supervision, inappropriate discipline, or medical neglect.

Figure 48: Investigation and Monitoring Inspections
Source: Case review data
n = 526



The monitoring team found that more than half of the reviewed ECHRs associated with investigation inspections at foster homes (81 of 155, or 52%) involved an allegation that was like an allegation in a prior investigation, compared to nearly one-third of investigation inspections at operations (67 of 213, or 31%). The inspector discussed similar investigations in 81% of investigation inspections involving operations (GROs, RTCs, and CPAs) (54 of 67) and in 57% of investigation inspections involving a foster home (46 of 81).

## Consideration of Risk in Investigations

Inspectors are also expected to document whether they determine a risk exists in the operation or foster home under review. The inspector recorded in the ECHR that their review of the operation or foster home's history indicated there was no safety risk present in nearly half of inspections.

Figure 49: Inspector Documented No Safety Risk
in ECHR Assessment of History, 2022



Based on their ECHR assessment, inspectors recorded there was no safety risk present in 45% of inspections (239 of 526) in 2022. This report of no safety risk is an increase from 2021 when only 29% of ECHRs (270 of 943) contained documentation that no risk was present.[147]

Inspectors documented no risk in 37% of inspections involving GROs, RTCs, or foster homes affiliated with CPAs that had one or more substantiated findings of abuse, neglect, or exploitation and/or citations for corporal punishment (147 of 403) and in 35% of inspections at GROs, RTCs, or foster homes affiliated with CPAs that were under Heightened Monitoring (51 of 144).

---

[147] Monitors' analysis of 2021 case read data.

123



Figure 50: Inspector Documented No Safety Risk in ECHR Assessment of History and Number of Confirmed ANE Findings, 2022

Inspectors' ECHRs recorded "no safety risk" in foster homes less often than in other types of operations.

### Figure 51: Inspector Documented No Safety Risk Present in ECHR Assessment of History by Inspection Type, 2022



Source: Case review data
n = 526

■ Monitoring inspections (n=158)
■ Investigation inspection at an operation (n=213)
■ Investigation inspection at a foster home (n=155)

The inspector documented in the ECHR that no safety risk was present in 36% of investigation inspections at foster homes (55 of 155) compared to 48% of investigation inspections at operations (103 of 213) and 51% of monitoring inspections (81 of 158) at operations.

The monitoring team also examined the history of operations and foster homes to determine whether a risk existed. The monitoring team documented a safety risk more often than inspectors,[148] finding a risk present at the time of the inspection in more than two-thirds of inspections.

---

[148] The monitoring team's determination of safety risk at the operation was based on the information provided in the ECHR, including the number of and details about ANE findings and corporal punishment citations (i.e., when they occurred and actions taken by operation as a result), the operation's Heightened Monitoring status, whether there were any active/open ANE investigations, and the severity of current allegations (i.e., high-weighted standard). In addition, for investigation inspections at agency homes, the monitoring team reviewed both the current allegation and the investigation history of the foster home. This degree of review into investigation histories of GRO/RTCs was not conducted due to CLASS functionality and the extensive time this would require.

**Figure 52: Monitoring Team Assessment of Safety Risk at the Time of Inspection, 2022**

Source: Case review data
n = 526

■ Safety risk   ■ No safety risk



The findings from the 2022 case read were consistent with 2021, when the monitoring team determined there was a safety risk in 69% of inspections (650 of 943) at the time of the inspection.[149]

The monitoring team found there was a safety risk in 82% (127 of 155) of foster homes that were the subject of reviewed investigation inspections compared to 64% of investigation inspections at operations (136 of 213).

Inspectors' ECHRs failed to document a safety risk in more than one-quarter of the operations for which the monitoring team determined a safety risk existed at the time of the inspection.[150]

---

[149] Fourth Report, 73 ECF No 1248.

[150] In their comments to the draft of this Sixth Report, HHSC repeatedly requests information about the criteria used by the Court Monitors to define "safety risk" and "components included in these assessments." The Monitors used HHSC's own guidance to its inspectors for conducting an ECHR in developing the tool used by the monitoring team during case reads. *See* HHSC, Extended Compliance History Review Guide (May 2021)(on file with the Monitors).

This guide notes, "A thorough review and assessment of an operation's compliance history prior to conducting an inspection is a critical part of assessing risk. Being familiar with allegations and patterns of citations over a longer eriod lends itself to more informed decision making."  *Id.* at 1. The guidance speaks to the purpose of the "Assessment of Information Reviewed" field on the CLASS ECHR inspection page:

> The *Assessment of Information Reviewed* is a very important piece of the Extended Compliance History Review and therefore must be a robust and thorough evaluation of the information you obtained from your review. Note that this section is an **assessment**

126



Figure 53: Investigation and Monitoring Inspections
Source: Case review data
n = 526

---

of risk at the operation, not just a summary of information reviewed. A summary is just regurgitating information, but an assessment is the inspector's evaluation of the operation's 5-year compliance history in the specified areas and whether the history is indicative of risk to children currently placed in the care of the operation….**If a determination is made indicating no risk is currently present in the operation because no pattern/trends were identified in the information reviewed or risk has been mitigated, document that in your assessment.**

*Id.* (emphasis in the original).

In addition to the operation's history of intakes and substantiated findings of abuse, neglect, and exploitation and violations for minimum standards associated with corporal punishment, HHSC's guidance includes the following under "Other Factors to Consider:" how long the facility has been operating, whether there are other known patterns in the operation's history, whether the operation is currently participating in a plan of action or corrective action (and if so, the conditions in place to address ANE/corporal punishment violations), whether the operation previously participated in a plan of action or had been placed on a corrective action (and if so, whether the operation saw a reduction in findings of ANE or corporal punishment citations, if relevant), what the operation's most recent ETC provided, if the operation is a CPA, whether there are known trends and patterns with certain agency homes or branches, and if agency homes have citations or ANE findings, how the CPA responded.  *Id.* at 3.

Regarding the "Statement of Risk" the guidance next instructs, "The data you collect for the assessment is a story about the possible risk at the operation. Interpret what the data means and what risk may be posed to children currently at the operation."  *Id.*

127

The monitoring team found significant risks to children's safety existed for 365 of the foster homes or operations' ECHRs among the 526 reviewed; the HHSC inspector recorded that no safety risk existed in 100 of these. Approximately half of these inspections (51 of 100, 51%) involved operations on Heightened Monitoring.

Examples of ECHRs that failed to identify a risk:

- An investigation inspection of a foster home conducted in July 2022 in which the CPA (Children of Diversity) had six ANE findings and 12 corporal punishment citations in the previous five years. Seven of the 12 corporal punishment citations were issued within two years of the inspection date. The foster home had significant history that was not discussed in the ECHR assessment of history: the home was relinquished by its former CPA in February 2015 due to noncompliance and pending an investigation and was verified by Children of Diversity two months later in April 2015. The home had since had five ANE investigations (four related to discipline and one related to supervision), none of which had resulted in a substantiated finding or citations. The investigation that triggered the ECHR involved allegations that a child was not being appropriately supervised and was being subjected to corporal punishment. Although the inspector's ECHR included information on the CPA's ANE finding and corporal punishment citations, they did not include any information on the extensive history of the agency home. The inspector stated in the Steps Taken to Mitigate Risk: "The assessment of information reviewed indicates there is not risk present at the operation because no patterns/trends were identified in the information reviewed or risk was mitigated."[151]

- An investigation inspection of a foster home conducted in July 2022 in which the CPA (America's Angels) had five ANE findings and five corporal punishment citations in the past five years. One ANE finding occurred within the past year (October 2021), one occurred in 2020, two in 2019, and one in 2018. There was an identified pattern of inappropriate discipline at the operation; one of the corporal punishment citations occurred within six months of the inspection. The inspector summarized the most recent Enforcement Team Conference "The overall analysis from the ETC was that there were consistent concerns of physical discipline and supervision, and the agency is proactive in closing the homes that get cited when it is a high-risk home." The investigation that triggered the ECHR involved an allegation that a foster parent was not providing appropriate education to a child in care and that the child was not attending summer school. While the current allegation was not related to prior history, there was a clear pattern of risk identified for the operation by the inspector in the assessment. Despite this, the inspector wrote in Steps Taken to Mitigate Risk: "No steps were taken to mitigate risk. There is no risk present."

---

[151] In the instructions to inspectors related to completing the "Steps to Mitigate Risk" section of the CLASS ECHR, HHSC's guidance to inspectors instructs that "[i]f no risk was identified during the inspection, document what you observed what you observed during the inspection." *Id.* at 4.

- An investigation inspection of a foster home conducted in December 2022 in which the CPA (Texas Dept FPS Region 05) had a history of two substantiated findings of abuse, neglect, or exploitation and two corporal punishment citations in the preceding five years. Both Reason to Believe (RTB) findings were for Neglectful Supervision that had resulted in sexual abuse of children; one had occurred in February 2022. The foster home under investigation had a total of eight previous investigations, three of which were investigations of ANE allegations, and had been licensed since 2003. The two most recent ANE investigations were initiated in May 2022 and April 2021, but neither resulted in substantiated findings.

- The foster home had been the subject of multiple allegations of inappropriate supervision, a trend also identified with the CPA. The allegations in the investigation associated with the ECHR involved multiple high-weighted standards regarding supervision, child rights, and medication storage and administration. The inspector noted in the assessment "the [foster] home has been investigated on several occasions related to inappropriate supervision as well as serious incident reporting resulting in two citations" and "the foster home has several allegations related to a child's medical needs not being met by foster parent; however, resulted in no citations." The inspector mentioned the long period that the agency home had been licensed and that several of the home's citations were dated, but "the [agency] home's last investigation in relation to inappropriate supervision was approximately one year and six months ago" and "the current investigation is related to improper supervision of a child in care." Despite this history, the inspector determined "the overall compliance during this review was very good" and simply noted in the Steps Taken to Mitigate Risk: "The assessment of the information reviewed indicated there is not risk present at the operation because no patterns/trends were identified in the information reviewed or risk was mitigated."

- An investigation inspection conducted in December 2022 in which the GRO/RTC (Make a Way Residential Treatment Center) had no ANE findings or corporal punishment citations but had only been licensed since September 2021 (a little more than one year). In this short amount of time, the operation had five ANE intakes and, at the time of review, had two open ANE investigations regarding inappropriate discipline/restraints and medical neglect, physical neglect, and physical abuse. The allegation in the investigation that triggered the ECHR was also related to restraints and overall treatment of children in care. Despite this clear pattern, the inspector notes in the assessment "there is not risk currently present" and states in Steps Taken to Mitigate Risk: "The assessment of the information reviewed there is not risk present at the operation because no patterns/trends were identified in the information reviewed or risk was mitigated."

## Monitoring Team Evaluation of Inspector's Consideration of Patterns/Trends at Operations and Agency Homes

When an inspector or the monitoring team documented a safety risk in the ECHR, the monitoring team also reviewed information included in the ECHRs to determine whether and how the inspector considered the safety risks in planning for the inspection.[152]



Figure 54: Monitoring Team Determined Inspector Documented Consideration of History During Inspection, 2022

The monitoring team found that the inspector documented how the operation's history or safety risk was taken into consideration in 62% of inspections (225 of 365).

The monitoring team found that inspection activities were not linked to the operation or foster home's history or safety risk in 15% of all inspections where a safety risk was present (56 of 365 and 19 of 127, respectively). In another 22% of inspections of foster homes (28 of 127) and 23% (84 of 365) of inspections of other operations, the

---

[152] The monitoring team determined the inspector's consideration of history by assessing documentation provided in Steps Taken to Mitigate Risk of the ECHR, which describes the actions taken by the inspector during the inspection. If the actions taken were reflective of the patterns/trends or areas of concern identified by the inspector or monitoring team, it was determined that history was taken into consideration during the inspection. It was possible for the monitoring team to determine consideration of history regardless of whether the inspector documented a safety risk was present.

Consideration of history does not mean that all risk was mitigated for an operation or agency home, only that the inspector took actions that demonstrated the history or safety concerns were considered during inspection.

documentation was insufficient to determine whether the history or risk was considered in planning the inspection activities.



Figure 55: Inspectors' Consideration of Operation and Foster Home

Source: Case review data

When the monitoring team found there to be no documentation on activities, the Steps to Mitigate Risk box typically included only the statement "The assessment of the information reviewed indicates there is not risk present at the operation because no patterns/trends were identified in the information reviewed or risk was mitigated."

Examples of ECHRs that failed to document any actions were taken in response to an identified risk:

- An investigation inspection of a GRO/RTC (The Burke Foundation-Pathfinders RTC) conducted in July 2022. The operation had no ANE findings or corporal punishment citations in the preceding five years. However, as documented by the inspector, the operation began a Plan of Action in May 2022 and was on Heightened Monitoring. The most recent Enforcement Team Conference for the operation noted concerns for EBI and discipline. The investigation pertained to prohibited discipline (child rights), which the inspector noted "is a concern of the operation." While the concerns were not related specifically to abuse, neglect, or exploitation or corporal punishment, there was a safety risk given the identified pattern of EBI/discipline concerns and the operation's enforcement history of a Plan of Action and Heightened Monitoring. The inspector simply states in Steps Taken to Mitigate Risk: "The assessment of information reviewed indicates there is not risk present at the operation because no patterns/trends were identified in the information reviewed or risk was mitigated."

- An investigation inspection of a foster home conducted in July 2022. The CPA that the home was affiliated with (Texas Dept of FPS Region 03) had two substantiated findings of abuse, neglect, or exploitation and eight corporal

punishment citations in the preceding five years. The agency home had a total of three investigations in the previous year that all involved inadequate supervision resulting in injuries to children. The inspector noted, "The (agency home) has had two previous investigations, neither involving concerns of inappropriate discipline. One deficiency was found during one of the investigations regarding a child's service plan review. The assessment of the information reviewed indicates there is risk present at the operation." Despite this, the steps the inspector noted in the Steps Taken to Mitigate Risk were the steps an investigator would take in any investigation, without reference to the specific risks identified: "I reviewed the agency's five-year compliance in regards to [sic] A/N findings and corporal punishment citations, I reviewed the foster home's investigation history, I conducted an unannounced inspection and walkthrough of the foster home, I interviewed all foster home members regarding concerns reported, and I discussed Minimum Standards for reporting serious incidents and medical treatment with both foster parents."

- An investigation inspection of a GRO/RTC (Fort Behavioral Health) conducted in July 2022 in which the operation had three substantiated findings of Neglectful Supervision in 2021: In May, June, and July 2021 the operation had three incidents in which a child with a history of self-harm was left without a caregiver, resulting in the child's self-harm that required medical attention, a second incident involved a group of children engaging in sexual activity and using unauthorized medication after not being provided an appropriate level of supervision, and a third incident involving staff failing to provide appropriate supervision and monitoring vitals after two children ingested non-prescribed over-the-counter medications. The inspector stated, "the assessment of the information reviewed indicates there is risk present at the operation. Risk to children has been high concerning multiple allegations concerning inappropriate supervision." The investigation allegation involved inadequate medical care, including a child no longer in care not receiving required prescriptions while in the operation's care. While the investigation allegation was not related to past trends, there was risk at the operation regarding supervision that was acknowledged by the inspector in the assessment. However, the inspector documented in Steps Taken to Mitigate Risk: "Due to the child no longer being placed at the operation, documents including incident reports, intake paperwork, and med logs were required. Two nurses who treated the child while present at the operation were interviewed regarding his finger injury and medications prescribed. The care coordinator who was present at the time of the finger injury was interviewed."

## State's Case Reads on ECHR Completion

The Monitors also reviewed the State's case reads on ECHR completion. The HHSC review evaluated the following:

- Whether staff entered the correct data points for number of ANE intakes received, number of confirmed ANE findings, and number of corporal punishment citations (retired March 2022);

- Whether staff referenced the data points accurately, if included in the narrative entered in the Assessment of Information Reviewed (retired March 2022);

- Whether the narrative entered in the Assessment of Information Reviewed included documentation of 1) history of ANE findings; 2) explanation of any patterns and trends or lack thereof in the ANE history and corporal punishment citations; 3) whether the agency home has any patters and trends with ANE and corporal punishment, if applicable; and 4) an assessment of risk;

- Whether the assessment of risk narrative was an accurate interpretation of the history reviewed;

- Whether the documentation entered in Steps Taken to Mitigate Risk described the steps taken by the inspector during the inspection to mitigate risk (or no steps were taken if no risk was identified in the assessment); and

- Whether the steps taken during the inspections addressed the risk identified in the assessment (if any).

Both HHSC and the monitoring team found high rates of accuracy in the inspector's reporting of data points on the operation's five-year history of abuse or neglect intakes, findings, and citations for corporal punishment. By the end of 2022, both HHSC and the monitoring team found that high rates of ECHRs included a discussion of foster home ANE and corporal punishment history.

There were significant differences, however, between the State's review and the Monitors' findings. While over 90% of cases were reported to accurately describe the compliance history and identified risk in HHSC's case reads, the monitoring team and RCCR inspector's assessment of risk differed: In 42% of cases in which the inspector documented no risk, the monitoring team assessed that there was a safety risk present.

HHSC's review found between 80% and 85% of cases took steps to address all risk identified in the assessment (including taking no steps when no risk was present) across the four case reads in 2022. The monitoring team assessed that, of inspections where there was a safety risk, the inspector documented how the operation's history or safety risk was taken into consideration in just over 60% of inspections between July and December 2022.

In its findings, HHSC does not differentiate between operations in which there is a safety risk and those where there is no risk. This results in a higher rate of inspectors having taken the steps necessary to address risk. For instance, the monitoring team's review of cases found that the inspector documented how the operation's history was taken into consideration in 62% of cases where there was an assessed risk. However, if

133

cases are included where there was no assessed safety risk, this would increase to 73% of cases in which steps were taken to address risk or were unnecessary due to no risk.

## Adherence to Obligation to Report Abuse, Neglect, or Exploitation

Between January 1, 2022, and December 31, 2022, HHSC issued 24 citations to operations related to minimum standards violations associated with licensed operations' failure to report abuse, neglect, or exploitation.[153] Deficiencies cited for failure to report abuse, neglect, or exploitation declined by 48% between 2021 and 2022, with 46 deficiencies cited in 2021 and 24 deficiencies cited in 2022. Deficiencies cited for failure to report represented approximately .5% (24 of 5,030) of all deficiencies cited during the year.



Figure 56: Number of Deficiencies Cited for Failure to Report ANE



Failure to Report ANE Deficiencies Cited

The biggest decline in citations for failure to report abuse, neglect, or exploitation derived from inspections for a minimum standards investigation following an ANE investigation.

---

[153] Deficiencies cited do not include deficiencies overturned after administrative review.

Figure 57: Deficiencies Cited for Failure to Report ANE by Type
of Monitoring



Deficiencies cited for failure to report that were associated with a monitoring inspection increased from 2021, from three to five in 2022, while citations for failure to report associated with an investigation inspection declined 56% from 43 in 2021 to 19 in 2022. Deficiencies cited for failure to report that were associated with an inspection linked to an abuse, neglect or exploitation investigation declined by nearly 60%, from 34 in 2021 to 14 in 2022.

There are six standards associated with failure to report: two (748.303(a)(3)(A) and 749.503(a)(3)(A)) are associated with a GRO/RTC or CPA's failure to report an allegation as soon as they are aware of it. Two standards (748.303(a)(4)(A) and 748.503(a)(4)(A)) are specifically associated with a GRO/RTC or CPA's failure to report child-on-child Physical Abuse as soon as they are aware of the allegation, but no later than 24 hours after the incident occurred. And two standards (748.303(a)(5)(A) and 749.503(a)(5)(A)) are associated with a GRO/RTC or CPA's failure to report child-on-child sexual abuse as soon as they are aware, but no later than 24 hours after the incident occurred. Most of the failure to report citations issued in 2022 related to standards requiring the reporting of allegations of abuse, neglect, or exploitation (13 of 24), while 33% (8 of 24) related to the reporting of child-on-child sexual abuse and 6% (3 of 24) related to the reporting of child-on-child physical abuse.

## Figure 58: Deficiencies Cited for Failure to Report ANE by Standard Type, CY 2022

Source: RCCR deficiencies data
n = 24



All operation types were cited for a standard associated with failure to report abuse, neglect, or exploitation. However, CPAs were not cited with any deficiencies associated with a failure to report child-on-child Physical Abuse, and GROs were not cited with any deficiencies associated with failure to report child-on-child Sexual Abuse. There were 22 operations responsible for the 24 deficiencies cited in 2022 for failure to report abuse, neglect, or exploitation. Some were cited more than once. Four of the 22 operations that were cited for failure to report in 2022 were on Heightened Monitoring when they were cited for the violation.[154]

## Table 18: Operations with a Deficiency Cited for FTR Abuse/Neglect, 2022
Source: RCCR deficiencies data

| Operation | Failure to Report Citations | Heightened Monitoring |
|---|---|---|
| CPA operations | | |
| Agape Manor Home Child Placing Agency | 1 | Y |
| America's Angels Inc. | 1 | N |
| Benevolent House Child Placing Agency | 1 | N |
| Covenant Kids, Inc. | 1 | N |

[154] One of the four, Freedom Place, has since closed. Have Haven was in the "post plan" phase of Heightened Monitoring when they received the citation.

| | | |
|---|---|---|
| Families Especial, Inc. | 1 | N |
| Have Haven Child Placing Agency | 1 | Y |
| Lifetree Adoption Agency, LLC | 1 | N |
| Lonestar Social Services | 1 | N |
| Texas Baptist Home for Children | 1 | Y |
| We R Champions | 1 | N |
| Total for CPA operations | 10 | |
| GRO operations | | |
| Castillo Children's Center | 1 | N |
| Dream Residential Treatment Center, Inc. | 1 | N |
| Freedom Place | 1 | Y |
| Kaufman County Children's Emergency Shelter | 1 | N |
| Kensley Care LLC | 1 | N |
| New Hope Living LLC | 1 | N |
| Total for GRO operations | 6 | |
| RTC operations | | |
| Caring Heart Residential Care Services LLC | 2 | N |
| EVERYDAY LIFE INC | 1 | N |
| Kensley Care LLC dba Kensley Care South | 1 | N |
| La Maison, LLC | 2 | N |
| Laurel Ridge Treatment Center | 1 | N |
| Shiloh Treatment Center | 1 | N |
| Total for RTC operations | 8 | |

Ongoing problems associated with operations' compliance with the obligation to report abuse, neglect, or exploitation may be tied to staff misunderstanding their obligation to report incidents to the hotline, or misunderstanding what constitutes abuse, neglect, or exploitation. During site visits, the monitoring team asks administrators and caregivers questions related to reporting abuse, neglect, or exploitation. The monitoring team also examined staff records to determine what training they had completed.

During the 13 site visits made in 2022, when asked about the process for reporting, two-thirds of all staff interviewed (92 of 138, or 67%) said that they first report allegations of abuse, neglect, or exploitation to a supervisor or program administrator; less than a quarter of staff interviewed (32 of 138, or 23%) said that they would first report allegations to the hotline. More than 90% of staff (130 of 138) reported never having witnessed an incident of abuse, neglect, or exploitation. One staff member reported being aware of suspicions or allegations of abuse, neglect, or exploitation that were not reported.

Figure 59: Staff Report Who They Would First Report Allegations of Abuse and Neglect To



Source: Monitoring team site visit data, Caregiver Staff Interview
n = 138

The monitoring team found 32 of 242 employee files (13%) did not have documentation on file showing the employee completed the required abuse, neglect, and exploitation training and another 31 of 242 employee files (13%) documented the training was not completed in the last 12 months. Twenty of 242 employee files (8%) lacked documentation of completion for both child sexual aggression training (CSA) and abuse, neglect, and exploitation training.

Small gaps persisted in communication between HHSC and DFPS related to failure to report. The State-created process for complying with Remedial Order 22 begins with HHSC: when a deficiency is cited by HHSC and entered CLASS, the deficiency is included on a daily report sent via e-mail to DFPS. DFPS reviews the citation and determines contract compliance. The Monitors cross-matched the citation data both with the reports sent to DFPS by RCCR and with a report DFPS sent to the Monitors, to determine the State's response, upon discover of a lapse in reporting abuse, neglect, or exploitation. The Monitors' Fourth Report identified improvements in this process, but still found a lack of alignment between the citations issued, the notifications sent by HHSC to DFPS, and DFPS' report of the citations for which it received notifications.[155]

A small gap persisted in 2022. Two citations were not found in either the HHSC or the DFPS reports, and two were found in the HHSC report, but not in the DFPS report. The two that were not included in the DFPS report were for citations associated with child-on-child abuse.

---

[155] Fourth Report, 76 ECF No 1248.

Figure 60: Citations Associated with Child-on-Child Abuse

Source: RCCR deficiencies data, HHSC Failure to Report ANE report, DFPS Failure to Report ANE report



In addition to reviewing and analyzing the citation data, the HHSC report, and the DFPS report, the Monitors reviewed all 24 of the investigations or inspections that resulted in a citation to identify the allegations that operations failed to report. The review revealed failures to report allegations of abuse, neglect, or exploitation that, in many cases, were substantiated after an investigation.

In other cases, the operation was cited based on information found by HHSC or DFPS during a monitoring visit. Examples include the following citations:

- DFPS substantiated Sexual Abuse and Neglectful Supervision against foster parents verified by America's Angels Inc. CPA after a child's therapist reported that a foster child disclosed that the foster parent "raped her." The DFPS investigator found that the foster father touched the child's breasts on multiple occasions causing the child to feel uncomfortable, resulting in an RTB for Sexual Abuse naming the foster father as the perpetrator. A second RTB was issued for Neglectful Supervision due to the foster mother's failure to protect the victim child from the foster father after the child informed her about the incidents of sexual abuse on their way to a psychological assessment. Both RTBs were overturned after an administrative review. However, two citations were also issued and upheld during an administrative review. One citation was for the foster mother's failure to report the allegation of sexual abuse after the child told

her about the abuse. The second citation was for violation of the minimum standard associated with children's right to be free of abuse, neglect, and exploitation.

- During an HHSC monitoring visit to the Benevolent House CPA office on May 5, 2022, it was discovered that a serious incident had not been called to SWI. A citation for failure to report was issued to the CPA at the time of the monitoring visit. The serious incident that was not reported involved a foster mother who walked into the bedroom of two siblings, a five-year-old and an eight-year-old and found one of the children bent over with his pants and underwear pulled down and his sibling holding a toy gun in his bottom. The foster mother reported that she called the CPA and completed an incident report, however the CPA failed to report the incident to SWI.

- HHSC issued a citation to Caring Heart Residential Care Services for failing to report child-on-child sexual abuse. On October 21, 2022, a child's CVS caseworker reported to SWI that during a visit with one of her assigned children, the child made an outcry that another child[156] sexually harassed him by "grabbing his head and humping it" while both children were in the living room of the facility. It was reported that staff were present and did not report the incident. DFPS opened an investigation and Ruled Out Neglectful Supervision, but HHSC issued a citation finding the operation failed to report sexual abuse against a child in care by another resident.

- During a July 1, 2022, DFPS contract monitoring visit to Caring Heart Residential Care Services the DFPS staff found two incident reports in child files pertaining to a child "humping" two other children (who were also involved in the investigation listed above) on two separate occasions. Neither incident was reported to SWI. HHSC opened a Priority 3 investigation for minimum standards violations that involve low risk to children. Children interviewed reported that staff intervened quickly when another child was acting out sexually and that staff are always around. Staff who observed the incident confirmed reports were not made to SWI. The investigator found that staff intervened quickly by separating

---

[156] DFPS added an indicator for sexual aggression to this 12-year-old child's IMPACT records on November 14, 2022, and modified it on January 13, 2023. The information on the child's Sexual Incident History page indicates that he was "using force and threats to engage in sexually aggressive behavior with a child much younger than himself. [The child] touched a younger male youth on his private areas both over and under the clothes. He threatened to beat the youth up if he didn't allow him to touch him." The victim named in the description of the incident is not the same child who made the outcry in this investigation or in the serious incident reports found by DFPS staff during the July 1, 2022, monitoring visit, but was also a resident at Caring Heart Residential. The incident was the subject of a Neglectful Supervision investigation. DFPS Ruled Out Neglectful Supervision, though the child's CVS caseworker noted that she was aware of his sexually aggressive behavior and had concerns about supervision at the operation. The local permanency worker also said she had called in "multiple cases regarding outcries from children" related to this child's sexual aggression and said she had concerns about whether the children were being properly supervised. DFPS Ruled Out because they found staff did not "physically observe" the child inappropriately touching others, but acted appropriately when they were informed.

the children and putting a safety plan in place. A citation for failure to report was issued.

- During an HHSC monitoring inspection to Castillo Children's Center on August 31, 2022, an incident report was found in a child's file containing an allegation of child abuse, but there was no documentation of the allegation being reported to SWI and a report to SWI regarding the abuse incident could not be identified. A citation for failure to report was issued during the monitoring inspection.

- On July 25, 2022, a DFPS special investigator reported to SWI that a foster parent verified by Covenant Kids, Inc CPA was arrested on July 19, 2022, for continuous sexual abuse of an adopted child. The arrest was made after the foster parent was observed sexually abusing his adopted daughter during a sleep study. DFPS opened an investigation for Neglectful Supervision and Sexual Abuse because one foster child lived in the home at the time of the arrest and during the investigation a second foster child was identified as a possible victim. DFPS Ruled Out Sexual Abuse and Neglectful Supervision after both foster children denied the allegations. However, HHSC issued two citations, one associated with the operation's failure to report the Sexual Abuse to SWI when staff became aware of the abuse, and one associated with the CPAs for failure to report the arrest of the foster parent.

- DFPS substantiated allegations of Physical Abuse of two children by two different staff members at Dream RTC. Two staff pushed and hit two children who were residents at the RTC. Staff, including the owner of the RTC were aware of the incidents but failed to make a report to SWI for several days. When a report was made three days after the incident occurred, it was characterized as an accident and the intake was screened out by DFPS and opened as a minimum standards investigation by HHSC. The attorney ad litem for one of the children made a second report involving the incident to the hotline four days after the first report, after the child made an outcry to the attorney, resulting in the DFPS investigation for Physical Abuse.

- After HHSC completed a Priority 3 investigation opened after an August 6, 2022, report to SWI alleged multiple minimum standards violations, HHSC issued a citation to La Maison LLC finding the operation failed to report two serious incidents to SWI. One incident report involved a child biting another child on the back and leaving teeth marks which required first aid. The second incident report involved a child punching another child before staff broke up the altercation. Operation staff reported that they were not aware that these two incidents were required to be reported to SWI.

- DFPS Ruled out Neglectful Supervision after a report was made to SWI that several children made an outcry of having witnessed two residents (an eight-year-old and a nine-year-old) engage in child-on-child sexual contact. HHSC issued a citation for failure to report because the incident was not timely reported to SWI.

Serious incident reports reviewed for the investigation showed that the children made the outcry three days before the report was made to SWI.

- HHSC issued a citation to Kaufman County Children's Emergency Shelter due to the operation's failure to timely report a child's sexually inappropriate behavior to SWI. An awake-night staff person found a child in bed with another child during bedroom checks. The operation did not report the incident to SWI until eight days after it occurred. DFPS Ruled Out Neglectful Supervision.

- Have Haven CPA was cited for failure to report because a foster parent verified by the agency failed to timely report finding two foster children engaging in sexual contact. The incident was reported to SWI by a CVS caseworker, who said that the foster mother told him what had occurred but "was very reluctant to make the report because she does not want her ex-husband to use it against her for custody of her children." DFPS Ruled Out Neglectful Supervision.

- Everyday Life RTC received a citation for failure to report because a resident made an outcry involving Sexual Abuse by a staff member at previous placement. Everyday Life staff acknowledged they did not report the incident and said that they did not make a report to the hotline because they were under the impression that it had already been reported.

- Laurel Ridge Treatment Center received a citation for failure to make a report to SWI after becoming aware that two children, an 11-year-old, and a 13-year-old (neither of which were in foster care) engaged in sexual contact. A CVS caseworker for another child reported the incidents to SWI. DFPS Ruled Out Neglectful Supervision.

- DFPS substantiated Physical Abuse and Neglectful Supervision against a staff member at Shiloh Treatment Center after finding a staff member dragged an 11-year-old foster child off a couch, down a hallway, and pushed her into a room. Another staff member failed to intervene, and no report was made to SWI. The staff member who dragged the child off the couch falsified the incident report filed with the operation by omitting the details of the abuse and claiming the child was the aggressor. Failure to report was one of eight citations issued by HHSC.

- Texas Baptist Home for Children received a citation for failure to report an allegation of child-on-child sexual contact involving a five-year-old child and an unknown child. The operation was cited because of a Heightened Monitoring inspection; serious incident reporting was one of the problems that led to the operation's placement on Heightened Monitoring.

- We R Champions CPA was cited for failure to report because its "file review detailed several concerning events that could possibly indicate abuse, neglect and/or exploitation. The agency failed to report the incidents and instead conducted an "internal investigation." This was one of 11 citations issued because

142

of the Priority 3 investigation, after a foster parent called SWI and alleged foster parents were not being paid by the CPA.

## Remedial Order 22 Summary

The data elements reported in ECHRs by inspectors regarding intakes, findings, and citations were found to be largely consistent with the aggregate data provided by the State to the Monitors. The Monitors' identified risks to children's safety in connection with 365 of the 526 inspections, however, that the State did not identify in 100 cases, significantly undermining the effectiveness of the ECHR process and the purpose of Remedial Order 22.

The accuracy of reported ANE intakes and ANE findings in the ECHR improved from 2021. In 2022, 96% of inspections contained the exact number of ANE findings as the aggregate data for the month, compared to 93% in 2021. Similarly, 60% of inspections contained the exact number of ANE intakes in 2022 compared to 57% in 2021. For both years, 95% of inspections contained the exact number of corporal punishment citations. The discrepancies are likely explained by the timing of the inspection.

The State's review and the Monitors' findings differed regarding compliance history. In 42% of cases in which the inspector documented no risk, the monitoring team assessed that there was a safety risk present.

HHSC's review found between 80% and 85% of cases took steps to address all risk identified in the assessment (including taking no steps when no risk was present) across the four case reads in 2022. The monitoring team assessed that, of inspections where there was a safety risk, the inspector documented how the operation's history or safety risk was taken into consideration in just over 60% of inspections between July and December 2022.

Twenty-two operations responsible for the 24 deficiencies cited in 2022 for failure to report abuse, neglect, or exploitation. Some operations were cited more than once. Four of the 22 operations that were cited for failure to report in 2022 were on Heightened Monitoring when they were cited for the violation.

Finally, a small gap persisted in 2022 in communication between HHSC and DFPS related to failure to report. Two citations were not found in either the HHSC or DFPS reports, and two were found in the HHSC report, but not in the DFPS report. The two citations that were not included in the DFPS report were for citations associated with child-on-child abuse.

## Remedial Orders 12-19: Timeliness of Minimum Standards Investigations

### Background

HHSC regulates child care and child-placing activities in Texas and creates and enforces minimum standards. Each set of minimum standards is based on a specific chapter of

143

the Health and Human Services title of the Texas Administrative Code. Title 26 Chapters 748 and 749 set the minimum standards for GROs and CPAs, including those serving PMC children.[157] The minimum standards establish basic requirements to protect the health and safety of children in care and are weighted by HHSC based on the agency's assessment of the risk that a violation of that standard presents to children. RCCR is responsible for inspecting childcare operations for compliance with these minimum standards and investigating reports of standards violations. These RCCR investigations, ordinarily known as minimum standards investigations, are classified as Priority One, Two, Three, Four, or Five.[158]

Regarding data and information updates for this period, HHSC continued to provide its monthly data reports to the Monitors for validation of Remedial Orders 12 to 19.[159]

## Performance Validation (HHSC)

To validate the timeliness of the State's performance associated with Remedial Orders 12 through 19, the Monitors assessed all 2,888 completed minimum standards investigations with an intake date between January 1, 2022, and November 30, 2022. Because HHSC reported it does not have the capacity to distinguish which investigations specifically involve PMC children and instead produced to the Monitors all its minimum standards investigations during the period, the Monitors evaluated all RCCR investigations included in the data HHSC produced with intake dates between January 1, 2022, and November 30, 2022.[160]

---

[157] *See generally* 26 TEX. ADMIN. CODE §§ 748.1 –748.4767 and 749.1 - 749.4267.

[158] *See generally* HHSC, *Child Care Licensing Policy and Procedures Handbook* § 6240 (2021) *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/6000-investigations#6240 [hereinafter *Child Care Licensing Policy and Procedures*]. More information about the definitions of the priorities is also included in the Monitors' First Report to the Court. *See also* Deborah Fowler & Kevin Ryan, First Report, 273 ECF No. 869.

[159] The main data deficiency persisted during this reporting period in that HHSC remained unable to identify children's legal status (and in the context of referrals, they were not able to identify their names) as the Monitors have noted previously. When the Monitors requested that HHSC identify the legal status of children in the data, HHSC previously responded: "[t]he agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral [or investigation]; the PMC identifier is only associated with referrals of abuse or neglect in IMPACT." HHSC, Memorandum from Tex. Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors, at 5-6 (Dec. 6, 2019) (on file with the Monitors) (responding to the Monitors' Sept. 30, 2019, Data, and Information Request). *See also*, Deborah Fowler & Kevin Ryan, First Report, 275 ECF No. 869. However, recently HHSC reported to the Monitors that it expects to be able to cure this deficiency in the relevant reports by June 2023. E-mail from Sinty Chandy, Attorney, HHSC, to Deborah Fowler and Kevin Ryan (March 15, 2023) (on file with the Monitors).

[160] The data reports used for analysis for Remedial Orders 12 to 19 were the two sets of monthly files regularly submitted by HHSC to the Monitors listing the relevant information for all minimum standards investigations initiated by RCCR between January 1, 2022, and November 30, 2022, as of the date the reports were submitted. Unless otherwise noted, the methodology is the same as in prior reporting periods.

Table 19: Priority of RCCR Investigations, January 1, 2022, to November 30, 2022

| Priority | Number | Percent |
|----------|--------|---------|
| Priority One | 0 | 0% |
| Priority Two | 349 | 12% |
| Priority Three | 1,944 | 67% |
| Priority Four | 13 | <1% |
| Priority Five | 582 | 20% |
| Total | 2,888 | 100%[161] |

**Remedial Order 12:** Timeliness of Observations or Interviews with Alleged Child Victims in Priority One Investigations

*Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

HHSC reported no Priority One RCCR investigations with intake dates between January 1, 2022, and November 30, 2022. The rate of face-to-face contact within 24 hours of intake in the Fourth Report was 50% (two of four Priority One investigations examined in the Fourth Report).[162]

**Remedial Order 13:** Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

HHSC reported 349 Priority Two RCCR investigations with an intake date between January 1, 2022, and November 30, 2022. [163] The data indicate that 93% (325) of the investigations included face-to-face contact with all alleged child victims within 72 hours of intake; the remaining 7% (24) of investigations did not include face-to-face contacts within 72 hours (21) or HHSC determined that there were no alleged child

---

[161] Total does not add up to 100% due to rounding.
[162] *See* Deborah Fowler & Kevin Ryan, Fourth Report, 83 ECF No. 1248.
[163] To measure timeliness of HHSC's face-to-face contact with all alleged child victims in Priority Two RCCR investigations, the Monitors calculated performance using the data fields for intake date and time; "first face-to-face contact date and time" for each alleged victim; and "Reason Face to Face Contact Not Made or Not Made Timely." To be considered compliant, investigations with multiple alleged victims must document unique time stamps for each alleged child victim; after the Monitors noted six investigations with this issue in the data reports submitted during this reporting period, HHSC provided updated data to the Monitors and those investigations were included as timely.

victims (3). The rate of face-to-face contact within 72 hours increased from the rate in the Fourth Report when it was 84%.[164]

Of the investigations that did not include face-to-face contact with all alleged victims within 72 hours of intake, face-to-face contact was made in the following timeframes: up to 12 hours late (3), 24 to 48 hours late (3), 96 to 120 hours late (2), more than 120 hours late (4).[165]

Additionally, of the 21 investigations that did not include face-to-face contact within 72 hours, HHSC data documented the following reasons for 19 investigations with untimely face-to-face contact: "victim was identified after the required timeframe for conducting FTF contacts with victim" (2), "whereabouts of the victim were unknown during the required timeframes for conducting FTF contacts" (4), "victim no longer lives in Texas" (1), "whereabouts of the victim were unknown during the entire course of the investigation" (2), and "a valid exception does not apply" (10).

Figure 61: Timeliness of Face-to-Face Contact with Alleged Child Victims in Priority Two HHSC Investigations

Source: HHSC RO 12-19 data, January to November 2022
n=349 investigations
100%
95%
90%
85%
80%
Percent timely
96%
95%
97%
90%
93%
92%
89%
94%
92%
90%
96%
Jan. 22 (27)
Feb. 22 (21)
Mar. 22 (39)
Apr. 22 (39)
May 22 (30)
Jun. 22 (37)
Jul. 22 (28)
Aug. 22 (33)
Sep. 22 (38)
Oct. 22 (30)
Nov. 22 (27)
Intake Month (number of cases)

---

[164] *See* Deborah Fowler & Kevin Ryan, Fourth Report, 84 ECF No. 1248.

[165] Nine investigations were non-compliant because they did not include face-to-face contact with all the alleged child victims in the investigation.

**Remedial Order 14:** Completion of Priority One and Priority Two Investigations within 30 days

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

HHSC reported 349 Priority One (0) and Priority Two (349) RCCR investigations with an intake date between January 1, 2022, and November 30, 2022. During this period, HHSC completed 96% (335) of investigations within 30 days of intake. HHSC's rate of completing Priority One and Priority Two minimum standards investigations within 30 days was higher than the rate in the Fourth Report (93%).[166]

Figure 62: Completion of Priority One and Two Investigations within 30 Days



**Remedial Order 15:** Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

HHSC reported 2,539 Priority Three, Four, and Five RCCR investigations with an intake date between January 1, 2022, and November 30, 2022. The priorities of investigations broke down as follows: Priority Three (1,944); Priority Four (13); and Priority Five (582)

---

[166] *See* Deborah Fowler & Kevin Ryan, Fourth Report, 85 ECF No. 1248.

investigations. During this period, HHSC completed 98% (2,488) of investigations within 60 days of intake. HHSC's rate of completing Priority Three, Four, and Five minimum standards investigations within 60 days was higher than the rate in the Fourth Report (97%).[167]

Figure 63: Completion of Priority Three, Four, and Five Investigations



**Remedial Order 16:** Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

HHSC reported 349 Priority One (0) and Priority Two (349) completed RCCR investigations with an intake date between January 1, 2022, and November 30, 2022. During this period, in 96% (335) of the investigations, the documentation was completed on the same day the investigation was completed. HHSC's rate of completing documentation on the same day the investigation was completed in Priority One and Priority Two investigations was higher than the rate in the Fourth Report (95%).[168]

---

[167] *See* Deborah Fowler & Kevin Ryan, Fourth Report, 86 ECF No. 1248.
[168] *Id*. at 87 ECF No. 1248.

148

Figure 64: Completion of Documentation in Priority One and Priority Two Investigations

Source: HHSC RO 12-19 data, January to November 2022
n=349 investigations



**Remedial Order 17:** Completion and Submission of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported completion of 2,539 Priority Three (1,944), Priority Four (13), and Priority Five (582) RCCR investigations with intake dates between January 1, 2022, and November 30, 2022. During this period, HHSC completed documentation within 60 days of the intake date in 98% (2,482) of the investigations. HHSC's rate of completing documentation within 60 days of intake in Priority Three, Priority Four, and Priority Five investigations was higher than the rate in the Fourth Report (96%).[169]

---

[169] *Id.* at 88, ECF No. 1248.

Figure 65: Completion of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations

Source: HHSC RO 12-19 data, January to November 2022
n=2,539 investigations



**Remedial Order 18:** Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

HHSC reported completion by December 31, 2022, of 349 Priority One (0) and Priority Two (349) RCCR investigations with intake dates between January 1, 2022, and November 30, 2022. Of those 349 RCCR investigations, 93% (326 investigations) included notification to the referent (or notification was not required);[170] and notification to the provider within five days of completion of the minimum standards investigation. HHSC's reported rate of notifying the referent and provider within five days of completion of Priority One and Priority Two minimum standards investigation was lower than the rate in the Fourth Report (94%).[171]

---

[170] The data indicated that no letter was required in 7% (23) of Priority One and Two investigations. A letter is not required when the reporter is either anonymous or notification will jeopardize the reporter's safety. HHSC, *Child Care Regulation Handbook* §6640, available at https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/6600-completing-investigation.
[171] *See* Deborah Fowler & Kevin Ryan, Fourth Report, 89 ECF No. 1248.

Figure 66: Notification Letters Sent within Five Days of Investigation Completion in Priority One and Two Investigations

Source: HHSC RO 12-19 data, January to November 2022
n=349 investigations



**Remedial Order 19:** Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four, and Priority Five investigations within 60 days of intake.*

HHSC reported completion by December 31, 2022, of 2,539 Priority Three (1,944), Priority Four (13), and Priority Five (582) RCCR investigations with intake dates between January 1, 2022, and November 30, 2022. Of the 2,539 investigations, 92% (2,343) of RCCR investigations included notification to the referent (or a letter was not required);[172] and to the provider within 60 days of intake. HHSC's rate of notifying the referent when required and provider within 60 days of intake of Priority Three, Priority

---

[172] In 4% (92) of Priority Three, Four, and Five RCCR investigations, the data reported that notification was not required; however, in 22 of these investigations, HHSC reported that a notification was provided to both the referent and to the provider within 60 days of intake. When the Monitors notified HHSC of this finding to inquire about the anomaly, HHSC acknowledged it and confirmed that it had implemented an update in CLASS to prevent repetition of this recording error. E-mail from Sinty Chandy, Attorney, HHSC, to Megan Annitto, Monitoring Team (March 24, 2023) (on file with the Monitors). The Monitors were able to confirm that the data did not contain the error after the CLASS update in August 2022 and will continue to examine the validity of the data provided.

Four, and Priority Five investigation was lower than the rate in the Fourth Report (95%).[173]

Figure 67: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations



Source: HHSC RO 12-19 data, January to November 2022
n=2,539 investigations

## Remedial Orders 12-19 Summary

### Remedial Order 12

There were no Priority One RCCR investigations during this reporting period.

### Remedial Order 13

93% (325) of Priority Two investigations included face-to-face contact with all alleged child victims within 72 hours of intake; the remaining 7% (24) of investigations did not include face-to-face contacts within 72 hours (21) or HHSC determined that there were no alleged child victims (3).

### Remedial Order 14

---

[173] *See* Deborah Fowler & Kevin Ryan, Fourth Report, 90 ECF No. 1248.

96% (335) of Priority One and Two RCCR investigations were completed within 30 days of intake.

## Remedial Order 15

98% (2,488) of Priority Three, Four, and Five RCCR investigations were completed within 60 days of intake.

## Remedial Order 16

In 96% (335) of Priority One and Two RCCR investigations, documentation was completed on the same day the investigation was completed.

## Remedial Order 17

In 98% (2,482) of Priority Three, Four, and Five RCCR investigations, documentation was completed within 60 days of intake.

## Remedial Order 18

93% (326) of Priority One and Two RCCR investigations included notification to the referent (or a letter was not required) and notification to the provider within five days of completion.

7% (23) of Priority One and Two RCCR investigations did not require notification.

## Remedial Order 19

92% (2,343) of Priority Three, Four, and Five RCCR investigations included notification to the referent (or a letter was not required) and to the provider within 60 days of intake.

4% (92) of Priority Three, Four, and Five RCCR investigations did not require notification.

## Remedial Order 20: Heightened Monitoring

**Remedial Order 20**: *Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections,*

*corrective actions, and, as appropriate, other remedial actions under DFPS'*
*enforcement framework.*[174]

## Overview of Operations Placed Under Heightened Monitoring

Most Texas operations serving foster children are not subject to Heightened Monitoring.
Of the 399 Texas operations serving foster children in 2021, the State placed only 101
(25%) on Heightened Monitoring.

Between 2020 and 2022,[175] 144 operations (36%) qualified for Heightened Monitoring,
with most of these 144 operations (91 of 144, or 63%) qualifying in multiple years. Of the
144 operations, 112 (78%) qualifying operations were placed on Heightened Monitoring;
the remaining 32 operations closed prior to beginning Heightened Monitoring.[176]
The 144 operations that qualified for Heightened Monitoring between 2020 and 2022
accounted for **712 substantiated findings of abuse, neglect, or exploitation** in
the years used to determine their eligibility for Heightened Monitoring. Deficiency
citations totaled 15,375, of which **13,542** were **citations issued for violation of
minimum standards weighted high, medium-high, or medium**.

Of the 13 operations placed on Heightened Monitoring in August 2022, the Monitors
found that the most common problem areas risking children's safety were related to
medication management/medical care, discipline, and records management, with 62%
of operations (8 of 13) having these issue areas identified. Similarly, also as discussed
below, the most frequently cited standards violations for all deficiencies cited in the six
months prior to operations moving to graduate from Heightened Monitoring in their
post-plan stage were related to medication management/medical care (21 of 110, or
19%).

---

[174] Two subsequent orders further described the methodology for identifying operations subject to
Heightened Monitoring, the method for developing a Heightened Monitoring plan and what is required to
be included, the cadence of monitoring visits by the State, requirements for placement of PMC children in
operations under Heightened Monitoring, the length of time operations are to stay on Heightened
Monitoring and the requirements an operation must meet to exit Heightened Monitoring. Order, March
18, 2020, ECF No. 837; Order Modifying Order Regarding Heightened Monitoring, December 7, 2020,
ECF No. 1012.
[175] The identification of operations for Heightened Monitoring began in 2020 and analysis is conducted
yearly. To date, operations have been identified and have been placed on Heightened Monitoring in 2020,
2021, and 2022.
[176] "Placed on Heightened Monitoring" includes all operations that were notified of Heightened
Monitoring, had a plan developed and monitoring by the Heightened Monitoring Team began. Four
operations were notified of Heightened Monitoring but closed prior to plan development, which are
included in the 32 operations that qualified but closed prior to beginning monitoring.

Figure 68: Overview of Operations Qualifying for and Placed on Heightened Monitoring



There are two stages of Heightened Monitoring: the period during which time the State actively monitors the operation's compliance with the Heightened Monitoring Plan ("Plan in Effect" stage), and "post-plan monitoring," during which time the State continues to visit the operation to ensure it continues to maintain the changes required by the Heightened Monitoring Plan.[177] As of March 1, 2023, only 39 of the 112 operations (35%) placed on Heightened Monitoring were still under active Heightened Monitoring (Plan in Effect), 12 (11%) were in post-plan monitoring, 25 (22%) had completed Heightened Monitoring, and 36 (32%) had closed or terminated their contract to serve children in the foster care system.

---

[177] *See* HHSC, Child Care Regulation Handbook §11100 Overview of Heightened Monitoring, *available at* https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/11100-overview-heightened-monitoring

The Court's order requires operations to remain under Heightened Monitoring for at least one year and until: the operation satisfies the conditions of the Heightened Monitoring Plan; at least six months' successive unannounced visits indicate the operation complies with the standards and contract requirements that led to Heightened Monitoring; and the operation is not out of compliance on any medium-high or high-weighted licensing standards. Order, 3 ECF 837.

After the operation is released from the Plan, the Court's order requires DFPS and HHSC to coordinate to make at least three unannounced visits in the three months following the release from the Plan, and to continue to track intake data for six months to ensure that the operation does not lose progress made during Heightened Monitoring. *Id.* at 3.

Table 20: Status of Heightened Monitoring Operations Starting HM 2020 − 2022

| Status of Heightened Monitoring Operations Starting HM 2020 − 2022 | | | | |
|---|---|---|---|---|
| | 2020 | 2021 | 2022 | Total |
| Operations Starting Heightened Monitoring | 86 | 13 | 13 | 112 |
| | | | | |
| Operations with Plans in Effect | 24 | 4 | 11 | 39 |
| Operations in Post Plan Monitoring | 8 | 4 | 0 | 12 |
| Operations Completing HM | 24 | 1 | 0 | 25 |
| Operations Closed/Contract Terminated | 30 | 4 | 2 | 36 |

## Operations Placed on Heightened Monitoring in 2022

Thirteen operations were newly placed on Heightened Monitoring in 2022, with most having a Heightened Monitoring plan start date in September 2022. The monitoring team conducted an in-depth review of the 13 operations, including extensive data analyses of the operations' historical compliance and problem areas as well as a review of all Heightened Monitoring documentation associated with the operations through December 2022.[178]

### Analysis of Problem Areas and Heightened Monitoring Plans

Over the five-year period between 2017 and 2021, the 13 operations placed on Heightened Monitoring in 2022 accounted for 70 substantiated findings of abuse, neglect, or exploitation ("Reason to Believe" findings or "RTBs"), and 980 citations for minimum standards deficiencies.[179] The violations, broken out by operation are as follows:[180]

---

[178] The in-depth review of Heightened Monitoring documentation was completed through December 2022. Analysis of all Heightened Monitoring operations' deficiencies and abuse, neglect, or exploitation investigations, discussed *infra* is current through January 2023. . .

[179] The number of citations includes all deficiencies cited for minimum standards without reference to weight.

[180] Hill County Youth Ranch CPA was one of the 13 operations placed on Heightened Monitoring in 2022 . . . Hill Country Youth Ranch is a small CPA and had a total of two homes active in 2021. Over the five-year period between 2017 and 2021, Hill Country Youth Ranch had no RTBs and five minimum standards violations. . . Hill Country Youth Ranch also had contract violations during the period. The State administratively closed Heightened Monitoring for the operation on March 24, 2023, because the operation did not have any children in care, and no open contracts with DFPS or an SSCC. Five of the operations Adiee Emergency Shelter, Harbor of Hope, Rob & Simon's Hawthorne House, Guardian's Promise and Center for Youth Services qualified for heightened monitoring even though they had less than five years of data to analyze

**Texas Department of FPS Region 10:**
No RTBs and 55 citations for minimum standards deficiencies during the period.

**Promise House:**
14 RTBs (13 for Neglectful Supervision and one for Physical Abuse) and 144 minimum standards deficiencies during the period.

**Texas Baptist Home for Children:**
Six RTBs (two for Medical Neglect and four for Neglectful Supervision) and 61 minimum standards deficiencies during the period.

**Sheltering Harbor:**
10 RTBs for Physical Abuse and 177 minimum standards deficiencies during the period.

**Angels Crossing:**
13 RTBs (12 for Neglectful Supervision and one for Physical Abuse) and 80 minimum standards deficiencies during the period.

**Children of Diversity:**
8 RTBs (one for Medical Neglect and seven for Physical Abuse) and 90 minimum standards deficiencies during the period.

**Silver Lining Residential:**
No RTBs and 76 minimum standards deficiencies during the period.

**Rob & Simon's Hawthorne House:**
8 RTBs (three Neglectful Supervision and five Physical Abuse) and 103 minimum standards deficiencies during the period.

**Guardian's Promise:**
Six RTBs (two Neglectful Supervision and four Physical Abuse) and 48 minimum standards deficiencies during the period.

**Center for Youth Care Services:**
No RTBs and 30 minimum standards deficiencies during the period.

**Adiee Emergency Shelter:**
No RTBs and 65 minimum standards deficiencies during the period.

**Harbor of Hope:**
Five RTBs (three Neglectful Supervision and two Physical Abuse) and 46 minimum standards deficiencies during the period.

The five-year history (2017-2021) of enforcement actions for the 13 operations placed on Heightened Monitoring in 2022 is below.[181] The most common enforcement action was a monetary penalty, accounting for 77% (24 of 31) of the actions against the operations during the period. Three of the operations had no enforcement actions during the period.

Table 21: Number of Enforcement Actions Starting 2017 – 2021 for Operations Placed on Heightened Monitoring in 2022

| Number of Enforcement Actions Starting 2017 – 2021 | | | |
|---|---|---|---|
| | Probation/ Evaluation | Plan of Action | Monetary Penalty |
| Adiee Emergency Shelter | 0 | 0 | 0 |
| Angels Crossing | 0 | 1 | 4 |
| Center for Youth Care Services | 0 | 0 | 2 |
| Children of Diversity | 0 | 0 | 3 |
| Guardian's Promise | 0 | 0 | 2 |
| Harbor of Hope | 0 | 1 | 1 |
| Promise House | 1 | 1 | 6 |
| Rob & Simon's Hawthorne House | 0 | 0 | 1 |
| Sheltering Harbor | 1 | 1 | 4 |
| Silver Lining Residential | 0 | 1 | 0 |
| Texas Baptist Home for Children | 0 | 0 | 1 |
| Texas FPS Region 10 | 0 | 0 | 0 |

Five of the operations placed on Heightened Monitoring in 2022 were also subject to an enforcement action in 2022. Children of Diversity and Rob & Simon's Hawthorne House were placed on probation in 2022 prior to being placed on Heightened Monitoring and were on probation at the time Heightened Monitoring began. Monetary penalties were assessed to Silver Lining (1), Promise House (1), and Guardian's Promise (3) in 2022 after each operation was placed on Heightened Monitoring.

## Heightened Monitoring Plans

Heightened Monitoring Plans are developed for all operations placed on Heightened Monitoring by the State's Heightened Monitoring Development Team.[182] The Plan

---

[181] Includes placement on probation by HHSC, or an evaluation, a voluntary action that was discontinued by the State.
[182] The Heightened Monitoring Development team is comprised of program specialists from each of the following Divisions: HHSC CCR, DFPS CPS, DFPS RCC, and DFPS CCI.

identifies the operation's five-year compliance trends and current violation patterns and outlines the tasks the operation must accomplish to complete monitoring. Tasks relate to the operation's problem areas and completion of the tasks is expected to result in improved compliance.

The monitoring team reviewed each operation's Heightened Monitoring Plans to identify the operation's problem areas as described by the Heightened Monitoring Development Team.[183] The 13 operations had a total of 77 problem areas identified. The most common problem areas presenting a risk to children's safety were related to medication management/medical care, discipline, and records management, with 62% of operations (eight of 13) having these issue areas identified. Most operations (54%, or seven of 13) also had compliance problems related to child rights, serious incident reporting, and supervision during the period of 2017 to 2021.

Figure 69: Problem Areas Identified in Heightened Monitoring Plans



Source: Heightened Monitoring Plan Documentation
n = 13

---

[183] Task categories include Administration, Admission/Service/Discharge Planning, Child Rights, Criminal Background Checks, Discipline, EBI, Foster Home Screening, Health and Safety, Medical/Medication Management, Physical Plant, Records, Serious Incident Reporting, Staff Oversight, Staff Turnover, Supervision, Supervisory Visits (to foster homes), and Training.

Operations had, on average, six problem areas identified in their Heightened Monitoring Plan, with a range of two to nine problem areas. More than half of the operations (54%, or seven of 13) had six or more problem areas, with 15% (two of 13) having eight or more.

**Figure 70: Number of Problem Areas Per Operation**



The review conducted by the monitoring team also compared each operation's historical trends to the problem areas identified in the operation's Heightened Monitoring Plan. The monitoring team identified one or more problem areas that were not included in the operation's Heightened Monitoring Plan for two-thirds of the operations reviewed (69%, or 9 of 13). Problem areas identified by the monitoring team that were not found in Heightened Monitoring Plans included physical plant issues, child rights, emergency behavioral interventions (EBIs), supervision, and staff oversight. Two operations had two problem areas that were not identified in their Heighted Monitoring Plan, and three of the 13 operations newly placed under Heightened Monitoring in 2022 had three or more problem areas that were not addressed in their Plans.

Heightened Monitoring Plans include Tasks intended to help the operation improve child safety. Tasks must be completed for the operation to comply with and successfully complete Heightened Monitoring. The 13 operations placed on Heightened Monitoring in 2022 had a total of 122 tasks in their Heightened Monitoring Plans. Operations had, on average, nine Tasks with a range of two to 17 Tasks. One of the 13 operations (8%) had only two Tasks in their Heightened Monitoring Plan while three (23%, or 3 of 13) had between 12 and 17 Tasks. Most operations (9 of 13, or 69%) had between six and eleven Tasks in their Plan.

For all operations, the number of Tasks appeared to relate to the number of problem areas identified by the Heightened Monitoring Team. The operation with two Tasks had two problem areas identified, while operations with six to eight Tasks had three to four problem areas identified, and operations with nine or more Tasks had five to nine problem areas identified.

Figure 71: Number of Plan Tasks for Operations Placed on Heightened Monitoring in 2022



Tasks included in Heightened Monitoring Plans relate to the operation's five-year compliance trends and problem areas. A single Task may relate to more than one problem area or multiple Tasks may relate to a single problem area.

The monitoring team reviewed the Tasks in each operation's Heightened Monitoring Plan to identify the associated problem area(s). Of the operations reviewed, 62% (8 of 13) had Tasks related to medication management and discipline while 54% of operations had Tasks related to child rights, serious incident reporting, and training. Eleven of the 13 operations (85%) had Tasks related to record keeping.

Figure 72: Operation Task Problem Areas



All operations placed on Heightened Monitoring in 2022 had one or more Tasks associated with each of their identified problem areas. Nine operations (69%) had Tasks included in their Plan that did not directly relate to the problem areas identified by the Heightened Monitoring Development Team. These Tasks related to supervisory visits of foster homes, records management, and administration/oversight.

Plan Tasks provide the operation with basic instruction on how each Task is expected to be accomplished, including the development of policies and procedures, the creation of checklists and guides, and the of training staff and foster parents. Some Tasks include multiple steps that an operation is expected to take to comply. The monitoring team categorized how each of the 122 Tasks were to be accomplished. More than one category could be assigned to each Task.

Figure 73: How Heightened Monitoring Tasks Will Be Accomplished



Source: Heightened Monitoring Plan Tasks
n = 176

Over one quarter of the Tasks for operations placed on Heightened Monitoring in 2022 required the development of a tool, guide, or checklist (46 of 176, or 26%) and more than one-fifth of the Tasks required a plan or process development or revision (39 of 176, or 22%) or training (38 of 176, or 22%). Few Tasks required the development of quality assurance (9%) processes, records management, or policy development (7%).

Quality of Heightened Monitoring Tasks

The Court's order requires a "specific and detailed" Heightened Monitoring Plan.[184] The order states that the FITS team[185] is responsible for developing a specific Plan addressing: the pattern of policy violations that led to Heightened Monitoring; any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses; any technical assistance needed by the operation from DFPS, HHSC, or a third party; and the steps the operation must take to satisfy the Plan.[186] The

---

[184] Order, ECF 837.
[185] The Facility Intervention Team Staffing (FITS) Team for the operation includes all members of the Heightened Monitoring Development Team.
[186] *Id.*

State included the same language in the Heightened Monitoring Process Overview Document that it created to guide implementation of the Court's order.[187]

The monitoring team's review of Heightened Monitoring Plan Tasks included an assessment of the quality of the Plan's Tasks, including whether each Task had clear objectives, whether the Tasks only required the operation to take steps to follow minimum standards or to follow the requirements of an existing enforcement action, and whether completion or implementation of the Task was likely to have a direct, positive impact on child safety.

The monitoring team found that nearly all Tasks were specific in describing what the operation was required to accomplish (121 of 122, or 99%). The monitoring team found that there was improvement in the Task language found in Heightened Monitoring Plans for operations placed on Heightened Monitoring in 2022 compared to those placed on Heightened Monitoring in 2020 and 2021.

Ninety-nine percent of Tasks (121 of 122) for operations placed on Heightened Monitoring in 2022 were specific in their requirements compared to 95% (431 of 456) for operations placed on Heightened Monitoring in 2020 or 2021. The percentage of Tasks simply requiring operations to comply with minimum standards declined to 30% (37 of 122) for operations placed on Heightened Monitoring in 2022 from 45% (204 or 456) of Tasks for operations placed on Heightened Monitoring in 2020 and 2021. Neither of the two operations that were on probation at the time they were placed on Heightened Monitoring had a Task that only directed them to follow the requirements of their probation.

Figure 74: Task Characteristics as Identified by Monitor's Staff for Operations Placed on Heightened Monitoring in 2020-2022



---

[187] HHSC & DFPS, Heightened Monitoring Process Overview (undated) (on file with the Monitors).

164

While most of the 122 Tasks included in these 13 Heightened Monitoring Plans should strengthen operations if implemented effectively, the Tasks most likely to a direct, positive impact on child safety are a subset of 28 Tasks. An additional 20 of 122 Tasks are likely to have the most direct, positive impact only if the policy or plan required by the Task is fully implemented by the operation.

### Review of Placements of PMC Children Made to Operations Under Heightened Monitoring, January 1, 2022, through December 31, 2022

During calendar year 2022, CVS caseworkers made a total of 5,495 requests to place foster children (TMC and PMC) in operations that were under Heightened Monitoring. Just over one-third of these requests involved a PMC child.



Figure 75: Legal Status of Children with Placement Requests to Heightened Monitoring Operations, Calendar Year 2022

Source: DFPS, Placement authorization requests
n = 5,495

The number of requests made to place a child in an operation under Heightened Monitoring declined in the latter part of 2022.

165

Figure 76: Number of Heightened Monitoring Placement Requests by Month, Calendar Year 2022



Source: DFPS Placement authorization requests
n = 5,495

During 2022, 1,422 placements of PMC children were made to operations under Heightened Monitoring. An average of 119 placements involving PMC children were made to operations under Heightened Monitoring each month in 2022, compared to 133 in 2021. Nineteen fewer operations were under Heightened Monitoring in 2022: 91 in 2022, compared to 110 in 2021, which, in part, explains the reduction in children's placements in operations under Heightened Monitoring.[188]

---

[188] Two operations closed in 2020 and 19 operations closed in 2021.

Figure 77: Number of Placements of PMC Children at Operations
Under Heightened Monitoring by Month, Calendar Year 2022



Source: PMC placement data
n = 1,422

Nearly all requests to approve placement of a PMC child at an operation under
Heightened Monitoring received approval by a Director or Associate Commissioner. Of
the 1,422 requests to place a PMC child in an operation on Heightened Monitoring in
2022, 1,402 (99%) were approved.

Figure 78: Placements of PMC Children at Heightened
Monitoring Operations by Approval Status, Calendar Year 2022



Source: PMC placement data, Placement authorization
requests
n = 1,422

.

.

Approximately 6% of placement approvals were made after the PMC child had already been placed. The timing of placement approval marks an improvement over the Monitors' findings for 2021 during which 31% of placements were approved after the child was placed.[189]

Figure 79: Timing of Approval in IMPACT for Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2022



Source: PMC placement data, Placement authorization requests
n = 1,402

- Approved prior to placement: 981 (70%)
- Approved same day as placement: 332 (24%)
- Approved after placement: 89 (6%)

SSCCs were more likely than DFPS to approve a PMC child's placement in a Heightened Monitoring operation the same day that the child was placed. DFPS approved 75% (684 of 912) of PMC placements in Heightened Monitoring operations prior to the day the child was placed, compared to 58% (297 of 510) of SSCC placements.

The monitoring team reviewed IMPACT records for PMC children who were placed in Heightened Monitoring operations in 2022 to determine whether the Court's requirements related to placement approvals were documented.[190] Although almost all

[189] Deborah Fowler & Kevin Ryan, Fourth Report, 113 ECF No. 1248.
[190] The Court's December 7, 2020, order required, "Before approving a PMC child's placement into a facility on Heightened Monitoring, the Regional Director must consider all required elements as set forth in applicable DFPS policy, including but not limited to reviewing the facility's history over the previous five years. If the Regional Director approves the placement, he or she will personally document approval of the placement in the comment box within the placement section of IMPACT, will confirm that the facility's history was reviewed and considered for the past five years, and will document the justification for the approval, which will constitute certification that the Regional Director approved the placement and followed the required DFPS policy." Order, 1-2 ECF No. 1012.

The monitoring team reviewed the Heightened Monitoring Placement Request tab in IMPACT for each 2022 placement of a PMC child in a Heightened Monitoring operation to determine: whether a best interest statement was included in the request (per DFPS policy); whether the Regional Director or Associate Commissioner documented justification for the placement approval; and, whether the Regional Director or Associate Commissioner documented that they had reviewed the operation's history over the previous five years.

168

approvals included a best interest statement, most approvals did not include documentation of the approver's justification for placement or a discussion of their review of the operation's five-year child safety history.[191]

Figure 80: Information Included in Heightened Monitoring Placement Request for Approved Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2022



The monitoring team found documentation of both the approver's justification for the PMC child's placement and a review of the operation's five-year child safety history in only 17% (235 of 1,402) of approved placements.

The monitoring team found these elements for significantly fewer placements than were found in 2021. In 2021, IMPACT records included justification for the placement and a five-year review of the operation's history in 65% (874 of 1355) of PMC placements.

---

[191] If the approver simply stated, "history reviewed" or "reviewed CLASS," this was not considered to be an indication that the operation's five-year history was reviewed. . . When the monitoring team reviewed the information for information justifying the placement, the team looked to see whether the approver provided reasons that the placement would be able to meet the child's needs, or context around the child's current placement and why the requested placement was the best option. If the approver simply stated, "I am in agreement with the best interest statement," this was not considered to be justification for placement.

Figure 81: Documentation of Approver's Justification for Placement and Review of Operation's Five-Year History in Heightened Monitoring Placement Request for Approved PMC Placements, Calendar Year 2022

Source: PMC placement data, Placement authorization requests
n = 1,402



- Included five-year history and justification
- Included justification only
- Included five-year history only
- Did not include justification or history

The monitoring team also noticed that staff that approved placement requests frequently copied and pasted statements, resulting in generic approvals that did not appear to consider a child's individual needs. Requesters cut and paste between requests, approvers cut and paste the requestors' language without adding their own justification for the placement, and in some cases cut and paste incorrect information from a former request or approval into a subsequent request or approval.

For example, one child whose records were reviewed had four placements in different foster homes verified by CPAs that were under Heightened Monitoring. The first request was made July 6, 2022, another on September 22, 2022, a third on October 3, 2022, and the last on December 5, 2022. In the September 22, 2022, request for approval, the requestor's best interest statement provided:

> The youth is in an unauthorized relative home, that is no longer appropriately supervised. The foster home caregiver is willing to further nurture the youth, meet her day to day [sic] needs, ensure her educational needs are met, and assist with transportation to all appointments. The youth will benefit in this positive environment and will have time to adjust.

When the Regional Director approved the placement, she simply cut-and-pasted the same language into the comment box on the approval page, without adding any additional information.

When the placement disrupted and the child's caseworker made a subsequent request on October 6, 2022, to place the child in a home verified by the same CPA, the requestor this time stated:

> The youth is currently a "Child Without Placement." The foster home caregiver is willing to further nurture the youth, meet her day to day [sic] needs, ensure her educational needs are met, and assist with transportation to all appointments. The youth will benefit in this positive environment and will have time to adjust.

However, when she approved this placement, the Regional Director again stated:

> The youth is in an unauthorized relative home, that is no longer appropriately supervised. The foster home caregiver is willing to further nurture the youth, meet her day to day [sic] needs, ensure her educational needs are met, and assist with transportation to all appointments. The youth will benefit in this positive environment and will have time to adjust.

When that placement disrupted, the child's caseworker submitted a placement request for a foster home verified by a different CPA that was also under Heightened Monitoring. That placement request again recycled almost all the same language from the two previous the best interest statements:

> The youth is being discharged from her current placement due to attempt to steal from caregiver, destruction of property and truancy. The potential home currently has the youth's younger bio sister and the caregiver is willing to further nurture the youth, meet her day to day [sic] needs, and assist with her defiant behaviors with positive re-direction. The youth will benefit in this positive environment and will have time to adjust to new structured environment.

The Regional Director cut-and-pasted this language into the approval, without including any additional information, even though the first sentence was in no way relevant to either the child's best interests or a justification for placing the child in a home that was verified by an operation that was under Heightened Monitoring.

In another placement reviewed by the Monitors, the caseworker who requested placement for the child simply stated, "This foster home is the best option for [name omitted] at this time, as they are able to meet his needs and provide them with a structured environment."  When she approved the placement, the DFPS approver stated, "I approve this placement. I have reviewed HM and history. Placement is in best interest because this foster home is able to meet the youth's needs and will provide a structured environment."  The placement request for another unrelated child for a different foster home verified by the same CPA was identical, as was the Regional Director's approval. The only difference was the child's name.

In some cases, the requestor and approver cut-and-pasted the same information for a sibling. For example, on October 20, 2022, two siblings – a 13-year-old and a 7-year-old -- were placed in a foster home verified by a CPA that was on Heightened Monitoring. The caseworker's placement request for the 13-year-old (Child A) stated, "[Child A] is currently in the home for respite and the family is willing to take his sibling. The home can meet the needs of both boys." The Regional Director approved the placement, and simply cut-and-pasted the same language into the comments box in IMPACT, without adding anything. The same language, without any changes, appeared in the placement request and approval for the seven-year-old sibling.

In other cases, children with significant behavioral health needs were placed into an RTC that was under Heightened Monitoring, with the DFPS staff who approved the caseworker's placement request simply cutting and pasting the language included in their request. For example, Child A's caseworker included the following in her request to place the child in Shamar Hope Haven on October 18, 2022:

> [Child A] has been in Child Without Placement since 9/06/22 after returning from a psychiatric hospital. His level of care is intense and his IQ is 75. According to the most recent psychological this youth [sic] diagnosis is as follows: Major depressive disorder, recurrent, moderate with suicidal ideations and mixed features, Unspecified disruptive, impulse control, Conduct Disorder, Child physical abuse by history, Child sexual abuse by history, Child neglect, Borderline intellectual Functioning, Specific learning disorder with impairments in reading and mathematics, ADHD by history. Please take a look at the attachments regarding this youth to learn more about his/her behavior and needs. The operation is confident they are able to work with this youth.

The Regional Director approved the placement, cutting and pasting the language into the IMPACT comments section on the approval page, without even removing the language referring to the attachments and without describing the justification for the placement. A close review of the operation's history was important, given the child's needs, and particularly since the operation's pattern of problems identified in the Heightened Monitoring Plan included a pattern of problems related to timely and accurate service plans for children. Just one month prior to the placement request, an investigation of the operation resulted in four citations being issued after a new staff person who had not yet been fully trained was supervising a youth who had to be restrained when he threatened to use a shank to harm two other residents. Yet, there is no language in the Regional Director's approval that suggests that she was even aware of this investigation and had considered it in the context of the behavioral health challenges described in the placement request. The placement that was the subject of the request ultimately disrupted within approximately one month.

Approximately 20% (258 of 1,402) of approvers simply stated "approved" or "reviewed" in the narrative box used by the approver to document their review of the placement. One Regional Director alone was responsible for 172 of these, representing 78% (172 of

221) of the placement requests that he approved that had some notation in the comments box.

The percentage of placement approvals that included all the required documentation declined throughout 2022. Though a best interest statement was consistently documented, the justification for the placement and a discussion of the five-year review of the operation's child safety history dropped significantly between January 2022 and December 2022.

Figure 82: Percent of Approved Placements of PMC Children at Heightened Monitoring Operations Containing the Required Documentation by Month, Calendar Year 2022



Source: PMC placement data, Placement authorization requests
n = 1,402

In 2022, only 16% (225 of 1422) of all placements of PMC children to operations under Heightened Monitoring received prior approval that met all the Court's requirements, a significant reduction from 2021, when the monitoring team found 38% (602 of 1,595) met all the Court's requirements.

## Analysis of Heightened Monitoring Quarterly Reports and Data

Operations placed under Heightened Monitoring are reviewed by the operation's Heightened Monitoring team on a quarterly basis to monitor the operation's progress.[192] A quarterly compliance status report is developed and reviewed to determine whether any modifications to the Heightened Monitoring plan are needed.[193] After the quarterly report is reviewed and approved by the Heightened Monitoring Directors, the lead Heightened Monitoring Director assigned to the operation meets with the operation leadership to discuss the quarterly report.[194]

---

[192] HHSC & DFPS, Heightened Monitoring Process Overview 6 (undated) (on file with the Monitors).
[193] *Id.*
[194] *Id.*

The monitoring team reviewed 177 quarterly reports for 68 operations on Heightened Monitoring in 2022.[195] Analysis of data collected from these reports include the following:

- Heightened Monitoring status of operations in 2022
- Completion of Heightened Monitoring Tasks due during the quarter
- Compliance with Heightened Monitoring Tasks
- Deficiencies cited, findings of contract violations, and enforcement actions initiated during the review period (i.e., prior quarter)
- Comparison of the consistency between quarterly report documentation and monthly Heightened Monitoring documentation
- Deficiencies and Task compliance over time for operations in 2021 quarterly report analysis with four quarterly reports in 2022.

Of the 68 operations reviewed, 43 (63%) were identified for Heightened Monitoring by the State in 2020 (i.e., 2020 cohort), 13 of the operations (19%) were identified in 2021 (i.e., 2021 cohort), and 12 of the operations (18%) were identified in 2022 (i.e., 2022 cohort).[196]

---

[195] Quarterly reports with a review period ending in 2022 are included in the analysis. Operation's do not have quarterly reports in the post-plan monitoring stage. An operation's first quarterly report (Q1) represents the first quarter following the Heightened Monitoring Plan Start Date. Operations on Heightened Monitoring in 2022 had plan start dates that ranged from July 2020 to September 2022 and have from one to four quarterly reports reflecting review periods as early as Quarter 1, for operations starting Heightened Monitoring in 2022, to Quarter 8, for operations that started Heightened Monitoring in 2020.

[196] One operation was identified for Heightened Monitoring in 2022 but did not have a quarterly report during the year because the operation closed on December 31, 2022 (Angel's Crossing). One operation identified for Heightened Monitoring in 2020 was closed in April 2022 and had one quarterly report during the year but was not included in the analysis (Freedom Place).

Figure 83: Heightened Monitoring Cohort Year for
Operations with a Quarterly Report in 2022

Source: HM Quarterly Reports, 2022
n = 68



The 68 operations had a range of one to four quarterly reports during 2022. Nearly half of operations (31 of 68, or 46%) had four reports during 2022 while over one-third (24 of 68, or 35%) had one report during 2022.

Operations that have been on Heightened Monitoring for more than one year with an annual review decision to extend Heightened Monitoring begin the next quarterly report at Quarter Five and continue quarterly until they move to post-plan monitoring.[197] Nearly three-quarters of quarterly reports in 2022 (129 of 177, or 73%) covered Quarter Five to Quarter Eight.

Figure 84: Number of Quarterly Reports for Operations on Heightened
Monitoring in 2022

Source: HM Quarterly Reports, 2022
n = 68



---

[197] Quarterly reports are not conducted once an operation moves to post-plan monitoring.

Operations with quarterly reports completed in 2022 were at various stages of involvement in Heightened Monitoring. Operations with one quarterly report included those starting Heightened Monitoring during 2022 (13)[198], those that completed one quarter in 2022 before moving to post-plan monitoring (8), and those that completed one quarter before closing or relinquishing their contract in 2022 (3). Operations with four quarterly reports include those that were extended at their annual review and remained on Heightened Monitoring throughout the year (30) and one that completed four quarters during the year before moving to post-plan monitoring (1).

Nearly half of operations (31 of 68, or 46%) in the 2022 quarterly report analysis were on active Heightened Monitoring throughout the entire year, 16 of 68 (23%) operations moved to post-plan monitoring during 2022, eight of 68 (12%) operations closed during 2022, and 13 of 68 (19%) operations had started Heightened Monitoring or had only a first quarterly report in 2022. Of the 16 operations that moved to post-plan monitoring during 2022, 14 had initially been extended on Heightened Monitoring after their annual review, and two of 16 moved to post-plan monitoring after their annual review.

The most consistent reason noted in quarterly reports for operations being extended on Heightened Monitoring was open or pending abuse and neglect investigations. Other reasons given for extending Heightened Monitoring include deficiencies cited for minimum standards, particularly those related to a problem area, and not maintaining compliance with Heightened Monitoring tasks for a required six-month compliance period.

Figure 85: Status on Heightened Monitoring for Operations with a Quarterly Report in 2022



Source: HM quarterly reports, 2022
n = 68

---

[198] One operation identified for Heightened Monitoring in 2021 did not have a plan start date until 2022 and had only completed Quarter 1 during the year (VisionQuest Four Directions).

The 31 operations that remained active on Heightened Monitoring throughout 2022 accounted for 70% of all quarterly reports (123 of 177).

## Compliance with Heightened Monitoring Plan Tasks

Most operations completed all Heightened Monitoring Plan Tasks in 2022.[199] For operations with a first quarterly report conducted during 2022, 69% (9 of 13) had completed all the requirements for Plan Tasks during the quarter. This is slightly lower than 2021, when 72% of operations (13 of 18) had completed all requirements for Plan Tasks during the first quarter of Heightened Monitoring.[200]

For operations in Quarter Five of Heightened Monitoring during 2022 (which, again, indicates Heightened Monitoring was extended after an annual review), only one operation had not completed all Plan Tasks during the quarter. Most operations in Quarter Five to Quarter Eight that had yet to complete all Plan Tasks had received new or revised Tasks or were not in compliance with all Plan Tasks. Twenty-one percent (14 of 68) had a new or revised Plan Task during the year. Eighty-three percent of quarterly reports with Task revisions (15 of 18) occurred in Quarter Five through Quarter Eight. None of the Task revisions resulted in less rigorous requirements for the operation.

During the quarterly review process, the Heightened Monitoring Team reviews the operation's compliance and progress following the Heightened Monitoring Plan during the quarter. A quarterly compliance status report is developed and reviewed by the Team to determine whether any modifications to the Heightened Monitoring Plan are needed. In nearly half of quarterly reports in 2022 (85 of 177, or 48%), the Heightened Monitoring Team determined that operations were not in compliance with all Plan Tasks.

The number of Tasks found to be out of compliance per quarter ranged from one to five, with an average of 1.7 Tasks out of compliance. Fifty-three percent of quarterly reports with Tasks out of compliance (45 of 85) had one task out of compliance, 31% (26 of 85) had two tasks out of compliance, and 16% (14 of 85) had three to five tasks out of compliance. Operations were found to be out of compliance with tasks for the following reasons, including but not limited to:

- Service plan not signed by child's caseworker
- Incomplete foster home/home study analysis or audit
- Home screenings were not completed
- Staff files missing required training documentation

---

[199] Heightened Monitoring Plan Tasks refer to a set of Tasks identified in a Heightened Monitoring Plan for which an operation has had a history of non-compliance. The operation's intended plan for compliance for each Task is submitted to the Heightened Monitoring Team for evaluation and is approved by the Team. Once approved, the operation begins the process of implementing all the requirements and conditions of the Task. Testing of each Task begins once implemented. The operation is evaluated during unannounced monitoring visits to assess whether the requirements of the Task are being followed and to determine if substantial compliance has been achieved. Once substantial compliance has been achieved, the Task will no longer be routinely monitored.

[200] Fourth Report, 122 ECF No. 1248.

- Failure to implement required Safety Plans
- Pre-filled or missing medication logs or errors in medication logs
- Citations received by operation
- Physical site requirements were not met

Figure 86: Heightened Monitoring Team's Determination of Compliance with Plan Tasks in Quarterly Reports



Source: HM quarterly reports, 2022
n = 177

- In compliance with all tasks
- Not in compliance with one or more tasks

Forty-two of 68 operations (62%) were out of compliance with their Plan Tasks in one or more quarters, an improvement over 2021 when 74% were out of compliance in one or more quarters;[201] 26 of 68 (38%) operations had no quarters out of compliance. Eighty-four percent of operations under extended Heightened Monitoring throughout 2022 (26 of 31) had one or more quarters out of compliance, including 13 operations with three or four quarters out of compliance. Five of 16 operations (31%) that moved to post-plan monitoring in 2022 were determined to be out of compliance with one or more tasks in the quarter prior to moving to post-plan monitoring.

---

[201] Fourth Report, 124 ECF No. 1248.

Figure 87: Heightened Monitoring Team's Determination of Compliance with Plan Tasks by Operation Status



Source: HM quarterly reports, 2022
n = 68

Compliance with Heightened Monitoring Plan Tasks does not mean that the operation had no minimum standards or contract violations during the quarter. An operation may be found to be compliant with Plan Tasks even while continuing to have deficiencies cited. Of the 92 quarterly reports that found the operation reviewed by the Heightened Monitoring Team to comply with all tasks:

- 52 (57%) indicated the operation had deficiencies cited for standards related to the operation's Heightened Monitoring problem areas during the quarter.
- 21 (23%) indicated the operation had contract or enforcement actions taken, including one operation being placed on probation, during the quarter.[202]

Quarterly reports capture the number of minimum standards citations that were issued to the operation during the quarter.[203] Most operations (53 of 68, or 78%) had a deficiency cited in every quarter during 2022. Only six of 68 operations (9%) had no deficiencies cited in any quarters during the year. The 68 operations included in the analysis had a total of 1,007 deficiencies cited during the quarterly report periods ending in 2022. **Nearly half of these deficiencies (485 of 1,007, or 48%) were related to an operation's Heightened Monitoring problem area.**

Ninety percent of quarterly reports (160 of 177) indicated the operation was cited for a deficiency during the quarter. Operations were found to be out of compliance with

---

[202] Youth in View was found to be compliant with all Plan Tasks and placed on probation in Quarter 5.
[203] Citations may have been pending administrative review.

medium-high or high-weighted standards in 145 of 177 quarterly reports (82%). These deficiencies included citations for staff falling asleep while caring for children, staff pushing and yelling at children in care (prohibited punishment), staff consuming alcohol on duty, and failing to ensure children were taking medication as prescribed. In 126 of the 160 quarterly reports with a deficiency cited during the period, at least one deficiency was related to the operation's Heightened Monitoring problem areas. Operations had, on average, 6.29 deficiencies cited per quarter with a range of one to 38 and had, on average, 3.85 deficiencies related to a Heightened Monitoring problem area with a range of one to 21.

Figure 88: Deficiencies Related to Heightened Monitoring Cited During the Quarter as Reported on the Quarterly Report



Source: HM quarterly reports, 2022
n = 177

- One or more deficiency related to HM problem area
- None of deficiencies related to HM problem area
- No deficiencies cited

Operations moving to post-plan monitoring during the year had, on average, the lowest number of deficiencies cited. Operations on extended Heightened Monitoring throughout 2022 had an average of 28 total deficiencies in the year, 14 of which were related to a Heightened Monitoring problem area.



Figure 89: Average Number of Deficiencies Cited in Quarterly Reports by Status on Heightened Monitoring

For operations with quarterly reports in Quarter Five to Quarter Eight during 2022, slight improvement was made regarding deficiencies related to problem areas. In Quarter Five, these 27 operations had an average of 4.3 deficiencies cited during the period and in Quarter Eight the average dropped to three deficiencies cited during the period.



Figure 90: Average Number of Deficiencies Cited in Quarter Five to Quarter Eight of Heightened Monitoring

Note: This figure includes the 27 operations that were placed on Heightened Monitoring in 2020 and had four quarters after the annual review. The remaining four operations that were on active Heightened Monitoring throughout 2022 were operations in the 2021 cohort that received an extension in July-August 2022.

The quarterly reports also capture contract violations that occurred during the quarter. Most operations did not have a contract violation in any quarter. Of the 25 operations (37%)[204] that had a contract violation during 2022, 16 had a contract violation related to a Heightened Monitoring Plan Task or problem area.

Figure 91: Number of Quarters Operations had Contract Violations in 2022



Twenty-five operations had a total of 64 contract violations identified in quarterly reports during 2022. Twenty-eight of these violations were related to a Heightened Monitoring Plan task or problem area.

Table 22: Operations with a Contract Violation and Number of Violations in Quarterly Reports

| Operation | Number of Quarterly Reports | Number of Contract Violations | Number Related to HM Task |
|---|---|---|---|
| Heightened Monitoring Status in 2022: Extended HM Throughout 2022 | | | |
| A World for Children | 4 | 4 | 2 |

---

[204] DFPS Region 10 was not eligible to receive a contract violation and was excluded from the analysis.

| | | | |
|---|---|---|---|
| Azleway Children Services | 4 | 2 | 0 |
| Beacon of Hope | 4 | 1 | 1 |
| Boys Haven of America | 4 | 1 | 1 |
| Children's Hope | 4 | 3 | 0 |
| Circles of Care | 4 | 5 | 2 |
| East Texas Open Door | 4 | 2 | 2 |
| Family Link CPA | 4 | 2 | 0 |
| Global Foster Care | 4 | 3 | 0 |
| Hands of Healing CPA | 4 | 1 | 0 |
| Lutheran Social Services | 4 | 7 | 5 |
| New Life Children's RTC | 4 | 1 | 1 |
| Passage of Youth Family Center | 4 | 6 | 0 |
| Texas Foster Care and Adoption Services | 4 | 8 | 2 |
| The Burke Foundation CPA | 4 | 1 | 0 |
| Total | 60 | 47 | 16 |
| Moved to Post-Plan Monitoring | | | |
| Ascension Child & Family Services | 1 | 2 | 1 |
| Bridge Emergency Shelter | 2 | 1 | 1 |
| Fred and Mabel Parks Youth Ranch | 2 | 1 | 1 |
| Heart to Heart Family Services | 2 | 2 | 2 |
| Total | 7 | 6 | 5 |
| Started Heightened Monitoring in 2022 | | | |
| Center for Youth Services | 1 | 2 | 0 |
| Promise House | 1 | 1 | 1 |
| VisionQuest Four Directions | 1 | 1 | 0 |
| Total | 3 | 4 | 1 |
| Closed in 2022 | | | |
| Grammy's Home and Emergency Shelter | 2 | 3 | 2 |
| Hands of Healing | 2 | 1 | 1 |
| The Lighthouse for the Betterment of Life | 1 | 3 | 3 |
| Total | 5 | 7 | 6 |

Quarterly reports also capture other enforcement actions taken during the quarter. Twenty-nine of the 68 operations with a quarterly report in 2022 had a total of 52 enforcement actions identified in one or more of their reports. Sixty-one percent of operations under extended Heightened Monitoring had an enforcement action in one or more quarters during 2022.

Four operations that moved to post-plan monitoring in 2022 had a corrective action prior to moving to post-plan monitoring. These operations include Ascension Child & Family Services, Bridge Emergency Shelter, Fred and Mabel Parks Youth Ranch, and Heart to Heart Family Services. Three of the 13 operations starting Heightened Monitoring in 2022 (23%) had an enforcement action during their first quarter of review.

Figure 92: Operations on Heightened Monitoring with Enforcement Actions Identified in Quarterly Reports



Source: HM quarterly reports, 2022
n = 68

For operations with one or more quarterly reports in 2022, the most common enforcement actions were liquidated damages (23) and DFPS Corrective Action Plans (CAPs) (14). Quarterly reports documented that three Heightened Monitoring operations were placed on probation in 2022 (The Grandberry Intervention Foundation, Youth in View, and Texas Foster Care and Adoption Services) and one agreed to a voluntary Plan of Action (The Burke Foundation – Pathfinders GRO).[205]

---

[205] Only one of these was placed on the enforcement action after the Monitors' Fourth Report was filed on June 2, 2022.

Figure 93: Type of Enforcement Action Identified in Quarterly
Reports

Source: HM quarterly reports, 2022
n = 52



Twelve of the 29 operations (41%) with an enforcement action had multiple
enforcement actions noted in their 2022 quarterly reports.

Table 23: Operations with Multiple Enforcement Actions Taken in
Quarters Ending in 2022

| Operation | Number of Actions | Type of Action |
|---|---|---|
| A World for Children | 2 | Liquidated Damages, Other (Safe in Care Remedy)[206] |
| Azleway Children Services | 2 | Liquidated Damages, Other (YFT violation) |
| Beacon of Hope | 2 | Liquidated Damages, Administrative Penalty |
| Children's Hope | 3 | Liquidated Damages (2), Administrative Penalty |
| Circles of Care | 3 | Liquidated Damages (3) |
| Family Link CPA | 2 | Liquidated Damages, Corrective Action Plan |
| Girls Haven | 2 | Administrative Penalty, Corrective Action Plan |
| Grammy's Home and Emergency Shelter | 3 | Liquidated Damages, Corrective Action Plan (2) |
| Hands of Healing CPA | 3 | Liquidated Damages, Corrective Action Plan (2) |

[206] The "Safe in Care" remedy is a contract performance remedy assessed by DFPS when a contractor fails
to meet the performance measure target of 100% for the measure related to keeping children safe in care.

185

| Heart to Heart Family Services | 2 | Liquidated Damages, Safe in Care Remedy |
|---|---|---|
| Lutheran Social Services | 5 | Liquidated Damages (3), Corrective Action Plan (2) |
| Texas Foster Care and Adoption Services | 6 | Plan of Action, Liquidated Damages (2), Corrective Action Plan (2), Safe in Care Remedy |

Enforcement actions were identified in 43 of 177 (24%) quarterly reports, with most occurring in Quarter Five to Quarter Eight. Ten of the 25 (40%) quarterly reports in Quarter Eight identified an enforcement action.



Figure 94: Percent of Quarterly Reports with an Enforcement Action by Quarter

Source: HM quarterly reports, 2022
n = 177

## Consistency between Quarterly Reports and Monthly Files

The monitoring team reviewed monthly files for 25 operations on Heightened Monitoring during 2022 and compared information found in Heightened Monitoring documentation to the information found in the 58 2022 quarterly reports for those operations. In 22% (13 of 58) of quarterly reports in which a comparison was made, the monitoring team found inconsistencies between the information in the quarterly report and the monthly Heightened Monitoring documentation.

Figure 95: Comparison of Information in Quarterly Reports and
Other Heightened Monitoring Documents for the Quarter

Source: HM quarterly reports, 2022
n = 58



■ Consistent    ■ Not consistent

Inconsistencies most often related to issues or concerns documented in monthly files that were not discussed in quarterly reports, which occurred in 12 of the 13 quarterly reports in which an inconsistency was found. Issues include tasks not being met or contract violations, fines, and citations not reported in quarterly reports but identified in the monthly Heightened Monitoring files.

## Follow-Up Analysis: Operations on Heightened Monitoring in 2021 and Reviewed in Fourth Report

The Monitors' Fourth Report reviewed quarterly reports for 19 operations;[207] 11 of these operations were still under Heightened Monitoring and had four quarterly reports in 2022. Of the remaining eight operations, six moved to post-plan monitoring and two closed after the Fourth Report was filed.

The eight quarterly reports completed over a two-year period (i.e., 2021 and 2022) were analyzed for the 11 operations. The average number of deficiencies cited at these operations declined over eight quarters, particularly deficiencies related to Heightened Monitoring problem areas. These 11 operations had an average of 7.2 deficiencies related to Heightened Monitoring problem areas in Quarter One compared to an average of 1.9 deficiencies in Quarter Eight. Overall, the average number of deficiencies declined from 10.1 in Quarter One to 4.9 in Quarter Eight.[208]

---

[207] Deborah Fowler & Kevin Ryan, Fourth Report, at 121 – 134. . . Operations were randomly selected for in-depth review by the monitoring team, representing a sample of operations under Heightened Monitoring in 2021. All 19 operations were in the 2020 Heightened Monitoring cohort with plan start dates ranging from July 2020 to February 2021. Apart from Azleway Valley View, for which a Quarter 1 report was not provided, four quarterly reports were analyzed for a total of 75 reports.
[208] A similar decline in deficiencies for these operations was found in analysis of monthly deficiency data provided by the State.



Figure 96: Deficiencies Cited by Quarter for Operations in 2021 Quarterly Report Analysis with Four Quarterly Reports in 2022

While deficiencies trended downward for these operations in 2022, compliance with Heightened Monitoring Plan Tasks did not improve. In Quarter Two, Quarter Five, and Quarter Eight, 46% of operations (5 of 11) were out of compliance with one or more Heightened Monitoring Plan Task(s) and 82% of operations (9 of 11) were out of compliance with one or more Plan Task(s) in Quarters Four and Quarters Seven.

Figure 97: Plan Task Compliance Rate by Quarter for Operations in 2021 Quarterly Report Analysis with Four Quarterly Reports in 2022



## Analysis of Waiver and Variance Requests made by Heightened Monitoring Operations

The Monitors analyzed waivers and variances requested in 2022 by all operations under Heightened Monitoring. Of the 91 operations that were on Heightened Monitoring in 2022, 38 (42%) made a waiver or variance request.[209] Twenty-seven of 38 (71%) operations made a waiver or variance request while their Heightened Monitoring Plan was still in effect, eight operations (21%) made a request while on post-plan monitoring and three operations (8%) made a request while on both active and post-plan monitoring.[210] Ten of the 38 operations (26%) that requested a variance during 2022 completed Heightened Monitoring as of March 1, 2023, and six of 38 operations (16%) that requested a variance were closed as of March 1, 2023. A lower proportion of operations on Heightened Monitoring made a waiver/variance request in 2022 (42%) than in 2021 (61%).

Most operations that requested a variance were CPAs (22 of 38, or 58%). GROs accounted for 35% (13 of 38) of variance requests, and RTCs accounted for 8% (3 of 38). Thirty-eight operations made 149 waiver/variance requests in 2022. Most waiver or variance requests from operations on Heightened Monitoring were made while their Plan was still in effect (103 of 149, or 69%), but nearly one-third of requests (46 of 149, or 31%) were made while operations were on post-plan monitoring. Twelve of 149 requests (8%) were made while the operation was on both Heightened Monitoring and probation.

Twenty-six percent of requests for waivers or variances made by operations on Heightened Monitoring (39 of 148) were duplicate requests or were no longer needed by the time a supervisor decision was to be made.[211] Of the remaining requests, 89% (97 of 109) were granted, a slightly lower approval rate than for operations not on Heightened Monitoring that requested a waiver or variance. The approval rate for operations on Heightened Monitoring that requested a waiver or variance was slightly higher in 2022 (89%) than in 2021 (81%). Operations on Heightened Monitoring made more than two times the number of requests for a waiver/variance in 2021 (399) than in 2022 (149).[212]

---

[209] 91 operations were on Heightened Monitoring at any time during 2022, 13 of which were on post-plan monitoring during the year, 22 completed Heightened Monitoring during the year, 12 operations closed during the year, and 44 were under active monitoring throughout the year. Three of the 53 operations requested variances in 2022 but were not on Heightened Monitoring at the time of the request. Embracing Destiny Foundation RTC requested a variance only after completing Heightened Monitoring, Texas Department of FPS Region 10 requested a variance prior to notification of Heightened Monitoring, and Texas Hill Country School requested a variance after terminating their contract.

[210] One of the 38 operations also requested a waiver of a minimum standard.

[211] One request had no decision information in CLASS at the time of analysis. Ten percent of requests by operations not on Heightened Monitoring were no longer needed or rescinded compared to 26% of requests by operations on Heightened Monitoring. It is unclear why requests are no longer needed or why operations on Heightened Monitoring have a larger proportion of requests that are no longer needed or rescinded.

[212] 2021 analysis includes 93 operations that were active on Heightened Monitoring as of March 1, 2021. In July 2021, HHSC adopted in policy that a waiver/variance would not be granted if the operation is requesting to waive or vary a minimum standard that is a basis for a probation, plan of action, or



**Figure 98: Request for Waiver/Variance Decision by Heightened Monitoring Status**

Source: Waivers/Variances, 2022
n = 983

Waiver or variance requests in 2022 made by operations during post-plan monitoring received a higher approval rate (35 of 38, or 92%) than requests made by operations during active monitoring (62 of 71, or 87%). Of the 12 requests for a waiver or variance made by operations on Heightened Monitoring that were denied, denial was often based



**Figure 99: Reason Waiver/Variance Request was Denied for Operations on Heightened Monitoring**

Source: Waiver/Variance Requests, 2022
n = 12

on the request information being insufficient or a failure to provide sufficient grounds for the variance.[213]

---

Heightened Monitoring. HHSC, Child Care Regulation Handbook, 5120 Decision Guidelines for Granting Waivers or Variances.

[213] No additional information or detail was provided in the waiver/variance data for the "other" denial reason category. For operations not on Heightened Monitoring, the most common reasons for denial of a

Most waiver or variance requests granted to Heightened Monitoring operations were for placement extensions at emergency shelters as well as administrative and physical plant issues.

Figure 100: Standard Categories for Granted Variance Requests for Operations on Heightened Monitoring in 2022



Source: Waiver/Variance Requests, 2022
n = 97

Half of the Heightened Monitoring operations (4 of 8) that were granted variances for physical plant standards had physical site included as a trend or problem area identified on their Heightened Monitoring Plan.

Heightened Monitoring operations were not granted any variances in 2022 for the following categories:

- Child rights
- Discipline
- Emergency Behavioral Interventions (EBI)
- Serious Incidents
- Medication
- Criminal Background Checks
- Records

**Abuse, Neglect, and Exploitation Investigations, Substantiated Findings of Abuse, Neglect, and Exploitation, and Minimum Standards Deficiencies Cited for Operations Placed Under Heightened Monitoring**

---

waiver/variance request were "other" (34%), impact on children's health/safety (21%), and insufficient information (21%).

In addition to reviewing the deficiencies cited and discussed in quarterly reviews, *infra*, the Monitors conducted an analysis of abuse, neglect, and exploitation investigations, substantiated findings of abuse, neglect, and exploitation, and deficiencies cited for all Heightened Monitoring operations. In all, the 112 operations placed on Heightened Monitoring between 2020 and 2022 had 6,493 abuse, neglect, and exploitation investigations opened,[214] and received 3,785 citations for minimum standards violations while under Heightened Monitoring.[215]

The analysis is grouped by year of placement on Heightened Monitoring (i.e., 2022 or 2020-2021) and by the Heightened Monitoring status of operations as of March 1, 2023. The Monitors examined Heightened Monitoring operations' histories just prior to notification, and after being placed on Heightened Monitoring to determine whether being placed on Heightened Monitoring had an impact on safety or enforcement actions.

The tables below compare the number of investigations opened for abuse, neglect, and exploitation, the substantiated findings, and deficiencies cited for all operations at each of the stages discussed in this analysis.[216]

---

[214] The Monitors analyzed abuse, neglect, and exploitation investigations opened and closed between June 2020 and January 2023 for all operations placed on Heightened Monitoring between 2020 and 2022. Analysis is based on data for investigations opened and investigations closed provided by DFPS. The Monitors receive the "RO20_RCI_Allegations_CYXX" file monthly. This file contains all allegations associated with an RCI investigation that was opened and all allegations associated with an RCI investigation that was closed in the month. Investigations are not limited to PMC children. Data includes allegations that were pending ARI or SOAH review as of the date the data was pulled. Allegations that were overturned after review reflect the final disposition for the case.

"Investigations opened" includes RCI investigations opened while an operation was on active Heightened Monitoring or on Post-Plan Monitoring. The State opened 6,247 investigations during active monitoring and 246 during post-plan monitoring. This includes all investigations opened on or after the operation's Heightened Monitoring notification date and the date the operation completed Heightened Monitoring or closed/terminated their contract to serve foster children. Investigations opened and closed through January 31, 2023, were included in the analysis.

[215] The Monitors analyzed minimum standards deficiencies cited between June 2020 and January 2023 for all operations placed on Heightened Monitoring between 2020 and 2022 and is based on deficiency data provided by HHSC. HHSC provides the Monitors with the "RO.22.3 Rep. Punish (FCL – RCCL Deficiencies with Weights)" file monthly through Tableau uploads. This file contains all deficiencies cited in an inspection or assessment and all deficiency standards investigated. Citations that were overturned after administrative review are not included in the analysis.

"Deficiencies cited" includes minimum standards deficiencies cited while an operation was on the Plan in Effect stage and Post-Plan Monitoring stage of Heightened Monitoring. Includes all standards cited on or after the operation's Heightened Monitoring notification date and as of the date the operation completed Heightened Monitoring or closed/terminated their contract to serve foster children. . . Deficiencies through January 31, 2023, were included in the analysis. Includes only citations with a finding of "Deficiency" and an administrative review status that was not "Overturned."

[216] Average time in stage for the operations on Plan in Effect and operations on post-plan monitoring was as of March 1, 2023. . . Investigations opened and RTB findings for the operations on Plan in Effect and operations on post-plan monitoring was as of January 31, 2023.

## Operations Placed on Heightened Monitoring in 2022

Table 24: Operation on Heightened Monitoring, Investigations Opened for Abuse, Neglect, and Exploitation, RTB Findings, and Deficiencies Cited

| Operations Placed on HM in 2022<br><br>13 | Operations Placed on HM in 20 & 21, Plan in Effect as of 3/1/23<br><br>28 | Operations on Post-Plan Monitoring as of 3/1/23<br><br>12 | Operations that Completed HM as of 3/1/23<br><br>25 |
|---|---|---|---|
| Average Time in Stage | Average Time in Stage | Average Time in Stage | Average Time in Stage |
| Plan in Effect: 184 days | Plan in Effect: 804 days | Plan in Effect: 578 days<br>PPM: 184 days | Plan in Effect: 461 days<br>PPM: 210 days |
| Investigations Opened | Investigations Opened | Investigations Opened | Investigations Opened |
| Plan in Effect: 121 | Plan in Effect: 3,679 | Plan in Effect: 582<br>6 Months Prior to PPM: 141<br>On PPM: 104 | Plan in Effect: 549<br>6 Months Prior to PPM: 171<br>On PPM: 142 |
| RTB Findings | RTB Findings | RTB Findings | RTB Findings |
| Plan in Effect: 0 | Plan in Effect: 135 | Plan in Effect: 49<br>6 Months Prior to PPM: 1<br>On PPM: 1 | Plan in Effect: 18<br>6 Months Prior to PPM: 0<br>On PPM: 5 |
| All Deficiencies Cited | All Deficiencies Cited | All Deficiencies Cited | All Deficiencies Cited |
| Plan in Effect: 114 | Plan in Effect: 1,927 | Plan in Effect: 258<br>6 Months Prior to PPM: 70<br>On PPM: 29 | Plan in Effect: 276<br>6 Months Prior to PPM: 40<br>On PPM: 79 |

The Monitors analyzed abuse, neglect, and exploitation investigations opened and substantiated findings of abuse, neglect, and exploitation for the 13 operations placed on Heightened Monitoring in 2022 during the five-month period prior to and after their notification of Heightened Monitoring.[217] Twelve of these operations had at least one abuse, neglect, or exploitation investigation opened in the five months before or after being placed on Heightened Monitoring.[218]

The number of abuse, neglect, and exploitation investigations opened in operations placed on Heightened Monitoring in 2022 decreased 32% after notification, with

---

[217] Operations placed on Heightened Monitoring in 2022 were notified of their Heightened Monitoring status on August 24, 2022.
[218] Hill County Youth Ranch did not have any ANE investigations start or close in 2022.

operations having 177 abuse, neglect, and exploitation investigations opened in the five months prior to notification compared to 121 investigations in the five months after notification. Operations placed on Heightened Monitoring in 2022 had an average of 18 abuse, neglect, and exploitation investigations opened in the five months prior to Heightened Monitoring and an average of 11 investigations opened in the five months after Heightened Monitoring.

Figure 101: Number of ANE Investigations Opened Five Months Prior to and After Heightened Monitoring Notification, Operations Placed on Heightened Monitoring in 2022



Although there was an overall reduction in the number of investigations five months after Heightened Monitoring started, five of the operations that were placed on Heightened Monitoring in 2022 had more abuse, neglect, and exploitation investigations opened in the five months after notification than in the five months prior to notification.

Table 25: Number of ANE Investigations Opened in 5 Months Before and After Heightened Monitoring Notification by Operation, Operations Placed on Heightened Monitoring in 2022

| Operation Name | 5 Months Before HM | 5 Months After HM | More/Less After HM |
|---|---|---|---|
| Adiee Emergency Shelter | 13 | 6 | Less |
| Angels Crossing[219] | 0 | 5 | More |
| Center for Youth Care Services | 2 | 0 | Less |
| Children of Diversity | 11 | 11 | Same |
| Guardian's Promise, LLC | 14 | 4 | Less |

---

[219] Angels Crossing terminated their contract with DFPS and Belong on December 31, 2022, and did not have a full five months of follow-up time after Heightened Monitoring notification.

| | | | |
|---|---|---|---|
| Harbor Of Hope, Inc. | 0 | 2 | More |
| Promise House | 18 | 38 | More |
| Rob & Simon's Hawthorne House | 2 | 7 | More |
| Sheltering Harbor | 42 | 27 | Less |
| Silver Lining Residential, LLC | 66 | 12 | Less |
| Texas Baptist Home for Children | 4 | 3 | Less |
| Texas Dept of FPS Region 10 | 5 | 6 | More |

The allegation type for investigations opened after operations were notified of Heightened Monitoring in 2022 included a higher percentage of allegations related to Physical, Emotional, and Sexual Abuse than allegations in investigations opened before notification. Forty-two percent (51 of 121) of abuse, neglect, or exploitation investigations opened in the five months after Heightened Monitoring started included an allegation related to Physical, Emotional, or Sexual Abuse compared to 29% (51 of 177) of investigations opened in the five months prior to Heightened Monitoring.

Figure 102: Allegation Type for Investigations Opened in 5 Months Before and After Heightened Monitoring Notification, Operations Placed on Heightened Monitoring in 2022



Source: DFPS RCI Investigations
n =298

The operations placed on Heightened Monitoring in 2022 had 170 abuse, neglect, and exploitation investigations close in the five months prior to Heightened Monitoring

notification and 148 investigations close in the five months after notification.[220] These operations had a total of four RTB findings in the five months prior to notification and zero RTB findings in the five months after notification. The RTB findings in the five months prior to Heightened Monitoring were split between two operations: Children of Diversity (2) and Guardian's Promise (2).[221]

The Monitors also analyzed minimum standard deficiency citations for these operations during the five-month period prior to and after they started Heightened Monitoring.[222] All had at least one deficiency cited in the five months before or after being notified of their Heightened Monitoring status.

The number of minimum standards deficiencies cited in operations placed on Heightened Monitoring in 2022 increased 52% after notification. Operations had a total of 75 deficiencies cited in the five months prior to notification compared to 114 citations in the five months after notification. The number of citations for standards weighted high, medium-high, and medium increased 57% after notification, from 65 in the five months prior to Heightened Monitoring to 102 in the five months after.

Figure 103: Number of Minimum Standards Deficiency Citations Five Months Prior to and After Heightened Monitoring Notification, Operations Placed on Heightened Monitoring in 2022



---

[220] Operations placed on Heightened Monitoring in 2022 had 136 investigations that both opened and closed in the five months prior to notification and 107 investigations that both opened and closed in the five months after notification.
[221] The investigation resulting in an RTB for Children of Diversity opened more than five months prior to Heightened Monitoring notification while the investigation resulting in an RTB for Guardian's Promise opened in the five months prior to notification.
[222] Operations placed on Heightened Monitoring in 2022 were notified of their Heightened Monitoring status on August 24, 2022.

Operations placed on Heightened Monitoring in 2022 had an average of 6.8 deficiencies cited in the five months prior to Heightened Monitoring notification and an average of 9.5 deficiencies cited in the five months after Heightened Monitoring notification. Most operations (77%, or 10 of 13) had more deficiencies cited in the five months after Heightened Monitoring notification than in the five months before notification. One operation (8%) had the same number of citations both before and after notification while two operations (15%) had fewer citations.

Table 26: Number of Deficiency Citations Five Months Before and After Heightened Monitoring Notification by Operation

| Operation Name | 5 Months Before HM | 5 Months After HM | More/Less After HM |
|---|---|---|---|
| Adiee Emergency Shelter | 24 | 11 | Less |
| Angels Crossing | 0 | 11 | More |
| Center for Youth Care Services | 1 | 7 | More |
| Children of Diversity | 8 | 9 | More |
| Guardian's Promise, LLC | 8 | 8 | Same |
| Harbor of Hope, Inc. | 3 | 5 | More |
| Hill Country Youth Ranch | 0 | 3 | More |
| Promise House | 6 | 24 | More |
| Rob & Simon's Hawthorne House | 1 | 2 | More |
| Sheltering Harbor | 8 | 11 | More |
| Silver Lining Residential, LLC | 10 | 19 | More |
| Texas Baptist Home for Children | 2 | 4 | More |
| Texas Dept of FPS Region 10 | 4 | 0 | Less |

Note: Operations placed on Heightened Monitoring in 2022.

Deficiencies for high, medium-high, and medium-weighted standards accounted for most citations in the five months prior to and after the operations were placed on Heightened Monitoring in 2022. In the five months prior to Heightened Monitoring, high-weighted standards accounted for 20% (15 of 75) of citations, medium-high-weighted standards accounted for 40% (30) of citations, and medium-weighted standards accounted for 27% (20) of citations. In comparison, in the five months after starting Heightened Monitoring, high-weighted standards accounted for 21% of citations (24 of 114), medium-high weighted standards accounted for 33% (38) of citations, and medium weighted standards accounted for 35% (40) of citations.

197

Figure 104: Minimum Standards Deficiencies Five Months Before and After Heightened Monitoring Notification by Weight, Operations Placed on Heightened Monitoring in 2022



Source: RCCR Deficiencies
n = 189

In the five months prior to Heightened Monitoring the standards categories most frequently cited at operations placed on Heightened Monitoring in 2022 were related to admission/service planning (9 or 12%), medical/medicine (8 or 11%), EBI (8 or 11%), health and safety (8 or 11%), and training (7 or 9%).[223] In the five months after Heightened Monitoring notification the most frequently cited minimum standards related to medical/medicine (22, or 19%), records (17, or 15%), admission/service planning (13, or 11%), and physical plant (10, or 9%).

An operation can be cited for a minimum standards deficiency during an inspection or assessment or because of an investigation.[224] In the five months prior to Heightened Monitoring notification most citations were the result of an investigation (52%, or 39 of 75) while in the five months after notification of Heightened Monitoring, deficiencies were most frequently cited during an inspection (48%, or 55 of 114). The change may be related, in part, to visits made by the Heightened Monitoring team to the operations as part of the Heightened Monitoring process.

---

[223] For operations placed on Heightened Monitoring in 2022, the standards categories most frequently in the five months prior to Heightened Monitoring are slightly different than the most frequently cited standards categories across the five years used for the pattern analysis used to determine whether an operation should be placed under Heightened Monitoring  Appendix B includes tables that show the most commonly cited standards deficiencies over the five-year period used for the State's pattern analysis. . . . For each of the Heightened Monitoring cohorts (2020, 2021, and 2022), medical/medication management was the highest category of standards cited in the five years used for the pattern analysis.
[224] A minimum standard deficiency may be cited as part of an ANE or Non-ANE investigation. . . A deficiency may be cited by a Heightened Monitoring inspector as part of a Heightened Monitoring visit. . . These visits are considered inspections.

## Operations Placed on Heightened Monitoring in 2020 or 2021 and Still Under Heightened Monitoring

Twenty-eight operations that were placed on Heightened Monitoring in 2020 and 2021[225] were still under Heightened Monitoring as of March 1, 2023. These operations had been on active monitoring for an average 26.4 months (804 days) as of March 1, 2023, with the operations having a minimum of 274 days and a maximum of 918 days in the Plan in Effect stage of monitoring. While 23 of these 28 operations were notified in 2020 that they were being placed on Heightened Monitoring, most notifications occurred late in the year (October and November 2020).[226]

### Investigations Opened

Figure 105: Inspection, Assessment, and Investigation Related Deficiencies Five Months Before and After Heightened Monitoring Notification, Operations Placed on Heightened Monitoring in 2022



Source: RCCR Deficiencies
n =189

___

[225] VisionQuest Four Directions was identified for Heightened Monitoring as part of the 2021 cohort though was not notified of Heightened Monitoring until June 2022 and didn't begin the Plan in Effect stage until July 2022.
[226] Of operations starting Heightened Monitoring in 2020 and 2021 with a Plan in Effect as of March 1, 2023, 23 were notified of Heightened Monitoring in 2020; one in August, one in September 10 in October, and 11 in November 2020. Five operations were notified of Heightened Monitoring in 2021: one in March and four in June 2021.

The 28 operations that were placed on Heightened Monitoring in 2020 or 2021 and had not moved to the post-plan stage had 3,679 abuse, neglect, or exploitation investigations opened between the time of Heightened Monitoring notification and January 31, 2023,[227] with an average of 131 investigations opened while on Heightened Monitoring and a range of 12 to 525 investigations opened while on Heightened Monitoring. Most of the ANE investigations opened for these operations were opened in 2021 (1,935 of 3,679, or 53%).

Figure 106: Number of ANE Investigations Opened While on Heightened Monitoring, Operations Active as of March 1, 2023



Note: Operations placed on Heightened Monitoring in 2020 and 2021 with a Plan in Effect as of 3/1/23.

The rate of investigations opened[228] for this group of operations declined between 2021 and 2022. In 2021, the rate of investigations opened was 21.2 per 100 days on Heightened Monitoring compared to a rate of 13.3 in 2022.

---

[227] Data on RCI investigations opened and closed was available through January 31, 2023, at the time of the analysis.
[228] Rate of opened ANE investigations per 100 days on Heightened Monitoring. Denominator includes the total number of days all operations were on active monitoring (Plan in Effect) in the year. Numerator includes the number of ANE investigations opened in the year.

Figure 107: Rate of ANE Investigations Opened, Operations
Active as of March 1, 2023



Source: DFPS RCI Investigations
n =3,679

Note: Operations placed on Heightened Monitoring in 2020 and 2021 with a Plan in Effect as of March 1, 2023.

Although the rate of opened abuse, neglect, or exploitation investigations declined overall, there were operations that had more investigations opened in 2022 than in 2021. Of the 27[229] operations that were on Heightened Monitoring in both 2021 and 2022, 26% (7 of 27) had more investigations opened in 2022 than in 2021.[230] The number of additional investigations opened in 2022 ranged from 5 to 61.

---

[229] Twenty-seven of the 28 operations were on Heightened Monitoring in both 2021 and 2022. Vision Quest Four Directions was notified of Heightened Monitoring in 2022 so was excluded from this analysis.
[230] Operations with more ANE investigations opened in 2022 than in 2021 included A New Day Foundation (10), Boy's Haven of America (five), Fostering Life Youth Ranch (61), Hands of Healing CPA (26), Jae's Helpers (20), New Hope Youth Center (40), and The Burke Foundation-Pathfinders RTC (eight). Fostering Life Youth Ranch was notified of Heightened Monitoring on March 29, 2021, and Jae's Helpers was notified of Heightened Monitoring on June 21, 2021, so did not have two full years of comparison. Vision Quest Four Directions was excluded from this analysis as they were not on Heightened Monitoring in 2021.

Figure 108: Operations on Heightened Monitoring Active as of March 1, 2023, with More ANE Investigations Opened in 2022 Compared to 2021

Source: DFPS RCI Investigations
n = 27



■ Fewer Investigations Opened in 2022
■ More Investigations Opened in 2022

Note: Operations placed on Heightened Monitoring in 2020 and 2021 with a Plan in Effect as of March 1, 2023

## Investigations Closed and Substantiated Findings

The 28 operations that began Heightened Monitoring in 2020 and 2021 and were still in the Plan in Effect stage of monitoring as of March 1, 2023, had 3,942 ANE investigations closed while on Heightened Monitoring.[231] DFPS substantiated abuse, neglect, or exploitation in 135 of these investigations.[232] Twenty-one of these 28 operations (75%) had an RTB finding while on Heightened Monitoring. The number of RTB findings for the 21 operations ranged from one to 17. Most RTB findings were for Neglectful Supervision (75 of 135, or 56%) and Physical Abuse (45 of 135, or 33%). However, 10% (13 of 135) were related to a Sexual Abuse allegation and 2% (two of 135) were related to Medical Neglect. Most RTB findings occurred in 2021 (75 of 135, or 67%).

---

[231] Includes all investigations closed as of January 31, 2023.
[232] An additional 50 investigations were disposed with an "Unable to Determine" finding.

Figure 109: RTB Findings While on Heightened
Monitoring by Year, Operations Active as of March 1, 2023



Note: Operations placed on Heightened Monitoring in 2020 and 2021 with a Plan in Effect
as of March 1, 2023.

The rate[233] of RTB findings for these 28 operations declined between 2021 and 2022. In 2021, the rate of RTB findings was 0.99 per 100 days on Heightened Monitoring compared to a rate of 0.32 in 2022. The rate of RTB findings per 100 days on Heightened Monitoring increased slightly to 0.35 in January of 2023.[234]

---

[233] The rate of RTB findings per 100 days on Heightened Monitoring. Denominator includes the total number of days all operations were on active monitoring (Plan in Effect) in the year. Numerator includes the number of RTB findings in the year.

[234] There were 28 operations with 31 days on Heightened Monitoring in January 2023 for a total of 838 days. Data used for the analysis was available through January 31, 2023.

**Figure 110: Rate of RTB Findings While on Heightened Monitoring by Year, Operations Active as of March 1, 2023**

Source: DFPS RCI Investigations
n =135



Note: Operations placed on Heightened Monitoring in 2020 and 2021 with a Plan in Effect as of March 1, 2023.

These 28 operations had a total of 1,927 minimum standards citations between the date of Heightened Monitoring notification and January 31, 2023,[235] with an average of 69 deficiencies cited and a range of 21 to 211 deficiencies cited. Minimum standards citations most often resulted from an inspection (47%, or 903 of 1,927) or an investigation (46%, or 882 of 1,927).[236]

Most of the deficiencies for operations starting Heightened Monitoring in 2020 and 2021 and in Plan in Effect stage as of March 1, 2023, were cited in 2021 (927 of 1,927, or 48%). While 23 of these 28 operations were notified of Heightened Monitoring in 2020, most notifications occurred in October and November 2020, resulting in less than a full year on Heightened Monitoring in 2020 for operations in this group.[237] High, medium-high, and medium-weighted standards accounted for 93% of citations in 2020 and 2021 (135 of 146 and 857 of 927), 89% of citations in 2022, and 95% of citations in January 2023.

---

[235] Data on minimum standards deficiencies was available through January 31, 2023, at the time of the analysis.

[236] Investigations include both ANE and non-ANE investigations. An additional 7% of deficiencies (142 of 1,927) resulted from an assessment.

[237] Of operations starting Heightened Monitoring in 2020 and 2021 with a Plan in Effect as of March 1, 2023, 23 were notified of Heightened Monitoring in 2020; one in August 2020, one in September 2020, 10 in October 2020, and 11 in November 2020. Five operations were notified of Heightened Monitoring in 2021; one in March 2021 and four in June 2021.

Figure 111: Number of Minimum Standards Deficiencies Cited While on Heightened Monitoring, Operations Placed on Heightened Monitoring in 2020 and 2021 with Plan in Effect as of March 1, 2023



Source: RCCR Deficiencies
n =1,927

The rate of minimum standards deficiencies[238] for these operations declined between 2021 and 2022. In 2021, the rate of deficiencies cited was 10.2 per 100 days operations were on Heightened Monitoring compared to a rate of 7.7 in 2022. The rate of minimum standards deficiencies increased in January 2023 to 9.0 per 100 days on Heightened Monitoring.

---

[238] Rate of deficiencies per 100 days on Heightened Monitoring. Denominator includes the total number of days all operations were on active monitoring (Plan in Effect) in the year and in January 2023. Numerator includes the total number of deficiencies cited in the year and in January 2023 (all weights).

Figure 112: Rate of Minimum Standards Deficiencies Cited While on Heightened Monitoring, Operations Placed on Heightened Monitoring in 2020 and 2021 with Plan in Effect as of March 1, 2023



The rate of minimum standards deficiencies cited for high, medium-high, and medium weighted standards mirrored the trend for all deficiencies. The rate of high, medium-high, and medium-weighted standards was 9.1 in 2020, 9.4 in 2021, 6.8 in 2022, and 8.5 in January 2023.

## Operations Placed on Heightened Monitoring in 2020 and 2021 That Moved to Post-Plan Monitoring

Thirty-seven operations placed on Heightened Monitoring in 2020 and 2021 had moved to post-plan monitoring (PPM) as of March 1, 2023. To move from Plan in Effect stage of monitoring to post-plan monitoring, an operation must have completed at least 12 months in the Plan in Effect stage, have satisfied the conditions of their plan, have at least six months' successive unannounced visits showing compliance with the standards and contract requirements that led to Heightened Monitoring, and not be out of compliance with any medium-high or high-weighted licensing standards.

## Investigations Opened

Almost all (97%, or 36 of 37) operations that moved to post-plan monitoring had one or more abuse, neglect, or exploitation investigations opened while their Heightened Monitoring Plan was in effect (Plan in Effect).[239] These 36 operations had a total of 1,131 ANE investigations opened while on active monitoring, with the number of investigations opened ranging from one to 143. Operations with an investigation had, on

---

[239] Serving Children and Adults which was placed on Heightened Monitoring in December 2021 did not have any ANE investigations open during Phase 1 of Heightened Monitoring.

average, 31 investigations opened while their Heightened Monitoring Plan was in effect. The time that operations were on Plan in Effect stage ranged from 13 to 27.5 months.[240] Most operations had an investigation opened in the six months immediately preceding being moved to the post-plan monitoring stage: 31 of the 37 post-plan monitoring operations (84%) had one or more investigation opened in the six months prior to post-plan monitoring. On average, operations with an investigation in the six months prior to moving to post-plan monitoring had ten investigations opened in that period. The most common allegations for investigations opened in the six months prior to moving to post-plan monitoring were Neglectful Supervision (66%, or 205 of 312), Physical Abuse (20% or 61 of 312), and Sexual Abuse (8%, or 25 of 312).[241]

Most of these operations also had an investigation opened while they were in the post-plan monitoring stage: 73% (27 of 37) had an abuse, neglect, or exploitation investigation opened while on post-plan monitoring. As of January 31, 2023,[242] these operations had a total of 246 investigations opened while on post-plan monitoring, ranging from two to 33 investigations opened. Most investigations opened while an operation was on post-plan monitoring involved allegations of Neglectful Supervision (50%, or 122 of 246) and Physical Abuse (31%, or 75 of 246).

Three operations had one or more open investigations at the time they transitioned to post-plan monitoring. These operations included Family Link Treatment Services CPA (one open investigation), Mission Road Development Center (three open investigations) and Assuring Love CPA (six open investigations). None of these resulted in a substantiated finding.

Figure 113: Number of ANE Investigations Opened While on Heightened Monitoring, Operations That Moved to Post-Plan Monitoring as of March 1, 2023



Source: DFPS RCI Investigations
n = 4,564 investigations

---

[240] The average time spent in the Plan in Effect Stage of Heightened Monitoring was 499 days (16.4 months) for operations that had moved to post-plan monitoring as of March 1, 2023.
[241] Includes the three most frequently occurring allegations. Other allegations included medical neglect (3%), physical neglect (2%), and emotional abuse (1%).
[242] RCI investigation data was analyzed through January 31, 2023.

## Investigations Closed and Substantiated Findings

Thirty of the post-plan monitoring operations (81% of 37) had a total of 396 ANE investigations close in the six months prior to transitioning to post-plan monitoring. Only one of the closed investigations resulted in a RTB finding. Sweeten Home for Children received a RTB finding for Exploitation on November 22, 2022, less than a month before moving to post-plan monitoring.[243]

Seventy-three percent (27 of 37) of post-plan monitoring operations had an investigation of child abuse, neglect or exploitation that closed while on post-plan monitoring. These operations had a total of 238 abuse, neglect, or exploitation investigations close, 229 of which both opened and closed during post-plan monitoring. Five operations received a total of six RTB findings while on post-plan monitoring, all of which both opened and closed during the post-plan stage. The operations with an RTB finding during post-plan monitoring include Embracing Destiny Foundation RTC (1), Have Haven Child Placing Agency (1), House of Shiloh Family Services (1), Pathways Youth Family Services - 3H Youth Ranch (1), and Serving Children and Adults (2 resulting from the same investigation).[244]

---

[243]A staff member was found to have exploited a child by using him to make illegal purchases of vape pens and other illegal substances. The staff member also asked the child to sell pills for him. The staff member told the child they were "going to make money off the high school by moving pills." The operation moved to post-plan monitoring on December 14, 2022.

[244] Embracing Destiny Foundation RTC had a substantiated finding of Neglectful Supervision after an 11-year-old child who is autistic and non-verbal ran away from the facility unnoticed and was found in a neighbor's pool. The child had a history of running away and his service plan required one-to-one supervision while inside the facility. The staff person said he was aware of the child's supervision requirements but was conducting room checks on the other children when the child ran away. The neighbor who found the child in the pool said that as the child neared the deep end, "he began to struggle in the water and could not swim." The neighbor helped the child out of the water and stayed with him until the police arrived. The operation received four minimum standards citations associated with the investigation, including a citation related to the operation's failure to accurately report the child's run from the facility (because the facility failed to tell SWI that the child was found in the neighbor's pool).

Have Haven CPA had a substantiated finding of Physical Abuse associated with a home that it verified, after a police officer's body camera footage revealed video of the foster parent improperly restraining an 11-year-old foster child. The video showed the child was sitting on the floor when the foster parent "tackl[ed] him to the ground" and sat on top of him while he was in a prone position. The child sustained bruising and scratches to his neck.

House of Shiloh Family Services CPA had a substantiated finding of Neglectful Supervision associated with a home that it verified after an unapproved caregiver was allowed to have contact with a foster child. The unapproved caregiver had a previous RTB finding in an unrelated Physical Abuse investigation that the foster parent was aware of. The child alleged the unapproved caregiver and the foster parent both physically abused him. DFPS made a finding of Unable to Determine finding for Physical Abuse by the unapproved caregiver and Ruled Out Physical Abuse by the foster parent.

Pathways 3H Youth Ranch GRO had a substantiated finding of Neglectful Supervision related to the restraint of a child at the facility. DFPS determined that the circumstances did not merit use of a restraint because the child did not pose a threat to himself or others. The child was dragged out of his classroom by his arm by the staff person (the child alleged he was still seated at his desk when the staff person grabbed him by the arm). As the child was being pulled out of the classroom, he ran into a white board and the

The 37 operations that had moved to post-plan monitoring as of March 1, 2023, had 1,275 abuse, neglect, and exploitation investigations close while they were still on Heightened Monitoring (Plan in Effect).[245] Sixty-six of these investigations were closed with an RTB finding. Thirteen operations that moved to post plan monitoring had a total of 28 RTB findings and four UTD findings for investigations that both opened and closed[246] while operations were on the Plan in Effect stage (i.e. – prior to being allowed to move to post-plan monitoring). The thirteen operations that had a substantiated finding of abuse, neglect, or exploitation related to an investigation that opened while they were on the Plan in Effect stage were:

- Archangel Foster and Adoption Services Child Placing Agency
- Bridge Emergency Shelter
- Connections
- Family Link Treatment Services CPA
- Fred and Mabel R. Parks Youth Ranch
- Hands of Healing
- Heart to Heart Family Services
- High Plains Children's Home
- Mission Road Developmental Center
- New Horizons Child Placing Agency
- Sweeten Home for Children
- The Gladney Center for Adoption
- The Settlement Home Club

---

door frame. The child was injured. Physical Abuse was Ruled Out by DFPS because "there [was] no evidence to show [the staff person] intentionally caused injury to [the child], although it [did] appear safety measures were not followed to reduce risk of injury."

Serving Children and Adults GRO had two substantiated findings of Neglectful Supervision (one for each child) after a direct caregiver failed to conduct night checks on January 29, 2022, resulting in a 16-year-old child and a 17-year-old child having sexual contact. The 16-year-old girl was able to sneak into the bedroom of the 17-year-old boy "in the middle of the night." The staff person did not conduct any room checks for a five-hour period. DFPS found, "Not once throughout the night did [the staff person] check the rooms to monitor the youth activities."

[245] All operations that moved to post-plan monitoring as of March 1, 2023, had one or more ANE investigations close while on the Plan in Effect stage of Heightened Monitoring.

[246] Operations that moved to post-plan monitoring had 1,121 ANE investigations that both opened and closed while on the Plan in Effect stage of Heightened Monitoring.

Figure 114: Number of RTB Findings while on Heightened Monitoring
for Operations That Moved to Post-Plan Monitoring as of March 1, 2023

Source: DFPS RCI Investigations
n = 4,564 investigations



As of March 1, 2023, 25 of the operations that had moved to post-plan monitoring had completed Heightened Monitoring.[247] These operations were on post-plan monitoring for an average of 209 days (6.9 months).[248] Almost half of the operations (44%, or 11 of 25) that completed Heightened Monitoring, had more abuse, neglect, or exploitation investigations opened while in post-plan monitoring than they did in the six months prior to moving to post-plan monitoring. Three operations that had zero investigations opened in the six months prior to moving to post-plan monitoring had four or more investigations opened while in the post-plan stage.[249]

Five of the investigations that were opened during the post-plan stage for operations that have completed Heightened Monitoring were closed with a RTB finding. For two of these investigations, the RTB finding occurred approximately five months prior to the operation completing Heightened Monitoring (House of Shiloh Family Services and Pathways Youth Family Services – 3H Youth Ranch). For three of these investigations, the RTB finding occurred approximately three months prior to the operation completing Heightened Monitoring (Serving Children and Adults (2), Embracing Destiny Foundation RTC (1)).

[247] Twenty-five of the 37 operations that moved to post-plan monitoring had completed Heightened Monitoring as of March 1, 2023.These 25 operations are included in the post-plan monitoring analysis.
[248] Operations completing Heightened Monitoring as of March 1, 2023, were on post-plan monitoring 165 to 296 days (5.4 to 9.7 months).
[249] Harmony Family Services Emergency Shelter had seven ANE investigations opened while on post-plan monitoring (PPM), Pathways Youth & Family Inc. had six investigations opened while on PPM, and Serving Children and Adults had four investigations opened while on PPM. All these operations had zero ANE investigations opened in the six months prior to moving to PPM.

## Deficiencies Cited

All the operations that moved to post-plan monitoring had one or more minimum standards deficiencies cited while their Heightened Monitoring Plan was in effect. These 37 operations received a total of 534 citations while their Heightened Monitoring Plan was in effect, 90% of which (479 of 534) were citations for high, medium-high, and medium-weighted standards. Operations that moved to post-plan monitoring had an average of 14 deficiencies cited[250] while their Heightened Monitoring Plan was in effect, with a range of two to 43 minimum standards deficiencies. While in the Plan in Effect stage, 51% (273 of 534) of deficiencies cited at these operations resulted from an inspection, 43% (231 of 534) resulted from an investigation,[251] and 6% (30 of 534) resulted from an assessment.

Most of the operations had a deficiency cited in the months immediately preceding their move to post-plan monitoring: 31 of the 37 operations (84%) that moved to post-plan monitoring had a deficiency cited in the six months prior to moving to post-plan monitoring. These 31 operations had a total of 110 minimum standards deficiency citations in the six months prior to moving to PPM. The average number of deficiencies cited was 3.5, with a range of one to 17 citations in the six months prior to post-plan monitoring.[252] Deficiencies in the six months prior were most frequently cited as part of an investigation (47%, or 52 of 110), with deficiencies resulting from an inspection accounting for 44% (48 of 110) of deficiencies cited.[253]

Most operations also received a citation while they were on post-plan monitoring: 59% (22 of 37) of post-plan monitoring operations had a minimum standards deficiency citation while on post-plan monitoring.[254] As of January 31, 2023,[255] these operations had a total of 108 deficiencies while on PPM, ranging from one to 16 citations.[256] Fifteen of the 22 operations that were cited (68%) had more deficiencies cited in the post-plan

---

[250] Operations that moved to post-plan monitoring as of March 1, 2023, had an average of 13 minimum standards citations for standards weighted high, medium-high, and medium while on active monitoring.

[251] There were 121 (22.7% of 534) deficiencies resulting from an ANE investigation and 110 (20.6%) resulting from a Non-ANE investigation.

[252] The Settlement Club Home had 17 minimum standard citations in the six months prior to moving to post-plan monitoring.

[253] Deficiencies resulting from an assessment accounted for 9% (10 of 110) of citations in the six months prior to post-plan monitoring.

[254] Includes deficiencies that were cited as of the date the operation moved to post-plan monitoring through January 31, 2023.

[255] Deficiencies data through January 31, 2023, was available for this analysis.

[256] House of Shiloh Family Services had 16 minimum standard deficiencies cited while on post-plan monitoring.

monitoring stage than in the six months prior to post-plan monitoring.[257] Most deficiencies cited resulted from an investigation (65%).[258]

Only three operations that moved to post-plan monitoring had no deficiencies cited in the six months prior to post-plan monitoring or while in the post-plan stage of monitoring. These operations were Assuring Love CPA, Family Link Treatment Services, Inc. (GRO), and Mission Road Developmental Center.[259]



Figure 115: Number of Minimum Standards Cited while on Heightened Monitoring, Operations Moving to Post-Plan Monitoring as of March 1, 2023

Note: Deficiencies occurring in the six months prior to post-plan monitoring are also included in the deficiencies cited while the plan was in effect.

Ninety-four percent of the deficiencies cited in both the six months prior to and while on post-plan monitoring were for high, medium-high, and medium-weighted standards, both the number and proportion of citations for high-weighted standards increased during post-plan monitoring, however.

---

[257] The operations with more deficiencies cited in post-plan monitoring than in the six months prior to PPM are: Azleway Valley View (one), Caregivers Youth and Transitional Living Services (11), Connections (four), Connections Individual and Family Services (one), Embracing Destiny (nine), Hands of Healing (three), Have Haven CPA (seven), House of Shiloh Family Services (13), L'Amor Village RTC (two), New Horizons CPA (two), Pathways 3H Youth Ranch (three), Pathways Youth & Family Services, dba Habilitative Homes (one), Road to Wisdom (two), Serving Children and Adults (five), and Turning Point Children's Social Service (one).

[258] Abuse, neglect, and exploitation (ANE) investigations accounted for 44% (48) of minimum standard citations, Non-ANE investigations 20% (22), inspections 31% (33), and assessment 5% (five) of citations during post-plan monitoring.

[259] All operations that had no deficiencies in the six months prior to post-plan monitoring and no deficiencies while in post-plan monitoring had completed Heightened Monitoring as of March 1, 2023.

Figure 116: Minimum Standards Deficiencies by Weight Six Months
Prior to and During Post-Plan Monitoring



Operations must be in compliance with all high and medium-high weighted standards in order to move to post-plan monitoring.[260] Almost all of the operations that moved to post-plan monitoring received a high or medium-weighted standards in the months prior to being placed in the post-plan stage: 68% (25 of 37) of operations that moved to post-plan monitoring had a high and/or medium-high weighted standard deficiency cited in the six months prior to moving to post-plan monitoring. Of those, 41% (15 of 37) had a high-weighted standard deficiency and 57% (21 of 37) had a medium-high weighted standard deficiency. The average number of days between receiving a high-weighted standard citation and moving to post-plan monitoring was 121 days, with a range of two to 177 days.[261] The average number of days between receiving a medium-high weighted standard citation and moving to the post-plan stage was 139 with a range of 11 to 177 days.

The most frequently cited standards for all deficiencies cited in the six months prior to operations moving to the post-plan stage were related to medication management/medical care (21 of 110, or 19%), physical plant (18 of 110, or 16%), supervision (15 of 110, or 14%), and health and safety (12 of 110, or 11%). The most frequently cited standards for all deficiencies cited during post-plan monitoring were related to physical plant (14 of 108, or 13%), EBI (11 of 108, or 10%), supervision (11 of 108, or 10%), and medication management/medical care (10 of 108, or 9%).

---

[260] Order, ECF 837.
[261] The Court's order does not specify the point at which compliance with high and medium-weighted standards is to be measured; the language that immediately precedes the language related to compliance with high and medium-weighted standards specifies that operations may not move to post-plan monitoring until six months' successive unannounced visits indicate the operation complies with the standards and contract requirements that led to heightened monitoring. *Id.* at 3.

## Operations that Moved to Post-Plan Monitoring and had Completed Heightened Monitoring as of March 1, 2023

As of March 1, 2023, 25 of the operations that had moved to post-plan monitoring had completed Heightened Monitoring[262]. These operations were on post-plan monitoring for an average of 209 days (6.9 months)[263]. Nineteen of the operations that completed Heightened Monitoring had a total of 142 investigations opened while on post-plan monitoring, with a range of 2 to 15. One operation that completed Heightened Monitoring had an investigation that opened while in post-plan monitoring that was still open on the day they completed Heightened Monitoring.[264]  Six operations that completed Heightened Monitoring (24%) had no investigations opened while they were on post-plan monitoring.

Almost half of the operations (44% or 11 of 25) that had completed Heightened Monitoring as of March 1, 2023, had more ANE investigations opened while in post-plan monitoring than they did in the six months prior to moving to PPM. The number of additional investigations opened ranged from one to nine. Three operations that had zero investigations opened in the six months prior to moving to post-plan monitoring had four or more investigations opened while on PPM.[265]

Operations that completed Heightened Monitoring also received citations during the post-plan stage.[266] Almost half of the operations (48%, or 12 of 25) that had completed Heightened Monitoring had more deficiencies cited while in post-plan monitoring than they did in the six months prior to moving to post-plan monitoring. Three operations that had no deficiencies cited in the six months prior to moving to post-plan monitoring had two or more deficiencies cited while they were in the post-plan stage.[267]

Most operations – 16 of 25 (64%) – that completed Heightened Monitoring had at least one minimum standards deficiency citation while on post-plan monitoring. These 16 operations had a total of 79 minimum standards deficiency citations while on post-plan monitoring, with a range of one to 16. Thirty percent (24 of 79) of the deficiencies cited while operations that completed Heightened Monitoring were on post-plan monitoring were for high-weighted standards, 42% (33 of 79) were for medium-high-weighted

---

[262] Twenty-five of the 37 operations that moved to post-plan monitoring had completed Heightened Monitoring as of March 1, 2023. These 25 operations are included in the post-plan monitoring analysis.
[263] Operations completing Heightened Monitoring as of 3/1/23 were on post-plan monitoring 165 to 296 days (5.4 to 9.7 months).
[264] Embracing Destiny Foundation RTC had an investigation with a stage start date of 9/20/22 and a stage closed date of 10/14/22. Heightened Monitoring documentation indicates Embracing Destiny Foundation completed Heightened Monitoring on 9/21/22. (Case ID#49328260).
[265] Harmony Family Services Emergency Shelter had 7 ANE investigations opened while on PPM, Pathways Youth & Family Inc. had 6 investigations opened while on PPM, and Serving Children and Adults had 4 investigations opened while on PPM. All these operations had zero ANE investigations opened in the six months prior to moving to PPM.
[266] Operations that completed Heightened Monitoring by March 1, 2023, are included in the analysis.
[267] New Horizons CPA had two deficiencies while on post-plan monitoring (PPM), Road to Wisdom had two deficiencies while on PPM, and Serving Children and Adults had five deficiencies while on PPM. All these operations had zero deficiencies in the six months prior to moving to PPM.

standards and 20% (16 of 79) were for medium-weighted standards. A quarter of the high-weighted standard deficiencies (6 of 24, or 25%) were cited within 20 days of the operation completing Heightened Monitoring.[268]

## Operations Placed on Heightened Monitoring Between 2020 and 2022 That Closed or Terminated their Contract as of March 1, 2023

Thirty-six operations that were placed on Heightened Monitoring in 2020, 2021, and 2022 had closed or terminated their contract to care for foster children as of March 1, 2023. These operations were under Heightened Monitoring an average of 10.8 months (327.2 days), with a range of 52 to 841 days. While on Heightened Monitoring, these operations had a total of 1,359 ANE investigations opened, 1,421 ANE investigations closed, and 95 RTB findings. They had a total of 1,135 minimum standards deficiency citations, 89% of which were for high, medium-high, and medium-weighted standards. Details on operations that closed/terminated their contract while on Heightened Monitoring can be found in Appendix B of this report.

## Administrative Reviews for Citations

Operations cited for a minimum standards deficiency may request an administrative review if the operation believes the citation was issued in error. The number of requests for administrative review more than doubled between 2019 and 2022, from 596 to 1,322. The total number of citations issued for a minimum standard deficiency decreased 16% during the same period, from 6,418 in 2019 to 5,379 in 2022. The proportion of deficiency findings with a request for administrative review increased by 18 percentage points, from 9% in 2019 (596 of 6,418) to 27% (1,854 of 6,814) in 2021, and then declined slightly to 25% (1,322 of 5,379) in 2022.

---

[268] The average time between High weighted standard citation and completing Heightened Monitoring was 124.6 days, with a range of 12 to 238 days.



Figure 117: Percent of Deficiency Citations with a Request for Administrative Review by Year

Although the percentage of deficiencies with a request for administrative review increased substantially between 2019 and 2022, the percentage of reviews resulting in a finding being overturned did not. In 2019, 32% of administrative review decisions overturned citations (192 of 593) compared to a high of 36% (659 of 1,816) in 2021, an increase of three percentage points.[269]



Figure 118: Percent of Deficiency Findings Overturned in an Administrative Review Decision, 2019 to 2022

---

[269] Includes only administrative reviews with a decision of overturned or upheld recorded in the deficiency data provided by the State. In 2019, the administrative review status was "requested" or pending for three cases (<.001% of 6,418), in 2020 42 cases (.7% of 6,136), in 2021 38 cases (.6% of 6,814), and in 2022 394 (7.3% of 5,379) cases.

## Administrative Review Trends by Heightened Monitoring Status at Time of Citation, 2020 to 2022

One hundred and twelve operations were placed on Heightened Monitoring between 2020 and 2022. Citations issued to these operations for minimum standards violations while they were on Heightened Monitoring accounted for 22% (4,094 of 18,329) of all deficiencies cited during the period[270].

Deficiencies cited while an operation was on Heightened Monitoring were more likely to have an administrative review request[271] than deficiencies cited while an operation was not on Heightened Monitoring, with the difference becoming more pronounced as the number of requests for administrative reviews increased. In 2020, an administrative review was requested for 20% (133 of 671) of deficiencies cited while an operation was on Heightened Monitoring compared to 14% (771 of 5,465) of deficiencies cited while an operation was not on Heightened Monitoring, a difference of six percentage points. This difference increased in 2022 when an administrative review was requested for 36% (489 of 1,376) of deficiencies cited while an operation was on Heightened Monitoring compared to 21% (833 of 4,003) of deficiencies cited while an operation was not on Heightened Monitoring, a difference of 15 percentage points.

Figure 119: Percent of Deficiencies with Administrative Review Requested by Heightened Monitoring Status at the time of the Citation, 2020 to 2022



---

[270] Includes all deficiency citations that occurred while the operation was on the Plan in Effect stage or post-monitoring stage of Heightened Monitoring. Citations that occurred while an operation was not on Heightened Monitoring are considered "Citations Not During HM." Operations placed on Heightened Monitoring in 2020 were notified of their Heightened Monitoring status beginning in June, with most operations beginning Heightened Monitoring in October and November of that year.
[271] Includes deficiencies with an administrative review status of "Requested," "Upheld," and "Overturned."

Although the number of requests for administrative reviews increased between 2020 and 2022 for all deficiency citations, the decision to overturn the citation remained largely consistent regardless of Heightened Monitoring status at the time of the citation. The percentage of administrative reviews with a decision of overturned[272] ranged from 35% to 37% of deficiencies cited while an operation was on Heightened Monitoring compared to 32% to 36% of deficiencies cited while an operation was not on Heightened Monitoring.

Table 27: Administrative Review Decision of Overturned by Heighted Monitoring Status at the Time of the Citation, 2020 to 2022

| Cite Year | HM at Time of Citation | # Admin Review Decisions | # Overturned | % Overturned |
|---|---|---|---|---|
| 2020 | HM | 130 | 45 | 35% |
| | Non-HM | 732 | 235 | 32% |
| | | | | |
| 2021 | HM | 673 | 428 | 37% |
| | Non-HM | 1,143 | 411 | 36% |
| | | | | |
| 2022 | HM | 325 | 118 | 36% |
| | Non-HM | 603 | 207 | 34% |

## Update Regarding Emerging Issues Identified in Fourth Report

The Monitors' Fourth Report identified several emerging issues or patterns related to the State's implementation of Heightened Monitoring.[273] The State has made progress in addressing several of these issues.

### Duplication of Tasks Between Heightened Monitoring and Other Enforcement Actions

The Monitors' Fourth Report identified operations that were placed on a voluntary Plan of Action or probation by HHSC, or a Corrective Action Plan by DFPS, after starting Heightened Monitoring. The Fourth Report raised two primary concerns related to this practice.

First, some operations under Heightened Monitoring continued to have significant safety problems despite weekly visits from DFPS and HHSC, and rather than implement one of the remedies identified in the Court's order (suspension of placements, imposition of fines, suspension or revocation of the facility or CPA's license, or termination of the contract) the State instead placed the operations under what was often a redundant corrective action.

---

[272] Includes only administrative reviews with a decision of overturned or upheld recorded in the deficiency data provided by the State. In 2020, the administrative review status was "requested" or pending for 42 (.7% of 6,136) cases, in 2021 38 (.6% of 6,814) cases, and in 2022 394 (7.4% of 5379) cases.
[273] Fourth Report, at 134-151.

Second, placing operations under what were often duplicative enforcement actions created inefficiencies, led to miscommunication between the different State teams overseeing the two corrective actions, and frustrated providers with a revolving door of DFPS and HHSC staff through the operations, with some operations receiving multiple visits during a single week or, though more rarely, on a single day.

DFPS and HHSC have made progress related to the second concern. On July 6, 2022, HHSC e-mailed the Monitors an internal plan developed by HHSC to address the concerns raised in the Fourth Report and a joint plan developed with DFPS to streamline and align oversight practices.[274] HHSC's plan included having inspectors responsible for Heightened Monitoring oversight assume responsibility for other types of inspections for the operations assigned to them. The Heightened Monitoring inspector is now responsible for all activities at their assigned operation except for standards investigations.[275]

As part of their joint plan, DFPS and HHSC agreed that HHSC would complete Heightened Monitoring inspections at CPAs, and DFPS would complete Heightened Monitoring inspections at agency foster homes.[276] The two agencies agreed to alternate inspections at GROs.[277]

In addition to these changes in inspection policy, on December 1, 2022, HHSC implemented a change related to agency foster home sampling visits: because the foster homes affiliated with CPAs that are under Heightened Monitoring are subject to visits through Heightened Monitoring, HHSC has removed those foster homes from the list of agency homes that are eligible for sampling inspections if they have received a Heightened Monitoring visit in the previous 12 months.[278]

The primary response to the first concern raised – related to operations placed under duplicative corrective actions while under Heightened Monitoring – appears to have been to discontinue this practice altogether. While this eliminates the inefficiencies identified in the report, it does not address the safety concerns raised for operations that have been placed under Heightened Monitoring, have a regular HHSC and DFPS presence in the facilities as a result, and yet continue to receive citations for minimum standards deficiencies or substantiated findings of abuse, neglect, or exploitation.

At a June 6, 2022, status conference, the Court expressed concern with the State's failure to address operations' ongoing noncompliance with Heightened Monitoring through one of the penalties identified in the March 18, 2020, Heightened Monitoring

---

[274] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Updates on Plan for Streamlining HM Oversight and Meaningful Technical Assistance, July 6, 2022 (on file with the Monitors).
[275] HHSC, Streamline & Align Oversight of Facilities on Heightened Monitoring & Provide Meaningful Technical Assistance 2 (2022)(on file with the Monitors).
[276] DFPS & HHSC, DFPS/HHSC Coordination to Streamline and Align Oversight and Provide Meaningful Technical Assistance (undated)(on file with the Monitors).
[277] *Id.*
[278] HHSC, Child Care Regulation Field Communication (December 1, 2022) (on file with the Monitors).

order. Since then, the most common penalty assessed has been the imposition of a fine. In all, the State fined 33 operations for failing to come into compliance with a Heightened Monitoring plan; 27 of those operations have been fined twice. Fines ranged from $100 to $500.[279]

In addition, DFPS cancelled its contract with one operation – Grammy's Home and Emergency Shelter GRO – nearly two years after the operation was placed under Heightened Monitoring on December 7, 2020. The operation struggled to comply with the Heightened Monitoring Plan and on September 7, 2022, DFPS notified the Monitors that it had terminated its contract with the GRO as of August 31, 2022.[280] DFPS did not give a reason for the contract termination, however Grammy's Home had been placed under a DFPS Contracts Corrective Action Plan in March 2022 for failing to maintain an administrator.[281] Grammy's Home did not lose its license but has not served any children since June of 2022. According to CLASS notes, the operation is in the process of working toward a permit change to become a Residential Treatment Center. An unannounced inspection completed by HHSC on April 23, 2023, shows that the operation received a citation for violation of a medium-high weighted minimum standard that requires caregivers to have current certifications in first aid. The unannounced visit was associated with the permit renewal process.

Several other Heightened Monitoring operations either voluntarily closed or closed after DFPS suspended placements or terminated a contract in 2022, or both. These operations include:

Freedom Place GRO

This operation was placed on Heightened Monitoring on October 20, 2020. DFPS removed all children from the GRO and suspended placements on March 11, 2022. The operation terminated its contract with DFPS on April 8, 2022, and requested a two-year voluntary suspension of its license on April 20, 2022.

---

[279] The fine is based on the number of children in care at the time that the penalty is assessed for CPAs, and the operation's licensed capacity for GROs. 26 Tex. Admin. Code §745.8714(a)(2). Thus, A World for Children CPA, which is responsible for hundreds of foster homes throughout Texas and has contracts with DFPS exceeding $50 million (*See* DFPS, Active Client Service Contracts Exceeding $100,000, *available at* https://www.dfps.texas.gov/Doing_Business/Active_Contracts/client_services.asp ), was twice fined $500.

[280] E-mail from Lesley Castillo, DFPS Program Specialist, to Deborah Fowler and Kevin Ryan, re: August 2022 – Suspensions, Contract Terminations and Disallowances (September 7, 2022)(on file with the Monitors). On the same date, HHSC issued five citations to Grammy's Home for violation of minimum standards, all weighted medium (1), medium-high (3), or high (1). The five deficiencies included a citation for violation of a Texas statute (Human Resources Code §42.063(a)(1)) requiring operations to report abuse, neglect, and exploitation; the citation was issued because "one of the three employee files reviewed showed that an employee received disciplinary in June 2019 for admittingly hitting a child during a restraint. This incident was never reported to Licensing."

[281] E-mail from Lesley Castillo to Deborah Fowler and Kevin Ryan, re: March 2022 – Suspensions, Contract Terminations and Disallowances (April 11, 2022)(on file with the Monitors).

### Texas Foster Care and Adoption Services

This operation was placed on Heightened Monitoring on October 26, 2020. DFPS suspended placements on November 3, 2022, after a series of media articles exposed the operation for maintaining an employee on staff despite allegations that he sexually abused a child.[282]  The operation's license was revoked on February 14, 2023; the revocation was upheld on administrative review.

### Hands of Healing RTC

This operation was placed on Heightened Monitoring on January 13, 2021. DFPS suspended placements and removed children from the operation on May 5, 2022. The operation requested a one-year voluntary suspension of its license on June 10, 2022, indicating that it would take the time during the license suspension to "reorganize, build additional financial reserves and refine [its] operational plan to ensure success."

### Jae's Helper CPA

This operation was placed on Heightened Monitoring on June 21, 2021. Jae's Helper was fined $100 for failing to come into compliance with its Heightened Monitoring Plan on July 29, 2022. DFPS suspended placements on August 15, 2022. DFPS terminated its contract with the operation on February 3, 2023. Notes in CLASS indicate that the operation voluntarily closed on March 28, 2023.

### Lighthouse for the Betterment of Life

This operation was placed on Heightened Monitoring on June 22, 2021, soon after starting a voluntary Plan of Action on May 11, 2021. DFPS suspended placements on July 19, 2021, and terminated its contract with the operation on April 14, 2022. The operation voluntarily relinquished their permit on November 10, 2022.

### Globel Foster Care CPA

This operation was placed on Heightened Monitoring on June 21, 2021. The operation was fined $100 for failing to come into compliance with its Heightened Monitoring Plan on July 29, 2022. DFPS suspended placements on August 30, 2022. HHSC notified the operation that it would revoke its license on February 15, 2023. The decision is pending an appeal of the revocation.

Other operations remained open as of May 31, 2023, after a placement suspension, and are still under Heightened Monitoring:

---

[282] *See* Paul Flahive, *Executive at a Texas foster placement agency kept job despite sex abuse allegation*, September 29, 2022 (Texas Public Radio); Paul Flahive, *Texas Foster Care and Adoption Services' executive director steps down*, October 1, 2022 (Texas Public Radio).

## Circle of Living Hope CPA

This operation was placed on Heightened Monitoring on October 26, 2020. The operation was placed on probation on May 24, 2021, and completed the probation May 23, 2022. DFPS suspended placements on October 31, 2022. The operation has still not moved to post-plan monitoring. The operation was twice fined $200 for failing to come into compliance with its Heightened Monitoring Plan, on September 2, 2022, and March 6, 2023.

## Boys Haven of America GRO

This operation was placed on Heightened Monitoring on November 17, 2020. DFPS suspended placements on June 30, 2022. Boy's Haven was twice fined $150 for failing to come into compliance with its Heightened Monitoring Plan, on September 23, 2022, and March 27, 2023. On May 8, 2023, DFPS notified the Monitors that it had again suspended placements as of April 21, 2023. An unannounced monitoring inspection conducted on May 24, 2023, showed that six children were in the facility's care.

## Children's Hope Residential Services CPA

This operation was placed on Heightened Monitoring on October 12, 2020. DFPS issued a placement suspension June 13, 2022. Children's Hope was twice fined $500 for failing to come into compliance with its Heightened Monitoring Plan, on September 2, 2022, and March 6, 2023.

## Beacon of Hope

This operation was placed on Heightened Monitoring on August 26, 2020. DFPS suspended placements on August 31, 2022. This was one of the operations discussed in the Fourth Report, because it was placed on probation after starting Heightened Monitoring. The placement hold was lifted on September 29, 2022. The operation successfully completed its probation on February 8, 2023, but remains on Heightened Monitoring, with the most recent extension of its Heightened Monitoring Plan scheduled to end on July 19, 2023. The operation has been fined $150 twice for failing to comply with its Heightened Monitoring Plan.

## Passage of Youth Family Center

This operation was placed on Heightened Monitoring on June 23, 2021. The operation was fined $150 for failing to come into compliance with its Heightened Monitoring Plan on July 29, 2022, and DFPS suspended placements August 30, 2022. The operation was fined $150 a second time on January 31, 2023.

Of the first cohort of 86 operations placed under Heightened Monitoring in 2020, as of March 1, 2023, 24 remained on Heightened Monitoring. Since being placed under Heightened Monitoring, these operations have had 127 RTB findings for abuse, neglect,

222

or exploitation and have received 1,813 citations for minimum standards deficiencies, of which 1,652 were weighted high, medium-high, or medium. The table below shows the history of safety problems associated with these 24 operations since being placed on Heightened Monitoring.

Table 28: Operations Placed on Heightened Monitoring in 2020 in Plan in Effect Stage as of March 1, 2023, Deficiencies, ANE Investigations, RTB Findings, and Enforcement Actions While on Heightened Monitoring

| Operation Name | Deficiencies | | ANE Investigations | | Enforcement Action | | |
| | All | High, Med-High, Med | Investigations Opened | RTB Finding | Probation | Monetary Penalty | Plan of Action |
|---|---|---|---|---|---|---|---|
| A New Day Foundation | 34 | 29 | 58 | 1 | 0 | 1 | 0 |
| A World for Children | 160 | 145 | 518 | 12 | 0 | 3 | 1 |
| Agape Manor Home CPA | 90 | 80 | 118 | 4 | 0 | 2 | 1 |
| Azleway Children's Services | 126 | 115 | 184 | 6 | 0 | 4 | 0 |
| Bair Foundation | 70 | 66 | 234 | 15 | 0 | 5 | 0 |
| Beacon of Hope | 58 | 49 | 59 | 1 | 1 | 2 | 0 |
| Boy's Haven of America | 85 | 70 | 24 | 0 | 0 | 2 | 0 |
| Caring Hearts for Children | 51 | 51 | 100 | 1 | 0 | 5 | 0 |
| Children's Hope Residential Services CPA | 112 | 103 | 235 | 6 | 1 | 4 | 0 |
| Circle of Living Hope | 82 | 74 | 156 | 15 | 1 | 4 | 1 |
| Circles of Care | 57 | 57 | 158 | 17 | 0 | 5 | 0 |
| East Texas Open Door Inc | 44 | 36 | 62 | 1 | 1 | 0 | 0 |
| Fostering Life Youth Ranch | 26 | 26 | 81 | 0 | 0 | 5 | 0 |
| Girls Haven | 26 | 25 | 33 | 0 | 0 | 3 | 0 |
| Hands of Healing (CPA) | 48 | 48 | 171 | 2 | 0 | 2 | 0 |
| Lutheran Social Services of the South | 211 | 197 | 525 | 11 | 0 | 7 | 1 |
| New Hope Youth Center | 58 | 55 | 95 | 4 | 0 | 1 | 0 |
| New Life Children's Treatment Center | 43 | 42 | 155 | 6 | 0 | 1 | 1 |
| The Burke Foundation CPA | 39 | 38 | 84 | 3 | 0 | 2 | 1 |
| The Burke Foundation-Pathfinders RTC | 21 | 20 | 31 | 0 | 0 | 1 | 1 |
| The Giocosa Foundation | 52 | 51 | 71 | 2 | 0 | 3 | 0 |
| The Grandberry Intervention Foundation | 163 | 139 | 90 | 2 | 1 | 3 | 0 |

| Therapeutic Family Life | 84 | 68 | 224 | 6 | 1 | 3 | 0 |
| Youth in View | 73 | 68 | 87 | 12 | 1 | 4 | 1 |
| Total | 1,813 | 1,652 | 3,553 | 127 | 7 | 72 | 8 |

Note: Data as of January 31, 2023.

These 24 operations have been under Heightened Monitoring for more than two years and have yet to come into compliance with the Plans intended to address significant safety concerns. Six of these operations have each had more than 10 RTB findings since being placed under Heightened Monitoring. According to information on the DFPS website, some of these operations have active contracts with DFPS with a value of tens of millions of dollars.[283] Some operate hundreds of foster homes. The ongoing failure to hold them accountable for compliance with their Heightened Monitoring Plans puts the safety of a significant number of PMC children at risk.

## Lack of Meaningful Guidance or Technical Assistance

The Monitors also raised concerns in the Fourth Report related to the lack of meaningful guidance or technical assistance to operations placed under Heightened Monitoring. Since then, the Monitors' anecdotal review of technical assistance provided in conjunction with, or instead of, a minimum standards citation appears to show that (at least in some instances) HHSC inspectors are providing more meaningful guidance and feedback rather than simply reciting the minimum standard. As part of its plan to address the issues raised in the Fourth Report, HHSC committed to:

- Participate in efforts by the Provider Working Group, facilitated by the Expert Panel agreed upon by the parties in this matter, to address Heightened Monitoring and Technical Assistance as recommended by the Expert Panel.
- Conduct a targeted read on Technical Assistance provided/documented in CLASS.
- Conduct an internal review of HHSC – RCCR's existing Technical Assistance Library, update accordingly, and develop tools for identified topics including medication logs, and serious incident reports.
- Look at data for trends of citations in which Technical Assistance is most often provided and evaluate if there are any trends and patterns that need to be addressed with staff.
- Further explore developing TA Specialists positions, reviewing basic skill development curriculum related to TA, and creating an inspector workgroup to solicit feedback and ideas regarding meaningful TA. [284]

---

[283] *See* DFPS, *Active Client Service Contracts Exceeding $100,000*, *available at* https://www.dfps.texas.gov/Doing_Business/Active_Contracts/client_services.asp

[284] HHSC, Streamline & Align Oversight of Facilities on Heightened Monitoring & Provide Meaningful Technical Assistance 5-6.

In keeping with this, HHSC has issued sample forms for medication logs,[285] serious incident reports,[286] and supervisory visits.[287]

In early 2023 the monitoring team made five abbreviated visits to operations (three CPAs and two GROs) under Heightened Monitoring.[288] During those visits, administrators continued to express frustration with the lack of guidance offered during and after development of their Heightened Monitoring Plans. This issue was also one of the topics discussed with providers as part of the Provider Working Group convened by the Expert Panel.[289] During the Working Group meetings, providers expressed a desire for the State to adopt technical assistance that provided coaching and support to prevent minimum standard violations, rather than providing technical assistance only after a deficiency had been identified.[290]

Many of the same frustrations were expressed by the administrators for the five Heightened Monitoring operations visited by the monitoring team, who complained that the process often seemed bureaucratic, and burdened them with administrative tasks that they did not think the State had tailored to address child safety. The administrators who were interviewed expressed a desire for an approach to Heightened Monitoring and technical assistance that provided an opportunity to learn and develop skills.

The Expert Panel shared a draft of the Working Group's report with the Monitors and the Working Group members on March 17, 2023.[291] The draft report included five short-term recommendations, a medium-term recommendation, and two longer-term recommendations.[292] The recommendations were focused on improving the State's technical assistance to providers. The State and the working group members were given

---

[285] Email from Nicol Hoffer, Foster Care Litigation Project Manager to Deborah Fowler and Kevin Ryan, New Voluntary Residential Provider Medication Log Forms, March 27, 2023 (on file with the monitors).
[286] Email from Nicol Hoffer, Foster Care Litigation Project Manager to Deborah Fowler and Kevin Ryan, New Voluntary Residential Provider Serious Incident Forms, April 21, 2023 (on file with the monitors).
[287] Email from Nicol Hoffer, Foster Care Litigation Project Manager to Deborah Fowler and Kevin Ryan, New Voluntary Residential Provider Supervisory Visit Forms, April 24, 2023 (on file with the monitors).
[288] The monitoring team visited Aidee Emergency Shelter, Guardian's Promise CPA, Harbor of Hope CPA, Horizon Project GRO, and Texas Baptist Home for Children CPA. The one-day abbreviated visits focused solely on interviews with administrators and staff to discuss their experiences related to Heightened Monitoring and did not include the extensive record reviews and interviews that the monitoring team typically completes during multi-day site visits.
[289] The Expert Panel that crafted recommendations for addressing the State's increasing reliance on unlicensed, unregulated settings to house children was asked by the parties to facilitate a provider working group focused on a set of recommendations from the Expert Panel report related to Heightened Monitoring, including provision of effective technical assistance. *See* Ann Stanley, et al, Recommendations for Improving Texas' Safe Placement and Services for Children, Youth and Families (January 10, 2022), ECF No. 1166. The Monitors attended the provider working group meetings.
[290] The providers also expressed frustration with the lack of information available about the Heightened Monitoring process. In March 2023, DFPS added a section to the CPS Handbook detailing the Heightened Monitoring process. DFPS, CPS Handbook, Section 4600 *et seq*.
[291] E-mail from Judith Meltzer to Deborah Fowler and Kevin Ryan et al, re: HHSC-DFPS- Provider Workgroup Draft Report, March 17, 2023 (on file with the Monitors).
[292] Judith Meltzer et al, Draft for Working Group Review, Report of the Working Group to Improve Communication and Relationships Between Providers, State Agencies (DFPS and HHSC) and Court Monitors (March 17, 2023)(on file with the Monitors).

an opportunity to provide feedback to the Expert Panel and request changes.[293] On May 19, 2023, the State sent the "final report" to the Working Group, the Expert Panel, and the Monitors, with an e-mail indicating that the work of the group was "complete."[294] The report circulated by the State did not include any recommendations.[295] .[296]  Eight of nine recommendations from the Provider Working Group's first draft circulated in March 2023 correspond with "activities currently underway" and/or "accomplishments" in the final report issued by DFPS and HHSC in May 2023. The State eliminated from the final version of the report one recommendation that appeared in the earlier version: "HHSC should fully investigate opportunities and secure resources to provide caregiver training and coaching from a third party on how to successfully serve and meet the needs of youth in the conservatorship of DFPS while maintaining compliance with minimum standards and contract requirements. HHSC and DFPS will provide updates to the providers during quarterly provider meetings."[297]

## Operations Allowed to Refuse Tasks or Change Tasks

The Monitors' Fourth Report identified examples of Heightened Monitoring operation administrators refusing to agree to Tasks identified by the Heightened Monitoring Plan, or amending Plans after they started Heightened Monitoring when the operation had difficulty complying with a Task. The monitoring team did not identify any altered Tasks or refusals in Heightened Monitoring documentation reviewed for this report.

## Other Issues

The Monitors' Fourth Report identified several other issues related to operations under Heightened Monitoring, including struggling CPAs being allowed to add new foster homes, operations dropping census to achieve compliance with Heightened Monitoring, and technical assistance for minimum standards deficiencies not being considered for purposes of determining compliance with Plan Tasks. CPAs on Heightened Monitoring continue to add new foster homes – for example, Azleway CPA, which has been under Heightened Monitoring since 2020, had 50 active foster homes in December 2021 and 61 active homes in March 2022. But the monitoring team's review of GROs did not reveal ongoing concerns related to the other two issues.

---

[293] The Monitors did not see the feedback or changes requested by the working group members or the State.

[294] E-mail from Jordan Dixon, HHSC, and Jennifer Sims, DFPS, to Deborah Fowler and Kevin Ryan et al, re: Provider Working Group Final Report, May 19, 2023 (on file with the Monitors).

[295] HHSC & DFPS, Working Group to Improve Communication and Relationships between Residential Child Care Providers and State Agencies (May 2023)(on file with the Monitors).

[296] HHSC & DFPS, Working Group to Improve Communication and Relationships between Residential Child Care Providers and State Agencies (May 2023) (on file with the Monitors).

[297] See Judith Meltzer et al, Draft for Working Group Review, Report of the Working Group to Improve Communication and Relationships Between Providers, State Agencies (DFPS and HHSC) and Court Monitors (March 17, 2023) (on file with the Monitors) and HHSC & DFPS, Working Group to Improve Communication and Relationships between Residential Child Care Providers and State Agencies (May 2023) (on file with the Monitors).

The team did identify a new concern, however: in addition to operations remaining under Heightened Monitoring well beyond the one-year period (discussed above), some operations that moved to post-plan monitoring lingered in the post-plan phase due to ongoing child safety concerns. For example, Hands of Healing GRO [298] (1509926) was placed on post-plan monitoring in March 2022, and still has not been released. According to CLASS notes, the operation has not been released from post-plan monitoring because of open DFPS investigations of abuse, neglect, or exploitation. The Monitors were notified May 8, 2023, that DFPS suspended placements to the operation on April 24, 2023. As of June 1, 2023, the operation had two open DFPS investigations, one of which was opened just that day.

The ongoing problems at Hands of Healing raises questions about whether the operation should have moved to post-plan monitoring when it did. Hands of Healing GRO moved to post-plan monitoring on March 16, 2022, despite their failure to come into compliance with a Task in their Heightened Monitoring Plan, which required the operation to come into compliance with the terms of an HHSC probation plan. The operation was placed on probation on September 8, 2021, after receiving three RTB findings while on Heightened Monitoring, all for Neglectful Supervision. Hands of Healing was still five months away from completing probation when they moved to post-plan monitoring. In January and February of 2022, technical assistance was given to the operation for minimum standards that were related to probation and Heightened Monitoring Tasks. Though the Fourth Report was critical of the State's decision to place operations under Heightened Monitoring on another type of enforcement action, in this case, ignoring the enforcement action (which was presumably intended to address significant safety concerns) and moving the operation to post-plan monitoring failed to consider the risks associated with prematurely moving the operation to the post-plan stage.

Hands of Healing GRO is still on post-plan monitoring and continues to struggle with safety issues, as evidenced by the recent placement suspension. On April 26, 2023, the operation was fined $500 for failing to report a child's injuries. The CLASS notes indicate that the operation failed to report that a child was treated for a sprained finger and had a follow-up evaluation with an orthopedic specialist. An unannounced monitoring inspection on May 31, 2023 (associated with an intake for a pending HHSC investigation) showed 20 children were in the facility's care.

The discussion on pages 51 through 58, *supra*, identified the number of substantiated findings of abuse, neglect, or exploitation and deficiencies cited for operations that were allowed to move to post-plan monitoring. Twenty-eight operations that moved to post-plan monitoring had investigations opened during active Heightened Monitoring that resulted in a substantiated finding. One of these operations (Sweeten Home for Children) had a substantiated finding of abuse, neglect, or exploitation less than a month before it moved to post-plan monitoring. Six operations that moved to post plan

---

[298] Hands of Healing also operated an RTC, which was also under Heightened Monitoring. As discussed on page 64, *supra*, the RTC requested a one-year suspension of its license on June 10, 2022, after DFPS suspended placements to the operation and removed the children placed there on May 5, 2022.

monitoring had substantiated findings in investigations that opened during post-plan monitoring.

Yet, the most common enforcement action that the State is opting to use in response to ongoing problems associated with safety for operations on Heightened Monitoring is to issue a $100-to-$500 fine. The Monitors have deep concerns associated with ongoing safety problems for operations under Heightened Monitoring – particularly considering the State's seeming reluctance to heed providers calls for improved technical assistance.

New guidance drafted by the State related to Heightened Monitoring that the State began to share with providers on June 9, 2023,[299] sheds light on the way DFPS and HHSC consider substantiated findings of abuse, neglect, or exploitation and citations issued for minimum standards violations during an operation's time on Heightened Monitoring.[300] As discussed, the Court's March 18, 2020 Order requires operations placed under Heightened Monitoring to remain on Heightened Monitoring for at least a year, and until all the conditions of the Plan have been satisfied, at least six months' successive unannounced visits indicate the operation is in compliance with the standards and contract requirements that led to Heightened Monitoring, and the operation is not out of compliance with any medium-high or high-weighted licensing standards.[301]

The guidance specifies that in order to satisfy the conditions of a Heightened Monitoring Plan, the operation must be "substantially meeting" the requirements of the Plan Tasks.[302] The guidance indicates that in determining whether an operation has "substantially met" the requirements, the State will ask: whether the operation has

---

[299] An e-mail from the State indicated that the agencies were "planning to move forward with the use of these two documents by Friday, June 9, 2023." E-mail from Ora Chisom to Deborah Fowler and Kevin Ryan, re: Request Joint Meeting with DFPS/HHSC for Heightened Monitoring Discussion, June 5, 2023 (on file with the Monitors). In addition to the guidance, the State also sent the Monitors a document describing how the agencies would interpret the Court's order for purposes of determining whether an operation that was released from Heightened Monitoring would be eligible to go back on Heightened Monitoring.

[300] On May 15, 2023, DFPS sent the Monitors an e-mail that noted that "providers have consistently had many questions about the Heightened Monitoring process." The -mail indicated that DFPS and HHSC had prepared documents "to explain the existing Heightened Monitoring process used by the two agencies and to hopefully address providers ongoing questions." E-mail from Ora Chisom, Director, Foster Litigation Compliance, DFPS, to Deborah Fowler and Kevin Ryan, re: Request Joint Meeting with DFPS/HHSC for Heightened Monitoring Discussion, May 15, 2023 (on file with the Monitors). The e-mail proposed times to discuss the documents with the Monitors, however the Monitors had difficulty with the two May dates proposed by DFPS for a meeting and responded by noting that the Monitors would ultimately have to share the documents with the Court and seek the Court's guidance on the matter. On June 5, 2023, DFPS again e-mailed, noting that DFPS and HHSC were planning to move forward with the use of the documents sent to the Monitors by Friday June 9, 2023. E-mail from Ora Chisom to Deborah Fowler and Kevin Ryan, re: Request Joint Meeting with DFPS/HHSC for Heightened Monitoring Discussion, June 5, 2023 (on file with the Monitors). The Monitors responded, noting that they would include discussion of the documents in this report and discuss them with the Court in advance of the June 27, 2023, status conference.

[301] Order, 3 ECF No. 837.

[302] DFPS & HHSC, Heightened Monitoring Compliance Considerations, Stage Progression, and Extension Framework (undated)(on file with the Monitors).

implemented the requirements in the Plan; if the operation experienced delays with implementation, whether the operation completed the Tasks "in a reasonable timeframe;" and if the operation faced "challenges" with consistent implementation of Plan Tasks, whether the operation "ma[de] overall progress and demonstrate[d] that children are safe, risks are reduced, and that there is appropriate internal oversight of the operation."[303]

The guidance later describes the process for determining an operation's compliance "for purposes of [the] court order requirement:"

> When an operation has been on HM for at least one year, an evaluation is conducted to determine whether the operation has substantially complied with the HM plan. This includes a review of whether the operation has achieved six successive months of compliance with minimum standards and contract requirements in the pattern/trend areas that led to HM.

> Each violation the operation receives while on HM is evaluated to determine whether it falls under the pattern/trend areas. To demonstrate compliance for purposes of this court order requirement, an operation must not be found to have any violations in pattern/trend areas for the duration of a period of six successive months.[304]

However, the guidance appears to allow the six-month period for successive compliance to be any six-month period within the year that the operation is on Heightened Monitoring:

> The six-month compliance period begins once all HM tasks have been submitted by the operation and approved by DFPS and HHSC. The "end date" for the six months is determined by DFPS and HHSC...[W]hen an operation has been on HM for at least one year, the operation's history is reviewed to determine whether, following the approval of all task submissions, there has been a period of six successive months of compliance with minimum standards and contract requirements in the pattern/trend area that led to HM.[305]

Thus, at the end of the operation's first year on Heightened Monitoring, if the operation had a six-month period without citations related to their pattern/trend areas at any point during the year, a citation after that six-month period would not prevent the operation from moving to post-plan monitoring. In answering a hypothetical question related to an operation achieving six successive months without any violations, then receiving a violation in a pattern/trend area before moving to post-plan monitoring, the guidance advises:

---

[303] *Id.*
[304] *Id.*
[305] *Id.* at 5.

> [V]iolations resulting from an investigation are considered non-compliance on the date the investigation is initiated rather than the date the violation was issued[306]....[A]n operation may still be eligible to move to the post-plan monitoring phase as long as the investigation associated with the violation was initiated after the necessary six-month compliance period. Beyond the six-month requirement, the scope, severity, and number of any violations received in pattern/trend areas are considered as part of the determination of whether it is appropriate for an operation to advance to [post plan monitoring].[307]

Similarly, in answering the question "Is the activity start date[308] or the activity closure date used to determine whether and when a violation is counted as evidence of non-compliance for purposes of this court ordered requirement," the guidance states:

> If a minimum standard citation or contract violation in a pattern/trend area is received during the HM episode but is associated with an activity that began before the initiation of a HM episode, the violation is <u>not</u> considered in the HM compliance evaluation. This is because the violation is considered to be attributable to the concerning patterns and trends that "led to heightened monitoring" rather than evidence of the operation's non-compliance during the HM episode.[309]

The guidance also discusses the Court's language specifying that operations may not move off Heightened Monitoring if they are out of compliance on any medium-high or high-weighted licensing standards:

> An operation will be considered "not out of compliance" for the purposes of this court-ordered requirement if the operation corrects, or comes into compliance with, any licensing standard violations weighted MH/H received while on HM. This court requirement is construed by the agencies as applying to <u>all</u> licensing standards weighted medium-high or high regardless of whether the standard is in an identified pattern/trend category for that operation.[310]

The guidance notes that an operation may receive a medium-high or high weighted violation and still move to post-plan monitoring "as long as the operation first comes into compliance with any [medium-high or high] weighted minimum standards

---

[306] The guidance is at odds with HHSC's practice. HHSC usually issues citations for violation of minimum standards after completing an investigation. When the citation is issued, HHSC assigns a "Compliance Date," which is the date by which the operation must <u>come into compliance</u> with the minimum standard cited. In some cases, the date is the same day the operation received the citation; in others, it is a later date. This practice assumes the operation is not in compliance on the date that the citation was issued, not the date that the investigation was initiated.

[307] DFPS & HHSC, *supra* n. 284, at 5.

[308] An "activity start date" is defined as "an investigation intake date, inspection date, citation by assessment date, and/or the date a contract violation was assigned." *Id*. at 4.

[309] *Id*. at 4.

[310] *Id*.

violations received…and they have already demonstrated six successive months of compliance."[311]  For operations that are not in "substantial compliance" at the end of the one-year period, the guidance states that the operation's Plan may be extended for up to another year.

The guidance similarly suggests a good deal of flexibility for determining whether an RTB or will affect movement to post-plan monitoring. For example, it specifies:

> If an operation receives a disposition of Reason to Believe (RTB) during the HM episode. . . assessment of the operation's response and ability to mitigate future risk will be completed before determining whether the operation is eligible to move to post-plan monitoring or be released from HM.[312]

Finally, the guidance articulates a new rule related to open investigations, noting that HHSC and DFPS had not previously allowed an operation to move to post-plan monitoring or be released from Heightened Monitoring entirely if an investigation was still pending. According to the guidance, (presumably starting June 9, 2023) an "assessment procedure" will be used to review all open investigations, which will include determine whether the "documented evidence" is sufficient to conclude no serious risk, and whether the "documented evidence" is likely to support a minimum standard violation or other type of violation.[313]  The guidance specifies that if "there does not appear to be an unreasonable risk of serious harm associated with the placement of children at the operation, the operation may be authorized to move forward to the next phase of HM."[314]

## Remedial Order 20 Summary

Thirteen operations were newly placed on Heightened Monitoring 2022, with most having a Heightened Monitoring plan start date in September 2022. Between 2017 and 2021, these 13 operations accounted for 70 substantiated findings of abuse, neglect, or exploitation, and 980 citations for minimum standards violations. For these 13 operations, the most common problem areas risking children's safety were related to medication management/medical care, discipline, and records management, with 62% of operations having these issue areas identified. Similarly, the most frequently cited standards violations for all deficiencies cited in the six months prior to operations moving to graduate from Heightened Monitoring in their post-plan stage were related to medicine management/medical care (19%). Five of the 13 operations were also subject to another type of enforcement action (probation, a Plan of Action, or monetary penalty) in 2022.

---

[311] *Id.*

[312] *Id.* The guidance later notes, "If an operation receives an RTB finding, the operation must be responsive and act quickly to address the incident resulting in the RTB and demonstrate the ability to mitigate future risk. The operation's HM plan may be extended to allow time to evaluate whether the operation has implemented processes to mitigate any identified risk."

[313] *Id.*

[314] *Id.*

The monitoring team also compared each operation's historical trends to the problem areas identified in the operation's Heightened Monitoring Plan, and identified one or more problem areas that were not included in the operation's Heightened Monitoring Plan for two-thirds of the operations reviewed (69%). Problem areas identified by the monitoring team that were not found in Heightened Monitoring Plans included physical plant issues, child rights, emergency behavioral interventions (EBIs), supervision, and staff oversight. Two Heightened Monitoring operations had two problem areas that were not identified in their Heighted Monitoring Plan, and three of the 13 operations placed under Heightened Monitoring had three or more problem areas that were not addressed in their Plans.

During 2022, 1,422 placements of PMC children were made to operations under Heightened Monitoring. Nearly all (99%) requests to approve placements received approval by a Regional Director or Associate Commissioner. The monitoring team found documentation of the justification for the child's placement and the approver's review of the operation's safety history in only 17% (235 of 1402) of the placements. Staff that approved placement requests often copied and pasted statements across placement requests, resulting in generic approvals that did not appear to a consider a child's individual needs. Only 16% (225 of 1422) of placements received prior approval meeting all the requirements of the Court's order.

Many operations placed under Heightened Monitoring continued to struggle with safety problems. DFPS suspended placements to nine Heightened Monitoring operations in 2022 due to safety concerns. Five of these operations subsequently closed.

Twenty-four operations have been under Heightened Monitoring for more than two years and have yet to come into compliance with the Plans intended to address significant safety concerns. These operations have had 127 Reason to Believe findings and have received 1,813 citations for minimum standards deficiencies since being placed on Heightened Monitoring. Six of these operations have each had more than 10 RTB findings since being placed under Heightened Monitoring. Some of these operations have active contracts with DFPS with a value of tens of millions of dollars. Some operate hundreds of foster homes. The State's inaction to meaningfully hold operations accountable for their failure to come into compliance with their Heightened Monitoring Plans puts the safety of a significant number of PMC children at risk.

Since the concerns raised in the Fourth Report related to the lack of meaningful guidance or technical assistance to operations placed under Heightened Monitoring, the Monitors' anecdotal review of technical assistance provided in conjunction with, or instead of, a minimum standards citation appears to show that (at least in some instances) HHSC inspectors are providing more meaningful guidance and feedback rather than simply reciting the minimum standard. However, the technical assistance that is being provided (which often appears to consist of little more than a written statement explaining the reason for the minimum standard) still falls short of the type of technical assistance providers have expressed an interest in receiving. The State issued a

final version of the Expert Panel report without including the panel's recommendations related to technical assistance.

## Remedial Order 21: Revocation of Licenses

**Remedial Order 21:** *Effective immediately, RCCL and/or its successor entity shall have the right to directly suspend or revoke the license of a placement in order to protect the children in the PMC class.*

## Background

Since the Monitors' last update to the Court regarding agency home closures and license revocations or denials for operations, HHSC recommended 13 agency homes for closure. HHSC leadership denied one closure recommendation, one operation was approved for recommended closure but was not closed by the CPA. One home recommended for closure was closed, but then re-verified and re-opened by another CPA, and then approved for closure a second time by HHSC, then ultimately closed by the CPA. HHSC also denied one operation license for a history of lack of compliance with minimum standards.

In addition to the HHSC closure recommendations, DFPS placed 13 foster homes on a list of disallowed placements in 2022. One of the disallowed homes was closed by the CPA. The home was then verified under a different CPA, and children continue to be placed in the home. The home remains on the DFPS Disallowance List.

## Methodology and Performance Validation Results

The Monitors reviewed CLASS and IMPACT records for the homes that HHSC recommended for closure and the homes DFPS placed on its Disallowed List.

## Approved HHSC Closure Recommendations

Home A (Family Link Treatment Services, Inc.)
Closed January 21, 2022

Family Link Treatment Services, Inc. verified Home A on August 11, 2020. During the time that it was licensed, two standards investigations resulted in six deficiencies.

The first investigation involved a five-year-old child testing positive for COVID on August 19, 2021. The foster parent did not report the positive test to SWI until September 1, 2021. The incident report was signed and dated August 19, 2021, and lists the call ID number from September 1, 2021, report to SWI. HHSC issued two citations after the investigation: one for inaccurate records and one for not reporting within 24 hours that the child contracted a communicable disease.

The second investigation was initiated on September 22, 2021, after a five-year-old child told his biological mother that the foster mother spanked him twice on his bottom. In

interviews, the five-year-old foster child, and his four-year-old sister each reported that the foster mother had slapped the five-year-old on the hand.

The HHSC investigator issued four citations for minimum standards violations associated with the following: corporal punishment for spanking the children on their hands; loose blankets in an infant's crib; over-the-counter medication not being stored in a locked container; food being stored on the floor in the pantry; and a mattress not having a protector. In addition, HHSC provided technical assistance related to a child's right to be free of harsh punishment.

After a Heightened Monitoring visit on December 31, 2021, the home received two citations: corporal punishment for spanking a child and prohibited items in a crib.

On January 3, 2022, HHSC recommended foster home closure based on its history of citations. HHSC approved the recommendation for closure and notified Family Link Treatment Services of the closure by letter on January 19, 2022.[315] The CPA closed the home on January 21, 2022. The home was placed on the DFPS Disallowance List updated on March 15, 2022.

Home B (Lutheran Social Services of the South- Lubbock)
Closed March 17, 2022

Foster Home B was verified by Lutheran Social Services of the South CPA - Lubbock Branch (Lutheran Social Services) on January 7, 2020. Lutheran Social Services has been on Heightened Monitoring since December 2020.[316]

Home B was investigated only once during the period that it was verified. On October 8, 2021, DFPS opened an investigation for Neglectful Supervision. The biological children alleged that at the end of September 2021, the foster parents were involved in a "domestic violence incident." The incident was recorded on video. The couple were seen arguing back and forth, yelling profanity at one another, calling each other names, "swinging" at each other, and pulling each other's hair. The allegation narrative indicates that the whereabouts of the children, both biological and foster, were unknown at the time of the incident.

---

[315] Letter from Jenny Hinson, Director of Heightened Monitoring, HHSC, to Heather Morton (January 19, 2022) (on file with the monitors).

[316] The issue areas identified in the Heightened Monitoring plan included administrative operations, therapeutic services, physical environment, and supervision and staff interactions. The Heightened Monitoring plan indicates, "Overall, the areas needing growth are appropriate leadership structure, home studies and foster home certification, service plans, ongoing home management, and medical care...The foster parents could use guidance and training in medication management, discipline and punishment, and the treatment towards children and child." Between September 2015 and November 2020, the Lutheran Social Services of the South had 449 allegations of ANE from 342 investigations. 187 of those allegations were for Neglectful Supervision. There was a total of 18 investigations that resulted in a total of 33 Reasons to Believe dispositions, 14 of which were for Neglectful Supervision. Of the 342 investigations that occurred between September 2015 and November 2020, 84 investigations were closed with 139 citations. 26 of those citations were for supervision. At the start of Heightened Monitoring in December 2020, there were 12 open investigations, eight of which alleged Neglectful Supervision.

The biological children reported seeing the parents push each other. One child reported that the father kicked a hole in the wall and threw his mother's phone at the wall. The same child reported that on another night, he woke up because his mother was screaming for help. The other biological child reported his parents regularly spanked one of the foster children with a belt as punishment, and that his parents co-slept with the five-month-old foster child.

The foster parents reported that the domestic violence incident occurred at a friend's house after they had been drinking. Their biological and foster children were at their house with a nanny and were not present. Both parents denied engaging in physical altercations at home or in front of the children, claiming this was an isolated event. Both parents also denied co-sleeping or using corporal punishment.

The allegation of Neglectful Supervision was Ruled Out, but the investigator noted a concern that the couple's arguments had been ongoing since before the couple became foster parents. HHSC issued a citation related to a minimum standard associated with caregiver responsibilities noting that the "Caregivers placed children at risk when over-consuming alcohol and engaging in a physical and verbal altercation while under the influence." The home also received technical assistance on safe sleep and corporal punishment.

The foster children were removed when the investigation was initiated, and the home was placed on inactive status on December 21, 2021. The investigation closed on March 17, 2022. The home's verification was relinquished on March 29, 2022, as "Involuntarily closed without deficiencies."[317] The CPA closed the home before HHSC made a final decision on the Closure Recommendation.

After the foster home was closed, a two-year-old foster child was placed in the home. An IMPACT contact dated March 29, 2022, documented that a court order was in place for the child to remain in the home. The child's placement list in IMPACT reflects the home's status changed to an unauthorized placement. This family adopted the child on February 10, 2023.

Home C (Circle of Living Hope)
Closed February 21, 2022

Home C was verified by four CPAs before closing. The home was first verified by Hope for Tomorrow on December 2, 2010, then relinquished on September 16, 2013, and immediately verified by Giocosa Foundation. The home changed CPAs to the Circle of

---

[317] Home closure recommendation document (Form 2980a) indicates the foster parents intended to adopt one of the foster children. The form also indicates that the Program Director for Lutheran Social Services of the South did not feel they had enough evidence to justify closing this home. The Program Director stated the home would receive more announced and unannounced visits after the "judge ordered the foster/adoptive child back into the home for adoptive placement." Both foster parents agreed to refrain from consuming any type of alcohol "during the court order[ed] foster/adoptive placement by the judge."

Living Hope on August 5, 2017.[318] After it was verified by Circle of Living Hope, the home voluntarily closed with deficiencies on February 21, 2022, and moved to the Renaissance Child Placing Agency[319] on February 22, 2022, its most recent CPA. Less than three months after moving its verification to Renaissance CPA, the home voluntarily closed with deficiencies on May 13, 2022.

Over the 12 years and three months that it was open, this foster home was the subject of 22 investigations; four involved allegations of abuse, neglect, or exploitation, and 18 involved allegations of minimum standards violations.

Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on March 24, 2017, after a 10-year-old child made an outcry to both his caseworker and school personnel that his foster father hit him with an open hand on the head. One reporter said, "he [the child] feels that he is hit more often than his other foster siblings." The 10-year-old gave inconsistent accounts of the abuse when he was interviewed. Other children in the home denied any physical discipline. The allegation of Physical Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on September 24, 2021, after a caseworker reported that two foster children said that the foster father yanked one of the children by his shirt, leaving red marks around his neck. The children reported that the foster father hit one of the children many times and yanked another child off the bed on another occasion. The children said they feared retaliation from the foster parents when they learned about the report. The two children recanted the allegations of abuse during interviews with the investigator. Two other children denied any type of physical discipline in the home. The allegation of Physical Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on October 8, 2021, for Neglectful Supervision due to allegations that a 13-year-old foster child was left sitting outside for five to six hours. The child reported that both foster parents told her to sit outside when they left the house. The child also reported that the foster father had kicked her out of the house multiple times. The allegation narrative for the intake stated the child "reports not feeling safe going back inside the home and that things were not right in the home." Both foster parents denied the allegations, stating that the foster child was suspended from school multiple times and voluntarily left the home. The investigator detailed several discrepancies in the foster child's reports

---

[318] Circle of Living Hope started Heightened Monitoring on November 20, 2020, and the plan was extended with a planned end date of August 23, 2022. The issue areas that led to Heightened Monitoring for Circle of Living Hope include foster home screenings, foster home verification, ongoing foster home management, physical site conditions, medication management, discipline and punishment, and general supervision and responsibility.

[319] Renaissance CPA is relatively new, having received its initial permit on August 20, 2021, and its full permit on February 18, 2022.

and determined the foster father followed procedures for reporting the child as a runaway.[320] The allegation of Neglectful Supervision was Ruled Out.

- DFPS initiated an investigation on May 1, 2022, for Emotional Abuse and Neglectful Supervision. A child allegedly ran away from the home because she did not feel safe as another child in the home was "touching her genitals against her will." Both children involved in the incident reported minimal supervision in the home. The child who allegedly engaged in inappropriate sexual contact denied that it had occurred. Both children involved in the reported incident stated the foster father yells and curses.

  Both foster parents denied yelling and cursing at the children. Both foster parents also denied inappropriate contact between the two foster children. Three collateral children and two of the four caseworkers interviewed also stated the foster parents yell and curse excessively. The investigator noted that "law enforcement referred the allegation to juvenile services to address the sexual acting out." The investigation concluded that the foster parents followed the correct procedure in reporting the runaway and that the reports of the foster father yelling did not rise to the level of abuse. The allegations of Emotional Abuse and Neglectful Supervision were Ruled Out.

- A DFPS investigation for alleged Medical Neglect was Administratively Closed the day after the December 20, 2021, intake because DFPS determined that the case should be investigated by HHSC for minimum standards violations rather than by DFPS for Medical Neglect.[321] The intake narrative details allegations that the foster parents did not immediately provide a child's medication upon discharge from the home. The child was moved to a placement in Pennsylvania. The foster parents provided the medication days later, and the pill count was off. The report states that paperwork was either not provided or is missing. HHSC investigated for minimum standards violations and issued a citation for violation of a minimum standard associated with medication storage because when the home was inspected, medications were not stored properly.

## Standards Investigations

Eighteen of the 22 investigations into Home C between December 2010 and May 2022 were for minimum standards violations. The foster home was cited three times for

---

[320] Investigation #2806402.

[321] Investigation #2827083.  In an email found in CLASS from a CVS caseworker to the DFPS investigator, it was reported that the CVS worker called the foster father and case manager at the CPA about the medication, and they both said, "they can't do anything." Eventually, the foster father brought the medication to the Killeen CPS office where the medication was to be mailed to the child's new placement. The medication did not arrive for a few days, and the pill count in the bottles was inconsistent with their fill date. The CVS worker also requested discharge paperwork, including paperwork for school withdrawal, from the CPA's case manager, who did not send the paperwork. The CVS worker eventually discovered the foster parents never withdrew this child from school. The CVS worker stated, "These items above make me concerned about how these issues were handled while [the child was in the home] and how other children's circumstances in the home still will be handled as well."

violations between October 2016 and February 2017. The foster home did not receive another citation until December 2021 (discussed above). Then, between December 2021 and May 2022, the home received seven citations.

While verified by Renaissance CPA, the home was most frequently investigated for prohibited discipline, corporal punishment, violations of children's rights, and other minimum standards related to background checks, foster home screening and home verification. Like the home's abuse, neglect, and exploitation allegation history, there was a pattern of children reporting feeling unsafe and uncomfortable with the foster father's use of profane language. The foster home was issued a total of 10 citations: three for prohibited discipline, two for corporal punishment, two for medication storage and administration, one for a missing background check, and two for agency home verification.

Three of the minimum standards investigations that resulted in citations for prohibited discipline included allegations of the foster father using profane language, calling children profane names, and frequently yelling at them, leading a child to describe the environment as "scary."[322] One minimum standards investigation initiated by HHSC in October 2016 resulted in a citation for corporal punishment after children alleged, and the foster parents admitted, that they slapped the children on the hand as a discipline.[323] Another minimum standards investigation initiated in May 2022 resulted in a citation for corporal punishment because three out of four children stated the foster parents threaten to hit them.[324]

Two citations were issued for improper medication administration and improper medication storage. In 2017, the foster parent admitted to sending a child on an overnight visit with their medication stored in a paper envelope in their book bag. In 2021 (also discussed above), a bedroom door served as the second lock as required for medication storage, but the door was wide open during the inspection.

One citation was issued in 2022 because there was no background check for the foster parents' adult son who visited the home frequently. Two more citations were issued to two of the CPAs that had verified the home for failing to request the required transfer documentation for the home from the previous CPAs.

The abusive language and discipline methods in the home and the discovery of insufficient agency and home transfer documents immediately preceded the home's closure by Renaissance CPA on May 13, 2022. All five foster children were removed from the home on May 13, 2022, following the child's outcry of being inappropriately touched by another child in care.

A Closure Recommendation was completed by HHSC staff on May 11, 2022. The recommendation raised concerns regarding the home's licensure across four different CPAs and outlined the home's history of noncompliance regarding medication storage,

---

[322] Reference investigations are #2292118 and #2872704.

[324] Investigation #2880963

inappropriate discipline, yelling at the children in care, and cursing at the children in care as examples of the foster parents' unwillingness to comply with regulatory standards.[325] HHSC did not issue a final closure recommendation, because the CPA closed the foster home before HHSC made a final decision.

## Home D (House of Shiloh Family Services)
## Closed July 15, 2022

Home D was verified on August 5, 2016, by Lutheran Social Services of the South CPA. The home voluntarily closed on December 4, 2020, and was later verified as a foster home on March 16, 2021, by House of Shiloh Family Services CPA. House of Shiloh Family Services was placed on Heightened Monitoring on January 13, 2021, and moved to post-plan Monitoring on March 4, 2022.[326]

### Abuse and Neglect Allegations

HHSC's recommendation for closure was motivated by five allegations and investigations of abuse, neglect, and exploitation between July 2019 and May 2022, resulting in 13 citations and one Reason to Believe finding for Neglectful Supervision. The intakes demonstrated a pattern in allegations of Neglectful Supervision and Physical Abuse, most frequently accompanied by allegations of and citations for inappropriate discipline, inappropriate supervision, and inadequate background checks for visitors. There was also a concerning trend in minimum standards investigations and DFPS investigations involving the foster father's paramour.

Four abuse, neglect, or exploitation intakes were received while the home was verified by Lutheran Social Services:

- DFPS initiated an investigation on July 8, 2019, for Physical Abuse and Neglectful Supervision. The intake alleged two children engaged in inappropriate sexual contact and that a child in care was hit with a broom handle by the foster father's mother who would "babysit" them, though the investigation conclusion described the perpetrator as an unknown adult. The allegations of Physical Abuse were Ruled Out, and no citations were issued.

---

[325] The closure recommendation summary references the following citations: While licensed with The Giocosa Foundation from 2013 to 2017, and the home received one citation for medication storage, one citation for corporal punishment, and one citation for subjecting a child to profane language. During licensure with Circle of Living Hope from 2017 to February 2022, the home received one citation for medication storage. When licensed with their most recent CPA, Renaissance CPA, starting in February 2022, the home received two citations for yelling at children in care and subjecting children to profane language. However, the summary was completed before three additional citations were issued for agency home verification, a missing background check, and corporal punishment.

[326] Issues identified in the Heightened Monitoring plan include foster home screenings, prohibited discipline, medication storage, supervision of the foster homes, and recordkeeping. Information regarding when the CPA moved to Post Plan Monitoring is found in the "Updates" section of the June 10, 2022, FITS Meeting in CLASS.

- DFPS initiated an investigation on August 21, 2020, for Neglectful Supervision. The children's therapist reported that she had concerns the children in the home, ages three, nine, and 10, were not being fed well-balanced meals, one child was possibly spanked by the foster parent, and the older brother was left home alone. The allegation of Neglectful Supervision was Ruled Out and one citation was issued for a high-weighted standard due to the foster parent's failure to have background checks completed for two frequent visitors, the foster father's paramour, and the foster father's sister.

- DFPS initiated an investigation on November 5, 2020, for Physical Abuse and Neglectful Supervision. The foster father's paramour, whose background check showed provisional eligibility, along with an unapproved and unnamed person, took the children to a bedroom in the home, away from the foster father's supervision, and disciplined them with a belt, resulting in multiple physical injuries.[327]  The allegation of Neglectful Supervision by the foster father was Ruled Out. The allegation of Physical Abuse by the foster father's paramour was found Reason to Believe.[328] Four deficiencies were issued for high-weighted standards: one for supervision because the foster father allowed another person to take the children to another location where the person caused injuries to the children; one associated with an unapproved person being allowed to have access to the children; one for corporal punishment, and one for violating the children's rights.[329]

- DFPS initiated an investigation on January 21, 2021, for Neglectful Supervision. The investigation found that a child asked the foster parent at four o'clock in the morning for his allowance. The foster parent told the child to go back to sleep and said he would address it in the morning. The child became upset, and he killed the family cat. The allegation of Neglectful Supervision was Ruled Out, no citations were issued.[330]

The remaining intake alleging abuse, neglect, or exploitation was received while the home was verified by the House of Shiloh Family Services:

DFPS initiated an investigation on May 20, 2022, for Physical Abuse and Neglectful Supervision. After being placed in a different operation, a 13-year-old foster child made an outcry that his former foster father slammed him to the ground after he

---

[327] As found in the Lutheran Social Services of the South (25-25-6) forms & Letters list, a background check eligibility letter dated September 4, 2020, indicates the foster father's paramour is allowed at the home on a provisional basis, and one of the conditions is that he is not allowed to be alone with the children in care.

[328] The Investigation 2668839/48427818. CLASS has contradictory information about this investigation. Licensing Investigation Summary Report found in IMPACT shows the allegation of Physical Abuse (two allegations because two children were involved) was found RTB.

[329] The investigation conclusion page suggests the foster father's paramour had two warrants out for his arrest for injury to a child, and it was believed he had left the state.

[330] Although the child admitted to killing the cat, the investigation found that the foster parent took the proper measures in telling the child they would resolve the allowance issue in the morning. The foster parent assumed when he heard the child at 4 a.m. that he was just going to the bathroom. Both findings led to the disposition of Ruled Out.

fought with the foster father's adoptive son. He also alleged that the foster father's paramour hit him in the face as a form of discipline. The allegation of Physical Abuse by the foster father was Ruled Out, however, Neglectful Supervision was found Reason to Believe because the child reported having contact with the previous foster father's paramour (the other alleged perpetrator). The allegation of Physical Abuse by the foster father's paramour was found Unable to Determine. Eight citations were issued, including:

- Three citations (one medium-high and one medium) for violations associated with foster home screenings, including a citation based on the CPA's failure to explore several serious investigations from the home's previous CPA;
- One citation for violation of the high-weighted minimum standard associated with background checks, because a background check for the foster father's paramour revealing previous criminal or abuse allegations was not submitted, and the paramour had direct contact with children in the home;
- One citation for violation of the high-weighted standard related to children's rights;
- One citation for violating a medium-high-weighted standard associated with CPA Administrator Responsibilities for failing to ensure a person with a history of harmful behaviors was absent from the home.

Four of the citations issued in this investigation reflect similar concerns identified in a September 2021 sampling inspection of the foster home. The concerns raised in the sampling inspection included: the agency failing to account for the foster father's paramour with whom he has frequent contact; failing to address the foster father's childhood trauma related to abuse; failing to review investigations from a previous CPA; failing to acquire background checks for frequent visitors; and for the CPA conducting only one in-person visit to the home with the foster parent (all other visits were conducted via Zoom). The citations related to home screenings and background checks and the UTD for Physical Abuse also directly correlate to issue areas identified in the House of Shiloh Family Services Heightened Monitoring Plan.

## Standards Investigations

The home had a total of five minimum standards investigations between April 2017 and May 2022. Inappropriate discipline and inappropriate supervision were common concerns in all five minimum standards investigations. In addition to the 13 citations issued because of the DFPS investigations, the home was also issued six standard violations resulting from HHSC investigations of minimum standards violations between April 2017 and May 2022:

- HHSC initiated an investigation on April 10, 2017, due to allegations that the foster father needlessly restrained a 6-year-old child in care. One citation was issued for a high-weighted standard related to the use of prohibited personal restraints, and two citations were issued for medium-high-weighted EBI standards because no attempt was made to use other

241

intervention techniques before a restraint, coupled with the fact that it was a non-emergency situation.

- HHSC initiated a minimum standards investigation on January 25, 2019, due to allegations that the foster father was using inappropriate discipline and was not providing adequate supervision. The CPA received one citation for violation of a medium-weighted standard associated with its failure to notify licensing of the home's address change within 30 days.
- HHSC initiated an investigation on April 20, 2022, due to allegations that the foster parent failed to intervene in an altercation between children. One citation was issued for a medium-high-weighted EBI standard because the caregiver did not intervene or de-escalate an altercation between two children that resulted in an injury to one child. Another citation was issued for a high-weighted standard associated with supervision because the foster father did not conduct frequent visual checks as required by one of the children's service plans.

HHSC's closure recommendation was based on the foster father's history of the inappropriate discipline, deception about contact with his paramour, and failure to comply with the paramour's provisional status by allowing him unsupervised access to the children in care. The recommendation noted the home's 11 citations related to EBI, background checks, child's rights, and supervision as justification for the closure recommendation.

On July 15, 2022, HHSC notified House of Shiloh Family Services of its recommendation to close the home, and House of Shiloh relinquished verification of the home the same day. At the time, there was one 13-year-old PMC child in the home[331] in addition to the foster father's two adopted sons.[332]  IMPACT records indicate that the PMC child was placed in the home from May 23, 2022, until July 15, 2022. After the House of Shiloh relinquished the home's verification, the child's attorney sought a court order to continue the placement, and the placement was documented as an unauthorized placement from July 15, 2022, to August 25, 2022. The child was moved to a different foster home on August 25, 2022.

Home E (Therapeutic Family Life CPA)
Relinquished November 12, 2022

Texas Mentor CPA verified Home E on January 2, 2013. Texas Mentor voluntarily relinquished the home on October 16, 2014, and on October 17, 2014, the home was verified by Circle of Living Hope. The home changed CPAs again on February 15, 2017,

---

[331] PMC as of July 1, 2020 (PID 46907977). Form 2908a indicates the child had a long history of prior placements in RTCs and hospitals. The CPA was amenable to moving the child to a respite placement pending the outcome of an open ANE investigation (though it is unclear, it appears it was Investigation #2884089/IMPACT Case ID 49162175) but the child's attorney obtained a court order for the child to remain in the home. The form does not indicate a specific reason for why the attorney chose to keep the child in the home.

[332] The adopted children are both 11-year-old males. One adoption was consummated on May 13, 2021 (PID 74496162), and the other was consummated on May 2, 2022 (PID 70044986).

and was verified by Therapeutic Family Life CPA. The home's verification was relinquished on November 12, 2022, upon HHSC's recommended closure.

The home was subject to a total of five investigations, three of which were related to allegations of abuse, neglect, or exploitation.

### Abuse, Neglect, and Exploitation Investigations

▪ DFPS initiated an investigation on October 13, 2015, for Neglectful Supervision due to allegations that another child injured a foster child. The intake stated that a 16-year-old foster child hit and injured a 15-year-old foster child who has an Intellectual or Developmental Disorder (IDD). The 15-year-old fell down the stairs and hurt his head. The altercation started after the 16-year-old traded a jacket for video games and equipment with the 15-year-old, and the 15-year-old changed his mind about the trade.

The foster mother and collateral foster children told the investigator that the 16-year-old refused to return the video game items to the 15-year-old. The foster mother reported that she attempted to verbally "redirect" the 16-year-old after he began bullying and hitting the other child. When the 15-year-old was removing himself from the situation by walking down the stairs, the 16-year-old hit him in the back of the head. The 15-year-old told the investigator that he thinks he may have hit his head on the railing as he fell to his knees.

When the foster father returned home from work, he attempted to intervene by telling the 16-year-old to return the items or speak with the police. The 16-year-old refused, and the foster father called the police. According to the foster father, the 16-year-old became "rude and oppositional" with the police, and he was arrested. The foster father took the 15-year-old to urgent care for head pains, and he was instructed to go to the ER. The foster child was discharged from the hospital with instructions to treat with Tylenol and ice.

The investigator Ruled Out Neglectful Supervision and no citations were issued.

▪ DFPS initiated an investigation on February 9, 2016, for Physical Abuse after a 15-year-old foster child with IDD "received a 2-inch cut/scratch behind his neck during a fight with the foster dad," which reportedly occurred when the foster father choked him during an argument.

Collateral foster children in the home told the investigator that they heard the foster child and the foster father arguing and "hear[d] what sounded like a scuffle" between the foster child and the foster father. None of the collateral children reported seeing the foster father choking the foster child.

The foster father told the investigator that the foster child's behavior worsened in the month-and-a-half before the incident, and he felt that the foster child was influenced by one of the other foster children in the home. The foster father

stated that he was attempting to have a conversation with the foster child about his behaviors and that during the conversation, he overheard one of the other foster children ask the foster child if he was "going to be a man now." The foster child then became upset and tried to hit the foster father. The foster father blocked the hit and attempted to "escort" the foster child out of the area, and a struggle ensued, during which time the foster child obtained a small scratch on the back of his neck. The foster father stated that the foster child "was wearing a necklace and that there was a scratch on the back of his neck afterwards."

The therapist told the investigator that she felt that the other foster child was negatively influencing the foster child who was injured, and she met with the foster parents to discuss her concerns before the incident.

The investigator Ruled Out the allegations of Physical Abuse and no citations were issued.

- DFPS initiated an investigation on July 22, 2022, for Physical Abuse after a 15-year-old foster child, Child A, reported that the foster father choked and pushed him against a wall during an argument.

Child A told the investigator that the argument started because he and another foster child in the home, Child B, went to Six Flags without permission. He stated that the foster father was 'in his face' at multiple points during the argument, and the foster father stuck his finger in his face at one point as well. Child A told the foster father to get out of his face multiple times, and then the foster father began choking him. Child A told the investigator that he told the foster father to stop and that he could not breathe, and only "right as he was about to pass out" did the foster father stop choking him. He also told the investigator that he was on the ground when the foster father began pulling his hair to get him up and pushing him into the wall. Two other foster children in the home told the investigator that they did not witness the choking part of the incident, but they saw the foster father pulling the foster child's hair and pushing him into the wall.

Child A told the investigator that he left the house to "walk around the neighborhood to cool off," and the police were at the home when he returned. The investigator noted that the police "bodycam footage showed how [the foster father] contradicted himself by saying [Child A] hit him when he had already said h[e] hadn't, just to have [Child A] arrested." The investigator also noted that the footage showed the police and the foster father agreeing to have the foster child "stay somewhere else for the night," and the foster father "admit[ing] to the fact that he was not supposed to let [the foster child] go but that he was going to do so either way." The police took the foster child to his biological mother's home.

The investigator issued an Unable to Determine disposition for Physical Abuse, citing that there was a previous case with the same allegation and "consistencies in the information gathered from collaterals that gives reason to believe something happened, however, lack of evidence leads to indetermination as to

what exactly occurred." HHSC issued two citations, one for violation of a minimum standard associated with children's rights because a child "sustained a bruise on [the] neck and arm after physical contact with a caregiver," and one associated with violation of a minimum standard associated with supervision due to the foster child going to Six Flags without permission.

## Standards Investigations

The foster home was also the subject of seven minimum standards investigations, five related to supervision. None of the investigations resulted in citations.

- An investigation initiated by HHSC on November 22, 2016, alleged (1) that the foster parents did not enroll a foster child in school for two weeks; and (2) that the foster parents wanted to pierce a foster child's ears against her wishes. The investigator obtained evidence that the foster parents attempted to enroll the child in school, but "there was a delay on the school's part." The investigator also noted that the foster parents did not want to pierce a foster child's ears. Instead, it was the foster child who wanted another foster child to do so, but the foster parents refused permission.

- An investigation initiated by HHSC on December 22, 2016, alleged concern for supervision after a 17-year-old foster child started a small fire in the home and then ran away from the home. The investigator determined that supervision was adequate because the foster child obtained the lighter while at school, the fire was put out quickly, and the child ran away "out of his own choosing."

- An investigation initiated by HHSC on November 8, 2017, alleged concerns for both supervision and inappropriate remarks made to a 16-year-old foster child. The investigator ruled out the allegations of improper supervision after reviewing the foster child's Service Plan that documented the foster child's allowance "to walk to the park and around the neighborhood unsupervised." The foster parents, a collateral foster child, and a caseworker all denied the allegation that the foster parents called the foster child "retarded."

- An investigation initiated by HHSC on May 30, 2018, alleged supervision issues after a 14-year-old foster child "engaged in self harm." The child reported that he found a razor in his room and cut the word "fear" into his left arm. The investigator noted that the foster child did not have a history or reports of self-harming behaviors.

- An investigation initiated by HHSC on June 22, 2018, alleged concerns about both supervision and serious incident reporting after a 15-year-old foster child ran away. The investigator noted records that confirmed the foster parents reported the incident within the required 24-hour time frame. The foster child stated that the foster father attempted to stop him, but he left "regardless of what [the foster father] had to say."

- An investigation initiated by HHSC on October 29, 2020, alleged that the foster parents were not providing appropriate items for foster children's rooms. During a home inspection, the investigator confirmed the child was receiving appropriate items and confirmed the same with the CPA case manager.

- An investigation initiated by HHSC on April 4, 2022, alleged concerns about supervision and failure to include high-risk behavior in a Service Plan after a child placed in the home ran away. After reviewing the 72-hour Service Plan and noting the 14-year-old child's history of running away the investigator found the child was being provided appropriate supervision.

HHSC approved the Closure Recommendation on October 27, 2022, based on the pattern of eight investigations for supervision and three investigations for inappropriate discipline, including two involving allegations that the foster father choked foster children, one that resulted in a UTD finding.

The foster home page in CLASS indicates that the home was closed on November 12, 2022. Verification was relinquished because HHSC recommended closure with no investigations pending. No children have been placed in this home since September 1, 2022.

Home F (Have Haven CPA, Houston)
Closed January 5, 2023

Home F was first verified on February 6, 2019, by Angel Wings Family Services, Inc. in Missouri City, Texas. The home relinquished verification and changed CPAs to Have Haven CPA in Houston[333]  three months later, on May 10, 2019, during a pending investigation.

The home was the subject of three investigations in just under three years. Two investigations involved allegations of abuse, neglect, or exploitation and one was for allegations of a minimum standards violation.

Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on April 2, 2021, for Physical Abuse. An eight-year-old foster child made an outcry that the foster mother physically disciplined him for throwing pinecones at her car and attempting to run away. The intake states that the foster child was observed with a "1 1/2-2-inch scratch on the right

---

[333] Have Haven, CPA was placed on Heightened Monitoring beginning December 12, 2020, moved to Post Plan Monitoring on April 29, 2022, and has not been recommended for ending Heightened Monitoring as of December 31,2022. The areas identified showing patterns and trends included: Background Checks, Caregiver Responsibilities – Supervision, Discipline and Punishment, Home Screening and Verification - Foster Home Screenings, and Serious Incident Reporting.

arm, red bruises on neck and shoulders, and 2-inch scratch on the left cheek." The intake also stated that the foster mother stole money from the foster child.

The foster child told the investigator that the foster mother scratched his face during a restraint she performed because he was trying to run away. He told the investigator that he was a few houses from the foster home, and he picked up a stone with bugs attached to the underside, and that he began throwing the bugs at the foster mother, who was following him. He also admitted to throwing small stones at the foster mother's house and her car, causing minor damage to the windshield. The child said that he offered the foster mother $24 for the damage, but she would not accept the money.

The foster mother stated that she performed a "basket hold" restraint on the foster child because he was "hitting her to the floor and she fell on her back." She also told the investigator that the following day, the foster child ran out of the house while a CPS caseworker was there, and he "picked up debris, stones, and pinecones and started throwing them at her, her house, and her cars," so she called the police. The CPS caseworker, who was visiting another child at the home, told the investigator that the foster child arrived home after hitting another child while on the bus on the way home from school. She elaborated that the foster child went to his room and "slammed the door for no reason," and the foster mother told him he could not close the door. She said that the foster child "hid in his closet… [then] screamed and said [the foster mother] scratched him… and [h]e was going to tell his mom that [the foster mother] was cursing him [sic], grabbed him, and scratched him."

The foster child was subsequently transported to a psychiatric hospital. Other children in the home interviewed denied any physical discipline.

The investigator Ruled Out the allegation of Physical Abuse and no citations were issued.

- DFPS initiated an investigation on October 7, 2022, for Physical Abuse after the foster mother performed a restraint on an eleven-year-old foster child. The intake report called in by the school nurse provides a detailed description of multiple marks, scratches, and bruised skin on the foster child's neck.

The foster child told the investigator that he and the foster mother began to argue after he refused to sanitize his hands because he had already washed them before getting his snack. He described that the foster mother "threw him on the ground and grabbed him and he did hit her right leg out of self-defense, but that he did later apologize for it. [He] then said that while [the foster mother] was on top of him, she clawed the left side of his neck with her fingernails, stomped on the left side of his stomach with her foot, and threw him on the ground in the garage. He also stated that he hit the right side of his forehead on the wall all causing pain."

247

A Harris County Sergeant interviewed the foster mother the following day and viewed video footage of the incident on the foster mother's phone. The Sergeant described the video (recorded by the foster mother's live-in elderly mother), indicating the video showed the foster child "sitting on the floor of the kitchen in an Indian style position with his left hand holding the doorknob to the pantry door." The Sergeant described the restraint captured by the video:

> "[The foster child] then began to hit a [c]hina cabinet next to the pantry door repeatedly. [The foster mother] advised [him] to stop. [She] then approached [him] while standing over him and grabbed his hand and [he] hit her right leg. [She] then held him down on the kitchen floor and stated "You don't hit me" as [he] began to cry and scream for [her] to get off of him. I then saw [her] still on top of [him] as the camera repositions and no longer is recording them for a brief period. I hear [him] yell, 'You scratched me.' [She] then continues to hold him down as he cries. The video continued, but you could only hear yelling. I did not see [the foster child] being combative or assault [the foster mother] other than when he struck her leg."

The Sergeant questioned the foster mother about restraining the foster child by the neck. The foster mother claimed that restraint by the neck was proper, and the scratches resulted from that action. The foster mother was arrested and charged with Injury to a Child.

The investigator found a Reason to Believe for Physical Abuse and HHSC issued five minimum standards citations: two for improper EBI implementation and technique, one for prohibited personal restraints, one for corporal punishment, and one for children's rights to be free from abuse. All foster children were removed from the home.

## Standards Investigations

The foster home was also the subject of one minimum standards violation. HHSC initiated an investigation on February 2, 2022, for violation of minimum standards associated with supervision. The investigator noted that a foster child was "throwing a temper tantrum," and he threw a toy that bounced off the wall hitting himself in the eye/forehead area. The foster mother took the foster child to a physician for examination of the injury. One citation was issued for not reporting a serious injury to a child. The citation was later overturned after an administrative review, which indicated that the foster child's injury was not serious and did not need medical care, even though the foster mother sought medical care "to be safe."

HHSC recommended closure based on injuries to children occurring during restraints applied by the foster mother and on the foster mother's arrest related to the investigation initiated on October 7, 2022, which made her ineligible to be a foster parent. The home was closed on January 5, 2023, and the license was relinquished involuntarily due to deficiencies.

A review of IMPACT reflects that all six foster children who were placed in the home at the time of the October 6, 2022, incident were moved to respite care on that date; no children have been placed in the home since then.

Home G (Caregivers Youth and Transitional Living Services CPA)
Relinquished December 30, 2022

Home G was first verified on November 19, 2018, by Caregivers Youth and Transitional Living Services.[334] The CPA was placed on Heightened Monitoring during the time the foster home was verified by the agency. The home's verification was relinquished on December 30, 2022, after an HHSC Closure Recommendation.

While active, the foster home was the subject of seven investigations, six of which involved allegations of abuse, neglect, or exploitation.

Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on July 17, 2019, for Neglectful Supervision. A DFPS Human Resource Technician reported that an eight-year-old foster child made an outcry that "another child in the home... put their mouth on" his two-year-old biological brother's penis (also a foster child in the home).

  The investigator interviewed the eight-year-old child and reported that the child was inconsistent in describing the events and kept changing his description "from moment to moment." At one point, the child said the incident involved his five-year-old sister and a two-year-old, and later said another child and a two-year-old were playing a game. At another point, the child said it happened while he was sleeping, and then he reported that it was "just a trick."

  The other four children in the home were all five years or younger, and the verbal children did not report being touched inappropriately. The foster parents reported they did not know the children engaged in inappropriate sexual behavior. They did, however, report that two of the children had demonstrated sexualized behavior.

  The investigator Ruled Out Neglectful Supervision. HHSC did not issue any citations.

- DFPS initiated an investigation on January 13, 2020, for Physical Abuse after school personnel reported that a six-year-old foster child with autism "was witnessed with bruising on his right cheek and forehead and slight swelling on

---

[334] CLASS shows that the CPA was on Heightened Monitoring from November 6, 2020, to April 7, 2022, with issue areas including Caregiver Responsibilities – Supervision, Health & Safety - Fire Safety, Home Screening and Verification, Home Screening and Verification - Foster Home Screenings, Medication Management, Medication Storage, Required Trainings, Serious Incident Reporting, and Therapeutic Services.

the right side of his head." The allegations included that the foster child told the school personnel that his "dad hit [him] with a belt on [his] face and head because [he] acted bad."

The foster child initially told the investigator that he hit his head on the wall during a time out, but then he said that the foster father "hit him with a belt... on his face and his foot." He also told the investigator that he saw someone else being hit with a belt. The foster parents denied any physical discipline in the home and told the investigator that the six-year-old foster child "was throwing his whole body at the wall" and "rock[ed] his face on the wall." They reported no injuries following the incident.

Two collateral foster children told the investigator that they did not see the six-year-old foster child during the incident, but they heard "him banging his body." This collateral foster child also told the investigator that the foster parents were in bed at the time of the incident, but another collateral foster child told the investigator that the foster father was trying to calm down the six-year-old foster child. A third collateral foster child told the investigator that the six-year-old foster child "was hitting himself and that was how he got hurt in time out."

The six-year-old foster child's CVS worker told the investigator that the foster child told them that he had banged his head and body against the wall because he did not like time-out.

The investigator Ruled Out the allegation of Physical Abuse and closed the investigation with no citations.

- DFPS initiated an investigation on November 9, 2020, for Physical Abuse and Neglectful Supervision after a school nurse reported that an eight-year-old foster child with an intellectual disability displayed injuries to both sides of his face that were "typically a sign of asphyxiation or shaking." The reporter also expressed concern that the foster child's explanations for the injuries were inconsistent.

The foster mother initially told the investigator that she sent the eight-year-old foster child to his room after he became upset and hit multiple other foster children. She explained that the eight-year-old child then left his room and began hitting his head, arms, and legs on the living room wall, so she sent the collateral foster children to their rooms. The foster mother also told the investigator that she did not see any injuries to the eight-year-old face on the night of the incident, but she noticed bruises the next day. She stated that the foster father (who was not present during the incident) wrote the serious incident report for the CPA.

During the investigation, one of the collateral foster children reported to the investigator that the foster father "whipped [a foster child] with a black belt in the dangerous room." The foster father denied the allegation, but the investigator did not note that they questioned or requestioned any other foster children in the home about this allegation after it was made.

The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision but noted concerns about unapproved cameras in two children's bedrooms. HHSC issued one citation for the unapproved cameras.

- DFPS initiated an investigation on May 26, 2021, for Neglectful Supervision alleging that an eight-year-old foster child hit multiple other foster children in the home.

  The collateral foster children in the home told the investigator that the eight-year-old became angry after the foster mother noticed he had peed on the wall, and the child began acting out and hitting them. The other children said that the foster mother tried to intervene, and the eight-year-old child hit the foster mother, as well. The foster mother told the investigator that she put her body between the eight-year-old foster child and the other foster children. The police responded twice, and the eight-year-old foster child was transported to a psychiatric hospital.

  The investigator noted that during an interview with one of the collateral foster children, the child said that the eight-year-old foster child "touched his private area." There is no indication in the investigation documentation that the investigator followed up on this new allegation or called the allegation into SWI. The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

- DFPS initiated an investigation on September 23, 2021, for Neglectful Supervision and Sexual Abuse after a 10-year-old foster child with an intellectual disability was seen masturbating at school. When asked about this behavior, the child reported that her "daddy does this to me."  She also told school staff that this happened to other children. Law enforcement was notified, and all the foster children were removed from the home immediately. Other children in the home denied being touched inappropriately.

  The 10-year-old child was forensically interviewed and said that someone had touched her in her private parts but would not identify the perpetrator. The investigator noted that the foster child called all male figures "daddy," and that she had special needs. They also reported that the foster child continued to sexually act out in her respite placement. The investigator Ruled Out the allegation of Sexual Abuse. HHSC did not issue any citations.

- DFPS initiated an investigation on September 10, 2022, for Physical Neglect after three foster children made outcries about not being provided proper care in the foster home. The children also expressed concerns regarding the foster parents' care for a one-month-old infant, a three-year-old foster child, and a two-year-old foster child. The allegations included not being provided breakfast at the foster home, optional snacks being withheld by the foster parents, alternative meals not

being offered, strictly controlled portions during meals, and food being withheld from the 11-year-old foster child when he must lay down for medical reasons.

The foster children also made outcries that all the food in the home was locked up and there were no "boy toys" available for the male foster children. The intake also described the foster children being afraid of the foster parents because there were cameras throughout the house, they were being "yelled at and screamed at," and ostracized by the foster parents as a form of punishment, and all foster children were being punished if "one or two of the children gets in trouble."

The foster parents denied withholding food from the foster children. The foster father told the investigator that the 13-year-old foster child "stole" bread from the pantry, so that is why they keep the pantry locked. The foster mother told the investigator that the 11-year-old foster child is offered food, but "he does not always eat."

The nine-year-old foster child told the investigator that the foster father does not yell at him. He stated that he was asked to walk home from school once and lost his way home. The 11-year-old foster child stated that he feels that he is treated differently, and the foster parents serve him "meal portions like his youngest siblings instead of his siblings closer to his age." The 13-year-old foster child told the investigator that "he and his siblings may have gone to bed about 4 times hungry."  He said that they do not get snacks, and "he has never stolen food out of the pantry." He also told the investigator that he, the nine-year-old, and the 11-year-old foster child usually wake up around eight or nine in the morning on the weekends, but the foster parents do not come to get them until about noon.

The nine, 11, and 13-year-old foster children told the investigator that they all "pop" the three-year-old foster child when he misbehaves. The investigator noted that all three reported not being corrected by the foster parents against this behavior.

 The investigator Ruled Out the allegation of Physical Neglect but expressed concerns about multiple issues: a Safety Plan was put in place on September 9, 2022, without any documented issues or concerns to prompt a Safety Plan; the panty and cabinets were locked and no snacks were readily available for the foster children; the CPA was "not asking adequate questions" about the foster children's well-being; the foster children had been in the home since April 2022, and were not yet receiving therapy; four children ages three to 13 were sharing a room "in a 5 bedroom home;" and foster children were being made to stay in their room until noon after waking up around nine in the morning.

HHSC issued nine citations: one for prudent parenting related to the nine-year-old foster child walking home from school,[335] one for caregiver responsibilities

---

[335] CLASS notes state, "The school personnel were concerned for his well-being and printed directions to the home for him. The child got lost while walking home. The route home requires the child to walk along a busy roadway."

related to making at least four foster children remain in their rooms "from 8PM until noon the following day on weekends, despite waking up several hours before noon" and "the pantry and cabinets being locked at all times, preventing the children from having food readily available to them," one for discipline related to the foster parents allowing the foster children to punish a younger foster child, one for feeding related to depriving the foster children from food for the fourteen hours they were forced to stay in their room on weekends, one for food choices related to locking the food in the pantry and cabinets and not informing the biological parents and CVS caseworker, one for prohibited items in an infant's crib,[336] one for bedroom space related to four foster children sharing a bedroom "measuring only 143 square feet," one for a trampoline "missing the shock-absorbing pads covering the springs, hooks and frame," and one for another trampoline being "broken, with poles protruding from the side, creating a potential entanglement hazard."

## Standards Investigations

Before the closure of September 10, 2022, DFPS investigation, SWI received another intake alleging that a two-year-old foster child was hurt while on the trampoline and that the foster parents did not seek medical care until the next day. Multiple collateral foster children in the home told the investigator that they witnessed the incident during which the two-year-old foster child landed on his knees on the trampoline. The children told the investigator that shortly after the incident the two-year-old foster child was not able to walk. The foster mother confirmed that she was aware that the two-year-old foster child was not able to walk, but she did not take him to urgent care until the following day.

Three citations were issued: one for the foster parents' failure to seek medical attention immediately after noticing the foster child could not walk, one for a ladder being in front of the trampoline during use, and one for the presence of both a blanket and pillow in an infant's crib.

The HHSC Closure Recommendation was approved on December 15, 2022. The recommendation was based on the pattern of foster children receiving facial injuries and on child-on-child sexual allegations. The Closure Recommendation Form also described recent concerns with children's rights, withholding food, allowing older children to discipline younger children, safe sleep, supervision, and physical site and space.

The foster home page in CLASS shows that the home was voluntarily relinquished without deficiencies on December 30, 2022. No children have been placed in this home since November 7, 2022.

---

[336] Class notes state, "Multiple blankets were observed in the bassinet used by a two-month-old infant in the home."

**Home G (Transitions for Tomorrow CPA)**
**Closed July 20, 2022**

Home G was first verified on June 6, 2006, by Trinity Foster Care and was under this CPA for less than a year before relinquishing verification on April 23, 2007, to change CPAs. The foster home was then verified by the Houston branch of Kids at the Crossroads on April 24, 2007, and remained with this CPA for 11 years and five months. The home changed CPAs a third time, moving to Hands of Healing on September 25, 2018, and was with this CPA for less than three months. Transitions for Tomorrow issued the home's last verification on December 18, 2018.

While the home was open, it was the subject of five investigations of abuse, neglect, or exploitation and 11 minimum-standards investigations.

**Abuse, Neglect, and Exploitation Investigations**

- DFPS initiated an investigation on June 14, 2008, for Physical Abuse and Neglectful Supervision after a 17-year-old foster child made an outcry that the foster parent's mother and sister pushed and slapped him during an argument. The foster mother and other foster children in the home denied allegations of physical discipline being used in the home. The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision. No citations were issued.

- DFPS initiated an investigation on September 16, 2013, for Physical Abuse after a 10-year-old foster child made an outcry that the foster parent pushed him down for cursing resulting in a scratch on his shoulder. When interviewed, the child stated the foster mother accidentally scratched him when she placed her hand on his shoulder. The other three foster children in the home denied being physically disciplined. The investigator Ruled Out Physical Abuse and no citations were issued.

- DFPS initiated an investigation on November 1, 2013, for Neglectful Supervision after the foster mother reported that a foster child made an outcry that he and two other foster children "all had sex at the same time," while placed in the home. Two additional foster children also reported incidents of inappropriate touching. Two out of the 10 foster children interviewed reported consensual sexual acts taking place in the home while the foster mother was downstairs and one reported being "raped."

  During the interviews, all ten children stated the foster mother never left them unsupervised and frequently checked on them. The foster mother denied the allegations stating baby monitors and intercoms were also used to assist with monitoring the children. Service plans for all children appeared to be implemented correctly.

254

The investigator Ruled Out Neglectful Supervision and no citations were issued.

- DFPS initiated an investigation on February 1, 2022, for Neglectful Supervision after a 14-year-old foster child made an outcry that he and a ten-year-old foster child had inappropriate sexual contact. When interviewed the ten-year-old reported he and another foster child in the home were doing "inappropriate stuff." The 10-year-old stated he consented to the act because he felt forced and the other child bribed him.

  During a forensic interview, the ten-year-old disclosed that the two children previously watched pornography together and the aggressor stated, "That's what I'm about to do to you." The child then stated the 14-year-old woke him up at night and directed him to take off his clothes before preceding to anally assault him. He tried to scream but the aggressor had his hands over his mouth. Afterward, the victim was threatened to remain silent, or he would be killed.

  When interviewed, the 14-year-old confirmed he and the victim watched pornography two times on their bedroom TV, once during the day and the other at night. The child described the incidents as consensual and stated the baby monitors in the bedroom were unplugged both times. The foster mother confirmed the previous incident with the children watching pornography and said she responded by separating the two boys and placing the aggressor in a bedroom with an 11-year-old autistic child. The foster mother also acknowledged she knew the 14-year-old had a history of sexual aggression.

  The investigator made a Reason to Believe determination for Neglectful Supervision, finding the foster mother failed to separate the children after the pornography incident, failed to provide appropriate supervision by placing the known aggressor in a room with a younger, autistic child, after being made aware of a recent incident in her home, and failed to follow the conditions of a Safety Plan put in place in January 2021. The case manager was made aware of the sexual aggression incident and failed to personally notify the abuse hotline or advise the foster mother to do so.

  As a result of the investigation, two conditions were added to a Safety Plan requiring the children to remain in visual and audio distance during the preparation of meals and the aggressor must sleep in a separate room alone. Both children were eventually removed from the home. HHSC issued two citations related to supervision and children's rights.

- DFPS initiated an investigation on May 31, 2022, for Neglectful Supervision after the foster mother sent the children's therapist to pick up the foster children from school. The school conducted a background check on the therapist because he was not listed on the children's approved pick-up list. The background check returned with a sex offender flag from another state. DFPS conducted a background check on the alleged perpetrator resulting in no record of sexual

offenses or a sex offender record. The school acknowledged that it used a system that had previously returned inaccurate results due to partial matches. The investigator Ruled Out the allegation of Neglectful Supervision.

## Standards Investigations

The foster home was also the subject of 11 minimum standards investigations over the 14-year period the home was verified, none of which resulted in citations being issued. The investigations were as follows:

- An investigation was initiated by HHSC on March 26, 2008, due to allegations that the foster mother refused to allow a foster child back in the home when he returned from runaway. The foster mother reported the child returned to the home angry, "banging" on doors and windows, and she did not want him to stay. The child's caseworker and law enforcement were contacted, and the child was transferred to another placement.

- An investigation was initiated by HHSC on April 13, 2010, due to allegations that two foster children were involved in a physical altercation, resulting in a cut under one child's eye. Both children stated they were playing football at the park and one child became agitated and punched the other child in the eye. The foster parent was close by and provided medical attention promptly.

- An investigation was initiated by HHSC on December 8, 2010, due to allegations that foster children engaged in inappropriate sexual activity in the home. When interviewed the 12-year-old stated another child in the home inappropriately touched him while they were watching tv. The foster mother reported seeing two children on the bed, one behind the other when she walked into the room. She stated the 12-year-old made an outcry that the 13-year-old tried to stick his "wee-wee" in his behind. She separated the two children and contacted his caseworker and therapist. When the 13-year-old was interviewed he denied the allegations and stated they were only wrestling. Two other foster children in the home denied the allegations and confirmed the foster mother checks on them often.

- An investigation was initiated by HHSC on June 13, 2012, due to allegations that the foster mother has been administering unprescribed medication to foster children. The three foster children living in the home denied taking medication not prescribed to them and displayed knowledge of the purpose of their prescriptions.

- An investigation was initiated by HHSC on October 3, 2012, due to allegations that the foster parent failed to report a child being hospitalized and a medication change to the child's caseworker. The foster child's caseworker denied the allegations and reported receiving notification of the hospitalization and medication change.

- An investigation was initiated by HHSC on May 24, 2013, due to allegations that the foster parent used profanity toward a child in care and kicked a child out of her home. When interviewed, the foster child stated he returned from the park after curfew and the foster mother began using profanity. He then left the house but returned and fell asleep on the porch. The foster mother woke him up and took him to the psychiatric hospital claiming he was suicidal when he was not. The child reported the foster mother cursed only at him, not at the other children.

  When the foster mother was interviewed, she stated the foster child missed his curfew, refused to accept his consequences, and walked out of the home. She notified the caseworker and law enforcement of the missing child. When the child returned, she took the child to the hospital for a medication adjustment. Two of the three other children in the home corroborated the foster mother's story.

- An investigation was initiated by HHSC on October 14, 2013, due to allegations that three children in care were unsupervised. When interviewed, the 14-year-old victim stated the foster mother caught them "having sex," and would punish the children for doing so. Another child in the home reported inappropriate sexual acts also taking place in the home. Three of the five foster children reported going to the library and park unsupervised.

  When interviewed, the foster mother confirmed she allowed all but one foster child to go to the park unsupervised. She also reported hearing allegations of the children sexually acting out but denied witnessing the acts herself. She placed baby monitors in the bedrooms and room changes were made to prevent the inappropriate behavior.

- An investigation was initiated by HHSC on November 6, 2014, due to allegations that a child in care needed medical attention for an unknown illness. The CPA's case manager reported that the foster mother informed her of the incident and sought medical attention promptly.

- An investigation was initiated by HHSC on July 13, 2015, due to allegations that children in care were improperly supervised and were not receiving proper nutrition. When interviewed the 14-year-old foster child stated the foster mother yelled at him when he got into trouble and made the children go to the library or the pool while she ran errands. He reported occasions where they were outside under a tree for up to three hours waiting for the foster mother to return. The foster child reported eating cereal, frozen meals, and sandwiches every day. When interviewed, two other foster children in the home confirmed the foster mother sent them to the library or pool daily but perceived this as an outing rather than punishment. They also stated the foster mother made home-cooked meals regularly. Another 16-year-old child in the home reported he was the only one allowed to stay home alone; however, after work, if the foster mother was not home, he had to wait at a coffee shop for a few hours until she returned.

- An investigation was initiated by HHSC on August 18, 2016, due to allegations that children in care were inappropriately supervised because an 18-year-old foster child reportedly overdosed on Tylenol. When interviewed the foster mother stated the 18-year-old foster child told her he had taken a handful of Tylenol that he purchased on his own. Paramedics were called and the child was taken to the hospital where no Tylenol was found in his system. The child was later transported to a psychiatric hospital.

- An investigation was initiated by HHSC on September 24, 2019, after a 17-year-old foster child made an outcry that he did not have the necessary resources to complete school assignments, was forced to help with the family business without receiving pay, could not participate in age-appropriate activities, and was told his ADHD medication would be increased because he was "not in a good mood." When interviewed the four foster children in the home denied all allegations.

In addition to the 11 standards investigations, the home had 12 reports of runaways.

The HHSC Closure Recommendation was approved on July 17, 2022. The recommendation was based on the Reason to Believe finding for Neglectful Supervision, a pattern of inappropriate supervision allegations, three corporal punishment allegations, and 12 runaways.

The foster home page in CLASS indicates that the home was closed by the CPA on July 22, 2022, due to HHSC-recommended closure. No children have been placed in this home since July 18, 2022.

## Home H (Covenant Kids CPA)
## Closed November 11, 2022

This foster home was verified by the Dallas branch of Covenant Kids on April 24, 2014. The foster home later moved under the same CPA's main branch until the home's closure on November 11, 2022.

During the eight-and-a-half years this foster home operated, it was the subject of five investigations, one DFPS investigation for abuse, neglect, or exploitation, and four minimum standards investigations.

## Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on October 29, 2021, for Physical Abuse after a foster child made an outcry that the foster mother forced him to lay on the bed on his stomach and pulled his arms behind him as a form of punishment. The child demonstrated physical discipline to the investigator, who described that the child "lay on the floor [with] his stomach on the ground and both hands behind his back and said that it is called 'bear restraint' and his face to the side... he said he is not able to breathe and when he tells his foster mom she doesn't care." During

the interview, the foster child also told the investigator that the foster mother forced him to stay outside "for about 20 min[utes]" when "he gets in trouble."

The foster mother and her sister, who also resided in the home, denied the allegations. A collateral foster child (who no longer lived in the home) did not respond to questioning during an interview. The investigator described the foster child as becoming submissive and beginning to cry when asked about living at the foster home. Another collateral child (who also no longer lived in the home) told an investigator that he did not like living in the home because the foster mother spanked him with a belt and yelled at him. The investigator reported that the foster child "did not want to tell [the interviewer] whom [sic] he had seen physically disciplined" in the home while he was there. The investigator reported this allegation to SWI, and a separate investigation was initiated by HHSC for minimum standards violations.

The investigator Ruled Out the allegation of Physical Abuse, finding the incident was "inappropriate [but it did] not raise [to] the level of abuse."

## Standards Investigations

- HHSC initiated an investigation on October 4, 2016, due to allegations that the child was playing in the playroom and broke his arm while the foster mother was in the kitchen. The child was taken to the hospital for surgery. Though the foster child and a collateral child reported that the foster mother was in the kitchen at the time of the incident, the investigator noted that the playroom was visible from the kitchen. The child's service plan required the foster parent to visually monitor him every three-to-five minutes during waking hours and to remain within hearing distance. No citations were issued from this standard investigation.

- HHSC initiated an investigation on January 24, 2017, due to allegations that the foster mother failed to use car seats when transporting foster children. The foster mother stated that on one occasion the foster children were sitting in booster seats. The investigator noted that the CPA case manager informed the foster mother that the foster children needed to ride in an upright forward-facing car seat. Neither the CPA nor the foster home was issued a citation for this standards investigation.

- HHSC initiated an investigation on September 12, 2017, due to allegations that both the foster parent and a household member inappropriately disciplined previous foster children. The foster children reported to a therapist that one of the foster children previously placed in the home received spankings with a belt. The children further reported that the foster mother and the live-in friend "cussed at them," and the foster mother pushed the children in the forehead. She also stated that the foster mother told them, "Not to tell anyone because this would mess up their happy home." The foster children who were placed in the home at the time of the investigation told the investigator that the live-in friend threatened to kick them out of the home when they misbehaved. They also

reported that they were forced to hold their arms up as a form of punishment. The live-in friend denied forcing the children to hold up their arms as punishment but confirmed that she had threatened to kick the children out of the home, and she told the investigator that "she is playing" when she says this to the foster children. Both the foster mother and the live-in friend denied the allegations of cursing at or pushing any foster children. One foster child reported having been spanked, and all the remaining children interviewed for the investigation reported they had not been spanked and had not seen the one child spanked but that she had told them she was spanked or thought they had heard her being spanked.

The foster home received a citation for cursing at the foster children and a citation for forcing the foster children to hold a physical position as a form of discipline. The investigator stated that the children's statements regarding spankings were "inconsistent," and a citation for prohibited discipline was not issued.

- HHSC initiated an investigation on December 21, 2021, due to allegations that a foster child was spanked with a belt as a form of discipline when the child and his siblings were previously placed in the foster home. The foster children involved in this investigation confirmed that the foster mother spanked them with a belt when they were placed in the home between March and November 2020. The foster mother denied the allegation, but the investigator noted the similarities between this investigation and the September 2017 investigation. During an inspection of the home, the adult household member, who is the foster parent's sister, admitted to having cameras around the home. She also told the investigator that she had listened to the investigator's interview with one of the foster children, insisted the child was lying, and demanded that the investigator make the child tell the truth in her presence. After the investigator refused, the foster parent's sister demanded that the investigator take the foster child from the home. The CPA told the investigator that it conducted a home screening addendum to address discipline after the home was already licensed years prior.

Three citations were issued for the use of corporal punishment; caregivers in ratio not providing a safe home environment; and for the use of video cameras other than with infants and toddlers without consent.

## HHSC Closure Recommendation

Before the HHSC approved its inspector's Closure Recommendation, DFPS placed this foster home on its Disallowance List effective April 28, 2022. On September 7, 2022, DFPS issued a Disallowance Letter to Covenant Kids. The letter informed Covenant Kids that this foster home was being disallowed after DFPS received information regarding standard violations of corporal punishment and inappropriate discipline. The letter also

acknowledged "a pattern of allegations regarding corporal punishment which causes reasonable concern for the safety of any child placed in the home." [337]

HHSC approved the closure recommendation on October 7, 2022. The recommendation was based on consistent outcries of corporal punishment with a belt, being yelled at by the adult sister of the foster parent, and concerns for inappropriate discipline being used in the home and the foster parent "not being protective of the child placed with her."

A closure recommendation letter was sent by HHSC to Covenant Kids, Inc on October 13, 2022.[338]  The foster home page in CLASS indicates that the home was closed on November 11, 2022. No children have been placed in this home since February 22, 2022.

### Home I (Circles of Care CPA)
### Closed March 16, 2022

Home I was verified by two different CPAs, first operating under the Laredo branch of The Burke Foundation from August 26, 2005, until August 24, 2010, then under Circles of Care CPA, from August 3, 2012, until the home was closed on March 16, 2022.

Over the 17-year period that it operated, this foster home was investigated for abuse, neglect, or exploitation nine times and for minimum standards violations 12 times.

### Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on December 11, 2006, for Neglectful Supervision and Physical Abuse. The intake stated that the foster parents did not intervene during a physical altercation between children, resulting in scratches and bruises and that the foster mother pinched the children and pulled their hair. During the investigation, one child reported that the foster mother left six children in the car when she went inside the foster home to get something she had forgotten. During this "almost 2 minutes," the children became physically aggressive, pinching and hitting one another. When interviewed a week later, the same child instead claimed that she received the scratches on her face when she was outside for "30-35 minutes," and "she was running, and she tripped in front of the house" during which time the foster mother "could not see from inside" the home. Another child in the home told the investigator that his siblings hit each other, and the foster mother pulled his sister's hair, slapped them on their hands, screamed at them, told him to "' shut up,'" and spanked his sister on the butt. The foster mother said that the children received the scratches on their faces from the siblings fighting one another and falling on "dirt and loose rocks." She denied screaming at the children or pulling their hair and instead said that one of the foster children pulled her hair.

---

[337] Letter from Kason Vercher, Director of Residential Contracts, DFPS to Yolanda Deaton, Administrator, Covenant Kids, Inc., RE: DFPS Disallowance of Placement in Contractor's Foster Home, September 7, 2022 (on file with the monitors).
[338] Letter from Toni Cantu, Director of Field-Residential Child Care Regulation to Covenant Kids, Inc, October 13, 2022 (on file with the monitors).

The allegations of Neglectful Supervision and Physical Abuse were Ruled Out, and a citation was issued for allowing a child over one-year-old to sleep in a crib in the foster parent's bedroom. HHSC overturned this citation on administrative review.[339]

- DFPS initiated an investigation on July 2, 2008, for Physical Abuse and Neglectful Supervision related to allegations that the foster mother physically restrained a 14-year-old foster child during an altercation with the foster parent's biological child. The investigation also included allegations that the foster mother took the two foster siblings to the lake and, while there, allowed them to see their biological father though his parental rights were terminated, and that while they were at the lake, the foster children took a vehicle and almost drove onto the highway before being stopped by the park security.

  When interviewed, both children denied knowing that their biological family members would be at the lake and reported it was accidental that they saw their father. Both children also denied taking a car. One child reported her former foster father allowed her to drive his truck while he was in the vehicle. The foster mother also denied making any arrangements for the children to see their biological family at the lake.

  The investigator interviewed the worker who monitored the family visit where the alleged altercation and restraint occurred. The monitor told the investigator that she neither saw the children physically fighting nor saw the foster mother restrain any of the girls.

  Physical Abuse and Neglectful Supervision were both Ruled Out. HHSC issued a citation, resulting from an inspection of the foster home, for a child having to walk through the master bedroom to get to the child's bedroom.[340]

- DFPS initiated an investigation on March 3, 2010, for Neglectful Supervision, due to allegations that two siblings, ages 14 and 9, physically fought and bit each other and that the foster parents failed to intervene. According to the intake, while the foster parents and children were at the courthouse for an adoption hearing on March 2, 2010 (which was contested by CPS) the foster father was in a room with the three siblings and two of the siblings began to fight. According to the children, the foster father moved the youngest child out of the way and attempted to break up the fight. The CVS worker told the investigator that she could hear screaming and banging from the room where the children were waiting with the foster father. She stated that, when she entered the room, the

---

[339] At the time of the investigation, there was an existing standard (AF33006) that did not allow a child over one year old to sleep in the same room as foster parents. A note in the investigation states that there was "new standard that will allow a child up the [sic] age of three to sleep in the same room with an adult."

[340] CLASS indicates that the standard is AF33006 but, when you click on the hyperlink, the standard states that it is 749.3023(b)(2).

two siblings were fighting, and the foster father was "sitting in a chair." She explained that one of the children's hands was bleeding. The worker told the investigator that "[s]he [did] not feel it [was] in the best interest of the children to be in the home." She removed the siblings from the home shortly after the intake was reported.

The foster father stated that he was trying to intervene in the fight between the children when the CVS worker entered the room. The foster mother stated that she witnessed her husband trying to separate the children. The allegation of Neglectful Supervision was Ruled Out, and the investigation was closed with no citations issued. The children were removed from the home on March 2, 2010, the day of the adoption hearing.

- DFPS initiated an investigation on October 12, 2012, for Medical Neglect, due to allegations that a child, age 15, did not receive medication as directed by a physician, which led to her fighting with another child in the home. The two children in the home provided varying accounts of being provided medication by the foster mother. One child stated that the children received their medication regularly and that she witnessed the other child refuse, "cheek," and spit out her medication. The other child denied ever refusing her medication and told the investigator that, on at least three occasions, the foster mother was too busy to provide her medication in the morning.

The foster mother told the investigator that she "would give [Child A] the medication in [her] hand and she would watch [Child A] put the medication in [her] mouth and swallow the pills." The investigator noted in the medication logs that the dosages provided to Child A should have had more of one medication and less of two other medications. The investigator also added that the foster mother was "lying to the Department when she stated she provided the child with [her] medication as directed" and that the foster mother falsified the medical logs and noted some dates had "whited out" information: "This shows the foster parent is not filling out the medical logs on a daily basis and it appears she is filling it out all at once."

Moreover, the investigator noted that the foster mother contacted the investigator and provided them with an account that she had "run out of medication" for one of the children, so she had made an appointment to have prescriptions filled. The foster mother provided a copy of her planner with medication notes.

According to the investigator's notes, the medication logs indicated that the foster mother had provided one of the children with her medication on the dates during which the "planner" entries indicated she had not done so. The investigator noted further falsification of the documents and concluded "This further proves [the foster mother] was falsifying the medical logs." Despite these notes, the

investigator concluded that a risk assessment indicated "low to medium risk to children who take medication."[341]

The allegation of Medical Neglect was Ruled Out. Two citations were issued: one for a minimum standard associated with caregiver responsibility due to the finding that the foster parent forged medication logs to show a foster child took medication when in fact the child did not; and one for a minimum standard associated with administration of medication, because the foster parent was not giving a foster child their medication as instructed.

- DFPS initiated an investigation on May 9, 2013, for Physical Abuse, due to allegations that a child was bruised when the foster mother grabbed her arm in an attempt to take a phone away. The child, age 15, told the investigator that she received the bruises after the foster mother grabbed her arm. This event was confirmed by another child present at the time, who provided further details about the foster mother being "on top of" the victim child while trying to retrieve a phone. Another child in the home confirmed that the victim child had taken a phone but denied witnessing a physical confrontation. Both foster parents denied the foster mother grabbing the child.

  The allegation of Physical Abuse was Ruled Out. HHSC issued one citation because none of the children's mattresses had protective covers.

- DFPS initiated an investigation on November 8, 2017, for Neglectful Supervision due to allegations that a foster child engaged in inappropriate contact with another child. The investigator noted that the incident report stated that foster mother reported finding Child A on top of Child B and Child A "inappropriately touching" Child B in their shared bedroom after the boys became quiet playing in their bedroom. She told the investigator that she went to the children's bedroom and saw that Child A's hands were on Child B's shoulders, shaking them, and the children told her they were playing. She also told the investigator that "it ha[d] been hard having [Child A] at the house because [they were] so hyper and [didn't] like to listen," and she placed a 30-day discharge notice on Child A the same day the incident occurred.

  During a forensic interview, Child B told the interviewer that they were "never left alone," and "no one ha[d] ever hurt" [their] "private parts." Child A reported that "no one ha[d] tried to touch [them] or asked [them] to touch them while at the [foster] home." The allegation of Neglectful Supervision was Ruled Out and a citation was issued for children of opposite sex over the age of six sharing a bedroom.

- DFPS initiated an investigation on May 27, 2021, for Physical Abuse and Neglectful Supervision, after a child, age 15, was observed with burn marks on the

---

[341] A July 13, 2007, Sampling Inspection revealed concerns almost identical to the issues involving the failure to provide medication raised during this investigation.

top of both hands resembling the shape of an iron. The reporter stated that, when asked about the injuries, the child "avoided talking about it and left the classroom after the class." A few weeks prior, the child was observed with what appeared to be a cigarette burn behind her right elbow and scratches on her arm. Another child in the home told the investigator that he had witnessed the child burn herself with a lighter before the report. The foster mother told the investigator that the child often spoke about depression, would "scratch" herself, and discussed hurting herself when she was upset. She also informed the investigator that the child often hid her injuries. The child told the investigator that she hurt herself when she was mad and scratched herself. The investigator noted that the child's Service Plan listed her as at a Specialized level of care with "no special need or high-risk behaviors." The allegations of Physical Abuse and Neglectful Supervision were Ruled Out, the investigation was closed with no citations.

- DFPS initiated an investigation on October 27, 2021, for Physical Abuse, Emotional Abuse, and Neglectful Supervision due to allegations that the foster parent's adult daughter (an approved caregiver) shook the head and covered the mouth of a three-year-old child in care so that he would stop crying. It was also alleged that the foster parents were using scare tactics with the children, threatening removal from the foster home. When interviewed, the three siblings of the three-year-old confirmed that the foster parent's daughter shook their brother's head and kicked him out of the room. One of the siblings demonstrated "how the daughter placed her hands on her brother's head and shook him... about 5 times... and that she then covered her brother's mouth with her hand for him to be quiet." The child kept crying, so the daughter "then pushed him out of the room by grabbing him by the arm."

  During interviews several additional allegations were made, these allegations included:

  - The foster mother listened to the children's conversations with their caseworker. One child reported that he knows this because, after the visits, the foster mother "tells him what he told his caseworker, gets mad at him, and then sends him to his room." The CVS worker reported that she had been aware of the foster mother coaching the child on what to say during her visits to the home and would "lower the volume of the television to hear what was being said during their confidential conversations," and she described at least one other incident when the foster mother instructed the foster child to listen to phone conversations between her and her clients in the home. She told the investigator that she had been addressing this issue since September 2021, and had even attended the foster child's therapy sessions to help ensure the conversations were not being overheard and/or coached.

  - The foster father made threats of discharge. A child described an incident in which the foster father threatened him with a fourteen-day discharge, using the Spanish slang for "Get the hell out of here."

- The foster parents instructed their three-year-old grandson to hit the youngest foster child.

- The foster mother contacted one of the foster children via cell phone and Instagram with a threatening message, stating "pinches werkos I am not going to let you ruin my career as a DPS trooper."

DFPS found a RTB for Physical Abuse based on the adult daughter shaking the head of the child and covering his mouth. HHSC issued five standards citations: one for inappropriate discipline for covering the child's mouth and shaking his head; one for children's rights to have telephone conversations and keep a personal journal; one for children's rights to be free of abuse, neglect, or exploitation; one for caregiver responsibilities – prudent judgment associated with the finding that the foster parents contacted and threatened a child after discharge encouraged their grandchild to hit a foster child; one for prohibited discipline related to the foster parents using profane language towards a foster child, making slurs to a foster child (calling him gay), placing a foster child in a dark room, and threatening a foster child's placement.

- DFPS initiated an investigation on November 19, 2021, for Physical Neglect, Medical Neglect, and Neglectful Supervision after two intakes were received with multiple allegations regarding two sibling children (ages 10 and 12). The allegations included that the foster parents allowed children unauthorized access to their biological parents, used cockroach spray to treat the children's hair for lice, failed to seek immediate medical attention when a child received a head injury after fainting and hitting her head causing it to bleed, and failed to provide the children with adequate food.

Collateral children interviewed confirmed that they witnessed the 12-year-old child with blood on the back of her head, and the foster parent admitted that she did not take the child to the doctor for four days after the child received the injury.

The 10-year-old and 12-year-old foster children reported that they and their two other siblings were treated for head lice with Lysol by the foster parent's adult daughter. The foster parents and the foster parents' daughter denied that Lysol was used. The foster father admitted to using "Ariel" laundry detergent, and it was confirmed that the children were treated for lice with Ariel's laundry soap, Vaseline, and Listerine.

The case concluded with a disposition of Reason to Believe for Medical Neglect, finding that the foster mother failed to obtain immediate medical attention when the child injured her head; and for Neglectful Supervision due to the finding that the foster mother allowed the children to have access to their biological parents without DFPS approval.

HHSC issued five standards citations: one for violation of a minimum standard related to supervision, one for the foster home's failure to report the serious incident involving the foster child sustaining a head injury, one for the failure to seek immediate medical care after the head injury, one for violation of a minimum standard associated with prudent judgment related to the caregivers washing the foster children's hair with laundry soap and Listerine mouthwash and spraying their hair with an insecticide not intended for use on humans, and one for violating children's rights.

Only one additional citation was issued as a result of the standards investigations, related to the CPA's failure to complete a timely background check.

HHSC recommended home closure on February 28, 2022, and based the recommendation on two areas of concern: inappropriate discipline and inadequate supervision. HHSC approved the HHSC recommended closure however, the CPA closed the home on March 16, 2022, before being notified of the HHSCs recommendation.

CLASS notes show the home was closed on March 16, 2022, as an involuntary closure due to deficiencies.

## Pending HHSC Closure Recommendations

### Home J (CPA: Globel Foster Care)
### Active

Home J was originally licensed in March 2013, by Safe Haven Community Services CPA, which closed on December 2, 2013. The home was licensed to provide services to both male and female children ages 0-17 at the following levels of care: basic, moderate, and specialized, including children with emotional disorders, pervasive development disorders, and children requiring emergency care services.

Home I was not verified again until March 25, 2018. Since then, this home was verified by six other CPAs: Good Hearts Youth and Family Services (verified April 25, 2018, and relinquished April 4, 2019, due to non-compliances),[342;] Houston Serenity Place (verified May 22, 2019, and relinquished November 12, 2019, when the home changed CPAs), Angel Arms Family Care LLC (verified November 13, 2019, and relinquished February 28, 2021, when the home changed CPAs), Transitions for Tomorrow (verified March 1, 2021, and relinquished June 10, 2021, when the home changed CPAs),  and Globel Foster Care, CPA (verified on June 14, 2021, and relinquished on April 12, 2022, due to HHSC's Recommended Closure).

Despite HHSC's February 11, 2022, recommendation for closure, the home was verified for a sixth time by Ascension Child and Family Service CPA on November 3, 2022. The home closed on June 9, 2023.

---

[342] The non-compliances were related to inappropriate discipline.

## Abuse, Neglect, and Exploitation Investigations

Home J was investigated for abuse and neglect five times before HHSC's closure recommendation:[343]

- DFPS initiated an investigation on January 13, 2020, for Physical Abuse due to allegations that a foster child (who is autistic and has difficulty verbalizing) had a "hand print" on the right side of his face and said that the foster parent hit him. The foster parent denied the allegations. Others who were interviewed expressed no concerns about the home and said the child self-injured. Physical Abuse was Ruled Out, and no citations were issued.

- DFPS initiated an investigation for Emotional Abuse on May 2, 2020, due to allegations that the foster parent called a foster child names, used profanity with the children, drank and smoked a lot, and threatened to kick the child out of the home. The child also alleged that the foster parent hit the other two children in the home and that one of the children whom the foster parent hit was "mentally challenged." The foster parent denied the allegations. Neither of the two collateral children who were interviewed reported concerns (though one was noted to be nonverbal). None of the adult witnesses interviewed reported any concerns with the home. Emotional Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on May 8, 20202, for Physical Abuse and Neglectful Supervision due to allegations that the foster parent left the children alone every week to get her hair and eyelashes groomed. The intake also alleged the foster parent physically abused the child who has autism and forced him to lie about how he was injured and did not intervene when two other children smoked marijuana. The children denied the allegations. The foster parent denied the allegations and said she'd discussed adopting the children with them. Collateral adults denied the allegations. No citations were issued.

- DFPS initiated an investigation on November 5, 2021, for Physical Abuse and Emotional Abuse due to an outcry made by one of the children (the sibling of the autistic child) that when the foster parent got angry, she punched him. The child also said the foster parent was emotionally abusive. Though the child was consistent when he was interviewed for the investigation, two collateral children denied the allegations. The foster parent denied the allegations. Three citations were issued for inappropriate discipline, corporal punishment, and weapons

---

[343] This foster home also had one standards investigation with Good Hearts and Family Services CPA (August 29,2018) that resulted in two deficiencies for driving safety and Supervision; two standards investigations when she was with Houston Serenity Place and three ANE investigation with 1 Angel Arms Family Care LLC that did not result in citations or RTB/UTD findings. This foster home had three Administrative Closure cases: one for a runaway (1 Angel Arms), one injury that occurred at school (Houston Serenity), and another injury that occurred at school (Transitions for Tomorrow).

stored inappropriately and accessible to children in the home. The investigator reported the following findings in support of the citations:

- The victim child, age 15, reported that the foster parent "yells and cusses at him" when he gets in trouble. He reported there was a time in August [2021] when he walked someone home without permission and when he returned home, his foster mother grabbed him by the shoulder and pushed him. The child recounted another incident at the end of the school year where he was disciplined for an incident that occurred at school. Upon his return home, the child attempted to explain to the foster parent that he was not at fault. He went to take a shower and said something under his breath, and the foster mother eventually entered the restroom while he was showering and punched him in the back with a closed fist. Following this incident, an investigator observed he had a horizontal one-inch bruise on his right mid-arm. When asked how he received the bruise he replied, "FP [name omitted] grabbed his arm for skipping class." Due to the allegations, the child was removed from the home on November 5, 2021.

- Another male child, age 15, who resided at the home at the time of the November 5, 2021, investigation reported "[FP] yells and cusses at the other kids but not me personally, because I haven't gotten in trouble." When asked to describe the foster mother's language, he stated, "I'd rather not say what things she says, but its [sic] things like "why the f*** did you get in trouble."  He also reported that he had been told, "what happens in the house, stays in the house." He reported that he observed the foster mother strike another child in care (the autistic child) when he gets in trouble. He stated: "[FP] will go up behind him and slap him on the chest, stomach, and shoulder with an open hand." This child is non-verbal and was not able to deny or confirm the allegations. He further reported that another child in the home (age six) was annoying the foster mother and the foster mother, "told me to flick him on the head, so I did it." This child denied all allegations and he continued to reside in the home. The child who made these reports was removed from the home on November 23, 2021. Before removal, the foster mother contacted his caseworkers and stated he had stolen property and "stared" at her and her biological son.

## HHSC Closure Recommendation

On February 11, 2022, an HHSC recommendation for closure was approved after the November 2021 investigation resulted in deficiencies. At the time of HHSC's approval for closure on February 11, 2022, three foster care children still lived in the home, Child A (age nine); Child B (age six); Child C DOB (age 17, the child who has autism).

On March 4, 2022, HHSC notified Globel Foster Care of the recommendation for the CPA to close the foster home. According to CLASS notes, the CPA closed the home on April 12, 2022, due to HHSC's recommendation. On the day of closure, the remaining child (the 17-year-old autistic child) in the home was adopted by the foster parent.

After HHSC provided notice of their recommended closure and after Globel Foster Care CPA closed the home, the foster home changed CPAs. On November 3, 2022, Ascension Child and Family Service CPA verified the home. On December 9, 2022, a 15-year-old child with autism was placed in the home.

On February 2, 2023, SWI received a report that this foster home was reopened by a different CPA after the home was closed due to an HHSC recommendation. The investigation was closed without citation noting that Ascension Child and Family Service, CPA was not made aware of the status of the foster home.

On February 10, 2023, HHSC made a second recommendation for the closure of this foster home. HHSC leadership approved the second recommendation for closure and notified Ascension Child and Family Services, CPA on March 14, 2023.

The home closed on June 9, 2023. According to IMPACT, on May 22, 2023, the child placed in the home on December 9, 2022, was removed, with DFPS noting the removal reason as "Facility/Home closed/inactive."

Home K (Texas Baptist Home for Children CPA)
Active

Home K has been licensed for almost 19 years and verified five times by four different CPAs. The home was first verified on November 20, 2003, by A World for Children, CPA. The foster home relinquished verification with this CPA on April 14, 2004. No investigations were documented during the brief five months this CPA verified the foster home.

On April 15, 2004, this foster home moved immediately to Optimum Children's Services CPA. The home relinquished verification with this CPA on August 10, 2009, and changed CPAs. On August 11, 2009, the foster home was verified by Texas Baptist Home for Children, CPA. On January 26, 2011, the foster home again relinquished its verification and changed CPAs.

On January 27, 2011, Dallas Metrocare Services CPA verified the home. The home remained with Dallas Metrocare for just over four years when it again relinquished its verification and again changed CPAs. The home returned to Texas Baptist Children's Home[344] and was verified on March 17, 2017, where it remains open.

---

[344] Texas Baptist Home for Children was placed on Heightened Monitoring August 24, 2022. Trends identified in the Heightened Monitoring Plan included: Caregiver Responsibilities – Supervision; Child's Rights- Child's right to be free from abuse and neglect; Discipline and punishment; Health & Safety- Weapons/Firearms; Medical Care: Medication Management- Medication Administration Medication Management-Medication Storage; Required Trainings; and Serious Incident Reporting

Over the course of 19 years, this foster home was the subject of six abuse, neglect, or exploitation investigations; five were ruled out and one was closed as Unable to Determine (UTD) with two standards citations. In addition, the home had 15 standards investigations resulting in four citations for minimum standards violations.

## Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on April 4, 2008, for Neglectful Supervision. A foster child made an outcry to the foster mother that he saw two other foster children in the home, and the 13-year-old pulling down the pants of the seven-year-old. An investigator interviewed the seven-year-old who reported that a "bad touch" occurred between her and the 13-year-old. She confirmed that another child witnessed the incident. When interviewed, the 13-year-old denied the allegations and stated the children were having a pillow fight. The foster father, who was supervising the children, reported that he was moving a freezer at the time of the alleged incident and conducted 15-minute checks, as required by the safety plan. He was aware of the seven-year-olds sexual history and made the boys and girl sit on separate couches. The foster mother was not home at the time of the incident. The investigator Ruled Out Neglectful Supervision and no citations were issued.

- DFPS initiated an investigation on May 23, 2008, for Physical Abuse after a 13-year-old foster child made an outcry that the foster father dragged him across the concrete. The investigator interviewed the child, each of the foster parents, the speech therapist, and the occupational therapist. The foster child stated while he was running in the yard, he grew tired and fell on the ground. The child reported that the foster father told him to get up because he was in an ant bed, then dragged him into the yard and the house. The foster father stated the child was in an occupational therapy appointment and was not following the therapist's directions and then became verbally aggressive with the therapist. The foster father suggested that the child go outside to get some exercise. While jogging in the yard, the child stopped and fell on the ground in a large ant bed and then refused to get up. The foster father reported that he had a back injury that prevented him from carrying the child to safety, so he pulled the child "by his foot and dragged" him onto the porch and into the home. The foster father reported that he had to physically move the child regularly.

  The foster mother stated that when she arrived home the child appeared to be "hyperventilating." The child told her that he needed to be taken to the hospital because the foster father hurt his back. The foster mother did not see any visible marks. A speech therapist arrived and entered the home at the same time as the foster mother. She reported that the child told the foster mother his back was hurting, and the foster mother said she did not see anything. The speech therapist observed that the child was missing a shoe and had scratches down his back that was bleeding. She said she asked the foster father about the incident,

271

and he told her the child fell into an ant bed on purpose, but she did not observe any ant bites on the child.[345]

The occupational therapist, who was also at the home reported seeing the child running and "being self-destructive."  She denied witnessing any physical discipline used in the home. Other children interviewed denied physical discipline being used in the home.

The investigator ruled Unable to Determine (UTD) for Physical Abuse but noted that the child had scratches and two bumps on his back and abdomen. The ant bed was inactive at the time of inspection. The investigator reported that the foster father "forcibly removed the child as a result of defiance," and that the reason the foster father pulled the child by his legs was unknown. Two citations were issued:  for corporal punishment and a second for failure to comply with "general responsibilities," for physically redirecting the child causing injury.

- DFPS initiated an investigation on May 7, 2009, for Physical Abuse and Neglectful Supervision after a 17-year-old foster child (Child A) reported to Statewide Intake that his former foster father accused him of taking a cell phone charger belonging to another child in the home, pushed him off the bed, took all his belongings except bed linens and told him he was going to treat him like he was in jail. The child also reported that the foster parents told him if he did not go to sleep, they would let "the kids jump him."  He also reported that another child in the home hit him in the eye with a closed fist and the next day his eye was swollen, and his chest hurt.

  Another 17-year-old child who lived in the home was interviewed and said Child A became upset when the foster mother searched his room and missing items were found including checks, candy, and money. The child stated that the foster father told Child A he would "treat him like he was in an RTC." The child denied anyone hitting Child A that night. A 15-year-old child (Child B), who was living in the home at the time of the incident, stated when the foster parents searched Child A's room looking for a missing cellphone charger, he saw Child A push a cabinet onto the foster mother. To protect the foster mother Child B said he hit Child A in the head three times and the foster mother told him to stop. Child B denied the foster parents told the children to jump the 17-year-old child and he thought the foster parents were trying to protect Child A.

  The foster parents denied allowing the other children to fight Child A and said they immediately broke up the fight. The foster mother reported that she searched the child's cabinet and found "a lot of the other children's belongings

---

[345] When the investigator later the Speech Therapist, the therapist reported she removed herself from working with this home. She stated, "she felt uncomfortable with the incidents occurring in the home." She reported incident where the same child became mad during a therapy session and tore up her therapy cards and in return the foster mother encouraged her to destroy something of the child's. Because she refused the foster mother tore up a CD cover belonging to the child. The child ran out of the home. She reported that the foster mother asked her not to report that the child was gone to CPS.

that had been missing." She reported that Child A had been stealing from school and church.

The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision and no citations were issued.

- DFPS initiated an investigation on October 4, 2011, for Sexual Abuse. A 12-year-old foster child made an outcry to the foster mother that the foster mother's 13-year-old adopted child exposed his privates to other children in the home. When interviewed, all foster children in the home reported that the adopted son had exposed himself on several occasions while they were in their bedroom and the foster parents were downstairs. The adopted son admitted that he was "doing something inappropriate" to the other children "to be funny." The foster mother stated that when she heard about the adopted son's activities, she immediately notified the agency, called the hotline, and removed the child from the bedroom.

The investigator Ruled Out the allegations of Sexual Abuse and no citations were issued. The foster home implemented a Safety Plan requiring additional supervision of the adopted child.

- DFPS initiated an investigation on January 13, 2018, for Neglectful Supervision based on an 11-year-old foster child's outcry to the foster mother that he and a 9-year-old foster child who also lived in the home had been having inappropriate sexual contact. When interviewed, the 11-year-old child reported that he was disciplined by the foster parents by being pushed down, slammed down, pushing pressure points, or having his ears twisted by the foster parents. The investigation included five different intakes.

The 11-year-old foster child stated he "got" the 9-year-old "interested in sex," and after a month "they started doing it." The children engaged in sexual activities during the day and night when the foster mother was downstairs, or the foster father was at work. He also reported that other children in the home observed the sexual activity. During a forensic interview, the 9-year-old reported his 11-year-old foster brother "dared" him to have sex, but he refused. The foster brother then approached his bed and began to "hump" him. The foster brother threatened to punch him if he did not comply. Afterward, the 9-year-old was "scared" and hid under his covers waiting for his foster brother to go to sleep. During another incident, the foster brother held the 9-year-old against the wall so that their private areas touched. The incident was interrupted when another child walked into the room. The 9-year-old child reported this activity took place over five nights. The 9-year-old stated he was afraid the foster brother would do it again and that he wanted to be in another home away from his foster brother. The child also reported feeling unsafe in the home because the foster parents pushed him down and yelled at him.

The remaining four children in the home denied seeing any inappropriate sexual behavior and denied the use of physical discipline by the foster parents. The

273

foster mother and father denied being aware of the inappropriate behavior and the use of inappropriate discipline. The foster father stated the children were in separate beds during night checks.

The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision and issued no citations. The investigator reviewed the children's treatment plans and supervision requirements and found that they were being followed. The 11-year-old child was removed from the home.

- On April 4, 2022, two intakes involving the same 17-year-old, autistic foster child initiated a single DFPS investigation. One intake called in on March 19, 2022, alleged inappropriate supervision by the foster parents and was upgraded to an abuse and neglect case for Neglectful Supervision on April 1, 2022. This allegation involved the 17-year-old becoming separated from his foster family while hiking in Oklahoma. The child was missing from 2:00 p.m. until 11:30 p.m. and was found by a search-and-rescue team using a helicopter. The investigation concluded that the foster parents followed the child's supervision Safety Plan and responded appropriately. The allegation of Neglectful Supervision was Ruled Out.

  The second intake involved the same child who reported having to be rescued by the Coast Guard after wandering off in the water on a previous vacation. During the summer of 2021, the foster family was on vacation in Georgia. The child went into the ocean on a "boogie board," and the tide carried him out so far that he had to be rescued by the Coast Guard. The child was wearing a life jacket at the time. The incident was confirmed, and a citation was issued for a minimum standard violation associated with failure to document and report a serious incident.

## Standards Investigations

Two standards investigations resulted in citations for minimum standards violations:

- An investigation initiated by HHSC on October 23, 2009, alleged the foster father was drinking while the children were in the home. Three out of the five children interviewed confirmed the foster father drank but denied that he was ever intoxicated. The foster father confirmed that he consumed alcohol occasionally. Additional allegations of the foster father "flicking" a child in the head were confirmed by two foster children. HHSC issued a single citation for prohibited discipline.

- An investigation initiated by HHSC on July 15, 2016, alleged that two foster children, ages 17 and 14, crashed while riding a "four-wheeler. During interviews it was reported by the foster parents that the two foster children rode a four-wheeler without their permission. The children had an accident while on the "four-wheeler" resulting in both children having a concussion and abrasions. Two citations were issued to the CPA for failing to report the serious incidents within 24 hours.

274

## HHSC Closure Recommendation

HHSC approved the closure recommendation and sent a closure recommendation letter[346] to Texas Baptist Home for Children on September 7, 2022, stating that the closure recommendation was based on several deficiencies and investigations that "create an endangering situation." Four citations were listed in the letter justifying the recommendation.

The CPA did not relinquish the home's verification. The home is currently active and remains verified by Texas Baptist Home for Children CPA. IMPACT reflects that as of June 1, 2023, two foster children reside in the home. One PMC child who has been placed in the home since February 28, 2021, turned 18 on January 5, 2023, the child voluntarily remains in Extended Foster Care. The second child is an 11-year-old TMC child, who was placed in the home on October 24, 2022. On December 15, 2022, the attorney ad litem filed a motion for a restraining order when a change of placement was set to occur for this child, and the order was granted by the court. The child remains in the foster home.

Since HHSC's recommended closure of the home in September of 2022, there have been no new investigations of abuse or neglect, or standards violations.

## Denied HHSC Closure Recommendations

### Home L (Lutheran Social Services of the South, Inc.)

This foster home was verified on February 20, 2019, and licensed by Lutheran Social Services CPA. The home was investigated for abuse or neglect twice during the two-and-a-half-year licensing period. The Lutheran Social Services CPA was placed on Heightened Monitoring on December 8, 2020, with Plan Tasks related to home oversight, service planning, discipline and punishment, and supervision.

### Abuse, Neglect, and Exploitation Investigations

- An investigation initiated on July 22, 2022, alleged Neglectful Supervision when, inconsistent with the child's safety plan, a three-year-old child was not properly supervised to be "within eyesight and hearing range of either foster parent." The intake states that the child was alone near the barn "in front of a stall with a horse," into which he could have climbed and been hurt. The foster parents denied that the child was ever left alone, stating that the foster father was with him while "going in and out" of the barn doing chores. The case manager reported that he observed the child alone for a period of two-three minutes next to the low-height stall door with the horse.

---

[346] Toni Cantu, Director of Field Residential Child Care Regulations, HHSC to Jason Curry, Texas Baptist Home for Children, CPA, September 7, 2022 (on file with the monitors)

The investigator interviewed the child and noticed that the child had a rash on his back, upper neck area, and area above his buttocks. The child's three siblings also resided in the home. The investigator observed a three-year-old sibling with a burn, which was being addressed in a different investigation. The one-year-old sibling was observed with a rash on his right thigh and with white "circular specks" in his hair, which appeared to be lice. All children were taken for medical attention. The rash on two of the children was determined to be heat rash, and the third child did not have lice.

The allegation of Neglectful Supervision was Ruled Out. One citation was issued for supervision for not following the child's service plan when the foster parents did not keep the youth "within eyesight and hearing range of either foster parent." In response to the deficiency, on September 13, 2022, the CPA submitted a corrective action plan via email to RCCR, CLASS deficiency notes indicate that a service plan addendum was to be completed by September 19, 2022. During a follow up inspection on September 26, 2022, the supervision deficiency was again cited noting that the foster parents were unable to implement appropriate supervision while the children were outside. The inspector documented that the service plan "remains unrealistic and not attainable for the foster parent."

- An investigation initiated on August 18, 2022, alleged that a three-year-old foster child was burned by hot milk, and the foster parents waited a day to seek medical treatment. The investigation was originally initiated on July 20, 2022, as an RCCR Priority 2 standards investigation. Later, on August 17, 2022, the case was staffed, and it was determined that due to the severity of the burn and the age of the child it should be upgraded to an ANE investigation. The case was resubmitted to SWI as an ANE investigation shortly after. The investigation notes indicate that the foster mother had a pot of hot milk in her hand, turned around, and bumped into the foster child. The milk burned the child's head, neck, and back. According to the investigator's notes, the CPA instructed the foster parents to delay taking the child to the doctor until the following day, and the doctor concurrently approved the foster parents waiting and using a home remedy. The following day, the foster father took the child to the doctor who prescribed a topical treatment. The associated standards investigation notes indicate that the doctor told the investigator that the foster father was using a honey-based topical home remedy that was not approved in medical guidelines. Moreover, the notes indicate that that doctor recommended the child be referred to a burn specialist, but the foster parents were not willing to follow through with the recommendation. The FACN results were nonspecific, finding the burns may have resulted from abuse or neglect, but accidental or natural explanations were also possible.

The allegations of Neglectful Supervision were Ruled Out. Three citations were issued because of the investigation: one citation for administration of medication, one for the foster parents not immediately seeking medical treatment for the injury, and one for the CPA for not reporting the serious incident within the required twenty-four-hour time frame.

276

## Standards Investigations

The foster home has also been the subject of three additional standards investigations, one that resulted in a citation for physical discipline after the foster father admitted to using his hand to spank a foster child. The foster child also reported that he was disciplined by the foster parents pulling his ear. The same investigation resulted in a citation to the CPA for failing to provide service plans for the children.

The home was involved in an announced sampling inspection on September 30, 2021, with no standard concerns found during the inspection.

An HHSC Home Closure Recommendation Form was submitted on September 22, 2022. The HHSC - RCCR Associate, the Deputy Associate Commissioner, and HHSC Legal Representative originally denied the recommendation on September 22, 2022. The denial notes state that "[l]ocal child advocates are reportedly in favor of children remaining in placement for adoption and DFPS is conducting weekly home visits as well. Based on this information, closure of home is not recommended at this time, however, RC/HM will continue to work with the CPA to provide oversight of the home."

Since the closure recommendation was denied, two additional investigations were opened, one abuse and neglect investigation and one standards investigation.

An HHSC investigation was initiated on October 14, 2022, involving four siblings aged one, two, three and six years. The intake alleged that the six-year-old child sustained an injury to the head after another child threw a toy at him during an altercation over the toy. The six-year-old was treated and received stitches. No citations were issued.

The second investigation was opened after the HHSC investigator in the case above reported to SWI on October 21,2022 that the investigator noticed that a two-year-old child had what appeared to be a rope burn across his neck that appeared to be healing. According to case documentation the rope burn was superficial and was caused when a horse pushed on a rope fence and caused the rope to snap, striking the child across the neck. All children were initially removed from the home after the report to SWI, however on November 4, 2022, the court ordered the four children returned to this foster home. The allegations of Medical Neglect and Physical Abuse were Ruled Out, two citations were issued; one for failure to report an injury, and one for failure to seek medical treatment as soon as the injury occurred.

On October 27, 2022, this foster home was again staffed for and was approved for recommended closure. The HHSC Closure Recommendation form decision narrative states "due to two additional incidents, causing continued and increased concern so home is approved for closure recommendation."  The same day HHSC sent a letter to Lutheran Social Services notifying the CPA of the closure recommendation. The letter documents the recommendation decision is based on the recent injury of a child because of inadequate supervision as well as other deficiencies. CLASS records show that the CPA closed the home involuntarily due to deficiencies, on November 4, 2022.

The four PMC siblings involved in each of the investigation discussed above were ordered returned to this home on November 4, 2022, as a fictive kin placement. PMC was given to the caregivers and they are in the process of attempting to adopt the children.

The home was added to the DFPS Disallowance List on June 6, 2023, with an effective date of November 23, 2022.

### DFPS List of Disallowed Homes

In addition to foster homes that HHSC considered for a closure recommendation, DFPS keeps a list of homes that are "disallowed" for placement of foster children. According to the CPS Handbook, a caseworker may recommend that a home be disallowed for placements if they have a "serious concern about child safety or well-being."[347] A caseworker who wishes to place a home on the disallowed list is required to "thoroughly document the reasons" and submit the documentation to his or her direct supervisor.[348] The request "goes up the chain of command for consideration and approval."[349]

As of January 23, 2023, the DFPS Disallowance List included a total of 64 foster homes; 13 homes were added to this list in 2022. HHSC had recommended closure for only two of these 13 homes.

The Monitors reviewed CLASS records for the 11 homes on the DFPS disallowed list that HHSC did not recommend for closure. The CPA involuntarily closed three of the 11 homes due to deficiencies. One home was involuntarily closed by the CPA but was not noted to have closed due to deficiencies. One home voluntarily closed with deficiencies, one voluntarily closed without deficiencies, and three reflect closure by the CPA. Two homes are still listed as active in CLASS.

#### Home M
#### Closed involuntarily March 9, 2022

Home M was verified by Lutheran Social Services of the South, Inc. CPA (San Antonio Branch) on November 23, 2020. Lutheran Services was placed on Heightened Monitoring on November 11, 2020, and as of December 31, 2022, the CPA has not moved to the post-plan Stage.[350]

---

[347] DFPS, CPS Handbook §4222.1 Disallowing Placements into a Foster Home, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_4000.asp#CPS_4222_1
[348] *Id.*
[349] *Id.*

[350] The CPA was and remains on Heightened Monitoring for issues related to the following violations: background checks; caregiver responsibilities (supervision, discipline, and punishment); home oversight; home screening and verification; leadership responsibilities (personnel and record keeping); living space and physical environment; medical care; initial service plans; and therapeutic services.

278

Home M was the subject of four investigations during the 16 months it was active. Three investigations were for allegations of abuse, neglect, or exploitation and one was for a minimum standards violation.

Abuse, Neglect, and Exploitation Investigations

DFPS initiated an investigation on August 25, 2021, for Neglectful Supervision by the foster parent and Physical Abuse by the foster parent's biological son. The investigator interviewed the following individuals: (1) an 8-year-old foster child, (2) his 6-year-old biological sister; (3) the foster parent's 17-year-old biological son; (4) the child's case manager; and (5) the foster mother.

The 8-year-old foster child made an outcry during a forensic interview that he had been choked by the 17-year-old biological child of the foster parent. The child told the investigator that the foster mother sprayed him with the water hose in a joking manner, and she got his Pokémon cards wet. This upset him, and "he tried to hit her like ten times." He reported that the foster parents' 17-year-old biological son approached him from behind and proceeded to choke him for "1-2 minutes." The child told the investigator that he also hit his head on a rock on the floor during this physical altercation. He stated that the foster mother feared that he may have had a concussion because he vomited shortly after the incident, but that the foster mother did not seek medical attention until the following day. The child also told the investigator that he was forced to move rocks in a wheelbarrow as a form of punishment.

The child's 6-year-old sibling told the investigator that she was inside the house with the foster father when they "heard a big bang," and she came outside and saw the 17-year-old push her 8-year-old brother to the ground and choke him. She stated that the foster mother screamed at her biological son, and he stopped choking the child. The sibling also told the investigator that the foster mother's biological son had pushed her brother before. Another child in care, who was present during the incident, described the bear hug as being below the shoulders and said that the child was not choked.

The foster mother's 17-year-old biological son stated that he witnessed the foster child becoming physically aggressive with his mother after she sprayed him with the water hose. He told the investigator that he grabbed the child in a bear hug from behind with his arm around the child's shoulder and arms so that the child would not knock his mother off the deck. He reiterated that he was sure that he did not grab the child by the neck.

The case manager told the investigator that she was aware that the foster mother's biological child had restrained the foster child on a prior occasion and there was a Safety Plan in place at the time of the incident to prohibit unsupervised contact between the two boys. The foster mother confirmed that her biological son intervened in the conflict and restrained the foster child when he was trying to push her off the deck. She denied being concerned about the child having a concussion and reported that the child never hit his head on a rock or threw up and that they never went to the doctor.

The investigator did not inspect the home. During the first attempt to do so, the foster mother stated she could not leave work. When the investigator attempted a second inspection, the foster mother stated that the household was on COVID quarantine.

The investigator Ruled Out the allegation of Neglectful Supervision and no citations were issued by HHSC. The allegation of Physical Abuse by the foster parent's biological son was administratively closed because "RCCL does not have the authority to investigate this allegation." After the investigation, HHSC provided Technical Assistance to the foster home. The Technical Assistance provided included: ensuring background checks are completed when required— one of the foster parent's biological children mention that his grandparents watch the children periodically, but background checks had not been completed for them; having only a qualified caregiver administer an EBI; and maintaining current, true, accurate, and complete records.

* * *

DFPS initiated an investigation on January 14, 2022, for Neglectful Supervision after the foster mother drove her car into a tree at a high speed in a suicide attempt. Law enforcement told the investigator that he responded to a call involving the foster mother becoming angry with her father, who was her landlord. The officer told the investigator that the landlord had served the foster family with an eviction notice the day before. The officer told the investigator that the foster mother told him she felt suicidal and had attempted to take her life two years prior. The investigator received a 2016 police report related to an incident during which the foster father had threatened the foster mother and their son with a gun. The foster mother then took "Xanax and other medication." Her son found her unresponsive and "lying beside her vehicle."

DFPS Ruled Out Neglectful Supervision and reported that the foster mother became uncooperative both with this investigation and with a CPI companion case. No citations were issued.

* * *

DFPS initiated an investigation on January 28, 2022, for Neglectful Supervision after a six-year-old foster child reported that she had sex with her "boyfriend" while placed in this home. The child told her foster mother that while placed in her previous foster home she and her former foster mother's 7-year-old grandson kissed each other on the lips, pulled down each other's pants and underwear, and touched each other's private parts while outside of the home by the fence. During the forensic interview, the six-year-old child denied the allegation, but her biological brother stated that he and one of the foster parents' nieces had witnessed his sister, the foster parent's grandson, and another niece engage in inappropriate contact while they were unsupervised outside.

The foster parents and their eldest biological 18-year-old son denied the allegations that the children had ever been left outside without supervision. Both nieces denied the allegations, but one of them told the investigator that she had seen the six-year-old child

and the grandson naked in a closet on another occasion.[351] No supervision concerns were noted, the allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

## Standards Investigations

The foster home was also the subject of one minimum standards investigation after the foster mother tested positive for COVID-19 on January 9, 2022, but failed to make a report to SWI until January 13, 2022. One citation was issued for not reporting the serious incident to Licensing within the required 24-hour time frame.

DFPS placed this foster home on the agency's September 23, 2022, Disallowance List, with an effective date of February 24, 2022. On September 7, 2022, DFPS issued a Disallowance Letter to Lutheran Services informing the CPA that under its contract with the CPA, DFPS was disallowing the placement of any children in this home after information was received regarding standard violations regarding the foster mother's mental health and a pending eviction. The letter acknowledged "significant safety concerns" presented by the foster mother's declining mental health and "instability" due to the eviction.[352]

The home was closed involuntarily by the CPA on March 9, 2022, due to deficiencies. No children have been placed in this home since January 20, 2022.

## Home N
## Closed Involuntarily March 15, 2022

Home N was first verified on March 5, 2012, by the Have Haven CPA in Houston. Class documentation indicates that the home was voluntarily relinquished for a brief period on April 25, 2018, and reverified by the CPA on July 16, 2018. The home was involuntarily closed with deficiencies on December 21, 2020. Three months later, on March 29, 2021, the foster home was verified by Ascension Child and Family Services.[353]

While operating under Have Haven Child Placing Agency, the home was the subject of seven abuse, neglect, and exploitation investigations:

DFPS initiated an investigation On September 11, 2014, for Physical Abuse related to an outcry by a seven-year-old child that the foster mother pulls her by the hair "a lot times" and it hurts, pushes her down the hallway into time out, and pinches her cheeks. The child stated she did not feel safe at her foster home and wanted to leave. One of the foster children placed in the home reported witnessing the foster mother push the

---

[351] This allegation was investigated by CPS instead of RCCI or HHSC, even though the alleged incident occurred in the foster home and involved a foster child placed in their home. Sexual Abuse was Ruled Out in this investigation.

[352] Letter from Kason Vercher, Director Residential Contracts to Krystale Bezio, Lutheran Social Service of the South, Inc., RE DPFS Disallowance of Placements in Contractor's Foster Home. September 7, 2022.

[353] Ascension Child and Family Service was placed on Heighten Monitoring October 21, 2020, and did not move to Post Pan Monitoring until April 1, 2022.

seven-year-old on her back, causing her to fall on the ground, and said that the foster mother is "mean" to the seven-year-old "because she is bad all the time." Another foster child placed in the home witnessed the foster mother pinching the seven-year-old on the check three to five times, "but it was not hard." The investigator observed no visible injuries. The foster parents denied using inappropriate discipline. The allegation of Physical Abuse was Ruled Out, and no citations were issued.

* * *

DFPS initiated an investigation on May 20, 2015, for Physical Abuse due to allegations that the foster father "popped" a 6-year-old male foster child with a towel, causing a welt. When interviewed, all the children in the home denied the allegations. The foster parents denied using inappropriate discipline, stating that the child sustained scratches from fighting with his sibling. The allegation of Physical Abuse was Ruled Out, and no citations were issued.

* * *

DFPS initiated an investigation on May 24, 2016, for Physical Abuse after a 12-year-old male foster child reported that the foster father choked and slammed him while the foster father was intervening in an altercation. A ten-year-old child reported that on a different occasion, the foster father once choked another foster child with one hand. Four of the six children denied witnessing the incident. The foster parents denied the use of inappropriate discipline. The allegation of Physical Abuse was Ruled Out, and no citations were issued.

* * *

DFPS initiated an investigation on June 21, 2016, for Physical Abuse, Medical Neglect, and Neglectful Supervision after a child's attorney reported that while he was visiting a 15-year-old male foster child he noticed the child had scabs and sores on his body and a blood-soaked sock, and that the child had severe eczema/impetigo that was not being treated. The child also said the foster mother hit him on the back with a belt and that she threatened him if he told anyone, and that another child in the home had hit and scratched him during an altercation. When interviewed, all children denied the allegations. DFPS determined that the allegations related to the altercation between the two children were previously investigated and Neglectful Supervision was Ruled Out and did not investigate those allegations as part of this case. The allegations of Physical Abuse and Medical Neglect were Ruled Out. One citation was issued for prohibited discipline after four foster children confirmed the foster mother would withhold snacks as a form of discipline.

* * *

DFPS opened an investigation on October 26, 2017, for Physical Abuse due to allegations that the foster father punched a 12-year-old boy in his face. When interviewed, the 12-year-old said that the foster father hit him in the face and that the

foster mother had grabbed his hair on another occasion. Three other children in the home said the foster father stood up with his fist raised in front of the 12-year-old, and when he swung at the child, the foster mother stepped in, causing the foster father to hit the child in the arm. One CPS caseworker reported concerns about the lack of age-appropriate activities and inappropriate discipline but stated she felt like the child may have lied about the incident. The previous case manager recalled concerns about inappropriate discipline used in the home. The allegation of Physical Abuse was Ruled Out. HHSC issued three citations, for prohibited discipline, violation of children's rights, and violation of a minimum standard requiring children to be able to participate in normal childhood activities.

* * *

DFPS opened an investigation on September 25, 2020, for Neglectful Supervision due to allegations that the foster mother walked in on a nine-year-old foster child "dry humping" a seven-year-old foster child. The foster mother was aware that the nine-year-old had a history of sexually acting out, and she reported the child "took delight" in hurting his younger foster siblings. Despite this observation, the foster parent allowed the two children to sleep in the same room. When interviewed, the nine-year-old child confirmed he was allowed to play with his peers with the bedroom door closed. The seven-year-old denied the allegations but reported that he had seen the child "humping" stuffed animals at night. Neglectful Supervision was Ruled Out, and a deficiency citation was issued for improper supervision due to the foster mother allowing the children to play with the door closed and not following a child's service plan

DFPS opened an investigation on November 13, 2020, for Physical Abuse due to allegations that the foster father forcibly removed a seven-year-old child from a chair while the child was on camera during virtual school. When the child returned, he was crying and red in the face. The foster parents and five other foster children were interviewed and denied the allegations. The teacher reported seeing the child grabbed by the foster father by what appeared to be the child's arm. Because the teacher witnessed the incident, the agency removed the child from the home. Physical Abuse was Ruled Out, and no citations were issued.

Standards Investigations

In addition to the ANE investigations, three deficiencies were issued across eight standard investigations.

- An HHSC investigation initiated on August 21, 2014, resulted in one citation for violation of a minimum standard associated with children's rights after children in care reported being pinched on the cheek by the foster parents.

- An HHSC investigation initiated on October 8, 2015, resulted in two citations for prohibited discipline because children in care reported being pinched, having their noses grabbed, and not receiving snacks as a form of discipline.

283

On March 10, 2022, DPFS notified Ascension Child and Family CPA that any further placements of children in the foster home were disallowed.[354] DFPS supported the disallowance with documentation of the following noted trends and observations:[355]

- A pattern of Physical Abuse investigations resulting in improper discipline citations.
- A pattern of Physical Abuse allegations increased in 2020.
- A pattern of noncompliance with minimum standards.
- A pattern of youth reporting abuse, then recanting despite having marks to prove abuse occurred.
- Nine children had been discharged at the request of CPS for risk of abuse/neglect.
- A pattern of both foster parents cursing and arguing in front of the children.

According to Class, Ascension Child and Family Services CPA involuntarily closed the foster home on March 15, 2022.[356] The last child was removed from the home on March 4, 2022.

## Home O
## Voluntarily closed without deficiencies September 1, 2021

Lonestar Social Services CPA in Dallas, Texas, verified Home O on August 26, 2020. The home has no other verification history. During the 13 months this home was active, it was the subject of one abuse and neglect investigation and no minimum standards investigations.

The home voluntarily closed without deficiencies on September 1, 2021.

## Abuse, Neglect, and Exploitation Investigations

DFPS initiated an investigation initiated on July 25, 2021, for Physical Abuse, Sexual Abuse, and Neglectful Supervision. The victims were one 11-year-old female, Child A, and one 17-year-old female, Child B, placed in the home.

Child A made an outcry to the foster mother that while at her stepmother's house, the foster mother's 15-year-old nephew, Child C, would inappropriately touch her. The foster mother frequently dropped off Child A and Child D, another foster child living in the home, at her stepmother's house while she worked 24-hour shifts as a paramedic. When interviewed, Child C admitted to engaging in sexual acts with Child A but claimed Child A initiated it. Child C stated the acts would occur on the bus ride home from school and in the living room of the stepmother's (his grandmother's) home. Both Child

---

[354] Letter from DPFS Kason Vercher, Director of Residential Contracts to Tammie Ware, Administrator, Ascension Child, and Family Child Placing Agency, re: DPFS Disallowance of Placements in Contractor's Foster Home, March 10, 2022.
[355] Memo from Heather Cornet, Placement Safety Specialist, Home N under Ascension Child, and Family Services Child Placing Agency (CPA) Evaluation for Placement Disallowance, January 19, 2022.

C and his father stated that Child A repeatedly initiated the contact. Child C was arrested and detained, but the DA did not proceed with the case. The allegation of Sexual Abuse was Ruled Out.

During the investigation, SWI received an additional call on August 16, 2021, alleging that the foster mother gave the children alcohol and left the children alone at night. While the allegation regarding giving the children alcohol was unfounded, the foster mother admitted to leaving the children alone in the home for multiple hours during the night to drive for Uber and Lyft in neighboring cities ranging from approximately 16 to 50 miles away from the home. The stepmother stated that before Child D was placed in the home, the foster mother would leave Child A home alone while she drove for Uber. The foster mother thought this was acceptable because Child A would be sleeping.

The foster mother claimed the CPA permitted her to leave the children unsupervised. When interviewed on August 19, 2021, the CPA's case manager said she gave the foster mother permission to leave the children alone to run errands for a few hours during the day. The case manager stated Child A's and Child D's service plans both allowed the foster mother to run errands during the day. The case manager said the foster mother did not disclose she worked for Uber and Lyft.

When interviewed on July 25, 2021, by RCCI, the foster mother told the investigator that the longest she had left the children alone was to get dinner from a store 12 minutes away from the home. When interviewed again on August 18, 2021, the foster mother disclosed to the investigator that she had been leaving them alone during nighttime hours to drive for Uber and Lyft. The foster mother also admitted to going on a date one night and leaving the children unsupervised from 11 pm to 2 am.

The investigation was closed with a Reason to Believe finding for Neglectful Supervision. Four citations for violation of minimum standards associated with supervision were issued by HHSC.

### DFPS Disallowance

DFPS recommended the home for the disallowance list on September 13, 2021. The recommendation was based on the RTB finding for Neglectful Supervision. The memorandum and CLASS records indicate the home voluntarily closed without deficiencies on September 1, 2021. At the time of closure, there were no children in the home. DFPS added the home to the DFPS Disallowance List dated March 15, 2022, with an effective date of October 11, 2021.

### Home P
### Closed June 17, 2021; Disallowed March 25, 2022

Arrow Child and Family Ministries of Texas CPA (Arrow CPA) verified Home P on August 23, 2019. Arrow CPA closed the home on June 17, 2021, following a minimum standards violation.

The foster home has no history of abuse, neglect, or exploitation investigations. During the verification period, the home was subject to one Priority 3 Minimum Standards investigation initiated on March 5, 2021, alleging a child in care was inappropriately disciplined.

## Standards Investigations

On February 9, 2021, an 18-year-old foster child in extended care, Child A, made an outcry to her therapist that the foster parents spanked a five-year-old child (Child B) as a method of discipline. The therapist called in this allegation SWI on February 23, 2021, and the investigation was initiated on March 5, 2021.

Child A provided video footage of the incident to the investigator. The video shows the foster mother hit Child B with an object, allegedly a wooden spoon. Child A described that the video shows Child B screaming in pain. Child A also stated this was not the first time the foster mother spanked Child B.

Both foster parents denied ever hitting or spanking a child in their care. Throughout the course of the investigation, Child A did not want the foster mother to know she made the report. In an interview on March 16, 2021, Child A stated that the foster mother tried to manipulate her into lying to licensing entities and to DFPS to conceal that she hit Child B with a wooden spoon. Child A reported that the foster mother told her, "You are the one who determines what happens with this investigation." Child A stated the foster mother would hit Child B almost every other day on his arms and legs, sometimes with her hand. Child A reported one instance where the foster mother was driving, and she and Child B were passengers in the car. Child B told the foster mother he had to use the bathroom, and she did not stop the car. Child B urinated in the car and the foster mother hit Child B.

HHSC issued one citation for a high-weighted standard related to corporal punishment after the foster mother was recorded "spanking" a child as a method of discipline on video.

Arrow CPA closed the home on June 17, 2021.

DFPS placed the home on the DFPS Disallowance List updated on March 15, 2022. The list reflects an effective date of September 9, 2021. On March 2, 2022, DFPS notified the CEO and Administrator of Arrow CPA[357] disallowing any future placements at this foster home based on the home's citation for corporal punishment. DFPS cited the foster mother's use of inappropriate discipline, manipulation with a collateral child in the investigation, and dishonesty with investigators as primary factors in the home's disallowance.

---

[357] Letter from Kason Vercher, DFPS Director of Residential Contracts to Michael Scott Lundy, CEO Arrow Child, and Family Ministries Child Placing Agency, RE: DFPS Disallowance of Placements, (March 2, 2022) (on file with the monitors).

Home Q
Closed November 5, 2021; Disallowed September 28, 2022

Home Q was first verified on June 30, 2021, by Children's Shelter CPA. During the four-and-a-half months this home was licensed, it was subject to one abuse and neglect investigation.

Abuse, Neglect, and Exploitation Investigations

DFPS initiated an investigation on July 6, 2021, alleging Physical Abuse, Physical Neglect, and Neglectful Supervision after a one-year-old foster child was returned to his foster home from respite with "[b]ruising on chin, arms, and legs. Scratch on the right ear and scratch on left knee." The intake also states that the respite care providers (a new foster family at the time) "were able to send incident reports for the chin and ear injuries, but they did not provide documentation for the arm and leg bruises."

The investigator noted that, on June 25, 2021, upon dropping off the foster child with the respite care family, the foster mother and respite care mother conducted a joint body check on the foster child, and they signed a document acknowledging the foster child "had diaper rash and a [sic] two bruises to his shin." When the foster mother picked up the foster child on July 5, 2021, the foster mother noticed multiple bruises, including bruises in the foster child's "underarm area." The investigator reviewed the incident reports provided to the CPA by the respite care family, and the only acknowledged injuries were those under the foster child's chin and behind his ear.

Both respite care parents told the investigator that the foster child had "bad separation anxiety," and would have "tantrums" and the foster child obtained the injuries on his chin and behind his ear because "he would 'thrash' around" in the crib. They could not explain the injuries under the foster child's arm.

A forensic assessment of the child's injuries states that the injuries under the foster child's arm were "clustered bruises... not typical of accidental trauma, and the history that the [injuries on the] arms were 'from the crib' does not explain [the] injuries." The report continues by explaining that "the bruising to the right knee seen in the 7/5 image has some curvilinear pattern to it; the area of bruising is moderate in size and unexplained, which is concerning for either physical abuse or supervision neglect." The physician's opinion was noted to explain that "the bruises to the inner upper arms are in locations that are not commonly injured by accident, and the pattern of the bruising to the left upper arm is consistent with grab marks. For these reasons in my professional opinion, there is a concern that [the foster child] has been the victim of physical abuse."

The investigation resulted in an RTB for Neglectful Supervision and Physical Abuse by the respite foster parents. Two citations were also issued- one for supervision because the respite foster child "was not being properly supervised which led to unexplained bruising" and one for children's rights because the "child in care was grabbed in an inappropriate manner causing bruising to arms [sic]."

287

DFPS placed this home on the October 6, 2022, Disallowance List, with an effective date of September 28, 2022. DFPS issued a Disallowance Letter to Children's Shelter CPA. The letter informed the CPA that this foster home was being disallowed after information was received regarding the two RTBs issued to the home.

The foster home page in CLASS indicates that the home was closed on November 5, 2021, and the verification was voluntarily relinquished with deficiencies. No foster children were ever placed in the home, aside from for respite care.

Home R
Closed March 1, 2021, with deficiencies

Home R was first verified by the Bair Foundation CPA on October 29, 1999. The home changed CPAs to Good Hearts Youth & Family Services CPA (Good Hearts) on June 12, 2012. The home relinquished verification on September 30, 2015, due to corporal punishment citations. Good Hearts re-verified the home on September 23, 2016,[358].

Over the more than 20 years that it operated, the home was the subject of a total of 21 investigations, eight for allegations of abuse, neglect, or exploitation.

Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on March 2, 2007, after law enforcement reported that a 16-year-old foster child left the foster home and took her male, infant child with her but did not bring any diapers, food, or clothing for the infant. The foster mother dropped off the 16-year-old and her child at the library at 7:30 p.m.

  After the case was initiated on March 2, 2007, the 16-year-old's caseworker reported to SWI that the foster parents were "rude and verbally abusive" toward the 16-year-old foster child and that the foster father "threatened to hit the 16-year-old and 'bucked her' (approached her like he was going to hit her)." The caseworker reported concern that the infant child had "severe diaper rash and warts on his bottom." The caseworker also reported the following information about the library incident included in the first intake: the foster mother instructed the 16-year-old foster child to walk one mile home at 9:00 pm from the library with her infant child. The 16-year-old foster child did not return to the foster home but instead ran away and stayed with a friend.

  The foster mother denied the child was told to walk home from the library. She said the child was supposed to call the foster parent when she was ready to be picked up. The foster child returned to the foster home with the infant a few days later. The foster mother told the investigator that the infant was in the custody of

---

[358] According to the DFPS Disallowance Letter issued October 8, 2021, the foster father passed away in 2019, but the home remained open under the foster mother.

the 16-year-old and that the 16-year-old was responsible to care for the infant. She acknowledged that the infant had diaper rash and said the 16-year-old would not change or clean the infant properly.

The 16-year-old reported that she did not want to walk home from the library because she was tired of having to walk home in the dark. Instead, she walked to a friend's house and stayed for two days. The 16-year-old acknowledged the infant had diaper rash but blamed it on the foster father not changing the child's diaper.

The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

- DFPS initiated an investigation on September 11, 2008, for Physical Abuse. A CPA case manager reported the foster parents made a report a few days prior that a seven-year-old child foster child had fallen on the table and injured her chin. When the case manager visited the children, the seven-year-old and her two siblings, she observed the seven-year-old child with a black eye. The injury was incongruent with the reasoning provided by the foster parents. *i.e.*, that the child had fallen on the table. The case manager stated that the seven-year-old foster child "seemed very coached and nervous" when asked about the injuries. The intake also alleged that the foster parent's adult daughter would stand on the backs of younger foster children and, when she was left to babysit them, she put the children in trash bags inside garbage containers and took them to the curb.

  The seven-year-old told the investigator that the black eye occurred when she was running in the house, she said she slipped, fell, and hit the table, and bruised her eye. All three children denied being placed in trash bags. The foster mother told the investigator that the children were horse playing and the 7-year-old child tripped and hit the table, causing a black eye and a bruise on her cheekbone. The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

- DFPS initiated an investigation on November 26, 2010, for Physical Abuse after a five-year-old foster child told a DFPS staff that the foster parents used "a belt and sometimes a branch" to physically discipline her and her sibling. The child and two collateral foster children denied being spanked or hit by the foster parents. The foster parents denied using any physical discipline in the home. The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

- DFPS initiated an investigation on February 23, 2012, for Physical Abuse after a seven-year-old foster child told her caseworker that the foster parents hit her and other foster children. The child also told her caseworker that she was denied food as a punishment for fighting, and she had to beg to be able to eat before bed.

The child later recanted her statements when interviewed. An 11-year-old collateral foster child denied being physically disciplined or not being allowed to eat, and the foster parents denied using physical discipline or withholding food as a form of punishment. The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

- DFPS initiated an investigation on October 31, 2014, for Physical Abuse after the caseworker for an eight-year-old foster child said that the foster father "drug him around by his neck" during a family visit. The eight-year-old foster child told the investigator that the foster father was "slamming him down" and "picked him up by the back of the neck and threw him against a wall." [The foster child] later added that [the foster father] "picked him up with both of his hands by the ribs and threw him to the floor" and "dragged him around the house." The foster child demonstrated the actions to the investigator "by pushing himself into a wall and then... laughing." The investigator noted that the foster child would go back and forth between confirming the incident and denying the incident occurred. All the children in the home denied enduring physical discipline. Both foster parents denied the incident and the use of any physical discipline in the home. The investigator Ruled Out the allegation of Physical Abuse and no citations were issued.

- DFPS initiated an investigation on December 31, 2014, for Physical Abuse and Neglectful Supervision. A nine-year-old foster child reported to his caseworker that the foster parents hit him and his three siblings, ages six, three, and two, and hit another foster child placed in the home. The intake stated that a three-year-old collateral foster child had a scar under his eye, but it was unclear whether the scar was obtained before being placed in foster care. The sibling group also told their caseworker that the foster parents threatened "to 'f**k them up' if they [did] not leave [the foster child with special needs in the home] alone" and that they witnessed the foster father "smoking marijuana."

The nine-year-old child told the investigator that "he was always yelled at and treated 'mean'" in the foster home. He said that the foster father "'grabbed' him by the arm and walked him upstairs." The child reported that the foster mother was the one who threatened to "fuck [him] up."

The six-year-old child denied physical discipline being used by the foster father. He told the investigator that he saw the foster father smoking "in the doorway of the back door." He also confirmed that the foster mother threatened to have someone come over and "fuck [the nine-year-old foster child] up" if he didn't leave "that special boy" alone. The six-year-old foster child also told the investigator that the foster mother hit him on his hand.

The foster parents both denied the allegations of physical discipline, threatening the foster children, and smoking inside the home. The foster father admitted to smoking cigarettes outside the home. The foster parents both admitted to "getting loud" at times to get the foster children's attention. The investigator

Ruled Out the allegations of Physical Abuse and Neglectful Supervision and no citations were issued.

▪ DFPS initiated an investigation on February 27, 2015, for Physical Abuse, child-on-child Sexual Abuse, and Neglectful Supervision based on the statement of a former foster child. A school counselor reported that a nine-year-old child reported that two other children in the home of "A and Mr. J," sexually abused him while he was placed in the home approximately two years prior. He said that the foster mother offered his five-year-old sister money to pull down her pants and touch her genital area. He also reported that the foster father "choked him, slapped him, and thumped" him.

The nine-year-old who made the outcry told the investigator that the foster father had picked up his five-year-old biological brother by the arm and "slammed" him on the couch. The 9-year-old said the five-year-old child said afterward that his arm hurt. He said one of the adopted children in the home "tried to have sex" with him and when he told the foster parent the other child got into trouble. He reported witnessing an incident where another child in the home was on top of his brother without clothes on moving up and down on him, he told the foster mother and reported that she "pulled on both of their privates and said don't do it again".

An 11-year-old sibling of the 9-year-old, who was also placed in the foster home, said that the foster father grabbed her five-year-old brother by one hand and tossed him on the couch. She said the foster father pointed a knife at her face while he was cooking. She detailed an incident where the foster father dragged her upstairs with her body on his back. She stated the foster father grabbed her by the legs. She also reported that both foster parents cursed and would use the "b" and "f" words.

Another child in the home reported that she did not like to see her brother get "beat." She said that the foster mother "whopped" him on his "bottom" with her hand and the foster father "popped" him once. Another sibling, age 8, who lived in the home at the time of the alleged abuse of the 9-year-old and five-year-old, said he witnessed the foster father hit another child twice "with the belt on the bottom." He said the child was not wearing pants, a shirt, or underwear when the father spanked him.

Another child said that physical discipline was used in the foster home and that the foster father hit him. This child also reported profanity was used in the home. The investigator noted that this child was "not deemed a credible source" because the child "has a developmental delay and speech impediment that made his responses unclear."

One other child foster child, age 8, who was living in the home at the same time as the victims denied all the allegations. However, a 6-year-old child stated that

"she does not get enough food and sometimes goes to bed hungry and thirsty." This child denied any physical discipline in the home.

The foster parents denied all the allegations and denied consent for the adopted daughters to be interviewed as part of the investigation. The allegation of Physical Abuse was Ruled Out and the allegation of Neglectful Supervision was found Unable to Determine, one citation was also issued for corporal punishment.

- DFPS initiated an investigation on September 9, 2020, based on the report of a 13-year-old former foster child.[359] The child told her adoptive parent that when she was six to seven years old, she was sexually abused while in the foster home.

  The 13-year-old child said the foster parent's adopted daughter made a tent and forced her and another boy[360] who lived in the home into the tent. The adopted daughter made them touch each inappropriately and she "made [the boy] get on top of her and put his penis in me for a while I think five minutes." She said this happened four times. The child reported the foster parent was upstairs when this occurred.

  The investigator located a service plan for the adopted daughter documenting that the child needed heightened supervision because she was sexually acting out. The foster parent acknowledged that the children made tents but claim she provided constant supervision when the children were playing.

  The investigator found an RTB for Neglectful Supervision. Two citations were issued one for supervision, and one for children's rights to be free of abuse, neglect, and exploitation.

## Standards Investigations

The foster home was also the subject of 13 minimum standards investigations. None resulted in minimum standards citations being issued.

On February 8, 2008,[361] the CPA conducted an internal investigation due to allegations that the foster parents physically disciplined a seven-year-old foster child. The child reports that the foster parents "beat" her. The CPA conducted the investigation and found five violations, all related to corporal punishment or improper discipline.

---

[359] This is the same collateral child interviewed in the February 27, 2015, investigation that denied all the allegations.

[360] The investigator noted in the investigation that it was suspected the boy was the 9-year-old victim in the February 27, 2015, investigation.

[361] The citations, however, are not reflected in the home's compliance history in CLASS. The CPA completed an internal investigation and found deficiencies in the home.

During the time this home was active, at least six different children alleged inappropriate discipline including hitting, spanking, yelling, and dragging. Six children reported not having enough food or being denied food.

A DFPS memorandum dated October 8, 2021, documents that the Deputy Commissioner of DFPS requested a review of the foster home because "the county attorney expressed concern about the home's history and that HHS Child Care Licensing's CCL lack of action regarding that history."

In a memorandum, the CPS Director disallowed the foster home for future placement because the home had an RTB finding for Neglectful Supervision and a UTD finding for Neglectful Supervision. The memorandum also acknowledged concerns about "several citations for corporal punishment and . . . concerns indicated for inappropriate discipline."

CLASS indicates that the home was closed on March 1, 2021, and the verification was relinquished with deficiencies. No children have been placed in this home since February 11, 2021.

Home S
Disallowed March 15, 2022, effective November 8, 2021

ACH Child and Family Services in Fort Worth, Texas (ACH), verified Home S on June 18, 2019. The home has no history of verification with other operations. During the time the home was verified by ACH, the home was subject to only one abuse and neglect investigation.

Abuse, Neglect, and Exploitation Investigations

DFPS initiated an investigation initiated on June 7, 2021, for Physical Abuse and Neglectful Supervision. The victim, a four-month-old infant in care, was inappropriately strapped into a swing, which resulted in two dark circular marks on both child's arms. The foster parent claimed the straps were used to keep the infant from scratching her face, which the foster parent said the child did continuously. The foster parent additionally admitted to leaving the child in the swing overnight and for other prolonged periods stating the reason that the child has acid reflux. The child was removed from the home on June 2, 2021.

The investigator interviewed the child's conservatorship worker, the new foster mother, and the child's physician. The child's conservatorship worker reported surprise when the foster parent requested the discharge of the child. The worker stated she had no concerns about the child until she moved the child out of the home on June 2, 2021. In her interview on June 14, 2021, she expressed multiple concerns with the foster parent. The worker thought it was odd that the foster parent requested discharge due to the child having special needs because the child does not have any documented special needs. The conservatorship worker was also concerned that the child's acid reflux medication was nearly empty when the worker picked her up because the prescription

293

was filled roughly four days before.

The child's new foster parent stated the child had no issues with scratching herself or spitting up since she arrived at the new home. As part of a Forensic Assessment Center Network (FACN) consultation, the physician expressed concerns about neglect because the child was left in an unsafe sleeping environment overnight. The safety instructions for the swing provided that the swing is not intended for prolonged periods of sleeping. The investigator found the caregiver breached her duty by placing the child to sleep in the swing overnight, which caused injury and exposed the child to a serious risk of injury or death.

The allegation of Physical Abuse was Ruled Out, but the investigator found a Reason to Believe for Neglectful Supervision. In addition to the RTB, the home received two high-weighted citations: one citation was issued because the caregiver used straps to tie the infant's arms down, and one citation was issued because the infant sustained injuries from the straps.

A memorandum dated October 14, 2021, details the evaluation of the foster home for placement on the DFPS Disallowance List. The memorandum documents its recommendation based on the result of the RTB finding for Neglectful Supervision and two citations for the use of straps and subsequent injury to the child's arms. The CPS memorandum also indicates the home received two additional citations for foster home screening and supervision, but these citations are not reflected in CLASS.

ACH closed the home on October 14, 2021, with an investigation pending. This foster home was added to the DFPS Disallowance List updated on March 15, 2022, showing an effective date of November 8, 2021.

Home T
Closed March 2, 2022; Disallowed March 15, 2022

Home T was first verified by ACH Child and Family Services CPA on December 12, 2017. The home was licensed for just over three years, during which time it received a total of two investigations. One investigation was for allegations of abuse, neglect, or exploitation and one was a minimum standards investigation.

Abuse, Neglect, and Exploitation Investigations

DFPS initiated an investigation on June 9, 2021, for Medical Neglect. A respite foster mother noticed that a three-year-old foster child recently complained of shoulder pain and developed a "bump." The bump was medically confirmed as a broken collar bone that had already begun to heal.

On May 14, 2021, the foster child began to have weekend visits with her younger infant brother at the respite foster mother's (respite mother) home. The respite mother informed the foster mother that the foster child complained of shoulder pain, and the foster mother stated that she would make an appointment with a doctor for the foster

child. The respite foster mother told the investigator that during the next weekend visit on or around May 29, 2021, she noticed a "bulge" had developed on the foster child's shoulder. She stated that the foster child told her that another foster child in the home had thrown a toy at her. The respite mother felt the foster child had "made it up."

The foster child was placed in the respite mother's home on June 4, 2021. On June 7, 2022, the respite mother took the foster child to a doctor who ordered a complete body X-ray. The scan revealed that the foster child had "an angulated fractured [sic] on clavicle that had started to heal."

The former foster mother told the investigator that she never noticed a bump on the foster child's shoulder, and the foster child never complained of pain in her shoulder. She acknowledged that the respite mother informed her about the foster child complaining of pain, but she told the investigator that she was told that the foster child complained of "back" pain. She admitted to forgetting to make a medical appointment for the foster child because "it slipped her mind."

The nurse at the Orthopedic Surgeon's office stated that the doctor "did not think the provided mechanism of a toy hitting [the foster child's] shoulder was consistent with the type of fracture she had," and the injury was "likely to be about 3-4 weeks old when [the doctor] saw [the foster child] on 06/10/2021." The nurse further "advised that the injury was likely caused by a hard fall to the shoulder or a direct hit on the clavicle," and she "reported that it would have had to be a brutal force for the toy to cause the injury and without the toy, it would be hard to say that it caused the injury."

The investigator found a Reason to Believe for Medical Neglect. Six citations were also issued by HHSC. The six citations included: supervision- the foster parent not being aware of or able to explain the injury; not providing information to the respite caregiver; the CPA not documenting information about the child being interviewed in private about the pain; serious incident reporting for failing to provide notification of the injury requiring medical care; not seeking medical care for an injury; and children's rights to be free from abuse, neglect, and exploitation. Two of the citations (supervision and not documenting the private interview with the foster child) were later overturned during the administrative review.

## Standards Investigations

The foster home was also the subject of one minimum standards investigation initiated on January 4, 2021, alleging that a foster child may have been supervised and cared for by an unauthorized caregiver. The investigator noted that the names of the adults mentioned by the foster child were approved respite caregivers with the CPA. No citations were issued.

DFPS placed this foster home on the agency's March 15, 2022, Disallowance List effective September 3, 2021. DFPS issued a Disallowance Letter to ACH Child and Family Services CPA on March 2, 2022. The letter informed the CPA that this foster

home was being disallowed after information was received regarding the RTB for Medical Neglect.

The foster home page in CLASS indicates that the CPA closed the home on March 2, 2022. No children have been placed in this home since July 13, 2021.

Home U
Involuntarily closed on October 8, 2021

Caring Hearts for Children CPA verified Home U on March 19, 2019. The home has no prior verification history with other CPAs. According to CLASS records, the home involuntarily closed on October 8, 2021, with deficiencies and one pending investigation.

Home U has been the subject of a total of seven investigations: six abuse, neglect, and exploitation investigations and one minimum standards investigation. The home's investigation history reveals a pattern of children making outcries of inappropriate discipline and children losing weight or appearing malnourished while in the home.

Abuse, Neglect, and Exploitation Investigations

Of the six abuse, neglect, and exploitation investigations, four alleged Physical Abuse, two alleged Sexual Abuse, one alleged Neglectful Supervision, one alleged Emotional Abuse, and one alleged Physical Neglect. All six investigations involve three children placed in the home. An 18-month-old child was involved in one investigation alleging Neglectful Supervision. A sibling pair, Child A, age seven, and Child B, age eight, were involved in five of the abuse, neglect, and exploitation investigations and one minimum standards investigation.

DFPS initiated an investigation on March 31, 2021, for Neglectful Supervision. The allegation narrative stated that Child A, age seven, took inappropriate and nude photos of himself on his tablet. The narrative additionally stated that Child A inappropriately touched another child in the home when the children shared a room. The investigator found that the foster mother allowed the children to take their tablets into the bathroom. Child A took his tablet into the bathroom and took naked pictures of himself. Child A's counselor stated that Child A exhibits sexualized behaviors, and she said a safety plan was implemented to separate Child A from his eight-year-old brother, Child B because Child A was mean to Child B.

The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

* * *

DFPS initiated an investigation on June 10, 2021, for Physical Abuse. On June 9, 2021, a 2Ingage worker transported an 18-month-old child in care to a visit with her biological parents. When the transporter picked up the child from the foster parent's home, she noticed the child was wearing a long sleeve shirt and pants despite 95-degree weather.

296

The foster parent told the transporter that the child was "fussy" after receiving a vaccine in her leg. The transporter noted that the child was fussy on the car ride to and from the visit. The observer of the visit stated there were no concerns with the child during the visit.

When the transporter returned the child to the foster parent, the foster parent noticed a red spot on the child's back and discovered that the child's left arm was swollen and warm to the touch. The foster parent stated there was no such red spot before the child visited with her biological parents. The foster mother took the child to the ER, where she was diagnosed with an arm fracture. The foster mother believed the injuries were sustained during the child's visit with her parents.

The results of the Forensic Assessment Center Network (FACN) consultation showed that the fracture could have been caused by falling directly onto the elbow or falling on an outstretched arm. The assessment indicated it could not have been caused by being put into or removed from a car seat. The assessment stated Physical Abuse could not be ruled out as a possible explanation based on the information available.

The investigation found the evidence could not confirm nor deny Physical Abuse, and as a result, the allegation was found Unable to Determine (UTD). No citations were issued.

* * *

DFPS initiated an investigation on August 25, 2021, for Physical Abuse involving the same seven and eight-year-old children involved in the first investigation. In his subsequent placement after this home, an eight-year-old foster child, Child B, made an outcry that as punishment, his previous foster mother spanked him, put him in the closet, and sometimes would not allow him to eat. The child's brother, Child A, stated he was never spanked, but as punishment, he was put in the closet for an evening and hit in the head. The foster mother stated the closets are not large enough for a child to fit inside. The foster mother shared that both children talked about being put in the closet in their biological home and stated that a neighbor had to get them out. The investigator concluded the closets are not big enough for children to fit inside.

The investigation also discussed how Child B gained weight after being removed from this foster home. The investigator spoke with Child B's physician who stated he gained and lost weight while in this foster home. She stated while in the home, the child went from 62 pounds to 57 pounds and then back to 63 pounds in May 2021. He was removed from the home in June 2021 and by August 2021, his weight increased to 78 pounds. The physician stated there are numerous reasons for weight gain but that he seemed much happier in his new home.

Additional allegations involved the foster mother treating Child B and Child A disparately compared to her biological children. In an interview, Child Bs new foster mother stated that Child B told her his previous foster mother was mean to him, spanked him, put him in the closet as punishment, made him eat alone as punishment, and would let her biological family have their dinner first and give him leftovers. In an

interview, the Attorney Ad Litem stated Child B and his brother told their CASA worker that the prior foster mother withheld food from him and his brother, Child A, and often gave them different food than the other members of the household.

The new foster mother also disclosed that Child B's previous foster mother dressed her biological children in neat, nice clothes and dressed Child B and his brother in unclean clothes and worn shoes. Child B stated he and his brother went to school with messy hair, and that the children's gym teacher started bringing a brush to school to fix their hair. When interviewed, the gym teacher corroborated the accounts of Child B and Child A's attire and matted and messy hair.

The new foster mother also explained the previous foster mother would drive her biological children home from school while requiring that Child B and his brother ride the bus home. The investigator spoke with the principal of Child B's school, and he expressed concerns about Child B's previous foster mother and didn't think she cared for the children as she should have. He said he noticed the foster mother would drive her biological children home from school and make Child B and his brother take the bus.

The allegation of Physical Abuse was Ruled Out. However, the investigation found that the foster parents did not treat the children equally compared to her biological children, and one citation was issued for children's rights.[362]

* * *

DFPS initiated an investigation on December 30, 2021, for Emotional Abuse and Physical Abuse due to allegations that the children were locked in a closet as a form of discipline and that the caregiver did not meet the children's basic needs. One of the children in care, Child B, stated that his former foster mother used to stick her fingers down his throat and make him gag. He stated he threw up one time and the foster mother made him eat his vomit. The foster mother denied all these incidents. She stated Child B and his brother, Child A, would throw up but only from eating too much pizza and rice. She described the boys as having eating disorders and hoarding food. Child A also made an outcry that he was hit and spanked but would not say by whom. Child A said he was choked by the foster mother, and he stated his foster mother threatened him with a knife and said they were going to kill him. Both foster parents denied all these allegations.

The investigator noted that the allegations of the children being locked in the closet and not being provided with food were previously investigated. The allegations of Emotional Abuse and Physical Abuse were Ruled Out. No citations were issued.

* * *

---

[362] As part of this investigation, HHSC also expressed concerns with the foster mother's history of assault charges from 2015 and 2018 as well as a few theft charges.

DFPS initiated an investigation on March 8, 2022, for Physical Abuse, Sexual Abuse, and Physical Neglect due to allegations that the former foster mother subjected a child to physical discipline, locked the children in a bedroom for an unknown period, forced the children to do chores, and failed to meet the child's direct care needs. The investigation notes several of the allegations were previously investigated.

Regarding the allegation of Sexual Abuse, Child B reported that his former foster mother would make him take his clothes off in front of everyone and she would touch his private parts with a fly swatter. Child A did not corroborate Sexual Abuse, and the allegation was Ruled Out.

Regarding the allegation of Physical Neglect, both Child B and Child A reported not being fed and reported the former foster mother would withhold food as punishment. The foster parents denied using food as a discipline technique. Other collaterals interviewed included the children's elementary school principal, the children's CASA, and the therapist, none of whom expressed any concerns that the children were malnourished or not eating. The allegation of Physical Neglect was Ruled Out.

Regarding the allegation of Physical Abuse, both children reported being slapped, hit, punched, pushed, and kicked by the foster parents and forced to eat hot peppers. The children's school principal, therapist, CASA, Attorney Ad Litem, case worker, and case manager did not express any concerns about Physical Abuse. The investigation report notes no evidence of Physical Abuse but did note that both children were consistent in all interviews stating they were hit with the metal part of a belt.

The allegation of Physical Abuse was Ruled Out, and no citations were issued.

* * *

DFPS initiated an investigation on April 20, 2022, for Sexual Abuse due to allegations that now 9-year-old Child B said that in his previous foster home, he did not like therapy because his previous foster mother used to take inappropriate pictures of him and send them to his therapist. He said the therapist then showed him the photos during their session. He would not disclose whether the photos were sexual in nature or whether he was clothed in the photos.

When interviewed, the child reported an incident where the former foster mother threw their clothes outside where the dog could "chew them up." He stated this all happened after a morning football game with the foster mother's brother. The child's brother, Child A, was interviewed and stated no one had ever taken pictures of him without his clothes on, though he did say he did not like the foster mother and stated she was "a bad foster parent." He stated she spanked them.

The foster mother disclosed that they did not have a dog while the boys were at their home except for a very short period when they were fostering a dog. She stated she did take photos of the boys when they were injured and sent them to the caseworkers and

the therapist, but they were never nude in the photos. She also stated the football games were on Friday nights and never in the morning.

The child's CASA worker stated she never received photos of the child, but she did report that the child told her once that the foster mother made him take his clothes off and took pictures of him. The therapist and the Attorney Ad Litem both said they never received nude photos of the child.
The investigator Ruled Out Sexual Abuse and no citations were issued.

According to Class, the home involuntarily closed on October 8, 2021, without deficiencies and with one pending investigation.

On October 13, 2021, DFPS sent a memorandum to the Director of Placement at Caring Hearts for Children CPA notifying the CPA that DFPS disallowed this home from any future placements due to the operation's UTD finding for Physical Abuse. The memorandum also cited the home for failure to meet the basic needs of the children, based on one child sustaining an unexplained serious injury and another child losing significant weight while placed in the home that was regained when the child was removed from the home.

At the time of disallowance, there were no children in the home and the home was closed.

## Disallowed Homes Still Active

### Home V
### Still Active

Home V was first verified under the Waxahachie branch of FaithWorks, Inc., on January 4, 2008. FaithWorks CPA closed on May 10, 2021, and the home was verified by Tomorrow's Children CPA on the same date.

Between 2010 and 2021, this foster home was investigated 15 times for abuse, neglect, or exploitation and five times for standards violations. While operating under FaithWorks, the home was the subject of 13 abuse, neglect, and exploitation investigations. After transferring to Tomorrow's Children CPA, the home was the subject of two more abuse or neglect investigations.

### Abuse, Neglect, and Exploitation Investigations

- DFPS initiated an investigation on June 24, 2010, for Physical Abuse. The intake stated that the foster parents hit a five-year-old child with a shoe. The investigator noted that the CPS caseworker mentioned no concerns regarding inappropriate discipline, but there was an ongoing concern with the foster parents providing the foster child with psychotropic medications without prior consent from CPS. The foster parents denied hitting the child with the shoe. The foster child's brother also denied any knowledge of physical discipline. The foster

child stated that a "ghost" hit her, and the allegation of Physical Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on April 1, 2011, for Physical Abuse due to allegations that the foster mother hit a foster child in the mouth and pulled her hair. When interviewed, the child claimed that for the past 1.5 years, the foster mother has "popped her in the mouth, pulled her hair, and kicked" her. The investigator observed no visible bruises or marks. Two other foster children denied being physically disciplined. The foster parents denied the allegations. Other children in the home and the child's CASA noted that the child often lies. The foster parents denied the use of inappropriate discipline. The allegation of Physical Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on May 11, 2011, for Neglectful Supervision. A 12-year-old child reported that two other foster children (both eight years old) touched her "private parts" and one "tried to rape her with a knife." When interviewed, one of the eight-year-old children told the investigator that the foster mother had told him to tell the investigator that he was asleep and to "not tell their 'business.'" The other child stated that the foster mother told her not to tell the investigator anything. The eight-year-old children told the investigator that the 12-year-old had attempted to "hump" them. The investigator noted that the 12-year-old child had previously exhibited sexualized behaviors, and reviewed a prior incident report concerning the behavior and a Safety Plan that was put in place. The foster parents both stated that they did random bed checks and have monitors, but they were unaware of any inappropriate touching.

  The allegation of Neglectful Supervision was Ruled Out and no citations were issued. The investigator did provide technical assistance to the foster mother for interfering with the investigation by coaching the children on what to tell the investigator.

- DFPS initiated an investigation on May 17, 2012, for Physical Abuse due to allegations that a child in care was inappropriately disciplined by an "unknown caregiver." When interviewed, the child denied that anyone had hit her. Other children in the home denied any abuse occurring in the home. The foster parents stated that another child that had been previously placed in the home had "behavioral issues." They denied that this child had hit anyone in the home, and they told the investigator that "they would not allow anyone to harm their children." The allegation of Physical Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on November 5, 2012, for Physical Abuse due to allegations that the foster mother physically choked a 10-year-old child. When interviewed the child reported the foster mother put her hands on his neck because he was swinging and that she only did this on one occasion. Another child in the home told the investigator that the child had been upset and began kicking the living room table, and the foster mother grabbed the child by the

301

jacket and wrapped the sleeves around him as a form of restraint. He denied seeing the foster mother choke the child. Other children in the home denied being physically disciplined by either foster parent.

The foster mother explained that the child had become upset and became physical, she attempted de-escalation and "guided" him to the couch. She further explained that, after arriving at church, she noticed that the child had something in his mouth, and it appeared as if he may be choking. She told the investigator that the child spit it out, and it was "Halloween fake fangs." She stated that she placed her hand on the back of his neck to help and console him. The foster father denied any physical discipline. The investigator later noted that the child's CPS caseworker informed them that he had recanted his story. The allegation of Physical Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on July 15, 2013, for Sexual Abuse due to allegations that the foster mother sexually abused a 2-year-old foster child when the child was placed in the foster home. The foster child told her grandmother that the foster mother had licked her private area after the grandmother noticed that her private area was "swollen and red... and had discharge." The foster mother denied the allegations and told the investigator that the child "had an allergy to lotions and soaps... [and] would get irritated easily." The caseworker denied having any concerns, as well as the CASA and CPA staff. The investigator noted that the child "had a history of being allergic which caused vaginal itching and other issues." Other children in the home denied any sexual abuse occurring in the home. The allegation of Sexual Abuse was Ruled Out and no citations were issued.

- DFPS initiated an investigation on January 10, 2014, for Neglectful Supervision and Physical Abuse. It was initially alleged that the foster mother hit the child. The investigation revealed that the child was injured and bleeding after being hit by another child. According to the investigator, the foster parents "did not examine the injury, nor did they offer to apply medication." Six of the seven foster children told the investigator that they witnessed an incident during which all the children in the home began hitting the child in front of both foster parents while they sat on the couch. Three of the children stated that the foster mother permitted them to hit the child "because she had been acting out all day - yelling, screaming, calling them names, and hitting them." The investigator acknowledged that "an incident occurred" with both foster parents present, but there were conflicting stories from the foster child about whether the foster parents intervened.

The investigation was closed as UTD for both Neglectful Supervision and Physical Abuse. Two citations were issued: one for discipline and one for supervision, based on the foster mother allowing a child to use corporal punishment on another child and both foster parents failing to intervene while the child was hit.

- DFPS initiated an investigation on April 29, 2014, for Neglectful Supervision, after a 12-year-old child in care reported that she had been "humped" by another child in the home. When interviewed the child victim reported that another child in the home had tried to "hump" her but she would not provide any details on when, how, or where. The foster mother denied this happened and commented that the child victim "always mentioning 'humping.'" All the children interviewed denied any Sexual Abuse. The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

- DFPS initiated an investigation on September 10, 2014, for Neglectful Supervision and Sexual Abuse after a child in care made an outcry that her foster father had sex with her and that her foster brother also had sex with her. The child victim told the investigator that her foster brother touched her private parts with his penis and "did it inside her private part." She explained that he came into her room at night and in the afternoon. She also told the investigator that the foster parents hit her with a fly swatter. She later told investigators conflicting information. During a forensic interview, the child recanted being sexually abused by the foster father. Other children in the home denied any knowledge of sexual activity occurring in the home and denied any physical discipline being used. The foster parents also denied any knowledge of any of the children engaging in sexual activity or physical discipline occurring in the home. The allegations of Sexual Abuse and Neglectful Supervision were Ruled Out, and no citations were issued.

- DFPS initiated an investigation on February 19, 2015, for Physical Abuse, due to allegations that the foster mother wrapped a guitar string around a foster child's finger and pulled on it, resulting in a small cut on her finger. The foster mother told the investigator that, while the child was "having an episode" following a physical altercation at school, the foster mother was trying to get the child to remove the string from her finger so as not to cut off the circulation, and, in that process, the string left a small paper-like cut on the child's finger.

  The child told the investigator that she was twirling the string around her finger when the foster mother told her to stop, so she threw the string across the room. She said that the foster mother got the string and re-wrapped it around her finger and "peeled" her skin off. She also told the investigator that the foster mother grabbed her by the neck and threw her into the car on at least two occasions. She also told the investigator that the foster mother "slapped her across the forehead" after she bit her on one occasion and that the foster mother talks down to her. The foster mother denied all allegations.

  All other foster children in the home denied seeing the foster mother hurt the child with the string. One child reported that he saw the child do it to herself. The CPA Program Manager and the CVS worker both told the investigator that the child tends to lie and make up stories.

  The HHSC Inspector raised concerns regarding the number of investigations and

303

the types of allegations creating a pattern. The CPA staff said that they were aware of the number and type of allegations and stated that most of these were due to being uninformed of the true nature of some children's behaviors because they were "first removal placements" and because others dealt with children being in an intensive level of care. They stated they had no concerns. The allegations of Physical Abuse were Ruled Out, and no citations were issued.

- DFPS initiated an investigation on July 27, 2015, for Neglectful Supervision. A foster child reported to a summer camp counselor that her brother and sister "were doing the nasty." The brother and sister denied the allegation, as well as all foster children in the home and the foster parents. One of the CVS workers told the investigator that she had concerns about the home because the siblings' mental health had declined, she had witnessed the girl's hair not being combed, the foster mother requested the boy's level of care to be raised without sufficient reasoning, and due to the high number of children in the home- foster, biological, and adopted. The foster mother initially refused to allow her adopted child (one of the possible victims) to be interviewed, and she only agreed after the investigator explained the importance.

  The allegation of Neglectful Supervision was Ruled Out, and no citations were issued. Technical Assistance was provided for interfering with an investigation "due to the foster parents denying consent to HHSC and CPS to speak with their biological daughter and then giving consent to CPS but only for five minutes."

- DFPS initiated an investigation on November 21, 2018, for Physical Abuse. Two foster children reported that the foster father slammed their heads against walls and body slammed them. When interviewed, both children denied being hit by the foster parents, though one said the foster parents were mean. One of the other foster children in the home told the investigator that the foster father "tapped" him and their biological child on the head and that this did not hurt. He also reported that on one occasion the foster mother shoved him down and held him; he said this hurt and that he cried. The allegations of Physical Abuse were Ruled Out, and no citations were issued.

- DFPS initiated an investigation on February 26, 2021, for Neglectful Supervision. The intake stated that the child victim told the CVS worker that an unknown individual had touched her. She described him as "maybe Hispanic" and having a cast. The caseworker told the investigator that the child stated in her forensic interview that she had made the outcry in the past, but it had not been reported. The former CVS worker denied having been told about this incident, and she told the investigator that she had concerns about the supervision in the home due to the number of children placed there and "they were not really kind to the kids." The foster mother told the investigator that the child's older brother was the only person in the home at the time who had a cast. She also denied any knowledge of or concerns about the child's older brother touching her inappropriately. The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

304

- DFPS initiated an investigation on September 3, 2021, for Physical Abuse due to allegations that the foster father scratched a foster child's neck. The case was merged with a recently opened case when another foster child told the investigator that the foster father scratched and choked him. He also told the investigator that he saw the foster father do the same thing to the other children in the home. Both foster parents denied using any physical discipline, hitting, or choking any foster child, and the foster mother told the investigator that one of the alleged victims had been restrained at school on multiple occasions. A teacher told the investigator that the child had told him the previous day that he did not know where the scratches and bruises came from. The therapist, case manager, CASA, and LPS worker all denied having any knowledge of the foster father using inappropriate discipline and/or physically abusing the foster child. The allegations of Physical Abuse were Ruled Out, and no citations were issued.

- DFPS initiated an investigation initiated on October 21, 2021, for Physical Abuse. The intake stated that, during an altercation in a subsequent foster home, the foster child claimed that his previous foster mother threw him through a wall, choked him, and made his eyes black and bleed. Other children in the home denied seeing any incident like this, and they denied any physical discipline. Both foster parents denied the allegations, as well as the therapist, case manager, caseworker, and the CASA worker. The therapist told the investigator that the foster child had made up similar stories about the foster home in the past.

  A risk assessment was conducted, which noted a high number of similar investigations with the previous CPA and stated there is "a very concerning pattern of allegations for physical discipline/prohibited punishment and neglectful supervision." The risk assessment concluded that "this home appears to pose a high risk to children in care." The allegation of Physical Abuse was Ruled Out, and no citations were issued.

  No citations were issued across five standards investigations. On July 23, 2021, HHSC conducted a Sampling Inspection, and five sampling concerns were noted related to minimum standards.

### DFPS Disallowance

On February 25, 2022, DFPS notified Tomorrow's Children CPA effective immediately that placement of children in the home was disallowed.[363] DFPS documentation reflects the decision to disallow the home was based on several noted trends and observations:[364]

- Two UTD findings for Physical Abuse.

---

[363] Letter from DFPS Kason Vercher, Director of Residential Contracts to Brenda Shepard, Administrator, Tomorrow's Children Child Placing Agency, re: DFPS Disallowance of Placements in Contractor's Foster Home, February 25, 2022.
[364] Memo from Jacquelyn Robbins, Placement Division, Subject S Foster Home under Tomorrow's Children Child Placing Agency (CPA) Evaluation for Placement Disallowance, December 15, 2021.

- Children reported physical discipline by the foster mother and subsequently recanting when interviewed.
- Children reported being coached by the foster mother ahead of DFPS interviews.
- The children appeared to be fearful of the foster mother.
- The foster father had a minimal presence in the home and his disbelief of the abuse allegations against his wife caused concerns about his ability to be protective of the children in his care.
- Concerns regarding supervision in the home due to multiple outcries of children sexually acting out with one another; and
- Concerns that there appeared to be evidence that corporal punishment was used in the home and that children were coerced or threatened with placement disruption if they discussed what was going on in the foster home. The foster mother also had access to other foster children placed with a relative who provided respite care.

Although the home was placed on the DFPS Disallowance List, the home is still listed as active with Tomorrow's Children CPA in CLASS. IMPACT reflects that a 19-year-old foster child has resided in the foster home since November 2018 and has chosen to remain in the home in Extended Care. No other children have been placed in the home since the home was placed on the DFPS Disallowance List.

Home W
Still Active

Six different CPAs have verified Home W over approximately 19 years. This foster home was first verified on November 12, 2002, by DFPS Region 6, which relinquished verification on November 6, 2006, with no reason noted. Trinity Foster Care next verified the home on November 7, 2006. The foster home relinquished this verification and changed CPAs on December 21, 2016. Beginning December 22, 2016, Houston Serenity Place CPA verified this home until it was relinquished on December 22, 2018, to change CPAs.

This foster home was verified a fourth time on December 23, 2018, by Houston Serenity Place Guardians' Promise, LLC. After 25 months, on January 16, 2020, verification was relinquished, and the CPA changed to the Grandberry Intervention Foundation, Inc. On March 10, 2022, the foster home was relinquished and closed as "involuntary closed due to deficiencies." The foster home had one pending investigation at the time of closure. Houston Strong Children Services CPA (Houston Strong) then verified this home on October 3, 2022. According to CLASS, this home started the Houston Strong verification process on February 15, 2022, approximately 30 days before the involuntary closure by Grandberry Intervention. This home is currently active with Houston Strong.

Over the 20 years that it operated, Home W has been the subject of nine abuse, neglect, or exploitation investigations and eight investigations for minimum standards violations.

## Abuse, Neglect, and Exploitation Investigations

DFPS initiated an investigation on March 6, 2007, for Physical Abuse and Neglectful Supervision after a 17-year-old foster child made an outcry that the foster father hit him and failed to intervene in an altercation between the 17-year-old and another child in the home. All children interviewed reported the foster father allowed the two boys to fight. The foster father denied the allegation and said he separated the boys to prevent them from fighting; however, he did not comment on hitting the foster child. The 17-year-old sustained a black eye from the altercation and reported the foster father told him not to tell how he got the black eye. It is unclear whether medical attention was provided after the incident, but the school nurse and assistant principal both observed the 17-year-old with a black eye.

The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision. One citation for employee general responsibilities was issued due to the foster father "encouraging the children to fight" and failure to intervene during the fight.

* * *

DFPS initiated an investigation on August 22, 2008, for Physical Abuse after a seven-year-old foster child made an outcry that the foster father hits him. When interviewed, the seven-year-old and five older foster children denied the allegations of physical discipline being used in the home. No bruises or marks were observed on the children. The inspector observed that the foster father was physically handicapped and appeared to have a limited range of motion. The investigator Ruled Out the allegation of Physical Abuse. No citations were issued.

* * *

DFPS initiated an investigation on August 13, 2011, for Neglectful Supervision after a 16-year-old foster child made an outcry that the foster father hit him and told other foster children to "jump" him. All six foster children interviewed, including the 16-year-old, denied the allegations of physical discipline and reported the children were engaged in "horseplay" when the injuries occurred. The 16-year-fractured his arm by hitting the bedpost and the other foster child, age 17, lost his tooth falling while running in the home. The foster father's statements were consistent with the children's interviews regarding the events. The 16-year-old also made an outcry that they "always" must massage the foster father's legs, but he recanted this statement during the interview. Two caseworkers were interviewed and reported knowledge of the injuries and no concerns with the home. The 17-year-old reported going to the dentist but there was no medical documentation from the visit. One citation was issued for general medical requirements. The investigator Ruled Out the allegation of Neglectful Supervision.

* * *

DFPS initiated an investigation on December 5, 2013, for Physical Abuse after a 16-year-old foster child made an outcry that the foster father hit him with a cane. The 16-year-

old reported multiple incidents of abuse by the foster father such as being hit with a bat and a walking cane, being choked, being told "a dildo would be stuck up his butt," and that "he would never be nothing." Five other foster children interviewed denied all allegations of abuse. The foster father also denied allegations of using any physical discipline and reported the 16-year-old was his "only problem child" placed in his home. The investigator Ruled Out Physical Abuse. One citation was issued for the initial service plan not having discipline instructions listed.

\* \* \*

DFPS initiated an investigation on June 24, 2016, for Physical Abuse and Neglectful Supervision after a 17-year-old foster child made an outcry that the foster father was verbally abusive and allowed his 27- and 28-year-old adult children to "whoop" the foster children. Five foster children in the home, including the 17-year-old denied the allegations and reported physical discipline is not used by the foster father or his adult children. The foster father also denied the allegations and reported providing adequate supervision to the children. He reported the two adult children no longer reside in the home and that there is a restraining order on one of them for a past incident. The three current caregivers, who are former foster children, denied the use of physical discipline by anyone in the home. During the intake, the reporter stated she believed the "boys are afraid of the foster parent and adult children" and have been "brainwashed." The investigator Ruled Out Physical Abuse and Neglectful Supervision. No citations were issued.

\* \* \*

DFPS initiated an investigation on November 22, 2017, for Physical and Sexual abuse after two 16-year-old foster children made an outcry that the foster father touched them inappropriately and threw objects at them. The two children also reported not eating and being forced to empty the foster father's urine tube.

One of the 16-year-olds denied not having food to eat and being inappropriately touched by the foster father. He initially stated he has had to "dump urine in the toilet" for the foster father, but later recanted the statement. The other 16-year-old also recanted the outcry about being inappropriately touched by the foster father. He reported being hit by the foster father and made to massage his legs which made him feel "uncomfortable."

Four other foster children denied being inappropriately touched by the foster father. Three children reported massaging the foster father's legs voluntarily, not as a punishment. One child also reported helping empty the urine bag.

The foster father denied allegations of inappropriate touching and physical discipline. He reported having a muscle condition and said that some of the children have helped him massage his legs, but it was not "sexual." There was an incident when he had a urinal bag, but he denied asking the children to help with it. Three caseworkers interviewed reported no concerns with the home.

The investigator Ruled Out physical and Sexual Abuse noting that the two 16-year-old foster children were inconsistent in their reports. The investigator found that the home screening information revealed the foster father's limitations did not prevent him from providing adequate care. No citations were issued.

* * *

DFPS initiated an investigation on August 30, 2019, for Physical Abuse and Sexual Abuse after a foster child made an outcry that the foster father hit him in his mouth and on the back of his head. The 17-year-old foster child reported being hit with a bat and a board by the foster father. The foster child reported the foster father used his condition as "an excuse for physical discipline," and that the foster father touched his private area. He stated he felt "threatened" and unsafe in the home. Six other foster children denied the use of physical discipline and inappropriate touch. The foster father denied all the allegations. The CPA's Case Manager reported the 17-year-old had a history of making false allegations. The foster home's investigation history was reviewed, and a risk assessment was conducted. No bruises were observed on the children. The investigator Ruled Out Physical Abuse and Sexual Abuse. No citations were issued.

* * *

DFPS initiated an investigation on December 23, 2021, for Physical Abuse and Neglectful Supervision after a 15-year-old foster child made an outcry that another foster child hit him in the eye during a fight. The 15-year-old reported playing basketball and being hit in the eye with an elbow by another child in the home.

During a second interview that took place at school, the investigator described the child as being more forthcoming and willing to speak. The 15-year-old reported the injury was a result of a fight and that the foster father did not intervene. The child reported he was prevented from going to school because of "the severity of his black eye," and the foster father did not want to be reported. The 15-year-old reported feeling unsafe in the home because the foster father hit him in the head with a paddle, made him do squats as punishment, and said he was "verbally and physically assaulted" by the foster children and the foster parent's adult child at the foster father's request. The 15-year-old stated "living in the home has been hell" since the investigation due to retaliation.

A ten-year-old, who used to live in the home reported being physically disciplined by being "pinched" on the ears, being hit, and being forced to do squats for punishment. The ten-year-old reported the foster father had a gun in his room, would hit him in the bedroom behind closed doors, and tell the children not to tell others about what happened in the house. He stated he believed the other children "were too afraid" to speak out about the events.

Including the alleged victim, investigators interviewed eight foster children in the home. Two children, ages 14 and 11, reported the black eye being a result of a basketball game and denied physical discipline. The investigator described the 14-year-old child as "defensive" during the interview. During follow-up interviews conducted at the school,

these children later reported the black eye came from a fight and that they "lied" to prevent the 15-year-old from getting into trouble. Two out of eight children interviewed reported physical discipline being used.

The investigator made a report to SWI on February 28, 2022, regarding the weapons allegation, and this intake was administratively closed on March 10, 2022.

The investigator Ruled Out Physical Abuse and Neglectful Supervision, noting there was no consistency in the allegations of physical discipline. Four citations were issued, including a citation related to the foster father allowing a caregiver with a provisional status to care for the children alone; a citation for inconsistent incident reports explaining a child's injury a signature on the incident reports that did not match the foster parent's signature on the safety plans; a citation related to the foster father making the children write "100 to 400" paragraphs as a form of discipline; and a citation related to the physical environment for the home found to be "unclean, cluttered, with trash and clothes on the floors."

This investigation was re-opened after the Monitors disagreed with the outcome of the DFPS investigation in the Fifth Report, finding it should have resulted in a substantiated finding for Neglectful Supervision. DFPS agreed, and a new disposition was entered in February 2023.

* * *

DFPS initiated an investigation on December 12, 2022, for Neglectful Supervision. A 17-year-old child in care reported to his caseworker that he blacked out in his room, he was drugged and woke up with bruises, and he had been "jumped" by a child in the home. When the 17-year-old was interviewed, he reported he did not remember what happened but said another child in the home beat him up with a group of his friends. The child was taken to the hospital for examination and drug testing, and the drug test results showed no evidence of drugs in the child's system. Further, the physical examination found there was no sign of injury. The hospital's final diagnosis was "confusion." The investigator confirmed that the child who was alleged to have beaten the 17-year-old was not home during the timeframe of the alleged assault. The other children in the home reported no knowledge of the altercations. The foster father also denied any knowledge of an incident between the two boys. Neglectful Supervision was Ruled Out and no citations issued.

## Standards Investigations

This home was investigated eight times for minimum standards violations. Two investigations resulted in the foster home being issued citations for violation of a minimum standard associated with the physical environment, because the home was found to be in general disrepair, and two citations associated with violation of minimum standards for medication records and administration of medication.

The home was also the subject of three sampling inspections from September 2007 through July 18, 2018. Inspectors noted concerns during the September 28, 2007, inspection related to the fire extinguisher, smoker detectors, and background checks.

## HHSC Closure Recommendation and DFPS Disallowance List

Before the HHSC Closure Recommendation approval, DFPS placed this foster home on the agency's September 23, 2022, Disallowance List with an effective date of March 15, 2022. DFPS issued a Disallowance Letter to The Grandberry Intervention Foundation on September 7, 2022. The letter informed the Foundation that this foster home was being disallowed for any future placement of children in the care of DFPS because of standard violations associated with the physical environment and employee responsibilities. The letter also noted that the foster parent had "proven uncooperative with HHSC CCL" and had a pattern of allegations for Neglectful Supervision. The letter also acknowledged that this CPA closed the home due to deficiencies.

The home has remained on the Disallowance list since September 23, 2022. The home was verified under a different CPA, Houston Strong, on October 3, 2022. At the time of the March 10, 2022, closure, one child remained in the home as an "unauthorized placement." According to a contact note in IMPACT, following an emergency hearing, a court ordered that the child remain in the home though the caseworker documented that the child was "not doing well in the home or at school." Another child was court ordered to remain in the placement in February 2023, after DFPS substantiated Neglectful Supervision. The foster parent is in the process of adopting one of the children.

## Closure of Congregate Care Operations and Child Placing Agencies

During the period between January 1, 2022, and December 31, 2022, one operation closed due to denial of a license.

## Bethel Residential Treatment Center (1718606)
## Full Permit Denied, August 12, 2022

Bethel Residential Treatment Center (Bethel RTC) received an initial permit on July 30, 2021, and renewed the initial permit on January 28, 2022. On May 4, 2022, HHSC issued a letter to Bethel RTC, warning the operation that an enforcement action may be imposed if there was no improvement in the operation's compliance history.

On August 12, 2022, HHSC denied Bethel RTC's permit application, citing 44 standards citations, along with a Reason to Believe finding for Neglectful Supervision. The letter provides:

The permit holder does not demonstrate an ability to comply with the Minimum Standards, rules, and law. A total of 44 deficiencies have been cited since the initial permit was issued. Repeated citations in the areas of personnel and administration demonstrate a lack of understanding, unwillingness, or inability to comply with the

minimum standards. The operation has maintained a maximum of 3 children in care at a time. With a low census of children, the permit holder should be able to implement Minimum Standards and maintain proper compliance.[365]

Bethel exhausted all appeals, and HHSC issued a letter[366] on March 8, 2023, to the operation's owner advising that the decision to deny a permit was final and that an application for another permit may not occur for five years after the date of the effect of the adverse action.

## Abuse, Neglect, and Exploitation Investigations

In 2021 and 2022, Bethel RTC was the subject of nine ANE investigations with one resulting in a substantiated finding against the operation's CEO for Neglectful Supervision:

On January 29, 2022, SWI received a report from law enforcement alleging an altercation between three children, ages 13, 15, and 16, resulting in the police being called and injury to the 13-year-old child.

A 13-year-old child walked away from the operations because she did not want to go skating. The CEO and another caregiver transported the other four children in a van to locate the 13-year-old child. When the 13-year-old was located, two girls, ages 15 and 16, got out of the van and a fight ensued between the three girls. The caregiver got out of the car and attempted to stop the fight between the girls; however, she was unsuccessful in stopping the fight. The CEO remained in the vehicle and watched the fight and yelled out the window for the girls to stop fighting.

The investigation concluded with the issuance of an RTB to the CEO of the operation for Neglectful Supervision of two children when she failed to intervene in the altercation and both children received injuries of bruises and scratches to their arms and face. Two citations were also issued one for Caregiver Responsibility - failing to intervene in the situation to ensure child safety, and one for children's rights.

After the investigation, the Centralized Background Check Unit (CBCU) imposed a condition on the CEO that she may not be alone with children.

## Standards Citations

Since receiving its initial permit, Bethel received 44 standards citations: 14 high-weighted, 8 medium-high-weighted, 17 medium-weighted, and five medium-low weighted. Areas of citation included:

- **EBI**: failure to ensure caregivers have EBI training before counting in ratio.

---

[365] August 12, 2022, letter from HHSC to Bethel RTC ----
[366] Letter from Heather Bradley, HHSC Program Specialist to Osagie Isimemsh, Bethel Residential Treatment Center, Final Adverse Action (March 8, 2023) (on file with the Monitors)

- **Supervision**: failing to intervene when necessary to ensure child's safety, failure to provide the level of supervision necessary to ensure each child's safety and well-being, failure to be aware of and accountable for each child's on-going activity

- **Administration**: failure to maintain current, true, accurate, and complete records; failure to maintain annual summary log, failure to report serious incidents to licensing, failure to implement and follow child service plans, failure to obtain notarized Licensing Affidavit for Applicants for Employment, failure to maintain records of TB screening for employees, failure to obtain fire inspection, failure to obtain a gas inspection, failure to maintain record of training and training hours, failure to obtain drug testing for applicants

- **Personnel**: the most cited area of concern during the review period, 16 citations and 8 of them directly related to supervision.

No children have been placed at the operation since the notice of denial on August 12, 2022.

## Summary of Remedial Order 21

In 2022, HHSC recommended 13 agency homes for closure. HHSC leadership denied one closure recommendation, one operation was approved for recommended closure but was not closed by the CPA. One home recommended for closure was closed, but then re-verified and re-opened by another CPA, and then approved for closure a second time by HHSC, then ultimately closed by the CPA. HHSC also denied one operation license for a history of lack of compliance with minimum standards.

In addition, to the HHSC closure recommendations, DFPS placed 13 foster homes on a list of disallowed placements in 2022. One of the disallowed homes was closed by the CPA. The home was then verified under a different CPA, though the home remained on the DFPS Disallowance List. Two children remain in the home as court-ordered placements.

# List of Tables

Table 1: Race for Children in PMC on December 31, 2022, and Estimates of Total Child Population in Texas by Race, August 12, 2021¹ ................................................................................ 27
Table 2: Living Arrangement by Race, Children in PMC on December 31, 2022 ...................... 28
Table 3: Living Arrangement for Children in PMC on December 31, 2019, and December 31, 2022 .................................................................................................................................. 29
Table 4: Length of Stay in Care of Children in PMC on December 31, 2019 ................................31
Table 5: Exits from PMC by Exit Outcome between July 1 and December 31, 2022 ...................31
Table 6: Out of State Living Arrangement Type for Children in PMC, June 30, 2022, and December 31, 2022 ............................................................................................................ 32
Table 7: Children in PMC Placed Out of State by Race on December 31, 2022 ......................... 32
Table 8: Out of State Living Arrangement Type for Children in PMC, December 31, 2019, and December 31, 2022 ............................................................................................................ 33
Table 9: Authorized Level of Care for Children in PMC as Reported by DFPS as of December 31, 2022 .................................................................................................................................. 34
Table 10: Top Five Counties of Removal for Children in PMC on December 31, 2022 ............... 34
Table 11: Children in PMC by Regions on December 31, 2022 ................................................... 35
Table 12: Children in PMC from Regions with Single Source Continuum Contractor Presence by Region on December 31, 2022 ......................................................................................... 35
Table 13: Number of Placements for PMC Children by Sexual Indicator Type, January to December 2022 ................................................................................................................. 38
Table 14: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, January to December 2022 ................................................................................................................. 39
Table 15: Child Sexual Abuse Training Completion by Caseworker Type, ................................. 42
Table 16: Site Visit Data Collection, January to December 2022 ............................................... 68
Table 17: Number of Operation Locations Requiring Awake-Night Supervision, January 1 to December 31, 2022 ...........................................................................................................75
Table 18: Operations with a Deficiency Cited for FTR Abuse/Neglect, 2022 ...........................136
Table 19: Priority of RCCR Investigations, January 1, 2022, to November 30, 2022 ................145
Table 20: Status of Heightened Monitoring Operations Starting HM 2020 – 2022 .................156
Table 21: Number of Enforcement Actions Starting 2017 – 2021 ............................................158
Table 22: Operations with a Contract Violation and Number of Violations in ..........................182
Table 23: Operations with Multiple Enforcement Actions Taken in ..........................................185
Table 24: Investigations Opened for Abuse, Neglect, and Exploitation .....................................193
Table 25: Number of ANE Investigations Opened in 5 Months Before and After Heightened Monitoring Notification by Operation .............................................................................194
Table 26: Number of Deficiency Citations Five Months Before and After Heightened Monitoring Notification by Operation .................................................................................................197
Table 27: Administrative Review Decision of Overturned by Heighted Monitoring Status at the Time of the Citation, 2020 to 2022 ..................................................................................218
Table 28: Operations Placed on Heightened Monitoring in 2020 in Plan in Effect Stage as of March 1, 2023, Deficiencies, ANE Investigations, RTB Findings, and Enforcement Actions While on Heightened Monitoring ...................................................................................... 223

# List of Figures

Figure 1: Age of Children in PMC on December 31, 2022 .......................................... 26
Figure 2: Living Arrangements for Children in PMC on December 31, 2022 ............................. 28
Figure 3: Length of Stay in Care of Children in PMC on December 31, 2022 ............................. 30
Figure 4: Children in PMC Placement with a Sexual Characteristic Flag (Aggressor or Victim), December 31, 2021, to December 31, 2022 ...................................................................... 36
Figure 5: Timing of Sexual Abuse, PMC Children with Confirmed Sexual Abuse ...................... 48
Figure 6: Number of Incidents of Sexual Abuse While in Care, PMC Children with Confirmed Sexual Abuse in Care....................................................................................................... 49
Figure 7: Location of Sexual Abuse While in Care Incidents for PMC Children with Confirmed Sexual Abuse in Care....................................................................................................... 50
Figure 8: Perpetrators Identified in Sexual Abuse Incidents Occurring While in Care for PMC Children with Confirmed Sexual Abuse in Care ...................................................................51
Figure 9: Sexual Abuse Incident Documented in DFPS Child Perpetrator's Sexual Incident History ................................................................................................................................. 52
Figure 10: Timing of Sexual Aggression for PMC Children with Confirmed Sexual Aggression . 53
Figure 11: Number of Sexual Aggression Incidents While in Care, PMC Children with Confirmed Sexual Aggression in Care.............................................................................................. 54
Figure 12: Location of Sexual Aggression While in Care Incidents, PMC Children with Confirmed Sexual Aggression in Care..............................................................................................55
Figure 13: Sexual Aggression Incident Documented in DFPS Child Victim's Sexual Incident History ................................................................................................................................. 56
Figure 14: Sexual Abuse History of Children Sampled as Sexual Aggressors ............................. 56
Figure 15: Timing of Abuse for Children with Confirmed Abuse Sampled as Sexual Aggressors .57
Figure 16: Completeness of Sexual History Information on the Common Application ............... 60
Figure 17: Both Attachment A and Placement Summary Found by Time Period ........................61
Figure 18: Percent of Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature on or Before Placement Start ................................. 63
Figure 19: Records with Placement Summary and Attachment A Forms .................................... 64
Figure 20: Records with Placement Summary and Attachment A Forms with Complete History and Caregiver Signature on or Before Placement Start by Placement Entity ............................. 65
Figure 21: Timing from Date Caregiver Signed Attachment A to Date Caseworker Indicated Caregiver Signed in IMPACT ..................................................................................... 66
Figure 22: Records with Attachment A Found, Signed, and Includes Complete History for Hospital and Juvenile Justice Placements .............................................................................. 66
Figure 23: Forms Found and Signed in Children's Site Records, 2022 ....................................... 69
Figure 24: Program Administrators Reporting They Receive Proper Notice of Children with Sexual Characteristics Prior to or at Entry ............................................................................ 71
Figure 25: Direct Care Staff Asked to Sign Attachment A for Children with Sexual History....... 72
Figure 26: Documents Direct Care Staff Report Receiving When Supervising a Child for the First Time .................................................................................................................................. 72
Figure 27: Direct Care Staff Informed if a Child They Supervise is a Victim of Sexual Abuse or is Sexually Aggressive ..........................................................................................................73
Figure 28: Number of Operation Locations Requiring Awake-Night Supervision Visited, January 1 to December 31, 2022............................................................................................................ 76

Figure 29: Months with Visits to Operation Locations When Required, January 1 to December 31, 2022 ................................................................................................................................. 77

Figure 30: Awake-Night Certification Visits, January 1 to December 31, 2022 ........................... 78

Figure 31: Reports of Noncompliance with 24-Hour Awake-Night Supervision Requirements, January to November 2021 and 2022 ..................................................................................... 80

Figure 32: Actions Taken Due to Noncompliance with Requirements of 24-Hour Awake-Night Supervision, January to November 2022 .............................................................................. 81

Figure 33: Deficiencies for Standards Reviewed by Monitors for Issues Related to Awake-Night Supervision, January to November 2022 .............................................................................. 85

Figure 34: Priority Level of HHSC Investigations ...................................................................... 98

Figure 35: Monitoring Team Agreement with Priority Level Assignment of HHSC Investigations ................................................................................................................................................ 99

Figure 36: Monitoring Team Agreement with Assigned Priority Level of HHSC Investigations by Priority Level .................................................................................................................. 100

Figure 37: HHSC Investigations Considered Deficient by The Monitoring Team .................... 109

Figure 38: Number of Inspections Sampled by Inspection Type, 2022 ...................................... 112

Figure 39: Investigation Inspections Sampled by Type, 2022 .................................................... 113

Figure 40: Days from ECHR Completion Data to Inspection Begin Date for Inspections with an ECHR, 2022 ...................................................................................................................... 114

Figure 41: Timing of ECHR by Sample Period, 2022 ................................................................ 115

Figure 42: Comparison of ANE/Corporal Punishment Data Found in ECHRs and State Aggregate Data as of the First Day of the Month, 2022 .................................................................... 116

Figure 43: Number of ANE Intakes, Findings, and Corporal Punishment Citations Reported in ECHRs, 2022 .................................................................................................................... 117

Figure 44: Investigation and Monitoring Inspections .............................................................. 118

Figure 45: Items Discussed in the ECHR Assessment of Risk, 2022 ......................................... 119

Figure 46: Investigation and Monitoring Inspections .............................................................. 120

Figure 47: Foster Home History Discussed in ECHR, 2022 ...................................................... 121

Figure 48: Investigation and Monitoring Inspections .............................................................. 122

Figure 49: Inspector Documented No Safety Risk in ECHR Assessment of History, 2022 ........ 123

Figure 50: Inspector Documented No Safety Risk in ECHR Assessment of History and Number of Confirmed ANE Findings, 2022 ..................................................................................... 124

Figure 51: Inspector Documented No Safety Risk Present in ECHR Assessment of History by Inspection Type, 2022 ...................................................................................................... 125

Figure 52: Monitoring Team Assessment of Safety Risk at the Time of Inspection, 2022 ......... 126

Figure 53: Investigation and Monitoring Inspections .............................................................. 127

Figure 54: Monitoring Team Determined Inspector Documented Consideration of History During Inspection, 2022 ............................................................................................................. 130

Figure 55: Inspectors' Consideration of Operation and Foster Home ...................................... 131

Figure 56: Number of Deficiencies Cited for Failure to Report ANE ....................................... 134

Figure 57: Deficiencies Cited for Failure to Report ANE by Type of Monitoring ..................... 135

Figure 58: Deficiencies Cited for Failure to Report ANE by Standard Type, CY 2022 .............. 136

Figure 59: Staff Report Who They Would First Report Allegations of Abuse and Neglect To .... 138

Figure 60: Citations Associated with Child-on-Child Abuse .................................................... 139

Figure 61: Timeliness of Face-to-Face Contact with Alleged Child Victims in Priority Two HHSC Investigations ................................................................................................................... 146

Figure 62: Completion of Priority One and Two Investigations within 30 Days ....................... 147

Figure 63: Completion of Priority Three, Four, and Five Investigations ................................... 148

Figure 64: Completion of Documentation in Priority One and Priority Two Investigations ......149
Figure 65: Completion of Documentation within 60 Days of Intake in .....................................150
Figure 66: Notification Letters Sent within Five Days of Investigation Completion in Priority One and Two Investigations ....................................................................................................... 151
Figure 67: Notification Letters Sent within 60 Days of Intake in.............................................152
Figure 68: Overview of Operations Qualifying for and ............................................................155
Figure 69: Problem Areas Identified in Heightened Monitoring Plans ....................................159
Figure 70: Number of Problem Areas Per Operation ............................................................... 160
Figure 71: Number of Plan Tasks for Operations on Heightened Monitoring ..........................161
Figure 72: Operation Task Problem Areas ...............................................................................162
Figure 73: How Heightened Monitoring Tasks Will Be Accomplished .....................................163
Figure 74: Task Characteristics as Identified by Monitor's Staff for Operations Placed on Heightened Monitoring in 2020-2022........................................................................................164
Figure 75: Legal Status of Children with Placement Requests to Heightened Monitoring Operations, Calendar Year 2022 ...............................................................................................165
Figure 76: Number of Heightened Monitoring Placement Requests by Month, Calendar Year 2022 ...........................................................................................................................................166
Figure 77: Number of Placements of PMC Children at Operations Under Heightened Monitoring by Month, Calendar Year 2022.................................................................................................167
Figure 78: Placements of PMC Children at Heightened Monitoring Operations by Approval Status, Calendar Year 2022 .....................................................................................................167
Figure 79: Timing of Approval in IMPACT for Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2022 .............................................................................168
Figure 80: Information Included in Heightened Monitoring Placement Request for Approved Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2022 .......169
Figure 81: Documentation of Approver's Justification for Placement and Review of Operation's Five-Year History in Heightened Monitoring Placement Request for Approved PMC Placements, Calendar Year 2022 ..................................................................................................................170
Figure 82: Percent of Approved Placements of PMC Children at Heightened Monitoring Operations Containing the Required Documentation by Month, Calendar Year 2022 ..............173
Figure 83: Heightened Monitoring Cohort Year for Operations with a Quarterly Report in 2022 ...................................................................................................................................................175
Figure 84: Number of Quarterly Reports for Operations on Heightened Monitoring in 2022 ..175
Figure 85: Status on Heightened Monitoring for Operations with a Quarterly Report in 2022 176
Figure 86: Heightened Monitoring Team's Determination of Compliance with Plan Tasks in Quarterly Reports ....................................................................................................................178
Figure 87: Heightened Monitoring Team's Determination of Compliance with Plan Tasks by Operation Status ......................................................................................................................179
Figure 88: Deficiencies Related to Heightened Monitoring Cited During the Quarter as Reported on the Quarterly Report................................................................................................................ 180
Figure 89: Average Number of Deficiencies Cited in Quarterly Reports by Status on Heightened Monitoring .................................................................................................................................181
Figure 90: Average Number of Deficiencies Cited in Quarter Five to Quarter Eight of Heightened Monitoring .................................................................................................................................181
Figure 91: Number of Quarters Operations had Contract Violations in 2022 ...........................182
Figure 92: Operations on Heightened Monitoring with Enforcement Actions Identified in Quarterly Reports ....................................................................................................................184
Figure 93: Type of Enforcement Action Identified in Quarterly Reports ...................................185

Figure 94: Percent of Quarterly Reports with an Enforcement Action by Quarter.....................186
Figure 95: Comparison of Information in Quarterly Reports and Other Heightened Monitoring Documents for the Quarter............................................................................................187
Figure 96: Deficiencies Cited by Quarter for Operations in 2021 Quarterly Report Analysis with Four Quarterly Reports in 2022 .......................................................................... 188
Figure 97: Plan Task Compliance Rate by Quarter for Operations in 2021 Quarterly Report Analysis with Four Quarterly Reports in 2022............................................................ 188
Figure 98: Request for Waiver/Variance Decision by Heightened Monitoring Status.............. 190
Figure 99: Reason Waiver/Variance Request was Denied for Operations on Heightened Monitoring ...................................................................................................................... 190
Figure 100: Standard Categories for Granted Variance Requests for Operations on Heightened Monitoring in 2022...................................................................................................... 191
Figure 101: Number of ANE Investigations Opened Five Months Prior to and After Heightened Monitoring Notification,.................................................................................................194
Figure 102: Allegation Type for Investigations Opened in 5 Months Before and After Heightened Monitoring Notification....................................................................................................195
Figure 103: Number of Minimum Standards Deficiency Citations Five Months Prior to and After Heightened Monitoring Notification, Operations Placed on Heightened Monitoring in 2022 ..196
Figure 104: Minimum Standards Deficiencies Five Months Before and After Heightened Monitoring Notification by Weight, Operations Placed on Heightened Monitoring in 2022 ....198
Figure 105: Inspection, Assessment, and Investigation Related Deficiencies Five Months Before and After Heightened Monitoring Notification, Operations Placed on Heightened Monitoring in 2022 ................................................................................................................................199
Figure 106: Number of ANE Investigations Opened While on Heightened Monitoring, All Active Operations as of March 1, 2023 ...................................................................................200
Figure 107: Rate of ANE Investigations Opened, Operations Active as of March 1, 2023..........201
Figure 108: Operations Active as of March 1, 2023, with More ANE Investigations Opened in 2022 than in 2021 .................................................................................................................... 202
Figure 109: RTB Findings While on Heightened Monitoring by Year, Operations Active as of March 1, 2023 ....................................................................................................................... 203
Figure 110: Rate of RTB Findings While on Heightened Monitoring by Year, Operations Active as of March 1, 2023 ................................................................................................................ 204
Figure 111: Number of Minimum Standards Deficiencies Cited While on Heightened Monitoring, Operations Placed on Heightened Monitoring in 2020 and 2021 with Plan in Effect as of March 1, 2023 ...................................................................................................................... 205
Figure 112: Rate of Minimum Standards Deficiencies Cited While on Heightened Monitoring, Operations Placed on Heightened Monitoring in 2020 and 2021 with Plan in Effect as of March 1, 2023 ...................................................................................................................... 206
Figure 113: Number of ANE Investigations Opened While on Heightened Monitoring, Operations That Moved to Post-Plan Monitoring as of March 1, 2023 .................................... 207
Figure 114: Number of RTB Findings for Operations That Moved to Post-Plan Monitoring as of March 1, 2023 .................................................................................................................210
Figure 115: Number of Minimum Standards Cited, Operations Moving to Post-Plan Monitoring as of March 1, 2023................................................................................................................212
Figure 116: Minimum Standards Deficiencies by Weight Six Months Prior to and During Post-Plan Monitoring.....................................................................................................................213
Figure 117: Percent of Deficiency Citations with a Request for Administrative Review by Year 216

Figure 118: Percent of Deficiency Findings Overturned in an Administrative Review Decision, 2019 to 2022 .................................................................................................................. 216

Figure 119: Percent of Deficiencies with Administrative Review Requested by Heightened Monitoring Status at the time of the Citation, 2020 to 2022 ...................................................... 217