IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, *et al.*, | § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, | § § § § § | |
| *Defendants*. | § | |

**DEFENDANTS' OBJECTIONS TO THE MONITORS' JUNE 2023 REPORTS**

Defendants respectfully submit the following objections to the Monitors' Sixth Report [Dkt. 1380] and Update to the Court regarding Remedial Order 35 Caseload Performance [Dkt. 1379]. Fed. R. Civ. P. 53(f)(2). Defendants are dedicated to safeguarding the children in their care, committed to working with the Monitors to demonstrate substantial compliance with the Court's Remedial Orders, and understand the importance of complete and accurate reports from the Monitors in that process.

OBJECTIONS TO THE MONITORS' SIXTH REPORT

- Page 13; Page 228, Footnote 299; and Court's Exhibit 6 [Dkt. 1384]: "The State sent the Monitors guidance that it released on June 9, 2023. The guidance indicates that when the State is making determinations about whether an operation has had six-months of successive compliance, it post-dates any citations issued to the date that the intake was received for the investigation. This approach is inconsistent with HHSC's own practice. When HHSC issues a

1

citation, it sets a compliance date for the minimum standard cited. The compliance date is most often in the future, though in some cases, it can be the day the citation was issued. In other words, the operation is out-of-compliance the day the citation is issued—not the day the report was made to SWI."

> **Objection:** This guidance was a draft document shared with the Monitors for their input. Each page has a watermark "DRAFT" label and the heading "COMMUNITY OF INTEREST PRIVILEGED COMMUNICATIONS." Dkt. 1384 at 11–18. It hasn't been released for implementation, and Defendants remain open to discussing the guidance with the Monitors, including how Defendants have been and will be determining six months of compliance.
>
> Defendants deny that they engage in back-dating citations to intake dates; rather, an intake date may be considered in the holistic analysis of the current risk to and safety of the children.

- Page 13: "The State's guidance indicates that it does not look to the most recent six-month period that the operation is on Heightened Monitoring for determining whether it has achieved six successive months without receiving a citation for noncompliance with a standard associated with a pattern identified in the operation's Heightened Monitoring Plan. Rather, the State looks back over the year that the operation was on Heightened Monitoring to determine whether any successive six-month period can be identified during which the operation did not receive a citation associated with the pattern or trend that led to its placement on Heightened Monitoring. Therefore, an operation may be issued more than one citation related to the problems that led to Heightened Monitoring in the last six months of Heightened Monitoring and still be moved to post plan monitoring if there was an earlier six-month period without a citation."

  > **Objection:** It isn't a new practice to consider a successive six-month compliance period in evaluating an operation's readiness to enter Post-Plan Monitoring. This practice has been in place since 2021 and disclosed (including identifying the qualifying period and assessment) to the Monitors in the operations' plans, Facility Intervention Team Staffing (FITS) notes, IMPACT, and the CLASS system.
  >
  > The Monitors have previously agreed with Defendants placing operations on Post-Plan Monitoring by considering a six-month successive compliance period. During the June 6, 2022 status conference, the Court commented on the Monitors' agreement with 22 facilities being placed on Post-Plan Monitoring based on this method.[1] The Court also remarked that operations

---

[1] June 6, 2022, Hearing Transcript Pg. 95, lines 13–15: "And I think the Monitors agreed with your evaluation of the 22 facilities that were placed on post-planned monitoring."

2

> on Heightened Monitoring were making vast improvements, indicative of "how this [Heightened Monitoring] was working."[2]

- Pages 15 and 20: "Finally, this Sixth Report identifies problems with HHSC minimum standards investigations that affect all the remedial orders related to the State's regulatory monitoring and oversight of licensed placements. These investigations are an essential accountability mechanism to monitor operations' compliance with State regulations, many of which go to the heart of child safety. The outcomes of these investigations can determine whether an operation should be subject to Heightened Monitoring by the State due to risks to child safety, as set forth in Remedial Order 20. The monitoring team's case record review found 25% (70 of 285) of these HHSC investigations so deficient that the appropriate outcome could not be determined or disagreed with the outcome based on the collected evidence."

   **Objection:** Defendants agree that investigations are a key regulatory function and continuously strive to conduct quality assessments. Defendants object, however, to the Monitors' statement that every minimum standards investigation is related to or implicates all Remedial Orders. Nonetheless, as an example of Defendants' commitment to continuous quality improvement, Defendants have implemented mandatory supervisory staffings for all Priority 1 and 2 standards investigations as of May 1, 2023. For intakes received on or after May 1, 2023, and initially assigned as a Priority 1 or 2, the inspector must staff the investigation with a supervisor by the 5th day of the investigation and again by the 20th day. Defendants implemented these mandatory staffings to improve quality, provide more oversight of standards investigations, and support inspectors.

   Additionally, Defendants implemented a system to review investigations more holistically—examining more than simply whether an investigation satisfied technical policies and procedures. Defendants are using the information gained from these reviews to identify training opportunities and clarifications to policy that can further enhance the quality of standards investigations.

   Finally, to demonstrate a commitment to continuous improvements, Defendants requested lists of investigations sampled and reviewed by Monitors to conduct thorough internal reviews and further self-identify areas and opportunities for development and improvement.

---

[2] June 6, 2022, Hearing Transcript Pg. 96, lines 8–13: "Look at the number of deficiencies of the facilities with heightened monitoring, and that's out of a number of 16 was the review. 554 deficiencies and those moved to post-planned monitoring 19 and on down. The vast improvements and how this is working. For those who complain, look at that table."

- Pages 15, 20, and 94: "In addition, the Monitors disagreed with the priority level assigned to these investigations almost half of the time (138 of 285, 48%). Priority level impacts the quality of an investigation because it dictates the timeline for initiation: the lower the priority, the later the required initiation, making it more difficult to gather evidence such as video footage, find and interview witnesses and obtain their fresh recollection of events."

    **Objection:** When HHSC assigns a priority level, it does so based solely on the information available at the time in the intake report. At that point in time, HHSC doesn't have the benefit of hindsight or knowledge of what the subsequent investigation will reveal. HHSC continuously strives to improve in this area—for example, in March 2023, RCCR's Professional Development Division developed and delivered a robust training on prioritization that was delivered to RCCR and Heightened Monitoring Supervisors. The training included an assessment component, in which all Supervisors demonstrated competency of the material.

- Pages 18 and 40: "State system data flaws prevented the Monitors from validating the State's performance in training staff on the policy for child-on-child sexual abuse. The State failed to correct inconsistencies in the data provided regarding staff number, staff transfers, staff titles, mistakes in record keeping, and staff training over two fiscal Quarters in 2022."

    **Objection:** Defendants continue to be in substantial compliance with Remedial Order 32. Defendants provide quarterly data to the Monitors for all staff identified that must be trained on the policy for child-on-child sexual abuse, including the staff who make the determinations on child-on-child sexual abuse. As outlined in the data provided to the Monitors, staff identified as being case-assignable on the last day of the quarter reported have completed the required training. Issues that the Monitors identified as data inconsistencies relate to unique personnel changes, and Defendants are available to provide documentation that these staff received the required training appropriate for their role(s).

- Page 19: "In the case record review of a random sample of 786 PMC children who had a sexual characteristic indicator documented in their IMPACT records in 2022, 24% of children identified as victims of sexual abuse suffered abuse that occurred after the child entered care. Of that 24%, 16% suffered sexual abuse only after entering foster care; the remaining 8% were sexually abused both before and after entering foster care. Approximately one-third of children (45 of 132 or 34%) who were victimized after entering care experience two or more incidents of sexual abuse while in foster care."

    **Objection:** As the Monitors note, these statistics arise from children who have a sexual characteristic indicator. For all PMC children, though, fewer

4

than 0.1% experience a new confirmed sexual victimization incident while in DFPS custody—based on a Conservatorship Worker Quality Assurance team data review of August 2022 to April 2023.

- Pages 21, 138, and 143: "Finally, a small gap persisted in 2022 in communication between HHSC and DFPS related to failure to report.  Two citations were not found in either the HHSC report to DFPS, and two were found in the HHSC report, but not in the DFPS report.  The two citations that were not included in the DFPS report were for citations associated with child-on-child abuse."

    **Objection:** As the Monitors note, the gap is small.  But Defendants are constantly working to improve quality and protect the children in their care, so HHSC and DFPS representatives meet monthly to reconcile receipt of automated notices.  The agencies are implementing additional improvements including reviewing data reports to identify any failure-to-report citations that the automated system may have missed.

- Pages 24, 218, 219, and 224:

    - Page 24: "The State's inaction to meaningfully hold operations accountable for their failure to come into compliance with their Heightened Monitoring Plans puts the safety of a significant number of PMC children at risk."

    - Page 218: "First, some operations under Heightened Monitoring continued to have significant safety problems despite weekly visits from DFPS and HHSC, and rather than implement one of the remedies identified in the Court's order the State instead placed the operations under what was often a redundant corrective action."

    - Page 219: "The primary response to the first concern raised—related to operations placed under duplicative corrective actions while under Heightened Monitoring—appears to have been to discontinue this practice altogether.  While this eliminates the inefficiencies identified in the report, it does not address the safety concerns raised for operations that have been placed under Heightened Monitoring, have a regular HHSC and DFPS presence in the facilities as a result, and yet continue to receive citations for minimum standards deficiencies or substantiated findings of abuse, neglect, or exploitation."

    - Page 224: "The ongoing failure to hold them [facilities] accountable for compliance with their Heightened Monitoring Plans puts the safety of a significant number of PMC children at risk."

    **Objection:** Defendants use a variety of tools to ensure that providers comply with Heightened Monitoring plans and work closely with these providers to

5

ensure the safety of children placed with child placement agencies and residential facilities on Heightened Monitoring. For example, since June 2020, Defendants have issued corrective action plans on a range of issues, performed additional safety visits in addition to standard Heightened Monitoring visits, assessed 61 penalties, assessed 505 liquidated damages resulting from quarterly targeted monitoring, issued 33 placement holds and 10 license revocations, disallowed 29 foster homes associated with child placing agencies on Heightened Monitoring, and ended contracts with 46 operations eligible for Heightened Monitoring. In addition, all operations on Heightened Monitoring are closely monitored by both DFPS and HHSC, including visits conducted at least weekly, to help ensure the safety of children.

- Page 37: "The Monitors reviewed the IMPACT records for the 30 children who had an indicator for sexual victimization on January 31, 2022, but not on December 31, 2022. DFPS reported removing from IMPACT the sexual victimization indicators for all 30 children during a 'quality assurance' process because the agency determined the underlying incident was unconfirmed. The unconfirmed incidents include . . . ."

    **Objection:** Defendants respectfully request the Person Identification (PID) of the children that are referenced on page 37 who had an indicator of sexual victimization on January 31, 2022 but not on December 31, 2022. Additionally, for the five children referenced on this page, Defendants respectfully request the identity of those children. Without this information, Defendants cannot adequately respond to these statements.

- Pages 43–44: "As described in the Monitors' prior reporting, the State has been unable to produce a comprehensive list of all caregivers and, therefore, the Monitors have been unable to validate the State's performance in this area. . . . Despite DFPS's implementation of the Provider Portal, the Monitors cannot determine whether the data included an exhaustive list of all caregivers. The Monitoring team requested that DFPS provide a list of all active caregivers and an unique identifier for each caregiver who is listed in the quarterly data report (derived from the Provider Portal); DFPS was unable to fulfill the request. Therefore, the Monitors remain unable to validate the State's performance in this area."

    **Objection:** Defendants are in substantial compliance with Remedial Order 4 as it relates to caregiver training. Indeed, the Monitors note DFPS's 98.7% compliance rate for caregivers completing the training during the review period.

    The caregiver list that DFPS provides quarterly to the Monitors includes a unique identifier for each active caregiver listed in the new Provider Portal—

an identifier generated when a caregiver is added to the Provider Portal. HHSC's CLASS system also lists active caregivers for GROs, RTCs, and foster homes. The Monitors have access to both systems, and individuals requiring and receiving training can be cross-referenced to the active caregivers listed on the quarterly report that shows when caregivers have completed the training. As Defendants explained to the Monitors before the June 27, 2023 status conference and reiterated at that status conference, Defendants continue to be available to assist and work with the Monitors to verify and reconcile the data provided by the HHSC and DFPS systems.

- Page 73: "Though direct care staff did not consistently report receiving the Attachment A, they did report being informed of a child's history of aggression or victimization at higher rates . . . . Many direct care staff reported that they received only verbal information about a child's history."

    **Objection:** DFPS provider contracts require that caregivers are informed of a child's history of sexual aggression or sexual victimization, but those contracts don't specify that the information must be obtained from Attachment A. The language allows for the administrator to verbally inform the caregiver of the history. Caregivers acknowledge that they have received this information by signing the Certification Form 2279b. Specifically, 24 Hour RCC Requirements - Section 1420 Notifications Related to the Child states: "At the time of placement, when the Attachment A is updated, and before being a caregiver responsible for a child in care, each child's placement administrator must inform all caregivers if a child has a history of sexual aggression or sexual victimization as provided for in the Attachment A. As proof of this notification, the placement administrator must obtain each caregiver's signature on the DFPS certification form."

- Page 76: "The Monitors reviewed 2,672 awake-night certifications completed during an unannounced visit by DFPS staff from January 2022 through December 2022, and found DFPS made overnight, unannounced visits to almost all operations requiring awake-night supervision each month . . . . The Monitors also found that 84% of operations that were eligible in more than one month were visited in each month that they were eligible."

    **Objection:** The chart in the Monitors' report reflects that DFPS visited 95–100% of eligible operations each month. To understand how the Monitors calculated 84% compliance, Defendants respectfully request that the Monitors provide a list of the operations that they determined were eligible in more than one month.

- Page 81: "Of the 11 incidents included in the quarterly reports submitted to the Monitors, only four were subsequently reported to SWI, despite DFPS's instructions to its staff to report all incidents of noncompliance to SWI."

7

>   **Objection:** DFPS staff reported these allegations to Statewide Intake as required for at least 9 of the 11 incidents included in the Quarterly Report. IMPACT IDs associated with these reports are 76225698, 49046722, 49062943, 49089981, 49099004, 49146023, 49172150, 49197599, and 76450528.

- Pages 110–111 Footnotes 135 and 136:

    - "135 [. . .] (4) a narrative description of how this data and information was considered"

    - "136 [. . .] The narrative format of the ECHR makes validation difficult as it lacks a standardized way to assess whether the inspector determined there was risk and/or considered risk during inspection. This assessment is greatly impacted by the quality of documentation."

    **Objection:** As Footnote 136 indicates, the narrative format makes validation of the ECHR difficult. As initially requested in HHSC's comments to the draft report, HHSC respectfully renews its request for information on how the assessments were validated.

- Page 110: "The findings of the monitoring team's case read are consistent with the very high rate of citations overturned by HHSC after an administrative review. The monitoring team's analysis of administrative reviews, discussed infra, showed that in 2022, 35% (325 of 928) were overturned after an administrative review. This high reversal rate reflects a systemic problem associated with HHSC investigations."

    **Objection:** Defendants object to the Monitors' statement that a high rate of overturned citations is indicative of systemic problems with HHSC investigations. A citation may be overturned for myriad reasons. For example, an operation may later provide additional information that it couldn't produce at the beginning of the investigation.

- Page 111, Footnote 136 and Page 120:

    - Page 111, Footnote 136: "136 [. . .] (2) Items documented in the Assessment of Information Reviewed (e.g., details of RTBs and/or citations for corporal punishment, other deficiencies cited, corrective action/Heightened Monitoring, areas where the operation has historically had safety or compliance issues)"

    - Page 120: "The percentage of inspections at Heightened Monitoring operations where the operation's status on Heightened Monitoring was mentioned in the ECHR increased from 67% (29 of 43) in July 2022 to 75% (39 of 52) in December 2022."

> **Objection:** This methodology has not previously been provided as a clarification or mentioned in any communication with the Monitors as part of evaluating compliance with ECHRs.

- Page 132: "There were significant differences, however, between the State's review and the Monitors' findings. While over 90% of cases were reported to accurately describe the compliance history and identified risk in HHSC's case reads, the monitoring team and RCCR inspector's assessment of risk differed: In 42% of cases in which the inspector documented no risk, the monitoring team assessed that there was a safety risk present."

   > **Objection:** Defendants respectfully request the criteria the Monitors use to determine the presence of a "safety risk" when evaluating an ECHR. Without that information, Defendants are unable to evaluate this statement.

- Page 138: "The monitoring team found 32 of 242 employee files (13%) did not have documentation on file showing the employee completed the required abuse, neglect, and exploitation training and another 31 of 242 employee files (13%) documented the training was not completed in the last 12 months."

   > **Objection:** On June 27, 2023, after the Monitors filed their Sixth Report, they shared additional information, including noting that the referenced list includes staff at General Residential Operations and a private psychiatric hospital. The applicable standards for GROs include § 748.121, which states that "[y]ou must develop policies on preventing, recognizing, and responding to abuse and neglect of children, including (1) Required annual training for employees"; and § 748.881(2), which states that "[t]he general pre-service training must include the following curriculum components: (2) Measures to prevent, recognize, and report suspected occurrences of child abuse (including sexual abuse), neglect, and exploitation."
   >
   > Using the list provided by the Monitors, RCCR identified eight employees with active background checks at the named operation and indicated as having no abuse, neglect, and exploitation training. RCCR and Heightened Monitoring will follow up to determine if citations are warranted.

- Page 174 Footnote 195: "Quarterly reports with a review period ending in 2022 are included in the analysis. Operation[s] do not have quarterly reports in the post-plan monitoring stage."

   > **Objection:** Defendants do have a quarterly report for operations in Post-Plan Monitoring, called the Heightened Monitoring Post-Plan Monitoring Report. Additionally, when an operation is eligible to be released from Heightened Monitoring altogether, a Heightened Monitoring Final Assessment Report is completed.

- Page 189 Footnote 212: "2021 analysis includes 93 operations that were active on Heightened Monitoring as of March 1, 2021.  In July 2021, HHSC adopted [a] policy that a waiver/variance would not be granted if the operation is requesting to waive or vary a minimum standard that is a basis for a probation, plan of action, or Heightened Monitoring.  HHSC, Child Care Regulation Handbook, 5120 Decision Guidelines for Granting Waivers or Variance."

    **Objection:** This is an internal RCCR policy, not outlined or required by any of the Remedial Orders.

- Page 192 and Footnote 214:

    o Page 192: "In all, the 112 operations placed on Heightened Monitoring between 2020 and 2022 had 6,493 abuse, neglect, and exploitation investigations opened . . . ."

    o Footnote 214: "The Monitors analyzed abuse, neglect, and exploitation investigations opened and closed between June 2020 and January 2023 for all operations placed on Heightened Monitoring between 2020 and 2022.  Analysis is based on data for investigations opened and investigations closed provided by DFPS.  The Monitors receive the 'RO20_RCI_Allegations_CYXX' file monthly.  This file contains all allegations associated with an RCI investigation that was opened and all allegations associated with an RCI investigation that was closed in the month.  Investigations are not limited to PMC children.  Data includes allegations that were pending ARI or SOAH review as of the date the data was pulled.  Allegations that were overturned after review reflect the final disposition for the case."

    **Objection:** This appears to be an allegation count, not an investigation count.  One investigation can have multiple allegations and alleged perpetrators.

- Page 207: "Three operations had one or more open investigations at the time they transitioned to post-plan monitoring.  These operations included Family Link Treatment Services CPA (one open investigation), Mission Road Development Center (three open investigations) and Assuring Love CPA (six open investigations).  None of these resulted in a substantiated finding."

    **Objection:** Before any operation enters Post-Plan Monitoring, DFPS and HHSC work collaboratively to thoroughly and holistically review the operation and determine if entering Post-Plan Monitoring would promote the safety and wellbeing of the children.  Specifically, DFPS and HHSC continually communicate about operations with open investigations.  As evidenced by the dates below, each operation's investigations were substantively complete and wouldn't have resulted in substantiated findings when the operation moved into Post-Plan Monitoring:

10

1. Family Link CPA moved to Post-Plan Monitoring on February 8, 2023. At that time, there was one Priority 3 standards investigation (2961210) still open. The investigation was completed on February 7, 2023 and was closed in CLASS on February 8, 2023.

2. Mission Road Developmental Center moved to Post-Plan Monitoring on December 30, 2021. It had one abuse and neglect investigation (48920509) open at that time. The investigation was completed in IMPACT with no reason to believe findings on December 23, 2021 and subsequently transferred to HHSC on December 31, 2021, on which date the investigation was closed with no deficiencies.

3. Assuring Love moved to Post-Plan Monitoring on August 20, 2021. It had one abuse and neglect investigation (48740351) open at that time. The investigation was completed in IMPACT with no reason to believe findings on August 9, 2021 and was transferred to HHSC on August 29, 2021. HHSC closed the investigation with no deficiencies on August 30, 2021.

- Page 227: "Though the Fourth Report was critical of the State's decision to place operations under Heightened Monitoring on another type of enforcement action, in this case, ignoring the enforcement action (which was presumably intended to address significant safety concerns) and moving the operation to post-plan monitoring failed to consider the risks associated with prematurely moving the operation to the post-plan stage."

    **Objection:** Defendants closely monitored Hands of Healing GRO throughout the Plan-in-Effect stage, and continue to do so during the Post-Plan Monitoring stages, including performing 36 safety visits. Hands of Healing GRO moved to Post-Plan Monitoring in March 2022 while in good standing with its probation. In June 2022, Defendants stopped placing Heightened Monitoring operations on probation as doing so needlessly duplicated the Heightened Monitoring plans. Now, Defendants address any emerging trends through amending Heightened Monitoring plan tasks or imposing penalties, including revocation, contract termination, or placement hold. Hands of Healing successfully completed its probation on August 31, 2022. It remains on Post-Plan Monitoring at this time. Hands of Healing is currently on a placement hold, which was initiated on April 24, 2023.

- Page 232: "During 2022, 1,422 placements of PMC children were made to operations under Heightened Monitoring. Nearly all (99%) requests to approve placements received approval by a Regional Director or Associate Commissioner. The monitoring team found documentation of the justification for the child's placement and the approver's review of the operation's safety history in only 17% (235 of 1402) of the placements. Staff that approved placement requests often copied and pasted statements across placement requests, resulting in generic

11

approvals that did not appear to a consider a child's individual needs. Only 16% (225 of 1422) of placements received prior approval meeting all the requirements of the Court's order."

> **Objection:** Many Heightened Monitoring placement requests never make it to the desk of a Regional Director or Associate Commissioner. If they do, they have already been analyzed by at least three independent reviewers: CPU, a caseworker, and a supervisor. Each reviewer is focused on determining whether the placement would be in the child's best interest and whether the placement would meet the child's behavioral, medical, and therapeutic needs. So it makes sense that this multi-tiered process would result in a high approval rate *upon final review* by a Regional Director or Associate Commissioner—because only requests that staff believe are in the best interest of the children advance to final review.
>
> As required by the Court's orders, reviewers are examining the five-year history and indicating that in their approval or denial documentation.

- Pages 228 and 233:
    - Page 228: "The Monitors have deep concerns associated with ongoing safety problems for operations under Heightened Monitoring—particularly considering the State's seeming reluctance to heed providers calls for improved technical assistance."
    - Page 233: "The State issued a final version of the Expert Panel report related to the Provider Working Group without including the panel's recommendations related to technical assistance."

> **Objections:**
>
> *First*, as the Court acknowledged at the June 27, 2023 status conference, the Expert Panel and Provider Working Group are not part of the Court's Remedial Orders. Defendants have voluntarily engaged with these groups as part of their good-faith effort to continuously improve and safeguard the children in their care.
>
> *Second*, the document that the Monitors refer to on page 233 isn't an Expert Panel report, but is rather a state agency document summarizing the work of a distinct committee known as the Provider Working Group.
>
> As explained by DFPS Commissioner Muth at the June 27, 2023 status conference, the Expert Panel produced or helped produce two separate reports.
>
> The first report examined Children Without Placement and made recommendations on that issue. HHSC and DFPS evaluated that report and

12

adopted every single one of its recommendations. For example, Defendants have re-designed the DFPS provider payment structure to better serve the unique needs of each child in Defendants' care and pay providers at a fully funded rate.

The second report examined Defendants' relationships with providers. The three authors of the first report served as "Consultant-Facilitators" with the Provider Working Group to produce this report. Defendants engaged with the Expert Panel, Provider Working Group, and providers to better understand providers' needs, and Defendants accepted and implemented virtually all of the Provider Working Group's recommendations—including several that involved improving and expanding technical assistance. The only recommendation Defendants didn't adopt would have required making payments to a third party as a "go between" for Defendants and the providers. Defendants take very seriously their responsibility to safeguard the children in their care, and work directly and diligently with providers to accomplish that mission. Providers are of course welcome to seek and receive technical assistance from third parties—in addition to the extensive technical assistance provided by Defendants.

*Third*, it's inaccurate to characterize Defendants as not "heed[ing] providers['] calls" for technical assistance. To the contrary, Defendants provide technical assistance to all providers, including those on Heightened Monitoring, and continue to engage in efforts to deliver, research, evaluate, and improve technical assistance.

Defendants' efforts regarding technical assistance include, but are not limited to, the following:

1. Connecting providers with Subject Matter Experts like Educational Specialists, Disability Specialists, and Wellbeing Specialists to help operations come into compliance with all requirements.

2. Conducting a national review of other states' technical assistance policies and processes for evaluation and potential implementation.

3. Creating a repository of guidance and tools for staff to use with providers on various topics, and continuously adding tools to the repository.

4. Developing and administering a survey to providers on technical assistance.

5. Organizing and facilitating provider focus groups on technical assistance.

13

6. Conducting onsite visits with Heightened Monitoring operations to provide technical assistance during exit conferences to address any safety concerns, compliance with minimum standards, and compliance with contract requirements. These exit conferences help ensure that operations know what is required of them, understand how and why they didn't satisfy the standard or contract requirement, and receive guidance and tools on how to come into compliance moving forward.

7. Reviewing policies, training materials, and the Technical Assistance Library materials to identify any potential improvement areas.

8. Suggesting that an operation connect with third-party resources—such as the Texas Alliance for Child and Family Services—to complement the technical assistance provided by Defendants.

9. Working closely with new residential childcare contractors and providing additional education and oversight to onboard them to Defendants' requirements.

- Page 234: "(Home A) After a Heightened Monitoring visit on December 31, 2021, the home received two citations: corporal punishment for spanking a child and prohibited items in a crib."

    **Objection:** The Heightened Monitoring inspection on Home A occurred on December 31, 2020.

- Page 234: "(Home B) Home B (Lutheran Social Services of the South – Lubbock) Closed March 17, 2022."

    **Objection:** Home B was closed on March 29, 2022.

- Page 236: "(Home C) Over the twelve years and three months that it was open, this foster home was the subject of 22 investigations; four involved allegations of abuse, neglect, or exploitation, and 18 involved allegations of minimum standards violations."

    **Objection:** Home C was open from December 2, 2010 to May 13, 2022, which is eleven years and six months.

- Page 239: "(Home D) DFPS initiated an investigation on July 8, 2019, for Physical Abuse and Neglectful Supervision. . . . The allegations of Physical Abuse were Ruled Out, and no citations were issued."

    **Objection:** The allegations of Neglectful Supervision were also Ruled Out.

- Page 246: "(Home F) The home was first verified on February 6, 2019 by Angel Wings Family Services, Inc. in Missouri City, Texas. The home relinquished

14

verification and changed CPAs to Have Haven CPA in Houston three months later, on May 10, 2019, during a pending investigation."

> **Objection:** Home F was verified by Angel Wings Family Services, Inc. from February 6, 2019 to May 9, 2019; however, there are no intakes or investigations associated with Home F during the time it was verified by Angel Wings Family Services, Inc.

- Pages 249 and 254: "(Home G) Home G (Transitions for Tomorrow CPA) Closed July 20, 2022."

    > **Objection:** There are two homes identified as "Home G." The first is on page 249 and the second is on page 254.

- Page 258: "(Home G) The HHSC Closure Recommendation was approved on July 17, 2022. . . . The foster home page in CLASS indicates that the home was closed by the CPA on July 22, 2022, due to HHSC-recommended closure. No children have been placed in this home since July 18, 2022."

    > **Objection:** HHSC staffed the home for a recommendation for closure on July 14, 2022, but didn't proceed with making the recommendation to the CPA. Instead, a Determination of Immediate Threat (DIT) was approved on this date and the CPA was notified of the decision by the Centralized Background Check Unit (CBCU) on July 15, 2022. The CPA closed the home on July 22, 2022, with a closure reason of "Criminal History Match."

- Page 270: "(Home K) On January 27, 2011, Dallas Metrocare Services CPA verified the home. The home remained with Dallas Metrocare for just over four years when it again relinquished its verification and again changed CPAs. The home returned to Texas Baptist Children's Home and was verified on March 17, 2017, where it remains open."

    > **Objection:** Home K was verified by Texas Baptist Children's Home on March 27, 2015.

- Appendix A – HHSC Standards Investigations

    > **Objection:** As ordered by the Court at the June 27, 2023 status conference, RCCR conducted thorough reviews of the seventy cases identified in Appendix A and has provided a separate response to the Monitors summarizing the results of this review and recommended actions.

- Appendix A, Page 13: "The Attachment A does not indicate a history of sexual abuse or sexual aggression for Child A."

    > **Objection:** Attachment A wouldn't indicate history on the document because

15

> Child A's sexual history is unconfirmed. Only confirmed incidents will appear on Attachment A.

- Appendix B, Page 9: "On March 6, 2019, SWI received an intake alleging a staff person was smoking marijuana at work and shared it with a 17-year-old child in care as well as possibly five other girls in the home."

  **Objection:** This intake was received on April 6, 2019.

- Appendix B, Page 18: "Rise Services Texas, Inc. CPA (Rise Services) operators applied for a permit to operate in Allen, TX on July 26, 2018. HHSC returned the application on August 31, 2018, noting that '[s]everal items required edits, clarification and/or additional information,' including the operation's EBI, weapons, and primary medical needs services policies."

  **Objection:** RCCR returned the application on August 15, 2018 and the operation resubmitted it on August 31, 2018.

- Appendix B, Page 28 and Footnote 25:

  - Page 28: "Gulf Winds had 126 standards citations[25] from the time the initial permit was issued until the operation was placed on Heightened Monitoring, 24 for high-weighted standards, 49 for medium-high-weighted standards, 37 for medium-weighted and 16 for medium- low and low-weighted standards."

  - Footnote 25: "In HHSC[']s comments to the draft of this report, the agency noted that the operation was issued 153 standard citations between September 27, 20[]10 and November 9, 2020, but did not include the weights for the standards cited. The Monitors did not have time to validate the number or discover the reason for the difference."

  **Objection:** Defendants' data reflects that this operation received 153 standard citations between September 27, 2010 and November 9, 2020. If the Monitors have now had sufficient time to validate the numbers, Defendants welcome additional information to better understand the discrepancy.

<u>OBJECTIONS TO THE MONITORS' UPDATE TO THE COURT REGARDING REMEDIAL ORDER 35 CASELOAD PERFORMANCE</u>

- Page 10: "Monitors' interviews with caseworkers to validate the data DFPS submitted about caseloads provided additional insight into other major job responsibilities, over and above the duties associated with caseload management. Most notably, workers described being assigned CWOP shifts (both required and voluntary) to supervise children who are experiencing a lack of a licensed placement and are housed in unregulated settings, such as hotels and churches."

16

**Objection:** As required by Remedial Order 35, each child in temporary or permanent managing conservatorship—including a Child Without Placement—is reflected in the caseload of that child's primary caseworker and is within the caseload data provided to the Monitors. DFPS continues to demonstrate substantial compliance with Remedial Order 35 regarding caseload standards with an average of 87% of caseworkers carrying caseloads less than or equal to 17 children between July 2022 and January 2023.

Adjusting primary caseworker caseloads to reflect discrete Child Watch hours would inaccurately inflate primary caseworker caseload data, because every child cared for on Child Watch is a Child Without Placement and is already assigned to a primary caseworker and reflected in that caseworker's caseload. A worker performing discrete Child Watch hours has not assumed the primary caseworker's case management duties.

Date: July 17, 2023

Respectfully submitted,

ANGELA V. COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Acting Deputy Attorney General for Civil Litigation

 /s/ Kimberly Gdula
KIMBERLY GDULA
  State Bar No. 24052209
  Southern District No. 10092074
  Deputy Chief
  General Litigation Division
KARL E. NEUDORFER
  State Bar No. 24053388
  Southern District No. 725939
  Assistant Attorney General
  Administrative Law Division
CLAYTON R. WATKINS
  State Bar No. 24103982
  Southern District No. 3663032

 /s/ Allyson N. Ho
ALLYSON N. HO
  *Attorney-in-Charge*
  State Bar No. 24033667
  Southern District No. 1024306
SAVANNAH SILVER
  State Bar No. 24129020
  Southern District No. 3844454
Gibson, Dunn, & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
(214) 571-2900 – Fax
aho@gibsondunn.com
ssilver@gibsondunn.com

PRERAK SHAH
  State Bar No. 24075053
  Southern District No. 2137529
Gibson, Dunn, & Crutcher LLP
811 Main Street, Suite 3000
Houston, TX 77002
(346) 718-6600
(346) 718-6620 – Fax
pshah@gibsondunn.com

ATTORNEYS FOR DEFENDANTS

Assistant Attorney General
Administrative Law Division
NOAH REINSTEIN
  State Bar No. 24089769
  Southern District No. 3355459
  Assistant Attorney General
  Civil Medicaid Fraud Division
ROBERT SALMON
  State Bar No. 24088923
  Southern District No. 3662721
  Assistant Attorney General
  Civil Medicaid Fraud Division
LEIF OLSON
  State Bar No. 24032801
  Southern District No. 33695
  Chief
  Special Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120 | Fax (512) 370-0667
kimberly.gdula@oag.texas.gov
karl.neudorfer@oag.texas.gov
clayton.watkins@oag.texas.gov
noah.reinstein@oag.texas.gov
robert.salmon@oag.texas.gov
leif.olson@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2023, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system, which automatically provided notice to all attorneys of record.

  _/s/ Allyson N. Ho_
  Allyson N. Ho