Plaintiffs' Corrected Second Amended Motion to Show Cause Why
Defendants Should Not Be Held in Contempt

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity | § | |
| as Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' CORRECTED SECOND AMENDED MOTION TO SHOW CAUSE
WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT[1]**

"While courts are required to afford the State deference in administration of its state systems and 'the [first] opportunity to correct [its own] errors,' these principles are less applicable where, as here, the State has had ample opportunity to cure the system's deficiencies." *M.D. v. Abbott*, 907 F.3d 237, 272 (5th Cir. 2018) (*Stukenberg I*).

Nearly a decade has passed since the trial confirmed what the State long knew: its chronic systemic failures place Texas children at substantial risk of serious harm. Close supervision has resulted in improvements since then, but the State continues to defy orders issued by the Court and affirmed by the Fifth Circuit. This Court is "entitled to worry about the State's motivation to self-correct and [is] justified in doubting that it [will] achieve compliance independently." *Id.* As such, Plaintiff Children move for an order directing the State to show cause why defendants should not be held in contempt based on clear and convincing evidence that they have not complied with critical remedial orders, threatening the safety and wellbeing of innocent children.

---

[1] This filing corrects and replaces Plaintiffs' Second Amended Motion to Show Cause Why Defendants Should Not Be Held in Contempt, Dkt. 1419, filed on October 13, 2023.

More than four years after the appellate mandate, children remain at risk of harm. Certain especially vulnerable children, whose maltreatment is investigated by a special group of the State, go months with no resolution, are largely ignored, and remain at risk. Other children suffer from medical abuse and neglect, including mismanagement of powerful drugs. Their lifelines—primary caseworkers—cannot protect them because they are crushed with extra (and uncounted) childcare duties caused by the ongoing crisis of hundreds of children in unlicensed placements. And children lack the information they need to report abuse/neglect when it happens to them. This remains an especially grave risk because the State fails to notify caregivers of children's sexual abuse histories or ensure they are trained to recognize and report sexual abuse.

There is no good excuse for these violations of remedial orders and for defendants shirking their responsibilities to keep these children safe. Plaintiffs respectfully request that the Court take steps, including a finding of contempt and receivership order, to ensure compliance with its Fifth Circuit-mandated remedies at long last.

## GOVERNING LAW

In *Stukenberg I*, the Fifth Circuit affirmed the Court's finding that the State's dysfunctional foster care system violated PMC children's substantive due process rights. *Id.* at 287-88. In *Stukenberg II*, the appeals court affirmed most of the Court's remedial orders entered after remand; others went unchallenged on appeal. *See* 929 F.3d 272, 281 (5th Cir. 2019). The Fifth Circuit directed the Court "to begin implementing . . . the modified injunction." *Id.* Its mandate issued in July 2019. In *Stukenberg III*, the Fifth Circuit reiterated that its mandate governs implementation of the affirmed remedial orders imposed on the State. *See* 977 F.3d 479, 483 (5th Cir. 2020).

In implementing its injunction, a court is "not reduced to issuing injunctions against state officers and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). "Once issued, an

injunction may be enforced." *Id*. Thus, a court has "inherent power to enforce compliance" with its affirmed remedial orders "through civil contempt." *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966).

This contempt power is recognized by statute. "A court of the United States shall have the power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other," as

> (1)     Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; . . . [and]
>
> (3)     Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. §401 (1988). The Supreme Court recognizes this authority of federal courts to impose civil contempt sanctions. *See, e.g*., *Hicks v. Feiock*, 485 U.S. 624, 632 (1988); *Shillitani*, 384 U.S. at 370-71; *Gompers*, 221 U.S. at 441. A court has "inherent authority" to sanction parties for "a full range of litigation abuses." *Chambers v. NASCO, Inc*., 501 U.S. 32, 46 (1991). This power derives from "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*. at 43 (cite omitted).

A court's findings of fact in support of a contempt order are reviewed for clear error, with its underlying conclusions of law reviewed de novo. *See, e.g.*, *Petroleos Mexicanos v. Crawford Enters., Inc*., 826 F.2d 392, 401 (5th Cir.1987); *U.S. v. City of Jackson, Miss*., 359 F.3d 727, 731 (5th Cir. 2004). And a decision based on "years of experience" overseeing reform litigation, and familiarity with a defendant's history of obstructing change, is entitled to "special deference." *Hutto*, 437 U.S. at 687-88:

> [T]he exercise of discretion in [a] case is entitled to special deference because of the trial judge's years of experience with the problem at hand [and] taking the long and unhappy history of the litigation into account, [a] court [is] justified in entering a comprehensive order to insure against the risk of inadequate compliance.

A movant for contempt has the burden to show three facts by clear and convincing proof: a court order was in effect, the order required certain conduct, and the party required to comply failed to do so. *See Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009); *Lyn-Lea Travel Corp. v. Am. Airlines, Inc*., 283 F.3d 282, 291 (5th Cir. 2002). Clear and convincing proof here is

> that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (cite/quote omitted). If a movant proves a prima facie case that an order was not complied with, the respondent then bears the burden to show mitigating circumstances, substantial compliance with the order, or every reasonable effort to comply, such that the court might withhold exercising its contempt power. *See Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987); *Petroleos Mexicanos*, 826 F.2d at 401.

In using civil contempt to ensure compliance with remedial orders, a court should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *U.S. v. United Mine Workers of Am*., 330 U.S. 258, 304 (1947). Moreover, "while a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable," sanctions "may be warranted when a party acts in bad faith." *Taggart v. Lorenzen,* 139 S. Ct. 1795, 1802 (2019). Thus, a party's "record of continuing and persistent violations" and "contumacy" justifies placing the "burden of any uncertainty in the decree . . . on [the] shoulders" of the contemnor. *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 192-93 (1949). *See also McPhaul v. U.S.*, 364 U.S. 372, 379 (1960) (proof "established a prima facie case of willful failure to comply with the subpoena").

- 4 -

To ensure compliance with its remedial orders, the Court may, as it has done in the past, levy fines against the State. *See* Dkt. 1017 ("If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance. . . . [The] power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief.") (quoting *Hutto*). But courts have authority "to fashion practical remedies when confronted with complex and intractable constitutional violations" and may need to "issue multiple orders directing and adjusting ongoing remedial efforts." *Brown v. Plata*, 563 U.S. 493, 516, 526 (2011).

> There can be no doubt that the paramount duty of the federal judiciary is to uphold the law. That is why, when a state fails to comply with the Constitution, the federal courts are compelled to enforce it.

*United States v. Hinds Cty.*, 2023 WL 1186925, at *4 (S.D. Miss. 2023) (cite omitted). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).

Another available mechanism for enforcing a court's remedial orders directed to complex and intractable constitutional violations is receivership. Courts have imposed receiverships "in the context of ensuring a governmental entity's compliance with court orders." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 306 (5th Cir. 2012) (citing *Morgan v. McDonough,* 540 F.2d 527 (1st Cir. 1976) (receivership to enforce school desegregation orders), and *Plata v. Schwarzenegger,* 603 F.3d 1088 (9th Cir. 2010) (receivership to administer prison health care)). Faced with years of noncompliance and expecting further "confrontation and delay," a court may be "justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction." *Newman*, 466 F.Supp. at 635. Indeed, "[t]here can be little question . . . that receiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Plata*, 603 F.3d at 1093-94; *see also Plata v. Schwarzenegger* ("*Plata I*"), 2005 WL 2932253, at *22-23 & n.5 (N.D. Cal. 2005), *aff'd*, *Brown v. Plata*, 563 U.S. 493, 131

(2011) (discussing the history of federal courts' "use of receivers to reform public institutions . . . in the civil rights arena").

Especially in the context of a federal court exercising jurisdiction over state governmental entities, receivership is not an enforcement tool to be taken lightly.  However, as put by the district court in *Plata* when imposing a receivership over California's prison medical system, such a receivership may be "drastic but necessary."  *Plata I*, 2005 WL 2932253, at *1.  Only "having exhausted all reasonable coercive measures at its disposal, yet finding itself unable and unwilling to sit idly by while people are needlessly dying," and finding that it was "resoundingly clear . . . that continued insistence on defendants' compliance with Court orders would lead to nothing but further delay, as well as further needless death and morbidity," did the *Plata* court feel compelled to impose the receivership.  *Id.* at *28-29.

Here, the Court confronts a similar pattern of protracted noncompliance, with its attendant danger to human safety and life.  Children in the Texas foster care system have been unsafe for decades. And the State has now had over four years to comply with all of this Court's affirmed remedial orders. The State's persistent noncompliance means that PMC children continue to face the risks of otherwise avoidable neglect; physical, sexual, and emotional abuse; and even death.

Receivership has been used by other courts to enforce compliance with remedial orders in the child welfare context. Within this Circuit, *Gary W. v. State of Louisiana* was a class action by "Louisiana children," some physically or mentally disabled, "who had been placed in Texas institutions by Louisiana officials." 1990 WL 17537, at *1 (E.D. La. 1990). Thirteen years after the *Gary W.* court found that the conditions of those placements violated the class members' "constitutional right to adequate care and treatment," Louisiana still was not in compliance with the court's remedial orders.  *Id.* at *1-3, *31.  Noting that, in similar instances, "courts have

appointed administrators or receivers and vested them with substantial authority to implement the Court's remedial Orders," the court found that the facts of the case justified "the judicial appointment of administrative personnel to carry out certain aspects of [the] Court's prior Orders," with the administrators' authority "restricted only to those demonstrated areas of protracted non-compliance." *Id.* at *17, *28-33.

Similarly, in *LaShawn A. v. Kelly*, 887 F.Supp.297 (D.D.C. 1995), *aff'd, LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996), after monitoring and limited receiverships failed to bring the District of Columbia's fraught child welfare system into compliance with remedial orders, the district court imposed a systemwide full receivership. *Id.* at 297-99. The District was violating remedial orders that required it to fix "severe staffing shortages," "develop and implement training for contract agencies focused on the needs of the child-care and group home providers," conduct home studies in a timely manner, and "monitor the progress of adoption activity, identify barriers, and develop the necessary corrective action plans on a quarterly basis." *Id.* at 301-02, 304. Here, the Monitors have identified many similar violations by the State.

Like the government entities in *Plata*, *Hinds County*, *Gary W.*, and *LaShawn*, the State has, for years, demonstrated unwillingness or inability to comply with the Court's injunction, even after previously being fined for contempt. Indeed, here, the State treats the Monitors as adversaries rather than the neutral eyes and ears of the Court that they are and wastes resources trying to justify its tepid compliance with the reform orders. *See* Hr'g Tr. at 18 (May 1, 2023) ("mostly what's being spent for tax money is for you arguing about not following these Remedial Orders."). In addition, turnover in leadership can prevent resolution of problems within a reasonable time. *See* Hr'g Tr. at 17-18 (June 27, 2023).

As illustrated by *Plata*, *Hinds County*, *Gary W.*, and *LaShawn*, at least a partial receivership may become the necessary next step in a series of escalating enforcement measures. After efforts like increased monetary sanctions have been tried and failed, a partial receivership can quickly and efficiently enforce remedies for specific current deficiencies. Here, the record shows that a receivership may well become necessary to protect the PMC children's liberty interests in reasonable care and safety. These factors weigh in favor of receivership. *See Hinds Cty*, 2023 WL 1186925, at *4-5.

The scope of any receivership should be tailored to address the underlying violations of remedial orders. "As with any equity case, the nature of the violation determines the scope of the remedy" *Swann*, 402 U.S. at 16. *See also Stukenberg I*, 907 F.3d at 271 ("remedies fashioned by the federal courts to address constitutional infirmities 'must directly address and relate to the constitutional violation itself,' and 'federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.'") (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)).

A court will consider several factors when determining the appropriateness and scope of a receivership to ensure a governmental entity complies with remedial orders:

(1)  Whether there is a grave and immediate threat or actuality of harm . . . ;
(2)  Whether the use of less extreme measures of remediation have been exhausted or prove futile;
(3)  Whether continued insistence [upon] compliance with the Court's orders would lead only to confrontation and delay;
(4)  Whether there is a lack of leadership to turn the tide within a reasonable period of time;
(5)  Whether there is bad faith;
(6)  Whether resources are being wasted; and
(7)  Whether a receiver is likely to provide a relatively quick and efficient remedy.

*Hinds Cty.*, 2023 WL 1186925, at 4 (quoting *Plata I*, 2005 WL 2932253, at *23). The Fifth Circuit has identified similar factors for a receivership over property of a private judgment debtor. *See id.* (citing *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997)).

Here, investigative findings of the Monitors establish a prima facie case of noncompliance with vital orders requiring specific remedial conduct by the State. Chronic safety issues arise from noncompliance with orders governing intake and investigation of abuse/neglect reports, as well as requiring heightened monitoring and corrective actions at operations with a pattern of violations. Problems with management of psychotropic drugs pose crucial risks to children. These safety risks are heightened because the State is not meeting its mandate to ensure that children are effectively taught how to report abuse/neglect. And the State is out of compliance with orders on caseworker workloads, as it allows the ongoing crisis of children in unsafe, unlicensed placements to linger and grow, straining caseworkers and the system past the breaking point.

### ARGUMENT AND AUTHORITIES

1. **Noncompliance with Requirements for Investigations Under RO 3, 7, 8, and 10 Puts Children at Risk of Abuse/Neglect.**

The Monitors have documented serious, widespread, and persistent problems of all manner of abuse and neglect. One reason these dangers persist is noncompliance with the Court's orders requiring timely and effective investigations, ROs 3, 7, 8, and 10.

**Remedial Orders 3, 7-8, and 10** deal with the State's system for receiving, screening, and investigating reports of abuse and neglect:

> 3. DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs. [Dkt. 606 at 2]

7. Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake. [Dkt. 606 at 3]

8. Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake. [Dkt. 606 at 3]

10. Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record. [Dkt. 606 at 3]

RO 3 requires abuse/neglect to be investigated. RO 7, 8, and 10 specify critical procedural requirements for investigations. These include completing initial face-to-face contact with alleged child victim(s) within specific timeframes and documenting good cause for extensions and delays. The Monitors found substantial noncompliance with these orders of the Court. *See, e.g.*, Dkt. 1412.

The Monitors have made numerous findings showing noncompliance with RO 3, 7, 8, and 10, putting children at grave risk of abuse/neglect.

**a.   Noncompliance with Remedial Orders 3, 7, 8, and 10**

RO 3, 7, 8, and 10 were born out of evidence at trial establishing that "faulty investigations" were putting children at an "unreasonable risk of harm." Dkt. 1017 at 70-76 (collecting evidence).

The Fifth Circuit upheld these orders because the State's "dysfunction," "incompetence in responding to incidents," and "inadequate [investigations]" had "led to an 'epidemic of physical and sexual abuse.'" *Stukenberg I*, 907 F.3d at 291-92. As the Fifth Circuit observed, "investigators are not encouraged to complete investigations quickly, leaving children in potentially dangerous situations. Staff fail to interview parties, review evidence, or address continuing risks to children.

- 10 -

And failed investigations endanger PMC children by leaving them in placements where abuse is ongoing . . . ." *Id*. at 292. In response to the ongoing abuse, the State relied on "pervasive administration of psychotropic drugs to PMC children" "to dampen the mental and emotional symptoms of trauma." *Id*. at 291. In sum, investigations were untimely, incomplete, inadequate, and indifferent to child safety.

This is why RO 3 requires the State to "ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs." Dkt. 606 at 2. Sadly, this is not the first noncompliance. In a prior order holding the State in contempt for violating RO 3, 7, and 10, the Court warned that "simply checking the boxes of commencing and completing investigations by certain times is not sufficient for Defendants to implement this Remedial Order in a way that 'ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm,' as required by the Court's injunction." Dkt. 1017 at 77.

Nevertheless, state bureaucracy grinds on, checking boxes while children suffer. The State is not starting or finishing investigations in a timely manner, it is not taking into account the child's safety needs, and its investigations are chronically and substantially deficient.

In addition to the direct dangers caused by noncompliance with the court orders, defective abuse/neglect investigation practices also hamper compliance with RO 20, the order regarding heightened monitoring. *See* Dkt. 606 at 4-5. As discussed below in Section 2, investigation failures also mean failure to identify facilities that should be under heightened monitoring, increasing the risk of harm to children living in those facilities.

The Monitors' latest update on RO 3 documents a chronic failure to start and complete investigations in a timely manner. Dkt. 1412. The State left "investigations open with no activity

for months on end—in numerous instances for more than one year—while children with significant developmental disabilities were left in harm's way." *Id*. at 2. And, despite repeated cries for help and obvious signs of abuse and neglect, the State "failed to respond in a manner consistent with this Court's orders (and their own policies) and left children exposed to danger that in certain instances caused them terrible suffering and harm." *Id*. These disturbing conclusions stem from a careful review of Provider Investigations (PI) of Health & Human Services Commission (HHSC) in the four-month period from January 1, 2023 to April 30, 2023. *Id*. at 4 n.10.

As background, the PI unit and the DFPS's Child Protection Investigations (CPI) unit have different investigative jurisdictions. Dkt. 1412 at 3. When PI lacks authority, CPI is charged with investigating. The lines are not clear. The Monitors "observed examples of jurisdictional confusion between SWI, CPI and PI during the intake and investigation process." *Id.* at n.5.

There are four possible findings for PI investigations:

<u>Confirmed</u> — There is a preponderance of credible evidence to support that abuse, neglect, or exploitation occurred.

<u>Inconclusive</u> — There is not a preponderance of credible evidence to indicate that abuse, neglect, or exploitation did or did not occur due to lack of witnesses or other available evidence.

<u>Unconfirmed</u> — There is a preponderance of credible evidence to support that abuse, neglect, or exploitation did not occur.

<u>Unfounded</u> — Evidence gathered indicates that the allegation is spurious or patently without factual basis.

*Id*. at 4. In addition to these four findings, PI may close investigations "using a disposition of 'Other' when it determines that it does not have jurisdiction over any of the allegations." *Id*. Moreover, when PI investigations result in both Unconfirmed and Inconclusive dispositions, PI downgrades the overall disposition to Unconfirmed. *Id*. at 5 n.12.

- 12 -

PI closed 101 investigations during the review period. *Id*. at 5. To validate the State's compliance with RO 3, the Monitors "conducted reviews of 50 PI investigations." *Id*. at 6. Of those, "PI assigned an overall disposition of Unconfirmed to 43 (86%); Inconclusive to 6 (12%); and Confirmed to 1 (2%)." *Id*. Thus, HHSC found that 98% of allegations of abuse were either not credible or there was not enough evidence to indicate whether abuse did or did not happen.[2]

The Monitors found that these HHSC investigations were pervasively defective. Some 56% of the investigations "were inappropriately resolved or deficient." *Id*. at 6. Specifically: 6% were "inappropriately resolved." 48% were done "with such substantial deficiencies that the Monitors were prevented from reaching a conclusion"; that is, the Monitors could not even tell whether they were resolved inappropriately. And, in the one Confirmed investigation, PI "failed to conduct the investigation consistent with the child's safety needs due to the extensive, unexplained delay that kept the child in an unsafe situation." *Id*.[3]

Deficiencies often "began at the start of the investigations during the expected assessment of the alleged victim's current safety and recounting of the allegations; these problems included a failure to promptly interview children face-to-face and, in some instances, a failure to conduct interviews with children at all, despite the Court's orders." *Id*. at 7. These findings indicate that, in investigations conducted by PI, the State is also violating RO 7 and 8, which require it to complete "initial face-to-face contact with the alleged child victim(s)" "no later than 24 hours after intake" for Priority One investigations and "no later than 72 hours after intake" for Priority Two

---

[2] The numbers were similar for all 101 investigations done by PI in this period. "HHSC determined that 2% (2) of the investigations resulted in an overall disposition of Confirmed, thereby substantiating at least one allegation as abuse, neglect, or exploitation. In the remaining investigations, HHSC reported that the overall dispositions in 8% (8) of investigations were Inconclusive, 55% (56) of investigations were Unconfirmed, and 35% (35) of investigations were assigned a disposition of Other." *Id*.

[3] *Compare M.D. v. Abbott*, 907 F.3d 237, 292 (5th Cir. 2018) ("The typical error rate for child-welfare agency investigations is 2% to 3%. DFPS's error rate is 75%. That is, three out of every four cases of abuse are erroneously resolved—numbers that push beyond deliberate indifference.").

investigations. *Id.* at 7 n.14. Moreover, "PI frequently failed to conduct the investigations in a manner that appropriately accommodated and considered the limited capacities, verbal or otherwise, among this population of PMC children." *Id.* at 7. In other words, the investigations failed to "tak[e] into account at all times the child's safety needs." Dkt. 606 at 2.

In addition, the Monitors found "very few [investigations] were completed in 30 days and many had egregious delays, remaining open without activity for extended periods even in situations where the child was an alleged victim in newer additional serious allegations at the same placement." *Id*. Even when "untimely investigations had documented extensions approved, the delays in investigative activity were frequently without documented justification and/or exceeded reasonable periods of time to complete the investigation." *Id*. In one instance, "the Monitors discovered a child was an alleged victim in three investigations that remained open for more than 20 months while several new allegations of child abuse and neglect arose, resulting in three new additional investigations." *Id*. at 8. These findings also indicate that, in PI-conducted investigations, the State is in violation of RO 10, which requires completion of "Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record." *Id.* at 7 n.15.

The Monitors further observed that "PI's response is often fragmented and uncoordinated where multiple intake reports and investigations involve the same child or children at the same placement," which "creates or exacerbates serious risk of harm for PMC children." *Id*. at 8. In the case of one PMC child, "there had been 12 investigations that remained open, including four Priority One investigations, into allegations of abuse and neglect of the child over a 12-month period." *Id*. PI ignored multiple outcries of sexual abuse, "allowing the investigations to remain

- 14 -

totally dormant for inexplicable periods of time—in multiple instances for over one year." *Id*. And "when investigators finally returned to the allegations many months or over a year later, they appeared to adopt as fact the statements by staff members who claimed no wrongdoing or that the child routinely made false outcries." *Id*. In another Priority One investigation into allegations of sexual abuse, investigators did not question the obviously inconsistent statements provided by the administrator of a group home, and "the investigation into the child's allegation of Sexual Abuse sat dormant for one year." *Id*.

The Monitors also identified a troubling policy. "PI investigations do not involve a review of the referral history of the placement location, the supervising agency or owner, or of specific group home locations"—history that is relevant to the fact-finding endeavor and "could tip the scales towards a specific finding when the evidence leads to two equally plausible conclusions." *Id*. at 8-9. HHSC's policy of ignoring referral history increases the risk that PI investigations will leave PMC children in situations where they are being abused and neglected.

Finally, HHSC has a disturbing practice of ignoring whether administrators are neglectful. *Id*. at 10. For example, in one instance, staff members locked two children in a room and left them unsupervised for hours. In another instance, staff reported to PI investigators that administrators were not providing adequate staffing, resources, or training. In yet another, a staff member reported that she was unable properly to care for a child who was self-harming because the administrator failed to provide any training. One staff member called SWI to report neglect because she could not properly care for the six children left in her care. *Id*. In all these instances, HHSC failed to consider whether the administrator was negligent despite numerous reports, including from law enforcement officers, and obvious signs that an administrator failed to provide a safe environment.

Accordingly, Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for failing to comply with RO 3, 7-8, and 10 as to PI-conducted investigations.

**2.  Noncompliance with RO 3 and 20 Puts Children at Risk of Medical Abuse/Neglect.**

The Monitors have documented serious, widespread, and persistent problems of medical abuse/neglect. Particularly disturbing is neglect involving mismanagement of powerful prescribed drugs for children. These dangers persist because of noncompliance with RO 3 and 20.

**Remedial Order 3** (quoted above) deals with the State's system for receiving, screening, and investigating reports of abuse and neglect. Dkt. 606 at 2. By law, child neglect includes medical neglect. "Failure to seek, to obtain, or to follow through with medical care for a child" by anyone "working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child" is per se neglect. 40 Tex. Admin. Code §745.8559(5).

Likewise, acts like causing "a child to use" a prescription drug classified as "a controlled substance . . . other than a prescription drug that is prescribed to the child and used as prescribed" can be abuse. *Id*. §745.8557(4)-(5). As the DFPS Associate Commissioner for Statewide Intake confirmed, "medication errors" and "abuse of not abiding by the possible standards" can be child abuse or neglect. Dkt. 1356 at 58-59 (Black) (May 1, 2023). "Over medicat[ion] would be abuse, under-medication could be a medical (indiscernible), it depends on the act." *Id*. *See also, e.g.*, Dkt. 1352-18 (Court Ex. 8), 1352-20 (Court Ex. 10), 1352-27 (Court Ex. 23).

Similarly, emotional abuse includes acts/omissions that mentally or emotionally injure a child, resulting "in an observable and material impairment in the child's growth, development, or

psychological functioning." 40 Tex. Admin. Code §707.787. Medication or policy violations—including those involving psychotropic drugs—have obvious potential to inflict such injury.

The DFPS Associate Commissioner for Statewide Intake expects "medication errors to be reported to SWI." Dkt. 1356 at 59 (Black) (May 1, 2023). SWI gets the referrals "to assess either abuse or neglect, or abuse of not abiding by the possible standards and . . . take[s] the standards reports as well." *Id.* Similarly, failures "to seek, to obtain or follow through with medical care for a child by a person working under the auspices of an operation . . . are reportable events." *Id.*

The Monitors found grave deficiencies in investigations of medical abuse/neglect. *See, e.g.*, Dkt. 1352-27 (Court Ex. 23, listing intakes that the monitoring team identified as medical neglect yet not assigned to a medical neglect investigation by the State and describing poor investigations, including of mismanagement of psychotropic medication).

**Remedial Order 20** requires heightened monitoring of facilities with patterns of contract or policy violations. The State must address concerns at the facilities by taking corrective actions.

> Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

Dkt. 606 at 4-5.

RO 3—and accompanying orders addressing conduct of investigations, RO 7-8 and 10—and RO 20 are interrelated. Properly receiving and investigating reports of abuse/neglect is integral to identifying and tracking safety concerns at operations. It is an element of the formula that subjects an operation to heightened monitoring. *See* Dkt. 837. Medical abuse/neglect can have

severe and even catastrophic consequences. Whether the State complies with RO 3 in getting and investigating reports of medical abuse/neglect also redounds to its compliance with RO 20.[4]

      Contract and policy violations involving children's medical care can trigger heightened monitoring under RO 20. Examples include misadministration and mismanagement of prescription drugs and medical records, which violate minimum standards policies and contract duties. Key minimum standards relate to psychotropic drugs. These include 26 Tex. Admin Code §748.1337, §748.1345, §748.1385, §748.2253, §748.2255, §748.2257, §748.2259, and §748.2261.[5] And there are contract duties to the same effect.[6] Under RO 20, a pattern of "contract or policy violations" subjects operations to heightened monitoring and requires "corrective actions" to "address concerns." Dkt. 606 at 4-5. Indeed, at operations on heightened monitoring in 2020-22, "the number one concern and the most citations issued" are in the category of "Medical and medication management." May 1, 2023 Hearing Tr. 58; Dkt. 1352-18 (Court's Ex. 8). It is the *top* concern.

---

[4] Deficiencies in reporting, receiving reports, investigating, and addressing medical abuse and neglect also may implicate RO 22. It requires the State, in inspecting childcare placements and placement agencies, to consider reports and confirmed findings of child abuse and neglect and to monitor adherence to obligations to report child abuse and neglect. Dkt. 606 at 5. When the State finds a lapse in such reporting, it immediately must investigate and determine corrective action. *Id.* Accordingly, referrals and findings of medical abuse/neglect must be considered during placement inspections, and lapses in reporting of such events must be addressed. Dkt. 606 at 5. And the State must monitor placement agency adherence to their duties to report medical abuse/neglect. *Id.*

[5] For example, when a child is admitted to a general residential operation, the child's initial service plan must include "Medical needs" and "Therapeutic needs, including . . . the use of psychotropic medications." *Id*. §748.1337. "The roles of professional level service providers in service planning include," for children with emotional or autism spectrum disorders, reviewing "any medications prescribed for a child with special review of psychotropic medications." *Id*. §748.1345. And, when reviewing and updating a child's service plan, the operation must "Evaluate the possible effectiveness and side effects in the use of psychotropic medications prescribed for the child, any change in psychotropic medications during the period since the last review, and the behaviors and reactions of the child observed by caregivers, professional level service providers, and parents, if applicable." *Id*. §748.1385. Numerous other minimum standards relate to medication generally. *See, e.g.*, *id*. §748.2001-2233.

[6] *See* DFPS Resid. Child Care Contracts, 24-Hour Resid. Child Care Requirements 55 (accessed May 23, 2023), at https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf; Comparison of Min. Standards, Resid. Contract Requirements, & Service Level Indicators, DFPS.texas.gov (accessed May 4, 2023), at https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/comparison.asp.

In reviewing compliance with RO 20, the Monitors assessed factors like whether the State ensures that operations comply with contract requirements. These requirements include requiring a care provider to raise "concerns to DFPS and STAR Health if prescribed regimens are outside the Psychotropic Medication Utilization Parameters for Foster Children."[7] And they include minimum standards like those relating to drug storage, maintaining records of prescribed medications dispensed to children, and properly administering medications according to "a prescribing health-care professional's orders." Dkt. 1352-18 at 4-10.

The unreported abuse/neglect, un-cited minimum standards violations, and unaddressed contract violations discovered by the Monitors are proof of noncompliance with RO 20. When the State turns a blind eye to policy and contract violations, it undermines RO 20, and operations that need heightened monitoring do not get it.

Without the Monitors' review of child records during site visits, the State would not have discovered serious unsafe conditions at congregate care facilities. *See, e.g.*, Dkt. 1352-3-8 (Court Ex. 5A-5F, examples of unsafe conditions found by the Monitors); Dkt. 1356 at 86-87 (Muth) (May 1, 2023) (admitting the agency took steps to ensure children in RTCs have valid medical consenters after Monitors uncovered improprieties). The State does not dispute the accuracy of the Monitor findings, and its inability to identify or failure to correct these serious risks is symptomatic of noncompliance with the Court's orders. *See, e.g.,* Dkt. 1337 at 4-15 (site visit report).

---

[7] DFPS Comparison of Min. Standards, Resid. Contract Requirements, & Service Level Indicators, https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/comparison.a sp (accessed May 26, 2023); *see also, e.g.*, Dkt. 1352-23 (Court Ex. 19, excerpt from HHS Psychotropic Med. Util. Parameters for Children and Youth in Tex. Public Behaviorial Health (6th version)); DFPS 24-Hour Resid. Child Care Requirements, Resid. Contracts (RCC) at 55, at https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/ documents/24_Hour_RCC_Requirements.pdf (accessed May 26, 2023) (providers are required by contract to "follow[] the guidelines" in the State's PMU Parameters).

The Monitors have made numerous findings related to medical abuse and neglect that indicate noncompliance with RO 3 and 20.

### b.  Noncompliance with Remedial Order 3

RO 3 was born out of evidence at trial establishing that "faulty investigations" were putting children at an "unreasonable risk of harm." Dkt. 1017 at 70-76 (collecting evidence at trial). As the Court held in its contempt order, "simply checking the boxes of commencing and completing investigations by certain times is not sufficient for Defendants to implement this Remedial Order in a way that 'ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm,' as required by the Court's injunction." *Id*. at 77. Nevertheless, the State continues to check boxes while children suffer. Because the State is not properly investigating/substantiating alleged medical neglect at residential facilities, there is a risk that operations that should be identified for heightened monitoring will not be, and a substantial risk that children needing careful medical care will suffer irreparable harm.

Mismanagement or misadministration of medication constitutes medical neglect. "Failure to seek, to obtain, or to follow through with medical care for a child" by "a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child," is per se neglect. 40 Tex. Admin. Code §745.8559(5); *see also* Dkt. 1352-21 at 2. As the DFPS Associate Commissioner admits, "failure to seek, to obtain or follow through with medical care for a child by a person working under the auspices of an operation" must be investigated for abuse/neglect under RO 3 and for minimum standards under RO 20. Hr'g. Tr. at 58-59 (Black) (May 1, 2023). Yet his boss is unable to say whether mismanagement or misadministration of psychotropic drugs amounts to medical neglect/abuse. *See* Hr'g. Tr. at 65-66 (Muth) (May 1, 2023). This leadership lapse can only worsen an already dangerous situation.

Periodic reviews reveal chronic problems with the State's intake and investigation of medical neglect. The Monitors' First Report, Dkt. 869 (June 2020), identified problems existing from before the Fifth Circuit's 2019 mandate. Their later reports confirm the risks still exist. Time and again, investigations of medical neglect are found to be deficient,[8] and allegations of medical neglect are inappropriately downgraded or ruled out.[9] Their findings reveal an astounding practice of issuing citations for minimum standards violations yet ruling out medical neglect.[10]

---

[8] *See, e.g.*, Dkt. 1318 (Fifth Report) at 14 (Monitors could not determine the disposition of medical neglect due to deficient investigation); *id.* at 36-37 (same); Dkt. 1165-2 (Third Report) at 1-2 (same); *id.* at 10-11 (same); *id.* at 38-39 (same); Dkt. 1080-1 (Second Report) at 23-24 (same); *id.* at 60 (same); *id.* at 69 (same).

[9] *See, e.g.*, Dkt. 869 (First Report) at 94, Dkt. 869-4 at 4-5 (ruling out medical neglect despite multiple reports by nurses that foster parents set the heart monitor too low for a 10-year-old nonverbal, medically fragile child on a ventilator because the monitor kept sounding and waking them up at night); Dkt. 869-4 at 5-6 (ruling out medical neglect against a foster parent with a history of medical neglect and a CPA administrator who both failed to obtain timely medical treatment for a 13-year-old child who tried to hang himself); *id.* at 50-51 (failing to code for medical neglect where a facility failed to give medical attention to 16-year-old attacked by another child); Dkt. 869-3 at 8-9 (downgrading a Priority 2 investigation for medical neglect to only minimum standards where the foster parent admitted to failing to administer medication to 9-year-old girl with severe autism, which disabled her balance, focus, attention, and writing skills); *id.* at 57-58 (downgrading Priority 2 investigation for medical neglect to only minimum standards where a facility likely overmedicated a 13-year-old child with ADHD and intellectual delays and was not responsive to concerns from school staff); Dkt. 1080 (Second Report Appendices) at 2-3 (failing to code for medical neglect where the facility failed to give timely medical attention to 11-year-old child who struck his head on a wall hard enough to cause a concussion); *id.* at 7-8 (downgrading Priority 2 investigation for medical neglect to only minimum standards where facility failed to give timely medical treatment to 15-year-old child who attempted suicide); *id.* at 19-20 (downgrading Priority 1 investigation for medical neglect to only minimum standards where foster parent failed to secure timely mental health treatment for 15-year-old child expressing suicidal and homicidal behaviors); *id.* at 42-43 (ruling out medical neglect where facility failed to give timely medical treatment to 16-year-old child with untreated injuries sustained during a restraint by RTC staff); *id.* at 44-45 (ruling out medical neglect where medication/treatment records at a GRO indicated that staff failed to dispense medicines as prescribed, to follow-up with medically recommended services, or to document the provision of therapies as required by children's treatment plans); Dkt. 1080-1 at 5-6 (failing to investigate/substantiate medical neglect where facility failed to give medical treatment to intellectually disabled youth who told staff she was anally penetrated by another youth); *id.* at 67-68 (ruling out medical neglect where a facility failed to refill psychotropic medication prescription for child and likely did not store or account for the medication properly).

[10] *See, e.g.*, Dkt. 1318 (Fifth Report) at 97-98 (issuing citation but ruling out medical neglect despite findings that "the child had missed a dose of the medication prescribed for 'Mood, anger, and aggression' prior to his hospitalization and that there were 'inconsistencies contained in the medication documentation'"); *id.* at 98 (issuing citation but ruling out medical neglect despite findings that RTC staff administered two psychotropic medications that were not prescribed to the 11-year-old child); Dkt. 1248 (Fourth Report) at 154 (issuing/overturning citation and ruling out medical neglect despite findings that foster parent forged dates on medical logs and medication was filled but not documented); *id.* at 156 (issuing citation but ruling out medical neglect where foster parents failed to provide a child's prescribed medication to respite caregivers); *id.* at 161 (issuing citation but ruling out medical neglect despite foster parents' failure to take 1-year-old with traumatic brain injury to medical appointments on more than one occasion); *id.* at 175 (issuing citation but ruling out medical neglect where foster parents failed to take 2-year-old to the doctor after a fall that flattened and bloodied his nose); *id.* at 184 (issuing citation but ruling out medical neglect because the child had had no follow-up cardiologist appointment despite having irregular heartbeats); Dkt. 1080-1 (Second Report

The State's failures persist. The Monitors' site visit reports detail ongoing problems with intake/investigation of abuse, neglect, or exploitation reports, including those involving medical neglect. *See, e.g.,* Dkt. 1337 at 15-85. Of the ten reports the monitoring team made to SWI, three were improperly screened out, and investigations for the screened in cases were "so substantially deficient that the disposition could not be validated in six of the seven cases." *Id*. at 15-16.[11]

In their findings, the Monitors cited examples of "improperly plac[ing] the responsibility to request medical care on the child." Dkt. 1337 at 51.[12] A practice of relying on children to self-substantiate medical neglect makes it highly unlikely that DFPS ever will find medical neglect. Indeed, when the monitoring team asked children if they were getting medications as prescribed, "[e]ight of the nine children whose records documented that they were not receiving medications as prescribed were unaware of the problem." Dkt. 1337 at 13 n.33.

Accordingly, Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for failing to comply with the RO 3.

---

Appendices) at 63-64 (issuing citation but ruling out medical neglect where the foster mother missed or failed to schedule medical appointments for infant's ongoing care for a seizure disorder in the months prior to infant's hospitalization).

[11] For example, the monitoring team reported to SWI that a facility was misadministering and mismanaging prescription drugs. Dkt. 1337 at 43-44. The team supported its report with documentary evidence, which was emailed to the DFPS investigator. *Id* at 46. DFPS ruled out any medical neglect by the facility because the child "never asked to go to the doctor" and other children "did not make any outcries regarding any medical neglect." *Id*. at 47-48. DFPS closed its investigation and sent the case to HHSC. *Id*. at 46. HHSC initially cited the facility for minimum-standards violations related to medication destruction, storage, and administration. *Id*. at 48-49. It turns out that DFPS did not review the documentary evidence or forward it to HHSC. *Id*. at 49. After getting the evidence directly from the Monitors, HHSC issued more citations based on findings that a medical record was altered and another pre-filled before the child got medication. *Id*. at 49-50. HHSC apparently took no other enforcement action. It alerted DFPS to the monitoring team's findings, but "the documentation was never uploaded to One Case and there is nothing in the IMPACT records to suggest DFPS reviewed the documents and video or reconsidered its findings after HHSC alerted it to the information." *Id*. at 50. DFPS simply has ignored the evidence of medical neglect.

[12] *See, e.g.*, Dkt. 1337 at 42-48 (ruling out medical neglect since injured child "never asked to go to the doctor"); Dkt. 1248 (Fourth Report) at 154 (ruling out medical neglect "because the children either denied that the foster parent failed to give them medications, or said that if she did, they did not feel 'strange or ill' or have behavioral issues"); Dkt. 1165 (Third Report) at 5 (ruling out medical neglect because "child did not indicate that she was medically neglected or . . . that she was suffering from a headache").

### c. Noncompliance with Remedial Order 20

RO 20 emerged from proof at trial that "DFPS continues to under-regulate facilities" which causes an unreasonable risk of harm. *M.D. v. Abbott*, 152 F.Supp.3d 684 (S.D. Tex. 2015). "The State had knowledge of these problems. Moreover, that . . . inadequate enforcement policies place children at a substantial risk of serious harm seems painfully obvious." *Stukenberg I*, 907 F.3d at 267. The State has had ample time to comply with RO 20, even as the Court has granted it leeway. *See* Dkt. 950.[13] But time and again, the Monitors have found a lack of meaningful enforcement. *See, e.g.,* Dkt. 832 (Update Re: RO 20); Dkt. 955 (Update Re: Heightened Monitoring); Dkt. 1079 (Second Report); Dkt. 1248 (Fourth Report); Dkt. 1337 (Site Visit Report). This under-regulation puts children at a substantial risk of serious harm, most notably for children with medical needs.

Especially concerning are failures to enforce policies and contract duties as to psychotropic medications. Defendants created the Psychotropic Medication Utilization Parameters for Children & Youth in Texas Public Behavioral Health as "a 'best practices' guide to ensure the proper use of psychotropic medication for the children in foster care." 2023 Ann. Prog. & Servs. Rpt., Targeted Plan B. Health Care Oversight & Coord. Plan, DFPS [2023 APSR], at 15. The Parameters are "in place overall to ensure safety of children." Hr'g Tr. at 58 (Muth) (Apr. 12, 2023).

The Parameters detail criteria that indicate a need for further review of a child's medication regimen. *See* Dkt. 1337 at 5-6; HHSC, Psychotropic Med. Util. Parameters for Children & Youth in Tex. Public Behavioral Health (6th ver.); DFPS, Med. Servs. Resources Guide (Apr. 2020), at 18. Yet, there is no State enforcement. As it admits, "there is not a specific person or group of

---

[13] Plaintiffs' second show cause motion alleged that the State failed "to implement a credible system of heightened monitoring of private providers with a pattern of violations." Dkt. 901 at 17. Due to the difficulty of complying with the heightened monitoring requirements during the pandemic, Plaintiffs agreed to strike RO 20 from its motion to show cause. The Court then extended the compliance deadline, permitting the State to rollout the remedy incrementally.

people that are necessarily in place to police the medication guidelines." Hr'g Tr. at 68 (Apr. 12, 2023). Instead, "there is a process in place to review the extent to which those guidelines are being followed . . . and that process is the [PMU Review] process," *id.*, done by a vendor.

PMU Review is handled by STAR Health, a state contractor tasked with "conduct[ing] ongoing oversight of the psychotropic medication regimens of children to ensure the medication practices are in compliance with the Parameters." 2023 APSR at 15. If a child's medication regimen does not appear to comply with the Parameters, the case should be referred to STAR Health for a PMU Review. CPS's Director of Services confirmed that this process is a "very important" safety issue. Hr'g Tr. at 69 (Kromrei) (Apr. 12, 2023). The State relies on this process to monitor psychotropic medication regimens of children. *See id.* at 68; 2023 APSR at 15.[14]

The State does not dispute the findings of serious safety concerns at residential facilities detailed in the Monitors' site visit reports. These include that "PMC children [were] prescribed psychotropics in contravention of the State's psychotropic medication utilization parameters, posing a risk to children's health and safety." Dkt. 1337 at 5. The issue here is not prescription decisions but rather the State's failure to oversee childcare facilities' compliance with related contract duties and state policies. The Monitors' findings indicate chronic noncompliance with contract duties to alert DFPS and STAR Health when prescribed regimens appear not to comply with the Parameters.[15]

---

[14] A case is referred for a PMU Review in one of four ways: request by a court; requests by CPS staff, CASAs, caregivers, attorneys, residential care providers, and other interested parties; request by an HHSC service manager; or an automated process that uses pharmacy data to identify when a child's medications are outside the Parameters. *See* Dkt. 1337 at 4-15; Superior Healthplan, Psych. Med. Util. Rev. (PMUR) Process for STAR Health Members FAQ and Stakeholder Manual (July 2019); DFPS, Med. Servs. Resources Guide (Apr. 2020), at 17. After a PMU Review is referred, a STAR Health Behavioral Health Service Manager (masters level clinician) does a preliminary screening. Then a STAR Health Behavioral Health Medical Director (a child psychiatrist) reviews the information. If indicated, the case is forwarded to a child psychiatry consultant for a formal review and peer to peer consultation with the prescribing physician. *See id.*, DFPS Resources Guide at 18-19; 2023 APSR at 15.

[15] *See* DFPS Comparison of Min. Standards, Resid. Contract Requirements, & Service Level Indicators, https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/

For example, many children at multiple sites were prescribed four or more psychotropics (excluding drugs prescribed for side effects) under circumstances that violate the Parameters. *Id*. at 7. But a PMU Review had been done at some point for only 28% of the children. And most of those PMU Reviews were done a year or more before placement, when the children were taking a different set of medications than those prescribed at the time of the site visits. *Id*. at 7-9.[16] Indeed, of 18 children for whom a PMU Review was completed before monitoring team visits between December 2021 and December 2022, "[o]nly one child was taking the same set of medications reviewed." *Id.* at 9.

Errors in application/administration of medicine were legion. Some logs were prefilled and did not include medication counts, some did not consistently document when drugs were given, and others had blanks with no data at all. After hospitalization, children were medicated at a lower dosage than prescribed while hospitalized. When a doctor reduced the dosage of a drug, children continued to get a higher dosage. Children did not get prescribed medication because they needed a refill. Facilities had a practice of pre-pulling medication, they were named as medical consenters, and site records did not include the appropriate consent forms. *Id*. at 11-14.[17]

---

comparison.asp (accessed May 26, 2023); *see also, e.g.*, Dkt. 1352-23 (Court Ex. 19, excerpt from HHS Psych. Med. Util. Parameters for Children & Youth in Tex. Public Behaviorial Health (6th ver.)). Providers are required by contract to "follow[] the guidelines" in the State's PMU Parameters. DFPS 24-Hour Resid. Child Care Requirements, Resid. Contracts at 55, at https://dfps.texas.gov/Doing_Business /Purchased_ Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf (accessed May 26, 2023).

[16] Under RO 20, based on contract and policy compliance, care providers are to refer cases for PMU Reviews, which is not happening. Beyond that, the PMU Review process itself appears to be ineffectual. In 2023, a shocking 93% of cases referred for a PMU Review were screened out. Of the 7% that advanced, only 1% of cases got a full review. *See* 2023 APSR at 18. The numbers were as bad in prior years. *See* 2022 APSR at 18 (94% screened out); 2021 APSR at 17 (86%).

[17] As the Associate Commissioner for CPS said, it is unsafe for facilities to act as medical consenters. They may be "prescribing something to the child that the worker hasn't been alerted to or doesn't understand." Hr'g Tr. at 65-66 (Banuelos) (Apr. 12, 2023).

Nevertheless, the State appears to take no meaningful action against violators of minimum standards or contract provisions related to psychotropic medications. Its inaction undermines and violates the requirements imposed by RO 20 for heightened monitoring of dangerous facilities.[18]

Both agencies have critical duties related to RO 20. HHSC is to regulate childcare and child-placing activities in Texas and create/enforce minimum standards. These standards establish basic requirements to protect the health and safety of children in care and are weighted by HHSC based on the agency's assessment of the risk that a violation presents to children. Minimum standards cover medications generally and psychotropic drugs specifically.

In addition to being codified in Chapter 26 of the Texas Administrative Code, the current standards are published in Minimum Standards for General Residential Operations, December 2022 (revised 2/24/2023) (GRO Min. Standards).[19] GRO Min. Standards assigns ratings to each minimum standards provision.   A "pattern" of violations triggering heightened monitoring is defined based on violations "rated medium, medium-high, or high."  Dkt. 837.

---

[18] After RO 20 issued, the State sought clarification of the meaning of the terms "pattern of contract or policy violations" and "heightened monitoring." The Court entered an order defining the terms. *See* Dkt. 837 (Mar. 18, 2020). A pattern is "a high rate of contract and standards violations for at least three of the last five years." *Id*. at 1. To identify patterns, each agency must "review data for the rate of contract and standards violations, including confirmed findings of abuse and neglect, for the last five years." *Id*. "If the operation's rate of violations rated medium, medium-high, or high is above the combined rate of violations rated medium, medium-high, or high for operations of similar size and service type for three of the last five years, then there is a pattern of violations." *Id*. "When an operation is identified for heightened monitoring, a Facility Intervention Team Staffing (FITS) is scheduled within 5 days. The intervention team is made up of staff from, at least, RCCL, DFPS CCI, DFPS Contracts, and CPS." *Id*. at 2. "If the review reveals events that implicate an ongoing concern for the health and safety of children, the intervention team will develop a safety plan and temporarily suspend placements until all concerns for children's health and safety have been addressed." *Id*. The FITS team must develop a "detailed and specific" heightened monitoring plan addressing the pattern of policy violations that led to heightened monitoring; any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses; any technical assistance needed by the operation from DFPS, RCCL, or a third party; and the steps the operation must take to satisfy the plan. *Id*. at 2. "While an operation is on heightened monitoring, RCCL and DFPS will share responsibility for at least weekly unannounced visits to the operation, and any placements of PMC children must be directly approved by the Associate Commissioner of CPS." *Id*. Facilities that fail to correct contract and policy violations are subject to enforcement action, including suspension of placements, fines, suspension/revocation of the facility or CPA's license, and termination of the contract. *Id*.

[19] Available at https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/protective-services/ccl/min-standards/chapter-748-gro.pdf.

Minimum standards relating expressly to psychotropic medications and rated from medium to high, *see* GRO Min. Standards 148-49, 155, 159, 229-32, include:

- 26 Tex. Admin. Code §748.1337(b): "child's initial service plan . . . must include . . . "Therapeutic needs, including plans for psychiatric evaluation, psychological evaluation, psychosocial assessment or follow-up treatment, testing, and the use of psychotropic medications."

- 26 Tex. Admin. Code §748.1345: "roles of professional level service providers in service planning include . . . Reviewing any medications prescribed for a child with special review of psychotropic medications . . . ."

- 26 Tex. Admin. Code §748.1385: "To review and update a service plan, you must . . . Evaluate the possible effectiveness and side effects in the use of psychotropic medications prescribed for the child, any change in psychotropic medications during the period since the last review, and the behaviors and reactions of the child observed by caregivers, professional level service providers, and parents, if applicable."

- 26 Tex. Admin. Code §748.2253: "If my operation employs or contracts with a health-care professional who prescribes psychotropic medications to a child in care, what information must I provide the person legally authorized to give consent before requesting his consent for the child to be placed on psychotropic medication?"

- 26 Tex. Admin. Code §748.2255: "If my operation does not employ or contract with a health-care professional who prescribes psychotropic medications to a child in care, what information must I provide the person legally authorized to give medical consent prior to the health-care professional prescribing psychotropic medications to a child in care?"

- 26 Tex. Admin. Code §748.2257: "What are the requirements if a physician orders administration of a psychotropic medication to a child in an emergency?"

- 26 Tex. Admin. Code §748.2259: "What information must I document about a child's use of psychotropic medication?"

- 26 Tex. Admin. Code §748.2261: "If my operation employs or contracts with a health-care professional who prescribes psychotropic medications to a child in care, what are the requirements for evaluating whether a child should continue taking a psychotropic medication? [20]

---

[20] The Monitors documented multiple instances of likely violations of psychotropic-specific standards. *E.g.*, Dkt. 1337 at 11-12 (medication errors and medication log errors relevant to multiple standards, including 26 Tex. Admin. Code §§748.2259 and 748.2261), 14-15 (violations of standards regarding medical consenters and documentation of

- 27 -

DFPS has its own duties. Its Residential Child Care contracts impose requirements with which child placing agencies and general residential operations must comply in providing services to children. *See* 24-Hour RCC Requirements.[21] Providers must "follow[] the guidelines" in the Parameters and "ensure[] that the Caregiver administers and documents the provision of psychotropic medication as prescribed, and in accordance with Minimum Standards." *Id*. at 55. The DFPS guide for licensing/contracting requires providers to be responsible for "[r]aising concerns to DFPS and STAR Health if prescribed regimens are outside" the Parameters and for "[e]nsuring evaluation for continued treatment by a physician in the STAR Health Network at least quarterly." Comp. of Min. Standards, Resid. Contract Requirements, & Serv. Level Indicators, DFPS.texas.gov (accessed May 4, 2023).[22]

In fact, providers regularly violate these minimum standards and contract provisions. In 2020-21, 26% of operations qualified for heightened monitoring. *See* Dkt. 1248 at 92; Dkt. 1352-2 at 13. The most-cited problem in heightened monitoring plans, out of 485 problem areas listed,

---

informed consent, including §§748.2253 and 748.2255). Minimum standards relating to medications generally that are rated from medium to high, *see* GRO Min. Standards 217-28, include:

- *Id*. §748.2001: "What consent must I obtain to administer medications?"
- *Id*. §748.2003: "What are the requirements for administering prescription medication?"
- *Id*. §748.2005: "May I accept verbal orders on the administration of medication?"
- *Id*. §748.2051: "What are the requirements for a self-medication program?"
- *Id*. §748.2053: "Who must record the medication dosage if a child is on a self-medication program?"
- *Id*. §748.2101: "What medication storage requirements must my operation meet?"
- *Id*. §748.2103: "What are the requirements for discontinued or expired medication?"
- *Id*. §748.2151: "What records must you maintain for each child receiving medication?"
- *Id*. §748.2203: "What must I do if I find a medication error?"
- *Id*. §748.2205: "What must I do if I find a medication label error?"
- *Id*. §748.2231: "What must I do if a child has an adverse reaction to a medication?"
- *Id*. §748.2233: "What must I do if a child experiences side effects from any medications?"

[21]   Available   at   https:   //dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/ 24_Hour_RCC_Requirements.pdf.

[22]   Available   at   https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/comparison.asp.

was medical neglect: "Medication management, including documentation of medication logs and medication storage." *Id*. at 97; Dkt. 1352-2 at 3. The DFPS corrective steps "frequently lacked detail about how the [steps] should be implemented or accomplished." Dkt. 1248 at 101 n.135; 1352-2 at 7. For example, a facility is to develop "a plan for oversight of medication management to ensure all medication is being administered, documented, and stored correctly"; or "review and update the current policies and procedures of medication management (administration and documentation) to ensure all medication is being administered and documented according to minimum standard requirements." Dkt. 1248 at 101-102; 1352-2 at 7-8.

The State has displayed a disturbing lack of meaningful enforcement to protect children from unreasonable risks of harm. Again, the Monitors findings' show that deficiencies from before the Fifth Circuit's mandate persist such as scant penalties for violations.

For example, from mid-2016 to mid-2019, 2936 inspections of CPAs ended in a citation. Dkt. 832 at 5. A citation "is a determination that a violation of a minimum standard occurred"; it "does not, in and of itself, carry any penalty." *Id*. Of these instances, only 7% resulted in further involuntary enforcement action. *Id.* And of the 2778 inspections of GROs and RTCs that resulted in a citation, only 12% resulted in any other involuntary enforcement action. *Id*. SWI data shows similar results. In July-Nov. 2019, 1944 referrals resulted in RCCL opening a new investigation of an alleged minimum standards violation. "Of these, 81 resulted in at least one deficiency being cited, but only 6 [1.0%] resulted in some action being taken beyond a citation." *Id*. at 6 (orig. emph.). Of the 12 Priority 1 investigations, in which a reported violation poses an immediate risk of serious harm, none resulted in a citation or any corrective action. *Id*. at 7. Of 586 Priority 2 investigations, based on a reported injury or serious mistreatment of a child, 6% resulted in a citation, and "only 3 [0.5%] were the basis of some action beyond the citation." *Id*. (orig. emph.).

- 29 -

During a five-year period of 2014-19, "*not a single license was revoked* for a GRO (including RTCs) or a CPA." *Id*. at 7 (orig. emph.). Stats for enforcement actions in 2016-20 reveal a startling lack of meaningful action beyond monetary penalties. *See* Dkt. 1248 at 96; Dkt. 1352-2 at 2.

After the Monitors provided the site visit report to the State, HHSC made more discoveries during surprise visits and issued citations for violations of minimum standards. *See* Letter from Monitors re: RO 20 & Medication Issues (Apr. 26, 2023). Yet, it appears that HHSC has taken no enforcement action beyond issuing citations. In short, little has changed since the Fifth Circuit called the State's enforcement practices "problematic." *Stukenberg I*, 907 F.3d at 267.

Lack of effective enforcement is due to confusion about which agency is responsible. As the DFPS Director of Contracts Division said, "We're just trying to work out the responsible agency. Whether it's DFPS or HHSC that would implement and impose those remedies . . . DFPS has the contract. HHSC would have the licenses and so we're trying to figure out whether it makes sense [as a] contract action or a licensing action." Hr'g Tr. at 263-64 (Walsh) (Apr. 12, 2023).

The State also fails to use its full array of enforcement remedies to ensure compliance. As HHSC's Chief Policy and Regulatory Officer testified, "we assessed $8600 of fines on 35 operations [in 2022]. That's the total for all 35." Hr'g Tr. at 265-67 (Dixon) (Apr. 12, 2023). This is an average penalty of $245. The Court aptly noted, "a simple fine of that amount is not going to touch . . . . their operation . . . Especially when you're giving them thousands of dollars every month." *Id*. at 266-67. Nevertheless, the State continues to use and license facilities that routinely mismanage medications and records, exposing the children to significant risk of harm.

Just as facilities that operate without fear of enforcement will continue to jeopardize the children, defendants that operate without fear of contempt will continue to violate court orders. The "'collaborative' approach to compliance was simply not working. This is evidenced by the

fact that there is a very high rate of repeat violations, as licensees do not perceive that they will be held accountable for their malfeasance." *Stukenberg I*, 907 F.3d at 267. The State's ongoing failure to enforce its own contracts/policies puts children at serious risk of harm and violates RO 20.

Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for not complying with RO 3 and 20. Sanctions may include substantial monetary penalties assessed 30 days after the order unless the State implements meaningful remedies that cure the violations.

### 3. The Placement Crisis Overburdens Caseworkers and Puts All PMC Children at Risk.

In late 2019, the State agreed to an order requiring it to adhere to caseload guidelines of 14-17 children per caseworker. *See* Dkt. 771. This was to remedy "the problem with excessive caseworker workloads." *Stukenberg I*, 907 F.3d at 255. The order binds the State. *See, e.g.*, *Spallone*, 493 U.S. at 276 (contempt sanctions were proper against city that failed to remedy unconstitutional public housing practices, despite its agreement by consent decree to do so); *In re Flechas & Assocs., P.A.*, 592 B.R. 639, 649 (Bankr. S.D. Miss. 2018) (agreed judgment "becomes a court judgment" and "binds the parties as fully as other judgments." (quotes omitted)).

The State-created crisis of children sleeping in unlicensed, unsafe placements has rendered nominal compliance with the Agreed Order's guidelines a farce. It puts a burden on caseworkers that poses a safety risk to all children in the system. In addition to their usual caseload, caseworkers are having to spend exhausting extra shifts trying to care for hundreds of children that the State puts into unlicensed, unsuitable, and dangerous settings each month. And they must shoulder these extra care duties without proper training or resources. It is wishful thinking by the State to presume that caseworkers crushed with mandated double duty can keep any children safe for very long. The

reality of the workload on caseworkers is that the State is not complying with the agreed workloads order. This lack of compliance implicates other remedial orders relating to workloads.

The caseload order requires the State to implement the "guidelines for determination of generally applicable internal caseload" to which it agreed: "14-17 children per caseworker for DFPS conservatorship caseworker caseloads." Dkt. 771 at 2. In lieu of doing the workload study required by affirmed RO A.1 and A.2, *see* Dkt. 606 at 8-9, the State must "use these guidelines to satisfy" its requirement "to establish generally applicable internal caseload standards." Dkt. 771 at 2; *see also* Dkt. 606 at 8-9 (RO A.3 and A.4 requiring use of internal caseload standards in distributing caseloads and informing hiring goals).

The order is clear that "Defendants' use and implementation of these guidelines will remain subject to supervision by the Monitors and approval of the Court, as explained in the November 20, 2018 order." Dkt. 771 at 2. The now-routine practice of making caseworkers pull extra shifts to care for children sleeping in hotels and other risky, unlicensed settings implicates the State's use/implementation of the caseload guidelines.

 A caseworker who nominally has a 17-child caseload but also must spend dozens of hours monthly working extra shifts does not have a child caseload within the guidelines. *Cf.* Dkt. 606 at 9 (RO A.3: "The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. . . .). Under RO A.3, "caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly." *Id.* The State does no prorating of caseloads for primary caseworkers whom it regularly requires to work in the "other function" as caregiver of children in unlicensed placements.

In addition to violating the caseload order and RO A.3 and A.4, overloading caseworkers due to the placement crisis may violate RO 35's requirements for caseload tracking and reporting:

> Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.

Dkt. 606 at 7.[23]

Child-only caseload tracking and reporting is illusory if each caseworker is responsible, in addition to a primary caseload, for directly supervising multiple other children every month. This is particularly true because the extra shifts tend to involve older children with significant mental health or behavioral needs and must be done without proper training/resources and in an ill-suited placement. This double duty is far more taxing on caseworkers. Again, these extra shifts are "other functions" that must be counted. *See id.* ("Caseloads for staff . . . who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.").

"That a policy or practice of maintaining overburdened caseworkers directly causes all PMC children to be exposed to a serious risk of physical and psychological harm is adequately supported by the facts in the record." *Stukenberg I*, 907 F.3d at 264-65. Indeed, "the principle

---

[23] This RO also provides, "Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015." Dkt. 606 at 7. *See also* Dkt. 368 at 250 ("DFPS must track primary CVS caseworker caseloads on a child-only basis. The Special Master shall recommend whether tracking should be categorized separately for full-time and part-time primary CVS caseworkers, and how tracking should be categorized on a region and county-level. The State cannot include in the calculations secondary workers, workers in training, or fictive workers created out of overtime. The State is welcome to continue tracking caseloads by stages, but not in lieu of child-only tracking.")

seems obvious: when workloads exceed caseworker bandwidth, caseworkers are not able to effectively safeguard children's health and well-being." *Id.* at 265. As the Fifth Circuit observed, high caseloads "are a direct cause of high turnover rates." *Id.* at 260. In holding that the State was "deliberately indifferent to the risks posed by its policies and practices toward caseload management," the court noted, the "combination of unmanageable caseloads and high caseworker turnover creates a 'cycle of crisis' that allows children to 'fall through the cracks.'" *Id.* at 258, 260.

Although the State agreed to the order requiring a 14-17 children caseload guideline, given the ongoing placement crisis, the State's "charitable" caseload calculations continue to "undersell the scope of the problem." *Id.* at 257. DFPS staff work overtime to supervise children in these risky, unlicensed settings in addition to their full-time responsibilities as caseworkers. *See* Dkt. 1318 (Fifth Report) at 50-55, 122-23. These competing job duties create significant safety risks. DFPS staff often fail to—because they do not have time to—review critical case information or adequately supervise children.

Simple math illustrates the problem. Caseworkers already work more than full-time. As the CPS Associate Commissioner said, "I know when I was a caseworker, I didn't work 40 hours. I worked a lot more than that . . . I would say in any given week, depending on whether I had emergencies or not, I would say at least 50 hours." Hr'g Tr. at 215 (Banuelos) (Apr. 12, 2023). Then, on top of those 50 hours/week working their normal workload, caseworkers work double time to care for children in unlicensed placements. Based on a survey of DFPS caseworkers, 80% reported having responsibility for children in unlicensed placements: 29% reported working >35 hours/month working these extra shifts; 47% worked 12-35 hours; and 23% worked <12 hours. *See* Dkt. 1318 at 123; Dkt. 1132 at 74 (in 2021, the average shift lasted 4-6 hours, not including

"the time it took staff to travel to and from the [Unlicensed] Setting, which could be more than an hour each way, depending on the region where they worked."). The burden is obvious.

Beyond these alarming statistics, some of these caseworkers already had workloads beyond the guidelines. 17% of the workers doing the extra shifts had child caseloads that exceeded the agreed guidelines. *See* Dkt. 1318 at 122. Of those, 8% carried 18-20 children on their caseloads, 9% had 21-25 children on their caseloads, and all were DFPS workers. *Id*. 82% carried caseloads nominally meeting the agreed standards (not counting extra shifts), and 33% of those were subject to graduated caseloads because they were new to their positions. *Id*. at 122-23. Given all that, the State caps the extra shifts at 18 hours/week, *see* Hr'g Tr. at 224 (Banuelos) (Apr. 12, 2023), which is almost half of a full-time week for normal employees.

The math is daunting: 50+ hours/week working an assigned caseload plus 18 hours/week working these extra shifts. Caseworkers are working nearly 70 hours per week, every week. *See* Hr'g Tr. at 218 (Apr. 12, 2023). Not surprisingly, these crushing workloads are causing significant burnout among caseworkers, as evidenced by the State's caseworker turnover rate of 36%. *Id*. at 219. This "cycle of crisis," using the Fifth Circuit's words, caused by unmanageable workloads and caseworker turnover ripples into the PMC class at large. This is precisely the harm that the orders pertaining to child workloads were intended to remedy and stop.

The State's calculations do not reflect the true workload of caseworkers because these extra shifts are not factored into caseloads. *See* Dkt. 1136 at 14. DFPS admits that hours actually spent by its caseworkers trying to care for children in unsafe, unlicensed placements are *not* factored "in any caseload." Hr'g Tr. at 218 (Muth) (Apr. 12, 2023). This failure to account for these extra hours "gives a false representation of the State's compliance with their agreement of 14 to 17 cases per caseworker." Hr'g Tr. at 224 (Apr. 12, 2023). Moreover, while caseloads are a useful proxy for

workload, the Fifth Circuit understood that the constitutional violation stems from unmanageable workloads not merely caseloads. *See Stukenberg I*, 907 F.3d at 256-65 (emphasizing workloads). Deciding compliance with RO 35 based on caseloads alone is contrary to the Fifth Circuit holding.

The State is aware that nearly all DFPS workers may or must take on shifts, in addition to their full caseloads, to care for the many children it places in motels and other unlicensed settings. It knows that this practice causes low morale and high turnover. And it admits that unmanageable workloads and caseworker turnover results in a cascade of harms that place foster children at significant risk of irreparable harm. These facts are beyond dispute. "The State is well-aware that caseworkers have unmanageable workloads. It also knows that high caseloads—which are a direct cause of high turnover rates—have a negative impact on PMC children's welfare." *Stukenberg I.*, 907 F.3d at 260. *See also* Dkt. 1175 at 159-61 (Commissioner Masters).

Serious incidents during these double shifts illustrate that overloading DFPS workers puts all children in the system at risk.  Children in unsafe, unlicensed settings have ingested pills and used state-issued cell phones to send nude photos via social media sites. *See* Dkt. 1318 at 50-52. A child in need of "Line of Sight" supervision ran away from one unlicensed setting because the caseworker was reading emails on her cell phone about a child on her caseload who had run away just hours earlier. *Id*. at 54-55. A 13-year-old child—also in need of "Line of Sight" supervision— was sexually assaulted by a man in a motel room while she was on runaway status. *Id*. at 52 n.96. Working double-duty puts caseworkers in an untenable position: they are responsible for both the many children on their assigned caseloads and extra children in unlicensed, unsafe placements. They are simply unable to fulfill both responsibilities.

 Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for not substantially complying with the Agreed Order (Dkt. 771)

- 36 -

and RO A.3, A.4, and 35. Sanctions may include substantial monetary penalties assessed 30 days after the contempt order unless the State implements meaningful remedies that cure the violations.

### 4. Failure to Facilitate Reports of Abuse/Neglect Imperils Children and Violates RO A6.

**Remedial Order A6** requires the State to ensure that caseworkers provide children with the appropriate point of contact for reporting abuse/neglect and information including about the Foster Care Bill of Rights and the Texas Health and Human Services Ombudsman:

> DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of this information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record. [Dkt. 606 at 11]

Nearly four years after the Fifth Circuit's mandate, the Monitors report "serious concerns regarding the ability of children in some facilities to reach out for help if they encounter safety risks." Dkt. 1318 (Fifth Report) at 80. The State's failure to ensure that children are provided an appropriate point of contact to report abuse places children at serious risk of harm and undermines the basis of the Fifth Circuit's decision. *See id.* at 71-89.

According to the Fifth Report, only 54% of the children interviewed had heard of the Foster Care Bill of Rights, and 46% had not heard of it even after a description was given. *Id.* at 75. (Knowledge varied by age: 69% of 9 and 10-year-olds had not heard of the Bill of Rights compared to 15% of 15 to 17-year-olds; 66% of children 12 years or younger had not heard of the Bill of Rights. *See id.* at 75.) Of those who reported hearing about the Bill of Rights, only 17% had read the document, and only 39% said someone had explained it to them. *Id.* at 76. Younger children were even less likely to report having read the Bill of Rights or having the document explained to

them. *Id*. Over half (51%) of children interviewed had not heard of the SWI hotline even after a description was given. *Id*. at 77-78.[24] In total, only 35% of children knew how to call the hotline. *Id*. at 78.[25] Many (59%) had never heard of the Ombudsman even after a description was given, and most (67%) did not know how to reach the Ombudsman. *Id*. at 76-77.[26]

While nearly all respondents (93%) reported having access to a phone, phone use was highly regulated: 83% needed caregiver approval before using a phone, and 31% reported specific days or times of the day when phone use was allowed. *Id*. at 81-82. 74% of interviewed caregivers reported restrictions on when a child can make a call, 67% reported restrictions on both when a child may make a call and who a child may call; only 9% of caregivers reported no call restrictions. *Id*. at 83. Even when children knew how to call the SWI hotline or Ombudsman, nearly half (49%) reported that children or staff could always hear their conversation, while 30% said others could sometimes hear their conversation. *Id*. Only 14% percent reported being able to use the phone without children or staff overhearing their conversation. *Id*.

A child's caseworker is required to report outcries of maltreatment. *Id*. at 86. But over half of youth interviewed (57%) said that caseworkers only "sometimes" answered or responded, and 19% of youth interviewed reported that their caseworker did not answer or respond when they called or texted. *Id*. Only 27% said their caseworker "always" answered or responded. *Id*.

---

[24] Knowledge of the hotline varied by age: nearly all 15 to 17-year-olds had heard of the hotline (77%) and another 15% reported having heard of it after a description was given, but 80% of 9 and 10-year-olds had not heard of the hotline even after a description was given. *See* Dkt. 1318 at 78.

[25] Knowledge of how to call the hotline varied by age: 85% of children ages 15 to 17 knew how to call the hotline while only 12% children aged 9 and 10 knew how to call the hotline. *See* Dkt. 1318 at 78.

[26] 75% of 9 and 10-year-old children had not heard of the Ombudsman compared to 31% of 15 to 17-year-olds. *See* Dkt. 1318 at 77.

In the years since the mandate issued, the State has neither developed nor implemented an effective plan to ensure that children know about available reporting mechanisms or that reporting mechanisms are accessible to children. As the CPS Director of Permanency recently testified:

> MR. HENSARLING: … So we worked with our provider network to communicate out that children and youth should have access and are allowed to have access to phones.
>
> THE COURT: Are you documenting it with each child?
>
> MR. HENSARLING: So they're provided that information through their Foster Care Bill of Rights, the rights of youth and children in foster care.
>
> THE COURT: What if they don't have the Foster Care Bill of Rights?
>
> MR. HENSARLING: We're working on a plan to make sure that there -- one, it's posted in every operation. So we also sent another reminder communication out to operations to ensure. We did some spot-checking as well to make sure that it was posted out. And we do regularly check that. And we're also working on some plans to be able to provide more communication methods for youth to have access to that information, that they can have it at all times.
>
> THE COURT: Do you know how many years it's been since this order was in place?
>
> MR. HENSARLING: Yes, ma'am.

Hr'g Tr. at 31-32 (Hensarling) (Jan. 27, 2023).

Nearly four years after the mandate issued, the State is still "working on some plans." And these purported plans are woefully insufficient. Ensuring that facilities post a Foster Care Bill of Rights somewhere in the facility will neither effectively inform children of reporting mechanisms nor ensure that facilities permit access to reporting mechanisms. Indeed, even when facilities post the SWI hotline and Ombudsman phone numbers on site—which nearly all (98%) do, *see* Dkt. 1318 at 81—most children still lack the knowledge about whom and how to contact, and those who do lack adequate access to those reporting mechanisms. This plan is manifestly ineffective. Moreover,

the vague "plans to be able to provide more communication methods" stretches the definition of "plan" into absurdity.

"Inability to report facilitates abuse." *Stukenberg I*, 907 F.3d at 302-03. The State's failure to maintain an appropriate point of contact places children at significant risk of serious harm. The State's failure increases the risk that operations that should be identified for heightened monitoring will not be (RO 20), and the risk that operations that should be investigated for abuse/neglect will not be (RO 3). The State displays little sense of urgency or concern about the harms related to the inability to report abuse.

Accordingly, Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for failing to comply with RO A6. Sanctions may include substantial monetary penalties assessed 30 days after the contempt order unless the State implements meaningful remedies that cure the violations.

### 5. The State's Refusal to Comply with RO 4's Sexual Abuse Training Undermines the Monitors' Authority and Endangers Children.

**Remedial Order 4** requires the State to train caseworkers and caregivers who interact with PMC children to identify and report child sexual abuse, including child-on-child sexual abuse:

> Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse. [Dkt. 606 at 2]

The State repeatedly has failed to provide data for the Monitors to validate compliance. *See* Dkt. 869 at 217-218 (First Report); Dkt. 1079 at 185-186 (Second Report); Dkt. 1248 at 34-35, 37 (Fourth Report); Dkt. 1380 at 41, 43-44 (Sixth Report).

In the First Report, the Monitors requested the State to provide a list that includes the date of completion of sexual abuse training for all caregivers, including names, identification numbers, and addresses of the caregivers assigned to serve children in the PMC class. *See* Dkt. 869 at 217-

218. In response, the State admitted that "DFPS has no way to track completion." *Id*. at 220. "As an alternative, DFPS stated that it directed the operations serving PMC children to ensure licensed caregivers are trained and report to the State on whether caregivers completed the training." *Id*.

In the Second Report, the Monitors again requested "a single, unified list that includes the date of completion of sexual abuse training for all caseworkers and caregivers." Dkt. 1079 at 185-186. The Monitors could not rely on case reviews to validate training by caregivers because, as the Monitors discovered, users can "obtain a certificate of completion for the caregiver training without completing the training." *Id*. at 191. The State said it rectified these "computer glitches." *Id*. 191 n. 401. Still, as "the State does not maintain a list of all caregivers serving DFPS children or their training completion date(s) . . . the Monitors cannot validate that all or most caregivers completed the full child sexual abuse training required by Remedial Order 4." *Id*. at 192.

By the Fourth Report, DFPS admitted it "[had] not been able to demonstrate compliance" with Remedial Order 4 because it "has never had a comprehensive list of caregivers required to take the training." *Id*. To show compliance, "DFPS implemented a Provider Portal to administer its online training module and to address previous administrative deficiencies in the training delivery." Dkt. 1248 at 35. The Monitors said they would "provide an update on the State's progress with the newly implemented portal" in the next report addressing RO 4.

Years after the Court's order and repeated requests, the Sixth Report confirms that the State still cannot validate its performance even with the new portal. "Despite DFPS's implementation of the Provider Portal, the Monitors cannot determine whether the data included an exhaustive list of all caregivers." Dkt. 1380 at 44. In emails to the Monitors, the State admitted, "DFPS does not have its own list of all active caregivers," nor "unique identifiers for caregivers that would allow for cross referencing between relevant data reports." *Id*. at n.74. Without caregiver IDs, the

Monitors are unable "to cross reference between the DFPS data reports listing caregiver training completion and those listing child placement location." *Id*. at n.75. And "while such an identifier would not permit validation of all caregivers, if the Monitors received matching unique identifiers for foster parents in both data reports, it would, for example, allow them to partially verify Remedial Order 4 with respect to caregivers in foster homes caring for PMC children." *Id*.

The State never objected to the Monitors' requests for caregiver data, despite its admission that data deficiencies rendered it unable to show compliance with RO 4. Only now, five years after the Court's order, does the State object to this data request. *See* Dkt. 1393 at 6-7.

Notwithstanding the State's admission that it is "not able to provide unique identifiers for caregivers," its objection to the Sixth Report states that the Monitors "have access to both systems [DFPS's Provider Portal and HHSC's CLASS system], and individuals requiring and receiving training can be cross-referenced to the active caregivers listed on the quarterly report that shows when caregivers have completed the training." *Id*. The State cannot keep its story straight. It is willing to work with the Monitors to validate caregiver training, it says, but its actions say otherwise. Monitors' requests have fallen on deaf ears for years, and the State's new objection is the legalese equivalent of "figure it out yourselves."

Worse, the State claims supposed significant progress on caregiver training, even though it is unable to aggregate the data necessary to show compliance with RO 4. The State cannot judge its own compliance. That is the Court's role.

The Court appointed the Monitors "to assess and report on Defendants' compliance with the terms of this Order." Dkt. 606 at 16. The Monitors have a duty to "independently verify data reports and statistics provided pursuant to this Order" and "have the authority to conduct, *or cause to be conducted*, such case record reviews, qualitative reviews, and audits as the Monitors

reasonably deem necessary." *Id*. (emph. added). The Monitors must "take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order" and to produce a report to the Court every six months "set[ting] forth whether the Defendants have met the requirements of this Order . . . the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects." *Id*. at 17.

The State's inability or unwillingness to produce data critical to validate compliance with RO 4 undermines the Monitors' authority granted by the Court and prevents them from conducting their duties. The claims of "significant progress" and "substantial compliance" are groundless.

As evidence of alleged substantial compliance, the State points to the "98.7% compliance rate for caregivers completing the training during the review period." Dkt. 1393 at 6. But this number is based on incomplete data provided by the State. *See* Dkt. 1380 at 43-44 ("DFPS used its new Provider Portal to produce quarterly data files that included all individuals who were registered in the Portal and were active during the period from January 1, 2022 through November 30, 2022, a total of 47,372 unique individuals."). The Monitors cannot validate the 98.7% since they "cannot determine whether the data included an exhaustive list of all caregivers." *Id*. at 44.

If the State cannot confirm the denominator, it cannot rely upon the unverifiable data. This is why the Monitors have repeatedly requested a full list of caregivers.

Because the State has not complied with repeated requests, the Monitors have tried to check compliance through case record reviews and caregiver interviews. Defendants do not dispute any of the Monitors' fact findings. Of the 242 staff records reviewed, 17% did not have documentation showing the staff person had the required training; of the 117 staff members interviewed, 87% had

done the training, and 14% reported not having completed the training or were unsure whether they had done the training. *See* Dkt. 1380 at 44.[27]

This remedial order is not complicated: caregivers get the training or they do not. Showing compliance is just as simple: the full list of caregivers shows that training was done, or it does not. The harms from noncompliance are simple and serious: untrained caregivers may be unable to identify child sexual victimization or aggression, increasing the risk that PMC children will be raped or sexually assaulted while in the custody of the state.

Nearly a quarter—24%—of PMC children identified as victims of sexual abuse suffered abuse *after* entering foster care. Of those, 66% suffered sexual abuse *only* after entering foster care; 34% were abused both before and after entering foster care; and one-third suffered two or more incidents of abuse while in foster care. *See* Dkt. 1380 at 47-48. Almost half of the children victimized in state custody later engaged in two or more incidents of sexual aggression while in care. *Id*. at 53. RO 4's explicit requirements combined with the extremely serious risk created by noncompliance mean that anything less than 100% compliance is dangerous and unacceptable.

Accordingly, plaintiffs request an order directing the State to show cause why it should not be held in contempt for failing to comply with RO 4. Sanctions may include monetary penalties assessed 30 days after the order unless the State implements remedies that cure the violations.

---

[27] *See also* Dkt. 869 at 225 (First Report) (Out of 288 staff records reviewed, 86% had completed the training. At one facility, only 59% of employee files contained certification for child sexual abuse training completion.); Dkt. 1079 at 193 (Second Report) (Out of 18 caregivers interviewed, only 3 stated that they would call SWI if a child disclosed sexual contact with another child. The record review confirmed this problem: only 70% of the reviewed records of direct care staff and supervisors included documentation showing they had completed the Child Sexual Aggression training.); Dkt. 1248 at 37 (Fourth Report) (Of the 53 staff records reviewed, 28% did not include documentation showing the staff person had completed the required training. Of the 31 staff members interviewed, 87% reported having completed CSA training, and 13% reported not having completed training or were unsure whether they had completed the training.).

**PRAYER**

For these reasons, plaintiffs respectfully pray that the Court order the State to show cause why defendants should not be held in contempt and sanctioned for failing to comply with court orders. In addition, plaintiffs urge the Court to consider imposing partial receiverships as to areas in which the State has shown it will not or cannot comply with remedial orders intended to ensure child safety. This includes the State-created crisis of children sleeping in unlicensed, unsafe placements and resulting burden on caseworkers. It also includes the deficiencies in investigations conducted by HHSC Provider Investigations. The Monitors could develop a plan to implement partial receiverships over areas that the Court considers most significant.

Now twelve years after this litigation began, it is beyond time enough for the State to fully protect the rights of PMC children. Only the enforcement steps of contempt and receiverships will ensure this constitutionally required protection.

Dated:  October 13, 2023

Respectfully submitted,

_R. Paul Yetter_____

Samantha Bartosz (*pro hac vice*)
Stephen Dixon (*pro hac vice*)
CHILDREN'S RIGHTS
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
sbartosz@childrensrights.org

R. Paul Yetter
State Bar No. 22154200
Christian J. Ward
State Bar No. 24033434
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
355 Lexington Avenue, Floor 16
New York, New York 10017
(646) 795-4456
mlowry@ABetterChildhood.org

Barry F. McNeil
State Bar No. 13829500
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
(214) 651-5000
barry.mcneil@haynesboone.com

ATTORNEYS FOR PLAINTIFFS AND
THE GENERAL CLASS AND SUBCLASSES

## CERTIFICATE OF SERVICE

I certify that on the 13th day of October, 2023, a true and correct copy of this document was served on all counsel of record using the Court's CM/ECF e-file system.

_/s/ R. Paul Yetter_____
R. Paul Yetter