IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, *et al.*, | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 2:11-CV-00084 |
| | § | |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' THIRD
AMENDED MOTION FOR ORDER TO SHOW CAUSE
WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT**

---

**TABLE OF CONTENTS**

Page

Table of Authorities ....................................................................... iii

Introduction ...................................................................................... 1

Legal Standard ................................................................................. 2

Summary of Argument ..................................................................... 4

Argument ........................................................................................... 9

I. Remedial Orders 3, 7, 8, and 10 .............................................. 9

   A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Orders 3, 7, 8, and 10. ................. 9

   B. Defendants have substantially complied with Remedial Orders 3, 7, 8, and 10, and at minimum have made good-faith efforts to comply. .......................................................... 13

II. Remedial Order 20 ................................................................ 17

   A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order 20 ..................................... 18

   B. Defendants have substantially complied with Remedial Order 20, and at minimum have made good-faith efforts to comply. .................. 21

III. Remedial Order 35 and the Agreed Order ............................ 23

   A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order 35 and the Agreed Order. ................................................................... 24

   B. Defendants have substantially complied with Remedial Order 35 and the Agreed Order, or have cured any noncompliance ................... 27

IV. Remedial Order A6 ............................................................... 30

   A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order A6. .................................. 30

   B. Defendants have substantially complied with Remedial Order A6. .... 31

V. Remedial Orders 26 and 29 .................................................. 32

   A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Orders 26 and 29 ....................... 32

   B. Defendants have substantially complied with Remedial Orders 26 and 29, and at minimum have made good-faith efforts to comply. ....... 34

VI. Remedial Orders 25, 27, and 31 .......................................... 34

i

**TABLE OF CONTENTS**
(cont'd)

Page

  A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Orders 25, 27, and 31. ............... 36

  B. Defendants have substantially complied with Remedial Orders 25, 27, and 31, and at minimum made good-faith efforts to comply. ......... 40

VII. Remedial Order 4 ............................................................................. 41

  A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order 4 ....................................... 41

  B. Defendants have substantially complied with Remedial Order 4, and at minimum have made good-faith efforts to comply. ................... 43

VIII. Mitigating Circumstances:  Defendants' undisputed compliance with the vast majority of the remedial orders weighs against contempt .................... 45

 IX. Receivership:  The extreme remedy of receivership is inappropriate and unwarranted in light of defendants' substantial compliance, good faith, and undisputed improvement. ....................................................................... 47

Conclusion ................................................................................................. 50

## TABLE OF AUTHORITIES

Page(s)

### Cases

*R.C. ex rel. Ala. Disabilities Advoc. Project v. Walley,*
    270 F. App'x 989 (11th Cir. 2008) .................................................. 46

*Anderson v. Sch. Bd. of Madison Cnty.,*
    517 F.3d 292 (5th Cir. 2008) .......................................... 15, 16, 45

*In re Baum,*
    606 F.2d 592 (5th Cir. 1979) ............................................ 3, 10, 39

*Bd. of Educ. of Okla. City v. Dowell,*
    498 U.S. 237 (1991) ............................................................... 15

*Gary W. v. Louisiana,*
    1990 WL 17537 (E.D. La. Feb. 26, 1990)............................. 47, 49

*In re Gee,*
    941 F.3d 153 (5th Cir. 2019) .......................................... 3, 18, 48

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck
    Drivers Local No. 70 of Alameda Cnty.,*
    415 U.S. 423 (1974) ............................................................... 24

*In re Hailey,*
    621 F.2d 169 (5th Cir. 1980) ................................................... 22

*Hornbeck Offshore Servs., LLC v. Salazar,*
    713 F.3d 787 (5th Cir. 2013) ....................... 2, 10, 11, 18, 26, 37

*LaShawn A. v. Kelly,*
    887 F. Supp. 297 (D.D.C. 1995)............................................... 49

*Little Tchefuncte River Ass'n v. Artesian Util. Co., Inc.,*
    155 F. Supp. 3d 637 (E.D. La. 2015) ...................................... 45

*Miller v. Carson,*
    563 F.2d 741 (5th Cir. 1977) ................................................. 50

*Morgan v. McDonough,*
    540 F.2d 527 (1st Cir. 1976).................................................. 48

*Morrow v. Harwell,*
    768 F.2d 619 (5th Cir. 1985) ................................................. 25

*Neely v. City of Grenada,*
    799 F.2d 203 (5th Cir. 1986) ................................................. 28

*Netsphere, Inc. v. Baron,*
    703 F.3d 296 (5th Cir. 2012) ...................................... 3, 8, 47, 50

TABLE OF AUTHORITIES
(cont'd)

*Newman v. Alabama*,
    466 F. Supp. 628 (M.D. Ala. 1979)........................................................................ 49

*In re PFO Glob., Inc.*,
    26 F.4th 245 (5th Cir. 2022)................................................................................ 25

*Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*,
    177 F.3d 380 (5th Cir. 1999) .................................................................... 4, 13, 33

*Plata v. Schwarzenegger*,
    603 F.3d 1088 (9th Cir. 2010) ............................................................................. 49

*Price v. Austin Indep. Sch. Dist.*,
    945 F.2d 1307 (5th Cir. 1991) ............................................................................. 21

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ..................................................................................... 13, 48

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980) ............................................................................................. 2

*Santibanez v. Wier McMahon & Co.*,
    105 F.3d 234 (5th Cir. 1997) ......................................................................... 3, 47

*M.D. ex rel. Stukenberg v. Abbott*,
    509 F. Supp. 3d 683 (S.D. Tex. 2020)......................3, 13, 16, 20, 31, 34, 40, 44

*M.D. ex rel. Stukenberg v. Abbott (Stukenberg I)*,
    907 F.3d 237 (5th Cir. 2018) .................................................................... 5, 23, 27

*M.D. ex rel. Stukenberg v. Abbott (Stukenberg II)*,
    929 F.3d 272 (5th Cir. 2019) ......................................................................... 23, 43

*M.D. ex rel. Stukenberg v. Abbott (Stukenberg III)*,
    977 F.3d 479 (5th Cir. 2020) ........................................................................... 6, 25

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019) ................................................................................... 2, 11

*Texas v. Dep't of Labor*,
    929 F.3d 205 (5th Cir. 2019) ........................................................................... 2, 33

*Travelhost, Inc. v. Blandford*,
    68 F.3d 958 (5th Cir. 1995) ......................................2, 3, 5, 7, 18, 19, 26, 29, 42

*United States v. Barnett*,
    346 F.2d 99 (5th Cir. 1965) ........................................................................... 14, 44

*United States v. Hinds Cnty.*,
    2023 WL 1186925 (S.D. Miss. Jan. 30, 2023)................................................... 49

iv

**TABLE OF AUTHORITIES**
(cont'd)

*United States v. Rizzo,*
    539 F.2d 458 (5th Cir. 1976) ........................................................ 30

*Waste Mgmt. of Wash., Inc. v. Kattler,*
    776 F.3d 336 (5th Cir. 2015) ........................................................ 43

*In re White-Robinson,*
    777 F.3d 792 (5th Cir. 2015) ........................................................ 29

## Other Authorities

DFPS, *Caregiver Training* ............................................................... 41

DFPS, *Certification of Receipt of Child Sexual Abuse
    or Sexual Aggression Information* ..................................... 35, 36

DFPS, *Child Care Investigations Handbook* ......................... 9, 14

DFPS, *Child Protective Services Handbook* ............... 32, 34, 38

DFPS, *Generally Applicable Caseload Standards* ..... 26, 27, 45

DFPS, *Residential Contracts, 24-Hour Residential
    Child Care Requirements* ....................... 34, 35, 37, 38

HHSC, *Child Care Regulation Handbook* ............................... 17

## Rules

Fed. R. Civ. P. 66 .............................................................. 47, 48

## Regulations

26 Tex. Admin. Code § 745.8607 ........................................... 18

40 Tex. Admin. Code § 745.8559 ........................................... 11

**INTRODUCTION**

Contempt is a severe remedy. That's why the Fifth Circuit and the Supreme Court have established strict requirements before this potent weapon can be unsheathed. The most fundamental requirement is grounded in common sense—you can't be held in contempt for failing to do something you haven't been ordered to do. This cornerstone requirement is all the more important in institutional-reform cases (like this one) involving broad, structural injunctions that govern areas of traditional state authority. It also requires denying plaintiffs' motion. Plaintiffs do not—and cannot—show that defendants have violated the express terms of the Court's remedial orders.

Even if plaintiffs could make that showing (they can't), contempt still would be unwarranted because the Monitors' own reports demonstrate that defendants have at minimum substantially complied with the Court's remedial orders. Over 90 percent of DFPS caseworkers are, on average, within the Court's caseload guideline range; defendants regularly impose severe consequences on facilities subject to heightened monitoring; and at least 95 percent of investigations were indisputably properly conducted. Each of these figures has gradually improved since the remedial orders went into effect—demonstrating defendants' good-faith efforts to comply with the orders, and underscoring why contempt is unjustified here. These improvements also render plaintiffs' requested receivership remedy—one the Fifth Circuit has *never* approved in this context—entirely inappropriate.

Defendants' improvements and accomplishments flow from their commitment to safeguarding the welfare of the children in their care. Every action defendants

1

have taken is to further that mission—including efforts to demonstrate substantial compliance at least with each and every one of the Court's remedial orders.[1]

## LEGAL STANDARD

Contempt is a "severe remedy," *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019), which "must be exercised with restraint and discretion." *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)).  Plaintiffs must prove contempt by clear and convincing evidence:  "evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotation marks omitted).

In particular, plaintiffs first must make a *prima facie* showing that (1) a court order was in effect; (2) the order required certain conduct by defendants; and (3) defendants failed to comply with that order.  *Texas v. Dep't of Labor*, 929 F.3d 205, 213 n.11 (5th Cir. 2019).  Because contempt is a "potent weapon," it may not be used if "there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct"— e.g., doubt as to whether the challenged conduct falls within an order's scope.  *Taggart*, 139 S. Ct. at 1801–02 (alteration in original).  Instead, plaintiffs must show that

---

[1] This response to plaintiffs' third amended motion for order to show cause, Dkt. 1427 (filed Nov. 1, 2023), is timely under Local Rule 7.4(A), which requires that a response be filed within 21 days of a motion's filing.  Defendants recognize that the Court has already granted plaintiffs' third amended motion, Dkt. 1428 (Nov. 2, 2023 Order), and file this response for purposes of comprehensiveness and preservation, without prejudice to any arguments and evidence they may wish to present at any evidentiary hearing on plaintiffs' allegations, including the upcoming show-cause hearing.  This response is also timely as to plaintiffs' corrected second amended motion for order to show cause, Dkt. 1420 (filed Oct. 13, 2023), which the Court has also already granted.  Dkt. 1424 (Oct. 25, 2023 Order).

defendants have "violate[d] a definite and specific order of the court requiring [them] to perform or refrain from performing a *particular* act or acts." *Travelhost*, 68 F.3d at 961 (emphasis added); *In re Baum*, 606 F.2d 592, 593 (5th Cir. 1979) (same).

As this Court has recognized, even if plaintiffs make the required *prima facie* showing, defendants can still avoid contempt by:

(1)  showing "substantial compliance,"

(2)  "showing mitigating circumstances,"

(3)  "asserting good faith in its attempts to comply,"

(4)  "demonstrating an inability to comply" with the order, or

(5)  "justifying noncompliance."

*M.D. ex rel. Stukenberg v. Abbott*, 509 F. Supp. 3d 683, 704 (S.D. Tex. 2020) (contempt order).

Receivership is an "extraordinary remedy," *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012), traditionally invoked "to preserve property pending final determination of its distribution" in response to some "imminent danger that property will be concealed, lost, or diminished in value." *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241–42 (5th Cir. 1997). As the Fifth Circuit has warned, receivership may be used "only where . . . less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Netsphere*, 703 F.3d at 305. The Fifth Circuit has never approved the imposition of a receivership on a state institution, much less as a remedy for contempt. That isn't surprising, given the serious federalism concerns raised by this extraordinary remedy. *In re Gee*, 941 F.3d 153, 167 (5th Cir. 2019) ("Federalism is a 'clear restraint[] on the use of

equity power' because '[a] structural reform decree eviscerates a State's discretionary authority over its own program and budgets.'").

## SUMMARY OF ARGUMENT

Whether it's second-guessing the precise steps defendants took during a particular investigation, questioning the types of corrective actions taken against facilities subject to heightened monitoring, or attempting to convert the Court's caseload guidelines into a strict cap, plaintiffs seek to impose the severe contempt remedy for purportedly failing to do things the Court's orders don't clearly require defendants to do.  That alone requires denying plaintiffs' third amended contempt motion.  Dkt. 1427 ("Motion").

What's more, plaintiffs have not made (and cannot make) the *prima facie* showing required to hold defendants in contempt of any of these orders, and that requires denying their motion under Fifth Circuit and Supreme Court precedent.  Even if plaintiffs could make such a showing, the Monitors' own reports demonstrate that defendants have substantially complied with the remedial orders in question, and at minimum made good-faith efforts to comply with those orders—each of which is independently sufficient to defeat contempt.

**Remedial Order 3** doesn't cover post-hoc disagreements with the ultimate outcome of complex investigations—so plaintiffs haven't made a *prima facie* showing because contempt can be invoked only "where a specific aspect of [an order] has been clearly violated." *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d

380, 383 (5th Cir. 1999).  Even if disagreements over judgment calls about how particular investigations were (or should have been) conducted could serve as a proper basis for contempt, the Monitors' review expresses overwhelming *agreement* with how defendants have conducted their investigations.  This demonstrates defendants' substantial compliance and good-faith attempts to comply with Remedial Order 3.

**Remedial Orders 7, 8, and 10** require prompt face-to-face meetings with alleged victims of abuse and neglect and timely completed investigations.  Plaintiffs haven't met their burden to show noncompliance.  The recent Monitors' report on which plaintiffs rely recounts investigations involving only nine PMC children, so it's far too limited to be clear and convincing evidence of contempt.  *See Travelhost*, 68 F.3d at 961.

**Remedial Order 20** doesn't expressly require defendants to take any particular corrective action with respect to any particular facility subject to heightened monitoring, meaning plaintiffs' broad criticisms that corrective actions are insufficiently severe cannot be the basis for contempt.  But even if plaintiffs were correct about the order's scope, they still didn't identify a single instance in which defendants failed to adequately sanction a facility subject to heightened monitoring.  What's more, the Monitors' reports demonstrate that defendants have substantially complied (or at minimum made good-faith efforts to comply) with the order by fully implementing a heightened-monitoring system and consistently sanctioning facilities that fail to meet the heightened-monitoring requirements.

**Remedial Order 35 and the Agreed Order** don't impose a strict caseload cap—nor could they under the Fifth Circuit's *Stukenberg I* decision. *M.D. ex rel. Stukenberg v. Abbott* (*Stukenberg I*), 907 F.3d 237, 274 (5th Cir. 2018) (rejecting cap). So plaintiffs cannot make out a *prima facie* case for contempt by claiming that defendants have failed to stay within the guideline range. Even if the orders were modified to impose a strict cap—despite the Fifth Circuit's express instruction not to modify the orders, *M.D. ex rel. Stukenberg v. Abbott* (*Stukenberg III*), 977 F.3d 479, 483 (5th Cir. 2020)—contempt would still be improper. The Monitors' reports establish that over 90 percent of DFPS caseworkers carry on average a caseload well within the range established by the orders—demonstrating substantial compliance.

**Remedial Order A6** requires that children be appropriately apprised of the appropriate point of contact for reporting abuse and neglect, and plaintiffs haven't produced any direct evidence of a violation. In fact, the Monitors' findings show the opposite—defendants have consistently taken steps to apprise children of the Foster Care Bill of Rights and provide them with a point of contact for reporting issues, including the Ombudsman's phone number and Statewide Intake hotline. This demonstrates that defendants have substantially complied with the order.

**Remedial Orders 26 and 29** require defendants to document children's sexual-abuse histories, and plaintiffs haven't identified any evidence (let alone clear and convincing evidence) showing that defendants haven't documented the histories in the relevant forms. The Monitors' own report shows that defendants' compliance exceeds 90 percent with respect to one of the forms, and plaintiffs haven't provided any

relevant evidence demonstrating issues with the other.  This leads to one conclusion: defendants have substantially complied or, at minimum, have made good-faith efforts to comply with these orders.

**Remedial Orders 25, 27, and 31** expressly govern neither how defendants apprise caregivers of confirmed allegations of sexual abuse, nor when (or even *whether*) caregivers certify receipt of this information.  Even if plaintiffs' single, extremely limited survey were sufficient to show noncompliance (it isn't, *see Travelhost*, 68 F.3d at 961), the Monitors' own reports and defendants' certification processes and policy overhauls demonstrate defendants' substantial compliance and good-faith attempts to comply with these orders.

**Remedial Order 4** requires that defendants "ensure" that caseworkers and caregivers are trained—and plaintiffs haven't even *alleged* that defendants haven't properly trained caseworkers and caregivers on sexual abuse, complaining instead that they don't have the data to verify compliance.  But nothing in Remedial Order 4 requires defendants to develop a database that can be used to instantaneously identify every single person who qualifies as a "caregiver" under Texas law at any given point in time so that plaintiffs can verify compliance.  The order requires only that defendants "ensure" that caseworkers and caregivers are trained, and plaintiffs identify no deficiencies whatsoever with the relevant training.  And the evidence shows that 100 percent of caseworkers and over 98.5 percent of caregivers registered in DFPS's provider portal have completed the required training—easily amounting to substantial compliance.

7

*       *       *

Even if plaintiffs could make the *prima facie* showing required for contempt (they can't), and even if defendants couldn't show substantial compliance and good-faith efforts (they can), contempt still would be unjustified because defendants have indisputably complied with the vast majority of this Court's remedial orders—a mitigating circumstance that is a separate and independent basis for denying plaintiffs' motion.

Imposing receivership as a remedy for contempt would be particularly inappropriate. A receivership is an "extraordinary remedy" that demands "the utmost caution" before implementing. *Netsphere*, 703 F.3d at 305. No Fifth Circuit precedent permits receiverships—traditionally a remedy to protect property—to administer state institutions. To the extent the Court even has power to impose such a remedy, nothing about this situation warrants such drastic, sweeping relief—as even plaintiffs seem to recognize. *See*, *e.g.*, Motion 54 (urging "the Court to *consider* imposing *partial* receiverships") (emphases added). Defendants have indisputably complied with the vast majority of remedial orders, and plaintiffs don't challenge the Monitors' findings that defendants' compliance with the orders at issue in this motion has improved over time.

ARGUMENT

## I.    Remedial Orders 3, 7, 8, and 10

Remedial Order 3 imposes three obligations on DFPS's handling of "reported allegations of child abuse and neglect" involving permanent managing conservatorship (PMC) children.  Dkt. 606, at 2.  DFPS must ensure that (1) allegations "are investigated," and (2) investigations are (a) "commenced and completed on time consistent with the Court's [November 20, 2018] Order," and (b) "conducted taking into account at all times the child's safety needs."  Dkt. 606, at 2.

As background, DFPS's Statewide Intake (SWI) unit receives reports and screens them to determine whether they contain allegations of abuse or neglect. DFPS, *Child Care Investigations Handbook* §§ 3310–3311, 3320 (2020).[2]  If they don't, DFPS can refer the reports to HHSC to investigate possible minimum-standard violations.  *Id.* § 3332.1.  If they do, DFPS investigates and determines whether abuse or neglect occurred.  *Id.* § 3321.1.  DFPS processes thousands of reports annually. Dkt. 1318, at 34 ("Fifth Report").

### A.    Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Orders 3, 7, 8, and 10.

Plaintiffs argue that DFPS should be held in contempt as to Remedial Order 3 based on its investigation of reports alleging medical neglect, which comprise 5 percent of all reports of abuse and neglect.  Motion 20–22; Fifth Report 35.  Plaintiffs

---

[2]  https://www.dfps.texas.gov/handbooks/CCI/Files/CCI_pg_3000.asp#CCI_3200.

9

don't contend that these allegations haven't been investigated, or that DFPS's response wasn't timely. Instead, they argue that DFPS is "not *properly* investigating/substantiating alleged medical neglect." Motion 20 (emphasis added).

More specifically, plaintiffs assert—based on a handful of Monitor-reviewed cases over a three-year span—that DFPS has (1) incorrectly referred reports of medical neglect to HHSC for minimum-standard investigations instead of conducting investigations for abuse and neglect; (2) inadequately investigated reports of medical neglect; and (3) incorrectly failed to conclude after investigating that medical neglect had occurred. Motion 20–22. In each case, plaintiffs seek to hold defendants in contempt based on whether DFPS's actions align with the Monitors' post-hoc preferred resolution or course of action.

As a matter of law, however, plaintiffs haven't met their burden on the second element of contempt—i.e., that Remedial Order 3 requires the conduct that plaintiffs allege DFPS failed to undertake. The Fifth Circuit has been clear that, for an order to require certain conduct, it must "include an express or clearly inferrable obligation" to take the specific action in question. *Hornbeck Offshore Servs.*, 713 F.3d at 793. Plaintiffs' post-hoc disagreements on judgment calls about which steps should have been taken in a particular investigation or how the standard of neglect should have been applied to a certain set of facts aren't grounded in the order's command to "investigate[]" while accounting for "the child's safety needs." Dkt. 606, at 2. *See Baum*, 606 F.2d at 593 (contempt still improper even though deposition was taken despite

10

court's order vacating deposition notice because the order "did not explicitly direct that the deposition not take place").

Consider plaintiffs' examples of assertedly deficient investigations into medical neglect. *See* Dkt. 1352-17. In one from early 2021, DFPS received a report that a facility may be improperly administering a child's medication. Dkt. 1352-17, at 25. The investigator conducted interviews at the facility and reviewed the medical discharge summary from the hospital, but the Monitors reviewing these notes months later deemed the investigation deficient because the investigator didn't *also* check the child's STAR Health records or consult the pharmacy. This difference in opinion as to when an investigation is complete—between two sets of experts with different levels of first-hand knowledge—isn't a ground for contempt as a matter of law, because plaintiffs can't show that the Court's directive to "investigate" dictates these additional steps, and certainly not with contempt-worthy clarity. *Hornbeck Offshore Servs.*, 713 F.3d at 793.[3]

So too for plaintiffs' examples of "inappropriately downgraded or ruled out" reports of medical neglect. Motion 21. Whether a "failure to seek, to obtain, or to follow through with medical care for a child" constitutes neglect depends on whether that failure "causes or may cause substantial emotional harm or substantial physical injury to a child." 40 Tex. Admin. Code § 745.8559(5). This standard is "written in

---

[3] *See also* Dkt. 1352-17, at 26–27 (investigation into administration of medication that interviewed all seven people living in the home was "deficient" because it did not also request a FACN consultation). Non-medical examples further illustrate this point. *See, e.g.*, Dkt. 1318-2, at 5–6 (investigation deemed "deficient" because investigator did not also interview other children after "uncooperative" potential victim said he was "joking" when he made the report a month earlier).

general terms," giving rise to more than a "fair ground of doubt" as to which precise situations—such as a single missed dose of medication or a faulty medication log— reach the level of neglect. *Taggart*, 139 S. Ct. at 1803–04.  Nothing in Remedial Order 3 expressly requires or clearly implies that DFPS's application of the neglect standard to any particular set of facts must accord with the Monitors' preferred result—and, again, certainly not with contempt-worthy clarity.

For these same reasons, plaintiffs' allegations (at 11–16) concerning HHSC's Provider Investigations don't carry plaintiffs' *prima facie* burden to show contempt. Those allegations rely on a Monitors report that expresses the same type of post-hoc disagreements discussed above, which find no basis in Remedial Order 3 itself.  Nor do the additional criticisms of investigations have a basis in any order.  *See* Motion 15 (faulting investigators for not reviewing the referral history of a placement, but failing to identify any order requiring that step).

Moreover, the report cited by plaintiffs reviewed investigations involving only nine PMC children, or about 0.01 percent of the PMC class—eight of whom were in a type of placement that houses less than 1.5 percent of PMC children.  *See* Dkt. 1418, at 2 (Defendants' Objections).  Defendants diligently strive to ensure the welfare of each and every child in their care, but that small sample—which the Monitors didn't indicate was randomly selected, *see id.*—isn't enough to carry plaintiffs' burden to provide clear and convincing evidence that defendants are in contempt as to Remedial Order 3.  *Travelhost*, 68 F.3d at 961.  Plaintiffs' contention that defendants failed to comply with Remedial Orders 7, 8, and 10—which require defendants to promptly

12

meet face-to-face with alleged victims of abuse and neglect and resolve such allegations within 30 days, *see* Dkt. 606, at 3—is based on the same limited report, and fails for the same reason.

In sum, plaintiffs cannot root their assertions of noncompliance in any failure to take actions not plainly within the scope of the remedial orders.  Given the seriousness of contempt, it may be invoked only "where a specific aspect of [an order] has been clearly violated." *Piggly Wiggly*, 177 F.3d at 383.  Plaintiffs haven't made that showing—and it's especially important in institutional-reform cases like this one, where federalism concerns loom large.  *See Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (federal courts must be "mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law") (internal quotation marks omitted).

### B.    Defendants have substantially complied with Remedial Orders 3, 7, 8, and 10, and at minimum have made good-faith efforts to comply.

Even where a plaintiff can make the requisite three-part showing for contempt, a defendant can defeat contempt by "justifying noncompliance, rebutting the conclusion, demonstrating an inability to comply, asserting good faith in its attempts to comply, or showing mitigating circumstances or substantial compliance." *Stukenberg*, 509 F. Supp. 3d at 705.  At minimum, defendants have substantially complied (and attempted to comply in good faith) with all of the Court's orders, including Remedial Orders 3, 7, 8, and 10.

13

Plaintiffs' focus on a handful of isolated situations cannot obscure the reality that disagreements between defendants and the Monitors as to defendants' investigations are few and far between. The Monitors have reported overwhelming *approval* of defendants' investigations of allegations of abuse and neglect—observing that investigations have "measurably improved over time" and "often resulted in an appropriate disposition." Fifth Report 47. So even if plaintiffs' isolated examples were found to involve shortcomings on defendants' part, contempt would be improper as a matter of law because defendants have at least substantially complied. *See United States v. Barnett*, 346 F.2d 99, 100 (5th Cir. 1965) (substantial compliance precludes contempt).

In the Fifth Report, the Monitors surveyed a year's worth of allegations reported to SWI between July 1, 2021 and June 30, 2022—resulting in over 3,100 total intakes involving PMC children. Fifth Report 34. The Monitors reviewed only the 770 intakes involving PMC children that recommended an investigation for minimum-standard violations rather than for abuse and neglect. Fifth Report 36. Of these intakes, the Monitors agreed with DFPS's decision not to investigate for abuse and neglect 93.4 percent of the time. Fifth Report 36. And only four of the intakes that the Monitors flagged in the Fifth Report involved medical neglect, which is the basis for plaintiffs' contempt motion. *See* Dkt. 1318-1.

The Monitors' scrutiny of abuse-and-neglect investigations was even more favorable. Together, DFPS's Residential Childcare Investigations (RCCI) and Child Protective Investigations (CPI) units closed out over 2,000 investigations in a one-

14

year span, and the Monitors reviewed only those that ruled out allegations of abuse and neglect—753 RCCI investigations and 151 CPI investigations.  Fifth Report 38–40, 46–47.[4]  The Monitors agreed with RCCI's disposition 95 percent of the time and CPI's disposition 94 percent of the time.  Fifth Report 46–47.  The rate of approval actually increased from the Third Report, which evaluated only RCCI investigations.  Dkt. 1165, at 43 ("Third Report") (86 percent).  Only two times did the Monitors disagree with a decision to rule out medical neglect.  Dkt. 1318-2.[5]

In other institutional-reform contexts, *full* compliance justifying relief from federal-court orders *entirely* requires only "good faith" efforts and attainment "to the extent practicable"—lest an entity be subject to "judicial tutelage for the indefinite future."  *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 297 (5th Cir. 2008) (first two quotes); *Bd. of Educ. of Okla. City v. Dowell*, 498 U.S. 237, 249 (1991) (last quote).  Given the scale of defendants' enterprise, the thousands of allegations they handle annually, and the highly individualized, fact-specific nature of their work, the Monitors' statistics demonstrate that defendants have at minimum substantially complied with Remedial Order 3 to "ensure that reported allegations . . . are investigated" and have done so in good faith and to the extent practicable.  Dkt. 606, at 2.[6]

---

[4]  RCCI is responsible for investigating abuse and neglect in licensed placements, while CPI handles those investigations in unlicensed placements (including kinship foster homes).  DFPS, *Child Care Investigations Handbook* §§ 1150–51.

[5]  Plaintiffs mention (at 22) ten reports that the monitoring team made to SWI over the course of 2022, but only one of these reports involved any allegations of medical neglect.  *See* Dkt. 1337, at 15–85.

[6]  The Monitors' criticism of HHSC Provider Investigation cases involving nine PMC children (approximately 0.01 percent of the PMC class), *see* Dkt. 1418, at 2, does nothing to undermine defendants' substantial compliance with Remedial Order 3.  *See* Fifth Report 36, 46–47 (noting Monitors' 93–95

Defendants' good-faith efforts to comply with Remedial Order 3 are further underscored by numerous policy improvements impacting the investigative process overall, including those implemented to comply with other remedial orders.  For example, DFPS has created a "child sexual aggression" training course that thousands of investigators have completed to help them better recognize sexual abuse.  Dkt. 1248, at 29–30 ("Fourth Report").

DFPS has also changed its policy to greatly reduce which intakes may be downgraded to "priority none" for PMC children and has restructured its secondary review for intakes about licensed placements to ensure that reports lacking key information were still properly investigated.  Dkt. 1079, at 51–52, 110 ("Second Report"); *see also* Fourth Report 108 n.142 (noting that this change in procedure has led to increased investigations).  These efforts, too, demonstrate good-faith attempts at compliance. *See Anderson*, 517 F.3d at 301–02 (no contempt where alleged contemnor "devoted considerable time and resources in a good faith effort" to comply).

*       *       *

Defendants have promptly investigated allegations of abuse and neglect and have done so correctly—according to the Monitors—in at least 93–95 percent of cases. At minimum, defendants have substantially complied with Remedial Orders 3, 7, 8,

---

percent rate of agreement with 770 intakes and 904 investigations over roughly the same time frame). Nor do any isolated instances of delayed face-to-face contact or investigations exceeding 30 days undermine defendants' high rate of substantially complying with Remedial Orders 7, 8, and 10 across a much broader sample.  *See* Fifth Report 69–70 (surveying 1,554 investigations and finding roughly 80 percent compliance rate with Remedial Orders, 7, 8, and 10); Third Report 63–64 (same).

and 10, and attempted to comply in good faith, which is a complete defense to con-
tempt. *Stukenberg*, 509 F. Supp. 3d. at 704.

## II.    Remedial Order 20

Remedial Order 20 requires that (1) Residential Child Care Licensing "iden-
tify, track and address concerns at facilities that show a pattern of contract or policy
violations"; and that (2) DFPS "subject [such facilities] to heightened monitoring,"
which includes "more frequent inspections, corrective actions and, as appropriate,
other remedial actions under DFPS'[s] enforcement framework."  Dkt. 606, at 4–5.

Per this Court's order, DFPS and HHSC implement heightened monitoring by
first identifying facilities that qualify based on a higher rate of contract and stand-
ards violations than similar facilities during at least three of the previous five years.
Dkt. 837; HHSC, *Child Care Regulation Handbook* § 11100.  Staff from multiple di-
visions of DFPS and HHSC then work collaboratively to develop a plan to address
problem areas at these facilities with targeted tasks to be completed by specific due
dates. *Id.* §§ 11200, 11300.

Defendants monitor the facilities' progress through weekly unannounced visits
and quarterly and annual reviews. *Id.* §§ 11300, 11400.  Facilities that satisfy their
plan's tasks and conditions may transition to post-plan monitoring after a year. *Id.*
§ 11500.  Facilities that continue to struggle may be subject to corrective steps, in-
cluding suspension of placements, fines, canceled contracts, and license revocations.
*Id.* § 11600.

17

## A.   Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order 20.

Plaintiffs raise a narrow challenge to defendants' compliance with Remedial Order 20.  They assert (at 26) that defendants "appear[] to take no meaningful action against violators of minimum standards or contract provisions related to psychotropic medications."  In the language of Remedial Order 20, plaintiffs appear to contend that defendants haven't "address[ed] concerns" or taken more frequent "corrective actions" in response to facilities' patterns of violations regarding psychotropic medications because, in plaintiffs' view, the punishments defendants have imposed aren't severe enough.  *See* Motion 17–18.  These allegations don't make out a *prima facie* case of contempt under well-settled Fifth Circuit and Supreme Court case law.

1.   From the outset, plaintiffs' argument founders on a failure to show that Remedial Order 20 imposes any "express or *clearly* inferrable obligation" to take a particular corrective action to remedy a specific pattern of contract-or-policy violations.  *See Hornbeck Offshore Servs.*, 713 F.3d at 793 (emphasis added).  Remedial Order 20 requires defendants to "address concerns" and take "corrective action," but myriad considerations go into exactly how to fulfill those obligations in specific situations.  *See* 26 Tex. Admin. Code § 745.8607.  Remedial Order 20 couldn't possibly speak to each scenario with the precision necessary to form the basis for contempt.  *See Travelhost*, 68 F.3d at 961 (contempt is available only where party violates a "definite and specific order" requiring "a particular act").

At bottom, this is another attempt to elevate post-hoc disagreements about particular outcomes to the drastic level of contempt—but well-settled law doesn't allow that, particularly not in the institutional-reform context. *See Gee*, 941 F.3d at 167 ("Federalism is a 'clear restraint[] on the use of equity power' because '[a] structural reform decree eviscerates a State's discretionary authority over its own program and budgets.'").

2.     Ultimately, whether plaintiffs could show contempt by second-guessing individual punishments (and they can't) is beside the point, because plaintiffs don't actually identify any punishment imposed on a facility on heightened monitoring that in their view was insufficiently severe.  By failing to advance any facts showing non-compliance beyond their own say-so, plaintiffs haven't made out a *prima facie* case for contempt.  *Travelhost*, 68 F.3d at 964 (reversing contempt order because, "[a]lthough [movant] contends that" an order was violated, "there is no evidence in the record that supports this contention").

Plaintiffs principally attempt to show a violation of Remedial Order 20 by reciting purported examples of minimum-standard and contract-duty violations.  *See* Motion 23–31.  These alleged deficiencies relate to (1) requesting a Psychotropic Medication Utilization Review for medication regimens falling outside the guidelines defendants use, (2) administering and documenting medication, and (3) medical consent.  *See* Dkt. 1337, at 5–14.  But plaintiffs don't allege that any of the supposed violations were committed by a facility on heightened monitoring—or even by a facil-

19

ity that should have been on heightened monitoring.  In fact, only one of the ten fa-cilities mentioned in the passage of the Monitors' report cited by plaintiffs was on heightened monitoring at the time.  *See* Dkt. 1337, at 5–14, 43 n.76; *see also* Dkt. 1380, at 158 ("Sixth Report") (reporting corrective actions taken at Silver Lining RTC).

This shortcoming dooms plaintiffs' motion.  Remedial Order 20 deals exclu-sively with facilities that "show a pattern of contract or policy violations."  Dkt. 606, at 4–5.  The Court has defined that phrase by order:  a facility shows a pattern of violations if its "rate of violations rated medium, medium-high, or high is above the combined rate of [such violations] for [facilities] of similar size and service type for three of the last five years."  Dkt. 837, at 1.  If a facility doesn't meet those criteria, it doesn't qualify for heightened monitoring and Remedial Order 20 doesn't apply.  So plaintiffs can't possibly meet their burden to show noncompliance with Remedial Or-der 20 without showing that a violation was part of a pattern at the facility in ques-tion.

That's not the only missing link.  Plaintiffs don't specify which corrective action defendants took in response to any of the violations they cite or explain why any such action was insufficient.  Instead, plaintiffs attempt to demonstrate noncompliance *en masse* through general enforcement statistics from 2014–2020.  Motion 29–30.  But this data (1) isn't specific to heightened monitoring, (2) isn't specific to medication management, and (3) pertains almost exclusively to a time period *before* defendants

20

had even begun implementing a heightened-monitoring program. *See* Dkt. 950 (giving defendants until January 1, 2021 to implement heightened-monitoring program); Motion 23 n.13.  It's also seriously undermined by more recent data about the actions defendants have taken to remedy violations by facilities on heightened monitoring. *See infra*, Section II.B.

### B.    Defendants have substantially complied with Remedial Order 20, and at minimum have made good-faith efforts to comply.

Even if plaintiffs could make out a *prima facie* showing of contempt as to Remedial Order 20 (and they can't), contempt would still be inappropriate because defendants have at least substantially complied. *Stukenberg*, 509 F. Supp. 3d at 704.

The Monitors' most recent report confirms that defendants have, in the Fifth Circuit's words, "done all that [they] could" to implement heightened monitoring. *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991).  According to the report, between 2020 and 2022, defendants placed all 112 operating facilities that qualified for it on heightened monitoring and created plans with tasks and deadlines for all those facilities.  Sixth Report 154.[7]  For the facilities placed on heightened monitoring in 2022, the Monitors found that 99 percent of plan tasks were "specific in describing what the [facility] was required to accomplish."  Sixth Report 164.  The Monitors further found that defendants have consistently followed up with quarterly reports and inspections, given "meaningful guidance and feedback," and fashioned revised tasks where appropriate.  Sixth Report 175–77, 224.

---

[7] An additional 32 qualifying facilities closed before beginning heightened monitoring.  Sixth Report 154.

As a result of these efforts, "[m]ost [facilities] completed all Heightened Monitoring Plan Tasks in 2022," and the average number of deficiencies cited at facilities that had been on heightened monitoring since 2021 declined.  Sixth Report 177, 186–87.  According to the Monitors' report, only 39 facilities out of the nearly 400 system-wide remain on active heightened monitoring.  Sixth Report 154–55.[8]

Moreover, defendants have regularly taken corrective action against facilities on heightened monitoring that have failed to progress.  Between June 2020 and July 2023, defendants assessed 61 penalties, imposed 505 liquidated damages, issued 33 placement holds, revoked 10 licenses, disallowed placement into 29 foster homes associated with child-placement agencies on heightened monitoring, and ended 46 contracts with operations that were eligible for heightened monitoring.  Dkt. 1393, at 5–6 ("Objections to Sixth Report"); Sixth Report 219–22 (recapping recent placement suspensions, license revocations, and contract terminations).  The reality is that *every* facility that fails to come into compliance with its heightened-monitoring plan receives at least a fine, and many receive stricter sanctions.  Hr'g Tr. at 265–67 (Dixon) (Apr. 12, 2023).

---

[8]  The formula used to determine whether a facility should be on heightened monitoring evaluates facilities relative to other facilities—with the "worst" facilities then placed on heightened monitoring. Dkt. 837, at 1.  As a result, there will *always* be facilities on heightened monitoring, because there will always be some facilities that are "worse" than others based on the formula—even if those facilities are doing an excellent job.

\*      \*      \*

Contempt "is a potent weapon which should be used only where clearly warranted," and plaintiffs' vague assertion that *some* facility deserved a more severe punishment than it received makes noncompliance anything but clear. *In re Hailey*, 621 F.2d 169, 172 (5th Cir. 1980). Even if plaintiffs could make a *prima facie* showing of contempt (and they can't), at minimum defendants' implementation of heightened monitoring and sanctioning of facilities that fail to comply constitute substantial compliance in good faith, which makes a contempt finding improper.

## III.    Remedial Order 35 and the Agreed Order

In December 2019, the Court entered the Agreed Order, which relieved DFPS and the Monitors of their obligation to conduct "workload studies" for formulating "internal caseload standards," and instead directed DFPS to implement a standard of "14–17 children per caseworker for DFPS conservatorship caseworker caseloads." Dkt. 772, at 2. The Agreed Order requires DFPS to ensure that this "guideline[]" is "utilized to serve as guidance for supervisors who are handling caseload distribution." Dkt. 772, at 2; Dkt. 606, at 10 (Remedial Order A4).

The Agreed Order commands that the guideline of 14–17 cases per caseworker "shall not be used or interpreted as a 'caseload cap' or an 'enforced caseload range.'" Dkt. 772, at 1. This mandate is grounded in the Fifth Circuit's decision in *Stukenberg I*, which "struck down the caseload caps on primary caseworkers" that the Court originally imposed. *M.D. ex rel. Stukenberg v. Abbott* (*Stukenberg II*), 929 F.3d 272, 278 (5th Cir. 2019); Dkt. 559, at 59.

23

*Stukenberg I* rejected the "hard cap on caseloads" because it (1) "would completely hamstring DFPS's ability to approach caseload distribution in a holistic, nuanced way," (2) can at times be "logistically impossible given [] staffing constraints," and (3) "constitute[d] 'relief beyond what [was] minimally required' to remedy the constitutional violation." 907 F.3d at 274. The Fifth Circuit instead permitted "flexible" "internal caseload standards" to serve as a "rough guide" for assigning cases. *Id.*

Remedial Order 35 requires DFPS to "report to the Monitors, on a quarterly basis, caseloads for all staff . . . who provide primary case management services to children in the PMC class." Dkt. 606, at 7. "Caseloads for staff . . . who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly." Dkt. 606, at 7.

### A. Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order 35 and the Agreed Order.

Plaintiffs contend (at 32–33) that DFPS is "violating the caseload order" because—when accounting for DFPS caseworker shifts spent supervising children without placement (Child Watch shifts)—the caseworkers don't "have a child caseload within the guidelines" of 14–17 children per caseworker. But plaintiffs haven't shown (and can't show) that the action they fault defendants for not taking is required by the order, dooming their *prima facie* case. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 444 (1974) (reversing contempt finding where alleged contemnor "had no reason to believe" that the order in question prohibited its conduct).

24

As an initial matter, plaintiffs appear to misunderstand DFPS's treatment of children without licensed placements in caseload statistics. As defendants have explained, "each child in temporary or permanent managing conservatorship—*including a Child Without Placement*—is reflected in the caseload of that child's primary caseworker and is within the caseload data provided to the Monitors." Objections to Sixth Report 17 (emphasis added). That is, *every* child is assigned one primary caseworker and is counted exactly once across the caseload figures. To avoid double counting, children without placement that caseworkers supervise only temporarily during Child Watch shifts aren't counted on that caseworker's caseload.

Even setting this misunderstanding aside, the Agreed Order is clear on its face that it doesn't impose a caseload cap—so plaintiffs cannot make out a case for contempt by asserting that DFPS has "violat[ed] the caseload order" because caseworkers don't "have a child caseload within the guidelines." Motion 32–33. If accepted, this argument would reinstate the very cap that the Fifth Circuit rejected—in violation of the Fifth Circuit's mandate not to further modify the order. *See Stukenberg III*, 977 F.3d at 483.[9]

Nor can plaintiffs extract an obligation to count children without placement in more than one caseload from the order's general "inten[t]." Motion 35. As the Fifth

---

[9] Plaintiffs also try to create a *de facto* caseload cap by pointing to this Court's instruction that DFPS's "use and implementation of [the] guidelines will remain subject to supervision by the Monitors and approval of the Court." Dkt. 772, at 2. But that additional supervision doesn't impose a contempt-worthy requirement that the caseloads must fall within the range—a point this Court could not have made clearer. Dkt. 772, at 2 ("The guidelines described above shall not be used or interpreted as a 'caseload cap'"); *see also* Dkt. 772, at 3 ("This order does not expand the November 20, 2018 order or impose any additional obligations on Defendants").

Circuit has explained, courts "must read [an] order as written." *In re PFO Glob., Inc.*, 26 F.4th 245, 255 (5th Cir. 2022).  That instruction applies with special force where the drastic penalty of contempt is concerned—and particularly where the alleged contemnor is a state actor. *See Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985) ("injunctive relief" is "intrusive into state functions" because it "affirmatively commands specific future behavior under the threat of the court's contempt powers"). This Court ordered implementation of a guideline for caseloads, not workloads—and plaintiffs themselves recognize the difference.  *See* Motion 35–36 (recognizing a distinction between a "workload" and "caseload," and identifying Child Watch shifts as part of a caseworker's "workload"); *see also* Dkt. 606, at 7 (requiring DFPS to "track caseloads on a child-only basis").

Plaintiffs also argue (at 33) that DFPS not reporting Child Watch hours to the Monitors "*may* violate RO 35's requirements for caseload tracking and reporting." (emphasis added).  But speculation is no basis for contempt. *See Travelhost*, 68 F.3d at 961 (requiring "clear, direct[,] and weighty" evidence to meet *prima facie* burden to show contempt).  By its own terms, Remedial Order 35 requires DFPS to report "*caseloads*" for staff who spend part time in other functions.  Dkt. 606, at 7 (emphasis added).  And as explained above, (1) Child Watch is part of a caseworker's "workload," *not* their "caseload," and (2) every caseworker's caseload is reported.  Moreover, every child in foster care—including every child without placement—is assigned to a caseload.  Objections to Sixth Report 17.

In sum, because the Agreed Order contains no "express or clearly inferrable" command to count Child Watch shifts in caseloads, *Hornbeck Offshore Servs.*, 713 F.3d at 793, plaintiffs haven't carried (and can't carry) their burden of making a *prima facie* showing of contempt on that basis.[10]

## B.   Defendants have substantially complied with Remedial Order 35 and the Agreed Order, or have cured any noncompliance.

Even if plaintiffs could make out a *prima facie* showing of contempt (they can't), contempt still wouldn't be justified because DFPS has substantially complied with Remedial Order 35 and the Agreed Order.  It has adopted the guideline of 14– 17 children per caseworker and uses it to assign cases.  *See* DFPS, *Generally Applicable Caseload Standards* 1 (2020).[11]  The agency's standards allow supervisors the much-needed flexibility (highlighted by the Fifth Circuit) to determine the precise number of cases each caseworker handles based on case complexity, caseworker expertise, and other staffing considerations.  *Id.* at 2–3; *Stukenberg I*, 907 F.3d at 274 (authorizing "flexible" standard to enable DFPS to "take[] into account the complexity of the cases and the experience of the caseworker").  High-level DFPS officials also

---

[10]   Plaintiffs argue that DFPS doesn't comply with Remedial Order A3's command to implement a caseload standard wherein caseloads "for staff who spend part-time in the work described by the caseload standard and part-time in other functions [are] prorated accordingly."  Motion 32; Dkt. 606, at 13–14.  But DFPS's policies do just that.  DFPS, *Generally Applicable Caseload Standards* 4 (managers should adjust a worker's caseload to accommodate other tasks, such as when the worker "has an upcoming contested hearing or trial," or when the worker "has a significant conference or training coming").  Moreover, DFPS supervisors are aware of caseworker burdens and can adjust caseloads as needed.  *See* Hr'g Tr. at 221–23 (Banuelos) (June 27, 2023).  Caseloads couldn't possibly be prorated below 14–17 children for every "other function" a caseworker performs (training, team meetings, etc.), lest that guideline become a sham.

[11]   https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/CPS_Generally_Applicable_Internal_Caseload_Standards.pdf.

analyze caseload data to track trends and address concerns as they arise.  DFPS, *Generally Applicable Caseload Standards* 9–10.

Caseload data leaves no doubt that DFPS has implemented the guidelines and uses them in assigning cases.  The Monitors' most recent report notes that over 90 percent of DFPS caseworkers carried a caseload of 17 or fewer children as of June 2023.  Dkt. 1426, at 5; *see also* Dkt. 1379, at 4 (89 percent for the second half of 2022).  That percentage represents an increase from the Third Report (59 percent for the first half of 2021), and a vast improvement from the state of affairs when the Agreed Order was entered (49 percent in January 2020).  *See* Third Report 102; Dkt. 869, at 174 ("First Report").  Only 3 percent of caseworkers in January 2023 carried more than 20 children on their caseloads.  *Compare* Dkt. 1379, at 4 *with* Third Report 104 (22 percent in June 2021).

Child Watch comprises only a small fraction of a caseworker's overall work-load, so the fact that the Child Work shifts aren't counted in caseloads doesn't invalidate DFPS's extensive efforts to monitor, assess, and control caseloads.  According to the Monitors, on any given evening, there are roughly 58 PMC children without placement in foster care—and there are 1,500 caseworkers working with nearly 10,000 PMC children in total.  Dkt. 1379-1, at 1; Dkt. 1379, at 4; Dkt. 1380, at 25.  And as the Monitors' recent survey discloses, almost half of these caseworkers (45 percent) had *no* Child Watch responsibilities, and another quarter (28 percent) served four or fewer Child Watch hours per week.  Dkt. 1379, at 10.  Even if Child Watch hours were required to be included in the caseload computation, omitting them

doesn't render the over-90 percent within-guidelines rate "illusory." Motion 33; Dkt. 1426, at 5; *see Neely v. City of Grenada*, 799 F.2d 203, 209 (5th Cir. 1986) (affirming decision not to impose contempt where noncompliance was not "significant enough").

Plaintiffs attempt (at 34–35) to use "[s]imple math" to paint a different picture, but their assertion that caseworkers "are working nearly 70 hours per week, every week" rests on multiple flawed assumptions. They begin by assuming a 50-hour work week based solely on the statement of a single former caseworker about her experience years ago. *See* Hr'g Tr. at 215 (Banuelos) (Apr. 12, 2023). They then add the *maximum* amount of allowable weekly Child Watch hours under previous guidelines (16–18 hours), despite evidence showing that few (if any) caseworkers are responsible for that many Child Watch hours every week. *See* Dkt. 1379, at 10–11. Speculation upon speculation is not enough to carry the heavy burden of making a *prima facie* showing of contempt.

Finally, although required by neither Remedial Order 35 nor the Agreed Order, DFPS recently implemented a policy that further addresses any issues that plaintiffs could possibly have here. As part of its ongoing efforts to safeguard the children in its care, DFPS recently adopted a new Child Without Placement Supervision and Overtime Policy. As of September 1, 2023, only those caseworkers with a caseload of 17 or fewer children are eligible to work Child Watch. In addition, caseworkers are limited to 16 overtime hours of Child Watch per week.

So there is no need for contempt to compel DFPS to "implement[] remedies that cure" any alleged violations, Motion 37—particularly in light of this new policy,

which fully addresses plaintiffs' issues. *See In re White-Robinson*, 777 F.3d 792, 795 (5th Cir. 2015) (civil contempt "is meant to coerce the contemnor *into* compliance") (emphasis added).

*     *     *

Plaintiffs haven't made (and can't make) out a *prima facie* showing of contempt because they cannot show that Remedial Order 35 or the Agreed Order required DFPS to "perform" the "particular act" that is the basis for their motion. *See Travelhost*, 68 F.3d at 961. Even if they could, contempt would still be improper because defendants have substantially complied with Remedial Order 35 and the Agreed Order.

## IV.   Remedial Order A6

Remedial Order A6 requires DFPS to "ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect." Dkt. 606, at 11. "In complying with this order, DFPS shall ensure" that PMC children (1) "are apprised by their primary caseworkers" of the appropriate point of contact, and (2) receive "a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman." *Id*.

### A.   Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order A6.

Tasked with the burden to show noncompliance, plaintiffs don't come forward with any direct evidence. They don't even explicitly argue that DFPS hasn't apprised PMC children of the SWI hotline, or reviewed the Foster Care Bill of Rights or Ombudsman number with the children. The closest they come is reciting survey results

30

showing that some children haven't *retained* information about the appropriate point of contact for reporting abuse and neglect. Motion 37–38. But that data isn't sufficient to support a contempt finding. *See United States v. Rizzo*, 539 F.2d 458, 465–66 (5th Cir. 1976) (evidence that documents existed and weren't produced held insufficient to support inference that alleged contemnor didn't search for the documents in good faith).

Plaintiffs also contend that defendants haven't complied with Remedial Order A6 because PMC children don't have *access* to the appropriate point of contact. They cite a series of tangentially related statistics about how and when children can use a phone to argue that "phone use was highly regulated." Motion 38. Even assuming the order speaks to access with the clarity required for contempt, plaintiffs cannot show noncompliance by showing "regulated" phone use. The question would be whether any purported regulations impermissibly inhibit access to the appropriate point of contact for reporting abuse and neglect. And all available evidence suggests that they don't. Fifth Report 82 ("90% (52 of 58) [of caregivers] said children could call the [SWI] hotline whenever they wanted and 85% (49 of 58) said children could call the Ombudsman whenever they wanted to call.").

## B. Defendants have substantially complied with Remedial Order A6.

The Monitors' Fifth Report demonstrates that DFPS has at least substantially complied with this order. During a series of site visits, the Monitors found proof that caseworkers reviewed the Foster Care Bill of Rights with PMC children—"87% of PMC children's files (97 of 112) contained a Bill of Rights *signed by the child*." Fifth

31

Report 73 (emphasis added) (another 7 percent contained an unsigned Bill of Rights). Similarly, more than two-thirds of 15- to 17-year-olds—the age range most likely to remember this information—report having heard of the Ombudsman.  Fifth Report 76.  As for apprising children of their primary point of contact for reporting abuse and neglect, "[n]early all direct caregiver staff interviewed (57 of 58 or 98%) reported that both the [SWI] hotline phone number and Ombudsman phone number are posted in the unit on site."  Fifth Report 80.  This substantial compliance defeats contempt. *Stukenberg*, 509 F. Supp. 3d at 704.

## V.     Remedial Orders 26 and 29

Remedial Orders 26 and 29 require DFPS to "ensure" that information about the sexual-abuse history of a PMC child—whether victim or aggressor—"is reflected in the child's placement summary form and common application for placement."  Dkt. 606, at 5–6.  DFPS transmits a child's common application to prospective place-ments,[12] and gives providers the placement summary form—including a sexual his-tory report (as "attachment A")—upon the child's placement.  DFPS, *Child Protective Services Handbook* §§ 4211.1, 4121.3, 4133.

### A.     Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Orders 26 and 29.

Plaintiffs don't attack the completeness of the common applications (for good reason, *see infra*, Section V.B), taking aim instead (at 43–44) at DFPS's placement summary forms.  But plaintiffs marshal no evidence that the placement summary

---

[12]   This is true unless the potential placement is a foster home, in which case DFPS transmits only the placement summary form and attachment A.

forms themselves are deficient, instead relying on survey statistics about how many files reviewed by the Monitors contain *both* a placement summary form *and* attachment A with "complete" sexual victimization and aggression history (as determined by the Monitors' assessment).  Motion 43–44; Sixth Report 63.  Neither order requires that *both* the placement summary form and its attachment A contain the sexual-abuse history (indeed, neither even mentions the attachment).  For good reason:  the relevant information is sufficiently and effectively conveyed so long as it's included on *either* the form or its attachment A.  By measuring compliance against whether *both* documents contain the required information, plaintiffs have failed to provide evidence on which to base a *prima facie* case for noncompliance.  *See Dep't of Labor*, 929 F.3d at 213 n.11 (movant must show a failure to comply with the court's order).[13]

Plaintiffs also complain (at 43–44) about matters even further removed from these orders, including the extent to which the placement summary form and its attachment A were (1) signed, and (2) received (a) before placement, (b) by caregivers, or (c) by operation administrators.  But the orders don't speak to any of these matters (expressly or implicitly)—they simply require that the information be documented.  Dkt. 606, at 5–6.  Plaintiffs' allegations therefore do nothing to demonstrate that a "specific aspect of [the orders] has been clearly violated."  *Piggly Wiggly*, 177 F.3d at 383.

---

[13]  For the same reason, plaintiffs' passing criticism (at 43–44) of the completeness of attachment A for children in a juvenile justice or hospital setting must fail.

### B. Defendants have substantially complied with Remedial Orders 26 and 29, and at minimum have made good-faith efforts to comply.

Defendants have substantially complied with Remedial Orders 26 and 29 in all events. As the Monitors explain, at least 90 percent of the common applications contained the required sexual-abuse information—so providers almost *always* have a child's complete history before placement. Sixth Report 59–60.

As to the placement summary form, the Monitors assessed only whether the relevant information was contained in *both* the form *and* its attachment A, which—as explained above—isn't what the order requires. But even if it were, the Monitors' own data shows substantial compliance: sexual-aggression history was included on both the form and its attachment A 75 percent of the time and sexual-victimization history 66 percent of the time. Sixth Report 63. Both figures demonstrate marked improvement. *See* Fourth Report 51 (61 and 50 percent, respectively); Second Report 229 (54 and 40 percent, respectively); *see also* Sixth Report 63–64 (noting improvement). That improvement shows defendants' "good faith attempts to comply" with the orders, and—together with DFPS's impressive performance on common applications—confirms contempt is unwarranted. *Stukenberg*, 509 F. Supp. 3d at 777.

## VI. Remedial Orders 25, 27, and 31

Remedial Orders 25, 27, and 31 require that caregivers "be apprised of confirmed allegations" about a child's sexual-abuse history (regardless of whether the child was the victim or the aggressor). Dkt. 606, at 5–6. Defendants' implementation of these orders depends on the type of placement. *See* DFPS, *Child Protective Services*

34

*Handbook* § 4133; DFPS, *Residential Contracts, 24-Hour Residential Child Care Requirements* § 1420.[14]  Plaintiffs' arguments focus on large placement facilities called General Residential Operations (GROs).  Motion 45–48.

When a child with a sexual-abuse history is placed at a GRO, the GRO administrator, receiving intake staff, and the child's case manager are apprised of the child's sexual-abuse history through the placement summary form and attachment A.  DFPS, *Residential Contracts, 24-Hour Residential Child Care Requirements* § 1420.

DFPS then requires GRO administrators to communicate that information to each of the child's caregivers:  "before" a caregiver is "responsible for a child," the GRO administrator must (1) inform the caregiver of the child's sexual-abuse history and (2) obtain the caregiver's signed certification that he has both (a) been made "aware" of the child's sexual-abuse history, and (b) read the documents detailing that history (the placement summary form and attachment A).  DFPS, *Residential Contracts, 24-Hour Residential Child Care Requirements* § 1420; DFPS, *Certification of Receipt of Child Sexual Abuse or Sexual Aggression Information* (Form 2279b), at 2.[15]

---

[14]   https://www.dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf.

[15]   https://www.dfps.texas.gov/site_map/forms.asp.

Because of the size and nature of GROs' operations, all caregivers who will eventually be responsible for the child might not be present at the time of placement.  Accordingly, DFPS enlists the help of GRO administrators to ensure that *all* caregivers—including those who are not present at placement—are apprised of the child's sexual-abuse history *before* caring for the child.

### A.      Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Orders 25, 27, and 31.

Neither of plaintiffs' alleged concerns—that caregivers don't actually read a document they certify that they have read and that DFPS policies allow 72 hours for certifications to be obtained in some placement scenarios—establish noncompliance with any of the remedial orders' requirements.  And the Monitors' survey of 117 caregivers—89 of whom stated that they are *always* informed of the required sexual-history information—is far from clear and convincing evidence that defendants haven't apprised the more than 47,000 caregivers of the required sexual-abuse history at each placement.

*First*, plaintiffs discuss at length DFPS's contract requirements and policies for ensuring that GRO caregivers certify that they were apprised of a child's sexual-abuse history.  Motion 45–48.  Plaintiffs don't dispute that GRO caregivers certify that they have:  (1) been made aware of the sexual-abuse information and (2) read the documents containing that information (the placement summary form and attachment A).  *See* DFPS, *Certification of Receipt of Child Sexual Abuse or Sexual Aggression Information* (Form 2279b), at 2.  Nor do they dispute that GRO administrators *have in fact* obtained the caregivers' signed certifications.  Instead, plaintiffs claim—based on the Monitors' survey of 117 GRO caregivers—that some GRO caregivers don't *actually* read attachment A notwithstanding their signed certifications to the contrary.

The cause of the discrepancy between these caregivers' certifications and their answers to the Monitors is unclear.  Perhaps the caregivers were confused by the

Monitors' question or didn't recall what attachment A was. Or perhaps the caregivers didn't *receive and retain* a copy of attachment A itself (and told the Monitors so), but were able to *view*—and therefore *read*—attachment A (as certified on the form).

Whatever the reason for the discrepancy, plaintiffs don't explain how potentially inaccurate certifications by *GRO caregivers* establishes that *DFPS* violated the remedial orders, contract requirements, or policies. Plaintiffs don't point to any provisions requiring *DFPS* (or even GRO administrators) to separately validate the veracity of each caregiver's certification. And they don't contend that DFPS knew or had reason to know that any caregiver certification may have been inaccurate. For those reasons, plaintiffs haven't made out a *prima facie* case for contempt. *See Hornbeck Offshore Servs.*, 713 F.3d at 793 (contempt proper only for violation of "an express or clearly inferrable obligation" to take a specific action).

*Second*, plaintiffs critique DFPS policy and contract requirements themselves (rather than the implementation of those requirements). According to plaintiffs, in certain circumstances, the requirements permit GRO administrators up to 72 hours to obtain caregivers' signed certifications that they are aware of the required sexual-abuse history—and 72 hours is too long. But plaintiffs misunderstand the requirements.

DFPS's contracts expressly require GRO administrators to "inform" the caregiver of a child's sexual-abuse history and "obtain [the] caregiver's signature" on the certification form "*before*" the caregiver is "responsible for a child." DFPS, *Residential Contracts, 24-Hour Residential Child Care Requirements* § 1420 (emphasis added).

37

This requirement ensures that caregivers are aware of a child's sexual-abuse history and needs before caring for the child.  Plaintiffs' assertion that "the policies allow at least three days to elapse before caregivers are told of the child's history" directly contradicts the policies themselves, and relies almost entirely on ambiguous, incomplete, and irrelevant snippets of testimony from a recent status conference.  Motion 48 (emphasis omitted).[16]

The only written policy plaintiffs mention doesn't support their critique either. They cite (at 48) a provision in DFPS's caseworker handbook dealing with *initial* placements—i.e., placements on the first day a child enters foster care.  DFPS, *Child Protective Services Handbook* § 4133.  For these initial placements, the caseworker must convey to those present "at the time of placement":  (1) the child's "immediate and special needs" and (2) "[a]ny known sexual victimization or sexual aggression history."  *Id.*  Over the next 72 hours, as the caseworker gathers more information about the child, the caseworker must provide the caregivers with the child's placement summary form and attachment A, and obtain the caregivers' signatures on those forms acknowledging that they read the forms and received the information. *Id.*  Plaintiffs don't explain why this policy is unreasonable or prohibited.[17]

---

[16]   Closer scrutiny of the testimony shows that the witness wasn't able to provide complete answers and explain DFPS's various contract requirements and policies that govern the myriad placement scenarios.  Hr'g Tr. at 142–46 (Banuelos) (June 27, 2023).  Many of the questions didn't specify (1) the type of facility, (2) the type of placement (initial or subsequent), or (3) the specific actor (a GRO administrator or a DFPS caseworker) being addressed.  *Id.*

[17]   Plaintiffs also note the requirement that "placement administrator[s]," "receiving intake staff," and "case manager[s]" who aren't present at a GRO at the time of placement must sign the required forms within three business days.  DFPS, *Residential Contracts, 24-Hour Residential Child Care Requirements* § 1420.  Under the requirements, to the extent any of these individuals work as direct

In all events, plaintiffs fail to connect their criticism of the supposed 72-hour certification window to the remedial orders themselves. DFPS's certification requirements go above and beyond what's required by the orders, which say that caregivers must "be apprised" of the underlying sexual-abuse history, but don't say anything about how that must happen, from whom it must come, or that the caregivers must acknowledge (let alone certify) receipt. Dkt. 606, at 5–6. Plaintiffs don't say what amount of time *would* be short enough under the orders. Plaintiffs haven't met their burden to show that an order requires something defendants haven't done. *See Baum*, 606 F.2d at 593.

*Third*, plaintiffs rely (at 44) on the Monitors' survey of 117 caregivers at large congregate facilities to support their contempt argument. But this survey is insufficient to establish a clear and convincing violation of the orders. For one thing, the survey sampled less than 0.25 percent of the total caregivers statewide, *see* Sixth Report 44 (over 47,000 caregivers), and only caregivers at the largest facilities. Sixth Report 68.

Moreover, the survey didn't ask whether those 117 caregivers were apprised of the relevant information for a particular child that was placed with them—instead they were asked generally how often they were informed about children's sexual-abuse histories. Sixth Report 68, 73. Eighty-five percent said always or sometimes;

---

caregivers, they must certify awareness of the child's sexual-abuse history "before" being responsible for the child. *Id.*

15 percent (17 caregivers) said never.  Sixth Report 73.  The Monitors have not dis-

closed the survey's methodology, and it is a conundrum how a caregiver could possibly

answer that he "never" knew that a child had a sexual-abuse history without in fact

having been apprised at some point that the child has such a history.

**B.** **Defendants have substantially complied with Remedial Orders 25, 27, and 31, and at minimum made good-faith efforts to comply.**

Even if plaintiffs' evidence were sufficient to support their contentions—and

even if those contentions were supported by the remedial orders' requirements—con-

tempt still wouldn't be warranted because defendants have substantially complied

with Remedial Orders 25, 27, and 31.  Holding the survey's methodological deficien-

cies to the side, 76 percent of the 117 caregivers surveyed said they *always* receive

the required information, and 90 percent of the administrators responsible for those

caregivers surveyed said they *always* communicate the required information.  Sixth

Report 71, 73.

Defendants were able to achieve this level of success through DFPS's extensive

efforts to overhaul the policies and contracts governing how sexual-abuse history is

communicated to caregivers in large congregate facilities, including by developing the

certification process discussed above.  *See* Sixth Report 59 (discussing the policy

changes).  The time, energy, and effort DFPS spent in developing and implementing

a workable solution to overcome the thorny problem of transmitting the necessary

information to staff who are off-site at the time of placement is emblematic of defend-

ants' "good faith attempts" to safeguard the children in their care and comply with

40

the Court's orders—attempts that confirm that contempt is unwarranted. *Stukenberg*, 509 F. Supp. 3d at 777.

## VII.   Remedial Order 4

Remedial Order 4 requires DFPS to "ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse." Dkt. 606, at 2.

DFPS requires its caseworkers and caregivers to complete sexual-abuse training courses. Sixth Report 41. A course on child sexual abuse is required for all new caseworkers. *Id.* For caregivers, DFPS implemented an online provider portal to systematize training on sexual abuse. *Id.* DFPS instructed all providers to (1) register all caregivers in the provider portal, and (2) ensure that each caregiver completes an online training module that DFPS made available through the portal. *Id.*[18] The portal tracks which caregivers have registered and which have completed the required training module. *Id.* DFPS has periodically updated its caseworker and caregiver curricula, which were designed to ensure compliance with Remedial Order 4. *Id*.

### A.   Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order 4.

Plaintiffs assert (at 49–54) that defendants should be held in contempt for violating Remedial Order 4 for failing to sufficiently train caseworkers and caregivers.

---

[18] *See* DFPS, *Caregiver Training*, https://www.dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/Training/default.asp#:~:text=Caregiver%20refers%20to%20individuals%20who,residential%20facility%20or%20operation%20staff.

But rather than identify any deficiencies in the trainings DFPS requires caseworkers and caregivers to complete, plaintiffs complain (at 50–51) that they lack sufficient evidence to assess DFPS's compliance with the order because there isn't currently a system to assess—to plaintiffs' satisfaction—whether every caregiver has received the required training.

In other words, plaintiffs don't actually provide evidence that defendants have *not* trained their caseworkers or caregivers. They don't challenge the content of the training programs, nor do they contest any aspect of *caseworker* training at all. Instead, plaintiffs' sole argument is that defendants should be held in contempt because plaintiffs haven't been able to gather what they deem sufficient evidence to confirm compliance with caregiver training required by Remedial Order 4. That's not enough. As the Fifth Circuit has made clear, *plaintiffs* bear the burden to come forward with proof that DFPS has violated the Court's order. *Travelhost*, 68 F.3d at 961.

In any event, plaintiffs are wrong to suggest any level of obstructionism on DFPS's part. DFPS has provided the Monitors with all of the data available from the provider portal quarterly data file. That data shows that nearly 99 percent of all registered caregivers (46,750 out of 47,372) have completed the online sexual-abuse training module. Sixth Report 43–44. DFPS requires every caregiver to be registered in the portal, and plaintiffs have given no reason to believe the true number of caregivers is significantly more than those registered in the portal.

At base, plaintiffs' complaint is that DFPS has not created (and cannot create) a separate database tracking system capable of dynamically generating a list of every

single person in Texas who qualifies as a "caregiver" at any given point in time.[19]  But the Fifth Circuit has made clear that this Court's remedial orders can't demand such exorbitant investments.  *Stukenberg II*, 929 F.3d at 279 (a "multimillion-dollar computer-system overhaul—while maybe a best practice—goes well beyond what is minimally required to remedy" a violation).  DFPS has repeatedly offered to work with the Monitors to find another solution.  Objection to Sixth Report 7 ("Defendants continue to be available to assist and work with the Monitors to verify and reconcile the data provided by the HHSC and DFPS systems").  To the extent Remedial Order 4 requires defendants to create the list plaintiffs demand, defendants' "inability to comply" is a complete defense.  *Waste Mgmt. of Wash., Inc. v. Kattler*, 776 F.3d 336, 341 (5th Cir. 2015).[20]

## B.   Defendants have substantially complied with Remedial Order 4, and at minimum have made good-faith efforts to comply.

A wealth of evidence—indeed all of the available evidence—indicates that defendants have fully complied with Remedial Order 4 (to say nothing of substantial compliance or their good-faith efforts to comply).  As to the caseworkers, the Monitors themselves agree that *100 percent* of them (all 2,369 *caseworkers*) have completed the

---

[19]   Contrary to plaintiffs' allegations (at 47), defendants' position here is entirely consistent with the position taken in their objections to the Sixth Report.  As defendants explained, caregivers in GROs, RTCs, and foster homes are registered in HHSC's CLASS system, and the Monitors can cross-reference the caregivers registered in the CLASS system against the list of caregivers from the provider portal. Objections to Sixth Report 6–7.  What plaintiffs want here, and what defendants are currently unable to provide, is a dynamically generated list of caregivers *statewide*.

[20]   Plaintiffs have not requested that DFPS be held in contempt of any order governing the provision of information to the Monitors.  *See* Motion 51.  Such request would have been futile—no remedial order requires DFPS to create the list plaintiffs seek.

required sexual-abuse training.  Sixth Report 42.  Unsurprisingly, plaintiffs wholly fail to mention caseworkers in alleging noncompliance.

As for caregivers, all of the available data confirms that DFPS has been successful in complying with the order and ensuring that the caregivers receive the required training.  As noted, nearly 99 percent of registered caregivers have completed the online training (46,750 out of 47,372 registered in the provider portal).  The Monitors' own sampling backs this up:  out of the 117 large-facility caregivers the Monitors surveyed, only 9 (8 percent) indicated that they haven't completed the training.  Sixth Report 44.

Moreover, training nearly 2,500 caseworkers and 47,000 caregivers has been no simple task—nor has tracking compliance and completion.  DFPS has invested significant time and effort into developing and implementing its online provider portal and training courses and materials.  The provider portal itself is a significant improvement on its previous method of tracking compliance with the required sexual-abuse training.  *See* Second Report 186–87 (documenting the many different logs, forms, and folders submitted to the Monitors regarding caregivers' training statuses).  DFPS has even periodically updated the course's curriculum—demonstrating its ongoing dedication to ensuring all caregivers receive proper training on such an important topic.  Sixth Report 41.

Defendants' substantial compliance and good-faith efforts to comply with Remedial Order 4 confirm contempt is unwarranted.  *Barnett*, 346 F.2d at 100.

## VIII.  Mitigating Circumstances:  Defendants' undisputed compliance with the vast majority of the remedial orders weighs against contempt.

Even if plaintiffs could make a *prima facie* showing that defendants have vio-lated every remedial order cited in their motion (they can't), the Court should still deny their motion because mitigating circumstances weigh heavily against contempt. *See Stukenberg*, 509 F. Supp. 3d at 704 ("showing mitigating circumstances" can de-feat contempt).

Defendants have expended enormous efforts and millions of taxpayer dollars to implement and comply with this Court's many remedial orders.  *See Little Tche-functe River Ass'n v. Artesian Util. Co., Inc.*, 155 F. Supp. 3d 637, 662–64 (E.D. La. 2015) (refusing to hold utility in contempt, even though it violated various anti-pol-lution provisions of an order, because it successfully complied with other numerous provisions); *Anderson*, 517 F.3d at 301 (affirming dissolution of desegregation order where school district "devoted considerable time and resources in a good faith effort" to comply).

The Monitors' own reports document defendants' extensive efforts and suc-cesses:

- **Caseworker Training (Remedial Order 1)**: DFPS has ensured that at least 92 percent of caseworkers have completed the CPS Pro-fessional Development training module before being assigned cases. Fifth Report 103–10 (explaining that data issues precluded Monitors from confirming remaining 8 percent).

- **Graduated Caseloads (Remedial Order 2)**: DFPS developed and implemented a graduated caseload policy to ease newly hired case-workers into a full caseload.  DFPS, *Generally Applicable Caseload Standards* 6–7 (2020).  In the Fifth Report, the Monitors concluded that "DFPS's performance with respect to Remedial Order 2 was

again strong" based on the agency's 99 percent compliance rate. Fifth Report 6, 142.

- **Timing of Investigations (Remedial Orders 5–19)**: HHSC has demonstrated near-perfect compliance with the remedial orders governing the initiation, completion, and documentation of investigations and notifying the referent of the outcome.  Sixth Report 22–23 (finding 92–98 percent compliance with various requirements). DFPS's compliance has hovered near or above 80 percent for similar deadlines, complicated largely by allegations of abuse and neglect that do not correctly identify the abused child from the outset.  Fifth Report 55–71 (noting 87 percent timely referent notification rate).

- **Sexual Abuse History (Remedial Orders 23, 24, and 28)**: Defendants implemented "sexually abused" and "sexual aggressor" profile characteristics before the Monitors' First Report.  *See* Sixth Report 45.  The Sixth Report determined that 100 percent of confirmed sexual-abuse victims and 83 percent of aggressors have electronic profiles that "appropriately indicate" the child's history and status. Sixth Report 47, 55.

- **Investigator Caseloads (Remedial Orders B1–B4)**: As the Monitors recently explained:  "The State's performance associated with caseloads for both RCCI investigations and regulatory investigations by HHSC with respect to Remedial Orders B1 to B4 was also strong." Fifth Report 6.  RCCI investigator caseloads were 100 percent within guidelines most months.  Fifth Report 127–28 (showing caseloads uniformly above 96 percent within guidelines).

- **Caseworker Notification of Abuse and Neglect (Remedial Order B5)**: DFPS has "promptly communicate[d] allegations of abuse to the child's primary caseworker."  Dkt. 606, at 15.  Every single allegation is automatically reported to the child's primary caseworker either the same day or the next day.  Fifth Report 90 (noting 100 percent notification rate).

As the Eleventh Circuit commented in another institutional-reform case involving a state's child-welfare system, "[t]he system is not yet perfect and may never be, but its improvement has been tremendous."  *R.C. ex rel. Ala. Disabilities Advoc. Project v. Walley*, 270 F. App'x 989, 992–93 (11th Cir. 2008) (dissolving injunction of state's foster-care program).  So too here.

46

Defendants' continued, demonstrable efforts to comply with the Court's reme-
dial orders and successful compliance with the vast majority of those orders strongly
indicate that contempt is unwarranted at this stage, and plaintiffs' motion should be
denied.

## IX.   Receivership:  The extreme remedy of receivership is inappropriate and unwarranted in light of defendants' substantial compliance, good faith, and undisputed improvement.

Plaintiffs ask the Court (at 2, 5–9, 54) to consider imposing a partial receiver-
ship as to certain remedial orders.  Not only would imposing an institutional receiv-
ership exceed the scope of the Court's authority, but it would also be unjustified.

Receivers are ordinarily appointed "to preserve property pending final deter-
mination of its distribution" in response to some "imminent danger that property will
be concealed, lost, or diminished in value."  *Santibanez*, 105 F.3d at 241–42; Fed. R.
Civ. P. 66 (requiring receivers' administration of an estate to "accord with the histor-
ical practice in federal courts").  But even in the context of property preservation, the
Fifth Circuit has warned that "[r]eceivership is 'an extraordinary remedy that should
be employed with the utmost caution'" and is defensible "only where . . . less drastic
equitable remedies are inadequate, and the benefits of receivership outweigh the bur-
dens on the affected parties."  *Netsphere*, 703 F.3d at 305, 315 (reversing appointment
of receiver).

What plaintiffs request is an even more extreme remedy than the already ex-
traordinary remedy of the typical receivership.  They seek "the judicial appointment

of administrative personnel to carry out" the remedial orders by administering portions of a state institution.   Motion 5–9 (quoting *Gary W. v. Louisiana*, 1990 WL 17537, at \*1 (E.D. La. Feb. 26, 1990)).   While plaintiffs cite out-of-jurisdiction cases, notably absent is any Fifth Circuit case approving such a receivership.   That's because there is none.[21]

And for good reason.   The Federal Rules of Civil Procedure state that "the practice in administering an estate by a receiver . . . must accord with the historical practice in federal courts or with a local rule."   Fed. R. Civ. P. 66.   But there is neither a local rule nor a historical practice in federal courts allowing for the appointment of a receiver to run state institutions.   After all, replacing officials who were appointed by the state's duly elected chief executive officer and confirmed by the state's senate with appointments by a federal court raises profound federalism concerns—even more so than injunctions or contempt.   *See Rizzo*, 423 U.S. at 378 ("important considerations of federalism" and the "special delicacy" of federal versus state power counseled against federal-court injunction); *Gee*, 941 F.3d at 167 ("Federalism is a 'clear restraint[ ] on the use of equity power' because '[a] structural reform decree eviscerates a State's discretionary authority over its own program and budgets.'").

Even accepting plaintiffs' premise that a receivership is available as a remedy, it would be unwarranted and unjustified here.   For one thing, plaintiffs haven't made

---

[21]   The only appellate court case affirming a receiver to run a state institution that plaintiffs cite (at 5) (or of which defendants are aware) is *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), which involved desegregation.   Critically, the district court there still kept the schools under state-government control by appointing the Superintendent of Schools, who was a staunch proponent of integration, as the receiver.   *Id.* at 535.

out a *prima facie* case of contempt for any remedial order—and at minimum, defendants have substantially complied with each remedial order and acted in good faith to comply. *See supra*, Sections I–VII.  At the very least, the Monitors' reports find that defendants have significantly improved in complying with the remedial orders at issue in this motion, and plaintiffs don't contest those findings. *See*, *e.g.*, Fifth Report 47 (compliance with Remedial Order 3 has "measurably improved over time" and "often resulted in an appropriate disposition"); Sixth Report 63–64 (noting improvement in compliance with Remedial Orders 26 and 29); *see supra* pp. 27–30 (discussing improvements regarding Remedial Order 35), 41–44 (improvements regarding Remedial Order 4).  That's to say nothing of defendants' undisputed compliance with the vast majority of remedial orders that are not at issue in this motion. *See supra* Section VIII.

So the situation here is nothing like the circumstances in the out-of-jurisdiction (and out-of-Texas) cases plaintiffs cite, where there was a "lack of *any* significant progress" over sustained periods of time,[22] conditions had become worse over time,[23] or the state "candidly admitted" "its inability to comply" with the court's orders.[24]  Here, defendants' good-faith efforts to comply have already yielded measurable results and have substantially mitigated harm to PMC children.  Defendants take seriously

---

[22]   *Newman v. Alabama*, 466 F. Supp. 628, 630, 635 (M.D. Ala. 1979) (emphasis added); *United States v. Hinds Cnty.*, 2023 WL 1186925, at *1, *7 (S.D. Miss. Jan. 30, 2023), *appeal filed*, 22-60597 (5th Cir. Feb. 3, 2023).

[23]   *LaShawn A. v. Kelly*, 887 F. Supp. 297, 300, 315 (D.D.C. 1995).

[24]   *Plata v. Schwarzenegger*, 603 F.3d 1088, 1091, 1097 (9th Cir. 2010) (discussing, but not analyzing, the receivership order imposed by the district court), *aff'g*, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005); *see Gary W.*, 1990 WL 17537, at *28–29.

plaintiffs' allegations concerning the small subset of abuse and neglect allegations involving medical neglect, or the way the 50-or-so children without placement at any given time are counted in caseloads, but these allegations don't demonstrate the sort of large-scale deficiencies that courts have found to justify receivership—as plaintiffs' half-hearted request implicitly concedes. *See* Motion 8 ("a *partial* receivership *may* become the necessary next step") (emphases added).

A receivership would be anything but a "quick[] and efficient[]" remedy to the shortcomings plaintiffs allege. Motion 8. Instead, it would threaten significant disruption that would jeopardize the gains defendants have already made and execute a semi-permanent "intrusion into state administration" of its own programs. *Miller v. Carson*, 563 F.2d 741, 753 (5th Cir. 1977). Such a "drastic" measure would be unprecedented in the Fifth Circuit and manifestly improper here. *Netsphere*, 703 F.3d at 305.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion should be denied.

Date:  November 3, 2023

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

 */s/ Kimberly Gdula*
**KIMBERLY GDULA**
  State Bar No. 24052209
  Southern District No. 10092074
  Acting Chief
  General Litigation Division
**KARL E. NEUDORFER**
  State Bar No. 24053388
  Southern District No. 725939
  Assistant Attorney General
  Administrative Law Division
**CLAYTON R. WATKINS**
  State Bar No. 24103982
  Southern District No. 3663032
  Assistant Attorney General
  Administrative Law Division
**NOAH REINSTEIN**
  State Bar No. 24089769
  Southern District No. 3355459
  Assistant Attorney General
  Civil Medicaid Fraud Division
**ROBERT SALMON**
  State Bar No. 24088923
  Southern District No. 3662721
  Assistant Attorney General
  Civil Medicaid Fraud Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120 | Fax (512) 370-0667

Respectfully submitted,

 */s/ Allyson N. Ho*
**ALLYSON N. HO**
  *Attorney-in-Charge*
  State Bar No. 24033667
  Southern District No. 1024306
**BRADLEY G. HUBBARD**
  State Bar No. 24090174
  Southern District No. 3450976
**SAVANNAH SILVER**
  State Bar No. 24129020
  Southern District No. 3844454
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
(214) 571-2900 – Fax
aho@gibsondunn.com
ssilver@gibsondunn.com

**PRERAK SHAH**
  State Bar No. 24075053
  Southern District No. 2137529
Gibson, Dunn & Crutcher LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
(346) 718-6620 – Fax
pshah@gibsondunn.com

ATTORNEYS FOR DEFENDANTS

51

kimberly.gdula@oag.texas.gov
karl.neudorfer@oag.texas.gov
clayton.watkins@oag.texas.gov
noah.reinstein@oag.texas.gov
robert.salmon@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

### CERTIFICATE OF SERVICE

I certify that on November 3, 2023, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system, which automatically provided notice to all attorneys of record.

 */s/ Allyson N. Ho*
Allyson N. Ho
