```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    CORPUS CHRISTI DIVISION

 4
     M.D., b/n/f SARAH R.          )        2:11-CV-0084
 5   STUCKENBERG, et al.,          )
                 Plaintiffs,       )
 6                                 )
                                   )        DALLAS, TEXAS
 7   VS.                           )
                                   )
 8                                 )
     GREG ABBOTT, et al.,          )
 9               Defendants.       )        December 4, 2023

10

11            TRANSCRIPT OF SHOW CAUSE HEARING
                         VOLUME 1
12
             BEFORE THE HONORABLE JANIS GRAHAM JACK
13
              SENIOR UNITED STATES DISTRICT JUDGE
14

15
     A P P E A R A N C E S:
16

17

     FOR THE PLAINTIFFS:        PAUL YETTER
18                              Yetter Coleman LLP
                                811 Main Street
19                              Suite 4100
                                Houston, TX  77002
20                              713-632-8000
                                pyetter@yettercoleman.com
21

22                              MARCIA ROBINSON LOWRY
                                A Better Childhood, Inc.
23                              355 Lexington Ave., Floor 16
                                New York, NY  10017
24                              646-795-4456
                                mlowry@ABetterChildhood.org
25
```

```
 1                                    DAVID BALOCHE
                                      A Better Childhood, Inc.
 2                                    355 Lexington Ave., Floor 16
                                      New York, NY  10017
 3                                    917-232-1748
                                      dbaloche@ABetterChildhood.org
 4

 5                                    SAMANTHA BARTOSZ
                                      Children's Rights
 6                                    330 Seventh Ave, Fourth Floor
                                      New York, NY  10001
 7                                    212-683-2210
                                      sbartosz@childrensrights.org
 8

 9   FOR THE DEFENDANT,              ALLYSON N. HO
     GREG ABBOTT, in his             Gibson Dunn & Crutcher LLP
10   Official Capacity as            2001 Ross Avenue
     Governor of the State of        Suite 2100
11   Texas:                          Dallas, TX  75201
                                     214-698-3233
12                                   aho@gibsondunn.com

13
                                     PRERAK SHAH
14                                   Gibson Dunn & Crutcher LLP
                                     811 Main Street
15                                   Suite 3000
                                     Houston, TX  77002
16                                   717-538-2270
                                     prerakshah@gmailcom
17

18                                   BRADLEY GEORGE HUBBARD
                                     Gibson Dunn & Crutcher LLP
19                                   2001 Ross Avenue
                                     Suite 2100
20                                   Dallas, TX  75201
                                     214-698-3001
21                                   bhubbard@gibsondunn.com

22
                                     JOHN STEWART ADAMS
23                                   Gibson Dunn & Crutcher LLP
                                     2001 Ross Avenue
24                                   Suite 2100
                                     Dallas, TX  75201
25                                   214-698-3335
                                     JSAdams@gibsondunn.com
```

```
 1                              JASON MUEHLHOFF
                                Gibson, Dunn & Crutcher LLP
 2                              2001 Ross Avenue
                                Suite 2100
 3                              Dallas, TX  75201
                                214-698-3100
 4                              jmuehlhoff@gibsondunn.com

 5
                                SAVANNAH CATHERINE SILVER
 6                              Gibson Dunn & Crutcher LLP
                                2001 Ross Avenue
 7                              Suite 2100
                                Dallas, TX  75201
 8                              214-698-3100
                                ssilver@gibsondunn.com
 9

10   FOR THE DEFENDANT,         ALLYSON N. HO
     HHSC:                      Gibson Dunn & Crutcher LLP
11                              2001 Ross Avenue
                                Suite 2100
12                              Dallas, TX  75201
                                214-698-3233
13                              aho@gibsondunn.com

14
                                PRERAK SHAH
15                              Gibson Dunn & Crutcher LLP
                                811 Main Street
16                              Suite 3000
                                Houston, TX  77002
17                              717-538-2270
                                prerakshah@gmailcom
18

19                              BRADLEY GEORGE HUBBARD
                                Gibson Dunn & Crutcher LLP
20                              2001 Ross Avenue
                                Suite 2100
21                              Dallas, TX  75201
                                214-698-3001
22                              bhubbard@gibsondunn.com

23

24

25
```

```
 1                              JASON MUEHLHOFF
                                Gibson, Dunn & Crutcher LLP
 2                              2001 Ross Avenue
                                Suite 2100
 3                              Dallas, TX  75201
                                214-698-3100
 4                              jmuehlhoff@gibsondunn.com

 5
                                JOHN STEWART ADAMS
 6                              Gibson Dunn & Crutcher LLP
                                2001 Ross Avenue
 7                              Suite 2100
                                Dallas, TX  75201
 8                              214-698-3335
                                JSAdams@gibsondunn.com
 9

10                              NOAH REINSTEIN
                                Office of the Attorney General
11                              300 W. 15th Street
                                9th Floor
12                              Austin, TX  78701
                                512-463-3457
13                              noah.reinstein@oag.texas.gov

14
     FOR THE DEFENDANT,         ALLYSON N. HO
15   DFPS:                      Gibson Dunn & Crutcher LLP
                                2001 Ross Avenue
16                              Suite 2100
                                Dallas, TX  75201
17                              214-698-3233
                                aho@gibsondunn.com
18

19                              PRERAK SHAH
                                Gibson Dunn & Crutcher LLP
20                              811 Main Street
                                Suite 3000
21                              Houston, TX  77002
                                717-538-2270
22                              prerakshah@gmailcom

23

24

25
```

```
 1                              BRADLEY GEORGE HUBBARD
                                Gibson Dunn & Crutcher LLP
 2                              2001 Ross Avenue
                                Suite 2100
 3                              Dallas, TX  75201
                                214-698-3001
 4                              bhubbard@gibsondunn.com

 5
                                JOHN STEWART ADAMS
 6                              Gibson Dunn & Crutcher LLP
                                2001 Ross Avenue
 7                              Suite 2100
                                Dallas, TX  75201
 8                              214-698-3335
                                JSAdams@gibsondunn.com
 9

10                              JASON MUEHLHOFF
                                Gibson, Dunn & Crutcher LLP
11                              2001 Ross Avenue
                                Suite 2100
12                              Dallas, TX  75201
                                214-698-3100
13                              jmuehlhoff@gibsondunn.com

14
                                KARL ERIC NEUDORFER
15                              Office of the Attorney General
                                P.O. Box 12548
16                              Capital Station
                                Austin, TX  78711-2548
17                              832-258-1686
                                Karl.Neudorfer@oag.texas.gov
18

19   THE MONITORS:              KEVIN RYAN
                                DEBORAH FOWLER
20

21   ALSO PRESENT:             ZOOM PARTICIPANTS

22

23

24

25
```

```
 1   COURT REPORTER:              TODD ANDERSON, RMR, CRR
                                  United States Court Reporter
 2                                1100 Commerce St., Rm. 1625
                                  Dallas, Texas  75242
 3                                (214) 753-2170

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23         Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1          SHOW CAUSE HEARING - DECEMBER 4, 2023
 2                  P R O C E E D I N G S
 3          COURTROOM DEPUTY CLERK:  Court calls Civil Case
 4  2:11-CV-84, M.D., et al., versus Abbott, et al.
 5          THE COURT:  May I have appearances, please?
 6          MR. YETTER:  Paul Yetter for the Plaintiff Children,
 7  along with my co-counsels Marcia Lowry and Samantha Bartosz.
 8          MS. BARTOSZ:  Good morning, Your Honor.
 9          THE COURT:  Good to see you-all.
10          MR. SHAH:  I'm Prerak Shah for the defense, Your
11  Honor, along with my co-counsel John Adams, Brad Hubbard,
12  Allyson Ho, Jason Muehlhoff, and Savannah Silver.
13          THE COURT:  That's very distinguished, the second
14  president and very nice people.
15          (Laughter)
16          THE COURT:  I thought the first thing we'd take up
17  are the outstanding objections that have been filed, the
18  various filings of the Monitors.  It will help me get a clearer
19  picture of where we are now.
20          So the first document that was filed was the
21  Monitors' update regarding Remedial Order 3.
22          And, Jason, if you could put up that paragraph of the
23  Defendants' objections on page 2.
24          MR. SHAH:  Your Honor, we might be able to make this
25  go a little bit quicker.  My understanding is Mr. Yetter has
```

1    submitted an exhibit list of over 100 exhibits, which include

2    the Monitors' reports.  We've submitted an exhibit list of, I

3    think, 46 exhibits.  This is essentially a bench trial, Your

4    Honor.  Your Honor is capable of weighing the evidence as Your

5    Honor decides the weight.

6              THE COURT:  I want to discuss these objections.

7              MR. SHAH:  Of course, Your Honor.  I didn't --

8              THE COURT:  So that's why we're doing this.

9              MR. SHAH:  Of course.  I just wanted to say we're

10   also willing to preadmit all those exhibits for Your Honor to

11   review them, and we can discuss them, too, just to avoid --

12             THE COURT:  I'm just going to take judicial notice of

13   all the docket entries --

14             MR. SHAH:  Okay.

15             THE COURT:  -- and all the Monitors' reports, and

16   we're done, and I'll admit -- anybody have objections to the

17   exhibits that are being admitted?

18             Mr. Yetter, your exhibits are numbered --

19             MR. YETTER:  I believe 1 to 114, Your Honor.

20   Plaintiffs' Exhibit 1 to Plaintiffs' Exhibit 114.

21             THE COURT:  Any objections, Mr. Shah?

22             MR. SHAH:  No, Your Honor.

23             THE COURT:  Then Plaintiffs' Exhibits 1 through 114

24   are admitted.

25                  (Plaintiffs' Exhibit Nos. 1-114 received)

```
1              THE COURT:  And Defendants' Exhibits --
2              MR. SHAH:  Exhibits 1 through 48.
3              THE COURT:  1 through 48.
4              Any objections, Mr. Yetter or Ms. Lowry?
5              MR. YETTER:  No.  No, Your Honor.
6              THE COURT:  Defendants' 1 through 48 are admitted.
7                  (Defendants' Exhibit Nos. 1-48 received)
8              MR. SHAH:  Thank you, Your Honor.
9              THE COURT:  So now -- thank you.
10             We can start with that.
11             If you'd flash up page 2 of the Defendants'
12      objections.
13             How do we get that screen on over there?
14             COURTROOM DEPUTY CLERK:  We're getting it, Judge.
15             THE COURT:  Thank you.
16             (Pause)
17             THE COURT:  I need the screen over there.
18             (Discussion off the record)
19             THE COURT:  And this has to do with the children and
20      HSC?  Are those the right initials?
21             MR. YETTER:  HCS, Your Honor.
22             THE COURT:  HCS.
23             And the Monitors reviewed, and it's in their report
24      that is objected to, 69 cases that were closed between
25      January 1st and April 30th of this year, including four that
```

1   were closed last year of the same children investigated again

2   in 2023.

3          So together, 69 cases that were closed with no

4   findings of conclusions.

5          And that, by the way, is 100 percent of the universe

6   of closed PMC cases that were investigated and found no finding

7   of abuse, neglect, or exploitation.

8          So the -- it wasn't a sampling.  It was the entire

9   number.  And the -- and the footnote on that page says the

10   Monitors don't -- report doesn't indicate whether the Monitors

11   randomly or specifically selected these investigations.  Well,

12   there wasn't anything random about it.  It's in the actual

13   report that they looked at every single one.

14          Is that right, Monitors?

15          MR. RYAN:  That's correct, Your Honor.

16          THE COURT:  So I'm disappointed that the Plaintiff --

17   that the Defendants are not actually reading the report and

18   checking before they file these kind of objections.

19          Mr. Shah, are you getting this?

20          MR. SHAH:  Yes, Your Honor.  May I respond?

21          THE COURT:  There's more to come.  Yes.

22          MR. SHAH:  May I respond to that one, Your Honor?

23          THE COURT:  Yes.

24          MR. SHAH:  So one question, Your Honor.  Your Honor

25   just said that they looked at 69 reports, that was the universe

1    that were found inconclusive and conclusive.  Well, one of

2    them, I believe, was found confirmed.  They also said that on

3    the report.  So that's -- I think there's some confusion here.

4          So they said that it was an over -- they looked at

5    all PI investigations involving PMC children that closed with

6    an overall disposition of unconfirmed or inclusive between

7    January 1 and April 30.  And then later in that same

8    PowerPoint, the next paragraph, of the 69 PI investigations

9    Monitors reviewed, confirmed one investigation.

10         So which -- like, if they were looking at the

11   inclusive and conclusive, I think we're just --

12         THE COURT:  The Monitors confirmed one.  Not you.

13   The Monitors confirmed.

14         MR. SHAH:  No, Your Honor.  I believe they're saying

15   that the disposition was confirmed.

16         MR. RYAN:  Yes, Your Honor.  We explained that in the

17   report.  There were five reports, investigations that closed

18   before 2023 that opened at the same time that these reports

19   involving PMC children were opened.  And one of those from

20   before 2023, as we say in the report, was confirmed.

21         MR. SHAH:  Okay, Your Honor.  So one of those 69 was

22   a confirmed disposition, not just confirmed by the Monitors,

23   correct, Your Honor?

24         THE COURT:  Right.

25         MR. RYAN:  That's in both of our filings.

1          MR. SHAH:  Okay.  And then I guess, Your Honor, one

2    additional question, or Mr. Ryan can answer, whoever it may be.

3    So of the -- Mr. Ryan just said that they looked at five

4    additional investigations involving PMC allegations.

5          THE COURT:  With the same children.

6          MR. SHAH:  So that's actually what I'm covering.  It

7    says PMC children around the same time and the same

8    allegations.

9          Is that every allegation involving that PMC child or

10   just five of the -- because they were around the same time?

11         THE COURT:  It was five that was closed in 2022, at

12   the end of 2022, with the same children that had the 64 in

13   January 1st to April 30th.

14         MR. SHAH:  In January '23.  And were there any

15   other -- like, did they only pick those five, or were there

16   additional ones as well, Your Honor?

17         THE COURT:  They just went back and picked up the

18   children that had been -- that were part of the 64.

19         MR. SHAH:  Okay.

20         THE COURT:  From January 1st till April 30th.

21         MR. SHAH:  Okay.

22         THE COURT:  And I guess my point is, I thought their

23   report was really clear.  I was not unclear about that at all.

24   And you questioned like they were sampling.  This was the

25   entire universe of cases.

```
 1              MR. SHAH:  For inconclusive.
 2              THE COURT:  For PMC for inconclusive or
 3    insufficient --
 4              MR. SHAH:  Right.  Except for one that's confirmed
 5    from this one.
 6              THE COURT:  Right.  But that was the entire universe.
 7    It wasn't that they picked a sample.
 8              And I can tell you something else that you-all also
 9    say, oh, this is just a tiny, tiny little percentage of PMC
10    children, as if it's insignificant.
11              Let me explain that there are -- at any time you
12    should know there are about a hundred PMC children that are in
13    these HCS placements.  A hundred.  And we're talking 69
14    complaints here.
15              And so in the universe that -- of these unconfirmed
16    allegations, the Monitors disagreed with your insufficient
17    findings in 38 of those cases, which is over 50 percent.
18              So that is not substantial compliance.  And that
19    universe is really small.  This is an HHSC universe.  We're not
20    putting them in with the DFPS investigations, okay?  This is a
21    very small universe of HCS investigations, children that were,
22    even according to the State, incredibly neglected and abused,
23    and many deficiencies.
24              You know, they -- you say in some of them in your
25    objections that the statements were inconsistent by the
```

 1    children.  Well, of course, in this category of investigators,

 2    the PI investigators, these are homes with children that have

 3    extreme disabilities.  They have IQs from 35 to 70 or something

 4    like that.

 5            They're housed, as we know, it turns out, with adult

 6    children with mental disabilities, with -- you realize that,

 7    Mr. Shah?

 8            MR. SHAH:  Yes, Your Honor.

 9            THE COURT:  And then you-all actually had the nerve

10    to object that that was not an adult foster care facility.

11            If you look at the Monitors' response to that that

12    was filed, I think, last night, they found in your provided

13    information to the Monitors that it is called an adult foster

14    care institution placement.  Did you see that?

15            MR. SHAH:  Your Honor, I remember looking at that

16    portion, but I --

17            THE COURT:  That's what it says.

18            MR. SHAH:  Yes.

19            THE COURT:  And it's directly from you-all.

20            (Pause)

21            COURTROOM DEPUTY CLERK:  Judge, I'm sorry.  The

22    people on Zoom are unable to hear at this moment.  We're trying

23    to fix it.

24            THE COURT:  Okay.

25            So my concern is after -- after May or so of this

1   year a whole new set of objections are being filed, to me

2   demonstrating the shifting sands of the State's position on the

3   care and safety of these children.  And I have great concerns,

4   which is why I'm going through these objections.

5          Prior objections from the State were really spelling,

6   name -- name corrections, typos.  Now we're talking about

7   substantive objections to actually information provided to the

8   Monitors word for word by the State.  And that, of course, runs

9   up billable hours for your firm, incredible scores of hours for

10  the Monitors to rebut these many times spurious objections, all

11  money that could go to the children.

12         So I -- with these objections, I'm trying to get an

13  understanding of where the sands are now shifting and why, and

14  why this has become an adversarial situation against the safety

15  of the children, in my opinion, with these types of objections.

16         Okay.  The next set is the Monitors' update -- wait a

17  minute.

18         MR. YETTER:  Your Honor, before we leave that one

19  objection, this is the objection that it was too -- it was too

20  small a sample.

21         THE COURT:  It's two parts.

22         MR. YETTER:  Oh, I'm sorry.

23         THE COURT:  It's two parts.  I'm getting to -- I

24  think it's continued on in 6.

25         (Pause)

1          THE COURT:  Go ahead.  I want to make sure I've got

2     it right, Mr. Yetter.  Go ahead.

3          MR. YETTER:  Okay.  Your Honor, the -- one of the

4     objections that the Defendant now seems to be making is that

5     the Monitors looking at the 69 closed cases, which is the

6     universe of all PMC closed cases in that timeframe, was that it

7     was just such a small number.  And the Court mentioned this

8     already.

9          THE COURT:  Oh, no, I'm not going to pay any

10    attention to that.  That's like -- that's like those little

11    kids don't matter because it's -- they've substantially

12    complied, because most investigations in DFPS and most

13    investigations elsewhere are just fine, but this is a very

14    small group of children in ACS that are placed in the most

15    appalling conditions I think we've seen in this case

16    altogether.

17         MR. YETTER:  These are the most vulnerable of the

18    most vulnerable children in the State's care.

19         THE COURT:  And in their investigations, I'm sure you

20    noticed, Mr. Yetter, they didn't do face-to-face.  They did

21    telephone calls without any -- without any intent.  They didn't

22    record them, in contrast to other investigations.

23         This is a separate unit of investigators.  They don't

24    record their investigations, so they just say the children's

25    report -- they're inconsistent, the children's statements.  We

 1    don't know that.  We know that in other recorded instances that

 2    the investigators' summary are in controversy to the recorded

 3    statement.  We know that.

 4          So we might assume that they have reported

 5    inconsistencies that are not correct and might have been a

 6    little bit clearer if they had indeed recorded these

 7    conversations.

 8          We also know that they -- these investigators made no

 9    attempt to get special assistance in interviewing children with

10    learning disabilities, with all kinds of other mental

11    disabilities, along with physical disabilities.  No -- no

12    attempt to make any accommodation for these children.

13          And in your contempt, we'll get to these children in

14    a more particular area.  I just wanted to address the

15    objections.

16          MR. YETTER:  The one thing I did want to bring up,

17    Your Honor, is just to -- and I know the Court recalls this,

18    but maybe new defense counsel doesn't, which is that the Fifth

19    Circuit's ruling on investigations was in part based on audits

20    that what was then the residential childcare licensing group,

21    the DFPS group, did of small numbers of investigations.

22          And one of those audits, Your Honor, we have marked

23    as an exhibit, Plaintiffs' Exhibit 103, so it's in this record.

24    It was in the trial record in 2015.

25          And Plaintiffs' Exhibit 103 is an audit by Child

1    Care -- RCCL, by their audit group called Performance

2    Management Unit.  And I know that Your Honor remembers all

3    this, but I'm -- for the record, for this hearing, for

4    this contempt hearing --

5              THE COURT:  Well, I think you and me and Ms. Lowry

6    and Ms. Bartosz were the only people here from the beginning.

7              MR. YETTER:  The Fifth Circuit --

8              THE COURT:  And we have a memory that these people do

9    not have.

10             And every time we get a new set of lawyers, a new set

11   of commissioners, from the one who was in the Coast Guard to

12   the -- we get a whole new set of sands that are shifting, a

13   whole new set of interests, and no universal memory within DFPS

14   or HHSC.

15             Of course, when we all started, DFPS was one agency,

16   and then it split after the trial into HHSC and DFPS, with

17   numerous other issues coming along.

18             But go ahead, Mr. Yetter.

19             MR. YETTER:  The point I'm making, Your Honor, is

20   that part of the evidence at the trial which validated

21   constitutional violations which this Court found and the Fifth

22   Circuit upheld was in part these small audits.

23             Now, the Monitors weren't doing a sampling, but the

24   evidence at trial was a sampling by the State itself with its

25   own internal auditing group.  And the sample they took, this is

1  Plaintiffs' 103, this is actually dated -- it's almost ten

2  years ago, January 2014.  And this is the State's own

3  methodology to determine whether their investigations are valid

4  or invalid.

5          They took a sampling of 48 cases, 48 investigations.

6  They made a determination -- and it obviously was terrible,

7  Your Honor.  64 percent of them were wrong.  They made a

8  determination back then across all of their investigations,

9  based on a sampling of 48.  The Monitors didn't take a sample.

10  They took all 69.  And the State to this day --

11          THE COURT:  And the State is questioning their

12  sampling method.  It's just stunning to me.  The hours they

13  must have put in of billable hours to come up with these kind

14  of objections is stunning.

15          MR. YETTER:  That's all.  I wanted to just point that

16  out, Your Honor.  And we may hold that --

17          THE COURT:  I think it's been well pointed out.

18          MR. YETTER:  I'm sorry, Your Honor?

19          THE COURT:  I think we've got it.

20          MR. YETTER:  Yes.  I -- I just wanted to point that

21  out.

22          THE COURT:  And here is the Monitors' update to the

23  Court's PMC children without a licensed placement.

24          And if you put up there page 2, which is the

25  beginning of the objections, the most common corresponding

1   characteristics or treatment needs that DFPS identified among

2   those children were as follows:

3          History of physical aggression, 418 children, 90

4   percent.

5          History of mental health diagnosis, 410 children, 88

6   percent.

7          History of psychiatric or mental hospitalization, 370

8   children.  That would be about 80 percent.

9          Cognitive or physical disability, 354 children or 76

10  percent.

11         Now, then the objection is the Defendants were

12  unable -- this is stunning.  Look at this one.  The Defendants

13  were unable to discern what diagnosis the Monitors consider to

14  constitute cognitively -- cognitive delay and/or physical

15  disabilities.

16         The Monitors do not diagnose.  Now, if you look at

17  their response, this came directly -- these diagnoses came

18  directly from the diagnoses in the State records.

19         Is that right, Ms. Fowler?  Mr. Ryan?

20         MR. RYAN:  That's correct, Your Honor.  We based this

21  summary on data and information that were provided from the

22  State.  And in our future filings we'll break it out to

23  coincide directly --

24         THE COURT:  Has anybody --

25         MR. RYAN:  -- with the State categories.

 1          THE COURT:  Has anybody in your department, Mr. Shah,
 2  looked at those exact diagnoses?  They picked them up word for
 3  word from -- what was the IMPACT?
 4          MR. RYAN:  Your Honor, it's a report that the State
 5  provides to us on a weekly basis.
 6          THE COURT:  Okay.  And did you-all look at that?
 7          MR. SHAH:  Your Honor, it sounds like the Monitor is
 8  going to be providing a summary of every single diagnosis.
 9          Is that right, Mr. Ryan?
10          THE COURT:  They just took all of the universe of
11  children in CWOP, children without -- should be licensed
12  placements -- and went through every single one of them with
13  your diagnoses.
14          MR. SHAH:  We look forward to seeing that, Your
15  Honor.  And if that is what it is --
16          THE COURT:  It's right here in their response.
17          MR. SHAH:  Well, no.  Sorry, Your Honor.  I'm talking
18  about the summary document Mr. Ryan just indicated they would
19  be filing at some point.
20          THE COURT:  Well --
21          MR. RYAN:  Your Honor, I was talking about our future
22  CWOP reporting.
23          MR. SHAH:  Yeah.
24          MR. RYAN:  So in the future we'll connect it
25  directly to the --

```
 1              THE COURT:  The problem is that these are -- these
 2   are -- these are diagnoses that you have given to the Monitors.
 3              Do you want them repeated?  Do you not know where
 4   they are when you record them and when you -- and you provide
 5   them?
 6              MR. SHAH:  No, Your Honor.
 7              THE COURT:  You don't keep a record of what you
 8   provide to the Monitors?
 9              MR. SHAH:  Your Honor, yes, we do.  I was responding
10   to no, that we don't need to see those, Your Honor.
11              THE COURT:  I would think not, because you provided
12   them to the Monitors and now you're objecting to them using
13   them.  Do you see where I'm going with this, Mr. Shah?
14              MR. SHAH:  No, Your Honor, but I want to go through
15   it all.
16              THE COURT:  Okay.  I think you're going to get it
17   shortly.
18              MR. SHAH:  Yes, Your Honor.
19              THE COURT:  You and Ms. Ho signed these objections.
20              MR. SHAH:  Yes.
21              THE COURT:  You know what the Rule 11 requirements
22   are.
23              MR. SHAH:  Yes, Your Honor.
24              THE COURT:  Okay.  That may be a -- that may be a
25   subject for another hearing.
```

1          Okay.  Then update to the Remedial Order caseload

2    performance filed by the Monitors and the Defendants' objection

3    to that same caseload performance.

4          Now, this was stunning to me.  This is one of the

5    examples of the shifting sands with new attorneys.

6          If you look at the Monitors' response to this, what

7    you are objecting to is the Monitors took your representation

8    that there was a supervisor, one supervisor to seven

9    caseworkers, and has used that representation in every report

10   for the last three and a half years, used that exact ratio

11   because the State supplied it.

12         Mr. Kevin Ryan verified it, I think with Ms. Olah at

13   one point, that that was the exact ratio of supervisors to

14   caseworkers.  Ms. Olah, who is no longer with you of course.

15   And suddenly in this report with the shifting sands of the

16   State's position, you-all say, oh, no, that's one supervisor to

17   all staff, not one supervisor for seven caseworkers, for the

18   first time in like five reports after confirming with the

19   Monitors that this is your formulation.

20         Now, where does this come from, Ms. Ho?  You're the

21   one who signed this objection.

22         MS. HO:  Your Honor, I'm going to defer to Mr. Shah

23   who I have designated as my -- as lead for this proceeding.

24   He's the one who --

25         THE COURT:  Is he going to be on the hook for --

```
 1              MS. HO:  Yes, Your Honor.
 2              THE COURT:  -- for signing it?
 3              MS. HO:  He will respond.
 4              THE COURT:  All right.  Mr. Shah, are you ready for
 5  this?
 6              MR. SHAH:  Yes, Your Honor.
 7              THE COURT:  Okay.  Where did you get it?
 8              MR. SHAH:  We consulted with our clients.
 9              THE COURT:  Who?
10              MR. SHAH:  Your Honor, I believe part of that is
11  attorney-client privilege who we talked to, Your Honor.
12              THE COURT:  Well, who in your department knows what
13  the ratio is?  The last one we had from your department was
14  Ms. Olah.
15              MR. SHAH:  Your Honor, I don't have a name.
16              THE COURT:  Can you tell me who is -- who is changing
17  the formula now?
18              MR. SHAH:  No, Your Honor, I don't know who that
19  person is.
20              THE COURT:  So you don't know who you conferred with?
21              MR. SHAH:  I don't know the specific person who has
22  that --
23              THE COURT:  Ah-oh.
24              MR. SHAH:  -- specific information, Your Honor.
25              THE COURT:  So perhaps you did not properly when you
```

1    signed your name to this objection make inquiries or read the

2    prior records or the prior Monitors' reports.

3              I think you get where we're going now, Mr. Shah.

4              MR. SHAH:  Your Honor --

5              THE COURT:  Is it sinking in?

6              MR. SHAH:  Yes, Your Honor, or no, Your Honor?

7              THE COURT:  Slowly?

8              MR. SHAH:  I want to talk through everything Your

9    Honor wants to talk about.

10             THE COURT:  Okay.  You're a good man, Mr. Shah, in a

11   not good position at this moment.  And it actually isn't your

12   signature on these, I don't think.

13             Anything else on that particular formula?  So now

14   where are we?  What formula are you using at this point in the

15   game?  Can you call somebody to tell me right now what your

16   formula is, the one to seven that you gave to the Monitors

17   three and half years -- three years and four months ago?

18             Ms. Ho?  Mr. Shah?  Anybody?

19             MR. SHAH:  Your Honor, to the extent that this is

20   subject to the contempt hearing --

21             THE COURT:  Since you don't know where -- you don't

22   know where it came from, the one to seven, you don't know who

23   you talked to when you filed the objection, and you don't know

24   why it's changed over time.

25             MR. SHAH:  Your Honor, I would ask Mr. Yetter.  He

1  submitted a witness list to prove his case for contempt.  If

2  there's any witnesses that he wishes to call to prove his case

3  for contempt --

4          THE COURT:  I'm asking you if you've got anybody on

5  these objections to tell me where you got that information, one

6  to seven is no longer supervisor -- one supervisor to seven

7  caseworkers.

8          MR. SHAH:  Your Honor, we have witnesses prepared to

9  defend ourselves from the allegations of contempt.  If those

10 witnesses --

11         THE COURT:  I've got another allegation right now.

12 I'm going through these objections that you-all filed.  This is

13 the day we're hearing them.

14         MR. SHAH:  So, Your Honor, are you adding to the list

15 of things to which the Defendants will be held in contempt --

16         THE COURT:  No.

17         MR. SHAH:  -- with this question?

18         THE COURT:  No.  I want to know -- that's for another

19 hearing.

20         MR. SHAH:  Okay.

21         THE COURT:  I want to know what your position is,

22 what the State's position is now on this one-to-seven ratio.

23         MR. SHAH:  Your Honor, what is filed in the record --

24         THE COURT:  Where did you get this, and who can tell

25 me?

```
 1            MR. SHAH:  Two things on that, Your Honor.  What is
 2   in the record is the Defendants' position on that issue.
 3            THE COURT:  Well, it's been in the record now for
 4   three and a half years almost that the caseworker is -- that
 5   the supervisor is one to seven caseworkers.  And now with this
 6   objection you have changed that position.  Where does it come
 7   from?
 8            MR. SHAH:  Your Honor, I don't have the answer to
 9   that question for you at this time.
10            THE COURT:  Well, who filed the objection?
11            MR. SHAH:  Well, Your Honor, we -- the Defendants did
12   as a group.
13            THE COURT:  Well, where did you get your information?
14            MR. SHAH:  Your Honor, that information is not --
15            THE COURT:  You don't know?
16            MR. SHAH:  May I answer, Your Honor?
17            THE COURT:  You told me earlier you didn't know.
18            MR. SHAH:  Your Honor --
19            THE COURT:  Do you know now?
20            MR. SHAH:  -- we have prepared witnesses to testify
21   as to the allegations in defense of contempt.  If Your Honor --
22            THE COURT:  We're not getting to the contempt yet.
23   I'm doing these objections, and they're ripe for ruling.
24            MR. SHAH:  Your Honor, we were not noticed that these
25   objections would be ruled on today.  And if Your Honor finds
```

1    that position --

2             THE COURT:  Listen, it doesn't matter that you

3    weren't noticed.  I'm telling you that.  You filed this with

4    your handwriting on it.  Ms. Ho filed this objection.  I need

5    to know where it came from.

6             MR. SHAH:  Your Honor --

7             THE COURT:  This is simple.  You can't just file

8    things with the Court and say, oh, we -- we're not prepared to

9    tell you why we did that or what it means or where it came

10   from.

11            MR. SHAH:  Your Honor --

12            THE COURT:  If it's before me, it's before me.

13            MR. SHAH:  Yes, Your Honor.  And, Your Honor, we have

14   submitted the evidence we think is sufficient.  If Your Honor

15   thinks that that is insufficient, you are free to overrule the

16   objections, of course.

17            THE COURT:  No.  I want to know where -- what your

18   position is now --

19            MR. SHAH:  Your Honor --

20            THE COURT:  -- and where it came from.  Is that not

21   clear?

22            MR. SHAH:  It is very clear what Your Honor wishes to

23   know.  I understand that.

24            THE COURT:  And you can't tell me?

25            MR. SHAH:  Your Honor, we --

1          THE COURT:  This is a yes or a no.

2          MR. SHAH:  No, Your Honor.

3          THE COURT:  Okay.  Then I will assume that that was a

4   bad-faith objection, and we'll go back to saying one supervisor

5   per seven caseworkers, which is what we've done for three and a

6   half years until a new group of lawyers came in and decided to

7   change the framework.

8          What do you think, Mr. Yetter?

9          MR. YETTER:  I agree, Your Honor.  And this -- it is

10  just reflective of, as the Court said, the shifting sands.  But

11  it is also reflective of how difficult it is for these Monitors

12  to get a straight answer from the State.

13         THE COURT:  No, they don't have an answer.  They file

14  objections without any background and unable to defend them or

15  explain where they came from.

16         MR. YETTER:  And then they get indignant about being

17  asked about them, Your Honor.  I --

18         THE COURT:  Yes.  They were not noticed -- they

19  didn't notice that their filings would actually be called into

20  account for the filings.

21         MR. SHAH:  Your Honor, we accept the Court's ruling,

22  but we would just object to the finding of bad faith.  I think

23  Your Honor said that would be something you would address at a

24  future hearing if our objections were filed in bad faith.

25         THE COURT:  Yes.  Well, that will be -- that will be

 1   a future hearing as to whether there will be sanctions.  I'll

 2   have a Rule 11 hearing on that.

 3          MR. SHAH:  Thank you, Your Honor.

 4          THE COURT:  Because you have just proved it actually

 5   by saying you don't know where you got the information.  And,

 6   again, I think it's Ms. Ho's signature on here.

 7          Is that right, Ms. Ho?

 8          MS. HO:  Yes, Your Honor.

 9          THE COURT:  Do you know where you got the

10   information?

11          MS. HO:  No, Your Honor.  We'll be prepared on proper

12   notice for Rule 11 proceedings to respond to Your Honor's

13   questions.

14          THE COURT:  I will --

15          MS. HO:  Thank you, Your Honor.

16          THE COURT:  -- but I'm just asking you now, because

17   these are objections you-all filed and I assume in good faith,

18   and now you cannot defend them in the court.  And these are --

19   this is a matter we're taking up now.  Very, very surprising to

20   me, these objections.

21          Okay.  The next group of objections are the -- I

22   think we did 3, 7, and 8, didn't we?

23          MR. YETTER:  Yes, Your Honor, we did.  That would be

24   docket 1460.  And I think you've done docket 1444 and docket

25   1443.

```
 1              (Pause)
 2         THE COURT:  I mean, isn't the theory of Rule 11,
 3   Mr. Yetter, that when you sign your name you know what you're
 4   talking about?
 5         MR. YETTER:  You have had to have made an
 6   investigation into that factual assertion, which this is, and
 7   it has to be made in good faith.
 8         THE COURT:  Well, apparently that never happened,
 9   because he doesn't know where he got the information.  Ms. Ho
10   says it's over to Mr. Shah, even though it's her signature, and
11   Mr. Shah cannot tell me where the information came from.
12         MR. SHAH:  Your Honor --
13         THE COURT:  First he tried to claim attorney-client
14   privilege.
15         MR. SHAH:  Your Honor, to be clear, that's about
16   specific conversations; however, our response --
17         THE COURT:  I just want to know where you got the new
18   formula.
19         MR. SHAH:  Our response, Your Honor, is when we filed
20   those objections we talked to a team of people and we have that
21   information.  I do not recall them right now because the issue
22   was not, in our view, noticed properly for this hearing.
23   However, our understanding is Your Honor is going to issue a
24   special hearing on potential Rule 11 sanctions, in which case
25   we will be prepared to defend our good faith in filing those
```

1    objections.  So we are prepared to do that, Your Honor,

2    whenever Your Honor notices the hearing.

3              THE COURT:  I'm not understanding why you're not

4    prepared now to tell me where you got the information.

5              MR. SHAH:  Your Honor, because we are prepared for

6    the contempt hearing and the defenses that we have prepared to

7    present.  If Your Honor finds cause to hold the Defendants in

8    contempt, it shifts the burden to us.

9              THE COURT:  Okay.  While we're talking about the

10   contempt motion, what is your definition of substantial

11   compliance?  What's your legal definition that you're using?

12             MR. SHAH:  Your Honor, I think it depends on each

13   Remedial Order, and I can explain what I mean by that.

14             THE COURT:  Go ahead.

15             MR. SHAH:  There are certain, for example, Remedial

16   Orders where it's almost sort of like an on/off light switch,

17   where, you know, really substantial compliance is really just

18   doing that one thing, where we would agree that there really is

19   no distinction, there's no real, you know, debate over what

20   substantial compliance would mean, if that makes sense, Your

21   Honor.  There are certain items that are literally just go do

22   this one thing, right, Your Honor?

23             However, when the orders speak to broad policy issues

24   or incomplete or inconclusive as to how they are going to be

25   specifically executed, substantial compliance would mean that

1    the Defendants are acting in good faith and have demonstrated a

2    significant achievement and --

3              THE COURT:  And they couldn't do any more?

4              MR. SHAH:  It depends on what you mean by "any more,"

5    Your Honor.  But it's within reason, of course.

6              THE COURT:  Well, you're unable to comply completely.

7              MR. SHAH:  That's another prong, Your Honor.

8              THE COURT:  Right.

9              MR. SHAH:  That's inability to comply, Your Honor.

10             THE COURT:  They said you did it -- you did what you

11   did in good faith and that you were unable to comply further.

12             MR. SHAH:  Those are two independent grounds.  Good

13   faith can be an independent ground for -- to be in contempt,

14   and inability to comply is also an independent ground.

15             THE COURT:  Do you have any of these inability -- any

16   of these defenses are going to be inability to comply?

17             MR. SHAH:  It depends, Your Honor, in the evidence

18   that Mr. Yetter puts forward and specifically what he is asking

19   and demanding that Defendants should have done.  And then we

20   can evaluate --

21             THE COURT:  Actually, I've been doing this for years,

22   demanding that you do the following.  I ordered things to be

23   done within 90 days instanter that were all affirmed, and none

24   of them have been done completely.

25             And you do realize that to get off monitoring you

1    have to completely, fully comply.  It's not substantial
2    compliance.  Did you know that?
3              MR. SHAH:  Your Honor, our view is that the Fifth
4    Circuit has held a substantial compliance with court orders --
5              THE COURT:  Let me explain to you one more time.
6    This order that was affirmed said full compliance.  Did you
7    understand that?  It's not a contempt one.  It's to get off
8    monitoring is full compliance.
9              You-all tried to appeal that and could not do it.
10   Did you know that?  Were you aware of that history?
11             MR. SHAH:  I have read the Fifth Circuit opinions,
12   Your Honor.
13             THE COURT:  Okay.  That was not overruled.  That part
14   of the order requiring -- is that right, Mr. Yetter?
15             MR. YETTER:  Absolutely, Your Honor.
16             THE COURT:  Full compliance.  It's not substantial
17   compliance.  And that Fifth Circuit, as Ms. Ho knows her
18   husband, issued very clearly that we cannot go outside the
19   mandate.  Mandate was issued full compliance.
20             Are we clear, Mr. Shah?
21             MR. SHAH:  Your Honor, we understand the Court
22   believes it's full compliance and the Fifth Circuit --
23             THE COURT:  I believe what my order says.  And that
24   was not reversed.
25             MR. SHAH:  I hear you, Your Honor.

```
 1                THE COURT:  Did you see it reversed anywhere?
 2                MR. SHAH:  I did not see language taking that out
 3   of the --
 4                THE COURT:  Right.
 5                MR. SHAH:  -- orders, Your Honor, if that's what
 6   you -- if that's what you mean.
 7                THE COURT:  Yes.  And I believe you-all actually
 8   attempted to appeal that, but were too -- too late.
 9                Is that right procedurally, Mr. Yetter?
10                MR. YETTER:  I believe -- I believe so.  I would have
11   to go back.  But they did object to the termination provisions
12   of the order in which heightened -- in which the injunction,
13   the Remedial Orders would terminate.  And the Fifth Circuit
14   denied the objections, the appeal.
15                THE COURT:  Just so we're on the same page on this.
16                Now, did you -- did you see the Monitors' response
17   where you objected to them calling this an adult foster care
18   site?
19                MR. SHAH:  When was that filed?  I'm sorry.  When was
20   that filed?
21                THE COURT:  I think it was filed yesterday.
22                MR. SHAH:  Last night?
23                THE COURT:  Would you put that up on the board?  Put
24   their objection for that one.  Put the State's objection and
25   then the response by the Monitors.
```

```
 1                    (Pause)
 2              THE COURT:  Yeah.  This is where you said on your
 3    page 2 of that objection that the adult foster care, that
 4    licensed IF -- ICF/IID is not adult foster care.
 5              Would you put the response of the Monitors up?
 6                    (Pause)
 7              THE COURT:  This is a response actually to another
 8    objection where the -- where the State once again complained
 9    about that the report doesn't indicate whether the Monitors
10    randomly or specifically selected the investigations that they
11    reviewed.
12              These are for the PI's; is that right, Mr. Ryan?
13              MR. RYAN:  That's correct, Your Honor.
14              THE COURT:  And this is a restatement of what we've
15    already discussed, that the -- that the Monitors' response is
16    that it's a misrepresentation to the Court.
17                    (Pause)
18              THE COURT:  Now, the second part -- would you move
19    that page down a little bit?  The second part was where the
20    State complained about its own language once again.
21              Did you find the Monitors' response about the adult
22    foster care?
23              LAW CLERK:  Right here, Your Honor.
24              THE COURT:  Well, the Monitors' response --
25              MR. YETTER:  That's what's on the screen, Your Honor.
```

```
1              THE COURT:  Okay.  Thank you.
2              MR. YETTER:  It's docket number 14 --
3              THE COURT:  The State identified as date of
4     submission.  And, in fact, I think it's -- is it in a footnote
5     where you put in where exactly you got that information,
6     Mr. Ryan?
7              MR. RYAN:  Yes, Your Honor.  We searched through our
8     emails, and we found an email communication from the State in
9     March of 2023, which identified these facilities as AFC.  And
10    then we looked to see whether there had been a correction to
11    the facility type in any of the communications with the State
12    since March of 2023, and there had been none.
13             THE COURT:  Well, did you see that, Mr. Shah?
14             MR. SHAH:  I don't see the email.  I just see the
15    citation to the email, but --
16             THE COURT:  Do you have the email?  Well, you-all
17    sent the email.
18             MR. SHAH:  Yes, Your Honor.  I just mean I don't see
19    it right now.
20             THE COURT:  Okay.  Do you have a copy of the email,
21    Mr. -- Mr. Ryan, that we can show him?
22             MR. RYAN:  Yes, Your Honor, I can get that.
23             THE COURT:  Do you see how disturbing this is,
24    Mr. Shah, that you-all object to your own language?  You
25    provide the Monitors with something that describes adult foster
```

1    care, and then you deny it ever existed, there is no adult

2    foster care.

3              MR. SHAH:  No, Your Honor.  If you go back to the

4    page before that -- so if you see, Your Honor, I think what's

5    happened here -- and, again, if Your Honor wants to hold a

6    hearing on this, we can figure it out for sure.  Happy to do

7    that.

8              THE COURT:  Defendants respectfully clarify that

9    licensed IID is not adult foster care?

10             MR. SHAH:  No, Your Honor.

11             THE COURT:  That's what we're talking about.  That's

12   your objection.

13             MR. SHAH:  Your Honor, I believe the issue is if you

14   look at the State identifying and saying that submission to

15   Monitors must be using a facility type AFC-ICF/IID, so I think

16   the issue is -- and, Your Honor, I want to see this email, so

17   maybe we can wait until we see the email.

18             THE COURT:  Can you pull up those emails, Mr. Ryan?

19             MR. RYAN:  Yes.  Should I forward them to Jason?

20             THE COURT:  Please.  And forward them to Jason so we

21   can actually display them.

22             MR. RYAN:  So the email has extensive attachments

23   with confidential --

24             THE COURT:  Okay.

25             MR. RYAN:  -- and child specific information in them.

1           THE COURT:  Okay.  Send it to Mr. Shah right now, and
2    we'll wait.
3           MR. SHAH:  Your Honor, we were told not to bring in
4    phones, so we don't have Internet.
5           THE COURT:  Well, you should have attorney laptops.
6    You should have your laptops.
7           MR. SHAH:  Well, our laptops can't connect.  Like, we
8    have a VPN with our phones.  I couldn't even logon to my laptop
9    without my phone.
10          THE COURT:  Okay.  We'll use -- do we have somebody
11   here, tech, that can log them into the attorney network?
12          MR. RYAN:  Your Honor, should I see if my team can
13   redact the child-specific information --
14          THE COURT:  Sure.
15          MR. RYAN:  -- before we forward it?
16          THE COURT:  Sure.
17          MR. RYAN:  Let me work on that, and I'll be back in
18   touch with you.
19          THE COURT:  Okay.
20          (Pause)
21          THE COURT:  I have to assume that nobody in your
22   legal department reviewed those emails before you responded to
23   this.
24          MR. SHAH:  Your Honor, without seeing the email, I
25   don't know.

1          THE COURT:  Well, since you filed the objection, it

2     had to be based on something, is what I'm saying.

3          MR. SHAH:  Your Honor, you're asking if we ever

4     looked at the emails, and this is, as Your Honor knows, a

5     lengthy document history in this case.  I don't know if I've

6     seen that --

7          THE COURT:  I'm just saying that this is such a waste

8     of time for your billable hours, for the Monitors' billable

9     time.  And I get paid no matter what.  It's no waste of my

10    time.  I'm here for you-all, all day, all night, whatever.

11         But when you file these objections without proper

12    review of a 13-year history, almost 13 years, it just makes my

13    job extremely difficult, the Monitors' job almost impossible at

14    times, and it does not help the children.

15         And what I'm trying to figure out is where this

16    change of attitude came in, not latitude.  This is not Jimmy

17    Buffet.  I want to know where the change of attitudes came in

18    from working --

19         (Technical interruption)

20         THE COURT:  I'm sorry, her voice is better than mine.

21         (Laughter)

22         THE COURT:  So once again, my point is this has

23    become an adversarial proceedings when I don't --

24         (Technical interruption)

25         IT TECHNICIAN:  Sorry.

Case 2:11-cv-00084   Document 1487   Filed on 12/21/23 in TXSD   Page 41 of 385

Vol. 1   41

```
1                (Pause)
2                THE COURT:  While we're hearing from her, Mr. Ryan,
3    Ms. Fowler, any other objections?
4                (Technical interruption)
5                IT TECHNICIAN:  Okay.  We're set, Judge.
6                THE COURT:  Thank you.
7                IT TECHNICIAN:  Thank you.
8                THE COURT:  Now, Mr. Shah, Ms. Ho, I'm not going
9    to -- I'm not going to have a Rule 11 hearing on this at all.
10   I'm just giving you fair warning that any more of these
11   objections without foundation, without explanation, are not
12   going to be accepted by the Court and may be subject to future
13   fines.
14               MR. SHAH:  Yes, Your Honor.
15               THE COURT:  Are we clear on that?
16               MS. HO:  Yes, Your Honor.
17               MR. SHAH:  Yes, Your Honor.
18               THE COURT:  Thank you.
19               And let me say something else while I'm jumping on
20   you.  I have the greatest respect for both of you, Ms. Ho and
21   Mr. Shah, and glad you're in the case and hope that this will
22   facilitate getting this resolved for the children.  But at some
23   point I have to step in and say let's not do this.  We don't
24   need to argue about every single thing, especially
25   unnecessarily taking away money from the kids.  And I know
```

1    that's not your point, that you didn't do this for that.

2    You're representing your client.  But may I ask if we could

3    have an attitude shift on this of more cooperative for the sake

4    of the children.

5              And while we're waiting on the email to come, I'll

6    rant some more.

7              These children, according to all learned treatises,

8    come in abused, neglected, and exploited.  They come in

9    needing.  They come in with anxiety, PTSD, depression,

10   behavioral problems.

11             What historically has happened from The Forgotten

12   Children, Strayhorn's studies, 2004, 2006 -- I don't know if

13   you read those, but I commend you to read those two studies,

14   2004, 2006, and all the other studies that have come since,

15   from all the governors of this state who care deeply about

16   these children.

17             So what seems to happen to them too many times is

18   they get put in, for all of these problems that they come in

19   with, residential treatment centers, tons of drugs.  And then

20   they get kicked out because they've got behavioral problems and

21   go into child without placements, without licensed placements,

22   because nobody will take them because of the disruptive

23   behavior they have.

24             Way back when, in 2004 and 2006, Comptroller

25   Strayhorn, who was clearly committed to this issue of foster

1    care, recommended so many -- she put down in her studies -- and
2    I know this has improved, so I don't mean to compare apples and
3    oranges.  But the $35- to $60 million a year that was spent
4    just on psychotropic medications.  $35 million.  And outlined
5    alternative ways of addressing these terrible issues that the
6    children come in with, from diet and exercise.  You know, we
7    have children that are in foster care that are not getting
8    enough to eat.  And behavioral modification, mental health
9    treatment.
10            And you know that's what the specialists recommended,
11   didn't they, Ms. Lowry and Mr. Yetter?  Mr. Shah and Mr. Ho?
12            MR. YETTER:  Yes, Your Honor.
13            THE COURT:  They recommended mental health, mental
14   health, mental health.  These are children who come in with
15   issues, and they go out, as I found in 2014, '15, with more
16   issues.
17            They come in at seven with a second-grade education
18   and go out at 18 with a second-grade education.
19            So I know that these remedies do not have -- don't
20   let these children be raped, don't let them be overmedicated
21   without testing, don't let them be -- they don't specifically
22   say don't let them be restrained, but what you are obligated to
23   do, what the State is obligated to do under RO 3 and many of
24   the other ROs is investigate these complaints when they come
25   in.

1            And it doesn't mean -- and I hope your position is

2    not that we've investigated so that's all we're required to do

3    under RO 3, because without a good investigation and a complete

4    investigation that doesn't address the constitutional violation

5    that was found by this Court and affirmed by the Fifth Circuit

6    Court.

7            And it is clear that though the Fifth Circuit was

8    clear that if you violate a -- just a policy, it doesn't mean

9    that's a constitutional violation.  But if you take a whole

10   pool of policy -- policies that were created to address a

11   certain issue and don't follow any of them, that rises to a

12   constitutional violation.

13           So in that regard, policies can come into play in

14   this order and these remedies.

15           Is that -- Ms. Lowry, Mr. Yetter, is that clear?

16           MR. YETTER:  Absolutely, Your Honor.

17           The intent of every one of these remedial orders, the

18   underlying safety issue that was trying to be addressed is

19   vital to interpreting every one of these Remedial Orders.  It's

20   all about child safety, and everyone has -- every one of them

21   has a slightly different purpose to ensure --

22           THE COURT:  Do you understand, Mr. Shah?  And I know

23   y'all are waiting for me -- and Ms. Ho -- and I don't know why,

24   waiting for me to issue some order that you think you can take

25   immediately up to the Fifth Circuit and get rid of heightened

```
 1    monitoring or get rid of this or get rid of that.
 2              All we want to do is keep these children safe.  And I
 3    am relying on you.  You have wonderful reputations.
 4              The Governor is a good man.  I know he cares about
 5    these children.  And I am relying on you to help that happen.
 6              I know you have children, Ms. Ho, and you care about
 7    them, too, like I care about these children.  So please,
 8    please, let's work together.
 9              You got the email?  Has Mr. Ryan gone out to get it?
10    We're almost done and ready to go into the contempt.
11              (Pause)
12              THE COURT:  Have we got the audio yet for the Zoom?
13              COURTROOM DEPUTY CLERK:  No, Your Honor.
14              THE COURT:  I guess we didn't test this out to begin
15    with?
16              COURTROOM DEPUTY CLERK:  It was working this morning,
17    and I don't know what's happened.
18              THE COURT:  Do we have anybody here?  How are we
19    doing with the audio?
20              IT TECHNICIAN:  So this unit is not working.  We're
21    going to pull another one out.
22              THE COURT:  Go ahead.
23              IT TECHNICIAN:  So we can go ahead and see if we can
24    swap it out.  We're going to do it right outside the courtroom
25    here.  So if it works, we're just going to roll it in.
```

 1              THE COURT:  Thank you, sir.

 2              IT TECHNICIAN:  Yes, ma'am.

 3              THE COURT:  We haven't had any audio going out over

 4     the Zoom.  I remind you-all, though, and I guess I'll do it

 5     when we get the audio back on --

 6              Do you have CDs recording where we -- where we

 7     usually hold court, we have electronic EROs.  Can they -- can

 8     people buy a CD?

 9              THE REPORTER:  There's a transcript.

10              THE COURT:  But no CD?

11              THE REPORTER:  No, ma'am.

12              THE COURT:  This is why -- I love court reporters,

13     but I like the ERO system.

14              You got it?

15              MR. RYAN:  Your Honor, every month HHSC sends the

16     Monitors an email that notices us that they have loaded up to

17     their Sharepoint site all the data and the information that

18     they believe is required for our monitoring.

19              I have an email from them like we get every month

20     which I will forward to the Court which notices us that that

21     information has been uploaded to their Sharepoint site.

22              I'm getting a photo from you -- for you of one of the

23     cells in that submission which is not atypical, which includes

24     a facility type of AFC.

25              This isn't exclusive to the email that I'm forwarding

1    to you.  In fact, this facility type was identified by HHSC as

2    recently as September.  It's very common.  Anybody familiar

3    with HHSC's submissions to us knows that this is the facility

4    type that HHSC routinely identifies to us.

5              THE COURT:  So you're going to get that and give it

6    to me?

7              MR. RYAN:  Yes, Your Honor.

8              THE COURT:  In this lifetime?

9              MR. RYAN:  Yes, Your Honor.  The challenge is that,

10   as you know, those monthly submissions include tens of

11   thousands of data cells.

12             THE COURT:  With children's identification.

13             MR. RYAN:  So we're going to get you a photo of just

14   this language.

15             THE COURT:  Okay.

16             MR. RYAN:  But it would be very easy for HHSC right

17   now to simply go back into its own Sharepoint records and look

18   at what they provide to Ms. Fowler and me every single month

19   and confirm that the AFC facility type is routinely identified

20   to us by them.

21             THE COURT:  It just would be helpful if somebody in

22   your department checked these things.

23             (Pause)

24             THE COURT:  While we're waiting on that, why don't we

25   begin the contempt.

 1              MR. YETTER:  Your Honor, there's one issue that

 2    I'm -- I need to bring up if I could, and this is with regard

 3    to the discovery that the Court ordered leading up to this

 4    hearing.

 5              One of the pieces of discovery that we learned is out

 6    there and still has not been produced, the Court might recall

 7    that class counsel made a request of the managed care provider

 8    for the State, Superior HealthPlan, for PMU reviews of all the

 9    children whose psychotropic medication regimens trigger a

10    review.  We did this in April.

11              And, look, we obviously -- we did it in court, I

12    believe, and then we did it in writing.  And the State has been

13    aware of it now for nine -- eight months.  And the State and

14    its managed care provider, Superior HealthPlan, have been

15    working together on this.

16              The timeline -- basically they -- Superior came up

17    with results for most of the children in September and then

18    again in -- I believe in September and then again in November.

19    And they made reports on each of these reviews.  And we need

20    those reports produced.  And we have been getting a little bit

21    of a runaround from the State and from Superior Health.

22              One of the witnesses that the State put up as a

23    corporate representative on this issue, PM -- Psychotropic

24    Medication Use Parameters and Reviews was interacting with the

25    Superior HealthPlan on this.  This came up in his deposition.

1    I asked for it in his deposition.  We followed up in writing.

2             Counsel for the State, not -- not their outside

3    counsel, said that we would get it produced directly from

4    Superior HealthPlan.  Then the lawyer for Superior HealthPlan

5    said no, they have to give it to the State to produce it.

6             And the bottom line is, Your Honor, we have these 203

7    reports.  We still don't have them yet.  We don't know when

8    they're going to be produced.  I've talked with counsel about

9    it several times over the last week, and we have no date and

10   nothing in hand.

11            And we -- we raise this with the Court so that we can

12   get a firm date.  These are relevant to this hearing.  These

13   are relevant to a request that we made eight months ago, and we

14   still haven't got them.

15            MR. SHAH:  Your Honor, may I respond?

16            THE COURT:  Yes, sir.  You're welcome back.

17            MR. SHAH:  To this podium?

18            THE COURT:  Anywhere you want -- anywhere you want to

19   stand.

20            MR. SHAH:  Really, Your Honor, it's up to you.

21            I'll stay here.

22            Well, Your Honor, just one --

23            THE COURT:  Just don't want to get any closer than

24   you have to.

25            MR. SHAH:  It's actually very hot in this room.  I

1   don't know if you noticed, Your Honor.

2           THE COURT:  It is so hot.  They're supposed to be

3   cooling it off.

4           MR. SHAH:  We'll see.

5           THE COURT:  In a minute we're going to have to take

6   off everybody's jackets and forge ahead.

7           MR. SHAH:  Well, Your Honor, just to clarify the

8   timeline here, Mr. Yetter is correct.  There was a 30(b)(6)

9   deposition Wednesday.  So that was last week Wednesday.  During

10  that deposition, Plaintiffs made an oral request for five

11  categories of documents, and they followed up via email

12  Thursday.

13          We have produced fully responsive documents for four

14  of those five categories, so those four are done.  And we did

15  that by the end of the day Friday.  The fifth category is, as

16  Mr. Yetter notes, PMUR reports.  We believe there are 203 of

17  them.

18          THE COURT:  Okay.  Where are they?

19          MR. SHAH:  Well, they're in the process of being

20  produced.  We -- we don't object to producing them at all, Your

21  Honor.

22          THE COURT:  Where are they physically?

23          MR. SHAH:  Physically with Superior, like

24  literally -- if you mean physically, Your Honor, they have

25  the -- they have the documents.

```
 1              THE COURT:  Where are they located?
 2              MR. SHAH:  Your Honor, I believe -- I don't mean to
 3    be blunt here, but the cloud.  I think they are literally
 4    speaking like Internet electronic files.
 5              THE COURT:  So how --
 6              MR. SHAH:  Stored files.
 7              THE COURT:  -- do we get them to just shuttle them
 8    down here?
 9              MR. SHAH:  So we've already started that process,
10    Your Honor.  I'm just saying -- giving the timing.
11              So they are all going to be marked confidential
12    because they contain PHI.  But under your Court's existing
13    protective order, they would be marked confidential, produced
14    confidentially.  We would ask that Mr. Yetter, if he were to
15    submit them as exhibits, submit them under seal.
16              My understanding as of last night that 60 have been
17    sent to the State already.  Superior is rolling production,
18    Your Honor, to get -- try to get these out as quickly as they
19    can.  I have not been able to check email since 7 --
20              THE COURT:  Well, how hard is it to get -- to
21    download something from the cloud?
22              MR. SHAH:  Your Honor, I -- it's Superior's data
23    systems.  I don't know how long it takes them to get it.
24              THE COURT:  Have you asked them?
25              MR. SHAH:  Yes, Your Honor.  They told us --
```

1           THE COURT:  What did they tell you?

2           MR. SHAH:  They initially told us the time that would

3    be unacceptable to us, so we yelled at them a little bit, Your

4    Honor.  And they said that they are going to produce them on a

5    rolling basis.  And they plan to get them done sometime this

6    week for all of them.

7           They -- like I said, Your Honor, they produced 60

8    last night that are being marked confidential and might have

9    been produced to Plaintiffs this morning.  Again, I -- we don't

10   have Internet in this courtroom right now to check that.  I

11   don't know if Mr. --

12          THE COURT:  Can I put somebody -- what they're trying

13   to do -- we don't have any audio on the Zoom.  They're trying

14   to change out the equipment as we speak, new equipment, so

15   there's audio on the zoom.

16          MR. SHAH:  But, Your Honor, we agree to producing

17   these documents, and we are going to produce them.

18          THE COURT:  Well, I think the point is he needs them

19   for this hearing.

20          MR. SHAH:  Your Honor, I mean, to be perfectly

21   honest, we received this formal --

22          THE COURT:  It's always best.

23          MR. SHAH:  We received these -- this formal request

24   Thursday.  We will produce them within a week, Your Honor.

25          THE COURT:  You got 60 right now?

```
 1              MR. YETTER:  Yes, Your Honor.

 2              THE COURT:  Mr. Yetter, have you gotten those 60?

 3              MR. YETTER:  Not to -- not to my knowledge.  Not when

 4    I left this morning, Your Honor.

 5              But let me correct something that counsel just said.

 6    The lawyer for Superior Health said she would get all the rest

 7    today to the State.

 8              MR. SHAH:  Perfect.

 9              MR. YETTER:  I could not get a straight answer over

10    the weekend when we were going to get them.  It was all this --

11    well, we're going to have to mark them and this and that.

12              These -- I would just point out, Your Honor -- and

13    this is part of why the system is so broken.  On behalf of the

14    Children, our clients, we made this request for these -- this

15    Psychotropic Medication Review eight months ago.

16              THE COURT:  I thought I talked about it in the

17    hearing, the last hearing.

18              MR. YETTER:  The reviews are done.  The reports are

19    out, and we the requester never got a copy.  And now counsel

20    for the State is saying, well, they can wait around, we'll give

21    it to them in a week or what -- you know, this is -- you're

22    asking it for so quick.

23              This was eight months ago, and we didn't even get the

24    report, and we're the requester.  What happens when a caregiver

25    asks for a review?  They never get a response either,
```

 1    evidently.  Certainly we have not.

 2            So, Your Honor, I'm a little frustrated, because I

 3    could not get a straight answer over the last several days.

 4    But it is important.

 5            THE COURT:  I'll tell you what.  Why don't you send

 6    somebody from your team to call up and see what the latest --

 7    Mr. Shah's team -- see what information we've got right now.

 8            MR. SHAH:  Mr. Yetter, I believe you've been dealing

 9    with someone who's not in this room, so they should at least

10    have their phone available to them.  So if your team would like

11    to call.

12            But Mr. Yetter just said that Superior will be

13    producing them by the end of the day today.  We have no

14    objections to that, Your Honor.

15            THE COURT:  Well, I know that, but you -- it's your

16    contract with Superior, not Mr. Yetter's.  And you're in a

17    better position to put the --

18            MR. SHAH:  We will put pressure on them as needed.

19            THE COURT:  Put the pressure on them.  If you can

20    call them today and see what the update is.  You've got 60 out

21    of 204, but Mr. Yetter doesn't have them.

22            MR. SHAH:  I believe 203, but yes, Your Honor.

23            THE COURT:  203.  Sorry.  203.

24            MR. SHAH:  Yes.

25            THE COURT:  You've got 60 available.  And he -- can

1    you get them to him?

2            MR. SHAH:  Yes, Your Honor.

3            THE COURT:  Who on your team can go out now and call

4    Superior and say what's the status of the other 143.

5            MR. SHAH:  We'll send someone out, Your Honor.

6            THE COURT:  143?  Is that right?  Something like

7    that.

8            MR. SHAH:  Yes, Your Honor.  I think that's the math.

9            THE COURT:  My math is not good.

10           MR. SHAH:  Yeah.  Neither am I.

11           THE COURT:  So you can do that now?

12           MR. SHAH:  Yes, we can send someone out and try to

13   find that information.

14           THE COURT:  Okay.  Let's do that now.

15           How are we coming on the Zoom?

16           IT TECHNICIAN:  Still trying to figure it, Judge.  So

17   it's not our VTC units.  It's not this.  We tried it on another

18   one up there.

19           THE COURT:  They worked this morning, though?

20           IT TECHNICIAN:  It was connected.

21           COURTROOM DEPUTY CLERK:  It worked.  I got an email

22   from someone saying that they could hear earlier.

23           IT TECHNICIAN:  I tested it as well.

24           THE COURT:  So what happened?  Somebody pushed the

25   buttons now?

1          IT TECHNICIAN:  Now it's giving us a message that

2    somebody has enhanced closed captioning on, and then it kicks

3    us out.  So I'm not sure where that setting is.

4          THE COURT:  Can we communicate with those people?

5          IT TECHNICIAN:  We can unmute here.

6          THE COURT:  Tell me how to do that.  Communicate and

7    see who's got enhanced closed captions, and we'll have to kick

8    them out and send them a transcript.  Can we do that?

9          (Technical interruption)

10          IT TECHNICIAN:  Who are we connected on?  Oh, the

11    court audio.

12          THE COURT:  Could you mute that, Lori?

13          IT TECHNICIAN:  So if anyone has enhanced closed

14    captioning on, would you kindly turn that off and --

15          THE COURT:  We're unable to get sound to everybody,

16    because unfortunately that -- what we can do, if you will

17    provide your contact information, the one who's using closed

18    captions, to the Court Clerk here, we will get you a transcript

19    so you won't have missed out on anything.

20          But you need to turn off, unfortunately, closed

21    captions.  I don't know the problem, but it interferes with

22    getting sound to everybody else.

23          IT TECHNICIAN:  Thank you, Judge.

24          (Discussion off the record)

25          THE COURT:  Okay.  Can you find out if anybody can

```
 1   hear now?
 2            IT TECHNICIAN:  They can hear you.
 3            THE COURT:  They can hear -- you can hear me, but you
 4   may not be able to hear from the podium?
 5            IT TECHNICIAN:  Correct.  They may pick them up a
 6   little bit, but --
 7            THE COURT:  Can anybody -- Mr. Yetter, would you come
 8   back to the podium and see if people can hear you?
 9            MR. YETTER:  Certainly, Your Honor.  Testing.
10            THE COURT:  Can you hear Mr. Yetter?  Can anybody
11   hear Mr. Yetter?
12            MR. YETTER:  Testing, testing, testing.
13            THE COURT:  Ms. Hardin?
14            (Pause)
15            THE COURT:  Can anybody hear now?
16            MR. YETTER:  Testing, testing.
17            (Pause)
18            THE COURT:  Can anybody hear?
19            MR. YETTER:  Testing, testing, testing.
20            (Discussion off the record)
21            THE COURT:  See if -- Mr. Yetter, if you sit down if
22   you can be heard.
23            MR. YETTER:  Sure.  Testing, testing.
24            THE COURT:  Can you hear that?
25            MR. RYAN:  They can hear the Judge but not the
```

```
 1   podium.
 2            MR. YETTER:  Testing.
 3            THE COURT:  Well, if I put Mr. Yetter back in his
 4   seat with a microphone, can you hear that?
 5            MR. YETTER:  Testing, testing, testing.
 6            (Discussion off the record)
 7            THE COURT:  In the meantime, why don't you go ahead
 8   and put that exhibit up, Mr. Lundry?  Put the exhibit up.
 9            (Pause)
10            THE COURT:  Can you go print that out and bring it in
11   physically?
12            (Discussion off the record)
13            LAW CLERK:  Okay.  Judge, it's up there.
14            THE COURT:  Okay.  Mr. Shah, the email is up there
15   identifying the adult foster care.
16            MR. SHAH:  Do you mind, Your Honor, if I go a little
17   bit closer?  My eyes are not quite as --
18            THE COURT:  Go right ahead.
19            MR. SHAH:  -- good as they should be, I guess.
20            MR. RYAN:  Your Honor -- Your Honor, can you --
21            THE COURT:  They're all off.
22            MR. RYAN:  Okay.  So, Your Honor, there are three
23   emails that I sent to counsel and to the Court.  The first is
24   this email which notices us of the monthly HHSC data production
25   in which we're advised that the State has posted to its
```

1    Sharepoint site the data and information that we need for our

2    monitoring work.  In the second email that I sent, there is a

3    photo capture of the title if you can scroll up.  Scroll up

4    more, please.

5            THE COURT:  Scroll more.

6            MR. RYAN:  Right there.

7            THE COURT:  Stop.

8            (Technical interruption)

9            MR. RYAN:  So here you'll see a not -- atypical

10   facility type that is identified in the monthly data

11   production.  This occurred most recently, again, in the State's

12   September data production.

13           And then in the third email that I just sent to

14   counsel for the parties and to the Court, I identified where in

15   our September 19, 2023 and November 10, 2023 updates to the

16   Court we identified the files that we drew from.  The State

17   would only have to go into the files that we relied on to

18   identify the information, including the AFC programs that we

19   used.

20           (Technical interruption)

21           THE COURT:  Okay.  Have you got that, Mr. Shah?

22           MR. SHAH:  Yes, Your Honor.  Can we pull back up

23   actually his -- the response to our objections that -- or our

24   objection, whatever docket that may be?

25           THE COURT:  Yeah.  Can you put on the response to the

```
 1   ones that were filed last night?
 2          MR. SHAH:  Or even our objections, Your Honor, that
 3   lays it out.
 4          THE COURT:  Put up his -- their objections.
 5          (Technical interruption)
 6          MR. SHAH:  Your Honor, if it's a hassle, it's okay.
 7   We -- we see the email.
 8          (Technical interruption)
 9          MR. SHAH:  Do you mind if I look at your binder
10   there, or is it --
11          LAW CLERK:  It's all right.
12          MR. SHAH:  I want to make sure he's pulling up the
13   right thing.
14          (Technical interruption)
15          THE COURT:  Okay, Mr. Shah?
16          MR. SHAH:  Okay, Your Honor.  So I think that email
17   relates to this response right here.  We'll look at it, Your
18   Honor, but I think one thing we just want to be very sure of is
19   the clarification.
20          There are so many different programs, as Your Honor
21   understands, but there is -- I believe it was actually linked
22   in the footnote Mr. Ryan put together.  There is a link to
23   something called --
24          (Technical interruption)
25          IT TECHNICIAN:  Sorry about that.
```

```
 1              MR. SHAH:  That's all right.

 2              IT TECHNICIAN:  I'll mute it for now.

 3              MR. SHAH:  There is something called adult foster

 4    care.  I think we just want to be very clear here that we need

 5    to have licensed ICF/IID is not within that larger category.

 6              This, Your Honor, is just making sure that the

 7    reports are 100 percent clear on something like this.  As you

 8    can tell, it's just a --

 9              THE COURT:  Well, instead of filing an objection with

10    your name on it, you just call Mr. Ryan.

11              MR. SHAH:  Your Honor, we've been -- Your Honor said

12    at a previous hearing that Monitors are essentially arms of the

13    Court.

14              THE COURT:  Yes.  Within the order --

15              MR. SHAH:  We're uncomfortable --

16              THE COURT:  If you ever read the back orders, they

17    have equal access to both sides, and you have equal access to

18    them.

19              MR. SHAH:  Your Honor, we -- we wanted to put these

20    things in the record so we have no accusations from Plaintiffs

21    that we're communicating about the substance of things by

22    lawyers to the Monitors.  If Your Honor is instructing us not

23    to do that, we're happy to listen to Your Honor.

24              THE COURT:  I don't want to waste everybody's time

25    with addressing these ridiculous, spurious objections.
```

1          You have adult foster care.  You have my class of

2    children rooming with adult foster care people.  And that's the

3    bottom line.

4          You don't need to be messing with objecting about

5    there is no such thing as adult foster care 2c, or whatever

6    you're talking about, because there is.  And that's what this

7    PI was about.  It was a joint housing with adult foster care,

8    mentally disabled and adults, with my class of PMC --

9          (Technical interruption)

10          THE COURT:  -- mentally challenged PMC children.

11          And you actually have a place where they were rooming

12    in the same room, locked in the room together, and the adult.

13    And then my PMC class child had to jump out of a window and run

14    to a neighbor to escape.  That's not denied.  You didn't deny

15    any of that.  You just denied that there was AFC abbreviation,

16    right?

17          MR. SHAH:  We do have other objections, but, yes,

18    Your Honor, not on the point you're having.

19          THE COURT:  Well, you're not objecting to what

20    happened to those children.  That's -- there are no objections

21    in that.

22          MR. SHAH:  Your Honor, I don't recall the specific

23    circumstances.

24          THE COURT:  The specific language was we are so sad,

25    something to that effect, of what happened to these children,

1   and there are no excuses.  That's what you put in your

2   response.

3               Let me see if I've got that right.

4               (Pause)

5               THE COURT:  Can you find that in their response, the

6   Defendants' response to the PI?  Mr. Ryan, can you show me

7   where that is?

8               MR. RYAN:  Yes, Your Honor.

9               (Discussion off the record)

10              THE COURT:  Did it work?

11              (Discussion off the record)

12              THE COURT:  Okay.  Page 3 of your initial objections

13  to Remedial Order 3, you state as to the PI investigations that

14  there's no excuse for what happened, what many of these

15  children went through.  The Monitors' report recounts many

16  heartbreaking stories.  Defendants are committed to continuing

17  to take steps to prevent tragedies like these from occurring

18  and to fully -- and to fully investigate them when they do.

19              That was your statement about the Monitors' report

20  for the PI investigations.  And then followed these bizarre

21  objections.

22              (Pause)

23              THE COURT:  Is there any way to get this courtroom

24  cool?  Any possible way?  This is intolerable for all involved.

25              (Pause)

1           THE COURT:  Do we have a response yet from your
2    person, from Superior?
3           MR. SHAH:  No, Your Honor.  They're outside
4    somewhere.
5           THE COURT:  Okay.  Good.  Thank you.
6           MR. SHAH:  Yeah.
7           THE COURT:  They're on it?
8           MR. SHAH:  Yeah.
9           THE COURT:  And I guess another thing, Mr. Shah,
10   about objecting to the adult foster care designation, which is
11   your -- is the State's designation, what difference does it --
12   could it possibly have made -- you knew where this happened, on
13   where these children were housed.  And one of -- at least one
14   of the two institutions had adult foster care in it, right?
15          MR. SHAH:  Your Honor, I don't have the report in
16   front of me, but if Your Honor is fairly characterizing it,
17   we'll look at the report, though.
18          THE COURT:  Well, I expect you to do that before you
19   file these objections.
20          MR. SHAH:  Your Honor, we did at that time.  What I
21   mean is we don't have it in front of me here for this contempt
22   hearing, Your Honor.
23          (Discussion off the record)
24          THE COURT:  So, Mr. Shah, at least tell me what the
25   nature of the AFC objection was.  What was the -- what was the

```
 1   reason for it, and what is it supposed to mean?
 2           MR. SHAH:  Your Honor, we're just clarifying the
 3   language used to make sure that it's precise.
 4           THE COURT:  And from what to what?
 5           MR. SHAH:  To the -- it disappeared.
 6           Acronyms are hard to remember, Your Honor, off the
 7   top of my head, the II --
 8           THE COURT:  You're supposed to have this all
 9   memorized.
10           MR. SHAH:  Your Honor, I am trying actually to do
11   that --
12           THE COURT:  All right.
13           MR. SHAH:  -- for lack of any other materials here.
14           THE COURT:  So you didn't like the II?  It may have
15   been off?
16           MR. SHAH:  That one, yeah, Your Honor.
17           THE COURT:  So there, Mr. Ryan.  Did you have the II
18   in your memos?
19           MR. RYAN:  I believe -- I believe so, Your Honor.
20   I'll confirm that.
21           THE COURT:  Thank you.  I'm just not seeing what
22   possible reason there would be to object, because it was clear
23   where this happened, what was going on.
24           I'm sorry.  Did somebody just -- where's Mr. Garrett?
25   I just got a note -- Ms. Fowler, could you check on that?
```

```
1          MR. YETTER:  I think the security -- the Marshal is
2     talking to him outside about maybe a laptop or a phone.
3          THE COURT:  Oh, no, I had authorized the laptop for
4     everybody but not the phones.
5          Could you go check on that?
6          MR. YETTER:  I heard them -- I saw them talking.
7          THE COURT:  Would you bring him in here, please?
8          Sorry.  Could you come in, Mr. Garrett?
9          Mr. Garrett, I'm sorry.  What's the issue?
10    Ms. Fowler just tells me you were hauled out.
11         SECURITY OFFICER:  We had somebody complain, another
12    reporter complain because he has a laptop, and I just needed to
13    verify that he had access that he could have it in the
14    courtroom.
15         THE COURT:  No, all you need to do is ask me.  He
16    can -- any reporter --
17         SECURITY OFFICER:  I didn't want to disturb you, Your
18    Honor.  That's the problem.
19         THE COURT:  No, I -- I've got voices coming out of
20    the air here.  You can't disturb me.
21         SECURITY OFFICER:  If he's okay with it, you're okay
22    with it.
23         THE COURT:  All reporters can bring in laptops but
24    not phones.  And I've asked them to not use the camera or
25    recording app on their laptop, if any.
```

```
 1              SECURITY OFFICER:  Okay.  So you're okay with the
 2     other reporters?
 3              THE COURT:  Absolutely.
 4              SECURITY OFFICER:  Okay.  We were told no reporters
 5     were allowed to bring laptops.
 6              THE COURT:  Oh.
 7              SECURITY OFFICER:  That's what we were told.
 8              COURTROOM DEPUTY CLERK:  They can't bring cell
 9     phones.
10              THE COURT:  No cell phones.
11              SECURITY OFFICER:  We were told laptops as well, Your
12     Honor.
13              THE COURT:  No, sir.  All laptops, because that's how
14     they type.
15              SECURITY OFFICER:  Perfect.  That's all we needed to
16     know, Your Honor.  Our -- what we were told was totally
17     different than what y'all are saying.
18              THE COURT:  No, I'm sorry.  There was just one of
19     those mixup in communications.
20              SECURITY OFFICER:  Okay.
21              THE COURT:  But we're all straight now.  And make
22     sure that the reporters have their laptops.
23              SECURITY OFFICER:  All right.  I'll make sure that
24     happens, Your Honor.
25              THE COURT:  Because they're kind of the voice of the
```

```
 1   people.
 2            Are you okay, Mr. Garrett?
 3            MR. GARRETT:  Yes, sir.  Yes, ma'am.
 4            THE COURT:  You didn't get frisked or anything?
 5            MR. GARRETT:  No, no.  No, Your Honor.
 6            THE COURT:  So I never met you, Mr. Garrett.  It's
 7   nice to see you.  Though I read what you write.
 8            MR. GARRETT:  I read what you write, too, Your Honor.
 9            THE COURT:  It's good to know we both read.
10            (Discussion off the record)
11            THE COURT:  Okay.  I really need to know who can cool
12   down this room.
13            COURTROOM DEPUTY CLERK:  Felicia has checked with
14   GSA.
15            THE COURT:  I need you to call GSA.  Obviously
16   they're not paying any attention.
17            IT TECHNICIAN:  Judge, we're back up.
18            THE COURT:  Oh, we're on?
19            IT TECHNICIAN:  Yeah.
20            THE COURT:  We're all set.
21            IT TECHNICIAN:  So we're set.  It's connected.  I
22   just heard it through her laptop, so we're just waiting for
23   everyone else to move over to the new meeting.
24            THE COURT:  Thank you.
25            IT TECHNICIAN:  Thank you for your patience, Judge.
```

1    I apologize.

2           THE COURT:  I don't have any patience.  Nobody has

3    ever accused me of that.  But thank you for your work and your

4    patience.

5           (Pause)

6           THE COURT:  Mr. Yetter and Ms. Lowry, I just found

7    that Strayhorn study last night, the 2004, 2006.  Am I correct

8    in assuming -- and I'm not leaving y'all out.  It's just

9    because he was here and I was here and y'all weren't -- nobody

10   could find those studies.

11          MR. YETTER:  Oh, no, I think we had them.  We had

12   them at the trial, Your Honor.

13          THE COURT:  You did?

14          MR. YETTER:  They were exhibits.

15          THE COURT:  What study were we missing that nobody

16   could find?

17          MR. YETTER:  That I don't remember, but I do remember

18   the Strayhorn studies --

19          THE COURT:  Was it admitted?  Because I don't think I

20   ever saw it.

21          MR. YETTER:  Yeah, I believe it was admitted, Your

22   Honor.

23          THE COURT:  Okay.

24          MR. YETTER:  Because I think it was important is it

25   was the same problems 20 years before that you were --

1          THE COURT:  That is now.  And that's why I was

2    reading it again last night.

3          MR. YETTER:  Yes, yes.

4          THE COURT:  Because I thought, oh, my goodness.

5          MR. YETTER:  Same problems, different children.

6          THE COURT:  Well, it was pretty informative.

7          MR. YETTER:  It was.  And it was actually -- had

8    many, many good recommendations, most of --

9          THE COURT:  Excellent.  None of which were followed.

10          MR. YETTER:  -- most of which have never been

11    enacted.

12          THE COURT:  Well, the PMRU was followed, we think,

13    because we haven't seen them.

14          MR. YETTER:  Yeah.  Well, that is an issue, Judge,

15    we're going to talk about in this hearing.  It is -- it's --

16    frankly, it's a mess.  The psychotropic medication reviews is a

17    big issue.

18          THE COURT:  And I think it's the Defendants' position

19    is that that's not covered by the remedial orders.

20          MR. YETTER:  Well, it's a contractual requirement,

21    Your Honor, and the Remedial Orders require them to keep track

22    of contractual violations.

23          THE COURT:  Well, they're supposed to be

24    investigating under RO 3.  And that's part of --

25          MR. YETTER:  And investigate them, yes.  Exactly,

1    Your Honor.

2          THE COURT:  And they are not investigating doctors.

3    They are investigating what's happening to the children on the

4    drugs.

5          MR. YETTER:  What providers -- the caregivers are

6    doing.  That's the key thing that we are --

7          THE COURT:  And the last time we met, I don't think

8    we still had the medical consenter issue straightened out.  I

9    was told -- who was it?  Ms. Muth?  Commissioner Muth or

10   Commissioner Young told me it was all straight, and it turned

11   out it wasn't, that staff members were still calling in

12   prescriptions.

13         MR. YETTER:  Yes.  Facilities were being named as --

14         THE COURT:  Is Commissioner Muth here?

15         MR. YETTER:  Commissioner Muth is right here on the

16   first row, Your Honor.

17         THE COURT:  Okay.  Thank you.

18         (Pause)

19         THE COURT:  Okay.  We're trying to -- there are 640

20   or so people on Zoom that we're trying to reconnect.  Do

21   you-all want to wait, take a break?  What do you want to do?

22         MR. SHAH:  The number is slowly going up, Your Honor.

23         MR. YETTER:  It might be a good time to take a short

24   break, Your Honor.

25         THE COURT:  Okay.  We'll take a short break.

```
 1                    SECURITY OFFICER:  All rise.
 2                    THE COURT:  Thank you.  You can be seated.
 3                    (Recess)
 4                    THE COURT:  Thank you.  You may be seated.
 5                    Okay.  I think everybody is back on now.
 6                    We're ready to go with the contempt.  And what the
 7       Zoom audience missed was that the majority of the objections
 8       that were filed by the State's responses by the Monitors to
 9       various documents, and we sorted through that.
10                    So, Mr. Yetter?
11                    MR. YETTER:  Yes, Your Honor.  May it please the
12       Court.
13                    I know the Court does not need any sort of
14       introduction or opening statement.  By way of roadmap, we are
15       going to cover our six grounds for the show cause motion.  Some
16       witnesses are going to cover more than one ground.  We're going
17       to start with Provider Investigations, but then many of the
18       witnesses cover several issues, and I will flag the Court
19       before every witness on what basic issues they will cover.
20                    THE COURT:  I think you did that on the witness list
21       that you filed yesterday.
22                    MR. YETTER:  Not as much as we probably should have,
23       Your Honor.
24                    THE COURT:  Okay.
25                    MR. YETTER:  But we will -- I will do it more.
```

1          We expect our evidence to go through Wednesday based

2     on the witnesses that we have, of course subject to the State's

3     cross-examination, which I'm hoping is not much more than our

4     direct examination.  That's what we have calculated.  And so

5     we're trying to get through four or five witnesses a day, which

6     we think we can do and finish by Wednesday.

7          THE COURT:  Okay.  Be nice to wrap up by the end of

8     the week.

9          What do you think, Mr. Shah?

10         MR. SHAH:  Your Honor, I think hopefully we can.

11    What I would say is it sounds like Mr. Yetter is going to

12    present witnesses in support of his contempt motion.

13         THE COURT:  And it will also be in support of your

14    defense probably.

15         MR. SHAH:  Potentially, Your Honor.  We would ask two

16    things on that, Your Honor.

17         Until we know everything that Mr. Yetter is going to

18    be presenting in defense, we obviously don't know what we are

19    shooting at completely with our defense.  So we would have to

20    call witnesses after he is done with his presentation --

21         THE COURT:  Right.

22         MR. SHAH:  -- to support our defense.

23         So, Your Honor, we would ask that we reserve our

24    witnesses until the end.

25         THE COURT:  Of course.

1           MR. SHAH:  And, of course, reserve also our redirect

2    until Mr. Yetter is completed, and we could recall witnesses

3    once we know everything he's presenting.

4           THE COURT:  You do -- you do your redirect as much as

5    you can while he's -- while his witnesses are on the stand.

6    And if you need to recall them, Mr. Yetter will have their

7    contact information.  You make sure you have it for Mr. Yetter.

8    And then you can notify them if you need to recall.

9           MR. SHAH:  That sounds perfect, Your Honor.  A couple

10   more just housekeeping things, I guess, on the order.

11          THE COURT:  Okay.

12          MR. SHAH:  Given that we may or may not be

13   questioning the witnesses on issues that Mr. Yetter has not

14   raised in his direct, we would ask that we waive the

15   requirement that our cross be limited to only the issues raised

16   by direct, because, again, we're going to have to call our

17   defenses --

18          THE COURT:  I don't have any problem with that.

19          MR. SHAH:  Perfect.

20          THE COURT:  It's for the benefit of the witnesses and

21   their time and everybody's time.

22          MR. SHAH:  Absolutely, Your Honor.

23          And then, too, Your Honor, I guess in that case,

24   Mr. Yetter -- I don't know if that was the end of Mr. Yetter's

25   opening or if he still has an opening.  I will always

1    absolutely defer to him if he has more.  We would ask that we

2    reserve our response until after he's presented his case.

3              THE COURT:  I would think so unless you want to --

4    you can do both.  You can make some when he finishes and then

5    you can do it again.

6              MR. SHAH:  Okay.  Well, Your Honor, and then the last

7    thing, Your Honor, is that Defendants are going to be invoking

8    Rule 615 which will require that witnesses be excluded from the

9    courtroom and do not hear any other testimony.

10             THE COURT:  Unless they're expert witnesses.

11             MR. SHAH:  Your Honor, we haven't received any expert

12   witness designations.

13             THE COURT:  I assume that that -- Ms. Miller is going

14   to be an expert witness because she was in the first trial.

15             MR. YETTER:  And Dr. Bellonci is, Your Honor.

16             THE COURT:  And Dr. Bellonci.

17             MR. YETTER:  We named -- we named both of them.

18             MR. SHAH:  You name or named?

19             MR. YETTER:  We named in our witness list both of

20   those witnesses.

21             MR. SHAH:  Your Honor, that does not satisfy the

22   requirements of Rule 26(a)(2).  Parties have to disclose expert

23   witnesses at least 90 days before this thing is set for trial

24   or at least in some --

25             THE COURT:  This -- for one thing, I don't think this

1    applies to contempt.  I'm going to exclude those two witnesses

2    from the rule.

3            Any witnesses you have, bring them in and let's get

4    them in sworn in now, including the experts if they're here.

5            MR. YETTER:  We have --

6            THE COURT:  Do you have any experts at all, Mr. Shah?

7            MR. SHAH:  Your Honor, we did not know there would be

8    experts being presented, so we have not been given an

9    opportunity to prepare experts if we wanted to.  As of right

10   now, none of them are witness --

11           THE COURT:  You know what the charges are.  If you

12   need experts to refute them, that's not -- that's not -- that's

13   sort of elementary, Watson.

14           MR. SHAH:  Your Honor, we have not received the

15   reports from these experts at all.

16           MR. YETTER:  This is a contempt hearing, Your Honor.

17   This is not a trial under Rule 26.  This is a contempt hearing.

18   We gave them notice of -- that these witnesses --

19           THE COURT:  Of their --

20           MR. YETTER:  -- who are obviously experts.  One of

21   them testified at the original trial as an expert.

22           THE COURT:  And she's still an expert.

23           MR. YETTER:  She is.  And what their topics are.  So

24   they've known about this for probably two or three weeks

25   already.  So we have --

```
 1              MR. SHAH:  Your Honor, we have some of our witnesses
 2    here, Your Honor.  Some of them are not coming in --
 3              THE COURT:  Well, I'm not understanding, Mr. Shah.
 4    If you needed experts, you know exactly what the charges are.
 5    What could be the hesitation in your getting experts?
 6              MR. SHAH:  Your Honor, until we -- for rebuttal
 7    testimony, we did not receive any written reports from these
 8    experts from Mr. Yetter --
 9              THE COURT:  They're not required.  Do you need
10    experts?
11              MR. SHAH:  Your Honor, we --
12              THE COURT:  I think you need lots of experts, but
13    that's only my opinion.
14              MR. SHAH:  Your Honor's ruling that Rule 26(a)(2)
15    does not apply to this hearing; therefore, the Plaintiffs are
16    not obligated to provide any of the disclosures or notification
17    required by that rule.
18              THE COURT:  It's not a trial.
19              MR. SHAH:  So Your Honor --
20              THE COURT:  Go ahead.
21              MR. SHAH:  -- is ruling that 26(a)(2) does not apply.
22              THE COURT:  Go ahead, Mr. Yetter.
23              Are you finished?
24              MR. YETTER:  Yes, Your Honor.  And we did give them
25    disclosures.  They know what these witnesses are going to
```

1    testify about.

2            MR. SHAH:  Your Honor --

3            MR. YETTER:  We will get all of our -- some of our

4    witnesses are out in the hall, Your Honor, so that -- because

5    of the rule.  So we'll go get those witnesses to come in and

6    get sworn and --

7            THE COURT:  And your witnesses, Mr. Shah?

8            MR. YETTER:  The State's witness --

9            MR. SHAH:  Your Honor, we don't know which witnesses

10   we're going to call until we hear his presentation, so --

11           THE COURT:  Okay.  Oh, my goodness.

12           MR. SHAH:  We'll let Mr. Yetter bring his witnesses

13   forward.

14           THE COURT:  That is the most absurd thing I've ever

15   heard anybody say.  You know what these charges are.  If you

16   can defend them, bring in your witnesses now.  You don't have

17   to use them.  I want to place them under the rule if they're

18   here and you intend to use them at any -- in any possibility,

19   combination, or permutation.

20           MR. YETTER:  And, Your Honor --

21           MR. SHAH:  Okay.  Your Honor, we will --

22           THE COURT:  Wait a minute.

23           MR. YETTER:  We have named their -- their employees

24   as our witnesses.

25           MR. SHAH:  We can bring them in, Your Honor.

```
 1            MR. YETTER:  We believe they would be here, ready for
 2   testimony.
 3            THE COURT:  Okay.  Bring them in.
 4            MR. SHAH:  They're in the building, Your Honor.  We
 5   can -- it might take us time to go get them.  They're down --
 6            THE COURT:  You're the one that invoked the rule, for
 7   goodness sake, Mr. Shah.  Now you don't have your witnesses
 8   here?
 9            MR. SHAH:  Your Honor, our breakout room, so to
10   speak, Your Honor, is on a different floor.
11            THE COURT:  We never -- I never had breakout rooms
12   before.  How did this come about, by the way?
13            MR. SHAH:  I don't know, Your Honor.  We --
14            MR. YETTER:  They asked for them, Your Honor.
15            MR. SHAH:  We requested space to have room for
16   attorneys to meet while we're in the courtroom.
17            THE COURT:  Who did you ask?
18            MR. SHAH:  Ms. Purifoy.
19            THE COURT:  Okay.  Bring in your witnesses now.
20            MR. SHAH:  Okay, Your Honor.  We can go send someone
21   to get all our witnesses.
22            THE COURT:  That would be good.  You're the one
23   invoking the rule.
24            (Pause)
25            THE COURT:  I think we're doing this in two batches.
```

```
 1              MR. YETTER:  Two batches.
 2              MR. ADAMS:  Your Honor, we're physically going to get
 3   our witnesses because they don't have their cell phones in the
 4   building, so it will be just a minute.
 5              THE COURT:  Would you say that again?
 6              MR. SHAH:  Your Honor, we're physically going to get
 7   our witnesses.  They don't have their cell phones, obviously.
 8   They were told not to bring cell phones.
 9              THE COURT:  Right.
10              MR. SHAH:  So we're going to get them physically.
11              THE COURT:  Do they need their cell phones?
12              MR. SHAH:  No, Your Honor.  We're just saying why we
13   didn't just call them.  We sent someone out to go get them.
14              THE COURT:  Oh, okay.
15              MR. SHAH:  Yeah.
16              MR. YETTER:  Your Honor, we have two of our fact
17   witnesses here that the Court can swear in if that's okay.
18              THE COURT:  Okay.  Whoever you've got here, come
19   forward and we can do that.
20              Would you raise your right hand, please?
21              MR. YETTER:  Right hand.  The other right.
22              THE COURT:  I have a problem, too.  To me they're
23   both correct and right.
24              (The witnesses were sworn)
25              MR. YETTER:  Your Honor, let me introduce you to
```

1    Jackie Juarez, a very recent -- no longer, but very recent PMC
2    child within the custody of the State of Texas.  And Hannah
3    Reveile, who is very knowledgeable and was once an employee of
4    the State of Texas as a conservatorship caseworker.
5              THE COURT:  Thank you.
6              MR. YETTER:  They will be two of our witnesses today,
7    Your Honor.
8              THE COURT:  Okay.  What has happened is that one
9    party has invoked what's called the rule, which means that you
10   can no longer discuss the case with anybody except the lawyers
11   involved or remain within hearing distance of anyone discussing
12   the case.
13             And the reason for that rule is sometimes if you sit
14   in on a case and you hear other witnesses tell the same story
15   that you know, it might unconsciously influence your testimony.
16   So we want your testimony to be fresh from your own memory.
17             Any questions about that?
18             MS. REVEILE:  No, Your Honor.
19             MS. JUAREZ:  No, Your Honor.
20             THE COURT:  Can you explain the rule to them?
21             MR. YETTER:  Yes.  Yes, we will, Your Honor.
22             THE COURT:  Thank you very much.  It's good to
23   see you.
24             MR. YETTER:  And they're just going to be right
25   outside or in that room outside.

```
 1              THE COURT:  And don't be nervous.  These lawyers are
 2    more nervous than you are.
 3              MR. YETTER:  She's going to do great, Your Honor.
 4              (Pause)
 5              MR. SHAH:  Your Honor, two quick things.  One is I
 6    wonder --
 7              MR. YETTER:  Sorry.  One more witness is in the
 8    courtroom, Your Honor.
 9              THE COURT:  Administer the oath, please.
10              COURTROOM DEPUTY CLERK:  Yes, Your Honor.
11              Please raise your right hand.
12              (The witness was sworn)
13              THE COURT:  Your full name, please, sir?
14              DR. BELLONCI:  Dr. Christopher Bellonci.
15              THE COURT:  And you're -- he's in the expert
16    category?
17              MR. YETTER:  He is absolutely an expert, and his
18    expertise is in psychotropic medications, Your Honor.
19              THE COURT:  Oh.  I'm anxious to hear about that.
20              Are you an M.D.?
21              DR. BELLONCI:  I am.
22              THE COURT:  And a clinical pharmacologist, or what is
23    your background?  I'll find that out, but I'm just curious.
24              DR. BELLONCI:  I'm a board certified child and
25    adolescent psychiatrist.
```

1              THE COURT:  Okay.  Well, this will be interesting.

2              MR. YETTER:  His testimony probably won't be till

3      late Tuesday or Wednesday --

4              THE COURT:  Okay.

5              MR. YETTER:  -- Your Honor, but he is -- with the

6      Court's permission, he is going to listen to the testimony of

7      the other fact witnesses.

8              THE COURT:  So have you been in here all morning?

9              DR. BELLONCI:  I have.

10             THE COURT:  When I was talking about how the children

11     come in and damaged and come out that way?

12             DR. BELLONCI:  Yes.

13             THE COURT:  It's very disappointing, isn't it?

14             DR. BELLONCI:  Yes.

15             THE COURT:  Anyway, so that rule doesn't really apply

16     to you, because you can sit here and listen to the testimony

17     and use it as part of your testimony as you see fit.  So --

18     and, of course, you can talk to the lawyers.

19             DR. BELLONCI:  Yes.

20             THE COURT:  Anything -- any other warning I should

21     give him, Mr. Shah?

22             MR. SHAH:  Not that I'm aware of, Your Honor.

23     Obviously we maintain our objection to him being called as an

24     expert which Your Honor has overruled.  We understand.

25             THE COURT:  Thank you very much.

```
 1              DR. BELLONCI:  Thank you.
 2              MR. SHAH:  While we wait for other witnesses to come
 3    forward, two other just quick clarifications, Your Honor.  If
 4    Mr. Yetter does have a witness order and when he might be
 5    calling people, we don't necessarily have to have people
 6    waiting right outside the courtroom.
 7              THE COURT:  Exactly.
 8              MR. SHAH:  So whatever Mr. Yetter decides.  And
 9    especially in terms of the staff of ours he plans on calling,
10    if he can tell us whether they need to be here today or
11    tomorrow or Wednesday.  He doesn't have to decide now, of
12    course, Your Honor.
13              THE COURT:  Do you office here, Mr. Shah?  I know
14    Ms. Ho does.
15              MR. SHAH:  I live in Houston, Your Honor.
16              THE COURT:  Okay.  But you office here, Ms. Ho,
17    right?
18              MS. HO:  Yes, Your Honor, I do.
19              MR. SHAH:  And then the second thing, Your Honor, I
20    just wanted to clarify, Your Honor said that Mr. Yetter will
21    get a chance to present his testimony to establish a prima
22    facie case for contempt --
23              THE COURT:  And then we decide whether to move
24    forward.
25              MR. SHAH:  And then Your Honor will decide whether
```

```
 1    we -- if he has met that burden and in which case we have to

 2    defend ourselves from that charge.

 3              THE COURT:  Yes, sir.

 4              MR. SHAH:  All right.  Thank you, Your Honor.

 5              MR. YETTER:  And in that regard, one thing I want

 6    to -- I do want to raise, Your Honor, just for the sake of

 7    witnesses.  Defense counsel should cross-examine the witnesses

 8    after they give direct testimony on our behalf rather than call

 9    them twice.  That's the protocol that we have used for every

10    hearing during the trial.

11              THE COURT:  That's what I intend to do.

12              MR. YETTER:  And counsel at one point suggested to me

13    that they were not going to ask any questions, they were going

14    to reserve all their questions for all the witnesses until

15    their case, which would be very inefficient and very

16    duplicative.

17              THE COURT:  Yes, it is.

18              MR. YETTER:  And very --

19              THE COURT:  It's not a good use of the witnesses'

20    time, so --

21              MR. SHAH:  Your Honor, let me clarify.

22              THE COURT:  I think we straightened that out already.

23              MR. SHAH:  Only if we needed to recall based on

24    something that Mr. Yetter has raised later.

25              THE COURT:  Subsequent.  Subsequent to their
```

```
 1    testimony.  Yes, of course.
 2              MR. YETTER:  We're fine with that.  We're fine with
 3    that.
 4              THE COURT:  I think we're clear.
 5              Are we ready to go?
 6              MR. YETTER:  Yes.  Well, there's some more witnesses.
 7              MR. SHAH:  I think there's more witnesses.
 8              Any more witness for you today that need to be sworn
 9    in?
10              MR. YETTER:  No.
11              MR. SHAH:  I'm sorry.  Then I should ask, any of our
12    witnesses that need to get sworn?
13              MR. YETTER:  Yes.  Yes.
14              MR. SHAH:  So which ones do we need to ensure today
15    are present?
16              MR. YETTER:  Your Honor, we have one more witness
17    that's in the courtroom.  Ms. Miller, Vi Miller.
18              THE COURT:  Oh, Ms. Miller.
19              MR. YETTER:  If you would come forward.
20              THE COURT:  How is your grandchild?
21              DR. MILLER:  She is almost 11 years old, if you can
22    believe that.
23              THE COURT:  Mine is -- oldest one is in college now.
24              DR. MILLER:  Almost 11 years old.
25              THE COURT:  And the next one is in high school.  Can
```

```
 1   you believe how much time has gone by?
 2           DR. MILLER:  And, you know, they grow up too fast.  I
 3   don't love it.  What am I supposed to do?
 4           THE COURT:  That's good.
 5           DR. MILLER:  Oh, sorry.
 6           COURTROOM DEPUTY CLERK:  Raise your right hand.
 7           (The witness was sworn)
 8           THE COURT:  Well, either my eyes are failing or you
 9   haven't changed a bit, so --
10           DR. MILLER:  Thank you.  That is very, very kind.
11           THE COURT:  No, I don't think my eyes are failing.
12           So, Ms. -- Dr. Miller, I just want to tell you that
13   for the same thing I said to the other gentlemen, you are --
14   have been classified before in this case as an expert witness,
15   and I figure you haven't lost your expertise, so you can
16   continue right along.  So you can stay in the courtroom, but --
17           You know what?  I'm not sure they're supposed to talk
18   to other witnesses, are they?
19           MR. YETTER:  We are not going to have them talk to
20   other witnesses, but --
21           THE COURT:  The doctor is still here, too.
22           Don't either of you talk to any other witnesses, just
23   the lawyers.  But you can stay in the court and listen to
24   everybody's testimony.
25           DR. MILLER:  Great.  Thank you.
```

 1          MR. SHAH:  Your Honor, our witnesses are -- there's a

 2   long line of them at security right now.  The Marshals are

 3   checking them for -- I don't know what, Your Honor.

 4          THE COURT:  Ask Mr. Garrett.

 5          MR. SHAH:  None of them have cell phones, so I don't

 6   know.

 7          MR. ADAMS:  Your Honor, may I clarify?  If you're

 8   doing them one at a time -- I stepped out, so I'm not sure.  I

 9   can get them one at a time, or if you want the group -- to wait

10   for the group to clear security.

11          THE COURT:  No, we do them all together.

12          MR. ADAMS:  That's what I thought.  Okay.

13          THE COURT:  All together.

14          MR. SHAH:  Hopefully soon, Your Honor, they'll be

15   through security.

16          THE COURT:  At the original trial, Ms. -- Dr. Miller

17   and I compared grandchildren when they were -- hers was a

18   newborn really and --

19          MR. SHAH:  I understand yours lives in Dallas, Your

20   Honor?

21          THE COURT:  Mine are now 20 and 16, and they were

22   quite young at the time.

23          DR. MILLER:  Mine wasn't born yet when I was first

24   here.

25          THE COURT:  Yeah.

```
 1              (Pause)
 2         THE COURT:  It's still warm in here.
 3         MR. SHAH:  We have a couple bottles of water, Your
 4    Honor, if you want one.
 5         THE COURT:  You are welcome to have water at the
 6    tables.
 7              I don't know what the rules are.  In my courtroom in
 8    Corpus Christi the wiring is in -- you know, in panels, so
 9    we're very careful about what's drunk there, make sure the
10    water has caps on it.
11         MR. SHAH:  I think the wiring is under --
12         THE COURT:  It doesn't look like there's any wiring
13    in the tables, so --
14         MR. SHAH:  Yeah, I don't think there is, Your Honor.
15              (Pause)
16         MR. SHAH:  Your Honor, just to clarify, the witnesses
17    we are bringing in are the witness that Mr. Yetter identified
18    on his witness list as well as our witness list, so it's the
19    entire universe.
20         THE COURT:  Okay.
21              (Pause)
22         THE COURT:  One thing that Mr. Ryan brought up to me
23    about when -- do you remember how the last hearing I said pick
24    any 60-day or 90-period or whatever it was and give me one date
25    where you can identify all the caregivers and all the children
```

1    and the addresses?

2              MR. SHAH:  Yes, Your Honor.

3              THE COURT:  And so that was kind of a rolling thing

4    sent out.  And initially, you know, the reason for it was to

5    find out who had had -- so the Monitors could check about the

6    sexual abuse training and the victimization and some other

7    things.

8              And the original part of the list that came to the

9    Monitors had a date of the training on it, and then it was

10   erased in the next iteration.  So the Marshals -- so the

11   Monitors said, "We're the ones with the -- you know, give us

12   the ones with the training date on it."

13             And the response was we, "We consider that a complete

14   response."

15             Well, of course, in my original orders on the

16   Monitors, they're able to ask for any kind of information, and

17   they need that information.  If you have it readily available,

18   which you apparently you do on a computer, just send it to

19   them.  Have them send it out today.

20             MR. SHAH:  Your Honor, my understanding is -- and we

21   can always check.  That's not readily on the computer.  So to

22   explain that situation, Your Honor, the order that we saw

23   initially, the order from the Court, was by a certain date to

24   provide those two columns, so --

25             THE COURT:  Right.  Without regard to the order, the

 1    Monitors get to make their own request.

 2            MR. SHAH:  Understood, Your Honor.  The only question

 3    is why that document was produced now while we're working on

 4    the rest of it.

 5            To be honest with you, that third column was we

 6    expected that request to come, so I think people starting work

 7    on it.  It was not done.  It was not validated.  So we --

 8            THE COURT:  You mean you put -- Okay.  Now, here's

 9    where I --

10            MR. SHAH:  Well, that's why --

11            THE COURT:  -- turn the -- you know.

12            MR. SHAH:  Yes, Your Honor.

13            THE COURT:  So you put information on there that's

14    not been validated in your records?

15            MR. SHAH:  Your Honor, that's why we immediately told

16    the Monitors, "Oh, that column shouldn't be there.  Here's the

17    updated one."  It was just sent to the Monitors.  It was not --

18            THE COURT:  But if you have a column that has dates

19    on it, why not give it to them and help their checking?

20            MR. SHAH:  Your Honor, that column has not been

21    validated yet.

22            THE COURT:  Well, let them validate it.

23            MR. SHAH:  But the --

24            THE COURT:  Oh, okay.

25            MR. SHAH:  -- the Monitors want to have --

 1              THE COURT:  How long does it take to then get a
 2     validated training then?
 3              MR. SHAH:  Your Honor, I don't know.
 4              THE COURT:  Okay.  I guess I can never figure out why
 5     you-all keep putting unvalidated information in your computer
 6     system.
 7              MR. SHAH:  Your Honor, it wasn't the computer system.
 8     It was the Excel spreadsheet itself that we turned over to the
 9     Monitors that was unvalidated.
10              THE COURT:  Well, they printed it off of something,
11     didn't they?
12              MR. SHAH:  Your Honor, I don't how it was printed
13     out, but it was a separate document.  But it was combining
14     multiple sources of information, Your Honor --
15              THE COURT:  Okay.
16              MR. SHAH:  -- to produce the document.
17              THE COURT:  Okay.
18              MR. SHAH:  It was an Excel spreadsheet.
19              THE COURT:  Well, in any event, to circumvent whether
20     I ordered it or not, you have to obey -- you have to do what
21     the Monitors ask you.  They get all access to all information
22     unless you have some objection.  So get those -- get that --
23     get those validated dates of training done, because that's what
24     it was all about.
25              MR. SHAH:  Your Honor, I -- we're looking into that,

1    Your Honor.

2              THE COURT:  What do you mean, you're looking into it?

3              MR. SHAH:  We're looking into Your Honor's question

4    on when that can be done.

5              THE COURT:  Oh, okay.  But you're going to do it?

6              MR. SHAH:  Your Honor, I can't say right now, because

7    I don't know how it's going to go.

8              THE COURT:  You don't know if they've been trained or

9    not or have dates?

10             MR. SHAH:  Your Honor, I don't know how that's going

11   to be pulled into a document.  And without knowing that, Your

12   Honor, I don't want to make any commitments to this Court right

13   now that I cannot back up honestly.

14             THE COURT:  Who on here -- who in the State's

15   staff -- in the staff would know how to answer that question?

16             MR. SHAH:  I don't know yet, Your Honor, because --

17             THE COURT:  Oh, dear.

18             MR. SHAH:  -- because that was not an issue raised

19   for this contempt hearing for which witnesses have been called

20   to testify.

21             THE COURT:  I'm asking you -- I can ask you anything

22   I want to in the contempt hearing or not, and you need to

23   answer it.  To come in here and tell me, for instance, that you

24   signed your name to objections and you don't know where you got

25   the information and you're not prepared to ever tell me is just

```
 1    categorically bizarre for an attorney.
 2              MR. SHAH:  Your Honor, we didn't --
 3              THE COURT:  Call your first witness, Mr. Yetter.
 4    Obviously we're not going to have these people come in and get
 5    sworn in.
 6              MR. SHAH:  They're there, but I think they're
 7    just slowly trickling in.
 8              THE COURT:  Okay.  Bring them in.
 9              MR. SHAH:  I don't think it's all of them that have
10    gone through security.
11              THE COURT:  This is so frustrating.
12              I think, Mr. Shah, you should be in Chicago.  You're
13    a good enough dancer.
14              (Pause)
15              THE COURT:  Could you come in front of the podium
16    here, please, all of you?
17              Good morning.
18              MS. TALBERT:  Good morning.
19              THE COURT:  Okay.  We're going to ask you all to
20    stand up in a line, and we're going to ask you to raise your
21    right hand, take the oath.  And then we're going to go down
22    from this side to this side for full names, and if you want to,
23    positions, if you with -- if you work for the State.
24              Everybody here?  Have you got -- have you got a slot
25    there?
```

```
 1            MR. YETTER:  Your Honor, they have some more outside.
 2            MR. SHAH:  Do you want to start with these, Your
 3    Honor --
 4            THE COURT:  Yes.
 5            MR. SHAH:  -- and then bring --
 6            THE COURT:  Fine.
 7            MR. SHAH:  Yeah.
 8            THE COURT:  Raise your right hand, please.
 9            (The witnesses were sworn)
10            MS. HINSON:  Jenny Hinson, DFPS.
11            MS. GUERRERO:  Cristina Guerrero, DFPS.
12            MS. CASTILLO:  Laura Castillo, HHSC.
13            MS. CANTU:  Toni Cantu, HHSC.
14            MS. TALBERT:  Marta Talbert, DFPS.
15            MS. BANUELOS:  Erica Banuelos, DFPS.
16            MS. O'NEILL:  Audrey O'Neill, DFPS.
17            MS. WEIRETHER:  Susie Weirether, HHSC.
18            MS. CROWSON:  Jenny Crowson, HHSC.
19            THE COURT:  Have you-all heard from Commissioner
20    Young?  How is she doing?
21            MS. CROWSON:  Haven't heard from her.
22            THE COURT:  Nobody cares.
23            The rule has been invoked, so that means that you
24    cannot talk among yourselves about the case, talk to anybody --
25    other witness, anybody else about this case at all, only
```

1    through your attorneys.  And you're not to remain within

2    hearing distance of anyone who's discussing the case as well.

3    And the reason for that is that so you don't inadvertently --

4    whatever someone else says might impact your statement.

5              Any questions about this?

6              (Prospective witnesses indicating in the negative)

7              THE COURT:  You-all have been here, done this before.

8              MS. TALBERT:  Yes, Your Honor.

9              THE COURT:  Okay.  Thank you very much.  Then you're

10   excused.

11             MR. SHAH:  We have another group as well that's now

12   through security.

13             THE COURT:  Should we start with a witness then and

14   wait for the next group?

15             MR. SHAH:  I think we have one -- a couple and then

16   the Commissioner as well.

17             THE COURT:  Commissioner Muth, ready?

18             COMMISSIONER MUTH:  Yes.

19             THE COURT:  And you're in the expert category.

20             MR. SHAH:  No, Your Honor, we're not submitting her

21   as an expert.

22             THE COURT:  Well, I'm not going to ask her to leave

23   the courtroom.

24             MR. SHAH:  Your Honor, she's potentially a witness,

25   and the rule is mandatory.  She can't be in the courtroom.

```
 1              THE COURT:  Well, I don't think it's -- I can make
 2   excuses from the rule.  Why would you not want --
 3              MR. YETTER:  We will waive it as to Commissioner
 4   Muth.
 5              THE COURT:  Yeah, I don't know why you wouldn't want
 6   her in the room.
 7              MR. SHAH:  Your Honor, we maintain our objection.  If
 8   the Court is overruling our objection as to applying the
 9   rule --
10              THE COURT:  You object to your -- I ordered
11   Commissioner Young and Commissioner Muth to be in attendance.
12              MR. SHAH:  They will be --
13              THE COURT:  That's the order.
14              MR. SHAH:  They will be in attendance when it's time
15   for them if anyone calls them to testify, Your Honor.
16              THE COURT:  Okay.  Would you administer the oath,
17   please?
18              COURTROOM DEPUTY CLERK:  Yes, Your Honor.
19              (The witnesses were sworn)
20              COURTROOM DEPUTY CLERK:  Your name?
21              DR. VAN RAMSHORST:  Ryan Van Ramshorst.
22              COURTROOM DEPUTY CLERK:  Thank you.
23              THE COURT:  And you're -- oh, you're the doctor?
24              DR. VAN RAMSHORST:  Yes, ma'am.
25              THE COURT:  In charge of the medications, right?
```

 1              DR. VAN RAMSHORST:  Your Honor, I'm the Chief Medical

 2     Director for Medicaid and CHIP Services.

 3              THE COURT:  Okay.  Yeah, we met before.

 4              DR. VAN RAMSHORST:  Yes, Your Honor.

 5              THE COURT:  It did not go well, I don't think,

 6     did it?

 7              DR. VAN RAMSHORST:  I can't quite recall.

 8              THE COURT:  Okay.  Wiped it from your mind.

 9         Okay.  So apparently -- do you want him in during the

10     testimony of the physician?

11              MR. YETTER:  He is a fact witness.

12              THE COURT:  Okay.

13              MR. SHAH:  They're both fact witnesses, Your Honor.

14              THE COURT:  Then you -- the same for you, Doctor.

15     You're not to be in here for -- to discuss -- you can't discuss

16     the case with any other witnesses or remain within hearing

17     distance of anyone discussing it.  Only the -- only the

18     attorneys.

19              DR. VAN RAMSHORST:  Understood, Your Honor.

20              THE COURT:  Thank you.

21         And of course, Commissioner, you're to be here.

22              MR. SHAH:  Your Honor, just to be clear, you're

23     overruling --

24              THE COURT:  Just to be clear, I have ordered her

25     previously to attend this hearing.  Don't go there, Mr. Shah.

1   You're just annoying me.  And that is bad form.  And I'm about
2   to hold you in contempt.
3            You know what I ordered.  I'm not going to go into
4   Commissioner Young.  But you know what I ordered for the
5   commissioners to be here.  They've been here at attendance in
6   every single hearing I've had, contempt and otherwise, for
7   years now, whatever commissioner they were, because I need to
8   question them sometimes when something comes, and you would
9   think they would want to be informed about what's going on in
10  their own department.
11           So you are very close, Mr. Shah, to be held in
12  contempt yourself.  Do you want that on your malpractice
13  insurance?
14           MR. SHAH:  No, Your Honor.
15           THE COURT:  I would think not.
16           Now, when I give an order, I don't want you arguing
17  with it again.  Is that clear?
18           MR. SHAH:  Yes, Your Honor.
19           THE COURT:  You knew I ordered for both Commissioner
20  Young and Commissioner Muth to be in attendance at this
21  hearing, did you not?
22           MR. SHAH:  Yes, Your Honor.
23           THE COURT:  Because you actually did a hearing with
24  me to excuse Commissioner Young because of a laparoscopic
25  procedure, right?

```
 1                    MR. HUBBARD:  Objection, Your Honor.  This is a
 2       public hearing.
 3                    THE COURT:  Yes, it is.  And don't object to my
 4       comment, sir.  And stand when you address the Court.
 5                    What is your name?
 6                    MR. HUBBARD:  Brad Hubbard, Your Honor.  I apologize.
 7                    THE COURT:  Sorry?
 8                    MR. HUBBARD:  I'm Brad Hubbard, Your Honor.  I
 9       apologize.
10                    THE COURT:  Do not address me without standing in
11       this court.
12                    MR. HUBBARD:  Yes, Your Honor.
13                    THE COURT:  And do not -- do not argue with my orders
14       again.
15                    MR. HUBBARD:  Yes, Your Honor.
16                    THE COURT:  We've already been through this.  And,
17       you know, you knew what my orders were, and you knew they were
18       particular, which is why you were requesting a hearing on the
19       other matter.  And we're not going there.
20                    And, yes, I know this is a public hearing, sir.  You
21       don't need to call that to my attention.  And you-all are
22       getting off to a very bad start here.
23                    Take your seat, Ms. Muth.  Thank you.
24                    (Pause)
25                    THE COURT:  Call your first witness.
```

1           MR. YETTER:  There are some more witnesses, Your

2    Honor, outside that are going to be sworn.  And our first

3    witness is among those more witnesses.

4           (Pause)

5           THE COURT:  Could you come in front of the podium,

6    please, and just line up one single line?  And in a minute

7    we're going to administer the oath and then ask you your names.

8           And if you could raise your right hand, please.  Some

9    of you I've met before.  It's good to see you again.

10          (The witnesses were sworn)

11          THE COURT:  Your full name, sir?

12          MR. COX:  Clint Cox.

13          THE COURT:  And your position?

14          MR. COX:  Director of Child Care Investigations for

15   Department of Family and Protective Services.

16          THE COURT:  Okay.  You do the -- you're the Director

17   of the PI services?

18          MR. COX:  For Child Care Investigations, CCI.

19          THE COURT:  Okay.

20          MS. ASHWORTH-MAZEROLLE:  My name is Rachel

21   Ashworth-Mazerolle.  I'm the Associate Commissioner for Child

22   Care Regulation at HHSC.

23          THE COURT:  Thank you.

24          MR. PAHL:  My name is Stephen Pahl.  I'm the Deputy

25   Executive Commissioner for --

```
 1                 THE REPORTER:  I'm sorry.  Stephen --
 2                 THE COURT:  You need to speak up, sir.
 3                 MR. PAHL:  My name is Stephen Pahl.  I'm the Deputy
 4    Executive Commissioner for the Regulatory Services Division at
 5    HHSC.
 6                 THE COURT:  Thank you.
 7                 MS. LAMMONS:  My name is Kelsey Lammons.  I'm the
 8    manager of the Contract Performance Team at DFPS.
 9                 THE COURT:  Thank you.
10                 MS. PARRATO:  My name is Ashly Parrato.  I'm the
11    Quality Assurance Director for Conservatorship.
12                 THE COURT:  And DFPS?
13                 MS. PARRATO:  Yes.
14                 THE COURT:  Thank you.
15                 MS. NAJERA:  My name is Jamie Najera.  I'm the Deputy
16    Director for Purchased Client Services for DFPS.
17                 THE COURT:  Thank you.  Are you okay?
18                 MS. NAJERA:  Yeah, I'm good.
19                 THE COURT:  Okay.
20                 MR. VERCHER:  I'm Kason Vercher.  I'm the Director of
21    Residential Contracts for DFPS.
22                 THE COURT:  Thank you.
23                 MR. BLACK:  Stephen Black, Associate Commissioner for
24    Statewide Intake at DFPS.
25                 THE COURT:  Thank you.
```

1              The rule has been invoked by the State, meaning that

2    you cannot discuss this case with -- among yourselves or with

3    anyone other than the lawyers involved in this case.  The

4    purpose of the rule -- I'm sure you've been told this before --

5    is so that you might not even unconsciously tailor your

6    testimony to something you heard from somebody else.  So we

7    want it straight from you.

8              So if there are -- are there any questions about that

9    at all?

10             MS. ASHWORTH-MAZEROLLE:  No, ma'am.

11             THE COURT:  All right.  Thank you very much.  Then

12   you can wait outside or wherever you came from.  I think you

13   had a room in another floor.

14             MR. YETTER:  Your Honor, for our first witness it

15   will be Mr. Pahl, Stephen Pahl.

16             THE COURT:  Okay.

17             MR. YETTER:  So we would ask that he stay.

18             THE COURT:  So you can take -- where's the witness

19   stand here?  Oh, over there.  Thank you.

20             MR. SHAH:  And, Your Honor, if there's a certain

21   witness Mr. Yetter plans on calling today, we'll make sure they

22   are right outside the courtroom.

23             THE COURT:  Okay.  Just tell them who's going to be

24   next if you can.

25             MR. YETTER:  There will be two of our witnesses and

```
 1    then Ms. Banuelos and Mr. Vercher.
 2              THE COURT:  Okay.
 3              MR. SHAH:  Okay.  Would we release the rest of the
 4    witnesses for the day, Your Honor, or how does Mr. Yetter --
 5              THE COURT:  Just keep them on standby and sit down.
 6              MR. SHAH:  Okay, Your Honor.
 7              THE COURT:  You may continue.
 8              MR. YETTER:  Thank you, Your Honor.  May it please
 9    the Court.
10              STEPHEN PAHL, PLAINTIFFS' WITNESS, SWORN
11                      DIRECT EXAMINATION
12    BY MR. YETTER:
13    Q.   Would you introduce yourself again to the Court and your
14    title?
15    A.   Yes, sir.  My name is Stephen Pahl.  I'm the Deputy
16    Executive Commissioner for the Regulatory Services Division at
17    HHSC.
18    Q.   Thank you, Mr. Pahl.  That's P-A-H-L, right?
19    A.   Yes.  That is correct.
20              MR. YETTER:  Let's put the demonstrative exhibit,
21    Your Honor, an organizational chart off of the HHSC website up
22    on the stand for the Court.
23    BY MR. YETTER:
24    Q.   And, Mr. Pahl, I just want to -- there we go.  Let's start
25    at the top.  Let's just blow up the top.
```

1           All right.  So there's Commissioner Young, and down
2    from Commissioner Young let's go to the column, the second
3    column from the right.  Let's just do the second column from
4    the right.
5           Your boss is Jordan Dixon, the Chief Policy and
6    Regulatory Officer, correct?
7    A.   Yes, sir.
8    Q.   And then you are Stephen Pahl, right there.  We can
9    highlight your box, Deputy Executive Commissioner, Regulatory
10   Services, right?
11   A.   Yes, sir.
12   Q.   And in that role as Deputy Executive Commissioner for
13   Regulatory Services, one of the groups that you are in charge
14   of is called Provider Investigations, is it not?
15   A.   That is correct.
16   Q.   And you've been in this role for about two -- a little
17   less than two and a half years.  Since August of 2021?
18   A.   Yes, sir.  That's correct.
19   Q.   Before then, you were in a different group called the
20   Office of Inspector General at one point, true?
21   A.   At one point, yes, that is true.
22   Q.   And you were an Assistant Deputy Inspector General?
23   A.   Yes.
24   Q.   I mention that because we'll get to something that the OIG
25   did later in your testimony.

```
 1              Now, your background is not in child welfare, is it?
 2   A.   That is correct.
 3   Q.   Until this job, you were -- you had no prior work
 4   experience in child welfare, did you?
 5   A.   No, sir.
 6   Q.   So let's focus on Provider Investigations.  That is a
 7   group obviously that does investigations as part of HHSC, is it
 8   not?
 9   A.   Yes, it is.
10   Q.   And by way of background --
11              THE COURT:  Can you speak up, please, sir?  Do we
12   need to move the microphone closer to you?  Is that better?
13              THE WITNESS:  Yes, ma'am.
14              THE COURT:  That's good.  Thank you.
15              MR. YETTER:  Thank you.  Thank you.  That's better.
16   BY MR. YETTER:
17   Q.   Just by way of background, now that you're kind of in
18   charge of Provider Investigations, I want to go through briefly
19   a brief chronology of how it got to be where it is, okay?  The
20   responsibilities of Provider Investigations, okay?
21   A.   Yes, sir.
22   Q.   So in 2015, the investigations of allegations of abuse,
23   neglect, or exploitation involving consumers in the -- in a
24   certain area of the agency was being done by DFPS in 2015,
25   right?
```

```
 1   A.   I started in 2021, but it's my understanding that that
 2   is -- that sounds correct.
 3   Q.   Good.  And then it moved to HHSC in 2017, did it not?
 4   A.   That sounds correct, from my recollection.
 5   Q.   And the point of these investigations are to have careful
 6   and accurate inquiries into an allegation of abuse, true?
 7   A.   True.
 8   Q.   In other words, an investigation isn't just going through
 9   the motions, is it?
10   A.   Can you explain what you mean by going through the
11   motions?
12   Q.   Checking the boxes.  That's not what a true investigation
13   is, right?
14   A.   I would -- I would think that's right.
15   Q.   Supposed to be careful, accurate, thorough?
16   A.   True.
17   Q.   All right.  Because if it's not a careful, accurate,
18   thorough investigation, it might as well not have even been
19   done, true?
20   A.   I would say true.
21   Q.   All right.  Now, there were problems, you learned, once
22   you got in charge of --
23           MR. YETTER:  Let's go to Plaintiffs' Exhibit 106,
24   which is -- we have some notebooks for us.
25           We'll come back to that.
```

```
 1    BY MR. YETTER:
 2    Q.   Plaintiffs' Exhibit 106, you can see it on the screen.
 3    And this is an HHSC document, is it not?
 4    A.   Yes, it is.
 5    Q.   It's all about Provider Investigations, true?
 6    A.   Appears so.
 7    Q.   And one of the problems -- let's go to the second full
 8    paragraph.  One of the problems is that in 2015 when these
 9    extra responsibilities went to Provider Investigations, you
10    didn't get extra staff, right?  See that first sentence?
11           While the 2015 legislation significantly expanded
12    Provider Investigations jurisdiction, you didn't get more
13    staff.
14    A.   That's what the document says, yes.
15    Q.   And as a result, backlogs resulted, true?
16    A.   That's what the document says, yes, sir.
17    Q.   So this is eight years ago, right?
18    A.   Yes, sir.
19    Q.   And today there are still backlogs, aren't there?
20    A.   There are.
21    Q.   So in 2017 -- the next paragraph, in 2017 these
22    responsibilities for Provider Investigations went from DFPS to
23    HHSC.  You've told us that.  True?
24    A.   True.
25    Q.   And in the -- right in the middle there of the fourth line
```

1    down, Provider Investigations, PI, used the database of DFPS,

2    called IMPACT, right?

3    A.    Correct.

4    Q.    Let's go to the next -- but one of the problems -- well,

5    let's go back to that one paragraph.

6              One of the problems was you're now fragmenting

7    responsibilities for investigations.  That was one of the

8    problems, wasn't it?  I'm looking at the last full sentence.

9              "This transition also resulted in the generation of

10   two case intakes."  Do you see that?

11   A.    Yes, I do.

12   Q.    So you have two groups, and responsibilities are being

13   fragmented, right?

14   A.    Two groups are responsible for taking the intakes, yes.

15   Q.    The next paragraph talks about what happens in 2020.

16             In 2020, Provider Investigations is fully integrated

17   into HHSC, right?

18   A.    That's what it says, yes, sir.

19   Q.    And LTCR is one of the groups within HHSC, is it not?

20   A.    It is.

21   Q.    Remind us what that acronym stands for.

22   A.    Long Term Care Regulation.

23   Q.    Now, you're not in charge of Long Term Care Regulation.

24   That's a different group, right?

25   A.    No, sir.

```
 1    Q.   You are in charge of that?
 2    A.   Yes, sir.
 3    Q.   Good.
 4              Okay.  Now, the next page, page 2.  One of the groups
 5    that Provider Investigation looks at, the second bullet at the
 6    top, are HCS homes, isn't it?
 7    A.   Yes, sir.
 8    Q.   Community -- excuse me.  Home and Community-Based
 9    Services, they have homes in the state of Texas, do they not,
10    all across the state?
11    A.   They do.
12    Q.   And they serve -- they serve populations of intellectually
13    delayed or disabled children, right?
14    A.   Yes, they do.
15    Q.   And they also serve populations of intellectually disabled
16    or delayed adults, true?
17    A.   True.
18    Q.   And HHSC has made the decision that in some of these HCS
19    homes, adults and children reside together, right?
20    A.   I believe so.
21    Q.   Now, it's not just --
22              THE COURT:  You believe so or you --
23    BY MR. YETTER:
24    Q.   You know that's the case.
25              THE COURT:  You don't know?
```

```
 1              THE WITNESS:  I don't -- can you repeat the question?
 2              THE COURT:  Sir?
 3              THE WITNESS:  Can you repeat the question?
 4              MR. YETTER:  Sure.
 5              THE COURT:  Have you made the -- has HHSC determined
 6    that in some of these positions, some of these facilities,
 7    adult foster care and child foster care people, children,
 8    reside in the same residential facility?
 9              THE WITNESS:  I believe that is correct, ma'am.
10              THE COURT:  Okay.  Do you believe that is correct?
11    What do you mean you believe that is correct?  Is it -- do you
12    know that to be correct?
13              THE WITNESS:  I don't know that to be correct.
14              THE COURT:  Why wouldn't you know that?
15              See, this is what I'm getting at, Mr. Yetter.  It's
16    these -- it's this -- nobody knows anything in this department.
17    Have you noticed that, Mr. Yetter?
18              MR. YETTER:  We'll have testimony about a lot of
19    that, Your Honor.
20    BY MR. YETTER:
21    Q.   You know -- you do know, don't you, that adults and
22    children are in HCS homes residing together.  You know that,
23    don't you?
24    A.   I do know that.
25    Q.   Okay.
```

```
 1            THE COURT:  Well, that was the question.
 2   BY MR. YETTER:
 3   Q.   That was the question.
 4            Now, it's not just adults and children with
 5   intellectual delay or disabilities, is it?  There are other
 6   residents of these homes, these HCS homes, aren't there?
 7   A.   Would you mind repeating that question?
 8   Q.   Sure.
 9            In these HCS homes, the State puts children that they
10   can't find a licensed regulated placement for, what the State
11   calls CWOP children.  They put them in the HCS homes, don't
12   they?
13   A.   I'm not sure.  That is not -- CWOP does not fall under
14   HHSC, Mr. Yetter.
15   Q.   Yes.
16            THE COURT:  Well, does H -- does -- sorry, but do the
17   HCH placements --
18            MR. YETTER:  HCS.
19            THE COURT:  -- HCS placement, does that fall under
20   your purview?
21            THE WITNESS:  The placements do not fall under my
22   purview.  The investigations of those locations falls under my
23   purview.
24            THE COURT:  Under each HCS, you're charged with every
25   investigation for children, for PMC children and other children
```

 1    that arise out of that facility; is that right?

 2            THE WITNESS:  Could you -- would you mind repeating

 3    that question?  I'm sorry.

 4            THE COURT:  Okay.  What exactly do you do with --

 5    what investigations come to you out of those facilities?

 6            THE WITNESS:  Investigations for abuse and neglect in

 7    those facilities come to Provider Investigations.

 8            THE COURT:  For adults and all children?

 9            THE WITNESS:  That is correct, ma'am.

10            THE COURT:  And that includes, apparently, the

11    children without licensed placements.

12            THE WITNESS:  It could, yes, ma'am.

13            THE COURT:  Well, does it or do you mean it could?

14    Does it, yes or no?

15            THE WITNESS:  If they're in those homes, then it

16    would, yes, ma'am.

17            THE COURT:  Do you know that they're in those homes?

18    That's the question.  And if not, why not?

19            THE WITNESS:  We know that they're in the homes, yes,

20    ma'am.

21            THE COURT:  Okay.

22            MR. YETTER:  Okay.  So --

23            THE COURT:  Why are we dragging this out?

24            MR. YETTER:  So this is really -- Your Honor, I would

25    like to say, so Provider Investigations is --

```
 1    BY MR. YETTER:
 2    Q.   So, Mr. Pahl, Provider Investigations is looking at
 3    allegations of abuse and neglect and exploitation for
 4    intellectually disabled children but also for CWOP children,
 5    what the State calls CWOP children, children without licensed
 6    placements, isn't it?
 7              That's what Provider Investigations, your group,
 8    does?
 9    A.   It investigates abuse and neglect for individuals that are
10    placed in those homes or reside in those homes, yes, sir.
11    Q.   And so if --
12              THE COURT:  In the HSC's?
13              MR. YETTER:  HCS.
14              THE COURT:  I'm sorry.  HCS.  I obviously can't get
15    the initials right.
16              Is that right, sir?
17              THE WITNESS:  Would you mind repeating that?
18              THE COURT:  All ANE investigations that come out of
19    these HCS homes fall under your purview?
20              THE WITNESS:  Yes, Your Honor.  That's right.
21              THE COURT:  whether they are adult mentally
22    challenged, child mentally challenged, or children without
23    licensed placements, CWOP children?
24              THE WITNESS:  Yes, Your Honor.  That is correct.
25              THE COURT:  Okay.
```

```
 1   BY MR. YETTER:
 2   Q.   Okay.  Now, let's go to 2023, this fourth paragraph down.
 3   The one right above it.  Third paragraph down.  I'm sorry.
 4          Okay.  Now, here we are in 2023, and you still have a
 5   backlog of Provider Investigations investigations.  Do you see
 6   the very last sentence?
 7   A.   Yes, sir.
 8   Q.   Such as the PI investigation backlog.  That's correct,
 9   right?  You still have a backlog today?
10   A.   Yes, sir.
11   Q.   Because you still don't have the right staffing, right?
12   A.   That's correct.
13   Q.   And you know this Court ordered four years ago that
14   investigations of abuse, neglect, and exploitation of PMC
15   children had to be done timely and properly, carefully and
16   accurately, right?
17   A.   That is correct.
18   Q.   But your group, Provider Investigations, has a backlog.
19   So they're not getting done timely, are they?
20   A.   No, sir.
21   Q.   And you have not hired any more staff in the last three
22   months to start making these investigations timely, have you?
23   A.   I don't know if we've hired any new staff in this area in
24   the last three months.
25   Q.   And --
```

```
 1              THE COURT:  Who would know?  Aren't you in charge of
 2   this?
 3              THE WITNESS:  Yes, ma'am.  It's a -- it's a
 4   department that falls within my division, but I have a
 5   leadership structure within Long Term Care Regulation that
 6   makes hiring and staffing decisions, so I'm not always
 7   apprised.
 8              THE COURT:  Don't you know what their vacancies are,
 9   what your vacancies are?
10              THE WITNESS:  I do get periodic updates of vacancies,
11   yes, ma'am.
12              THE COURT:  How often do you meet with your staff to
13   get updates on adequate staffing in these placements?
14              THE WITNESS:  Generally about once a month.
15              THE COURT:  And you still don't know if there's new
16   staff in the last three months?
17              THE WITNESS:  I don't recall without seeing a
18   staffing report.  I look at a lot of reports, Your Honor.  I
19   would have to take a look at one of those current staffing
20   reports.
21              THE COURT:  These are children that are in very
22   precarious placements.  I would think you would look at a lot
23   of reports and do a lot of -- take a lot of remedial action,
24   which apparently is not happening.
25              So you're not up to date on the staffing issues.
```

```
 1                    Go ahead, Mr. Yetter.
 2     BY MR. YETTER:
 3     Q.   Okay.  We know there are staffing issues, because this
 4     document that the State produced says there are staffing and
 5     resource challenges in 2023, right?  It says it right there.
 6     Do you read that?
 7     A.   Yes, sir, I do.
 8     Q.   Staffing and resource challenges, true?
 9     A.   True.
10     Q.   And you know that the Monitors wrote a report, several
11     reports now, a couple of reports, to this Court addressing your
12     group, Provider Investigations?
13     A.   Yes, sir.
14     Q.   And huge deficiencies and delays in your group, Provider
15     Investigations, true?
16     A.   That is true.
17     Q.   And since you read that report, you're not aware of any
18     plans to hire more staffing so that these investigations comply
19     with the Court's Remedial Orders.  You're not aware of any of
20     those plans, are you?  Right?
21     A.   We have been trying to address staffing issues for --
22     Q.   Eight years.
23     A.   -- for a long time, sir.  Yes, sir.
24     Q.   Okay.  There you go.
25                    THE COURT:  Well, do you -- you have the funding from
```

```
 1    the Legislature.

 2              THE WITNESS:  Yes, ma'am.

 3              THE COURT:  So it's doable?

 4              THE WITNESS:  Yes, ma'am.

 5              THE COURT:  It just hasn't been done?

 6              THE WITNESS:  Again, we're -- Your Honor, we are very

 7    focused at filling our vacancies.  That's been a priority of

 8    ours.

 9              THE COURT:  Well, you don't know anything about it,

10    though, at this point, what's happened in the last three

11    months.  So it's not a big priority with you, or is it?

12              THE WITNESS:  Your Honor, reducing our vacancies is a

13    priority of mine for my division.

14              THE COURT:  Well, do you know how many interviews

15    have been conducted in the last three months for new staffing?

16              THE WITNESS:  I wouldn't know that information off

17    the top --

18              THE COURT:  Why wouldn't you know that information if

19    it's such a priority?

20              THE WITNESS:  I delegate interviews down to --

21              THE COURT:  So you delegate everything?

22              THE WITNESS:  Not everything, ma'am.  No, ma'am.

23              THE COURT:  Apparently the staffing issue, which has

24    got to be one of the number one concerns, isn't it?

25              THE WITNESS:  It's a -- it is a big concern of ours,
```

```
 1   yes, ma'am.
 2             THE COURT:  So you delegate that, and somebody else
 3   knows about it?
 4             THE WITNESS:  I delegate the hiring actions and
 5   interview process down.  Yes, ma'am, I do.
 6             THE COURT:  Okay.  The Monitors had told me that some
 7   of these investigations that you've done, besides the 69 that
 8   we were talking about here, that the Monitors reviewed that
 9   were closed without particular findings of ANE, that some of
10   the other ones -- that some of them you said you didn't have
11   jurisdiction.
12             What does that mean, to investigate?  Were those some
13   of the CWOP children?
14             THE WITNESS:  I don't recall that, Your Honor.
15             THE COURT:  Did you know about that, Mr. Yetter?
16             MR. YETTER:  I'm not sure I know exactly where
17   that -- I do know there --
18             THE COURT:  I think it's in the Monitors' report.
19             MR. YETTER:  I know that they were at -- the HHS --
20   well, let me just say I don't recall exactly where --
21             THE COURT:  Mr. Ryan, can you tell us where that is?
22             MR. RYAN:  Your Honor, some children, PMC children
23   who are housed in some HCS group homes are, when they're
24   alleged to have been abused and neglected, the subject of
25   investigation by CPI.  Provider Investigations does not
```

1    investigate all allegations of abuse and neglect of children in

2    all HCS homes.

3            There is certainly a lot of confusion between those

4    two divisions about that.  And at times that we have

5    documented, PI will establish that it does not have

6    jurisdiction and then will move the case over to CPI.  CPI will

7    in some instances say, "We don't have jurisdiction either."

8    And those two agencies are working to sort that out.

9            That is included in a number of the cases that we

10   investigated and will be part of our comprehensive monitoring

11   report in January as well.

12            THE COURT:  Okay.

13            MR. YETTER:  That --

14            THE COURT:  So that is a critical issue.

15   BY MR. YETTER:

16   Q.   Is confusion -- is -- there's a lot of confusion in your

17   group, Provider Investigations, among who's supposed to

18   investigate what, isn't there?

19   A.   I think there may be confusion at times.

20   Q.   And providers, the facilities are confused, too, aren't

21   they?  Like, who's going to investigate me for this allegation

22   of abuse, neglect, and exploitation, true?

23   A.   I wouldn't be able to speak on what confuses providers,

24   sir.

25   Q.   Well, we know it because it's in this document.  Let's go

```
 1    to the next paragraph.
 2              THE COURT:  I'm sorry.  Wait a minute.  He said --
 3    you said you wouldn't know what?
 4              THE WITNESS:  I wouldn't know what would confuse a
 5    provider of --
 6              THE COURT:  Why wouldn't you know that?  Isn't
 7    that -- isn't that part of your job to know?
 8              THE WITNESS:  I suppose they could be confused about
 9    a number of things.  I --
10              THE COURT:  Well, if you're not investigating, would
11    that be confusing?
12              THE WITNESS:  I don't think I understand.
13              THE COURT:  Well, what we found out from the
14    Monitors' review is that some of the SWI call-ins or some of
15    the allegations of abuse, neglect, and exploitation -- we call
16    that ANE -- are not being investigated by you in these HCS
17    placements because you determined you don't have jurisdiction.
18    Do you know about that?
19              THE WITNESS:  I'm not aware of that, ma'am.
20              THE COURT:  Oh, my goodness.  Who would be aware of
21    that in your delegated-down-the-road department?
22              THE WITNESS:  It would be someone within our Provider
23    Investigations unit.
24              THE COURT:  Somebody in your department?
25              THE WITNESS:  Yes, ma'am.
```

```
 1              THE COURT:  But you don't know who?
 2              THE WITNESS:  I believe some of them may be here
 3    today.
 4              THE COURT:  Who would you think might know what
 5    happens to these children investigations where you say that you
 6    don't have jurisdiction?
 7              THE WITNESS:  I would think Jenny Crowson.
 8              THE COURT:  Okay.  Do you have a category in your
 9    reports that carries -- that says no investigations of these
10    because we don't think we have jurisdiction?
11              THE WITNESS:  I'm not sure, ma'am.  I don't know.
12    BY MR. YETTER:
13    Q.   You're the head of Provider Investigations, and you don't
14    know how you divide up investigations of allegations of abuse,
15    neglect, and exploitation of children in the homes that you're
16    covering; is that right?  You don't know?
17    A.   I may personally not know, but we do have staff within
18    Provider Investigations that my expectation is that they know.
19    Q.   Okay.  But you're the top guy.  How can you not know
20    something so important about something so basic as who's
21    supposed to investigate that allegation of abuse?  How can you
22    not know?
23    A.   So I oversee a fairly large division within the agency.
24              THE COURT:  And what's the -- and that is an excuse
25    for why?
```

```
1              THE WITNESS:  I'm not making an excuse, Your Honor,
2    but I have a lot of responsibility, a lot of areas that I
3    oversee.
4              THE COURT:  You're responsible for these children and
5    HCH -- or HCS.  You're responsible for them, for the
6    investigations of abuse, neglect, and exploitation.
7              THE WITNESS:  Your Honor --
8              THE COURT:  And you don't even keep records of the
9    ones you're not investigating, because you say you don't have
10   jurisdiction.
11             THE WITNESS:  Your Honor, I do not -- I don't believe
12   I said that we -- I don't keep records.
13             THE COURT:  You just don't know where they are?
14             THE WITNESS:  That is correct.
15             THE COURT:  Oh, my goodness.
16   BY MR. YETTER:
17   Q.   You know how important these investigations are, don't
18   you, Mr. Pahl?
19   A.   All of our investigations are important.
20   Q.   Because children's lives and safety are at stake, right?
21   A.   I would agree.
22   Q.   And if you don't do an investigation or if you do a poor
23   investigation, a child can stay in a situation that puts his or
24   her life and health and safety at risk, true?
25             THE COURT:  Is this a hard question?
```

1    A.    I would say that's true.

2    Q.    Of course it's true.  That's -- you know how important

3    these investigations are.

4          Now, one last point before we move on to some of the

5    steps you've taken.  Everybody's confused.

6          Let's go to the next paragraph, the last sentence.

7          You know what providers think because it's in your

8    documents.  Providers -- that last sentence.  Wait a minute.

9    It's the second to the bottom, "this law addresses."  Sorry.  I

10   gave you the wrong paragraph.

11         The last sentence, "Providers."  That's the

12   facilities, the caregivers, true?

13   A.    Yes, sir.

14   Q.    "Have long voiced concerns about staff from both agencies

15   conducting dual investigations based on different sets of

16   statutes and regulations, which creates confusion and lengthens

17   the time agency staff are on site."

18         So the providers are confused and concerned, right?

19   A.    That's what it says, yes, sir.

20   Q.    Now, one of the steps that your group, Provider

21   Investigations, has taken given this big backlog and untimely

22   investigations, is to come up with more so-called efficient

23   procedures for investigations, right?

24   A.    Correct.

25   Q.    And one of the more efficient procedures that you just

1   came up with starting this year is to no longer explain -- to

2   have the investigator not explain why they came up with a

3   finding of unconfirmed or inconclusive in response to an

4   allegation of abuse, neglect, and exploitation.  You know that

5   new policy, don't you?

6   A.   I have been shown that policy.

7   Q.   Sure.  Plaintiffs' Exhibit 6 is a new policy.  And we see

8   the date right at the top.  Do you see the date?  When did it

9   go into effect?

10  A.   June 1, 2023.

11  Q.   So five months ago, maybe six months ago, right?  True?

12  A.   True.

13  Q.   And you've got this backlog, and you're not doing timely

14  investigations, and you're supposed to be very concerned about

15  accurate, thorough investigations.  And you come up with a new

16  policy June 1, 2023, right?

17  A.   Yes, sir.

18  Q.   And the new policy -- if we go down to the bottom of the

19  page, "procedures," the first paragraph -- there is a part of

20  an investigative report where the investigator, having done a

21  careful, thorough, accurate investigation, explains the

22  evidence.  There is a part of the report that does that, true?

23  A.   That's correct.

24  Q.   Okay.  But now the new policy in the first sentence says,

25  "when the evidence demonstrates an unconfirmed or inconclusive

1    finding, the investigator will no longer explain how the

2    evidence does or does not satisfy the element when documenting

3    the analysis of evidence," right?

4             That's the new policy that Provider Investigations,

5    HHSC, just adopted a few months ago, true?

6    A.   That is true.

7    Q.   So basically you have an allegation of abuse, neglect, or

8    exploitation.  The investigator looks at the evidence and

9    determines, "I can't confirm it, I'm inconclusive, but I'm not

10   going to explain why," true?

11   A.   That's what it says.

12   Q.   And so no supervisor could look at that report and figure

13   out, well, is it a good conclusion or not, because there's no

14   explanation, right?

15   A.   I'm not sure about that.

16   Q.   Well, let's look at some of the examples.  Let's go to

17   page 3 of Plaintiffs' Exhibit 6.  And you give the investigator

18   an example and -- the one category, the second -- the first

19   sentence that's not cut out says, "The evidence does not show."

20   This is the conclusion that the investigator comes up with.

21            Just do the whole thing.

22            If it's inconclusive or unconfirmed.  "The evidence

23   does not show the act or omission caused, could have caused, or

24   placed the individual receiving services at risk of physical or

25   emotional injury or death."

```
 1              Do you see that?
 2   A.   I do.
 3   Q.   That's on the form, true?  That the investigator fills
 4   out, right?  True?
 5   A.   I'm not understanding your question about the form the
 6   investigator fills out.  Could you explain that?
 7   Q.   Yeah, there --
 8              THE COURT:  Whose form is that, sir?
 9              THE WITNESS:  I'm not sure that I'm familiar with the
10   form that --
11              THE COURT:  Where did you get the form, Mr. Yetter?
12              MR. YETTER:  This is in their document.  And they're
13   telling the investigators how to implement the new policy --
14              THE COURT:  So it's an HHSC form?
15              MR. YETTER:  Yes.  It's a Provider Investigations
16   form.
17              THE COURT:  Is it your form?  Do you know what the
18   forms are that you use?
19              THE WITNESS:  I'm not sure in this instance what form
20   we're talking about.
21              THE COURT:  Well, look at it.
22              Could you show it to him, Mr. Yetter?
23              MR. YETTER:  Yes.
24   BY MR. YETTER:
25   Q.   Let's go to --
```

1          MR. ADAMS:  Your Honor, may I clarify for the record?

2          THE COURT:  Your client can do that.  Did you have an

3     objection?

4          MR. YETTER:  Your Honor, may I approach the witness?

5          THE COURT:  Yes.

6          MR. ADAMS:  I do have an objection, Your Honor.  The

7     question is vague to begin with and compound and

8     mischaracterizes what the actual document is.  I have no

9     objection to the document, of discussing it.  It's not the form

10    itself.  And I think that's part of the confusion.  He may have

11    the form --

12         THE COURT:  I don't understand your objection, so I'm

13    going to have to overrule it, because I don't -- your objection

14    is compounding and confusing.

15         MR. ADAMS:  May I clarify the objection, Your Honor?

16         THE COURT:  Why don't we just let him clarify the

17    form.  Would that be helpful?

18         MR. ADAMS:  If there's a new question, that might

19    help, Your Honor.  Thank you.

20         THE COURT:  Okay.

21    BY MR. YETTER:

22    Q.   Okay.  Mr. Pahl, we just -- I just gave you a notebook.

23    We're in tab 2.  This is an HHSC document, is it not?

24         Let's go to page 1 at the top.  You see HHSC, true?

25    A.   What page are you on, Mr. Yetter?

```
 1   Q.   Tab 2, the first page.
 2   A.   Okay.
 3            THE COURT:  Is this Plaintiffs' Exhibit 6?
 4            MR. YETTER:  Plaintiffs' Exhibit 6, yes.  Sorry.
 5   BY MR. YETTER:
 6   Q.   This is a temporary management directive for, quote,
 7   efficient investigative procedures, right?
 8   A.   That's what it says, yes, sir.
 9   Q.   Okay.  And it is going to take effect June 1, 2023, true?
10   A.   That's what it says.
11   Q.   And investigators in the background part, the second
12   paragraph says investigators will immediately begin using the
13   new procedures, right?
14   A.   That's what it says, yes, sir.
15            THE COURT:  Okay.  When you say that's what it says,
16   are you not familiar with any of this?
17            THE WITNESS:  I'm not familiar with all of our
18   policies and procedures.
19            THE COURT:  This is your department.  Why would you
20   not be familiar with the policies and procedures?  Don't you
21   promulgate them and approve of them?
22            THE WITNESS:  Not all policies and procedures, ma'am.
23   BY MR. YETTER:
24   Q.   Well, this is a pretty important one.  This is the result
25   of an investigation that is supposed to be complete, accurate,
```

1    and thorough, right?  This is the report, true?

2    A.   Yes, sir.

3    Q.   So reports are pretty critical for the children at risk,

4    aren't they?

5    A.   Yes, sir.

6    Q.   And this report, this new policy says the reports -- let's

7    go to the bottom of page 1 of the Plaintiffs' Exhibit Number 6.

8    It tells the investigator what to do.  The investigator will

9    continue including the Texas Administrative Code definition,

10   allegation header, et cetera, et cetera, right?

11            And let's go on to page 2 at the top.

12            Then it says, the areas, the very second sentence,

13   the -- the first full paragraph, the areas the investigator

14   will no longer include are crossed out, right?

15            So the document is telling the investigator this is

16   what you no longer need to put into your reports?

17   A.   It appears so, yes, sir.

18   Q.   Okay.  And in the critical analysis of evidence, that's

19   the next -- the next heading, right there, analysis of

20   evidence, it has various elements.  And the elements after

21   they -- after you repeat the Texas law, the elements are at the

22   bottom.

23            Let's go to the bottom.  There we go.

24            The first element, the alleged perpetrator was a

25   direct provider.  That's an element, true?  That's a finding?

```
 1   A.   True.
 2   Q.   Okay.  But the explanation, you're telling your
 3   investigators, leave it out.  That's why it's crossed out
 4   there.  True?
 5   A.   Yes, sir.
 6   Q.   Okay.  The next element, next finding, the alleged victim
 7   was an individual receiving services, right?
 8   A.   Yes.
 9   Q.   Leave out the explanation.  True?
10   A.   That's correct.
11   Q.   Now, page 3.  The critical finding of whether there was
12   abuse, and in this case that there does not show abuse, leave
13   out all the explanation, right?
14   A.   It appears so, yes, sir.
15   Q.   Okay.  So if you are a supervisor -- if this investigator
16   has a supervisor and the supervisor is supposed to check on the
17   accuracy of the investigation, the supervisor has nothing to
18   read to check the accuracy, right?
19   A.   I'm not sure.
20   Q.   And if you have some sort of audit group in Provider
21   Investigations that is supposed to go back and look to see, are
22   these investigations being done properly, the auditors have
23   nothing to read for inconclusive or unconfirmed findings,
24   right?
25   A.   I'm not sure that that's true.
```

```
 1   Q.   Well, all you have is the findings.  You have no
 2   explanation.  They have no explanation to read.  True?
 3   A.   Yes, true.
 4   Q.   Okay.  And you know that the Monitors had tremendous
 5   concerns because so many Provider Investigations came out to be
 6   unconfirmed or inconclusive, right?
 7   A.   That's what the reports indicated.
 8   Q.   Inaccurately.  True?
 9   A.   Can you repeat that question?
10   Q.   Sure.  The Monitors said those conclusions were wrong.
11   A.   That's what the report said.
12   Q.   Okay.
13            THE COURT:  Okay.  Did you -- I didn't see any
14   disagreement with any of those.
15            THE WITNESS:  I have no disagreement.
16            THE COURT:  Okay.  You could have done a better job
17   with your resources, couldn't you?
18            THE WITNESS:  Your Honor, we have areas --
19            THE COURT:  Just -- this is -- you could have done a
20   better job for these children.  You read about these children.
21            THE WITNESS:  I did read about them.
22            THE COURT:  You could have done a better job with
23   your resources at hand, couldn't you?
24            THE WITNESS:  We're striving to do a better job now.
25            THE COURT:  Could you have done a better job for
```

```
 1    these children with the resources you had at hand?
 2              THE WITNESS:  I would hope so, yes, ma'am.
 3              THE COURT:  You know so, don't you?
 4              THE WITNESS:  We're always striving to do the best
 5    that we can.
 6              THE COURT:  I know what you're striving to do, but
 7    you read what happened to these children.
 8              THE WITNESS:  I did read what happened.
 9              THE COURT:  Could you have done a better job with
10    these children with the resources at hand?
11              You want me to read out loud Child C's background?
12              MR. YETTER:  We're going to get to that, Your Honor.
13              THE COURT:  Could you -- can you answer my question?
14    Could you have done a better job for these children with the
15    resources you had at hand?
16              THE WITNESS:  I think we can always --
17              THE COURT:  Could you have done a better job?
18              THE WITNESS:  Yes, ma'am.
19              THE COURT:  Okay.
20    BY MR. YETTER:
21    Q.   Now, children are not going to be safer if investigators
22    leave out all the explanations for their findings, are they?
23    A.   I don't know if I agree with that.
24    Q.   How does it make children safer for the investigators not
25    to explain their findings?
```

```
 1   A.    Could you go back to your original question?
 2   Q.    Sure.  How does -- I'm going to ask the question I just
 3   asked.  How does it make children safer for investigators not
 4   to explain their findings?
 5   A.    I suppose it doesn't.
 6   Q.    All right.  Now, delay can be extremely dangerous for
 7   children who make allegations, who make outcries of abuse and
 8   neglect and exploitation, can't it?
 9   A.    Could you repeat that, please?
10   Q.    Sure.  Delay in investigating an outcry of abuse, neglect,
11   and exploitation can be extremely damaging to children,
12   can't it?
13   A.    I would agree.
14   Q.    And do you know today and for every month that you have
15   been Deputy Executive Commissioner for the Regulatory Services
16   Division of HHSC, Provider Investigations have been backlogged
17   and delayed by months.  You know that, don't you?
18   A.    Yes, sir.
19   Q.    That's dangerous for children, isn't it?
20   A.    It can be, yes, sir.
21   Q.    It is dangerous for children to delay investigating their
22   outcries, isn't it?
23   A.    I would agree that it can be, yes, sir.
24   Q.    Can you --
25             THE COURT:  Well, all right.  Let's just say this.
```

1   Let's look at Child C.  How dangerous was your delay in that to

2   her?

3   BY MR. YETTER:

4   Q.   Do you remember Child C, broke her jaw in two places?

5   Twelve -- twelve --

6           THE COURT:  Twelve.  Twelve outcries --

7           MR. YETTER:  -- outcry.

8           THE COURT:  -- with no findings, ongoing delayed

9   investigations without any -- without any written extension,

10  and finally she was dumped in an emergency room with a broken

11  jaw in two places.

12          MR. YETTER:  By herself.

13          THE COURT:  By herself.

14          Now, how -- do you think she might have been damaged

15  by your delays?

16          THE WITNESS:  It's possible, ma'am.

17          THE COURT:  It's possible?  With a broken jaw?  Was

18  that just, what, a childhood accident?

19          You know she complained that she was raped by a staff

20  member and pointed it out, and that same staff member was

21  convicted of raping his stepdaughter.  Did you know that?

22          THE WITNESS:  I've read the report, yes, ma'am.

23          THE COURT:  And you never made any findings that that

24  was true for her, did you?

25          THE WITNESS:  No, ma'am.

```
 1                    THE COURT:  Okay.  So what did the -- what do you
 2    think the delay -- she stayed in that same place the whole time
 3    until she was dumped at the hospital with a broken jaw, alone.
 4                    Now, what do you think the delay of all your
 5    investigations -- how do you think that affected Child C?
 6                    THE WITNESS:  I would say that it did not affect the
 7    child positively.
 8                    THE COURT:  Oh, my.
 9    BY MR. YETTER:
10    Q.   It hurt her.  It hurt that child, didn't it?
11                    THE COURT:  Is this really hard for you to admit when
12    there are problems?
13                    THE WITNESS:  No, ma'am.  We've identified problems,
14    and we are working hard to address those problems.
15                    THE COURT:  Okay.
16    BY MR. YETTER:
17    Q.   Well, one of the only changes that I've -- we've seen is
18    this new change where investigators no longer explain their
19    findings if it's inconclusive or unconfirmed.  That's one of
20    the changes, right?
21    A.   It's one of many changes, yes.
22    Q.   Okay.  We'll get to these many changes, but that's one of
23    the changes, and you're sticking to it.  You're not -- you
24    haven't abandoned that, right?
25    A.   Correct.
```

1    Q.   Now, this child who had her jaw broken in two places

2    because she was repeatedly hit in the -- with a fist of a staff

3    member, her investigation took nine months to come to a

4    finding.  You know that?

5              THE COURT:  And she stayed in the same place all the

6    time until she broke -- got the broken jaw.

7    BY MR. YETTER:

8    Q.   As did the alleged perpetrator until she was moved out.

9    You know that, right?

10   A.   That's my recollection, yes, sir.

11   Q.   And at the end of the nine months, do you remember what

12   the conclusion, the finding was of this child that ended up in

13   the hospital with a broken jaw in two places, by herself?

14   A.   Not specifically, I don't recall.

15   Q.   They found -- they didn't -- your group, Provider

16   Investigations, didn't conclude that there had been abuse and

17   neglect.  They didn't know.

18             THE COURT:  You don't know what --

19   BY MR. YETTER:

20   Q.   Did you see that?

21             THE COURT:  -- any of the results of these

22   investigations are for these children outlined in the Monitors'

23   report for the PI -- for your PI investigations?

24             THE WITNESS:  I know that we've looked into all of

25   these investigations.  My team has reviewed them.  I don't

1    recall what all the outcomes are for all these investigations,
2    Your Honor.
3            THE COURT:  Well, there weren't that many in the
4    report.  And you don't know, recall.
5            I'm sorry, Mr. Yetter.  I keep interrupting you.
6            MR. YETTER:  No, that's okay.
7    BY MR. YETTER:
8    Q.   And you know -- did you -- when you checked onto poor
9    Child Number C -- poor Child C, broken jaw in two places, 11
10   other outcries of abuse, do you know that when the Monitors
11   went to look at the investigative report there was no
12   explanation of the findings of the investigative activity?
13   A.   I recall reading that in the report, yes.
14   Q.   And that, of course, is your new policy in Provider
15   Investigations, isn't it?  Don't explain what you find if it's
16   inconclusive or unconfirmed, right?
17   A.   Correct.
18   Q.   I guess if you never explain, you can't be second-guessed.
19   Is that the purpose?
20   A.   No, sir.
21           THE COURT:  What was the purpose?
22   BY MR. YETTER:
23   Q.   What's the good purpose for not letting them -- not
24   explaining?
25   A.   I don't know.

```
 1  Q.   Okay.
 2            THE COURT:  Well, aren't you in charge of this?
 3            THE WITNESS:  Yes, ma'am.
 4            THE COURT:  Well, how did that line get in there,
 5  don't explain your findings?
 6            THE WITNESS:  I don't know.
 7            THE COURT:  You don't have a clue?
 8            THE WITNESS:  I don't know how it got in the --
 9            THE COURT:  Okay.
10            MR. YETTER:  All right.
11            THE COURT:  Who came up with the policy, don't record
12  the children's statements?
13            THE WITNESS:  It would have been someone within my
14  Provider Investigations unit.
15            THE COURT:  And did you approve, though?  Don't you
16  approve those kind of things?
17            THE WITNESS:  I don't approve -- I don't approve all
18  policies and procedures within --
19            THE COURT:  Isn't that a biggie?
20            THE WITNESS:  I'm sorry, ma'am?
21            THE COURT:  Isn't that a big issue?
22            THE WITNESS:  A big issue?
23            THE COURT:  Yes.
24            THE WITNESS:  Would you mind -- would you repeat the
25  question, ma'am?
```

1          THE COURT:  Sure.  Isn't it a big issue that your

2    investigators do not record the conversations we -- that they

3    have with the victims of this abuse?

4          THE WITNESS:  I'm not sure.

5          THE COURT:  You're not sure?

6          THE WITNESS:  (Indicating in the negative)

7          THE COURT:  Why would that be?  How could you not be

8    sure about something like that?

9          THE WITNESS:  I don't know all the reasonings that go

10   into --

11         THE COURT:  And you investigated the reasons that go

12   into make a determination of when these investigations -- DFPS,

13   don't they, Mr. Ryan -- doesn't DFPS record their

14   investigations with the children?

15         MR. RYAN:  Yes, most of them, Your Honor.

16         THE COURT:  Okay.  All right.  And not only do you

17   not record them, but -- so we don't have any evidence of any

18   way to determine when your investigators say the child

19   contradicted herself or himself, whether that actually

20   happened, number one.  And number two, we also don't have any

21   evidence or any indication of what special services your

22   investigators used to interview these children, do we?  No

23   recordation of any -- anything like that, do we?

24         Many of these children require assistance with

25   special educators and translators, don't they?

1            THE WITNESS:  Some of them do, yes, ma'am.

2            THE COURT:  And we don't have any indication that

3    your investigators ever used any of that, do we, any of those

4    assistance?

5            THE WITNESS:  I'm not sure that I understand the

6    question, Your Honor.

7            THE COURT:  Well, that's sad.

8            How would we know whether your investigators used any

9    of these -- any of these available assistance to them in

10   investigating these -- in interviewing the child?

11           THE WITNESS:  It would need to be documented.

12           THE COURT:  Where?

13           THE WITNESS:  I suppose in the report.

14           THE COURT:  Are you sure it's documented?  Do you

15   know -- have you ever seen one?

16           Mr. Ryan, do you have any documentation that anybody

17   used in any of these 69 special assistance?

18           MR. RYAN:  There was no evidence in the record in any

19   of the 69 cases.

20           THE COURT:  None of any kind.  Are you -- does that

21   surprise you, sir?

22           You seem unable to answer any of these questions.

23   Are you surprised that there's no evidence in the reports of

24   special assistance to communicate with these children?

25           THE WITNESS:  I don't say that I -- I wouldn't say

 1    that I was -- that I'm surprised.

 2              THE COURT:  Apparently not.

 3              Well, do you -- do you have these services available

 4    to your investigators?

 5              THE WITNESS:  Interpretation services?

 6              THE COURT:  Well, how to talk to a mentally

 7    challenged child?

 8              THE WITNESS:  We have policies and procedures that

 9    lay out when and how investigations are conducted, including

10    instances where children may have difficulty communicating.

11              THE COURT:  Do you know if any of these were followed

12    with these children who had IQs of 40 and 50?

13              THE WITNESS:  My expectation is that all of our

14    policies and procedures are followed.

15              THE COURT:  Well, you told me that if they had been

16    followed they would have been documented, so I'll take that as

17    your answer.  Is that correct?

18              THE WITNESS:  If that's what the policy calls for.

19              THE COURT:  Does it?

20              THE WITNESS:  I'm not sure.

21              THE COURT:  Oh, my goodness gracious.

22              Okay.  So do you know that most of these interviews

23    were done by telephone?

24              Is that right, Mr. Ryan?

25              MR. RYAN:  Yes, Your Honor, many of the interviews

```
 1  were conducted by phone, and many of them were many months
 2  after the events had taken place.
 3              THE COURT:  Did you know that?
 4              THE WITNESS:  I read that in the report, yes, ma'am.
 5              THE COURT:  And what's your response to that?  Is
 6  that an adequate investigation?  Is this hard for you?
 7              THE WITNESS:  I would say that each investigation is
 8  different.
 9              THE COURT:  Months delayed to talk to the child.  Is
10  that adequate?
11              THE WITNESS:  I would say no.
12              THE COURT:  Okay.
13  BY MR. YETTER:
14  Q.   Well, you know that the Court's Remedial Orders require
15  either 24-hour face-to-face interviews or 72-hour face-to-face
16  interviews.  You know that, right?
17  A.   Yes, sir.
18  Q.   So if it's months late, it's completely in violation of
19  the Court's Remedial Orders, right?
20  A.   That's correct.
21  Q.   And it's dangerous for the child?
22  A.   It can be, yes, sir.
23              THE COURT:  Well, it turned out to be dangerous,
24  didn't it?  Can you answer that?  Just look at Child C.  It was
25  dangerous.  The delays were dangerous to her, weren't they?
```

1           THE WITNESS:  It appears so, yes, ma'am.

2           THE COURT:  They kept her in a dangerous placement

3    for a year after 12 outcries, didn't it?

4           THE WITNESS:  It appears so, yes, ma'am.

5    BY MR. YETTER:

6    Q.   And you know the facility she was in eventually was shut

7    down by the State, and yet she was in there for nine months

8    while the investigation of her broken jaw took place, right?

9    A.   Correct.

10   Q.   Now, you told us if it --

11          THE COURT:  Wait.  I think, Mr. Yetter, that she was

12   never put back there after the hospitalization for the broken

13   jaw.  She was in -- she was in the whole time before that with

14   the rape and the physical abuse and all the other outcries she

15   made that no one believed.

16          MR. YETTER:  Excuse me.  I correct that.  I stand

17   corrected.

18   BY MR. YETTER:

19   Q.   Now, let me -- before we leave this new policy of no

20   explanations, can you think of any good child safety reason for

21   this new policy of no explanations?

22   A.   Sitting here today, I can't think of any.

23          THE COURT:  Do what?

24          THE WITNESS:  Sitting here today, I can't think of

25   any, Your Honor.

```
 1              THE COURT:  Okay.
 2   BY MR. YETTER:
 3   Q.   Now, you don't know whether there's anything in this form,
 4   especially after your new policy of no explanations, that would
 5   indicate or tell the investigator make sure you are clear and
 6   you write down that you used a expert resource to communicate
 7   with a child who has communication difficulties.  There's
 8   nothing in the form that you're aware of on that, is there?
 9   A.   Not that I'm aware of.
10   Q.   Okay.  Now, one of the things also in the forms that
11   Provider Investigations does is nothing about the history of
12   the facility where the allegation of -- where the outcry of
13   abuse, neglect, and exploitation took place, right?
14   A.   Would you mind repeating that, please, sir?
15   Q.   Sure.  Like, one of things when you're doing an
16   investigation in your group, one of the things you don't look
17   at is the track record of the facility where the outcry
18   occurred?
19              THE COURT:  Did you -- did you find that hard -- do
20   you not know the answer to that?
21              THE WITNESS:  Yes, Your Honor, I do know the answer
22   to that.
23   BY MR. YETTER:
24   Q.   The history of the operation, that's not part of your
25   investigations in your group, is it?
```

```
 1   A.   That's one of the changes that we're making, and we are --
 2             THE COURT:  when are you making that?
 3             THE WITNESS:  I believe that has already gone into
 4   effect, but I'll have to check with my staff to make sure.
 5             THE COURT:  But you're not sure?
 6             THE WITNESS:  Yes, ma'am.
 7             THE COURT:  Okay.  But you knew it wasn't in effect
 8   during all these cases reported by the Monitors, that you did
 9   not check the history of the facility?
10             THE WITNESS:  That's true.
11             THE COURT:  What -- oh, my goodness.
12   BY MR. YETTER:
13   Q.   And as far as you know, for the eight years that these
14   investigations have been done by Provider Investigations, the
15   agency, HHSC, DFPS before then, never looked at the track
16   record, the history of the operation at which the alleged
17   abuse, neglect, and exploitation occurred, right?  Never
18   looked.  True?
19   A.   Within Provider Investigations?
20   Q.   Yes.  Yes.
21   A.   That's true.  They're focused on the perpetrator.
22   Q.   Okay.  But you know that the track record of the operation
23   is relevant when you're investigating an outcry of abuse, isn't
24   it?
25   A.   Would you mind repeating the question?
```

1    Q.   You know that it's relevant, it's important to know the

2    track record of the facility, the operation where the abuse,

3    the alleged abuse took place?  That's relevant, isn't it?

4    A.   Yes, sir.

5    Q.   Because you tell your investigators it's relevant, but

6    then you tell them don't look for it, don't you?

7    A.   According to this policy, yes, sir.

8           THE COURT:  Well, it's your policy, isn't it?  Aren't

9    you in charge of this?  I mean, why don't you know about your

10   own policies for these children, for the safety of these

11   children?

12          Is this difficult -- why is this so hard for you?

13   Because you feel responsible?

14          THE WITNESS:  I am responsible, ma'am, for --

15          THE COURT:  I know.

16   BY MR. YETTER:

17   Q.   These are children's lives that you are responsible for.

18   You know that, don't you?

19          THE COURT:  One other thing I understood is that

20   these children -- you didn't -- you didn't have your

21   investigators check to make sure these staff had criminal

22   history backgrounds even after the rape -- this Child C accused

23   and identified a staff member of rape.  You did not have your

24   staff check for the -- make sure they had criminal history

25   background checks.  Did you know that?

1            THE WITNESS:  I read that in the report, yes, ma'am.

2            THE COURT:  Is that true?

3            THE WITNESS:  I believe that's true.

4            THE COURT:  Okay.

5      BY MR. YETTER:

6      Q.   So you don't look at the facilities' track record, history

7      of abuse.  You don't look at the perpetrator's criminal

8      history.  That's dangerous for children, isn't it, Mr. Pahl?

9            MR. ADAMS:  Your Honor, I would like to lodge an

10     objection to the question.

11           THE COURT:  Sure.

12           MR. ADAMS:  Are we talking specifically about

13     Provider Investigations?

14           THE COURT:  We are.  At this point, we're at that

15     particular -- all of my questions and all of Mr. Yetter's

16     questions have been in the confines of the Monitors' report for

17     the PI at the HCS placements.

18           MR. ADAMS:  Thank you, Your Honor.

19           THE COURT:  Thank you for that clarification.  And

20     it's true, we kind of -- everybody kind of jumps around in

21     these things.

22           MR. ADAMS:  And understand --

23           THE COURT:  So we're focusing on that.  And, again, I

24     reiterate that this is a -- affects 100 percent of that

25     subgroup of PMC children that are in HCS placements.

```
 1              MR. ADAMS:  And thank you, Your Honor.  So
 2   Mr. Yetter's questions about "your people," "your groups,"
 3   those things, that was the issue with my objection.
 4              THE COURT:  That's my understanding.
 5              Is that right, Mr. Yetter?
 6              MR. YETTER:  Yes.  I'll repeat it.
 7   BY MR. YETTER:
 8   Q.   Your group in Provider Investigations -- are you with me?
 9   A.   Yes, sir.
10              THE COURT:  Now, just to be clear for the record, I
11   understand that Provider Investigations is a special unit under
12   this man for investigating, A, abuse, neglect, and --
13              MR. YETTER:  Exploitation.
14              THE COURT:  -- exploitation complaints from HCSs.
15   BY MR. YETTER:
16   Q.   Among other facilities.  But HCS group homes, right?
17              MR. ADAMS:  Your Honor, is that a question at all
18   directed to me?  I don't want to leave the record --
19              THE COURT:  No, no.  I'm trying to clarify with
20   Mr. Yetter.  And, yes, they were all clear about this, that now
21   the conversation is on HCS provider investigators under the
22   this gentleman.
23              MR. ADAMS:  Yes, Your Honor.  But what I don't want
24   to leave is anything unclear in the record that -- we are
25   talking about Provider Investigations.  That's fine.  I don't
```

```
 1    want this to appear that this is the exclusive realm of
 2    anything in the Long Term Care Regulatory Division that
 3    addresses complaints about providers.  There will be evidence,
 4    I expect, that's presented during this hearing from other units
 5    that deal with --
 6              THE COURT:  Well, I thought you didn't have any
 7    plans.
 8              MR. ADAMS:  Your Honor --
 9              THE COURT:  Gotcha on that one.
10              MR. ADAMS:  And I may regret it.
11              THE COURT:  Okay.  Go ahead.
12              MR. ADAMS:  Thank you, Your Honor.
13    BY MR. YETTER:
14    Q.   Okay.  Let's just -- because I know -- I believe I know
15    where counsel is going.  But let's just make it very clear,
16    Mr. Pahl.  Your group, Provider Investigations, is
17    investigating specific allegations of abuse, neglect, and
18    exploitation, right, at HCS homes, group homes, among other
19    facilities?
20    A.   That's correct.
21    Q.   And your group, Provider Investigations, doesn't look at
22    the track record of abuses by the facility?
23    A.   That's true for the past, yes.
24    Q.   And don't look at the criminal record of the alleged
25    perpetrator?
```

```
 1   A.   That's true for the past, yes, sir.
 2   Q.   And the -- you know that's relevant information to that
 3   investigation about a specific outcry of abuse, neglect, and
 4   exploitation, isn't it?  It's relevant information?
 5   A.   It is relevant.
 6            MR. YETTER:  And, Your Honor, very quickly, tab
 7   number 8, Plaintiffs' Exhibit 7.
 8   BY MR. YETTER:
 9   Q.   It's in your handbook that it's relevant, isn't it?
10            There's your handbook.  True?
11   A.   This is our handbook.
12   Q.   Let's go to page 75 of the document at the top paragraph.
13            Now, you said you just changed this, but this one
14   says it was revised in October 2023, true?
15   A.   You referenced page 75.  This is 74.
16   Q.   Well, it is 75 of the document.  It's page 74 marked on
17   that page, but the --
18   A.   Oh, gotcha.
19   Q.   -- exhibit is page 75.
20            So just six weeks ago, it says, "when reviewing
21   principal case history, it is possible that the history of the
22   provider agency may be relevant in a case, as well as the
23   alleged perpetrator's and victim's history with previous
24   providers."  Do you see where I'm reading?
25   A.   Yes, I do.
```

```
 1   Q.   And then you say, "However, the current provider agency
 2   may not have the legal right to information from prior cases in
 3   other settings, which affects how information can be used in
 4   the current case."  Right?  That's six weeks ago.
 5   A.   Correct.
 6   Q.   So you're saying it's -- it can be relevant, but we're not
 7   going to let you look for it, true?
 8   A.   I don't know if I'd agree with that.
 9   Q.   Well, that's -- you're telling them you may not have the
10   legal right to that information.
11   A.   Oh, I see where you're going.
12   Q.   So you're saying don't look for it, right?  That's the
13   policy?
14   A.   Unless we have the legal right to do so.
15          THE COURT:  Well, what would that mean to you?
16   Explain that to me.
17          THE WITNESS:  I'm not --
18          THE COURT:  Where did you get that language, the
19   legal right?
20          THE WITNESS:  I'm -- I'm not sure where that language
21   comes from.  These policies and procedures are vetted with our
22   legal staff.
23          THE COURT:  Who is that?
24          THE WITNESS:  We have staff attorneys -- I don't know
25   them by name -- that work at HHSC and support the programs.  I
```

```
 1    can't recall the name of the lawyer that would have worked on
 2    this.
 3              THE COURT:  Well, who told you what that meant?  I
 4    mean -- Okay.  I don't want to get into an attorney-client
 5    thing here, but I'd like to know what -- what you understood
 6    that language to mean.  How's that?
 7              MR. ADAMS:  Your Honor, I instruct the witness not to
 8    divulge attorney-client privileged communications.  To the
 9    extent he's capable of answering that question --
10              THE COURT:  Yeah.
11              MR. ADAMS:  I'm not sure he is.
12              THE COURT:  Do you know what that -- what does that
13    mean to you?  When you train your staff, what does that
14    language mean to you?
15              THE WITNESS:  It means that they can't obtain the
16    information if they don't have a legal right to the
17    information.
18              THE COURT:  What gives -- I don't understand what --
19    what does that mean to you?  When you teach them about
20    obtaining information, what are the parameters of the legal
21    rights that you understand?
22              THE WITNESS:  I mean, I don't teach them the policies
23    and procedures.
24              THE COURT:  who does?
25              THE WITNESS:  Training specialists within my PI --
```

```
 1                THE COURT:  Who are those people?
 2                THE WITNESS:  I don't know their names.
 3                THE COURT:  Oh, my goodness.
 4                THE WITNESS:  It's a big organization.  I don't
 5     know --
 6                THE COURT:  How many staff do you have?
 7                THE WITNESS:  In my division, I have 2,500 staff.
 8                THE COURT:  Okay.  And how many do you have in your
 9     PI department?
10                THE WITNESS:  I'm going say approximately a hundred,
11     which falls --
12                THE COURT:  Okay.  So that -- we're limiting to a
13     hundred of your 2,500, right, for this part of the hearing?
14                Is that right, Mr. Yetter?
15                MR. YETTER:  Yes.
16     BY MR. YETTER:
17     Q.   This -- we're talking about Provider Investigations, not
18     the rest of your group.  This group is all we're talking about,
19     right?
20     A.   Correct.
21     Q.   Okay.  Is there a group that -- is there -- do you have
22     another group within your organization that audits the accuracy
23     of investigative findings by Provider Investigations?
24     A.   Yes, sir.
25     Q.   And what is the name of that group?
```

1    A.    It's our quality assurance unit within Long Term Care
2    Regulation.
3    Q.    Have you ever talked to them about whether it would help
4    them or not help them audit if they had an explanation from the
5    investigator?
6    A.    I have not asked them that.
7    Q.    Now, you know that when you read the Monitors' report of
8    September 19, 2023, about your group, Provider Investigations,
9    that the report demonstrated that Provider Investigations was
10   not in compliance with the Court's Remedial Orders,
11   specifically Remedial Order Number 3.  You know that, right?
12   A.    Would you mind saying that again, please?
13   Q.    Sure.  When you read the September 19, 2023 Monitors'
14   report, you concluded that it demonstrated, it showed that
15   Provider Investigations was not in compliance with Remedial
16   Order Number 3.  You know that, don't you?
17   A.    Yes, sir.
18   Q.    And you knew at the time that changes are necessary within
19   Provider Investigations to be in compliance, right?  You had to
20   make changes?
21   A.    We were putting changes in place prior to the Monitors'
22   report, sir.
23   Q.    Well, we've talked about one of them.  That was the
24   no-explanation policy change, true?
25   A.    True.

1    Q.   And you're not aware of any staff increases specifically

2    to address the backlog, are you?

3    A.   I'm not aware of any.

4    Q.   Are you aware of any changes to your auditing group to

5    make sure that the investigations are more accurate?

6    A.   Our Provider Investigations are going through our quality

7    assurance group now as they were not before.

8    Q.   So before, you didn't even have an auditing group?

9    A.   And we identified that issue, and we made a change as

10   soon --

11   Q.   Well, wait a minute.  Wait a minute.  First confirm for

12   eight years, since this Provider Investigations started, there

13   was not even an auditing group.  No one checked, right?

14   A.   So I've been here for about 28 months.  I don't know what

15   happened eight years ago.

16   Q.   You never heard of --

17            THE COURT:  You didn't look back?  I'm sorry.  You

18   don't have any -- you don't have any information about the

19   history of this?

20            THE WITNESS:  I'm not sure if they've -- if eight

21   years ago if they went through a quality assurance.

22            THE COURT:  Did you look and see when you took over

23   this department?

24            THE WITNESS:  No, I did not look.

25            THE COURT:  So you didn't even look in the history of

```
 1    your own department, let alone the history of these placement
 2    places?
 3               THE WITNESS:  Provider Investigations was not in our
 4    department, Your Honor, eight years ago.
 5    BY MR. YETTER:
 6    Q.   Okay.  But you never -- have you -- are you aware of there
 7    ever being an auditing or quality assurance function for
 8    Provider Investigations until you just came up with a new rule?
 9    A.   I personally am not aware of that.
10    Q.   Okay.  So you're not aware for eight years of any auditing
11    function at Provider Investigations?
12    A.   I'm not personally aware of any.
13    Q.   Did it occur to you that that was a pretty bad process?
14    A.   It's a process that we made improvements to, which we are
15    now moving investigations -- the review of investigations
16    through our quality assurance unit.
17    Q.   And when did that go into effect?
18    A.   I don't recall the exact date, but it was -- it's been
19    maybe a year ago.  I would have to look to make sure.
20    Q.   So it's -- well, where is it?  It's not in your provider
21    handbook, is it?
22    A.   I'm not sure if it is or if it isn't.
23    Q.   Okay.
24               THE COURT:  Where was Provider Services before it
25    came under your administration?  Provider Investigations?
```

1          THE WITNESS:  My understanding, it was before I was

2    employed at HHSC, but it was my understanding that it was at

3    one time at DFPS, and before that it was at the Department of

4    Aging and Disability Services, I believe, if -- but I would

5    have to go back and check to make sure.

6          THE COURT:  When you took over this section -- when?

7    28 months ago?

8          THE WITNESS:  Yes, ma'am.  In August of '21.

9          THE COURT:  Did you look into the history of the

10   productivity and the patterns and procedures of the Provider

11   Investigations?

12         THE WITNESS:  I personally did not look into --

13         THE COURT:  To see what you were getting, I mean?

14         THE WITNESS:  No, but I was apprised of some areas of

15   improvement that we needed to focus on.

16         THE COURT:  28 months ago?

17         THE WITNESS:  I don't know if it was exactly 28

18   months ago, but it was sometime after I was hired here.

19         THE COURT:  Say in the last year, in the last -- 12

20   months ago?

21         THE WITNESS:  I would say probably before that.

22         THE COURT:  What problems were you told about then?

23         THE WITNESS:  We had some timeliness issues with our

24   investigations.  We're moving to correct that.  We're

25   looking -- we've put in measures to track those better, moving

1    investigations through the quality assurance process to ensure

2    that they are thorough and well conducted, for example, Your

3    Honor.

4              THE COURT:  And what did you do when you found out

5    about those deficiencies?

6              THE WITNESS:  We put these measures in place, Your

7    Honor.

8              THE COURT:  What measures?  Don't tell anything?

9    Don't ask, don't tell?

10             THE WITNESS:  No.  We put a better tracking mechanism

11   in so we can track the timeliness of the inspections.  We put a

12   process -- or we have our Provider Investigations going through

13   our quality assurance process to make sure that those are

14   thorough and well-conducted investigations, as an example.

15   BY MR. YETTER:

16   Q.   Last topic, Mr. Pahl, and that is the related group, Long

17   Term Care Regulation.  That's the LTCR group within HHSC,

18   right?

19   A.   Yes, sir.

20   Q.   And that's something that you say you are partly

21   responsible for?

22   A.   That is one of the departments within my division.

23   Q.   And in the past year, that group has been -- that group

24   has been audited by the Texas Office of Inspector General, has

25   it not?

```
 1   A.   There was an audit conducted by the inspector general,
 2   yes, sir.
 3   Q.   It is tab 9 in your notebook, Plaintiffs' Exhibit 82.
 4        This is the report, the audit report by the Office of
 5   Inspector General of your group, Long Term Care Regulation,
 6   with regard to HCS homes, true?
 7   A.   Yes, sir.
 8   Q.   And the date is November the 22nd, 2020 [sic], almost
 9   exactly a year ago, right?
10   A.   That's correct.
11   Q.   Let's go to page 7 of the document, of the exhibit.
12        And the conclusion was not good, was it?
13   A.   It pointed out some deficiencies, yes, sir.
14   Q.   Yeah.  The conclusion was this group, another one of the
15   groups within your responsibility, Long Term Care Regulation,
16   did not consistently -- let's blow up -- there you go --
17   conduct residential reviews timely.  There's that big delay
18   issue again, right?
19   A.   The issue we've been striving to correct, yes, sir.
20   Q.   Or calculate residential review scores correctly, true?
21   A.   Again, the reason why we've put these investigations
22   through our quality assurance unit.
23   Q.   Or communicate with HCS providers, right?
24   A.   That's correct.
25   Q.   Or document follow-up?
```

```
1    A.   Again, the reason why we put this through our quality
2    assurance unit now.
3    Q.   So the Office of Inspector General is telling you, you
4    need to document better.  And after this comes out, you come up
5    with a no-explanation policy, right?
6    A.   Yes, sir.
7    Q.   And then lastly, "or ensure corrective action was taken to
8    resolve identified issues."
9         Those are all bad things for children, aren't they?
10   A.   They could be, yes, sir.
11   Q.   Because we know that there are over 600 HCS program
12   providers in the state of Texas, isn't there?  At least at the
13   time of this audit?
14   A.   At the time of the audit, yes, sir.
15   Q.   Let's go to page 10.  There's a box to the right,
16   "Contracted providers:  663.  Counties:  209."
17        Do you see where I'm reading?
18   A.   Yes, I do.
19   Q.   "Beneficiaries:  8,603.  Reimbursed claims:  $2.6
20   billion."  Right?
21   A.   That's what it says, yes, sir.
22   Q.   So all of these deficiencies, all of these negative
23   findings related to hundreds of HCS program providers across
24   the state from your department, right?
25   A.   Correct.
```

```
 1   Q.   You got this report, didn't you?
 2   A.   I've seen this report, yes.
 3   Q.   Mr. Pahl, thank you for your patience.
 4             MR. YETTER:  Your Honor, pass the witness.
 5             THE COURT:  Thank you.
 6             Would this be a good time to break for lunch, or what
 7   are y'all -- what is your pleasure?
 8             MR. ADAMS:  Your Honor, I don't -- I'm not going to
 9   answer that question in particular.  I'm just going to inform
10   you, I don't expect to spend more than about 20 --
11             THE COURT:  That's fine.
12             MR. ADAMS:  -- maybe half an hour with this witness.
13   I'm happy to do it whenever -- your convenience.
14             THE COURT:  Go ahead.  If you prefer to go now,
15   that's fine with me.
16             MR. ADAMS:  At the Court's convenience.
17             THE COURT:  You decide.
18             MR. ADAMS:  Thank you, Your Honor.  I'll proceed.
19             THE COURT:  Do you need some more water?
20             THE WITNESS:  I think this will do.  Thank you.
21             MR. ADAMS:  Your Honor, may I approach the witness
22   with a bottle of water?
23             THE COURT:  Sure.
24             MR. ADAMS:  Thank you.
25             THE WITNESS:  Appreciate that.  Thanks.
```

```
 1                      CROSS-EXAMINATION
 2    BY MR. ADAMS:
 3    Q.   Mr. Pahl, are you familiar with the Provider
 4    Investigations policies that apply to interviewing individuals
 5    that may have disabilities?
 6    A.   I'm not -- I'm not totally familiar with them, but I do
 7    know that they exist.
 8    Q.   All right.  Would you turn to page 71 of Plaintiffs'
 9    Exhibit 8 that was already in front of you?
10    A.   Exhibit page 71 or --
11    Q.   Excuse me.  I meant 79.  And the bottom, I guess it's
12    Exhibit 7-0080 at the very bottom in Exhibit 79.
13              So, for example, sir, are you familiar with the fact
14    that there are policies related to Children's Advocacy Centers?
15    A.   I am aware that there are policies.
16    Q.   But you don't know the details of the policies?
17    A.   Not the details, no, sir.
18    Q.   Even though there are policies that are specific to, for
19    example, Children's Advocacy Centers and dealing with
20    individuals with disabilities?
21    A.   I would say that's correct.
22    Q.   Okay.  So let me back up for a second, Mr. Pahl.
23              You mentioned that you're the -- is it the Deputy
24    Executive Commissioner?
25    A.   For the Regulatory Services Division, yes, sir.
```

1   Q.   For Regulatory Services.

2            And within your purview, what are the general groups

3   that report to you?

4   A.   Okay.  I have three what I would refer to as functional

5   departments.  One of them is the Long Term Care Regulatory

6   Department.  Another one is the Child Care Regulatory

7   Department.  And there -- I have a Health Care Regulation

8   Department.

9   Q.   Okay.  And so when we're talking about Provider

10  Investigations, that only falls within the one bucket of Long

11  Term Care Regulation; is that correct?

12  A.   That is correct.

13  Q.   Okay.  Within the purview of all these three categories,

14  though, how many facilities filter up to you that you generally

15  oversee?

16  A.   Facilities, in the neighborhood of 100,000 different

17  operations that we regulate.

18  Q.   Okay.  And within each of these categories --

19  A.   Excuse me.

20  Q.   Excuse me.

21  A.   That's not within Long Term Care Regulation.  That was in

22  total for the division.  I just want to make that correction.

23  Q.   Thank you, sir.

24            So it's about 100,000 facilities across these three

25  categories that you oversee?

1    A.    Approximately, yes, sir.

2    Q.    And within, for example, Health Care Regulation, are there

3    specific policies and procedures that apply to that category of

4    facilities?

5    A.    Yes, sir.

6    Q.    Okay.  And within Child Care Regulation, there are

7    specific policies and procedures that relate to that?

8    A.    Yes, sir.

9    Q.    And then we talked Long Term Care.  We know there's

10   policies and procedures that relate to that, right?

11   A.    That's correct.

12   Q.    Are you generally aware that there's voluminous policies

13   applicable to each?

14   A.    There are many policies, yes, sir.

15   Q.    Okay.  And within each of these categories, do you have a

16   person that reports to you?

17   A.    Yes.  Each of the departments, I have a person that

18   directly reports to me.

19   Q.    And -- and for the Long Term Care category, who is that

20   person?

21   A.    Her name is Michelle Dionne-Vahalik, and she is an

22   Associate Commissioner.

23   Q.    Okay.  Have you ever addressed concerns about Provider

24   Investigations?  And I'm sorry, I'm going to butcher that last

25   name.

1    A.    Dionne-Vahalik.

2    Q.    Have you ever addressed concerns about Provider

3    Investigations with Ms. Dionne-Vahalik?

4    A.    Yes, I have.

5    Q.    Okay.  Including after the Monitors' reports that were

6    issued in September and November of this year?

7    A.    Including after the Monitors' reports.

8    Q.    Okay.  Mr. Yetter addressed with you that there is a

9    backlog of investigations.  Do you recall that testimony?

10   A.    Yes, I do.

11   Q.    Do you know if that backlog is applicable to PMC children

12   as they're referred to here or if that is a backlog that is

13   across Provider Investigations?

14   A.    It's a backlog across all Provider Investigations, and by

15   default it would include some of the PMC class.

16   Q.    Do you actually know today what the backlog is or to the

17   extent there is a backlog related to PMC children?

18   A.    The last time that I was apprised of that, I don't believe

19   there were any backlog associated with PMC children.

20   Q.    And to be clear, when was the last time you were informed

21   about that or looked into that issue?

22   A.    Probably three weeks to a month ago --

23   Q.    Okay.

24   A.    -- I would say approximately.

25   Q.    You mentioned that there have been changes related to, I

1    think, data or visibility into timelines?

2    A.    Yes.  We've asked for more detailed information related to

3    timelines.

4    Q.    Okay.  And to be clear, though, so there's a person that's

5    below you, but Ms. Dionne-Vahalik -- is she just like the head

6    of Provider Investigations, or what's the scope of her

7    responsibility?

8    A.    She's the Associate Commissioner, and she's the head of

9    all of Long Term Care Regulatory.

10    Q.    What does that mean to be the head of Long Term Care

11    Regulatory?

12    A.    That oversees a division of approximately 1,100 staff that

13    regulate all long-term care settings in Texas, be it nursing

14    home facilities, assisted living facilities, Provider

15    Investigations, as an example.

16    Q.    Okay.  And so does she have someone that reports to her,

17    then, that is more directly responsible for Provider

18    Investigations?

19    A.    She has somebody that reports to her, and that person

20    oversees the person that's over Provider Investigations.

21    Q.    Okay.  So there's a few layers of separation, but there's

22    a chain of command that relates to Provider Investigations?

23    A.    Absolutely.

24    Q.    Okay.  And these data reports that you mentioned where

25    there's more visibility into the timelines, at what level in

1    this chain of command is that data being passed?

2    A.    It would -- I guess it would be developed and put together

3    by probably manager level staff, director level staff within

4    Provider Investigations.  I'm not exactly sure.  It's a fairly

5    big organization.

6    Q.    But has that improved your visibility into data and

7    timelines?

8    A.    It has.

9    Q.    And how often do you -- you have this direct report,

10   Ms. Dionne-Vahalik.  How often do you meet with her?

11   A.    I meet with my direct reports all the time, but at least

12   once a week.

13   Q.    Okay.  And is there an expectation now that if there are

14   issues of concern, things that you need to personally address,

15   that she will bring those to you?

16   A.    That is a longstanding expectation, yes, sir.

17   Q.    Well, based on the Monitors' reports, though, is that

18   something that you have revisited with her?

19   A.    We have revisited that, yes.

20   Q.    Sir, you mentioned that there were some changes being made

21   also regarding the structure of investigations.  Do you recall

22   that?

23   A.    Yes, sir.

24   Q.    And before I get to this, Mr. Yetter commented on your

25   background not related to child welfare.  Would you describe in

```
 1    a little more detail what your background is?
 2    A.    Okay.  My background with employment with the State of
 3    Texas, I have 26 years of employment with the State of Texas,
 4    and all of those years have been related to the regulatory
 5    aspect of my job, meaning that either I have carried out
 6    regulation directly or overseen that for --
 7    Q.    As part of your job and work experience, has that
 8    involved, for example, dealing with State Legislature and
 9    appropriations or funding type issues?
10    A.    Yes.  My job over the years has transformed more into an
11    administrator's role or someone that is over the operations of
12    a division.  So, yes --
13              THE COURT:  Aren't you supposed to know about what
14    you do -- what the operations are if you're doing that since
15    you're ultimately responsible?
16              THE WITNESS:  Yes, ma'am.
17              THE COURT:  Okay.
18    BY MR. ADAMS:
19    Q.    So in this context then, Mr. Pahl, are you familiar with
20    HB 4696?
21    A.    Yes, I am.
22    Q.    Can you briefly describe what that is?
23    A.    So House Bill 4696 was an initiative of the Department to
24    get some statutory changes related to the HCS area.  It -- it
25    corrected some jurisdictional issues within two different
```

1    codes.  It gives us an opportunity to create some efficiencies

2    and combine processes that exist within what we call our survey

3    area -- you can think of those as inspections -- to combine

4    those with ANE investigation.

5              So we expect to be more efficient with our

6    investigations now since it's not a bifurcated -- it won't be a

7    bifurcated system any longer.

8    Q.   Do you know, sir, what the timeline for implementation is

9    under HB 4696?

10   A.   We expect to be fully implemented by the end of next year.

11   We hope -- we hope to do it sooner than that.

12             There are some resource transfers that have to be

13   authorized by the legislative budget board.  That's out of our

14   control.  But we are hoping to get that implemented sooner if

15   possible, but by the end of the next year.

16   Q.   And, sir, you said that was an initiative of the

17   Department.  What did you mean by that?

18   A.   It was one of our -- when the Department is getting ready

19   to go through a legislative session, amongst a number of things

20   we have an opportunity to develop statutory initiatives,

21   whether it's a change to a statute that we see an issue with or

22   maybe it's outdated or it doesn't work well anymore.

23             We have a governmental relations team that will help

24   us put together a plan going forward so we can make those

25   appropriate changes -- or those appropriate changes can be

```
 1   made.
 2   Q.   And so was that, then, this team that you have within
 3   HHSC, that this is something that they worked on with the
 4   Legislature to come up with and ultimately, I guess, pass or
 5   receive the benefit of HB 4696?
 6   A.   That is correct.
 7   Q.   Okay.  I want to move on, Mr. Pahl, just very briefly.
 8           You started in August of 2021, correct?
 9   A.   That's right.
10   Q.   Okay.  Were there particular challenges that you
11   identified?
12           THE COURT:  Would you speak up, please, sir?
13           MR. ADAMS:  Yes, Your Honor.
14           THE COURT:  Thank you, sir.
15           MR. ADAMS:  I apologize.  And I'll focus on the
16   microphone.
17           THE COURT:  Yes, sir.
18   BY MR. ADAMS:
19   Q.   Mr. Pahl, when you started in August of 2021, were there
20   particular challenges that you identified or were facing your
21   department?
22   A.   Yes.
23   Q.   Would you explain what some of those were?
24   A.   Some of the bigger challenges that we were facing was some
25   staffing turnover issues.
```

```
 1   Q.   Why is that?

 2   A.   Why did it occur or --

 3   Q.   If you're aware, were there particular issues ongoing at

 4   that point in time that had led to significant staff turnover?

 5   A.   Yes, sir.  The public health emergency took a toll on our

 6   staff, I believe, and we saw a lot of turnover during that

 7   time.

 8   Q.   When you say the public health emergency, sir, what are

 9   you referring to?

10   A.   The COVID pandemic.

11   Q.   And, sir, when you say it affected your staff, you

12   mentioned, for example, there's different divisions.  Were

13   there particular areas where that was affected more?

14   A.   More so in the Long Term Care Regulatory area.

15   Q.   Okay.

16            THE COURT:  Did you do an exit interview forms of any

17   kind for people who left?

18            THE WITNESS:  Yes, ma'am, we did.

19            THE COURT:  And what did they say?

20            THE WITNESS:  They say a variety of things.

21   Sometimes they say they left because of pay, sometimes working

22   conditions like we experienced in the -- during the pandemic,

23   just -- amongst other things.  But those were --

24            THE COURT:  What was the number one reason, do you

25   know?
```

1          THE WITNESS:  I don't know without looking at the

2     reports, but I know that pay was one of the main concerns, and

3     the working conditions was another one that seems to -- seems

4     to arise.

5          THE COURT:  Too much work and too little time kind of

6     thing?

7          THE WITNESS:  I would say that as a result of the

8     pandemic, certainly a lot of work during that time and some --

9     many staff experienced burn-out and decided to move on for

10    whatever reasons that they had.

11         THE COURT:  What exact effect did the pandemic have

12    on your investigators?

13         THE WITNESS:  During the pandemic --

14         THE COURT:  They are still interviewing by phone,

15    so --

16         THE WITNESS:  We're only talking about Provider

17    Investigations or --

18         THE COURT:  Just Provider Investigations.

19         THE WITNESS:  Well, during the pandemic, many staff

20    were required to go to facilities.

21         THE COURT:  You don't require that now.

22         THE WITNESS:  We still do investigations at

23    facilities, yes, ma'am.

24         THE COURT:  How come you interview the children by

25    phone months after the events and not in face-to-face?

```
 1                THE WITNESS:  I'm not sure, ma'am.
 2                THE COURT:  Okay.
 3                MR. ADAMS:  May I proceed, Your Honor?
 4                THE COURT:  Yeah.  Do you mind me questioning?
 5                MR. ADAMS:  I didn't mean anything by that, Your
 6   Honor --
 7                THE COURT:  Okay.
 8                MR. ADAMS:  -- except I wanted to not interrupt you.
 9                THE COURT:  Go ahead.
10                MR. ADAMS:  Thank you, Your Honor.
11   BY MR. ADAMS:
12   Q.   Mr. Pahl, as a result of some staffing issues, some
13   related to pay, have there been changes within the agency to
14   increase retention?
15   A.   Yes, there have been.
16   Q.   Has that been a particular focus of yours?
17   A.   It has been.
18   Q.   What have you done to try and increase retention?
19   A.   They've looked at --
20                THE COURT:  Sorry.  Say that again.  Increase
21   tension?
22                MR. ADAMS:  Retention.  Retention of employees, Your
23   Honor.
24                THE COURT:  Oh, retention.  I thought you meant
25   tension.
```

```
 1              MR. ADAMS:  I am going to --
 2              THE COURT:  Retention.
 3              MR. ADAMS:  -- try and decrease tension, Your Honor,
 4    but he's increasing retention.
 5              THE COURT:  That's good.
 6              MR. ADAMS:  Thank you, Your Honor.
 7              THE COURT:  You're tensing; they're retenting.
 8    A.   One of the things that we were -- that I've been focused
 9    on is bringing compensation up to a competitive market rate,
10    and we've made some investments on our own out of our own
11    operating budget since I've been here.  And the Department has
12    also asked for an exceptional item to our appropriation to
13    receive funding to help bring some of our important frontline
14    staff and manager level staff up to what we've referred to as a
15    competitive market rate.
16    Q.   Mr. Pahl, final set of questions related to this temporary
17    management directive.  I believe it was tab 2 in your binder if
18    you want to look at that.
19              Do you know if that changed anything about how
20    investigators collect evidence?
21    A.   I'm not aware that it does.
22    Q.   Do you know if there's anything related to that temporary
23    management directive that prohibits them from looking at all
24    relevant evidence?
25    A.   I'm not aware that it does.
```

```
 1   Q.   Are you aware --
 2              THE COURT:  I'm still concerned about that legal
 3   rights business.  What is that supposed to constrict?
 4              MR. ADAMS:  Your Honor, I'm -- if that's a question
 5   directed to me directly --
 6              THE COURT:  It is.
 7              MR. ADAMS:  -- I'm --
 8              THE COURT:  Do you know anything about that?
 9              MR. ADAMS:  I do actually a little bit, Your Honor,
10   but I want to be careful what I'm speaking to.  And if I have a
11   witness over the course of this hearing that's able to address
12   that, I'm happy to do that.
13              THE COURT:  Okay.  Well, give me some idea.
14              MR. ADAMS:  Yes, Your Honor.  So there's a couple
15   things.  In particular, my understanding is that providers may
16   have multiple facilities.
17              THE COURT:  Okay.
18              MR. ADAMS:  And, if, for example, there is a facility
19   that has other -- a governance function or they may not be able
20   to share information among facilities.  There may be, for
21   example, law enforcement investigations ongoing where Provider
22   Investigations is unable to obtain information.  Again, the
23   legal right issue.
24              THE COURT:  Okay.  I understand unable to obtain, but
25   there's no restriction on them trying to obtain information.
```

 1    That was my concern.

 2              MR. ADAMS:  Your Honor, my understanding of what the

 3    policy is and what I expect the witnesses to testify here is

 4    that if they have the legal ability to obtain that

 5    themselves -- to be clear, there's nothing within the policies

 6    that is preventing -- giving -- not giving them that legal

 7    right.  It's if there's some third party --

 8              THE COURT:  That says, "We're not giving you this

 9    information"?

10              MR. ADAMS:  Correct.  Then that is a limitation that

11    may exist.  And there is a policy about how to address that.

12              THE COURT:  Okay.  That's what I would be interested

13    in too.

14              MR. ADAMS:  Yes, Your Honor.  And I can actually --

15    well, if you'd like, I can present that through witnesses.  I

16    can direct you to a handbook.

17              THE COURT:  Anytime at your convenience.

18              MR. ADAMS:  Then I intend to present through

19    witnesses.

20              THE COURT:  But I'd like to know that the

21    investigators know what that means.

22              MR. ADAMS:  Yes, Your Honor.  With that and --

23              THE COURT:  So they don't just stop asking questions

24    because they're not sure.

25              MR. ADAMS:  I expect the evidence will bear that out,

```
 1   Your Honor.
 2             THE COURT:  Thank you.
 3             MR. ADAMS:  Mr. Pahl, thank you for your time.
 4             THE COURT:  Any further redirect?
 5             MR. YETTER:  None, Your Honor.
 6             THE COURT:  I'm thinking of a long lunch break.  Are
 7   you-all opposed to that?
 8             MR. SHAH:  No, Your Honor.
 9             MR. YETTER:  No, Your Honor.
10             THE COURT:  I'm thinking an hour and a half.  Can we
11   do that?
12             MR. YETTER:  Yes, Your Honor.
13             THE COURT:  We usually have food brought in, and it's
14   just nasty, so --
15             MR. YETTER:  What time would you like us back?
16             THE COURT:  2:00?
17             MR. YETTER:  Fine.
18             THE COURT:  Ten after 2:00?
19             MR. SHAH:  That's fine, Your Honor.
20             Does Mr. Yetter know which witness he'll call next?
21   We'll just make sure that person is ready to go at 2:00.
22             MR. YETTER:  We have two of our own witnesses next.
23             THE COURT:  He's got two of his own and then some of
24   yours.
25             MR. YETTER:  And then two of theirs.
```

1          THE COURT:  Ten after 2:00.  Thank you.

2          (Recess)

3          THE COURT:  Thank you.  Be seated.

4          Would you call your next witness, Mr. Yetter?

5          MR. YETTER:  Yes, Your Honor.  On behalf of the

6    Plaintiff Children, our next witness is Hannah Reveile.  And I

7    believe she is in the courtroom.

8          MR. ADAMS:  Your Honor, may I ask one brief

9    housekeeping question?

10         I understand Mr. Yetter intends to call three, maybe

11   four witnesses today?

12         MR. YETTER:  Correct.

13         MR. ADAMS:  Could the remaining witnesses that are in

14   our control, may we release them for the day to come back

15   tomorrow?

16         THE COURT:  Can we wait?  I want to go till 6:30.

17         MR. ADAMS:  Okay.

18         THE COURT:  Is that okay with everybody?  The thing

19   is, after this morning, I needed a break.  So we took a long

20   lunch hour, which we don't ever do.

21         MR. ADAMS:  Thank you, Your Honor.

22         THE COURT:  Thank you, ma'am.  You may be seated.

23         You may proceed.

24         MR. YETTER:  May it please the Court.

25

```
 1              HANNAH REVEILE, PLAINTIFFS' WITNESS, SWORN

 2                        DIRECT EXAMINATION

 3   BY MR. YETTER:

 4   Q.   Ma'am, would you introduce yourself again to the Court and

 5   spell your last name?

 6   A.   My name is Hannah Reveile.  Last name is spelled

 7   R-E-V-E-I-L-E.

 8   Q.   And, Ms. Reveile, were you at one time a conservatorship

 9   caseworker for the State of Texas?

10   A.   Yes.

11   Q.   And did you -- in that capacity, did you have interaction

12   with Provider Investigations, the group that investigates

13   allegations of abuse, neglect, and exploitation at HCS group

14   homes?

15   A.   No.

16   Q.   Did you have some interaction with them on a report?

17   A.   I did not.  I did put in Statewide Intakes, but I didn't

18   have any response from Provider Investigations.

19   Q.   Okay.  Well, we'll get to that.  That was the interaction

20   I'm going to talk about --

21   A.   Okay.

22   Q.   -- or we're going to talk about.

23              Second, did you have any involvement with children

24   that are placed in unregulated, unlicensed placements by the

25   State of Texas, what the State has been calling CWOP children?
```

1    A.    Yes.

2    Q.    And third area we're going to talk about is the training

3    that you got with regard to some of the medications,

4    specifically the psychotropic medications for the children that

5    you cared for, training or lack of training.  Is that another

6    area that you had some experience with?

7    A.    I had experience with that, yes.

8    Q.    Before we get to all that, let's help the Judge understand

9    a little bit of who you are.

10           What sort of education do you have, ma'am?

11   A.    I graduated from Capella University in December of 2021

12   with a bachelor's of science in psychology.  And I'm currently

13   in a master's program, master's of science for forensic

14   psychology also at Capella.  I'm set to graduate next year.

15   Q.    And after you -- or during that -- your education at

16   Capella University, were you working?

17   A.    Yes.

18   Q.    What sort of role did you have?  Let's go back to, say,

19   2019.  What sort of job did you have at the time?

20   A.    In 2019, I worked with a job title of registered

21   behavioral technician, providing behavior therapy to kids

22   ranging from two years old to 12 years old with behavior

23   therapy for their diagnosis of autism.

24   Q.    And what sort of behavioral issues did the children that

25   you were counseling or caring for have back when you were a

1    behavioral therapist technician?

2    A.   They would engage in -- and the words we used at the time

3    were aggression.  We called it SIB, but sexually inappropriate

4    behavior.  Disrobing, yelling, screaming, destruction of

5    property.

6    Q.   What were the behavioral innovations that you were working

7    at at the time, if you know what I'm talking about?

8    A.   Can you reword that?

9    Q.   Sure.  As a behavioral technician, were you trained to

10   help these children that had aggressive tendencies, sexually

11   inappropriate tendencies, that sort of thing?  Did you get

12   training to do that?

13   A.   Yes.

14   Q.   In 2020, did you start a new position?

15   A.   Yes.

16   Q.   And what was that?

17   A.   I became a juvenile detention officer in Travis County at

18   Gardner Betts.

19   Q.   What was your responsibilities as a juvenile detention

20   officer?

21   A.   I would be in the unit with the kids eight hours a day on

22   most days, and I would be helping them out with their daily

23   routine management, making sure they have what they needed.  I

24   would respond to emergencies and provide crisis intervention

25   when necessary.

1  Q.   Why were these children in detention?

2  A.   They would be awaiting adjudication for crimes that they

3  alleged to have committed with charges ranging from truancy to

4  murder.

5  Q.   So were some of these crimes serious or violent crimes?

6  A.   Yes.

7  Q.   How long did you work with the Travis County Detention

8  Center?

9  A.   I worked there from April 2020 until December 2021.

10 Q.   So a little bit more than a year and a half?

11 A.   Yes.

12 Q.   How closely did you work with the young people there, the

13 children?

14 A.   Directly.

15 Q.   And, again, was it -- were you a one-on-one counselor to

16 some and a group counselor to some?

17 A.   I would be in the unit with up to eight children.  And

18 should crisis arrive, a counselor would be on staff, on standby

19 ready to help the kids through whatever they're going through.

20 Q.   How long were your shifts in these detention units with

21 these children?

22 A.   Usually eight hours, but I volunteered for overtime quite

23 frequently.

24 Q.   Obviously I'm sure the Court has noticed that these two

25 jobs that you had both dealt with children.  Why were you --

1   why is your career focused on children at least at that point?

2   A.   At that time I had a long-term goal of working for CPS.

3   Q.   And why was that your long-term goal of working for Child

4   Protective Services?

5   A.   Just because of what I've been through in my own life.  I

6   wanted to help be part of a system that kept kids safe.

7   Q.   Did you eventually reach that goal of being able to work

8   for Child Protective Services?

9   A.   Yes.

10   Q.   And when was that?

11   A.   December 2021.

12   Q.   What role were you hired as?

13   A.   I was hired on as a Conservatorship Specialist I.

14   Q.   What exactly does a Conservatorship Specialist I do?

15   A.   Well, in very brief terms, because it is all encompassing,

16   lots of hats.  Overall the goal is to try to keep kids safe.

17   We're matched with families once the investigation is done and

18   there's been found reason to believe of abuse or neglect.  And

19   we assess needs, and we try to match services to those needs

20   and find kids safe places to stay and go while we're trying to

21   ultimately reunify the family.

22   Q.   How long were you in a role with the Department of Family

23   and Protective Services?

24   A.   From December 2021 until June of this year, 2023.

25   Q.   So about six months ago you left that role?

```
 1   A.    I did.
 2   Q.    Did you leave the employment of the State of Texas?
 3   A.    Yes.
 4   Q.    Was that for about -- so you worked about a year and a
 5   half --
 6   A.    Yes.
 7   Q.    -- as a conservatorship worker?
 8   A.    Yes.
 9   Q.    Was your position always Conservatorship Specialist I?
10   A.    No, I did eventually get promoted to Specialist II.
11   Q.    In your role as a Conservatorship Specialist I and then a
12   Specialist II, did you have occasion to train any other of your
13   peers?
14   A.    Yes.
15   Q.    And why would you as a new employee at Child Protective
16   Services be training your peers?
17   A.    The supervisors at the time put in a waiver because they
18   acknowledged that I was doing some good work and decided that I
19   should be a trainer sooner than the usual year it takes to
20   become a trainer.
21   Q.    Did you enjoy aspects of your work with these children
22   at -- the foster children that you were working with?
23   A.    I -- I enjoyed a lot of aspects, yes.
24   Q.    Were these children -- do you know what a TMC child, a
25   temporary managing conservatorship child and a permanent
```

1    managing conservatorship child is?

2    A.   Yes.

3    Q.   Did you have both TMC and PMC children on your caseload as

4    part of your casework?

5    A.   Yes.

6    Q.   Since July 2023, what have you been doing?

7    A.   I have been working as a forensic specialist on a team of

8    qualified mental health professionals on an assertive community

9    treatment team with Integral Care.

10   Q.   Who is your employer?

11   A.   Integral Care.

12   Q.   And is it a vendor for a governmental entity?

13   A.   I'm not sure actually.

14   Q.   Is it -- is it -- how is it related to Travis County?

15   A.   It's the Travis County Mental Health Authority.

16   Q.   And in that -- what is your title with -- as a forensic

17   specialist?  Is that your title?

18   A.   Yes.

19   Q.   And what exactly do you do with regard to what people?

20   A.   I provide psychosocial rehabilitation skills training to

21   those that were deemed incompetent to stand trial to try to

22   restore competency.

23   Q.   So these are people that have been incarcerated for

24   alleged crimes that -- for which they have been found

25   criminally insane or incapable of committing the crime?

```
 1    A.    Correct.
 2    Q.    Were you happy to leave your position at DFPS in June of
 3    2023?
 4    A.    I don't know if I would say the word "happy," because it
 5    was the hardest decision I had to make, leaving my kids.  But
 6    ultimately my life has significantly improved since leaving the
 7    department.
 8    Q.    We'll come back to that.
 9              First topic, Provider Investigations.  And this is
10    the topic that you -- I had earlier said you had some
11    interaction, and then you corrected me and you said you had no
12    interaction with them.
13              But let's talk -- do you know who Provider
14    Investigations is?
15    A.    Broadly, yes.
16    Q.    And do you know what a Home & Community-Based Services
17    group home in the system is?
18    A.    Yes.
19    Q.    Did you have any children on your caseload who were in HCS
20    homes while you were a caseworker for the State?
21    A.    At times, yes.
22    Q.    Did you have any situations where you felt like something
23    happened with one of your children that you made a report of
24    potential abuse or neglect?
25    A.    Yes.
```

```
 1   Q.   Can you explain that to the Court?
 2   A.   I had a child who turned 18 at this HCS home, but she -- I
 3   had some suspicions of male staff there with her -- having
 4   inappropriate relations with her.  She did have a cognitive
 5   functioning of a five- to eight-year-old even though she did
 6   turn 18 while she was there still.
 7   Q.   Let me stop you.  So this child who was a -- who
 8   eventually turned 18, but was a child during the time she was
 9   on your caseload, right?
10   A.   Uh-huh.
11   Q.   True?
12   A.   Yes.
13   Q.   What was her cognitive functioning?  What level?
14   A.   As a five- to eight-year-old.
15   Q.   And you had concerns about a relationship with a male
16   staff member at the facility?
17   A.   Yes.
18   Q.   The HCS home?
19   A.   Yes.
20   Q.   Where was this home?
21   A.   In Dallas.
22   Q.   Dallas.
23        And what was -- what did you -- once you had those
24   concerns, what did you do?
25   A.   I reported it to Statewide Intake.
```

```
1    Q.    And statewide intake, as the Court knows, is the source

2    of -- for third parties like you, a caseworker, to report

3    suspected abuse and neglect?

4    A.    Correct.

5    Q.    And did you report it specifically about this facility and

6    about this caregiver?

7    A.    Yes.

8    Q.    What happened then?

9    A.    I didn't hear anything back, and I got mad.

10   Q.    So this was an HCS home involving a child that had

11   intellectual development disabilities.  You made an outcry of

12   an inappropriate sexual relationship, in other words, of sexual

13   abuse?

14   A.    (Indicating in the affirmative)

15   Q.    Provider Investigations, which should have been

16   investigating.  What did you hear from the investigator?

17   A.    Nothing.

18             THE COURT:  Okay.  This was an HCS placement?

19             MR. YETTER:  It was, Your Honor.

20             THE COURT:  Was.

21             MR. YETTER:  With a developmentally disabled child.

22   BY MR. YETTER:

23   Q.    So having heard nothing, what happened to the child?

24   A.    Her behavior got worse at that placement, and they soon

25   after discharged her from that placement.
```

1    Q.   So she has -- this relationship with the staff member that

2    you're very concerned amounts to sexual abuse, you report it.

3    Nothing happens from -- by Provider Investigations.  Am I right

4    so far?

5    A.   Correct.

6    Q.   And the child, you said her behavior got worse.  What

7    happened?

8    A.   She -- I was receiving reports that she was harassing

9    neighbors, banging on their doors, shouting, punching walls,

10   just generally being disrespectful to staff overall.  And

11   ultimately they decided that her disruptive behavior couldn't

12   be welcome at their placement anymore and discharged her.

13           THE COURT:  She wasn't 18?  They just discharged her

14   beforehand?

15           THE WITNESS:  She had turned 18 while she was there.

16           THE COURT:  Okay.

17   BY MR. YETTER:

18   Q.   And before she was discharged by the facility at which you

19   believe there had been sexual harassment or sexual

20   exploitation, had there been anything done by Provider

21   Investigations about your report?

22   A.   Not that I knew of.

23   Q.   Did you ever hear back from anyone at Provider

24   Investigations about this report that you made to Statewide

25   Intake about sexual exploitation at this HCS home?

```
 1   A.   Not that I remember at all.
 2             THE COURT:  What was the timeframe between the time
 3   you called it in and the time she was discharged, do you
 4   remember?
 5             THE WITNESS:  A month, tops.
 6             THE COURT:  Okay.
 7   BY MR. YETTER:
 8   Q.   Now, had you ever reported concerns about sexual
 9   exploitation in any -- with any of your other children in any
10   of the other facilities?
11   A.   I don't remember.
12   Q.   Was this a significant thing to you, this report that you
13   made?
14   A.   Yes.
15   Q.   And how did you react when you heard nothing from Provider
16   Investigations?
17   A.   I was furious.
18   Q.   To your knowledge, was there any investigation ever of
19   this -- of your report of sexual exploitation of this child
20   with a five- to eight-year-old cognitive functioning?
21   A.   Not that I know of.
22             THE COURT:  Did you record in your case notes that
23   this was now in like the Attachment A that she was a victim of
24   sexual exploitation?
25             THE WITNESS:  I don't remember.
```

```
 1              THE COURT:  Okay.
 2    BY MR. YETTER:
 3    Q.   All right.  Let me change topics slightly.
 4              You were a caseworker for the State of Texas, for
 5    DFPS, for about 18 months.  During that 18 months, I want to
 6    ask you about your training, all right?
 7    A.   Okay.
 8    Q.   Now, you have had education and work experience in dealing
 9    with mental health issues of children, am I right?
10    A.   Yes.
11    Q.   And you're continuing to have -- your current role
12    involves children that can have mental health challenges, does
13    it not?
14    A.   My current role is with adults.
15    Q.   Adults.  Okay.
16              But while you were a caseworker at -- with the State
17    of Texas, did you learn how -- whether any of your -- the
18    children on your caseloads were under a psychotropic
19    medications regimen?
20    A.   Yes.
21    Q.   And was that something that was rare, or how common did
22    you find that?
23    A.   It was reasonably common with the teenagers.
24    Q.   In the course of your 18 months, how much training did the
25    State of Texas give you about whether you as a caseworker,
```

1    close to a child that's on a psychotropic medications regimen,

2    to ask for a review of that regimen by the State?

3    A.   Can you --

4    Q.   Were you ever trained to do that?

5    A.   Not exactly a review, no.  We were trained to call STAR

6    Health if we had any questions about, like, dosages or certain

7    medications and their usual dosages, stuff like that, but

8    nothing other than that.

9    Q.   Did you -- were you ever trained on something called the

10   Psychotropic Medication Utilization Parameters?

11   A.   No.

12   Q.   Have you -- before this lawsuit and your testimony here,

13   have you -- did you ever hear about Psychotropic Medication

14   Utilization Parameters?

15   A.   No.  I was shocked to hear about that, honestly.

16   Q.   All right.  And do you understand that it's basically a

17   set of rules that the State of Texas has put together over the

18   last -- almost 20 years for the use of these very powerful

19   medicines for children?

20   A.   I know that now, and I'm horrified that I didn't before.

21   Q.   Why would you have wanted to have learned about the rules

22   of the State of Texas for using psychotropic medications for

23   children in foster care?  Why would you have wanted to know

24   that?

25   A.   So that I can better make sure that my kids are okay.

1  Q.   Did you ever get any training by the State of Texas into

2  how to assess or address children that are on your caseload

3  that are on psychotropic medications?

4  A.   Besides just calling the STAR Health hotline, no.

5  Q.   Did you ever see a review by STAR Health or its kind of

6  owner, Superior HealthPlan, of psychotropic medication regimen?

7  Did you ever see what was called a review, a report on a

8  review?

9  A.   No.

10  Q.   In your discussions with other caseworkers, did you ever

11  hear that there was the opportunity to ask for someone to check

12  out a child's psychotropic medications, prescriptions, and

13  regimen?

14  A.   Not in those words, no.  Usually they would ask for

15  another psychiatrist to review, like just have an appointment

16  and prescribe different medications is what we were trained to

17  have them do.

18  Q.   Do you know what the phrase "medical consenter" means in

19  the foster care system?

20  A.   Yes.

21  Q.   Were you a medical consenter for some or all of the

22  children -- the foster children on your caseload?

23  A.   Yes.  Well, I was a -- whenever my children were placed in

24  Child Watch, I was their medical consenter.

25  Q.   Child Watch, is that another name that the State goes by

1    for children that are being -- or CWOP children or children

2    being put in unlicensed, unregulated placements?

3    A.    Yes.

4    Q.    On that topic of children in unlicensed, unregulated

5    placements, how much involvement or exposure did you have to

6    that in your 18 months with the State of Texas?

7    A.    With children being in Child Watch?

8    Q.    Yes.

9    A.    I had two teenagers in and out of Child Watch in my last

10   ten months working there.

11   Q.    And were they PMC children?

12   A.    They were.

13   Q.    And did you get a chance to observe how being on Child

14   Watch, being in an unregulated placement impacted the children

15   that were on your caseloads?

16   A.    Yes.

17   Q.    And was it a positive thing in your opinion for the

18   children?

19   A.    It was not.

20   Q.    And why so?

21   A.    I -- I experienced a lot of different crises that my kids

22   would experience while in Child Watch and the need to respond

23   appropriately to help make sure that they're okay and taken

24   care of.

25   Q.    Let's talk first about the impact on you as a caseworker

1    of having children on Child Watch.

2            Did you also do overtime Child Watch shifts?

3    A.   Yes.  I never didn't have overtime working at the

4    department.

5    Q.   When you started as a brand-new conservatorship

6    caseworker, did you have a period of training before you

7    started getting caseloads?

8    A.   Yes.

9    Q.   And did you then start with graduated caseloads, smaller

10   caseloads as you got more experienced?

11   A.   Yes.

12   Q.   Once you were able to -- got past that initial training

13   and able to take a caseload, were you eligible to start doing

14   overtime shifts for this Child Watch program?

15   A.   I started doing Child Watch after one month of working at

16   the department.

17   Q.   Did you have -- after one month of working at DFPS, did

18   you have any training to do those Child Watch shifts?

19   A.   I had -- my mentor explained to me how to do the Child

20   Watch shifts.

21   Q.   Did you have any training in deescalating outbursts by

22   children in that -- in that group, the Child Watch -- you know,

23   the children without regulated placements?

24   A.   If memory serves me correctly, we had one very general and

25   broad online deescalation training.

 1    Q.    Did you have any training on restraining children that are

 2    having an emotional outburst?

 3    A.    Just while I was working at the department?

 4    Q.    Yes.

 5    A.    We were not allowed to restrain the children.

 6    Q.    Can you describe the sort of children that you were --

 7    that you were seeing on these Child Watch overtime shifts?

 8    Like, what, were they high needs children?  Younger children?

 9    Older children?

10    A.    It was a range of ages.  Usually very high needs.  They'd

11    experienced a lot of complex trauma in their lives and had had

12    difficulties at previous placements and I guess were just in

13    between placements and needed a place to go.

14    Q.    As a caseworker, were these children easy to provide

15    services to or more challenging to provide services to?

16    A.    They were more challenging.

17    Q.    So in your overtime shift watching children that were in

18    unregulated placements, was that an easier part of your job or

19    a more challenging part of your job?

20    A.    More challenging.

21    Q.    Was it stressful to you?

22    A.    Yes.

23    Q.    How stressful?

24    A.    Besides at one point my blood pressure being four points

25    from hypertension, it was almost impossible to get through a

1    shift on a lot of days.  It would -- it would be scary driving

2    in, and it would be a long drive too.  There -- mainly CWOPs --

3    excuse me.  Child Watch shifts were in Belton or Temple.  And

4    driving from Austin, or I live in Elgin, it's easily an hour,

5    hour and a half drive.  So waking up at 2:00 in the morning,

6    getting to Belton or Temple by 4:00, you're stressed your whole

7    drive.

8           You're building up your cortisol levels and your

9    adrenaline, all that.  And then you get to your shift, and you

10   have only the amount of time that you had maybe sitting in your

11   car before you walked in to kind of read about what happened

12   with the kids on the previous shift.

13          And you may or may not actually know the kids.  You

14   may or may not know what they like or what they like to do if

15   you don't fully read that shift log before you go in.  So you

16   always try to get there even earlier than your shift starts,

17   and then anything could happen on your shifts.

18   Q.   Were these children getting -- in your opinion and your

19   personal experience, were they getting the services they need

20   in these hotels or churches or facilities that they were being

21   put in because they didn't have a real licensed and regulated

22   place to sleep?  Were they getting the services that they

23   needed?

24   A.   No.

25   Q.   Were these children regularly attending school as far as

```
 1   you could see?
 2   A.   No, not all of them.
 3   Q.   Did you see -- did you observe how doing these shifts,
 4   these Child Watch shifts, how it impacted your fellow
 5   caseworkers?
 6   A.   Yeah.
 7   Q.   Was it something that people looked forward to?
 8   A.   No.
 9   Q.   Was it exhausting?  Was it stressful?
10   A.   It was both of those things, exhausting, stressful.  Most
11   people tried to give away their shifts to other people; but if
12   nobody wanted to pick up their shift, then they would have to
13   work it.  It was mandatory.
14   Q.   Did you ever see someone leave the department because of
15   these stressful, challenging, difficult shifts with Child
16   Watch?
17   A.   Oh, yes.
18   Q.   Was that frequent or rare?
19   A.   It was pretty frequent.
20   Q.   You said something about the driving.  Was the -- was the
21   driving, the distance driving, did that add to the exhaustion
22   or tension of dealing with these Child Watch shifts?
23   A.   It definitely added to the exhaustion.
24   Q.   How much would you drive in a particular day?
25   A.   My record was 19 hours driving.  That record wasn't
```

1    necessarily related to CWOP, but just in general.  I -- it's

2    just a lot of driving.

3    Q.   Did you do -- we've been talking about the Child Watch

4    overtime.

5    A.   Yeah.

6    Q.   Did you have a regular caseload as well?

7    A.   Yes.

8    Q.   Was that your full-time job?

9    A.   Yes.

10   Q.   How did you look at your Child Watch overtime work?

11   A.   It was like a very stressful part-time job.

12   Q.   Did you -- did you volunteer for each of those shifts?

13   A.   No.  Whenever I first started, we were allowed to sign up

14   for our preferred times, but it was still the expectation.  It

15   was mandatory.  They told me in my interview that it was

16   mandatory.  And then after a while, eventually they didn't even

17   let you sign up for your preferred shift.  They just assigned

18   you.

19   Q.   And was this true all the way until you finished working

20   at the department in the summer of 2023, just six months ago?

21   A.   Yeah.

22   Q.   That it was mandatory?

23   A.   CWOP had always been mandatory the whole time I worked

24   there, and we progressively got assigned more and more shifts

25   each month.

```
1    Q.   Were your fellow coworkers, your other caseworkers, were
2    they driving as much as you and exhausted as much as you based
3    on your personal interaction with them?
4    A.   Yeah.  Everybody was exhausted.
5    Q.   How do you think this affected the morale of the
6    caseworkers, at least yours and the ones that you interacted
7    with closely?
8    A.   There was little, if any, morale left.
9    Q.   Is the casework that you do with a child that's on Child
10   Watch, a child that's in an unregulated placement, is that
11   intense casework or routine, or how would you describe that?
12   A.   I would not call it routine, but I would call it intense.
13   Q.   At the end of one of those shifts, how would you feel?
14   A.   Grateful for making it through conscious and alive.
15   Q.   As between --
16   A.   But ultimately tired.
17   Q.   As between the work that you had been doing with juveniles
18   in detention, in prison, and the work you went to do with the
19   State of Texas with children that are in these unregulated
20   placements, which was better?
21   A.   I would rather work in juvenile detention.
22   Q.   Why is that?
23   A.   Because there was support.  If an emergency broke out,
24   people would come to help you in less than a minute.  And there
25   was counselors on standby if extra intervention was needed,
```

1    just ready to go to help the kids through what they were going

2    through.  But with CWOP, there was -- you could call the

3    police, but then somebody would yell at you for calling the

4    police on kids in care.

5              THE COURT:  What kind of a caseload did you carry?

6              THE WITNESS:  I, for a lot of the time that I worked

7    there, had the highest caseload in the office at 16 kids, but

8    eight of them were special needs, so they were complex cases.

9              THE COURT:  And how was the CWOP -- how did the CWOP

10   shift go into your caseload?

11             THE WITNESS:  They didn't.  Everybody had to work the

12   same amount of shifts.

13             THE COURT:  Okay.

14   BY MR. YETTER:

15   Q.   So when you're saying your caseload was 16, that doesn't

16   count the CWOP shifts?

17   A.   Correct.

18   Q.   That extra part-time job, that stressful, intense

19   part-time job that you've been telling the Court about?

20   A.   Correct.

21   Q.   You said that in a detention center there are trained

22   specialists to come to your -- that come to your support,

23   trained in helping the children.

24             Were there any trained specialists to come to your

25   support when you were in an unregulated setting with these

1    Child Watch shifts that would help the children?

2    A.   Besides your partner caseworker that's on the shift with

3    you, the one other person, and calling law enforcement or EMS,

4    that was it.

5    Q.   The --

6    A.   We could call our supervisor for advice, but that was it

7    too.

8    Q.   When you worked in the detention center, was that facility

9    set up for children that have -- that could have aggressive

10   outbursts or emotional issues?

11   A.   Yes.

12   Q.   And was that the same when you were on these Child Watch

13   shifts?  Were the facilities that they were putting these

14   unregulated placements, were they set up for children that have

15   intense service needs?

16   A.   No, but I also don't want that to come across like I want

17   kids in Child Watch to be in detention.  I don't.  I don't

18   agree with that.

19   Q.   Fair enough.  But you had experience with residential

20   treatment centers?

21   A.   Yes.

22   Q.   And those are places, as I understand it, where children

23   with high service needs can get the services that they need

24   from professionals that are trained to give it?

25   A.   They're supposed to.

```
 1    Q.   They may not always do that, but at least that's what
 2    they're set up to do?
 3    A.   Yes.
 4    Q.   Were the Child Watch facilities, the unregulated
 5    placements that you went to, anything like that, set up to
 6    actually give the children the services that they need?
 7    A.   No.
 8    Q.   So you said that you started within a month, brand-new
 9    caseworker for the State of Texas, you started doing mandatory
10    CWOP or Child Watch shifts; is that right?
11    A.   Yes.
12    Q.   And how many did you do in the beginning after that first
13    month?  How many shifts?
14    A.   I think in the beginning I just had maybe one or two a
15    month.
16    Q.   And did that change?
17    A.   Yes.
18    Q.   And how did it change?
19    A.   It eventually increased to three and then eventually to
20    four, and then towards the very end it was five or six.
21              THE COURT:  A month?
22              THE WITNESS:  A month.
23              THE COURT:  How long were the shifts?
24              THE WITNESS:  Four hours usually if the person that
25    was scheduled after you showed up to their shift; otherwise,
```

1    you would be asked and volun-told to take their shift.

2    BY MR. YETTER:

3    Q.   If you had worked a Child Watch shift at an overnight

4    period, did you get part of the next day off from your regular

5    work?

6    A.   No.

7    Q.   What would you have to do?

8    A.   Just keep going.

9    Q.   So you would work part of the night and then have to start

10   your day job, your full-time job, the very next morning?

11   A.   Yes.

12   Q.   Are the caseworkers that -- you and the other caseworkers

13   that you worked with, how hard were they trying to do the best

14   they could with these children?

15   A.   They were trying so hard.  I admire every single worker

16   that I worked with there.  It's not an easy job to do, and

17   they're all doing their best.

18   Q.   How -- did they have the resources to do a good job for

19   these children from the State of Texas?

20   A.   No.

21   Q.   Did they have the training to do a good job, the right

22   job, a safe job for these children from the State of Texas?

23   A.   No.

24   Q.   Did they -- were they in the facilities that they could

25   give these children the right services to keep them safe

```
 1   that -- provided by the State of Texas?
 2   A.   Can you reword that?
 3   Q.   Were they in facilities that were -- that would allow
 4   giving these children the services that they needed?
 5   A.   No.
 6   Q.   Did you -- in the end did you make a decision about
 7   whether it was something that you could keep doing, working in
 8   those Child Watch-CWOP shifts as part of your -- in addition to
 9   your full-time job as this very stressful part-time job?
10   A.   I -- I couldn't do it anymore.
11   Q.   What did you decide?
12   A.   I decided to put in my resignation.  I put in my two
13   weeks' notice.
14   Q.   And this was -- was this the job that you had been looking
15   forward to as your dream job of working for Child Protective
16   Services?
17   A.   Yeah.  Wanting it for ten years and then finding out that
18   it's just a system that's broken and breaks people.  It was
19   awful.  It was a really hard decision.  I tried really hard to
20   stick it out, tried to make it better for the other workers,
21   and it just -- I couldn't do it anymore.
22        It felt like -- you know, they say don't burn the
23   candle at both ends.  I had my candle, and I was burning it on
24   one end, but then the system came in with like a flamethrower.
25   But then they would just blame me and say it was like --
```

1    because I wasn't doing self-care when I was.

2    Q.   Did it affect your health?

3    A.   Yes.

4    Q.   How so?

5    A.   I know I mentioned my blood pressure being four points

6    away from hypertension, but since leaving the department I've

7    actually had time to have my own mental health appointments and

8    have since been diagnosed with moderately severe depression and

9    severe anxiety.

10   Q.   How did -- what were some of the -- were you concerned

11   about how the children in these facilities, these unregulated

12   facilities, the outcomes for them?  Did you see anything that

13   concerned you while you were working these Child Watch shifts?

14   A.   Yeah, absolutely.

15   Q.   And can you give us and the Court some examples of the

16   things that you saw with the children at these unregulated

17   hotels and other places that caused you concern?

18   A.   Two stories specifically come to mind, one when it was my

19   shift and one when it was my child.

20         On the one where it was my shift, I was walking up to

21   the shift for the day.  It was one of the -- the house in

22   Temple.  And there was a young girl, a teenager out front in

23   her underwear, screaming that she was drunk.  There was another

24   worker out there making sure that she was okay.  The worker

25   told me that EMS was on the way already, but this girl did not

1    look like she was in good shape at all.

2              I made sure that worker had what she needed.  I went

3    inside, checked in with the other worker, tried to get kind of

4    a basis of what was going on, because when stuff like that

5    happens, there is no reading the shift log before you come to

6    the shift.  Because they've been so busy dealing with the

7    crisis, there's no way to also update the shift log, because we

8    can't ignore the kids to update the shift log.

9              And so eventually EMS came, law enforcement came.

10   Law enforcement talked to the girl in her car.  And at this

11   point, it's been a while.  The past shift has left.  It's me

12   and my partner worker on that shift.

13             And while one officer is still talking to the girl in

14   their car, the other officer comes up to me and says that she

15   made an outcry of sexual assault and that they wanted to take

16   care her to the hospital to get evaluated, all the tests that

17   they do after that.

18             And so they had EMS come back, and they take her to

19   the hospital.  They have another worker -- I think it was my

20   supervisor -- go meet her at the hospital to watch her while me

21   and my partner worker stayed for the other kids.

22             We try to do our incident reports and update the

23   shift log as fast as possible.  We were -- everybody was

24   supposed to.  I emailed her caseworker, program director,

25   supervisor, everybody that I'm supposed to do on that.  And by

1    that time, the shift was ending and I am exhausted myself but

2    still concerned about the girl, of course.

3           And on my way, I'm about to pull onto the highway to

4    drive home, my program director calls me and asks me to go sit

5    with her at the hospital to relieve my supervisor who had gone,

6    so I do.

7           And she does eventually go to -- the child does

8    eventually go to a psych hospital.  Somebody does eventually

9    come to relieve me, I think, maybe two, two and a half hours

10   later.

11          And I don't know what happened to her after the psych

12   hospital.

13   Q.   Is this -- was that the only time that you saw a child, a

14   girl that was subject to sexual assault or abuse?

15   A.   There was the incidence with my child.  I wasn't there on

16   that shift, but I -- since she was on my caseload, I did have

17   to respond.  I got a report on early Monday morning that there

18   was an alleged sexual assault for my child.

19          And so I start gathering more information.  I'm

20   already driving to Belton to see her from wherever I was at the

21   time, probably Austin, driving to Belton to go see her, make

22   sure she's okay, take her to the hospital, because she hadn't

23   gone to the hospital yet.

24          And I find out on the way that she had left the Child

25   Watch location despite -- in the shift log it says supervise

1    her at all times, go on walks with her, make sure you see her

2    and hear what she's doing, what she's talking about.  Just --

3    this is the girl with the cognitive function of five to eight

4    years old.  I should mention that.  Just because she has such a

5    young functioning level, making sure that she's supervised as

6    someone with a low functioning level should, to make sure she's

7    safe.

8            But she left.  And the workers at the time didn't

9    follow her.  But, again, I don't blame them.  I do not blame

10   them.  But she left the CWOP -- the Child Watch location and

11   met a stranger on the street and went home with that stranger,

12   and the stranger gave her drugs and alcohol and had -- I think

13   it was two or three people rape her five times while she was

14   there at that home.  And then she went back to Child Watch, and

15   they did their reports, and that's when I took her to the

16   hospital.

17           We waited in the hospital for hours.  We were there

18   for hours.  She was very agitated.  She did not like waiting.

19   I don't know anybody who does just love waiting, though,

20   especially after something like that.

21           And she consented to some of -- like the antibiotics

22   and stuff.  But just helping her process through all of that

23   for the hours that we were sitting there was draining for her,

24   absolutely, also draining for me.

25           I know some details about events that no one should.

```
 1   And she -- I -- sorry.
 2          She just destabilized from there, and it was so hard
 3   to watch because she had to move so many times.  She never
 4   had -- oh, my God.  She never had consistent treatment because
 5   she had to move so many times to so many different places.
 6          And in that moment, helping her process through that,
 7   it really hit that she is so far past these experiences that
 8   she's been through, she hasn't even realized that it's bad yet.
 9   And she keeps getting in these situations because it's so hard
10   for somebody to consistently teach her that.
11          Anyway, off on a tangent.
12          Her behavior --
13          THE COURT:  These are the kind of things we need to
14   hear.
15          THE WITNESS:  Taking a quick breather.
16   BY MR. YETTER:
17   Q.   It's okay.
18   A.   She struggled a lot after that.  Lots of different psych
19   hospitals.  She ended up in jail at one point, and eventually
20   is when we scraped together somehow a HCS home.  And going from
21   there, the --
22   Q.   Then we have the staff --
23   A.   And then we have the staff.
24   Q.   -- guy at the HCS home?
25   A.   And then at that HCS home, and then somehow by the skin of
```

1  our teeth scraping together a second HCS home in a row, which
2  was basically unheard of, because the waitlist is so long.  I
3  don't know how, like, we got it.  We wouldn't have gotten it if
4  there wasn't a contract in place.  So she wasn't even like a
5  full actual HCS person.
6         But, like, she went to this second home, and drove
7  from Austin to Dallas, picked her up in Dallas, packed her up,
8  made sure everything was set up there, did the paperwork, drove
9  her all the way down to Houston, did the paperwork, settled
10 her, made sure she was okay.  Drove all the way back to Austin,
11 600 miles, I think, or 700 in a day.  That was the very long
12 day.
13        And then a couple of days later is when I start
14 getting more reports of her behavior just getting worse and
15 worse.  She's breaking things.  She's leaving.  She's
16 screaming.  She's threatening, threatening herself and others.
17        So she goes in and out of the psych hospital a couple
18 of times while she's there.  And there's this tricky thing that
19 happens with placements.  When a kid gets put into a psych
20 hospital, the placement is within their rights to put in a
21 24-hour discharge notice, which it's almost impossible to find
22 a placement in 24 hours.  And, I mean, honestly, I think that's
23 a big problem for Child Watch too.  But I digress.
24        She -- every time she had to go to the hospital, I
25 would have to deescalate the placement, because they would call

1    me angry that she did this, she did that, all these behaviors

2    that she was doing.  And I would deescalate placement, make

3    sure they were calm and ready to have a conversation and ready

4    to reconsider about maybe keeping her and helping her through

5    these tough times, because she had been through so much.  And

6    they were fully informed of everything because of all the

7    paperwork and because I met with them a lot of times over the

8    phone and emails back and forth, phone calls, everything.  They

9    were informed.

10           But eventually, too, they discharged despite -- it

11   meaning because she's 18, she wouldn't have a place to go.

12   Child Watch isn't an option when you're over 18.  And you can

13   stop me if I'm rambling.  I know this is a long story.

14           But ultimately she ended up having to move in with

15   her sister, and then her sister kicked her out, and then she

16   ended up somewhere in Kyle.  And I heard from her maybe once

17   every couple of months until I left.

18   Q.   During the 18 months that you were a conservatorship

19   worker with the State of Texas, were these sort of traumatic

20   events with the children that you were trying to care for, were

21   they just one or two, just a rare sort of thing, or were they

22   common?

23   A.   It was common.

24   Q.   And the trauma to the children, did it inflict trauma on

25   you as the caseworker as well?

```
 1    A.    Yes.
 2    Q.    You had -- at one point did you raise your concerns about
 3    the safety and well-being of children in these unregulated
 4    placements, these Child Watch children, CWOP children, with
 5    some of the executives of DFPS?
 6    A.    Yes.  So at one point around New Year's, 2022-2023 New
 7    Year's time --
 8    Q.    So about a year ago?
 9    A.    About a year ago.  They asked for volunteers, like, three
10    of us.  Like -- they emailed, like, the workers that had been
11    there the longest that had good work if anybody wanted to
12    volunteer to have Commissioner Muth shadow or do a ride-along.
13    Q.    Okay.  Let me stop you.  You had been there for just a
14    year at this point, right?
15    A.    Yeah.
16    Q.    So you're one of the workers that had been there the
17    longest?
18    A.    Yeah.
19    Q.    All right.  So what happens?  So you're talking about
20    shadowing who?
21    A.    Having Commissioner Muth shadow me.
22    Q.    Commissioner Muth?
23    A.    Muth, yes.
24    Q.    Muth.  Okay.
25    A.    Am I pronouncing it correctly?
```

```
 1   Q.   No, you're good.  And so what happened?
 2   A.   We coordinated.  We met one day, and I gave her a tour
 3   around the office.  She actively asked for everybody's
 4   concerns.  And this was also individually, like between
 5   different offices.  And almost everybody brought up CWOP.
 6              ZOOM UNIDENTIFIED SPEAKER:  They talking about the
 7   Commissioner.
 8              THE COURT:  A voice from the ether.
 9   BY MR. YETTER:
10   Q.   Okay.  You said almost everybody in the office brought up
11   what?
12   A.   Everybody that -- about everybody that I introduced her
13   to, almost everybody that I introduced her to brought up
14   concerns with CWOP about how unsafe and unregulated it was and
15   just how bad it was.  And every single time she would say, "I
16   agree.  CWOP is bad, and I'm going to get rid of it."  There's
17   a special session coming.  She -- she says she was going to get
18   it to stop.  She wanted to end CWOP.
19   Q.   This was a year ago?
20   A.   Yes.
21              THE COURT:  Who said that?
22              THE WITNESS:  Commissioner Muth.  She sent me cookies
23   after.
24   BY MR. YETTER:
25   Q.   She sent you what?
```

1   A.   She sent me cookies after.

2   Q.   After she shadowed you?

3   A.   Yeah.  It was nice.

4   Q.   How did you feel when the Commissioner of your department,

5   Department of Family and Protective Services, said, "I agree

6   putting children -- CWOP is not safe for the children"?

7        What did she say about for the workers?

8   A.   She agreed that it wasn't safe for anybody.

9   Q.   And what did she say she was going to do about it?

10  A.   She said she was going to end CWOP.

11  Q.   And how did you feel when you heard from the Commissioner

12  of your agency that she was going to end this hugely traumatic

13  and stressful part-time job that you had?

14  A.   I was thrilled.  I took her at her word, because she was

15  the Commissioner or is the Commissioner.  I told my coworkers,

16  because I was like, "The Commissioner said she was going to end

17  CWOP."  That's -- I had such high hopes.

18  Q.   Six months later, June, July 2023, was CWOP ended?

19  A.   No.

20  Q.   Were you still doing mandatory CWOP shifts?

21  A.   I was doing more CWOP shifts.

22  Q.   How were you feeling at that point?

23  A.   I mean, I quit.  It was awful.  I felt terrible.

24  Q.   Was there anything in particular, any final straw that

25  broke the camel's back on this issue?

```
 1   A.    Another story that I might tear up for.

 2             I had this eight-year-old child with severe special

 3   needs.  He had several diagnoses.  Since coming into care his

 4   diagnoses got less severe.  He had an amazing foster home,

 5   absolutely incredible people.  They taught him so much.  He

 6   learned to talk and was potty trained at their home.  Eight

 7   years old.  I'll repeat that.  Amazing foster home, but they

 8   had a deadline.  They gave me three months' notice to try to

 9   find him a new home.

10   Q.    What was his disability exactly?

11   A.    He had cerebral palsy and autism and vocal cord paralysis

12   and retinopathy and just all sorts of things.

13   Q.    So they gave you how much time?

14   A.    Three months' notice.

15   Q.    To do what?

16   A.    To find him a new home.

17             And I gave our placement search team three months'

18   notice to find him a home.  They said, "That's too much time.

19   Give us 30 days' notice."

20             And so I still emailed them every couple of weeks,

21   like, "Hey, don't forget, this is impending.  We need to find

22   him a home.  He's going to be hard to find a home for."

23             And then the Friday before -- Monday was the last

24   day.  The Friday before that Monday, they are still scrambling

25   to finish up that contract.  And I'm panicking because I gave
```

1    them three months' notice.  Why are we waiting until the very

2    last minute to do this contract?

3              And the person told me -- they were like, "We're

4    going to get the contract done by the end of the day."  And I

5    never heard back.

6              And so Monday morning, I see an email that says, "We

7    didn't get the contract done."

8              And in this whole meantime, me and my supervisor are

9    game planning, what are we going to do?  "This is -- this is

10   the home.  We need this contract done.  There's nowhere else."

11             And so we were game planning putting him in a hotel.

12   We were game planning having a Child Watch for this

13   eight-year-old with significant disabilities.

14             And I was very familiar with all of them, and I did

15   not want to leave him alone.  I was mentally preparing to just

16   stay there with him, like having a two-bedroom hotel, I stay in

17   one, he stays in the other, and there's still CWOP workers so

18   that they would have that support of somebody who knew him,

19   because also he trusted me.  He was nervous with strangers.  He

20   wouldn't have done well at all.  He would have regressed back

21   to where he was before.  And so I was mad.

22             So that Monday, I saw that email, I immediately -- I

23   had already had so many thoughts about quitting before that,

24   but he -- he needed to be safe.  And so that morning when I saw

25   the email that the contract wasn't done, I typed up my

1    two-weeks, handed it to my supervisor, asked if she needed one

2    copy or two and if it needed to be signed, because that is not

3    okay.

4              He's fine now, by the way.  For the record, he's

5    fine.  We scraped together something.

6    Q.   Good.  Thank you, Ms. Reveile.

7              MR. YETTER:  Your Honor, I pass the witness.

8              THE COURT:  Ms. Muth, did you hear that?

9              COMMISSIONER MUTH:  Yes, Your Honor.

10             THE COURT:  Is that true?

11             MS. MUTH:  I'm sorry, is what true?

12             THE COURT:  Is what she said true about you?

13             COMMISSIONER MUTH:  That I did a ride-along with her

14    and listened to concerns from staff in the office?  Yes, Your

15    Honor.

16             THE COURT:  And what she said you told her?

17             COMMISSIONER MUTH:  I believe what I said was I was

18    working to end CWOP.  I did not make a promise, and talked

19    about some of the initiatives that we had, yes.

20             THE COURT:  And did you say it was awful?

21             COMMISSIONER MUTH:  I said that it is not the right

22    thing for the kids in our care and that we were working to find

23    placements and that it's not ideal for our staff as well.

24             THE COURT:  Did you tell her it was unsafe?

25             COMMISSIONER MUTH:  Did I tell her it was unsafe?  I

```
 1   don't recall.
 2            THE COURT:  Did she tell you that?
 3            THE WITNESS:  That was my understanding of -- that's
 4   what I took away from it.
 5            THE COURT:  Thank you.
 6            Go ahead.
 7            MR. ADAMS:  Thank you, Your Honor.
 8                         CROSS-EXAMINATION
 9   BY MR. ADAMS:
10   Q.   Thank you for all of your efforts that you recounted.  It
11   sounds like that you in many instances went to extraordinary
12   efforts in your job.  Is that fair?
13   A.   Yeah.  Thank you.
14   Q.   And it sounds like you worked with a lot of people that
15   also worked very hard.
16   A.   Yes.
17   Q.   And it's apparent from your testimony that you care a lot.
18   You referred to these as "my children" in numerous instances.
19   A.   Yeah.
20   Q.   Was that consistent with your experience with other
21   people, your colleagues that you worked with, that they cared a
22   lot?
23   A.   Yes.
24   Q.   And they worked very hard?
25   A.   Yes.
```

1   Q.   And ultimately you just couldn't do it anymore.  Is that

2   fair?

3   A.   Yes.

4   Q.   I have a few questions about the initial child that you

5   explained that you called Statewide Intake and you never heard

6   from Provider Investigations.

7   A.   Yes.

8   Q.   I want to talk about that for a few minutes.

9   A.   Okay.

10          MR. ADAMS:  Your Honor, one of the questions that I

11   intend to ask is the name of the child.  It will be important

12   for some rebuttal evidence.  I don't know if we should do that

13   under seal or how the Court would like to handle that.

14          THE COURT:  Why don't you-all approach the bench just

15   for a minute and see if we can mute out the courtroom and the

16   Zoom, and let's figure out how to do that.

17          MR. ADAMS:  Thank you, Your Honor.  And I don't know

18   if I'm going left or right.

19          THE COURT:  I have no idea.

20          LAW CLERK:  It's on this side.

21          MR. ADAMS:  That side.

22          THE COURT:  That side.  Okay.

23          Is the Zoom muted out?

24          COURTROOM DEPUTY CLERK:  I muted Zoom, yes.

25          THE COURT:  Okay.

```
 1              THE REPORTER:  Is this on the record, Judge?
 2              THE COURT:  Yes, please.
 3              MR. ADAMS:  Come around?  Us coming to you?
 4              THE COURT:  Just up here.
 5              MR. ADAMS:  Oh, I apologize.
 6              THE COURT:  There are microphones here.  You can come
 7    sit with me if you'd like.  I'll bring up another chair.
 8              MR. ADAMS:  I do what I'm told, Your Honor.  I try.
 9              (Bench Conference on the record)
10              THE COURT:  So what do we do?
11              (Pause)
12              THE COURT:  What we're going to have her do is have
13    her write -- we can do this -- we can do it on the record.
14    We're fine.  All this hullabaloo.
15              (End of Bench Conference)
16              THE COURT:  All right.  What we've decided to do to
17    protect her -- the name of the person is for you to write it
18    down.
19              THE WITNESS:  Okay.
20              THE COURT:  So if you -- sir, could you give her a
21    piece of paper?
22              MR. ADAMS:  Yes, Your Honor.
23              THE WITNESS:  That might be easier for spelling
24    reasons, too.
25              THE COURT:  And then you can -- and then you can
```

1    verify it with your records.

2              Do you know who the person is, Mr. Yetter?

3              MR. YETTER:  I do not, Your Honor.

4              THE COURT:  So you need to share that.  And I would

5    appreciate it if you would share the name with the Monitors.

6    Just hand it to them.

7              MR. ADAMS:  Your Honor, if I may, once the witness

8    has done this, I would like to mark this as an exhibit.  Would

9    that be acceptable?

10             MR. YETTER:  If the Court keeps it under seal.

11             THE COURT:  I can do it under seal.

12             MR. ADAMS:  Okay.  So I'm going to file a motion to

13   mark this as an exhibit under seal.

14             THE COURT:  What's the number, please?  1-0 --

15             MR. SHAH:  Well, it will be Defendants' Exhibit 49.

16             THE COURT:  49?

17             MR. ADAMS:  Yes, Your Honor.

18             THE COURT:  Defendants' Exhibit 49?

19             MR. SHAH:  Filed under seal.

20             MR. ADAMS:  Mark that as --

21             THE COURT:  Do you have the name now, Mr. Yetter?

22             MR. YETTER:  I do not, Your Honor.

23             THE COURT:  I don't know if you need the name.  Let

24   me think.  I would like the Monitors to have the name.  Would

25   you hand it to them?

```
 1              MR. ADAMS:  Yes, Your Honor.
 2              THE COURT:  And without objection, then, Defendants'
 3    49 is admitted.
 4              MR. SHAH:  Yes, Your Honor.
 5              THE COURT:  Have you got it marked now?
 6              MR. SHAH:  Yes.
 7              THE COURT:  Sir, could you see Mr. Shah to get the --
 8              So that's admitted under seal.
 9                   (Defendants' Exhibit No. 49 received)
10              MR. ADAMS:  Thank you, Your Honor.
11              And to be clear, am I sharing this with Mr. Yetter or
12    keeping it?
13              THE COURT:  I'm not sure that that's necessary.
14              Mr. Yetter?
15              MR. YETTER:  Your Honor, as long as the Monitors have
16    it, I think that's fine.
17              THE COURT:  Okay.  I mean, we're pretty clear that
18    the Monitors get this information, but not -- I mean the actual
19    identities but not anybody else unless there's some reason.
20    So, no, you don't have to share it with anybody else.
21              MR. ADAMS:  Thank you, Your Honor.  And --
22              THE COURT:  So you want to hand it to the clerk, or
23    do you need it?
24              MR. ADAMS:  I'm just trying to think, Your Honor, if
25    I phrase the questions in terms of Child L?
```

```
 1                THE COURT:  You can do initials.
 2                MR. ADAMS:  Or child J.L.  Would that --
 3                THE COURT:  Perfect.
 4                MR. ADAMS:  Okay.  Hand this to the court reporter,
 5      Your Honor?
 6                THE COURT:  It's been admitted, and that's under
 7      seal.
 8                Do you want to write down J.L.?
 9                MR. ADAMS:  I'm going to do that in my notes.  Thank
10      you, Your Honor.
11                THE WITNESS:  If I may also, if it's easier for you,
12      if you just say "the child," I'll understand.
13                THE COURT:  Well, let's do J.L., because you talked
14      about a couple of different kids.
15                THE WITNESS:  Okay.
16      BY MR. ADAMS:
17      Q.   And I do want to -- I'm going to ask you about a few of
18      them, so I appreciate that, and I will try to be consistent
19      here.
20                So regarding child J.L., my understanding is that at
21      some point that child went into an HCS group home, correct?
22      A.   Yes.
23      Q.   At that time, had the child reached the age of 18?
24      A.   She got there a little bit before her 18th birthday.
25      Q.   Do you know how long before her 18th birthday?
```

```
 1    A.    Almost two weeks.
 2    Q.    Okay.  So about two weeks before she entered -- and is
 3    this the first HCS group home that she entered?
 4    A.    Yes.
 5    Q.    Okay.  And at some point you became aware of some issues
 6    that you ultimately reported to Statewide Intake?
 7    A.    Yes.
 8    Q.    Do you recall about how long that was after the child
 9    entered the first HCS group home?
10    A.    I don't remember exactly.
11    Q.    Okay.  When you first became aware of these -- let me ask
12    you this.  How did you -- generally how did you become aware of
13    those allegations about -- I think it was sexual abuse related
14    to child J.L. in the HCS group home?
15    A.    I talked to a few people that were working at the group
16    home, different staff members that would be in her apartment or
17    the manager of the facility, and there was an LPS worker as
18    well.
19    Q.    Okay.  So these were staff people that worked for the
20    provider that discussed with you and gave you concerns?
21    A.    Yes.  And for the record, LPS worker is Local Permanency
22    Specialist.
23    Q.    Thank you.
24          Did you find that during your work with -- whether
25    it's regard to child J.L. or otherwise, that frequently
```

```
 1   providers would be cooperative and helpful for your work?
 2   A.    Other Statewide Intakes that I made not in regards to HCS
 3   homes, I had an investigator contact me.  Is that what you're
 4   asking me?
 5   Q.    My question's slightly different.
 6   A.    Okay.
 7   Q.    So you mentioned that you received information from staff
 8   members that worked for the provider, correct?
 9   A.    Yes.
10   Q.    And do you know what I mean when I say a provider?
11   A.    Yes.
12   Q.    Okay.
13              THE COURT:  The HCS.
14              THE WITNESS:  Yes.
15   BY MR. ADAMS:
16   Q.    The -- it's the --
17              THE COURT:  Have I finally got the initials right?
18              MR. ADAMS:  Yes.
19   BY MR. ADAMS:
20   Q.    And those staff members worked for the provider, right --
21   A.    Yes.
22   Q.    -- that provided you that information?
23   A.    Yes.
24   Q.    And did you coordinate with providers and staff members on
25   occasion to help you do your job?
```

```
1   A.   Yes.
2   Q.   Okay.  So with respect to child J.L., when staff members
3   informed you that there were issues that gave you concerns and
4   you called Statewide Intake, did you call anybody else?
5   A.   I debriefed with my supervisor as well, of course.
6   Q.   Did you call 911?
7   A.   No.
8   Q.   Why not?
9   A.   Because there wasn't -- there wasn't protocol for that.
10  Q.   All right.  Do you have -- is there a protocol for calling
11  911, law enforcement, if you believe that there is an imminent
12  threat to the child?
13  A.   Yes.
14  Q.   Do you know -- do you remember what that protocol is that
15  you're supposed to call them if there is a substantial risk or
16  imminent threat?
17  A.   Not off the top of my head, no.
18  Q.   Okay.  Is that something that you would have done if you
19  believed that there was an imminent risk?  For example, you
20  mentioned another situation, EMS was on its way.
21  A.   Yes.
22  Q.   Okay.  Was that your understanding of the protocol that if
23  there was this kind of emergency threat that you would call
24  911?
25  A.   Yes.
```

```
 1   Q.   Okay.  Not Provider Investigations -- or not Statewide
 2   Intake?
 3   A.   If you're --
 4   Q.   I can clarify the question if it's helpful.
 5   A.   Please.
 6   Q.   In addition to calling Statewide Intake, if you believed
 7   there was an emergency, would you have called 911?
 8   A.   Yes.
 9   Q.   Okay.  You said that you called Statewide Intake.  Do you
10   know who the investigator was that was assigned from Provider
11   Investigations?
12   A.   No.
13   Q.   And you said that this instance seemed to upset you or you
14   were surprised by it, is that right, that you didn't end up
15   receiving any information from Provider Investigations?
16   A.   Yes.
17   Q.   Is that because it stood out to you in comparison to other
18   instances where you had called Statewide Intake?
19   A.   Yes.
20   Q.   And had you had occasion to call Statewide Intake multiple
21   times in the past?
22   A.   Yes.
23   Q.   And did they promptly get back to you and conduct
24   investigations?
25   A.   Yes.  Sometimes the very next day.
```

1   Q.   Okay.  And in this case, with respect to child J.L., you

2   don't actually know one way or another whether an investigation

3   was conducted; you just weren't informed about it one way or

4   another?

5   A.   Correct.

6   Q.   You left your employment in June of this year?

7   A.   Yes.

8   Q.   Are you aware of what, if any, policy changes have been

9   made with respect to children without placement since then?

10  A.   I heard through a grapevine of former colleagues that

11  Child Watch shifts were going to go up to eight per month in

12  August.

13  Q.   What about since August?  Have you heard anything since

14  then?

15  A.   No.

16  Q.   Okay.  Are you aware if there's been any staffing changes

17  since August of this year to children without placement?

18  A.   Not that I'm aware of.

19  Q.   Do you think it would have helped in your experience with

20  children without placement to have had staff dedicated to

21  dealing with those children?

22  A.   Yeah.

23  Q.   And it sounds like so -- and help me understand a little

24  bit your background and your role working with children.  It

25  sounds like part of it was a counseling role?

```
 1    A.    Unofficially, yeah.
 2    Q.    Okay.  Were you involved in helping to find placements for
 3    children?  Is that something that would have fallen within your
 4    duties?
 5    A.    Sometimes, yeah.
 6    Q.    Okay.  And were you mostly successful in finding
 7    placements for children?
 8    A.    I usually always eventually found a place, yeah.
 9    Q.    Fair to say that you had some difficulties?
10    A.    Yes.
11    Q.    Despite working very hard at it?
12    A.    Yes.
13    Q.    Why did you have difficulty finding placements for
14    children?
15    A.    Because there was a team that was supposed to be dedicated
16    for placement searches, and they had contacts at various
17    provider locations and I did not have that list, so I would
18    have to just Google search and call people randomly.
19    Q.    Okay.  But is it fair to say that some of the children
20    that you were trying to find placements for, it was difficult,
21    that there were homes or caregivers that maybe were reluctant
22    to accept them into their homes?
23    A.    Yes.
24    Q.    Okay.  And is that due to behavioral issues?
25    A.    I can't say what their motivations were for denying if
```

1    they were just a foster home or anything.

2    Q.   Okay.  Do you know or was it your experience that children

3    in the category of children without placement typically had

4    more behavioral issues?

5    A.   Typically, yes.

6    Q.   Okay.  And was that one of the reasons that they were

7    children without placement in the first instance?

8    A.   In my opinion, no.  I think it's not the kid's fault.

9    I --

10   Q.   And to be clear, I appreciate that and I'm not asking you

11   to blame the children.  But there's a point in time when they

12   enter the CWOP program, right?  And you've explained that there

13   were issues that you observed while children were in the CWOP

14   program.

15            My question is if some of those children that ended

16   up in the CWOP program also had significant behavioral issues

17   before they entered the CWOP program?

18   A.   Were statistics taken, there would be a correlation.

19   Q.   And consistent with your observations and experience, that

20   was true --

21   A.   Yes.

22   Q.   -- wasn't it?

23            You mentioned that some of the children that you

24   observed in the CWOP program were not regularly attending

25   school.  Do you recall that?

```
 1   A.    Correct.  Yeah.
 2   Q.    Do you know how long those children were in the CWOP
 3   program?
 4   A.    They would be -- the children in the Child Watch locations
 5   that weren't in school generally were in and out of Child
 6   Watch, and they weren't in school because they would be living
 7   all over the state at any given time, and it was hard to find a
 8   school program and consistent enough technology for online
 9   school that would accommodate moving so much as well as the
10   trauma that the kids experience from having to move so much.
11   The motivation goes down, and participation is required, and
12   et cetera, et cetera.
13   Q.    Do you know how long the children that you observed that
14   were not going to school, do you know how long they were in
15   CWOP without attending school?
16   A.    I don't know.
17            THE COURT:  Well, what months of the year -- maybe
18   that would help -- did you work with CWOP?  Year-round?
19            THE WITNESS:  Year-round.
20            THE COURT:  Okay.  Never mind.
21   BY MR. ADAMS:
22   Q.    Do you know, the children that you observed not going to
23   school regularly, were some of those during summer months?
24   A.    I worked CWOP during the summer, yes.
25   Q.    Do you know, going back to child J.L. for a moment -- and
```

```
 1    I actually don't know if I refer to he or she.
 2    A.   She.
 3    Q.   She.  Do you know when she was in this HCS group home, was
 4    she receiving Medicaid waiver services?
 5    A.   Waiver services isn't familiar to me, so I don't know.
 6              THE COURT:  What does that mean?
 7              MR. ADAMS:  Your Honor, my understanding is that the
 8    way many of these group homes function and are regulated is
 9    because they are providing services, what they call waiver
10    services as part of Medicaid program and that's the
11    reimbursement, and I believe that affects --
12              THE WITNESS:  Oh, no, she was not.
13    BY MR. ADAMS:
14    Q.   Okay.
15    A.   It was by contract.  So she wasn't officially under that
16    waiver.  She was being paid by the department for contract.
17    Well, she wasn't.  The home was.
18              MR. ADAMS:  Your Honor, may I have one moment to
19    confer with counsel?
20              THE COURT:  Of course.
21              MR. ADAMS:  Thank you.
22              (Pause)
23              MR. ADAMS:  Thank you very much for your time.  No
24    further questions.
25              THE COURT:  Any redirect?
```

REDIRECT EXAMINATION

BY MR. YETTER:

Q.   Ms. Reveile, I thought I just heard counsel for the State suggest that the reason why these high needs children don't have a placement is because they're high needs children.  Do you think that's the reason?

A.   No.

Q.   Do you think it's the children's fault that the State of Texas, one of the richest states in the United States, doesn't have a placement, a safe, regulated placement for these children?  Do you think it's the children's fault?

A.   No.

Q.   Did you know before you got hired as a conservatorship caseworker that there were these hundreds of children that every night would be sleeping in unregulated placements because the State of Texas just didn't invest enough in the right placements and the right places for these children?  Did you know that?

A.   I didn't know that was the reason.

Q.   Once you found out, what did you think about that?

A.   It was disgusting.

            MR. YETTER:  Thank you, Your Honor.

            THE COURT:  Anything further?

            MR. ADAMS:  No, Your Honor.  Thank you.

            THE COURT:  Thank you, ma'am.  You're excused.

```
 1                    THE WITNESS:  Thank you.
 2                    THE COURT:  Is this witness excused?
 3                    MR. YETTER:  Yes, from our perspective, Your Honor.
 4                    MR. ADAMS:  No intent to recall her, Your Honor.
 5       Thank you.
 6                    THE COURT:  Thank you very much.
 7                    THE WITNESS:  Thank you.
 8                    (Pause)
 9                    MR. YETTER:  Your Honor, might -- since she has been
10       excused by the Court, might Ms. Reveile remain in the courtroom
11       for a little longer today?  I think she would like to listen to
12       the testimony.
13                    MR. ADAMS:  No objection, Your Honor.
14                    THE COURT:  Yes, you may.  She -- so what does that
15       mean?
16                    MR. YETTER:  I think she's going to the bathroom or
17       something.  She's going to come back and sit.
18                    Our next --
19                    THE COURT:  TMI.
20                    MR. YETTER:  Sorry.
21                    THE COURT:  That's all right.  I asked, didn't I?
22                    MR. YETTER:  And I'm going to answer you, Judge.
23                    Our next witness is Jackie Juarez.  And she should be
24       out --
25                    THE COURT:  The young lady that was sworn in earlier?
```

```
 1              MR. YETTER:  Yes.  Former PMC child.  And she
 2     should -- we're going to go get her right now.
 3              THE COURT:  Well, it could be that the other lady
 4     went out to get her.
 5              MR. YETTER:  It could be.  I believe she wants to
 6     stay and watch her testimony.
 7              THE COURT:  Okay.
 8              MR. ADAMS:  Your Honor, may I be excused from the
 9     courtroom for two minutes?
10              THE COURT:  Sure.
11              MR. ADAMS:  Thank you, Your Honor.
12              THE COURT:  Is this going to be your witness?
13              MR. SHAH:  No, it's not, Your Honor.
14              THE COURT:  Okay.  So we can continue while you're
15     out?
16              MR. ADAMS:  Yes, Your Honor.  Thank you.
17              MR. SHAH:  Your Honor, one point of clarification.
18     Mr. Pahl, is there any chance that he will -- we don't intend
19     to recall him at this time.  I don't know if Mr. Yetter does.
20              MR. YETTER:  I don't know what their other witnesses
21     are going to say, so I would revert -- reserve our right to
22     recall him if need be, but we can give them notice to have
23     him --
24              THE COURT:  Are they -- aren't they staying up here?
25              MR. SHAH:  They're staying here in Dallas, Your
```

```
 1   Honor.
 2             THE COURT:  Okay.
 3             MR. SHAH:  So we'll keep him obviously overnight.  I
 4   just mean that once we find out.
 5             THE COURT:  Do you want to just give a cell phone
 6   number to Mr. Yetter, and if he wants to go to his hotel or
 7   sightsee or something like that?
 8             MR. SHAH:  I will have it on me, on my cell phone,
 9   but --
10             THE COURT:  Or maybe review his policies even.
11             MR. SHAH:  We'll figure it out, Your Honor.
12             THE COURT:  Then he can -- then he can be free to go
13   about his business as long as he stays in the area.  How about
14   that?
15             MR. SHAH:  Yes, Your Honor.  That works.
16             (Pause)
17             THE COURT:  There is the witness stand over there.
18   And you're still under oath.  Just be seated and relax.  Easy
19   to say, huh?
20           JACKIE JUAREZ, PLAINTIFFS' WITNESS, SWORN
21                      DIRECT EXAMINATION
22   BY MR. YETTER:
23   Q.   Good afternoon, Ms. Juarez.
24   A.   Good afternoon.
25   Q.   And you're doing a good job.  You're going to sit up
```

1    close, if you don't mind, to that microphone, because the Judge

2    and everybody in this courtroom wants to hear your testimony,

3    all right?

4    A.    All right.

5    Q.    Now, you are -- the Court knows that you are a former

6    foster child, PMC foster child with the State of Texas, are you

7    not?

8    A.    Yes.

9    Q.    And did you come here with one of your attorneys?

10   A.    Yes.

11   Q.    And does she work for Disability Rights?

12   A.    Yes.

13   Q.    And is that -- can you point her out?  Is that her right

14   there?

15   A.    Yes.

16   Q.    Meredith Parekh?

17             MS. PAREKH:  Parekh.

18             MR. YETTER:  Parekh.

19             And, Your Honor, she works with Disability Rights,

20   and she has been representing and counseling Ms. Juarez in the

21   past.

22             THE COURT:  I reread also before this hearing that --

23   I'm not sure I had ever seen that -- the amicus brief, the

24   Disability Rights filed with the Fifth Circuit.

25             MR. YETTER:  Yes, Your Honor.  They have been --

1  they're an amazing organization, and they have been very

2  supportive of this litigation from the outset, including in

3  front of the Fifth Circuit and continuing until today.

4           THE COURT:  I was particularly moved by the part of

5  the brief that the children in care sometimes are destined for

6  sex trafficking while in care, which I guess was filed in 2016

7  or so.

8           MR. YETTER:  Might have been a bit later.  Yeah, '16

9  or '17.  Yes, Your Honor.

10  BY MR. YETTER:

11  Q.   Ms. Juarez, we're going to talk about your experience in

12  foster care in the State of Texas, okay?

13  A.   Okay.

14  Q.   All right.  How old are you today?

15  A.   I am 18 years old.

16  Q.   When did you turn 18?

17  A.   October 1st.

18  Q.   So you've been 18 for about two and a half months.  Two

19  months?

20  A.   Yes.

21  Q.   Before you turned 18, were you in the Texas foster care

22  system?

23  A.   Yes.

24  Q.   How old were you when you first came into the system?

25  A.   About 11.

```
1   Q.   11 years old.  So would that mean that you were in the
2   Texas foster care system for about seven years?
3   A.   Yes, sir.
4            THE COURT:  Do you have a stable place to live right
5   now?
6            THE WITNESS:  Yes, I do.
7            THE COURT:  Thank you.
8   BY MR. YETTER:
9   Q.   Are you in extended foster care now?
10  A.   Yes.
11  Q.   And that means you're still within the foster care system,
12  but you're a young adult now?
13  A.   Yes.
14  Q.   And do you live in an apartment?
15  A.   It's a program where there are kids that are aged out of
16  care, and they help us -- we're like a different program.  They
17  help us and -- to go to school and to get our driver's license,
18  all of those stuff we need.
19  Q.   And going to school, is that something that you're trying
20  to do?
21  A.   Yes.
22  Q.   Do you have a little catching up to do?
23  A.   Yes.
24  Q.   Are you -- do you like school?
25  A.   I do.
```

```
 1   Q.   Do you plan on getting -- going to college?
 2   A.   Yes.
 3            THE COURT:  What grade are you classified in now?
 4            THE WITNESS:  I was working -- I'm working on my GED.
 5            THE COURT:  You're working on your GED?
 6            THE WITNESS:  Yeah.
 7            THE COURT:  How far did you go in school while you
 8   were in foster care?
 9            THE WITNESS:  Into the eighth grade.
10            THE COURT:  I see.  And -- Okay.  Go ahead.
11   BY MR. YETTER:
12   Q.   So after you get your GED, you plan to go to college?
13   A.   Yes.
14            THE COURT:  Do you remember how many schools you went
15   to in foster care?
16            THE WITNESS:  I don't remember, but there were like
17   around five, because every time you move in placements, you
18   move schools.
19            THE COURT:  How many times did you move?
20            THE WITNESS:  I don't remember.
21            THE COURT:  Okay.
22            THE WITNESS:  But it was a lot.
23            THE COURT:  It's hard to stay in school when that's
24   happening?
25            THE WITNESS:  Yes.
```

```
 1    BY MR. YETTER:
 2    Q.   There were other reasons why you had trouble staying in
 3    school, weren't there?
 4    A.   Yes.
 5    Q.   And was it with -- did it deal with the medicine that you
 6    were -- that you were being given?
 7    A.   Yes.
 8    Q.   Okay.  We're going to get to that, but let's kind of take
 9    it a step at a time, all right, Mr. Juarez?
10    A.   All right.
11    Q.   You're doing great, by the way.
12    A.   Thank you.
13    Q.   All right.  Keep your voice up, and you want to -- it's
14    Judge Jack that wants to hear your testimony.  Everybody in
15    this courtroom does.
16            Were you -- do you remember whether you stayed
17    anytime at a facility or a home called Forever Family?
18    A.   Yes.
19            MR. YETTER:  And, Your Honor, that is a Home &
20    Community-Based Services home, an HCS home, Forever Family.
21    BY MR. YETTER:
22    Q.   While you were there, did the staff at this HCS home, how
23    did they treat you and the other children there that you saw?
24    A.   Poorly.
25    Q.   And why do you say that?
```

```
 1              THE COURT:  What did she say?  I didn't hear.
 2              MR. YETTER:  Poorly.
 3   BY MR. YETTER:
 4   Q.   Why do you say that?
 5   A.   Because they would -- when we would misbehave -- like if
 6   we even cried about something or just like out of nowhere they
 7   would tell us when we misbehaved that we were there because our
 8   family didn't want us or that because we were bad kids and
 9   nobody wants bad kids, and to be appreciated that they even
10   accept us.
11   Q.   Did the staff ever curse at you and the other children
12   that were -- the staff at Forever Family, the HCS home?
13   A.   Yes.
14   Q.   Did you ever see some of the other children being
15   restrained really roughly?
16   A.   Yes.  There was one time where the staff was actually on
17   top of the girl like choking her.
18   Q.   Did you see a boy being restrained who actually got his
19   arm hurt?
20   A.   Yes.
21   Q.   And what happened to his arm?
22   A.   They just put like a little bandage over it.  They took
23   him to the doctor and said that he fell playing soccer.
24   Q.   Okay.  So he was hurt by the staff while they were holding
25   him down.  And what happened to his arm?  Was it -- how did it
```

```
 1   get hurt?  How bad was it hurt?
 2   A.   It was broken.
 3   Q.   Broke his arm.  Then they took him to the doctor.  And
 4   what did you -- what did they tell the doctor?
 5   A.   That he fell playing soccer.
 6   Q.   Now, do you remember --
 7            THE COURT:  How long were you there?
 8            THE WITNESS:  A couple of months.
 9            THE COURT:  Thank you.
10   BY MR. YETTER:
11   Q.   This was in 2020, wasn't it?
12   A.   Yes.
13   Q.   You were 15 years old?
14   A.   Yes.
15   Q.   Okay.  Do you remember on Christmas Eve you got a present
16   in December of 2020?
17   A.   Yes.
18   Q.   What was the present?
19   A.   It was an iPod.
20   Q.   And did that iPod -- could you text people with that iPod?
21   A.   Yes, if you had Wi-Fi.
22   Q.   Okay.  And did they have Wi-Fi at the home?
23   A.   Yes, they did.
24   Q.   At some point did one of the staff members start to text
25   you on that new iPod that you got in December 2020?
```

```
 1   A.    Yes.  It was a male staff.
 2   Q.    This is a man that's working at this HCS home who's a
 3   staff member?
 4   A.    Yes.
 5   Q.    And he's texting you and you're 15 years old?
 6   A.    Yes.
 7   Q.    And what are the kind of things he's telling you in these
 8   texts?
 9   A.    That I looked cute and that he likes my personality.  And
10   after that, he kept texting me morning and night asking me what
11   I was doing and all those kind of stuff.
12   Q.    How did you feel?
13   A.    Uncomfortable.
14   Q.    What did you think was happening?
15   A.    Because I already had a trauma with my stepdad, I didn't
16   trust men.  And I gave the staff the -- I showed them the iPod,
17   and I told them that he kept texting me and I was getting -- I
18   felt uncomfortable with it.
19   Q.    Did you show them the text from this male staff member at
20   the Forever Family HCS home?
21   A.    Yes.
22   Q.    And did they tell you, "Oh, that's wrong.  We're going to
23   stop that right away"?
24   A.    No.  They took my iPod away.
25   Q.    Well, then after they took their -- your iPod away, did
```

1    they do something about the staff member that was sending you

2    all of these texts day and night?

3    A.   No.

4    Q.   Did he stay there, work there?

5    A.   Yes.

6    Q.   And how did the staff make you feel after they took your

7    iPod away about the fact that you had kind of tried to tell

8    them that the staff member was doing something wrong?  How did

9    they make you feel, the other staff members?

10   A.   They made me feel bad.

11        THE COURT:  Who had given you the iPod?  Was it a

12   charitable organization?

13        THE WITNESS:  No, it was my caseworker.

14        THE COURT:  Your caseworker gave it to you?

15        THE WITNESS:  Yes, for Christmas.

16   BY MR. YETTER:

17   Q.   Did you have -- after you made this outcry about the staff

18   member and they took your iPod away, did you get in a scuffle

19   with anybody at the home?  In a fight?

20   A.   Yes, because she -- she told me that I was trying to ruin

21   an innocent man's life and --

22        THE COURT:  Oh, you got in a fight with the staff man

23   who was texting you?

24        THE WITNESS:  No.  The staff got the kid to fight me.

25        THE COURT:  Okay.

```
 1    BY MR. YETTER:
 2    Q.   So another foster child got in a fight with you?
 3    A.   Yes.
 4    Q.   Because?  What did that child say to you?
 5    A.   That it was my fault that he was -- well, there was
 6    like -- they told her that I had like wanting to get with him
 7    kind of stuff and to get him fired.  And so then she told me
 8    that I tried to get an innocent man fired and that if anything
 9    happened to him it would be my fault.
10    Q.   At some point a few weeks later did someone show up to the
11    home and tell you that they were an investigator?
12    A.   Yes.
13    Q.   And what did they -- what were they -- what did they talk
14    to you about?
15    A.   About the iPod situation.
16    Q.   Did you tell them everything that happened?
17    A.   Yes.  And the lady told me that that was wrong of him and
18    that he shouldn't --
19              THE COURT:  Wait a minute.  The what?  Who told you
20    you were wrong?
21              THE WITNESS:  The lady who came and see me -- see me
22    at that time.
23              THE COURT:  The investigator?
24              THE WITNESS:  She told me she was an investigator but
25    not for CPS.
```

```
 1              THE COURT:  Okay.  But she said she wasn't -- sorry?
 2              MR. ADAMS:  Your Honor --
 3              MR. YETTER:  She said not for CPS.
 4              THE COURT:  What?
 5              MR. ADAMS:  I believe the testimony --
 6              THE COURT:  I thought this wasn't your case, the
 7    witness.  It is your witness?
 8              MR. ADAMS:  Yes, ma'am, Your Honor.
 9              THE COURT:  Okay.  That was the last one.  This is
10    your witness?
11              MR. ADAMS:  For now, yes, Your Honor.  Yes, forever
12    and always.  Yes, Your Honor.
13              I believe the testimony was that the investigator --
14              THE COURT:  What's the objection?
15              MR. ADAMS:  That wasn't the witness's testimony.
16    Your question --
17              THE COURT:  Well, I know what she said, so sit down.
18    If you don't have a legal objection, don't interrupt her.
19              MR. ADAMS:  Thank you, Your Honor.
20              THE COURT:  Thank you.
21    BY MR. YETTER:
22    Q.  What did the investigator say to you about this staff
23    member's texts to you?  What did she say about that?
24    A.  The staff or the investigator?
25              THE COURT:  The staff or the investigator?
```

```
 1   BY MR. YETTER:
 2   Q.   Okay.  You showed -- you told this investigator about the
 3   staff member sending you texts?
 4   A.   Yes.
 5   Q.   What did the investigator say about that?
 6   A.   That he shouldn't have been doing that.
 7   Q.   Okay.  And at some point did you leave the -- this family,
 8   Forever Family HCS home?
 9   A.   Yes.
10   Q.   And was that sometime later after the investigator talked
11   to you?
12   A.   Yes.
13   Q.   And was the staff member still working at that place --
14   A.   Yes.
15   Q.   -- at that home?
16        When you left, where did you go?
17   A.   To a mental hospital.
18   Q.   A residential treatment center, a psychiatric hospital?
19   A.   Yes.  And when they dropped me off in there, they told me
20   that it was because they didn't want me anymore in there.
21   Q.   So Forever Family HCS home made you leave, and you had to
22   go to a mental hospital?
23   A.   Yes.
24   Q.   And you're 15 years old?
25   A.   Yes.
```

```
 1   Q.   At some point did you get out of the psychiatric hospital?
 2   A.   Yes.
 3   Q.   Did you -- did you then have a placement, a regulated
 4   normal placement to go to?
 5   A.   No.
 6   Q.   Were you in what -- in this system they call CWOP, were
 7   you one of those children in unlicensed, unregulated
 8   placements?
 9   A.   Yes.
10   Q.   This was in -- was this the same -- the next year, 2021?
11   A.   Yes.
12           THE COURT:  Who did you -- I wanted to ask her, who
13   did you tell about outside of Forever Family about the texts
14   that you were receiving that caused the investigator to come?
15           How -- do you know how that came about?
16   BY MR. YETTER:
17   Q.   Do you know?
18           THE COURT:  Did you tell your caseworker?
19           THE WITNESS:  No.
20           THE COURT:  Okay.
21   BY MR. YETTER:
22   Q.   But you told the other staff at Forever Family about the
23   texts?
24   A.   Yes.
25   Q.   Okay.
```

```
 1              MR. YETTER:  And so we believe, Your Honor, it was
 2   Provider Investigations that showed up to interview her, and
 3   nothing happened obviously to the staff member.  And it was
 4   weeks later.
 5   BY MR. YETTER:
 6   Q.   All right.  So here you are.  You're in 2020.  And you're
 7   one of the CWOP children at this point; is that right?
 8   A.   Yes.
 9   Q.   You just come out of a mental health hospital, and you
10   don't have a regulated placement to go to?
11   A.   Yes.
12   Q.   And you're -- how old are you?  15 still or 16?
13   A.   15.
14   Q.   How many different places did you stay at?
15              THE COURT:  At what point in time?
16   BY MR. YETTER:
17   Q.   This is in 2021 while you were in CWOP.  How many
18   different places?
19              THE COURT:  Before or after CWOP?  I'm not --
20              MR. YETTER:  In CWOP.  She stayed --
21              THE COURT:  Oh, how many different CWOP places --
22              MR. YETTER:  She stayed in different --
23              THE COURT:  -- did you stay at?
24              MR. YETTER:  Yes.
25              THE COURT:  I got it.
```

```
 1   A.   It was one church and three offices.
 2   Q.   Okay.  So you were there in CWOP for three or four months?
 3   A.   Yes.
 4           THE COURT:  In four different placements.
 5   BY MR. YETTER:
 6   Q.   In four different placements?
 7   A.   Yes.  And at the end I went to a hotel.
 8   Q.   Oh, a hotel.  So you had five different places?
 9           THE COURT:  Five.
10   BY MR. YETTER:
11   Q.   You went to three offices for Child Protective Services?
12           THE COURT:  A church, three offices, and a hotel.
13           MR. YETTER:  And a hotel.
14   BY MR. YETTER:
15   Q.   And when you went to -- did you only go to one hotel?
16   A.   If -- what I remember is that it was three different ones.
17   Q.   Three different hotels.  And did you go during the
18   weekdays or on the weekend?  Three different hotels.
19           THE COURT:  Was it three different hotels?
20           THE WITNESS:  Yes.
21           THE COURT:  Okay.  So a church, three offices, and
22   three hotels?
23           MR. YETTER:  And three hotels.
24           THE WITNESS:  Yes.
25           MR. YETTER:  And --
```

```
 1                THE COURT:  What was it like in the hotel?  Did you
 2    have roommates, or who was there with you?
 3                THE WITNESS:  Yes, I had a roommate.
 4                THE COURT:  And did a staff member stay in the room
 5    with you, too?
 6                THE WITNESS:  Yes.
 7                THE COURT:  Okay.
 8    BY MR. YETTER:
 9    Q.   And was this during the weekdays or on the weekends?
10    A.   On the weekends.
11    Q.   Was it -- what was it like that you went to these three
12    hotels on the weekends?
13                THE COURT:  Okay.  Wait a minute.  When you say on
14    the weekends, the staff was only there on the weekends?
15                THE WITNESS:  Yes.
16                THE COURT:  They were not staying in the room with
17    you during the week?
18                THE WITNESS:  They would only --
19                THE COURT:  These are the hotels we're talking about.
20                THE WITNESS:  They would only take us to hotels
21    around the weekend.
22                MR. YETTER:  They went to the hotels on the weekend,
23    You Honor.
24                THE COURT:  Oh, I got it.
25                MR. YETTER:  Yes.
```

```
 1              THE COURT:  Okay.
 2              MR. YETTER:  So they would stay at the offices during
 3    the week or at the church, and they go to the hotels during the
 4    weekend.
 5    A.   Yes.
 6    Q.   And when you were at the church, how many children were
 7    there about?
 8    A.   About ten.
 9    Q.   How many bed were there?
10    A.   There were four beds.
11    Q.   Four beds, ten children?
12    A.   Yes.
13    Q.   When you were at the Child Protective Services offices,
14    how were the beds?  Did they have beds?
15    A.   They did.  They were small beds, like four small beds.
16    Q.   Did they have pillows and sheets and blankets?
17    A.   Some of them.
18              THE COURT:  Well, did they have showers, or how did
19    you do hygiene?
20              THE WITNESS:  They had showers at the church.
21              THE COURT:  But not at the offices?
22              THE WITNESS:  Only some of the offices had.
23              THE COURT:  Okay.
24              THE WITNESS:  Because one of the offices is a clinic
25    in the office.
```

```
 1              THE COURT:  I understand.
 2   BY MR. YETTER:
 3   Q.   Was there always food to eat when you went to these
 4   various places?
 5   A.   No.
 6   Q.   When you were there during these three --
 7              THE COURT:  You mean they were not hotels with room
 8   service?
 9              (Technical interruption)
10              THE COURT:  Goodbye.
11              MR. YETTER:  Goodbye.
12              THE COURT:  We'll miss you.
13   BY MR. YETTER:
14   Q.   Here we are, 2021 --
15              THE COURT:  So the hotels didn't have food service?
16              THE WITNESS:  No.
17              THE COURT:  Okay.
18   BY MR. YETTER:
19   Q.   When you went to -- when you were in these three offices,
20   one church, and three hotels, what did you see the caseworkers
21   doing when you would go in?
22   A.   They would be on their phone or their computer.
23   Q.   And how do you -- what do you think they were doing on
24   their computers?
25   A.   Checking on their other cases.
```

```
 1   Q.   Why do you think they were checking on their other cases?
 2   A.   Because they will be talking out loud about their next --
 3   like they had to catch up on their work for their hearing the
 4   next day.
 5   Q.   And how did you hear them saying that?  Where were you?
 6   A.   I was next to them.
 7   Q.   Why were you sitting next to them when you would go to
 8   these offices or church or the hotels?  Why would you be
 9   sitting next to the caseworkers?
10   A.   Because the kids will fight me all the time.
11   Q.   Were you afraid of the other children?
12   A.   Yes.
13   Q.   Did you -- did you get a sense of whether the
14   caseworkers -- how much they were worried about the children in
15   these -- that were in the offices and the hotel and the church
16   as opposed to the children that were their regular children on
17   their caseload?
18   A.   If you were their own kid, they will -- if they -- if you
19   were their kid, they will worry about you.  But if they didn't
20   have to worry about you, they wouldn't worry.
21   Q.   Did any of the caseworkers that you came in contact with,
22   were they -- did they seem happy to be there, excited to be
23   working on these CWOP shifts?
24   A.   No.
25   Q.   What were they -- what was their attitude?
```

```
 1   A.   Every time my caseworker -- my caseworker I had before the
 2   one I have now, she would take me to her office, because I
 3   didn't have any place to go to.  And every time they will
 4   mention CWOP, everyone would be like, "Oh, no," like, "I
 5   don't -- I don't want to work CWOP," but they had to.
 6          And they were like -- they would say the curse word,
 7   "Oh, no, I don't want to go."  And they were like, "There's
 8   some bad --"
 9          Can I say the word?
10          THE COURT:  Yes.
11          THE WITNESS:  "There's some bad ass kids in there."
12   BY MR. YETTER:
13   Q.   Okay.  So your older -- your prior caseworker sometimes
14   would take you to her office?
15   A.   Yes.
16   Q.   And you would hear the other caseworkers talking?
17   A.   Yes.
18   Q.   And were they happy about doing CWOP shifts?
19   A.   No caseworker was happy to do CWOP.
20          THE COURT:  That you knew?
21          THE WITNESS:  Yes, ma'am.
22          THE COURT:  Can I interrupt everything --
23          MR. YETTER:  Certainly.
24          THE COURT:  -- before I forget, which happens.
25          Have you got an update on the Superior?
```

1          MR. YETTER:  Oh, I believe we got some documents in

2     this morning.

3          THE COURT:  The 60?

4          MR. YETTER:  Yes.  And I don't know for sure exactly

5     what it is, but I expect it's only the 60.

6          THE COURT:  What's the latest?

7          MR. SHAH:  Your Honor, as of lunch, my understanding

8     is the rest will be produced by the end of the day, but I just

9     haven't gotten emails here, so I don't know if they have been.

10         I don't know if anyone on your side -- I think

11    they're going to Ms. Ray on your staff, Mr. Yetter.  I don't

12    know if she's --

13         MR. YETTER:  I believe so.

14         MR. SHAH:  So they're connected, Your Honor, with the

15    production team, Ms. Ray is.

16         THE COURT:  So that's going to happen today?

17         MR. SHAH:  I believe so, but honestly, Ms. Ray and

18    the production team are talking.  I'm just not -- because I'm

19    in the courtroom, I don't know.

20         THE COURT:  Thank you.

21    BY MR. YETTER:

22    Q.   Ms. Juarez, did you ever get concerned about what some --

23    what you saw some of the other girls that were staying in these

24    CWOP places doing?

25    A.   Yes.

```
 1   Q.   And what were you concerned about?
 2   A.   They would text grown men to come pick them up at the
 3   church or the offices.
 4   Q.   And what would they -- would they leave with these grown
 5   men?
 6   A.   Yes.  And they would come back.
 7   Q.   How did they meet these grown men?
 8   A.   By social media.
 9   Q.   Like Facebook or what?
10   A.   Instagram.
11   Q.   Instagram?
12   A.   And Facebook.
13   Q.   What about some of the boys?  Did you ever see any of the
14   boys that were in these CWOP situations get hurt?
15   A.   Yes.
16   Q.   And when they -- did any of them ever run away?
17   A.   All of them ran away.
18   Q.   Did they ever get hurt after they ran away?
19   A.   Yes.
20   Q.   And do you remember -- can you give the Judge what you
21   remember about that?
22   A.   One of them got shot.
23   Q.   What was -- what was that boy that ran away from his CWOP
24   office or hotel, what was he doing when he got shot?
25   A.   He was trying to steal a car.
```

1   Q.   Did you ever get hurt when you were staying in these
2   unregulated places, churches, offices --
3   A.   Yes.
4   Q.   -- hotels?
5         And how did you get hurt?
6   A.   The girls would fight me.  There would be four girls
7   jumping on me, hitting me on my stomach and just basically
8   beating me up.
9   Q.   And where did you -- did you have to get any medical care
10  for that?
11  A.   Yes.
12  Q.   Where did you get it?
13  A.   At Memorial Hermann.
14  Q.   At the hospital?
15  A.   Yes.
16  Q.   And did -- why weren't the caseworkers there to keep
17  things under control?
18  A.   Because they wouldn't -- they wouldn't put hands on them.
19  Q.   So when a fight broke out, what would the caseworkers do?
20  A.   They would just call the cops after they were done
21  fighting.
22  Q.   So they would let the children fight it out, and then they
23  would call the cops?
24  A.   Yes.
25  Q.   Was that unusual that the caseworkers would call the

```
 1  police up?
 2  A.   They would call the cops after everything had happened.
 3  Q.   Now, you said everybody ran away from these CWOP
 4  placements.  Is that what you said?
 5  A.   Yes.
 6  Q.   Did you ever run away?
 7  A.   Yes.
 8  Q.   And why did you run away?
 9  A.   To get away from getting beat up and --
10  Q.   Was it tough for you, Ms. Juarez?
11  A.   Yes.
12  Q.   Was it -- was it hard on you emotionally?
13  A.   Yes.
14  Q.   How did it make you feel when you were staying in these
15  places like hotels and offices and this church?
16  A.   Bad, because they would tell me that I was in CPS because
17  my parents didn't want me.
18  Q.   They would tell you you were in CPS because your parents
19  didn't want you?
20  A.   No.
21           THE COURT:  Counsel, I interrupted you before and
22  told you to sit down.  I shouldn't have done that.
23           If you want to clarify something, go ahead.  It's
24  just hard to listen.  It's hard to listen to what she has to
25  say.
```

```
 1              MR. ADAMS:  Nothing, Your Honor.  Thank you very
 2    much.
 3              THE COURT:  Okay.  Do you want a minute with some
 4    water?
 5              THE WITNESS:  I'm good.
 6              THE COURT:  Take your time.
 7              THE WITNESS:  I'm ready.
 8              THE COURT:  I don't know how you could ever be ready
 9    for this.
10              THE WITNESS:  Because I'm trying to fight for kids in
11    CPS.
12              THE COURT:  Thank you.
13    BY MR. YETTER:
14    Q.   Are you ready?
15    A.   Ready.
16    Q.   Ms. Juarez, when you were staying in these places, these
17    offices, people were trying to beat you up, how did you feel?
18    How did you -- did you feel like you were fighting for your
19    life?
20    A.   Yes, because I was literally fighting for my life.
21    Q.   When you go -- when you ran away from CWOP, did the --
22    does the system have a name for that?  Like call it AWOL?
23    A.   Yes.
24    Q.   And did you go -- when you went -- after you went AWOL,
25    after you ran away, did you eventually find a placement?
```

```
 1   A.   When I ran away, I did have a place to live and food.

 2   Q.   Who allowed you to stay at that place?

 3   A.   Well, I didn't talk to CPS until the year after, in 2022.

 4   And I told them where I was staying.  And my judge put in a

 5   no-move order.

 6   Q.   Okay.  So you ran away because you were afraid for your

 7   life --

 8   A.   Yes.

 9   Q.   -- in a CWOP situation?

10        Child Protective Services didn't know where you were,

11   didn't help you out, didn't find you a place to stay?

12        THE COURT:  Where did you go?

13   BY MR. YETTER:

14   Q.   Where did you go?

15   A.   I just left to my mom's house, but I -- then I left to --

16   with somebody else, and I was happy.

17   Q.   You didn't have any other place to go, did you?

18   A.   No.

19   Q.   CPS didn't find you a place, did they?

20   A.   No.

21   Q.   Did they have a safe home for you?

22   A.   No.

23        THE COURT:  Are you safe now where you are?

24        THE WITNESS:  Yes, I am.

25        THE COURT:  Good.
```

```
1    BY MR. YETTER:
2    Q.   Now, eventually you called CPS back?
3    A.   Yes.
4    Q.   All right.  And then they -- you had a -- you sat down
5    with them by video?
6    A.   Yes.
7    Q.   And you told them how things were going, didn't you?
8    A.   Yes.
9    Q.   And one of the things that came out of that was a written
10   form about what you were doing, the plan for you.  Do you
11   remember that?
12   A.   Yes.
13            MR. YETTER:  And, Your Honor, I'm going to hand the
14   witness Plaintiffs' Exhibit 105, which is a document that she
15   provided to us.
16            THE COURT:  Has that been admitted?
17            MR. YETTER:  Yes, Your Honor.  It's part of the
18   initial -- everything was admitted.  This is Plaintiffs' 105.
19            And this is a -- this is a document that she --
20   BY MR. YETTER:
21   Q.   Well, Ms. Juarez, what is this document?  Is this
22   something you got or your lawyer got?
23   A.   Yes.
24   Q.   Okay.
25            THE COURT:  Can I emphasize again, she went into care
```

```
 1   at age 11?
 2              MR. YETTER:  11.
 3              THE COURT:  And what year was that?
 4              MR. YETTER:  That was --
 5              (Pause)
 6              MR. YETTER:  Just a minute, Your Honor.  It would
 7   have been -- it would have been 2015?  2016.
 8              THE COURT:  So after this case was tried, she went
 9   into care?
10              MR. YETTER:  Yes.
11              THE COURT:  And this is what she experienced?
12              MR. YETTER:  Yes, Your Honor.
13              THE COURT:  Years after the mandate was issued, I
14   might add, right?
15              MR. YETTER:  Yes, Your Honor.
16   BY MR. YETTER:
17   Q.   Now we're in 2021.  This is two years after the Remedial
18   Orders are in.  And you're talking again with CPS, aren't you?
19   A.   Yes.
20   Q.   And they're coming up with a plan for you, right?
21   A.   Yes.
22   Q.   Okay.  If you look on your screen, it's the same thing up
23   there as on your screen.  You see where we highlighted the date
24   of the conference?  It's a permanency conference dated May
25   the 12th, 2021.
```

```
 1   A.   Yes.

 2   Q.   Right?

 3   A.   Yes.

 4   Q.   And do you remember that call with all these people?

 5   A.   Yes.

 6   Q.   And, see, it says the location of the meeting is a

 7   teleconference link.

 8   A.   Yes.

 9   Q.   And then it says the children's name, Jacqueline Juarez.

10   Is that you, Jackie?

11   A.   Yes.

12   Q.   And then at the very bottom -- let's go to the bottom.

13   And that list of names of people that participated, you see

14   that last name there, Meredith Parekh, Foster Care Advocacy?

15   A.   Yes.

16   Q.   Is that your lawyer over there that was there?

17   A.   Yes.

18   Q.   So you've known her for several years now?

19   A.   Yes.

20   Q.   And she was there trying to make sure that you're safe?

21   A.   Yes.

22   Q.   What I want to ask you about this, let's -- let's go to

23   this next page.  And on the top line it says at that stage, in

24   May of 2021, you're a runaway, you're AWOL, right?

25   A.   Yes.
```

```
 1   Q.   And you're 15 years old, right?
 2   A.   Yes.
 3   Q.   And your service level was intense?
 4   A.   Yes.
 5   Q.   Okay.  Let's look to see.  On page 3, that first -- above
 6   the redactions.
 7             MR. YETTER:  And, Your Honor, Ms. Parekh has redacted
 8   parts of this that are -- that we believe are confidential to
 9   Ms. Juarez.
10             THE COURT:  Of course.
11   BY MR. YETTER:
12   Q.   And this says she is currently AWOL as of yesterday.  She
13   ran away from a temporary placement that she was in.  She ran
14   away from CWOP.  Is that all true?
15   A.   Yes.
16             THE COURT:  She had said you were being picky about
17   what you wanted to eat?
18             THE WITNESS:  No.
19   BY MR. YETTER:
20   Q.   She was refusing food while you were there.  Is that true?
21   A.   No.
22   Q.   Okay.  The next -- let's go down to the next one.
23             It says she's in the eighth grade; however, she has
24   missed a lot of school.  Do you see that?
25   A.   Yes.
```

```
 1   Q.   And why were you missing a lot of school?
 2   A.   Because I was sleepy.
 3   Q.   Because you were sleepy?
 4   A.   Yes.
 5   Q.   And why do you think you were sleepy?
 6   A.   Because they had me on a lot of medications.
 7   Q.   How many pills were you taking every day?
 8   A.   I don't remember, but at one point I was taking eight
 9   pills.
10   Q.   Eight pills?
11   A.   Yes.
12   Q.   Okay.  Let's go to page 4.
13            THE COURT:  Do you know what they were?
14            MR. YETTER:  We do, Your Honor.  It's on -- it's
15   in this -- on this document.
16            THE COURT:  Thank you.
17   BY MR. YETTER:
18   Q.   And let's see what you were taking.
19            So it says you're physically healthy.  Are you a
20   healthy young woman?
21   A.   Yes.
22   Q.   Okay.  You think you have mental health issues right now?
23   A.   No.
24   Q.   Are you taking any mental health medications today?
25   A.   No.
```

```
 1   Q.   Are you taking any medications at all today?
 2   A.   No.
 3   Q.   Okay.  This is just a few years ago while you were under
 4   the care of the State of Texas.  And let's look to see what you
 5   were on.  The bottom line says, "She is on the following."
 6            MR. YETTER:  Your Honor, I believe that -- and the
 7   Court is going to knows these very well.
 8            THE COURT:  It's probably Albuterol and not
 9   Abbuterol.
10            MR. YETTER:  It is Albuterol, Your Honor, but --
11            THE COURT:  It should be an A-L.
12            MR. YETTER:  Which is an asthma drug, but it's --
13   she's being -- she's getting it as needed for panic attacks.
14   BY MR. YETTER:
15   Q.   Do you think you had panic attacks at the time?
16   A.   No.
17            MR. YETTER:  She is on Lithium.
18            THE COURT:  Yes, Lithium, which is a drug for bipolar
19   disorder, some organic salt.
20            MR. YETTER:  Latuda, Prazosin.  We believe all of
21   these are psychotropic medications, Your Honor.  Keppra.
22            THE COURT:  I think -- I don't know about -- I don't
23   know what Lithium is qualified to do.  The psychiatrist can
24   tell us that.  But it's an organic salt.  I don't know if it's
25   a psychotropic.  It is?  It is a psychotropic?
```

```
1              MR. YETTER:  Yes, Your Honor.  We'll have testimony
2    on that.
3              THE COURT:  And --
4              MR. YETTER:  Keppra.
5              THE COURT:  -- Prazosin, is that like a -- that's
6    psychotropic?
7              MR. YETTER:  Prazosin.
8              THE COURT:  Or is that like a Prozac?
9              DR. BELLONCI:  It's actually a blood pressure
10   medicine --
11             THE COURT:  Okay.
12             DR. BELLONCI:  -- that can be used for PTSD.
13             THE COURT:  It could be for mood control, too, right?
14             MR. YETTER:  PTSD, Your Honor.
15             THE COURT:  Sorry.
16             MR. ADAMS:  Can we just identify --
17             THE COURT:  Yes.  The speaker was the expert they've
18   got, the psychiatrist on psychotropic -- the child psychiatrist
19   on psychotropic drugs.
20             MR. YETTER:  Dr. Bellonci.
21             THE COURT:  Yes.  And I understand that those blood
22   pressure medications are used for children with PTSD, you
23   know --
24             DR. BELLONCI:  ADHD.
25             THE COURT:  ADHD and whatever.
```

```
 1              DR. BELLONCI:  Prazosin is typically for PTSD.
 2              THE COURT:  Typically what?
 3              DR. BELLONCI:  For posttraumatic stress disorder.
 4              THE COURT:  Yes.  Thank you.  Which almost all the
 5  kids come into care with.
 6              MR. YETTER:  Or get.
 7              THE COURT:  They're going to get it one way or the
 8  other.
 9              And Keppra?
10              DR. BELLONCI:  Keppra is an anticonvulsant.  It's for
11  seizure medications.
12              THE COURT:  Okay.
13              DR. BELLONCI:  It doesn't really have any psychiatric
14  indication.
15  BY MR. YETTER:
16  Q.   Did you have seizures?
17  A.   No.
18              THE COURT:  Do we have her medical records?  I mean,
19  you never see the medical records completely.
20              MR. YETTER:  Your Honor, we don't have access to
21  them, but we will request them from the State.
22              THE COURT:  Do you-all have access to those?
23              MS. FOWLER:  We have access to Health Passport.
24              THE COURT:  Can you look up her records?
25              MS. FOWLER:  I don't know if we'll be able to look
```

1    her records up since she's turned 18.

2            THE COURT:  Do you know, State, if the records are

3    still in the computer, in Health Passport?

4            MR. SHAH:  I don't know with the age situation, Your

5    Honor.

6            THE COURT:  Would you ask, Ms. Muth?

7            (Pause)

8            MR. SHAH:  Don't know, Your Honor.

9            THE COURT:  She doesn't know?

10           Ms. Muth, you don't know?

11           COMMISSIONER MUTH:  Your Honor, no, I don't know.

12           THE COURT:  Okay.  Well, we'll give it a try and see

13   why she was getting the anti-seizure drug.

14           MR. YETTER:  Visprall?  Vistaril, maybe, perhaps.

15           THE COURT:  Vistaril?

16           MS. PAREKH:  Vistaril.

17           MR. YETTER:  Vistaril.

18           MS. PAREKH:  With a T.  It's just a typo.

19           THE COURT:  So --

20           MR. YETTER:  Is that an anti -- is that a

21   psychotropic, Doctor?

22           MS. PAREKH:  Yes.

23           MR. SHAH:  Your Honor, can we ask again who's

24   testifying here?

25           MS. PAREKH:  Sorry.

```
 1                MR. YETTER:  Meredith Parekh.

 2                MR. SHAH:  Identify her for the record.

 3                THE COURT:  That's her attorney.

 4                MR. YETTER:  That's her attorney, for the record.

 5                THE COURT:  Thank you.

 6                MR. YETTER:  From Disability Rights.

 7                MS. PAREKH:  And it's intended to be a T.  Vistaril

 8  is the --

 9                THE COURT:  Okay.  Oh, Vistaril?

10                MR. YETTER:  Vistaril.

11                THE COURT:  Not Visprall.

12                MS. PAREKH:  Yes.

13                THE COURT:  Okay.  And these are her -- this is her

14  service record, and they can't even spell the medicines that

15  she's on?  This is so impressive.

16  BY MR. YETTER:

17  Q.   And then Benadryl.  Why were you taking Benadryl?  Do you

18  have any idea?

19                THE COURT:  Did you have allergies?

20  BY MR. YETTER:

21  Q.   Did you need it to sleep?  Were they giving it to you so

22  that you would go to sleep?

23  A.   Yes.  And they're also giving me Melatonin.  It's not in

24  there.

25  Q.   All right.  Melatonin.  And that's one of --
```

1       THE COURT:  And I guess we'll hear from the doctor,

2  but a lot of these are not prescribed for children -- not

3  approved for children, used in children.  So we'll hear of that

4  later.  I'll be anxious to hear that.

5  BY MR. YETTER:

6  Q.   How did all of these -- this is eight different drugs.

7  How did they make you feel, Jackie?

8  A.   They would make me sleepy, and I would throw up every

9  night because of the medication.  I would feel always tired.

10  And when I went to school, I -- I would stay focused, but then

11  my whole mood would drop.  I would feel so tired that I

12  couldn't stay awake.

13  Q.   I asked you this before.  Do you like school?

14  A.   I do.

15       THE COURT:  How tall are you?

16       THE WITNESS:  4'8.

17       THE COURT:  And how much do you weigh?  I know that's

18  personal, but --

19       THE WITNESS:  105.

20       THE COURT:  I'd just like the doctor to know it for

21  when he testifies.

22       THE WITNESS:  105.

23       THE COURT:  Is that about what you were weighing

24  at 15 and --

25       THE WITNESS:  No.

```
1              THE COURT:  You weighed less?

2              THE WITNESS:  I don't remember.

3              THE COURT:  Okay.  Well, I just want him to have that

4    information to evaluate the medicines for your size, because

5    you seem petite.

6              THE WITNESS:  Thank you.

7    BY MR. YETTER:

8    Q.   Did you ever complain about getting all this -- all these

9    powerful drugs?

10   A.   Yes.

11   Q.   And who did you complain to?

12   A.   My -- the person who was taking care of me, whichever

13   person was taking care of me.  Even I told caseworkers at CWOP.

14   Q.   And what would they -- what was their answer to you when

15   you said, "These medicines make me feel terrible"?

16   A.   "That's what they prescribed you.  That's what you have to

17   take."

18             THE COURT:  Did you ever see a prescribing physician?

19             THE WITNESS:  Yes.

20             THE COURT:  How many times, do you remember?

21             THE WITNESS:  Once a month.

22             THE COURT:  Okay.

23   BY MR. YETTER:

24   Q.   You saw a doctor, and did you complain to the doctor?

25   A.   Yes.
```

1   Q.   What did the doctor say?

2   A.   "You need them."

3            THE COURT:  Did you have testing, evaluations of any

4   kind?  Like, did you take psychological tests, or were you --

5   if you know what those are.  If you don't, that's okay.

6            THE WITNESS:  I don't know.

7            THE COURT:  Okay.

8   BY MR. YETTER:

9   Q.   Did they give you any other counseling or anything like

10  that, or did you just get medicine?  Just get pills?

11  A.   No.  I just -- I was in therapy.

12  Q.   Therapy.

13  A.   Yes.  And -- but my therapy never talked to my doctor.

14  And I would just go in his office for like ten minutes, and he

15  would prescribe the medication.  And he would just ask me how

16  you've been in the week, and I would tell him I'm okay.

17           And he was like, "Are the medicines good for you?"

18           And I was like, "No, they're making me tired."

19           He was like, "Give them time."

20           And I went three years by them telling me, "Give them

21  time.  Give them time."  And they would still give them to me.

22           THE COURT:  Okay.  Was this a psychologist or a

23  physician?  Do you know the difference?

24           THE WITNESS:  It was a psychologist.  His name was

25  Dr. Ten.

1          MR. YETTER:  Dr. what?

2          THE WITNESS:  Ten.

3          THE COURT:  How do you spell that, do you know?

4          THE WITNESS:  T-E-N.

5          THE COURT:  T-E-N?

6          And where was this located?

7          THE WITNESS:  It's close to Bissonnet.  It's on the

8    highway.

9          THE COURT:  In what city?

10          MR. YETTER:  In Houston?

11          THE WITNESS:  Yes, city of Houston.

12   BY MR. YETTER:

13   Q.   Houston, close to Bissonnet Avenue?

14   A.   Yes.

15   Q.   Okay.  And your caseworker would take you there?

16   A.   The foster moms or the people who were in charge of me.

17   And sometimes when I didn't have a place to go to, it would be

18   my caseworker.

19   Q.   Okay.  Did you like your caseworker?

20   A.   I -- when I got to CPS, I was considerate of her, but

21   after, no.

22          THE COURT:  How -- tell me the difference in your

23   mental capacity, in your mental feelings now that you're off

24   these medications.

25          THE WITNESS:  I feel happy.  I'm able to process

```
 1    things more.  I do a lot of things.  I'm not tired.  I am able
 2    to focus more on, you know, like sports and art, reading and
 3    school.
 4              THE COURT:  So it's easier to do your schoolwork?
 5              THE WITNESS:  Yes.
 6              THE COURT:  Are you going to organized classes?
 7              THE WITNESS:  Yes.
 8              THE COURT:  And you're able to follow along and do
 9    the homework?
10              THE WITNESS:  Yes.
11              THE COURT:  Could you do that before with all those
12    medicines?
13              THE WITNESS:  No.
14    BY MR. YETTER:
15    Q.   Did you take a test recently, like a test that, you know,
16    that gets you into college or something like that?
17    A.   Yes.
18    Q.   And what -- do you remember what test that was, the name
19    of it?
20    A.   No.
21              THE COURT:  You mean like SATs or GEDs or which one?
22              THE WITNESS:  GED.
23              THE COURT:  Okay.  How did you do?
24              MR. YETTER:  How did you do?
25              THE COURT:  Oh, sorry.
```

```
 1              THE WITNESS:  I passed.

 2              THE COURT:  Well, congratulations.  Yay.

 3              So you're a high school graduate?

 4              THE WITNESS:  Well, I'm working on my test, because

 5    right now I'm the youngest one there, and I'm the one that got

 6    the high score.

 7              THE COURT:  You got the high score?

 8              THE WITNESS:  Yes.

 9              THE COURT:  Well done.

10              THE WITNESS:  Thank you.

11              MR. YETTER:  Good for you.

12    BY MR. YETTER:

13    Q.   Ms. Juarez, when you were taking all of these medications,

14    did anyone ever stop and say, "Does she need all of these

15    drugs?"

16    A.   No one ever questions the medications.

17    Q.   Who -- who -- did anybody at CPS or at the State of Texas

18    ever tell you to stop taking all the medication?

19    A.   No.

20    Q.   Did you do that on your own?

21    A.   Yes.

22    Q.   And was that hard to do?

23    A.   No.

24    Q.   Okay.  I want to ask you one last thing, Ms. Juarez.  It's

25    very hard to sit on the stand and give testimony like you're
```

1    giving no matter how old are you.  Why are you doing this

2    today?  Why are you here?

3    A.    Because kids need to be heard, and things need to change

4    for everyone.  And we need a change, because everybody tells

5    you, oh, CPS is going to take care of you, but just like they

6    let me down, they let a bunch of kids down.  So I'm here today

7    fighting for things to change.

8                    MR. YETTER:  Thank you.

9                    Your Honor, pass the witness.

10                    THE COURT:  Yes, sir.

11                    MR. ADAMS:  Your Honor, we appreciate the bravery of

12    the witness coming here and thank her for her time, but no

13    questions.

14                    THE COURT:  Thank you.

15                    Do you mind if I say something to her privately?

16                    MR. ADAMS:  No objection, Your Honor.

17                    MR. YETTER:  Not at all, Your Honor.

18                    (Bench Conference held off the record)

19                    THE COURT:  Call your next witness.

20                    MR. YETTER:  Your Honor, might it be a good time for

21    a short break --

22                    THE COURT:  Yes.

23                    MR. YETTER:  -- before we call our next witness?

24                    THE COURT:  15.

25                    (Recess)

```
 1              THE COURT:  Ready?
 2              MR. YETTER:  Ready when you are, Your Honor.
 3              THE COURT:  Everybody ready?
 4              MR. SHAH:  Yes, Your Honor.  We're ready.
 5              THE COURT:  Okay.  Call your next witness, please.
 6              MR. YETTER:  Your Honor, the Children would call
 7    Erica Banuelos, who is the Associate Commissioner for Child
 8    Protective Services.  I believe she's in the hall.
 9              THE COURT:  And I've known her from past hearings.
10              MR. YETTER:  You have, Your Honor.  She's testified a
11    number of times.
12              (Pause)
13              MR. YETTER:  May it please the Court.
14              ERICA BANUELOS, PLAINTIFFS' WITNESS, SWORN
15                        DIRECT EXAMINATION
16    BY MR. YETTER:
17    Q.   Ma'am, would you introduce yourself again to the Court?
18    A.   Erica Banuelos.
19    Q.   And you have attended a number of hearings, and you've
20    testified before Judge Jack in the past, have you not?
21    A.   I have.
22    Q.   And you are the Associate Commissioner for Child
23    Protective Services?
24    A.   That's correct.
25              THE COURT:  And that falls under DFPS?
```

```
 1   BY MR. YETTER:
 2   Q.   It is a DFPS position, is it not?
 3   A.   Yes.
 4   Q.   Let's pull up the demonstrative for the org chart for the
 5   Department of Family and Protective Services.
 6             MR. YETTER:  And this is -- Your Honor, this is
 7   similar to the HHSC chart that we had.  This is for DFPS,
 8   October 2, 2023.
 9   BY MR. YETTER:
10   Q.   Do you see that, Ms. Banuelos?  It's on your screen.
11   A.   I'm seeing one that says 10-22.
12             THE COURT:  We have a new commissioner.
13             MR. YETTER:  Oh, yeah, we do.  I thought we got a new
14   one.  I'm sorry.
15             THE COURT:  It goes --
16             MR. YETTER:  This is an old --
17             THE COURT:  Pardon me.
18             MR. YETTER:  This is an old one.
19   BY MR. YETTER:
20   Q.   But I think your position is the same?
21   A.   Yes.
22   Q.   Okay.  So let's -- new commissioner, but your -- your
23   position is right down there on the left side, Associate
24   Commissioner for Child Protective Services?
25   A.   That's correct.
```

1  Q.   Your -- among other responsibilities, part of your role is

2  to monitor caseloads for conservatorship caseworkers in the

3  State of Texas, is it not?

4  A.   That's one of my roles.

5  Q.   And to identify trends in caseloads across the state?

6  A.   Correct.

7  Q.   In other words, are they getting too much, too little?

8  A.   That's correct.

9  Q.   You know, of course, that the Judge has entered an order

10  enforcing an agreement between the class counsel and the State

11  on guidelines for child caseloads.  You know that, of course?

12  A.   Yes.

13  Q.   Now, one of the ongoing issues in the State of Texas is

14  children for which there is no licensed regulated placement.

15  Do you know what I'm talking about?  Sometimes the State calls

16  it CWOP.

17  A.   Yes.

18  Q.   That's a big issue in the State of Texas, isn't it?

19  A.   I would say that it's -- we do have some children that are

20  without placement.

21  Q.   It's a big issue in the State of Texas, isn't it?

22        THE COURT:  We should say that they have placements,

23  it's just not a licensed placement.

24        MR. YETTER:  Yes.

25  BY MR. YETTER:

```
 1   Q.   Not licensed or regulated, true?
 2   A.   I would say that we have children that are without
 3   placement.
 4   Q.   Well, you put them somewhere.  They're placed somewhere
 5   aren't they?
 6            THE COURT:  Well, that's what I'm trying to clarify.
 7            THE WITNESS:  Yes.
 8            THE COURT:  They're in a placement.  They're in
 9   shabby hotels, duplexes around, but they're -- but they're not
10   in licensed or regulated placements.
11            THE WITNESS:  They're not in licensed, regulated
12   placements.
13            THE COURT:  Okay.
14   BY MR. YETTER:
15   Q.   Sure.  Good.  And that's a problem for the State of Texas
16   today, isn't it?
17   A.   It's a concern.
18   Q.   All right.
19            THE COURT:  It's not a problem?
20            MR. YETTER:  We'll work on that.
21            THE COURT:  Sorry.  It's not a problem?
22            THE WITNESS:  We would prefer that children are in
23   licensed placements.
24            THE COURT:  Because?
25            THE WITNESS:  Because we want children to be placed
```

```
 1  in a licensed placement --
 2          THE COURT:  You want them to be safe?
 3          THE WITNESS:  -- where there's different caregivers.
 4          THE COURT:  You want them to be safe?
 5          THE WITNESS:  We have want them to have a safe and
 6  good placements.
 7          THE COURT:  Good.
 8  BY MR. YETTER:
 9  Q.  And a hotel is no place for a safe, good placement for
10  children, is it?
11  A.  Sometimes.
12          THE COURT:  How is that?
13  BY MR. YETTER:
14  Q.  Are you --
15          THE COURT:  Sorry.  I need to know.  Sometimes what?
16          THE WITNESS:  So -- can you repeat the question?
17  BY MR. YETTER:
18  Q.  Sure.  A hotel is no place for a safe and good placement
19  for a child under the care of DFPS?
20          (Pause)
21          THE COURT:  She apparently has a great deal of
22  trouble answering that.
23          THE WITNESS:  I would say that a hotel can be a
24  difficult place for a child to have as a placement.
25  BY MR. YETTER:
```

```
1    Q.   It can be an unsafe place for a child, can't it, a hotel?
2    A.   Sometimes.
3    Q.   Because they're not -- especially for a child with -- has
4    been through a lot of trauma, right?  Yes?
5    A.   Some of our children have been through a lot of trauma.
6    Q.   And so --
7              THE COURT:  Have any of them -- are any of the
8    children not been through trauma?  That's why you pick them up,
9    right?
10             MR. YETTER:  Good point.
11   BY MR. YETTER:
12   Q.   Every child in foster care has been through trauma because
13   they're no longer with their family, right?
14   A.   That could be traumatic.
15   Q.   Some of the children have been through additional trauma,
16   for example, abuse, physical or sexual abuse, true?
17   A.   That can be additional trauma.
18   Q.   Before they come into the system and after?
19             THE COURT:  Wait a minute.  Aren't all the children
20   that you pick up have been traumatized?
21             THE WITNESS:  Yes, they've experienced some trauma.
22             MR. YETTER:  Some --
23             THE COURT:  I thought if you don't know that, we're
24   in deep trouble.
25   BY MR. YETTER:
```

1   Q.   It's not just some.  This is kind of the trauma of losing

2   your family.

3   A.   Yes.

4   Q.   That's tremendously severe trauma, isn't it?

5   A.   Yes, it's some trauma.  Absolutely.

6   Q.   And a hotel is no place for a child that has been

7   traumatized severely, is it, as a placement by the State of

8   Texas?  That's no place for a child to be safe, is it?

9   A.   I can't say that it's always not safe.

10  Q.   What an answer.  What do you mean, you can't say that it's

11  always not safe?  Like it's just hit or miss?  You're just --

12  you --

13          Okay.  All right.  Let's just -- we'll step back and

14  we'll come back to that.

15          THE COURT:  Well, tell us some names of hotels you

16  put them in.  What kind of hotels?

17          THE WITNESS:  I don't -- I don't have all the names

18  of the hotels.

19          THE COURT:  Right.  Just some examples.

20          THE WITNESS:  Some of them might be -- I think maybe

21  one of them can be La Quinta.  That's one that I remember.

22          THE COURT:  And what others?

23          THE WITNESS:  Residence Inn.

24          THE COURT:  Okay.  They have kitchens, Residence Inn?

25          THE WITNESS:  Some do have kitchens.

```
 1              THE COURT:  Okay.  What about the children that I
 2    have seen, not just heard today, but that don't get enough food
 3    where they are in CWOP?
 4              What provision do you make for food in hotels that
 5    have -- don't have food service?
 6              THE WITNESS:  We have -- we have somebody who
 7    actually orders groceries and brings them over if they're not
 8    in a location where -- most if not all the hotels that we have,
 9    they do have a refrigerator in them.
10              THE COURT:  But they don't have stoves.  They can't
11    cook food.  What --
12              THE WITNESS:  Some do.
13              THE COURT:  So you're talking about cereal and milk?
14              THE WITNESS:  Some do, some don't.  If they don't
15    have a kitchen, then we do order food for them --
16              THE COURT:  What kind of food?
17              THE WITNESS:  -- to be delivered.
18              It depends.  Sometimes -- it can be anywhere from --
19    it can be anywhere from whataburger to -- it can be somewhere
20    where we pick up a full plate for them.  It can be taco --
21              THE COURT:  What's your budget per child per meal?
22              THE WITNESS:  I don't have the exact budget, but we
23    do get them the food that is needed for breakfast, lunch, and
24    dinner.
25              THE COURT:  What do you have them -- what do you give
```

```
 1    them for breakfast in hotels with no breakfast service and no
 2    kitchens?
 3              THE WITNESS:  So I know that in some instances they
 4    will order breakfast for them.  They can order it from a
 5    restaurant.  They can order it from a fast-food restaurant.
 6              THE COURT:  Is that -- does that happen every time
 7    for a CWOP child that has no kitchen and no food service in the
 8    hotel?
 9              THE WITNESS:  Yes, Your Honor.
10              THE COURT:  They order out breakfast?
11              THE WITNESS:  They order out food, yes, Your Honor.
12              THE COURT:  And you don't know what the budget is for
13    this?
14              THE WITNESS:  I don't know the exact budget, no, Your
15    Honor.
16              THE COURT:  We just heard testimony from a child who
17    said she didn't get enough food while she was in CWOP, and that
18    appears to be a common complaint from the Monitors' reports.
19    Did you know that?
20              THE WITNESS:  No.
21              THE COURT:  Do you read the reports?
22              THE WITNESS:  Yes.
23              THE COURT:  And you haven't read any of the reports
24    where the children complained about lack of food?
25              THE WITNESS:  Your Honor, I have read lots of
```

```
 1   reports.
 2             THE COURT:  Okay.  But none of them complained about
 3   the lack of food?
 4             THE WITNESS:  I don't recall reading specifically
 5   about the lack of food.
 6             THE COURT:  Okay.  Go ahead, Mr. Yetter.  Sorry I
 7   interrupted you.
 8   BY MR. YETTER:
 9   Q.   Before we get back -- I want to get back to the trends,
10   because one of your responsibility is trends for caseloads,
11   right?
12   A.   Correct.
13   Q.   Have you been concerned for the safety of children that
14   are put in these unregulated placements based on what you've
15   read in the Monitors' reports?  Have you been concerned about
16   their safety?
17   A.   For some situations.
18             THE COURT:  So it's not an all-consuming concern is
19   what you're saying?
20             MR. YETTER:  Just kind of concerning?
21             THE COURT:  It's just sort of hit or miss with you?
22             THE WITNESS:  I said some concerns.
23   BY MR. YETTER:
24   Q.   Other -- you're not concerned about the other children
25   that have been highlighted in the Monitors' reports?
```

```
 1   A.   I -- again, when there's a Monitor report that comes out,
 2   I look at it, and we try to find who the child is in the
 3   report, and we have follow-up information sometimes that's not
 4   included in the report.
 5            THE COURT:  You don't report on that?
 6            THE WITNESS:  I'm sorry?
 7            THE COURT:  You don't make a report when you follow
 8   up?
 9            THE WITNESS:  I'm sorry, Your Honor.  I'm not
10   understanding the question.
11            THE COURT:  You said it's not in a report.  It's not
12   in whose report?
13            THE WITNESS:  Your Honor, I was referring to when the
14   Monitors put out a report, we go back and look for the child
15   that they are referencing and try to acquire more background on
16   what happened and what were the follow-ups.  That's what I
17   was -- I was referencing.
18            THE COURT:  Okay.  But you make a record of that?
19            THE WITNESS:  The record?
20            THE COURT:  You make a record of your follow-up, do
21   you?
22            THE WITNESS:  Not always, Your Honor, because a
23   follow-up that we do is already somewhere in our system or
24   somewhere in some of our reports.
25            THE COURT:  So somebody makes a report of the
```

```
1    follow-up?

2              THE WITNESS:  I don't think I'm following, Your

3    Honor.

4              THE COURT:  Okay.  When you read the Monitors' report

5    and you see Child C has been raped, tased, handcuffed, and had

6    her jaws broken over a nine-month period, who follows up for

7    that?

8              THE WITNESS:  When we identify the child, we will

9    follow up on that, Your Honor.

10             THE COURT:  Okay.  Well, now this child -- by the

11   way, Child C is in a new placement, and she's had six new --

12   six new investigations in the new placement.  Did you know

13   that?

14             THE WITNESS:  I don't know what Child C you're

15   referring to, Your Honor.

16             THE COURT:  In the Provider Investigations.

17             THE WITNESS:  Your Honor, I don't know what child

18   that is.

19             THE COURT:  Okay.  When you follow up, say another

20   one, a DFPS investigation, a CPI investigation, and you see in

21   the Monitors' report that they think it's been inadequately

22   investigated, you send somebody out to follow up, right?

23             THE WITNESS:  Your Honor, I'm not Investigations.

24             THE COURT:  Okay.  Well, what were you saying that

25   you followed up?
```

```
 1              THE WITNESS:  Concerning -- I believe the question
 2     was concerning if we followed up with the concerns that the
 3     Monitors had on the report.  I was referencing the children in
 4     the CWOP report or any of the reports where they mentioned our
 5     children.
 6              THE COURT:  Okay.  Go ahead.  Sorry, Mr. Yetter.
 7     BY MR. YETTER:
 8     Q.   All right.  Let's talk about trends.  We're focused for
 9     the moment on children in unregulated placements, okay?
10     A.   Uh-huh.
11     Q.   Yes?
12     A.   Yes.
13     Q.   And we're going to focus on how much of a burden that is
14     on the system and specifically caseworkers, okay, Ms. Banuelos?
15     A.   Okay.
16     Q.   And that all falls right within your wheelhouse of
17     responsibilities, doesn't it?
18     A.   Yes.
19     Q.   For years there have been children in the state of Texas,
20     as far as you know, that the State could not find regulated
21     licensed placements for, true?
22     A.   When you say for years, what is -- I'm not clear when you
23     say for years.
24     Q.   10 years, 20 years.  As long as you've been working at the
25     State.
```

```
 1    A.    Not always.
 2    Q.    Okay.  But it's really gotten bad lately, hasn't it?
 3    A.    What is the timeframe for lately?
 4    Q.    In the last three years.
 5    A.    I don't know that I would agree that it's gotten bad.
 6    Q.    It's not getting any better either, is it?
 7    A.    I would say that if I looked today at where we're at, I
 8    would say it has gotten better.
 9            MR. YETTER:  All right.  Your Honor, we asked an
10    interrogatory answer.  It is the interrogatory to the State.
11    It is marked as 102, I believe.  102.
12            Let's just put it up.
13            We'll get in -- the information, actually, Your
14    Honor, was in a spreadsheet.  But we asked the State -- and
15    let's pull up Number -- interrogatory Number 9 on page 15 of
16    Plaintiffs' Exhibit 102.
17            And blow up that -- there we go.
18            And we asked the State to list the total number of
19    hours the conservatorship workers have dedicated to Child Watch
20    shifts.  These are -- these are the shifts, as the Court knows,
21    for children that are in unregulated placements.  And the
22    smallest interval tracked, for example, monthly.  And then we
23    came to the Court about this before.
24            And their response is:  The attached Exhibit B, which
25    is fully incorporated by reference, identifies the requested
```

1  categories of information sought by this interrogatory.

2          And that is -- Exhibit B is going to be part of the

3  record, Your Honor, but it is an electronic spreadsheet, so we

4  really can't show it.  But I am going to talk to the witness

5  about the statistics reflected in Exhibit B.

6  BY MR. YETTER:

7  Q.   Now, were you involved in helping gather the information

8  on the number of hours dedicated by conservatorship caseworkers

9  to Child Watch shifts?

10 A.   No, I was not directly involved with pulling those

11 hours, no.

12 Q.   But you know that you keep track of those hours, you

13 meaning the Department of Family and Protective Services?

14 A.   Yes.

15 Q.   Because you have to pay the caseworkers for those overtime

16 hours, don't you?

17 A.   Yes, they get paid.

18          MR. YETTER:  And in Exhibit B, Your Honor --

19          THE COURT:  Do they get paid overtime?

20          THE WITNESS:  Yes, caseworkers get paid overtime.

21          THE COURT:  Okay.  For their shift work?

22          THE WITNESS:  For the overtime that they work, yes,

23 Your Honor.

24          THE COURT:  Okay.

25          MR. YETTER:  And the State's answers, which they

1    swore to as accurate, I'm going to give the Court a few

2    statistics.

3              In 2019, for the last six months, July through

4    December of 2019, which is basically after the Remedial Orders

5    were affirmed by the Fifth Circuit to the end of the year, the

6    total number of Child Watch hours was 25,057 hours.

7              In 2020, it was -- that was six months.

8              THE COURT:  Wait a minute.  Say that again.

9              MR. YETTER:  25,057 hours.

10             THE COURT:  In 2020?

11             MR. YETTER:  In 2020, it was for 12 months, it was

12   87,360 total hours for Child Watch.

13             MR. SHAH:  Your Honor, just one clarification so we

14   can follow along.

15             THE COURT:  Sure.

16             MR. SHAH:  What document or Bates number, or what is

17   Mr. Yetter --

18             MR. YETTER:  This is -- this is the statistics that

19   the State provided as an Exhibit B, which is a spreadsheet.

20             MR. SHAH:  Okay.

21             THE COURT:  But it's 1-0 -- 1-0 -- what was it?

22             MR. YETTER:  For 2020, it's 87 thousand --

23             THE COURT:  No, no.

24             MR. SHAH:  No, no.  What exhibit?

25             THE COURT:  What exhibit number?

```
 1                    MR. YETTER:  Oh, 102.

 2                    THE COURT:  102.

 3                    MR. YETTER:  Plaintiffs' 102.

 4                    MR. SHAH:  And what page?  My understanding, that's a

 5       large exhibit.

 6                    THE COURT:  It's Exhibit B to 102.

 7                    MR. SHAH:  Exhibit B, my understanding, is many, many

 8       files actually.

 9                    MR. YETTER:  Correct.

10                    MR. SHAH:  It's a lot of pages.  So I'm just

11       wondering which page he's referring to.

12                    MR. YETTER:  It's a spreadsheet.  2020 --

13                    THE COURT:  It's one of those pages.

14                    MR. SHAH:  Okay.

15                    MR. YETTER:  It is a compilation of those pages.

16       2021 --

17                    THE COURT:  Do you have -- do you have Exhibit B in

18       front of you?

19                    MR. SHAH:  I don't have -- Your Honor, maybe one

20       clarification.  Did Mr. Yetter prepare these graphs he's

21       looking at from the Exhibit B, or is this part of Exhibit B, or

22       what is he describing or looking at, Your Honor?

23                    THE COURT:  I got it.

24                    MR. SHAH:  Put it under a little number right there.

25                    MR. YETTER:  The numbers are from Exhibit B, and
```

1   we're going to show some graphs reflecting that, which we --

2            THE COURT:  So he has prepared the graphs.

3            MR. SHAH:  So he has prepared the graphs.

4            THE COURT:  He has prepared the graphs.

5            MR. YETTER:  For demonstrative purposes.

6            THE COURT:  Are they in evidence?

7            MR. YETTER:  They will be for demonstrative

8   initially, and then we will offer them into evidence after a

9   witness testifies about them.

10           MR. SHAH:  Can Mr. Yetter please produce them to us

11  so we can look at them?

12           THE COURT:  Apparently not.

13           Yes.  Where are they?

14           MR. YETTER:  We're going to put them up shortly, Your

15  Honor, but I wanted to give you the numbers first.

16           THE COURT:  Okay.  Wait minute.  Well -- wait a

17  minute.  Well, what he wants to clarify, I think Mr. Shah wants

18  to make sure the numbers are the exact numbers that they gave

19  you and that you haven't transposed them in some fashion onto a

20  graph that they didn't create.

21           Is that a fair statement?

22           MR. SHAH:  Yes, Your Honor.  I just don't know who

23  created this graph.  He may have taken our numbers to make the

24  graph.

25           MR. YETTER:  Yes, we --

```
 1                THE COURT:  He took your numbers and made the graph.
 2                MR. SHAH:  Okay.
 3                THE COURT:  But the numbers apparently are in
 4    evidence now.
 5                MR. YETTER:  Yes.
 6                THE COURT:  Not the graph.
 7                MR. YETTER:  Right.
 8                THE COURT:  And he's going to read the numbers to me.
 9                MR. SHAH:  Okay.
10                MR. YETTER:  Yes.
11                THE COURT:  And then somebody else is going to tell
12    us all about the graph.
13                MR. SHAH:  That's wonderful, Your Honor.
14                The only question I would ask is, I mean, we do have
15    the ELMO function, so if he wants to put the graph so we can
16    all look at it while he's reading them, that might be more
17    useful.
18                MR. YETTER:  Well, let me just give you the totals
19    first, Judge.
20                MR. SHAH:  Okay, Your Honor.
21                THE COURT:  He doesn't want to do it yet.
22                MR. SHAH:  I understand.
23                MR. YETTER:  And there's a method to my madness, Your
24    Honor.
25                2021, the total number of hours devoted to Child
```

1    Watch according to the State is 693,364.  That's for 12 months.

2              For 2022, the total number of hours for Child Watch

3    for 12 months in 2022 is 667,048 hours.

4              And then in 2023, for the first ten months of the

5    year, through October, the total number of Child Watch hours,

6    including travel time that they keep separately recently --

7              THE COURT:  Is travel in those previous numbers you

8    just gave me?

9              MR. YETTER:  Travel used to be combined, and now

10   they're breaking it out as of September and October.

11             THE COURT:  But you put it back together for 2023?

12             MR. YETTER:  I put it all back together.

13             For the first ten months of 2023, 604,273 hours.

14             I will represent to the Court those are numbers that

15   we got reflected in their spreadsheet.  And now we, for a

16   demonstrative exhibit, have put those numbers into a graph to

17   show the Court visually and Ms. Banuelos visually how those

18   numbers play out.

19             So we are now going to show demonstrative Exhibit

20   109, which I believe we have produced to the other side.  It

21   may have been recently, like today.  But this is a graph.

22   BY MR. YETTER:

23   Q.   And, Ms. Banuelos, can you see that on your screen?

24   A.   Yes.

25             MR. YETTER:  So, Your Honor, if you take all the

1   hours that the State disclosed in the interrogatory answer as

2   true and correct devoted to Child Watch, these unregulated

3   placements, per month it averages out in 2019 a little bit more

4   than 4,000 hours a month.  4,176.  In 2020, it's 7,280.  And

5   then you --

6              THE COURT:  Okay.  I hear where you are going here,

7   but does this include -- these recent numbers, that includes

8   the $1 million police that they've hired?

9              MR. YETTER:  No.  These are just hours, Your Honor.

10             THE COURT:  Just caseworker hours?

11             MR. YETTER:  Paying for caseworkers.

12             THE COURT:  Is that right?

13             MR. YETTER:  Yes.  This is all --

14             THE COURT:  That you're representing to me?

15             MR. YETTER:  This is -- and that is what the State

16  has represented to us in their interrogatories.

17             THE COURT:  Okay.  Is this supposed to mean that

18  there are -- that there are more children or that they're

19  putting more hours in to protect the children?

20             MR. YETTER:  I believe it's a little of both, Your

21  Honor.  I believe the two are exactly the same.  There's more

22  children starting in 2021 that are being placed in unregulated

23  placements.

24  BY MR. YETTER:

25  Q.   Isn't that right, Ms. Banuelos?

```
 1              THE COURT:  Go ahead.  Do you have something to say?
 2              MR. SHAH:  Your Honor, I was just going to say if
 3    counsel would rather direct the question as opposed to
 4    testifying, because I don't know if those facts are in evidence
 5    yet.
 6              THE COURT:  I think he was testifying to me.  It was
 7    my fault.
 8              MR. SHAH:  Yes, Your Honor.
 9              THE COURT:  I will give the only weight it deserves,
10    which I'm not sure what it is.
11              MR. YETTER:  Okay.  We're going to -- I want -- this
12    is the --
13              THE COURT:  I mean, I need to know what this all
14    means.
15              MR. YETTER:  We will -- I will lay that all out, Your
16    Honor.
17    BY MR. YETTER:
18    Q.   Ms. Banuelos, far more children were put into unregulated
19    placements starting in 2021; isn't that true?
20    A.   I would have to look at the numbers in order to answer
21    your question.
22              THE COURT:  I have to say I don't get that from the
23    numbers, because it could be that the people got raises that
24    when they found out -- let's just give them the benefit of the
25    doubt here for just one minute, that the people got raises, the
```

 1    caseworkers got raises; that they discovered there weren't

 2    enough people, weren't enough shifts, so they doubled and

 3    tripled up on the shifts, which is what your own caseworker

 4    testified to.

 5              It started out with a shift a month and became five

 6    shifts a month.  So that doesn't mean there were more children,

 7    it just means they devoted more staff to the children.  Just

 8    saying.

 9              MR. YETTER:  I hear what you're saying, Your Honor.

10              THE COURT:  Just saying.

11              MR. YETTER:  But I believe the Monitors' reports --

12    and we will draw this out during the hearing.  But the

13    Monitors' reports also verify there are more children.

14              THE COURT:  I have a -- I don't think so.  I think

15    I've got a chart -- it's like 100 or something on a given day

16    up from maybe 80 or something earlier.  But it's down

17    significantly from when we first started this, I think.

18              MR. YETTER:  Okay.

19              THE COURT:  When we first started tracking in 2019.

20              MR. YETTER:  What this chart reflects, though, Your

21    Honor -- and we will have more testimony about this -- is

22    that --

23              THE COURT:  Am I making this up, Mr. Ryan or -- the

24    number of children per night has gone up recently.

25              MR. RYAN:  We filed last night an update to the

```
1    Court --
2             THE COURT:  Right.
3             MR. RYAN:  -- which documents the number of children
4    experiencing -- PMC children experiencing CWOP from 2020
5    forward, and that update includes statistics showing that there
6    is a significant uptick from '20 to '21.  And to your point,
7    Your Honor, more recently a deduction.
8             THE COURT:  Just saying.
9             MR. YETTER:  I hear you, Your Honor, but what we --
10            THE COURT:  Because you know how numbers can be.
11            MR. YETTER:  But the point of this chart and the
12   point of the evidence we're going to present to the Court is
13   that caseworkers are working more hours.
14            If they're doubling up caseworkers, that's fine.
15   That's a decision that the DFPS has made.  And the caseloads
16   are not taking into account of the additional work that the
17   caseworkers are doing in overtime.
18            THE COURT:  I got all that.  And I also got the fact
19   that there should never be a child in a CWOP placement.
20            MR. YETTER:  And this goes directly to whether the
21   caseloads are properly following the guidelines that the Court
22   has ordered and the State has agreed to.
23            So I'll finish up very quickly on this point.
24            THE COURT:  But we already know that's not the case.
25   They're not being factored.  I don't know what that computes
```

```
 1   to, but we know that the shift work that the caseworkers are

 2   doing for CWOP are not being counted toward their caseload --

 3              MR. YETTER:  And this evidence is --

 4              THE COURT:  -- because they told me that those kids

 5   are already on somebody else's caseload, which makes no sense

 6   to me at all.  So I got that, too, assuming you're trying to

 7   convince me.

 8              MR. YETTER:  No, I want to have the record adequately

 9   reflect the evidence.

10              Ms. Reveile on -- just earlier today said it was a

11   crushing load on the caseworkers.  These statistics show how it

12   is, that these hours have just ballooned on this very stressful

13   part-time job the caseworkers have to maintain in addition to

14   their full-time job.

15              THE COURT:  Yes.

16              MR. YETTER:  And the State has not taken account of

17   any of it.

18              And -- Okay.  If I could very briefly --

19              THE COURT:  And add the police onto that with the,

20   what, $27 million contract?

21              MR. YETTER:  Yes, Your Honor, which has all kinds of

22   things -- bad implications for the children.  But for the

23   caseworkers which directly relate to the safety of the

24   children, this is what's burdening them, is they are being

25   crushed with extra hours in this side job that the State is
```

```
 1   putting on them.
 2             MR. SHAH:  Your Honor, I'm just going ask if
 3   Mr. Yetter has questions for the witness, but that's factual
 4   testimony he --
 5             THE COURT:  I think I elicited it, and I'll treat it
 6   for what you want me to treat it for.  But I do think at some
 7   juncture we need to say on the record how grateful we are to
 8   the caseworkers and what they've done for these children.
 9             MR. SHAH:  Absolutely, Your Honor.
10             MR. YETTER:  Absolutely, Your Honor.
11             THE COURT:  And we owe them a huge debt of gratitude.
12             MR. SHAH:  Absolutely, Your Honor.
13             THE COURT:  And, you know, we should all remember
14   that, because none of this is the caseworkers' fault.
15             MR. SHAH:  Absolutely.
16             THE COURT:  They work hard, they don't last long, and
17   they do the best they can.  Okay.
18             MR. YETTER:  Second --
19             THE COURT:  So that's my spiel.  Now we'll move on.
20             MR. YETTER:  The second chart, Your Honor, page 2, is
21   if you break it down instead of hours per month to hours per
22   day, it's about the same ratio.  You see a huge jump in 2021.
23   But 2023 is not down significantly in terms of hours spent by
24   caseworkers on these Child Watch shifts.
25             And the third slide, which is the last slide, Your
```

1   Honor, if you take those hours per day and divide it into an

2   eight-hour day, that's a full-time job, it is as of 2023 almost

3   250 full-time shifts per day across the State is devoted to

4   Child Watch.  That would be --

5               THE COURT:  Which means how many case workers account

6   for.

7               MR. YETTER:  Exactly, Your Honor.

8               THE COURT:  That's what you're going to tell me?

9               MR. YETTER:  Yes, Your Honor.  That would be a

10   full-time caseworker working eight hours every day, 248 of them

11   just to work the Child Watch hours that the State has disclosed

12   to us.

13               MR. SHAH:  My only question would be which witness

14   does he intend to --

15               THE COURT:  We just heard it.

16               MR. SHAH:  Mr. Yetter?  I would love to cross-examine

17   Mr. Yetter, Your Honor.

18               MR. YETTER:  This --

19               THE COURT:  I think when he's talking to me -- and

20   let me say what I get from this.  The hours, if you allocate

21   them to -- if you turn them into individual caseworkers, it

22   comes to 200-and-some-odd caseworkers.

23               MR. YETTER:  48.  248 as of 20 --

24               THE COURT:  248 caseworkers.  I got that.

25               MR. YETTER:  These are not my numbers, Your Honor.

```
 1   These are the State's numbers.
 2          THE COURT:  If this is not true, give me another
 3   graph that's --
 4          MR. SHAH:  Well, Your Honor, it's most just confused.
 5   So is this correct for -- I mean, I would love to see how he
 6   came to -- is this just literally like -- I mean, did he count
 7   the number of employees even per hour?
 8          THE COURT:  No.  You just take the hours.
 9          MR. SHAH:  Okay.  Gotcha.
10          MR. YETTER:  You take the hours.
11          THE COURT:  You just take the overtime hours.
12          MR. SHAH:  Gotcha.
13          THE COURT:  Remember y'all used to do this, by the
14   way.  The State used to do this.
15          MR. YETTER:  Yes.  Fictional work -- they used to
16   take overtime and create caseworkers out of this.
17          THE COURT:  You-all did this yourselves.  Do you --
18   this is before your time, Mr. Shah and Ms. Ho and all of Gibson
19   Dunn.  But the State used to create fictive caseworkers out of
20   the overtime numbers to say they had all the case workers they
21   needed.
22          MR. SHAH:  So, Your Honor --
23          THE COURT:  So he's turned that around on you here.
24          MR. SHAH:  So, Your Honor, just to clarify, he is
25   just doing a raw linking of hours, not taking into account the
```

 1    number of caseworkers may have changed between 2020, 2021,

 2    2022?

 3              THE COURT:  No, no.  No, no.  He's just saying if

 4    there are this many overtime hours, you got yourself some

 5    fictive caseworkers here, which we thought we got rid of in

 6    2000 -- with the mandate in 2018.

 7              MR. YETTER:  Yes, Your Honor.

 8              If you hired caseworkers to do this one job, watching

 9    children in unregulated placements, it would take you 248

10    caseworkers to accomplish that job working full time.

11              THE COURT:  And that's without sick leave or paid

12    vacation?

13              MR. YETTER:  This has nothing to do with money.  This

14    is just how much time, physical time it takes.

15              THE COURT:  Got it.

16              MR. SHAH:  So, Your Honor, we'll take a look at these

17    exhibits.  If Mr. Yetter also has the calculations he used to

18    drive at these exhibits --

19              THE COURT:  I think he took those hours and just

20    divided them up by a work year.

21              MR. YETTER:  It's just math.  It's just math.

22              THE COURT:  It's just plain math.

23              MR. SHAH:  Just in terms of -- that's fine.

24              THE COURT:  But figure it out and we'll take it up

25    tomorrow.  I don't know where Ms. Banuelos comes in on this.

 1                MR. SHAH:  Me neither, Your Honor.

 2                MR. YETTER:  Because, Your Honor, she is in charge of

 3      tracking trends.

 4                THE COURT:  Yes.

 5                MR. YETTER:  And I asked Ms. Banuelos --

 6                THE COURT:  Now we're back to the trends.  Got it.

 7      BY MR. YETTER:

 8      Q.   Didn't -- in 2021, wasn't there a significant increase in

 9      the amount of time that the State asked its caseworkers to

10      devote to this Child Watch program in 2021?

11      A.   I -- I don't have the total amount of time that they spent

12      in 2021 doing Child Watch.

13      Q.   Nor do you, as you're sitting here today, even though you

14      are in charge of watching trends, you don't know the numbers

15      for 2022?

16      A.   I'm sorry, the numbers of --

17      Q.   Total time that the State asked its caseworkers in

18      overtime to devote to Child Watch.

19      A.   I don't have those numbers with me today.

20      Q.   And you don't know them for 2023 either?

21      A.   I don't know the total numbers for 2023.

22      Q.   Now, you know that caseworkers and staff -- you've read

23      the Monitors' reports about their reaction to all of this huge

24      burden of case -- of Child Watch, watching children in these

25      unregulated placements.  You know that the Monitors asked

1    caseworkers about that, don't you?

2    A.    I did read that the Monitors asked questions.

3    Q.    And caseworkers have given you and your staff feedback on

4    that same issue, haven't they?

5    A.    Some have.

6    Q.    And --

7              THE COURT:  I think -- can I summarize what I think

8    so you're saying?

9              MR. YETTER:  Yes, Your Honor.

10             THE COURT:  What he's saying, because we have these

11   guidelines that you all agreed to, the 14 to 17, instead you

12   have created 248 more caseworkers.

13             MR. YETTER:  By making their current caseworkers work

14   overtime.

15             THE COURT:  Yes.

16             MR. YETTER:  Each --

17             THE COURT:  Out of the existing caseworkers.  And so

18   the caseloads do not reflect now what they should with the

19   overtime workers.  That's his point.

20             So that's what you-all concentrate on tonight, and

21   I'll hear from the State tomorrow about that.

22   BY MR. YETTER:

23   Q.    Now, Ms. Banuelos, you've heard from -- you read the

24   Monitors' report where the caseworkers and staff expressed

25   exhaustion at this extra work, haven't you?  You read that,

```
 1   didn't you?
 2   A.   I read the Monitors' report.
 3   Q.   And that many of their peers had quit their jobs.  You've
 4   read that too, didn't you?
 5   A.   I read a synopsis of that in the Monitors' report.
 6   Q.   And that these caseworkers are saying they didn't have the
 7   background or the skills to do that work, to supervise these
 8   children in these unregulated placements.  You read that too,
 9   didn't you?
10   A.   I don't recall those exact words.
11           MR. YETTER:  Let's go to -- let's go to Plaintiffs'
12   Exhibit --
13           THE COURT:  How many total caseworkers do you have?
14           THE WITNESS:  Currently I have -- CPS caseworkers, I
15   have about 1,000 -- approximately about 1,200, just CPS
16   caseworkers, but overall I see about 6,000 employees.
17           THE COURT:  Okay.  And those 1,200 have a caseload
18   of -- are we going to get to the supervisor versus the
19   caseworkers?
20   BY MR. YETTER:
21   Q.   Are you talking 1,200 just caseworkers or including
22   supervisors?
23   A.   I'm just talking about CPS caseworkers.
24           MR. YETTER:  So that would not include supervisors,
25   Your Honor.
```

1          Let's go to Plaintiffs' --

2          THE COURT:  So what he's saying is that if you took

3    those 16 cases that the 248 fictive workers have, those

4    caseloads would be well over the agreed limit.  Do you

5    understand what he's saying?

6          THE WITNESS:  I'm not following, Your Honor.  I'm

7    sorry.

8          THE COURT:  Who does?

9          Okay.  He's saying that you have created out of all

10   these overtime hours 248 caseworkers, a load that would require

11   248 caseworkers based on the hours.

12         MR. YETTER:  Working full-time.

13         THE COURT:  Working full-time.

14         Just based on the hours divided by the work year

15   equals, according to him -- and I don't know if his math is

16   correct -- 248 caseworkers that would ordinarily be carrying 16

17   cases apiece, 14 to 17 cases.  And, instead, your present staff

18   that's carrying 14 to 17 cases has an additional number of

19   those cases, an additional 1/5 more.  1/6 more.  1/5.  About

20   1/5.

21         MR. YETTER:  1/5.  Yes.

22         THE COURT:  So he's saying that they should be

23   allocated 1/5 more.

24         MR. YETTER:  I actually think it's more than that.

25   There are some -- we have had testimony that they are working

1   50 percent more than their full-time jobs.  They're working

2   eight shifts of four hours a shift.  That's the standard today,

3   isn't it?

4          THE COURT:  Who's got this witness?

5          MR. SHAH:  Your Honor, I have the chart, but he's

6   going to be doing the cross.

7          THE COURT:  Okay.

8          MR. SHAH:  So I will defer to Mr. Hubbard.  But like

9   the chart thing, I was just responding to because that was part

10  of discovery.

11         THE COURT:  That's fine.

12         MR. HUBBARD:  Your Honor, if I may, I believe part of

13  the confusion is that each child that is currently without

14  placement has a caseworker even if they're also being

15  watched --

16         THE COURT:  Yes, but don't you understand that that's

17  double time?  They've got their regular caseworker, and then

18  they've got this extra caseworker that's not being credited for

19  the case.  So that's not confusing.  What it is, is that each

20  child, therefore, has two caseworkers 24/7.

21         Do you see what the -- do you see what the point is?

22         MR. HUBBARD:  I --

23         THE COURT:  Because they got the regular assigned

24  caseworker, then they've this overtime shift worker working.

25         MR. HUBBARD:  I understand, Your Honor.  I believe --

1    so the confusion is the terminology that DFPS uses and just

2    wanted to sort of clarify that there is a -- each child without

3    placement has a --

4              THE COURT:  We know that.

5              MR. HUBBARD:  -- caseworker independent of --

6              THE COURT:  We know that, but the problem --

7              MR. HUBBARD:  -- Child Watch.

8              THE COURT:  -- is that these -- that these -- if

9    you're actually contributing, I mean, 680,000 hours overtime in

10   caseworkers for these other children who already have

11   caseworkers, that means they got two caseworkers, and they're

12   not getting credit -- or they're not being credited or charged

13   with those children on their caseloads.

14             Is this a -- is this a real difficult concept,

15   Mr. Yetter?

16             MR. YETTER:  No, it's not, Your Honor.  This is a

17   simple concept.  We -- they are putting caseworkers who already

18   have a full load, which is the load that they agreed is the

19   load to keep children safe, and adding in another significant,

20   very intense part-time job and taking no account of it and

21   claiming that they've met the caseload guidelines.

22             THE COURT:  Do you see -- do you see, Mr. Hubbard,

23   where we're going?

24             MR. HUBBARD:  Yes, Your Honor, I believe so.  I was

25   just wondering if there was a pending question for the witness

1    at present.  I was trying to figure out where our testimony is.

2              THE COURT:  Well, we're just talking to you.  That's

3    where we are.

4              MR. HUBBARD:  Thank you.

5              THE COURT:  All right.  It was a joy.

6              Continue on, Mr. Yetter.

7    BY MR. YETTER:

8    Q.   Plaintiffs' 33, tab 2.  And let me give you a notebook.

9              (Pause)

10   Q.   If you turn to tab 2, that's Plaintiffs' Exhibit 33, which

11   is the Monitors' update dated October 25, 2023.  Are you with

12   me on that?

13   A.   Which page, I'm sorry?

14   Q.   It's page 43 of the exhibit at the bottom.  We were

15   talking about the exhaustion and the ill-prepared caseworkers.

16   Page 43.

17   A.   Give me a minute.

18   Q.   You said you didn't remember reading this, so I wanted to

19   refresh your memory.

20             "The caseworkers," page 43, at the bottom.  "The

21   caseworkers and staff" -- this is a month and a half ago --

22   "with whom the monitoring team spoke all expressed exhaustion."

23             You've heard that before, haven't you, from

24   caseworkers?

25   A.   Sometimes.

1    Q.   "Noting that many of their peers had quit their jobs due

2    to the requirement that they had to supervise CWOP settings."

3            You've heard that before, haven't you, from

4    caseworkers, that they quit?

5    A.   Sometimes.

6    Q.   They noted that they did not have the background or skills

7    to supervise children with high mental and behavioral health

8    needs in a home setting.

9            I'm sure you've heard that before, haven't you,

10   Ms. Banuelos, from caseworkers?

11   A.   I know I read it in the Monitors' report.  I don't --

12   Q.   Did you hear --

13   A.   No, I have not had a worker directly tell me.  Not that I

14   can recall.

15   Q.   Directly.  Okay.  "And that they not only feared for the

16   children's safety but feared for their own safety."

17            You've heard caseworkers express safety concerns,

18   haven't you?

19   A.   I've heard workers express safety concerns for themselves,

20   yes.

21   Q.   "All of them expressed their love for their work and for

22   the children they worked with but felt ill-equipped to manage

23   the children's behavior."  Do you see that?

24   A.   I read that.

25   Q.   If that's true, Ms. Banuelos, there's a major problem with

```
 1    these caseworkers, isn't there?
 2    A.   When you say there's a problem with the caseworkers, can
 3    you -- I don't understand what you're asking.
 4    Q.   They're under tremendous stress from this work that the
 5    State is putting on them to manage children, high needs
 6    children in unregulated settings, aren't they?
 7    A.   They are under stress.
 8    Q.   And stressed caseworkers make it harder for them to do
 9    their job, doesn't it?
10    A.   It can make it difficult.
11    Q.   You were a caseworker at one time in your career, were you
12    not?
13    A.   I was.
14    Q.   Did you ever do a -- regularly do shifts, overtime shifts
15    for children that were in unregulated placements?
16    A.   I did not.
17    Q.   So you don't personally know the sort of intense pressure
18    that today's caseworkers have to live with, do you?
19    A.   Not -- I have not -- I never did that as a caseworker.
20               THE COURT:  Did you -- have you shadowed them like
21    Commissioner Muth has?
22               THE WITNESS:  I have done some CWOP shifts.
23               THE COURT:  And how long ago?
24               THE WITNESS:  It's been -- I can't recall the exact
25    time, Your Honor, but it's been some time.  Maybe about a year
```

```
 1   and a half ago maybe.  A year ago.  I can't recall the exact
 2   time, Your Honor.
 3            THE COURT:  How did you find it?
 4            THE WITNESS:  It was -- I found that we have some
 5   very dedicated caseworkers --
 6            THE COURT:  Yes.
 7            THE WITNESS:  -- who really do their best to work
 8   very closely with the children that are currently without
 9   placement, and they try to provide structure for them, and they
10   try to provide a routine.  And they do a lot of one-on -- when
11   I was there, it was a lot of one-on-one with -- there was three
12   kids, I believe, when I was there, and so it was a lot of
13   one-on-one time with them.
14            THE COURT:  What -- how is the caseworker doing that
15   was beaten so severely, had a concussion and was hospitalized?
16   Wasn't she hospitalized?  She was hospitalized.
17            THE WITNESS:  I don't have an update on her, but I do
18   know what you're speaking.
19            THE COURT:  It was just kind of really frightening.
20            THE WITNESS:  Uh-huh.
21   BY MR. YETTER:
22   Q.   New caseworkers do -- the State asks new caseworkers to
23   perform these shifts for children in unregulated settings,
24   doesn't it?
25   A.   Can you -- when you say new caseworkers, what does that
```

```
 1   mean?
 2   Q.   Caseworkers with graduated caseloads.
 3   A.   Yes --
 4   Q.   That means --
 5   A.   -- graduated caseloads.
 6   Q.   That means they're new, right?
 7   A.   That means that they've become case assignable.
 8   Q.   So as soon as you become case assignable, which is after
 9   12 weeks of training, right?
10   A.   Correct.
11   Q.   You can start working -- the State can ask you to start
12   working shifts, overtime shifts to keep track of children in
13   unregulated placements, right?
14   A.   Yes.
15   Q.   And when you ask them after that initial training, do you
16   give them special training on deescalation techniques?  Does
17   the State do that?
18   A.   They -- I don't recall all the training that they get in
19   CPD, so I'm not -- I don't recall.  I know that they get
20   various trainings during CPD, but I can't remember if
21   deescalation is one of those.
22   Q.   When you have these new caseworkers start watching
23   children in unregulated settings, do you keep -- give them
24   special training on restraining children that have outbursts?
25   A.   No.
```

```
 1   Q.   Do you know that according to the statistics of the State
 2   of Texas that caseworkers with graduated caseloads, in other
 3   words the new caseworkers, 33 percent of them are doing shifts
 4   with -- for children in unregulated settings?
 5   A.   I'm not familiar with that statistic.
 6             THE COURT:  Say that again.
 7             MR. YETTER:  33 percent of the caseworkers, the new
 8   caseworkers on graduated caseloads, are handling overtime
 9   shifts for children in unregulated settings, the CWOP.
10             THE COURT:  Is that right?
11             MR. YETTER:  CWOP shifts.
12             (Technical interruption)
13             THE COURT:  We're getting feedback, I guess.
14             Is that right, Ms. Banuelos?
15             THE WITNESS:  Your Honor, I don't recall seeing that
16   statistic of 33 percent.
17             THE COURT:  But is it -- but are the new caseworkers
18   doing shift work on CWOP?
19             THE WITNESS:  They -- they will be asked to do if
20   there's a necessity, but they do it alongside others.  They
21   don't do it by themselves.
22             THE COURT:  But they still have to do it?
23             THE WITNESS:  They will be asked to do shifts but not
24   by themselves.
25             THE COURT:  Do any of the -- do any of the staff
```

```
 1   people do these by themselves?
 2            THE WITNESS:  No, they do not, Your Honor.
 3            THE COURT:  Okay.
 4            Go ahead.
 5            MR. YETTER:  Yes, Your Honor.
 6   BY MR. YETTER:
 7   Q.   Now, these overtime shifts are not -- can be voluntary,
 8   can't they?
 9   A.   They can.
10   Q.   But they are overwhelmingly mandatory, aren't they?
11   A.   It depends where you're -- what part of the region you're
12   in.
13            THE COURT:  What part of what?
14            THE WITNESS:  Your Honor, it just depends on the
15   number of children that we have that are without placement.
16            THE COURT:  They're required to do this, though, the
17   caseworkers, right?
18            THE WITNESS:  They are required to do it if we don't
19   have enough people who volunteer.
20            THE COURT:  Okay.
21   BY MR. YETTER:
22   Q.   And every day, all across the state, caseworkers in every
23   region are having to watch children in unregulated settings,
24   right?
25   A.   Not everywhere across the state.
```

1   Q.   There are some regions with no children in unregulated
2   settings?
3   A.   There are some regions that don't have any.
4   Q.   And are the regions with the larger cities like Houston,
5   Dallas, Austin, and San Antonio have most of the children in
6   unregulated settings?
7   A.   Can you repeat that question?
8   Q.   Do most of the children in unregulated -- unregulated
9   settings reside in areas with the largest cities, Houston,
10  Dallas, Austin, San Antonio, El Paso?
11  A.   Currently it would be Houston and Austin and -- those
12  would be the two, the top two.
13  Q.   The top two.
14        And the current policy -- let's go to Plaintiffs'
15  Exhibit 114, tab 4.  This is children without placement
16  supervision and overtime policy.
17        Let's go back to the bottom.
18        "CWOP shift and hour limitations.  The current policy
19  in effect today as of September 2023 is that employees may work
20  up to 16 CWOP overtime hours per week," right?
21  A.   That's correct.
22  Q.   That is almost 50 percent of a full-time week, right?
23  It's 40 percent of a full-time week.  40 percent of 40 hours?
24  A.   I'm not very good with math.
25  Q.   Okay.  Trust me on that one.  That's true.

```
 1              That's a huge extra part-time job, isn't it?
 2   A.   I want to say it's part-time.
 3   Q.   That's like two more days full-time work a week, isn't it?
 4   Two more eight-hour days is 16, right?
 5   A.   That would only be if one person is doing it, but it's not
 6   one person.
 7   Q.   Well, this says CPS employees -- "Each employee may work
 8   up to 16 hours a week in overtime watching children in
 9   unregulated placements," true?
10   A.   Yes.  Correct.
11   Q.   And they can do that week after week after week.  That's
12   the policy of the State of Texas today, isn't it?
13   A.   They -- they can, but they have to -- there's parameters
14   around that.
15   Q.   Working two more days a week is like working seven days a
16   week, eight hours a day for these caseworkers, isn't it?
17   A.   Can you repeat that?
18   Q.   Working these 16 overtime hours would be like working two
19   extra days.  That's -- if they work a full-time week, that's
20   two more days.  That's working seven straight days full-time,
21   right?
22   A.   It would be working two eight-hour shifts.
23   Q.   You know that being a caseworker is a tough job even for
24   the -- when you're dealing with your regular caseload?
25   A.   I would agree that it can sometimes be a tough job.
```

1   Q.   And you will agree that watching children in unregulated

2   placements that are high needs children is an even tougher,

3   more stressful, more difficult job, isn't it?

4   A.   Not always.

5   Q.   The State of Texas has thought about, talked about hiring

6   dedicated positions, caseworkers to watch children in these

7   unregulated placements, hasn't it?

8   A.   Yes.

9   Q.   And why has it not done that?  Why haven't you hired

10  caseworkers that are trained to provide the right services for

11  children, these high needs children in unregulated placements?

12  A.   Can you repeat it?

13  Q.   Sure.  Why is the State of Texas, according to your --

14  based on your knowledge, the person in charge of caseloads and

15  trends, why have they not hired dedicated caseworkers that are

16  trained to provide the services that these high needs children

17  in unregulated settings need?

18  A.   So in the -- as far as my recollection, in the past we had

19  tried to hire dedicated staff, but we were not able to -- there

20  was not enough applicants in order to hire staff.

21  Q.   Well, how about building more facilities that can handle

22  children with high service needs and provide them the services

23  that they need instead of putting them in unregulated

24  placements?  Has the State of Texas considered that?

25  A.   We've considered everything that we can to try to find

1    licensed placements or kinship placements.

2    Q.   And I was asking specifically about building the

3    facilities to provide the high -- the high degree of service

4    that these children need.  Has the State considered doing that?

5    A.   We don't build facilities.

6    Q.   Well, the State can always hire somebody to build them

7    out, you know, hire a private provider or provide them

8    themselves.  They used to do that in the State of Texas.

9    A.   I'm not the person to answer that question.

10   Q.   So what is the solution for 600,000 hours in 2022 -- 2021,

11   2022, and 2023 watching children that are high needs children

12   in unregulated settings?  What is the State's solution,

13   Ms. Banuelos?

14   A.   So we have worked very hard in building our qualified

15   residential treatment.  We have expanded our treatment foster

16   care program.  We have -- we're working in intensive

17   psychiatric treatment.  We're looking at different placements.

18            We're working very closely with our providers, and we

19   have been able to bring down our number to only 29.  As of the

20   last number that I had seen, it was approximately 29 PMC

21   children out of almost 8,000 children that are in PMC.

22            So we are finding -- the majority of our children are

23   placed in --

24            THE COURT:  There are still children that actually

25   physically have been in that placement for months.  You know

```
 1  that.
 2            THE WITNESS:  Your Honor, I know --
 3            THE COURT:  That is incredible.
 4            THE WITNESS:  Your Honor, I would like to be at zero.
 5  That is our goal.  But we are making progress.
 6  BY MR. YETTER:
 7  Q.   But the hours that caseworkers are working watching
 8  children in unregulated settings are still 600,000 hours a
 9  year, so they're not going down.  Those hours aren't going
10  down, are they?
11  A.   I am not looking at the hours that you're talking about.
12  Q.   Okay.  Your -- these 600,000 hours a year, 2021, 2022,
13  2023, you, for caseloads, are not counting them at all, are
14  you?
15  A.   We count by what the Remedial Order tells us to count,
16  which is the one --
17            THE COURT:  No, you're not.  Let me explain that rule
18  to you very clearly.
19            When you put 248 fictive workers, what you are doing
20  is giving those children two workers and only counting them for
21  one worker.  So you're going to start having to count them for
22  two workers.
23            You've got to put those hours that the caseworkers
24  are giving in overtime to the children on their caseloads.
25  They have to go somewhere.
```

```
 1   BY MR. YETTER:
 2   Q.   Ms. Banuelos, you just can't continue --
 3              THE COURT:  And let me -- let me explain to you,
 4   that's what the Remedial Order is about.  And that was the
 5   agreement you-all made, was 14 -- a range, a guideline range of
 6   14 to 17.  And you can't do -- you can't fiddle with those the
 7   way you're doing it.
 8   BY MR. YETTER:
 9   Q.   Do you understand, Ms. Banuelos, that the caseload
10   guidelines are designed to make sure that the caseworkers have
11   the time to safely manage their children?  Do you understand
12   that's the purpose?
13   A.   I would agree that the guideline -- yes, the guideline is
14   so that workers can have time to work on their caseloads.
15   Q.   And it's --
16              THE COURT:  But you can't take a worker that's
17   already got 16, 17 cases and give them a shift a week with
18   somebody else's case -- casework, case child, without counting
19   it for them.  Don't you understand that?  This is -- this is
20   really simple.  This is simple.
21              You -- the whole reason we've got the 14 to 17
22   guidelines is because you were having this huge turnover when
23   we did the trial, because the workload was too stressful.  Now
24   you've created it again with this workload for the CWOP
25   children.  So you have a huge turnover once again, don't you,
```

```
 1    in caseworkers?
 2           THE WITNESS:  Our turnover continues to be a concern.
 3    It goes up and down.
 4           THE COURT:  Why do you think that is?  That's the
 5    whole reason we've got these guidelines so that you don't have
 6    the burnout with caseworkers and they can devote the time to
 7    their caseload.  They're not doing that.  Because you're not
 8    counting the overtime in their caseloads, and they're getting
 9    burned out with being beaten up in the CWOP settings and
10    calling the police and tasing -- getting these children tased
11    and handcuffed and carted off.  And as you know, the sex
12    traffickers know where all these CWOP locations are.
13           I mean, this is just -- anyway, to get back to the
14    point, you have got to count these children in the caseloads of
15    the overtime workers, because that was the whole point of the
16    guidelines.  Did you understand that?  So your workers wouldn't
17    be stressed and they could devote their time to the children on
18    their caseloads.  Now they're not.  You're mandating that
19    they're having to do overtime with somebody else's caseload.
20           Is this hard for you to understand?
21           THE WITNESS:  Your Honor --
22           THE COURT:  Do you understand what I'm saying?
23           THE WITNESS:  I understand what you're saying in
24    regards to the guidelines, because, again, the Remedial Order
25    asked us to look -- the workload is the number of children that
```

```
 1   are assigned to any caseworker.  That's what the workload is.
 2          THE COURT:  You've got to start assigning those -- if
 3   you're making them do mandatory shift work with somebody else's
 4   child, you've to give them -- assign them to the caseload.
 5   That's why the Remedial Order was written, to keep these
 6   children safe, and that's what you're not doing.
 7          You can't force the caseworkers to do these mandatory
 8   overtimes and not count it toward their caseload.  What about
 9   that is not -- can you not understand?
10          THE WITNESS:  Your Honor, as I mentioned, the
11   Remedial Order for the caseload guidelines --
12          THE COURT:  I wrote it.
13          THE WITNESS:  -- instructs us to --
14          THE COURT:  I know exactly what it means.
15          THE WITNESS:  Right.
16          THE COURT:  And it's to be interpreted along with the
17   underlying constitutional violations.
18   BY MR. YETTER:
19   Q.   Do you know what --
20          THE COURT:  Do you at least comprehend what I'm
21   saying?  If you don't agree with it, do you comprehend it?
22          THE WITNESS:  Your Honor, I -- what I --
23          THE COURT:  This is a yes or a no.
24          THE WITNESS:  Your Honor, I can't say yes or no,
25   because it's -- I cannot say yes or no.
```

```
 1            THE COURT:  That's really sad.  So what you're saying
 2   is that you can't tell me that you get the point.
 3            Go ahead, Mr. Yetter.  I don't think we're going to
 4   get anywhere here.
 5   BY MR. YETTER:
 6   Q.   Ms. Banuelos, you're not going to -- you're not prepared
 7   to make any change in how you're counting caseloads.  Am I
 8   right?
 9   A.   I will follow the Remedial Order of counting caseloads by
10   the number of child that -- the workload is counted by the
11   number of children --
12            THE COURT:  I just told you what it is.
13            THE WITNESS:  -- on our primary caseload.
14            THE COURT:  I just told you what to do.  Are you
15   going to do it?
16            THE WITNESS:  Your Honor, I'm going to follow the
17   Remedial Order --
18            THE COURT:  I just told you what it was.
19            THE WITNESS:  -- of counting case loads --
20            THE COURT:  Mr. Shah, do you get it?  Do you
21   understand the problem here?
22            MR. SHAH:  Your Honor --
23            THE COURT:  At least tell me you got it.
24            MR. SHAH:  Your Honor, I understand what you're
25   saying if that's what you're asking.
```

1          THE COURT:  Okay.  That's fine.

2          So what do you-all intend to do?  Nothing?  You're

3    going to make these people work on somebody else's caseload

4    without crediting to their caseload so that they are stressed

5    and quitting, which is the whole thing we tried to address with

6    the Remedial Orders.

7          MR. SHAH:  Your Honor, we're going to substantially

8    comply with the Remedial Orders.

9          THE COURT:  I would like that.  You've got to fully

10   comply actually, according -- according to my order that was

11   affirmed, I might add that part, of the order.

12         So this is -- this is a serious problem.  And

13   Mr. Yetter and the Monitors have brought it to my attention,

14   and I share their concerns.  So I want to tell you that.

15         So if you're giving each of those CWOP children two

16   caseworkers, they've got to be counted twice on the caseloads.

17   That's just simple common sense.

18         What about that do you think is wrong?  Anybody from

19   the State?

20         Ms. Ho?

21         MR. SHAH:  Your Honor, just to be clear, are you

22   saying that you're ordering that Remedial Order --

23         THE COURT:  I'm not ordering.  I'm just telling you

24   that's what it is.  That's the intent of the order when read in

25   conjunction with the constitutional harm, and that is the

```
 1   caseworkers have too high a caseload.  Now you're shoving it
 2   back up again with mandatory -- mandatory shifts on somebody
 3   else's children that are counted in somebody else's caseload.
 4   And if you've got two caseworkers assigned to one child, they
 5   both have to count on their caseload.  It's pretty simple.
 6          MR. SHAH:  I don't know if Mr. Yetter has any more
 7   questions, but, Your Honor, we hear you.
 8          THE COURT:  That's -- you know, again, the whole
 9   order for that was to address the safety of the children first,
10   but as a consequence of that, these caseworkers are just
11   turning over like crazy because of the stress of the job.
12          Are you doing exit interviews with the caseworkers
13   when they leave?
14          THE WITNESS:  We -- I don't myself do exit
15   interviews, but --
16          THE COURT:  Do you have them?
17          THE WITNESS:  I'm sorry?
18          THE COURT:  Are they done?
19          THE WITNESS:  I know that there's -- I believe
20   there's a -- HR might gather some of that information.  I don't
21   have that directly.
22          THE COURT:  Do you know what their number one
23   complaint is?
24          THE WITNESS:  I don't know it from the top of my
25   head, Your Honor.
```

```
 1            THE COURT:  Go ahead, Mr. Yetter.  I'm sorry, I keep
 2   interrupting.
 3            MR. YETTER:  No, not at all, Your Honor.
 4            THE COURT:  But I finally got it.
 5            MR. YETTER:  I think --
 6            THE COURT:  I finally understood it.
 7            MR. YETTER:  I think we're at where we're at.  And I
 8   have no other questions at this time for Ms. Banuelos.
 9            Pass the witness, Your Honor.
10            MR. SHAH:  Your Honor, we have no questions for this
11   witness.
12            THE COURT:  Okay.  Thank you, ma'am.
13            THE WITNESS:  You're welcome.
14            MR. SHAH:  Your Honor, is Ms. Banuelos dismissed for
15   the hearing, or does Mr. Yetter intend on recalling --
16            THE COURT:  Probably the same thing as the --
17            MR. SHAH:  Mr. Pahl?
18            THE COURT:  -- Mr. Pahl.
19            MR. SHAH:  Okay.  So she doesn't necessarily have to
20   stay here but stay in town?
21            THE COURT:  Mr. Yetter, is that right?
22            MR. YETTER:  Yes, Your Honor.
23            THE COURT:  Pardon?
24            MR. SHAH:  Not necessarily stay in the courthouse but
25   stay in town?
```

```
 1              THE COURT:  Well, are you in a better hotel than the
 2    kids are in?  That's all I want to know.
 3              Thank you, Ms. Banuelos.  You're excused.
 4              (Pause)
 5              THE COURT:  Next witness.
 6              How many witnesses have we done today?
 7              MR. YETTER:  We've done four, Your Honor.
 8              THE COURT:  One more?
 9              MR. YETTER:  This will be -- I don't know if we can
10    finish in an hour, but we can certainly start, or we can start
11    tomorrow.  It's up to the Court.
12              THE COURT:  We just lost so much time this morning,
13    and I want to try to keep on schedule.  Is anybody opposed to
14    going, say, another 30 minutes?
15              MR. SHAH:  No, Your Honor.  No objection.
16              THE COURT:  I said 6:30.
17              MR. SHAH:  No objection, Your Honor.
18              THE COURT:  But I want to make sure that everybody
19    gets their witnesses on.
20              You had planned on four or five a day, I think.
21              MR. YETTER:  Yes, Your Honor.  That --
22              MR. SHAH:  Frankly, we might need to do more per day
23    if Mr. Yetter is only -- I don't know -- I think he had 23
24    witnesses on his list, so --
25              MR. YETTER:  We're on track, Your Honor.  We can
```

```
 1   finish this --
 2            THE COURT:  Okay.  Let's do -- let's start another
 3   one.
 4            MR. YETTER:  If we finish this one, we're on track.
 5            Mr. Vercher.  Kason Vercher.
 6            THE COURT:  Are you all right, Mr. Yetter?  You've
 7   been standing there for hours.
 8            MR. YETTER:  I'm good.  I'm good, Your Honor.
 9            (Pause)
10            THE COURT:  Could you come forward please, sir?
11            Can you see that over there?  That's the witness
12   stand over there.
13            Thank you.  And you're still under oath.
14            THE WITNESS:  Yes, ma'am.  Yes, Your Honor.
15            MR. HUBBARD:  Your Honor, permission to approach to
16   give the witness some water.
17            THE COURT:  Yes, sir.
18            And, sir, if you need anything, just let us know,
19   okay?  I haven't been saying to the witnesses, but if you need
20   water or a break, let me know, okay?
21            THE WITNESS:  Thank you, Your Honor.
22            MR. YETTER:  May it please the Court.
23
24
25
```

```
 1                KASON VERCHER, PLAINTIFFS' WITNESS, SWORN
 2                          DIRECT EXAMINATION
 3      BY MR. YETTER:
 4      Q.   Would you introduce yourself again to the Court and spell
 5      your last name?
 6      A.   Sure.  It's Kason Vercher, V, like Victor, E-R-C-H-E-R.
 7      I'm the Director of Residential Contracts with DFPS.
 8      Q.   So as the Director -- so you work for DFPS, right?
 9      A.   Correct.
10      Q.   And you're the Director of Residential Contracts, true?
11      A.   Yes.
12      Q.   And you oversee a group of employees called residential
13      contract managers?
14      A.   Yes, sir, that's part of who I oversee.
15      Q.   Among other people.  And those managers, they manage
16      licensed contract operations, child care facilities?
17      A.   Yes, sir.
18      Q.   And you also work closely -- your managers, they work
19      closely with licensing, child care licensing, don't they?
20      A.   In some instances we do work closely with them and in
21      others we have separate things that we manage and are
22      responsible for.
23      Q.   You've been in this area of Residential Contracts for the
24      past 13 years, have you not?
25      A.   Yes, sir, I have.
```

```
 1   Q.   One of the requirements in the Residential Contracts in
 2   the State of Texas for child welfare -- child care facilities,
 3   residential child care facilities, is to follow the rules for
 4   using psychotropic medications in the State of Texas, right?
 5   That's a requirement.
 6   A.   They have -- there are contract terms regarding PMURs,
 7   yes, sir.
 8   Q.   All right.  Let's just make sure we're all clear on the
 9   various terms.
10           The PMUR, that's the Psychotropic Medication
11   Utilization Parameters.  Those are the rules.
12   A.   No, sir.  Psychotropic Medication Utilization Reviews.
13   Q.   I must have misspoke.
14           Psychotropic Medication Utilization Parameters, those
15   are the rules for using psychotropic medications in this state,
16   right?
17   A.   Not that I'm aware of, no, sir.
18   Q.   Well, when it says parameters, those are the guidelines
19   you need to stay within, true?
20   A.   Not according to my contract, no, sir.
21   Q.   All right.  Let's go to -- let me give you a notebook.
22   Let's go to Plaintiffs' Exhibit 10, tab 5 in this notebook.
23           And you're familiar with this document, are you not,
24   sir?
25   A.   Yes, sir, I've seen something that appears to be this
```

1    document as a link from the contract.

2    Q.    Okay.  It is June of 2019, right?

3    A.    Yes, sir.

4    Q.    And it is the PMU parameters, Psychotropic Medication

5    Utilization Parameters?

6    A.    Yes, sir.

7    Q.    And this is the -- this is the -- these are the rules, I'm

8    calling them rules, you can call them parameters, that a

9    provider of child care services has to follow in the State of

10   Texas, right?

11   A.    My understanding is that these are the parameters for

12   medical professionals regarding medications in the State of

13   Texas.

14   Q.    Let's go to tab 4, Plaintiffs' Exhibit 8.  These are the

15   contract requirements for the State of Texas, are they not?

16   A.    This is part of the contract requirements, yes, sir.

17   Q.    Okay.  So 24-hour residential child care requirements.

18   This is part of -- this is what your group oversees and

19   manages?

20   A.    This is a part of it, yes, sir.

21   Q.    And these are long documents.  So let's go to page 56,

22   Section 5400.  Page 56.  And it's up on the screen for you.

23   Feel free to look at the document at the top, 5400.  And that

24   deals with psychotropic medications, does it not?

25   A.    It does.

```
 1   Q.   It says that this is part of the contract requirements?
 2   A.   Yes, sir.
 3   Q.   24-hour residential child care requirements.  So this
 4   isn't voluntary; this is mandatory, isn't it?
 5   A.   Yes, sir.
 6   Q.   And it's dated as of March of 2023.  So this is current,
 7   too, isn't it?
 8   A.   Yes, sir.
 9   Q.   It says the provider -- and the provider would be the
10   child care operation, wouldn't it be?
11   A.   That is correct.
12   Q.   The facility or the operation that DFPS has a contract
13   with, true?
14   A.   That is correct.
15   Q.   And it says one of the requirements is that the provider
16   follows the guidelines in the PMU parameters, right?
17   A.   Yes.
18   Q.   So that's not something you hope they do.  That's
19   something they have to do, isn't it?
20   A.   Sure.
21            THE COURT:  It's a term of their contract.
22            THE WITNESS:  Yes.
23   BY MR. YETTER:
24   Q.   It's a term of their contract?
25            THE COURT:  You said yes?
```

```
 1                THE WITNESS:  Yes, Your Honor.
 2                THE COURT:  Thank you.
 3    BY MR. YETTER:
 4    Q.   And because you're the contract managers, if you want to
 5    figure out whether they're violating that term or satisfying
 6    that term of their contract, you've got to monitor it, don't
 7    you?
 8    A.   Yes.
 9    Q.   Okay.  You can't have a contract requirement and then just
10    ignore whether the operations, the facilities are following it
11    or not following it, can you?
12    A.   That is correct.
13    Q.   Because if you have a contract requirement that you don't
14    enforce, it might as well as not even be a requirement, true?
15    A.   Yes.
16    Q.   Okay.  So you have a requirement to follow the guidelines,
17    but you don't have any group within your Residential Contract
18    group that actually makes sure that the providers are following
19    the guidelines, do you?
20    A.   In -- can I ask for clarification in what way?
21    Q.   Well, are you checking -- do you have any group that you
22    have told or that the State tells --
23                (Technical interruption)
24                THE COURT:  Another gift from above.
25                MR. YETTER:  Yes.
```

```
 1   BY MR. YETTER:
 2   Q.   Do you have any group within Residential Contracts, the
 3   group you're with, that actually goes out and checks to see
 4   whether providers are actually following the guidelines in the
 5   PMU parameters?  Do you have any group that does that?
 6   A.   We do have a group that goes out and monitors at different
 7   operations; however, I would need to know the specific
 8   guidelines that you were talking about, because I don't -- I
 9   don't understand fully what we're -- where we're going here.
10   Q.   Okay.  Well, we're --
11           THE COURT:  You don't really need to know where
12   they're going.  You just need to answer the questions.
13           THE WITNESS:  Then I apologize.
14           THE COURT:  That's all right.
15           THE WITNESS:  We do have a group that goes out and
16   does monitoring, and they do look at psychotropic medication as
17   part of the monitoring.
18           THE COURT:  Now, if I were you, I would also want to
19   know where he's going, but I'm just telling you.
20           THE WITNESS:  I appreciate it.  I'm sorry.
21   BY MR. YETTER:
22   Q.   Okay.  So you have a group within contracts -- Residential
23   Contracts that is kind of the in-house experts on the PMU
24   parameters; is that right?
25   A.   That is not what --
```

```
 1   Q.   No, I didn't think that was right.
 2   A.   No.
 3   Q.   Do you have any group that you actually train in your
 4   Residential Contracts division on the PMU parameters that you
 5   say, "I want you to read it.  We're going to make sure we all
 6   know it, because you're going to have to enforce it"?
 7            Is there any group like that?
 8   A.   No, sir.
 9   Q.   Okay.  Do you personally, Mr. Vercher, as the head, as the
10   Residential Contract Director -- do you -- are you familiar
11   with the requirements in the PMU parameters for providers?
12   A.   I have a high level understanding of what's in the
13   document.
14   Q.   When is the first time you read the PMU parameters?
15   A.   I really couldn't say.  It has been awhile ago.
16   Q.   Okay.  So do you have a checklist for your contract folks
17   to go in and see if the provider is following the parameters?
18   A.   Again, not all of the parameters are included.  There are
19   some that are checked for.
20   Q.   Okay.  Which -- which parameters -- which of the PMU
21   parameters do you have a group that actually goes out to
22   providers and says, "Are you following the parameters?"
23            Which one of the parameters?  Which of the rules?
24   A.   So some of the rules that we look at as far as the
25   psychotropic medication parameters would be that children are
```

1    provided other psychosocial therapies like talk therapy and

2    whatnot, that they are seeing a physician's assistant or the

3    prescribing physician, et cetera, at least once every 90 days.

4    And we also check for documentation to ensure that they are

5    covering what they are supposed to be covering during those

6    reviews.

7    Q.   And it's your -- what you're telling us is those are all

8    requirements -- some of the requirements in the PMU parameters?

9    A.   Yes, sir, I believe so.

10   Q.   What about the requirement that when a child is on four or

11   more psychotropic medications that you need to check to see if

12   they need to be reviewed, that the prescribed regimen --

13   whether it needs to be reviewed?

14   A.   No, sir, we don't check for that.

15   Q.   All right.  So you know that psychotropic medications is a

16   big issue among the foster care child population, isn't it?

17   A.   Yes, sir.

18   Q.   Because they're very --

19              THE COURT:  I'm sorry?

20              THE WITNESS:  Yes, sir.

21              THE COURT:  Thank you.  Yes.

22   BY MR. YETTER:

23   Q.   They're very powerful drugs, aren't they, psychotropic

24   medications?

25   A.   That's really outside of my scope --

```
 1   Q.   Well --
 2   A.   -- to be able to answer.  I --
 3             THE COURT:  I mean, you've got to know they've got
 4   these regulations because they're powerful drugs.
 5             THE WITNESS:  Yes, Your Honor.
 6             THE COURT:  And many of them are not approved for use
 7   in children.
 8             THE WITNESS:  Yes, Your Honor.
 9             THE COURT:  And they're still used in children, which
10   I'm not saying -- I don't have any idea whether that's good,
11   bad, or indifferent, but I'm just saying that this -- it's a
12   critical area of concern.
13             THE WITNESS:  Yes, Your Honor.  I'm just not an
14   expert in psychotropic medications.
15   BY MR. YETTER:
16   Q.   Sure.  But one of the reasons why the contracts require
17   the providers to follow the guidelines is because these are
18   very powerful drugs that could have a potential safety impact
19   on children, right?  You know that.  That's kind of obvious,
20   isn't it?
21   A.   I -- from what I've heard, yes.
22   Q.   Sure.
23             THE COURT:  Well, this is your area of contract,
24   right?
25             THE WITNESS:  Yes, Your Honor.
```

```
 1              THE COURT:  To make sure they follow these
 2    parameters?
 3              THE WITNESS:  Yes, Your Honor.  I'm, again, just not
 4    an expert in the psychotropic medications themselves.
 5              THE COURT:  I think that's what he's trying to find
 6    out, is that you know why they're important.
 7              THE WITNESS:  Yes, Your Honor.
 8    BY MR. YETTER:
 9    Q.   Okay.  They're important because they impact children and
10    the child's health, mental health and physical health?
11    A.   Yes.
12    Q.   So you can't ignore them, can you?
13    A.   No.
14    Q.   All right.  Now -- but the one thing you have none of your
15    people doing is actually checking to see whether the providers
16    are doing any -- asking for any sort of review of prescribed
17    regimens of children with four or more psychotropic
18    medications.
19              You're not checking on that at all, are you?
20    A.   No.
21    Q.   It's not hard to see, Mr. Vercher, that a child taking
22    that much psychotropic medication should be checked carefully,
23    don't you think?
24    A.   Again, that's outside of the contracting realm that I
25    would --
```

 1            THE COURT:  I thought they had to follow these
 2    regulations?
 3            THE WITNESS:  They are required to follow the PMUP
 4    regulations; however, the prescribing physician would be the
 5    one that would need to make the decisions about prescribing
 6    psychotropic medications.
 7    Q.   But the providers --
 8            THE COURT:  Who contracts -- who contracts with the
 9    prescribing physician?
10            THE WITNESS:  I believe that they would --
11            THE COURT:  State does, doesn't it?
12            THE WITNESS:  STAR Health Medicaid providers.
13            THE COURT:  Okay.  But doesn't the State -- State
14    provides Medicare, Medicaid?
15    BY MR. YETTER:
16    Q.   State hires a managed care provider, which is Superior
17    HealthPlan or STAR Health, right?
18    A.   Correct.
19    Q.   Okay.  But the point of these -- you know that children
20    in -- foster children are more likely to be prescribed
21    psychotropic medications.  You know that, don't you?
22    A.   I have seen some statistics on that, yes.
23            THE COURT:  Sorry?
24            THE WITNESS:  I said I have seen some statistics
25    about that, yes.

1          THE COURT:  I just reread -- I was talking earlier,

2    you weren't in here, but the comptroller of the State of Texas

3    in 2004 and 2006 did an initial study in 2004 and an update in

4    2006, and it looked like about a fourth of her 2006 study was

5    on psychotropic medications and psychiatric hospitalizations

6    for the foster children.

7          And she had in there -- and I'm sure that's changed

8    now, but she had in there some very compelling statistics about

9    why it was of a concern.  Because if you compare it to the

10   general population or you compare Texas foster care to other

11   states' foster care, much higher use of psychotropic drugs and

12   psychiatric hospitalizations.  And I know that has come down

13   from --

14         I think what was it then, Ms. Fowler?  39 percent of

15   all foster children in Texas were on psychotropics in 2006 or

16   thereabout?

17         MS. FOWLER:  Judge, I would have to get the number

18   for you.  It's in the site visit report that we published.  But

19   it comes from the State's own data, so they should be able to

20   provide that.

21         THE COURT:  Okay.  Well, I don't think it's -- what I

22   meant was I think it was 39 percent in 2006 and it's gone down

23   to 28, 27, something like that, according to the report?

24         MS. FOWLER:  Yeah.  It's -- well, so the site visit

25   report included the -- kind of a historic -- historical look at

1    the use of psychotropics with foster children, and it
2    documented a reduction in the percentage of foster children,
3    mostly younger foster children.  It hasn't reduced --
4              THE COURT:  Four to eight?
5              MS. FOWLER:  -- so much for --
6              THE COURT:  Yeah.
7              MS. FOWLER:  -- the teenagers, but for the younger
8    kids.
9              THE COURT:  But that's still -- it was over one in
10   four foster children are on psychotropics, I think, if I'm
11   remembering the statistics right, so --
12             MR. YETTER:  Let's go to tab 8, Plaintiffs' Exhibit
13   108, talking about why it's so important with children in
14   foster care.
15             This is a document that the State produced recently,
16   Your Honor.
17             Let's go -- let's just do the left-hand side, that
18   first green box and the gray -- the gray column to the left.
19             So this is actually a briefing of both of the
20   Commissioners, DFPS and HHSC, Your Honor, earlier in 2023.  And
21   it is the overview of the PMU review process in STAR Health.
22   BY MR. YETTER:
23   Q.   Do you see that, Mr. Vercher?
24   A.   I'm looking at it now, yes.
25   Q.   All right.  So the first box in this briefing of

1   Commissioner Muth -- I believe she was there at the time -- and

2   Commissioner Young, gives some background.  And the second

3   bullet says, "Children in child welfare" --

4           Why don't we just -- can we blow up that bullet?  It

5   makes it a little easier to read.  That bullet and the sub

6   bullets.

7           "Children in child welfare are more likely to be

8   prescribed psychotropic medications."  Do you see that?

9   A.   Yes, I see it.

10  Q.   "More likely to receive polypharmacy," in other words,

11  multiple medications, true?

12  A.   I see it here, yes.

13  Q.   "More likely to have a mental health diagnosis," right?

14  A.   Yes, I see that.

15  Q.   "And more likely to have a developmental disorder."

16          All those things the State of Texas recognizes

17  internally.  That's why psychotropic medications are -- it's so

18  important to keep track of them, right?  Right?

19  A.   Yes.

20  Q.   And that's why you have a contract requirement for that,

21  true?

22  A.   I did not write this contract, so I assume that is the

23  case.

24  Q.   Well, you enforce it?

25  A.   Correct.

1   Q.   And you know that you're also telling providers that they

2   have to raise concerns to DFPS and to STAR Health if the

3   prescribed regimens are outside the PMU parameters.  You're

4   telling providers that, aren't you?  They have to raise

5   concerns?

6   A.   Yes.  If they have concerns, they should raise them.

7   Q.   But you're not enforcing that, are you?

8          THE COURT:  Well, if nobody is checking it, you're

9   not enforcing it.

10          THE WITNESS:  Right.  I'm not -- I'm not -- I'm not

11   reviewing that information that I'm aware of at all.

12   BY MR. YETTER:

13   Q.   And, frankly --

14          THE COURT:  Even when you renew the contract, you

15   don't -- you don't review that?

16          THE WITNESS:  The contracts are renewed at a

17   five-year interval, so --

18          THE COURT:  You're in charge of that?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  But you don't review any of this

21   information when you evaluate whether or not to renew the

22   contract?

23          THE WITNESS:  Yes, Your Honor.  We look at a variety

24   of things, including their history.

25          THE COURT:  Do you look at these regulations on

1    psychotropic drugs?

2              THE WITNESS:  No, Your Honor.

3              THE COURT:  One of the concerns that I -- that we've

4    had in past hearings is that each child that's on psychotropic

5    drugs, according to these rules and regulations, which are for

6    the safety of the children, each child must have a medical

7    consenter, and it must be a particular type of medical

8    consenter.  And it turns out they're not having the right

9    medical consenters.

10             And so -- and they're supposed to be going -- the

11   medical consenter is supposed to be going with the child to the

12   doctor.  And I don't -- I'm not sure that that's happening.

13             Mr. Yetter, do you have information on that?

14             MR. YETTER:  I -- I do not have information at my

15   fingertips about that, Your Honor.

16             THE COURT:  Well -- but, remember, I think, Ms. Muth,

17   we talked about this, and you said all is straight with the

18   medical consenters.  Then the Monitors went out for more

19   visits.  All is not straight for the medical consenters.

20             COMMISSIONER MUTH:  Your Honor -- sorry.  I was --

21             MR. SHAH:  I was going to say, Your Honor, I do

22   recall those questions happening before, but if Ms. Muth needs

23   to come forward to testify, but --

24             THE COURT:  Okay.  Ms. Muth, did you know?  So what

25   is -- have you done anything?

1          COMMISSIONER MUTH:  Your Honor, I'm sorry, what was

2     the question?  What we've done regarding --

3          THE COURT:  We worried about that the wrong people

4     were medical consenters, they were not qualified, they were not

5     allowed to be, and they were.  And so then you told me that

6     that had been rectified.

7          COMMISSIONER MUTH:  Yes, Your Honor.

8          THE COURT:  Monitors went out for more visits.  It

9     was not rectified.

10          COMMISSIONER MUTH:  Yes, Your Honor.

11          THE COURT:  So where are we now?

12          COMMISSIONER MUTH:  So my understanding is when I

13     testified about that originally, we had gone through the effort

14     of updating all the IMPACT records.  And what the Monitors

15     discovered on their visits, that there were still some paper

16     records that existed at the facilities.  So we did put in place

17     a process to make sure that those were updated at the

18     individual provider level as well.  I don't have a recent

19     update --

20          THE COURT:  Okay.

21          COMMISSIONER MUTH:  -- of the status of that.

22          THE COURT:  Thank you.

23          Sorry.  Another diversion.

24     BY MR. YETTER:

25     Q.   Okay.  Mr. Vercher, you've told us that providers are

1    supposed to follow the parameters and raise concerns when the

2    prescribed regimens are outside the PMU parameters.  You told

3    us that earlier, correct?

4    A.   Yes.

5    Q.   But you say no one in your group ever goes to check

6    whether they're doing that, right?

7    A.   Specifically whether they are following the parameters,

8    no.

9    Q.   In fact, you have never -- as far as you're aware, the

10   State of Texas has never cited a single provider for failing to

11   follow the PMU parameters, have you?

12   A.   None that I'm aware of, no.

13   Q.   So you have a contract requirement.  You don't look to see

14   if it's being violated.  And you've never cited anybody for any

15   violation because you're not looking, right?

16   A.   For the PMU parameters, that is correct.

17   Q.   Okay.  Now, do you know that the Court -- one of the

18   Court's Remedial Orders is to -- is for the State of Texas to

19   keep track, to put on heightened monitoring providers that have

20   a pattern of contract violations?  Do you know that?

21   A.   Yes.

22   Q.   Okay.  Well, if you've got -- if the State has got an

23   obligation to keep track of patterns of contract violations,

24   you would agree that you have to be looking for contract

25   violations?

```
 1    A.    Yes.
 2    Q.    Sure.  Because you can't -- you can't take action against
 3    a pattern of contract violations if you're not looking for
 4    contract violations, can you?
 5    A.    No.  You would have to have the data to support it.
 6    Q.    Right.
 7          And so if one of the contract violations that
 8    providers are committing out there every day with children with
 9    psychotropic medications that are not properly administered,
10    your group, the contracts group, is not looking for that
11    violation, is it?
12    A.    That's actually untrue.  It's an improper administration
13    of medication.  We are looking for that.
14    Q.    You're not looking to see whether the providers are
15    following the PMU parameters, are you?
16    A.    Not -- yes.  That's correct.
17    Q.    And that's what they're required under the contract to
18    follow, aren't they?
19    A.    Yes.
20    Q.    And you are telling them they have to raise concerns, but
21    they are raising zero concerns, are they?
22    A.    I don't have the data on how many concerns happened.
23          THE COURT:  You've looked at the Monitors' reports.
24    They go to the -- they go to these facilities that you've
25    contracted with, and they're making medication errors.  They
```

1    run out of medications for 30 days at a time for a child.  They

2    don't give the medication consistently.  All kinds of problems

3    that should be investigated that are not being investigated

4    under RO 3.

5               THE WITNESS:  Yes, Your Honor.  But on the later --

6    what you're speaking to, we actually do look for those things.

7    And we do have citations and corrective actions in place with

8    various contractors around the administration of psychotropic

9    medications and --

10              THE COURT:  So what is their consequence for doing

11   that?

12              THE WITNESS:  Well, we start with a corrective action

13   plan with contracts, and we call that information into the

14   hotline as well.

15              THE COURT:  But you don't -- you didn't even know

16   about these things until the Monitors found them, those

17   particular instances that they reported.

18              THE WITNESS:  Well, in some of them we actually did,

19   and in some we were -- we already have the operations on a

20   corrective action through their monitoring.

21              THE COURT:  Okay.

22              THE WITNESS:  So --

23              THE COURT:  Thanks to their monitoring you found out

24   about it?

25              THE WITNESS:  Our internal monitoring.  I apologize.

```
 1                THE COURT:  Okay.
 2                THE WITNESS:  We have a group of providers that we
 3      do --
 4                THE COURT:  Well, were you already monitoring and
 5      they found all these errors?  Is that what you're saying?
 6                THE WITNESS:  We -- we do a fairly continual
 7      monitoring.
 8                THE COURT:  And yet -- and yet the Monitors found all
 9      these errors that were not -- that you didn't have recorded?
10                THE WITNESS:  And, again, I don't know exactly which
11      ones.
12                THE COURT:  And this is your monitoring?
13                THE WITNESS:  We do -- we do have multiple operations
14      on corrective actions at this point for monitoring throughout
15      the whole year.
16                THE COURT:  Well, some of the -- the ones you looked
17      at, Ms. Fowler, were on corrective actions, and they were still
18      making mistakes, weren't they?
19                MS. FOWLER:  I think my microphone has stopped
20      working.
21                THE COURT:  It cuts off at 5:30.
22                MR. YETTER:  It does not work overtime, Your Honor.
23                THE REPORTER:  There's one here, right here.
24                MS. FOWLER:  Judge, we know that some of the
25      operations that we visited where we found medication errors had
```

 1    already been cited for the same or similar errors.

 2              THE COURT:  And they were still doing it?

 3              MS. FOWLER:  Right.  Right.

 4              THE COURT:  You see -- you see what the concerns are?

 5              THE WITNESS:  Yes, Your Honor.

 6              THE COURT:  So your monitoring is not -- is not

 7    working.  That's a possibility.  Do you understand?

 8              THE WITNESS:  I understand.

 9              THE COURT:  Thanks.

10    BY MR. YETTER:

11    Q.   Okay.  I want to get back to the requirement of providers

12    to raise concerns about whether a prescribed regimen is outside

13    the PMU parameters, okay?  Are you with me?

14    A.   I'm with you.

15    Q.   All right.  Now, none of the providers are asking for any

16    reviews of the prescribed regimen.  You know that, don't you?

17    A.   I actually don't.

18    Q.   Let's go to -- in your notebook, it is Plaintiffs' Exhibit

19    102, tab 7.

20              MR. YETTER:  These are, Your Honor, the interrogatory

21    answers again, recent interrogatory answers by the State of

22    Texas.

23    BY MR. YETTER:

24    Q.   Let's go to page 2, interrogatory Number 1.  And we asked,

25    tell us how many for a particular timeframe the first half of

1  fiscal year 2020 who was asking for reviews of whether

2  prescribed regimens of children fell within the PMU parameters.

3           And there is a response and a chart.  Do you see the

4  chart?

5  A.   I do.

6  Q.   Okay.  So just to give some framework, these are the

7  people -- these are the entities asking, as the parameters

8  require, if the child has four or more psychotropic medications

9  or under various other circumstances should there be a review,

10  they are requesting reviews.

11          Do you see that there's 1,390 PMURs?  That is a PMU

12  review in the first and second quarter of fiscal year 2022,

13  right?

14  A.   Yes.

15  Q.   You saw that.

16          Of that 1390, if we go down to the chart, CPS nurse

17  consultants asked for two of them.  Two reviews, right?

18  A.   I see that.

19  Q.   Residential child care providers.  These are the providers

20  that are contractually required to follow the PMU parameters,

21  right?

22  A.   Yes.

23  Q.   And raise concerns if the prescribed regimens are outside

24  the parameters, true?

25  A.   Yes.

```
 1   Q.   And not a single one of them in those six months in 2022
 2   asked for a review of whether the prescribed regimens fell
 3   within the PMU parameters.  Do you see it?
 4   A.   I do see it.
 5   Q.   So providers aren't taking any efforts to -- under PMU
 6   parameters to have children's regimens reviewed even though
 7   they have four or more psychotropic drugs, are they?
 8   A.   It doesn't appear so.
 9           THE COURT:  Well, that's not good, is it?
10           THE WITNESS:  No, Your Honor.
11           THE COURT:  Thank you.
12   BY MR. YETTER:
13   Q.   And you have probably never given any thought to whether
14   you should change your policy to actually try to enforce this
15   requirement that the providers follow the PMU parameters,
16   right?  You have no plans to try to enforce that, do you?
17   A.   Try to -- to change it or to --
18           THE COURT:  He wants to know if you're going to
19   change anything.
20   BY MR. YETTER:
21   Q.   Are you going to change your practices to make providers
22   actually follow the parameters?
23   A.   We -- that's not something that has been discussed at this
24   point.
25   Q.   All right.  I appreciate that, Mr. Vercher.
```

```
 1              THE COURT:  Thank you.
 2              MR. YETTER:  Pass the witness, Your Honor.
 3                     CROSS-EXAMINATION
 4   BY MR. SHAH:
 5   Q.   Mr. Vercher, is your division tasked with ensuring that
 6   doctors are following the psychotropic parameters?
 7              MR. YETTER:  This is not about doctors, Your Honor.
 8   I know the Court knows that, but I have to object.
 9              THE COURT:  Mr. Shah, we're really not there.  You
10   can cross-examine any way you want to, but for my benefit, if
11   this is for me, I already know that this is not about the
12   prescribing physicians.  This is about the requirements of
13   these regulations and having the contracts and the failure to
14   investigate.
15              That's what this is about, RO 3, failure to
16   investigate the misuse of these drugs and the mis-medications,
17   all of these problems that the Monitors have identified.
18              We have no control over what the doctors do.  You and
19   I don't.  I don't think the State does, unless they want to
20   change their contracts.
21              MR. SHAH:  Your Honor, I have a few questions I want
22   to ask the witness just to establish --
23              THE COURT:  You go right ahead.
24              MR. SHAH:  -- for the record.
25              THE COURT:  But I just wanted to tell you my
```

```
 1    understanding of it, if that helps.
 2              MR. SHAH:  Of course, Your Honor.  If I may repeat
 3    the question, perhaps, for the witness.
 4              THE COURT:  Absolutely.
 5    BY MR. SHAH:
 6    Q.   Mr. Vercher, is your division responsible -- is your
 7    division tasked with ensuring that doctors are following the
 8    psychotropic parameters?
 9    A.   No.
10    Q.   Would you ever ask your own staff to substitute their own
11    judgment for that of a medical professional?
12    A.   No.
13    Q.   Would you ever ask any of your providers who enter into
14    contracts to substitute their own judgment for that of a
15    medical professional?
16    A.   No.
17    Q.   So your division is responsible for ensuring that the
18    provider ensures the child sees the relevant medical
19    professional how often?
20    A.   Every 90 days at minimum.
21    Q.   And, you know, if you can turn back to --
22              THE COURT:  And that they follow the prescriptions
23    and administer the medications properly?
24              MR. SHAH:  Your Honor, you're asking the questions
25    I'm about to ask.
```

```
 1    BY MR. SHAH:
 2    Q.   But -- if we can just turn perhaps to --
 3            THE COURT:  No, you go right ahead.  I'm sorry.
 4    BY MR. SHAH:
 5    Q.   -- tab 4, the same page I think Mr. Yetter had up.  It's
 6    page 56 of tab 4.  It's the thing that begins 5,400
 7    psychotropic medications.
 8    A.   I'm there.
 9    Q.   Do you see the part that says the provider ensures that
10    the child receiving psychotropic medications is provided
11    appropriate psychosocial therapies, behavior strategies, and
12    other nonpharmacological interventions?
13    A.   Yes.
14    Q.   And does your division -- is your division responsible for
15    ensuring that is done?
16    A.   Yes.
17    Q.   And do you see the section that says that the provider
18    ensures that the child receiving psychotropic medication is
19    seen by the prescribing physician, physician assistant, or
20    advanced practice nurse in the STAR Health network at least
21    once every 90 days?
22    A.   Yes.
23    Q.   And does your division ensure that that provision is
24    followed?
25    A.   That's part of what we look for when we're monitoring.
```

```
 1   Q.   All right.  To speed things up, do you see the next
 2   paragraph in those three bullet points where it says the
 3   medical consenter must accompany the child to each of these
 4   visits, seeing the child at least once every --
 5             THE COURT:  Does that happen?  Do you know that -- do
 6   you check to see that that happens?
 7             THE WITNESS:  That they see the --
 8             THE COURT:  The medical consenter goes with the
 9   child?
10             THE WITNESS:  We do check for that during our
11   monitoring events as well.
12             THE COURT:  Okay.  The reason I'm concerned about
13   that is they had all the wrong medical consenters, so it didn't
14   really matter that you were checking to see, because they had
15   the wrong ones.
16             THE WITNESS:  Yes, Your Honor.
17             THE COURT:  And hopefully that's been straightened
18   out, but it only took what?  How many years since trial?
19   Anyway.
20   BY MR. SHAH:
21   Q.   So to clarify --
22             MR. YETTER:  Nine.
23             THE COURT:  About nine, give or take.
24   BY MR. SHAH:
25   Q.   To clarify, Mr. Vercher, your division is responsible for
```

1    ensuring that the contract providers comply with this

2    requirement?

3    A.    That's correct.

4    Q.    Now, you said earlier that you have at least looked at the

5    PMUR parameters; is that right?  Or PMU parameters, I

6    apologize.

7    A.    That's correct.

8    Q.    Is it your understanding that in the PMU parameters

9    different people play different roles?

10   A.    Yes.

11   Q.    Okay.  Is there a different role that's played by

12   providers versus doctors in the PMU parameters?

13   A.    That's my understandings, yes.

14   Q.    Okay.  And you're responsible for regulating the

15   providers; is that right?

16   A.    Correct.

17   Q.    Okay.  And what are the contract requirements for

18   providers as it relates to the PMU parameters?

19   A.    And I don't have the direct quote, but it is to ensure

20   that they comply with requests for information to assist with

21   those PMURs, the -- to provide the notes that are required and

22   whatnot to facilitate those happening.

23   Q.    And does your division ensure that they are following that

24   contract requirement?

25   A.    To the best of our ability, yes.

```
 1    Q.   Does your team receive any trainings to help them perform
 2    their duties?
 3    A.   They -- they do.
 4    Q.   And can you describe some of those trainings they receive?
 5    A.   Most are on-the-job trainings for the monitoring team;
 6    however, we also have a variety of other trainings that are
 7    provided to the different staff members based on their roles.
 8              If you're -- is there any training in particular that
 9    you're --
10    Q.   Whenever these five-year evaluations happen, does your
11    team receive trainings on how to evaluate a contract for
12    renewal?
13    A.   They receive training on their portion of the evaluation,
14    yes.
15    Q.   Yes.  And other people are also evaluating that contract;
16    isn't that right?
17    A.   That's correct.
18    Q.   So your division is not the sole evaluator?
19    A.   That's correct.
20    Q.   Okay.  And are you the only department that evaluates
21    medication -- medication-related violations or issues that
22    might be occurring in any of these homes?
23    A.   No.
24    Q.   Okay.
25              MR. SHAH:  Your Honor, that's all I have for this
```

```
 1   witness.
 2              THE COURT:  Sorry?
 3              MR. SHAH:  That's all I have for this witness, Your
 4   Honor.
 5              THE COURT:  Thank you.
 6              Any redirect?
 7              MR. YETTER:  No, Your Honor, nothing further.
 8              THE COURT:  So how about this witness being excused?
 9   Do you need him around?
10              MR. YETTER:  Subject to the same --
11              THE COURT:  Same.
12              MR. YETTER:  -- arrangement.
13              THE COURT:  Can you do that?
14              MR. YETTER:  Yes, Your Honor.
15              MR. SHAH:  Is that true for all the witnesses we've
16   had, sort of stay in town --
17              THE COURT:  I think he's going to want to hear from
18   his psychiatrist and see if there's something to circle back on
19   this.  Fair enough?
20              MR. SHAH:  That works.
21              MR. YETTER:  Yes, Your Honor.
22              THE COURT:  Does that sound right, Mr. Yetter?
23              MR. YETTER:  Yes, it does, Your Honor.
24              THE COURT:  Then are there any questions anybody has?
25   We'll come back tomorrow, I guess, at 9:00.
```

```
 1            MR. YETTER:  No, Your Honor.
 2            MR. SHAH:  Your Honor, only one question.  If
 3   Mr. Yetter wants to tell us which witnesses he intends to call,
 4   we'll make sure we have them first off.
 5            THE COURT:  First off.
 6            MR. YETTER:  Happy to do that.  We'll think of --
 7   we'll reconnect tonight, and I'll send them an email.
 8            MR. ADAMS:  Your Honor --
 9            THE COURT:  Over libations, I assume?
10            MR. YETTER:  I'll have to ask Ms. Lowry if we are
11   allowed to do that.
12            THE COURT:  Okay.  I want to circle back just for a
13   minute about the objections, Mr. Shah, because you-all have not
14   been in the case that long like the rest of us have.  It's been
15   the practice of the Monitors since they first started filing
16   these big reports, the June and January ones, to give -- to
17   file them in advance with the State to hear about any
18   corrections, and they make them.  That should obviate the need
19   for these objectionable objections that I complained about this
20   morning.
21            You can talk freely to the Monitors anytime you want.
22   The Plaintiffs' attorneys do and always have, and they have
23   been in constant communication over the years with
24   Mr. Neudorfer and several of the other attorneys from the
25   Attorney General's Office.  There's never been an issue.
```

1          But I think if you get advance copies of these

2   matters, review them with your client, ask questions from the

3   Monitors, and get it straightened out before we come in and

4   argue about adult foster care abbreviations.

5          MR. SHAH:  Your Honor, I don't think we've received

6   advance copies of some of these ad hoc reports.

7          THE COURT:  You have not.

8          MR. SHAH:  Okay.

9          THE COURT:  And we're going to change that.

10         MR. SHAH:  Okay, Your Honor.

11         THE COURT:  Okay.  Some, there was no time.  And I --

12  that is my fault.  I instructed them to get them filed as soon

13  as possible so you could respond, because the response -- and

14  you did.  But it was a matter of timing.  And it was also my

15  problem and not theirs.  They've always been very careful about

16  giving advance copies to both sides at the same time for the

17  big reports, the major ones.  But the smaller ones have not --

18  we have not done that.

19         So we don't have any problem doing that in the

20  future, do we, Monitors?

21         MR. RYAN:  Judge, we always say you have two things

22  we don't have:  nomination by the President and confirmation by

23  the Senate.  It's totally up to you.

24         THE COURT:  Okay.  Well, then, with that in mind,

25  we'll -- I'll make sure that these are given to you.  These

 1   short ones that have been coming in, how about three days in

 2   advance of filing?

 3           MR. SHAH:  Your Honor, I don't think that will be

 4   enough time for us to evaluate in the same way.  We've been

 5   taking at least 21 days to even do a quick report.  We don't

 6   know how long it will be, what issues will be raised,

 7   especially with the ad hoc reports where they're about issues

 8   we don't even know they're coming up versus the planned

 9   reports.

10           I would say that we would strive --

11           THE COURT:  A lot of them are from me.  I look at the

12   things.  I call them up and I say, "Look, this is an issue.

13   Get this addressed."  And they'll do some findings and review

14   the records, send it to me, and I tell them to file it.

15           MR. SHAH:  Your Honor, we will -- we will commit to

16   looking at them and trying to work on that timeline.  I just

17   can't promise without knowing what that report is.

18           THE COURT:  I'm just trying to help you out here,

19   because I don't want you to get into any Rule 11 arguments in

20   the future.

21           MR. SHAH:  Of course, Your Honor.

22           THE COURT:  And I'm sure you'll want to protect

23   yourselves from that as well.

24           MR. SHAH:  Yes, Your Honor.

25           THE COURT:  Any other questions?

```
 1              MR. ADAMS:  May I ask for a clarification, Your
 2    Honor?
 3              THE COURT:  Yes, sir.
 4              MR. ADAMS:  Mr. Yetter has proven very capable at
 5    estimating which witness and how long.  If we're able to reach
 6    agreement or understand who he intends to call tomorrow, would
 7    it be all right if other witnesses stay at their hotel on-call
 8    here in Dallas?
 9              THE COURT:  Sure.
10              MR. YETTER:  I'm okay with that.  I'm really okay
11    with that.
12              MR. ADAMS:  Thank you.  So it's subject to whatever
13    he tells us --
14              THE COURT:  You're not going to tell us where they're
15    staying, are you?
16              MR. SHAH:  I don't think there's one place, Your
17    Honor.
18              THE COURT:  Okay.
19              MR. ADAMS:  Thank you, Your Honor.
20              THE COURT:  I'm just kidding.
21              Anything else you-all can think of?
22              Ms. Ho, any questions?
23              MS. HO:  No, Your Honor.
24              THE COURT:  Are you missing any school events
25    tonight?
```

1          MS. HO:  No, Your Honor.

2          THE COURT:  Thank you-all very much for your

3    appearances.  I'll see you in the morning.

4          MR. YETTER:  Thank you, Your Honor.

5          MR. SHAH:  Thank you, Your Honor.

6          (Hearing recessed for the day)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           INDEX

 2   OPENING STATEMENT:  Mr. Yetter........................... 72

 3                                                     Further
                   Direct  Cross  Redirect  Recross  Redirect
 4
     WITNESSES FOR THE
 5   PLAINTIFFS

 6   STEPHEN PAHL        104    163

 7   HANNAH REVEILE      180    220      235

 8   JACKIE JUAREZ       238

 9   ERICA BANUELOS      282

10   KASON VERHER        338    362

11
     PLAINTIFFS' EXHIBITS                              Received
12
        1   4/21/2023 Dkt. 1350 - Letter from M. Lowry      8
13          Regarding Psychotropic Medication Utilization
            Request for PMC Class
14
        2   5/15/2023 Email of Ora Chisom to Monitors       8
15          re Request Joint Meeting with DFPS-HHSC for
            Heightened Monitoring Discussion with
16          Attachments

17      3   6/5/2023 Email from Ora Chisom to Monitors      8
            re HM policy (Dkt. 1384 Court Ex 5)
18
        4   9/19/2023 Dkt. 1412 Update to K. Ryan Report    8
19          to the Court

20      5   11/10/2023 Dkt 1442 Monitors' Supp Update to    8
            Court re RO 3, 7, and 8 and HHSC Provider Info
21
        6   6/1/2023 PI Directive - Efficient Investigative 8
22          Procedures and Documentation Practices in All
23          Settings

24      7   10/23/2023 HHSC Provider Investigations Handbook 8

25      8   Undated TXDFPS - 24-Hour Residential Child Care  8
            Requirements - Residential Contracts (RCC)
```

| 1 | 9 | 3/15/2023 TXDFPS Addenda to the 24-Hour Residential Child Care Requirements | 8 |
| 2 | 10 | 6/2019 TXHHS - Psychotropic Medication Utilization Parameters for Children and Youth in Texas Behavioral Health (6th Version) | 8 |
| 3 | 11 | 9/2019 Superior HealthPlan - Psychotropic Mediation Utilization Review (PMUR) Process for STAR Health Members - FAQ and Stakeholder Manual | 8 |
| 4 | 12 | 10/2023 TXHHS - Minimum Standards for General Residential Operations - Child Care Regulation | 8 |
| 5 | 13 | 10/2023 TX HHSC - Minimum Standards for Child Placing Agencies - Child Care Regulations | 8 |
| 6 | 14 | Undated TXDFPS - Comparison of Minimum Standards, Residential Contract Requirements, and Service Level Indicators | 8 |
| 7 | 15 | 11/20/2018 Dkt 606 Order | 8 |
| 8 | 16 | 12/17/2019 Dkt 772 Order Regarding Workload Studies in November 20, 2018 Order | 8 |
| 9 | 17 | 3/18/2020 Dkt 837 Order - Definitions Applicable to RO 20 | 8 |
| 10 | 18 | 6/16/2020 Dkt 869 First Court Monitors' Report 2020 | 8 |
| 11 | 19 | 5/4/2021 Dkt 1079 Second Report of the Monitors | 8 |
| 12 | 20 | 5/4/2021 Dkt 1080 2021-05-04 Appendices to Monitor's Second Report – RCCI Intake Reports | 8 |
| 13 | 21 | 1/10/2022 Dkt 1165 Third Report of Monitors | 8 |
| 14 | 22 | 6/2/2022 Dkt 1247 Third Update to the Court re The Refuge for DMST | 8 |
| 15 | 23 | 6/2/2022 Dkt 1248 Fourth Report of the Monitors | 8 |
| 16 | 24 | 1/20/2023 Dkt 1318 Fifth Report of Monitors | 8 |
| 17 | 25 | 3/27/2023 Dkt 1337 Update to the Court Regarding Site Visits Conducted between December 1, 2021 and December 31, 2022, and the Reopening of The Refuge for DMST | 8 |

```
1     26  6/25/2023 Dkt 1380 Monitors Sixth Report        8

2     27  6/27/2023 Dkt 1384 Exhibit list and exhibits    8
          from hearing on 6-27-2023
3
4     28  6/27/2023 Transcript from 6-27-2023 status      8
          conference (amended)

5     29  1/10/2022 Dkt 1171 Monitors' Report Regarding   8
          Safety of Settings Housing Children Without
6         Placement and Site Visits

7     30  9/13/2021 Dkt 1132 Monitors' Update to Court    8
          Regarding Children Without a Placement House in
8         CPS Offices, Hotels, and Other Unlicensed Settings

9     31  1/24/2023 Dkt 1319 Monitor' Update to the Court 8
          Regarding Children Without Placement
10
11    32  6/23/2023 Dkt 1379 Update to the Court Regarding 8
          RO 35 Caseload Performance

12    33  10/25/2023 Dkt 1425 Monitors' Update to the     8
          Court Regarding PMC Children Without a Licensed
13        Placement

14    34  10/27/2023 Dkt 1426 Monitors' Update to the     8
          Court Regarding RO 35 Caseload Performance
15
16    35  7/17/2023 Dkt 1393 Defs Obj. to Monitors' Sixth 8
          Report

17    36  11/15/2023 Dkt 1443 Defs Obj. to Monitors' Update 8
          to the Court Regarding PMC Children Without a
18        Licensed Placement

19    37  9/2/2023 Dkt 1407 Monitors Response to State's  8
          Objection to June 2023 Reports
20
21    38  1/17/2022 Dkt 1175 Transcript of Hearing on     8
          January 11, 2022

22    39  4/12/2023 Transcript from hearing on April 12,  8
          2023 (amended)
23
24    40  5/1/2023 Dkt 1352 Exhibit list and Court        8
          Exhibits from Hearing on 5-1-2023

25    41  5/1/2023 Transcript from 5-1-2023 Status        8
          Conference (amended)
```

| | | | |
|---|---|---|---|
| 42 | 5/4/2023 Dkt 1356 Hearing Transcript of 5/1/2023 Hearing | 8 |
| 43 | 6/1/2010 TXHHS – Home and Community-Based Services (HCS) | 8 |
| 44 | 10/2020 TXDFPS - Child Protective Services Handbook, Section 4133 | 8 |
| 45 | 10/2017 TXDFPS - Child Protective Services Handbook, Section 11327 | 8 |
| 46 | 4/2023 TXDFPS - Placement Summary (Form 2279) | 8 |
| 47 | 6/2023 Application for Placement (Common Application) (Form 2087) | 8 |
| 48 | 9/2023 Certification of Receipt of Child Sexual Abuse or Sexual aggression Information (Form 2279b) | 8 |
| 49 | 8/2023 TXDFPS - CPS Rights of Children and Youth in Foster Care (Form 2530) | 8 |
| 50 | 2021 TXDFPS - 2021 Annual Progress & Services Report - Targeted Plan - Health Care Oversight and Coordination Plan | 8 |
| 51 | 2022 TXDFPS - 2022 Annual Progress & Services Report - Targeted Plan B - Health Care Oversight and Coordination Plan | 8 |
| 52 | 2023 TXDFPS - 2023 Annual Progress & Services Report - Targeted Plan B - Health Care Oversight and Coordination Plan | 8 |
| 53 | Undated 26 Tex. Admin. Code §748.1119 | 8 |
| 54 | Undated 26 Tex. Admin. Code §748.2705 | 8 |
| 55 | Undated 26 Texas Admin Code §711.19 | 8 |
| 56 | Undated 37 Tex. Admin. Code §343.804 | 8 |
| 57 | 3/29/2022 DFPS Vendor Contract, Premier Protection and Investigations, LP, DBA PPI Security | 8 |
| 58 | 2/9/2022 DFPS Vendor Contract, Silver Shield Security Inc. | 8 |

| 1  | 59 | Undated TCOLE History, Texas Commission on Law Enforcement | 8 |
| 2  |    | | |
| 3  | 60 | 2/28/2023 Basic Peace Officer Proficiency Certification Chart dated 2.28.2023 | 8 |
| 4  | 61 | 2/28/2023 Intermediate Peace Officer Proficiency Certification Chart dated 02.28.2023 | 8 |
| 5  |    | | |
| 6  | 62 | 2/28/2023 Advanced Peace Officer Proficiency Certification Chart dated 02.28.2023 | 8 |
| 7  | 63 | 12/2017 De-escalation Techniques Course | 8 |
| 8  | 64 | 2015 AACAP - Recommendations about the Use of Psychotropic Medications for Children and Adolescents Involved in Child-Serving Systems | 8 |
| 9  |    | | |
| 10 | 65 | 2/1/2007 Letter from Dr. David Lakey, Commissioner with TX Department of State Health Services regarding revision to Psychotropic Medication Utilization Parameters for Foster Children with same attached | 8 |
| 11 |    | | |
| 12 |    | | |
| 13 | 66 | 4/11/2012 ACF - Information Memorandum re Psychotropic Medication | 8 |
| 14 | 67 | 11/20/2013 Psychotropic Medication for Children in Texas Foster Care Presentation | 8 |
| 15 |    | | |
| 16 | 68 | 9/7/2018 TXDFPS - Contractor Noncompliance and Contract Remedies | 8 |
| 17 |    | | |
| 18 | 69 | 4/2020 TXDFPS - Medical Services Resource Guide | 8 |
| 19 | 70 | 8/9/2021 TXDFPS - Client Services SMP | 8 |
| 20 | 71 | 10/4/2021 TXDFPS - Contract Monitoring | 8 |
| 21 | 72 | 9/26/2022 TXDFPS - Review Reason:  Risk-Based, Enhanced, Complaint, Follow-up | 8 |
| 22 | 73 | 9/5/2023 TXDFPS - Management of Contract Records and Personal Identifiable Information | 8 |
| 23 |    | | |
| 24 | 74 | 9/5/2023 TXDFPS - Risk Assessment Instrument (RAIs) | 8 |
| 25 | 75 | Undated TXDFPS - Residential Contract Managers | 8 |

| | | | |
|---|---|---|---|
| 76 | 4/2023 TXDFPS - Sexual Incident History Resource Guide | 8 |
| 77 | 10/2023 TXDFPS - Statewide Intake Policy & Procedures §4760 | 8 |
| 78 | Not used | 8 |
| 79 | Undated TXDFPS Preponderance of Evidence - a Guide to Writing the Most Appropriate Preponderance of Evidence Statements - Participant Manual | 8 |
| 80 | 9/21/2021 Dkt 1137 Governor Greg Abbott's Advisory Concerning the Court's September 14, 2021 Inquiries | 8 |
| 81 | 12/14/2022 Email from Katy Gallagher (HHSC) to Megan Annitto re Provider Investigations Questions | 8 |
| 82 | 11/22/2022 TXHHS Oversight of the HHSC Home and Community-Based Services (HCS) Program - OIG Report No. AUD-23-002 | 8 |
| 83 | Not used | 8 |
| 84 | 6/22/2023 Attachment to Ora Chisom 6/22/2023 email - Defendants' Comments on the June 17, 2023 Drafts of Monitor's Report | 8 |
| 85 | Undated HHSC Regulations § 711.1 - What is the Purpose of this Chapter | 8 |
| 86 | Undated Heightened Monitoring (HM) Considerations for Operations that Meet HM Eligibility Following Successful HM Release | 8 |
| 87 | 5/25/2023 Excerpt of Dkt 1380, page 63 | 8 |
| 88 | 6/25/2023 Excerpt from Dkt 1380, page 159 | 8 |
| 89 | 10/25/2023 Excerpt from Dkt 1425, pages 3, 4, 6, 8, and 9 | 8 |
| 90 | 10/5/2023 Dr. Christopher Bellonci Curriculum Vitae | 8 |
| 91 | Undated TXHHS - What is HCS | 8 |

| | | | |
|---|---|---|---|
| 92 | Undated TXDPS document regarding Children Without Placement and Child Watch Schedules | 8 |
| 93 | 11/3/2023 Dkt. 1429. Defs Response to Third Motion for Order to Show Cause as to Why Defendants Should Not be Held in Contempt | 8 |
| 94 | 10/2021 TXDFPS Statewide Intake Policy & Procedures | 8 |
| 95 | Undated TXDFPS Region 08 Caseload Tracker Regional Plan | 8 |
| 96 | Undated 40 Tex. Admin. Code §707.469 | 8 |
| 97 | 9/22/2023 Letter from Jennifer Sims, Deputy Commissioner of TXDFPS to Judges Jones, Hallford, and Mabray with update | 8 |
| 98 | 10/24/2023 TXHHS - PMC/TMC Requirements - Provider Investigations | 8 |
| 99 | 11/21/2023 TXDFPS - Children Without Placement Agency Efforts | 8 |
| 100 | 9/25/2023 Email from N. Hoover to Dr. Van Ramshorst re Foster Care 4+ Meds PMUR Request | 8 |
| 101 | 11/16/2023 Email from N. Hoover to Dr. Van Ramshorst re Request for Status Update- Plaintiffs' Attorneys PMUR Request | 8 |
| 102 | 11/28/2023 Defendants' Response to Plaintiff's Interrogatories for Third Amended Motion to Show Cause per Court Order (Dkt. 1439) | 8 |
| 103 | 1/2014 Child Care Licensing - Performance Management Unit - Report to Residential Child Care Management - Residential Care - Physical Abuse Investigations - Focus:  Unable to Determine Dispositions | 8 |
| 104 | 10/3/2023 Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action to Trish Evans | 8 |
| 105 | 5/12/2021 Permanency Conference Plan - Jacqueline Juarez | 8 |

1    106  Undated TX HHS Provider Investigations          8

2    107  Undated CPS Time Sheets - Excel spreadsheets -  8
          D_050706 - D_050723
3
     107A  D_050706                                        8
4
     107B  D_050707                                        8
5
     107C  D_050708                                        8
6
     107D  D_050709                                        8
7
     107E  D_050710                                        8
8
     107F  D_050711                                        8
9
     107G  D_050712                                        8
10
     107H  D_050713                                        8
11
     107I  D_050714                                        8
12
     107J  D_050715                                        8
13
     107K  D_050716                                        8
14
     107L  D_050717                                        8
15
     107M  D_050718                                        8
16
     107N  D_050719                                        8
17
     107O  D_050720                                        8
18
     107P  D_050721                                        8
19
     107Q  D_050722                                        8
20
     107R  D_050723                                        8
21
     107S  Undated Summary                                 8
22
     108  5/29/2023 Joint Commissioner Briefing -          8
23        Psychotropic Medication Utilization Review in
          STAR Health
24
     109  Undated Child Watch Demonstrative Exhibit        8
25

```
 1      110  11/28/2023 Dkt 1447 Monitor's Supplemental      8
             Response to the State's Objections to the Sixth
 2           Report and Responses to the State's Objections
             to the Updates to the Court Regarding Remedial
 3           Order 3, PMC Children Without a License Placement,
             and Remedial Order 35
 4
        111  12/3/2023 Dkt 1461, Monitors' Responses to the   8
 5           State's Objections to the Monitors' Supplemental
             Update to the Court Regarding Remedial Orders 3,
 6           7, and 8 and HHSC Provider Investigations

 7      112  12/3/2023 Dkt 1462 Update to the Court on the    8
             Prevalence of PMC Children Without Placement
 8           And Out of State Facility Placement

 9      113  1/10/2022 Dkt 1166, Recommendations for          8
             Improving Texas' Safe Placement and Services for
10           Children, Youth and Families

11      114  Undated TXDFPS Child Without Placement            8
             Supervision and Overtime Policy
12

13      DEFENDANTS' EXHIBITS                             Received

14         1  Child Care Investigations Case Documentation     9

15         2  Child Care Investigations Basic Skills           9
              Development Week 8:  Day 4 Instructor Guide
16
           3  DFPS Child Care Investigations Case Reading      9
17            Guide

18         4  Complex Investigation Division Case Reading      9
              Guide
19
           5  Overview                                         9
20
           6  Enforcement Actions at Residential Operations    9
21            Summary

22
           7  748 Subchapter L, Mediation                      8
23
           8  RCC Heightened Monitoring Tool - Child Interview 9
24
           9  RCC Heightened Monitoring Tool - Employee        9
25            Interview
```

| | | |
|---|---|---|
| 10 | RCC Heightened Monitoring Tool - Family Tour Checklist | 9 |
| 11 | RCC Heightened Monitoring Tool - Foster Parent Interview | 9 |
| 12 | RCC Heightened Monitoring Tool - RCM Site Visit Checklist | 9 |
| 13 | RCC Programmatic Monitoring Tool - Child Interview | 9 |
| 14 | RCC Program Monitoring Tool - Foster Parent Interview form for Americas Angels Inc. | 9 |
| 15 | RCC Administrative and Programmatic SMP, Provisional, and Routine | 9 |
| 16 | RCC Administrative and Programmatic SMP, Provisional, and Routine | 9 |
| 17 | Monitor Resource Guide - FY23 Version | 9 |
| 18 | Residential Contracts Weekly Monitoring Visit | 9 |
| 19 | 24-Hour Residential Child Care Requirements - Residential Contracts (RCC) | 9 |
| 20 | DFPS Residential Contracts Caregiver Training Hub Review | 9 |
| 21 | Child Without Placement Supervision and Overtime Policy | 9 |
| 22 | CPS Rights of Children and Youth in Foster Care | 9 |
| 23 | Placement Summary Form | 9 |
| 24 | Child Sexual History Report (Attachment A) | 9 |
| 25 | CVS Child Caseload Snapshot | 9 |
| 26 | Certification of Receipt of Child Sexual Abuse or Sexual Aggression Information | 9 |
| 27 | Caseload Tracker Regional Plan | 9 |
| 28 | Ombudsman Flyer | 9 |

| 1 | 29 | 0003973_Module1_V2 | 9 |
| 2 | 30 | DFPS FY 2020-2025 Child Welfare Funding History | 9 |
| 3 | 31 | Children Without Placement Agency Efforts | 9 |
| 4 | 32 | Increased Funding to Support Transition to Foster Care Rate Modernization | 9 |
| 5 6 | 33 | Home and Community-Based (HCS) and Texas Home Living (TxHmL) Handbook | 9 |
| 7 | 34 | Provider Investigations Handbook (FY2024) | 9 |
| 8 | 35 | Child Care Regulation Field Communication | 9 |
| 9 | 36 | Investigation Staffings Template (RC Only) | 9 |
| 10 11 | 37 | HHSC Long-term Care Regulation, Notification Regarding an Investigation of Abuse, Neglect or Exploitation | 9 |
| 12 | 38 | WOM Services Overview | 9 |
| 13 | 39 | Provider Investigations Handbook (FY2022) | 9 |
| 14 | 40 | Provider Investigations Handbook (FY2023) | 9 |
| 15 | 41 | Quality Assurance External Handbook | 9 |
| 16 | 42 | DFPS Remedial Order Compliance Chart | 9 |
| 17 | 43 | Child Sexual History Report, Quarter 4 -- Fiscal Year 2023 | 9 |
| 18 19 | 44 | Application for Placement | 9 |
| | 45 | Draft DFPS Temporary Youth Housing Plan | 9 |
| 20 | 46 | Spreadsheet re:  Monitor Reports | 9 |
| 21 | 47 | CCR Compliance | 9 |
| 22 | 48 | Provider Investigations Information_HHSC | 9 |
| 23 | 49 | Child's Name (Sealed) | 224 |
| 24 | | | |
| 25 | | | |

1          I, TODD ANDERSON, United States Court Reporter for the

2     United States District Court in and for the Northern District

3     of Texas, Dallas Division, hereby certify that the above and

4     foregoing contains a true and correct transcription of the

5     proceedings in the above entitled and numbered cause.

6          WITNESS MY HAND on this 20th day of December, 2023.

7

8

9                              /s/Todd Anderson
10                             TODD ANDERSON, RMR, CRR
                               United States Court Reporter
11                             1100 Commerce St., Rm. 1625
                               Dallas, Texas  75242
12                             (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25