UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CIVIL ACTION NO. 2:11-CV-00084

January 10, 2024

M.D.; bnf STUKENBERG, *et al.*, Plaintiffs, v. GREG ABBOTT, *et al.*, Defendants.

Hon. Janis Graham Jack, Senior United States District Judge

## Seventh Report Of The Monitors: Remedial Orders 1,2,3,5 to 11, 16, 18, 37, A6, and B1 to B5

Deborah Fowler and Kevin Ryan, Monitors

# Table of Contents

**Introduction and Executive Summary**..........................................................3

   Summary of the Monitors' Findings.........................................................6

   Summary of Findings by Remedial Order.................................................8

     Screening, Intake and Investigation of Maltreatment in Care Allegations..............8

     Organizational Capacity ................................................................. 15

**Demographics of Children in PMC Care** .........................................17

     Age, Gender and Race ....................................................................17

     Living Arrangements and Length of Time in Care ................................. 19

     Out of State Placement................................................................... 23

     Level of Care ............................................................................... 24

     Geographic Location ..................................................................... 25

     SSCC Presence and Placement Oversight ........................................... 26

**Screening, Intake and Investigation of Maltreatment in Care Allegations** . 27

   Remedial Order 3: Screening and Intake Performance Validation ............................ 27

     Background................................................................................... 27

     SWI Performance ......................................................................... 29

     Remedial Order 3: Screening and Intake Performance Validation........................ 35

     Remedial Order 3: Maltreatment in Care Investigations .......................................38

     Summary of Performance for Receiving, Screening and Investigating Allegations of Maltreatment........................................................................... 49

   Timeliness of RCCI Investigations: Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS)....................................................... 51

     Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS) .......... 52

     Summary ................................................................................... 66

   Remedial Order A6: Reporting Allegations...............................................68

     Background................................................................................... 69

     Performance Validation ................................................................. 70

     Foster Care Bill of Rights ............................................................... 70

     Summary ................................................................................... 85

   Remedial Order B5: Communicating Allegations to Caseworkers ............................ 85

     Background................................................................................... 86

     Performance Validation ................................................................. 87

PI Case Record Reviews ................................................................................ 102

Summary ........................................................................................................ 105

Remedial Order 37: Reporting Abuse and Neglect ......................................... 106

Background.................................................................................................... 106

Performance Validation ................................................................................ 106

The State's Case Reads .................................................................................. 107

Comparison of Monthly Intake Data and State's Case Read Data ................ 108

Summary ........................................................................................................ 108

**Organizational Capacity ................................................................... 109**

Remedial Order 1: CPS Professional Development......................................... 109

Performance Validation ................................................................................ 109

Remedial Orders B1-B4: RCCI and RCCR Investigator Caseloads.............................114

Background....................................................................................................115

Performance Validation ................................................................................115

Validation of RCCR Caseloads ..................................................................... 123

Summary ........................................................................................................ 128

Remedial Order 2: Graduated Caseloads ....................................................... 128

Background.................................................................................................... 129

Remedial Order 2 Graduated Caseloads Results and Performance Validation .... 129

Summary of Performance Validation ........................................................... 132

**Child Fatalities ................................................................................... 133**

Child Fatalities Involving Children in the PMC Class................................... 133

Child Fatalities, No Abuse or Neglect Determined ...................................... 133

# Introduction and Executive Summary

This is the Monitors' seventh comprehensive report (Seventh Report) to the United States District Court (Court) in *M.D. by Stukenberg v. Abbott* following the mandate issued by the United States Court of Appeals for the Fifth Circuit (Fifth Circuit) implementing the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship (PMC) of the Texas Department of Family and Protective Services (DFPS) who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission (HHSC).[2] Now DFPS is an independent State agency reporting directly to the Governor.[3]

Following a bench trial in 2014, the Court published a Memorandum Opinion and Verdict in December 2015 finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[4] The Court issued a Final Order on January 15, 2018. Following a stay order, the Fifth Circuit adopted in part, reversed in part and modified in part the remedial orders. Upon remand, the Court issued a modified Order on November 20, 2018.[5] The Fifth Circuit again adopted in part and reversed in part the Court's Order and issued its Judgment as Mandate on July 31, 2019.[6] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[7] specifies numerous remedial orders that implement the Court's injunction as detailed below, charging the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[8]

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] Effective February 2021, HHSC changed the name of its child care regulation unit, Residential Child Care Licensing (RCCL), to Residential Child Care Regulation (RCCR). This report uses RCCR to describe this division of HHSC even when referring to historic work done by the unit under its previous name.

[3] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent State agency reporting directly to the Governor, H.B. 5 (TX 2017), 85th Leg., R.S.

[4] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[5] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. (S.D. Tex. Nov. 20, 2018), ECF No. 606.

[6] *M.D. ex rel. Stukenberg,* 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[7] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[8] *M.D. ex rel. Stukenberg*, No. 2:11-cv-84, slip. op. at 16, ECF No. 606. ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order. The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying

On June 16, 2020, the Monitors filed the first comprehensive report (First Report) with the Court, concluding that "the Texas child welfare system continues to expose children in permanent managing conservatorship (PMC) to an unreasonable risk of serious harm." On July 2, 2020, Plaintiffs filed a Motion to Show Cause Why Defendants Should Not Be Held in Contempt for their failure to comply with Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37 and B5 (July 2, 2020 Show Cause Motion). The State filed written objections to the Monitors' First Report on July 6, 2020[9] and a Response in Opposition to the Motion to Show Cause on July 24, 2020. On September 3 and 4, 2020, the Court held a hearing on Plaintiffs' July 2, 2020 Show Cause Motion, and on December 18, 2020, found Defendants to be in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37 and B5, but not in contempt of Remedial Orders 24, 28 or 30.[10]

On May 4, 2021, the Monitors filed the second comprehensive report (Second Report) with the Court, concluding that the State made progress toward eliminating some of the "substantial threats to children's safety" that surfaced in the Monitors' First Report; but the Monitors also concluded the State's performance in some areas, including its oversight of the care of children by the Single Source Continuum Contractors (SSCC) and certain general residential operations (GRO), was contrary to the Court's remedial orders.[11]

Following discussions with the Court and parties in 2021, the Monitors developed a report schedule that focused the third report (Third Report) to the Court, filed on January 10, 2022, on Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6 and B1 to B5 and the fourth report (Fourth Report) to the Court on the balance of the remedial orders was filed on June 2, 2022.

Similarly, the report filed January 20, 2023 (Fifth Report) covering Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6 and B1 to B5, was divided from the

---

9 Defendants' Verified Objections to Monitors' Report, ECF No. 903.

10 The Court held: "Defendants are ORDERED to file with the Court a sworn certification of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 within thirty (30) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021 and continuing thereafter until the compliance hearing concludes. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing. No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing. To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing."

11 Deborah Fowler & Kevin Ryan, Second Report, ECF No. 1079.

report filed on June 25, 2023 (Sixth Report) addressing Preventing Sexual Abuse and Child-on-Child Sexual Aggression, along with Regulatory Monitoring and Oversight of Licensed Placements, which included Remedial Orders 4, 12 through 32,[12] A7 and A8.

The Seventh Report once again follows the cycle established in the above reporting and focuses on Screening, Intake and Investigation of Maltreatment in Care Allegations and Organizational Capacity, which includes Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 37, A6 and B1 to B5 (with the exception of Remedial Order 35, about which the Monitors updated the Court in a separate report on October 27, 2023).[13]

In preparing this Seventh Report, the Monitors and their staff (the monitoring team) undertook a broad set of activities to validate the State's performance, as detailed throughout this report. The Monitors requested data and information from both DFPS and HHSC to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. The Monitors also requested data and information from the SSCCs with which DFPS contracts to provide case management and placement services to foster children in DFPS regions that have transitioned to the Community Based Care (CBC) model.[14] Due to some data and information gaps in the State's routine monthly reporting, the Monitors offered the State the opportunity to provide updated data and information in September 2023. On December 12, 2023, at the direction of the Court, the Monitors provided the parties with a draft of this report and associated appendices, and requested feedback by January 4, 2024, which the State provided and the Monitors reviewed before finalizing this report.[15] In this report, the

---

[12] Remedial Orders 16 and 18 are covered as to HHSC in that reporting cycle.

[13] Deborah Fowler & Kevin Ryan, Update to the Court Regarding RO 35 Caseload Performance, ECF No. 1426 (October 27, 2023).

[14] Region 8a, which previously was operating under the CBC model, transitioned back to DFPS management. There are three stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services. The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families." DFPS, *Community-Based Care*, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp.
According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services. Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.* Two SSCCs – OCOK and 2INgage – moved to Stage II of the CBC model in 2020. Stage II includes shifting case management services from DFPS to the SSCC. Stage III involves performance assessment and financial incentives for achievement of permanency for children. *Id.*

[15] After reviewing the draft report, DFPS requested numerous sets of data and information from the Monitors. E-mail from Michael Hayman, Director of Project Management, DFPS, to Deborah Fowler and Kevin Ryan, Monitors (December 21, 2023). DFPS asserted that it could not identify the data and information requested. E-mail from Audrey O'Neill, Deputy Commissioner for Programs, DFPS, to Kevin Ryan (December 22, 2023). The Monitors and staff expended substantial time reviewing months of data and information submissions from the State and confirmed to the State in a detailed email that the State possessed, and should be able to identify, data and information for seven of the State's requests, pointing the State to its previous data and information submissions to the Monitors. E-mail from Kevin Ryan to Audrey O'Neill (January 3, 2024). The Monitors provided information to the State for three other requests. E-mail from Viveca Martinez, Monitoring Team, to Audrey O'Neill (January 3, 2024). At the direction of the Court, the Monitors did not identify specific children and adults with whom the Monitors spoke in monitoring compliance with the Court's Orders. E-mail from Kevin Ryan to Audrey O'Neill (January 3, 2024).

Monitors adhered to the methodology for validating and reporting as set forth in prior reports unless otherwise noted.

CBC was formerly known as Foster Care Redesign. There are currently seven regions that have transitioned to the CBC model (excluding the failed transition in Region 8a). Four regions have transitioned to Stage II, including Region 1 (St. Francis, in the Texas Panhandle); Region 2 (2Ingage, in 30 counties in North Texas); Region 3b (Our Community Our Kids [OCOK], in seven counties around Fort Worth); and Region 8b (Belong, in 27 counties surrounding Bexar County). New regions that entered Stage I of SSCC oversight in the Fall of 2023 include Empower (Region 3E), 4Kids 4Families (Region 4), and Family Care Network (Region 5). Additionally, OCOK entered into a contract with the State to expand into three additional counties, which DFPS now calls Metroplex West, Region 3W.

The State is reportedly releasing four new Request for Applications to expand CBC in the communities of Harris County (Region 6a), Bay Area/Montgomery (Region 6b), Bexar County (Region 8a), and El Paso (Region 10). DFPS anticipates that new contract decisions for these areas may occur by the Fall of 2024.

The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical incidents; child fatality reports; medical examiner reports; restraint log entries; videos of critical incidents; witness statements; interviews; policies; resource materials, such as handbooks, plans, guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake (SWI or hotline), including E-Reports and recorded phone calls when appropriate; and an array of employee and caregiver human resources and training records and certifications.

## Summary of the Monitors' Findings

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship (PMC) in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[16]

The Monitors' investigation, analysis, interviews and site visits in preparation for this report identified areas in which the State made progress toward eliminating "substantial threats to children's safety" surfaced in prior reports and updates to the Court, including performance associated with Remedial Orders:

- The State's performance associated with caseloads for both DFPS's Residential Child Care Investigations (RCCI) investigations and regulatory investigations by HHSC with respect to Remedial Orders B1 to B4 was strong. The Monitors' review found that almost all RCCI investigators and most HHSC inspector caseloads were

---

[16] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

within the guidelines during each month of the period from July 2022 through June 2023.

- With respect to Remedial Order 1, the Monitors confirmed that a strong majority of caseworkers hired between September 1, 2022 and March 31, 2023 and subject to full or partial Child Protective Services (CPS) Professional Development (CPD) pre-service training completed the program. Overall, the monitoring team validated the completion of CPD training by July 31, 2023 for 420 of 449 caseworkers (94%) hired between September 1, 2022 and March 31, 2023.

The State's performance in some areas is contrary to the Court's remedial orders. Specifically:

With respect to Remedial Order 3 and the Monitors' review of investigations performed by HHSC's Provider Investigations (PI), the Monitors' findings revealed egregious deficiencies and a substantial number of investigations that were not "conducted taking into account at all times the child's safety needs," as required by Remedial Order 3. The Monitors determined dispositions were inappropriate and/or investigations were deficient in 55% of the investigations reviewed.[17] Many of the PI investigations evidenced an utter disregard by the State for children's safety, falling seriously below the standard required by the Remedial Orders. Texas repeatedly addressed allegations of Sexual and Physical Abuse of some of the State's most vulnerable children with shocking carelessness, leaving PI investigations open with no activity for months on end—in numerous instances for more than one year—while children with significant developmental disabilities were left in harm's way. The State repeatedly left children exposed to danger that in certain instances caused them terrible suffering and harm.

- With respect to Remedial Order 3, DFPS's performance declined again as it relates to receiving reports of alleged abuse, neglect and exploitation. Callers to SWI reporting allegations waited an average of 5.6 minutes before their calls were handled or abandoned, an increase of nearly half a minute (24 seconds) from the data reported in the Fifth Report.

- The Monitors' evaluation of the State's system for notifying caseworkers of allegations of abuse, neglect or exploitation for purposes of Remedial Order B5 demonstrated ongoing gaps. The monitoring team reviewed allegations and the State's documented safety actions to determine whether the State took sufficient action to ensure the immediate safety of children after receiving intakes with maltreatment allegations. The monitoring team found an automated notice of allegations to the caseworker in 100% of the 358 RCCI intakes included in the case record review. However, for intakes that SWI referred for investigation to Child

---

[17] The Monitors described this review in two previous Updates to the Court. Deborah Fowler & Kevin Ryan, The Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023) (November 10, 2023 Update) and Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023) (September 19, 2023 Update).

Protective Investigations (CPI) or PI, the Monitors found no automated notifications to caseworkers. Moreover, although the Monitors found improvement over prior reporting, the monitoring team found relevant documentation showing that DFPS took appropriate action to ensure a child's safety after notification of alleged child maltreatment in 69% of all allegations reviewed (as opposed to 42% in the Fifth Report).

- With respect to Remedial Order A6, only 18 of the 55 children (33%) interviewed who answered questions related to their knowledge of the SWI hotline had heard of the SWI hotline and reported that they knew how to call it if they needed to do so. Only 17 of the 55 children (31%) had heard of and reported that they knew how to call the Foster Care Ombudsman (FCO). Children's reports to the SWI hotline made up only 1% of all reports made during the period reviewed.

## Summary of Findings by Remedial Order

### Screening, Intake and Investigation of Maltreatment in Care Allegations

*Remedial Order 3: DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

**Receiving Allegations**

- Between July 1, 2022 and June 30, 2023, hotline staff received 763,495 calls. During the period analyzed, 23% (173,472) of calls were abandoned, similar to the rate of 22% observed in the previous report.[18]

- On average, callers waited for 5.6 minutes before their calls were handled or abandoned, an increase of nearly half a minute from the data reported in the Fifth Report.[19] Forty-five percent (345,690) of callers waited on the queue for under one minute.

**Screening Allegations**

- The Monitors reviewed 1,185 referrals to SWI from July 1, 2022 to June 30, 2023, which SWI did not send to RCCI for an investigation of child abuse, neglect or

---

[18] *See* Deborah Fowler & Kevin Ryan, Fifth Report 31, ECF No. 1318.
[19] In the Fifth Report, the data demonstrated an average queue time of 5.2 minutes for calls placed from July 1, 2021 to June 30, 2022. *Id.* at 29.

exploitation but instead sent directly to HHSC (and that HHSC then assigned for a minimum standards investigation). Of these 1,185 reports, the Monitors concurred with SWI's determination in 92% (1,089) of reports.

## Investigating Allegations

- Of the 101 PI investigations closed between January 1, 2023 and April 30, 2023, HHSC determined that 2% (2) of the investigations resulted in an overall disposition of Confirmed; 8% (8) of investigations were Inconclusive; 55% (56) of investigations were Unconfirmed; and 35% (35) of investigations were assigned a disposition of Other.

- The Monitors reviewed all 64 PI investigations involving PMC children that PI closed with an overall disposition of Unconfirmed or Inconclusive between January 1, 2023 and April 30, 2023 and five additional related investigations that closed prior to 2023.

- As previously reported to the Court in September and November 2023, the Monitors found that of the 69 investigations reviewed, PI inappropriately resolved four (6%) investigations and conducted investigations with such substantial deficiencies in 33 (48%) investigations that the Monitors were prevented from reaching a conclusion. In one additional (1%) Confirmed investigation, the Monitors agreed with the disposition but found that PI failed to conduct the investigation consistent with the child's safety needs due to extensive, unexplained delays that kept the child in an unsafe situation; the reviews resulted in a total of 38 investigations (55%) that were inappropriately resolved, deficient, and/or inconsistent with child safety.

- State records revealed egregious deficiencies in these PI investigations. Texas repeatedly addressed allegations of Sexual and Physical Abuse of some of the State's most vulnerable children with shocking carelessness, leaving PI investigations open with no activity for months on end—in numerous instances for more than one year—while children with significant developmental disabilities were left in harm's way. The State repeatedly left children exposed to danger that in certain instances caused them terrible suffering and harm.[20]

- Of the 1,712 RCCI investigations DFPS completed involving PMC children between May 1, 2022 and April 30, 2023, 65 investigations (4%) resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 1,647 investigations (96%) where RCCI issued a disposition of Ruled

---

[20] *See* Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023) and Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).

Out, Unable to Determine or that resulted in Administrative Closure, the Monitors evaluated 431 investigations.

- The Monitors found that, of the 405 investigations reviewed where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 359 (89%) cases; inappropriately in 15 (4%) cases; and conducted investigations with such substantial deficiencies in 31 (8%) cases that the Monitors were prevented from reaching a conclusion.

- Of the 26 investigations reviewed that RCCI either Administratively Closed or closed with a disposition of Unable to Determine, the Monitors agreed with RCCI's decisions.

- Of the 1,017 CPI investigations DFPS completed involving PMC children between May 1, 2022 and April 30, 2023, 149 (15%) investigations resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 868 (85%) investigations where CPI issued a disposition of Ruled Out, Unable to Determine or that resulted in Administrative Closure, the Monitors evaluated 276 investigations.

- The Monitors found that of the 238 investigations reviewed where CPI Ruled Out all of the allegations, CPI did so appropriately in 213 (89%) investigations; inappropriately in three and conducted investigations with such substantial deficiencies in 22 investigations that the Monitors were prevented from reaching a conclusion.

- In addition to the 25 investigations that CPI Ruled Out that were inappropriately resolved or had substantial deficiencies, the Monitors also identified one investigation assigned a disposition of Unable to Determine with such substantial deficiencies that the Monitors were prevented from reaching a disposition conclusion and three that were inappropriately resolved, resulting in 29 (11%) investigations that the Monitors' review identified as having been inappropriately resolved or conducted with substantial deficiencies.

***Remedial Order 5:*** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

- 84% (162) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 were initiated within 24 hours of intake; and

- 16% (31) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 were not initiated timely or did not have sufficient data to assess.

**Remedial Order 6:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

- 88% (1,269) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 were initiated within 72 hours of intake; and

- 12% (177) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 were not initiated timely or did not have sufficient data to assess.

**Remedial Order 7:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

- 84% (162) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 included initial face-to-face contact with all alleged victims within 24 hours of intake; and

- 16% (31) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

**Remedial Order 8:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

- 88% (1,269) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 included initial face-to-face contact with all alleged victims within 72 hours of intake; and

- 12% (177) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

**Remedial Order 9:** *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the*

*Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

- Of 1,639 investigations opened by RCCI from July 1, 2022 to June 30, 2023 including both single and multi-alleged victim investigations, DFPS was able to track and report to the Monitors 95% of the time (1,563 investigations) whether face-to-face contact was made with each alleged victim within an investigation and the date and time that contact occurred.

- In the remaining 5% (76) of investigations, DFPS was not able to track and report whether face-to-face contact was made and the date and time that contact occurred.

*Remedial Order 10: Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

- Of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023, DFPS documented that 64% (1,046) were documented as completed within 30 days of intake;

- Of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023, DFPS documented that 16% (262) of investigations were not completed timely; and

- Of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023, DFPS documented that 18% (302) of investigations had an approved extension and were completed within the extension timeframe.

- Two percent (29) of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023 remained open with an active extension and, therefore, were not yet due at the time of analysis.

*Remedial Order 11: Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked.*

- Of the 593 investigations that were opened by RCCI between July 1, 2022 and June 30, 2023 and were not completed within 30 days, DFPS data included extensions approved for 391 (66%) investigations with the dates the extensions were

approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- *(Remedial Order 16 applies to both DFPS and HHSC. The Monitors report on DFPS's performance in this Seventh Report and on HHSC's performance in the upcoming Eighth Report.)* With respect to DFPS, the agency advised the Monitors it uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered complete when the documentation is finally submitted to the supervisor in compliance with this Order.

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

*(Remedial Order 18 applies to both DFPS and HHSC. The Monitors' report on DFPS's performance in this Seventh Report and on HHSC's performance in the upcoming Eighth Report.)* With respect to DFPS:

Notification to Referent:

- Of the 1,599 (out of 1,639) Priority One and Priority Two investigations opened by RCCI from July 1, 2022 to June 30, 2023 and documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 90% (1,440) of investigations.

- Of the remaining cases, in 2% (30) of investigations, notification letters to the referents were not mailed timely; 3% (45) were mailed to the referent prior to supervisor approval; 2% (28) of investigations did not require notifications as the reporters were anonymous; and 4% (56) were unknown due to documentation deficiencies.[21]

Notification to Provider:

- Of the 1,599 (out of 1,639) Priority One and Priority Two investigations opened by RCCI from July 1, 2022 to June 30, 2023 and documented as closed at the time of the Monitors' review, the notification letter to the provider was mailed within five days of closure in 92% (1,475) of investigations. Of the remaining cases, in 5% (76)

---

[21] Percentages do not add up to 100 due to rounding.

of investigations, notification letters to the provider were not mailed timely; 1% (11) were mailed to the provider prior to supervisor approval; and 2% (37) were unknown due to documentation deficiencies.[22]

***Remedial Order A6:*** *Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- Only 18 of the 55 children (33%) interviewed who answered questions related to their knowledge of the SWI hotline had heard of the SWI hotline and reported that they knew how to call it if they needed to do so. Children's reports to the SWI hotline made up only 1% of all reports made during the period reviewed.

- Only 17 of the 55 children (31%) had heard of and reported that they knew how to call the FCO.

***Remedial Order B5:*** *Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

- The monitoring team found a staffing contact for most intakes included in the case record review, with more staffing contacts found for RCCI intakes than PI and CPI intakes.

- Most of the staffing contacts included notes documenting a staffing between the caseworker, supervisor and/or program director. When a staffing contact was found, the monitoring team determined that the staffing contact documented appropriate action in 69% (482 of 696) of all intakes reviewed.

***Remedial Order 37:*** *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

---

[22] The documentation deficiencies included blank cells.

- The Monitors reviewed 26 intakes involving PMC children downgraded to PN between December 1, 2022, and June 30, 2023 and identified three intakes involving a PMC child in a verified foster home. One of the identified cases required an HHR staffing. DFPS had previously investigated the remaining two cases and found that neither case required an HHR. The monitoring team reviewed each of the three cases and found no concerns.

- HHSC provided an HHR for an intake that was not included in the data. This HHR involved a report concerning the fatality of a four or five-year-old child. DFPS determined that the allegations did not fall under the jurisdiction of RCCI because the child had been adopted by the foster parent before the child's death. At the time of the child's death on May 9, 2021, CPI initiated an investigation and allegations of Neglectful Supervision were Ruled Out.

- The State conducted two case reads during the period reviewed by the Monitors for this report. In its first case read, the State reported that 11 reports of abuse, neglect, or exploitation made to SWI involved a PMC child placed in a foster home and later downgraded to PN. Of these 11 reports, three required an HHR and the remaining eight involved an incident that did not occur in a foster home.

## Organizational Capacity

**Remedial Order 1:** *Within 60 days, the Texas Department of Family Protective Services (DFPS) shall ensure statewide implementation of the CPS Professional Development (CPD) training model, which DFPS began to implement in November 2015.*

- The Monitors confirmed that a strong majority of caseworkers hired between September 1, 2022 and March 31, 2023 and subject to full or partial CPS CPD pre-service training completed the program. Overall, the monitoring team validated the completion of CPD training by July 31, 2023 for 420 of 449 caseworkers (94%) hired between September 1, 2022 and March 31, 2023.

**Remedial Order 2:** *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

- For staff subject to graduated caseload standards between July 1, 2022 and June 30, 2023, caseloads conformed with the graduated caseload standards more than 98% of the time.

**Remedial Orders B1:** *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately*

*investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

**Remedial Order B2:** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order B3:** *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order B4:** *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.*

- On December 16, 2019, the Court approved an agreed motion submitted by the parties establishing as caseload guidelines a standard of 14-17 investigations per RCCI investigator and 14-17 tasks per Residential Child Care Regulation (RCCR) (HHSC) inspector.

- All reported RCCI investigators' caseloads were within the guidelines in every month of the 12-month period analyzed, with the exception of July 2022. Though most RCCR inspectors' caseloads appear to have been within the guidelines in every month of the 12-month period analyzed, the monitoring team's efforts to validate caseload data raised some questions regarding the accuracy of the monthly caseload data provided to the Monitors by HHSC. However, the Monitors cannot determine what impact (if any) these errors (and others like them) have on compliance with the caseload standards.

## Demographics of Children in PMC Care

According to DFPS data, there were 8,511 children in PMC status as of June 30, 2023,[23] a decrease of 699 children from the 9,210 children in PMC status on December 31, 2022.[24] DFPS cared for 11,436 PMC children between January 1, 2023 and June 30, 2023. During this period, 2,224 children entered PMC status and 2,923 children exited PMC status. Of the 8,511 children in PMC status on June 30, 2023, 2,086 (25%) children first entered PMC status after January 1, 2023.[25] The total number of children in PMC status on June 30, 2023 (8,511) is a significant decrease from December 31, 2019 (12,707).[26]

### Age, Gender and Race

As of June 30, 2023, 37% of children in PMC status were age zero to six years old (3,124); 23% were seven to 11 years old (1,922); and 41% were 12 to 17 years old (3,465).[27]

Figure 1: Age of Children in PMC on June 30, 2023

*Source: PMC Child List*
*n=8,511 children*

---

[23] Analyses in this section for January 1, 2023 to June 30, 2023 are based on a comprehensive data file reflective of the reporting period. *See* DFPS, RO.Inj_PMC_Children_List_010123_063023d2023_09_01_log109945, (September 1, 2023) (on file with the Monitors).

[24] This is according to DFPS's corrected data; DFPS provided to the Monitors a comprehensive data file reflective of the reporting period (January 1, 2023 to June 30, 2023) to address data lag issues that occurred in its monthly data reports. In its updated data report, DFPS reported 12 fewer children in PMC status on January 1, 2023 than previously reflected in the data the Monitors used in preparation of the Sixth Report reflecting December 31, 2022. Ten of the children previously reported in PMC status were not included in the data report that DFPS provided for this Seventh Report and two exited care on January 1, 2023. *See also* Deborah Fowler & Kevin Ryan, Sixth Report 25, ECF No. 1380.

[25] Of the 9,210 children in care on December 31, 2022, two exited care on January 1, 2023 and therefore, are excluded from the January 1, 2023 cohort.

[26] Analyses in this section for December 31, 2019 are based on a comprehensive data file reflective of December 1, 2019 through February 29, 2020. *See* DFPS, *RO.Inj - List of Placements for Children in PMC Q2 FY 20 - Apr 15-20 - 97298 (002),* (April 16, 2020) (on file with the Monitors).

[27] No children were in care after their 18th birthday. Percentages may not add to 100% due to rounding.



Note: Percentages may not add to 100% due to rounding.

Forty-seven percent of children in PMC status were reported as female and 53% were reported as male.[28]

The race of non-Hispanic children in PMC status breaks down as follows: 27% (2,276) of children in PMC on June 30, 2023 were White; 24% (2,044) were Black/African American; <1% (29) were Asian; <1% (13) were Native American; and 6% (492) were categorized as "Other." Additionally, 43% (3,657) of children in PMC on June 30, 2023 were of Hispanic ethnicity. Non-Hispanic Black/African American children in PMC status are overrepresented compared to the racial category totals for Texas's population of all children ages zero to 17 years in the 2020 census.

<span style="color:blue">Table 1: Race for Children in PMC on June 30, 2023 and Estimates of Total Child Population in Texas by Race, August 12, 2021[29,30]</span>

*n=8,511 children*

---

[28] Less than <1% of children were reported as unknown.

[29] *See* UNITED STATES CENSUS BUREAU, Table IDs P2 & P4, Product: 2020: DEC Redistricting Data (PL 94-171) (August 2021), available at https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity&tid=DECENNIALPL2020.P2 and https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity%20&tid=DECENNIALPL2020.P4. These totals were derived by subtracting Table P4 totals (population over 18) from Table P2 totals (total population). The categories used by the Census Bureau and DFPS do not match exactly. The Census data were aggregated as follows: the non-Hispanic Other category includes all children in the non-Hispanic Other category with one race and all non-Hispanic children with more than one race; the non-Hispanic Native American totals combine the American Indian Alaska Native category with the Native Hawaiian and Pacific Islander category.

[30] The format of the data provided by DFPS to the Monitors does not provide the ability to identify the racial categories for a child of Hispanic ethnicity.

18

| Race/Ethnicity | Children in PMC on June 30, 2023 | | Estimates of Total Population of Children Less than 18 in Texas by Race | |
|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent |
| Non-Hispanic White | 2,276 | 26.7% | 2,146,604 | 29.5% |
| Non-Hispanic Black/African American | 2,044 | 24.0% | 869,455 | 12% |
| Non-Hispanic Other | 492 | 5.8% | 346,518 | 4.8% |
| Non-Hispanic Native American | 13 | 0.2% | 25,890 | 0.4% |
| Non-Hispanic Asian | 29 | 0.3% | 355,940 | 4.9% |
| Hispanic (of any race) | 3,657 | 43.0% | 3,534,398 | 48.6% |
| **Total** | **8,511** | **100%** | **7,278,805** | **100%** |

Note: Percentages may not add to 100% due to rounding.

## Living Arrangements and Length of Time in Care

Based upon information provided by DFPS, 79% (6,680) of children in PMC on June 30, 2023 lived in family settings, including 50% (4,267) living in foster homes; 25% (2,107) living with relatives or fictive kin and 4% (306) living in adoptive homes; 16% (1,322) of children in PMC lived in congregate care settings; and 443 (5%) children lived in other types of living arrangements.[31] The remaining 66 (<1%) PMC children were without a licensed, regulated placement on June 30, 2023.[32]

Figure 2: Living Arrangements for Children in PMC on June 30, 2023[33]

*Source: PMC Child List*
*n=8,511 children*

---

[31] The 443 children listed in the "Other" living arrangement category include those identified by DFPS as: "Unauthorized Placement" (29%, 129), "HCS Group 1-4" (20%, 89), "Runaway" (14%, 64), "City County Jail/Other Juv. Det" (Incarcerated) (12%, 54), "Psychiatric Hospital" (5%, 21), "Own-home/Non-Custodial Care" (5%, 21), "Independent Living" (1%, 4), and eight other living arrangement types (14%, 61). During the period from January 1, 2023 to June 30, 2023, 276 unique children experienced time in a jail (81) or in a juvenile detention facility (195).

[32] The monitoring team cross-checked the children identified without placement with the ongoing e-mail notifications from DFPS to the Monitors about children without placements and were able to substantially validate the number.

[33] Of the 1,322 children living in congregate care settings, 6% (82) were placed out of state.



Note: Percentages may not add to 100% due to rounding.

PMC children who were identified as non-Hispanic Other (81%) and Hispanic (of any race) (81%) lived in family settings more often, followed by non-Hispanic Black/African American (78%), non-Hispanic Asian (76%)[34], and non-Hispanic White (75%)[35], while PMC children identified as non-Hispanic Native American (69%) lived in family settings less often.

Table 2: Living Arrangement by Race, Children in PMC on June 30, 2023

*n=8,511 children*

| Race/Ethnicity | Living Arrangement | | | | | Total |
|---|---|---|---|---|---|---|
| | Foster Home | Adoptive Home | Congregate Care | Relative/Fictive Kin | Other | |
| Non-Hispanic White | 50% | 3% | 20% | 21% | 6% | 100% |
| | 1,138 | 76 | 448 | 487 | 127 | 2,276 |
| Non-Hispanic Black/African American | 51% | 3% | 15% | 24% | 7% | 100% |
| | 1,052 | 63 | 302 | 489 | 138 | 2,044 |
| Non-Hispanic Other | 55% | 4% | 13% | 22% | 6% | 100% |
| | 269 | 22 | 64 | 107 | 30 | 492 |

---

[34] Percentages in Table 2 do not add to 76% due to rounding.
[35] Percentages in Table 2 do not add to 75% due to rounding.

20

| | | | | | | |
|---|---|---|---|---|---|---|
| Non-Hispanic Native American | 54% | 0% | 31% | 15% | 0% | 100% |
| | 7 | 0 | 4 | 2 | 0 | 13 |
| Non-Hispanic Asian | 55% | 10% | 14% | 10% | 10% | 100% |
| | 16 | 3 | 4 | 3 | 3 | 29 |
| Hispanic (of any race) | 49% | 4% | 14% | 28% | 6% | 100% |
| | 1,785 | 142 | 500 | 1,019 | 211 | 3,657 |

Note: Rows may not add to 100% due to rounding.

Based upon information provided by DFPS, 82% (10,459) of children in PMC on December 31, 2019, lived in family settings, including 49% (6,262) living in foster homes, 27% (3,401) living with relatives or fictive kin and 6% (796) living in adoptive homes; 14% (1,758) of children in PMC lived in congregate care settings; and 490 (4%) children lived in other types of living arrangements.[36]

Table 3: Living Arrangement for Children in PMC on December 31, 2019 and June 30, 2023

*n= 12,707 children and 8,511 children respectively*

| Living Arrangement | December 31, 2019 | June 30, 2023 |
|---|---|---|
| Foster Home | 6,262 (49%) | 4,267 (50%) |
| Adoptive Home | 796 (6%) | 306 (4%) |
| Congregate Care | 1,758 (14%) | 1,322 (16%) |
| Relative/Fictive Kin | 3,401 (27%) | 2,107 (25%) |
| Other | 490 (4%) | 509 (6%)[37] |
| **Total** | **12,707** | **8,511** |

Note: Columns may not add to 100% due to rounding.

Of the children in PMC status on June 30, 2023, 4% (348) were in care for less than one year; 32% (2,759) were in care for one to two years; 27% (2,274) were in care for two to three years; and 37% (3,130) were in care for more than three years.

Figure 3: Length of Stay in Care of Children in PMC on June 30, 2023

*Source: PMC Child List*
*n=8,511 children*

---

[36] The 490 children listed in the "Other" living arrangement category (2019) include those identified by DFPS as: "Own Home/Non-Custodial Care" (9%, 43), "Runaway" (21%, 104), "Incarcerated" (13%, 66), "Independent Living" (5%, 24), and "Other" (52%, 253). (DFPS did not further define "Other").
[37] This includes 66 children who were housed in unlicensed, unregulated settings (previously referenced as Children without placement or CWOP) on June 30, 2023.



Of the children in PMC status on December 31, 2019, 10% (1,273) were in care for less than one year; 45% (5,747) were in care for one to two years; 21% (2,673) were in care for two to three years; and 23% (2,981) were in care for more than three years. Most PMC children 55% (7,020) had been in care for less than two years on December 31, 2019, but that has changed significantly. On June 30, 2023, most PMC children 63% (5,404) were in care for more than two years.

Table 4: Length of Stay in Care of Children in PMC on December 31, 2019 and June 30, 2023

*n=12,707 children and 8,511 respectively*

| Length of Stay | December 31, 2019 | June 30, 2023 |
|---|---|---|
| Less than one year | 1,273 (10%) | 348 (4%) |
| 1 to 2 years | 5,747 (45%) | 2,759 (32%) |
| 2 to 3 years | 2,673 (21%) | 2,274 (27%) |
| 3 to 6 years | 2,077 (16%) | 2,303 (27%) |
| 6 years plus | 904 (7%) | 827 (10%) |
| Unable to Determine[38] | 33 (<1%) | 0 (0%) |
| **Total** | **12,707** | **8,511** |

Children exited from PMC status primarily through adoption; reunification with family; having custody transferred to relatives; or by aging out of care. Of the 2,923 children's

---

[38] The relevant data report for this information was received by the Monitors in 2020; the report listed PMC children as of December 31, 2019 and had minor data issues for 33 children, which prevented the Monitors from determining their lengths of stay. For this period, the Monitors were able to calculate length of time since removal for all children.

exits from PMC status that DFPS reported between January 1, 2023 and June 30, 2023, the most frequent reason for exit was adoption, with more adoptions by non-relatives (1,066) than relatives (783). The breakdown of exit reasons is as follows: 63% (1,849) of children were adopted; 20% (587) of children had custody transferred to a relative; and 13% (379) of children aged out of foster care. Finally, a small number of children were reunified with their families (3%, 94) or had other outcomes (<1%, 14).

Table 5: Exits from PMC by Exit Outcome between January 1, 2023 and June 30, 2023

*n=2,923 exits from foster care*

| Exit Outcome | Frequency | Percent |
|---|---|---|
| Adoption | 1,849 | 63% |
| Custody to Relative | 587 | 20% |
| Emancipation | 379 | 13% |
| Reunification | 94 | 3% |
| Other | 14 | <1% |
| **Total** | **2,923** | **100%** |

## Out of State Placement

Of the 8,511 children in PMC status on June 30, 2023, 448 (5%) children were placed in living arrangements that were located out of state. Of the PMC children placed out of state, 345 (77%) lived in family settings, including 31% (139) living with relatives or fictive kin and 15% (66) living in adoptive homes; and 18% (82) of children in PMC lived in congregate care out of state, a 1% increase from December 31, 2022 (81).

Table 6: Out of State Living Arrangement Type for Children in PMC, December 31, 2022 and June 30, 2023

*n=474 children and 448 children respectively*

| Living Arrangement Type | December 31, 2022 | | June 30, 2023 | | Percent Change |
|---|---|---|---|---|---|
| Foster Home | 161 | 34% | 140 | 31% | -15% |
| Adoptive Home | 77 | 16% | 66 | 15% | -17% |
| Congregate Care | 81 | 17% | 82 | 18% | 1% |
| Relative/Fictive Kin | 143 | 30% | 139 | 31% | -3% |
| Own Home/Non-Custodial Care | 1 | <1% | 3 | 1% | 67% |
| Other | 11 | 2% | 18 | 4% | 39% |
| **Total** | **474** | **100%** | **448** | **100%** | **-6%** |

Of the 448 children who were placed out of state, 146 (33%) were Hispanic (of any race), 145 (32%) were non-Hispanic White, 122 (27%) were non-Hispanic Black/African

23

American, 33 (7%) were non-Hispanic Other, <1% (2) were non-Hispanic Native American, and zero children placed out of state were non-Hispanic Asian.

Table 7: Children in PMC Placed Out of State by Race on June 30, 2023

*n = 448 children*

| Race/Ethnicity | Frequency | Percent |
|---|---|---|
| Hispanic (of any race) | 146 | 33% |
| Non-Hispanic White | 145 | 32% |
| Non-Hispanic Black/African American | 122 | 27% |
| Non-Hispanic Other | 33 | 7% |
| Non-Hispanic Native American | 2 | <1% |
| Non-Hispanic Asian | 0 | 0% |
| **Total** | **448** | **100%** |

Note: Percentages may not add to 100% due to rounding.

Of the 12,707 children in PMC status on December 31, 2019, 519 (4%) children were placed in living arrangements that were located out of state. Of the PMC children placed out of state, 475 (92%) lived in family settings, including 41% (215) living with relatives or fictive kin and 23% (118) living in adoptive homes; and 5% (26) of children in PMC lived in congregate care out of state.

The number of children placed in relative/fictive kin homes has decreased from 41% (215) on December 31, 2019 to 31% (139) on June 30, 2023 and in adoptive homes from 23% (118) on December 31, 2019 to 15% (66) on June 30, 2023. Out of state placements in congregate care have more than tripled, from 5% (26) on December 31, 2019, to 18% (82) on June 30, 2023.

Table 8: Out of State Living Arrangement Type for Children in PMC, December 31, 2019 and June 30, 2023

*n=519 children and 448 children respectively*

| Living Arrangement Type | December 31, 2019 | June 30, 2023 |
|---|---|---|
| Congregate Care | 26 (6%) | 82 (18%) |
| Foster Home | 142 (27%) | 140 (31%) |
| Relative/Fictive Kin | 215 (41%) | 139 (31%) |
| Adoptive Home | 118 (23%) | 66 (15%) |
| Other | 12 (2%) | 18 (4%) |
| Own Home/Non-Custodial Care | 6 (1%) | 3 (<1%) |
| **Total** | **519** | **448** |

Note: Percentages may not add to 100% due to rounding.

## Level of Care

24

Of the 8,511 children in PMC status on June 30, 2023, 4,977 (58%) children were identified with a Basic level of care,[39] 1,370 (16%) were in a Specialized level of care; 1,110 (13%) were in a Moderate level of care; and 358 (4%) were in an Intense level of care. The data included 590 (7%) PMC children with no authorized level of care recorded.[40]

Table 9: Authorized Level of Care for Children in PMC as Reported by DFPS as of June 30, 2023

*n=8,511 children*

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 4,977 | 58% |
| Specialized | 1,370 | 16% |
| Moderate | 1,110 | 13% |
| No Authorized Level of Care Recorded | 590 | 7% |
| Intense | 358 | 4% |
| (TFC) Treatment Foster Care | 104 | 1% |
| Intense Plus | 1 | <1% |
| Psychiatric Transition | 1 | <1% |
| **Total** | **8,511** | **100%** |

Note: Percentages may not add to 100% due to rounding.

## Geographic Location

For 40% (3,381) of the 8,511 children in PMC status on June 30, 2023, the county of removal was one of five Texas counties: Bexar, Harris, Tarrant, Dallas, or Bell.

Table 10: Top Five Counties of Removal for Children in PMC on June 30, 2023[41]

*n=3,381 PMC children of 8,511 PMC children in care*

| County Name | Frequency | Percent |
|---|---|---|
| Bexar | 1,126 | 13% |
| Harris | 938 | 11% |

---

[39] The number of children identified in a Basic level of care is overrepresented. The SSCCs' current recorded levels of care for children are not stored in IMPACT and are not reflected in the data reports DFPS provides to the Monitors.

[40] The Monitors found that for most of those children lacking identification of an authorized level of care (90%, 529), the placement type in the data was identified as "kin only (non-licensed)." The Monitors inquired with DFPS for insight into the circumstances when the data indicate "no authorized level of care" recorded. The State reported that when a child is in "fictive kin, non-custodial parent, unauthorized, return home, relative home placement, juvenile detention/adult jail, unauthorized placement or any placement that DFPS does not pay, the service level is not assessed as this is not a licensed placement and there is no rate of reimbursement." E-mail from Ingrid Vogel, Program Specialist, DFPS, to Megan Annitto, Monitoring Team (April 20, 2023).

[41] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the corresponding IMPACT data.

| | | |
|---|---|---|
| Tarrant | 562 | 7% |
| Dallas | 519 | 6% |
| Bell | 236 | 3% |
| **Total** | **3,381** | **40%** |

## SSCC Presence and Placement Oversight

As of June 30, 2023, 25% (2,155) of children in PMC status were from regions where SSCCs operated in the first two stages of implementation.[42] Three new regions were transferred to Stage I of SSCC oversight in the Fall of 2023 or were anticipated to transfer. These include Empower (Region 3E), 4Kids 4Families (Region 4), and Family Care Network (Region 5). Additionally, OCOK entered into a contract with the State to expand into three additional counties, which DFPS now calls Metroplex West, Region 3W.

### Table 11: Children in PMC by Region on June 30, 2023

*n=8,511 children*

| Regions | PMC Children | Percent |
|---|---|---|
| SSCC Regions | 2,155 | 25% |
| DFPS Regions | 6,356 | 75% |
| **All Regions** | **8,511** | **100%** |

As shown in the table below, Region 3b (now Metroplex West), where OCOK was responsible for placement, had the greatest number of PMC children from a region that has SSCC placement oversight.

### Table 12: Children in PMC from Regions with SSCC Presence by Region on June 30, 2023[43]

*n=2,155 children*

| SSCC Name | Legal Region | PMC Children | Percent |
|---|---|---|---|
| St. Francis Ministries | 1 | 590 | 27% |
| 2Ingage | 2 | 503 | 23% |
| Our Community Our Kids (OCOK) | 3b | 710 | 33% |
| Belong | 8b | 352 | 16% |
| **Total** | | **2,155** | **100%** |

Note: Percentages may not add to 100% due to rounding.

---

[42] DFPS reports to the Monitors both the Legal Region and the Placement Region of children; here, the Monitors are referring to Legal Region for ease of reference. However, the children may be placed in and therefore, currently living in another region.

[43] Prior to OCOK's recent expansion, the 3b catchment area was comprised of Tarrant, Erath, Hood, Johnson, Palo Pinto, Parker, and Somervell counties in DFPS Region 3W. The 8b catchment area is comprised of all counties in DFPS Region 8 excluding Bexar County. *See* DFPS, *Quarterly Report on Community Based Care Implementation Status*, 4-5 (December 2021).

# Screening, Intake and Investigation of Maltreatment in Care Allegations

## Remedial Order 3: Screening and Intake Performance Validation

***Remedial Order 3:*** *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

To assess DFPS's performance with respect to Remedial Order 3, the Monitors gathered a wide range of data relating to the safety of PMC children for analysis and qualitative review. This section discusses the Monitors' assessment and review of the statewide system for appropriately receiving, screening and investigating reports of abuse, neglect and exploitation involving PMC children at several points, including referrals to SWI; the screening of those referrals to determine whether they should be investigated for child abuse, neglect or exploitation; and investigations of child maltreatment allegations.

## Background

### RCCI and CPI Investigations

SWI is expected to assign reports that allege abuse, neglect or exploitation of children in licensed residential operations to RCCI for an investigation.[44] The RCCI investigator is required to assess the immediate safety of involved children,[45] to evaluate the risk to the children during the investigation,[46] and to initiate the investigation timely based on the assigned priority–24 hours for Priority One and 72 hours for Priority Two.[47] The RCCI investigator is required to conduct interviews of children and collateral witnesses,[48] to collect evidence,[49] and to complete the investigation within 30 days for both Priority One and Priority Two cases.[50] RCCI's possible findings include:

> <u>Reason to Believe (RTB)</u> – A preponderance of evidence indicates that abuse, neglect, or exploitation occurred. If the disposition for any allegation is Reason to Believe, the overall case disposition is Reason to Believe.

---

[44] DFPS, *Child Care Investigations Handbook* § 6100, *available at* https://www.dfps.state.tx.us/handbooks/CCI/default.asp (*Child Care Investigations*).

[45] *Child Care Investigations* § 6330.

[46] *Child Care Investigations* § 6220.

[47] *Child Care Investigations* § 6361.1-2.

[48] *Child Care Investigations* § 6420.

[49] *Child Care Investigations* § 6440.

[50] *Child Care Investigations* § 6110.

Ruled Out (R/O) – A preponderance of evidence indicates that abuse, neglect, or exploitation did not occur. If the dispositions for all allegations are Ruled Out, the overall case disposition is Ruled Out.

Unable to Determine (UTD) – A determination could not be made because of an inability to gather enough facts. The investigator concludes that:

- there is not a preponderance of the evidence that abuse or neglect occurred; but

- it is not reasonable to conclude that abuse or neglect did not occur.

If the disposition for any allegation is Unable to Determine and there is no allegation assigned a disposition of Reason to Believe, the overall case disposition is Unable to Determine.

Administrative Closure (ADM) – The operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect or exploitation. If the dispositions for all allegations are Administrative Closure, the overall disposition is Administrative Closure.[51]

RCCI is charged with investigating allegations of abuse, neglect or exploitation of children in operations licensed by RCCR (HHSC), which includes foster homes and GROs.[52] Abuse, neglect and exploitation by caregivers in a licensed facility are defined specifically for child care operations in the Texas Administrative Code.[53]

CPI is responsible for investigating abuse, neglect or exploitation of children in unlicensed placements, such as kinship foster homes, children under DFPS Supervision in CWOP Settings and certain allegations regarding children living in Home and Community-Based Services (HCS) residences as further explained below. CPI's scope of authority also includes investigating reports of child abuse or neglect alleged to have occurred prior to the child's entrance into DFPS custody.[54,55] Investigations of abuse, neglect and exploitation by caregivers in unlicensed placements are defined differently from those conducted by RCCI in the Texas Administrative Code.[56]

---

[51] *Child Care Investigations* § 6622.3

[52] *Child Care Investigations* § 1142.

[53] 40 TEX. ADMIN. CODE §§707.785-801.

[54] DFPS, *Child Protective Services Handbook* § 2120, available at https://www.dfps.state.tx.us/handbooks/CPS/default.asp.

[55] The language in Remedial Order 3 specifically refers to the General Class, rather than limiting its application to children in licensed settings. In an advisory filed with the Court on September 21, 2021, Governor Greg Abbott advised that with respect to the scope of the Court's injunctions, "[A] General Class member should receive the same protections under the Court's remedial orders regardless of the licensed or unlicensed nature of the facility where the member is housed, unless the remedial order at issue specifies that it applies only to the [Licensed Foster Care] subclass or licensed or unlicensed facilities." Governor Greg Abbott's Advisory Concerning the Court's September 14, 2021 Inquiries 3, ECF No. 1137.

[56] 40 TEX. ADMIN. CODE §§707.453-471 (defining abuse, neglect and exploitation of children who are placed in licensed settings).

### HHSC PI Investigations

As described in the Monitors' September 19, 2023 and November 10, 2023 Updates to the Court, HHSC's PI investigative authority includes HHSC state operated facilities, including state supported living centers, state hospitals and HCS residences; the HCS residences include three and four person residences (HCS Group Homes) and host home settings. PI investigates abuse, neglect and exploitation at HCS Group Homes regardless of whether the individual is deemed eligible under the home and community-based services Medicaid waiver program (under Sec. 1915 of the Social Security Act) (HCS waiver services).[57]

If the allegations take place in an HCS host home setting, HHSC investigates abuse, neglect or exploitation of an individual who is deemed eligible for HCS waiver services from a person who contracts with a health and human services agency or managed care organization to provide home and community-based services. DFPS CPI investigates allegations involving children in those same residences and by the same caregivers in instances when PI's jurisdiction does not apply because the alleged victim is not deemed eligible under the HCS waiver.[58]

## SWI Performance

### Background

Calls to SWI are answered by an automated system that asks the caller a series of questions in order to determine the way the call is routed.[59] These questions include a caller's language preference; whether the caller is asking about the status of a case; and

---

[57] 26 TEX. ADMIN. CODE §§711.1(2)(A)(ii) &(iii). The Code states that Adult Protective Services (APS) has jurisdiction in the instances described herein; the jurisdiction is exercised by HHSC's PI. Eligibility for HCS waiver services requires that an individual has an intellectual disability under state law or a diagnosis of a "related condition" with an IQ of 75 or below as further defined in the Code of Federal Regulations, Title 42, §435.1010.

[58] As previously reported to the Court by the Monitors, HHSC and DFPS appeared to clarify the SWI Handbook intake and investigation policy and procedures regarding investigative jurisdiction over allegations involving children in different types of HCS Group Homes and/or for children deemed eligible under the HCS waiver program in other settings, including those group homes identified by HHSC as "HCS Group Homes (1-4)." For example, in September 2023, DFPS updated language in its SWI Handbook where it discusses jurisdiction; it now states that PI: "has jurisdiction to investigate abuse, neglect, or exploitation of a child who resides in one of the following settings: [1] A Home and Community-based Services (HCS) group home. [2] A setting with services to meet the child's special needs paid for by a Medicaid waiver." The Handbook updates further state "Child Protective Investigations (CPI) has jurisdiction to investigate abuse or neglect of a child receiving services when all of the following apply: [1] The child does not reside in an HCS group home. [2] The child resides in a setting with services to meet his or her special needs, but those services are not paid for by a Medicaid waiver. [3] The home is not licensed by RCCR." DFPS, *Statewide Intake Policy & Procedures Handbook* §4760, available at https://www.dfps.texas.gov/handbooks/SWI_Procedures/Files/SWP_pg_4000.asp#SWP_4760 (Updated in September 2023). The Monitors have observed examples of jurisdictional confusion among SWI, CPI and PI during the intake and investigation process.

[59] *See* DFPS, *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

whether the caller wants to learn more about online reporting.[60] Depending upon the answers to these questions, the call is routed to one of 24 "call queues."[61] If an SWI staff member is not immediately available, the caller waits on the queue.[62] If a caller hangs up before an SWI staff member answers the call, the call is categorized as "abandoned."[63] If an SWI staff member speaks with the caller, the call is categorized as "handled." The automated system records the date and time that each call starts and ends; the call queue to which the call is routed; whether the call is handled or abandoned; the time the caller waits after being routed to a queue before speaking with an SWI staff member; and other information.[64]

During this reporting period, DFPS continued to produce data files containing daily SWI call records of all hotline calls made, pursuant to this Court's order; [65] the specific times of these calls to the hotline; and the wait time for each call, including, but not limited to, dropped and unanswered calls.[66]

## SWI Call Center Performance Analysis

The Monitors analyzed SWI's Avaya call data related to the 763,495 calls made to SWI from July 1, 2022 to June 30, 2023. The analysis examined the distribution of calls by month, weekday, hour and call queue, the prevalence of handled and abandoned calls, and the amount of time callers waited before the call was answered by a staff person.

### Volume of Calls to SWI

On average, the SWI data recorded over 63,000 calls a month. Average call volume increased by 2,000 calls per month compared to the Monitors' previous report.[67] The State's data reports list calls from the public as well as calls and transfers from within SWI. Call volume increased by 29% from its lowest point in July 2022 (55,778 calls) to its highest point in September 2022 (71,916 calls), before it decreased through December 2022 (57,769 calls). Call volume then rose and remained somewhat stable through May 2023 (66,994 calls), before it decreased in June 2023 (59,317 calls).

---

[60] *Id.*

[61] *Id.*

[62] *See* DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors).

[63] *Id.*

[64] DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors); DFPS, *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

[65] On February 21, 2020, the Court ordered DFPS to provide the Monitors by February 26, 2020, and continuing thereafter until further order of the Court, the records of all SWI calls made, the specific times of all calls made to SWI, and the wait time for each SWI call including, but not limited to, dropped and unanswered SWI calls. *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. at 2 (S.D. Tex. Feb. 20, 2020), ECF No. 811 (ordering that starting February 26, 2020 and continuing thereafter in 24-hour increments until further order of the Court, the Defendants are to provide the Monitors with records of all Statewide Intake hotline calls made and the wait time for each call including, but not limited to, dropped and unanswered calls, and including the specific times of these calls to the Statewide Intake hotline).

[66] The Monitors received SWI call data in workbooks with titles in the following format: "export_[month]-[day]-[year].csv". The Monitors received individual files for each day during the reporting period.

[67] The Fifth Report found an average of over 61,000 calls per month from July 1, 2021 to June 30, 2022. *See* Deborah Fowler & Kevin Ryan, Fifth Report 29, ECF No. 1318.

Figure 4: Number of SWI Calls by Month



*Queue Times*

On average, callers waited for 5.6 minutes on the queue before their calls were handled or abandoned, 24 seconds longer than the wait time observed in the previous reporting period.[68] Forty-five percent (345,690) of callers waited on the queue for under one minute; 18% (137,988) waited for one to five minutes; 13% (102,209) waited five[69] to ten minutes; 10% (75,267) waited ten to 15 minutes; 7% (51,412) waited 15 to 20 minutes; and 7% (50,929) waited more than 20 minutes.

Figure 5: Time Callers Waited before Calls were Handled or Abandoned

---

[68] The Fifth Report found an average queue time of 5.2 minutes for calls placed between July 1, 2021 to June 30, 2022. *Id*.
[69] This indicates five minutes and one second as is true throughout the time categories.

31



*Handled Calls*

Of 763,495 calls, 77% (589,982) were answered,[70] a slight decrease from 78% observed in the Fifth Report.[71] Handled calls had an average duration of 12.5 minutes. Four percent (26,486) of handled calls lasted under one minute; 19% (112,390) lasted one to five minutes; 26% (152,512) lasted five to ten minutes; 23% (138,251) lasted ten to 15 minutes; 12% (72,559) lasted 15 to 20 minutes; and 15% (87,784) lasted more than 20 minutes (percentages do not add to 100 due to rounding).[72]

Figure 6: Duration of Handled SWI Calls

---

[70] Handled calls were determined by the presence of a "Handled Flag." Forty-one calls were not flagged as either handled or abandoned, an indicator of data quality issues.
[71] The Fifth Report found that 78% of calls were handled from July 1, 2021 to June 30, 2022. *See* Deborah Fowler & Kevin Ryan, Fifth Report 30, ECF No. 1318.
[72] Fewer than 1% (43) of handled calls had a duration of zero minutes, a potential indicator of data quality issues; calls that were answered should, by definition, have a duration. Calls with a duration of zero minutes were abandoned before the caller finished navigating the automated system.



There were 1,653 calls in the dataset with durations longer than two hours, which may be indicative of data system issues. Of these 1,653 calls, 984 (60%) lasted two to three hours; 387 (23%) lasted three to four hours; 188 (11%) lasted four to five hours; 63 (4%) lasted five to six hours; and 31 (2%) lasted more than six hours.

*Abandoned Calls*

During the period analyzed, 23% (173,472)[73] of calls were abandoned, as compared to 22% in the last reporting period.[74] A total of 67% (115,415) of abandoned calls occurred after callers waited for up to five minutes, including 17% (30,113) of all abandoned calls that occurred before the caller finished navigating the automated system.

Of the 345,690 calls waiting on the queue for up to one minute, 16% (53,664) were abandoned and 84% (292,011) were handled. The highest number of abandoned calls occurred among those 137,988 calls waiting on the queue for one to five minutes, when 45% (61,751) of those calls were abandoned.

The figure below shows the queue time of abandoned calls and handled calls.

Figure 7: Queue Time of Abandoned and Handled SWI Calls[75]

---

[73] Abandoned calls were determined by the presence of a "Queue Abandoned Flag." Forty-one calls were not flagged as either handled or abandoned, an indicator of data quality issues.
[74] *See* Deborah Fowler & Kevin Ryan, Fifth Report 31, ECF No. 1318.
[75] The number of calls in the figure does not include the 41 calls that were not flagged in the data as either handled or abandoned.



*Call Queues*

Calls were routed to 24 different queues in the reporting period. Of the 763,495 calls, the abuse queue received the majority of incoming calls (63%, 477,724). The next most common queues were calls from intake staff to their supervisors (13%, 101,194); calls from law enforcement (11%, 85,404); calls to support staff (3%, 23,969); and other general calls in English including calls pertaining to state hospitals and state supported living centers (3%, 19,353). These five queues represent 93% (707,644) of all calls.

Four percent (3,178) of the 85,404 calls to the law enforcement queue were abandoned. In contrast, 29% (139,225) of 477,724 calls to the abuse queue were abandoned. On the law enforcement queue, 75% (64,328) of calls were handled or abandoned in the first minute and 96% (81,705) in the first five minutes. In contrast, 27% (129,811) of calls to the abuse queue were handled or abandoned in the first minute and 47% (224,891) were handled or abandoned in the first five minutes.

The rate of abandoned calls to the abuse queue increased to 29% from 27% in the previous reporting period. The rate of calls handled or abandoned in the first five minutes decreased to 47% from 52% in the previous reporting period.[76]

*Calls by Day of the Week and Time of Call*

SWI calls were higher in volume on weekdays than on weekends. The average weekday call volume (2,491 calls per day) was more than twice the average weekend call volume (1,091 calls per day). On average, calls were abandoned at a higher rate on weekdays (24%) as compared to weekends (18%). Average queue times were also three minutes longer on weekdays (6.0 minutes) as compared to weekends (3.3 minutes).

---

[76] *See* Deborah Fowler & Kevin Ryan, Fifth Report 32, ECF No. 1318.

34

Figure 8: Number of SWI Calls Handled and Abandoned by Day of the Week[77]



Sixty-nine percent (530,561) of all calls were placed during typical work hours (9:00 a.m. through 6:00 p.m.), with a higher rate (72%) placed during work hours on weekdays as compared to weekends (54%). Calls were abandoned at a higher rate during the typical work week (Monday through Friday, 9:00 a.m. through 6:00 p.m.). On average, 27% of calls placed during the typical work week were abandoned, as compared to the overall average abandonment rate of 23%, a slight increase from the previous reporting period.[78]

## Remedial Order 3: Screening and Intake Performance Validation

### Overview of Allegations in Referrals for Maltreatment in Care

The Monitors analyzed maltreatment in care allegations for PMC children using data about intakes pertaining to PMC children received by SWI from July 1, 2022 to June 30, 2023.[79] From July 1, 2022 to June 30, 2023, DFPS reported 1,831 intakes for PMC children in licensed placements that were coded as allegations of abuse, neglect or exploitation by SWI intake specialists for investigation by RCCI. In that same period, DFPS reported 1,415 intakes for PMC children living in unlicensed placements that were

---

[77] The number of calls included is 763,454 because 41 of the total calls were not flagged in the data as either handled or abandoned.

[78] The Fifth Report found that 25% of calls were abandoned during the typical work week from July 1, 2021 to June 30, 2022. *See* Deborah Fowler & Kevin Ryan, Fifth Report 33, ECF No. 1318.

[79] The Monitors used the regular monthly data reports relevant to this time period submitted by DFPS and HHSC and those reports are on file with the Monitors and with DFPS and HHSC. The CPI data, as provided to the Monitors by DFPS, includes allegations based upon the child's living arrangement at the time of intake; therefore, they are not necessarily related to the current caregiver or time period. For example, it can include allegations of maltreatment alleged to have occurred in the child's birth home or with another guardian prior to the child's entry in care.

coded as allegations of abuse, neglect or exploitation by SWI intake specialists for investigation by CPI.

The 1,831 RCCI intakes reported by DFPS involved 1,400 unique children in licensed placements between July 1, 2022 and June 30, 2023 and contained 2,497 allegations of child abuse, neglect or exploitation, an average of 208 allegations per month.[80] This represents an increase in average monthly allegations of 14 (7%) per month from the Monitors' Fifth Report.[81]

Among those 2,497 allegations, Neglectful Supervision was the most common allegation type, constituting 52% of all allegations (1,286), affecting 891 children; Physical Abuse allegations constituted 28% of allegations (706), affecting 511 children; Medical Neglect allegations constituted 7% of allegations (185), affecting 162 children; and Sexual Abuse allegations constituted 6% of all allegations (162), affecting 142 children.[82] The remaining 6% of allegation types included Emotional Abuse, Physical Neglect and Sex Trafficking.[83] The data may underrepresent the prevalence of alleged sexual abuse victimization among PMC children due to the nature of Neglectful Supervision allegations. The Monitors have found during ongoing reviews of intakes and investigations that between one quarter and one third of allegations of Neglectful Supervision involve sexual contact among children in care.[84] DFPS's data does not identify the type of harm underlying Neglectful Supervision allegations.

Figure 9: Allegation Types for RCCI Intakes Involving PMC Children in Licensed Placements, July 1, 2022 to June 30, 2023

---

[80] Some intakes include more than one child and more than one allegation for each child. Moreover, some children appear as alleged victims in one or more intakes.

[81] Deborah Fowler & Kevin Ryan, Fifth Report 34, ECF No. 1318.

[82] If a child was the subject of more than one allegation type, that child is counted within each allegation category; a child with more than one intake with the allegation type is counted once in that category.

[83] Percentages do not add to 100% due to rounding.

[84] Deborah Fowler & Kevin Ryan, Third Report 37, ECF No., 1165; *see also*, Deborah Fowler & Kevin Ryan, Second Report 64-65, ECF No. 1079.



Source: RCCI Intakes July 1, 2022 to June 30, 2023
n = 2,497 allegations in 1,831 intakes

Note: Percentages do not add to 100% due to rounding.

In its monthly data reports to the Monitors, HHSC reported that 11,999 referrals were assigned to the agency by SWI between July 1, 2022 and June 30, 2023 to review and determine whether to conduct a minimum standards investigation (meaning they were not assigned to DFPS for an abuse, neglect or exploitation investigation). In the final three months of the period, HHSC included the legal status of the children in the data reports and therefore, for those three months, the total includes only referrals involving PMC children.

### SWI Original Screening Validation Results for Referrals Assigned to HHSC

To evaluate DFPS's performance associated with Remedial Order 3 and assess the appropriateness of screening of referrals of abuse, neglect or exploitation involving PMC children, the monitoring team conducted a qualitative review of referrals received by SWI. The Monitors' review focused on whether SWI appropriately screened the referrals when it determined that they did not contain any allegations of abuse, neglect or exploitation.[85]

The HHSC referral data did not provide child identifiers nor the legal status of children until the final three months of the reporting period; therefore, the Monitors' methodology and analysis continued to include a preliminary two-step process to discern which referrals involved children in PMC status. The monitoring team first undertook the effort

---

[85] For this reporting period, the Monitors reviewed 50% of all referrals assigned by HHSC for a minimum standards investigation upon referral from SWI for the period of July 1, 2022 through March 31, 2023; when HHSC commenced identification of children's legal status for reports received, beginning with data for April 2023 referrals, the Monitors reviewed a random sample of 300 reports referred to HHSC using a 95% confidence level and a 5% margin of error methodology, oversampling for those that HHSC assigned to a minimum standards investigation and, consistent with prior reporting, excluding referrals that HHSC administratively closed due to the high rate of concurrence between the Monitors and the State regarding the disposition of that subset of referrals.

of reviewing each individual report to identify which child or children were the subject of the report. Next, the monitoring team searched the IMPACT records of each child or children identified in each report to determine whether it involved a child in PMC status by checking for the child's legal status on the date of the intake report. Referrals that involved children reported to be in Temporary Managing Conservatorship (TMC) status or children who were not in DFPS custody were not included in the Monitors' full review. For the final three months of the reporting period, HHSC identified the legal status of the children in the data and, therefore, the additional steps were no longer required.

In the Monitors' sample of 1,869 SWI referrals from July 1, 2022 to June 30, 2023 sent directly to HHSC and assigned by HHSC for a minimum standards investigation, the Monitors identified 1,185 reports that involved a child(ren) with PMC status. Of these 1,185 reports, the Monitors assessed that SWI appropriately determined that 92% (1,089 referrals) did not contain an allegation of abuse or neglect of a PMC child(ren) and were properly assigned to HHSC to determine whether to conduct a minimum standards investigation. In the Fifth Report, the Monitors determined that 93.4% of referrals reviewed were properly assigned to HHSC.[86]

Conversely, the Monitors found that SWI inappropriately referred 96 of 1,185 reports (8%) to HHSC instead of assigning them for an abuse, neglect or exploitation investigation. The Monitors concluded that these 96 reports contained allegations that warranted an investigation for abuse, neglect or exploitation to ensure the safety and well-being of a child(ren) with PMC status.

Of the 96 reports elevated by the Monitors as containing allegations of abuse, neglect or exploitation, the Monitors found that Physical Abuse was the most common type of alleged maltreatment that SWI intake specialists did not refer for investigation. Forty-seven (49%) of the 96 reports contained such allegations, frequently involving outcries by a child alleging that a foster parent hit them with a hand or an implement or allegations that a staff member at a congregate care facility improperly restrained or used force on a child. The next most common type of alleged maltreatment not referred for investigation was Neglectful Supervision (40%); these reports often included allegations of inadequate supervision resulting in self-harm or sexual contact between children. The Monitors' summaries of these 96 referrals are located in the Appendices.

## Remedial Order 3: Maltreatment in Care Investigations

### Maltreatment in Care Investigations Involving Children in Placements Investigated by HHSC PI

As previously reported to the Court in the September 19, 2023 and November 10, 2023 Updates, PI closed 101 investigations of maltreatment of PMC children between January 1, 2023 and April 30, 2023.[87] Of the 101 investigations closed during this period, HHSC

---

[86] *See* Deborah Fowler & Kevin Ryan, Fifth Report 36, ECF No. 1318.
[87] Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No.1442 (November 10, 2023) and Deborah Fowler &

determined that 2% (2) of the investigations resulted in an overall disposition of Confirmed, thereby substantiating at least one allegation as abuse, neglect or exploitation. In the remaining investigations, HHSC reported that the overall dispositions in 8% (8) of investigations were Inconclusive,[88] 55% (56) of investigations were Unconfirmed, and 35% (35) of investigations were assigned a disposition of Other.[89]

## RCCI Maltreatment in Care Investigations Involving Children in Licensed Placements

RCCI opened 1,698 new investigations involving at least one PMC child between May 1, 2022 and April 30, 2023.[90] The number of investigations opened per month ranged from 103 to 164.[91]

RCCI closed 1,712 investigations of maltreatment of a PMC child in licensed placements between May 1, 2022 and April 30, 2023. The number of investigations closed per month ranged from 118 to 167.

Figure 10: Closed RCCI Investigations, May 1, 2022 to April 30, 2023

---

Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).

[88] As noted above, HHSC informed the Monitors that for PI investigations with allegations resulting in both Unconfirmed and Inconclusive dispositions, the overall disposition appears as Unconfirmed in the HHSC data reports submitted to the Monitors. Therefore, there are additional allegations that PI resolved as Inconclusive in other investigations reviewed by the Monitors. This approach is unlike DFPS, which assigns an overall disposition of Unable to Determine (similar to PI's disposition of Inconclusive) in those situations.

[89] The Monitors described the experience of Child C in their September 19, 2023 RO 3 Update to the Court. As of December 1, 2023, in Child C's current placement, PI opened seven additional investigations involving alleged abuse or neglect of Child C between June 11, 2023 and August 30, 2023.

[90] The Monitors analyzed data about maltreatment in care investigations pertaining to PMC children in licensed facilities that were opened and/or closed from May 1, 2022 to April 30, 2023 using the relevant monthly data reports submitted by DFPS during this time period (on file with the Monitors and the State).

[91] Investigations that opened in this period and were later Administratively Closed were excluded from the investigations that the Monitors assessed for timeliness in relation to Remedial Orders 5 through 18.



Of the 1,712 investigations closed during this period, 4% (65) of the investigations resulted in a disposition of Reason to Believe, thereby substantiating at least one allegation as abuse, neglect or exploitation in each of these 65 investigations, a slight decrease from the prior reporting period (5.8%).[92] Additionally in the current period, RCCI Ruled Out 1,555 (91%) investigations, Administratively Closed 81 (5%) investigations, and closed 11 (<1%) investigations as Unable to Determine.[93]

Figure 11: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in Licensed Placements, May 1, 2022 to April 30, 2023

---

[92] Deborah Fowler & Kevin Ryan, Fifth Report 38, ECF No. 1318.
[93] Percentages do not add to 100% due to rounding.



Institutional staff accounted for 1,939 (48%) of the 4,050 alleged perpetrators, which is notable because only 16% (1,322) of children in PMC status on June 30, 2023 lived in congregate care settings.[94] Foster parents accounted for 1,350 (33%) of the alleged perpetrators; service providers accounted for 104 (3%); other family members accounted for 71 (2%); household members accounted for 60 (1%); parents and guardians accounted for 24 (<1%); and the alleged perpetrator was listed as unknown or not listed for 240 (6%) investigations.[95] Of the alleged perpetrators, 262 (6%) were listed as other (147) or were identified as having some other relationship not already described above (115).[96]

Figure 12: Alleged Perpetrators in RCCI Allegations Involving PMC Children in Licensed Placements, May 1, 2022 to April 30, 2023

---

[94] The 1,698 RCCI investigations opened from May 1, 2022 to April 30, 2023 involved 4,050 allegations. In the data the Monitors received from DFPS, each allegation has a perpetrator category, but not a unique identifier for each perpetrator. As a result, it is possible that some perpetrators may be counted more than once in a single investigation or over time.

[95] In the RCCI investigations data the Monitors received from DFPS, the data dictionary notes that, "A blank cell [for alleged perpetrator's relationship to victim] generally indicates that a perpetrator has not yet been identified." DFPS, *RO3.2_RCI_Investigations_2023_04d2023_06_01_log109638* (June 1, 2023) (on file with the Monitors and the State).

[96] Those alleged perpetrators categorized as "other relationships not already described" include, for example, day care provider (12), babysitter (12), and parent's paramour (5).



Source: RCCI Investigations, May 1, 2022 to April 30, 2023 Investigations Data
n=4,050 allegations in 1,698 opened investigations

## Overview of CPI Maltreatment in Care Investigations Involving Children in Unlicensed Settings

CPI opened 1,148 new investigations involving at least one PMC child between May 1, 2022 and April 30, 2023.[97] The number of investigations opened per month ranged from 68 to 122. As reported below, the data included investigations as provided by DFPS to the Monitors and included those that commenced while the child was living in an unlicensed placement regardless of the identity of the alleged perpetrator and location of the allegation.

CPI closed 1,017 investigations of maltreatment of a PMC child between May 1, 2022 and April 30, 2023. The number of investigations closed per month ranged from 63 to 103.

Figure 13: Closed CPI Investigations Involving PMC Children, May 1, 2022 to April 30, 2023

---

[97] For this report, the Monitors analyzed data about the CPI investigations involving PMC children that were opened and closed from May 1, 2022 to April 30, 2023 using the relevant monthly data reports submitted by DFPS during that period (on file with the Monitors and the State).



Of the 1,017 investigations CPI closed during this period, 15% (149) of the investigations resulted in a disposition of Reason to Believe, thereby substantiating at least one allegation as abuse, neglect or exploitation in each of the 149 investigations. Additionally, CPI Ruled Out 587 (58%) investigations, Administratively Closed 169 (17%) investigations, closed 108 (11%) investigations as Unable to Determine, and closed four (<1%) investigations as Unable to Complete.[98,99]

---

[98] According to DFPS, Unable to Complete is the dispositional result "usually because the family could not be located to begin the investigation, or the family was contacted but later moved and could not be located to complete the investigation or the family refused to cooperate with the investigation." DFPS, *Child Protective Investigations*, available at https://www.dfps.state.tx.us/Investigations/. *See also*, DFPS, *Child Protective Services Handbook* § 2281.4, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_2200.asp#CPS_2281_4.
[99] Percentages do not add to 100% due to rounding.

Figure 14: Reason to Believe Findings in Closed CPI Investigations Involving PMC Children, May 1, 2022 to April 30, 2023



Source: CPI Investigations Closed May 1, 2022 to April 30, 2023
n=149 investigations closed with Reason to Believe

Month investigation closed (number of investigations closed with RTB)

Parents and guardians accounted for 774 (33%) of the 2,327 alleged perpetrators;[100] other family members accounted for 720 (31%) of the alleged perpetrators; fictive kin (110)[101] accounted for 5% of the alleged perpetrators; paramours (101) accounted for 4% of the alleged perpetrators; foster parents (75) accounted for 3% of the alleged perpetrators; DFPS staff (70) and school personnel (70) each accounted for 3% of the alleged perpetrators; unrelated home members (59) accounted for 3% of the alleged perpetrators; and institutional staff (38) accounted for 2% of the alleged perpetrators. The alleged perpetrator was listed as unknown or not listed for 206 (9%) of the alleged perpetrators.[102] Of the alleged perpetrators, 104 (4%) were listed as other (74), or as having some other relationship not already described (30).[103,104]

---

[100] DFPS identifies alleged perpetrators based on their relationship to the oldest alleged victim in the investigation.

[101] Fictive kin is defined as "someone who is not related to a child under DFPS conservatorship, but who has, or who once had, a prior longstanding relationship with the child or the child's sibling group. Teachers, coaches, family friends, godparents, and long-time neighbors are examples of people who may be fictive kin." DFPS, Definition of Terms, *Child Protective Services Handbook*, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPSDefinitions.asp.

[102] In the data reports submitted by DFPS with CPI investigations, the data dictionary notes that, "A blank cell [for alleged perpetrator's relationship to victim] generally means that a perpetrator has not yet been identified." DFPS, *RO3.2_CPI_Investigations_2023_04d2023_06_01_log109835* (June 1, 2023).

[103] Those categorized as "some other relationship not already described" include, for example, service provider (4), friend (3), and babysitter (1).

[104] In the data reports that DFPS submitted to the Monitors, each allegation has an alleged perpetrator category but not a unique identifier for each alleged perpetrator. As a result, it is possible that some alleged perpetrators may be counted more than once in a single investigation or over time.

### Remedial Order 3 Investigation Validation Results

To validate DFPS's performance associated with Remedial Order 3 and the appropriateness of its RCCI, CPI, and PI investigations of alleged maltreatment of PMC children, the monitoring team conducted reviews of 1,128 State investigations:

- Reviews of all 64 PI investigations involving PMC children that closed with an overall disposition of Unconfirmed or Inconclusive between January 1, 2023 and April 30, 2023 and 5 additional investigations that closed prior to 2023 but involved the same PMC children and allegations related to the investigations that closed during 2023;[105],[106]

- Reviews of a randomly selected sample of 431 (out of 1,712) RCCI investigations closed between May 1, 2022 and April 30, 2023;[107] and

- Reviews of a randomly selected sample of 628 (out of 1,017) CPI investigations closed between May 1, 2022 and April 30, 2023.[108]

#### *PI Investigations*

As previously reported to the Court in the September 19, 2023 and November 10, 2023 Updates, of the 69 PI investigations the Monitors reviewed, PI assigned an overall disposition of Unconfirmed to 58 investigations (84%), Inconclusive to ten investigations (14%) and Confirmed to one investigation (1%).

---

[105] The Monitors described this review in two previous Updates to the court. Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No.1442 (November 10, 2023) and Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).

[106] To evaluate dispositional results for the investigations included in the sample, the Monitors designed an instrument for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used.

[107] To evaluate dispositional results for the investigations included in the sample, the Monitors designed an instrument for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used. The sample was drawn from monthly reports provided to the Monitors by DFPS during the reporting period using a 95% confidence level by quarter for a period of four months, from May 2022 to August 2022, and using a 90% confidence level for a period of eight months, from September 2022 to April 2023. The Monitors excluded from the sample population investigations where RCCI substantiated any or all allegations with a disposition of Reason to Believe.

[108] The sample of CPI investigations was drawn from monthly reports DFPS provided to the Monitors during the reporting period. During the period, CPI closed 1,017 investigations, of which the Monitors created a random sample of 628 investigations using a 95% confidence level; the Monitors excluded from the sample population investigations where CPI substantiated any or all allegations with a disposition of Reason to Believe. Within the sample of 628 investigations, the Monitors then identified and reviewed the investigations (276) involving allegations associated with maltreatment by a caregiver assigned by DFPS or associated with the time period the child was under DFPS Supervision without an authorized placement. The Monitors excluded those investigations in the sample where the allegations were associated with the child's home and caregiver prior to entry into DFPS care.

The Monitors concluded that 38 of 69 PI investigations (55%) were conducted in a manner that was inconsistent with Remedial Order 3 in that they were inappropriately resolved or deficient.[109] These investigations were not "conducted taking into account at all times the child's safety needs" as Remedial Order 3 requires. As previously reported to the Court, these investigations frequently left some of the most vulnerable children in unsafe situations for extensive periods of time with a shocking disregard for their suffering or the risk of harm they faced.[110]

As the Monitors reported in the November 10, 2023 Update to the Court, the Monitors' review in 2023 surfaced a significant child safety issue related to employment eligibility and background checks conducted for caregivers.[111] The background checks performed by the Central Background Check Unit (CBCU) for employment at residential child care operations include criminal history background, the Central Registry, and sex offender registration.[112]

As the Monitors reported in November 2023,[113] the Central Registry does not appear to consistently include instances of child abuse or neglect confirmed by PI.[114] The Monitors found examples of individuals confirmed as perpetrators in PI investigations of abuse or neglect of a child but who are not listed on the Central Registry.[115] For example, PI issued a disposition of Confirmed on June 23, 2022 against an individual working at a State Supported Living Center for Physical Abuse of a child (IMPACT Case ID: 49052280); the individual was entered in the Employee Misconduct Registry on February 9, 2023. However, this individual does not appear in the Central Registry.

Moreover, background checks performed by the CBCU for residential child care operations do not appear to include the Employee Misconduct Registry (EMR), which is used to determine hiring eligibility for persons employed in HHSC-regulated locations, such as HCS residences.

---

[109] *See* Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023) and Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).

[110] *Id.*

[111] Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023).

[112] 26 Tex. Admin. Code §745.607; HHSC, *Child Regulation Handbook*, §10000 Background Checks. DFPS is required to "establish and maintain a central registry of the names of individuals found by the department to have abused or neglected a child." Tex. Fam. Code §261.002.

[113] Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023).

[114] Tex. Fam. Code §261.002 (establishing the Central Registry and stating, "[t]he department shall establish and maintain a central registry of the names of individuals found by the department to have abused or neglected a child."); 40 Tex. Admin. Code §702.251 (requiring instances of confirmed abuse or neglect of a child by PI to be included in the Central Registry).

[115] The monitoring team checked for Central Registry inclusion by using the social security number and perpetrator identification number of individuals with Confirmed findings of abuse or neglect against a PMC child to verify.

According to HHSC, "the purpose of the Employee Misconduct Registry is to ensure that unlicensed personnel who commit acts of abuse, neglect, exploitation, misappropriation, or misconduct against residents and consumers are denied employment in HHSC-regulated facilities and agencies."[116] However, the same individual may well be permitted to work at a licensed residential child care facility if the victim of the abuse or neglect is an adult. For example, in one RCCI investigation (IMPACT Case ID: 49487234) the Monitors reviewed in 2023, the alleged perpetrator in an investigation into Physical Abuse of children was a caregiver at a licensed child care operation despite being a sustained perpetrator for Physical Abuse of an adult during employment at an HCS residence. The investigation is included in the appendices.

Among the investigations the State did not conduct "taking into account at all times the child's safety needs," as required by Remedial Order 3, certain common factors frequently contributed to deficiency. During interviews with key individuals, investigators did not consistently ask adequate questions regarding the allegations. Investigators also often did not ask children follow-up questions to help children articulate the alleged incidents fully and clearly. In addition, the Monitors observed that investigators did not consistently gather sufficient information from children and caregivers about supervision at the time of alleged incidents of abuse or neglect. In some of these investigations, investigators focused their interviews with children and caregivers on determining whether an alleged incident occurred (i.e., whether children engaged in sexual contact) and did not include in these interviews adequate questioning to understand whether caregivers were supervising children at the time of the alleged incident.

### RCCI Investigations

Review of RCCI Investigations in Licensed Placements

The Monitors concluded that a total of 46 investigations (11% of 431) were inappropriately resolved or deficient and, thus, conducted in a manner that was inconsistent with Remedial Order 3. In the Fifth Report, the Monitors determined a total of 38 (5%) investigations had substantial deficiencies or were inappropriately resolved.[117]

Specifically, RCCI Ruled Out all the allegations in 405 of the 431 investigations reviewed by the Monitors. The Monitors found that RCCI did so appropriately in 359 cases (89%);

---

[116] HHSC, *Employee Misconduct Registry*, available at https://www.hhs.texas.gov/business/licensing-credentialing-regulation/long-term-care-credentialing/employee-misconduct-registry-emr#:~:text=In%20accordance%20with%20Chapter%20253,in%20HHSC%2Dregulated%20facilities%20and.

[117] *See* Deborah Fowler & Kevin Ryan, Fifth Report 47, ECF No. 1318. In the Third Report, the Monitors determined 14% of sampled investigations had substantial deficiencies or were inappropriately resolved. *See* Deborah Fowler & Kevin Ryan, Third Report 43, ECF No. 1165. In the First and Second Reports, the Monitors determined 28.6% and 18% of sampled investigations to which RCCI assigned a disposition of Ruled Out to all allegations, respectively, had substantial deficiencies or were inappropriately resolved. *See* Deborah Fowler & Kevin Ryan, Second Report 73, ECF No. 1079; Deborah Fowler & Kevin Ryan, First Report 25, ECF No. 869.

inappropriately in 15 cases (4%);[118] and conducted investigations with such substantial deficiencies in 31 cases (8%) that the Monitors were prevented from reaching a conclusion.[119] To appropriately reach a final disposition in these deficient investigations, additional information would have been required to determine whether children were abused or neglected.

In addition, of the 431 RCCI investigations analyzed by the monitoring team, 23 were Administratively Closed and three of the investigations reviewed by the Monitors resulted in a disposition of Unable to Determine; the Monitors found that RCCI's disposition was appropriate in those instances.

The Monitors' summaries of the 46 inappropriately resolved and deficient RCCI investigations are located in the Appendices.

*CPI Investigations in Unlicensed Placements*

The Monitors' review of 276 CPI investigations identified 29 investigations (11%) as having been inappropriately conducted or resolved. Specifically, of the 276 CPI investigations the Monitors reviewed, CPI assigned a disposition of Ruled Out in 238 (86%) of the investigations. The Monitors found that CPI did so appropriately in 213 investigations (89%); inappropriately resolved three investigations (1%); and conducted investigations with such substantial deficiencies in 22 investigations (9%) that the Monitors were prevented from reaching a conclusion.[120] To appropriately reach a final disposition in these investigations, additional information would have been required to determine whether children were subject to maltreatment.

In addition, of the 276 CPI investigations analyzed by the monitoring team, 21 were Administratively Closed and the Monitors agreed with CPI's closure decisions. Seventeen investigations reviewed by the Monitors resulted in a disposition of Unable to Determine and the Monitors found one of these investigations was conducted with such substantial deficiencies the Monitors were unable to reach a conclusion and three were inappropriately resolved. The Monitors' summaries of the 29 inappropriately resolved and deficient CPI investigations are located in the Appendices.

Of the 29 investigations that were inappropriately resolved or conducted with substantial deficiencies, six of them were investigations into allegations of child maltreatment for children under DFPS Supervision in CWOP settings. The Monitors' review found that these investigations and their challenges amplified the safety concerns and additional risk of harm that children face when they are under DFPS Supervision in CWOP settings.

---

[118] Of the 15 investigations the Monitors identified as inappropriately resolved, 13 investigations should have been assigned a disposition of Reason to Believe for abuse or neglect and two investigations should have been assigned a disposition of Unable to Determine.
[119] Percentages do not add up to 100% due to rounding.
[120] Percentages do not add to 100% due to rounding.

In the Fifth Report, the Monitors determined a total of ten (5.6%) CPI investigations had substantial deficiencies or were inappropriately resolved.[121]

## Summary of Performance for Receiving, Screening and Investigating Allegations of Maltreatment

Receiving Allegations

- Between July 1, 2022 and June 30, 2023, hotline staff received 763,495 calls. During the period analyzed, 23% (173,472) of calls were abandoned, similar to the rate of 22% observed in the previous report.[122]

- On average, callers waited for 5.6 minutes before their calls were handled or abandoned, an increase of nearly half a minute from the data reported in the Fifth Report.[123] Forty-five percent (345,690) of callers waited on the queue for under one minute.

Screening Allegations

- The Monitors reviewed 1,185 referrals to SWI from July 1, 2022 to June 30, 2023, that SWI did not send to RCCI for an investigation of child abuse, neglect or exploitation but instead sent directly to HHSC (and that HHSC then assigned for a minimum standards investigation). Of these 1,185 reports, the Monitors concurred with SWI's determination in 92% (1,089) of reports.

Investigating Allegations

- Of the 101 PI investigations closed between January 1, 2023 and April 30, 2023, HHSC determined that 2% (2) of the investigations resulted in an overall disposition of Confirmed; 8% (8) of investigations were Inconclusive; 55% (56) of investigations were Unconfirmed; and 35% (35) of investigations were assigned a disposition of Other.

- The Monitors reviewed all 64 PI investigations involving PMC children that PI closed with an overall disposition of Unconfirmed or Inconclusive between January 1, 2023 and April 30, 2023 and five additional related investigations that closed prior to 2023.

- As previously reported to the Court in September and November 2023, the Monitors found that of the 69 investigations reviewed, PI inappropriately resolved

---

[121] *See* Deborah Fowler & Kevin Ryan, Fifth Report 47, ECF No. 1318.
[122] *Id.* at 31.
[123] In the Fifth Report, the data demonstrated an average queue time of 5.2 minutes for calls placed from July 1, 2021 to June 30, 2022. *Id.* at 29.

four (6%) investigations and conducted investigations with such substantial deficiencies in 33 (48%) investigations that the Monitors were prevented from reaching a conclusion. In one additional (1%) Confirmed investigation, the Monitors agreed with the disposition but found that PI failed to conduct the investigation consistent with the child's safety needs due to extensive, unexplained delays that kept the child in an unsafe situation; the reviews resulted in a total of 38 investigations (55%) that were inappropriately resolved, deficient, and/or inconsistent with child safety.

- State records revealed egregious deficiencies in these PI investigations. Texas repeatedly addressed allegations of Sexual and Physical Abuse of some of the State's most vulnerable children with shocking carelessness, leaving PI investigations open with no activity for months on end—in numerous instances for more than one year—while children with significant developmental disabilities were left in harm's way. The State repeatedly left children exposed to danger that in certain instances caused them terrible suffering and harm.[124]

- Of the 1,712 RCCI investigations DFPS completed involving PMC children between May 1, 2022 and April 30, 2023, 65 investigations (4%) resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 1,647 investigations (96%) where RCCI issued a disposition of Ruled Out, Unable to Determine or that resulted in Administrative Closure, the Monitors evaluated 431 investigations.

- The Monitors found that of the 405 investigations reviewed where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 359 (89%) cases; inappropriately in 15 (4%) cases; and conducted investigations with such substantial deficiencies in 31 (8%) cases that the Monitors were prevented from reaching a conclusion.

- Of the 26 investigations reviewed that RCCI either Administratively Closed or closed with a disposition of Unable to Determine, the Monitors agreed with RCCI's decisions; as a result, there were 46 (11%) RCCI investigations that the Monitors' review identified as having been inappropriately resolved or conducted with substantial deficiencies.

- Of the 1,017 CPI investigations DFPS completed involving PMC children between May 1, 2022 and April 30, 2023, 149 (15%) investigations resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of

---

[124] See Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023) and Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).

the remaining 868 (85%) investigations where CPI issued a disposition of Ruled Out, Unable to Determine or that resulted in Administrative Closure, the Monitors evaluated 276 investigations.

- The Monitors found that of the 238 investigations reviewed where CPI Ruled Out all of the allegations, CPI did so appropriately in 213 (89%) investigations; inappropriately in three and conducted investigations with such substantial deficiencies in 22 investigations that the Monitors were prevented from reaching a conclusion.

- In addition to the 25 investigations that CPI Ruled Out that were inappropriately resolved or had substantial deficiencies, the Monitors also identified one investigation assigned a disposition of Unable to Determine with such substantial deficiencies that the Monitors were prevented from reaching a disposition conclusion and three that were inappropriately resolved, resulting in 29 (11%) investigations that the Monitors' review identified as having been inappropriately resolved or conducted with substantial deficiencies.

## Timeliness of RCCI Investigations: Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS)

**Remedial Order 5:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

**Remedial Order 6:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

**Remedial Order 7:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

**Remedial Order 8:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

51

**Remedial Order 9:** *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

**Remedial Order 10:** *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

**Remedial Order 11:** *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

### Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS)

The monitoring team reviewed the data provided by DFPS to validate performance for all 1,639 investigations opened by RCCI from July 1, 2022 to June 30, 2023.[125][126] The monitoring team reviewed the 1,639 RCCI investigations for compliance with the Court's orders relating to timeliness using the methodologies described in prior reporting.[127]

---

[125] To identify the investigations opened by DFPS and the corresponding data points, the Monitors used as source files monthly and bi-annual data files (received up to October 2, 2023) on open and closed investigations that DFPS submitted to the Monitors for the months corresponding with the investigations under review, consistent with previous reporting. In prior reporting periods, the Monitors performed case record reviews on every investigation reported in the data and were able to substantially validate the accuracy of the data reports; thus, the results in this report reflect the data as reported to the Monitors by DFPS. In this reporting period, the monitoring team independently performed case record reviews on randomly selected investigations opened during the reporting period to validate the data as reported by DFPS.

[126] The DFPS data included 99 investigations that were administratively closed and were, therefore, excluded from the analysis.

[127] Deborah Fowler & Kevin Ryan, Third Report 52-53, ECF No. 1165.

Wherever data was missing or invalid, the monitoring team identified those investigations to DFPS during the year. For example, regarding Remedial Orders 5 through 8, the Monitors identified to DFPS the investigations that did not include a unique time stamp subsequent to intake. The Monitors provided DFPS with multiple opportunities to clarify or correct the information contained in the data regarding these investigations, and this report includes the most current data and information provided by DFPS as of October 31, 2023.[128]

**Remedial Order 5:** Initiation within 24 Hours in Priority One Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within twenty-four hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

The Monitors found that of 1,639 investigations opened by RCCI between July 1, 2022 and June 30, 2023, 193 (12%) were assigned Priority One, requiring that DFPS initiate the investigation within 24 hours of intake.[129] DFPS initiated 84% (162) of Priority One investigations within 24 hours of intake through face-to-face contact with all alleged victims. DFPS's rate of initiating Priority One investigations through face-to-face contact with each alleged victim within 24 hours in the Monitors' previous report was 79%.[130]

The remaining 31 investigations (16%) did not include evidence of individual face-to-face contact with each alleged victim within 24 hours of intake.

Figure 15: Initiation of Investigations within 24 Hours in Priority One Investigations

---

[128] E-mails from Jill Lefkowitz, Monitoring Team, to DFPS FCL Compliance and Michael Hayman, Director of Project Management, DFPS (June 7, 2023, September 25, 2023, and October 19, 2023).

[129] As previously reported, DFPS initiation occurs through face-to-face contact between the investigator and all alleged child victims. Deborah Fowler & Kevin Ryan, Third Report 52, ECF No. 1165. As in prior reporting, consistent with DFPS policy, initiation through face-to-face contact was deemed timely if the data documented investigators met with each alleged victim individually subsequent to intake, denoted by a unique timestamp of the face-to-face contact in IMPACT. *Id.*

[130] *See* Deborah Fowler & Kevin Ryan, Fifth Report 57, ECF No. 1318.



Of the 31 investigations where DFPS data did not provide evidence of timely initiation, 26 documented that the late initiation was made in the following timeframes: up to one hour late (2), one to ten hours late (5), ten to 20 hours late (2), 20 to 24 hours late (1), and more than 24 hours late (16). In the remaining five instances, the data did not include valid evidence of face-to-face contact.[131]

The Monitors conducted case record reviews in those 26 instances where the DFPS data documented late initiation to identify documentation of the reasons for untimely face-to-face contact. In these 26 instances, the records evidence that late contact was due to the following: a child who was not initially listed as an alleged victim at intake but who was later added during the investigation (8); the child was on runaway status (7); the child was not present at the location where the investigator went to conduct the interview (3);[132] the child was located in another region, unit, or state and the investigator sent a courtesy request to an investigator in another location (1). The record did not contain a reason, or the reason for late contact was unclear, in the remaining investigations (3). In each of those instances (3 of 3) where the record did not document a reason for late contact, the Monitors confirmed the contact was late by one day or less. Finally, in four instances, the face-to-face contact was late due to other circumstances, such as the intake being assigned to the investigator late.

Figure 16: Documented Reasons for Late Initiation in Priority One Investigations

---

[131] As noted above, the Monitors provided the investigation numbers in advance to DFPS for an opportunity to clarify or address invalid evidence. DFPS performed case record reviews and provided addendum information; however, the State's response did not include these five investigations as requested.

[132] For example, in one instance, the child was not present at the facility due to attendance at an outing at the time of the investigator's attempted face-to-face contact, which caused a delay.



Note: Chart does not add up to 100% due to rounding.

**Remedial Order 6:** Initiation within 72 Hours in Priority Two Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within seventy-two hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

There were 1,446 Priority Two RCCI investigations requiring DFPS initiation within 72 hours of intake. DFPS initiated 88% (1,269) of Priority Two investigations within 72 hours of intake through face-to-face contact with all alleged victims. DFPS's rate of initiating Priority Two investigations through face-to-face contact with each alleged victim within 72 hours in the Monitors' previous report was 83%.[133]

The remaining 177 investigations (12%) did not include evidence of individual face-to-face contact with each alleged victim within 72 hours.

Figure 17: Initiation of Investigations within 72 Hours in Priority Two Investigations

---

[133] *See* Deborah Fowler & Kevin Ryan, Fifth Report 59, ECF No. 1318.



Of the 177 investigations where DFPS data did not provide evidence of timely initiation, 106 documented that the late initiation was made in the following timeframes: up to 12 hours late (24), 12 to 24 hours late (3), 24 to 48 hours late (10), 48 to 72 hours late (9), 72 to 96 hours late (6), 96 to 120 hours late (7), and more than 120 hours late (47). In the remaining 71 instances, the data did not include valid evidence of face-to-face contact subsequent to the intake.[134]

The Monitors conducted case record reviews in those 106 investigations where the DFPS data documented late initiation to identify the reasons for untimely face-to-face contact. In these instances, the late contact was due to the following: a child who was not initially listed as an alleged victim at intake but who was later added during the investigation (47); the child was not present at the location where the investigator went to conduct the interview (8);[135] the child was located in another region, unit, or state and the investigator sent a courtesy request to an investigator in another location (7); the child was on runaway status (6); the investigator was delayed locating the child due to the child aging out of care or experiencing a recent placement move (3); the face-to-face contact was late due to

---

[134] In response to the Monitors' identifying to DFPS in advance which investigations did not include valid data in DFPS's monthly data reports, DFPS performed case record reviews and provided addendum information. In 15 instances where DFPS's data reports did not include valid evidence of face-to-face contact, DFPS reported the following information: a data error resulted in invalid data in the report but it was initiated late (4); the investigation was initiated late (6); the child/youth was missing/runaway (1); the child was out of state/country (1); determination of an alleged victim was delayed (2); or the face-to-face contact was timely despite lack of unique time stamps (1). Six additional investigations addressed in DFPS's addendum were already resolved in its bi-annual data report received on October 2, 2023 and, therefore, already considered by the Monitors. The remaining 56 investigations were not addressed in the State's data addendum.

[135] For example, in two instances, the child was not present at the facility due to attendance at an outing at the time of the investigator's attempted face-to-face contact, which caused a delay.

other circumstances (14), such as issues related to the child being in juvenile detention[136] or the child was on a vacation or out of the state. The record did not contain a reason, or the reason for late contact was unclear, in the remaining investigations (16). In most of those instances (13 of 16) where the record did not document a reason for late contact, the contact was late by one day or less. Finally, in five instances, it appears that the DFPS data documenting the late initiation may have contained an error as the Monitors' case record review indicated that the initiation was timely.

Figure 18: Documented Reasons for Late Initiation in Priority Two Investigations



Note: Chart does not add up to 100% due to rounding.

**Remedial Order 7:** Timeliness of initial face-to-face contact with the alleged victims in Priority One Investigations[137]

---

[136] For example, in one investigation, the investigator attempted to conduct a face-to-face interview with the child at the juvenile detention center, but the investigator's name was not yet on the visitation list, which caused a delay.

[137] The Monitors recently reported on the State's compliance with Remedial Order 7 in PI investigations. Among the 69 PI investigations the monitoring team reviewed and discussed in the November 10, 2023 Supplemental Update to the Court, 19 were Priority One, requiring face-to-face contact with each alleged victim within 24 hours of intake. Of the 19 Priority One reviewed investigations, 58% (11) of the investigations included initial face-to-face contact with each alleged child victim individually within 24 hours. The remaining eight investigations (42%) did not include individual face-to-face contact with each alleged victim within 24 hours of intake. Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023).

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than twenty-four hours after intake.*

Of the 193 Priority One investigations opened by RCCI between July 1, 2022 and June 30, 2023, the Monitors found that 84% (162) of the investigations included initial face-to-face contact with each alleged child victim individually within 24 hours. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority One investigations within 24 hours in the Monitors' previous report was 79%.[138]

The remaining 31 investigations (16%) either did not include individual face-to-face contact with each alleged victim within 24 hours of intake (26) or did not have sufficient data to assess timeliness (5).

Figure 19: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in Priority One Investigations



**Remedial Order 8:** Initial Face-to-Face Contact with All Alleged Victims in Priority Two Investigations within 72 Hours[139]

---

[138] *See* Deborah Fowler & Kevin Ryan, Fifth Report 61, ECF No. 1318.

[139] The Monitors recently reported on the State's compliance with Remedial Order 8 in PI investigations. Among the 69 PI investigations the monitoring team reviewed and discussed in the November 10, 2023 Supplemental Update to the Court, 50 were Priority Two, requiring face-to-face contact with each alleged victim within 72 hours of intake. Of the 50 Priority Two reviewed investigations, 70% (35) of the investigations included initial face-to-face contact with each alleged child victim individually within 72 hours. The remaining 15 investigations (30%) did not include individual face-to-face contact with each alleged victim within 24 hours of intake. Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023).

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than seventy-two hours after intake.*

Of the 1,446 investigations assigned Priority Two, the Monitors' review found that 88% (1,269) of investigations included initial face-to-face contact with each alleged child victim within 72 hours of intake. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority Two investigations within 72 hours in the Monitors' previous report was 83%.[140]

The remaining 177 investigations (12%) either did not include individual face-to-face contact with each alleged victim within 72 hours (106) or did not have sufficient data to assess timeliness (71).

Figure 20: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in Priority Two Investigations



Priority Two Investigations Opened
July 1, 2022 - June 30, 2023
n=1,446 investigations opened

177, 12%

1,269, 88%

■ 72 Hours  ■ Not Timely

## Remedial Order 9: Tracking and Reporting Face-to-Face Contacts

*Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

---

[140] *See* Deborah Fowler & Kevin Ryan, Fifth Report 62, ECF No. 1318.

Overall, in 95% (1,563) of all 1,639 investigations opened by RCCI from July 1, 2022 to June 30, 2023 (both single and multi-alleged victim investigations), DFPS was able to track and report in its submissions to the Monitors whether face-to-face contact was made with each alleged child victim within an investigation and the date and time that contact occurred for each child.[141] DFPS's rate of tracking and reporting whether face-to-face contact was made with each alleged child victim within an investigation and the date and time the contact occurred in the Monitors' previous report was 92%.[142]

In 98% (1,085) of the 1,108 investigations with one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with the alleged child victim within an investigation and the date and time the contact occurred. In investigations with one victim, DFPS's rate of tracking and reporting whether face-to-face contact was made with the alleged child victim and the date and time the contact occurred in the Monitors' previous report was 96%.[143]

In 92% (490) of the 531 investigations with more than one victim, DFPS was able to track and report in its submissions to the Monitors whether face-to-face contact was made with each of the alleged child victims and the date and time the contacts occurred. In investigations with more than one victim, DFPS's rate of tracking and reporting whether face-to-face contact was made with each of the alleged child victims and the date and time the contact occurred in the Monitors' previous report was 85%.[144]

**Remedial Order 10:** Completion of Priority One and Priority Two Investigations within 30 Days

*Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023, DFPS documented that 16% (262) were not completed in a timely manner. Of these, 10% (158) were not completed within 30 days of intake and 6% (104) had approved extensions but were not completed within the extension timeframe.

---

[141] As noted above and in previous reporting, the Monitors considered data on initiation through face-to-face contact as valid if the recorded initiation date occurred subsequent to the intake date and included unique time stamps for each alleged child victim. Otherwise, the Monitors considered it invalid, meaning it was blank, did not have unique time stamps for each child victim, or the time stamp preceded the intake. DFPS is aware of the methodology and able to review its data to correct or clarify these issues; moreover, as noted above, after reviewing the data reports provided by DFPS, the Monitors shared all applicable investigations with DFPS in advance.

[142] *See* Deborah Fowler & Kevin Ryan, Fifth Report 63, ECF No. 1318.

[143] *See* Deborah Fowler & Kevin Ryan, Fifth Report 63, ECF No. 1318.

[144] *See* Deborah Fowler & Kevin Ryan, Fifth Report 63, ECF No. 1318.

Of the remaining investigations, 64% (1,046) were documented as completed within 30 days of intake and 18% (302) had approved extensions and were completed within the extension timeframe.[145] Two percent (29) remained open with an active extension and, therefore, were not yet due at the time of analysis. DFPS's rate of completing Priority One and Two investigations within 30 days of intake in the Monitors' previous report was 59%.[146]

Of the 435 investigations with documented, approved extensions that were not completed within 30 days, as noted above, 302 (69%) of those investigations were completed within the approved timeframe allotted by the extension and 104 were not completed within the allotted extension timeframe.[147]

Figure 21: Completion of Priority One and Two Investigations within 30 Days



The percentage of investigations completed within 30 days increased from 61% in July 2022 to 77% in December 2022. By the end of the review period, in June 2023, the rate had dropped to 50%, not including those investigations with extensions.

Figure 22: Completion of Priority One and Two Investigations within 30 Days over Time

---

[145] Twenty investigations had approved extensions but were still completed within 30 days.

[146] *See* Deborah Fowler & Kevin Ryan, Fifth Report 64, ECF No. 1318. An additional 13% had extensions. *Id.*

[147] Twenty-nine investigations that opened during this time period that had not yet closed had active extensions reported in the data from DFPS as of August 31, 2023.



**Remedial Order 11:** DFPS Track and Report Requirement

*Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

The Monitors reviewed data and information provided by DFPS in association with Remedial Order 11, which requires DFPS to track and report all investigations that are not completed on time. Approved extensions to the standard closure timeframe and the reason for the extension must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

Of the 593 investigations that were opened by RCCI between July 1, 2022 and June 30, 2023 and were not completed within 30 days, DFPS data included extensions approved for 391 (66%) of those investigations with the dates the extensions were approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.[148]

---

[148] These data matched to the investigations' corresponding intake start date and original due date and, therefore, the Monitors were able to determine the due dates associated with the extensions to assess timeliness of completion within the extension period.

Twenty additional investigations included extensions but were still completed within 30 days; 9 investigations with extensions did not include a reason;[149] and one did not list the number of days approved, for a total of 455 investigations with extensions reported.

Of these 455 investigations that contained at least one extension, the extensions were approved for either seven, 14, 21, or 30 days each. Of those with extensions, 60% (273) included one extension, 23% (104) included two extensions, 7% (32) included three extensions, 7% (33) included four extensions, 1% (3) included five extensions, 1% (5) included six extensions, 1% (3) included seven extensions, <1% (1) included 12 extensions, and <1% (1) included 14 extensions.[150]

Figure 23: Number of Extensions in Priority One and Two Investigations



Note: Chart does not add up to 100% due to rounding.

The total number of extension days approved for an investigation ranged from seven to 300 days.[151] Fifteen percent (66) of investigations with extensions were extended for seven-14 days; 47% (215) were extended for 15-30 days; 5% (22) were extended 31-50 days; and 33% (151) were extended for more than 50 days. One investigation was missing the number of extension days approved.

**Remedial Order 16:** Timeliness of Completion and Submission of Documentation in Priority One and Priority Two Investigations

---

[149] This analysis was based on both regular reporting and supplemental information provided by DFPS upon the Monitors' inquiry for missing reasons.

[150] Percentages do not add up to 100 due to rounding.

[151] The investigation was granted several extensions due to a request by law enforcement and to gather necessary records.

63

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed. (Remedial Order 16 applies to both DFPS and HHSC. The Monitors report on DFPS's performance in this Seventh Report and reported on HHSC's performance in the Sixth Report.)*

DFPS advised the Monitors that the agency uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered completed when the documentation is finally submitted to the supervisor in compliance with this Order.[152]

**Remedial Order 18:** Timeliness of Notification Letters to Referent and Provider

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation. (Remedial Order 18 applies to both DFPS and HHSC. The Monitors report on DFPS's performance in this Seventh Report and reported on HHSC's performance in the Sixth Report.)*

For the referent letter, of the 1,599 (out of 1,639) Priority One and Priority Two investigations opened by RCCI from July 1, 2022 to June 30, 2023 and documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 90% (1,440) of investigations.[153] Of the remaining cases, in 2% (30) of investigations, notification letters to the referents were not mailed timely; 3% (45) were mailed to the referent prior to supervisor approval; 2% (28) of investigations had an anonymous reporter; and 4% (56) were unknown due to blank data.[154,155] In the Monitors' previous report, the State's rate of mailing notification letters to referents

---

[152] DFPS advised the Monitors, "When an investigator submits for closure an investigation in IMPACT, the supervisor may determine that the case needs additional work or documentation to ensure a quality investigation has occurred. If so, the supervisor will return the investigation and once the additional tasks have been completed, the caseworker will submit it again. Because the IMPACT date is captured in an automated way and the CLASS date is manually entered, the IMPACT date will provide a more accurate date and may ease verification and as the agency moves forward in its efforts to improve the quality of its investigations, it believes it's important to capture the final submission rather than initial submission date. Finally, the final date submitted for approval in IMPACT will also be used as the one date to determine compliance with Remedial Order 16 to 'submit and complete documentation in Priority One and Priority Two investigations on the same day the investigation is completed.' The date complete in CLASS will no longer be used to calculate compliance with any remedial order." E-mail from Heather Bugg, former Dir. of Project Management, DFPS, to Kevin Ryan and Deborah Fowler, Monitors (Jan. 4, 2021).

[153] Closure data was not yet available for 40 investigations that remained open. As noted above, 29 investigations had active extensions and 11 were overdue because either their extensions expired (7) or they had no extensions (4).

[154] DFPS's data report states that: "Unless otherwise noted, any blank cell is generally the result of missing data due to data entry and documentation issues." Of the 56 investigations with blank data that the Monitors identified to DFPS regarding letters to the referent, DFPS's data addendum addressed six of them and stated "Letter Not Needed – DFPS Employee." (Two additional investigations were included in DFPS's addendum but they were already resolved in the DFPS bi-annual data report).

[155] Percentages do not add up to 100 due to rounding.

within five days of investigation closure in Priority One and Two investigations was 87%.[156]

**Figure 24: Notification Letter Sent to Referent within Five Days of Investigation Closure in Closed Priority One and Two Investigations**



Note: Chart does not add up to 100% due to rounding.

For the provider letter, of the 1,599 (out of 1,639) Priority One and Priority Two investigations opened by RCCI from July 1, 2022 to June 30, 2023 and documented as closed at the time of the Monitors' review, the notification letter to the provider was mailed within five days of closure in 92% (1,475) of investigations. Of the remaining cases, in 5% (76) of investigations, notification letters to the provider were not mailed timely; 1% (11) were mailed to the provider prior to supervisor approval; and 2% (37) were unknown due blank data cells.[157] The State's rate of mailing notification letters to providers within five days of investigation closure in Priority One and Two investigations in the Monitors' previous report was 83%.[158]

**Figure 25: Notification Letter Sent to Provider within Five Days of Investigation Closure in Closed Priority One and Two Investigations**

---

[156] *See* Deborah Fowler & Kevin Ryan, Fifth Report 67, ECF No. 1318.

[157] In DFPS's data addendum submitted in response to the Monitors request for clarification, DFPS provided information confirming that four of the letters with blank cells were untimely and in one instance, DFPS noted that it sent a notice to the parties of a change in disposition. The addendum did not address the remaining investigations with blank cells.

[158] *See* Deborah Fowler & Kevin Ryan, Fifth Report 68, ECF No. 1318.



Of the 1,599 (out of 1,639) investigations opened by RCCI from July 1, 2022 to June 30, 2023 and documented as closed at the time of the Monitors' review, 84% (1,336) included evidence that notification to both the referent and provider occurred within five days of closure of the investigation as required by Remedial Order 18. DFPS's rate of mailing notification letters to the referents and providers within five days of investigation closure in the Monitors' previous report was 73%.[159]

## Summary

### Remedial Order 5:
- 84% (162) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 were initiated within 24 hours of intake; and

- 16% (31) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 were not initiated timely or did not have sufficient data to assess.

### Remedial Order 6:
- 88% (1,269) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 were initiated within 72 hours of intake; and

- 12% (177) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 were not initiated timely or did not have sufficient data to assess.

### Remedial Order 7:
- 84% (162) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 included initial face-to-face contact with all alleged victims within 24 hours of intake; and

---

[159] *See* Deborah Fowler & Kevin Ryan, Fifth Report 69, ECF No. 1318.

- 16% (31) of Priority One RCCI investigations opened from July 1, 2022 to June 30, 2023 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

## Remedial Order 8:

- 88% (1,269) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 included initial face-to-face contact with all alleged victims within 72 hours of intake; and

- 12% (177) of Priority Two RCCI investigations opened from July 1, 2022 to June 30, 2023 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

## Remedial Order 9:

- Of 1,639 investigations opened by RCCI from July 1, 2022 to June 30, 2023 including both single and multi-alleged victim investigations, DFPS was able to track and report to the Monitors 95% of the time (1,563 investigations) whether face-to-face contact was made with each alleged victim within an investigation and the date and time that contact occurred.

- In the remaining 5% (76) of investigations, DFPS was not able to track and report whether face-to-face contact was made with each alleged victim.

## Remedial Order 10:

- Of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023, DFPS documented that 64% (1,046) were documented as completed within 30 days of intake;

- Of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023, DFPS documented that 16% (262) of investigations were not completed timely; and

- Of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023, DFPS documented that 18% (302) of investigations had an approved extension and were completed within the extension timeframe.

- Two percent (29) of the 1,639 Priority One and Priority Two investigations opened between July 1, 2022 and June 30, 2023 remained open with an active extension and, therefore, were not yet due at the time of analysis.

## Remedial Order 11:

- Of the 593 investigations that were opened by RCCI between July 1, 2022 and June 30, 2023 and were not completed within 30 days, DFPS data included extensions approved for 391 (66%) investigations with the dates the extensions were approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.

67

Remedial Order 16:

- Investigation completion is measured by DFPS on the date the investigation is submitted for supervisor approval. Therefore, all investigations are completed on the same day as submission.

Remedial Order 18:

Notification to Referent by DFPS:

- Of the 1,599 (out of 1,639) Priority One and Priority Two investigations opened by RCCI from July 1, 2022 to June 30, 2023 and documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 90% (1,440) of investigations.

- Of the remaining cases, in 2% (30) of investigations, notification letters to the referents were not mailed timely; 3% (45) were mailed to the referent prior to supervisor approval; 2% (28) of investigations did not require notifications as the reporters were anonymous; and 4% (56) were unknown due to documentation deficiencies.[160]

Notification to Provider by DFPS:

- Of the 1,599 (out of 1,639) Priority One and Priority Two investigations opened by RCCI from July 1, 2022 to June 30, 2023 and documented as closed at the time of the Monitors' review, the notification letter to the provider was mailed within five days of closure in 92% (1,475) of investigations. Of the remaining cases, in 5% (76) of investigations, notification letters to the provider were not mailed timely; 1% (11) were mailed to the provider prior to supervisor approval; and 2% (37) were unknown due to documentation deficiencies.[161]

## Remedial Order A6: Reporting Allegations

*Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of this information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

---

[160] Percentages do not add up to 100 due to rounding.
[161] The documentation deficiencies included blank cells.

## Background

Remedial Order A6 is intended to address the Court's findings related to underreporting of abuse, neglect or exploitation.[162] The Monitors rely on information gathered during site visits to validate the State's compliance with Remedial Order A6 and progress toward ensuring children know how to report abuse, neglect or exploitation when it occurs.

The Fifth Report showed no improvement in the percentage of youth interviewed by the monitoring team who reported knowing about the SWI hotline and Foster Care Ombudsman (FCO); in fact, the percentage of children reporting knowledge of the SWI hotline declined between the Third and Fifth Reports.[163] Of the children interviewed for the Fifth Report, many still reported that they had not heard of the SWI hotline; even fewer knew how to reach the SWI hotline.[164] Similarly, most children still did not know of or know how to reach the FCO.[165]

Even when children reported knowing how to call the SWI hotline or the FCO, interviews with caregivers and children confirmed that access to phones was restricted, with caregivers limiting both who a child could call and when a call could be made.[166] In addition, when caregivers were specifically asked whether children could call the SWI hotline or FCO whenever they wanted to, 10% of caregivers (7 of 72) said children could

---

[162] The Fifth Circuit vacated the Court's remedial order that would have required the State to ensure that foster homes had a landline with the toll-free number for the abuse and neglect hotline appended to the phone. However, in doing so, the Fifth Circuit found, "To the extent that the court is worried about underreporting, this can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues." *M.D. by Stukenberg v. Abbott*, 907 F. 3d 237, 279 (5th Cir. 2018). Before it addressed the Court's remedies, the Fifth Circuit found that the trial record showed abuse, neglect, and exploitation was underreported:

> [T]he evidence in the record indicates that abuse is underreported. Several former foster children testified that they did not know how to report abuse or whom they should tell. Even if children knew whom to call, many are so distrustful of the system that they are unlikely to feel comfortable reporting abuse.

*Id*. at 266.

[163] It is possible that the high percentage of youth who were interviewed for the Third Report who indicated having knowledge of the SWI hotline was skewed by the age of children interviewed; children interviewed for the Third Report were interviewed in CWOP Settings. Deborah Fowler & Kevin Ryan, Third Report 67, ECF No. 1165. CWOP Settings tend to house older children, and older children are more likely to report knowing of the SWI hotline. *See* Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding PMC Children Without a Licensed Placement 4, ECF No. 1425 (showing the majority of children in CWOP Settings were teenagers); *See* Deborah Fowler & Kevin Ryan, Fifth Report 77, ECF No. 1318 (reporting older children were more likely to have heard of the hotline).

[164] In the Fifth Report, the Monitors found that of the 75 children who responded to the interview questions related to the SWI hotline, nearly half (37 of 75, or 49%) had heard of the SWI hotline. Of those children, only 26 knew how to call the SWI hotline. *Id.*

[165] The Monitors found that fewer than half of the children interviewed who answered questions related to the FCO (31 of 76, or 41%) had heard of the FCO. Only 25 of those children knew how to contact the FCO. *Id.* at 75-76.

[166] *Id.* at 82.

69

not call the SWI hotline whenever they wanted to, and 11% (8 of 72) said they could not call the FCO whenever they wanted to.[167]

## Performance Validation

The monitoring team conducted site visits at eight GROs/Residential Treatment Centers (RTCs) between January and August 2023. Operations visited include Ray of Hope, Make a Way, New Pathways, Renewed Strength East, Creighton Oaks, Pegasus, Castillo Children's Center, and Bluebonnet Haven. The following includes an analysis of PMC child files reviewed and interviews of PMC children, direct caregivers, case managers, and program administrators. Participation in interviews was voluntary. Respondents were allowed to refuse any question or terminate the interview before completing it.[168] The denominator (N) for children interviewed in the charts/analysis below reflects the number of children responding to a given question and can vary across questions.

Table 13: Total Number of Children and Staff Interviewed

| Type of Data Collected at Site Visits | Number of Interviews/Files Reviewed |
|---|---|
| Child Interviews | 59 |
| Direct Caregiver Interviews | 72 |
| Case Manager Interviews | 8 |
| Program Administrator Interviews | 9 |
| **Total Interviews** | **148** |
| Child File Reviews | 96 |

## Foster Care Bill of Rights

During the child file reviews on site, the monitoring team determined that 93% of the child files reviewed (89 of 96) contained a Foster Care Bill of Rights (Bill of Rights) signed by the child.[169] Five additional child files (5%) had a Bill of Rights on file, but it was not

---

[167] *Id.* The Monitors' Update to the Court Regarding Site Visits, filed March 27, 2023, included an example of the way that phone restrictions can have an impact on a child's ability to make a report to the SWI hotline, even when a member of the monitoring team is with the child who has requested use of the phone for that purpose. Deborah Fowler & Kevin Ryan, Update to the Court Regarding Site Visits Conducted between December 1, 2021, and December 31, 2022, and the Reopening of The Refuge for DMST 19, ECF No. 1337.

[168] Three of the 59 children interviewed did not answer a majority of the interview questions.

[169] HHSC's minimum standards require GROs and child placing agencies (CPAs) to review a child's rights with them within seven days after they are admitted to the operation and to include a signed copy of the rights in the child's records. 26 TEX. ADMIN. CODE §748.1103; 26 TEX. ADMIN. CODE §749.1005. In addition, DFPS policy requires the child's CVS caseworker to review the Bill of Rights with them each time their Child Plan of Service is reviewed. DFPS, CPS Handbook §6420. In February 2022, DFPS added a new field in IMPACT that allowed CVS caseworkers to document the most recent review of the Bill of Rights. DFPS, *IMPACT Job Aid* (indicating the IMPACT change would go into effect on February 10, 2022)(on file with the Monitors). In July 2023, DFPS instructed all of its caseworkers that by July 30, 2023, they were to

signed by the child. Two of the 96 child files (2%) did not have a Bill of Rights in the child's file. The proportion of signed Bill of Rights documents found varied slightly across operations and, in four of eight operations visited, 100% of child files contained a signed Bill of Rights.

Figure 26: Child File Contained Signed Bill of Rights



Figure 27: Percent of Child Files Containing a Signed Bill of Rights by Operation[170]

---

"obtain an updated signature" on the Bill of Rights from each child in a foster home. Supervisors were then required to verify that all youth had a newly signed and reviewed Bill of Rights and that the date in the appropriate IMPACT field reflected the same date as the signed document uploaded to OneCase. DFPS, *Memo to CPI/CPS Staff and SSCCS in Stage II from Nancy Taylor*, CPS Director of Permanency, June 27, 2023 (on file with the Monitors). The memo also instructed that a Bill of Rights must be signed and uploaded to IMPACT twice a year, in July and January. *Id*. The same memo requires the child's caseworker to "explain the purpose and provide the Foster Care Ombudsman hotline" during monthly face-to-face visits with children on their caseloads. *Id*.

[170] All child files reviewed at Renewed Strength East contained a Bill of Rights, but two of five were not signed by the child.



Of the eight case managers interviewed across seven sites,[171] half (4 of 8, 50%) responded that they "always" reviewed the Bill of Rights with children at intake/admission, while the remaining 50% responded that they did not review the Bill of Rights with children.[172]

---

[171] At least one case manager was interviewed at all sites except Pegasus RTC.

[172] In their informal response to the draft of this report, DFPS commented: "It appears that this sentence refers to case managers in congregate care facilities. But Remedial Order A6 specifically and exclusively imposes obligations on primary caseworkers. Accordingly, it is unclear why case manager analysis was conducted and included in the draft report and defendants request that this analysis either be removed or clarified as to its inclusion and relevance." As discussed in the Court Monitors' prior reports, because the State has only recently implemented policy changes that may provide additional methods for validating compliance with this remedial order (to be implemented by July 30, 2023, as described in footnote 166, *supra*), the primary method for determining compliance with this remedial order has been through interviews and record reviews conducted during site visits to GROs.

In its September 9, 2019 report to the Monitors regarding its compliance with the Court's remedial orders, the State indicated that children and youth were provided with a copy of the CPS Rights of Children and Youth in Foster Care and that the document was reviewed with the child and caregiver "each time their placement changes." Deborah Fowler & Kevin Ryan, First Report, at 123. And, as noted above, HHSC's minimum standards for GROs and CPAs include a medium-weighted standard requiring operations to review a child's rights with them within seven days after they are admitted and to include a signed copy of the rights in the child's records. DFPS also requires GROs and CPAs to review the CPS Rights of Children and Youth in Foster Care with foster children in their care "upon request" and to explain the rights "if appropriate." DFPS, 24-Hour Residential Child Care Requirements §1540, *available at* https://www.dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Cont racts/documents/24_Hour_RCC_Requirements.pdf

In addition to other case management duties, a GRO's case manager is often the staff person who assists children with orientation and paperwork when children are newly admitted. The monitoring team developed the site visit protocol, after reviewing the relevant DFPS and HHSC policies, to maximize opportunities to advise the Court about how and whether the team could validate that children were being advised of their rights by their caseworker or another adult caregiver.

Among children interviewed, 33 of 55 (60%) had heard of the Bill of Rights, ten of whom responded "yes" to having heard of it only after a description was offered by the interviewer. Twenty-two of 55 children interviewed (40%) had not heard of the Bill of Rights even after a description was given. The age of the child impacted whether they were familiar with the Bill of Rights: 57% of eight to ten-year-olds (4 of 7) had not heard of the Bill of Rights compared to 24% of 15 to 17-year-olds (4 of 17). Ten of the 22 children (45%) who responded that they had not heard of the Bill of Rights were 12 years old or younger.

Figure 28: Children Responded They Had Heard of the Bill of Rights



Of the 33 children who had heard of the Bill of Rights, 36% (12 of 33) reported having read the document, while 58% (19 of 33) said someone had explained it to them. Six percent of children (2 of 33) had heard of the Bill of Rights but had never read or had the document explained to them. During site visits conducted by the monitoring team in 2022,[173] a higher percentage of children interviewed responded that they had not heard of the Bill of Rights, 46% (35 of 76) compared to 37% in 2023, and a much higher percentage of those who had heard of it responded they had not read it or had it explained (44% compared to 6% in 2023).

Figure 29: Children Reporting Whether They Read or Had Someone Explain Bill of Rights

---

[173] January 2022 to August 2022

73



In addition to asking children about the Bill of Rights, the monitoring team also asked children's direct caregivers whether the phone numbers for the SWI hotline and FCO were posted in the children's living units. Most direct caregiver staff interviewed (63 of 72 or 88%) reported that both the SWI hotline and FCO phone numbers were posted on-site in the unit. The remaining nine caregivers did not know if the numbers were posted in the unit. During walkthroughs of the facility grounds, the monitoring team observed the FCO and SWI hotline numbers posted in all units at the operations visited, an improvement over sites visited for the Fifth Report.[174]

These improvements, however, have not improved children's reported knowledge of the SWI hotline or the FCO.

## Children's Knowledge of the FCO

Fewer than half of the children interviewed (20 of 55 or 36%) had heard of the FCO, eight of whom responded yes only after a description was given by the interviewer. Thirty-five of 55 children (64%) had not heard of the FCO even after a description was given. None of the eight to ten-year-olds (0 of 7, 0%) had heard of the FCO compared to 47% of 13 to 14-year-olds (9 of 19) and 65% of 15 to 17-year-olds (11 of 17).

**Figure 30: Children Responded They Had Heard of the FCO**

---

[174] Deborah Fowler & Kevin Ryan, Fifth Report 80, ECF No. 1318 (reporting that the monitoring team found FCO and SWI hotline numbers consistently posted in living units in five of eight facilities visited).



The monitoring team also asked the 20 children who responded that they had heard of the FCO if they knew how to reach the FCO if needed. Of children who had heard of the FCO, 17 of 20 (85%) responded that they knew how to reach the FCO. In total, 17 of the 55 children interviewed (31%) had heard of the FCO and knew how to reach them if they needed to do so. This was similar to the findings from site visits conducted in 2022 where 33% of children interviewed (25 of 76) had heard of the FCO and knew how to reach them if they needed to do so.

**Figure 31: Percentage of Children Reporting Whether They Know How to Reach the FCO if They Need To**



## Children's Knowledge of the SWI Hotline

Just under half of the children interviewed (27 of 55 or 49%) had heard of the SWI hotline, including two children who initially indicated they had not but changed their response after a description was given. Twenty-eight of the 55 children interviewed (51%) had not

heard of the SWI hotline even after a description was given. Knowledge of the SWI hotline varied greatly by age category.

Figure 32: Percentage of Children Responding that They Knew of the Existence of the SWI Hotline



Interviewers also asked the 27 children who responded that they had heard of the SWI hotline if they knew how to call the SWI hotline. Of the children who had heard of the SWI hotline, 18 of 27 (67%) knew how to call it. In total, 18 of the 55 children interviewed (33%) had heard of the SWI hotline and knew how to call it if they needed to do so.

Figure 33: Percentage of Children Reporting Whether They Knew How to Call the SWI Hotline



Interviewers also asked the children if they had ever wanted to call the SWI hotline while living in their current placement and, if so, whether they were allowed to call. Only two children who had heard of the SWI hotline responded they had ever wanted to call.

76

**Figure 34: Percentage of Children Reporting Whether They Wanted to Call the SWI Hotline**



**Figure 35: Children Reporting Knowledge of Bill of Rights, FCO, and SWI Hotline**



Overall, only one in five children (11 of 55 or 20%) had heard of the Bill of Rights, the FCO, and the SWI hotline. Results varied significantly by operation.

**Figure 36: Percent of Children That Had Heard of the Bill of Rights, FCO, and SWI Hotline by Operation[175]**

---

[175] Includes yes after description.



## Telephone Process

In addition to asking whether children knew how to call the FCO or SWI hotline, the monitoring team asked children and caregivers about children's access to telephones and ability to make calls, and about the process for making calls. All but one child reported being able to use a phone at the operation; one child had never asked to use the phone. Of those who reported being able to use a phone, half reported always being able to use the phone (27 of 54) and the remaining half reported sometimes being able to use the phone (27 of 54).

Figure 37: Children Reporting Whether They Can Use the Phone

78



While children reported a high degree of access to the phone, children frequently reported that others could hear their conversation while on the phone. Only 12 of the 54 children who responded (22%) reported that other children or staff could not hear their conversations when they are on the phone. More than 40% (22 of 54 or 41%) reported that other children or staff could always hear their conversations, while 30% (16 of 54) said other children or staff could sometimes hear their conversations. The remaining four of 54 (7%) did not know if others could hear or had not asked to use the phone. When asked about the process for using the phone, the majority of children (33 of 54 or 61%) described having to gain caregiver approval before being allowed to use the phone. Nearly half of children (24 of 54 or 44%) reported specific days or times of the day when phone use was allowed.

**Figure 38: Process for Using the Phone as Reported by Children[176]**



---

[176] Multiple responses were allowed. Includes only children who responded, five of 59 children interviewed did not respond.

79

Most caregivers also reported restrictions on phone use. Three-fourths of direct care staff interviewed (54 of 72 or 75%) reported restrictions on both when a child could make a call and who a child could call. Three of 72 caregivers (4%) said there were restrictions only with regard to when a child could make a call. Eight of 72 caregivers (11%) said there were restrictions only with regard to whom a child could call. Seven of 72 caregivers (10%) reported no call restrictions of any kind.

Figure 39: Caregiver Reported Restrictions on Phone Use



Though most caregivers reported restrictions on phone use, 90% (65 of 72) said children could call the FCO or the SWI hotline whenever they wanted to call.[177] Seven caregivers (10%) said children could not call the SWI hotline or the FCO whenever they wanted. Staff at four operations (Make a Way, New Pathways, Pegasus, and Renewed Strength East) said children could not call the SWI hotline or the FCO whenever they wanted.[178]

Figure 40: Caregivers Reporting Ability of Children to Call the SWI Hotline/FCO at Any Time

---

[177] One of the 65 caregivers reported children being able to call the SWI hotline only whenever they wanted.
[178] One-third of staff interviewed at Make a Way and New Pathways reported children could not call the SWI hotline or the FCO whenever they wanted.



## Child Grievances and General Safety

More than 85% of program administrators (8 of 9 or 89%) and all case managers (8 of 8 or 100%) reported having a formal process to handle grievances, but only 60% of direct care staff (43 of 72) reported a formal process. Nine of 72 direct care staff (12%) reported not having a formal process, and 20 of 72 (28%) did not know if there was a formal process for grievances.

Only seven of 52 children responding (13%) said they had wanted to report a grievance since being in their current placement, while nearly 90% (45 of 52 or 87%) said they had not wanted to report a grievance. Nearly all children who said they had wanted to report a grievance responded they were able to report it (6 of 7 or 86%).

Regarding general safety, 39 of 55 (71%) responding children said they always felt safe in their current placement while the remaining 29% (16 of 55) said they sometimes felt safe. There were no children who said they did not feel safe in the placement where they were interviewed, an improvement over interviews conducted for the Fifth Report, which documented that 9% (7 of 75) of the children interviewed said they did not feel safe in their placement.[179]

Despite this, of 54 children who responded to a question about whether they had previously been or were currently being bullied, eight (15%) reported they were currently being bullied and 11 children (20%) reported previously being bullied.

### Figure 41: Children Reporting Feeling Safe in Current Placement

---

[179] Deborah Fowler & Kevin Ryan, Fifth Report 84, ECF No. 1318.



Two-thirds of children (35 of 53 or 66%) responded that they always feel comfortable talking to staff if needed, while 34% (18 of 53) said they sometimes feel comfortable talking to staff. Importantly, of the 16 children who reported that they did not always feel safe in the placement (answering they "sometimes" felt safe), only seven (44%) said they always felt comfortable talking to staff. By contrast, 27 of the 36 children (75%) who said they always felt safe in the placement also reported that they always felt comfortable talking to staff.[180]

<span style="color:#2E5496">Figure 42: Children Reporting Feeling Comfortable Talking to Staff to Express Needs</span>



A child's caseworker can be an important figure for reporting abuse and neglect if the child does not feel comfortable reporting via more formal methods such as the SWI

---

[180] Three children did not answer the question.

hotline or FCO. However, just over half of the children who responded[181] (25 of 47 or 53%) said that when they called or texted their caseworker, the caseworker always answered or responded. About one-third (16 of 47 or 34%) said their caseworker sometimes answered or responded, and 13% (6 of 47) said their caseworker did not answer or respond when they called or texted. However, the response rate has improved since the Monitors' Fifth Report, which documented that only 27% (18 of 67) of children reported their caseworker always responded to calls or texts.

Figure 43: Children Reporting Whether Their Caseworker Answers or Responds When They Call or Text



Source: Monitoring team site visit data, Child Interview
n = 47

- 25 / 53% — Yes, always
- 16 / 34% — Yes, sometimes
- 6 / 13% — No

## Analysis of SWI Hotline Reporting

Monthly data submitted to the Monitors by the State includes records of intakes to the SWI hotline indicating whether the child victim was the reporter of the allegation. Between January and June 2023, there were 1,851 intakes received by the SWI hotline that included a PMC child as an alleged victim in an RCCI, CPI or PI investigation.[182] The intake documented an alleged victim as the reporter in only 17 (1%).[183]

---

[181] Six of 59 children responded to a previous question that they had not asked to call their caseworker and were excluded from this question. Of the remaining 53 children who were asked if their caseworker answered/responded when called, six did not answer or refused the question.

[182] An intake may include multiple allegations involving one or more children. RCCI intakes include residential settings such as a GRO, RTC, or foster home. CPI intakes include kinship or unlicensed placements. PI intakes include state supported living centers, psychiatric or state hospitals, and private HCS homes.

[183] The monitoring team's interviews with children highlight the importance of providing them with access and opportunity to report abuse, neglect or exploitation. When the monitoring team visits facilities and interviews children, outcries made by a child during interviews are subsequently reported by the monitoring team to the SWI hotline. In all, the monitoring team has made 39 individual calls or reports to the SWI hotline since site visits started in 2019; of those, 21 (54%) were based on a child's outcry during an interview. Some of the reports to the SWI hotline included a report of more than one outcry by children interviewed. Children's outcries included injuries caused by restraints, child-on-child sexual abuse, medical neglect, and physical abuse by staff.

83

Figure 44: RCCI, CPI, and PI Intakes, January to June 2023



The following is an alt-text transcription of the chart:

Source: RCCI, CPI, and PI Intakes January to June 2023
n = 1,851

- Reporter is not victim: 1,834 (99%)
- Reporter is victim: 17 (1%)

Although PI intakes were the smallest in number (144 of 1,851 or 8% of intakes), they represented more than half of the 17 intakes in which the alleged victim was the reporter (10 or 59%). Eight of these reports were made by the same child after she was placed at a State Supported Living Center; none of the reports were substantiated. Overall, ten of 144 PI intakes (7%) were reported by the alleged victim compared to four of 999 RCCI intakes (0.4%) and three of 708 CPI intakes (0.4%).

Figure 45: Intakes Showing Reporter as an Alleged Victim by Investigation Type



Source: RCCI, CPI, and PI Intakes January to June 2023
n = 17

- RCCI: 4 (24%)
- CPI: 3 (18%)
- PI: 10 (59%)

The Monitors also receive monthly data on complaints, in the form of phone calls, made by children to the FCO that are reported to SWI by the FCO. Between January and June 2023, there were 17 SWI reports made by the FCO resulting from a child's complaint. Four of the 17 SWI reports, or 24%, were made by children in operations under Heightened Monitoring. None of the reports were made by children in CWOP settings. Three operations had two separate complaints made against the placement or staff during the

84

period.[184] The subject of the complaints ranged from general concerns with staff or foster parents, feeling unsafe at the placement, and inappropriate restraints. During the same period in 2022 (January to June 2022), there were 25 SWI reports made by the FCO, five of which were made by a child in a CWOP location.

Figure 46: Youth Complaints to the FCO Resulting in Notification to SWI



Source: HHSC, RO.A6.3 Ombudsman List, January 2021 – June 2023
n = 62

## Summary

Remedial Order A6 is intended to address the underreporting of abuse, neglect and exploitation resulting from a child's lack of knowledge about how to make a report. The remedial order directs the State to "ensure" children are apprised of the appropriate point of contact and methods for reporting abuse, neglect or exploitation. It includes a directive to review the Bill of Rights and information about the FCO with children but does not limit the State to those methods.

Though the remedial order has been in place for four years, there has been little improvement in children's understanding of the means and methods for reporting abuse, neglect or exploitation. In total, only 18 of the 55 children (33%) interviewed who answered questions related to their knowledge of the SWI hotline had heard of the SWI hotline and knew how to call the SWI hotline if they needed to do so. Only 17 of the 55 children (31%) had heard of and knew how to call the FCO. Children's reports to the SWI hotline made up only 1% of all reports made during the period reviewed.

## Remedial Order B5: Communicating Allegations to Caseworkers

---

[184] The three operations include Guardian Angels RTC, Journey to Dream, and Settlement Home.

*Effective immediately, DFPS shall ensure that RCCL or any successor entity promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigations, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

## Background

In its Contempt Order of December 18, 2020, the Court included specific instructions to the Monitors related to their validation of the State's compliance with Remedial Order B5:

> [T]he Court instructs the Monitors to assess Defendants' evidence and determine whether Defendants are "promptly communicat[ing] allegations of abuse to the child's primary caseworker." To implement the remedy to ensure that PMC children are free from an unreasonable risk of serious harm, compliance with Remedial Order B5 requires more than prompt communication to the caseworker of the existence of an allegation. It requires that caseworkers receive prompt communication of "allegations of abuse." Therefore, the Court instructs the Monitors that in their assessment of Defendants' compliance with this Remedial Order, they must assess whether Defendants "promptly communicate [ ]" the substance of the "allegations of abuse" to "the child's primary caseworker."
>
> Furthermore, Remedial Order B5 requires that Defendants "maintain [ ] a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children." The Monitors are therefore instructed to continue to assess not just whether Defendants are maintaining a system for receiving, screening, and assigning for investigation allegations of child maltreatment, but also that it "takes into account at all times the safety needs of children."[185]

After entry, DFPS changed its policies to conform compliance to the requirements articulated in the Court's Order. However, as discussed in the Monitors' Third Report, the State struggled to implement the new policies, which require that caseworkers be notified of the substance of any allegations of abuse, neglect or exploitation for a child on their caseload in an "I&R Notification" in IMPACT.[186] The caseworker is required to document an "I&R Notification Staffing" contact (staffing contact) in IMPACT within one business day of receiving the notification.[187] DFPS requires the staffing contact to include: a copy of the notification, notes of the discussion between the caseworker, their supervisor, and program director, consideration of the child's safety needs, and any follow-up action identified during the staffing related to the child's safety.[188] If follow-up is required, the

---

[185] Order 327, ECF No. 1017.
[186] Deborah Fowler & Kevin Ryan, Third Report 71, ECF No. 1165.
[187] *Id.*
[188] *Id.*

caseworker must document its execution and the results in a subsequent IMPACT contact.[189] The Monitors' Fifth Report discussed case record reviews, which showed that "I&R Notification Staffing" contacts were absent in 33% (127 of 387) of the RCCI intakes included in the sample. Results were worse for the samples of CPI and PI intakes, where "I&R Staffing" contacts were absent in 59% (184 of 312) of CPI intakes and 45% (45 of 99) of the PI intakes.

For this report, the monitoring team conducted case record reviews for a randomly selected sample of 358 RCCI, 264 CPI, and 74 PI intakes[190] for PMC children alleging child maltreatment received during the months of January, March, and June 2023.

In addition, as described below, the Monitors reviewed whether caseworkers received any notification in the 69 PI investigations that were discussed in the Monitors' September 19, 2023 and November 10, 2023 Updates to the Court.[191]

## Performance Validation

### Review of Automated Notification for RCCI Intakes

The monitoring team's case record review for the randomly selected sample during the months of January, March, and June 2023 included evaluation of the timing of the automated notification sent to caseworkers when a report of alleged maltreatment was made to SWI. The monitoring team found an automated notice to the caseworker in 100% of the 358 RCCI intakes included in the case record review. Most notifications (63% or 226 of 358) occurred on the same day as the intake, while most of the remainder (36% or 129 of 358) occurred on the day after the intake. Two of 358 notifications (0.6%) occurred three days and one notification (0.3%) occurred four days after the intake. The average number of days from intake to system-generated notice to the caseworker was 0.39 days.[192]

The monitoring team did not find an automated notification to caseworkers in IMPACT for any of the CPI or PI intakes included in the case record review.

The monitoring team also compared the date of the automated notification included in the monthly RCCI intake data produced by the State with the information the monitoring team found in IMPACT. Of the 358 notifications for RCCI intakes in the sample, all but three matched the notification date in the State monthly data. For the three not matching

---

[189] *Id.* at 71-72.

[190] Samples were selected based on unique intake and alleged victim ID. One intake ID may include allegations related to multiple children.

[191] See Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC PI Investigations, ECF No. 1442 (November 10, 2023); Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).

[192] The calculation of days from intake to system-generated notice is based on the date of intake compared to the date of automatic notification. While intake data provided by the State includes the date and time of notification, the automated notification in IMPACT includes only the date of notification.

the monthly data, the notification date found in the monthly data was associated with a linked case.[193]

The Monitors also evaluated the time between DFPS's receipt of the RCCI intake and the automated notification to the caseworker using the monthly SWI data produced by the state.[194] For RCCI intakes, the average time between intake and the system-generated notification to the caseworker was 10 hours and seven minutes.

### Review of IMPACT Case Contacts for RCCI, CPI, and PI Intakes for I&R Notification Staffing

After receiving notification of an intake alleging child maltreatment, a caseworker is required to review the intake, discuss the intake with their supervisor and/or program director, and contact the investigator for additional information. The caseworker is expected to create a staffing contact in the child's IMPACT record and to document the following in the contact: a copy of the I&R Notification (which includes the allegations) and notes related to the staffing with the caseworker's supervisor and/or program director, including consideration of the child's safety needs and any actions taken or plans for future action needed to ensure the child's safety.

During the case record review of child maltreatment intakes involving PMC children received during the months of January, March, and June 2023, the monitoring team identified a staffing contact for most intakes: for 91% (326 of 358) of RCCI intakes, 78% (58 of 74) of PI intakes, and 80% (211 of 264) of CPI intakes.[195]

Figure 47: Percentage of Intakes with a Case Contact Found by Intake Type

---

[193] Cases can be "linked" if multiple calls are made for the same allegation, for the same child, or for a similar allegation at an operation where an investigation is already underway.

[194] This data included information related to the automated I&R Notification, and the timing of the I&R Notification Staffing for RCCI.

[195] Of the contacts found across all intake types, 98% (582 of 595) were documented using an I&R A/N Notification Staffing contact and 2% (13 of 595) were documented using another type of contact. Monthly data produced by the State related to RCCI intakes include a data field titled, "Date of 1st A/N Notification Staffing Contact." During the case record review for RCCI intakes, when the monitoring team found an I&R Notification Staffing contact rather than another type of contact, the Monitors compared the date included in the data field for the monthly data with the date found in the IMPACT contact. In the 321 RCCI intakes where the contact found in IMPACT during the review was an I&R A/N Notification Staffing, the contact date in IMPACT matched in 92% (296 of 321). For 19 intakes, the dates for the I&R Staffing contact did not match and six of the contacts found in IMPACT were not included in the monthly data produced by the State. Of the 37 RCCI intakes included in the case record review for which a contact documenting the I&R Notification Staffing was not found by the monitoring team, the monthly data also did not include an I&R A/N Notification Staffing date.



Figure 48: Percentage of Intakes with a Case Contact Found by Type and Month



The percentage of case contacts found during the case read varied slightly by month. The percentage of case contacts found for all types of intakes was consistently highest in March (87% or 204 of 234) and consistently lower in June (84% or 193 of 231). CPI and PI intakes had slightly lower rates of case contacts found across all months compared to RCCI intakes.

The percentage of intakes with a case contact found has improved since the Monitors' last analysis for all types of intakes, with the greatest improvement for CPI intakes. Between January and June 2022, the percentage of RCCI intakes with a case contact found was 67% compared to 91% in 2023, for CPI intakes in 2022 it was 41% compared to 80% in 2023, and for PI intakes in 2022 it was 55% compared to 78% in 2023.

The time from intake to the staffing contact varied; however, across all three intake types (RCCI, CPI, and PI), staffing contacts most frequently occurred the same day or the day after the intake.

The average time between intake and the staffing contact was three or fewer days across all three intake types.[196] In the Monitors' case record review conducted in 2022 the average time between intake and the staffing contact was shorter across all intake types – 0.36 days less for RCCI intakes, 0.83 days less for CPI intakes, and 1.72 days less for PI intakes.

Table 14: Intakes with a Case Contact Found and Timing from Intake to Contact by Intake Type

| | RCCI Intakes (n=358) | | CPI Intakes (n=264) | | PI Intakes (n=74) | |
|---|---|---|---|---|---|---|
| Intake to Case Contact – Up to 12 Days Prior | 5 | 2% | 5 | 2% | 1 | 2% |
| Intake to Case Contact – Same Day | 90 | 28% | 62 | 29% | 14 | 24% |
| Intake to Case Contact – Next Day | 106 | 33% | 63 | 30% | 19 | 33% |
| Intake to Case Contact – 2+ Days | 125 | 38% | 81 | 38% | 24 | 41% |
| **Total Case Contact Found** | **326** | | **211** | | **58** | |
| Average Days – Intake to Case Contact | 1.97 Days | | 2.80 Days | | 3.00 Days | |

The monitoring team found that nearly all the staffing contacts across three investigative assignment types (RCCI, CPI, and PI) included information about the alleged abuse, neglect or exploitation.

Figure 49: Case Contacts with Incident Information

---

[196] The State produces monthly SWI data for the Monitors that also includes a field for the date and time the I&R Notification Staffing occurred. However, the Monitors' case record reviews have identified instances in which the caseworker documented the date of the staffing within the contact narrative, and this date was different from the date found in the contact detail in 33% of contacts that had a date documented in the narrative.



Some staffing contacts in the monitor team's review did not include any information except the information about the alleged abuse, neglect or exploitation: 7% (4 of 58) of staffing contacts related to PI intakes contained only incident information and 3% of CPI contacts (6 of 211) and 3% of RCCI contacts (11 of 326) contained only incident information. Overall, 4% of the case contacts found contained only information about the alleged incident compared to 22% in 2022.

Nearly all contacts found across all intake types included notes describing a staffing between the caseworker, supervisor, and/or program director. The documentation of a staffing improved over the period for CPI and PI case contacts. For RCCI case contacts, documentation of a staffing declined slightly from January to June but remained above 90% for each month of the period.

Table 15: Case Contacts with a Staffing Documented by Intake Type and Month

|  | RCCI Case Contacts (n=326) | | CPI Case Contacts (n=211) | | PI Case Contacts (n=58) | |
|---|---|---|---|---|---|---|
| **Total Case Contacts with Staffing Documented** | **305 (94%)** | | **201 (95%)** | | **52 (90%)** | |
| Staffing Documented-January | 103 | 95% | 74 | 95% | 9 | 82% |
| Staffing Documented-March | 98 | 93% | 65 | 93% | 25 | 86% |
| Staffing Documented-June | 104 | 93% | 62 | 98% | 18 | 100% |

When the monitoring team found a staffing contact, the contact documented that some action was taken to ensure the child's safety in 88% of all intakes (525 of 595).

91

Figure 50: Case Contacts with Safety Action Documented



The staffing contact related to some intakes indicated that the caseworker planned to take more than one action to ensure the child's safety:

- Twenty-five percent (73 of 291) of staffing contacts related to an RCCI intake that documented a safety action planned or taken included one safety action, 35% (102 of 291) included two, and 40% (116 of 291) included three or more.

- Twenty-six percent (48 of 183) of staffing contacts related to a CPI intake that documented a safety action, planned or taken, included one safety action; 43% (79 of 183) included two; and 31% (56 of 183) included three or more.

- Twelve percent (6 of 51) of staffing contacts related to a PI intake that documented a safety action, planned or taken, included one safety action; 41% (21 of 51) included two; and 47% (24 of 51) included three or more actions.

The most common safety action documented during the case record review across all intake types was continued monitoring and follow-up. This included monitoring the outcome of the investigation and following up with the placement, staff, law enforcement, or the investigator on the case to gather information about the incident or the child. Continued monitoring and follow up was documented as the only safety action in 11% (33 of 291) of RCCI contacts with a safety action, 7% (12 of 183) of CPI contacts with a safety action, and 6% (3 of 51) of PI contacts with a safety action.

Figure 51: Safety Actions Documented in RCCI, CPI, and PI Case Contacts[197]

---

[197] More than one safety action could have been documented in the contact. A total of 48 contacts (35 CPI and 13 RCCI) contained "other" safety actions, which included court filings or special hearings, increasing,



The monitoring team reviewed the allegations and documented safety actions included in the staffing contacts to determine whether sufficient action was taken to ensure the child's immediate safety.[198] In most cases, the monitoring team determined that the documented safety action was sufficient. Staffing contacts related to PI intakes had the lowest rate of determination by the monitoring team that the safety action taken was sufficient to ensure child safety.

Figure 52: Percentage of Documented Safety Actions that Adequately Ensured the Immediate Safety of the Child

---

or reviewing child's level of care, conducting background checks, drug testing caregivers, and parenting or home services.

[198] The caseworker, RCCR investigator, or operation staff/foster parents could have taken actions in response to the allegation.



When the monitoring team determined that additional action should have been taken, the actions that were most often needed included: development of a safety plan for the child (55% or 52 of 94), ensuring no contact between the child and the alleged perpetrator (31% or 29 of 94), and changing placement for the child (28% or 26 of 94).

Of the 595 intakes for which the monitoring team found a corresponding staffing contact, 70 (12%) did not include any notes documenting that action was taken to ensure the child's safety. Of these 70 intakes, the monitoring team determined some action should have been taken to ensure child safety in 37% (13 of 35) of RCCI contacts, 57% (4 of 7) of PI contacts, and 7% (2 of 28) of CPI contacts.

Overall, the monitoring team found an IMPACT staffing contact that documented appropriate action to ensure the child's safety in 69% (482 of 696) of all intakes reviewed, an improvement from 2022 in which it was determined appropriate action was documented in only 42% (335 of 798) of intakes reviewed.[199]

<span style="color:blue">Figure 53: Documentation of Appropriate Action Ensuring Child Safety</span>

---

[199] Deborah Fowler & Kevin Ryan, Fifth Report 99, ECF No. 1318.



The staffing contacts that the monitoring team identified during the case read that did not document any action or documented insufficient action taken to ensure the child's safety included:

- A staffing contact followed a January 3, 2023 report to the hotline that a ten-year-old PMC child who was placed at Guiding Light RTC made an outcry that she woke up two nights prior to her outcry to find two of her roommates were touching her "front part" private area. The staffing contact documented the caseworker's report that she had seen the child two days prior to the intake and talked to her again the next day and the child did not make an outcry during either conversation. The staffing contact did not document any action taken related to ensuring the child's safety.

- A staffing contact followed a January 10, 2023 intake involving a 14-year-old PMC child placed in an RTC, documenting allegations that the child, along with three other 14-year-old children, were able to gain access to the roof of the RTC and remain there for "a few minutes." The intake noted, "One of the teenagers was upset and made his way up to the roof and the others followed him." The intake said that the reporter did not know where staff were at the time of the incident and "why they were unable to provide proper supervision." The staffing contact included only the intake narrative and did not document that a staffing took place between the CVS primary caseworker and a supervisor or that any steps were taken to ensure proper supervision of the children at the RTC.

- A staffing contact followed a January 12, 2023 intake for a 12-year-old PMC child who was living in an RTC, who alleged that a staff member "grabbed her from behind, arms crossed over her chest and picked her up and slammed her to the ground hitting the left side of her face, knee and hip on the tiled/concrete floor."

The intake noted that the child "had a large bruise on her left cheek that was yellowing and small bruises on her knees" and indicated that pictures were available. The incident was originally reported to the hotline by a staff person at the facility on January 4, 2023, and opened as a Priority 3 minimum standards investigation by HHSC. After the HHSC investigator interviewed the child on January 11, 2023, the incident was re-reported to the hotline and opened as an investigation for Physical Abuse. The I&R staffing does not indicate any action was taken to ensure the child's safety.[200]

- A staffing contact followed a January 23, 2023 intake involving a ten-year-old PMC child who is autistic and requires 24-hour continuous supervision. The intake documented allegations that the child was coming to school unbathed and wearing dirty clothing. The contact indicated that the school personnel who made the report to the hotline also noted ongoing concerns for multiple children's care at the placement and said that, when asked about the issues, the operation staff "brought up ratio concerns as the reason, stating there are four to five staff members for 21 to 22 children, all of which [sic] have disabilities." The intake also noted that the operation staff appeared to suggest "an overall lack of training or skills for staff" when handling children with special needs. The intake documented the reporter's concern regarding "increased injuries (black eyes, bruising, and transports to hospitals for sutures)" to the children in care at the facility. The staffing contact did not document any action or steps taken by the caseworker to determine whether the placement could provide the necessary care for children with special needs. In the "Identified Safety Concerns/Needs" the staffing contact stated, "None, the facility has not had many intakes. The facility holds multiple youth in the home that have intellectual disabilities."

- A staffing contact dated January 24, 2023 related to a second intake for another resident at the same RTC, a 17-year-old PMC child who is non-verbal and autistic. The second report was made to the hotline the same day and was related to the same meeting between school staff and the facility staff. The two intakes were linked. This intake indicated that school personnel from multiple schools were involved in the meeting with facility staff, and that one of the school principals had scheduled the meeting "due to physical conditions and hygiene of her three high school students," which included the child for whom this staffing was completed. This intake alleged that the children's teachers "had reported the students were arriving at school and appeared not to be bathed, wearing dirty clothing, have a bad odor, and had dried feces on them that teachers had to clean when arriving at school." In addition, there were concerns that the child who was the subject of the staffing was not having his teeth brushed. One of the elementary school staff who

---

[200] Two of the collateral children who were interviewed said they saw the staff person pick the child up and slam her to the ground and another child reported having heard a loud noise but did not witness the restraint. However, collateral staff denied the abuse occurred. The facility's nurse confirmed that the child made an outcry to her "days after" the restraint allegedly occurred and that on the day of the outcry the child's "left cheek was black and blue when she saw her." The investigation was closed with an Unable to Determine finding because the alleged perpetrator was not available to interview during the investigation due to his military deployment.

attended expressed concerns that several of his students "would arrive at school beaten up with black eyes and scratches on their chest." The staffing does not list any safety concerns or actions to ensure the child's safety.[201]

- A staffing contact followed a January 25, 2023 intake that alleged a 13-year-old PMC child who was placed at Guiding Light RTC[202] made an outcry regarding an inappropriate restraint during a service plan meeting. The child alleged she was "restrained face down with her right arm pulled behind her back." The staffing contact indicated that several other children at the RTC reported inappropriate restraints by the same staff person and that two of the children alleged they had difficulty breathing during the restraints. The staffing contact noted that the investigator asked Guiding Light to put a safety plan in place, but the case manager for the RTC "reported Guiding Light does not implement safety plans and furthermore, any safety plan would have to be approved by RTC director." The investigator documented that DFPS "attempted to reach" the RTC director "but no response" and that the investigator "later found out from a collateral staff" that the alleged perpetrator had "voluntarily agreed not to restrain until [DFPS] finishes their investigation." The only next step documented in the staffing contact was a ten-day staffing.

- A staffing contact followed a January 26, 2023 intake that documented a report to the hotline by an RTC staff person alleging that a 12-year-old PMC child and three other children "have each of them...heard or possibly witnessed each of them having some 'inappropriate touching' with one of them." The staff person reported that when the children were asked about it, they "denied allegations directing the allegation to one of the others."[203] A "Summary of Discussion with RCCI/CPI Investigator" in the staffing contact states, "The concerns seem to be hearsay." It noted that the child "would be interviewed" by the investigator. The staffing took

---

[201] A subsequent contact note entered the same day indicates the caseworker spoke to the investigator, and that the investigator told the caseworker he did not see any safety concerns when he visited the facility that day and that the child was clean and wearing appropriate clothing. However, given the number of school staff who participated in expressing concerns about multiple children housed at the facility, the Monitors believe some action should have been taken by the caseworker. RCCI Ruled Out all the allegations after having interviewed two facility staff, and without having spoken to any of the school staff who participated in the meeting or reported concerns to the hotline.

[202] The operation voluntarily suspended its license on June 30, 2023.

[203] A review of IMPACT records for the four named victims shows that one child is a confirmed victim of sexual abuse, another child was an unconfirmed victim of sexual abuse (the "additional relevant information" narrative box shows two UTD findings related to sexual abuse of the child by his father), one child was later determined to have a history of sexual aggression due to an incident involving his sister, and the child who was the subject of the staffing contact had neither a history of sexual abuse or a history of sexual aggression. At the time of the intake, the child who was the subject of the staffing contact was bunkmates with the child who was later determined to have a history of sexual aggression.

Though the RCCI investigation of the allegations Ruled Out Neglectful Supervision, RCCI found that it was "plausible that sexualized touching may have occurred" but that the evidence did not show that, if it did occur, it was "a direct result of staff's negligence." During the investigation, one of the children said he witnessed the child who was later determined to have a history of sexual aggression "masturbating" the child who was the subject of the staffing.

place on January 31, 2023, five days after the report was made to SWI. Under "Identified Safety Concerns/Needs and any related actions" the staffing noted "None" and states that the child "is seen monthly and doesn't report that he feels unsafe in his placement" and "self reports [sic] that he does like this placement."[204] The caseworker documented that she had spoken with the intake screener but had not spoken to the investigator.

- A staffing contact followed a January 30, 2023 intake for a ten-year-old PMC child who was living in an RTC. The staffing contact documented that the caseworker received an intake that the child "alleged being afraid of the workers at the placement." It included a copy of the allegation narrative from the intake, which specified that the child alleged staff members at the RTC "restrain a lot of the girls and she was restrained a few days ago to the point where she has scratches all over her arm." The intake noted the child "has red bruises," and said the child alleged that children were restrained on the floor and was afraid to go back to the RTC. Though the reporter is not included in the staffing contact, CLASS shows the counselor at the child's elementary school made the report to SWI. There is no information in the staffing narrative about any action taken (or that would be taken) to ensure the child's safety. The caseworker's monthly face-to-face visit with the child occurred three days after the intake, and the contact note for the visit shows that the caseworker discussed the allegations with the child. The notes state that the child told the caseworker that her "face was shoved into the bed" during a restraint but then conclude that the child "is in a safe environment" and that there were "no bruises or marks on child that would concern caseworker" though the child "did still have some scratches on her face."

- A staffing contact dated February 8, 2023 related to two intakes involving a 17-year-old PMC child and her 12-year-old brother, both of whom were living in a kinship home with their grandfather. One of the intakes alleged problems associated with the condition of the home, including that there was "feces and urine from the dog all over the floors, including [the oldest child's] bedroom, there are roaches crawling around floors and tables in the kitchen, living room and children's room." This intake also alleged that the burners on the gas stove were being used for heat and that a large electric space heater was left on while the family was out; when the safety concerns were raised to the children's caregiver "he had no concerns or intension [sic] to change it." The other intake alleged that the 17-year-old made an outcry that her mother "makes her have sex with different men" when she visits her mother. The staffing contact noted that the caseworker

---

[204] Though this is consistent with the IMPACT notes associated with the caseworker's December 20, 2022, face-to-face visit with the child, a contact note associated with a January 11, 2023, face-to-face visit documented a change in behavior that the operation and caseworker associated with a recent visit with his family. The notes indicate that after he returned, he was "good for about a week then he had a rough time." When his caseworker asked him why he was "acting out" the notes document that the child responded that "he just didn't want to be at Pathways any longer." The caseworker also noted that the child "didn't seem very comfortable" discussing the issues. The caseworker asked the child "if he would be able to speak with his therapist" and the child "stated no" and his "eyes appeared to become watery" and the child "immediately changed the subject."

would make a request with the court for the 17-year-old's visits with her mother to end. It noted that the caseworker would make a request to the court to move the younger child but said the 17-year-old did not want to leave the home and "[t]here are no relatives who can care for the children." The staffing contact said that the "conditions of the home are not new" and that the caseworker would "discuss with grandpa and call APS report to assist with home maker services."

- A staffing contact followed a March 7, 2023 intake which alleged that two medically fragile, nonverbal children (aged ten and six-years old) were left at their foster home alone for an unknown period. The children were reported to have been alone when the children's homebound teacher came to the house to meet with them. The teacher alleged there was no answer when the teacher knocked on the door. According to the intake narrative, one of the children's daytime caregivers arrived just as the teacher was about to leave; when they entered the home, one of the children "was found standing in his wheelchair and he was attached to his feeding machine." The other child was in bed.[205] The only planned safety action documented in the staffing contact were a visit to the home by the caseworker scheduled for March 9, 2023 (the staffing occurred on March 8, 2023) during which the caseworker would discuss appropriate supervision with the foster parents. The caseworker noted that she had just been assigned the case and had not yet met with the children or family.[206] The children were later adopted by the foster parents.

- A staffing contact followed a March 10, 2023 intake for a seven-year-old PMC child who was with his seven-year-old foster sister (who is nonverbal) and foster mother at a barber shop when the reporter alleged the foster mother was seen "grabbing both [children] by the arms...aggressively." The foster mother allegedly "twisted their arms" and separately took the children into the restroom. The reporter alleged that both children were heard screaming when they were each taken into the restroom. The reporter said that the owner of the barber shop said that the children "have it rough" with the foster parent, and that the children were "visually impacted" by the incident. This intake was linked to a February 22, 2023, intake[207] related to an outcry of Physical Abuse made by the seven-year-old boy to a

---

[205] DFPS Ruled Out Neglectful Supervision based on the family's claim that the grandmother was home, did not hear the doorbell when the teacher arrived, and that the children were never left alone. The intake specifically stated that the reporter alleged that "Another adult who refers to herself as [grandmother] came home with groceries 10 minutes before [the reporter] left." The staffing contact also indicates that the intake specialist contacted the reporter and the reporter stated, "the grandmother arrived later during his services with the children." However, the reporter acknowledged that he did not ask whether anyone else was present in the home and did not walk through the home prior to going upstairs to meet with the children.

[206] An IMPACT contact note shows that the caseworker made a face-to-face visit the day after the staffing, discussed the intake with the family, and they told her that the grandmother was home when the teacher arrived but did not hear him knock or ring the doorbell.

[207] This case was reported by the caseworker on February 13, 2023, but was opened as a Priority 3 investigation for minimum standards violations associated with discipline. The investigation was upgraded after the HHSC investigator interviewed the child on February 17, 2023, and the child again alleged that the foster mother pinched both children and that she had pulled his hair. The investigator witnessed bruises on the nonverbal child's arms that could not be explained.

caseworker during a face-to-face visit with the children.[208] The staffing contact for the March intake (which occurred on March 13, 2023) indicates that when the DFPS investigator contacted the child's caseworker and "asked if [the child] would be removed from the home due to receiving another intake in less than 30 days," she told him that the case had been transferred from her caseload that day, and that she had seen the child "for a good-bye visit" the day before the intake. Under "Identified Safety Concerns/Needs and any related actions," the only documented action was that the DFPS investigator would go to the home to interview the children the day of the staffing and would reach out to the new caseworker.

- A staffing contact followed a March 15, 2023 intake for a 15-year-old PMC child that documented allegations that the child's foster parent was not giving the child her prescribed psychotropic medications. The intake was reported by the Heightened Monitoring inspector for the facility, who made the report after visiting the home, reviewing medication logs and counting the pills in the prescription bottles. The staffing narrative includes only the intake allegations, with no discussion of child safety or actions that would be taken to ensure safety. The intake allegations included that the child was supposed to be taking Abilify and Lexapro daily, but that there were still 20 pills left in each bottle on the day of the inspector's visit, though the prescriptions had been filled more than a month prior to the visit.[209]

---

[208] The seven-year-old boy recanted the allegations when he was interviewed by the DFPS investigator, and Physical Abuse was Ruled Out. On June 8, 2023, the behavior analyst for the nonverbal child made another report to SWI, alleging the child "is constantly having bruises show up all over her body" that are "documented but are unexplained." The foster mother blamed the behavior analyst for the bruising. Both children were removed from the home and placed in respite care.

There were two DFPS investigations of allegations of Physical Abuse in 2022, the first was reported after an outcry by a different child and the second after the nonverbal child came to school with a black eye; both were Ruled Out. The foster home changed CPAs and was verified by a different CPA (her third since first being licensed by Have Haven CPA on March 12, 2020) on October 31, 2023. There did not appear to be any children placed in the home as of November 4, 2023.

[209] The child's IMPACT records show that her primary CVS caseworker conducted a face-to-face visit with the child on March 9, 2023, and that during the visit, the child told the caseworker that she "[hadn't] really been taking her medications much." When the caseworker asked her why, the child answered that her foster parent "is not good about giving them to her" and "said she [was] fine without them." The caseworker "expressed her concern over her not taking them as prescribed" and told the child "that some medications have bad withdrawal symptoms." Nothing in IMPACT explains why the caseworker did not make a report to SWI after the conversation with the child. The investigation revealed that the child was spending weekends and vacations with a friend's family, and that the foster parent was not sending the child's medications with her on those visits, because the friend's parents were not trained in administering medications. HHSC issued a citation and an administrative penalty to the CPA because of HHSC's finding that the child was prescribed three medications (Lexapro, Cetirizine, and Ariprazole) that she was not receiving. When the CPA was advised of the result of the investigation, the CPA supervisor said the CPA "did not feel comfortable allowing [the child] to have control over her medication because [she] has suicidal ideation history." A Common Application dated December 9, 2022, showed the child had a history of six psychiatric hospitalizations ranging from two days to 19 days related to suicidal ideations.

- A staffing contact followed a March 19, 2023 intake for a ten-year-old PMC child that alleged that the child made an outcry to a police officer that, during a restraint, the foster parent choked him "with one hand around [his] neck." The intake alleged that after the foster parent restrained the child, he ran to a nearby business and asked them to call the police. According to the intake, the foster parent told the officer that the child became aggressive during an argument with an adopted child who lived in the home and she "had [the child] sit on the ground...crossed [the child's] arms across his body and held [his] arms to prevent assault." However, the officer reported that the 12-year-old adopted child who witnessed the restraint said the foster parent "had her hand over [the child's] face with [her] thumb on one cheek and fingers on [the child's] other cheek in a squeezing-type restraint." The staffing contact noted that the incident report completed by the foster parent claimed that the child ran out of the house because the foster parent turned off the child's cell phone, did not report a restraint, and said the child "told the officers he was not being abused and that he was just upset with [the foster parent]." The staffing contact does not document any planned follow-up except to "continue to keep the attorney Ad Litem and all other stakeholders informed of the case status" and "confer with the investigator once the case has been assigned."[210]

- A staffing contact followed a June 7, 2023 intake that alleged that a 16-year-old PMC child with an intellectual disability had a cut on her head after a "tussle" with a caregiver. The child was living in an HCS Group Home (Community Options, Inc.). The staffing occurred on June 13, 2023. According to the staffing contact, another child claimed to have witnessed the caregiver hit the child over the head with a glass jar. The child required medical attention including having four staples to close the wound; the child also had a hairline fracture to her skull. The intake also noted that there was no record of a background check for the alleged perpetrator. Under "Identified Safety Concerns/Needs and any related actions" the staffing contact noted, "The child's behaviors are concerning and there was an emergency staffing held on 06/13/2023."[211] Under "Plans for Future Actions/Next Steps" the staffing contact said, "All parties involved with the child are working to help find adequate solutions in addressing her behavioral issues."

- A staffing contact followed a June 20, 2023 intake that alleged that a 17-year-old child who was placed in a GRO made an outcry to her CVS caseworker that she had an allergic reaction after eating mangos. The GRO staff took the child to the doctor, who told them to monitor her condition. The child reported that she was worse the next day; that evening "puss was coming out of her mouth." The child reported that she continued to complain to staff that it was getting worse, and that she told staff

---

[210] The child's caseworker visited the home two days after the staffing and discussed the allegations with the child and the foster parents. The child recanted, and the foster parent said that when the child was arguing with the 12-year-old, she "stepped in by using her hand to covered [sic] [the child's] mouth to avoid [the child] fighting the other foster child." DFPS Ruled Out Physical Abuse (but found that the foster parent "sometimes would squeeze [the child's] face when redirecting him"). HHSC issued a citation for prohibited discipline, finding the foster parent placed her hand on the child's mouth to prevent him from talking back. The child is still placed in the home.
[211] The monitoring team did not find an IMPACT contact note for the emergency staffing.

that she was having difficulty breathing. Finally, three days after she was first taken to the doctor "it was way worse" and she was taken to the emergency room. According to the intake, the child told her caseworker that the doctor "told her that she should've been seen earlier and if she would've kept waiting her throat would've closed up." The child was given a steroid ointment for her mouth. Under "Plans for Future Actions/Next Steps" the staffing contact stated only, "I let [the child] know if anything like this happens in the future to reach out to me." The caseworker also indicated that the placement denied the allegations.

## PI Case Record Reviews

### Evidence of Caseworker Notification

The Monitors previously reported their findings regarding their review of 69 PI Investigations closed between January 1, 2023 and April 30, 2023 (including five related to those closed in that time period).[212] Among the 69 initial intakes that resulted in those PI investigations, the monitoring team found that there were no automated notifications to the caseworkers regarding the intake. To determine whether the children's caseworkers received any notification of the allegations, the Monitors reviewed the case contacts and found that in 70% (48) of children's IMPACT case contacts, caseworkers received notification of the allegations of abuse, neglect or exploitation, including the substance. In the remaining 21 intakes (30%), the monitoring team did not find evidence of notification to the caseworker in the child's record. Among these 21 intakes, one-third of them (5) did not yet identify the PMC child as a victim in the intake because the child was later identified as an alleged victim during the investigation.

Figure 54: Evidence of Notification to Caseworker in Case Contacts of Allegations of Abuse, Neglect or Exploitation Regarding PMC Children

---

[212] Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023); Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).



*Includes five intakes in which child was not named as an alleged victim in the intake report.

Of the 48 caseworkers who were notified, most of them (69% or 33 of 48) documented notification of allegations in the child's case contacts within two days of the initial intake report date;[213] the remainder (31% or 15 of 48) documented notification more than two days after the initial intake report date.

## Evidence of Caseworker Staffing

Forty-three of 69 (62%) intakes included caseworker documentation in the child's case contacts that a staffing related to the allegations of abuse, neglect or exploitation occurred.

Figure 55: Evidence of Caseworker Staffing Regarding Allegations

---

[213] DFPS requires caseworkers to document the staffing contact within one business day of receiving the original notification. Deborah Fowler & Kevin Ryan, Third Report 71, ECF No. 1165. In this instance, because there is no automated notification, the monitoring team could not make that determination but was able to determine the time between the SWI report and the staffing contact.



Most staffing contacts (77% or 33 of 43) were documented within two days of notification; the remainder (23% or 10 of 43) occurred more than two days after notification.

*Safety Actions Documented*

When the monitoring team found a staffing contact, the contact documented that the caseworker planned to take some action to ensure the child's safety 88% (38 of 43) of the time. In the remaining five staffing contacts, caseworkers documented that a safety action was not needed after review of the allegations of abuse or neglect. Of the 38 staffing contacts with a documented safety action(s), the most common safety actions documented were: monitoring and follow-up by the caseworker with the child or other individuals involved (23), follow-up regarding medical or psychological interventions (11), efforts to change the child's placement (10), and the development of a safety plan (10).

Table 16: Safety Actions Documented in Staffing Contacts

| Safety Actions Documented | Number of Staffing Contacts Containing Safety Action n=38 | Percent of Staffing Contacts Containing Safety Action n=38 |
|---|---|---|
| Monitoring/Follow-up | 23 | 61% |
| Medical/Psychological | 11 | 29% |
| Efforts to Change Placement | 10 | 26% |
| Safety Plan | 10 | 26% |
| Increase Supervision | 2 | 5% |
| Other | 9 | 24% |

Note: Total does not add up to 100% because some staffing contacts documented more than one action.

104

Finally, the Monitors' September 19, 2023 Update to the Court discussed PI investigations of alleged abuse and neglect of Child A and Child C, among other children, in HCS residences.[214] Below are the Monitors' findings regarding Remedial Order B5 as related to Child A and Child C.

For the five intakes[215] that included Child A as a named victim, there was no automated notification to the case worker; however, the child's case contacts contained evidence that Child A's caseworker received notification of all five allegations of abuse, neglect or exploitation. In response to each intake, the caseworker documented a staffing with other DFPS staff members regarding the intake allegations and the action(s) the caseworker or other parties planned to take. These documented actions included: reported efforts to increase the child's Level of Need (LON) at the placement; coordination with the placement to improve staff members' ability to respond to child's behavioral health needs; research of other available placements for child and completion of paperwork to request new placement(s); respond to child's immediate mental health needs through hospitalization and consultation with medical personnel; and review of appropriateness of a court-order to expedite child's placement change.

For the ten intakes[216] that included Child C as a named victim, there was no automated notification to the caseworker; however, the child's case contacts contained evidence that Child C's caseworker received notification of nine of the allegations of abuse, neglect or exploitation. In response to each of the nine intakes, the caseworker documented a staffing with other DFPS staff members regarding the intake allegations and the action(s) the caseworker or other parties planned to take. These documented actions included: coordination with placement regarding development of safety plan to increase supervision of the child, ensure the placement reports all incidents of elopement to SWI, and reiterate to placement that physical discipline is prohibited; conduct a face-to-face visit with the child to assess safety; advise placement that alleged perpetrator(s) cannot have access to child; and conduct searches for a new placement for the child.

## Summary

- The monitoring team found a staffing contact for most intakes included in the case record review, with more staffing contacts found for RCCI intakes than PI and CPI intakes.

- Most of the staffing contacts included notes documenting a staffing between the caseworker, supervisor and/or program director. When a staffing contact was found, the monitoring team determined that the staffing contact documented appropriate action in 69% (482 of 696) of all intakes reviewed.

---

[214] Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).
[215] One intake was excluded from this analysis because Child A was not a named alleged victim in the intake report.
[216] Two intakes were excluded from this analysis because Child C was not a named alleged victim in the intake reports.

## Remedial Order 37: Reporting Abuse and Neglect

*Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

### Background

As discussed in the Monitors' Second, Third, and Fifth Reports, the State's restrictions around the practice of downgrading abuse, neglect, and exploitation intakes for children in licensed placements dramatically reduced the number of downgraded intakes. DFPS's current protocol only permits these intakes to be downgraded to Priority None (PN) when the allegations were previously investigated or fall outside RCCI's jurisdiction to investigate. The Monitors' Fifth Report reviewed 22 intakes downgraded to PN involving PMC children between January 1, 2022, and June 30, 2022, revealing that none of the incidents occurred while any PMC child was placed in a foster home.[217] The monitoring team also reviewed four Home History Reviews (HHRs) completed and provided by the State during the six months reviewed and found concerns in two of the four.[218]

### Performance Validation

Based on data provided by the State, the Monitors identified 26 intakes related to a PMC child downgraded to PN between December 1, 2022 and June 30, 2023.[219] The monitoring team reviewed the 26 intakes and identified three intakes involving a PMC child in a foster home.

---

[217] Deborah Fowler & Kevin Ryan, Fifth Report 100, ECF No. 1318.

[218] *Id.* at 100-102.

[219] One intake involved two PMC children as alleged victims. For the 26 intakes downgraded to PN, the PN closure reason provided for these cases included "incident jurisdiction of other DFPS program," (12 or 46%), "incident addressed in previous case," (4 or 15%), and "incident responsibility of other agency/out-of-state," (10 or 38%).

SWI intake data includes a data field entitled "private CPA or CPS acting as a CPA," defined as "an indicator for whether the entity that the subject of the intake is a private Child Placing Agency (CPA) or Child Protective Services acting as a CPA (RCCI)." Of the 26 intakes downgraded to PN, 20 intakes were identified with "CPS as CPA" or "Private CPA." The other six intakes involved children living in GROs at the time of the allegations. Of the remaining 20 intakes with the CPA flag, only three involved children in foster homes. Of the remaining intakes, five involved children in a kinship placement, four involved children in an HCS home/Group Home, two involved children in a CWOP Setting, two involved children in an unauthorized placement, two involved children in a substance abuse placement and the remaining two involved children who were in a former home out of State and a hospital.

In reviewing the associated case records the three downgraded intakes involving a PMC child in a foster home, the monitoring found that one of the identified cases required an HHR staffing. DFPS had previously investigated the remaining two cases and determined for that reason, neither case required an HHR. The monitoring team reviewed each of the three cases and found no concerns.

In addition to the downgraded intakes identified in the data, DFPS provided an HHR for an intake that was not included in the data. A review of this HHR and associated records revealed that on March 15, 2023, SWI received a report concerning the fatality of a young child (either four or five years old). DFPS determined that the allegations did not fall under the jurisdiction of RCCI because the child had been adopted by the foster parent before the child's death. At the time of the child's death on May 9, 2021, an investigation was initiated by CPI and allegations of Neglectful Supervision were Ruled Out.

DFPS completed an HHR on March 16, 2023, as the foster home actively housed two sibling TMC children who were placed in the home on June 22, 2022. A third sibling was placed in the home on March 29, 2023; all three remained in the home as of October 23, 2023.[220]

## The State's Case Reads

The State conducted two case reads during the period reviewed by the Monitors for this report. The first case read covered the second quarter of Fiscal Year 2023, or December 1, 2022 through February 28, 2023; the second covered the third quarter of Fiscal Year 2023 (March 1, 2023 through May 31, 2023). In its case read for the period December 1, 2022 through February 28, 2023, the State reported that 11 reports of abuse, neglect or exploitation were made to SWI that involved a PMC child placed in a foster home and later downgraded to PN. Of these 11 reports, three required an HHR and the remaining eight involved an incident that did not occur in a foster home.

In the three cases requiring an HHR, the State found that the HHR was completed within the 48-hour time frame required by DFPS policy. The Monitors confirmed an accurate summary of the HHR was included in the narrative, as was the summary of the staffing with the supervisor, and details or actions taken by the caseworker or supervisor.

The State's second case read covered March 1, 2023 through May 31, 2023, or the third quarter of Fiscal Year 2023. Of the 17 reports made to SWI involving a PMC child placed in a foster home that was downgraded to PN, none required an HHR. Of the 17 reports:

- 14 involved incidents that did not occur in a foster home;
- One involved a foster home that was no longer open;
- One involved a home where no children were placed; and

---

[220] As a result of the downgraded intake, RCCR conducted a risk assessment. RCCR Minimum Standards Investigation #2980938 resulted in a citation for physical environment due to two exposed electrical outlets in the home. The home inspection also yielded citations for Medication Storage, Smoke Detectors, physical environment, and Trampolines – ladders.

- One was called back into SWI for an investigation.

## Comparison of Monthly Intake Data and State's Case Read Data

The Monitors compared data produced by the State for the HHR Case Read for the second and third quarters of Fiscal Year 2023 (December 2022 to May 2023) to monthly intake data provided to the Monitors. Both data sets included all RCCI intakes involving a child in PMC status that the State downgraded to PN. Between December 1, 2022 and May 31, 2023, 21 intakes were downgraded to a PN as the final priority in the monthly data.[221] All but one of these intakes were identified in the State's case read data over the same period.[222]

In addition to the 20 intakes that were found in both the monthly data and the State's case read data, the State's case read included information for eight intakes not found in the monthly data. Two of these eight involved other PMC children residing in a foster home at the time of the SWI intake but who were not alleged victims. These children were included in the HHR for the allegation, their caseworkers were notified, and required staffings occurred. The remaining six intakes found in the State's case read data, but not in the monthly data, did not occur in a foster home, and did not require an HHR.

## Summary

The Monitors reviewed 26 intakes involving PMC children downgraded to PN between December 1, 2022, and June 30, 2023 and identified three intakes involving a PMC child in a verified foster home. One of the identified cases required an HHR staffing. DFPS had previously investigated the remaining two cases and found that neither case required an HHR. The monitoring team reviewed each of the three cases and found no concerns.

HHSC provided an HHR for an intake that was not included in the data. This HHR involved a report concerning the fatality of a four or five-year-old child. DFPS determined that the allegations did not fall under the jurisdiction of RCCI because the child had been adopted by the foster parent before the child's death. At the time of the child's death on May 9, 2021, CPI initiated an investigation and allegations of Neglectful Supervision were Ruled Out.

The State conducted two case reads during the period reviewed by the Monitors for this report. In its first case read, the State reported that 11 reports of abuse, neglect, or exploitation made to SWI involved a PMC child placed in a foster home and later downgraded to PN. Of these 11 reports, three required an HHR and the remaining eight involved an incident that did not occur in a foster home.

---

[221] Six downgraded intakes were found in the June 2023 intake data, which were included in the monitoring team's review.
[222] One intake not identified in the State's case read data took place at a GRO and, therefore, it did not meet the criteria for an HHR.

# Organizational Capacity

## Remedial Order 1: CPS Professional Development

*Within 60 days, the Texas Department of Family Protective Services (DFPS) shall ensure statewide implementation of the CPS Professional Development (CPD) training model, which DFPS began to implement in November 2015.*

### Background

As discussed in the Monitors' prior reports, the training model ordered in RO 1 is required for DFPS caseworker training, as well as for SSCCs that enter Stage II of the CBC model, at which time DFPS transitions responsibility for casework services to the SSCCs.[223] The Monitors' prior reports analyzed the training programs adopted by the first two SSCCs (OCOK and 2Ingage) to transition to Stage II. The Third Report confirmed that the abbreviated training that 2Ingage initially adopted was inconsistent with the CPD training model but noted that the SSCC transitioned to the full CPD training in March 2021. The Fifth Report was the first for the revised 2Ingage training program and for the St. Francis training program. Both were determined to be consistent with the CPD training model. This report is the first to assess the performance of Belong, which transitioned to Stage II in October 2022.

### Performance Validation

#### Caseworkers Hired and Trained by DFPS

DFPS hired 440 caseworkers between September 1, 2022 and March 31, 2023.[224] Of those hired, 426 (97%) were subject to full or partial CPD training before being assigned cases while 14 (3%) were exempt from training, including nine transfer employees and five rehired employees. Seventy-eight of the 426 caseworkers hired who were subject to CPD training (18%) left the agency before or during CPD training and were excluded from the cohort analysis. A total of 348 caseworkers were tracked for CPD training completion.

Figure 56: DFPS Caseworkers Hired September 2022 – March 2023 and Included in CPD Training Completion Analysis

---

[223] Deborah Fowler & Kevin Ryan, Fifth Report 100, ECF No. 1318; Deborah Fowler & Kevin Ryan, Third Report 90, ECF No. 116; Deborah Fowler & Kevin Ryan, First Report 156, ECF No. 869.

[224] Data limitations discussed in the Monitors' previous reports still apply. *See* Deborah Fowler & Kevin Ryan, Third Report 92, ECF No. 1165. The analysis included in this report covers a cohort of all CVS caseworkers hired, including transfers and rehires, between September 2022 and March 2023. This cohort was tracked through July 2023, the latest data available at the time of the analysis, to determine if hired caseworkers became case assignable (the proxy used for completing CPD training) within that time. The case assignable date is the date used as a proxy for training completion because DFPS and the SSCCs have not been able to provide actual training completion dates (OCOK provides a cohort completion date; but it is estimated, not actual).



Three hundred ten of 348 caseworkers (89%) were subject to full CPD training, including 260 new hires and 50 transfers and rehires, while 38 caseworkers (11%) were transfers and rehires subject to partial CPD training.

Figure 57: DFPS Caseworker CPD Training Completion by Training Level



According to DFPS, CPD training takes an average of 13 weeks (91 days) to complete. Of the caseworkers subject to training, 297 of 310 (96%) had completed full CPD training

and 34 of 38 (89%) had completed partial CPD training by July 31, 2023.[225] The average time taken to complete full CPD training was 97 days, with a range of 79 to 197 days. Eleven of the 297 caseworkers who completed full CPD training did so more than seven and up to 11 days earlier than expected given the expected timeline of 91 days to complete CPD training.

Of the 17 caseworkers (13 new hires and four transfers or rehires) for whom the monitoring team could not validate completion of CPD training, none were identified as having a full caseload before completing CPD training.[226]

## Caseworkers Hired and Trained by SSCCs

There were four SSCCs with Permanency Specialists and Permanency Case Managers (caseworkers) serving PMC children during the study period:[227] OCOK, 2INgage, St. Francis, and Belong. Belong was the only SSCC to enter Stage II of the CBC model during the September 2022 through March 2023 study period. The initial hiring of case assignable permanency specialists for Belong, including DFPS transfer staff (resource transfers), began in October 2022.

Training curricula differed slightly across the four SSCC agencies, but all were consistent with the CPD training model used by DFPS:

- The OCOK Permanency Academy training is eight weeks, consisting of 50% field work and 50% classroom time, and is conducted by alternating two weeks of classroom training with two weeks of training in the field. Staff complete two to six weeks of fieldwork while awaiting the start of their Permanency Academy training in addition to a one-week orientation specific to OCOK. In total, the expected time to complete OCOK CPD training is ten to 14 weeks (70 to 98 days).

- Originally designed to last three weeks, 2INgage lengthened the fieldwork portion of the training curriculum to ten weeks in March 2021 after the Monitors raised concerns about adherence to Remedial Order 1. Since 2021, the estimated time to complete CPD training for 2INgage is 13 weeks (91 days), matching the average length of time that DFPS reports it takes to complete CPD training.

- Both St. Francis and Belong follow the same curriculum outline, training, and timeline as the DFPS 13-week CPD training, including the Individualized Training Plan (ITP). In the tenth week of the program, staff meet with supervisors to discuss progress and determine whether extended training time is needed. If the protégé

---

[225] Training completion could not be verified for 17 DFPS caseworkers.

[226] Not identified in the CVS caseloads data as of July 31, 2023. One of the 17 caseworkers that did not complete training (6%) transferred internally from a Foster and Adoptive Home Development position and was noted to have a delay in beginning CPD training because the caseworker was continuing to work on cases from their previous position and may not have had time to complete training. Seven (of 17, 41%) new hires started CPD training in April 2023 and may not have had time to complete the training.

[227] For SSCC staff who provide caseworker services, Permanency Specialist is the job title used by OCOK, Belong and St. Francis; Permanency Case Manager is the title used by 2INgage.

needs additional training time, the supervisor must approve the extension. The estimated average time to complete CPD training for St. Francis and Belong is identical to DFPS at 13 weeks. In addition to the ITP curriculum, new hires for St. Francis and Belong complete two weeks of agency-specific orientation before beginning CPD training.

The SSCCs hired 187 caseworkers between September 2022 and March 2023; 121 of the 187 (65%) were subject to full or partial CPD training while 66 of the 187 (35%) were exempt from training. Of these, Belong hired 111, OCOK hired 34, St. Francis hired 29, and 2INgage hired 13.

Of the 111 caseworkers hired by Belong, 55% (61 of 111) were direct transfers from DFPS and exempt from training requirements. Two of OCOK's 34 new staff (6%) were exempt from training, and St. Francis had three (10%) of 29 newly hired staff exempt from training. There were not any training exemptions for the 13 newly hired staff for 2INgage.

Figure 58: SSCC Permanency Specialists and Permanency Case Managers (Caseworkers) Hired September 2022 – March 2023 and Included in CPD Training Completion Analysis



Twenty of the 121 (17%) caseworkers hired who were subject to full or partial training left the SSCC before or during training. The proportions varied by agency. Two of 2INgage's 13 newly hired staff who were subject to training (15%) left before or during training, 9% of OCOK's new staff left (3 of 32), 4% of St. Francis's new staff (1 of 26) left, and 28% of

Belong's new staff (14 of 50) left before or during training. A total of 101 SSCC employees were tracked for CPD training completion.

Of the 101 SSCC caseworkers who were subject to full or partial training, 92 (91%) were subject to full CPD training, while nine caseworkers (9%) were subject to partial CPD training. Of SSCC caseworkers subject to full CPD training, 80 of 92 (87%) had completed training by July 31, 2023, while for nine caseworkers subject to partial CPD training all (100%) had completed training.

Figure 59: SSCC Caseworker CPD Training Completion by Training Level



For those subject to full training, the average time to complete training was 98 days with a range in training time of 70 to 135 days.[228]

Table 17: SSCC Number of Hires from September 2022 – March 2023 Completing Full Training and Average, Minimum, and Maximum Days to Completion

|  | N | Average (Days) | Minimum (Days) | Maximum (Days) |
|---|---|---|---|---|
| **OCOK** | 24 | 96 | 88 | 129 |
| **St. Francis** | 21 | 98 | 70 | 120 |
| **Belong** | 25 | 101 | 88 | 135 |
| **2INgage** | 10 | 98 | 78 | 119 |

---

[228] Of the nine permanency specialists who completed partial training, the average time to complete training was 55 days.

| SSCC | 80 Total | 98 Average | 70 Min | 135 Max |
|------|----------|------------|--------|---------|

The 12 caseworkers for whom the monitoring team could not validate completion of CPD training were not identified in the full caseload data before July 31, 2023. Two of the 12 (17%) were with OCOK, four were with St. Francis (33%), and six (50%) were with Belong. All of 2INgage's staff were validated in the data. Nine of the 12 caseworkers (75%) who did not complete training had cohort start dates in April or May 2023, so it is possible they had not completed training by the end of July 2023.[229] None of the 12 SSCC hires were identified as having a caseload before completing training.[230]

## Remedial Orders B1-B4: RCCI and RCCR Investigator Caseloads

*Remedial Orders B1:* *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

*Remedial Order B2:* *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

*Remedial Order B3:* *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

---

[229] Of the 12 permanency specialists who did not complete training by July 31, 2023, three Belong workers were confirmed to have completed the training as of August 31, 2023.

[230] The Monitors made this determination using the caseloads data reports as of July 31, 2023 submitted by the State.

***Remedial Order B4:*** *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators or successor staff.*

## Background

As discussed in the Monitors' prior reports, on December 16, 2019, the Court entered an agreed order that, in part, required DFPS and HHSC to use standardized, statewide caseload guidelines of 14 to 17 investigations per RCCI (DFPS) investigator and 14 to 17 tasks per RCCR (HHSC) inspector. On February 18, 2020, the State sent the Monitors the guidance developed for HHSC and DFPS staff related to the caseload guidelines.[231]

In the Fifth Report, the Monitors found that nearly 100% of RCCI investigator caseloads were at or below the guidelines for the twelve months included in the analysis.[232] The majority of RCCR inspectors' caseloads were also within the guidelines in all months analyzed for the Fifth Report.[233]

For this report, the Monitors analyzed caseloads for RCCI and RCCR for the 12 months of July 2022 through June 2023, using point-in-time caseload data submitted by the State.

## Performance Validation

### RCCI Caseloads

The Monitors analyzed monthly caseload data for RCCI investigators, supervisors, and non-RCCI investigator staff working on RCCI investigations.[234] The total number of open RCCI investigations declined through the end of 2022, then increased by 79% from December 2022 to June 2023 (from 220 investigations in December 2022 to 393 investigations in June 2023). Overall, the number of investigations assigned to a caseload increased 18% between July 2022 and June 2023.

Figure 60: Number of RCCI Investigations by Month, July 2022 to June 2023

---

[231] Deborah Fowler & Kevin Ryan, First Report 182-84, ECF No. 869.
[232] *Id.* at 128.
[233] *Id.* at 132.
[234] Each month, DFPS produces point-in-time caseload data for RCCI investigators, supervisors, and non-RCCI investigator staff assigned as the primary on an investigation as of the last day of the month.



The number of RCCI investigators assigned to at least one investigation varied throughout the period, from a low of 63 investigators assigned at least one investigation in November 2022, to a high of 86 assigned at least one investigation in June 2023.[235] Between July 2022 and June 2023, RCCI investigator caseloads were consistent with or below the guidelines in all but one of the months reviewed.

Table 18: RCCI Investigators with Caseloads at or Below the Guidelines, July 2022 to June 2023[236]

| Month/Year | RCCI Investigators with at least one Investigation | 17 or Fewer Investigations | |
|---|---|---|---|
| | No. | No. | % |
| July 2022 | 76 | 75 | 99% |
| August 2022 | 75 | 75 | 100% |
| September 2022 | 71 | 71 | 100% |
| October 2022 | 66 | 66 | 100% |
| November 2022 | 63 | 63 | 100% |
| December 2022 | 72 | 72 | 100% |

---

[235] This number reflects the investigators who were assigned at least one investigation as of the last day of the month. Monthly differences in the number of investigators assigned commonly relate to staff leaving the position, staff hired but not yet case assignable, and staff on extended leave as of the last day of the month.

[236] The figure includes only investigations assigned to an RCCI investigator as of the last day of the month.

116

| | | | |
|---|---|---|---|
| January 2023 | 73 | 73 | 100% |
| February 2023 | 74 | 74 | 100% |
| March 2023 | 80 | 80 | 100% |
| April 2023 | 78 | 78 | 100% |
| May 2023 | 84 | 84 | 100% |
| June 2023 | 86 | 86 | 100% |

Approximately three-quarters[237] of RCCI investigators had five or fewer investigations on their caseload in nine of the 12 months analyzed. No RCCI investigator was assigned to more than 13 investigations in 11 of the 12 months analyzed. In July 2022, one investigator was assigned 18 investigations.

Figure 61: RCCI Investigator Caseloads by Number of Investigations, July 2022 to June 2023



As discussed in the Monitors' previous reports, RCCI supervisors, master investigators, and non-investigator staff sometimes act as the primary investigators in an investigation. The number of investigations assigned to staff other than RCCI investigators ranged from one to 26 per month analyzed and accounted for up to 8% of investigations assigned in the month. Other staff assigned as the primary on an RCCI investigation included master investigators (48% of investigations assigned to non-RCCI investigators), administrative

---

[237] In April and May, 74% of RCCI investigators had five or fewer cases. In September, October and February one-third of investigators had five or fewer cases on their caseload.

assistants (27% of investigations assigned to non-RCCI investigators), and supervisors (25% of investigations assigned to non-RCCI investigators).[238]

Figure 62: RCCI Investigations by Staff Assigned as Primary on the Investigation, July 2022 to June 2023



Staff assigned as the primary on an RCCI investigation may also be assigned secondary tasks related to an investigation that is not on their caseload. DFPS reported 220 secondary assignments between July 2022 and June 2023. The majority (89% or 195 of 220) of these secondary assignments were assigned to RCCI investigators.[239] Secondary assignments did not affect the caseloads of those investigators for purposes of the guidelines.

Figure 63: RCCI Secondary Assignments by Month, July 2022 to June 2023

---

[238] Staff titles included CPI Master Investigator, CPS Master Investigator, CCI Master Investigator, RCCL Administrative Assistant, RCCL Supervisor, and SWI Supervisor.
[239] Supervisors were assigned 6% (13 of 220) of secondary assignments and master investigators were assigned 5% (12 of 220).



## RCCR (HHSC) Caseloads

RCCR caseloads consist of "tasks," including investigations referred from RCCI for minimum standards review, minimum standards investigations, assigned operations, and sampling inspections in agency foster homes. According to the point-in-time caseload data provided by HHSC, the total number of RCCR tasks assigned to RCCR caseloads[240] increased by 5% between July 2022 and June 2023.[241] The slight increase contrasts with the 21% decline in RCCR tasks documented by the Monitors in the Fifth Report.[242]

Figure 64: Number of RCCR Tasks, July 2022 to June 2023

---

[240] Includes tasks assigned the RCCR inspectors, Heightened Monitoring inspectors, and supervisors. The number of tasks does not include administrative reviews assigned to the caseload of RCCR supervisors or RCCR inspectors. RCCR inspectors are assigned administrative reviews after completion to ensure operation notification and compliance and to close the investigation in CLASS.

[241] Each month, HHSC produces point-in-time caseload data for RCCR and Heightened Monitoring inspectors and supervisors as of the first day of the month.

[242] Deborah Fowler & Kevin Ryan, Fifth Report 131, ECF No. 1318.



Facility inspections (which include both monitoring inspections of assigned operations and sampling inspections of foster homes) consistently accounted for most inspection and investigation tasks, ranging from 59% to 65% of tasks per month.[243] Both facility and investigation tasks increased during the period. Administrative reviews declined, primarily due to a policy change regarding the entity within HHSC responsible for conducting administrative review tasks.[244]

Figure 65: Number of Facility and Investigation Tasks and Administrative Reviews by Month, July 2022 to June 2023



---

[243] Percentage includes all facility and investigation tasks and does not include administrative reviews.
[244] In July 2022, the responsibility for conducting administrative reviews was transferred from RCCR supervisors to the Child Care Enforcement (CCE) division within HHSC.

The majority of RCCR inspectors' caseloads were within the guidelines throughout the review period, with the number of RCCR inspectors assigned at least one task in the month ranging from a low of 84 inspectors in November 2022 to a high of 93 inspectors in February 2023.

Table 19: RCCR Inspectors with Caseloads[245] at or Below the Guidelines, July 2022 to June 2023

| Month/Year | Inspectors with at Least One Task | 17 or Fewer Tasks | |
|---|---|---|---|
| | No. | No. | % |
| July 2022 | 93 | 86 | 92% |
| August 2022 | 88 | 82 | 93% |
| September 2022 | 88 | 83 | 94% |
| October 2022 | 87 | 83 | 95% |
| November 2022 | 84 | 79 | 94% |
| December 2022 | 88 | 87 | 99% |
| January 2023 | 87 | 83 | 95% |
| February 2023 | 93 | 91 | 98% |
| March 2023 | 91 | 91 | 100% |
| April 2023 | 89 | 84 | 94% |
| May 2023 | 90 | 81 | 90% |
| June 2023 | 86 | 72 | 84% |

Although most RCCR inspectors had caseloads that were within the guidelines in the period reviewed, caseload highs ranged from 17 to 26 tasks. In 11 of the 12 months reviewed, at least one and as many as 14 inspectors had caseloads above the guidelines.

Figure 66: RCCR Inspector Caseload High and Low by Month, July 2022 to June 2023

---

[245] The Table includes only tasks assigned to an RCCR inspector as of the first day of the month. It does not include team inspections, designee assignments, or administrative reviews assigned to RCCR inspectors.



In addition to RCCR inspectors, RCCR tasks may be assigned to Heightened Monitoring inspectors and RCCR supervisors.

When HHSC developed policies and procedures associated with Heightened Monitoring, it created new positions for staff dedicated to operations under Heightened Monitoring. Heightened Monitoring inspectors work with between five and eight Heightened Monitoring operations as part of the Heightened Monitoring process. Beginning in March 2021, RCCR began assigning agency home inspections and Priority Five (desk review only) minimum standards investigations to Heightened Monitoring inspectors.[246]

In October 2022, RCCR began transitioning all inspections[247] of operations on Heightened Monitoring to Heightened Monitoring inspectors. Risk Assessments conducted for RCCI investigations at operations on Heightened Monitoring were also transitioned to Heightened Monitoring inspectors, along with the responsibility to receive completed RCCI investigation transfers and send out notifications to providers on Heightened Monitoring.[248] The result was an increase of more than 550% in the number of RCCR tasks assigned to Heightened Monitoring inspectors and a 6% decrease in the number of tasks assigned to RCCR inspectors between July 2022 and June 2023.[249] Even with the increase in tasks, 100% of Heightened Monitoring inspectors had caseloads within the guidelines in all months of the review period.

---

[246] In March 2021, RCCR began assigning up to five Priority Five investigations to Heightened Monitoring inspectors. In February 2022, assignments to Heightened Monitoring inspectors changed to allow up to eight Priority Five investigations and agency home inspections.

[247] Includes monitoring inspections, follow-up inspections, probation inspections, and plan of action inspections at operations on Heightened Monitoring.

[248] DFPS, *Blueprints for Quality Investigations* (September 2022) (on file with the Monitors).

[249] Before the transfer in October 2022, while Heightened Monitoring inspectors worked with operations on Heightened Monitoring, the responsibility for all non-Heightened Monitoring inspections at these operations was assigned to RCCR inspectors.

Between July 2022 and June 2023, RCCR supervisors had a total of 27 tasks and 510 administrative reviews assigned to their caseloads. As of July 1, 2022, the responsibility for conducting an administrative review of a citation related to an investigation was transitioned from RCCR and RCCR supervisors to HHSC's Child Care Enforcement (CCE) division. Administrative reviews requested before July 1, 2022 remained with RCCR supervisors through completion.[250] As of June 1, 2023, six RCCR supervisors had seven administrative reviews assigned to their caseload, down from 16 supervisors assigned 88 administrative reviews on July 1, 2022.

Figure 67: Number of Administrative Reviews Assigned to RCCR Supervisors, July 2022 to June 2023



RCCR inspectors continue to have administrative reviews assigned to their caseloads; however, the inspector is not responsible for investigation activities while the administrative review is pending and is not responsible for conducting administrative review tasks.[251] A total of 239 administrative reviews were on RCCR inspectors' caseloads during the review period. The number of administrative reviews assigned to RCCR inspectors ranged from four to 35 per month.

**Validation of RCCR Caseloads**

Interviews with RCCR and Heightened Monitoring Staff

---

[250] E-mail from Elizabeth Hendrie, Attorney, Litigation Dep't., HHSC, to Nancy Arrigona, Monitoring Team (August 18, 2023).
[251] *Id.*

The monitoring team conducted interviews with RCCR and Heightened Monitoring inspectors and supervisors to determine if their reported caseload at the time of the interview was consistent with the case assignment list retrieved from CLASS on the morning of the interview.[252] The monitoring team conducted interviews on February 1, March 1, May 1, and June 1, 2023. A total of 48 inspectors and 14 supervisors were interviewed.[253]

Thirteen of the 48 inspectors (27%) who were interviewed reported that the CLASS case assignment did not accurately reflect their caseload.[254] The 13 inspectors reported inaccuracies for a total of 23 tasks, 15 of which were tasks the inspector reported but were not found on the case assignment list and eight of which were on the case assignment list but not reported by the inspector. The 23 tasks represented 6% of all tasks (23 of 415) reported by inspectors during interviews. Most of the 23 tasks were sampling inspections (16 of 23 or 70%) and transferred RCCI (DFPS) investigations (4 of 23 or 17%).[255]

Figure 68: Number of Inspector Tasks Not Matching on Day of Interview by Type

---

[252] Staff were randomly selected for interview based on a listing of all active RCCR and Heightened Monitoring staff provided by HHSC on January 8, 2023 and April 5, 2023. To be eligible for interview inspectors had to have been case assignable and supervisors had to have been in their position at least 30 days. Priority for selection was given to those staff that had never been interviewed by the monitoring team.
[253] RCCR staff interviewed included 24 RCCR inspectors, 24 Heightened Monitoring inspectors, eight RCCR supervisors, and six Heightened Monitoring supervisors.
[254] Case assignment lists were pulled from CLASS on the morning of the interview. Three additional inspectors reported that the CLASS case assignment list did not accurately reflect their caseloads, but the difference was explained by timing of the interview (i.e., changes to the case assignment list took place after the lists were pulled but before the interview that day).

In April 2022, when the monitoring team was in the process of scheduling the second set of interviews with HHSC inspectors conducted for the Fifth Report, the monitoring team learned that the caseload reports that had been provided for HHSC inspectors prior to their interviews had been pulled from the same dataset used to produce monthly data to the Monitors. For that reason, the process for validating HHSC's caseload data was changed, requiring case assignment lists to be pulled from CLASS. This was discussed in footnote 210 of the Fifth Report. Deborah Fowler & Kevin Ryan, Fifth Report 136, ECF No. 1318.
[255] Tasks not matching at the time of interview also included one assigned operation, one non-ANE investigation, and one investigation pending administrative review.

124



Fourteen percent of supervisors interviewed (2 of 14) had caseloads that did not match their case assignment list.[256] These supervisors reported that two tasks that were on their case assignment list were not on their caseload and reported that they had one task on their caseload that was not reflected on their case assignment list. These tasks included two transferred RCCI investigations and one investigation pending administrative review. The monitoring team reviewed case assignment lists for up to seven days after interviews to determine whether tasks that did not match on the day of the interview were resolved in CLASS after the interview. The differences were resolved the next day for four of the 13 inspectors (31%) and within seven days for another inspector (8%). The differences remained unresolved for 61% of inspectors (8 of 13) seven days after the day of the interview.[257] Fifteen of the 23 tasks that were reported as differences (65%) remained unresolved seven days after the day of the interview.

Though the discrepancies would not have resulted in any of the interviewed inspectors' caseloads exceeding the guidelines, the identification of the differences led to an additional analysis, described below, that identified numerous discrepancies between CLASS case assignment lists and monthly caseload data provided by the State. This analysis, and subsequent conversations with HHSC, raised concerns related to the reliability of the monthly caseload data provided by HHSC.

### Matching Case Assignment List Data with Monthly Caseload Data

The monitoring team selected a random sample of 95 RCCR and Heightened Monitoring inspectors active during the months of February, March, May, and June 2023 to validate

---

[256] An additional four supervisors had tasks not matching their caseload on the day of interview but were explained by timing. All these tasks were intakes. Case assignment lists pulled from CLASS included intake cases assigned to supervisor caseloads. These intake cases were included in the caseload/case assignment analysis.

[257] Overall, 73% of reported caseloads matched the inspector's case assignment list on the day of interview (35 of 48), 10% of caseloads did not match but were resolved within seven days of the interview (5 of 48), and 17% of reported caseloads did not match the case assignment list and were not resolved within seven days.

monthly caseload data received from HHSC.[258] Case assignment lists were pulled from CLASS on the morning of February 1, March 1, May 1, and June 1, 2023 for each inspector sampled. Tasks found on these case assignment lists[259] were matched to the caseload data provided by HHSC for the same months.[260] The analysis matched each task based on type of case, operation or investigation number, employee ID, and month.

The monitoring team found one or more inconsistencies between the monthly caseload data and the CLASS case assignment list for 42% of inspectors (40 of 95) during the period analyzed.[261] These inconsistencies included tasks that were on the case assignment list but not included in the monthly caseload data, tasks that were included in the monthly caseload data but were not in the case assignment list, and tasks that were found in the caseload data and case assignment list but assigned to different inspectors.

A total of 69 tasks did not match, accounting for 8% of the 877 tasks on the sampled inspectors' CLASS case assignment lists for the months analyzed. Forty-one of these tasks were found on the inspectors' case assignment list but were not in the monthly data, and 28 tasks were included in the monthly data but were not on the inspectors' CLASS case assignment list.

**Figure 69: Inspectors with Monthly Caseloads Matching Case Assignment Data**



---

[258] All inspectors selected for interview were included in the sample. Additional inspectors were randomly selected from data identifying active RCCR and Heightened Monitoring staff provided by HHSC on January 7, 2023, and April 11, 2023. An inspector could have been sampled in multiple months. Sixty-eight inspectors were sampled for a total of 95 unique inspector months.

[259] Intakes assigned to inspectors were not included in the analysis as monthly data provided by HHSC does not include intake cases.

[260] Each month, HHSC produces point-in-time caseload data for RCCR and Heightened Monitoring inspectors and supervisors as of the first day of the month.

[261] Three supervisors had one or more caseload errors during the period analyzed.

126

The monitoring team's validation of the monthly caseload data through interviews and the match between caseload data and CLASS case assignment lists, and subsequent conversations with HHSC, identified several issues that affect the accuracy of RCCR's reported inspector caseloads.[262] Based on the review conducted by the monitoring team, the issues that impact caseload accuracy include:

- Investigations that remain on an inspector's caseload when pending an administrative review appear to be active tasks when the inspector is not responsible for any work associated with the investigation.

HHSC guidelines instruct that when an administrative review is requested by an operation, the investigation should be transferred from the RCCR inspector's caseload to the CCE Division within one business day of the date the completed review request is received.[263] The CCE is responsible for conducting all administrative review tasks. Once complete, the investigation is transferred back to the RCCR inspector, and it appears on their case assignment list with the administrative review field marked "Y" until all notifications have been made and the investigation is closed in CLASS. Cases that remain on an inspector's caseload as an investigation while under administrative review appear to be active investigations.

Example: At the time of the August 1, 2023 interview, inspector A's case assignment list indicated that the inspector was assigned a minimum standards investigation that was not pending administrative review. The inspector mentioned that they were not actively working on the investigation because it was pending administrative review. Review of the investigation in CLASS showed that administrative review was requested July 19, 2023.

- Tasks associated with operations and investigations assigned to non-RCCR or non-Heightened Monitoring inspectors or supervisors are not included in the monthly caseload data received from HHSC.

Monthly caseload data are pulled based on the designated positions of RCCR inspector, Heightened Monitoring inspector, and supervisor. When operations and investigations are assigned to a position other than one of these designated positions, the task does not appear in the caseload data and is not included in the count of RCCR tasks. All open operations and assigned investigations not pending administrative review are considered RCCR tasks.

---

[262] The monitoring team identified numerous discrepancies in inspector caseloads during the validation process. The Monitors met via telephone with HHSC staff members on August 16, 2023 to discuss policy and the usual processes for the assignment to and removal of tasks on inspector caseloads. Following the meeting, the monitoring team provided HHSC with examples of instances for which task assignment and removal did not appear to conform with policy or usual process. HHSC responded on September 15,2023, providing explanations for identified discrepancies.

[263] HHSC, *HHSC response to 8.18.23 Caseload questions with examples*, September 15, 2023 (on file with the Monitors); HHSC, *CCE Residential Child Care Administrative Review Processing and Transfer Guidelines*, September 12, 2023 (on file with the Monitors).

Example: Two branches of an open CPA were transferred to a program specialist in the CCE division on March 6, 2023. These branches were not included as assigned tasks in the monthly caseload data from April through August 2023. When the monitoring team asked HHSC why the branches were no longer included in the monthly data, HHSC responded that the main and branch operations were transferred to the CCE program specialist in error. The main and branch operations were transferred back to an RCCR inspector on August 30, 2023.[264]

- Delays in transferring active operations and investigations when an inspector leaves employment with RCCR result in operations, inspections, and investigations that are not assigned to active RCCR inspectors, Heightened Monitoring inspectors, or supervisors and are not included in the monthly caseload data.

Example: The operation Heart to Heart Family Services appears as an assigned operation in the monthly caseload data in March and May 2023 but did not appear in the April data. When the monitoring team asked HHSC why the operation was not included in April caseload data, HHSC responded that the inspector assigned to the operation left employment and the operation was not transferred to another RCCR inspector until April 10, 2023.[265]

This review calls into question the accuracy of the monthly caseload data that is being used to validate HHSC's compliance with caseload standards. However, the Monitors cannot determine what impact (if any) these errors (and others like them) have on compliance with the caseload standards. Though the monitoring team's review identified tasks that should have appeared in the monthly caseload data but did not, and tasks that appeared in the caseload data but were associated with administrative reviews that had been (or should have been) transferred to CCE staff, the Monitors do not know whether the issues represent an exhaustive list of the data discrepancies because, for example, the monthly caseload data do not include data associated with tasks that are assigned to a non-inspector or supervisor.

## Summary

All reported RCCI investigators' caseloads were within the guidelines in every month of the 12-month period analyzed, with the exception of July 2022. Though most RCCR inspectors' caseloads appear to have been within the guidelines in every month of the 12-month period analyzed, the monitoring team's efforts to validate caseload data raised some questions regarding the accuracy of the monthly caseload data provided to the Monitors by HHSC.

## Remedial Order 2: Graduated Caseloads

---

[264] *Id.*
[265] *Id.*

*Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

## Background

Pursuant to the generally applicable, internal caseload standards, effective February 15, 2020, in the first month following a protégé worker's eligibility for primary case assignment, per DFPS's policy, the protégé's caseload may not exceed six children.[266] In the second month of eligibility, the protégé's caseload may not exceed 12 children.[267] In the third month of eligibility, the protégé is eligible to be assigned a full caseload.[268]

DFPS provides monthly data reports to the Monitors for its caseworkers, along with dates associated with primary case assignment eligibility. In its monthly reports, DFPS includes compliance data reporting on caseloads for the 15th and 45th days after caseworkers' eligibility for primary case assignment.[269] DFPS provides the same information for caseworkers employed by the SSCCs responsible for case management in their respective regions.

## Remedial Order 2 Graduated Caseloads Results and Performance Validation

The Monitors evaluated the State's performance associated with Remedial Order 2 through analysis of the data provided by DFPS about its own caseworkers and the caseworkers employed by OCOK, 2INgage, St. Francis, and Belong, the four SSCCs responsible for case management during this period, consistent with prior reporting periods.[270,271] To further validate the accuracy of the State's caseload data, the monitoring team also interviewed 48 randomly selected caseworkers during this reporting period who were subject to graduated caseloads and validated the data in the caseload reports.

For this report, the monitoring team examined the caseloads of caseworkers who became eligible for case assignment between July 1, 2022 and June 30, 2023. As in prior

---

[266] DFPS, *Generally Applicable Caseload Standards – Guidelines for Conservatorship (CVS)*, at 8 (July 2020).

[267] *Id.*

[268] *Id.*

[269] DFPS reported in March 2020 that it was unlikely it could report on the daily compliance data for graduated caseloads in the near term as requested. *See* E-mail from Tara Olah to Kevin Ryan and Deborah Fowler (Mar. 24, 2020) (attaching DFPS response to Feb. 21, 2020 Data and Information Request).

[270] As previously identified and consistent with prior reporting, the Monitors used the relevant monthly data reports for the corresponding time period, along with a comprehensive data report submitted by DFPS at the close of the reporting period, all on file with the Monitors and DFPS.

[271] As reported previously, DFPS informed the Monitors that the department did not have the capacity to report the total number of days during the month that new caseworkers' caseloads are not compliant with the graduated caseload standard. *See* Deborah Fowler & Kevin Ryan, First Report 163-164, ECF No. 869; E-mail from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler (Oct. 18, 2019) (attaching DFPS Information and Data Request Proposal in response to the Monitors' Sept. 30, 2019 Data and Information request).

reporting, the Monitors verified the caseloads at three points in time.[272] The monitoring team identified 683 instances where caseworkers stayed in their positions for at least 15 days after they became eligible for case assignment between July 1, 2022 and June 30, 2023. Of these 683 instances, 572 were staff who worked for DFPS; 32 were staff who worked for OCOK; 17 were staff who worked for 2INgage; 43 were staff who worked for St. Francis; and 19 were staff who worked for Belong.[273]

Most of the caseworkers subject to graduated caseloads who worked for DFPS had the job title CPS CVS Specialist I (472 of 572 or 83%). The other workers at DFPS subject to graduated caseloads had the job titles CPS CVS Specialist II (24 of 572 or 4%), III (30 of 572 or 5%), IV (44 of 572 or 8%), V (1 of 572 or <1%) or CPS Program Specialist (1 of 572 or <1%). The caseworkers subject to graduated caseloads at 2INgage all had the title of Permanency Case Manager. The caseworkers subject to graduated caseloads at OCOK had the job title Permanency Specialist (31 of 32 or 97%) or On-Call Permanency Specialist (1 of 32 or 3%). The caseworkers subject to graduated caseloads at St. Francis all had the title of Permanency Specialist. The caseworkers subject to graduated caseloads at Belong had the job title of Permanency Specialist (13 of 19 or 68%) or Adoption Specialist (6 of 19 or 32%).

As shown in the table below, on the 15th day after becoming case assignable, 98% (672 workers) of the 683 workers conformed to the graduated caseload standard of six or fewer case assignments. On the last day of the month following the 15th day, 98% (627 workers) of the 641 workers who matched the monthly data were in conformance with the graduated caseload standard.[274] On the 45th day after becoming case assignable, 99% (582 workers) of the 586 workers still receiving case assignments and who had reached their 45th day after becoming case assignable conformed to the graduated caseload standard.

Table 20: Caseworkers Conforming to the Graduated Caseload Standards at Three Points in Time

---

[272] The Monitors used the same methodology as reported previously. *See e.g.,* Deborah Fowler & Kevin Ryan, Third Report 17, ECF No. 1165. The Monitors verified whether staff subject to graduated caseloads conformed to the graduated caseload standard at three points in time: the 15th day after eligibility, the 45th day after eligibility, and on the calendar date at the end of the month after the 15th day of eligibility. To assess performance associated with the graduated caseload standards, the monitoring team calculated the percentage of workers who carried a number of children on their caseloads that was at or below the allotted caseload limit by the total number of staff subject to graduated caseloads at each point in time.

[273] Belong transitioned to Stage II in October 2022 and due to data quality issues, the Monitors commenced assessment of their conformance in November 2022.

[274] The standard the Monitors used on the last day of the month after the 15th day of case assignability was either six assignments or 12 assignments, depending on when the worker became eligible to accept cases. Twenty-four workers did not appear as carrying caseloads in DFPS's caseload data reports and had no termination date. Of these 24 workers, eight were workers employed by SSCCs and 16 were workers employed by DFPS. Workers subject to graduated caseloads may not appear in the caseload data reports because, for example, there were no children assigned on their 15th day. For instance, 13 DFPS workers had not been assigned any children on their 15th day after becoming case assignable. In other situations, workers subject to graduated caseloads may have been sent for retraining in a different casework specialty and no longer appear in the graduated caseload reports.

| Month Case Assignable | New Caseworkers who reached 15th day | 15th Day | Last Day of Month Following 15th Day | 45th Day | Average Conformity Rate |
|---|---|---|---|---|---|
| July 2022 | 44 | 98% | 100% | 100% | 99% |
| August 2022 | 45 | 96% | 95% | 98% | 96% |
| September 2022 | 64 | 98% | 100% | 100% | 99% |
| October 2022 | 56 | 100% | 91% | 100% | 97% |
| November 2022 | 50 | 100% | 100% | 100% | 100% |
| December 2022 | 62 | 98% | 96% | 100% | 98% |
| January 2023 | 64 | 100% | 98% | 98% | 99% |
| February 2023 | 51 | 98% | 100% | 100% | 99% |
| March 2023 | 59 | 97% | 98% | 98% | 98% |
| April 2023 | 47 | 100% | 100% | 98% | 99% |
| May 2023 | 67 | 99% | 100% | 100% | 100% |
| June 2023 | 74 | 97% | 95% | 98% | 97% |
| **Total** | **683** | **98%** | **98%** | **99%** | **98%** |

On average over the three points in time, 98% of new caseworkers' caseloads were in conformance with the graduated caseload standard. The high correlation of rates of conformance on the last day of the month to the rates of conformance on the 15th and 45th days is important, as the end of month data were verified by the Monitors through interviews with caseworkers.

In general, almost all workers who became case assignable on or after July 1, 2022 received assignments that conformed to the graduated caseload standards.

The monitoring team interviewed 48 caseworkers assigned to 23 counties across the state who were subject to the graduated caseloads policy under Advancing Practice. Between February 6, 2023 and April 6, 2023, the monitoring team interviewed via videoconference a randomly selected sample of 30 caseworkers from DFPS and 18 caseworkers from the four SSCCs (OCOK, 2INgage, Belong, and St. Francis) responsible for case management during this reporting period. All were hired between May 31, 2022 and January 23, 2023

131

and became subject to graduated caseloads between December 7, 2022 and March 27, 2023. Twenty-eight of the DFPS caseworkers in the sample had the job title CPS CVS Specialist I, and two had the title CPS CVS Specialist II. The SSCC workers included 16 Permanency Specialists (10 OCOK, 4 St. Francis, and 2 Belong) and two Permanency Case Managers (2INgage).

During interviews with SSCC workers in February 2023, the monitoring team reviewed their case assignment workload reports dated February 1, 2023 and provided by DFPS. During interviews with the DFPS workers, the monitoring team reviewed their case assignment detail reports dated April 1, 2023; the reports were generated from the DFPS INSIGHT system. The individual caseloads of 47 of the 48 caseworkers interviewed ranged from one to 12 children.[275] None of the 47 caseworkers had a caseload that exceeded the caseload guidance during the first or second month of case assignability. The monitoring team compared the results of the interviews of these caseworkers with the corresponding monthly caseload data submitted by DFPS to confirm the accuracy of the graduated caseload data collected during caseworker interviews. During the Monitors' cross-data validation of the INSIGHT and workload reports of these 47 workers with the DFPS monthly caseload data, the monitoring team found that 98% of the caseloads were a perfect match to those reported directly by caseworkers interviewed who were subject to graduated caseloads.

### Summary of Performance Validation

For staff subject to graduated caseload standards between July 1, 2022 and June 30, 2023:

- On average, staff's caseloads conformed with the graduated caseload standards more than 98% of the time. This represents the average rate of conformance of the 683 workers assessed on their 15th day following case assignability; the 641 workers assessed on the last day of the month following the 15th day of case assignability; and the 586 workers assessed on their 45th day following case assignability.

- On the 15th day, 98% of workers conformed to the graduated caseload standard of six children.

- On the last day of the month following the 15th day of case assignability, 98% of workers conformed to the graduated caseload standard.

- On the 45th day, 99% of workers conformed to the graduated caseload standard of 12 children.

- The State's average compliance with Remedial Order 2 reached or exceeded 96% in each of the 12 months during the period.

---

[275] One SSCC caseworker had no child assignment on the last day of the month under review; therefore, the worker was not included in the monthly caseload data reported by DFPS.

# Child Fatalities

After learning through the Monitors of the death of a child in the PMC General Class, the Court ordered on February 21, 2020:

*Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

Defendants have continued to provide notification to the Monitors of PMC child fatalities. As discussed in prior reporting to the Court, DFPS notified the Monitors that 48 children in the PMC General Class died between July 31, 2019 and June 1, 2023. These fatalities included eight children whom DFPS determined were abused or neglected by their caregivers in connection with their deaths or their care prior to their deaths.[276]

DFPS reported that one additional PMC child died between June 1, 2023 and November 1, 2023, bringing the number of PMC children who have died since July 31, 2019 to 49. DFPS did not investigate the death of this child due to the child being on runaway status at the time of her death, as described below.

## Child Fatalities Involving Children in the PMC Class

### Child Fatalities, No Abuse or Neglect Determined

### M.M., Born June 3, 2007; Died July 12, 2023

M.M., a 16-year-old girl, passed away in a fatal car accident. At the time of her death, M.M. was on runaway status from DFPS Supervision at a CWOP location, a hotel, for three weeks and her whereabouts were unknown to DFPS. The night before M.M. ran from the

---

[276] The Monitors' June 2023 Update to the Court Regarding Child Fatalities (filed in conjunction with the Sixth Report to the Court) discussed the death of a one-year-old PMC boy, K.A. Following publication of the Monitors' report, DFPS re-opened its closed fatality investigation of K.A. and changed the final disposition from Unable to Determine for the allegation of Medical Neglect by K.A.'s caregiver to Reason to Believe. DFPS documented the following regarding the new finding, "Based on a preponderance of the evidence, this allegation is being given a Reason to Believe disposition. The Medical Examination and the Forensic Consultation both indicated that although the cause of death was acute bronchopneumonia associated with parainfluenza virus 3 infection, failure to thrive also contributed to [K.A.'s] death. Medical findings noted that this was consistent with medical neglect occurring prior to his death. [K.A.] was noted to have been malnourished, which was identified as a likely contributing cause of his death. During the investigation, it appeared that [the child's caregiver] was not aware of the seriousness of [K.A.'s] condition, but review of the contacts made by [K.A.'s] conservatorship worker reveal repeated requests for [the child's caregiver] to have taken him for an updated medical appointment as his last appointment was his 9-month checkup."

CWOP location, law enforcement had recovered M.M. from a prior runaway episode and brought her to the CWOP location at the hotel. The following morning, M.M. eloped again from the hotel and, according to the hotel's video footage, left the hotel in a pickup truck. DFPS immediately contacted the San Antonio Police Department Missing Persons Unit to record the license plate of the vehicle, which law enforcement identified as stolen earlier that morning.

While on runaway status prior to her death, DFPS records indicate the agency made efforts to locate M.M. but was unable to do so. When M.M. died in the car accident, she was with another individual (Individual 1, 18-year-old male, reportedly M.M.'s boyfriend). After the car accident, the mother of Individual 1 told law enforcement that M.M. had been staying in their home; law enforcement estimated that M.M. had been staying with the family since the time she stopped posting on social media, around July 1, 2023 (11 days before her death). Law enforcement reported that on the night of M.M.'s death, Individual 1 was driving at high speeds, hit another car and subsequently crashed the car into a tree, instantly killing himself and M.M. CPI did not pursue an investigation into M.M.'s death.

M.M.'s case contacts in IMPACT documented that DFPS determined that M.M. was at high risk for sex trafficking. DFPS assigned M.M. a special investigator to attempt to locate the child during her frequent elopements. The National Center for Missing & Exploited Children reported to M.M.'s caseworker in March 2023, four months prior to M.M.'s death, that the agency marked M.M. as a "suspected sex trafficking victim" and assigned the child a Resource Specialist on a Child Sex Trafficking Recovery Services Team. M.M.'s Attachment A did not identify M.M. as a confirmed or suspected victim of sex trafficking; however, it documented an incident in December 2022 when M.M. alleged that a 20-year-old man had sex with her while she was on runaway.

M.M. first entered DFPS care in 2013 and experienced two failed adoptions. M.M. entered DFPS care for the third time in July 2021 and experienced the following placements:

| Start Date | End Date | Placement |
| --- | --- | --- |
| 06/20/2023 | 07/12/2023 | Runaway |
| 06/19/2023 | 06/20/2023 | DFPS Supervision (CWOP Setting): Candlewood Suites |
| 06/10/2023 | 06/19/2023 | Runaway |
| 06/05/2023 | 06/10/2023 | DFPS Supervision (CWOP Setting): Candlewood Suites |
| 04/23/2023 | 06/05/2023 | Runaway |
| 04/19/2023 | 04/23/2023 | Runaway |
| 04/14/2023 | 04/19/2023 | Runaway |
| 04/05/2023 | 04/14/2023 | DFPS Supervision (CWOP Setting): Candlewood Suites |

| 03/08/2023 | 04/05/2023 | Runaway |
|---|---|---|
| 03/07/2023 | 03/08/2023 | DFPS Supervision (CWOP Setting): Sonesta ES Suites |
| 02/10/2023 | 03/07/2023 | Birth mother – Unauthorized Placement |
| 01/26/2023 | 02/10/2023 | Bexar County Juvenile Detention Center |
| 12/14/2022 | 01/26/2023 | Guiding Light Residential Treatment Center |
| 12/13/2022 | 12/14/2022 | DFPS Supervision (CWOP Setting): Quality Inn |
| 03/10/2022 | 12/13/2022 | Boysville, Inc Basic Child Care |
| 03/08/2022 | 03/10/2022 | San Antonio Behavioral Health Psychiatric Hospital |
| 12/31/2021 | 03/08/2022 | Therapeutic Foster Home 2 |
| 11/12/2021 | 12/31/2021 | Guiding Light Residential Treatment Center |
| 11/05/2021 | 11/12/2021 | T E P Unity Girls RTC (Temporary Emergency Placement) |
| 09/23/2021 | 11/05/2021 | DFPS Supervision (CWOP Setting): House in San Antonio |
| 09/17/2021 | 09/23/2021 | San Antonio Behavioral Health Psychiatric Hospital |
| 07/21/2021 | 09/17/2021 | Therapeutic Foster Home 1 |

# List of Tables

Table 1: Race for Children in PMC on June 30, 2023 and Estimates of Total Child Population in Texas by Race, August 12, 2021 ................................................................. 18

Table 2: Living Arrangement by Race, Children in PMC on June 30, 2023 .................... 20

Table 3: Living Arrangement for Children in PMC on December 31, 2019 and June 30, 2023 ............................................................................................................................. 21

Table 4: Length of Stay in Care of Children in PMC on December 31, 2019 and June 30, 2023 ............................................................................................................................. 22

Table 5: Exits from PMC by Exit Outcome between January 1, 2023 and June 30, 2023 ................................................................................................................................. 23

Table 6: Out of State Living Arrangement Type for Children in PMC, December 31, 2022 and June 30, 2023 ...................................................................................................... 23

Table 7: Children in PMC Placed Out of State by Race on June 30, 2023 ...................... 24

Table 8: Out of State Living Arrangement Type for Children in PMC, December 31, 2019 and June 30, 2023 ...................................................................................................... 24

Table 9: Authorized Level of Care for Children in PMC as Reported by DFPS as of June 30, 2023 ............................................................................................................................. 25

Table 10: Top Five Counties of Removal for Children in PMC on June 30, 2023 ........... 25

Table 11: Children in PMC by Region on June 30, 2023 ................................................. 26

Table 12: Children in PMC from Regions with SSCC Presence by Region on June 30, 2023 ................................................................................................................................. 26

Table 13: Total Number of Children and Staff Interviewed ........................................... 70

Table 14: Intakes with a Case Contact Found and Timing from Intake to Contact by Intake Type ................................................................................................................................. 90

Table 15: Case Contacts with a Staffing Documented by Intake Type and Month .......... 91

Table 16: Safety Actions Documented in Staffing Contacts ......................................... 104

Table 17: SSCC Number of Hires from September 2022 – March 2023 Completing Full Training and Average, Minimum, and Maximum Days to Completion .......................... 113

Table 18: RCCI Investigators with Caseloads at or Below the Guidelines, July 2022 to June 2023 ............................................................................................................................. 116

Table 19: RCCR Inspectors with Caseloads at or Below the Guidelines, July 2022 to June 2023 ............................................................................................................................. 121

Table 20: Caseworkers Conforming to the Graduated Caseload Standards at Three Points in Time ............................................................................................................................. 130

# List of Figures

Figure 1: Age of Children in PMC on June 30, 2023 ........................................................17
Figure 2: Living Arrangements for Children in PMC on June 30, 2023 .......................... 19
Figure 3: Length of Stay in Care of Children in PMC on June 30, 2023 ......................... 21
Figure 4: Number of SWI Calls by Month .......................................................... 31
Figure 5: Time Callers Waited before Calls were Handled or Abandoned ..................... 31
Figure 6: Duration of Handled SWI Calls ........................................................... 32
Figure 7: Queue Time of Abandoned and Handled SWI Calls ......................................... 33
Figure 8: Number of SWI Calls Handled and Abandoned by Day of the Week .............. 35
Figure 9: Allegation Types for RCCI Intakes Involving PMC Children in Licensed
Placements, July 1, 2022 to June 30, 2023 ......................................................... 36
Figure 10: Closed RCCI Investigations, May 1, 2022 to April 30, 2023 ......................... 39
Figure 11: Reason to Believe Findings in Closed RCCI Investigations Involving PMC
Children in Licensed Placements, May 1, 2022 to April 30, 2023 .................................. 40
Figure 12: Alleged Perpetrators in RCCI Allegations Involving PMC Children in Licensed
Placements, May 1, 2022 to April 30, 2023 ......................................................... 41
Figure 13: Closed CPI Investigations Involving PMC Children, May 1, 2022 to April 30,
2023 ............................................................................................... 42
Figure 14: Reason to Believe Findings in Closed CPI Investigations Involving PMC
Children, May 1, 2022 to April 30, 2023 ........................................................... 44
Figure 15: Initiation of Investigations within 24 Hours in Priority One Investigations .. 53
Figure 16: Documented Reasons for Late Initiation in Priority One Investigations ....... 54
Figure 17: Initiation of Investigations within 72 Hours in Priority Two Investigations .. 55
Figure 18: Documented Reasons for Late Initiation in Priority Two Investigations ....... 57
Figure 19: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in Priority
One Investigations ................................................................................ 58
Figure 20: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in
Priority Two Investigations ....................................................................... 59
Figure 21: Completion of Priority One and Two Investigations within 30 Days ............. 61
Figure 22: Completion of Priority One and Two Investigations within 30 Days over Time
.................................................................................................... 61
Figure 23: Number of Extensions in Priority One and Two Investigations .................... 63
Figure 24: Notification Letter Sent to Referent within Five Days of Investigation Closure
in Closed Priority One and Two Investigations .................................................... 65
Figure 25: Notification Letter Sent to Provider within Five Days of Investigation Closure
in Closed Priority One and Two Investigations .................................................... 65
Figure 26: Child File Contained Signed Bill of Rights ............................................. 71
Figure 27: Percent of Child Files Containing a Signed Bill of Rights by Operation .......... 71
Figure 28: Children Responded They Had Heard of the Bill of Rights .......................... 73
Figure 29: Children Reporting Whether They Read or Had Someone Explain Bill of Rights
.................................................................................................... 73
Figure 30: Children Responded They Had Heard of the FCO ...................................... 74
Figure 31: Percentage of Children Reporting Whether They Know How to Reach the FCO
if They Need To ................................................................................... 75
Figure 32: Percentage of Children Responding that They Knew of the Existence of the SWI
Hotline ........................................................................................... 76

Figure 33: Percentage of Children Reporting Whether They Knew How to Call the SWI Hotline.................................................................................................................... 76
Figure 34: Percentage of Children Reporting Whether They Wanted to Call the SWI Hotline..................................................................................................................... 77
Figure 35: Children Reporting Knowledge of Bill of Rights, FCO, and SWI Hotline ...... 77
Figure 36: Percent of Children That Had Heard of the Bill of Rights, FCO, and SWI Hotline by Operation................................................................................................... 77
Figure 37: Children Reporting Whether They Can Use the Phone .................................. 78
Figure 38: Process for Using the Phone as Reported by Children ................................... 79
Figure 39: Caregiver Reported Restrictions on Phone Use............................................. 80
Figure 40: Caregivers Reporting Ability of Children to Call the SWI Hotline/FCO at Any Time.............................................................................................................................. 80
Figure 41: Children Reporting Feeling Safe in Current Placement.................................. 81
Figure 42: Children Reporting Feeling Comfortable Talking to Staff to Express Needs.82
Figure 43: Children Reporting Whether Their Caseworker Answers or Responds When They Call or Text ......................................................................................................... 83
Figure 44: RCCI, CPI, and PI Intakes, January to June 2023 ......................................... 84
Figure 45: Intakes Showing Reporter as an Alleged Victim by Investigation Type.........84
Figure 46: Youth Complaints to the FCO Resulting in Notification to SWI .................... 85
Figure 47: Percentage of Intakes with a Case Contact Found by Intake Type................ 88
Figure 48: Percentage of Intakes with a Case Contact Found by Type and Month .........89
Figure 49: Case Contacts with Incident Information ...................................................... 90
Figure 50: Case Contacts with Safety Action Documented ............................................ 92
Figure 51: Safety Actions Documented in RCCI, CPI, and PI Case Contacts.................. 92
Figure 52: Percentage of Documented Safety Actions that Adequately Ensured the Immediate Safety of the Child.................................................................................... 93
Figure 53: Documentation of Appropriate Action Ensuring Child Safety ...................... 94
Figure 54: Evidence of Notification to Caseworker in Case Contacts of Allegations of Abuse, Neglect or Exploitation Regarding PMC Children ............................................ 102
Figure 55: Evidence of Caseworker Staffing Regarding Allegations .............................. 103
Figure 56: DFPS Caseworkers Hired September 2022 – March 2023 and Included in CPD Training Completion Analysis.................................................................................... 109
Figure 57: DFPS Caseworker CPD Training Completion by Training Level.................... 110
Figure 58: SSCC Permanency Specialists and Permanency Case Managers (Caseworkers) Hired September 2022 – March 2023 and Included in CPD Training Completion Analysis ................................................................................................................................... 112
Figure 59: SSCC Caseworker CPD Training Completion by Training Level ................... 113
Figure 60: Number of RCCI Investigations by Month, July 2022 to June 2023............ 115
Figure 61: RCCI Investigator Caseloads by Number of Investigations, July 2022 to June 2023........................................................................................................................... 117
Figure 62: RCCI Investigations by Staff Assigned as Primary on the Investigation, July 2022 to June 2023 ..................................................................................................... 118
Figure 63: RCCI Secondary Assignments by Month, July 2022 to June 2023.............. 118
Figure 64: Number of RCCR Tasks, July 2022 to June 2023 ........................................ 119
Figure 65: Number of Facility and Investigation Tasks and Administrative Reviews by Month, July 2022 to June 2023................................................................................. 120

Figure 66: RCCR Inspector Caseload High and Low by Month, July 2022 to June 2023 ....................................................................................................................................121
Figure 67: Number of Administrative Reviews Assigned to RCCR Supervisors, July 2022 to June 2023.................................................................................................... 123
Figure 68: Number of Inspector Tasks Not Matching on Day of Interview by Type..... 124
Figure 69: Inspectors with Monthly Caseloads Matching Case Assignment Data ........ 126