

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | Civil Action No. 2:11-CV-00084 |
| as Governor of the State of Texas, et | § | |
| al., | § | |
| | § | |
| Defendants. | | |

## The Monitors' Responses to the State's Objections to the June 2023 Reports

On January 10, 2024, the Monitors filed the Seventh Report and two appendices, which reviewed the State's compliance with the Court's remedial orders addressing Screening, Intake and Investigation of Maltreatment in Care Allegations and Organizational Capacity, covering Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 37, A6 and B1 to B5 (with the exception of Remedial Order 35, about which the Monitors updated the Court in a separate report on October 27, 2023).[1] The Monitors previously provided copies of the Seventh Report and two appendices to the parties on December 12, 2023, and requested the parties' feedback by January 4, 2024.[2] The Monitors reviewed the parties' written feedback and finalized the Seventh Report and two appendices, after incorporating small changes based on the parties' feedback. On January 31, 2024, the State filed objections related to the findings in the Seventh Report and its appendices, most of which the State had not previously raised with the Monitors in the State's written comments of January 4, 2024. The Monitors' responses to the Objections are set out below.

A. The State's Objections to the Seventh Report

### 1. The State's Objection:

---

[1] Deborah Fowler & Kevin Ryan, Seventh Report of the Monitors: Remedial Orders 1, 2, 3, 5 to 11, 16, 18, 37, A6, and B1 to B5 (Seventh Report), ECF No. 1496.

[2] E-mail from Kevin Ryan and Deborah Fowler to Prerak Shah *et al.*, re: Confidential DRAFT Seventh Monitors' Report, Not for Publication, December 12, 2023 (on file with the Monitors). The State e-mailed joint comments to the Monitors at 11:46 a.m. (CST) on January 4, 2024. E-mail from Michael Hayman, Director of Project Management, DFPS, *et al.*, to Kevin Ryan and Deborah Fowler, re: Comments to the Monitors' Draft Seventh Report, January 4, 2024 (on file with the Monitors).

- Pages 7–8: "However, for intakes that SWI referred for investigation to Child Protective Investigations (CPI) or PI, the Monitors found no automated notifications to caseworkers."

  Objection: Remedial Order B5 requires "prompt[ ]," not automated, notification to caseworkers. Statewide Intake manually and promptly notifies caseworkers.

**The Monitors' Response:**

As discussed in the Monitors' Second Report, the first process instituted by DFPS in an effort to comply with Remedial Order B5 was an automated notification to caseworkers.[3] On December 19, 2019, the State implemented an automated process for notifying caseworkers when an abuse, neglect, or exploitation intake related to a licensed setting was received for a child on their caseload.[4]  The automated notification did not include information about the allegations associated with the intake; the caseworker could only identify the allegations by reviewing the intake in IMPACT.[5] After the Monitors' filed the First Report, Plaintiffs filed a motion arguing that the State should be held in contempt for, among other failures, failing to comply with Remedial Order B5.[6]  In its response to the Plaintiffs' arguments related to the remedial order, the State pointed to the automated notification as a defense to contempt.[7]

In its December 18, 2020 Contempt Order, the Court found that Remedial Order B5 required not just notification of an intake, but notification of the substance of the allegations.[8] The Court also held that tying the notification to the timeframe for initiation of an investigation failed to comply with the remedial order's requirement of "prompt" notification.[9]  When the State later certified compliance with the remedial order, it described short-and-long-term solutions implemented for allegations related to both licensed and unlicensed placements.[10]  These solutions were intended to address the failure of the automated notification to notify caseworkers of the substance of the allegations associated with an intake, and the requirement that the process take the safety needs of the children into account.[11]  These new procedures were implemented for child abuse and neglect intakes investigated by CPI and PI, in addition to RCCI.  However, the State did not add CPI and PI investigations to the automated caseworker notification process.

Remedial Order B5 does not specify the process the State should implement to comply with its requirements. However, when the State creates a process for complying with a remedial order (and communicates that process to the Monitors and the Court), it should

---

[3] Deborah Fowler & Kevin Ryan, Second Report, 97 - 102, ECF 1079.
[4] *Id.*
[5] *Id.* at 99.
[6] *Id.*  at 98.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 100.
[10] *Id.* at 102.
[11] *See* Deborah Fowler & Kevin Ryan, Seventh Report, at 86.

expect the Monitors to review the process when they attempt to validate compliance with the remedial order. Nothing in the Seventh Report's discussion of the automated notification process suggested that the remedial order requires automated notification; the Monitors simply reported to the Court the findings associated with their review of *all* the processes created by the State to comply with the remedial order.[12]

Further, the Seventh Report revealed a lower compliance rate for CPI and PI caseworker notification and staffings.[13]  The case record review conducted for the Seventh Report of child maltreatment intakes involving PMC children  identified a staffing contact for only 78% of PI intakes and 80% of CPI intakes.[14]  When the Monitors reviewed *all* intakes for PI investigations closed between January 1, 2023 and April 30, 2023 and five related PI investigations, the monitoring team found that the child's caseworker received notification of the intake in 48 of 69 (70%).[15]

## 2.  The State's Objection:

- Page 16: "Though most RCCR inspectors' caseloads appear to have been within the guidelines in every month of the 12-month period analyzed, the monitoring team's efforts to validate caseload data raised some questions regarding the accuracy of the monthly caseload data provided to the Monitors by HHSC. However, the Monitors cannot determine what impact (if any) these errors (and others like them) have on compliance with the caseload standards."

  Objection: HHSC reaffirms its objection to the characterization of erroneous data. HHSC continually strives for accuracy in data entry and reporting and the agency has made numerous efforts to work with the Monitors to help them better understand the caseload data and how it can be accessed and verified by members of the monitoring team. Representatives of HHSC spoke with staff from Texas Appleseed on a telephone call on August 16,  to answer questions about RCCR caseloads. That staff member asked clarification questions on August 18,  via email and HHSC answered those September 15, 2023. If there was any further confusion or any doubt as to the accuracy of the data, HHSC was not made aware and any

---

[12] While Remedial Order B5 does not require the State to implement the automated process for CPI and PI intakes, as it did for RCCI intakes, DFPS might consider what the entirety of the Monitors' review of the State's compliance with Remedial Order B5 suggests: though it is not sufficient, in and of itself, for B5 compliance, the automated process may spur caseworkers to complete the other processes created by the State to meet the remedial order's requirements more quickly.  The Seventh Report documents a higher and quicker completion rate for the I&R Notification and Staffing process (the process created by the State in response to the Court's December 2020 contempt order) for RCCI intakes than for CPI and PI intakes. The average number of days between the intake and the I&R Staffing contact for RCCI intakes was 1.97 days, compared to 2.8 and 3 days for CPI and PI, respectively. Seventh Report, at 90.
[13] *Id.* at 88-89.
[14] *Id.*
[15] Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7 and 8 and HHSC Provider Investigations, ECF No. 1442 (November 10, 2023); Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Remedial Order 3, ECF No. 1412 (September 19, 2023).

implication of impropriety on the part of HHSC or suggestion that the monthly caseload data is not accurate or verifiable is unwarranted.

### The Monitors' Response:

The Monitors' comparison of the point-in-time data provided by HHSC monthly to a random sample of inspectors' caseloads, extracted directly from CLASS the same day the point-in-time data was produced, raised extensive concerns regarding the accuracy of HHSC's caseload data. The analysis included in the Seventh Report showed pervasive inconsistencies (for 40 of 95, or 42% of inspectors) between the monthly caseload data and sampled inspectors' CLASS case assignment lists.

As described in the State's objection (and discussed in the Seventh Report), when the monitoring team identified the discrepancies, they scheduled a telephone call with HHSC to discuss the agency's policy and process for the assignment and removal of tasks and administrative reviews on inspectors' caseloads (as described in footnote 262 of the Seventh Report). After the conversation, the monitoring team followed up by providing examples of problems that were inconsistent with the policies and processes described by HHSC during the call. The examples sent to HHSC were not an exhaustive list of the inconsistencies; instead, the monitoring team provided specific examples of the different "situations" or "scenarios" that "[did] not…fit the expectations outlined" by HHSC during the call.[16]

HHSC's responses to each of the examples explained that the discrepancies were caused by erroneously entered data, untimely data entry, a need for data "corrections" or "fixes," or untimely transfers of an operation or task to another inspector's caseload. These explanations failed to alleviate the Monitors' concerns related to HHSC's caseload data, since the explanations revealed that the data was inaccurate.

The Monitors did not intend to imply that HHSC engaged in "impropriety." In fact, after HHSC raised the same concern in the State's joint responses to the draft of the Seventh Report on January 4, 2024, the Monitors added the last sentence, which the State quotes from the Seventh Report. Many of the identified errors were errors of (seemingly unintentional) omission, making it impossible to determine their pervasiveness and the impact on overall caseload validation. The result is that the Monitors cannot verify the accuracy of HHSC's monthly caseload data and cannot state with certainty that caseloads are (or are not) within the guidelines. Given HHSC's asserted commitment to accuracy in its data entry and reporting, the Monitors expect the accuracy of the caseload data to improve, which will allow the monitoring team to validate caseloads in future reporting.

### 3. The State's Objection:

---

[16] E-mail from Nancy Arrigona, et al., to Katy Gallagher, et al, re: RCCR Caseload Examples and Questions, August 18, 2023 (on file with the Monitors).

- Page 46: "Moreover, background checks performed by the CBCU for residential childcare operations do not appear to include the Employee Misconduct Registry (EMR), which is used to determine hiring eligibility for persons employed in HHSC-regulated locations, such as HCS residences."

  Objection: The Central Background Check Unit (CBCU) does not conduct background checks for any facility not regulated by childcare regulation. HCS homes are not regulated by childcare regulation and therefore CBCU is not required or authorized to conduct background checks on HCS homes. Prior to 9/1/23, CBCU was not required or authorized to search the Employee Misconduct Registry (EMR) as part of background checks. However, defendants note that, during the most recent legislative session, HHSC and DFPS worked with legislators on the passage of Senate Bill 1849, establishing the Texas Reportable Conduct Search Engine. When implemented, this initiative will establish a search engine that pulls information from the Central Registry and Employee Misconduct Registry, as well as the Texas Juvenile Justice Commission's misconduct registry and the Texas Education Agency's Do Not Hire List. The search engine will eventually be accessed by the HHSC CBCU to screen applicants at residential childcare operations, by DFPS to screen both DFPS and HHSC caseworkers for employment, by school districts to screen potential employees, and by TJJD to screen county and state employees working in juvenile detention centers. Funding was allocated to work over the next 18 months to build the search engine.

**The Monitors' Response:**

The State's Objection consists of information about a legislative change that, in the future, aspires to address the safety gap the Monitors identified in the report (that background checks for child care operations do not capture allegations of abuse or neglect contained in the Employee Misconduct Registry). The statements and information confirm – rather than contradict – the Monitors' findings. Moreover, the Monitors' Report does not state or imply that the CBCU has any role in conducting background checks for HCS placements. The State's response is consistent with the Monitors' reporting on this topic and is not contrary to the information in the report, despite being labeled by the State as an Objection.

### 4. The State's Objection:

- Page 46 & n.115: "The Monitors found examples of individuals confirmed as perpetrators in PI investigations of abuse or neglect of a child but who are not listed on the Central Registry. For example, PI issued a disposition of Confirmed on June 23, 2022, against an individual working at a State Supported Living Center for Physical Abuse of a child (IMPACT Case ID: 49052280); the individual was entered in the Employee Misconduct Registry on February 9, 2023. However, this individual does not appear in the Central Registry. . . . The monitoring team checked for Central Registry inclusion by using the social

security number and perpetrator identification number of individuals with Confirmed findings of abuse or neglect against a PMC child to verify."

Objection: The individuals referenced as part of IMPACT Case ID: 49052280 are sustained perpetrators in the Central Registry. The Central Registry is a subset of IMPACT data that pulls all persons with a role of alleged, designated, or sustained perpetrator. The date they went on the Central Registry is March 6, 2022, because that is the date the case was open, and they were alleged perpetrators at that point. DFPS will provide the screenshot of IMPACT under separate cover as it contains confidential information that needs to be preserved.

**The Monitors' Response:**

The Monitors attached an appendix with redacted copies of documentation from IMPACT dated February 1, 2024, stating that the two individuals are not in the Central Registry. The State has not yet provided the alternative conflicting documentation the State cites in its Objection.

### 5. The State's Objection:

- Page 47: "According to HHSC, 'the purpose of the Employee Misconduct Registry is to ensure that unlicensed personnel who commit acts of abuse, neglect, exploitation, misappropriation, or misconduct against residents and consumers are denied employment in HHSC-regulated facilities and agencies.'[113] However, the same individual may well be permitted to work at a licensed residential child care facility if the victim of the abuse or neglect is an adult. For example, in one RCCI investigation (IMPACT Case ID: 49487234) the Monitors reviewed in 2023, the alleged perpetrator in an investigation into Physical Abuse of children was a caregiver at a licensed child care operation despite being a sustained perpetrator for Physical Abuse of an adult during employment at an HCS residence. The investigation is included in the appendices."

Objection: The person in question was a caregiver at #1719866 who had a background check at a GRO (#1732144) submitted on 1/26/2023. The central registry check showed they were involved in open investigation 49487234. The CBCU inspector reviewed the open investigation, and also saw this person had a confirmed finding for PHAB from 2022 from an AFC (PI) investigation, and they were on the Employee Misconduct Registry because of this finding. Due to the severity of the history, CBCU completed a DIT and this person was made Ineligible at #1732144. An Eligible letter was never sent to the operation; therefore, she was never a caregiver at this operation.

**The Monitors' Response:**

There are no facts included in the State's Objection that contradict the Monitors' factual reporting and it is unclear to what information the State objects:

- A caregiver discussed in the Monitors' Report and in Appendix 2 (in IMPACT Case ID: 49487234) had a Confirmed PI finding for Physical Abuse of an adult that PI assigned on May 23, 2022. That fact is not disputed by the State.

- After PI entered the disposition of Confirmed in May 2022, that individual was subsequently able to work at a GRO serving PMC children in the class. During the individual's employment at the GRO, RCCI initiated an investigation into a Physical Abuse allegation of a PMC child in IMPACT Case ID: 49487234. The allegation in the RCCI investigation occurred during the individual's employment at the GRO on January 19, 2023, eight months after PI entered a disposition of Confirmed for Physical Abuse. Those facts are not disputed by the State.[17]

- Therefore, again, the State's filing does not dispute the analysis: an individual with a Confirmed history of Physical Abuse of an adult (resulting in the victim's death) was later confirmed to be working at a GRO serving PMC children.

- Subsequently, as noted in the Monitors' Report and related Appendix 2, on March 31, 2023, RCCI opened another investigation related to this individual, IMPACT Case ID: 49584629; a DFPS caseworker reported an allegation of Neglect to SWI after learning this same individual had a Confirmed history of Physical Abuse and was working at the RTC. DFPS itself opened the investigation to determine whether the hiring of the individual at this RTC, House of Hope at Spring, was Neglectful Supervision by the administrators at the RTC given the individual's PI history.[18] Those facts are not disputed.

- The full content of the passage from Appendix 2 to the Seventh Report, which summarizes the Defendants' own documentation of these investigations, is below. The facts contained remain undisputed by the State:

    Finally, the investigative record documented that Staff 1's investigative history included a Confirmed disposition of Physical Abuse by HHSC's Provider Investigations (PI) related to an adult resident placed at a Home and Community-based Services (HCS) placement (meaning that PI substantiated the

---

[17] Moreover, in its objection preceding this point, the State acknowledges this policy gap and discusses the legislation that aspires to address it in the future.

[18] According to DFPS's documentation, it appears that by the time the above investigation began or shortly thereafter, the individual had been arrested or the police were seeking her arrest.

allegation). PI assigned the Confirmed disposition on May 23, 2022 and Staff 1 was added to the Employee Misconduct Registry on June 28, 2022 as a sustained perpetrator.[19] It appears that Staff 1's background check for employment at the GRO was completed on April 25, 2022, suggesting her employment at the GRO commenced shortly thereafter. The allegation in the instant investigation was reported to SWI on January 19, 2023, eight months after PI entered a disposition of Confirmed for Physical Abuse.

The background checks performed by the Central Background Check Unit (CBCU) for employment at residential child care operations include criminal history background, the Central Registry, and sex offender registration.[20] Background checks performed by the Central Background Check Unit for residential child care operations do not include the Employee Misconduct Registry (EMR); therefore, although Staff 1's status as a sustained perpetrator for Physical Abuse made her ineligible for employment at a location operating pursuant to the HCS waiver program, because it involved abuse of an adult, it does not appear to preclude her from employment at a licensed residential child care facility.

*In a related investigation (IMPACT Case ID: 49584629), on March 31, 2023, a DFPS caseworker reported allegations of Neglectful Supervision against administrators at a separate operation, House of Hope, an RTC, for hiring Staff 1 (in light of her prior substantiation by PI). At the time of the intake, Staff 1 was employed by House of Hope. The RCCI investigator assigned a disposition of Ruled Out to the allegation upon confirming that the administrators were not responsible for checking the EMR and permissibly relied on the clearance provided by the CBCU regarding employment eligibility of Staff 1. During that investigation, an HHSC staff member reported that a CBCU representative informed her that CBCU's system does not "capture" EMR findings and that CBCU results showed Staff 1 as eligible for employment.*

The State's Objection appears to indicate that this individual, after her confirmed PI finding of Physical Abuse and pending RCCI investigation into child neglect at a GRO, was eventually deemed ineligible for employment at yet another child care operation; it does not dispute any facts presented in the Monitors' reporting.

---

[19] HHSC, *Employee Misconduct Registry (EMR)*, available at
https://www.hhs.texas.gov/business/licensing-credentialing-regulation/long-term-care-credentialing/employee-misconduct-registry-emr.
[20] 26 TEX. ADMIN. CODE §745.607; HHSC, *Child Regulation Handbook*, §10000 Background Checks.

### 6. The State's Objection:

- Pages 74 & 85: "These improvements, however, have not improved children's reported knowledge of the SWI hotline or the FCO. . . . Though the remedial order has been in place for four years, there has been little improvement in children's understanding of the means and methods for reporting abuse,  or exploitation."

  Objection: Remedial Order A6 instructs DFPS to "provide" and "apprise[]" youth in the PMC class of certain appropriate points of contact as well as "review" the Foster Care Bill of Rights and the number for the Ombudsman. DFPS has put into place numerous improvements to ensure that the Foster Care Bill of Rights is reviewed with the youth by their caseworker every six months and upon a placement change as well as properly documented. In addition, GROs are required to review the Foster Care Bill of Rights upon placement. The Monitors determined that 93 percent of the child files reviewed (89 of 96) at the operations contained a Foster Care Bill of Rights signed by the child. Seventh Report 70. To focus on the "understanding," "reported knowledge," or "recall" by PMC youth or by their caregivers as a measurement of DFPS's compliance is inconsistent with Remedial Order A6.

### The Monitors' Response:

Reviewing the Foster Care Bill of Rights and the number for the Ombudsman are two methods explicitly identified by Remedial Order A6 that the State should "apprise"[21] children of the appropriate methods and contacts for reporting abuse or neglect. However, Remedial Order A6 does not limit the State to these methods – the language of the order simply requires that apprising children "shall include" a review of this information.

For many children, particularly children who have experienced significant trauma, young children, children who suffer from significant mental health issues, and children who have an intellectual or developmental disability, reviewing the six-page CPS Rights of Children and Youth in Foster Care, which lists 48 rights (of which information related to reporting abuse, neglect, or exploitation is the 46th) may not be an effective method of "apprising" them of the appropriate point of contact and method for reporting abuse, neglect, or exploitation.   When that is the case, the

---

[21] According to the Oxford English Dictionary, "apprise" means "To impart knowledge or information to; give formal notice to; inform, acquaint."  Oxford English Dictionary, *available at* https://www.oed.com/search/dictionary/?scope=Entries&q=apprise

remedial order gives DFPS flexibility for finding additional methods of "apprising" children of this critical information.

The State's objection also makes an inferential leap when it assumes that, because children's site files included a signed Foster Care Bill of Rights, this necessarily means that their caseworker or a caregiver "reviewed" it with them before they signed the document. For these reasons, while the Monitors look for and report on the presence (or absence) of a signed Foster Care Bill of Rights in children's site files, the presence or absence of the document is not the sole method the Monitors employ for determining whether the State is complying with the remedial order's requirement that caseworkers "apprise" children of the appropriate contact and methods for reporting abuse, neglect, or exploitation.

In arguing that children's knowledge of how to report abuse, neglect, or exploitation is inconsistent with Remedial Order A6, the State's objection attempts to divorce the remedial order from the harm it was intended to address. Equitable remedies like those in this case are framed "to repair the denial of a constitutional right" and are intended "to correct...the condition that offends the Constitution."[22] Remedial Order A6 is intended to address the Court's findings related to underreporting of abuse, neglect or exploitation.[23]  The Court and the Fifth Circuit found that the evidence showed that abuse was underreported, in part, because foster children did not know how to report abuse.[24]

The Fifth Circuit found, "[T]he evidence in the record indicates that abuse is underreported. Several former foster children testified that they did not know how to report abuse or whom they should tell."[25]  The Fifth Circuit continued, "To the extent that the court is worried about underreporting, this can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues."[26]  The State now objects that children's "understanding" or "reported knowledge" of how to report abuse, neglect, or exploitation is irrelevant and "inconsistent" with the remedial order that was crafted to cure this very lack of understanding and knowledge.

The Court's order does not limit the State to the two explicitly named methods (reviewing the Foster Care Bill of Rights and the number for the Ombudsman), leaving flexibility for determining other developmentally appropriate, trauma-informed ways of sharing this important safety information with children that may make the information more accessible and comprehensible. Though children's own cognitive limitations may mean that interviews never show that *every* PMC child understands how to appropriately reach out for help if they are being abused, the Seventh Report

---

[22] Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15-16 (1971).
[23] Seventh Report, at 69.
[24] *Id*. at note 162.
[25] M.D. by Stukenberg v. Abbott, 907 F. 3d 237, 266 (5th Cir. 2018).
[26] *Id*. at 279.

showed that the State's current methods for "apprising" children of this information worked for less than half of the children interviewed.

### 7. The State's Objection:

- Page 123: "Between July 2022 and June 2023, RCCR supervisors had a total of 27 tasks and 510 administrative reviews assigned to their caseloads."

  Objection: Clarification of this statement is warranted. Please note there were a total of 159 distinct investigations with administrative reviews on RCCR supervisors' caseloads during the review period. The Monitors' number of 510 may come from adding the number of investigations with administrative reviews each month over the timeframe without taking into account that some administrative reviews span more than one month.

**The Monitors' Response:**

Counts of RCCR tasks in this analysis are based on the number of tasks by type per month as of the first day of the month as reported in data provided by HHSC. Tasks assigned to RCCR inspectors and supervisors may span months or may change daily. For this analysis, assigned operations, sampling inspections, investigations, and administrative reviews are counted in each month that they are assigned. A single operation assigned over the twelve-month review period would be counted as 12 tasks, not 1 task. Inspector and supervisor caseload guidelines are based on the number of tasks per month, not the number of unique tasks assigned per year. Thus, though RCCR supervisors were assigned a total of 159 investigations with administrative reviews, some administrative reviews spanned multiple months (as acknowledged by the Objection), resulting in 510 "tasks" associated with the administrative reviews during the period being counted in the caseload analysis.

### 8. The State's Objection:

- Page 123: "A total of 239 administrative reviews were on RCCR inspectors' caseloads during the review period. The number of administrative reviews assigned to RCCR inspectors ranged from four to 35 per month."

  Objection: Clarification of this statement is warranted. Please note there were a total of 175 distinct investigations with administrative reviews on RCCR inspectors' caseloads during the review period. The Monitors' number of 239 may come from adding the number of investigations with administrative reviews each month over the timeframe without taking into account that some administrative reviews span more than one month.

**The Monitors' Response:**

See the explanation, above.

**9.  The State's Objection:**

- Page 125: "Though the discrepancies would not have resulted in any of the interviewed inspectors' caseloads exceeding the guidelines, the identification of the differences led to an additional analysis, described below, that identified numerous discrepancies between CLASS case assignment lists and monthly caseload data provided by the State. This analysis, and subsequent conversations with HHSC, raised concerns related to the reliability of the monthly caseload data provided by HHSC."

  Objection: The monthly report provides point-in-time data as of the 1st of the month. The later in the month the data is reviewed, the more discrepancies from the report will exist. HHSC has made every effort to be transparent to the Monitors and has met with them on this issue many times.

**The Monitors' Response:**

The monitoring team uses two analyses to verify the accuracy of RCCR caseload data:

- An analysis to verify monthly RCCR caseload data compares the CLASS case assignment list, extracted on the first day of the month for a randomly selected sample of inspectors, to the point-in-time caseload data produced by HHSC the same day. The analysis reviews RCCR staff person, task type, operation or investigation number, and month. The CLASS case assignment list is not reviewed later in the month; the case assignment list is extracted the same day that the point-in-time data is produced.

- An analysis to verify the CLASS case assignments compares the case assignment list for RCCR staff selected for interview, extracted on the morning of the first of the month (again, consistent with the point-in-time data) to the staff person's report regarding their caseload on the day of the interview. During the interviews, the monitoring team asks RCCR staff the number of tasks per type, the operation name associated with each task, and the operation or investigation number associated with the task to ensure appropriate coding. If there are differences between the case assignment list and the staff person's response, the Monitors discuss the potential differences with the interviewee.[27]

  In all cases where there is a difference between the CLASS case assignment list and the staff response, the monitoring team extracts and reviews that staff person's case assignment list daily for up to 5 days to try to explain differences, and then notes the number of days until the difference is resolved. In instances where the explanation of a difference was that the task was assigned or transferred on the day

---

[27] The question on the RCCR inspector and supervisor interview tool is "Ask the inspector/supervisor what the reason(s) for the differences between the case assignment list and their response may be and select all that apply: Operation was assigned today, Operation was transferred today, Operation closed, Computer/system error, Other, Don't know."

of the interview, the task date of review is verified and, if the task was assigned the day of the interview, it is not considered a discrepancy. For the Seventh Report, the monitoring team concluded three inspectors and four supervisors had discrepancies explained by timing. These were not considered to be caseload errors.

As stated, and contrary to the State's objection, the case assignment lists extracted from CLASS should align with the point-in-time data produced to the Monitors by HHSC, because the case assignment list is downloaded on the same day.[28]

### 10.        The State's Objection:

- Page 126: "The monitoring team found one or more inconsistencies between the monthly caseload data and the CLASS case assignment list for 42% of inspectors (40 of 95) during the period analyzed.[261] These inconsistencies included tasks that were on the case assignment list but not included in the monthly caseload data, tasks that were included in the monthly caseload data but were not in the case assignment list, and tasks that were found in the caseload data and case assignment list but assigned to different inspectors."

  Objection: HHSC explained to the Monitors on August 15, 2023 that discrepancies could occur if the Monitors compared report data frozen on a date other than the date the Case Assignment page was printed. Instructions on how to investigate any identified discrepancies can be found on the document titled "Residential Child Care Licensing - Reviewing Caseload Assignments in CLASS.pdf - All Documents," which has been given to the Monitors.

  **The Monitors' Response:**  See above. The monitoring team compared the case assignment information for the same day.

### 11. The State's Objection:

- Page 126: "A total of 69 tasks did not match, accounting for 8% of the 877 tasks on the sampled inspectors' CLASS case assignment lists for the months analyzed. Forty-one of these tasks were found on the inspectors' case assignment list but were not in the monthly data, and 28 tasks were included in the monthly data but were not on the inspectors' CLASS case assignment list."

  Objection: Defendants incorporate by reference the same objections asserted above to Pages 125 and 126.

---

[28] Case assignment lists used for interviews are pulled from CLASS on the first day of the month between the hours of 7 and 8 am, just prior to the interviews.  Case assignment lists for staff not interviewed are pulled on the first day of the month between 9 am and 4 pm.

**The Monitors' Response:** The Monitors incorporate by reference the same response to the objections asserted above to pages 125 and 126.

B. The State's Objections to Appendix 1 and Appendix 2 of the Seventh Report

The Monitors provided copies of Appendix 1 and Appendix 2 to the parties for review and feedback on December 12, 2023, and requested the parties' feedback by January 4, 2024. At no time prior to the filing of its Objections on January 31, 2024, did the State express concern or objection to the Monitors or the Court regarding the information in Appendix 1 or 2. In any event, the information included in the State's Objection does not change the Monitors' analysis regarding the intake reports and investigations discussed in the respective appendices.