IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, | § § § § | |
| *Defendants.* | § § | |

---

## DEFENDANTS' RULE 60(b)(5) MOTION FOR RELIEF FROM JUDGMENT

---

# TABLE OF CONTENTS

Page

Table of Authorities ....................................................................................................ii

Introduction ..............................................................................................................1

Background ................................................................................................................2

Argument ..................................................................................................................3

I.    Rule 60(b)(5) requires relief from judgment when the judgment has been satisfied or applying the judgment prospectively would be inequitable. ........ 3

II.   Defendants are entitled to relief from Remedial Orders 1 and B4 ................. 8

    A.    Defendants are entitled to additional relief under this Court's 2018 order because they have achieved "full compliance." ..................... 9

    B.    Defendants are also entitled to relief under Rule 60(b)(5). ................. 10

III.   Defendants are entitled to relief from Remedial Orders 2, 13, 14, 15, 16, 17, 18, 19, 37, B3, and B4 ................................................................................. 11

    A.    Remedial Order 2 ................................................................................. 11

    B.    Remedial Orders 13 and 14 ................................................................. 12

    C.    Remedial Order 15 ............................................................................... 14

    D.    Remedial Order 16 ............................................................................... 15

    E.    Remedial Order 17 ............................................................................... 16

    F.    Remedial Order 18 ............................................................................... 16

    G.    Remedial Order 19 ............................................................................... 17

    H.    Remedial Order 37 ............................................................................... 18

    I.    Remedial Order B3 .............................................................................. 19

    J.    Remedial Order B4 as to HHSC .......................................................... 20

Conclusion ............................................................................................................... 21

Certificate of Conference ........................................................................................ 23

Certificate of Service ............................................................................................... 23

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bd. of Educ. of Okla. City v. Dowell*,
498 U.S. 237 (1991) ................................................................ 2, 6, 15

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004) ................................................................ 6, 10, 11

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) ................................................ 6

*Frew v. Young*,
2022 WL 135126 (5th Cir. Jan. 13, 2022).................................*passim*

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ................................................................ 7

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) ................................................ 5, 7

*Horne v. Flores*,
557 U.S. 433 (2009) ................................................................*passim*

*M.D. ex rel. Stukenberg v. Abbott*,
907 F.3d 237 (5th Cir. 2018) ................................................ 4, 19

*M.D. ex rel. Stukenberg v. Abbott*,
977 F.3d 479 (5th Cir. 2020) ................................................ 13

*Milliken v. Bradley*,
433 U.S. 267 (1977) ................................................................ 5

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ................................................................ 4

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ................................................................ 5

*In re PFO Glob., Inc.*,
26 F.4th 245 (5th Cir. 2022).................................................. 13

*R.C. ex rel. Ala. Disabilities Advoc. Program v. Walley*,
475 F. Supp. 2d 1118 (M.D. Ala. 2007)................................ 8

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ................................................................ 6, 7, 10

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ................................................................ 13

**TABLE OF AUTHORITIES**
(cont'd)

*United States v. Overton*,
 834 F.2d 1171 (5th Cir. 1987) .................................................................................... 9

**Rules**

Fed. R. Civ. P. 60 ............................................................................................... 1, 2, 6, 7

**Other Authorities**

Texas Health & Human Services Commission, *Minimum Standards*...................... 13

## INTRODUCTION

The Supreme Court has made clear that "Rule 60(b)(5) serves a particularly important function in . . . 'institutional reform litigation'"—like this case. *Horne v. Flores*, 557 U.S. 433, 447 (2009).  Because injunctions issued in institutional-reform cases can remain in force for years and often intrude on core areas of state authority, the Supreme Court has cautioned that courts imposing such injunctions should apply a "flexible approach to Rule 60(b)(5) motions" to ensure that "'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Id.* at 447–48, 450.  With respect to at least 12 of this Court's remedial orders, the time to return that responsibility has come.

Since the Court imposed an injunction and numerous remedial orders on defendants over five years ago, defendants have undertaken extraordinary measures to satisfy the Court's orders—spending over $100 million on compliance efforts in the process.  As the Court has recognized, defendants have achieved 99 percent compliance with two of those orders—leading the Court to enter a finding of "full compliance" as to those orders.  The reports produced by the Court's Monitors confirm that defendants have consistently exceeded 90 percent compliance with at least 10 more of the Court's remedial orders.

Defendants' consistent, proven track record of compliance with those 12 orders warrants relief from judgment.  That compliance warrants a finding that the judgment has been satisfied with respect to those 12 orders.  *See* Fed. R. Civ. P. 60(b)(5).  In addition, in light of that compliance, prospective application of those orders to the

defendants would be inequitable. *See id.* Given defendants' demonstrated compliance with those orders, continued "judicial tutelage" over defendants in this "area[]" of core state responsibility" raises "sensitive federalism concerns." *Bd. of Educ. of Okla. City v. Dowell*, 498 U.S. 237, 249 (1991) (first quote); *Horne*, 557 U.S. at 448 (second and third quotes).

Because "a durable remedy has been implemented" by defendants regarding these 12 orders, "continued enforcement of the order[s] is not only unnecessary, but improper." *Horne*, 557 U.S. at 450. Indeed, "the longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Id.* at 453. So defendants seek relief from Remedial Orders 1, 2, 13, 14, 15, 16, 17, 18, 19, 37, B3, and B4 under the Court's 2018 order, Dkt. 606, and under Federal Rule of Civil Procedure 60(b)(5).

## BACKGROUND

In November 2018, the Court entered an injunction against defendants along with a number of remedial orders. Dkt. 606. The Court also appointed Kevin Ryan and Deborah Fowler as special masters ("Monitors") under Federal Rule of Civil Procedure 53. Dkt. 606 at 16. The Court's order provides that "[e]ither party may apply to the Court during the term of the monitoring to terminate supervision over one or more components of this Order if that party can show full compliance with that component and that further monitoring will not serve a purpose." Dkt. 606 at 19. The order states that the Court "retains jurisdiction for a period of three years after full compliance as certified by the Monitors." Dkt. 606 at 19.

Since June 2020, the Monitors have produced reports about every six months "to assess and report on Defendants' compliance with the terms of" the Court's remedial orders. Dkt. 606 at 16 (Remedial Order AA1); *see also* Dkt. 1496 (Seventh Report) at 4.

At a January 22, 2024 status conference, the Court announced that the Monitors had certified defendants' full compliance with two of the Court's remedial orders—Remedial Orders 1 and B4. Dkt. 1510 at 4 (Jan. 22, 2024 Status Conf. Trans.). Plaintiffs didn't object, and the Court entered a finding of full compliance with those orders. Dkt. 1514. The Court stated, however, that its full-compliance finding for Remedial Order B4 applies "only . . . to DFPS"—not HHSC. Dkt. 1514 n.1. And instead of granting full relief from Remedial Orders 1 and B4, the Court has stated that it will subject defendants to a three-year monitoring and supervision period, during which any drop in compliance below 99 percent would lead the Court to "vacate the full compliance and start over." Jan. 22, 2024 Status Conf. Trans. at 6.

## ARGUMENT

## I. Rule 60(b)(5) requires relief from judgment when the judgment has been satisfied or applying the judgment prospectively would be inequitable.

Rule 60(b)(5) provides for relief from a judgment or order if "the judgment has been satisfied, released, or discharged," or if "applying [the judgment or order] prospectively is no longer equitable." As the Supreme Court has explained, "Rule

60(b)(5) serves a particularly important function in . . . 'institutional reform litiga-tion.'" *Horne*, 557 U.S. at 447.  The Supreme Court has articulated two reasons for the importance of Rule 60(b)(5) in this context.

*First*, "injunctions issued in such cases often remain in force for many years." *Horne*, 557 U.S. at 447–48.  But "the passage of time frequently brings about changed circumstances" that call for "reexamination of the original judgment" in light of new developments.  *Id.* at 448.

*Second*, "institutional reform injunctions often raise sensitive federalism con-cerns." *Horne*, 557 U.S. at 448.  Such injunctions frequently intrude on "areas of core state responsibility," *id.*—including the child-welfare system at issue here.  *See M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) (cautioning that "insti-tutional reform injunctions are disfavored" and that "[a]n intrusion of this scale should not be taken lightly").  Those "[f]ederalism concerns are heightened" when, as in this case, "a federal court decree has the effect of dictating state . . . budget priori-ties." *Horne*, 557 U.S. at 448.  An institutional-reform decree "eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds." *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring); *see Horne*, 557 U.S. at 448.

Those decrees also "interfere with a State's democratic processes" and diminish the political accountability at the heart of our system of government.  *Horne*, 557 U.S. at 448–50, 453, 471.  In sum, the "expansive use of equitable remedies has long been

recognized as a threat to federalism," because sweeping institutional-reform injunctions "threaten 'the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *In re Gee*, 941 F.3d 153, 167 (5th Cir. 2019) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974)).  For that reason, "federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken v. Bradley*, 433 U.S. 267, 280–81 (1977).

The profound concerns surrounding institutional-reform litigation require that courts apply "a 'flexible approach' to Rule 60(b)(5) motions." *Horne*, 557 U.S. at 450; *see Frew v. Young*, 2022 WL 135126, at *3 (5th Cir. Jan. 13, 2022) (Rule 60(b)(5) should be given a "liberal construction").  This "flexible approach allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Horne*, 557 U.S. at 450.  "If a durable remedy" addressing the objective of the underlying order "has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.*

Here, applying the "flexible approach" to Rule 60(b)(5) mandated by the Supreme Court makes clear that this Court should grant defendants relief from judgment with respect to 12 of the Court's remedial orders for two separate but related reasons:  (1) defendants' over-90-percent compliance with those orders means that the orders have been satisfied, and (2) applying those orders to defendants prospectively is no longer equitable given defendants' high degree of compliance.

**A.    The judgment has been satisfied.**   A defendant is entitled to relief from judgment when "the judgment has been satisfied, released, or discharged."  Fed. R. Civ. P. 60(b)(5).  A party can demonstrate that a "judgment has been satisfied" by showing "substantial compliance" with the court's order.  *Frew v. Janek*, 780 F.3d 320, 330 (5th Cir. 2015); *accord Frew*, 2022 WL 135126, at *3.[1]  "Substantial compliance excuses deviations" from an order that "do not severely impair" the purpose of the order.  *Frew*, 2022 WL 135126, at *3.  Under this framework, a defendant's "compliance with the Decree is measured in how closely it follows the Decree's policy mandates."  *Id.* at *6.  In determining whether a defendant has achieved substantial compliance warranting relief from judgment, courts must take into account an order's "potential to 'undermine the sovereign interests and accountability of state governments.'"  *Frew*, 780 F.3d at 323, 327 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

A party can also demonstrate that a "judgment has been satisfied" by showing that it has "complied in good faith" with the order and that the constitutional violation targeted by the order has "been eliminated to the extent practicable."  *Dowell*, 498 U.S. at 249–50.

---

[1]  While *Frew* applied the substantial-compliance analysis to a consent decree, that framework applies equally to injunctions.  A consent decree "is subject to the rules generally applicable to other judgments and decrees," *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992), and there is no basis for distinguishing between consent decrees and injunctions under Rule 60(b)(5).  *See Horne*, 557 U.S. at 453 ("the longer an *injunction or consent decree* stays in place, the greater the risk that it will improperly interfere with a State's democratic processes") (emphasis added).

**B.      Prospective application is no longer equitable.**  A defendant is also entitled to relief from judgment when "applying [the original injunction] prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  Prospective application of an institutional-reform injunction is no longer equitable when "'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"  *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384).

The Supreme Court has identified a wide range of "factual and legal changes" that may render continued enforcement of the original injunction "no longer equitable," including but not limited to:  (1) implementation of a "significantly more effective" policy; (2) new legislation in the area; (3) "[s]tructural and management reforms" within the government entity; and (4) an "overall increase" in funding to address the issue.  *Horne*, 557 U.S. at 459, 460–61, 462, 465, 468.

Modifying institutional-reform injunctions to account for changed factual or legal circumstances serves the public interest because "the longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes."  *Horne*, 557 U.S. at 453.  Restoring state control over core areas of state responsibility in light of changed circumstances comports with the Supreme Court's admonition that courts must avoid "permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers."  *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006); *see Gee*, 941 F.3d at 167–68.

7

## II.      Defendants are entitled to relief from Remedial Orders 1 and B4.

In its February 2, 2024 order, the Court found that "the Department of Family and Protective Services is in full compliance as to Remedial Order 1 and Remedial Order B4." Dkt. 1514.[2]  Remedial Order 1 requires DFPS and certain SSCC case-workers to take professional development training; Remedial Order B4 requires that caseload guidelines serve as guidance for supervisors handling caseload distribution. The Court stated at a January 22, 2024 status conference that it "consider[s] full compliance 99 percent or above," and the Monitors had reported that DFPS was "99 percent and above for the past year" in compliance with Remedial Orders 1 and B4. Jan. 22, 2024 Status Conf. Trans. at 4, 6.

The Court nevertheless stated that defendants would remain subject to at least three more years of federal supervision and monitoring with respect to these orders. Jan. 22, 2024 Status Conf. Trans. at 5–6.  But because Remedial Orders 1 and B4 have been satisfied, the Court's 2018 order and Rule 60(b)(5) both require the Court to relieve defendants from them.

---

[2]   This motion seeks relief from only those remedial orders that defendants have achieved 90 percent or greater compliance with according to the Monitors' reports because neither the Court nor plaintiffs have ever disputed those reports.  *See R.C. ex rel. Ala. Disabilities Advoc. Program v. Walley*, 475 F. Supp. 2d 1118, 1127, 1142–43 (M.D. Ala. 2007) (praising compliance scores above 90 percent in finding substantial compliance and terminating consent decree involving Alabama's child-welfare system), *aff'd*, 270 F. App'x 989 (11th Cir. 2008).  Despite seeking relief from only those orders at this time, defendants maintain that they are in substantial compliance with *all* of the Court's remedial orders (whether challenged in this motion or not), as they have repeatedly argued, including through the use of evidence outside the Monitors' reports.

## A. Defendants are entitled to additional relief under this Court's 2018 order because they have achieved "full compliance."

The Court has stated that it will continue to subject defendants to three years of federal supervision and monitoring even *after* achieving full compliance, as certified by the Monitors.  But the Court's 2018 order provides for three years of retained jurisdiction following a certification of full compliance, not three years of monitoring.

The 2018 order provides that "[e]ither party may apply to the Court during the term of the monitoring *to terminate supervision* over one or more components of this Order if that party can show *full compliance* with that component and that further monitoring will not serve a purpose."  Dkt. 606 at 19 (emphasis added).  The order therefore connects a showing of full compliance with the termination of supervision.  While the order says that "[t]he Court retains *jurisdiction* for a period of three years after full compliance," Dkt. 606 at 19 (emphasis added), in this context retaining jurisdiction refers to the Court retaining authority to address violations of the order.  *See*, *e.g.*, *United States v. Overton*, 834 F.2d 1171, 1173, 1175 (5th Cir. 1987).  It says nothing about continued monitoring during that period.

To the contrary, the 2018 order makes clear it does not allow for further monitoring following a showing of full compliance.  The order allows a party to apply for the termination of supervision if it can show "full compliance . . . and that further monitoring will not serve a purpose."  Dkt. 606 at 19.  Reading the order to allow for continued monitoring for three years even *after* a showing "that further monitoring will not serve a purpose" would be nonsensical—monitoring should not exist without a purpose and there is no purpose when a party is in compliance with a court's order.

9

As established by the Court's February 2, 2024 order, defendants have achieved full compliance as to Remedial Order 1 and DFPS has achieved full compliance with Remedial Order B4. Because continued monitoring with respect to those orders will serve no purpose, supervision regarding those orders should be terminated.

### B. Defendants are also entitled to relief under Rule 60(b)(5).

Even if the Court's 2018 order allowed for continued monitoring following a showing of full compliance, defendants would be entitled to relief from Remedial Orders 1 and B4 under Rule 60(b)(5). Rule 60(b)(5) provides that "satisf[ying]" a judicial order is grounds for "reliev[ing] a party or its legal representative from a final judgment, order, or proceeding." A court's continued interference with a core area of state responsibility after the State achieves "full compliance" is "detrimental to the public interest." *Horne*, 557 U.S. at 447.

The Supreme Court has repeatedly emphasized that Rule 60(b)(5) serves an important function in limiting the ongoing imposition of institutional-reform injunctions. Rule 60(b)(5) should be applied with "flexibility," *Rufo*, 502 U.S. at 383, to ensure that once the object of the institutional-reform injunction is achieved, the imposition on the State concludes: "The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew*, 540 U.S. at 442.

Because the "objects of" Remedial Orders 1 and B4 "have been attained," *Frew*, 540 U.S. at 442, the Court may not continue subjecting defendants to three years of continued monitorship under those orders and should relieve defendants from Remedial Orders 1 and B4.

### III.   Defendants are entitled to relief from Remedial Orders 2, 13, 14, 15, 16, 17, 18, 19, 37, B3, and B4.

Defendants are also entitled to relief from Remedial Orders 2, 13, 14, 15, 16, 17, 18, 19, 37, B3, and B4.  Because defendants have demonstrated substantial, good-faith compliance with those orders—as established by the Monitors' own reports—those orders have been satisfied, and continuing to apply them prospectively to defendants would be inequitable.

#### A.   Remedial Order 2

Under Remedial Order 2, DFPS is to "ensure . . . implementation of graduated caseloads for newly hired" caseworkers.  Dkt. 606 at 2.  The Monitors' most recent report found that 98 percent "of new caseworkers' caseloads were in conformance with the graduated caseload standard."  Seventh Report 131.  Moreover, during the review period, there were 19 distinct points of time at which 100 percent of caseworkers' caseloads conformed with the standard.  Seventh Report 131.  The Monitors also "confirm[ed] the accuracy" of DFPS's reported data by interviewing randomly selected caseworkers and checking INSIGHT and workload reports; 98 percent of the caseloads were a "perfect match."  Seventh Report 132.

Graduated caseload performance has been strong over a sustained period of time, as noted by the Monitors' prior reports.  Dkt. 1318 (Fifth Report) at 141 ("more

than 99 percent of caseworkers' caseloads" conformed to the graduated standard); Dkt. 1165 (Third Report) at 127 (98 percent). The Court itself has praised defendants' success on Remedial Order 2, calling it "[e]xcellent work." Dkt. 1321 at 42.

Defendants have ensured implementation of graduated caseloads. Their demonstrated compliance with this order over a sustained period of time warrants relief from Remedial Order 2. *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### B. Remedial Orders 13 and 14

Remedial Order 13 requires "the State of Texas" to "ensure" that investigators in "abuse or neglect investigations" "observe or interview the alleged child victims in Priority Two" investigations "within 72 hours of intake." Dkt. 606 at 4. Remedial Order 14 requires "the State of Texas" to "ensure" that Priorities One and Two "child abuse and neglect investigations" are "complete[d]" "within 30 days of intake, consistent with DFPS policy." Dkt. 606 at 4.

The Court has stated that Remedial Orders 13 and 14 apply to HHSC's RCCR division, even though RCCR doesn't perform "abuse or neglect investigations" and instead handles minimum standards investigations. *See* Dkt. 869 (First Report) at 274 n.635. Defendants, however, have maintained that Remedial Orders 13 and 14

don't apply to HHSC RCCR or minimum standards investigations—despite fully co-operating with the Monitors in their oversight of these investigations.  First Report 274–75.[3]

But even if Remedial Order 13 applied to HHSC RCCR, the Monitors have concluded that investigators succeed 93 percent of the time at making "face to face contact" with all alleged child victims within 72 hours of intake of Priority Two minimum standards investigations.  Dkt. 1380 (Sixth Report) at 145; *see also* Dkt. 1248 (Fourth Report) at 84 (finding that, for Priority Two investigations with available data, 93 percent of them included face-to-face contact with the child victims within 72 hours of intake).  Even for the remaining 7 percent of investigations, RCCR investigators often had good reasons for missing the 72-hour deadline.  For example, they sometimes determined that there actually wasn't a child victim (meaning that Remedial Order 13 didn't apply) or the person who originally reported the allegation didn't identify the child and the investigator wasn't able to determine the child's identity

---

[3]  By their plain text, Remedial Orders 13 and 14 apply to "abuse or neglect investigations."  So they don't apply to HHSC RCCR, which conducts minimum standards investigations, not "abuse or neglect investigations."  *See United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) (the "scope of a consent decree must be discerned within its four corners"); *In re PFO Glob., Inc.*, 26 F.4th 245, 255 (5th Cir. 2022) ("We must read the order as written . . . ."); *see also M.D. ex rel. Stukenberg v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020) (this Court may not modify, expand, or change the remedial orders); *accord id.* ("courts" must "draft their mandates carefully").

This is a crucial distinction.  Abuse and neglect investigations are distinct from minimum standards investigations—not only are they handled by different agencies, but they also involve different purposes, regulatory frameworks, and governing laws.  *See* Texas Health & Human Services Commission, *Minimum Standards*, bit.ly/3OCZKpF (last visited Feb. 13, 2024) (explaining that Texas law requires HHSC to regulate and enforce minimum standards against child care facilities, while DFPS is tasked with investigating child abuse and neglect at those facilities).  That's why the Court was careful to note where other remedial orders apply to *both* abuse or neglect investigations *and* minimum standards investigations.  *See, e.g.*, Dkt. 606 at 4 (Remedial Order 18: "abuse and neglect investigation or . . . standards investigation").

until after the 72-hour period (meaning it was impossible to meet the deadline, despite the investigator's best efforts).  Sixth Report 145–46.

The Monitors have observed similar success regarding Remedial Order 14, finding that investigators "complete" Priorities One and Two minimum standards investigations within 30 days of intake 96 percent of the time.  Sixth Report 147. HHSC's performance has been consistently high since the Monitors began publishing their reports over three years ago:  93 percent timely completion (Fourth Report 85); 96 percent (Dkt. 1079 (Second Report) at 274); and 95 percent (First Report 280).

Thus, even assuming that Remedial Orders 13 and 14 apply to HHSC RCCR, investigators timely "observe or interview" child victims in at least 93 percent of Priority Two minimum standards investigations and timely "complete" at least 93 percent of Priorities One and Two minimum standards investigations.  Dkt. 606 at 4. Relief from judgment is appropriate in light of defendants' robust record of compliance.  *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### C. Remedial Order 15

Remedial Order 15 requires "the State of Texas" to "ensure" that Priorities Three, Four, and Five investigations are "complete[d]" "within 60 days of intake." Dkt. 606 at 4.  The Monitors have noted that HHSC's RCCR investigators timely complete 98 percent of these minimum standards investigations.  Sixth Report 147– 48.  HHSC's performance has been consistently high throughout the Monitors' reporting period:  97 percent timely completion (Fourth Report 86); 98 percent (Second Report 275); and 96 percent (First Report 281).

14

Defendants have ensured that Priorities Three, Four, and Five investigations are timely completed.  Defendants accordingly seek relief from Remedial Order 15—in light of their exceptional compliance and lest the State be subject to "judicial tutelage for the indefinite future."  *Dowell*, 498 U.S. at 249; *see Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### D. Remedial Order 16

Remedial Order 16 compels "the State of Texas" to "ensure" that "documentation" is "complete[d] and submit[ted]" in Priorities One and Two investigations on "the same day the investigation is completed."  Dkt. 606 at 4.

The Monitors have observed that HHSC RCCR investigators "completed" the documentation the same day that they completed the investigation 96 percent of the time.  Sixth Report 148.  The Monitors have previously reported similarly high performance in this area.  Fourth Report 87 (95 percent timely documentation completion).  When DFPS's RCCI investigators complete investigations and submit them to supervisors for closure, the IMPACT system records the date of completion—which matches the date the investigation is submitted to the supervisor—and uploads all documentation to the supervisor for closure of the investigation.  Seventh Report 64 n.152.  So DFPS automatically (and always) "complete[s] and submit[s]" documentation "the same day the investigation is completed."  Dkt. 606 at 4.

Defendants have "ensure[d]" that documentation in Priorities One and Two investigations is timely "complete[d] and submit[ted]."  Dkt. 606 at 2.  Their sustained

progress and demonstrated record of good-faith compliance compels relief from Remedial Order 16. *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### E. Remedial Order 17

Remedial Order 17 compels "the State of Texas" to "ensure" that "documentation" is "complete[d] and submit[ted]" in Priorities Three, Four, and Five investigations "within 60 days of intake." Dkt. 606 at 4. The Monitors have found that investigators timely complete the documentation in 98 percent of these investigations. Sixth Report 149. Prior performance was likewise strong. *See* Fourth Report 88 (96 percent timely documentation completion).

The Monitors' reports establish that defendants have "ensure[d]" that documentation in Priorities Three, Four, and Five investigations is timely "complete[d] and submit[ted]." Dkt. 606 at 4. Defendants' high degree of compliance warrants relief from Remedial Order 17. *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### F. Remedial Order 18

Remedial Order 18 commands the "State of Texas" to "ensure" that "RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation." Dkt. 606 at 4.

The Monitors have found that HHSC's RCCR investigators had a 93 percent success rate at timely notifying referents and providers after completing Priorities

One and Two minimum standards investigations. Sixth Report 150. HHSC's performance was likewise strong for the Fourth Report with 94 percent timely notification. Fourth Report 89. As for DFPS, the agency timely mailed provider letters for 92 percent and referent letters for 90 percent of Priorities One and Two RCCI investigations. Seventh Report 64–65.

Defendants have ensured that investigators timely mail notification letters in the vast majority of investigations. This record of compliance exceeding 90 percent warrants relief from judgment. *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### G. Remedial Order 19

Remedial Order 19 commands the "State of Texas" to "ensure" that "RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake." Dkt. 606 at 4. The Monitors have found that HHSC's RCCR investigators timely notify the referents and providers in 92 percent of investigations. Sixth Report 151. Notification performance was also strong in the Fourth Report with 95 percent timely notification. Fourth Report 90.

Defendants have ensured timely notification in Priorities Three, Four, and Five minimum standards investigations. Defendants' demonstrated compliance warrants relief from Remedial Order 19. *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### H. Remedial Order 37

Remedial Order 37 directs DFPS to "ensure that all abuse and neglect referrals regarding a foster home . . . which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral." Dkt. 606 at 7. Additionally, "[u]pon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record." Dkt. 606 at 7.

As the Monitors explain, "the State's restrictions around the practice of downgrading abuse, neglect, and exploitation intakes for children in licensed placements dramatically reduced the number of downgraded intakes" covered by this Remedial Order. Seventh Report 106; *see also* Fifth Report 100; Third Report 86. Indeed, in the Monitors' most recent reporting period, there were only three downgraded intakes involving a foster home. Seventh Report 106. The Monitors "reviewed each" and "found no concerns." Seventh Report 107.

Defendants have substantially restricted the circumstances in which an investigation can be downgraded and inform caseworkers and supervisors of the few that are downgraded. Defendants' high degree of good-faith compliance, as described by the Monitors, calls for relief from Remedial Order 37. *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

## I.  Remedial Order B3

Remedial Order B3 requires defendants to "establish internal guidelines for caseload ranges" to be used for DFPS RCCI investigators and HHSC RCCR inspectors.  Dkt. 606 at 13–14.  The guidelines are 14–17 investigations per RCCI investigator and 14–17 tasks (e.g., assigned operations, minimum standard investigations, or agency home sampling) per RCCR inspector.  *See* Order Regarding Workload Studies, Dkt. 772 at 2; *see also* Seventh Report 115.  The guidelines are just that—they aren't "cap[s]" or "enforced caseload range[s]."  Dkt. 772 at 2; *see also Stukenberg*, 907 F.3d at 279 ("caseload caps are misguided").

Defendants have satisfied Remedial Order B3 by "establish[ing] internal caseload guidelines."  Dkt. 606 at 13–14; *see* Dkt. 772 at 1–2.  Indeed, the Court's finding that DFPS has achieved "full compliance" with Remedial Order B4 logically compels additional relief from Remedial Order B3 at least with respect to that agency.  Dkt. 1514.  Remedial Orders B3 and B4 work in tandem:  Remedial Order B3 requires defendants to establish guidelines, while Remedial Order B4 requires that those guidelines serve as "guidance for supervisors who are handling caseload distribution."  Dkt. 606 at 14.  A finding that DFPS has fully complied with Remedial Order B4 by using guidelines to serve as guidance for supervisors necessitates the predicate finding that those guidelines have been established in the first place—as the Monitors' reports confirm.[4]

---

[4]   The Monitors' most recent report found that 99–100 percent of DFPS RCCI investigators have had caseloads within the guidelines since July 2022.  Seventh Report 116–17.  The Fifth Report noted

Continued federal supervision under Remedial Order B3 is therefore unjustified.  *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

### J.  Remedial Order B4 as to HHSC

Remedial Order B4 requires that the guidelines called for by Remedial Order B3 serve as "guidance for supervisors who are handling caseload distribution."  Dkt. 606 at 14.  The Court has already acknowledged that DFPS has achieved "full compliance" with Remedial Order B4, Dkt. 1514, but HHSC has also demonstrated compliance with this order over a sustained period of time.

HHSC has satisfied Remedial Order B4 by having supervisors use the internal caseload guidelines as "guidance" in distributing caseloads.  Dkt. 606 at 14.  HHSC's compliance is demonstrated by the Monitors' own finding that HHSC RCCR caseloads are consistently within the guidelines.  *See* Seventh Report 121 (average 94 percent within guidelines); Fifth Report 132–33 (average 86.5 percent within guidelines).[5]

HHSC's demonstrated compliance warrants relief from Remedial Order B4.  *See Horne*, 557 U.S. at 447; *Frew*, 2022 WL 135126, at *3, *6.

---

similar achievements.  Fifth Report 138 ("Almost all RCCI investigator . . . caseloads were within the guidelines"); *see also* Fifth Report 127–28 (97–100 percent within guidelines).

[5]  The Monitors' Seventh Report noted some purported "discrepancies" in RCCR's data, but none of the purported discrepancies would've resulted in a single inspector's caseload exceeding the guidelines.  Seventh Report 125.  In addition, the Monitors note and provide examples of reasonable justifications for the purported discrepancies.  Seventh Report 127–28.  For example, an investigation may appear on an inspector's case assignment list in CLASS while the investigation is pending administrative review but the inspector isn't doing "any work associated with the investigation."  Seventh Report 127.  In all events, even if a small percent of investigators or inspectors exceeded the guidelines, that would be no basis to find a lack of substantial compliance because the Court has made clear that the guidelines aren't caps.  Dkt. 772 at 2.

## CONCLUSION

This Court should relieve defendants from Remedial Orders 1, 2, 13, 14, 15, 16, 17, 18, 19, 37, B3, and B4 under the Court's 2018 order, Dkt. 606, and under Federal Rule of Civil Procedure 60(b)(5).

Date:  February 13, 2024

**KEN PAXTON**
 Attorney General

**BRENT WEBSTER**
 First Assistant Attorney General

**JAMES LLOYD**
 Deputy Attorney General for Civil Litigation

 */s/ Kimberly Gdula*
**KIMBERLY GDULA**
 State Bar No. 24052209
 Southern District No. 10092074
 Chief
 General Litigation Division
**KARL E. NEUDORFER**
 State Bar No. 24053388
 Southern District No. 725939
 Assistant Attorney General
 Administrative Law Division
**CLAYTON R. WATKINS**
 State Bar No. 24103982
 Southern District No. 3663032
 Assistant Attorney General
 Administrative Law Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120
(512) 370-0667 – Fax
kimberly.gdula@oag.texas.gov
karl.neudorfer@oag.texas.gov
clayton.watkins@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

Respectfully submitted,

 */s/ Allyson N. Ho*
**ALLYSON N. HO**
 *Attorney-in-Charge*
 State Bar No. 24033667
 Southern District No. 1024306
**BRADLEY G. HUBBARD**
 State Bar No. 24090174
 Southern District No. 3450976
**JOHN ADAMS**
 State Bar No. 24097277
 Southern District No. 3004597
**SAVANNAH SILVER**
 State Bar No. 24129020
 Southern District No. 3844454
**JASON MUEHLHOFF**
 State Bar No. 24135719
 Southern District No. 3865730

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
(214) 571-2900 – Fax
aho@gibsondunn.com
bhubbard@gibsondunn.com
jsadams@gibsondunn.com
ssilver@gibsondunn.com
jmuehlhoff@gibsondunn.com

**PRERAK SHAH**
 State Bar No. 24075053
 Southern District No. 2137529

Gibson, Dunn & Crutcher LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
(346) 718-6620 – Fax
pshah@gibsondunn.com

ATTORNEYS FOR DEFENDANTS

22

**CERTIFICATE OF CONFERENCE**

On February 13, 2024, counsel for defendants asked counsel for plaintiffs whether plaintiffs were opposed or unopposed to the relief requested by this motion. Counsel for plaintiffs stated that plaintiffs are opposed to the relief sought.

 */s/ Allyson N. Ho*
Allyson N. Ho

**CERTIFICATE OF SERVICE**

I certify that on February 13, 2024, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system, which automatically provided notice to all attorneys of record.

 */s/ Allyson N. Ho*
Allyson N. Ho