IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as | § | |
| Governor of the State of Texas, et al., | § | |
| | § | |
| *Defendants*. | § | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 60(b)(5)
MOTION FOR RELIEF FROM JUDGMENT**

---

## INTRODUCTION

Amid the swirling chaos that is the Texas foster care system, the State seizes upon positive recent progress reports on 12 discrete components of the Court's comprehensive reform injunction. It asks the Court to dismantle its injunction piecemeal, beginning with these cherrypicked pieces. The Court should reject that request. As to nearly all 12 components, the State admits it cannot show *full* compliance—a threshold requirement for finding that any injunctive order has been satisfied or for suspending monitoring over any component of this Court's injunction. Nor can the State show the *durable* compliance that would make further monitoring unnecessary. The State's system remains unreasonably dangerous for thousands of children. To make and keep Plaintiff Children safe, this Court must continue to supervise compliance with its entire injunction.

Defendants' Rule 60(b)(5) Motion for Relief from Judgment, Dkt. 1518, is meritless. Defendants are not entitled to relief either under Rule 60(b)(5) or the Court's 2018 Order, Dkt. 606. Defendants wax rhetorically about the dangers of institutional reform injunctions, touting

concerns about federalism and interference with the State's democratic processes that are not implicated here.  They liberally quote *dicta* from *Horne v. Flores* to impugn the legitimacy of the Court's 2018 Order.  But they fail to show how the Order raises the elevated federalism concerns discussed in *Horne* or any other reason to modify the Order.

The *Horne* decision is not even apposite to this motion.  Defendants move for relief under the first prong of Rule 60(b)(5), arguing that they should be relieved from parts of the 2018 Order because "the judgment has been satisfied."  *Horne*, however, involved a motion for relief under the third prong of Rule 60(b)(5), which permits modification where "applying [the decree] prospectively is no longer equitable."  It did not address a claim that the judgment had been satisfied and therefore has no bearing here.  Although Defendants throw in a few conclusory remarks about the equity of continuing to apply the judgment prospectively, they make no actual argument about equity.  They merely refer back to their purported compliance with the 12 Remedial Orders ("ROs") from which they seek relief.  They point to no significant changes in facts or law that would support such a claim.  Nor could they, as there have been no significant changes in the circumstances surrounding enforcement of the 2018 Order that call into question its continued application.  Their failure even to articulate—much less prove—changed circumstances is fatal to any equitable claim for relief.

As to prong one, Defendants have not fulfilled the objective of the 2018 Order and therefore have not, in any sense, satisfied the judgment.  Defendants must show that: (1) they have fully achieved the objective of the injunction, and (2) a durable remedy is in place to guarantee their compliance absent judicial oversight.  They do not even argue that they satisfy this standard.

The key objective of the Court's 2018 Order is "to ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm."  Dkt. 606 at 2.  Yet Defendants continue to

2

countenance shocking harms to Plaintiffs despite the injunction. The issues were so severe that Plaintiffs moved to hold Defendants in contempt. The Court held a week-long contempt trial in December 2023 and a decision on the merits is pending. Subsequent court hearings have also exposed numerous problems that demonstrate Texas's child welfare system remains deeply dysfunctional. Defendants' motion does not mention any of this.

Defendants, in fact, move for relief from only a handful of the Remedial Orders, and those only on the basis of "substantial compliance." But substantial compliance is a creature of contract law that uniquely applies to consent decrees, which are court-approved settlement agreements. The Court's 2018 Order is not a consent decree; it is a narrowly-tailored injunction specifically aimed at redressing Defendants' constitutional violations. Under its own terms, the 2018 Order requires "full compliance." Therefore, substantial compliance is not applicable.

Finally, Defendants also cannot get relief under the 2018 Order. That Order requires a party seeking to terminate monitoring over one or more components of the Order to show: (1) "full compliance with that component" *and* (2) "that further monitoring will not serve a purpose." Dkt. 606 at 19. Defendants have not established either element of this two-part test for any of the 12 ROs from which they seek release.

Additionally, Defendants' apparent belief that the 2018 Order's termination provision allows for a piecemeal exit from the Court's *jurisdiction* flatly misreads the provision. The Order provides for the possible incremental reduction of active *monitoring*. The Court retains jurisdiction over the entire case for three years after "full compliance" with the *whole* Order is achieved. *Id.*

The Court should deny Defendants' motion in its entirety.

## BACKGROUND

The backdrop to the State's pinprick motion is a tapestry of dysfunction. Since the Court entered its injunction in November 2018, Dkt. 606, the Texas foster care system remains in shocking disarray. Plaintiffs—children in permanent management conservatorship ("PMC")—continue to be exposed to an unreasonable risk of serious harm on so many levels, despite the Court's injunction.

The State is leagues away from the "full compliance" with the Court's *entire* 2018 Order required to start the three-year clock for terminating jurisdiction. Dkt. 606 at 19. Nor can it show "that further monitoring will not serve a purpose," *id.*, as to any discrete component, let alone all, of this disordered, unaccountable system. It is not entitled to any of the relief it seeks while children throughout the system remain unsafe.

The dangers posed to children consigned to this chaotic system were fully evident during the three-day contempt hearing the Court held in December 2023. That evidentiary hearing covered a range of topics addressed in Plaintiff Children's Third Amended Motion to Show Cause, Dkt. 1427, and the Court's contempt decision is still pending. In particular, the contempt motion and hearing addressed violations of numerous ROs stemming from deficient and untimely investigations of abuse and neglect of developmentally disabled PMC children; risks of medical abuse and neglect posed by the State's failure to enforce contract and policy requirements against care providers, especially those relating to management of powerful psychotropic medications; failure to adhere to caseworker caseload guidelines caused by the exploding crisis of children sleeping in unlicensed, unsafe placements (whom the State refers to as "Children Without Placements" or "CWOP"); and failures to apprise caregivers of sexual abuse histories and to validate compliance with sexual abuse training requirements. *See generally id.*

Although Defendants' current motion steers clear of the ROs at issue in the contempt proceedings, the evidence of widespread dysfunction presented at the contempt hearing and other recent hearings demonstrates why this motion should be denied. The system as a whole remains woefully noncompliant, and even an incremental easing of monitoring over this system will leave children at even greater risk.

During the contempt hearing, the Court heard testimony from a range of witnesses with direct and intimate experience with the system, including a former CWOP child, a former caseworker, an attorney at litem, and a guardian ad litem; and experts on child welfare and child health care. Witnesses also included senior officials from the Defendant agencies, who often displayed shocking ignorance about areas they supposedly manage.

Lowlights from the hearing include:

- Multiple witnesses testified about the deplorable and dangerous conditions prevalent in CWOP. These children are shuffled among offices, churches, leased houses, motels, and the like. In these settings, they are routinely exposed to numerous dangers including violence, drug use, physical and sexual abuse, rape, and sexual exploitation and trafficking. CWOP houses and hotels are often squalid and seedy. *E.g.*, Dec. 4, 2023, Contempt Hearing Tr. Vol. 1 ("Contempt Day 1 Tr.") 259-63; Dec. 5, 2023, Contempt Hearing Tr. Vol. 2 ("Contempt Day 2 Tr.") 15-21, 23-25, 28-34, 36-40; 159, 161-76, 181-84, 188-89, 219-20, 226-30.

- Former PMC child Jackie Juarez observed underage girls texting grown men to pick them up and a boy getting shot while trying to steal a car. She herself was beaten up so badly she had to be taken to the hospital. Contempt Day 1 Tr. 259-62.

- Attorney ad litem Julie Pennington testified about filthy and dangerous conditions typical in leased homes used to house children. *Id.* at 15-21, 23-25, 28-34, 36-40. Guardian ad litem Lindsey Dionne testified to similarly dangerous conditions in unregulated CWOP settings, including hotels rampant with sex trafficking, rape, and drugs. Contempt Day 2 Tr. 159, 161-76. She noted a single CWOP location in Temple had generated over 800 calls to law enforcement. *Id.* at 181-84.

- Ms. Dionne also testified about the State's tactics for obscuring its numbers. When a Texas state district judge called a contempt hearing regarding CWOP in Travis County, one of Ms. Dionne's child clients was taken out of CWOP and driven around in a car for hours so that the State would not have to count him as being "in

CWOP" when reporting to the judge. *Id.* at 191-92. "They dropped him right back off the second the hearing ended." *Id.* at 192.

- Christie Carrington, a former DFPS worker who currently works with the Texas State Employees Union and frequently interacts with current caseworkers, testified about an incident during an overnight CWOP shift when a child left the group home and "came back with a gun" and had threatened to kill another child. *Id.* at 229-30.

- Ms. Carrington also testified that CWOP had "hijacked the agency." It has become an all-encompassing crisis, subjecting caseworkers to tremendous stress because working overtime on Child Watch shifts has become a mandatory, essential job function requiring "all hands on deck." *Id.* at 210-11, 213, 224. It has "burned out everyone," especially caseworkers, who must work mandatory overtime hours, on top of their assigned caseloads, in settings where they fear getting injured and are trying to care for high-need children without proper training, facilities, or support. *Id.* at 216-20, 225-28.

- Testimony from other witness also confirmed what should be obvious—the CWOP overload directly contributes to caseworkers burning out and resigning, and exposes children to greater danger because caseworkers are exhausted, overburdened, and ill-supported. *E.g.*, Contempt Day 1 Tr. 311-20; Contempt Day 2 Tr. 166-68.

- The Provider Investigations ("PI") unit within HHSC is responsible for investigating reports of abuse, neglect, and exploitation of PMC children with developmental disabilities housed in certain facilities. PI is massively backlogged, taking months if not longer to complete investigations, and the quality of its investigations is woefully deficient. *E.g.*, Contempt Day 1 Tr. 106-27. The executive in charge of the unit has little idea what goes on in his own department. *E.g.*, *id.* at 129 (S. Pahl: "I'm not familiar with all of our policies and procedures."); *see also, e.g.*, *id.* at 115-23, 126-28, 131. The unit has "been trying to address staffing issues for" eight years, and, despite claiming it is a priority, this official delegates hiring and knows nothing about what is actually happening on that front. *Id.* at 117-19.

- One particularly tragic example of the consequences of PI's backlog and deficiencies is the case of Child C, a developmentally disabled, nonverbal 15-year-old girl, who suffered several instances of abuse, including alleged sexual abuse, in her group home. Twelve investigations of alleged abuse or neglect were opened as to Child C over the course of 12 months, during which she stayed in the home. *E.g.*, Contempt Day 2 Tr. 98-99. Of these investigations, the quickest one took nine months; it involved allegations against a staff member with a long history of abuse allegations against him, who allegedly beat up Child C, breaking her jaw in two places. *Id.* at 102-04. Despite the group home owner's certainty that the staffer perpetrated the abuse of Child C, PI's defective nine-month investigation reached a conclusion of "unconfirmed." *Id.*

6

- PI recently adopted a new policy instructing its investigators to omit any explanation of a finding of "unconfirmed" or "inconclusive" from their reports to shield PI's deficient investigations from scrutiny. *E.g.*, Contempt Day 1 Tr. 124-34, 138-39, 144-45, 155-61.

- Many PMC children are prescribed powerful psychotropic medications. The State's contracts with residential care facilities require them to follow state policies and practices for management of these medications. These include rules known as the Psychotropic Medication Utilization Parameters ("PMU parameters"). *E.g.*, *id.* at 339-41. DFPS's Director of Residential Contracts did not even know that the State's contracts require facilities to follow the PMU parameters. *Id.* at 339-40. Asked whether the facilities must follow the PMU parameters, she first replied "Not according to my contract," and then shared her misunderstanding that these rules for child-care facilities are actually "parameters for medical professionals." *Id.* She was wrong; they are contract requirements. *Id.* at 340-42. Unsurprisingly, her division does not monitor whether facilities actually follow the contractually required PMU parameters. *Id.* at 342- 49.

Another metric demonstrating the lack of safety in CWOP locations is the high number of Serious Incident Reports ("SIRs") filed in relation to children in CWOP—2,131 within the last three years. Pls. Ex. 2, to Jan. 22, 2024 Status Conf., Dkt. 1538; *see also* Jan. 22, 2024 Status Conf. Tr. 78. One such SIR surfaced after Monitors inquired about missing shift logs and the SRI for a 13-year-old PMC child arrested at a CWOP setting on September 2, 2023. Monitors' Update to the Court Regarding the State's Failure to Provide Records and Information Related to Safety Issues in Unlicensed Settings, Dkt. 1521 at 2.[1] The shift log notes and SRI reveal that the child, LN, "had to be hospitalized within hours of being placed in" a CWOP Setting "after two other children physically assaulted her." *Id.* at 3. After she was moved to another CWOP location, she was bullied and physically attacked by other children." *Id.* LN's behavior subsequently "disintegrated", culminating in a "mental break" that resulted in the child causing serious injury to

---

[1] The Monitors only asked for this documentation after several stakeholders described the events leading to the child's arrest. Dkt. 1521 at 2. "Because DFPS did not produce the specific SIR until the Monitors asked for it, despite a standing request to produce all SIRs, the Monitors would not have known about the incident but for the tip from a stakeholder." *Id.* at 4.

a caseworker and law enforcement officer, which led to her arrest. *Id.* at 3-4. These kinds of incidents occur in CWOP with numbing regularity. *See, e.g.*, Dkt. 1538.

As this and other evidence from recent hearings and the Court Monitors' submissions shows, Texas's foster care system remains an unreasonably dangerous place, even if Defendants have made some progress on the 12 ROs at issue in their motion. Additionally, the need for continued monitoring is obvious. The entire system is plagued with deficiencies, and the State's own data reporting is suspect at best.

## I.    Defendants Are Not Entitled to Relief from Judgment Pursuant to Rule 60(b)(5).

Federal Rule of Civil Procedure 60(b)(5) permits relief from a final judgment when "the judgment has been satisfied, released or discharged" or "applying it prospectively is no longer equitable." Fed. R. Civ. Pro. 60(b)(5); *see also Horne v. Flores*, 557 U.S. 433, 450 (2009). Whether to grant a Rule 60(b)(5) motion is within the Court's discretion. *Frazar v. Ladd*, 457 F.3d 432, 435 (5th Cir. 2006). "The district court, by way of its role in overseeing the institutional reform litigation for many years, is in the best position to evaluate both whether a party has complied with federal law and, if so, whether the party is committed to ongoing compliance with federal law in the absence of oversight by the federal court." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1200 (10th Cir. 2018).

Defendants fail to show grounds for the Court to exercise its discretion to modify the Order.

### A.   Defendants' Invocations of *Horne* Are Misplaced.

Defendants lean heavily on the Supreme Court's 2009 decision *Horne v. Flores*, but their reliance on that decision is misplaced because it was directed to claims and issues not relevant here. In particular, *Horne*'s references to "a 'flexible approach'" were in the context of "consent decrees" and similar judgments, not fully litigated permanent injunctions, and involved

modifications based on changes in circumstances, not purported compliance with the decrees themselves.   557 U.S. at 448-51 (discussing and relying on cases involving consent decrees, including *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992), and *Frew v. Hawkins,* 540 U.S. 431(2004)).  In any event, Defendants fail to satisfy the requirements for relief under *Horne* and the Rule 60(b)(5) authorities it relied upon.  *See Horne*, 557 U.S. 433; *Rufo*, 502 U.S. 367; *Bd. of Educ. of Okla. City v. Dowell*, 498 U.S. 237 (1991).

The entire motion boils down to the argument that 12 components of the 2018 Order should be terminated because Defendants have substantially complied with the judgment.  *See* Dkt. 1518 at 1-3, 5, 8-10, 11-20.  They cite as evidence recent Monitors' reports, which found that they attained over 90 percent compliance on these specific components within the last 18 months.  *See* Dkt. 1518 at 1-3, 5, 8-10, 11-20.

*Horne*, however, did not address a claim that the judgment at issue had been satisfied. Rather, Arizona argued that significant changed circumstances, both legal and factual, warranted relief under the third prong of Rule 60(b)(5).  *See Horne*, 557 U.S. at 459-70.  The Supreme Court reversed and remanded the case because the lower courts failed to address these changed circumstances, focusing solely on whether the State had complied with the requirements of the decree.  *Id.* at 439, 459.  Consequently, *Horne* is largely inapposite to Defendants' motion.

Furthermore, despite Defendants' rhetoric, the heightened federalism concerns animating *Horne* are not implicated here. In *Horne*, the Court cited scholarship and court opinions that expressed concerns about institutional reform litigation because "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Id.* at 448-50.  These concerns were primarily directed to consent decrees, which the Court noted "present a risk of collusion between advocacy groups and executive officials who

want to bind the hands of future policymakers." *Id.* at 449 (citation omitted). Although the injunction in *Horne* was not a consent decree, the Court worried that it raised many of the same concerns because the principal defendants never appealed the original decree and in fact sided with the plaintiffs, prompting state legislators to intervene. *Id.* at 442-43. Moreover, the *Horne* district court had effectively "dictat[ed] state or local budget priorities" by expressly ordering Arizona to provide specific funding for educational instruction and imposing fines if the state legislature (not a party to the suit) failed to appropriate funds by a specific deadline. *Id.* at 441-42, 448; *see also* Dkt. 1518 at 4.

The Court's 2018 Order is completely different. It was—and still is—vigorously litigated. It issued after a full trial that culminated in a 260-page opinion and verdict finding Defendants liable for deliberate indifference to egregious violations of Plaintiff Children's constitutional "right to be free from an unreasonable risk of harm" to their physical and emotional well-being. *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 250-56 (5th Cir. 2018) ("*Stukenberg I*"); *see* Mark Kelley, Note, *Saving 60(b)(5): The Future of Institutional Reform Litigation*, 125 Yale L.J. 272, 303 (unlike consent decrees and "potentially collusive injunctions", "litigated injunctions pose far weaker threats to political accountability, and deference to the proponent of modification is not appropriate for that reason alone"). The 2018 Order is also narrowly tailored to remedy Defendants' established constitutional violations, and the Fifth Circuit has repeatedly directed this Court to implement it. *M. D. by Stukenberg v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020) ("*Stukenberg III*"); *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg II*"), 929 F.3d 272, 281 (5th Cir. 2019); *see Stukenberg I*, 907 F.3d at 287-88.

Additionally, unlike orders in *Horne*, the 2018 Order does not dictate specific budget appropriations. To the extent resources must be allocated to compliance, that is not a function of

the Court's 2018 Order but, rather, is "required by the state's constitutional . . . obligations to the children in its care." *Juan F. v. Rell*, 2010 WL 5590094, at *3 (D. Conn. Sep. 22, 2010).

Finally, Defendants primarily challenge the Court's continued monitoring of their compliance efforts, not their substantive obligations under the decree.  Monitoring and reporting obligations, however, do not raise concerns under *Horne* because they "do not intrude on the defendant's authority to operate as it sees fit and should not trigger the same type of scrutiny." Jason Parkin, *Aging Injunctions and the Legacy of Institutional Reform Litigation*, 70 Vand. L. Rev. 167, 218.  In fact, monitoring and reporting help the parties and the court assess whether "the impact of changed circumstances" warrants modification of the decree.  *Id.* at 219.  Defendants' reliance on the Monitors' reports for their motion demonstrate their utility for Defendants, as well as the Court and Plaintiffs.

In short, the heightened federalism concerns in *Horne* are not implicated here.  These are mere strawmen arguments that distract from the fact that Defendants do not establish relief under either prong one or three of Rule 60(b)(5).

### B.  Defendants Have Not Established That the Judgment Is Satisfied.

A judgment is satisfied when the objective of the judgment has been fully achieved and a "durable remedy is implemented."  *Horne*, 557 U.S. at 450; *Dowell*, 498 U.S. at 247 (a decree "may not be changed if the purposes of the litigation as incorporated in the decree have not been fully achieved") (citation and alterations omitted).  "The status of compliance in light of the governing standards require overall attention to whether the larger purposes of the decrees have been served." *Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011).  It is "necessary for the district court to focus on 'whether there has been full and satisfactory compliance with the decree . . . and whether the [defendant] has demonstrated . . . its good-faith commitment to the whole of the court's

decree and to those provisions of law and the Constitution that were the predicate for judicial intervention in the first instance." *Id.* (quoting *Freeman v. Pitts*, 503 U.S. 467, 491 (1992)); *Dowell*, 498 U.S. at 247 (district court finding that school district "was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the school board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved").

As to what constitutes a durable remedy, "at a minimum, a 'durable' remedy means a remedy that gives the Court confidence that defendants will not resume their violations of plaintiffs' [rights under federal law] once judicial oversight ends." *Evans v. Fenty*, 701 F. Supp. 2d 126, 171 (D.D.C. 2010); *see also Dowell*, 498 U.S. at 247 (the purposes of an injunction are "fully achieved" where it is unlikely that defendants will "return to [their] former ways."). A durable remedy is the equivalent of having in place "a mechanism for future compliance." *Consumer Advisory Bd. v. Harvey*, 2009 WL 5792159, at *11 (D. Me. Oct. 9, 2009); *accord Evans*, 701 F. Supp. 2d at 171; *Marin Cty. Chapter of Nat'l Org. for Women v. Cty. of Marin*, 2023 WL 2095931, at *3 (N.D. Cal. Feb. 17, 2023). "Whether there is a durable remedy thus necessarily depends on the actual impacts or outcomes experienced by the plaintiffs." *Evans*, 701 F. Supp. 2d at 171.

From these principles, a few things become clear. For one, that Defendants have made some progress toward complying with the 2018 Order is far from sufficient to get relief under Rule 60(b)(5). *See, e.g.*, *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 36 (D.C. Cir. 2000) ("[C]ompliance with previous court orders is obviously relevant. However, . . . compliance over an extended period of time is not in and of itself sufficient to warrant relief."); *Juan F.*, 2010 WL 5590094 at *4 (denying state's Rule 60 motion although commending its "considerable progress

in achieving the goals of the consent decree"); *Evans*, 701 F. Supp. 2d at 172 ("These structural changes are all extremely positive developments, but they do not necessarily translate into proof of a durable remedy.").

Secondly, proof of a durable remedy requires a sufficient track record of longstanding and consistent compliance. The Supreme Court's "reference to a 'durable remedy' [is] recognition that fleeting federal compliance is insufficient to warrant relief." *Jackson*, 880 F.3d at 1203. Where a defendant has made changes only recently, there is not a sufficient record to establish whether a durable remedy has been implemented. *See Evans*, 701 F. Supp. 2d at 172 ("All of the changes have occurred within the past year or two, . . . it is simply too soon to tell whether they will result in improved outcomes for the plaintiffs, and, if so, whether the improvements will be sustained absent judicial involvement."). The same goes for inconsistent performance with the injunction. *Id.* at 173 (denying Rule 60(b)(5) motion when, despite improvements, defendants' performance was still "less than consistent"); *Harris Teeter*, 215 F.3d at 36 (denying Rule 60(b)(5) motion where defendants failed to show a clean record of compliance over a substantial period of time).

Defendants' assertion that "'a durably remedy has been implemented' by defendants," Dkt. 1518 at 2, is entirely conclusory and flatly contradicted by the record. *See LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 111 (D.D.C. 2010) (denying Rule 60(b)(5) motion to modify consent decree where defendants made only conclusory statements as to the durability of their remedial actions). Defendants base their entire motion on Monitor findings with respect to 12 of more than 60 ROs, all within the last 18 months. This is too sparse a record to determine whether they have implemented a durable remedy, even with respect to these 12 ROs. *Jackson*, 880 F.3d at 1203; *Evans*, 701 F. Supp. 2d at 172. Moreover, as Plaintiffs demonstrate, Defendants' overall

compliance remains woefully deficient, compelling the conclusion that Rule 60(b)(5) relief is off the table. *Evans*, 701 F. Supp. 2d at 172; *Harris Teeter*, 215 F.3d at 36.

The durability of Defendants' compliance efforts simply cannot be measured against these 12 ROs alone. Defendants do not even contend that full compliance with these 12 ROs, standing alone, would ensure that Plaintiff Children "are free from an unreasonable risk of serious harm." Dkt. 606 at 2. The 2018 Order establishes a comprehensive set of standards and interrelated objectives that are designed to ensure the safety of the children in Defendants' custody. Defendants aim to chip away, piece by piece at the comprehensive remedial structure established by the 2018 Order until nothing remains of the Court's supervision. The Court should not allow this to happen.

### Defendants can show no durable compliance throughout the dysfunctional system.

In affirming the main pillars of the Court's injunction, the Fifth Circuit was most alarmed at Defendants' exceedingly high caseloads, high caseworker turnover, high error rates in abuse and neglect investigations, and unreliable abuse statistics. *Stukenberg I*, 907 F.3d at 256-68. There remain persistent and serious problems in all of these areas; and Defendants' compliance efforts on these 12 ROs do not resolve them. The disorder throughout the entire system makes the durability of any level of compliance with any specific component doubtful at best. And it undoubtedly demonstrates that any such compliance has not achieved the injunction's overall goal of keeping children safe.

Defendants' investigatory practices remain grievously deficient. Plaintiffs presented compelling evidence at the multi-day contempt hearing in December 2023 that revealed Defendants' appallingly inadequate progress in improving the quality and timeliness of HHSC investigations into child maltreatment in care. *E.g.*, Contempt Day 1 Tr. 106-21, 124-39, 142-48,

150-52, 155-61, 187-91; Contempt Day 2 Tr. 92-93, 95, 98-104, 113-15, 122, 125.  Moreover, in their most recent comprehensive report, the Monitors gave Defendants a failing grade with respect to Provider Investigations:

> Many of the PI investigations evidenced an utter disregard by the State for children's safety, falling seriously below the standard required by the Remedial Orders. Texas repeatedly addressed allegations of Sexual and Physical Abuse of some of the State's most vulnerable children with shocking carelessness, leaving PI investigations open with no activity for months on end – in numerous instances for more than one year – while children with significant developmental disabilities were left in harm's way.

Seventh Report of the Monitors: Remedial Orders 1, 2, 3, 5 to 11, 16, 18, 37, A6, and B1 to B5, Dkt. 1496 at 7.  At the contempt hearing, HHSC's Executive Commissioner for Regulatory Services squarely admitted in his testimony that existing staffing levels at PI are deficient and that "huge deficiencies and delays" are the result.  *See* Contempt Day 1 Tr. 108, 115, 117.

Second, the record reflects that Defendants' caseload numbers and caseworker turnover persist at perilously high levels at great cost to the Plaintiff Children.  Plaintiffs demonstrated at the contempt hearing that conservatorship caseworkers' actual workloads are routinely misrepresented by the caseload data currently shared by DFPS.  In calculating active caseloads, DFPS has not been factoring in caseworkers' substantial time performing CWOP shifts.  The DFPS Associate Commissioner for Child Protective Services testified that she oversees the calculation of conservatorship worker caseloads, that she does not count CWOP shift assignments, and specified no plans to change that practice.  *See id.* at 338-332 (E. Banuelos).  To make matters worse, CWOP shifts hours, which are mandatory, continue to soar.  Total shift hours have increased from under 20,000 in 2019 to over 700,000 by the end of 2023.  Pls. Ex. 3 to Jan. 22, 2024 Status Conf., Dkt. 1508-2 at 1.  Indeed, as a former DFPS worker and current staffer for the Texas State Employees Union testified, "CWOP has hijacked the agency."  Contempt Day 2 Tr. 210.

15

CWOP directly contributes to caseworker turnover.  *E.g.*, Contempt Day 1 Tr. 311-20; Contempt Day 2 Tr. 166-68, 210-11, 216-20, 224-28.  Not only are caseworkers crushed by the extra burden of monthly CWOP shifts, but they are also demoralized by the egregious safety violations in these places.  *See, e.g.*, *id.*  During the January 22, 2024 status conference, Plaintiffs introduced into evidence a compilation of comments collected within the last six months of outgoing DFPS caseworkers, many of whom are leaving because of CWOP.   One DFPS caseworker stated:

> CWOP has been catastrophic for DFPS.  DFPS completely failed the children in foster care and more so with their employees.  I'd been assaulted, threatened countless times and was forced to travel at times distances of over 250 miles round trip to watch kids at hotels!  Female workers get assaulted and groped, CWOP kids run away and do drugs all the while these CWOP kids also engage in sex trafficking while on runaway.  It's a disgrace!  Everyone is leaving especially tenured workers like me.  So the ones left have little to no experience.  All commissioner Muth cared about was privatizing the Dept via CBC.  This agency is falling apart and that is terribly sad for our Texas children, families and workers.

Pls. Ex. 1 to Jan. 22, 2024 Status Conf., Dkt. 1508-1 at 1.

Defendants' data and reporting continue to prove unreliable and misleading.  This confirms the need for continued monitoring.  As the Court is well aware, this case includes a deeply concerning history of unreliable and misleading aggregate data published by DFPS.  For example, at the time of trial in 2014, DFPS reported an annual rate of maltreatment in foster care that facially conformed to the federal standard.   However, the Court credited Plaintiffs' evidence, which revealed an alarming 75% error rate in a significant sample of the agency's investigative findings.  *See* Mem. Op. and Verdict of the Court, Dkt. 368 at 201-2.  Likewise at the time of trial, it was determined that DFPS's methodology in calculating and reporting caseworker caseloads, using "stages" as a unit of measure, significantly underreported caseworkers' workloads.  *Id.* at 162-3.  The Court consequently ordered DFPS to calculate conservatorship caseloads using the number of

individual children assigned to the caseworker as the unit of measure.  *See* RO 35 ("DFPS shall track caseloads on a child-only basis.").  Yet despite the Court's injunction, Defendants are still not calculating workloads honestly, failing to account for the substantial mandatory CWOP responsibilities their caseworkers shoulder.  Contempt Day 1 Tr. 328-31 ("You can't force the caseworkers to do these mandatory overtimes and not count it toward their caseload.").

Further, it has recently come to light that DFPS is undercounting the total time caseworkers spend on CWOP assignments by omitting from their daily CWOP counts any children who have run away from a CWOP setting or returned from runaway status outside certain hours of the day.  Feb. 23, 2024 Status Conf. Tr. 17-18 (testimony from Deputy Commissioner for Programs, Audrey O'Neill, that DFPS's "long-standing practice and definition of Child Without Placement excludes children who are in their first night of being without placement"), 23-24 (O'Neill testimony that child who had run away prior to midnight was not counted on daily CWOP report).  DFPS consequently discounts the worker's daily hours expended on any of these cases.

Moreover, despite being required to do so, DFPS has not been providing shift logs for these children because they are not counted on DFPS's daily rosters.  But for a whistleblower, the Monitors would not have learned about missing shift logs concerning a PMC child who ran away from a CWOP setting, her later outcry that she had been raped, and the fact that she was taken to the hospital after the outcry.  Dkt. 1521 at 5-6.  Chastened at the February status conference, DFPS stated that it would provide all shift logs to the Monitors going forward, although they still do not count these children as members of CWOP.  Feb. 23, 2024 Status Conf. Tr. 18, 24.[2]

---

[2] Even aside from DFPS' general underreporting on runaway CWOP children, the Monitors report that they "do not consistently find shift log notes in children's IMPACT records."  Dkt. 1521 at 2 n.6

Additionally, the Monitors have alerted the Court to "pervasive inconsistencies" in the monthly HHSC caseload data reported by the State, which "raised extensive concerns regarding the accuracy of HHSC's caseload data." Dkt. 1517 at 4; *see also* Dkt. 1496 at 16.

The record is replete with similar recent evidence of the State's continuing failure to keep the Plaintiff Children safe from an unreasonable risk of serious harm. And the Monitors are playing an indispensable role in holding Defendants accountable.

Right now, the only thing ensuring Defendants' compliance with any of the Remedial Orders is the Court's continued monitoring and supervision. And Defendants want to terminate it. If they were allowed to do so, they would gut the 2018 Order and all but ensure that its core purpose of ensuring a safer Texas child welfare system is never achieved. As another court observed in similar litigation, "this case will not end until the state has fully met its responsibilities in addressing the needs of these children." *Juan F.*, 2010 WL 5590094, at *4.

### C. Defendants Cannot Rely on Substantial Compliance to Satisfy The Judgment.

As to the vast majority of ROs at issue here[3], Defendants do not even assert full compliance. They base their demand for relief from ROs 2, 13-19, 37, B3, and B4 (as applied to HHSC) on a claim of *substantial* compliance (which they define as achieving more than 90 percent compliance according to recent Monitor's reports). *E.g.*, Dkt. 1518 at 1, 11. But substantial compliance is not the standard here. Substantial compliance is uniquely relevant to consent decrees, which are interpreted as contracts under state law. Defendants cite no case, nor have Plaintiffs' counsel identified one, where the doctrine of substantial compliance applied to a litigated injunction.

---

[3] The exceptions being RO 1 and RO B4 (as applied to DFPS), the two ROs as to which the Court has accepted the Monitors' certification of full compliance. *See* Dkt. 1514.

The State relies on *Rufo*'s observation that "'rules generally applicable to other judgments and decrees" apply to consent decrees to contend that "there is no basis for distinguishing between consent decrees and injunctions under Rule 60(b)(5)." Dkt. 1518 at 6 n.1 (quoting *Rufo*, 502 U.S. at 378). But that is faulty logic. *Rufo*'s point is that consent decrees are like injunctions in that they are "enforceable judicial orders." *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008). However, unlike injunctions, they are also contracts, meaning different interpretive rules apply. *See id.* ("Courts should not impose their own terms within a consent decree and should read consent decree terms by their plain meaning."). "A consent decree is essentially a settlement agreement subject to continued judicial policing." *ACLU of Tenn., Inc. v. City of Memphis*, 2019 WL 13169896, at *3 (W.D. Tenn. Nov. 13, 2019) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). Thus, consent decrees "are construed according to general principles of contract interpretation," and "look[] to state law to provide the rules of contract interpretation." *Frew v. Janek*, 780 F.3d 320, 327 & n.28 (5th Cir. 2015) (citations omitted); *id.* at 327 ("The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed in the written instrument.").

Defendants rely on *Frew v. Janek* throughout their motion.[4]  Indeed, they cite it almost as frequently as *Horne*.  *See generally* Dkt. 1518 at 11-20. But *Frew* is inapposite. Because it was a consent decree, the court construed it like a contract. It found that the parties had agreed that the defendants' substantial compliance with several action plans would achieve the decree's purpose. *Id.* at 328. *Frew* thus drew on state contract law to assess whether the defendants had met this standard: "In determining that a party to a contract has fulfilled its contractual obligations, Texas

---

[4] *Frew v. Janek* went through several successive appeals.  Defendants frequently cite the most recent opinion, *Frew v. Young*, 2022 WL 135126 (5th Cir. Jan. 13, 2022) throughout their brief.  These opinions consistently asess compliance with the consent decree at issue through the lens of Texas state law and for relevant purposes can be treated as one case.

law allows substantial compliance." *Frew*, 780 F.3d at 330.  "Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose." *Id.* (quoting *Interstate Contracting Corp. v. City of Dall., Tex.*, 407 F.3d 708, 727 (5th Cir. 2005)).

Additionally, under the express terms of the *Frew* decree, compliance with the various corrective action orders that comprised the decree was "to be assessed separately." *Frew v. Janek*, 820 F.3d 715, 718 (5th Cir. 2016).  "Once Defendants comply with a particular order and the part of the consent decree that the order is intended to enforce, 'then the Court may terminate that part of the Consent Decree and the Corrective Action Order.'" *Id.*  The district court terminated portions of the consent decree on the basis of this language and the Fifth Circuit for the most part affirmed.  *See id.*; *Frew*, 780 F.3d at 323; *Frew v. Young*, 2010 WL 5590094, at *4 (5th Cir. Jan. 13, 2022).

By contrast, the Court's 2018 Order is not a negotiated consent decree and thus the contract-interpretation framework does not apply to it.  Even if it did, substantial compliance could not substitute for the 2018 Order's express requirement of "full compliance," Dkt. 606 at 19.  "[S]ubstantial compliance is not the legal equivalent of strict compliance if the contract *expressly* calls for the latter." *See Frew*, 780 F.3d at 330 n.42.  "Full compliance", which the Court has defined as 99% and above as validated by the monitors, is akin to "strict compliance" and Defendants do not meet that standard.[5]  *See id.*

The Court made this point clear to the State during the December 2023 contempt hearing: "And you did realize that to get off monitoring you have to completely, fully comply.  It's not substantial compliance." Contempt Day 1Tr. 33-34.  The Court emphasized that "[t]his order that

---

[5] The Court has clarified that "full compliance" means 99% and above.  Jan. 22, 2024 Status Conf. Tr. 6.

was affirmed said full compliance," and the Fifth Circuit has said "very clearly that we cannot go outside the mandate." *Id.* at 34.

Further, although the 2018 Order contains a provision allowing either party to apply "to terminate supervision" over component parts of the Order, the party must show not only "full compliance with that component," but ***also*** that "further monitoring will not serve a purpose"—an additional requirement that was absent in the *Frew* decree.  As discussed *infra*, Defendants have not met either of these requirements.  Finally, if full compliance with the 2018 Order is achieved, the Court still retains jurisdiction for a three-year period.  Dkt. 606 at 19.  The *Frew* order also did not provide for any period of extended jurisdiction.

*R.C. v. Walley*, 475 F. Supp. 2d 1118 (M.D. Ala. 2007) also involved a consent decree and is similarly distinguishable. Unlike the 2018 Order, the decree expressly permitted satisfaction through substantial compliance.  The decree's termination clause stated that "the defendant may move for termination of this Decree upon a showing that DHR is in *substantial compliance* with the requirements of the Decree and of the Implementation Plan . . ." *Id.* at 1125 (emphasis added).

Consequently, because they have not fully achieved the objective of the 2018 Order by establishing full compliance with any, let alone all, of its components, nor implemented a durable remedy to ensure full compliance is sustainable without supervision, Defendants are not entitled to relief under the first prong of Rule 60(b)(5).

### D.   **Defendants Have Neither Argued Nor Established Changed Circumstances.**

The third prong of Rule 60(b)(5) provides that a court may relieve a party from final judgment "if applying it prospectively is no longer equitable."  Fed. R. Civ. Pro. 60(b)(5).  The Fifth Circuit "has recognized a 2-step test for determining whether modification is warranted under prong 3." *Frew*, 820 F.3d at 720 (internal quotations and citation omitted).  "First, the party seeking

modification must show that 'a significant change either in factual conditions or in law' . . . 'make compliance with the decree substantially more onerous [or] . . . unworkable because of unforeseen obstacles[,] . . . or when enforcement of the decree without modification would be detrimental to the public interest.'" *Id.* (quoting *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne* ("*LULAC*"), 659 F.3d 421, 437 (5th Cir. 2011) (quoting *Rufo*, 502 U.S. at 383-84)). "Second, the court must then 'consider whether the proposed modification is suitably tailored to the changed circumstance.'" *Id.* "The party seeking modification under prong 3 must meet its burden at both steps of this test." *Id.* To meet its burden on step 1, the movant "must show that the change in circumstance is 'significant,' and not merely that 'it is no longer convenient to live with [the decree's] terms.'" *LULAC*, 659 F.3d at 437 (quoting *Rufo*, 502 U.S. at 383).

Aside from citing the general standard for equitable relief, Defendants do not even argue what changed circumstances in this case warrant it. *See* Dkt. 1518 at 7. Nor do they argue how their proposed modification—the termination of 12 ROs—is suitably tailored to those circumstances. In other words, they have not applied the legal standard for relief to the facts of this case. Without adequately briefing this claim, Defendants have forfeited it. *See Granger v. Dir., Tex. Dep't of Crim. Just.-Corr. Insts. Div.*, 2023 WL 2224444, at *98 n.31 (E.D. Tex. Feb. 24, 2023) ("Simply stating possible legal foundations, without argument or supporting case law, is inadequate briefing, so the 'claims' founded upon them are forfeited."); *see also Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588, 594 (5th Cir. 2023) ("A party forfeits an argument . . . by failing to adequately brief the argument[.]").

Even had Defendants not forfeited this claim, they have not carried their burden on the 2-step inquiry. Defendants' only argument is that "in light of [their] compliance [with the 12 orders], prospective application of those orders to the defendants would be inequitable." Dkt. 1518 at1-2

(citing Fed. R. Civ. Pro. 60(b)(5)); *see also id.* at 5 ("applying those orders to defendants' prospectively is no longer equitable given defendants' high degree of compliance"), 11 (same). This argument does not pass muster.

Essentially, the State collapses Rule 60(b)(5)'s third prong into its first, making it meaningless.  Numerous courts, including the Fifth Circuit, have held that compliance with an injunction alone does not establish entitlement to equitable relief.

For example, in *Frew*, the district court had granted the defendants relief under prong 1 of Rule 60(b)(5) on the grounds that they had satisfied the judgment with respect to the ROs at issue. 820 F.3d at 720.  Alternatively, the district court granted defendants relief under prong 3 based on the fact that they had satisfied prong 1:  "The proposed modification pursued by Defendants is suitably tailored to the changed conditions because it seeks release only from certain parts of the Decree that have been either satisfied or become obsolete . . ."  *Id.* (quoting the district court's opinion).  The Fifth Circuit rejected this approach.  It held that because the "district court's prong 3 analysis . . . [was] dependent upon its conclusion that these provisions have been 'satisfied' under prong 1", its holding on prong 3 could "not serve as an independent ground for affirmance."  *Id.*

Other courts have reached the same conclusion.  *See, e.g.*, *Jackson*, 880 F.3d at 1201 ("[A] motion for relief from a consent decree based on an assertion that 'applying it prospectively is no longer equitable' demands a different focus than a motion based on an assertion that 'the judgment has been satisfied, released or discharged.'"); *Harris Teeter*, 215 F.3d at 36 ("[C]ompliance over an extended period of time is not in and of itself sufficient to warrant relief [under the third prong of Rule 60(b)(5)]. . . . [P]arties who have successfully sought modification have also established events or changed circumstances . . ."); *Juan F.*, 2010 WL 5590094 at *2 ("The substantial progress

the state has made to better fund, staff and operate DCF is to be commended, but it does not make continuing enforcement by this Court of the Exit Plan unworkable or inequitable.").

In any event, as discussed above, Defendants' progress (whether substantial or not) toward compliance with the 12 ROs does not establish a basis for relief under prong 1 of Rule 60(b)(5). It certainly cannot serve as grounds for relief under prong 3.

For all these reasons, Defendants' Rule 60(b)(5) motion should be denied.

## II.     Nor Are Defendants Entitled to Relief Under the 2018 Order.

Although the contours of their argument are unclear, Defendants assert that they are also entitled to relief under the 2018 Order itself, apart from the relief they seek under Rule 60(b)(5). *See* Dkt. 1518 at 2, 9-10, 21.[6]  The Court should deny this relief because the requirements of the 2018 Order's termination provision are not met here.  The "termination provision" comprises two sentences:

> The Court retains jurisdiction for a period of three years after full compliance as certified by the Monitors. Either party may apply to the Court during the term of the monitoring to terminate supervision over one or more components of this Order if that party can show full compliance with that component and that further monitoring will not serve a purpose.

Dkt. 606 at 19.

### A.     Defendants Misconstrue the Language of the Termination Provision.

Defendants' argument for relief under the 2018 Order is based on a misreading of this provision.  This is evident in their discussion of the Court's treatment of ROs 1 and B4 during the

---

[6] It is unclear whether Defendants are applying for relief under the 2018 Order as to ROs 2, 13-19, 37, B3, and B4 (as applied to HHSC).  Their Conclusion requests such relief. Dkt. 1518 at 21.  But they make no argument for relief under the 2018 Order except as to RO 1 and RO B4 (as applied to DFPS). *Id.* at 9-10.  Their argument as to the remaining ROs is limited to Rule 60(b)(5) grounds.  *Id.* at 11 (asserting "those orders have been satisfied, and continuing to apply them prospectively to defendants would be inequitable").  Any argument for relief under the 2018 Order's termination provision except as to RO 1 and B4 (as applied to DFPS) is thus waived.  *See Granger*, 2023 WL 2224444, at *98 n.31.  In any event, it would be meritless because, as discussed further below, the State cannot show the required "full compliance" or lack of need for further monitoring. Dkt. 606 at 19.

January 22, 2024 status conference.  During that status conference, the Court stated that the Monitors had certified that DFPS achieved "full compliance" as to RO 1 and B4.  Jan. 22, 2024 Status Conf. Trans. at 4.  The Court defined full compliance as "99% and above", which the Monitors found Defendants had attained over the past year.  *Id.*  The Court made this statement *sua sponte* as no party had applied for termination of monitoring over these ROs.  The Court then stated that compliance with those ROs would continue to be "monitored for three years," and if compliance dropped below 99%, the Court would "vacate the full compliance [certification] and start over."  *Id.* at 5-6.  Defendants did not object.

Defendants now insinuate in their motion that the Court erred by subjecting them to continued monitoring as to ROs 1 and B4.  Dkt. 1518 at 9.  They argue that "the 2018 order provides for three years of retained jurisdiction following a certification of full compliance, not three years of monitoring."  *Id.*  Thus, Defendants contend that "the 2018 order makes clear that it does not allow for further monitoring following a showing of full compliance."  *Id.*

One problem with this argument is that it conflates the first and second sentences of the termination provision, and falsely equates "full compliance" with the whole Order with "full compliance with [a] component" of the Order.  Dkt. 606 at 19.[7]  The first sentence reserves the Court's jurisdiction over this entire case for three years once "full compliance" is achieved.  "Full compliance" in the first sentence refers to just that—full compliance with the entire 2018 Order.  There is no mention of components of the Order.  The sentence immediately follows the introductory sentence of the paragraph, which states that Defendants must "cooperate fully with the Monitors to implement each provision" of the Order.  *Id.*  From the context, it is clear that "full

---

[7] Indeed, Defendants conveniently omit the limiting language in the second sentence of the termination provision, stating that the 2018 Order "allows a party to apply for the termination of supervision if it can show full compliance . . . and that further monitoring will not serve a purpose."  Dkt. 1518 at  9.  The ellipses elide over the phrase "with that component."

compliance" in the first sentence is full compliance with the whole Order, *i.e.*, each and every provision of the Order.  The first sentence says nothing about an end to monitoring.

By contrast, the second sentence provides a potential avenue to terminate monitoring—not jurisdiction—on a component-by-component basis.  It uses "supervision" as a synonym for monitoring.  This usage is clear from the context: a "party may apply" "to terminate *supervision*" "during the term of *the monitoring*" upon a showing including "that *further monitoring* will not serve a purpose." *Id.* (emphasis added).  The Court's citation to *Freeman v. Pitts* further confirms that plain reading.   In *Freeman*, the Supreme Court held that, "in the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages . . . .  *While retaining jurisdiction over the case* . . . ." 503 U.S. at 490-91 (emphasis added); *see also id.* at 489.

In short, the second sentence addresses possible termination of monitoring over "one or more components" of the Order, while, under the first sentence, the Court retains jurisdiction over the entire case—including any such components—until three years after the State comes into compliance with the whole Order.

Defendants' second error is that they make superfluous the second requirement for partial termination of supervision: a showing "that further monitoring will not serve a purpose."  The Court's Order makes clear that the State must make two distinct showings: "full compliance with [a] component ***and*** that further monitoring will not serve a purpose."  Dkt. 606 at 19 (emphasis added).  Defendant's view that "there is no purpose [to monitoring] when a party is in compliance with a court's order," Dkt. 1518 at 9, would render the second required showing superfluous, which violates the canon against surplusage. *See, e.g.*, *Crocker v. Navient Sols., L.L.C. (In re Crocker)*, 941 F.3d 206, 220 (5th Cir. 2019) (applying "the canon against surplusage" to statutory

interpretation).  And it makes no logical sense—the purpose of monitoring after a showing of compliance would be to show that such compliance is not "fleeting" and that, instead, a "durable remedy" has been achieved.  *Jackson*, 880 F.3d at 1203.

In its *sua sponte* consideration of the Monitors' certifications, the Court was not invoking the termination provision's first-sentence reference to retaining jurisdiction for three years after full compliance with the entire Order.  Rather, the Court was indicating it needs time to assess whether further monitoring of compliance with ROs 1 and B4 (as applied to DFPS) is needed.  The Court regards three years as an appropriate period for that assessment, as it explained: "We have to see what the trends are."  Jan. 1, 2024 Hearing Tr. 6.  If compliance drops below 99% within the three years, "we . . . start over."  *Id.*

The Court cited specific reasons for its timetable.  One was that "as new SSCs come on line during that three-year period, we want to make sure that they're using the proper training modules" because in the past Defendants "brought on some new SSC's and they weren't using the proper model."  *Id.* at 5.[8]

Defendants cannot claim any error when they did not even "apply to the Court" to terminate monitoring over these ROs, much less make the required showing "that further monitoring will not serve a purpose."  Dkt. 606 at 19.  The Court gave Defendants relief they did not even request— a declaration of full compliance on these ROs and a timetable for terminating monitoring of those components.  Defendants are not entitled to anything more.

---

[8] Notably, in relation to RO 1, although the Court Monitors found 94% compliance with pre-service training requirements for DFPS hires, the performance of the SSCC's operating in Community-Based Care regions badly lagged DFPS performance.  Only 72% of SSCC hires at St. Francis and 82% of SSCC hires at 2Ingage timely completed pre-service training. Dkt. 1318 at p. 108 and 111.  By the subsequent reporting period, only 87% of all SSCC hires were found to have timely completed pre-service training.  Dkt. 1496 at 113.

**B.** **Aside from ROs 1 and B4 with Respect to DFPS, Defendants Have Not Reached Full Compliance with Any of the Remedial Orders.**

Defendants' motion fails because they do not show full compliance as to ROs 2, 13, 14, 15, 16, 17, 18, 19, 37, or B3, or as to RO B4 with respect to HHSC.  As the Court has clarified at recent hearings full compliance means "99% and above."  Jan. 22, 2024 Status Conf. Tr. 4; Contempt Day 1 Tr. 33-34.  Full compliance connotes "strict compliance".  Anything less, even substantial compliance, does not satisfy that standard.  *See Frew*, 780 F.3d at 330 n.42; *Interstate Contracting Corp.*, 407 F.3d at 727.

Defendants have not reached full compliance on any of these ROs on which they move for relief.  Indeed, the periodic Monitors Reports to date demonstrate that Defendants have not achieved a 99% or better aggregate performance level on any of the cited ROs as required to show full compliance.  The Monitors have validated Defendants' performance on these individual ROs as follows:

- **RO 13**: 93% of Priority 2 investigations included face-to-face contact with all alleged victims within 72 hours of intake.  Sixth Report of the Monitors: Remedial Orders 4, 12 to 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, A7, and A8, Dkt. 1380 at 145.  Previously, only 84% of these investigations included face-to-face contact with all alleged victims within 72 hours of intake.  Fourth Report of the Monitors: Remedial Orders 4, 12 to 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, A7, and A8, Dkt. 1248 at 84.

- **RO 14**: 96% of Priority 1 and 2 investigations were completed within 30 days of intake.  Dkt. 1380 at p. 147.  Previously, only 93% of these investigations were completed within 30 days of intake.  Dkt. 1248 at 85.

- **RO 15**: 98% of Priority 3, 4 and 5 investigations were completed within 60 days of intake.  Dkt. 1380 at 148.  Previously, only 97% of these investigations were completed within 60 days of intake.  Dkt. 1248 at 86.

- **RO 16**: 96% of Priority 1 and 2 investigations had documentation timely completed and submitted by HHSC.  Dkt. 1380 at 148.  Previously, only 95% of these investigations were timely documented by HHSC.  Dkt. 1248 at 87.  The Court Monitors further verified that DFPS uses the date the investigation report in submitted to the supervisor as the completion date and, therefore, meets the remedial order.  Dkt. 1496 at 64.

- **RO 17**: 98% of Priority 3, 4 and 5 investigations had documentation completed and submitted by HHSC within 60 days of intake.  Dkt. 1380, 149.  Previously, only 96% of these investigations had documentation completed and submitted by HHSC within 60 days of intake.  Dkt. 1248 at 88.

- **RO 18**: 90% of referent letters for Priority 1 and 2 investigations were mailed within 5 days of closure by RCCI.  Dkt. 1496 at 64.  Previously, only 87% of these referent letters for Priority 1 and 2 investigations were mailed within 5 days of closure by RCCI.  Fifth Report of the Monitors: Remedial Orders 1, 2, 3, 5 to 11, 16, 18, 35, 36, A1 to A4, A6, and B1 to B5, Dkt. 1318 at 67.  92% of provider letters for Priority 1 and 2 investigations were mailed within 5 days of closure by RCCI.  Dkt. 1496 at 65.  Previously, only 83% of these provider letters for Priority 1 and 2 investigations were mailed within 5 days of closure by RCCI.  Dkt. 1318 at 68.  Only 93% of referent and provider letters for Priority 1 and 2 investigations were mailed within 5 days of completion by RCCR.  Dkt. 1380 at 150.  Previously, 94% of these referent and provider letters for Priority 1 and 2 investigations were mailed within 5 days of completion by RCCR.  Dkt. 1248 at 89.

- **RO 19**: 92% of referent and provider letters for Priority 3, 4 and 5 investigations were sent within 60 days of intake by RCCR.  Dkt. 1380 at 151.  Previously, 95% of these referent and provider letters for Priority 3, 4 and 5 investigations were sent within 60 days of intake by RCCR.  Dkt. 1248 at 90.

- **RO 37**: The Court Monitors reviewed a total of three abuse and neglect intakes involving PMC children residing in a verified foster home that were downgraded to PN in the period under review. Though the Court Monitors "found no concerns" regarding the need for or completion of  Home History Reviews in these three cases, the small sample size provided limited data on which to evaluate overall systemic performance.  Dkt. 1496 at 108.

- **RO B3 and B4:** Although RCCI investigator caseloads were found to conform to the caseload standard better than 99% of the time, the Court Monitors found that questions arose "regarding the accuracy of the monthly caseload data provided to the Monitors by HHSC" in relation to RCCR caseloads.  Dkt. 1496 at 128.

- **RO 2**: Conformity to DFPS Graduated Caseload Standards was found on average 98% of the time. Dkt. 1496 at 132.  Previously, conformity to DFPS Graduated Caseload Standards was found on average 99% of the time.  Dkt. 1318 at 142.

In summary, Defendants cannot demonstrate full compliance with any of the cited ROs, as periodically validated by the Court Monitors, and in fact their performance degraded from one reporting period to the next in relation to multiple ROs (*i.e.*, ROs 2, 18, and 19).  Their motion for termination of supervision under the 2018 Order should be denied on this ground alone.

Furthermore, there are additional reasons that it would be premature to certify compliance with several of the ROs from which Defendants want to be released.

### ROs 13-19, and 37

These ROs all pertain to RCCL investigations of abuse and neglect.  They relate to the timeliness of completing various steps in the investigation process.  But there is a significant factor that impacts Defendants' ongoing compliance with all of these ROs.  Namely, the Monitors continue to find that abuse and neglect is underreported.  For example, in their Seventh Report, the Monitors stated that "there has been little improvement in children's understanding of the means and methods for reporting abuse, neglect or exploitation."   Dkt. 1496 at 85; *see also id.* at 74 ("children's reported knowledge of the SWI hotline and [Foster Care Ombudsman]" "have not improved").  This was a key issue at trial and on appeal and is a major plank of the Remedial Orders.  *See* Dkt. 1517 at 10. ("The Court and the Fifth Circuit found that the evidence showed that abuse was underreported, in part, because foster children did not know how to report abuse.").  If Defendants remedy this issue, as they must, their compliance on ROs 13-19 and 37 may slip as they will inevitably be investigating a greater number of allegations into abuse and neglect.  It would be premature to certify full compliance on ROs 13-19 and 37.

There is yet another reason that full compliance should not be certified with respect to ROs 14-17.  All of these ROs pertain to the completion of RCCL investigations.  As explained in the Seventh Monitors' Report in relation to RO 16:

> DFPS advised the Monitors that the agency uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered completed when the documentation is finally submitted to the supervisor in compliance with this Order.

Dkt. 1496 at 64.

But DFPS further advised the Monitors:

> When an investigator submits for closure an investigation in IMPACT, the supervisor may determine that the case needs additional work or documentation to ensure a quality investigation has occurred. If so, the supervisor will return the investigation and once the additional tasks have been completed, the caseworker will submit it again.

*Id.* at 64 n.152. In other words, the date that DFPS assigns as the date of completion for an investigation may not actually correspond to the actual date of completion. The Monitors noted that DFPS was taking steps to remove this discrepancy, but that process had not yet been completed. As a result, the accuracy of Defendants' compliance with these investigation timelines cannot be adequately assessed until Defendants improve their tracking and reporting processes.

### **RO B4**

Underreporting of abuse and neglect also affects Defendants' compliance with RO B4 as it relates to HHSC. RO B4 requires DFPS's internal caseload guidelines for caseload ranges and investigative timelines to be based on the determination of how many caseloads RCCL investigators can safely manage. Dkt. 606 at 14. Supervisors must use these guidelines when distributing caseloads and setting hiring goals. *Id.* Whether supervisors are appropriately utilizing these guidelines depend on how many investigators are staffed and how many cases those investigators have. Once again, if investigations go up because more abuse and neglect allegations are being brought, Defendants' compliance with RO B4 may degrade. It is likewise premature to certify compliance with RO B4.

### **RO 2**

Under RO 2, DFPS must "ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private

entity." Dkt. 606 at 2. Due to the State's increasing privatization of case management services, the system is still in flux. Through the State's adoption of Community-Based Care, private Single Source Continuum Contractors ("SSCCs") are taking over the services for children under DFPS conservatorship.[9] Case management is a key service that SSCCs will provide.[10] This initiative is being rolled out across the state region by region.[11] RO 2 applies to both public and private entities, and thus applies to SSCCs. And SSCCs are and will continue to be hiring new caseworkers as they expand into different regions. Thus, even were DFPS in full compliance at this moment in time—which it is not—there is no assurance that it would remain in compliance in the coming years given how much the system is changing.

## C. Defendants Have Not Shown That Further Monitoring Will Not Serve a Purpose.

Defendants' failure to show that monitoring on these 12 ROs will not serve a purpose is an independent ground for denying their motion. As previously stated, Defendants essentially ignore the second requirement for the termination of supervision over a component of the 2018 Order. Their only argument on this point is that "monitoring should not exist without a purpose and there is no purpose when a party is in compliance with a court's order." Dkt. 1518 at 9; *see also id.* at 10 ("Because continued monitoring with respect to those orders will serve no purpose, supervision regarding those orders should be terminated."). These statements are conclusory and tautological. They exhibit the same logical fallacy that Defendants commit in attempting to graft their Rule 60(b)(5) prong 1 argument onto prong 3. Establishing compliance and equitable relief under Rule 60(b)(5) are distinct inquiries. So too here, Defendants must independently show that they fully

---

[9]   *See* Community Based Care, "Expanding Community-Based Care," available at *https://www.dfps.texas.gov/CBC/expanding-cbc/*.

[10] *Id.*

[11] *Id.*

complied with a Remedial Order **and** that further monitoring with respect to that Remedial Order will not serve a purpose.  They have not done so.

To the contrary, the Monitors continue to serve a vitally important role in this case.  As is typical in these cases, Defendants do not gather and publicize information about their inner workings, making monitoring and reporting obligations absolutely necessary to holding Defendants accountable.  *See* Parkin, "Aging Injunctions and the Legacy of Institutional Reform Litigation", 70 Vand. L. Rev. at 217 ("Because institutional reform defendants do not typically gather and publicize information about their inner workings, . . . performance-based termination criteria must be paired with monitoring and reporting obligations that specify the data that the defendant is required to gather and how frequently and to whom it must be disclosed.").

No one knows the system better than the Monitors do—not even Defendants.  In recent hearings, numerous agency executives testified that they were not aware of what was going on in their own departments.  *E.g.*, Contempt Day 1 Tr. 115-23, 126-29, 131, 289-91, 296, 303, 311, 339-42.  Were it not for the Monitors, critical information about Defendants' underreporting and misleading statistics would not have come to light.  Missing shift logs and SIRs concerning the safety of PMC children in CWOP would not see the light of day.

In *Stukenberg I*, the Fifth Circuit reviewed Defendants' terrible track record on self-monitoring:

> There are three critical problems with DFPS's policies and practices regarding monitoring and oversight. First, deficient investigatory practices have yielded a high error rate in abuse investigations. Second, DFPS does not centrally track instances of child-on-child abuse. Lastly, RCCL maintains inadequate enforcement policies. All three problems contribute to an increased risk of serious harm to the LFC subclass.

907 F.3d at 265.

As discussed above, Defendants are still not properly tracking and reporting data that would give the Court and Plaintiffs assurance that monitoring no longer serves a purpose. Defendants would have concealed that CWOP presents such an extraordinary burden on already overloaded caseworkers were it not for the Monitors' discovery and investigation into this issue. Caseworkers continue to be severly overburdened even aside from CWOP.  Turnover is still high and the toxic culture of DFPS exacerbates the issue, particularly in the context of CWOP. Defendants' investigatory practices also remain grievously deficient.

In short, monitoring and reporting are essential to ensure that Defendants implement a durable remedy, which plainly they have not yet done.  *See United States v. Tennessee*, 986 F. Supp. 2d 921, 935 (W.D. Tenn. 2012) ("[T]he Court cannot conclude that the State has a durable remedy in place to ensure class member safety without an adequate reporting system in place.").  As discussed above, Defendants have achieved over 90 percent compliance with respect to these twelve ROs only within the last 18 months.  Because each Monitors Report addresses only some of the ROs, there are not even recent compliance findings with respect to ROs 13, 14, 15, 17, and 19.  There is not a sufficient record for the Court to conclude that Defendants' compliance is "more than merely fleeting."  *Jackson*, 880 F.3d at 1207.  Before monitoring is terminated, "[t]he Court has to be persuaded that defendants are no longer violating plaintiffs' constitutional rights and that they will 'not return to [their] former ways.'"  *Evans*, 701 F. Supp. 2d at 171 (quoting *Dowell*, 498 U.S. at 247-48).  The record here does not support such a conclusion.  Defendants have not satisfied either of the requirements for relief from supervision under the 2018 Order.

## CONCLUSION

For these reasons, the Court should deny Defendants' motion in its entirety.

Dated:  April 4, 2024                          Respectfully submitted,

                                               /s/ R. Paul Yetter
Samantha Bartosz (*pro hac vice*)              R. Paul Yetter
Stephen Dixon (*pro hac vice*)                 Texas State Bar No. 22154200
CHILDREN'S RIGHTS                              Christian J. Ward
88 Pine Street                                 Texas State Bar No. 24033434
New York, New York 10005                       Karla Rosali Maradiaga
(212) 683-2210                                 Texas State Bar No. 24126746
sbartosz@childrensrights.org                   YETTER COLEMAN LLP
                                               811 Main Street, Suite 4100
                                               Houston, Texas 77002
Marcia Robinson Lowry (*pro hac vice*)         (713) 632-8000
David Baloche (*pro hac vice*)                 pyetter@yettercoleman.com
Laura Welikson (*pro hac vice*)
A BETTER CHILDHOOD, INC.                        Barry F. McNeil
355 Lexington Avenue, Floor 16                 State Bar No. 13829500
New York NY 10017                              HAYNES AND BOONE, LLP
(646)795-4456                                  2323 Victory Ave., Suite 700
mlowry@ABetterChildhood.org                    Dallas, Texas 75219
                                               (214) 651-5000
                                               barry.mcneil@haynesboone.com

ATTORNEYS FOR PLAINTIFFS AND THE GENERAL CLASS AND SUBCLASSES


CERTIFICATE OF SERVICE

I certify that on the 4th day of April, 2024, a true and correct copy of this document was served on all counsel of record via email or by using the Court's CM/ECF e-file system.

/s/ R. Paul Yetter
R. Paul Yetter