United States District Court
Southern District of Texas

**ENTERED**

April 15, 2024

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D. bnf STUKENBERG, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:11-CV-00084 |
| | § | |
| GREG ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

**<u>ORDER</u>**[1]

---

[1] The Court is aware that this Order is of extraordinary length due to the fact intensive nature of these findings and the Court's opinion that the stories of these children need to be told.

1

## <u>TABLE OF CONTENTS</u>

I.      Introduction ...................................................................................................... 6

II.     Jurisdiction ....................................................................................................... 7

III.    Procedural History ........................................................................................... 7

   A.    Procedural history prior to the present motion ............................................ 7

   B.    Prior contempt proceedings ......................................................................... 8

      1.   The November 2019 contempt order ........................................................ 8

      2.   The December 2020 contempt order ......................................................... 8

   C.    The present Contempt Motion ..................................................................... 9

IV.     Legal Standard ............................................................................................... 21

   A.    Generally .................................................................................................... 21

   B.    "Substantial compliance" defined ............................................................. 23

   C.    Notice required ........................................................................................... 26

   D.    No right to a jury in civil contempt proceedings ....................................... 26

   E.    Determining the appropriate sanction ....................................................... 26

   F.    Standard of review ..................................................................................... 27

V.      Continuing safety concerns in DFPS and HHSC .......................................... 27

   A.    Heightened monitoring and Remedial Order 20 ........................................ 27

      1.   History of heightened monitoring and Remedial Order 20 .................... 28

      2.   Defendants' implementation of heightened monitoring is a prime example of their attempts to work around the Remedial Orders ...................................... 31

   B.    Psychotropic medications ........................................................................... 43

      1.   The history of psychotropic drug use in Texas foster care .................... 43

      2.   The State appears to not ensure that Psychotropic Medication Utilization Reviews (PMURs) are conducted, which places PMC children at risk of harm ................. 53

         a.   The importance of conducting PMURs ............................................. 53

         b.   HHSC's contract with Superior HealthPlan, the managed care organization that manages Medicaid coverage for Texas foster children, requires Superior to create the psychotropic medication review process described in the Parameters .......... 72

         c.   Superior's implementation of the PMUR process is not consistent with the Parameters ........................................................................ 75

         d.   HHSC is not requiring Superior to conduct PMURs in accordance with the Parameters ........................................................................ 90

         e.   Completed PMURs help the State identify potential instances of abuse and neglect 97

3. Failure to properly administer psychotropic medications or keep adequate records ................................................................................................................ 99

4. Inadequate monitoring of side effects ................................................................ 110

5. Inadequate medication storage ........................................................................... 115

C. The CWOP crisis ................................................................................................ 117

1. Background ......................................................................................................... 121

2. Children placed in CWOP have high needs, and CWOP workers lack the training to care for them ....................................................................................................... 128

3. Further, CWOP workers lack the time, authority, or institutional support to care for children placed in CWOP ................................................................................... 133

4. Accordingly, children placed in CWOP suffer grievous harms .......................... 139

   a. Deaths ............................................................................................................ 139

   b. Sex trafficking and exploitation .................................................................... 141

   c. Child-on-child sexual abuse and physical violence ...................................... 161

   d. Drug, alcohol, and tobacco use .................................................................... 169

   e. Weapons at CWOP settings .......................................................................... 175

   f. Emotional trauma and self-harm ................................................................... 178

   g. Security guards, law enforcement, and jail .................................................. 185

5. The physical conditions of CWOP Settings are shockingly poor ...................... 192

6. Placement in CWOP interrupts children's medical, therapeutic, and other services ............................................................................................................................ 212

7. The State appears to blame the children for being placed in CWOP ................. 218

8. The State is spending extraordinary sums of money on the harmful CWOP system ............................................................................................................................ 227

9. Attempts to manipulate data regarding CWOP .................................................. 233

10. The State's commitment to ending CWOP is questionable ............................... 235

11. One night at a CWOP Setting ........................................................................... 240

D. Caseworker caseloads ......................................................................................... 242

1. The long history of excessive caseworker caseloads in the Texas foster care system ............................................................................................................................ 242

2. DFPS's failure to count CWOP shifts in caseworkers' caseloads is once again driving excessive caseworker caseloads, burnout, and turnover ....................... 250

3. Harms to caseworkers working CWOP shifts .................................................... 261

E. Defendants are failing to appropriately apprise PMC children of the ways to report abuse and neglect ............................................................................................... 265

1. History of Remedial Order A6 ........................................................................... 265

3

2.  Current concerns regarding noncompliance with Remedial Order A6 ................ 267

F.  PMC children's medical and educational records continue to be inadequate ...... 271

VI.  Contempt ........................................................................................................ 279

A.  The Court finds Defendant Cecile Erwin Young, in her official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas, in contempt of Remedial Order 3 and Remedial Order 10 ................................... 280

1.  Background of HHSC's Provider Investigations (PI) unit ................................... 284

2.  HHSC's PI unit conducts deficient investigations that are not in compliance with Remedial Order 3 or Remedial Order 10 ......................................................... 294

a.  Child C ........................................................................................................ 302

i.  Investigation 1 ................................................................................... 304

ii.  Investigation 2 ................................................................................... 305

iii.  Investigation 3 ................................................................................... 307

iv.  Investigation 4 ................................................................................... 309

v.  Investigation 5 ................................................................................... 312

vi.  Investigation 6 ................................................................................... 314

vii.  Investigation 7 ................................................................................... 317

viii. Investigation 8 ................................................................................... 318

ix.  Investigation 9 ................................................................................... 322

x.  Investigation 10 ................................................................................. 326

xi.  Investigation 11 ................................................................................. 330

xii.  Investigation 12 ................................................................................. 333

b.  Child A ........................................................................................................ 343

i.  Investigation 1 ................................................................................... 343

ii.  Investigation 2 ................................................................................... 348

iii.  Investigation 3 ................................................................................... 349

iv.  Investigation 4 ................................................................................... 352

v.  Investigation 5 ................................................................................... 355

c.  Child D ........................................................................................................ 358

i.  Investigation 1 ................................................................................... 359

ii.  Investigation 2 ................................................................................... 361

iii.  Investigation 3 ................................................................................... 363

iv.  Investigation 4 ................................................................................... 365

d.  Child F ........................................................................................................ 368

i.  Investigation 1 ................................................................................... 368

        ii.     Investigation 2 .................................................................................. 370

        iii.    Investigation 3 .................................................................................. 373

        iv.    Investigation 4 .................................................................................. 375

        v.     Investigation 5 .................................................................................. 377

    e.   Child L ............................................................................................... 379

    f.    Child N .............................................................................................. 382

    g.   Child O .............................................................................................. 383

    h.   Child H .............................................................................................. 385

        i.     Investigation 1 .................................................................................. 385

        ii.    Investigation 2 .................................................................................. 387

    i.    Child I ................................................................................................ 390

    j.    Child K .............................................................................................. 392

    k.   Child J ............................................................................................... 393

    l.    Child M ............................................................................................. 395

    m.  Child Q ............................................................................................. 397

  3.    The leadership of HHSC's PI unit lacks basic knowledge of the unit ................. 399

  4.    Defendant failed to establish defenses to contempt ............................................ 415

VII.  Conclusion ........................................................................................................... 422

VIII.  Glossary ............................................................................................................... 425

Came on to be heard Plaintiffs' Third Amended Motion to Show Cause Why Defendants Should Not Be Held in Contempt (D.E. 1427) and Defendants' Response to Plaintiffs' Third Amended Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt (D.E. 1429).

## I.   INTRODUCTION

More than a decade has passed since Plaintiffs first brought to the Court's attention the numerous deficiencies in the Texas foster care system that were violating the right of children in the Permanent Managing Conservatorship ("PMC") of the State of Texas to be free from an unreasonable risk of harm, under the Fourteenth Amendment to the United States Constitution. (*See* D.E. 1.) Plaintiffs alleged that by the time they filed their Complaint on March 29, 2011, Defendants had already "long been aware of these and other deficiencies of the Texas foster care system, yet ha[d] failed to effectively address them." (*Id.* at 3 ¶ 10.) In the twelve years that followed, this case proceeded to trial; the Court held that PMC children face an unconstitutional risk of harm in the State's custody; the Court and its Special Masters underwent two years of work to fashion appropriate orders to remedy the State's constitutional violations ("Remedial Orders"); the Fifth Circuit heard multiple appeals of those Remedial Orders; and this Court twice found that Defendants were in contempt of those Remedial Orders, as modified by the Fifth Circuit. As part of its remedy of the State's constitutional violations, the Court also ordered the appointment of Monitors who would review information from Defendants to assess their compliance with the Remedial Orders.

In June 2023, Plaintiffs moved for an order to show cause why Defendants should not be held in contempt and a partial receivership imposed. Plaintiffs stated "the State continues to defy orders issued by the Court and affirmed by the Fifth Circuit," thus "threatening the safety and wellbeing of innocent children." (D.E. 1376 at 1.)

6

On December 4, 5, and 6, 2023, the Court held a Contempt Hearing with the following: Defendant GREG ABBOTT, in his official capacity as Governor of the State of Texas; Defendant CECILE ERWIN YOUNG, in her official capacity as Executive Commissioner of the Health and Human Services Commission ("HHSC") of the State of Texas; and Defendant STEPHANIE MUTH, in her official capacity as Commissioner of the Department of Family and Protective Services ("DFPS") of the State of Texas..

## II.    JURISDICTION

Plaintiffs' Motion to Show Cause seeks to hold Defendants in contempt of this Court's orders regarding remedies for a class action brought under 42 U.S.C. § 1983, in which the Court held, and the Fifth Circuit affirmed, that Defendants—officials of the State of Texas—violated the substantive due process rights of a class of foster children in Texas State custody under the Fourteenth Amendment to the United States Constitution. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

Furthermore, "[t]he power to punish for contempt is an inherent power of the federal courts and . . . it includes the power to punish violations of their own orders." *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009); *see also Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911) ("[T]he power of courts to punish for contempt[] is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law.").

## III.    PROCEDURAL HISTORY

### A. Procedural history prior to the present motion

The prior procedural history of this case is more thoroughly described in previous orders. (*See* D.E. 368 at 4–5 (December 17, 2015 Memorandum Opinion and Verdict); D.E. 546 at 1 (Special Masters' Implementation Plan); D.E. 559 at 2–4 (January 19, 2018 Final Order)); *M.D. ex rel.*

*Stukenberg v. Abbott* (*Stukenberg I*), 907 F.3d 237, 243 (5th Cir. 2018); (D.E. 606 at 1 (November 20, 2018 Order)); *M.D. ex rel. Stukenberg v. Abbott* (*Stukenberg II*), 929 F.3d 272, 275 (5th Cir. 2019); (D.E. 725 at 2 (November 7, 2019 Contempt Order); D.E. 1017 at 9–11 (December 18, 2020 Contempt Order)); *M.D. ex rel. Stukenberg v. Abbott* (*Stukenberg III*), 977 F.3d 479, 481–482 (5th Cir. 2020).

## B. Prior contempt proceedings

As noted above, this is the third time the Court has considered whether Defendants are in contempt of its orders.

### 1. *The November 2019 contempt order*

On October 18, 2019, following the Fifth Circuit's Mandate in *Stukenberg II*, Plaintiffs moved for an order to show cause why Defendants should not be held in contempt for, *inter alia*, "[f]ailure to comply with the Order requiring defendants to provide 24-hour awake-night supervision in all placements housing more than six children"[2] (D.E. 695 at 2); a hearing was held on November 5, 2019 (*see* D.E. 697). Following the hearing, the Court held Defendants in civil contempt for failure to follow Remedial Order A7, which requires Defendants to provide 24-hour awake-night supervision in facilities housing more than six children where PMC children are placed. (D.E. 725 at 1, 18–20.)

### 2. *The December 2020 contempt order*

On July 2, 2020, Plaintiffs again moved the Court for an order to show cause why Defendants should not be held in contempt. (*See* D.E. 901 ("2020 Contempt Motion").) Plaintiffs alleged that Defendants had failed to implement sixteen of the forty-six affirmed Remedial Orders—

---

[2] Plaintiffs also moved for an order to show cause why Defendants should not be held in contempt for "[f]ailure to comply with the Order requiring defendants within 60 days after issuance of the Fifth Circuit's Mandate to provide detailed proposals for the required workload studies as to conservatorship caseworkers and [Residential Child Care Licensing] investigators." (D.E. 695 at 2.) The Court did not hold Defendants in contempt of this order. (*See* D.E. 725 at 23.)

specifically, Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5.[3] (*Id.* at 4–17; *see also* D.E. 1017 at 14–15.)

The 2020 Contempt Motion was heard on September 3 and 4, 2020. (*See* D.E. 990 (Tr. of Sept. 3, 2020); D.E. 991 (Tr. of Sept. 4, 2020).) The Court found Defendants in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37, and B5, and did not find Defendants in contempt of Remedial Orders 24, 38, or 30. (D.E. 1017 at 326.)

## C. The present Contempt Motion

Plaintiffs first moved for an order to show cause on June 20, 2023. (D.E. 1376 (Plaintiffs' Motion to Show Cause Why Defendants Should Not Be Held in Contempt).) In the months that followed, Plaintiffs amended and revised the motion several times. (*See* D.E. 1404 (Plaintiffs' Amended Motion to Show Cause Why Defendants Should Not Be Held in Contempt); D.E. 1419 (Plaintiffs' Second Amended Motion to Show Cause Why Defendants Should Not Be Held in Contempt and for receivership); D.E. 1420 (Plaintiffs' Corrected Second Amended Motion to Show Cause Why Defendants Should Not Be Held in Contempt and for receivership).)

On November 1, 2023, Plaintiffs filed their Third Amended Motion to Show Cause Why Defendants Should Not Be Held in Contempt and for receivership ("Plaintiffs' Motion" or "Contempt Motion"). (D.E. 1427.) Defendants filed responses to Plaintiffs' amended motion and third amended motion. (D.E. 1408 (responding to D.E. 1404); D.E. 1429 (responding to D.E. 1427).)

---

[3] The 2020 Contempt Motion also requested an order to show cause as to Remedial Order 20. (D.E. 901 at 17–18.) But before the 2020 Contempt Motion was heard, Defendants filed an unopposed motion requesting that they be given until January 1, 2021 to implement Remedial Order 20. (*See* D.E. 942 (filed Aug. 13, 2020); D.E. 942-1.) The Court granted the motion (D.E. 950), so Defendants' compliance with Remedial Order 20 was not at issue at the hearing on the 2020 Contempt Motion.

As noted above, on December 4–6, 2023, the Court held a hearing on Plaintiffs' Motion (the "Contempt Hearing"). (*See* D.E. 1427 (Order to Show Cause); D.E. 1487 (Tr. of Dec. 4, 2023); D.E. 1488 (Tr. of Dec. 5, 2023); D.E. 1489 (Tr. of Dec. 6, 2023).) The Court is carrying the receivership motion forward and it was not considered at the Contempt Hearing.

The following remedial orders were the subject of the Contempt Motion (*see* D.E. 1427 at 9–54):

Remedial Order 3, which provides:

DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.

(D.E. 606 at 2 ¶ 3.)

Remedial Order 4, which provides:

Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.

(*Id.* at 2 ¶ 4.)

Remedial Order 7, which provides:

Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.

(*Id.* at 3 ¶ 7.)

Remedial Order 8, which provides:

Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.

(*Id.* at 3 ¶ 8.)

Remedial Order 10, which provides:

Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

(*Id.*at 3 ¶ 10.)

Remedial Order 20, which provides:

Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

(*Id.* at 4–5 ¶ 20.)

Remedial Order 25, which provides:

Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.

(*Id.* at 5 ¶ 25.)

Remedial Order 26, which provides:

Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.

(*Id.* at 5 ¶ 26.)

Remedial Order 27, which provides:

Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.

(*Id.* at 5 ¶ 27.)

Remedial Order 29, which provides:

Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.

(*Id.* at 6 ¶ 29.)

Remedial Order 31, which provides:

Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

(*Id.* at 6 ¶ 31.)

Remedial Order 35, which provides:

Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.

(*Id.* at 7 ¶ 35.)

Remedial Order A3, which provides:

Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.

(*Id.* at 9 ¶ 3.)

Remedial Order A4, which provides:

Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.

(*Id.* at 10 ¶ 4.)

Remedial Order A6, which provides:

Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.

(*Id.* at 11 ¶ 6.)

Also at issue in the Contempt Motion was the provision of the Order Regarding Workload Studies (D.E. 772), entered pursuant to Defendants' agreement to use, as a "generally applicable internal caseload standard," "14-17 children per caseworker for DFPS conservatorship caseworker caseloads" (*id.* at 2).

During the three-day Contempt Hearing, the Court heard testimony from the following witnesses.

The Plaintiffs called thirteen witnesses:

**Stephen Pahl** is the Deputy Executive Commissioner of HHSC's Regulatory Services Division. (D.E. 1487 at 104:15–17.) He reports to Jordan Dixon, HHSC's Chief Policy and Regulatory Officer, who in turn reports to Commissioner Young. (*Id.* at 105:5–7.) Mr. Pahl has been in his current role since August 2021; prior, he was an Assistant Deputy Inspector General.

(*Id.* at 105:16–23.) Mr. Pahl has no background in child welfare, nor any prior work experience in the field. (*Id.* at 106:1–5.) He testified regarding HHSC's Provider Investigations unit.

**Hannah Reveile** is a former DFPS conservatorship caseworker. (*Id.* at 180:8–10.) Ms. Reveile earned a bachelor's degree in psychology in December 2021 (*id.* at 181:11); while earning the degree, she worked with autistic children as a registered behavioral technician (*id.* at 181:20–23), then as a juvenile detention officer in Travis County. (*Id.* at 182:14–18.) In December 2021, she was hired by DFPS as a conservatorship caseworker, and resigned in June 2023. (*Id.* at 184:7–24.) While employed as a caseworker, Ms. Reveile had both PMC and TMC children on her caseload. (*Id.* at 186:3–5.) Two of the teenagers on her caseload (both PMC) were in and out of CWOP.[4] (*Id.* at 195:9–10.)

Because Ms. Reveile excelled as a conservatorship caseworker, her supervisors obtained a waiver so that she could "be a trainer sooner than the usual year it takes to become a trainer." (*Id.* at 185:19–20.) She is currently earning a master's of science in forensic psychology. (*Id.* at 181:12–14.) Ms. Reveile testified regarding the CWOP crisis and the related problem of caseworker burnout and turnover.

**Jackie Juarez** is an eighteen-year-old who, from age eleven to eighteen, was in the Texas foster care system. (*See id.* at 240:24–241:3.) She aged out of foster care in October 2023 (*id.* at 240:14–20) at an eighth-grade education level. (*Id.* at 242:7–9.) She testified as to her experiences

---

[4] "CWOP," or "Children Without Placement," is DFPS's euphemistic term referring to foster children for whom the State has failed to find a licensed placement. These children are house in unlicensed, unregulated settings rented by the State—generally, either leased homes or hotel/motel rooms. The children are supervised by conservatorship caseworkers during mandatory overtime shifts, who lack the training to provide day-to-day care for the children typically placed in CWOP. This Order details the many problems with CWOP, both as they relate to the children placed in CWOP, *infra* page 117–242, and to caseworkers, *infra* page 242–65.

In this Order, "CWOP" refers to DFPS's overarching system for handling children without a licensed placement. "CWOP Settings" refers to the leased homes, hotel rooms, and other locations at which the children are housed. The children themselves are referred to as "children placed in CWOP." And the caseworkers who supervise CWOP Settings are referred to as "CWOP workers." DFPS uses other terms to refer to CWOP, including "DFPS Supervision" and "Child Watch." (*See* D.E. 1425 at 1 n.1.)

in the State's PMC, including as a child placed in CWOP, and the three years she spent being subjected to large quantities of psychotropic medications. Ms. Juarez explained that she was testifying on these intensely personal matters "[b]ecause kids need to be heard, and things need to change for everyone. And we need a change, because everybody tells you, oh, CPS is going to take care of you, but just like they let me down, they let a bunch of kids down. So I'm here today fighting for things to change." (*Id.* at 281:3–7.)

**Erica Banuelos** is DFPS's Associate Commissioner for Child Protective Services. (*Id.* at 282:22–23.) Ms. Baneulos reports to Audrey O'Neill, who in turn reports to Commissioner Muth.[5] She testified regarding the CWOP crisis and the problem of caseworker burnout and turnover due to the requirement that they take CWOP overtime shifts.

**Kason Vercher** is DFPS's Director of Residential Contracts. (*Id.* at 338:10–11.) He is in charge of DFPS's residential contract managers, who oversee licensed childcare facilities. (*Id.* at 338:12–17.) Mr. Vercher has been employed in the Residential Contracts field for the past thirteen years. (*Id.* at 338:23–25.)

**Julie Pennington** is an attorney and has been practicing law in Texas since 2015. (D.E. 1488 at 12:4–7.) Since 2016, her practice has included serving as court-appointed guardian ad litem, attorney ad litem, or both, for children.[6] (*See id.* at 10:8–13.) Ms. Pennington has represented approximately 168 children or sibling groups, including those in the child welfare system. (*Id.* at 10:18–21.) In the two years prior to the Contempt Hearing, she represented four boys who have

---

[5] *See* DFPS, Organizational Chart (rev. Nov. 13, 2023), https://www.dfps.texas.gov/About_DFPS/Executives/DFPS_Org_Chart.pdf.

[6] Ms. Pennington explained the difference between the two ad litem positions: An attorney ad litem "solicit[s] and understand[s] the child's goals and then act[s] on behalf of the child in court, in the same way that [the attorney] would [when representing] an adult client," though the attorney ad litem will make adjustments based on the child's developmental capacity. (D.E. 1488 at 13:13–18.) A guardian ad litem, on the other hand, "represents what's in the child's best interest, and that may not be what the child wants." (*Id.* at 13:19–21.) *See generally* O'Connor's Texas Rules, ch. 1-J § 2 (2024 ed.) (comparing guardian ad litem and attorney ad litem).

been in CWOP. (*Id.* at 15:12–15.) At the time of the hearing, three of her ten child clients were in PMC. (*Id.* at 14:20–22.) She testified regarding the CWOP crisis.

**Trisha Evans** is the founder, owner, and administrator of C3 Christian Academy (also referred to as C3 Academy). (*Id.* at 66:7–9.) A licensed, registered nurse (*id.* at 127:3–6), she began operating certified care facilities in 2006 (*id.* at 88:1–3). In 2014, C3 Christian Academy opened its first HCS group home; by 2023, C3 Christian Academy was operating seven such homes in Grand Prairie and one in Dallas. (*Id.* at 71:24–73:4.) These homes housed both adults and children with developmental disabilities, learning disabilities, and "intelligence challenges." (*Id.* at 73:9–13.) As for her experience caring for children with disabilities, Ms. Evans explained that "sometime between 2006 and 2020," she worked part-time as a nurse at two psychiatric hospitals with pediatric patients. (*Id.* at 126:17–20, 128:6–129:4.) In 2023, C3 Christian Academy lost its certification to operate HCS group homes. (*Id.* at 73:24–74:2, 88:14–16.) Ms. Evans testified regarding abuse and neglect allegations of a PMC child, identified as Child C, placed at C3 Christian Academy from April 2021–2022.

**Lindsey Dionne** is an attorney who has been licensed to practice law in Texas since 2013. (*Id.* at 150:8–16.) For the past seven years, Ms. Dionne has been in private practice (*id.* at 155:5–7) and has represented clients across the gamut of the child welfare system. (*Id.* at 155:16–20.) Specifically, she has represented children and families, as well as agencies and individuals who have been found to have abused and neglected children. (*Id.* at 149:14–17.) She also served as guardian and attorney ad litem for children in the child welfare system. (*Id.* at 149:18–25.) Prior, Ms. Dionne worked as a contract attorney for DFPS's Administrative Hearings unit,[7] where she reviewed appeals from charges of abuse, neglect, and exploitation or citations for minimum

---

[7] The Administrative Hearings unit is currently part of HHSC. (D.E. 1488 at 150:25–151:1.)

standards violations, and then represented the Department before the State Office of Administrative Hearings. (*Id.* at 150:18–151:17.) In that capacity, she became "very familiar" with the minimum standards for childcare providers. (*Id.* at 154:14–17.) Ms. Dionne has also taught a continuing legal education course on administrative reviews of investigative findings. (*Id.* at 154:21–24) She testified regarding the CWOP crisis, including sex trafficking of children placed in CWOP and the conditions inside CWOP Settings.

**Christie Carrington** testified regarding the CWOP crisis and the burden it has imposed on conservatorship caseworkers and DFPS as a whole. After earning a bachelor's degree in psychology with a minor in sociology, then a master's in social work,[8] Ms. Carrington joined DFPS in 2009. (*Id.* at 202:13–19.) She first worked in the Children's Assessment Center where she specialized in sexual abuse cases, then moved to Family-Based Safety Services where she began as a caseworker before being promoted to supervisor. (*Id.* at 202:22–24, 205:4–12.) She retired from DFPS in April 2022 then joined her present employer, the Texas State Employees Union (TSEU). (*Id.* at 207:12–18.) TSEU's membership includes DFPS conservatorship caseworkers, and part of Ms. Carrington's job is to "keep up with the concerns and the working conditions of conservatorship caseworkers and investigators in the Texas foster care system." (*Id.* at 208:2–5.)

**Doctor Viola Miller** is Plaintiffs' expert in child welfare systems. (*Id.* at 247:4–6.) She previously testified in this case, both at the class certification hearing and at trial.[9] (*Id.* at 247:10–14.) Her career in child welfare "spans more than 40 years." (D.E. 368 at 44.) "From 1995 to 2003, she served as Secretary of Kentucky's equivalent to Health and Human Services, overseeing

---

[8] While earning her master's degree, Ms. Carrington worked at a residential treatment center for children with mental health disorders, many of whom had also come through the juvenile justice system. (*Id.* at 204:24–205:2.)

[9] Doctor Miller's curriculum vitae was filed as part of the trial record. (*See* D.E. 340-10 at 64–76.)

approximately10,000 employees and a budget of $950 million." (*Id.* at 44; D.E. 1488 at 251:5–252:24.) She was then appointed Commissioner of Tennessee's Department of Child Services, where she oversaw "approximately 5000 employees and a budget of $640 million." (D.E. 368 at 44–45; D.E. 1488 at 252:25–253:8.) Since retiring in 2011, Doctor Miller has consulted in the child welfare field, including for child welfare agencies in Massachusetts, Illinois, and Oklahoma, and volunteers on the boards of child welfare organizations. (D.E. 368 at 45; D.E. 1488 at 253:14–20.) She has authored 24 publications about social work, child welfare, and child development and has, over the years, presented at countless workshops and conferences in those fields. (D.E. 368 at 45.) At least one other court relied on Doctor Miller's expert testimony on child welfare systems and caseworkers' caseloads in a class action similar to the present case. (*Id.* at 45 (citing *D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635 (N.D. Okla. 2011) (denying defendants' motion to decertify the class after full discovery)).)

Doctor Miller testified regarding HHSC's Provider Investigations unit; the CWOP crisis and the importance of caseworker caseload guidelines; psychotropic medications and the Psychotropic Medication Utilization Review process; the importance of children being told how to report abuse and neglect; timely notifying caregivers of a child's sexual history; and verifying that caregivers receive and complete training to identify sexual abuse in children.

**David Balonche** is an attorney for the Plaintiff children. (D.E. 1489 at 13:4–7.) He testified as to the foundation for Plaintiffs' exhibits summarizing records produced by Defendants. (*See id.* at 13:8–22:11.)

**Doctor Christopher Bellonci** is a board-certified child and adolescent psychiatrist. Doctor Bellonci has had an extensive career in child and adolescent psychiatry, both as a clinician and an academician. (*See* PX 90 at 1–25 (curriculum vitae).) He is currently an Assistant Professor of

Psychiatry at Harvard Medical School (PX 90 at 1) and serves as the Senior Policy Advisor at the Baker Center for Children and Families in Boston (D.E. 1489 at 23:16–19). In 2017 he was named a Distinguished Fellow of the American Academy of Child and Adolescent Psychiatry (AACAP) (*id.* at 29:11–23; PX 90 at 5), a distinction conferred on long-time AACAP members who have served in committees or elected offices within the organization and have demonstrated clinical or teaching excellence (D.E. 1489 at 29:15–20).

Of particular relevance to this matter, Doctor Bellonci served for twelve years on AACAP's Committee on Quality Issues (*id.* at 29:21; PX 90 at 3), "which writes the standards of care for the field of child behavioral health" (D.E. 1489 at 29:22–23). He was hired by Doctor Miller to revise her state's policies regarding "both psychotropic medication and the management of behavioral outbursts" (*id.* at 32:6–7), and also wrote the guidelines for Tennessee regarding psychotropic polypharmacy[10] (*id.* at 51:8–14). He has written and presented extensively on mental healthcare in child welfare systems and the use of psychotropic medications therein (*see* PX 90 at 10–18; 20–24), including a multi-state study on psychotropic medication oversight in foster care (*id.* at 24 ¶ 5). From 2012 to 2015, Doctor Bellonci led a three-year funded six-state collaborative to define best practices in the oversight and monitoring of psychotropic medications for youth in the child welfare system.[11] (*Id.* at 3.) In 2017, he coauthored an article published in the Child and Adolescent Psychopharmacology News that discussed polypharmacy and appropriate prescribing in children and adolescents. (*Id.* at 23 ¶ 9.) And he was a member of a working group established by the Administration on Children, Youth, and Families, an agency within the United States Department of Health and Human Services. (D.E. 1489 at 48:12–49:9.) In that capacity, he was one of the

---

[10] Polypharmacy refers to the administration of "more than one medication simultaneously." (D.E. 1489 at 33.)

[11] The collaborative continued on an informal basis after the funding period ended, and expanded to cover another twenty states. (*Id.* at 106.)

compilers of a 2012 Information Memorandum addressed to "State, Tribal and Territorial Agencies Administering or Supervising the Administration of Titles IV-B and IV-E of the Social Security Act" (*id.* at 48:12–17; PX 66 at 1), the purpose of which was "[t]o serve as a resource to State and Tribal title IV-B agencies as they comply with requirements to develop protocols for the appropriate use and monitoring of psychotropic medications in the title IV-B plan" (PX 66 at 1).

In addition to his considerable academic contributions, Doctor Bellonci works to educate other segments of the child welfare infrastructure. For example, it is commonly believed that if a doctor writes a prescription, there need be no further check and balance on, or discussion regarding, utilization rates; given the state of knowledge regarding psychotropic medications in children, he has been educating residential childcare providers to reframe their mindset and think about psychotropic medication as a quality improvement area. (D.E. 1489 at 31:7–19.) And in 2015, he was the invited keynote speaker at the National Foster Parent Association, where he gave a presentation titled "Psychotropic Medication for Children and Adolescents: What we Know, what we don't and why you should care." (PX 90 at 19.)

At the Contempt Hearing, Doctor Bellonci testified regarding the State's Psychotropic Medication Utilization Parameters, the Psychotropic Medication Utilization Review process, and the use of psychotropic medications in the foster care system.

The Defendants called one witness:[12]

**Doctor Ryan Van Ramshorst** is HHSC's Chief Medical Director for Medicaid CHIP Services. (D.E. 1489 at 167:20.) He is the "lead physician for the Texas Medicaid program." (*Id.*

---

[12] This is in spite of Defendants' representation, made several times during the proceeding, that they would be calling multiple witnesses. (*See*, *e.g.*, D.E. 1489 at 165:2 (referring to Doctor Van Ramshorst as "our first witness"); D.E. 1487 at 26:8–9 ("Your Honor, we have *witnesses* prepared to defend ourselves from the allegations of contempt." (emphasis added)); *id.* at 27:20 (asking to "reserve our *witnesses* until the end" (emphasis added)); *id.* at 77:1–2 (stating that "we have some of our *witnesses* here" (emphasis added)); *id.* at 78:9–10 ("we don't know which *witnesses* we're going to call until we hear [Plaintiffs'] presentation" (emphasis added)).)

at 167:22–23.) His office "provides clinical consultation and clinical direction for our managed care and fee-for-service programs" and "provide[s] clinical oversight of the programs under Texas Medicaid." (*Id.* at 167:23–168:1.) He testified as to the Psychotropic Medication Utilization Parameters, the Psychotropic Medication Utilization Review process, and the use of psychotropic medications in the foster care system.

In addition to his position at HHSC, Doctor Van Ramshorst "maintain[s] a part-time volunteer practice as a general pediatrician." (*Id.* at 217:20–21.)

## IV.    LEGAL STANDARD

### A.  Generally

The Court has broad powers to issue a finding of civil contempt and to levy sanctions in accordance with that finding. "The power to punish for contempt is an inherent power of the federal courts and . . . includes the power to punish violations of their own orders." *In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009) (quoting *United States v. Fidanian*, 465 F.2d 755, 757 (5th Cir. 1972)). "Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947)). District courts have broad discretion in imposing damages in civil contempt proceedings. *Am. Airlines, Inc.*, 228 F.3d at 585.

"A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir.1995) (quoting *SEC v. First Fin. Grp. Of Tex., Inc.*, 659 F.2d 660, 669 (5th Cir. 1981)); *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (citing *Baddock v. Villard* (*In re Baum*), 606 F.2d 592, 593 (5th Cir. 1979))

("Contempt is committed only if a person violates a court order requiring in specific and definite language that a person do or refrain from doing an act.").

> Though the court order must be clear, a court 'need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated.' *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000). The order must 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required,' Fed. R. Civ. P. 65(d), but a district court is entitled to a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order.

*Hornbeck Offshore Servs., L.L.C. v. Salazar* (*Hornbeck I*), 713 F.3d 787, 792 (5th Cir.), *cert. denied*, 571 U.S. 1110 (2013). Thus, a party can be held in contempt for violating either "an express or clearly inferable obligation." *Id.* at 793. As the Supreme Court explained in *McComb v. Jacksonville Paper Co.*, a party cannot claim "immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." 336 U.S. 187, 192 (1949):

> Such a rule would give tremendous impetus to the program of experimentation with disobedience of the law . . . [and] could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was not specifically enjoined. Immunity is once more obtained because the new plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.

*Id.* at 192.[13] Recently, the Supreme Court explained "that a party's 'record of continuing and persistent violations' and 'persistent contumacy' justified placing 'the burden of any uncertainty in the decree . . . on [the] shoulders' of the party who violated the court order." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) (quoting *McComb*, 336 U.S. at 192–193).

---

[13] Judge Clement made the same point in dissent, observing that "[a] litigant that does not violate the explicit terms of a court order can still be held accountable for engaging in '[a] program of experimentation with disobedience of the law' or 'persistent contumacy' of the court's order." *Hornbeck Offshore Servs., L.L.C. v. Salazar* (*Hornbeck II*), 730 F.3d 402, 404 (5th Cir. 2013) (per curiam) (Clement, J., joined by Jones, Smith, and Elrod, JJ., dissenting from denial of reh'g en banc) (quoting *McComb*, 336 U.S. at 192; second brackets in original).

The movant must establish by clear and convincing evidence[14] "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995) (citing *Martin*, 959 F.2d at 47). "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Waste Mgmt. of Wash., Inc. v. Kattler*, 776 F.3d 336, 341 (5th Cir. 2015) (internal quotations and citations omitted).

If the movant has made the above three-part showing, the burden shifts to the respondent to defend against a civil contempt finding by justifying noncompliance, rebutting the conclusion, demonstrating an inability to comply, asserting good faith in its attempts to comply, or showing mitigating circumstances or substantial compliance. *See LeGrand*, 43 F.3d at 170 (noting that an inability to comply is a defense against civil contempt); *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987) (holding that good faith and inability to comply are defenses to civil contempt); *Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987) (holding that burden falls on defendants "to show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the consent order.").

## B.  "Substantial compliance" defined

It does not appear that the Fifth Circuit has given a definitive definition of "substantial compliance"; as one court in the Northern District of Texas recently observed:

> The phrase "substantial compliance" has received very little discussion or treatment by the courts. Some courts examine whether the party has been "reasonably diligent and energetic in attempting to accomplish what was ordered." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 583 F. Supp. 115, 120 (W.D. La. 1984) (citing *Aspira of New York v. Bd. of Educ. of City of New York*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976)). Other courts within the Fifth Circuit apply a more exacting test, examining "whether the defendants took 'all

---

[14] "Evidence is clear and convincing if it 'produces in the mind of the trier of fact a firm belief . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case.'" *Waste Mgmt. of Wash. v. Kattler*, 776 F.3d 336, 341 (5th Cir. 2015) (quoting *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 396 (5th Cir.2004)).

reasonable steps within their power to insure compliance with the orders.'" *Alberti v. Klevenhagen*, 610 F. Supp. 138, 141 (S.D. Tex. 1985) (quoting *Mobile Cnty. Jail Inmates v. Purvis*, 551 F. Supp. 92, 97 (S.D. Ala. 1982)).

*Bisous Bisous LLC v. Cle Grp., LLC*, No. 3:21-cv-1614-B, 2021 WL 4219707, at *3 (N.D. Tex. Sept. 16, 2021).[15]

With that in mind, the "more exacting" test appears to have broader adoption. *See McNeal v. Tate Cnty. Sch. Dist.*, No. 2:70-cv-29-DMB, 2016 WL 7156554, at *11 (N.D. Miss. Dec. 7, 2016) ("To show substantial compliance, a defendant must show that it took 'all the reasonable steps within its power to insure compliance with the order.'" (quoting *Alberti*, 610 F. Supp. at 141)); *Food Lion, Inc. v. United Food & Commercial Workers Intern. Union*, 103 F.3d 1007, 1017 (D.C. Cir. 1997) ("In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within [its] power to comply with the court's order." (citing *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991)); *In re Sealed Case*, 77 F.4th 815, 835 (D.C. Cir. 2023) (same); *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 530 (4th Cir. 2022) ("Substantial compliance is found where all reasonable steps have been taken to ensure compliance: inadvertent omissions are excused only if such steps were taken." (citation and quotation marks omitted)); *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976) (affirming contempt order based on "conclusion that the appellants have not taken all the reasonable steps within their power to insure compliance with the orders by all concerned including the individual members of the Tribe"), *cert. denied*, 430 U.S. 931 (1977); *Mobile Cnty. Jail Inmates v. Purvis*, 551 F. Supp. 92, 97 (S.D. Ala. 1982) ("While the defendants herein are not held to 'absolute compliance' with the court's order, the court looks to see whether the defendants took 'all the reasonable steps within

---

[15] *See also Carter v. Transp. Workers Union*, --- F. Supp.3d ----, ----, 2023 WL 5021787, at *5 & n.35 (N.D. Tex. Aug. 7, 2023) (recognizing the two standards for substantial compliance, but declining to "resolve that issue" because alleged contemnor "flunks even the less-onerous standard").

their power to insure compliance with the orders.'" (citation omitted)), *aff'd*, 703 F.2d 580 (11th Cir. 1983) (unpublished); *Phone Directories Co. v. Clark*, 209 F. App'x 808, 815 (10th Cir. 2006) (unpublished) (noting that the Tenth Circuit has not recognized substantial compliance as a defense to contempt, but indicating that it would adopt the formulation requiring proof that "all reasonable steps were taken in good faith to ensure compliance with the court order and that there was substantial compliance"); *F.T.C. v. Lane Labs-U.S.A., Inc.*, 624 F.3d 575, 591 (3d Cir. 2010) ("formally adopt[ing] defense of substantial compliance" and requiring defendant to "show that it (1) has taken all reasonable steps to comply with the valid court order, and (2) has violated the order in a manner that is merely 'technical' or 'inadvertent'"); *Codexis, Inc. v. EnzymeWorks, Inc.*, 759 F. App'x 962, 964 (Fed. Cir. 2019) (unpublished) ("Civil contempt 'consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.'" (quoting *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006)).

The more exacting standard is not universal, however; several circuits have adopted or cited the less exacting standard, *see Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.), *cert. denied*, 454 U.S. 832 (1981); *Langton v. Johnson*, 928 F.2d 1206, 1220 (1st Cir. 1991); *In re Gallo*, 573 F.3d 533, 441 (7th Cir. 2009), as has one court in the Southern District of Texas, *see Dynamic Sports Nutrition, Inc. v. Roberts*, No. H-08-1929, 2009 WL 10711815, at *4 (S.D. Tex. July 14, 2009) (citing *Drywall Tapers, Local 1974 v. Local 530*, 889 F.2d 389, 394 (2d Cir. 1989)).

Of course, one could argue that neither standard is, in fact, more "exacting"; as the touchstone for both standards is the reasonableness of the alleged contemnor's attempts to comply, they seem largely interchangeable. For example, it would be difficult to argue that a person has been "reasonably diligent and energetic in attempting to accomplish what was ordered" if there were

one or more "reasonable steps within their power to insure compliance with the orders" yet to be taken. Nonetheless, in this Order the Court will use the more stringent standard.

## C.  Notice required

Due process requires "that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses." *Kattler*, 776 F.3d at 339–340 (quoting *In Re Oliver*, 333 U.S. 257, 275 (1948)). Adequate notice typically takes the form of a show-cause order and a notice of hearing identifying each litigant who might be held in contempt. *Id.* at 340. The Court notes that Defendants have not complained about inadequate notice.

## D.  No right to a jury in civil contempt proceedings

"[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *Bagwell*, 512 U.S. at 827.

## E.  Determining the appropriate sanction

Upon a finding of civil contempt, the Court may determine the appropriate sanctions by taking into account (1) "the character and magnitude of the harm threatened by the continued contumacy"; (2) "the probable effectiveness of [the] suggested sanction in bringing about the result desired"; and (3) "the amount of [the party in contempt's] financial resources and the consequent seriousness of the burden to that particular defendant." *United Mine Workers of Am.*, 330 U.S. at 303–304. Such sanctions "may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Id.* at 303–304. "[C]ivil contempt sanctions, or those penalties designed to compel

26

future compliance with a court order, are considered to be coercive and avoidable through obedience." *Bagwell*, 512 U.S. at 827. "When contemnors carry the keys of their prison in their own pockets, the contempt proceedings are almost universally found to be civil." *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) (citing *Shillitani v. United States*, 384 U.S. 364, 368 (1966); *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976); quotation marks and one citation omitted).

## F.  Standard of review

The Fifth Circuit "review[s] an order of contempt for abuse of discretion," and "review[s] the district court's underlying fact findings under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a)." *Travelhost, Inc.*, 68 F.3d at 961 (citing *LeGrand*, 43 F.3d at 166).

The Fifth Circuit will "read the order" on which the contempt is based "as written," but will "defer to the" issuing court's "reasonable resolution of any ambiguities" in that order. *In re PFO Glob., Inc.*, 26 F.4th 245, 255 (5th Cir. 2022).

## V.    CONTINUING SAFETY CONCERNS IN DFPS AND HHSC

The testimony given at the contempt hearing, and the Monitors' recent reports, raise many serious concerns about the present state of Texas' foster system vis-à-vis PMC children. Before the Court addresses actual contempt findings, it is pertinent to first discuss a few of the areas of continuing concern. It is hoped that this discussion will help guide the defendants to implement remedial orders based on the injunctive relief and keep these children free from an unreasonable risk of serious harm. The Court is demonstrating areas of concern and carrying forward the Contempt Motion on these issues.

## A.  Heightened monitoring and Remedial Order 20

Remedial Order 20 provides:

Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

(D.E. 606 at 4–5 ¶ 20.)

### 1. *History of heightened monitoring and Remedial Order 20*

In its 2015 Memorandum Opinion and Verdict, the Court concluded that DFPS was "failing its licensing and inspecting duties."[16] (D.E. 368 at 208.) DFPS could "choose from 13 types of enforcement actions against a licensed facility when it finds a violation," including "working with facilities to voluntarily correct deficiencies, probations, monetary penalties, and denial, suspension, or revocation of an operator's permit." (*Id.* at 208.) But DFPS "almost never" took an enforcement action: During fiscal year 2013, DFPS oversaw more than 10,000 licensed residential childcare facilities; "CCL cited providers for 6050 violations, but only issued 12 corrective actions and 1 adverse action." (*Id.* at 208.) "Instead of enforcement actions, DFPS chooses 'Collaborative approaches like corrective plans, probation, and evaluation periods [that] can take up to one year or longer for operations to come into compliance.'" (*Id.* at 208 (citing to trial exhibit DX 119 at 91) (brackets retained).)

But this collaborative strategy was not working: The "relaxed regulatory environment" led to a "high incidence of repeat violations," as "regulated entities perceive that they will not be held accountable for ignoring the State's requirements." (*Id.* at 209 (citing to trial exhibit DX 119 at 92) (quotation marks omitted).) Worryingly, most of the repeat violations "occurred on the highest-

---

[16] At the time of trial, DFPS's Residential Child Care Licensing (RCCL) was responsible for inspecting licensed child care facilities. After the 2015 Memorandum Opinion and Verdict was filed, RCCL was restructured and the licensing division was moved to HHSC. (*See* D.E. 559 at 81 n.50.)

risk standards." (*Id.* at 209 (citing to trial exhibit DX 119 at 92) (brackets and quotation marks omitted).)

Indeed, in the five years before trial the State had closed just one facility—the Daystar facility in Manvel—but it was "a story of horror rather than optimism regarding enforcement." (*Id.* at 209.) "Between 1993 and 2002, three teenagers died at Daystar from asphyxiation due to physical restraints. In most cases, the children were hog-tied." (*Id.* at 209.) There were also "reports of sexual abuse and staff making developmentally disabled girls fight for snacks." (*Id.* at 209.)

> Numerous stakeholders, including the district attorney, spoke out against Daystar, but the facility kept its license. In November 2010, a fourth child died in what was ruled a homicide by asphyxiation due to physical restraints. Daystar's license was still not revoked until January 2011. DFPS allowed this facility—that was responsible for four deaths, numerous allegations of sexual abuse, and unthinkable treatment of developmentally disabled children—to operate for 17 years.

(*Id.* at 210 (citing to trial exhibit PX 2172-75).)

The Fifth Circuit agreed "that . . . inadequate enforcement policies place children at a substantial risk of serious harm seems painfully obvious." *Stukenberg I*, 907 F.3d at 267. "The State had knowledge of these problems," "[y]et DFPS has not done any significant work to improve on these deficiencies." *Id.* at 267. While DFPS "held a mandatory one-day meeting to impress upon its staff the importance of maintaining high standards for investigations," "RCCL policies and procedures apparently remained unchanged." *Id.* at 267.

> Similarly, reports have consistently flagged inadequate oversight in licensing and enforcement as a critical problem area. But DFPS rarely heeds the advice of risk analysts to impose administrative penalties and ignores recommendations from the internal quality control experts at PMU to revoke licenses at non-compliant facilities.
>
> In short, DFPS is aware of the systemic deficiencies plaguing its monitoring and oversight practices. It also knows that these deficiencies pose a significant safety risk for foster children. Despite this knowledge, DFPS has not taken reasonable steps to cure the problems. Indeed, it is not clear that it has taken any steps at all. The district court correctly found that the State was deliberately indifferent to a substantial risk of serious harm to the LFC subclass as a result of its insufficient monitoring and oversight, and that these deficiencies are a direct cause of the constitutional harm.

*Id.* at 267–68.

In order to remedy the deficiencies in Defendants' investigation processes found at trial, the Court ordered the Special Masters to "help craft . . . reforms and oversee their implementation." (*See* D.E. 368 at 245; *see also id.* at 246–248, 250, 252.) In its January 2018 Order, the Court adopted the Special Masters' proposed remedies to address DFPS's failure to adequately investigate allegations of abuse and neglect giving rise to an unreasonable risk of harm to children. (D.E. 559 at 81 ¶ 13; *see also* D.E. 546 at 40 ¶ 13.) *Stukenberg I* expressly validated the heightened monitoring provision. 907 F.3d at 276, 277–78 ¶ 18. Therefore, in its November 2018 Order implementing *Stukenberg I* on remand, the Court restated that provision as Remedial Order 20.[17] (D.E. 606 at 4–5 ¶ 20.) The Fifth Circuit's opinion in *Stukenberg II* did not disturb Remedial Order 20, and it became effective upon the Fifth Circuit's July 30, 2019 Mandate. *See* 929 F.3d at 276 (listing issues on appeal, none of which pertain to Remedial Order 20).

In September 2019, the Monitors met with the leadership of HHSC and DFPS, who provided the Monitors with information relating to their proposed implementation of each remedial order. (D.E. 832 at 9.) During the meeting, HHSC and DFPS requested "clarification related to definitions for 'pattern,' the timeframe for determining a pattern, and a definition for 'heightened monitoring.'" (*Id.* at 9.) The Court directed the State to propose "specific and detailed" definitions for both terms.[18] (*Id.* at 10.) On November 1, 2019, HHSC and DFPS each submitted proposed definitions for the two terms. (*Id.* at 10, 12 (HHSC's proposal); *id.* at 14–17 (DFPS's proposal).)

---

[17] The language of the heightened monitoring provision proposed by the Special Masters and that of Remedial Order 20 is identical except for the compliance deadline. (*Compare* D.E. 559 at 81 ¶ 13 (requiring compliance "By July 2018"), *with* D.E. 606 at 4 (requiring compliance "Within 120 days").)

[18] As to the timeframe for determining a pattern, the Court specified that it must be "nothing fewer than 5 years." (D.E. 832 at 10.)

The Monitors identified several issues. First, the two proposals had little in common—the Monitors noted that "DFPS has proposed an entirely separate framework for determining a 'pattern' of contract violations, and heightened monitoring." (*Id.* at 14.) Further, the Monitors identified inadequacies in both proposals. (*See id.* at 10–13 (discussing problems with HHSC's proposal); *id.* at 14–18 (discussing problems with DFPS's proposal).)

"After reviewing the agencies proposals, the Court directed the Monitors to draft a proposed definition and methodology for pattern and heightened monitoring to share with HHSC and DFPS for feedback." (*Id.* at 18.) "Following consultation with HHSC and DFPS involving written and verbal feedback, the Monitors" proposed a "framework for implementation of Remedial Order 20." (*Id.* at 19; *see also id.* at 19–21 (enumerating the proposed framework).)

On March 18, 2020, the Court entered an order adopting the Monitors' proposed framework. (*See* D.E. 837.) Defendants did not appeal that order, and it continues without appeal.

Finally, on August 31, 2020, the Court extended Defendants' deadline to implement heightened monitoring until January 1, 2021. (D.E. 950 at 1.)

### 2. *Defendants' implementation of heightened monitoring is a prime example of their attempts to work around the Remedial Orders*

The purpose for which the Court entered the injunction and Remedial Orders in this case is to "ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm." (D.E. 606 at 2.) Remedial Order 20 furthers this purpose by ensuring that the State gives increased scrutiny to operations that have demonstrated a pattern of contract or policy violations—which put PMC children in those operations at an unreasonable risk of serious harm. Or, as Commissioner Muth put it, "the advantage and the tool that heightened monitoring gives us is a laser focus on these facilities." (D.E. 1395 at 44:1–3.)

The logic of heightened monitoring is simple. First, the State must identify childcare operations that demonstrate a "pattern" of contract and standards violation—namely, "a high rate of contract and standards violations for at least three of the last five years" as determined by the enumerated formula. (D.E. 837 at 1–2.)

Second, for each operation that exhibits such a pattern, and is therefore identified for heightened monitoring (*id.* at 2), the State must create a heightened monitoring plan which lays out "the violations that led to heightened monitoring," any "barriers to compliance," any "technical assistance needed" by the operation, and "the steps the [operation] must take to satisfy the plan" (*id.* at 2). In other words, the plan tells the operation why it presents an unreasonable risk of seriously harming children, and the steps it must take to no longer present such a risk.

Third, the operation must prove that it no longer presents an unreasonable risk of serious harm to the children by complying with its heightened monitoring plan and satisfying the other requirements to exit heightened monitoring.[19] (*See id.* at 3.)

Fourth, if the operation fails to do so, the State must take further steps to remove the risk, either by compelling compliance (through the "imposition of fines") or by keeping PMC children away from the operation altogether (through "suspension of placements"; "suspension or revocation of the [operation]'s license"; or "termination of the contract"). (*Id.* at 3.) In either case, the end result of heightened monitoring is that the operation no longer presents an unreasonable risk of serious harm to PMC children.

---

[19] This includes a period of post-plan monitoring to ensure that the operation does not backslide. (See D.E. 837 at 3 ("After the operation is released from the plan, DFPS and RCCL will coordinate to make at least three unannounced visits in the three months following the release from the plan, and the heightened monitoring team will continue to track intake data for the operation for six months to ensure it does not lose progress made during monitoring.").)

It follows that if Defendants choose to impose a fine, it should be in an amount likely to compel a change in the operation's behavior. And that leads to the first example of Defendants' attempts to work around Remedial Order 20: their use of fines that amount to a slap on the wrist. The Monitors report[20] that the "most common sanction the State has imposed on these operations for failing to come into compliance with Heightened Monitoring is a fine of $100 to $500. Some operations have been fined repeatedly." (D.E. 1380 at 14.) At a hearing in April 2023, Jordan Dixon, HHSC's Chief Regulatory and Policy Officer, testified that HHSC had assessed a total of $8600 in fines among thirty-five operations in 2022. (D.E. 1347 at 265:21–22.) As the Court noted at the hearing, a fine averaging $245 per operation is unlikely to cause a change in behavior when the same operations are being paid thousands of dollars per month by the State. (*Id.* at 266:25–267:6.) Even more so for the operations on heightened monitoring that have contracts with DFPS "with a value of tens of millions of dollars." (D.E. 1380 at 232.)

The Monitors report, for example, that "A World for Children CPA, which is responsible for hundreds of foster homes throughout Texas and has contracts with DFPS exceeding $50 million, was twice fined $500." (*Id.* at 220 n.279 (*See* DFPS, Active Client Service Contracts Exceeding $100,000, *available at* https://www.dfps.texas.gov/Doing_Business/Active_Contracts/client_services.asp).) And this is not an isolated case; more examples of the mismatch between fines levied against operations on heightened monitoring and amounts paid to those operations are provided in the table below.[21]

Ms. Dixon stated that fines are capped at $500 by state law. (D.E. 1347 at 266:3–4 ("I would note our administrative penalties are capped at $500 per penalty in state law.").) But her testimony suggested that fines are more akin to a fee to extend heightened monitoring—and presumably,

---

[20] All mentions of the Monitors' reports refer to unobjected-to portions thereof, except where otherwise indicated.
[21] *Infra* page 36–37.

stave off more serious penalties: "MS. DIXON: Your Honor, Jordan with HHSC. So we have started doing – I'm from the HHSC licensing side. *We have started assessing administrative penalties before we allow an operation to be extended on heightened monitoring*." (D.E. 1347 at 265:14–17 (emphasis added).) Thus, while Defendants assess clearly inadequate fines, children remain in facilities that present an unreasonable risk of serious harm.

At that same hearing, DFPS's William Walsh, Director of Purchased Client Services, indicated that the reason more serious penalties were not being imposed was that Defendants had not yet figured out whether DFPS or HHSC was responsible for handling enforcement actions: "We're just trying to work out the responsible agency. Whether it's DFPS or HHSC that would implement and impose those remedies. . . . So, DFPS has the contract. HHSC would have the licenses and so we're trying to figure out whether it makes sense contract action or a licensing action." (D.E. 1347 at 264:7–14; *see also id.* at 364:15–20 ("THE COURT: Well, it's been almost a year. So who's going to figure this out when? . . . How long does it take to figure it out? MR. WALSH: We have been talking about it and trying to work the solution.").) But evidence presented at the 2020 Contempt Hearing suggested that it was decided over four years ago that HHSC was responsible for taking enforcement actions against childcare operations: When discussing coordination between HHSC and DFPS in the context of Remedial Order 3, Defendants explained that they had "put in place a process for DFPS to notify HHSC-RCCL consistently of the dispositions of abuse and neglect investigations so that HHSC-RCCL might take enforcement action regarding the license of a facility where abuse or neglect occurred." (D.E. 1017 at 128.) Neither DFPS nor HHSC has explained why placement on heightened monitoring would change this enforcement calculus. Moreover, inadequate coordination and communication between the two agencies is no excuse for

34

failing to implement a remedial order—certainly, it should not take a year to decide which agency is responsible for handling enforcement actions. (*See id.* at 128.)

Relatedly, a second example of workarounds to Remedial Order 20 is that Defendants are frequently allowing operations to remain on heightened monitoring for years without coming into compliance. Per the Monitors:

> As of March 1, 2023, 24 of the 86 operations that were placed on Heightened Monitoring in 2020 remained on Heightened Monitoring. Since being placed on Heightened Monitoring, these operations have been responsible for an additional 127 substantiated findings of abuse, neglect, or exploitation and 1,813 minimum standards deficiencies, of which 1,652 were weighted high, medium-high, or medium. Though DFPS has suspended placements to some of these operations (in some cases, more than once), they remain open and continue to serve children.

(D.E. 1380 at 14.) The Monitors included a table, reproduced below, showing the number of minimum standards deficiencies, abuse, neglect, and exploitation investigations opened, Reason to Believe (RTB) findings (meaning that the State substantiated allegations of abuse, neglect or exploitation of a child or children), and enforcement actions at each of these operations during the "more than two years" in which they have failed to come into compliance with their heightened monitoring Plans "intended to address significant safety concerns" (*id.* at 224):

| Operation Name | Deficiencies | | ANE Investigations | | Enforcement Action | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | All | High, Med-High, Med | Investigations Opened | RTB Finding | Probation | Monetary Penalty | Plan of Action |
| A New Day Foundation | 34 | 29 | 58 | 1 | 0 | 1 | 0 |
| A World for Children | 160 | 145 | 518 | 12 | 0 | 3 | 1 |
| Agape Manor Home CPA | 90 | 80 | 118 | 4 | 0 | 2 | 1 |
| Azleway Children's Services | 126 | 115 | 184 | 6 | 0 | 4 | 0 |
| Bair Foundation | 70 | 66 | 234 | 15 | 0 | 5 | 0 |
| Beacon of Hope | 58 | 49 | 59 | 1 | 1 | 2 | 0 |
| Boy's Haven of America | 85 | 70 | 24 | 0 | 0 | 2 | 0 |
| Caring Hearts for Children | 51 | 51 | 100 | 1 | 0 | 5 | 0 |
| Children's Hope Residential Services CPA | 112 | 103 | 235 | 6 | 1 | 4 | 0 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Circle of Living Hope | 82 | 74 | 156 | 15 | 1 | 4 | 1 |
| Circles of Care | 57 | 57 | 158 | 17 | 0 | 5 | 0 |
| East Texas Open Door Inc | 44 | 36 | 62 | 1 | 1 | 0 | 0 |
| Fostering Life Youth Ranch | 26 | 26 | 81 | 0 | 0 | 5 | 0 |
| Girls Haven | 26 | 25 | 33 | 0 | 0 | 3 | 0 |
| Hands of Healing (CPA) | 48 | 48 | 171 | 2 | 0 | 2 | 0 |
| Lutheran Social Services of the South | 211 | 197 | 525 | 11 | 0 | 7 | 1 |
| New Hope Youth Center | 58 | 55 | 95 | 4 | 0 | 1 | 0 |
| New Life Children's Treatment Center | 43 | 42 | 155 | 6 | 0 | 1 | 1 |
| The Burke Foundation CPA | 39 | 38 | 84 | 3 | 0 | 2 | 1 |
| The Burke Foundation-Pathfinders RTC | 21 | 20 | 31 | 0 | 0 | 1 | 1 |
| The Giocosa Foundation | 52 | 51 | 71 | 2 | 0 | 3 | 0 |
| The Grandberry Intervention Foundation | 163 | 139 | 90 | 2 | 1 | 3 | 0 |
| Therapeutic Family Life | 84 | 68 | 224 | 6 | 1 | 3 | 0 |
| Youth in View | 73 | 68 | 87 | 12 | 1 | 4 | 1 |
| Total | 1,813 | 1,652 | 3,553 | 127 | 7 | 72 | 8 |

(*Id.* at 223–24.) Clearly, this bespeaks a "relaxed regulatory environment" leading to a "high incidence of repeat violations," as "regulated entities perceive that they will not be held accountable for ignoring the State's requirements." (D.E. 368 at 209 (citation and quotation marks omitted).)

Many of these operations have contracts with the State valued at $5 million or more, yet the most common enforcement action is a fine. To demonstrate why the fines levied are inadequate, the following table provides, for some of the above operations, the maximum possible value of monetary penalties assessed, as well as the value of each operation's contracts.

| Operation Name | Number of Monetary Penalties | Maximum Possible Value of Penalties | Value of Contracts[22] |
|---|---|---|---|

---

[22]   *See* DFPS, Active Client Service Contracts Exceeding $100,000, *available at* https://www.dfps.texas.gov/Doing_Business/Active_Contracts/client_services.asp. For operations that have multiple contracts with the State, the amount set forth in this column is the sum of the values of all contracts.

| A New Day Foundation | 1 | $500 | $5,868,052.33 |
|---|---|---|---|
| A World for Children | 3 | $1500 | $61,866,805.90 |
| Agape Manor Home CPA | 2 | $1000 | $10,971,420.50 |
| Azleway Children's Services | 4 | $2000 | $27,634,977.70 |
| Bair Foundation | 5 | $2500 | $20,219,224.02 |
| Beacon of Hope | 2 | $1000 | $5,080,499.77 |
| Caring Hearts for Children | 5 | $2500 | $7,369,205.61 |
| Children's Hope Residential Services CPA | 4 | $2000 | $26,872,343.54 |
| Circle of Living Hope | 4 | $2000 | $16,744,742.65 |
| Circles of Care | 5 | $2500 | $24,751,629.62 |
| Lutheran Social Services of the South | 7 | $3500 | $77,914,788.80 |
| New Hope Youth Center | 1 | $500 | $5,314,400.78 |
| The Giocosa Foundation | 3 | $1500 | $12,115,044.65 |
| Youth in View | 4 | $2000 | $5,833,221.20 |

Other operations are released from heightened monitoring, but linger in post-plan monitoring "due to ongoing safety concerns." (D.E. 1380 at 227.) For example, "Hands of Healing GRO was placed on post-plan monitoring in March 2022," and was still on post-plan monitoring as of June 2023. (*Id.* at 227.) Records indicate that the operation remained on post-plan monitoring "because of open DFPS investigations of abuse, neglect, or exploitation." (*Id.* at 227.) The Monitors explain that HHSC moved Hands of Healing to post-plan monitoring prematurely, as the operation had yet to come into compliance with "a Task in their Heightened Monitoring Plan, which required the operation to come into compliance with the terms of an HHSC probation plan. The operation was placed on probation on September 8, 2021, after receiving three RTB findings while on Heightened Monitoring, all for Neglectful Supervision." (*Id.* at 227.) The operation "was still five months away from completing probation when they moved to post-plan monitoring." (*Id.* at 227.)

Allowing operations to remain on heightened monitoring or post-plan monitoring for years while they continue to harm children does not constitute implementing heightened monitoring in

a way that "ensure[s] that Texas's PMC foster children are free from an unreasonable risk of serious harm." (D.E. 606 at 2.) Indeed, it reduces heightened monitoring to the sort of "inadequate enforcement polic[y]" that "place[s] children at a substantial risk of serious harm," *Stukenberg I*, 907 F.3d at 267, which Remedial Order 20 was implemented to remedy.

Other examples of Defendants' workarounds to Remedial Order 20 are apparent from their handling of the termination of heightened monitoring. The Court has specified the conditions that must be met for a facility to exit heightened monitoring:

> The heightened monitoring plan will remain in place for at least one year and until:
> - the operation satisfies the conditions of the plan;
> - at least six months' successive unannounced visits indicate the operation is in compliance with the standards and contract requirements that led to heightened monitoring; and
> - the operation is not out of compliance on any medium-high or high weighted licensing standards.

(D.E. 837 at 3.) In their Sixth Report, the Monitors discussed "[n]ew guidance drafted by the State related to Heightened Monitoring that . . . sheds light on the way DFPS and HHSC consider substantiated findings of abuse, neglect, or exploitation and citations issued for minimum standards violations during an operation's time on Heightened Monitoring."[23] (D.E. 1380 at 228.) The guidance appears to create workarounds to the termination provisions.

For example, the guidance interprets the requirement that "at least six months' successive unannounced visits indicate the operation is in compliance with the standards and contract requirements that led to heightened monitoring" (D.E. 837 at 3) in a manner inconsistent with both the interpretation that would be given by "any rational human" (D.E. 1395 at 64:10) and the safety of PMC children; the Monitors note that "the guidance appears to allow the six-month period for successive compliance to be any six-month period [even] within the [first] year that the operation

---

[23] Testimony at the June 2023 hearing indicated that the guidance document represents practices that were already implemented, rather than new practices that were being contemplated. (D.E. 1395 at 71:13–14.)

is on Heightened Monitoring" (D.E. 1380 at 229) rather than the most recent six months before the operation is moved off of heightened monitoring.

But this interpretation is clearly inconsistent with the Court's order—six successive months of compliance is required because uninterrupted compliance for at least that period of time indicates that the operation has corrected whatever problems led to the violations of "standards and contract requirements" for which the operation was placed on heightened monitoring in the first place. If an operation has six consecutive months of compliance, but then violates one of the standards or contract requirements before the end of the heightened monitoring period, it clearly has not corrected its problems, and releasing it from heightened monitoring would reduce heightened monitoring to an "inadequate enforcement polic[y]" that "place[s] children at a substantial risk of serious harm." *Stukenberg I*, 907 F.3d at 267. Hopefully, this practice has been resolved. But it is one more example of the State's attempts to work around the Remedial Orders of the Court—and one that is clearly at odds with the text of the provision.

Relatedly, to make it as easy as possible to identify a six successive month period without a violation, the guidance explained that a minimum standards citation or contract violation would "not be considered in the HM compliance evaluation" if the citation or violation "is received during the HM episode but is associated with an activity that began before the initiation of a HM episode." (D.E. 1380 at 230 (emphasis in original).) Defendants justify this practice on the ground that "the violation is considered to be attributable to the concerning patterns and trends that 'led to heightened monitoring' rather than evidence of the operation's non-compliance during the HM episode." (*Id.* at 230 (footnote omitted).) But because the State then considers fewer of the facility's violations and citations as part of its analysis, this practice runs counter to the purpose of the remedial order. Instead of focusing on child safety, it appears to prioritize exit from heightened

39

monitoring, essentially by making it easier to identify a six-month period without citations related to the facility's pattern/trend area.

So, too, does another provision in the guidance:

[V]iolations resulting from an investigation are considered non-compliance on the date the investigation is initiated rather than the date the violation was issued . . . . [A]n operation may still be eligible to move to the post-plan monitoring phase as long as the investigation associated with the violation was initiated after the necessary six-month compliance period.

(*Id.* at 230.) Since Defendants have flexibility as to when an investigation is initiated, this practice further facilitates the identification of a six-month period of compliance. This practice is particularly dubious because it is inconsistent with Defendants' usual practice. (*See id.* at 230 n.306.)

Second, the guidance indicates that the State will consider the first condition—that "the operation satisfies the conditions of the plan" (D.E. 837 at 3)—to be met if the operation is "'substantially meeting' the requirements of the Plan Tasks" (D.E. 1380 at 228). One factor the State will consider in determining whether an operation is "substantially meeting" the requirements is "whether the operation has implemented the requirements in the Plan." (*Id.* at 228–229.) But the State will also consider a number of other factors: "whether . . . the operation experienced delays with implementation, whether the operation completed the Tasks 'in a reasonable timeframe;' and if the operation faced 'challenges' with consistent implementation of Plan Tasks, whether the operation 'ma[de] overall progress and demonstrate[d] that children are safe, risks are reduced, and that there is appropriate internal oversight of the operation.'" (*Id.* at 229 (footnote omitted, brackets in original).) In other words, under the guidance, an operation could substantially meet the requirements of its Heightened Monitoring plan without having implemented the requirements of the plan—and thus, without having "satisfie[d]" the requirements of the plan (D.E. 837 at 3).

Third, the guidance also articulates rules that are inconsistent with Defendants' usual practices, with the inconsistencies facilitating operations' exit from heightened monitoring rather than adhering to the purpose of the order to protect child safety. For example, the Monitors note that "HHSC and DFPS had not previously allowed an operation to move to post-plan monitoring or be released from Heightened Monitoring entirely if an investigation was still pending." (D.E. 1380 at 231.) But "[a]ccording to the guidance, . . . an 'assessment procedure' will be used to review all open investigations, which will include determin[ing] whether the 'documented evidence' is sufficient to conclude no serious risk, and whether the 'documented evidence' is likely to support a minimum standard violation or other type of violation. The guidance specifies that if 'there does not appear to be an unreasonable risk of serious harm associated with the placement of children at the operation, the operation may be authorized to move forward to the next phase of HM.'" (*Id.* at 231 (footnotes omitted).) Clearly, the policy allows a facility on heightened monitoring to keep repeating the exact violations for which they were placed on heightened monitoring and still be released from heightened monitoring. This practice is antithetical to the very necessity for heightened monitoring. This is a policy that clearly protects the facilities over the safety of the children.

After all, the result of a completed investigation is a far better indicator of whether there is an unreasonable risk of serious harm than is speculation as to the outcome of an ongoing investigation—obviously, the "documented evidence" at the time of the "assessment procedure" may not "support a minimum standard violation," but subsequent evidence may tip the balance. Presumably, this is why HHSC and DFPS did not previously allow operations to exit heightened monitoring if there were investigations pending. Thus, the novel assessment procedure is the sort

of "inadequate enforcement polic[y]" that "place[s] children at a substantial risk of serious harm." *Stukenberg I*, 907 F.3d at 267.

Finally, it appears that the State is reverting to the ineffective collaborative approach to enforcement that was the very reason for Remedial Order 20. (D.E. 368 at 208 ("Instead of enforcement actions, DFPS chooses 'Collaborative approaches like corrective plans, probation, and evaluation periods . . . .'").) For example, the Monitors reported that "Sweeten Home for Children received a RTB finding for Exploitation on November 22, 2022, less than a month before moving to post-plan monitoring." (D.E. 1380 at 208.) Specifically, a "staff member was found to have exploited a child by using him to make illegal purchases of vape pens and other illegal substances. The staff member also asked the child to sell pills for him. The staff member told the child they were 'going to make money off the high school by moving pills.'" (*Id.* at 208 n.243.) Yet "[t]he operation moved to post-plan monitoring on December 14, 2022," well after the receipt of the RTB finding. (*Id.* at 208 n.243.)

At the June 2023 hearing, the Court inquired why the operation was allowed to move to post-plan monitoring so soon after receiving the RTB finding. (D.E. 1395 at 57:7–10.) Defendants' heightened monitoring "subject matter experts" (*id.* at 56:24 (characterization of Mr. Neudorfer)) explained that "we had been working with the operation for a few months before the actual investigation had closed and the citations and dispositions had been rendered" (*id.* at 57:20–23). She explained that the operation "self-reported and it began to address the situation themselves. The operation remedied the citations that were issued, they provided technical assistance. We also had been meeting with the operation regularly. One of the things that they did was address professional boundaries. They developed a form for training of that." (*Id.* at 58:10–17.) This

incredible doublespeak once again demonstrates the State's concern for facilities over the safety of children.

*     *     *

Defendants' attempts to work around heightened monitoring are not unique; they demonstrate, in microcosm, Defendants' approach to this matter broadly.[24] Thanks to the Monitors, these practices have been exposed. The Court carries forward the Contempt Motion on the issue of heightened monitoring.

## B. Psychotropic medications

### 1. *The history of psychotropic drug use in Texas foster care*

It has long been understood that the overuse of psychotropic medications—"any medication used to impact the emotions, the behavior, [or] the thinking of a child" (D.E. 1489 at 37:5–6)[25]—in foster children is a concern. Indeed, the State has known for nearly two decades that its oversight of the use of psychotropic medication in the foster system is inadequate. In 2004, then-Texas Comptroller Carole Keeton Strayhorn published a special report[26] on the Texas foster care system

---

[24] Another example—Defendants' failure to comply with the caseworker caseload guidelines to which Defendants themselves agreed—is discussed later. *See infra* page 242–65.

[25] The Texas Family Code defines "psychotropic medication" as a "medication that is prescribed for the treatment of symptoms of psychosis or another mental, emotional, or behavioral disorder and that is used to exercise an effect on the central nervous system to influence and modify behavior, cognition, or affective state." Tex. Fam. Code § 266.001(7). Expressly included in this definition are "psychomotor stimulants," "antidepressants," "antipsychotics or neuroleptics," "agents for control of mania or depression," "antianxiety agents," and "sedatives, hypnotics, or other sleep-promoting medications." *Id.* § 266.001(7)(A)–(F).

[26] This is just one of many reports—both State-commissioned and independently prepared—that have discussed issues in the Texas foster care system. In its 2015 Memorandum Opinion and Verdict, the Court noted that many of the system's shortcomings have been known about for several decades:

- In 1996, a committee established by then-Governor Bush issued a report on the foster care system. (D.E. 368 at 11.) This report apparently fell by the wayside until 2009, when then-Governor Perry and the Texas legislature "formed the Texas Adoption Review Committee 'to take a hard look at the Texas foster care system.'" (*Id.* at 10 (citing to trial exhibit PX 1964 at 2).) "After drafting its recommendations, the 2009 Committee unearthed" the 1996 report, and "found that 11 of its 14 general recommendations were made in 1996, leading it to conclude that 'many of the same problems identified in 1996' had not been fixed." (*Id.* at 11 (citing to trial exhibit PX 1964 at 2, 7–12).)
- In 2004, the Texas Comptroller issued a 306-page report that "detailed a number of shortcomings" in the state's foster care system. (*Id.* at 24.) (The report was titled "Forgotten Children, A Special Report on the Texas Foster Care System.")

(the "2004 Report" or "2004 Strayhorn Report"). (D.E. 1486-5–1486-9[27] (Court's Ex. 5).) The

report noted:

> Texas' foster children in all service levels receive psychotropic drugs—that is, drugs that
> affect the mind through action on the central nervous system—for depression,
> schizophrenia, attention deficit hyperactivity disorder (ADHD), seizures and a variety of
> other conditions.

(D.E. 1486-8 at 13.)

> Many foster children have psychological problems and are being treated with an array of
> medications to manage their symptoms. But even fundamentally normal children who have
> been taken from their homes and families can become aggressive and "emotionally
> reactive" due to a lost sense of trust and their conditions are only worsened by multiple
> placements and frequent caseworker turnover. As their feelings of instability increase, their
> emotions may erupt, and their caretakers then are, in the words of one child psychiatrist,
> "just chasing an untreatable problem with more medication."

(*Id.* at 13.) "Many observers, including physicians, children's advocates and foster parents, have

expressed concern over the types and amounts of psychotropic medications prescribed to foster

children." (*Id.* at 13.) The report further noted that "[a] leading child psychiatrist has expressed

concern regarding children receiving multiple medications of the same class, such as two

stimulants or antidepressants." (*Id.* at 15 (endnote omitted).) Yet the State "exercise[d] little

meaningful oversight over these medications." (*Id.* at 13.) Thus, the 2004 Report recommended

that the State "develop a best practices manual for the appropriate use of medications for foster

children." (*Id.* at 21.)

---

- In 2007 and 2010, Texas Appleseed issued reports discussing the foster care system. (*Id.* at 23.) "The
  2010 report was commissioned by the Supreme Court of Texas Permanent Judicial Commission for
  Children, Youth and Families." (*Id.* at 23–24.)
- In 2014, the Texas Sunset Advisory Commission issued a report on the foster care system. (*Id.* at 23–
  24.)
- Also in 2014, then-DFPS Commissioner Specia commissioned "an operational review of DFPS and CPS
  to figure out why so many problems remain despite" all the money and effort invested in the agency over
  the prior eight years. (*Id.* at 23–24.)

[27] Because of its size, this exhibit was filed in multiple parts.

In 2006, Comptroller Strayhorn published a follow up report (the "2006 Report" or "2006 Strayhorn Report") (D.E. 1486-10–1486-14[28] (Court's Ex. 6)) with a more detailed analysis of psychotropic medications and their usage in the foster care system. Much of the analysis and its conclusions are no less relevant today. For example, the 2006 Report noted the lack of data supporting the use of psychotropics in children:

> Most psychotropic medications have not been studied extensively for efficacy and safety in children. The National Institutes of Mental Health notes that about 80 percent of psychotropic drugs are not approved for use in children or adolescents. Their use in this population is described as "off-label." Yet the off-label use of these drugs in children is common.

(D.E. 1486-10 at 12.) Further:

> Many medications prescribed to Texas foster children have been shown to have no or minimal efficacy. Among antidepressants, for instance, FDA findings from clinical trials showed little or no efficacy from the use of escitaloram (Lexapro), paroxetine (Paxil) and venlafaxine (Effexor). Yet prescription pattern among foster children appears to ignore such findings from clinical trials that show a lack of or minimal efficacy.
>
> . . . .
>
> [Likewise, m]any anticonvulsant drugs are being used as mood stabilizer for Texas foster children, including oxcarbazepine and topiramate. These drugs have been found to be ineffective for psychiatric purposes. Nevertheless, they were widely prescribed to Texas foster children . . . .

(*Id.* at 12.)

The 2006 Report specifically noted that the "widespread use of antipsychotics in children and adolescents raises particular concerns regarding long-term safety." (*Id.* at 11.) "Serious questions exist regarding this issue, which involves documented[] side effects. Little is known about the long-term effects of early and prolonged exposure to psychotropic medications on the development of children's brains." (*Id.* at 11.) And, the 2006 Report noted that there was inadequate evidence

---

[28] Because of its size, this exhibit was filed in multiple parts.

regarding either the safety or efficacy of polypharmacy or the use of psychotropic drugs in pediatric populations generally. (*Id.* at 11.)

Moreover, the 2006 Report noted that foster children face many issues that are not treatable pharmacologically:

> While medication may be beneficial in treating mental disorders, a "pill" cannot solve all of the emotional issues and problems foster children face while in care. The Zito/Safer External Review states, "poverty, social deprivation and unsafe environments do not necessarily require complex drug regimes."
>
> Often when foster children experience emotional problems they undergo psychiatric evaluations and are then taken to a physician, frequently a psychiatrist (but not always) who then prescribes one or more medications to help treat the problem.

(*Id.* at 14.) And "[w]hile some foster children suffer from severe mental illness, others have milder problems" that would be better treated with nonpharmaceutical means, such as psychotherapy,[29] diet and exercise, and mentorship. (*Id.* at 14–17.)

The 2006 Report also highlighted the then-current rate of psychotropic drug use:

> More than 12,200 children—or 37.4 percent of all children in foster care received at least one psychotropic medication during fiscal 2004. This number includes 686 children age four and younger. The majority of these powerful medications are not FDA-approved for use by children, in fact many manufacturers of these drugs have warned against their use in children because in many cases long-term studies are nonexistent for this population. Also, many of these powerful medications have dangerous side effects.

(D.E. 1486-12 at 5.) These 12,200 children received nearly 261,000 psychotropic prescriptions during fiscal year 2004, for an average of 21.3 prescriptions per child (at a cost of nearly $30 million). (*Id.* at 10.)

Psychotropic medications have been an issue in this case since its inception. (*See, e.g.*, D.E. 1 at 11 ¶ 29, 12 ¶ 33, 74–75 ¶ 328(k).) At trial in 2014, the Court heard testimony indicating that

---

[29] The 2006 Report elaborates that "[m]any foster children need therapy because they have been removed from their homes, which can be very stressful. . . . Many foster children receive therapy, but Medicaid records reveal that this therapy often is inconsistent, with months passing between sessions, and some children in need of therapy never receive it." (D.E. 1486-10 at 15–16.)

46

little had changed in the decade following the two Strayhorn reports. Lead plaintiff M.D., for example, entered the foster care system in 2007, at the age of ten. (D.E. 368 at 57–58.) "When the State assumed custody of M.D. in April 2007, her level of care was Basic. Within four months her level of care rose to Specialized. Three months later, her level of care rose to Intense. Except for three months (August-October 2010, March 2013), M.D.'s level of care remained Intense over her eight years in DFPS custody." (*Id.* at 69 (citations omitted).)

> Coinciding with M.D.'s rising levels of care, M.D. was steadily diagnosed with psychological disorders and prescribed a litany of medication. In November 2007, after seven months in foster care, M.D. was diagnosed with Bipolar Disorder and Post-Traumatic Stress Disorder ("PTSD"). In April 2008, M.D. was diagnosed with Attention Deficient Hyperactive Disorder ("ADHD") and Oppositional Defiant Disorder. In 2010, Impulse Control Disorder and Borderline Personality Disorder were added to the list. In 2011, Schizophrenia, Mood Disorder, and Conduct Disorder. In 2013, Major Depressive Disorder, Mathematics Disorder, and Disorder of Written Expression.

(*Id.* at 70 (citations omitted).)

As a result, "M.D. was prescribed a pharmacy of psychotropic medications," including "Adderall, Intuniv, Clonidine, Concerta, Vyvanse, Tenex, and Focalin for ADHD; Depakote and Divalproex for Bipolar Disorder; Fluoxetine (or Prozac), Celexa, and Trazodone for Depression; Abilify, Risperdal, and Seroquel (all anti-psychotics) for Schizophrenia, Depression, and Bipolar Disorder; and Trileptal for mood disorders." (*Id.* at 70–72 (footnotes omitted).) "She often took five or six medications at a time." (*Id.* at 72 (citing to trial exhibit PX 2015 at 34, 39 (sealed)).) Yet, according to Plaintiffs' expert, "M.D.'s problems [were] likely not solvable by medication. In his view, the State over-relied on psychotropic drugs and overmedicated M.D." (*Id.* at 72 (citing to trial exhibit PX 2015 at 49).)

P.O., another named plaintiff, was prescribed albuterol for bronchitis and was taking Sudafed "for reasons that are not clear in the record." (*Id.* at 108 (citing to trial exhibit 1 RFP CPS 034490, 034609).) Both medicines can cause sleeplessness. (*Id.* at 108.) Based on his foster mother's

complaint that he had trouble sleeping, a psychiatrist prescribed three-year-old P.O. Clonidine to help him sleep. (*Id.* at 109.) It is unclear that the psychiatrist knew that P.O. was taking the other medications. (*Id.* at 109 (citing to trial exhibit 1 RFP CPS 034496).) Yet, a month later, the psychiatrist increased P.O.'s Clonidine dosage. (*Id.* at 109 (citing to trial exhibit 1 RFP CPS 034506-07).)

Later that year, the psychiatrist "added Focalin and Risperdal to P.O.'s medication regimen." (*Id.* at 109 (citing to trial exhibit 1 RFP CPS 034508-09).) "The next month, P.O. began to have occurrences of enuresis (involuntary urination) and encopresis (involuntary defecation). Nothing in the record indicates that any of P.O.'s caregivers or health care providers questioned the possible link between his new medications and his urinary and bowel troubles. These conditions plagued him for years." (*Id.* at 109 (citing to trial exhibit 1 RFP CPS 034337).)

Since 2020, the Monitors have reported concerns regarding psychotropic medications. (*See*, *e.g.*, D.E. 869 at 63 (explaining that, at one Residential Treatment Center ("RTC"), "the Monitors observed and reported very little evidence of medical treatment for the children other than psychotropic drugs"); *id.* at 94 (noting that the outcries of children in one foster home, who reported "that an adult male was inappropriately touching" them, were dismissed as hallucinations caused by their psychotropic medication, histories of mental health issues, trauma, and hospitalizations); *id.* at 355–57 (noting that a fourteen-year-old child who "hanged herself in the bathroom of a shelter where she was placed by DFPS following her discharge from a psychiatric hospital" was prescribed an increasing number of psychotropic medications in the weeks before her death); D.E. 1027 at 52 & n.104 (noting that a child's psychotropic medication was misspelled in the child's service plan (service plan stated that the child was taking "Prosatin"; Monitors did "not find any psychotropic matching this name in online searches, and the monitoring team's

record reviews instead indicate A.A. was taking Prazosin for nightmares")); D.E. 1066 at 32 (citations issued and RTB found after a different child went without psychotropic medications for fifteen days because the facility "can't find them"; the medications were eventually found "on top of the refrigerator"); *id.* at 47 (inspection revealing that a different facility was improperly storing psychotropic medications); D.E. 1079 at 343 (noting that after sixteen-year-old foster child was discharged from foster home shortly before foster parent went on cruise, "DFPS staff went to the foster parent's home to pick up the child's insulin and psychotropic medications, and no one would answer the door. Consequently, the foster child was without the medication for the entire weekend.").)

The following are further examples.

- The Monitors reported that staff at "many of the CWOP Settings visited . . . were not providing children with medications at the same time of day each day, or even close to the same time of day each day" which "can be very problematic for psychotropic medications." (D.E. 1132 at 97.)

- The Monitors recounted a "Serious Incident Report" which "indicated that a child was given three psychotropic medications that were not prescribed to him" (*Id.* at 99.)

- Another child accumulated large amount of psychotropic medication through "cheek[ing],"[30] then attempted to overdose. (*Id.* at 107 n.177.)

- Another child went without psychotropic medication because prescription was not refilled. (D.E. 1171 at 9.)

---

[30] "Cheeking" refers to the temporary storage of pills in the cheek of the mouth so that they can be diverted for nonmedical use. *See* Substance Abuse & Mental Health Servs. Admin., Medication-assisted Treatment Inside Correctional Facilities 1, https://store.samhsa.gov/sites/default/files/pep19-mat-corrections.pdf (last visited Jan. 14, 2024).

- The Monitors recount that a foster parent was cited for failing to administer psychotropic medication (and other medications) as prescribed and for improper medication logs, though citation was overturned after administrative review. (D.E. 1248 at 154.)

- A child was "prescribed ADHD medication, but after being placed with the foster parents, she was prescribed Abilify, a mood stabilizing medication, though she had not been diagnosed with a mood disorder. The CPA and foster parents failed to notify CPS or request medical consent prior to giving the child the medication." (*Id.* at 161.)

- An RTC was cited because staff gave an eleven-year-old child "two psychotropic medications that were not prescribed to him, rather than his own prescriptions." (D.E. 1318 at 99.)

- A fourteen-year-old child reported that she self-administered psychotropic medication because her foster parent "wasn't always there to give it to her." (D.E. 1380-1 at 11.)

- A GRO was cited "because a staff did not administer a child's psychotropic medication (Clonidine) as prescribed." (D.E. 1380-2 at 31–32.)

Between December 2021 and December 2022, the Monitors conducted fourteen multi-day site inspections of Texas General Residential Operations ("GROs"). (D.E. 1337 at 1.) They reported that staff members at the facilities were not properly administering psychotropic medications, and that staff members were not properly documenting the administration of the medication. (*Id.* at 11–14.) They further reported that many of the GROs were violating DFPS policies regarding medical consenters and documentation of informed consent for psychotropic medications. (*Id.* at 14–15.)

The Monitors also reported that seventy-five of the 161 children whose files the monitoring team reviewed were on psychotropic medication regimens that, under the State's Psychotropic Medication Utilization Parameters ("PMU Parameters"), would trigger a secondary review—a Psychotropic Medication Utilization Review ("PMUR" or "PMU Review")—of the child's clinical status. (*Id.* at 5–7.) Yet a PMUR had been completed for only 21 of those children (*id.* at 7), and most of those PMURs were out of date (*see id.* at 9 (noting that most of the PMURs "were completed when the child was taking a different set of medication than they were prescribed at the time of the visit")).

The Monitors also cited a report published by the State[31] that documented the number and percentage of foster children receiving psychotropic medications for at least sixty days in the years 2002 and 2019. (*Id.* at 4.) The State's report documented that the percentage dropped from 29.5 percent to 17.9 percent, and that the percentage dropped for each age group.[32] (*Id.* at 4.) But because the foster child population had nearly doubled from 2002 to 2019, the total number of foster children receiving psychotropics for at least sixty days increased by one thousand.[33] (*Id.* at 4.)

After the Monitors filed this report, Defendants objected to that entire discussion on the ground that "prescription and administration of psychotropic medications to class members is outside the scope of the Court's Remedial Orders." (D.E. 1344 at 1.) Indeed, Defendants argued that "[b]ecause none of the Remedial Orders discusses the prescription or administration of

---

[31] HHSC, Update on the Use of Psychotropic Medications for Children in Texas Foster Care: State Fiscal Years 2002–2019 Data Report, *available at* https://www.hhs.texas.gov/sites/default/files/documents/laws-regulations/reportspresentations/ 2021/psychotropic-meds-tx-foster-care-fy2002-2019.pdf.

[32] Specifically, children aged 0–3, 4–5, 6–12, and 13–17. (D.E. 1337 at 4.) Children aged 13 to 17 experienced the smallest reduction in psychotropic drug use—in 2002, 47.5 percent of such children were taking a psychotropic medication for at least sixty days; by 2019, the rate was 43.5 percent. (*Id.* at 4.)

[33] The number of children taking psychotropic medication for at least sixty days in each age range also increased. (*Id.* at 4.)

psychotropic medications, the Monitors do not have the authority to 'consider' or report on those issues." (*Id.* at 2.) At a hearing in April 2023, Defendants took a different position—that "the prescribing decisions of medical doctors and Texas doctors" are "not part of these Remedial Orders." (D.E. 1347 at 29:19–20 (per Reynolds Brissenden).)

And at the Contempt Hearing, the Court explained: "It is my position that our Remedial Order 3, which applies to State's duty to investigate applies to the investigation of the use of these drugs in children [t]o make sure they're being used properly and administered properly by the caregivers and recorded properly and refilled properly in all the things that they're -- that they're required to do, including instituting a review, requesting a review." (D.E. 1489 at 70:16–22.) The Defendants agreed that, insofar as medications are covered by the remedial orders, psychotropic medications are included. (*Id.* at 70:23–71:1 ("MR. SHAH: Let me respond, Your Honor. To the extent RO 3 addresses medications, we do not think that the psychotropic medications should be treated any differently. And that is our position, Your Honor.").) Hopefully, this is their last change of position, as clearly, medication investigations are covered under Remedial Order 3.

Further, on May 1, 2023, Stephen Black, Associate Commissioner for Statewide Intake, testified that medication issues could constitute abuse or neglect. Specifically, he explained that "[i]n some circumstances," "[o]ver-medicat[ion]" would be abuse, under-medication could be a medical neglect, it depends on the act." (D.E. 1365 at 59:14–16.) He agreed that such acts "must be investigated under our Remedial Order 3," and that they also implicate Remedial Order 20. (*Id.* at 59:25–60:5.)[34]

---

[34] The Texas Administrative Code defines several types of abuse, two of which are particularly relevant. *See* 40 Tex. Admin. Code §§ 707.787 (emotional abuse), 707.789 (physical abuse).

"Emotional abuse" includes "permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning." *Id.* § 707.787(a)(2); *id.* § 707.453(a)(2). "Mental or emotional injury" means "[t]hat a child of any age experiences any significant change in the child's physical health, intellectual development, or social behavior, including changes in sleeping and eating patterns, changes in school, or depression." *Id.* § 707.787(b)(1);

2. ***The State appears to not ensure that Psychotropic Medication Utilization Reviews (PMURs) are conducted, which places PMC children at risk of harm***

    a. ***The importance of conducting PMURs***

Shortly after publication of the 2004 Report:

> [T]he Texas Department of State Health Services (DSHS), with review and input from various medical associations, published *Psychotropic Medication Utilization Parameters for Foster Children*. These best-practice guidelines were based on medical literature and developed by a panel of child and adolescent psychiatrists, psychologists and other mental health experts.

(D.E. 1486-13 at 19.)[35] Since then, the Psychotropic Medication Utilization Parameters ("PMU Parameters" or the "Parameters") have gone through five revisions; the currently operative sixth version of the Parameters was published by HHSC in June 2019. (PX 10 at 1.) "It has long been recognized that the Parameters are based upon sound psychiatric principles and scientific evidence." (*Id.* at 3.) The Parameters address many topics, including general principles related to the use of psychotropics (*id.* at 5–7), their use in young children (*id.* at 7–8), information on the usual recommended doses for psychotropic medications (*id.* at 11), specific guidance regarding

---

*see also id.* § 707.453(b)(1) (defining mental or emotional injury using similar language). And "observable and material impairment" means "discernible and substantial damage or deterioration to a child's emotional, social, and cognitive development," including "a substantial and observable change in behavior, emotional response, or cognition." *Id.* § 707.787(b)(2); *id.* § 707.453(b)(2).

    "Physical abuse" includes both "[c]ausing, expressly permitting, or encouraging a child to use a controlled substance," *id.* § 707.789(a)(4), and a "[f]ailure to make a reasonable effort to prevent an action by another person that results in" "any bodily harm," *id*. § 707.789(a)(2), (b)(3).

    The Administrative Code defines neglect as any "negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program, including failure to comply with an individual treatment plan, plan of care, or individualized services plan that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by a facility or program." *Id.* § 707.801(a). "Substantial emotional harm" includes any "observable impairment in a child's psychological growth, development, or functioning that is significant enough to require treatment by a medical or mental health professional." *Id.* § 707.801(b)(5). "Substantial physical injury" is any "bodily harm that warrants treatment by a medical professional." *Id.* § 707.801(b)(6). And "negligent act or omission" is defined generally as "a breach of duty by an employee, volunteer, or other individual working under the auspices of a facility or program that causes or may cause substantial emotional harm or substantial physical injury to a child." *Id.* § 707.801(b)(1). The Code also enumerates specific negligent acts or omissions, including a "[f]ailure to seek, to obtain, or to follow through with medical care for a child." *Id.* § 707.801(b)(1)(E).

    [35] Notably, the State retained Peter Jensen to help write the PMU Parameters. (D.E. 1489 at 41:12, 62:11–12, 109:4.) Doctor Jensen is one of the nation's foremost experts in the field; he worked at the National Institutes of Mental Health, Columbia University, and is currently at the Mayo Clinic. (*Id.* at 62:11–14.)

antidepressants and antipsychotics (*id.* at 11–13), and a chart summarizing the levels of evidence for the short- and long-term efficacy of psychopharmacological treatment (*id.* at 14).

The Parameters also set forth criteria—what Doctor Bellonci described as "red flags" that identify "outlier prescribing" (D.E. 1489 at 55:18–19)—indicating the need for a clinical review:

The following situations indicate a need for review of a patient's clinical care. These parameters do not necessarily indicate that treatment is inappropriate, but they do indicate a need for further review. For a child being prescribed a psychotropic medication, any of the following suggests the need for additional review of a patient's clinical status:

- Absence of a thorough assessment for the DSM-5[36] diagnosis(es) in the child's medical record.
- Four (4) or more psychotropic medications prescribed concomitantly (side effect medications are not included in this count).
- Prescribing of:
  - ○ Two (2) or more concomitant stimulants*
  - ○ Two (2) or more concomitant alpha agonists*
  - ○ Two (2) or more concomitant antidepressants
  - ○ Two (2) or more concomitant antipsychotics
  - ○ Three (3) or more concomitant mood stabilizers
  - *The prescription of a long-acting and an immediate-release stimulant or alpha agonist of the same chemical entity does not constitute concomitant prescribing.
- Note: When switching psychotropic medications, overlaps and cross taper should occur in a timely fashion, generally within 4 weeks.
- The prescribed psychotropic medication is not consistent with appropriate care for the patient's diagnosed mental disorder or with documented target symptoms usually associated with a therapeutic response to the medication prescribed.
- Psychotropic polypharmacy (2 or more medications) for a given mental disorder is prescribed before utilizing psychotropic monotherapy.
- The psychotropic medication dose exceeds usual recommended doses (literature based maximum dosages in the following tables).
- Psychotropic medications are prescribed for children of very young age, including children receiving the following medications with an age of:
  - ○ Stimulants: Less than three (3) years of age
  - ○ Alpha Agonists: Less than four (4) years of age
  - ○ Antidepressants: Less than four (4) years of age
  - ○ Mood Stabilizers: Less than four (4) years of age
  - ○ Antipsychotics: Less than five (5) years of age

---

[36] DSM-5 is the fifth, "and most recent," edition of the Diagnostic and Statistical Manual of Mental Disorders, "a reference book on mental health and brain-related conditions and disorders" published by the American Psychiatric Association. *DSM-5*, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/24291-diagnostic-and-statistical-manual-dsm-5 (last updated Oct. 14, 2022).

- Prescribing by a primary care provider who has not documented previous specialty training for a diagnosis other than the following (unless recommended by a psychiatrist consultant):
  - Attention Deficit Hyperactive Disorder (ADHD)
  - Uncomplicated anxiety disorders
  - Uncomplicated depression
  - Antipsychotic medication(s) prescribed continuously without appropriate monitoring of glucose and lipids at least every 6 months.

(PX 10 at 10–11.)

As Commissioner Muth noted in April 2023, the PMU Parameters—and thus, the review criteria—"are put in place overall to ensure safety of children." (D.E. 1347 at 58:23–24.) They do so by identifying "[p]atterns that may signal that factors other than clinical need are impacting the prescription of psychotropic medications . . . ." (PX 66 at 8.) "Practices that may be of concern include instances where children are prescribed *too many* psychotropic medications, *too much* medication, or at *too young* an age."[37] (*Id.* at 8 (emphasis added).)

These practices are particularly concerning given the dearth of research supporting the safety of prescribing psychotropic medications to children. As Doctor Bellonci explained, most of the research on psychotropic drugs is conducted not by the Food and Drug Administration (FDA) (or any other federal agency), but by the drug companies themselves. (D.E. 1489 at 41:22–42:4.)

---

[37] The Court notes that HHSC expressly incorporates this definition of "outlier" practices into the template for its Managed Care Organizations' annual PMUR Action Plan and PMUR Report in HHSC's Uniform Managed Care Manual. *See* HHSC, Texas Medicaid and CHIP—Uniform Managed Care Manual, ch. 5.13.7, *available at* https://www.hhs.texas.gov/sites/default/files/documents/laws-regulations/handbooks/umcm/5-13-7.xlsx ("The Administration of Children and Families (ACF), an office within the U.S. Department of Health and Human Services defines 'outlier' and/or 'outlier[] practices' as 'patterns that may signal that factors other than clinical need are impacting the prescription of psychotropic medications.['] Practices that may be of concern include 'instances where children are prescribed too many psychotropic medications, too much medication, or at too young an age,' commonly referred to as 'too many, and too much, too young.'").

HHSC's contract with Superior HealthPlan—the State's managed care organization that provides health coverage to foster children (discussed in more detail below, *infra* page 72–75)—"incorporate[s] by reference" the Uniform Managed Care Manual. HHSC, Ex. A at 26, *available at* https://contracts.hhs.texas.gov/contracts/2022/hhs001042700001. The Uniform Managed Care Manual is also attached as an exhibit to the contract. *See* HHSC, Contract No. HHS00104270001, Signature Document for Health And Human Services Commission Contract No. HHS001042700001 at 2 ("This Contract consists of the following documents . . . . Exhibit C – Texas Medicaid and CHIP—Uniform Managed Care Manual").

Before the drug companies can begin marketing a medication, "they have to show to the federal government, the FDA, whether these medicines are effective and for what conditions." (*Id.* at 42:1–3.) But, the "problem" is that the drug companies are "not required to actually test these medications in the pediatric population." (*Id.* at 42:3–4.) Therefore, "these medications get put out on the market, and as a child psychiatrist I have the dangling of this . . . potentially nice treatment" that "might work for a child, but I don't know, because they haven't been required to actually test it in children." (*Id.* at 42:7–13.)

And it is not just child psychiatrists who are subject to the allure of these medications—Doctor Bellonci noted that caregivers can also be "drivers of the utilization of medication," as "[s]ometimes these children can be quite challenging, and the hope is that the medication can help to address those challenges and challenging behaviors." (*Id.* at 32:20–24.) Indeed, he was surprised to find that the National Foster Parent Association[38] was one of his "toughest audiences around this topic." (*Id.* at 32:17–18.)

Of course, the lack of data regarding the pediatric population is only one aspect of the overall lack of data. Doctor Bellonci elaborated that "the level of science that is required to get these medications approved for market tend to be small studies of short duration. . . . I'm talking 6- to 12-week studies." (*Id.* at 42:21–24.) But when the medications go to market, "people stay on [them] for years." (*Id.* at 42:25–43:1.) Therefore, "a lot of what we learn about the safety and efficacy of these medications actually happens post-marketing"—that is, "[w]ith actual use." (*Id.* at 43:1–6.) Accordingly, when these medications are prescribed to pediatric patients, it is "your

---

[38] The National Foster Parent Association is the group to which he gave the presentation titled "Psychotropic Medication for Children and Adolescents: What we Know, what we don't and why you should care." (PX 90 at 19.) When he spoke about the need for close monitoring and oversight, the audience "perceived that [he] was somehow taking a tool away from them." (D.E. 1489 at 32:11–33:2.)

children being the guinea pigs to determine whether these medicines are safe or effective." (*Id.* at

43:6–7.)

Antipsychotic medications are a particularly compelling example of the risks inherent to such

off-label use of psychotropic drugs in children. As Doctor Bellonci explained later in his

testimony:

> [P]art of the concern about the lack of scientific studies of these medications in children is that there are a number of examples where medications were safe in the trials that the drug company produced to get the FDA approval in adults, but when we started giving them in kids, we got completely different or more significantly concerning side effects. Great example of that is the antipsychotic medications.
>
> In the adult studies, the adults might have gained three, four, five pounds. Nobody wants to gain any weight from a medication, but if it's helping to treat your hallucinations, your delusions, that might be a tradeoff that makes sense. With kids we started seeing 20, 30, 40, 50-pound weight gain. We saw problems with their prolactin level.
> Q. Meaning?
> A. Prolactin is a hormone that can -- for girls, if it's impacted, can cause amenorrhea. They stop having their periods. They can start developing breast milk. Boys can actually develop breast tissue to the point where there are some boys who have been prescribed Risperdal, a different antipsychotic, and had to have mastectomies because of the side effects from those medications.
>
> We have concerns about diabetes, about heart disease. I mean, I worry that we're creating a whole new class of children who are going to have deleterious, long-term health impacts from some of the medications that we use.

(*Id.* at 155:18–156:18.)[39]

---

[39] The State was well aware of the risks associated with the use of antipsychotics in children, as those risks were one of the grounds for its lawsuit against pharmaceutical giant Johnson & Johnson relating to the company's deceptive marketing of the antipsychotic drug Risperdal. For example, in 2008—three years before the present litigation commenced—the State averred that "The use of Risperdal has given rise to serious safety concerns and has been shown to have a number of serious side effects and health risks, including, but not limited to, tardive dyskinesia; increased risk of stroke and transient ischemic attacks; hyperglycemia; diabetes mellitus; metabolic syndrome; hyperlipidemia (elevations in cholesterol, triglycerides); excessive weight gain; hyperprolactinemia; and increased risk of pituitary tumors." Pl. Second Am. Compl., *Texas ex rel. Jones v. Janssen, L.P.* (No. D-IGV-04-001288), 2008 WL 5328187, at ¶ 10.1 (Tex. Dist. filed Dec. 12, 2008).

The State then acknowledged that Risperdal posed a peculiar risk to children: "Defendants did not limit their claims of safety and efficacy to the treatment of the very small adult population believed to suffer from schizophrenia and bipolar disorder. Rather, Defendants used each of the marketing tools described above to promote Risperdal as a medication that could be safely prescribed for a variety of symptoms and disorders in the child and adolescent and other vulnerable populations. . . . Defendants targeted individual Texas Medicaid prescribers and state mental health decision makers to penetrate the child and adolescent market. Defendants concealed and misrepresented the risk of

Generally, this post-marketing safety research—if done at all—is conducted "by individual researchers who are then publishing studies of using these medications for specific children with specific conditions." (*Id.* at 44:24–45:1.) And the PMU Parameters have a chart, reproduced below, which "summarizes what we know in all the post-marketing published research." (*Id.* at 62:18–19.)

| PROBLEM AREA | MEDICATION | SHORT-TERM EFFICACY | LONG-TERM EFFICACY |
|---|---|---|---|
| Anxiety Disorders | SSRIs | A | B |
| | Benzodiazepines | C | C |
| OCD | SSRIs* | A | C |
| ADHD | Stimulants* | A | A |
| | Atomoxetine* & TCAs | A | B |
| | Central Adrenergic Agonists* | A | C |
| Autism (for irritability and aggression) | Atypical antipsychotics * | A | B |
| Aggressive Conduct Problems with or without ADHD | Lithium | B | C |
| | Valproate | A | C |
| | Carbamazepine | C | C |
| | Atypical antipsychotics | A | B |
| Bipolar Disorder | Lithium* | A | C |
| | Valproate | C | C |
| | Carbamazepine | C | C |
| | Atypicals* | A | C |
| Depression | SSRIs* | A | C |
| | TCAs | C | C |
| Treatment Resistant MDD | Switching: SSRIs = Venlafaxine | B | C |
| Schizophrenia (psychotic disorders) | Antipsychotics* | A | B |
| Tourette's | Antipsychotics* | A | C |
| | Central Adrenergic Agonists | B | C |

(PX 10 at 14.) The safety and efficacy data is graded on a scale from "A" to "C":

A = Adequate data to inform prescribing practices. For efficacy and safety: 2 ≥ randomized controlled trials (RCTs) in youth; long-term efficacy and safety are defined based on studies lasting 12 months or longer. Please note, for safety, "A" doesn't mean "safe", it merely indicates that the risks have been characterized in 2 or more carefully executed studies.

B = For short- and long-term efficacy and short-term safety: 1 RCT in youth or mixed results from ≥ 2 RCTs. For long-term safety, only 1 careful prospective study lasting 12 months or more, or mixed results from ≥ 2 longitudinal studies.

C = No controlled evidence or negative studies; case reports and FDA reports of adverse events only.

---

serious side effects and long-term health consequences of Risperdal use in all patient populations[,] including children and adolescents." *Id.* at ¶ 10.2.

In 2012, the parties settled the case for $158 million, which was "the highest Texas settlement to date." Office of the Attorney General & Texas Health and Human Services Commission, Joint Semi-Annual Interagency Coordination Report   March   1,   2012   through   August   31,   2012   at   8   ¶ 1,   *available at* https://www2.texasattorneygeneral.gov/files/agency/hhsc_oag_fy12_q3-4.pdf.

(*Id.* at 14.) Thus, the chart is "an incredibly useful and concise way of conveying what the state of the science tells us about the safety and efficacy of these medications, specifically for children and for specific psychiatric conditions."[40] (D.E. 1489 at 62:20–23.)

But the chart has limitations. Most notably, it is based on "studies of one medication for one condition." (*Id.* at 65:25–66:1.) "Most children in the child welfare system would never even be entered into the study to show whether or not this works because they have too many conditions going on." (*Id.* at 66:2–4.) And, of course, the studies did not "even look[] at polypharmacy. Polypharmacy complicates this" (*id.* at 65:24–25), and is "so far beyond what we know in the science about whether these medicines are safe in those combinations" (*id.* at 51:8–10). Indeed, "we have no studies about" polypharmacy with "three or more medications." (*Id.* at 51:11–12.)

A review process like the one described in the Parameters creates an opportunity for a "secondary review" of a child's medications. (*Id.* at 59:1–4.) "[W]hen a prescribing regimen falls outside of a parameter," the regimen is "review[ed] either by someone with child psychiatric expertise within the child welfare system or sometimes contracted outside of the child welfare system." (*Id.* at 57:23–58:2.) Interestingly, defense counsel described the review process used in Texas (referred to as a Psychotropic Medication Utilization Review, or "PMUR") in substantially identical terms at the hearing in April 2023—specifically, he stated that "there is a process in place to review the extent to which those guidelines are being followed and whether or not . . . there need to be adjustments made, and that process is the PMUR process." (D.E. 1347 at 68:11–14 (proffer of Mr. Neudorfer).)

Doctor Bellonci opined that "a secondary review, when the prescribed regimen falls outside the standard parameters, is . . . a widely accepted standard" "for the health care for foster children."

---

[40] The chart was last updated in 2019, but the information is still current—as Doctor Bellonci noted, "[w]e don't have suddenly new evidence that these medications are effective, sadly." (D.E. 1489 at 64–65.)

(D.E. 1489 at 58:3–6.) Indeed, a secondary review system is "nonnegotiable" as such a system is "necessary . . . to keep the children safe." (*Id.* at 58:19–25.)

Doctor Bellonci repeatedly stressed that conducting a review when a child's prescriptions raise one of the red flags is a critical safety issue. The following colloquy is illustrative:

> Q. Now, have you reviewed the red flags that Texas has in these rules for psychotropic medication?
> A. Yes.
> Q. And in general do you believe that these are important, appropriate red flags that would require a childcare provider to seek a review on behalf of the child?
> A. Yes. I would raise the bar even higher. I think three or more should actually get a review and three or more concomitant mood stabilizers given, again, what we know and don't know. But, yes, these are critical for triggering reviews and red flags.
> Q. Do these -- do these Texas rules, these Texas red flags, go right back to that document, the federal document, the Administration for Children and Families, where they were talking about too many or too much, too young?
> A. Directly.
> Q. Are they -- are each of these red flags related in your opinion, your professional opinion, given your long role in dealing with the mental health of children and adolescents, do they deal with safety for the children?
> A. Yes. The federal government actually required child welfare systems to develop oversight in monitoring plans. They didn't dictate what the red flags needed to look like, but these are pretty consistent across all the states that I'm aware of.
> Q. Can you simply choose not to enforce something as important as these red flags for a secondary review for children in the foster care system that are being prescribed psychotropic medication? Can you simply choose not to enforce it in your opinion and keep children safe?
> A. No.

(*Id.* at 60:15–61:20.) Doctor Miller likewise opined that "the State of Texas' policies and practices with regard to not enforcing the PMU parameters" is "a substantial safety risk. There's no question." (D.E. 1488 at 286:16.) And at the hearing in April 2023, Elizabeth Kromrei,[41] CPS

---

[41] At that hearing, Commissioner Muth offered Ms. Kromrei to answer questions about the monitoring of psychotropic drugs. (D.E. 1347 at 42:19–23.) Ms. Kromrei is a member of a psychotropic medication monitoring group composed of physicians, Doctors of Pharmacy, and representatives from both DFPS and HHSC. (*Id.* at 43:5–10.) Ms. Kromrei indicated that one of the committee members is Doctor Crismon (*see id.* at 44:1–3), who co-chairs the working group that writes and revises the PMU Parameters (*see* PX 10 at 25–26).

Director of Services, stated that PMURs are "very important" and agreed that they are "a safety issue." (D.E. 1347 at 69:7–15.)

Another reason PMURs are so important is that most children receiving psychotropic medications are diagnosed using criteria designed for adults. Doctor Bellonci explained:

> One of the challenges that I didn't talk about earlier is the psychiatric nomenclature, the diagnostic manual, is really based on adults. We don't have a diagnostic manual for children. So from three to 18 . . . we have to use the adult diagnostic criteria.[42] So think about this. A five-year-old or an eight-year-old who's experienced trauma has to meet the same diagnostic criteria for PTSD as an adult. Does that make any sense?
>
> . . . .
>
> . . . . A five-year-old, you know, think about what their capacity is to communicate. Why would we think that a five-year-old is going to manifest trauma in the same way as a 50-year-old? It makes completely no sense. That becomes relevant in something like bipolar disorder where there's been huge debates in the field about what is that. Is it every time a child has, you know, an aggressive episode, we're calling that bipolar disorder? We did, and we started giving them antipsychotics.
>
> It's why these reviews are so critical and the complexity of not just looking at aggregate data, *but looking at child specific explanations when you hit one of these red flags*.

(D.E. 1489 at 119:21–120:18 (emphasis added).) Once again, Doctor Bellonci's explanation may have been more thorough, but he was not treading new ground—at the April 2023 hearing, Ms. Kromrei described the PMUR as "a clinical review that takes into consideration the child, their circumstances, their medical circumstances, and reviews the rationale." (D.E. 1347 at 69:9–11.)

And looking at the child-specific explanation for a medication regimen is especially important because clinicians treating foster children are typically working with less than complete information about their patients. Properly diagnosing and safely treating psychiatric disorders in children require that the treating physician be adequately informed about the child; as Doctor Bellonci explained, the process of formulating a diagnosis and treatment plan "has direct relevance

---

[42] There is a diagnostic manual for children from age zero to three. (D.E. 1489 at 119:24–25.)

to this case[] because it does become more complicated in the child welfare system." (D.E. 1489 at 37:17–18.)

The increased likelihood that foster children have a history of psychological trauma is also a complicating factor. Such trauma is near-universal among foster children—as Doctor Bellonci put it, "which of these children don't have a behavioral health condition, at least trauma, by either virtue of why they were removed or the removal itself being traumatic" (*id.* at 117:24–18:2)—and can significantly affect the clinician's analysis:

> Part of the challenge . . . in working with foster youth is that the primary issue you're dealing with is trauma. And trauma in children can manifest itself in almost everything in the psychiatric nomenclature. It can look like a psychotic disorder. It can look like depression. It can look like adult PTSD. It can look like anxiety. And if it's driven by trauma, it's not going to be reactive to those medications. . . . [W]e don't have a medication for trauma. We don't have medication for PTSD. We have to treat that through therapeutic supports and ensuring that we've removed the sources of that trauma from the child's life.

(*Id.* at 132:6–17.)[43]

In sum, few psychotropic drugs are approved for children, and there is a dearth of clinical data about their safety and efficacy in children. Further, there is practically no clinical data supporting the safety and efficacy of psychotropic polypharmacy. Therefore, when a child's medication regimen raises one of the red flags set forth in the PMUR criteria, it is "critical" to look for a "child specific explanation" for the regimen. (*Id.* at 120:15–17.) Notably, Ms. Kromrei made the same

---

[43] Of course, this observation would be familiar to those who read the PMU Parameters, which explain that "children and youth . . . in foster care for whom the Parameters were originally developed, may have treatment complexity related to emotional or psychological stress. They may have experienced abusive, neglectful, serial or chaotic caretaking environments. . . . These traumatized children often present with a fluidity of different symptoms over time reflective of past traumatic events that may mimic or underlie many psychiatric disorders and result in difficulties with attachment, mood regulation, behavioral control, and other areas of functioning." (PX 10 at 3.) Likewise the 2006 Strayhorn Report which, as noted above, *supra* page 44, explained that "fundamentally normal children who have been taken from their homes and families can become aggressive and "emotionally reactive" due to a lost sense of trust and their conditions are only worsened by multiple placements and frequent caseworker turnover. As their feelings of instability increase, their emotions may erupt, and their caretakers then are, in the words of one child psychiatrist, 'just chasing an untreatable problem with more medication.'" (D.E. 1486-8 at 13.)

point in April 2023, agreeing that the PMUR process is in place "to monitor the way in which psychotropic drugs are administered to" "individual children." (D.E. 1347 at 72:8–12.)

To make the importance of PMURs concrete, Doctor Bellonci reviewed the medication regimens of two PMC children.

First, the medication regimen of Jackie Juarez who, at the age of sixteen, was so sedated that she did not pass eighth grade. Her Permanency Conference Plan, dated May 12, 2021 (PX 105 at 1), indicates that she was "on the following" medications: Albuterol,[44] Xulane,[45] Lithium, Latuda, Prazosin, Keppra, Vistaril,[46] and Benadryl (*id.* at 4). She was also given Melatonin, though this was not documented. (D.E. 1487 at 274:21–24.) Doctor Bellonci first addressed the Albuterol which, according to the Permanency Conference Plan, was prescribed "as needed for panic attacks." (PX 105 at 4.) He found this to be "fascinating" because Albuterol is an asthma medication, and there is "no evidence base for it to be used as needed for panic attacks." (D.E. 1489 at 88:8–12.) Indeed, the only thing Albuterol could do for panic attacks is make them worse: "Albuterol . . . can actually make anxiety worse." (*Id.* at 88:25–89:1.) The Court noted that Ms. Juarez does have asthma. (*Id.* at 89:19–20.) But even if it were only that the justification was improperly documented, that alone should have prompted a review. (*Id.* at 90:4–11.)

Lithium and Latuda are both psychotropic medications—a mood stabilizer and antipsychotic, respectively. (*Id.* at 91:12–15.) Prazosin is blood pressure medication, but is "frequently" used as a psychotropic medication "for posttraumatic nightmares." (*Id.* at 91:17–18.) Doctor Bellonci

---

[44] This medication was misspelled in her Permanency Conference Plan as "Abbuterol." (PX 105 at 4; *see* D.E. 1487 at 270:8–11; D.E. 1489 at 88:2–4 (noting misspelling).)

[45] Xulane is a birth control medication.

[46] This medication was misspelled in her Permanency Conference Plan as "Visprall." (PX 105 at 4; *see* D.E. 1487 at 273:14–18 (noting misspelling).)

noted that it has "some evidence base" as a psychotropic, but "less" of an evidence base in children. (*Id.* at 91:18–19.)

As for Keppra, it was unclear why this medication was prescribed to Ms. Juarez. Doctor Bellonci explained that Keppra is a seizure medication, but is not one of the seizure medications that is used as a psychotropic. (*Id.* at 91:22–24.) Since Ms. Juarez did not have a seizure disorder (*id.* at 92:1–2; *see* D.E. 1487 at 272:16–17 (Ms. Juarez testifying that she did not have seizures)), he could not determine why it was prescribed (D.E. 1489 at 91:25).

Vistaril is an antihistamine that is "often given for sedation," and Benadryl is an antihistamine that is "[f]requently given for sedation." (*Id.* at 92:4–9.) Doctor Bellonci described this practice as "problematic in and of itself." (*Id.* at 92:9) He did not know why Ms. Juarez would be given both medications, but suspected that they were being used "to calm her down" (*i.e.*, being used for their psychotropic effect).[47] (*Id.* at 92:7–11.)

Doctor Bellonci was not surprised that this medication regimen was putting Ms. Juarez to sleep. (*Id.* at 92:14.) Indeed, the regimen "raises tons of concern[s]" and should have triggered a PMUR. (*Id.* at 92:17–21("It's the exact reason we have these.").)[48]

Next, Doctor Bellonci reviewed the medications being administered to a current foster child referred to as "Child C."[49] This child was being given Benztropine, Clonidine, Banophen, Valproic Acid, Abilify, and Demopressin. (PX 117 at 146.)

---

[47] Recall that under Texas law, psychotropic medications include "sedatives." Tex. Fam. Code § 266.001(7)(F).

[48] Under cross-examination, Doctor Bellonci was asked if Ms. Juarez's physician was providing "deficient" treatment. (D.E. 1489 at 133:2.) He replied: "No. As an expert, I'm concerned with the medication regimen that I saw. I didn't see the full clinical record to be able to step into that role. That's what your PMUR system is supposed to be doing." (*Id.* at 133:3–6.)

[49] Child C is discussed in much greater detail later. *See infra* page 302–43. But briefly, Child C was placed in a group home, where she made several abuse outcries in one year—none of which were timely or adequately investigated—and ended up being dropped off at the emergency room with a broken jaw by the group home's staff.

Abilify is an antipsychotic medication. (D.E. 1489 at 96:6.) Abilify, like other antipsychotic medications, "can cause abnormal" or "bizarre" "involuntary movements" known as "dyskinesia." (*Id.* at 96:10–13.) Antipsychotic-induced dyskinesia can be "irreversible." (*Id.* at 96:21–22.) And Doctor Bellonci believed Child C had developed a dyskinesia because of the Benztropine prescription—this medication is used to treat such movement disorders after they start to manifest. (*Id.* at 96:5–97:3.) He noted that "they could have taken [Child C] off the antipsychotic, but instead they added the Benztropine." (*Id.* at 97:6–7.)

Clonidine is a blood pressure medication that is also used for ADHD. (*Id.* at 37:10–11.) It was unclear if Child C had high blood pressure; if not, the medication was being used as a psychotropic. (*Id.* at 97:11–14.) As for Banophen, Doctor Bellonci noted that it is not a psychiatric medication, and he was unsure why it was being administered.[50] (*Id.* at 99:13–15.) Valproic acid is an anticonvulsant that is often used for mood stabilization. (*Id.* at 99:16–18.) It was unclear if Child C had a seizure disorder. But if not, this medication was being used as a psychotropic. (*Id.* at 99:17–20.) And desmopressin is used to treat enuresis (*i.e.*, bed-wetting). (*Id.* at 99:23–24.) Child C's medication log did not explain the reason for her enuresis; the Court noted that it is a symptom of PTSD and other psychological problems, and Doctor Bellonci suggested that Child C could

---

[50] Per the National Institutes of Health, Banophen is an antihistamine used to "temporarily relieve[]" certain symptoms of hay fever (runny nose; itchy, watery eyes; sneezing; and itching of the nose or throat) or the common cold (runny nose; sneezing). *See Label: Banophen*, DailyMed (updated Dec. 7, 2023), https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=69b7f7ca-7a3a-4fe6-a9bb-90b0e6ad62c1. Like Vistaril and Benadryl, Banophen can be used as a sedative or sleep aid. *See Banophen*, Drugs.com, https://www.drugs.com/mtm/banophen.html (last visited Jan. 19, 2024). In fact, Banophen and Benadryl have the same active ingredient. *See id.* (noting that Banophen and Benadryl are two brand names for Diphenhydramine HCl). The Court heard testimony at trial that Benadryl was one of three drugs, along with "Haldol and Ativan," used to "chemically restrain[]" named plaintiff D.P. (D.E. 323 at 72:14–15, 73:1–2.)

Child C's medication log indicates that Banophen was administered in the morning and at night (PX 117 at 146; *see also id.* at 147–150 (same)), which might suggest that it was being used to sedate her during the day, and make her sleep at night.

have been wetting her bed because "she was so sedated at night that she . . . didn't feel the impulse to wake up." (*Id.* at 100:1–7.)

Ms. Juarez and Child C are not isolated examples—the Monitors' reports are replete with children who were prescribed four or more psychotropic medications. A particularly tragic example is B.B., who "entered foster care July 15, 2009, when she was two years old." (D.E. 1027 at 39.) B.B., along with her five siblings, were "removed from their parents' home due to neglectful supervision, after one of the children was taken to the hospital with what was suspected to be alcohol poisoning." (*Id.* at 39.) In April 2011, "parental rights were terminated" and B.B. (as well as her siblings) entered the State's PMC. (*Id.* at 39.)

The Monitors report that in the eleven years she has been in the State's care, B.B. "has been in 38 placements, including eight psychiatric hospitals and nine RTCs. Two of the RTCs in which B.B. lived are now closed because of systemic safety problems, including substantiated abuse or neglect allegations. Of the 16 foster homes where B.B. was placed, only four lasted more than 60 days. In 2016 alone, when B.B. was nine years old, she was moved to nine different placements." (*Id.* at 40.) And while the behavioral problems that led to B.B.'s placement instability "were identified early in her time in care, they were not effectively addressed, resulting in a constant cycle of disrupted foster care and adoptive placements, and eventually a cycle between psychiatric hospitals and RTCs." (*Id.* at 40.)

During her eleven years in the State's care, B.B. was subjected to various permutations of psychotropic polypharmacy:

- "[A]t the age of three-and-a-half years old, she was first placed on significant psychiatric medications. An August 23, 2010 psychiatric note indicates that B.B. was diagnosed with ADHD and impulse control disorder and prescribed Risperidone

(0.25mg once a day). Clonidine (0.1mg) and Ritalin (5mg ½ tab twice a day) were added on September 29, 2010." (*Id.* at 42.)

- "During the last two months of 2016," B.B.'s "psychotropic medication dosages increased and additional psychiatric medications were added: Trileptal (600 mg 2 times a day) for bipolar disorder along with Trazadone at night for sleep. Risperidone was increased (1 mg 3 times a day) for mood." (*Id.* at 45–46.)

- On December 6, 2016, "DFPS moved B.B. . . . to a Florida RTC, where she remained until June 29, 2017." (*Id.* at 46.) While there, B.B. "was placed on the following medications: Clonidine (0.2 mg. once a day), Risperidone (2 mg once a day) for mood, Trileptal (600 mg 3 times a day) for mood, DDVAP (0.4 mg) for the enuresis, and Topamax (50 mg a day) for mood." (*Id.* at 46.)

- "When B.B. returned to Texas, she was placed at Devereux Treatment Center in Victoria where she remained until October 19, 2018." (*Id.* at 46.) While there, "her medications were again adjusted: Risperidone was changed out for Geodon which was again changed out for Latuda. Clonidine and Trileptal were continued and Strattera was added for ADHD." (*Id.* at 46.)

- From "December 21, 2018 through January 7, 2019," B.B. was in a psychiatric hospital. (*Id.* at 47.) "Some of her medications increased in dosage, but the medications themselves remained the same." (*Id.* at 47.) On January 7, 2019, B.B. was placed in "The Tree House Center Inc.," an RTC, where "Risperidone was again changed out for Geodon, her Trileptal was changed out for Lithium, and Prazosin was added back for . . . PTSD." (*Id.* at 47.)

- B.B. was discharged from The Tree House Center less than three months later. (*Id.* at 47.) After a "brief . . . stay at a psychiatric hospital," she was placed at an RTC called Prairie Harbor, "where she remained until November 5, 2019." (*Id.* at 48.) "While at Prairie Harbor her medications were again adjusted. Geodon was switched back to Latuda and Lithium was stopped and not replaced with another mood stabilizer." (*Id.* at 48.)

- On November 6, 2019, B.B. was discharged from Prairie Harbor and was moved to "Hector Garza Residential Treatment Center," where she stayed until July 30, 2020. (*Id.* at 48–49.) "While at Hector Garza, B.B. took Strattera for ADHD, Clonidine (1/2 of a .1 mg tablet, three times daily) as "a sedative," Latuda (antipsychotic), and stayed on Prazosin (for nightmares)." (*Id.* at 49.)

- On July 30, 2020, B.B.—who at this point was thirteen years old—was moved to "Devereux – League City," yet another RTC. (*Id.* at 54.) A "psychological evaluation, completed the day she was admitted, indicate[d] when she was discharged from Hector Garza, her medication had changed again and she was taking Abilify and Zoloft, which she continued to take at Devereux – League City, along with Strattera." (*Id.* at 54.)

- After further transfers, B.B. was again sent, on December 6, 2020, to the same RTC in Florida where she had previously been placed. (*Id.* at 56–57.) A note dated January 4, 2021, documented that "a new psychotropic was added to B.B.'s medications: Thorazine (25 mg. in the morning, and 50 mg in the evening)." (*Id.* at 57.)

- Less than a month later, on January 29, 2021, the Monitors were notified that "Depakote (500 mg., twice daily)" had been added to B.B.'s medication regimen, "and

that her Thorazine dosage had increased to include another dose (25 mg) in the middle

of the day." (*Id.* at 58.)

AL, as a second example, is a fourteen-year-old PMC child who was placed in foster care "in

October 2012, one day after her sixth birthday." (D.E. 1132-2 at 31.) "At the time of the monitoring

team's visit to her CWOP Setting in July 2021, AL had spent nine years shuffling through at least

20 placements during her time in DFPS' care, with seven different Primary Caseworkers assigned

to her during that time." (*Id.* at 31.)

The Monitors reported that AL had several mental health diagnoses: "Disruptive Mood

Dysregulation Disorder, Attention-Deficit/Hyperactivity Disorder, Enuresis, Nocturnal Only, and

Child Physical Abuse." (*Id.* at 33.) She also had at least seven psychiatric hospitalizations between

June 2106 and July 2021:

> AL's psychiatric hospitalizations include one that occurred during a failed adoption
> placement in June 2016 and again a month after the failed adoption placement. In 2019,
> she was hospitalized on three different occasions for behavioral outbursts. Two of these
> hospitalizations followed suicidal ideations and occurred while placed with her maternal
> grandparents. The third hospitalization occurred during a therapy session. After a brief
> period in which no further hospitalizations occurred, AL was again hospitalized in July
> 2020 after becoming upset with her foster parents and expressing suicidal ideation.
>
> In June 2020, AL was also hospitalized while in a foster placement in which the foster
> mother was found to have emotionally abused her. AL reported her foster mother made her
> donate all of her belongings and denied her access to her siblings and CASA, despite DFPS
> granting AL that privilege. AL ran away from this placement, threatened self-harm, and
> was later admitted to a behavioral hospital for suicidal ideations. . . .

(*Id.* at 33.)

As for AL's medication regimen, the Monitors reported that her "records are inconsistent in

describing the psychotropic medications she is prescribed" (*id.* at 33):

> AL's most recent Service Plan documents her current prescriptions as Clonidine and
> Sertraline for mood and depression, respectively. However, her most recent Common
> Application excludes Clonidine, includes Sertraline, but also includes two psychotropic
> medications not found in her Service Plan: Trileptor for "Mood Disorder," and
> Aripiprazole for "Mood Stabilization."

25

(*Id.* at 33.) AL's medication logs at the CWOP Setting, reviewed by the monitoring team during their site visit, "indicated" that AL "was receiving all" four "of these medications." (*Id.* at 33.)

Another example reported by the Monitors is AM, a fifteen-year-old PMC child who was placed in foster care "as an infant in 2007 when his mother was unable to care for him and for his sister." (*Id.* at 29.) AM was adopted at the age of two years, and reentered foster care at the age of twelve: His adoptive mother "told DFPS she was unable to manage AM's behavior, had him admitted to a psychiatric hospital and refused to pick him up when he was ready for release." (*Id.* at 29.)

AM's records "indicate he has been diagnosed with Cerebral Palsy which affects the right side of his body, as well as with Epilepsy" (*id.* at 29), and he is prescribed seizure medications to be "taken as needed" (*id.* at 30). AM also has several psychiatric diagnoses—"Disruptive Mood Dysregulation, Depression/Anxiety, ADHD, and Dyslexia" (*id.* at 29)—for which he "is prescribed psychotropic medications taken daily" (*id.* at 30). But, as with AL, AM's records give conflicting information as to which medications he is actually supposed to be taking:

> The monitoring team reviewed AM's IMPACT records and on-site CWOP Setting records and found though completed only days apart, AM's May 30, 2021 Service Plan and his June 4, 2021 Common Application list different prescribed psychotropic medications.
>
> AM's Service Plan lists the following prescriptions:
>
> • Divalproex Tab (500 mg; Impulse control)
> • Depakote (125 mg am & 250 mg pm; mood stabilizer)
> • Risperidone (1 mg; Aggression)
> • Fluoxetine (20 mg; Depression)
>
> The June 4, 2021 Common Application lists the following:
>
> • Clonidine (.1 mg)
> • Divalproex Sodium (500 mg; 2 tabs at bedtime)
> • Fluoxetine (20 mg; 1 tab am)
> • Quetiapine Fumarate (25 mg 1tab 2X daily)

(*Id.* at 30.) The Monitors note that the "information in AM's on-site CWOP Setting Child Without Placement Service Plan was consistent with the Common Application's list of prescribed medications." (*Id.* at 30.) But there was still an inconsistency, as the CWOP Setting Child Without Placement Service Plan "indicated AM received only 1 tablet of Divalproex at bedtime." (*Id.* at 30.) The on-site medication logs further indicated that AM was also being given a fifth psychotropic medication, "Atomoxetine," that was "not included in his Common Application or Service Plan." (*Id.* at 30.)

Like Ms. Juarez, AM was visibly impaired by his medications: "When the monitoring team interviewed AM" during the site visit "he was visibly sleepy, and the team was advised that he had just started new medication and was sleepy for that reason." (*Id.* at 30.) Yet another example is AG, a fifteen-year-old PMC child. (*Id.* at 84.) AG entered foster care in 2008 at the age of three, and was adopted in 2011. (*Id.* at 84.) He reentered foster care in October 2018 after an altercation with his adoptive mother. (*Id.* at 84.) Prior to reentry, AG "was not on any medication." (*Id.* at 85.) By April 2020, he was "prescribed five medications: Seroquel (Mood and Insomnia), Depakote (Mood), Visteral (Anxiety), Prozac (Depression), and Melatonin (Sleep)." (*Id.* at 85.)

For his part, Doctor Van Ramshorst agreed that the PMUR "process should be initiated anytime one of th[e] indicators occurs." (D.E. 1489 at 193:1–2.) But, worryingly, he would not agree that PMURs—or for that matter, the PMU Parameters—are for the safety of the children. The best he could do was state that the "parameters are designed to support safe and effective prescribing patterns." (*Id.* at 187:8–10.) Again, this is contrary to the April 2023 testimony of Commissioner Muth and Ms. Kromrei, both of whom agreed that PMURs are conducted for the safety of the children. (*See* D.E. 1347 at 58:23–24, 69:14–15.)

### b. HHSC's contract with Superior HealthPlan, the managed care organization that manages Medicaid coverage for Texas foster children, requires Superior to create the psychotropic medication review process described in the Parameters

The State does not conduct PMURs itself. Instead, the State has entrusted this critical task to a private entity called Superior HealthPlan ("Superior"). Doctor Van Ramshorst explained that PMC children receive health coverage through the "STAR Health managed care program." (D.E. 1489 at 168:22–24.) The State contracts with Superior, "a single statewide Managed Care Organization (MCO)," to operate STAR Health. (*Id.* at 169:1–2); *see* HHSC, Contract No. HHS00104270001, *available at* https://contracts.hhs.texas.gov/contracts/2022/hhs001042700001 (hereinafter "Superior HealthPlan Contract").[51] And HHSC's Medicaid CHIP Services division oversees the contract with Superior HealthPlan. (D.E. 1489 at 169:11–14.) "That contract requires Superior HealthPlan to have a process to perform Psychotropic Medication Utilization Review and work with providers to comply with the psychotropic parameters -- psychotropic utilization parameters for children and youth."[52] (*Id.* at 182:3–8.)

The contract between the State and Superior requires the MCO to follow the Parameters in its oversight of children's psychotropic medication prescriptions. The Scope of Work for the contract requires Superior to develop:

> A plan for conducting ongoing retrospective reviews of any psychotropic medication regimen that is not compliant with HHSC's *Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health* (Parameters) or standards of care. The plan must address strategies for correcting any non-compliant regimen. The plan must also address strategies and incentives that encourage Providers to comply with the Parameters and standards of care.

Superior HealthPlan Contract, Ex. B at 29 ¶ 8.

The Scope of Work further states:

---

[51] The Court judicially notices this contract. Fed. R. Evid. 201.

[52] Superior HealthPlan publishes a Frequently Asked Questions and Stakeholder Manual describing its process for conducting PMURs. (*See* PX 11.)

> [Utilization Management (UM)] should specifically assess prescribing patterns for psychotropic medications against the *Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health* found at the DFPS website. The MCO must maintain the ability to assess prescribing patterns for psychotropic medications through both an automated and manual process. UM that requires direct contact with the actual Provider must be scheduled at times convenient to the Provider's schedule, so as not to interrupt regular clinical care duties.

*Id.* at 77.

Later, the Scope of Work refers to the Parameters in provisions requiring evidence-based practices, and specifies that Superior must contractually require providers to follow the Parameters:

> The MCO must use evidence-based integrated healthcare practices. These practices include, for example, the use of an appropriate outcome measurement instrument to monitor the effectiveness of medication and psychotherapy, and access to psychiatric consultation for the PCP and Service Coordinator. The MCO must contractually require all Providers to comply with the most recent version of *the Psychotropic Medication Utilization Parameters for Children and Youth in Texas Behavioral Health* found at the HHSC website.

*Id.* at 164.

In a section titled "Drug Utilization Review Program," the Scope of Work requires:

> The MCO must have a [Drug Utilization Review (DUR)] program process in place to conduct prospective and retrospective Utilization Review of prescriptions . . . . The MCO must submit an annual report . . . that provides a detailed description of its DUR program activities, as provided for under 42 C.F.R. § 438.3(s).

> The MCO must implement a prospective review in the pharmacy claims processing systems at Point of Sale (POS). The prospective review at the POS must include screening to identify potential drug therapy problems such as drug-disease contraindication, therapeutic duplication, adverse drug-drug interaction, incorrect drug dosage, incorrect duration of drug treatment, drug-allergy interactions, and clinical abuse/misuse.

> The MCO's retrospective review must monitor prescribers and contracted pharmacies for outlier activities . . . . MCO's retrospective reviews must also determine whether services were delivered as prescribed and consistent with the MCO's payment policies and procedures. The MCO must provide the requested data as described in Chapter 2 of Exhibit C, UMCM.

> The MCO's DUR should specifically assess prescribing patterns for psychotropic medications as defined by Texas Family Code § 266.001(7), for all Members. If the MCO

identifies patterns outside of the MCO's parameters for psychotropic medications, or if HHSC notifies the MCO of outlier prescribing patterns, then the MCO must conduct a review and, if necessary, an intervention, such as a letter or phone call to the prescriber or a Peer-to-Peer review between the prescriber and the MCO. For children, the MCO must model its parameters on DFPS's "Psychotropic Medication Utilization Parameters for Foster Children." For adults, the MCO must base its parameters for psychotropic medications on a peer-reviewed, industry standard. The MCO must submit a Psychotropic Medication Utilization Review Plan and Report on an annual basis as specific in Chapter 5 of Exhibit C, UMCM.

*Id*. at 176–77. Though the contract expressly requires a prospective review of medication utilization—indeed, the word "prospective" appears three times just in the foregoing quotation—Superior's implementation appears to be solely retrospective. The Superior HealthPlan FAQ document submitted by Plaintiffs at the Contempt Hearing (*see* PX 11) was updated in May 2023; the updated version answers the question "What are the reasons that all requests do not result in a PMUR intervention?" by explaining:

A PMUR is intended to retrospectively review stable medication regimens. Sometimes a child's situation is unstable and a PMUR is not appropriate at that time. In the following circumstances the PMUR team will follow the case and initiate a PMUR intervention once stability has been achieved:
  1. Hospitalization less than 60 days ago.
  2. Enrolled in STAR Health less than 60 days ago.
  3. Prescriber change less than 60 days ago.
  4. Significant medication change less than 60 days ago.

Superior HealthPlan, Psychotropic Medication Utilization Review (PMUR) Process for STAR Health Members FAQ and Stakeholder Manual 2 (updated May 2023). Nowhere does the FAQ document indicate that Superior's PMUR process involves a prospective component.

The contract also expressly conveys the importance and urgency of PMURs, as it provides that Superior's "Medical Director, or his or her designee, must be available by telephone 24 hours a Day, seven Days a week, for Utilization Review decisions. The Medical Director, and his or her designee, must either possess expertise with [Behavioral Health] Services, or have ready access to that expertise to ensure timely and appropriate medical decisions for Members, including after

regular business hours."[53] Superior HealthPlan Contract, Ex. A at 39. And the clause that follows clarifies that the "Medical Director, or his or her physician designee, must exercise independent medical judgment in all decisions relating to medical necessity. [Superior] must ensure that its decisions relating to medical necessity are not adversely influenced by fiscal management decisions." *Id.* at 39.

### c. *Superior's implementation of the PMUR process is not consistent with the Parameters*

Doctor Bellonci identified several issues with Superior HealthPlan's implementation of the PMUR process. First, he concluded that Superior was disregarding the PMU Parameters when they became inconvenient:[54]

> Q. Okay. In your opinion, do the PMUR reports that are produced out -- in Texas, are they -- do the reports themselves adequately address the issues raised by the parameters?
> A. No.
> Q. Okay. Can you explain why?
> A. Yes. . . . [I]n reading the report, one of the responses can be ["]outside of parameters but meets standard of care.["] That makes no sense to me whatsoever. The parameters define the standard of care.
>
> So maybe after the review is done and the consulting child psychiatrist for Superior has gotten additional documentation justifying the medication regimen? I wouldn't call that now within standard of care. I might say clinically indicated . . . the concern by stamping it a standard of care is you lose the urgency. You lose the focus that needs to continue to be present to ensure that eventually you get within the standard of care, which is the parameter guidelines.

(D.E. 1489 at 136:20–137:11.) Later, he elaborated regarding the "outside of parameters but meets standard of care" response:

> Q. . . . [W]hy does that [response] make no sense to you?

---

[53] The contract defines "Utilization Review" as "the system for retrospective, concurrent, or prospective review of the medical necessity and appropriateness of Healthcare Services provided, being provided, or proposed to be provided to a Member. The term does not include elective requests for clarification of coverage." Superior HealthPlan Contract, Ex. A at 27. The contract does not have a separate definition for psychotropic medication utilization reviews.

[54] It bears repeating that the PMU Parameters were developed by some of the leading experts in Texas with the help of Doctor Jensen, one of the nation's foremost experts. Thus, Superior is substituting its own judgment in place of the combined knowledge and expertise—"based upon sound psychiatric principles and scientific evidence" (PX 10 at 3)—of the Parameters' authors.

A. Well, whose standard of care are we talking about? Who's decided that that's the standard of care? I thought Texas brought in national experts, including their own at the University of Texas School of Pharmacy, to develop these really nice parameters. That was the standard of care. I mean, [the American Academy of Child and Adolescent Psychiatry] has standards of care. I was on the committee writing these standard of care for 12 years.
THE COURT: So you're saying Superior Health has modified their own standard?
THE WITNESS: They're substituting their own judgment in place of the parameter. That's what I'm saying.

(*Id.* at 160:1–14.)

For his part, Doctor Van Ramshorst seemed to argue that the PMU Parameters were not a standard of care, as "the State of Texas generally does not create standards of care." (*Id.* at 253:8–9.) But he then clarified:

In terms of standards of care, Mr. Yetter, I feel that those are created by organizations such as the American Academy of Child and Adolescent Psychiatry. And as you'll note in our document, the parameters, we reference those guidelines from 2015.[55] So it's really a group of organizations that sets a standard of care.

(*Id.* at 254:8–13.) Thus, Doctor Van Ramshorst agrees that the PMU Parameters set forth a standard of care, his only disagreement is with its origin.

Second, Doctor Bellonci expressed concern with Superior's answer to the hypothetical question "Why won't all the requests result in a formal PMUR report?" (PX 11 at 3 (emphasis omitted).) The answer states:

A: Superior wants CPS staff, medical consenters and caregivers to contact the doctor to ask why a medication or dosage was prescribed. Only the doctor can answer this based on the foster child's problems and symptoms. The PMUR process can take 2-3 weeks to complete. Waiting for the formal PMUR report can delay needed treatment or changes in medications. The doctor should be made aware of any concerns about side effects to take any needed action.

(*Id.* at 3.) Doctor Bellonci noted that this answer "seems to actively discourage people from actually seeking a PMUR voluntarily." (D.E. 1489 at 137:18–20.)

---

[55] Doctor Bellonci served for twelve years on AACAP's Committee on Quality Issues ( PX 90 at 3), "which writes the standards of care for the field of child behavioral health" (D.E. 1489 at 29:22–23). He was a member of this committee from 2008 to 2020. (PX 90 at 3.)

It says if you've got questions about dosage or side effects or why the child is taking this medicine, you should go back to the prescriber to ask them. I mean, yes, I suppose, but that shouldn't be the end point. They also discourage you from seeking the PMUR because they say it takes two to three weeks to turn these things around and you wouldn't want to delay the child receiving the medicine.

(*Id.* at 137:20–138:2.)[56]

Third, it is unclear whether a caregiver who requests a PMUR will ever see the report. Superior

explains that "[t]he Superior Service Managers will send a copy of the completed formal PMUR

---

[56] Relatedly, the Court heard revealing testimony from Hannah Reveile that the State did not train caseworkers to request PMURs:

Q. In the course of your 18 months, how much training did the State of Texas give you about whether you as a caseworker, close to a child that's on a psychotropic medications regimen, to ask for a review of that regimen by the State?

. . . .

Q. Were you ever trained to do that?
A. Not exactly a review, no. We were trained to call STAR Health if we had any questions about, like, dosages or certain medications and their usual dosages, stuff like that, but nothing other than that.
Q. Did you -- were you ever trained on something called the Psychotropic Medication Utilization Parameters?
A. No.
Q. Have you -- before this lawsuit and your testimony here, have you -- did you ever hear about Psychotropic Medication Utilization Parameters?
A. No. I was shocked to hear about that, honestly.
Q. All right. And do you understand that it's basically a set of rules that the State of Texas has put together over the last -- almost 20 years for the use of these very powerful medicines for children?
A. I know that now, and I'm horrified that I didn't before.
Q. Why would you have wanted to have learned about the rules of the State of Texas for using psychotropic medications for children in foster care? Why would you have wanted to know that?
A. So that I can better make sure that my kids are okay.
Q. Did you ever get any training by the State of Texas into how to assess or address children that are on your caseload that are on psychotropic medications?
A. Besides just calling the STAR Health hotline, no.
Q. Did you ever see a review by STAR Health or its kind of owner, Superior HealthPlan, of psychotropic medication regimen? Did you ever see what was called a review, a report on a review?
A. No.
Q. In your discussions with other caseworkers, did you ever hear that there was the opportunity to ask for someone to check out a child's psychotropic medications, prescriptions, and regimen?
A. Not in those words, no. Usually they would ask for another psychiatrist to review, like just have an appointment and prescribe different medications is what we were trained to have them do.

(D.E. 1487 at 192:24–94:17.) And Doctor Miller saw no "indication that the State of Texas is encouraging or directing or requiring the caregivers, the people closest to the children, to be looking for potential issues with the prescribed medication regimens." (D.E. 1488 at 283:14–19.) Indeed, based on the Monitors' reports, she concluded that the State was doing "[q]uite the opposite." (*Id.* at 283:19.)

report to the CPS Caseworker, Regional Nurse Consultant, Medical Administration and DFPS Medical Director," and that a copy will be posted to Health Passport "within 7 business days." (PX 11 at 4.) Thus, the healthcare decisionmaker "may not even be told that the prescribing regimen falls outside of the parameter." (D.E. 1489 at 142:18–20.)

Fourth, Superior has unaccountably modified the PMUR process, in that Superior's policy provides that children are not flagged for a PMUR until they "have gotten psychotropic medication(s) treatment for 60 days or more." (PX 11 at 2.) This policy has no basis in the PMU Parameters, and it is unclear how allowing a child to be on powerful psychotropic medications for two months before being flagged for a review furthers the child's safety[57]—as Doctor Bellonci explained, even thirty days is "too long to be on a dangerous dose or a dangerous regimen of medication before somebody catches it" (D.E. 1489 at 138:17–19). And, indeed, the reason for this sixty-day policy appears to be administrative convenience—a document published by HHSC in December 2022 explains:

> Analysis of prescription data comes with no guarantee that individuals are taking the drugs they were prescribed. Many times, these medications are not taken past a few days due to ineffectiveness, side effects, or failure to adhere to the prescribed regimen. Therefore, it makes sense to concentrate monitoring efforts on those children who most likely were actually taking medications past an initial 30 day prescription for at least 60 days.

HHSC, Update on the Use of Psychotropic Medications for Children in Texas Foster Care: State Fiscal Years 2002 20 21 Data Report 17 n.3 (rev. Dec. 2022). In other words, waiting sixty days minimizes the number of PMURs that must be conducted.

Fifth, automatic reviews triggered by pharmacy claims data are "run monthly" (PX 11 at 2), allowing children to be on an outlier regimen for up to thirty days before a review even begins.

---

[57] Perhaps unsurprisingly, Doctor Van Ramshorst could not explain the origin of this policy. (*See* D.E. 1489 at 211:5–6 ("Your Honor, that requirement probably was created before I was in this role.").) It was Doctor Van Ramshorst's "understanding," however, that the policy was created by Superior Health. (*Id.* at 211:7–8.)

This is inadequate, Doctor Bellonci explained, because such reviews should be "a two-prong process," involving both a prospective and retrospective component (D.E. 1489 at 138:13):

> It's a prospective review before the pill is even taken, because the other concern about this PMUR system is the ones that are getting triggered by the Medicaid claims, they're running that, as I understand it, once a month. And the – that's too long to be on a dangerous dose or a dangerous regimen of medication before somebody catches it.
>
> So ideally you would have -- certainly for anything that's flowing outside of your own parameter, which is your own standard of care, shouldn't even get filled before there was a review.
>
> And then the retrospective review is really just an audit to make sure you're catching the medications, because as was shown by the Monitors' report, even the PMURs don't seem to be getting done for children that fall out of the guideline, the parameter.

(*Id.* at 138:13–139:3.)

And disturbingly, evidence at the hearing suggests that these monthly reviews are not, in fact, taking place. In April 2023, Plaintiffs' counsel formally requested a PMUR for all PMC children prescribed four or more psychotropic drugs and who had not received a PMUR in the prior five months. (PX 1 at 1.) Over the following seven months,[58] Superior accordingly screened data for 203 PMC children. Notably, by September 25—five months after the request was made—Superior had "not yet reviewed" the data for twenty-seven of those children. (PX 100 at 1.)

When Superior finally sent Doctor Van Ramshorst the results of all of the reviews on November 16, 2023 (approximately two weeks before the Contempt Hearing), Superior reported that it determined that of the 203 children that it originally determined met the criteria based on counsel's request, 86 of the children were ineligible for a PMUR. (PX 101 at 1.) Of those, Superior said 42 were ineligible because a review of the children's records showed their medications were no longer outside the parameters; another 21 were ineligible because they were no longer STAR Health members. However, four were deemed ineligible by Superior because, less than 60 days

---

[58] Superior finished the reviews for all 203 children on November 16, 2023. (PX 101 at 1.)

prior to the review, they had been released from an inpatient psychiatric hospitalization. (PX 101 at 1.) And 18 were ineligible because their medication had changed less than 60 days prior to the review. (*Id.* at 1.) One child was deemed ineligible for a review because of a recent placement change. (*Id.* at 1.) Yet, nothing in the Parameters speaks to an ineligibility for review based on these criteria. The use of these criteria for PMUR eligibility appears to be a policy created by Superior without reference to the Parameters. (*See, e.g.*, PX 11 at 2 (indicating that only children who have "gotten psychotropic medication(s) for 60 days or more" will be screened).)

Even when a child's prescribed medications met Superior's criteria for a review, the letters produced by the State for the 117 children who were eligible for a PMUR showed that, prior to completing a PMUR, Superior sends an initial letter that alerts the prescriber that the child's medications meet the criteria for a PMUR to be completed. (PX 116.) These letters state that "a PMUR will be pursued" if, in 90 days, "the medication regimen continues to meet the…criteria." (*Id.* at 9.) The letter asks the prescriber to fax Superior to indicate whether the prescriber will: coordinate care with other providers; make a treatment plan modification; make a referral to a specialist; call the pharmacy to discontinue a medication; or "other" with space to specify. (*Id.* at 9.) Of the 117 children whose medications qualified for a PMUR, this initial letter was sent to 44 (38%) prescribing professionals. These 44 PMC children included: a seven-year-old who qualified for a PMUR because (according to the letter sent to her prescriber) she was taking four or more psychotropic medications, two of which were antidepressants. Of the remaining 72 children:

- Superior sent the prescribing medical professional for three children a letter noting the child was prescribed more than one antipsychotic and recommending discontinuance of one of the medications.

- Superior sent the prescribing professional for two children a letter noting the child was prescribed multiple alpha agonists and recommending discontinuance of one of the medications.

- Superior sent the prescribing professional for eight children a letter warning of the risks of Serotonin Syndrome, due to the prescribed antidepressants.

- Superior sent the prescribing professional for 25 children (21% of 117) a letter indicating that the child's medication was outside the parameters and that there were "opportunities to reduce polypharmacy."

- Superior sent the prescribing professional for 34[59] children (29% of 117) a letter indicating the child's medication was outside the parameters but "within the standard of care."

While Superior's PMUR form also includes a checkbox for the conclusion that "Medication regimen is outside parameters with risk or evidence of significant side effects," none of the 117 letters included this conclusion.[60]

The PMURs that recommended a reduction in polypharmacy included one completed for a seven-year-old boy. (PX 116 at 371.) The drugs prescribed to the child, listed in the PMUR, were clonidine ER, divalproex sodium ER, risperidone, aripiprazole, lisdexamfetamine, and amphetamine/dextroamphetaimine. (*Id*. at 374.) The PMUR was triggered by both the number of prescribed psychotropic drugs (seven), and the prescription of two antipsychotic medications. The potential drug therapy problems identified in the letter included:

---

[59] Two reviews were completed for one 12-year-old child, the first on May 17, 2023, and the second on November 1, 2023. Both were sent to the same prescribing doctor and listed the same drugs. Both were titled, "Initial Psychotropic Medication Utilization Review Report."

[60] The same was true of the PMURs that the Monitors reviewed for the April 2023 Site Visit report. (*See* D.E. 1337 at 7 n.21.)

- Duplicate drug therapy: Multiple antipsychotics prescribed concurrently – there is an increased risk of weight gain, metabolic side effects, development of diabetes, extrapyramidal symptoms, hyperthermia, tardive dyskinesia and neuroleptic malignant syndrome. There are multiple medications prescribed that treat ADHD, although prescribing a stimulant(s) and alpha-agonist together is a common treatment strategy, as is prescribing a long-acting stimulant and short-acting booster dose of the same stimulant sub-class.

- Dosage of drug can be optimized: Doses of multiple medications are not optimized and could be titrated to an adequate therapeutic dose while others are tapered to streamline the medication regimen if indicated by clinical presentation and response.

- Potential adverse drug reaction(s) or side effect(s): Caution is advised with prescribing multiple psychotropic medications concurrently. Medication interactions can occur and risk of side effects can be amplified. Generally, there can be increased risk of CNS depression, psychomotor impairment, hypertension and altered seizure threshold. It is noted that member appears to be getting laboratory monitoring completed in a way that correlates with the current standards of care for antipsychotic monitoring per claims data. The combination of aripiprazole, risperidone and clonidine increases risk of orthostasis and syncope. Periodic consideration of the active diagnoses, effectiveness of each medication, target symptoms, tolerability, dose optimization, evidence basis and long-term plan is prudent and can lead to a reduction in polypharmacy to the minimal effective regimen.

Another PMUR reviewed the prescription regimen for an eight-year-old child whose seven psychotropic drug prescriptions included three antidepressants. The potential drug therapy

problems identified by the PMUR included "Drug(s) without an indication," with the reviewer noting "It is unclear what the indication is for topiramate based on the listed diagnoses in claims."[61] The PMUR also included a long list of cautions due to the prescription of three antidepressants, listing potential side effects and health problems associated with the combination of the specific antidepressants the child was prescribed.

A nine-year-old child's PMUR was triggered by the number (five) of psychotropic medications she was prescribed, and the concurrent prescription of antidepressants. In addition to listing the potential side effects associated with the drug combinations, the PMUR noted that the child was prescribed an antipsychotic and "[did] not appear to be getting laboratory monitoring completed in a way that correlates with the current standards of care for antipsychotic monitoring per claims data." The same note appeared in the PMUR for three other children (however, the prescribed medications were determined to be "outside the parameters but within the standard of care" for one of these children, a 13-year-old prescribed five psychotropic medications).

Of the 102 children whose medications were reviewed because they were prescribed four or more psychotropic drugs,[62] a total of 15 reviews were completed for children who were taking two or more antipsychotic medications; the reviewer recommended reducing polypharmacy for nine of these. The PMUR deemed the medications to be "outside the parameters but within the standard of care" for two, and a letter advising the prescriber that a PMUR would be completed was sent for five of the children. Of the 117 children, 71 were prescribed two or more antidepressants. Five

---

[61] Topiramate is an anticonvulsant used "to treat certain types of seizures." *Topiramate*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a697012.html (last visited Feb. 15, 2024).

[62] Medications for 14 children were reviewed solely because they were prescribed two or more of a single class of drugs. The letter to the prescriber for one child simply indicated the child's medications were outside the Parameters but did not specify why, and indicated a review would be conducted in 90 days if the child's medications did not change.

children were prescribed two or more alpha agonists, stimulants, or anti-psychotics *and* two or more antidepressants.

The PMURs produced by the State appear to show tiers of reviews. The PMUR for most of the children was titled "Initial Psychotropic Medication Utilization Review Report."[63] This review form includes a section to be completed by the prescriber, with instructions to complete the form and return it to Superior's PMUR Department by fax, mail, or email within 5 business days. The section to be completed notes, "Superior acknowledges that there are many potential reasons for an individual's treatment plan to be outside of the Psychotropic Medication Utilization Review (PMUR) parameters. Please fill out the following for clarification regarding clinical rational for this individual's treatment plan."

The short-answer questions included in this section require the prescriber to explain the reason for prescribing drugs that are inconsistent with the Parameters (with very little space provided for the explanation), and indicate psychosocial intervention strategies being used (with a series of check-boxes for cognitive-behavioral therapy, support group therapy, strength-based interventions, trauma-based therapy, other (with space to name it) and "Not applicable."). The form asks prescribers ("as applicable") for the last evaluation for metabolic and cardiovascular risk and "therapeutic/toxic plasma concentrations" (though in some this information was already included by Superior), and "What barriers, if any, make care coordination challenging?" (with check boxes for "Other provider(s) unreachable," "Technology," "Member or member's caregiver unreachable," "Insufficient teamwork or resources," "Other" (with a space to specify) and "Not applicable."). Finally, the prescriber is asked to complete the sentence, "I will complete the

---

[63] Another form, titled "Abridged Psychotropic Medication Utilization Review (PMUR-A) Report" was also used for some of the reviews, but appears to be identical to the "Initial Psychotropic Medication Utilization Review Report," except for the title of the form.

following" by checking boxes next to "all that apply:" The list that follows includes: "Coordinate care with other providers," "Conduct an Abnormal Involuntary Movement Scale (AIMS) or another tardive dyskinesia assessment," "Other additional lab monitoring," "Make a treatment plan modification" (with boxes asking the prescriber to indicate whether they will start, stop, or change a medication and leaving space to specify the medication), "Refer the member to a specialist," "Call the pharmacy to discontinue a medication," "Other" (with room to specify), and "Not applicable." Two additional boxes allow the prescriber to indicate that the child is no longer in their care, or "The antipsychotic medication count is less than 2. Additional intervention is unnecessary."

This document does not appear to anticipate any further interaction between Superior and the prescriber once Superior receives the form back from the prescriber. This is the form that was used for all but four of the 59 (55 of 59, 93%) children who had a PMUR completed.

The form sent for the other four children was titled, "Psychotropic Medication Utilization Review (PMUR) Report." This form includes much of the same information but appears to require a fuller review of the child's records. For example, the form includes sections for detailing any hospitalizations in the year preceding the review, lab work done, notes related to provider appointments, doctor visits shown in claims data, documents reviewed (which appears to include treatment notes from the prescriber, in some cases), other services the child receives and the frequency of those services, and a section to detail placement changes. It includes a section titled, "Prescriber Communication and Contact" that describes what attempts Superior's reviewer made to schedule a peer-to-peer consultation with the prescriber.

Three of the four children for whom Superior completed this more comprehensive PMUR Report were determined to have prescriptions outside the Parameters, with opportunities to reduce

polypharmacy. One of these children was a 12-year-old who was prescribed eight psychotropic medications, including two or more antidepressants and two or more antipsychotics. (PX 116 at 358.) The PMUR also noted that it was triggered by the prescriber's failure to appropriately monitor the child's glucose and lipids. (*Id*. at 359.) It noted "opportunities to reduce polypharmacy." (*Id*. at 359.) In the "Comments on Medication Regimen" section, the reviewer noted:

> Psychotropic Medication Utilization Review (PMUR) was triggered by concomitant prescription of 4 or more psychotropic medications, 2 or more antidepressant medications and 2 or more antipsychotics in a pediatric member, plus not documenting recommended lab and other monitoring. Member is prescribed 2 antidepressants, 2 anti-seizure medications also used as mood stabilizers, a non-stimulant medication used to treat ADHD, a stimulant ADHD medication and 2 antipsychotic medications. Member has no inpatient psychiatric hospitalizations noted within the past 12 months. There is no record of recent laboratory results that are standard for monitoring with certain psychotropic medications member is taking. Vital signs are being monitored with height, weight and BMI. Medication dosages appear to be within FDA recommended limits. It appears member is receiving play therapy and ancillary therapy services. A PMUR was reviewed from 4/18/23 and medications were found to be outside parameters with opportunities to reduce polypharmacy. Since that time the medications remained and a stimulant was added.

(*Id*. at 359.) Despite the clear concerns that the reviewer expressed, under "Prescriber Communication and Contact," the PMUR simply states, "outreach attempt to schedule [peer-to-peer] on 7/28/23 was unsuccessful. Outreach attempt made by [name omitted] on 8/9/23 15:50, left message with voicemail."

Similarly, the PMUR Report for a 14-year-old child indicated that he was prescribed six psychotropic medications, including two antipsychotic medications. (*Id.* at 365.) The review determined there were opportunities to reduce polypharmacy and commented:

> Psychotropic Medication Utilization Review (PMUR) was triggered by concomitant prescription of 4 or more psychotropic medications and 2 or more antipsychotics in a pediatric member. Member is prescribed an antidepressant, a non-stimulant medication used to treat ADHD, a stimulant ADHD medication and 2 antipsychotics also used as mood stabilizers. Members has not inpatient psychiatric hospitalizations noted within the past 12 months. There is records of recent laboratory results that are standard for monitoring with certain psychotropic medications member is taking from the past 12 months…Vital signs

> are being monitored with height, weight, and BMI only. Medication dosages appear to be
> within FDA recommended limits. A PMUR was reviewed from 1/8/23 and medications
> were found to be outside parameters with opportunities to reduce polypharmacy. Since
> then, the medications remain the same. Per clinician response, member is stable on this
> regimen and is receiving Cognitive Behavioral Therapy, but this is not reflected in claims.

(*Id.* at 366.) Under "Prescriber Communication and Contact," the Superior reviewer simply stated,

"Outreach attempt made…to schedule [a peer-to-peer] on 8/02/23 was unsuccessful and unable to

leave a message. Outreach attempt made…on 8/9/23 @ 10:05, left message with office staff." (*Id.*

at 368.)

The third, completed for a 16-year-old child who was prescribed six psychotropic medications,

including two or more antidepressants, also documented that the Superior reviewer attempted to

contact the prescribing physician but was "unable to schedule a case consult." (*Id.* at 303.) When

a Superior reviewer reached out a second time, they "left [a] message with staff who agreed to

pass it on and have someone call back to schedule." (*Id.* at 303.)

The fourth child for whom Superior completed a PMUR Report was a 12-year-old prescribed

five psychotropics, including two stimulants. Superior determined this child's medications to be

outside the parameters but within the standard of care, commenting:

> Medication dosages appear to be within FDA recommended limits. It appears member was
> receiving psychotherapy services. A PMUR-A was reviewed from 5/5/22 and medications
> were found to be outside parameters with opportunities to reduce polypharmacy. [The
> prescriber] sent a detailed letter with additional chronological history on 6/1/22 noting that
> member was stable on this regimen. Based on the diagnoses, doses, records reviewed and
> history of symptoms reported, the medication regimen appears to fall within the standard
> of care.

(*Id.* at 407.) Under "Prescriber Communication and Contact," the reviewer noted, "[Reviewer] will

attempt to schedule peer-to-peer with [prescriber] as directed by Medical Director. Additional

outreach deferred as member's medication regiment was within the standard of care and no other

significant concerns noted on records review." (*Id.* at 409.) In short, none of the more

comprehensive PMUR Reports document a peer-to-peer review, even when the reviewer recommended reducing polypharmacy.

Doctor Bellonci reviewed several of Superior's PUMR Reports and noted the use of checkboxes, which suggested a focus on efficiency. (D.E. 1489 at 154:7–8.) Further, the information in "the open box text fields" "seemed very duplicative," as though the boxes were populated with standardized language that was copied and pasted. (*Id.* at 154:11–12.) One of the PMUR Reports he reviewed, for example, was for a twelve-year-old child prescribed five psychotropic drugs. (*See* PX 116 at 406–411.) The "Comments on Medication Regimen" provides a one sentence summary of each drug's FDA indications and approvals for pediatric populations then, without further elaboration, states that the medication dosages "appear to be within FDA recommended limits."[64] (*Id.* at 407.) The Report also states that "Member is prescribed multiple medications" that "can lead to an increased risk of serotonin toxicity." (*Id.* at 408.) But it does not identify the specific medications. Likewise, the Report notes that the child's "medication regimen has an elevated anticholinergic load" which can cause various side effects, and that the child "is on several agents that carry risk for electrolyte disturbance." (*Id.* at 408.) Again, however, the specific medications/agents are not identified. Indeed, the "Serotonin Toxicity," "Anticholinergic Risk," and "Antidepressant Medication Monitoring (AMM)" sections match, word for word, the language in corresponding sections in other PMUR Reports. (*Compare id.* at 408, *with id.* at 301–302, *and id.* at 361; *compare also id.* at 407, *with id.* at 264, *and id.* at 301 (using identical language under heading "Disruptive Mood dysregulation Disorder," including statement that "This medication is consistent with this treatment approach").) *See also*, *e.g.*, *id.* at 264, 360 (identical

---

[64] Immediately above this statement, the Report states that "Trazodone does not have any pediatric indications but can be used off-label for treatment of depression or insomnia." (PX 116 at 407.) The Report does not explain how this medication can simultaneously "not have any pediatric indications" and be prescribed in a dosage "within FDA recommended limits"—recall that off-label use is a use for which no FDA approval has been obtained.

language under "Oxcarbazepine" heading); *id.* at 264, 360 ((identical language under "Antidepressant Risk with Bipolar Disorder" heading); *id.* at 263, 300, 359, 407 (identical language for Trazodone's entry under "FDA Indication for Pediatric Populations" heading).)

Even the "Medication Interactions" sections follow the same pattern: Each starts with the statement that "Caution is advised with prescribing multiple psychotropic medications concurrently. Medication interactions can occur and risk of side effects can be amplified. Generally, there can be increased risk of CNS depression, psychomotor impairment, hypotension and altered seizure threshold," which is followed by brief (one-sentence) statements specifying side-effects, the risk of which may be increased by particular medication combinations. (*See id.* at 264, 301, 360, 408.)

There also appears to be copy/pasting in the "Recommendations" section of the Reports. (*E.g.*, *id.* at 264, 302, 361, 408 (identical language as to "Shared Decision Making (SDM)"); *id.* at 265 ¶ 2, 302 ¶ 3, 362 ¶ 3, 409 ¶ 1 (identical language as to "Abnormal Involuntary Movement Scale (AIMS)"). Even the recommendations regarding "Psychotropic medication polypharmacy" have much identical language. (*See id.* at 265 ¶ 4, 302 ¶ 6, 362 ¶ 6, 409 ¶ 3.) Further, even language that seems regimen-specific is, in fact, copied and pasted. (*E.g.*, *id.* at 265 ¶ 4, 302 ¶ 6, 362 ¶ 6 (as to statement that "There are multiple medications prescribed that can target mood."); *id.* at 265 ¶ 4, 302 ¶ 6, 362 ¶ 6 (as to statement that "It may be reasonable to consider picking the most effective agent(s) for ongoing management and optimizing the dose to a therapeutic range.").)

Finally, the evidence shows that Superior's automated review system has an unacceptably high failure rate. As noted above Superior screened 203 PMC children and conducted PMURs for fifty-eight. (PX 101 at 1.) For twenty-six of those fifty-eight children, Superior determined that there

were opportunities to "reduce polypharmacy." (*Id.* at 1.) There was no indication that its automated review system identified any of these opportunities previously.

### d. HHSC is not requiring Superior to conduct PMURs in accordance with the Parameters

HHSC is responsible for overseeing Superior HealthPlan's implementation of the PMUR process and ensuring the quality of PMURs. Indeed, the contract expressly contemplates such oversight, as "[a]ll areas of responsibility and all Contract requirements will be subject to performance evaluation by HHSC." Superior HealthPlan Contract, Ex. A at 74. Such evaluations "may be conducted at the discretion of HHSC at any time and may relate to any responsibility and/or requirement. Any and all responsibilities and/or requirements not fulfilled may be subject to remedies set forth in the Contract." *Id.* at 74.

Later, the contract expressly contemplates HHSC oversight as to utilization reviews:

HHSC, at its discretion, will review, evaluate, and assess the development and implementation of the MCO's policies and procedures related to the timely and appropriate delivery of Services and Deliverables as required under the Contract. For example, HHSC may review, evaluate, and assess:

1. [Superior]'s reviews of its own policies and procedures and the corrective actions taken by [Superior] . . . ;

. . . .

4. The [Utilization Monitoring] program, including [Superior's] internal Utilization Review policies and processes;
5. The potential for overutilization or underutilization of services . . . .

Superior HealthPlan Contract, Ex. B at 34. The contract then specifies that "HHSC will monitor [Superior] to ensure [Utilization Management] is appropriately used by [Superior] to prevent overutilization or underutilization of services." *Id.* at 35.

Yet a lack of oversight from the State has allowed these problems to persist: As Doctor Van Ramshorst explained, "Superior largely conducts [the PMUR] process independently as they've

developed this process over time." (D.E. 1489 at 235:2–4.) Doctor Miller expressed great concern

at this shocking lack of redundancy:

> Q. In your opinion is it safe for children to rely entirely -- for State to rely entirely on a
> managed care insurance group to come up with reviews of children's prescribed medication
> regimens? Is that a safe practice and policy for the children?
> A. You know, so much of things like this that are this critically important probably need
> redundancy in the system. And what you just mentioned is probably a piece of that. But
> there should be other pieces like in the licensure reviews and investigations. So you – that's
> too important to not have systemic factors that are constantly -- that are indigenous to the
> system that monitor what's going on with drugs and kids.

(D.E. 1488 at 283:22–284:9.) And from Doctor Van Ramshorst's testimony, it is quite apparent

that the lack of oversight starts at the top. The following colloquy about the PMUR reports is

illustrative:

> Q. Now, you've seen the reviews, and not one of them says they're already – well, we just
> reviewed them last month but we're going to review them again?
> A. Sir, I have not seen the reviews.
> Q. So these are 203 children in the PMC, in the custody of your employer, the State of
> Texas, and your health insurance company does psychotropic medication reviews on them
> in the context of federal litigation. You're the Chief Medical Director, and you have not
> bothered to look at the results?
> A. Sir, I have not seen those reports. We don't normally review specific PMUR reports.

(D.E. 1489 at 237:1–11.) He also demonstrated a worrying lack of familiarity with Superior's

PMUR process. For example, he was asked why Superior "excluded" some of the 203 children

(*see* PX 100 at 1; PX 101 at 1):

> Q. Now, if you exclude a PMC child that you're reviewing their psychotropic medications
> for, I suspect your insurance company is going to have somebody look at it and document
> why they excluded it, right?
> A. Sir, I'm not familiar with that level of detail with this process.
> Q. This -- this is psychotropic medication. You're the Chief Medical Director, and you
> don't even know the process, how it works?
> A. I disagree with that characterization.
> Q. Okay. Well, how does it work? Do they -- when they look at a child's – that's got four
> psychotropic medications that's triggered the red flags, you've got to have a review, and
> they say I'm excluding this, what do they generate? Do they have an exclusion report? Do
> they have clinical notes? Who does that? Do you know?
> A. Generally speaking, yes.

Q. Okay. Well, what is the – what's the piece of paper that shows us why they excluded that child?

A. There will usually be a screening indicator that is inserted into Health Passport if a screening occurs. I do not know sitting here off the top of my head if that screening notice includes the reason why the screening determined that a further investigation was not needed.

Q. Okay. So children can have four or more psychotropic medications. They can be excluded, rejected from a review. And you don't even know if you get a reason for that?

A. I don't have that level of detail.

(D.E. 1489 at 238:3–239:5.) He even failed to review the PMUR reports for those children for

whom it was determined that there was an opportunity to reduce polypharmacy:

THE COURT: Did you look at that? As the Medical Director, did you look at the reasons that they might be on it?

THE WITNESS: Your Honor, I have not reviewed these specific individual reports.

THE COURT: I thought you said you were sort of quality control. Did you look at anything like that?

THE WITNESS: Not for this. I have not reviewed the actual PMUR reports for this specific group of children.

(*Id.* at 242:13–20.) He then clarified that reviewing PMUR reports was not part of HHSC's quality

control process:

Q. What group of people in your department does the quality – has done the quality control on these PMU reviews?

A. Sir, it's not generally part of our process to examine specific PMUR reports for specific children.

Q. Okay. So if it's not your group, what group within HHSC actually is the quality control for the insurance company doing PMU reviews of whether a child is getting too much psychotropic medication? What group within the whole agency is the quality control?

A. Medicaid CHIP Services provides that oversight.

Q. But what's the group called?

A. We have a variety of areas that participate in our contract oversight.

Q. And have they reviewed these findings on the PMU reviews that we requested for the PMC children?

A. There's no area within Medicaid CHIP Services to my knowledge that has reviewed these specific reports.

Q. Is there an area within your CHIP Services that reviews any specific PMU review reports?

A. Generally, that's not part of our process. However, if I may, from time to time there are children that come to our attention usually through collaboration with DFPS that are identified as having complex behavioral health needs. And as part of our managing that child's needs and supporting them, we may see one of the PMUR reports in that process, but it is relatively uncommon.

> Q. Okay. So that's an ad hoc sort of thing?
> A. I agree with that characterization.
> Q. So there's no regular, routine quality check within your group, CHIP Services, of specific PMU review reports done by your insurance company for these children who are on four-plus psychotropic medications, right?
> A. We don't review specific reports, but we have quarterly meetings with DFPS, Superior HealthPlan, and HHSC to review trends.

(*Id.* at 242:22–244:6.) This blithe indifference to oversight is all the more distressing given Doctor Van Ramshorst's apparent recognition that "psychotropic prescribing is a very important issue," and that overprescription of such drugs "could impact" a child's "health, physical and emotional well-being." (*Id.* at 224:2–12.) It also belies his claim to be "very concerned with th[e] issue" of "psychotropic prescribing, specifically for children and youth in foster care," as well as his assertion that "Texas . . . has worked very hard to address this issue." (*Id.* at 222:24–223:5.)

And Doctor Van Ramshorst's testimony was alarming for other reasons. For example, the Court noted that one of his responsibilities was "clinical oversight," and asked if he makes sure that medical care is delivered to PMC children "properly and under medical necessity and guidelines." (*Id.* at 170:3–171:2.) He replied that his office helps ensure that the services delivered are "medically necessary," but said nothing about ensuring they were delivered properly (*id.* at 171:4)—indeed, he asked the Court to define what it meant to deliver medical services "properly" (*id.* at 171:6–7).

Doctor Van Ramshorst again distanced himself from any clinical oversight when discussing the relationship between the State, Superior HealthPlan, and physicians: He emphasized that it was Superior HealthPlan that contracts with physicians, admitted that he is "not intimately familiar with" those contracts, and then stated that regulating the practice of medicine is the job of the Texas Medical Board.[65] (*Id.* at 172:15–19.) The only oversight he mentioned is that his office

---

[65] The Court notes that Defendants offered no evidence that a physician was reprimanded by either Superior HealthPlan or the Texas Medical Board for overmedication of foster children.

tracks "a variety of quality metrics for our managed care organizations." (*Id.* at 173:10–11.) Thus, it is apparent that what oversight is provided amounts to nothing more than box-checking, of the kind the Court found inadequate when it held Defendants in contempt in 2020.[66]

And after passing the buck to Superior HealthPlan and the Texas Medical Board, Doctor Van Ramshorst passed the buck to DFPS, explaining that he is "with the Texas Health and Human Services Commission, which is not the area that has conservatorship over the kids," and suggesting that DFPS, as the agency with conservatorship, is responsible for protecting PMC children from inadequate medical care. (*Id.* at 177:23–178:5.)[67]

---

[66] When the Court found Defendants in contempt of Remedial Order 3, it explained:

> [S]imply checking the boxes . . . is not sufficient for Defendants to implement this Remedial Order in a way that "ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm," as required by the Court's injunction. Defendants must also "conduct" investigations in such a way that "tak[es] into account at all times the child's safety needs." Defendants must approach allegations of abuse and neglect involving PMC children in such a way that "taking into account at all times the child's safety needs" is the main objective.

(D.E. 1017 at 77–78 (citations and emphasis omitted).)

[67] Plaintiffs also raised concerns related to DFPS's failure to ensure that residential childcare providers are adhering to contractual requirements related to the Parameters. DFPS contracts with the residential facilities that care for foster children. DFPS has adopted a set of "24-Hour RCC Requirements that Child Placing Agencies (CPAs) and General Residential Operations (GROs) must comply with when they provide services to DFPS Children." (PX 8 at 8.) These requirements include adhering to the minimum standards for psychotropic medications and following the PMU Parameters. (PX 8 at 56 ("The provider follows the guidelines in the Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health. The provider ensures that the Caregiver administers and documents the provision of psychotropic medication as prescribed, and in accordance with Minimum Standards.").).

At the hearing, the Court heard from Kason Vercher, DFPS's Director of Residential Contracts regarding the Department's efforts to investigate and enforce childcare providers' obligations to follow the PMU Parameters. Mr. Vercher has been working in the "area of Residential Contracts for the past 13 years." (D.E. 1487 at 338:23–25.) Despite the language in DFPS's contracts that require providers to follow the guidelines in the Parameters, Mr. Vercher testified that he understood the review process described by the Parameters to apply only to medical professionals and not to residential child care providers. When the questioning turned to PMU Parameter enforcement, Mr. Vercher stated that he could not recall a single citation being issued to a childcare provider:

> Q. Okay. Mr. Vercher, you've told us that providers are supposed to follow the parameters and raise concerns when the prescribed regimens are outside the PMU parameters. You told us that earlier, correct?
> A. Yes.
> Q. But you say no one in your group ever goes to check whether they're doing that, right?
> A. Specifically whether they are following the parameters, no.
> Q. In fact, you have never -- as far as you're aware, the State of Texas has never cited a single provider for failing to follow the PMU parameters, have you?
> A. None that I'm aware of, no.

Moreover, Doctor Van Ramshorst was unable to recall basic data.[68] For example, he asserted that the use of psychotropic medications in children enrolled in STAR Health peaked in 2004 and, as of 2021, had dropped "by relatively or roughly 14 percentage points." (*Id.* at 188:23–25.) But he did not recall the percentage of children who were receiving psychotropic medications in either year—he "just do[es]n't have that number. It fell out of [his] brain earlier." (*Id.* at 189:6–7.) Likewise, in "late March or early April" of 2023 his office "worked with Superior HealthPlan to do a deep dive" into the lack of PMURs, "because obviously this was of concern to us." (*Id.* at 183:22–184:6.) Yet he could not recall any details about the deep dive's analysis or conclusions.[69] (*Id.* at 184:13–18.)

And, no less worryingly, Doctor Van Ramshorst was unable to answer basic questions. For example, he agreed that, as a medical doctor, he "understand[s] the concept of child safety." (*Id.* at 206:3–5.) But when asked if the use of psychotropic drugs "is a child safety issue," he asked counsel to "clarify" the question. (*Id.* at 205:11–12.) When asked if the PMU Parameters "are in place to help ensure child safety," he was "not able to" answer "with a yes or no." (*Id.* at 206:18–207:2.) When asked if the PMU Parameters were "really significant rules," he did not "understand what [counsel] mean[t] with the word 'significant.'" (*Id.* at 214:6–10.) When asked if he had an "obligation to these children" as "a licensed practicing physician," he asked counsel to "be more specific." (*Id.* at 207:16–19.) And most shockingly of all, when asked if "it is up to the State of

---

Q. So you have a contract requirement. You don't look to see if it's being violated. And you've never cited anybody for any violation because you're not looking, right?
A. For the PMU parameters, that is correct.

(*Id.* at 354:25–355:16.)

[68] The Court observed similar memory gaps in other high-level State employees. *See, e.g., infra* page 259–61 (DFPS Associate Commissioner Banuelos).

[69] Curiously, he was able to recall that "in most of those 75 children there was an explanation for why the Monitors weren't able to find that a full PMUR was completed." (D.E. 1489 at 184:16–18.) Presumably, anything beyond "an explanation" is just details.

Texas to keep these children medically safe," he asked for "a few seconds to think about that," then never answered the question. (*Id.* at 256:20–257:4.)

Doctor Miller explained that psychotropic medication "is a very important piece of the public child welfare system" because "[t]hese kids are much more often medicated and with multiple medications than the general population. It's a real problem in the whole child welfare system."[70] (D.E. 1488 at 282:8–12.) Doctor Miller faced a similar problem when she took charge of Tennessee's child welfare system—"our kids were way overmedicated." (*Id.* at 284:20–21.) She did not, however, solve the problem by passing the buck to a private insurer. Instead, she established a system of direct oversight.

First, she brought in experts to figure out where things were going wrong. (*Id.* at 284:16–285:3.) She then established a system with "nurses, psychologists, and master clinicians in every region of the state," and "part of their role was to monitor psychotropic drugs." (*Id.* at 285:4–7.) She also ensured that the state's data system "interfaced beautifully with the Medicaid system," and had a child psychiatrist at the agency's central office who reviewed records. (*Id.* at 285:8–11.) And if a child's medication regimen raised any red flags, "we went directly to the providers." (*Id.* at 285:12–13.) Using the Medicaid data also allowed Tennessee to identify when a child was getting prescriptions from multiple prescribers. (*Id.* at 285:24–286:1.) And, because Tennessee could connect each prescription to its prescriber, the state was able to identify physicians who over-prescribed, or who prescribed unsafe combinations of drugs. (*Id.* at 285:24–286:5.)

---

[70] And it is a real problem in Texas. The 2006 Strayhorn Report found that foster children were prescribed psychotropic medications at a rate more than nine times higher than the general population. (D.E. 1486-13 at 25 ("Children in foster care had a much higher rate of psychotropic drug use than all Medicaid children. For every 1,000 children in the Medicaid program, just 35 had at least one psychotropic drug prescription; for foster children, the prevalence rate was 324 out of 1,000."); *see also id.* at 26.)

Doctor Miller noted that this process was not easy—"It requires a lot of hard work and a lot of time and a lot of bringing in experts." (*Id.* at 284:16–17.) But it is necessary to keep the children safe.

### e. *Completed PMURs help the State identify potential instances of abuse and neglect*

The PMUR process is used to identify outlier prescribing (including overprescribing) and other serious risks (like the failure to order laboratory monitoring consistent with the standard of care), that could pose a significant safety risk to a child and, as noted earlier, that the State concedes could constitute abuse or neglect.[71] And when it works as it should, the PMUR process has another information-generating function: the process apprises mandated reporters,[72] including CPS caseworkers, a child's medical consenter, and a child's attorney or court-appointed special advocate (CASA) (if they receive a copy of a court-requested PMUR), of a prescribing practice that could constitute abuse or neglect.

---

[71] *Supra* page 52 (quoting D.E. 1365 at 59:14–16 (testimony of Associate Commissioner Black)).

[72] The Texas Family Code names certain professionals as mandated reporters of child abuse, neglect, or exploitation:

> If a professional has reasonable cause to believe that a child has been abused or neglected or may be abused or neglected . . . the professional shall make a report not later than the 48th hour after the hour the professional first has reasonable cause to believe that the child has been or may be abused or neglected or is a victim of an offense under Section 21.11, Penal Code. A professional may not delegate to or rely on another person to make the report. In this subsection, "professional" means an individual who is licensed or certified by the state or who is an employee of a facility licensed, certified, or operated by the state and who, in the normal course of official duties or duties for which a license or certification is required has direct contact with children. The term includes teachers, nurses, doctors, day-care employees, employees of a clinic or health care facility that provided reproductive services, juvenile probation officers, and juvenile detention or correctional officers.

Tex. Fam. Code § 261.101(b).

According to Superior, a completed PMUR is posted to a child's Health Passport record within seven business days of its completion. Superior HealthPlan, Psychotropic Medication Utilization Review (PMUR) Process for STAR Health Members FAQ and Stakeholder Manual (updated May 2023). Medical Consenters (which can include foster parents for children placed in foster homes) and DFPS staff (including a foster child's CPS Caseworker) have access to Health Passport. *See* DFPS, Health Passport A Guide to Medical Services at CPS, *available at* https://www.dfps.texas.gov/Child_Protection/Medical_Services/Health_Passport.asp.

Or, at least, it did so until recently. As of the May 2023 revision to its PMUR FAQ document, Superior HealthPlan appears to have changed its policy and practice of automatically notifying a child's caseworker when a PMUR is conducted. Prior to the update, Superior HealthPlan answered the question "If I've requested a formal PMUR report, how will I get a copy of the report?" as follows:

> The Superior Service Managers will send a copy of the completed formal PMUR report to the CPS Caseworker, Regional Nurse Consultant, Medical Administration and DFPS Medical Director. The PMUR will also be posted to Health Passport within 7 business days of completion.

(PX 11 at 4.) As of the May 2023 update, the FAQ answers the question (which has been slightly reworded to "If I've requested a PMUR intervention, how will I get a copy?") with "The PMUR intervention will be posted to Health Passport within approximately 7 business days of completion." Superior HealthPlan, Psychotropic Medication Utilization Review (PMUR) Process for STAR Health Members FAQ and Stakeholder Manual 4 (updated May 2023). It does not state that a copy of the PMUR report (or intervention) will be sent to anybody.

Superior HealthPlan professionals who conduct PMURs also have a duty to report suspected abuse or neglect, both as mandated reporters named in the Family Code, and by virtue of the contract between the State and the MCO. The contract explicitly states that the MCO "must protect against ANE." Superior HealthPlan Contact, Ex. B at 220. It requires Superior to "provide ANE and Unexplained Death training to all MCO staff who have direct contact with a Member. Direct contact includes in-person and telephone contact." *Id.* at 221. It further states, "The MCO must also ensure all employees that receive the required training sign, upon completion of the training, an acknowledgement of their understanding of their duty to report." *Id.* at 221.

But if a PMUR is not completed, the caregivers and professionals who ensure a foster child's safety are left without critical information they may need to report allegations of abuse and neglect

to SWI. Accordingly, the failure to appropriately conduct a PMUR (and the State's failure to appropriately monitor and enforce the contractual provisions requiring them to be conducted) represents a potential lapse in the receipt of such reports. At the very least, completed PMURs add a layer of "redundancy [to] the system" that, Doctor Miller explained, is "critically important" to keeping children safe (D.E. 1488 at 283:22–284:3)—in this case, by providing one more way for mandatory reporters to detect outlier prescribing practices that might constitute abuse or neglect.

### 3. *Failure to properly administer psychotropic medications or keep adequate records*

Once a child receives a psychotropic medication prescription, it is critical that the medication is administered as prescribed, without interruption, and that the administration is documented. As Doctor Bellonci explained, the failure to do so can cause "very significant" problems for a child's health. (D.E. 1489 at 82:8–13.) This is because the prescribing physician will assume that the child is taking the medication as prescribed—and when the child reports that his condition has not improved, the physician may increase the dosage. (*Id.* at 82:14–18.) Thus, the physician "may be giving" the child "an overdose" without even knowing that the child was not put on the medication in the first place. (*Id.* at 82:19–24.)

Interruptions in administration can be equally harmful. Antiseizure medications, for example, are prescribed "for mood stabilization" in "young people who don't have a seizure disorder." (*Id.* at 47:13–15.) And "even if you don't have a seizure disorder, if you're taking an antiseizure medication and you suddenly stop it, it can induce a seizure." (*Id.* at 47:20–22.) Likewise, "[i]f you're taking an antihypertensive, which we're using for ADHD, and you suddenly stop it . . . [y]ou can have a hypertensive crisis and stroke." (*Id.* at 47:23–48:1.) Doctor Bellonci also expressed concern "about going on and off medications," as doing so "makes them less effective

over time and can actually exacerbate the psychiatric condition."[73] (*Id.* at 48:4–6.) Therefore, it is "critically essential" to a child's safety that the child's caregivers know that the child is on psychotropic medication, are aware of possible side effects, and "keep track of the impact of the medications" and "report back" to the child's physician. (*Id.* at 47:4–10.) And, of course, the caregiver must also understand that "once initiated, you can't just stop these medications." (*Id.* at 47:11–12.) Sharing all of this information with the child's medical consenter is the basis for informed consent.[74] (*Id.* at 84:3–10.)

Yet the record shows that all too often, medications are not being properly administered to PMC children. In their update to the Court regarding site visits to General Residential Operations (D.E. 1337) the Monitors reported numerous examples of medication and medication log errors,[75] including:

- "At Camp Worth RTC, two children were prescribed anxiety medications on an 'as needed' basis. Despite this, their medication logs showed that they were administered the medication every morning and evening without any documentation of the reason for administering the medication, in violation of minimum standards." (*Id.* at 11.)

- "At DePelchin, one child's site records showed their doctor ordered that one psychotropic (Qelbree, prescribed for ADHD) be discontinued and another (Intuniv) started on June 21, 2022. The child's medication logs showed that Qelbree was

---

[73] Defendants were aware of these risks before Doctor Bellonci's testimony: In April 2023, Ms. Kromrei noted that "the side effects of immediate changes" to a psychotropic medication regimen "can be a serious problem." (D.E. 1347 at 76:17–20.)

[74] One national medical organization conceptualizes informed consent as a three-legged stool. (D.E. 1489 at 85:13–14.) The first leg is the research and scientific information regarding the medication in question. (*Id.* at 85:14–15.) The second leg is the physician's opinion as informed by his clinical experience. (*Id.* at 85:15–16.) And the third leg is the patient, her values and beliefs. (*Id.* at 85:19–20.)

[75] The Monitors have also reported that standards violations related to medication management and medical care are among the most common reasons for which childcare operations were placed on heightened monitoring. (D.E. 1380 at 11, 159, 159 fig. 69.) The Monitors note that this has been true for operations placed on heightened monitoring in 2020, 2021, and 2022. (*See id.* at 11.)

discontinued on June 21, 2022, but Intuniv was not started until July 1, 2022." (*Id.* at 11.)

- The records of another child at DePelchin "showed that Latuda was supposed to be discontinued on June 21, 2022, but medication logs showed that it was administered through the end of June." (*Id.* at 11.)

- "At Gold Star Academy, the PMC children's medication logs did not consistently document the time that the medication was administered." (*Id.* at 11.)

- At Silver Lining RTC:

  o One child's medication logs "showed that he was last given a dose of a prescribed ADHD medication (Vyvanse, a stimulant) four days before the monitoring team's visit, yet there was no documentation in his records indicating the medication had been discontinued." (*Id.* at 11.)

  o "Another child's medication logs appeared to indicate he had not received ADHD medication (Concerta, also a stimulant) for 10 days after the RTC ran out of the medication." (*Id.* at 12.)

  o "Another child's records showed that the psychiatrist had decreased the dosage of a medication (Abilify, from 10 mg to 5 mg) in December 2021, but medication logs appeared to show the child continued to receive the higher dosage until March 2022." (*Id.* at 12.)

  o "Another child's records indicated he was supposed to receive a medication (Clonidine) in the morning and at noon; yet his medication logs showed the medication was being administered in the morning and at night." (*Id.* at 12.)

101

- o "Medication logs were prefilled with a staff member's signature, the date of administration, and pill count, and lacked only the time the medication was administered. During staff interviews, staff confirmed that one staff member pre-filled all information except the time the medication was administered, and the staff who administered the medication filled in the time that it was administered." (*Id.* at 12.)

- At ACH RTC, "PMC children's records showed many documentation errors, including failure to timely refill medications, missed doses, miscounted medications, and failure to follow psychiatric orders. The monitoring team's review of medication logs for nine of the 10 PMC children showed that all had missed at least one dose of prescription medication[76] in August 2022 because the RTC failed to refill the medications promptly."[77] (*Id.* at 12 (footnote omitted).) For example:

  - o One child's "August medication log showed they were not administered Seroquel and Zoloft for nine days." (*Id.* at 12.)

  - o Another child's "August medication log showed the medication count for Vistaril (used as a sedative) at "0" for nine days, and Lexapro (an antidepressant) at "0" for a week." (*Id.* at 12.)

  - o Another child's "August medication log showed they were not administered a morning dose of Qelbree, as prescribed, for nine days." (*Id.* at 12.)

---

[76] When interviewed, eight of these nine children were unaware that they were not receiving their medications as prescribed. (D.E. 1337 at 13 n.33.) And the medication management errors were not limited to psychotropic medications—the Monitors note that "one child's records showed Naproxen was not being administered as prescribed. Another child's records showed she was supposed to receive an oral antibiotic twice daily for 10 days for a UTI, but it took 20 days to administer the 10-day regimen." (*Id.* at 13 n. 33.)

[77] The Monitors noted that "ACH did not provide medication logs for one of the PMC children." (*Id.* at 12 n.32.)

  o Another child's "August medication log showed the medication count for morning and evening doses of Depakote ER and Seroquel at "0" for five days." (*Id.* at 13.)

  o Another child's "August medication logs showed missed doses of Seroquel on five days, missed doses of Trileptal on eight days and missed doses of Zoloft on four days." (*Id.* at 13.)

  o Another child's "August medication logs showed they did not receive Zoloft for five days." (*Id.* at 13.)

- ACH RTC's medication logs also had serious shortcomings. Some logs "had blanks with no information at all, but the children's records failed to document any reason for this (for example, a hospitalization, home visit, or refusal of medication). Others showed a miscount of medication, with no explanation. Medication logs also showed children were not being administered the medication as prescribed." (*Id.* at 13.) For example:

  o One child's "records indicated a morning dose of Seroquel was supposed to be discontinued after August 9, 2022," yet the child "continued to receive the dose until the child was hospitalized on August 15, 2022, then continued to receive the dose after returning from the hospital on August 24, 2022." (*Id.* at 13.)

  o Another child's "records showed Vistaril was prescribed on an 'as needed' basis," yet the child's "medication logs showed they were receiving the medication every evening without any documentation of the reasons it was administered." (*Id.* at 13.)

- o Another child's "medication logs documented pill counts for a Seroquel prescription for August 27 – 30 as: 9, 8, 6, 5." (*Id.* at 13.)

- o Another child's "August medication logs showed the pill count for a Remeron prescription was 25 on August 20, then 28 on August 23, without documenting any reason or correction of an error." (*Id.* at 13.)

- o Another child's "August medication logs showed the pill count for a Trileptol prescription was 23 on August 24, and 25, without documenting a reason." (*Id.* at 13.)

- o Another child's "September medication logs had irregular counts for a prescription for Intuniv. The child's prescription specified a one-milligram pill be given twice daily. The evening count for September 1 – 6 read: 8, 6, 4, 27, 26, 25. The morning count for the same dates read: 8, 7, 6, 3, 32, 30, 29." (*Id.* at 13.)

- At Paloma Place RTC, "three children did not receive medication because they were waiting for a refill of a prescription." (*Id.* at 13.)

- "At Moving Forward RTC, a child's prescription for Seroquel was increased from 50 mg to 75 mg when the child was hospitalized. When the child returned to the RTC, the RTC continued to administer the medication at a lower dosage." (*Id.* at 13.)

- "At Helping Hand Home, the medication logs were prefilled and initialed and did not include medication counts, making it impossible to determine whether the medications were being administered as prescribed." (*Id.* at 14.)

- And at "Open Arms, Open Hearts, a staff person reported that she distributed morning medications that are prepared for her by another staff person who completes the

medication logs." (*Id.* at 14.) The records "confirmed that the awake-night staff person's initials were not on the medication logs for children's morning medications." (*Id.* at 14.)

When asked about the foregoing medication administration and log errors, Doctor Bellonci opined that given the risks described above, such errors are "not good for children's mental" or "physical health"; they "absolutely" "present a substantial risk to the children of great emotional and physical harm." (D.E. 1489 at 83:8–16.)

And Ms. Dionne reported that medication interruptions are the norm for some of the State's most vulnerable children—those placed in CWOP. She explained that when children arrive at a CWOP Setting, "[t]hey never come with their medication. The RTC doesn't give it to them. The caseworker doesn't pick it up." (D.E. 1488 at 164:8–9.) Later, she elaborated:

> Q. Are any of the children that you have represented, to your knowledge, that were put into these CWOP, these unregulated placements, were any of them not on psychotropic medications?
> A. I mean, there's many that aren't taking them. There are -- every single time a child comes to CWOP that I know about, it means that they have somehow, even though IMPACT exists, lost the ability to understand what medications they're supposed to have. They don't have their prescriptions with them. And so most of the time these are unmedicated children who have been medicated up until that point.
> Q. So they're supposed to be on medications --
> A. Yes.
> Q. -- but they -- their medications didn't transfer with them?
> A. Yes. And now they have to see a new doctor because they're in a new location in Texas.

(*Id.* at 178:2–17.) The Monitors' reports are consistent with Ms. Dionne's observations. For example, in an update to the Court regarding children placed in CWOP filed in January 2022 (D.E. 1171), the Monitors reported that "all the [five] children interviewed took prescription medications, however only one child reported receiving the medications every day as prescribed." (*Id.* at 9.) "One child reported being without a psychotropic medication after running out of the medication." (*Id.* at 9.) A second child "reported that they did not receive medication for three

days after arriving at the CWOP Setting." (*Id.* at 9.) And a third child "reported that she had been taking prescription medications for mood, anxiety, ADHD and sleep prior to arriving at the CWOP Setting, but had not been able to get in touch with her caseworker to schedule an appointment with a psychiatrist to get her prescriptions updated." (*Id.* at 9.)

During his testimony, Mr. Vercher asserted that his department "actually do[es] look for" medication errors, and that through such "internal monitoring"[78] his department has issued citations and put corrective actions in place. (D.E. 1487 at 357:5–25.) He further asserted that "multiple operations" were on corrective actions, and so were subject to "monitoring throughout the whole year." (*Id.* at 358:13–15.) Yet he could not explain why some of these operations continued to make medication errors after having been cited "for the same or similar errors." (*Id.* at 358:16–359:1.) He did, however, accept that his department's monitoring may not be working. (*Id.* at 359:4–8 ("THE COURT: You see . . . what the concerns are? THE WITNESS: Yes, Your Honor. THE COURT: So your monitoring is not -- is not working. That's a possibility. Do you understand? THE WITNESS: I understand.").)

Perhaps the frequency of medication errors is due to another problem identified by the Monitors in their March 2023 report: that PMC children frequently have invalid medical consenters. (D.E. 1337 at 14.) Under Texas law, "[m]edical care may not be provided to a child in foster care unless the person authorized by this section has provided consent." Tex. Fam. Code § 266.004(a). Texas law also specifies the persons who can be authorized to provide consent: either (1) "an individual designated by name in an order of the [Texas state] court, including the child's foster parent"; or (2) DFPS "or an agent of" DFPS. *Id.* § 266.004(b).

---

[78] So phrased to distinguish it from work done by the Monitors.

Consistent with the Family Code, DFPS policy provides that when a child is placed in a GRO, "DFPS must designate the DFPS caseworker or Single Source Continuum Contractor (SSCC) equivalent as medical consenters for children in residential facilities with shift staff, unless another appropriate designee can be found, such as an involved relative or a Court Appointed Special Advocate (CASA)." DFPS, CPS Handbook § 11113.1, *available at* https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_pg_x11000.asp#CPS_11113_1. DFPS policy also provides that DFPS "must not designate shift staff employees" at GROs "as a child's medical consenter or backup medical consenter." *Id.* § 11113.1.

Yet the Monitors reported that for some children, "a staff member at the RTC where the child was placed had been named as a medical consenter, contrary to DFPS published policy." (D.E. 1337 at 14.) For example:

- "At Gold Star Academy . . . one PMC youth's site records showed DFPS designated an employee of the RTC as the child's backup medical consenter, in violation of DFPS policy." (*Id.* at 15.)

- "At Silver Lining RTC, DFPS forms in the PMC children's site records showed DFPS appointed the RTC's administrator or another staff member as the children's primary and/or backup medical consenter." (*Id.* at 15.)

- "At Moving Forward RTC, DFPS designated one of the facility's controlling persons as the primary medical consenter for two of the four PMC children. A DFPS form for a third PMC child was signed by DFPS staff as the primary and second primary medical consenters but was signed by the same controlling person for the facility as the backup consenter." (*Id.* at 15.)

- "At Open Arms, Open Hearts RTC, though the monitoring team found medication consent forms in all the PMC children's site records, the facility's director, and program director were named as second primary medical consenters for two of the PMC children. However, during interviews, both said they asked that DFPS be designated as both the primary and backup consenters, but that DFPS failed to respond." (*Id.* at 15.)

At the hearing that followed the filing of this report, Commissioner Muth assured the Court that "we went and pulled all of the children that are in RTCs and insured that they have appropriate medical consenters." (D.E. 1347 at 20:20–21.) She clarified that this was done "not just for the facilities that are in this report, but for all RTCs. And we've put in a process that we will ensure compliance on an ongoing basis." (*Id.* at 21:1–4.) But, even after Commissioner Muth's assurances, the Monitors continued to observe that children had invalid medical consenters. (*See* D.E. 1365 at 90:2–8.)

The Monitors also reported "several instances in which the child's psychotropic medications had changed after being placed at the facility, but where the site records did not include the appropriate consent form" (D.E. 1337 at 14):

- "At Guiding Light RTC, site records for four of the PMC children were missing consent forms for psychotropic medications prescribed after the child was placed at the facility." (*Id.* at 14.)

- "At Camp Worth RTC, site records for three PMC children whose medications changed after placement were missing signed medication consent forms." (*Id.* at 14.)

- "At Gold Star Academy, site records for two of the PMC children were missing medication consent forms." (*Id.* at 15.)

- "At DePelchin, psychotropic medications for two children changed after they were placed at the facility; their site records did not include a signed consent form for the new medication. One of these children had been prescribed a new antipsychotic medication, and the new medication was causing extrapyramidal symptoms (EPS) that her prior antipsychotic medication did not cause." (*Id.* at 15.)

- At Silver Lining RTC, "six of the PMC children had a medication change after being placed" there, but "a psychotropic medication consent form was not in their site records." (*Id.* at 15.)

That children in these facilities are being given these powerful medications at the behest of staff suggests that the medications are being used merely to make the children more compliant. For example, it is difficult to understand Ms. Juarez's experience with psychotropic medications— the somnolence the medications induced, the insistence by her caregivers that she continue taking them regardless, and her success after cessation, *see infra* page 112–14—as anything other than behavioral control.

And the Court heard similar experiences recounted at trial. Former PMC child Kristopher Sharp testified at trial that, while he was at an RTC called "Lamar Village," he was on "lots of medications. I -- I've been told that I have lots of things. I was bipolar, schizophrenic and ODD, as every foster child does apparently." (D.E. 325 at 177:22–24.) Mr. Sharp was of the belief that the diagnoses and medication were "just remedies to, I don't know, I guess get me to behave." (*Id.* at 178:5–6.)

Former PMC child Jordan Arce likewise testified at trial, of his placement at one GRO (D.E. 324 at 51:24–52:3), that "a lot of" the children at the facility "have behavioral issues" and were "on medications" (*id.* at 56:1–4). He noted that many of the children at the facility were between

109

ten and fourteen years old, and that "it just seemed like a lot of them were on medication and needed like special needs like that." (*Id.* at 56:10–12.) And former PMC child Crystal Bentley testified at trial that children "being overly medicated" is "a really bad problem, especially in RTCs." (*Id.* at 68:19–20.)

And at the Contempt Hearing, Doctor Bellonci noted that caregivers are faced with the temptation of using psychotropic medication to deal with challenging behaviors:

> Some of the drivers of utilization of medication are the folks who are in the trenches caring for these children. Sometimes these children can be quite challenging, and the hope is that the medication can help to address those challenges and challenging behaviors.

(D.E. 1489 at 32:20–24.)

### 4. *Inadequate monitoring of side effects*

Once a prescription is written, the child's caregivers have a vital, ongoing role in keeping that child safe. First, Doctor Bellonci explained, the caregiver should be told what to be "looking for in terms of" benefits, the timeline in which those benefits should become apparent, possible side effects, which side effects might be transient, and how to manage side effects if they do appear. (D.E. 1489 at 46:3–6.) The caregiver should be apprised of what is known and not known about the medication. (*Id.* at 46:7–8) And the caregiver should know "how to ensure or help the child to understand that the medicine isn't controlling them, that they're still in control and responsible for their behavior, but the medicine may help them to make better choices" (*id.* at 46:10–13); doing so is important to protect the child's sense of agency and bodily integrity (*id.* at 46:15–17 ("I worry sometimes about the sense of agency for a child welfare youth, and by that I mean their sense of autonomy over their bodily integrity and over their control.")).

Doctor Bellonci also stressed that regular laboratory tests and blood pressure checks are a "critically important" part of "monitoring for side effects." (*Id.* at 55:13–14, 21–23.) This is particularly true "[w]ith the antipsychotic medications" as "they can cause significant weight gain

in children. 20, 30, 40 pounds." (*Id.* at 155:15–17.) Because this raises "concerns about diabetes" and "heart disease," children who are on antipsychotics must have their glucose and lipid levels regularly monitored.[79] (*Id.* at 155:10–12, 156:15–16.) Thus, it is unsurprising that one of the red flags indicating the need for a PMUR is "Antipsychotic medication(s) prescribed continuously without appropriate monitoring of glucose and lipids at least every 6 months." (PX 10 at 11.)

But PMC children on antipsychotics are not consistently having their glucose and lipids monitored, a fact of which the State is well aware. As Doctor Van Ramshorst explained:

> THE COURT: . . . . Do you have anything to do with the quality of the medical care provided to these foster children?
> THE WITNESS: Yes.
> THE COURT: What is it?
> THE WITNESS: We track a variety of quality metrics for our managed care organizations in all of our --
> THE COURT: What are they?
> THE WITNESS: We use a variety of metrics to include HEDIS metrics,[80] which is Health Effectiveness Data Information Set, tracking things such as well child visit rates, immunization visit rates, metabolic monitoring for children on antipsychotic medications, and a variety of other measures.
> THE COURT: Okay. Well, you know that the metabolic studies are not being done for everybody on antipsychotics. Did you know that?
> THE WITNESS: Your Honor, I'm aware that they're not being done on all children.

(D.E. 1489 at 173:5–22.) He then reaffirmed that "the data indicates that the metabolic studies are not being ordered . . . every time they're needed." (*Id.* at 175:15–18.) And while Doctor Van Ramshorst recognized that "it is important" to "have this blood work done" (*id.* at 174:3–6), he

---

[79] The witnesses referred to laboratory studies measuring glucose and lipid levels collectively as "metabolic monitoring."

[80] Per the Department of Health and Human Services, HEDIS "is a tool used by more than 90 percent of U.S. health plans to measure performance on important dimensions of care and service. More than 190 million people are enrolled in health plans that report quality results using HEDIS. . . . Because so many health plans use HEDIS and because the measures are so specifically defined, HEDIS can be used to make comparisons among plans." *Healthcare Effectiveness Data and Information Set (HEDIS)*, Dep't of Health & Human Servs. (last visited Apr. 4, 2024), https://health.gov/healthypeople/objectives-and-data/data-sources-and-methods/data-sources/healthcare-effectiveness-data-and-information-set-hedis.

could not explain how HHSC is going to correct this. Instead, he offered that "Superior HealthPlan is working with those providers to provide education."[81] (*Id.* at 173:25–174:2.)

And when children raise concerns about the side effects of their medications, the concerns are ignored. Ms. Juarez's experiences with psychotropic medication poignantly illustrate this problem. Her Permanency Conference Plan, dated May 12, 2021 (PX 105) stated that she "is in 8th grade; however, she has missed a lot of school" (*id.* at 3).

> Q. And why were you missing a lot of school?
> A. Because I was sleepy.
> Q. Because you were sleepy?
> A. Yes.
> Q. And why do you think you were sleepy?
> A. Because they had me on a lot of medications.
> Q. How many pills were you taking every day?
> A. I don't remember, but at one point I was taking eight pills.

(D.E. 1487 at 269:1–9.) As noted above, Ms. Juarez was being given Albuterol, Xulane, Lithium, Latuda, Prazosin, Keppra, Vistaril, Benadryl, and Melatonin. (PX 105 at 4; D.E. 1487 at 274:23–24.)

> Q. . . . . How did they make you feel, Jackie?
> A. They would make me sleepy, and I would throw up every night because of the medication. I would feel always tired. And when I went to school, I – I would stay focused, but then my whole mood would drop. I would feel so tired that I couldn't stay awake.

(D.E. 1487 at 275:7–12.)

Ms. Juarez raised concerns about the medications and their side effects several times, but they were brushed aside:

> Q. Did you ever complain about getting all this -- all these powerful drugs?
> A. Yes.
> Q. And who did you complain to?

---

[81] When asked why HHSC continues to contract with Superior despite knowing that metabolic monitoring is not regularly being conducted, Doctor Van Ramshorst explained "we feel that largely Superior HealthPlan is doing a good job" (D.E. 1489 at 176:7–11), and opined that "it's difficult to achieve 100 percent compliance on any of those metrics" (*id.* at 177:14–15). Unsurprisingly, he could not recall the actual compliance rate: "I don't have the benchmarks off the top of my head." (*Id.* at 177:18–19.) He did, however, know that the benchmarks "are reported" (*id.* at 177:19) which begs the question why he failed to familiarize himself with them before testifying.

A. My -- the person who was taking care of me, whichever person was taking care of me. Even I told caseworkers at CWOP.

Q. And what would they -- what was their answer to you when you said, "These medicines make me feel terrible"?

A. "That's what they prescribed you. That's what you have to take."

THE COURT: Did you ever see a prescribing physician?

THE WITNESS: Yes.

THE COURT: How many times, do you remember?

THE WITNESS: Once a month.

THE COURT: Okay.

BY MR. YETTER:

Q. You saw a doctor, and did you complain to the doctor?

A. Yes.

Q. What did the doctor say?

A. "You need them."

. . . .

A. . . . . And I would just go in his office for like ten minutes, and he would prescribe the medication. And he would just ask me how you've been in the week, and I would tell him I'm okay. And he was like, "Are the medicines good for you?" And I was like, "No, they're making me tired." He was like, "Give them time." And I went three years by them telling me, "Give them time. Give them time." And they would still give them to me.[82]

(*Id.* at 276:8–77:21.)[83]

Further, she was not consistently taken to appointments by the same person. At times, she would be taken by "[t]he foster moms or the people who were in charge of me." (*Id.* at 278:16.) "And sometimes when I didn't have a place to go to, it would be my caseworker." (*Id.* at 278:17–18.) Perhaps this is why nobody appeared to question her medication regimen:

Q. Ms. Juarez, when you were taking all of these medications, did anyone ever stop and say, "Does she need all of these drugs?"

A. No one ever questions the medications.

Q. Who -- who -- did anybody at CPS or at the State of Texas ever tell you to stop taking all the medication?

A. No.

---

[82] Ms. Juarez recalled that the prescriber was a "Dr. Ten," whose office is in Houston close to Bissonnet Avenue. (D.E. 1487 at 278:1–11.)

[83] Doctor Bellonci stressed that the child taking the medication should be informed about its benefits and side effects. "Ultimately the choice is theirs." (D.E. 1489 at 46:13–14.) Had he been Ms. Juarez's psychiatrist, he would have listened to her concerns. (*Id.* at 46:25–47:1.)

(*Id.* at 280:13–19.)

After she aged out of the foster care system, Ms. Juarez stopped taking the medications. (*Id.* at 270:1–2.) Almost immediately, she saw dramatic improvements in her mood and mental acuity:

> THE COURT: How -- tell me the difference in your mental capacity, in your mental feelings now that you're off these medications.
> THE WITNESS: I feel happy. I'm able to process things more. I do a lot of things. I'm not tired. I am able to focus more on, you know, like sports and art, reading and school.
> THE COURT: So it's easier to do your schoolwork?
> THE WITNESS: Yes.
> THE COURT: Are you going to organized classes?
> THE WITNESS: Yes.
> THE COURT: And you're able to follow along and do the homework?
> THE WITNESS: Yes.
> THE COURT: Could you do that before with all those medicines?
> THE WITNESS: No.

(*Id.* at 278:22–279:13.) Indeed, Ms. Juarez recently passed the GED exam, earning the highest score in her class. (*Id.* at 279:21–280:6 ("I'm the youngest one there, and I'm the one that got the high score.").)[84]

Beyond making it quite apparent that Ms. Juarez's medication regimen was both unnecessary and detrimental, her testimony also suggests that nobody provided informed consent. Doctor Bellonci explained that the role of a physician is to summarize his medical knowledge and assessment of the patient, in order to help the consenter come to an informed decision. (D.E. 1489 at 84:3–5.) But the physician does not "get to make informed consent decisions for children," or decide "whether or not a child is going to take a medication." (*Id.* at 85:20–21, 83:23–24.) Clearly, that is not what happened here—Ms. Juarez's doctor decided that she "need[ed]" the medications, and kept her on them for three years. (D.E. 1487 at 277:2.) Thus, Ms. Juarez's experience

---

[84] The Court heard a nearly identical story at trial from Kristopher Sharp, who was in the Texas foster care system from the age of ten until he turned eighteen and aged out. (D.E. 325 at 163:19–164:4.) While in the foster system he was diagnosed with bipolar disorder, schizophrenia, and oppositional defiant disorder, and was on "lots of medications." (*Id.* at 177:22–24.) After aging out, Mr. Sharp was told by a psychiatrist to stop taking the medications. (*Id.* at 178:10–13.) Mr. Sharp did not believe he ever had any of the psychiatric disorders for which he had been medicated. (*Id.* at 178:14–17.)

evidences "why foster youth have to have a different level of oversight and monitoring than youth who have engaged and involved parents outside of the foster care system." (D.E. 1489 at 86:9–11.)

### 5. *Inadequate medication storage*

State law and DFPS policy require medications to be stored in secure, locked containers. (*See* D.E. 1132 at 97; 26 Tex. Admin. Code §§ 748.2101, 749.1521.) The Monitors have reported, however, that this often does not occur in practice. In one of their updates to the Court regarding children placed in CWOP, the Monitors reported:

> During site visits, the monitoring team observed several instances of medication left outside of a locked box or file cabinet, found unlocked medication storage boxes, and also found examples described in daily logs for CWOP Settings either of children breaking into locked file cabinets and accessing medication, or of children stealing the key to the locked file cabinet and accessing medications. During an interview, one DFPS staff person who provided supervision at a hotel noted that, because there was no place to lock medications in the hotel rooms, children's medications were kept in a bag next to the staff.

(D.E. 1132 at 97.) And at one site, the Monitoring team observed "a bag of prescription medications sitting on a dresser in the living area . . . next to the large stuffed Teddy bear." (*Id.* at 98.)

The Monitors also summarized "Serious Incident Reports reviewed by the monitoring team [that] . . . documented problems":

> One Serious Incident Report reported that when staff attempted to retrieve a youth's medication, the medication was not secured . . . [and] that a youth was allowed to follow the staff into the room where the medication was kept, and grabbed a bottle of Ibuprofen before the staff person could stop her.
>
> Another Serious Incident Report indicated that children's medications were found in an unlocked box. . . . In another Serious Incident Report, a note indicated that the key to the cabinet holding medications was "lost," and another Serious Incident Report reported that two children were missing medications that staff were working with pharmacies to try to fill.

(*Id.* at 98–99.) And in a particularly blatant breach of medication security, a TMC child "was able to obtain her own prescription medication from her locked medication box because, days before the incident took place, while staff were in the children's presence, the staff had called out the code ('1,2,3') for the lock on the box containing the key to the medication box. The child ingested her own anti-seizure medication in her bedroom after taking it out of her locked medication box without staff noticing." (*Id.* at 99 n.173.)

In another report, the Monitors recounted that when their team visited a CWOP Setting in Belton, "the locks to the cabinets where medicine was stored seemed to be faulty or broken." (D.E. 1171 at 16.)

In other cases, there is a failure to secure a child's medication when the child arrives at a new placement. The Monitors note one DFPS investigation in which a child arrived at a "CWOP location with her belongings, including prescription and over-the-counter pain medications, after a visit with her family." (D.E. 1318 at 51.) "[T]he staff member greeted the child and took her photograph and temperature as required," but "did not attempt to locate or secure the child's medications from her belongings before leaving the child alone in the bedroom to unpack. Shortly thereafter, the child ingested her pills." (*Id.* at 51–52.)

And in still other cases, medications could not be retrieved from storage when they were needed. For example:

> During one site visit, the monitoring team observed staff unable to access needed medications because a staff person who supervised children during the previous shift left with the key to the locked file cabinet where the medication was stored. Staff who supervised children at a hotel site reported storing the children's medication in the trunk of their cars; one staff person left a shift without removing the medication from their car's trunk.

(D.E. 1132 at 98.)

*     *     *

The State's disregard for the enforcement of its own safety parameters (*i.e.*, PMURs), and its failure to adequately monitor and record the administration of medications, the refilling or discontinuation of medications when ordered, and the keeping medications properly stored, create an unreasonable risk of serious harm for PMC children in care.

The State's inconsistent enforcement of its own safety parameters and minimum standards related to adequately monitoring and recording the administration of medications, the refilling or discontinuation of medications when ordered, and keeping medications properly stored, create an unreasonable risk of serious harm for PMC children in care and implicate compliance with the Court's orders related to monitoring and oversight, particularly Remedial Orders 3 and 20. The Court carries forward the Contempt Motion on this issue.

## C.  The CWOP crisis

Children placed in CWOP suffer some of the worst abuses in the Texas foster care system. The DFPS caseworkers forced to work overtime to supervise them are not permitted to intervene in fights, make them go to school, or even make them stay in the placement. Thus, the children beat each other, they fall behind academically, and they come and go from the CWOP Settings as they please. While on runaway, the children obtain drugs, alcohol, and tobacco; many of the girls are sex-trafficked, both within Texas and to other states; and some of the children have been killed.

Further, the caseworkers forced to take CWOP shifts rarely have the training needed to care for the children—many of whom have specialized behavioral needs—and lack any support from those who do. So, when these children act out, the CWOP workers are unable to handle them. Instead, the CWOP workers often rely on private security guards, hired by the State to oversee CWOP Settings, to control the children. And because CWOP Settings are "not . . . licensed, regulated placements" (D.E. 1487 at 285:11–12 (testimony of Associate Commissioner

Banuelos)), the children held in these Settings lack protections they would be afforded elsewhere.[85] Thus, the guards handcuff, pepper spray, and taser the children—none of which would be permissible were the same children in a licensed setting. Other times the CWOP workers call police, and the children are arrested and jailed. In sum, CWOP is a danger to the children.

The CWOP crisis also harms caseworkers, who are forced to work long overtime shifts supervising CWOP Settings. Because the State provides neither appropriate training nor support, some caseworkers have been assaulted by the children they are charged with supervising. Many caseworkers fear for their safety when working CWOP shifts. And because CWOP overtime amounts to a very stressful part-time job, caseworkers are less able to care for the children on their own caseloads. As a result, the CWOP crisis is contributing to a distressingly high burnout and turnover rate among caseworkers.[86]

In short, CWOP "serves nobody" (D.E. 1488 at 221:20–21), a fact that Commissioner Muth apparently realized shortly after her appointment. Ms. Reveile testified that she gave Commissioner Muth "a tour around the office. She actively asked for everybody's concerns. . . . [A]lmost everybody that I introduced her to brought up concerns with CWOP about how unsafe and unregulated it was and just how bad it was. And every single time she would say, 'I agree. CWOP is bad, and I'm going to get rid of it. . . .'" (D.E. 1487 at 215:2–16.) Commissioner Muth agreed that CWOP "wasn't safe for anybody"—either the children or the caseworkers—and "said

---

[85] It should be noted, however, that the minimum standards for childcare providers apply whether or not the provider has obtained a license (D.E. 1488 at 157:22–158:1 (per Ms. Dionne)), unless the operation or provider is exempt according to Tex. Hum. Res. Code § 42.041. *See* 26 Tex. Admin. Code § 745.39 ("Does Licensing regulate state agencies that run child-care operations? . . . **Yes.** While state agencies that run non-exempt operations do not have to obtain a license from us, they must obtain a certificate. We will monitor the operation on a regular basis for compliance with minimum standards."); *see also id.* §§ 746.111(2), 747.111(2), 748.3(b).

[86] The impact of CWOP on caseworkers is discussed later in this Order. *See infra* page 242–65.

she was going to end CWOP."[87] (*Id.* at 216:8–10.) And she could hardly conclude otherwise, given that the State is spending $17 million annually to place private security guards at CWOP Settings.[88]

It is not just Commissioner Muth who knows that there are serious safety problems with CWOP. In September 2023, three Texas state court judges held a meeting to discuss their own concerns about sex trafficking of girls placed in CWOP. (*See* D.E. 1488 at 179:10–180:9.) The meeting was attended by several DFPS executives[89]—Staci Love, Marta Talbert, Lindsey van Buskirk, Jennifer Sims, and Erica Banuelos—as well as numerous stakeholders, including Ms. Dionne, with "probably hundreds of years of collective child welfare experience." (*Id.* at 180:10–181:16, 184:22–23.) Based on their statements at the meeting, there was "no question in [Ms. Dionne's] mind" that the DFPS executives knew CWOP was unsafe for the children (*id.* at 190:3–6): "They are completely aware. They talk about it all the time" (*id.* at 190:7–8). They were also aware that CWOP was a danger to caseworkers. (*See id.* at 189:23–190:1.) And Staci Love conceded that the CWOP Settings failed to comply with the State's minimum standards. (*Id.* at 189:1–5.)

Though it seems apparent to all involved that CWOP has "got to go" (*id.* at 277:2), there is little evidence that the State has made any progress. To the contrary, Ms. Carrington testified that CWOP has "[h]ijacked DFPS." (*Id.* at 210:11.) "[I]t runs side-by-side with the daily activities of

---

[87] When the Court asked about her interactions with Ms. Reveile, Commissioner Muth was able to recall that she "did a ride-along with her and listened to concerns from staff in the office." (D.E. 1487 at 219:13–15.) When asked about her statements regarding CWOP, Commissioner Muth stated "I believe what I said was I was working to end CWOP. I did not make a promise, and talked about some of the initiatives that we had, yes." (*Id.* at 219:17–19.) She also recalled telling Ms. Reveile that CWOP "is not the right thing for the kids in our care and that we were working to find placements and that it's not ideal for our staff as well." (*Id.* at 219:21–23.)

But when the Court asked Commissioner Muth if she told Ms. Reveile that CWOP is unsafe, her memory failed: "COMMISSIONER MUTH: Did I tell her it was unsafe? I don't recall." (*Id.* at 219:24–220:1.)

[88] *See infra* page 227–33.

[89] The judges wanted Commissioner Muth to attend the meeting, but she did not show up. (*See* D.E. 1488 at 180:12–18.)

caseworkers, kinship workers across the board. So everyone has to work CWOP. *It is now an essential job function*." (*Id.* at 210:15–17 (emphasis added).)

As faulty as the monitoring and oversight in licensed settings has been, CWOP Settings lack even flawed monitoring and oversight. CWOP Settings are not held to any minimum standards, and there is no investigation of minimum standard violations to ensure that basic safety measures are being followed. There is no contract, so DFPS is not overseeing contractual provisions related to safety and appropriate care—including contractual requirements related to medical and mental health care. And while allegations of abuse, neglect, and exploitation are (sometimes) reported to DFPS, those allegations rarely result in the kind of investigation one would see in a licensed setting. And DFPS is understandably (and appropriately) reluctant to substantiate findings against its own caseworkers, who are not trained as licensed caregivers for residential settings.

The State has finally started meaningfully enforcing its standards for licensed facilities, resulting in revocation of licenses and closure of facilities where children were repeatedly subjected to abuse, neglect, and exploitation. But, rather than working toward opening new, safe, licensed operations for children—for which the State knew it did not have sufficient placements, even before these closures—it resorted to placing more children in unlicensed settings where there are no real rules. Further, the only monitoring and oversight in these settings, does not result in meaningful action: Serious Incident Reports and shift log notes are created, but they merely document the serious problems that exist in CWOP Settings without serving as a meaningful tool toward improving them. There is no consequence to exposing children to ANE in CWOP Settings.

### 1. *Background*

CWOP Settings originally included DFPS offices but, effective June 14, 2021, this was prohibited by legislation.[90] *See* 2021 Tex. Sess. Law Serv. Ch. 621 § 3 (adding § 264.1071 to the Texas Family Code, which provides that "The department may not allow a child to stay overnight at a department office"). Now, CWOP Settings consist of motels, rented duplexes, and other rented homes.

The Monitors first discussed the CWOP problem in 2021, when they "learned that PMC children categorized by DFPS as Children Without Placement (CWOP) are being housed in unlicensed settings." (D.E. 1066 at 1.) Further investigation revealed that a shortfall in licensed placements has existed since at least 2007—a DFPS report published in 2008 noted that the Department "began tracking the number of youth without placements in January 2007. Prior to January, youth were known to stay overnight in offices on occasion, but the increasing occurrences led DFPS to develop a centralized database in order to determine the scope of the issue." (D.E. 1132 at 11 n.23 (citation and quotation marks omitted).) "This report noted that 32 youth stayed overnight in a CPS office or other location in January 2007 and that the 'placement challenge peaked in the month of May 2007 with 160 youth spending at least one night in an office.'" (*Id.* at 11 n.23 (DFPS, Moving Foster Care Forward (2008)).) In other words, the State was aware of this problem no less than three years before this litigation commenced. (*See* D.E. 1 (filed Mar. 29, 2011).)

---

[90] The Monitors report that despite this legislation, DFPS continued using its offices to house children placed in CWOP until March 2022. (D.E. 1425 at 8 n.18.)

The Court notes that this did not reduce the number of children placed in CWOP; it instead reallocated them to other CWOP Settings, particularly to hotel CWOP Settings. (*Compare*, *e.g.*, D.E. 1132 at 11 fig. 7 (showing that, for the period of January 1 to June 30, 2021, 56 percent of the 749 spells in CWOP were in a CPS office and 15 percent were in a hotel), *with* D.E. 1425 at 9 fig. 7 (showing that, for the period of January 1 to August 31, 2023, 78 percent of the 928 spells in CWOP were in a hotel).)

And more recent State publications showed that the problem had not been rectified. As the Monitors noted in September 2021:

> Since at least 2017, DFPS has produced an annual report documenting the capacity needs of the Texas foster care system. In each of the reports published since 2017, DFPS has documented a capacity shortfall, particularly for children whose treatment needs place them in the Specialized or Intense level of care. In January 2017, DFPS noted "DFPS is experiencing difficulty securing and maintaining placement resources for children. By July 2019, the same month the Fifth Circuit issued its mandate in this case, DFPS noted a need for, "[m]ore foster home capacity across the state for: youth 14 and older with basic and moderate service levels; for all higher needs children and youth; and in rural areas, capacity for all ages and services levels." In the report that DFPS released in November 2020, it noted that there "is still a need" to build capacity in these areas.

(D.E. 1132 at 11–12 (footnotes omitted).) Though DFPS's own publications "document an historical and ongoing problem with capacity, particularly for children with a high level of care," the State attributed the reliance on CWOP Settings "to a number of different causes, none related to failures associated with DFPS's statutory and constitutional responsibility to ensure that the system's capacity provides for safe placements that do not expose children to an unreasonable risk of serious harm." (*Id.* at 12.)

Shortly before the Contempt Hearing, the Monitors filed a report quantifying the number of PMC children in unlicensed placements in each month from April 2020 to October 2023. (D.E. 1462 at 1–3.) The data indicate that the number of PMC children placed in CWOP was low until the end of 2020, then rose rapidly in the first half of 2021 and peaked in the Summer of 2021 when there were over 100 PMC children placed in CWOP per night. (*Id.* at 2–3.) By January 2022, that number had dropped to around sixty children placed in CWOP per night, where it has held steady ever since, according to the State. (*Id.* at 1–2.)

Information that came to light after the Contempt Hearing indicates that the numbers reported by the Monitors are likely inaccurate, as the State does not report children as in CWOP on the day they arrive, leave, or are on runaway status—this despite the fact that they are still PMC children

under the care of the State, and they are still without licensed placement on those days. (*See* D.E. 1543 at 43–44.) Therefore, the true number of children placed in CWOP is higher.

Specifically, on February 21, 2024, the Monitors filed an update discussing Defendants' failure to provide the Monitors with certain records related to children placed in CWOP. (*See* D.E. 1521.) The Monitors noted that a PMC child placed in a Waco CWOP Setting ran away from the placement on February 5, 2024, and returned the next day. (*Id.* at 5.) When the Monitors "checked the shift logs that DFPS had produced for February, they found that DFPS had produced shift logs for the PMC child for February 4, 2024 (the day before she ran away) and February 7, 2024 (the day after she returned), but not for February 5, 2024, and February 6, 2024. The Monitors reviewed the missing child log in the PMC child's IMPACT records and confirmed that the children left the CWOP setting at 11:08 pm on February 5 and that the PMC child returned at 3:11 pm the next day, leaving no doubt that shift logs should have been completed for both days." (*Id.* at 5.)

On February 23, a hearing was held to discuss this issue and others identified in the Monitors' update. (*See* D.E. 1543 (transcript of hearing).) During the hearing, DFPS Deputy Commissioner Audrey O'Neill testified that this child was not counted as being in CWOP on the day she ran away or the day she returned:

> MR. YETTER: Ms. O'Neill, did you count this child who spent 23 hours and eight minutes in a Child Watch, so called CWOP location and then ran away, did you count her as being in CWOP that day . . . ?
> MS. O'NEILL: We counted -- I want to be very specific in my answer. We counted her on the 4th. We did not count her on the 5th or the 6th. We counted her on the 7th.

(*Id.* at 43:4–11.) The Court thus concludes that all CWOP numbers provided to the Monitors, and hence, to the Court, are unreliable and inaccurate. Therefore, all CWOP numbers quoted by the Monitors supplied by the State are clear undercounts. This applies to all CWOP numbers subsequently used by the Monitors referenced in this Order.

CWOP is meant to be a short-term placement: As explained in a document titled "Children Without Placement" (D.E. 1130 at 1), filed by Defendants in September 2021, some youth "receive temporary emergency care (referred to as 'child without placement,' or 'CWOP') until a licensed, appropriate placement can be secured." (*Id.* at 5.) The document later reiterates that CWOP is meant to provide "temporary emergency care" and, further, describes CWOP as a "last resort." (*Id.* at 8.) Indeed, the document refers to CWOP as "temporary" eight times. (*See id.* at 5, 8 & n.5, 9.)

And the statutory authorization for CWOP twice specifies that it is "temporary." *See* Tex. Fam. Code § 264.107(g)[91] ("If the department or single source continuum contractor is unable to find an appropriate placement for a child, an employee of the department or contractor who has on file with the department or contractor, as applicable, a background and criminal history check may provide *temporary* emergency care for the child. . . . The department or contractor shall provide notice to the court for a child placed in temporary care under this subsection not later than the next business day after the date the child is placed in *temporary* care." (emphasis added)).

But the Monitors report that a placement in CWOP is not necessarily short-term: Of the 465 PMC children discussed in their October 25, 2023 report, "The average number of nights without licensed placement per PMC child (i.e., combining the length of all spells without licensed placement during the period) was 32 nights, with a maximum of 271 nights." (D.E. 1425 at 3.)

It is also noteworthy, the State refused to accept the recommendations of a panel of experts that it agreed to retain. "By the summer of 2021, . . . [t]here was broad agreement that the efforts to house and supervise" children placed in CWOP "were not working, and that a fresh, independent perspective on the problem was needed to develop actionable solutions." (D.E. 1166 at 2.) Thus,

---

[91] Defendants cited this provision of the Family Code as the source of the statutory authority. (*See* D.E. 1130 at 8 n.5.)

the parties "agreed to authorize a panel of independent experts, with experience in multiple states across the country and in transforming child welfare systems, to carry out an intensive, short-term assessment of the structure and operations of the Texas child welfare system and produce a report with actionable short-, medium- and long-term recommendations for reducing and ultimately eliminating the number of Children Without Placement." (*Id.* at 2.) The panelists were Ann Stanley (Managing Director at the Casey Family Programs), Paul Vincent (Director at The Child Welfare Policy and Practice Group), and Judith Meltzer (President at the Center for the Study of Social Work) (*id.* at 1; D.E. 1155 at 1), three of the country's top child welfare experts—Doctor Miller observed that there were no better experts in the country to handle this issue (D.E. 1488 at 278:13–17). And the panel was convened at no cost to the State; the entire cost being paid by Plaintiffs' private law firm counsel from a trust fund established for the benefit of the children.[92]

In November and December 2021, the panel "reviewed thousands of pages of documents and spoke[] to more than 30" stakeholders from across the Texas foster care system. (D.E. 1166 at 3.) In January 2022, the expert panel duly issued a report[93] making formal recommendations. (*Id.* at 3.) Doctor Miller agreed with the panel's recommendations and would have given Defendants the same advice. (D.E. 1488 at 277:15–20.)

After it reviewed their recommendations, "the State asked the Panel members to facilitate a working group that would tackle the communications, relationship and accountability issues raised

---

[92] (*See* D.E. 1153 at 1; D.E 1154 at 1; D.E. 1155 at 1 (setting forth remuneration for each panel member).)

The reason for the trust account also merits a brief explanation. In their first attorneys fee motion, private law firm counsel moved for just over six million dollars in fees, but asked "that the Court order the State to allocate $6,034,275.25 in new funding, which is the amount of reasonable fees for the work of the Class's private law firm counsel . . . to a program that benefits current or future Texas foster children, as recommended by the Monitors and approved by the Court." (D.E. 683 at 12.) But after the State misrepresented this position as a waiver of attorneys fees (*see* D.E. 709 at 4–5), Plaintiffs asked—and the Court agreed—that private counsel should hold its "earned and legally entitled fees" in trust for the benefit of the Plaintiff children, "to confirm that the funds are devoted to the benefit of present or future foster children" (D.E. 713 at 1, 2; D.E. 714).

[93] The Expert Panel Report was submitted as Plaintiffs' Exhibit 113.

in their report." (D.E. 1381 at 2.) The Panel members agreed and, after several productive working group meetings, they started drafting a second report. (*Id.* at 2–3.)

Then—without explanation—the State decided to "unilaterally releas[e] a modified" (and inferior[94]) "version of the [working group] report" without input from the Panel members. (*Id.* at 3.)

> For her part, Doctor Miller has never seen such recalcitrance from a child welfare agency:
>
> Q. Have you -- in your experience with Tennessee and Kentucky and other states that you've consulted with regard to child welfare reform, have you seen a state quite as resistant to actually fixing their child welfare system to make it safe for children as what we're seeing here in the state of Texas?
> A. No, I haven't. And that's -- that's the number one step, you know, to come clean, to say we've got a system that needs to be fixed and, you know, be willing to look inside yourself. And I don't see any evidence of that. And it's -- it's sad, because I know they know.

(D.E. 1488 at 281:17–282:1.)

Moreover, the State has consistently disclaimed responsibility for the CWOP crisis, claiming that the crisis is caused by factors beyond its control. In September 2021, for example, the Monitors noted that the State blamed the lack of licensed placements on COVID-19, the closure of unsafe facilities, the "displacement of foster children by unaccompanied migrant children in operations that contract with the federal government," and the implementation of heightened monitoring causing providers to stop serving foster children, or to serve only lower needs children. (D.E. 1132 at 12–13.) The State "also pointed to children's refusal of placements as a reason for the crisis," even as DFPS's own data showed that a "very low number" of children—"eight of 169, or 4.7%"—"had refused placement."[95] (*Id.* at 12 n.31.)

---

[94] "The principal omission in the report released by the State agencies was the discussion of the need for additional support by the State for technical assistance to the provider agencies that goes beyond technical compliance issues and offers help and guidance to providers in managing practice challenges that contribute to placement instability and children without placement." (D.E. 1381 at 3.)

[95] During interviews, the monitoring team asked children if they had ever refused a placement and, if so, why. (D.E. 1132 at 12 n.31.) Of the children who refused a placement, the reasons "included not wanting to move out of state, and not wanting to move far away from siblings or other family members." (*Id.* at 12 n.31.) Another reason for

The Monitors observed, however, that the State failed to provide "data or information that can be validated by the Monitors to substantiate these representations, apart from DFPS's statements regarding beds lost due to operation closures." (*Id.* at 13.) And the State's intimation that the remedial orders are to blame is belied by its own reports which, "since 2017"—one year before the remedial orders were entered and two years before the Fifth Circuit issued its mandate— "document an historical and ongoing problem with capacity, particularly for children with a high level of care." (*Id.* at 12.) Indeed, "The Monitors' analysis revealed the vast majority of 'lost' beds were in unsafe operations across Texas and were closed because of the State's action: either HHSC's decision to revoke or deny an operation's license because of serious safety problems, or DFPS's decision to cancel a contract for the same reason." (*Id.* at 13.)

> In all, more than 1,200 beds have closed in operations deemed so unsafe by either HHSC or DFPS that the State determined that revoking a license or ending a contract and removing children was the best option; more than 200 were eliminated from the system when operations with a serious history of safety violations voluntarily closed after being placed under Heightened Monitoring. These closures are appropriately linked to the State's implementation of the Court's orders in this matter and Texas's efforts to remedy the constitutional infirmities documented by the Court and validated by the Fifth Circuit. The Court found, and the Fifth Circuit agreed, that Texas's foster care system was unconstitutional due, in part, to the State's failure to appropriately monitor and enforce minimum standards, causing PMC children to be placed in settings that posed an unreasonable risk of serious harm. As the Fifth Circuit explained, Texas's lax enforcement created a system in which repeat violators were "not a new phenomenon" and "licensees do not perceive that they will be held accountable for their malfeasance." [*Stukenberg I*, 907 F.3d at 265.]

(*Id.* at 13.) It was, of course, unsurprising that such unsafe placements would close as the State implemented the Court's remedial orders; what was—and is—surprising is that "the State did

---

refusal was that "they had heard from other children who had unsafe experiences at the facility where the State wanted to place them, and they were afraid to go based on what they had heard about the placement." (*Id.* at 12 n.31.)

not"—and has not—"add[ed] adequate capacity in new, safe settings for higher-needs children, despite its own reports having for years identified a capacity problem."[96] (*Id.* at 13.)

## 2. *Children placed in CWOP have high needs, and CWOP workers lack the training to care for them*

By definition, children entering the foster care system are traumatized, both by the abuse, neglect, or exploitation that led to their removal and by the removal from their family itself. (*See* D.E. 1489 at 117:22–118:2 (testimony of Doctor Bellonci); D.E. 1487 at 287:12–288:5 (testimony of Associate Commissioner Banuelos); *see also* D.E. 1486-11 at 19 (2006 Strayhorn Report, noting that "Foster children are often prone to emotional problems, due to the dissolution of their families and the trauma they may have experienced due to neglect or abuse.").) Experts agree that, as a result, extreme behavior is to be expected. (D.E. 1489 at 117:24–25 (Doctor Bellonci asking, rhetorically, "which of these children don't have a behavioral health condition[?]").)

And children placed in CWOP have generally suffered more trauma than the typical foster child. As the Monitors explained in their first report on the topic, children placed in CWOP "typically have experienced multiple placements; frequently the children's mental health needs and underlying trauma have not been effectively addressed in the numerous placements that accepted them. Placement instability, unsafe placements that retraumatize children, and the chronic failure to meet children's behavioral health needs, contribute to, and in many instances, cause, the most commonly indicated characteristics or needs." (D.E. 1066 at 7–8.)

---

[96] In *Stukenberg I*, the Fifth Circuit addressed whether the State's placement array violated Plaintiffs' substantive due process rights. *See* 907 F.3d at 268–69. The Fifth Circuit's findings were limited to a review of whether a foster child had a substantive due process right to a placement that "maximize[s] foster children's personal psychological development," and whether they have a "right to a stable environment" or a right "not to be moved from home to home." *Id.* at 268.

The abuse, neglect, and exploitation that foster children are being exposed to by placement in CWOP Settings that are entirely unregulated is a far cry from "placement challenges related to ensuring a child's unique fit with a prospective placement." *Id.* at 268. Here, the question is not whether the placement array is sufficient for purposes of allowing children to be placed "in region, in a placement ideal for his service level and personal needs, or with his siblings when appropriate," *id.* at 268, but whether the State has any safe placement.

As a result, children placed in CWOP have "notably high assigned levels of care compared to the broader PMC population." (*Id.* at 10.) In their first CWOP report, the Monitors noted that "nearly half (45%, 138) of the children [placed in CWOP] . . . required a 'specialized' level of care, with 27% (83) needing 'intense' care, and 19% (58) requiring 'moderate' or 'basic' care." (*Id.* at 10.) In contrast, only 4 percent of all PMC children had an "intense" level of care, and just 15 percent had a "specialized" level of care; 58 percent of all PMC children had a "basic" level of care.[97] (*See id.* at 10 fig. 4.)

Subsequent reports paint a similar picture. For example, in September 2021, the Monitors reported that "nearly half (45% or 218) of the children without placement during this period required a 'Specialized' level of care, with 21% (104) needing 'Intense' care, and 24% (116) requiring 'Moderate' or 'Basic' care." (D.E. 1132 at 7.) Only 4 percent of all PMC children had an "intense" level of care, and just 16 percent had a "specialized" level of care; 59 percent of all PMC children had a "basic" level of care. (*See id.* at 8 fig. 4.)

The Monitors have also consistently documented that the great majority of children placed in CWOP are teenagers. (*See* D.E. 1066 at 7 (88 percent); D.E. 1132 at 5 (86 percent); D.E. 1319 at 4 (89 percent); D.E. 1425 at 4 (90 percent).)

Testimony at the Contempt Hearing was consistent with the Monitors' reports. Ms. Reveile explained that these children "[u]sually [have] very high needs. They'd experienced a lot of complex trauma in their lives and had had difficulties at previous placements and I guess were just

---

[97] DFPS publishes lengthy descriptions of each service level. *See* DFPS, Service Levels for Foster Care, *available at* https://www.dfps.texas.gov/Child_Protection/Foster_Care/Service_Levels.asp. But, in general terms:

- A child with a **basic** level of care may have "transient difficulties and occasional misbehavior," "but the behavior is considered typical for the child's age and can be corrected." *Id.*
- A child with a **moderate** level of care "has problems in one or more areas of functioning." *Id.*
- A child with a **specialized** level of care "has severe problems in one or more areas of functioning." *Id.*
- A child with an **intense** level of care "has severe problems in one or more areas of functioning that present an imminent and critical danger of harm to self or others." *Id.*

in between placements and needed a place to go." (D.E. 1487 at 197:10–13.) Ms. Pennington concurred that "the vast majority" of children placed in CWOP have "higher service needs," and thus "need specialized care from their caregivers." (D.E. 1488 at 32:21–24.)

And Ms. Dionne explained, based on her experience having represented or counseled dozens of children "that have gone through these CWOP operations," that many of them are placed in CWOP immediately after a traumatic event:

> Almost always when a child is appearing at CWOP, it is because something major has just happened to them and they need help in that moment. So imagine a child who's just attempted suicide and then they get put in this place instead of brought to a hospital or anything to help them.

(*Id.* at 166:6–10.)

The data bear out Ms. Dionne's observation. In October 2023, the Monitors reported that 928 CWOP spells were initiated between January 1 and August 31, 2023. (D.E. 1425 at 8 fig. 6 ("n=928 spells initiated in period").)[98] Of those, 238 spells were immediately preceded by a stay in a psychiatric hospital. (*Id.* at 8 fig. 6.) In other words, more than 25 percent of the time, children went directly from a psychiatric hospital to placement in CWOP. This is alarming because placement in a CWOP Setting is very likely to undo any progress the child made in the hospital. Ms. Dionne explained that "if you had a child in a treatment center who was going to school every day, and, you know, maybe still had those mental health issues but we were getting the routine going," and "the next stop is CWOP, we've lost all that progress." (D.E. 1488 at 165:13–18.)

Further, the Monitors reported that the great majority of the 465 children placed in a CWOP Setting between January 1 and August 31, 2023 had at least one treatment need: The three "most common corresponding characteristics or treatment needs that DFPS identified among [children placed in CWOP] were as follows: history of physical aggression (418 children, 90%); history of

---

[98] This figure was displayed at the Contempt Hearing as Court's Exhibit 2. (*See* D.E. 1486-2 at 1.)

mental health diagnosis (410 children, 88%); [and] history of psychiatric or mental health hospitalization (370 children, 80%).” (D.E. 1425 at 5.) “More than half of the children (252 or 54%) were identified as having all” three of these treatment needs. (*Id.* at 5.)

Yet there is a marked mismatch between the needs of the children placed in CWOP and the knowledge base of CWOP workers: The CWOP Settings are staffed by caseworkers who, as the Monitors noted in September 2021, “are not trained for the role of providing direct day-to-day care and supervision for children.” (D.E. 1132 at 77.)

> A common complaint among the DFPS staff who spoke to the monitoring team was frustration with what they described as inadequate training for the direct caregiver role that they were being required to provide, particularly for children who have high behavioral health needs. They frequently reported feeling ill-prepared to intervene when children acted out with each other or with staff, and noted that they had no training in the appropriate use of restraints, which is required of direct caregivers in other settings.

(*Id.* at 77.)

For example, CWOP workers are not trained in preventing self-harm. This is a particularly pernicious knowledge gap because:

> Many of the children who are without placement have been hospitalized for self-harm or suicidal ideation in the past. Despite the known histories of self-harm, many children are now being housed in settings where they have easy access to objects that may be common in office settings, but that can be easily used to self-harm or as part of a suicide attempt. During on-site visits, the monitoring team documented scissors left in unlocked drawers, a “sharps” box that contained used syringes, disposable razors left in showers or bathrooms used by the children, as well as more common office items (paperclips, tacks) that children could use to self-harm.

(*Id.* at 99.) While “direct care staff in treatment settings are typically trained to be aware” of these risks, CWOP workers are not. (*Id.* at 99.) Sometimes, as discussed later,[99] this lack of training can have disastrous results.

---

[99] *Infra* page 181–82.

Four months later, in January 2022, the Monitors reported that some progress was made in terms of training. (D.E. 1171 at 10.) Nonetheless, caseworkers placed in roles as caregivers continued to report inadequate training in areas like restraints, de-escalation and behavioral interventions, medication administration or management, supervision of children with histories of sexual abuse or aggression, and supervision of children with high mental health needs. (*Id.* at 10, 12.) Ms. Reveile explained that when she began working CWOP shifts in January 2022,[100] her training consisted of "one very general and broad online de-escalation training" and some tips from her mentor. (D.E. 1487 at 196:17–25.)

The Monitors' October 2023 update documented more of the same. "Interviews with stakeholders, which included caseworkers and staff present during the monitoring team's September 18, 2023, site visit, and others who later contacted the Monitors, describe their intense frustration and anger over the ongoing requirement that they supervise CWOP Settings . . . without adequate training." (D.E. 1425 at 41.) "None of the caseworkers or staff interviewed by the monitoring team reported having had any 'hands on' de-escalation training prior to being assigned to work in a CWOP Setting, nor did they report having had any restraint training." (*Id.* at 44.) "They noted that they did not have the background or skills to supervise children with high mental-and-behavioral health needs in a home setting, and that they not only feared for the children's safety but feared for their own safety. All of them expressed their love for their work and for the children they worked with but felt ill-equipped to manage the children's behavior." (*Id.* at 43–44.)

---

[100] Ms. Reveile joined DFPS as a caseworker in December 2021, and she began working CWOP shifts a month later. (D.E. 1487 at 184:11, 196:15–16.)

### 3. *Further, CWOP workers lack the time, authority, or institutional support to care for children placed in CWOP*

As discussed in greater detail later,[101] CWOP workers already have full time jobs as conservatorship caseworkers. And casework alone involves more than a forty-hour work week: Of her time as a conservatorship caseworker, Associate Commissioner Banuelos recalled that she never "work[ed] 40 hours. I worked a lot more than that. . . . I would say in any given week, depending on whether I had emergencies or not, I would say at least 50 hours." (D.E. 1347 at 215:17–23.) And, as Associate Commissioner Banuelos clarified at the Contempt Hearing, those 50 or more hours per week were accrued without the mandatory CWOP shifts that she is now imposing on her caseworkers:

> Q. Did you ever do a -- regularly do shifts, overtime shifts for children that were in unregulated placements?
> A. I did not.
> Q. So you don't personally know the sort of intense pressure that today's caseworkers have to live with, do you?
> A. Not -- I have not -- I never did that as a caseworker.

(D.E. 1487 at 319:14–19.)

It is thus unsurprising that many caseworkers must use their time working CWOP shifts to catch up on their regular caseloads. As Ms. Dionne explained, CWOP workers

> . . . . [A]re there doing casework . . . . They sit down. They tell me -- I call them. They say, "Let me call you back when I get to CWOP. Then I'll have a lot of time to talk, because I've got a CWOP shift today."
> Q. And what does that mean? Why are they saying they have a lot of time to talk when they get to a CWOP?
> A. That is what they're doing there. They are working on their caseloads. They are sitting at a desk.
> Q. For what? Their regular caseloads?
> A. Yes, their regular caseloads.
> Q. So they're so busy with their regular caseloads that when they're doing CWOP shifts, what are they paying attention to?
> A. Only their casework. They are not -- unless there's an incident in which they have to get up and call law enforcement or something else like that, then it is just them working on

---

[101] *Infra* page 242–65.

laptops, get up, two more people come in, sit down, open their laptops, begin to work. No "Hey, girls, how's it going today? Did you get to school? Why are you here? It's the middle of the school day." Just -- just nothing.

(D.E. 1488 at 166:24–167:17.) In the same vein, Ms. Juarez testified that when she was placed in

CWOP Settings, the CWOP workers:

> A. . . . would be on their phone or their computer.
> Q. And how do you -- what do you think they were doing on their computers?
> A. Checking on their other cases.
> Q. Why do you think they were checking on their other cases?
> A. Because they will be talking out loud about their next -- like they had to catch up on their work for their hearing the next day.
> Q. And how did you hear them saying that? Where were you?
> A. I was next to them.
>
> . . . .
>
> Q. Did you -- did you get a sense of whether the caseworkers -- how much they were worried about the children in these [CWOP settings] as opposed to the children that were their regular children on their caseload?
> A. If you were their own kid, . . . they will worry about you. But if they didn't have to worry about you, they wouldn't worry.

(D.E. 1487 at 256:22–257:20.)

And Ms. Pennington described similar interactions with CWOP workers—upon entering a residential CWOP Setting, she would find "a folding table pretty near the entrance to a home. And there would be . . . one to four adults seated at that table. They're typically . . . looking at their phones or computers. It's very common that no one will look up and make eye contact. It's often a very awkward situation." (D.E. 1488 at 20:8–13.) Indeed, Ms. Pennington explained that they resented that she was interrupting them:

> A. I don't always figure out who the adults are. In fact, I often will ask them what their names are, whether they are caseworkers or kind of what their role is. And I'm often met with resistance about that.
> THE COURT: What do you mean?
> THE WITNESS: I've had –
> THE COURT: They won't tell you who they are and what they're doing?
> THE WITNESS: Correct. It's very common that the adults will not make eye contact with me. They seem angry with my presence or bothered.

(*Id.* at 20:16–21:1.)

Of course, the CWOP workers are doing the best they can under the circumstances—Ms. Pennington noted that the CWOP workers with whom she interacted "appear[] overwhelmed . . . frustrated and exhausted." (*Id.* at 42:10–12.) And the Monitors explained that CWOP workers are placed in an "untenable position,"[102] as they cannot simultaneously fulfill their duties with respect to their assigned caseloads and supervise the children at the CWOP Setting. (D.E. 1318 at 56.)

To illustrate the point, the Monitors recounted the events leading up to the runaway of a sixteen-year-old girl placed at a residential CWOP Setting, who, because of her "significant behavioral and mental health needs and history," required "24-hour supervision." (*Id.* at 56.) The CWOP worker charged with her supervision was a fulltime DFPS caseworker. (*Id.* at 56.) At some point during the shift, the worker was "reviewing e-mails on her state issued cell phone regarding a child on her caseload who had run away 12 hours earlier," and sixteen-year-old used this opportunity to leave the CWOP Setting through a side door "when no one was looking." (*Id.* at 56.) The CWOP worker was focusing on her responsibility to the child on her regular caseload, and "[w]hen she looked up from reviewing her e-mails," the sixteen-year-old "was no longer in the living room with her." (*Id.* at 56.) "As this investigation showed, this caseworker was unable to fulfill both responsibilities, which resulted in an unsupervised child leaving a CWOP location alone." (*Id.* at 56.)

And even if CWOP workers were properly trained to care for the children placed in CWOP and were able to give the children their undivided attention it would make little difference, as CWOP workers lack authority over the children nominally in their care. Ms. Carrington explained:

> [T]he thing that's counterintuitive about CWOP is that, you know, if a child refuses to go to school, we can't make them go to school. If a child refuses to take their medication, we

---

[102] As discussed in greater detail below, *infra* page 250–61, they are placed in this untenable position by the State.

can't make them take their medication. If a child runs, we can't make them stay. We don't have legal authority to do that. . . .

Of course, we try to convince them to not leave. We try to make sure we get license plate numbers, pictures of the youth, because we had a runaway protocol if they left. But they would leave all the time.

So as a caseworker, as a supervisor, you're failing in your mission. Your mission is to protect the unprotected. And here we are, our hands tied, and we've taken these children out of very traumatic circumstances, and we haven't really placed them in much better.

(D.E. 1488 at 214:22–215:12.)

In other words, the overworked and undertrained CWOP workers are largely reduced to the position of passive bystanders. Thus, it is unsurprising that "many children" placed in CWOP Settings "come and go as they please." (D.E. 1132 at 89.) One child interviewed by the monitoring team in September 2023 candidly "reported being able to freely leave" the "CWOP Setting where she has been living for months." (D.E. 1425 at 18.) Likewise, CWOP workers have "confirmed" to the Monitors that "children frequently run away or attempt to run away." (D.E. 1171 at 9.) And Ms. Juarez testified that many of the girls placed in CWOP ran away, as did all of the boys placed in CWOP. (D.E. 1487 at 260:2–17.)

As a result, in Ms. Pennington's experience, CWOP Settings "are often empty or mostly empty of children." (D.E. 1488 at 34:9.) Children placed in CWOP "come and go all through the night . . . . No one knows where they are." (*Id.* at 34:18–20.) And the CWOP workers tell her that there is nothing they can do about it. (*Id.* 34:13–14.)

The Monitors' reports show that "no one knows where they are" is not a new problem: For example, of an October 2021 visit to a residential CWOP Setting, the Monitors noted that "staff did not appear to know whether other children housed at the CWOP Setting were in school or on runaway status." (D.E. 1171 at 15.)

Ms. Dionne explained that when a child runs from a CWOP Setting, CWOP workers are to report it to law enforcement. (D.E. 1488 at 182:2–19.) But apparently, runaways are not reported immediately—after one of her clients ran away, Ms. Dionne was told that the CWOP workers wait 30 minutes to an hour before reporting children as missing. (*Id.* at 183:10–11.) And sometimes, they do not report the child missing at all. (*Id.* at 12–13 ("This is one of the children that was brought on a plane to Miami. They don't call it in every time.").)[103]

As an example, Ms. Dionne recounted:

> The last time I went to that CWOP location, it was my client's birthday. I walked in with cupcakes, and she wasn't there. They said, "She ran away, but she always comes back." And I said, "Where's the – where's the number? I need all the info. Since I'm here, just give it to me," because they wanted to email it to me usually, but I was there. So I said, "Give me the case number. Give me the call number. Give me the detective's name. I'm here. So I'm going to try to drive around and try to find her."

(*Id.* at 183:1–9.) The CWOP worker replied "Oh, well, we stopped calling it in until they're gone for 30 minutes or an hour." (*Id.* at 183:10–11.)

Ms. Dionne further explained that it often fell to her to recover runaway children; but once they were recovered, the children immediately left the placements again:

> When they go missing, nobody looks. . . . I'm an attorney. I have spent the last six years being a social worker instead. When I roam the streets and sometimes find my client because they call me or most of the time they call their biological parent, when we recover them, they bring them right back to CWOP, and they walk right back out the door.

(*Id.* at 163:1–6.)

Further illustrating their freedom of movement, the Monitors have reported that children placed in CWOP are able to move between CWOP Settings located in different towns "with no explanation for" their "ability to move between these houses." (D.E. 1425 at 38.) For example, LT (female) and RJ (male) began "dating" in June 2023 when they were held at the same CWOP hotel.

---

[103] This sex-trafficking will be discussed below. *Infra* page 156–57.

(*Id.* at 38–39.) By early July, LT was held at a girls' residential CWOP Setting in Temple, and RJ was at a boys' residential CWOP Setting in Belton. (*Id.* at 39.) On July 5, RJ left the Belton site and returned with LT, who was on runaway status from the Temple site. (*Id.* at 39.) LT then "attempted to walk into one of the bedrooms." (*Id.* at 39.) After LT "was told to get out," she and RJ "grabbed food from the kitchen and went out the back door." (*Id.* at 39.) Apparently, it is not unusual for girls in the Temple and Killeen CWOP houses to have contact with boys in the Belton house. (*Id.* at 39.)

Other times, the children run right back to the parents whose abuse or neglect was the reason the children entered foster care. For example, Ms. Juarez entered foster care—and her parents' rights were terminated—because of "Emotional Abuse/Risk," "Physical Abuse/Risk," and "Sexual Abuse/Risk." (PX 105 at 2, 4.) Yet the first place Ms. Juarez went after running from CWOP was her mother's house. (D.E. 1487 at 264:10–15.) Likewise, fifteen-year-old EE's family had a long history of involvement with DFPS "due to her mother's substance abuse and neglect," and EE was removed from the home because her caregivers were "violent, unpredictable, and unreliable." (D.E. 1132-2 at 44.) She reportedly ran from CWOP Settings every night, sometimes going back to her mother's home. (*Id.* at 44.) Doctor Bellonci noted that this sort of behavior is common—children who run from their placements "often go" back to their parents. (D.E. 1489 at 85:1–2.)

That children placed in CWOP are free to come and go as they please is the first link in a chain that ends in several of the harms discussed below, including death,[104] sex trafficking and exploitation,[105] and access to and use of drugs, alcohol, and tobacco.[106]

---

[104] *See infra* page 139–41.
[105] *See infra* page 141–61.
[106] *See infra* page 169–75.

Moreover, CWOP workers are given little institutional support. Ms. Reveile unfavorably compared the support she received working CWOP shifts with the support she was given working in juvenile detention:

> Q. As between the work that you had been doing with juveniles in detention, in prison, and the work you went to do with the State of Texas with children that are in these unregulated placements, which was better?
> A. I would rather work in juvenile detention.
> Q. Why is that?
> A. Because there was support. If an emergency broke out, people would come to help you in less than a minute. And there w[ere] counselors on standby if extra intervention was needed, just ready to go to help the kids through what they were going through. But with CWOP, there was -- you could call the police, but then somebody would yell at you for calling the police on kids in care.

(D.E. 1487 at 201:17–202:4.) But in CWOP Settings there is nobody trained to care for children in crisis. As a result, if "extra intervention" is needed in a CWOP Setting, it comes from on-site security or law enforcement, resulting in physical and emotional trauma, arrest, and, all too often, lengthy stints in jail.[107]

### 4. *Accordingly, children placed in CWOP suffer grievous harms*

#### a. *Deaths*

Children placed in CWOP have been killed during runaway spells.

In October 2023, the Monitors reported on the death of sixteen-year-old MM, who "was killed in a car accident after running away from" the hotel CWOP Setting in which she was placed. (D.E. 1425 at 20 n.35.) "When she died, MM had been on runaway status . . . for three weeks and her whereabouts were unknown to DFPS." (*Id.* at 20 n.35.) "Video footage from the hotel showed that she left . . . in a pickup truck. Law enforcement determined that the pickup had been stolen earlier that morning. When MM died, she was with an 18-year-old male (reportedly MM's boyfriend). The 18-year-old was driving when the fatal accident occurred." (*Id.* at 20 n.35.)

---

[107] *See infra* page 178–92.

That MM ran away is unsurprising given the conditions of the CWOP Settings. "The night before she ran away, law enforcement had recovered her from a prior runaway episode and returned her to the hotel CWOP Setting." (*Id.* at 20 n.35.)

In their Fifth Report, the Monitors discussed the death of T.S., "a 17-year-old boy[ who] was fatally shot by another individual during an altercation." (D.E. 1318 at 148.) "At the time of his death, T.S. was on runaway status from a CWOP episode at a hotel for approximately seven weeks and his whereabouts were unknown to DFPS. . . . DFPS records indicate the agency made efforts to locate T.S. and, through intermittent contact with T.S., determined that T.S. was unwilling to provide his location or return to DFPS care. CPI did not pursue an investigation into T.S.'s death." (*Id.* at 148.)

As with MM, T.S. had previous episodes of running away. First, he had two prior runaway incidents, the most recent of which also was from a CWOP Setting and occurred less than a month before the fatal runaway. (*See id.* at 149 (noting that fatal runaway began on April 21, 2022, and prior runaway ended on March 27, 2022).) Second, he was clearly suffering emotional distress: "On the day T.S. left the CWOP location, T.S.'s caseworker, a supervisor, CASA advocate, and a judge held a virtual meeting to discuss T.S.'s placement options; according to T.S.'s record, T.S. was unwilling to attend the virtual meeting. During the meeting, the judge ordered T.S. to a placement secured by T.S.'s caseworker. Following the meeting, T.S.'s caseworker informed T.S. of the judge's order, which T.S. promptly refused. Shortly thereafter, T.S. packed his belongings and left the CWOP location." (*Id.* at 148.)

The Fifth Report also discussed A.W. who, like T.S., was shot to death. (*Id.* at 146.) "A.W.'s caseworker arrived to the CWOP location in the morning and brought A.W. to a friend's home to play basketball for the afternoon. The caseworker did not possess or gather contact information

about the friend. The caseworker knew the apartment building's address, but not the apartment number." (*Id.* at 146.) The caseworker reported that he was in contact with A.W. throughout the day, and that his last call with A.W. was at 8:45 p.m. (*Id.* at 146–47.) "Following this call, the caseworker made numerous attempts to contact A.W.; however, these attempts were unsuccessful." (*Id.* at 147.)

A.W. was not reported missing until the following morning, and then only "after the caseworker's supervisor instructed him to do so." (*Id.* at 147.) A.W. remained "on runaway status for the week prior to his death," during which "DFPS was unaware of A.W.'s whereabouts." (*Id.* at 147.) "On the night of March 23, 2022, A.W. was reportedly sleeping at a different friend's home when the friend fatally shot A.W. and another individual in the home." (*Id.* at 147.)

Once again, it was clear that A.W. was prone to running away—like MM, A.W. had returned from runaway status the day before his fatal runaway incident. (*Id.* at 147.)

### b. *Sex trafficking and exploitation*

Like most of the problems in the Texas foster system, sex trafficking of children placed in CWOP is not new. Indeed, in an amicus brief filed in the Fifth Circuit on April 6, 2018, Disability Rights Texas explained that this type of exploitation was not only happening, but that it was happening frequently. (D.E. 1486-4 at 14–18 (Court's Ex. 4).) It is unclear if the State made any attempt to protect the children from this horrific form of exploitation. But if any attempts were made, they have been wholly ineffective: The Monitors' reports and testimony at the Contempt Hearing demonstrate that sex trafficking and sexual exploitation of children placed in CWOP continue unabated.

In September 2021, the Monitors reported that "children [were] being sex trafficked out of CWOP Settings." (D.E. 1132 at 101.) They noted that "children seem to come and go at will from the CWOP Settings where they are housed; in some cases, children with a history of being sex

trafficked are clearly leaving to meet either the trafficker or people who paid them for sex." (*Id.* at 101.) For example, the Monitors discussed PMC child JB, who entered foster care at the age of sixteen and aged out in April 2021. (*Id.* at 101.) "She was placed in foster care after being charged with assault for having pushed her mother down the stairs. During her time in juvenile detention, JB made an outcry of having been sexually abused by her stepfather from age seven-years-old to age 14-years-old. She also reported that a 'pimp' gave her drugs and started trafficking her at the age of 14." (*Id.* at 101.)

"After entering care," JB "was placed in six licensed GROs, was admitted to a psychiatric hospital four times, had seven spells in CWOP Settings, and ran from care 11 times." (*Id.* at 101.) Her records indicate "that two of her late 2020 runaway incidents resulted in sex trafficking, with a runaway event ending in December 2020 when her 'pimp' was arrested in a police sting for sex trafficking and drug charges." (*Id.* at 101.)

And a Serious Incident Report documents JB's "last runaway event prior to aging out of care." (*Id.* at 101.) The Report begins by characterizing JB as "our youth that continues to run to be with her pimp." (*Id.* at 101.) "On Friday, March 12[, 2021]," while the CWOP workers were checking into a "[h]otel for CWOP," one of them noticed JB "walking with a man." (*Id.* at 101.) When JB "recognized the worker she began walking swiftly in the opposite direction and the male took off running through the hotel." (*Id.* at 101–02.) When JB was found, she complained "about stomach pains and stated that she thought she was pregnant." (*Id.* at 102.) She was thus taken to Texas Children's Hospital, where it was confirmed that she was "4 weeks pregnant." (*Id.* at 102.) Doctors also diagnosed JB "with a Pelvic Inflammatory Infection,"[108] which required treatment with two

---

[108] As the Court noted when discussing lead plaintiff M.D. in the 2015 Memorandum Opinion and Verdict, "pelvic inflammatory disease . . . is often caused by—and therefore an indication of—and STD." (D.E. 368 at 68 (citations omitted).) Indeed, JB's experience is similar to M.D.'s. Shortly before her seventeenth birthday, M.D.—who had a "history of running away"—ran from an RTC in Houston. (*Id.* at 67.) She was found in a park by law enforcement

142

intravenous antibiotics. (*Id.* at 102.) She "also tested positive for cocaine" and was treated for "withdrawal symptoms." (*Id.* at 102.)

The Monitors also discussed TMC[109] child AZ, who was sixteen at the time of the Monitors' September 2021 report. (*Id.* at 103 n.177.) AZ first entered foster care "as a young child due to her mother's substance abuse disorder, but was adopted in 2012 by her paternal aunt and uncle." (*Id.* at 103 n.177.) "The adoption disrupted and AZ re-entered foster care in September 2020" (*id.* at 103 n.177); she alleged that "her uncle began abusing her when she was in the fourth grade, and that the abuse continued until she entered foster care in 2020"[110] (*id.* at 103 n.177).

AZ's records state that she

is in need [of] a secure and structured environment that specializes in dealing with children with sexual victimization and at high risk for being sex trafficked. [AZ] has a history of having sex with older men for money. She seeks out these men online and will meet up with them. [AZ] believes this is the best way to live and is not interested in alternatives. She reports that she has no self-worth and does not care if she puts herself in dangerous situations because "everybody dies someday."

(*Id.* at 103 n.177.) Unsurprisingly, CWOP Settings did not meet AZ's needs. The Monitors noted that she "seemed to come and go from CWOP Settings at will, and reported having sex with adults in exchange for money during her time away." (*Id.* at 103 n.177.) Indeed, AZ returned to her CWOP Setting from a runaway spell while the monitoring team was conducting its on-site visit. (*Id.* at 103 n.177.) "AZ's IMPACT records show that after being placed in her first CWOP setting

---

[109] and returned to the RTC, where she "said that she had been 'selling her body to men for money.'" (*Id.* at 67 (D.E. 324 at 227).) Two days later, she again ran from the RTC. (*Id.* at 67–68.) She was again found several weeks later and "was taken to a Houston CPS emergency shelter, where she told the staff that she was 'high on crack' and continuously said that she wanted to go back to a man who was 'someone that makes money off of her by having her sleep with other boys/men.'" (*Id.* at 68 (citing to trial exhibit #1 RFP CPS 175293 (sealed)).) "CPS staff allowed M.D. to leave within 15 minutes of her arrival at the shelter." (*Id.* at 68 (citing to trial exhibit DX 120 at 1 RFP CPS 175293 (sealed)).)

[109] "[T]he monitoring team was initially told that AZ was a PMC youth but discovered that she was in TMC during a review of her IMPACT records." (D.E. 1132 at 103 n.177.) AZ aged out of care on July 20, 2023. (D.E. 1425 at 14 n.28.)

[110] The allegation was not substantiated, but AZ "has been consistent in reporting the abuse." (D.E. 1132 at 103 n.177.)

on March 4, 2021, she developed a pattern of running away, staying away from the CWOP setting for several days before returning. In all, IMPACT shows **13 runaway incidents followed AZ's first stay in a CWOP setting**." (*Id.* at 104 n.177.)

"During her time in CWOP settings, AZ was sex trafficked, sometimes leaving the CPS office where she was living in an Uber that had been sent to pick her up." (*Id.* at 104 n.177.) The Monitors highlight several entries from her sexual victimization page in IMPACT:

- "[AZ] reports that she has had multiple sexual encounters with adult men for money. There is a [sic] unconfirmed encounter where she met a man online and he sent her an Uber to his home to have sex. [AZ] snuck out of her placement and met the man at his home. They had sex, he paid her, and she left. She claims she does not want to finish school because she knows she can make money easily by prostituting." (*Id.* at 104 n.177.)

- "On 3/12/21 [AZ] left CWOP in a [sic] Uber. [AZ] stated her friend 'Mexico' provided an Uber for her to get to San Antonio where she met him at a hotel. [AZ] reported she and 'Mexico' had sex for money. She also stated that the sex was consensual. [AZ] is 15 and 'Mexico' is 20." (*Id.* at 104 n.177.)

- "On 04/09/21 [AZ] reported while on runaway, she states that she stayed with two [convenience store] workers she met the night before and had sex with both of them." (*Id.* at 104 n.177.)

The Monitors concluded their discussion of AZ by noting that she "reports having had sex with men for money during each of her runaway episodes and described one 'boyfriend' from Houston as being a 'pimp.'" (*Id.* at 104 n.177.)

The Monitors revisited the trafficking problem in their Fifth Report, where they recounted the experience of a thirteen-year-old PMC child who "was a confirmed victim of sex trafficking" and "had an extensive history of running away from previous placements at RTCs and foster homes." (D.E. 1318 at 53 n.96.) Her IMPACT records indicated that during one runaway incident in late 2021, "two men abducted her from a gas station, drugged, and sexually assaulted her." (*Id.* at 53 n.96.) And after a second, extensive runaway incident, the child was found "living with a woman who said she allowed the child to stay with her when a twenty-four-year-old man, who the child believed to be her 'boyfriend,' ended his relationship with [the child] and moved out . . . leaving the child without a place to live." (*Id.* at 53 n.96.)

The child was then placed in a CWOP Setting where, despite her service plan stating that she needed "'constant line of sight' supervision," she started running away almost immediately. (*Id.* at 53–54 n.96.) She was then moved to a second CWOP Setting and, a week later, she ran away shortly after midnight through her bedroom window. (*Id.* at 54 n.96.) "DFPS contacted law enforcement to report the child as missing. Several hours later, law enforcement located the child. The child reported to law enforcement that a man sexually assaulted her in a motel room while she was on runaway status." (*Id.* at 54 n.96.)

The Monitors' most recent report to discuss sex trafficking in CWOP Settings, filed in October 2023, shows that there has been little, if any, improvement. Indeed, they noted that "[o]f the 20 female foster children placed in a Bell County CWOP location during the period reviewed [January 1, 2023 to August 31, 2023], the Monitors identified 12 . . . who exhibited a pattern of frequent runs from the . . . CWOP Setting, and whose records raised concerns related to child sex trafficking." (D.E. 1425 at 19–20.)

AW, for example, is a seventeen-year-old PMC child whose background and early sex trafficking incidents were discussed in the Monitors' September 2021 CWOP report. (*See* D.E. 1132-2 at 39–41.) AW entered the foster care system on September 26, 2019 after her father "failed to pull over during a traffic stop, and engaged in a police chase with AW's sister in the car [apparently, AW was not in the car at the time]." (*Id.* at 39.) When AW and her sister "were interviewed after being picked up by DFPS, they stated that both parents smoked marijuana at home. Both parents admitted to drug use and subsequently tested positive for marijuana and cocaine. AW and her sister also tested positive for marijuana and cocaine. AW's parents' rights were terminated after they stopped complying with drug testing requirements." (*Id.* at 39.)

AW's records explained "that she 'needs a placement that will help her engage in therapy in a helpful manner.'" (*Id.* at 39.) "A needs assessment noted that AW 'would benefit from a stable, consistent, and nurturing environment where rules and expectations are clearly defined . . . .'" (*Id.* at 39.) Yet her time in the State's care has been precisely the opposite: Between September 2019 and the Monitors' September 2021 report, AW had "three different primary caseworkers, and has resided in at least 15 placements, including a spell as a child without placement that lasted more than a month, and a runaway incident that lasted two months. Her placements include eight placements in a GRO or RTC, one foster home, and multiple psychiatric hospitalizations," "at least six" of which were "for suicidal ideation or self-harm." (*Id.* at 39–40.)

The Monitors noted that AW "has a history of running away with other children since entering foster care." (*Id.* at 40.) During one runaway incident from an RTC, AW (who was thirteen at the time) "had sex with a male peer" (who was sixteen). (*Id.* at 40.) After running away from a second RTC, "AW and her peers 'engaged with unknown males in partying (alcohol, cigarettes, and marijuana)' and . . . AW 'admitted to sexual intercourse' but 'did not disclose if it was consensual

or if she was a victim.'" (*Id.* at 40.) AW again ran from the second RTC, this time "with three

other girls." (*Id.* at 40.) They "were picked up by two women who took them to a house where

there were other children and three men residing." (*Id.* at 40.) Accounts of "what happened differed

between the children but suggest the women who picked the children up and the men at the house

may have been sex traffickers." (*Id.* at 40.) The September 2021 report concluded its discussion of

AW by noting that "[o]n September 7, 2021, after almost two months in [a] psychiatric hospital,

AW was released and is again without placement and housed in a CWOP Setting." (*Id.* at 41.)

The October 2023 report began its discussion of AW by noting that she "is still in a CWOP

Setting." (D.E. 1425 at 13.)

> When not in a CWOP Setting, AW has continued a cycle among placements in Temporary
> Emergency Placement (TEP) beds, psychiatric hospitals, juvenile detention, two RTCs,
> and runaway status. Her IMPACT placement logs (which include entries for runaway
> events and psychiatric hospitalizations) show a total of 64 entries since she left the CWOP
> Setting where she was living in September 2021. She is currently housed at a CWOP
> Setting in Bell County. She has run away from the Bell County CWOP Setting on an almost
> weekly basis, sometimes more than once a week, though she typically returns within 24
> hours. Her departures from CWOP Settings have resulted in several confirmed and
> suspected but unconfirmed incidents of child sex trafficking.

(*Id.* at 13.) Indeed, AW's IMPACT records document three trafficking incidents—one

"confirmed" and two "suspected-unconfirmed"—in November 2021 alone. (*Id.* at 14.)

- "The first incident, which was suspected but not confirmed, occurred on November 7,

   2021." (*Id.* at 14.) AW's IMPACT record explains: "[AW] ran from Child Without

   Placement at the Round Rock office on 11/07/2021, with youth [AZ]. Both youth [sic]

   showed up at a different Child Without Placement location in Austin on 11/08/2021, and

   turned themselves in. Although [AW] refused a recovery interview after this runaway,

   there are later outcries that she was being trafficked by [AZ]." (*Id.* at 15.)

147

- The second incident, which was also suspected but not confirmed, "occurred three days after th[e first] one, when AW and AZ again ran from the same CWOP Setting." (*Id.* at 15.)

- The third incident in November 2021—this one "confirmed"—took place on November 13, when AW again ran away with AZ (and this time, with a third child as well). (*Id.* at 15.) As documented in IMPACT, "[AW] reported to staff that [AZ] had been taking them to 'have fun' and they thought only one guy would be there but when they'd get to where they were going, sometimes 5–7 men would be there. She reported [AZ] would talk the other girls into having sex with the men and then [AZ] would get paid. [AW] reported that some of the men were well over the age of 30. [AW] and [the other child] reported that if they refused to have sex with the men, [AZ] would threaten to leave them stranded wherever they were. [AW] reported she had sex for [AZ] a couple of weeks prior to her report, which would have been around mid-November. Both [AW] and [the other child] advised they were afraid to report the trafficking because they were afraid [AZ's] friends would come shoot up the office. CWOP Staff noted they'd overheard [AZ] talking about sending men photos of other youth at CWOP. CWOP Staff also reported witnessing [AZ] preparing herself and her peers to run by dressing up and putting on makeup." (*Id.* at 15–16.)

In December 2021, AW was moved from the CWOP Setting in Round Rock to a CWOP Setting in Waco. (*Id.* at 16.) On December 17, she ran from the Waco CWOP Setting and was not recovered until March 28, 2022 (*id.* at 16); after AW was recovered, it was confirmed that another trafficking incident took place during this runaway period:

On 02/23/2022, [AW] showed up at a local teenage shelter the day before looking for resources. From her conversations with the shelter volunteer, it is believed she had been

148

residing with a 38-year old male locally. He was with her at the shelter and seemed uncomfortable when the shelter started asking questions and ended . . . their conversation. Waco PD is aware of who this man is, know of his home, and have him marked in their system as dangerous and not to engage alone. Waco PD reported there had been a call to the home on 12/23/2021, indicating a concern of human trafficking in the home.

On 03/28/2022, Law Enforcement recovered [AW] from the home of [K]. [AW] made an outcry that she had sex several times with [the man] and the last time was three days ago. [AW] was interviewed on 03/29/2022, about what happened while she was on runaway. [AW] disclosed that a male named [J] took her to different places. One place was [J's] cousin's house. [AW] stated she performed oral sex on [J's] cousin, and he gave her $20. When [J] picked her up, he asked her if she made any money, but she lied and denied. [J] then took her back to another guy's house where he ([J]) forced vaginal sex with [AW] and told her that he would kill her if she told anyone.

In early January, she began staying with [K] and began having sex with him. [AW] stated he provided her food, personal belongings, and a place to stay. He also told her to stay inside so she would not get caught. At some point during this runaway event, a male put his penis in her face and touched her face with it, but she pushed him away. After being placed with her aunt, [S], [AW] would have conversations on speakerphone and [S] overheard [AW] talking about the man she had been staying with abusing her. She reportedly stated he "choked her with a dog collar once, would hit her, and call her names. [AW] told her aunt she "was scared for [her] life."

(*Id.* at 16 (ellipsis retained; paragraph breaks added).)

By early 2023, AW had been moved back to a Round Rock CWOP Setting. (*Id.* at 17.) On February 20, 2023 she ran from that Setting, resulting in yet another confirmed trafficking incident: "Upon recovery, she reported that she made contact with another youth, [WS], via social media and asked her to pick her up. She reported that [WS] sent her brother instead and that [WS] told her she'd have to give her brother something in exchange for the ride. [AW] explained that the something she was talking about was sex. She reported having unprotected sex with this individual." (*Id.* at 17–18.)

Another IMPACT entry described a suspected-unconfirmed trafficking incident in early April 2023 at a CWOP Setting in Temple. (*Id.* at 18.) The entry explains that AW and another child left the CWOP Setting and "went to the nearby apartments" where "a man" was "attempting to traffic

them." (*Id.* at 18.) The other child reported that "[AW] was 'messing with guys there,' but did not say anything else about that incident." (*Id.* at 18.)

A second PMC child discussed in the October 2023 report, WS, may have been recruited into sex trafficking by AZ. The Monitors report that "WS and AZ ran away from the same CWOP Setting on December 13, 2021. The narrative describing WS's confirmed trafficking incident states" (*id.* at 14 n.29.):

> I received a message from [WS] saying, "Hey I might [be] pregnant." I responded, urging her to return to Child Watch to have her tested. She responded saying no. At 10:18 AM, [WS] called me and told me she was not going to return to get tested. She changed the conversation and began to tell me about [AZ]. [WS] told me, "[AZ] tried to prostitute me." She informed me she met up with [AZ] but did not identify a specific date. . . . [WS] said when she went with [AZ] she told her to dress up and wear make-up. She said there was an "older man" there requesting her to "suck his dick." [WS] said when she refused, he threatened to slap her and so she did it. [WS] also mentioned [AZ] told her they are going to do a "two for one deal," yet she did not know what that meant.

(*Id.* at 14–15 n.29.)

And third child "who was housed at the same CWOP Setting described AZ's recruitment of other children from the CWOP Setting." (*Id.* at 15 n.29.) This child explained that AZ "flashes clothing and everything when she comes back to" the CWOP Setting, and stated "she was thinking [']I want it too.[']" (*Id.* at 15 n.29.) "Per [the child], [AZ] offered them freedom, it doesn't feel good not being able to do normal teenage stuff. [The child] stated it didn't feel good wanting to do stuff but had [sic] to wait to get it approved." (*Id.* at 15 n.29 (quotation marks omitted).) Sadly, the child learned too late that "running away with [AZ] was not good," and she gave "a graphic description regarding the human trafficking that she and AZ endured, during which multiple men sexually exploited and abused the girls." (*Id.* at 15 n.29.)

A fourth PMC child discussed by the Monitors, sixteen-year-old SK, was placed in a Bell County CWOP Setting from May 8, 2023, to September 7, 2023. (*Id.* at 23.) SK's IMPACT records indicate that on the evening of August 6, 2023, SK and several other girls ran from the CWOP

Setting. (*Id.* at 23–24.) The following morning, one of the girls "called from their flip phone . . . and want[ed] a ride home." (*Id.* at 24.) IMPACT records note that the "girls were with 20-year-old something men" who "target girls" in CWOP Settings. (*Id.* at 24.)

A fifth PMC child, fourteen-year-old HM, was "housed in a Bell County CWOP location from June 28, 2023, through July 21, 2023." (*Id.* at 25.) She had been "sexually abused by her father prior to entering foster care and was again victimized by an older youth when she was placed at an RTC." (*Id.* at 25.) Thus, her IMPACT record states that she "needs to be supervised by adults at all times" and requires "bed checks every 10 minutes." (*Id.* at 25.) Nonetheless, on July 10, 2023, HM ran away from the placement with two other children:

> Law enforcement made contact at the CWOP placement around 12 am this morning, 7/11/23. Law enforcement were advised that [AW] (17 yo), [FA] (15 yo) and [HM] ran away from the placement. While Law enforcement were taking the report, 15 yo [FA] and [HM] were dropped off by 17 yo [AW] and a male believed to be between 20 and 30 years old. [HM] made an outcry that she was sexually assaulted by the male and that he made her give him oral sex. Law enforcement were advised that 17 yo [AW] and [the other children] ran away from the placement between 10:30 pm to 10:40 pm last night, 7/10/23. It is unclear whether [they] snuck out or if the staff were aware and tried to stop them. Law enforcement advised that there is a history of runaways at the placement, and it is likely they snuck out.
>
> Law enforcement were advised that 17 yo [AW] was talking to the male on Instagram. 17 yo [AW] told the male that [HM] and 15 yo [FA] were also 17 years old like her. The male drove a stolen vehicle from Austin to the placement to get 17 yo [AW] and [HM] and 15 yo [FA]. After 17 yo [AW] and [HM] and 15 yo [FA] were picked up the male drove them to a church and told them that he wanted oral sex. The girls told him no, and he replied, "I didn't drive here for nothing." 17 yo [AW] performed oral sex on the male, and he advised that he wanted oral sex from [HM], but they said no, and later [HM] got in the vehicle with the male and performed oral sex on him. Afterwards, the male and 17 yo [AW] dropped off [HM] and 15 yo [FA] at the placement. . . . 17 yo [AW] returned to the location a few hours later. 17 yo [AW] advised that she had consensual intercourse and oral sex with the male.

(*Id.* at 25–26 (paragraph break added).)

A sixth PMC child, fourteen-year-old BP, "cycled among Bell County CWOP Settings, psychiatric hospitalizations, and runaway events for most of 2023." (*Id.* at 26.) Like HM, BP was

a confirmed victim of sexual abuse; "[t]he perpetrator was a 17-year-old foster child at a previous

placement." (*Id.* at 26.)

> When the monitoring team visited the Bell County CWOP Settings, BP had just returned
> from a run from care that lasted just over three weeks. Shift log notes for August 25, 2023
> (the day that BP ran) document that shortly before running away, BP "changed her clothing
> into a black dress with black heels and began to take pictures." The log also notes that BP
> had a cell phone that she "[was] not willing to give up."

> In addition, IMPACT Contact notes dated September 16, 2023, related to BP's return from
> her last runaway event, indicate that upon being recovered, BP (who was taken to the
> hospital because she said she was injured) requested a pregnancy test. During a recovery
> interview, and in conversation with hospital staff, BP (who was recovered at a local park,
> with AW, who had also run from care) said that she "[had] been having sex with men in
> their 40s." BP acknowledged having had sex with men for money. When she was asked
> when she had last had sex, she said that "she had sex with a 29-year-old male subject whom
> she just met" the day before, though she claimed the contact was "consensual" and did not
> involve an exchange of money.

(*Id.* at 26.) "An October 3, 2023, IMPACT Contact note indicates that . . . BP tested positive for

Chlamydia and Trichomoniasis, both sexually transmitted diseases." (*Id.* at 27.)

A seventh PMC child, thirteen-year-old HN, was placed at the Bell County CWOP Setting for

three weeks, during which she "ran away at least twice." (*Id.* at 28.) "During a recovery interview

after HN ran away from a subsequent placement," HN told the DFPS investigator about her second

runaway from the Bell County Setting, when she ran with VJ, a thirteen-year-old TMC child (*id.*

at 28 & n.46): HN "advised that when she ran with [VJ], [VJ] had been trying to get her to prostitute

herself out. [HN] advised that [VJ] would call her boyfriends and set up dates and do things for

money. [HN] indicated that [VJ] made a lot of money." (*Id.* at 28–29.) The Monitors note that VJ

"has both confirmed and suspected-unconfirmed entries on the trafficking page in her IMPACT

records. Both are related to runaways from the CWOP Setting. The suspected-unconfirmed

incident notes that VJ was found by Killeen police to be in the company of two adult males after

being recovered from a runaway event." (*Id.* at 28–29 n.46.)

152

An eighth PMC child, seventeen-year-old CM, had several "non-confirmed" sexual abuse incidents in her past, "including an outcry CM made against her father, . . . an outcry she made on January 19, 2022 (after running away from an RTC) that 'she was raped by an unknown male while on runaway . . . that . . . took place in the back of the person's car,'" and an outcry that she and another child "were sexually assaulted by two men who picked them up in their car after the children ran from [a] CWOP Setting."[111] (*Id.* at 21 n.37.)

"On April 27, 2023, CM left the Bell County CWOP Setting with another foster child." (*Id.* at 21 n.37.) CM's "records indicate that after the children ran, they met other teenage girls and traveled to Louisiana. CM was given drugs. CM reported that the child she ran away with trafficked her while they were in Louisiana, and then left her there. CM eventually snuck out of the hotel room while others were sleeping, and traveled to Florida, where she was eventually recovered." (*Id.* at 21 n.37.) "After being recovered in Florida, CM was again placed in a Bell County CWOP location. She ran away from the CWOP Setting nine days later and was arrested and jailed (she is now 17 years old) when she was found in a local park past curfew hours. She returned to a Bell County CWOP Setting for approximately two weeks," briefly stayed at an RTC, then was "returned to a Bell County CWOP Setting and ran away at least three more times." (*Id.* at 21 n.37.)

"After running from the CWOP Setting on August 12, 2023, she was found in Temple, TX on September 8, 2023, when the local Sheriff's office was serving an eviction notice at the house where she was staying. Contact notes in IMPACT indicate that during an interview with an investigator from the Attorney General's office, after she was recovered, she made an outcry 'to multiple sexual assaults.'" (*Id.* at 21–22 n.37.)

---

[111] This last allegation was unconfirmed despite the fact that CM's Sexual Assault Nurse Examination revealed that "she had bruising consistent with non-consensual sexual activity." (D.E. 1425 at 21 n.37.)

The Monitors also report that KR, whose trafficking history is discussed in more detail below, offered to traffic BF, a thirteen-year-old foster child. (*Id.* at 29.) "[KR]'s shift log notes indicate that on September 11, 2023, BF asked KR for two dollars. KR told BF 'she was not going to give her money but that she could pimp her out and she could make her own money.'" (*Id.* at 29–30.) KR further "told BF that she had a 'sugar daddy' and that is what she was getting her money from."[112] (*Id.* at 30 (some quotation marks omitted).)

Of course, sex trafficking is not a problem limited to Bell County CWOP Settings. The Monitors note, for example, that "a 16-year-old Bexar County PMC child who has spent much of the last two years in CWOP Settings has three confirmed incidents of sex trafficking that appear to have occurred when he ran away from a CWOP Setting in June 2023." (*Id.* at 20 n.35.) A second child ran from a CWOP hotel Setting in Austin to have sex with a twenty-four-year-old man she met on a dating app.[113] (*Id.* at 20 n.35.) And a third child, sixteen-year-old MM, who died during a runaway incident while in the company of an adult male,[114] "was suspected to be a victim of child sex trafficking" and "was also a confirmed victim of sexual abuse." (*Id.* at 20 n.35.)

At the Contempt Hearing, several witnesses testified to the ubiquity of sex trafficking of children placed in CWOP. When Ms. Dionne was asked if there was "anything about these CWOP locations that you think is safe for these children or at any way beneficial for these children," she replied bluntly:

A. There is absolutely nothing. There are trafficking rings being run out of these CWOPs.
Q. Trafficking meaning sex?
A. I mean, these children are being sex trafficked from these CWOP locations. I've had clients come into the Department in this past two years who have come in having never even gone on a date or had their first kiss, and their first experience with anything like that is the day that they walk away from a CWOP, those traffickers know where they are and

---

[112] KR "reportedly has a cash app where her 'friends' send her money." (D.E. 1425 at 27 (some quotation marks omitted).)

[113] This incident is discussed in more detail below. *See infra* page 160.

[114] *See supra* page 139–40.

they are waiting in the wings for any child to walk out that door. And she was assaulted.
Since then she's been assaulted at least 30 times by 30 different people.
THE COURT: You mean --
THE WITNESS: I mean sexually assaulted.
THE COURT: Raped?
THE WITNESS: Yes.
THE COURT: And how old was she?
THE WITNESS: She was 14 when she came into care. I believe she's 16 now.

(D.E. 1488 at 162:3–25.)

Ms. Dionne also noted—consistent with the Monitors' reports—that girls who have been trafficked will recruit other girls placed in CWOP: The girls "talk to each other, and . . . the girl who's been groomed and trafficked introduce[es] all the new girls to" the trafficker. (*Id.* at 165:9–10.) The danger that a sex-trafficked child would recruit other children was also raised by Ms. Carrington, who observed that "if you had a child that was with, say, someone who had trafficking behaviors, well, then that was just going to corrupt the other child." (*Id.* at 214:4–6.) But DFPS apparently does not understand that a trafficked child's return to a CWOP Setting is often just another part of the trafficking cycle—Ms. Dionne noted that "the Department -- the curious thing is they don't understand why the girls just can come back . . . . But these people [the traffickers] know that they have a plethora of new kids every time one goes back." (*Id.* at 175:1–4.)

Nor does DFPS understand why the conditions in CWOP Settings might drive children to traffickers in the first place. Ms. Dionne noted that placement in CWOP gives children the impression that they are "such . . . bad kid[s] that no placement in the State of Texas wants" them. (*Id.* at 175:18–19) And in the CWOP Setting, "there's nothing going on." (*Id.* at 175:20) Thus, it not surprising that AZ, as noted earlier, convinced another child to be sex trafficked with the promise of clothes, money, and freedom. Further, as noted above,[115] the CWOP Settings lack interaction with trained caregivers and supportive programming and resources. On the other hand,

---

[115] *Supra* pages 128–39.

the traffickers "talk to the children," and give them a way to "make money" and "meet people."[116]

(*Id.* at 175:16–25.)

Ms. Dionne also explained that some hotels used as CWOP Settings are already also being

used by sex traffickers, making it especially easy for girls to be trafficked:

> Q. What's the condition of these hotels?
> A. Oh, the hotels. So I have asked -- I have one particular client who they bring her there, and she walks out in her bra and underwear. And maybe the first man or the second man doesn't take her, but the third does. Every single time. I've asked them to just take her maybe to the Hampton Inn or something that is not already running operations of sex trafficking out of there.
> THE COURT: You mean renting rooms by the hour?
> THE WITNESS: Yes. So these hotels --
> THE COURT: Sex trafficking operations?
> THE WITNESS: Yes. Absolutely. Where you are seeing -- visibly seeing drug deals. You are visibly seeing sex work go on, and then there are CPS kids.

(*Id.* at 169:7–20.) She was told that the children are staying in that sort of hotel (rather than a

Hampton Inn) because "those are the only ones that will take [the State's] contract." (*Id.* at 170:2–

4.)

Ms. Dionne then described in detail the troubling ordeal endured by her client's adoptive

daughter—troubling not only because of the trafficking itself, but also because of the response by

DFPS and the special investigator assigned to the case.

> She met a girl in CWOP. That girl convinced her to run away. The next thing we heard about them, they were in New Orleans from Temple, Texas. The Department did not believe this in any way, shape, or form. They just did not --
> THE COURT: Didn't what? They didn't believe it?
> THE WITNESS: No, because they didn't think she could get anywhere like that. They didn't think she could get on a plane. And she was -- she was sometimes contacting her guardian ad litem and sometimes contacting my client, her mother, and saying, "I was brought on a plane." And then she said she was in Miami, and then they started seeing her pictures on the websites where she was being trafficked. And, in fact, my client -- and this is almost how -- every child who is found by the Department is almost found in the exact same way. They call somebody who cares about them, whether it's their CASA[,] guardian ad litem, their attorney ad litem, their caseworker, their mother, whoever it is and say, "I'm

---

[116] These reasons why children might prefer traffickers to CWOP Settings have been known to Defendants for at least five years, as they were identified in Disability Rights Texas' 2018 amicus brief. (*See* D.E. 1486-4 at 16–17.)

at so-and-so, and I really, really want McDonald's. Will you please DoorDash me McDonald's?" And every smart parent goes, "Sure. Tell me the address." And so my client found out that her child was in a hotel in Miami where we knew she had been trafficked to, and she gave her the address. My client called the [DFPS] special investigator -- his name is David Morris -- on a Saturday and said, "Oh, my God, I found her. She's at this hotel." And --

Q. Special investigator for the State of Texas?

A. For the State of -- for the Department. He's a type of investigator with Child Protective -- CPI.

THE COURT: CPI?

THE WITNESS: Uh-huh. And he said, "I don't work on the weekends," and hung up the phone.

(*Id.* at 172:4–173:14.)[117] Fortunately, Ms. Dionne's client "ended up getting in touch with law enforcement," who "recovered the child" and brought her back to Texas. (*Id.* at 173:17–19.)

Ms. Dionne also noted that DFPS was unwilling to accept that her client's adoptive daughter moved through an organized trafficking network. DFPS only accepted that the child was the victim of organized traffickers after a second child from the same CWOP Setting was trafficked to Miami:

The Department was wary of the story that she was brought on an airplane. They did not believe her until a month later when another child from that same CWOP was brought to Miami on an airplane. When that child came back -- she was my client. I was her guardian ad litem -- I said, "How did you get on an airplane?" . . . She pulled out a copy of her birth certificate. In my time as an attorney ad litem, I have almost never had a client given their documentation that they're supposed to get when they turn 16, let alone in a CWOP. Someone gave this child her birth certificate, and they were able to get her on a plane, I believe out of Burnet or Waco, in a private airport, because I can't imagine them walking her through any of the other airports. And we didn't have her on any manifests. They said they checked that. These girls are getting taken by the same group over and over and over again.

THE COURT: So it's a transportation network?

THE WITNESS: Yes.

THE COURT: Private planes?

THE WITNESS: Yes.

THE COURT: Private airports?

THE WITNESS: Uh-huh.

(*Id.* at 173:24–174:25.)

---

[117] The Temple CWOP site from which this child was trafficked "had over 800 calls to law enforcement" in 2023 related to runaways. (D.E. 1488 at 181:23–182:5.)

Ms. Juarez witnessed first-hand how easily girls in CWOP Settings are trafficked:

Q. Ms. Juarez, did you ever get concerned about what some -- what you saw some of the other girls that were staying in these CWOP places doing?
A. Yes.
Q. And what were you concerned about?
A. They would text grown men to come pick them up at the church or the offices.
Q. And what would they -- would they leave with these grown men?
A. Yes. And they would come back.
Q. How did they meet these grown men?
A. By social media.
Q. Like Facebook or what?
A. Instagram.
Q. Instagram?
A. And Facebook.

(D.E. 1487 at 259:22–260:12.) In fact, the use of social media to meet adult men appears to be a

common theme—for example, the Monitors report:

- KW and another child "ran away from a CWOP Setting . . . to meet a man who [KW] had

  met on the 'Plenty of Fish' social media platform." (D.E. 1132 at 102.) Both children

  "reported having been raped by the man as a result of the encounter." (*Id.* at 102.)

- Similarly, sixteen-year-old AK ran away with another sixteen-year-old female foster child

  "after making contact with a male on the app Plenty of Fish. . . . AK reported to her

  caseworker that the adult who they met had raped them both and made them perform sexual

  acts with each other . . . ." (D.E. 1132-2 at 35 (quotation marks omitted).)

- The "[d]aily logs for one CWOP Setting noted" that a child referred to as "[A] was caught

  getting in the truck of grown man this evening." (D.E. 1132 at 102–03.) The child met the

  man "on SnapChat and told him where to pick her up." (*Id.* at 102–03.) The next day, "[A]

  ran away and one of the other children reported that [A] had told her that she was 'getting

  an Uber.'" (*Id.* at 103.)

158

- A "DFPS staff member reported that a named staff member (Staff 1) allowed a child (age 17) to use her state-issued cell phone during a CWOP episode at a hotel. During the time the child had Staff 1's phone, she took nude photographs of herself. The child reportedly used a social media website to send the photograph(s) to an unknown individual."[118] (D.E. 1318 at 52.)

- At some point during the 12:00 am to 4:00 am CWOP shift on September 2, 2023, fourteen year old KR[119] "was making food in the kitchen and she was facetim[ing] (or video chatting) an older male. . . . [KR] was observed to be in a small bra and men's underwear when she was talking with the older man making sexual gestures and telling him she was going to perform certain sex acts."[120] (D.E. 1425 at 27 (second brackets retained).) "At 9:15 am on the same day, KR 'left with an unknown man in a black Chevrolet Malibu.' She returned to the house at 3:49 pm." (*Id.* at 27.) Later that day, "There was a man on [KR's] tablet telling her he sent an Uber her way. [KR] left in an Uber . . . at 7:20 pm." (*Id.* at 27 (second brackets retained).) "A day earlier, KR's shift log notes show that she left the CWOP Setting in a white pickup truck. Two days earlier, on August 30, 2023, KR left the house and was seen getting into a black car; another child told the caseworkers that KR was leaving with a 25-year-old man. Notes documenting KR leaving the house getting into unknown vehicles recur throughout her September and August shift log notes." (*Id.* at 28.)

---

[118] This incident also implicates the State's failure to properly train CWOP workers. The Monitors note that this child was a known sex trafficking victim, yet Staff 1 "did not have adequate guidance or training regarding how to supervise and care for" such children. (D.E. 1318 at 53.)

[119] "KR has been housed in Bell County CWOP Settings since May 8, 2023. KR was pregnant when the Monitors wrote the Fifth Report; she gave birth on June 20, 2023. The child was removed from [KR's] care and is in the State's conservatorship." (D.E. 1425 at 27.)

[120] KR had previously told the CWOP worker "that she was trying to get pregnant so she could have another baby." (*Id.* at 27.)

- One of KR's IMPACT entries, describing a "suspected-unconfirmed trafficking incident," states "[KR] has had multiple missing events during this time. She goes missing to meet with people she meets on chatki.com. She will not disclose who she met with. She also reportedly has cash app where her 'friends' send her money. Based on her history of victimization, missing events, meeting older men online, and receiving money from 'friends' this is being entered as suspected-unconfirmed for sex trafficking." (*Id.* at 27 (some quotation marks omitted).)

- An unnamed twelve-year-old PMC child twice ran from a hotel CWOP Setting in Austin. (*Id.* at 20 n.35.) After the second runaway incident, on January 18, 2023, "the child was discovered to have contacted a male through the dating app Badoo. 'She stated that she told the male that she was 21 on the dating app but told him her true age when they met. She gave him the hotel address and reported that she left with him on 1/18/23. She reported that she had sex with him on 1/18/23. She identified the male as [name omitted], age 24. [The child] reported that she met with this male again on 1/20 and 1/21/23.'" (*Id.* at 20 n.35.)

- A Serious Incident Report indicated "that three girls ran from a CWOP Setting after meeting a 24-year-old male online and engaging in a sexually explicit video chat with him." (D.E. 1171 at 6.)

Of course, not all trafficking involves social media. For example, Ms. Reveile described the ordeal of one of the children on her caseload. The child had "the cognitive function of [a] five to eight year[] old," and the shift log stated that she required supervision at all times. (D.E. 1487 at 210:2–7.) Nonetheless, she left the CWOP Setting

and met a stranger on the street and went home with that stranger, and the stranger gave her drugs and alcohol and had -- I think it was two or three people rape her five times while

she was there at that home. And then she went back to Child Watch, and they did their reports, and that's when I took her to the hospital.

(*Id.* at 210:10–16.)[121]

And sometimes, the trafficking takes place in the presence of DFPS investigators. Ms. Dionne recounted that, at the meeting held by the three state court judges, a DFPS "special investigator described to us watching my 14-year-old client drugged and being taken from room to room in a Motel 6 for men to have sex with her, to sexually assault her." (D.E. 1488 at 195:10–13.) Assuming that the men had been arrested, Ms. Dionne demanded that the investigator give her "all the police records for all these men." (*Id.* at 195:16–17.) The investigator replied: "'Why would we arrest them? They gave her right back to us. They – as soon as we asked, they gave her right back to us.'" (*Id.* at 195:17–19.)

### c. *Child-on-child sexual abuse and physical violence*

Child-on-child sexual abuse appears to be common in CWOP Settings. This is because, as the Monitors report, "CWOP Settings present challenges for preventing child-on-child sexual abuse." (D.E. 1132 at 105.) The Monitors noted several reasons for this. First is inadequate oversight. For example, "the monitoring team noted that though DFPS staff often reported an 'open door' policy for children while they were in their bedrooms, that policy was not being enforced consistently." (*Id.* at 105.) Second, many of the children placed in CWOP have a history of sexual abuse or sexual aggression—the staff at one CWOP Setting "noted that one-out-of-five children at the location had been sexually abused, and two-out-of-five had been sexually aggressive." (*Id.* at 105.) Third, because of "the space constraints" at CWOP Settings, staff have "difficulty . . . separating children

---

[121] The long-term consequences that the child suffered because of this incident are described later. *See infra* page 184.

by history." (*Id.* at 105.) Thus, children with a history of sexual abuse and children with a history of sexual aggression are "placed . . . in the same room overnight." (*Id.* at 105.)

The Monitors provided several examples of child-on-child sexual abuse at CWOP Settings. One "referral to SWI reported that a child (Child A, age 17) . . . alleged that another child (Child B, age 16) touched him inappropriately multiple times." (*Id.* at 105.) Specifically, "[Child A] stated that [Child B] touched him on the penis and buttocks under his pants and this was not consensual. He also reported [Child B] rubbed his penis on the outside of his clothes." (*Id.* at 105 (quotation marks omitted).) Another referral to SWI "that related to a child who self-harmed also alleged that the child was involved in sexual contact with her roommate in the CWOP Setting. The investigation revealed that the night-time supervision level at the time of the intake was hourly checks at night." (*Id.* at 105.) And a Serious Incident Report "documents an incident in which three children were in the bathroom at a CWOP location and one of them filmed the other two, both girls, engaging in oral sex, then uploaded the video to Instagram." (*Id.* at 105.)

Another Serious Incident Report documented that sixteen-year-old PMC child AK "appears to have had a sexual relationship with a male foster youth who was housed at the same CWOP Setting." (D.E. 1132-2 at 35 n.13.) The report "indicates that AK and a male youth were sharing an air mattress during the 1:00 a.m. to 8:00 a.m. shift when a caseworker entered the conference room where the bed was located. When the caseworker attempted to get the children to separate, they barricaded themselves in the room with another youth. Law enforcement was called. When the children eventually exited the room, the male youth told the police officer that he and AK had sex while they were in the room." (*Id.* at 35 n.13.)

In another report, the Monitors noted that "[then-]Commissioner Masters alerted the Monitors to an investigation involving" sexual contact between "two TMC youth," a thirteen-year-old girl

housed in a CWOP Setting and a seventeen-year-old boy who, at the time of the incident, "was on runaway status." (D.E. 1066 at 13.) "The two youth had communicated via social media and agreed to 'meet up'" at the CWOP Setting where the girl was housed. (*Id.* at 13.) Staff "were unaware of the incident until the 13 year-old asked about the need for a pregnancy test." (*Id.* at 13.) The Monitors also noted a second incident at a CWOP Setting, "involving a 17 year-old male foster child who allegedly digitally penetrated a 12 year-old female foster child while the children were sitting on a couch watching television under the supervision of DFPS staff." (*Id.* at 14.)

To further illustrate the point, the Monitors recounted the experience of AV, a fifteen-year-old boy interviewed by the monitoring team during a site visit in June 2021. (D.E. 1132 at 106.) From an early age, AV had a history of both sexual victimization and aggression: He reported that at the age of three or four, his "foster father raped him." (*Id.* at 106.) He was then placed in the care of his biological father and, at the age of ten, he was "adjudicated delinquent for sexually abusing a younger cousin. AV also acknowledged having sexually abused his younger siblings, though these incidents are unsubstantiated." (*Id.* at 106.) "AV entered the foster care system in June 2020 because his father refused to allow him to return home after he was released from a secure Texas Juvenile Justice Department (TJJD) facility." (*Id.* at 106.)

AV's Service Plan noted "that he 'needs supervision at all times due to his past history of sexual aggression.' Under 'Describe plans to ensure child's safety,' the Service Plan state[d], '[AV] will be monitored at all times.'" (*Id.* at 107.) But he did not receive that level of supervision in CWOP Settings. The Monitors explained that AV was placed in CWOP for three months, during which "he was moved among three different CWOP Settings." (*Id.* at 107.) "One of his moves was precipitated by an outcry of inappropriate sexual contact by two female youths, a 16-year-old and a 17-year-old, who were housed at the same" CWOP Setting. (*Id.* at 107–08.)

163

> The 16-year-old alleged that AV raped her; the 17-year-old reported having consensual sexual contact with AV. The youths reported that the incidents occurred when they were able to "distract the DFPS staff long enough to have sexual contact on more than one occasion."

(*Id.* at 108.)

The Monitors' more recent reports confirm that child-on-child sexual abuse in CWOP Settings continues to be a serious problem. In their Fifth Report, the Monitors recounted that CWOP workers "allowed . . . two children to be in the bathroom at the same time and, during this time, the children allegedly engaged in inappropriate sexual contact."[122] (D.E. 1318 at 55.) The Monitors also noted several allegations of sexual activity that were reported to SWI and investigated. For example, a caseworker reported that one child placed at a residential CWOP Setting in Von Ormy, "(Child A, age 14)[,] disclosed that another child (Child B, age 15) entered her bedroom and inappropriately touched her at night on more than one occasion. Child A also reported that Child B threatened her, however, she did not provide any further detail regarding how Child B threatened her. After Child A's outcry, DFPS staff members charged with supervision of the children at the CWOP location reportedly separated the children from one another."[123] (D.E. 1318-2 at 53.)

A second investigation was initiated after a "DFPS staff member reported that a child (Child A, age unknown) disclosed that another child (Child B, age 15) engaged in sexual contact with another child (Child C, age 16) while under DFPS Supervision at a CWOP location, SAFE Harbor

---

[122] Apparently, it was known that these two children needed to be separated "at all times, including in the bathroom," but this information was not communicated to the staff on duty when the incident occurred. (D.E. 1318 at 55 ("According to the investigative record, an e-mail chain was developed between those DFPS staff members who worked in the county responsible for this CWOP location; . . . one of those e-mail chains included documentation that the children involved in this investigation must be separated at all times, including in the bathroom. . . . [B]ecause the two staff members involved in this investigation were from a different county, they were not included on the e-mail chain. Therefore, they had no information about this supervision requirement.").)

[123] This allegation was investigated as neglectful supervision, and was ultimately ruled out. (D.E. 1318-2 at 53.) The Monitors disagreed, concluding that the investigation was conducted in a manner too deficient to rule out the allegations. (*Id.* at 53.)

164

(shelter) in Austin. Child A also reported that Child B previously engaged in sexual contact with another child at the CWOP location."[124] (*Id.* at 54.)

A third investigation was initiated after a "DFPS caseworker reported allegations of Neglectful Supervision of two children under DFPS Supervision at a CWOP location, a house in Belton. According to the reporter, two children (Child A, age 15 and Child B, age 16) engaged in sexual contact in their room while a staff member was in the living room. At the time of the alleged incident, reportedly a few days prior to the date of the intake, Child A and Child B were roommates."[125] (*Id.* at 55.)

And in their October 2023 update, the Monitors reported that LT (female) and RJ (male) began "dating" in June 2023, when they were placed in the same CWOP hotel Setting. (D.E. 1425 at 38–39.) Shift logs state that "RJ and LT spent time in each other's hotel rooms and on June 30, 2023, a caseworker arrived and was told that the two 'have been in bed together.'" (*Id.* at 39 n.54.)

Further, one investigation recounted by the Monitors suggests that children in CWOP Settings are at risk of sexual victimization by CWOP workers.

> A DFPS caseworker alleged that a DFPS employee (Staff 1), a Human Services Technician charged with supervising children without an authorized placement, inappropriately touched a child (age 17) at a CWOP location, an HHSC office in Copperas Cove. According to the reporter, during Staff 1's shift at the CWOP location, Staff 1 allowed the child to drive her car. In the car, Staff 1 and the child inappropriately touched one another. The child reported that he and Staff 1 were intimately involved and that they exchanged text messages. The child also stated to the reporter that when he met Staff 1's husband, the husband allegedly told him that once he turns 18 years old, the child could be with his wife.

---

[124] This allegation was investigated as neglectful supervision, and was ultimately ruled out. (*Id.* at 54.) The Monitors disagreed, concluding that the investigation was conducted in a manner too deficient to rule out the allegations. (*Id.* at 54 (noting that "the investigator's questioning [of Child C] focused exclusively on whether Child C engaged in unwanted sexual contact with Child B and did not explore whether the children engaged in consensual sexual contact," and further, that the investigator failed to "interview any DFPS staff members who worked a CWOP shift while Child B and Child C were placed together at the location.").)

[125] Neglectful supervision was ultimately ruled out. (*Id.* at 55.) The Monitors disagreed, concluding that the investigation was conducted in a manner too deficient to rule out the allegations. (*Id.* at 55 (noting that "in an absence of interviews with DFPS staff members who were responsible for the children's supervision at the location, the investigative record is incomplete, and a disposition could not be rendered.").)

(D.E. 1318-2 at 52.) Though the allegation was ultimately ruled out by investigators,[126] "DFPS

immediately terminated Staff 1" "after the incident." (*Id.* at 52.)

Like trafficking and child-on-child sexual abuse, physical violence appears to be common in

CWOP Settings. Ms. Pennington testified:

> Q. Did you learn from your children that you were representing that there were fights in these CWOP placements?
> A. Absolutely. You know, I've witnessed verbal fights and kids taking things from each other physically, high escalation. But I also am aware of one of my youth just being absolutely beaten by another. I get several serious incident reports where the children are assaulting each other.
> Q. In a CWOP placement?
> A. Yes.
> Q. In these places where there's no security at the front door, the house is in disrepair, the adults are not sure who's there, they have these fights and they're beaten up?
> A. Yes. Inside the four walls of the home.

(D.E. 1488 at 36:20–37:7.)

Ms. Juarez was attacked so badly that she had to go to the hospital:

> Q. Did you ever get hurt when you were staying in these unregulated places, churches, offices –
> A. Yes.
> Q. . . . And how did you get hurt?
> A. The girls would fight me. There would be four girls jumping on me, hitting me on my stomach and just basically beating me up.
> Q. And where did you -- did you have to get any medical care for that?
> A. Yes.
> Q. Where did you get it?
> A. At Memorial Hermann.
> Q. At the hospital?
> A. Yes.

(D.E. 1487 at 261:1–15.) And the CWOP workers simply stood by:

> Q. And did -- why weren't the caseworkers there to keep things under control?
> A. Because they wouldn't -- they wouldn't put hands on them.
> Q. So when a fight broke out, what would the caseworkers do?

---

[126] The Monitors disagreed with this disposition because the investigation was deficient. (D.E. 1318-2 at 52.) Specifically, the Monitors note that the investigator "did not attempt to identify or interview" a security guard who may have witnessed the activity alleged. (*Id.* at 52.) Thus, "the investigator did not gather sufficient information to Rule Out the allegation of Sexual Abuse by Staff 1." (*Id.* at 52.)

A. They would just call the cops after they were done fighting.

Q. So they would let the children fight it out, and then they would call the cops?

A. Yes.

(*Id.* at 261:16–24.)[127]

The Monitors have documented fights and attacks in CWOP Settings. For example, in their September 2021 report, they recount an incident in which then-fifteen-year-old PMC child ZZ attacked another child. (D.E. 1132-2 at 80.) ZZ was removed from her mother's care at age eleven; the home environment was "very chaotic," the conditions were "cluttered and unsanitary," and her mother tested positive for methamphetamine. (*Id.* at 77.)

Her entry into foster care did not, however, provide stability: from 2018 to the date of the Monitors' report, "ZZ ha[d] been in at least 17 placements, including three foster homes, four RTCs, one GRO, one kinship placement, and has had eight psychiatric hospitalizations." (*Id.* at 77.) Her first hospitalization was "for homicidal and suicidal ideation: 'she cut herself, attempted to fight a girl, [was] depressed, talked about running away, talked about wanting to kill herself and hurt others including her sister.'" (*Id.* at 78.) ZZ was diagnosed with "Disruptive Mood Dysregulation Disorder, Posttraumatic Stress Disorder, Child Neglect, Confirmed, Child Physical

---

[127] Ms. Juarez's experience is consistent with Ms. Reveile's testimony that caseworkers "were not allowed to restrain the children." (D.E. 1487 at 197:5.) And this noninterventionist approach is also followed when children threaten self-harm. The Monitors report:

On 9/4/23 LE was called to the home *by a neighbor*. [BF] had gotten up on the roof and threatened to jump off and cause herself harm. It is unknown how long [BF] was on the roof prior to the neighbor calling law enforcement. . . . CPS staff were trying to talk [BF] down. [Another child] told [BF] that if she didn't get off the roo[f], [she] would throw [BF] off the roof. [BF] got down off the roof, kicked out a window, grabbed a shard of glass, and threatened to harm herself with the piece of glass. [BF] sustained a cut to the foot, and possibly a cut to the leg. *Because "no one was doing anything," [another child] went up to [BF] and grabbed [BF] to stop her from hurting herself*. [BF] then hit [the other child], the [the other child] hit [BF] back. The children did not sustain any injuries from the fight. There are concerns staff did not attempt to intervene in the fight because staff at the home typically let the children "do whatever they want." When asked why, staff say they are unable to "put their hands on the kids." [BF] then ran away from the home.

(D.E. 1425 at 32 (emphasis added; ellipsis and brackets retained).)

Abuse, Confirmed, and Child Sexual Abuse, Confirmed," and was on several prescription medications, including "Intuniv for ADHD, Remeron for Insomnia, and Latuda for Depression/Moods." (*Id.* at 78–79.) She also had a history of substance abuse. (*Id.* at 78.)

On June 30, 2021, ZZ was placed in CWOP after being discharged from a psychiatric hospital. (*Id.* at 79.) On August 2, one of the other girls at the CWOP Setting "reported that ZZ had used bath salts the night before."[128] (*Id.* at 80.) "This angered ZZ and she attacked the other girl." (*Id.* at 79.) As a result, ZZ was arrested and placed in juvenile detention; after her release, ZZ returned to the CWOP Setting. (*Id.* at 79.)

The Monitors also documented a violent confrontation between II, a PMC child who aged out of care while placed in CWOP, and a CWOP worker. (*Id.* at 6.) II entered care at sixteen, "after his father and stepmother refused to pick him up from a psychiatric hospitalization resulting from a suicide attempt." (*Id.* at 6.) "During his two-year stay in foster care, II was placed in three RTCs and two emergency shelters prior" to placement in CWOP. (*Id.*) He was diagnosed with "Bipolar, and as having 'Disruptive Behavior Disorder,'" as well as "Major Depressive Disorder, Conduct Disorder, and Poly-Substance Abuse Disorder." (*Id.* at 7.)

The fight occurred in a CPS office used as a CWOP Setting. (*Id.* at 8.) "Staff alleged that II became angry when a male staff person asked him to stop using profanity, and stated that II repeatedly hit the staff person in the face, injuring the staff person. The police were called, but did not arrest II. During the investigation interview, II said that after he called the male staff person the 'n-word,' that the staff person got very angry, reached over and grabbed II by the neck, and started choking him. II claimed that he punched the staff member to defend himself, and that the

---

[128] "Bath salts" are synthetic central nervous system stimulants that mimic the effects of cocaine, methamphetamine, and MDMA. DEA, Bath Salts 1 (Oct. 2022), *available at* https://www.dea.gov/sites/default/files/2023-03/Bath%20Salts%202022%20Drug%20Fact%20Sheet%20NEW.pdf.

staff person punched him back. The staff person refused to give a statement to the investigator because 'he did not want to get [II] in any kind of trouble.'" (*Id.* at 8.)

And violence at CWOP Settings can lead to further violence, sometimes years later. Ms. Dionne recounted the experience of one of her clients, a sexually aggressive boy who spent over a year placed in CWOP, then over a year in an RTC, before "finally get[ting] into a foster home." (D.E. 1488 at 193:4–6.) A couple weeks later, he called Ms. Dionne "from a hospital . . . and he has just spent the entire night having sexual assault kits." (*Id.* at 193:7–9) The assault was committed by a child with whom Ms. Dionne's client "had had negative interactions," including "major fights in a CWOP," after the child was put in the same room as Ms. Dionne's client. (*Id.* at 193:14–16.) This incident is particularly disturbing because the children's history was in their records, so the foster mother's placement agency should have known not to place the two children together.[129] (*Id.* at 193:10–16.)

### d. Drug, alcohol, and tobacco use

The presence and use of drugs, alcohol, and tobacco are also remarkably common in CWOP Settings. Ms. Pennington testified that the lawn and driveway of one of the CWOP Settings she visited was "typically absolutely littered with cigarettes" to such an extent that it looked like the "outside of a honky-tonk bar." (D.E. 1488 at 16:19–23.) And "[t]he interior of the home – the floor sometimes was almost as bad as the grass outside in terms of the crushed cigarette butts on the floor . . . . There were, you know, empty crushed cigarette packets throughout." (*Id.* at 24:3–7.)

---

[129] This incident also illustrates why it is crucial that caregivers are timely notified of the sexual history of children in their care. Doctor Miller explained that such notifications are necessary for the protection of both children who are sexually aggressive or who have been sexually victimized and "the other children and the other people" in the child's environment. (D.E. 1488 at 290:14–18.) "You want to give those children as normalized a childhood as you can at the same time that you're creating and managing an environment around them where they and others are safe. . . . [A] caretaker can't do that if they don't have the information that they need." (*Id.* at 290:19–23.)

During cross-examination, she explained why she believed that these cigarettes had been smoked by the children:

> A. I know that I have seen several serious incident reports offered by caseworkers that describe children smoking, vaping pretty regularly, and that my youth tell me that they themselves smoke or that other youth do very regularly at the homes.
>
> Q. Ms. Pennington, I understand you may have seen other instances that indicate children have smoked. With regard to the cigarette butts that you describe in the facilities that you describe, do you have any information about those cigarette butts, how long they've been there and who put them there?
>
> A. I have never observed a cigarette going from someone's hand and lips to the ground at a CWOP home.
>
> Q. And no one told you where they came from?
>
> A. Yes. Serious incident reports describe children smoking inside and outside of the home very regularly, and my youth tell me that they themselves smoke, that other children smoke inside the home or outside the home regularly.
>
> Q. And when you say that, are you being specific in talking about the home you described earlier, or are these more general reports that you have seen that indicate children have smoked in other homes?
>
> A. I would have to look at my history of serious incident reports to match that -- the address of the one that I described earlier when I was visualizing, but I can say with some degree of confidence that every CWOP home in Bell County, the three that I am most familiar with, have pretty consistent reports of smoking inside and outside the home and that my youth have described that happening at every one of those houses.
>
> Q. Okay. Including by the children themselves?
>
> A. Only by the children. I've never seen in a serious incident report anything about the staff's own smoking, and a youth has never told me that a staff member smokes . . . .

(*Id.* at 54:5–55:13.)

When asked whether she believed it was unusual for children placed in CWOP to use marijuana, Ms. Pennington replied that marijuana use is "not unusual at all. That's consistently reported in serious incident reports. And my youth tell me that that is a matter -- matter of course." (*Id.* at 57:5–7.) And Ms. Dionne testified that the last time she was at a CWOP Setting, "there was a pregnant . . . 12-year-old smoking. There was somebody else -- another child smoking pot. There was -- marijuana." (*Id.* at 161:15–18.)

The Monitors have likewise reported that substance use by children placed in CWOP is a widespread problem, both while they are in the CWOP Settings and on runaway status. For example:

- BB, a PMC child who was sixteen at the time of the September 2021 report, "has been without placement and housed in a CWOP Setting seven times." (D.E. 1132 at 56, 57.) Her "most recent period without placement started on May 30, 2021 . . . . This CWOP Setting stay has been punctuated by BB running away[130] . . . . On July 26, 2021, BB was arrested and placed in juvenile detention because she had marijuana with her when she returned to the CWOP Setting after having run away. Notes in a July 2021 monthly evaluation in her IMPACT records note, '[BB] continues to be in CWOP, however, appears to be leaving the facility when she is not suppose to [sic] . . . . On July 26, she left the facility and went to get high with whoever she goes to, and came back and was arrested . . . due to her being in possession of marijuana.'" (*Id.* at 58 (first and second ellipsis added).)

- "[S]takeholder interviews, IMPACT records, and shift logs note that children in [Bell County CWOP settings] are obtaining and using illegal drugs. Children are often observed with, or return from runaway events smelling of, marijuana." (D.E. 1425 at 33.)

- "[A] Serious Incident Report dated July 14, 2023, notes that when a caseworker recovered FA, HB, AW, and HM from a runaway event and returned them to the house, LT was waiting for them, though she was housed at a different location." (*Id.* at 33.) "During this time something was passed to [HB]. When staff tried to figure out what

---

[130] BB's IMPACT records indicate that "she was sexually exploited during at least one of these runaway incidents." (D.E. 1132 at 58.)

[HB] was holding [LT] came up to her and took it from her hands, and then put it in her mouth and ate it. At this point, [HB] became very upset and kept telling us that she had nothing in her hands . . . Staff went into [HB's] room to look around and noticed a small bud of marijuana on the dresser." (*Id.* at 33.)

- "The monitoring team met and interviewed AW during a September 18, 2023, visit to the Bell County CWOP Setting where she has been living for months." (*Id.* at 18.) She reported "that she left often to spend time with her boyfriend (who she described as 'older' and said that he was someone she had known 'for years'), to smoke marijuana, or just to take a walk." (*Id.* at 18.)

- "Male foster children housed at the Bell County CWOP Setting also seemed to have access to illegal drugs." (*Id.* at 35.) "Shift logs also document several of the male foster youth smoking marijuana or vaping THC on a regular (and perhaps daily) basis. They smoke marijuana inside the house, in the yard, or return to the house after being gone, smelling strongly of marijuana, according to shift log notes. On several occasions, caseworkers or law enforcement found either marijuana or THC vape cartridges while they were searching or cleaning the children's rooms." (*Id.* at 35.)

- A Serious Incident Report dated February 7, 2023, "indicated that when RJ and another youth came downstairs and went out the back door, staff could smell marijuana. When staff inspected the upstairs bathroom, they found a 'green leafy substance' in the sink and toilet." (*Id.* at 36.)

- A second Serious Incident Report, dated February 26, 2023, recounts that "[a]t approximately 9:30 [name omitted] noticed a yellow towel under the bathroom door upstairs." (*Id.* at 36.) The CWOP worker "opened the restroom and it smelled like

marijuana, and there was a lighter on the sink. I grabbed the lighter, which was later turned over to LE. The window was open. [RJ] asked if LE was going to be called. I informed him yes. . . . [RJ] stated he was upset and stated that if we don't care he doesn't care and started to vape in front of us. He stated that he did not smoke marijuana. He ran outside with a package and ran around the corner. LE arrived around 10:18pm. At this time, [RJ] handed over a vape to the officer and stated that is all he had." (*Id.* at 36 (ellipsis added).)

- A third Serious Incident Report for the same location, dated March 17, 2023, recounts that "when staff showed up at 8PM for the 8PM – 12AM shift, groceries were being delivered by another worker. Staff was notified there were concerns that [RJ] might be under the influence of Marijuana. The youths immediately began hoarding food items, cooking and eating various items. At 9PM, staff checked on the youths while they were upstairs. [RJ], [A], [S] and [J] were observed not in the home due to having climbed out of one of the upstairs bedroom windows and onto the roof. Staff stood outside the backyard and yelled towards the youths on the room to come inside and they are not allowed to be on out on the roof. The youths could be heard mocking the instructions. There was a sweet and smokey aroma outside while the youths were on the roof, as if they were smoking swisher sweets on the roof. Shortly after, the youths came inside. [RJ] said they were never outside. Staff confronted him that the house was searched and none of the youths were inside. He then responded that staff can't tell the youths to not go out on the roof, because this is their home and it is their roof . . . At 9:18 PM, staff walked upstairs again and [J] was observed drinking a beverage from a glass bottle

173

and quickly hiding it in his closet . . . The police officer on duty . . . searched [J's] closet and found a 750 ml bottle of Campo Viejo Rose wine." (*Id.* at 35–36.)

- "More recent shift log notes (for June 28, 2023, through September 18, 2023) show that RJ frequently rolls marijuana cigarettes in front of the staff supervising the CWOP Setting and has smoked them inside the DFPS-leased house. Some caseworkers have begun removing the knobs to the kitchen stove so that RJ and other children can't light cigarettes or joints from the stove." (*Id.* at 36.)

The Monitors also report that there is drug dealing in CWOP Settings:

- One child, RD, was "found to be in possession of large amounts of marijuana." (*Id.* at 34.) Specifically, she "had a backpack full of [marijuana] gummies," which she was distributing to other girls in the CWOP Setting. (*Id.* at 34 (two workers observed that HB "had weed gummies"; when asked where she obtained them, HB "indicated" that they were from RD).) Another child, AW, "came out to the living room and smelled very strong[ly] of marijuana." (*Id.* at 34.) "After the police were called," RD gave the caseworker "a bong with marijuana residue, 10 bags of marijuana gummies, and a sandwich bag with small marijuana pieces." (*Id.* at 34.)

- A subsequent search of RD's room, conducted while she was at school, located "vape juice." (*Id.* at 34.) When RD returned and realized that her vape juice had been confiscated, she stated that the CWOP workers "had no right to go through her things." (*Id.* at 34.) She then left the room and returned a few minutes later with still more marijuana gummies. (*Id.* at 34.) She refused to turn them over to the CWOP workers; instead, she "quickly gave some to a couple of other youth," and the three girls ate the gummies. (*Id.* at 34.)

- "IMPACT records for another PMC child, who was taken to the Belton CWOP Setting on September 13, 2023, show that on September 18, 2023, his caseworker said that he had been buying marijuana for children in the home." (*Id.* at 37.) A shift log from the prior day is consistent with the caseworker's statement, as it notes that this child "'asked workers if he could get his money' and 'asked for $80 to go to the Dollar Store.' He and another child left the house and when they returned approximately one hour later, he gave the staff $36 to put back in the file cabinet for him. When the staff person asked what he spent $44 on at the Dollar Store, he told them he spent it on drinks and candy. The shift log notes that the children returned without any drinks or candy with them." (*Id.* at 37 n.52.)

Moreover, the children engage in dangerous behavior to obtain these substances. For example, Ms. Carrington knew a child who "was a cigarette smoker. . . . He would go and ask people for cigarettes. . . . So because he was addicted to cigarettes, that's what he would do. That's a high-risk behavior." (D.E. 1488 at 221:2–6.) Ms. Dionne likewise explained that children placed in CWOP "spend all day walking around the neighborhood, somehow getting drugs, somehow getting alcohol, somehow getting vapes and cigarettes, finding their way to adults who are willing to take them places." (*Id.* at 168:2–6.) And the Monitors note that RD would frequently run from CWOP Settings and "return[] smelling like marijuana." (D.E. 1425 at 24 n.41.) "Her shift log for September 11, 2023, notes that she told the staff supervising the CWOP Setting that a police officer was 'upset with her' because 'she was standing with adult males holding a blunt when the Officer pulled up.'" (*Id.* at 24 n.41.)

### e. *Weapons at CWOP settings*

The Monitors have repeatedly documented the presence of weapons in CWOP Settings. In September 2021, for example, they reported that a child found a pellet gun in the office in which

she was housed. (D.E. 1132 at 100.) The Serious Incident Report explained that the child "found what looked like a rifle when she was 'roaming' through the CPS office where she was living. She ran to the conference room with the gun to show it to staff, who initially thought it was a real gun." (*Id.* at 100.) "[A] police officer later identified the gun as a pellet gun, and disassembled it." (*Id.* at 100.)

More recently, the Monitors documented concerns about firearms at the boys' CWOP Setting in Belton. In February 2023, law enforcement searched the residence and found "BB's, and a spin of a bullet in [RJ's] room." (D.E. 1425 at 36.) RJ denied having a gun but told law enforcement that "there was one out back in the yard." (*Id.* at 36.) "He stated that another peer who left stated he would find a gun in the yard." (*Id.* at 36.) Law enforcement found no gun in the yard, and the author of the serious incident report believed that RJ was referring to a BB gun that had previously been turned in. (*Id.* at 36.) The Monitors also document that "on September 4, 2023, RJ was overheard having a phone conversation with someone 'about getting a [G]lock 42,' telling the person on the phone, 'I am at the same placement.'" (*Id.* at 38 (brackets retained).)

Concerns were also expressed regarding fifteen-year-old LD, who had "been placed at the Belton CWOP Setting since June 2, 2023, leaving once for a psychiatric hospitalization on July 27, 2023, and for a brief placement in an RTC that started on August 14, 2023, and ended October 2, 2023. On October 3, 2023, LD returned to the Belton CWOP Setting despite an order in his conservatorship case prohibiting further placement in a CWOP Setting." (*Id.* at 37.)[131]

An IMPACT Contact note indicates that on July 24, 2023, LD's biological father reported that LD had sent social media messages and texts, pictures, and videos "indicating that [LD] was in possession of firearms and that he had sold some of those firearms. He also sent a video of himself

---

[131] The Monitors note that LD frequently ran away from the Belton CWOP Setting. (D.E. 1425 at 37.)

shooting a weapon in what appeared to be a park." (*Id.* at 37.) Later that day, LD's half-brother

"report[ed] that [LD] had reached out to him with texts, videos and pictures also indicating that he

was in possession of firearms and that he had stolen and sold some of the guns." (*Id.* at 37.) And

a Serious Incident Report for July 24 indicated that LD and RJ may have had a fistfight over a gun:

> [RJ] went outside and staff heard some yelling and when they went out [RJ] and [LD] were fighting. Staff . . . ran outside to break them up. [LD] and [RJ] were separated and [RJ] claimed that [LD] was sending nude inappropriate pictures to his girlfriend. [RJ] also claimed that [LD] had a gun but claim[ed] that he took the gun away from him and gave it to his cousin in Austin. [RJ] claimed that that was why [LD] was angry with him. [RJ] claimed that [LD] ran upon [sic] him first starting the conflict. . . .

(*Id.* at 38.)[132]

And at the Contempt Hearing, Ms. Carrington recounted her own experience in which a child

placed in CWOP brought a firearm to a CWOP Setting. On the night of this incident, Ms.

Carrington and a colleague were supervising "11 to 12 hotels" and two residential CWOP Settings

in Houston from 6pm to 6am. (D.E. 1488 at 229:14–15, 231:22–23.) A child left one of the

residential Settings, then returned with a gun. (*Id.* at 229:22–23.) Neither the on-site security guard

nor the CWOP workers discovered the gun; they only learned this child had the firearm at around

9pm, when he "threatened one of the other youth, told him that he was going to kill him." (*Id.* at

230:2–3.) Ms. Carrington's co-supervisor had to deal with that incident, and Ms. Carrington had

---

[132] That LD might have a weapon, or access to weapons, is particularly concerning because he has threatened to kill his caseworker:

> LD's IMPACT records show that on July 26, 2023, after he was fired from his job at a pizza restaurant (due to his age), he lashed out at his caseworker, and told him that the next time the caseworker came to the CWOP Setting, LD would "shoot [him] in the head" and "that [he] would be stabbed" and that "all of the boys in the house were going to give [him] a beat down." The IMPACT Contact note indicates that the "boys in the home heard him and were cheering him on."

(*Id.* at 43.) It is also noteworthy that the caseworker on the receiving end of LD's threats was the same one who, just two days earlier, received the reports from LD's father and half-brother regarding LD's possession of and access to firearms. (*Id.* at 43.)

to supervise all twelve of the CWOP hotels for the rest of the night. (*Id.* at 231:1–23.) And the following morning, she had to go straight to her regular job. (*Id.* at 232:8–9.)

### f. Emotional trauma and self-harm

The Monitors indicate that the trauma begins immediately upon a child's placement in CWOP, noting that caseworkers have "expressed concern for those children on their caseloads who they have had to bring to a CWOP Setting." (D.E. 1425 at 44.) One twelve-year-old child, for example, was "terrified" when his caseworker left him at a CWOP hotel setting. (*Id.* at 44.) Another child, FV, was "in good spirits" and "optimistic about going to" a CWOP "house with other boys." (*Id.* at 44.) But as soon as FV and the caseworker arrived, the other boys "verbally attacked" FV, and one boy said that the caseworker "needed to get [FV] out of here." (*Id.* at 44.) "At this point [FV] was shaking with fear" as he stood next to his caseworker. (*Id.* at 44.) And "[t]he caseworker for a female child who was placed at one of the Bell County CWOP Settings for just under one month noted . . . that the child asked to be moved to a different home soon after being placed there. The . . . note states that the child 'expressed her frustration with the behaviors of the other girls at the CWOP location' and 'stated that she was not happy at CWOP'" because "'one of the girls started to bully her.'" (*Id.* at 45.)

Testimony at the Contempt Hearing indicated that the trauma continues beyond the initial placement, to the extent that children placed in CWOP develop coping mechanisms. For example, one of Ms. Pennington's clients coped with placement in a CWOP Setting by "dragg[ing] his box spring and mattress into the closet" because "he felt safer there." (D.E. 1488 at 36:10–13.) "He felt that he might be . . . harassed less or messed with a little less. He felt like his belongings might be more secure, that he had a hard time sleeping in the bedroom." (*Id.* at 36:13–16.) Ms. Pennington interpreted this as "nesting and creating . . . a safe cave to block out some of the distressing" CWOP "environment." (*Id.* at 36:18–19.)

178

Ms. Juarez described firsthand the emotional toll taken by placement in a CWOP Setting.

Q. Was it tough for you, Ms. Juarez?
A. Yes.
Q. Was it -- was it hard on you emotionally?
A. Yes.
Q. How did it make you feel when you were staying in these places like hotels and offices and this church?
A. Bad, because they would tell me that I was in CPS because my parents didn't want me.

. . . .

Q. Ms. Juarez, when you were staying in these places, these offices, people were trying to beat you up, how did you feel? How did you -- did you feel like you were fighting for your life?
A. Yes, because I was literally fighting for my life.

(D.E. 1487 at 262:10–263:20.) Indeed, Ms. Juarez ended up running away from the CWOP Setting because she was "afraid for [her] life." (*Id.* at 264:6–8.) She noted bluntly that the State did not have a safe home for her, and explained that after running away, she found a safe home all on her own.[133] (*Id.* at 264:10–22.)

Other children react to the stress of placement in a CWOP Setting through self-harm or suicide attempts. For example, fourteen-year-old SO attempted suicide twice while in a Bell County CWOP Setting. (D.E. 1425 at 31.) The first time, SO cut "her arms and wrists, resulting in hospitalization." (*Id.*at 31–32.) SO's second attempt took place after "a very chaotic night." (*Id.* at 32.) She and another child "were attempting to run away"; they "later returned on their own, but left again, when staff followed them outside and 'found the girls in the neighbor's car.'" (*Id.* at 32.) Later, SO and the other child "obtain[ed] their medication boxes and took them to their room," "discovered the medication boxes were locked," then "took them outside and smashed them on

---

[133] This placement was approved by a state court judge. (D.E. 1487 at 264:4–5.) And Ms. Juarez is not the only child placed in CWOP who had to find their own placement—as noted later, one child found his own placement after the State refused to pick him up from jail. *Infra* page 192.

the ground until they were able to open them." (*Id.* at 32.) SO and the other child each "ingested all their medications and were both hospitalized." (*Id.* at 32.)

BF, who was discussed earlier,[134] has several documented self-harm incidents at CWOP Settings. On May 21, 2023, "[t]he youth" at a Bell County CWOP Setting "were name calling [BF]." (*Id.* at 33.) BF "grabbed a plastic knife from the kitchen," "refused to give" the knife to the Child Watch worker, then "started hitting her head on the side of the dryer." (*Id.* at 33.) BF "then started punching herself in the side of the head." (*Id.* at 33.) When the worker "placed their hand between" BF's "punch and her head," BF "went outside and punched the garage with both fists," then "went [back] inside the house and hit the side of her head on the air conditioner panel." (*Id.* at 33.) And on August 17, 2023, while at a CWOP hotel, BF "became dysregulated, 'began crying and walked to the window in the room' and 'swung her fist at the window and it shattered cutting her arm on her wrist and her forearm.'" (*Id.* at 33.) Fortunately, "[t]he cuts were superficial and did not require stitches." (*Id.* at 33.) But three days later, BF "again cut herself with glass during two different shifts, and she was admitted to a psychiatric hospital." (*Id.* at 33.)

In an earlier report, the Monitors noted that one child left the CWOP Setting "where he was living because he was sad that DFPS had not found a placement for him. The child ran to a nearby park, where he found a piece of rope and attempted to kill himself by hanging from the monkey bars on the playground." (D.E. 1132 at 100.) The attempt failed, but only because "the rope broke and he fell to the ground." (*Id.* at 100.) This child, referred to as "LL" by the Monitors, had "a history of depression, anxiety, low self-esteem, and psychiatric hospitalizations" and, "[e]arly in life," he "began exhibiting self-harming behaviors which led to an ongoing need for mental health

---

[134] *See supra* page 154, *supra* footnote 127.

services." (D.E. 1132-2 at 12.) The Monitors note that during his placement in CWOP, this child

"had not been receiving any of the medication prescribed for anxiety or depression." (*Id.* at 12.)

> The same report documents that another
>
> PMC child, who had a history of self-harm prior to being in a CWOP Setting, was taken to the emergency room from a CWOP Setting after having engaged in cutting, with the injuries described in the report to SWI as "about 15-20 cuts on [the child's] arm that were self-inflicted using a blade from a shaving razor." A Serious Incident Report completed by staff indicated the child was bleeding heavily due to the cuts. When her caseworker met with the child at the hospital, the caseworker described the injuries in a Face-to-Face Contact Note in IMPACT, "[Caseworker] observed multiple cuts over her entire inner arm from the elbow to the wrist." The investigation report noted that the day before the child cut her arms, a child at the same location had to be transported to the hospital after swallowing earrings. On the same day, another child in this CWOP Setting locked herself in the bathroom and cut her wrists, but EMS determined her injuries did not require hospitalization.

(D.E. 1132 at 99.) Blades from disposable razors were also used in self-harm incidents "in other

CWOP settings"—one incident "involved only superficial cuts," but the other "resulted in staff

finding the child in a puddle of her own blood." (*Id.* at 99.)

> Another Serious Incident Report documented an incident involving a child who had a knife and locked herself in the bathroom of the CWOP Setting where she was housed; when staff forced their way into the bathroom, she was observed to be cutting herself and said that she would kill herself. At the same CWOP Setting, another youth locked himself inside the bathroom and tied a string from a basketball net around his neck. When the staff gained entry, they found the youth unconscious. Staff hurriedly removed the string and the youth regained consciousness . . . .

(*Id.* at 100.)[135]

A Serious Incident Report reproduced in the Monitors' January 2022 report vividly illustrates

"the challenges that staff who are not trained in behavioral management experience in supervising

children in CWOP Settings. The child involved was an eight-year-old PMC child" (D.E. 1171 at

6):

---

[135] Recall that "direct care staff in treatment settings" are trained to be aware of the danger that even everyday objects can pose, but CWOP workers lack such training. *Supra* page 131 (citing D.E. 1132 at 99).

[Child] was asked to brush her teeth. She brushed her teeth then went to the couch and refused to get up and go to bed. Multiple staff asked her to go to bed. She grunted at staff and refused. Staff . . . tried to get her to stand up. Child would not stand up. [Staff person] carried her to the hallway and child attempted to spit on [staff person]. [Staff person] set child on the floor due to spitting and wiggling.

Child started spitting on staff . . . Child then took her shirt off. Staff requested she put it back on. She would not put it back on and threw it at staff. Child continued spitting on staff. Child took pants off. Staff request child put pants back on. Child refused and threw pants at staff. Child continued spitting on staff. Child continued to sit in hallway with no clothing for several minutes. . . . [Staff person] called On-Call Supervisor . . . who advised to keep line of sign on the child and ignore behavior. Staff all went to end of hall and kept line of sight. . . .

Child began hitting her head on the wall. Staff asked child to stop, she did not. [Staff person] got a pillow to put behind her head. Child took the pillow and tried to throw it and began hitting elbows on the wall. Child hit head on the wall again. [Another child] was trying to go to sleep in the room next to this and was upset that the child was making the noise . . . Child then got into [another child's] bed, still with no clothes on and began spitting on everything and throwing [the other child's] things off [her] bed. Child did not listen . . . [Staff] called On-Call Supervisor again who stated to call 911 and have a staff sit with child at the ER.

Child began biting herself on the arms and legs during this phone call. [Staff] called 911 and requested an ambulance to get assistance with the child's self-harm behavior . . . Law enforcement arrived, not an ambulance like requested. Law Enforcement observed naked child banging head on the wall and spitting at law enforcement. . . . Law enforcement asked child why she didn't want to go to bed. Child stated she wants her brother, law enforcement asked where he was. Child stated in hospital, CPS put him there. Child started crying. Law enforcement continued to speak to child about going to bed and asked to see her bedroom. Child took them to her room. Child put clothes on, and law enforcement read her a bedtime story and left.

(*Id.* at 6–7 (paragraph breaks and some ellipsis added).)

But positive interactions with law enforcement are not the norm. Quite the contrary interactions with the security guards at the CWOP Settings and law enforcement called to the CWOP Settings frequently traumatize or retraumatize the children placed in CWOP.[136] As Ms. Pennington explained:

---

[136] The physical trauma they suffer because of these interactions will be covered shortly. *See infra* page 185–92.

Q. Based on your personal observation of these CWOP placements, was the security not - - were the police officers and security, did they have a role in managing the children as well, you know, taking -- supposedly taking care of the children? Did you see that?

A. Yes, absolutely. And, in fact, I would say that the security roles were much more interactive with the youth, and I assume it's because they did display this authority or this power, and so they act more of the . . . traditional, you know, male authoritarian . . . . They would come with the power and the force.

Q. Based on your background in sociology and your working with these children in child welfare situations, is that sort of a police officer presence a constructive thing for your clients to have as a -- kind of a managing them as children as such a de facto caseworker for them?

A. I don't think so. I think what we know about power and control and trauma, specifically for these children, from a theoretical perspective as well as what I know from my personal interactions with and examination of the history of these youth, that it's absolutely the wrong direction.

. . . . [S]ome of the youth that come into care may have been removed from their homes because of, say, a domestic violence situation. And so they have had young experiences of fear and distress and trauma where police may have been present.

So, you know, when I see police, that means mom is going to jail. That means I'm going to see . . . dad dragged away in handcuffs. It's a trigger for fear for some of these youth. It's not the kind of nurturing and the safety and the security, the nurturing of resilience that we want to see when we work to undo trauma for these children.

(D.E. 1488 at 39:8–40:15.)

In other cases, frequent contact with law enforcement results in the opposite problem: children placed in CWOP will come to view law enforcement officers as the only stable fixture in their lives, causing them to engage in risky behavior to induce further interactions with law enforcement. For example, the Monitors reported that RD, who was held at a Bell County CWOP Setting,

made very frequent (and sometimes multiple times a day) requests to contact an officer or officers according to shift logs. She also discussed with other children at the CWOP Setting an officer that she found attractive. On September 11, 2023, when a police officer returned RD to the CWOP Setting at 1:28 am, the caseworker who was supervising children "asked if he had any ideas on how to break the cycle of [RD] leaving just to get police called." The officer responded that "he thought that her contacting them was more that they were a stable fixture to her life than the people who are randomly on shift for a few hours" and "stated that once they had denied her the ability to call him and she ended up cutting herself just to get them out there."

(D.E. 1425 at 25 n.42.)

And for some children placed in CWOP, the emotional trauma suffered because of the placement begets further trauma and harm. As noted earlier,[137] one of the children on Ms. Reveile's caseload was raped by several strangers after she left a CWOP Setting. Ms. Reveile recounted that after that horrific ordeal, the child "just destabilized from there, and it was so hard to watch because she had to move so many times." (D.E. 1487 at 211:2–3.) As a result, she "never had consistent treatment." (*Id.* at 211:4.) Instead, she bounced between "[l]ots of different psych hospitals" and "ended up in jail at one point." (*Id.* at 211:18–19.)

Eventually, Ms. Reveile was able to find a placement. (*Id.* at 212:2–4.) But just days after the child arrived, Ms. Reveile "start[ed] getting more reports of her behavior just getting worse and worse. She's breaking things. She's leaving. She's screaming. She's threatening, threatening herself and others." (*Id.* at 212:13–16.) Further trips to a psychiatric hospital followed; with each trip, Ms. Reveile would have to "deescalate" the placement so that they would not discharge the child. (*Id.* at 212:25–213:5.)

But despite Ms. Reveile's best efforts, the placement eventually discharged this child. (*Id.* at 213:10.) And at this point she was eighteen, so CWOP was no longer an option. (*Id.* at 213:12.) She "ended up having to move in with her sister, and then her sister kicked her out, and then she ended up somewhere in Kyle. And I heard from her maybe once every couple of months until I left." (*Id.* at 213:14–17.) Ms. Reveile noted that "these sort[s] of traumatic events" are "common." (*Id.* at 213:18–23.)

---

[137] *Supra* page 160–61.

### g.  Security guards, law enforcement, and jail

Because children placed in CWOP have experienced serious trauma and are not receiving adequate care, they sometimes act out. For example, Ms. Pennington testified that one of her clients, a 17-year-old youth, allegedly "ripped the frame off of the door" at a CWOP Setting and damaged a wall "during a state of distress." (D.E. 1488 at 29:18–20.) She clarified that this sort of outburst from children placed in CWOP is "not uncommon" (*id.* at 33:4):

> These children are all in the situation they're in because they have experienced abuse or neglect that was not their fault, but yet that they must be responsible for carrying. This type of response is a known[,] predictable, reasonably expected response to a child who has experienced and is continuing to experience trauma. And the CWOP homes, the conditions in the homes themselves, perpetuate and re-traumatize these children.
>
> And so they're acting out -- and I don't mean acting up or misbehaving. I mean acting out what they're feeling inside is reasonable for children who have gone through this.

(*Id.* at 33:7–18.) Doctor Miller agreed: "These kids are not bad kids. These are kids who are hurt, and they're damaged, and they're traumatized, and they're in pain, and they don't have the people around them who have the skills and abilities to help them deal with that. . . . [I]f I were in there, I would probably be punching holes in walls too." (*Id.* at 276:2–8.)

In many cases, however, these outbursts are dealt with by security guards or law enforcement, who all too often use restraints and other methods of control that would be impermissible in a licensed setting.

"In a licensed childcare operation in a residential setting, physical intervention and restraint practices are regulated by" HHSC. (D.E. 1425 at 10.) These regulations define the type of physical interventions and restraints—termed "emergency behavior intervention"—that may be used. *See* 26 Tex. Admin. Code § 748.2451(a). They define who may administer emergency behavior restraints. *See id.* § 748.2453 ("Only a caregiver qualified in emergency behavior intervention may administer any form of emergency behavior intervention, except for the short personal restraint of

185

a child."). They provide that less restrictive methods must be attempted before an emergency behavior intervention is used, *id.* § 748.2455(a)(1), and that—as the name implies—such interventions can only be used in "[a]n emergency situation," *id.* § 748.2455(a)(2)(A). They also define under what circumstances a "short personal restraint" may be used. *See id.* § 748.2459 (limiting their use to "urgent situations"). And there are detailed training requirements for a caregiver to qualify to administer emergency behavior interventions. *See id.* § 748.889.

Moreover, emergency behavior intervention "may never be used as: (1) Punishment; (2) Retribution or retaliation; (3) A means to get a child to comply; (4) A convenience for caregivers or other persons; or (5) A substitute for effective treatment or habilitation." *Id.* § 748.2463. Regulations also enumerate "[c]ertain techniques [that] must not be used on a child, including:"

> (2) Aversive conditioning, which includes, but is not limited to, any technique designed to or likely to cause a child physical pain, the application of startling stimuli, and the release of noxious stimuli or toxic sprays, mists, or substances in proximity to the child's face;
>
> (3) Pressure points;
>
> . . . .
>
> (6) Taser or stun guns.

*Id.* § 748.1119. In June 2023, Associate Commissioner Banuelos affirmed that in a licensed placement, staff cannot handcuff, taser, or pepper spray children.[138] (D.E. 1395 at 214:2–13.)

In the unlicensed, unregulated CWOP Settings, on the other hand, children have been subjected to all of these "means that are otherwise strictly prohibited in the childcare environment." (D.E. 1425 at 11.) The Monitors note that the State's contracts with the companies that provide security guards at CWOP Settings do not incorporate the above regulations regarding restraints. (*Id.* at 11.) And while the contracts provide "that the security officers will assist with de-escalation of the

---

[138] The Monitors note that the Texas Administrative Code bars the use of tasers even in secure juvenile facilities. (D.E. 1425 at 11 n.25 (citing 37 Tex. Admin. Code § 343.804(10)).)

child or youth or intervene when necessary to protect staff, other children, and youth, or themselves," there are "no additional requirements that are specific to youth, mental health, or youth in crisis." (*Id.* at 11.)

Because of this and the lack of appropriately trained staff, children placed in CWOP are frequently restrained with handcuffs. For example, the Monitors reported that in "May and June 2023, there were 92 serious incident reports involving 54 PMC children." (*Id.* at 10.) Seventeen of those ninety-two reports reflect "that security officers under contract with DFPS physically intervened and/or restrained the child," and six of the seventeen indicate that security restrained the child using handcuffs. (*Id.* at 10.) In most cases, handcuffs were used to prevent children from causing self-harm. (*Id.* at 10.) Indeed, the Monitors note that in "most of those instances, physical restraint through handcuffs appears to be the only resource available at the site to prevent a child from self-harm as there are no other available resources for the caseworkers, working as caregivers, to assist children in crisis." (*Id.* at 11.)

Some Serious Incident Reports document even more egregious uses of force by security guards. One report documented "an on-site officer using pepper spray 'multiple times' on two 13-year-old girls." (D.E. 1171 at 7.) This incident occurred at a CWOP hotel Setting because the children "did not want to return to the hotel room after being in the pool." (*Id.* at 7 n.11.)

> One of the children was restrained by the officer when she would not get up from the floor to go up to the room. At that point, the other child walked up behind the officer and attempted to reach for the officer's weapon; he released the restraint on the other child and attempted to restrain the second child. The first child began hitting the officer with "large sticks" and the second child also began hitting the officer. The officer "pepper sprayed both of the girls multiple times." The SIR notes that the girls were taken to juvenile detention and that the officer "had his glasses broke[n] and some scratches from the sticks." The SIR does not note whether staff followed proper decontamination procedures after the officer pepper-sprayed the children.

(*Id.* at 7 n.11.)

A second "SIR documents an on-site officer using a Taser on a child to break up a fight between the child and another youth." (*Id.* at 7.) The SIR documents that two children, "[M] and [I] got up like they were going to fight." (*Id.* at 7 n.12.)

> Staff attempted to redirect the youth but had to move out of their way to prevent worker from being caught between them. Officer . . . instructed Caseworker . . . and Admin . . . to remain in the sitting area as he attempted to get control of the situation in the bedroom area. Officer . . . stated that he was unsure who hit who first, but the situation quickly escalated. The officer instructed [the DFPS staff] to call 911 and he also asked dispatch for backup from . . . PD. [DFPS staff person] heard the officer tell the youth he had his taser and was going to use it, but both youths ignored him. [DFPS staff person] could hear the youth hitting each other and she went back into the bedroom area and [I] was on the ground with the officer beside him. Officer . . . had tased [I]. Officer . . . reported that he warned of the taser and neither boy complied.

(*Id.* at 7 n.12.)

And a third SIR "documents an on-site security officer slapping a child across the face in response to the child's profanity." (*Id.* at 7.)

> The security guard was standing in front of [F] and told him that he cannot talk to people like that. [F] threw the plastic spoon and pint of ice cream towards the worker and started to yell at the worker and security . . . The security guard slapped [F] across the face.

(*Id.* at 7 n.13.)

A more recent Serious Incident Report documented "that two children (both aged 15) were hitting one another." (D.E. 1425 at 11.) A security officer placed one of the children "in a chokehold and placed her on the ground." (*Id.* at 11 (quotation marks omitted).) "The officer released the child 'minutes later'" and a CWOP worker called 911. (*Id.* at 11.) "When the child acted out physically again, the security officer 'tried to restrain [the child] on the ground for a few minutes,' and then let the child get up while the officer went downstairs." (*Id.* at 11–12.) The report noted that this "security officer is no longer working shifts" at CWOP Settings. (*Id.* at 12.)

Another recent Serious Incident Report indicates that a seventeen-year-old child "was being disruptive in the hotel where she was being housed." (*Id.* at 12.) Specifically, she was "knock[ing]

on hotel room doors and yell[ing] in workers' faces." (*Id.* at 12.) "The security officer attempted to detain the child, which resulted in a physical struggle in the hallway between the child and the security officer where the child was able to obtain the security officer's weapon." (*Id.* at 12.) The child then "r[a]n away from the hotel." (*Id.* at 12.) Fortunately, before running away, she "threw [the weapon] to the floor" and it "was secured." (*Id.* at 12.)

And in one case, a security guard simply victimized a child: The Monitors reported that AZ,[139] "who was 16 years old at the time, was sexually abused by a security guard working at the CWOP Setting." (*Id.* at 14 n.28.)

Further, the Monitors report that workers supervising the children frequently call the police to CWOP Settings. (*Id.* at 10.) As a result, children placed in CWOP—most of whom have mental health diagnoses and other documented challenges—are put through the trauma of arrest; in May and June 2023, more than one quarter of the fifty-four children "who experienced a serious incident" in a CWOP Setting "were arrested because of the inherent chaos of housing children in this environment." (*Id.* at 10.) "Three of the children were arrested more than once, one of whom was ten years old." (*Id.* at 10.)

The Monitors recounted the events leading up to the ten-year-old's arrests. This child went directly from a psychiatric hospital to the CWOP Setting. (*Id.* at 12.)

> Because caseworkers and the contracted security officer were unable to safely care for her and obtain therapeutic services, her experience then culminated with two arrests on two consecutive days. With no other appropriate resources to assist in supporting the child and reducing harmful behavior, staff reported that after a conflict with the caseworkers (acting as caregivers) on May 23, 2023, the caseworkers summoned local law enforcement and the child was arrested. The next day, during another conflict, the ten-year-old was "taken to the ground" by the DFPS contracted security officer, and the caseworker summoned local law enforcement again. The child then subsequently endured being handcuffed, arrested, and transported to juvenile detention by responding police officers for the second time in two days. For the second arrest, the caseworker reported that the child was "arrested for

---

[139] As discussed earlier, AZ was also a frequent victim of sex trafficking. *See supra* page 143–44.

resisting arrest." The ten-year-old child was then in juvenile detention for 21 days. Age ten is the youngest that a child can be charged with a crime under Texas law.

(*Id.* at 12.) "When the child was released from juvenile detention 21 days later, this child was" again placed in a CWOP Setting, "and the same cycle repeated itself: she was admitted for mental health hospitalization," released to a CWOP Setting, "then arrested again." (*Id.* at 12.)

There is, of course, a direct relationship between a caseworker's caseload and reliance on law enforcement—as Ms. Carrington noted, "exhausted caseworkers rely on police" more than caseworkers who are not overloaded. (D.E. 1488 at 236:19–20.) To illustrate this, she recounted an incident that involved two of her "good caseworkers," who were supervising a nine-year-old girl at a hotel CWOP Setting on a Saturday morning. (*Id.* at 236:23–237:2.) After the child became upset and started acting out, one of the caseworkers called Ms. Carrington to "let you know that I'm getting ready to call the police." (*Id.* at 237:7–8.) Ms. Carrington then spoke with the child and learned that she just did not want to be stuck in a hotel room; she wanted to see a movie and get her hair done. (*Id.* at 238:3–4.) Fortunately, a third caseworker volunteered—on her day off— to pick the girl up and take her to the movies and hairdresser. (*Id.* at 238:10.) Ms. Carrington found the notion of calling the police because a nine-year-old child is acting out is "ridiculous," but she was quick to clarify that it was "a result of" the "sustained crazy that is CWOP." (*Id.* at 239:5–9.)

And for many of these children, arrest leads to another traumatic ordeal: jail.

Ms. Pennington explained that following their arrests, children placed in CWOP are typically charged with "criminal mischief," which is "a Class B misdemeanor." (*Id.* at 43:8–9.) Since Class B criminal mischief "is absolutely a candidate for bond," Pretrial Services will make the recommendation and the judge will grant bond—"[e]veryone's in agreement." (*Id.* at 43:18–23.) Before the child is released, however, Pretrial Services must verify the child's address. (*Id.* at 43:23–24.) But the State "tells Pretrial Services we don't have a placement for them" and

"refus[es]" to pick the child up from jail. (*Id.* at 44:2–7.) Thus, the State "is allowing the children to stay in what is undoubtedly a horrible environment for any person, much less a child who's experienced trauma." (*Id.* at 44:14–16.)

For example, the Monitors recount a "concerning incident" in which then-fifteen-year-old ZZ[140] was arrested during what "appeared to be a mental health crisis" that the CWOP workers were clearly unable to handle. (D.E. 1132-2 at 79.) ZZ's Service Plan documented that she:

> went into a convenience store and took her arm and cleared the entire top two shelves of glass liquor onto floor. There was major property damage to this store. [ZZ] then went to the back cooler of the store. Worker Holman went in the cooler with her trying to calm her down. That was not successful. She did not calm down. She threatened to hit the worker. Started throwing can drinks in the cooler. Worker . . . then allowed her to leave out the cooler to keep from being hurt. 911 had been called but [Law Enforcement] still had not arrived when [ZZ] exited the store. Worker Holman grabbed her shirt as she was about to run. Worker Holman and [ZZ] then had a physical altercation and [ZZ] still was not calm. There were two random men in the parking lot that offered to assist. Worker Holman could not keep [ZZ] from running. The two men assisted with keeping [ZZ] in place until LE arrived. They did not arrive until about 20 minutes later. It literally took 8 officers to cuff [ZZ] by feet and hands in the parking lot. She was fighting all the officers.

(*Id.* at 80.) ZZ was "then transported to Angelina County Juvenile Detention Center where charges [were] pending." (*Id.* at 80.) She was released two days later and was again placed in CWOP. (*Id.* at 80.)

And jail is especially traumatic for the seventeen-year-olds, as they are jailed with adults.[141] (D.E. 1488 at 43:8–13.)

---

[140] This is the same ZZ who attacked another child after that child reported that ZZ was using bath salts. *See supra* page 167–68.

[141] Worryingly, seventeen-year-olds are overrepresented in the population of children placed in CWOP. As the Monitors report:

> The majority (89%, 543) of children without placement during the period [January 1, 2022 to November 30, 2022] were teenagers. . . [T]he oldest children were 17 years old. . . . The vast majority of females without placement were teenagers (ages 13 to 17) (87%, 281) and 62% (202) were older teens aged 15-17. Male children without placement during this period were similarly aged: 91% (262) were teenagers and 72% (207) were older teens aged 15-17.

(D.E. 1319 at 4.)

Ms. Pennington noted that several of her client children "stay[ed] in adult jail for long periods of time because the department won't come get them." (*Id.* at 44:12–13.) Indeed, the State left one of them in jail for so long that the child "developed a relationship with" one of the guards, who "contacted the Department, and said, 'I want the child placed with me. I will take him from the jail.'" (*Id.* at 45:20–46:3.) "The child found a placement for himself from inside a jail cell because the Department of Family and Protective Services couldn't find . . . a placement that would get him out of jail. So he did it himself."[142] (*Id.* at 46:15–18.)

### 5.  *The physical conditions of CWOP Settings are shockingly poor*

At the Contempt Hearing, Ms. Pennington described what she would encounter when visiting one of the residential CWOP Settings in Bell County. She began by explaining how access is controlled when she visits a client at a licensed congregate care facility: "often . . . there may be a gate that . . . has an intercom . . . . You would have to often have an appointment and they know that you're coming. You would have to show your ID and bar card. They make copies." (D.E. 1488 at 18:1–8.) But "[t]his is absolutely not the situation at the CWOP house" (*id.* at 18:9); instead, "the door frame on the [front door] is often, you know, broken, damaged, written on. And the door is often unattended and standing open. . . . [N]ot propped open, but not actually latched" (*id.* at 16:25–17:3).

Ms. Pennington then described the appalling physical condition of the Setting:

Q. Now, the homes that you've seen, the placements that you've seen for these children that are put in CWOP homes, can you describe for the Court kind of what sort of state they were in, the condition they were in?
A. Sure. So they appear to be residential houses, in residential neighborhoods. And so when you pull up and walk towards the home, you will notice that the lawn and the driveway walking up is typically absolutely littered with cigarettes. The grass in the driveway appears to be, you know, outside of a honky-tonk bar.

---

[142] Recall that Ms. Juarez likewise found her own placement, which was approved by a judge. (D.E. 1487 at 263:24–264:5.)

(*Id.* at 16:14–23.) She was then asked about the conditions inside the home—"[w]ere they well kept, clean, that sort of thing?" (*Id.* at 24:1–2):

> A. Absolutely not. The interior of the home -- the floor sometimes was almost as bad as the grass outside in terms of the crushed cigarette butts on the floor, the carpet of the homes. There were, you know, empty crushed cigarette packets throughout. Sometimes there were empty, full, or half-full liquor bottles.
>
> . . . .
>
> . . . . The -- there's often damage to the walls, holes in the walls. There's, you know, dirt or grime or dark spots over the wall. The carpet is filthy. The furniture is dirty. It's just very, very messy. It's just in a state of complete disarray.

(*Id.* at 24:3–8, 28:20–24.) Ms. Pennington was then shown the following photograph of her client's room in the CWOP Setting and asked if the "littered, trashy, unkept situation in this room, is . . . consistent or unusual for these CWOP placements that you visited on behalf of your clients?" (*Id.* at 31:10–12.)



(PX 115 at 5.) She replied that other than the broken table

> this is absolutely consistent. This is not – this does not appear to me to be indicative of a
> state of particular distress. This is how all of the children's bedrooms and common spaces
> to some extent look typically every time I've been.
> Q: Meaning trash on the floor, bags for – looks like snacks, clothes, towels, empty water
> bottles, and who knows what else?
> A. Yes.

(D.E. 1488 at 31:13–20.)

Photographs taken by the Monitors during visits to CWOP Settings bear out Ms. Pennington's observations. For example, the following images were recently captured at a girls' CWOP Setting in Temple:







(D.E. 1425-1 at 1, 4, 6.) And these were taken at a girls CWOP setting in Killeen:













(D.E. 1425-1 at 8–10, 12, 14–15.)

To the extent the sites are cleaned, the Monitors report that the task falls on the already overworked CWOP workers, or on the caseworker whose child will be staying at the CWOP Setting. (*See* D.E. 1425 at 44 n.60 (One "[CWOP worker] noted that in addition to their supervision duties, they are often told that they are responsible for cleaning the CWOP Settings they supervise. The [CWOP worker] said that they have at times been assigned a list of chores that included dusting, mopping, and doing the children's laundry. Shift log notes confirm that caseworkers often clean the house and launder children's clothes."); *id.* at 45 (noting that one child's caseworker "swept" the floor of his new room and "disinfected the floor which had blood stains").)

Moreover, photographs taken by the Monitoring team show how the homes have been allowed to fall into a state of disrepair. The following photograph was taken during a visit to a site in Belton, in November 2021:



(*See* D.E. 1171 at 16–17.) The next photograph was taken less than two years later, on September 18, 2023 (*see* D.E. 1425 at 18 n.32):



(D.E. 1425-1 at 21.) As for the interior, the Monitors reported in November 2021 that it "appears to have been recently updated[ and] the furnishings were adequate and in good repair"; they concluded that "the interior of the house was in good condition." (D.E. 1171 at 16.) By September 2023, the interior had deteriorated substantially:



(D.E. 1425-1 at 22.)



(*Id.* at 25.)



(*Id.* at 26.)

Moreover, the residential CWOP Settings are often in unsafe neighborhoods. For example, the Monitors said, of their visit to "The Villas, a group of four houses in Von Ormy, Texas, that DFPS has leased from a private entity" (D.E. 1171 at 12 (footnote omitted)):

> Perhaps the most striking feature of The Villas is their proximity to an abandoned housing development. Though the houses that DFPS has leased appear to be new construction and in good condition, just across the street from the houses where foster children are living is a neighborhood that is completely abandoned. While the houses immediately adjacent to those leased by DFPS appear to be in good repair, few of them appeared to be inhabited aside from those leased by DFPS.
>
> The abandoned neighborhood across the street is blighted. The houses' windows are broken, garage doors are caved in, doors are missing from the houses, and the insides and outsides of houses are covered with graffiti. The houses are surrounded by tall, unattended grass. This abandoned neighborhood is easily accessible from The Villas, and the dangerous condition of the houses poses a significant safety risk to children. . . . [M]any of the children placed at The Villas have histories of self-harm and suicidal ideation; a neighborhood of abandoned houses, that are unsecured and contain broken glass and other objects that could be used to self-harm, pose a risk.

(*Id.* at 12–13.) The Monitors' photographs documenting this abandoned, blighted neighborhood are reproduced below:



(*Id.* at 13–14.)

More recently, the Monitors discussed a boys' CWOP Setting in Bell County, and noted that

the children housed there "seemed to have access to illegal drugs" (D.E. 1425 at 35):

The monitoring team interviewed stakeholders who reported that an apartment located behind the DFPS-leased house that sheltered boys was inhabited by adult drug dealers, and that the male foster children living in the CWOP Setting often ran to this apartment.

208

The Monitors received shift log notes for five foster children who were living at the Bell County CWOP Setting (located in Belton) that housed male children when the monitoring team visited. Shift logs confirm that several of the male foster children housed at the location spent time at an apartment behind the leased house and indicate that at least two children spent the night at an apartment behind the house.

(*Id.* at 35.)

Residential CWOP Settings are made further unsafe because, while the children may come and go as they please, they often have no way to contact their attorney, caseworker, or the abuse hotline. Ms. Pennington has "never observed a landline or a house phone" in a residential CWOP Setting. (D.E. 1488 at 37:13.) Therefore, the only way one can communicate with a child in such a Setting is "through the cell phones of whoever may be there working a shift." (*Id.* at 37:17–18.) And because the Child Watch workers are changing every four to eight hours, it is often impossible to get in touch with a child by phone. (*Id.* at 37:18–21 ("Those shifts are four or eight hours long, and they're constantly changing. So there's no way for me to know from the outside who may be working or how to get in touch.").) Of course, this hampers communication in the other direction as well: "[I]f a youth wants to call their attorney or call for help, medical help, or . . . call the ombudsman, then they would need to request the use of the phone from a worker who's there."[143]

(*Id.* at 37:22–25.)

Ms. Dionne handily summed up many of the problems with these CWOP Settings. The supervision is "two caseworkers who are doing their own work sitting at a table. . . . [F]or the most part they are head down while trying to stay out of the way while 12-year-olds and other children are running a home and living there alone." (*Id.* at 161:7–14.) After their shift ends, a CWOP worker will "get up, walk out the door, and the next one sits down. They don't even say bye." (*Id.*

---

[143] Ms. Pennington notes that one residential CWOP Setting "did have a cell phone that was meant to be for that home," but "the cell phone went away" after a few weeks. (D.E. 1488 at 38:1–4.)

at 161:9–10.) Moreover, the Settings are "filthy," the children "don't even have beds," and "[t]here's nothing in the fridge." (*Id.* at 161:4–5.) "[N]othing is adequate." (*Id.* at 161:6.) She noted that if a Residential Treatment Center "were run like a CWOP," "they would be shut down immediately." (*Id.* at 160:24–161:2.)

The hotels used to house children placed in CWOP are no better.[144] Like residential sites, there is a remarkable lack of security and supervision at hotel CWOP Settings. Ms. Dionne explained "I'm pretty sure I could drive to Austin right now, walk into a CWOP location and take two kids and nobody would blink." (*Id.* at 170:18–20.) She also told to Court about one of her clients who, while staying in a CWOP hotel Setting, would "walk[] out in her bra and underwear" and be picked up by men.[145] (*Id.* at 169:8–11.)

Moreover, testimony revealed that the State uses hotels that are already being used for sex and drug trafficking. Ms. Dionne explained that one of her clients was placed at a CWOP hotel site "[w]here you are seeing -- visibly seeing drug deals. You are visibly seeing sex work go on, and then there are CPS kids." (*Id.* at 169:18–20.) The Monitors have made similar observations. For example, they recount one Serious Incident Report that "documented [two girls] being exposed to and engaging with adults who were the subjects of a drug raid by US Marshalls in the Super 8 Motel where they were temporarily housed." (D.E. 1425 at 34.) The two girls left their room and went for an unsupervised walk. (*Id.* at 35.) Later, "the Sherriff deputy that was on shift went to the 3rd floor and found out the Marshalls had been watching the room on the 3rd floor and completed a drug raid and the girls were in the room during that period of time [the CWOP workers] couldn't find them." (*Id.* at 35.)

---

[144] The Monitors report that 78 percent of children placed in CWOP are held at hotels. (D.E. 1425 at 8.)
[145] This incident is discussed in more detail above. *See supra* page 156.

And sometimes, children placed in CWOP are victimized by hotel staff. In their January 2022 update to the Court, the Monitors discussed a Serious Incident Report which documented that a fifteen-year-old TMC child was "suspected of having a sexual relationship with a hotel clerk in the CWOP Setting where she was housed." (D.E. 1171 at 6.) The report explains that the child— who "DFPS suspects . . . is a trafficking victim"—"r[an] from the hotel room where she was housed. Staff searched the hotel but could not find her and could not find the male hotel employee who was usually at the front desk. Later, after the child returned, she told a DFPS staff person that 'she wanted to go get a plan B medication. When asked why she stated that she had sex with the hotel staff. She stated that she had sex with him in one of the hotel rooms. She stated that she did not want to leave because she did not want other teenagers placed here and he do [sic] the same thing to the other children.[']" (*Id.* at 6 n.10.)

The Court recognizes, of course, that in certain DFPS regions children are placed in higher-caliber establishments. Ms. Carrington testified that the hotels used as CWOP sites in Regions 6A and 6B are "like the suites, the Home Suites," and have kitchens. (D.E. 1488 at 241:4–12.) But this is because Houston is large, with a wide selection of such hotels. (*Id.* at 241:24–25.) Thus, when the management of one hotel decides that it will no longer be used as a CWOP Setting, the children are moved to a similar hotel across town:

> THE COURT: You've been put out of hotels in Houston?
> THE WITNESS: Yes. But we have – we – Houston is huge, so we have more to choose from.
> THE COURT: So do you go down in classification when you get thrown out of something?
> THE WITNESS: No. They just move, you know. Like I said, you can –
> THE COURT: Management says, "We've had enough of this"?
> THE WITNESS: Right. Management said they've had enough, but we can just move them to another hotel. But instead of being on the north side, we can move them to the south side, something like that.

(*Id.* at 241:23–242:10.)

While this may work for a time in places like Houston, not every child is in a region with such a selection of higher caliber hotels. When asked about Ms. Dionne's statement that "Motel 6s and Motel 8s" are "the only ones that will take" the State's contract (*id.* at 170:2–4), Ms. Carrington agreed that this was a problem in various regions throughout the state (*id.* at 222:14–16). She noted that this very issue was raised in a phone call regarding DFPS Region 8 that took place the Saturday before the Contempt Hearing. (*Id.* at 222:17–19.)

Ms. Juarez's testimony exemplifies many of the problems with CWOP Settings. During the three or four months she was placed in CWOP, she stayed in a church,[146] three DFPS offices, and three hotels. (D.E. 1487 at 253:2–16.) At the church, she was held with about nine other children. (*Id.* at 255:6–8.) But the facility was not equipped for this number of children, as there were only four beds. (*Id.* at 255:9–10.) The DFPS offices had small beds, but only "some of them" had pillows, sheet, and blankets. (*Id.* at 255:13–17.) Further, only one of the three offices had showers, and then only because it also had a clinic. (*Id.* at 255:18–25.)

Ms. Juarez also confirmed that the hotels at which she stayed lacked food service, and that food was not always otherwise provided, whether at the hotels, the church, or the offices. (*Id.* at 256:3–5 ("Q. Was there always food to eat when you went to these various places? A. No.").)

### 6.  *Placement in CWOP interrupts children's medical, therapeutic, and other services*

The Monitors have reported that children do not receive crucial services when they are placed in CWOP. For example, the Monitors' September 2021 update discussed child AA, a 15-year-old PMC child who entered foster care at the age of eight after her mother went to a domestic violence shelter. (D.E. 1132 at 54.) AA's Common Application stated that she was "diagnosed with Disruptive Mood Dysregulation Disorder, and Persistent Depressive Disorder, Early Onset, with

---

[146] The Monitors report that 5 percent of children placed in CWOP are held at churches. (D.E. 1425 at 8.)

anxious distress. Her Service Plan notes a 'mild form of Asperger's' and says 'ASD' (Autism Spectrum Disorder) has been diagnosed." (*Id.* at 54–55.)

The Monitors explained that "AA's records show the difficulty of ensuring children who are without placement continue to receive needed mental health services." (*Id.* at 56.) An IMPACT entry made by AA's caseworker stated that "[AA's] medication needs to be reviewed. She was prescribed 3 50 mg Seroquel tablets in the morning and again 3 50 mg of Seroquel tablets in the evening when released from the psychiatric hospital . . . We called the office for a refill when her medication ran out this past weekend. The doctor only prescribed 1 50 mg tablet of Seroquel in the evenings." (*Id.* at 56 (ellipsis and brackets retained).) Another IMPACT note entered by AA's caseworker stated that AA "is not in any therapy services due to being in CWOP." (*Id.* at 56.) And in the placement summary prepared by AA's caseworker for Bluebonnet Haven RTC, it was stated that AA "need[s] to see a therapist for anger issues and to learn how to calm herself down, for self-esteem to build her self-confidence. She has been ordered by Judge . . . to be put into Trauma-Based therapy . . . CHILD NEED[S] TO BE PLACE[D] IN THERAPY ASAP." (*Id.* at 56 (ellipsis and brackets retained).) The placement summary then stated that AA "has been in child without placement status but need[s] to be placed back in therapy." (*Id.* at 56 (brackets retained).)

Another child, AO, moved to Texas to live with her father after being removed from her mother's care by the State of Tennessee; the mother "allowed her boyfriend to 'tie [AO] up and hang her by her hands until her hands turned white as well as drag her through the house by her hair,' resulting in serious injuries to AO." (*Id.* at 49 (brackets retained).) After allegations of neglectful supervision were substantiated against AO's stepmother, AO entered foster care in 2016. (*Id.* at 48, 49.) AO was diagnosed with "Unspecified Bipolar and Related Disorder, Other Specified Trauma and Related Stressor Disorder, ODD, and ADHD," for which she was

"prescribed several psychotropics." (*Id.* at 48, 49.) It was also recommended that she receive

therapy. (*Id.* at 48, 49.) An IMPACT note dated May 14, 2021—when she began her fifth spell

without licensed placement since entering foster care—indicated that she was seeing both a

therapist and a psychiatrist; yet hospital records from June 2021 stated that she had "No Therapist"

and "No Psychiatrist." (*Id.* at 52–53.)

Placement in CWOP likewise interrupted both the psychotropic medications and therapy that

were supposed to be provided to II, whose fight with a CWOP worker was discussed earlier.[147] As

the Monitors note:

> Both II's Common Application and Service Plans list psychotropic drugs prescribed for
> II's diagnosed mental health disorders. II's Service Plan indicates that "he will need to
> continue with his medications" and also needs "ongoing support therapeutically."
> However, the medication logs in the on-site files reviewed by the monitoring team did not
> list any psychotropic medications. Notes in his June 2021 monthly evaluation indicated
> that he had refused medication since returning to care after running away from Renewed
> Strength RTC. The monitoring team's review of the Daily Logs for II kept at the CPS office
> where he lived did not indicate that he was receiving any therapy or mental health treatment
> during his time there, though the logs documented emotional outbursts that included crying
> and "sobbing."

(D.E. 1132-2 at 7–8.)

And for fifteen-year-old AR, the interruption in his medications precipitated serious changes

in his behavior. AR was removed from his mother's custody in 2013, reunified with her the

following year, then removed again in 2015. (*Id.* at 37.) After the second removal, "his placements

included six different GROs, two therapeutic foster homes, two hospitalizations, and two spells"

placed in CWOP. (*Id.* at 37.) Also after his second removal, AR was diagnosed with "ADHD and

'aggression,'" and was put on several different medication regimens. (*Id.* at 38.) By 2019, he was

---

[147] *Supra* page 168–69.

on four psychotropic medications, "Sertraline, Methylphenidate, Olanzapine, and Oxcarbazepine, and case notes indicated that he was adjusting well over the previous few months."[148] (*Id.* at 38.)

Then, on May 28, 2021, he was placed in CWOP Setting. (*Id.* at 38.)

For the first two and a half weeks his CWOP activity log depicts him as helpful with one instance of being disrespectful towards staff and punching walls and doors. Around June 22, 2021, however, the notes indicate that he ran out of multiple medications, and did not receive them for two to three days. Around this date, AR's activity logs reflect an increase in volatile behavior. It was noted that he had multiple incidents of being disrespectful, aggressive, and "hyperactive." His sleep schedule also shifted completely to being almost entirely nocturnal. AR was staying awake until mid-morning, then went to bed and woke up sometime during the afternoon.

(*Id.* at 38.)

Further, children placed in CWOP often do not go to school. In part, this is because the CWOP workers lack the authority to make the children go to school. (D.E. 1488 at 164:15–17.) But that is not the only reason that these children do not attend classes. For example, in January 2022, the Monitors reported on their visits to several CWOP Settings, during which they interviewed five children placed in CWOP. (D.E. 1171 at 9.) Four of the children "reported that they were not attending school," and three "indicated that they had not been enrolled in school since arriving at the CWOP setting." (*Id.* at 9.) "One child expressed considerable frustration at the delay in enrolling her in school and noted that she had attempted to reach her caseworker, but her caseworker did not respond to her calls." (*Id.* at 9.)

In a GRO this would, of course, violate the children's right to "[l]iv[e] a normal life, including . . . [t]he right to receive educational services appropriate to the child's age and development." 26 Tex. Admin. Code § 748.1101(b)(3)(B). It is also one of the reasons that CWOP Settings are so unsafe: The Monitors noted that "[f]ailure to enroll children in school . . . contributes to safety

---

[148] This medication regimen was an improvement on his earlier regimen. The Monitors note that in September 2017, AR was taking seven medications: "Abilify, Adderall, Depakote, Hydroxyzine Pamoate, Hydroxyzine HCL, . . . Zoloft," and "Zyprexa." (D.E. 1132-2 at 38.)

problems associated with CWOP settings," as it adds to the "lack of structure and routine" that make such settings "chaotic." (D.E. 1171 at 9–10.)

Defendants assert that children placed in CWOP "generally maintain access to their existing medical, developmental, and community-based services and support systems." (D.E. 1443 at 2.) But no evidence was offered in support, either in the filing or at the Contempt Hearing. And there was plenty of credible testimony to the contrary. For example, Ms. Reveile testified that in her experience, children placed in CWOP were not getting their needed services, nor were they going to school. (D.E. 1487 at 198:18–199:2.) And Ms. Dionne testified that the notion that children placed in CWOP maintain access to their services "is just simply not true" (D.E. 1488 at 163:20– 164:2):

> If a child moves even across town, they're going to say that they can't get them to the provider that they went to before, let alone these children are bouncing all over the state of Texas and in and out of places outside of the state of Texas.
> They never come with their medication. The RTC doesn't give it to them. The caseworker doesn't pick it up. Now they have a new doctor because the RTC had their specific doctor they were using and now they're using a new one. They barely even get their personal items or clothing.
> THE COURT: In garbage bags still?
> THE WITNESS: Always in garbage bags, yes. Always. They – I mean, to give – to give caseworkers credit, they have no – no ability to force a child to go to school or anything like that, but –
> THE COURT: They can't do what they can't do.
> THE WITNESS: They can't do what they can't do. But why can't a tutor show up at the CWOP location every day? Why doesn't somebody come in and talk to them about sex education? I mean, I'm a parent. I imagine most people in here are. If you don't make your kid busy, they're going to get into trouble.

(*Id.* at 164:3–24.) Indeed, the Court has difficulty understanding how children placed in CWOP could continue receiving their services, given their practically nonexistent medical and educational records.[149]

---

[149] The lack of medical and educational records is discussed in detail below. *See infra* page 271–79.

And when asked if the children receive mental health or educational services, Ms. Dionne replied "Absolutely not. Nobody ever speaks to them." (*Id.* at 160:1–5.) Later, she elaborated that, based on her experience representing "dozens of CWOP children" or the parents of CWOP children:

> They are not getting any services. If they are – if the Department is telling you they're getting services, they're not meaningful. They're not real. There might be somebody who comes on Zoom for ten minutes and that's therapy. There's no – there's nothing happening except for girls who spend all day walking around the neighborhood, somehow getting drugs, somehow getting alcohol, somehow getting vapes and cigarettes, finding their way to adults who are willing to take them places, and just generally – I mean, imagine what a house would look like if 12-year-old children who are traumatized and dealing with mental health issues actually lived in and ran a house themselves. That's what every CWOP location I've ever been to looks like, or a hotel or whatever church they found or whatever. Whatever that location is, it's the children running it.

(*Id.* at 167:23–168:12.)

The Court heard other examples of what passes for services to children placed in CWOP. As noted earlier[150] Ms. Juarez—who was in CWOP numerous times while in PMC—was on an extraordinary psychotropic medication regimen for three years, which caused her to vomit every night and sedated her to such an extent that she slept through eighth grade. (D.E. 1487 at 275:8–12.) Yet every month during that three-year period she had a ten-minute appointment with a doctor, who told her that—despite the disruptive side effects—she needed to continue taking the medication. (*Id.* at 276:18–277:2.)

Another example came courtesy of Ms. Dionne, who described the psychological evaluation given to one of her client's intellectually disabled children: "It was about 105 degrees outside. [The provider] brought [the child] into the driveway and talked to her for ten minutes." (D.E. 1488 at 161:21–23.) Of course, "ten minutes in a hot driveway" "is not adequate to do a psychological evaluation on . . . any child or any human." (*Id.* at 161:25–62:2.)

---

[150] *Supra* page 112.

7.   *The State appears to blame the children for being placed in CWOP*

During the Contempt Hearing, the State suggested that children's high needs are the reason

they are placed in CWOP. The following colloquy during Ms. Reveile's cross-examination is

illustrative:

> Q. Okay. But is it fair to say that some of the children that you were trying to find
> placements for, it was difficult, that there were homes or caregivers that maybe were
> reluctant to accept them into their homes?
> A. Yes.
> Q. Okay. And is that due to behavioral issues?
> A. I can't say what their motivations were for denying if they were just a foster home or
> anything.
> Q. Okay. Do you know or was it your experience that children in the category of children
> without placement typically had more behavioral issues?
> A. Typically, yes.
> Q. Okay. And was that one of the reasons that they were children without placement in the
> first instance?
> A. In my opinion, no. I think it's not the kid's fault. I –
> Q. And to be clear, I appreciate that and I'm not asking you to blame the children. But
> there's a point in time when they enter the CWOP program, right? And you've explained
> that there were issues that you observed while children were in the CWOP program. My
> question is if some of those children that ended up in the CWOP program also had
> significant behavioral issues before they entered the CWOP program?
> A. Were statistics taken, there would be a correlation.

(D.E. 1487 at 231:19–232:18.)

Relatedly, Ms. Reveile recounted one example of a high-needs child, for whom she repeatedly

requested the Child Placement Unit (CPU) to find a placement well in advance of the deadline to

find a placement. The child was an eight-year-old boy with severe special needs, and was on Ms.

Reveile's regular caseload. (*Id.* at 217:2–12 (his diagnoses included cerebral palsy, autism, vocal

cord paralysis, and retinopathy).) This child had made great progress in one foster home but,

because the foster parents "had a deadline," they asked Ms. Reveile to find him a new home in the

next three months. (*Id.* at 217:7–9.)

Ms. Reveile gave DFPS's "placement search team three months' notice to find him a home.

They said, 'That's too much time. Give us 30 days' notice.'" (*Id.* at 217:17–19.) She then emailed

the placement search team "every couple of weeks," reminding them that "'this is impending. We need to find him a home. He's going to be hard to find a home for.'" (*Id.* at 217:20–22.)

But when the deadline arrived, DFPS had not secured a placement for this high-needs child. (*Id.* at 217:23–218:7.) So Ms. Reveile and her supervisor "were game planning putting him in a hotel. We were game planning having a Child Watch for this eight-year-old with significant disabilities." (*Id.* at 218:11–13.) Ms. Reveile was "mentally preparing" to stay with the child in a two-bedroom hotel so that he wouldn't lose the progress he made in the foster home—since he was nervous around strangers, he "wouldn't have done well at all" with new Child Watch workers every four hours; "[h]e would have regressed back to where he was before." (*Id.* at 218:15–21.)

Fortunately, they were able to "scrape together" a placement for this child. (*Id.* at 219:4–5.) But the only reason he was at risk of being placed in CWOP—and losing the progress he made in the foster home—was the State's tardiness, not his high needs.

And to the extent children are placed in CWOP because of their high needs, the Monitors have reported time and again that the State is responsible because of the intense trauma that the children have been exposed to in the foster care system. In 2021, the Monitors addressed exactly this issue:

> The children most affected by the [CWOP] crisis are, in many cases, PMC children who were formerly served in the RTCs and GROs that the State closed due to safety problems. Many of the children the monitoring team met during on-site visits to CWOP Settings this summer had cycled through multiple operations closed due to safety violations; some were living in facilities when they closed. Most of these children . . . shuffled for years between RTCs and psychiatric hospitals, retraumatized along the way by unsafe conditions.

(D.E. 1132 at 13.)

For example, male PMC child WW, who was fourteen at the time of the Monitors' September 2021 report, had been placed in CWOP since May 2021, except for a four-day stint in a psychiatric hospital. (D.E. 1132-2 at 1.) WW entered foster care in 2013, at the age of six, after DPFS

substantiated allegations of neglectful supervision against his parents. (*Id.* at 1.) The Monitors recounted his placement history prior to CWOP:

> WW has had a number of placements since entering care in 2013, including the kinship placement with his aunt, four foster homes, two emergency shelters, and five RTCs. One of the RTCs where WW was placed, HeartBridges, has since closed due to HHSC's revocation of its license. A GRO where WW was placed in 2015, KCI Servants Heart Residential, later changed its name to Whataburger Center . . . . Another RTC, Family Link Treatment Services, has been placed under Heightened Monitoring due to a history of safety violations.

(*Id.* at 1.)

> Further, the Monitors report that WW was allegedly an abuse victim at several RTCs:

> During his time at KCI Servants Heart (which later became Whataburger Center), two allegations of Physical Abuse of WW by staff were Ruled Out after investigation by RCCI. One of them involved a report that WW had been injured during restraints. Whataburger Center was placed under Heightened Monitoring prior to its closure due, in part, to a history of violations related to restraints.

> WW was also named as a victim in two RCCI investigations during his time at HeartBridges. In the first, DFPS received a referral with several allegations regarding another child at HeartBridges. In that referral it was reported that other children, including WW, had exposed themselves to the child. DFPS found that the child had acknowledged that the children had grabbed themselves, rather than exposed themselves, and later said that one child had pulled another child's pants down on a dare and staff did not see it. DFPS Ruled Out Neglectful Supervision. The second investigation followed a report to SWI by WW's adoption worker that an RTC staff member hit and kicked WW, causing bruises on his right arm. DFPS Ruled Out Physical Abuse against the staff, finding that other witnesses did not confirm the abuse. DFPS also Ruled Out Neglectful Supervision and Medical Neglect. HHSC's decision to revoke HeartBridges's license was based, in part, on substantiated allegations of Physical Abuse of children by staff.

(*Id.* at 1–2.) Given this history of placement instability and abuse, it is unsurprising that "WW has had five psychiatric hospitalizations since entering foster care for suicidal ideations with a verbalized plan, self-harm and physical aggression/assault. He wrapped a sheet around his neck, ran out into the middle of the road in an attempt to be hit by a car, and wrapped barbed wire around his arm and said that he wanted to die." (*Id.* at 2.) Nor is it surprising that WW has acted out: DFPS reported that the child "took a taser gun from a school police officer, fought with other children,

220

used profanity and inappropriate language, refused to follow instructions, caused conflict, and has run away from placement." (*Id.* at 2.)

A second child, female PMC youth KK, was fifteen years old at the time of the Monitors' report. (*Id.* at 9.) She first entered the foster system in 2006, when she was five months old, "due to parental drug abuse and abandonment." (*Id.* at 9.) Between 2007 and 2010, KK was placed with two different relatives; in February 2010, she was adopted by a third relative. (*Id.* at 9.)

KK lived with her adoptive family until 2019, when she reentered foster care because her adoptive parents relinquished their parental rights after KK ran away. (*Id.* at 9–10.) The Monitors note a 2017 outcry by KK that her adoptive mother was "physically and emotionally" abusive; this was investigated by CPS, who "rendered an Unable to Determine finding because KK recanted her allegation due to fear of her adoptive mother." (*Id.* at 10.)

After being removed from three families, DPFS recognized that KK "needs to be placed with a caregiver who can 'foster and model' a healthy parent/child relationship for KK while also providing her with structure and consistency." (*Id.* at 10.) Sadly, the Monitors note that since reentering the State's care in 2019, "DFPS has not yet secured such a placement and KK has instead experienced extensive placement instability" (*id.* at 10):

> Since reentering foster care in 2019, KK has been in at least 13 placements, including six congregate care settings, three emergency shelters, two foster homes, one admission to a psychiatric hospital and, on July 17, 2021, an unauthorized placement with the relative who adopted KKs sister. Two of the RTCs where KK was placed, Children's Hope and The Landing, later closed due to a history of safety problems. Another GRO where KK was placed, Hearts with Hope, has since been placed under Heightened Monitoring. Krause Children's RTC, another GRO where KK was placed, closed voluntarily in lieu of having its license revoked, following a significant history of safety problems. KK has had at least one psychiatric hospitalization since entering care, and also has had contact with the juvenile justice system. KK had four spells without placement, with the first in October 2020; the length of time for her periods without placement ranged from three days to a little more than a month.

(*Id.* at 10.)

Or take AD, a male PMC child who was seventeen at the time of the Monitors' September 2021 report. (*Id.* at 26.) He "entered care" in 2012 "due to his mother's mental health issues and her lack of housing." (*Id.* at 26.) AD's "level of care when he entered placement was Basic, but during his placement at his first foster home, his level of care moved up to Moderate, and then Specialized. Since then, his care level has bounced between Intense, Specialized, and Moderate almost as often as he has moved among placements." (*Id.* at 27.)

And he has moved placements many times:

> During his nine years in foster care, AD has had eight primary caseworkers, and been in at least 20 placements, including four psychiatric hospitalizations. His placements include four RTCs, all of which have now closed: Five Oaks Achievement Center, Children's Hope RTC, Houston Serenity Place (three times), and HeartBridges. Three of these RTCs closed due to safety reasons (Five Oaks Achievement Center, Children's Hope, and HeartBridges), and the other RTC (Houston Serenity Place) closed after having been placed on Heightened Monitoring due to safety violations. AD successfully completed the program at Five Oaks, Children's Hope, and at Houston Serenity twice; each time his LOC dropped and he was placed back into a Therapeutic Foster Home, only to have the placement disrupt, usually in less than a year. AD was placed in seven therapeutic foster homes, and was also placed in an emergency shelter and a respite home.

Another example is B.B., who was discussed earlier[151] with regard to her many and varying psychotropic drug prescriptions. The Monitors interviewed B.B. and reviewed "a complete copy" of her records. (D.E. 1027 at 37.) Though B.B. was not placed in CWOP, her history of placement instability and escalating behavioral problems exemplify the way in which the State's use of unsafe placements causes children to develop high needs.

> In B.B.'s 11 years in DFPS care she has been in 38 placements, including eight psychiatric hospitals and nine RTCs. Two of the RTCs in which B.B. lived are now closed because of systemic safety problems, including substantiated abuse or neglect allegations. Of the 16 foster homes where B.B. was placed, only four lasted more than 60 days. In 2016 alone, when B.B. was nine years old, she was moved to nine different placements.

> Through all of these placements, B.B.'s behaviors have been consistent, although increasing in intensity. Her IMPACT records show that though her behavioral problems were identified early in her time in care, they were not effectively addressed, resulting in a

---

[151] *Supra* page 66–69.

constant cycle of disrupted foster care and adoptive placements, and eventually a cycle between psychiatric hospitals and RTCs. During the monitoring team's interview with her, B.B.'s placements seemed to be a blur to her.[152] She did not seem to remember any placements prior to her first RTC placement at Children's Hope. This is not terribly surprising, since she was seven years old at the time of that placement. She was able to remember the RTCs when prompted with the name and the sequence.

(*Id.* at 40.) During her interview with the Monitors, B.B.:

> [N]oted that she did not think that any of the RTCs had been helpful in addressing her behavioral needs, and said she instead felt she picked up bad behavior from other children in these settings. For example, before going to Hector Garza she had never cut herself but while there she started cutting. These placements have also further exposed B.B. to antisocial behaviors, teaching her about riots and how to protect herself from staff and other residents. While she has been sexually active in some of the recent RTC placements, no notes indicate that she is receiving proper sexual education and health education. When she was interviewed by Monitor Deborah Fowler and a member of the monitoring team, B.B. reported that she had had sex with her boyfriend during the riot at Devereux – League City, but noted that she did not believe she was pregnant because "it doesn't hurt when I sleep on my stomach."

(*Id.* at 40.)

During her first five years in the State's care, B.B. "had already bounced around approximately 18 different placements," at which point she had "her first psychiatric hospital admission." (*Id.* at 43.) She was then placed "at her first RTC, Children's Hope, "from May 16, 2014 until March 11, 2015. This started a cycle between psychiatric hospitalizations and RTCs that continue[d]" to the time of the Monitors' report. (*Id.* at 43.)

The Monitors note that "Children's Hope was a troubled facility, and had been placed under a corrective action evaluation plan by HHSC Licensing just before B.B. was admitted. Licensing indicated that it took this step due to repeated citations for minimum standards deficiencies. The list of citations that spurred the plan included violations of minimum standards associated with corporal punishment and other prohibited punishment, and citations related to inappropriate

---

[152] The Court is reminded of trial testimony regarding named plaintiff S.A. who, "because of her many placements," "could not remember all of the places she has been and could not assist" Plaintiffs' expert "in developing a chronology of her life." (D.E. 368 at 89 (citing D.E. 326 at 98:22–99:5).)

restraints." (*Id.* at 43.) And there are indications that B.B. was abused by Children's Hope staff: "B.B.'s case worker made a report to the abuse and neglect hotline when she noticed a mark on B.B.'s face. When asked about it, B.B. told her that a staff person caused the injury during a restraint. B.B.'s case worker noted that the mark on B.B.'s face looked like a rug burn." (*Id.* at 44.) The allegation was ruled out by DFPS, but "two years later (after multiple investigations of allegations against this staff), the facility was issued citations for inappropriate discipline after several children reported that the same staff person hit them with a wooden stick." (*Id.* at 44.) B.B. was eventually discharged from Children's Hope and was then placed in a foster home, where she stayed for around five months before "she was again placed in a psychiatric hospital." (*Id.* at 44.) She then returned to Children's Hope RTC on August 31, 2015, where she stayed "until February 1, 2016, when all the children were removed from the facility by DFPS due to contractual violations which included: improperly restraining children, rooms that "smelled strongly of urine," incomplete medication logs, children injuring other children, punishing children who refused to go to sleep by making them go outside without proper clothing for the weather, a significant number of reports that staff members hit or kicked children, mouse droppings in the kitchen and bedrooms and dead roaches throughout the facility, diabetic children who had to be hospitalized because the facility did not have appropriate testing equipment, and feces smeared on walls in some rooms." (*Id.* at 45.)

During her interview with the Monitors, B.B. described herself as a "good fighter," and explained that she first learned to fight "at Children's Hope, got better during her stay at Prairie Harbor RTC, but really honed her skills at Hector Garza [RTC]." (*Id.* at 45.)

From 2016 to 2019, B.B. bounced between foster homes, psychiatric hospitals, and RTCs, including around five months in a Florida RTC. (*Id.* at 45–47.) In 2019, she was placed in Prairie

Harbor RTC. (*Id.* at 48.) Of her time there, B.B. "recalled that staff at Prairie Harbor often gave the youth in care a hard time, though she said that since she was the youngest child at the facility, staff were not as hard on her." (*Id.* at 48.) She was discharged from Prairie Harbor on November 5, 2019; the following day, she was placed at Hector Garza RTC. (*Id.* at 48.)

Hector Garza was a particularly poor placement for B.B. A Service Plan completed shortly after her placement listed several of B.B.'s triggers, including "'having her arms placed behind her back' and 'men touching her.'" (*Id.* at 48.) Yet both of these triggers were unavoidable at Hector Garza, as the facility "relied on restraints as a primary method of controlling children, restrained children with their arms behind their backs, and allowed male staff to restrain female clients." (*Id.* at 48.) Thus, it is hardly surprising that "[n]otes in IMPACT indicate that during her placement at Hector Garza, she was 'regressing in her treatment, displaying highly aggressive behaviors.'" (*Id.* at 48.)

Further, "while she was at Hector Garza, in addition to honing her fighting skills, she picked up the habit of cutting (self-harm) from other kids at the facility." (*Id.* at 48.) B.B. also told the Monitors that there was "a lot of 'gang activity' at Hector Garza, and said that in addition to affiliations with outside gangs, the youth at Hector Garza started their own gangs." (*Id.* at 48–49.) Moreover, "B.B. reported that Hector Garza was the first facility she was placed in where riots occurred; she indicated that she was involved in at least one riot during her time there." (*Id.* at 49.)

"On May 20, 2020, DFPS reported that they had decided to end their contractual relationship with Hector Garza after determining that 'while improvements were being made, their particular model was not the direction DFPS was going long-term.' B.B. stayed at Hector Garza until July 30, 2020." (*Id.* at 49.) She was then placed at yet another RTC, Devereux – League City. (*Id.* at 49.)

Devereux – League City described itself as "a safe, structured, and nurturing environment that helps create a sense of community in both clients and staff, a sense of shared expectations and responsibility for the well-being of others as well as one's own." (*Id.* at 49.) It claimed to offer individualized treatment "that addresses their individual mental and behavioral health needs." (*Id.* at 49.) But the reality at Devereux was different: "B.B.'s records related to [her] stay at Devereux – League City show substantial lapses in treatment and safety while at the facility, during which time" B.B. "deteriorated." (*Id.* at 50.)

For example, B.B.'s Devereux – League City records show that the facility was aware of her prior placements and behavioral challenges. (*Id.* at 55.) Her "Devereux – League City files . . . indicated she was supposed to receive a trauma assessment by September 25, 2020, [but] there was no evidence to confirm one was done. Instead, the primary interventions used with B.B. were the same interventions that had been tried at every RTC she had been to, without success – a level system that rewards children with points and penalizes them by withdrawing privileges, along with weekly individual and group therapy." (*Id.* at 55.) Indeed, "during B.B.'s short stay" at the facility:

> [S]he was disciplined, restrained, and placed in seclusion on a regular basis. The monitoring team noted at least 14 instances of restraint or seclusion documented in B.B.'s Devereux – League City records. A Client Service Review Summary from Devereux – League City indicated that during the one-month period between August 27, 2020 and September 30, 2020, B.B. had "demonstrated 55 incidents of Major Behaviors including safety threats (39), physical aggression (9), property destruction (3), elopement (2), and self-injurious behavior (2)" though it noted "[h]er behaviors have improved in the several [sic] days."

(*Id.* at 54.)

> [D]espite clear indications . . . that B.B.'s behavioral challenges continued and escalated during her first few weeks at Devereux – League City, aside from the level system used campus-wide as part of Devereux – League City's RISE program, it does not appear that the treatment staff attempted any new strategies, or provided any additional supports and services for addressing B.B.'s behavior as her challenges and safety risks persisted . . . . The Monitors found no evidence that Devereux – League City had scheduled – or even considered – a functional behavioral assessment that would allow B.B.'s treatment team to develop a behavior support plan that treated her serious emotional disorders . . . .

(*Id.* at 54.)

B.B.'s stint at Devereux – League City ended on October 2, 2020, after she was arrested as a result of a riot at the facility. (*Id.* at 37, 56.) "After being discharged from Devereux – League City, B.B. was placed in a foster home, where her behavior resulted in two additional psychiatric hospitalizations. While in the foster home, she again had contact with the juvenile system as a result of misdemeanor assault charges related to an altercation with a member of the foster parent's family." (*Id.* at 56.)

On December 6, 2020, B.B. was placed, for a second time, at the RTC in Florida, though her discharge plan after her first stint "described B.B. as making little progress during her stay at the facility." (*Id.* at 56–57.) A month later, on January 4, 2021, the Monitors learned that "B.B. had twice been assaulted by peers in the month that she had been at the Florida RTC." (*Id.* at 57.) And on January 23, DFPS reported that B.B. "experienced some temporary regression. She reportedly began presenting negative behavior that she hadn't engaged in for over a year. . . . After several years of sustained improvement, B.B. recently experienced some issues with enuresis." (*Id.* at 58.) "Less than a week later, on January 29, 2021, DFPS notified the Monitors that B.B. had been admitted to another psychiatric hospital." (*Id.* at 58.)

### 8. *The State is spending extraordinary sums of money on the harmful CWOP system*

A comprehensive accounting of the burden that CWOP imposes on Texas taxpayers is, of course, beyond the scope of this Order. But to get a sense of scale, the Court will discuss two expenditures for which amounts can readily be calculated: the cost of placing private security guards at CWOP Settings and the cost of staffing CWOP Settings with caseworkers.

In early 2022, the State contracted with two private security companies to provide security guards at CWOP Settings. (*See* PX 57 at 1 (contract with "Premier Protection and Investigations, LP, DBA PPI Security"); PX 58 at 1 (contract with "Silver Shield Security Inc.").) These contracts

(the "2022 Contracts") obligated the State to pay up to $27,089,855.40 for services rendered between February 14, 2022 and August 31, 2023. (PX 57 at 1 ("The total amount of this Contract may not exceed $23,219,876.00."); PX 58 at 1 ("The total amount of this Contract may not exceed $3,869,979.40.").) The hourly rates under the 2022 Contracts ranged from $53 per hour (for non-holiday shifts) (*see* PX 57 at 6) to $127.50 per hour (for shifts during holidays) (*see* PX 58 at 6). The rate schedules are reproduced below:

| Questions | DFPS Region 1 | DFPS Region 2 | DFPS Region 3 | DFPS Region 4 | DFPS Region 5 | DFPS Region 6 | DFPS Region 7 | DFPS Region 8 | DFPS Region 9 | DFPS Region 10 | DFPS Region 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| What is your **Non-Holiday** Hourly Rate to provide Officers for Service Requests? | $55 | $55 | $62 | $62 | $53 | $53 | $62 | $53 | $72 | $58 | $53 |
| What is your **Holiday** Hourly Rate to provide Officers for Service Requests? | $65 | $65 | $72 | $72 | $63 | $63 | $72 | $63 | $82 | $68 | $63 |

(PX 57 at 6.)

| Questions | DFPS Region 1 | DFPS Region 2 | DFPS Region 3 | DFPS Region 4 | DFPS Region 5 | DFPS Region 6 | DFPS Region 7 | DFPS Region 8 | DFPS Region 9 | DFPS Region 10 | DFPS Region 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| What is your **Non-Holiday** Hourly Rate to provide Officers for Service Requests? | $85.00 | $85.00 | $85.00 | $85.00 | $85.00 | $85.00 | $85.00 | $85.00 | $85.00 | $85.00 | $85.00 |
| What is your **Holiday** Hourly Rate to provide Officers for Service Requests? | $127.50 | $127.50 | $127.50 | $127.50 | $127.50 | $127.50 | $127.50 | $127.50 | $127.50 | $127.50 | $127.50 |

228

(PX 58 at 6.) For context, a conservatorship caseworker's highest possible salary is $72,408[153] which, assuming the caseworker works forty hours per week, fifty weeks per year, is $36.20 per hour. Thus, the lowest-paid security guard gets paid around 50 percent more per hour than the highest-paid caseworker.

The Monitors report that in March 2023, the State issued a "$17 million Request for Proposals (RFP) that extended contracting with the security" companies. (D.E. 1425 at 11.) The RFP specified that the "projected amount of the contract under Historical Compensation"—that is, based on the amounts paid under the 2022 Contracts—"is $17 million per fiscal year." (*Id.* at 11 n.26.) Thus, the State spent nearly the full amount allowed under 2022 Contracts,[154] and expects to continue spending that amount going forward.[155]

As for cost of staffing, CWOP shifts are staffed by caseworkers working overtime. The overtime paid to these workers can be estimated from the CWOP hours reported by DFPS. In the first ten months of 2023, caseworkers worked an average of 60,427 CWOP hours per month. (PX 107S at 1; *see also* D.E. 1489 at 21:16–19 (noting that hours reported for 2023 covered period from January to October).) Thus, caseworkers worked approximately 725,124 CWOP hours in 2023. The Court will assume that the caseworkers are paid $30 per overtime hour.[156] Thus, staffing CWOP Settings cost the State approximately $21,753,720 in 2023.

---

[153] CPS employees whose responsibilities include "serving as conservator of a child" are those classified as Child Protective Services Specialist I–IV. *See, e.g.*, State Auditor's Office, Child Protective Services Specialist IV at 1 (Sept. 1, 2023), *available at* https://hr.sao.texas.gov/Compensation/JobDescriptions/R5026.pdf. The Child Protective Services Specialist IV classification is in Salary Group B19, *see id.* at 1, with a corresponding Salary Range of $45,244 to $72,408, *id.* at 1; *see also* State Auditor's Office, Salary Schedule B, Annual Salary Rates: Effective September 1, 2023 to August 31, 2024, *available at* https://hr.sao.texas.gov/CompensationSystem/ScheduleAB?scheduleType=2024B.

[154] Specifically, $17 million per year means that, over the 18.5 month (1.54 year) duration of the 2022 Contracts, the State paid around $26,180,000.

[155] At the Contempt Hearing, it was confirmed that the security services provided under the 2022 Contracts and their extension pursuant to the RFP were exclusively for CWOP Settings. (*See* D.E. 1488 at 51:15–52:24.) Thus, while there may be security guards at other facilities, their services would not be paid for from these contracts.

[156] As noted in footnote 153, *supra*, CPS employees whose responsibilities include "serving as conservator of a child" are those classified as Child Protective Services Specialist I–IV. The entry level Child Protective Services

229

Accordingly, in 2023, the State spent approximately $38,753,720 just to CWOP staff and to secure the CWOP Settings, or $106,174.58 per day. Divided by 81.5 children (the number of children, on average in CWOP per day, according to the State (D.E. 1555 at 1)),[157] or $1302.75 per day per child placed in CWOP. Again, this excludes all costs of food, lodging, and transportation. Compare this per day expenditure to the following quoted rates for every other foster care placement. These figures include food, housing, and transportation. It is possible to surmise that CWOP has become financially self-perpetuating.

---

Specialist, Child Protective Services Specialist I, is in Salary Group B16, *see* State Auditor's Office, Child Protective Services Specialist I at 1 (Sept. 1, 2023), *available at* https://hr.sao.texas.gov/Compensation/JobDescriptions/R5023.pdf, with a corresponding Salary Range of $37,918 to $58,130, *id.* at 1; *see also* State Auditor's Office, Salary Schedule B, Annual Salary Rates: Effective September 1, 2023 to August 31, 2024, *available at* https://hr.sao.texas.gov/CompensationSystem/ScheduleAB?scheduleType=2024B. Taking the average of this salary range, the Child Protective Services Specialist I is paid $48,024 per year. Assuming such workers work 2000 hours per year (forty hours per week, fifty weeks per year), they are paid $24.01 per hour, and would be "pa[id] for the overtime at the rate equal to 1 ½ times the employee's regular rate of pay," Tex. Gov't Code § 659.015(c)(2), or $36.02 per hour. Thus, the Court's estimate of $30 per overtime hour is very conservative.

[157] The Court notes that these numbers from the State are unreliable as referenced herein. *Supra* page 122–23.

The following payment rates are effective **September 1, 2023**.

## 24-Hour Residential Child Care Rates

| Service Level | Type of Care | Payment Rate |
|---|---|---|
| Basic | Child Placing Agency | $57.71 |
| | General Residential Operation (excluding Emergency Shelters) | $52.65 |
| Moderate | Child Placing Agency | $101.77 |
| | General Residential Operation (excluding Emergency Shelters) | $126.03 |
| Specialized | Child Placing Agency | $126.62 |
| | General Residential Operation (excluding Emergency Shelters) | $227.34 |
| Intense | Child Placing Agency | $218.11 |
| | General Residential Operation (excluding Emergency Shelters) | $324.52 |
| Intense Plus | General Residential Operation/Residential Treatment Center (GRO/RTC) | $480.86 |
| Other | General Residential Operation/Emergency Care Services (GRO/ECS) | $153.09 |
| | Intensive Psychiatric Transition Program (IPTP) | $449.20 |
| | Treatment Foster Family Care - Agency | $318.98 |
| | Temporary Emergency Placement (TEP) | $480.86 |

## Minimum Daily Reimbursement to a Foster Family

| Service Level | Payment Rate |
|---|---|
| Basic | $27.07 |
| Moderate | $47.37 |
| Specialized | $57.86 |
| Intense | $92.43 |
| Treatment Foster Family Care | $137.52 |

The amounts above are the minimum amounts that a child-placing agency must reimburse its foster families for clients receiving services under a contract with the Texas Department of Family and Protective Services.

## Supervised Independent Living (SIL)

| Service Level | Type of Care | Payment Rate |
|---|---|---|
| Host Home Setting | Young Adult Only | $35.21 |
| | Young Adult plus one (1) Child | $47.29 |
| | Enhanced Case Management* | $47.54 |
| Non-College Dorm Setting | Young Adult Only | $45.17 |
| | Young Adult plus one (1) Child | $57.25 |
| | Enhanced Case Management* | $47.54 |
| College Dorm Setting | Young Adult Only | $43.56 |
| | Young Adult plus one (1) Child | $51.82 |
| Apartment or Shared Housing Setting | Young Adult Only | $45.17 |
| | Young Adult plus one (1) Child | $57.25 |
| | Enhanced Case Management* | $47.54 |

* Enhanced Case Management (ECM) services are not provided in college dorm settings.

## Community-Based Care (CBC) Rates

| Catchment Area | Blended Rate | Exceptional Care Rate |
|---|---|---|
| Catchment Area 1 | $99.43 | $511.80 |
| Catchment Area 2 | $104.13 | $511.80 |
| Catchment Area 3W | $100.84 | $511.80 |
| Catchment Area 3E | $101.61 | $511.80 |
| Catchment Area 4 | $101.69 | $511.80 |
| Catchment Area 5 | $98.23 | $511.80 |
| Catchment Area 8b | $102.67 | $511.80 |

DFPS, 24-Hour Residential Child Care Reimbursement Rates, *available at* https://www.dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care _Contracts/Rates/default.asp.

Of course, the full cost of CWOP is far higher. As discussed in greater detail below, the CWOP crisis is overburdening caseworkers, thus driving an unprecedented 36 percent caseworker turnover rate.[158] (*See* D.E. 1347 at 219:1–7 (April 2023 testimony of Associate Commissioner Banuelos).) And caseworker turnover is staggeringly expensive. In *Stukenberg I*, the Fifth Circuit noted that "[t]urnover is . . . an enormous fiscal burden for DFPS. The Sunset Commission estimated in 2014 that the loss of caseworkers over the prior year resulted in a $72.7 million impact to the agency." 907 F.3d at 258. And that was with a turnover rate of around 25 percent. *See id.* at 257 ("Over 25% of the roughly 2,000 CVS caseworkers leave CPS annually."); (*see also* D.E. 368 at 177–78 n.46 (noting "the Stephen Group's finding that yearly CVS caseworker turnover is 26.7%.")). Thus, the cost of the present turnover rate likely runs into the hundreds of millions of dollars.

And a full accounting would also include, *inter alia*:

- The cost of the hotels and dilapidated houses in which the children are being held.

- The cost of logistics: As Ms. Carrington explained, "There's a whole team that's dedicated to nothing but scheduling CWOP, making sure the hotels have been reserved, making sure that staff have been . . . scheduled to supervise the youth." (D.E. 1488 at 224:18–21.)

- The cost of caring for the many children who have been sex-trafficked out of CWOP Settings. (*See* Court's Ex. 4 at 17 (noting that one can calculate the "net present value of the lifetime cost of care required as a consequence of human trafficking for each child victim").)

---

[158] *Infra* page 250–61.

In short, the State is spending at least $38 million dollar per year—and, almost certainly, many multiples more—on a system that appears to harm everyone it touches except, evidently, the security companies, the owners of the hotels and residences used as CWOP Settings, and the sex traffickers.

### 9.   *Attempts to manipulate data regarding CWOP*

During the Contempt Hearing, the Court commented on the State's efforts to "do workarounds of my orders . . . and redefine so they don't connect at all to the constitutional violation they were intended to address." (D.E. 1488 at 191:4–9.) Ms. Dionne informed the Court that Defendants use similar workarounds in Texas state courts:

> . . . . Let me give you an example. One time when Judge Martinez Jones called a contempt hearing, every person who had a child in CWOP in Travis County, every lawyer who had a client in CWOP, was called to that. So there were five of us in there. And the Department said there's only two kids in CWOP. At the same time my client texts me and goes, "Yo, Lindsey, why are they driving me around in a car right now, and why won't they take me back?" . . . .
> BY MR. YETTER:
> Q. What was that about? What was he doing? Why were they driving him in a car?
> A. Because their definition of . . . CWOP had changed that day.
> THE COURT: And that's what – that's what they were doing, were cutting the numbers down for the hearing day?
> THE WITNESS: Yes.
> BY MR. YETTER:
> Q. Put a child in a car, and they're not in CWOP –
> A. Exactly.
> Q. – because they're driving around the city?
> A. Now, they were – potentially he was going to get taken to a placement. I put air quotes around that for the record, because that's not really what was going to happen. They dropped him right back off the second the hearing ended.
>
> . . . .
>
> THE COURT: Well, that certainly messes with the numbers, doesn't it?
> THE WITNESS: You can't believe the numbers. You can't trust them. You cannot trust whatever they're telling you. Even within – they can't trust each other. Travis County can't trust Williamson County. None of this is interfacing with each other.

(*Id.* at 191:10–193:1.)

This unrebutted testimony is reminiscent of the subject matter of the first contempt motion. At trial in 2014, then-Assistant Commissioner of CPS Lisa Black falsely testified that all group facilities except foster group homes[159] had 24-hour awake-night supervision. (D.E. 725 at 6 (D.E. 300 at 60–62).) As the Court discovered four years later, the first part of Ms. Black's testimony was false: Not all group facilities had 24-hour awake-night supervision, and no group facilities were required to have such supervision. (*Id.* at 8.) Defense counsel heard this testimony, of course, as did then-DFPS Commissioner Specia and other DFPS staff members, but none of them sought to correct it. (*Id.* at 6 (D.E. 300 at 23–29, 43, 48).) Later, the Court and Mr. Specia had a colloquy about 24-hour awake-night supervision, and he again failed to correct Ms. Black's testimony. (*Id.* at 7 (D.E. 300 at 27–28).)

For the next four years Defendants relied on Ms. Black's testimony and made further false representations about 24-hour awake-night supervision before both this Court and the Fifth Circuit. (*Id.* at 7–8 (Reply in Support of Mot. For Stay Pending Appeal at 13 (Feb 5, 2018)).) Specifically, they maintained the position that all other group facilities had 24-hour awake-night supervision. (*Id.* at 7–8.) And after the Court ordered Defendants to "immediately stop placing PMC foster children in unsafe placements, which include foster group homes that lack 24-hour awake-night supervision" (D.E. 368 at 245), they "assured" the Court that all foster group homes except one had such supervision (D.E. 725 at 7).

Then, in September 2019, the Monitors discovered that the State had not required any group facilities to provide 24-hour awake-night supervision until July 2019. (*Id.* at 8 (D.E. 711 at 2).) On October 9, 2019, Defendants finally conceded "that not all placements in Texas housing more than

---

[159] Foster Group Home was a classification of childcare facility that provided "care for 7 to 12 children for 24 hours a day." (D.E. 368 at 256.) The classification was eliminated by legislation enacted in 2017. (*See* D.E. 711 at 2 n.1 (citing Act of May 24, 2017, 85th Leg., R.S., ch. 317, § 4 (amending Tex. Fam. Code § 101.0133)).)

six children have 24-hour awake night supervision nor were they required to do so at the time of trial." (*Id.* at 9 (D.E. 679 at 8–9 (emphasis omitted).) As the Court noted in its first contempt order, these false statements likely affected the course of trial. (*See id.* at 9 (noting that because of the false testimony, the Court was never presented with evidence about the dangers created by the absence of 24-hour awake-night supervision in larger congregate care settings).) And they were certainly relied upon by the Fifth Circuit in *Stukenberg I*. (*See id.* at 10 (citing to *Stukenberg*, 907 F.3d at 270 (5th Cir. 2018)).)

Affirmative mendacity by those in leadership positions certainly has the potential to skew the data. But so too does an apparent propensity by some CWOP workers to underreport incidents in CWOP Settings. In their Fifth Report, the Monitors note that a member of the monitoring team found an incident report from a CWOP Setting in Beaumont, documenting that a seventeen-year-old child "drank a cleaning product at the CWOP location and, afterwards, an unnamed staff member found the child slumped over on the floor." (D.E. 1318-2 at 56.) This incident was not reported to SWI by any of the CWOP workers on duty at the time; instead, it was reported by the monitoring team member. (*Id.* at 56.)

> When the [DFPS] investigator questioned one of the staff members about the failure to report the incident to SWI, the staff member reported that if staff members had to report every incident that occurred "on every shift [at CWOP locations], statewide intake would be blowing up with investigations."

(*Id.* at 56.)

### 10. *The State's commitment to ending CWOP is questionable*

As noted above,[160] Defendants know that CWOP is unsafe. And it is clear that resources are available—after all, the State is spending at least tens of millions of dollars annually perpetuating the CWOP crisis. Thus, in a vacuum, Commissioner Muth's assertions that she is working to end

---

[160] *Supra* page 118–19.

CWOP are encouraging. But it is far from clear that the rest of DFPS shares her commitment to

this goal. For example, Associate Commissioner Banuelos was notably reluctant to recognize that

CWOP was even a problem:[161]

> Q. Now, one of the ongoing issues in the State of Texas is children for which there is no licensed regulated placement. Do you know what I'm talking about? Sometimes the State calls it CWOP.
> A. Yes.
> Q. That's a big issue in the State of Texas, isn't it?
> A. I would say that it's -- we do have some children that are without placement.
>
> . . . .
>
> Q. Sure. Good. And that's a problem for the State of Texas today, isn't it?
> A. It's a concern.
>
> . . . .
>
> THE COURT: Sorry. It's not a problem?
> THE WITNESS: We would prefer that children are in licensed placements.
> THE COURT: Because?
> THE WITNESS: Because we want children to be placed in a licensed placement --
> THE COURT: You want them to be safe?
> THE WITNESS: -- where there's different caregivers.
> THE COURT: You want them to be safe?
> THE WITNESS: We have want them to have a safe and good placements.

(D.E. 1487 at 284:13–86:6.)

Likewise, Ms. Banuelos was reluctant to admit that children were at risk of harm when placed

in CWOP:

> Q. And a hotel is no place for a safe, good placement for children, is it?
> A. Sometimes.
> THE COURT: How is that?
> BY MR. YETTER:
> Q. Are you –
> THE COURT: Sorry. I need to know. Sometimes what?
> THE WITNESS: So – can you repeat the question?
> BY MR. YETTER:

---

[161] The Court noticed a major difference in State employees' willingness to call any situation unsafe between testimony in April 2023 and December 2023. The Court can only speculate as to the sea change in the ability and inability to recognize unsafe situations.

Q. Sure. A hotel is no place for a safe and good placement for a child under the care of DFPS?

(Pause)

THE COURT: She apparently has a great deal of trouble answering that.

THE WITNESS: I would say that a hotel can be a difficult place for a child to have as a placement.

BY MR. YETTER:

Q. It can be an unsafe place for a child, can't it, a hotel?

A. Sometimes.

. . . .

Q. And a hotel is no place for a child that has been traumatized severely, is it, as a placement by the State of Texas? That's no place for a child to be safe, is it?

A. I can't say that it's always not safe.

(*Id.* at 286:9–288:9.) In fact, she was remarkably unconcerned about the dangers posed by placement in CWOP:

Q. Have you been concerned for the safety of children that are put in these unregulated placements based on what you've read in the Monitors' reports? Have you been concerned about their safety?

A. For some situations.

THE COURT: So it's not an all-consuming concern is what you're saying?

MR. YETTER: Just kind of concerning?

THE COURT: It's just sort of hit or miss with you?

THE WITNESS: I said some concerns.

(*Id.* at 291:13–22.)

Indeed, she repeatedly minimized the trauma endured by children in foster care:

Q. Every child in foster care has been through trauma because they're no longer with their family, right?

A. That could be traumatic.

Q. Some of the children have been through additional trauma, for example, abuse, physical or sexual abuse, true?

A. That can be additional trauma.

Q. Before they come into the system and after?

THE COURT: Wait a minute. Aren't all the children that you pick up have been traumatized?

THE WITNESS: Yes, they've experienced some trauma.

. . . .

Q. It's not just some. This is kind of the trauma of losing your family.

237

A. Yes.

Q. That's tremendously severe trauma, isn't it?

A. Yes, it's some trauma. Absolutely.

(*Id.* at 287:12–288:5.) Associate Commissioner Banuelos' reticence at the Contempt Hearing is particularly noteworthy given her candor and forthrightness at previous hearings.[162]

Moreover, it is difficult to reconcile Commissioner Muth's stated goal with the State's apparent plan to make CWOP permanent. Ms. Dionne reported that at the meeting convened by the state court judges:

> Q. What has the State said they're going to do?
> A. Okay. So Staci Love said, "We have been hesitant to institutionalize CWOP, but we are starting to realize that that is going to be necessary."
> THE COURT: Institutionalize?
> THE WITNESS: Meaning make rules.
> THE COURT: Make it permanent?
> THE WITNESS: Make rules around it, have them follow the minimum standards. . . .
> THE COURT: So they're thinking about it in September?
> THE WITNESS: They're thinking about it. They're thinking about it.
> THE COURT: Two months ago?
> THE WITNESS: Yes. And --
> BY MR. YETTER:
> Q. They said they've been thinking about it for a while but not doing it because they're hesitant.
> A. They do not want to. They think it would be a negative thing, because then the children would think, oh, I can just be here because now we've -- it's institutionalized.

(D.E. 1488 at 187:19–188:16.)

And DFPS's September 22, 2023 letter to the three state court judges as a result of their meeting with DFPS gives the Court no reason to believe that the Department is taking the problems in CWOP seriously. For example, the letter appears to blame the children and CWOP workers for the problems at CWOP Settings. (*See* Attachment 1 at 1 ("DFPS is updating the expectations of youth temporarily staying at child watch locations. Updates include new guidelines and a system

---

[162] (*See, e.g.*, D.E. 1347 at 65:14–20 (discussing issue with PMC children having proper medical consenters and conceding that "the error was on the DFPS because we should have never made the provider a medical consenter, it should have been the caseworker").)

for increased structure to incentivize positive behavior. The updated structure will provide transparency to youth regarding rules and routine and will clarify staff expectations for DFPS employees working child watch.").)[163] The letter also implies that local law enforcement is to blame. (*See id.* at 2 ("DFPS is coordinating with local law enforcement agencies who have jurisdiction over child watch locations to reiterate the critical need for law enforcement support. As part of the discussion, DFPS will share information regarding . . . the need for consistent and prompt law enforcement response to address worker safety concerns and missing children reports, trafficking concerns, and support for DFPS children who may have experienced criminal victimization while not in our care and supervision.").) And it blames the Texas legislature. (*Id.* at 3 ("Senate Bill 1930 passed during the 88th Regular Legislative Session. . . . Since the effective date of September 1, discussions and confusion regarding requirements of the court and legal party responsibilities prior to a placement occurs have developed.").)[164]

Conspicuously absent is any recognition that DFPS may have some responsibility for the situation. The letter states that the DFPS is "working with the Department of Public Safety (DPS) to conduct security assessments of all child watch locations in Region 7,"[165] and that the assessments "are specifically targeted to identify risks related to human trafficking." (*Id.* at 2.) But it does not propose any solutions to the trafficking problem—quite the contrary, the letter commits DFPS to nothing more than "review[ing] the results of those assessments to determine *whether additional actions are needed* to ensure the safety of children and youth temporarily staying at child watch locations." (*Id.* at 2 (emphasis added).)

---

[163] This letter was submitted at the Contempt Hearing as Plaintiffs' Exhibit 97. It is attached to this Order for the convenience of the reader.

[164] As noted earlier, *supra* page 126–27, this is not the first time that DFPS has disclaimed responsibility for the CWOP crisis.

[165] Of course, the letter does not disclose whether security assessments will be conducted at CWOP locations in the other DFPS regions.

### 11. *One night at a CWOP Setting*

In their September 2021 update to the Court, the Monitors reproduced a Serious Incident Report that recounts all the incidents that took place at one CWOP Setting on a single night. The report documents children freely leaving and returning to the CWOP Setting, a child smoking, inappropriate child-on-child sexual behavior, reliance on law enforcement, threats of physical violence, and a child using unaccounted-for pills to attempt suicide. **All in a single CWOP Setting on a single night**.

At 1:15AM [G] decided to go smoke, staff . . . followed her outside. At this same time [a caseworker and staff person] noticed [T] and [J] go into the room where [R] was laying down. [The caseworker] went into the room and turned on the lights, and it seemed as the teens were trying to be inappropriate with each other they got upset due to [the caseworker] being there and not leaving, [T], [J] and [R] got up and stated they were going to walk to the store. At 1:24AM [R], [T] and [J] were stopped by [a staff person] and [asked] "Hey guys where are y'all going?" [R] responded, "We're going to take a walk to the store." [The staff person] replied, "Its dark guys, it's not a good area and if y'all wanna go to the store, let me call [a Program Director] and see if she approves for me to drive you instead of y'all walking out there as there aren't any close corner stores that are open." [R] said, "No, I don't wanna be seen with . . . you, you're weak and I'd be embarrassed to be seen with you." They then started walking towards [the road]. [The Program Director] was called and she advised to call law enforcement. [Law enforcement] was called and [a] missing children report was generated.

At 3:10AM the teenagers were seen walking back to location and [law enforcement] spotted them and walked them to the location. [The Program Director] was notified teens refused to be separated. [The Program Director] informed [the staff person] that [R] will need to go to [to another CPS office]. At the same time, [G] and [T] were blowing up gloves and popping them with pencils, they were asked to stop doing that as they can hurt themselves with the pencils, they refused and said they weren't going to be hurt. [Three] min[ute]s later, [G] threw the pencil to [T's] blown glove and pencil bounced and hit [T] in the eye. [T] was asked if she was ok and she stated she wanted medical attention for her eye. [The Program Director] was called and EMS was called at 3:42AM. As EMS called for [T], [J] and [R] got up and started walking down the hall towards the outside door, [the caseworker], [T] and [G] followed. Staff . . . asked them where were they going? They stated mind your business we'll be back later.

Law enforcement was called again at 3:50AM to report [R] and [J]. As they were leaving the premises, EMS pulled up and [T's] eye was checked, medical staff reported her eye looked fine and he didn't think she needed medical attention, but staff was advised if her eye keeps bothering her to take her to urgent care clinic. About 10 minutes later both [G] and [T] walked back outside. [T] stated to [the caseworker] [G] has pills with her and

threatened to beat her up if she is to tell anyone as she is feeling depressed and doesn't feel like living anymore. [T] was scared and told staff, "Don't tell her I told you, but I'm worried about her." [G] was seen walking towards the trash bin. [The caseworker] mentioned to Staff . . . we need to closely monitor [G] as she is acting distant and weird and she was seen putting something in her mouth. [G] was called several times but purposely ignored staff and would not take her ear phones out of her ears while making eye contact at times with staff [who motioned to her] to take them out and hear us. It was stated what [T] had told [the caseworker], then Staff . . . followed [G], she then went behind the bin and made gag sounds and left the scene walking towards building. When Staff . . . arrived at [the] trash bin, I turned on my phone's flashlight and I saw [vomit] on the floor. I was approached by [T] and she informed me [G] had a handful of pink pills and she had taken them and made the following statement to [T], "I'm done with life." Staff . . . approached [G] and she refused to talk to anyone and put her headphones back on. For precaution, [the Program Director] was called as we didn't physically see her with pills on her hand or taking pills, we were advised to call EMS to check up.

At 4:05AM [R] was seen around the corner running towards CWOP building and police car chasing him down. [R] opened the back door and ran inside, officer got out his car and ran inside after [R]. [The caseworker] and [police officers] walked throughout building as [R] was hiding in front of building and eventually came to CWOP area as [the caseworker] called stating he is back in area [the police officers] then stayed in hallway and placed handcuffs on [R] asking him why is he running away from police. [R] gave smart remarks back to [the police officers] and cooperated being handcuffed and was escorted out of building. Meanwhile, [G] was still outside and laid down on the floor, she was addressed and asked if she was feeling ok and did not respond. Second officer was taking [J] out of the police car and released her. [J] started cussing at the officers and told them she was going to leave. Officer went after her and told her, "get your ass inside the building" and was guiding her towards the door. [R] was then put inside the police car.

[T] came outside and told staff . . . she was fearful as [G] had threatened her if [she] "opened her mouth". [The staff] for safety precaution told [T] to go inside his car and stay there until it's safe. [The staff] got a call from [the caseworker] that [J] had gotten the water hose out of [the] glass door and was starting to pull it all out of [the] box. [The caseworker] pulled the hose away from [J] and told her to stop to avoid any incidents. [J] got upset and cursed at worker. [J] then walked towards front door of building and was witnessed kicking glass door to building by [the caseworker] who told her repeatedly to stop kicking [the] door as glass was going to shatter on door. [J] cursed at worker and then [G] walked into area and tried to convince her to stop. [J] would not reason with either [the caseworker] or [G] and continued kicking the door.

[G] then walked out of front area. [The caseworker] called . . . [to ask] . . . for assistance by [the police officers,] as they were still on premises[,] to help with [J] kicking glass door and trying to destroy property. During this time, [J] had woken up the rest of the youths from banging on the door. [The police] officer came and spoke to [J] and she calmed down a bit.

Shortly after . . . [p]aramedics walked into the front area with [the police] officer and [the caseworker] requesting [to be directed to the] child that shows signs of overdosing. Paramedics [were] escorted to CWOP area where [G] was. [G] refused to be checked, she stated she only had two individual pills of ibuprofen a [caseworker] had given her. [G] repeatedly kept crying stating she only had two pills and she was informed that she can't take pills without staff administering them to teens. EMS asked [T] and [T] reported she did see [G] with a handful amount of pills. EMS and another police officer escorted [G] out as she was refusing to go outside. Once [G was] in the ambulance, [T] was brought back inside the building. [R] was taken to [another CPS office] by law enforcement. [The caseworker] escorted [G] to Texas Children's, while other staff remained. Staff started cleaning [G's] room and a box of 50 coated Ibuprofen 200mg tablets was found, however, the bottle was not found. [Staff] reported to [the Program Director] that [the police officers] stated they were going to call in an intake because staff should have known [G] was suicidal and been watching her so she did not take the pills. [The Program Director] also talked to an officer who asked what was our plan to prevent [J] from destroying property. He asked if we were going to lock her in a room to prevent this from happening. [The Program Director] explained that we cannot lock a child in a room.

(D.E. 1132 at 90–92.)

So goes a night in the "sustained crazy that is CWOP." (D.E. 1488 at 239:8–9.)

\*       \*       \*

The State is unable to articulate a reason that these facilities could not be licensed and staffed with trained caregivers. Further, all of these issues are directly related to and exacerbated by the requirement that DFPS caseworkers supervise CWOP Settings, leading to unmanageable caseloads, burnout, and turnover. The Court carries forward the Contempt Motion on this issue.

## D. Caseworker caseloads

### 1. *The long history of excessive caseworker caseloads in the Texas foster care system*

From the outset, excessive caseloads leading to caseworker burnout and turnover have been major features of this litigation. (*See*, *e.g.*, D.E. 1 at 64 ¶ 266 (alleging that "high caseloads lead to turnover rates among DFPS caseworkers that Texas itself has deemed 'excessive'"); *id.* at 65–66 ¶ 273 ("Despite Defendants' long awareness of these problems, they continue now. An

Adoption Review Committee report[166] from December 2010 found that 'caseworkers carry extremely high caseloads, often twice what is deemed best practice. This contributes to high turnover rates and reduces positive outcomes for children.'").)

By the time of trial, the State was well aware that tracking caseworker caseloads and keeping them within a manageable range was crucial to maintaining a workforce that would keep foster children safe. As the Court explained in the 2015 Memorandum Opinion and Verdict:

> DFPS has known for almost two decades that overburdened caseworkers cause a substantial risk of serious harm to foster children. DFPS also admitted, "An overloaded case worker is bad for the children they are supposed to protect" and high caseloads "put[] a burden on the worker" and "can have a number of negative consequences. Further, DFPS's external consultants have told DFPS that manageable caseloads are crucial to foster children's well-being. Numerous reports echo this sentiment.
>
> In addition, DFPS has long been aware that its caseloads are too high. As early as 1996, the Governor's Committee to Promote Adoption told DFPS that it needed to reduce CVS caseworker caseloads.
>
> . . . .
>
> DFPS has also known for a long time that caseworker turnover poses a substantial risk of serious harm to foster children. . . . An internal study done by DFPS in December 2012 found that two of the main factors contributing to CPS caseworker turnover were "poor working conditions and environment (safety and work-related stress)" and "workload concerns making it difficult to perform adequate work."

(D.E. 368 at 186–87, 189–90 (citations omitted).)

Indeed, the importance of tracking and managing caseworker caseloads was made clear to the State by both internal and external reports. In 2007, for example, a report by Texas Appleseed explained that "[w]hen those caseworkers are inadequately trained, inexperienced, or overburdened, the system breaks down and children in the system are harmed." (*Id.* at 163 (citing

---

[166] The Texas Adoption Review Committee was formed in 2009 by the Texas Legislature and then-Governor Perry "to take a hard look at the Texas foster care system." (D.E. 368 at 10.) "The Committee conducted a ten-month review, which included testimony from DFPS employees, foster care advocates, policy analysts, foster and adoptive parents, CPAs, and experts from ten areas of DFPS." (*Id.* at 10.) The Adoption Review Committee's December 2010 report was submitted by Plaintiffs as trial exhibit 1964.

to trial exhibit PX 1966 at 11).) A 2014 DFPS audit likewise reported that "[t]he single most important improvement any system can make is to ensure it has a well-trained workforce with workloads that meet national standards." (*Id.* at 163 (citing to trial exhibit PX 1880 at 16).) Indeed, CPS's then-Director of Systems Improvement wrote in an article that "'[w]ith respect to CVS, historically, a fairly direct relationship exists between caseloads and voluntary turnover.' In support of that statement, [she] cited data showing that when 'caseloads declined 16 percent from 2006 to 2008 . . . CVS voluntary turnover declined 10 percent.'" (*Id.* at 177 (citing to trial exhibit PX 1871 at 11) (ellipsis retained).)

Yet, at the time of trial, Texas' child welfare system was unique, in that it "put[] no limits on the caseload size that a conservatorship worker can carry." (*Id.* at 163 (D.E. 305 at 27:22–24).) Nor was the State tracking its caseworkers' caseloads in an intelligible way. Instead, it tracked caseloads "in terms of 'stages,' each of which represent[ed] an aspect of the work that needs to be done with a child or her family, rather than by individual children." (*Id.* at 162.) This method of counting caseloads—which was "unique to Texas"—gave little useful information: "Defendants' and Plaintiffs' experts could barely understand the stage-counting approach, let alone explain it to the Court. It is therefore difficult to compare DFPS caseworker caseloads to national and professional standards." (*Id.* at 162 (D.E. 327 at 38–39; D.E. 325 at 124–125; D.E. 305 at 45–51).)

And while this "nebulous" approach to caseload tracking already muddied the waters, DFPS padded the numbers to further obfuscate the true extent of its caseload problem. For example, DFPS would count as caseworkers "people that are not there, such as workers on maternity or medical leave." (*Id.* at 164 (D.E. 305 at 41:7–9) (quotation marks omitted).) DFPS's computer system would count secondary workers as conservatorship caseworkers, even though secondary workers had nowhere "close to the responsibility of a primary caseworker." (*Id.* at 164.) DFPS

even counted "fictive workers who are 'created out of all the overtime,' which 'are not actually even people.'" (*Id.* at 164 (D.E. 310 at 67).)

DFPS could not, however, hide the views of its caseworkers, over half of whom reported that they were overworked. (*Id.* at 165.) One former CVS caseworker testified at trial that she worked "approximately 50 hours in a typical week" and that "overtime was the rule, not the exception." (*Id.* at 165 (D.E. 323 at 34–35).) She stated that "this caseload was typical and unmanageable." (*Id.* at 165 (D.E. 323 at 34).) It caused her to "experience '[e]xtreme stress, burnout, wearing down, [and] anxiety,' and affected her relationship with her family." (*Id.* at 165 (D.E. 323 at 38) (brackets retained).) And she explained that PMC children were the ones most affected by her high caseload. "This was because TMC children's cases have 'many [more] moving parts' and 'many aspects that are demanding for services,' while PMC children are generally already in a placement and at least appear to be relatively settled. As a result, . . . 'when something else [was] blowing up,' PMC children were 'the first ones to . . . get pushed to the side.'" (*Id.* at 165–66 (D.E. 323 at 37) (brackets and ellipsis retained).) "In a survey, 70% of the caseworkers that left listed 'Workload' as the first or second reason." (*Id.* at 177 (citing to trial exhibit PX 1993 at 306).)

Many other consequences of excessive caseloads and turnover were also made apparent at trial. For example, overburdened caseworkers are "often too busy to keep up with their documentation responsibilities, even though they considered them vital." (*Id.* at 168 (D.E. 323 at 36; D.E. 324 at 16).) Again, DFPS was "well aware that its caseworkers often cannot keep up with required documentation when their caseloads are high," as it was discussed in an internal memorandum in October 2012. (*Id.* at 168 (citing to trial exhibit PX 1825 at 2).) The lack of documentation became "especially problematic when caseworkers left and their cases were redistributed," as the "remaining caseworkers could not immediately assess the needs, and appropriately monitor the

safety of, the new children on their caseload if their files did not contain thorough and up-to-date documentation." (*Id.* at 168 (D.E. 324 at 16).)

Paperwork delays can also prevent children from finding a permanent home: The Court learned that several potential adoptions of named plaintiff S.A. never materialized because of "her caseworkers' failure to update" paperwork that was required "before any adoption can go forward." (*Id.* at 86 (citing to trial exhibit DFPS #49445-61, #49123).) More broadly, an audit of DFPS reported that "[n]umerous transitions in caseworker assignments disrupt momentum toward permanency by forcing children/youth and their families to 'start over' repeatedly with new caseworkers"; and then-DFPS Commissioner "Specia admitted that foster children are '[a]bsolutely' harmed when they do not achieve permanence." (*Id.* at 178 (citing to trial exhibit PX 1880 at 5; D.E. 229 at 39) (brackets retained).)

The Court also learned of other ways in which excessive caseloads and consequent high turnover can harm PMC children. For example, it prevents foster children from building a trusting relationship with their caseworker. "[A] CVS caseworker is often a foster child's 'only continuous and stable relationship.' Given that PMC children have been removed from their home and likely shuttled between placements, CVS caseworkers are one of the few people that foster children look to for support and guidance." (*Id.* at 172 (citing to trial exhibit PX 1871 at 1; D.E. 326 at 85).) "Trust is 'highly important' between a foster child and their primary caseworker because children need to feel comfortable telling them their problems." (*Id.* at 172 (D.E. 326 at 85).) Yet "repeated turnover in PMC children's caseworkers 'contributes to the child[ren]'s difficulties in establishing trust' with their caseworkers." (*Id.* at 179 (citing to trial exhibit PX 1988 at 67) (brackets retained).) A "rotation of overburdened caseworkers only causes 'despair,' 'isolation,' and 'helplessness.' Instead of becoming a stable influence in a child's life, foster children 'don't want to have a

relationship with [caseworkers] . . . they lose confidence, they lose trust,' and see caseworkers as just a 'number.'" (*Id.* at 178–79 (citing to trial exhibit PX 2015 at 4 (sealed); D.E. 324 at 20–21) (brackets and ellipsis retained).) Thus, children are less likely to report abuse to their caseworker, and the caseworker is unlikely to be familiar enough with the child to perceive that there is something wrong. (*See id.* at 179–81.)

The Court also learned that caseworker turnover can disrupt a foster child's healthcare, with disastrous consequences: Turnover "contributed to disruptions" in named plaintiff Z.H.'s "medication regimen, which resulted on at least one occasion in a psychiatric hospitalization that exacerbated" his "already-disturbed condition and behaviors." (*Id.* at 131 (citing to trial exhibit DFPS #33580).)

Overall, at the time of trial, the turnover rate among CVS caseworkers was 26.7 percent, and was 28 to 38 percent for first-year caseworkers. (*Id.* at 176–77 (citing to trial exhibit PX 1993 at 16–18; D.E. 300 at 38–39).)

The Court entered several remedial orders to resolve the excessive caseworker caseload problem. First, Remedial Order A1 required:

> DFPS, in consultation with and under supervision of the Monitors, shall propose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study.

(D.E. 606 at 8 ¶ 1.)

Remedial Order A2 required DFPS to:

> [P]resent the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.

(*Id.* at 9 ¶ 2.)

Remedial Order A3, in turn, required DFPS to:

[E]stablish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.

(*Id.* at 9 ¶ 3.)

On December 17, 2019, the Court approved an agreed motion submitted by the parties that in lieu of conducting a workload study pursuant to Remedial Orders A1 and A2, DFPS would use as the caseload guideline:

- "14-17 children per . . . DFPS conservatorship caseworker." (D.E. 772 at 2.) The order specified that DFPS "will use these guidelines to satisfy the requirements in the November 20, 2018 order, which require DFPS . . . to establish generally applicable internal caseload standards." *Id.* at 2 (citing D.E. 606 at 9–10 ¶¶ 3, 4 (Remedial Orders A3 and A4)).)

In accordance with this order, DFPS implemented the "caseload guideline of 14–17 children per conservatorship caseworker." DFPS, Generally Applicable Caseload Standards—Guidelines for Conservatorship (CVS) 1 (July 2020), *available at* https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/CPS_Generally_Applicable_Internal_Caseload_Standards.pdf.

Further, to address turnover among newly hired caseworkers, the Court entered Remedial Order 2, which provides:

Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.

(D.E. 606 at 2 ¶ 2.)[167]

Under DFPS policy implementing graduated caseloads, a newly hired caseworker must proceed through two phases of training before being eligible to hold a full caseload. During the first phase, caseworkers are trained "using the CPS Professional Development (CPD) training model," which "includes a 12 to 13-week training period, during which time new caseworkers are paired with a mentor (a tenured caseworker) who works with the new caseworker to prepare them to work cases independently." DFPS, Generally Applicable Caseload Standards—Guidelines for Conservatorship (CVS) 12–13 (July 2020), *available at* https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/CPS_Generally_Applicable_Internal_Caseload_Standards.pdf.

During this first phase of training, caseworkers are not eligible for a caseload; they "are deemed case assignable" only upon "the successful completion of CPD." *Id.* at 6. But they are not yet eligible for a full caseload. Instead, for the first two months after becoming case-assignable they are gradually ramped up to a full caseload: Specifically, caseworkers "will be assigned no more than 6 children in the first month of becoming case assignable and no more than 12 children in the second month after they are deemed case assignable at the successful completion of CPD. In the third month after being determined eligible for case assignments, the caseworker may receive a full caseload." *Id.* at 6. This two-month period of graduated caseloads allows new caseworkers some time to adjust to a caseload.

---

[167] A substantially similar provision was validated by the Fifth Circuit in *Stukenberg I. See* 907 F.3d at 273, 273 ¶ 3. Therefore, in its November 2018 Order implementing *Stukenberg I* on remand, the Court restated that provision as Remedial Order 2. The Fifth Circuit's opinion in *Stukenberg II* did not disturb Remedial Order 2, and it became effective upon the Fifth Circuit's July 30, 2019 Mandate. *See* 929 F.3d at 276 (listing issues on appeal, none of which pertain to Remedial Order 2).

2. ***DFPS's failure to count CWOP shifts in caseworkers' caseloads is once again driving excessive caseworker caseloads, burnout, and turnover***

At the Contempt Hearing, Doctor Miller noted that the agreed-upon guideline of fourteen to seventeen children is "a full load. And anything you put on top of that is going to take away from" caseworkers' ability to care for children. (D.E. 1488 at 272:2–4.) Thus, failing to count CWOP shifts in a caseworker's caseload effectively renders the agreed-upon guideline of fourteen to seventeen children per caseworker meaningless:

> Q. If you have a system in the State of Texas with caseworkers – let's just assume they were all within the 14 to 17 child caseloads. They're not. Let's assume they were. And then you ask them to work another half of a week in CWOP shifts. What's – how meaningful is the fact that they have a caseload between 14 and 17 children?
> A. Well, it's not meaningful at all, because they no longer – that isn't their workload any longer. It's like they have a job and a half.
> Q. And can you just ignore the other half of the job and actually make sure that the caseworkers have the time to safely manage their children?
> A. No.

(*Id.* at 272:6–18.)

Yet that is precisely how DFPS is handling CWOP shifts—while caseworkers are required to work up to sixteen CWOP overtime hours per week, DFPS is neither counting these shifts as part of their caseloads nor prorating their caseloads to account for the shift as an "other function." (D.E. 606 at 9.) As a result, caseworkers are being overburdened on an unprecedented scale.

As Ms. Carrington explained at the Contempt Hearing, working CWOP shifts (also called "Child Watch" shifts) is "an essential job function." (D.E. 1488 at 211:3.) As a result, CWOP shifts are mandatory, and caseworkers can be penalized if they refuse a CWOP assignment:

> Q. . . . What's the importance of designating CWOP shifts as an essential job function for a caseworker?
> A. So as a caseworker, you have consequences if you don't work CWOP . . . .
> Q. What kind of consequences?
> A. I mean, consequences being written up, consequences up to being terminated if you don't show up for a shift for CWOP . . . .

Q. So if you're -- if you're a caseworker and have a very busy normal caseload and you just physically or emotionally can't take more CWOP shifts, do you have the option of just saying, "No, I can't do them"?

A. You have an option of maybe trying to find someone to replace you in that shift, but you can't just say, "No, I'm not going to work the shift." The only way you can not work a CWOP shift at all is if you have a reasonable accommodation, and that's -- you know, you have to go through civil rights and do all of that.

(*Id.* at 210:25–211:17.) Thus, most caseworkers have no choice in whether they take these overtime shifts.

Associate Commissioner Banuelos testified that caseworkers are only required to take CWOP shifts "if we don't have enough people who volunteer." (D.E. 1487 at 323:16–19.) But Ms. Reveile explained that CWOP shifts were never actually voluntary:

Q. How did you look at your [CWOP] overtime work?

A. It was like a very stressful part-time job.

Q. Did you -- did you volunteer for each of those shifts?

A. No. Whenever I first started, we were allowed to sign up for our preferred times, but it was still the expectation. It was mandatory. They told me in my interview that it was mandatory. And then after a while, eventually they didn't even let you sign up for your preferred shift. They just assigned you.

Q. And was this true all the way until you finished working at the department in the summer of 2023, just six months ago?

A. Yeah.

Q. That it was mandatory?

A. CWOP had always been mandatory the whole time I worked there, and we progressively got assigned more and more shifts each month.

(*Id.* at 200:10–25.)

Moreover, mandatory CWOP shifts are assigned without reference to the caseworker's regular caseload. Ms. Reveile explained that for much of her tenure as a DFPS caseworker, she "had the highest caseload in the office at 16 kids." (*Id.* at 202:6–7.) And eight of the children had "special needs, so they were complex cases." (*Id.* at 202:8.) Nonetheless, her regular caseload was not considered when CWOP shifts were assigned—she "had to work the same amount of shifts" as everyone else. (*Id.* at 202:11–12.) Consistent with Ms. Reveile's testimony, the Monitors have reported that caseworkers whose regular caseloads exceed the agreed-to guideline range are

251

responsible for CWOP shifts, as are new caseworkers who should have a graduated caseload. (D.E. 1318 at 123–24.)

In fact, Ms. Reveile's testimony indicates that caseworkers are assigned CWOP shifts before they become eligible for any caseload. She testified that within a month of being hired as a DFPS caseworker, she was required to work CWOP shifts. (D.E. 1487 at 196:12–16.) This is contrary to DFPS's caseload standards: As noted above,[168] newly hired caseworkers must complete CPS Professional Development, which takes twelve to thirteen weeks, before they are eligible for any caseload. Thus, Ms. Reveile was working CWOP shifts at least two months before she was eligible to be assigned any caseload.[169]

Moreover, these mandatory shifts are not rare—they a routine part of the life for a DFPS caseworker. Ms. Reveile testified to an increasing CWOP burden over time: At the start of her tenure, she was assigned "maybe one or two" four hour "shifts per month." (*Id.* at 204:14–15, 24.) The number of CWOP shifts "eventually increased to three and then eventually to four, and then towards the very end it was five or six" per month. (*Id.* at 204:19–20.) Ms. Carrington testified that caseworkers are now responsible for five to ten five-hour Child Watch shifts each month. (D.E. 1488 at 225:7–9.) This is consistent with the Monitors' October 2023 CWOP report, which noted that caseworkers interviewed by the monitoring team "indicated that they are required to supervise anywhere from six to eleven four-hour shifts each month, depending on the number of caseworkers and other staff available to supervise CWOP." (D.E. 1425 at 41.)

---

[168] *Supra* page 249.

[169] Ironically, DFPS refers to new caseworkers as protégés. DFPS, Generally Applicable Caseload Standards—Guidelines for Conservatorship (CVS) 13 (July 2020). Based on the way DFPS treats them, this term seems rather inapt. *See Protégé*, Webster's II New Riverside University Dictionary 946 (1st ed. 1984) (a person "whose welfare, training, or career is advanced by an influential person"); *Protégé* (def. 1), Black's Law Dictionary (11th ed. 2019) ("A person protected by or under the care or training of another person or an entity . . . .").

Of course, DFPS's "Child Without Placement Supervision and Overtime Policy" (the "CWOP Overtime Policy") gives little relief, as it permits caseworkers to "work a maximum of 16 CWOP overtime hours per week,"—*i.e.*, sixty-four CWOP overtime hours per month. (PX 114 at 1.) Thus, assigning a caseworker ten five-hour overtime shifts each month is—according to the State— perfectly acceptable. So too is assigning a five-hour overtime shift immediately after a regular shift: The CWOP Overtime Policy explains that "On a weekday that an employee is scheduled to work on a regular eight-hour shift of non-CWOP responsibilities, they may work that regular shift and up to six hours of additional CWOP time." (*Id.* at 2.)

Evidence presented at the Contempt Hearing revealed the full scope of the burden imposed on caseworkers. As noted earlier,[170] DFPS's data show that in 2023, caseworkers worked around 725,124 hours of CWOP overtime. Based on this, Plaintiffs calculated that CWOP workers worked about 1988 CWOP overtime hours per day. (PX 107S at 1.) In other words, "every day," caseworkers worked the equivalent of "248 full-time shifts just for CWOP." (D.E. 1489 at 21:14– 19.)

This does not, however, mean that DFPS is just 248 caseworkers short, as full-time employees do not work seven days per week. A full-time caseworker—one working forty hours per week, fifty weeks per year—would work 2000 hours in 2023. Thus, DFPS would need to hire 363 additional full-time caseworkers—725,124 hours divided by 2000 hours per caseworker—to cover all of that overtime. Or, to put it in more concrete terms, Associate Commissioner Banuelos testified that she has "about 1200" caseworkers, including new caseworkers who have a graduated caseload. (D.E. 1487 at 313:14–16.) Thus, these 1200 caseworkers are doing the work of 1563 full-time caseworkers. In other words, their caseloads are being undercounted by about 30 percent.

---

[170] *Supra* page 229.

At trial, the Court heard testimony that DFPS was underestimating caseworker caseloads by counting, as real caseworkers, "fictive workers who are 'created out of all the overtime'" worked by actual caseworkers, but "'are not actually even people.'" (D.E. 368 at 164 (citing D.E. 310 at 67)); *Stukenberg I*, 907 F.3d at 257 (noting DFPS's use of "non-human workers 'created out of overtime'" in "calculating caseload distribution," helping DFPS arrive at an "exceedingly generous" caseload estimate). Here, the Court is, in essence, using the fictive caseworker calculation, but in reverse, to demonstrate that DFPS is 363 workers short. Further, no cases are attributed to these 363 "fictive" workers—nor, therefore, to the actual caseworkers who work the CWOP shifts—thereby creating an unsafe workaround to the agreed-upon guideline of fourteen to seventeen cases per caseworker.

This mandatory overtime burden is, no doubt, the main reason why DFPS is currently facing a 36 percent turnover rate among caseworkers. (*See* D.E. 1347 at 219:3–7 (testimony of Associate Commissioner Banuelos).) But related DFPS policies and practices undoubtedly exacerbate the discontent felt by caseworkers, and thus, the turnover rate.

For example, as noted above, the CWOP Overtime Policy permits the assignment of up to six hours of CWOP overtime on the same weekday as a "regular eight-hour shift." (PX 114 at 2.) But the CWOP Overtime Policy contains no provision that would allow a caseworker some time to recover after working up to fourteen hours in a single day. And both Ms. Reveile and Ms. Carrington testified that caseworkers are afforded no such recovery time. (D.E. 1487 at 205:3–11; D.E. 1488 at 228:4–7.) Ms. Reveile never got time to recover after working a CWOP night shift, she "would work part of the night and then have to start [her] day job, [her] full-time job, the very next morning" (D.E. 1487 at 205:9–11)—she had to "[j]ust keep going" (*id.* at 205:8).

Ms. Reveile also explained that a CWOP shift that was supposed to be four hours might be extended at last minute. For example, "if the person that was scheduled after you" failed to show up to their shift, "you would be asked and volun-told to take their shift." (*Id.* at 204:24–205:1.)

Likewise if there is an emergency. Ms. Reveile recounted arriving at one shift at the CWOP Setting in Temple, and finding one of the children in the front yard "in her underwear, screaming that she was drunk." (*Id.* at 207:20–23.) After law enforcement and paramedics arrived, the child made a sexual assault outcry and was taken to the hospital "to get evaluated, all the tests that they do after that." (*Id.* at 208:13–17.) Ms. Reveile's supervisor was sent to watch the child in the hospital; Ms. Reveile and the other CWOP worker completed the relevant incident reports, updated the shift log, and notified the child's caseworker, all while supervising the other children held at the CWOP Setting. (*Id.* at 208:19–25.)

By the end of the shift, Ms. Reveile was "exhausted." (*Id.* at 209:1.) Yet, as she was driving home, she was instructed to relieve her supervisor at the hospital. (*Id.* at 209:3–6.) Thus, she spent a further two and a half hours on this extended CWOP shift before she herself was relieved. (*Id.* at 209:7–10.)

While DFPS can underreport and obfuscate caseload data, it cannot hide the discontent expressed by its caseworkers—as the Court noted in the 2015 Memorandum and Opinion, "Despite DFPS's deception, the caseworkers themselves say that they are overworked." (D.E. 368 at 165.) The same is true now—the toll on caseworkers is quite apparent from their universal dissatisfaction with CWOP. As the Monitors recently reported:

> Interviews with stakeholders, which included caseworkers and staff present during the monitoring team's September 18, 2023, site visit, and others who later contacted the Monitors, describe their intense frustration and anger over the ongoing requirement that they supervise CWOP Settings in addition to their existing responsibilities and without adequate training. All the caseworkers expressed the difficulty that the supervision requirements create for completing the regular tasks associated with their positions.

(D.E. 1425 at 41 (footnote omitted).) "[O]ne DFPS caseworker said that '[CWOP] has turned into such a cancer it has taken the joy out of everything else' and, in speaking of DFPS, said 'at the end of the day it feels like they don't care about us.' Another DFPS caseworker said that the DFPS staff and caseworkers have 'been worked so hard that their passion burns out and they become angry.'" (*Id.* at 41 n.57.) Further, "the caseworkers and staff with whom the monitoring team spoke all expressed exhaustion, noting that many of their peers had quit their jobs due to the requirement that they supervise CWOP Settings." (*Id.* at 43.) And, as noted earlier,[171] the caseworkers also complained about the lack of training to care for the high-needs children that tend to predominate in CWOP Settings, and their consequent concern for their own safety and that of the children placed in CWOP.

Unsurprisingly, mandatory overtime, combined with inadequate training and lack of support, make for unbearably stressful working conditions. Ms. Reveile explained:

> . . . . [I]t was almost impossible to get through a shift on a lot of days. It would -- it would be scary driving in, and it would be a long drive too. . . . [I]t's easily an hour, hour and a half drive. So waking up at 2:00 in the morning, getting to Belton or Temple by 4:00, you're stressed your whole drive.
>
> You're building up your cortisol levels and your adrenaline, all that. And then you get to your shift, and you have only the amount of time that you had maybe sitting in your car before you walked in to kind of read about what happened with the kids on the previous shift.
>
> And you may or may not actually know the kids. You may or may not know what they like or what they like to do if you don't fully read that shift log before you go in. So you always try to get there even earlier than your shift starts, and then anything could happen on your shifts.

(D.E. 1487 at 197:25–198:17.)

And Ms. Reveile testified that CWOP was equally exhausting and demoralizing to her colleagues:

---

[171] *Supra* page 131.

Q. Were your fellow coworkers, your other caseworkers, were they driving as much as you and exhausted as much as you based on your personal interaction with them?
A. Yeah. Everybody was exhausted.
Q. How do you think this affected the morale of the caseworkers, at least yours and the ones that you interacted with closely?
A. There was little, if any, morale left.

(*Id.* at 201:1–8.)[172]

Finally, Ms. Reveile explained that working as a DFPS caseworker was her dream job, which

made her eventual decision to resign because of CWOP all the more difficult:

Q. . . . [W]as this the job that you had been looking forward to as your dream job of working for Child Protective Services?
A. Yeah. Wanting it for ten years and then finding out that it's just a system that's broken and breaks people. It was awful. It was a really hard decision. I tried really hard to stick it out, tried to make it better for the other workers, and it just -- I couldn't do it anymore.

It felt like -- you know, they say don't burn the candle at both ends. I had my candle, and I was burning it on one end, but then the system came in with like a flamethrower. But then they would just blame me and say it was like -- because I wasn't doing self-care when I was.
Q. Did it affect your health?
A. Yes.
Q. How so?

---

[172] Indeed, caseworkers' dissatisfaction was apparent even to the children at the CWOP sites. Ms. Juarez recounted:

Q. Did any of the caseworkers that you came in contact with, were they -- did they seem happy to be there, excited to be working on these CWOP shifts?
A. No.
Q. What were they -- what was their attitude?
A. Every time my caseworker -- my caseworker I had before the one I have now, she would take me to her office, because I didn't have any place to go to. And every time they will mention CWOP, everyone would be like, "Oh, no," like, "I don't -- I don't want to work CWOP," but they had to. And they were like -- they would say the curse word, "Oh, no, I don't want to go." And they were like, "There's some bad --" Can I say the word?
THE COURT: Yes.
THE WITNESS: "There's some bad ass kids in there."
BY MR. YETTER:
Q. Okay. So your older -- your prior caseworker sometimes would take you to her office?
A. Yes.
Q. And you would hear the other caseworkers talking?
A. Yes.
Q. And were they happy about doing CWOP shifts?
A. No caseworker was happy to do CWOP.

(D.E. 1487 at 257:21–258:19.)

> A. I know I mentioned my blood pressure being four points away from hypertension, but since leaving the department I've actually had time to have my own mental health appointments and have since been diagnosed with moderately severe depression and severe anxiety.

(*Id.* at 206:14–207:9.)

Given the crushing burden under which caseworkers operate, it is no surprise that their turnover rate is "about 36 percent." (D.E. 1347 at 219:6.)[173] Indeed, Doctor Miller was "surprised that the turnover rate isn't higher." (D.E. 1488 at 270:13–14.)

And turnover is not the only problem created by excessive caseloads; as both the Court's trial findings and the Contempt Hearing testimony indicate, the burden significantly degrades caseworkers' ability to care for the children on their caseload. Doctor Miller explained why adhering to the caseload guidelines is "critically important" to the safety of the children (*id.*at 269:16):

> Because casework is very difficult, and your number one resource in a child welfare system are those case managers. That's -- that's your front line. And if they are overloaded . . . , they cannot do that work. It's not that they don't want to. It's simply they cannot. There are only so many hours.

(*Id.* at 269:18–270:1.) She "absolutely agreed" with Ms. Carrington's observation that exhausted caseworkers cannot keep children safe (*id.* at 270:2–6): Caseworkers are a child's "first line of defense" (*id.* at 270:25–271:1). The caseworker is the person that "is going to make certain" that the child's needed services are available and are, in fact, being provided, and that the child "is safe in their environment." (*Id.* at 271:1–4.) But when caseworkers are exhausted and stressed, they simply "don't have the capacity to do the work . . . that needs to be done." (*Id.* at 271:5–8.) Adherence to caseload guidelines prevents caseworkers from reaching that point, as it ensures that "caseworkers have the time to safely manage the children." (*Id.* at 271:9–12.)

---

[173] In June 2022, then-DFPS Commissioner Jaime Masters testified that the caseworker turnover rate was "between 30 and 35 percent." (D.E. 1267 at 103:14–16.)

Ms. Carrington noted that, between their regular caseloads and CWOP duties, caseworkers "work Monday through Sunday. You literally work Monday through Sunday, because your visits with your primary casework -- case, your cases, those are mandatory. You have to do those visits." (*Id.* at 228:4–7.) And she explained how this schedule "impact[s] the caseworkers' ability to take care of the children" (*id.* at 228:8–9):

> A. Well, they're exhausted. And . . . every time we visit a family, visit a child, interact with a child, we're supposed to be assessing for risk. We're supposed to be assessing for safety. We're supposed to be really observing a lot of different factors when we're interacting with our families and interacting with our children.
> Q. How are --
> A. Exhausted people can't do that.
> Q. I'm sorry. Exhausted people can't do what?
> A. Exhausted people miss safety threats. They miss risk factors. They miss them, because they're tired. It's just as simple as that. They're too tired literally to do their jobs.
> Q. Can exhausted caseworkers keep children --
> A. Can't keep children safe.

(*Id.* at 228:10–24.)

In sum, DFPS's failure to properly count CWOP shifts in caseworkers' caseloads is driving dedicated caseworkers to leave the job in dangerously high numbers. And those who stay cannot adequately serve either the children on their caseload or the children who should be on their caseload (*i.e.*, the children placed in CWOP). But the testimony of Associate Commissioner Banuelos gives the Court little reason to believe that DFPS is taking the problem seriously. She explained that one of her roles as Associate Commissioner of Child Protective Services is to monitor caseworker caseloads and track trends:

> Q. Your -- among other responsibilities, part of your role is to monitor caseloads for conservatorship caseworkers in the State of Texas, is it not?
> A. That's one of my roles.
> Q. And to identify trends in caseloads across the state?
> A. Correct.
> Q. In other words, are they getting too much, too little?
> A. That's correct.

(D.E. 1487 at 284:1–8.) And she agreed that the burden created by CWOP "on the system and specifically caseworkers" "falls right within [her] wheelhouse of responsibilities." (*Id.* at 294:13–18.) Nonetheless, she was blithely unaware of even the most basic statistics:

> BY MR. YETTER:
> Q. Didn't -- in 2021, wasn't there a significant increase in the amount of time that the State asked its caseworkers to devote to this [CWOP] program in 2021?
> A. I -- I don't have the total amount of time that they spent in 2021 doing [CWOP].
> Q. Nor do you, as you're sitting here today, even though you are in charge of watching trends, you don't know the numbers for 2022?
> A. I'm sorry, the numbers of --
> Q. Total time that the State asked its caseworkers in overtime to devote to [CWOP].
> A. I don't have those numbers with me today.
> Q. And you don't know them for 2023 either?
> A. I don't know the total numbers for 2023.

(*Id.* at 311:8–21.)[174] Yet alarmingly—and contrary to the State's own data[175]—she believed that the CWOP burden "has gotten better." (*Id.* at 295:7–8.)

Moreover, Ms. Banuelos appeared to understand the significance of following the agreed caseload guideline vis-à-vis child safety and caseworker turnover:

> Q. Do you understand, Ms. Banuelos, that the caseload guidelines are designed to make sure that the caseworkers have the time to safely manage their children? Do you understand that's the purpose?
> A. I would agree that the guideline -- yes, the guideline is so that workers can have time to work on their caseloads.
> Q. And it's --
> THE COURT: But you can't take a worker that's already got 16, 17 cases and give them a shift a week with somebody else's case -- casework, case child, without counting it for

---

[174] This is quite out of character given her mastery of the facts at prior hearings. (*See, e.g.*, D.E. 1395 at 88:2–6 ("Good morning, Your Honor. So, in reviewing the Monitors' Report, I did see their percentage. We went back and looked at, for the last two years, we had an 85 percent approval rate given prior to the child being placed."); *id.* at 91:2–7 ("[W]hen we looked at the last eight months, out of 31,345 placements, we only placed 3,212 children into heightened monitoring placements. So, we are thoroughly reviewing those. We are making decisions based on the safety of the child and those that are currently placed at those particular placements."); D.E. 1321 at 47:3–49:23 (describing current placement and treatment being provided to child discussed in Monitors' report, and providing additional details as to the incident addressed by the Monitors; *id.* at 107:9–11 (discussing grants for expansion of treatment foster care and explaining that "we had a total of $19 million, but we divided it amongst 23 providers"); *id.* at 159:11–15 (volunteering that "I know at one of the last hearings there was also a concern" that foster parents who were found to be abusive could move to a different Child Placement Agency, and noting that DFPS had changed IMPACT so that Agencies "get an alert so that they know this foster parent has a reason to believe").)

[175] From 2019 to 2023, the number of CWOP hours went from 25,057 (July to December 2019), to 87,360 (2020), to 693,364 (2021), to 667,048 (2022), to 604,273 (January to October 2023). (PX 107S at 1.)

them. Don't you understand that? . . . [T]he whole reason we've got the 14 to 17 guidelines is because you were having this huge turnover when we did the trial, because the workload was too stressful. Now you've created it again with this workload for the CWOP children. So you have a huge turnover once again, don't you, in caseworkers?
THE WITNESS: Our turnover continues to be a concern. It goes up and down.

(*Id.* at 329:9–330:3.) But despite this, and even after the Court explained that under the remedial order, DFPS "can't force the caseworkers to do these mandatory overtimes and not count it toward their caseload" (*id.* at 331:7–8), she was unwilling to commit to any change in policy:

BY MR. YETTER:
Q. Ms. Banuelos, you're not going to -- you're not prepared to make any change in how you're counting caseloads. Am I right?
A. I will follow the Remedial Order of counting caseloads by the number of child that -- the workload is counted by the number of children --
THE COURT: I just told you what it is.
THE WITNESS: -- on our primary caseload.
THE COURT: I just told you what to do. Are you going to do it?
THE WITNESS: Your Honor, I'm going to follow the Remedial Order --
THE COURT: I just told you what it was.
THE WITNESS: -- of counting case loads --

(*Id.* at 332:6–19.)

### 3. *Harms to caseworkers working CWOP shifts*

Stress, high blood pressure, and depression are far from the only risks to the health and safety of CWOP workers. The Monitors report that "without adequate services and support, children placed in CWOP Settings—many of whom have significant mental and behavioral health needs— frequently become dysregulated and act out, harming the caseworkers and staff supervising them. Caseworkers are verbally and physically assaulted, and in some cases, sexually assaulted." (D.E. 1425 at 41.) The Monitors discuss several illustrative incidents in which CWOP workers either feared for their safety or were physically harmed:

- "The night before the monitoring team visited the Belton CWOP Setting, the children became dysregulated and began to engage in property damage throughout the house. There was no law enforcement officer or security on site during the shift. The staff who

were supervising the setting feared for their own safety and waited outside for law enforcement to arrive after calling 911." (*Id.* at 43.)

- As discussed in more detail earlier,[176] LD threatened that "the next time the caseworker came to the CWOP Setting, LD would 'shoot [him] in the head' and 'that [he] would be stabbed' and that 'all of the boys in the house were going to give [him] a beat down.'" (*Id.* at 43.)

- "The monitoring team also learned of a recent incident during which a DFPS staff person was physically assaulted and suffered a concussion while she was supervising a Bell County CWOP Setting. The staff person had to be hospitalized and, close to a month after the incident, was still recovering from her injuries. The child who was involved in the altercation was already on probation due to similar behavior." (*Id.* at 43.)

Perhaps most disturbing is an incident in which RH, a sixteen-year-old male PMC child, sexually assaulted a CWOP worker:

[RH] was not at the location when worker arrived for the shift. When he returned to the house, he noticed worker and said [worker's name] and ran over to worker and gave her a hug. Worker had the words, "[RH], we only fist bump" coming out of her mouth, but he ran up so quickly there wasn't time to finish the sentence. Worker immediately told him, "we only fist bump from here on out, ok?" [RH] said, "whatever [name omitted]" smiled and walked away. Worker has had several shifts with [RH] where he does not respect personal boundaries.

LE was present at this time, so [RH] did not approach worker for the next hour or so. At approximately 2:15 pm, LE left the child watch house and there was no replacement LE officer for the rest of this shift.

Around 3pm, [RH] sat down with the worker at the table. [RH] told worker, "I love you [name omitted]" and "I love your face" and then started touching Worker and she repeatedly asked him to stop. Worker continued to tell [RH] that he could not touch her without permission. Worker told [RH] that they could only fist bump, but he had to ask first. [RH] asked for a fist bump, so worker put up her hand. [RH] clinched his fist and

---

[176] *Supra* footnote 132.

punched workers hand forcefully instead of a "bump". Worker said, "oww, [RH] we're not doing that anymore either if you punch my hand." [RH] continued telling worker, "I love you, [name omitted]" and said this multiple times. Worker ignored [RH].

[RH] then started saying very sexually explicit things at the table. They were very sexual in nature and made worker feel extremely uncomfortable. He said things like, "put my disk so deep make her ass go to sleep," "I'd eat it out from the front and the back," "my dick so deep I'd make it bleed," "sit on it," "and send me a big hair pic." He said these things while laughing and grunting. [RH] was told to stop . . . . [RH] continued to say sexually aggressive things while thrusting his pelvis in his chair.

[RH] was redirected to make some food. [RH] remained in the kitchen with worker for about 5 minutes and then came back into the common area (where the table is) and sat by the . . . worker. The first thing he said was, "I love you [name omitted]." And then put his head on worker['s] shoulder. Worker immediately pulled away and [RH] got closer and began touching worker. Worker told him, "[RH], stop touching me" and he continued to do so. Worker repeatedly and sternly asked [RH] to stop touching her.

Worker looked at the table where Law Enforcement usually sits. [RH] saw worker look over there and he looked right into worker's eyes and said, "he left, there isn't anyone here. There is nobody here to help you." [RH] was touching worker's arms, shoulders, trying to play with worker's hair, poking worker with his fingers, rubbing worker's back, arms shoulders, etc. Worker stood up to get away from [RH] and he stood up and moved closer. Worker asked him repeatedly to stop and he would not. He said, "what [name omitted], I just love you." [RH] was told to stop. [RH] backed away and sat in the chair on the side of the table. He kept telling worker, "I love you." As soon as worker sat down, [RH] began grabbing the back of [her] chair and was dragging it towards him. Worker jumped up and when she did, [RH's] hands went from the bottom of worker's breasts all the way down her stomach past her belly button. Law enforcement was contacted.

(*Id.* at 42–43 (paragraph breaks and some ellipsis added).) Notably, DFPS knew that RH had a history of engaging in this sort of behavior—"RH's IMPACT records document a history of engaging in sexually inappropriate behavior from a young age, including 'acting out sexually towards . . . female staff at the school' which included attempting to touch their breasts and disrobing in the classroom." (*Id.* at 43.) The Monitors conclude their discussion of the incident by noting that "[d]espite a history of acting out sexually, RH has not been flagged by DFPS with an indicator for sexual aggression or a sexual behavior problem, even after the incident described above." (*Id.* at 43.)

At the Contempt Hearing, Ms. Carrington testified bluntly that Child Watch workers "get assaulted all the time." (D.E. 1488 at 219:10–11.) She knew of one worker who "was stomped in the face," another whose "hair was pulled out," and a third whose "ribs were broken." (*Id.* at 219:13–19.) And Ms. Carrington herself was nearly hit with a fire extinguisher. When she arrived at a CWOP site, a girl around ten or eleven years old was "walking around in her underclothes." (*Id.* at 233:22–23.) So Ms. Carrington instructed the child to put some clothes on. (*Id.* at 233:22–23.)

> [T]hroughout the night she was upset with me because I made her go put clothes on. And, you know, it -- you know, she's screaming at me and all of that. That's fine. That's not a big deal. She took the snacks, she threw them at me. It's not a big deal.
>
> Finally because I wasn't responding the way she wanted me to respond, she picked up the fire extinguisher. So she has the fire extinguisher, and she has it over her head, and she was walking towards me. And I'm sitting there. I'm trying to stay calm and not, you know, do anything to get her further upset.

(*Id.* at 234:7–17.) Fortunately, crisis was averted because the other youth informed Ms. Carrington and the other CWOP worker that this child "likes Cocomelon":

> So the caseworker is on YouTube. She's trying to find it. She does find it. [The child] has the fire extinguisher above her head. She hears Cocomelon, and she says, "Oh, Cocomelon," drops the fire extinguisher, runs over to the couch and sits with the caseworker, you know. And she's happy for, you know, 20 minutes, or, you know, until something else happened.

(*Id.* at 234:19–235:14.) Ms. Carrington emphasized that this was not a one-off event: "[T]hat's just one example of CWOP. It's not the worst example. This is what people deal with all the time." (*Id.* at 235:15–16.)

\*     \*     \*

DFPS caseworkers are overworked, undertrained, and unprepared to provide day-to-day care for high needs children. Yet, every day, they go above and beyond, doing their utmost to care for

both the children on their caseloads and the children placed in CWOP. They are truly the unsung heroes of the foster care system.

The State, on the other hand, has utterly failed to learn the lessons made clear at trial and discussed at length in the Court's Memorandum Opinion and Verdict regarding the need to ensure that caseworkers' caseloads are manageable. Indeed, all credible evidence indicates that the State is treating its caseworkers with at least the same indifference that was revealed at trial. If anything, the fact that the caseworker turnover rate is now significantly higher than it was at trial suggests that the State's indifference is now worse.

The Court carries forward the Contempt Motion on the issue of caseworker caseloads.

## E. Defendants are failing to appropriately apprise PMC children of the ways to report abuse and neglect

Remedial Order A6 provides:

Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.

(D.E. 606 at 11 ¶ 6.)

### 1. History of Remedial Order A6

The requirement that caseworkers apprise PMC children of the appropriate point of contact and methods of contact to report abuse, including a review of the Foster Care Bill of Rights and Ombudsman's number, resulted from evidence at trial indicating that abuse and neglect in foster care facilities were being underreported. (*Id.* at 11–12; D.E. 368 at 205.) One reason for this is that foster children "often do not know to whom they should report abuse and neglect." (D.E. 368 at

205.) The Fifth Circuit expressly affirmed the approach taken by Remedial Order A6, finding that "[t]o the extent that the court is worried about underreporting, this can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues." *Stukenberg I*, 907 F.3d at 279.

Ahead of their First Report, in order to facilitate their assessment of the State's compliance with Remedial Order A6, the Monitors asked DFPS to provide information regarding abuse and neglect reports made by children. (D.E. 869 at 125–26.) The information provided by DFPS was, however, "not responsive to the Monitors' request." (*Id.* at 126.) Because "DFPS's responses to the Monitors included blanket representations of compliance with Remedial Order A Six, and the data provided by the State was not adequate to support validation," the Monitors validated the performance through "face-to-face interviews with and case record reviews of PMC youth in care, and interviews with caregivers," made during unannounced monitoring visits. (*Id.* at 127.)

In their First Report, the Monitors noted that 28 percent of 163 children interviewed[177] had heard of or knew of the Foster Care Ombudsman. (*Id.* at 128.) And even fewer children—19 percent of the 163 children interviewed—knew how to contact the Ombudsman. (*Id.* at 129.)

The numbers were somewhat better for the SWI hotline. The Monitors reported that 60 percent of children who were asked about the SWI hotline reported having heard of it. (*Id.* at 129.) But only two children interviewed reported actually having called the hotline. (*Id.* at 129.)

As for the Foster Care Bill of Rights, only 48 percent of the children were aware of it. (*Id.* at 127.) The Monitors noted that children "under the age of thirteen were less likely to know about the Foster Care Bill of Rights." (*Id.* at 127.)

---

[177] The children interviewed for the First Report were in licensed facilities. (D.E. 869 at 127.)

In their Third Report, the Monitors visited twenty-five unlicensed settings (*i.e.*, CWOP sites) and interviewed fifty-six children without licensed placement. (D.E. 1165 at 68.) They reported that 75 percent of the children were aware of the SWI hotline, but only 55 percent knew how to reach the hotline if they needed to report abuse or neglect. (*Id.* at 70.) Only 31 percent of children were aware of the Foster Care Ombudsman, and only 29 percent knew how to reach the Ombudsman. (*Id.* at 70.)[178]

### 2. *Current concerns regarding noncompliance with Remedial Order A6*

In their Fifth Report, the most recent report to address Remedial Order A6, the Monitors noted "serious concerns regarding the ability of children in some facilities to reach out for help if they encounter safety risks." (D.E. 1318 at 80.) Between January 1, 2022 and August 31, 2022, the monitoring team visited eight operations, interviewed seventy-eight children[179] and reviewed 112 child files. (*Id.* at 73–74.) They also interviewed eight case managers across five of the operations. (*Id.* at 75.)

Four of the eight case managers stated that they "'always' (3 [of 8] or [37.5]%) or 'sometimes' (1 of 8 or [12.5]%) reviewed the Bill of Rights with children at intake/admission." (*Id.* at 75.) Forty-one of seventy-six children (54 percent) had heard of the Bill of Rights, but seventeen of those children said they had heard of it only after a description was offered by the interviewer. (*Id.* at 75.) Thirty-five (46 percent) children had not heard of the Bill of Rights even after a description was offered by the interviewer.[180] (*Id.* at 75.) A higher percentage of younger children answered that they had not heard of the Bill of Rights than older children.[181] (*Id.* at 75.) Younger children

---

[178] The Third Report did not provide data regarding the Foster Care Bill of Rights.

[179] Not all children answered all questions from the Monitors. (D.E. 1318 at 72 n.130.)

[180] Since only half of the case managers reviewed the Bill of Rights with the children, it makes sense that only about half of the children had heard of the Bill of Rights. (*Id.* at 75 n.131.)

[181] Sixty-nine percent of nine- and ten-year olds (11 of 16) had not heard of the Bill of Rights compared to 15 percent of fifteen- to seventeen-year-olds (2 of 13). (*Id.* at 75.) Twenty-three of the thirty-five children who had not heard of Bill of Rights were twelve years old or younger. (*Id.* at 75.)

were also less likely to report having read the Bill of Rights or having had the Bill of Rights explained to them.[182] (*Id.* at 75.)

Thirty-one of seventy-six (41 percent) children had heard of the Ombudsman, but eleven of those only reported having heard of the Ombudsman after a description was given by the interviewer. (*Id.* at 76.) Forty-five of seventy-six children (59 percent) had not heard of the Ombudsman even after a description was given. (*Id.*) As with the Bill of Rights, younger children were less likely to report having heard of the Ombudsman than older children.[183] (*Id.* at 77.) Twenty-five of the thirty-one (81 percent) children who had heard of the Ombudsman knew how to contact the Ombudsman. (*Id.* at 77.) Overall, only twenty-five of seventy-six (33 percent) children knew how to contact the Ombudsman. (*Id.* at 77.)

Thirty-seven of seventy-five children (49 percent) reported having heard of the SWI hotline, with four so reporting only after a description was given by the interviewer. (*Id.* at 77–78.) Thirty-eight of seventy-five (51 percent) children had not heard of the hotline even after a description was given. (*Id.* at 78.) As with the Ombudsman and the Bill of Rights, younger children were less likely to have heard of the hotline than older children and less likely to know how to call the hotline.[184] (*Id.* at 78.) Twenty-six of the thirty-seven (70 percent) children who had heard of the hotline knew how to call the hotline.[185] (*Id.* at 78.) In total, only twenty-six of seventy-five (35 percent) children knew how to call the hotline. (*Id.* at 78.) Worryingly, eight of the children reported that they needed

---

[182] Forty-five percent of children (9 of 20) twelve years old or younger had never read the Bill of Rights nor had the Bill of Rights explained to them compared to 37 percent (7 of 19) of children who were older than twelve years. (*Id.* at 76.)

[183] Seventy-five percent (12 of 16) of nine- and ten-year-old children had not heard of the Ombudsman compared to 31 percent (4 of 13) of fifteen- to seventeen-year-old children. (*Id.* at 77.)

[184] Seventy-seven percent (10 of 13) of fifteen- to seventeen-year -olds had heard of the hotline but 80 percent (12 of 15) of nine- and ten-year-olds had not heard of the hotline even after a description was given. (*Id.* at 78.)

[185] Eighty-five percent (11 of 13) of fifteen- to seventeen-year-olds knew how to call the hotline compared to 12 percent (2 of 17) of nine- and ten-year-olds who knew how to call the hotline. (*Id.* at 78.)

to call the SWI hotline at some point during their current placement, but only two of them were able to call the hotline. (*Id.* at 79.)

In sum, 46 percent of the children interviewed had not heard of the Foster Care Bill of Rights even after a description was given. (*Id.* at 75.) Fifty-nine percent of children had not heard of the foster care ombudsman even after a description was given. (*Id.* at 76.) And 51 percent of the children interviewed had not heard of the SWI hotline even after a description was given. (*Id.* at 78.) In their response to the Contempt Motion, Defendants argued that the Monitors' data showed only that the children "hadn't *retained*" that information. (D.E. 1429 at 37.) But that assertion does not account for the fact that another subset of children did report having heard of the Foster Care Bill of Rights, the ombudsman, or the SWI hotline after those things were described. (*See* D.E. 1318 at 75 (17 of 76 children responded that they had heard of the Foster Care Bill of Rights only after a description was offered by the interviewer); *id.* at 76 (11 of 76 children reported having heard of the ombudsman after a description was given by the interviewer); *id.* at 77–78 (4 of 75 children who initially indicated having not heard of the hotline changed their answer after a description was given).)

And even if it were a problem of retention, that would not absolve Defendants of their responsibility to explain the Bill of Rights, Ombudsman, and SWI hotline to the children, given that it is "critically important" "that children actually know . . . who to contact, who to call, who to make a report, an outcry of abuse and neglect." (D.E. 1488 at 286:18–21.) Doctor Miller explained that information must be conveyed to children in a way that they are likely to understand:

> This is another place in any system where you have got to have redundancy. With kids, think about this. You give them a piece of paper -- you know, my granddaughter is 11 years old. I give her a piece of paper, the first thing that's going to happen to it is it's going to be lost. And if I say, "This is really important, and I need you to remember this," I might ask her two weeks later and she doesn't even remember that piece of paper. So there's got to

be redundancy in the system. . . . We've got to think about how we get this information through to a child and that brain in a way that they can use that information effectively.

(*Id.* at 286:25–287:12.) This is especially true when the information is first conveyed under circumstances that are not conducive to retention. The Bill of Rights, for example, enumerates the rights of children in foster care in forty-eight numbered paragraphs, some of which are further subdivided, stretching across five pages. (DX 22 at 1–5.) The phone numbers for SWI and the Ombudsman are listed in the forty-sixth paragraph, along with two other hotlines. (*Id.* at 5 ¶ 46.) And the language introducing the list of four hotlines—"Depending on the nature of the complaint, I have the right to call: . . ." (*id.* at 5 ¶ 46)—suggests that each hotline addresses different types of complaints, and that the child must determine which is the correct hotline before calling.

Moreover, the Bill of Rights is presented to children when "they come into care" and "when a placement change is made into a DFPS FAD home." (*Id.* at 1.) But, as the Monitors have observed, the Bill of Rights is just one of many documents a child is required to review during these stressful events, and their Fifth Report explained that "many of the children interviewed by the monitoring team reported having to sign so many documents at intake that the children did not always absorb the information relayed in documents signed during intake." (D.E. 1318 at 75 n.131.) Indeed, a child can hardly be expected to retain information if the child does not first absorb it. To that end, Doctor Miller required her caseworkers, every time they met with a child on their caseload, "to talk with that child . . . and to go over . . . if you have any problems, this is how you handle it." (D.E. 1488 at 287:13–21.)

Given Defendants' ongoing failure to apprise PMC children of the means by which to report abuse and neglect, it is almost certain that abuse and neglect continue to be underreported, thereby interfering with proper investigations and the monitoring thereof. The Court is carrying forward the Contempt Motion on this issue.

270

## F.  PMC children's medical and educational records continue to be inadequate

Like the other problems identified in this Order, the State's failure to keep adequate medical and educational records has been known since at least the start of this case.

Inadequate medical records was one of the issues identified in the 2004 Strayhorn Report. Citing a study by the federal Office of Inspector General, the 2004 Report noted that the caregivers of nearly half the Texas foster children studied "never received medical histories of the children in their care." (D.E. 1486-8 at 20.) This was true for both children with basic needs and those with "serious medical conditions," and "made it difficult for [the caregivers] to effectively care for foster children." (*Id.* at 20–21.) Accordingly, the 2004 Report recommended that the State "develop 'Medical Passports' for foster children," which "would accompany the child on every doctor and therapist visit and would provide information on their complete medication, medical and therapy history. This passport would stay with the child during their entire time in foster care, even if they change placements, physicians, therapists, etc."[186] (D.E. 1486-8 at 21.)

This issue was also a topic discussed in the 2006 Strayhorn Report, where it was identified as a "significant medical concern[] within the state's foster care system." (D.E. 1486-10 at 7.) "DFPS still does not provide its foster children with a 'medical passport' explaining their medical history, including diagnoses and prescriptions although the passport is required by law.[187] Instead, foster children often move from one placement to another, seeing new physicians or counselors who have little or no knowledge of their past medical histories. A medical passport would help provide more consistent care for these children." (*Id.* at 7.) And as of "September 2006, DFPS stated that it 'is

---

[186] This was not a novel idea. The 2004 Report notes that "Florida and San Diego have created 'medical passports' to ensure that each physician seeing a foster child has a complete record of his or her medical treatment. This medical passport stays with each child as they change placements and/or physicians." (D.E. 1486-8 at 18.) And "[i]n San Diego, all of the passport information is also automated and placed into a database." (*Id.* at 18.)

[187] *See* Tex. Fam. Code § 266.006.

working with HHSC on the development of the health passport, scheduled to be implemented September 2007.'" (*Id.* at 7 (The Report notes that September 2007 was "more than three years after the Comptroller's first published recommendation" for a health passport).) The 2006 Report also made a new recommendation on this topic: that each foster child's medical passport "should be updated consistently and should document all medical treatments, prescriptions, psychological diagnoses and counseling to provide continuity of care." (*Id.* at 13.)

In short, the two Strayhorn reports recommended that each child's medical records be electronically stored in a centralized database that would be updated regularly and accessible to the child's physician and caregiver.

The 2006 Report also observed that "On July 20, 2006, HHSC issued a request for proposals (RFP) 'to contract with a single Managed Care Organization (MCO) to develop a statewide Comprehensive Health Care Model for Foster Care.'" (D.E. 1486-13 at 37 (endnote omitted).) The RFP "instructs the MCO to address" issues identified in the 2004 Strayhorn Report, including "the need for a medical passport." (*Id.* at 37.)

As noted earlier in this Order, the State's MCO is Superior HealthPlan. And Superior HealthPlan does maintain a medical passport system, called Health Passport. But, nearly twenty years on, Health Passport falls far short of the comprehensive database recommended in the Strayhorn reports: As Doctor Van Ramshorst described the situation in June 2022, "we're still a ways away from . . . what we'd all like to have, which is all of that information in one place." (D.E. 1267 at 185:11–13.)

The Court first broached this topic during a March 2017 hearing when it asked then-DFPS Commissioner Whitman how caseworkers "access the medical, dental, and mental health records of the children?" (D.E. 701 at 26:2–3.) Mr. Whitman replied that the medical information was kept

in the IMPACT system; this was quickly corrected by then-Deputy Commissioner Woodruff, who explained that the information was "kept in a system . . . called the Health Passport." (*Id.* at 26:7–10.) He elaborated that caseworkers "and health providers have access to those records," as do foster parents. (*Id.* at 29:19–21.) Later, the Court asked "how many different places" one would have to look "to get a complete record of the child's case" (*id.* at 52:24–25); Mr. Woodruff replied that one would have to review "the IMPACT system, the [child's] external file, and the Health Passport" (*id.* at 53:1–2). He represented that Health Passport has dental and medical records, and that "[i]f there's any mental health services, they should be in there." (*Id.* at 53:3–8.)

Later in the hearing, Mr. Woodruff called Cheryl Valenzuela, a conservatorship caseworker, to give the Court a live demonstration of the State's various databases. (*See id.* at 70:11–15 ("[W]e have one of our excellent local caseworkers, Cheryl Valenzeula . . . , here if the Court would like to see IMPACT live and . . . would like to see Health Passport.").) She explained that health records would be uploaded to Health Passport, if at all, by the healthcare provider. (*Id.* at 114:24–115:3 (discussing a child's psychological evaluation); *see also id.* at 115:2–3 ("THE COURT: So you rely on them to upload it? MS. VALENZUELA: Into the health passport, correct.").) Ms. Valenzuela demonstrated the Health Passport data for one child, and found that "none of her medical records are actually there." (*Id.* at 121:17–19.) And she elaborated that, while DFPS maintains all the medical records in paper format in the child's "external case file,"[188] "[w]e don't have access to upload it [to Health Passport]. To my knowledge the doctors' offices would have to upload this information." (*Id.* at 121:2–11.) The Court noted that "what I need to do is find out if you're going to be able to get these uploaded and make it a requirement for your health care

---

[188] (*See also* D.E. 701 at 124:15–20 ("THE COURT: Okay, let's say Megan -- it was your PMC child in Corpus Christi area. She went to doctors, she attempted suicide, and went through psychological evaluation. All of those records are in your external file, in hand, in paper form, in your office? MS. VALENZUELA: Correct.").)

providers to make sure that all these records are current in the Passport." (*Id.* at 122:25–123:3.) The Court reminded Defendants that physicians and other healthcare providers were already required by federal law[189] to keep electronic records. (*Id.* at 127:15–18.) The Court noted that "this is an area for improvement," and suggested that "the quickest fix" to the dearth of medical records in Health Passport—one that would also come at no cost to the State—would be to contractually obligate healthcare providers to "upload these documents" (*id.* at 127:11–14).

Then-Commissioner Whitman replied "I have it so noted; two stars by it." (*Id.* at 127:23–24.)

Five years later, in January 2022, the Court noted that Defendants had yet to provide any further information regarding medical records in Health Passport. (*See* D.E. 1175 at 113:1–5 ("[S]o I said, 'How about you have them E-file into the health passport, which are the medical records for the children?' [Then-Commissioner Whitman] said, 'I'm putting two stars by that,' and that's the last we heard. So we have no medical records to speak of . . . .").)

And in March 2022, the Court remarked on the still-inadequate nature of PMC children's medical records. (D.E. 1225 at 74:6–8 ("You know, to this day . . . the medical records . . . are paper, and they're very insufficient.").) By that time, Mr. Whitman was no longer with DFPS;[190] the Court reminded his successor, Jaime Masters, of Mr. Whitman's promise to "put two stars by" the e-filing issue and "get that done." (*Id.* at 74:20–21.) When asked if that was ever taken care of, then-Commissioner Masters replied "No, I don't think so, Your Honor."[191] (*Id.* at 74:22–24.)

---

[189] *See* HITECH Act, Pub. L. No. 111-5, 123 Stat. 115, 226–79 (2009).

[190] In June 2023, the Court prepared a chart showing the name and length of tenure for each of the seven DFPS Commissioners since this litigation began, and each of the eight HHSC Commissioners since this litigation began. (*See* D.E. 1384 at 2.)

[191] The Court notes that Mr. Whitman served as Commissioner for two years after making this promise to the Court. (*See* D.E. 701 at 1 (noting that the hearing took place on March 16, 2017); D.E. 1384 at 2)); *see also Hank Whitman Steps Down as DFPS Commissioner*, DFPS (May 28, 2019), https://www.dfps.texas.gov/About_DFPS/News/press_releases/2019-05-28_Hank_Whitman_Steps_Down.pdf (noting that Mr. Whitman "is stepping down . . . on June 30").

When asked if someone could "follow-up on that," Commissioner Masters replied "Yes, Your Honor." (*Id.* at 74:25–75:2.)

Three months later, at the June 2022 hearing, the Court again explained that doctors were not e-filing medical records with Health Passport, so there was little to no information on diagnoses, evaluations, or medical tests. (D.E. 1267 at 180:1–20.) Also absent were things like medication and immunization records, "and particularly lacking are the mental healthcare records." (*Id.* at 180:21–22.) And to the extent information was entered in Health Passport, it was so abbreviated that it was unhelpful. (*Id.* at 180:23–24.) The Court noted that it "is not safe for children not to have medical records readily available" (*id.* at 183:10–11), and asked how difficult it would be to require healthcare providers to put all the information into Health Passport (*id.* at 181:1–5).

Doctor Van Ramshorst explained that incomplete Health Passport information was a problem of which the State and Superior HealthPlan are "well aware." (*Id.* at 182:22.) He elaborated that it was a "linkage issue":

> [T]here are multiple electronic medical record vendors out there and even for clinics that might use the same vendor for their electronic medical records, some practices have more bells and whistles than others, and that just makes it difficult for multiple sources to feed into the one singular Health Passport.

(*Id.* at 184:15–20.) And he explained that Superior HealthPlan "is working on . . . better connecting that Health Passport with health information exchanges and the electronic medical records that providers use on a day-to-day basis." (*Id.* at 181:18–21.) The Court inquired as to the cost of solving this linkage issue,[192] and Doctor Van Ramshorst promised several times that he would "get back to you with an estimate." (*Id.* at 182:4–5; *see also id.* at 183:4–5 ("[W]e can look into that, Your Honor."); *id.* at 184:5–6 ("We can certainly get back to you with a cost estimate.").)

---

[192] The Court so inquired because Plaintiffs had money held in trust for the benefit of the children, and some of that money could be used to solve the issue. (*See* D.E. 1267 at 183:6–7); *see also supra* footnote 92 (discussing trust fund).

In January 2023, the Court again noted that the medical records in Health Passport continued to be inadequate. (D.E. 1321 at 83:16–17; *see also id.* at 181:2–13 ("On the medical records that are in Health Passport, I keep asking you-all and I still don't get an answer. There's an electronic recording act that I think all these things are supposed to be recorded electronically. And you have like a contract with these providers, for mental and physical health providers. And I keep asking if you-all can put in your contract that they have to enter directly into Health Passport what happens at each of these meetings. Like, there are not proper immunization records for these children. Mental health records just say mental health visit or psychiatric visit, and no indication of what kind of treatment the children are getting, either mental or physical. Some do, but most do not.").) The Court again asked whether the State would require healthcare providers to electronically submit medical records to Health Passport. (*Id.* at 181:24–82:1, 184:18–21.) Doctor Van Ramshorst did not answer the question. Nor did he give the Court the cost estimate he had promised three times in June 2022. Indeed, the Court learned that—five years after the topic was first broached—Defendants apparently did not even understand the problem:

> COMMISSIONER YOUNG: Your Honor, this is Commissioner Young. Can I request that we could spend some time with Monitors so we understand what it is they are looking for? Most of these things are supposed to be in the Health Passport, so I want to understand if there's something else that is not showing up in there.

(*Id.* at 182:3–8.)[193]

And at the Contempt Hearing, the Court heard more of the same. The Court reminded Doctor Van Ramshorst of his statement in June 2022 that Superior HealthPlan was working to better connect Health Passport with health information exchanges and electronic medical records. (D.E. 1489 at 201:20–25.) He replied that Superior "pursued a variety of enhancements, just not to the

---

[193] The Court notes that by January 2023, Commissioner Young had been in charge of HHSC for nearly three years. (*See* D.E. 1384 at 2.)

level that I know you've discussed before, Your Honor." (*Id.* at 202:10–12.) The Court then

reminded Doctor Van Ramshorst of his promise to give the Court an estimate as to the cost of that

Health Passport enhancement; his response was rather disappointing:

> THE COURT: You said you're looking at that as a possible enhancement for the future.
> So I said, "How much does that cost? Have you got an estimate? Can we find a workaround
> on this?" And you said, "Judge, I'm happy to work with the team and get back to you with
> an estimate." What is it?
> THE WITNESS: Your Honor, I don't have the estimate.
> THE COURT: Did you ask for one?
> THE WITNESS: Your Honor, that was awhile ago. Again, I do recall having conversations
> about this.

(*Id.* at 202:13–23.) Apparently, Doctor Van Ramshorst—and Defendants generally—need to be

reminded that this is federal litigation, not a Socratic seminar; here, "conversations" are a means

to an end—namely, results—not an end unto themselves.

And because of Defendants' ongoing failure to do anything more than "hav[e] conversations,"

PMC children's medical records continue to be inadequate and unsafe. Doctor Bellonci explained

that clinicians need a great deal of information to properly diagnose and care for children. For

example, the clinician should know the family's history of medical conditions, as the clinician can

glean if a child is at an increased risk of developing any medical conditions, and if the child might

be at an increased risk of side effects from medications. (D.E. 1489 at 37:18–38:9.) Maternal

health, drug use, and stress during the pregnancy are likewise factors which should be known to

the clinician. (*Id.* at 37:17–23.) And, of course, it is important that the clinician "know when did

this condition first present, when were symptoms first manifest, what did it look like." (*Id.* at 39:5–

7.)

"[A]ll of that information, that historical information, that rich kind of detail" "goes into

formulating" a diagnosis. (*Id.* at 39:7–17.) Ordinarily, a clinician would get that information from

a parent. (*Id.* at 39:18.) But "the challenge in the child welfare system" is that "often . . . there's

no parent for me to be talking with," so the only source of information is medical records. (*Id.* at 39:15–24("And so I'm left to . . . dig through significant piles of records . . . in order to then formulate my opinion.").) Of course, a clinician's opinion "is only going to be as good as the data [they] have to formulate that understanding of what's going on." (*Id.* at 39:24–40:1.) And the medical records of PMC children continue to be inadequate to help clinicians "understand what's going on" with their patients: Doctor Bellonci assessed the medical record system for PMC children from a physician's perspective, and concluded that "as a child psychiatrist, I wouldn't know how to function in that system." (*Id.* at 98:10–11.)

Like all the other shortcomings documented thus far, Defendants' failure to adequately maintain children's educational records has been known for years, yet the problem remains unresolved. Plaintiffs noted from the outset of this litigation that inadequate handling of PMC children's educational records "impede" their "ability to advance with their peers in school." (D.E. 1 at 46 ¶ 181.) At trial, the Court learned that named plaintiff Z.H.'s education log "seems to indicate that Z.H. went directly from second grade to fourth grade, although there does not appear to be any explanation for that in the record." (D.E. 368 at 131.) Named plaintiff K.E.'s education log likewise had "no record of K.E.'s sixth or eighth grades and there are date gaps after leaving one school and beginning another." (*Id.* at 132.)

Like medical records, inadequate and inaccessible educational records has been an ongoing topic of inquiry since trial. In March 2017, the Court was told that educational records were kept as "paper records" in a child's "external file." (D.E. 701 at 53:21–25.) In January 2022, the Court noted that educational records continued to be kept only as hard copies that were "hand carried, I don't know by whom, from placement to placement to placement." (D.E. 1175 at 111:17–20.) The

Court further noted that those children who frequently moved between placements simply "don't have any" of their educational records. (*Id.* at 111:21–22.)

In March 2022, the Court again noted that "all the educational records are paper." (D.E. 1225 at 74:7.) Indeed, nothing had changed since 2017—the records were still "not in any system whatsoever," and continued to be "hand-delivered," if at all. (*Id.* at 75:20–21.)

In January 2023, the Court reiterated that "educational records . . . are in paper form and they go from place to place." (D.E. 1321 at 83:23–24.) The Court also noted the Monitors' report that very few residential facilities they visited had "any educational records whatsoever" for the children in their care. (*Id.* at 83:25–84:1, 185:6–9; *see also id.* at 186:15–18 (one of the Monitors explaining that "It is true that we rarely see educational records from the children's previous placements when we're in a congregate care setting, and we ask to see everything that they have for that child").) The Court explained that these incomplete and inaccessible educational records are "a huge, huge issue of concern." (*Id.* at 83:23–84:2.) Associate Commissioner Baneulos informed the Court that DFPS has "education specialists that do follow-ups on ensuring that" educational records "are sent over to the next placement." (*Id.* at 185:15–17.) Further, Ms. Banuelos said that she "will go back and look at" whether educational records were, in fact, being provided and, if not, that DFPS "will work on some more processes" to ensure that the records were provided. (*Id.* at 185:21–23.) Since then, the Court has heard nothing more from Defendants about educational records.

## VI.   CONTEMPT

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law. Any finding of fact that also constitutes a conclusion of law is adopted as a conclusion of law. Any conclusion of law that also constitutes a finding of fact is adopted as

a finding of fact. All of the Court's findings of fact and conclusions of law are based upon clear and convincing credible evidence.

## A. The Court finds Defendant Cecile Erwin Young, in her official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas, in contempt of Remedial Order 3 and Remedial Order 10[194]

Remedial Order 3 provides:

> DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.

(D.E. 606 at 2.)[195]

At trial, the Court found that, despite the importance of "correct decisions" in investigations of potential abuse and neglect of children, "faulty investigations" were putting children at an "unreasonable risk of harm."[196] (*See* D.E. 368 at 201, 208; D.E. 301 at 28:20–23.) The Fifth Circuit agreed in *Stukenberg I*, observing that it "seems painfully obvious" that "high error rates in abuse investigations . . . place children at a substantial risk of serious harm." 907 F.3d at 267. When investigations are flawed or untimely, "children are left with their abusers without receiving necessary treatment, and adult perpetrators continue to house foster children with nothing

---

[194] Because the contempt underpinnings of Remedial Order 3 and Remedial Order 10 are many times interchangeable, the two will be discussed together.

[195] The text of Remedial Order 3 also implicates other remedial orders. Specifically, the requirement that allegations of abuse and neglect be "investigated; commenced and completed on time consistent with the Court's Order; and conducted at all times taking into account the child's safety needs" (D.E. 606 at 2) implicates Remedial Order 7 and Remedial Order 8, which require investigators to make face-to-face contact with alleged victims "no later than," respectively, "24 hours after intake" of "Priority One . . . investigations" (*id.* at 3 ¶ 7), or "72 hours after intake" of "Priority Two . . . investigations" (*id.* at 3 ¶ 8).

[196] Of course, the applicable standard in the final injunction is that: "The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an **unreasonable risk of serious harm**." (D.E. 606 at 2 (emphasis added).)

indicating a risk." (*See* D.E. 368 at 212.) It is not enough under Remedial Order 3 that an investigation just occur. It must be conducted at all times considering the safety of the child.

The first element for a finding of civil contempt requires a movant to establish by clear and convincing evidence that a court order was in effect. *See LeGrand*, 43 F.3d at 170. In order to remedy the deficiencies in the State's investigation processes found at trial, the Court ordered the Special Masters to "help craft . . . reforms and oversee their implementation." (*See* D.E. 368 at 245; *see also id.* at 246–48, 250, 252.) In its January 2018 Order, the Court adopted the Special Masters' proposed remedies to address DFPS's failure to adequately investigate allegations of abuse and neglect giving rise to an unreasonable risk of harm to children. (D.E. 559 at 39 ¶ D2; *see also* D.E. 546 at 13 ¶ 2.) In *Stukenberg I*, the Fifth Circuit held that "[m]ost of the injunction provisions relating exclusively to the monitoring and oversight violation are reasonably targeted toward remedying the identified issues," and expressly validated those provisions. *See* 907 F.3d at 276, 276 ¶ 1. Therefore, in its November 2018 Order implementing *Stukenberg I* on remand, the Court restated one of those validated Remedial Orders as Remedial Order 3.[197] (D.E. 606 at 2.) The Fifth Circuit's opinion in *Stukenberg II* did not disturb Remedial Order 3, and it became effective upon the Fifth Circuit's July 30, 2019 Mandate. *See* 929 F.3d at 276 (listing issues on appeal, which did not pertain to Remedial Order 3). Thus, the Court finds by clear and convincing evidence that the first element of civil contempt, that an order was in effect, *see LeGrand*, 43 F.3d at 170, is satisfied as to Remedial Order 3, which Defendant does not dispute.

The second element of civil contempt requires a movant to establish by clear and convincing evidence that the order requires certain conduct. *See LeGrand*, 43 F.3d at 170. The text of Remedial

---

[197] Remedial Order 3 repeats the language of the corresponding Remedial Order from the Court's January 2018 Order, with only slight revisions to the wording. (*Compare* D.E. 559 at 39 ¶ D2 (referring to "the Court's Final Order," the "monitor(s)," and "Items 9-6 of this Section of the Court's Final Order"), *with* D.E. 606 at 2 ¶ 3 (referring to "the Court's Order," the "Monitors," and "this Order").)

Order 3 makes clear that it requires Defendant to "investigate[]" all "reported allegations of child abuse and neglect involving children in the PMC class," and ensure that such investigations are completed "on time" and "conducted taking into account at all times the child's safety needs." (D.E. 606 at 2.) Remedial Order 3 contains specific language detailing required conduct by Defendant. Hence, the Court finds by clear and convincing evidence that Remedial Order 3 "require[s] certain conduct" by Defendant and fulfills the second element of civil contempt. *See LeGrand*, 43 F.3d at 170.

> Remedial Order 10 provides:
>
> Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

(D.E. 606 at 3.)

At trial the Court found that, "[b]esides being full of errors, RCCL's investigations were often late. Only 58% of investigations were completed within the required 45-day timeframe." (D.E. 368 at 211 (citing trial exhibit PX 1118).) Delays in completing investigations can create risk of harm for children because alleged perpetrators might remain free to continue causing harm to children until the investigation is finally completed. "Due to RCCL's systemic failures,"[198] the Court found that "children are left with their abusers without receiving necessary treatment, and adult perpetrators continue to house foster children with nothing indicating a risk." (*Id.* at 212.)

In its 2015 Opinion and Verdict, the Court ordered the Special Masters to propose remedies that would address the problems with the inappropriately lengthy and delayed investigations

---

[198] The 2015 Memorandum Opinion and Verdict was entered before the legislature separated HHSC and DFPS into independent agencies.

identified at trial. (*See* D.E. 368 at 245–48, 251–52.) In its January 2018 Order, the Court adopted

the provision proposed in the Special Masters' Implementation Plan. (*See* D.E. 546 at 15 ¶ 15;

D.E. 559 at 43 ¶ D15.) The Fifth Circuit validated this Remedial Order from the January 2018

Order in *Stukenberg I*, 907 F.3d at 277, and the Court restated it as the substantially similar[199]

Remedial Order 10 in its November 2018 Order (*see* D.E. 606 at 3 ¶ 10). Remedial Order 10 was

not at issue and therefore remained undisturbed in *Stukenberg II*, so it became effective upon the

Fifth Circuit's July 30, 2019 Mandate. *See* 929 F.3d at 276. Therefore, the Court finds by clear

and convincing evidence that the first element of civil contempt is established as to Remedial

Order 10: "a court order was in effect." *See LeGrand*, 43 F.3d at 170.

The problem of untimely and delayed investigations did not end with the imposition of

Remedial Order 10. Each Monitors' report discussing Remedial Order 10 has outlined

investigations that were compromised by significant delays. (*See* D.E. 869 at 13–14 (reporting that

there are "numerous examples where [abuse and neglect investigations] languish for months or

even years with no activity"); D.E. 1165 at 47 (reporting that "[c]onsistent with the Second Report,

the Monitors observed that while the investigations were generally initiated timely . . .

investigative activity often ceased after these initial tasks were completed—sometimes for many

months").) And while DFPS's compliance with Remedial Order 10 has improved over time (*see*

D.E. 1318 at 65) the same cannot be said for PI.

The text of Remedial Order 10 is clear that it requires Defendant to "complete Priority One

and Priority Two child abuse and neglect investigations" involving PMC children "within 30 days

of intake," absent an "extension . . . approved for good cause and documented in the investigative

---

[199] Remedial Order 10 repeats the language of the corresponding Remedial Order from the January 2018 Order but with a different specified timeframe for compliance. (*Compare* D.E. 559 at 43 ¶ 15 ("Effective March 2018 . . . ."), *with* D.E. 606 at 3 ¶ 10 ("Within 60 days . . . .").)

record." (D.E. 606 at 3.) Therefore, the Court finds by clear and convincing evidence that Remedial

Order 10 "require[s] certain conduct" by Defendant, which satisfies the second element of

contempt. *See LeGrand*, 43 F.3d at 170. Defendant does not argue otherwise.[200]

### 1. *Background of HHSC's Provider Investigations (PI) unit*

In the Contempt Motion, Plaintiffs argue that Defendant has failed to comply with Remedial

Order 3 due to the "chronic failure" by HHSC's Provider Investigations (PI) unit to timely

investigate, commence and complete investigations of abuse and neglect of PMC children. (*See*

D.E. 1427 at 12.) Meanwhile, Plaintiffs argue, "state bureaucracy grinds on, checking boxes while

children suffer." (*Id.* at 11.) Therefore, Plaintiffs urge the Court to find that Defendant has failed

to comply with Remedial Order 3 as to abuse and neglect investigations conducted by PI. (*Id.* at

16.)

In 2015, Senate Bill (SB) 1880 transferred jurisdiction for investigating allegations of abuse,

neglect, and exploitation (ANE) involving individuals in Home and Community Support Services

Agencies (HCSSA) from the Department of Aging and Disability Services (DADS) to the

Department of Family and Protective Services (DFPS). (*See* PX 106 at 1.) Also in 2015, SB 200

transferred "PI and DADS Long-Term Care Regulation (LTCR) as separate departments" from

DFPS to HHSC, though PI continued to use DFPS's IMPACT system. (*Id.* at 1.) In September

2020, PI became fully integrated into HHSC LTCR. (*Id.* at 1.)

PI's jurisdiction was expanded by SB 1880 and SB 760, from the same session, to include

investigating ANE allegations involving "[i]ndividuals residing in an HCS 3- or 4- person

---

[200] One heading in Defendant's response to the Contempt Motion states "Plaintiffs haven't carried their burden to make a *prima facie* showing of contempt as to Remedial Order[] . . . 10." (D.E. 1429 at 15.) In the text that follows, however, Defendant only disputes the sufficiency of the evidence showing noncompliance with Remedial Order 10. (*Id.* at 18–19.)

residence (group home), regardless of whether the individual is receiving services under the waiver program[201] from the provider." (*Id.* at 1.)

The Home and Community-Based Services (HCS) waiver program is a Medicaid program authorized under § 1915(c) of the Social Security Act for the provision of services and support to individuals with intellectual disabilities or related conditions and allows them to live in community-based settings and avoid institutionalization. (*See* PX 85 at 3; PX 91 at 1; PX 82 at 63.) These settings include homes managed by private HCS providers that are contracted by HHSC to coordinate and monitor the delivery of individualized services to Medicaid beneficiaries. (PX 82 at 63.) HCS program providers managing three- and four-person homes must comply with HHSC's certification standards[202] (*id.* at 63) that establish "the minimum health and safety expectations and responsibilities of a HCS program provider."[203] 26 Tex. Admin. Code § 565.2(a). "Eligibility for HCS waiver services requires that an individual has an Intellectual disability under state law or a diagnosis of a 'related condition' with an IQ of 75 or below as further defined in the Code of Federal Regulations, Title 42, § 435.1010."[204] (D.E. 1412 at 3.) These individuals, both adults and children, receive around-the-clock residential assistance from staff employed by the HCS program provider, who help the individuals in care perform various essential tasks of daily

---

[201] In the 1980s, the U.S. Health Care Financing Administration, now the Centers for Medicare & Medicaid Services (CMS), granted waivers from the existing Medicaid rules. (PX 43 at 1.) The waivers allowed states flexibility in designing alternatives to institutional services. (*Id.* at 1.) In 1985, Texas developed the Home and Community-based Services (HCS) waiver program which allows "flexibility in the development of services for individuals who have intellectual and developmental disabilities that choose to receive their services in the community." (*Id.* at 1.)

[202] HCS providers are certified by HHSC and not licensed.

[203] HCS program providers also undergo annual surveys conducted by HHSC LTCR to ensure continuous compliance with the HCS program certification principles and standards outlined in 26 Tex. Admin. Code §§ 565, 566. (*Id.* at 63; *see* DX 33 at 126.)

[204] Ms. Juarez, who did not have any documented intellectual or developmental disability, testified that she was placed at Forever Family, an HCS Group Home, for "a couple months." (D.E. 1487 at 243, 245.) But it is unclear why, as she would not qualify for HCS Group Home placement. *See* 42 C.F.R. § 435.1010.

living. (*See* PX 82 at 63.) The Monitors report that there are eighty-eight PMC children in HCS group homes.[205] (D.E. 1380 at 28 n.33.)

PI is responsible for conducting "time-sensitive, evidence-based" investigations of allegations of ANE of individuals that receive services from certain providers, such as HCS Group Homes that house three or four residents. (DX 33 at 106; D.E. 1412 at 3.) But PI investigations do not use the same parameters as RCCI or RCCL, as will become obvious in the investigations as outlined below. For instance, "[u]nlike DFPS investigations into child maltreatment, PI investigations do not involve a review of the referral history of the placement location, the supervising agency or owner, or of specific group home locations, despite its relevance to the fact-finding endeavor." (D.E. 1412 at 8.) "PI investigators are instructed to review the case history of alleged perpetrators and victims; however, the referral history of abuse, neglect, and exploitation allegations at a specific placement location, such as an HCS Group Home or the agency overseeing it, is not available in IMPACT." (*Id.* at 9.) "HHSC confirmed that it does not consider that history during PI investigations."[206] (*Id.* at 9.) Further, PI investigators do not verify that there are current background checks for staff that may be identified as alleged perpetrators, thereby failing to ensure the safety of the children with whom the staff are in daily contact.[207] 26 Tex. Admin. Code § 745.605.

---

[205] The number of PMC children in HCS has not changed significantly over time. (*See*, *e.g.*, D.E. 1318 at 21 n.24 (ninety-three children); D.E. 1248 at 20 n.20 (101 children); D.E. 1165 at 20 n.23 (seventy-three children).)

[206] In contrast, DFPS instructs RCCI investigators to review prior referral history at "an operation or at other operations supervised by the same administrator, director, owner, or other person in charge." (D.E. 1412 at 8 n.17.) DFPS investigators are also "instructed to consider operational referral history to determine culpability of administrators." (*Id.* at 8 n.17.)

In response to the inquires by the Monitors about locating the referral history for HCS Group Homes over which PI has jurisdiction, HHSC explained that it does not consider this information for the fact-finding process of the investigation, but when it performs a sampling of PI investigations at an operation during the *recertification* process, "the process *might* lead to an additional inquiry into systemic concerns and *might* result in additional inquiry into the operational history." (*Id.* at 9 n.19 (emphasis added).)

[207] Mr. Pahl, the HHSC executive who oversees PI, admitted that PI investigators do not conduct background checks for placement staff:

Also notable, the Monitors "have observed examples of jurisdictional confusion between SWI, CPI[,] and PI during the intake and investigation process." (*Id.* at 3 n.5.) If ANE is alleged in a HCS host home setting, HHSC has authority to investigate the allegations relating to an individual (child or adult) who receives HCS waiver services. (*Id.* at 3.) But if the allegations involve children in those residences who do not receive HCS waiver services, DFPS's CPI investigates the allegations. (*Id* at 3.) Because of this bifurcation of investigative responsibility, allegations of abuse and neglect can fall through the cracks, even when both agencies receive reports of the allegations.

For example, SWI received two reports of neglectful supervision of a PMC child, Child A (age 14), who was placed at D&S Residential Services, an HCS residence. (D.E. 1486-1 at 29.) In the first intake, the child's current foster mother reported that the child engaged in sexual activity with the son of his prior caregiver (Child B, age 15, not in DFPS care) while placed in the HCS residence. (*Id.* at 29.) The second intake was reported by a psychologist, who stated that Child A made an outcry that he engaged in oral and anal sex with Child B multiple times at the previous placement. (*Id.* at 29.)

SWI assigned the first intake to HHSC PI, and PI determined that it did not have jurisdiction to investigate the neglectful supervision allegation. (*Id.* at 29.) Then, the intake was re-entered and assigned to DFPS RCCI, which also determined that it did not have jurisdiction to investigate the

---

THE COURT: One other thing I understood is that these children -- you didn't -- you didn't have your investigators check to make sure these staff had criminal history backgrounds even after the rape -- this Child C accused and identified a staff member of rape. You did not have your staff check for the -- make sure they had criminal history background checks. Did you know that?

THE WITNESS: I read that in the report, yes, ma'am.

THE COURT: Is that true?

THE WITNESS: I believe that's true.

(D.E. 1487 at 147:19–148:3.) This is different from the requirement that a private provider conduct background checks for applicants before hiring them for employment. *See* 40 Tex. Admin. Code § 49.304.

neglectful supervision allegation. (*Id.* at 30.) When the intake was re-entered a second time, it was not assigned to an investigation; as a result, the intake was closed and the allegations in the first intake were not investigated. (*Id.* at 30.) The psychologist reported the second intake with similar allegations one week later, and it was assigned to DFPS CPI for an abuse and neglect investigation. (*Id.* at 30.) "If SWI had not received this second intake, it appears that DFPS would not have investigated the allegations included in the first intake since it had been closed without investigation at that point." (*Id.* at 30.)

Further, even if SWI correctly assigns an intake to HHSC PI, PI can nonetheless determine that it lacks jurisdiction, resulting in the alleged victim remaining in an unsafe placement because the allegation remains without investigative activity. *Cf. Stukenberg I*, 907 F.3d at 266 ("[R]eports of abuse may receive only cursory [] follow-up, and some are never investigated at all. This means that children could make an abuse outcry and then languish in the offending placement indefinitely."). For example, Child A, discussed below,[208] placed at Educare, an HCS Group Home, was the subject of an intake report alleging emotional abuse, neglect, and physical abuse of the child. (D.E. 1412 at 13.) Although the report contained serious allegations related to neglect by a staff member—who allegedly instructed Child A to sleep in the same bed as another resident of the group home—the PI investigation was concluded with a determination that "PI did not have jurisdiction over the Neglect allegation."[209] (*Id.* at 13.) Although the investigative record stated that the intake was referred to the provider for appropriate action, the Monitors were unable to find additional documentation that any action was taken to investigate the allegation that Child A was

---

[208] *See infra* page 343.
[209] The investigator failed to cite a specific provision of the Administrative Code in reaching this conclusion. (D.E. 1412 at 13 n.32.)

told to share a bed with another resident. (*Id.* at 14.) Thus, children continue to face an unreasonable risk of serious harm while in the PMC of the State.

PI maintains a prioritization system for investigations conducted in provider settings. (PX 7 at 34.) Priority One intakes "have a serious risk that a delay in investigation will impede the collection of evidence" or "allege that the victim has been subjected to abuse, neglect, or exploitation by an act or omission that caused, or may have caused, serious physical or emotional harm." (*Id.* at 34.) Priority Two intakes "have some risk that a delay in investigation will impede the collection of evidence" or "allege that the victim has been subjected to abuse, neglect, or exploitation by an act or omission that caused, or may have caused, non-serious physical injury or emotional harm not included in Priority I." (*Id.* at 34.) Statewide Intake (SWI) assigns priorities to investigations when an intake is received. (*Id.* at 35.)

When an investigation is completed, PI investigators are to close the case with one of four dispositions:

> Confirmed—There is a preponderance of credible evidence to support that abuse, neglect or exploitation occurred.

> Inconclusive—There is not a preponderance of credible evidence to indicate that abuse, neglect or exploitation did or did not occur due to lack of witnesses or other available evidence.

> Unconfirmed—There is a preponderance of credible evidence to support that abuse, neglect or exploitation did not occur.

> Unfounded—Evidence gathered indicates that the allegation is spurious or patently without factual basis.

(D.E. 1412 at 4 (citing 26 Tex. Admin. Code § 711.11–711.23).) A fifth disposition—"Other"—is used when PI determines that it does not have jurisdiction over any of the allegations. (*Id.* at 4.) Notably, "Other" is not defined in the Texas Administrative Code, but is listed as a disposition for

investigations in the IMPACT database and in data reports submitted to the Monitors by HHSC. (*Id.* at 4.)

When PI reports investigation results to the Monitors, the overall disposition is reported as "Inconclusive" only if there is no finding of "Confirmed" or "Unconfirmed" as to any allegation within the investigation. (*Id.* at 4, 5 nn.8, 12.) Thus, "for PI investigations with allegations resulting in both Unconfirmed and Inconclusive dispositions, the overall disposition appears as Unconfirmed in the HHSC data reports submitted to the Monitors." (*Id.* at 5 n.12.) "This approach is unlike DFPS, which assigns an overall disposition of Unable to Determine (similar to PI's disposition of Inconclusive) in those situations." (*Id.* at 5 n.12.)

In their Sixth Report, the Monitors identified that on December 31, 2022, there were 88 PMC children living in "HCS Group 1-4." (D.E. 1380 at 28 n.33.) These children have various documented developmental and intellectual disabilities, and the full IQ score of the children identified in Monitors' reports range from 40–71.

Between January 1, 2023, and April 30, 2023, HHSC opened 77 new PI investigations involving at least one PMC child, and closed 101 investigations into abuse and neglect allegations that were analyzed by the Monitors. (D.E. 1442 at 4.) Of the 101 investigations closed between January 1, 2023 and April 30, 2023, ninety-nine resulted in no findings of abuse and neglect by HHSC PI: sixty-four of the investigations were closed with dispositions of Inconclusive or Unconfirmed, and thirty-five were assigned a disposition of Other. (*Id.* at 5.)

In order to assess the appropriateness of PI investigations of alleged maltreatment of PMC children, the monitoring team conducted in-depth reviews of all sixty-four investigations—that is, 100 percent of the investigations—that PI closed with a disposition of Unconfirmed or Inconclusive between January 1, 2023, and April 30, 2023. (*Id.* at 2.) Additionally, the Monitors

reviewed five PI investigations that were closed prior to 2023[210] "but involved the same PMC children and allegations related to the investigations that closed during the referenced period in 2023," for a total of sixty-nine. (*Id.* at 2.)

Of these, the Monitors disagreed with thirty-eight (55 percent). Those thirty-eight are discussed in detail below; all involve violations of Remedial Order 3, and thirty-one involve violations of Remedial Order 10.

The deficiencies reported were serious and egregious, especially considering the alleged victims were children with severe intellectual and developmental disabilities. The investigative failures were outrageous, leaving PMC children to endure harm in dangerous placements while the investigations sat without activity for prolonged periods of time.

The Monitors discovered various deficiencies among the thirty-eight investigations that were inappropriately resolved. (*Id.* at 2.) "Often the deficiencies began at the start of the investigations during the expected assessment of the alleged victim's current safety and recounting of the allegations. These problems included a failure to promptly interview children face-to-face and, in some instances, a failure to conduct interviews with children at all, despite this Court's orders." (*Id.* at 7 & n.12; *see* D.E. 606 at 3 ¶¶ 7, 8.).)

Other investigative deficiencies were common, further demonstrating PI's failure to conduct investigations in a manner that "account[s] at all times [for] the child's safety needs." (D.E. 606 at 2 ¶ 3.) In many cases, interviews with both alleged perpetrators and witnesses were significantly delayed. In some cases, the investigator's first attempt to interview the alleged perpetrator was so delayed that the alleged perpetrator no longer worked at the facility and either could not be located or refused to speak with the investigator. In other cases, investigators failed to obtain

---

[210] One of these investigations was assigned a disposition of Confirmed, but the investigation was not completed for over sixteen months.

documentation that would have resolved factual discrepancies. And many of the investigations—nine of thirty-eight—were initiated with a telephone or FaceTime call, rather than with face-to-face contact.

Further, the majority of the investigations were not completed timely. "The Monitors discovered lengthy, unexplained delays in PI's completion of investigations that impacted child safety, including in Priority One investigations. Among the investigations the Monitors reviewed, very few were completed in 30 days and many had egregious delays, remaining open without activity for extended periods even in situations where the child was an alleged victim in newer additional serious allegations at the same placement." (D.E. 1442 at 7.) Indeed, thirty-one of the thirty-eight deficient investigations (82 percent), were not completed in a timely manner. (*Id.* at 6.) And of those thirty-one, twenty-nine investigations (94 percent) "had approved extensions but there was no information regarding the extension length in IMPACT." (*Id.* at 6.) Notably, even when extensions were documented and approved, the delays in investigative activity exceeded reasonable periods of time without documented justifications; the child's safety was not accounted for during these lapses in investigations. (*Id.* at 7.) For example, the Monitors "discovered a child was an alleged victim in three investigations that remained open for more than 20 months," meanwhile "several new allegations of child abuse and neglect arose, resulting in three new additional investigations." (*Id.* at 7.)

Moreover, the Monitors reported that, in many instances, PI investigators do not appropriately facilitate the child's meaningful participation in investigative interviews. (*Id.* at 7.) For example, the Monitors recounted that one investigator conducted telephone interviews with one child who "was 'non-verbal'" and another child with serious speech impediments. (D.E. 1412 at 53–54.) The Monitors reported many such examples. Doctor Miller wondered how the investigator would "get

anything like the kind of information that they would need" through these telephone interviews. (D.E. 1488 at 264:17–19.) PI's frequent failure to accommodate the disabilities of children being interviewed is particularly baffling because the children are "eligib[le] for HCS services"—and thus, within PI's investigative jurisdiction—because of the very "documented intellectual disabilities" that the investigators "were so frequently ill-equipped to accommodate." (D.E. 1412 at 7.) It is also emblematic of PI's failure to conduct investigations in a manner that "account[s] at all times [for] the child's safety needs." (D.E. 606 at 2 ¶ 3.)

Without ensuring the child's participation in investigation interviews by accommodating their limited capacities, investigators cannot accurately determine whether the child is safe in a particular placement. For example, PI investigated a physical abuse allegation of Child M after she made an outcry that a staff member "attacked" her and "hit her all over her body and face with metal kitchenware."[211] (*See* D.E. 1442 at 16–17.) The Monitors reported that she is "deaf or hard of hearing," and has communication issues and an IQ of 57; yet the investigator interviewed Child M on the telephone after failing to conduct a face-to-face interview. (*Id.* at 17 & n.26 ("The investigator attempted a timely face-to-face interview with the child at the placement; however, the child was unavailable at that time. The investigator did not attempt any other face-to-face interviews with the child.").) Without accommodating Child M's special needs during the phone interview, the investigator assigned a disposition of Unconfirmed to the allegation that a staff member attacked the child. (*Id.* at 17.) The Monitors were not able to determine a disposition due to the investigator's failure "to confirm whether or not the child was injured and safe at the group home." (*Id.* at 17.)

---

[211] This was one of the few investigations in which the allegation was reported by a facility staff member. (D.E. 1442 at 16.) It was also one of the many in which the investigator failed to make face-to-face contact with the child. (*Id.* at 17.)

After noting the need for policies and practices addressed specifically to children with special needs, Doctor Miller concluded that PI's came up short:

Q. Did you see any – in all of your reading, in all the testimony you've heard so far, have you seen anything among the practices or policies of Provider Investigations that tailored the investigations to the needs and the realities of developmentally disabled children?
A. Absolutely not. Quite the opposite.

(D.E. 1488 at 264:22–265:2.)

For his part, Mr. Pahl agreed that if PI investigators are accommodating the communication needs of the children they interview, then the accommodation would be documented by the investigator in IMPACT. (D.E. 1487 at 141:7–13.) Tellingly, the Monitors found few examples of investigators utilizing special assistance when communicating with children who have limited capacities.

Finally, Mr. Pahl conceded that PI was underperforming:

THE COURT: Could you -- can you answer my question? Could you have done a better job for these children with the resources you had at hand?
THE WITNESS: I think we can always --
THE COURT: Could you have done a better job?
THE WITNESS: Yes, ma'am.

(*Id.* at 133:13–18.)

### 2.   *HHSC's PI unit conducts deficient investigations that are not in compliance with Remedial Order 3 or Remedial Order 10*

PI's failure to properly investigate allegations of abuse and neglect by or involving HCS program providers presents safety risks for the PMC children who are housed in these settings. This is, perhaps, best illustrated by the experience of a fifteen-year-old PMC child, referred to by the Monitors as Child C, during her placement at C3 Christian Academy, a private HCS group home, as discussed in detail below.

At the Contempt Hearing, the Court heard testimony from Trisha Evans, the owner and administrator of C3 Christian Academy, who owned and operated eight 24/7 facilities that were

classified as "3 bed person Group Home[s]" (D.E. 1412 at 41) that housed up to three adults and/or children in each home (D.E. 1488 at 72:4–6, 17–18). Ms. Evans testified that "on occasion," her group homes housed intellectually and developmentally disabled adults and children in the same home. (*Id.* at 72:20–22.) Further, it appears that these three-bedroom residences house both males and females together—in one investigation concerning Child C, she made an outcry that a male resident at the placement punched her. (D.E. 1412 at 34.) Notably, this resident "had previously been incarcerated for 'assaulting his mother.'" (*Id.* at 34 n.65.)

Ms. Evans is a registered—and, at the time of the Contempt Hearing, licensed—nurse. (D.E. 1488 at 127:3–6.) As for her experience working with developmentally disabled children, she explained that she worked "with children" "at a couple of the psychiatric facilities . . . in the Dallas area." (*Id.* at 126:17–20.) Specifically, "sometime between 2006 and 2020, [she] worked at Green Oaks." (*Id.* at 128:8–9.) She also worked at a facility called "Hickory Trail" "sometime in that same . . . timeframe [2006–2020]." (*Id.* at 128:10–12.) And she "believe[d]" that in the "1990s," she worked at "a facility in Bedford." (*Id.* at 127:1–2.) The job at Hickory Trails was part-time, and lasted "[p]robably less than a year." (*Id.* at 128:18–23.) At Green Oaks, Ms. Evans "worked with the psychiatrists there that were seeking the children," where she was responsible for "anywhere from five to 12" children. (*Id.* at 129:1–2, 13–14.) She worked at Green Oaks for "probably over a year"; she did not state whether this job was full- or part-time, but she was also running her company during that time. (*Id.* at 128:16–19.)

In 2006, she began operating "a licensed or certified facility for the State of Texas." (*Id.* at 88:1–3.) She did not elaborate on the nature of the facility, but did note that they "include[d] children." (*Id.* at 88:5–6.)

In 2014, Ms. Evans became certified to operate HCS Group Homes to care for developmentally disabled children and adults. (*Id.* at 87:14–16.) Her HCS homes were limited to three inhabitants with separate bedrooms. (*Id.* at 106:6–7.) Frequently, these homes mixed children and adults, males and females. She generally "had between 15 and 20 staff" working in two shifts. (*Id.* at 74:3–4, 18–19.) During the day shift, all residents from the eight group homes were brought to "the day habilitation center," where they were under the care and supervision of five to six staff. (*Id.* at 74:19–20; 75:10–11.) During the night shift, the residents were returned to their respective group homes, and Ms. Evans "had just one caregiver, one staff member for up to three residents in each home." (*Id.* at 74:24–75:1.)

Chapter 565 of the Tex. Admin. Code establishes the "minimum health and safety expectations and responsibilities of a HCS program provider." HCS program providers, like C3 Academy, must abide by certification standards to ensure the health and safety of individuals placed with the program provider; violations of the certification standards are subject to administrative penalties. 26 Tex. Admin. Code § 565.3. One of the certification standards is an individual's right to "live free from abuse, neglect, or exploitation in a healthful and safe environment." *Id.* at § 565.5. Further, Defendant previously agreed that "a General Class member should receive the same protections under the Court's remedial orders regardless of the licensed or unlicensed nature of the facility where the member is housed, unless the remedial order at issue specifies that it applies only to the LFC subclass or licensed or unlicensed facilities." (D.E. 1137 at 3.)

 C3 Christian Academy lost its certification in 2023 (D.E. 1488 at 73:24–75:2) due to its repeated failure to keep children and adults with intellectual and developmental disabilities free from physical or emotional harm, including abuse and neglect at the hands of staff members responsible for their care.

Below, this Order details several PI investigations into abuse and neglect of PMC children housed in HCS Group Homes. It is notable that most of the reports leading to these investigations were made by persons other than the child's caregiver. Caregivers' failure to report abuse or neglect is a common occurrence, and Ms. Evans' testimony suggests a reason for this. Ms. Evans explained that she conducted her own investigations into outcries made by the children (and adults) in her care; she frequently chose not to report[212] these outcries to Statewide Intake because "every allegation doesn't make for an investigation." (*Id.* at 88:24–89:1.) Tellingly, she "believed that these children or these adults manipulate the system because they want a change of scenery, they just want to go into the hospital, or they're getting better food or getting more food over there than they're getting here." (*Id.* at 90:1–4.)

Ms. Evans explained the methodology of her internal investigations: She would speak with the person who made the outcry "in regards to the situation and when their recount of a situation was not clear or was not consistent, then we thought that there was something that was incorrect going on." (*Id.* at 90:13–16.) In such cases, Ms. Evans would not report the outcry to SWI: "It's not that we don't believe it. We know the history of some of these individuals, which is to make false outcries so that they can manipulate their situation." (*Id.* at 90:21–23.)

In information provided by the State, the Monitors found no calls to SWI by Ms. Evans or her staff for any of the investigations involving Child C. (*Id.* at 138:5–12.) As evidenced by Ms. Evans' testimony and the reporters identified in the investigations detailed below, many caregivers are not reporting outcries made by children in their care, making it clear that the words of children alone are not enough to confirm a finding of abuse and neglect.[213] Ms. Evans stated that she did not

---

[212] *See supra* footnote 72.

[213] For several years, the Court has asked the State to present evidence of an investigation that resulted in a disposition of Confirmed or Reason to Believe "from just a child's outcry without any other witnesses." (D.E. 1488 at 26:1.) The State "ha[s] never found one." (*Id.* at 26:2.) The Monitors prepared a document detailing investigations

report outcries until she conducted her own investigation because "every allegation doesn't make for an investigation." (D.E. 1488 at 88:24–89:1.) It is the Court's ongoing concern that caregivers'

---

by DFPS RCCI, CPI, and HHSC PI in which PMC children maintained their allegations of abuse or neglect during the course of the investigation, but the investigation resulted in no findings of ANE. (*See* D.E. 1486-1 (Court's Exhibit 1).) It is the Court's ongoing concern that direct caregivers are not reporting abuse and neglect allegations as required, and as evidence of this ongoing issue the Court identified that out of fifty-eight investigations contained in the report, forty-seven were opened after someone other than a child's direct caregiver reported an outcry or allegation of abuse and/or neglect to SWI. (*See id.* at 1–2.) The following are some of the more egregious abuse and neglect allegations, including the types of allegations reported, the classification of the reporter, and the disposition of the investigation.

- Medical personnel reported that the child (age 13) disclosed that a staff member at New Horizons Ranch (RTC) stood on one of his legs. (*Id.* at 4.) The child also disclosed to the reporter that he no longer discussed the alleged incident because "no one believed him." (*Id.* at 4.) The RCCI investigator Ruled Out the allegation of physical abuse. (*Id.* at 5.)
- A school counselor reported that a child (age 9) disclosed that her foster parent (the child's aunt) grabbed her neck and scratched her. (*Id.* at 8.) Reportedly, the counselor observed "deep scratches on the child's neck and the scratches limited the child's ability to turn her head." (*Id.* at 8.) RCCI Ruled Out the physical abuse allegation despite all three children in the home making consistent outcries of the physical abuse. (*Id.* at 9.) The Monitors disagreed with the RCCI investigator's disposition of Ruled Out for the physical abuse allegation and instead determined that "the record contains a preponderance of evidence that a foster parent hit three children with a belt on the forearm." (*Id.* at 9.)
- A caseworker reported an allegation of physical abuse of a child (age 16) diagnosed with Juvenile Onset Huntington's Disease who is "physically fragile and has an 'S shape'" due to his disability. (*Id.* at 25.) The child made an outcry to the caseworker that a staff member at The Wilson Family Caring Center, Inc. (HCS Group Home) pushed the child "'hard' using his two hands" down on his bed because the staff member "thought the child was about to throw an object at him." (*Id.* at 25.) The CPI investigator closed the case with a disposition of Ruled Out and the Monitors could not determine a disposition due to substantial investigative deficiencies. (*See id.* at 25–26.)
- An "individual" reported to SWI that a child (age 17) made an outcry that a staff member at T E P Unity Girls RTC forced the child to touch him inappropriately. (*Id.* at 68.) In the second intake, the child's probation officer reported that the child disclosed that an unnamed staff member inappropriately touched her and that she wanted to run away but was concerned about violating her probation. (*Id.* at 68.) The RCCI investigator Ruled Out the sexual abuse allegation but the Monitors could not determine a disposition due to the investigative deficiencies. (*Id.* at 69.)
- School personnel reported that a child (age 13) made an outcry that a staff member at A.B.E. Residential Services (GRO) punched him, and the reporter observed a small abrasion on the child's lip that "resembled a canker sore." (*Id.* at 71.) The Monitors disagreed with the RCCI investigator's disposition of Ruled Out and determined it should have been substantiated as a Reason to Believe. (*Id.* at 71.) Reportedly there was a preponderance of evidence that the staff member hit the child as the child remained consistent in his disclosure of the abuse to three professionals and two children. (*Id.* at 71.)
- A therapist reported that child (Child A, age 15) made an outcry that another child (Child B, age 16) sexually assaulted her at Krause Children's Residential (RTC). (*Id.* at 84.) Reportedly, the children were playing a game of truth or dare when Child B asked Child A to touch and kiss her, which Child A agreed to. (*Id.* at 84.) Thereafter, Child B pushed Child A to the ground and Child A reportedly told Child B, "No, stop, please don't." (*Id.* at 84.) Child A disclosed that she "passed out" and "when she awoke her shorts were around her knees, her bra was unclipped, [] her shirt had been lifted[, and she] experienced pain all over her body, including her vaginal area." (*Id.* at 84.) The child stated that she believed she had been "penetrated by an unknown object." (*Id.* at 84.) RCCI Ruled Out the neglectful supervision allegation and the Monitors could not determine the disposition due to investigative deficiencies. (*Id.* at 85.) Reportedly, "it is unclear why DFPS did not conduct a Child Sexual Aggression Staffing in light of the allegations and Child A's consistent statement that Child B's actions included sexual acts that were forced and unwanted." (*Id.* at 85.)

failure to report as required is a systemic issue and not merely anecdotal. The State has a responsibility to follow-up and investigate outcries made by the children in its care and ensure each child's safety and well-being.[214]

The following are a sampling of PI investigations reviewed by the Monitors that were closed with a disposition of Unconfirmed or Inconclusive, and one closed with a disposition of Confirmed. The Monitors' detailed reports of these investigations were not objected to by HHSC, except where noted. All the investigations were conducted with serious deficiencies that caused some of the most vulnerable PMC children to remain in dangerous placements for long periods of time. Where an investigation violated both Remedial Order 3 and Remedial Order 10, both violations are discussed together.

But first, the Court will briefly address the policies that HHSC has promulgated regarding the completion of PI investigations. The PI Handbook[215] provides that Priority One and Priority Two investigations in most settings, including HCS group homes,[216] must be completed in "30 calendar days."[217] (*See* DX 39 at 159; DX 40 at 162; DX 34 at 146.) This is consistent with Remedial Order 10's requirement that Priority One and Priority Two abuse and neglect investigations involving children in the PMC class be completed within thirty days of intake. (D.E. 606 at 3.)

---

[214] Certainly, investigations may implicate an alleged perpetrator's due process rights. But respecting an alleged perpetrator's rights need not come at an expense of properly investigating abuse, neglect, and exploitation allegations.

[215] Defendant submitted the Provider Investigations Handbooks for Fiscal Years 2022, 2023, and 2024 as, respectively, Defense Exhibit 39, Defense Exhibit 40, and Defense Exhibit 34. (*See* D.E. 1490 at 3 (Defendants' exhibit list).)

[216] The PI Handbook provides different timeframes for the completion of investigations in State Supported Living Centers ("10 calendar days"), State Hospitals ("14 calendar days" or "21 calendar days" depending on the priority of the intake), and "All other provider types" ("30 calendar days"). (*See* DX 39 at 159; DX 40 at 162; DX 34 at 146.) HCS placements are included in the last category. (*See* DX 34 at 16 (definition of "Provider" including both "a facility" and "a person who contracts with a health and human services agency or managed care organization to provide home and community-based services"); *see also* DX 39 at 17–18 (same); DX 40 at 17 (same).)

[217] The PI Handbook provides that if the "30th day falls on a weekend or holiday," "the investigation must be completed and approved in IMPACT by the next business day." (*See* DX 39 at 159; DX 40 at 162–63; DX 34 at 146.) The Court needs not, and therefore does not, address whether this is consistent with Remedial Order 10.

The PI Handbook also addresses extensions. It explains that "request[s] for additional time to complete an investigation must be for good cause." (*See* DX 39 at 161; DX 40 at 164; DX 34 at 148.) And it provides a list of "reasons [that] constitute good cause" (DX 39 at 161; DX 40 at 164; DX 34 at 148), most of which appear to be specific grounds that would legitimately warrant a delay in the investigation's completion (*e.g.*, DX 39 at 161; DX 40 at 164; DX 34 at 148 (reasons constituting good cause include "Witnesses have not been available for interviews"; "Processing of evidence by an outside entity requires additional time"; or "Law enforcement requests that an investigation temporarily be discontinued").)

But one of the listed reasons—"Extraordinary Circumstances" (DX 39 at 161; DX 40 at 164; DX 34 at 148)—does not, by itself, demonstrate good cause for an extension. The PI Handbook defines "extraordinary circumstance" as "an unexpected event or external factor that delays the completion of an investigation; it is something that could not have been prevented even if reasonable measures had been taken." (DX 39 at 161; DX 40 at 165; DX 34 at 148.) Certainly, an "unexpected event or external factor" "that could not have been prevented even if reasonable measures had been taken" may well warrant extending the deadline for an investigation. Not so, however, simply stating that "Extraordinary Circumstances" exist; a showing of "good cause" under Remedial Order 10 requires that the facts warranting the extension be elaborated.[218] *Cf.*

---

[218] The PI Handbook also provides a non-exclusive list of extraordinary circumstances:

Extraordinary circumstances include:
- inclement weather or natural disasters;
- a death in the primary investigator's family;
- excessive workload due to PI employee vacancies or an uncommon rise in intakes; or
- IMPACT errors that prevent the investigation from being closed.

(*See* DX 34 at 148; DX 40 at 165; DX 39 at 161.) Inclement weather or natural disasters would likely demonstrate good cause for an extension. On the other hand, "excessive workload due to PI employee vacancies would likely not rise to the level of good cause, at least without the elaboration of additional facts. This is so even under the Handbook's definition of "extraordinary circumstance" (DX 34 at 148; DX 40 at 165; DX 39 at 161), given that the fact of employee turnover is neither "an unexpected event" nor an "external factor" (DX 34 at 148; DX 40 at 165; DX 39 at 161).

*Cause* (def. 2), Black's Law Dictionary (11th ed. 2019) (noting that "Good cause is often the burden placed on a litigant (usu. by court rule or order) to show why a request should be granted").

Indeed, it appears that the State recently concluded that "extraordinary circumstances," without elaboration, does not demonstrate good cause under Remedial Order 10. Pursuant to an October 2023 revision, the section of the PI Handbook titled "Completion and Approval of Extension Requests" now provides that "For investigations involving a child or young adult under DFPS CPS conservatorship, the investigator cannot submit an extension with the reason being *Extraordinary Circumstances*." (DX 34 at 149; *cf.* DX 40 165–66 (similarly titled section not containing such provision).) It is also notable that this revision came just one month after the Monitors' first report on deficient PI investigations. (*See* D.E. 1412 (filed on Sept. 19, 2023).)

The PI Handbook also addresses the timeframes that apply to extensions. Pursuant to the PI Handbooks for fiscal years 2022 and 2023, an extension for an investigation in an HCS group home had "no specific time frame" within which the investigation would have to be completed.[219] (DX 39 at 160; DX 40 at 164.) In other words, an extension granted pursuant to the 2022 and 2023 Handbooks would be of an indefinite duration.

Extensions of indefinite duration are, of course, contrary to the purpose for which the Court entered Remedial Order 10—namely, ending the practice by which investigations were unreasonably delayed, resulting in harm to PMC children as abundantly demonstrated herein. Moreover, indefinite extensions are contrary to the text of Remedial Order 10, the last sentence of

---

Moreover, it is unclear why an investigator would need to use the general term "Extraordinary Circumstances" when a brief factual statement—for example, "Law enforcement requests that an investigation temporarily be discontinued" (DX 34 at 148; DX 40 at 165; DX 39 at 161)—will typically suffice.

[219] In contrast, the PI Handbook provided that "[f]or investigations in state supported living centers, the extension may be in 1 to 10 calendar day increments depending on the situation but should not exceed 10 days." (DX 39 at 160; DX 40 at 164.) Likewise, "[f]or investigations in state hospitals, the extension may be in 1 to 14 calendar day increments depending on the situation but should not exceed 14 days." (DX 39 at 160; DX 40 at 164.) In other words, the length of an extension for an investigation in either setting could not exceed the maximum length of an unextended investigation in that setting.

which provides that "[if] an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record." (D.E. 606 at 3.) This provision presupposes that any first extension granted for good cause will be of limited duration; otherwise, an investigation would never be "extended more than once," and the provision would be superfluous. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("Whenever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be presumed improbable."). Thus, an indefinite extension is invalid under Remedial Order 10.

And again, it seems that Defendant came to the same conclusion. Shortly after the Monitors filed their September 2023 report on PI investigations, the PI Handbook for fiscal year 2024 was revised to limit the duration of extensions to a maximum of thirty days. (DX 34 at 147 (specifying that "the extension may be in 1 to 30 calendar day increments depending on the situation but should not exceed 30 days").)

### a. Child C

Like many PMC children, Child C entered the foster care system traumatized at a young age. Child C was three years old when she was removed from the care of her biological mother due to physical and mental abuse. (*See* PX 117 at 1.) Prior to her placement at C3 Christian Academy, she was adopted at the age of five and lived with her adoptive mother, grandmother, and six-year-old cousin. (*Id.* at 1.) When she was placed at C3 Academy from April 4, 2021, to May 4, 2022, Child C was fourteen years old, performed at a two- to four-year-old level, and had an IQ of 55. (*See id.* at 21, 36; *see also* D.E. 1412 at 27.)

Roughly two years before her placement at C3 Academy, a Determination of Intellectual Disability (DID) assessment noted that Child C had "significant speech impediments and . . . difficultly expressing herself verbally." (*See* PX 117 at 2.) At the time of the assessment, Child C

could "ask[] simple questions but [did] not speak in three or four word sentences." (*Id.* at 5.) Ms. Evans stated that Child C could "make herself understood" and put together a sentence, as well as "curse" the staff at the placement (D.E. 1488 at 98:24–99:2); however, Child C's school records indicate that, one month before her discharge from C3 Academy, she had a speech impairment and required additional testing to determine the need for speech therapy (PX 117 at 12). The records provided by Ms. Evans for Child C, which she stated were complete, did not contain any documentation of additional testing for speech therapy. (*See* D.E. 1488 at 70:11–23.)

According to her Plan of Service, Child C is diagnosed with Unspecified Disruptive Behavior Disorder, Language Disorder, ADHD-Combined Presentation, and Intellectual Disability-Mild (provisional). (D.E. 1412 at 27.) Additionally, she suffers from major depressive disorder, recurrent severe psychotic symptoms, mood dysregulation disorder, and posttraumatic stress disorder. (D.E. 1488 at 99:6–9.) In the records provided by Ms. Evans, Child C's speech quality was described as slow, her cognitive impairment was severe, and she experienced delusions, hallucinations, and suicidal ideations. (*See* PX 117 at 121.)

Child C's medication regimen remained largely consistent during her year at C3 Academy and consisted of her taking approximately twelve pills every day, with some medications administered multiple times a day. (*See id.* at 145–195.) The medications include: benztropine (commonly known as Cogentin), Abilify (antipsychotic medication), clonidine (blood pressure medication), banophen, valproic acid (an anticonvulsant commonly known as Depakene), and desmopressin (for enuresis). (*See id.* at 147, D.E. 1489 at 96:1–100:18.)

PI opened twelve investigations of abuse and neglect of Child C while she was placed at C3 Academy. (D.E. 1486-3 (Court's Exhibit 3).) Child C remained at C3 Academy for approximately one year after the first abuse and neglect allegation was reported. (*See* D.E. 1412 at 27–28.)

### i. *Investigation 1*

"On May 24, 2021, six weeks after Child C was placed at C3 Academy, PI initiated its first investigation . . . of Physical Abuse by a named staff member." (*Id.* at 29.) The reporter of this allegation is not identified in the Monitors' report, but the reporter was not a staff member or administrator of C3 Academy. (*See id.* at 138:8–12 ("MR. RYAN: Your Honor, based on all the data and information the State has provided to us with respect to the 12 investigations involving Child C, there is no evidence that we found that either the witness [Ms. Evans] or anyone at C3 called the outcries to trigger the investigations.").)

PI initiated a Priority One physical abuse investigation which—after seventeen months—was assigned a disposition of Confirmed, as the investigator "found a preponderance of evidence that a staff member tasered Child C on her arm while she was in bed" (*id.* at 29):

> Testimony from [Child C] supports that [Child C] identified [Staff 1] by name and that [Staff 1] held a taser to [Child C's] inner left forearm multiple times. Photographs of [Child C's] inner left forearm support there were burn, signature or taser marks. Testimony from Officer [name removed] supports that after review of the photographs of [Child C] by Officer [name removed] that he could confirm the marks were signature marks or burn marks from a taser and it looked like when someone would touch a taser to skin and the person would pull away and then the taser would be touched again to the skin harder. Although a taser could not be recovered, Incident/Investigation Report supports that at one point [Staff 1] did have a taser even though she had not seen it since December of 2020.

(*Id.* at 29 (footnote omitted).)

The investigator obtained Child C's testimony during a face-to-face interview using an American Sign Language (ASL) interpreter to accommodate Child C's limited speech.[220] (*Id.* at 30.) "With the assistance of the interpreter, Child C used some signs, gestures, and language to

---

[220] The use of an interpreter is notable only because, in the subsequent investigations that occurred during the year that Child C was at C3 Academy, "investigators routinely failed to accommodate Child C's limited speech through methods such as an ASL interpreter; this failure in subsequent investigations may have reduced the child's ability to communicate and report allegations of abuse or neglect during her subsequent interviews with investigators." (D.E. 1412 at 30.)

communicate to the investigator that Staff 1 held something against her forearm twice and that it hurt." (*Id.* at 30.)

The intake was received on May 24, 2021; an extension was approved thirty-one days later, on June 25, and was therefore untimely under Remedial Order 10. (*Id.* at 30.; D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").) The documented reason for the extension—"Other: Need to interview collaterals and alleged perpetrator" (D.E. 1412 at 30)— failed to establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Indeed, it also failed to show good cause under PI's own policies. (*See* DX 39 at 161 (listing "reasons [that] constitute good cause").) Moreover, the investigation was not completed until October 2022, sixteen months after the extension was approved. (D.E. 1412 at 30.) As explained earlier,[221] a single extension cannot, consistent with Remedial Order 10, extend an investigation more than thirty days. For these reasons, the investigation violated Remedial Order 10.

Because of the lengthy and inadequately approved delay, the investigation was not "completed on time consistent with the Court's Order." (D.E. 606 at 2 ¶ 3.) Further, the "significant delay in the resolution of these serious allegations as eleven new investigations emerged naming this child as an alleged victim, evidences a profound failure to conduct the investigation" (D.E. 1412 at 30) "taking into account at all times" Child C's "safety needs" (D.E. 606 at 2 ¶ 3). Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### ii.   *Investigation 2*

On July 19, 2021, a law enforcement officer reported that Child C ran away from the C3 Academy. (D.E. 1412 at 31.) After law enforcement located and returned her to the placement,

---

[221] *See supra* page 301–02.

Child C "attempted to strangle herself by placing a sheet around her neck. According to the officer, the child stated that she was trying to kill herself and that she wanted to be admitted to a hospital." (*Id.* at 31.) This incident was not reported by any caregivers or staff members.

These allegations resulted in a Priority Two neglect investigation of Child C by Staff 2, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 31.) The Monitors disagreed—as a result of the "substantial investigative deficiencies" discussed below, they concluded that "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 31.)

First, the "investigator did not attempt to gather sufficient evidence to determine whether Staff 2 adequately supervised Child C at the time of the incident." (*Id.* at 31.) During the investigator's face-to-face interview with Child C—conducted eight days after the intake was received, in violation of Remedial Order 8 (*id.* at 31; *see* D.E. 606 at 3)—she conveyed through an ASL interpreter that she "ran away from the group home and wrapped a sheet around her neck in response to verbal and physical altercations with the other residents in the home." (D.E. 1412 at 31.) After this interview, the investigation laid dormant for eighteen months without investigative activity; only after this long delay did the investigator identify Staff 2 as "the staff member responsible for Child C's supervision at the time of the incident." (*Id.* at 31.) Still, the investigator "did not attempt to interview this key individual." (*Id.* at 31.) "The investigator also did not attempt to identify and interview any other staff members or other residents who may have been present on the day that" Child C "attempted to kill herself." (*Id.* at 31.)

Thus, "the investigator did not assess whether" Staff 2 "appropriately supervised Child C prior to her elopement," and "failed to determine whether staff members took appropriate actions to minimize, address, or contain any verbal or physical altercations between Child C and the other

residents or whether supervisory failures contributed to the conflicts in other ways." (*Id.* at 31–32.)

The investigation was completed on January 26, 2023, eighteen months after intake; one extension was approved on November 2, 2021, four months after intake. (*Id.* at 32.) Thus, both the extension and the investigation were untimely under Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").) Besides, the documented reason for the extension—"Need to talk to collaterals, Ap, request documentation and police report" (D.E. 1412 at 32)—failed to establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Indeed, it failed to show good cause under PI's own policies. (*See* DX 39 at 161 (listing "reasons [that] constitute good cause"); DX 40 at 164–65 (same).) Thus, the investigation failed to comply with Remedial Order 10. (*See* D.E. 606 at 3.)

And because of the above-described investigative deficiencies, the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iii.   *Investigation 3*

On August 7, 2021, less than three weeks after the prior incident, a law enforcement officer reported that Child C eloped from C3 Academy. (D.E. 1412 at 32.) No one from C3 Academy reported this.

> According to the reporter, law enforcement observed Child C running down a busy street and a staff member was running after her. The reporter expressed concern that Child C was a "flight risk" and that the staff members at the placement may not have provided adequate care for her. The reporter noted that other residents had allegedly wandered off "unnoticed"

from the placement. Lastly, the reporter stated that he observed marks on Child C's arm, but he did not know whether the marks were injuries.

(*Id.* at 32.)

PI initiated a Neglect investigation related to Child C by an unknown staff member, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 32.) The Monitors disagreed—as a result of the "substantial investigative deficiencies" discussed below, they concluded that "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 32.)

First, the investigator failed to make face-to-face contact with Child C. The investigator attempted to interview Child C three days after the intake report while she was in the hospital,[222] but she was asleep. (*Id.* at 32.) The investigator "documented that she observed Child C asleep in the emergency room with a blanket over her and that she did not observe any marks or bruises on the child, presumably because the blanket covered" Child C's body. (*Id.* at 32–33.) The investigator made no further attempts to interview or otherwise have face-to-face contact with Child C (*id.* at 33), thus violating Remedial Order 8 (*see* D.E. 606 at 3).[223] "In the absence of interviewing and adequately observing the child, the investigator failed to assess the child's safety and gather information about the allegation, particularly given the reporter's observation that the child had marks on her arms and was not receiving adequate care at C3 Academy." (D.E. 1412 at 33.)

---

[222] "The Monitors could not determine why" Child C "was hospitalized from the available records." (*Id.* at 32 n.60.)

[223] An instructional PowerPoint for PI investigators, dated October 24, 2023, states that for an initial face-to-face contact, if the victim is asleep, the investigator is to "come back later or the next day." (PX 98 at 53; *see* D.E. 1471 at 4.) The Monitors note that a separate neglect investigation of Child C during the same time period referenced a visitor suspension at C3 Academy due to COVID-19, but the record indicates the investigator did not attempt to observe or speak to the child through any other means. (D.E. 1412 at 33 n.61.)

Second, "[t]he investigator concluded the investigation without identifying and interviewing an alleged perpetrator or any other staff members who may have been present on the day of the alleged incident." (*Id.* at 33.)

Third, "the investigator did not consider highly relevant information about the allegations, including reports by a law enforcement officer that residents wandered off from the property 'unnoticed.'" (*Id.* at 33.) And "[t]he investigator did not consider whether the group home's referral history included similar allegations that the group home failed to provide adequate care to and supervision of children." (*Id.* at 33.)

In sum, "[b]ecause the investigator did not gather any evidence related to the allegations . . . the assigned disposition of Unconfirmed to the allegation of Neglect is baseless and inappropriate." (*Id.* at 33.)

The investigation was completed on January 26, 2023, seventeen months after intake, with no approved extensions.[224] (*Id.* at 33.) Thus, the investigation failed to comply with Remedial Order 10. (*See* D.E. 606 at 3.)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iv. *Investigation 4*

On August 13, 2021, a law enforcement officer:

[R]eported another allegation of Neglect of Child C at C3 Academy. The law enforcement officer reportedly spoke to Child C while she was admitted to a hospital (a different hospital

---

[224] The investigator requested an extension on September 9, 2021, but it was not approved by the supervisor. (*Id.* at 33 n.63.)

stay from the one referenced above, during which time the investigator failed to return to interview the child). The child was hospitalized after she allegedly jumped out of a van and attempted to tie sheets around her neck for the second time in approximately four weeks. Child C disclosed to the law enforcement officer that she was punched a lot at her placement. The law enforcement officer observed a laceration near the child's right eye. The child then reported that a named resident (Individual 1, age 20) [who had previously been incarcerated for assaulting his mother] punched her and she bled a lot. The child reported that she did not receive medical care for the injury to her eye.

(D.E. 1412 at 33–34, 34 n.65.) This incident was not reported by any caregivers or staff members.

The physical abuse and neglect allegations resulted in a Priority Two neglect investigation of Child C by Staff 2, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 34.) The Monitors disagreed—as a result of the "substantial investigative deficiencies" discussed below, they concluded that "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 34.)

The investigator failed to make face-to-face contact with Child C, instead interviewing her using FaceTime[225] (*id.* at 34)—in violation of Remedial Order 8 (*see* D.E. 606 at 3). Further, the investigator did not document any efforts to accommodate Child C's limited speech during this interview, despite two prior investigations documenting the use of an ASL interpreter. (D.E. 1412 at 34.) "[I]t is unclear how this investigator determined that she could ensure Child C's meaningful participation" in the interview without aid. (*Id.* at 34.) Nonetheless, Child C conveyed "that she jumped out of the van because Staff 2 poured out her soda." (*Id.* at 34.) Child C then made an outcry that Individual 1 scratched her and caused her lip to bleed. (*Id.* at 34.) The investigator took screenshots of Child C on FaceTime, but the record does not indicate whether those pictures were of her face or whether any injuries were observed. (*Id.* at 34.)

---

[225] FaceTime interviews do not rule out that C3 Academy staff members are present with the child, and they should never be substituted for face-to-face contact absent exigent circumstances.

Shortly thereafter, the investigator interviewed the case manager at C3 Academy. (*Id.* at 34.) Though the case manager was unaware of any incidents between Individual 1 and Child C, she corroborated that Child C "jumped out of the van" and eloped. (*Id.* at 34.) Of the elopement, the case manager explained that Child C was gone for an unknown duration,[226] and that law enforcement located the child and returned her to C3 Academy. (*Id.* at 34.) Finally, the case manager explained that upon Child C's return, and while law enforcement was still present, Child C "attempted to tie a sheet around her neck in another room" at the home, where a staff member later discovered her and intervened. (*Id.* at 34–35.) The Monitors note that the police report recounts that Child C "wrap[ped] a bed sheet around her neck and state[d] that she wanted to kill herself," causing officers to place Child C under an emergency detention, restrain her with "double lock handcuffs," and take her to the hospital. (*Id.* at 35.) The Monitors note that Child C was subject to routine supervision at this time. (*Id.* at 35.)

Despite the serious allegations and the consistency of these accounts, "the investigator did not pursue any investigative activity for one year and five months." (*Id.* at 35.) The investigator then "attempted to locate the alleged perpetrator (Staff 2) and Individual 1 for interviews," but "[l]ikely due to the significant delay, the investigator was unable to locate and interview these key individuals." (*Id.* at 35.) The investigator then re-interviewed the case manager—who could not

---

[226] After Child C jumped out of the van, she ran into a stranger's backyard and jumped into their pool. (*Id.* at 34.) Fortunately, "Child C knew how to swim and was able to safely exit the pool by herself" (*id.* at 34); other PMC children have drowned or nearly drowned due to inadequate supervision. (*See, e.g.*, D.E. 1380 at 208 n.244 (recounting that an "autistic and non-verbal child" with "a history of running away" "ran away from" a Residential Treatment Center "unnoticed and was found in a neighbor's pool . . . . The neighbor who found the child in the pool said that as the child neared the deep end, 'he began to struggle in the water and could not swim.'"); D.E. 1380-2 at 22 (six-year-old child nearly drowned, and "[t]he caregiver's whereabouts were unknown when the child went under water and started floating face down"); D.E. 1079 at 373 (infant drowned in foster parents' above-ground swimming pool— "her licensed foster parents inadvertently left the ladder in place" and "each [foster parent] thought the other was supervising the child"); *id.* at 341 (child with Down Syndrome, placed in a different foster home, almost drowned in family's pool—foster mother was in the pool but was "making adjustments to the pool pump and was not supervising the child").)

311

recall the incident—and the responding law enforcement officer, who reported similar information to that in the intake report. (*Id.* at 35.)

"Due to these deficiencies, the investigator failed to gather sufficient information to render a disposition for the allegation of Neglect." (*Id.* at 35.)

The investigation was completed on January 26, 2023, seventeen months after intake; one extension was approved on October 29, 2021, more than two months after intake. (*Id.* at 35.) Thus, both the extension and the investigation were untimely as per Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegations of physical abuse and neglect were not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

> ### v.   *Investigation 5*

Between August 20, 2021, and October 28, 2021, SWI received eight reports of physical abuse regarding Individual 2 (an adult resident at C3 Academy) which PI merged into a single investigation. (D.E. 1412 at 35.) "The reporters, including a law enforcement officer, medical facility staff, and Individual 2's service coordinator, reported that Individual 2 stated a staff member (Staff 3) 'punched,' 'beat up,' 'assaulted,' and 'hit' her on her arms and face," causing injuries.[227] (*Id.* at 35.) Four days after receipt of the first intake, the investigator interviewed

---

[227] Staff 3 was identified as Rodney McCuin, who is discussed in further detail below. This was the first abuse and neglect investigation that identified Mr. McCuin as the alleged perpetrator. (D.E. 1412 at 28.) Subsequently, Mr. McCuin was identified as the alleged perpetrator in four more abuse and neglect investigations of Child C. (*Id.* at 28.)

Individual 2 who stated that she and another adult resident, Individual 3 (age 18), engaged in a physical altercation with Child C while Staff 3 was driving them in a van on two occasions. (*Id.* at 35–36.)

As a result, a neglect allegation as to Child C was added to the existing Priority Two investigation (*id.* at 35), to which the investigator assigned a disposition of Inconclusive (*id.* at 36). The Monitors disagreed—as a result of the "substantial investigative deficiencies" discussed below, they concluded that "a disposition of the Neglect allegation cannot be determined." (*Id.* at 36.)

The Monitors identified several "critical deficiencies" in this investigation. (*Id.* at 36.) First, "the investigator did not conduct an interview of Child C related to the allegations contained in this investigation." (*Id.* at 36.) "Instead, the investigator included in the investigative record an interview that was conducted with Child C on September 1, 2021 for a separate investigation . . . regarding unrelated allegations" (*id.* at 36), in violation of Remedial Order 8's requirement for initial face-to-face contact within 72 hours of intake (*see* D.E. 606 at 3).

Second, "the investigator failed to interview the alleged perpetrator; having waited 18 months to attempt the interview, the investigator was unable to locate him." (D.E. 1412 at 36.)

Third, the investigator failed to obtain adequate information about the altercation from Individual 2 and Individual 3. Individual 2 referenced the physical altercation with Child C, but "the investigator never asked Individual 2 to describe the physical altercation. As a result, the nature and severity of the alleged altercation between the two adults and Child C is unknown." (*Id.* at 36.) And the "investigator did not document that she asked Individual 3 any questions related to the alleged physical altercations in the van." (*Id.* at 36.)

In sum, "the investigator gathered almost no information about the allegation related to Child C and the disposition of Inconclusive for the allegation of Neglect is baseless and inappropriate." (*Id.* at 36.)

The investigation was completed on March 20, 2023, took one year and seven months after intake; an extension was approved on September 21, 2021, thirty-two days after the intake was received. (*Id.* at 36–37.) Thus, both the extension and the investigation were untimely under Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### vi.   *Investigation 6*

On August 29, 2021, a social worker at a hospital reported that Child C ran away after an unnamed staff member at C3 Academy hit her, and that Child C informed the law enforcement who located her that she wanted to kill herself with a knife. (D.E. 1412 at 37.) This incident was not reported by any caregivers or staff members. Law enforcement officers transported Child C to the hospital, where she was seen by a psychiatrist who observed that Child C was "'extremely dirty,' not wearing underwear, with feces in her pants" and had "'lots' of scarring on her body due to self-injurious behavior." (*Id.* at 37.) "At this time, there were five separate investigations opened regarding allegations of Physical Abuse and/or Neglect of Child C, with both distinct and similar allegations." (*Id.* at 37.)

These allegations resulted in a Priority Two investigation related to physical abuse and neglect of Child C by a named staff member, Staff 2. (*Id.* at 37.) Seventeen months later, PI "entered a disposition of Unconfirmed for the allegation of Neglect and a disposition of Inconclusive for the allegation of Physical Abuse." (*Id.* at 37.) The Monitors disagreed; due to the "substantial investigative deficiencies" discussed below, dispositions as to both allegations "cannot be determined." (*Id.* at 37.)

First, the investigator's interview with Child C was inadequate.[228] The investigator made no effort to accommodate Child C's limited speech and comprehension during the interview. (*Id.* at 38.) Despite this, Child C confirmed that a staff member hit her on the arm and, when asked who hit her, pointed toward "'the staff' present in the home." (*Id.* at 37.) The investigator also questioned Child C about the scratches on her face, and she responded that she got into a fight with another individual in the home, who she pointed out. (*Id.* at 37.) But the record does not document which staff member or individual Child C pointed out to the investigator. (*Id.* at 37.) Further, Child C appeared to have stopped responding to the investigator's questions, and the record is unclear whether that was due to her limited speech and comprehension. (*Id.* at 37.)

Second, the "investigator did not appear to consider whether Child C's allegation that a resident scratched her was related to the" intake dated August 13, 2021.[229] (*Id.* at 38.) "Based on the documentation in the record, the two investigators failed to collaborate and jointly staff the two investigations; this failure limited both investigators' ability to gather and assess information about the safety of Child C in her placement." (*Id.* at 38.)

Third, and "even more confounding" (*id.* at 38):

---

[228] The report does not indicate whether the investigator's face-to-face contact with Child C was within the seventy-two hours required by Remedial Order 8 for a Priority Two investigation. (*See* D.E. 606 at 3.)

[229] *Supra* page 309–12.

> [A]fter completing an interview with Child C, during which the investigator observed injuries on the child, the investigator did not conduct any additional investigative activity for more than 16 months. When the investigation resumed on January 23, 2023, the investigator assigned in the record an alleged perpetrator based upon the staff member who was working on the date of the intake report (August 29, 2021) and completed the investigation four days later. As noted above, the investigator observed the child point at a staff member(s) who allegedly hit her, but the record does not clarify the connection between the two and it is not clear the child was hit on the date of the intake report. Before completing and closing the investigation, the investigator did not attempt to interview the alleged perpetrator nor the other individual to whom the child pointed during her interview.

(*Id.* at 38.) "As a result of these substantial deficiencies, the investigator failed to determine whether a staff member hit Child C; and whether a staff member's inadequate supervision allowed a resident to scratch Child C." (*Id.* at 38.)

Finally, the allegations reported by the psychiatrist—that Child C was "dirty, had no underwear on, and had feces on her pants"—were not investigated because PI determined these "general complaints regarding [Child C] being unkept do not meet the definition of neglect."[230] (*Id.* at 38.) There was nothing in the record about the resolution of those allegations. (*Id.* at 39.)

The investigation was completed on January 27, 2023, seventeen months after intake; one extension was approved on October 7, 2021, more than a month after the intake. (*Id.* at 39.) Thus, both the extension and the investigation were untimely under Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegations of physical abuse and neglect were not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's

---

[230] The Monitors note that neglect, as defined in the Texas Administrative Code, includes a failure to "provide adequate nutrition, clothing, or health care to a specific individual receiving services in a residential or inpatient program if such failure results in physical or emotional injury or death to an individual receiving services or which placed an individual receiving services at risk of physical or emotional injury or death." (D.E. 1412 at 38–39 n.66 (quoting 26 Tex. Admin. Code § 711.19(b)(2)).)

"safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### vii.   *Investigation 7*

On August 26 and September 1, 2021, a law enforcement officer reported two separate allegations of abuse and neglect related to Individual 2, which were similar in nature to those alleged in the fifth ANE investigation—namely, that Staff 3 hit Individual 2. (D.E. 1412 at 39.) Child C was not mentioned in the reports but was added to the Priority Two physical abuse investigation as an additional victim during the investigation. (*Id.* at 39.)

"Following receipt of the two intake reports, PI initiated a Priority Two Physical Abuse investigation related to Child C by Staff 3, which became its seventh concurrent open investigation into Physical Abuse and/or Neglect of Child C." (*Id.* at 39.) The investigator assigned the allegation a disposition of Inconclusive. (*Id.* at 39.) The Monitors disagreed; because of the "substantial investigative deficiencies" described below, "a disposition of the Physical Abuse allegation related to Child C cannot be determined." (*Id.* at 39.)

First, "the investigator did not document her reason(s) for adding Child C as a victim," so "it is unclear why the investigator added Child C as an alleged victim to this investigation." (*Id.* at 39.) "[T]he absence of this central information" alone renders the "investigation . . . deficient" as to Child C. (*Id.* at 39.)

Second, the investigator failed to make face-to-face contact with Child C, in violation of Remedial Order 8. (D.E. 606 at 3.) Instead, the investigator "used a separate interview of Child C that occurred during a different investigation . . . to document her initial face-to-face contact with Child C for the instant investigation." (D.E. 1412 at 39–40.) "[B]ecause the investigator did not interview Child C related to the instant allegation, the investigator did not gather any information about it." (*Id.* at 40.)

Third, the investigator not only failed to interview the alleged perpetrator (Staff 3) until sixteen months after intake, but when the investigator finally interviewed him, she "did not document whether she asked the alleged perpetrator any questions related to Child C." (*Id.* at 40.) Likewise, her "interviews with other collateral staff members . . . did not discuss any allegations related to Child C." (*Id.* at 40.)

For these reasons, "the basis for the investigator's [disposition] of Inconclusive for the allegation of Physical Abuse of Child C is unknown." (*Id.* at 40.)

The investigation was completed on February 7, 2023, seventeen months after intake; one extension was approved on October 7, 2021, more than thirty days after intake. (*Id.* at 40.) Thus, both the extension and the investigation were untimely under Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of physical abuse was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### viii.   *Investigation 8*

On September 1, 2021, SWI received multiple allegations that Child C and another resident had been locked in a bedroom together and left unsupervised, and that Child C was observed with multiple bruises on her face. (D.E. 1412 at 40.)

First, a law enforcement officer reported that he responded to a 911 call at 3:29 am, made by two residents at C3 Academy. (*Id.* at 40.) Individual 2 and Child C, both intellectually disabled

females, disclosed that at an unknown time during the night, Staff 4 locked them in a bedroom[231] and left the HCS residence.[232] (*Id.* at 40.) Child C and Individual 2 were stuck in the bedroom until Individual 2 broke the bedroom door in half; Child C and Individual 2 then went to a neighbor's home and called law enforcement. (*Id.* at 40.)

When law enforcement officers arrived at the home at approximately 4:00 am, "no staff members were present in the home nor did they observe any posting or other information to inform law enforcement who to contact regarding Individual 2 and Child C's care." (*Id.* at 40.) After the first report was called in, a different law enforcement officer reported a similar allegation and stated that the staff member (Staff 4) left the group home due to a purported family emergency. (*Id.* at 40.) According to Ms. Evans, the reason why the staff member—whom she identified as "Anthony Curly" (D.E. 1488 at 106:20)—left the residents locked alone in the bedroom was to "be with a woman on a love rendezvous"—clearly, not a family emergency (*id.* at 107:1–2). Ms. Evans testified that the Mr. Curly did return to the placement but when "he saw the police [he] did not go back to the house." (*Id.* at 107:24–25.)

Approximately thirty minutes after the second report, the same officer reported that Child C had multiple bruises and cuts on her eyelids and face and that Individual 2 had a cut under her left

---

[231] At the Contempt Hearing, Ms. Evans conceded that Child C and Individual 2 were locked in, but suggested that they were locked in separate bedrooms. (D.E. 1488 at 108:14–109:16.) On the other hand, the police report from the incident states that Staff 4 locked Child C and Individual 2 in a bedroom together. (*See* D.E. 1412 at 41.) Indeed, all the evidence reviewed by the Monitors indicates that Child C and Individual 2 were locked in the same room together. (D.E. 1488 at 108:11–12, 109:11–14.)

This must not have been an unusual occurrence as Mr. McCuin (Staff 3), the husband of Ms. Evans' assistant, was fired and rehired a few times after promising to mend his ways regarding bringing lady friends to stay with him on his overnight shifts. (*See id.* at 76:16–77:3.) It is presumed that he was using one of the three bedrooms for this purpose, requiring two residents to stay together.

[232] Staff 4, who left the home after locking the residents in the room, called another staff member supervising residents in a different HCS group home owned and operated by Ms. Evans to watch his residents while he was away. (*Id.* at 111:9–12.) The other staff member was responsible for the care of up to three developmentally disabled residents in her group home that night, whom she left alone to come care for Staff 4's residents. (*Id.* at 111:23–25 ("Q.[BY MR. YETTER] . . . [Y]our other staff member, left up to three developmentally disabled residents in her group home alone? A: She did.").)

eye. (D.E. 1412 at 40.) Both Child C and Individual 2 disclosed that Staff 3 punched them. (*Id.* at 40.) None of the intakes were reported by a caregiver or staff member.

The allegations were referred to PI for a Priority One physical abuse and neglect investigation related to Child C by Staff 3 and Staff 4, respectively. (*Id.* at 41.) The investigator assigned dispositions of Inconclusive as to both the Neglect and Physical Abuse allegations. (*Id.* at 41.) The Monitors disagreed with both dispositions. (*Id.* at 41.)

As to the Neglect allegation, the Monitors concluded that it "should have been substantiated with a disposition of Confirmed as related to Staff 4." (*Id.* at 41.)

Notably, the police report for the incident "confirmed Individual 2's allegation that Staff 4 locked Child C and Individual 2 in a bedroom and exited the premises and left them unattended for over two hours." (*Id.* at 41.) The police report further noted that "the residents did not have access to a telephone in the home and had to exit the home during the night to access a telephone in a neighbor's home, further exposing the residents to risk of physical or emotional injury. They also did not have access to a bathroom or any means of exit should there have been an emergency." (*Id.* at 41.) The police report also reflects that officers "attempted to contact numerous numbers associated with the group home's management, C3 Christian Academy," but that the officers "were unable to reach anyone." (*Id.* at 41–42.) The Monitors note that "after law enforcement arrived on the scene, it took approximately two hours before a C3 Academy staff member was located and arrived at the home." (*Id.* at 42.) Based on this evidence, "the investigative record includes a preponderance of evidence that Staff 4 was negligent when he locked Child C and Individual 2 in a bedroom and left them unattended with no access to an exit, bathroom or means to summon help for over two hours in the night, which placed Child C at risk of physical or emotional injury or death." (*Id.* at 42.)

The Monitors also faulted the investigator for failing to interview Staff 4[233] and failing to consider whether C3 Academy's administration was at fault. Specifically, the Monitors considered it "confounding that the investigator failed to consider whether administrators at C3 Academy were also neglectful when they failed to 'provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff.'"[234] (*Id.* at 42.)

Regarding the physical abuse allegation, the Monitors concluded that, for the following reasons, "the investigator did not adequately investigate whether Staff 3 hit Child C causing injury to her face" (*id.* at 42), so "a disposition cannot be determined" (*id.* at 41).

First, the interview with Child C was inadequate, as the investigator documented no attempt to accommodate Child C's documented communicative limitations. (*Id.* at 42.) Child C "did not want to discuss the allegations," and having accommodations available "may have encouraged Child C's participation in the interview." (*Id.* at 42.) Moreover, the investigator "did not document whether she observed any injuries on Child C." (*Id.* at 42.) Thus, the investigator failed to gather any information from Child C.

Likewise, the investigator failed to gather any information about the physical abuse of Child C when she interviewed Individual 2. This is so because "the investigator did not ask Individual 2 any questions related to whether Staff 3 hit her or Child C and did not document whether she observed any injuries on Individual 2." (*Id.* at 42.)

Further, the interview with Staff 3, the alleged perpetrator, was severely delayed, taking place sixteen months after intake. (*Id.* at 42.) And when the investigator finally did get around to interviewing Staff 3, the investigator "did not ask Staff 3 any questions related to the allegation of

---

[233] "The investigator was unable to locate Staff 4 for an interview and at the time he attempted to do so 16 months after the investigation began, according to C3, he was no longer employed there." (D.E. 1412 at 42.)

[234] *See* 26 Tex. Admin. Code § 711.19(b)(3).

Physical Abuse and the injuries the officer observed on Individual 2 and Child C. Instead, the investigator asked Staff 3 questions related to the allegations that Staff 4 locked Child C in the room with an adult also living at the home." (*Id.* at 42.)

Finally, the Monitors note that the day after Child C and Individual 2 were locked in the bedroom, "law enforcement returned to the group home to conduct a welfare check. According to the police report, 'While on scene, medics assessed [Child C] as she complained of not feeling well. [Child C's] heart rate and blood pressure vitals were elevated to the point that medics determined she needed to go to the hospital.'" (*Id.* at 42.) Yet the investigator did not consider whether Child C's medical issues were related to the physical abuse or neglect. (*Id.* at 42.)

The investigation was complete on February 7, 2023, seventeen months after intake; an extension was approved on November 1, 2021, two months after the intake. (*Id.* at 43.) Thus, both the extension and the investigation were untimely under Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegations of physical abuse and neglect were not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### ix. *Investigation 9*

On October 2, 2021, approximately one month after the prior incident, a law enforcement officer reported that Child C eloped from the placement and was hit by a staff member. (D.E. 1412 at 43.) No staff members or caregivers reported this incident.

The officer was called to locate Child C after she ran away from the placement while a staff member was spoon feeding another resident. (*Id.* at 43.) He found Child C walking with her shirt off on a busy street approximately a mile and a half away from C3 Academy. He also noted that she had issues with her speech and was unable to enunciate her name or address well. (*Id.* at 43.) When the officer located her, Child C appeared happy to see the officer. (*Id.* at 43.) But as they neared the placement, the officer observed Child C's mood change and noted that she became "sad" and was "whimpering." (*Id.* at 43.) "Child C told the officer that Staff 3 hit her." (*Id.* at 43.) She "demonstrated the hit by making a fist and putting it on her chin. The officer did not observe any injuries on Child C." (*Id.* at 43.)

This was the third time that Child C made an outcry of physical abuse at C3 Academy, and the second time that Child C specified it was Staff 3 who hit her. (*Id.* at 43.) And this was the fifth abuse or neglect investigation related to Child C that identified Staff 3 as the alleged perpetrator. (*Id.* at 28.) All previous four investigations were still open, and no correlation was made between this allegation and the previous four involving the same staff member and type of allegations.

PI initiated a Priority Two neglect and physical abuse investigation of Child C by Staff 3. (*Id.* at 43.) Sixteen months later, PI "entered a disposition of Unconfirmed for the allegation of Neglect and a disposition of Inconclusive for the allegation of Physical Abuse." (*Id.* at 43.) The Monitors disagreed with both; for the reasons discussed below, "[t]he investigator failed to appropriately investigate the allegations of Neglect and Physical Abuse of Child C by Staff 3" (*id.* at 44), so the disposition as to both allegations "cannot be determined" (*id.* at 44).

First, despite the serious allegations, the investigator failed to establish face-to-face contact with Child C within the timeframe required by Remedial Order 8 (D.E. 606 at 3)—the investigator

did not conduct a face-to-face interview with Child C until five days after the intake[235] (D.E. 1412 at 44). Further, the investigator "did not document any efforts to accommodate Child C's limited speech and comprehension during the interview." (*Id.* at 44.) Nonetheless, Child C was able to confirm that when she ran away Staff 3 was caring for another resident, and that Staff 3 hit her with a closed fist on the right side of her face. (*Id.* at 44.) Also, the investigator observed discoloration on Child C's face, but discounted it as dark skin pigmentation rather than a bruise.[236] (*Id.* at 44.)

Second, despite Child C's disclosure that Staff 3 hit her in the face, the investigator "inexplicably . . . did not pursue any investigative activity for 16 months." (*Id.* at 44.) It should be noted that Child C remained at C3 Academy for approximately six months after this investigation commenced,[237] and "[i]t is unclear from the investigative record whether Staff 3 had access to Child C during this extended timeframe." (*Id.* at 44.) Relatedly, the investigator did not attempt to interview Staff 3 for sixteen months; but at that point Staff 3 no longer worked at C3 Academy and did not respond to the investigator's attempts to conduct an interview. (*Id.* at 44.)

Third, the investigator failed to consider that this was not the first physical abuse allegation Child C had made against Staff 3; indeed, the investigator "deemed" the case history of the alleged

---

[235] "The investigator made a first attempt to interview Child C three days after the receipt of the intake report at the location she attended for treatment services; however, the child was no longer present at that location when the investigator arrived. The investigator did not attempt to interview her at the group home later that day." (D.E. 1412 at 44 n.69.)

[236] The Monitors reviewed the photographs documenting the discoloration and explained that it was "difficult to discern" from the photographs "whether Child C had a bruise on her right temple or whether it was a spot of dark skin pigmentation." (*Id.* at 44.) It should go without saying that if face-to-face contact had been established within 72 hours as required by Remedial Order 8 (*see* D.E. 606 at 3) rather than 120 hours, any bruise on Child C's face would have been more easily discernible.

[237] Child C left C3 Academy on April 28, 2022, when C3 Academy staff left her at a hospital with a broken jaw. (D.E. 1412 at 49.)

perpetrator to be "not relevant."[238] (*Id.* at 44.) "This conclusion is unreasonable and inappropriate and raises questions regarding whether required case history reviews are performed." (*Id.* at 44.)

Fourth, the sixteen-month delay impaired the investigator's ability to gather information from "a nurse who reported that she saw Child C daily and assessed her after any incidents" (*id.* at 44):

> The nurse reported that she no longer had access to her notes related to Child C, presumably due to the investigator's significant delay interviewing her. Based on her recollection 16 months later, she stated that she did not observe any injuries on Child C that were consistent with being hit or punched in the face during the time around October 2, 2021, when the child eloped from the placement. However, Child C did not provide a date or timeframe for when Staff 3 allegedly hit her and the delay and lack of access to her notes rendered the utility of the nurse's statement limited at best.

(*Id.* at 44.)

The investigation was completed on January 27, 2023, sixteen months after intake; one documented extension was approved on November 2, 2021, thirty-one days after intake. (*Id.* at 45.) Thus, both the extension and the investigation were untimely under Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegations of physical abuse and neglect were not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

---

[238] HHSC requires PI investigators to review the case history of the alleged victim and perpetrator at the commencement of all investigations because "the prior case history search may be used to inform the current investigation." (PX 7 at 176.)

### x.   *Investigation 10*

Approximately one month later, on November 7, 2021, a clinical therapist at a hospital reported an allegation of sexual abuse of Child C—that a staff member forced Child C to have sex with him. (D.E. 1412 at 45.) The reporter stated that Child C locked herself in her room at C3 Academy and, after an unknown period of time alone, used her hand to break a window and ran away from the home. (*Id.* at 45.) After she was located, she was taken to the hospital for "aggression and running away." (*Id.* at 45.) While at the hospital, Child C "made an outcry that an unnamed staff memberforced her to have sex with him and attempted to force [her] to have sex with his girlfriend." (*Id.* at 45.) Child C did not name the staff member in her outcry, so he was recorded as an "unnamed staff member" in IMPACT. (*Id.* at 47 n.71.) The investigative record shows that Staff 2 was identified as the alleged perpetrator, and Ms. Evans confirmed at the Contempt Hearing that Child C accused Staff 2—Jonathan Jones—of sexually abusing her. (D.E. 1488 at 141:6–10, 17–23.) This incident was not reported by any caregivers or staff members at C3 Academy.

PI initiated a Priority One sexual abuse investigation. (D.E. 1412 at 45.) After thirteen months (*id.* at 48), the investigator "assigned the allegation a disposition of Inconclusive" (*id.* at 45). The Monitors disagreed; they concluded that "[d]ue to a dangerous delay and an utter disregard for child safety by the State, a disposition of the Sexual Abuse allegation related to Child C cannot be determined." (*Id.* at 45.)

First, the investigator failed to establish face-to-face contact within the timeframe required by Remedial Order 7. (D.E. 606 at 3.) The investigator attempted to conduct a timely face-to-face interview of Child C at the hospital. (D.E. 1412 at 45.) But due to her "difficult behaviors" a nurse asked the investigator not to speak with her, to which the investigator agreed.[239] (*Id.* at 45.) "It is

---

[239] In such situations, the PI Handbook directs the investigator to "speak[] to the administrator and the facility medical director to ensure that all parties at the facility agree with the clinician's recommendations" and "obtain[] a

unclear from the investigative record whether the investigator observed Child C" at this time. (*Id.* at 45.)

Ten days later, the investigator attempted to schedule a forensic interview of Child C by the Children's Advocacy Center (CAC).[240] (*Id.* at 46.)

> The CAC informed the investigator that only a law enforcement officer or detective who was assigned to Child C's case could request a forensic interview of a child. The investigator did not document any other efforts to secure a forensic interview. As a result, Child C did not participate in a forensic interview with a skilled interviewer who was competent in speaking with children who report allegations of Sexual Abuse.

(*Id.* at 46.)

Second, the investigation languished for a year without activity, at which point the investigator "finally attempted to identify an alleged perpetrator through interviews with administrative staff members at C3 Academy." (*Id.* at 46.) The administrators identified a male staff member, Staff 2 (Jonathan Jones), and the investigator added him as the alleged perpetrator. (*Id.* at 47.)

Of course, long before these interviews there were signs that Staff 2 might have been the perpetrator, had the investigator only been looking for them. For example, while PI's investigation languished without activity, Staff 2 "was investigated by DFPS's CPI for Sexual Abuse of his stepdaughter (*id.* at 46):

> [O]n June 22, 2022, . . . DFPS had received an intake report that Staff 2 [Jonathan Jones] sexually abused his stepdaughter and substantiated the allegations on September 28, 2022. When the [PI] investigator resumed in November 2022 and Staff 2 had already been substantiated by DFPS for the Sexual Abuse of his stepdaughter, the investigator appeared entirely unaware of these developments.

---

written statement from the clinician making the request, outlining why it is not advisable for PI to interview the individual receiving services." (DX 34 at 86.)

[240] The PI Handbook states that CACs "provide specialized forensic interviews conducted by trained, neutral professional using research and practice-informed techniques as part of a larger investigative process." (*Id.* at 80.) The Handbook directs investigators to notify the CAC "within 24 hours or by the next business day after determining the victim meets the criteria for a forensic interview." (*Id.* at 81.)

(*Id.* at 47.) And the PI investigator likewise "failed to review or discuss" a sexual abuse investigation into Staff 2 "from November 2018 while [he was] employed by C3 Academy." (*Id.* at 47.) That investigation was opened by PI after "a young woman resident at the home alleged that Staff 2 masturbated while she was showering."[241] (*Id.* at 47.)

Because the investigator missed all of this, and thus failed "to timely identify" Staff 2 "as an alleged perpetrator and conduct this investigation, it appears that Staff 2 had access to all of the residents at the HCS home, including Child C for some period of time." (*Id.* at 47.) Indeed, Child C's records establish that Staff 2 continued to have access to Child C, as he was administering her medications from December 2021 until March 2022, shortly before her discharge from the placement. (*See* PX 117 at 145–50, 153–61.)

Third, when Child C was interviewed over a year after the investigation commenced (by different investigators), the investigators "did not facilitate Child C's participation in the interviews through appropriate accommodations for her limited speech and comprehension." (D.E. 1412 at 46.) Despite this, Child C's responses were consistent with they outcry she made in the hospital the year prior:

> Child C confirmed over the computer [the interview was conducted through a Microsoft Teams video call] that an unnamed individual sexually abused her. Child C additionally stated that the abuse occurred in a living room and she nodded affirmatively that the unnamed individual's girlfriend was present at the time, as she alleged in the original intake. Child C was reportedly unable or unwilling to provide the name of the alleged perpetrator to the investigator.

(*Id.* at 46.) Remarkably, the interview was cut short: this investigator—who, it bears repeating, failed to secure accommodations for Child C—"documented the following: 'Investigator ended the interview due to [Child C's] limited speech and lack of response.'" (*Id.* at 46.)

---

[241] PI assigned a finding of Unconfirmed to this allegation. (D.E. 1412 at 47.)

Fourth, the investigator failed to "interview any other staff members or residents who may have had information related to Child C's allegation." (*Id.* at 46.) This may have been due to the long investigative delay: "When the investigator asked one of the administrators to provide the names of other residents who lived in the home at the same time as Child C one year prior, the administrator reported that she did not remember their names and when the investigator followed up for records of their names, there is no documentation indicating that she ever received it from the administrator." (*Id.* at 46.)

Fifth, the investigator failed to secure documentation that may have helped the investigation, such as "such as timesheets, Staff 2's employment application, names and numbers of other residents, and Child C's incident reports and hospital records." (*Id.* at 46.)

Finally, "the investigator did not review any of Child C's nine prior investigations," each of which "included names and contact information of other residents and staff members who lived or worked in the home during that time period." (*Id.* at 46.)

The intake was received on November 7, 2021, and an extension was approved more than thirty days later, on December 10, 2021. (*Id.* at 48.) The investigation was completed on December 21, 2022, thirteen months after intake. (*Id.* at 48.) Thus, both the extension and the investigation were untimely under Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of sexual abuse was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2

¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

It should also be noted that despite PI assigning a disposition of Inconclusive, Ms. Evans testified at the Contempt Hearing that she believed Child C was sexually abused as this was "the first time that [Child C] actually complained of sexual abuse." (D.E. 1488 at 125:4.) She also asserted that "we took the necessary steps" in response to Child C's outcry. (*Id.* at 125:5.) But Ms. Evans clearly lacked a sense of urgency—the alleged abuse occurred on November 7, but Child C was not taken to a doctor until December 30. (*Id.* at 125:12–13.) And then, all Child C received was a pregnancy test.[242] (*Id.* at 125:14–15.)

### xi.   Investigation 11

On April 6, 2022, a caseworker reported an allegation of physical abuse of Child C; specifically, that Staff 5 hit Child C on the leg with a cord because she was "behaving 'bad.'" (D.E. 1412 at 48.) The caseworker also reported observing a thin bruise on Child C's left thigh that was "about two inches long." (*Id.* at 48.) A week later, school personnel reported that Child C "did not want to return to C3 Academy because she was being abused there." (*Id.* at 48.) The reporter also stated that the school nurse observed circular bruises on the child's thigh, one of which "was approximately two inches in length." (*Id.* at 48.) "Child C said the injury occurred in the group home," but would not state the name of the person who caused the injury. (*Id.* at 48.) This became the eleventh pending abuse and neglect investigation related to Child C while she was placed at

---

[242] Ms. Evans claimed that Child C received a gynecological exam. (D.E. 1488 at 105:12–13.) But Child C's records, which Ms. Evans testified are complete (*id.* at 70:11–23), clearly indicate that only a urine pregnancy test was administered on December 30, 2021. (*See* PX 117 at 55.) There are no records of a rape kit, a medical forensic exam conducted by a Sexual Assault Nurse Examiner (SANE), or a gynecological exam. (*Id.* at 55.) The pregnancy test was negative, which is not indicative of a lack of sexual abuse, and upon discharge Child C was prescribed two medications to treat dysuria. (*Id.* at 54.)

C3 Academy, and the sixth allegation of physical abuse of Child C. (*Id.* at 48.) No caregivers or staff members at C3 Academy reported the incident to SWI.

PI initiated a Priority Two physical abuse investigation of Child C by Staff 5. (*Id.* at 48.) More than nine months after intake, the investigator assigned the allegation a disposition of Inconclusive. (*Id.* at 48.) The Monitors disagreed; due to the "substantial investigative deficiencies" described below, they concluded that "a disposition of the allegation cannot be determined." (*Id.* at 48.)

First, the investigator failed to make face-to-face contact with Child C until nine-days after the first intake report (*id.* at 48), in violation of Remedial Order 8 (*see* D.E. 606 at 3).[243]  During the interview Child C recounted—consistent with her original allegation—that "on an unknown date, she went in the bathroom at C3 Academy and hit her head on the wall; after Staff 5 heard Child C hit her head, Child C stated that Staff 5 entered the bathroom and hit her with a white cord on her leg." (*Id.* at 48–49.) Child C stated that no one observed the incident" and, "[a]ccording to the investigator, Child C did not allow her to observe whether she had any bruising nor photograph her." (*Id.* at 49.)

Second, even though Child C confirmed both the allegation of physical abuse and the identity of the alleged perpetrator, Staff 5, the investigator failed to take any further investigative activity for nine months. (*Id.* at 49.) Further, the investigative record does not document whether Staff 5 continued to work at C3 Academy and have access to Child C and the other residents during the investigative delay. (*Id.* at 49.) Indeed, because of the delay, the investigator failed to interview Staff 5 at all—"Nine months after Child C's interview . . . the investigator first attempted to contact

---

[243] Apparently, "[t]he investigator attempted a timely face-to-face interview with Child C," but "the attempt was unsuccessful because no one at the group home allegedly opened the door to the investigator." (D.E. 1412 at 49 n.74.) "The investigator did not attempt to interview Child C again until nine days after the date of the first intake report." (*Id.* at 49 n.74.)

Staff 5. At that point, Staff 5 reportedly no longer worked at C3 Academy and did not respond to the investigator's late attempt for an interview." (*Id.* at 49.)

Third, to compound the "absence of this key interview with Staff 5," "the investigator did not attempt to interview collateral staff members nor residents [of C3 Academy] to gather information about the allegation." (*Id.* at 49.)

In sum, "[d]ue to significantly delayed and missing interviews, the investigator failed to gather sufficient information to determine whether Staff 5 physically abused Child C." (*Id.* at 48.)

The intake was received on April 6, 2022. (*Id.* at 49.) Two extensions were approved; but because the first was approved more than thirty days after the intake (on May 11, 2022) (*id.* at 49), they were untimely. The extensions were also inadequate because the documented reason for each—"Extraordinary Circumstances" (*id.* at 49)—does not demonstrate "good cause."[244] And, of course, the investigation was not completed until January 27, 2023, nearly ten months after intake. (*Id.* at 49.) For all these reasons, the investigation violated Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of physical abuse was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

---

[244] As explained earlier, *supra* page 300–01, simply stating "Extraordinary Circumstances," without providing the facts that make the circumstances extraordinary, does not demonstrate "good cause" under Remedial Order 10.

###### xii.   *Investigation 12*

On April 28, 2022, Child C's caseworker reported that Child C was at the hospital with a broken jaw. (D.E. 1412 at 49.)

> The caseworker reported that on the date of the intake report hospital staff notified her that an unnamed staff member dropped Child C off at the hospital. The unnamed staff member reported to the hospital that Child C had been restrained at the group home; the staff member reportedly did not provide any other information to the hospital before departing and no one stayed with the child at the hospital. While at the hospital, medical personnel determined that Child C had a fractured jaw, which required surgery. The reporter stated that it was unclear how or when Child C was injured. One day later, on April 29, 2022, medical personnel from the hospital reported that Child C had a fractured mandible (lower jaw) in two places and Child C was unable to explain how she was injured.

(*Id.* at 49–50.) The Monitors also noted that no administrator or staff member from C3 Academy stayed with Child C at the hospital. (*Id.* at 49.) At the Contempt Hearing, Ms. Evans averred that her administrative assistant, Georgia McCuin, accompanied Child C to Urgent Care, but could not say if anyone visited Child C once she was moved to the hospital. (D.E. 1488 at 130:21–131:20.)

PI initiated a Priority One physical abuse investigation of Child C by Staff 6. (D.E. 1412 at 50.) "This investigation became the twelfth pending concurrent investigation of abuse and neglect of Child C at C3 and the seventh allegation of Physical Abuse." (*Id.* at 50.) Nine months after intake, the physical abuse allegation was assigned a disposition of Inconclusive. (*Id.* at 50.) Per the Monitors, this disposition was inappropriate—the "allegation of Physical Abuse should have been substantiated with a disposition of Confirmed." (*Id.* at 50.) Indeed, notwithstanding the deficiencies in the investigation, the Monitors concluded that "the record contains a preponderance of evidence that Staff 6 hit child C, causing substantial injury to the child by fracturing her jaw." (*Id.* at 50.)

First, there was no question that Child C was seriously injured: "Medical personnel reported that Child C was diagnosed with a fractured jaw in two places after a C3 staff member dropped the child off at the hospital." (*Id.* at 50.)

Second, both Child C and a C3 Academy administrator identified Staff 6 as the perpetrator. "When the investigator asked Child C what Staff 6 'did to her,' Child C 'clearly stated' that Staff 6 hit her." (*Id.* at 50.) Likewise:

> An administrator of C3 Academy, who was interviewed six months after the intake, reported that another resident informed her that she observed Staff 6 hit Child C in the face with his fist multiple times the day before the child was taken to the hospital.[245] According to the administrator, after the child was physically abused by Staff 6, presumably the only staff member on-duty for that evening's shift, Child C reportedly went to bed with untreated and substantial injuries. The following day, a different staff member and the administrator observed blood and bruising on Child C's face. At this time, the administrator instructed a staff member to transport the child to a hospital and the administrator reportedly notified law enforcement. . . .[246] The administrator reported that Staff 6 was immediately terminated.

(*Id.* at 50 (footnote omitted).) Thus, "the investigative record contains a preponderance of evidence that Staff 6 used inappropriate and excessive force when he hit Child C and fractured her jaw in two places." (*Id.* at 50–51.)

The Monitors note that Child C's broken jaw could have been prevented had another PI investigation of physical abuse by Staff 6 been conducted and completed timely:

> The monitoring team's review identified that on February 24, 2022, two months prior to Staff 6 hitting and significantly injuring Child C, PI initiated a separate investigation . . . involving allegations that Staff 6 physically abused an adult resident at the group home. Because PI did not conduct a timely or adequate investigation of the Physical Abuse allegation related to the adult resident, Staff 6 continued to work at the group home and two months later was able to physically assault Child C.

(*Id.* at 51 (footnote omitted); *see also id.* at 51 n.76 (summarizing investigation of Staff 6's abuse of adult resident).)

---

[245] The Monitors note that C3 Academy refused to provide the resident's contact information, and it is "unclear whether the investigator could have obtained the witness's contact information independent of C3 Academy." (D.E. 1412 at 50 n.75.) In any event, the investigator did not interview the resident. (*Id.* at 50 n.75.) The Monitors also note that the refusal to provide contact information was not an isolated act of contumacy—"C3 Academy also failed to comply with the investigator's request for other documentation related to Child C and the allegations." (*Id.* at 50 n.75.)

[246] "The Monitors were not able to locate any documentation confirming that anyone at C3 Academy notified SWI of the critical incident of abuse and the investigator did not attempt to corroborate the administrator's claim that the group home notified law enforcement." (*Id.* at 50.)

Of course, like the other eleven abuse and neglect investigations related to Child C that remained pending when Child C's jaw was broken, this one was not without deficiencies, though the deficiencies here were "particularly egregious given the severity of the incident of Physical Abuse suffered by Child C." (*Id.* at 51.)

First, as noted above, the investigator did not interview a "key individual[]"—the C3 Academy administrator—until six months after intake.

Second, the investigator failed to "investigate the following allegations of Neglect made by the child's caseworker during the investigation. These allegations raised significant concern for the safety and well-being of the residents placed at C3 Academy." (*Id.* at 51.)

- The caseworker "reported that when law enforcement arrived at the group home a few hours after Child C arrived at the hospital, 'C3 Academy had completely cleaned out the house.'" (*Id.* at 51.) The investigator failed to ask questions that would clarify or elaborate on this statement. (*Id.* at 51.) Further, the investigator waited eight months to contact the responding police station to request additional information, and the investigative record did not include a police report. (*Id.* at 51.)

- The caseworker "reported that when law enforcement arrived at the group home they observed that one on-duty staff member had an ankle monitor and was reportedly 'out on bond for felony stalking' and another on-duty staff member was a registered sex offender."[247] (*Id.* at 51 (footnote omitted).) Yet the "investigator made no attempts to identify the names of these staff members, to determine whether they continued to be employed at C3 Academy and had access to residents, nor to corroborate or explore the

---

[247] The Monitors note that the registered sex offender may have been Staff 2 (Jonathan Jones) who was incarcerated for sexually assaulting his stepdaughter. (*Id.* at 51 n.77.) But "[d]ue to investigative failures," the registered sex offender's identity could not be determined from the investigative record. (*Id.* at 51 n.77.)

information about the staff members' alleged criminal charges." (*Id.* at 51.) Indeed, the investigator merely "documented . . . that 'It is a concern that the agency is employing registered sex offenders.' The investigator did not appear to take any action regarding this serious safety concern." (*Id.* at 51.)

- The caseworker "reported that C3 Academy terminates staff members after allegations of abuse or neglect are made against them" and will rehire the staff members "after an investigation has closed." (*Id.* at 52.) "The investigator did not investigate this allegation and did not appear to discover evidence that, in this instance, it was not accurate." (*Id.* at 52.)

- The caseworker "reported that C3 Academy did not provide her with any of Child C's paperwork, medications, or belongings after Child C left the placement. The caseworker reported that she threatened to call law enforcement in order for the group home to provide Child C's medications, which she ultimately received. The group home never provided Child C's belongings or paperwork." (*Id.* at 52.)

- Finally, the caseworker "reported in her intake report that according to hospital personnel, a staff member from C3 Academy dropped the child off at the hospital and departed without providing additional information on behalf of the child, leaving the child alone. She also indicated that she learned of the child's status through hospital personnel, as opposed to notification from anyone at the placement. The investigative record failed to clarify or confirm the duration of time C3 Academy left the child alone at the hospital with a fractured jaw nor whether anyone attempted to notify the caseworker or law guardian." (*Id.* at 52.)

But PI's complete failure to protect Child C (and the other residents of C3 Academy) is perhaps best exemplified by the statement of "a detective for the local police department," who reported to the investigator that "the department was presently attempting to 'shut down' C3 Academy." (*Id.* at 52.) Remarkably, it seems that the detective's statement fell on deaf ears—at the very least, "the investigator did not document that she took any additional action to safeguard the children and adults still placed at C3 Academy." (*Id.* at 52.)

The intake was received on April 28, 2022. (*Id.* at 52.) One extension was approved, but was approved more than thirty days after the intake (on June 8, 2022) (*id.* at 52), and was thus untimely. The extension were also inadequate because the documented reason—"Extraordinary Circumstances" (*id.* at 52)—does not demonstrate "good cause." And, of course, the investigation was not completed until February 7, 2023, nine months after intake. (*Id.* at 52.) For all these reasons, the investigation violated Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of physical abuse was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child C's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10. Indeed, this significantly deficient investigation was conducted with clear and utter disregard for Child C's safety.

This investigation and the underlying events were discussed at the Contempt Hearing. Ms. Evans testified that there was "no doubt" in her mind that Staff 6 punched Child C because "[t]he evidence was there that the child had been abused." (D.E. 1488 at 103:24; 104:12.) Indeed, Ms.

Evans terminated Staff 6's employment and stated he was in police custody following the incident. (*Id.* at 115:1–3.) Ms. Evans claimed she appealed the disposition of Inconclusive (*id.* at 103:8–11), but the Monitors found nothing to indicate that an appeal was filed by Ms. Evans or anyone at C3 Academy (*id.* at 196:15–197:2).

This incident is also further evidence that direct caregivers are not reporting abuse and neglect. Child C's records indicate that on April 21, 2022, one week before the incident was reported by a caseworker to SWI, Ms. Evans filled out a "Nurse Services Delivery Log-Billable Activities" for Child C stating:

> [Child C] came to the [day hab] this am instead of going to school. She presented w/the lt side of face swollen. It appeared that she had a dental abscess. On further examination, bruising was seen at the lt temple and she c/o pain. . . . Mr. Byron was the caregiver the evening before and was questioned. He informed us she had an altercation w/another client in the GH. Upon further investigation, Mr. Byron's account was completely fabricated. He caused the swelling to her face . . . An attempt to notify APS via phone was made.

(PX 117 at 53.) The Monitors' review of SWI records revealed no phone call to SWI by Ms. Evans and her staff until the caseworker reported the incident.

\*     \*     \*

As noted by the Monitors, all of the investigations had extensive, unexplained delays which created a risk of harm for Child C and other residents in the placement because alleged perpetrators remained free to continue causing harm while investigations were pending. (D.E. 1412 at 29.) Staff 6 broke Child C's jaw nearly one year after she was tasered, seven months after she was locked in the bedroom, and five months after her outcry of sexual abuse by a staff member who was subsequently incarcerated for sexually abusing his stepdaughter. (*Id.* at 52.)

Further, PI investigators consistently failed to consider or discuss whether administrators at C3 Academy were neglectful, particularly for a failure to "provide a safe environment for [Child C], including the failure to maintain adequate number of appropriately trained staff, if such failure

results in physical or emotional injury . . . to [Child C] or which placed [Child C] at risk of physical or emotion injury or death." *See* 26 Tex. Admin. Code § 711.19(b)(3).

Certainly, Ms. Evans' staffing practices contributed to the unsafe environment at C3 Academy. Ms. Evans explained that C3 Academy had a "revolving door" of staff members coming and going. (D.E. 1488 at 76:6–8.) Sometimes, she would rehire former staff that she had fired for "inappropriate conduct." (*Id.* at 76:9–15.) One such staff member was Rodney McCuin, identified as Staff 3 in PI investigations involving Child C:

> Q. [BY MR. YETTER] For example, Mr. McCuin, you terminated him two or three times?
> A. I did.
> Q. . . . . But then you hired him back two or three times[248] because he promised to do better?
> A. He promised not to bring women in at night.
> Q. Got it. And his – the thing he did that was wrong is that he had inappropriate sexual relationships at your – or interactions with women at your facilities,[249] at the homes?
> A. At the group homes.
> Q. And, of course, he was married,[250] too, wasn't he?
> A. He was.
> Q. And these were women that were not his wife, right?
> A. Right.

(*Id.* at 76:16–77:5.) Thus, Ms. Evans repeatedly rehired a man who conducted extramarital affairs instead of doing his job—caring for the children and adults with disabilities who were present in the residence. (*See id.* at 74:10–13.) Apparently, "bringing women in at night and having sex with them" (*id.* at 80:21) was acceptable at C3 Academy.

---

[248] This is consistent with the caseworker's report, noted in the Monitors' discussion of the twelfth investigation into abuse of Child C, that "C3 Academy terminates staff members after allegations of abuse or neglect are made against them; however, the group home will then hire these same staff back after an investigation is closed." (*Id.* at 52.)

[249] This group home was a three-person home, presumably with three bedrooms, one for each resident. Unless Mr. McCuin was using one of the common areas to conduct his extramarital affairs, it seems likely that two residents were placed together in one room while Mr. McCuin and his paramours commandeered one of the resident's bedrooms.

[250] Mr. McCuin's wife, Georgia McCuin, was Ms. Evans' "number two person in the business." (*See* D.E. 1488 at 120:5–17.)

So too was molesting the clients. Ms. Evans explained that female clients complained that Mr. McCuin "had touched them inappropriately." (*Id.* at 81:16–24.) Yet she did not fire him—quite the contrary, her testimony indicates that he continued to "assist clients with bathing, dressing, and things to that nature."[251] (*Id.* at 82:6–7.) Ms. Evans disbelieved the complaints because these women had made similar complaints at other facilities. (*Id.* at 82:23–83:1 ("THE COURT: Okay. Now, why did you not believe the women that complained about inappropriate touching? THE WITNESS: Because in our receiving of the history of these clients, that was typical of their behaviors . . . .").)

Ms. Evans also knew about Child C's outcry that Mr. McCuin "touched her inappropriately." (*See id.* at 83:10–14.) But, Ms. Evans did not report the outcry to SWI because Child C "had the typical behavior of undressing completely in front of everybody in the day hab,"[252] and Mr. McCuin was merely "trying to put a towel or something on her." (*Id.* at 83:20–21; 84:16–17.) Ms. Evans noted that "[t]here were other male staff" who "were trying to cover" Child C as well. (D.E. 1488 at 84:21–25.) She did not explain how this fact made Child C's outcry less credible. Overall, SWI received five reports of ANE allegations of Child C for which Mr. McCuin was listed as the alleged perpetrator. (*See* D.E. 1486-3 (naming Staff 3 as the alleged perpetrator); D.E. 1488 at 101:2–6 (Ms. Evans verifying Staff 3 to be Mr. McCuin).)

Ms. Evans described Mr. McCuin and some of her other staff as "unsavory employees," and observed that the "child and adult care industry" "kind of reeks of scamsters and schemers.". (D.E.

---

[251] Ms. Evans stated that Mr. McCuin did not bathe female clients, he would only "make sure that they had their towels and toiletries." (*Id.* at 82:13–15.) She did not, however, elaborate on his role in "dressing" clients, or what "other things of that nature" he was responsible for.

The Court notes that since the C3 Academy group homes only had one staff member present during the nights and mornings, the times when residents would be showering, the residents would be supervised by a male staff member. Moreover, Ms. Evans was unfazed when she said that naked females were supplied with towels and supervised by men.

[252] A "Patient Safety Plan" included in Child C's record filled out during a stay at the hospital states that undressing is one of the "Warning Signs" that she may be "nearing an emotional crisis." (*See* PX 117 at 107.)

1488 at 86:7–16.) Certainly, Ms. Evans proves the veracity of this statement through her own example.

Further, Ms. Evans testified that she did not report Child C's outcries to SWI because either she disbelieved them, or because the outcry would have been reported to Adult Protective Services (APS),[253] which is the same number as SWI. (*Id.* at 244:6–7.) The Monitors reviewed Child C's records and concluded that neither Ms. Evans nor her staff called in a report to SWI and APS, despite the multiple ANE allegations that arose during Child C's placement at the facility. (*Id.* at 244:8–14.)

Even Mr. Pahl was able to agree that improper delays and deficient investigations are harmful to children like Child C:

> THE COURT: Okay. So what did the -- what do you think the delay -- she stayed in that same place the whole time until she was dumped at the hospital with a broken jaw, alone. Now, what do you think the delay of all your investigations -- how do you think that affected Child C?
> THE WITNESS: I would say that it did not affect the child positively.
> THE COURT: Oh, my.
>
> . . . .
>
> Q.[BY MR. YETTER]: Well, you know that the Court's Remedial Orders require either 24-hour face-to-face interviews or 72-hour face-to-face interviews. You know that, right?
> A. Yes, sir.
> Q. So if it's months late, it's completely in violation of the Court's Remedial Orders, right?
> A. That's correct.
> Q. And it's dangerous for the child?
> A. It can be, yes, sir.
> THE COURT: Well, it turned out to be dangerous, didn't it? Can you answer that? Just look at Child C. It was dangerous. The delays were dangerous to her, weren't they?

---

[253] According to the PI Handbook, DFPS's APS has the following jurisdiction:

[APS] investigates allegations of abuse, neglect, and financial exploitation of persons that: are aged 65 or older, or are aged 18-65 and have mental, physical, or developmental disabilities that substantially impair their ability to live independently or provide for their own self-care or protections; and reside in the community, e.g., private homes, unlicensed adult foster homes, unlicensed board and care homes, etc.

(DX 34 at 25.)

THE WITNESS: It appears so, yes, ma'am.

THE COURT: They kept her in a dangerous placement for a year after 12 outcries, didn't it?

THE WITNESS: It appears so, yes, ma'am.

(D.E. 1487 at 136:1–8; 143:14–144:4.)

C3 Academy remained open for more than a year after Child C was removed from the placement, despite substantial evidence that staff members and other individuals in the placement put her safety at risk. Doctor Miller found it incomprehensible that the State allowed C3 Academy to operate for nine years:

> Q. Based on your knowledge of the child welfare system and how safe homes are run, was – did you have – were you surprised that the group homes run by C3 Academy were allowed to stay in this system in Texas for nine years with the kind of practices that they told us about today?
>
> A. That's just incredible. It's impossible to understand that.
>
> . . . .
>
> Q. [Ms. Evans] said [PI] wouldn't come out for six to 12 months. And then we saw that with Child C in each of the investigations how long it took. Do you have any opinion about that?
>
> A. Well, once again, it – it's just intolerable. And, again, you're talking about developmentally delayed kids. The urgency and the need for a sense of urgency with those kiddos to get in there, get the information that they have available, and do that in a very sensitive way is just crucial. You wait that much time and you're not going to get any information. And the kids are put at increased risk.

(D.E. 1488 at 266:5–11; 266:25–267:9.)

Although the delay was substantial, HHSC revoked Ms. Evans' certification to run group homes under the HCS program in 2023, and no children will be placed at C3 Academy any longer.

(*See* D.E. 1488 at 73:24–74:1.)

### b.  Child A

Child A is a fifteen-year-old PMC child with an IQ of 56.[254] (D.E. 1412 at 11.) According to Child A's Plan of Service she has Fetal Alcohol Spectrum Disorder, Persistent Depressive Disorder, Intellectual Disability, Mild, Disruptive Mood Dysregulation Disorder, and Intermittent Major Depressive Episodes. (*Id.* at 11.) She was placed at various HCS facilities operated by Educare from May 11, 2020 to April 30, 2021.[255] (*Id.* at 11.) During this year, "Educare moved her among at least four of its different group home locations." (*Id.* at 11.) Five of the six abuse and neglect investigations reviewed by the Monitors "appear to have occurred at the final Educare location." (*Id.* at 11.) PI opened six investigations of alleged abuse and neglect of Child A between March 7, 2021 and May 4, 2021. (*Id.* at 11.) Child A remained at Educare group homes for more than seven weeks after the first abuse and neglect allegation was reported. (*Id.* at 11–12.)

### i.  Investigation 1

On March 7, 2021 a DFPS caseworker reported allegations of physical abuse, emotional abuse, and neglect of Child A that resulted in a Priority One investigation. (*Id.* at 13.) Child A made an outcry that three days prior, a staff member (Staff 1) "provided her with money and allowed her to walk alone to a nearby store where she purchased a bottle of Tylenol containing 24 pills (*Id.* at 13.) Child A returned to the placement, went to her bedroom, and ingested all 24 pills. (*Id.* at 13.) "[A]t the time the intake report was made, the child was at a hospital for ingesting the pills." (*Id.* at 13.) An incident report written by an unnamed staff member documented that when Child A

---

[254] The Monitors reported the IQ of the children "due to its significance to the discussion about the investigative deficiencies surrounding child interviews and assessment of child safety and risk, though it is not the only relevant factor." (D.E. 1412 at 11 n.23.)

[255] The Monitors reported that Child A's last day at Educare was listed on the placement log as May 10, 2021, but her actual last day at the Educare facility was April 30, 2021. (*Id.* at 11 n.26.) Child A appears to have been hospitalized for "ongoing mental and behavioral health issues" from April 20, 2021 to May 10, 2021. (*Id.* at 11 n.26.) Around September 1, 2022, Child A was placed at another HCS group home where she was an alleged victim in one open neglect investigation since January 5, 2023. (*See id.* at 11 n.24.) She remained at this placement as of September 1, 2023. (*Id.* at 11 n.24.)

returned from the store, she "showed a 20oz soda and a small bottle that contain[ed] 24 pills of migraine medication. Staff told her she can't have it[,] she said she don't give a fuck[,] she keeping them and that's when she left to walk to the other group home again after the site manager told her not to leave. She then walked back in the house[,] walk to the backyard and said she wants to die and that she already took all the medications." (*Id.* at 14.)

When the caseworker went to visit Child A at the hospital, Child A made an outcry that, on an unknown date, a staff member instructed Child A to sleep in the same bed as another individual in the home (Individual 1, age unknown)[256] and she complied. (*Id.* at 13.) The caseworker also reported that Child A disclosed she engaged in self-harming behavior by cutting herself with a plastic pen while at the placement, and the caseworker observed scratches on Child A's wrists. (*Id.* at 13.) When a staff member (Staff 3) at Educare observed her self-injurious behavior, Staff 3 "yelled at [Child A] to stop cutting herself" and threatened to hit her. (*Id.* at 13.) Finally, Child A "told the reporter that staff members did not provide her with her morning medications." (*Id.* at 13.)

PI initiated a Priority One investigation of emotional abuse, neglect, and physical abuse of Child A by three named staff members and two unknown staff members.[257] (*Id.* at 13.) The investigator assigned a disposition of Unconfirmed to all the allegations except the allegation that staff instructed Child A to sleep in the same bed as Individual 1, which was given a disposition of Other.[258] (*Id.* at 13.) The Monitors disagreed; due to the "substantial investigative deficiencies"

---

[256] The Monitors reported that the investigator in this case failed to determine or document whether this individual was an adult or a child; however, Child A provided the first name of the individual and the Monitors discovered the name in another investigation at Educare that suggests the individual is an adult, but the monitoring team could not confirm this information. (*Id.* at 13 n.31.) This is yet another example of a critical lapse in investigating the allegation and assessing the risk to Child A.

[257] The Monitors were unable to find any documentation in the record that any staff member or administrator called-in these incidents to SWI. (*Id.* at 13.)

[258] The disposition of "Other" was made because the PI investigator concluded that PI did not have jurisdiction over the neglect allegation according to Title 26 of the Texas Administrative Code, § 711.7. (*Id.* at 13.) But the

discussed below, the Monitors concluded that "a disposition of the allegations cannot be determined." (*Id.* at 13.)

First, the investigator's interviews with staff members were severely delayed—taking place twenty-one months after the investigation commenced—and failed to gather vital information. Further, the investigative record contained an incident report (quoted from above) by an unnamed staff member documenting Child A's "departure from the home and ingestion of pills, during which time the staff member documented that he was the only staff member on site." (*Id.* at 14.) Yet, during the interviews, the investigator failed to reference this incident report. (*Id.* at 14.) Indeed, the investigator "did not attempt to identify the staff member who authored the . . . incident report nor the person responsible for" Child A's "supervision at the time of the elopement and self-harming behavior. Instead, the investigator's interviews with staff members and her documentation thereof appeared to lack detailed questioning about the alleged incident, including a failure to identify which staff member(s) was on duty." (*Id.* at 14.)

Second, the Monitors noted that the investigator failed to gather other information necessary to "inform an assessment of the allegation of Neglect" (*id.* at 14):

- "How many children or other residents was the single, on-duty staff member responsible for supervising at the time of the incident? What was the group home's contractual staff-to-client ratio and was the group home in compliance with this ratio at the time of this incident?" (*Id.* at 14.)

- "What efforts, if any, did a staff member make to prevent the child from leaving the placement, particularly given that the child possessed a bottle of pills and had a documented history of self-harming behavior and suicidal ideation? Additionally,

---

investigator failed to identify which provision of § 711.7 warranted the conclusion that PI was without jurisdiction. (*Id.* at 13 n.32.)

given the child's history of frequent elopement, what safety precautions had the group

home implemented to prevent, as best as possible, the child from eloping?" (*Id.* at 14.)

- "Given that the child left the placement with pills, did the staff member notify the other
  HCS Group Home that the child was walking toward the home and had pills with her?"
  (*Id.* at 15.)

The investigator assigned a disposition of Unconfirmed despite failing to acquire (or even

attempt to acquire) this critical information. The Monitors note that the disposition appears to have

been based solely on "evidence that the child was not subject to heightened supervision at the time

of the incident. Statements and conclusions in the investigative record seemed to suggest that any

acts and omissions by staff members did not rise to the level of Neglect when, as here, the child

eloped and self-harmed so long as a staff member adhered to her 'routine' supervision level."[259]

(*Id.* at 15.)

Third, despite "the record includ[ing] documentation" that Child A "exhibited emotional

dysregulation, suicidal ideation leading to inpatient hospitalization and . . . a serious incident of

self-harm," the investigator did not "explore or discuss" "whether Educare failed to 'establish or

carry out an appropriate individual program plan or treatment plan' for Child A that resulted in or

placed her at risk of physical or emotional injury or death." (*Id.* at 15 (quoting 26 Tex. Admin.

Code § 711.719(b)(1)).)

Fourth, the investigator learned from an Educare case manager that despite Child A's "ongoing

high-risk behaviors," she "did not have a Behavior Support Plan while at the placement nor did

staff members have 'special training' or instruction about caring for" her. (*Id.* at 15.) Yet the

---

[259] The Monitors explain that under "routine" supervision, staff were not required to maintain either one-to-one or line of sight supervision. (D.E. 1412 at 15 n.33.) Thus, "[w]hile supervising Child A, a staff member was permitted, according to facility documentation, to care for and supervise other residents and this care for other residents may occur in a separate room or part of the HCS Group Home from where Child A was located." (*Id.* at 15 n.33.)

investigator "did not discuss or further explore whether" these failures were "tantamount to or at least evidence of Neglect due to a failure by Educare 'to provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff' that resulted in or created risk of physical or emotional injury or death for this child." (*Id.* at 15 (quoting 26 Tex. Admin. Code § 711.719(b)(3)).)

The Monitors concluded that due to the lengthy investigative delay, the investigation was also deficient as to "the remaining allegations of Physical Abuse, Emotional Abuse, and Neglect related to the administration of medication and instructing the child to sleep in a bed with another resident." (*Id.* at 15.) Child A later denied many of the disclosures she made to her caseworker regarding these allegations, and "the investigation's delay of one year and nine months made it impossible to reconcile the child's outcries to her caseworker (the reporter) with her statements to the investigator." (*Id.* at 15.) "For example, regarding the allegation her medication was not administered appropriately, the investigator's lack of activity precluded the opportunity to probe the records at the group home and timely review the information with staff." (*Id.* at 15–16.)

Finally, the Monitors disagree with the investigator that PI lacked jurisdiction over the allegation that Child A was instructed to sleep in a bed with another resident, as it was "an allegation of Neglect and should have been investigated for placing the child at risk of physical or emotional injury." (*Id.* at 16 (quoting 26 Tex. Admin. Code § 711.719(a)).)

The intake was received on March 7, 2021. (*Id.* at 16.) The one approved extension was inadequate, both because it was untimely (the "extension was approved on September 14, 2022," over eighteen months after the intake) and because the there was no demonstration of good cause (the "record did not include any explanation for the extension"). (*Id.* at 16.) And, of course, the investigation was not completed until December 21, 2022, twenty months after intake. (*Id.* at 16.)

For these reasons, the investigation violated Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegations of abuse and neglect were not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child A's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### *ii.   Investigation 2*

On April 14, 2021, the parents of an eleven-year-old child (Child B, not in DFPS care) reported that her son came to school with cuts on his wrists that he said were caused by Child A. (D.E. 1412 at 16.) Child B also informed his mother that Child A had "cuts all over her wrists." (*Id.* at 16.) The children were at Educare when the incident occurred. (*Id.* at 16.)

PI initiated a Priority One neglect investigation related to Child A and Child B by an unknown staff member. (*Id.* at 16.) After twenty-one months, the investigator assigned a disposition of Unconfirmed. (*Id.* at 16.) The Monitors disagreed; given the "substantial investigative deficiencies" noted below, "a disposition for the Neglect allegation related to Child A cannot be determined." (*Id.* at 16.)

First, Child B verified that "Child A used a broken piece of glass to cut his wrist," that "he and Child A were in the group home's backyard at the time of the incident," and that "staff members were allegedly inside the facility while the children were allegedly cutting one or both of their wrists outside." (*Id.* at 17.) Yet, "[d]uring the investigation, the investigator did not attempt to establish the date and duration of time Child A and Child B were reportedly alone outside in the

backyard using glass to cut Child B's wrist and possibly Child A's wrist; nor how Child A, a child known to self-harm, had access to a broken piece of glass." (*Id.* at 17.)

Second, the investigator failed to interview staff members until eighteen months after the intake, so they "were unable to recall the alleged incident with any detail."[260] (*Id.* at 17.) They were, however, able to recall "that the children were not subject to a heightened level of supervision" at the time of the incident; on this basis, "the investigator reported no concern for Neglect." (*Id.* at 17.)

The intake was received on April 14, 2021. (*Id.* at 17.) The one approved extension was inadequate because the documented reason—"Extraordinary Circumstances" (*id.* at 17)—does not demonstrate good cause. And, of course, the investigation was not completed until January 20, 2023, twenty-one months after intake. (*Id.* at 17–18.) For these reasons, the investigation violated Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child A's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iii. *Investigation 3*

Two days after the prior intake, on April 16, 2021, a law enforcement officer reported that Child A self-harmed and eloped from the placement. (D.E. 1412 at 18.) The officer reported that

---

[260] The investigator conducted timely interviews with the case manager, administrator, and nurse but none of these individuals were directly involved in the alleged incidents. (*Id.* at 17 n.40.)

a staff member at the group home contacted law enforcement to report Child A as a runaway. (*Id.* at 18.) The officer also noted that Child A informed the officer "that she cut herself but that she did not want to kill herself, she 'only wanted to feel the cuts.' The child reportedly had superficial wounds to her right wrist." (*Id.* at 18.) This incident was not reported by any caregivers or staff members.

PI initiated a Priority Two neglect investigation related to Child A by an unknown staff member. (*Id.* at 18.) Twenty-one months later, the investigator assigned a disposition of Unconfirmed. (*Id.* at 18.) The Monitors disagreed; because of the "substantial investigative deficiencies" "evidenc[ing] a serious disregard for child safety," the Monitors concluded that a disposition cannot be confirmed. (*Id.* at 18.)

First, the investigator failed to make timely face-to-face contact with Child A. On the day of the intake, the investigator attempted to make contact with Child A in connection with an earlier intake. (*Id.* at 18.) But when the investigator arrived at the placement, Child A was in an ambulance due to a different incident of self-harm. (*Id.* at 18.) The investigator spoke with her briefly, but "was not able to speak to Child A about the allegations" in this investigation (*id.* at 17 n.38), and "did not document whether he observed any injuries on the child's body" (*id.* at 18). Three days later, the investigator made another attempt to conduct a face-to-face interview with Child A at the placement, but the interview did not occur at that time and the investigator did not document the reason.[261] (*Id.* at 18.) Thus, the investigator failed to make face-to-face contact with Child A as required by Remedial Order 8. (D.E. 606 at 3.)

Over the following five months, "the investigator attempted" but apparently failed to "interview Child A at her placement." (D.E. 1412 at 18.) On December 8, 2022—twenty months

---

[261] The Monitors noted that Child A was placed at a behavior unit of a local hospital at this time. (*Id.* at 18.)

after the intake—an investigator finally conducted an interview with Child A using FaceTime. (*Id.* at 18.) Once again, due to the extensive delay, Child A had a difficult time remembering the incident, which staff member was responsible for her during that time, and the reasons for her self-harm and elopement. (*Id.* at 19.) "In the absence of a timely face-to-face interview, the investigator failed to assess and address, as appropriate, the child's safety at the placement, observe the child's alleged injuries and gather information from the child about the allegation of Neglect." (*Id.* at 19.)

Second, severely delayed interviews with staff members—conducted twenty months after the intake—likewise inhibited the investigation, as they could not recall the incident with any detail. (*Id.* at 19.) Thus, the investigator "was unable to identify an alleged perpetrator who was responsible for Child A's supervision at the time of the incident." (*Id.* at 19.) On the other hand, the staff members were able to recall that Child A was not subject to increased supervision at the time of the incident. (*Id.* at 19.) "The investigator documented and appeared to adopt the view of Child A's case manager at Educare that Child A was not likely subject to 'abuse or neglect because there was not an increased level of supervision that required staff to see [Child A] at all times.'" (*Id.* at 19.)

The Monitors noted that the substantial delay made it difficult for the investigator to determine whether Educare failed to "establish or carry out an appropriate individual program plan or treatment plan" for Child A that resulted in placing her at risk of physical injury or death.[262] (*Id.* at 20.)

The intake was received on April 16, 2021. (*Id.* at 20.) The one approved extension was inadequate because the documented reason—"Extraordinary Circumstances"[263] (*id.* at 20)—does

---

[262] *See* 26 Tex. Admin. Code § 711.719(b)(1).

[263] The PI Handbook defines extraordinary circumstances as "[A]n unexpected event or external factor that delays the completion of an investigation; it is something that could not have been prevented even if reasonable measures had been taken." These circumstances include: "inclement weather or natural disasters; a death in the primary

not demonstrate good cause. And, of course, the investigation was not completed until January 12, 2023, twenty-one months after intake. (*Id.* at 20.) For these reasons, the investigation violated Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child A's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iv.  *Investigation 4*

Six days after the prior investigation began, on April 22, 2021 a law enforcement officer reported that he was dispatched to the Educare placement because of a "suicidal person"—a staff member contacted law enforcement "because Child A was cutting herself with a knife and the staff member was unable to recover it from the child."[264] (D.E. 1412 at 20.) When law enforcement arrived they were able to take the knife away from Child A, and then observed that she had "carved the word 'fake' into her left leg." (*Id.* at 20.) Thereafter, an officer accompanied the child and EMS paramedics to the hospital. (*Id.* at 20.) This incident was not reported to SWI by any caregivers or staff members.

PI initiated a Priority Two neglect investigation related to Child A by Staff 4, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 20.) The Monitors disagreed; due to the

---

investigator's family; excessive workload due to PI employee vacancies or an uncommon rise in intakes; or IMPACT errors that prevent the investigation from being closed." (DX 34 at 148; DX 39 at 161; DX 40 at 165.)

[264] These allegations were related to the incident that occurred on April 16, 2021 when Child A was observed in the ambulance by the investigator. (D.E. 1412 at 20.)

"substantial investigative deficiencies" described below, "a disposition of the Neglect allegation related to Child A cannot be determined." (*Id.* at 20.)

First, the investigator failed to make timely face-to-face contact with Child A. The Monitors note that the investigator attempted to make timely contact with Child A at her placement, but she was in the hospital at the time "and the investigator did not attempt to interview the child at the hospital." (*Id.* at 21 n.44.) Thus, face-to-face contact did not occur until "six days after the date of the intake" (*id.* at 21), in violation of Remedial Order 8 (D.E. 606 at 3).

Second, the investigator failed to assess several crucial facts:

- "Given Child A's frequent engagement in self-harming behavior at the placement, which at this point was well-known and well-documented, the investigator did not assess whether the administrators of the HCS Group Home implemented any preventive safety measures to reduce the likelihood that the child could gain access to both a knife and a glass jar in a single day and then use one of those items to self-harm." (D.E. 1412 at 21.)

- "The investigator did not assess how often Staff 4 was required to conduct checks on Child A and whether Staff 4 adhered to this requirement on the date of the incident." (*Id.* at 21.)

- "The investigator did not assess how long the child went unsupervised in the backyard when she cut herself with the jar." (*Id.* at 21.)

- "The investigator did not assess why the child was permitted to be alone in the backyard after having acquired a knife within the past hour requiring intervention from law enforcement to recover it." (*Id.* at 21.)

The investigator likewise failed to consider, in her assessment of the neglect allegation, Staff 4's statements evidencing administrative failures. Specifically, Staff 4 explained that "she was the only staff member on duty" on the day of the incident "and that she was also responsible for the care of another resident who was attempting to elope from the placement." (*Id.* at 21.) Further,

> Staff 4 reported that she had asked the administrators of the placement "constantly" for an additional staff member to assist in the care of the residents; however, the placement administrators had not yet hired another staff member. Staff 4 also reported that while she was aware of Child A's history of self-harming behavior, administrators did not provide her with any training related to Child A's care.

(*Id.* at 21.) Of this, the investigator merely stated that "[i]t is a concern that there was no record to show that [Staff 4] was trained on [Child A's] Special Needs or Person-Directed Plan." (*Id.* at 21.) Thus, "the investigator failed to discuss or further explore whether Educare administrators were neglectful due to their 'failure to provide a safe environment for [Child A], including failure to maintain adequate numbers of appropriately trained staff' that resulted in or created risk of physical or emotional injury or death for this child." (*Id.* at 22 (citing 26 Tex. Admin. Code § 711.719(a)-(b)(3)).)

Third, the investigator noted that, despite the now well-documented risk of self-harm, Child A was still "not subject to any heightened supervision." (*Id.* at 22.) Further, a case manager reported to the investigator "that the placement personnel were presently in the 'observation and data collection stages' of creating Child A's Behavior Support Plan and once the plan was completed, the staff member(s) responsible would conduct a meeting and potentially set certain restrictions, such as 'locked sharps' and an increased level of supervision." (*Id.* at 22.) Yet the investigator "failed to consider whether Educare failed to 'establish or carry out an appropriate individual program plan or treatment plan' for Child A that resulted in or placed her at risk of physical or emotional injury or death." (*Id.* at 22 (citing 26 Tex. Admin. Code § 711.719(a)-(b)(1); 26 Tex. Admin. Code § 711.423(c)).)

The investigation was completed on June 15, 2021, seven weeks after the intake was received. (*Id.* at 22.) An extension was approved thirty days after intake but the documented reason—"A statement from the Area Site Supervisor is required to make a determination in this case" (*id.* at 22)—failed to establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Indeed, it failed to show good cause under PI's own policies. (*See* DX 39 at 161 (listing "reasons [that] constitute good cause"); DX 40 at 164–65 (same).) Thus, the investigation failed to comply with Remedial Order 10. (*See* D.E. 606 at 3.)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child A's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### *v.   Investigation 5*

On May 1, 2021, approximately one week after the prior investigation began, a law enforcement officer reported that when law enforcement was dispatched to the placement, they found Child A "emotionally upset and argumentative." (D.E. 1412 at 23.) The officer observed "numerous cuts" on Child A's forearms and thighs, most of which "seemed older, although some appeared new." (*Id.* at 23.) The officer observed that "Child A was hiding a small orange knife on her person," which she surrendered at law enforcement's request. (*Id.* at 23.) Law enforcement then "instructed the on-duty staff member to hide all knives and scissors from" Child A. (*Id.* at 23.) This incident was not reported to SWI by any caregivers or staff members.

PI initiated a Priority Two neglect investigation related to Child A by Staff 5, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 23.) The Monitors disagreed; due to the

"substantial investigative deficiencies" described below, "a disposition of the Neglect allegation related to Child A cannot be determined." (*Id.* at 23.)

First, the investigator failed to gather several pieces of "pertinent information necessary for the investigator to make an informed disposition for the allegation of Neglect" (*id.* at 23):

- "The investigative record showed that Child A likely obtained the knife from school and hid the knife in her room." (*Id.* at 23.) Yet despite Child A's "recent self-harming behavior, the investigator did not determine or inquire whether Educare administrators provided training for staff members or communicated to them policies or directives to minimize the risk that a harmful object, such as a knife, could be hidden in the child's room." (*Id.* at 23.)

- The investigator determined that Staff 5, "who was responsible for" Child A's "supervision on the day of the incident," had not previously worked with Child A. (*Id.* at 23.) Further, "the investigative record showed that [Educare] failed to adequately train Staff 5 on Child A's Person-Directed Plan and special needs prior to her shift caring for Child A." (*Id.* at 23.) Yet the investigator "did not appear to consider Educare's failure to" provide adequate training. (*Id.* at 23.)

Second, the investigator learned that Child A continued to be "on 'routine' supervision" which, as noted earlier, "permitted a staff member to complete other tasks while supervising the child and assist other residents who were not in the same room as Child A." (*Id.* at 24.) The investigator also learned that Educare "was still in the process of creating Child A's Behavior Support Plan." (*Id.* at 24.) Yet, the investigator failed to "question the case manager regarding when Child A's Behavior Support Plan was required to be completed," "what actions the HCS placement had taken to ensure Child A's safety" in the meantime, or whether Edcuare had adjusted "Child A's

supervision." (*Id.* at 24.) The Monitors also note that, as with the other investigations, "the investigator failed to consider whether personnel at Educare failed to 'establish or carry out an appropriate individual program plan or treatment plan' for Child A that resulted in or placed her at risk of physical or emotional injury or death." (*Id.* at 24 (citing 26 Tex. Admin. Code § 711.719(b)(1)).)

Third, "Staff 5 reported that she was not able to properly supervise Child A and did not have the training to do so, but again this investigator failed to assess whether Educare administrators had evidenced a failure to 'provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff' resulting in or creating risk of physical or emotional injury or death for this child." (*Id.* at 24 (citing 26 Tex. Admin. Code § 711.719(b)(3)).)

The investigation took over two months to be completed with no approved extensions (*id.* at 24); one extension was requested but was never approved (*id.* at 24 n.52). Thus, the investigation violated Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child A's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

*　　*　　*

During the eleven months Child A was placed at various Educare facilities, PI opened six investigations of alleged ANE related to Child A. (D.E. 1412 at 11–12.) Most of the investigations

sat dormant for long periods of time—the longest investigation remained open for twenty-one months before completion. (*Id.* at 12.) Four of the six investigations contained documented extensions, but the investigations were not completed within the extended time frame. One of the investigations had no documented extension and was not completed within the time frame required by the remedial orders, and one investigation had a documented extension and was completed within the extended time frame. (*See id.* at 12–27.) All the reports made to SWI regarding Child A were called in by non-caregivers, with caseworkers, law enforcement officers, and another child's (not in foster care) parents reporting the ANE allegations to SWI. (*See id.* at 12–27.) The deficiencies highlighted are severe and egregious and lead to the Court's finding that HHSC is not "ensur[ing] that reported allegations of child abuse and neglect . . . are investigated; commenced and completed on time . . . and conducted taking into account at all times the child's safety needs." (D.E. 606 at 2 ¶ 3.)

### c.   Child D

Child D, a fifteen-year-old PMC child with an IQ of 47,[265] was placed at Exceptional Employment Service, an HCS Group Home, on April 23, 2018. (D.E. 1412 at 53.) Child D is diagnosed with Autism Spectrum Disorder, Moderate Intellectual Disabilities, speech impairment, Attention-Deficit/Hyperactivity Disorder, urinary incontinence, and Mitochondrial Metabolic disease which causes gastrointestinal and respiratory problems. (*Id.* at 53.) Child D's mental age is between that of a six- to nine-year-old; his records indicate that he is primarily non-verbal and is "only able to use a few words and gestures." (*Id.* at 54 n.79.) The Monitors reviewed three abuse and neglect investigations of Child D that were closed with a disposition of Unconfirmed. (*Id.* at

---

[265] HHSC characterizes the intellectual functioning of children with an IQ between 40 to 55 as: "Children experience a marked difference in communicative behavior from their peers and their social judgment and decision-making abilities are limited Children in this group reach elementary academic skill development." (D.E. 1412 at 11 n.23.)

53.) As of September 19. 2023, Child D remained at Exceptional Employment Service—twenty-three months after the first abuse and neglect allegation of Child D was reported at the placement. (*See id.* at 53.)

### i. *Investigation 1*

On October 20, 2021, a law enforcement officer reported an allegation of neglect of a child (age 13, not in DFPS care) at Exceptional Employment Service, stating that the child ran away and that "[t]his [was] not the first or second time a special needs child ran away or escaped" from the group home. (*Id.* at 53.) No caregivers or staff members from the group home reported this incident to SWI.

PI initiated a Priority Two neglect investigation of the child. (*Id.* at 53.) Nearly four months later, the investigator added Child D and another PMC child (Child E, age 15), to the investigative record as alleged victims because they lived at the HCS residence at the time of the incident. (*Id.* at 53.) The investigation was completed fifteen months later, with a disposition of Unconfirmed assigned to the neglect allegation as to Child D (and Child E as well). (*Id.* at 53.) The Monitors disagreed; due to the "substantial investigative deficiencies" described below, "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 53.)

First, the investigator failed to "identif[y] the other residents who lived in the home at the time the primary victim ran away" until four months after the investigation commenced. (*Id.* at 53.) This, in turn, delayed by four months the identification of Child D and Child E as potential victims. (*Id.* at 53.)

Second, the investigator never conducted a face-to-face interview with Child D (or with Child E), in clear violation of Remedial Order 8. (*Id.* at 53; *see* D.E. 606 at 3.) Instead, the PI investigator conducted a telephone interview with Child D and Child E; this despite the investigator having been informed that Child D is "non-verbal" and that Child E knows "one or two words or [can]

mimic a full sentence,[266] but he wouldn't understand what you are saying." (D.E. 1412 at 54 (brackets in original).) Unsurprisingly, the investigator documented that Child D did not respond to any of the questions asked and Child E was able to answer some initial questions but "became distracted and was not able to answer" further questions. (*Id.* at 54.) Thus, "the investigator did not gather any relevant information from either Child D or Child E regarding the allegation or their safety at the placement." (*Id.* at 54.)

Second, the investigator waited nearly four months before first attempting to interview the alleged perpetrator. (*Id.* at 54.) By then, the perpetrator was no longer employed at the group home and did not respond to the investigator's attempts to conduct the interview. (*Id.* at 54.)

Third, the "investigator did not investigate the reporter's allegation that multiple children eloped from the home due to repeated concerns for a lack of supervision." (*Id.* at 54.)

The intake was received on October 20, 2021, and the investigation was not completed until fifteen months later on January 27, 2023. (*Id.* at 54.) One extension was approved thirty-one days after intake and was thus untimely, and the documented reason—"Extraordinary Circumstances" (*id.*)—failed to establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Thus, the investigation failed to comply with Remedial Order 10. (*Id.* at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child D's or Child E's "safety needs." (*Id.*

---

[266] Child E's records document that he is "diagnosed with severe autism and exhibits echolalia, meaning that the child is prone to repeating words spoken by another person." (*Id.* at 54 n.79.)

at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### ii. *Investigation 2*

On March 12, 2022, a law enforcement officer reported an allegation of neglect of Child D, stating the child eloped from the Exceptional Employment Service group home while a staff member was using the bathroom. (D.E. 1412 at 54.) Law enforcement officers found Child D "on the median of a roadway during rush hour at 5:45 pm" "approximately a mile and a half from" the placement. (*Id.* at 54.) The officer also noted that law enforcement had responded to "multiple incidents of Child D running away from the home and that they were familiar with Child D." (*Id.* at 55.) The reporter was concerned that the home may not be equipped to properly take care of Child D. (*Id.* at 55.) No caregivers or staff members from the group home reported this incident to SWI.

PI initiated a Priority Two neglect investigation related to Child D, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 55.) The Monitors disagreed; due to the "substantial investigative deficiencies" described below, the Monitors concluded that "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 55.)

First, while the investigator conducted a timely face-to-face interview with Child D, the investigator did not document any efforts to accommodate Child D's limited communication; instead, the investigator asked Child D a "series of questions" about the incident," to which the child was unable to respond." (*Id.* at 55.) "As a result, the investigator did not gather any information from the child about the allegations." (*Id.* at 55.)

Second, the investigator "failed to reconcile conflicting descriptions of the incident between law enforcement and staff members." (*Id.* at 55.) The investigator interviewed the on-duty staff member and case manager ten months after the start of the investigation, both of whom reported

that the child ran away at night. (*Id.* at 55.) The accounts given by the staff conflicted with the account given by the law enforcement officer who, as noted above, reported that Child D was found on a median at 5:45 pm. Thus, if the officer was correct, Child D could not have run away at night. Yet the investigator failed to reconcile these conflicting descriptions of the incident. (*Id.* at 55.) "This discrepancy impacts the investigator's assessment of supervision because during the day the child was subject to one-to-one supervision whereas during the night, while asleep, the child was not subject to one-to-one supervision."[267] (*Id.* at 55.)

Third, the investigator failed to identify and interview other individuals present, if any, at the home about the incident or Child D's supervision during the time of his elopement. (*Id.* at 55.)

Finally, despite the report by law enforcement that staff members appeared unable to adequately supervise the residents in the home, the investigator did not consider whether administrators failed to "provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" that resulted in a risk of physical or emotional injury or death to Child D.[268] (*Id.* at 55.)

The intake was received on March 12, 2022, and the investigation was not completed until January 26, 2023, ten months later. (*Id.* at 56.) One extension was approved a month after intake, but the documented reason—"Extraordinary Circumstances" (*id.* at 56)—failed to establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Thus, the investigation failed to comply with Remedial Order 10. (*Id.* at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

---

[267] The Monitors note that the investigator could have requested a police report to confirm when Child D was found. (D.E. 1412 at 55.)

[268] *See* 26 Tex. Admin. Code § 711.719(b)(3).

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child D's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iii.   Investigation 3

On May 16, 2022, school personnel reported that Child D was observed "with three marks on his right cheek, two bruises on his left hip, and a small bruise on his right hip." (D.E. 1412 at 56.) Additionally, the reporter disclosed that two weeks prior, the school nurse documented that Child D had a bruised knuckle that "appeared to suggest that someone had bent the child's finger back." (*Id.* at 56.) Three days earlier, another school personnel observed bruising on Child D's Adam's apple and left upper cheek and stated her belief that a staff member or resident of the group home was causing Child D's injuries. (*Id.* at 56.) No caregivers or staff members from the group home reported these injuries to SWI.

PI initiated a Priority Two physical abuse investigation related to Child D, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 56.) The Monitors disagreed; because of the "substantial investigative deficiencies" discussed below, "a disposition regarding the Physical Abuse allegation cannot be determined." (*Id.* at 56.)

First, during the initial face-to-face interview, the investigator yet again failed to document any efforts to interview non-verbal Child D in a manner that facilitated his participation in the interview; instead, "she asked Child D a series of questions related to his injuries and the allegations, and the child was unable to respond to any of the questions." (*Id.* at 56.) The

investigator also "observed and photographed the injuries on Child D's body," which depicted injuries that were consistent with the allegations.[269] (*Id.* at 56.)

Second, despite observing Child D's injuries, the investigator "inexplicably . . . did not pursue any investigative activity for nearly nine months." (*Id.* at 56.)

Third, when the investigator finally "conducted interviews with, among other individuals, the child's caseworker, school and facility nurses, facility staff and administration" and the reporter (*id.* at 56–57), the investigator's questions:

> focused on Child D's history of reportedly difficult and "aggressive" behaviors which often resulted in injury to Child D and others. The investigator did not document any attempts during the interviews to gather information regarding the cause(s) of the specific injuries to Child D as of the report date.

(*Id.* at 57.) Additionally, the investigative record included several incident reports from the group home that involved Child D around the date of the intake, but the "investigator did not explore these incidents with the individuals interviewed to determine whether any of these incidents resulted in injuries to Child D nor whether staff members supervised and cared for Child D appropriately during these incidents." (*Id.* at 57.) And the investigator failed to interview "staff members who were responsible for the supervision of Child D," as well as "two other residents reportedly involved in the incident." (*Id.* at 57.)

The intake was received on May 16, 2022, and the investigation was not completed until February 10, 2023, nearly eight months later. (*Id.* at 57.) One extension was approved a month after intake, but the documented reason—"Extraordinary Circumstances" (*id.* at 57)—does not establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Thus, the investigation failed to comply with Remedial Order 10. (*Id.* at 3 (requiring investigations to be

---

[269] The Monitors viewed the investigator's photographs of Child D's injuries and reported that "they were consistent with the injuries the reporter described in the intake report." (D.E. 1412 at 56.)

completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of physical abuse was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child D's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iv.   *Investigation 4*

On February 27, 2023, a law enforcement officer reported an allegation of neglect of Child D, stating that they had recovered Child D after he ran away from the Exceptional Employment Service group home. (D.E. 1442 at 10.) The officer "expressed concern that law enforcement had observed 'ongoing issues' regarding the child's repeated elopement from the placement, which in some instances involved the child crossing a highway to reach a store, which placed the child at risk of being hit by a car." (*Id.* at 10.) Further, the officer noted that Child D "is 'very big in stature,' easily triggered, and staff members at the facility could not physically control the child." (*Id.* at 10.) The officer believed that Child D "required placement in 'a more secure facility' and was concerned that the child could 'be hurt running away from the facility or by the police if there is an officer who does not know [the child's] diagnosis.'" (*Id.* at 10.) This incident was not reported by any caregivers or staff members at the facility.

PI initiated a Priority Two neglect investigation related to Child D by an unknown staff member, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 10.) The Monitors disagreed; due to the "substantial investigative deficiencies" discussed below, "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 10.)

Due to untimely interviews with key individuals, the investigator did not gather sufficient information to determine whether a staff member(s) adequately supervised the child when he eloped twice from the facility on the same date. The question of supervision was highly relevant because at the time of the incidents, the child was subject to one-to-one supervision due to his history of elopement and the high risk presented to the child when he eloped; the child does not understand pedestrian safety rules.

Likely due to the investigator's delayed interviews with staff members one month after the intake, the investigator did not establish which staff member(s) was assigned to one-to-one supervision of the child on the specified dates and times that the child eloped. Since the investigator did not identify the staff member(s) responsible for the child's care at the time of the incidents, the investigator did not gather any information related to the child's supervision at the time of the incidents to assess the allegation of Neglect.

(*Id.* at 10–11 (paragraph break added).)

The investigator also failed to "consider whether the reporter's concern that staff members were unable to safely care for the child evidenced that the facility administrators failed to ensure the facility was adequately staffed and trained to care for the child." (*Id.* at 11 (citing 26 Tex. Admin. Code § 711.719(b)(3)).)

Defendant objected to the Monitors' statement that "Due to untimely interviews with key individuals, the investigator did not gather sufficient information to determine whether a staff member(s) adequately supervised the child when he eloped twice from the facility on the same date." (D.E. 1460 at 2 (quoting D.E. 1442 at 10).) Defendant asserted:

Defendant[] respectfully disagree[s] with the Monitors' view that the investigator didn't gather sufficient information to support the disposition of "unconfirmed" neglect. The investigator's report includes a time sheet showing which two staff members were on duty on the date of the intake report, February 27, 2023. The investigator interviewed both of those staff members. Law enforcement also stated that staff members were with the child both times the child eloped and were trying to intervene and prevent the child from eloping. Finally, when the home supervisor arrived on scene, she couldn't remember which staff member called her—but stated that the staff member who was present with the child was trying to gain cooperation to prevent the child from eloping. Under these circumstances, an "unconfirmed" disposition was appropriate. *See* 26 Tex. Admin. Code § 711.421 ("preponderance of credible evidence to support that abuse, neglect, or exploitation did not occur").

(*Id.* at 2–3.) In their response to the objection, the Monitors pointed out that "The PI investigator never established which staff member was assigned one-to-one supervision with Child D at the time of the incident and did not conduct a sufficient inquiry into supervision to assign an Unconfirmed disposition." (D.E. 1461 at 3.)

The intake was received on February 27, 2023, and the investigation was completed thirty-one days later, on March 30, without any documented extensions. (D.E. 1442 at 11.) Thus, the investigation failed to comply with Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child D's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

*     *     *

PI opened four investigations into allegations of abuse and neglect of Child D, with the longest investigation not completed until fifteen months after intake. (*See* D.E. 1442 at 10–11, D.E. 1412 at 54–57.) Three investigations had documented extensions but were not completed within the extended time frame. (D.E. 1412 at 54–57.) Additionally, none of the four allegations were reported by the staff or caregivers: three were reported by law enforcement officers, and the fourth by school personnel. (*Id.* at 54–57; D.E. 1442 at 10.)

367

#### d. Child F

Child F is a sixteen-year-old PMC child with an IQ of 71.[270] (D.E. 1412 at 57.) She was identified as an alleged victim in four investigations related to her placement at Educare Group Home (*see id.* at 57–61; D.E. 1442 at 11–12), and an alleged victim in one investigation at her subsequent placement, Ability Options, LLC, another HCS Group Home (*see* D.E. 1412 at 62). Child G, another child placed at Educare and involved in the first investigation, is a seventeen-year-old with an IQ of 57.[271] (*Id.* at 62.) Child F remained at Educare for almost five months after the first abuse and neglect allegation was reported. (*See id.* at 61.)

#### i. Investigation 1

On June 5, 2021, a staff member (Staff 1) reported allegations of neglect of Child F and Child G, explaining that when she arrived at work to relieve another staff member (Staff 2), Staff 1 became the sole caretaker of six residents, including one other individual who required one-on-one supervision. (*Id.* at 57.) She reported that Educare "was short-staffed," that she "could not properly supervise" the residents in her care alone, and that "she needed help." (*Id.* at 57.) Staff 1 also reported that five residents had not received their medication that day. (*Id.* at 57.)

PI initiated a Priority One neglect investigation related to Child F and Child G by Staff 2, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 58.) The Monitors disagreed, concluding that "[d]ue to substantial investigative deficiencies" discussed below, "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 58.)

---

[270] HHSC characterizes children with an IQ score between 70 and 80 as: "Children may need assistance with complex tasks, navigating social nuances, judgment and decision-making. Children may require special education services while remaining mainstreamed." (*Id.* at 11 n.23.)

[271] HHSC characterizes children with an IQ score between 55 and 70 as: "Children's memory, judgment and decision-making are impaired. Children with IQ scores in this range have a concrete problem-solving approach and may struggle to use academic skills in daily life." (*Id.* at 11 n.23.)

First, the investigator attempted to conduct timely face-to-face interviews with Child F and Child G, but documented that when she knocked on the door of the group home, nobody answered. (*Id.* at 58.) Thereafter, the investigator did not attempt to interview the children for nineteen months, in violation of Remedial Order 7 (*id.* at 58; *see* D.E. 606 at 3), at which point the children were interviewed by telephone. (D.E. 1412 at 58.) Child G refused to participate in the interview and Child F stated that she "didn't remember anything"—indeed, Child F "was unable to recall living at the" group home. (*Id.* at 58.)

Second, the investigator likewise failed to interview Staff 2 until nineteen months after the intake. (*Id.* at 58.) Staff 2 "reported that he was also unable to recall the alleged incident 19 months later." (*Id.* at 58.)

In sum, due to the nineteen-month delay in investigative activity, "the investigator failed to gather any information regarding the allegations." (*Id.* at 58.)

The intake was received June 5, 2021, and the investigation was not completed until January 20, 2023, nineteen months later. (*Id.* at 58.) One extension was approved less than a month after intake, but the documented reason—"Extraordinary Circumstances" (*id.* at 58)—does not establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Thus, the investigation failed to comply with Remedial Order 10. (*Id.* at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child F's "safety needs." (*Id.* at 2 ¶ 3.)

Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### ii.   *Investigation 2*

On September 30, 2021, a law enforcement officer reported that Child F ran away from the group home to visit an adult male (Individual 1, age 37), the husband (or boyfriend) of an Educare staff member (Staff 2). (D.E. 1412 at 58.) Per the officer, "Staff 2 provided law enforcement with an audio recording" in which Child F disclosed "that she had a sexual relationship with Individual 1." (*Id.* at 58–59.) The officer also reported that law enforcement was investigating Individual 1's alleged sexual assault of Child F. (*Id.* at 59.)

The next day, school personnel reported to SWI that Child F believed she was pregnant and reported "experiencing cramps and morning sickness and" that she "missed her period." (*Id.* at 59.) "Child F reported that she had sexual intercourse with Individual 1 multiple times over the past few months." (*Id.* at 59.) "Reportedly, Individual 1 brought Child F lunch at school and the two were observed hugging in his car." (*Id.* at 59.) No caregivers or staff members reported these incidents to SWI.

Following the two intakes, PI initiated a Priority One investigation of sexual abuse as to Individual 1 and neglect as to an unnamed staff member. (*Id.* at 59.) As to the sexual abuse allegation, PI assigned a disposition of "Other" because the investigator determined that Individual 1 did not meet the definition of direct provider, "as he was not providing any direct care to [the child] and was not working under the auspices of a volunteer or care provider while in [the child's] home."[272] (*Id.* at 59.) The Monitors note that law enforcement's criminal investigation into the

---

[272] The Monitors reported that the investigator made this disposition despite confirming that Individual 1 was employed by two different agencies to work at HCS Group Homes, Daybreak and D&S Residential, at the time of the allegation. (*Id.* at 59 n.84.) Nonetheless, PI maintained that Individual 1 did not qualify as a direct provider for Child

sexual assault of Child F resulted in Individual 1 being charged and subsequently incarcerated. (*Id.* at 59.)

As to neglect, the investigator assigned a disposition of Unconfirmed; the Monitors disagreed—because of the "substantial investigative deficiencies" discussed below, they concluded that "a disposition of the neglect allegation cannot be determined." (*Id.* at 59.)

First, the investigative record shows that during his visits to the group home to see Staff 2,[273] Individual 1 "was able to meet and interact with Child F." (*Id.* at 59.) Another staff member, Staff 3, reported seeing Child F and Individual 1 "together on the back porch of the group home and Staff 3 observed the child with her arms on Individual 1's shoulders." (*Id.* at 59.)

> The investigator did not adequately explore whether staff members permitting Individual 1 to visit the group home and their subsequent failure to immediately remove Individual 1 from the group home constituted Neglect. Furthermore, given that it was the central factor that led to the sexual assault of Child F by Individual 1, the investigator did not adequately explore or probe Educare's training, policies and procedures associated with allowing third parties into the home. The investigator instead noted it only as a concern and suggested future training for staff members about related protocol.

(*Id.* at 59.)

Second, the investigator "failed to adequately and timely investigate whether staff members appropriately supervised the child to prevent or address her elopements from the group home." (*Id.* at 59.) Specifically, though "the investigative record includes specific instances when" Child F ran from the group home "to meet with Individual 1," the investigator failed to adequately question staff or Child F "to determine whether staff members maintained appropriate supervision of" Child F in those "specific instances," or at "any other times." (*Id.* at 60.) Without this "key

---

F. *See* 26 Tex. Admin. Code § 711.3(15) (defining a direct provider as "[a] person, employee, agent, contractor, or subcontractor of a service provider responsible for providing services to an individual receiving services.").

[273] "Staff 2 reported to the investigator that . . . that she let [individual 1] come into the group home because he was reportedly suspicious of her cheating on him and she intimated that she was fearful of disallowing his visits because he was physically violent with her in her own home." (D.E. 1412 at 59 n.85.)

information regarding supervision, the investigator cannot render a finding for the allegation of Neglect." (*Id.* at 60.)

Third, staff reported that there was inadequate training to care for Child F, that Child F was difficult to manage, that the group home was "inadequately staffed for increased supervision of" Child F, and that "the group home 'cannot keep staff' due to the long hours staff members are expected to work." (*Id.* at 60.) Yet "the investigator failed to consider whether Educare administrators failed to 'provide a safe environment for [the child], including the failure maintain adequate numbers of appropriately trained staff' and whether this failure contributed to the alleged harm and risk of harm to Child F."[274] (*Id.* at 60.)

Fourth, the investigator noted that Child F "did not have a Behavior Support Plan in place at the group home." (*Id.* at 60.) Yet, once again, as in other investigations containing allegations of potential neglect by administrators, the investigator failed to appropriately apply the applicable definition requiring consideration of administrative failures; the investigator "failed to consider whether administrators at Educare failed to 'establish or carry out an appropriate individual program plan or treatment plan' for the child and whether this failure contributed to the alleged harm and risk of harm to the alleged victim." (*Id.* at 60.)

The intake was received on September 30, 2021, and the investigation was not completed until January 24, 2023, one year and three months later. (*Id.* at 60.) One extension was approved with a documented reason of "Law enforcement requests that an investigation be temporarily discontinued," but was not approved until thirty-four days after intake. (*Id.* at 60.) Thus, while the documented reason established good cause, the extension was untimely as per Remedial Order 10. (*See* D.E. 606 at 3 ¶ 10.) The Monitors note that "[l]aw enforcement permitted the investigation to

---

[274] *See* 26 Tex. Admin. Code § 711.719(b)(1), (3).

resume in early March 2022," yet no further extensions were granted. (D.E. 1412 at 60.) Thus, even overlooking the untimeliness of the documented extension, the investigation failed to comply with Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegations of abuse and neglect were not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child F's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iii. *Investigation 3*

On October 10, 2021, Staff 3 reported that between 11:00 a.m. and 12:00 p.m., Child F ran away from the group home twice to meet Individual 1. (D.E. 1412 at 60.) After the first runaway episode, "law enforcement located Child F with Individual 1 in his vehicle." (*Id.* at 60–61.) "Due to these incidents, the group home placed Child F on one-to-one supervision." (*Id.* at 61.)

After intake, PI initiated a Priority Two neglect investigation of Child F by an unnamed staff member, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 61.) The Monitors disagreed; because of the "substantial investigative deficiencies" discussed below, they concluded that "a disposition of the Neglect allegation cannot be determined." (*Id.* at 61.)

The Monitors note that "PI investigators appear to have conducted" this and the prior investigation[275] together, so "the investigative flaws detailed for the [prior] investigation apply to

---

[275] *Supra* page 370–73.

this investigation." (*Id.* at 61.) The Monitors identified the following deficiencies specific to this investigation.

First:

> During interviews with staff members and the child, the investigator did not adequately explore staff members' supervision of the child on October 10, 2021 when she ran away twice to meet Individual 1. In her interview, the child stated that she exited the group home from her bedroom window when staff members were attending to other residents. The question of supervision is highly relevant to this investigation because these runaway incidents occurred after the group home administrators and staff members were clearly aware of Individual 1's involvement with, and alleged sexual assault of, the child.

(*Id.* at 61.)

Second, as noted above, the group home placed Child F on one-to-one supervision only after the two runaway incidents that led to this investigation. The investigator "should have explored whether the group home administration's failure to immediately increase the child's supervision level after they were informed of the criminal investigation involving Individual 1 and the child had disclosed sexual contact by Individual 1 in September 2021 constituted Neglect." (*Id.* at 61.)

The intake was received on October 10, 2021, and the investigation was not completed until January 24, 2023, one year and three months later. (*Id.* at 61.) One extension was approved thirty-three days after intake. (*Id.* at 61.) Further, the documented reason—"Extraordinary Circumstances"[276] (*id.* at 61)—does not establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Thus, the investigation failed to comply with Remedial Order 10. (*Id.* at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

---

[276] The Monitors attribute part of the delay—from October 2021 to March 2022—"to law enforcement's request that the above, related investigation be temporarily discontinued." (D.E. 1412 at 61.) The delay from April 2022 to January 2023 is unexplained, and no additional extension was granted. (*Id.* at 61.)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child F's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### iv. Investigation 4

On October 24, 2021, an Educare administrator reported that the on-duty staff member (Staff 1) left Child F and two adult residents unattended for an unknown duration of time. (D.E. 1442 at 11.) According to the reporter, Staff 1 administered medication before leaving the group home and the three residents did not have any injuries due to Staff 1's absence. (*Id.* at 11.) The administrator stated that one of the residents called the administrative number and notified an Educare case manager that they were alone. (*Id.* at 11.)

PI initiated a Priority Two neglect investigation related to Child F by Staff 1. (*Id.* at 11.) The Monitors concluded, for the following reasons, that "the investigator's assignment of a disposition of Inconclusive to the allegation was inappropriate," and that "allegation of Neglect should have been substantiated with a disposition of Confirmed." (*Id.* at 11.)

First, Child F confirmed during her interview that "Staff 1 left the group home in the morning and did not return," leaving Child F and "two adult residents in the home alone." (*Id.* at 12.) She also confirmed "contact[ing] 911 and the Educare case manager" and recalled that either law enforcement or the case manager arrived "ten minutes after her phone call." (*Id.* at 12.)

Second, "[t]here is no evidence in the record that Staff 1 ever returned to the group home. Child F could have been left alone for a much longer period of time" had she "not called for help." (*Id.* at 12.)

Third, when the case manager was interviewed one year after intake, she corroborated Child F's account of the incident, including that she arrived at the home "ten minutes" after Child F called her. (*Id.* at 12.) The case manager also noted that "a staff member was required to be present to 'ensure [the residents] have someone meeting their needs and in case of an emergency.'" (*Id.* at 12.)

For these reasons, "the record contains a preponderance of evidence that Staff 1 left the group home premises during her shift, and thereby, left the children and two adult residents alone for approximately ten minutes, which placed the child at risk of physical or emotional injury or death." (*Id.* at 11.)

The intake was received on October 24, 2021, and the investigation was not completed until January 27, 2023, one year and three months later. (*Id.* at 12.) One documented extension was approved on November 23, 2021, with the documented reason of "Additional time is required to complete this investigation due to unusually high caseloads and an increase in PI staff vacancies." (*Id.* at 12.) This reason is similar to one of the reasons for an extension request that constitutes good cause in the then-current version of the PI Handbook. (*See* DX 39 at 161 (providing that "excessive workload due to PI employee vacancies or an uncommon rise in intakes" qualifies as good cause for an extension).) But because hiring and retention of investigators, and thus, caseloads, are largely within PI's control, the Court is not convinced that "unusually high caseloads" and "staff vacancies" constitute good cause for an extension under Remedial Order 10. Regardless, the investigation remained pending for over a year after the extension was approved without further documented extensions. (D.E. 1442 at 12.) Because indefinite extensions are not consistent with Remedial Order 10,[277] this investigation failed to comply with Remedial Order 10.

---

[277] *See supra* page 301–02.

(D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child F's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

Four days after this incident was called into SWI, DFPS removed Child F from Educare "due to concerns with the placement and services not received in the home." (D.E. 1412 at 61.)

### v.   *Investigation 5*

On February 7, 2023, a case manager reported an allegation of neglect of Child F, who was now placed at an HCS Group Home run by Ability Options, LLC. (*Id.* at 62.) The reporter stated that Ability Options staff members had "failed to secure medical care for Child F when she had a urinary tract infection (UTI)." (*Id.* at 62.) The reporter stated that both Child F and her caseworker requested that a staff member take Child F to the doctor because she was experiencing "pain when using the bathroom." (*Id.* at 62.) Because no one at Ability Options did so, the caseworker took the child to the doctor and she was prescribed medication for a UTI. (*Id.* at 62.) But "no one at the placement provided the child with the prescribed medication needed to treat the UTI following the doctor appointment." (*Id.* at 62.) This incident was not reported to SWI by any caregiver or staff member at the group homr.

PI initiated a Priority Two neglect investigation of Child F by a named and unnamed staff member, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 62.) The Monitors disagreed; due to "substantial investigative deficiencies," they concluded that the "disposition of the Neglect allegation cannot be determined." (*Id.* at 62.)

The Monitors based this conclusion on the fact that the investigator failed to resolve a discrepancy that emerged during the investigation:

> During interviews, staff members and a different caseworker reported to the investigator that, [contrary to the reports of Child F and her caseworker, which were consistent with the case manager's report to SWI], someone at the placement secured a medical appointment for the child in a timely manner three months prior and during the appointment, the child received a urinalysis and a birth control shot. Prior to entering a disposition of Unconfirmed, the investigator did not resolve the discrepancy of whether anyone at the home secured the child a medical appointment. While the investigator requested that the placement provide the child's medical records, it appears the placement did not comply with this request as the investigative record does not confirm it. There is no evidence that the child received medical care at the time she requested it.

(*Id.* at 62.)[278]

Because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated . . . consistent with the Court's Order; [or] conducted taking into account at all times" Child F's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3.

*   *   *

PI opened five investigations into allegations of abuse and neglect of Child F, with the longest investigation remaining open for nineteen months before completion. (*See* D.E. 1412 at 57–62, D.E. 1442 at 11–12.) Four investigations had documented extensions but were not completed within the extended time frame. (D.E. 1412 at 57–62.) Additionally, two allegations were reported by non-caregivers: one by law enforcement and one by a case manager. (*Id.* at 57–62.)

---

[278] By the time the Monitors reviewed this investigation, Child F had aged out of foster care. (D.E. 1412 at 62 n.86.) Thus, the Monitors could not access Star Health Passport to review her medical appointments while in foster care. (*Id.* at 62 n.86.)

### e. *Child L*

Child L is a fourteen-year-old PMC child with an IQ of 61. (D.E. 1442 at 15.) "SWI received three intakes alleging physical and emotional abuse of Child L while he was placed at Forever Home Living Center, Inc., an HCS Group Home. (*Id.* at 15.)

"In the first intake, on January 13, 2023, a former adult client of the HCS Group Home reported that the day before the intake, a staff member hit the child on the back of the head with her fist and on his back. The intake report did not specify how the child was allegedly hit on the back. The child reportedly has a 'scratch on [his] back that is a scar.'" (*Id.* at 15.)

"On January 18, 2023 and on January 26, 2023, a mental health professional from the Office of Ombudsman for Behavioral Health and an HHSC staff member reported similar allegations as contained in the first intake." (*Id.* at 15–16.) They also reported that "a staff member hit" Child L "with a dustpan, which caused a scar on the child's back," and that "the same staff member hit the child with her hand and a broom stick" during a separate incident. (*Id.* at 16.) Child L "reportedly stated that 'he is scared and doesn't want to live in the group home.'" (*Id.* at 16.)

PI initiated a Priority Two physical abuse and emotional abuse investigation related to Child L by Staff 1 (*Id.* at 16.) The investigator assigned a disposition of Unconfirmed as to the physical abuse allegation. (*Id.* at 16.) The Monitors disagreed; due to the "substantial investigative deficiencies" discussed below, "a disposition regarding the Physical Abuse allegation cannot be determined."[279] (*Id.* at 16.)

Despite the alleged physical injury to Child L, the investigator failed to conduct a face-to-face interview with the child, in violation of Remedial Order 8. (*Id.* at 16.; *see* D.E. 606 at 3.) "Instead, the investigator conducted two telephone interviews" with Child L and "requested a staff member

---

[279] The Monitors agreed with the disposition of Unconfirmed assigned to the emotional abuse allegation. (D.E. 1442 at 16.)

(Staff 2) . . . electronically send photos of the child's back, face, and body to the investigator."[280] (D.E. 1442 at 16.) "Because the photographs were reportedly taken and sent by Staff 2 and not by the investigator, the credibility of the photographs is questionable and do not replace the investigator's observation of the child." (*Id.* at 16.) Besides, the photographs were too poor in quality to be useful. (*Id.* at 16 ("Staff 2's photograph of the child's back (the location of the child's alleged injury) lacked adequate light and clarity for the investigator to determine whether the child had an injury on his back.").) During both his telephone interviews, Child L "remained consistent in his allegation that Staff 1 hit him once with a dustpan in the garage and hit him with a closed fist" because he was "'acting up' one night." (*Id.* at 16.)

Defendant objected to the Monitors' assessment that, during his telephone interviews, Child L "remained consistent in his allegation that Staff 1 hit him once with a dustpan in the garage and hit him with a closed fist in response to the child 'acting up' one night." (D.E. 1460 at 3 (quoting D.E. 1442 at 16.).) Specifically, "Defendant[] respectfully disagree[d] with the Monitors' view that the child's testimony remained consistent. The child's testimony contained contradictory statements, including denying and affirming the allegations." (*Id.* at 3.)

In response, the Monitors noted:

The key elements of Child L's interview described by the Monitors were consistent: namely that the child said a named staff member hit him with a dustpan and a closed fist. Other parts of Child L's statement appear inconsistent based on the PI investigator's notes, but because PI does not record victim interviews, it is not possible for the Monitors to confirm whether those inconsistencies were due to inadequate note taking by the investigator or caused by PI's decision to conduct the interview with a child (with an IQ of 61) by phone and without any documented effort to accommodate the child's intellectual and developmental disabilities.

---

[280] The PI Handbook states that investigators should take photographs when helpful to the investigation as they "provide an accurate, objective representation of the existence or absence of injuries." (PX 7 at 123.) But the Handbook does not state that a photograph can be used as a substitute for observing the child in person.

(D.E. 1461 at 4.) Further, they reiterated concerns about PI investigations raised in their September 19, 2023 filing:

> Often the deficiencies identified by the Monitors began at the start of the investigations during the expected assessment of the alleged victim's current safety and recounting of the allegations; these problems included a failure to promptly interview children face-to-face and, in some instances, a failure to conduct interviews with children at all, despite the Court's orders. PI frequently failed to conduct the investigations in a manner that appropriately accommodated and considered the limited capacities, verbal or otherwise, among this population of PMC children. Due to the children's documented developmental challenges and accompanying eligibility for HCS services, it is unclear why PI investigators were so consistently ill-equipped to accommodate or consider them during investigations into allegations about the children.

(*Id.* at 4 (footnotes omitted).) The Monitors also noted that, in one of their earlier reports,[281] they "uncovered significant discrepancies between the information conveyed to State investigators by alleged child victims, collateral children or staff, or witnesses (including members of the monitoring team) and the summaries of these interviews found in IMPACT contact notes. In some cases, the misinformation included in the contact notes appears to have informed the disposition of the case." (*Id.* at 5 (footnote omitted).) The Monitors concluded their response to the objection by pointing out that "PI's failure to accommodate the special needs of PMC children who receive HCS services may contribute to reported inconsistencies in children's accounts, and PI's failure to record their interviews makes it impossible to assess the extent to which that occurs." (*Id.* at 5.)

Because of the above-described investigative deficiencies, it is apparent that the allegation of physical abuse was not "investigated; [or] commenced . . . on time consistent with the Court's Order; [or] conducted taking into account at all times" Child L's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3.

---

[281] Specifically, their Update to the Court Regarding Site Visits Conducted between December 1, 2021, and December 31, 2022, and the Reopening of The Refuge for DMST. (D.E. 1337.)

### f. *Child N*

Child N is a sixteen-year-old PMC child with an IQ of 40, placed at Able Living, an HCS Group Home. (D.E. 1442 at 17.) On February 16, 2023, "school personnel reported that" Child N "was hungry, 'really sleepy,' and 'slept the whole day in school'" because the child stated that staff members at Able Living . . . did not feed her as punishment for 'being bad in school.'" (*Id.* at 17–18.) Child N also told the reporter "that she could not sleep during the night because she was hungry." (*Id.* at 18.) No staff members or caregivers from the group home reported to SWI.

Following intake, PI initiated a Priority Two Physical Neglect investigation related to the child by an unknown staff member, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 18.) The Monitors disagreed; due to the "substantial investigative deficiencies" described below, they concluded that "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 18.)

First, the investigator failed to establish face-to-face contact with Child N (*id.* at 18), in violation of Remedial Order 8 (*see* D.E. 606 at 3). Further, the investigator "did not document any efforts to conduct a face-to-face interview with the child." (D.E. 1442 at 18 n.28.) In lieu of a face-to-face interview, the investigator interviewed Child N "on the telephone one month after the intake, on the same date the investigation was completed." (*Id.* at 18.)

Second, while the investigator "documented that the child denied the allegations during the delayed phone interview," the investigator failed to "document whether she interviewed the child in English or Spanish." (*Id.* at 18.) This is significant because Child N's record indicates that while she "speaks and understands Spanish," "her English-speaking skills are limited." (*Id.* at 18.)

Third, the investigator "also failed to timely interview the alleged perpetrator, collateral staff members, and collateral individuals in the group home; the earliest phone interview in the investigation took place three weeks after the intake." (*Id.* at 18.) "Due to these deficiencies, the

investigator did not gather adequate information to render a disposition of Unconfirmed for the allegation of Physical Neglect." (*Id.* at 18.)

Because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated; [or] commenced . . . on time consistent with the Court's Order; [or] conducted taking into account at all times" Child N's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3.

### g.   *Child O*

Child O, a seventeen-year-old PMC child with an IQ of 51, was placed at Forever Home Living Center, Inc., an HCS Group Home. (D.E. 1442 at 18.) "Child O aged out of DFPS care while incarcerated in a county jail." (*Id.* at 19.)

Between March 5 and March 17, 2023, SWI received five intakes with allegations of neglect of Child O and another child, Child P (age 13, not in DFPS care), that resulted in sexual contact between the children. (*Id.* at 18.) The reporters—a staff member, a law enforcement officer, a nurse, a DFPS caseworker, and a worker at the local Children's Advocacy Center (CAC)— "similarly alleged that Child O sexually assaulted Child P." (*Id.* at 18.) "The reporters stated that staff members took Child P to the hospital for a SANE examination," which revealed that Child P sustained "'abrasions to his anal region' and contusions on his anal fold and rectal area." (*Id.* at 18–19.) Further, "Child P stated that on the date of the incident staff members were watching the children 'for a while' and that the children were able to go to the bathroom together without a staff member present." (*Id.* at 19.) The reporters also stated that Child O was arrested for aggravated sexual assault and was incarcerated. (*Id.* at 19.)

PI initiated a Priority One investigation of neglect by Staff 1, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 19.) The Monitors disagreed; due to the "substantial

investigative deficiencies" discussed below, "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 19.)

First, "the investigator failed to determine whether Staff 1 appropriately supervised the children prior to the sexual assault." (*Id.* at 19.) "According to documentation gathered by the investigator, both children required 24-hour supervision and routine room checks at night when asleep." (*Id.* at 19.) Yet the investigator failed "to gather critical information from" Staff 1 "about her supervision at the time of the incident." (*Id.* at 19.) For example, the investigator "failed to determine" whether Staff 1 "adhered to the children's supervision requirements." (*Id.* at 19.) The investigator likewise failed to establish "how Child O entered the bathroom . . . where Child P was already located, undetected by the staff member and why the staff member was unaware that the children were alone in the bathroom together when the assault occurred." (*Id.* at 19.) These investigative failures were "particularly problematic because the children were unable to provide a detailed account of the night." (*Id.* at 19.)

Second, the incident occurred on Staff 1's first night caring for the children. (*Id.* at 19.) Yet the investigator "did not consider whether the facility administrators provided her with adequate training and support to care for the children alone on her first night, particularly in light of the children's significant behavioral health needs and an incident that led to a sexual assault and arrest." (*Id.* at 19.)

Because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated . . . consistent with the Court's Order; [or] conducted taking into account at all times" Child O's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3.

### h.   Child H

Child H, a fifteen- to sixteen-year-old PMC child with an IQ of 40, was placed at an HCS group home operated by Educare. (D.E. 1442 at 12.)

#### i.   Investigation 1

SWI received three intakes alleging sexual abuse of Child H when he was fifteen years old. (*Id.* at 12.) On May 17, 2022, "school personnel reported that Child H made an outcry that a staff member (Staff 1) had sex with him." (*Id.* at 12.) "According to the reporter, Staff 1 allegedly sexually abused the child more than once in Staff 1's bedroom and that she wore a condom." (*Id.* at 12–13.) On May 18, 2022, a law enforcement officer reported that Child H "disclosed the same allegations regarding Staff 1 and also disclosed that he had sexual contact with his special education aide at school." (*Id.* at 13.) That same day, a Sexual Assault Nurse Examiner (SANE) reported that Child H "used diagrams to show where he and Staff 1 touched one another, and that the child stated that having sex meant 'when you hump someone.'" (*Id.* at 13.) The Sexual Assault Nurse Examiner also reported that Child H "made an outcry that his special education aide touched him on the penis." (*Id.* at 13.) None of these reports were made by caregivers or staff members of the group home.

PI initiated a Priority One sexual abuse investigation related to Child H by Staff 1, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 13.) The Monitors disagreed; due to the "substantial investigative deficiencies" described below, "a disposition regarding the Sexual Abuse allegation cannot be determined." (*Id.* at 13.)

In particular, many of the interviews were delayed until many months after the investigation commenced. The Monitors explain that "[t]he investigator did not attempt to interview the residents who lived at the placement at the time of the alleged incident(s) until nearly nine months after the intake," and that the delay "may have impeded the quality of information the investigator

385

was able to gather from these individuals about the allegation." (*Id.* at 13.) Likewise, the investigator "did not attempt to interview school personnel and law enforcement until two months after the intake," and did not obtain responses from these individuals until eight months after the intake. (*Id.* at 13.) These investigative delays were especially significant here because Child H "confirmed the allegation of Sexual Abuse" during his interview with the investigator, "but did not confirm the allegation in subsequent interviews with law enforcement." (*Id.* at 13.) Indeed, the Monitors note that because of the "significantly delayed interviews with key individuals, the fact-finding process of this investigation was impaired and resulted in a deficient investigation." (*Id.* at 13.)

Moreover, the investigation was not completed timely. The intake was received on May 17, 2022, and the investigation was not completed until nine months later. (*Id.* at 13.) One extension was approved, on June 16, 2022, but the documented reason—"Extraordinary Circumstances" (*id.* at 13)—failed to establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3). Further, the investigation remained pending for eight months after the extension was approved without further documented extensions. (D.E. 1442 at 12.) And indefinite extensions are not consistent with Remedial Order 10. For these reasons, this investigation failed to comply with Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, the sexual abuse allegation was not "investigated; . . . completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child H's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### ii.   *Investigation 2*

On October 19, 2022, school personnel reported several allegations of neglect related to Child H. First, the reporter explained that "[f]or the first two months of school, the Educare HCS Group Home did not pick up the child from school on time. Staff members from the home reportedly did not arrive at the school until approximately 5:30 p.m., despite the school allegedly conducting several face-to-face conversations with staff members regarding an appropriate pick-up time for the child." (D.E. 1412 at 63.) Second, on "Saturday, October 15, 2022, a school paraprofessional observed" Child H "running alone along a roadside. After stopping the child, the school personnel observed that the child was wearing a diaper that was 'saturated,' had no shoes on, and 'seemed lost.'" (*Id.* at 63.) Third, "[f]or the month preceding the report," Child H "had been 'extremely' tired in school." (*Id.* at 63.) When asked about his fatigue, Child H explained "that his 'mother has been giving him melatonin in the mornings.'" (*Id.* at 63.) Finally, the reporter explained that Child H "arrived at school appearing unbathed" and that he was "'constantly hungry and begging for food' from teachers and classmates." (*Id.* at 63.)

The following day, "a DFPS staff member reported similar allegations of Neglect" as to Child H. (*Id.* at 63.) The staff member added some new information:

- The name of the Educare staff member who was administering the melatonin. (*Id.* at 63.)

- That melatonin was "not on the child's list of prescribed medications." (*Id.* at 63.)

- That Child H "ran away from the placement" on October 15, the day the paraprofessional found him running along a roadside. (*Id.* at 63.)

The DFPS staff member also "stated that the child is 'low functioning' and should not have been on a busy street alone," "alleged that staff members at the home were not aware that the child

had eloped for at least 35 minutes," and expressed concern that Child H "could have been seriously injured while unsupervised." (*Id.* at 63.)

Following the two intakes, PI initiated a Priority Two "Neglect investigation of the child by two named staff members," to which the investigator assigned a disposition of Unconfirmed (*Id.* at 63.) The Monitors disagreed; due to the "substantial investigative deficiencies" described below, the Monitors concluded that "a disposition of the Neglect allegation cannot be determined." (*Id.* at 63.)

First, the investigator "did not attempt to reconcile conflicting descriptions" of Child H's elopement. (*Id.* at 63.) Specifically, Child H reported during his interview that the staff member named as the alleged perpetrator "was asleep at the time of the elopement." (*Id.* at 64.) The alleged perpetrator, on the other hand, "reported that she was in a separate room attending to the hygiene needs of two other individuals living in the home." (*Id.* at 64.) Yet the investigator "did not attempt to interview the other two individuals who may have been able to resolve this discrepancy." (*Id.* at 64.)

Second, the investigator failed to determine "the duration of time" between Child H's elopement and the alleged perpetrator's discovery that Child H had eloped. (*Id.* at 64.)

> In the second intake report, the [DFPS staff member] alleged that the [alleged perpetrator] was unaware the child ran away for at least 35 minutes; however, delayed interviews with the on-duty staff member and an assisting staff manager suggest that they responded timely to the elopement. The investigator did not attempt to corroborate the staff members' accounts during interviews with school personnel. The investigator also did not attempt to interview the responding law enforcement officer who may have been able to provide information on the timeframe and whether the child was observed in a "saturated" diaper.

(*Id.* at 64.)

Third, as to the allegations regarding the provision of unprescribed melatonin, the investigator again did not attempt to resolve conflicting accounts. During his interview, Child H "confirmed his allegation and stated that a named staff member provided him with melatonin." (*Id.* at 64.) The

staff member "denied the allegation." (*Id.* at 64.) Again, the investigator "did not interview any other residents to obtain information regarding whether a staff member provided the child or other residents melatonin." (*Id.* at 64.) Further, the investigative record shows that Child H "was prescribed multiple medications" that listed "drowsiness" as a side effect, yet the investigator "did not attempt to interview" his nurse or prescribing physician to determine if his prescribed medications could have caused his drowsiness in school. (*Id.* at 64.)

"Due to these lapses in investigative practice, the investigator did not gather sufficient information to assign a disposition for the allegation of Neglect." (*Id.* at 64.)

Further, the investigation was not completed in accordance with Remedial Order 10. The intake was received on October 19, 2022, and the investigation was not completed until three months later. (*Id.* at 64–65.) One extension was approved, on November 18, 2022, but the documented reason—"Need to interview AP and potential collateral witnesses" (*id.* at 64)—does not establish "good cause" as required by Remedial Order 10 (*see* D.E. 606 at 3).[282] Further, the investigation remained pending for over two months after the extension was approved without further documented extensions (D.E. 1412 at 65 (investigation completed on January 27, 2023)), and indefinite extensions are not consistent with Remedial Order 10. For these reasons, this investigation failed to comply with Remedial Order 10. (D.E. 606 at 3 (requiring investigations to be completed "within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record").)

And because of the above-described investigative deficiencies, the allegation of neglect was not "investigated; . . . completed on time consistent with the Court's Order; [or] conducted taking

---

[282] Nor is this consistent with the "reasons [that] constitute good cause" enumerated in the then-current version of the PI Handbook. (*See* DX 40 at 164–65.)

into account at all times" Child H's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### i. Child I

Child I is a sixteen-year-old PMC child with an IQ of 60. (D.E 1442 at 14.) She was placed at Brenham State-Supported Living Center when the following allegations were reported. (*Id.* at 14.)

On June 17, 2022, a counselor at Brenham reported "that a staff member (Staff 1) witnessed another staff member (Staff 2) asleep while caring for" Child I. (*Id.* at 14.) "At the time of the alleged incident," Child I "was subject to one-to-one supervision due to a history of eloping and suicidal behavior; the child was also reported to have an intellectual disability and 'psychiatric issues.'" (*Id.* at 14.) "The reporter stated that Staff 1 woke up Staff 2 and that the child was not injured during the incident." (*Id.* at 14.) This incident was not reported by any caregivers or staff members.

Following intake, PI initiated a Priority Two Neglect investigation of Child I by two staff members, to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 14.) The Monitors disagreed; because of the "substantial investigative deficiencies" described below, the Monitors concluded that "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 14.)

First, the Monitors note that after conducting a timely face-to-face interview with Child I,[283] "the investigator did not pursue any investigative activity for three months" (*id.* at 14); only after this delay did the investigator interview the reporter or the alleged perpetrators. (*Id.* at 14.) Second, the investigator failed to resolve inconsistencies that surfaced during the interviews. During her interview, the reporter "clarified that she observed two staff members sleeping and that the child

---

[283] Child I "confirmed that she was sleeping at the time of the alleged incident and was not harmed." (D.E. 1442 at 14.)

was subject to two-to-one supervision at the time of the incident." (*Id.* at 14.) The investigator subsequently interviewed both alleged perpetrators, who "denied the allegation that they were asleep and provided additional information about the allegation." (*Id.* at 14.) "Based on this additional information, the investigator should have re-interviewed the reporter to reconcile the conflicting accounts of the alleged incident. Due to the above-described deficiencies, a disposition on the allegation of Neglect cannot be rendered." (*Id.* at 14.)

The intake was received on June 17, 2022, and the investigation was completed four months later on October 21. (*Id.* at 14.) "Thirteen extensions were approved approximately every ten days between June 27, 2022 and October 16, 2022 with documented reasons that included 'Further interviews need to be completed,' 'Witnesses have not been available for interviews,' and other similar reasons."[284] (*Id.* at 14.) The Court notes that "further interviews need to be completed" is not good cause for an extension, even under PI's then-controlling extension policy. (*See* DX 39 at 161 (listing the "reasons [that] constitute good cause"); DX 40 at 164 (same).) Likewise, the fact that interviews need to be completed does not, by itself, establish "good cause" for an extension under Remedial Order 10. (D.E. 606 at 3.)

As for the second documented reason, that witnesses "have not been available for interviews," under the circumstances of this investigation it is pretextual. As noted two paragraphs prior, the investigator "did not pursue any investigative activity" for the three months following the timely face-to-face interview with Child I. Thus, the investigative record indicates that the investigator did not attempt, during that three-month period, to verify whether the witnesses were available.[285]

---

[284] Since Child I was placed in a State Supported Living Center, the maximum extension length permitted under Provider Investigations' policy was ten days. (*See* DX 39 at 160; DX 40 at 164.)

[285] The Court notes that, per the Monitors' report, unsuccessful interview attempts are documented in the investigative record. (*See*, *e.g.*, D.E. 1412 at 25 (recounting investigator's attempts to interview Child A); *id.* at 42 ("The investigator was unable to locate Staff 4 for an interview and at the time he attempted to do so 16 months after the investigation began, according to C3, he was no longer employed there."); *id.* at 44 n.69 ("The investigator made a first attempt to interview Child C three days after the receipt of the intake . . . however, the child was no longer

Since the investigator had no apparent basis on which to assert that witnesses were not available to interview, it does not establish "good cause" for an extension under Remedial Order 10. (*Id.* at 3.)

In sum, the investigation was not completed within thirty days, and at least some of the extensions were not approved for "good cause." (*See* D.E. 606 at 3 ¶ 10 (requiring that "If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record").) Accordingly, the investigation violated Remedial Order 10. (*Id.* at 3 ¶ 10)

And because of the above-described investigative deficiencies, the allegation of neglect was not "investigated; . . . completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child I's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### j.   *Child K*

Child K is a seventeen-year-old PMC child with an IQ of 61 placed at D&S Community Services, an HCS Group Home. (D.E. 1442 at 14–15.) Child K's records indicate she "is unable to grasp simple conversations" and needs to have conversations "repeated to [her] in the most basic verbiage, to ensure [she] is able to understand and follow along." (*Id.* at 15.)

On December 28, 2022, a D&S Community Services staff reported an outcry by Child K that "an adult resident (Individual 1, age 23) 'grabbed'" Child K's "breast over her clothing when the child attempted to block Individual 1 from leaving the group home. The reporter stated that staff members in the home did not witness the contact." (*Id.* at 15.)

---

present at that location when the investigator arrived."); *id.* at 49 ("Nine months after Child C's interview and when Child C was no longer placed at the group home, the investigator first attempted to contact Staff 5. At that point, Staff 5 reportedly no longer worked at C3 Academy and did not respond to the investigator's late attempt for an interview."); *id.* at 49 n.74 ("The investigator attempted a timely face-to-face interview with Child C . . . .").)

Following intake, PI opened a Priority Two investigation of Neglect of Child K "by a staff member," to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 15.) The Monitors disagreed; because of the "substantial investigative deficiencies" described below, "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 15.)

In particular, the investigator failed to adequately interview Child K. First, the investigator "failed to conduct a face-to-face interview" with Child K. The child's record indicates that she has difficulty with verbal communication—specifically, "she 'is unable to grasp simple conversations' and 'things must be repeated to [her] in the most basic verbiage, to ensure [she] is able to understand and follow along.'" (*Id.* at 15 (brackets retained).) Yet the investigator not only interviewed Child K via telephone, but did so without any documented "efforts to accommodate the child's limited communication needs." (*Id.* at 15.) The Monitors also note that the lack of an in-person interview "prevented the investigator from observing the child and assessing her safety at the HCS Group Home." (*Id.* at 15.)

The intake was received on December 28, 2022. (*Id.* at 15.) An extension was approved on January 27, 2023, but the investigation was not completed until thirty-one days later. (*Id.* at 15.) Thus, the investigation was not completed timely under Remedial Order 10. (*See* D.E. 606 at 3.)

And because of the above-described investigative deficiencies, the allegation of neglect was not "investigated; commenced and completed on time consistent with the Court's Order; [or] conducted taking into account at all times" Child K's "safety needs." (*Id.* at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3 and Remedial Order 10.

### k. Child J

Child J is a seventeen-year-old PMC child with an IQ of 57 placed at Meridian Living Center, Inc., an HCS Group Home. (D.E. 1412 at 65.) "On April 3, 2023, a DFPS staff member reported

that" Child J "was located by law enforcement in a Target store. The officer believed the child was experiencing homelessness." (*Id.* at 65.) When the staff member discovered that Child J was missing, the staff member "called 911 and gathered the other residents into a car to search for the child." (*Id.* at 66.) But he did not report Child J's elopement to SWI.

Following intake, PI opened a Priority Two investigation of Neglect of Child J "by a staff member," to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 66.) The Monitors disagreed; because of the "substantial investigative deficiencies" described below, "a disposition regarding the Neglect allegation cannot be determined." (*Id.* at 66.)

First, the investigator's interview of Child J was inadequate. "The investigator documented that the child 'presented with limited verbal ability' and his language was 'difficult to understand.'" (*Id.* at 66.) Yet the "investigator did not appear to contact the HCS Group Home or the child's caseworker prior to the interview to identify whether the child had speech and/or intellectual limitations that may require accommodation." (*Id.* at 66.) And the investigator "did not document efforts to accommodate the child's limited speech and comprehension during" the interview. (*Id.* at 66.) As a result, "the investigator did not appear to gather any information from the child related to the allegation or to the child's safety at the placement." (*Id.* at 66.)

Second, the investigator's interview with the alleged perpetrator was similarly inadequate. "According to the staff member, at the time the child eloped, the staff member was grooming and bathing another resident. When the staff member completed this task, he could not locate the child in the home." (*Id.* at 66.) Yet the investigator failed to "adequately probe whether the staff member adequately supervised the child prior to the child eloping; for example, the investigator did not determine the child's proximity to the staff member." (*Id.* at 66.)

Third, the investigator failed to consider whether Meridian had sufficient capacity to meet Child J's "supervisory needs to ensure his safety." (*Id.* at 66.) Child J's "records documented that he has a history of 'high risk behaviors,' including frequently running away from placements and that, as a result, the child must be monitored 'at all times.'" (*Id.* at 66.) And it "d[id] not appear that one staff member would have been able to prevent" Child J's elopement "or other similar instances under the current staffing capacity in use at Meridian." (*Id.* at 66.) Yet "the investigator did not discuss or further explore whether the allegations were due to a failure by Meridian to 'provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff' that resulted in or created risk of physical or emotional injury or death for this child." (*Id.* at 66 (citing 26 Tex. Admin. Code § 711.719(b)(3)).) Instead, the investigator merely "documented that 'It is recommended that [the child's] level of supervision be re-evaluated.'" (*Id.* at 66.)

Because of the above-described investigative deficiencies, it is apparent that the allegation of neglect was not "investigated . . . consistent with the Court's Order; [or] conducted taking into account at all times" Child J's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3.

### l. *Child M*

Child M is a seventeen-year-old PMC child with an IQ of 57 placed at Forever Home Living Center, Inc., an HCS Group Home. (D.E. 1442 at 16.) "On March 14, 2023, a staff member reported that" Child M made an outcry "that a different staff member (Staff 1) 'attacked' her and 'hit her all over her body and face with metal kitchenware' on the weekend prior to the intake report," though the reporter "did not observe any visible injuries on the child." (*Id.* at 16.) Per the reporter, Child M further "stated that Staff 1 did not allow her to call her caseworker nor her CASA

worker when she asked to do so. Lastly, the child also stated that there was not enough food in the home. The reporter observed that the child appeared to be healthy." (*Id.* at 16–17.)

Following intake, PI opened a Priority Two investigation of Physical Abuse of Child M "by Staff 1," to which the investigator assigned a disposition of Unconfirmed. (*Id.* at 17.) The Monitors disagreed; because of the "substantial investigative deficiencies" described below, "a disposition regarding the Physical Abuse allegation cannot be determined." (*Id.* at 17.)

Specifically, the investigator failed to adequately interview Child M. First, the investigator failed to establish face-to-face contact with Child M (*id.* at 17), in violation of Remedial order 8 (D.E. 606 at 3). The investigator "attempted a timely face-to-face interview with the child at the placement," but Child M "was unavailable at that time," and the investigator made no further attempts at establishing face-to-face contact." (D.E. 1442 at 17 n.26.)

Second, Child M's record states that "she is deaf or hard of hearing, has a 'minor speech issue,' and 'needs to work more on her communication to make sure trusted adults know when she is confused.'" (*Id.* at 17.) Nonetheless, the investigator chose to interview Child M via telephone. (*Id.* at 17.) And despite Child M's "hearing and communication disabilities, the investigator did not document any attempt to accommodate the child's special needs during the phone interview." (*Id.* at 17.) Thus, although Child M "denied her outcry during the phone interview with the investigator, an interview by phone was not a reliable method . . . and did not allow the investigator to confirm whether or not the child was injured and safe at the group home." (*Id.* at 17.)

Because of the above-described investigative deficiencies, it is apparent that the allegation of physical abuse was not "investigated[ or] commenced . . . consistent with the Court's Order; [or] conducted taking into account at all times" Child M's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3.

### m.  Child Q

Child Q is a sixteen-year-old PMC child with an IQ of 59 and a "diagnosed . . . intellectual disability," placed at Meridian Living Center, Inc., an HCS Group Home. (D.E. 1442 at 20.) "On March 20, 2023, the Program Director at Meridian . . . reported an allegation of Sexual Abuse of" Child Q. (*Id.* at 20.) "According to the reporter, the child stated that a staff member (Staff 1) at the group home 'took her to a strip club' to have sex with an unknown male (Individual 1, age unknown)." (*Id.* at 20.)

Following intake, PI opened a Priority One investigation of Sexual Abuse of Child Q "by Staff 1,"[286] to which the investigator assigned a disposition of Inconclusive. (*Id.* at 20.) The Monitors disagreed; because of the "substantial investigative deficiencies" described below, "a disposition regarding the Sexual Abuse allegation cannot be determined." (*Id.* at 20.)

Though the investigator's face-to-face interview with Child Q did not support the specific allegation in the intake report, "the investigation surfaced a new allegation made by collateral staff members that Staff 1 transported the child and another child (age 12, not in DFPS care) to her apartment during her shift and while at the apartment," Child Q "had sex with a male (Individual 2, name and age unknown)." (*Id.* at 20.) "Allegedly, the child disclosed this information to the collateral staff members; however, during her interview with the investigator, the child denied the allegation that she engaged in sexual activity with anyone. During her interview, Staff 1 confirmed that she transported the children to her apartment, but she denied that the child engaged in sex with anyone." (*Id.* at 20.)

---

[286] "The Administrative Code definition of Sexual Abuse includes when an alleged perpetrator requests, solicits, or compels an individual receiving services to engage in sexual contact. As such, PI assigned the staff member as the alleged perpetrator to the allegation of Sexual Abuse." (D.E. 1442 at 20 n.30 (citing 26 Tex. Admin. Code § 711.13).)

"Regarding this new allegation that surfaced during the investigation, the investigator failed to establish whether Staff 1 transporting the child to her apartment exposed the child to a risk of harm. The investigator also failed to gather a timeline or factual understanding of the visit to the apartment to attempt to assess the veracity of the child's initial allegation that she engaged in sexual activity at the apartment. In addition, the investigator did not attempt to identify and interview Individual 2. Finally, the investigator did not attempt to interview the child's therapist nor caseworker; these individuals may have provided insight regarding the child's initial disclosure of Sexual Abuse and subsequent denial." (*Id.* at 20–21.)

Because of the above-described investigative deficiencies, it is apparent that the allegation of sexual abuse was not "investigated . . . consistent with the Court's Order; [or] conducted taking into account at all times" Child Q's "safety needs." (D.E. 606 at 2 ¶ 3.) Accordingly, this investigation was conducted in a manner that violated Remedial Order 3.

*　　*　　*

As the foregoing examples demonstrate, PI investigations frequently were beset by "lengthy and severe unexplained delays in investigations' completion that impacted child safety, including in Priority One investigations." (D.E. 1412 at 7.) The Monitors observed that "very few [investigations] were completed in 30 days and many had egregious delays, remaining open without activity for extended periods even in situations where the child was an alleged victim in newer additional serious allegations at the same placement." (*Id.* at 7.) Further, the "lack of management, diligence and coordination across many PI investigations fails to prioritize child safety and creates or exacerbates serious risk of harm for PMC children." (*Id.* at 8.) In other words, because PI failed to "do[] a better job for these children with the resources [it] had at hand" (D.E. 1487 at 133:14–15), some of the most vulnerable PMC children languished in unsafe placements as PI bungled investigation after investigation. Or, in Defendant's words: "The Monitors' report

[referring to D.E. 1412] recounts many heartbreaking stories. There's no excuse for what many of these children went through." (D.E. 1418 at 3.) Later, Defendant developed some objections.

### 3.   *The leadership of HHSC's PI unit lacks basic knowledge of the unit*

The first witness to testify at the Contempt Hearing was Stephen Pahl. Mr. Pahl is the Deputy Executive Commissioner of HHSC's Regulatory Services Division, a position that, as the time of the Contempt Hearing, he had held for around two and a half years. (D.E. 1487 at 105:16–18.)

As the Deputy Executive Commissioner of the Regulatory Services Division, Mr. Pahl is "in charge of" Provider Investigations. (*Id.* at 105:13–15.) Or at least, he is supposed to be in charge of Provider Investigations. Mr. Pahl's testimony left no doubt that he lacks even a casual familiarity with the department or its policies, and he certainly lacks the knowledge needed to provide meaningful oversight. Indeed, at the conclusion of Mr. Pahl's testimony, it was quite apparent that PI's failings start right at the top.

As an initial matter, the basis on which Mr. Pahl was selected to serve as Deputy Executive Commissioner of HHSC's Regulatory Services Division is unclear. Certainly, it was not based on his work history—before serving in his current role, Mr. Pahl was an Assistant Deputy Inspector General. (*Id.* at 105:22–23.) Before that, he "served as associate commissioner for the Consumer Protection Division at the Texas Department of State Health Services," where he "overs[aw] the licensing of EMS providers, radiation machine technicians and people who handle hazardous environmental substances."[287] And before that, he "spent 18 years" "at the Texas Department of Agriculture" "developing and implementing the agency's diverse consumer protection

---

[287]   Deputy Executive Commissioner for Regulatory Services, Stephen Pahl, HHSC, https://www.hhs.texas.gov/about/leadership/executive-teams-organizational-charts/deputy-executive-commissioner-regulatory-services-stephen-pahl.

programs."[288] In other words, his "background is not in child welfare," and he has "no prior work experience in child welfare."[289] (*Id.* at 106:1–5.)

Perhaps, then, Mr. Pahl was appointed with the understanding that he would learn on the job. He did, after all, agree that, as a person in "an administrator's role . . . that is over the operations of a division," he is "supposed to know" what those "operations are," because they are "ultimately [his] responsb[ility]." (*Id.* at 169:10–16.) But if that was the understanding, Mr. Pahl has not upheld his end of the bargain—from his testimony, it is evident that he has learned almost nothing about PI in the two and a half years he has been on the job.

Throughout Mr. Pahl's testimony, his limited understanding of PI's policies, procedures, and guidelines became abundantly clear:

- When asked if PI had an auditing group since its establishment in 2015, Mr. Pahl replied "I've been here for about 28 months. I don't know what happened eight years ago." (*Id.* at 156:11–15.) When asked if he looked into the history of PI at the time he assumed the position, he responded "No, I did not look." (*Id.* at 156:22–24.)

---

[288] *Id.*

[289] This is not the first time a person with no background in child welfare has been appointed to a senior position. At trial, for example, then-Commissioner Specia testified that he selected one "Mr. Morris" to serve as the Assistant Commissioner of Licensing. (D.E. 331 at 30:16–31:2.) Before serving in this role, Mr. Morris was a program auditor. (*Id.* at 30:18–21.) Commissioner Specia also liked Mr. Morris because "[h]e also is a commander in the Coast Guard and had significant responsibilities in the Katrina matter. And so he's pretty cool under pressure. And so I felt like he would be a very good person to take that job." (*Id.* at 31:3–6.)

Likewise, the State hired Sergio Gamino as "in[t]er-agency lead between HHSC and DFPS," a position created to help resolve the CWOP crisis. (D.E. 1225 at 77:22.) Prior, he was "an integrity and compliance officer" at the Department of Veteran Affairs. (*Id.* at 77:23–78:2.) Before that, he "ran a public transit department for one of the counties in southern Oregon." (*Id.* at 78:16–17.)

- When questioned by Plaintiffs' counsel whether HCS homes house intellectually disabled adults and children together, Mr. Pahl stated, "I don't know that to be correct."[290] (*Id.* at 111:13.)

- He was "not sure" whether children placed in CWOP ever stay in HCS homes. (*Id.* at 112:13.)

- Mr. Pahl recognized that PI's backlog of investigations was due, at least in part, to a shortage of investigators. (*Id.* at 115:4–12.) He noted that "filling our vacancies" has "been a priority of ours." (*Id.* at 118:7–8.) Indeed, Mr. Pahl explained that reducing the number of vacancies was a personal priority of his. (*Id.* at 118:12–13 ("Your Honor, reducing our vacancies is a priority of mine for my division.").) Yet, when asked whether any new staff had been hired in the prior three months to address PI's backlog issue—which, if remedied, would enable PI to conduct investigations in a thorough, accurate, and timely manner—Mr. Pahl stated, "I don't know if we've hired any new staff in this area in the last three months."[291] (*Id.* at 115:23.) Likewise, he was unaware how many interviews have been conducted in the last three months for new staffing, because he "delegate[s] interviews down." (*Id.* at 118:14–20.)

- When asked if he knew that ANE allegations concerning children in HCS residencies were not investigated because PI determined that it lacked jurisdiction, Mr. Pahl responded, "I'm not aware of that, ma'am." (*Id.* at 121:13–19.) He did

---

[290] After repeated questioning by the Court and Plaintiffs' counsel, Mr. Pahl admitted that he did, in fact, know that adults and children reside together in HCS homes. (D.E. 1487 at 111:5–24.)

[291] In order to address the staffing issue, funds have been appropriated by the legislature for this specific purpose; the concern is whether they are being utilized. (*See id.* at 117:25–118:17; *see also* PX 106 at 12 ("To help address ongoing staff resource challenges, the 88th Legislature appropriated HHSC's Regulatory Services Division, including LTCR, $17 million to make equity adjustments to recruit and retain staff.").)

know that "someone within our Provider Investigations unit" would know the answer, but he could not name the person with any degree of certainty. (*Id.* at 121:22–25; *see id.* at 122:1–7 ("THE COURT: But you don't know who? THE WITNESS: I believe some of them may be here today. THE COURT: Who would you think might know what happens to these children investigations where you say that you don't have jurisdiction? THE WITNESS: I would think Jenny Crowson.").)

- When asked if PI "ha[s] a category in your reports that . . . says no investigations . . . because we don't think we have jurisdiction?" Mr. Pahl responded, "I'm not sure, ma'am. I don't know." (*Id.* at 122:8–11.)

- Mr. Pahl recognized that "there may be confusion at times" within Provider Investigations as to the unit's investigative jurisdiction. (*Id.* at 120:16–19.) When asked if "providers, the facilities are confused, too," about "who's going to investigate [them] for . . . allegation[s] of abuse, neglect, or exploitation," however, Mr. Pahl "wouldn't be able to speak on what confuses providers." (*Id.* at 120:23.) Presumably, as the person "ultimately responsible" for PI (*id.* at 169:14–16), he should have been aware that "[p]roviders . . . have long voiced concerns about staff from both agencies conducting dual investigations based on different sets of statutes and regulations, which creates confusion." (PX 106 at 2.)

- Next, Mr. Pahl was asked about a recently adopted[292] policy directing PI investigators to make Unconfirmed and Inconclusive findings without documenting

---

[292] The "Temporary Management Directive: Efficient Investigative Procedures and Documentation Practices in All Settings" first took effect on September 22, 2022. (PX 6 at 1.) The version discussed during the Contempt Hearing went into effect on June 1, 2023. (*See id.*)

an explanation. (D.E. 1487 at 125:24–126:10.) He was shown the document describing the policy and then asked questions about it, and his responses indicated that he was unfamiliar with the policy—instead of answering questions with a yes or no, he responded with "That's what it says." (*Id.* at 129:8, 14.) Mr. Pahl was then asked "[w]hen you say that's what it says, are you not familiar with any of this?" to which he responded, "I'm not familiar with all of our policies and procedures." (*Id.* at 129:15–18.)[293]

- He likewise responded "I don't know," both when asked about the purpose of the policy and who came up with the policy. (*Id.* at 138:14–139:8.) He did, however, acknowledge that the policy "would have been [created by] someone within my Provider Investigations unit." (*Id.* at 139:13–14.) Of concern, there is no change in the policy to require the history of the facility to be taken into account during investigations or even additional staff background checks. The only new policy change is to direct investigators to remove their reasons for not finding ANE.

- Perhaps unsurprisingly, Mr. Pahl conceded that he does not "promulgate . . . and approve" "all policies and procedures" issued by his department. (*Id.* at 129:19–23.)

- Mr. Pahl was asked about PI's investigation into Child C's broken jaw.Given that Child C's jaw was broken in two places after a named staff member "hit [her] in the face with his fist multiple times," that she was put to bed with the broken jaw, and that she did not receive treatment until the following day after different staff

---

[293] In fact, Mr. Pahl became aware of this policy for the first time at his deposition for the Contempt Hearing. (*See* Attachment 2 at 5 (page 14:12–23) ("Q. [BY MR YETTER] This summer, one of the things that came out is a temporary managing directive dated June 1, 2023. Do you know what I'm talking about? A. No, sir . . . . Q. You've seen this before, have you not? A. I don't recall seeing this.").)

members "observed blood and bruising on Child C's face" (D.E. 1412 at 50), this investigation certainly stands out from the rest; even more so because of the incongruity between the evidence and the disposition of Inconclusive assigned by the investigator (*id.* at 50). Nonetheless, Mr. Pahl could not recall the disposition made by the investigator. (*See* D.E. 1487 at 137:11–14 ("Q. And at the end of the nine months, do you remember what the conclusion, the finding was of this child that ended up in the hospital with a broken jaw in two places, by herself? A. Not specifically, I don't recall.").)

- When questioned by the Court regarding PI investigators' ongoing failures to accommodate children's limited speech and comprehension capabilities during interviews, Mr. Pahl stated that there are "policies and procedures that lay out when and how investigations are conducted, including instances where children may have difficulty communicating."[294] (*Id.* at 142:8–10.) When asked whether these accommodation policies require investigators to document how they have accommodated the child's limitations, Mr. Pahl responded, "I'm not sure." (*Id.* at 142:20) Upon further questioning by Plaintiffs' counsel whether, in light of the new policy that allows for no explanations on Unconfirmed or Inconclusive findings, the investigators would be required to document on the form whether they used proper resources to communicate with a child that has limited capacities, Mr. Pahl responded he was not aware of the form requiring any such action. (*Id.* at 145.)

---

[294] This is an improvement from his deposition, where Mr. Pahl stated he was "not aware of whether [there is] a requirement or not" for HHSC investigators to take into account the alleged victim's disabilities when conducting investigations. (*See id.* at 8 (page 28:10–18).) The PI Handbook directs investigators to "consider the person's unique abilities and needs when selecting methods of communication." (DX 40 at 33.)

- Plaintiffs' counsel questioned Mr. Pahl on PI's repeated failure to review the history of the facility at which ANE allegedly. (*Id.* at 145:10–18.) He responded that they were making changes,[295] but he was not certain whether the changes had already gone into effect. (*Id.* at 146:3–10 ("THE WITNESS: I believe that has already gone into effect, but I'll have to check with my staff to make sure. THE COURT: But you're not sure? THE WITNESS: Yes, ma'am. THE COURT: Okay. But you knew it wasn't in effect during all these cases reported by the Monitors, that you did not check the history of the facility? THE WITNESS: That's true.").)

- When questioned by Plaintiffs' counsel whether he is aware of an auditing or quality assurance group reviewing PI investigations, Mr. Pahl responded, "I'm not personally aware of any." (*Id.* at 157:6–9.) The PI Handbook for fiscal year 2024 added a section titled "Quality Assurance Mandatory Submission," pursuant to which "all cases involving . . . [a] child, regardless of DFPS CPS conservatorship status" must be approved by Quality Assurance. (DX 34 at 190–91.) But when asked whether the policy is in the Provider Investigations Handbook Mr. Pahl responded, "I'm not sure if it is or if it isn't." (D.E. 1487 at 157:22.)

Notably, Mr. Pahl expressed "no disagreement" with the conclusions reported by the Monitors in their review of PI investigations that were inappropriately conducted. (*See id.* at 132:13–15.) Further, Mr. Pahl was able to agree that the PI unit could be doing a better job investigating abuse

---

[295] A directive issued to staff at HHSC PI on October 24, 2023, states that under the new policy, investigators are now "required to review all case history for principals when the victim is a child or young adult in PMC/TMC." (PX 98 at 40.) For all other alleged victims, the investigator "may" consider such history. This directive, while emphasizing existing policy, does not resolve the problem discussed above regarding PI's failure to consider referral history more broadly (as is the well-settled practice for DFPS). Therefore, PI investigations continue to exclude other relevant critical information regarding past patterns of abuse, neglect, or exploitation in an operation's history and in the history of its owners and administrators.

and neglect allegations of PMC children with the resources at its disposal. (*See id.* at 132:19–133:18.)

Mr. Pahl's unfamiliarity with PI is worrying—it is, after all, difficult to competently oversee a unit one knows nothing about. More worrying, however, is the fact that Mr. Pahl is, apparently, the person most knowledgeable about the PI unit.

Under Federal Rule of Civil Procedure 30(b)(6), a party may provide "a governmental agency" with a list of "matters for examination," and the agency must designate one or more "officers [or] directors" that "must testify about information known or reasonably available to the organization." The purpose of Rule 30(b)(6) is "to enable the responding organization to identify the person who is best situated to answer questions about the matter, or to make sure that the person selected to testify is able to respond regarding that matter." Wright & Miller, 8 Fed. Prac. & Proc. § 2103.

During discovery ahead of the Contempt Hearing, Plaintiffs designated Mr. Pahl, as a named deponent. (*See* D.E. 1431 at 1.) Plaintiffs also asked Defendant to designate one or more "Rule 30(b)(6) witness(es)" (*id.* at 1) who were best situated to answer questions about the following topics concerning the Provider Investigations unit:

1. Policies relating to investigations by Provider Investigations, including policies and guidance relating to accommodations for children with developmental challenges and limited capacities.

2. Policies relating to Provider Investigations criteria for approving investigation extensions for good cause.

3. Policies or practices of Provider Investigations to forgo review of the referral history of the placement location, the supervising agency or owner, or specific group home locations.

(D.E. 1431-3 at 2.) Defendant failed to designate another witness for these topics at deposition, thereby asserting that Mr. Pahl is the person most knowledgeable as to those topics. Further, Mr. Pahl was asked and answered questions on two of these topics during his deposition. (*See* Attachment 2 at 7–8 (page 13:19–14:8, 23:18–25:8, 26:6–28:24) (Deposition of Stephen Pahl).)

Yet, as detailed above, Mr. Pahl's performance at the Contempt Hearing makes clear that even though he serves in an official capacity as the head of the department responsible for PI, his knowledge of the policies and procedures guiding PI is scant at best. His performance at his deposition and Contempt Hearing underscores both his lack of knowledge of his department and his complete disinterest in acquiring this knowledge. As Mr. Pahl was the only person designated by the State to respond to these three policy areas, it must be assumed that nobody in the department has any more knowledge than he does regarding these policy areas.

The Monitors' review of PI investigations indicated the need for PI to have reviewed other essential information in order to adequately assess whether children were subject to maltreatment. Mr. Pahl claimed his department has identified issues and is "working to address the problems," but the only change identified at the Contempt Hearing was the implementation of the Temporary Managing Directive. (D.E. 1487 at 136:13–14.) Issued on June 1, 2023, the "Temporary Management Directive: Efficient Investigative Procedures and Documentation Practices in All Settings" is implemented to provide "temporary[296] procedures that allow Provider Investigations (PI) to complete investigations in all settings more efficiently." (PX 6 at 1.) Under the "Background" heading, it states: "In an effort to assist with PI's backlog, PI leadership reviewed ways to make the investigative process *more efficient* while not compromising the quality of PI's investigations. To reduce the number of open investigations and maintain quality in investigations, PI management has approved the following procedures." (*Id.* at 1 (emphasis added).) One of these procedures, addressing documentation of Unconfirmed or Inconclusive findings, states "[T]he investigator will no longer explain how the evidence does or does not satisfy the element when

---

[296] Mr. Pahl was asked at his deposition whether this policy is still in effect, to which he responded, "I'm not sure. You would have to ask the leadership within PI if this is still in effect." (Attachment 2 at 6 (page 18:4–6).) Notably, the policy does not include an expiration date. (*See* PX 6.)

documenting the *Analysis of Evidence*."[297] (*Id.* at 1 (emphasis in original).) Thus, if a PI investigator determines that the proper disposition of an ANE allegation should be Unconfirmed or Inconclusive, the investigator is not required to explain what evidence was evaluated to reach that conclusion, nor what evidence supports each element of the allegation. (*See* D.E. 1487 at 130:15–131:14.)

Of course, if a quality assurance team were to review the investigation to determine whether the proper disposition was reached, it is unclear how this review could function effectively to approve or give complete guidance about the dismissal of allegations of ANE, given the lack of information about how the investigator reached the conclusion. (*See* DX 41 at 50 (listing as one purpose of Quality Assurance Provider Investigations (QAPI), "to analyze case actions in the field and provide constructive feedback for each live investigation" on whether the specific elements of an allegation are addressed).)

Doctor Miller opined that the Temporary Management Directive "puts children at risk of harm" because "there are no quality dimensions . . . [t]here are no qualitative efforts to try to – to keep kids safe by getting the kind of information that you need and holding people accountable." (D.E. 1488 at 268:9–13.) The current quality of PI's investigations is seriously deficient—as detailed by the Monitors' reports—and the State did not explain how the quality of investigations will improve by reducing the amount of documentation. Even Mr. Pahl agreed this policy does not make children safer. (*See* D.E. 1487 at 134:2–5 ("Q. [BY MR. YETTER] . . . . How does it make children safer for investigators not to explain their findings? A. I suppose it doesn't.").)[298] This cannot be

---

[297] The Analysis of Evidence is the section of the Provider Abuse/Neglect Report in which the investigator "reviews and discusses the credibility of the evidence collected to determine whether there is a preponderance of evidence to support or refute the allegation." (DX 34 at 156.)

[298] When questioned whether there was any "good child safety reason for this new policy of no explanation" Mr. Pahl responded, "Sitting here today, I can't think of any." (D.E. 1487 at 144:20–23.) On cross, he further admitted that he was unaware whether this policy changes how, if at all, PI investigators collect evidence in an investigation. (*See id.* at 175:16–21.)

interpreted as progress for the children. Defendant points to statutory changes such as HB 4696 which will "correct[] some jurisdictional issues within two different codes" leading to more efficient investigations into ANE allegations.[299] (D.E. 1487 at 169:19–170:7.) However, HB 4696 will not be fully implemented until the end of 2024 or early 2025. (*See id.* at 170:8–11.)

In response to the Contempt Motion, Defendant asserted that "plaintiffs haven't met their burden on the second element of contempt—*i.e.*, that Remedial Order 3 requires the conduct that plaintiffs allege DFPS failed to undertake" (D.E. 1429 at 16):

> . . . it must "include an express or clearly inferrable obligation" to take the specific action in question. *Hornbeck Offshore Servs.*, 713 F.3d at 793. Plaintiffs' post-hoc disagreements on judgment calls about which steps should have been taken in a particular investigation or how the standard of neglect should have been applied to a certain set of facts aren't grounded in the order's command to "investigate[]" while accounting for "the child's safety needs." Dkt. 606, at 2. *See Baum*, 606 F.2d at 593 (contempt still improper even though deposition was taken despite court's order vacating deposition notice because the order "did not explicitly direct that the deposition not take place").

(D.E. 1429 at 16–17.) Defendant then averred that for "these same reasons, plaintiffs' allegations . . . concerning HHSC's Provider Investigations don't carry plaintiffs' *prima facie* burden to show contempt. Those allegations rely on a Monitors report that expresses the same type of post-hoc disagreements discussed [earlier in the response], which find no basis in Remedial Order 3 itself. Nor do the additional criticisms of investigations have a basis in any order." (*Id.* at 18.)

But Plaintiffs did explain that Remedial Order 3 addresses deficient abuse and neglect investigations, a complex and multifaceted problem. (*See* D.E. 1427 at 10–11.) Notably, the Fifth Circuit recognized that the State's investigations suffered multifarious flaws:

> As the district court correctly pointed out, . . . the investigators in question were failing to interview all of the necessary parties, ask pertinent questions, gather all evidence and key information, and address risks. In other words, the main issue with the investigations was

---

[299] HB 4696 will, among other things, require HHSC to "generate a single intake to be investigated by one surveyor, who will be fully cross-trained to both investigate the ANE allegation and assess the provider's regulatory compliance." (PX 106 at 3.)

> not merely that there was competing evidence or that reports were uncorroborated. Rather, the information gathering process was fundamentally flawed.

*Stukenberg I*, 907 F.3d at 265–66 (footnote and quotation marks omitted). In such situations, the Fifth Circuit has been clear that a court need not, as Defendant seems to imply, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Am. Airlines, Inc.*, 228 F.3d at 578. It is not enough that the State conduct a rudimentary investigation to satisfy the requirements of Remedial Order 3.

For example, *North Alamo Water Supply Corp. v. City of San Juan* affirmed an injunction requiring the transfer, from the defendant to the plaintiff, of the provision of water service to several residential subdivisions. 90 F.3d 910, 913, 917–18 (5th Cir.) (per curiam), *cert. denied*, 519 U.S. 1029 (1996), *overruled on other grounds by Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020). The court reasoned:

> Transferring water service from the City to the Utility will be a relatively complicated logistical task, requiring a coordinated effort by both parties. The burdens of any disruption in service will fall more heavily on the residents than on the parties. With an eye on these potential pitfalls, the district court instructed the City to continue uninterrupted water service until the Utility is prepared to commence service, then to cease providing water service immediately upon commencement of service by the Utility. Although this order does not choreograph every step, leap, turn, and bow of the transition ballet, it specifies the end results expected and allows the parties the flexibility to accomplish those results.

*Id.* at 917. Likewise, abuse and neglect allegations take many forms, so investigating them is "a relatively complicated . . . task." *Id.* at 917. Remedial Order 3 specifies the end results expected—that Defendant investigates allegations of abuse and neglect, does so timely and consistent with the Court's orders, and conducts the investigations "taking into account at all times the child's safety needs." (D.E. 606 at 2.) Thus, Remedial Order 3 need not "choreograph" "which steps should . . . be[] taken in a particular investigation . . . ." 90 F.3d at 917 (first quotation); (D.E. 1429 at 16 (second quotation)).

Defendant cites *Baum* for the proposition that contempt was "improper even though deposition was taken despite court's order vacating deposition notice because the order 'did not explicitly direct that the deposition not take place.'" (*See* D.E. 1429 at 16–17 (citing 606 F.2d at 593).) But *Baum* is distinguishable because the bankruptcy court's order on which the contempt finding was based neither explicitly required nor explicitly prohibited any conduct—it stated only that "the notice of deposition mailed on August 3, 1976 noticing the deposition of Howard E. Samuel be vacated and set aside, same not being reasonable notice as required by the Federal Rules of Civil Procedure." 606 F.2d at 593. Remedial Order 3, on the other hand, clearly and unambiguously sets forth "an unequivocal command." *Id.* at 593 (quoting *H.K. Porter Co., Inc. v. Nat'l Friction Prod. Corp.*, 568 F.2d 24, 27 (7th Cir. 1977)).

Indeed, *Baum* indicated that a command may have been inferable from the bankruptcy court's order with sufficient clarity to support the contempt finding had the order merely been "addressed specifically to" the alleged contemnor. *Id.* at 593 ("In the present case, appellant Baddock did not violate a specific and unequivocal order of the bankruptcy court. The bankruptcy judge's order vacating the notice of deposition was not addressed specifically to Baddock."). Remedial Order 3 certainly clears that hurdle.

Tellingly, in the context of HHSC's Provider Investigations unit, the only example Defendant provides of an investigative step that "find[s] no basis in Remedial Order 3" is a review of a placement's referral history. (D.E. 1429 at 18.) Yet Mr. Pahl clearly inferred that a placement's referral history is relevant when investigating an allegation of abuse or neglect in that placement and, thus, implicates the alleged victim's safety needs. (D.E. 1487 at 147:1–4 ("Q. You know that it's relevant, it's important to know the track record of the facility, the operation where the abuse, the alleged abuse took place? That's relevant, isn't it? A. Yes, sir.").) Indeed, the relevance of a

placement's referral history when investigating abuse or neglect allegations is so obvious that it was already a step required by DFPS of its Residential Child Care Investigations (RCCI) investigators. (*See* D.E. 1412 at 8 & n.17.)

Further, Defendant's assertion that the Monitors merely report "post-hoc disagreement" (D.E. 1429 at 18) with PI's investigators is inaccurate. In fact, the Monitors conducted an in depth "review of State records" to "assess[] . . . investigation[s] of reports of abuse, neglect and exploitation of children in Permanent Managing Conservatorship (PMC) conducted by" PI. (D.E. 1412 at 1, 2.) As the foregoing summaries make clear, the Monitors reported facts about each investigation, including when it was commenced and completed, when the alleged victim, perpetrator, and witnesses were interviewed, and any acts or omissions by the investigator that indicated a failure to account for the alleged victim's safety needs. None of these topics "find no basis in Remedial Order 3 itself." (D.E. 1429 at 18; *see* D.E. 606 at 2 ¶ 3.) Further, these are the most vulnerable of an already vulnerable group of PMC children. To say that this entire cohort of children is so small as to be entirely disregarded by HHSC is absurd and inexcusable.

The third element of civil contempt requires a movant to establish by clear and convincing evidence that the respondent failed to comply with the Court's order. *See LeGrand*, 43 F.3d at 170. Defendant has not presented evidence that counteracts the substantial weight that the Court affords to information verified and reported by the Monitors, the factual basis of which Defendant did not refute during the Hearing. The Court finds the continued recalcitrance by HHSC PI to conduct thorough, accurate, and timely abuse, neglect, and exploitation (ANE) investigations to ensure the safety of PMC children in their care as clear and convincing evidence of their failure to comply with the remedial orders. As demonstrated by the stories of the children and PI's failure to take any action to remedy the egregious flaws identified by the Monitors, PI represents a significant,

systemic failure that increases the risk of serious harm to PMC children. The substantial rate at which the State's investigations are inappropriately resolved or deficiently conducted indicates that the State is failing to "ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs," as required by Remedial Order 3. (D.E. 606 at 2.)

The Monitors' reports and the testimony at the Contempt Hearing establish by "clear and convincing evidence," *see Hornbeck I*, 713 F.3d at 782, that Defendant has failed to comply with Remedial Order 3 and continues to expose PMC children to an "unreasonable risk of serious harm" (*see* D.E 606 at 2). The information in the Monitors' reports demonstrate that HHSC's Provider Investigations has failed to "ensure that reported allegations of child abuse and neglect involving children in the PMC class"—indeed, some of the most vulnerable children in the PMC class—"are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs." (*Id.* at 2.) Thus, the third element of civil contempt—that Defendant has failed to comply with the Remedial Order—is established by clear and convincing evidence as to this aspect of Remedial Order 3. *See LeGrand*, 43 F.3d at 170.

Defendant makes the same arguments regarding Remedial Order 10 as she did regarding Remedial Order 3. Defendant argues that "[t]he Monitors have reported overwhelming *approval* of defendants' investigations of allegations of abuse and neglect—observing that investigations have 'measurably improved over time' and 'often resulted in an appropriate disposition.'" (D.E. 1429 at 20 (quoting D.E. 1318 at 47) (emphasis retained).) But that comment by the Monitors was directed at DFPS, and is inapplicable to PI's compliance with Remedial Order 10.

Further, Defendant argues, "The recent Monitors' report on which plaintiffs rely recounts investigations involving only nine PMC children, so it's far too limited to be clear and convincing evidence of contempt." (*Id.* at 11 (citing *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995).).) Although the Monitors did commend the improvements made by DFPS as to investigating ANE allegations in licensed placements, the Monitors continue to find deficiencies in HHSC PI investigations such as inconsistently investigating each allegation contained in an investigation, failing to adequately interview, or interview at all, individuals relevant to the allegation, failing to review the history of the operation, failing to complete investigations in a timely manner, and failing to require updated staff criminal histories. (D.E. 1318 at 47.) The failure to adequately investigate within the time frame required by Remedial Order 10 leads to significantly delayed interviews with key individuals, thereby impairing the fact-finding process of the investigation. (D.E. 1442 at 13.) Additionally, as stated previously, the Monitors specifically note that HHSC PI "repeatedly addressed allegations of Sexual and Physical Abuse of some of the State's most vulnerable children with shocking carelessness, leaving PI investigations open with no activity for months on end—in numerous instances for more than one year—while children with significant developmental disabilities were left in harm's way." (*Id.* at 2–3.) The Monitors' reports identified deficient PI investigations of alleged abuse and neglect of vulnerable children, and the lapses in investigations are clearly against the Court's express remedial orders. For example, Child C remained in a placement like C3 Academy for approximately one year after the first abuse and neglect allegation of Child C was reported. (D.E. 1412 at 27–28.) PI's failure to conduct timely, accurate, and thorough investigations repeatedly resulted in PMC children remaining in unsafe placements for prolonged periods of time. Based on the foregoing, it appears that PI "investigators are not encouraged to complete investigations quickly, leaving children in

potentially dangerous situations. Staff fail to interview parties, review evidence, or address continuing risks to children." *Stukenberg I*, 907 F.3d at 292.

In sum, most of the PI investigations reviewed by the Monitors were not compliant with Remedial Order 10 and its requirement that investigations must be completed within thirty days unless they have an approved and documented extension for good cause. (*See* D.E. 606 at 3.) Defendant has failed to rebut the "clear and convincing evidence," *see Hornbeck I*, 713 F.3d at 782, provided in the Monitors' Report that Defendant has failed to comply with Remedial Order 10's requirement that Priority One and Priority Two investigations be completed within thirty days of intake barring a documented extension for good cause. (D.E. 606 at 3.) Therefore, the Court finds by clear and convincing evidence that the third element of civil contempt, "failure to comply with the court's order" is satisfied as to Remedial Order 10. *See LeGrand*, 43 F.3d at 170.

### 4. *Defendant failed to establish defenses to contempt*

Once the three elements of civil contempt have been established, the respondent may defend against a finding of civil contempt by justifying noncompliance, rebutting the conclusion, demonstrating an inability to comply, asserting good faith in its attempts to comply, or showing mitigating circumstances or substantial compliance. *See LeGrand*, 43 F.3d at 170 (noting that an inability to comply is a defense against civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (holding that good faith and inability to comply are defenses to civil contempt); *Whitfield*, 832 F.2d at 914 (holding that burden falls on defendants "to show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the consent order.").

As an initial matter, the Court notes that Defendant did not attempt to demonstrate any of these defenses at the Contempt Hearing through evidence, presenting their own witnesses, or cross-examination of Plaintiffs' witnesses. This despite Defendant indicating that she would present such

witnesses.[300] (*See supra* footnote 12; *see also* D.E. 1488 at 340:16–19 (Defense counsel explaining that "the evidence is not final at this point, and we haven't put on our case-in-chief").)

Defendant did raise several defenses in her response to the Contempt Motion. (D.E. 1429.) Defendant attempted to rebut the conclusion of contempt by arguing that the number of PMC children discussed in the Monitors' PI reports is too "small [of a] sample . . . to prove that Defendant[ is] in contempt as to Remedial Order 3." (D.E. 1429 at 18.) First, these children being abused in HCS group homes are not just a data set, they are some of the most vulnerable children in the State's care—children who suffered for months or years while the State bungled investigation after investigation. Second, the fifteen children discussed in the Monitors' reports[301] represent a substantial portion of the eighty-eight PMC children in HCS group homes.[302] (D.E. 1380 at 28 n.33.) And the Monitors reviewed not just a sample of the PI investigations involving PMC children during the assessment period, they reviewed "all PI investigations involving PMC children that closed with an overall disposition of Unconfirmed or Inconclusive between January 1, 2023 and April 30, 2023." (D.E. 1461 at 2.) And they concluded that over half of those investigations—55 percent—were deficient. (*Id.* at 2.) In other words, the Monitors uncovered a pattern of inadequate PI investigations. Indeed, these numbers belie Defendant's claim to "diligently strive to ensure the welfare of each and every child in . . . care." (D.E. 1429 at 18; *cf.* D.E. 1412 at 2 ("In one of the most appalling failures by the State, [Child C] was the subject of multiple reports of abuse and neglect leading to 12 PI investigations, all pending simultaneously, over a one-year period at the same placement, C3 Academy, LLC." In the "twelfth investigation

---

[300] The Court also notes that Defendant did not claim lack of notice.

[301] Children A, C, D, E (discussed in the first investigation of Child D, *supra* page 359–60), F, G, H, I, J, K, L, M, N, O, and Q. (D.E. 1412; D.E. 1442.)

[302] The number of PMC children in HCS has not changed significantly over time. (*See, e.g.*, D.E. 1318 at 21 n.24 (ninety-three children); D.E. 1248 at 20 n.20 (101 children); D.E. 1165 at 20 n.23 (seventy-three children).)

of alleged abuse and neglect of the same child at that same placement—a staff member allegedly broke the child's jaw in two places. The child and a witness identified the staff member who attacked the child. . . . Nonetheless, PI took nine months to complete the investigation with long periods of inactivity and it ultimately determined the allegations were Inconclusive, despite a preponderance of evidence that the staff member abused the child.").)

Defendant argues that she has substantially complied with Remedial Order 3 because the Monitors "agreed with RCCI's disposition" of abuse and neglect investigations "95 percent of the time and CPI's disposition 94 percent of the time." (D.E. 1429 at 21.) But RCCI and CPI are both units of DFPS, so these statistics have no relevance to PI's compliance with Remedial Order 3. Indeed, if one were to use the rate at which the Monitors agreed with the agency's disposition as the metric for substantial compliance, then PI would certainly fall short—after all, the Monitors agreed with PI's disposition of just 45 percent of abuse and neglect investigations. Indeed, juxtaposing the rates of agreement only highlights PI's failure to comply—substantially or otherwise—with Remedial Order 3.

In any event, the touchstone of substantial compliance is "whether the defendant[] took 'all reasonable steps within [its] power to insure compliance with the orders.'" *Alberti*, 610 F. Supp. at 141. And given Mr. Pahl's concession that PI could have done a better job with the resources at hand (D.E. 1487 at 133:13–16), the Court does not find that HHSC took all reasonable steps within its power to comply with Remedial Order 3. For the same reason, the Court does not find that HHSC took all reasonable steps within its power to comply with Remedial Order 10.

Defendant also highlights her "good faith efforts to comply with Remedial Order 3." (D.E. 1429 at 22.) Defendant did not offer a definition of "good faith" in her brief. But based on the context in which she uses the term, the Court understands Defendant to have been arguing that she

acted with "faithfulness to [her] duty or obligation" under the remedial order. *Good faith* (def. 2),

Black's Law Dictionary (11th ed. 2019). Specifically, Defendant notes that "DFPS has created a

'child sexual aggression' training course that thousands of investigators have completed to help

them better recognize sexual abuse" and that "DFPS has also changed its policy to greatly reduce

which intakes may be downgraded to 'priority none' for PMC children and has restructured its

secondary review for intakes about licensed placements to ensure that reports lacking key

information were still properly investigated." (D.E. 1429 at 22.) But, as with the statistics

Defendant offers as evidence of substantial compliance, these steps were taken by DFPS, not

HHSC. Therefore, they say nothing about HHSC's good faith effort to comply with Remedial

Order 3.

Indeed, PI's most notable policy change—directing investigators not to explain their reasons

for assigning a disposition of Inconclusive or Unconfirmed—hardly demonstrates good faith. Mr.

Pahl agreed that this policy did not make children safer. (D.E. 1487 at 134:2–5.) And it would be

difficult to conclude otherwise, given that the purpose of the policy change is to "reduce the

number of open investigations" by "mak[ing] the investigative process more efficient." (PX 6 at

1.) In other words, the change allows investigators to close cases more quickly. But the Court

already explained, the last time it held Defendants in contempt of Remedial Order 3, that:

> [S]imply checking the boxes of commencing and completing investigations by certain
> times is not sufficient for Defendants to implement this Remedial Order in a way that
> "ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm,"
> as required by the Court's injunction. Defendants must also "conduct" investigations in
> such a way that "tak[es] into account at all times the child's safety needs." Defendants must
> approach allegations of abuse and neglect involving PMC children in such a way that
> "taking into account at all times the child's safety needs" is the main objective.

(D.E. 1017 at 77–78 (emphasis and citations omitted).) Of course, the practical effect of the no

explanation policy is to insulate dispositions of Inconclusive or Unconfirmed—the ones that result

in the child remaining in the group home at which the abuse or neglect was alleged—from review

by the Monitors or PI's internal quality control team.[303] This hardly bespeaks an approach to allegations of abuse and neglect in which "taking into account at all times the child's safety needs" is the main objective.

In support of the claim of good faith compliance, Defendant cites *Anderson v. School Board of Madison County* for the proposition that contempt is inappropriate where the "alleged contemnor 'devoted considerable time and resources in a good faith effort' to comply." (D.E. 1429 at 22 (quoting 517 F.3d 292, 301–02 (5th Cir. 2008)).) But *Anderson* also noted that "if the evidence showed that the [defendant] disregarded known facilities' deficiencies, it likely would have failed in its duty to act in good faith." 517 F.3d at 301. Since at least 2018, the State has known that its investigations into abuse and neglect allegations were "fundamentally flawed," as investigators "were failing to interview all of the necessary parties, ask pertinent questions, gather all evidence and key information, and address risks." *Stukenberg I*, 907 F.3d at 265–66. Indeed, the Monitors reports reveal that every one of these fundamental flaws is common among PI investigations.

In sum, Defendant offered no evidence that HHSC acted with "faithfulness to [its] duty or obligation" under Remedial Order 3. *Good faith* (def. 2), Black's Law Dictionary (11th ed. 2019).

Defendant also argues that "mitigating circumstances weigh heavily against contempt." (D.E. 1429 at 51.) As mitigating circumstances, Defendant highlights "extensive efforts and successes" in complying with other of the remedial orders (*id.* at 51–52), and asserts she has "expended enormous efforts and millions of taxpayer dollars to implement and comply with the Court's many

---

[303] It is telling that the no explanation policy does not apply when the investigator assigns a disposition of Confirmed. (*See* PX 6 at 1 ("When the evidence demonstrates an unconfirmed or inconclusive finding, the investigator will no longer explain how the evidence does or does not satisfy the element when documenting the *Analysis of Evidence*. This does not apply to investigations when the evidence demonstrates a confirmed or confirmed-reportable conduct finding.").) Presumably, this is to allow the finding to survive administrative review if it is challenged by the perpetrator.

remedial orders" (*id.* at 51). But Defendant does not explain why these claims would mitigate Provider Investigations' failure to comply with Remedial Order 3 and 10. And the cases upon which Defendant relies show that the grounds alleged do not establish mitigating circumstances, as the defense requires a showing that circumstances beyond the contemnor's control prevented compliance.

Defendant cites *Anderson v. School Board*, 517 F.3d 292, 301 (5th Cir. 2008), and suggests that the Fifth Circuit "affirm[ed] dissolution of [the] desegregation order where school district 'devoted considerable time and resources in a good faith effort' to comply." (D.E. 1429 at 51.) But this only tells half the story—in the paragraph immediately prior, the Fifth Circuit noted that "the failure of the [magnet school] program to attract white students was not attributable to the [school district]'s actions or lack of good faith. Instead, the [district] court found that the magnet program's goal of attracting white students was doomed because of location and cultural factors that were not attributable to the [school district]." 517 F.3d at 301. Here, Defendant has not alleged that Provider Investigations' efforts to comply were similarly "doomed" by an exogenous factor. Indeed, quite the contrary, Stephen Pahl agreed that Provider Investigations "[c]ould have done a better job for these children with the resources . . . at hand." (D.E. 1487 at 133:14–18.)

And in *Little Tchefuncte River Association v. Artesian Utility Co.*, the mitigating circumstances were not, as Defendant claims, Artesian's successful compliance "with other numerous provisions" of the injunction. (D.E. 1429 at 51.) Instead, the court found mitigating circumstances because Artesian's violations were the result of discrete, unexpected events, and because Artesian "instituted corrective measures after every" violation. 155 F. Supp. 3d 637, 664 (E.D. La. 2015); *see*, *e.g.*, *id.* at 663 (defendant testified "that the fecal coliform exceedances in July and August 2014 were caused by a decomposing turtle in the chlorine contact chamber" and "that in order to

prevent the problem in the future Artesian has added a screen over the chlorine contact chamber and mesh at the inlet pipe to ensure that turtles do not enter the chamber"). The only corrective measure (to use the term loosely) instituted by Provider Investigations is to omit information from investigative reports, which is unlikely to prevent further faulty investigations.

Defendant concludes the brief by quoting an unpublished Eleventh Circuit opinion:

As the Eleventh Circuit commented in another institutional-reform case involving a state's child-welfare system, "[t]he system is not yet perfect and may never be, but its improvement has been tremendous." *R.C. ex rel. Ala. Disabilities Advoc. Project v. Walley*, 270 F. App'x 989, 992–93 (11th Cir. 2008) (dissolving injunction of state's foster-care program). So too here.

(D.E. 1429 at 52.) It is certainly true that Texas's foster care system "is not yet perfect and may never be," but Defendant presented no evidence that Provider Investigations has made a "tremendous" improvement, as that term was used in *Walley*. 270 F. App'x at 992. There, the district court found that "the Alabama child welfare system had undergone radical changes and was on secure footing to continue its progress in the years to come, without court supervision." *Id.* at 992. The record makes clear that the same cannot be said of Provider Investigations.[304]

Thus, Defendant has failed to establish that she has substantially complied or made good faith efforts to comply with Remedial Order 3 or Remedial Order 10, nor has she established mitigating circumstances. *See LeGrand*, 43 F.3d at 170; *Petroleos Mexicanos*, 826 F.2d at 401. Defendant did not assert either an inability to comply or justify her noncompliance, *Petroleos Mexicanos*, 826

---

[304] Defendant's reliance on *Walley* is also curious because the Eleventh Circuit suggested that a district court should be given special deference when overseeing a long-term structural injunction: "[T]he district court was in the unique position to rely on its personal experience with the parties and its knowledge of this case to emphasize the State's history of good faith and its present commitment to remedying remaining problems as mitigating factors when assessing substantial compliance and sustainability thereof." 270 F. App'x at 993 (citing *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 394 (1992) (O'Connor, J., concurring in the judgment) ("Our deference to the District Court's exercise of its discretion is heightened where, as in this litigation, the District Court has effectively been overseeing a large public institution over a long period of time.")). This reasoning would suggest that a district court is likewise in a unique position to rely on its experience with the parties and knowledge of the case to emphasize the State's history of failing to comply with remedial orders, and its lack of commitment to remedying the remaining problems.

F.2d at 401, in her pleadings or otherwise. This leads to the Court's finding that HHSC has failed to ensure investigations of serious abuse and neglect allegations are "investigated; commenced and completed on time . . . and conducted taking into account at all times the child's safety needs." The Court therefore holds, based on clear and convincing credible evidence, that Defendant Cecile Erwin Young, in her official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas, is in contempt of Remedial Order 3 and Remedial Order 10.

## VII.    CONCLUSION

For the foregoing reasons, the Court finds Defendant Cecile Erwin Young, in her official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas, in contempt of Remedial Order 3. It is hereby ordered that Commissioner Cecile Erwin Young, in her official capacity, is ORDERED to pay $50,000 per day until HHSC agency leadership certifies that all PI investigations involving at least one PMC child closed from December 4, 2023 until the date of the State's certification, are substantially compliant[305] with the Remedial Order 3 AND concurrently produce to the Monitors the list of all PI investigations involving at least one PMC child closed between December 4, 2023 and the date of the State's certification. The fine will be suspended upon complete submission by the State of the foregoing. The Monitors will conduct a case record review of the cases identified by the State in its submission and report their findings to the Court.

The Court further finds Defendant Cecile Erwin Young, in her official capacity, in contempt of Remedial Order 10. Defendant Cecile Erwin Young, in her official capacity, is ordered to pay $50,000 per day until HHSC agency leadership certifies that all open PI investigations involving

---

[305] This in no way waives the Court's retention of jurisdiction for a period of three years after full compliance as certified by the Monitors. (*See* D.E. 606 at 19.)

at least one PMC child are substantially compliant with Remedial Order 10 AND concurrently produce to the Monitors the evidence upon which the verification is based including, but not limited to:

- A list of all open PI investigations involving at least one PMC child; and
- For each of these investigations:
  - The date and time of intake;
  - The date and time the investigation was opened; and
  - The date of any and every extension, with copies to the Monitors of the documentation in the PMC child's record providing the good cause basis for the extension.

The fine will be suspended upon complete submission of the foregoing by the State. The Monitors will review the State's submission and report their findings to the Court.

 Defendant Cecile Erwin Young, in her official capacity, is ordered to pay any and all fines levied in accordance with this Order into the Registry of the Court at:

Clerk, U.S. District Court
Attn: Finance
1133 N. Shoreline Blvd., Ste. 208
Corpus Christi, TX 78401

The Court hereby directs the Clerk of the Court to segregate and preserve all funds paid in accordance with this Order for the benefit and use of PMC foster care children, to be determined by future order of the Court.

The Court is carrying forward Plaintiffs' motion for partial receivership. The Court is also carrying forward Plaintiffs' Contempt Motion as it relates to CWOP, caseworker caseloads, heightened monitoring, psychotropic medications, and appropriately apprising PMC children of the ways in which to report abuse and neglect. A compliance hearing will be held on June 26, 2024, at 8:30 a.m. CST, at which time, absent substantial compliance, any previously abated fines may be reinstated.

SIGNED and ORDERED this 15th day of April, 2024.

Janis Graham Jack
Senior United States District Judge

# VIII.    GLOSSARY

**ANE** – Abuse, Neglect, and Exploitation.

**CCI** – Child Care Investigations. A division of CPI within DFPS that investigates abuse, neglect, and exploitation allegations regarding children in licensed care. CCI contains RCCI, which investigates allegations of abuse, neglect, and exploitation regarding children in licensed residential foster care (*see also* **RCCI**).

**CCL** – Child Care Licensing. A division of HHSC (previously a division of DFPS within HHSC) responsible for establishing minimum standards for foster care operations and licensing such operations.

**CHIP** – Children's Health Insurance Program. A program under HHSC that covers children in families that earn too much money to qualify for Medicaid but cannot afford to buy private insurance.

**CLASS** – Child Care Licensing Automation Support System. The electronic case file system used by HHSC-RCCL.

**CPA** – Child Placement Agency. A private agency contracted by DFPS to place foster children in homes.

**CPI** – Child Protective Investigations. A division of DFPS that investigates abuse, neglect, and exploitation allegations regarding children. CPI contains CCI, which investigates allegations of abuse, neglect, and exploitation regarding children in licensed care (*see also* **CCI**).

**CPS** – Child Protective Services. A division of DFPS responsible for providing services to children and families, and for placing children in foster care.

**CVS** – Conservatorship (i.e., foster care).

**CWOP** – Children Without Placement. A term used by DFPS to refer to foster children that are housed in unlicensed, unregulated settings. Also referred to as "Child Watch" or "DFPS Supervision" (*see also* **CWOP Setting**).

**CWOP Setting** – Refers to the leased homes, hotel rooms, and other locations at which children are housed.

**DFPS** – Department of Family and Protective Services. A Defendant, and the Texas State agency responsible for protecting the State's children, elderly, and disabled.

**GRO** – General Residential Operation. A child-care facility that provides care for more than 12 children for 24 hours a day. GROs include RTCs, halfway houses, emergency shelters, and therapeutic camps, and may be a single building or a campus with multiple cottages.

**HHSC** – Health and Human Services Commission. A Defendant and the Texas State agency responsible for overseeing licensing and minimum standards for foster care operations.

**HHSC-RCCL** (*see also* **RCCL**) – Residential Child Care Licensing within HHSC. A division of CCL that regulates, licenses, and investigates residential foster care operations. This division is currently in HHSC and separate from DFPS, but at the time of trial, RCCL was a division of DFPS, which fell within HHSC.

**HM** – Heightened Monitoring. Refers to the increased scrutiny given to operations that have demonstrated a pattern of contract or policy violations.

**Home and Community-based Services (HCS) Waiver Program** – Medicaid program authorized under § 1915(c) of the federal Social Security Act for the provision of services to persons with an intellectual or developmental disability described by the Texas Government Code Section 534.001(11)(B).

**IMPACT** – Information Management for the Protection of Adults and Children in Texas. An automated system, included in case files, in which DFPS staff record casework related activities.

**MCO** – Managed Care Organization. A health care organization of medical service providers who offers managed care health plans. HHSC contracts with MCOs and pays them a monthly amount to coordinate and reimburse providers that deliver health services to Medicaid members enrolled in their health plan. The State's MCO is Superior HealthPlan (Superior).

**PI** – Provider Investigations. A program within HHSC Regulatory Services Division, Long-Term Care Regulation that investigates allegations of abuse, neglect, and exploitation of individuals receiving services from certain providers.

**PMC** – Permanent Managing Conservatorship. A type of legal custody granted by the courts to DFPS. The legal status for children typically progresses to PMC from TMC, 12–18 months after the child enters foster care.

**PMU** – Performance Management Unit. At trial, a unit within CCL that performs internal quality control.

**PMUR** – Psychotropic Medication Utilization Review. A secondary review system that should be conducted under the PMU Parameters for certain psychotropic medication regimes that trigger "red flags." Also referred to as "PMU Review" or "PMUR process" (*see also* **PMU Parameters**).

**PMU Parameters** – Psychotropic Medication Utilization Parameters. Best-practice guidelines based on medical literature developed by a panel of child and adolescent psychiatrists, psychologists, and other mental health experts that address many topics including general use of psychotropics, their use in young children, and evidence for short- and long- term efficacy of psychopharmacological treatment. Also referred to as "Parameters."

**PMUR Report** – A report generated by Superior HealthPlan when a PMUR is conducted.

**PN** – Priority None. A "downgraded" investigation prioritization in which an allegation of abuse, neglect, or exploitation is determined to involve either (a) a minimum standard violation but not the abuse, neglect, or exploitation of a child; or (b) a past risk to a child without current abuse, neglect, or exploitation.

**RCCI** – Residential Child Care Investigations. A division of CCI that investigates abuse, neglect, and exploitation allegations regarding children in licensed residential foster care (*see also* **CCI**, **CPI**).

**RCCL** – Residential Child Care Licensing. A division of CCL that regulates, licenses, and investigates residential foster care operations.

**R/O** – Ruled Out. An investigation disposition, meaning that a preponderance of evidence indicates that abuse, neglect, or exploitation did not occur.

**RTB** – Reason to Believe. An investigation disposition, meaning that a preponderance of evidence indicates that abuse, neglect, or exploitation occurred.

**RTC** – Residential Treatment Center. A type of GRO for children with more serious physical and mental health needs.

**SIR** – Serious Incident Report.

**STAR Health** – A statewide healthcare program run by Superior HealthPlan that provides Medicaid covered medical and behavioral health services for children in DFPS conservatorship and young adults in DFPS paid placements.

**SWI** – Statewide Intake. A division of DFPS that is responsible for receiving reports of abuse, neglect, and exploitation and referring those reports to the appropriate program for investigation.

**TMC** – Temporary Managing Conservatorship, a type of legal custody granted by the courts to DFPS. A child may remain in the State's TMC for 12 months, although a court can order a 6-month extension.

**UTD** – Unable to Determine. An investigation disposition, meaning that a determination could not be made because of an inability to gather enough facts. The investigator concludes that there is not a preponderance of evidence that abuse or neglect occurred; but it is not reasonable to conclude that abuse or neglect did not occur.