# ATTACHMENT 2

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   CORPUS CHRISTI DIVISION
 3
    M.D., B/N/F SARAH R.         §
 4  STUKENBERG, ET AL.,          §
                                 §  CIVIL ACTION NO.
 5       PLAINTIFFS,             §  1:19-CV-01610
                                 §
 6  V.                           §
                                 §
 7  GREG ABBOTT, IN HIS          §
    OFFICIAL CAPACITY AS         §
 8  GOVERNOR OF THE STATE        §
    OF TEXAS, ET AL.,            §
 9                               §
         DEFENDANTS.             §
10
11
12
                       ORAL DEPOSITION OF
13                        STEPHEN PAHL
                       NOVEMBER 21, 2023
14
15
16
         ORAL DEPOSITION OF STEPHEN PAHL, produced as a
17  witness at the instance of the Plaintiffs and duly
    sworn, was taken in the above styled and numbered
18  cause on Tuesday, November 21, 2023, from 1:04 p.m.
    to 1:58 p.m. before TAMARA CHAPMAN, CSR, RPR-CRR in
19  and for the State of Texas, reported by computerized
    stenotype machine, at the offices of Haynes & Boone
20  LLP, 98 San Jacinto Boulevard, Austin, Texas,
    pursuant to the Federal Rules of Civil Procedure and
21  any provisions stated on the record herein.
22
23
24
25  Job No. HOU 6322893
```

Page 1

### Page 2

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
       R. Paul Yetter
 3     Karla Maradiaga
       YETTER COLEMAN LLP
 4     811 Main Street, Suite 4100
       Houston, Texas 77002
 5     713-632-8000
       pyetter@yettercoleman.com
 6     kmaradiaga@yettercoleman.com
 7
    FOR THE DEFENDANTS:
 8     Kimberly Gdula
       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 9     P.O. Box 12548-Capitol Station
       Austin, Texas 78711
10     512-463-2120
       kimberly.gdula@oag.texas.gov
11
12  ALSO PRESENT:
       Katy Gallagher, HHSC
13     David Baloche
       Deborah Fowler
```

### Page 3

```
 1              I N D E X
 2
                                    PAGE
 3
 4  APPEARANCES................  2
 5  STEPHEN PAHL
 6  EXAMINATION
       BY MR. YETTER............  4
 7
 8  CORRECTION PAGE............ 33
    SIGNATURE PAGE............. 34
 9  REPORTER'S CERTIFICATION... 35
10
11          E X H I B I T S
12  NO.    DESCRIPTION       PAGE
       Exhibit 4   Monitors' Update to the
13              Court Regarding Remedial
                Order 3
14              (No Bates - 66 pages)     10
       Exhibit 5   Monitors' Supplemental
15              Update to the Court
                Regarding
16              Remedial Orders 7 and 8 and
                HHSC Provider
17              Investigations
                (No Bates - 21 pages)     11
18     Exhibit 6   Temporary Management
                Directive: Efficient
19              Investigative Procedures
                and Documentation Practices
20              in All Settings
                (D_000314 - D_000316)    14
21     Exhibit 7   Provider Investigations
                Handbook
22              (D_000003 - D_000252)    18
```

### Page 4

MS. GDULA: Paul, can we get an agreement on the record that "objection; form" will be sufficient and I'll provide more detail if and when you ask for it.

MR. YETTER: Yes.

MS. GDULA: Thank you.

STEPHEN PAHL, having been first duly sworn, testified as follows:

EXAMINATION
BY MR. YETTER:

Q. Would you introduce yourself to the Court, sir, please.

A. Yes, sir. My name is Stephen Pahl.

Q. Thank you, sir.

You're currently an employee of the Department of Family and Protective Services, I -- excuse me. Scratch that.

You're currently an employee of Health and Human Services --

A. Yes, sir.

Q. -- I understand?

A. That is correct.

Q. And how long have you worked for the State?

A. For the State of Texas?

### Page 5

Q. Correct.

A. Going on 26 years, I believe.

Q. Among your responsibilities, as I understand it, you were an Assistant Deputy Inspector General for a period of time?

A. That is correct.

Q. I think it was 2016 to 2018?

A. That sounds right.

Q. And you've been in this role for about two years, since 2021?

A. A little over two years. That's correct.

Q. Your current title is Deputy Executive Commissioner, Regulatory Services, for the Services Division for the -- for HHSC?

A. Yes. I would say that Deputy Executive Commissioner for the Regulatory Services Division for HHSC. If that's what you were trying to say, yes, sir.

Q. Yes, that's what I was trying to say.

A. All right.

Q. Your boss currently is Jordan Dixon, who is the chief policy and regulatory officer, I believe?

A. That's correct.

Q. And his boss is Commissioner Young?

2 (Pages 2 - 5)

```
 1    A.   Jordan Dixon is a female.
 2    Q.   I didn't catch what you just said.
 3    A.   Jordan Dixon is a female.  You referred
 4  to her as "he," I believe.
 5    Q.   I'm sorry.  Her boss is Commissioner
 6  Young?
 7    A.   That's correct.
 8    Q.   Is this role as Executive Commissioner of
 9  Regulatory Services the first role you've had in
10  child welfare?
11    A.   Yes, sir.
12    Q.   I don't believe you have any education in
13  child welfare.  Am I correct about that?
14    A.   You are correct.
15    Q.   And prior to 2021, did you have any work
16  experience in the child welfare profession?
17    A.   No, sir.
18    Q.   Part of your responsibilities as Deputy
19  Executive Commissioner of the Regulatory Services
20  Division would include investigations of providers
21  subject to HHSC regulation.  Am I correct?
22    A.   Yes, sir.
23    Q.   And those investigations are done through
24  a group called Provider Investigations, which is
25  part of HHSC?
                                              Page 6
```

```
 1    A.   Provider Investigations, they do conduct
 2  investigations.  Yes, sir.
 3         MR. YETTER:  I'm having trouble
 4  hearing his response.  I'm sorry.  I don't know if
 5  it's your issue, Mr. Pahl, or maybe we just need to
 6  move that mic closer to you.
 7         THE WITNESS:  Is that better?
 8         MR. YETTER:  That's better.
 9    Q.   So in your role as Deputy Executive
10  Commissioner do you have responsibility for Provider
11  Investigations, the group that does investigations
12  of certain providers?
13    A.   Yes, sir.
14    Q.   Those providers for which the group
15  Provider Investigations applies include homes that
16  are staffed or called, within HHSC, the home and
17  community-based services?
18         MS. GDULA:  Objection; form.
19    A.   That's correct.
20    Q.   And that -- those providers are all
21  private providers.  Am I right about that?
22    A.   I believe that is correct.  Yes, sir.
23    Q.   Now, we can agree, can we not, Mr. Pahl,
24  that investigations of reports of abuse, neglect, or
25  exploitation of children are significant and
                                              Page 7
```

```
 1  important undertakings.  True?
 2         MS. GDULA:  Objection; form.
 3    A.   I would say that's true.
 4    Q.   And you know that because if there has
 5  been a report of abuse, neglect, or exploitation,
 6  the investigation will determine whether the report
 7  was accurate and the child remains at risk in that
 8  placement.  Right?
 9    A.   Would you mind repeating that question?
10    Q.   Sure.  You agree that these
11  investigations are significant because upon a report
12  of abuse, neglect, or exploitation, if the
13  investigation determines that it was well-founded,
14  then that child remains -- at least could remain in
15  a placement that puts the child at risk.  True?
16         MS. GDULA:  Objection; form.
17    A.   You used the "well-founded."  Could you
18  explain what you mean by that?
19    Q.   Sure.  "Well-founded" meaning
20  "confirmed."
21    A.   Okay.
22    Q.   That the report of abuse, neglect, or
23  exploitation is confirmed.
24    A.   Okay.  Then I would agree.
25    Q.   So having accurate investigations really
                                              Page 8
```

```
 1  is a matter that directly relates to child safety,
 2  does it not?
 3    A.   I would say yes.
 4    Q.   Now, Provider Investigations at HHSC, is
 5  there a -- a specific executive that is in charge
 6  just of that group?
 7    A.   By "executive," explain what you --
 8    Q.   Or manager or administrator?
 9    A.   Yes.
10    Q.   And who is that person?
11    A.   That person ultimately is Michelle
12  Dionne-Vahalik.  She is the Associate Commissioner
13  over the long-term care regulatory department.
14    Q.   And does she report to you or Ms. Dixon?
15    A.   She reports to me.
16    Q.   I'm sorry?
17    A.   She reports to me.
18    Q.   All right.  And I didn't catch her last
19  name.  Could you spell it for me?
20    A.   I'm going to try my best.  D-I-O-N-N-E,
21  hyphen, V-A-H-A-L-I-K, I believe.
22    Q.   All right.  And since she reports to you,
23  then, you have -- and her title, by the way, excuse
24  me, is what?
25    A.   Associate Commissioner for long-term care
                                              Page 9
```

*Page 10*

```
 1  regulation.
 2      Q.  Now, this issue of the quality of
 3  Provider Investigations, this group, has obviously
 4  come front and center in the foster care litigation
 5  in recent months.  Do you know that?
 6          MS. GDULA:  Objection; form.
 7      A.  I'm aware of that.
 8      Q.  And have you read the monitor reports
 9  that came out in September, and another one in
10  November, that touch on this issue of Provider
11  Investigations?
12      A.  I've read through most of that report,
13  yes, sir.
14      Q.  And which report have you read through
15  most of?
16      A.  It's a report that is -- concerns the
17  Remedial Order 3.  I don't know if that's the exact
18  title, but I'm sure you know what I'm talking about.
19      Q.  I do.  Let me put that in front of you.
20  It's Tab No. 5.  We'll mark this as Plaintiffs'
21  Exhibit No. 3, I believe.  4.
22          (Exhibit 4 was marked.)
23      Q.  And, Mr. Pahl, do you have in front of
24  you Plaintiffs' Exhibit No. 4, which is titled:
25  Monitors' Update to the Court Regarding Remedial
```

*Page 11*

```
 1  Order No. 3.
 2          And it's dated September 19th, 2023.
 3      A.  I do, yes.
 4      Q.  Is this the document that you've read
 5  most of?
 6      A.  I believe it is.  Yes, sir.
 7      Q.  Let me hand you Plaintiffs' Exhibit 5,
 8  which is Tab 6.
 9          (Exhibit 5 was marked.)
10      Q.  Mr. Pahl, we've handed you Plaintiffs'
11  Exhibit No. 5, which is a supplemental update to the
12  Court dated -- from the monitors, dated November 10,
13  2023.  Do you see that?
14      A.  Yes, I do.
15      Q.  Have you had a chance to read this
16  document?
17      A.  I have not.
18      Q.  I'm sorry.  Did you say you have not?
19      A.  That is correct.  I have not.
20      Q.  Now, the -- do you recall that one of the
21  issues in the first monitors' report in September,
22  Plaintiffs' Exhibit No. 4, is that Provider
23  Investigations, that group, was not conducting
24  timely investigations.
25          Do you recall that was one of the
```

*Page 12*

```
 1  concerns?
 2          MS. GDULA:  Objection; form.
 3      A.  I recall that being one of the concerns,
 4  yes.
 5      Q.  Do you know, as one of the executives at
 6  HHSC responsible for Provider Investigations, what
 7  the timeline is that's required by the Federal
 8  Court's remedial orders for face-to-face contact
 9  with the alleged child victim?
10          Do you know what that timeline is?
11      A.  I believe it depends on what priority is
12  given.  So it depends.
13      Q.  Let's start with Priority 1.  What's the
14  timeline or deadline?
15      A.  I believe it's 24 hours.
16      Q.  How about a Priority 2 report?
17      A.  I believe that is within 72 hours.
18      Q.  And you understand those requirements
19  come from a federal court order in the foster care
20  litigation, do you not, Mr. Pahl?
21      A.  I'm not sure that I was aware of where
22  those originated.
23      Q.  In your position as Executive
24  Commissioner of Regulatory Services at HHSC, have
25  you read the Federal Court's remedial orders?
```

*Page 13*

```
 1      A.  I have read some of them, I recall.  I
 2  don't believe I've read all of them in their
 3  entirety.
 4      Q.  Now, when you read the monitors' -- or at
 5  least most of the monitors' report in September,
 6  which is Plaintiffs' Exhibit No. 4, were there any
 7  factual statements in the report that you can tell
 8  us today were inaccurate?
 9      A.  I don't believe that I am able to tell
10  you if there's any inaccuracies in the report.  I
11  have not reviewed the report to -- that extensively.
12      Q.  I didn't quite catch the tail end of your
13  answer.  But did you receive any reports from your
14  colleagues, your associate commissioner or any of
15  her staff that there were inaccurate facts in the
16  September 2023 update to the Court, which is marked
17  as Plaintiffs' Exhibit No. 4?
18      A.  I don't recall any.
19      Q.  Now, some of the work that the monitors
20  did in checking on the -- Provider Investigations
21  confirmed that these -- this -- these investigations
22  were sometimes months late.  Did you -- do you
23  recall reading that?
24          MS. GDULA:  Objection; form.
25      A.  I recall reading in the report that there
```

**Page 14**

1  was some concerns that some of them were late, yes.
2  Q. And since you read that in September
3  of 2023, have you, as executive commissioner of the
4  regulatory services division, instituted a new
5  policy or practice for Provider Investigations to
6  ensure that their investigations are done according
7  to the deadlines of the federal court order?
8  A. I personally have not, no, sir.
9  Q. One of the things that has come out since
10 the September report by the monitors is a temporary
11 management directive -- excuse me. Scratch that.
12     This summer, one of the things that came
13 out is a temporary management directive dated
14 June 1st, 2023. Do you know what I'm talking about?
15 A. No, sir.
16 Q. It is Tab No. 7 and let's mark that as
17 Plaintiffs' Exhibit No. 6.
18     (Exhibit 6 was marked.)
19 Q. What you have in front of you now,
20 Mr. Pahl, is Plaintiff's Exhibit No. 6, which is a
21 June 1, 2023 temporary management directive. You've
22 seen this before, have you not?
23 A. I don't recall seeing this.
24 Q. It deals with efficient investigative
25 procedures. Do you see that in the title?

**Page 15**

1  A. I do.
2  Q. And that obviously, then, would -- and it
3  is from your agency, the Texas Health and Human
4  Services agency. Right?
5  A. Correct.
6  Q. And this would be for Provider
7  Investigations, would it not, as it says in the
8  first paragraph for purpose?
9  A. As stated in the purpose, yes, sir.
10 Q. Okay. So this is about five months ago
11 and a new directive -- directive means -- am I
12 correct it would mean a policy or a requirement for
13 Provider Investigations?
14 A. That would be a fair characterization.
15 Q. Okay. And this says it -- that the
16 directive, in the first paragraph, actually started
17 in September of 2022. So it's been -- do you see
18 that?
19 A. Yes, sir.
20 Q. It's been going on now for about
21 15 months. Right?
22 A. About, yeah. Yes, sir.
23 Q. And in the background paragraph, it says
24 that this new directive was issued in an effort to
25 assist with a backlog in Provider Investigations.

**Page 16**

1  Do you see where I'm reading?
2  A. I do. Yes.
3  Q. And a backlog meaning investigations --
4  reports of abuse, neglect, and exploitation were not
5  being investigated timely and they were stacking up.
6  Right?
7  A. That's fair.
8  Q. Then it says PI leadership, so Provider
9  Investigations' leadership. And would that include
10 your colleague, the associate commissioner?
11 A. I would assume so. Yes, sir.
12 Q. And would it -- since you're ultimately
13 in charge of Provider Investigations, would it
14 include you?
15 A. Not necessarily.
16 Q. So this is saying that the PI leadership
17 review ways to make the process -- investigative
18 process more efficient. Right?
19 A. That's what it says, yes.
20 Q. And then in the procedures paragraph, it
21 says in the -- I'm still on Page 1 of Plaintiff's
22 Exhibit No. 6. It says: When the evidence
23 demonstrates an unconfirmed or inconclusive finding,
24 the investigator will no longer explain how the
25 evidence does or does not satisfy the element when

**Page 17**

1  documenting the Analysis of Evidence.
2     Do you see where I was reading?
3  A. Yes, I do.
4  Q. So basically, if the investigator
5  concludes that or finds that the report of abuse,
6  neglect, and -- or exploitation is unconfirmed or
7  inconclusive, the investigator is told by HHSC not
8  to explain why the evidence does or doesn't show the
9  finding of the investigator.
10     MR. WATKINS: Objection --
11 Q. Did I read that right?
12     MS. GDULA: Objection; form.
13 A. I believe you read that correctly, yes,
14 sir.
15 Q. Okay. Now, why would it be, Mr. Pahl, in
16 your experience now and as basically the top agency
17 executive in charge of Provider Investigations, why
18 is it a good idea not to explain the evidence that
19 supports an investigator's finding? Do you have any
20 idea?
21 A. I would say no. I don't -- I don't have
22 any idea why.
23 Q. Now, is this directive, to your
24 knowledge, still in place at HHSC telling
25 investigators not to explain why they find that a

5 (Pages 14 - 17)

```
 1  report of abuse, neglect, or exploitation is
 2  unconfirmed or inconclusive?
 3      A.  I'm not --
 4      Q.  Is it still in place?
 5      A.  I'm not sure. You would have to ask the
 6  leadership within PI if this is still in effect.
 7      Q.  Now, one of the things that has come out
 8  from your group since the September report of the
 9  monitors is an updated Provider Investigations
10  handbook, has it not?
11      A.  I'm not aware.
12      Q.  Let me show you Exhibit No. 7, which is
13  Tab No 8.
14          (Exhibit 7 was marked.)
15      Q.  And we have just handed you Plaintiff's
16  Exhibit No. 7, which is called "Provider
17  Investigations Handbook."
18          Do you have that, sir?
19      A.  Yes, sir.
20      Q.  And this obviously is an official policy
21  document of the -- your employer, Texas Health and
22  Human Services. True?
23      A.  I would say it's an official
24  investigations handbook.
25      Q.  Right. I mean, these are the -- this is
                                                Page 18
```

```
 1  the -- these are the formal policies for this group
 2  issued or adopted by the Texas Health and Human
 3  Services agency. Right?
 4      A.  I'm not aware of the -- if this is a
 5  policy handbook or a procedures handbook without
 6  reviewing it any further.
 7      Q.  Okay. As the ultimate head of Provider
 8  Investigations, you can confirm for the Court that
 9  this handbook is what the investigators in this
10  group are required to follow. True?
11      A.  It appears so. Yes, sir.
12      Q.  Because it says in the front page this
13  document is for the Provider Investigations staff,
14  including administrative assistants, investigators,
15  program managers, assistant regional directors,
16  regional directors, and other Provider
17  Investigations employees. So everybody's supposed
18  to follow it. Right?
19      A.  As you have described, yes.
20      Q.  And it says: This document is intended
21  to provide direction. Right? So this is not, kind
22  of, voluntary. This is mandatory. True?
23      A.  I would agree with that.
24      Q.  Okay. Now, if you look at the -- on the
25  bottom right-hand corner, it says that it -- this is
                                                Page 19
```

```
 1  for fiscal year 2024 and what is the fiscal year of
 2  the HHSC? Is it a calendar year or some other year?
 3      A.  Repeat the question, please.
 4      Q.  What's the fiscal year for HHSC? Is it a
 5  calendar year or summer to summer, or do you know?
 6      A.  It starts -- it starts in September and
 7  ends in August.
 8      Q.  Okay. So fiscal year 2024 would -- we
 9  would be in fiscal year 2024 right now. It started
10  in 2023 and it ends in August 2024?
11      A.  Yes.
12      Q.  So what we're looking at, Exhibit No. 7,
13  is the -- to your knowledge, the current handbook
14  for Provider Investigations?
15      A.  It appears so, yes.
16      Q.  And this was issued on October 23, 2023.
17  You see that date?
18      A.  I do.
19      Q.  So this would be about a month after the
20  monitors' update to the Court that you read most of
21  on September 19th, 2023. True?
22      A.  It appears so, yes.
23      Q.  Now, in the monitors' report, am I --
24  would I be correct to say that you read -- the
25  Exhibit No. 4, the September 2023 report, you read
                                                Page 20
```

```
 1  some very troubling results of the monitors'
 2  investigations?
 3          MS. GDULA: Objection; form.
 4      A.  By "troubling," can you explain what you
 5  mean by "troubling"?
 6      Q.  Meaning that you personally were upset
 7  and concerned about the things you read in the
 8  monitors' update in September, were you not?
 9      A.  I don't know that I would say I was
10  upset, but concerned is fair.
11      Q.  Okay. Concerned, not upset?
12      A.  I would say that's correct, yes.
13      Q.  Okay. Got it.
14          Because children's lives are at stake.
15  Right?
16      A.  That's right.
17      Q.  And after you read these findings in the
18  monitors' report in September 2023 which caused you
19  concern for children's safety, did you make a point
20  of telling your staff to -- in the new edition of
21  the handbook, to deal with those concerns that you
22  had?
23      A.  That would not be my role to -- to make
24  that announcement. That would -- that would lie
25  somewhere within Provider Investigations. Some
                                                Page 21
```

```
 1  management staff within Provider Investigations
 2  would have done such.
 3      Q.  All right.  So am I -- would it be fair
 4  to say that you, Mr. Pahl, as executive
 5  commissioner, did not initiate any changes to the
 6  Provider Investigations handbook based on the
 7  monitors' September 2023 report?  Is that accurate?
 8          MS. GDULA:  Objection; form.
 9      A.  That is accurate, yes.
10      Q.  Now, did your colleague, your assistant
11  commissioner who you say is kind of focused entirely
12  on Provider Investigations, did she report to you on
13  any changes that were made in the Provider
14  Investigations handbook in order to address the
15  concerns that you had from the monitors' September
16  2023 update to the Court?
17      A.  I don't recall.
18      Q.  So as you're sitting here today, since
19  the September 2023 report of the monitors to the
20  Court about Provider Investigations, are you aware
21  of any changes in practice or policy at HHSC with
22  regard to Provider Investigations to address the
23  concerns that were raised by the monitors, any
24  changes?
25      A.  Not apart for those that are -- been
                                                  Page 22
```

```
 1  updated in the handbook, I'm not aware of any.
 2      Q.  All right.  Let's go through the handbook
 3  and let's see what's there.  And have you read the
 4  handbook any time recently?
 5      A.  No, sir.
 6      Q.  Would you agree that an investigation by
 7  your group, Provider Investigations, of a report of
 8  abuse, neglect, or exploitation of a child in a
 9  provider facility should take into account the
10  history of the provider agency, good, bad, or
11  indifferent?
12      A.  In the -- in the scope of Provider
13  Investigations?
14      Q.  Yes.
15      A.  I'm not sure.
16      Q.  Well, let me give you an example.
17      A.  Okay.
18      Q.  If a particular provider agency had a
19  history of violations or confirmed reports of abuse,
20  neglect, or exploitation of children, wouldn't you
21  think, Mr. Pahl, as Executive Commissioner of
22  Regulatory Services that the investigator in
23  Provider Investigations, should consider that bad
24  track record of the provider agency when assessing
25  the new report of alleged abuse, neglect, and
                                                  Page 23
```

```
 1  exploitation?
 2          MS. GDULA:  Objection; form.
 3      A.  My understanding is that Provider
 4  Investigations is focused on the perpetrator and not
 5  the provider.  Maybe --
 6      Q.  I'm not sure if that was an answer to my
 7  question.
 8          Is the answer to my question is, no, you
 9  do not think that a bad track record of a provider
10  agency should be considered in investigating a new
11  report of alleged abuse, neglect, and exploitation
12  at the same agency?
13      A.  Would you mind repeating the question.
14      Q.  I didn't catch that answer.
15      A.  Would you mind repeating the question?
16      Q.  Certainly.  Are you saying that a bad
17  track record, a -- a troubled history of a provider
18  agency should not be considered by Provider
19  Investigations when investigating a new report of
20  alleged abuse, neglect, or exploitation of a child
21  at the very same agency?
22      A.  I would say, yes, if they're given the
23  authority to do so.
24      Q.  And that's logical because history can
25  repeat itself, can't it?
                                                  Page 24
```

```
 1          MS. GDULA:  Objection; form.
 2      A.  I suppose history can repeat itself, yes,
 3  sir.
 4      Q.  And just like a bad or troubled history
 5  of a particular perpetrator, a particular caregiver,
 6  can be relevant to an investigation.  You'd agree
 7  with that, wouldn't you?
 8      A.  Yes.  Yes.
 9      Q.  A bad track record or history of a
10  provider agency where there is a new report of
11  alleged abuse, and neglect, or exploitation at the
12  same agency is relevant.  Right?
13      A.  I would say so, yes.
14      Q.  Now, do you know that the children at
15  facilities that are being investigated by Provider
16  Investigations can be disabled, and maybe they're
17  all disabled, but at least some of them, many of
18  them are disabled -- intellectually disabled.  Do
19  you know that?
20          MS. GDULA:  Objection; form.
21      A.  Yes, sir.
22      Q.  And likewise, at many of these home and
23  community-based facilities, there are adults that
24  reside there and they too are intellectually
25  disabled?
                                                  Page 25
```

7 (Pages 22 - 25)

**Page 26**

1  A. That's my understanding. Yes, sir.
2  Q. Did you realize that these what are, I
3  think, called HCS homes, can have both children and
4  adults residing at the same home?
5  A. I was not aware of that.
6  Q. Now, if -- you'd agree, wouldn't you,
7  that if your investigators in Provider
8  Investigations are going to do an investigation of
9  alleged abuse, neglect, or exploitation of chi- --
10 an intellectually disabled child, that the
11 investigator from HHSC needs to take account of the
12 child's disability in making the investigation.
13 You'd agree with that, wouldn't you?
14 A. Yes, I would.
15 Q. For example, if a child's limitations are
16 such that they are nonvocal, that their disability
17 is such that they don't speak, the investigator
18 would need to take account of that so that they
19 could actually comm- -- that the investigator could
20 communicate with the alleged child victim. Wouldn't
21 you agree with that?
22 A. Yes, sir.
23 Q. And if you -- if your group of Provider
24 Investigations is not taking account of the
25 individual disabilities of the alleged victims, then

**Page 28**

1  be able to understand what the child victim -- his
2  or her perspective is, you're saying that is not a
3  necessary part of an investigation by your group
4  Provider Investigations of -- of alleged abuse,
5  neglect, and exploitation?
6  A. It may be -- it may be necessary for
7  certain investigations. As I said before, I think
8  all investigations are different and aren't
9  conducted the same way.
10 Q. Now, do you know whether it is a
11 requirement of HHSC to take into account the -- an
12 alleged child victim's unique capabilities and
13 disabilities in order to best communicate with the
14 child in a situation of a report of alleged abuse,
15 neglect, and exploitation? Do you know whether
16 that's a requirement of HHSC?
17 A. I'm not aware of whether it's a
18 requirement or not.
19 Q. And given what you were saying about it
20 may not be actually necessary to communicate with
21 the alleged child victim, you're not sure there's
22 really even a requirement to try to communicate with
23 the alleged child victim. Am I right?
24 A. I'm not aware of a requirement, yes.
25 Q. Let -- let's move from the child vic- --

**Page 27**

1  you're not going to be completing accurate
2  investigations, are you?
3     MS. GDULA: Objection; form.
4  A. I'm not sure that I agree with that.
5  Q. I'm sorry. What -- how would -- what
6  about that would you disagree? If you can't talk to
7  the child or communicate with the child, how do you
8  complete an investigation?
9  A. I don't know that that is always
10 necessary to obtain your evidence in such a manner.
11 There may be other ways that you obtain evidence
12 there and I think that each investigation would
13 probably be very different.
14 Q. All right. Mr. Pahl, let me see if I
15 understand the answer you just gave to us.
16    You're not sure as the ultimate executive
17 for Provider Investigations that it is always
18 necessary to communicate with the alleged child
19 victim in order to have a reliable and accurate
20 investigation and -- did I hear you correctly?
21 A. Yes. There may be other ways that you
22 can obtain evidence that you would need without
23 having to speak with a -- with the victim.
24 Q. Sure. And I'm not saying necessarily
25 speak like converse, but just communicate, just to

**Page 29**

1  the alleged child victim to the alleged perpetrator.
2  Do you believe, Mr. Pahl, as -- in your position as
3  kind of the head man or the top executive of
4  Provider Investigations that understanding the track
5  record or the history of the alleged perpetrator is
6  vital information for an accurate and reliable
7  investigation?
8  A. I would agree.
9  Q. And that track record that is so vital
10 would include the criminal history and the criminal
11 history records of the alleged perpetrator, wouldn't
12 it?
13 A. I would assume it would.
14 Q. Because I can't -- can you think of any
15 sort of information about an alleged perpetrator's
16 history that would be, perhaps, more relevant than
17 their criminal record involving similar conduct?
18 A. I can't think of any.
19 Q. Would you agree that an investigation
20 done months later is likely to be a less reliable
21 and less accurate investigation than one done timely
22 and near the -- near the alleged abuse, neglect,
23 and/or exploitation?
24 A. Would you mind repeating that question?
25 Q. Sure. Would you agree that an

8 (Pages 26 - 29)

**Page 30**

```
 1   investigation done months after an outcry of alleged
 2   abuse, neglect, or exploitation is likely to be less
 3   accurate and reliable than one that is done timely?
 4            MS. GDULA:  Objection; form.
 5       A.   I think it's possible but maybe not
 6   always.
 7       Q.   I want to change topics slightly,
 8   Mr. Pahl.  There is -- there are situations where an
 9   investigation involves allegations of multiple
10   violations.  You understand that that can happen, do
11   you not?
12       A.   Yes.
13       Q.   And the investigation of multiple
14   violations may result in different findings on
15   different violations.  You can appreciate that that
16   might happen as well --
17       A.   Yes.
18       Q.   -- would you not?
19       A.   Yes.
20       Q.   For example, if you had two or more
21   violations and some of the violations were found to
22   be inconclusive and others were found to be
23   unconfirmed -- and do you know what those categories
24   mean?
25       A.   I believe I do, yes.
```

**Page 31**

```
 1       Q.   Do you have any good reason to explain to
 2   us why HHSC or Provider Investigations would take
 3   the lesser finding and apply it to the investigation
 4   as opposed to the more serious finding?
 5            MS. GDULA:  Objection; form.
 6       A.   I do not.
 7       Q.   Can we agree that there is no reason why
 8   children that are intellectually disabled should
 9   receive less thorough and accurate investigations of
10   their outcries of alleged abuse, neglect, and
11   exploitation than children who do not have the same
12   intellectual disabilities?
13       A.   I would agree.
14            MR. YETTER:  Excuse me.  I'm moving
15   to a new topic.  I apologize for the pause.  Can we
16   take a five-minute break to make sure that I'm
17   finished.  But I think I'm about ready to wrap up
18   and then we can let Mr. Pahl go.
19            MS. GDULA:  Sure.  So we'll be back
20   here at 1:55?
21            MR. YETTER:  That sounds fine.
22            THE STENOGRAPHER:  Rough today.
23   Final as soon as possible.
24            MR. YETTER:  Thank you for your time
25   today.  We pass the witness.
```

**Page 32**

```
 1            MS. GDULA:  We'll reserve our
 2   questions.
 3            (Deposition concluded at 1:58 p.m.)
 4            THE STENOGRAPHER:  Rough draft?
 5            MS. GDULA:  No.  Final when the other
 6   side gets it.  When will it be ready?
 7            THE STENOGRAPHER:  Tomorrow.
 8            MS. GDULA:  Okay.
```

**Page 33**

```
CORRECTION PAGE
WITNESS NAME: STEPHEN PAHL     DATE: 11/21/2023
PAGE  LINE  CHANGE           REASON
```

9 (Pages 30 - 33)

Veritext Legal Solutions
346-293-7000

```
 1            SIGNATURE PAGE
 2
        I, STEPHEN PAHL, have read the foregoing
 3   deposition and hereby affix my signature that same
     is true and correct, except as noted on the
 4   correction page.
 5
 6      _____
              STEPHEN PAHL
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Job No. HOU6322893
                                              Page 34
```

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3
     M.D., B/N/F SARAH R.      §
 4   STUKENBERG, ET AL.,       §
                               § CIVIL ACTION NO.
 5      PLAINTIFFS,            § 1:19-CV-01610
                               §
 6   V.                        §
                               §
 7   GREG ABBOTT, IN HIS       §
     OFFICIAL CAPACITY AS      §
 8   GOVERNOR OF THE STATE     §
     OF TEXAS, ET AL.,         §
 9                             §
        DEFENDANTS.            §
10
11
12        REPORTER'S CERTIFICATION
          DEPOSITION OF STEPHEN PAHL
13         TAKEN NOVEMBER 21, 2023
14     I, TAMARA CHAPMAN, Certified Shorthand Reporter in
15   and for the State of Texas, hereby certify to the
16   following:
17     That the witness, STEPHEN PAHL, was duly sworn by
18   the officer and that the transcript of the oral
19   deposition is a true record of the testimony given
20   by the witness;
21     That the original deposition was delivered to R.
22   PAUL YETTER;
23     That a copy of this certificate was served on all
24   parties and/or the witness shown herein on
25   _____.
                                              Page 35
```

```
 1     I further certify that pursuant to FRCP No.
 2   30(f)(i) that the signature of the deponent:
 3     X  was requested by the deponent or a party
 4   before the completion of the deposition and that the
 5   signature is to be returned within 30 days from date
 6   of receipt of the transcript.  If returned, the
 7   attached Changes and Signature Page contains any
 8   changes and the reasons therefor;
 9        was not requested by the deponent or a party
10   before the completion of the deposition.
11     I further certify that I am neither counsel for,
12   related to, nor employed by any of the parties in
13   the action in which this proceeding was taken, and
14   further that I am not financially or otherwise
15   interested in the outcome of the action.
16     Certified to by me this 22nd of November, 2023.
17
18
19
20
21
22   _____
     Tamara Chapman, CSR, RPR-CRR
     CSR NO. 7248; Expiration Date: 12-31-23
23   Veritext Legal Solutions
     Firm Registration No. 571
24   300 Throckmorton Street, Suite 1600
     Fort Worth, Texas  76102
25   800-336-4000
                                              Page 36
```

```
 1   kimberly.gdula@oag.texas.gov
 2              November 22, 2023
 3   RE: MD, Et Al v. Abbott, Greg, Et Al.
 4   DEPOSITION OF: Stephen  Pahl (# 6322893)
 5      The above-referenced witness transcript is
 6   available for read and sign.
 7      Within the applicable timeframe, the witness
 8   should read the testimony to verify its accuracy. If
 9   there are any changes, the witness should note those
10   on the attached Errata Sheet.
11      The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
                                              Page 37
```

10 (Pages 34 - 37)