IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | Civil Action No. 2:11-CV-00084 |
| as Governor of the State of Texas, et | § | |
| al., | § | |
| | § | |
| Defendants. | | |

## Monitors' Report to the Court Regarding PMC Children Placed in Maofu/Forever Home HCS Group Homes

### Background

On August 9, 2024, the Monitors received information from stakeholders detailing safety concerns with the care of MM, a 15-year-old PMC child, who had been hospitalized and diagnosed with acute liver failure. The doctor reported MM's diagnoses were "suspected toxic ingestion" and "acute liver failure," and the child's prognosis was poor. MM had been placed in two different HCS Group Homes run by the same provider, Maofu Home Health Care Service (Maofu), which also owns Group Homes under the name of Forever Home Living Center (Forever Home).[1]

In the days following MM's August 6, 2024 hospitalization, his condition deteriorated, eventually leading the state court with jurisdiction over his case to authorize a Do Not Resuscitate (DNR) order, after DFPS conducted an ethics review, per the agency's policy.[2] His condition subsequently improved, leading the court to rescind authorization for the DNR order. Though MM's condition has improved dramatically, he remains significantly disabled by the encephalopathy that resulted from his liver failure. MM was transferred to an in-patient rehabilitation hospital on September 6, 2024. The Health and Human Services Commission's Provider Investigation (HHSC -

---

[1] The Monitors described three HHSC – PI investigations of abuse, neglect, or exploitation of children (Child L, Child M, and Child O) placed in Maofu/Forever Home HCS Group Homes in the Supplemental Update to the Court Regarding Remedial Orders 3, 7, and 8, filed November 10, 2023. Deborah Fowler & Kevin Ryan, Monitors' Supplemental Update to the Court Regarding Remedial Orders 3, 7, and 8 and HHSC Provider Investigations, ECF No. 1442. The alleged victims discussed in that report (Child L, Child M, and Child O) are not the PMC children (AA, MM, RR, or SS) discussed in this report.

[2] See DFPS, CPS Handbook §11720 et seq.

PI) unit is conducting investigations to determine whether abuse or neglect of MM in the HCS Group Home led to his health crisis.

As of September 6, 2024, at least three other PMC children (SS, RR, and AA) were placed in Maofu or Forever Home HCS Group Homes.  The Monitors compiled this report after an extensive review of IMPACT and Health Passport records for MM, SS, RR, and AA.  The Monitors also reviewed IMPACT records associated with outcries of abuse, neglect, or exploitation made by foster children placed in a Maofu or Forever Home HCS Group Home.

On August 19, 2024, after reviewing IMPACT and Health Passport records for MM and the other three PMC children, the Monitors sent the following to Commissioner Muth and Commissioner Young via e-mail:

> We have been made aware of a child…who was placed in an HCS Group Home (Forever Home/Maofu), and is gravely ill and not expected to recover.  We also understand there were concerns expressed about the placement and his medications in the weeks leading up to his illness.

> We have reviewed some available records for [MM], and for the other three PMC children who are also placed in a Forever Home/Maofu setting, as well as the investigative histories of some of these homes.  We are concerned about the PMC children's medical care, their medications, and their placement safety.  We wanted to bring this to your attention quickly and before we have completed an in-depth review of child [MM's] experience and treatment because of the critical health and safety issues involved.[3]

The Commissioners' legal counsel acknowledged receipt of the e-mail the same day.[4]  On August 27, 2024, the DFPS Director of Foster Care Litigation Compliance responded:

> On behalf of both agencies, we are glad to report that the child has improved and continues to improve. The agencies continue to look into this matter.[5]

**Review of IMPACT and Health Passport Records for PMC children**

    A.  MM's care prior to placement at Forever Home/Maofu

---

[3] E-mail from Deborah Fowler and Kevin Ryan to Stephanie Muth, Commissioner, DFPS & Cecile Young, Executive Commissioner, HHSC (copying legal counsel), re: PMC children placed in Forever Home/Maofu HCS Group Homes (August 19, 2024) (on file with the Monitors).
[4] E-mail from Prerak Shah, counsel for DFPS & HHSC, to Deborah Fowler and Kevin Ryan, re: PMC children placed in Forever Home/Maofu HCS Group Homes (August 19, 2024) (on file with the Monitors).
[5] E-mail from Val Aguirre to Deborah Fowler and Kevin Ryan, re: PMC children placed in Forever Home/Maofu HCS Group Homes (August 27, 2024) (on file with the Monitors).

According to MM's IMPACT records, MM entered TMC on October 31, 2018, after his maternal grandparent, who was caring for him and his siblings, was hospitalized for a terminal illness.  MM was nine years old.  After a short stay at an emergency shelter, MM was placed in a therapeutic foster home on January 16, 2019, where he remained until December 13, 2023.  While he was placed in this foster home, MM was diagnosed with ADHD, autism spectrum disorder and mild IDD (FSIQ 59).  His level of care (LOC) increased from moderate to specialized, and then to intense, where it has remained since February 21, 2020.

MM's siblings were adopted by a fictive kin "aunt" (aunt) and live in central Texas, where MM lived prior to his entry into foster care.  The therapeutic foster home where MM was first placed was located in North Texas.  MM's IMPACT records show that at times, during moments of emotional dysregulation, MM expressed that he missed his siblings and asked for his biological father, who continued to have contact with him.

MM entered PMC in November 2019, after his mother voluntarily relinquished her parental rights.  His biological father's parental rights were terminated in April 2023, but MM's visits with him were discontinued in 2021, due to reports from MM's caregivers that his behavioral challenges escalated after visits.  The adoptive parent for MM's siblings (the fictive kin aunt) and MM's Court Appointed Special Advocate (CASA) continued to facilitate virtual and in-person visits between MM and his siblings.

MM's placement in his initial therapeutic foster home disrupted due to his behavioral health challenges.  According to a contact note in MM's IMPACT records, the foster home's Child Placing Agency (CPA) issued a 30-day discharge notice in early November 2023 after Youth For Tomorrow (YFT) found that MM needed a more restrictive setting.[6]  Consequently, on December 13, 2023, MM was placed in his first HCS home, also located in north Texas, and run by Ahora y Siempre.  This placement also disrupted because of MM's behavioral health challenges, and after a short stay in an Ahora y Siempre respite home, on April 10, 2024, MM was placed in a Houston-area HCS Group Home run by Maofu/Forever Home.

In addition to counseling[7] and school-based services to address MM's autism and IDD diagnoses, psychotropic medications were prescribed soon after MM's entry into foster care.  MM was first prescribed medications to treat his ADHD, and medication to help

---

[6] MM's IMPACT records show that he was determined to have qualified for HCS services while he was still placed in the therapeutic foster home.  The foster home did not want to become an HSC home.  DFPS considered moving him to an HCS home prior to the placement disruption in an effort to offer permanency to MM by placing him in a home where he could remain after aging out of foster care.

The service level assessment completed by YFT that referred to a more restrictive placement stated, "There appears to have been little progress for the last year and a more restrictive setting, which might better meet [MM's] low functioning needs, may need to be considered at this time, especially as he continues to grow and become stronger."

[7] Just prior to his removal from the therapeutic foster home, his caregiver reported that MM was receiving virtual counseling twice a week.

him sleep. [8]  As MM grew, MM's behavior[9] became more difficult for caregivers to manage when he was dysregulated.  As a consequence, his psychotropic medication prescriptions increased in number and dosage.  By the time MM was placed in his first HCS Group Home with Ahora y Siempre in December 2023, he was prescribed the following psychotropic medications:

- Trazadone 100 mg tablet (two at bedtime)
- Oxcarbazepine[10] 300 mg tablet (one at bedtime)
- Oxcarbazepine 150 mg tablet (one in the morning)
- Clonidine HCI ER 0.1 mg tablet, extended release, 12 hour (two in the morning and at bedtime)
- Olanzapine[11] 2.5 mg tablet (one in the morning)
- Olanzapine 10 mg tablet (one at bedtime)
- Concerta 36 mg tablet, extended release (one in the morning)

IMPACT records show that after MM was placed in the Ahora y Siempre HCS host home, his caregiver struggled to find a therapist and psychiatrist to treat him.  An e-mail from MM's DFPS caseworker to staff at Ahora y Siempre, dated February 5, 2024 (almost two months after he was placed), stated:

> Would you please help [MM's caregiver] with getting [MM] setup with services.
>
> He needs a psychiatrist, and his medication needs to be re-evaluated.
>
> He also needs a behavioral therapist and it needs to be in person, not virtual.  It would be good if he can get ABA therapy.

An administrator with Ahora y Siempre responded, "Can you please let me know who your email is addressed to? If its [sic] one of my people I'll know to follow up with them?"  The DFPS caseworker responded, "Yes it is to any one of your people.  Please help [MM's caregiver].  She reports that she gets no support from you guys."  An e-mail

---

[8] MM was prescribed Risperidone while he was still placed in the emergency shelter, on December 17, 2018.  Soon after moving to the foster home, MM was prescribed Vyvanse, Guanfacine (a blood pressure medication that is used off-label as a psychotropic) and Hydroxyzine, in addition to the Risperidone.

[9] MM's early IMPACT records described behavior very similar to the dysregulation that resulted in the disruption of his placements in the therapeutic foster home and Ahora y Siempre.  For example, IMPACT records show that he was often restrained when he became dysregulated at school.  In addition to hitting and biting others, MM's behavioral challenges included self-harm (head banging, poking his eyes, choking, hitting, or punching himself).  A contact note in IMPACT, dated March 4, 2020, documented a report from MM's school that MM had engaged in 75 instances of hitting himself and 40 instances of banging his head into objects that day.  MM also hit, kicked, punched, and spit on his teachers and caregivers when he became dysregulated.  More recently, IMPACT records show that MM's behavior would escalate when electronics were taken away from him or when he was not allowed something that he wanted.

[10] Oxcarbazepine is an anti-seizure medication.  MM's records do not show he has been diagnosed with a seizure disorder.

[11] Olanzapine is an atypical anti-psychotic medication.  MM's records do not show he was diagnosed with a mental illness that requires treatment with an anti-psychotic.

sent to Ahora y Siempre by MM's CVS caseworker later implored, "[P]lease help [MM's caseworker] get [MM] to a therapist and a psychiatrist as soon as possible. His behavior is not good and his medication needs to be reevaluated." MM's Health Passport records indicate that he continued to have monthly virtual appointments with the same psychiatrist who was treating him prior to his move to the Ahora y Siempre home. MM appears to have had only two counseling sessions during his placement at Ahora y Siempre, one of which was an intake appointment.[12]

His placement in this home ultimately disrupted after MM's caregiver reported that he attempted to choke her.[13] Ahora y Siempre concluded that the caregiver was "not equipped to handle" MM's behavior. MM's IMPACT records include an e-mail, dated March 20, 2024, documenting an Ahora y Siempre staff person's description of this incident that indicated that MM's caregiver reported that his psychiatrist "told her that [MM] [was] maxed out on medications due to his age." However, the Ahora y Siempre staff person reported that because this was "hearsay," they were attempting to schedule a conversation with MM's psychiatrist.

Notes from a March 14, 2024 telehealth appointment with MM's psychiatrist show that the psychiatrist increased his dosage of oxcarbazepine from 450 mg per day to 750 mg (300 mg in the morning and 450 mg in the evening)[14] "for mood/aggression" and that his trazadone dosage was increased to 250 mg at bedtime. MM was moved to the Ahora y Siempre respite placement on March 28, 2024. On April 10, 2024, MM was placed in the first Forever Home/Maofu HCS Group Home.

MM's Health Passport records include only one Psychotropic Medication Utilization Review (PMUR),[15] conducted May 3, 2023, while MM was still placed in the therapeutic

---

[12] Entries show that he received services at the Child and Family Guidance Center on January 29, 2024; however, his caregiver reported that the center did not provide the type of therapy MM needed. Entries on March 9, 2024, and April 5, 2024 showed that he received services from a clinical social worker. Notes stored in One Case related to the March 9, 2024, appointment show that it was an intake appointment.
[13] This incident resulted in investigations by HHSC – PI because the caregiver bit MM during the incident, allegedly in self-defense, and MM later made outcries that in addition to being bitten, the caregiver's boyfriend punched him in the side of the face during the incident.

An additional investigation was opened September 4, 2024, related to allegations of Physical Abuse of MM during his stay in the Ahora y Siempre respite home that he lived in. This was based on an injury that MM's caseworker noticed when she picked him up (a scrape on his wrist). When she asked the caregiver about it, he said that the child obtained the injury playing basketball and then picked at the scab. The injury was not reported to SWI until September 4, 2024.
[14] This increase appears to have been reduced; the last refill of 150 mg of oxcarbazepine occurred March 29, 2024. On April 8, 2024 (two days before his placement in the first Maofu/Forever Home), his oxcarbazepine was refilled with a dosage of 600 mg/day; the prescription for 150 mg was not refilled. A Comprehensive Nursing Assessment, dated May 15, 2024, completed by the registered nurse who worked for Forever Home, confirmed the increased dosage for trazadone continued, but documented the oxcarbazepine dosage as 300 mg twice daily.
[15] A second PMUR was considered on July 17, 2024. However, the PMUR Screening Notification found that due to a medication change less than 60 days prior, a PMUR would not be completed. The form indicated that Superior HealthPlan would review MM's prescriptions again within 60 days to determine whether a PMUR should be completed.

foster home.  The PMUR was triggered because MM was prescribed four or more psychotropics.  His medications (which, at that time, did not yet include oxcarbazepine) were found to be "outside parameters" but "within standard of care." Despite this, under "Potential Drug Therapy Problems to Address," the reviewer identified the following:

- Drug(s) without an indication.  It is unclear what the indication is for the antipsychotic medication based on the diagnoses listed in claims.  There is no diagnosis of Bipolar Disorder or psychotic disorder noted in the claims, although this medication can be used for off-label treatment of other conditions.

- Duplicate drug therapy.  There are multiple medications prescribed that treat ADHD, although prescribing a stimulant and alpha agonist together is a common treatment strategy.

- Potential adverse drug reaction(s) or side effect(s).  Caution is advised with prescribing multiple psychotropic medications concurrently.  Medication interactions can occur and risk of side effects can be amplified.  Generally, there can be increased risk of CNS depression, psychomotor impairment, hypotension and altered seizure threshold.  The combination of methylphenidate and trazodone increases risk of serotonin toxicity.  The combination of clonidine, olanzapine and trazodone increases the risk of hypotension, orthostasis and syncope.  Periodic consideration of the active diagnoses, effectiveness of each medication, target symptoms, tolerability, dose optimization, evidence basis and long-term plan is prudent and can lead to a reduction in polypharmacy to the minimal effective regimen.  Antipsychotic monitoring labs were last completed in September 2022 per claims.

MM's Health Passport records show monitoring labs were completed May 19, 2023, and on April 11, 2024, the day after he was moved to the first Maofu/Forever Home HCS Group Home.

B.  MM's placements through Maofu/Forever Home

MM's IMPACT records show that DFPS described the Forever Home placement as one that had more experience providing care to individuals who have IDD.   The first HCS Group Home that MM lived in served three other male clients, a 13-year-old, a 14-year-old, and a 17-year-old.  None of the other clients were in foster care; two were non-verbal.  DFPS asked a Local Permanency Specialist (LPS) to conduct face-to-face visits with MM twice monthly.

The LPS caseworker did not document any safety concerns regarding the Forever Home placement during her initial face-to-face visits.  However, the face-to-face visit with MM that took place on June 12, 2024, occurred at another home.  The LPS caseworker documented that she "arrived at [MM's] placement but after waiting almost an hour, he did not show up with staff."  The LPS caseworker "went to her next visit and [MM] was

6

at that placement." The staff told her that "they attempted to take [MM] to his placement but it appeared there were no staff members at the home so they brought [MM] to the next home."

Contact notes in IMPACT also documented that MM's DFPS caseworker and others were having difficulty communicating with and receiving information from the provider. For example, MM's IMPACT records show that in early May, his caseworker had texted the provider, noting that MM's aunt had "been calling" the placement and "can't seem to get anyone to call her back." The caseworker noted that MM's siblings wanted to talk to him. The provider responded that MM's aunt had called the day before and was able to speak with MM. Another contact note in May documents an e-mail from MM's caseworker to the provider asking for a school incident report, emphasizing the importance of sending incident reports to her. IMPACT records also show that MM's caseworker repeatedly asked for documentation related to medical visits in May, and on May 14, 2024, told the provider that they needed to send her monthly documentation of a medication review for MM.

A contact note added to IMPACT in June documented that his caseworker e-mailed the provider on June 13, 2024, and said she was "still waiting" for copies of documentation related to MM's medical and dental appointments, as well as therapy notes and medication reviews. The same contact note included a June 17, 2024 e-mail from MM's aunt, who complained that she had "called many times trying to speak with [MM] and check on him" but was only able to speak with him once. MM's caseworker subsequently contacted the provider to again emphasize the need for MM to have virtual visits with his siblings. The same day, MM's caseworker contacted the provider, noted that MM was overdue for a dental exam and said if MM had already had the exam, to send the documentation associated with it; his caseworker documented that she received no response from the provider.

When MM's caseworker dropped him off at the placement on April 10, 2024, she gave the caregiver (Staff 1) MM's medications and told him that MM "only had 10 trazadone so he would need a psychiatrist appointment pretty quick"[16] and the caregiver said he would make one "right away." Though the LPS caseworker documented a list of medications that MM was prescribed during her face-to-face visits, the notes associated with the visits do not show that the LPS checked medication logs or conducted medication counts.[17] Documentation found in One Case related to MM's initial visit with his primary care physician (PCP), which occurred April 11, 2024, shows that the doctor ordered "wellness labs" and indicated, "increased sleepiness daytime – please have psych evaluate bedtime medications."

---

[16] Prior to his placement in the Maofu/Forever Home, MM's trazadone prescription was filled on February 26, 2024.
[17] In fact, the list of medications included in the face-to-face visit notes are inaccurate; the May 2, 2024, May 14, 2024, and June 12, 2024, incorrectly identified the dosage of oxcarbazepine (listing 200 mg BID (twice daily) rather than 300 mg BID) MM was prescribed. MM 's most recent (July 2, 2024) Common Application also inaccurately reflected the dosage for oxcarbazepine, listing it as 200 mg BID. This is concerning, since MM's CVS caseworker is one of his medical consenters.

MM's Health Passport records show that he had an appointment with a psychiatrist on April 23, 2024.  Despite the note from MM's PCP requesting that a psychiatrist evaluate MM's bedtime medications, Health Passport shows no change to MM's medications. Notes made by the psychiatrist during MM's  April 23, 2024 appointment (found in One Case) stated that MM was "doing well on the current treatment" and determined "no medication changes this visit."

Health Passport also shows that MM's trazadone prescription was not refilled until May 7, 2024, almost a month after MM's caseworker said he had only 10 remaining.  Nothing in IMPACT describes how the provider managed MM's trazadone prescription prior to May 7, 2024.

During the initial face-to-face visits conducted by the LPS, the caregivers in the home did not report any behavioral problems for MM, a significant change from the history of behavioral challenges documented by his previous placements.   Notes associated with the face-to-face visit on May 14, 2024 said:

> The staff stated [MM] had no issues with his behaviors and he shows no signs of aggressiveness.  Staff described [MM] as the best resident in the home.  He does pretty well at school.  [MM] likes to be on his own and play on his own.

MM's records do not show any new therapy or counseling visits prior to May 29, 2024; notes associated with this appointment, found in One Case, indicate the appointment was MM's first with this therapist.  The appointment was conducted virtually.[18]  The DFPS Monthly Evaluation/Assessment Report for MM for the month of May indicated, "He…has a new therapist but no appointment date has been set yet."

On June 22, 2024, MM's CASA, his aunt, and his siblings arrived at the placement for their first in-person sibling visit since MM had moved to the Forever Home placement.

---

[18] The only narrative notes in the documentation related to this appointment contradict the description of MM's behavior in the May 14, 2024 face-to-face notes.  The notes related to the May 29, 2024 virtual therapy visit state:

> Client presented online w group home staff.  Staff has limited information.  Reports he's been in Group home for 3 months.  Client's mother is involved.  Client was put in group home due to behavior problems.  Client is in CPS custody.  Staff reports behavior is not good at the group home.  Client occasionally beats his head on the walls and floor, beating himself up if things don't go his way…Client was a poor historian.  Case worker had limited background information.  It is unclear how client came to be in CPS custody.  More information needed.

However, the Comprehensive Nursing Assessment, completed by the Maofu RN on May 15, 2024, lists "0" under each category of frequency, severity, and last exhibited for the following behaviors: hurtful to self, hurtful to others, destructive to property, pica, resists care, socially offensive/disruptive behavior, at risk behavior (including wandering, elopement, sexually aggressive behavior), history of suicide attempt, or other serious behavior.

The only two incident reports from Forever Home/Maofu in MM's One Case records are related to minor injuries, neither of which were self-inflicted.

This visit was planned, and the provider was aware that it would take place.  The visit resulted in a report to SWI, described in MM's IMPACT records in a June 24, 2024 I&R Staffing contact note:[19]

> Yesterday, one of the disabled residents answered the door and let visitors in the home.  After coming in, the visitors sat for several minutes before [the caregiver] woke up from sleeping on the couch.[20]  The home was very bare and did not look like people lived in the home.  There was poop smeared on the doors, walls and doorknobs in the home.  One of the residents took the visitors around the home, showed them two rooms that had beds but no mattresses.  The resident said that it hurts his back when he sleeps on the bars on the bed.  A non-verbal resident went to the visitors and was trying to take them to the fridge to get food.  There were some roaches in the kitchen and there were stacks of medications sitting out in the open where they could easily be reached.  There were two mattresses in the backyard that were soaked with urine.

A second I&R Staffing contact was entered the same day.  It stated:

> Today is June 23, 2024.  Yesterday, [MM's] residence was seen with feces on the bathroom door, and feces spread throughout the home.  [MM's] room was clean, but two of the other resident's [sic] rooms were not clean.  One other resident was sleeping on a urine-stained mattress.  And another resident didn't have a mattress because it was removed after constant bed wetting and the resident was sleeping on the rails.  The medication in the home was unsecured, and [MM] looked over medicated.  [MM] didn't recognize his visitors,[21] and [MM's] wrist was seen with a scar.  [MM] was unable to say where he sustained the scar.  [MM] was hungry, but he didn't look malnourished, and there was food in the home.  [MM] was unable to answer any questions, and all [MM's] responses were, "I don't know".  There was a caregiver in the home, but they didn't greet or acknowledge the visitors in the home, and they allowed the children in the home to open the door.[22]

[19] An I&R Staffing contact is used to document caseworker notification of an ANE intake, required by RO B5.
[20] During the investigation, MM's CASA clarified that the staff person was not asleep when they arrived, but that he was in the living room sitting on the couch and that they were in the home for five minutes before the staff person greeted them.  MM's aunt said that she did not witness the staff person sleeping but assumed that he was because it took him so long to greet them after they entered the house.
[21] Notes indicate that the CASA reported that MM did not recognize her (she has been his CASA for over five years) or his siblings.  Though MM has IDD, his IMPACT records show that, prior to his recent hospitalization, he was verbal and able to engage in conversations with his caseworkers and caregivers.  He liked to play video games.  He participated in school, though he was in a self-contained classroom due to behavioral challenges.  He was able to talk with his caseworker by phone if she called.
[22] Both I&R Staffing contacts were updated after MM's caseworker received an e-mail from the HHSC – PI investigator notifying her that the investigation had concluded.  The caseworker stated that she received an e-mail from the investigator on July 22, 2024 indicating that the investigation was concluded, and that the final disposition was Unconfirmed for Neglect.

MM's IMPACT records include a contact note documenting a telephone call between his caseworker and aunt on July 5, 2024, describing the in-person visit:

> She shared that the visit was hard.  He didn't recognize them at all.  He just stared at everyone.  They went to a playground area.  He didn't look tired,[23] he ran from activity to activity.  She stated that he seemed depressed.  He never engaged with his siblings, it was different.  They had not seen him since January.  The boys didn't seem to be engaged in anything…He called [the CASA] "my mom."

MM's IMPACT records document a face-to-face visit between MM and an LPS caseworker on June 26, 2024.  The contact note in IMPACT noted that the placement "appeared to be safe and free of hazards," that there were two caregivers and one other child present, and that when the LPS worker walked through the home she "smelled the scent of cleaning product."  She documented having viewed MM's bed and noted that it was made and that the common areas of the home "appeared neat and clean."

However, as a result of the concerns that MM's CASA and aunt shared with his attorney ad litem, an emergency hearing was held on July 2, 2024, and the judge ordered MM to be moved to a new placement within 24 hours. The comments entered by the child's caseworker under the Placement Removal tab for the IMPACT placement page for the Forever Home stated:

> I was Court Ordered to move [MM] from this home.  CASA and his attorney wanted him moved.  No safety issues, a visit was made by CASA and the home was found not to their liking.[24]

MM was moved to another group home licensed by the same provider, but entered the placement in MM's IMPACT records under the Maofu Home name, rather than Forever Home.  On July 2, 2024, MM's CVS caseworker also documented the following text message exchange with Staff 1 about the placement change:

---

However, IMPACT shows the investigation was reopened.  IMPACT shows the investigation was approved for closure on July 22, 2024, and that the case closed on August 22, 2024, but was reopened on August 28, 2024.  Nothing in IMPACT explains why the investigation was reopened.

[23] During the investigation, the HHSC – PI investigator documented an interview with MM's CASA who attended the same in-person visit.  She said that MM "appeared to be not his self," noting that MF was normally "aggressive and combative" but that he "appeared very calm and tranquil."  She said that "it appeared to her that [MM] may have been overly medicated at the time."  When his aunt was interviewed for the investigation, she said MM "had a very calm like demeanor that is very different from his usual self."

[24] MM's IMPACT records document e-mail exchanges between DFPS staff the day the hearing took place.  They document that DFPS and HHSC had "no concerns" about the Forever Home where MM was placed, that MM's CASA and his aunt "went to the home and made various allegations but…there was reported justification for some of the conditions of the home…nothing we have heard was related to safety or neglect."  The DFPS staff responding to the e-mails regarding the immediate need for a new placement noted, "Finding another HCS placement will take time."

[Caseworker]: [A]re the boys at this home also autistic? Does [caregiver name omitted] have a middle name of [name omitted]? Is her address on [street name omitted]?

[Staff 1]: Yes, that's her middle name.  She is new to us.  She lives on [street name omitted].

[Caseworker]: Was [another child, name omitted] moved from the [street name omitted] home to [t]his home?

[Staff 1]: Yes, ma'am.  They all get along pretty well.  The house is a good house.

[Caseworker]: Would this be a respite or permanent home? Would this home be with Maufu [sic] or Forever Homes [sic]?

[Staff 1]: He can stay there as a permanent placement.  Maofu.

[Caseworker]: Who will be the case manager for this home?

[Staff 1]: That's me.

[Caseworker]: If it's you, it is going to look like he wasn't moved.  Can you assign another case manager? CASA and the attorney have to believe that other folks are caring for him.

[Staff 1]: Sure.

[Caseworker]: I will still be in contact with you too.

[Staff 1]: No worries!  That's fine.

[Caseworker]: Would you be able to move [MM] to the home on [street name omitted] later when I text you with the ok? Then I can meet the case manager there tomorrow to sign the paperwork.

[Staff 1]: Yes, ma'am!  Okay, I will have the CM there.

MM's records reflect that he was moved to the second Maofu home placement on July 3, 2024.  Two of the male clients, the 13-year-old and 17-year-old (both of whom are non-verbal), also appear to have been moved to the second Maofu home.  Due to the concerns expressed by the CASA that MM appeared overmedicated during her visit with him, the judge also ordered drug tests to be done.

Just after the hearing and MM's move to the second Maofu/Forever Home, his caseworker discovered that he had been to therapy only once since being placed at the HCS Group Home and had been a "no show" several times.  On July 12, 2024, MM's

caseworker noted in IMPACT that she left a voice message for MM's psychiatrist because she was "trying to let them know that [she needed] to be invited to all of [MM's] medication reviews."[25]  MM's caseworker continued to document missed calls from MM's aunt and siblings to the second Maofu/Forever Home, and difficulty she had making contact with caregivers in the home.  A July 15, 2024 staffing contact in MM's IMPACT records states, "CASA and AAL still have some concerns regarding communication in the new placement."

On July 17, 2024, MM's caseworker documented a text message exchange with Staff 1 during which she expressed concern related to the number of staff that covered shifts in the group home where MM was placed:

> [Caseworker]: Do you always have two caregivers at the home? Like 24 hours?
>
> [Staff 1]: One caregiver at a time.  3 pm to 11 pm
>
> [Caseworker]: Please clarify this for me further.
>
> [Staff 1]: We don't have two staff at the home.  [Day habilitation] is from 7 am to 3 pm.
>
> [Caseworker]: Who takes care of him outside this timeframe?
>
> [Staff 1]: Group home shifts are from 3 pm to 7 am, and weekends 12 hour shifts.
>
> ***
>
> [Caseworker]: Thank you...I think that 3 boys – teens with a diagnosis of autism is too much for one caregiver to handle safely and without sanitation issues.  Is there any way you can get two caregivers in the home?

---

[25] In December 2023, DFPS changed its policy related to medical consenters for children placed in congregate care settings that have shift staff.  See DFPS, CPS Handbook, §11113.1.  Prior to the change, the policy did not allow *any* employee of GROs (except in emergency shelters), nursing homes, state-supported living centers, or HCS Group Homes to be named as a medical consenter for a foster child. While the policy still requires a foster child's DFPS or SSCC caseworker to be designated as the child's medical consenter when the child is placed in one of these settings, the DFPS policy now prohibits only *shift staff* from being named as medical consenters.  *Id.*  Thus, for MM, and the other three children who remain in a Maofu/Forever Home placement, a non-shift staff employee of Maofu/Forever Home is named as a medical consenter.  This makes it possible for the HCS Group Home employee who is named as a medical consenter make healthcare decisions for the child, including decisions related to the child's psychotropic medications.

[Staff 1]: Ma'am, we don't have any of the three individuals as 1 on 1.  The staff can handle them just fine.  If there is or was a need for an extra person, I will adjust accordingly.[26]

Another hearing was scheduled for July 17, 2024.  A contact note in MM's IMPACT records documents that, at the hearing:

We talked about the drug test and why we couldn't get the results that CASA was asking for.  [Name omitted] explained that she reached out to our substance abuse specialist for answers about the drug test.  The Judge seemed satisfied with the answer, and we had the drug test completed within the time requested.

The Judge asked that we continue to search for additional homes.

A contact note in MM's IMPACT records, dated July 16, 2024, documents an e-mail from a DFPS program director to MM's AAL explaining that the drug testing that was done did not include testing for overmedication:

[I]n court the judge did not specifically state what type of test only that the child needed to be drug tested.  Now that's not to say we didn't clearly know what the child needed to be tested for.  On our part there was perhaps some miscommunication/misunderstanding on what exactly type of test was needed.  In retrospect we likely should have reached out to our nursing specialist for further recommendations/guidance. But I did reach out to our substance abuse specialist and our nurse specialist on the drug test that was completed.

Our substance abuse specialist indicated that what she saw was that his initial drug screen…was positive for MDMA; and that there are no pharmaceuticals for MDMA, but some medication can cause a cross reaction on drug screens, but…it looks like they did a confirmation test for amphetamines/methamphetamines category and the drug test came back

---

[26] Despite this, in the abuse and neglect investigation initiated after the June 22, 2024 in-person visit, HHSC – PI lists the following concern: "It is of concern having one staff in charge of supervising four individuals receiving services at one time, and not having additional staff in the group home."

During that investigation, the licensed counselor who provides behavioral support to youth placed in Maofu homes told the investigator that she recommended that the 13-year-old non-verbal client be placed on one-to-one supervision "because he has a history of playing with his own feces, a history of elopement, constantly seeks food/drink, does not sleep much, bites self/others to the point of exposing flesh, head bangs, hits himself, strips frequently, steals, and is prone to destruction."  She recommended that the 17-year-old non-verbal client be placed on one-to-one supervision "due to a history of self-harm, perseveration, property destruction, and oppositional defiance."  She also said that she recommended MM be placed on one-to-one supervision.  However, she acknowledged that these were recommendations, and not "requirements."  According to the counselor, for one-to-one supervision to be "required" in an HCS Group Home, the HCS home must demonstrate that one-to-one is necessary based on "continued or increased behaviors over a period of time," and then has to request funding for one-to-one from the State.

negative for MDMA.  She stated that Trazodone can cause a cross reaction
for MDMA on drug screens but once the sample goes to confirmation
testing it is eradicated.  She could not say if these labs indicated the client
overdosed and that would be a question for a physician or nurse.

Our nurse indicated that the lab test that was done was a very inclusive
test, more so than a hospital would have done if a client came in for
concerns of drug use.  She indicated that there really is no way to test for
all possible meds especially if we don't know all the meds he may have
been exposed to (we sent them his medication list, but not of the other
children as we do not have access to that confidential information), but
even then, not all substances show on a test.  The test results do show he
was not positive for any amphetamines, stimulants, or opiates.  She did
review the list of his medications and noted that there are some that could
cause him to be drowsy/altered if he took too much but they wouldn't be
testable on a drug screen.  She indicated that if drowsiness or altered level
of consciousness is recurring for him, it could be that his regimen is not
therapeutic which would need to be discussed with the Prescriber or PCP.

The same IMPACT contact note documented an e-mail from MM's aunt, sent on July 17,
2024, in which his aunt reported that after MM was moved to the second Maofu home
his demeanor improved.  She reported that they had a virtual visit with him, and he was
"happy, talkative, silly, joking" and "knew his siblings and asked for them by name."

On August 5, 2024, MM's caseworker went to the Maofu home to bring MM for an
overnight visit with a prospective foster home placement.  In MM's IMPACT contacts,
his caseworker documents a text exchange between MM's caseworker Staff 1, indicating
that she found that MM was not at the home when she arrived.  The HCS Group Home
employee said that MM was with Staff 2, a case manager who worked for the provider,
and that they had gone to the pharmacy.  The employee noted that MM had vomited in
the van during this errand.  The caseworker asked the employee how far away the
pharmacy was, and he answered that it was about 10 minutes from the house.  The
caseworker noted that she had been waiting for MM an hour-and-a-half since arriving at
the home.

When MM arrived, the caseworker asked MM if he still felt well enough to go to the
prospective home for the visit.  MM said that he did.  He changed his socks and shorts
(which had vomit on them) and the caseworker took him to the home.  The next
morning, before MM's caseworker had checked out of the hotel, the caregivers at the
prospective foster home called and said that MM had been vomiting all night and
needed to be picked up.  The caseworker asked them to bring MM to the hotel.  MM's
caseworker documented the following in a face-to-face visit contact in IMPACT:

[MM's] visit with the [name omitted] family was cut short because [MM]
got sick.  When I picked him up on Monday, he was throwing up and [a
Maofu employee] called the nurse and she told him to give him some
Pepto, and a Sprite.  The nurse also told her to take his temperature and he

14

didn't have a fever. I went ahead and took him to his visit, since he appeared to be doing well. On the way to the visit, [MM] was singing and appeared well. When we arrived at the [name omitted] home, he asked for milk and [name omitted] told him that they were going to McDonald's in just a bit. He smiled and said he likes McDonalds.

Fast forward to this morning. [Name omitted] called me this morning and stated that they had not hardly slept all night, and that [MM] wasn't able to hold down any food. He brought him to me at the hotel that I was staying at. [A caregiver with the Group Home] met me at the hotel, and she took [MM] to Memorial Hermann in Sugar Land and they send [sic] him to Memorial Hermann Downtown – Children's Hospital. This morning, while I was waiting for [the caregiver] to pick [MM] up, he seemed weak and was pointing to his throat. He didn't say anything and he was restless.

Contact notes in IMPACT indicate that it took almost two hours to get MM to a doctor after the prospective foster caregiver dropped MM off at his caseworker's hotel. MM's caseworker documented the following timeline in MM's IMPACT records:

I was waiting on [MM] and I decided to text [Staff 1]. I decided that it made most sense for he [sic] and his team to take [MM] to the doctor because [Staff 2] had already spoke[n] with [the Maofu/Forever Home nurse] on 8/5/24 the morning that I picked [MM] up. I was not part of that conversation. So [Staff 2] could call [the nurse] and they could get [MM] in to see the doctor quickly. I figured that since [Staff 2] has a connection with [MM's] doctors, because she takes him, she would be able to get him into a doctor a lot quicker than I would. I also thought that his doctors had all his medical history in their data base [sic] and wanted him to go see his doctors.

I texted [Staff 1] at 8:43am. I asked [Staff 1] if he could get an appointment for [MM] to see the doctor? He continues to throw up and hasn't eaten hardly anything. I added that he hasn't had hardly any sleep. I told him that I had just heard from the family. I added that [MM] was weak.

[Staff 1] responded to me at 8:46 am and stated, Okay. No problem. He asked if the family could take him to the doctor. At 8:49 am I texted [Staff 1] back and I told him that I was going to take him back to him or he could give [me] the doctor's information and I will take him. I added that the [prospective foster] family can't take him. They are not medical consenters.[27]

---

[27] MM's IMPACT records show that MM's caseworker and Staff 2 were both medical consenters for the child.

[Staff 1] stated that he understood.  He sent me the doctor's contact info.  I asked again if he would please make an appointment for him.  I also asked [Staff 1] if he thought if [Staff 2] could take [MM] to the doctor.  [Staff 1] asked me if I was going to take [MM] back to him tomorrow so they could do a walk in.  At 8:55 am I responded to [Staff 1] by text and told him, no today, since he is so sick.  Visit is cut short.  Wherever you take children when they get sick.  [Staff 1] asked me where I was at right now with him.

I responded to [Staff 1] and told him that I was trying to check out of my hotel.  Waiting for the family to bring [MM] to me...I asked [Staff 1] if someone could come pick [MM] up from me at the hotel.

[Staff 1] responded at 9:06 am, ma'am, we have a lot going on today.  Some staff are heading to Brenham, some are on an outing, and others are at the Day Center.  I will call [Staff 2].  [Staff 1] told me that someone would be at my hotel in one hour.

[Staff 1] stated that someone would be at the hotel and they would take him to the doctor.  I thanked [Staff 1] for his help.

[Staff 1] stated, you are welcome.

[The prospective foster parent] arrived at the hotel with [MM] at around 9:30 am.  He had [MM's] clothes and his medication to give back to me and I put them in the very back of the vehicle.  I said hi to [MM].  [MM] pointed at his throat, and I put him in the back seat.  [The foster parent] stated that [MM's] medication needs to be evaluated and he thinks his current placement needs to do that.  I thanked [the foster parent] and he asked me to keep him updated on [MM].  I told him that I would.

I texted [Staff 1] again at 9:44 am to tell him that I was in the car with [MM], he is laying down.  I also asked [Staff 1] to please have whoever was coming to pick up [MM] to call me when they arrived at the hotel.  [Staff 1] responded at 9:47 am stating [Staff 2] is coming.

At 10:13, I texted [Staff 1] and asked him to have [Staff 2] call me.  She seems to not be here yet and sometimes gets information mixed up.  I want to be sure that she knows I'm waiting for her at the hotel.  She is not answering my calls.

[Staff 1] replied and said okay.  He was going to call her.  He added that he was in a meeting.  I replied at 10:38 am, thank you so very much.  She called me.

[Staff 1] stated, no worries.

> I texted [Staff 1] at 11:13 am, stating, [Staff 2] just picked [MM] up.  When [Staff 2] picked [MM] up…We took him out of my vehicle and put him in [her] car.  I also gave her [MM's] overnight bag and his medication.

IMPACT records show that after picking MM up at the hotel, Staff 2 noticed that MM "was looking really tired" and didn't respond when she spoke to him.  According to Staff 2, she asked MM's caseworker what was wrong, and the caseworker suggested that he may have just been tired because he didn't sleep all night.  Staff 2 called the Maofu/Forever Home nurse, who suggested that he be taken to the hospital.  MM was taken to the hospital, and after the seriousness of his condition was identified, he was transferred to another hospital via Life Flight and admitted to the pediatric intensive care unit (PICU).

MM's condition worsened after being admitted to the hospital, and he had to be intubated and sedated.  An August 8, 2024 contact note in his IMPACT records stated that MM had developed "edema of the brain."  The doctors told DFPS staff that his whole brain was swollen, and that, as a result, surgery could not be done to relieve any pressure.  On August 12, 2024, DFPS held a medical staffing that included the CPS medical director.  MM's diagnoses were listed as fulminant liver failure, and toxic/metabolic encephalopathy.  A liver transplant had been ruled out, and the staffing notes indicated, "that the EEG showed no activity."  The CPS medical director "discussed withdrawing versus withholding treatment" and "explained the steps that will need to happen to start the process for requesting end of life care."

Later the same day, DFPS held a medical staffing with MM's attending PICU doctor and the hospital social worker.  His attending physician said that MM had "no respiratory drive or cortical function" and confirmed that his poor neurological status meant he was not a candidate for a liver transplant.  The doctor described the options for end-of-life care, said there was "no chance of recovery," and that MM was "in a persistent comatose state…living with a non-functioning liver."  The doctor advised that he would likely die even with continued medical intervention.  The doctor said MM's diagnoses were "suspected toxic ingestion" and "acute liver failure."

A court hearing was scheduled for Friday, August 16, 2024, and the judge ordered DFPS to sign a DNR.  DFPS approved a DNR, withdrawal of life support, and organ donation the same day.  However, that weekend, MM began showing signs of improvement.  According to stakeholders, he appeared to respond to the sound of his siblings' voices.  He continued to improve, began opening his eyes and trying to move, and was responding to his name.  On August 20, 2024, the judge in MM's case rescinded the authorization for the DNR order so that the hospital could attempt to extubate him and determine whether he was able to breathe on his own.  He was extubated on August 20, 2024, and was able to breathe on his own.  He has continued to improve, though his IMPACT records document that as of August 28, 2024, he was still having difficulty swallowing. More recent records document that he is having difficulty walking, and some difficulty communicating.  MM was transferred to an in-patient rehabilitation hospital on September 6, 2024.

There is an open HHSC – PI investigation into allegations of Neglect associated with the care provided to MM by Maofu/Forever Home prior to his illness.[28]  The investigation was first opened August 9, 2024, but two additional intakes, dated August 13, 2024, and August 22, 2024, were later merged with the original intake.  According to the investigator's notes, MM's doctors do not know what caused his liver failure, though they suspect toxic ingestion because they ruled out all other potential causes.  The level of Tylenol in his system when he was admitted was reportedly not high enough to be considered toxic, though his symptoms were consistent with Tylenol poisoning.[29]  The screening did not reveal any other toxins.

On August 31, 2024, an IMPACT contact note with the heading "I&R Staffing Details" in the narrative was added to MM's IMPACT records.  It lists two intake identification numbers (79213644 and 79213849) and lists an "I&R Notification date" of August 30, 2024.  The "I&R Narrative" states:

> [MM] was given three prescriptions at the end of July clonidine 0.1 mg, trazodone 100 mg, amlodipine[30] 10 mg.  It is unknown why the medications were prescribed.  [MM] is no longer at the facility and the prescriptions are still be[ing] refilled.[31]  [MM] was prescribed two separate prescriptions for trazodone 100 mg one for 60 pills and the other for 75 pills. 5/5/24, 5/26/24, 7/09/24.[32]  All prescriptions were filled by [name

---

[28] The investigations associated with his health crisis were not the first alleging MM was a victim of abuse, neglect, or exploitation after he was placed in a Maofu/Forever Home.  An investigation was opened for Neglect and Sexual Abuse after a July 16, 2024 report to SWI alleging that a child made an outcry that a caregiver touched MM and another child inappropriately, and that the staff member smoked or vaped marijuana in the home.  MM and the other child denied being touched inappropriately; a medical exam did not reveal signs of Sexual Abuse.  Maofu/Forever Home staff said that the child who made the outcry was angry with the staff member, and that the allegations were untrue.  HHSC made a finding of Unconfirmed for Neglect and Sexual Abuse.

[29] MM's toxicology screen was positive for the presence of acetaminophen at a level of 13.8 mcg/mL, which is considered safe.

[30] This appears to be a typo; MM was prescribed 10 mg of olanzapine, not amlodipine.

[31] This is not supported by a review of MM's Health Passport records.  However, it is possible that the attempt to refill the prescription triggered a review by Superior and that the refill was disallowed.

[32] MM's Health Passport records do show that both prescriptions of trazadone – one for 60 pills and another for 75 pills – were being refilled.  As noted above, MM's prescription for trazadone was increased from 200 mg to 250 mg on March 14, 2024, just before he was moved to the first Maofu/Forever Home placement.  The only way to determine dosage from Health Passport records is by the quantity of the drug provided for a 30-day supply when it is refilled.  A prescription for 100 mg of trazodone with instructions for a dosage of 250 mg would be reflected with a quantity of 75 for a 30-day supply.

Two different doctors are listed as the prescribers in MM's Health Passport records, Doctor A and Doctor B.  Doctor A is the psychiatrist that MM saw on April 24, 2024, just after being placed in the first Maofu/Forever Home.  A Maofu "Professional Communication Report," dated May 9, 2024, documents an appointment with MM's psychiatrist for "medication management," which is also documented in MM's Health Passport records.  The doctor's notes on this document appear to indicate that the psychiatrist sent refills to the pharmacy on April 23, 2024, but the prescriptions were never picked up.

Doctor B appears to be an internist who practices with MM's primary care physician (PCP).  Another Maofu "Professional Communication Report" in MM's One Case records shows that MM saw Doctor B for

a medication refill on May 20, 2024.  Health Passport documents an appointment with MM's PCP on May 20, 2024, not Doctor B.

The refills for trazadone are shown in MM's Health Passport records as follows:

- May 7, 2024 – Trazadone HCL 100 mg, prescribed by Doctor A, refilled with a quantity of 60 for a 30-day supply
- May 26, 2024 – Trazadone HCL 100 mg, prescribed by Doctor B, refilled with a quantity of 75 for a 30-day supply
- June 20, 2024 – Trazadone HCL 100 mg, prescribed by Doctor A, refilled with a quantity of 60 for a 30-day supply
- July 9, 2024 – Trazadone HCL 100 mg, prescribed by Doctor B, refilled with a quantity of 75 for a 30-day supply
- August 5, 2024 – Trazadone HCL 100 mg, prescribed by Doctor A, refilled with a quantity of 60 for a 30-day supply

MM's other medications also appear to have been prescribed by the same two doctors, but were refilled every 25 days, likely through an automatic refill process at the pharmacy.  For example, MM's oxcarbazepine (which was filled April 8, 2024, two days before he was moved to the home) was filled as follows:

- May 3, 2024 – Oxcarbazepine 300 mg, prescribed by Doctor A, refilled with a quantity of 60 for a 30-day supply
- May 28, 2024 – Oxcarbazepine 300 mg, prescribed by Doctor B, refilled with a quantity of 60 for a 30-day supply
- June 22, 2024 – Oxcarbazepine 300 mg, prescribed by Doctor A, refilled with a quantity of 60 for a 30-day supply
- July 17, 2024 – Oxcarbazepine 300 mg, prescribed by Doctor A, refilled with a quantity of 60 for a 30-day supply

MM's olanzapine (the anti-psychotic, both dosages of which were filled on April 3, 2024, just before MM was placed) was refilled on the following schedule:

- April 24, 2024 – Olanzapine 10 mg, prescribed by Doctor A, refilled in a quantity of 30 for a 30-day supply.
  - May 7, 2024 – Olanzapine 2.5 mg, prescribed by Doctor A, refilled in a quantity of 30 for a 30-day supply.
- May 19, 2024 - Olanzapine 10 mg, prescribed by Doctor A, refilled in a quantity of 30 for a 30-day supply.
  - June 5, 2024 - Olanzapine 2.5 mg, prescribed by Doctor A, refilled in a quantity of 30 for a 30-day supply.
- June 13, 2024 - Olanzapine 10 mg, prescribed by Doctor B, refilled in a quantity of 30 for a 30-day supply.
  - June 30, 2024 - Olanzapine 2.5 mg, prescribed by Doctor B, refilled in a quantity of 30 for a 30-day supply.
- July 8, 2024 – Olanzapine 19 mg, prescribed by Doctor A, refilled in a quantity of 30 for a 30-day supply.
  - July 25, 2024 – Olanzapine 2.5 mg, prescribed by Doctor A, refilled in a quantity of 30 for a 30-day supply
- August 2, 2024 – Olanzapine 10 mg, prescribed by Doctor A, refilled in a quantity of 30 for a 30-day supply.

MM's ADHD medications were also prescribed by the two different doctors.  When he was placed at the first Forever Home HCS Group Home, MM was prescribed Concerta (36 mg) and clonidine (.2 mg) for

of pharmacy omitted] and prescribed by [doctor's name omitted].  It is unknown why the prescriptions were given.  It is unknown why the facility continues to refill them after he has left.  It is unknown the name of the HCS home [MM] was at when these were prescribed and who continues to refill them.

The contact notes document the following under "Identified Safety Concerns/Needs":

I&R called in expressing concerns if [MM] was prescribed three medications at the end of July for Clonidine, Trazodone, Amlodipine. There are also concerns that these prescriptions are still being refilled though child is not at his placement.  [MM] is reported to have been prescribed two different prescriptions for Trazadone.  Case worker indicated that the medications listed in the report are part of his listed medication he was to be taking.  However, Health Passport is showing the PCP and Psychiatrist did prescribe two prescriptions of Clonidine.  Case worker reported at the time of the preplacement she did get [MM's]

_____

ADHD.  His last refill of both prescriptions prior to being moved was on April 3, 2024, for a 30-day supply of both drugs.

On May 20, 2024, Doctor B prescribed .1 mg of clonidine and on May 24, 2024, prescribed .2 mg of clonidine.  These prescriptions continued to be filled through July, each with a quantity of 30 for a 30-day supply; clonidine .1 mg was last filled July 9, 2024, and clonidine .2 mg was last filled July 15, 2024.  On August 2, 2024, Doctor A prescribed .1 mg of clonidine, in a quantity of 90 for a 30-day supply.

The Concerta prescription was never refilled.  According to MM's Health Passport records, Doctor A wrote a prescription for Qelbree (viloxazine) at a dose of 200 mg on July 3, 2024.  MM's caseworker asked Staff 1 about this medication change and was told that Qelbree was substituted for Concerta because they had difficulty getting the Concerta prescription refilled.

Health Passport flags Qelbree for a "Moderate" Medication Interaction Level.  The flag specifies the potential for harmful interactions with olanzapine, the antipsychotic MM was prescribed.  The warning reads as follows:

**Moderate Interactions**
*Monitor Closely:*
Plasma concentrations of olanzapine may be increased by Viloxazine HCl Cap ER 24HR 200 MG. Toxicity secondary to olanzapine may occur.

*Management:*
Monitor for increased olanzapine effects/toxicities if combined with strong CYP1A2 inhibitors. Consider using lower doses of olanzapine in patients treated with strong CYP1A2 inhibitors.

*Monitor Closely:*
Plasma concentrations and pharmacologic effects of Carbamazepine Tab ER 12HR 100 MG may be increased by Viloxazine HCl Cap ER 24HR 200 MG. Toxicity characterized by somnolence, lethargy, nystagmus, ataxia and other cerebellar signs may occur.

*Management:*
Additional clinical and carbamazepine serum concentration monitoring are indicated.

medication when she picked him up and did return to HHSC caregiver
when she took him back.  On 8/5/24 when [MM] was picked up the HHSC
home caregiver did report that [MM's] Trazadone had been filled.

There are no immediate safety concerns as the child is still hospitalized
and not returning to this placement or agency HHSC home where said
incident was reported to have occurred.

As of September 6, 2024, the Monitors do not find an intake or investigation associated
with this I&R in MM's case list in IMPACT, nor do either of the open HHSC – PI
investigations related to allegations of overmedication or MM's health crisis list this
intake as merged.  An LPS caseworker arranged to pick up MM's remaining prescription
medication from Maofu/Forever Home on September 5, 2024.

### C.   Other PMC children placed in Maofu/Forever Home HCS Group Homes

The Monitors' review shows that at least three other PMC children are placed in a
Maofu/Forever Home setting, as of September 3, 2024.  These children are:

- 14-year-old RR
- 15-year-old SS
- 17-year-old AA

RR and SS, both male foster children, live in the same HCS Group Home.  AA is the only
female PMC child placed in an Maofu/Forever Home setting.  All three children are
prescribed psychotropic drugs that are similar to the drugs MM was taking prior to his
health crisis.

### 1.   RR

RR was placed in a Forever Home HCS Group Home on August 30, 2023.  RR is
diagnosed with autism, ADHD, Fetal Alcohol Syndrome (according to his most recent
Common Application), a mood disorder, moderate IDD, and is non-verbal.  RR entered
foster care in 2015 and was placed in several therapeutic foster homes, RTCs, and in an
unlicensed CWOP setting prior to the Forever Home HCS Group Home placement.

According to RR's most recent Child Plan, he "requires an immense amount of
supervision" because he "has a history of hitting others, choking other children, and
running across the street."  He also has a history of "eating non consumable items such
as strings to a pillow, leaves, etc."  While RR is not flagged with an indicator for a sexual
behavior problem (due to his disability), his IMPACT records indicate he engages in
sexualized behaviors that require heightened supervision.

RR's IMPACT records show that Maofu/Forever Home employees are named as both his primary and backup medical consenters, in contravention of DFPS's policies.[33]  RR's Health Passport records show he is prescribed the following psychotropic medications:

- Risperidone 5 mg
- Topiramate 50 mg
- Oxcarbazepine 600 mg
- Divalproex Sodium ER 500 mg
- Clonidine HCL .1 mg
- Trazadone 150 mg

Topiramate, oxcarbazepine, and divalproex sodium ER are all anti-seizure medications. However, his IMPACT and Health Passport records do not indicate that RR is diagnosed with a seizure disorder.  His most recent Child Plan shows that topiramate was prescribed for "mood" and oxcarbazepine was prescribed as a "mood stabilizer."  The divalproex sodium was recently added and is not listed in the Child Plan.

As was true of the refill history for MM's psychotropic medications (see note 32, *supra*), two different prescribers are listed in his Health Passport records for these medications. Doctor A is the same psychiatrist who was treating MM.  The second prescriber is a psychiatric nurse practitioner (PMHNP).  RR appears to have first seen the PMHNP on October 19, 2023, the same day that Health Passport indicates RR received services at Ace Behavioral Health Services Clinic (Ace).[34]  According to Health Passport, Ace and the PMHNP treated RR for ADHD, autism, and mild IDD.

The refill history for RR's trazadone prescription shows patterns similar to those found in MM's records:

**Trazadone**

- July 16, 2024, Trazadone HCL 150 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- July 30, 2024, Trazadone HCL 150 mg, prescribed by PMHNP, quantity of 60 for a 30-day supply.
- August 25, 2024, Trazadone HCL 150 mg, prescribed by Doctor A, quantity of 30 for a 30-day supply.

RR's other prescriptions, including oxcarbazepine, appear to be filled at 25-day intervals, as were MM's, likely due to an automatic refill schedule:

---

[33] DFPS policy states, "DFPS must designate the DFPS caseworker or Single Source Continuum Contractor (SSCC) equivalent as medical consenters for children in residential facilities with shift staff." DFPS, CPS Handbook §11113.1.

[34] The address associated with Ace also appears in an online search using the PMHNP's name (Health Passport shows a Dallas post office box associated with the PMHNP) and appears to be a one-family residential home.

**Oxcarbazepine**

- May 1, 2024, Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- May 27, 2024, Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- June 21, 2024, Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- July 16, 2024, Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- August 10, 2024, Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.

However, a different anti-seizure drug, topiramate 25 mg is prescribed by the psychiatric nurse practitioner (PMHNP),[35] and was filled on the following schedule:

- May 14, 2024, topiramate 25 mg, in a quantity of 60 for a 30-day supply.
- July 30, 2024, topiramate 25 mg, in a quantity of 60 for a 30-day supply.

A medication log saved to RR's One Case records on August 8, 2024, titled "[RR] updated medication" does not include the topiramate, though the log's documentation of RR's medication administration begins on August 1, 2024 (two days after the prescription was refilled). It lists only a cough syrup, prescribed on August 6, 2024, by RR's PCP, risperidone, trazodone, clonidine, and oxcarbazepine. The medication log included the initials of the staff who distributed the medications, but did not include a pill count.

In addition to the oxcarbazepine and topiramate, Doctor A has prescribed another anti-seizure drug – divalproex sodium 500 mg, and the prescription was filled August 21, 2024, with a quantity of 60 for a 30-day supply. According to RR's Health Passport records, the divalproex sodium has a flag for a "moderate" medication interaction level for topiramate, oxcarbazepine, and risperidone, all of which RR is prescribed. The warning that comes up in Health Passport states, in part:

**Moderate Interactions**

*Monitor Closely:*
Topiramate Tab 25 MG and Topiramate Tab 50 MG may enhance the adverse/toxic effect of Divalproex Sodium Tab ER 24 HR 500 MG. Specifically, the risk of hypothermia and hyperammonemia, with or without encephalopathy, may be increased.

---

[35] Topirimate was prescribed to RR prior to his placement at the Forever Home HCS Group Home, and it has been filled each month; the first prescription written by the PMHNP was filled September 15, 2023. The other two anti-seizure drugs – the oxcarbazepine and divalproex sodium – were first prescribed to RR after his placement in the Forever Home HCS Group Home.

*Management:*
Coadministration of Topiramate Tab 25 MG and Topiramate Tab 50 MG and Divalproex Sodium Tab ER 24 HR 500 MG should be undertaken with caution. Patients who develop symptoms of unexplained lethargy, vomiting, or changes in mental status while receiving Topiramate Tab 25 MG and Topiramate Tab 50 MG and Divalproex Sodium Tab ER 24 HR 500 MG should be evaluated for possible hyperammonemic encephalopathy. Consider discontinuation of either product if symptoms of hyperammonemia and/or hypothermia develop.

*Monitor Closely:*
Plasma concentrations of Divalproex Sodium Tab ER 24 HR 500 MG may be affected by Oxcarbazepine Tab 300 MG. Toxic metabolite concentrations of both drugs may be increased.

*Management:*
Monitor plasma concentrations and adjust the dosages of Divalproex Sodium Tab ER 24 HR 500 MG and Oxcarbazepine Tab 300 MG to provide maximum therapeutic benefit with minimum toxicity.

*Monitor Closely:*
Plasma concentrations and pharmacologic effects of Divalproex Sodium Tab ER 24 HR 500 MG may be increased by Risperidone Orally Disintegrating Tab 0.5 MG, Risperidone Tab 0.5 MG, Risperidone Tab 1 MG, Risperidone Tab 2 MG, and Risperidone Tab 3 MG. Additionally, fluid retention with edema has been reported to occur when Divalproex Sodium Tab ER 24 HR 500 MG and Risperidone Orally Disintegrating Tab 0.5 MG, Risperidone Tab 0.5 MG, Risperidone Tab 1 MG, Risperidone Tab 2 MG, and Risperidone Tab 3 MG are used concurrently.

*Management:*
No additional precautions appear necessary.

There are three recent PMUR screening documents in RR's Health Passport records, one dated May 28, 2024, a second dated July 1, 2024, and a third dated August 29, 2024.  All three determined that RR was not eligible for a PMUR due to a recent medication change.  The only full PMUR in his records was completed in 2016.

During the most recent face-to-face visit with RR, which occurred on August 26, 2024, an LPS caseworker documented the following:

The LPS worker observed [RR] to be jumping around and as she was looking in his room and checking the hot water in the bathroom, [RR] started undressing and was only wearing his underwear.  While the LPS worker was with the staff...checking the smoke detectors, [RR] took his underwear off and was naked.  [The staff person] said that [RR] was ready for a shower and wanted the LPS worker to take him to the bathroom to

help him shower.  The LPS worker immediately left the room and went to speak with another youth in the home.  While meeting with the other youth, the LPS worker heard someone knocking loudly at the door.  The LPS worker told staff…that there was someone at the door. [The staff person] let the other staff in that told him he had been knocking at the door for a while.  The staff came in and immediately started helping with [RR] while [the other staff person] went with the worker to check the medications.

The list of medications included in the IMPACT contact for this face-to-face visit did not include topiramate.

RR's IMPACT records indicate the judge in his case ordered DFPS to find another placement for him on August 22, 2024.[36]  He will remain in the Forever Home placement until a new placement is found.  As of September 6, 2024, he was still placed in the Maofu/Forever Home HCS Group Home.

### 2.  SS

SS is placed in the same Forever Home that RR lives in.  He was first placed in a Forever Home HCS Group Home on November 9, 2022.[37]  SS is from Dallas County; the SSCC

---

[36] An IMPACT contact note, dated August 28, 2024, documenting a conversation between RR's LPS caseworker and an HHSC inspector noted that "[RR's] worker had expressed concerns that [RR] had not been put in ABA or OT and that they were not receiving [RR's] medical documentation.  The LPS worker indicated that she spoke to [a caseworker] who was temporarily working the case…She stated that…those services are different from foster homes and RTC's and that those types of services…have to be specified in the Child specific contract and agreed upon before placement."

[37] SS's most recent Common Application, dated February 7, 2023, notes that he was placed at the Forever Home HCS Group Home "after leaving another group home due to staff shortage and…concerns of neglectful supervision due to the staffing shortage."  A DFPS investigation, opened after SS eloped from the Accountable Services home on November 8, 2022, describes the conditions that the investigator found in the home:

> The home appears to have several residents in and out of the home.  I was told that two people live in the home however there were 4 residents ([SS], [E], [R], and an adult male) in the home while I was there and about 6 additional residents appeared there.  One of the residents took a chair, opened the rear door and started smoking cigarettes.  The home appears very busy and there was only 1 adult staff worker in the home with all the residents of varying degrees of autism and developmental delays.

Despite this, because the caregiver who was supervising SS when he eloped described trying to follow him, Neglectful Supervision was Ruled Out.  This was not the only investigation of abuse, neglect, or exploitation that was opened while SS was in the Accountable Services HCS Group Home.  On June 24, 2022, an I&R Staffing contact in IMPACT documents a report to SWI alleging that SS had "what appear[ed] to be burns on both upper leg[s]."  The staffing notes indicate the reporter alleged that the burns appeared to be several days old and appeared to be second-degree burns.  The caregivers could not explain how the burns occurred, though they noted he was at a playground and may have sat on a hot swing or slide.  The staff noticed the injuries when he was preparing to get in the shower.  HHSC – PI opened an investigation, but closed it without completing an investigation, after determining that it did not have jurisdiction because SS was a foster child who was placed in the home on a child-specific contract.  CPS subsequently open an investigation and Ruled Out Physical Abuse and Neglect after an

Empower is responsible for his placements and casework services.  SS entered foster care in 2012, and has been in numerous placements, including therapeutic foster homes, RTCs, treatment foster care, psychiatric hospitals, and CWOP settings.  SS was in one other HCS Group Home, run by Accountable Source, Inc., immediately prior to being placed at Forever Home.

SS is diagnosed with autism, moderate IDD, ADHD, bipolar disorder, and schizophrenia. According to SS's most recent Child Plan,[38] he requires close proximity and direct line of sight supervision.  The Child Plan further specifies, "[SS] will have one on one supervision at all times."  It indicates that SS "can become physically aggressive when he is upset or agitated" and will "wander off…getting in situation[s] that are unsafe to him."  It cautions that SS "will walk off without permission."

SS's Health Passport records show he is prescribed the following psychotropic medications, and medications to manage symptoms associated with the psychotropics:

- Risperidone 4 mg
- Benztropine Mesylate 1 mg
- Desmopressin Acetate .2 mg
- Trazodone HCL 50 mg
- Guanfacine HCL 2 mg
- Oxcarbazepine 600 mg

SS also has two prescribers for some of his psychotropic medications: Doctor A, the same psychiatrist who treats RR and treated MM, and the PMHNP who also prescribes psychotropic drugs for RR.  He appears to have first been treated by the PHMNP for insomnia, autism, and ADHD on November 18, 2022, the same day that Health Passport shows he was treated at Ace Behavioral Health Services Clinic.  Until May 2024, the PMHNP appears to have been the sole prescriber of SS's psychotropic medications.

However, his records do not reveal the same concerns raised by MM and RR's prescription refills regarding double-filling or double-prescribing similar psychotropic drugs.  Like the other PMC children placed in Maofu/Forever Home HSC Group Homes,

---

abbreviated investigation, finding SS "was seen by a medical professional who diagnosed him with friction burns" based on reports that SS had been to the park.  The doctor determined that it was "possible [he] sustained the friction burns from secondary contact with heated playground equipment, such as a swing, at the park."  The doctor did not find evidence of maltreatment.

SS's Common Application also notes that he was "physically assaulted in a past foster home," which affects his trust with caregivers.

[38] The child-specific contract between DFPS and Maofu/Forever Home requires the HCS Group Home to "ensure that all adult caregiving staff are oriented to child's service plan and are able to ensure that child attends all services and appointments."  It also requires the HCS Group Home to provide SS with 1:1 supervision during awake hours, and defines one-to-one supervision as "one caregiver assigned specifically to child at all times."

his prescriptions are consistently refilled, suggesting an automatic refill schedule.  For example:

- May 1, 2024 - Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- May 26, 2024 – Oxcarbazepine 300 mg, prescribed by PMHNP, quantity of 60 for a 30-day supply.
- June 20, 2024 – Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- July 15, 2024 – Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.
- August 9, 2024 – Oxcarbazepine 300 mg, prescribed by Doctor A, quantity of 60 for a 30-day supply.

The most recent PMUR conducted for SS was completed August 31, 2023.  It was triggered because SS was prescribed four or more psychotropics.  The PMUR found the medication regimen "outside parameters" but "within standard of care."  Despite the finding, it listed the following "Potential Drug Therapy Problems to Address:"

- Conflicting drug therapy: Prescribing an antidepressant (trazodone) to someone with Bipolar Disorder can increase risk of precipitating mania or dysphoria.

- Potential adverse drug reaction(s) or side effect(s): Caution is advised with prescribing multiple psychotropic medications concurrently.  Medication interactions can occur and risk of side effects can be amplified.  Generally, there can be increased risk of CNS depression, psychomotor impairment, hypotension and altered seizure threshold.  The combination of guanfacine, risperidone and trazodone increases the risk of orthostasis and syncope.  The combination of guanfacine and oxcarbazepine may decrease guanfacine levels.  Periodic consideration of the active diagnoses, effectiveness of each medication, target symptoms, tolerability, dose optimization, evidence basis and long-term plan is prudent and can lead to a reduction in polypharmacy to the minimal effective regimen.  It is noted that member appears to be getting laboratory monitoring completed in a way that correlates with the current standards of care for antipsychotic monitoring per claims data.

The only change in his prescriptions since this PMUR was completed was an increase in his Risperidone dosage from 1 mg twice daily to 2 mg twice daily.

SS was originally placed in a different Forever Home HCS Group Home and moved to the home that he currently lives in on February 15, 2023, after running away while he was at school (he was located the same day).  His IMPACT records document three additional runaway incidents since then, one on March 23, 2023, and another on April 4, 2023.  He was gone almost 24 hours during the April runaway event.  An I&R Staffing contact note in IMPACT, dated September 27, 2023, documented the third runaway event.  The staffing notes indicated that SS ran away after getting off the school bus at

the group home.  HHSC – PI investigated the incident and made a finding of Unconfirmed for Neglect.

There have been multiple reports to SWI of abuse, neglect, or exploitation related to SS's care at the Forever Home HCS Group Home.  First, on February 16, 2023, SS's school made a report to SWI alleging Neglect, claiming the HCS Group Home staff refused to pick him up from school after he had a "psychotic episode."  The school raised concerns regarding whether SS was receiving his medications as prescribed.  The investigation was initially terminated, but later reopened.  HHSC – PI found the allegations Unconfirmed.

An April 27, 2023 I&R Staffing contact in SS's IMPACT records indicated that a CPS staff person reported making an unannounced safety visit to the Forever Home on March 20, 2023.  The report indicated SS was supposed to be on one-to-one supervision, however, when the CPS staff person arrived at the home there were three residents at the home, and only one staff person.  The HHSC – PI investigation was closed on May 11, 2023, with a finding of Unconfirmed.  However, HHSC – PI listed as a "concern" that "administrative paperwork such as timesheets have discrepancies."

A May 30, 2023 I&R Staffing contact in SS's IMPACT records documented that a report was made to SWI alleging that another PMC child living in the home "reported he was raped by somebody at the placement facility, Forever Home."[39]  The child also reported that when staff intervened in a fight between him and SS, the staff "stomped" on his face.  The investigator told SS's caseworker that "there was no fight," that the investigator viewed video which showed that the other child "went from room to room messing with the other household members," jumped in the bed with SS and "choked him to get him to wake up."  The investigator said staff intervened.  The Physical Abuse and Sexual Abuse allegations were disposed with a finding of Unconfirmed.

During a review of SS's IMPACT records, the Monitors found the following in a contact note dated August 21, 2024:

---

[39] This PMC child has since been moved to an HCS Group Home managed by another provider.  The child made an outcry during a May 23, 2023 face-to-face visit with a DFPS caseworker that he "thought" he was "raped by an adult child in the placement."

A March 27, 2023 I&R Staffing contact note (related to intake 77397059) in SS's IMPACT records, which documented a March 8, 2023 runaway event, noted that the school "reported that [SS] is often dirty wearing dirty clothes," and also stated, that SS "told a school staff that [he] is being 'touched' at the home."  This intake was investigated by DFPS.  During the investigation, an educator with SS's middle school who was interviewed on March 27, 2023, described SS as a "chronic runaway" and noted that "the last time he ran away, he was located on the other side of Houston, and no one knows how he got there."  She noted that "the incident made the news, and he had been missing for a few days."  DFPS Ruled Out Neglectful Supervision; the Sexual Abuse allegations that the I&R Staffing referred to do not appear to have been investigated.

When caseworker arrived at the home, she was greeted at the door and welcomed in by [an administrator]. He manages all of the homes for Forever Homes and is the caseworker's usual point of contact. Caseworker entered the home and found that the LPS worker of one of the other boys who lives in the home was inside as well as her supervisor. There was also a regional nurse who was inspecting the medications. [The administrator] alerted the caseworker that the boys were not home. He stated that they had a medication review that morning and then had to pick up prescriptions and get their bloodwork done. The LPS supervisor...told the caseworker that they had just done a thorough walkthrough...Caseworker witnessed the closet where all the meds are kept. There was a lock on the door handle. Each boy's medication was in its own box in the closet.

The regional nurse went through and took pictures of all the medication and noted when it was filled and how many pills remained. She was alarmed by the fact that [SS's] Trazodone bottle was empty. It stated that it had been filled on 6/26/24. Had he not been taking it since it ran out? It was also a concern that his Oxcarbazepine was filled 07/15/2024 and there were still 27 pills left. Had he not been taking it daily? These concerns were voice [sic] to [the administrator] who introduced us to the fact that they had a container of what they call "overflow" pills. In here, we found [SS's] Trazodone for the two recent months, but the number still did not seem to add up. There were bottles/blister packs of each of his prescriptions that appeared to bring us to current day. The nurse just found it impossible to tell if these prescriptions were being taken as directed because they were obviously being taken out of order and it was unclear when each bottle/blister pack was first broken into. [The administrator] stated that the medication logs had been taken with the boys to their medication review. An LPS worker had met the boys at their medication review earlier that morning and looked through the med logs and taken photos. She told the supervisor that the logs were thorough and that all of the medications had been logged as administered as prescribed daily. The nurse stated that judging by the medication, she was unable to confirm whether it had been administered correctly or not. She stated that she would be emailing her findings with photos to the LPS supervisor who stated he would send it to the caseworker.

The caseworker then went to the lab where the boys were getting their blood drawn so that she could see [SS] and make sure he was doing well...The caseworker asked if [SS] was taking his medicine every day and he stated that he was. Due to his level of functioning, the caseworker is not confident she can trust these answers, but certainly hopes them to be the truth.

The Monitors did not find an intake or investigation associated with this contact note. On August 30, 2024, the Monitors sent an e-mail to DFPS to ask if a report was made to SWI, and if a report was made, to respond with the intake number. The Monitors also

asked whether the regional nurse had also reviewed medications for RR on the same day, since the children were placed in the same home, and if so, whether similar problems were found with his medications.[40]  The Monitors did not receive a response, but a report to SWI was made the same day and HHSC – PI has opened in investigation that is still pending as of September 6, 2024.

A contact note in SS's IMPACT records, dated August 23, 2024, reflects a staffing that included his SSCC and LPS caseworkers, as well as other SSCC staff, his AAL, and GAL. The staffing notes acknowledged, "concerns within the last week due to [SS's] medication not being up to date and not being enough staff in the placement" as well as "other minor concerns with the placement."  The staffing notes show that "Empower was given directives to move [SS] to a different placement" but "after [his SSCC caseworker] visited [SS] and ensured his well-being, Empower wished to preserve the placement with an action plan to ensure [SS] is receiving his medication appropriately." SS's AAL and GAL supported keeping SS in this placement "if all the safety concerns were corrected and addressed."  The participants developed an action plan that includes having the LPS caseworker make weekly announced and unannounced visits to the placement to review his medications and medication log and ensure that the mandated number of staff are present.  The plan also requires Maofu/Forever Home to "notify Empower and DFPS if/when he moves from homes" and "provide notice to Empower and DFPS before the move occurs."

### 3. AA

AA is from Potter County, in the Texas panhandle.  St. Francis Ministries is the SSCC that provides placement and casework services to children in this region.  AA is the only female PMC child placed in a Maofu/Forever Home HCS Group Home and was first placed in the group home on June 5, 2024.  Since being placed, AA has been admitted to a psychiatric hospital three times, from June 13, 2024, through June 21, 2024, from July 24, 2024, through an unknown date,[41] and most recently on August 28, 2024.  As of

---

[40] E-mail from Deborah Fowler and Kevin Ryan to Val Aguirre, re: PMC children placed in Forever Home/Maofu HCS Group Homes (August 30, 2024) (on file with the Monitors).

[41] This hospitalization is not reflected under the "Temporary Absence" tab on the Placement page in AA's IMPACT records.  On July 30, 2024, an LPS worker went to the day habilitation program affiliated with Maofu/Forever Home to conduct a face-to-face visit with AA, and she was told that AA had not been present that week due to a hospitalization.  Another contact note in IMPACT shows that a DFPS psychiatric caseworker conducted a face-to-face visit with AA at the hospital; it shows the date of admission as July 24, 2024.  The Monitors could not find a discharge date documented in AA's IMPACT records.

When the psychiatric caseworker asked AA why she was admitted, AA said she ran away.  She told the caseworker that there were three "kids" at the day habilitation program that "she doesn't get along with, so she left the dayhab."  She said she was having panic attacks and "had to go to…the medical hospital and they gave her things to calm down and then she came to the psych hospital."

An IMPACT contact note in AA's records also shows that she attempted to run away from the day habilitation program on July 18, 2024.  AA told the LPS caseworker, "Day hab is okay, but she ran from day hab today and staff brought her back."  AA "could not state why she ran or if something upset her" but "described some sort of altercation between some of the boys there."

September 3, 2024 (the most recent face-to-face visit recorded in IMPACT), she was still hospitalized.

AA entered foster care in 2011.  She has been in numerous placements since then, including therapeutic foster homes, RTCs, treatment foster care, and psychiatric hospitals.  She has had one other placement in an HCS Group Home, through Ahora y Siempre.  AA is diagnosed with ADHD, autism, bipolar disorder, and mild IDD.  Her IMPACT records also show she has an indicator for a sexual behavior problem, and that she is a confirmed victim of sexual abuse.  Her most recent Child Plan indicates that she requires close supervision, specifying "[AA] will remain in visual or auditory distance of [caregiver] during waking hours" and "[caregiver] will conduct nightly bed checks."

AA's psychotropic drug prescriptions appear to have changed since her placement in the Maofu/Forever Home HCS Group Home, likely due to her hospitalizations.  Prior to her most recent hospitalization on August 29, 2024, the following psychotropic drugs (and drugs intended to treat side-effects associated with psychotropics) were filled or refilled for AD:

- Trazodone HCL 150 mg, prescribed by Doctor A, in a quantity of 30 for a 30-day supply.
- Guanfacine HCL ER 2 mg, prescribed by Doctor A, in a quantity of 30 for a 30-day supply.
- Benztropine Mesylate 1 mg, prescribed by Doctor A, in a quantity of 60 for a 30-day supply.
- Risperidone 3 mg, prescribed by Doctor A, in a quantity of 30 for a 30-day supply.
- Divalproex Sodium ER 500 mg, prescribed by Doctor D,[42] in a quantity of 30 for a 30-day supply.[43]

The following psychotropic drugs appear to have been filled even after AA was hospitalized on August 28, 2024.  Doctor E is affiliated with the psychiatric hospital that admitted AA from July 24, 2024.  The medications prescribed by Doctor E were filled August 6, 2024, August 19, 2024, and August 30, 2024:

---

[42] Doctor D is affiliated with a Houston-area hospital.

[43] AA has been prescribed Divalproex since 2017, though the dosage has changed.  Through July 2024, for example, the dosage was 1000 mg/day; the most recent refill, on August 29, 2024, appears to have reduced that dosage by half.  This prescription was filled the day after she was hospitalized; however, Doctor D is not a psychiatrist and appears to be affiliated with a different hospital.

Prior to the August 29, 2024 refill, Doctor E prescribed the drug on August 8, 2024 in a quantity of 30 for a 15-day supply.  The refill immediately preceding this one, filled on July 14, 2024, was prescribed by Doctor A, with a quantity of 60 for a 30-day supply.

AA's Health Passport records do not indicate she is diagnosed with a seizure disorder; her Child Plan shows that Divalproex Sodium ER 500 mg was prescribed as a "mood stabilizer."  However, AA's most recent Common Application, updated August 29, 2024, indicates AA "has a recent history of seizures and pseudo seizures."

- Clonidine HCL 0.1 mg, prescribed by Doctor E, in a quantity of 45 for a 15-day supply.
- Trazodone HCL 50 mg, prescribed by Doctor E, in a quantity of 15 for a 15-day supply.
- Buspirone HCL 5 mg,[44] prescribed by Doctor E, in a quantity of 30 for a 15-day supply.
- Benztropine Mesylate .5 mg, prescribed by Doctor E, in a quantity of 30 for a 15-day supply.

AA's Health Passport records do not include any PMURs.

An I&R Staffing contact in AA's IMPACT records, dated June 12, 2024, reflected a report made after AA was admitted to the hospital after having a seizure at the first Maofu/Forever Home HCS Group Home where she was placed.  Emergency Medical Services (EMS) was called and took her to the hospital; the reporter alleged that when the paramedics asked for AA's medications, they were told she had just been placed in the home and did not arrive with medications.  The reporter alleged, "The person we spoke with…advised that the child had been placed in the group home the night prior and [they] were not provided with any medications upon arrival" and "did not know of any medication the child should have had or was supposed to be taking."  This allegation was disposed of with a finding of Unconfirmed.  The child's SSCC caseworker and the facility staff alleged that the allegation was untrue, and that she had arrived with and received her medications after being placed.  The investigation also reviewed an allegation that, while she was at the hospital, AA made an outcry that she was injured during a restraint at the day habilitation program.  The reporter alleged that AA had a bruise on her forearm that she alleged resulted from the restraint.  This allegation was determined to be outside the jurisdiction of HHSC – PI and was not fully investigated.

On August 20, 2024, an LPS caseworker attempted to conduct a face-to-face visit with AA.  Notes in IMPACT show that when she arrived at the Forever Home HCS Group Home, a staff person answered the door and said AA was moved the previous week to a

---

44 Health Passport includes a "major" medication interaction warning associated with the Buspirone prescription.  It warns:

**Major Interactions**

*Monitor Closely:*
Additive serotonergic effects may occur during coadministration of buspirone and Trazodone HCl Tab 50 MG, Trazodone HCl Tab 50 MG, Trazodone HCl Tab 100 MG, and Trazodone HCl Tab 150 MG, and the risk of developing serotonin syndrome may be increased.

*Management:*
Monitor for signs and symptoms of serotonin syndrome/serotonin toxicity (eg, hyperreflexia, clonus, hyperthermia, diaphoresis, tremor, autonomic instability, mental status changes) when these drugs are combined. Patients with other risk factors (eg, higher drug concentrations/doses, greater numbers of serotonergic agents) are likely at greater risk for these potentially life-threatening toxicities.

different home, "because she was having problems with another resident." The staff person did not know where AA was living. The LPS caseworker reached out to AA's SSCC caseworker, who said that she received an e-mail the previous week indicating that AA had been moved to a different home.

A face-to-face visit was conducted by AA's SSCC caseworker the next day, on August 21, 2024, at AA's school. Notes in AA's IMPACT records state:

> [AA's caseworker] arrived at [the high school] at 10:40...Worker...walked into the front office and explained who she was and that she needed to check on [AA] and talk to her for a few minutes if possible. The administrator said that [AA] was not in the system yet since it is her first day so she would have to find out which classroom she is in. The teachers that were contacted did not have [AA] in their classrooms. The second administrator stated that she helped the "group home lady" when she came in, but she ended up leaving with the girls she brought in because they did not have school records so none of the girls could start school today. Worker...thanked them and walked outside to call [Staff 1]. [Staff 1] stated that [AA] was at school, he said that [L] took her to school and left her there with one other child, but the other two children could not stay. [Staff 1] called [L] into the call with Worker...and [L] stated the same and said that [AA] is definitely at [the high school]. [Staff 1] hung up the call and Worker...walked back inside the school. Worker...told the administrators what was discussed on the phone. The administrators called all of the special education teachers again. Another teacher came down to the front office to try and help. They came up with the same result, that if [AA] is at this school, she is not where she is supposed to be. I called [Staff 1] back and asked if he could ask [L] who she left [AA] with. [L] got on the call and stated that she was left with a male teacher. He was African American and his classroom is right across the hallway from [another teacher]. The administrators figured out that that was [H's] classroom. They told Worker...that [H] is the 18+ teacher so they did not think [AA] would be in there. They called [Mr. H] and he indeed did have [AA] in his classroom and he stated it was a surprise when she showed up this morning...Worker...asked [AA] why she was in the 18+ classroom, and [AA] said she told them she was 18 because she wants to be 18 and that is where [L] left her at.

Prior to visiting the school, AA's SSCC caseworker went to the group home and reviewed her medications. She noted that AA's medication bin had all of AA's medications in it "with plenty of days left or refills if needed." However, the "medication log only had initials when the medication is given, it [did] not indicate a pill count." [45] The caseworker also asked to see AA's education binder, incident report, daily reports, and

---

[45] The notes associated with this visit also state that during the walk through of the Group Home, the caregivers at the home asked, "why they were having so many visits from case workers." The caseworker "explained that the state office requested that she come down and check on [AA] and report back to them."

other paperwork.  The caregivers told her that this documentation was kept at the main office where the Maofu/Forever Home case managers work.  The caseworker visited the main office and asked to see the documents, but when she "flipped through [AA's] binder" she "discovered only the forms and documents that [Staff 1] had already sent to her over email."

An I&R Staffing contact in AA's IMPACT records shows that on August 21, 2024, a reporter alleged:

> While observing [AA's] medication, I found that the medication log and medication package instructions for Divalproex Sodium ER and Benztropine Mesylate did not match.  Also, the log did not include all the medications found in the plastic box.  Additionally, there was a pre-filled weekly pill container.  [AA] reported that she was not wearing any underwear because she didn't have any.  She information the caregiver about this on 8/19/24.  When she showed me her clothes, I noticed only one brassiere, which she mentioned didn't fit her anymore.

It is not clear from the I&R Staffing, or the IMPACT records associated with the investigation, who made the report to SWI.  During the I&R Staffing, the notes reflect that AA's SSCC caseworker "did not have any concerns about [AA] or her placement" and said that "new clothing will be provided…as soon as possible.'  The allegations were disposed of with a finding of Unconfirmed.  During the investigation, Staff 1 and the Maofu/Forever Home nurse acknowledged that there were old blister packs and MARS associated with medication dosages that were not up to date in AA's medication bin, however the nurse said that she conducted an audit of AA's medications the same day that the report was made to SWI and determined that there was no error in administering AA's medications to her:

> [Maofu's nurse] stated that [AA] did have a weekly pill container in which medications are divided up by days in the week, but their staff does administer medications to the individuals receiving services… [The nurse] stated that [AA] recently transferred to their program and that she came to their agency with the pill container for her previous service provider.  [The nurse] stated that the pill container and any of her old medication would have been kept for evaluation by her doctor to see what medications she was taking before to see if there will be any changes to her medication.  [The nurse] stated she completed an audit of all medications on 8/21/24 and she did not observe any medication errors in [AA's] medication box.  [The nurse] stated what occurred with the medication Benztropine and Divalproex were that Benztropine was lowered in dosage from 1 milligram in July to .5 milligram in August and Divalproex was changed from two tablets by mouth at bedtime in July to one table by mouth two times a day.  [The nurse] stated that there were multiple MARS in the medication box with different instructions, but the staff would have known to administer [AA's] medication based on the most current and up to date MAR.  [The

nurse] stated when she conducted her audit, she removed the older MAR and the weekly pill container.

The group home was again visited, on August 22, 2024, by an LPS caseworker, and AA was interviewed again.  She did not make any outcries and said she felt safe in the placement.  However, though the medication bins were kept in a locked closet, the caseworker observed the key to the closet hanging at the top of the door.  She advised the caregiver who was present to "keep the key on her possession so the other clients don't get it." The caseworker reviewed AA's medications and medication log but noted that the caregiver "stated [AA's] binder [was] still at the home [AA] used to be at as well as the remainder of her clothing and belongings."  The caseworker asked when AA had been moved to the home and the caregiver said she moved "last week."

AA's Common Application was updated on August 29, 2024.  It notes, "DFPS...[is] requesting that [AA] be moved to a new placement due to some ongoing investigations at her current placement."[46]  As of September 6, 2024, her IMPACT records do not indicate a change in placement.  The contact note associated with the psychiatric hospital caseworker's face-to-face visit with AA on September 3, 2024 does not yet show a discharge date, but says that AA is "able to return to placement at discharge."

## Conclusion

The Monitors will keep the Court updated on the steps taken by DFPS and HHSC to address safety concerns for children placed in Maofu/Forever Home HCS Group Homes.  All closed and pending investigations discussed in this report will be reviewed in the regular course of the Monitors' reports of compliance with RO 3.

---

[46] This change may have been directed by DFPS; a St. Francis Ministries case staffing conferred took place on July 30, 2024; documentation of the conference in One Case shows that, though AA's admissions to the psychiatric hospital were noted as a "safety concern," the participates determined that AA was "in the safest and least restrictive setting at this time."