UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CIVIL ACTION NO. 2:11-CV-00084

10-25-2024

M.D.; bnf STUKENBERG, *et al.,* Plaintiffs, v. GREG ABBOTT, *et al.,* Defendants.

---

Hon. Janis Graham Jack, Senior United States District Judge

**<u>Eighth Report of the Monitors: Remedial Orders 4, 12 to 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, A7, and A8</u>**

Deborah Fowler and Kevin Ryan, Monitors

# Table of Contents

Table of Contents..................................................................................................2

Introduction and Executive Summary ......................................................5

   Introduction ....................................................................................... 5

   Summary of Monitors' Findings ........................................................ 8

   Summary of Findings by Remedial Order ......................................... 8

     Preventing Sexual Abuse and Child-on-Child Sexual Aggression ........... 8

Demographics of Children in PMC Care ................................... 17

     Age, Gender and Race ..................................................................17

     Living Arrangements and Length of Time in Care ...............................19

     Out of State Placement................................................................ 23

     Level of Care .............................................................................. 25

     Geographic Location .................................................................... 26

     SSCC Presence and Placement Oversight .................................... 26

Preventing Sexual Abuse and Child-on-Child Sexual Aggression .............. 27

   Data Related to PMC Children Flagged with an Indicator for Sexual Aggression or Sexual Victimization ............................................................ 28

   Remedial Order 32: Policy Creation and Training of Staff Responsible for Making Determinations ..................................................................... 33

     Remedial Order 32 ...................................................................... 33

     Background.................................................................................. 33

     Performance Validation ................................................................ 34

   Remedial Order 4: Caseworker and Caregiver Training on Sexual Abuse................. 38

     Background and Updates ..............................................................38

     Caseworker Training Performance Validation Results ....................... 39

     Caregiver Child Sexual Abuse Training ..........................................41

     Summary of Caseworker and Caregiver Sexual Abuse Training Performance Validation ............................................................. 43

   Remedial Orders 23, 24, 28, and 30: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression.......................................... 44

     Performance Validation: Case Record Review for Children Identified with an Indicator of Victim of Sexual Abuse or with an Indicator for Sexual Aggression... 44

     Summary: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression ............................................................... 63

   Remedial Orders 25, 26, 27, 29 and 31: Caregiver Notification .................................. 63

     Background.................................................................................. 64

Performance Validation ...................................................................................... 64

Remedial Orders A7 and A8: Awake-Night Supervision ........................................... 80

**Regulatory Monitoring and Oversight of Licensed Placements ..................96**

Analysis of HHSC Investigations ........................................................................... 96

  Assessment of Investigation Classification............................................................98

Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment and Obligation to Report Suspected Abuse or Neglect.....................................................107

  Remedial Order 22 ............................................................................................107

  Background.........................................................................................................108

  Changes to ECHR Functionality in CLASS ...................................................... 109

  Performance Validation ......................................................................................111

  Monitoring Team Evaluation of Inspector's Consideration of Patterns/Trends at Operations and Agency Homes.............................................................................127

  Remedial Order 22 Summary .............................................................................139

Remedial Orders 12-19: Timeliness of Minimum Standards Investigations ............. 141

  Background.........................................................................................................141

  Performance Validation (HHSC) ...................................................................... 141

  Remedial Order 12: Timeliness of Observations or Interviews with Alleged Child Victims in Priority One Investigations ................................................................142

  Remedial Order 13: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations .................................................................143

  Remedial Order 14:  Completion of Priority One and Priority Two investigations within 30 days .....................................................................................................143

  Remedial Order 15: Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake .....................................................................................144

  Remedial Order 16: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations ....144

  Remedial Order 17: Completion and Submission of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations....................................144

  Remedial Order 18: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations ..................................................145

  Remedial Orders 12-19 Summary ......................................................................146

Remedial Order 20: Heightened Monitoring.............................................................147

  Overview of Operations Placed Under Heightened Monitoring ..........................147

  Operations Placed on Heightened Monitoring in 2023.........................................149

  Heightened Monitoring Plans.............................................................................152

Heightened Monitoring Plans for Operations that Previously Completed Heightened Monitoring but were Placed on Again in 2023 .........................................................159

  Review of Placements of PMC Children Made to Operations Under Heightened Monitoring, January 1, 2023, through December 31, 2023 ...................................169

Review of Investigations and Compliance in the Six Months Before Approved Placement at Heightened Monitoring Operations ..................................................178

Implementation of Heightened Monitoring and Impacts on Child Safety ............ 191

Citations and ANE Investigations during Active Monitoring ...............................192

Remedial Order 21: Revocation of Licenses....................................................................218

Approved HHSC Closure Recommendations ......................................................... 218

Denied HHSC Closure Recommendations ............................................................. 292

Remedial Order 21 Summary.................................................................................. 436

**Figures ....................................................................................................................444**

**Tables ......................................................................................................................448**

# Introduction and Executive Summary

## Introduction

This is the Monitors' Eighth comprehensive report to the United States District Court ("Court") in *M.D. by Stukenberg v. Abbott* following the mandate issued by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") implementing the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship ("PMC") of the Texas Department of Family and Protective Services ("DFPS") who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission ("HHSC").[2] DFPS is now an independent State agency reporting directly to the Governor.[3]

Following a bench trial in 2014, in December 2015 the Court published a Memorandum Opinion and Verdict finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[4] The Court issued a Final Order on January 15, 2018, and following a stay order, the Fifth Circuit adopted in part and reversed and in part modified the remedial orders, remanding to the Court, which issued a modified Order on November 20, 2018.[5] The Fifth Circuit again adopted in part and reversed in part the Court's Order and issued its Judgment as Mandate on July 31, 2019.[6] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[7] specifies numerous remedial orders that implement the Court's injunction as detailed below, charging the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[8]

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] Effective February 2021, HHSC changed the name of its child care regulation unit, Residential Child Care Licensing ("RCCL"), to Residential Child Care Regulation ("RCCR"). This report uses RCCR to describe this division of HHSC even when referring to historic work done by the unit under its previous name.

[3] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent state agency reporting directly to the Governor, H.B. 5 (TX 2017), 85th Leg., R.S.

[4] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[5] *Id.*

[6] *M.D. ex rel. Stukenberg,* 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[7] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[8] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 16 (S.D. Tex. Nov. 20, 2018), ECF No. 606. ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. To avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall consider the

On June 16, 2020, the Monitors filed the first comprehensive report ("First Report") with the Court, concluding that "the Texas child welfare system continues to expose children in permanent managing conservatorship ('PMC') to an unreasonable risk of serious harm."

On July 2, 2020, Plaintiffs filed a Motion to Show Cause Why Defendants Should Not Be Held in Contempt for their failure to comply with Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5 ("July 2, 2020, Show Cause Motion"). The State filed written objections to the Monitors' First Report on July 6, 2020[9] and a Response in Opposition to the Motion to Show Cause on July 24, 2020.

On September 3 and 4, 2020, the Court held a hearing on Plaintiffs' July 2, 2020, Show Cause Motion, and on December 18, 2020, found Defendants to be in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37, and B5, but not in contempt of Remedial Orders 24, 28, or 30.[10]

On May 4, 2021, the Monitors filed the second comprehensive report ("Second Report") with the Court, concluding that the State made progress toward eliminating some of the "substantial threats to children's safety" that surfaced in the Monitors' First Report; but the Monitors also concluded the State's performance in some areas, including its oversight of the care of children by the Single Source Continuum Contractors ("SSCC") and certain general residential operations ("GRO"), was contrary to the Court's remedial orders.[11]

---

timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order. The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.") *Id.* at 17.

[9] Defendants' Verified Objections to Monitors' Report, ECF No. 903.

[10] The Court held: "Defendants are ORDERED to file with the Court a sworn certification of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 within thirty (30) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021, and continuing thereafter until the compliance hearing concludes. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing. No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing. To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing."

[11] Deborah Fowler & Kevin Ryan, Second Report of the Monitors, ECF No. 1079.

This report follows the same report schedule established in January 2022, starting with the third report to the court, filed on January 10, 2022 ("Third Report"), that bifurcated the remedial orders into two reports. The Third Report covered Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6, and B1 to B5. The fourth report to the Court ("Fourth Report"), filed June 2, 2022,[12] assessed the balance of the Remedial Orders addressing Preventing Sexual Abuse and Child-on-Child Sexual Aggression, Remedial Orders 32, 4, 23, 24, 28, and 30, 25, 26, 27, 29, and 31, A7 and A8 and Regulatory Monitoring and Oversight of Licensed Placement, Remedial Orders 22, 12, 13, 14, 15, 16, 17, 18, and 19, 20, and 21.

In preparing this Eighth Report, the Monitors, and their staff ("the monitoring team") undertook a broad set of activities to validate the State's performance and adherence to the Remedial Orders. The Monitors requested data and information from both DFPS and HHSC to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. In this Eighth Report, unless otherwise noted, the Monitors adhered to the methodology for validating and reporting as set forth in Reports 1-7.[13] The Monitors also requested data and information from the SSCCs with which DFPS contracts to provide case management and placement services to foster children in DFPS regions that have transitioned to the Community Based Care ("CBC") model.[14]

The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical incidents; restraint log entries; witness statements; interviews; policies; resource materials such as handbooks; plans; guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake ("SWI"), including E-Reports and recorded

---

[12] Deborah Fowler & Kevin Ryan, Fourth Report of the Monitors, ECF No. 1248.

[13] On December 17, 2021, the Monitors sent the State a supplemental data and information request. E-mail from Deborah Fowler and Kevin Ryan, re: December 2021 Supplemental Data & Information Request, December 17, 2021 (on file with the Monitors). The Monitors requested data associated with gaps in reporting or data across several of the Court's remedial orders. After a conversation with the State about the data requested, the Monitors clarified their request and reached a preliminary agreement about the content and timing of additional data requested. Some data requested is still pending.

[14] CBC was formerly known as Foster Care Redesign. There are currently four regions that have transitioned to the CBC model (excluding the failed transition in Region 8a): Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); and, most recently effective October 2021, Region 8b (26 counties surrounding Bexar County). Region 8a, which previously operated under the CBC model, has transitioned back to DFPS management. There are three stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services. The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families." DFPS, *Community-Based Care*, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services. Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.* Two SSCCs – OCOK and 2INgage – moved to Stage II of the CBC model in 2020. Stage II includes shifting case management services from DFPS to the SSCC. Stage III involves performance assessment and financial incentives for achievement of permanency for children. *Id.*

phone calls when available; and an array of employee and caregiver human resources and training records and certifications. The monitoring team made 12 site visits to licensed operations. The monitoring team also made one-day visits to six operations that the State placed under Heightened Monitoring pursuant to Remedial Order 20.

## Summary of Monitors' Findings

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[15]

The Monitors' investigation, analysis, interviews, and site visits in preparation for this report identified areas in which the State made progress toward eliminating "substantial threats to children's safety" by preventing sexual abuse and child-on-child sexual aggression, and through improved regulatory monitoring of licensed placements. The report also identified areas in which the State continues to struggle with implementation of the Court's remedial orders.

## Summary of Findings by Remedial Order

### Preventing Sexual Abuse and Child-on-Child Sexual Aggression

**Remedial Order 32:** *Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

The monitoring team identified the same problems with data inconsistencies in the quarterly data related to RO 32 reported in the Sixth Report but worked with DFPS to identify a method of validating course completion for DFPS staff using the DFPS Learning Station. Quarterly data for three SSCCs – OCOK, 2INgage, and Belong – shared similar inconsistencies and could not be used to validate CSA training. Quarterly data for St. Francis SSCC was free of these inconsistencies and showed that 100% of its staff had completed CSA training. The Monitors cannot validate compliance with RO 32 for OCOK, 2INgage, St. Francis, and Belong, using course completion information from the Learning Station because it is not used in training SSCC staff.

**Remedial Order 4:** *Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

---

[15] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

DFPS's data shows that 97.8% of caseworkers who carried at least one case from June 1, 2023, to November 30, 2023, completed the training required by Remedial Order 4, regardless of where they were employed.

A random sample of 262 caseworkers interviewed by the monitoring team between February 2023 and December 2023 resulted in all 262 caseworkers confirming their completion of child sexual abuse training.

The Monitors cannot validate that all or most caregivers completed the child sexual abuse training required by Remedial Order 4 based on the current submissions from DFPS.

During site visits, the monitoring team interviewed caregivers and reviewed their records to validate the data reporting completion of the training required by Remedial Order 4 and found that of the 203 employee files that were reviewed, 37 (18%) did not have documentation showing the employee completed the required CSA training. Of the 119 direct care staff who were interviewed, 110 (92%) reported having completed CSA training, two (2%) said they had not completed the training, and seven (6%) said they did not know whether they had completed CSA training.

**Remedial Order 23:** *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order 24:** *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order 28:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order 30:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

In the Monitors' case record review of a random sample of 787 PMC children who had a sexual characteristic indicator documented in their IMPACT records in 2023, 78% were confirmed victims of sexual abuse, while 32% had an indicator for sexual aggression.[16] Ten percent had experienced both sexual abuse and had a history of having engaged in sexual aggression. In addition to confirmed abuse and aggression, 32% of the children in the sample also had incidents of unconfirmed abuse, and 6% had a history of unconfirmed aggression documented in IMPACT.

---

[16] Children that were confirmed victims of sexual abuse and had an indicator of sexual aggression are counted in both categories.

Over one-fourth (26%) of the PMC children in the sample who had an indicator for confirmed sexual abuse suffered abuse that occurred after the child entered foster care. Of those children, 71% suffered sexual abuse only after entering foster care; the remaining 29% were sexually abused both before and after entering foster care. Another 7% percent of PMC children who had a confirmed history of sexual abuse before entering foster care also had an unconfirmed history of abuse after entering care documented in their IMPACT records. The 157 PMC children who had a confirmed incident of sexual abuse after entering care had a total of 255 confirmed sexual abuse incidents in care documented in their IMPACT records: 32% of these children experienced two or more sexual abuse incidents after entering foster care.

Of the 157 PMC children included in the sample who suffered sexual abuse after entering foster care, 50 (32%) were sexually abused by another foster child. These 50 children suffered 64 instances of child-on-child sexual abuse. In 20% of the incidents where a PMC child in the sample was abused by another child in DFPS care, the information found in the IMPACT records for the child who was identified as the aggressor was not consistent with that found in the victim's IMPACT records. No information was found in the aggressor's IMPACT records in 10% of incidents.

Incidents of sexual abuse in which the perpetrator was an adult not associated with the child's placement almost always (87% or 124 of 143) occurred while the child was on runaway from the placement; 85% (121 of 143) of those involved child sex trafficking. Incidents of abuse that occurred while the child was on runaway most often occurred after the child had run away from a CWOP Setting (29% or 39 of 135), a GRO (21% or 28 of 135), or an RTC (19% or 26 of 135).

**Remedial Order 25:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order 26:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 27:** *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order 29:** *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 31:** *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

The monitoring team located Common Applications for all placements reviewed during a case record review. Of the 426 placements with a Common Application, 97% of those involving a child identified as a victim of sexual abuse, and 98% of placements involving a child who had an indicator for sexual aggression included all the child's sexual history information.

The monitoring team found both an Attachment A and Placement Summary for 95% of the placements involving a child who had a history of sexual aggression and 96% of placements involving a child who had a history of sexual abuse. However, only 63% of the placements reviewed by the monitoring team had a Placement Summary and Attachment A signed by a receiving caregiver at the time of the child's placement that included all the child's known sexual history. Results were the same for children who had a history of sexual abuse and sexual aggression.

During the 12 site visits made in 2023, the monitoring team reviewed site records for all PMC children, reviewed a random sample of records for staff, and interviewed children and staff. The record reviews and interviews included an evaluation of information related to a child's sexual characteristic indicator. The monitoring team reviewed 136 children's records and 203 staff records. The monitoring team interviewed 84 children and 146 staff members.

Almost all the children's site records included a Common Application, Attachment A, or Placement Summary; most included all three documents. In most cases, a Placement Administrator had signed the Placement Summary forms, and 100% of the Attachment A forms found in child files were signed by either an administrator, receiving intake staff, case manager, or receiving caregiver. Multiple staff signatures were found on most of the signed forms (82% of Placement Summary forms and 95% of Attachment A forms). The Placement Administrator's signature was included in 71% of signed Placement Summary forms, while the Administrator's signature was included in 86% of signed Attachment A forms. Nearly 90% of the 136 reviewed records had a signed Placement Summary and Attachment A form in the children's record.

Though a majority of direct caregivers reported that they were always told of a child's history of sexual abuse or aggression, of the 76 direct care staff who reported that they were supervising a child who had a history of sexual aggression or sexual abuse at the time of the interview, 46% were not able to identify the child.

**Remedial Order A7:** *The Defendants shall immediately cease placing PMC children in licensed foster care (LFC) placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A8:** *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the*

*operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children*

The Monitors reviewed data and documentation related to DFPS awake-night visits to 279 placements. DFPS made 56 repeat visits to locations required to provide awake-night supervision in 2023, either because of a report to SWI (32 of 56, or 57%) or problems DFPS encountered during an initial visit (9 of 56, 16%). DFPS did not document the reason for the repeat visit in 13 (of 56, 23%). HHSC issued 32 citations to operations for violating minimum standards, either for staff sleeping while on duty or for a significant problem with the operation's awake-night supervision.

## Regulatory Monitoring and Oversight of Licensed Placements

**Remedial Order 22:** *Effective immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment in the placements. During inspections, RCCL, and any successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

HHSC changed CLASS functionality to streamline the ECHR process on August 5, 2023. The ECHR updates in CLASS required the inspector to respond to targeted questions about history and status. The CLASS changes led to the Monitors' discovery that the number of ANE findings included in ECHRs reflect the number of investigations that resulted in a substantiated finding rather than the actual number of substantiated findings. The monitoring team compared DFPS data documenting substantiated findings to HHSC's ECHR data and found significant differences. It is unclear what impact this may have, if any, on inspectors' risk identification during ECHR assessments.

All but three of the sampled ECHRs reviewed by the monitoring team were completed before or on the day of the inspection. The monitoring team found that nearly 40% of the reviewed ECHRs associated with investigation inspections at foster homes (81 of 209, or 39%) involved an allegation that was similar to an allegation in a prior investigation, compared to nearly half of investigation inspections at operations (115 of 240, or 48%). The inspector discussed similar allegations in 81% of investigation inspections involving a foster home (66 of 81) and 56% involving an operation (64 of 115).

The monitoring team found risks to children's safety in 473 of the foster homes or operations' ECHRs among the 635 reviewed; the HHSC inspector recorded that no safety risk existed in 108 of these (23%). Some of the safety risks found by the

monitoring team include the following: two-thirds (71 of 108 or 66%) had an open ANE investigation at the time of inspection; nearly one-third (34 of 108 or 32%) had a recent confirmed ANE finding or corporal punishment citation; 67 of 108 (62%) had an identified pattern of allegations that posed serious safety risks; half (58 of 108 or 54%) had multiple safety risks identified.

When an inspector documented, or the monitoring team identified, a safety risk in the ECHR, the monitoring team also reviewed the information included in the ECHRs to determine whether and how the inspector considered the safety risks in planning the inspection. The monitoring team found that the inspector documented how the operation or foster home's identified safety risk was considered in 60% of inspections (282 of 473) where a safety risk was present. The monitoring team further found that when the ECHR showed the inspector considered risk, the documented inspection activities were insufficient or vague in addressing risk in 16% of all inspections (76 of 473) and in 14% of foster home investigation inspections (26 of 188) where risk was present.

Between January 1, 2023, and December 31, 2023, HHSC issued 50 citations to operations related to minimum standards violations associated with licensed operations' failure to report abuse, neglect, or exploitation.[17] The number of deficiencies cited for failure to report abuse, neglect, or exploitation was higher than in the past two years, with 24 in 2022 and 46 in 2021. Ongoing problems associated with operations' compliance with the obligation to report abuse, neglect, or exploitation may be tied to staff misunderstanding their responsibility to report incidents to the hotline or misunderstanding what constitutes abuse, neglect, or exploitation.

**Remedial Order 12:** *Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

There were no Priority One RCCR investigations during this reporting period.

**Remedial Order 13**: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

Ninety-six percent (203) of Priority Two RCCR investigations included face-to-face contact with all alleged child victims within 72 hours of intake; the remaining 4% (9) of investigations did not include face-to-face contacts within 72 hours (5) or did not include face-to-face contacts with all child victims (4).

---

[17] Two of these citations were overturned following an Administrative Review, which occurred after the Monitors' analysis.

**Remedial Order 14:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy*.

HHSC reported no Priority One and 212 Priority Two RCCR investigations with an intake date between January 1, 2023 and November 30, 2023. During this period, HHSC completed 98% (207) of investigations within 30 days of intake. HHSC's rate of completing Priority One and Priority Two minimum standards investigations within 30 days was higher than the rate in the Sixth Report (96%).

**Remedial Order 15:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

Ninety-eight percent (803) of Priority Three, Four, and Five RCCR investigations were completed within 60 days of intake.

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

In 98% (208) of Priority One and Two RCCR investigations, documentation was completed on the same day the investigation was completed.

**Remedial Order 17:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

In 98% (800) of Priority Three, Four, and Five RCCR investigations, documentation was completed within 60 days of intake.

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

Ninety-six percent (204) of Priority One and Two RCCR investigations included notification to the referent (or a letter was not required) and notification to the provider within five days of completion. 8% (17) of Priority One and Two RCCR investigations did not require notification.

**Remedial Order 19:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

Ninety-six percent (788) of Priority Three, Four, and Five RCCR investigations included notification to the referent (or a letter was not required) and to the provider within 60 days of intake. Eight percent (64) of Priority Three, Four, and Five RCCR investigations did not require notification.

**Remedial Order 20:** *Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions, and, as appropriate, other remedial actions under DFPS' enforcement framework.[18]*

Fourteen operations were newly placed on Heightened Monitoring in 2023, with all operations notified of their Heightened Monitoring status in October 2023 and having a Heightened Monitoring Plan start date in December 2023.[19] Several of these operations were opened after 2018; three operations opened in 2019, and one operation opened in 2020. The most common problem areas identified by the Heightened Monitoring Team related to Caregiver Responsibilities – Supervision, Child Rights, Discipline & Punishment, Medication Management – Medication Documentation, and Service Plan – Preliminary, Initial, and Discharge. With the addition of these 14 operations, the 164 operations that have qualified for Heightened Monitoring since 2020 were responsible for 805 substantiated findings of abuse, neglect, or exploitation of children in the years used to determine their eligibility.

In addition to the 14 operations that were newly placed on Heightened Monitoring in 2023, four operations that had previously completed Heightened Monitoring again returned to Heightened Monitoring. All four were operations that originally qualified as part of the first group of Heightened Monitoring operations in 2020. Three of the four were over the state average violation rate in all five years of the qualifying analysis in 2023. The other operation was over the state average violation rate in four of the five years. One of them (A Pathway 2 New Beginnings, LLC) had only been off of Heightened Monitoring for approximately three months when they were notified of their return to that status.

During the calendar year 2023, caseworkers made 1,374 requests to place a PMC child in an operation that was under Heightened Monitoring, resulting in 873 placements.

---

[18] Two subsequent orders further described the methodology for identifying operations subject to Heightened Monitoring, the method for developing a Heightened Monitoring plan and what is required to be included, the cadence of monitoring visits by the State, requirements for placement of PMC children in operations under Heightened Monitoring, the length of time operations are to stay on Heightened Monitoring and the requirements an operation must meet to exit Heightened Monitoring. Order, March 18, 2020, ECF No. 837; Order Modifying Order Regarding Heightened Monitoring, December 7, 2020, ECF No. 1012.

[19] Two additional operations were placed on Heightened Monitoring in April 2023 because of linkages to operations on Heightened Monitoring. These operations include Horizon Project, linked to Sheltering Harbor, and Fostering Life Youth Ranch Meraki, linked to Fostering Life Youth Ranch.

Nearly all requests (858 of 873, 98%) were approved by a DFPS Regional Director or Associate Commissioner. Over a quarter of the approved placements to a GRO or RTC on Heightened Monitoring (60 of 216, 28%) were of children who had been in a CWOP or hospital setting immediately before the placement. In 2023, 35% (304 of 873) of all placements of PMC children to an operation under Heightened Monitoring received prior approval that met all of the Court's requirements (approver included justification for the placement, documented a review of the operation's five-year safety history, and included a best interest statement). This percentage was an improvement over 2022, when only 16% of placement approvals met all the Court's requirements. The percentage of placement approvals that met all the Court's requirements increased throughout 2023.

Despite improvement, the monitoring team continued to find generic placement approvals or placements that appeared to overlook evident safety problems. A total of 11 placements were approved in 2023 for foster homes that were later placed on DFPS's Disallowance list and recommended for closure by HHSC due to child safety concerns. Four other homes were relinquished by the CPA that licensed them after RTB findings; six children were placed in these homes in 2023.

The monitoring team conducted a comprehensive review of the operations placed under Heightened Monitoring since 2020. Some had ongoing safety problems that highlight problems with implementation identified in this and other reports. At every step of the process, the State frequently appeared to prioritize avoiding the more stringent enforcement penalties the Court set out in its orders in favor of maintaining licenses for operations that continue to have significant safety violations.

**Remedial Order 21:** *Effective immediately, RCCL and/or its successor entity shall have the right to directly suspend or revoke the license of a placement in order to protect the children in the PMC class.*

In 2023, the Health and Human Services Commission (HHSC) considered 27 recommendations for closure of foster homes. Among these, the Monitors described three in prior reports. Of the homes HHSC staff recommended for closure, four recommendations were not approved by HHSC leadership. One home HHSC leadership approved for closure has yet to be relinquished by the CPA as of September 1, 2024; the home still has children. A second home remained open an additional year before the home's verification was relinquished.

In addition to the HHSC closure recommendations, DFPS placed 75 foster homes on a list of disallowed placements in 2023. The Monitors summarized ten of these homes in prior reports, and 17 appeared on the HHSC closure and DFPS disallowance lists.

At the time of the recommendation, eight homes HHSC recommended for closure were verified by CPAs on Heightened Monitoring, while 28 of the DFPS disallowed homes were verified by CPAs on Heightened Monitoring at the time of their closure. Sixteen

(16) of the DFPS Disallowance Reviews were initiated at the request of Heightened Monitoring staff.

## Demographics of Children in PMC Care

According to DFPS data, there were 7,506 children in PMC status as of December 31, 2023,[20] a decrease of 1,043 children from the 8,549 children in PMC status on June 30, 2023.[21] DFPS cared for 10,565 PMC children between July 1, 2023 and December 31, 2023. During this period, 2,016 children entered PMC status, and 3,058 children exited PMC status. Of the 7,506 children in PMC status on December 31, 2023, 1,832 (24%) children first entered PMC status after July 1, 2023.[22] The total number of children in PMC status on December 31, 2023 (7,506) is a significant decrease from the number of children in PMC status four years prior on December 31, 2019 (12,707).[23]

### Age, Gender and Race

As of December 31, 2023, 36% of children in PMC status were age zero to six years old (2,665); 22% were seven to 11 years old (1,688); and 42% were 12 to 17 years old (3,153).[24]

---

[20] Analyses in this section for July 1, 2023 to December 31, 2023 are based on a comprehensive data file reflective of the reporting period. *See* DFPS, RO.Inj_PMC_Children_List_070123_123123d2024_03_01_log110858, (March 1, 2024) (on file with the Monitors).

[21] This is according to DFPS's corrected data; DFPS provided to the Monitors a comprehensive data file reflective of the reporting period (July 1, 2023 to December 31, 2023) to address data lag issues that occurred in its monthly data reports. In its updated data report, DFPS reported 38 more children in PMC status on July 1, 2023 than previously reflected in the data the Monitors used in preparation of the Seventh Report reflecting June 30, 2023. See also Deborah Fowler & Kevin Ryan, Seventh Report 17, ECF No. 1496.

[22] Of the 8,549 children in care on June 30, 2023, one child exited care on July 1, 2023 and therefore, this child is excluded from the July 1, 2023 cohort.

[23] Analyses in this section for December 31, 2019 are based on a comprehensive data file reflective of December 1, 2019 through February 29, 2020. *See* DFPS, *RO. Inj - List of Placements for Children in PMC Q2 FY 20 - Apr 15-20 - 97298 (002),* (April 16, 2020) (on file with the Monitors).

[24] No children were in care after their 18th birthday. Percentages may not add to 100% due to rounding.

Figure 1: Age of Children in PMC on December 31, 2023

*Source: PMC Child List*
n=7,506 children



Forty-six percent of children in PMC status were reported as female and 54% were reported as male.

The race of non-Hispanic children in PMC status breaks down as follows: 26% (1,941) of children in PMC on December 31, 2023 were White; 26% (1,917) were Black/African American; <1% (21) were Asian; <1% (10) were Native American; and 6% (475) were categorized as "Other." Additionally, 42% (3,142) of children in PMC on December 31, 2023 were of Hispanic ethnicity. Non-Hispanic Black/African American children in PMC status are overrepresented compared to the racial category totals for Texas's population of all children ages zero to 17 years in the 2020 census.[25]

---

[25] Percentages may not add to 100% due to rounding.

Table 1: Race for Children in PMC on December 31, 2023 and Estimates of Total Child Population in Texas by Race, August 12, 2021 [26, 27]

n=7,506 children

| Race/Ethnicity | Children in PMC on December 31, 2023 | | Estimates of Total Population of Children Less than 18 in Texas by Race | |
|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent |
| Non-Hispanic White | 1,941 | 25.9% | 2,146,604 | 29.5% |
| Non-Hispanic Black/African American | 1,917 | 25.5% | 869,455 | 11.9% |
| Non-Hispanic Other | 475 | 6.3% | 346,518 | 4.8% |
| Non-Hispanic Native American | 10 | 0.1% | 25,890 | 0.4% |
| Non-Hispanic Asian | 21 | 0.3% | 355,940 | 4.9% |
| Hispanic (of any race) | 3,142 | 41.9% | 3,534,398 | 48.6% |
| **Total** | **7,506** | **100%** | **7,278,805** | **100%** |

Note: Percentages may not add to 100% due to rounding.


## Living Arrangements and Length of Time in Care

Based upon information provided by DFPS, 77% (5,799) of children in PMC on December 31, 2023 lived in family settings, including 50% (3,767) living in foster homes; 25% (1,849) living with relatives or fictive kin and 2% (183) living in adoptive homes; 17% (1,303) of children in PMC lived in congregate care settings; and 363 (5%)

---

[26] *See* UNITED STATES CENSUS BUREAU, Table IDs P2 & P4, Product: 2020: DEC Redistricting Data (PL 94-171) (August 2021), available at
https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity&tid=DECENNI ALPL2020.P2 and
https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity%20&tid=DECE NNIALPL2020.P4. These totals were derived by subtracting Table P4 totals (population over 18) from Table P2 totals (total population). The categories used by the Census Bureau and DFPS do not match exactly. The Census data were aggregated as follows: the non-Hispanic Other category includes all children in the non-Hispanic Other category with one race and all non-Hispanic children with more than one race; the non-Hispanic Native American totals combine the American Indian Alaska Native category with the Native Hawaiian and Pacific Islander category.
[27] The format of the data provided by DFPS to the Monitors does not provide the ability to identify the racial categories for a child of Hispanic ethnicity.

children lived in other types of living arrangements.[28] The remaining 41 (<1%) PMC children were without a licensed, regulated placement on December 31, 2023.

Figure 2: Living Arrangements for Children in PMC on December 31, 2023[29]



Source: PMC Child List
n=7,506 children

Note: Percentages may not add to 100% due to rounding.

PMC children who were identified as non-Hispanic Asian (86%)[30] lived in family settings more often, followed by Hispanic (of any race) (79%)[31], non-Hispanic Other (79%), non-Hispanic Black/African American (79%), and non-Hispanic White (72%),[32] while PMC children identified as non-Hispanic Native American (50%) lived in family settings less often.

---

[28] The 363 children listed in the "Other" living arrangement category include those identified by DFPS as: "Unauthorized Placement" (28%, 100), "HCS Group 1-4" (18%, 66), "Runaway" (16%, 59), "City County Jail/Other Juv. Det" (Incarcerated) (14%, 49), "Own-home/Non-Custodial Care" (6%, 21), "Psychiatric Hospital" (6%, 20), "Independent Living" (1%, 5), and ten other living arrangement types (12%, 43). During the period from July 1, 2023 to December 31, 2023, 261 unique children experienced time in a jail (88) or in a juvenile detention facility (173). Percentages may not add to 100% due to rounding.
[29] Of the 1,303 children living in congregate care settings, 6% (76) were placed out of state.
[30] Percentages in Table 2 do not add to 86% due to rounding.
[31] Percentages in Table 2 do not add to 79% due to rounding.
[32] Percentages in Table 2 do not add to 72% due to rounding.

## Table 2: Living Arrangement by Race, Children in PMC on December 31, 2023

n=7,506 children

| Race/Ethnicity | Living Arrangement | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- |
| | Foster Home | Adoptive Home | Congregate Care | Relative/Fictive Kin | Other | |
| Non-Hispanic White | 49% | 2% | 22% | 22% | 5% | 100% |
| | 948 | 35 | 433 | 424 | 101 | 1,941 |
| Non-Hispanic Black/African American | 53% | 3% | 16% | 23% | 6% | 100% |
| | 1,013 | 58 | 298 | 434 | 114 | 1,917 |
| Non-Hispanic Other | 53% | 1% | 17% | 25% | 4% | 100% |
| | 251 | 6 | 79 | 118 | 21 | 475 |
| Non-Hispanic Native American | 50% | 0% | 20% | 0% | 30% | 100% |
| | 5 | 0 | 2 | 0 | 3 | 10 |
| Non-Hispanic Asian | 71% | 0% | 14% | 14% | 0% | 100% |
| | 15 | 0 | 3 | 3 | 0 | 21 |
| Hispanic (of any race) | 49% | 3% | 16% | 28% | 5% | 100% |
| | 1,535 | 84 | 488 | 870 | 165 | 3,142 |

Note: Percentages may not add to 100% due to rounding.

Based upon information provided by DFPS, 82% (10,459) of children in PMC on December 31, 2019 lived in family settings, including 49% (6,262) living in foster homes, 27% (3,401) living with relatives or fictive kin and 6% (796) living in adoptive homes; 14% (1,758) of children in PMC lived in congregate care settings; and 490 (4%) children lived in other types of living arrangements.[33]

## Table 3: Living Arrangement for Children in PMC on December 31, 2019 and December 31, 2023

n= 12,707 children and 7,506 children respectively

| Living Arrangement | December 31, 2019 | December 31, 2023 |
| --- | --- | --- |
| Foster Home | 6,262 (49%) | 3,767 (50%) |
| Adoptive Home | 796 (6%) | 183 (2%) |
| Congregate Care | 1,758 (14%) | 1,303 (17%) |
| Relative/Fictive Kin | 3,401 (27%) | 1,849 (25%) |

[33] The 490 children listed in the "Other" living arrangement category on December 31, 2019 include those identified by DFPS as: "Own Home/Non-Custodial Care" (9%, 43), "Runaway" (21%, 104), "Incarcerated" (13%, 66), "Independent Living" (5%, 24), and "Other" (52%, 253). (DFPS did not further define "Other").

| | | |
|---|---|---|
| Other | 490 (4%) | 404 (5%)[34] |
| **Total** | **12,707** | **7,506** |

Note: Columns may not add to 100% due to rounding.

Of the children in PMC status on December 31, 2023, 4% (280) were in care for less than one year; 35% (2,604) were in care for one to two years; 22% (1,662) were in care for two to three years; and 39% (2,960) were in care for more than three years.

**Figure 3: Length of Stay in Care of Children in PMC on December 31, 2023**

Source: PMC Child List
n=7,506 children



Of the children in PMC status on December 31, 2019, 10% (1,273) were in care for less than one year; 45% (5,747) were in care for one to two years; 21% (2,673) were in care for two to three years; and 23% (2,981) were in care for more than three years. Most PMC children, 55% (7,020), had been in care for less than two years on December 31, 2019, but that has changed. On December 31, 2023, most PMC children, 62% (4,622), were in care for more than two years.

**Table 4: Length of Stay in Care of Children in PMC on December 31, 2019 and December 31, 2023**

n=12,707 children and 7,506 children respectively

| **Length of Stay** | **December 31, 2019** | **December 31, 2023** |
|---|---|---|
| Less than one year | 1,273 (10%) | 280 (4%) |

---

[34] This includes 41 children who were housed in unlicensed, unregulated settings (previously referenced as Children without placement or CWOP) on December 31, 2023.

| | | |
|---|---|---|
| 1 to 2 years | 5,747 (45%) | 2,604 (35%) |
| 2 to 3 years | 2,673 (21%) | 1,662 (22%) |
| 3 to 6 years | 2,077 (16%) | 2,124 (28%) |
| 6 years plus | 904 (7%) | 836 (11%) |
| Unable to Determine[35] | 33 (<1%) | 0 (0%) |
| **Total** | **12,707** | **7,506** |

Children exited from PMC status primarily through adoption; ; having custody transferred to relatives; or by aging out of care. Of the 3,058 children's exits from PMC status that DFPS reported between July 1, 2023 and December 31, 2023, the most frequent reason for exit was adoption, with more adoptions by non-relatives (1,215) than relatives (841). The breakdown of exit reasons is as follows: 67% (2,056) of children were adopted; 16% (492) of children had custody transferred to a relative; and 13% (391) of children aged out of foster care. Finally, a small number of children were reunified with their families (3%, 100) or had other outcomes (1%, 19).

Table 5: Exits from PMC by Exit Outcome between July 1, 2023 and December 31, 2023

n=3,058 exits from foster care

| **Exit Outcome** | **Frequency** | **Percent** |
|---|---|---|
| Adoption | 2,056 | 67% |
| Custody to Relative | 492 | 16% |
| Emancipation | 391 | 13% |
| Reunification | 100 | 3% |
| Other | 19 | 1% |
| **Total** | **3,058** | **100%** |

## Out of State Placement

Of the 7,506 children in PMC status on December 31, 2023, 379 (5%) children were placed in living arrangements that were located out of state. Of the PMC children placed out of state, 77% (292) lived in family settings, including 28% (107) living with relatives or fictive kin and 16% (59) living in adoptive homes; and 20% (76) of children in PMC lived in congregate care out of state, a 7% decrease from June 30, 2023 (82).

---

[35] The relevant data report for this information was received by the Monitors in 2020; the report listed PMC children as of December 31, 2019 and had minor data issues for 33 children, which prevented the Monitors from determining their lengths of stay. For this period, the Monitors were able to calculate length of time since removal for all children.

## Table 6: Out of State Living Arrangement Type for Children in PMC, June 30, 2023 and December 31, 2023

n=448 children and 379 children respectively

| Living Arrangement Type | June 30, 2023 | | December 31, 2023 | | Percent Change of Total |
|---|---|---|---|---|---|
| Foster Home | 140 | 31% | 126 | 33% | 2% |
| Adoptive Home | 66 | 15% | 59 | 16% | 1% |
| Congregate Care | 82 | 18% | 76 | 20% | 2% |
| Relative/Fictive Kin | 139 | 31% | 107 | 28% | -3% |
| Own Home/Non-Custodial Care | 3 | 1% | 1 | <1% | -<1% |
| Other | 18 | 4% | 10 | 3% | -1% |
| **Total** | **448** | **100%** | **379** | **100%** | **--** |

Note: Percentages may not add to 100% due to rounding.

Of the 379 PMC children who were placed out of state, 121 (32%) were non-Hispanic White, 111 (29%) were Hispanic (of any race), 111 (29%) were non-Hispanic Black/African American, 33 (9%) were non-Hispanic Other, <1% (3) were non-Hispanic Native American, and zero children placed out of state were non-Hispanic Asian.

## Table 7: Children in PMC Placed Out of State by Race on December 31, 2023

n = 379 children

| Race/Ethnicity | Frequency | Percent |
|---|---|---|
| Non-Hispanic White | 121 | 32% |
| Hispanic (of any race) | 111 | 29% |
| Non-Hispanic Black/African American | 111 | 29% |
| Non-Hispanic Other | 33 | 9% |
| Non-Hispanic Native American | 3 | <1% |
| Non-Hispanic Asian | 0 | 0% |
| **Total** | **379** | **100%** |

Note: Percentages may not add to 100% due to rounding.

Of the 12,707 children in PMC status on December 31, 2019, 519 (4%) children were placed in living arrangements that were located out of state. Of the PMC children placed out of state, 475 (92%) lived in family settings, including 41% (215) living with relatives or fictive kin and 23% (118) living in adoptive homes; and 5% (26) of children in PMC lived in congregate care out of state.

The number of children placed in relative or fictive kin homes out of state has decreased from 41% (215) on December 31, 2019 to 28% (107) on December 31, 2023 and in

adoptive homes from 23% (118) on December 31, 2019 to 16% (59) on December 31, 2023. The number of children in out of state placements who are in congregate care increased from 5% (26) on December 31, 2019 to 20% (76) on December 31, 2023.

Table 8: Out of State Living Arrangement Type for Children in PMC, December 31, 2019 and December 31, 2023

n=519 children and 379 children respectively

| Living Arrangement Type | December 31, 2019 | December 31, 2023 |
|---|---|---|
| Congregate Care | 26 (5%) | 76 (20%) |
| Foster Home | 142 (27%) | 126 (33%) |
| Relative/Fictive Kin | 215 (41%) | 107 (28%) |
| Adoptive Home | 118 (23%) | 59 (16%) |
| Other | 12 (2%) | 10 (3%) |
| Own Home/Non-Custodial Care | 6 (1%) | 1 (<1%) |
| **Total** | **519** | **379** |

Note: Percentages may not add to 100% due to rounding.

## Level of Care

Of the 7,506 children in PMC status on December 31, 2023, 4,308 (57%) children were identified with a Basic level of care,[36] 1,197 (16%) were in a Specialized level of care; 1,044 (14%) were in a Moderate level of care; and 364 (5%) were in an Intense level of care. The data included 484 (6%) PMC children with no authorized level of care recorded.[37]

Table 9: Authorized Level of Care for Children in PMC as Reported by DFPS as of December 31, 2023

n=7,506 children

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 4,308 | 57% |
| Specialized | 1,197 | 16% |
| Moderate | 1,044 | 14% |

[36] The number of children identified in a Basic level of care is likely overrepresented. The SSCCs' current recorded levels of care for children are not stored in IMPACT and are, thereby, not reflected in the data reports DFPS provides to the Monitors.

[37] The Monitors found that for most of the children lacking identification of an authorized level of care (83%, 401), the placement type in the data was identified as "kin only (non-licensed)." The Monitors inquired with DFPS regarding the circumstances when the data indicate "no authorized level of care." The State reported that when a child is in "fictive kin, non-custodial parent, unauthorized, return home, relative home placement, juvenile detention/adult jail, unauthorized placement or any placement that DFPS does not pay, the service level is not assessed as this is not a licensed placement and there is no rate of reimbursement." E-mail from Ingrid Vogel, Program Specialist, DFPS, to Megan Annitto, Monitoring Team (April 20, 2023).

| | | |
|---|---|---|
| No Authorized Level of Care Recorded | 484 | 6% |
| Intense | 364 | 5% |
| (TFC) Treatment Foster Care | 109 | 1% |
| Intense Plus | 0 | 0% |
| Psychiatric Transition | 0 | 0% |
| **Total** | **7,506** | **100%** |

## Geographic Location

For 43% (3,200) of the 7,506 children in PMC status on December 31, 2023, the county of removal was one of six Texas counties: Bexar, Harris, Tarrant, Dallas, Bell, or Lubbock.

Table 10: Top Six Counties of Removal for Children in PMC on December 31, 2023[38]

n=3,200 PMC children of 7,506 PMC children in care

| County Name | Frequency | Percent |
|---|---|---|
| Bexar | 997 | 13% |
| Harris | 827 | 11% |
| Tarrant | 513 | 7% |
| Dallas | 498 | 7% |
| Bell | 183 | 2% |
| Lubbock | 182 | 2% |
| **Total** | **3,200** | **43%** |

## SSCC Presence and Placement Oversight

As of December 31, 2023, 48% (3,637) of children in PMC status were from regions where SSCCs operated in the first two stages of implementation.[39] Three new regions were transferred to Stage I of SSCC oversight in the Fall of 2023. Additionally, in the Spring of 2024, OCOK expanded into three additional counties, and DFPS now calls the OCOK region Metroplex West, Region 3W. Empower (Region 3E) and Family Care Network (Region 5) entered Stage II as of March and April 2024, respectively, while 4Kids 4Families (Region 4) entered Stage II later in May 2024.

---

[38] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the corresponding IMPACT data.

[39] DFPS reports to the Monitors both the Legal Region and the Placement Region of children; here, the Monitors are referring to Legal Region for ease of reference. However, the children may be placed in and therefore, currently living in another region.

Table 11: Children in PMC by Region on December 31, 2023

*n=7,506 children*

| Regions | PMC Children | Percent |
|---------|--------------|---------|
| SSCC Regions | 3,637 | 48% |
| DFPS Regions | 3,869 | 52% |
| **All Regions** | **7,506** | **100%** |

As shown in the table below, Region 3W, where OCOK is responsible, had the greatest number of PMC children from a region that has SSCC placement oversight.

Table 12: Children in PMC from Regions with SSCC Presence by Region on December 31, 2023[40]

n=3,637 children

| SSCC Name | Legal Region | PMC Children | Percent |
|-----------|--------------|--------------|---------|
| St. Francis Ministries | 1 | 521 | 14% |
| 2Ingage | 2 | 400 | 11% |
| Empower | 3E | 701 | 19% |
| Our Community Our Kids (OCOK) | 3W | 829 | 23% |
| 4Kids4Families | 4 | 485 | 13% |
| Family Care Network | 5 | 358 | 10% |
| Belong | 8b | 343 | 9% |
| **Total** | | **3,637** | **100%** |

Note: Percentages may not add to 100% due to rounding.

## Preventing Sexual Abuse and Child-on-Child Sexual Aggression

This section discusses the remedial orders related to identifying, documenting, and notifying caregivers of a child's history of sexual abuse, sexual aggression, or sexual behavior issues and to preventing child-on-child sexual abuse.

---

[40] Prior to OCOK's recent expansion, the 3b catchment area was comprised of Tarrant, Erath, Hood, Johnson, Palo Pinto, Parker, and Somervell counties. The 8b catchment area is comprised of all counties in DFPS Region 8 excluding Bexar County. *See* DFPS, *Quarterly Report on Community Based Care Implementation Status*, 4-5 (December 2021).

## Number of PMC Children Flagged with an Indicator for Sexual Aggression or Sexual Victimization

As of December 31, 2023, the most recent point-in-time data the Monitors analyzed for this report, DFPS had identified 1,095 PMC children with a confirmed history of sexual abuse, an indicator for sexual aggression, or both. These children represented approximately 15% of the 7,506 children in placement on that day:

- 160 children (2%) had an indicator for sexual aggression;
- 866 children (12%) had an indicator for sexual victimization; and
- 69 children (1%) had an indicator for both sexual victimization and aggression.

An additional 109 children had an indicator for a sexual behavior problem, for a total of 1,204 (16% of children in placement) with a sexual characteristic flag.

The number of PMC children in placement who had a sexual aggression or sexual victimization indicator decreased steadily throughout the year.[41] The number of PMC children who had a sexual victimization indicator decreased by 12%, from 1,058 on December 31, 2022, to 935 on December 31, 2023, less than the 19% reduction in the overall size of the PMC population during the period.[42] The number of PMC children who had an indicator for sexual aggression decreased 10% during the same period, from 255 on December 31, 2022, to 229 on December 31, 2023.

---

[41] The number of PMC children in placement who did not have a sexual aggression and/or sexual victimization indicator decreased by 20% during the same period, from 7,979 on December 31, 2022, to 6,412 on December 31, 2023.

[42] Children with both a sexual victimization and sexual aggression indicator are counted in both categories. On December 31, 2022, there were 9,222 children with PMC status compared to 7,506 on December 31, 2023.

Figure 4: Children in PMC Placement with a Sexual Characteristic Flag (Aggressor or Victim) December 31, 2022, to December 31, 2023



Source: PMC child placement data

The Monitors compared children who had an indicator for sexual victimization or sexual aggression on January 31, 2023, and again on December 31, 2023, to determine whether any changes were made to a child's indicators during the year. Of the children in PMC on December 31, 2023, 4,432 were in PMC on January 31, 2023. Of the 607 PMC children who had an indicator for sexual victimization on January 31, 2023, 590 (97%) still had an indicator for sexual victimization on December 31, 2023.[43] Of the 165 PMC children who had an indicator for sexual aggression on January 31, 2023, 164 (99%) still had an indicator for sexual aggression on December 31, 2023.[44]

The Monitors reviewed the IMPACT records for the 18 children who had an indicator for sexual victimization, sexual aggression, or both on January 31, 2023, but not on December 31, 2023.[45] Over three-quarters of children who had an indicator removed (14 of 18, 78%) had incidents deleted from the child's Sexual Incident History page in

---

[43] Includes 49 children who had an indicator for both sexual aggression and sexual victimization. Of these 49 children, three had only an indicator for sexual aggression on the last day of the year.
[44] One hundred sixteen children had an indicator for sexual aggression only and 49 children had both sexual aggression and sexual victimization indicators.
[45] Seventeen children had an indicator for sexual victimization and one child had an indicator for sexual aggression on January 31, 2023, but not on December 31, 2023.

IMPACT following DFPS's determination that a victimization incident was unconfirmed.[46] These incidents[47] include:

- Removal of an indicator because an RTB finding against the child's father was changed to UTD after an administrative review. The findings of sexual abuse were substantiated after the child and their sibling made consistent reports in multiple interviews, including Child Advocacy Center forensic interviews. However, because criminal charges against the father were not pursued and there were "concerns for [child's] credibility" noted in the administrative review process, the findings were changed to Unable to Determine.

- Removal of an indicator because a UTD finding was not considered confirmed by DFPS. The allegations resulted in a UTD because the child was not able to provide enough detailed information on the alleged incident. The child's mother stated the abuse involved the child's "godfather" and took place while the family was living in Louisiana. The child had multiple other alleged incidents of sexual abuse, but notes in IMPACT indicate they were "never staffed" because "possible aggressors now adults, so no staffing possible."

- Removal of an indicator because the allegations of abuse that preceded a child's entry into foster care resulted in RTB findings of Sexual Abuse against an adult male babysitter for two of the child's siblings but resulted in a UTD finding for the child. The child's siblings made outcries that the child was forced to watch the babysitter touch the siblings inappropriately, but because the child did not make an outcry of sexual abuse, the finding for the child was UTD. An additional

---

[46] Two of the remaining four children who had an indicator on January 31, 2023, but not on December 31, 2023, still had confirmed incidents listed on the Sexual Incident History page when the Monitors reviewed their IMPACT records. One child had a confirmed sex trafficking incident, and the other child had two confirmed incidents of sexual victimization. In both instances, the data field Sexual Victimization History, which according to the definition provided by DFPS is "whether the indicator for sexual victimization history on the sexual victimization history page in IMPACT identifies the child as a confirmed victim of sexual victimization" and further "will pre-fill if the child is identified as a confirmed victim of sex trafficking on the trafficking page," was reported as "Y" in the January data file but "N" in the December data file.

For one of the remaining children, a single incident was incorrectly entered twice for both victimization and sexual aggression and was subsequently deleted as a victimization incident. The other remaining child, who had an indicator for sexual aggression on January 31, 2023, but not on December 31, 2023, had no information regarding any confirmed or unconfirmed incidents on the child's Sexual Incident History page. This child had the indicator removed after a DFPS Program Administrator received information indicating that the investigation of the underlying allegations did not support the indicator for sexual aggression.

[47] The Monitors provided a full draft of this Eighth Report and its appendices to the parties on September 20, 2024. On October 18, 2024, the State provided the Monitors with their comments on the draft. In its comments, the State noted that the incidents described were "relocated to the 'Additional Relevant Information' section" on the children's IMPACT Sexual Incident History page because "they did not meet the definition of confirmed." The Monitors note that information included in the "Additional Relevant Information section" of a child's Sexual Incident History page does not appear on the Attachment A provided to caregivers.

unconfirmed incident was deleted from the child's SIH page during a "quality assurance" process.

- Removal of an indicator for a child whose unconfirmed incidents of sexual abuse allegedly occurred while the child was on runaway status. A child ran away from placement with a suspected boyfriend, a 20-year-old male, during which she stated he sexually assaulted, physically, and verbally abused her. The notes in IMPACT state that a Quality Assurance Specialist deleted the incident as unconfirmed.

- Removal of an indicator for a child whose allegations of child-on-child sexual contact preceded the child's entry into foster care and were never confirmed. It was reported that the child's brother sexually acted out in front of his siblings and was separated from the siblings due to this behavior. The "additional relevant information" section on the child's Sexual Incident History page also details an RTB for Neglectful Supervision for the children's paternal grandfather, who would get drunk and sexually assault the children's aunt in front of them. It is not clear why this did not qualify for a "confirmed" finding of sexual abuse.

The four children who had an indicator for sexual aggression removed included a 16-year-old child (Child A) for whom there is no information on the sexual incident history page related to the removed indicator. However, a January 2024 Common Application notes that in 2019, Child A was alleged to have asked a peer at his RTC for oral sex, and in 2020, his foster parent caught him engaging in a sexual act with another foster child who was a year younger than Child A. A CSA Staffing was held on May 12, 2022, after another child made an outcry that he had been repeatedly sexually abused by Child A while they were both placed at a GRO. The staffing initially resulted in the flag being added to Child A's IMPACT record, but the incident was "re-staffed on August 18, 2023...because of concerns about the initial findings [of the staffing] not matching the outcome of the case." DFPS had Ruled Out Neglectful Supervision and noted that video evidence and evidence from the other child's SANE exam contradicted his outcries. The 2020 incident was also discussed during the CSA Staffing, but notes indicate the participants determined that the incident "appear[ed] to be consensual."

## Number of Placements and Runaway Incidents for PMC Children with and without a Sexual Characteristics Flag, January – December 2023

Children with an indicator for sexual victimization or sexual aggression were more likely to reside in a congregate care (GRO or RTC) placement than children with no sexual characteristic indicator. Of the 1,095 children with a sexual characteristic indicator in placement on December 31, 2023, 35% (379) were in a congregate care placement, and 33% (356) were in a foster home. By comparison, of the 6,412 children who did not have a sexual characteristic indicator on the same date, 14% (889) were in a congregate care placement, and 53% (3,412) were in a foster home.

Children who had an indicator for sexual aggression or sexual victimization[48] also changed placements[49] more frequently than children who did not have a sexual characteristic indicator. Of the total 13,506 PMC children in placements between January 1, 2023, and December 31, 2023, 1,472 (11%) were identified as having an indicator for sexual victimization, and 329 (2%) had an indicator for sexual aggression. Less than 1% of PMC children (99) had both indicators. Children with an indicator for sexual aggression had on average, 3.6 placements during the period, compared to 3.3 placements for children with an indicator for sexual victimization, and 1.7 placements for children with no sexual characteristic indicator.

Table 13

Number of Placements for PMC Children by Sexual Indicator Type, January to December 2023[50]

| Number of Placements | Sexual Abuse Indicator (n = 1,472) | | Sexual Aggression Indicator (n = 329) | | No Indicator (n = 11,804) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| One Placement | 579 | 39% | 104 | 32% | 7,971 | 68% |
| Two to Three | 536 | 36% | 130 | 40% | 3,024 | 26% |
| Four to Six | 206 | 14% | 53 | 16% | 575 | 5% |
| Seven or More | 151 | 10% | 42 | 13% | 234 | 2% |

Note: Percentages may not add to 100% due to rounding.

In addition to more frequent placement moves, the data show that runaway incidents were more likely among children who had a sexual characteristic indicator.[51]

Table 14: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, January to December 2023

---

[48] Children were considered to have a sexual victimization/aggression indicator if there was an indicator at any time between January 1, 2023, and December 31, 2023. For example, if they did not have an indicator in January but had an indicator in December, they were considered to have a sexual characteristic indicator.

[49] For this analysis, placements are defined as any change in a child's living arrangement that results in a new placement record for the child, including hospital stays, stays in a juvenile justice facility or jail, and runaway episodes. Changes in placement that were the result of a foster home changing CPA's, a kinship placement becoming licensed, or a service level change for the child were not considered to be a new placement.

[50] Ninety-nine children with both sexual characteristic indicators are included in both categories.

[51] PMC placement data was used for the analysis. As a result, only runaway incidents contained in the placement data are counted. Children may be absent as long as 14 days before a runaway designation is included in the placement data. Data source: DFPS written response to December 2021 Supplemental Data & Information Request, January 2023.

| Number of Runaway Incidents | Sexual Abuse Indicator (n = 1,472) | | Sexual Aggression Indicator (n = 329) | | No Indicator (n = 11,804) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| None | 1,329 | 90% | 297 | 90% | 11,609 | 98% |
| One | 67 | 5% | 20 | 6% | 143 | 1% |
| Two or more | 76 | 5% | 12 | 4% | 52 | 0.4% |

Note: Percentages may not add to 100% due to rounding

## Remedial Order 32: Policy Creation and Training of Staff Responsible for Making Determinations

*Remedial Order 32: Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within six months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

### Background

As discussed in the Monitors' previous reports, DFPS policy sets a protocol to determine whether a child's behavior meets the definition of sexual aggression. If the alleged sexual aggression occurred in an unlicensed setting, the conservatorship (CVS) program administrator determines whether the incident meets the definition of sexually aggressive behavior.[52] If the alleged behavior occurred in a licensed setting, the DFPS-RCCI program administrator confers with the CVS program administrator to reach a determination. If the RCCI and CVS program administrators disagree that the incident meets the definition of sexually aggressive behavior, the decision is elevated to the regional director to review with the Child Care Investigations Division Administrator. If no agreement can be reached at the regional level, the incident is elevated to the RCCI State Office Director and the CPS Director of Field.[53] All determinations of sexual aggression result in the documentation of the incident on the Sexual Incident History page of the aggressor and victim.[54]

The Monitors' Fourth Report noted that DFPS had incorporated some of the recommendations made by Praesidium[55] in an update of its CPD curriculum, which went "live" with the updated training curriculum in March 2021. In an e-mail to CPS

[52] DFPS, Sexual Incident History Resource Guide (Updated March 2024) 11-14, available at https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/Sexual_Incident.pdf
[53] *Id.* at 16
[54] *Id.* at 17
[55] *See* Deborah Fowler & Kevin Ryan, Fourth Report at 29, ECF No. 1248. Praesidium is a Texas-based consulting firm that works with organizations to prevent the sexual abuse of children. At the Monitors' request, Praesidium analyzed the State's policies and training related to child-on-child abuse and provided a written report to the Monitors.

staff dated April 2, 2021, DFPS stated that "[c]hild sexual aggression training is required annually" and that a new "annual refresher" training module was available to CPS staff.[56] According to the e-mail, the new refresher training "focuses on the differentiation between the terms of child sexual abuse and sexual aggression, and informs participants of the protocols for identifying and documenting instances of child sexual aggression."[57] The e-mail also stated that staff would "learn what they can do to help with the prevention of sexual abuse, as well as the protocols for placement and recommending services and/or supports for the children involved."[58]

DFPS again updated their child sexual aggression training in 2022, releasing the "Preventing and Recognizing Youth Sexual Abuse for Staff 0003973" training in the DFPS Learning Station on September.[59] In an e-mail to CPS staff dated August 23, 2022, DFPS stated that the "course will provide CPS, CPI, and CCI staff with skill training about reporting, prevention, recognition, supervision needs in a placement, and service needs of children that have been victims of sexual abuse by an adult or child and/or those children that have been determined to be sexually aggressive."[60] The e-mail explained that staff were to take the new course once due/overdue to complete their annual child sexual aggression training. The refresher training "Preventing and Recognizing Youth Sexual Abuse for Staff Refresher 0003984" was to be taken annually thereafter.[61]

## Performance Validation

To determine compliance with Remedial Order 32, the Monitors analyzed data produced quarterly to the Monitors by DFPS and the SSCCs in Stage Two of Community-Based Care. The data includes staff identified by the agencies as responsible for making determinations regarding child-on-child sexual aggression, and therefore subject to training requirements, and their most recent date of child sexual aggression (CSA) training. For this report, the Monitors analyzed DFPS, OCOK, 2INgage, Saint Francis, and Belong data for the fourth quarter of the fiscal year 2023 and the first quarter of the fiscal year 2024, covering the period June 1, 2023, through November 30, 2023.[62] In addition to the quarterly data provided by DFPS, the Monitors analyzed course completion data for Course 3973, "Preventing and Recognizing Youth Sexual Abuse for Staff," as found in the DFPS Learning Station and course completion data

---

[56] E-mail from DFPS CPS Communications to DDL DFPS CPS ALL, re: New Child Sexual Aggression CBT, April 2, 2021 (on file with the Monitors).
[57] *Id.*
[58] *Id.*
[59] A limited roll-out of the training for DFPS staff occurred 8/15/2022.
[60] E-mail from DFPS CPS Communications to DDL DFPS CPS ALL, re: Preventing and Recognizing Youth Sexual Abuse for Staff, August 23, 2022 (on file with the Monitors).
[61] *Id.*
[62] The analysis is based on data as reported by DFPS, OCOK, 2INgage, St. Francis, and Belong which provides the latest CBT CSA training date completed but does not indicate the exact training module completed.

provided for Course 3805 "Child Sexual Aggression FY19 0003085" and Course 3984 "Staff Preventing and Recognizing SXAB Refresher 0003984".[63]

## Validation of DFPS Training Data

The State provides CSA training data to the Monitors quarterly for all DFPS staff working at least one day during the quarter in a decision-making role.[64] The data provided to validate the Remedial Order includes "Date in Current Position," "Job Title," "Job Code," "Date CBT Completed," and notes indicating case assignable status. The Monitors reviewed the training data provided by the State and identified inconsistencies in the data elements used to validate the Remedial Order. These inconsistencies were similar to findings noted in the Monitors' Sixth Report.[65] The Monitors met via telephone with DFPS staff members on March 1, 2024, to discuss data inconsistencies in the quarterly data and access CSA course completion data in the DFPS Learning Station. The Monitors provided written questions to DFPS before the meeting.[66]

DFPS provided written responses, including details on specific employee scenarios, to the Monitors on March 20, 2024.[67] The DFPS response highlighted state system data challenges and process changes that impact the Monitor's ability to validate the Remedial Order using the quarterly data provided by DFPS.[68]  As a result, the Monitors verified compliance with the Remedial Order using CSA course completion data as found in the DFPS Learning Station.[69]

---

[63] Initial access to the DFPS Learning Station was provided to the Monitors by DFPS on September 15, 2023. Data for Course 3805 and Course 3984 was not available in the DFPS Learning Station and was provided by DFPS on May 6, 2024.
[64] In Q4 FY 23, the file provided by DFPS included 3,966 decision-making staff; in Q1 FY23, the file included 4,094 decision-making staff.
[65] *See* Deborah Fowler & Kevin Ryan, Sixth Report of the Monitors, ECF 1380, at 40.
[66] Questions were provided to DFPS via e-mail on February 26, 2024. E-mail from Nancy Arrigona to Michael Hayman, Director of Project Management, DFPS, *et al*., RE: Access to DFPS Learning Station, (February 26, 2024)(on file with the Monitors). Questions included examples of staff found with data inconsistencies and the number of staff/records found for each type of inconsistency. Questions also included issues experienced when accessing CSA course information in the DFPS Learning Station.
[67] E-mail from Michael Hayman, Director of Project Management, DFPS to Nancy Arrigona, RE: Access to DFPS Learning Station, (March 20, 2024) (on file with the Monitors).
[68] System data challenges include "Date in Current Position" data that reflects an employee's earlier employment episode, not their current employment; "Most Recent Date of Hire" that reflects an employee's earlier employment episode; changes to job title or job code resulting from a promotion though the employee's date in position remains static; changes in date of current position resulting from a unit transfer with no change to job title/job code, trainee staff positions that are not included in the data. Process changes include changes to the staff positions considered to be "decision-making staff"; changes to the CSA courses that qualify as meeting the CSA training requirement, no requirement for staff returning to employment with DFPS to complete CSA training if they had completed a similar training during their prior employment; and allowing multiple sexual abuse/sexual aggression courses to meet the CSA training requirement.
[69] CSA course completion data for the following courses was used to verify the training requirement: "Child Sexual Aggression FY19 – Course 3805", "Staff Preventing and Recognizing Youth Sexual Abuse – Course 3973", and "Staff Preventing and Recognizing SXAB Refresher – Course 3984". CSA course completion data for Course 3973 was found in the DFPS Learning Station. CSA course completion data was provided for Course 3805 and 3984 by DFPS on May 6, 2024.

Most staff included in the quarterly data provided by DFPS were found to have completed one of the following CSA training courses: "Child Sexual Aggression FY19," "Preventing and Recognizing Youth Sexual Abuse for Staff," or "Staff Preventing and Recognizing SXAB Refresher." Almost 100% of staff in the fourth quarter of fiscal year 2023 (3,882 of 3,894) and the first quarter of fiscal year 2024 (4,000 of 4,023) had a certificate of completion for a CSA course found in DFPS Learning Station data.[70]

Figure 5: DFPS Decision-Making Staff with a Validated Child Sexual Aggression Training Date Found



The Monitors could not verify the CSA training of 35 DFPS staff. Seventeen DFPS staff had training dates in the quarterly data that did not match course completion data while 18 DFPS staff had no CSA training date in the quarterly file.[71]

## Validation of SSCC Training Data

The analysis included SSCCs in stage two of Community-Based Care during the fourth quarter of fiscal year 2023 and the first quarter of fiscal year 2024. Each quarter, the State

---

[70] Total number of staff includes only those staff who were case assignable during the quarter. In Q4 FY23, 72 staff included in the file were not case assignable; in Q1 FY24, 71 staff included in the file were not case assignable.

[71] Sixteen staff with a training date in the quarterly data provided by DFPS were not found in the Learning Station data. One staff person was found in the Learning Station data but the date of course completion did not match.

provides CSA training data to the Monitors for all SSCC staff working at least one day during the quarter in a decision-making role. Each SSCC delivers these data to DFPS.

The data used to validate the Remedial Order includes "Date in Current Position," "Job Title," "Job Code," "Date CBT Completed," and notes indicating case assignable status. Consistent with findings noted in the Monitors' Sixth Report,[72] the Monitors identified inconsistencies in the quarterly data used to validate the order for OCOK, 2INgage, and Belong. These data inconsistencies were discussed with DFPS staff members via telephone on March 1, 2024. Written questions, including the number of records and staff impacted, were provided to DFPS on March 13, 2024.[73]

DFPS responded, including details on specific employee scenarios, to the Monitors on April 12, 2024.[74] The DFPS response highlighted SSCC data challenges and quality assurance issues that impact the Monitor's ability to validate the Remedial Order using only the quarterly data provided.[75]   Data provided indicated that 76% (25 of 33) of 2INgage staff in Quarter 4, Fiscal Year 2023 and 82% (27 of 33) of 2INgage staff in Quarter 1, 2024 had a CSA training date; 100% of Belong staff (19 of 19 in Q4, FY23 and 18 of 18 in Q1, FY24) had a CSA training date; and 38% (13 of 34) of OCOK staff in Quarter 4, Fiscal Year 2023 and 3% (1 of 32) in Quarter 1, Fiscal Year 2024 had a CSA training date.[76] SSCC staff do not use the DFPS Learning Station to complete trainings; therefore, the monitoring team could not use course completion data from the Learning Station as an alternative method for validating compliance. Therefore, the Monitors could not validate the Remedial Order training requirement for OCOK, 2INgage, and Belong.

The data provided to DFPS by St. Francis was free of inconsistencies in the fourth quarter of fiscal year 2023 and the first quarter of fiscal year 2024. In each quarter, data provided indicate 100% (27 of 27 in both Q4 FY23 and Q1 FY24) of St Francis staff had completed CSA training, all during fiscal year 2023 or fiscal year 2024. These training dates could not be validated using CSA course completion data from the DFPS Learning Station.[77]

## Remedial Order 32 Summary

[72] *See* Deborah Fowler & Kevin Ryan, Sixth Report at 40.
[73] E-mail from Nancy Arrigona to Michael Hayman *et al.*, RE: Access to DFPS Learning Station (March 13, 2024)(on file with the monitors).  Questions included staff that were found with data inconsistencies and the number of staff/records found for each type of inconsistency. The original question document provided to DFPS was updated March 18, 2024, to correct inconsistencies attributed to St Francis in the document.
[74] E-mail from Michael Hayman, Director of Project Management, DFPS to Nancy Arrigona, RE: Access to DFPS Learning Station (April 12, 2024)(on file with the monitors).
[75] Data and quality assurance issues include the failure to include all decision-making staff working at least one day in the quarter in the data provided to the Monitors, data entry and "typographic" errors in training, position hire and agency hire dates, and hiring dates pulled from a data system that defaults to Sunday, the start of the agency's work week.
[76] For 2INgage and OCOK staff with no CSA training date provided in the quarterly data, notes included in the file indicated these staff had completed caregiver CSA training rather than the required caseworker CSA training.  These staff completed the correct casework CSA training or were no longer in a position requiring training after the end of the quarter and the analysis period.
[77] SSCC staff course completion data is not stored in the DFPS Learning Station and was not available to the Monitors.

The monitoring team identified the same problems with data inconsistencies in the quarterly data related to RO 32 reported in the Sixth Report but worked with DFPS to identify a method of validating course completion for DFPS staff using the DFPS Learning Station. Quarterly data for three SSCCs – OCOK, 2INgage, and Belong – shared similar inconsistencies and could not be used to validate CSA training. Quarterly data for St. Francis SSCC was free of these inconsistencies and showed that 100% of its staff had completed CSA training. The Monitors cannot validate compliance with RO 32 for SSCCs using course completion information from the DFPS Learning Station because it is not used in training SSCC staff.

<div style="background:#2e5496;color:white;font-weight:bold;padding:4px;">Remedial Order 4: Caseworker and Caregiver Training on Sexual Abuse</div>

*Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

## Background and Updates

Remedial Order 4 requires caseworkers and caregivers to complete training on recognizing and reporting child sexual abuse. For its caseworkers, the State[78] implemented the child sexual abuse training requirement in Remedial Order 4 by providing a Child Sexual Aggression course and through pre-service training for new caseworkers. Regarding the caregiver training requirement in Remedial Order 4, DFPS requires caregivers to complete an online training module through its Caregiver Training Hub and tracks caregivers' completion of the training through the Provider Portal; both online systems became operational in January 2022.[79]

According to DPFS's website, providers register all caregivers in the Provider Portal and ensure that all caregivers complete the required training in the Caregiver Training Hub.[80] DFPS provided the Monitors with its caregiver training completion data reports based on the training hub.[81] The Monitors' update on the data DFPS provided in this reporting period is below.

---

[78] This reference to the State refers to DFPS and the SSCCs—2Ingage, OCOK, St. Francis, and Belong—administering case management in their respective regions.
[79] DFPS, *Caregiver Training,* available at https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/Training. *See* Deborah Fowler & Kevin Ryan, Fourth Report, ECF No. 1248, at 35.
[80] *See* Deborah Fowler & Kevin Ryan, Fourth Report, at 35.
[81] In prior reporting, DFPS reported to the Monitors that it was working to provide a comprehensive list of all caregivers in its reporting for this area of Remedial Order 4 and that its new technology would allow it to do so. *See* Deborah Fowler & Kevin Ryan, Fourth Report, at 35; E-mail from Michelle Mattalino, former Director of Project Management, DFPS, to Kevin Ryan, Deborah Fowler, and Timothy Ross (November 10, 2021).

## Caseworker Training Performance Validation Results

The Monitors determined that between June 1, 2023, and November 30, 2023, 2,159 case-carrying caseworkers were listed in the caseload data. Of those workers, 97.8% (2,112) completed the child sexual abuse training.[82] In the previous reporting period, 100% of caseworkers completed the training.[83]

Table 15: Child Sexual Abuse Training Completion by Caseworker Type, June 1, 2023 to November 30, 2023[84],[85]

| Caseworker Type | Child Sexual Abuse Training Completion | | Total Caseworkers | Percent Compliant |
|---|---|---|---|---|
| | Completed | Not Completed | | |
| DFPS CVS[86] | 1,790 | 0 | 1,790 | 100.0% |

---

[82] The Monitors used the following data submissions received in this reporting period to validate caseworker training: DFPS, *RO4_DFPS_Caseworker_Training_FY23Q4d2023_10_02_log110209* (October 2, 2023); DFPS, *RO4_DFPS_Caseworker_Training_FY24Q1d2024_01_02_log110988* (January 2, 2024); DFPS, *RO4_OCOKPermSpecTraining_FY23Q4* (October 2, 2023); DFPS, *RO4_OCOKPermSpecTraining_FY24Q1* (January 2, 2024); DFPS, *RO4_2INgagePermSpecTraining_FY23Q4* (October 2, 2023); DFPS, *RO4_2INgagePermSpecTraining_FY24Q1* (January 2, 2024); DFPS, *RO4_StFrancisPermSpecTraining_FY23Q4* (October 2, 2023); DFPS, *RO4_StFrancisPermSpecTraining_FY24Q1* (January 2, 2024); DFPS, *RO4_BelongPermSpecTraining_FY23Q4* (October 2, 2023); DFPS, *RO4_BelongPermSpecTraining_FY24Q1* (January 2, 2024). At the State's request, the Monitors also used revised versions of the relevant quarterly report data submissions that the State subsequently submitted in February 2024.

[83] *See* Deborah Fowler & Kevin Ryan, Sixth Report, at 42.

[84] In response to a draft of this report provided to the parties in advance, the State reported to the Monitors, "This chart reports fourteen OCOK staff had not completed the child sexual abuse training. OCOK reported to DFPS that five of those fourteen staff were out on Family Medical Leave Act leave and were unable to complete any training."

[85] In response to a draft of this report provided to the parties in advance, the State reported to the Monitors, "DFPS data reflect that, of the thirty-three 2INgage caseworkers found noncompliant by the Monitors, thirteen were not eligible to take the caseworker training because they were not case assignable or did not have any PMC/TMC youth on their caseload." The State's comment does not change the Monitors' findings presented in the chart. The Monitors excluded the 13 caseworkers from their analysis who were not case assignable or did not have any PMC/TMC youth on their caseload. As such, these caseworkers were not included in the 33 2INgage caseworkers the Monitors reported as noncompliant.

[86] Compliance was calculated for all 1,790 DFPS CVS caseworkers listed in the DFPS caseload data who carried at least one case between June 1, 2023 and November 30, 2023 and who had one of the following job titles in the caseload data: CPS CVS SPEC I - 5023X, CPS CVS SPEC II - 5024X, CPS CVS SPEC III - 5025X, CPS CVS SPEC IV - 5026X, CPS CVS SPEC V - 5027X, CPS CVS SPECIALIST V - 1574CX, CPS CVS Spec I, CPS CVS Spec II, CPS CVS Spec III, CPS CVS Spec IV, CPS CVS Spec V, or CPS CVS Specialist V. The use of these job titles is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

| | | | | |
|---|---|---|---|---|
| OCOK[87] | 111 | 14 | 125 | 88.8%[88] |
| 2INgage[89] | 54 | 33 | 87 | 62.1%[90] |
| St. Francis[91] | 101 | 0 | 101 | 100.0% |
| Belong[92] | 56 | 0 | 56 | 100.0% |
| **Total** | **2,112** | **47** | **2,159** | **97.8%** |

The monitoring team compared the caseworkers listed in the data report provided by the State with caseloads for DFPS, OCOK, 2INgage, St. Francis, and Belong caseworkers between June 2023 and November 2023 with the list of all caseworkers in the data provided by the State regarding completion of child sexual abuse training. Using the corresponding caseload files, the Monitors matched all DFPS, OCOK, Belong, and St. Francis caseworkers found in the caseload reports with the training reports; two 2INgage caseworkers were listed in the caseload reports but not the training reports.

Finally, the Monitors interviewed a random sample of 262 caseworkers between February 2023 and December 2023 to further verify caseworker completion of sexual

---

[87] Compliance was calculated for all 125 OCOK caseworkers listed in the OCOK caseload data who carried at least one case between June 1, 2023, and November 30, 2023, and who had one of the following job titles in the caseload data: "OCOKPS - OCOK Permanency Speclst,""OCOK Permanency Speclst", or "OCOK Local Permanency Spe." The use of these job titles is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[88] Of the 125 OCOK caseworkers, according to the State, 113 initially mistakenly completed the training for caregivers (but not for caseworkers) during the relevant time period. However, OCOK confirmed completion dates of the correct training by 99 of those caseworkers after November 30, 2023 in its data; 14 caseworkers did not take the correct training before they were terminated, transferred, or went on leave. The Monitors are reporting the 99 caseworkers with delayed training as compliant due to the subsequent documented completion of the training.

[89] The Monitors calculated compliance for all 87 2INgage caseworkers listed in the 2INgage caseload data who carried at least one case between June 1, 2023 and November 30, 2023 and who had one of the following job titles in the caseload data: "PCM", "Permanency Case Manager", "Intake Placement Specialist", "Intake and Placement Specialist I", "Intake and Placement Specialist II", "Intake and Placement Specialist 1", "Intake & Placement Specialist", or "Intake and Placment Spec." The use of these job titles is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[90] Of the 2INgage caseworkers, according to the State, 31 of 33 without a completed training date mistakenly took the caregiver training instead the caseworker training; the State requested, and the Monitors allowed for additional time to submit documentation in light of the issue. The Monitors then considered all data reports and revised data reports submitted by the State regarding training completion; however, the State's documentation did not confirm training completion for those caseworkers.

[91] Compliance was calculated for all 101 St. Francis caseworkers listed in the St. Francis caseload data who carried at least one case between June 1, 2023, and November 30, 2023, and who had the following job title in the caseload data: "Permanency Specialist". The use of this job title is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[92] Compliance was calculated for all 56 Belong caseworkers listed in the Belong caseload data who carried at least one case between June 1, 2023 and November 30, 2023, and who had the following job title in the caseload data: "Permanency Specialist". The use of this job title is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

abuse training. During individual interviews, all 262 (100%) caseworkers reported having completed training about child sexual abuse.[93]

## Caregiver Child Sexual Abuse Training

As described in the Monitors' prior reporting, the State has been unable to produce a comprehensive list of all caregivers; therefore, the Monitors have been unable to validate the State's performance in this area. DFPS used its Provider Portal to produce quarterly data files that included all individuals registered in the Portal and were active from January 1, 2023, through November 30, 2023, a total of 66,584 unique individuals.[94] The data included a list of caregivers who completed the child sexual abuse training, a total of 54,079 (81.2%) from January 1, 2023, through November 30, 2023; the remaining caregivers listed had no course completion information provided (12,505 or 18.8%). The Monitors cannot determine whether the data included an exhaustive list of all caregivers.

As previously reported, the monitoring team requested that DFPS provide a list of all active caregivers and a unique identifier for each caregiver listed in its quarterly data report (derived from the Provider Portal); DFPS could not fulfill the request.[95, 96]

During this reporting period, the Court ordered the State to "provide to the Monitors a complete list of all PMC children, with their caregivers and the caregivers' addresses, based on a date selected by the Defendants from the last three months" by November 29, 2023.[97] In response, on November 29, 2023, the State first provided the Monitors with a data report that, according to DFPS, represented all caregivers and "course completion dates" for some, but not all, caregivers; the State then explained it was still "working to complete and validate" the dates at the time.[98]

---

[93] In addition, each caseworker provided the dates on which they completed the child sexual abuse trainings. Of these 262 caseworkers, 97% provided the same date for completion of the computer-based component on child sexual aggression in their interview as was documented in the data file produced by the State for RO 4 training completion.

[94] DFPS, *RO4_ExternalLMS_Caregiver_Trng_FY23Q4d2023_10_02_log110207* (October 2, 2023); DFPS, *RO4_ExternalLMS_Caregiver_Trng_FY24Q1d2024_01_02_log110956* (January 2, 2024).

[95] E-mail from Michelle Mattalino to Kevin Ryan, Deborah Fowler, and Timothy Ross (November 10, 2021) (explaining that DFPS does not have its own list of all active caregivers); E-mail from Valarie Campbell to Jill Lefkowitz, Monitoring Team (January 24, 2023) (confirming that DFPS was not able to provide unique identifiers for caregivers that would allow for cross referencing between relevant data reports).

[96] The data reports do not include a unique caregiver identification number that would allow the Monitors to cross reference between the DFPS data reports listing caregiver training completion and those listing child placement location; while such an identifier would not permit validation of all caregivers, if the Monitors received matching unique identifiers for foster parents in both data reports, it would, for example, allow the Monitors to partially verify compliance with Remedial Order 4 with respect to caregivers in foster homes caring for PMC children.

[97] Order, ECF No. 1439.

[98] E-mails from Michael Hayman, Director of Project Management, DFPS, to Kevin Ryan (November 30, 2023 and November 30, 2023).

Moreover, on November 30, 2023, the State produced a revised version of the data report, removing all course completion dates. On December 3, 2023, the State explained that it had removed the dates because they were "incomplete and unvalidated" and stated that it would share the results once it had completed and validated the relevant data.[99]

During a December 4, 2023 hearing, the Court instructed the State to validate the course completion dates and provide the updated information, which the State has not yet submitted.[100] The Monitors remain unable to validate the State's performance in this area.

When the monitoring team visits GROs, the team reviews staff records and documents whether the records include information indicating the staff completed the required CSA training. During site visits to 12 congregate care operations in 2023, 205 employee files were reviewed.[101] The file review included records for 156 caregiver staff, 19 caregiver supervisors, five unit managers, four case managers, 12 treatment staff or directors, three program administrators or directors, one medical technician, two program managers, one Human Resources manager, a contracted consultant, and one maintenance staff. In addition, operation staff were asked about the completion of CSA training during on-site interviews.

The monitoring team found 37 of 203 employee files (18%)[102] did not have documentation showing the employee completed the required CSA training (no training certificate located in the file) while 166 of 203 (82%) did have CSA training completion documentation. Employee files without CSA completion documentation on file included

---

[99] E-mail from Michael Hayman to Kevin Ryan (December 3, 2023).
[100] Show Cause Hr'g Tr. 92:23 (December 4, 2023), ECF No. 1487.
[101] Two of the 205 employee file reviews do not have responses to questions on training.
[102] In their comments to the draft of this report, the State said, "The system of record for caregiver training is the Provider Portal. DFPS does not require providers to maintain a copy of the certificate in the employee's personnel file. Based on a review of the records in the Provider Portal, 25 of the 37 caregivers identified by the monitoring team as lacking documentation had completed the training and their documentation was in the Provider Portal at the time of the monitoring team's verification."

Until March 15, 2023, DFPS contractually required operations to maintain documentation of CSA training in caregiver's employee files. DFPS, Addenda to the 24-hour Residential Child Care Requirements, at 70 (Addendum #3, effective January 6, 2020, required the contractor to maintain a copy of the certificate of completion for caregiver child sexual abuse training). After receiving this comment, the Monitors discovered that DFPS amended their contractual language to eliminate this requirement. *Id.* at 20-21 (Addendum #18, effective March 15, 2023, removed the requirement). Of the 37 staff whose files did not include documentation, 21 were reviewed during site visits that occurred prior to March 15, 2023.

The Monitors do not have access to the Provider Portal. As a result of the State's comment, the monitoring team reviewed the quarterly CSA Provider Portal training data provided to the Monitors for the quarter closest to the date of the site visit and could find a CSA training date for 23 of the 37 caregivers whose files were reviewed. Of the 16 staff whose files were reviewed during site visits that took place after DFPS amended its contractual language, the monitoring team could find a training completion date in the quarterly data for only seven.

32 caregiver staff, a caregiver supervisor, a unit manager, one treatment staff, a program manager, and a program administrator. The monitoring team found 33 of 203 employee files (16%) did not have documentation on file showing the employee completed the required abuse/neglect training and another 38 of 203 employee files (19%) documented the abuse/neglect training was not completed in the last 12 months. Nine of 203 employee files (4%) lacked documentation of completion for both CSA and abuse/neglect training while 110 of 203 employee files (54%) contained documentation of completion for both abuse/neglect training within the past year and CSA.

During interviews with staff, 110 of 119 direct care staff (92%) reported having completed training on Child Sexual Aggression, two of 119 (2%) reported not having completed CSA training, and seven of 119 (6%) did not know whether they had completed CSA training. The monitoring team found documentation of CSA completion in three of the seven (43%) files for employees who did not know whether they had completed CSA training. All 13 program administrators (100%) and 13 of 14 (93%) case managers and other care staff reported having completed training on CSA.

## Summary of Caseworker and Caregiver Sexual Abuse Training Performance Validation

DFPS's data shows that 97.8% of caseworkers who carried at least one case from June 1, 2023, to November 30, 2023, completed the training required by Remedial Order 4, regardless of where they were employed.

A random sample of 262 caseworkers interviewed by the monitoring team between February 2023 and December 2023 resulted in all 262 caseworkers confirming their completion of child sexual abuse training.

The Monitors cannot validate that all or most caregivers completed the child sexual abuse training required by Remedial Order 4 based on the current submissions from DFPS.

During site visits, the monitoring team found 37 of 203 (18%) staff records did not include documentation showing staff had completed the required CSA training. Seven of 119 staff (6%) who were interviewed did not know whether they had completed the training, and two (2%) said they had not completed CSA training. Of the 119 direct care staff who were interviewed, 110 (92%) reported having completed CSA training, two (2%) said they had not completed the training, and seven (6%) said they did not know whether they had completed CSA training.

During site visits, the monitoring team found 37 of 203 (18%) staff records did not include documentation showing staff had completed the required CSA training. Seven of 119 staff (6%) who were interviewed did not know whether they had completed the training, and two (2%) said they had not completed CSA training.

**Remedial Order 23***: Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order 24:** *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order 28:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order 30:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

**Performance Validation: Case Record Review for Children Identified with an Indicator of Victim of Sexual Abuse or with an Indicator for Sexual Aggression**

The Monitors' First Report validated the State's compliance with Remedial Orders 23 and 28, requiring the creation of profile characteristics in IMPACT that would allow DFPS to document a child's history of sexual abuse or an indicator for sexual aggression.[103] To validate the State's performance regarding Remedial Orders 24 and 30, the Monitors conducted a case read for a random sample of 787 children who were in PMC in either August 2023 or November 2023 and who had an indicator for confirmed sexual abuse or sexual aggression.[104] The monitoring team reviewed children's IMPACT records, including the child's sexual incident history page and Attachment A, to identify the timing and details of the child's confirmed sexual abuse or sexual aggression incident.

Seventy-eight percent of PMC children sampled (611 of 787) were confirmed victims of sexual abuse, while 32% of children had an indicator for sexual aggression (255 of 787).[105] Ten percent of PMC children sampled had both experienced sexual abuse and engaged in sexual aggression (79 of 787). In addition to confirmed abuse and aggression, children sampled also had unconfirmed abuse and aggression documented

---

[103] *See* Deborah Fowler & Kevin Ryan, First Report 216 ECF No. 869.
[104] The sample included 533 PMC children who were identified as confirmed victims of sexual abuse, and 254 children identified with an indicator for sexual aggression. The Monitors used the State provided "sexual victimization history" indicator and the "child sexual aggression" indicator to identify children included in the sample for the case read.
[105] Children that were both confirmed victims of sexual abuse and had an indicator for sexual aggression were counted in both categories.

on their sexual incident history page in IMPACT. Thirty-two percent of children sampled (251 of 787) had unconfirmed abuse documented on the sexual incident history page in IMPACT, while 6% (45 of 787) had instances of aggression documented that did not result in an indicator for sexual aggression.

Figure 6: PMC Children with Confirmed Sexual Abuse or Sexual Aggression by Type of Indicator



Source: IMPACT Sexual History case review data
n = 787

## Sexual Abuse in Care

The case record review conducted by the Monitors reviewed child sexual history records to determine how many of the 611 PMC children identified with a sexual abuse indicator had incidents of abuse that occurred while the child was in foster care. Over one-fourth (157 of 611 or 26%) of PMC children identified as victims of sexual abuse suffered abuse

that occurred after the child entered foster care.[106] Of the children who were sexually abused while in care, 71% (112 of 157) suffered sexual abuse only after entering foster care; the remaining 29% (45 of 157) were sexually abused both before and after entering foster care. Sexual history IMPACT records may also document instances of unconfirmed sexual abuse.[107] Seven percent of children (31 of 454) who had a confirmed history of sexual abuse before entering foster care also had a history of unconfirmed abuse after entering foster care documented in their IMPACT record.

Figure 7: Timing of Sexual Abuse, PMC Children with Confirmed Sexual Abuse



Source: PMC Children IMPACT Sexual History Case Data
n=611

- Abuse prior to entering care only
- Abuse after entering care only
- Abuse prior to and after entering care

Note: Percentages may not add to 100% due to rounding

The 157 PMC children who were sexually abused after entering foster care had a total of 255 sexual abuse incidents in care documented on their sexual incident history page in IMPACT. Sixty-eight percent (107 of 157) of these children experienced one sexual abuse incident after entering foster care;[108] 32% (50 of 157) experienced two or more sexual

---

[106] This finding is consistent with the findings reported in the Monitors' Sixth Report, which concluded that 24% of PMC children included in the case record review who were identified as victims of sexual abuse had suffered an incident of abuse after entering foster care. Deborah Fowler & Kevin Ryan, Sixth Report, at 47. Children identified as victims of sexual abuse include children sampled for review with indicators of sexual abuse and indicators of sexual aggression. Seventy-eight children sampled with a sexual aggression flag had a confirmed history of sexual abuse.

[107] The Sexual Incident History page in IMPACT includes a box titled "Any other relevant information regarding previous unconfirmed findings that may impact the child" where the caseworker may enter additional information about the child's sexual history including unconfirmed abuse or aggression and incidents that have been removed from the child's confirmed sexual history.

[108] The number of incidents is based on those documented in the child's Attachment A and IMPACT sexual incident history page. If the narrative clearly described multiple incidents of sexual aggression, each incident was counted. The information documenting an incident of sexual abuse on a child's sexual incident history page may indicate that the child was abused more than once or over a period of time but

abuse incidents after entering foster care. Four children had suffered six or more incidents of sexual abuse after entering foster care, documented in IMPACT.[109]  When the sexual history narrative described abuse that occurred more than once but did not include the number of times the abuse occurred, the monitoring team considered the abuse to be a single incident that occurred "over time."  Of the children whose IMPACT record documented one confirmed incident of sexual abuse after entering care, the sexual abuse for 58% (62 of 107) had occurred over time.

Figure 8: Number of Incidents of Sexual Abuse While in Care, PMC Children with Confirmed Sexual Abuse in Care



Source: IMPACT Sexual History case review data
n = 157

PMC children who experienced sexual abuse while in care were most often placed in a congregate care setting (GRO or RTC) (36% or 91 of 255), foster home (21% or 53 of 255), or CWOP setting (18% or 45 of 255) at the time the abuse occurred.[110]

Figure 9: Child's Placement Type at the Time Abuse in Care Incident Occurred

---

may not include the number of incidents of abuse that occurred. This may occur because the child is not able to quantify the number of times abuse occurred or provide information about when the abuse occurred. This may also result when the child's abuse narrative lacks the detail needed to determine the number of incidents of abuse that occurred.

[109] One child had 6 incidents of sexual abuse while in care documented in IMPACT, one child had 8 incidents, and two children had 10 incidents of sexual abuse while in care documented.

[110] If the abuse incident occurred while the child was on runaway, the last placement prior to the runaway was considered to be the child's placement type.



Source: IMPACT Sexual History case review data
n=255

Most foster children who were sexually abused after entering care were abused while they were away from their placement (53% or 135 of 255) rather than at their placement (42% or 107 of 255).[111] Many incidents occurred while children were on runaway status: Over three-quarters of abuse in care incidents for children placed in a CWOP Setting (87% or 39 of 45) or unauthorized placements (78% or 7 of 9), and over half of abuse in care incidents for children placed in a GRO or RTC (59% or 54 of 91), occurred while the child was on runaway status.

Figure 10: Location of Abuse for Children Placed in a GRO/RTC, Foster Home, or CWOP at Time of Abuse in Care

___

[111] Thirteen of 255 abuse in care incidents occurred at locations other than while the child was on runaway or at their own placement. Eight incidents occurred during a visit and five occurred at an unknown or "other" location.



Source: IMPACT Sexual History case review data
n=225

Of the 255 incidents of sexual abuse that occurred after the child entered foster care, 67% (171 of 255) occurred over time.[112] Incidents that occurred over time most often occurred while the child was on runaway from their placement and involved sex trafficking and perpetrator(s) that were adults not associated with the child's placement.

Figure 11: Incidents of Sexual Abuse in Care Occurring Over Time

|  | Incident Not Over Time n=84 | Incident Over Time n=171 |
|---|---|---|
| Placement Type |  |  |
| GRO/RTC | 36% (30) | 36% (61) |
| Foster Home | 24% (20) | 19% (33) |
| CWOP | 12% (10) | 21% (35) |
| Location |  |  |
| Runaway | 16% (13) | 71% (122) |
| Child's Placement | 75% (63) | 26% (44) |

---

[112] The information documenting an incident of sexual abuse on a child's sexual incident history page may indicate that the child was abused more than once or over a period of time but may not include the number of incidents of abuse that occurred. When the sexual history narrative describing the incident indicated that abuse occurred more than once but did not include the number of times the abuse occurred, the monitoring team considered the abuse to be a single incident that occurred "over time."

| Trafficking | | |
|---|---|---|
| Yes | 8% (7) | 70% (120) |
| Perpetrator | | |
| Child in Care | 48% (40) | 14% (24) |
| Adult not Associated | 21% (18) | 70% (119) |

Three hundred and eighty-nine perpetrators were involved in the 255 confirmed incidents of sexual abuse that the PMC children in the sample experienced while in care.[113] Most perpetrators (68% or 264 of 389) were adults not associated with the child's placement.[114] Although incidents of abuse most often involved a single perpetrator, the number of perpetrators associated with a single incident of abuse ranged from one to eight.

Figure 12: Perpetrators Identified in Sexual Abuse Incidents Occurring While in Care for PMC Children with Confirmed Sexual Abuse in Care



Source: IMPACT Sexual History case review data
n = 389

---

[113] Based on information included in the description of the incident on the child's sexual history or trafficking history page in IMPACT. In instances where the number of perpetrators was unknow, the monitoring team considered there to be one perpetrator associated with the abuse. For incidents related to sex trafficking, the number of perpetrators represents the traffickers of the child, not the number of persons having sexual contact with the child during the trafficking episode.
[114] The 264 perpetrators that were adults not associated with the child's placement were involved in 143 sexual abuse incidents.

Incidents where a child was sexually abused by an adult not associated with the child's placement almost always occurred when the child was on runaway from their placement (87% of incidents with abuse by adults not related to placement or 124 of 143) and involved sex trafficking (85% of incidents with abuse by adults not associated or 121 of 143).

Most sexual abuse incidents involving a perpetrator who was a child in DFPS care occurred at the children's (victim and aggressor) placement (80%, or 51 of 64)[115] or while the abuse victim was on runaway (19%, or 12 of 64). Thirteen percent of incidents where the perpetrator was a child in DFPS care (8 of 64) involved abuse of a sibling.[116]

## Sexual Abuse Incidents While in Care that Occurred while on Runaway

Almost half of all PMC children in the sample who suffered an incident of sexual abuse in care (43% or 67 of 157) experienced abuse after running away from their placement. These 67 PMC children experienced 135 incidents of sexual abuse while on runaway, with more than half of these children (51% or 34 of 37) experiencing two or more instances of abuse while on runaway.[117]  For PMC children in the sample who suffered sexual abuse while on runaway, the number of incidents that occurred while on runaway ranged from one to ten.

Figure 13: Number of Incidents of Sexual Abuse in Care While on Runaway, PMC Children with Confirmed Sexual Abuse

---

[115] No sexual abuse incidents in care involved more than one child in care as the aggressor.
[116] All incidents where a PMC child was abused by a sibling in care occurred at the child's placement. Siblings include biological siblings and siblings by family association. Foster siblings were not considered to be siblings for this analysis.
[117] For 87% of children with abuse during a runaway (58 of 67), 100% of their abuse in care occurred while on runaway.



Source: Children with Abuse in Care During Runaway, IMPACT Sexual History case review data
n = 67

Abuse Incidents During Runaway

■ One   ■ Two   ■ Three or more

Incidents of abuse that occurred while the child was on runaway most often occurred after the child had run away from a CWOP setting (29% of 39 of 135), a GRO (21% or 28 of 135), or an RTC (19% or 26 of 135). The 135 incidents of abuse that occurred while a child was on runaway status involved 263 perpetrators, 92% (242 of 263) of which were adults not associated with the child's placement.[118]  Ninety percent (122 of 135) of abuse incidents that occurred while a child was on runaway status involved sex trafficking and abuse that occurred over time.

Almost all abuse in-care incidents related to sex trafficking occurred while the child was on runaway status. Ninety-six percent of incidents related to trafficking (122 of 127) involved a child on runaway and 95% of children trafficked (61 of 64) were on runaway status at the time they were trafficked.

---

[118] The perpetrator associated with abuse during a runaway included one caregiver, four adults associated with the child's placement, three non-DFPS children associated with the child's placement, 12 DFPS children in care and one unknown perpetrator.

## Figure 14: Trafficking Incidents for PMC Children in Care, Location at the Time of Abuse

Source: Abuse in Care Incidents Involving Trafficking,
IMPACT Sexual History case review data
n=127



- ■ Trafficked while on Runaway
- ■ Trafficked while Not on Runaway

### Sexual Abuse Incidents While in Care that Occurred in Child's Placement

Forty-two percent (107 of 255) of incidents involving abuse in care occurred at the child's placement. These incidents most often took place at a foster home (29% or 31 of 107), a kinship placement (20% or 21 of 107), an RTC (18% or 19 of 107), or a GRO (14% or 15 of 107).

The 107 abuse incidents occurring at a PMC child's placement involved 113 perpetrators, 45% (51 of 113) of which were other children in DFPS care.[119] Thirty-five percent of perpetrators in incidents occurring at a child's placement were adults associated with the child's placement[120] (40 of 113), while 10% (11 of 113) were children associated with the placement but not in DFPS care.[121] Most abuse incidents (59% or 63 of 107) that occurred at a child's placement involved a single episode of abuse and did not take place over time.

---

[119] Eight perpetrators who were children in DFPS care (7% of 113) were also the victim's sibling. All incidents of child-on-child sibling abuse occurred at the child's placement.
[120] Perpetrators associated with the child's placement included the child's foster parent (12 or 10%), a caregiver (9 or 8%), or an adult associated with the placement (19 or 17%).
[121] The remaining 10% (11 of 113) of perpetrators in incidents occurring at a child's placement were adults not associated with the placement.

## Sexual Abuse Incidents While in Care that Involved a Child in DFPS Care as Perpetrator

Of the 157 PMC children included in the case review sample who suffered sexual abuse after entering foster care, 50 (32%) were sexually abused by another foster child. These 50 children suffered 64 instances of child-on-child sexual abuse. PMC children abused by another child in care experienced one to four incidents of confirmed child-on-child abuse. Five children (10% of 50) were abused by more than one child in care in separate incidents.[122]

Incidents of child-on-child abuse most often occurred while the child was placed in a foster home (30% or 19 of 64), GRO (30% or 19 or 64), RTC (22% or 14 of 64), or in a CWOP setting (14% or 9 of 64).[123]  Eighty percent (51 of 64) of abuse incidents involving another child in DFPS care occurred at the child's placement, while 19% (12 of 64) occurred while the child was on runaway.[124]

The monitoring team reviewed the IMPACT sexual incident history page and Attachment A for the child identified as the aggressor in an incident of child-on-child abuse and compared the information found on the aggressor's page to that found on the history page of the victim. No information was found on the aggressor's Sexual Incident History page in 10% of incidents (6 of 64). This is an improvement from the case review conducted in 2022 when 17% of child-on-child incidents were not found on the child aggressor's page in IMPACT.

---

[122] A total of nine children were sexually abused more than once by another foster child. Five children (10% of 50) were abused multiple times by the same child in care. One child had four incidents of sexual abuse by two different foster children. This child is included in the count of children experiencing abuse multiple times by the same foster child and the count of children experiencing abuse by multiple different foster children.

[123] An additional two incidents of DFPS child-on-child abuse occurred in a kinship setting and one occurred in an institution.

[124] One incident occurred while the children were in the operation's van.

## Figure 15: Sexual Abuse Incident Documented in DFPS Child Aggressor's Sexual Incident History



Source: IMPACT Sexual History case review data
n=64

- Information Consistent
- Information Not Consistent
- No Information

In 20% (13 of 64) of incidents where a PMC child in the sample was abused by another child in DFPS care, the information found in the IMPACT records for the child who was identified as the aggressor was not consistent with that found in the victim's IMPACT records. Inconsistencies included different dates for the incident; differences in the level of detail and incident description in the narrative; differences in the timeline and extent of the abuse; and one case where the description of the incident was similar, but the aggressor was identified as a victim rather than aggressor on their IMPACT history page.

## Sexual Aggression in Care

Of the 255 PMC children with an indicator for sexual aggression included in the case record review,[125] over half (52% or 133 of 255) had an incident of aggression after entering foster care. Of those, 77% (102 of 133) had incidents of sexual aggression only while in foster care; 23% (31 of 133) had incidents of sexual aggression both while in and not in care. Forty-eight percent (122 of 255) of PMC children in the sample who had an

---

[125] One child with confirmed sexual aggression had only an abuse flag at the time the sample was pulled. The incident occurred prior to November 2023 but was not included on the child's history page until 2024.

indicator for sexual aggression had incidents of aggression only while not in care. The sexual incident history page in IMPACT also documented unconfirmed aggression for[126] 36 of the PMC children (14% of 255) included in the sample.

Figure 16: Timing of Sexual Aggression for PMC Children with Sexual Aggression



Source: IMPACT Sexual History case review data
n=255



- Aggression while Not in Care only
- Aggression while in Care only
- Aggression while in and Not in Care

The 133 children included in the sample who had an indicator for sexual aggression related to an incident that occurred after the child entered foster care engaged in 211 incidents of sexual aggression while in foster care. Sixty-three percent (84 of 133) had one incident of aggression; 37% (49 of 133) had two or more incidents[127] of sexual aggression while in care. The 49 PMC children in the sample whose IMPACT records documented multiple incidents of sexual aggression had engaged in 127 incidents of aggression as of the date of the case record review. Five children had five or more

---

[126] Unconfirmed aggression incidents are those incidents noted on the child's sexual incident history page in the "Additional Relevant Information" section.
[127] The number of incidents is based on those documented in the child's Attachment A and IMPACT Sexual Incident History page. If the narrative clearly described multiple incidents of sexual aggression, each incident was counted. The information documenting an incident of sexual aggression on a child's sexual history incident page may indicate that the child engaged in aggression more than once, or over a period of time, but may not include the number of incidences of aggression that occurred. When the sexual history narrative describing the incident indicated that aggression occurred more than once but did not include the number of times the aggression occurred, the monitoring team considered the aggression to be a single incident that occurred "over time."

incidents of sexual aggression while in care documented in IMPACT.[128] Of the children in the sample who had one incident of sexual aggression in care, 42% (35 of 84) had an aggression incident that occurred over time.

Figure 17: Number of Sexual Aggression Incidents While in Care, PMC Children with Confirmed Sexual Aggression in Care



Source: IMPACT Sexual History case review data
n = 133

Incidents of sexual aggression in care most often occurred in a foster home (42% or 89 of 211), a GRO or RTC (22% or 47 of 211), or a kinship placement (18% or 38 of 211).[129]

---

[128] Two children had five incidents of sexual aggression while in care documented in IMPACT, one child had six incidents, one child had seven incidents, and one child had 8 incidents of sexual aggression while in care documented.

[129] Aggression incidents in "Other" placements occurred while the child was placed in an adoptive home (1) or an unauthorized placement (2) If a child was on runaway at the time the aggression incident occurred, the child's last placement before running away was considered to be the placement type.



## Figure 18: PMC Child's Placement at the Time of Aggression in Care

Source: IMPACT Sexual History case review data
n=211



Unlike sexual abuse incidents, which occurred most often when the child was on runaway status, sexual aggression incidents in foster care most often occurred at the child's placement. Eighty-seven percent (183 of 211) of all sexual aggression incidents in care occurred at the child's placement.[130]  Close to half of sexual aggression incidents occurring at a child's placement (41% or 75 of 183) occurred over time. A quarter of these incidents (46 of 183) involved the sexual aggression of a sibling.[131]

Of the 211 incidents of sexual aggression that occurred in care, 37% (79 of 211) occurred over time. Aggression in care incidents that occurred over time were more likely to involve the child's sibling. Thirty-seven percent of aggression incidents occurring over time involved a child's sibling (29 of 79) compared to 19% (25 of 132) of incidents that did not occur over time.

---

[130] The remaining incidents of sexual aggression in care occurred during a visit (8 or 4%), while at school (7 or 3%), while on runaway (4 or 2%), or in an "other" or unknown location (9 or 4%).
[131] Siblings include biological siblings and siblings by family association. Foster siblings were not considered to be siblings for this analysis.



Figure 19: Percent of Sexual Aggression Incidents in Care Occurring Over Time

Source: IMPACT Sexual History case review data
n = 211



■ Occurred Over Time
■ Did Not Occur Over Time

The 133 children in the sample who engaged in sexual aggression while in care had a total of 222 victims. Nearly two-thirds (138 of 222 or 62%) of the victims were other foster children. In 35% (78 of 222) of incidents of sexual aggression in care, the victim was a child associated with the placement but who was not in DFPS care.[132]

---

[132] Two caseworkers and three adults associated with the child's placement were victims of sexual aggression while the child was in care. One additional adult not associated with the child's placement was also a victim of sexual aggression. This adult not associated was staff at the child's school.



Source: IMPACT Sexual History case review data
n = 222

Ninety-one PMC children in the sample were found to have engaged in sexual aggression against 138 other children in foster care. More than a quarter of these children (26% or 24 of 91) were found to have been aggressive toward multiple children in care; ten percent (9 of 91) were found to have been aggressive toward the same child on multiple occasions.[133]

The monitoring team reviewed the victim's IMPACT Sexual Incident History page for incidents in which the victim could be identified from the information included in the IMPACT records for the child who had an indicator for aggression.[134] Of the 129 incidents where identifying information for the victim was found, no information was found about the incident on the victim's IMPACT sexual incident history page for five percent of incidents (6 of 129). Consistent information was found on the victim's and aggressor's sexual incident history page in 84% (108 of 129) of incidents;[135] and in 11% (15 of 129) of incidents, the information included on the IMPACT sexual incident history page of the victim was inconsistent with the information found on the aggressor's page. Inconsistencies included different incident dates on the victim and aggressor pages and other details and descriptions of the aggression incidents.

---

[133] Children found to be sexually aggression toward another child in care had between one and four victims that were also children in care.

[134] The narrative in the PMC child's Sexual Incident History page included identifying information for the victim in 129 of 138 incidents.

[135] This is consistent with the findings in Report 6 where 83% of the incident information found on the victim's sexual incident history page matched the information found on the sexual aggressor's page.

## Figure 21:  Sexual Aggression Incident Documented in DFPS Child Victim's Sexual Incident History



Source: IMPACT Sexual History case review data
n = 129

- Information Consistent
- Information Not Consistent
- No Information

### Children Experiencing Both Sexual Abuse and Sexual Aggression in Care

Thirty-four percent (270 of 787) of all PMC children identified with a sexual characteristic indicator and sampled for the case read review had incidents of abuse or aggression that occurred while the child was in foster care.[136]  Twenty PMC children (7% of 270) sampled for the review had indicators related to both sexual abuse and sexual aggression that occurred while the child was in foster care. As of the time of the record review, the children who experienced both abuse and aggression in care had a total of 45 sexual abuse incidents in care and 32 incidents of aggression in care.

---

[136] One hundred and fifty-seven children experienced sexual abuse in care; 133 children engaged in sexual aggression while in care. There were 20 children that had both sexual abuse and sexual aggression while in care.



Figure 22: PMC Children with Confirmed Sexual Abuse or Sexual Aggression While in Care

Source: IMPACT Sexual History case review data
n= 270

■ Abuse Only    ■ Aggression Only    ■ Both Abuse & Aggression

## Timing of Information on IMPACT Sexual Incident History Page

The Sexual Incident History page in IMPACT includes information related to the child's confirmed incidents of sexual abuse and sexual aggression, including the date of the incident, a description of the incident, where the incident occurred, and information about the perpetrator or victim. The page also includes the date the incident was "created" or entered on the child's history page.

The monitoring team reviewed the time between the date of the child's sexual abuse or aggression incident and the date the incident was created on the child's sexual incident history page. For incidents occurring on or after January 1, 2020,[137] the average time between the occurrence of a sexual abuse incident and its inclusion on the child's sexual history page in IMPACT was 6.6 months, with a range of one day to 30.5 months. The average time between the occurrence of a sexual aggression incident and its inclusion on the child's history page was 6.7 months, with a range of 1 day to 43.5 months.

---

[137] Only incidents occurring after the implementation of the sexual incident history page were included in the analysis.

## Summary: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression

In the Monitors' case record review of a random sample of 787 PMC children who had a sexual characteristic indicator document in their IMPACT records in 2023, 78% were confirmed victims of sexual abuse, while 32% had an indicator for sexual aggression. Ten percent had experienced both sexual abuse and had a history of having engaged in sexual aggression. In addition to confirmed abuse and aggression, 32% of the children in the sample also had incidents of unconfirmed abuse, and 6% had a history of unconfirmed aggression documented in IMPACT.

Over one-fourth (26%) of the PMC children in the sample who had an indicator for confirmed sexual abuse suffered abuse that occurred after the child entered foster care. Of those children, 71% suffered sexual abuse only after entering foster care; the remaining 29% were sexually abused both before and after entering foster care. Another 7% percent of PMC children who had a confirmed history of sexual abuse before entering foster care also had an unconfirmed history of abuse after entering care documented in their IMPACT records. The 157 PMC children who had a confirmed incident of sexual abuse after entering care had a total of 255 confirmed sexual abuse incidents in care documented in their IMPACT records: 32% of these children experienced two or more sexual abuse incidents after entering foster care.

Of the 157 PMC children included in the sample who suffered sexual abuse after entering foster care, 50 (32%) were sexually abused by another foster child. These 50 children suffered 64 instances of child-on-child sexual abuse. In 20% of the incidents where a PMC child in the sample was abused by another child in DFPS care, the information found in the IMPACT records for the child who was identified as the aggressor was not consistent with that found in the victim's IMPACT records. No information was found in the aggressor's IMPACT records in 10% of incidents.

Incidents of sexual abuse in which the perpetrator was an adult not associated with the child's placement almost always (87%) occurred while the child was on runaway from the placement; 85% of those involved sex trafficking. Children in the sample who were abused while on runaway were most likely to have run away from a CWOP Setting (29%), a GRO (21%), or an RTC (19%).

## Remedial Orders 25, 26, 27, 29 and 31: Caregiver Notification

**Remedial Order 25:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order 26:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application.*

**Remedial Order 27:** *Effective immediately, all of a child's caregivers must be appraised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order 29:** *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form and common application.*

**Remedial Order 31:** *Effective immediately, all of the child's caregivers must be appraised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

## Background

After the Court held the State in contempt due, in part, to its failure to comply with Remedial Orders 25, 26, 27, 29, and 31,[138] the State made several changes to its process for notifying caregivers of a child's history of sexual abuse or indicator for sexual aggression.[139] The changes clarified the definition of a "caregiver" and defined "appraised" so that, going forward, DFPS required notification to individual foster parents, and in GROs, the administrator, receiving intake staff, and child's case manager.[140] Through contract enforcement, DFPS is obligated to monitor contractual requirements and agency expectations that the information will be shared by GRO staff with all of a child's caregivers.[141] DFPS also changed its policy to require notification to caregivers in juvenile justice and hospital settings.[142]

## Performance Validation

The monitoring team conducted three case record reviews to validate the State's compliance with the remedial orders related to caregiver notification.[143] The monitoring team also collected information related to caregiver notification through record reviews and interviews during 12 site visits to congregate care facilities in 2023.

---

[138] Order (December 18, 2020, ECF No. 1017.

[139] Deborah Fowler & Kevin Ryan, Second Report, 205 – 219, ECF No. 1079.

[140] *Id.* at 214.

[141] *Id.*

[142] *Id.*

[143] The Monitors' conducted three case reads sampling placement data for six months in 2023: February and March (first case read), July and August (second case read), and October and November (third case read). The Monitors randomly selected 623 unique placements (with a confidence interval of 95%), involving 490 children (some children started more than one new placement during the months reviewed). Of the 623 placements, 171 involved a child who had an indicator for sexual aggression, and 452 involved a child who had an indicator for sexual abuse. Of the 171 placements involving a child who had an indicator for sexual aggression, 106 were made to a congregate care facility or foster home, 25 were made to a kinship or adoptive home, and 40 were made to a juvenile justice facility or hospital. Of the 452 placements involving a child flagged as a victim or sexual abuse, 320 of the placements were made to a congregate care facility or foster home, 56 were made to a kinship or adoptive home, and 76 were made to a juvenile justice facility or hospital.

## Case Record Reviews

The monitoring team analyzed 426 placements to assess the documentation of the child's sexual victimization history or history of sexual aggression on the Common Application.[144] The monitoring team found a Common Application in IMPACT for all placements reviewed requiring a Common Application. Of the 426 placements with a Common Application, 97% of those involving a child identified as a victim of sexual abuse (309 of 320), and 98% of placements involving a child who had an indicator for sexual aggression (104 of 106) included all of the child's sexual history information.[145]

Figure 23: Completeness of Sexual History Information on the Common Application



Source: Case review data
n = 426

■ Sexual Aggression Indicator (n=106)
■ Sexual Abuse Indicator (n=320)

These findings are consistent with the State's case record reviews for the third and fourth quarters of fiscal year 2023 and the first quarter of fiscal year 2024.[146]

---

[144] DFPS requires completion of a Common Application, Placement Summary, and Attachment A for foster care and congregate placements. It requires only a Placement Summary and Attachment A for kinship and adoptive placements and requires only an Attachment A for juvenile justice and hospital placements. The monitoring team reviewed IMPACT records to assess whether the required documentation for the placement under review included the child's history of sexual victimization or aggression. Of the 623 total placements included in the case record reviews, only 426 required a Common Application to be completed.

[145] Information was considered complete if it is consistent with the information found in the child's IMPACT Sexual Victimization and Sexual Aggression pages. Incidents of aggression or victimization that occurred after the sample placement were not considered.

[146] DFPS, Child Sexual History Case Review Results, Quarter 3 - Fiscal Year 2023 (on file with the Monitors)(Common Application contained all known history of sexual aggression in 92% (54 of 59) of cases reviewed, and all known information regarding history of sexual abuse in 93% (212 of 227) of cases reviewed); DFPS, Child Sexual History Case Review Results, Quarter 4 – Fiscal Year 2023 (on file with the

The monitoring team analyzed 507 placements to assess documentation of the child's history of sexual aggression or abuse in the corresponding Placement Summary and Attachment A and signatures on the forms by the receiving caregivers at the time of placement.

The monitoring team found both an Attachment A and Placement Summary for 95% (124 of 131) of the placements involving a child who had a history of sexual aggression and 96% (359 of 376) of placements involving a child who had a history of sexual abuse. The rate of compliance remained constant over time.

**Figure 24: Both Attachment A and Placement Summary Found**



Results were consistent across all placement types: the monitoring team found both a Placement Summary and Attachment A for 96% of placements in a foster home (149 of 156) and for 95% of placements in a congregate setting (257 of 270) and adoptive or kinship home (77 of 81).[147] The results also showed improvement from the previous

___

Monitors)(Common Application contained all known history of sexual aggression in 100% (41 of 41) of cases reviewed, and all known information regarding history of sexual abuse in 95% (151 of 158) of all cases reviewed); DFPS, Child Sexual History Case Review Results, Quarter 1 – 2024 (on file with the Monitors)(Common Application included all known history of sexual aggression in 90% (52 of 58) of cases reviewed, and all known history of sexual victimization in 94% (193 of 205) of cases reviewed).
[147] The monitoring team found the Attachment A and Placement Summary forms at similar rates (97% and 96%, respectively) for placements involving children marked with an indicator for a history of sexual aggression and those who had a history of sexual victimization. The Placement Summary and Attachment A are supposed to be discussed and signed by the receiving caregiver at the same time (*see* DFPS, CPS Handbook, Section 4133 Provide and Discuss the Placement Summary Form (requiring the caseworker to complete, discuss, and obtain caregiver signatures on the Placement Summary and Attachment A within 72 hours of placement). Attachment A was designed as an attachment to the Placement Summary.

year: in the Monitors' Sixth Court Report filed in June 2023, the monitoring team found both a Placement Summary and Attachment A for 91% of placements in a foster home (72 of 79), 93% (152 of 163) of placements in a congregate setting, and 94% (58 of 62) of placements in an adoptive or kinship home.

The monitoring team did not always find that the Placement Summary accurately indicated that the child had a history of sexual aggression or sexual abuse. The child's sexual history characteristic was accurately marked in the Placement Summary for 76% (365 of 483) of all placements with both forms found. However, complete sexual history information was included in the Attachment A for 98% (475 of 483) of placements with both forms found.[148]

Figure 25: Complete Sexual History Information Included in the Forms Found



Source: Case review data
n = 483

The monitoring team reviewed the forms to ensure a receiving caregiver signed both forms at the time of placement and found high compliance when both forms were found.[149]

---

[148] Sexual history information on the Placement Summary form is reported by a series of check boxes indicating whether the child has a history of sexual victimization or trafficking or a history of sexual aggression. Information in the Attachment A found in One Case was compared to the Attachment A launched from the child's Sexual Incident History page in IMPACT to determine if it was complete. If incidents on the SIH page were not included in the Attachment A in One Case, but the incidents occurred after the Attachment A was signed, the information was considered consistent.

[149] A form was considered signed at the time of placement if the receiving caregiver signed and dated the form up to one day after and no more than 30 days prior to the placement start. Most forms were signed on the day of placement: 431 placements had both forms signed at the time of placement, and of these, 401 (93%) were signed on the same day as the placement start. There were an additional 35 placements where either the Placement Summary or the Attachment A was signed by the caregiver two or more days

**Figure 26: Caregiver Signature at the Time of Placement in the Forms Found**



Source: Case review data
n = 483

■ Placement Summary signed at the time of placement
■ Attachment A signed at the time of placement

Overall, 63% (317 of 507) of the placements reviewed by the monitoring team had a Placement Summary and Attachment A signed by the receiving caregiver at the time of the child's placement that included all the child's known sexual history. Results were the same for children who had a history of sexual abuse and sexual aggression.

---

after the placement started. The maximum number of days between the placement start and a caregiver signing the Attachment a was 43 days.



Figure 27: Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature at the Time of Placement

The monitoring team's review documented improvement over the results reported in the Monitors' Sixth Report, particularly for placements involving children with a history of sexual victimization. In the Sixth Report, the Monitors reported that both forms included a child's complete sexual history and were signed by a receiving caregiver at the time of placement in 59% (36 of 61) of placements involving a child who had an indicator for sexual aggression and 49% (120 of 243) of placements involving a child identified as a victim of sexual abuse.[150]

Figure 28: Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature at Time of Placement in 2022 and 2023

| Sexual Aggression Indicator | | |
|---|---|---|
| | 2022 (n=61) | 2023 (n=131) |
| Both forms found | 90% | 95% |
| Includes complete history | 75% | 73% |
| Signed by caregiver | 74% | 70% |
| Signed at time of placement | 59% | 63% |
| Sexual Abuse Indicator | | |
| | 2022 (n=243) | 2023 (n=376) |
| Both forms found | 93% | 95% |
| Includes complete history | 66% | 68% |

[150] The timing of the caregiver signature was expanded to include the day after the placement started for the current analysis. A total of 15 placements had a Placement Summary or Attachment A signed the day after the child's placement started.

| | | |
|---|---|---|
| Signed by caregiver | 65% | 67% |
| Signed at time of placement | 49% | 63% |

A comparison between SSCC and DFPS placements showed that SSCCs had similar compliance rates for placements involving children who had an indicator for sexual aggression. However, SSCCs had a lower compliance rate for placements involving children who were identified as victims of sexual abuse.[151]

Figure 29: Records with Placement Summary and Attachment A Forms with Complete History and Caregiver Signature at the Time of Placement, by Placement Entity



IMPACT includes a field requiring the child's CVS caseworker to record the date the caregiver was provided the Attachment A before the placement information can be saved. During the case record reviews, the monitoring team compared the date the child's CVS caseworker entered in IMPACT to the date recorded on the Attachment A. The date entered in IMPACT matched the date recorded on the Attachment A in most of the placements reviewed. However, the Attachment A was signed after the date entered in IMPACT in 14% (17 of 124) of placements involving a child who had a history of sexual aggression and in 6% (20 of 361) of placements involving a child who had a history of sexual abuse.[152] This is an improvement from the Monitors' Sixth Report, which documented that the monitoring team found that the Attachment A was signed

---

[151] The monitoring team reviewed a total of 74 DFPS placements and 57 SSCC placements involving children with an indicator for sexual aggression and a total of 229 DFPS placements and 147 SSCC placements involving children with an indicator for sexual abuse.

[152] Includes only placements where an Attachment A was found, signed, and dated by the receiving caregiver. There were 493 of 507 placements with an Attachment A found, and of these 490 were signed and 486 included a date with the signature. One hundred twenty-four of the 486 placements with an Attachment A found, signed, and dated involved a child with an indicator for sexual aggression and 362 of 486 placements involved a child with an indicator for sexual abuse. One of the 362 placements did not have a date that the caseworker entered in IMPACT resulting in 361 placements involving a child with an indicator for sexual abuse included in the analysis.

after the date entered in IMPACT in 21% (12 of 57) of placements involving a child with an indicator for sexual aggression and 12% (28 of 232) of placements involving a child who had a history of sexual abuse.

Figure 30: Timing from Date Caregiver Signed Attachment A to Date Caseworker Indicated Caregiver Signed in IMPACT



The monitoring team also reviewed 116 placements that involved a juvenile justice facility or hospital setting for children with an indicator for sexual aggression or sexual abuse. An Attachment A that was signed and included a child's complete history of aggression or victimization was found for less than half of these placements.[153]

---

[153] Includes two forms that were signed but not dated as well as forms signed up to three weeks after the placement started. Twenty forms were signed within a week of the placement start while seven were signed more than a week after the placement start.



Figure 31: Records with Attachment A Found, Signed, and Includes Complete History for Hospital and Juvenile Justice Placements

The child's caseworker documented the receiving caregiver's refusal to sign the Attachment A in 14 placements involving a juvenile justice facility and seven placements involving a hospital. In the Monitors' Sixth Report, caseworkers documented a caregiver's refusal to sign in only four cases.

Differences between the Monitors' case record reviews and the State's quarterly case record reviews make it difficult to compare outcomes.[154] The State's case reads in the third and fourth quarters of 2023 and the first quarter of 2024 showed that reviewers were able to find a Placement Summary and Attachment A signed by the receiving caregiver in most placements reviewed.[155]

---

[154] For example, in addition to reviewing adoptive, kinship, foster home, GRO, juvenile justice, and hospital placements, the State's case record review samples include unauthorized placements. The State's case record review determination of completeness of sexual history information is done by examining the IMPACT Sexual Incident History and Trafficking pages on the date of the case review, not by examining the information included on the Placement Summary and Attachment A forms uploaded to One Case on the date of placement.

[155] For placements involving a child with an indicator for sexual aggression, a signed Placement Summary was found in 73% (69 of 94) of placements in the third quarter of fiscal year (FY) 2023, 78% (52 of 67) of placements reviewed in the fourth quarter of FY 2023, and 71% (67 of 94) of placements reviewed in the first quarter of FY 2024. A signed Attachment A was found in 78% (73 of 94) of placements reviewed in the third quarter of FY 2023, 76% (51 of 67) of placements reviewed in the fourth quarter of FY 2023, and 79% (74 of 94) of placements reviewed in the first quarter of FY 2024.

For placements involving a child with an indicator for sexual victimization, a signed Placement Summary was found in 79% (275 of 346) of placements reviewed in the third quarter of FY 2023, 80% (183 of 227) of placements reviewed in the fourth quarter of FY 2023, and 77% (250 of 324) of placements reviewed in the first quarter of FY 2024. A signed Attachment A was found in 82% (285 of 346) of placements

## Information Collected During Site Visits

During the 12 site visits made in 2023, the monitoring team reviewed site records for all PMC children, reviewed a random sample of records for staff, and interviewed children and staff. The record reviews and interviews included an evaluation of information related to a child's sexual characteristic indicator. The monitoring team reviewed 136 children's records and 203 staff records. The monitoring team interviewed 84 children and 146 staff members. The monitoring team interviewed the following staff members:

- 119 direct care staff or direct care staff supervisors
- 13 program administrators
- 10 case managers
- 4 other care staff (house mentor, float staff, core staff, and contract staff)

### Table 16: Site Visit Data Collection, 2023

| Location | Child Records Reviewed | Staff Records Reviewed | Staff & Admin Interviewed |
|---|---|---|---|
| Ambience RTC | 6 | 14 | 10 |
| Bluebonnet Haven | 18 | 18 | 16 |
| Brownstone RTC | 6 | 9 | 7 |
| Castillo Children's Center | 9 | 12 | 8 |
| Creighton Oaks RTC | 19 | 23 | 16 |
| Make A Way RTC | 9 | 19 | 15 |
| New Pathways RTC | 11 | 18 | 11 |
| Pegasus RTC | 23 | 30 | 24 |
| Ray of Hope | 2 | 11 | 9 |
| Renewed Strength East | 5 | 13 | 8 |
| The Burke Foundation – Pathfinders RTC | 10 | 16 | 13 |
| Thompson RTC | 18 | 20 | 9 |
| **Total** | **136** | **203** | **146** |

reviewed in the third quarter of FY 2023, 85% (193 of 227) of placements reviewed in the fourth quarter of FY 2023, and 80% (258 of 324) of placements reviewed in the first quarter of FY 2024.

Almost all the children's site records included a Common Application, Attachment A, or Placement Summary; most (114 of 136 or 84%) included all three documents. Ninety-six percent of the Placement Summary forms (125 of 130) and 100% of the Attachment A forms found in child files (129 of 129) had been signed by a placement administrator, receiving intake staff, case manager, or receiving caregiver. Multiple staff signatures were found on most of the signed forms (82% of Placement Summary forms and 95% of Attachment A forms). The Placement Administrator's signature was included in 71% of signed Placement Summary forms (89 of 125), while the Administrator's signature was included in 86% of signed Attachment A forms (111 of 129). Nearly 90% of all records reviewed (119 of 136, 88%) had a signed Placement Summary and Attachment A form in the children's record.

Figure 32: Forms Found and Signed in Children's Site Records, 2023



Of the 136 children whose files were reviewed, 35 (26%) had a DFPS indicator for sexual abuse, and 32 (24%) had a DFPS indicator for sexual aggression.[156] Of these children, the following records were missing from site records:

- A Common Application was missing for two children with an indicator for sexual abuse and four children with an indicator for sexual aggression;
- A Placement Summary was missing for two children with an indicator for sexual abuse and two children with an indicator for sexual aggression;
- An Attachment A was missing for one child with an indicator for sexual abuse.

The monitoring team reviewed the sexual history forms contained in the Common Application, Placement Summary, and Attachment A forms found in the children's site

---

[156] Ten children had both sexual abuse and sexual aggression indicators and are counted in both categories. There was a total of 57 files of children with an indicator for sexual abuse, sexual aggression, or both.

records to determine whether the information in the forms was consistent with the sexual characteristic indicators found in PMC placement data. The monitoring team determined:

- Consistent information was found in a Common Application in the site records for 80% (28 of 35) of children with an indicator for sexual abuse and for 81% (26 of 32) of children with an indicator for sexual aggression.
- Consistent documentation was found in the Placement Summary in site records for 66% (23 of 35) of children with an indicator for sexual abuse and for 78% (25 of 32) of children with an indicator for sexual aggression.
- Consistent information was found in the Attachment A in site records for 89% (31 of 35) of children with an indicator for sexual abuse and for 100% (32 of 32) of children with an indicator for sexual aggression.

The monitoring team also reviewed the records for children who did not have an indicator for sexual aggression or victimization at the time of the visit to determine whether the records included information showing the child was a victim of sexual abuse or had engaged in sexual aggression. The monitoring team found information in 11 of 136 children's site records (8%) that indicated the child was a confirmed victim of sexual abuse or had confirmed sexual aggression. However, the child did not have an indicator for sexual abuse or aggression at the time of the visit.[157]

During interviews, most program administrators said they always (9 of 13, 69%) or sometimes (3 of 13, 23%) receive an Attachment A when a child with an indicator for sexual aggression or victimization is placed in their operation and most reported they sign the Attachment A once they receive it (11 of 13, 85%).

While most program administrators report receiving information on a child's sexual abuse or aggression history through the Attachment A (85% or 11 of 13) and/or the Common Application (62% or 8 of 13 reported receiving both), only five of 13 program administrators (39%) reported feeling they always receive proper notice of a child's sexual history before or upon a child's placement. Another six of 13 (46%) reported they sometimes receive proper notice, and two of 13 (15%) reported they do not receive proper notice of a child's sexual history before or at operation entry.

---

[157] Six files had sexual abuse information, and five files had sexual aggression information for children who did not have sexual history indicators.

### Figure 33: Program Administrators Reporting They Receive Proper Notice of Children with Sexual Characteristics Before or at Entry



Source: Monitoring team site visit data, Program Administrator Interview
n = 13

- Yes, always — 5 / 39%
- Yes, sometimes — 6 / 46%
- No — 2 / 15%

Almost all program administrators (11 of 12 or 92%) reported that when they receive information that a child is a victim of sexual abuse or has an indicator for sexual aggression, they always communicate the information to staff. In comparison, one of 12 (8%) reported they sometimes communicate this information.[158] However, only 57% (68 of 119) of direct care staff interviewed by the monitoring team reported they are always asked to sign the Attachment A or other form for children with a history of sexual abuse or aggression.[159] The remaining 43% (51 of 119) of direct care staff reported they are not asked to sign a form for children with a history of sexual abuse or aggression.

### Figure 34: Direct Care Staff Asked to Sign Attachment A or Other Form for Children with Sexual History



Source: Monitoring team site visit data, Caregiver Interview
n = 119

- Yes — 68 / 57%
- No — 51 / 43%

---

[158] One program administrator did not respond to this question.
[159] "Other form" includes the Certification Form 2279b or the Certification of Receipt of Child Sexual Abuse or Sexual Aggression Information.

Despite this, ninety-five of 119 direct care staff (80%) reported they are always informed if a child they supervise is a victim of sexual abuse or is sexually aggressive. Another five of 119 staff (4%) reported they are sometimes informed if a child they supervise is a victim of sexual abuse or is sexually aggressive. Nineteen of 119 direct care staff (16%) reported they are not informed if a child they supervise is a victim of sexual abuse or is sexually aggressive.

Figure 35: Direct Care Staff Informed if a Child They Supervise is a Victim of Sexual Abuse or is Sexually Aggressive



Forty percent of direct care staff (40 of 100) reported that they received only verbal information about a child's history of sexual aggression or victimization. Thirty-eight percent of direct care staff who reported they are informed if a child they supervise is a victim of sexual abuse or is sexually aggressive (38 of 100) reported they are informed of this fact by receiving or seeing a copy of the child's Attachment A while 62% (62 of 100) reported being informed verbally. Six percent of direct care staff (6 of 100) report they are only informed through written communication (in the form of e-mail) if a child they supervise is a victim of sexual abuse or is sexually aggressive.

Some of the caregivers' responses to interview questions were inconsistent. For example, more than half of the 38 staff (23 or 61%) who reported signing a copy of the child's Attachment A also reported not receiving the Attachment A when supervising a child for the first time. Of critical importance, of the 76 direct care staff who reported that, at the time of the interview, they supervised a child who had a history of sexual aggression or sexual abuse, 46% (35 of 76) were not able to identify the child.

In addition to interviewing direct caregivers, in 2023, the monitoring team began asking sites visited for signed copies of DFPS form 2279b[160] for the PMC children placed at the operations who had an indicator for abuse or aggression. This form is supposed to be used by GROs to certify caregivers' receipt of information related to child sexual abuse or sexual aggression. DFPS describes the form's purpose as follows:

> Use this form to certify all alternate, temporary, and General Residential Operation (GRO) caregivers have read the Child Sexual History Report (Attachment A) of the DFPS Placement Summary Form…and are aware of the child/youth's history of sexual victimization or sexual aggression, discussed its implication with their employer, (employer can be the case manager over the home or the Residential provider), and understands the importance of applying strategies to the direct care of the child/youth to ensure the safety, health and well-being of all children/youth in the same placement. Their signature(s) signify that they are aware of the child/youth's history of sexual victimization or sexual aggression.[161]

The monitoring team's review of 2279b forms for PMC children at 10 of the 12 sites visited[162] revealed that some or all caregiver signatures were missing at every site. Of the 33 PMC children placed at one of these sites on the date of the visit, the monitoring team could verify that all the child's caregivers had signed the form for only five children. However, these five children were placed at operations that housed other children who also had an indicator for sexual abuse or aggression, but whose 2279b forms were not signed by all caregivers. The monitoring team did not identify a single operation that could produce 2279b forms signed by all caregivers for all children who had an indicator for sexual abuse or sexual aggression.

Two facilities, Ambiance RTC and Brownstone Residential Care, could not produce any signed 2279b forms. At the time of the visits, Ambiance RTC housed one PMC child who was a confirmed victim of sexual abuse and Brownstone Residential housed three PMC children who had an indicator for a confirmed incident of sexual abuse and two who had an indicator for sexual aggression. When direct care staff were interviewed at these facilities, only four of the eight staff (50%) at Ambiance were able to identify the PMC child who was a confirmed victim of sexual abuse. At Brownstone, none of the direct care staff were able to identify all five children in their care who had an indicator for abuse or aggression. Of the six direct care staff at Brownstone, three (50%) correctly named one of the two children who had an indicator for aggression; none of the staff could name any of the children flagged with an indicator for abuse.[163]

[160] DFPS, Certification of Receipt of Child Sexual Abuse or Sexual Aggression Information, Form K-908-2279(b)(Revised September 2023).

[161] *Id.*

[162] One site, Pegasus, is devoted to treatment of children with a history of sexual aggression or sexual behavior problems. Staff at this facility are aware that all of the youth housed at the operation have a history of aggression. Renewed Strength had no children with an indicator for sexual abuse or sexual aggression at the time of the monitoring visit.

[163] This was particularly concerning since the Plan of Service for one of the children who had an indicator for sexual aggression specified that he would be "monitored 24 hours" and that Brownstone should not

When the monitoring team visited Ray of Hope Center for Children, the operation housed a child who had both a confirmed history of sexual abuse and an indicator for aggression. The child's 2279b form was missing signatures from seven of the 10 direct care staff; the form had not been signed by any direct care staff after June 2, 2022. During the monitoring team's interviews with eight direct care staff, all eight (100%) answered that they did not supervise any children who had a history of sexual abuse or aggression. The treatment staff who were interviewed were under the same misimpression. One of them suggested that the child did not qualify as a child with a history of sexual aggression because he had completed treatment at an RTC devoted to treating children who had sexual behavioral problems.

Creighton Oaks RTC housed nine PMC children who had a confirmed history of sexual abuse or an indicator for sexual aggression when the monitoring team visited. Only three children had a 2279b form that was signed by all of the child's caregivers. Of the 14 direct care staff interviewed, six (43%) could name only one child who had an indicator for abuse or aggression, and three (21%) could not name any of the children. At the time of the visit, one child who had an indicator for a history of sexual aggression was sharing a room with a child who had a confirmed history of abuse. Though the Plan of Service for the child with the history of sexual aggression did not specify that he should not share a room with other children, the direct care staff's lack of familiarity with the children's histories placed them at risk. Both children have since aged out of care.

## Summary: Remedial Orders 25, 26, 27, 29 and 31

The monitoring team located Common Applications for all placements reviewed during a case record review. Of the 426 placements with a Common Application, 97% of those involving a child identified as a victim of sexual abuse, and 98% of placements involving a child who had an indicator for sexual aggression included all the child's sexual history information.

The monitoring team found both an Attachment A and Placement Summary for 95% of the placements involving a child who had a history of sexual aggression and 96% of placements involving a child who had a history of sexual abuse. However, only 63% of the placements reviewed by the monitoring team had a Placement Summary and Attachment A signed by a receiving caregiver at the time of the child's placement that

---

allow him to share a room with other youth. When the monitoring team visited, DW was sharing a room with three other children, two of whom had an indicator for sexual abuse. None of DW's roommates made an outcry of inappropriate behavior or abuse, but the failure to abide by the instructions in his service plan and the lack of knowledge on the part of his caregivers was deeply concerning. When the Monitors reviewed his IMPACT records during preparation of this report on April 14, 2023, DW was still placed at Brownstone, his updated Plan of Service still included this information, and a March 2024 face-to-face visit with a local permanency specialist indicated he was still sharing a room with other children. The Monitors raised the concern with DFPS via e-mail. E-mail from Deborah Fowler to Michael Hayman, Director of Project Management, Foster Care Litigation Compliance, re: Concerns regarding youth placed at Brownstone (April 14, 2024) (on file with the Monitors).

included all the child's known sexual history. Results were the same for children who had a history of sexual abuse and sexual aggression.

During the 12 site visits made in 2023, the monitoring team reviewed site records for all PMC children, reviewed a random sample of records for staff, and interviewed children and staff. The record reviews and interviews included an evaluation of information related to a child's sexual characteristic indicator. The monitoring team reviewed 136 children's records and 203 staff records. The monitoring team interviewed 84 children and 146 staff members.

Almost all the children's site records included a Common Application, Attachment A, or Placement Summary; most included all three documents. In most cases, a Placement Administrator had signed the Placement Summary forms, and 100% of the Attachment A forms found in child files were signed by either an administrator, receiving intake staff, case manager, or receiving caregiver. Multiple staff signatures were found on most of the signed forms (82% of Placement Summary forms and 95% of Attachment A forms). The Placement Administrator's signature was included in 71% of signed Placement Summary forms, while the Administrator's signature was included in 86% of signed Attachment A forms. Nearly 90% of the 136 reviewed records had a signed Placement Summary and Attachment A form in the children's record.

Though a majority of direct caregivers reported that they were always told of a child's history of sexual abuse or aggression, of the 76 direct care staff who reported that they were supervising a child who had a history of sexual aggression or sexual abuse at the time of the interview, 46% were not able to identify the child.

## Remedial Orders A7 and A8: Awake-Night Supervision

**Remedial Order A7**: *The Defendants shall immediately cease placing PMC children in placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A8**: *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.*

## Background

Based on data provided by DFPS,[164] 279 unique operation locations[165] required awake-night supervision in at least one month during 2023. Of the 279 operations, 270 (97%) were GROs, and nine (3%) were foster homes. Twenty-nine operations (10%) were located outside of Texas.

Table 17: Number of Operation Locations Requiring Awake-Night Supervision, January 1 to December 31, 2023

Source: DFPS, RO A7 List of Operations with More than Six Children

| Month | Operation Locations Requiring Awake-Night Supervision |
|---|---|
| January | 215 |
| February | 214 |
| March | 211 |
| April | 205 |
| May | 221 |
| June | 226 |
| July | 223 |
| August | 224 |
| September | 220 |
| October | 228 |
| November | 227 |
| December | 229 |

The Monitors validated the State's compliance with remedial orders A7 and A8 through three methods: (1) reviewing the awake-night verification documents completed by

---

[164] Each month, DFPS provides the Monitors with a list of GROs, and foster homes flagged as eligible for awake-night supervision. The monitoring team compiled the lists of eligible locations for each month of 2023.

[165] Operations may have more than one location. The State's comments to the draft of this report indicated that this analysis misidentified five operations as eligible for an awake-night visit that were ineligible because there were no foster children placed in the operation in 2023. The monitoring team reviewed placement logs in IMPACT for the operations that the State identified in their comments as ineligible. The monitoring team's review of IMPACT verified that three operations were incorrectly coded in the monthly data provided to the Monitors by the State as "eligible" and requiring awake-night supervision, though no foster children were placed in the operation in the month that the data indicated they were "eligible" for a visit. After receiving the State's comments, these three operations were excluded from the analysis.

DFPS staff during unannounced visits to operations;[166] (2) reviewing data sources used to report noncompliance with awake-night supervision requirements, including violations that were self-reported by operations themselves, violations identified during DFPS's unannounced visits, and deficiencies cited by HHSC for violation of awake-night requirements; and (3) unannounced visits to operations requiring awake-night supervision.

## Performance Validation

### Awake-Night Verification Documents

The Monitors reviewed 2,729 awake-night verification documents completed during an unannounced visit by DFPS staff from January 2023 through December 2023. DFPS made overnight, unannounced visits to almost all operations requiring awake-night supervision each month.[167]

Figure 36: Number of Operation Locations Requiring Awake-Night Supervision Visited, January 1 to December 31, 2023



Source: DFPS, RO A7 List of Operations with More than Six Children and Awake Night Verification Documents

---

[166] Awake-night verification documents are provided to the Monitors monthly. The monitoring team reviewed the verification documents and entered information into an Excel spreadsheet, capturing the number of times a location was visited in the month and the details of the visits.
[167] DFPS also made visits each month to a small number of operations that did not require awake-night supervision at the time of the visit. Visits were not required because there were no PMC children placed at the operation on the date of the visit.

The Monitors also found that more than 90% of operations that required a visit to verify awake-night supervision in at least one month during the year were visited every month they were eligible.

Figure 37: Months with Visits to Operation Locations When Required, January 1 to December 31, 2023 [168]



Source: DFPS, RO A7 List of Operations with More than Six
Children and Awake Night Verification Documents
n = 279

Some operation locations received more than one awake-night visit from DFPS in a single month: 56 verification documents were completed after a second or third visit to a location in the month.[169] DFPS may make multiple visits during a single month if issues of concern were found in initial visits or if an allegation of potential noncompliance with the awake-night requirement is received during the month. DFPS staff should have indicated the reason for a second or third visit in 23% (13 of 56) of verification documents.[170]

___

[168] All five operations with no visits in any eligible month were only eligible for one month of the year.
[169] Two documents represented a third visit while 54 represented a second visit in a month.
[170] While it was not indicated in the verification documents, two of the 13 visits were made to Unity Children's Home – Girls in two consecutive months following a Reason to Believe finding of Neglectful Supervision as a result of staff sleeping.



**Figure 38: Verification Documents by the Number of Visits in a Month**

Source: DFPS Awake-Night Verification Documents
n = 2,729

The most frequently noted reason for a second or third visit to an operation in a month was an allegation reported to SWI (32 of 56, 57%). In 22 of 56 (39%) verification documents representing a repeat visit, DFPS staff noted that the visit was conducted due to an allegation of potential awake-night noncompliance.[171]

Five of the 56 (9%) repeat visits were conducted because DFPS staff could not certify awake-night supervision (either because operation staff were sleeping or DFPS could not gain access) in an earlier visit. These five included:

### Inspirational Hope House

DFPS staff conducted three awake-night monitoring visits to Inspirational Hope House in July 2023. The second visit[172] on July 27 resulted from an allegation received on July 21 involving a foster child who reportedly observed staff sleeping and heard staff snoring.[173] Upon arrival for the second visit, DFPS staff was met by one awake-night staff member who said there was one other staff member on shift. When DFPS staff checked the wing of the facility where the other awake-night staff should have been located, a person was observed lying on the floor, wrapped in a blanket, and snoring. After determining that there were no other awake-night staff present, the DFPS staff

---

[171] All 22 allegations were confirmed by the Monitors to be related to staff sleeping. In 20 of these 22, staff were sleeping during overnight shifts while in two of 22 it was unclear whether staff were sleeping during the day or at night. There were an additional 10 verification documents (18% of 56) representing a repeat visit where DFPS staff noted the visit was conducted due to an allegation, but the Monitors were unable to confirm an allegation was made or could not identify an RCI investigation based on allegations of noncompliance with the awake-night requirement.

[172] The first visit was conducted on July 12, with no issues noted.

[173] The DFPS - RCCI investigation that resulted from the case was disposed as Unable to Determine. HHSC issued one citation for caregiver responsibility 748.685(a)(4). Compliance was met after the staff was terminated by the operation.

returned to the sleeping person, woke them up, and confirmed that they were supposed to be providing awake-night supervision. The 24-hour supervision policy was discussed with staff, and awake-night supervision was not certified following the visit. A third visit was conducted the following night with no issues.

### Creighton Oaks Residential Treatment

DFPS staff conducted two awake-night monitoring visits to Creighton Oaks Residential Treatment in June 2023. The first visit, made on June 20, was conducted in response to an allegation received on June 19, when a child in placement reported an awake-night staff member sleeping when they were supposed to supervise the child.[174] During the first visit, DFPS staff observed one awake-night staff responsible for supervising seven children to be asleep. This staff person also had an incomplete bed check log. DFPS staff did not certify the visit and conducted a second visit the following night with no issues.

### Family Link Treatment Services –Foster Home

DFPS staff conducted two awake-night monitoring visits of a foster home under the CPA Family Link Treatment Services in March 2023 because the home was required to have awake night supervision. When DFPS staff conducted the first awake-night monitoring visit on March 8, they arrived at the residence at midnight. They attempted calling the residence because the home had a gate to enter the property. After multiple unsuccessful phone call attempts, DFPS staff left the property and did not certify the visit. The next day, at 7:25 a.m., DFPS staff received a phone call from the foster parent, who stated that they fell asleep and did not hear the phone. At the time of the visit, there were seven children in placement at the foster home, one of whom was PMC. The second visit was conducted on March 21 with no issues.

### Kinship Konnection

DFPS staff conducted two awake-night monitoring visits to Kinship Konnection in January 2023. A first visit was attempted on January 20. Upon arrival at the operation, DFPS staff did not receive an answer at the door after knocking and ringing the doorbell several times. The visit was not certified, and a second visit was made on January 30 with no issues.

### A.B.E. Residential Services

DFPS staff conducted two awake-night monitoring visits to A.B.E. Residential Services in November 2023. During the first visit on November 21, an awake-night staff person allowed them into the facility and said one other person was working that night. The two awake-night staff were responsible for providing supervision to six children, four of whom were PMC. DFPS staff observed the second awake-night staff sleeping on the

---

[174] The DFPS - RCCI investigation that resulted from the case was disposed as Ruled Out while HHSC issued one citation under standard 748.126(b) All employees and caregivers must be aware of and follow your policies and procedures. Compliance was met after the employee was terminated by the operation.

couch. The visit was not certified, and a second visit was made the following night with no issues.

In an additional four of the 56 (7%) locations with repeat visits, awake-night supervision had been certified during the initial visit, though DFPS found problems. DFPS again certified awake-night supervision during the repeat visit. These four locations included:

## High Plains Children's Home

On May 18, 2023, DFPS staff conducted an awake-night monitoring visit and observed operation staff asleep in a recliner in one of the five cottages. The DFPS staff had to shake the staff person to wake them, and no other staff was working in the cottage. The awake-night staff member was sent home and replaced by another staff member for the remainder of the shift. DFPS staff reviewed the bed check log and video surveillance to determine when the last bed check was made and confirmed that the staff had conducted a bed check 41 minutes earlier. Despite finding the awake-night staff asleep, DFPS staff certified the visit. A second visit to the operation was made two days later, and awake-night supervision was again certified.

## Whispering Hills Achievement Center

On May 2, 2023, DFPS staff conducted an awake-night monitoring visit at 2:25 a.m. and observed the bed check logs in both houses to be pre-filled through 7:00 a.m. Both awake-night staff (one located in each house) stated they completed bed checks every 15 minutes. One of the staff had no explanation for why they pre-filled the logs, while the other said they had started night shifts not long ago and thought the logs could be completed in this way. Despite the pre-filled logs, DFPS staff certified the visit and conducted a second visit two days later.

## Kismet RTC

On June 22, 2023, DFPS staff conducted an awake-night monitoring visit. DFPS gained access to the operation 40 minutes after they arrived when a DFPS supervisor assisted in locating the administrator's phone number. Operation staff appeared awake and alert, and DFPS staff determined that the phone ringer was off. Because of the difficulty gaining access, DFPS staff made an intake to SWI during the visit, but awake-night supervision was certified. A second visit to the operation was made the following night without incident.

## Caring Heart Residential Care

On November 17, 2023, DFPS staff conducted an awake-night monitoring visit. Upon arrival, DFPS staff knocked on the door and attempted to ring the doorbell, but it did not work. After five minutes, the investigator called an operation staff member who was not on shift that night. After 10 minutes, the awake-night staff on shift arrived and opened the door, stating she was in the bathroom and sick. Awake-night supervision

was certified for this visit, and a second visit was conducted the following night without incident.

Overall, awake-night supervision was certified by DFPS staff in 2,722 of 2,729 (99%) verification documents and not certified in seven (1%). In some instances, it was noted that awake-night staff were not logging or documenting bed checks, but these visits were certified because bed check logs were not required in the operation's policy.

Figure 39: Certification of Awake-night Supervision During DFPS Unannounced Visits

Source: DFPS Awake-Night Verification Documents
n = 2,729

■ Certified   ■ Not Certified



Two of the seven visits that were not certified were the only visits made by DFPS to the operation made during the month. These visits included:

Kazahs Emergency Shelter

DFPS staff conducted an awake-night monitoring visit to Kazahs Emergency Shelter on July 14, 2023. On the night of the visit, three total children were in placement, one of which was PMC, with one awake-night staff person on shift. Upon arrival at the facility, DFPS staff learned that one other PMC child was placed there but had run away five minutes before the DFPS staff arrived. When asked if the awake-night staff had reported the child leaving to the police and SWI, the staff responded that they had not and did not plan to report it because the child "does this often and returns later." DFPS staff asked about the operation's policy regarding children leaving the facility, and the awake-night staff responded that the child "would be 18 next month, so it's a little different." The awake-night staff was instructed by DFPS staff to call the police and SWI, which was done. DFPS staff then discussed training regarding awake-night supervision and observed bed check logs for accuracy and completion. DFPS staff did not certify that awake-night supervision was being provided. Kazahs Emergency Shelter had no other issues noted in the seven other awake-night monitoring visits conducted in 2023. From September through December 2023, the operation was not required to have awake-night supervision because no PMC children were placed in the operation.

## Harmony Therapy and Treatment

DFPS staff conducted an awake-night monitoring visit to Harmony Therapy and Treatment on April 25, 2023. On the night of the visit, there were six children in placement, three of whom were PMC, with one awake-night staff person on shift. Upon arrival at the facility, DFPS staff observed incomplete bed check logs from 1:00 a.m. to 4:00 a.m., which was out of compliance with the facility's 24-hour supervision policy. DFPS staff did not certify that awake-night supervision was being provided. Harmony Therapy and Treatment had no other issues noted in the eleven other awake-night monitoring visits conducted in 2023.

In 64 of 2,729 (2%) verification documents, DFPS staff noted that the reason for conducting a visit was an allegation of awake-night noncompliance.[175] Two-thirds of the visits made following an allegation (42 of 64, 66%) represented the only monthly visit by DFPS. Most of these allegations were made by children, often made during an interview in a separate investigation, who reported having observed staff sleeping on one or more occasions. DFPS Ruled Out Neglectful Supervision in 62 of the 64 allegations; one was found to be RTB and one UTD.[176] HHSC issued 14 citations for minimum standards violations based on the allegations.[177]

---

[175] In 14 of the 64 allegations, staff were reportedly sleeping on shift, but it was unclear whether the shift was at night based on the documentation in IMPACT. There were an additional 25 verification documents where the DFPS staff noted the visit was conducted based on an allegation received, but the Monitors were unable to confirm an allegation was made or could not identify an RCI investigation based on allegations of noncompliance with the awake-night requirement.

[176] The disposition summary in the case that resulted in the UTD finding stated, "[The staff person] has a history of sleeping in prior facilities as well as being placed on a written warning at [the GRO in question.]. [The staff person] was aware of her role as a staff during the night shift and aware of the need to be awake for her whole shift given the high-risk behaviors of the youth at the facility. In addition, a safety plan remained in effect and was implemented in [another DFPS investigation] when the current investigation was opened. While there have not been any other documented incidents occurring while [the staff person] was alleged to be sleeping, it was alleged she was seen sleeping numerous times and we cannot confidently say that there was not a risk of harm for these children while [the staff person] was alleged to be sleeping."

In the case that resulted in a substantiated finding of Neglectful Supervision, DFPS found that a staff member habitually slept during nighttime shifts, that one of the children he was supposed to be supervising had an indicator for sexual aggression, and the other children also had "a mixture of high-risk behaviors" and required constant supervision. The investigation also included other allegations of supervision problems, including that staff were on their cell phones during work shifts and that a staff person left the unit, leaving children unsupervised. However, the disposition summary did not document any actual harm to a child as a result of the staff member sleeping.

[177] As previously reported, though HHSC may find that staff slept and issue a citation, with the exception of the investigation discussed in note 169, DFPS does not appear to be substantiating Neglectful Supervision when staff sleep absent an injury to a child during the shift in question. For example, in one case, an HHSC inspector reported that while another allegation was being investigated, a child alleged he was inappropriately touched by another child while he was sleeping. The same intake alleged that three out of five children said that the staff person who was supervising children that night would sleep during shifts. However, DFPS found that there was "not enough evidence" to support Neglectful Supervision because, though children and staff members reported that the staff member slept during his shifts (and the alleged victim's roommate said he saw the other child enter their room and engage in the

## Quarterly Reports of Non-Compliance with Awake-Night Supervision

DFPS also compiles quarterly reports detailing operations' self-reported violations, violations identified by DFPS staff during unannounced visits, and any corrective actions taken related to these violations. According to these data, self-reports and DFPS-identified instances of noncompliance have increased since 2022, when operations experienced a substantial decline in noncompliance from the previous year.

---

inappropriate touching), they could not confirm that he was sleeping on the night in question. HHSC issued a citation, finding "Two staff members sleep during shifts."

Another case involved Garden of Hope of Central Texas, a GRO that the Monitors reported had awake-night violations (including a case involving a fatality) in the Sixth Report. Sixth Report, at 78 - 82. DFPS Ruled Out Neglectful Supervision because, though children and staff reported having observed staff sleeping, "There were no reports of children being hurt or injured while the staff was asleep." HHSC issued a citation, finding "A caregiver was not providing appropriate supervision to children when it was determined staff was sleeping and they were the only caregiver present." In another, an investigation was opened at an operation that was under Heightened Monitoring after a 17-year-old child made an outcry that a staff person often slept during awake-night shifts. The administrator was interviewed and "acknowledged this was not the first case called in for her sleeping." DFPS found the staff person (who had been laid off by the operation) "was more than likely falling asleep on shift" but "all persons denied any serious incidents occurring due to [the staff person] sleeping." HHSC issued a citation, finding "It was discovered through interviews with collaterals, that staff failed to supervise children accordingly, as staff member would fall asleep during their working hours."

During another investigation, children and staff confirmed allegations that a staff member slept during her awake-night shift, and DFPS viewed video footage that showed the staff person "had her head down on the desk." However, DFPS Ruled Out Neglectful Supervision because the staff members who were interviewed "confirmed that no incidents occurred." HHSC issued a citation, finding "it was determined that a staff fell asleep while on duty."



**Figure 40: Reports of Noncompliance with 24-Hour Awake-Night Supervision Requirements, January to November 2021, 2022, and 2023**

Source: DFPS Noncompliance Reports
n = 51

The DFPS quarterly reports and awake-night verification documents submitted to the Monitors were consistent, with three exceptions. According to the quarterly reports, DFPS placed Bridgeway Home on a contractual Corrective Action Plan on September 13, 2023, after a staff member admitted to sleeping during his shift.[178] The only awake-night visit verification document submitted for Bridgeway Home during September was dated five days later, September 18, with no issues mentioned.[179] Additionally, incidents reported by DFPS staff in two awake-night verification documents were not included in the quarterly reports of noncompliance following a monitoring visit.

The 2023 quarterly data included 16 incidents of self-reported and DFPS-identified noncompliance.[180] Of the 16 incidents, 10 (63%) were subsequently reported to SWI. DFPS took some action to address the noncompliance in all 16 incidents. DFPS put a corrective action plan in place in 13 of 16 (81%), issued a contract violation in one (6%), provided a Technical Assistance letter in one (6%), and made a second unannounced visit in one (6%).

---

[178] There were also children who witnessed the staff asleep.

[179] This visit was conducted timely according to DFPS policy which requires a visit to be conducted within three business days of an allegation of noncompliance with awake-night supervision. The allegation of noncompliance was received on Wednesday, September 13, and the visit was conducted on Monday, September 18.

[180] On review, Three of the 11 self-reported violations were found not to be violations of awake-night requirements because no foster care children were placed in the home at the time of the self-report.

**Figure 41: Actions Taken Due to Noncompliance with Requirements of 24-Hour Awake-Night Supervision, January to November 2023**

Source: DFPS Noncompliance Reports
n = 25



- ■ Reported to SI Intake
- ■ Corrective action plan issued
- ■ Contract violation issued
- ■ Technical Assistance letter issued

The eight self-reported incidents of awake-night noncompliance included in the quarterly reports were as follows:[181]

### Camp Worth

On May 22, 2023, the operation self-reported that "staff was found asleep while supervising youth on 5/17/23." The operation conducted an internal investigation and reported the incident to SWI. DFPS followed up by making an unannounced visit on May 25, 2023, and found the operation compliant. The quarterly report spreadsheet notes indicate that a Corrective Action Plan was pending approval when the data was submitted to the Monitors.

### Cumberland Presbyterian

On May 28, 2023, the operation self-reported that a staff member was viewed on camera appearing to be asleep. The shift supervisor checked on the staff member, confirmed the staff member was sleeping, and sent the staff member home. DFPS followed up by making an unannounced visit on June 1, 2023, and found the operation

---

[181] Seven of the eight remaining DFPS-identified incidents of noncompliance included in the quarterly reports are described in the section above, including: A.B.E. Residential Services, Caring Heart Residential Care, Creighton Oaks Residential Treatment, Family Link Treatment Services –Foster Home X, High Plains Children's Home & Family Services, Inspirational Hope House, and Kinship KonnectionThe quarterly reports indicated that a Corrective Action Plan was issued or pending for three of these operations (Creighton Oaks, Family Link Treatment Services, and Kinship Konection).  DFPS found a contract violation for Inspirational Hope House.

compliant. The quarterly report spreadsheet notes indicate that a Corrective Action Plan was pending approval when the data was submitted to the Monitors.

## Hill Country Youth Ranch

On March 2, 2023, the operation self-reported that on the previous night's shift, a night staff "missed some 15-minute checks on a child on close observation." The quarterly report spreadsheet notes indicate that a Corrective Action Plan was pending approval when the data was submitted to the Monitors.

On April 16, 2023, the operation self-reported that a resident said that night staff was observed asleep. The staff member "did acknowledge that she thinks she accidentally dozed [*sic*] off for about 10 minutes last week." The operation stated the issue would be "addressed accordingly through Human Resources and Training." The quarterly report spreadsheet notes indicate that a Corrective Action Plan was pending approval when the data was submitted to the Monitors.

## Hill Country Youth Ranch – Ingram

On March 2, 2023, the operation self-reported that a night staff member speaking with an RCCI investigator admitted that "he had dozed off a few times while on duty but cannot remember the dates." DFPS made a follow-up visit on March 6, 2023, and the operation was found to comply. Notes indicate that the safety plan was being followed at the time of the visit on March 6. DFPS also issued a Corrective Action Plan.[182]

## Pleasant Hill Children's Home

On March 15, 2023, the operation self-reported that a daytime staff observed the night staff to be asleep when she arrived for her morning shift. DFPS made a follow-up visit on March 20, 2023, and found the operation compliant. Notes indicate that a Corrective Action Plan was pending when the data was submitted to the Monitors.

## The SAFE Alliance

On January 18, 2023, the operation self-reported that a staff member emailed a director reporting that a coworker had fallen asleep at the staff workstation. Notes indicate that this incident occurred under a safety plan based on a previous allegation of staff sleeping and that HR directives were being explored for the staff by the operation. DFPS issued a Corrective Action Plan in response to the self-report.

## SJRC Texas (formerly known as St. Jude's Ranch for Children)

On April 20, 2023, the operation self-reported that "a staff member fell asleep while supervising the youth." DFPS issued a Corrective Action Plan in response to the self-

---

[182] The safety plan required the staff person to call the Assessment Center on campus every hour for each day he was on shift for one month.

report. Two other allegations of staff sleeping were reported in March and October that were not noted in the quarterly reports or mentioned in the awake-night verification documents for those months.

## Site Visits Made by the Monitoring Team

The monitoring team begins each visit to a GRO with an awake-night visit. Though the monitoring team did not observe any awake-night staff sleeping during visits in 2023, they had difficulty accessing the facility during three visits:

**The monitoring team made an awake-night visit to Creighton Oaks RTC on June 12, 2023, at approximately 1:50 a.m**. Children reside in two houses on the campus. The monitoring team arrived at one, which had a metal gate around the front porch, making the door inaccessible. The monitoring team pressed the doorbell several times with no response. A member of the team called the phone number listed for the facility's administrator at 2:05 a.m. and left a voicemail. The administrator immediately responded and informed the monitoring team member that she would contact the staff inside the house; she said that the doorbell might be "offline." After about two more minutes, the staff member opened the front door and said they "did not hear the doorbell." When the team visited the second house, they were greeted by the case manager, who had been called in to cover for a staff member who had to take a child to the hospital.

**The monitoring team made an awake-night visit to Bluebonnet Haven RTC on August 29, 2023, at approximately 1:45 a.m**. The monitoring team rang the doorbell at the main office several times, but there was no answer. The team called the listed phone numbers for each of the houses on campus; only the staff in House 3 answered. The staff person notified the supervisor that the monitoring team was waiting at the front door, and the team was allowed to enter. At the time of the visit, Bluebonnet Haven had just been placed on a Plan of Action by HHSC which addressed problems associated with awake-night staff falling asleep, among other issues. The Plan of Action was completed on February 13, 2024.

**The monitoring team made an awake-night visit to The Burke Foundation – Pathfinders RTC at 2:15 a.m. on November 14, 2023.** The monitoring team did not have the code to the front gate and called the front desk office five times without an answer. The monitoring team called an after-hours number and was given a code to the front gate, but the code had been changed that evening. The program administrator finally gave the team the correct gate code at 2:48 a.m. and when the team toured the dorms, they found all the staff awake. However, during the site visit, the monitoring team reviewed recorded video footage and observed one staff member who appeared to be sleeping during the nighttime

shift on November 15, 2023.[183]  At the time of the visit, four of the PMC children who were residents had an indicator for a history of sexual aggression.

Deficiencies Cited for Minimum Standard Violations

The monitoring team also reviewed citations for violations of minimum standards associated with awake-night supervision. No minimum standard specifies that awake-night supervision is required. The monitoring team found citations issued in 2023 for violation of four minimum standards due to problems associated with awake-night supervision:

- 748.685(a)(3) – Caregiver Responsibility – Being aware of and accountable for each child's ongoing activity.

- 748.685(a)(4) – Caregiver Responsibility – Providing the level of supervision necessary to ensure each child's safety and well-being.

- 748.683(2) – Caregiver Supervision – Provide oversight of caregivers to ensure that assigned duties are performed adequately.

- 748.126(b) – All employees and caregivers must know and follow your operation's policies and procedures.

HHSC issued 32 citations for violating minimum standards, either for staff sleeping while on duty or for a significant problem with the operation's awake-night supervision.

Figure 42: Deficiencies for Standards Reviewed by Monitors for Issues Related to Awake-Night Supervision, January to November 2023



Source: HHSC, Monthly deficiencies
n = 133

_____

[183] The monitoring team reported the incident to SWI and provided the video to the investigator. DFPS determined that the video did not conclusively show the staff person was asleep. Neglectful Supervision was Ruled Out; no citations were issued.

Violations resulting in citations included:

- A citation issued after it was determined that a female awake-night staff member slept in a vacant bed in a bedroom housing two male foster children, one of whom was non-verbal.
- A citation issued after a staff member admitted that she and another worker would sleep at the same time, in a bedroom with the door closed, during the overnight shift.
- A citation issued after a DFPS investigation resulted in photographic evidence of two different staff members sleeping on separate occasions. One of the photographs showed an awake child in the background. DFPS Ruled Out Neglectful Supervision because "there was no harm caused to any residents."
- A citation issued in a case in which the child recorded the staff member sleeping, but the operation's administrator deleted the recording and failed to report the incident to SWI. The administrator admitted to deleting the video and said it appeared to show the staff person sleeping. The incident was reported only because the child made an outcry when a DFPS investigator interviewed him for another case.[184]
- A citation issued in a case in which the investigator determined that a staff member had fallen asleep during several shifts, including in at least one shift where she was the sole caregiver on duty, and the operation had been aware of reports regarding this staff person repeatedly sleeping during her awake-night shift. The operation had performed an "internal" investigation and decided not to report the violation to SWI because they "deemed they did not have enough evidence."  The incident was reported to SWI by a DFPS awake-night monitor after she "received vague information from [a] staff member working on the home."
- A citation issued in a case in which the staff person fell asleep on the couch "covered in a blanket," and her phone alarm went off waking up the children. The children tried to wake her, but she was "in a deep sleep snoring."  The investigation revealed video capturing the incident.

Other citations were issued for violations that indicated significant supervision problems during nighttime shifts without direct evidence of staff sleeping. For example, a citation was issued to an operation after determining that a staff person pre-filled bed check logs, "notating all children were asleep the entire night until 6 am."

Summary: Remedial Orders A7 and A8

---

[184] The HHSC investigator in this case documented that when she reached out to the DFPS investigator who made the report to SWI, the DFPS investigator asked the HHSC investigator if "'this' was new, referring to HHSC inspectors contacting [DFPS] to discuss concerns in the investigation."  The DFPS investigator told the HHSC investigator "she doesn't do this and that any concerns she had would be documented in the risk assessment" and "she does not staff investigations with HHSC staff."

The Monitors reviewed data and documentation related to DFPS awake-night visits to 279 placements. DFPS made fifty-six repeat visits to locations required to provide awake-night supervision in 2023, either because of a report to SWI (32 of 56, or 57%) or problems DFPS encountered during an initial visit (9 of 56, 16%). DFPS did not document the reason for the repeat visit in 13 (of 56, 23%).[185] HHSC issued 32 citations to operations for violating minimum standards, either for staff sleeping while on duty or for a significant problem with the operation's awake-night supervision.

## Regulatory Monitoring and Oversight of Licensed Placements

### Analysis of HHSC Investigations

HHSC investigates allegations of violations of statutes, administrative rules, or minimum standards. These investigations play a critical role in the safety of children in care. According to the Texas Human Resources Code, HHSC promulgates minimum standards to "ensure that a child's health, safety, and welfare are adequately protected."[186] HHSC assigns minimum standards a weight – high, medium-high, medium, medium-low, or low – "based on the risk that a violation of that standard presents to children."[187]

HHSC recognizes minimum standards investigations as a "critical aspect" of its "efforts to protect the children in care."[188] When an investigation is initiated, the investigator is required to assess the immediate safety of both the children involved in the investigation and collateral children being cared for by the operation.[189] The investigator "continues to evaluate the safety of children in care throughout the investigation" and "takes steps to ensure children's safety if the investigator determines a child is not safe at any point during the investigation."[190]  According to HHSC policy, "safety" refers to "the threat of harm presented to a child."[191]  HHSC considers a child "unsafe" when there is "an immediate threat of harm to the child" and "the caregiver or operation does not demonstrate sufficient protective capacities to keep the child from being harmed."[192]

---

[185] In 22 of the 32 repeat visits that were made because of a report to SWI, the Monitors identified allegations of awake-night noncompliance. Two of the 13 repeat visits with no indication of the reason were made following a Reason to Believe finding for Neglectful Supervision as a result of staff sleeping at night. One repeat visit was conducted "in reference to a management concern regarding staff to youth ratios" and another was conducted to "review CAP items." During both visits, the operation was found to be compliant.

[186] Tex. Human Resources Code §42.042(e)(9).

[187] HHSC, Child Care Regulation Minimum Standards, *available at* https://www.hhs.texas.gov/providers/protective-services-providers/child-care-regulation/minimum-standards

[188] HHSC, Minimum Standards for General Residential Operations 7 (October 2023); HHSC, Minimum Standards for Child Placing Agencies 7 (October 2023).

[189] HHSC, Child Care Regulation Handbook §6330 Assessing the Immediate Safety of Children.

[190] *Id.*

[191] *Id.* at §6331.1

[192] *Id.*

The Court's remedial orders related to monitoring and oversight of licensed placements recognize the important role that HHSC plays in ensuring child safety.

Validating compliance with the Remedial Orders included in the Regulatory Monitoring and Oversight section of the Monitors' reports is largely determined by the appropriateness of an HHSC investigation's assigned priority level and the quality of minimum standards investigations involving PMC children. For example, the priority level assigned to an investigation is tied to the timeliness requirements of Remedial Orders 12 through 19. Priority level also represents a critical safety issue; the lower the priority level, the longer the timeline for initiating the investigation, interviewing the child, and assessing safety. A longer timeline may affect the investigator's ability to ensure safety of children's placements, because it may be more difficult to obtain important evidence, like video recordings, associated with the allegations.

In completing an ECHR, inspectors/investigators are guided by the quality of HHSC investigations and the enforcement of minimum standards through citations. When validating Remedial Order 22, the Monitors assess whether investigators correctly identify instances where operations failed to report to SWI abuse, neglect, or exploitation, as well as how operations are evaluated in the five-year pattern analysis for Remedial Order 20. An operation's history of citations is one measure that HHSC evaluates when it makes a recommendation for closure of an operation pursuant to Remedial Order 21.

If HHSC fails to enforce minimum standards by appropriately investigating alleged deficiencies and issuing warranted citations, more meaningful potential agency enforcement actions (a POA, probation, Heightened Monitoring, denial of a license, or license suspension) and enforcement actions that DFPS may take (placing a home on its disallowance list, or contractual remedies) are less likely. Enforcement of minimum standards through investigations is critical to child safety.[193]

For this report, the Monitors conducted a case record review of two random samples[194] totaling 400 HHSC minimum standards investigations classified as Priority Level 1, 2, or 3 investigations that closed in 2023. The monitoring team's review included: the appropriateness of the assigned priority level, whether the investigation was sufficient to reach the outcome, and whether the outcome was appropriate and took into account at all times the child's safety needs.

---

[193] HHSC acknowledges this, stating, "The investigator must complete an investigation of a report alleging possible risk to children promptly and thoroughly to ensure that children who are or will be in care at the operation are protected." HHSC, Child Care Regulation Handbook, § 6100 Overview of Investigations.
[194] The first random sample of 208 minimum standards investigations was taken from the 449 total investigations (for a confidence interval of 95/5) completed in January 2023 or March 2023. The second random sample of 192 investigations was taken from the 381 (for a confidence interval of 95/5) completed in September 2023 or November 2023. Starting in May 2023, the State began including legal status in the investigations data used to produce the samples. Due to potential differences in investigations between PMC and TMC children and the need for consistency in methodology across the periods, both samples included all investigations regardless of legal status.

Overall, the case record review revealed significant deficiencies with intake and investigation of minimum standard deficiencies, particularly associated with the priority level assigned by HHSC to the investigations reviewed. Of the 400 investigations included in the sample, the monitoring team disagreed with the assigned priority level in almost half (190 or 48%) based on applicable Texas law and policy. In addition, the monitoring team found investigations so deficient that an appropriate outcome could not be determined in 90 (23%) cases and disagreed with the outcome in 9 (2%), for a total disagreement rate of 25% (99 of 400).

## Assessment of Investigation Classification

When SWI screens out an intake for an investigation of abuse, neglect, or exploitation and routes it to HHSC, the intake is assigned a priority level by HHSC for its handling if HHSC determines that a minimum standards investigation is warranted.[195] According to HHSC, intake reports are assigned priorities based on: (i) information available at the time of intake; (ii) the presence of current threats to the child's immediate safety; (iii) the degree of harm the child has sustained or may sustain in the next 12 months; and (iv) the allegation that presents the greatest risk to the child if multiple allegations are reported.[196]

HHSC uses five priority levels:

**Priority 1**: A report of a violation of a law or minimum standard that places children in care at immediate risk of serious or substantial harm.

**Priority 2**: *Injury or serious mistreatment of a child.* A report that a child in care is disciplined, punished, or physically restrained in a manner that is prohibited by minimum standards, including a report that a child in care sustained a serious injury because of discipline, punishment, physical restraint, or other type of mistreatment prohibited by minimum standards.

**Priority 2**: *Serious Accidental Injury.* A report that a child suffered a serious accidental injury (i.e., a serious injury that is the result of an accident) and the injury may be a result of a violation of minimum standards.

**Priority 2**: *Serious safety or health hazards.* A report of a violation of the minimum standards related to safety or health that may pose a risk of substantial harm to children in care.

**OR.** A report that a person who is present at the operation has criminal or   Central Registry history that may expose children in care to risk of harm. This includes:

---

[195] *Id.* at § 6240 Assessing an Intake Report for Priority.
[196] *Id.*

- a person who has recent arrest history that poses a risk of harm to children and whose arrest has not gone through the justice system;
- a person who has recent Central Registry history and the person has not gone through due process; and
- a person on the sexual offender registry whose address is an exact match to the operation's address.

**OR.** A report that an unregulated operation:

- meets any of the criteria above;
- has a history of being investigated for operating without a permit;
- was previously listed, licensed, or registered and closed voluntarily or by adverse action; or
- is caring for more than 12 unrelated and related children.

**Priority 2**: *Serious supervision problems*. A report of a violation of the minimum standards related to supervision that may pose a risk of substantial harm to children in care.

**Priority 3**: *Illegal operations with no other allegations*. A report that care is being provided to children by a residential care operation that does not have a permit, may be subject to regulation, and there are no other allegations.

**Priority 3**: *Minor violation of the law or minimum standards that involve low risk to children*. A report of a violation of a law or minimum standard that poses low risk of harm to the health or safety of children in care.

**OR.** Risk factors exist that indicate children may be at risk of harm. Risk factors include, but are not limited to:

- Minor injuries that are accidental in nature and may indicate supervision problems; and
- A pattern of incidents that normally do not require an investigation (such as repeated runaways).

**OR.** A report of a serious injury or medical incident that:

- Contains information in the intake report that the parent or guardian has concerns regarding supervision or safety; and
- Is not a self-report; and
- Does not indicate the serious injury or medical incident is the result of a minimum standards violation.[197]

---

[197] *Id.* at § 6241.

Priority 5 investigations are desk reviews or cases assigned to a CPA for internal investigation.[198] The Priority 4 designation is used to reclassify a Priority 5 when the investigation requires an inspection.[199] Priority 5 investigations were not included in the sample of cases reviewed by the Monitors for this report.

The assigned priority level dictates key events in the timeline of an investigation:[200]

A Priority 1 investigation must be initiated with face-to-face contact with an alleged victim(s) within 24 hours of intake. An inspection of the operation must be completed within 15 days, and the investigation must be completed within 30 days. Notification of HHSC's findings must be mailed the same day the investigation is completed.

A Priority 2 investigation must be initiated with face-to-face contact with an alleged victim(s) within 72 hours of intake. The operation must be inspected within 15 days, and the investigation completed within 30 days. Notification must be mailed the same day the investigation is completed.

A Priority 3 investigation must be initiated with face-to-face contact with the alleged victim(s) within 15 days of intake. An inspection must be completed within 30 days, and the investigation must be completed within 60 days. Notification must be mailed within 60 days of the investigation's completion.

A Priority 5 investigation is a desk review and does not include face-to-face contact with an alleged victim or an inspection of the operation. A Priority 5 review must be initiated within five days of intake. The investigation must be completed within 60 days, and notification mailed within 60 days of completion.

Nearly one-quarter of the investigations included in the sample of cases reviewed by the monitoring team (86 of 400, or 22%) were classified as Priority 2 and over three-quarters (312 of 400, or 78%) were Priority 3. There were two Priority Level 1 investigations completed during the sample periods.[201]

---

[198] *Id.*
[199] *Id.* at § 6243.
[200] *Id.* at Appendix 6000-1 Investigator Time Frames for Investigations
[201] Neither Priority 1 investigations in the sample involved PMC children.

## Figure 43: Priority Level of RCCR Investigations Sampled

Source: RCCR Investigation case read
n = 400



### Assessment of Priority Levels

The monitoring team reviewed allegation information documented at intake and used by HHSC to assign the priority level of the investigations sampled. In nearly half of investigations (190 of 400, or 48%), the monitoring team disagreed with HHSC's priority level assignment.[202] This was an identical percentage to the monitoring team's review of HHSC investigations completed in 2022 and reported in the Monitors' Sixth Report (disagreement rate of 48%). The appropriateness of HHSC's screening prioritization improved over time in the Monitors' sample. The monitoring team disagreed with the priority level assignment in 38% (72 of 192) of investigations completed in September or November 2023, compared to 57% (118 of 208) of investigations completed in January or March 2023.

---

[202] HHSC defines Priority Levels in the Child Care Regulation Handbook as: Priority Level 1 – violation of law or minimum standards that pose an immediate risk to children; Priority Level 2 – injury or serious mistreatment of a child, serious accidental injury, serious safety or health hazards, or serious supervision problems; Priority Level 3 – minor violation of law or minimum standards that involve low risk to children.



**Figure 44: Monitoring Team Agreement with Priority Level Assignment of RCCR Investigations**

Source: RCCR Investigation case read
n = 400

■ Agree with Priority Level    ■ Disagree with Priority Level

210
(52%)

190
(48%)

RCCR Investigations

There was little difference between the results for operations under Heightened Monitoring versus operations that were not.[203] The monitoring team assessed the assigned priority level was inappropriate in 45% (40 of 89) of the sampled investigations that were conducted at Heightened Monitoring operations, compared to 48% of sampled investigations (150 of 311) at operations that were not under Heightened Monitoring. The monitoring team most often disagreed with the assigned priority level in investigations assigned a Priority 3 level.

---

[203] In the Sixth Report, the monitoring team disagreed with the priority level in a higher percentage of investigations at operations under Heightened Monitoring, 54% (38 of 71) compared to 47% (100 of 214) of investigations at operations that were not under Heightened Monitoring.



Figure 45: Monitoring Team Agreement with Assigned Priority Level of RCCR Investigations by Priority Level

Source: RCCR Investigation case read
n = 400

Nearly one-quarter of the 172 Priority 3 investigations (39 or 23%) where the monitoring team disagreed with the classification involved allegations of physical, emotional, or sexual abuse, corporal punishment, or physical or medical neglect.[204] Another 22 investigations (13%) involved a child running away from a placement and 14 (8%) involved a child self-harming. Nearly half of the 172 investigations (75 or 44%) involved serious supervision issues.

Examples of intakes that the monitoring team determined should have been assigned a higher priority level include the following:

Boysville, Inc. (178491), Investigation #3015816

A CPS caseworker made a report to SWI on July 21, 2023, that Child A was given a psychiatric medication (Remeron) and after eight doses reported that it made him sick and was giving him migraines. The intake alleged that the CPS caseworker for the child was not notified by the GRO about this new medication, and Boysville was not given permission to administer Remeron to Child A. A second report was made six days later after Child A ran away during a family visit.

The allegation narrative in CLASS states, "It is alleged that child was taking prescription medication without parent/guardian approval. Additional allegations that child went to sibling's home while on runaway." One high-weighted minimum standard was flagged for investigation. HHSC opened a Priority 3 investigation for minor violations of the law

---

[204] Includes issues with over medication or missed medication.

or minimum standards that involve low risk to children. The Monitors disagree with the Priority 3 designation.

Circles of Care (546152-513-4), Investigation #2960812

On January 6, 2023, DFPS staff reported to SWI that a foster mother was physically abusing a biological child in the home where two foster children reside. It was reported the foster mother "punched [biological child] in the face, pulled her hair, and choked her." A second report was made the following day by the foster children's older sibling, who stated her siblings described being "thrown in a dark room" for bad behavior and reported physical abuse of the biological child. The older sibling stated this information had been shared with their caseworker "multiple times" and "nothing has happened." The allegation narrative in CLASS states, "It is alleged that the children in care are being inappropriately disciplined. In addition, having to witness domestic fighting between foster mother and biological child." Four minimum standards were flagged for investigation, including two high-weighted standards, and two that were weighted medium-high. HHSC opened a Priority 3 investigation for minor violations of the law or minimum standards that involve low risk to children. The Monitors disagree with the Priority 3 designation.

Caring Hearts for Children (1242666-7091), Investigation #2956251

On December 19, 2022, a foster parent reported to SWI, after receiving a call from a child's caseworker, that the 16-year-old child had told a family member she was having a sexual relationship with a 17-year-old who also lived in the home. There were reportedly two or three separate incidents that had occurred when the foster parents were asleep. One high-weighted minimum standard related to supervision was flagged for investigation. HHSC opened a Priority 3 investigation for minor law violations or minimum standards involving low risk to children. The Monitors disagree with the Priority 3 designation.

Addy's Hope Adoption Agency (1062166-6411), CLASS Inv. # 2974988

On February 23, 2023, a child's mental health counselor reported to SWI that the child told the counselor that he was spanked by the foster parent and grandparents. The reporter alleged that the child reported being spanked with a hand, belt, or a paddle, as well as being hit in the face, and the child alleged this "happens often." In addition, the child reported that the foster parent threatens the loss of placement if the child "keeps being bad." The allegation narrative in CLASS states "It is alleged a child was spanked by more than one person in the home and was threatened to lose placement." Three minimum standards were flagged for investigation, including one high-weighted standard. HHSC opened a Priority 3 investigation for minor violations of the law or minimum standards that involve low risk to children. The Monitors disagree with the Priority 3 designation.

Castillo Children's Center (1684373), CLASS Inv. # 2963458

On January 17, 2023, School Staff reported to SWI a video found at Castillo Children's Center where staff used profanity, and verbally abused and threatened children. The reporter believed that the children's behavior problems at the school were "stemming from staff verbally and physically abusing them." It was also reported that a staff member at Castillo Children's Center feared retaliation from reporting the abuse.

The allegation narrative in CLASS states "It is alleged children's rights are being violated. It is alleged children are being subjected to verbal abuse by staff." A total of eight minimum standards were flagged for investigation, including one high-weighted standard, and two medium high-weighted standards. HHSC opened a Priority 3 investigation for minor violations of the law or minimum standards that involve low risk to children. The Monitors disagree with the Priority 3 designation.

Make A Way Residential Treatment Center (1724502), CLASS Inv. # 3036556

On October 16, 2023, A DFPS caseworker reported to SWI that an 8-year-old child alleged being "punched in the chest" by a staff member at the RTC. A high-weighted standard was flagged for investigation related to corporal punishment. HHSC opened a Priority 3 investigation for minor violations of the law or minimum standards that involve low risk to children. The Monitors disagree with the Priority 3 designation.

HORCH for Girls (1756811), CLASS Inv. # 3039242

On October 27, 2023, a school nurse reported to SWI that a 10-year-old nonverbal child arrived at school on several occasions wearing pull-ups that "appear not to have been changed," that the school staff had at times observed "dried stool…in the pullup," and that the child's bottom and rectum were "very reddened and irritated." The report noted, "the house mother has been spoken with six times about the concerns." The reporter also alleged that the child had ulcerated areas on her thumbs from sucking her thumbs. Three minimum standards were flagged for investigation, including one high-weighted standard and one medium high-weighted standard. HHSC opened a Priority 3 investigation for minor violations of the law or minimum standards that involve low risk to children. The Monitors disagree with the Priority 3 designation.

Trels Home for Children (1705965), CLASS Inv. # 3015484

On July 23, 2023, an HHSC investigator reported to SWI an allegation that one staff was supervising all of the children in care, causing ratio imbalance issues. The reporter also alleged that a staff member pushed a child against the wall and called it a restraint, that only one meal a day was being provided to children, and that food was not provided if the children missed a meal by oversleeping. Three high-weighted standards were flagged for investigation. HHSC opened a Priority 3 investigation for minor violations of the law or minimum standards that involve low risk to children. The Monitors disagree with the Priority 3 designation.

Guiding Light RTC (1509962), CLASS Inv. # 2962342

On January 16, 2023, a staff person for a behavioral health hospital reported to SWI that a child who was admitted to the hospital alleged that "the staff at Guiding Light will hit her when they are trying to restrain her" and said it had happened "on more than one occasion." In the intake narrative, in answer to the question, "Explain concerns about past injuries or incidents of inappropriate discipline" the reporter responded that the child "is reporting physical abuse by staff."

The CLASS allegation description states, "It is alleged a child in care is being hit while being restrained." HHSC opened a Priority 2 investigation for serious safety or health hazards. The Monitors disagree with the priority level assigned to the investigation. The intake alleged a child was being hit during restraints, and the reporter specifically alleged Physical Abuse.

## Assessment of Investigation Activities and Outcomes

Operations received a citation in 27% (109 of 400) of the HHSC investigations sampled. Investigations involving operations under Heightened Monitoring were cited at a higher rate than those involving operations not on Heightened Monitoring: 32% (28 of 89) compared to 26% (81 of 311). Priority Level 2 investigations resulted in a citation at a higher rate than Priority Level 3 investigations (35% and 25%, respectively).[205]

As part of the record review, the monitoring team reviewed the information documented over the course of the investigation, including interviews and document reviews conducted by the investigator. In 310 of the 400 (77%) investigations sampled; the monitoring team found the investigation sufficient to assess an outcome. When the investigation was sufficiently conducted to assess an outcome, the monitoring team agreed with the outcome in 97% (301 of 310) of HHSC investigations reviewed. This rate of agreement with the HHSC outcome was higher than in the previous year (91% of investigations in 2022).[206] The monitoring team agreed with the outcome in a similar percentage of investigations regardless of an operation's status on Heightened Monitoring.

Of the 400 investigations reviewed, the monitoring team found the investigation either so inadequate that an appropriate outcome could not be determined or disagreed with the outcome in 99, or 25% of investigations.[207]

---

[205] Neither of the two Priority Level 1 investigations resulted in a citation for the operation.
[206] Sixth Report, at 109.
[207] The monitoring team found the investigation was so inadequate that an appropriate outcome could not be determined in 90 investigations and disagreed with the outcome in nine investigations. The Monitors include summaries for 80 of the 99 investigations in Appendix A.

## Figure 46: HHSC Investigations Considered Deficient by the Monitoring Team

Source: RCCR Investigation case read
n = 400



- **Adequate and Agree**
- **Inadequate or Disagree**

99 25%

301 75%

Of the 89 investigations at Heightened Monitoring operations, 28% (25) were found to be deficient[208] compared to 24% (74 of 311) of investigations at operations not under Heightened Monitoring at the time of the intake. A higher percentage of Priority 2 investigations were found to be deficient than Priority 3 investigations. Of the 86 Priority 2 investigations, 30% (26) were found to be deficient compared to 23% (73 of 312) of Priority 3 investigations.

The percentage of investigations found to be deficient by the monitoring team was identical to the findings from the previous year. In the Sixth Report, 25% of investigations (70 of 285) were found to be deficient by the monitoring team.[209] This rate also remained consistent across the two case record reviews in 2023. For investigations completed in January or March 2023, 26% (53 of 208) were found to be deficient compared to 24% (46 of 192) of investigations completed in September or November 2023.

<div style="background:#3f5fa0;color:white;padding:6px;">

**Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment and Obligation to Report Suspected Abuse or Neglect**

</div>

Remedial Order 22*: Effective immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment in the placements.*[210]

---

[208] Deficient includes investigations determined by the monitoring team to be so inadequate that an outcome could not be determined and those where the monitoring team disagreed with the outcome of the investigation.

[209] Sixth Report, at 109.

[210] In response to the State's request for clarification regarding the timeframe for review and how to document RCCR's consideration of the required elements during inspections, on October 7, 2019, the Monitors advised HHSC that the Court, "directs with respect to the look-back period for consideration all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of

*During inspections, RCCL, and any successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

## Background

Remedial Order 22 includes two distinct requirements: First, RCCR must consider referrals and confirmed findings of abuse or neglect and corporal punishment during inspections (which the State documents in CLASS in a field for "Extended Compliance History Reviews," or ECHRs (RO 22A). Second, RCCR must monitor and report to DFPS lapses in placements' obligations to report abuse or neglect (RO 22B).

As to the first requirement, the Monitors validated the State's compliance through independent case record reviews.[211] For the second requirement, the Monitors analyzed

---

corporal punishment, RCCL inspectors should assess the previous 5 years. With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient. The Court directs the agency to have inspectors document in CLASS (1) the number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered." E-mail from Kevin Ryan and Deborah Fowler to Andrew Stephens, et al., re: Responses to State's Requests, October 7, 2019 (on file with the Monitors).

[211] Consistent with the methodology used in the Monitors' previous case record reviews for Remedial Order 22, the Monitors completed three case record reviews for a random sample of 526 inspections, with a 95/5 confidence interval. The first sample, in July 2022 consisting of 179 inspections; the second sample, in September 2022, consisting of 177 inspections; and the third sample, consisting of 170 inspections, covered December 2022. All RCCR inspections except for attempted, application, initial, follow-up, and sampling inspections were included in the sample.

All case reads included the following components:

(1) The total number of ANE intakes, findings, and corporal punishment citations provided in the inspection Extended Compliance History Report (ECHR);

(2) Items documented in the *Assessment of Information Reviewed* (e.g., details of RTBs and/or citations for corporal punishment, other deficiencies cited, corrective action/Heightened Monitoring, areas where the operation has historically had safety or compliance issues);

(3) An assessment of the quality of documentation in the Assessment and determination of the presence of risk at the time of inspection based on the information provided;

(4) The items documented in the *Steps Taken to Mitigate Risk* which reflect the activities conducted during the inspection (also referred to as inspection activities);

(5) A determination that the inspector documented how the operation or agency home's history was taken into consideration prior to or during the inspection.

citations issued to operations by RCCR for violations of minimum standards associated with the reporting of abuse, neglect, or exploitation. The Monitors also reviewed and compared two reports provided by the State to the Monitors: (1) a list of deficiencies cited for failure to report abuse, neglect, or exploitation, provided each month to DFPS by RCCR; and (2) a DFPS report on the failure to report notifications the agency receives from RCCR in each period. The Monitors cross-matched these two reports with the data for citations issued due to failure to report. The Monitors also reviewed the circumstances leading to each of the citations issued during the period reviewed.

## Changes to ECHR Functionality in CLASS

On August 5, 2023, HHSC changed CLASS functionality to streamline the ECHR process.[212] HHSC added functionality that automatically populates and displays the ECHR data counts on the Inspection Details page. HHSC also created an Extended Compliance History Summary and Listing and an Extended Compliance History Assessment page. The ECHR Summary and Listing page includes the number of ANE intakes, confirmed findings, and corporal punishment citations with links to the related investigations for an operation's previous five years and, if the inspection is of a foster home, the foster home.[213]

The ECHR Assessment page comprises four sections the inspector is responsible for completing: the operation's Abuse/Neglect History, Corporal Punishment History, Other Factors to Consider, and Assessment Summary. If the investigation involves a foster home, history sections cover the operation's history and the foster home's history. A separate button allows the inspector to pull up the operation's compliance history. In all history sections, fields are automatically populated with ANE intakes, substantiated findings, and corporal punishment citations. If the operation has a history of ANE and/or corporal punishment, the inspector is responsible for identifying patterns or trends with the operation's confirmed findings of ANE and corporal punishment citations. For foster homes, the inspector also identifies any patterns or trends specific to the home. For investigation inspections, the inspector also indicates whether the

---

The narrative format of the ECHR makes validation difficult as it lacks a standardized way to assess whether the inspector determined there was risk and/or considered risk during inspection. This assessment is greatly impacted by the quality of documentation.

[212] The Monitors received HHSC, Child Care Regulation, Field Communication #394 in September 2023, outlining the updated CLASS functionality related to the Extended Compliance History Review (ECHR). This update also included a Job Aid Extended Compliance History Review Guide. HHSC presented a detailed demonstration of the new functionality to the Monitors on February 20, 2024.

[213] The five-year period begins on January 1 and ends the day before the ECHR is reviewed for that inspection. For example, for an ECHR examined on September 25, 2023, the five-year period includes January 1, 2018, through September 24, 2023. From the Summary and Listing page, the inspector should have quick access to the history of abuse/neglect investigations, including Ruled Out and RTB findings and corporal punishment citations for the operation and foster home.

current allegations relate to the identified patterns or trends. If the inspector does not identify any patterns or trends, the inspector must also explain this determination.

"Other Factors to Consider" is a section of the ECHR Assessment page that includes the question, "Is the operation currently on Heightened Monitoring, Corrective Action, or a Plan of Action?" If the inspector answers "yes," they must summarize the conditions or plan tasks that address ANE and corporal punishment citation findings. In the last section, the Assessment Summary, the inspector must explain the identified risks, including but not limited to how long the operation has been operating; the timeframe of the findings or citations, history of enforcement actions; the operation's response to past ANE findings or corporal punishment citations; any concerns noted in the most recent Enforcement Team Conference (ETC); and the operation's ability to identify risk. If no risk is identified, the inspector must explain the method of that determination.

No changes were made regarding documentation of the inspectors' actions taken during the inspection in the *Steps Taken to Mitigate Risk* text box on the Inspection Details Page.[214]

## Calculation of ANE Findings in ECHR

In the filed response to the State's Objections to Court Report 6, the Monitors reported on a new insight into HHSC's calculations of operations' five-year history of substantiated ANE findings, identified as a result of the changes to the ECHR page functionality in CLASS. The Monitors' review revealed that the number of substantiated findings in the ECHR reflected the number of *investigations* that resulted in an RTB finding rather than the *actual number* of RTB findings. A single investigation can result in multiple RTB findings if there is more than one victim, perpetrator, or type of abuse, neglect, or exploitation alleged to have occurred.

To examine the impact of the data reviewed by HHSC inspectors in the ECHR,[215] the monitoring team compared HHSC's ECHR data with ANE investigations data by allegation provided by DFPS.[216] The results are below:

---

[214] The monitoring team updated the case record review tool they use to assess ECHRs as a result of the CLASS changes. For example, prior to the changes to CLASS, reviewers were asked to assess the accuracy of the inspector's entries related to the number of abuse, neglect, and exploitation intakes and substantiated findings, and corporal punishment citations. This was eliminated from the case record review because those fields automatically prefill; the inspector is not required to enter the information manually. Similarly, the case read tool eliminated a question asking whether the inspector discussed the foster home's history, because the new CLASS functions require the inspector to do so.

[215] HHSC trains inspectors to review each confirmed finding of abuse, neglect, or exploitation, including the allegation and investigation details. The new functionality (which allows investigators to click on the CLASS investigation number associated with a confirmed finding) takes the reviewer to the CLASS investigation pages. Very little information associated with the DFPS investigation is available in CLASS, since DFPS investigators stopped including most investigation information in CLASS. However, at the time of the case read the Investigation Conclusion page still included a disposition summary.

[216] Each month, HHSC provides the Monitors with data related to Remedial Order 22 that represents the number of intakes and confirmed findings of abuse, neglect, or exploitation for each licensed operation over the previous five years as of the first day of the month. DFPS also provides the Monitors with data

- According to the HHSC and DFPS files, 269 of 627 (43%) licensed operations included in the HHSC ECHR five-year history data file as of September 1, 2023, had at least one ANE finding.

- The substantiated findings of abuse, neglect, or exploitation in the HHSC ECHR data matched the number calculated in the DFPS file in 69 of the 269 operations (26%). However, the data reported by DFPS reflected a significantly higher number of substantiations for the remaining 200 of 269 operations (74%), because the DFPS data reflects each substantiated allegation.

- Specifically, the average number of substantiated investigations for the 200 operations was 3.22 based on the HHSC ECHR data, compared to an average of 9.10 substantiated allegations based on the DFPS data. When analyzed by each substantiated allegation rather than by investigation, the data demonstrated the following:

  - Fifty-two of 200 operations (26%) had one more substantiated finding.

  - 80 of 200 (40%) had a difference of between two and five more substantiated findings;

  - 33 of 200 (17%) had a difference of between six and nine more ANE findings; and

  - 35 of 200 (18%) had a difference of ten or more ANE findings.

## Performance Validation

### Case Record Review of Extended Compliance History Reports

Inspections included in the case record review sample included monitoring inspections and those associated with an investigation (investigation inspections). Investigation inspections comprised most of the 635 inspections in the Monitors' case record review sample. As discussed later in this section, the Monitors identified safety risks to children in 473 of the 635 inspections. The State failed to identify safety risks in 108 of these cases.

___

related to investigations into abuse, neglect, or exploitation (disaggregated by operation) each month. The number of RTB findings was calculated in the DFPS file according to the methodology followed under RO 20 to include each allegation disposition as a unique RTB finding for the past five years as of September 1, 2023. For comparison, the monitoring team matched the ECHR data file representing the five-year history as of September 1, 2023.

## Figure 47: Number of Inspections Sampled by Inspection Type



Source: Case review data
n = 635



Inspectors conducted just more than half of all inspections in the sample at GROs (51% or 321 of 635) and conducted the remaining inspections at foster homes or CPAs (49% or 314 of 635).

Investigation inspections are conducted at operations, including GROs, RTCs, CPA main or branch offices, and foster homes. There were fewer investigation inspections for foster homes and CPAs than for GROs: 47% of investigation inspections (209 of 449) were for a foster home, while 51% (229 of 449) were related to a GRO/RTC, and 2% (11 of 449) were for a CPA branch or main office.



Figure 48: Investigation Inspections Sampled by Type



The sample included investigation inspections of operations under Heightened Monitoring. Thirty-eight percent (80 of 209) of inspections associated with an investigation of a foster home were under a CPA on Heightened Monitoring, while 13% of GROs and RTCs (32 of 240) were for operations on Heightened Monitoring.

All but three ECHRs reviewed by the monitoring team were completed before the inspection date.[217]

---

[217] ECHR completion is defined as the date the Assessment of Information Reviewed (operation's history) is completed in CLASS. Inspectors are required by agency policy to complete the Assessment prior to the inspection. Inspectors have up to one calendar day after the inspection to complete the Steps Taken to Mitigate Risk, but the date this is entered is not captured in CLASS and cannot be verified with a case record review. For future reports, the Monitors will conduct analysis on the timeliness of information entered on Steps Taken to Mitigate Risk using the inspection data provided monthly by the State.



**Figure 49: Days from ECHR Completion Date to Inspection Begin Date for Inspections with an ECHR**

Source: Case review data
n = 635

In 2023, ECHRs were completed a maximum of 16 days before and up to eight days after inspection.[218] Ninety-three percent of inspections (588 of 635) sampled revealed that an ECHR was completed the same day or up to three days before the inspection. The timing of ECHR completion about the inspection date remained consistent throughout 2023, with 91% of inspections (180 of 199) in September and 95% of inspections (216 of 228) in November having an ECHR completed the same day or up to three days before the inspection.

In 41% of the inspections reviewed by the monitoring team, the ECHR documented 50 or more ANE intakes; more than half the ECHRs documented at least one substantiated finding of ANE during the five-year review period.[219]

---

[218] When ECHRs are completed too far before the inspection, there is a risk of missing substantiated abuse, neglect, or exploitation findings or corporal punishment citations issued before the inspection that could inform the inspector's work. The HHSC Job Aid for completing the ECHR states that staff "must conduct the ECHR review no sooner than 5 days prior to the inspection." Forty-two of the 44 inspections with ECHRs were completed more than three days before and within five days before the inspection. One ECHR was completed six days before the inspection, and one was completed 16 days before. Both inspections with ECHRs were completed more than five days before the inspections were conducted in September 2023.

[219] Analysis is based on inspections, not unique operations. Operations with a higher number of intakes, confirmed findings, and corporal punishment citations likely had a higher number of inspections throughout the year and an ECHR is required for each inspection.  For purposes of this case record review, a "substantiated finding" of ANE reflects the data documented in the ECHR for the investigation.

## Figure 50: Operations' ANE Intakes, Findings, and Corporal Punishment Citations Reported in ECHRs Sampled

Source: Case review data
n = 635



GROs and CPAs were much more likely than foster homes to have a prior confirmed finding of abuse, neglect, or exploitation or a citation for corporal punishment. Foster homes had a prior confirmed finding of ANE in only two of 209 (1%) investigation inspections included in the sample.[220] In another six of 209 (3%) inspections, the foster home had a prior citation for corporal punishment.[221]

However, more than half of the sampled investigation inspections at foster homes (127 of 209, 61%) involved a foster home with one or more intakes in the previous five years. Forty-one of 209 (20%) had only one intake, 34 of 209 (16%) had two intakes, and 52 of 209 (25%) had three or more intakes.

---

[220] One home had one prior finding, and one home had two prior findings.
[221] Compared to 55% of operations (352 of 635) having a prior confirmed finding of ANE and 53% of operations (335 of 635) having a prior citation for corporal punishment. Seventy-one percent of operations (452 of 635) had either a confirmed finding of ANE or a citation for corporal punishment.



Figure 51: Number of ANE Intakes for Foster Homes Reported in ECHRs Sampled, 2023

Source: Case review data
n = 209

## Inspector Discussion of Operation and Foster Home History

Remedial Order 22 requires an inspector to consider the history of referrals and findings of child abuse, neglect, and exploitation during the inspection of the operation. The Monitors analyze the narrative description provided by the inspector in the ECHR Assessment Summary and the Steps Taken to Mitigate Risk to determine whether an inspector considered the operation's history.

Of the 635 inspections included in the sample, 452 (71%) inspections involved an operation with one or more substantiated findings of abuse, neglect, or exploitation and a citation for corporal punishment in an investigation.[222] Inspectors discussed all substantiated findings of abuse, neglect, or exploitation and corporal punishment citations in 411 of the 452 (91%) ECHRs with one or more substantiated abuse, neglect, or exploitation findings and corporal punishment citations. [223]

---

[222] Three hundred fifty-two inspections involved an operation with at least one substantiated finding of abuse, neglect, or exploitation, and 335 inspections involved an operation with at least one corporal punishment citation.
[223] If the operation had both findings and citations, and one area was discussed but not the other, reviewers counted this as some, but not all, findings or citations discussed.



Figure 52: ANE Finding or Corporal Punishment Citations in Sampled Inspections and Inspector Discussion

Source: Case review data
n = 635

For operations with a history of one or more substantiated ANE findings or corporal punishment citations, the inspector must also indicate if there are any "patterns or trends" with the confirmed findings citations. Inspectors indicated a pattern or trend in 233 of 352 (66%) of the sampled inspections of operations with one or more ANE findings and 217 of 335 (65%) operations with one or more corporal punishment citations.

**Figure 53: Inspector Identified a Pattern or Trend in Operations' ANE Findings and Corporal Punishment Citations**



Source: Case review data
n = 452

■ Identified pattern    ■ Did not identify pattern

For investigation inspections of foster homes, inspectors must determine if there is a pattern or trend in allegations of ANE or corporal punishment for the foster home being investigated. Inspectors identified a pattern or trend in ANE or corporal punishment allegations in 30% (38 of 127) of the sampled investigation inspections of foster homes with one or more intakes.[224]

---

[224] Includes foster homes with one or more intake(s). Intakes include investigations into allegations of corporal punishment or abuse, neglect, or exploitation. In one inspection of a foster home with no prior intakes, the inspector identified a pattern or trend.

## Figure 54: Inspector Identified a Pattern or Trend in Foster Homes' Allegations of ANE and Corporal Punishment



Source: Case review data
n = 127

Just under a quarter of inspections (148 of 635 or 23%) occurred at an operation under Heightened Monitoring at the time of inspection. Operations on Heightened Monitoring include GROs, RTCs, and CPAs. Of inspections at operations on Heightened Monitoring, the inspector mentioned the operation's status on Heightened Monitoring in 97% of ECHRs (143 of 148).[225] This was an increase from 70% of ECHRs in 2022.

---

[225] In two of five inspections, the inspector stated that the operation had "successfully completed" Heightened Monitoring because the operation moved to post-plan monitoring but indicated "No" on whether the operation was on Heightened Monitoring. In one of five inspections, the operation had been notified of Heightened Monitoring but had not developed a Heightened Monitoring Plan at the time of inspection.

## Figure 55: Heightened Monitoring Status of Operations in Sample

Source: Case review data

Investigation and Monitoring Inspections
N = 635

Inspection at Operation on Heightened Monitoring?

| Yes 148 (23%) | No 487 (77%) |
|---|---|

Status on Heightened Monitoring mentioned in ECHR?

| Yes 143 (97%) | No 5 (3%) |
|---|---|

As part of the discussion of an operation's history, the monitoring team found that inspectors discussed similarities between current and prior investigations in more than two-thirds of investigation inspections in which a similarity existed.[226]

---

[226] An allegation was determined to be "similar" by the monitoring team by the type of issue being investigated including, but not limited to, inadequate supervision, inappropriate discipline, or medical neglect.



Figure 56: Discussion of Connection Between Prior Investigations and
Current Allegation in Investigation Inspections

Source: Case review data
n = 635

The monitoring team found that nearly 40% of the reviewed ECHRs associated with investigation inspections at foster homes (81 of 209, or 39%) involved an allegation that was similar to an allegation in a prior investigation, compared to nearly half of investigation inspections at operations (115 of 240, or 48%). The inspector discussed similar allegations in 81% of investigation inspections involving a foster home (66 of 81) and 56% involving an operation (64 of 115).

Consideration of Risk in Investigations

Inspectors are also expected to document whether they determine a risk in the operation or foster home under review. Based on their ECHR assessment, inspectors recorded a safety risk present in 57% of inspections (365 of 635) in 2023.

Source: Case review data
n = 635



Inspectors identified a risk in nearly all inspections on Heightened Monitoring (141 of 148, 95%) and in almost all operations with three or more substantiated findings of abuse, neglect, or exploitation (132 of 138, 96%).

Source: Case review data

Figure 58: Inspector Identified a Safety Risk in ECHR Assessment Summary and Number of Confirmed ANE Findings



Inspectors identified a higher rate of risk in investigation inspections at foster homes than in investigation inspections at operations.



Figure 59: Inspector Identified a Safety Risk Present in ECHR Assessment Summary by Inspection Type





The inspector documented in the ECHR that a safety risk was present in 79% of investigation inspections at foster homes (165 of 209) compared to 45% of investigation inspections at operations (107 of 240) and 50% of monitoring inspections (93 of 186) at operations.

The monitoring team also examined the history of operations and foster homes to determine whether a risk existed. The monitoring team documented a safety risk more often than inspectors,[227] finding a risk present in nearly three-quarters (473 of 635, 74%) of inspections at the time of the inspection as compared to 57%.

---

[227] The monitoring team's determination of safety risk at the operation was based on the information provided in the ECHR Summary and Listing pages, including the number of and details about ANE intakes and findings and corporal punishment citations (*i.e.*, when they occurred and actions taken by the operation as a result), as well as the operation's Heightened Monitoring status and the severity of current allegations (i.e., high-weighted standard). For investigation inspections at foster homes, the monitoring team reviewed the current allegation and the investigation history of the foster home and CPA.

### Figure 60: Monitoring Team Assessment of Safety Risk at the Time of Inspection

Source: Case review data
n = 635

■ Safety risk  ■ No safety risk



The monitoring team found there was a safety risk in 90% (188 of 209) of foster homes[228] that were the subject of an investigation inspection included in the sample, compared to 75% of investigation inspections at operations (181 of 240) and 56% of monitoring inspections (104 of 186).

Inspectors' ECHRs failed to document a safety risk in nearly one-quarter of the inspections for which the monitoring team determined a safety risk existed at the time of the inspection.[229]

---

[228] Includes risk assessed at the foster home or the affiliated CPA. In 63% of foster home investigation inspections (131 of 209), the monitoring team determined there was a safety risk in the home being investigated. In 119 of 209 foster home investigations (57%), there was a safety risk determined for both the CPA and the foster home. In 12 of 209 foster home investigation inspections (6%), there was a safety risk determined for the foster home only and in 57 of 209 foster home inspections (27%), there was a safety risk determined for the operation only.

[229] The Monitors used HHSC's guidance to its inspectors for conducting an ECHR in developing the tool used by the monitoring team during case reads. *See* HHSC, Extended Compliance History Review Guide (May 2021)(on file with the Monitors).

This guide notes, "A thorough review and assessment of an operation's compliance history prior to conducting an inspection is a critical part of assessing risk. Being familiar with allegations and patterns of citations over a longer period lends itself to more informed decision making." *Id.* at 1. This guidance was reiterated in the HHSC Job Aid for completing the ECHR following the CLASS changes to the ECHR page. *See* HHSC, Job Aid – Extended Compliance History Review Guide (July 2023)(on file with the Monitors). The Job Aid states:

> Assessing the operation's extended compliance history is a critical step in evaluating safety at an operation. An **assessment** is not just a summary of the information reviewed; rather, it is an evaluation of the operation's compliance history in the specified



Figure 61: Determination of Safety Risk by Monitors and Inspectors

Source: Case review data

n = 635

Investigation and Monitoring Inspections
N = 635

Monitoring team determined a safety risk in operation or foster home at time of inspection
473

Monitoring team determined no safety risk
162

108
(23%)

162
(100%)

Inspector documented no safety risk in ECHR

Inspector documented no safety risk in ECHR

---

areas during the review period and whether the history is indicative of risk to children currently placed in the care of the operation.

When evaluating the prior Abuse/Neglect/Exploitation (ANE) findings and Corporal Punishment citations (or allegations at an agency home), determine what trends and patterns exist....**If the assessment concludes there is currently no risk present at the operation because no patterns/trends were identified during the review, that must be documented along with an explanation of how the determination was made.**

*Id.* (emphasis in the original).

In addition to the operation's history of intakes and substantiated findings of ANE, and violations of minimum standards associated with corporal punishment, HHSC's guidance includes the following under "Other Factors to Consider:" whether the operation is currently participating in a plan of action or corrective action (and if so, the conditions in place to address ANE/corporal punishment violations), and whether the operation is currently on Heightened Monitoring. *Id.* at 3.

Regarding the "Assessment Summary," the guidance instructs, "The data evaluated for the assessment is an analysis of possible risk at the operation. Evaluate what the data means and what risk may be posed to children currently at the operation." Staff are to include factors in the *Assessment Summary* section such as how long the facility has been operating, other known patterns in the operation's history, information from the operation's most recent ETC, whether the operation had previously been on Heightened Monitoring or had previously participated in a plan of action or corrective action. *Id.*

The monitoring team found risks to children's safety for 473 of the foster homes or operations' ECHRs among the 635 reviewed; the HHSC inspector recorded that no safety risk existed in 108 of these (23%).[230] Some of the safety risks found by the monitoring team include the following: two-thirds (71 of 108 or 66%) had an open ANE investigation at the time of inspection; nearly one-third (34 of 108 or 32%) had a recent[231] confirmed ANE finding or corporal punishment citation; almost two-thirds of (67 of 108 or 62%) had an identified pattern of allegations that posed serious safety risks;[232] half (58 of 108 or 54%) had multiple safety risks identified.[233]

Examples of ECHRs in which the inspector failed to identify a risk include:

- An investigation inspection of an RTC (Creighton Oaks Residential Treatment) conducted in October 2023. The operation had no abuse, neglect, or exploitation (ANE) findings and no corporal punishment citations in the past five years. However, the operation had five open ANE investigations at the time of the inspection, four that involved Neglectful Supervision and one that involved Medical Neglect. Additionally, the operation had 13 Ruled Out ANE investigations in the prior two months. At the time of the inspection, Creighton Oaks had been permitted for just over a year and had 39 ANE intakes. In the Assessment Summary, the inspector first states, "no risk currently present at the operation because no patterns/trends were identified." The inspector noted that in the first Enforcement Team Conference, there were concerns related to an increase in investigations regarding supervision and citations, but no patterns or trends within the citations were noted. The inspector repeatedly states there were no patterns or trends despite increased investigations related to supervision and numerous allegations related to children fighting. The investigation tied to the inspection involved allegations of children fighting and staff being "unable to control their behaviors."

- A monitoring inspection of a GRO (Unity Children's Home – Girls) conducted in November 2023. The operation had one RTB finding of Physical Abuse in March 2021 and three citations for corporal punishment in January 2019, April 2021, and June 2023, just three months before the monitoring inspection. In addition, the operation had 237 ANE intakes in the previous five years, including 11 open ANE investigations at the time of inspection. The inspector noted that the last Enforcement Team Conference identified an increase in ANE and standards investigations and citations and indicated discipline, medical records, and child

---

[230] While most of the risk determined by the monitoring team not identified by inspectors was related to the operation, in five of the 108 inspections the monitoring team determined there to be a risk at the foster home but not with the operation. Seven of the 108 inspections involved operations on Heightened Monitoring at the time of inspection while two inspections involved an operation on a Plan of Action.
[231] Within the last year before the inspection.
[232] Pattern in allegations was defined as multiple (i.e., more than one) recent (i.e., within past six months) allegations that posed a serious risk to child safety including but not limited to inappropriate discipline or physical abuse, EBI, inadequate or neglectful supervision, and a high number of child runaways.
[233] Multiple safety risks are defined as two or three of the following: open ANE investigation, recent ANE finding or corporal punishment citation, pattern in allegations.

rights continued to be a concern. The operation completed a Plan of Action in February 2022 and was placed on Heightened Monitoring four days after the inspection. Despite this, the inspector wrote, "Based on the assessment, there is no risk identified at the operation."

- An investigation inspection of a foster home was conducted in September 2023. The CPA (1 Care Premier Services LLC) had one substantiated ANE finding and no corporal punishment citations in the previous five years. While the operation had only ten intakes and one confirmed finding of abuse or neglect, all 10 of the intakes and the findings had occurred within the last year. The operation had one open ANE investigation and a Ruled Out finding within two weeks of the inspection, both involving allegations of Neglectful Supervision. The foster home associated with the investigation inspection had two prior ANE investigations in the past five years, both Ruled Out, involving allegations of Physical Abuse and Neglectful Supervision. The foster home's initial investigation into Neglectful Supervision was Ruled Out seven months before the inspection. The investigation tied to the inspection involved allegations that a child in care was inappropriately supervised, resulting in an altercation between children at the home, and that a child was hospitalized after self-harming. The foster home was previously verified with Azleway Inc., an operation on Heightened Monitoring since the fall of 2020, and moved to 1 Care Premier Services in May 2023. Despite the pattern of intakes for the operation and the foster home associated with supervision issues, the inspector stated that no risk was present.

## Monitoring Team Evaluation of Inspector's Consideration of Patterns/Trends at Operations and Agency Homes

When an inspector or the monitoring team documented a safety risk in the ECHR, the monitoring team also reviewed the information included in the ECHRs to determine whether and how the inspector considered the safety risks in planning the inspection.[234] The monitoring team found that the inspector documented how the operation or foster

---

[234] The monitoring team determined the inspector's consideration of history by assessing documentation provided in Steps Taken to Mitigate Risk of the ECHR, which describes the actions taken by the inspector during the inspection. If the actions were reflective of the patterns/trends or areas of concern identified by the inspector, the history was considered during the inspection. If the monitoring team identified a risk but the inspector identified no risk, or if the actions taken did not address the risk identified by the inspector, it was determined that history was not considered. If the monitoring team and the inspector identified no risk, it was determined that there was no safety risk to consider.

Considering history does not mean that all risk was mitigated for an operation or foster home; only the inspector took actions that demonstrated the history or safety concerns considered during the inspection.

home's identified safety risk was considered in 60% of inspections (282 of 473) where a safety risk was present.

Figure 62: Monitoring Team Determined Inspector Documented Consideration of History During Inspection



Source: Case review data
n = 635

The monitoring team found that documented inspection activities did not address risk in 16% of all inspections (76 of 473) and 14% of foster home investigation inspections (26 of 188) where risk was present. This meant the documented actions were vague in detail (e.g., "walkthrough conducted," "records reviewed"), or the inspector took actions

Figure 63: Inspectors' Consideration of Operation and Foster Home Risk During Inspection, 2023

related to the current investigation or monitoring inspection and did not address broader patterns/trends identified.

When the monitoring team recorded "risk identified, no documented actions," the inspector identified risk in the Assessment Summary, but only wrote "The assessment of



Source: Case review data

the information reviewed indicates there is no risk present at the operation because no patterns/trends were identified in the information reviewed or risk was mitigated" in the Steps to Mitigate Risk box.

Inspections with ECHRs that failed to document any actions were taken in response to an identified risk included the following:

- An inspection of a foster home conducted in September 2023 was tied to an investigation of allegations related to supervision concerns. The CPA (Rio Grande Children's Home) had two prior substantiated ANE findings and three prior citations for corporal punishment. The inspector documented in the Assessment Summary that "there is a notable level of risk present at the agency" and noted concerns regarding supervision with the home under investigation. The investigation tied to the inspection was the third with the home involving allegations of supervision problems. The inspector stated that the risk factors were "primarily related to corporal punishment and supervision concerns" in the agency home under investigation. Despite this, in the Steps Taken to Mitigate Risk, none of the notes describe how the specific risks that the inspector had identified were addressed. The inspector noted that a home walkthrough was conducted, and "[the] foster parent addressed concerns with food storage and power tools accessible to the children." The inspector noted having interviewed both alleged victims and the foster parents but indicated the interviews were limited to "the nature of the incident." The inspector ended the section by stating,

"I identified no risk and will continue to gather information concerning allegations in the report."

- A monitoring inspection of an RTC (Thompson's Residential Treatment Center) was conducted in October 2023. The operation had one substantiated ANE finding and four citations for corporal punishment in the previous five years. The operation also had two open ANE investigations at the time of inspection. The inspector noted the presence of risk in the Assessment Summary due to "a pattern of corporal punishment citations, physical cite [sic] citations, [and] medications." The Steps Taken to Mitigate Risk appropriately documented actions related to the problems with the physical site and medications but did not identify any steps associated with the patterns associated with corporal punishment.

- An investigation inspection of a GRO (Hearts with Hope Foundation) conducted in October 2023. The operation had no substantiated ANE findings but had two prior citations for corporal punishment, including one six months before the inspection. In addition, the operation had six open ANE investigations at the time of the inspection, including multiple allegations of inappropriate discipline and physical abuse. In the Assessment Summary, the inspector noted the trend in corporal punishment and stated that the operation "fails to [take] disciplinary actions toward the staff who committed the corporal punishment." However, in the Steps Taken to Mitigate Risk, the inspector noted the inspection "was conducted at the operation to ensure that staff are in ratio and are appropriately supervising children." Other documented activities included a review of documentation regarding unauthorized absences and interviews conducted "regarding supervision [and] AWOL protocols."

- A monitoring inspection of the GRO St. Peter – St. Joseph Children's Home Emergency Shelter. The operation had five prior citations for corporal punishment and 109 ANE intakes that did not result in any confirmed findings. In the Assessment Summary, the inspector noted, "Based on the assessment of the information reviewed, there is risk present at the operation." The determination was made due to a "corporal punishment citation pattern with allegations regarding staff slapping children on their hands and pushing children." The inspector also noted, "The last ETC mentions concerns related to EBI, physical site, training, and Personnel." Despite the risk identified in the Summary, the inspector noted in the Steps Taken to Mitigate Risk, "The assessment of the information reviewed indicates there is no risk present at the operation because no pattern/trends were identified in the information reviewed or risk was mitigated. The exit was discussed with the Directors."

## State's Case Reads on ECHR Completion

The Monitors also reviewed the State's case reads on ECHR completion. The HHSC review evaluated the following:

- Whether the narrative entered in the Assessment of Information Reviewed included documentation of (1) an explanation of any patterns and trends or lack thereof in the ANE history and corporal punishment citations; (2) whether the agency home has any patterns and trends with ANE and corporal punishment, if applicable; and (3) an assessment of risk.

- Whether the assessment of the risk narrative was an accurate interpretation of the history reviewed.

- Whether the documentation entered in Steps Taken to Mitigate Risk described the steps taken by the inspector during the inspection to mitigate risk (or no steps were taken if no risk was identified in the assessment).

- Whether the steps taken during the inspections addressed the risk identified in the assessment (if any).

Both HHSC and the monitoring team found that most ECHRs sampled include a discussion of the foster home history and accuracy in describing the operation's compliance history.

The State's review and the Monitors' findings differed significantly. While HHSC determined that more than 90% of cases described the compliance history accurately and identified risk, the monitoring team and RCCR inspector's assessments of risk differed: In 40% of cases in which the inspector documented no risk, the monitoring team assessed that there was a safety risk present.

HHSC's review found that 79% of cases addressed all risks identified in the assessment (including taking no steps when no risk was present) in cases reviewed between October and December 2023. The monitoring team assessed that, of inspections with a safety risk, the inspector documented how the operation's history or safety risk was considered in 60% of inspections between September and December 2023.

In its findings, HHSC does not differentiate between operations with a safety risk and those without risk. This results in HHSC finding a higher rate of inspectors taking the steps necessary to address risk. For instance, the monitoring team's review of cases found that the inspector documented how the operation's history was considered in 60% of cases with an assessed risk. However, if cases are included with no assessed safety risk, this would increase to 70% of cases in which steps were taken to address risk or be unnecessary due to no risk.

## Adherence to Obligation to Report Abuse, Neglect, or Exploitation

Between January 1, 2023, and December 31, 2023, HHSC issued 50 citations to operations related to minimum standards violations associated with licensed operations'

failure to report abuse, neglect, or exploitation.[235] The number of deficiencies cited for failure to report abuse, neglect, or exploitation was higher than in the past two years, with 24 in 2022 and 46 in 2021. Deficiencies cited for failure to report represented approximately 1% of all deficiencies noted during 2023.

Figure 64: Number of Deficiencies Cited for Failure to Report ANE



Source: RCCR deficiencies data
n=120

Failure to Report ANE Deficiencies Cited

---

[235] Deficiencies cited do not include deficiencies overturned after administrative review. Two of the 50 deficiencies cited in 2023 were overturned following a 2024 administrative review, after the Monitors' analysis was conducted.



Figure 65: Deficiencies Cited for Failure to Report ANE by Type of Monitoring

Source: RCCR deficiencies data
n = 120

Citations for failure to report abuse, neglect, or exploitation were mainly derived from inspections for a minimum standards investigation following an ANE investigation.

Deficiencies cited for failure to report associated with a monitoring inspection increased in 2021 from three to six in 2023, while citations for failure to report associated with an investigation remained consistent with 43 in 2021 and 44 in 2023.[236]

There are six standards associated with failure to report: two (748.303(a)(3)(A) and 749.503(a)(3)(A)) are associated with a GRO/RTC or CPA's failure to report an allegation as soon as they are aware of it. Two standards (748.303)(a)(4)(A) and 748.503(a)(4)(A)) are associated explicitly with a GRO/RTC or CPA's failure to report child-on-child Physical Abuse as soon as they are aware of the allegation, but no later than 24 hours after the incident occurred. Two standards (748.303(a)(5)(A) and 749.503(a)(5)(A)) are associated with a GRO/RTC or CPA's failure to report child-on-child sexual abuse as soon as they are aware, but no later than 24 hours after the incident occurred. Most of the failure-to-report citations issued in 2023 related to standards requiring the reporting of allegations of abuse, neglect, or exploitation (37 of 50 or 74%), while 22% (11 of 50) related to the reporting of child-on-child sexual abuse and 4% (2 of 50) associated with the reporting of child-on-child physical abuse.

---

[236] Investigation inspections include ANE and Non-ANE investigations.

## Figure 66: Deficiencies Cited for Failure to Report ANE by Standard Type, CY 2023



Source: RCCR deficiencies data
n = 50

- Abuse, neglect, or exploitation
- Child-on-child Physical Abuse
- Child-on-child Sexual Abuse

All operation types were cited for a standard associated with failure to report abuse, neglect, or exploitation. However, CPAs were not cited with any deficiencies related to a failure to report child-on-child Physical Abuse. Thirty-five operations were responsible for the 50 deficiencies for failure to report abuse, neglect, or exploitation cited in 2023. Nearly a quarter of operations cited for failure to report in 2023 (8 of 35 or 23%) were on Heightened Monitoring when cited for the violation.

### Table 18: Operations with a Deficiency Cited for FTR Abuse/Neglect

| Operation | Failure to Report Citations | Heightened Monitoring |
|---|---|---|
| CPA operations | | |
| Arrow Child and Family Ministries of Texas | 4 | N |
| Ascension Child and Family Services | 1 | N |
| Bair Foundation | 3 | Y |
| Benevolent House CPA | 1 | N |
| Children of Diversity | 1 | Y |
| Covenant Kids | 1 | N |
| Forever Families | 1 | Y |
| Guardian's Promise, LLC | 1 | Y |

| | | |
|---|---|---|
| House of Shiloh Family Services[237] | 1 | N |
| Lutheran Social Services of the South | 1 | Y |
| Monarch Family Services | 1 | N |
| No One Left Behind Today, Inc. | 1 | N |
| Pathways Youth and Family Services, Inc. | 1 | N |
| San Antonio Foster Care and Adoption Services | 2 | N |
| Therapeutic Family Life | 2 | Y |
| Total for CPA operations | 22 | |
| GRO operations | | |
| Boysville Inc. | 1 | N |
| Fort Behavioral Health | 5 | N |
| Gulf Coast Trades Center[238] | 1 | N |
| High Plains Children's Home[239] | 1 | N |
| LifeWorks Emergency Shelter | 1 | N |
| My Friend's House | 1 | N |
| Roy Maas Youth Alternative – Girlsville/Junction[240] | 1 | N |
| SJRC Texas, Inc. | 1 | N |
| Texas Girls and Boys Ranch | 1 | N |
| The Childrens Home of Lubbock | 1 | N |
| Trels Home for Children | 1 | N |
| Triple 7 Ranch | 4 | N |
| Total for GRO operations | 19 | |
| RTC operations | | |
| Bayes Achievement Center | 1 | N |
| Guiding Light Residential Treatment Center, LLC | 1 | N |
| HMIH Cedar Crest, LLC | 2 | N |
| New Life Childrens Treatment Center | 1 | Y |
| North Star Residential Treatment Center | 1 | N |
| Shiloh Treatment Center | 1 | N |
| The Ambience Residential Treatment Center | 1 | N |
| VisionQuest – Four Directions | 1 | Y |
| Total for RTC operations | 9 | |

Ongoing problems associated with operations' compliance with the obligation to report abuse, neglect, or exploitation may be tied to staff misunderstanding their responsibility to report incidents to the hotline or misunderstanding what constitutes abuse, neglect, or exploitation. During site visits, the monitoring team asks administrators and

[237] House of Shiloh Family Services completed Heightened Monitoring in December 2022, was cited for Failure to Report ANE in July 2023, and was placed again on Heightened Monitoring in November 2023.
[238] Gulf Coast Trades Center had a terminated contract with DFPS at the time the citation was given, so was no longer on Heightened Monitoring at the time of the citation but was on Heightened Monitoring at the time of contract termination.
[239] High Plains Children's Home received a citation for Failure to Report ANE two months after completing Heightened Monitoring (completed in March 2023 and cited in May 2023).
[240] Roy Maas Youth Alternative – Girlsville/Junction was placed on Heightened Monitoring five days after receiving a citation for Failure to Report ANE.

caregivers questions related to reporting abuse, neglect, or exploitation. The monitoring team also examines staff records to determine their completed training.

During 12 site visits made by the monitoring team in 2023, when asked about the process for reporting abuse, neglect, or exploitation, more than two-thirds of all direct care staff interviewed (85 of 119, or 71%) said that they first report allegations to a supervisor or program administrator; less than a quarter of staff interviewed (28 of 119, or 24%) said that they would first report allegations of abuse, neglect, or exploitation to the hotline. More than 95% of staff (116 of 119) reported never having witnessed an incident of abuse, neglect, or exploitation.[241]

Figure 67: Staff Report Who They Would First Report Allegations of Abuse and Neglect To



The monitoring team found that 33 of 203 employee files (16%) did not have documentation showing the employee completed the required abuse, neglect, and exploitation training, and another 38 of 203 employee files (19%) documented that the training was not completed in the last 12 months.

Small gaps persisted in communication between HHSC and DFPS due to the failure to report. The State-created process for complying with Remedial Order 22 begins with HHSC. When a deficiency is cited by HHSC and entered into CLASS, the deficiency is included in a daily report sent via e-mail to DFPS. DFPS reviews the citation and determines contract compliance. The Monitors cross-matched the citation data with the reports sent to DFPS by RCCR and with reports sent from DFPS to the Monitors to determine the State's response upon discovering a lapse in reporting abuse, neglect, or exploitation. The Monitors' Sixth Report identified improvements in this process but found a lack of alignment between the citations issued by inspectors, the notifications sent by HHSC to DFPS, and DFPS' report of the citations for which it received notifications.[242]

---

[241] One staff member reported being aware of suspicions or allegations of abuse, neglect, or exploitation that were not reported.

[242] Sixth Report, at 139.

Although improvements were again found in 2023, a small gap persisted. One citation was not found in the HHSC or the DFPS reports, and one was found in the HHSC report but not in the DFPS report. The one citation not included in either report was associated with child-on-child physical abuse.[243]

Figure 68: Citations Associated with Child-on-Child Abuse

Source: RCCR deficiencies data, HHSC Failure to Report ANE report, DFPS Failure to Report ANE



In addition to reviewing and analyzing the citation data, the HHSC report, and the DFPS report, the Monitors reviewed all 50 investigations or inspections that resulted in a citation to identify the allegations that operations failed to report. The review revealed failures to report allegations of abuse, neglect, or exploitation that, in 12 cases, were substantiated after an investigation. In other cases, the operation was cited based on information found by HHSC or DFPS during a monitoring visit.

HHSC issued a citation in the following investigations which resulted in substantiated findings of abuse, neglect, or exploitation:

Therapeutic Family Life (IMPACT ID 49728636)

Staff from an 11-year-old child's school reported to SWI that when the child got off the bus on a Monday morning, he told school staff that dogs in the home "attacked him and bit him" over the weekend. The reporter said the child "was observed with bruises and bites all over his body." DFPS found a Reason to Believe for Neglectful Supervision of the child by his foster father. DFPS found the child suffered multiple injuries after the foster family's dogs attacked him. He had "bruises all over his body, bruises on both

---

[243] The two citations that were later overturned were found in HHSC and DFPS reports.

arms, an open wound under the left arm pit." The child reported "he had to fight for his life as the dogs were dragging him away." The foster father "did not seek medical treatment, did not notify the agency or caseworker, and did not complete [an] incident report at the time of the incident." The child's service plan required caregivers to keep the child within eyesight while outside; the foster father acknowledged he could not see the child when the attack occurred. HHSC issued four citations for violation of minimum standards.

## Therapeutic Family Life (IMPACT ID 49785477)

A former foster child reported to SWI that her former foster mother physically abused and failed to appropriately supervise multiple foster children over the fifteen-year period that she fostered children. She gave a specific example of a foster sibling who urinated in his pull-up diaper; the foster mother "took the pull up off him and placed it over his head and made him stand against the wall for over an hour. Then…pulled him outside to the backyard where she stripped him naked, threw dish soap all over him and sprayed him down with the water hose." The reporter alleged the foster mother forced her to watch this episode of abuse.

DFPS found a Reason to Believe that the foster mother engaged in the Physical Abuse of eight foster children, and Medical Neglect of one child. HHSC issued 24 citations for violation of minimum standards violations. One of the citations was issued because HHSC found that the "school counselor reported the foster mother prohibited her from speaking to the children in care" and that this "occurred after the children had reported concerns to the counselor." HHSC also found, "the agency case worker was not immediately allowed into the foster home" which "was not reported as addressed by the agency." Another citation was issued because the caregivers failed to report ongoing abuse, though one of the children reported "the foster father would tell the foster mother to cease and calm down when present for negative interactions."

## HMIH Cedar Crest RTC (IMPACT ID 49559334)

On March 13, 2023, a staff person from the operation made an anonymous report to SWI alleging that two children made an outcry that they were sexually abused by a male staff. When the DFPS investigator called the reporter, she said that the two children first made the outcry to a different staff person on March 11, 2023. That staff person told the reporter that "she would handle it" but did not make a report to SWI. Instead, the facility implemented a safety plan suspending the alleged perpetrator.

DFPS found a Reason to Believe that a staff person at the RTC engaged in Sexual Abuse of two foster children, ages 16 and 17 years old. DFPS found the staff person encouraged the girls to engage in sexually explicit behavior while he watched. The staff person denied the allegations, and said the girls exposed themselves to each other, but he redirected them. However, there was no incident report completed, and he did not report the incident to other staff. HHSC issued three citations for minimum standards violations, including one for failing to report a serious incident. HHSC found, "On the morning of [March 11, 2023], children in care reported allegations of sexual abuse by a

caregiver. This was not reported to Licensing until [March 13, 2023]. A report made by one of the administrative staff did not include sufficient details of the abuse to be referred to the appropriate investigative program."

## San Antonio Foster Care and Adoption Services, Inc. (IMPACT ID 49812443)

DFPS found a Reason to Believe that two foster parents engaged in Neglectful Supervision when they left a one-year-old child unattended in their car on a hot day. HHSC issued three citations for violations of minimum standards, including a citation for failing to timely report the incident to SWI. HHSC found that the CPA's administrator became aware of the incident six days before she reported it to SWI.

## Triple 7 Ranch GRO (IMPACT ID 49539038)

DFPS found a Reason to Believe that a staff person engaged in Physical Abuse of an 11-year-old child when she "struck [him] with a belt numerous times" causing injuries to his arms, legs, and abdomen. The staff person first struck the child in the living room of the GRO, then followed him to the bathroom "where she continued to strike him while he was on the ground." Other children reported the staff person struck the child hard enough for him to "scream in pain." DFPS found a Reason to Believe another staff person, who witnessed the incident and did not intervene, engaged in Neglectful Supervision and Physical Abuse. HHSC issued four citations for minimum standards violations, including a citation for failing to report a serious incident because a caregiver witnessed a child being hit with a belt by another caregiver and failed to report it.

## Texas Girls and Boys Ranch GRO (IMPACT ID 49245011)

DFPS found a Reason to Believe that two house parents at the GRO each engaged in Sexual Abuse of multiple children while the children were in their care, between 2013 and 2017. The house mother was determined to have sexually abused two male children, and the house father was determined to have sexually abused the two male children and four female children. Three of the female children who were sexually abused by the house father made an outcry to the house mother, but she failed to report it. DFPS therefore also found a Reason to Believe the house mother engaged in Neglectful Supervision of these children. HHSC issued three citations, including a citation for failure to report a serious incident, because a caregiver "knowingly failed to report sexual abuse to the Child Abuse Hotline which allowed sexualized contact to continue to be exhibited toward children by two caregivers at the operation."

## Remedial Order 22 Summary

HHSC changed CLASS functionality to streamline the ECHR process on August 5, 2023. The ECHR updates in CLASS required the inspector to respond to targeted questions about history and status. The CLASS changes led to the Monitors' discovery that the number of ANE findings included in ECHRs reflect the number of investigations that resulted in a substantiated finding rather than the actual number of substantiated

findings. The monitoring team compared DFPS data documenting substantiated findings to HHSC's ECHR data and found significant differences. It is unclear what impact this may have, if any, on inspectors' risk identification during ECHR assessments.

All but three of the sampled ECHRs reviewed by the monitoring team were completed before or on the day of the inspection. The monitoring team found that nearly 40% of the reviewed ECHRs associated with investigation inspections at foster homes (81 of 209, or 39%) involved an allegation that was similar to an allegation in a prior investigation, compared to nearly half of investigation inspections at operations (115 of 240, or 48%). The inspector discussed similar allegations in 82% of investigation inspections involving a foster home (66 of 81) and 56% involving an operation (64 of 115).

The monitoring team found risks to children's safety for 473 of the foster homes or operations' ECHRs among the 635 reviewed; the HHSC inspector recorded that no safety risk existed in 108 of these (23%).[244] Some of the safety risks found by the monitoring team include the following: two-thirds (71 of 108 or 66%) had an open ANE investigation at the time of inspection; nearly one-third (34 of 108 or 32%) had a recent[245] confirmed ANE finding or corporal punishment citation; almost two-thirds of (67 of 108 or 62%) had an identified pattern of allegations that posed serious safety risks;[246] half (58 of 108 or 54%) had multiple safety risks identified.

When an inspector or the monitoring team documented a safety risk in the ECHR, the monitoring team also reviewed the information included in the ECHRs to determine whether and how the inspector considered the safety risks in planning the inspection. The monitoring team found that the inspector documented how the operation or foster home's identified safety risk was considered in 60% of inspections (282 of 473) where a safety risk was present. The monitoring team further found that even when the ECHR showed the inspector considered risk, the documented inspection activities were insufficient or vague in addressing risk in 16% of all inspections (76 of 473) and in 14% of foster home investigation inspections (26 of 188) where risk was present.

Between January 1, 2023, and December 31, 2023, HHSC issued 50 citations to operations related to minimum standards violations associated with licensed operations' failure to report abuse, neglect, or exploitation.[247] The number of deficiencies cited for failure to report abuse, neglect, or exploitation was higher than in the past two years,

---

[244] While most of the risk determined by the monitoring team not identified by inspectors was related to the operation, in five of the 108 inspections the monitoring team determined there to be a risk at the foster home but not with the operation. Seven of the 108 inspections involved operations on Heightened Monitoring at the time of inspection while two inspections involved an operation on a Plan of Action.
[245] "Recent" here means within the year before the inspection.
[246] Pattern in allegations was defined as multiple (i.e., more than one) recent (i.e., within past six months) allegations that posed a serious risk to child safety including but not limited to inappropriate discipline or physical abuse, EBI, inadequate or neglectful supervision, and a high number of child runaways.
[247] Two of the 50 deficiencies cited in 2023 were overturned following a 2024 administrative review, after the Monitors' analysis was conducted.

with 24 in 2022 and 46 in 2021. Ongoing problems associated with operations' compliance with the obligation to report abuse, neglect, or exploitation may be tied to staff misunderstanding their responsibility to report incidents to the hotline or misunderstanding what constitutes abuse, neglect, or exploitation.

## Remedial Orders 12-19: Timeliness of Minimum Standards Investigations

### Background

HHSC is responsible for regulating child care and child placing activities in Texas and for creating and enforcing minimum standards. Each set of minimum standards is based on a specific chapter of the Health and Human Services title of the Texas Administrative Code. Title 26 Chapters 748 and 749 set forth the minimum standards for GROs and CPAs, including those that serve PMC children.[248] The minimum standards establish basic requirements to protect the health and safety of children in care and, as noted above, are weighted by HHSC based on the agency's assessment of the risk that a violation of that standard presents to children. RCCR is responsible for inspecting child care operations for compliance with these minimum standards and investigating reports of standards violations. These investigations by RCCR, ordinarily known as minimum standards investigations, are classified as Priority One, Two, Three, Four, or Five.[249]

HHSC continued to provide its monthly data reports to the Monitors for validation of Remedial Orders 12 to 19.[250]

### Performance Validation (HHSC)

To validate the timeliness of the State's performance associated with Remedial Orders 12 through 19, the Monitors assessed 1,031 completed minimum standards investigations with an intake date between January 1, 2023 through November 30, 2023. The Monitors evaluated all RCCR investigations included in the data HHSC produced with intake dates between January 1, 2023 and November 30, 2023, and included only those involving PMC children for investigations once HHSC included that

---

[248] *See generally* 26 TEX. ADMIN. CODE §§ 748.1 –748.4767 and 749.1 - 749.4267.

[249] *See generally* HHSC, *Child Care Licensing Policy and Procedures Handbook* § 6240 (2021) *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/6000-investigations#6240 [hereinafter *Child Care Licensing Policy and Procedures*]. More information about the definitions of the priorities is also included in the Monitors' First Report to the Court. *See also* Deborah Fowler & Kevin Ryan, First Report 273, ECF No. 869.

[250] Beginning with data reports involving investigations opened and/or closed in May 2023 and delivered by HHSC to the Monitors on June 30, 2023, HHSC's data reports involving minimum standards investigations included the legal status of the alleged victim children listed in the reports. E-mail from Nicole Hoffer to Kevin Ryan and Deborah Fowler, June 30, 2023 (noting that the data reports that are used to report performance of Remedial Orders 12 to 19, entitled "RO.12-13.1 FTF Tableau Report" and "RO.15-19.2 RCCL.Inspec - Tableau Report," now include the ability to identify the legal status of alleged victims). Thus, the updated data impacted the methodology as described in the text regarding performance validation.

information in the data reports to the Monitors, which occurred in data reports HHSC submitted in May 2023.[251]

Table 19:Priority of RCCR Investigations, January 1, 2023 to November 30, 2023

Source: HHSC RO 12 - RO 19 data

| Priority | Number | Percent |
|---|---|---|
| Priority One | 0 | 0% |
| Priority Two | 212 | 21% |
| Priority Three | 642 | 62% |
| Priority Four | 2 | <1% |
| Priority Five | 175 | 17% |
| **Total** | **1,031** | **100%[252]** |

## Remedial Order 12: Timeliness of Observations or Interviews with Alleged Child Victims in Priority One Investigations

*Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

HHSC reported no Priority One[253] RCCR investigations involving a PMC child with an intake date between January 1, 2023 and November 30, 2023. In the Sixth Report, the Monitors also found that HHSC did not report any Priority One RCCR investigations.[254]

---

[251] The data reports used for analysis for Remedial Orders 12 to 19 were the two sets of monthly files regularly submitted by HHSC to the Monitors listing the relevant information for all minimum standards investigations initiated by RCCR between January 1, 2023 and November 30, 2023 and the analysis reflects the data *as of the date HHSC submitted the monthly reports to the Monitors*. For example, the analysis for the relevant investigations that closed in November 2023 was derived from the data reports entitled RO.12-13.1 FTF (11.1.2023-11.30.2023) (December 29, 2023) and RO.15-19.2 RCCL. Inspec (11.1.23-11.30.23) (December 29, 2023); therefore, unless otherwise noted and as previously discussed by the Monitors with the State, any data related to the investigations that HHSC enters subsequent to the dates that HHSC first submitted the reports of record to the Monitors is not part of the analysis. Moreover, unless otherwise noted, the methodology is the same as in prior reporting periods.

[252] Table does not add up to 100% due to rounding.

[253] In response to a draft of this report provided to the parties in advance, the State reported an additional investigation that they had not previously identified in the monthly data to the Monitors and noted, "HHSC's data reflect that there was one Priority One investigation involving two PMC children that occurred between January 1 and November 30, 2023." The State indicated both children were seen timely. As documented in this report and consistent with the methodology used to measure performance with these remedial orders since the First Report, the Monitors' analysis reflects the data as of the date HHSC submitted the monthly reports to the Monitors; the State's data in those reports do not include the Priority One RCCR investigation the State recently disclosed.

[254] *See* Deborah Fowler & Kevin Ryan, Sixth Report, at 145.

## Remedial Order 13: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

HHSC reported 212 Priority Two RCCR investigations with an intake date between January 1, 2023 and November 30, 2023.[255] The data indicate that 96% (203) of the investigations included face-to-face contact with all alleged child victims within 72 hours of intake; the remaining 4% (9) of investigations did not include face-to-face contacts within 72 hours. The rate of face-to-face contact within 72 hours increased from the rate in the Sixth Report (93%).[256]

Of the investigations that did not include face-to-face contact with all alleged victims within 72 hours of intake, face-to-face contact was made in the following timeframes: up to 12 hours late (1), 24 to 48 hours late (2), and more than 120 hours late (2).[257]

Additionally, of the nine investigations that did not include face-to-face contact within 72 hours, HHSC data documented the following reasons for eight investigations with untimely face-to-face contact: "a valid exception does not apply" (4), "victim was identified after the required timeframe for conducting FTF contacts with victim" (2), "whereabouts of the victim were unknown during the required timeframes for conducting FTF contacts" (1), and "whereabouts of the victim were unknown during the entire course of the investigation" (1).[258]

## Remedial Order 14:  Completion of Priority One and Priority Two investigations within 30 days

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

HHSC reported no Priority One and 212 Priority Two RCCR investigations with an intake date between January 1, 2023 and November 30, 2023. During this period,

---

[255] To measure timeliness of HHSC's face-to-face contact with all alleged child victims in Priority Two RCCR investigations, the Monitors calculated performance using the data fields for intake date and time; "first face-to-face contact date and time" for each alleged victim; and "Reason Face to Face Contact Not Made or Not Made Timely." To be considered compliant, investigations with multiple alleged victims must document unique time stamps for each alleged child victim.

[256] *See* Deborah Fowler & Kevin Ryan, Sixth Report, at 145.

[257] Four investigations were non-compliant because they did not include face-to-face contact with all of the alleged child victims in the investigation.

[258] The Monitors manually reviewed the one investigation without a documented reason for the missed face-to-face contact within 72 hours in CLASS and the documentation did not include additional information.

HHSC completed 98% (207) of investigations within 30 days of intake. HHSC's rate of completing Priority One and Priority Two minimum standards investigations within 30 days was higher than the rate in the Sixth Report (96%).[259]

## Remedial Order 15: Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

HHSC reported 819 Priority Three, Four, and Five RCCR investigations with an intake date between January 1, 2023 and November 30, 2023. The priorities of investigations had the following classifications: Priority Three (642), Priority Four (2), and Priority Five (175) investigations. During this period, HHSC completed 98% (803)[260] of investigations within 60 days of intake. HHSC's rate of completing Priority Three, Four, and Five minimum standards investigations within 60 days was the same rate in the Sixth Report (98%).[261]

## Remedial Order 16: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

HHSC reported completion of no Priority One and 212 Priority Two RCCR investigations with an intake date between January 1, 2023 and November 30, 2023. During this period, in 98% (208) of the investigations, the documentation was completed on the same day the investigation was completed. HHSC's rate of completing documentation on the same day the investigation was completed in Priority One and Priority Two investigations was higher than the rate in the Sixth Report (96%).[262]

## Remedial Order 17: Completion and Submission of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations

---

[259] *See* Deborah Fowler & Kevin Ryan, Sixth Report, at 147.
[260] In response to a draft of this report provided to the parties in advance, the State reported, "HHSC's data indicate that seven additional Priority Three investigations were timely completed, even though they were completed more than sixty days after intake, because they had valid extensions."
[261] *See* Deborah Fowler & Kevin Ryan, Sixth Report, at 147-148.
[262] *Id.* at 148, ECF No. 1380.

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported completion of 819 Priority Three (642), Priority Four (2), and Priority Five (175) RCCR investigations with intake dates between January 1, 2023 and November 30, 2023. During this period, HHSC completed documentation within 60 days of the intake date in 98% (800) of the investigations. HHSC's rate of completing documentation within 60 days of intake in Priority Three, Priority Four, and Priority Five investigations was the same rate in the Sixth Report (98%).[263]

## Remedial Order 18: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

HHSC reported completion by December 31, 2023 of 212 Priority One (0) and Priority Two (212) RCCR investigations with intake dates between January 1, 2023 and November 30, 2023. Of those 212 RCCR investigations, 96% (204) included notification to the referent (or notification was not required);[264] and notification to the provider within five days of completion of the minimum standards investigation. HHSC's reported rate of notifying the referent and provider within five days of completion of Priority One and Priority Two minimum standards investigations was higher than the rate in the Sixth Report (93%).[265]

## Remedial Order 19: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported completion by December 31, 2023 of 819 Priority Three (642), Priority Four (2), and Priority Five (175) RCCR investigations with intake dates between January 1, 2023 and November 30, 2023. Of the 819 investigations, 96% (788) of RCCR

---

[263] *Id.* at 149, ECF No. 1380.
[264] The data indicated that no letter was required in 8% (17) of Priority One and Two investigations. A letter is not required when the reporter is either anonymous or notification will jeopardize the reporter's safety. HHSC, Child Care Regulation Handbook §6640, available at
https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/6600-completing-investigation.
[265] See Deborah Fowler & Kevin Ryan, Sixth Report, at 150.

investigations included notification to the referent (or a letter was not required)[266] and to the provider within 60 days of intake. HHSC's rate of notifying the referent when required and provider within 60 days of intake of Priority Three, Priority Four, and Priority Five investigations was higher than the rate in the Sixth Report (92%).[267]

## Remedial Orders 12-19 Summary

Remedial Order 12

- There were no Priority One RCCR investigations during this reporting period.

Remedial Order 13

- 96% (203) of Priority Two RCCR investigations included face-to-face contact with all alleged child victims within 72 hours of intake; the remaining 4% (9) of investigations did not include face-to-face contacts within 72 hours (5) or did not include face-to-face contacts with all child victims (4).

Remedial Order 14

- 98% (207) of Priority One and Two RCCR investigations were completed within 30 days of intake.

Remedial Order 15

- 98% (803) of Priority Three, Four, and Five RCCR investigations were completed within 60 days of intake.

Remedial Order 16

- In 98% (208) of Priority One and Two RCCR investigations, documentation was completed on the same day the investigation was completed.

Remedial Order 17

- In 98% (800) of Priority Three, Four, and Five RCCR investigations, documentation was completed within 60 days of intake.

Remedial Order 18

---

[266] The data indicated that no letter was required in 8% (64) of Priority Three, Four, and Five investigations.
[267] See Deborah Fowler & Kevin Ryan, Sixth Report, at 151.

- 96% (204) of Priority One and Two RCCR investigations included notification to the referent (or a letter was not required) and notification to the provider within five days of completion.
- 8% (17) of Priority One and Two RCCR investigations did not require notification.

Remedial Order 19

- 96% (788) of Priority Three, Four, and Five RCCR investigations included notification to the referent (or a letter was not required) and to the provider within 60 days of intake.
- 8% (64) of Priority Three, Four, and Five RCCR investigations did not require notification.

## Remedial Order 20: Heightened Monitoring

*Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions, and, as appropriate, other remedial actions under DFPS' enforcement framework.*[268]

### Overview of Operations Placed Under Heightened Monitoring

Most Texas operations serving foster children are not subject to Heightened Monitoring. Of the 424 Texas operations serving foster children in 2023,[269] only 75 (18%) operations were on Heightened Monitoring in the year.[270]

Operations qualify for Heightened Monitoring by having a violation rate[271] higher than the state rate for operations of similar size and type in three or more of the most recent

---

[268] Two subsequent orders further described the methodology for identifying operations subject to Heightened Monitoring, the method for developing a Heightened Monitoring plan and what is required to be included, the cadence of monitoring visits by the State, requirements for placement of PMC children in operations under Heightened Monitoring, the length of time operations are to stay on Heightened Monitoring and the requirements an operation must meet to exit Heightened Monitoring. Order, March 18, 2020, ECF No. 837; Order Modifying Order Regarding Heightened Monitoring, December 7, 2020, ECF No. 1012.

[269] Operations that were licensed by HHSC with an operating status of "Yes" in CLASS and having a status of "active" in IMPACT on one or more days in 2023.

[270] Includes all operations on Heightened Monitoring at any time during the year.

[271] The types of violations included in the Heightened Monitoring rate analysis include substantiated allegations of abuse, neglect, or exploitation, citations for violation of minimum standards weighted high, medium-high, or medium, contract violations, liquidated damages, awake night violations, complaints, and Youth for Tomorrow missed indicators.

five calendar years. Between 2020 and 2023,[272] 164 operations qualified for Heightened Monitoring, with most of these 164 operations (105 of 164, or 64%) qualifying in multiple years. Of the 164 qualifying operations, 128 (78%) were placed on Heightened Monitoring; the remaining 36 operations (22%) closed before beginning Heightened Monitoring.[273] These 164 operations were responsible for **805 substantiated allegations of abuse, neglect, or exploitation of children** in the years used to determine their eligibility for Heightened Monitoring. HHSC issued 16,690 deficiency citations to these operations during the same period, of which **14,717** were **citations issued for violation of minimum standards weighted high, medium-high, or medium**.

There are three stages of Heightened Monitoring: the period when the Heightened Monitoring Plan is developed (Pre-Plan Development), the period during which time the State actively monitors the operation's compliance with the Heightened Monitoring Plan (Plan in Effect) with weekly unannounced visits, and Post-Plan Monitoring, during which time the State continues to monitor the operation with less frequent visits to ensure it maintains the changes required by the Heightened Monitoring Plan.[274] Operations that complete Post-Plan Monitoring complete Heightened Monitoring.

An operation that has completed Heightened Monitoring may be placed on Heightened Monitoring again if they have a violation rate higher than the state rate in the most recent year of analysis. In 2023, four operations that had completed Heightened Monitoring were placed on Heightened Monitoring again. These operations were: A Pathway 2 New Beginnings, Caregivers Youth and Transitional Living Services, Connections, and House of Shiloh Family Services. All four of these operations were first placed on Heightened Monitoring in 2020.

---

[272] The identification of operations for Heightened Monitoring began in 2020 and analysis is conducted yearly. To date, operations have been identified and have been placed on Heightened Monitoring in 2020, 2021, 2022, and 2023.

[273] "Placed on Heightened Monitoring" includes all operations that were notified of Heightened Monitoring, had a plan developed, and monitoring by the Heightened Monitoring Team began. Four operations were notified of Heightened Monitoring but closed prior to plan development, which are included in the 36 operations that qualified but closed prior to beginning the Plan in Effect stage of monitoring.

[274] *See* HHSC, Child Care Regulation Handbook §11100 Overview of Heightened Monitoring, *available at* https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/11100-overview-heightened-monitoring

The Court's order requires operations to remain under Heightened Monitoring for at least one year and until: the operation satisfies the conditions of the Heightened Monitoring Plan; at least six months' successive unannounced visits indicate the operation complies with the standards and contract requirements that led to Heightened Monitoring; and the operation is not out of compliance on any medium-high or high-weighted licensing standards. Order, at 3, ECF 837.

After the operation is released from the Plan, the Court's order requires DFPS and HHSC to coordinate to make at least three unannounced visits in the three months following the release from the Plan, and to continue to track intake data for six months to ensure that the operation does not lose progress made during Heightened Monitoring. *Id.* at 3.

As of March 1, 2024, 44 of the 132[275] operations (33%) placed on Heightened Monitoring were under active Heightened Monitoring (Plan in Effect), 11 (8%) were in Post-Plan Monitoring, 31 (24%) had completed Heightened Monitoring, and 46 (35%) had closed or terminated their contract to serve children in the foster care system.[276]

Table 20: Status of Heightened Monitoring Operations Placed on HM 2020 – 2023

| Status of Heightened Monitoring Operations Placed on HM 2020 – 2023[277] | | | | | |
|---|---|---|---|---|---|
|  | 2020 | 2021 | 2022 | 2023[278] | Total |
| Operations Starting Heightened Monitoring | 86 | 13 | 13 | 20 | 132 |
|  |  |  |  |  |  |
| Operations with Plans in Effect | 18 | 0 | 6 | 20 | 44 |
| Operations in Post-Plan Monitoring | 6 | 4 | 1 | 0 | 11 |
| Operations Completing HM | 28 | 3 | 0 | 0 | 31 |
| Operations Closed/Contract Terminated | 34 | 6 | 6 | 0 | 46 |

Operations Placed on Heightened Monitoring in 2023

Fourteen operations[279] were newly placed on Heightened Monitoring in 2023, with all operations notified of their Heightened Monitoring status in October 2023 and all having a Heightened Monitoring Plan start date in December 2023.[280] Between 2018

---

[275] The four operations that completed Heightened Monitoring in 2022 and 2023 and were placed back on Heightened Monitoring in 2023 are counted in both their original monitoring year and in 2023.

[276] Does not include Bridges CPA (#1775976), which is in Plan in Effect stage as of March 6, 2024. Bridges CPA received their permit on August 25, 2023, and was notified of their Heightened Monitoring status February 5, 2024. Their Heightened Monitoring Plan was implemented March 6, 2024. Bridges was placed on Heightened Monitoring because of their affiliation with Passage of Youth Family Center (#1079686). The Monitors were not notified of the operation's affiliation with an operation on Heightened Monitoring or that the operation was placed on Heightened Monitoring. The Monitors identified the operation's status in CLASS on April 22, 2024.

[277] Status as of March 1, 2024. Does not include Bridges CPA (#1775976).

[278] The four operations that completed Heightened Monitoring in 2022 and 2023 and were placed on Heightened Monitoring again in 2023 are counted in both the 2020 and 2023 cohorts in the table. The two operations placed on Heightened Monitoring in April 2023 because of linkages to operations on Heightened Monitoring are included as part of 2023 cohort. These operations include Horizon Project, linked to Sheltering Harbor, and Fostering Life Youth Ranch Meraki, linked to Fostering Life Youth Ranch. Two operations placed on Heightened Monitoring in 2023 closed after March 1, 2024, and prior to the filing of this report. These operations were A SAFE Alliance, closed in March 2024, and A Pathway 2 New Beginnings, closed April 2024.

[279] Does not include Horizon Project or Fostering Life Youth Ranch Meraki. These operations were placed on Heightened Monitoring in April 2023 because of linkages to operations on Heightened Monitoring and had no violation history. Does not include the four operations that completed Heightened Monitoring and were placed on again in November 2023.

[280] In 2020, the State notified operations of their Heightened Monitoring status using a three-phase roll-out that began in June 2020 and ended in January 2021. In the two subsequent years, the State notified

and 2022, the 14 operations newly placed on Heightened Monitoring in 2023 accounted for 48 substantiated allegations of abuse, neglect, or exploitation ("Reason to Believe" allegation findings or "RTBs"), and 834 citations for minimum standards deficiencies.[281]

Several of the operations that were placed on Heightened Monitoring in 2023 were opened after 2018: A Heart with Hope Family Services, Castillo Children's Center, and Gold Star Academy all opened in 2019, and Safe Life Journey opened in 2020.

## Substantiated Allegations and Minimum Standards Deficiencies 2018 to 2022 for Operations Newly Placed on Heightened Monitoring in 2023

### A Heart with Hope Family Services:
No RTBs and 48 citations for minimum standards deficiencies during the period.

### Castillo Children's Center:
No RTBs and 110 citations for minimum standards deficiencies during the period.

### Families Especial, Inc.:
Two RTBs (one for Physical Abuse and one for Neglectful Supervision) and 67 citations for minimum standards deficiencies during the period.

### Forever Families:
Three RTBs (one for Sexual Abuse, one for Physical Abuse, and one for Neglectful Supervision) and 51 citations for minimum standards deficiencies during the period.

### Gold Star Academy:
Three RTBs (one for Physical Abuse and two for Neglectful Supervision) and 47 citations for minimum standards deficiencies during the period.

### Kidz 2 Kidz CPA:
Fourteen RTBs (five for Physical Abuse and nine for Neglectful Supervision) and 92 citations for minimum standards deficiencies during the period.

### Lifeline Children & Family Services:
Five RTBs (one for Physical Abuse and four for Neglectful Supervision) and 91 citations for minimum standards deficiencies during the period.

### Open Hearts Children and Family Services:
Four RTBs (four for Neglectful Supervision) and 44 citations for minimum standards

---

operations of Heightened Monitoring in June 2021 and August 2022. Notification of Heightened Monitoring was delayed in 2023 due, in part, to delays in DFPS' production of an index of providers serving DFPS youth in 2022.

[281] The number of citations includes all deficiencies cited for minimum standards without reference to weight. Violations for the Heightened Monitoring violation rate analysis also include contract violations, awake night violations, complaints, Youth for Tomorrow missed indicators, and liquidated damages.

deficiencies during the period.

Roy Maas Youth Alternatives- Girlsville/Junction:[282]
No RTBs and 22 citations for minimum standards deficiencies during the period.

Safe Life Journey:[283]
No RTBs and 13 citations for minimum standards deficiencies during the period.

St Peter St Joseph Childrens Home Emergency Shelter:
No RTBs and 71 citations for minimum standards deficiencies during the period.

The SAFE Alliance:
Two RTBs (two for Neglectful Supervision) and 43 citations for minimum standards deficiencies during the period.

TruLight127:
Thirteen RTBs (one for Medical Neglect, five for Physical Abuse, and seven for Neglectful Supervision) and 97 citations for minimum standards deficiencies during the period.

Unity Children's Home-Girls:
Two RTBs (both for Physical Abuse) and 38 citations for minimum standards deficiencies during the period.

The five-year history (2018-2022) of enforcement actions for the 14 operations newly placed on Heightened Monitoring in 2023 is below. During the period, these operations had a total of 37 enforcement actions, the most common of which was a monetary penalty, accounting for 86% (32 of 37) of the actions against the operations. Two operations, Trulight127 and Kidz 2 Kidz CPA, were placed on probation during the period while two operations, A Heart with Hope Family Services and Roy Maas Youth Alternatives – Girlsville/Junction, had no enforcement actions.

Table 21: Number of Enforcement Actions Starting 2018 – 2022 for Operations Newly Placed on Heightened Monitoring in 2023

| Number of Enforcement Actions Starting 2018 - 2022 |
| --- |

[282] Roy Maas Youth Alternatives – Girlsville/Junction is a medium-sized operation; in 2022, it was licensed to serve 32 children. On November 6, 2023, HHSC amended the operation's licensed capacity, reducing it to 16, noting "Junction will not have children at this time. Girlsville will have the capacity for 16." Between 2018 and 2022 Roy Maas Youth Alternative-Girlsville/Junction had 22 deficiencies, all for minimum standards weighted high, medium-high, and medium, 8 contract violations, 11 liquidated damages, and 13 awake night violations.
[283] Safe Life Journey is a small operation that opened in 2020. Between 2020 and 2022 the operation had 13 total deficiencies, 12 for minimum standards weighted high, medium-high, and medium, six liquidated damages, four contract violations and 24 YFT violations.

| Operation | Type of Enforcement | | |
|---|---|---|---|
| | Monetary Penalty | Plan of Action | Probation |
| A Heart with Hope Family Services | 0 | 0 | 0 |
| Castillo Children's Center | 3 | 0 | 0 |
| Families Especial Inc | 2 | 0 | 0 |
| Forever Families | 3 | 0 | 0 |
| Gold Star Academy | 3 | 1 | 0 |
| Kidz 2 Kidz CPA | 4 | 0 | 1 |
| Lifeline Children & Family Services | 2 | 0 | 0 |
| Open Hearts Children and Family Services | 4 | 0 | 0 |
| Roy Maas Youth Alternatives - Girlsville/Junction | 0 | 0 | 0 |
| Safe Life Journey | 1 | 0 | 0 |
| St Peter St Joseph Childrens Home Emergency Shelter | 1 | 0 | 0 |
| The SAFE Alliance | 7 | 0 | 0 |
| TruLight127 | 2 | 1 | 1 |
| Unity Children's Home - Girls | 0 | 1 | 0 |

In 2023, these operations were assessed an additional six monetary penalties before being placed on Heightened Monitoring.[284] Castillo Children's Center was placed on a Plan of Action in 2023 and Kidz 2 Kidz CPA was placed on a second probation before Heightened Monitoring. Both Castillo Children's Center and Kidz 2 Kidz CPA were on these actions at the time of Heightened Monitoring notification. Monetary penalties were assessed to Families Especial Inc (2), Kidz 2 Kidz CPA (1), Open Hearts Children and Family Services (1), and Unity Children's Home – Girls (1) in 2023 after each was placed on Heightened Monitoring. Between January 1 and December 31, 2023, these operations had 189 minimum standards deficiencies with the most common citations related to medication management (18% or 33 of 189), supervision (10% or 18 of 189), discipline (7% or 13 of 189) and serious incident reporting (7% or 13 of 189).

## Heightened Monitoring Plans

The State's Heightened Monitoring Team develops Heightened Monitoring Plans for all operations placed on Heightened Monitoring.[285]  The Plan identifies the operation's five-year compliance trends and current violation patterns and outlines the tasks the

---

[284] Monetary penalties were assessed to Castillo Children's Center (2), Families Especial (2), Forever Families (1), and The SAFE Alliance (1) in 2023 prior to the operation being placed on Heightened Monitoring.
[285] The Heightened Monitoring team is comprised of program specialists from each of the following Divisions: HHSC CCR, DFPS CPS, DFPS RCC, and DFPS CCI.

operation must accomplish to enhance child safety and complete Heightened Monitoring. Plan tasks relate to the operation's problem areas and completion of the tasks is expected to result in improved compliance.

The monitoring team reviewed each operation's Heightened Monitoring Plans to identify the operation's trends and problem areas as identified by the Heightened Monitoring Team.[286]  The most common problem areas identified in the 14 operations newly placed on Heightened Monitoring in 2023 related to Caregiver Responsibilities-Supervision, Child Rights, Discipline & Punishment, Medication Management - Medication Documentation, and Service Plan -Preliminary, Initial, and Discharge. Each of these areas was cited as a problem for 86% (12 of 14) of operations. Many operations were also identified as experiencing compliance issues related to Leadership Responsibilities- Record Keeping, Medical Care, or/and Medication Management – Administration (11 of 14 each or 79%) and Serious Incident Reporting (10 of 14 or 71%). Overall, 93% (13 of 14) of the operations placed on Heightened Monitoring in 2023 were experiencing one or more problem areas related to medication management,[287] 86% (12 of 14) were experiencing one or more problem areas related to caregiver responsibilities, and 79% were experiencing one or more problem area related to leadership. There were no operations with Adoption, Caregiver Responsibilities, Caregiver Responsibilities – Ratio & Capacity, Infant & Toddler Care, Leadership Responsibilities, or Application Requirements noted as problem areas in their Heightened Monitoring plans.

[286] Problem area categories include: Admissions, Adoption, Background Checks, Caregiver Responsibilities-Education, Caregiver Responsibilities-Normalcy, Caregiver Responsibilities-Ratio & Capacity, Caregiver Responsibilities-Supervision, Child Rights, Discipline & Punishment, EBI, Foster Home Oversight, Health and Safety, Health and Safety- Sanitation & Health, Health and Safety- Weapons/Firearms, Home Screening & Verification, Infant & Toddler Care, Leadership Responsibilities- Application Requirements, Leadership Responsibilities- Operational Policy & Procedures, Leadership Responsibilities- Personnel, Leadership Responsibilities- Record Keeping, Living Space & Physical Environment, Medical Care, Medication Management – Administration, Medication Management - Medication Documentation, Medication Management - Medication Storage, Recreation, Required Trainings, Respite Care, Serious Incident Reporting, Service Plan-Preliminary, Initial, Discharge, Therapeutic Services, and Transportation.
[287] Six of the 14 operations were identified as having issues related to all three medication management areas, six were identified as having issues related to two of the three medication management areas, and one operation was identified as having an issue related to one of the medication management areas.



Figure 69: Problem Areas Identified in 2023 Heightened Monitoring Plans

Source: Heightened Monitoring Plan Documentation
n = 14

| Problem Area | Percentage |
|---|---|
| Caregiver Resp-Supervision | 86% (12) |
| Child Rights | 86% (12) |
| Discipline & Punishment | 86% (12) |
| Med Management-Documentation | 86% (12) |
| Service Planning | 86% (12) |
| Leadership Resp-Record Keeping | 79% (11) |
| Medical Care | 79% (11) |
| Med Management-Administration | 79% (11) |
| Serious Incident Reporting | 71% (10) |
| Background Checks | 64% (9) |
| Living Space & Physical Environment | 64% (9) |
| Med Management-Storage | 57% (8) |
| Home Screening & Verification | 50% (7) |
| Required Trainings | 50% (7) |
| Therapeutic Services | 50% (7) |
| Admissions | 43% (6) |
| EBI | 43% (6) |
| Foster Home Oversight | 43% (6) |
| Health & Safety-Sanitation/Health | 29% (4) |
| Leadership Resp-Personnel | 29% (4) |
| Transportation | 29% (4) |
| Health & Safety-Fire Safety | 21% (3) |
| Health & Safety-Weapons/Firearms | 14% (2) |
| Leadership Resp-Policy & Procedures | 14% (2) |
| Recreation | 14% (2) |
| Caregiver Resp-Normalcy | 7% (1) |
| Respite Care | 7% (1) |

Operations had on average, 14 problem areas identified in their Heightened Monitoring Plan, with half of the operations (7 of 14) having between six and 12 problem areas identified and half (7 of 14) having between 13 and 21 areas identified. Overall, 27 of the 32 (84%) categories used by the State for Heightened Monitoring were identified as problem areas for operations placed on Heightened Monitoring in 2023.

Operations placed on Heightened Monitoring in 2023 had on average, twice as many problem areas identified in their Plan than operations placed on Heightened Monitoring in 2022. Operations placed on Heightened Monitoring in 2022 had an average of 7 problem areas identified compared to 14 in 2023, and a range of two to 10 problem

154

areas in 2022 compared to a range of six to 21 problem areas in 2023. The monitoring team observed that, for operations placed on Heightened Monitoring in 2023, all problem areas an operation had experienced during the five years appeared to be identified in the Plan, while in prior years, only an operation's most pressing problems appeared to have been identified.

Figure 70: Number of Problem Areas, Operations Placed on Heightened Monitoring 2022 and 2023



Source: Heightened Monitoring Plan Documentation

## Heightened Monitoring Tasks

Heightened Monitoring Plans include tasks intended to help the operation improve child safety and adhere to minimum standards that relate to the operation's five-year compliance trends and problem areas. One task can address multiple problem areas and multiple tasks can focus on the same problem area. Tasks must be completed for the operation to comply with, and ultimately complete, Heightened Monitoring. The 14 operations placed on Heightened Monitoring in 2023 had a total of 187 Plan tasks. Operations had on average, 13 tasks, with a minimum of six tasks and a maximum of 21 tasks.

Like the number of problem areas, operations placed on Heightened Monitoring in 2023 were assigned more tasks than operations placed on in 2022. Operations placed on Heightened Monitoring in 2022 had an average of nine tasks compared to 13 for operations placed on in 2023 and had between two and seventeen tasks compared to between six and twenty-one in 2023. The change in the number of tasks per operation

may be the result of changes in the way tasks were written in 2023. In prior years, related steps of an action were included in a single, multi-step task. For example, in 2022 the development of a policy and the implementation of that policy was often a single task, as was the creation of a checklist tool and the deployment of that tool. In 2023, these distinct steps were more likely to be written as separate tasks. Between 2022 and 2023, the total number of tasks increased from 122 to 187 (55 more tasks); the number of operations new to Heightened Monitoring increased by one operation from 13 to 14.

The number of tasks an operation was assigned did not directly relate to the number of problem areas identified for that operation. For operations placed on Heightened Monitoring in 2023, 50% (7 of 14) of operations had more tasks than problem areas while 50% (7 of 14) had fewer.[288]

Figure 71: Number of Plan Tasks for Operations Placed on Heightened Monitoring 2022 and 2023



Source: Heightened Monitoring Plan Documentation

The monitoring team reviewed the tasks in each operation's Heightened Monitoring Plan to identify the associated problem area(s). When developing an operation's plan tasks, the Heightened Monitoring Team identifies the problem area(s) a task is designed to address by selecting from a list that corresponds to the operation's identified problem

---

[288] Operations with more tasks than problem areas had between one and eight more tasks than problem areas. Operations with fewer tasks than problem areas had between two and eight fewer tasks than problem areas.

areas. The Heightened Monitoring Team may select at a minimum one problem area or as many as all the operation's problem areas for a specific task.[289]

Operations placed on Heightened Monitoring in 2023 had an average of three problem areas associated with each of their Plan tasks. Most tasks (108 of 187 or 57%) had one or two related problem areas, though in some cases, all the operation's problem areas were selected as relating to a specific task. The number of problem areas associated with a single task ranged from one to twenty-one. Tasks with the most problem areas were related to training and those that involved the development of policies and procedures for supervisory visits and foster home and child visits.

Figure 72: Number of Problem Areas Associated with Heightened Monitoring Plan Tasks



Source: Heightened Monitoring Plan Task Documentation
n=187

Number of Problem Areas

---

[289] The Heightened Monitoring Plan Details page is located in CLASS and allows the Heightened Monitoring Team to record all information associated with the operation's Heightened Monitoring Plan. Problem areas are recorded in the "Trends and Patterns Categories" section of the page while tasks are recorded in the "Tasks" section. All tasks are linked to task details which include the task category, task description, task due date, evaluation frequency and methods, and the plan trends and patterns addressed by the task. The list of plan trends and patterns includes all the operation's identified problem areas and ensures that only problem areas identified for the operation are associated with the specific task. In the review of operation tasks, the monitoring team found that all problem areas selected by the Heightened Monitoring Team were associated with the operation's identified problem areas and all problem areas were addressed by one or more tasks.

## Quality of Heightened Monitoring Tasks

The Court's March 18, 2020 order regarding Heightened Monitoring included a requirement for a "specific and detailed" Heightened Monitoring Plan. Specifically, the order states that the Facility Intervention Team Staffing (FITS) unit[290] is responsible for developing a detailed and specific plan addressing: the pattern of policy violations that led to Heightened Monitoring; any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses; any technical assistance needed by the operation from FPS, RCCL, or a third party; and the steps the operation must take to satisfy the plan. The State includes the same language in its Heightened Monitoring Process Overview Document.[291]

The monitoring team reviewed the quality of Heightened Monitoring Plan tasks by assessing whether each task had clear objectives. The monitoring team found that nearly all tasks in 2023 were specific as to what the operation was to accomplish (186 of 187, or 99.5%).

In the Monitors' Sixth Report, the monitoring team found improvement in the Heightened Monitoring Plan task language for operations placed on Heightened Monitoring in 2022 compared to those placed on Heightened Monitoring in 2020 and 2021.[292] Ninety-nine percent of tasks (121 of 122) for operations placed on Heightened Monitoring in 2022 were specific in their requirements compared to 95% (431 of 456) for operations placed on Heightened Monitoring in 2020 or 2021. The task language in the 2023 Heighted Monitoring Plans was consistent with 2022 findings, with 99.5% of tasks determined to be specific.[293]

---

[290] The FITS Team for the operation includes all members of the Heightened Monitoring Team.
[291] HHSC & DFPS, Heightened Monitoring Process Overview (undated) (on file with the Monitors).
[292] Court Monitors' Sixth Report, at 164.
[293] In 2022 99.2% of Plan tasks were determined to be specific compared to 99.5% in 2023. In both 2022 and 2023 one task was determined to not have specific language.

## Figure 73: Task Characteristics as Identified by Monitor's Staff for Operations Placed on Heightened Monitoring in 2020-2023



Source: Heightened Monitoring Plan Documentation 2020 – 2023

### Heightened Monitoring Plans for Operations that Previously Completed Heightened Monitoring but were Placed on Again in 2023

Operations on active Heightened Monitoring, Post-Plan Monitoring (PPM), and those that have completed Heightened Monitoring are included in the annual analysis to determine the operations to be placed on Heightened Monitoring. These operations often qualify for Heightened Monitoring in the current year.[294]

An operation that has completed Heightened Monitoring will qualify for and be placed on Heightened Monitoring again if they are found to have violations above the state rate in the annual pattern analysis in at least three of the last five years and one of those years is the latest year included in the analysis. Of the 13 operations that had previously completed Heightened Monitoring but again qualified in 2023, four met the criteria to be placed on monitoring a second time. These operations are A Pathway 2 New Beginnings, Caregivers Youth and Transitional Living Services, Connections, and House

---

[294] The current year Heightened Monitoring analysis uses the data and violation rates for four of the years used in the previous year's analysis and adds data for the most current complete calendar year. For example, for the analysis conducted in 2023, data from the years 2018 through 2021 were used from the previous analysis and calendar year 2022 data was added to complete the five-year period. An operation that had violation rates higher than the State average rate in 2019, 2020, and 2021 would qualify for Heightened Monitoring again in the 2023 analysis based on their historical trends. In 2023, of the 74 active operations that qualified for Heightened Monitoring, 47 (64%) were on active monitoring or PPM and 13 (18%) had completed Heightened Monitoring.

of Shiloh Family Services.[295]  All these operations were part of the initial group of operations identified for Heightened Monitoring in 2020.[296]

Table 22: Operations Qualifying for Heightened Monitoring in 2023 that had Completed Heightened Monitoring Previously

| Operation Name | Complete Date | Over State Rate in Latest Year Analyzed | # Years Over |
|---|---|---|---|
| 1 Archangel Foster and Adoption Agency | 1/2/2023 | | 3 |
| A Pathway 2 New Beginnings, LLC | 8/1/2023 | Yes | 5 |
| Ascension Child And Family Ser | 10/20/2022 | | 4 |
| Assuring Love Child Placement | 2/23/2022 | | 3 |
| Azleway Valley View | 7/8/2022 | | 3 |
| Bridge Emergency Shelter | 2/1/2023 | | 3 |
| Caregivers Youth and Transitional Living Services | 11/3/2022 | Yes | 5 |
| Connections (#181054) | 8/10/2022 | Yes | 4 |
| Heart To Heart Family Services | 2/1/2023 | | 4 |
| High Plains Children's Home | 3/10/2023 | | 3 |
| House Of Shiloh Family Service | 12/28/2022 | Yes | 5 |
| Nothing Just Happens Inc. | 6/29/2022 | | 3 |
| Road To Wisdom LLC | 9/16/2022 | | 3 |

The four operations returning to Heightened Monitoring were notified in November 2023 and began the process anew with Pre-Plan development. All the returning operations had a new Heightened Monitoring Plan developed and all Plans were finalized in December 2023.

A summary of the returning operations' violation history before and after completing Heightened Monitoring and a comparison of their original Heightened Monitoring Plan to their Plan in 2023 are provided below.

**A Pathway 2 New Beginnings (Operation #1708570)**

---

[295] Connections, operation number 181054. Have Haven Child Placing Agency qualified for Heightened Monitoring and was notified but was removed from monitoring after the State determined that contract violations had been attributed to the operation in error.

[296] The initial pattern analysis and identification of operations for Heightened Monitoring was conducted in 2020. One hundred and six operations qualified for Heightened Monitoring in 2020, 86 were placed on Heightened Monitoring. Because of the large number of operations identified in the initial cohort, operations were notified in stages beginning in June 2020 and ending in January 2021. All these operations are considered part of the 2020 cohort.

A Pathway 2 New Beginnings was first notified of its Heightened Monitoring status on January 13, 2021. To qualify for Heightened Monitoring in 2020, the operation had a total of 109 violations, including 101 citations related to minimum standards weighted medium, medium-high, or high, five Reason to Believe allegation findings, two contract violations, and one complaint. In the years included in the initial pattern analysis,[297] the operation was over the state average violation rate in four of the five years analyzed.[298]

A Pathway 2 New Beginnings' 2021 Heightened Monitoring Plan was finalized on February 11, 2021. This Plan identified patterns and trends in eight problem areas and assigned the operation seven tasks. Plan tasks were focused on personnel policies and procedures, service planning, therapeutic services, and medication administration and documentation. Tasks were to be achieved through policy and procedures revision/development, plan creation, and meetings with staff.

While on active Heightened Monitoring, A Pathway 2 New Beginnings was found in compliance with their Plan tasks in four of their six quarterly reviews. The operation's last Quarterly Review before moving to Post-Plan Monitoring indicated the operation provided a safe and healthy environment for all residents, while the operation's Compliance Report noted there had not been any new or emerging trends or patterns during the operation's time on Heightened Monitoring.[299]  A Pathway 2 New Beginnings moved to Post-Plan Monitoring (PPM) on November 4, 2022, and completed Heightened Monitoring on August 1, 2023.

A Pathway 2 New Beginnings was notified it would be returning to Heightened Monitoring on November 13, 2023. Between 2020 and 2022, and including while on Heightened Monitoring,[300] the operation had a total of 40 violations consisting of 18 citations related to minimum standards weighted medium, medium-high, or high, seven contract violations, 14 Youth for Tomorrow missed indicators,[301] and one awake-night supervision violation. The operation was over the state average violation rate in five of the five years included in the 2023 pattern analysis.[302]  In 2022, the violation rate for A

---

[297] The initial pattern analysis conducted in 2020 included data from the five-year period of calendar year 2015 to 2019.

[298] A Pathway 2 New Beginnings #1708570 is linked to Houston Serenity Place #852576. This linkage resulted in the operation being placed on Heightened Monitoring as part of the 2020 cohort.

[299] DFPS & HHSC, A Pathway 2 New Beginnings Heightened Monitoring Plan Quarterly Report, Quarter 6 (August 31, 2022) (on file with the Monitors); DFPS & HHSC, A Pathway 2 New Beginnings Heightened Monitoring Compliance Report (November 4, 2022) (on file with the Monitors).

[300] The count of violations includes all violation occurring in calendar years 2020 through 2022. A Pathway 2 New Beginnings was placed on Heightened Monitoring in January 2021 and completed monitoring in August 2023.

[301] Youth for Tomorrow (YFT) conducts annual quality assurance reviews of the Service System indicators implemented by residential programs who provide therapeutic level services and who contract with DFPS. Missed indicators are included as violations in the annual Heightened Monitoring Pattern analysis.  There are approximately 65 indicators that YFT monitors; DFPS counts violation of indicators during YFT quality assurance reviews as a contract violation. Texas Alliance of Child and Family Services, *Mapping Oversight & Visits* (undated)(on file with the Monitors).

[302] The 2023 pattern analysis included data from the five-year period of calendar year 2018 to 2022.

Pathway 2 New Beginnings was 4.69 compared to the state average rate of 3.45 for operations of similar size and type.

The operation's 2023 Heightened Monitoring Plan was finalized on December 19, 2023. The 2023 Plan identified patterns and trends in four problem areas and assigned the operation five tasks. Three of the operation's identified problem areas in 2023 were also problem areas identified in 2021. These problem areas were Caregiver Responsibilities - Supervision, Service Planning, and Therapeutic Services.

| A Pathway 2 New Beginnings | |
|---|---|
| Areas Identified in 2021 | Areas Identified in 2023 |
| Caregiver Responsibilities – Supervision | Caregiver Responsibilities – Supervision |
| Service Planning | Service Planning |
| Therapeutic Services | Therapeutic Services |
| Discipline & Punishment | Medical Care |
| Emergency Behavioral Interventions | |
| Leadership Responsibilities- Operational Policy & Procedures | |
| Leadership Responsibilities- Record Keeping | |
| Medication Management - Documentation | |

The trend and pattern summary included in the operation's 2023 plan indicated that violations in the areas of service plans, therapeutic services, and supervision led to the operation's renewed eligibility for Heightened Monitoring, "despite the progress A Pathway to New Beginnings made while on HM."[303]   The summary also noted that "the HM team identified service plans as the root cause for deficiencies. Service plans did not address the individual needs of children; the required professionals were not participating in the service planning of the children; and children did not receive timely and recommended medical or therapeutic services."[304]

A Pathway 2 New Beginnings 2023 tasks are new, and do not duplicate any of the operation's 2021 Plan tasks. They focus on service planning, therapeutic and medical services, and supervision.

| A Pathway 2 New Beginnings | | |
|---|---|---|
| Number of Tasks Assigned 2021 | Number of Tasks Assigned 2023 | Number of Duplicated Tasks |
| 7 | 5 | 0 |

---

[303] DFPS & HHSC, A Pathway 2 New Beginnings 2023 Heightened Monitoring Plan, Summary of 5 Year Analysis - Summary of Violation Patterns and Trends (as found on the CLASS HM tab, A Pathway 2 New Beginnings HM Plan List, version effective date December 19, 2023).
[304] *Id.*

**Caregivers Youth and Transitional Living Services (Operation #1556161)**

Caregivers Youth and Transitional Living Services was first notified of their Heightened Monitoring status on October 12, 2020. To qualify for Heightened Monitoring in 2020, the operation had a total of 54 violations including 52 citations related to minimum standards weighted medium, medium-high, or high, and two liquidated damages. In the years included in the initial pattern analysis,[305] the operation was over the state average violation rate in three of the five years analyzed.

The Caregivers Youth and Transitional Living Services 2020 Heightened Monitoring Plan was finalized on November 6, 2020. This Plan identified patterns and trends in seven problem areas and mentioned a Reason to Believe finding the operation received in June 2020 for Medical Neglect.

The operation was assigned four tasks as part of their 2020 Plan, related to foster home screenings, the training of foster parents, serious incident reporting, and supervisory visits. These tasks primarily required the operation to comply with minimum standards by developing plans, reviewing policies, and developing tracking systems.

While on active Heightened Monitoring, Caregivers Youth and Transitional Living Services was consistently found in compliance with their Plan tasks, although Quarterly Review assessments noted concerns related to the operation's problem areas. In the last quarter before moving to Post-Plan Monitoring, the quarterly assessment for the operation noted, "Though the operation has maintained compliance with most of HM plan tasks, there continue to be concerns related to the patterns and trends of home verifications/screenings, serious incident reporting and service planning which led the operation to HM."[306] Caregivers Youth and Transitional Living Services moved to Post-Plan Monitoring (PPM) on April 29, 2022, and completed Heightened Monitoring on November 3, 2022.

Caregivers Youth and Transitional Living Services was notified it would be returning to Heightened Monitoring on November 13, 2023. Between 2020 and 2022, including while on Heightened Monitoring,[307] the operation had a total of 80 violations consisting of 58 citations related to minimum standards weighted medium, medium-high, or high, three Reason to Believe allegation findings, seven contract violations, eight Youth for Tomorrow missed indicators, three liquidated damages, and one complaint. The operation was over the state average violation rate in five of the five years included in the 2023 pattern analysis.[308] In 2022, the violation rate for Caregivers Youth and

---

[305] The initial pattern analysis conducted in 2020 included data from the five-year period of calendar year 2015 to 2019.
[306] DFPS & HHSC, Caregivers Youth and Transitional Living Services Heightened Monitoring Plan – Quarterly Review (February 11, 2022) (on file with the Monitors).
[307] The count of violations includes all violation occurring in calendar years 2020 through 2022. Caregivers Youth and Transitional Living Services was placed on Heightened Monitoring in October 2020 and completed monitoring in November 2022.
[308] The 2023 pattern analysis included data from the five-year period of calendar years 2018 to 2022.

Transitional Living Services was 11.76 compared to the state average rate of 9.53 for operations of similar size and type.

The operation's 2023 Heightened Monitoring Plan was finalized on December 20, 2023. The 2023 Plan identified patterns and trends in 11 problem areas and assigned the operation 13 tasks. Three of the operation's identified problem areas in 2023 were also areas identified in 2020. These problem areas were Living Space and Physical Environment, Medical Care, and Serious Incident Reporting.

| Caregivers Youth and Transitional Living Services | |
|---|---|
| Problem Areas Identified in 2020 | Problem Areas Identified in 2023 |
| Living Space & Physical Environment | Living Space & Physical Environment |
| Medical Care | Medical Care |
| Serious Incident Reporting | Serious Incident Reporting |
| Health Safety – Fire Safety | Caregiver Responsibilities – Supervision |
| Foster Home Screening & Verification | Caregiver Responsibilities – Normalcy |
| Required Trainings | Child Rights |
| Service Planning | Discipline and Punishment |
| Therapeutic Services | Foster Home Oversight |
| | Infant and Toddler Care |
| | Leadership Responsibilities – Recordkeeping |
| | Recreation |

The operation's trend and pattern summary included in their 2023 plan indicated, "concerns for neglectful supervision continues to be noted as a trend/pattern. There have been multiple incidents in which youth in care have been left alone for extended periods, and there continues to be concern regarding discipline and punishment."[309] Neither supervision nor discipline and punishment were identified as a problem area in the operation's 2020 Plan. The operation's 2023 tasks focus on supervisory visits, serious incident reporting, training of foster parents and staff, and tracking medical and therapeutic services for children in care. All the 2023 tasks are new and do not duplicate any of the operation's 2020 Plan tasks.

| Caregivers Youth and Transitional Living Services | | |
|---|---|---|
| Number of Tasks Assigned 2020 | Number of Tasks Assigned 2023 | Number of Duplicated Tasks |
| 4 | 13 | 0 |

---

[309] Caregivers Youth and Transitional Living Services 2023 Heightened Monitoring Plan, Summary of 5 Year Analysis - Summary of Violation Patterns and Trends (as found on the CLASS HM tab, Caregivers Youth and Transitional Living Services HM Plan List, version effective date December 20, 2023 and February 22, 2024).

## Connections (Operation #181054)

Connections was first notified of its Heightened Monitoring status on October 26, 2020. To qualify for Heightened Monitoring in 2020, the operation had a total of 75 violations including 74 citations related to minimum standards weighted medium, medium-high, or high, and one Reason to Believe allegation finding. In the years included in the initial pattern analysis,[310] the operation was over the state average violation rate in three of the five years analyzed.

The Connections 2020 Heightened Monitoring Plan was finalized on November 25, 2020. This Plan identified patterns and trends in five problem areas and assigned the operation seven tasks. Plan tasks were focused on service plans, serious incident reporting, supervision, medication administration, and physical plant and were to be achieved through operation walkthroughs, the development of new systems/processes, records reviews, and training. The operation's Heightened Monitoring Plan was amended in April 2021. The amended plan included six tasks, combining Task One and Task Two into a single task. The amended plan also clarified the expectations for unannounced visits and walkthroughs, allowed walkthroughs to be conducted by staff other than the operation's management team, required the development and use of a site maintenance log listing all needed repairs, and added the requirement of a weekly medication audit.

While on active Heightened Monitoring, Connections was consistently found in compliance with their Plan tasks, although Quarterly Review assessments noted technical assistance provided in standards related to the operation's problem areas and tasks. Connections moved to Post-Plan Monitoring (PPM) on December 21, 2021, and completed Heightened Monitoring on August 10, 2022.

Connections was notified it would be returning to Heightened Monitoring on November 13, 2023. Between 2020 and 2022, and including while on Heightened Monitoring,[311] the operation had a total of 56 violations consisting of 34 citations related to minimum standards weighted medium, medium-high, or high, three Reason to Believe allegation findings, 12 contract violations, six liquidated damages, and one complaint. The operation was over the state average violation rate in four of the five years included in the 2023 pattern analysis.[312]  In 2022, the violation rate for Connections was 11.00 compared to the state average rate of 7.01 for operations of similar size and type. The operation received ten Reason to Believe allegation findings in 2023, eight of which resulted from investigations that began in 2022 after the operation completed Heightened Monitoring.[313]

---

[310] The initial pattern analysis conducted in 2020 included data from the five-year period of calendar year 2015 to 2019.
[311] The count of violations includes all violations that occurred in calendar years 2020 through 2022. Connections was placed on Heightened Monitoring in October 2020 and completed monitoring in August 2022.
[312] The 2023 pattern analysis includes data from a five-year period of calendar year 2018 to 2022.
[313] The investigations resulting in RTBs for the operations had start dates of December 8, 2022, December 22, 2022, and June 15, 2023. The operation completed Heightened Monitoring on August 10, 2022.

The operation's 2023 Heightened Monitoring Plan was finalized on December 18, 2023. The 2023 Plan identified patterns and trends in nine problem areas and assigned the operation ten tasks. Four of the operation's identified problem areas in 2023 were also areas identified in 2020. These problem areas were Caregiver Responsibilities – Supervision, Living Space and Physical Environment, Medication Management – Documentation, and Medication Management – Administration.

| Connections | |
|---|---|
| Areas Identified in 2020 | Areas Identified in 2023 |
| Caregiver Responsibilities – Supervision | Caregiver Responsibilities – Supervision |
| Living Space & Physical Environment | Living Space & Physical Environment |
| Medication Management - Documentation | Medication Management - Documentation |
| Medication Management - Administration | Medication Management - Administration |
| Medication Management - Storage | Child Rights |
| | Leadership Responsibilities – Recordkeeping |
| | Medical Care |
| | Serious Incident Reporting |
| | Service Planning |

The operation's trend and pattern summary included in their 2023 plan indicated that "This review found many areas of overlap with previously identified trend and pattern areas, including several issues each relating to Caregiver Responsibilities, Medication Management and Living Space and Physical Environment."[314]  The summary also noted that "The operation's most cited patterns and trends since their release relate to supervision deficiencies and physical environment, both areas which the prior HM plan addressed."[315]  All of the tasks included in Connections' 2020 Heightened Monitoring amended Plan are included as tasks in the operation's 2023 Heightened Monitoring Plan, with only some minor wording changes. Connections also had four new tasks assigned in their 2023 Plan including Task 10 which requires that "The operation will begin a review and update of policy and procedures to include procedural changes the operation made during the initial Heightened Monitoring episode that contributed to the operation's success."[316]

[314] DFPS & HHSC, Connections 2023 Heightened Monitoring Plan, Summary of 5 Year Analysis - Summary of Violation Patterns and Trends (as found on the CLASS HM tab, Connections HM Plan List, version effective date December 18, 2023).
[315] Id.
[316] Connections 2023 Heightened Monitoring Plan (as found on the CLASS HM tab, Connections HM Plan List, version effective date December 18, 2023).

| Connections | | |
|---|---|---|
| Number of Tasks Assigned 2020[317] | Number of Tasks Assigned 2023 | Number of Duplicated Tasks |
| 6 | 10 | 6 |

## House of Shiloh Family Services (Operation #1682066)

House of Shiloh Family Services was first notified of their Heightened Monitoring status on January 13, 2021. To qualify for Heightened Monitoring, the operation had a total of 37 violations, all citations related to minimum standards weighted medium, medium-high, or high. In the years included in the initial pattern analysis,[318] the operation was over the state average violation rate in three of the five years analyzed.[319]

The House of Shiloh Family Services 2021 Heightened Monitoring Plan was finalized on February 26, 2021. This Plan identified patterns and trends in five problem areas and assigned the operation six tasks. Plan tasks were focused on supervisory and foster parent visits, foster home screening, discipline and punishment, and recordkeeping and were to be achieved through the development of new policies, systems, and processes, records reviews, and training.

While on active Heightened Monitoring, House of Shiloh Family Services was consistently found in compliance with their Plan tasks.[320] The operation's Compliance Report, completed before the operation moved to Post-Plan Monitoring, indicated that House of Shiloh Family Services "implemented all tasks related to their Heightened Monitoring Plan, and demonstrated improved and sustained compliance with the patterns and trends that led to Heightened Monitoring."[321] House of Shiloh Family Services moved to Post-Plan Monitoring on March 4, 2022, and completed Heightened Monitoring on December 28, 2022.

House of Shiloh Family Services was notified it would be returning to Heightened Monitoring on November 13, 2023. Between 2020 and 2022, including while on Heightened Monitoring,[322] the operation had a total of 56 violations consisting of 38 citations related to minimum standards weighted medium, medium-high, or high, one

---

[317] Based on operation's amended Heightened Monitoring Plan. The Plan was implemented in November 2020 and amended in April 2021.
[318] The initial pattern analysis conducted in 2020 included data from the five-year period of calendar year 2015 to 2019.
[319] House of Shiloh #1682066 is linked to House of Shiloh #1629186 and House of Shiloh #1661927. This linkage resulted in the operation being placed on Heightened Monitoring as part of the 2020 cohort.
[320] In quarter one, the operation was found to be non-compliant with task 4 in one month of the quarter. This task required the development of a training that was not conducted in the month it was approved.
[321] DFPS & HHSC, House of Shiloh Family Services Compliance Report (March 4, 2022) (on file with the Monitors).
[322] The count of violations includes all violations that occurred in calendar years 2020 through 2022. House of Shiloh was placed on Heightened Monitoring in January 2021 and completed monitoring in December 2022.

RTB allegation finding, 12 contract violations, one Youth for Tomorrow missed indicators, and four liquidated damages. The operation was over the state average violation rate in all of the five years included in the 2023 pattern analysis.[323]  In 2022, the violation rate for House of Shiloh Family Services was 19.17 compared to the state average rate of 9.53 for operations of similar size and type.

The operation's 2023 Heightened Monitoring Plan was finalized on December 20, 2023. The 2023 Plan identified patterns and trends in 12 problem areas and assigned the operation nine tasks. Three of the operation's identified problem areas in 2023 were also areas identified in 2021. These problem areas were Discipline and Punishment, Foster Home Screening and Verification, and Medication Management – Storage.

| House of Shiloh Family Services | |
|---|---|
| Areas Identified in 2021 | Areas Identified in 2023 |
| Discipline and Punishment | Discipline and Punishment |
| Foster Home Screening and Verification | Foster Home Screening and Verification |
| Medication Management - Storage | Medication Management - Storage |
| Foster Home Oversight | Background Checks |
| Leadership Responsibilities – Recordkeeping | Caregiver Responsibilities – Supervision |
| | Child Rights |
| | Emergency Behavioral Interventions |
| | Leadership Responsibilities – Operational Policy & Procedures |
| | Medical Care |
| | Medication Management - Administration |
| | Required Trainings |
| | Serious Incident Reporting |

The operation's trend and pattern summary included in their 2023 Plan mentions two previous problem areas as continuing areas of concern, accounting for the greatest number of deficiencies for the operation. These areas are foster home screenings and verifications, and discipline and punishment. Medication Management is also noted as an area of concern, though was said to be less prominent.[324]  The operation's 2023 tasks focus on background checks, the implementation of a therapeutic program model, serious incident reporting, foster home screening, supervisory visits, and required training. All the 2023 tasks are new and do not duplicate any of the operation's 2021 Plan tasks.

---

[323] The 2023 pattern analysis includes data from the five-year period of calendar year 2018 to 2022.
[324] House of Shiloh Family Services 2023 Heightened Monitoring Plan, Summary of 5 Year Analysis - Summary of Violation Patterns and Trends (as found on the CLASS HM tab, House of Shiloh Family Services HM Plan List, version effective date December 20, 2023).

| House of Shiloh Family Services | | |
|---|---|---|
| Number of Tasks Assigned 2021 | Number of Tasks Assigned 2023 | Number of Duplicated Tasks |
| 6 | 9 | 0 |

## Review of Placements of PMC Children Made to Operations Under Heightened Monitoring, January 1, 2023, through December 31, 2023

During the calendar year 2023, caseworkers made a total of 4,155 requests[325] to place foster children (TMC and PMC) in operations that were under Heightened Monitoring. Just over one-third of these requests involved a PMC child.

Figure 74: Legal Status of Children with Placement Requests to Heightened Monitoring Operations, Calendar Year 2023



The number of requests made to place a child in an operation under Heightened Monitoring remained consistent throughout 2023.

---

[325] Excludes 394 requests made on November 1, 2023, and 21 requests made on December 1, 2023, that were auto-generated requests as a result of children's placements' transferring to a newly operating SSCC.



Figure 75: Number of Heightened Monitoring Placement Requests by Month, Calendar Year 2023

Source: DFPS Placement authorization requests
n = 4,155

During 2023, DFPS and SSCCs made 873 placements of PMC children to operations under Heightened Monitoring. An average of 73 placements involving PMC children were made to operations under Heightened Monitoring each month in 2023, compared to 119 in 2022. There were 75 operations under Heightened Monitoring in 2023 compared to 91 in 2022, which, in part, explains the reduction in children's placements in operations under Heightened Monitoring.[326] As noted previously, there were also fewer children in care, which also played a partial role in fewer children being placed in those settings.

---

[326] Twenty-two operations completed Heightened Monitoring and 13 closed in 2022, while 20 operations started Heightened Monitoring in 2023. A Pathway 2 New Beginnings both completed and started Heightened Monitoring in 2023.



Figure 76: Number of Placements of PMC Children at Operations Under Heightened Monitoring by Month, Calendar Years 2022 and 2023

Source: PMC placement data
n = 2,295

## Approval of Placements at Heightened Monitoring Operations

Nearly all caseworkers' requests to approve the placement of a PMC child at an operation under Heightened Monitoring received approval from a DFPS Regional Director or Associate Commissioner. Of the 873 placements of a PMC child in an operation on Heightened Monitoring in 2023, a DFPS Regional Director or Associate Commissioner approved 858 (98%).[327]

DFPS approved approximately 6% of placements (55 of 858) after the PMC child had already been placed at the operation. In 2023, DFPS approved more placements on the same day the placement was made than in 2022. In 2022, DFPS approved 24% (332 of 1,402) of placement approvals on the same day as placement compared to 36% (309 of 858) in 2023.

---

[327] A DFPS Regional Director or Associate Commissioner rejected seven of the 15 HM placement requests that were not approved. The monitoring team could not find HM placement requests in IMPACT within 30 days of the placement for the remaining eight.



Figure 77: Timing of Approval in IMPACT for Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2023

Source: PMC placement data, Placement authorization requests
n = 858

- Approved prior to placement: 494 (58%)
- Approved same day as placement: 309 (36%)
- Approved after placement: 55 (6%)

DFPS was more likely to approve an SSCC placement request on the same day that the child was placed. Sixty-three percent (63%, 344 of 550) of DFPS placements of PMC children in Heightened Monitoring operations were approved before the day the child was placed, compared to 49% (150 of 308) of SSCC placements.

Three-quarters of the placements (641 of 858, 75%) that DFPS approved in 2023 were to foster homes verified by a CPA under Heightened Monitoring, and one-quarter (217 of 858, 25%) were to a GRO or RTC under Heightened Monitoring. Most of the placements DFPS approved were to operations in the Plan in Effect stage of Heightened Monitoring (720 of 858, 84%).[328]

---

[328] Heightened Monitoring status at the time the approved placement started. Operations that are actively being monitored by the State for compliance with their Heightened Monitoring Plan are in the Plan in Effect stage of monitoring.



Figure 78: Stage of Heightened Monitoring for Approved Placements, Calendar Year 2023



Most of the placements approved by DFPS in 2023 were for placements in operations that started Heightened Monitoring in 2020 (644 of 858, 75%). Fifteen of the placements that DFPS approved were made to operations that later closed; 13 of these were for operations that closed due to a pending license revocation.[329]

In nearly three-quarters of approved placements[330] (622 of 844, 74%), the child was coming from a placement in a foster home, GRO or RTC, or emergency shelter. Sixty-two percent of these prior placements (383 of 622) were at operations that were not under Heightened Monitoring at the time of the placement change.[331] For 16% of approved placements (131 of 844), there was a placement change to a foster home within the same CPA under Heightened Monitoring.

Children placed in a GRO or RTC that was under Heightened Monitoring were more likely to have previously been without placement (CWOP) or placed in a hospital than children with an approved placement to a foster home. Over a quarter of approved placements to a GRO/RTC were for children who were previously in a CWOP Setting (38 of 216, 18%) or a hospital setting (22 of 216, 10%) compared to 9% of approved placements to a foster home (23 of 628, or 4%, were previously in CWOP and 33 of 628, or 5%, were previously in a hospital setting).

---

[329] The fifteen placements were made to three operations that closed: The Giocosa Foundation, Hands of Healing, and Boys Haven of America. Hands of Healing and Boys Haven were later closed pending revocation. All three operations had started Heightened Monitoring in 2020.

[330] Excludes fourteen children who did not have a prior PMC placement before the approved placement.

[331] For the remaining 26% of approved placements, children were previously placed in kinship (9%), CWOP (7%), hospital (7%), or other type of placement (3%) including juvenile detention, unauthorized placement, runaway, and independent living arrangement.



**Figure 79: Prior Placement Type for Children in Approved Placements at Heightened Monitoring Operations, 2023**

Source: PMC placement data
n = 855

- Approved placement at GRO/RTC (n=216)
- Approved placement at foster home (n=628)

Prior Placement Type

| | Foster home | GRO/RTC | Emergency Shelter | Kinship | CWOP | Hospital | Other |
|---|---|---|---|---|---|---|---|
| GRO/RTC | 19% | 32% | 9% | 8% | 18% | 10% | 4% |
| Foster home | 57% | 17% | 5% | 9% | 4% | 5% | 3% |

## Documentation of Approval in the Heightened Monitoring Placement Request

The monitoring team reviewed IMPACT records for PMC children in approved placements in Heightened Monitoring operations in 2023 to determine whether the Court's requirements related to placement approvals were documented.[332] Although the

---

[332] The Court's December 7, 2020, order required, "Before approving a PMC child's placement into a facility on Heightened Monitoring, the Regional Director must consider all required elements as set forth in applicable DFPS policy, including but not limited to reviewing the facility's history over the previous five years. If the Regional Director approves the placement, he or she will personally document approval of the placement in the comment box within the placement section of IMPACT, will confirm that the facility's history was reviewed and considered for the past five years, and will document the justification for the approval, which will constitute certification that the Regional Director approved the placement and followed the required DFPS policy." Order, 1-2 ECF No. 1012.

The monitoring team reviewed the Heightened Monitoring Placement Request tab in IMPACT for each 2023 placement of a PMC child in a Heightened Monitoring operation to determine: whether a best

monitoring team found that the documentation of the approver's justification for the placement and their review of the operation's safety history improved, this information was still lacking in 2023.[333] Documentation of the review of five-year history improved significantly during the second half of 2023. In placement approvals reviewed between January 1, 2023, and June 30, 2023, only 27% (129 of 479) included documentation that the five-year history was reviewed compared to 73% (275 of 379) of approvals reviewed between July 1, 2023, and December 31, 2023.

Figure 80: Information Included in Heightened Monitoring Placement Request for Approved Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2022 and 2023

Source: PMC placement data, Placement authorization requests
n = 2,260



The monitoring team found documentation of both the approver's justification for the PMC child's placement and a review of the operation's five-year child safety history in only 38% (329 of 858) of approved placements, up from 17% in 2022. This also improved throughout the year, with only 25% (121 of 479) of placement approvals

---

interest statement was included in the request (per DFPS policy); whether the Regional Director or Associate Commissioner documented justification for the placement approval; and, whether the Regional Director or Associate Commissioner documented that they had reviewed the operation's history over the previous five years.

[333] The monitoring team did not assess whether the approver's justification for placement was valid, only that justification was documented by the approver. When the monitoring team reviewed the information justifying the placement, the team assessed whether the approver provided reasons that the placement would be able to meet the child's needs, or context around the child's current placement and why the requested placement was the best option. If the approver simply stated, "I am in agreement with the best interest statement" or if they only stated that information was reviewed, this was not considered to be sufficient documentation consistent with the Remedial Order. For example, if the approver simply stated, "history reviewed" or "reviewed CLASS," this was not considered to be sufficient documentation that the operation's five-year history was reviewed.

reviewed between January and June containing documentation of both the justification and review of the five-year history, compared to 55% (208 of 379) of placement approvals reviewed between July and December.

Figure 81: Documentation of Approver's Justification for Placement and Review of Operation's Five-Year History in Heightened Monitoring Placement Request for Approved PMC Placements, Calendar Year 2023

Source: PMC placement data, Placement authorization requests
n = 858



- Included five-year history and justification
- Included justification only
- Included five-year history only
- Did not include justification or history

In the Sixth Report, the Monitors found that approvers frequently copied and pasted statements, resulting in generic approvals that did not appear to consider a child's individual needs.[334] The Monitors found that requestors appeared to cut and paste between requests, and approvers appeared to cut and paste the requestors' language without adding their justification for the placement. In some cases, the requestor or approver appeared to cut and paste incorrect information from a former request or approval into a subsequent request or approval.

For placement approvals made in 2023, the monitoring team assessed whether the approval appeared to have been copied from the best interest statement with no other justification provided, or whether the approver used the same statement across multiple approvals with no information unique to the child. Nearly one-quarter of the approvals with justification (146 of 618, 24%) were copied from the best interest statement or across approvals. When justification was copied across approvals, it often included a generic statement like, "I have reviewed [child's] application for placement, and it appears that this home will be able to meet their needs. I have reviewed the operation's history, CLASS, and IMPACT. I have reviewed the best interest statement and I'm in agreement with it."

---

[334] Sixth Report, at 170 – 172.

The percentage of placement approvals with generic justification statements declined throughout the year. In approvals made between January 1, 2023, and June 30, 2023, 30% (104 of 352) of approvals with a justification statement had what appeared to be a copied statement, compared to 16% (42 of 266) of approvals made between July 1, 2023, and December 31, 2023. In November and December 2023, all the placement approvals reviewed by the monitoring team (128 of 128, 100%) contained documentation of the approver's justification for the placement, with only 4% (5 of 128) having what appeared to be copied and pasted information with no other justification included.

**In 2023, 35% (304 of 873) of all placements of PMC children to operations under Heightened Monitoring received prior approval that met all the Court's requirements.** This was an improvement from 2022, when the monitoring team found 16% (225 of 1,422) met all the Court's requirements.

The percentage of placements that met all the Court's prior approval requirements increased throughout the year. In placements made between January 1, 2023, and June 30, 2023, only 23% (111 of 484) met the Court's requirements compared to 50% (193 of 389) of placements made between July 1, 2023, and December 31, 2023.

Figure 82: Placements of PMC Children to Operations on Heightened Monitoring that Met all the Court's Requirements, January 1, 2023, to December 31, 2023



Source: PMC placement data, Placement authorization requests
n = 873

177

## Review of Investigations and Compliance in the Six Months Before Approved Placement at Heightened Monitoring Operations

The monitoring team reviewed the investigation and compliance history for Heightened Monitoring operations and foster homes where DFPS approved a PMC child's placement between September 1, 2023, and December 31, 2023, and included a non-generic justification statement in the approval.[335] Of the 173 approved placements reviewed, 30% (52 of 173) involved placement to a GRO or RTC, and 70% (121 of 173) were placements to a foster home. For foster home placements, the CPA branch history was reviewed in addition to the foster home's history.

In a quarter of the reviewed placements (44 of 173, 25%), the operations had one or more RTB allegation findings[336] in the six months before the start of the approved placement.[337] The same operations also had an average of 4.77 high-weighted deficiencies cited in the six months before placement start.

Figure 83: Number of Reason to Believe Allegation Findings in the Six Months Prior to Placement Start for Approved Placements with Justification, September 1, 2023, to December 31, 2023



Source: PMC Placement data, Placement authorization requests, CLASS Extended Compliance History Review

---

[335] Includes all approved placements made between September 1, 2023, and December 31, 2023, where the approver gave justification and did not copy/pastes statements. The monitoring team utilized the Extended Compliance History Review (ECHR) to review the number and dispositions of ANE investigations conducted in the six months prior to the approved placement start date. The study period of September 2023 to December 2023 was chosen due to the updates to CLASS which enhanced the functionality of the ECHR beginning in mid-August 2023. In addition, the monitoring team reviewed operations' compliance with minimum standards in the six months prior to the approved placement start date.

[336] All RTB allegation findings were counted; one investigation could have more than one RTB allegation finding.

[337] Forty-four placements were made across 13 different operations that had one or more RTB allegation finding six months prior to the start of the approved placement.

Over a third of the reviewed placements (65 of 173, 38%) had an open ANE investigation when the approved placement of PMC children started. Sixty percent of placements at a GRO or RTC (31 of 52) had an open ANE investigation at the time of the approved placement, compared to 28% (34 of 121) of placements at a CPA. Examples of placements with open ANE investigations at the time of placement, and the approver justification for the Heightened Monitoring placement, are provided below.

**On October 2, 2023**, a Heightened Monitoring placement request was submitted and approved for a placement that started on October 4, 2023. The child was previously placed at an RTC that was not under Heightened Monitoring and the request was made for placement at a foster home with Children of Diversity CPA. Children of Diversity started Heightened Monitoring in August 2022 and, at the time of the placement, had six open ANE investigations. At closure, one of these investigations resulted in a UTD finding for Physical Abuse and Neglectful Supervision of a child by a respite provider, and two minimum standards citations. Two of the other investigations later closed with a total of 14 citations.

During the six months before the placement, Children of Diversity had three RTB findings, five ANE investigations that were Ruled Out, and 34 minimum standards deficiencies cited,[338] 15 of which were high-weighted. The foster home where the child would be placed had one ANE investigation with no finding and no cited minimum standards deficiencies in the six months before the placement. The home was licensed to care for children who had a Basic Level of Care (LOC); the child who was placed had a Moderate LOC until the day the child was placed in this home, when a Basic LOC was authorized.

The DFPS approver's statement in the Heightened Monitoring placement request said:

> I approve the HM request of [Child A] in the home of [foster parent] with Therapeutic Family Life[339]/CPA. I reviewed and considered [the foster parent's] 5 year investigative history in CLASS, the home has no open investigations and I reviewed Therapeutic Family Life's trends & patterns. I also reviewed [Child A's] Common App, Psychological eval., the best interest statement and [the foster parent's] home study. [The foster parent] is a tenured foster parent whom has experience fostering teens with similar challenges/needs as [Child A] and the home is also the least restrictive setting.

**On November 16, 2023**, a Heightened Monitoring placement request was submitted and approved for a placement that started on November 21, 2023. The child was previously placed in a CWOP Setting, and the request was made for placement at Connections, an emergency shelter.

---

[338] Includes only Medium, Medium High, and High weighted deficiencies.
[339] The approver incorrectly recorded the CPA as Therapeutic Family Life.

This was Child A's second placement at Connections; she was placed at the shelter from October 28, 2022, to December 21, 2022. Child A had moved through more than 35 placements since being in foster care and had been in a CWOP Setting for a month prior to this placement. Child A was prescribed at least two psychotropic medications when she was placed and had a Specialized LOC prior to and during the time that she was placed at the shelter.[340]  The shelter is not licensed to provide  treatment services.

Connections initially started Heightened Monitoring in October 2020 and completed in August 2022. The operation again qualified for Heightened Monitoring in 2023 and was notified on November 13, 2023, three days before the request for this placement was made. The patterns and trends that led the operation to be placed on Heightened Monitoring in 2020 included supervision concerns and medication management. In 2023, medication management was again identified as a concern.

At the time of the placement, Connections had five open ANE investigations. One of these investigations would result in two citations being issued for violation of minimum standards associated with the failure to appropriately implement a child's safety plan, and the staff's lack of awareness about the whereabouts of two of the children in their care "until one of the children came back and reported an incident that required police to be called."  In the six months before the placement, the operation had seven RTB findings, four ANE investigations with Ruled Out dispositions, and 10 minimum standards deficiencies cited, including six that were high-weighted. The approver's statement in the Heightened Monitoring placement request stated:

> I have reviewed the best interest statement and justification for placement in the HM placement request tab in IMPACT. I have reviewed and considered the operation's history from the past five years via review of impact and CLASS. There are not any restrictions or conditions of placement. This placement is in the best interest of the youth as the placement will meet all the basic and specific needs as identified in the youth's child plan of service. This placement is approved. [Child A] has expressed she's willing to come with an open mind and a mission to complete her treatment goals if approved to return to Connections. This placement is prior, and she considers her time there a positive experience and detailed the opportunities for youth in care, such as getting a job to earn extra money, a structured setting, and encouraging staff that can help with working on her attitude towards certain transgressions. [Child A] reports this is a second chance to do better and get it right this time. The placement is willing to work with the youth and help her to become stable once again.

**On December 11, 2023**, a Heightened Monitoring placement request was submitted and approved for a placement at Fred and Mabel Parks Youth Ranch, which is licensed

---

[340] When Child A was discharged from the shelter to her biological mother's care, her LOC was raised to Intense. Notes in IMPACT indicate she was moved back to her mother's care to prevent her from returning to a CWOP Setting. Since she was returned, she and her mother have been refusing services.

to provide emergency care and transitional living services. The placement was requested while the child, who had a Specialized LOC, was still on runaway status. The Best Interest statement in the Placement Request states:

> [Child] is currently on run. His discharge from his placement will end in 48 hours on 12/13. At that time, if he is recovered, he will need placement. Parks Youth Ranch will hold the placement until [Child] is recovered from run, allowing the Department to avoid the use of Child Without Placement (CWOP).

The child was recovered from runaway and the placement started on December 13, 2023. A Service Plan completed just prior to the placement indicated he was prescribed at least two psychotropic drugs, and in the section describing supervision needs, noted the child "should be in sight of staff at all times...should not be allowed access to any room other than the bathroom without staff supervision" and "requires sight and sound supervision at all times."

Fred and Mabel Parks Youth Ranch started Heightened Monitoring in November 2020 and moved to Post-Plan monitoring in July 2022. The operation was placed on Heightened Monitoring for patterns and trends associated with caregiver and leadership responsibilities and problems with medication management, among other things.

At the time of the approved placement, the operation had four open ANE investigations. None of these would result in an RTB, but one resulted in a citation for violation of a standard associated with medical care because a child missed two months of physical therapy due to short staffing. Another resulted in a citation for a standard associated with caregiver responsibilities because staff failed to follow the close supervision requirements detailed in another child's Safety Plan. The citation was issued because Heightened Monitoring staff found a pencil sharpener and pencil lead in the child's room though the Plan had been put in place because the child self-harmed and staff subsequently found scissors, half of a shaving blade, and tweezers during a room check. In the six months before placement, the operation had seven RTB findings, three ANE investigations with a disposition of Ruled Out, and two minimum standards deficiencies cited, none of which were high-weighted.

The approver's statement in the Heightened Monitoring placement request reads as follows:

> I approve the HM request of [Child A] with Fred and Mabel Parks Youth Ranch/shelter with the following condition. Due to [Child A's] recent history of runaway episodes; Primary Worker will develop a concrete safety plan and review with Fred & Mabel's Parks Youth Ranch's management/staff prior to placement to ensure understanding and their willingness to adhere to the safety plan. I reviewed & considered Fred & Mabel Parks Youth Ranch's Shelter's 5 year investigative history in CLASS and their open investigations. I also reviewed [Child A's] Common App, Psychological eval and the best interest statement. The placement will

provide [Child A] with a short-term placement providing appropriate supervision, structure, a daily routine educational services, supports and therapeutic services to address [Child A's] emotional needs.

The Monitors could not locate a copy of a Safety Plan in One Case or identify an IMPACT contact describing a Plan associated with this placement.

**On October 26, 2023**, a Heightened Monitoring placement request was submitted and approved for Child A's placement at New Life Children's Treatment Center (New Life) that started on November 8, 2023. New Life is licensed to provide care to children who have emotional disorders. The operation started Heightened Monitoring in September 2020. Its Heightened Monitoring Plan listed problems with caregiver responsibilities and supervision, as well as medication management, among the patterns and trends that led to Heightened Monitoring.

Child A has a history of sexual abuse and had multiple psychiatric hospitalizations for self-harming behavior and suicidal ideations and attempts. She was prescribed at least three psychotropics. Child A is from an SSCC region; the Monitors did not find an assigned LOC in her IMPACT records. The Best Interest statement noted that the placement would offer proximity to the child's grandmother and concluded that the operation was "able to meet [Child A's] therapeutic and supervision needs" but did not explain how, particularly in light of the chronic problems the operation had related to supervision.

The approver's statement in the Heightened Monitoring placement request included conditions:

> I approve the HM request of [Child A] with New Life Treatment Center/RTC with the following conditions. [Child A] will not share a bedroom with youth identified as CSA. Due to [Child A's] history of threats of self-harm, run away episodes, suicidal ideations, and/or threats and aggression towards peers. Primary Worker will develop a concrete safety plan and review with New Life Treatment Center's management/staff prior to placement to ensure understanding and their willingness to adhere to the safety plan.

At the time of the child's placement, New Life had three open ANE investigations. Two of the open investigations involved allegations of Neglectful Supervision. None of the investigations resulted in a substantiated finding, or citations. In the six months before the placement, the operation had no RTB findings, 12 ANE investigations with a disposition of Ruled Out, and 15 minimum standards deficiencies cited, six of which were high-weighted.

While the child was placed at New Life, she attempted suicide twice. The first time, she wrapped headphone cords around her neck while she was in the restroom. She lost consciousness. Staff responded approximately 14 minutes after she entered the restroom, when they heard her fall to the floor after she lost consciousness. While this

suicide attempt was still being investigated, less than two weeks later,[341] she again attempted suicide by wrapping an article of clothing around her neck.

Despite the Heightened Monitoring approver's requirement that the operation follow a Safety Plan that took Child A's history of suicidal ideation and attempts into consideration, the investigation of the two attempts while she was placed at New Life revealed she was not on any safety precautions at the time of the attempts.[342] The Disposition Summary, which explains why DFPS Ruled Out Neglectful Supervision, states:

> All [alleged perpetrators] confirmed that [Child A] was not on any safety precautions prior to entering the restroom on 1/28/2024 and on 2/08/2024. However, they followed safety precaution protocol because on 1/28/2024, [Staff 1] thought that she may have heard [Child A] fall in the restroom, and on 2/08/2024, [Staff 2] thought that because [Child A] self-harmed in the restroom in the past, she thought it best to check on [Child A] who had been in the restroom for 3 minutes. According to [two other alleged perpetrators], they received an e-mail from…the therapist, stating

---

[341] The Monitors review of CLASS and IMPACT showed that Child A was not the only PMC child who attempted suicide at the operation on that day. An 11-year-old child, who also had a history of suicidal ideations, also attempted suicide by tying a sweater and towel around her neck. The Best Interest statement in the Heightened Monitoring Placement Request for this child required her to be "under close supervision at all times of the day." The Best Interest Statement also noted that, when this child's placement was requested an approved, the operation had an open investigation associated with a suicide attempt by yet another child. The requestor dismissed this investigation as unconcerning [sic], because "it appears that the child attempted to commit suicide and staff intervened to prevent the attempt; this was given a disposition of ruled out." In fact, there were at least two suicide attempts reported and investigated prior to this placement (on December 21, 2023 and January 7, 2024). Both were still open at the time the request was made. The approval for the request to place the 11-year-old child also noted that the child's caseworker would be required to "develop a concrete safety plan and review with New Life Children's Treatment Center's management staff prior to placement."

[342] The Monitors were unable to find a copy of the Safety Plan in Child A's IMPACT or OneCase records. However, a Service Plan uploaded to OneCase in connection with the investigation of her suicide attempts included the following language in a section titled "Other supervision issues to be addressed":

> Safety Plan from DFPS FROM HM – THIS WILL STAY IN PLACE FOR THE DURATION OF HER STAY AT NEW LIFE – DO NOT TAKE HER POINTS FOR THIS SAFETY PLAN OR EXCLUDE HER FROM ACTIVITIES. 1. [Child A] will have arm and leg checks at random to monitor for new cuts/self harm. 2. [Child A] will be checked on as required by New Life Staff. If [Child A] does become suicidal or exhibits high risk behaviors, she will be assessed by a licensed professional and may be placed on safety precautions as determined by the assessment. 3. Staff will do a "feelings check-in" with [Child A] several times a day or when she is looking depressed or anxious. 4. [Child A] will not share a bedroom with a youth identified as CSA. 5. If at any time [Child A] becomes high risk of self-harming/suicide she will be immediately referred to a mental health professional for a suicide risk assessment. 6. Any harmful objects, chemicals, or substances that [Child A] could use to carry out a suicide attempt will be removed from her possession. 7. Each person responsible for [Child A's] care or supervision will be alerted to [Child A's] high risk for suicide and any new or updated safety plan. 8. Upon the completion of a risk assessment, staff will follow through on recommendations by the mental health professional and update the child's safety plan and service plan accordingly.

that [Child A] was no longer on safety precaution earlier in the day, prior
to her entering the restroom.

…

[T]he therapist explained that [Child A] was placed on a safety precaution
on January 24, 2024, due to peer-to-peer assault or restriction; therefor it
was not required for staff to follow additional protocol such as restroom
checks, portion control, sleeping milieu, etc. However, when [Child A]
returned from [a psychiatric hospital] on 2/05/2024, she was placed on
full safety precaution which included her belongings being removed,
portion control, sleeping in the milieu, restroom verbal's [sic] and checks.
[The therapist] reported [Child A] was removed from Safety precaution on
2/06/2024 and self-harmed on 2/08/2024. [Child A] was again sent to
[the same psychiatric hospital] for treatment.

## Foster Homes with Heightened Monitoring Placement Approval

In 2023 there were 362 foster homes verified with a CPA on Heightened Monitoring and
they received 641 approved placements of PMC children. Just over half of foster homes
with approved placements (200 of 362, 55%) received one placement during the year
while 45% (162 of 362) received two or more placements.

The Monitors matched the foster homes with approved placements in 2023 to data
received from DFPS for disallowances and data received from HHSC for active and
relinquished foster homes during 2023.[343] Forty-six of the 362 foster homes with
approved placements (13%) were relinquished without reverification, including four
homes that were disallowed by DFPS and recommended for closure by HHSC. Thirty-
three of the 46 homes (72%) were voluntarily closed without deficiencies while eight of
46 (17%) closed with deficiencies and five (11%) closed involuntarily. These 46 homes
accounted for 74 of the 641 (12%) approved placements in foster homes.[344] A total of 11
approved placements were made in four foster homes that were later placed on the
Disallowance list by DFPS and recommended for closure by HHSC. These four foster
homes are discussed under Remedial Order 21 on page 240 of this report.

---

[343] Data on disallowances and relinquished foster homes is provided to the Monitors under Remedial
Order 21.
[344] An additional two placements were made to a foster home that was later relinquished, which did not
receive prior approval by a DFPS Regional Director. All 46 homes were closed/disallowed after the
approved placement ended. Includes the following reasons for relinquishment: Voluntarily Closed
without Deficiencies, Involuntarily Closed without Deficiencies, Voluntarily Closed with Deficiencies,
Involuntary Closed due to Deficiencies, Involuntarily Closed with Noncompliances, CPA Closed Foster
Home, and CCR Recommended Closure. Three of the four disallowed homes received a CCR
recommended closure while one voluntarily closed with deficiencies. Further discussion of the disallowed
foster homes is included in a separate section of the report.



**Figure 84: Time from Placement Start to Date of Relinquishment for Relinquished Foster Homes, 2023**

Source: PMC Placement data, Placement authorization requests, Active & Relinquished Foster Homes
n = 74

In nearly a quarter of the 74 placements to foster homes that were later relinquished (17 of 74, 23%), the home was relinquished within 90 days after the child started the placement. In more than half of the 74 placements (41 or 55%), the home was relinquished within six months of the placement start.

In the six months before the date of relinquishment, the 46 foster homes had 22 ANE investigations, 14 RCCR investigations, 64 citations for minimum standards violations, and four RTB findings relating to caregiver abuse or neglect in four different homes.[345] The four homes where RCCI substantiated abuse or neglect by the caregivers with a disposition of RTB in 2023 are discussed below.

### Hands of Healing

Two PMC children were placed at this home, one in July 2023 and one in October 2023.

This foster home was initially verified by the Grandberry Intervention Foundation, Inc. (TGIF) on March 20, 2013. The home changed CPAs on June 6, 2013, and was verified by Grace Manor Incorporated. The home voluntarily closed on January 31, 2014. On September 17, 2020, the home was verified by Faith 2 Faith Foster Care and Adoption

---

[345] Four different foster homes accounted for the four RTB findings. DFPS did not immediately place any of these homes on the disallowance list, though as of May 18, 2024, IMPACT indicates that placements to the homes are not allowed due to RTB dispositions.

On May 26, 2023, the home moved to Hands of Healing CPA; verification was relinquished on December 6, 2023, with the reason documented as "CPA closed."[346]

Between July 2021 and April 2023, the foster home was investigated twice by HHSC for standards violations. One of these investigations resulted in a citation for Medication Storage. Additionally, the home was investigated twice by DFPS due to allegations of Medical Neglect and Neglectful Supervision; both investigations Ruled Out the allegations.

Six months before its closure, the foster home was the subject of a DFPS investigation that resulted in a Reason to Believe disposition and citations for seven minimum standard deficiencies. DFPS initiated an investigation on December 1, 2023, for Physical Abuse and Neglectful Supervision, after multiple intakes involving three foster children were merged. The first intake reported that the foster parent used a belt to hit a 12-year-old child, coached the children on what to say during visits with "workers," left two 12-year-old children alone at night in the care of a 16-year-old foster child (one of these two children had behavioral challenges), and cursed at the 16-year-old child.

Duplicate intakes were reported by the same law enforcement officer after the 16-year-old child ran away and went to the police station. The 16-year-old reported feeling unsafe in the foster home, alleged the foster mother threatened to have her biological son "rip their asses," slapped the child in the face, used profanity toward him, and kicked him out of the house and would not let him back in.

The final intake was received after a 12-year-old child who was no longer living in the home made an outcry of Physical Abuse. The child stated that while he was living in the home, the foster parent hit him in the face and also hit him with a belt on multiple occasions.  The foster parent hit the child in the face, resulting in a scratch on his face, but when the foster parent brought him to the doctor, the child disclosed the foster parent  coached him to omit the details of how the scratch on his face occurred.

During a forensic interview, the 12-year-old confirmed being subjected to physical discipline on at least seven occasions, including being struck on his back, bottom, and legs and slapped in the face. The 12-year-old reported he had bruises as a result of being hit and that the foster mother scratched his face when she slapped him with an open hand. Another child confirmed the foster parent hit the 12-year-old with a belt.

Two children reported being left unsupervised overnight, with no adult in the home. According to the two children's service plans, supervision was required inside the home and when interacting with others. The service plans specified that they were to remain within visual and audio distance of an adult. These two children's service plans also required them to be checked two to three times at night. Another child's service plan also required him to be within audio and visual range due to his history of "harming and becoming aggressive" when upset.

---

[346] This closure reason does not appear to mean that the CPA itself closed; Hands of Healing is still operating.

The foster parent denied all the allegations. The investigator assigned a disposition of a Reason to Believe for Physical Abuse of one of the 12-year-old children and a Reason to Believe for Neglectful Supervision of the 16-year-old child and one of the 12-year-old children by the foster mother. HHSC issued seven minimum standard citations related to Children's Rights (three citations), Other Prohibited Discipline, Corporal Punishment, Responsibilities, and Supervision.

## El Paso Center for Children

One child was placed in this home in February 2023.

This foster home was first verified by Bair Foundation El Paso on March 11, 2011. On January 10, 2012, the home changed CPAs and was verified by the El Paso Center for Children. The home was involuntarily closed with deficiencies on September 1, 2023.

Between May 2012 and June 2022, the foster home was investigated four times by DFPS for allegations of Neglectful Supervision and Physical Abuse. Three of these four investigations were related to allegations of Sexual Abuse. All the investigations Ruled Out the allegations, and no minimum standards citations were issued. During the same period, HHSC conducted nine minimum standards investigations related to the foster home. Among these, two investigations resulted in citations. One citation was issued for violation of a minimum standard associated with supervision due to the foster parents' failure to follow a child's service plan. The other citation was issued for violation of a minimum standard associated with caregiver responsibilities, because a child sustained an injury while roller skating without protective equipment and was not taken to the hospital until the following morning.

In the six months leading up to its closure, the foster home was investigated twice by DFPS for ANE allegations, and once by HHSC for allegations related to inappropriate supervision. One of the ANE investigations resulted in a Reason to Believe disposition and four citations for minimum standards violations. On May 20, 2023, DFPS initiated an investigation into allegations of Physical Abuse, Medical Neglect, and Neglectful Supervision involving a nine-year-old and a six-year-old foster child. The report stated that the children missed their school bus and decided to walk to the school unaccompanied. While they were walking, one of the children was bitten by a neighbor's dog. Another neighbor provided the children with a ride to the school. The hand of the child who was bitten was bleeding "and purple in color" as a result of the dog bite. The school called the foster mother and advised her that medical attention was necessary. The foster mother came to the school, spoke to the child, then allegedly refused to seek medical care for the injured child and instead said that "she was going home." The foster parent did not want the school to report the incident.

The investigator determined that the foster parent did take the child to the emergency room and her pediatrician's office, providing the immediate medical attention she needed. The investigator Ruled Out the allegations of Medical Neglect and allegations of Physical Abuse that arose during the investigation but were determined not to involve

the foster parents. However, the investigator found a Reason to Believe for Neglectful Supervision, concluding that the foster mother left the children unsupervised and failed to ensure they boarded the school bus. HHSC also issued four citations for minimum standards violations: one related to supervision, because the foster parent was unaware that the children were walking to the school or driven to the school by a neighbor; one for violation of the minimum standard associated with an initial service plan due to lack of instructions for unsupervised activities outside the home; one for violation of a minimum standard associated with children's rights; and one citation for violation of a minimum standard associated with beds and bedding because a bed lacked a mattress covering.

## Therapeutic Family Life

One child was placed in this home in March 2023.

This foster home was first verified by A World of Children, from March 27, 2001, until July 12, 2001, when it transferred to Lutheran Social Service of Texas. On January 19, 2005, A World of Children reverified the home. Six months later, the home again changed CPAs and was verified by Lutheran Social Services of the South CPA. The home's verification was relinquished due to noncompliance on August 27, 2008.[347] Less than a year later, on March 9, 2009, Therapeutic Family Life verified the home. The CPA involuntarily closed the home due to deficiencies on December 12, 2023.

Between September 2004 and November 2021, the foster home was investigated eight times due to abuse and neglect allegations. The ANE investigations included five allegations of Physical Abuse, four allegations of Neglectful Supervision, one allegation of Physical Neglect, and one allegation of Emotional Abuse. All these ANE investigations Ruled Out the allegations, but one citation was issued for violation of a minimum standard associated with serious incident reporting because the CPA failed to report an incident of two foster children running away from the foster home. During the same period, HHSC conducted 18 standards investigations yielding no citations. Among the 18 investigations conducted, ten involved inadequate supervision, five included violations of children's rights, and four involved allegations of inappropriate discipline.

In the six months before its closure, the foster home was the subject of three ANE investigations by DFPS. One of the investigations resulted in a Reason to Believe disposition and 24 minimum standards citations. On September 2, 2023, DFPS initiated an investigation after the adult adopted daughter of the foster mother alleged that the foster mother "physically and mentally abused" three foster children who previously lived in the home. The allegations included that the foster mother hit the children, threw objects at them, left them alone with no supervision, inappropriately medicated them, and used inappropriate discipline. The reporter described an incident during which the foster mother allegedly made a four-year-old child put his wet pull-up on his head and

---

[347] CLASS also shows that on September 18, 2008, the foster mother was verified by the Texas Dept of FPS Region 08 CPA as an adoptive home.

stand against the wall for more than an hour. The foster mother then stripped the four-year-old's clothes off in the backyard and sprayed him with the water hose. The reporter alleged the foster mother  physically abused the children, resulting in bruising, and then scared the children so they would lie about what happened, and as punishment, the children were required to stand outside on the back porch late at night in the cold weather.

Additional victims and allegations of Medical Neglect and Neglectful Supervision were added to the investigation following outcries made during interviews with children who had lived in the home.

According to the investigation, eight children who previously lived in the foster home consistently reported experiencing physical abuse. These outcries included instances of being hit with a belt, slapped, grabbed, subjected to ear pulling, and forced to sit outside for extended periods in various weather conditions without proper clothing. Additionally, two children reported the foster mother's friend, referred to as "Beast," subjected them to physical abuse.

While some children initially denied mistreatment, they later made concerning comments to their caseworkers. One of the children initially denied abuse, however, after he was removed from the home, he reported experiencing pain in his feet and was discovered to have untreated rashes caused by dirty water, urine, and feces in his shoes. The child reported that when he told the foster parent about the rashes, she did not do anything. Another former foster child refused to provide a statement, but she expressed frustration that her concerns weren't addressed when she lived in the foster home and emphasized the need for current foster children to speak out.

The foster parent and her biological adult children denied the allegations. The case managers and medical therapist did not report any concerns related to physical abuse. The investigator concluded the investigation with eight Reason to Believe findings for Physical Abuse. The investigator found the evidence collected proved a "consistent pattern of abuse in the foster home spanning from 2010 to 2023." The investigator also found a Reason to Believe for Medical Neglect stemming from the foster parent's failure to seek medical care despite the child's complaints about foot pain.

The allegation of Neglectful Supervision was Ruled Out. HHSC issued 24 minimum standard citations as a result of the investigation.[348]

---

[348] These citations were issued for violations of minimum standards related to: Initial Service Plan (plan did not included how to manage a child's behaviors); Physical Environment (the children's restroom had no shower curtain and no toilet seat, litter box was uncovered, clutter); Children's Rights (eight citations); Employee and Caregiver responsibilities (the foster parent prohibited the school counselor from speaking to the children and the caseworker was not allowed in the home); "Contact between child's placement staff and child" (the foster parent would not allow the CPA staff to speak privately to children); Foster Home Screening (the CPA did not address identified risk at the time of verification); Serious Incident Report (the foster father did not report incidents of "negative interactions"); Feeding Children (two citations)(providing children inadequate amounts of food and providing a child toilet water to drink); Animals (requiring children to conduct excessive chores to care for animals, animal created a health risk);

## Azleway Inc.

Two children were placed in this home: one in August 2023 and one in October 2023. DFPS later substantiated allegations of Physical Neglect by the foster parent regarding three children, including the child placed in the home in August 2023.
This foster home was first verified by The Bair Foundation of Texas on January 11, 2001, until it changed CPAs and was verified by Azleway INC CPA on December 15, 2009. On November 1, 2023, the home was involuntarily closed due to deficiencies.

Between April 2006 and December 2022, the foster home was investigated 14 times by HHSC for standards violations and nine times by DFPS due to Abuse and Neglect allegations. None of the ANE investigations resulted in an RTB finding. The most recent ANE investigation during that period, initiated on December 16, 2022, resulted in a minimum standards citation after the children's bathroom was found to be unsanitary. During the same period, HHSC initiated 14 minimum standards investigations; four of those investigations resulted in 11 minimum standards citations.

Six months before its closure, the foster home was the subject of two additional ANE investigations both involving similar allegations of Physical Neglect. An investigation initiated on May 8, 2023, alleged that a 15-year-old child had skin irritation due to bed bug bites. The CPA put a plan in place requiring the foster parent to fumigate the home. The child received the required medical attention and the professional collaterals interviewed did not share concerns about the children's physical needs. The investigator Ruled Out the allegation of Physical Neglect. HHSC issued two citations, one for violation of a minimum standard associated with food preparation because of unsanitary conditions in the foster home's kitchen, and one for violation of a minimum standard associated with physical environment due to the unsanitary and unsafe condition of the children's bathroom.

On July 31, 2023, DFPS initiated another ANE investigation after a caseworker reported that a child who was temporarily placed in the foster home informed her that the home had a bed bug infestation, which resulted in the child having bed bug bites all over his body that required medical attention.

The investigator documented that the foster home had ongoing bedbug problems since December 2022 and that the CPA had implemented a plan of correction in response to the May 8, 2023, investigation, which required at least five fumigation sessions every 15 days from May 30, 2023, to July 25, 2023. The investigator found that the foster parent

---

Discipline (telling children to hit another child with a dog collar for punishment); Other Prohibited Punishments (three citations) (yelling and cussing at the children, forcing a child to be outside for an extended period with no water, forcing a child to kneel, hosing a child down outside after bathroom incidents, purposefully using water that was too hot or too cold to clean a child, hitting children with a belt); Supervision (two citations) (encouraging children to fight each other and leaving children unattended); and General Medical Requirements (not obtaining medical treatment for children when needed).

failed to follow through with the plan to fumigate the home and thus placed children's health and safety at risk.

The investigator found a Reason to Believe for Physical Neglect of the three children in care. HHSC issued four standard citations: one for violation of a minimum standard associated with child placement staff responsibilities because the CPA failed to ensure compliance with the plan of correction , one related to employee and caregiver responsibilities due to the foster parent failing to follow the safety plan's timeframe for fumigation, one for physical environment due to the bed bug infestation, and one for violation of the minimum standards associated with children's rights.

## Implementation of Heightened Monitoring and Impacts on Child Safety

The calendar year 2023 represented the fourth year of the State's implementation of Heightened Monitoring. The Monitors first reported on Heightened Monitoring in the Second Report, filed on May 4, 2021, which reviewed the initial group of 86 operations placed on Heightened Monitoring in 2020.[349] Since then, another 42 operations were newly placed on Heightened Monitoring.

The following analysis includes an examination of the State's implementation of Heightened Monitoring since 2020 and the impact on child safety. This review focuses on operations' performance during the three stages of Heightened Monitoring,[350] the State's determination of Heightened Monitoring completion, and operations' performance on child safety before and after completion. This review also includes a more in-depth analysis of the 18 operations that qualified for Heightened Monitoring in 2020[351] and remained under active monitoring as of March 1, 2024.

### Active Monitoring

Active monitoring encompasses the first two stages of Heightened Monitoring and begins after operations are identified as having a higher-than-average[352] rate of violations in at least three of the five years reviewed. Once notified of Heightened Monitoring status, the operation enters active monitoring beginning with the Pre-Plan Development stage. At that stage, the operation's history is assessed, HHSC and DFPS begin weekly unannounced visits, and the Heightened Monitoring Team develops a

---

[349] Seven of the operations met the criteria for Heightened Monitoring in 2020 but were notified and placed in 2021. This does not include nine operations that were placed on Heightened Monitoring in 2020 but were not active at the time of the Monitors' Second Report due to closure or contract termination, three operations that qualified for Heightened Monitoring in 2020 but closed or terminated their foster care contract prior to Heightened Monitoring notification, and seven operations that were placed on Heightened Monitoring in 2020 but were removed following a modified capacity calculation.
[350] The three stages of Heightened Monitoring include Pre-Plan Development stage and Plan in Effect stage, which together are considered "active" monitoring, and Post-Plan Monitoring stage.
[351] Fostering Life Youth Ranch was notified of Heightened Monitoring in March 2021 due to a linkage with an existing Heightened Monitoring operation that qualified for Heightened Monitoring in 2020.
[352] Operations' violation rate is compared to a statewide average rate based on capacity and operation type (CPA, GRO, or RTC).

Heightened Monitoring Plan. After the Plan is developed, the Plan in Effect stage begins, and active monitoring continues with weekly visits to assess task implementation and Plan compliance. Operations are under active monitoring for at least one year. Operations may complete Heightened Monitoring if the operation satisfies the conditions of the Plan, compliance with the standards and contract requirements that led to Heightened Monitoring are met for at least six successive months, and the operation is not out of compliance with any medium-high or high-weighted standards.

To determine how operations are performing under the State's implementation of active monitoring,[353] the Monitors reviewed citations, ANE investigations, enforcement actions, and contract violations received during operations' time on active monitoring.

## Citations and ANE Investigations during Active Monitoring

The 128 operations under Heightened Monitoring between 2020 and 2023 received a total of 4,824 citations for minimum standards deficiencies (average of 38 deficiencies per operation) and had 7,848 ANE allegations reported with investigations opened (average of 61 allegations per operation) during active monitoring.[354] In each full year since the beginning of Heightened Monitoring, operations under active monitoring received more than 1,000 deficiencies per year.[355] In 2021, operations received a higher number of citations and ANE allegations with investigations opened during active monitoring than in any other year. This is, in part, due to 2021 having the highest number of operations under active monitoring during the year.[356]

[353] For this analysis active monitoring includes the time from Heightened Monitoring notification to movement to Post-Plan Monitoring. This includes the Pre-Plan Development and Plan in Effect stages.
[354] Includes all deficiencies cited that were not overturned after administrative review, with 4,389 deficiencies weighted Medium, Medium-High, or High.
[355] 2021, 2022, and 2023 are the only years with operations under Heightened Monitoring for every month of the year. Operations were notified of Heightened Monitoring starting in June 2020.
[356] There were 78 operations on active monitoring at any point in 2020, 95 in 2021, 85 in 2022, and 63 in 2023.



**Figure 85: Total Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on Active Monitoring for all Operations on Heightened Monitoring**

Source: HHSC, Deficiencies; DPFS, ANE Investigation allegations
n = 12,672

Although the total number of deficiencies and allegations was slightly lower in 2023 than in 2022, there were fewer operations in active monitoring in 2023. After accounting for the lower number of operations on active monitoring in 2023, the rate of deficiencies and allegations per operation was higher in 2023 than in 2022.

**Figure 86: Rate of Deficiencies Cited and ANE Allegations with Investigations Opened While on Active Monitoring for all Operations on Heightened Monitoring**

Source: HHSC, Deficiencies; DPFS, ANE Investigation allegations
n = 12,672



Operations under Heightened Monitoring between 2020 and 2023 had a total of 376 RTB allegation findings[357] during their time on active monitoring.[358] Forty-nine percent (63 of 128) of operations on active monitoring had one or more RTB allegation findings. Operations with at least one RTB allegation finding had an average of six RTBs while on active monitoring, with a range of one to 30 RTB allegation findings. Operations that have since closed or terminated their contract with DFPS accounted for 113 of the 376 (30%) RTB allegation findings for operations on active monitoring. Between January 1, 2023, and January 31, 2024, operations on active monitoring had a total of 86 RTBs.

---

[357] The number of RTB allegation findings includes all allegations for which an RTB was found. One investigation may result in multiple allegations with a finding.

[358] One hundred seventeen of the 376 RTB allegation findings (31%) resulted from investigations that were initiated prior to the operation being on Heightened Monitoring. Between January 1, 2020 and January 31, 2024, there were 259 RTB allegation findings from investigations that were initiated while operations were on Heightened Monitoring: 11 in 2020, 132 in 2021, 39 in 2022, 70 in 2023, and 7 in January 2024.

Figure 87: Number of Reason to Believe Allegation Findings While on Active Monitoring for All Operations on Heightened Monitoring



Source: DFPS, ANE investigation allegation dispositions
n = 376

Both the number and rate of RTBs per operation on Heightened Monitoring were higher in 2023 than in the previous year. Sixty-six of the 71 RTB findings disposed in 2023 (93%) were for allegations with an investigation opened in the year. Four operations accounted for 75% (53 of 71) of these allegation findings.[359]

Figure 88: Rate of Reason to Believe Allegation Findings While on Active Monitoring for all Operations on Heightened Monitoring



Source: DFPS, ANE investigation allegation dispositions
n = 376

## Enforcement Actions During Active Monitoring

Since 2020, a total of 285 enforcement actions have been taken against operations while they were on active monitoring; 84% of those were monetary penalties (239 of 285). Between 2020 and 2022, 23 operations under active monitoring agreed to a voluntary

---

[359] Agape Manor Home had nine RTB findings in 2023, Azleway Children's Services had 15, Lutheran Social Services of the South had 19, and Therapeutic Family Life had 10.

plan of action and HHSC initiated 13 probation enforcements against operations on active monitoring. These actions were discussed in previous Monitors' Reports as part of the Monitors' examination of the State's practice of placing Heightened Monitoring operations under what were often duplicative enforcement actions. In 2023, no operations were placed under these forms of enforcement action while they were on active monitoring. The use of monetary penalties against operations on active monitoring has increased each year since 2020.

Figure 89: Enforcement Actions Against Operations While on Active Monitoring, 2020 to January 31, 2024[360]



Source: HHSC, Enforcement actions
n = 285

In 2022, HHSC began administering enforcement actions based on standards relating to compliance with Heightened Monitoring Plans.[361] Between January 1, 2022, and January 31, 2024, these Heightened Monitoring compliance standards were the basis of 87 monetary penalties, accounting for almost half (49% or 87 of 179) of all monetary penalties assessed to operations on active monitoring during the period.[362] Heightened Monitoring compliance standards were also included in four revocation actions.[363]

An operation may receive a monetary penalty for a standards violation relating to Heightened Monitoring compliance after remaining on active monitoring for more than a year. Every operation placed on Heightened Monitoring before 2023 that was on

---

[360] Revocations include one involuntary suspension.
[361] Includes standards 748.535(2) AP Child-care administrator responsibilities – Ensure the operation complied with current heightened monitoring plans, if applicable; and 749.635(2) AP CPA administrator responsibilities – Ensure the operation complies with current heightened monitoring plans.
[362] Heightened Monitoring Standards accounted for 44% (33 of 75) of monetary penalties assessed to operations on active monitoring in 2022, and 50% (50 of 100) in 2023. In January 2024, 100% (4 of 4) of the monetary penalties assessed related to these standards.
[363] More than one standard may be used as the basis for enforcement actions. Heightened Monitoring related standards were cited seven times as part of four revocation actions. These revocations included from 67 to 215 basis of action source standards.

active monitoring as of March 1, 2024, had received at least one monetary penalty for a standard related to Heightened Monitoring compliance. The Monitors' Sixth Report raised concerns regarding the effectiveness of using small fines of $100 to $500 as a sanction for failing to comply with a Heightened Monitoring Plan.[364]

## Compliance During Active Monitoring

During active monitoring, an operation's compliance and progress in following their Heightened Monitoring Plan Tasks is reviewed by the Heightened Monitoring Team every quarter.[365] In 2023, 58% (72 of 124) of quarterly reports completed while an operation was on active monitoring indicated that the operation was not in compliance with all Plan Tasks.

Figure 90: Heightened Monitoring Team's Determination of Compliance with Plan Tasks in Quarterly Reports During Active Monitoring, 2023

Source: HM quarterly reports, 2023
n = 124



■ In compliance with all tasks
■ Not in compliance with all tasks

Operations that the Heightened Monitoring Team determined were out of compliance with Plan Tasks were non-compliant with one to four tasks per quarter, with an average of two tasks out of compliance. Fifty-eight percent of quarterly reports with tasks out of compliance (30 of 52) had one task out of compliance, 23% (12 of 52) had two tasks out of compliance, and 19% (10 of 52) had three to four tasks out of compliance. Operations were found to be out of compliance with tasks for the following reasons, including but not limited to:

- Case manager audits not being completed.
- Medication documentation/administration errors
- Home screenings missing or missing information.
- Child file audit errors

---

[364] Sixth Report, at 220, 228.
[365] Quarterly reviews of compliance with the minimum standards and contract requirements that led to Heightened Monitoring, as well as compliance with all medium-high and high weighted standards, are also conducted during Post-Plan Monitoring.

- Child service plans not completed on time or contained errors.
- Trainings were incomplete or past due.
- Physical site hazards
- Supervisory visit forms not signed by foster parents.

Of the 40 operations[366] on active monitoring with a quarterly report completed in 2023, nearly two-thirds (25 of 40, 63%) were out of compliance with their Plan Tasks in one or more quarters, while 37% (15 of 40) had no quarters out of compliance.

The Heightened Monitoring Team may determine that an operation is in compliance with its Heightened Monitoring Plan Tasks even though it has accrued minimum standards or contract violations during the quarter. In 54 of the 72 quarterly reports (75%) where the operation was found to be in compliance with all tasks, the operation had deficiencies cited for standards related to the operation's Heightened Monitoring problem areas[367] during the quarter.

The 40 operations with a quarterly report in 2023 had a total of 439 deficiencies related to a Heightened Monitoring problem area during the year. More than half of operations (24 of 40, 60%) had at least one deficiency cited related to a Heightened Monitoring problem area in every quarterly report during the year.

Twenty-four of 40 operations (60%) had one or more contract violations identified in quarterly reports in 2023. A total of 115 contract violations were identified, with 46 of these (40%) related to a Heightened Monitoring problem area. All contract violations that were related to a Heightened Monitoring problem area in 2023 were identified in Quarters 10, 11, or 12.

There were 19 operations placed on Heightened Monitoring that completed their third year under active monitoring and had quarterly reports in 2023 for Quarter 9 to Quarter 12.[368] For these 19 operations, the average number of deficiencies cited, both in total and for those related to Heightened Monitoring problem areas, increased throughout the year and was higher in Quarter 12 than in Quarter 9.

The Monitors reviewed the first two years of quarterly reports for these 19 operations (Quarter 1 to Quarter 8) and found that while deficiencies had increased in the third year, these operations had the highest number of deficiencies, on average, during the first year of Heightened Monitoring.

---

[366] Includes only quarterly reports completed during active monitoring in 2023. Sixty percent (24 of 40) of the operations on active monitoring with a quarterly report ending in 2023 were identified for Heightened Monitoring in 2020, 10% (4 of 40) were identified in 2021, 25% (10 of 40) were identified in 2022, and 5% (2 of 40) were identified in 2023. The two operations identified in 2023 were Fostering Life Youth Ranch – Meraki and Horizon Project, linked operations that were notified of their Heightened Monitoring status in April 2023.

[367] Heightened Monitoring problem areas are the areas that the Heightened Monitoring Team identified as violation patterns and trends in the Team's review of the operation's 5-year performance history. These problem areas are documented in the Heightened Monitoring Plan.

[368] Two of the 19 operations with Quarters Nine to Twelve reports were closed as of March 1, 2024, leaving 17 that were on active monitoring as of March 1, 2024.



Figure 91: Average Number of Deficiencies Cited in Quarter One to Quarter Twelve of Active Monitoring

Source: HM quarterly reports, 2023
n = 19 operations

### Post-Plan Monitoring (PPM)

The third and final stage of Heightened Monitoring is Post-Plan Monitoring (PPM), which includes a minimum of three unannounced visits[369] and data tracking for at least six months to ensure the operation is maintaining the changes required by the Heightened Monitoring Plan. The determination to move an operation to Post-Plan Monitoring, a decision made by the State, has potential impacts on child safety. To examine these potential impacts, the Monitors reviewed deficiencies and ANE investigations before and after operations moved to PPM, as well as those received while the operation was on PPM.

As of March 1, 2024, 43 operations had completed the active monitoring stage of Heightened Monitoring.[370] These operations spent on average 537 days[371] on active monitoring, with a minimum of 401 days and a maximum of 1,009 days.[372] Operations

---

[369] A minimum of three unannounced visits is required within the first three months of PPM. If the Heightened Monitoring Team determines that the operation is continuing to show progress during the first three months, the visits are discontinued, and intakes are tracked for an additional three months. HHSC, Child Care Regulation Handbook §11510, *available at* https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/11500-heightened-monitoring-post-plan-monitoring

[370] Includes 31 operations that completed Heightened Monitoring, 11 that completed active monitoring and were in Post-Plan Monitoring, and one that completed active monitoring and closed while in Post-Plan Monitoring.

[371] Number of days from HM notification date to PPM start date.

[372] After one year, operations have an annual review where the Heightened Monitoring Team determines whether the operation has met the requirements and can move to PPM or if active monitoring will be

that initially qualified for Heightened Monitoring in 2021 and 2022 and completed active monitoring moved to PPM more quickly than operations that initially qualified in 2020. It took an average of 543 days for the 35 operations that initially qualified for Heightened Monitoring in 2020 to move to PPM compared to an average of 509 days for the eight operations that qualified in 2021 and 2022.[373]

Figure 92: Average Number of Days to Post-Plan Monitoring for Operations that Completed Active Monitoring as of March 1, 2024, by Qualifying Year[374]



Source: HHSC, CLASS Heightened Monitoring
n = 43

For an operation to move from active monitoring to Post-Plan Monitoring, the operation is required to complete a six-month successive period of compliance with the standards and contract requirements that led to Heightened Monitoring.[375] In analysis completed for the Sixth Report, the Monitors identified that guidance produced by the State allowed the six months for successive compliance to be any six months during active monitoring, and, as a result, a citation issued after the six months would not prevent the operation from moving to Post-Plan Monitoring.[376]

In the Sixth Report, the Monitors noted that the State moved many operations to Post-Plan Monitoring though they had received citations for minimum standards deficiencies associated with their Heightened Monitoring problem areas in the six-month period

---

extended. Of the 43 operations that had moved to PPM, 14 (33%) moved to PPM and 29 (67%) were extended at the annual review. One of the 43 operations that had moved to PPM later closed, while 11 of 43 were still in PPM and the remaining 31 had completed Heightened Monitoring as of March 1, 2024.

[373] Seven operations qualified for Heightened Monitoring in 2021, and one operation qualified in 2022.

[374] Includes all operations that had moved to Post-Plan Monitoring as of March 1, 2024. Operations may qualify for Heightened Monitoring in multiple years; includes the earliest year of qualification, which in most instances reflects the year the operation began Heightened Monitoring.

[375] Six months of successive compliance is one of three requirements for an operation on Heightened Monitoring at least one year to move to PPM.

[376] Sixth Report, at 229.

that immediately preceded the move to PPM.[377]  The Monitors' analysis of quarterly reports in 2023 indicates that one of the seven operations[378] allowed to move to Post-Plan Monitoring during the year made the transition despite having citations issued that were related to a Heightened Monitoring problem area in the six months immediately preceding the operations' move to Post-Plan Monitoring. A summary of this operation is provided below.

**Hope Haven RTC (838067)**

In the operation's sixth quarterly report, covering the period of October 20, 2022, to January 20, 2023, a high-weighted deficiency was cited on December 22, 2022, for a Heightened Monitoring problem area related to supervision. HHSC issued the citation after finding that staff were not present when children walked out of the front door of the operation and were gone for three hours. Staff reportedly could not remember where they were when the children left the operation. The operation met compliance[379] for this citation on December 27, 2022, but the six months of compliance for the operation was identified as starting on June 6, 2022, and ending on December 6, 2022, and in the Sixth Quarterly Review's Overall Assessment the State noted "the operation came into compliance on December 6, 2022, however there are pending investigations that prevent the operation from moving to Post-Plan Monitoring."[380] In the operation's Compliance Report, a report that is submitted at the closure of active monitoring, the State noted that the operation received a second citation related to the operation's Heightened Monitoring problem area of leadership responsibilities – personnel, weighted medium-high, on January 31, 2023, and met compliance for that citation on February 1, 2023. Despite these citations, Shamar Hope Haven RTC was approved to move to Post-Plan Monitoring the following month on March 3, 2023.

The Monitors identified five other instances in 2023 quarterly reports (for operations that have not yet moved to Post-Plan Monitoring) where the six-month compliance period was not updated to accurately reflect the latest date of compliance with all standards related to Heightened Monitoring. In the twelfth quarterly report for three operations, Hands of Healing CPA, Therapeutic Family Life, and Youth in View, the State reported that the operations had achieved six months of compliance before the twelfth quarter, yet all had received deficiencies for violations of standards related to Heightened Monitoring problem areas during the quarter.[381] For two other operations,

---

[377] Sixth Report, at 211 – 212.

[378] Seven operations moved to Post-Plan Monitoring between February 9, 2023, and July 18, 2023.

[379] The State determines when and how an operation comes into compliance after a deficiency is cited for a violation of minimum standards. For the citation issued December 22, 2022, the operation met compliance after "an email was sent with an action plan to make sure they are in compliance" with the minimum standard for which a deficiency was cited.

[380] HHSC & DFPS, Heightened Monitoring Plan – Quarterly Review (January 11, 2023)(on file with the Monitors).

[381] Hands of Healing CPA was reported to have achieved six months of compliance as of August 24, 2021, despite coming into compliance with a Heightened Monitoring related deficiency as late as December 6, 2023. Therapeutic Family Life was reported to have achieved six months of compliance as of June 29, 2022, despite being out of compliance with a Heightened Monitoring-related deficiency as of November 28, 2023. Youth in View was reported to have achieved six months of compliance as of January 13, 2023,

Adiee Emergency Shelter, and The Bair Foundation, the six-month compliance period start date was updated to reflect the latest citation date for standards related to Heightened Monitoring, not the date that compliance was met.[382] As of May 19, 2024, none of these operations had moved to Post-Plan Monitoring.

In the Order issued by the Court on April 15, 2024, the Court described these practices as inconsistent with its orders related to Heightened Monitoring.[383]  It is not yet clear whether the State has changed its practices, consistent with the Court's guidance; the Monitors will not be able to determine whether these practices have been discontinued until more operations move to Post-Plan Monitoring. Shamar Hope Haven, discussed above, moved to Post-Plan Monitoring before the Monitors filed the Sixth Report, and before the Court's guidance during the June 27, 2023 hearing (which focused on compliance problems revealed by the Sixth Report) and in the April 15, 2024 Order.

### Citations and ANE Investigations Before and During Post-Plan Monitoring

The Monitors reviewed all deficiencies cited and ANE allegations with investigations opened in the six months before and after operations moved to Post-Plan Monitoring to assess the impact of this transition on child safety. On average, operations received fewer deficiencies and had fewer ANE allegations with investigations opened in the six months after moving to PPM than in the six months before PPM. In the six months before moving to PPM, operations had an average of three deficiencies cited and eight ANE allegations with investigations opened compared to two deficiencies and seven ANE allegations with investigations opened in the six months after moving to PPM.

While the overall average indicates a lower number of deficiencies and ANE allegations in the six months after starting Post-Plan Monitoring, over one-third of operations that moved to PPM (15 of 42, 36%) had more deficiencies cited and nearly half of operations (19 of 42, 45%) had more ANE allegations with investigations opened in the six months after moving to PPM than in the six months before.[384]

---

despite coming into compliance with a Heightened Monitoring-related deficiency on November 7, 2023. Youth in View and Therapeutic Family Life received Heightened Monitoring-related deficiencies in every quarter of 2023.

[382] This occurred in Quarter Five for Adiee Emergency Shelter and in Quarter Twelve for The Bair Foundation, both quarterly reports covered periods ending in December 2023. For Adiee Emergency Shelter, a citation was issued on October 6, 2023, and the operation came into compliance on October 23, 2023. The start date for the six-month period of compliance was entered as October 6, 2023. For The Bair Foundation, a citation was issued on December 8, 2023, and the operation came into compliance on December 15, 2023. The start date for the six-month period of compliance was entered as December 8, 2023.

[383] Order, ECF No. 1560, at 38-43.

[384] A list of operations with ANE allegations with investigations opened and deficiencies cited before and after PPM is provided in Appendix B.

**Figure 93: Deficiencies Cited and ANE Allegations with Investigations Opened in the Six Months Before and Six Months After Moving to Post-Plan Monitoring**



Source: HHSC, Deficiencies; DPFS, ANE Investigation allegations
n = 42 operations

The 42 operations on PPM between 2020 and 2023 received a total of 206 deficiencies and had 566 ANE allegations with investigations opened while on PPM.[385] The number of deficiencies ranged from zero to 22, while the number of allegations ranged from zero to 103. Operations that moved to PPM between 2020 and 2023 qualified for Heightened Monitoring in 2020 or 2021.[386] On average, operations that qualified for Heightened Monitoring in 2021 had more ANE allegations with investigations opened and deficiencies cited while on PPM than operations that qualified in 2020.

---

[385] DFPS Region 10 moved to PPM in February 2024 and is excluded from the analysis.
[386] Includes the year operations first qualified for Heightened Monitoring. Thirty-five of the 42 operations (83%) that had moved to PPM between 2020 and 2023 qualified for Heightened Monitoring in 2020, while the remaining seven (17%) initially qualified for Heightened Monitoring in 2021.



Figure 94: Average Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on Post-Plan Monitoring by Qualifying Year

Source: HHSC, Deficiencies; DPFS, ANE Investigation Allegations
n = 42

Operations qualifying for Heightened Monitoring in 2021 spent approximately 64 more days on Post-Plan Monitoring, on average, than operations qualifying in 2020, as of March 1, 2024. Furthermore, while 80% of the 35 operations qualifying in 2020 (28) had completed Heightened Monitoring as of March 1, 2024, fewer than half of the seven operations qualifying in 2021 (3 or 43%) had completed Heightened Monitoring.[387]

Sixteen operations had a total of 39 Post-Plan Monitoring quarterly reports completed during 2023. A total of 89 deficiencies were identified in these reports, with one-third of these deficiencies (29 of 89, 33%) being related to a Heightened Monitoring problem area. Operations in Post-Plan Monitoring had a deficiency cited for standards related to Heightened Monitoring in nearly half of PPM quarterly reports (17 of 39, 44%).

DFPS investigations resulted in 20 Reason to Believe allegation findings for operations on Post-Plan Monitoring.[388] Of the 20 RTB allegation findings, 12 were associated with operations that were on PPM as of March 1, 2024,[389] six were associated with operations that had completed Heightened Monitoring, and two were associated with an operation that had closed while on PPM. A total of five operations had one or more RTB allegation

---

[387] Overall, operations that initially qualified in 2021 had been under Heightened Monitoring for 26 days more on average than those that initially qualified in 2020. Operations that qualified in 2020 spent more time on active monitoring and less time on Post-Plan Monitoring.

[388] All RTBs received by operations during PPM were associated with operations that were identified for Heightened Monitoring in 2020. All investigations resulting in a Reason to Believe allegation finding began while the operation was on Heightened Monitoring; eighteen of the 20 began while the operation was on PPM and two began the day before the operation moved to PPM.

[389] Four of the 11 operations on PPM as of March 1, 2024 accounted for the 12 allegation findings. Fred and Mabel Parks Youth Ranch had seven allegations of Neglectful Supervision that were found Reason to Believe in June 2023. The Settlement Club Home GRO had one allegation of Neglectful Supervision and one allegation of Medical Neglect that were found RTB in December 2023. Children's Hope Residential Services CPA had two allegations of Neglectful Supervision found RTB in January 2024. The Burke Foundation CPA had one allegation of Physical Abuse found RTB in December 2023.

204

findings while on PPM and were allowed to complete Heightened Monitoring. The operations and dates of the RTB allegation findings and Heightened Monitoring completion are listed below.[390]

Table 23: Operations Completing Heightened Monitoring that had an RTB Allegation Finding While on Post-Plan Monitoring

| Operation | Date of RTB | Allegation Type | Date of HM Completion |
|---|---|---|---|
| Embracing Destiny Foundation RTC | 6/20/2022 | Neglectful Supervision | 9/22/2022 |
| Have Haven CPA | 12/20/2022 | Physical Abuse | 3/23/2023 |
| House of Shiloh Family Services[391] | 7/22/2022 | Neglectful Supervision | 12/28/2022 |
| Pathways 3H Youth Ranch | 7/9/2022 | Neglectful Supervision | 12/12/2022 |
| Serving Children and Adults | 3/11/2022 | Neglectful Supervision (2 findings) | 6/17/2022 |

Eleven operations were on Post-Plan Monitoring as of March 1, 2024. These operations took 23 months (701 days) on average to complete active monitoring and had spent, on average, one year (367 days) on PPM as of March 1, 2024.[392]

Six of the 11 operations on Post-Plan Monitoring as of March 1, 2024 qualified for Heightened Monitoring in 2020 while four operations qualified in 2021, and one operation, which had moved to PPM in February 2024, qualified in 2022.[393] Operations qualifying for Heightened Monitoring in 2020 on PPM as of March 1, 2024, had taken approximately eight months longer on average to complete active monitoring than operations qualifying in 2021 (815 days compared to 572 days, respectively).

For operations that qualified for Heightened Monitoring in 2020, the extended time on active monitoring resulted in a higher number of deficiencies and ANE allegations. Operations qualifying for Heightened Monitoring in 2020 that were on PPM as of March 1, 2024, had an average of 48 deficiencies cited and 107 ANE allegations with investigations opened during active monitoring while operations qualifying in 2021 had an average of 18 deficiencies cited and 39 ANE allegations with investigations opened during active monitoring. Operations in the two groups had approximately the same amount of time on PPM as of March 1, 2024.[394] While on PPM, operations qualifying in

---

[390] All operations receiving RTBs while on PPM except for Have Haven CPA were discussed in the Monitors' Sixth Report.

[391] After completing Heightened Monitoring in 2022, House of Shiloh Family Services qualified for and was placed on Heightened Monitoring again in 2023.

[392] This includes one operation that moved to PPM on February 16, 2024. The other ten operations had been on Post-Plan Monitoring for 403 days on average.

[393] Includes the year operations first qualified for Heightened Monitoring.

[394] Operations qualifying for Heightened Monitoring in 2021 had been on PPM for 412 days, on average, compared to 397 days, on average, for operations qualifying in 2020, a difference of 15 days.

2020 had received an average of eight deficiencies and 34 ANE allegations with investigations opened compared to 11 deficiencies and 23 ANE allegations with investigations opened for operations qualifying in 2021.

Figure 95: Average Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on PPM for Operations on PPM as of March 1, 2024, by Qualifying Year



Source: HHSC, Deficiencies; DPFS, ANE Investigation allegations
n = 10

The frequency and level of monitoring that operations receive are greatly reduced in the transition from active monitoring to Post-Plan Monitoring. Some operations continued to receive deficiencies related to their respective Heightened Monitoring problem areas and had ANE investigations opened and substantiated during Post-Plan Monitoring; however, no operation has moved back to active monitoring after beginning Post-Plan Monitoring.

## Completion of Heightened Monitoring

When an operation completes the PPM stage,[395] it is moved off Heightened Monitoring. Of the 128 operations under Heightened Monitoring between 2020 and 2023, nearly one-quarter (31 of 128, 24%) had completed Heightened Monitoring as of March 1, 2024. Twenty-eight of the 31 operations (90%) that completed qualified for Heightened Monitoring in 2020, while the remaining three operations qualified in 2021.

---

[395] Operations on PPM must complete at least six months of post-plan monitoring. During their time on PPM, reports that allege abuse, neglect or exploitation and violations of minimum standards are tracked and a minimum of three unannounced inspections/visits occur. If no serious concerns are identified after six months, the HM developmental team holds a final HM assessment meeting, and the operation is released from Heightened Monitoring. DFPS, CPS Handbook § 4660 HM Post-Plan Monitoring (March 2023), *available* at https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_pg_4500.asp#CPS_4660

Twenty-two operations (71% of 31) completed Heightened Monitoring in 2022, eight operations (26% of 31) completed in 2023, and one operation completed in February of 2024. Operations that completed Heightened Monitoring spent an average of 480 days under active monitoring and 228 days in Post-Plan Monitoring, for a total time of 708 days on Heightened Monitoring, approximately two years. The minimum amount of time an operation spent on Heightened Monitoring before completing was 19 months (578 days) and the maximum amount of time was nearly 3.5 years (1,208 days).

Operations that completed Heightened Monitoring had a total of 454 deficiencies cited[396] and 912 ANE allegations[397] with investigations opened during their time on Heightened Monitoring. In the first year under Heightened Monitoring, operations that completed had on average, far fewer deficiencies cited and ANE allegations with investigations opened than operations that had not completed as of March 1, 2024.[398]

Figure 96: Average Number of Deficiencies Cited and ANE Allegations with an Investigation Opened During First Year of Heightened Monitoring by Status on March 1, 2024



More than half of operations that completed Heightened Monitoring (16 of 31, 52%) had one or more Reason to Believe allegation findings during their time under Heightened Monitoring. These operations had a total of 52 RTB allegation findings: 46 during active monitoring and six during Post-Plan Monitoring. Over one-quarter of the RTB allegation findings during active monitoring (12 of 46, 26%) resulted from investigations

---

[396] Operations that completed had 364 deficiencies on active monitoring and 90 deficiencies on Post-Plan Monitoring.
[397] Operations that completed had 717 ANE allegations with an investigation opened during active monitoring and 195 ANE allegations with an investigation opened on Post-Plan Monitoring.
[398] Excludes operations that were closed as of March 1, 2024, and those that had been on active monitoring for less than a year. Sixteen of the 40 operations on active monitoring as of March 1, 2024 had not completed a full year of Heightened Monitoring.

initiated after the operation began Heightened Monitoring, while nearly three-quarters (34 of 46, 74%) resulted from investigations that were initiated before the operation started Heightened Monitoring.[399]

Figure 97: Operations with RTB Allegation Findings During Heightened Monitoring for Operations that Completed Heightened Monitoring

Source: DFPS, ANE Investigation Allegation Dispositions
n = 31



- RTB during active monitoring
- RTB during PPM
- RTB during both active monitoring and PPM
- No RTBs during HM

## Citations and ANE Investigations Before and After Heightened Monitoring

To assess the impact of the State's implementation of Heightened Monitoring on child safety, the Monitors compared deficiencies and ANE investigations in the year before notification and the year after completion of Heightened Monitoring for 22 of the 31 operations that had completed Heightened Monitoring.[400] Operations had 131 deficiencies cited in the year after completing Heightened Monitoring compared to 176 deficiencies in the year before notification, a reduction of 45 deficiencies or 26%. However, the number of ANE allegations with investigations opened in the year after completing Heightened Monitoring increased by 30% compared to the year before notification,[401] from 286 in the year before to 372 in the year after Heightened Monitoring.

---

[399] The operation with RTBs in both active monitoring and PPM is Have Haven CPA, which had 25 RTBs during active monitoring and one RTB during PPM. Have Haven CPA had 25 RTB allegation findings from three separate investigations that closed in March 2021 but were all initiated prior to the operation receiving notification of Heightened Monitoring. After excluding investigations that were initiated prior to an operations' placement on Heightened Monitoring, a total of eight operations had an RTB during active monitoring only and five operations had an RTB during PPM only, while 18 of 31 operations (58%) that completed had no RTBs during Heightened Monitoring.

[400] Tracks deficiencies and investigations through January 31, 2024. Twenty-two operations had completed Heightened Monitoring as of January 31, 2023, and had been operating for at least one year before notification of Heightened Monitoring. Road to Wisdom had completed Heightened Monitoring in September 2022, but was placed on Heightened Monitoring months after opening due to a linkage with an existing operation on Heightened Monitoring so was excluded from the analysis. Eight operations completed Heightened Monitoring after January 31, 2023, and did not have a full year after completion.

[401] This may be due, at least in part, to the State's change in practice (discussed in the Monitors' early reports) related to the way DFPS screened out intakes for an investigation of abuse, neglect, or



Source: HHSC, Deficiencies; DPFS, ANE Investigation allegations
n = 965

Reason to Believe allegation findings also increased in the year after Heightened Monitoring, from nine in the year before notification to 19 in the year after completion.[402] Five operations had one or more RTB allegation findings before Heightened Monitoring and five had one or more RTB allegation findings after Heightened Monitoring;[403] only one operation[404] had one or more RTB allegation findings in both the year before and in the year after Heightened Monitoring. Two of the five operations with RTB allegation findings in the year after completing Heightened

---

[402] exploitation. *See* Second Report, at 51. Operations that were placed on Heightened Monitoring in 2020 or 2021 may have had fewer ANE allegations with investigations opened prior to starting Heightened Monitoring because they were screened out for an investigation by DFPS, a practice that did not change until November 1, 2020. *Id.* After DFPS changed this practice, the number of intakes that were screened out for an investigation fell dramatically. *Id.* at 63.

[402] DFPS's change in practice related to screening out intakes of abuse, neglect, or exploitation for investigation may not only have resulted in a higher number of investigations opened after the practice changed but may also have resulted in a higher number of substantiated allegations. Thus, the increase in the number of RTBs in the year after Heightened Monitoring compared to the year prior to Heightened Monitoring may not reveal an increase in safety problems in operations that have completed Heightened Monitoring but may instead be indicative of the State's failure to identify and address existing safety problems prior to the policy change. However, the intent of Heightened Monitoring is to identify and correct safety problems. Substantiated allegations of abuse, neglect, or exploitation in the year after an operation has completed Heightened Monitoring may flag an operation that was removed from Heightened Monitoring too soon.

[403] The five operations that had an RTB allegation finding after completing Heightened Monitoring were: Caregivers Youth and Transitional Living Services, Connections (181054), Mission Road Development Center, Pathways Youth & Family Services Inc. dba Habilitative Homes, and The Children's Home of Lubbock.

[404] This operation was Caregivers Youth and Transitional Living Services.

209

Monitoring, Caregivers Youth and Transitional Living Services and Connections, were placed on Heightened Monitoring again in 2023.

## Operations that Returned to Heightened Monitoring

Four of the 31 operations (13%) that completed Heightened Monitoring qualified and were placed on Heightened Monitoring again in 2023.[405] The four operations that completed and returned in 2023 were originally on Heightened Monitoring for approximately the same amount of time as the 27 operations that completed and did not return, with one exception. A Pathway 2 New Beginnings was on Heightened Monitoring for more than seven months, or 229 days, longer than the average stay for operations that completed and did not return.

Figure 99: Number of Days on Heightened Monitoring for Operations that Completed and Returned in 2023[406]



Source: HHSC, CLASS Heightened Monitoring
n = 31

Two of the four operations that returned to Heightened Monitoring after completing had a higher number of minimum standards deficiencies cited during their initial time on Heightened Monitoring than operations that did not return after completing. Caregivers Youth and Transitional Living Services had a total of 41 deficiencies cited during Heightened Monitoring, 28 during active monitoring, and 13 during Post-Plan Monitoring, compared to an average of 14 deficiencies for the 27 operations that completed and did not return. House of Shiloh Family Services had a higher number of

[405] A Pathway 2 New Beginnings, Caregivers Youth and Transitional Living Services, Connections, and House of Shiloh Family Services had violation rates higher than the state average including in 2022, the last year of analysis.
[406] The average number of days is provided for operations that completed HM and did not return.

210

deficiencies cited during Post-Plan Monitoring, eight compared to an average of two for operations that completed without returning.

Figure 100: Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on Heightened Monitoring for Operations that Completed and Returned to Monitoring in 2023[407]



Source: HHSC, Deficiencies; DPFS, ANE Investigations
n = 31

Three of the four operations that returned to Heightened Monitoring had a Reason to Believe allegation finding during either active monitoring or Post-Plan Monitoring. Caregivers Youth and Transitional Living Services had two RTB allegation findings and Connections had three RTB allegation findings during active monitoring. House of Shiloh Family Services was one of five operations that completed Heightened Monitoring after receiving an RTB allegation finding during Post-Plan Monitoring.[408] In the year after completing Heightened Monitoring, Caregivers Youth and Transitional Living Services and Connections also had four and ten RTB allegation findings, respectively.

Ongoing Safety Concerns for Operations on Heightened Monitoring

---

[407] The average number of deficiencies and investigations is provided for operations that completed HM and did not return.

[408] The investigation that resulted in an RTB for House of Shiloh was initiated May 20, 2022, over two months after starting Post-Plan Monitoring on March 7, 2022, and was disposed as Reason to Believe on July 22, 2022. The State allowed the operation to complete Heightened Monitoring five months later, on December 28, 2022. The Monitors discussed this investigation in the Second Report. Second Report, at 208, n. 244.

A total of 18 operations qualified for Heightened Monitoring in 2020 and were still on active monitoring as of March 1, 2024.[409] These operations had been on active monitoring for 3.3 years (1,214 days), on average, and had received a total of 2,006 deficiencies[410] and had 4,151 ANE allegations with investigations opened. The number of ANE allegations with investigations opened at these operations increased between 2022 to 2023, and a higher number of citations were issued in 2023 than in any other year these operations were on Heightened Monitoring.



Figure 101: Deficiencies Cited and ANE Allegations with Investigations Opened While on Active Monitoring by Calendar Year for Operations Placed on Heightened Monitoring in 2020 and Active as of March 1, 2024

Source: HHSC, Deficiencies; DPFS, ANE Investigation allegations
n = 6,157



In addition, these operations had a total of 180 RTB allegation findings during their time on active monitoring.[411] Eight of the 18 operations (44%) had one or more RTB allegation findings in 2023, including three operations that received 10 or more RTBs during the year. More than one-third (70 of 180, 39%) of the RTB allegation findings received by these operations while on active monitoring occurred between January 1, 2023, and January 31, 2024.

---

[409] Seventeen of the 18 operations qualifying in 2020 were notified of Heightened Monitoring in 2020. One of the 18 operations was notified of Heightened Monitoring in March 2021 – Fostering Life Youth Ranch.
[410] Of the 2,006 deficiencies cited, 1,859 (93%) were weighted medium, medium-high, or high.
[411] Includes 23 RTB allegation findings for investigations that were initiated prior to Heightened Monitoring. All RTB allegation findings in 2022, 2023, and 2024 involved investigations that were initiated while the operation was on Heightened Monitoring.



Figure 102: Reason to Believe Allegation Findings While on Active Monitoring by Year of Investigation Closure for Operations Placed on Heightened Monitoring in 2020 and Active as of March 1, 2024

Source: DFPS, ANE Investigation Allegation Dispositions
n = 180

In the quarterly reports completed for these operations between 2020 and 2023, the monitoring team found that the operations were out of compliance with one or more Heightened Monitoring Plan Task in half of their quarterly reports (104 of 206, 51%) and 1,078 deficiencies were cited for violations of standards related to a Heightened Monitoring problem area.[412] In addition, Heightened Monitoring Plan Tasks were revised and/or added for two-thirds of these operations (12 of 18, 67%).[413] A total of 19 quarterly reports noted task revisions for these operations, with nearly all taking place in Quarter One to Quarter Seven (18 of 19).[414]

Given the ongoing safety and compliance concerns, the Monitors reviewed placement activity and placement holds assessed in 2023 for operations that qualified for Heightened Monitoring in 2020 and were still on active monitoring as of May 2, 2024. These 18 operations received 535 placements in 2023, including 480 PMC children. This number accounted for 61% (of 873) of all placements made to operations on Heightened

[412] Quarter One to Quarter Twelve was available for 17 of the 18 operations. For one operation, Fostering Life Youth Ranch, a linked operation, Quarter Three to Quarter Ten was available. The number of deficiencies may include citations that were overturned following administrative review.
[413] For five operations, new tasks were added, and existing tasks were revised. For seven operations, Plan tasks were revised.
[414] One operation, The Burke Foundation – Pathfinders GRO, had a task revised and new tasks added in Quarter 11.

Monitoring during the year. All but ten of the 535 placements received prior approval from a Regional Director or Associate Commissioner of DFPS.[415]

Between 2020 and 2023, DFPS administered placement holds in four of the 18 operations (22%), with three of the four operations receiving a placement hold in 2023.[416] A summary of the three operations with placement holds during the year is provided below.

**Circle of Living Hope**

DFPS issued a placement hold  for Circle of Living Hope on November 21, 2023, and lifted it on March 8, 2024. The documented reasons for the placement hold included pending abuse/neglect investigations related to Medical Neglect, multiple citations for minimum standards violations related to medication management, residential contracts violations, and "other factors relevant to child and youth safety." Ongoing issues and a lack of compliance related to medication administration and management were noted in the quarterly reports, with an increase in medication-related citations preceding the placement hold. In addition, the operation was previously put on a placement hold for one month in October 2022, for medication-related issues. A total of seven PMC children were placed at Circle of Living Hope during 2023, all of whom were placed before the placement hold in November.[417]

**New Life Residential Treatment Center**

DFPS issued a placement hold for New Life Residential Treatment Center on May 8, 2023, and lifted it on June 16, 2023. The documented reasons for the placement hold included staff supervision concerns, specifically staff sleeping during overnight hours, inappropriate supervision of a child with self-harming behavior, and staff not taking appropriate measures to protect a child from another aggressive child. The operation received a Reason to Believe finding in 2023 for Neglectful Supervision and had a total of six RTBs since starting Heightened Monitoring in 2020. A total of 31 PMC children[418] were placed at New Life during 2023, with none of the placements occurring during the placement hold.

---

[415] For four placements that did not receive prior approval, the placement request was rejected by the Regional Director, while six placements did not have an HM placement request found in IMPACT. In one placement that was rejected by the Regional Director, the operation (The Burke Foundation – Pathfinders GRO) was on a partial placement hold at the time of the placement.

[416] A placement hold was placed on Beacon of Hope starting on August 30, 2022, and ending September 29, 2022.

[417] Six of the seven children were still in placement at Circle of Living Hope when the placement hold went into effect. Four of these six children ended their placement at Circle of Living Hope within a month of the placement hold going into effect.

[418] One child was placed at the operation on two separate occasions, in January and October.

**The Burke Foundation – Pathfinders GRO**

DFPS issued a placement hold for The Burke Foundation – Pathfinders on January 26, 2023, due to ongoing concerns regarding the operation's improper use of Emergency Behavior Interventions (EBI). The placement hold was downgraded to a partial placement hold on March 10, 2023, allowing the operation to receive no more than two placements every two weeks. The placement hold was fully reinstated on April 24, 2023, following two investigations which each determined a child was injured during a restraint. The hold was partially lifted again on October 23, 2023, and fully lifted on December 22, 2023. The issues regarding the operation's use of EBI and improper restraints were continually documented throughout the year in Heightened Monitoring quarterly reports. It was also noted in quarterly reports that the operation, in response to the placement hold administered by DFPS, began accepting placements from juvenile probation departments to "recoup and maintain their financial plan" and sought additional contracts with juvenile probation departments with plans to admit more children who are under supervision of the juvenile justice system in addition to children in DFPS care. Four PMC children were placed at The Burke Foundation – Pathfinders in 2023. Two children were placed before the placement hold and two children were placed while the operation was under a partial placement hold.

## Operations Closing While on Heightened Monitoring

Over one-third of the operations on Heightened Monitoring between 2020 and 2023 (46 of 128, 36%) closed while on Heightened Monitoring because of revocation or a termination of their contract with DFPS or an SSCC. These operations spent an average of just over a year (391 days) on Heightened Monitoring before closure, with a range of 52 days to 1,208 days. Ten of the 46 operations that closed (22%) were on Heightened Monitoring for less than six months, 19 of 46 (41%) were on between six months to a year, 12 of 46 (37%) were on for more than a year, and five of 46 (11%) were on Heightened Monitoring for more than two years before closure. Only one of the 46 operations that closed, Hands of Healing, had moved to Post-Plan Monitoring before closing. Details on operations that closed/terminated their contract while on Heightened Monitoring can be found in Appendix C of this report.

## Updates Regarding Emerging Issues Identified in Previous Reports

The Sixth Report discussed the State's efforts to address several emerging issues with Heightened Monitoring identified in the Monitors' Fourth Report.[419]  The Sixth Report also identified new concerns related to the State's implementation of Heightened Monitoring.[420] The identified issues included:

- The State's failure to provide operations on Heightened Monitoring with meaningful Technical Assistance.

---

[419] Sixth Report, at 218 – 226.
[420] *Id.* at 226-230.

- Heightened Monitoring operations being allowed to refuse or change Plan Tasks.[421]
- The State's placement of Heightened Monitoring operations that continued to have significant safety problems on redundant corrective actions rather than implementing one of the more stringent remedies identified in the Court's order.
- The State's reliance on low fines as the primary remedy for operations that have failed to come into compliance with their Heightened Monitoring Plan.
- Operations remaining on Heightened Monitoring or Post-Plan Monitoring for prolonged periods, despite significant safety problems, without the State implementing one of the other remedies identified in the Court's order.
- The State's utilization of policies and practices that prioritize moving operations through the Heightened Monitoring process without considering children's safety.

All these problems highlight a central theme: the State's reluctance to implement Heightened Monitoring in a way that prioritizes children's safety, consistent with the Court's orders, continues to place children at risk. This summary of the ongoing safety

---

[421] Though the Sixth Report did not identify any additional operations that had been allowed to alter or refuse a Plan Task, the monitoring team identified two operations that refused new Plan Tasks intended to address ongoing safety problems. In March 2023, the Heightened Monitoring Team suggested adding two Plan Tasks to the Heightened Monitoring Plan for Agape Manor, which was placed on Heightened Monitoring on October 26, 2020, due to ongoing violations related to inappropriate discipline. The operation did not agree; instead, two months later, Agape Manor agreed to voluntarily implement similar practices to those proposed by the State. This informal process means that Agape Manor will not be held accountable for these practices in the same way that it would if they were added as Plan Tasks.

Another operation, Children of Diversity CPA, has been resistant to the Heightened Monitoring process, and according to State records, at times hostile to the State's Heightened Monitoring Team. Children of Diversity had three DFPS investigations in 2023 that resulted in an RTB disposition, and two that resulted in a disposition of UTD. During a Heightened Monitoring Plan Development Meeting on July 17, 2023, the HM Team discussed amending the HM Plan to specifically address concerns for inappropriate discipline; six new Plan Tasks were proposed. On August 8, 2023, a meeting was held with the operation's administrator regarding the proposed amendments. The State also proposed increasing their meetings with the operation from monthly to bi-weekly. The HM Team documented that the meeting abruptly concluded with the administrator "vehemently" refusing to accept the proposed amendments to the Plan. In response to an e-mail from the DFPS Heightened Monitoring staff attaching the amended Heightened Monitoring Plan, the administrator sent an e-mail to the State that said:

> Afternoon, All!!!
> We don't agree with these extra tasks and the newly added biweekly meetings as I stated in the meeting today!!!! This should be for Providers that are on HM who's problematic [sic]…Also, we shouldn't be held accountable on allegations unless it's a citation! Otherwise, you're denying my agency and foster parents due process which violates state and federal law!!!! We have successfully demonstrated compliance every week and will continue due to my expectations of my staff and foster parents!!! This is aggressive and over the top!!! I've added my attorney [name omitted], DFPS Commissioner, DFPS Deputy Commissioner, DFPS Associate Commissioner, and DFPS Deputy Associate Commissioner for their review and to intervene!!! We are working very hard to stay in compliance with the current agreed plan and tasks!!!! [Name of attorney omitted]…this will not be pushed down our throats!!!

problems at operations during and after their placement on Heightened Monitoring illustrates the risks associated with poor implementation.

## Remedial Order 20 Summary

Fourteen operations were newly placed on Heightened Monitoring in 2023; all operations were notified of their Heightened Monitoring status in October 2023 and began in December 2023. Several of these operations were opened after 2018; three operations opened in 2019, and one operation opened in 2020. The most common problem areas identified by the Heightened Monitoring Team related to Caregiver Responsibilities – Supervision, Child Rights, Discipline & Punishment, Medication Management – Medication Documentation, and Service Plan – Preliminary, Initial, and Discharge. With the addition of these 14 operations, the 164 operations that have qualified for Heightened Monitoring since 2020 were responsible for 805 substantiated allegations of abuse, neglect, or exploitation of children in the years used to determine their eligibility.

In addition to the 14 operations that were newly placed on Heightened Monitoring in 2023, four additional operations that had previously completed Heightened Monitoring again returned to Heightened Monitoring. All four were among the first group of Heightened Monitoring operations in 2020. Three of the four were over the state average violation rate in all five years of the qualifying analysis in 2023. The other operation was over the state average violation rate in four of the five years. One of them (A Pathway 2 New Beginnings, LLC) had exited Heightened Monitoring for approximately three months when it was notified of its return to that status.

During the calendar year 2023, caseworkers made 1,374 requests to place a PMC child in an operation that was under Heightened Monitoring, resulting in 873 placements. Nearly all requests (858 of 873, 98%) were approved by a DFPS Regional Director or Associate Commissioner. More than a quarter of the approved placements to a GRO or RTC on Heightened Monitoring (60 of 216, 28%) were of children who had been in a CWOP or hospital setting immediately before the placement. In 2023, 35% (304 of 873) of all placements of PMC children to an operation under Heightened Monitoring received prior approval that met all of the Court's requirements (approver included justification for the placement, documented a review of the operation's five-year safety history, and included a best interest statement). This percentage was an improvement over 2022, when only 16% of placement approvals met all the Court's requirements. The percentage of placement approvals that met all the Court's requirements increased throughout 2023.

Despite improvement, the monitoring team continued to find generic placement approvals or placements that appeared to overlook obvious safety problems. Eleven placements were approved in 2023 for foster homes that were later placed on DFPS's Disallowance list and recommended for closure by HHSC. Four other homes were relinquished by the CPA that licensed them after the caregivers were substantiated for

abuse or neglect with dispositions of RTB findings; six children were placed in these homes in 2023.

The monitoring team conducted a comprehensive review of the operations placed under Heightened Monitoring since 2020. Some had ongoing safety problems that highlight problems with HHSC's implementation, which the Monitors identified in this and other reports. At every step of the process, the State appeared to prioritize avoiding the more stringent enforcement penalties the Court set out in its orders in favor of maintaining licenses for operations that continue to have significant safety violations.

## Remedial Order 21: Revocation of Licenses

*Effective immediately, RCCL and/or its successor entity shall have the right to directly suspend or revoke the license of a placement in order to protect the children in the PMC class*

In 2023, the Health and Human Services Commission (HHSC) considered 27 recommendations for closure of foster homes. Among these, the Monitors described three in prior reports. Of the homes HHCS staff recommended for closure, four recommendations were not approved by HHSC leadership. One home HHSC leadership approved for closure has yet to be relinquished by the CPA; and still has children placed in the home.[422]  A second home remained open an additional year before the home's verification was relinquished.

In addition to the HHSC closure recommendations, DFPS placed 75 foster homes on a list of disallowed placements in 2023. The Monitors summarized ten of these homes in prior reports, and 17 appeared on the HHSC closure and DFPS disallowance lists.

Eight homes HHSC recommended for closure were verified by CPAs on Heightened Monitoring at the time of the recommendation, as were 28 of the DFPS disallowed homes.[423] Sixteen (16) of the DFPS Disallowance Reviews were initiated at the request of Heightened Monitoring staff.

### Approved HHSC Closure Recommendations

America's Angels Inc.
Relinquished July 3, 2024

Trinity Foster Care first verified this home June 22, 2001, the home changed CPAs on March 13, 2004 and was verified by Homes4Good on March 13, 2004. The home

---

[422] As of April 28, 2024, this home does not appear on the DFPS list of disallowed placements.
[423] Of these, five homes were included in both HHSC closures and DFPS disallowances.

voluntarily closed on September 14, 2007. On January 4, 2008[424] the home was re-verified by Homes4Good. On June 3, 2009, the home changed CPAs and was verified by Brighter Visions Child Care Services. The home changed CPAs again on August 31, 2011, and was verified by America's Angels Inc. On November 27, 2013, the CPA relinquished the verification, indicating a "background check match" as the reason for the closure. America's Angels Inc. again verified the foster home on September 25, 2019. As of June 23, 2024, according to CLASS, the home is still active.[425]

The foster home has been the subject of 20 investigations: four investigations for allegations of abuse, neglect, or exploitation and 16 minimum standards investigations.

## ANE Investigations Summaries

**On October 16, 2008**, DFPS initiated an investigation for Physical Abuse after a 13-year-old foster child made an outcry that the foster father choked him and threw him over the counter. School personnel observed two red marks on the child's neck. The 13-year-old child also reported that his younger sister was spanked.

The foster father reported "grabbing" the child by his shirt "from across the counter." The 13-year-old told the investigator that the foster father grabbed the back of his shirt and accidentally choked him.

The investigator Ruled Out the allegation of Physical Abuse; two citations were issued for employee general responsibilities and other prohibited discipline. During the investigation, the agency implemented a safety plan requiring the foster father to leave the home and return when the investigation was complete. The foster father violated the safety plan.

**On August 9, 2010**, DFPS initiated an investigation for Physical Abuse after a therapist reported that a five-year-old foster child made an outcry that the foster father spanked him "with a belt on [his] bottom." The child was observed to have "a darker brown line around [child's] wrist and old marks on [child's]arms."

The investigator interviewed five foster children, including those who made the outcry. Three foster children reported receiving or witnessing someone in the home receive a "whooping." One child reported remaining in timeout "all day" for doing something "really bad." Another child reported only receiving time out for discipline.

---

[424] CLASS includes multiple agency home pages for this home. One shows the initial Homes4Good verification and voluntary closure on September 14, 2007. Another shows Homes4Good verified the home January 4, 2007, but in the Comments box, it says "Homes4Good 2008." The Monitors assume the January 4, 2007 date was an error and should have been entered as January 4, 2008.
[425] On April 22, 2021, HHSC placed America's Angels Inc. on probation due to "a continued pattern of deficiencies in supervision, daily care, problem management, and medication." America's Angels Inc. successfully completed probation on November 17, 2022.

The foster parents denied the allegations of physical abuse. The childcare director, caseworker, and case manager reported no concerns for children's safety. At the time of the interview, the investigator observed no visible marks. The investigator noted it was "difficult to gauge" the four-year-old and three-year-old children's credibility due to their ages and levels of functioning.

The investigator Ruled Out the allegation of Physical Abuse and issued one citation because a frequent visitor did not have a background check.

**On February 28, 2011**, DFPS initiated an investigation for Physical and Emotional abuse after an eight-year-old child and a six-year-old child made an outcry that the foster parents "slap, pushed, punched, and made the six-year-old sit in a corner all weekend."

The foster children reported only receiving timeouts and stated that the foster parents neither use physical discipline in the home nor deny them meals and bathroom access. The foster parents and their biological son also denied the allegations of physical abuse. The children's CPS caseworker had no concerns with the home.

The investigator Ruled Out the allegations of Physical and Emotional Abuse, and no citations were issued.

**On November 19, 2013**, DPFS initiated an investigation of Sexual Abuse and Neglectful Supervision after a 15-year-old foster child made an outcry that a 19-year-old child living in the home "showed his genitals" and attempted to get into bed with the 15-year-old.

The Investigator interviewed seven foster children, including the 15-year-old. Three of the children reported that the 19-year-old exposed his genitals to them. Another foster child reported that the 19-year-old "pulled his pants down to scratch his family jewels."

Two foster children denied the allegation of sexual abuse. The 19-year-old reported "not showing his body parts intentionally" but said he would sometimes exit his room "while being naked" when he thought he was home alone.

The foster parents reported not being aware of the 19-year-old's actions and stated that he did not have a history of sexually acting out. All seven foster children stated that the foster parents did not leave them alone and often sat downstairs when the children were upstairs.

DFPS Ruled Out the allegations of Sexual Abuse and Neglectful Supervision, and no citations were issued.

Standards Investigations Summaries

CLASS documents that the foster home was also the subject of 16 minimum standards investigations between July 19, 2007 and November 22, 2022.

- On June 19, 2007, DFPS initiated a standards investigation for a report that a child ran away and was arrested for shoplifting. One citation for serious incident reporting was issued.

- On August 29, 2007, DFPS initiated a standards investigation for a report that a caregiver leaves the children unsupervised on weekends. A citation was issued for permit holder responsibilities after it was found that the foster home records did not contain a fire inspection, training and background check.

- On February 26, 2008, DFPS initiated a standards investigation for a report that two 12-year-old foster children "were sexually acting out at school." The foster parent became aware of the incident but did not report it, believing the act was consensual. The agency conducted an internal investigation; no citations were issued.

- On January 13, 2011, DFPS initiated a standards investigation for a report that a child was denied his snack for negative behavior, and the foster parents made foster children "get on their knees" as punishment. The inspector interviewed a total of five foster children. One reported witnessing his brother being made to "kneel" in the corner. The remaining four reported sitting on their "bottoms" in the corner for time out. The foster parent reported having the children sit on their "bottoms with legs crossed" in the corner for a "few minutes" as punishment. No citations were issued.

- On January 10, 2012, DFPS initiated a standards investigation after a 15-year-old foster child ran away. The investigator reviewed the documents and determined that the incident was reported promptly to all parties except licensing. One citation for incident reporting was issued.

- On March 22, 2012, DFPS initiated a standards investigation for an allegation that a 17-year-old foster child inappropriately touched a 15-year-old foster child. The 15-year-old reported being "raped" by the 17-year-old on two occasions, and said one incident lasted two hours. The investigator interviewed six additional foster children in the home, including the 17-year-old, and all children denied the allegations. The children reported that the 17-year-old works and is rarely at home. The foster parents denied the allegations and stated, "10 to 15-minute checks" are made when children are home. No citations were issued.

- On October 26, 2012, DFPS initiated a standards investigation for an allegation of inappropriate discipline of five foster children. Two children reported that the foster father used inappropriate discipline in the home. Three children reported that the foster father cursed and made threatening statements. Both foster parents said the foster father jokingly makes the statement "put a part in your head" to the children. The foster father admitted to grabbing a child when he was attempting to run away. The inspector issued four citations: two for other prohibited discipline, one for physical environment, and one for emergency behavior intervention.

- On March 13, 2013, DFPS initiated a standards investigation for allegations that two foster children engaged in a physical altercation and were arrested. The foster parents corroborated this statement. The inspector issued one citation for physical plant violations because ten children shared one bathroom.[426]

- On March 26, 2013, DFPS initiated a standards investigation for an allegation that an 18-year-old child was arrested for masturbating in public. The foster parents reported that when the child did not return to the foster home that night, they notified law enforcement. At that time, they became aware that the child was arrested for a "sexual act" in public. No citations were issued.

- On April 22, 2013, DFPS initiated a standards investigation after a 17-year-old foster child ran away from home and later reported being kicked out of the house. When interviewed, the 17-year-old child denied being forced to leave the home. The foster parents reported the child left on his own accord. School personnel stated the child explained "he had to leave" the home. When interviewed, the case worker also reported that the child thought the foster father asked him to leave the home; however, the foster father told the case manager he asked the child to "go outside to cool off." No citations were issued.

- On July 16, 2020, HHSC initiated an investigation for an allegation that the foster parent "hit" and "aggressively" grabbed a 17-year-old foster child's shirt. The inspector interviewed six foster children, including the 17-year-old child. Five of the six children denied the allegations. Three children reported that "profanity" was used by the foster father. Two children stated that the foster parent "threatened notice of removal for control." The foster parent denied using any physical discipline on the children. No citations were issued.

- On November 23, 2020, HHSC initiated an investigation for allegations that the foster father "lifted the child's bed out of anger," pushed and grabbed a 15-year-old foster child's shirt." The inspector interviewed six foster children, including the 15-year-old. Five children denied the allegations, and four reported that the foster father could not walk upstairs due to a recent knee surgery. The foster parents denied using inappropriate discipline, and the 15-year-old's caseworker had no concerns with the home. No citations were issued.

- On January 29, 2021, HHSC initiated an investigation for an allegation that the foster father "jerked up" a 15-year-old foster child for getting into trouble. The 15-year-old stated that the foster father "grabbed his shirt and pulled in an upward motion." The inspector interviewed a total of five foster children. Four reported that the foster parents did not use inappropriate discipline at home. Two children said the foster father used profanity and yelled at the children. When interviewed, the

---

[426] The foster parents reported that they had nine foster children placed in the home at the time of the investigation, and that two biological children also lived in the home.

foster father admitted to the yelling and stated he does not "directly curse" at the children. The inspector issued one citation for other prohibited discipline.

- On July 13, 2022, HHSC initiated an investigation for an allegation that the foster parents "failed to meet the educational needs" of a 15-year-old foster child. When the inspector interviewed the four foster children, including the 15-year-old, it was reported that the foster parents had COVID, which caused them to miss the summer school enrollment deadline. The foster parents corroborated this information. No citations were issued.

- On September 29, 2022, HHSC initiated an investigation for an allegation that the foster father "used inappropriate language in front of and towards children in care." When the inspector interviewed the four foster children living in the home, they reported the foster father "cursed," "yelled," and stated he would "call law enforcement and have them removed" when he became upset. One child noted that the foster father explained that if "he, his wife, or daughter are disrespected, then he will disrespect the child." The foster parents denied using physical discipline and inappropriate language in the home. The agency's case manager for the home did not report concerns with the home. The inspector issued one citation for other prohibited discipline for this standards investigation.

- On November 22, 2022, DFPS initiated an investigation after a 15-year-old foster child ran away, and the foster parents notified law enforcement. No citations were issued.

Sampling Concerns

The home was also the subject of five sampling inspections, two with noted concerns. On October 10, 2007, a concern related to capacity was noted, and on September 27, 2012, inspectors noted concerns related to medical storage, physical environment, administration of medication, and background checks.

HHSC-RCCR Closure Recommendation Summary

HHSC staff submitted a recommendation for closure to HHSC leadership on June 21, 2023. HHSC leadership approved the closure recommendation on July 6, 2023. The closure recommendation was based on "a pattern of allegations in supervision, children's rights, and disciplinary violations" and "citations for other prohibited discipline." The closure recommendation noted, "The foster father was accused of using inappropriate language in front of and towards children in care in multiple investigations."

According to the Home Closure Recommendation Details page in CLASS, America's Angel's response to the recommended closure was that the agency would "close the home by July 2024."

Four children who were placed before the RCCR Closure Recommendation with two removed in June and the remaining two were removed on July 1, 2024. The foster home page in CLASS indicates that the home closed on July 3, 2024, with the verification relinquishment reason documented as CCR Recommended Closure.

Since the home's initial verification, IMPACT shows there have been 138 placements of a child in the home.

Assuring Love Child Placement Agency
*Not Relinquished*

This foster home was initially verified on March 15, 2011, with The Bair Foundation-Dallas branch. On September 5, 2012, the home changed CPAs and was verified by Dallas Metrocare Services. The home changed CPAs again on April 24, 2015, and was verified by Covenant Kids, Inc.; on September 22, 2015, the CPA relinquished verification with a documented reason as "CPA Closed." After being closed for a year, the home was verified by Assuring Love Child Placement Agency on September 2, 2016.

This home has been the subject of 24 investigations: eight investigations for abuse, neglect, or exploitation and 16 minimum standards investigations.

ANE Investigations Summaries

Five of the eight ANE investigations involved allegations of Sexual Abuse by the foster father. These included two separate allegations of inappropriate touching, raping a child, and two reports of watching pornography in the presence of children. Although none of the investigations resulted in RTB findings, one resulted in a citation for violating a minimum standard related to supervision because "[a] caregiver took multiple videos of children in care in their swimming suits. The caregiver allowed children in care to view these videos. Children in care indicated that the caregiver views suggestive images of women and pornography. Children in care report feeling uncomfortable by this activity." After this citation was issued, the CPA, Covenant Kids, closed the home on September 22, 2015. However, the home reopened a year later with Assuring Love, CPA.

**On April 5, 2012**, DFPS initiated an investigation for Physical Abuse due to allegations that the foster mother grabbed a foster child by the arm and dragged him across the floor. The foster father threw the child on the bed and then stood over the child. The intake report stated that the foster father put both his hands around the child's throat, and the child had a one-inch scratch on his neck "from being choked by the foster father." The intake report stated that the foster parents yelled and cursed at the child, calling him a "bitch."

When interviewed, the seven-year-old child reported that the foster father picked him up and attempted to choke him. Two of the child's siblings were interviewed and made outcries of observing of the foster parent choking the seven-year-old child and carrying him to his room. Two other children were interviewed and denied that the foster parent choked the seven-year-old child but reported that the seven-year-old child was picked up and carried to the room. The foster father denied choking the seven-year-old child but admitted to carrying the child to the room. Both foster parents admitted to using an emergency behavior intervention (restraint, or EBI) to get the seven-year-old child to comply. The allegation of Physical Abuse was Ruled Out. HHSC issued one minimum standard citation for EBI.

**On November 14, 2013,** DFPS initiated an investigation for Sexual Abuse after a 17-year-old child in care alleged the foster father had been "tapping her on the butt" when she walked by him. The intake report alleged that the child stated it occurred often, and if he was unable to "swat" her on the butt, he would kick her on the butt.

During the investigation, the 17-year-old child made an outcry of being touched on the bottom by the foster father and said another child in the home was a witness. The witness child was interviewed and denied any inappropriate touching in the home. The allegation of Sexual Abuse was Ruled Out, and no citations were issued.

**On December 11, 2014,** DFPS initiated an investigation for Sexual Abuse after it was alleged that the foster father was looking at the breasts of a 14-year-old foster child. The intake report stated that the 14-year-old child had previously reported that the foster father touched her bottom when she went to receive her medication and that other children in the home witnessed the incident. The intake report stated that another nine-year-old foster child who had been discharged from the home was touched by the foster father.

The nine-year-child denied that the foster father had ever touched her inappropriately. The 14-year-old child reported that the foster father told her she had something on her bottom, and he rubbed it to get it off, but there was nothing there. One of the children who reportedly witnessed the incident first said that she saw the foster father touch the 14-year-old child and then recanted. The other children in the home denied ever seeing the foster father touch either child. The foster father denied the allegations. The foster mother reported that the foster father did not administer medication the day that he allegedly touched the 14-year-old. The allegation of Sexual Abuse was Ruled Out, and no citations were issued.

**On June 5, 2015**, DFPS initiated an investigation for Sexual Abuse after a 15-year-old child, who was in a trial placement in the foster home, alleged that the foster father was "creepy" and looked at her "weird." The 15-year-old said that other children in the home told her the foster father looks at pornography regularly and that the foster father showed the 15-year-old pornography on his tablet. The 15-year-old also alleged that one of the other children asked her to "lay on her lap and cuddle."

Seven foster children were interviewed. All but one child reported either seeing the foster father watching porn, seeing porn sites in the search history, or the foster father watching videos with women wearing only bikinis. One child reported witnessing the foster father take a picture of another child and that the foster father zoomed in on the child's bottom. The foster father was interviewed and denied watching porn but admitted to taking pictures of two of the children in his care. The foster father reported that he had numerous pictures of one child because she was new in the home. The foster father showed the investigator videos he had taken of two children jumping in the pool in their bathing suits, and one of the videos was in slow motion. The foster father reported that the children wanted him to video them. The allegation of Sexual Abuse was Ruled Out. HHSC issued two minimum standards violations for supervision and physical environment.

**On December 8, 2018**, DFPS initiated an investigation for Sexual Abuse after receiving a report that a 16-year-old child in care had communicated with grown men online. While placed in the foster home, the child made an outcry of sexual abuse against her foster father to one of the men, who reported the outcry to law enforcement. The intake report stated that the child was placed out of the home due to allegations of the foster father being sexually inappropriate with the child. The intake report stated that the allegations were previously reported, but no report could be found. A second intake was reported regarding the child meeting an adult man and having sexual intercourse with the man.

During the investigation, the 16-year-old child reported that a sexual encounter with the foster father occurred when they were home alone. The investigator spoke with the foster mother, foster father, agency administrator, therapist, and CPS caseworker, who denied having concerns for the home, and the foster father denied being left home alone with the child. The investigator interviewed a sheriff who conducted a joint investigation and reported that the children all made the same statement about not being left home alone with the foster father. The foster father's polygraph did not indicate sexual abuse. The allegation of Sexual Abuse was Ruled Out, and no citations were issued.

**On November 5, 2021**, DFPS initiated an investigation for Neglectful Supervision after law enforcement reported allegations that the foster parents left a 16-year-old child in care alone with a 17-year-old child while they were out of the country on vacation and that during this time, the child attempted suicide. The intake included that the 16-year-old child had locked herself in the bathroom, was found "slumped over" with an empty Tylenol bottle underneath her, and indicated the child had ingested the pills. The intake stated that the 16-year-old child believed she was pregnant and did not want the baby. A second intake included that it was believed the 16-year-old child purchased the Tylenol because the foster parents did not keep the brand in the home.

During the investigation, the children in the home reported they were left with respite providers while the foster parents were out of town. The 16-year-old child reported that she got the medicine from another child in the home. The foster parents and respite providers denied having Tylenol in the home at the time of the incident. The report stated that the child was not pregnant and was taken to the hospital for treatment. The

respite providers reported they were sleeping when the incident occurred. The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On November 30, 2022**, DFPS initiated an investigation for Sexual Abuse after it was reported that the foster father was playing porn while in the kitchen, and the children in the home could hear it. The intake report stated that one of the children in care went into the kitchen and observed the porn. The intake report stated the foster father was rubbing the leg of a 17-year- child in care while in the car and that the foster father pays much attention to the 17-year-old, who is allowed to do things other children are not allowed to do, such as turn on her cell phone at night.

During the investigation, there were concerns that the foster father showed favoritism with the 17-year-old child in the home, had issues with boundaries, and that one child reported seeing and hearing pornography on the foster father's phone when he was cooking dinner. The investigation report stated that none of the children made an outcry of sexual abuse, and they all reported feeling safe in the home. The foster father denied the allegations. The allegation of Sexual Abuse was Ruled Out, and no citations were issued.

**On August 16, 2023**, DFPS initiated an investigation for Neglectful Supervision after a nine-year-old and eight-year-old children in care stated they saw the foster father's phone that had pictures of body parts, specifically the breast and legs. The intake report stated that the nine-year-old and eight-year-old stated they saw the pictures when he looked at the foster father's phone while the foster father was viewing it. The report stated the eight-year-old stated she saw the pictures, and the child pointed between her legs; she also reported that the foster mother pulled down her pants with no explanation.

The eight- and nine-year-old children reported seeing a female lying down on the foster father's phone but did not state anyone was nude. The children reported the foster father yelling and screaming from downstairs up to them in their bedroom, which they thought was "creepy." The foster father denied having inappropriate pictures on his phone and indicated he watches cooking videos or has church meetings on his phone. The foster father said he yelled to the children to tell them dinner was ready. Collateral witnesses reportedly had no concerns about the home. The allegation of Neglectful Supervision was Ruled Out. HHSC issued one minimum standard citation for supervision for the foster father observing explicit videos while supervising children.

### Standards Investigations Summaries

This foster home had 16 standards investigations, reflecting a pattern of allegations for supervision and other prohibited discipline. While the foster home was open, it received five citations, three related to supervision. The foster home also reportedly received technical assistance related to supervising children in the home. The following investigations resulted in either a citation or technical assistance.

- On September 14, 2012, HHSC initiated an investigation for allegations that a 16-year-old child in care was taken to the hospital after taking illicit drugs. The foster parents indicated that they had allowed the child to go for a walk because she was upset, and when she came back, she reported she was "seeing spots" and admitted taking drugs.

  During the investigation, it was discovered that the foster parents were not providing the level of supervision that was required by the child's service plan. The report stated that the child had to have 24-hour supervision, and the foster parents admitted to allowing two children to leave the home unsupervised. The 16-year-old child admitted to taking drugs every time she left the home, but it was unknown whether she ingested illegal drugs. HHSC issued one minimum standard violation for preliminary service planning.

- On November 21, 2014, HHSC initiated an investigation after allegations that the foster father called a child in care a "bitch," and that the children were required to use their own money to buy things. The intake report stated that the children's biological mother reported that the children told her that another child in the home openly masturbated and that they were being racially discriminated against. A second intake alleged the foster father was seen patting another child on the butt during "morning meds."

  During the investigation, it was determined that the children had personal hygiene products, but if they wanted something different, they had to purchase it with their money. The children denied racial discrimination. The foster father admitted to yelling and cursing at the children at times. It was also reported that the children were left alone upstairs for a significant amount of time before being checked on, which was inconsistent with their service plans. HHSC issued two citations for violating minimum standards for other prohibited discipline and supervision.

- On August 4, 2017, HHSC initiated an investigation after it was alleged that the children did not have weather-appropriate clothing. It was reported that the children in the home were forced to attend church with the foster parents, and the children had to wash cars for the church's fundraiser.

  During the investigation, HHSC confirmed that the children's rights were being violated as they were forced to attend church twice a week. It was reported that the children needed additional clothes since they were in school uniforms. HHSC issued one minimum standard citation for child rights regarding the church attendance.

- On March 19, 2020, HHSC initiated an investigation after it was alleged that two children allowed four males in their hotel room, and the foster father had to ask them to leave. The intake report stated that the two children left the hotel with their backpacks and had no information about where they were headed.

  The investigator determined that the foster parents did not adequately supervise the children while on a family vacation. The investigation report stated that the children

were able to sneak boys into the hotel room without the foster parents' knowledge because the foster parents had a separate room from the children in care. HHSC issued one minimum standard citation for violating a minimum standard related to supervision.

- On August 10, 2020, HHSC initiated an investigation after a report was made of a foster child running away. The report stated that before the child left, there was no discord between the child and the foster parents, and the foster parent reported that the child was known for smoking marijuana.

  During the investigation, the child reported she left the foster home because she was upset  and reported that the foster father cursed at her for the first time the night of the incident. The child reported that she stayed at a friend's house. The investigation report stated that the child was allowed unsupervised time, confirmed through letters written by the CPS caseworker. The foster parents stated that the child had never smoked marijuana in the home but admitted to smoking marijuana to her caseworker and that she smoked marijuana the day she ran. HHSC did not issue minimum standard citations. However, technical assistance was provided for other prohibited discipline.

- On September 15, 2021, HHSC initiated an investigation after it was reported that a 14-year-old child in care had information regarding a shooting that had taken place. The intake report stated that the 14-year-old reported to the police that two 16-year-old foster children were sneaking out of the home to meet two boys whom the 14-year-old believed shot the person, and one of the 16-year-olds who was sneaking out was the getaway driver.

  During the investigation, the children in the home reported that it was too hard to sneak out because the foster parents had cameras and alarms on the doors and windows, which the foster parents confirmed. Law enforcement reviewed the home's video and saw no one leave. The police said that the information provided by the 14-year-old did not match the details. HHSC did not issue minimum standards citations. However, technical assistance was provided for verification certificates.

## HHSC - RCCR Closure Recommendation

On July 26, 2023, RRCR recommended closing the home due to concerns involving inappropriate discipline, inappropriate supervision, and patterns of serious allegations. RCCR approved closing the home on July 27, 2023, due to "repeated allegations involving pornography, plus high weighted citations including on EBI, discipline, supervision."

The CPA was notified on August 10, 2023, and responded that it would not relinquish the home. The CPA provided a "closure plan" stating the home was placed on probation and, as of 2023, had stopped receiving teenage girl placements. The CPA stated that the foster home would foster boys 12 years old and younger, and the agency would continue

monitoring the home closely. The CPA stated that the home would be immediately closed if the home had any citations and/or confirmed findings. The CPA reported that the plan was to close the home by the end of March 2024.

CLASS reflects that the foster home is still active. IMPACT shows two children were placed in this home on June 25, 2024. Since the home was first verified, IMPACT shows there were 105 placements of a child in the home.

## Agape Manor Home Child Placing Agency

Agape Manor Home CPA (Agape) verified this home on May 28, 2019; the home voluntarily closed with deficiencies on February 20, 2023. When the home closed, Agape had been on Heightened Monitoring since October 26, 2020. The Heightened Monitoring Plan lists the concerning patterns and trends areas, including background checks, discipline and punishment, and required trainings.

While the home was open, it was the subject of four investigations: one DFPS investigation for abuse, neglect, or exploitation and three minimum standards investigations.

### ANE Investigations Summaries

**On October 14, 2022**, DFPS initiated an investigation for Physical Abuse after a DFPS caseworker reported that a nine-year-old child was subject to physical discipline at the behest of the foster mother. The intake states that the foster mother allowed unsupervised visits with the child's biological mother, who was asked to "whoop" the child. The report also alleged that the foster mother had "whooped" the nine-year-old. The intake also included a report that the child was "covered in bruises" after a visit with her biological mother. The biological mother admitted to hitting the child with a shoe, leaving shoeprint-sized bruises on the child, and the foster mother explained the other bruises by stating the child fell down the stairs and was "scratched by a nail left up from…Christmas decorations."

The foster mother admitted to hitting the child on the hand with a ruler for stealing items at school, but she denied physical discipline in the home. She also told the investigator about an incident during which the biological mother was upset after the nine-year-old child and her siblings left a mess at the biological mother's home during a visit. She stated that the biological mother told her that she "was going to whoop her mother fucking ass," and the foster mother took the nine-year-old child to the biological mother's home under the guise of having the child clean up the mess. She admitted to leaving the child alone with the biological mother, and she stated she later noticed that the child had bruises during bath time. She took pictures of the child's bruises, transported her to urgent care, and contacted the caseworker. The foster mother's adopted daughter also confirmed this incident, and the foster child told her and her mother that the biological mother had hit her with a shoe.

The foster mother also informed the investigator about another incident during which the child locked herself in the bathroom. The foster mother said that she allowed the

biological mother to come to the foster home without DFPS approval. She denied that the mother physically disciplined the child. However, the foster mother's adopted daughter told the investigator that they were both aware of the biological mother physically disciplining the child during that unapproved visit. The nine-year-old foster child told the investigator that she heard the foster mother tell her mother that "she was supposed to talk to [the child] and not whoop her after the incident."

In the RCCI investigation, DFPS Ruled Out the Physical Abuse and found a Reason to Believe for Neglectful Supervision by the foster mother. HHSC issued four citations for violating minimum standards associated with supervision, being unaware of the CPA's policies, corporal punishment, and children's rights.

A companion CPI case involving the biological mother was pending during this investigation. The CPI investigator issued a finding of RTB for Physical Abuse by the biological mother, who was on probation at the time for Child Abuse.

## Standards Investigations Summaries

Only one of three minimum standards investigations resulted in citations being issued.

On May 9, 2020, HHSC initiated an investigation after an eight-year-old child made an outcry that her previous foster mother hit her with a toilet plunger and would "take [the child] to a neighbor's home and would have that person spank [the child]."[427]

When she was interviewed, the child confirmed the incident with the toilet plunger, alleging that the foster mother hit her with it after she bit another child. She told the investigator that the foster mother also hit her on her bottom with a belt twice, and she described the neighbor as someone she called "Tia Melany" who would "pop her in the mouth." She also told the investigator about being in a closet, but the investigator did not ask follow-up questions to ascertain what happened with the closet. The child's new foster parents told the investigator that the child also told them that the foster mother had hit her with the toilet plunger.

Two children who remained in the home after the eight-year-old child was removed told the investigator that the foster mother would "pop" the eight-year-old and would take her to "Tia Melany," who "popped [her] as well." They also stated that the foster mother hit them on the knee or arm when they "ruined [their] clothes, such as when [the clothes] got unfolded while in the drawer as she would look for what to wear." They both also told the investigator about the foster mother leaving them in the car "multiple times" while she went into the store or to get food, and the car would be off and "the windows would be down a little bit." The children also informed the investigator of three other adult caregivers who babysat them and with whom the children would sometimes stay overnight.

---

[427] This is not the same child who was the alleged victim in the October 2022 DFPS investigation, despite the very similar allegations.

The foster mother denied using any type of physical discipline, including using a toilet plunger or taking the child to someone else to have them perform physical discipline on the child. She denied having other adults watch the children, but she admitted to leaving the children in the car "only twice."

HHSC issued two citations, one for violating minimum standards associated with prohibited discipline and one for supervision.

## HHSC - RCCR Closure Recommendation Summary

On February 17, 2023, HHSC leadership approved a closure recommendation for this foster home. According to documentation in CLASS, the decision was based on the foster mother "failing to follow the operation's policies on supervision and discipline… despite having received additional training from the operation." On February 24, 2023, HHSC informed Agape Manor CPA of its recommendation to close this foster home. In the notification, HHSC noted that the CPA had already closed the home. HHSC's recommendation was based on the foster home's deficiencies in minimum standards, and it concluded that these deficiencies posed an endangering situation.

CLASS shows that the CPA closed the home on February 20, 2023, and documented the reason for the relinquishment as "voluntarily closed with deficiencies." IMPACT indicates that no children have been placed in the home since October 13, 2022. During the period this home was open, IMPACT shows there were nine children placed in the home and one child adopted by the foster parent.

## Therapeutic Family Life

Arrow Family Services verified this foster home on December 20, 1995.[428] The home transferred CPAs on May 9, 1999, and was verified by A World for Children, CPA. On February 27, 2014, the home changed CPS again and was verified by Therapeutic Family Life, Arlington branch. The home closed voluntarily with deficiencies on September 18, 2023. When the home closed, the CPA had been on Heightened Monitoring since October 20,2020. The Heightened Monitoring Plan listed concerning pattern and trend areas including caregiver responsibilities – supervision, discipline, and punishment, living space and environment – interior space, medication administration, medication storage and serious incident reporting.

During the time it was open, the home was the subject of 22 investigations: 17 investigations of abuse, neglect, or exploitation and five minimum standards investigations.

---

[428] Per notation in a comment box in CLASS and in the CCR Recommendation Summary.

**On July 26, 2006**, DFPS initiated an investigation for Neglectful Supervision after the CPA administrator reported that a foster child was allowed to attend an overnight church camp and, while there, engaged in sexually inappropriate behavior.

DFPS Ruled Out the allegation of Neglectful Supervision, finding that the foster parents did not know that the child was sexually acting out. Two citations were issued related to violation of minimum standards associated with service plans, one for failing to monitor a child as detailed in the service plan and one for failing to make progress in two target behaviors. A third citation was issued for a minimum standard associated with general requirements for failing to share supervision information with the overnight camp caregivers.

**On May 10, 2007**, DFPS initiated an investigation for Neglectful Supervision after an allegation was reported that a 15-year-old foster child sexually penetrated a 13-year-old-foster child who had an intellectual or developmental disability. The intake noted that the foster father indicated that "a similar incident" had occurred between the 15-year-old and another child who was placed in the home approximately six months earlier.

The 15-year-old admitted to sexually assaulting the 13-year-old child while they were in the TV room. Two other children were present. DFPS Ruled Out the allegations of Neglectful Supervision, and no citations were issued.

**On June 26, 2007**, DFPS initiated an investigation for Neglectful Supervision after two foster children, ages 15 and 13,[429] told the foster parent that they had sex at 2 a.m. and blamed each other for the incident. The 15-year-old was taken to juvenile detention. A respite caregiver was on duty at the time of the incident. DFPS Ruled Out the allegations of Neglectful Supervision, and no citations were issued.

**On May 5, 2008**, DFPS initiated an investigation for Neglectful Supervision after a child reported that during his placement in a previous foster home, they ate outside, where pets were allowed to have access to their food, and that he was frequently "hosed down" outside instead of taking a shower. A second report was received that the child witnessed a child in the home being sexually abused by another child. The foster father said all allegations of sexual behavior had been reported previously. The foster father admitted to throwing water on one child and maybe one other. He reported he did this because the child was threatening to beat another child with a rock.

DFPS Ruled Out the allegations of Neglectful Supervision, and one citation was issued for Other Prohibited Discipline.

---

[429] The 13-year-old was the same child named as an alleged victim in the May 2007 case. The 15-year-old was the child that was allegedly involved in a "similar incident" with the 15-year-old who was alleged to have assaulted the 13-year-old in May 2007.

**On October 11, 2010**, DFPS initiated an investigation for Physical Abuse after a DFPS staff reported that a 16-year-old child with Down syndrome reported being hit with a stick and hit on the head by the foster father. The child reported that the foster father also hit a 16-year-old child with IDD who also lived in the home. The intake alleged that the 16-year-old reported that when he showered, the foster father rubbed his head hard and rubbed it harder when asked to stop. The intake also alleged that another 16-year-old in the home reported that when children were in trouble, they were required to use a portable potty outside. It was also reported that children were made to sit on a mat outside all day.

The children in the home and the foster parents denied all the allegations. DFPS Ruled Out the allegations of Physical Abuse, and no citations were issued.

**January 14, 2011**, DFPS initiated an investigation for Physical Neglect and Neglectful Supervision after a 16-year-old foster child was observed at school with "redness and swelling in one eye," and the child reported being punched in the eye by another child in the home. The child also said he was put out of the house at night while the temperature was in the 20s or 30s.

The foster father said he told the 16-year-old to go outside to cool down because the child was cursing at the foster mother and that he was only outside for five minutes. Other household member interviews supported the foster father's statement. The other child denied hitting the 16-year-old.

DFPS Ruled Out the allegations of Physical Neglect and Neglectful Supervision, and no citations were issued.

**On April 20, 2011**, DFPS initiated an investigation for Neglectful Supervision after school personnel reported that a 15-year-old foster child with IDD had a bruise on his shoulder the size of a grapefruit and was unable to lift his arm. The child reported that his brother pushed him down. The report also stated that the child appeared to be underweight.

The 15-year-old was consistent in his outcry that a 17-year-old child in the home hit him. The 17-year-old denied hitting the 15-year-old. When interviewed, one of the teachers refused to answer questions, saying he was "aware of their reputation" and that he had an opinion but would not share it because "he did not have an attorney" and "could not afford to lose his job." The foster parent denied knowing how the child received the bruise but offered some possibilities. The medical doctor confirmed the child's medical condition could cause the child to bruise easily and reported concerns over the child's weight loss but said that the child had been hospitalized and gained seven pounds in seven days.

The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On September 1, 2011**, DFPS initiated an investigation for Physical Neglect after DFPS staff reported concerns that a 15-year-old with IDD was not being fed and that he

had lost a significant amount of weight while placed in the foster home even though he was supposed to be on a high-calorie diet. Medical staff reported no medical reason for the child's weight to continue to decrease.

The allegation of Physical Neglect was Ruled Out because the inspector found that the foster parents were frequently communicating with the CPA and doctors concerning the child's weight loss.

**On July 29, 2013**, DFPS initiated an investigation for Medical Neglect after medical staff reported concerns that an eleven-year-old child in care with special needs missed doctor's appointments in March, April, and June. The foster parents admitted to not taking the child to medical appointments because the offices were too far from their home.

DFPS issued a UTD for the allegation of Medical Neglect because "the child in care had no serious repercussions from the foster parent's refusal to meet his medical appointments." HHSC issued one citation for general medical requirements because the foster parents failed to take the child for ongoing appointments and physical therapy.

**On November 8, 2013**, DFPS initiated an investigation for Physical Abuse, Physical Neglect, and Neglectful Supervision after school officials reported observing injuries on a non-verbal 10-year-old with IDD three times in the past two weeks. The injuries included a large bruise on his left arm, a bump on his right forehead about the size of a quarter, and a red handprint on his upper left arm.

The investigator observed the 10-year-old child and noted a "lump" on each side of his forehead and a bruise on his right arm that "resembled an adult handprint." The child also had a circular bruise on his left arm. During the investigation, other concerns were raised about the care of the children in the home, including not being appropriately dressed for the weather, wearing the same clothes several days in a row, using the restroom outside, dressing in the garage, and a child sexually acting out at school. The foster father blamed the school staff for the child's bruise and said that the two lumps on the child's head were part of his disability. The foster mother denied the allegations and said she was not aware of the lumps on the child's head. The foster parents denied the children dressed in the garage but did say the children sometimes urinated outside.

The allegations of Physical Abuse and Neglectful Supervision were Ruled Out. The allegation of Physical Neglect was disposed of as UTD because the two non-verbal children were "unable to convey the necessary information to determine their treatment."

HHSC issued eight citations for violation of minimum standards related to:

- Service Plan Implementation: A child who was not supposed to be alone with other children was determined to be sharing a bedroom.
- Background checks: failing to complete background checks for frequent visitors.

- Bathrooms: Children used a portable toilet chair outside.
- Medication destruction: The home continued to store the medication of a former child resident.
- Administration of medication: Surplus indicated children were not receiving medication as prescribed.
- Serious incident reporting: The foster parents failed to report that a child sexually acted out with another child.
- Children's rights: the investigator found the children dressed in the garage within public view; and
- Children's rights: The investigator found that the children wore the same clothing for over a week on more than one occasion.

**On March 7, 2014**, DFPS initiated an investigation for Physical Abuse after school personnel reported that a nonverbal 10-year-old child in care with IDD was observed with a three-inch-long bruise on his upper arm.

The foster parents denied the allegations and stated the bruises were happening at school, and they had addressed the bruises with the school principal. Neither the CVS caseworkers nor the CPA Program manager expressed concerns regarding the foster parents. DFPS Ruled Out the allegation of Physical Abuse, and no citations were issued.

**On July 3, 2015**, DFPS initiated an investigation for Physical Abuse after medical staff reported noticing a strap mark and possibly friction burns on the ankles of a nonverbal 14-year-old child in care. Some areas looked like second and third-degree burns due to blistering and "because skin came off."

The foster father reported using a prescribed bathing chair when the 14-year-old had a severe case of diarrhea. He reported that the chair had straps, and after using it, he noticed the child had welts and blisters on the child's leg. The foster father said he believed the child picked at the blisters, making it worse. The child's medical doctor said the injuries were consistent with the straps on the chair, and he had no concerns about physical abuse. DFPS Ruled Out the allegation of Physical Abuse, and no citations were issued.

**On January 25, 2017**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after an intake on May 18, 2016, alleged that a 10-year-old child was observed to have bruising and a black eye. This intake noted that the child had bipolar disorder and had a history of hitting himself on the face and head. The reporter believed the injury was caused by the child hitting himself. A second report made on January 25, 2017, was linked to this report and alleged that a different foster child with autism who was non-verbal and had a seizure disorder was observed to have a knot over his right eyebrow, mild bruising on his face, and a wound on his lip.

The foster parents denied using any physical discipline in the home and reported that the children were always supervised. The physician for the child with the seizure disorder reported that the child's busted lip and facial bruising were consistent with

seizures and expressed no concerns with the child's care. DFPS Ruled Out the allegations of Physical Abuse and Neglectful Supervision, and no citations were issued.

**On April 25, 2017**, DFPS initiated an investigation for Physical Abuse after medical staff reported that a nonverbal 16-year-old was seen in the emergency room with two black eyes and "bruises all over him." There were concerns that the bruises may not be self-inflicted; one of the physicians said the bruises "seem to be unusual for a self-injury."

School personnel made two additional reports related to the same child. On May 22, 2017, a reporter alleged the child was observed with a ring around his neck that looked like either abrasions or bruises. The second report stated that the child had welts on both his upper thighs.

DFPS Ruled out the allegation of Physical Abuse, finding the child was self-injurious, and there was no evidence to support the allegations.

**On November 21, 2018**, DFPS initiated an investigation for Physical Neglect after medical staff reported concerns that a nonverbal 16-year-old child in care was not being fed appropriately and was losing weight.

The foster parents denied the allegations and reported that the child's doctor took the child off his protein drink for about five months, and this was when his weight decreased. When the drink was added back to the child's diet, he began to gain weight again. DFPS Ruled Out the allegation of Physical Neglect, and no citations were issued.

**On July 17, 2023,** DFPS initiated an investigation for Physical Abuse, Medical Neglect, and Neglectful Supervision after school personnel reported that when a 10-year-old child in care with autism arrived at school, he said he was attacked and bitten by dogs in the home over the weekend. The child was observed to have "bruises and bites all over his body." The 10-year-old's left arm had bruises from his elbow to his shoulder, an open wound under his left arm pit, and bite marks and bruises on his back. A second report made the same day included that the 10-year-old child had bruising on both legs, wounds on his back, wounds on his upper left arm, and a scratch on his temple. The child reported that the dog jumped on him when he and the foster father were "watering the dog."

The 10-year-old confirmed being attacked by dogs in the home. The investigator observed that the child had bruises all over his body and wounds. The child reported "fighting for his life as dogs were dragging him away." The foster father reported he was outside with the child and was giving the dogs fresh water; the child was around the corner of the house, and when he went to check on the 10-year-old, the child was playing with the dogs, and the foster father told him to stop. The foster father went back around the corner and then heard the child scream and found the child on the ground with the dogs circling him. The foster father denied that the dogs bit the 10-year-old. The foster father did not seek medical attention or report the incident.

When contacted about the investigation, a different foster child's CVS worker reported that when she visited the home, the child was always restrained in a car seat or a chair. She said she was concerned and planned to conduct unannounced visits to check on the child.

An FACN consult was conducted by a medical doctor who reviewed photographs of the child's injuries. The doctor noted that the child was reported to have a wound in his armpit, but a photograph of that wound was not included in the photos he reviewed. She concluded that the injuries in the photos provided for the review were not from aggressive dog bites but were "more consistent with overly playful puppies that nipped and knocked the child down." The doctor also concluded the injuries were "nonspecific for abuse."

The allegations of Physical Abuse and Medical Neglect were Ruled Out, and an RTB was issued for Neglectful Supervision. HHSC issued four citations for serious incident reporting, protective devices, supervision, and children's rights.

**On August 26, 2023**, DFPS initiated an investigation for Neglectful Supervision after a DFPS staff reported that a ten-year-old child in care made an outcry that while he was placed in his previous foster home, a lot of inappropriate things happened and that he was hit with an open hand on his legs.

The 10-year-old said he did not like living in the home because "I was scared of them for always being mean to me." The child said the foster mother "pulled his hair and put me in the bathroom on the toilet with the door open because I poop on myself a lot." The child reported being grabbed by the shirt and pushed to the ground by the foster father. The child denied being inappropriately supervised. The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

## Standards Investigations Summaries

Over seventeen years, the home had five minimum standards investigations, with three resulting in nine citations, in addition to the seventeen citations issued as the result of ANE investigations. The citations that resulted from the minimum standards investigation were associated with violations related to service plans, the home verification missing required information, a background check not completed for a frequent visitor, other prohibited discipline for yelling and ridiculing children and using profanity in the home, corporal punishment for children being thrown to the floor and spanked, and general medical requirements for missing follow up appointments.

## Sampling Concern

During a sampling inspection on December 27, 2007, a concern was identified for medication storage because the medication was improperly secured.

## HHSC - RCCR Closure Recommendation Summary

On September 21, 2023, HHSC approved a closure recommendation. According to CLASS, the approval was based on the home's "history of investigation and citations, including discipline and supervision concern" and a recent "RTB after a child with ASD was attached [sic] by large dogs and sustained multiple injuries as a result." Before the approval, the CPA had already closed the home. A letter dated September 22, 2023, from HHSC to Therapeutic Family Life provides notice of HHSC closure recommendation. The letter lists 22 deficiencies and a sampling concern.

IMPACT reflects that no children have been placed in the home since September 7, 2023. IMPACT shows 34 placements of a child in the home during the time that it was open.

## Pathways Youth and Family Services Inc

Pathways Youth and Family Services, Inc. CPA (Pathways) Abilene branch verified this home on November 24, 2021. The CPA closed the home on September 6, 2023, and documented the relinquishment reason in CLASS as "CCR Recommended Closure." After Pathways closed the home in response to RCCR's recommendation for closure, the home was verified by New Horizons CPA as an adoptive home on June 12, 2024.[430]

While open, the home was the subject of four investigations: two DFPS investigations for abuse, neglect, or exploitation, and two were minimum standards investigations by HHSC.

## ANE Investigations Summaries

**On April 6, 2023**, DFPS initiated an investigation for Neglectful Supervision after the CPA reported that the foster mother found videos and pictures on her paramour's phone of a 14-year-old foster child sleeping in her underwear. In a second related intake reported to SWI on May 25, 2023, the reporter alleged that the 14-year-old's sibling, who was 11 years old at the time of the intake, told her therapist that the foster mother's boyfriend "would make her feel uncomfortable and touch[ed] her butt and thighs."

---

[430] IMPACT indicates four siblings (the foster parent's nephews and nieces) were placed in the home on June 18, 2024, and immediately adopted by the foster parent. The last Child Plan of Service for one of the children notes, "New Horizons is willing to license [foster parent] as an adopt only home and have the adoptive placement completed the same day as the adoption hearing. [Foster parent] has been working on the licensing process with New Horizons to adopt [child] and her siblings."

These four children appear to have been the only children placed in the home after it was first verified. The IMPACT Resource Page for the foster home shows the children were removed from the home when it was closed on September 6, 2023. A second Resource Page was created when New Horizons licensed the home as an adoptive home, and it shows the children were placed in the home on June 18, 2024. However, the children's IMPACT records show that the children remained in the home after it was closed by Pathways; their placement lists show that the placement was re-entered as an unlicensed kinship placement.

The foster mother told the investigator that she found videos on her fiancé's phone of her 14-year-old and 11-year-old foster children asleep in their underwear. She also said that after she reported the videos, the girls told her about the fiancé touching them on their thighs in the car and slapping them on their bottoms. The 14-year-old and 11-year-old children told the investigator they were unaware of any inappropriate pictures or videos being taken of them, and they confirmed that the fiancé made them feel uncomfortable by touching their thighs and bottoms. The investigation revealed that the foster father "was using these videos for self-gratification by masturbating while watching the videos." The investigator noted that the foster mother and children moved out of the house, which belonged to her fiancé, the same morning the foster mother found the videos.

The police conducted a parallel criminal investigation and charged the fiancé with Invasive Visual Recording, a state jail felony. The foster mother informed the investigator that the police found methamphetamine and paraphernalia in a closet while conducting a search warrant in the fiancé's home. She denied any ownership or knowledge of the illicit items.

The investigator documented that the CPA did not accurately identify the fiancé's role when requesting his background check from HHSC's Centralized Background Check Unit (CBCU). The home study listed the fiancé as a household member and included his income. However, the CBCU representative told the investigator that the background check request "stated he was a Frequent/Regular Visitor." The CBCU representative also stated that a household member background check should have been run.

The investigator substantiated the allegations against the fiancé for Neglectful Supervision and Sexual Abuse with a disposition of RTB and Ruled Out the allegation of Neglectful Supervision against the foster mother. HHSC issued four citations for prudent judgment, sleeping arrangements for the children sleeping with the foster mother, prohibited discipline for the fiancé yelling at the foster children, and children's rights.

**On June 13, 2023**, DFPS initiated an investigation for Physical Abuse after an 11-year-old child reported that her foster mother slapped her.

The 11-year-old child told the investigator that the foster mother (the child's aunt) slapped her before she became licensed. The child reported to the investigator that the foster mother would yell at her and the other children and use "foul language around all the kids." The three other children in the home initially denied that the foster mother used physical discipline. After a second interview, two of the children said the foster parent spanked them. Two children also reported being left home without supervision during spring break. The foster mother denied using physical discipline, slapping the 11-year-old, or hitting any children in the face. She admitted to spanking the children before becoming a licensed foster parent. She said that at the time, she was unaware that physical discipline was not allowed and stated she is aware corporal punishment is prohibited.

The investigator Ruled Out the allegation of Physical Abuse, and HHSC issued a citation for supervision for leaving children in the home unsupervised.

## Standards Investigations Summaries

One of the two standards investigations in this home resulted in a deficiency being issued. HHSC initiated an investigation on March 18, 2023, after a CPA staff member reported that a foster child said that the foster parents spanked her two siblings, ages seven and nine. The intake also stated that the two younger children confirmed this allegation. All four children in the home told the investigator that the foster parents yelled at them and would "pat" them, not spank them. The foster mother denied the allegations. HHSC issued one citation for corporal punishment.

The second standards investigation was initiated June 15, 2023, when the younger of the two alleged victims from the ANE investigation that resulted in an RTB for the foster parent's fiancé became upset and expressed suicidal ideation after witnessing the foster parent show the child's mother and another aunt "boudoir photos" of the foster parent. The child reported she became upset because she felt the photos were inappropriate, and because her foster parent yelled at her for being upset. Though the investigation did not result in any citations, the inspection of the home associated with the investigation resulted in three deficiencies. The home was cited for prohibited discipline, because the investigator witnessed the foster parent yelling at the children and three of the children confirmed that the foster parent yelled at them. A citation was issued for physical environment because chemicals were stored under the sinks in the kitchen and restroom, and a citation was issued for medication storage because over the counter medication was found in an unlocked kitchen cabinet during the inspection.

## Sampling Concern

On May 24, 2022, a sampling inspection was conducted at the foster home. During the inspection, the Inspector identified two concerns for supervision. The Inspector noted that a child's required five-minute visual/auditory checks were missed after the foster mother stated being out of the house for 15 to 20 minutes and for allowing a child under 16 to babysit for a short period of time.

## HHSC - RCCR Closure Recommendation Summary

HHSC's closure recommendation was based on the home citation history, specifically in the areas of supervision and discipline and the failure of several safety plans that had been put in place to support the family. HHSC leadership approved the recommendation on August 31, 2023. The same day, HHSC provided notice to Pathways notifying the CPA of the closure recommendation. The letter indicated that the decision to recommend closure was based on the deficiency citations and the sampling inspections of the foster home, which identified safety concerns.

IMPACT indicates that no children have been placed in the home since September 6, 2023. During the period this home was open, IMPACT shows there were four children placed in the home.

## HHSC Closure Recommendation and DFPS Disallowance

### Lutheran Social Services of the South, Inc.

DFPS Region 11 verified this foster home on August 3, 2007.[431] On March 27, 2010, the home changed CPAs and was verified by the McAllen branch of Lutheran Social Services of the South, Inc. The CPA relinquished the home's verification on September 29, 2023, due to "CCR Recommended Closure."

At the time of closure, this CPA was on Heightened Monitoring. The CPA was placed on Heightened Monitoring beginning November 2, 2020, with a Plan start date of December 8, 2020. Concerning trend and pattern areas identified included background checks, supervision, discipline and punishment, home oversight, foster home screenings, foster home verifications, leadership responsibilities, personnel, record keeping, living space and physical environment, medical care, initial service plans, and services. The CPA has not yet moved off Heightened Monitoring.

While open, the home was the subject of 24 investigations: nine DFPS investigations for ANE and 15 minimum standards investigations by DFPS and, later, by HHSC.

### ANE Investigations Summaries

Of ANE investigations, five alleged Neglectful Supervision, three alleged Physical Abuse, two alleged Sexual Abuse, two alleged Emotional Abuse, and two alleged Medical Neglect. All allegations were Ruled Out. Three of these ANE investigations resulted in at least one minimum standards violation. The two investigations that alleged Sexual Abuse both involved the same four-year-old child; one of these investigations also included an allegation of Physical Abuse. The other seven ANE investigations involved different victims ranging in age from three months to 18 years.

**On February 27, 2009**, DFPS initiated an investigation for Neglectful Supervision, Emotional Abuse, and Medical Neglect of five foster children after a seven-year-old made an outcry to a school employee that her 11-year-old sibling touched her inappropriately, kissed her, and hit her. The report stated that when discussing the incident at the school, the employee witnessed the foster mother yell at the seven-year-old, call her a liar, and pull her pants and underwear down. The report also alleged that the foster mother refused to pick up the seven-year-old from school when she was sick and that the seven-year-old had had a visible red rash on her arm "for a long time."

---

[431] A note in CLASS indicates this foster home was with Spaulding for Children from 2006 to 2007.

The seven-year-old confirmed the allegations. The school principal and teacher confirmed witnessing the foster mother take off the seven-year-old's pants and underwear to show she did not have any bruises. The school nurse and another teacher confirmed that the foster mother requested "not to be called when the children are sick" and that she "will not pick them up when they are not feeling well."

The 11-year-old denied that he attempted to kiss or touch his seven-year-old sister and said he hit the other children in the past. A four-year-old child in care confirmed that the 11-year-old "will hit him and has tripped him before." A nine-year-old child in care confirmed that the 11-year-old "accidentally brushed up against" the seven-year-old. She denied that the 11-year-old touched her inappropriately.

The foster mother denied the allegations. She confirmed "she did not believe" the seven-year-old regarding the outcry. DFPS documentation confirmed that the foster mother previously discussed the incident and said she took off the seven-year-old's shirt and jeans "to show she did not have bruises."

During an unannounced home inspection, the foster father told the investigator that the children, including a three-month-old baby, were at a court visit with his wife. However, the investigator observed the three-month-old asleep in her crib, and the foster father stated that "he did not know the baby was there" and that he had been asleep in his room. There was a baby monitor in the child's room and in the bedroom where the foster father had been sleeping. The foster father also told the investigator that "he [had] trouble seeing and could not see much at that time."

The allegations of Neglectful Supervision, Emotional Abuse, and Medical Neglect were Ruled Out. Six minimum standards violations were issued for children's rights, supervision, background checks, employee general responsibilities, and infant requirements.

**On November 3, 2011**, DFPS initiated an investigation for Sexual Abuse of a four-year-old foster child after he made an outcry to his peers that "his father" had touched him on his penis "and that it hurt him." A school bus driver overheard the outcry and asked the four-year-old to clarify if he was referring to his biological or foster father. The report stated that the four-year-old pointed to the foster father's house in response.

The four-year-old child refused to be interviewed. The reporter denied that the four-year-old made a direct outcry of sexual abuse to her. She confirmed that another student reported the information to her. The foster parents denied the allegation of Sexual Abuse. The allegation of Sexual Abuse was Ruled Out. One minimum standards violation was issued for the physical environment because the garage converted to a bedroom for the children had no natural light.

**On December 31, 2013**, DFPS initiated an investigation for Physical Abuse of a seven-year-old foster child after she made an outcry during a supervised visit that the foster mother "has been pinching her a long time." The report also stated that the seven-year-old was afraid to return to the foster home and that she had bruises on her hands.

When she was interviewed, the seven-year-old child denied the allegation of Physical Abuse. The investigator did not observe any "visible external injuries" on the seven-year-old. Two collateral children denied that the foster mother used corporal punishment for discipline. The victim and two collateral children all reported that the foster mother yelled or screamed at them when they were misbehaving.

While reviewing documentation, the investigator discovered the seven-year-old child had made an earlier outcry of corporal punishment in the home, and this was not reported to SWI by the foster parent or the CPA.

The foster mother denied that she had used physical discipline on the children or yelled at the children. She reported receiving technical assistance "to be mindful of how loud her voice is as it may affect the foster children." She also confirmed she reported the earlier outcry of corporal punishment made by the seven-year-old.

The allegation of Physical Abuse was Ruled Out. Two minimum standards violations were issued for serious incident reporting and other prohibited discipline - yelling.

**On July 28, 2023**, DFPS initiated an investigation for Medical Neglect of a 12-year-old foster child after a doctor diagnosed him with tuberculosis and the foster mother did not take him to two follow-up appointments with an infectious disease specialist.

The 12-year-old child confirmed "that he did test positive for Tuberculosis [sic] via skin test." He also reported that his lab results and chest X-rays have been negative for the disease and denied feeling sick. He confirmed that the doctor told his foster mother to "take him to the specialist" and that his appointment was scheduled for July 31, 2023. The foster mother denied the allegation and reported that "she was not aware of his appointment and rescheduled it."

The allegation of Medical Neglect was Ruled Out. One minimum standards violation was issued for medical care. Three additional citations were issued related to the inspection of the foster home: interference with an investigation -because the foster parent refused to provide medical records for a child, refused to allow the investigator access to a bedroom in the home, and did not allow the investigator to view the dogs in the home; animals – foster parent refused to provide animal vaccines to the investigator, refused to report on the number of pets in the home and did not allow the investigator to view the pets; and physical environment – home furnishing were observed by the investigator to be ripped, and a strong odor of animals was present.

Standards Investigations Summaries

The foster home was also the subject of 15 minimum standards investigations; 12 of these investigations resulted in no minimum standards citations being issued to the foster home.

- On March 28, 2008, HHSC initiated an investigation after SWI received a report that during a home visit, DFPS staff observed a two-year-old child in care "with three deep fingernail scratches" on her face, which were between two and three inches long. The report stated that the foster mother told the staff person that during an outing, the two-year-old fought with another child who scratched her.

  The foster mother confirmed that the two-year-old victim had a physical altercation "with an older unknown child in the play area" while they were at a restaurant. She confirmed that the two children entered the "play/gym slide," and the two-year-old exited "and showed her the scratches on her face."

  During the home inspection, the inspector observed a cordless power drill on the garage floor where the children were playing. The inspector also observed chemical substances in the garage accessible to children.

  HHSC issued two citations for dangerous tools and physical environment.

- On March 27, 2014, HHSC initiated an investigation after SWI received a report that an eight-year-old and an 11-year-old voiced concerns that the foster mother's dog had bitten their three-year-old sibling. The children also alleged that the foster mother made them do chores such as cleaning up dog feces inside the home. The report also stated that the foster mother provided her biological children with ice cream and refused to give any to the foster children.

  The inspector did not observe "teeth marks or broken skin" on the children whom the foster mother's dog allegedly bit. All seven children in the home provided conflicting information about whether the foster mother's dogs had bitten the two children.

  The foster mother denied all allegations except that "she taught" the eight-year-old and 11-year-old to "clean the bathroom and wash the dishes as they were eager to learn, and both took turns cleaning."

  The eight-year-old and 11-year-old confirmed that on one occasion, the foster mother provided her biological family with ice cream and refused to give any to the foster children "because they had already received their snack."

  HHSC issued one citation for caregiver responsibilities.

- On August 30, 2023, HHSC initiated an investigation after SWI received a report that four foster children cleaned dog kennels for the foster mother, who bred dogs. The report stated that the children who cleaned the dog kennels were 12 years old, 13 years old, 17 years old, and 18 years old. The report added that the 17-year-old child did not have time to shower and fell asleep at school due to waking up early to clean the dog kennels. The report also stated that the 18-year-old said he received payment for cleaning the kennels. The report included additional concerns about a 15-year-old

foster child disclosing that his back hurt from sleeping on a worn-out mattress and overall issues with home maintenance and cleanliness.

During the investigation, the inspector observed stains throughout the home, broken floor tiles, and an odor from pet urine. The inspector also noted that the "foster mom's biological daughter denied access to her room."

Three of the foster children confirmed that they used to help the foster mother care for the dogs. The 18-year-old reported that the foster mother threatened to "turn off the Wi-Fi" if they did not help with the dogs, but she said she does not allow them to help. All six foster children denied having concerns related to fair treatment in the home.

Only one of six foster children confirmed that there were roaches inside the home. Heightened Monitoring documentation confirmed that roaches had been observed inside the home. The inspector also observed a picture of a roach inside the home.

HHSC issued two citations for physical environment and leadership responsibilities.

## Sampling Concerns

Five sampling inspections were also conducted from 2012 to 2021. Three of the inspections resulted in sampling concerns. On July 23, 2012, the inspector noted that the foster parent had not received service plans for children placed in the home. On May 28, 2016, the inspector noted that the home verification did not specify the treatment services provided by the foster parents. On April 14, 2017, the inspector noted that multiple smoke detectors in the home needed replacement batteries.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

On September 18, 2023, a closure recommendation was submitted to HHSC leadership. HHSC leadership approved the closure recommendation on September 21, 2023, based on the "Lengthy history of investigations, with several citations, with four recently issued in July due to poor physical condition of the home." The closure recommendation also cited concerns about "not following through on medical recommendations and lack of cooperation by both the Foster Parent and the CPA."

In a letter dated September 21, 2023, HHSC notified Lutheran Social Services of the South, Inc. that this home was recommended for closure. The letter listed the five deficiencies, and three sampling concerns received by the home. The letter stated that the "recommendation was based on a high-risk deficiency or a pattern of allegations, deficiencies, and/or sampling concerns that create an endangering situation." The letter also acknowledged the discussion with the CPA over the home's closure, noting that children were residing in the home, there was no respite available, and risk had been mitigated because the physical environment concerns had been addressed. Notes in CLASS indicate that HHSC received notice from the CPA on September 25, 2023, that

the home would be closed on October 2, 2023, and that they were "waiting for the last child to be moved from the home."

DFPS placed this home on its October 20, 2023, Disallowance List with an approval date by the DFPS Legal Department of October 26, 2023. In a letter dated October 20, 2023, DFPS notified Lutheran Social Services of the South, Inc. that this home was disallowed for future placements of children in care. The letter cited the foster home's minimum standards violations and that HHSC had "recommended home closure due to serious safety concerns."

IMPACT reflects that no children have been placed in this home since September 29, 2023, the same day as the home's closure. During the period this home was open, IMPACT shows there were 160 placements of a child in the home.

## Beacon of Hope

The Brownsville branch of the Beacon of Hope CPA (Beacon) verified this foster home on October 18, 2021, and relinquished verification voluntarily without deficiencies on June 21, 2022. On August 31, 2022, the home was verified with Bair Foundation-Harlingen CPA. Less than a year later, on June 21, 2023, the home involuntarily closed due to deficiencies.

Even though the home was on the DFPS Disallowance List and was previously closed due to an agency home closure recommendation by HHSC, Beacon verified it again on November 1, 2023. Four months later, on March 5, 2024, Beacon relinquished verification due to a second HHSC closure recommendation.

When the CPAs verified the home, Beacon and Bair Foundation were each on Heightened Monitoring. Beacon remains on Heightened Monitoring. Beacon's Heightened Monitoring concerning pattern and trend areas include caregiver supervision, child rights, discipline and punishment, home oversight, foster home screening and verifications, leadership responsibilities—record keeping and personnel—medication administration and storage, required training, and service plans.

While the home was open, it was the subject of seven investigations: three DFPS investigations for abuse, neglect, or exploitation and four standards investigations by HHSC.

## ANE investigations Summaries

**On November 5, 2021**, DFPS initiated an investigation for Neglectful Supervision following two incidents that occurred the same evening. The first involved a six-year-old foster child and her eight-year-old sibling racing up the stairs. The intake alleged that the 8-year-old pushed the 6-year-old, causing her to fall and fracture her leg. While the foster mother was at the hospital with the six-year-old, three remaining children were

under the supervision of the foster mother's roommate. During this time, the eight-year-old reportedly pushed the one-year-old child off the bed, resulting in a small bump on the child's forehead.

With regard to the initial incident, the six-year-old child initially stated she slipped and fell while running up the stairs in her socks and denied being pushed. The eight-year-old also denied pushing her sister, saying the six-year-old slipped while attempting to tackle her.

As to the second incident that occurred while the foster mother was at the hospital, according to the eight-year-old, she was in the room with her two siblings, ages one and two.. The two younger siblings were on the bed play-fighting, and when she told them to stop, the two-year-old shoved the one-year-old off the bed. The eight-year-old asserted that she knocked on the live-in babysitter's locked bedroom door because the one-year-old was crying, but the babysitter did not respond. Subsequently, the one-year-old fell asleep; she told the foster mother what happened when she returned from the hospital. The eight-year-old denied harming her siblings.

The two-year-old sibling said that the eight-year-old pushed the six-year-old and the one-year-old. The live-in babysitter denied being in her room when the one-year-old fell. She said she was present, and the eight-year-old was responsible for pushing the one-year-old off the bed.

The foster mother reported that the eight-year-old pushed the six-year-old. The investigator determined that the six-year-old did not suffer a fracture during the fall, as was alleged in the intake.

The allegations of Negligent Supervision by the foster mother and the babysitter were Ruled Out, and no citations were issued.

**On November 27, 2021**, DFPS initiated an investigation for Physical Abuse after medical personnel reported that an eight-year-old foster child disclosed that her former foster mother hit her on her arm, and she "had to block her hand from hitting her siblings." It was reported that the child is concerned about her younger siblings (one, two and six years old), who are still in the foster home.

The eight-year-old reported that she would "take hits" by the foster mother when the foster mother would try to hit the other younger children. The child reported receiving bruises. The child said she often cared for the one-year-old at nighttime because the foster parent would not care for the child. The report stated that the foster mother left the children home alone on multiple occasions.

A six-year-old child denied any physical discipline or abuse occurred in the home. The investigator observed no marks or bruises on the children in the home. The foster parent denied the allegations, and collateral contacts raised no concerns.

The allegations of Physical Abuse were Ruled Out, and no citations were issued.

**On January 26, 2023**, DFPS initiated an investigation for Physical Abuse when it was noticed that a four-year-old child in care had a bruise and scrape on his back. The child said, "Grandma pushed me because I was being bad."

During the interview, the investigator observed multiple scrapes on the child, the first on his right arm measuring 2 centimeters, a scratch on his left arm measuring approximately 4 centimeters, and a healing scrape measuring approximately 2.5 centimeters on his lower back. The child confirmed that he referred to the foster mother as grandma. The child reported that the scrape on his right arm was from slipping at his grandma's house while it was raining, but he said he fell at school. He said the scratch on his left arm was from the cat, but when asked the cat's name, he said they didn't have a cat. When asked about the scratch on his back, he said he "fell from the stairs," but his explanation was unclear, saying his grandma got in his way and he fell, and then he said she pushed him.

The foster mother denied pushing the child; she reported that the child was running down the slippery wooden step in a sock, and he slipped and fell. She stated that the child was three steps in front of her, and there was no way she could have pushed him. The allegation of Physical Abuse was Ruled Out, and two citations were issued, both for the physical environment, one because chemicals were not properly stored and the other due to unsanitary items being viewed on the floor of the restroom.

## Standards Investigations Summaries

This foster home was investigated four times for minimum standards violations. Three investigations resulted in the foster home being issued five citations for violations of minimum standards. Two of the investigations resulted in citations associated with beds and bedding for allowing the four children in care to sleep in the same bed, background check results because the foster mother's boyfriend was allowed to provide direct care to a child without a cleared FBI background check, and because when acting as a respite provider, a full history of the child was not obtained and adequate care for the child while under her care was not provided.

The final two citations resulted from an investigation initiated on May 10, 2023, after the foster parent's arrest for shoplifting. These citations included one for employee and caregiver responsibilities because the foster parent failed to plan for the child after being arrested and one for supervision after it was found that the foster parent's boyfriend was ineligible to be in the home and had regular access to the child in care.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

HHSC approved a closure recommendation on June 22, 2023. The closure recommendation found in CLASS states that the approval decision was based on the foster parent's arrest, failure to notify the CPA that she was unable to pick up a child because she was incarcerated, and multiple background check citations. CLASS

indicates that notification of the recommended closure was provided to The Bair Foundation on July 6, 2023.

On July 6, 2023, DFPS issued a letter to The Bair Foundation advising the CPA that this home was disallowed for future placements of children in care. The letter cites violations of minimum standards, and her practice related to prudent judgment and supervision. The letter states, "There is a serious safety concern for any children placed" in the home. DFPS placed the home on the August 1, 2023, Disallowance List with an approval date by the DFPS Legal Department of July 31. 2023.

After the home was re-verified by Beacon of Hope on November 1, 2023, CLASS shows that HHSC Leadership approved a second recommendation for closure. Documentation in CLASS indicates that the Beacon of Hope CPA was aware of the previous agency home closure recommendation. On March 4, 2024, HHSC issued a letter to Beacon of Hope informing the CPA of the second recommended closure decision. IMPACT reflects that no children have been placed in the home since May 30, 2023. CLASS notes that the home was closed on March 5, 2024, with a relinquishment reason of "CCR Recommended Closure." While this home was open, IMPACT shows there were nine foster children placed in the home.

## Texas Dept of FPS Region 5

DFPS Region 5 CPA verified this home on March 25, 2003. The home was inactive on February 27, 2023.

During the twenty years this home was verified, it was the subject of ten investigations: four DFPS investigations for allegations of abuse, neglect, or exploitation and six minimum standards investigations.

## ANE Investigations Summaries

**On February 14, 2007**, DFPS initiated an investigation for Neglectful Supervision after an RTC staff reported that a 16-year-old foster child made an outcry that, while placed in her former foster home, a 14-year-old foster child would "sneak into her bedroom and touch her." She also reported that the foster parent did not act after she informed the foster parent of the issues.

The 16-year-old child confirmed the allegations, adding that the touching only happened while she slept. She stated that she told the foster mother about the incident, who then "talked" to the 14-year-old.

The 14-year-old denied touching anyone in the home inappropriately. The foster mother denied the allegations, adding that the 16-year-old informed her of one incident when the 14-year-old accidentally touched her bottom while the children played.

The investigator Ruled Out the allegation of Neglectful Supervision, and HHSC provided technical assistance due to the foster mother allowing two opposite-sex siblings to sleep in the same room.

**On April 8, 2021**, DFPS initiated an investigation for Neglectful Supervision after a 16-year-old foster child (Child A) called SWI and reported he wanted to be moved because his roommate, another 16-year-old foster child (Child B), ejaculated on his clothes. He could not sleep because he did not know what his roommate would do while he slept. The intake also stated that he and his roommate fought about four months prior to the report after the other child pushed him.

When he was interviewed, Child A told the investigator he did not see Child B ejaculate on his clothing. Child A said that the day before the interview, Child B and the 19-year-old adopted son of the foster mother "beat him." Child B stated that Child A was cursing at and being aggressive with another adopted child in the home. Child B and the 19-year-old told the investigator that Child A became upset after being told to clean his room by another child, and they both intervened. The foster mother added that she went upstairs after the fight began and called law enforcement.

Child B denied ejaculating on Child A's clothing, and all collateral children and the foster mother denied that it occurred.

The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On May 11, 2022**, DFPS initiated an investigation for Physical Neglect after a DFPS caseworker reported that the foster home was filthy, with trash overflowing, training pads with dog urine and feces, and roaches. The intake also stated that a 15-year-old foster child had diarrhea for days due to the foster parent cooking "a lot of fried foods."

When she was interviewed, the 15-year-old child was no longer placed in the home, but she repeated the allegations of the home's lack of cleanliness and eating fried foods for days. She also added that there were no clean towels after a bath. The children who remained in the home and the foster mother denied the home being dirty or training pads being left with animal waste for extended periods. During the home inspection, the investigator observed no immediate risks or hazards. The investigator ruled out the allegation of Physical Neglect, and HHSC issued no citations.

**On February 21, 2023**, DFPS initiated an investigation for Physical Abuse after a DFPS caseworker reported that the foster mother pulled a gun on a 16-year-old child in care.

The foster mother admitted to having the handgun in her vehicle. She reported that there was one incident that occurred when a business owner (located behind her home) told her that a boy who knew the 16-year-old female foster child was in her backyard. The foster mother said she got her gun out of her vehicle, called the 16-year-old child into her room, and told the 16-year-old that "the boy coming around will get himself

killed." The foster mother admitted to having the loaded gun in the holster and her hand while she was talking to the 16-year-old child, but she denied pointing the gun at her or any of the other children.

Two other foster children denied seeing the foster mother point the gun at the 16-year-old child or anyone in the home. The 16-year-old child explained that, after being called into the bedroom, the foster mother yelled and waved the gun case with the gun inside it at first, and then the foster mother took the gun out of the case and pointed it directly at her. The 16-year-old child reported that the foster mother told her that she was not afraid of shooting anyone who came into her house and that the 16-year-old child was going to get someone killed.

The investigator Ruled Out the allegation of Physical Abuse. The investigator documented that because the foster mother did not point the gun at the children, "[t]here was no substantial harm or threat of harm to the child." HHSC issued two citations: one for the foster mother not reporting the gun to the CPA and one for prohibited discipline for the foster mother yelling at the children.

## Standards Investigations Summaries

The foster home was also the subject of six minimum standards investigations from January 2009 through November 2022 involving issues related to supervision, serious incident reporting, children receiving medical care, medication storage, and medication administration. During this time, HHSC issued three citations for serious incident reporting related to three incidents in which Licensing was not notified of children needing emergency medical care. HHSC also issued one citation for medication being stored improperly, resulting in a child accessing the medication to attempt suicide, and one citation for medication administration related to the foster mother failing to provide a child with her ADHD medication as directed.

## Sampling Concerns

The home was also the subject of five sampling inspections, four of which documented concerns:

- On July 24, 2007, HHSC conducted a sampling inspection concerning missing medication logs for children and improper medication storage.
- On October 13, 2009, HHSC conducted a sampling inspection with concerns related to the foster mother having an unvaccinated pet in the home, an infant being fed while lying in a bassinet, the infant not having a crib, the foster mother purchasing a baby walker for an infant, and not reporting a foster child's arrest in May 2009.
- On February 6, 2012, HHSC conducted a sampling inspection with concerns about the home's cleanliness and upkeep. The Inspector documented mouse droppings under the sink in the upstairs bathroom, feces in the garbage can in the upstairs bathroom, the ceiling drooping where there appeared to be recent water damage,

and large areas around the window units in children's bedrooms that allowed outside air into the bedroom.

- On February 16, 2016, HHSC conducted a sampling inspection with concerns related to missing documentation of tuberculosis shots for children in care, the home not having a recent fire inspection, foster children walking through the bedroom of the caregiver's biological son to access their bedroom, nails and wood shavings exposed on the paneling in a child's bedroom, and an exposed telephone port outlet in the upstairs floor hallway wall.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

HHSC's closure recommendation cited the seven standards citations and the foster mother having "a loaded weapon in the home and brandish[ing] it in front of the children," her failure to report the presence of a weapon in the home, and patterns of allegations including failing to report "serious incidents, medication, physical environment, and neglectful supervision." CLASS documents that HHSC leadership approved the recommendation for closure on July 27, 2023, and notice of HHSC's recommendation was provided to the CPA on August 9, 2023.

DFPS placed this home on its September 28, 2023, Disallowance List. The date of approval by the DFPS Legal Department is documented as September 5, 2023. In a letter dated August 31, 2023, DFPS notified DFPS Region 6 that this home was disallowed for future placements of children in care.

CLASS shows that the home was inactive as of February 27, 2023, and a note states, "The verification is not able to be entered as completely relinquished in CLASS; it is inactive, b/c there is an adoption subsidy." IMPACT indicates no children were placed in the home after February 23, 2023. During the period this home was open, IMPACT shows there were 67 placements of a child in the home and three children adopted.

## Arrow Child and Family Ministries of Texas

The Bair Foundation of Texas CPA verified this home on February 13, 2001. The same CPA's San Angelo branch re-verified this home on April 19, 2007; the home was closed voluntarily on July 2, 2009.[432] Arrow Child and Family Ministries of Texas CPA (Arrow CPA) verified the foster home on January 17, 2017, until it closed the home on August 18, 2023, with the relinquishment reason documented in CLASS as "CCR Recommended Closure."

---

[432] CLASS also shows that DFPS Region 9 verified the foster father as an adoptive home on January 28, 2003, the home was placed on inactive status on July 26, 2009.

While the home was open, it was the subject of 12 investigations: four DFPS investigations for abuse, neglect, or exploitation and eight minimum standards investigations.

ANE Investigations Summaries

**On April 27, 2020**, DFPS initiated an investigation for Physical Abuse after a six-year-old foster child made an outcry to his therapist that the foster father choked him against a wall. The intake also alleged that the foster mother denied the foster father choking the child but said he pulled him by his shirt and made him "stand by the wall."

When he was interviewed, the six-year-old child repeated the allegation that the foster father choked him, but his eight-year-old sibling denied the allegation. The foster mother told the investigator that the foster father led the six-year-old child to his room by the neck of his shirt. She further explained that the child began crying out that the foster father was choking him, and the foster father "explained to [the six-year-old child] that he was not choking and demonstrated the difference in a training manner." The foster father denied choking the child.

The investigator Ruled Out the allegation of Physical Abuse; no citations were issued.

**On December 22, 2021**, DFPS initiated an investigation for Physical Abuse and Medical Neglect after two intakes, reported the same day by the foster mother and the CPA that a five-year-old child broke a bone in her shoulder after falling out of bed during the night. The intake also alleged that the foster parents did not seek medical attention until three days after the fall because the child did not complain of pain and engaged in regular activities.

Neither foster parent reported witnessing the fall; both said it occurred on a Friday afternoon. The foster parents said they went bowling the next day, and the child seemed fine. The foster parents both noted that the child expressed being in pain before they sought medical care; however, the foster mother reported that she checked for bruising and did not see a bruise. The foster mother acknowledged that when the CPS caseworker took a photo of the child's shoulder, a bruise was visible. The foster parents both reported they went on a trip to Dallas the same weekend that the child hurt herself because the foster mother had a follow-up medical appointment following back surgery. The foster parents did not seek medical attention for the child until the following Tuesday.

A seven-year-old collateral foster child told the investigator that the bed was too high for the five-year-old, and she had to help her get into it. The case manager confirmed that the foster parents did not move the child to another bed after learning that the original bed was too tall for the child.

DFPS Ruled Out Medical Neglect and Physical Abuse. HHSC issued one citation for general medical requirements because the foster parents failed to seek medical care for the child after she expressed pain.

**On May 12, 2023**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after SWI received two reports alleging that an 11-year-old foster child said that the foster father attempted to assault the child after she engaged in a physical altercation with his 16-year-old biological daughter. According to both reporters, the child said that the only reason he did not punch the child was because the foster mother stepped between the child and the foster father while he was swinging his fist toward the child. The child reported that the foster father hit the mother when she stepped between them. The intake also stated that the foster father threatened the child's placement by telling her to pack her bags to leave following the incident.

When they were interviewed, the foster parents and their daughter denied the allegations, and the investigator noted that they all had consistent descriptions of the incident. The foster child recanted and told the investigator that the foster father did not hit the foster mother; however, she said that he told her that "if she was going to be hitting people, she needed to get out of the house." She stated that she hit their biological daughter and felt remorse for the incident.

The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision. HHSC issued a citation for prohibited punishment for the foster father yelling at the child during the incident.

**On October 25, 2023**, DFPS initiated an investigation for Sexual Abuse after law enforcement reported that a seven-year-old child (the same child whose shoulder was broken in 2021) made an outcry to her biological parents that the foster father put her hand on his "private area" while she was placed in the home.

The child's biological mother told the investigator that the child told her that "it looked like a banana." The foster parents denied the allegation, stating that the foster father was never left alone with the children. The child did not make an outcry during her forensic interview, and the investigator found that the child's mother appeared to have coerced her original outcry.

The investigator Ruled Out the allegation of Sexual Abuse, and no citations were issued.

### Standards Investigations Summaries

The home was also the subject of eight minimum standards investigations between March 2017 and May 2023, three of which resulted in eight citations being issued by HHSC. The allegations that were investigated included reports that foster children were spanked and hit and allegations that the foster parents' biological daughter was "mean" or assaultive. The eight citations were issued for violations of minimum standards

associated with corporal punishment, discipline, prudent judgment, children's rights, and serious incident reporting.

HHSC also provided technical assistance for violating minimum standards associated with prohibited discipline, feeding children, and supervision (twice).

### Sampling Concerns

On September 19, 2017, HHSC conducted a sampling inspection at the foster home. During the inspection, the Inspector identified six concerns: the in-ground swimming pool gate being unlocked, poisonous materials being accessible to children in an unlocked outside shed, a damaged fence in the back yard, animal feces and urine in the master bedroom, and psychotropic medications stored behind only one lock. Another sampling inspection on February 14, 2022, documented a concern related to an item in an infant's crib.

### HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

HHSC staff submitted a closure recommendation on June 22, 2023. The recommendation cited the foster parents' "lack of better judgment" and the number of investigations, as well as the home's citation history, specifically in the areas of corporal punishment, safe sleep, and delayed medical care. HHSC leadership approved the recommendation on June 29, 2023. The same day, HHSC notified Arrow CPA of the closure recommendation. The letter documents that the recommendation decision was based on the citations and the sampling inspections received by the foster home, creating concerns of an endangering situation.

DFPS placed this home on its August 31, 2023, Disallowance List with the date of August 15, 2023, as approved by the DFPS Legal Department. In a letter dated August 23, 2023, DFPS notified Arrow CPA that this home was disallowed for future placements of children in care. The letter cites standards' non-compliance, including "general medical requirement, discipline, and serious incident reporting."

IMPACT indicates that no children have been placed in the home since August 10, 2023. During the period this home was open, IMPACT shows there were 59 placements of a child in the home and five children adopted.

### Lonestar Social Services

Lonestar Social Services CPA verified this foster home on March 8, 2021, and relinquished its verification on February 17, 2023.

While the home was open, the foster home was the subject of three investigations: two DFPS investigations for allegations of abuse, neglect, or exploitation, with one resulting

in a UTD, and one HHSC investigation for violation of minimum standards. A third DFPS investigation was initiated after the home was closed and resulted in RTBs for Medical Neglect, Neglectful Supervision, and Physical Abuse.

## ANE Investigations Summaries

**On July 27, 2021**, DFPS initiated an investigation for Physical Neglect after SWI received an intake about a four-month-old foster child being hospitalized for "mild dehydration." The intake alleged that the child had medical needs requiring special formula and feeding methods. During the investigation, the medical professional and others who were interviewed all reported that the foster mother was providing appropriate care to the child. The allegation of Physical Neglect was Ruled Out, and no citations were issued.

**On October 27, 2022**, DFPS initiated an investigation for Neglectful Supervision after SWI received multiple allegations from the foster mother for "excessive lying." The reporter told SWI that the foster mother lied about a two-year-old foster child's medical needs and that the foster mother gave "inconsistent information about these health issues." The reporter also provided information that the foster mother hid her pregnancy, stated she was raped, and admitted to being a victim of Munchausen by Proxy (MBP). The reporter also expressed concerns about children in the foster mother's care and for children placed in the home for respite care "acting like zombies" and suspicions that the foster mother was "drugging" them.

The foster mother denied fabricating health issues for any foster children, and she denied to the investigator that she was a victim of MBP by her mother when she was young. The investigator noted that this was inconsistent with what was in the foster mother's home study, which included statements made by the foster mother that she was a victim of MBP by her mother, for which she had been in therapy for "as long as [she] could remember." Adult collaterals reported that the foster mother "displayed attention-seeking behaviors...would lie or exaggerate a child's health or medical issues...claimed she was raped...announced that she was pregnant, and said the baby already has health issues." The investigator also noted that the foster mother contacted the child's caseworker, "and stated she was willing to giv[e] up her unborn child to keep [the foster child]." The caseworker expressed her concern to the investigator about this statement.

The foster mother told the investigator that she took the child to five medical appointments but could not provide documentation, and the CPA Case Manager told the DFPS Caseworker that she did not have any documentation for the medical appointments. Health Passport showed that the foster mother took the child to three therapeutic and 26 medical appointments over approximately two-and-a-half months.

The FACN report found that the 2-year-old's medical appointments were medically necessary. However, the report documented concern for Medical Child Abuse regarding a previous placement of a six-month-old child in the home. It stated there was serious

concern for any child placed in the home.[433]  The investigator called SWI to report the concerns for medical abuse of the child previously placed in the home, and that investigation was opened after the home's verification was relinquished.

The investigation concluded with an Unable to Determine disposition for Neglectful Supervision. "It is highly likely that if [the 2-year-old] had stayed in this home for a longer amount of time, [the foster parent] would have had the chance to continue the established pattern for Medical Child Abuse."

**On June 21, 2023**, DFPS initiated an investigation for Medical Neglect, Neglectful Supervision, and Physical Abuse after SWI received allegations that an FACN conducted during the course of another investigation revealed concerns that the foster mother had falsified or exaggerated symptoms and reported inaccurate medical diagnosis for a now two-year-old child (the child was an infant when placed in the home) previously placed in the home. The FACN identified concerns of Fictitious Disorder by Proxy and substantial evidence of maltreatment and medical child abuse.

The CASA, CVS Caseworker, and the nurses who helped care for the child all reported concerns about the foster mother fabricating or exaggerating the child's medical issues and needs. The caseworker told the investigator that the foster mother said the child had issues swallowing, but the caseworker witnessed the child eating snacks with no issues. The CASA told the investigator that the foster mother told them that the child had seizures and sent a video of the child "having a seizure" to the CASA and a doctor. However, both individuals stated that they did not witness any behavior indicative of a seizure. The clinic where the child received primary medical care informed the caseworker of concerns and requested a meeting without the foster mother to discuss the concerns. However, the meeting never occurred because the child was removed from the home. The investigator also revealed that physicians directed the foster mother to "thicken" the child's food and try speech therapy to help the child swallow. Instead, the foster mother sought out another physician to insert a feeding tube, an invasive surgery.

The foster mother denied the allegations and told the investigator that the child had swallowing and heart issues when he was placed in the home. She said the child had heart surgery to correct a congenital issue and a feeding tube inserted to help with the child's swallowing.

The investigator issued three RTBs: one for Physical Abuse, one for Medical Neglect, and one for Neglectful Supervision. Four citations were also issued, all pending administrative review: one for Supervision, two for Children's Rights, and one for General Medical Requirements.

---

[433] The investigator requested an FACN assessment for the six-month-old foster child to help inform this investigation, and the physician reviewing the child's case agreed that the child "was most likely the victim of medical child abuse while in [the foster mother's] care." See investigation initiated on June 21,2023.

## Standards Investigations Summaries

On April 6, 2022, HHSC initiated a Priority 3 investigation alleging that the foster mother was "supplementing her income" through a GoFundMe account and that the foster mother raised more than $2600 for a three-month-old PMN foster child's medical care. The intake also alleged that the foster mother had a second GoFundMe for "legal fees to protest [the foster child's] current case."

Former and (then) current CPA staff and administration told the investigator that they knew about the two GoFundMe accounts: one set up in November 2021 to assist with the foster child's medical procedure and one set up in March 2022 to assist the foster mother with "legal costs to intervene in [the foster child's] custody arrangement with his biological family members." The regional director of the agency approved the two accounts. However, the new regional director was in place after the foster mother set up the accounts and requested removal.

The investigator noted that there was also evidence that the foster mother and her mother posted pictures of a foster child and his medical equipment on a public social media platform. The foster mother told the investigator that her friend had set up the accounts for her, but the investigator noted that the accounts were both registered to the foster mother. The investigator issued two citations, one for the child's right to receive confidential care and treatment and one for the child's right to consent in writing before participating in any publicity or fundraising activity.

The CPA also received a citation for failure to report inappropriate fundraising efforts to HHSC because of this investigation. The investigator also provided Technical assistance to the CPA because the agency home screening did not address the past abuse the foster mother experienced at the hands of her mother.

## HHSC – RCCR Closure Recommendation and DFPS Disallowance Summary

The investigation initiated on October 27, 2022, indicated that the home was disallowed to ensure no other children were placed in the home. However, the home was only included on the monthly Disallowance List provided to the monitors on June 6, 2023, which reflects an Effective Date of November 2, 2022. DFPS issued a letter to Lonestar Social Services, LLC, on December 2, 2022. The letter advised the CPA that any placements of DFPS children were being disallowed for placement in this home. The letter states the decision was based on information from HHSC regarding the foster home's standards violated regarding child rights and serious incident reporting. The letter also documents that "there is a pattern of allegations of Medical Neglect which causes significant and reasonable concern for the safety of any child placed in the home."

HHSC staff completed an Agency Home Closure Recommendation on February 14, 2023, approved by HHSC executive staff on March 10, 2023. The closure

recommendation was based on concerns regarding the foster mother's mental health issues (Munchausen by Proxy). The recommendation documented, "There are consistent patterns of alleged Munchausen Syndrome/Munchausen Syndrome by Proxy, alleged medical abuse, exaggerating foster children's health and/or medical issues, not reporting child's medical appointments to CVS and CPA, and concern for [foster parent] mental health from 4/2022 to present regarding two separate children in care."

IMPACT documents that the home has only had two placements. The last child placed in the home was removed on February 13, 2023 (but had been in a respite placement prior to that), while the investigation that resulted in a UTD finding was still pending.

The foster home page in CLASS indicates that the CPA closed the home voluntarily without deficiencies on February 17, 2023. During the period this home was open, IMPACT shows there were two children placed in the home.

### Guardian's Promise, LLC

Brighter Visions Child Care Services verified this home on September 14, 2009; it voluntarily closed on October 20, 2010. On January 11, 2011, Brighter Visions Child Care Services verified the home again. The home changed CPAs on August 26, 2011, to Tejano Center for Community Concerns CPA. On December 31, 2019, the foster home again changed CPAs, and Pathways Youth and Family Services, Inc. verified the home. The home changed CPAs a last time on April 27, 2021, moving to Guardian's Promise, LLC. On August 11, 2023, Guardian's Promise relinquished the verification, and the home was closed, with a relinquishment reason of "CCR recommended closure."

Guardian's Promise was placed on Heightened Monitoring on August 24, 2022. The Heightened Monitoring Plan documents patterns and trends related to a child's rights, discipline, punishment, health and safety—fire safety, medication management—medication administration, and medication management—medication documentation.

While the home was open, it was the subject of nine investigations: three DFPS investigations for abuse, neglect, or exploitation and six minimum standards investigations by HHSC.

### ANE Investigations Summaries

**On May 16, 2014**, DFPS initiated an investigation for Neglectful Supervision after the CPA staff reported to SWI that a two-year-old child in care was bitten by a dog, sustained injuries, and received medical attention.

The investigator observed the two-year-old with stitches on her upper lip; the child lacked the verbal ability to be interviewed. The investigator also observed the other two foster children in the home, who were too young to be interviewed.

The foster father explained that while he was sitting on the porch, holding the dog by its collar, the two-year-old walked nearby, and the dog "suddenly jumped" and bit her. The foster father reported that he immediately separated the dog from the child and transported her to the hospital, where she received plastic surgery to repair the injury. The foster father stated that the dog did not have a history of aggression; however, the family no longer had the dog. The foster mother and the foster parents' four-year-old biological daughter corroborated this story.

The investigator Ruled Out Neglectful Supervision. HHSC issued no citations.

**On June 1, 2018**, DFPS initiated an investigation for Physical Abuse after the biological parent of a six-year-old and a nine-year-old child reported that the children said that the foster mother pulled, yanked, and ripped out the six-year-old's hair and grabbed her by the arm. The reporter also alleged that the foster mother called the children names, threatened to stop caring for the children if another investigation was reported, and administered "non-prescribed medication" so the children would sleep at night.

The six-year-old reported that the foster mother "hit her hard on the head" and "yanked her hair hard," causing a little hair to come out, and that the foster mother referred to her as "stupid" on one occasion. The nine-year-old child stated she did not witness the hair-pulling incident but heard about it from her sister. She reported that the foster mother called the six-year-old "crazy" and "stupid" but denied that physical abuse took place.

The foster mother denied pulling the six-year-old's hair, calling the children names, and administering medication to help the children sleep. The foster father denied the allegations of physical abuse.

The investigator confirmed that the medication that was given to the child for sleeping was prescribed. The investigator Ruled Out Physical Abuse. HHSC issued one citation for children's rights after the two children reported that the foster mother called them names.

**On August 4, 2023**, DFPS initiated an investigation for Physical and Emotional Abuse after an HHSC staff member reported hearing an audio recording of the foster parent screaming at a nine-year-old foster child who was "hysterically crying." The foster parent was screaming at the child because she was refusing to eat what he fixed for her. The reporter also alleged that the foster parent "jerked" and "grabbed" the child forcefully by both arms and pulled her out of her chair. Children reported that in the past, a foster parent dragged a child for refusing to return to her room and made the children take cold showers.

The investigator interviewed five foster children. Three reported that the foster mother forcefully placed the toddler into her car seat. Four out of the five children reported that the foster father yelled at a child. Three children stated that the foster father "grabbed" a child by her arms and "dragged" another child. The children denied the allegations that

the foster parents made them take cold showers. CLASS notes indicate that the audio recording was the subject of a prior investigation.

The foster parents denied physically abusing the children; however, they did confirm that the foster father had yelled at a child, grabbed her by the wrist, and escorted her out of the room. The foster mother admitted to telling the children she was "counting the days until they left."

The investigator Ruled Out Physical Abuse due to the children making "no disclosures of physical abuse" and having no "marks or bruises." HHSC issued two citations for children's rights and other prohibited discipline.

## Standards Investigation Summaries

The foster home was also the subject of six minimum standards investigations. Two of these investigations resulted in HHSC issuing three minimum standards citations. In December of 2017, two citations were issued: one for violation of minimum standards requiring a renewal of background checks and one for other prohibited discipline when it was determined that the foster children were placed in time-out for hours at a time. In August of 2023, a citation was issued for disciplinary measures after it was determined that the foster parent forcefully placed a child in a car seat, yelled, and used profanity.

## HHSC – RCCR Closure Recommendation and DFPS Disallowance Summary

On August 17, 2023, HHSC leadership approved the recommendation for closure. HHSC based the decision on "a pattern of inappropriate discipline and interactions with children placed in the home," and a pending ANE case that was expected to result in additional discipline-related citations. HHSC issued a letter to Guardian's Promise, LLC on August 18, 2023, advising the CPA of the recommendation for closure of the foster home.

DFPS added the home to the December 22, 2023, Disallowance List with an approval date by the DFPS Legal Department of December 11, 2023. In a letter dated December 8, 2023, DFPS notified Guardian's Promise, LLC, that this home was disallowed from future placements of children in care. DFPS based its decision on the home's history of "non-compliance with the minimum standards violations as well as their prudent judgement [sic] and inappropriate discipline practices."

According to IMPACT, no children have been placed in the home since August 26, 2023. During the period this home was open, IMPACT shows there were 40 placements of a child in the home and one child adopted.

## Ratcliff Youth and Family Services

This foster home was first verified on November 16, 2016, by the Richardson branch of Lutheran Social Services of the South, Inc. The CPA closed the foster home on October 17, 2019, due to non-compliance. Ratcliff Youth and Family Services verified the foster home on July 15, 2020, but the CPA withdrew its application for a permit on August 5, 2020, resulting in its closure. Ratcliff Youth and Family Services resubmitted their application under a different operation number and reopened it on August 5, 2020. The foster home was transferred and verified under the CPA's new operation number on August 6, 2020.

During the time this home was verified, it was the subject of eight investigations: three investigations for allegations of abuse, neglect, or exploitation and five for minimum standards violations.

## ANE Investigations Summaries

**On February 1, 2019,** DFPS initiated an investigation for Neglectful Supervision after the foster parent's ex-boyfriend reported that a one-year-old foster child was not receiving adequate supervision. The report alleges that nurses did not show up for scheduled shifts and that the foster parent falsified nursing reports and left the nurses to care for and supervise the foster child. During interviews, four nurses denied that the foster parent left them alone to care for the foster child. One nurse confirmed that the foster parent left him alone with the foster child for a maximum of two hours. The foster parent denied that she left the foster child alone with the nurses or that she falsified nursing reports. The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On March 26, 2021,** DFPS initiated an investigation for Neglectful Supervision after a 17-year-old nonverbal foster child appeared anxious and fearful to return to the foster home after school. Allegedly, there had been multiple incidents of the 17-year-old foster child refusing to return to the foster home after school, and the foster parent allegedly refused to pick up the child during one such incident. Through interviews, the investigator learned that the victim had resisted getting on or off the bus at home and school and that he had engaged in similar behavior at a previous placement. All collaterals who were interviewed denied the allegation of neglectful supervision. The allegation of Neglectful Supervision was Ruled Out, and no citations for standards violations were issued.

**On September 2, 2022,** DFPS initiated an investigation for Medical Neglect after it was alleged that the foster parent had not met the medical needs of an eight-year-old and a two-year-old foster child. The investigator noted that both victims were "non-verbal" and had primary medical needs. Both the foster parent and her daughter denied the allegation of medical neglect. Both victims were assessed at Children's Hospital Dallas, and this assessment confirmed that no concerns "were attributed to medical neglect" and that both victims had contracted a virus. The nursing staff and the primary care physician for both children all denied having any suspicions of medical neglect. The investigator also noted a recent death in the foster home and that the medical professionals involved in this individual's care denied having any "concerns for wrongful

death or medical neglect." The investigator Ruled Out the allegation of Medical Neglect, and no citations for standards violations were issued.

## Standards Investigations Summaries

The foster home was also the subject of five minimum standards investigations, two of which resulted in the issuance of citations.

- HHSC initiated an investigation on September 19, 2019, after it was reported that a nine-month-old foster child was hospitalized for dehydration. The nine-month-old child had had a liver transplant and was being seen at a weekly clinic. The investigator contacted the transplant coordinator, who said the foster mother contacted the clinic at 12:30 am and reported that the child had vomited and showed no other symptoms. The clinic advised the foster parent that they would see the child the next morning at her scheduled appointment. When the child was brought in for her appointment, the child looked ill, was dehydrated, and had an intestinal virus. The transplant coordinator said that she felt the child "was not getting the correct medication, and this was what caused her to be so dehydrated." The child was taken to the ER immediately. The nurse who provided care in the home expressed no concerns regarding the child's care. The investigator also reviewed medical and medication documentation in the home and determined from interviews and documentation that the foster parent did not provide proper care for the foster child before the hospitalization. Five citations were issued: one for medication errors, one for medical records, and one for medication administration. Two citations were issued to the CPA for violations related to home study documentation and foster home screening documentation.

- HHSC initiated an investigation on August 16, 2022, due to a report alleging that the foster parent was not providing adequate care to children in the home after the death of a 19-year-old former foster child due to unknown causes. This investigation was initiated to ensure the other two foster children in the home received adequate medical care. The inspector noted that the foster parent could not provide medical documentation for both foster children during the home inspection. The foster parent reported that the nurses keep the medical documentation for each of the children. RCCR issued one citation for the absence of medical logs for children in care. This case was later upgraded to a Medical Neglect investigation, which was Ruled Out, see the September 2, 2022 investigation above.

## Sampling Concerns

The home was also the subject of four sampling inspections on October 24, 2017, April 4, 2019, July 7, 2021, and June 20, 2022. The sampling inspection on June 20, 2022, noted concerns related to child safety in the foster home that included fire extinguisher maintenance and medication storage, and six other concerns related to foster home screening (four related concerns), background checks, and verification certificate.

## HHSC – RCCR Closure Recommendation and DFPS Disallowance Summary

DFPS placed this foster home on the agency's September 28, 2023, Disallowance List with an approval date by the DFPS Legal Department of August 4, 2023. On September 1, 2022, DFPS issued a Disallowance Letter to Ratcliff Youth and Family Services. The letter informed Ratcliff Youth and Family Services that this foster home was being disallowed for future placements after receiving information regarding standards violations concerning medication records, medication errors, and foster home screenings. The letter also acknowledged that the foster parent "has a pattern of allegations for Neglectful Supervision (NSUP) including investigations involving adult foster care and a fatality which causes reasonable concern for any child in the home."

On October 5, 2023, RCCR recommended the closure of the foster home due to "significant concerns and patterns found in this home with allegations and citations of improperly caring for PMN children. In addition to the above documented investigations, the closure recommendation included that, "in August of 2022, within a two-week period, a previous 19 y/o foster child (that had aged out of care a few months prior) had a broken leg, broken femur--where medical staff did not believe the foster mother on how this happened, she had lost weight from not being fed properly (according to medical staff) and two days later she died."

HHSC approved the closure recommendation on October 12, 2023, and notified the CPA of the closure recommendation on October 16, 2023.

The foster home page in CLASS indicates that the CPA relinquished the foster home's verification on August 30, 2023, due to "CCR Recommended Closure."

During the period this home was open, IMPACT shows there were 11 placements of a child in the home and one child adopted. No children have been placed in this home since March 10, 2023.

## Children of Diversity

Children of Diversity verified this foster home on June 29, 2017. The CPA closed the home on January 8, 2024, for the listed reason "CCR Recommended Closure."

While the home was verified, Children of Diversity was placed on Heightened Monitoring with a planned start date of September 26, 2022. When the home was closed, the CPA remained on Heightened Monitoring. Concerning trend and pattern areas identified in the Plan included background checks, supervision, a child's right to be free from abuse and neglect, discipline and punishment, record keeping, and serious incident reporting.

While the home was open, it was the subject of 13 investigations: six DFPS investigations for abuse, neglect, or exploitation and seven minimum standards investigations. Although none of the investigations resulted in an RTB or UTD finding,

one investigation led to the issuance of eight citations, including one citation related to supervision. Two other minimum standards investigations resulted in a deficiency being cited.

## ANE Investigations Summaries

**On March 17, 2021**, DFPS initiated an investigation for Neglectful Supervision after the foster parent reported that while speaking with the children about an incident, she learned that the 13-year-old performed oral sex on the 12-year-old.

When interviewed, the 12-year-old victim denied that anyone had touched her in her "private areas." The 13-year-old confirmed that the 12-year-old had "asked her to touch her private parts" but refused to discuss the incident further. A collateral child in the home confirmed that she witnessed the discussion of the incident when the two girls were confronted.

The foster mother confirmed that the 12-year-old told her that the 13-year-old had given her a 'passion mark,' which the foster mother observed on her neck. She reported that the 13-year-old child initially denied this and then confirmed that she had given the 12-year-old the mark. Later, the 13-year-old told the foster mother that she performed oral sex on the 12-year-old because the 12-year-old "asked her to do it." She confirmed that she had increased monitoring of the children since the incident and changed their bedroom arrangements to keep them separated.

The allegation of Neglectful Supervision was Ruled Out, and no violations of minimum standards were cited.

**On December 13, 2021**, DFPS initiated an investigation for Neglectful Supervision of an eight-year-old child in care after a DPFS employee observed that the child was alone on the street during a virtual visit with her biological family.

The eight-year-old victim confirmed that she sits on a bench directly outside of the home when she talks with her biological mother. She also confirmed that she walks alone or will ride the bus to the home and that she carries her cell phone. She added that sometimes, she is home alone when the foster mother is at work.

Collateral children in the home denied ever being left alone while in the home.

The foster mother reported that during the alleged incident, the eight-year-old child "was sitting on a bench in the front yard," and the foster mother's adult brother, who is also a respite caregiver, was outside with the child. Her brother confirmed that the eight-year-old "is never outside alone."

The allegation of Neglectful Supervision was Ruled Out, and no violations of minimum standards were cited.

**On December 1, 2022**, DFPS initiated an investigation for Physical Abuse and Medical Neglect after DFPS staff reported that while talking with an 11-year-old foster child at school, the child kept nodding off and then fell asleep. The report stated that the child told the HHSC staff that her foster parent "had given her a blue pill" and that it was not one of her medications. The school counselor reportedly told the DFPS staff that the child recently complained about hunger.

The 11-year-old child confirmed that the foster mother provides her with her medications in the morning and nighttime. She also confirmed that her "pill is blue" and "is also white." The case manager reported that the victim was off her medication for multiple days and had the prescription filled at a higher dosage. The case manager also stated that the 11-year-old "was adjusting to the medication."

The allegation of Medical Neglect was Ruled Out. The allegation of Physical Abuse was Administratively Closed due to there being "no allegations of physical abuse." No citations were issued.

**On February 20, 2023**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after law enforcement reported that an 11-year-old foster child poked the foster parent's six-year-old grandchild in his private area while in the backseat of the car.

The 11-year-old confirmed touching the six-year-old child's private parts over his clothes and that the foster mother told her not to do that anymore. Children who were present during the incident confirmed that the 11-year-old quickly touched the six-year-old while he was asleep in the car and that the foster mother's brother, who is a respite caregiver, was driving the car. The brother "stated that he was driving" when the incident occurred but "quickly got home and separated the children" from the 11-year-old.

The allegation of Sexual Abuse was Administratively Closed because "a child in care cannot be listed as an alleged perpetrator." The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On September 20, 2023**, DFPS initiated an investigation for Neglectful Supervision after law enforcement reported that a 10-year-old foster child ran away from the foster home. When the child was located, she was naked and had taken her clothes off in a stranger's front yard. Law enforcement transported the child to a hospital. The report also stated that before the runaway incident, the 10-year-old engaged in a fight with the 11-year-old- and 13-year-old in the home.

The ten-year-old child reported that two children who also lived in the home, an 11-year-old child and a 16-year-old, physically attacked her directly outside of the home. She denied that her foster mother intervened to stop the fight. She did not explicitly mention running away but acknowledged removing her clothes. The child said the foster mother videoed her when her clothes were off, an older man who was there just stared at her, and her foster mother tried to cover her up.

The 10-year-old reported that the older girl pulled her hair, kicked and punched her in the stomach, and then said all the kids do this to her. She reported that this happened upstairs while the foster mother was downstairs and said the foster mother "never checks on the upstairs."

HHSC reviewed multiple videos taken by the foster mother. Some of these videos showed children "encircling" the ten-year-old victim. Three children confirmed that the foster mother or her adult brother asked the children to help restrain the ten-year-old child. A fourth child stated that the foster mother's brother asked her to help prevent the ten-year-old from running away. HHSC found that the children's service plans for supervision were inadequate because the plans allowed for the use of cameras, which are not an adequate substitute for physically supervising children. The home inspection also revealed concerns, such as children having access to dangerous chemicals and a smoke detector battery needing to be replaced.

The allegation of Neglectful Supervision was Ruled Out. HHSC issued eight citations for issues related to background check validation, caregiver responsibilities, supervision, initial service plan, emergency behavior intervention, fire safety, physical environment, and children's rights.

**On September 20, 2023**, DFPS initiated an investigation for Neglectful Supervision after the 13-year-old foster child made an outcry that the ten-year-old foster child physically assaulted her on multiple occasions. The report stated that the ten-year-old was no longer in the home. DFPS merged this with the above ANE investigation, which was initiated on the same date. The allegation of Neglectful Supervision was Ruled Out, and no violations of minimum standards were cited.

Standards Investigations Summaries

The foster home was also the subject of seven minimum standards investigations. Only two of these investigations resulted in a minimum standard citation being issued.

- On December 7, 2018, HHSC initiated an investigation after SWI received a report that an 11-year-old foster child made an outcry that her foster mother told her that it was her (the child's) fault that the foster father had died of a brain aneurysm "because he had to scream and get mad at her all the time for her bad behavior."

  The 11-year-old child and two collateral children in care denied the original allegation. However, all three children reported that for discipline, the foster mother had forced them to sit against the wall in a squatting position. The foster mother confirmed that she has made the children sit against the wall as a form of discipline.

  During this investigation, the inspector also learned that a child in the home had recently been hospitalized for behavioral concerns and that the report to the child's

CPS caseworker was not made until more than 24 hours after the incident. HHSC issued two citations for corporal punishment and serious incident reporting.

- On November 29, 2021, HHSC initiated an investigation after SWI received a report that three children in care received inadequate supervision, which resulted in one of them, an eight-year-old, having a tobacco product in her possession. Later, SWI received two linked reports that the same eight-year-old child "got on the wrong bus and was dropped off in the wrong neighborhood" after school and walked to a store without supervision. There were also concerns of bullying in the home.

  The eight-year-old confirmed she did not get on the wrong bus. She got off the bus several doors from the foster home and walked to the store. The children in the home and the foster mother confirmed that the children were permitted to go to the store without supervision. The foster mother also confirmed that she had a respite caregiver pick up the eight-year-old child from the store on the day of the incident.

  Originally, HHSC issued two citations for supervision. However, one was overturned during an Administrative Hearing.

## Sampling Concerns

The home was also the subject of two sampling inspections on March 29, 2019, and July 16, 2021. In 2019, inspectors noted concerns related to medication documentation and the physical environment, specifically that the home had a flea infestation, and chemicals found unsecured in the home. During the 2021 inspection, a concern was noted for the physical environment after chemicals were found within reach of children and for frequent visitors not having a background check.

On the day the HHSC closure recommendation was approved, November 29, 2023, HHSC inspected the home and issued two citations, one for smoke detectors and one for the physical environment for not storing chemicals out of the reach of children. On November 30, 2023, an administrative penalty was assessed after it was determined that a caregiver with a provisional background check, which prohibited the person from being alone with children in care, was found supervising them alone.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

On November 27, 2023, RCCR submitted an RCCR Closure Recommendation to HHSC leadership. HHSC leadership approved the RCCR Closure Recommendation on November 29, 2023, based on "multiple citations in several concerning areas" and concern related to the foster parent's "capacity and ability to care for children, especially with elevated behaviors." In a letter dated November 30, 2023, HHSC notified Children of Diversity that this home was recommended for closure. The letter lists the 11 deficiencies, and five sampling concerns received by the home. The letter stated that the "recommendation was based on a high-risk deficiency or a pattern of allegations, deficiencies, and/or sampling concerns that create an endangering situation."

DFPS placed this home on its December 22, 2023, Disallowance List on December 11, 2023, as approved by the DFPS Legal Department. In a letter dated December 8, 2023, DFPS notified Children of Diversity that this home was disallowed for future placements of children in care. The letter cited the foster home's minimum standards violations related to "prudent judgment regarding supervision and discipline practices" and an overall "history of non-compliance with minimum standards."

The foster home page in CLASS indicates that the CPA closed the home on January 8, 2024, and indicated "CCR Recommended Closure" as the closure reason. During the period this home was open, IMPACT shows there were 20 placements of a child in the home. IMPACT records reflect that no children have been placed in this home since December 27, 2023.

## Transitions for Tomorrow

Lutheran Social Services of the South, Inc. CPA verified this home on September 24, 2007. The home changed CPAs on September 1, 2009, and was verified by Azleway, INC, then moved to Therapeutic Family Life on June 1, 2011. The home again moved its license to Hands of Healing on June 26, 2019, and closed less than a year later on March 3, 2020. On June 22, 2020, 1 Angel Arms Family Care LLC verified the home until the foster home changed CPAs a last time and moved to Transitions for Tomorrow on April 13, 2021. The home was closed on July 25, 2023, with the relinquishment reason documented in CLASS as "CCR Recommended Closure."

During its open period, the home was the subject of 26 investigations, including four for abuse, neglect, or exploitation and 22 minimum standards investigations.

## ANE Investigations Summaries

**On December 9, 2011**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision due to allegations that the foster mother pulled a nine-year-old foster child's hair "real hard" and scratched her neck, leaving a red mark. A second linked intake contained allegations that the foster parent inappropriately supervised two children, ages seven and nine, resulting in the children engaging in sexual contact.

The seven-year-old child and collateral children confirmed the incident of sexual contact with the nine-year-old child, but the nine-year-old denied the incident. The seven-year-old told the investigator that the incident occurred between the times the foster mother would check on them in the garage while she was in the kitchen. The foster mother and the nine-year-old child denied that the foster mother pulled her hair. No children in the house reported physical discipline.

The allegations of Neglectful Supervision and Physical Abuse were Ruled Out, and no citations were issued.

**On June 14, 2016**, DFPS initiated an investigation for Neglectful Supervision after a police officer reported responding to an assault between two children, ages 17 and 15. The intake stated that the foster mother "was present during the incident and did not intervene." The intake also alleged that the other children placed in the home threw the 17-year-old's clothing into the street when she went to the neighbor's home to call the police.

Four children involved in the incident told the investigator different versions of the foster mother's involvement during the incident. One child stated that the foster mother "came upstairs and was at the door watching the entire incident… advising the girls to leave [the 15-year-old child] alone." Another child stated that the foster mother "remained in the home" until the police arrived at the neighbor's home, and a third child told the investigator that the foster mother "was at home on the couch inside the house" and "told the children to stop." The fourth child told the investigator that she and the foster mother were upstairs after the incident began, and they went back downstairs while the 15-year-old and the three other children ran outside. The fourth child said that the 15-year-old was running into traffic trying to get hit by a car, and "this went on for about 4 to 5 minutes before [the foster mother] went outside to check on the [15-year-old child] running into the street." The foster mother stated she was involved during the incident and only stepped away to "turn off the food that was cooking." She explained that she and the other girls looked for the 15-year-old after she ran down the street, but all five children told the investigator that the foster mother was not involved in the search and remained by the house.

The investigator Ruled Out the allegation of Neglectful Supervision, and HHSC issued two citations for violation of minimum standards associated with serious incident reporting and supervision.

**On August 1, 2018**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after a 13-year-old foster child (Child A) reported that another 13-year-old foster child (Child B), who was also placed in the home, touched Child A's breasts and vagina. The intake also contained allegations that the foster mother's adult biological son sexually molested Child B and that the foster mother left the children unsupervised for hours at a time.

The investigator documented that the allegations of child-on-child sexual contact and the foster mother leaving the children unsupervised were being addressed in other investigations. All of the children placed in the home at the time denied that the biological adult son was sexually inappropriate with them. The foster mother and her son also denied the allegations.

The investigator Ruled Out the allegation of Sexual Abuse by the foster parent's son. The allegations of Neglectful Supervision related to the foster mother leaving the foster children unsupervised were administratively closed because it was cited under a previous investigation. The investigator also documented that the allegation of inappropriate contact was being addressed under a separate investigation. HHSC did not issue any citations.

**On April 27, 2021**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after law enforcement reported responding to a call related to an altercation between the foster mother and a 16-year-old foster child. The foster mother reported that the 16-year-old hit the foster mother on the collarbone and spit in the foster mother's face. The 16-year-old was taken to jail and returned to the foster home. The reporter noted that in the past, foster children reported being hit by the foster mother before the children would hit her back and said the foster mother bullied and threatened them.

The 16-year-old child admitted to hitting and spitting on the foster mother. The foster mother told the investigator that she intervened when the two children began fighting, and then she called law enforcement.

The investigator also noted that the 17-year-old child and the foster mother admitted to leaving the 16-year-old child home alone on at least one occasion. However, the 16-year-old child's service plan stated that the child required constant line-of-sight supervision due to her aggression.

The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision, and HHSC issued technical assistance to the foster mother for supervision and to the CPA for the 16-year-old child's service plan being expired.

## Standards Investigations Summaries

While open, the home was the subject of 22 minimum standards investigations, most for concerns with supervision after child self-harm, child-on-child physical assault and sexual contact, and children running away. There were 17 investigations related to supervision, and three deficiencies were issued related to supervision.

HHSC investigated concerns about inappropriate or prohibited discipline in the home eight times. Those investigations resulted in three deficiencies related to discipline and punishment, one of which was overturned after an Administrative Review.

The minimum standards investigations also raised concerns about how the foster mother was feeding children. In May 2012, the foster mother received technical assistance for not offering children enough non-frozen food options. Food concerns continued through February 2023, with intakes stating that children needed to be offered more options and a child not receiving a meal before dinner.

## Sampling Concern

On March 17, 2008, a sampling inspection was conducted at the foster home, and two concerns were identified: one regarding medication documentation and one regarding the foster mother's son's gun not being properly stored. The Inspector noted that the

foster mother kept the medication log at her office and documented the time administered after she left the home.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

HHSC's closure recommendation was based on the home's history of citations, specifically in supervision, discipline, and medication. HHSC Leadership approved the recommendation on June 29, 2023.

DFPS placed this home on its August 31, 2023, Disallowance List; the DFPS Legal Department approval date was August 16, 2023. In a letter dated August 11, 2023, DFPS notified Transitions for Tomorrow that this home was disallowed for any future placements of children in care. The letter documents the disallowance decision was based on the foster mother's non-compliance with standards associated with supervision, discipline, and medication.

During the period this home was open, IMPACT shows there were 81 placements of a child in the home. IMPACT indicates that no children have been placed in the home since April 14, 2023.

## Bridges to Permanency LLC

Arrow Child and Family Ministries verified this home on September 16, 2019, and relinquished the verification on July 14, 2020. On September 14, 2020, Circle of Living Hope verified the home, but the home was involuntarily closed on December 21, 2021, after being cited for corporal punishment. Less than four months later, the home was verified by Bridges to Permanency LLC on April 4, 2022; CLASS documents that the home voluntarily closed with deficiencies on February 16, 2023.

While the home was open, it was the subject of three investigations. Two were DFPS investigations for abuse, neglect, or exploitation, and one was a minimum standards investigation.

## ANE Investigations Summaries

**On January 5, 2023**, DFPS initiated an investigation for Physical Abuse after school personnel reported that an 11-year-old foster child who has autism arrived at school crying and said that the foster parent hit her with clothing while she was "having some sort of tantrum."

When she was interviewed, the 11-year-old only told the investigator that she had been hit. During interviews with the two other foster children in the home, a six-year-old, and a nine-year-old, they said the foster mother hit them, and they saw the foster mother hit other children. A collateral child in care said he saw the foster mother hit the eleven-year-old and another child who was not part of the investigation.

The investigator noted a previous deficiency for corporal punishment because the foster mother was spanking children in care. The foster mother denied the allegations, and none of the "collateral adults" (caseworkers, AALs, therapist) reported having any concerns regarding the home.

The investigator Ruled Out Physical Abuse because there was "not enough detail to confirm or support the claims" that the foster mother was "hitting/causing harm" to children in care. The investigator noted no bruises or injuries, and "children were never in immediate danger of substantial harm or death." HHSC issued one citation for corporal punishment.

**On March 1, 2023**, DFPS initiated an investigation for Physical Abuse after HHSC referred the original intake to DFPS for an ANE investigation. The intake alleged that a seven-year-old and a four-year-old, who were both in foster care at the time of the intake, reported being physically disciplined by the foster mother.

At the time of the investigation, the foster home was closed. It was determined that the children lived in the foster home from November 18, 2021, to December 15, 2021. The children in this investigation were also victims in a minimum standards investigation of this home, initiated on December 14, 2021, which resulted in a corporal punishment citation. The children's CVS caseworker re-reported these allegations because "since the initial intake/investigation, she had other children that were placed in the home. Those children were removed due to a similar allegation of physical abuse." When interviewed, neither of the children remembered living in the home and denied ever being spanked while in the home. The allegation of Physical Abuse was Ruled Out, and no citations were issued.

Standards Investigations Summaries

On December 14, 2021, HHSC initiated an investigation after a DFPS caseworker visited the foster home and interviewed two children in care, who both reported that the foster mother spanked them with a belt as a discipline and said that it hurt.

When interviewed, all four children in care said that the foster mother spanks them when they get in trouble or break a rule. One of the children said they were coached by the foster mother to deny that they were spanked if asked. One of the children's teachers said a child made an outcry to her of being spanked, but the teacher did not report it because "there were no physical signs." Both foster parents denied the allegation of using physical discipline and said they only use time-outs. As a result of the outcries made by all four children interviewed and the teacher's statement, the investigator concluded that the home used physical discipline. HHSC issued one citation for Corporal Punishment.

HHSC – RCCR Closure Recommendation and DFPS Disallowance Summary

On March 14, 2023, HHSC notified Bridges to Permanency LLC of their recommendation to close this foster home. HHSC approved the decision to close the home on February 17, 2023, based on two citations for corporal punishment, which demonstrated a pattern of physical discipline. The home had been voluntarily closed since February 16, 2023.

DFPS placed the home on the June 6, 2023, Disallowance List, effective March 31, 2023. On March 2, 2023, DFPS notified Bridges to Permanency LLC that it was disallowing any future placements of children in its care in this foster home. This decision was based on the home's minimum standards violations for corporal punishment and the fact that over 60 percent of discharges for the home "were due to risk of or actual abuse and neglect." The letter also noted that the home had been closed twice before due to deficiencies in minimum standards.

Thirteen children were placed in the home while it was open. The last child was removed from the home on January 9, 2023. No children have been placed in the home since then.

### Arrow Child and Family Ministries of Texas

Arrow Child and Family Ministries of Texas verified this home on November 26, 2019. The home was closed on March 22, 2023, with a documented relinquishment reason in Class as "CCR Recommended Closure."

While the home was open, it was the subject of two DFPS investigations for abuse, neglect, or exploitation and one minimum standards investigation.

### ANE Investigations Summaries

**On November 12, 2021**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision of a nine-year-old foster child who has cerebral palsy, epilepsy, and scoliosis, is non-verbal, and is legally blind. A hospital medical staff reported that the child had an unexplained impacted fractured femur and said this type of injury is "hard to occur in a child that does not have normal function." The reporter also said that the foster mother stated that she was "racking her brain trying to figure out how this happen[ed]" but remembered that over the weekend, when the child was sitting in his chair, another child in the home came to tell her the victim was "flipping over in his chair." She said she picked up the victim; he was acting normally, and she did not see any injuries.

The foster mother said she was alone at home the day the child fell out of his wheelchair. She said the child was not wearing his seatbelt in his wheelchair, and as he went over the lip of the doorframe, he fell out of his wheelchair. She said this happened on November 2nd or 3rd. She said she did not notice any injuries until the child's leg was swollen on November 11, and she took him to the emergency room, where he was diagnosed with a fracture.

The forensic team at the hospital said this type of injury was not in line with a pattern of abuse but instead could be related to an accident. None of the collaterals interviewed had concerns with the home. The allegations of Physical Abuse and Neglectful Supervision were Ruled Out, and no citations were issued related to these allegations. The investigation conclusion noted that strapping the child into his wheelchair was not documented as a requirement from a physician or indicated in his service plan.

During the course of the investigation, it was identified that a child in care under 12 months of age was asleep in a crib with a pillow near the child and a blanket covering part of the child's body, and a citation was issued.

**On July 2, 2022**, DFPS initiated an investigation for Neglectful Supervision after the foster mother made a report that a nine-month-old child in care passed away. The intake narrative indicates the child had several primary medical needs, including G-tube dependence, sepsis, strokes, and seizures. This child was observed sleeping in a crib with a pillow and blanket during the prior investigation.

The foster mother told the investigator that she last checked on the child at 10:30 p.m. before going to bed; when she woke up the next morning to a beeping sound, she went to check on the child and found she had turned over on her stomach and was unresponsive. She immediately called 911.

The investigator found that the foster mother was not in compliance with the child's service plan, which required the child to be within auditory range at all times and prohibited her from being out of visual range except for short periods. The service plan allowed for the use of a monitoring device to keep the child within auditory range, however; the night the child passed away, the foster mother admitted that the monitor she had in the child's room was not working. The child slept in a room far away from the foster mother's room.

The foster mother also admitted she left the child in the care of unapproved caregivers. The foster mother's adopted son said two nurses would babysit him and the nine-month-old child.

The medical autopsy indicated that the child died of undetermined natural causes. Because the cause of death was an undetermined natural cause, the investigator could not determine if the foster mother's actions contributed to the child's death. The allegation of Neglectful Supervision was found UTD. HHSC issued three citations for violating minimum standards related to service planning, supervision, and background checks.

### Standards Investigations Summaries

On May 12, 2022, HHSC initiated a Priority 3 investigation after the foster mother reported that an eight-month-old child in care was hospitalized due to a seizure and elevated temperature. This child died on July 2, 2022. The intake narrative indicated the

child was admitted to the hospital due to uncontrollable seizures, high fever, low blood pressure, and a high heart rate, and was diagnosed with sepsis. No citations were issued.

<span style="color:#2E74B5">HHSC – RCCR Closure Recommendation and DFPS Disallowance Summary</span>

On February 16, 2023, HHSC staff submitted a recommendation to close the foster home based on concerns including inadequate supervision, safe sleep violations, and failure to report household members or frequent visitors for background checks. The recommendation summarized the investigations related to foster children placed in the home but also noted that before being verified as a foster parent, the foster mother was investigated related to injuries suffered by a child that she provided nursing care to in community care:

> APSFC history showed that the foster mom served as an LVN to a child in community care in 2016. It was alleged that she was negligent in her care of him by causing the child to have a lung injury which caused excessive bleeding and a diagnosis of pneumonia by not wetting his tracheostomy bib on 7/29/16. It was alleged that she refused to give the child a bath prior to a medical appointment on a different unspecified date and that the child's caregiver felt that the nurse was distracted by her phone or tablet. The case was closed as [the foster mother] was an LVN and thus under the regulation of the Texas Board of Nursing. The alleged injuries got more severe with each allegation pneumonia, broken femur, sepsis, death.

The Recommendation for Closure was approved and signed by HHSC Leadership on March 10, 2023.

The narrative cites the child fatality, the finding of UTD for allegations of abuse related to the child fatality, failure to ensure the monitor in the child's room was working the night of the death, and previous citation for safe sleep with the same child that passed away as contributing to the recommendation to close the home.

On March 15, 2023, HHSC sent a letter to Arrow Child and Family Ministries of Texas, notifying them of the recommendation to close the home. The letter states that the recommendation decision was based on the four deficiencies listed in the above investigations, noting that the deficiencies create an endangering situation.

A letter dated April 10, 2023, from DFPS to Arrow Child and Family Ministries informed the foster home that it was being disallowed any future placements of children. The basis for its decision was minimum standard violations regarding the foster parent's supervision abilities for the vulnerable population she was licensed to serve. The memorandum stated that the foster parent "received an Unable to Determine (UTD) and a Neglectful Supervision citation in an investigation where a primary medical need child died in her car. Child Care Regulations recommended home closure due to the concerns listed above.

During the period this home was open, IMPACT shows there were four children placed in the home and two children adopted. IMPACT reflects that no children have been placed in the home since July 2. 2022.

## Children of Diversity

Children of Diversity verified this foster home on April 20, 2020; the home voluntarily closed with deficiencies on October 5, 2023.

When the CPA relinquished the home's verification, Children of Diversity had been on Heightened Monitoring since August 8, 2022. The Heightened Monitoring Plan lists pattern and trend categories, including background checks, caregiver responsibility - supervision, child's rights, discipline and punishment, leadership responsibilities - record keeping, and serious incident reporting.

While it was open, the foster home was the subject of two DFPS investigations for abuse, neglect, or exploitation and two minimum standards investigations.

## ANE Investigations Summaries

**On September 18, 2023**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after a report was received for concern of a three-year-old foster child due to the foster parent's son having a previous allegation of sexual abuse of a child.

The investigator learned that the adult son of the foster parents had recently been the subject of a CPS investigation that resulted in an RTB for Sexual Abuse. There was concern about the safety of the children. The foster parents denied knowing that an RTB had been issued.

The two older children residing in the home denied anything inappropriate occurring in the home.

The foster parents stated they do not believe the allegations made against their son are true. They denied that their son had any unsupervised contact with the children placed in their home and that they were the only caregivers for the children. The foster mother refused to implement a safety plan requiring her son to leave the house.

DFPS Ruled out the allegations of Sexual Abuse and Neglectful Supervision, and no citations were issued. HHSC issued six citations for violations of minimum standards associated with supervision (because the foster parents refused a safety plan), caregiver responsibility (for not exercising competent or prudent judgment because they allowed someone with a substantial sex abuse finding to be present in the home), incident reporting (2)(for failing to report multiple investigations of ANE by other entities and for a substantiated sexual abuse finding by a household member), CPA administrator responsibilities, and child placement management staff responsibilities.

**On September 22, 2023**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after a report was made to SWI alleging that a child who was previously placed in the home made an outcry that he once smoked THC, marijuana, and nicotine with the foster parents' adult son and that the foster mother yelled at him and threatened to "ship him away." The child also alleged that the foster mother, who worked at a detention facility, would "tell [him] scary stories."

The child denied that the foster parents used physical discipline but again said that he smoked nicotine and THC with the foster parents' adult son five or six times and said that when the foster mother got mad at him, she threatened to "get him out of the home." He said the foster parents were not aware that he smoked with the adult son. The adult son and foster parents denied the allegations. None of the collateral adults who were interviewed expressed concerns. DFPS Ruled Out the allegations.

## Standards Investigations Summaries

- On November 18, 2022, HHSC initiated an investigation after the foster parent reported that an eleven-year-old child in care threatened another eleven-year-old child in care "that he was going to [sic] use his finger and go inside his butt like he did with his other brothers and sisters." The eleven-year-old denied making the threat to the other child and denied ever being sexually aggressive with his siblings. The other eleven-year-old reported that he was threatened but denied ever being touched. The foster mother was home at the time and providing supervision. No citations were issued.

- On May 19, 2023, HHSC initiated an investigation after the foster parent reported taking a two-year-old child in care to the hospital after the child ran into a table the night before and woke up with a red bruise the size of a quarter on his right cheek.

  All the household members were interviewed and shared a consistent story about the two-year-old hitting the kitchen table. Medical records indicated the injury was superficial and consistent with the explanation of how it occurred. No citations were issued.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

On September 28, 2023, HHSC staff submitted a closure recommendation for this foster home. The closure recommendation was primarily based on the concern that the foster parent's biological son has a substantiated finding of Sexual Abuse and was living in the home. The foster parents refused to sign a safety plan requiring the son to live elsewhere. HHSC leadership approved the recommendation for closure on October 5, 2023.

DFPS placed the foster home on the December 22, 2023, Disallowance List, approved by the DFPS Legal Department the same day.

In a letter dated December 15, 2023, DFPS notified the Children of Diversity, CPA, that this foster home was being disallowed for future placements of children in care.

During the period this home was open, IMPACT shows there were seven children placed in the home. IMPACT shows that no children have been placed in the home since September 9, 2023.

St. Jude's Ranch for Children - Texas Region, Inc.

Benchmark Family Services verified this foster home on March 23, 2018, and relinquished the verification on February 20, 2020, due to non-compliance. On September 30, 2020, Bair Foundation CPA verified the home. The home voluntarily closed on December 31, 2020, without deficiencies. Ten months later, on October 26, 2021, St. Jude's Ranch for Children CPA verified the home. St. Jude's involuntarily relinquished the home's verification due to deficiencies on January 3, 2023.

While open, the home was subject to 18 investigations: five DFPS investigations of abuse, neglect, or exploitation, and 13 minimum standards investigations.

ANE Investigations Summaries

**On October 31, 2019**, DFPS initiated an investigation for Physical Abuse after medical personnel reported that the foster mother "admitted to purposely overdosing [a seven-year-old foster child with Autism] on ADHD medications to keep him quiet."

The investigator interviewed the child's psychiatrists and the RN whose office was involved in the report; both denied that the foster parent admitted to purposely over-medicating the child. They reported that the child appeared sleepy and lethargic during the office visit. The child's psychiatrist expressed concern about the dosages following the child's release from a psychiatric hospital but also expressed concern about the possibility that the foster mother was over-medicating the child.

The foster mother said that she administered medications as prescribed after the foster child was discharged from the hospital. She further stated that the child's psychiatrist became upset that the child was prescribed certain dosages. The psychiatrist reduced the dosages, and the foster child's "behaviors...increased" after the dosage change. She told the investigator that she "dropped" the psychiatrist as the foster child's doctor.

The investigator reviewed the child's medication log. The child was prescribed "Amantadine 100 MG, Risperidone .50 MG, Clonidine .2 MG, and Divalproex Sodium [sic] 250 MG" following his release from a psychiatric hospital on October 15, 2019. The psychiatrist refilled all except Amantadine on the appointment day, October 30, 2019. The inspector found that the medication count matched the medication logs.

The investigator Ruled Out the allegation of Physical Abuse, and HHSC issued two citations: one for medication logs "not hav[ing] medications counts and [being] incomplete" and one for psychotropic medication documentation requiring caregivers to record noticeable changes in a child's behavior in response to medication.

**On December 2, 2019**, DFPS initiated an investigation for Neglectful Supervision based on a report that an eight-year-old[434] choked a six-year-old foster child while she was brushing her teeth. The intake also noted that the eight-year-old had recently been released from a mental health hospital, "started having behaviors again" a few days after his release, "'lost it'" at a Walmart, and was subsequently admitted to another psychiatric hospital.

The six-year-old child stated that the eight-year-old first pushed her and her younger brother while she was helping her brother brush his teeth. She noted that the foster father placed the eight-year-old child in the corner. Later that day, the 8-year-old pushed, hit, and then choked her. She said that, during the choking incident, the foster father was sleeping, and the foster mother was getting ready to go out.

A collateral foster child stated that she did not witness the choking incident but that the same day, the eight-year-old child hit her in the jaw with a closed fist and called her a "bitch'" while they were at Walmart. She said that the foster mother stopped the eight-year-old by grabbing his arms and putting him in a "mobile scooter car."   She reported that the foster mother took the eight-year-old to the hospital later that night.

A friend of one of the foster children who was present during both incidents stated that the choking incident occurred in the morning, and she was awakened by the children yelling, "Stop hitting me." The friend confirmed that the eight-year-old child hit another foster child at Walmart, and the foster mother held his arms and placed him in a "scooter and exited the store with him."

The foster parents confirmed intervening during the choking incident and talking with the eight-year-old about choking. The foster mother also confirmed the incident at Walmart, and she added that later that evening, the child continued to be physically aggressive in the home. The foster mother said that she messaged both the child's caseworker and the home's case manager to inform them about the child's out-of-control behavior and that he required hospitalization.

The investigator Ruled Out the allegation of Neglectful Supervision, and HHSC issued a citation for background checks due to the CPA not submitting one for the foster child's friend (who was over the age of 14) who stayed the night on more than one occasion.[435]

---

[434] This is the same foster child discussed in the investigation initiated on October 30, 2019. He turned eight during that investigation.

[435] The CLASS notes for the citation provide, "A young adult, that did not have a background check at the time, was allowed to spend the night and frequently visit the foster home. Interviews with the household members corroborated this information as did the young adult in their interview. The home had been cited in a previous investigation in September 2019 for allowing this person to provide unsupervised care

**On December 11, 2019**, DFPS initiated an investigation for Physical Abuse after a three-year-old foster child made an outcry that the foster mother hit him and his two-year-old brother with a toy and belt. The intake stated that the three-year-old urinated on himself when making the outcry, and he did not want to return to the home. The intake also alleged that the foster mother spoke negatively about the foster children, and she left other foster children in her vehicle when she brought the two-year-old and three-year-old children into daycare.

The investigator interviewed an 18-year-old collateral foster child who was living in a different home at the time of the investigation. In addition to what was documented in the intake narrative, the 18-year-old stated:

- She had to clean and cook for everyone in the house. She did "basically everything for everybody," and had to "stay up until 3 a.m. to finish the chores so she wouldn't get in trouble."
- Watched the other foster children in the home at night until the foster mother returned home at "12 or 2 a.m."
- Prepared the other children for school in the morning and took them to the bus. She would miss her own school bus pickup because she was helping the other children. The foster mother would yell at her for missing the bus.
- The foster mother yelled and cursed at her, threatened her placement, and "told her she disgusts her." She also alleged that the foster mother called her "crazy" and threatened to put her in a hospital.
- The foster mother slapped and spanked a two-year-old foster child when she "pooped or didn't listen."
- Another unknown 25-year-old person stayed at the home "for about one and a half months."
- The foster mother gave away some of her belongings, and she had only "one pair of shoes and 5 clothes [sic]."
- The foster mother favored one of the foster children over the others "because they were not black."
- There was an incident when the foster mother did not order food for her when she was hungry. She said the foster parents sometimes denied foster children a meal when eating out if they misbehaved.
- She lost her job because the foster mother would not provide a reliable ride, so she was forced "to walk to and from work."

The youth denied witnessing the foster mother hit the three-year-old foster child but reiterated that the foster mother spanked and slapped the two-year-old foster child. She alleged that the foster mother would stay in the car and instruct her to take the two and three-year-old children into daycare.

---

to the children without background checks. At the time this investigation was conducted, this person continued not to have a background check ran by the operation."

The three-year-old foster child was withdrawn during the interview. Initially, the investigator referred to the foster mother as "Mom" to the three-year-old. A daycare worker, also present during the interview, explained that the child referred to her as "foster mom." The three-year-old denied the allegations of being hit with a toy or belt. The investigator interviewed the two-year-old foster child in the home. The two-year-old also denied being hit with a toy or belt.

Two other collateral foster children denied being hit with a toy or belt, and each told the investigator they got enough to eat and felt safe in the home. They both told the investigator that the two-year-old foster child got bruises on her back while climbing and falling at the park. They both also denied being belittled by the foster mother.

Another collateral foster child told the investigator he did not know how the two-year-old child got the bruises on her back, and he denied that the foster parents hit him with or without a belt. He also told the investigator that he received enough food.

The daycare worker and teacher both told the investigator that the two and three-year-old foster children arrived at daycare scared and said that the foster parents hit them. They said that the children told them that the foster mother hit them with a broken toy. They both said that the foster children told them that they were "starving" and "hungry all the time."

The foster parents denied hitting, withholding food from, or belittling the children. The foster father admitted to yelling at the children sometimes, but the foster mother denied yelling. They denied leaving foster children unattended in the car while dropping off the younger foster children at daycare, but they both admitted that they sometimes left some of the children in the car with the (then) 17-year-old foster child because she "can supervise them." The foster father told the investigator that the two-year-old foster child arrived at their home with a bruise on her back, but the foster mother said that she fell while playing at the park.

The investigator Ruled Out the allegations of Physical Abuse, and HHSC issued no citations.

**On February 22, 2022**, DFPS initiated an investigation for Neglectful Supervision based on a report that a 10-year-old foster child (the same child involved in the investigations initiated in October and December 2019) was admitted to a psychiatric hospital after being aggressive "at home and at school," and that he hurt other children at school, teachers, and the foster parents. The intake also alleged that the child hurt himself, pulled out his teeth, and defecated and urinated on himself.

The foster parents, teachers, and school psychologist all confirmed that the incidents of the child pulling out his tooth and urinating and defecating on himself occurred at school. The foster parents told the investigator that he did not exhibit these behaviors at home, and the foster mother said she provided him with his medications as prescribed. The case manager told the investigator that she had reviewed the medication logs and that she had never seen an issue.

The investigator Ruled Out the allegation of Neglectful Supervision, and HHSC issued no citations.

**On September 1, 2022**, DFPS initiated an investigation for Neglectful Supervision and Physical Abuse after SWI received an intake regarding a seven-and-a-half-month-old infant with a "dime sized [sic] bruise" on her cheek and a "3-inch (possibly bigger) bruise" on her left inner thigh. The daycare reported that the foster parents picked up the infant on a Friday afternoon and did not return the child until Wednesday morning.

The incident report filed by the foster mother stated that, while shopping at a furniture store, the infant was still in her car seat when the foster mother placed the car seat on the ottoman. Another foster child who was with them "bumped into the car seat by accident," and the infant "was half buckled into the car seat." The foster mother reported that the "bottom seatbelt squished her thighs."

The photos taken by the investigator revealed that the bruises on the infant's inner thigh were larger than a "squished" thigh from a seatbelt. The FACN report stated that the infant had bruises on her "cheek near the corner of mouth [sic]," and the "foster mother gave 2 explanations: male child in home knocked her over while in care seat & male child pulled her off the ottoman." The physician noted concerns for physical abuse, noting the bruising sustained by the child "appears to be a cluster of small, rounded bruises consistent with a forceful grab by an adult."

The investigator issued an RTB for Physical Abuse by an unknown perpetrator and Neglectful Supervision for the foster mother, and HHSC issued a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect. During the administrative review process, DFPS changed the RTB disposition for the Neglectful Supervision by the foster mother to Ruled Out. The citation was also overturned during an administrative review conducted by HHSC.

## Standards Investigations Summaries

RCCR investigated 13 minimum standards allegations for the home while it was licensed across the three agencies. Three investigations related to inappropriate discipline and allegations of children being hit by the foster parent. One investigation included an allegation of threatening a child's placement, three related to supervision (including allegations related to children who self-harmed), and two involved allegations that the foster parents withheld food as punishment.

The 13 investigations resulted in three additional citations. HHSC issued one citation to the home related to withholding food as behavior management, one for background checks due to the foster parents allowing an unapproved person to provide supervision and for allowing an unapproved frequent visitor to have access to the children, and one for transporting children in a vehicle without car seats.

## HHSC – RCCR Closure Recommendation and DFPS Disallowance Summary

The HHSC staff submitted a Closure Recommendation on October 28, 2022, based on the home's "extensive number of investigations," pattern of allegations, and the citations issued for background checks, inappropriate discipline, not reporting a foster child's adverse reactions to medication, withholding food as a form of behavior management, not transporting children in proper car safety systems, and not completing medication logs timely. The Closure Recommendation Form describes concerns about one child being involved in seven minimum standards investigations and three ANE investigations. HHSC leadership approved the recommendation for closure on February 1, 2023,

In a letter dated August 4, 2023, DFPS notified St. Jude's Ranch for Children – Texas Region, Inc (CLOSED) that the home was disallowed for any future placements. The letter cites concerns for a pattern of standard violations, an RTB for Physical Abuse on an unknown perpetrator for unexplained injuries to a child while placed in the home, and a citation for children's rights. The home was placed on the DFPS August 31, 2023, Approved Disallowance List. Approval by the DFPS Legal Department was dated August 15, 2023.

CLASS reflects that St Jude's Ranch for Children closed the home involuntarily due to deficiencies on January 3, 2023. During the period this home was open, IMPACT shows there were 26 placements of a child in the home. IMPACT reflects that no children have been placed in this home since October 25, 2022.

### Forever Families

On May 25, 2018, Heart of the Kids Social Services, Inc. verified this foster home. The CPA relinquished the home on March 21, 2021, when the CPA closed. Forever Families CPA (Forever Families) next verified the foster home on April 18, 2022. The home closed on July 31, 2023, involuntarily due to deficiencies.

While the home was open, it was subject to two DFPS investigations for abuse, neglect, or exploitation and two minimum standards investigations.

### ANE Investigations Summaries

**On December 23, 2020**, DFPS initiated an investigation for Physical Neglect after a CPS caseworker reported that during transportation of a one-year-old child to an extended visit with a great-great uncle, the child's private area was observed to be "very raw," and the diaper rash appeared untreated. The CPS caseworker noted that the foster mother had previously taken the child to the doctor and was given a prescription but failed to send the medication with the child for the visit. The rash improved with treatment.

The foster mother reported that she took the one-year-old to the doctor when she noticed the diaper rash. She said the doctor informed her the child had pink pigmentation left over from a previous diaper rash. The foster mother stated that she applied the prescribed medication to the rash, which lasted no longer than a week. She denied that the child had the rash when the child left for the visit but acknowledged the presence of pigmentation. The foster mother stated that she received notice of the visit the day before and claimed she was not asked to pack any medication for the child.

None of the four other foster children residing in the home made any outcries of abuse or neglect during interviews.

The investigator reviewed medical records and medication logs and found that the foster parent documented applying the prescribed ointment between November 19 and November 31, 2022.

DFPS Ruled Out the allegation of Physical Neglect, and no citations were issued.

**On March 3, 2023**, DFPS initiated an investigation for Physical Abuse following a report from a school employee that a nine-year-old child arrived at school with marks on his face and body that were not there the day before. The child reported that "his mom pushed him and grabbed his head by his hair."

When he was interviewed, the nine-year-old, who had limited verbal ability, confirmed the injuries to his face were made by "the lady." He demonstrated by shaking his head and grabbing his shoulder. Although unable to clearly articulate how he was injured, he was observed with a bruise near his left eyebrow and another by his hairline, as well as multiple marks and bruising on his left shoulder and back.

The foster mother stated that the child had no other caregivers but could not explain how the child's injuries occurred. The foster mother mentioned that the child had a tantrum while she was trying to get him to the shower, during which he scratched his face and pulled at his collar. She reported that another child in the home was in his bedroom on his computer when the tantrum occurred. She said she did not notice a scratch until the following day. The foster parent stated she did not have the opportunity to make a report before the school made the report.

A collateral child residing in the home stated he did not witness the 9-year-old throwing a tantrum but mentioned that the foster mother told him it occurred at school. After review of the injuries and information, the FACN determined that the injuries were nonspecific and could have been caused by abuse or accidentally.

A former kinship caregiver for the nine-year-old stated that the child disclosed that the foster mother pulled his hair. The child's CPA case manager also reported that the child said, "the woman did it."

DFPS closed the investigation with a UTD finding for Physical Abuse. HHSC issued three citations, one for a minimum standard associated with serious incident reporting,

one for other prohibited discipline, and one for capacity for having more than one child in the home, though it was verified for only one child.

## Standards Investigations Summary

HHSC investigated allegations of minimum standards violations twice but did not issue any citations.

- On April 11, 2019, HHSC initiated a standards investigation after a CPS staff reported that a four-year-old child in care was observed with multiple dark bruises. The child had a big bruise on his right forearm and two on his right leg. The same CPS staff called in the intake after the foster parent reported that the 4-year-old ran into a door and cut his head. The foster mother reported taking the child to the ER.

  The four-year-old denied any physical discipline. A collateral child reported that the foster mother spanked the four-year-old with her hand or a belt hanging on the treadmill and slapped the hand of another child in the home. The collateral child confirmed that the four-year-old ran into the door, scratching his head. The foster mother denied using physical discipline and reported that the four-year-old has tantrums, throwing himself on the floor.

  The investigation was closed, and no citations were issued.

- On August 2, 2019, HHSC initiated a standards investigation for a report that the foster parent dropped off a 12-year-old child in care at the YMCA at 6:00 a.m. and left unattended; it is unknown what time the child was packed up. The report included that the child is not part of the summer program and is not being supervised according to his child's plan.

  The foster mother and the CPA staff acknowledge that the 12-year-old is dropped off at the YMCA and that the child participates in classes there. The mother and staff also reported that the child's CPS caseworker knew about the arrangement. HHSC closed this investigation without citation.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

On October 18, 2023, RCCR staff recommended closing this foster home. The recommendation was based on a pattern of investigations involving discipline-related allegations and citations issued in 2023. HHSC Leadership approved the recommended closure on October 19, 2023.

In a letter dated October 26, 2023, HHSC notified Forever Families of the closure recommendation. The letter lists four deficiencies received by the home and states: "The recommendation was based on a high-risk deficiency or a pattern of allegations, deficiencies, and sampling concerns that create an endangering situation."

DFPS placed the foster home on the agency's August 31, 2023, Disallowance List with an approval date by the DFPS Legal Department on August 15, 2023. In a letter dated August 4, 2023, DFPS notified Forever Families of disallowance for future placements of children in care. The letter details standard deficiencies for lack of prudent judgment and serious incident reporting as the reasons for disallowance and also mentions the UTD disposition for unexplained bruises on a special needs child.

IMPACT indicates no children have been placed in this home since July 31, 2023, after the foster mother adopted a 16-year-old who had been placed in the home as a foster child. During the period this home was open, IMPACT shows there were 16 placements in the home.

## Noble Children's Services

The Bair Foundation -Tyler branch (Bair) verified this home on June 15, 2018.[436] The CPA relinquished the home on August 13, 2021, listing a reason of "CPA Closed."[437] On December 27, 2021, Noble Children's Services verified the home. The CPA relinquished the verification on September 1, 2023, when the home voluntarily closed without deficiencies.

While the home was open, it was the subject of six investigations: four DFPS investigations for ANE and two minimum standards investigation.

## ANE Investigations Summaries

**On June 7, 2021**, DFPS initiated an investigation for Physical Abuse after a DFPS staff observed an eight-year-old foster child with a bruise beneath his right eye.

During the investigation, the foster father stated that the eight-year-old child, who is non-verbal, "slipped and fell" while taking a bath despite "holding onto the rail." After the incident, the foster father notified the case manager. The foster mother, a pediatric nurse, explained that she arrived after the fall took place but examined the eight-year-old child and applied ice to the child's eye. Both foster parents denied the allegations of physical abuse.

A collateral child denied witnessing the incident but did confirm that the foster father was in the bathroom with the eight-year-old. An FACN report indicated that the eight-year-old injuries were not "specific to abuse" and could be explained by falls.

---

[436] Class notes this home was previously license in Kansas.
[437] It is not entirely clear how this relinquishment reason is being used. The Tyler branch of Bair Foundation is still open.

The investigator Ruled Out the allegations of Physical Abuse, and no citations were issued.

**On July 30, 2021**, DFPS initiated an investigation for Physical Abuse, Medical Neglect, and Neglectful Supervision of three children in care: a six-year-old, an eight-year-old child, and a 12-year-old child. Allegations included that the foster parent yelled, banged on an 8-year-old child's hand with her fist, physically forced medication, hit the eight-year-old on the arm, called the children names, and that a child had two black eyes. On August 2, 2021, a second intake was received, alleging that the foster parents "forced medication" in the eight-year-old's mouth and then placed a sock in the child's mouth to make him swallow.

The 16-year-old adopted daughter, who was one of the reporters of the allegations, recalled witnessing the foster mother "slap," "push," and grab a foster child "a couple of times." The 16-year-old reported she was left to supervise a foster child for 30 minutes in the past and that the foster mother "banged" her fist on a child's hand. The 16-year-old described the foster mother as "harsh," however, she said that the foster mother "take[s] good care of the children" and denied physical discipline was used in the home.

The investigator interviewed the 12-year-old child in care, who denied the foster parents used physical discipline in the home but confirmed they provided supervision. She stated she received her medication and explained she saw a sock on the eight-year-old's mouth one time but was unsure who placed it there.

The foster parents denied using physical discipline on any of the foster children and reported providing appropriate supervision to the children. The foster mother stated that the children are administered their medications and transported to medical appointments.

The six-year-old and eight-year-old children mentioned in the intake were nonverbal; the investigator observed the children and noted no concerns. The investigator reviewed service plans, home study and addendum, critical incident reports, and the foster parents' training history.

The investigator Ruled Out Physical Abuse, Medical Neglect, and Neglectful Supervision and issued no citations.

**On June 21, 2023**, DFPS initiated an investigation for Neglectful Supervision of a six-year-old foster child. The intake alleged that the foster mother utilized "a safe bed," a bed meant for "persons with seizure," to confine the six-year-old while in "time out." The foster mother also allegedly attempted to record the child having a "tantrum," which appears "somewhat taunting."

During the investigation, the six-year-old, who is "paralyzed from the waist down," reported going to the safe bed for a time-out when he was "being bad." He stated he was not injured while in the safe bed but disliked it.

The foster mother explained she was "fearful" that the six-year-old would hurt himself, so she placed him in the safe bed but did not "completely close it, still allowing movement." The foster mother reported being in the room while the child was in the safe bed. The foster father corroborated the foster mother's actions.

The investigator Ruled Out the allegation of Neglectful Supervision after the FACN report found that using a safe bed to prevent the child from injuring himself and others was a "reasonable solution." HHSC issued no citations.

**On July 7, 2023**, DFPS initiated an investigation for Physical Abuse, Physical Neglect, Medical Neglect, and Neglectful Supervision after medical staff reported that a six-year-old child in care who has quadriplegia stated that the foster mother "pulled out his feeding tube," and that she prohibited him from using a wheelchair in the home. Medical staff observed the child having "sores and abrasions" on his knees and shins, indicating he had been "crawling without knee pads." Other allegations reported were that the six-year-old may have had prolonged exposure to sunlight and that law enforcement has been "called" on the child. On July 10, 2023, a second intake was received when a DFPS worker reported concerns regarding the six-year-old's feeding tube and injuries on the child's "knees and feet."

The six-year-old child refused to be interviewed. The foster mother explained that she had medical knowledge on how to maintain the child's feeding tube and that the child had knee pads available to him; however, she was unable to locate them. She stated that the wheelchair was removed after the child "tried to run over other children." The foster father confirmed that the child had knee pads and that they encouraged him to wear them.

The pediatrician and occupational therapist agreed that removing the wheelchair from the child was appropriate due to his behaviors. Medical professionals had no concern about the child being on the floor and not in the wheelchair; however, they expressed concern regarding the child using a skateboard to maneuver his way through the house.

The investigator Ruled Out the allegations of Physical Abuse, Physical Neglect, Medical Neglect, and Neglectful Supervision. HHSC issued two citations for violation of minimum standards associated with protective devices and supportive devices because the foster parents removed the child's wheelchair as a form of behavior intervention and were using the child's "safety net bed" as a form of behavior intervention without a recommendation from a professional.

Standards Investigation Summary

On May 8, 2019, HHSC initiated an investigation after school personnel alleged that a six-year-old foster child who used a wheelchair or a walker was not receiving the assistance she needed. Three intakes alleged that the child had ankle casts on her legs due to deformed feet and that the foster parents forced her to walk from the house to the bus and was not helped when she stumbled or fell. Another intake alleged that one

morning, the foster parent was in a rush to dress the child and "lifted [the child] up as if [she] was making a handstand and then let [her] go, causing the child's knees to hit the floor 'real hard.'" The third intake alleged that the foster parent "picked [the child] up by her underarm and neck and slammed [her] on her knees causing pain." None of the reports noted any observable injuries. The investigation was opened as a "Priority 4 – CPA internal investigation requiring inspection."

During the investigation, the six-year-old confirmed that the foster parents assisted her when needed. Another foster child living in the home, who also used a wheelchair, corroborated that the foster parents render aid when necessary. The foster parents denied the allegations of not assisting the six-year-old and denied knowing the child fell on her way to the bus. The foster parents described the six-year-old as a "manipulator" who likes to be "babied."

During the home inspection, HHSC staff observed medication on the counter and that the home was "cluttered and had dirty clothes and dishes in the sink." During interviews, the foster parents stated that children's phone calls are monitored. HHSC issued four citations for minimum standards associated with foster home screening (because the CPA did not acquire complete information from the previous state where the home was licensed), interview for foster home screening, child's rights (because the foster parents monitored phone calls), and physical environment.

## Sampling Concerns

Three home sampling inspections identified eight concerns. These concerns included medication storage, the physical environment—cleaning supplies were accessible to children—medical records—not available for review—and foster home screening—not making a diligent effort to contact the adult son of foster parents and not including proper information.

## HHSC - RCCR Closure Recommendation and DFPS Disallowance Summary

HHSC staff submitted a recommendation for closure to HHSC leadership. The recommendation noted the home's history of investigations and citations and stated:

> There are currently two open ANE investigations involving the same 6-year-old child who has a spinal cord injury and relies on a wheelchair to ambulate. The foster parents cared for him for approximately one month and appeared to have been overwhelmed with his behaviors. In the short time he was placed in the home, foster parents contacted law enforcement twice, took him to be assessed by a psychiatric hospital twice, and contacted the crisis center three times. They used a safe bed for time-outs when experiencing tantrums and to keep him separate from other children. Additionally, they removed his wheelchair from him inside the home after they said he rammed into the foster parent. He then relied on a

skateboard to ambulate until it was also removed from him due to the same concerns. Though the child does crawl, he requires knee pads to protect his skin from breakdown. Knee pads do not appear to be used and the child had multiple sores on his knees and ankles.

The foster home is a PMN home. The home has continued to receive allegations of PHAB, NSUP, and inappropriate discipline. The home currently has 2 A/N cases pending closure. The population of children they serve have primary medical needs and the amount of investigations and types are a concern. There have been four medication-related citations/TA/SC.

CLASS indicates that a letter providing notice of the closure recommendation was sent to Noble Children's Services on August 11, 2023.

The home was placed on the August 1, 2023, DFPS Disallowance List with an approval date by the DFPS Legal Division of July 31, 2023. In a letter dated July 11, 2023, DFPS notified Noble Children's Services that this home was disallowed from any future placements of children in care. DFPS based its decision on the home's July 10, 2023, monitoring assessment that resulted in a citation for "Beds and Bedding related to a child's mattress being placed on the floor as a means of addressing negative behavior" and "serious safety concerns regarding the foster parents' decision to remove a paraplegic child's wheelchair as a form of discipline." The letter also notes that a previous CPA closed the home due to concerns about "not reporting serious incidents regarding a child who sustained injuries."

According to CLASS, the home voluntarily relinquished its verification on September 1, 2023, without deficiencies. IMPACT reflects that no children have been placed in the home since July 20, 2023. During the period this home was open, IMPACT shows there were 13 placements of a child in the home and two children adopted.


## Denied HHSC Closure Recommendations

### The Sanctuary Foster Care Services
*Home Still Active*

Benchmark Family Services verified this foster home on March 6, 2018. The home remained with this CPA until May 29, 2020. The Sanctuary Foster Care Services CPA (The Sanctuary) verified the home on May 30, 2020. CLASS reflects that the home remains open and verified with The Sanctuary Foster Care Services.

Since first being verified, the home has been the subject of three investigations: an investigation by DFPS for allegations of abuse, neglect, or exploitation and two standards investigations by HHSC.

DFPS initiated an investigation on January 24, 2022, for Neglectful Supervision and Medical Neglect after hospital staff reported that while a 17-year-old foster child was placed in the home for a respite stay, she overdosed on her psychotropic medications and blacked out. The 17-year-old reported she was sexually assaulted by another foster child in the home while she was under the influence of the medications.

The 17-year-old foster child told the investigator that she had been staying in the foster home for weekend respite care. On the weekend in question, her boyfriend had ended their relationship while she was at the respite home and she reached out to her peers in a supervised chat group operated by the CPA. She told the investigator that she became upset during the chat, took 14 medication pills, and overdosed. She explained that after she began to feel the side effects of overdosing, she fell off her bed, "busted her head open," was vomiting, and was coming in and out of consciousness. She said a male foster child who lived in the home began to remove her clothes, telling her that she needed to change her clothes; she remembered he was touching her and "tried to put his thing inside of me." When she woke up, he was gone, and a new pair of shorts were pulled halfway up. She located her phone and called 911. She told the investigator that her foster mother had given her the medications this time because the respite foster mother picked her up directly from school; the investigator reported this to SWI. She also informed the investigator that she was her own medical consenter.

Two collateral foster children told the investigator they contacted a CPA staff member who was monitoring the group chat, and the respite foster mother. They reported that the respite foster mother muted her phone in the evening so as not to wake up the adopted child who slept in the room with her, so they could not speak with her to report their concerns.

The employees of The Sanctuary who were supervising the group chat informed the investigator that it was not evident that the 17-year-old was considering self-harm. One of the adults who contacted the 17-year-old directly and privately said the child messaged that she was "okay and just got frustrated." This staff member also reported that he contacted the respite foster parent by phone and text but received no response. He also said a supervisor was not notified.

During the investigation, multiple collateral children reported that the foster mother left them at home alone when she went to get food or run errands, despite the children's Service Plans indicating they were not allowed to be unsupervised due to past high-risk behaviors. The children also told the investigator that they had awakened in the mornings to find that the foster parent had already left the house without their knowledge.

Two RTBs were initially issued for Neglectful Supervision: one for the foster parent leaving the foster children alone for unknown periods and another for a CPA staff

member failing to intervene after becoming aware of concerns for the foster child's safety. Following an Administrative Review, both RTBs were overturned.

HHSC initially issued eight citations; however, two were overturned during the administrative review process. The six citations remaining included: CPA not updating the home study on adoption/changes in capacity; CPA not approving and documenting the placement of foster children in respite; two for the respite caregiver/foster parent not following foster children's supervision requirements in their Service Plans (supervision, service plan implementation; medication storage due to the foster child having her medications on her while in transition to respite; and respite caregiver not being informed of pertinent information.

## Standards Investigations Summaries

This home was the subject of two minimum standards investigations. On August 9, 2021, HHSC initiated an investigation for inappropriate discipline after it was reported that the foster mother poured water on a 17-year-old foster child to wake him up when he did not comply with the foster parent's request that he get out of bed. The foster mother admitted to the incident, and one citation was issued for prohibited discipline.

The second investigation by HHSC, initiated on September 6, 2023, alleged that the CPA was still using the foster home for respite care. This investigator concluded that the home was still eligible for verification, and no citations were issued.

## HHSC – RCCR Closure Recommendation and DFPS Disallowance Summary

RCCR staff submitted an Agency Home Closure Recommendation on March 20, 2023. The recommendation was based on the respite caregiver/foster parent receiving multiple medium-high and high citations. The notes in the recommendation form state that "[a]lthough the RTB for NSUP was overturned, there are still concerns for supervision in the home."

HHSC denied the closure recommendation on April 27, 2023, stating that additional oversight of the home would be provided.

CLASS reflects that the home's verification is still active. According to IMPACT, two children were placed in the home on June 1, 2023, and subsequently removed on July 27, 2023, due to "Risk (or actual) abuse or neglect." Both children were court-ordered to be placed back in the home on September 4, 2023.

DFPS placed the home on the June 6, 2023, Disallowance List, effective July 15, 2022. On June 6, 2022, DFPS issued a letter to The Sanctuary Foster Care Services advising that the home was being disallowed for future placements of children in care. The letter indicated the disallowance was due to "investigations involving Child Rights, Prohibited Discipline, Serious Incident Reporting, Supervision, Babysitter/Overnight Care/Respite

Provider Policy, Medication Storage, and Implementation of Service Plan." The disallowance letter further explained that "although the initial Reason to Believe (RTB) disposition was overturned, there are ongoing concerns for the [foster parent's] lack of prudent judgment."

IMPACT shows there have been ten children placed in the home and one child has been adopted.

The Dallas branch of the Bair Foundation first verified this foster home on October 15, 2003. The home changed CPAs and was verified by the Grand Prairie branch of Azleway Children's Services on December 15, 2006, until the CPA relinquished the verification on May 2, 2014, listing the reason as "other." On October 9, 2018, the home was verified by Passage of Youth North, a branch of Passage of Youth Family Center.

Passage of Youth Family Center was placed on Heightened Monitoring on June 2, 2021, with a Plan start date of July 27, 2021. The CPA has not yet moved off Heightened Monitoring. Concerning trend and pattern areas identified in the Plan included background checks, supervision, discipline and punishment, home oversight, foster home screenings, required training, and service plans.

Since opening, the foster home has been the subject of a total of 12 investigations: four DFPS investigations for abuse, neglect, or exploitation and eight minimum standards investigations.

### ANE Investigations Summaries

**On July 16, 2008**, DFPS initiated an investigation for Neglectful Supervision of a 14-year-old child and a 16-year-old child in care after the 16-year-old cut the 14-year-old with a knife during an altercation. The report included that the 14-year-old had a small scratch on her leg and did not need medical treatment. The report also alleged that police transported the 16-year-old to juvenile detention "for assault with a deadly weapon."

The 16-year-old reported that the 14-year-old was washing dishes when they started arguing, and then the 14-year-old "took a knife at her, but nothing happened." She also alleged that the 14-year-old attempted to choke her and that, while fighting, she "was able to grab the knife." She also confirmed that usually the "foster mother locks the knives in the pantry," except the 14-year-old "was washing the knives this time." She denied that the foster mother could have heard her and the 14-year-old child fighting. Both children confirmed that the foster mother was upstairs at the time of the incident. The 14-year-old reported that the 16-year-old "pulled a knife on her, and she got a

scratch by her neck." She added that the foster mother "came downstairs when she called her." Both children confirmed that the police arrested the 16-year-old.

The foster mother confirmed that "she normally keeps the knives locked up," but "two steak knives were out as they had eaten steak." She also confirmed that the 16-year-old "had come and complained" about the 14-year-old not washing the dishes properly and she instructed her to leave the 14-year-old alone. She confirmed she was not in the room at the time of the incident and that the 14-year-old told her that the 16-year-old "had cut her." She said that the 14-year-old "had a whelp" near her neck and that the police arrested the 16-year-old.

A collateral child in the home confirmed that the foster mother "usually supervises when they are cooking or in the kitchen." Two collateral children who were present during the incident confirmed that the foster mother was upstairs. One of these children confirmed that the foster mother came downstairs when one of the victims called her.

The investigator reviewed the children's treatment plans, which documented that line-of-sight supervision was required and that the foster mother was upstairs at the time of the incident.

The allegation of Neglectful Supervision was Ruled Out. One citation for violation of a minimum standard associated with supervision was issued.

**On December 9, 2011**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after law enforcement arrested a 17-year-old foster child for physically assaulting a 14-year-old foster child. The report stated that the foster mother contacted law enforcement after she learned about the assault when she observed a video recording of it on Facebook. The video showed the 17-year-old and a 16-year-old, who was also a foster child, physically assaulting the 14-year-old. The 14-year-old informed law enforcement that the assault occurred on December 4, 2011, and that she had been to the hospital twice since then for severe headaches and was diagnosed "with a concussion and closed head trauma." The 14-year-old said she "never told anyone for fear of retaliation." A second report by the CPA Case Manager indicated that the 17-year-old was arrested, and the injured child had bruising but no serious injuries.

The 14-year-old victim denied that they were ever left alone in the home. She reported that the foster mother entered her room after the assault had started and "verbally instructed the girls to stop fighting, and they did." She reported that immediately after the incident, "she was throwing up blood and bleeding." The 14-year-old reported having bruises and scratches on her face and confirmed that the foster mother took her to the doctor the next morning and that the foster mother took her to the hospital for a second visit to check for a concussion. The 14-year-old denied that she was diagnosed with a concussion.

A CPS worker confirmed that the foster mother took the 14-year-old to "her PCP" and "the ER" and that they did not find any serious injuries. She also added that the foster mother "down played the incident." The CPA's case manager said that she observed the

14-year-old the day of the incident with "scratches by her chin and a knot by her eye." She reported that, before this incident, two of the children had been left in the home alone without supervision and snuck two boys into the house and said she did not know if they "were allowed to be left home alone without adult supervision." The case manager said she did not call the incident in at the time because there were no serious injuries.

Both the 16-year-old and 17-year-old victims confirmed that the foster mother was home at the time of the incident but that she had left them home unsupervised on multiple occasions. Three collateral children also confirmed that the foster mother left them unsupervised in the home multiple times, and while she was not home, physical fights occurred between the children.

The foster mother confirmed that she had left children in the home unsupervised on two occasions but denied that she had left them alone at any other time. She also reported that she was present when the assault occurred, told them to stop, and then took the 14-year-old into her bedroom to clean her up. In her first interview, she stated that the 14-year-old's nose was bleeding. In her second interview, she denied this and instead said the 14-year-old "was bleeding from a cut on her chin, and she had a bruise on her back."

DFPS Ruled Out the allegations of Child-on-Child Physical Abuse but substantiated the allegation of Neglectful Supervision against the foster mother for all six children with a disposition of Reason to Believe.. Three citations were issued for violating minimum standards associated with supervision, serious incident reporting, and children's rights.

**On April 15, 2021**, DFPS initiated an investigation for Physical Abuse of a five-year-old child in care after the five-year-old outcried that her grandmother hit her "with a brush, switch, garden hose, and a fly swatter." The five-year-old also reported that her grandmother has "told her that if she does not behave, that she would be sent back to foster care."

The five-year-old victim denied "getting any spankings in the home" and apologized for lying, saying that "only her cousins get spankings in the home." The five-year-old's case manager denied that children in the home have "made any outcries to her when she speaks with them one-on-one." The victim's therapist and her OCOK worker, respectively, also denied that the child made any outcries regarding the foster home.

Collateral children in the home denied being spanked or left unsupervised while living in the home. The foster mother denied spanking the five-year-old or telling her "that she would go back to CPS." She also denied that her home is a kinship placement and added that the children do not call her grandma.

The allegation of Physical Abuse was Ruled Out, and no minimum standards violations were cited.

**On April 12, 2023**, DFPS initiated an investigation for Physical Abuse after a five-year-old made an outcry that the foster mother hit her with a belt. The report alleged

that the five-year-old had "a three-inch mark that broke the skin and is scabbed over" located on the back of her thigh. The report included that the foster parent spanks the five-year-old "when she gets in trouble."

When she was interviewed, the five-year-old told the investigator that the foster mother hit her one time with a black and brown belt. The child said she was spanked because her clothes got wet when playing at a neighbor's house. She also stated that her foster mother "made her get a scratch on her leg" when she spanked her. The child also denied "being afraid of anyone in the home." The investigator did not observe any scratches or bruises on the five-year-old.

Collateral children denied being spanked by the foster mother. The foster mother denied spanking the five-year-old and stated that the five-year-old was visiting the neighbor's house next door, and they had "rented a bounce house with a water slide." She explained she had told the five-year-old "not to get wet because [the five-year-old] was not feeling well" earlier that day. When the five-year-old returned home, the foster mother confirmed "she did fuss" for getting wet and that the five-year-old cried in response. The foster mother mentioned specific punishments, such as "sending the kids to their rooms," but did not mention using physical discipline in the home.

The allegation of Physical Abuse was Ruled Out, and no minimum standards violations were cited.

### Standards Investigations Summaries

Of the eight minimum standards investigations, four resulted in eight additional citations.

- On April 26, 2006, HHSC initiated an investigation after a 17-year-old child spent the weekend at a friend's house and did not return to the foster home as planned. The report stated that the 17-year-old contacted the foster mother to inform her that "she did not have a ride back to the foster home." The report added that the foster mother was unable to pick up the child because she had strep throat and was taking medication that prevented her from driving. The 17-year-old had two children who also lived in the foster home and did not accompany her on the weekend trip.

  The CPA conducted an internal review and cited the foster parent for failing to arrange for the 17-year-old child to be picked up or ensure that the child did not leave her friend's house by herself. The internal investigation also determined that the CPA did not receive written permission from the 17-year-old's managing conservator regarding the weekend spent at her friend's house.

  The foster mother confirmed that the victim and her two children were placed in her home for emergency respite care. She confirmed that she had not yet received any paperwork for the children. The foster mother also reported that the 17-year-old had "only been able to be enrolled in school about a week ago."

HHSC issued four citations for violating minimum standards for written policies, child rights, recordkeeping, and education.

- On April 26, 2010, HHSC initiated an investigation after a report was made to SWI alleging that a 16-year-old foster child bit a 14-year-old foster child on her arm "and then held a knife to her and threatened to kill her." The report also alleged that the 14-year-old only had one pair of pants and panties. The report also stated that law enforcement visited the home twice on the day of the altercation, and the 16-year-old child was transported "to a mental health facility."

  The foster mother confirmed that both children bit each other during a physical altercation. She stated that "she was in the shower" during the incident. She also stated that the 16-year-old child obtained a knife that was inside the van that a family member had left behind. The foster mother reported that she confiscated the knife from the 16-year-old. The foster mother confirmed that the 14-year-old child had more than one change of clothes but stated she needed to "get some additional clothing for the child."

  The 16-year-old confirmed that she bit the 14-year-old and that the 14-year-old bit her back. She reported that she obtained a knife from inside the van, that she threatened the 14-year-old with the knife, and that the foster mother took the knife away.

  The 14-year-old also confirmed the physical altercation with the 16-year-old, including that the two girls bit each other. She stated that the 16-year-old obtained "a small meat cutting knife about 4 inches long" from the kitchen and that she "threatened to kill her." The 14-year-old said that she ran upstairs and called for the foster mother and that the foster mother took the knife from the 16-year-old.

  HHSC issued one citation for violating a minimum standard associated with dangerous tools because the knife was left unsecured.

- On May 13, 2010, HHSC initiated an investigation after a school nurse observed a 16-year-old foster child with a black eye. The report stated that the 16-year-old told the nurse she hit a dresser in the middle of the night, which caused the injury to her eye. The report also stated that the foster mother learned about the injury when the school notified her.

  When she was interviewed, the 16-year-old victim reported that on the morning of the incident, the foster mother was at work, and the babysitter was not there. She reported that another child in the home hit her in the eye while they were arguing about a belt. The 16-year-old reported that, during the incident, the other child called the foster mother, who was at work. She stated that shortly after the fight, the babysitter came upstairs, asked them what happened, and examined the 16-year-old. The child reported that the babysitter "sent her to school anyway." Later at school, a teacher sent the 16-year-old to visit the nurse because she told the teacher that her

head and eye hurt. She confirmed that she did not tell the nurse the truth due to embarrassment and fear of retaliation. She said when she returned home that, the "foster mother asked her what happened and looked at her eye," and the foster mother said that this was "what happens when you steal or take other people's [sic] things without permission."

The inspector was unable to interview the other child involved in the altercation because she was on runaway status at the time of the investigation.

The babysitter for the children confirmed that she was running late by more than one hour on the morning of the incident. According to her, the foster mother contacted her and told her "to hurry to the home because the kids were upset about a belt." She stated that when she arrived at the home, she observed that the 16-year-old "was upset and crying" and that the 16-year-old told her that the other child had "hit her in the eye." She observed "a slight red area" near the child's eye. The babysitter also alleged that she informed the foster mother about the assault.

The foster mother confirmed that the babysitter "would be slightly late." She said that she received a call around 7:30 a.m. from the children regarding their argument over the belt. She added that she discovered the babysitter had not yet arrived and called her to ask her to hurry to the home. The foster mother said that a school social worker called her later that morning to inform her about the 16-year-old child's black eye. She denied that she knew of the child's eye injury but that she was already aware of the fight.

HHSC issued two citations for violation of minimum standards associated with supervision.

- On October 28, 2019, HHSC initiated an investigation after a medical professional reportedly observed bruises and scrapes shaped like fingerprints on the arm of an 11-year-old foster child. The 11-year-old reported that his previous foster parent "had grabbed his arm and squeezed it with her fingernails."

  When he was interviewed, the 11-year-old victim recanted. The inspector observed two bruises on the 11-year-old, who said that one bruise "was from the hospital taking his blood" and denied knowing how he got the other bruise. Neither of the 11-year-old siblings made any outcries against the foster mother. Both made positive statements regarding her and the foster home.

  The CPA administrator reported that the foster mother had her sister watch the 11-year-old and his siblings while she was in the hospital and that her sister was not an approved caregiver.

  While hospitalized, the foster mother contacted her sister to take care of the children and thought she was an approved respite provider. She elaborated that she "found out later that she had not completed her paperwork." The foster mother denied that she or anyone else grabbed the 11-year-old child.

HHSC issued one citation for violation of a minimum standard associated with initial background checks because the children stayed with the foster mother's sister, who did not have a background check.

## HHSC - RCCR Closure Recommendation Summary

On December 6, 2023, an HHSC staff submitted a Closure Recommendation to HHSC Leadership based on the foster home's minimum standards violations for supervision, RTBs for Neglectful Supervision, and concerns of inappropriate discipline. The recommendation stated that the RTB disposition was upheld during an administrative review in 2013. The recommendation noted that the Criminal Background Check Unit (CBCU) had conducted two risk evaluations since the RTB had been issued. Once reverified in 2018, the foster parent was deemed eligible and approved. The recommendation added that while verified with Passage of Youth North, "Supervision does not appear to be an issue," but "a pattern of inappropriate discipline allegations exists." However, it noted that the home had not received any citations for corporal punishment or any other inappropriate discipline.

On December 14, 2023, HHSC leadership denied the Closure Recommendation, noting that the home had not received citations since January 2020 and that the Neglectful Supervision finding was from 2013, with no conditions. The home had transferred CPAs and changed from serving teenage girls to young children.

As of June 24, 2024, IMPACT shows that three children, ages 10, eight, and six, were placed in the home. The Agency Home page in CLASS reflects that the home remains open. IMPACT shows there have been 57 placements of a child in the home.

## Caregivers Youth and Transitional Living Services
*Home Still Active*

Caregivers Youth and Transitional Living Services CPA verified this home on May 12, 2016.[438] Caregivers Youth and Transitional Living Services has been placed on Heightened Monitoring twice: first in October 2020 and most recently on November 13, 2023.

An HHSC home closure recommendation was denied by HHSC leadership, and the home remains open. As of April 28, 2024, four children were placed in the home: a 12-year-old girl whose IMPACT records indicate she is a confirmed victim of sexual abuse, her 11-year-old brother, and two male teenagers who are in extended foster care, an 18-year-old and 19-year-old.

---

[438] On October 12, 2020, this CPA was placed on Heightened Monitoring. CLASS indicates the operation was released from Post Monitoring on November 2, 2022. The CPA has been placed on Heightened Monitoring for a second time effective November 13, 2023.

This foster home has been the subject of 26 investigations: nine DFPS investigations for allegations of abuse, neglect, or exploitation and 17 for minimum standards violations.

## ANE Investigations Summaries

**On June 14, 2019**, DFPS initiated an investigation for Neglectful Supervision. The intake alleged that the foster father left five to six male teenage foster children "alone during the weekends for up to 8 hours at a time" and locked the pantry while he was gone. The intake also stated that the boys had "run out of food and toilet paper on multiple occasions," and "some of the boys have gotten into physical altercations" while the foster father was gone. The intake further alleged that the boys left the home and walked around the neighborhood alone to stores and restaurants.

The boys all denied being left alone, telling the investigator that they had access to food except the junk food that was locked in the pantry. The foster father told the investigator that he hired his niece to supervise the children during the summer while at work. The CPA staff confirmed that the niece was an approved caregiver for the home. The investigator Ruled Out the allegation of Neglectful Supervision, and HHSC issued no citations.

**On April 24, 2021**, DFPS initiated an investigation for Neglectful Supervision after receiving a report that the foster father allowed foster children to smoke marijuana in the home, locked the pantry and freezer, prevented the children from accessing food, and did not feed breakfast to a 13-year-old foster child before school.

The foster children denied not being able to access food, but all confirmed that the foster father locked up snacks and sodas at night. The 13-year-old told the investigator that the foster father provided cereal for breakfast and other options for him to take if he wanted, and he said that he chose not to eat due to football practice. Neither of the boys present in the home nor the foster father tested positive for marijuana. The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On July 25, 2022**, DFPS initiated an investigation for Neglectful Supervision after a 12-year-old foster child made an outcry that two older foster children physically hurt and bullied him without intervention from the foster parent. The intake also noted that one of the older boys cut the 12-year-old's finger.

The 12-year-old child stated that a 17-year-old child hit him with a phone charger, causing a small cut on his finger. The 12-year-old said that he feels safe in the home and that no other physical altercations have occurred since the incident.

Collateral children confirmed the altercation and said they felt safe in the home. Collateral professional contacts confirmed that the foster parent appropriately supervises the children in the home based on their service plans. The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On July 28, 2022**, DFPS initiated an investigation for Physical Abuse after a child interviewed in the investigation commenced on July 25, 2022, alleged that the foster father pushed a 16-year-old foster child, causing him to fall and cut his forearm. According to the intake, the foster father asked the 16-year-old child to allow him to smell his shirt for marijuana and "kept getting in his face." After the child "asked him multiple times to get out of his face," he took off his shirt and gave it to the foster father, who pushed him onto a motorcycle. The 16-year-old then fell and cut his arm.

The 16-year-old child told the investigator that after he returned home from an outing, the foster father accused him of smelling like marijuana. The child told the investigator that the foster father followed him around, asking him to remove his shirt. He said that he threatened to hurt the foster father, and he "jumped" at the foster father. He told the investigator that the foster father "then pushed him into a vehicle and tried to throw him into the bushes." He also informed the investigator that the foster father denied him food, locked the pantry and freezer, did not provide dinner regularly, and left the children alone at night and on weekends.

Collateral children told the investigator that the 16-year-old pushed his shirt into the foster father's face, and the foster father pushed him away "but not forcefully." They also told the investigator they were allowed access to food but needed to ask for snacks. The foster father told the investigator that the 16-year-old pushed his shirt into his face, and his "knuckle hit him in his eye." He stated that he blocked the child from entering the house at that point, and he contacted law enforcement. He said that he did not press charges, and the child was removed from the home. The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

**On January 29, 2023**, DFPS initiated an investigation for Neglectful Supervision when a 17-year-old foster child made an outcry that when he was 14 years old, a 13-year-old foster child in the home raped him. The intake also described another incident that occurred when the 17-year-old child was placed at an RTC.

When the child was interviewed, he discussed the allegations and denied that the foster father or anyone in the home knew of the incident because he was "too embarrassed" to say anything at the time. The child, who was the alleged aggressor, was no longer placed in the home. The other children who were placed in the home were also interviewed; one of them said that another child in the home made him feel unsafe because he yelled at him. None of the children expressed concerns about sexual abuse or supervision. The investigator Ruled Out the allegation of Neglectful Supervision, and RCCR issued no citations.

**On April 27, 2023**, DFPS initiated an investigation for Medical Neglect after receiving a report that the foster parent refused to take a 16-year-old foster child to receive a psychological evaluation as recommended by a counseling professional. Allegedly, the foster parent took the child home instead of to a psychiatric hospital for evaluation after the child reported that he was depressed. Text messages between the foster parent and the child's OCOK worker and case manager confirm that the foster parent intended to

take the foster child to the hospital for evaluation. The child confirmed that the foster parent asked him if he wanted to go to the psychiatric hospital after the foster child had an incident of psychosis at school. The investigator determined that the child was admitted to the hospital the following day after the incident of psychosis and that initially, the child had refused to be admitted to the hospital. The investigator Ruled Out the allegation of Medical Neglect, and no citations were issued.

**On November 22, 2023**, HHSC initiated an investigation for Neglectful Supervision related to allegations from two separate intakes made on the same day that were merged. The first intake was reported by hospital staff requesting information regarding who could consent to the care of a 17-year-old child who had been transported to the hospital by law enforcement after law enforcement observed the child's behavior as suicidal or self-harming. The intake also included information that the 17-year-old and another person robbed the foster parent using a gun.

The second intake was made by the child's caseworker, who reported that the child said he was kicked out of the house by the foster parent. According to the intake, the child reported that while he was suspended from school, the foster parent made him leave the home when everyone else left. The child said he wandered the streets until curfew, and when he returned home, he was locked out of the house. The report included that the respite caregiver comes to the home after school but that she did not cook or stay in the home. The child also reported that the foster parent had other children threaten him. He also reported that the respite caregiver told him there was an active warrant for her and did not want the police coming to the home. The child alleged that his roommate had put him in a headlock and choked him.

When he was interviewed, the 17-year-old told the investigator that he was suspended from school, and the foster father told him to leave the house while the foster father was at work. He reported returning to the home around 4:00 a.m. and waiting on the front porch until the foster father arrived. When the foster father arrived, the foster father was upset because some of the 17-year-old's friends were present. The 17-year-old reported leaving again and being gone for a few days. He reported going to a party, drinking alcohol, and smoking marijuana, and the police picked him up and called the foster father. The child reported that he jumped out of the foster father's car and called the police. When the police arrived, they called the foster father, but when the foster father arrived, he threatened to hit him, so the police took him to the hospital.

The foster father stated that he never told the 17-year-old to leave the house and that he never locked him out of the house. The foster father said an off-duty police officer found the child at 4:00 a.m. and called him to pick up the 17-year-old, but that the 17-year-old then jumped from his car and ran. They searched for the child for several hours until the 17-year-old contacted the police from a hotel. When they arrived at the hotel, the child made threats toward the foster father and the police. The police transported the child to the hospital. The foster father denied that the child came to the home with a gun.

Collateral children in the home reported that the 17-year-old left the home on his own accord. Several children reported that the foster father yells, with one child saying, "Living with [foster father] is exhausting."

DFPS Ruled Out the allegation of Neglectful Supervision. However, HHSC issued three standard citations: Supervision because the foster father did not supervise while the child was suspended from school; Serious Incident reporting for failing to report a runaway timely; and Other Prohibited Discipline for yelling at the children.

## Standards Investigations Summaries

The foster home was also the subject of 17 minimum standards investigations, resulting in 20 additional citations; 12 of the investigations involved supervision problems. The CPA has received four citations for violation of minimum standards associated with supervision from 2017 through 2023 due to investigations of the home, including investigations finding that the foster father left children at home alone. Multiple caseworkers reported witnessing the children home alone. The CPA also received a citation in May 2019 for interfering with an investigation after the foster father would not allow the investigator into a room in the home because it was "dirty." The CPA received a citation for prohibited discipline after the foster father interrupted an interview with an investigator to yell at the child.

Additional concerns involved food accessibility in the home. Three investigations included allegations about food being locked. While no investigation resulted in citations, an investigator reported that the foster father became upset that the home caregiver unlocked the freezer for a caseworker.

As of April 28, 2024, the most recent investigation listed in CLASS was initiated as Priority 3 by HHSC on April 3, 2024, after a DFPS staff person who had been to the home to conduct a sampling inspection made a report to SWI alleging that an 11-year-old foster child was left home alone with the 18-and-19-year-old youth who are in extended foster care. The reporter said that she interviewed the 11-year-old and one of the other youths, who both said: "They were left alone for a couple of hours along with the other kid that stays in the home...because [the respite care provider] had to pick her child up from school." She noted that the foster father denied the allegation. The 11-year-old and 18-year-old declined to be interviewed for the investigation. The 19-year-old said he did not see the respite caregiver leave the home because he was in his room, "but he heard the front door close." The foster father and respite caregiver denied the allegations, and the investigation was closed without citations being issued. The 11-year-old's sibling was also placed in the home during this investigation. The two children are the biological grandchildren of the foster parent.

## Sampling Concerns

A recent sampling inspection of the home, conducted on August 8, 2023, resulted in the following concerns being conveyed to the CPA:

- Supervision – "Several children are left at home alone for hours while out of school for the summer while the foster dad works and until the babysitter arrives in the afternoons."
- Feeding children – "Children are not provided a variety of foods, including fruits and vegetables."

### HHSC - RCCR Closure Recommendation Summary

On February 14, 2023, HHSC staff submitted a Home Closure Recommendation. The areas of concern noted were failure to report household members or regular/frequent visitors, inappropriate supervision, and investigation interference. The summary stated, in part:

> The home has a total of fourteen standards investigations and 5 ANE investigations. This home has several patterns of concern. Some concerning deficiencies include an adult child in care sharing a bedroom with minors, children being supervised by an individual without a background check, and the foster parent interfering with an investigation by not allowing Licensing to inspect a room in the home. Due to the concerning citations, high volume of supervision allegations and overall investigations, and high volume of incidents not reported by the foster parent or CPA, this agency home is recommended for closure.

After staffing the recommendation and discussing the home with DFPS, HHSC leadership denied the Agency Home Closure Recommendation on March 9, 2023, with notes stating that DFPS would not place any children under the age of six; the foster parent "has another adult caregiver to provide supervision while [the foster father] works" and for RCCR to "work with CPA [sic] to develop plan [sic] to provide additional oversight of the home."

Since the RCCR Closure Recommendation denial on March 9, 2023, the home has been the subject of two ANE and standards investigations, all discussed above. As of April 28, 2024, the foster home page in CLASS indicates that the home was still open, and IMPACT reflected that foster children continued to be placed in the home. IMPACT shows there have been 48 placements of a child in the home since it opened.

### Kids First, Inc.
*Home Closed*

The main branch of Kids First, Inc. verified this foster home on December 2, 2022, and relinquished verification on June 24, 2023, when the CPA closed. The home was recommended for closure, but HHSC leadership denied the recommendation. The home has not been reverified by another CPA.

While the home was open, the home was the subject of two DFPS investigations for abuse, neglect, or exploitation and no minimum standards investigations.

## ANE Investigations Summaries

**On December 27, 2022**, DFPS initiated an investigation for Neglectful Supervision and Medical Neglect after receiving a report that a three-week-old child's medical needs were not being met, that the foster mother was mentally unstable and was posting private information about the child on social media.

Both foster parents denied that the foster mother had a history of mental health issues. The foster mother denied the allegation of neglectful supervision and reported using a monitor and camera to observe the infant sleeping when she was in another room. She also denied sharing identifying information about the foster child on social media. Both foster parents denied the allegations of medical neglect and were able to produce medical documentation for the infant in care.

The investigator confirmed that the foster mother had not posted identifying photos or videos of the child in care. The investigator conducted an unannounced home walkthrough and did not observe safety hazards in the child's sleeping area. The investigator Ruled Out the allegations of Neglectful Supervision and Medical Neglect and no citations were issued.

**On February 15, 2023**, DFPS initiated an investigation for Neglectful Supervision of a one-year-old child in care. The report alleged that the foster mother left the child unattended for extended periods and that the foster mother had disclosed the child's identity through social media posts.

The investigator visited the child and foster home separately and documented no concerns. The foster mother and father both denied the allegation of neglectful supervision. Both reported that the foster mother protects the child's identity in her social media posts by blurring his face or placing an emoji over his face. The case manager and case worker reported no concerns regarding the allegations.

The investigator Ruled Out the allegation of Neglectful Supervision. HHSC issued four citations for noncompliance with minimum standards concerning home screening (2 citations), child's rights (because the caregivers "used children's images and references on social media disclosing the children's foster care and reunification status without prior permission"), and background checks (because an out-of-state registry check was not completed for a caregiver who had lived out-of-state).

HHSC staff submitted a recommendation for closure to HHSC leadership on May 31, 2023. The recommendation included concerns that the foster mother, who was described as a "social media influencer," had used the children for monetary gain and for sharing confidential information about the children to her viewers on social media. The foster mother is "a brand sponsor" and uses the children in her posts to promote

products for income; the foster mother contends that she is being discriminated against and says she is following the CPA's social media rules.

On June 1, 2023, HHSC leadership denied the recommendation for closure. HHSC based this decision on DFPS placing the home on the agency Disallowance List, the CPA placing the home on inactive status, the home being responsive to guidance from the CPA, and a finding that a risk to children's health and safety had not been established.

DFPS placed this foster home on the agency's June 29, 2023, Disallowance List, effective June 13, 2023. A Disallowance letter dated April 28, 2023, to Kids First Inc., states that this foster home was being disallowed after receiving information regarding standards violations and child safety concerns.

The foster home page in CLASS indicates that the home was closed on June 24, 2023, and "CPA closed" is listed as the reason the home's verification was relinquished. IMPACT indicates that no children have been placed in this home since March 7, 2023. During the period this home was open, IMPACT shows there were two children placed in the home.

## DFPS List of Disallowed Homes

### Benevolent Home CPA

Benchmark Family Services verified this foster home on April 29, 2019. The home remained with Benchmark until March 25, 2021, when Benevolent House CPA verified the home. On April 9, 2022, Benevolent Home CPA involuntarily relinquished the home's verification due to deficiencies.

During the three years the home was active, the State conducted seven investigations, five for allegations of abuse, neglect, or exploitation. Three of the ANE investigations included allegations of Physical Abuse.

### ANE Investigations Summaries

**On August 30, 2019**, DFPS initiated an investigation for Physical Abuse after a 10-year-old child reported to her caseworker that the foster mother physically disciplined a six-year-old child also placed in the home and that the foster mother did not feed the children breakfast. The investigator interviewed the 10-year-old child, the six-year-old child, the foster mother, the 10-year-old child's teacher, the six-year-old child's therapist, and the collateral children residing in the home.

The 10-year-old reported that she did not see the foster mother hit the six-year-old child but heard the six-year-old "crying when she [was] outside and believes [the other child

308

was] getting hit." The 10-year-old also said that when helping the six-year-old dry off after a bath, the six-year-old said her arm hurt, and she noticed faint marks on the six-year-old child's arm. The 10-year-old reported that the six-year-old child told her that the foster mother hit her with a cord. Additionally, the 10-year-old said that the morning she was interviewed for the investigation, the six-year-old told her that, the night before, the foster mother had hit her with a shoe. The six-year-old reported that the foster mother hit her with a shoe and that she ate breakfast at school.

The foster mother denied the allegations of Physical Abuse and told the investigator that she used "time-out" to discipline the children. The foster mother also explained that the children had only missed breakfast on one day because the police pulled her over while driving the children to school, which made the children late for breakfast. She denied withholding food from the children.

The 10-year-old's teacher reported that the 10-year-old told her that the foster mother hit the six-year-old, but the teacher did not see bruising or marks on the children. The six-year-old child's therapist also denied hearing anything about physical discipline in the home from the six-year-old. Collateral children previously placed in the home denied being physically disciplined or being denied food.

The investigator Ruled Out the allegations of Physical Abuse and issued no citations.

**On October 15, 2020**, DFPS initiated an investigation for Medical Neglect after SWI received an intake that the foster mother failed to provide prescribed medication to a 13-year-old child in placement. The intake included allegations that the foster mother caused the child to miss a family visit because she "was having her 'hair done,'" did not allow the foster children to talk with their caseworker on the phone in private, forced the foster children to sit for undisclosed amounts of time "on a bench until [the foster mother] gave them permission to leave their room," and required the children to eat dinner while sitting on the floor. In addition, the foster mother required the children to request permission to use the restroom. A nine-year-old child allegedly defecated on herself and had to sit in it for hours.

The foster mother denied all the allegations, explaining to the investigator that the directions for the dosage of the medication were not listed on the bottle prescribed for the 13-year-old's UTI. She told the investigator that the bottle was in that condition when she picked up the child from the behavioral health hospital. The foster mother stated that she attempted to contact the child's Case Manager and the child's CVS worker to no avail, so she "Googled" the medication dosage and proceeded to provide the child with the medication based on the search results.

All children interviewed denied either being prevented from using the restroom or enduring prolonged periods of "time out." While the children and the foster mother confirmed eating on the floor, the children told the investigator that they chose to sit on the floor when they could sit on the bar stools or the couch because the dining table was broken.

The CASA worker for the 13-year-old child expressed concerns about the home, stating that she met with the child outside of the home when picking up the child for visits. The foster mother missed one of the family visits and counseling sessions, the children were forced to sit on the bench, and the 13-year-old child "begged on several occasions for her to please get her out" of the home.

The investigator Ruled Out the allegation of Medical Neglect, and HHSC did not issue any citations.

**On November 5, 2021**, DFPS initiated an investigation for Neglectful Supervision and Physical Abuse after a 12-year-old foster child reported that the foster mother abused another child in the home by choking her, pulling her hair, and causing a nosebleed on one occasion. The 12-year-old child also reported that the foster mother withheld food from her.

The foster mother denied all of the allegations, stating that the 12-year-old's behavior had regressed since she was allowed visitation with her biological mother. She also noted that the 12-year-old pulled out her hair and said another foster child ate out of the trash because of past trauma and residing in a foster home where food was locked up. The foster mother denied withholding food from the children.

All but one of the foster children denied being physically disciplined, telling the investigator that the foster mother put them in timeout in their rooms on their beds or took away privileges as a form of punishment. The 12-year-old foster child who confirmed witnessing the foster mother hit the other children told the investigator that the foster mother also yelled and cursed at the foster children. She told the investigator that she and another foster child self-harmed due to the way the foster mother treated them.

The investigator Ruled Out the allegations of Neglectful Supervision and Physical Abuse, and HHSC issued no citations.

**On January 3, 2022**, DFPS initiated an investigation for Physical Abuse, Neglect, and Neglectful Supervision of a 12-year-old child in care. The child reported to her CASA worker that the foster mother used physical discipline on her. At the same time, she was placed in the home, stating that the foster mother twisted her nose until it bled and instructed the other foster children to hit her. The child also reported that the foster mother regularly hit the children with a "thick brown cord" for misbehaving, forced them to stay on their beds for days, and withheld food.

The collateral children in the home denied being physically disciplined with a "thick brown cord." The children told the investigator that the 12-year-old child who reported the allegations "stole, lied, hit, and was mean." The foster mother denied all allegations, telling the investigator that the child often lied.

The investigator Ruled Out the allegations of Physical Abuse, Neglect, and Neglectful Supervision, and HHSC issued no citations.

**On April 4, 2022**, DFPS initiated an investigation for Neglectful Supervision. SWI received an intake that the foster mother planned to drop off a 12-year-old foster child and a recently adopted child at a CPS office because she was "at her hit's [sic] end." The intake also included information that the 12-year-old foster child had a history of self-harming and stated that she wanted to die.

The foster mother dropped off the children at the DFPS office without following proper protocol for discharging the foster child and without accepting the assistance offered to her by the CPA. One of the collateral children told the investigator that the foster child was "brainwashed," which kept her from reporting the abuse in the home. The foster child told the investigator that the foster mother forced her to use mechanical restraints on the adopted daughter, and police found evidence "(cloth and handcuffs)" of a child being restrained to a bed. The foster mother was arrested for unlawful restraint and injury to a child.

The investigator issued a Reason to Believe for Neglectful Supervision because the foster mother left the foster child at the DFPS office. HHSC issued four citations: caregiver responsibilities: the foster mother failed to contain her stress levels appropriately; supervision: the foster mother abandoned the child at the DFPS office; discipline: the foster mother forced the foster child to restrain another child physically; child rights: failure to keep the child free from emotional abuse.

DFPS conducted a simultaneous ANE investigation regarding the adopted child. This case resulted in the issuing of five RTBs: Physical Abuse, Abandonment, Neglectful Supervision, Medical Neglect, and Refusal to Accept Parental Responsibility.

## Minimum Standards Investigations

The home was the subject of two minimum standards investigations when the home was verified; one involved inappropriate supervision, and one involved inappropriate discipline. The inappropriate supervision investigation involved two foster children reportedly engaging in sexual conduct during sleeping hours. The CPA initiated a Safety Plan and required the home to install baby monitors. No citations were issued. The inappropriate discipline investigation alleged that the foster mother used her hand to hit a 12-year-old foster child on the back. The foster mother denied the allegation, and the other foster children in the home denied being physically disciplined or seeing anyone physically disciplined. The investigator did not issue any citations.

## DFPS Disallowance List

The foster home was placed on the June 6, 2023, DFPS Disallowance List, effective May 6, 2022.

In a letter dated April 21, 2022, DFPS notified the Benevolent Home CPA that this home

was disallowed for further placement of children in care. The letter provides that the foster parent "has demonstrated a lack of prudent judgment in her responsibility as a Caregiver which creates a clear risk and reasonable concern for the safety of any Child in the home." The letter referenced HHSC minimum standard violations, including: "Discipline Measures, Children's Rights, Supervision, and Employee and Caregiver Responsibilities." The letter further documented that the foster parent received RTBs for Physical Abuse, Abandonment, Neglectful Supervision, Medical Neglect, and Refusal to Accept Parental Responsibility.

During the period this home was open, IMPACT shows there were 13 placements of a child in the home and one child adopted (who returned care). No children have been placed in the home since April 11, 2022. The Agency Home page in Class reflects that the CPA closed the home on April 9, 2022. The reason for relinquishment is documented as Involuntary Closed due to Deficiencies.

## Noble Children's Services

Noble Children's Services verified this foster home on January 8, 2019. The home closed voluntarily on November 2, 2021, without deficiencies. When the home was active, the State conducted five investigations, two of which involved violations of ANE.

## ANE Investigations Summaries

**On February 24, 2020**, DFPS initiated an investigation for Physical Abuse after SWI received allegations that the foster father choked and threw a 12-year-old foster child as a form of discipline.

The 12-year-old reported that the foster father would playfully hit him on the back of the head and denied that this action was punishment or caused any pain. The child denied that the foster father choked him.

A nine-year-old collateral foster child told the investigator that if the children break the rules, they must "get on their knees or sit outside for an hour." He further stated that he witnessed the foster father threaten the 12-year-old with a belt. He denied seeing any child physically disciplined. The child said he witnessed the foster father's hands around the 12-year-old's neck while telling the child he was lazy. The nine-year-old denied witnessing the foster father choke the 12-year-old.

A 16-year-old child denied seeing the foster father choke the 12-year-old foster child but confirmed that the foster father slammed the bed against the wall, and it broke because he was mad at the 12-year-old. The child denied that any physical discipline occurred in the home. He acknowledged that on prior occasions, the foster parent made the younger boys kneel when in trouble but said that it has not reoccurred after their caseworker discussed this issue with the foster parent. He also said that the children are allowed to ride four-wheelers without helmets.

The foster father admitted to threatening the child with a belt "to get his attention," making the children sit on their knees for punishment, having the children sit outside on the covered porch when they need to "cool down," and breaking the child's bed in anger. He denied choking the 12-year-old.

The allegation of Physical Abuse was Ruled Out, and no citations were issued.

**On October 18, 2021**, DFPS initiated an investigation for Physical Abuse after SWI received allegations that the foster father choked and slammed a 12-year-old foster child to the ground, leaving him with a bloody elbow, a small scratch on the side of his neck and an inch-long scratch on his stomach.

The 12-year-old foster child told the investigator that the foster father had taken him and his brother to the lake, and he was taking too long to get out of the water when it was time to go. He said that the foster father then called him a "dumb ass," and stated he was going to leave him at the lake. The child said he "flipped off" the foster father. The foster father "ran after him, pushed him on the ground, grabbed him around the neck and choked him." The child denied having any marks or bruises from the incident and stated that his brother caused the injury to his elbow. He also denied any physical discipline occurring in the home and reported that he does not want to leave the home.

The investigator interviewed the 12-year-old child's 15-year-old sibling, who denied seeing anything happen while at the lake and any physical discipline in the home. He reported that his brother told him that the foster father pushed him down but that he did not believe his brother.

The foster father told the investigator that he could not remember clearly what happened because his blood sugar had dropped, and he had lost his vision and lost where he was. He said he remembered grabbing the child and telling him to let go. He was not sure "how" he grabbed the child, however. He told the investigator that he saw a Park Ranger during the incident but was not sure what he said to the Ranger.

The Park Ranger told the investigator that the foster father "did not show any signs of being disoriented, but rather mad and wanting her to talk to the child." She noticed the child's bloody elbow and red marks on his neck during their conversation. The child told her that the foster father choked him. The Ranger also stated that the child informed her that the choking was "ongoing," but he did not want to report anything because he did not want to change placements. She reiterated with the investigator that she did not notice any problems with the foster father's mental awareness.

The FACN report addressed the statements about the foster father blacking out:

> "The caregiver states that he has stage 5 renal disease and does not remember. Renal disease can cause some mental fogginess or poor clarity. It does not cause frank memory loss unless a person is sick enough to pass out and need hospitalization. It would not be common that a person with

renal failure would act aggressively and not remember what happened. If a caregiver is sick enough to black out, he is likely not a suitable caregiver at this time. I remain concerned for child physical abuse."

The investigator found the allegation of Physical Abuse UTD, and HHSC issued one citation for prohibited discipline because the foster father admitted to grabbing the child.

## Minimum Standards Investigations

The home was also subject to three minimum standards investigations, two resulting in the home receiving citations.

HHSC initiated an investigation on April 11, 2019, after SWI received allegations that the foster father grabbed a child's arm and washed a child's mouth with soap. The child confirmed with the investigator that the foster father grabbed his arm and sometimes grabbed his legs as a form of discipline for cursing at his brother, who also lived at the home. The brother denied witnessing any such incident. The foster father admitted to threatening the child to wash out his mouth with soap for cursing but stated that he did not do it. HHSC issued a citation for a child's mattress not having a mattress cover.

HHSC initiated an investigation on July 31, 2020, after SWI received allegations that the foster father failed to document medication administration correctly and failed to provide a child with prescribed medication. The investigator found that the home ran out of ADHD medication for a child, waited to fill the prescription until after the child had his doctor's appointment, and then contacted the pharmacy for a refill a few days after the appointment. The investigator noted that the child went two weeks without the medication. HHSC issued three citations: failure to document the purpose of two medications on the medication logs, failure to timely refill the medication, and an overdue fire extinguisher inspection.

## DFPS Disallowance List

In a letter dated April 22, 2022, DFPS notified Noble Children's Services, LLC. that this home was disallowed for future placements of children in care. The letter states that the decision was based on the home's violations of minimum standards regarding Other Prohibited Discipline, Administration of Medication, Medication Records, and Beds and Bedding. The letter cited the UTD disposition for an allegation of Physical Abuse and the home's history of inappropriate discipline and physical abuse allegations.

DFPS placed the home on the June 6, 2023, Disallowance List with an effective date that indicates it was closed on November 2, 2021. During the period this home was open, IMPACT shows there were eight children placed in the home. No children have been placed in the home since November 3, 2021.

## Children's Hope Residential Services, Inc.

Children's Hope Residential Services CPA verified this foster home on December 13, 2021, to serve three children with a Basic level of care for children. The home's verification was relinquished involuntarily without deficiencies on July 15, 2022.

Children's Hope was on Heightened Monitoring when the verification was relinquished. The concerning pattern and trend areas listed in the operation's Heightened Monitoring Plan included child's rights, home screening and verification, medication management, discipline and punishment, and home oversight.

While the home was open, it was the subject of only one ANE investigation for allegations of Sexual Abuse and Neglectful Supervision. After it closed, another ANE investigation for Physical Abuse and Neglectful Supervision was initiated, alongside a standards investigation.

## ANE Investigations Summaries

**On June 26, 2022**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision. A 15-year-old female child in care made an outcry that her foster father was "grooming" her while she was placed in her previous foster home. The child alleged that the foster father took "provocative" photos of her wearing her swimsuit. The foster father would pretend to be the child and message her friends on social media. He had tried to contact the child after she left the home.

The child was placed at the home from February 13, 2022, to June 1, 2022. The child told the investigator that the foster father took her with him alone to a hotel because the foster mother was upset after the foster mother accused the foster father of sleeping with the child. The child alleged that the foster father gave her liquor in the hotel room. She said the foster parents allowed her to drink alcohol in their home. The child denied that any sexual contact occurred except for being kissed on the forehead by the foster father.

Both foster parents denied all the allegations. DFPS Ruled Out the allegations of Sexual Abuse and Neglectful Supervision. HHSC issued two citations, one for violation of the standard associated with "Other Prohibited Discipline" because the foster mother admitted to yelling at the child about her homework and one for "Employee and Caregiver Responsibilities" because the father took the child to a hotel alone for the night, made the child feel uncomfortable, and allowed the child to drink alcohol while at the hotel.

**On August 3, 2022** (after the home was closed), DFPS initiated an investigation for Physical Abuse and Neglectful Supervision. The same 15-year-old alleged victim from the previous investigation told a CPS staff that her previous foster parents and their adult children consumed alcohol together, and the foster parents would allow the child

in care to drink with them. The intake alleged that the child drank to intoxication.

One of the foster parents' adult children and his fiancé both stated they had never seen any alcohol in the home. The foster father refused to be interviewed because he had recently been interviewed for the same allegations in the previous intake. When he was interviewed for the prior investigation, the foster father denied giving the child alcohol. The child's CASA worker, CVS caseworker, LPS worker, and the case manager each stated that the child never reported the foster parents giving her alcohol. The CPA did report, however, that the foster father asked permission to give the 15-year-old child alcohol. The CPA told him he could not give the child alcohol, and the foster father agreed.

The investigator Ruled Out the allegations of Physical Abuse and Neglectful Supervision, and there were no citations for minimum standards violations.

## Standards Investigations Summaries

The home was subject to one minimum standards investigation, initiated after the home's verification was relinquished and reported to SWI by the foster father on September 12, 2022. The foster father alleged that the CPA failed to provide an opportunity to appeal the involuntary closure of his home. The investigation was concluded without any citations for minimum standards violations.

Children's Hope involuntarily closed the home without deficiencies on July 15, 2022.

## DFPS Disallowance List

In a letter dated September 21, 2022, DFPS provided notice to Children's Hope Residential Services that the home was disallowed from any future placements of children in care because the foster parents were uncooperative with investigators during an investigation, made inappropriate parenting decisions resulting in two minimum standards citations, and because the CPA involuntarily closed the home.

On March 20, 2023, the home was placed on the DFPS Disallowance List, effective September 23, 2022. IMPACT shows only one child was placed in the home after it opened.

## Accompanied by God's Love Inc.

DFPS Region 6 verified this home on August 3, 2017. The home voluntarily closed on August 12, 2021, without deficiencies. On September 14, 2021, Accompanied by God's Love Inc., CPA (AGL) verified the home, but AGL relinquished its license on November 4, 2021, by withdrawing its licensing application before the initial permit expired on November 17, 2021. On November 5, 2021, HHSC issued a second initial permit to AGL under a different operation number. The new AGL CPA verified the home on November 5, 2021, and the home voluntarily closed on April 18, 2022, with no deficiencies.

The home was not investigated while it was verified by DFPS Region 6. During the five months that AGL verified it, the home was subject to two ANE investigations, both for Physical Abuse and Neglectful Supervision.

ANE Investigations Summaries

**On February 14, 2022**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision of a five-year-old child in care by his foster father. The CPA Administrator reported that the foster mother said the child in care threw a tantrum in a parking lot. The foster father placed zip ties around the child's wrists and ankles and drove the child back to the home with restraints intact.

During the investigation, the foster father admitted to zip-tying the child's wrists to his seat belt and tying the child's ankles together with zip ties. The foster father explained that he thought the restraint was necessary because the child was aggressively kicking the interior of the car and attempting to break the car window. Collateral witnesses reported having no concerns about Physical Abuse or Neglectful Supervision in the home.

The investigator Ruled Out both Physical Abuse and Neglectful Supervision because the child "was not at risk for substantial harm at the time of the incident." The investigator determined that the child was throwing a tantrum and allegedly becoming aggressive and that the foster father attempted to manage the child's behavior and ensure his safety by using zip ties to restrain him.

HHSC issued four citations for violation of minimum standards associated with emergency behavior intervention because the foster father did not attempt to de-escalate the child's behavior before implementing an inappropriate restraint; child's rights because the foster parents used an unusual punishment on the child in care by zip tying his wrists and ankles instead of using approved redirection methods; employee and caregiver responsibilities, because the foster father failed to demonstrate appropriate judgment or self-control when he used an inappropriate restraint and inappropriate discipline techniques with the child in care; and employee behavior intervention, because the foster father used zip ties, i.e., a mechanical restraint, with the child in care to prevent him from kicking the interior of his car.

**On May 17, 2022**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after a DFPS contract monitor reported that while reviewing the CPA's records, she noticed a recorded serious incident that had not been reported to SWI. The incident report documented that on February 1, 2022, a five-year-old child in care left the foster home twice within a few hours without the foster parents noticing. A neighbor returned the child to the home on both occasions. A second report made by the same contract monitor described two additional incidents that occurred on January 27, 2022, and January 28, 2022, when the foster mother discovered bruises on a two-year-old child's diaper area. The incident report described the bruises could have resulted from "a very hard pinch."

DFPS Ruled Out the allegation of Physical Abuse. DFPS disposed of the allegations of

Neglectful Supervision with an RTB for the foster mother failing to provide appropriate supervision for a five-year-old child in care, noting that he was able to run away from the Houston foster home twice on the same day. In one instance, the child was unsupervised for fifteen minutes. The neighbor found the child ten houses down the street from the foster home. The second time, while the family ate dinner, the child asked to go to the bathroom. After a long time, the foster mother went to check on him and found that the child had run away from the home and was again down the street.

In the Investigation Conclusion, the investigator stated that the foster mother provided different accounts of the incidents than what was documented in the original serious incident reports. The child was required to be in earshot of the foster parents, and the foster mother failed to provide the appropriate level of supervision, placing the child at serious risk of harm.

In addition to the RTB, HHSC issued four citations for violations of minimum standards associated with the duty to report a serious incident to the hotline, completing a serious incident report after a child under age left the home unauthorized, and child rights and supervision.

## DFPS Disallowance List

In a letter dated March 21, 2023, DFPS notified AGL CPA that this home was disallowed from future placements of children in care. DFPS based its decision on the home's RTB finding for Neglectful Supervision and a pattern of minimum standards violations related to inappropriate discipline, emergency behavior intervention, supervision, serious incident reporting, and children's rights.

The home was placed on the April 28, 2023, DFPS Disallowance List, effective January 20, 2023.
According to CLASS, the home voluntarily relinquished its verification on April 18, 2022, without deficiencies. According to IMPACT, no children have been placed in the home since April 8, 2022. During the period this home was open, IMPACT shows there were 11 children placed in the home.

## Arrow Child and Family Ministries of Texas

The Waco branch of Arrow Child and Family Ministries of Texas verified the home on September 23, 2013. CLASS shows that the foster home relinquished verification on November 18, 2019, with the note, "voluntarily closed without deficiencies."

While open, the home was the subject of one DFPS investigation for abuse, neglect, or exploitation.

## ANE Investigations Summary

On December 3, 2015, DFPS initiated an investigation for Neglectful Supervision after a two-month-old foster child died.

The foster mother, a nurse, reported that at the time of the incident, four adopted

children and one foster child resided in the home. The two-month-old child had "spitting up issues," was experiencing "constipation," and had to take suppositories "every two days." On the day of the child's death, the child was "irritable" due to "tummy pains," and the foster mother gave the child "glycerin because she hadn't pooped." The child ate without spitting up, and the foster mother later placed her on the "tummy time mat" on top of the bed.

The foster mother could not recall how long the child was on the mat; however, she did recall taking the other children outside while the child lay on her back on the mat. The foster mother returned inside, and the child began to cry, so she turned the child "over onto her belly." The foster mother reported she played with an adopted child "for a minute," returned outside, interacted with the older children, and then escorted another child to the restroom before checking on the two-month-old foster child. When the foster mother returned to the bedroom "five minutes" later, she reported that the child "wasn't moving," her "face had been faced down on the mat," in "a lot" of spit up, and "it had blood in it." The foster mother said she performed CPR and called 9-1-1. The paramedics transported the two-month-old child to the hospital.

The investigator interviewed the foster father, who reported that the foster child was asleep when he left for work that morning. He stated he received a call from a neighbor, who is a voluntary firefighter, saying, "Something is wrong with the baby." At that time, he left work, arrived home, and witnessed unsuccessful "resuscitating" efforts. The foster father confirmed that the child recently started "tummy time," she was "puking more often," and that "suppositories" were used to assist with the child's constipation. He stated that the child had a cold a week or so before the incident, but the foster parents did not take the child to the doctor.

The investigator reviewed the child's treatment plan, which stated that the child required "eyesight supervision at all times in the home during waking hours." The manufacturers of the tummy time mat reported that the product had a warning label stating, "Supervision is required." The collateral professional contact who was interviewed did not express concerns for the foster parents.

The investigator issued an RTB disposition for Neglectful Supervision, and HHSC issued three citations for medication records, supervision, and infant requirements.

On February 15, 2018, the RTB was overturned and converted to Ruled Out during the administrative review.

## DFPS Disallowance List

DFPS placed the home on the June 6, 2023, Disallowance List, effective January 10, 2017. In a letter dated January 10, 2017, DFPS notified Arrow Child and Family Ministries that the home was disallowed for new placements. The DFPS letter documented that the disallowance was due to the foster parent's behavior that placed a child's safety at risk and interfered with providing services to the child.

The foster home page in CLASS indicates that the home was closed on November 18, 2019. IMPACT reflects that no children have been placed in this home since December 3, 2015. During the period this home was open, IMPACT shows there were four children placed in the home and three children adopted.

## Make A Way, Inc.

This foster home was verified by two different CPAs: Amazing Grace Child and Family Services on July 14, 2016, and Make A Way, Inc. on May 4, 2019. Due to deficiencies, the home was involuntarily closed on June 30, 2022. Make A Way verified the foster home on July 1, 2022; on August 9, 2022, it was again involuntarily closed due to deficiencies.

The home was subject to 16 investigations during the time it was verified; 11 for allegations of ANE and five for standards violations.

## ANE Investigations Summaries

**On October 7, 2016**, DFPS initiated an investigation of allegations of Physical Abuse, Sexual Abuse, and Medical Neglect. An anonymous caller reported having observed a five-year-old and three-year-old foster child being "lethargic," having scars and bruises on their faces, and "insect bites all over their bodies." The caller also reported concerns that the children were being sexually abused, that the three-year-old had a cut on her hand from a knife, and that it was not known if she received medical attention.

At the time of the investigation, four foster children lived in the home; two were five years of age or older and could complete an interview. The two children denied all the allegations. The other two children were too young to be interviewed but were observed by the investigator. The foster mother denied the allegations. The allegations of Physical Abuse, Sexual Abuse, and Medical Neglect were Ruled Out, and no citations were issued.

**On June 15, 2018**, DFPS initiated an investigation for Neglectful Supervision after a 10-year-old foster child made an outcry that a 13-year-old foster child living in the home sexually abused him on three separate occasions. There are five intakes for this investigation.

Five children lived in the foster home at the time of the investigation. During the interviews, a six-year-old child made an outcry that he had been sexually abused by both an 11-year-old and a seven-year-old living in the home. The foster mother denied knowledge of the incidents, but she reported allowing the children to play upstairs alone. Four of the five children reported that the foster mother only checks on them "when she hears a noise." Three children reported that the foster mother makes room checks at night. The case manager at the agency reported that CPS failed to share the 13-year-old's sexual aggression history with the foster parent, and the history was not documented in the child's Common Application.

The investigator found the home in compliance with the children's service plans. DFPS Ruled Out the allegations of Neglectful Supervision, and no citations were issued.

**On October 5, 2019**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision based on an allegation that the foster mother was aware that a 16-year-old foster child had consensual sex with her 21-year-old biological son, and she did not report the incident.

During the interview, the foster child reported she was 17 years old, not 16, when the biological son performed oral sex on her and digitally penetrated her while the foster mother was at work. The child reported that the acts were consensual and took place while she and the biological son were "under the influence of weed." A 15-year-old foster child living in the home denied the biological son engaged sexually with the 17-year-old and said the 17-year-old was lying. The biological son and foster mother denied the allegations and confirmed the son was 19 years old and not 21.

DFPS Ruled Out the allegations of Sexual Abuse and Neglectful Supervision, and no citations were issued.

**On January 14, 2021**, DFPS initiated an investigation for Medical Neglect and Neglectful Supervision after two foster children, ages 15 and 18, took 15 pills of Trazadone each without the foster mother's knowledge.

The 18-year-old reported that she did not receive her medication regularly, that she found unsecured Trazodone in the garage, and that the 15-year-old swallowed "about 30 Trazadone pills." The child also reported that the foster mother rarely checked on them in her bedroom. The 15-year-old denied taking any pills and stated that she receives her medication daily. The foster mother and another foster child in the home denied the allegations of improper medication storage.

Medical Neglect and Neglectful Supervision allegations were Ruled Out, and no citations were issued.

**On June 11, 2021**, DFPS initiated an investigation for Physical and Medical Neglect after a 16-year-old foster child made an outcry that she did not receive her medications as prescribed. A second intake alleged that adequate meals and nutrition were not being provided, described the foster home as dirty, and alleged that the foster parent's adult daughter was verbally abusive.

The 16-year-old reported that the respite caregiver did not administer her medication for a week while the foster mother was at work. She noted that the foster mother yelled at her once and that there was no food in the home before the intake. She also stated that the foster mother told her to "stall so she could catch up on medication logs."

During interviews, a 15-year-old foster child reported having enough food to eat "sometimes." She also reported missing a morning dose of her medication. The other

foster child in the home denied all allegations. The foster mother reported that the children received their medication as prescribed and confirmed that "the gnats in the kitchen" prevented her from cooking regularly.

The two respite caregivers denied all the allegations. The case manager stated that the 15-year-old child made this report after discovering that the foster mother decided not to keep the child in the home. The case manager also reported that the child had made similar allegations in her previous placement.

The investigator Ruled Out the allegations of Physical Neglect and Medical Neglect. During the home inspection, the investigator found that the only food in the home was "snack food," and therefore issued a citation for proper meals not being prepared daily.

**On June 14, 2021**, DFPS initiated an investigation for Physical and Medical Neglect after a 15-year-old foster child made an outcry that she did not receive her prescribed medication, sometimes only received one meal a day, and was given only tap water to drink. There was no food in the home.

The 15-year-old was interviewed and said she received one or two meals daily and did not ask for more food because she would be told she could not have any. She also noted that she did not receive her morning medication. A second child reported that she got enough food and that she "somewhat" got her medication but sometimes did not receive her nighttime medication. This child also reported that the foster mother "gave them a script to say" during the last investigation. A third child reported that she received enough food and received her medication regularly.

The foster mother denied all allegations and stated she was always home to administer medication and that the children have "full range" in the kitchen. The investigator noted concerns about expired medication and medication logs. The inspector noted that the home inspection was "infested with gnats and flies."

The investigator Ruled Out the allegations of Physical and Medical Neglect. Three citations were issued for violating minimum standards related to the physical environment, medication administration, and medication records.

**On August 6, 2021**, DFPS initiated an investigation for Neglectful Supervision after a 16-year-old foster child self-harmed while in the bathroom of the foster home. The 16-year-old reported obtaining a razor blade from another child who was previously placed in the home. She confirmed that an adult caregiver (described in CLASS contact notes as a babysitter) provided constant supervision at home.

The caregiver was interviewed and reported that the 16-year-old was taking a shower with the door cracked on the day of the incident. The caregiver walked to a different area of the house, and when she returned, the child had shut the bathroom door. The caregiver intervened when the water stopped, and shortly after, the caregiver observed the child with injuries.

The foster mother denied allegations of neglectful supervision and reported she had instructed the respite caregiver to watch the child "closely." During the incident, a safety contract required the caregiver to provide 15-minute visual checks and be "in auditory range." The investigator determined that the safety contract was being followed, and the child obtained the razor without the foster mother's knowledge.

The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On September 10, 2021**, DFPS initiated an investigation for Neglectful Supervision after two foster children -- a 16-year-old and a 14-year-old -- had a "physical altercation," resulting in the 14-year-old's head getting "slammed into the asphalt."

The 14-year-old reported she did not feel safe in the home due to the threats made by the 16-year-old. The child reported that the foster mother was not present, and another caregiver provided supervision on the day of the altercation. According to the child, the caregiver "stirred up chaos" and stated she was "going to let them [the girls] fight." The 16-year-old reported that the 14-year-old "attacked" her, and the caregiver intervened. The investigator interviewed an 11-year-old child who lived in the home, and she confirmed that the 14-year-old initiated the fight, and that the caregiver intervened.

The investigator Ruled Out Neglectful Supervision, and no citations were issued.

**On September 22, 2021**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after an 11-year-old foster child made an outcry that a 12-year-old foster child in the home performed oral sex on her.

The 11-year-old reported that the 12-year-old touched her "private parts" and tried to "climb on top of her." The foster parent separated the children when she became aware of the incident. The 12-year-old reported that the 11- 11-year-old attempted to kiss her, and when she refused, the 11-year-old said, "If she didn't do anything, then she would tell on her."

Two additional foster children interviewed reported appropriate supervision in the home and confirmed that the foster mother separated the children after the 11-year-old made the outcry. The foster mother reported that the 11-year-old recanted shortly after making an initial outcry by admitting she "made up the outcry."

The investigator Ruled Out the allegations of Sexual Abuse and Neglectful Supervision, and no citations were issued.

**On September 24, 2021**, DFPS initiated an investigation for Neglectful Supervision after an 11-year-old foster child made an outcry that a 16-year-old foster sibling inappropriately touched her breasts, butt, and vaginal area and was "threatening to beat her up." The report detailed that the children were eating popsicles with liquor in them, that the child was afraid of the foster parent, that two other children in the home threatened to beat her up, and that one child threatened to kill her while she slept.

The 11-year-old denied the allegations of being inappropriately touched by another foster sibling. The child reported only the incident from the September 22, 2023, intake, described above. The child also stated that "nothing" has happened since the 16-year-old made the threat and that the foster mother and caregiver provide adequate supervision. The child reported that she "wasn't afraid" to live in the home. The 16-year-old reported "just playing" with the 11-year-old, and said the caregivers provided supervision in the home. The foster mother, alternate caregiver, and two additional foster children in the home denied the allegations of Neglectful Supervision. The investigator found no evidence of alcohol-infused popsicles in the home.

The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On June 19, 2022**, DFPS initiated an investigation for Neglectful Supervision after a hospital social worker reported that a 16-year-old foster child was "cut with a knife, burned with hot water," and someone "attempted to strangle him."

At that time, three foster children lived in the home: two children aged 16 and one aged 17. One 16-year-old child reported his foster sibling "beat him with a broomstick, wrapped a cord around his neck choking him, splashed him with hot water and cut him with a butter knife. " The child said he then "grabbed a lighter and lit the rug on fire to signal for help." The foster mother arrived at the home after the first responders arrived. It was unknown who called 9-1-1. Two other children in the home refused to be interviewed; however, one stated, "I have no bruises on me, but to go check on that other child because I made sure I gave him lots of bruises."

Despite service plan requirements that the three boys would always be supervised, the foster mother admitted that she and her biological son changed a car's flat tire away from home, leaving the three foster children alone for approximately an hour without supervision. One of the foster children alleged that the foster mother and biological son were using marijuana; both refused a drug test.  Law enforcement and caseworkers reported having observed behavior and smelling odor indicative of marijuana use.

The investigator issued an RTB disposition for Neglectful Supervision and seven citations were issued. Two citations were for home screenings, and the other areas were mandatory drug testing, preliminary service planning, initial service plan, supervision, and children's rights. All the children were removed from the home, and the foster mother was arrested for child endangerment.

Standards Investigations Summaries

The foster home was subject to five minimum standards investigations; two resulted in deficiencies.

An HHSC investigation was initiated on November 29, 2017, alleging that children in care were "left unsupervised, not adequately receiving proper nutritious meals, do not have bedding or clothing and that children are illegally transported." The four foster

children were interviewed and denied the allegations of being unsupervised, being improperly fed, and having inadequate clothing. The children did report that the foster mother's biological son transported them to school while having his driver's permit. RCCR issued one citation for violation of a minimum standard associated with transportation.

An HHSC investigation was initiated on August 16, 2019, alleging that a 17-year-old foster child was left unsupervised when she "sent child pornography of herself." The foster mother reported allowing the 17-year-old to use her iPad when she discovered "sexual pictures and videos" that were sent online to the child's girlfriend. The child's electronic privileges were then taken away. RCCR issued one citation for background checks in this standards investigation.

## DFPS Disallowance List

DFPS placed this foster home on the June 6, 2023, Disallowance List effective September 23, 2022. In a letter dated September 15, 2022, DFPS notified Make A Way, Inc. that this foster home was being disallowed for any further placements of children after receiving information regarding standards violations involving "physical environment and feeding children." The letter acknowledged a pattern of inappropriate supervision that included criminal activity, which "causes reasonable and serious concern for the safety of any child in this home."

The foster home page in CLASS indicates that the home closed involuntarily on August 9, 2022, and the verification was relinquished. During the period this home was open, IMPACT shows there were 48 placements of a child in the home. No children have been placed in this home since August 4, 2022.

## Methodist Children's Home

The Houston branch of Methodist Children's Home first verified this foster home on July 17, 2020. Methodist Children's Home relinquished the verification on March 21, 2023, noting that it was "involuntarily closed without deficiencies."

While the home was licensed, DFPS opened one investigation for abuse, neglect, or exploitation.

## ANE Investigation Summary

**On December 21, 2022**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision. The investigation was opened after law enforcement executed a search warrant at the foster home and reported to SWI that the 18-year-old biological son of the foster parent and approved babysitter for the children "was storing images of child pornography in a Google account." When police searched the home, officers found a "shoebox full of little girl panties and training bras" in the attic.

The investigator observed that the children in care were free of injuries. However, because of the young ages of the children (six-month-old twin boys), the children were

immediately removed and placed in an emergency respite home. The foster parents and their 18-year-old son refused interviews without their attorney present. Law enforcement recovered images of children as "young as two to three years old" on the 18-year-old's computer.

The investigator Ruled Out the allegation of Sexual Abuse and Neglectful Supervision, and no citations were issued. Despite discovering that the 18-year-old was one of the twins' caregivers, the investigator found no evidence indicating that the foster parents were aware of their son's actions and found no evidence of the twin foster children having been abused. The investigation was closed on March 20, 2023; no citations were issued.

### DFPS Disallowance List

DFPS placed this foster home on the June 6, 2023, Disallowance List, effective April 28, 2023. In a letter dated April 17, 2023, DFPS notified Methodist Children's Home that this foster home was being disallowed for any further placement of children in care after information was received for violations regarding "the foster parent's prudent judgement and caregiver responsibilities." The letter also acknowledged that "the foster parent's adult son viewed pornographic images of children 10 years of age and younger while at the licensed foster home" and that a CPI investigation for sexual abuse of the foster parents' younger biological children by the adult son was pending.[439]

During the period this home was open, IMPACT shows there were two children placed in the home. No children have been placed in this home since December 21, 2022.

### Homes with Hope

Depelchin Children's Center (Spring Branch) (Depelchin) first verified this foster home on December 17, 2010. Depelchin relinquished verification on January 12, 2011, and the reason for the relinquishment was "CPA closed." Homes with Hope verified the home on December 7, 2021, and relinquished verification on May 31, 2023, as a voluntary closure with deficiencies.

DFPS opened one investigation related to allegations of abuse, neglect, or exploitation during the time the home was licensed.

### ANE Investigation Summary

DFPS initiated an investigation on March 7, 2022, for Neglectful Supervision after a law enforcement officer reported that the foster mother left four children inside a vehicle unsupervised for 30 minutes while she was in a grocery store.

Three of the four were foster children: a one-year-old, a two-year-old, and a five-year-old. The five-year-old foster child was placed in the foster mother's sister's home. The fourth child in the car, a six-year-old, was the biological child of the foster mother's

---

[439] The investigation ultimately Ruled Out Sexual Abuse of the younger siblings by the adult son.

sister. Because of the biological child's involvement, a companion CPI Neglectful Supervision investigation was also opened.

The investigator contacted the grocery store manager, who reported that a patron had alerted him to the children left in the vehicle. The patron waited with the children for 10 minutes, and then the manager waited with the children for 20-to-25 minutes.

According to the police report, the officer arrived and waited with the children for an additional 10-to-12 minutes for the foster parent to return. The report provides that the car was not turned on, and the windows were down. The foster parent returned to the vehicle with a cart full of groceries. The foster mother did not deny the circumstances.

The five and six-year-old children confirmed they were left unsupervised. The five-year-old stated, "There was no air in the car, and it was hot a little bit." The six-year-old reported that the foster mother did not tell her where she was going. She stated, "It was hot in the car, and the windows were open, but it was hot outside."

The foster mother explained that she intended to go into the store to "use the restroom and grab milk quickly." However, while in the store, "she started looking around." She admitted that after she got out of the car, someone asked her, "Are those your kids" but she ignored them. The foster mother confirmed she had left the children in the car, rolled down the windows, and placed the keys "in the side of the door."

Both investigations concluded with the foster mother receiving four RTBs for Neglectful Supervision. Two citations were issued, one for violation of a minimum standard associated with supervision and the other for child's rights. The police officer also issued the foster parent a Class C misdemeanor citation for leaving children under seven in a vehicle for more than five minutes.

## DFPS Disallowance List

DFPS placed this foster home on the agency's June 6, 2023, Disallowance List effective June 9, 2022. In a letter dated May 31, 2022, DFPS provided notice to Homes with Hope CPA that this foster home was being disallowed for further placement of children in care because of standards violations for Supervision and Children's Rights and because of the RTB disposition for Neglectful Supervision.

CLASS indicates that the home's verification was relinquished on May 31, 2023, with the stated reason "Voluntarily Closed with Deficiencies." During the period this home was open, IMPACT shows there were three placements in the home. No children have been placed in this home since March 15, 2022.

## ACH Child and Family Services

ACH Child and Family Services verified this foster home on December 19, 2016. CLASS shows that the CPA relinquished verification of the home on June 13, 2022, noting only "CPA closed."

During the time this home was verified, DFPS opened four investigations into allegations of abuse, neglect, or exploitation, and HHSC opened one minimum standards investigation.

ANE Investigations Summaries

**On August 10, 2017**, DFPS initiated an investigation for Physical and Emotional Abuse. The report to SWI alleged that the foster father dragged a five-year-old child by the arm and told the foster mother to slap the child if the child did not "shut up." It was also reported that the foster father hit and spanked the child and threw water at her.

The five-year-old reported she did not like living in the home and said, "they [the foster parents] would always throw water on her when she is falling asleep." The 10-year-old sibling who also lived in the home reported she believed the foster father spanked the five-year-old but never witnessed it. The 10-year-old also reported that the foster father "grabbed the five-year-old by the arm a lot" and made her eat in a "separate room alone" away from the rest of the family. She reported seeing her sister come downstairs wet after getting in trouble and said the foster father called the five-year-old a "snotty slut."

The foster parents denied the allegations. The other two foster children living in the home were under five and could not be interviewed. The foster parents' two biological children denied the allegations.

The investigator Ruled Out the allegations of Physical and Emotional Abuse, and no citations were issued.

**On August 31, 2020**, DFPS initiated an investigation for Physical Abuse after a daycare worker observed a two-year-old foster child with a "small scratch" on her face and a bump on her forehead described as the size of a "small lime."

The daycare worker reported that the two-year-old arrived at daycare with a bump and a scratch on her forehead. While she had no specific concerns about the home, she reported the injuries because she is a mandated reporter. Approximately 30 minutes later, the bump disappeared, but the scratch remained.

The investigator interviewed two other foster children who lived in the home. Both denied seeing the two-year-old injure her face; however, one child stated the two-year-old did receive a spanking for failing to follow the foster parent's instructions.

The foster parents denied all allegations of Physical Abuse and reported they did not observe the injuries on the two-year-old before the daycare drop-off. The agency case manager and child's caseworker expressed no concerns with the home.

The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

**On September 11, 2020**, DFPS initiated an investigation for Physical Abuse after an agency case manager observed a three-year-old foster child with bruises and marks on

his legs, inner thighs, shoulder blades, lips, and finger. The case manager transported the child to the doctor.

The doctor diagnosed the child with impetigo, a skin infection. The areas of the skin that appeared to be bruised were mosquito bites. The child was prescribed two medications. When interviewed, the three-year-old could not provide details about the alleged bruises to the investigator.

The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

**On July 14, 2021**, DFPS initiated an investigation for Neglectful Supervision after a five-year-old foster child drowned in a pool. There are three intakes for this investigation.

When interviewed, the six-year-old sibling reported that his five-year-old brother "fell into the pool trying to get a water gun." The six-year-old reported that the foster mother was "with the grownups" and that there "were a lot of people around, but one saw him fall" into the pool, including himself.

The six-year-old described the pool as "kind of far away" from where the foster mother was. During an interview, the foster mother reported that she and two foster children were at a PTA meeting at someone's house. Before attending the event, she explained to the children that they "were not getting in the water" and "were not there to swim." The foster mother reported that the other children were getting out of the pool and "transitioning" to going inside. At this time, she gave the six-year-old some food and instructed the five-year-old to "go back to the playground." Approximately "30 seconds or so" later, someone yelled call 9-1-1. The foster mother denied hearing water splashing or seeing the child get into the water. She did observe "rescue breaths and compressions" being performed on the five-year-old child.

The foster father was out of town at the time of the incident but described the five-year-old as being "impulsive and that you had to be on him." The investigator interviewed three collateral adults who were also at the party. The man who performed CPR reported getting out of the pool and seeing the five-year-old face down in the corner. He denied hearing a splash of any kind. Another woman described the foster mother as "just sitting and standing around the backyard." All three adults confirmed that no loud music was playing and no alcoholic beverages were at the party.

The investigator entered a UTD disposition for the allegation of Neglectful Supervision, and no citations were issued. The investigator reviewed 9-1-1 records and the home's security video but could not determine when the five-year-old entered the pool. The six-year-old child was placed in respite after the incident, but a judge ordered the child to return to the home until after a full hearing on the incident. The agency implemented a safety plan for pools. The medical examiner confirmed the death "was deemed an accident" and that a "non-swimming child could drown in 30 seconds or less."

## Standards Investigations Summaries

The foster home was also the subject of one minimum standards investigation.

An investigation was initiated on March 18, 2020, alleging inappropriate discipline after a five-year-old foster child reported being "spanked" by the foster father. During interviews, the five-year-old reported being "whooped" by the foster father and "spanked" by the foster mother with a wooden spoon. His three-year-old sibling, who also lived in the home, reported being "whooped five times" by the foster father and denied being spanked by the foster mother. The foster parents' two teenage biological children were interviewed and denied seeing their parents spank the two foster children despite spankings being used when they were younger. The foster parents denied using inappropriate discipline. HHSC issued no citations for this standards investigation.

## DFPS Disallowance List

DFPS placed this foster home on the June 6, 2023, Disallowance List, effective June 23, 2022.  In a letter dated May 4, 2023, DFPS notified Child and Family Services that this foster home was being disallowed after information was received regarding standards investigations about supervision.  The letter also documented the UTD disposition. The letter states, "This home has a pattern of investigations for lack of supervision and investigations alleging Physical Abuse and Emotional Abuse that create reasonable concern for any Child in the home."

The foster home page in CLASS indicates that the home was closed on June 13, 2022. During the period this home was open, IMPACT shows there were eight placements of a child in the home and one child adopted. No children have been placed in this home since November 18, 2021.

## Kids Grace CPA

Pressley Ridge CPA verified this foster home on May 20, 2008. The CPA relinquished the foster home's verification for non-compliance on February 15, 2010. The home was then verified by the Hurst branch of The Giacosa Foundation on March 17, 2010. On November 21, 2020, the home relinquished its' verification to change CPA's. Kids Grace CPA verified the foster home a third time on January 22, 2021. The home was involuntarily closed on April 22, 2022, due to deficiencies.

DFPS opened three investigations into allegations of abuse, neglect, or exploitation, and HHSC opened one minimum standards investigation during the time the home was open.

## ANE Investigations Summaries

**On January 6, 2010**, DFPS initiated an investigation for Physical Abuse after a six-year-old and four-year-old foster child made an outcry that both foster parents spanked them with a belt. Each child reported that they had been spanked with a belt by the foster parents when they got into trouble. The four-year-old child confirmed that both foster parents had spanked him with a belt on his hand, "butt" and "upper, outer thigh."

The foster parents denied using spanking as a form of discipline and reported that they use time-outs to discipline the children. The CPA staff member and therapist reported that they believed the foster parents were spanking the two children because both children were consistent in their stories.

The investigator Ruled Out the allegation of Physical Abuse. One citation for a minimum standards violation was issued related to corporal punishment due to the foster parents spanking the two children an unknown number of times as a method of discipline.

**On February 3, 2014**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after medical professionals observed bruising and clumps of hair missing on a one-year-old child. The foster parent reported that the five-year-old had pulled out the one-year-old's hair and that the one-year-old was bleeding. Medical professionals reported that the bleeding was due to an injury on the one-year-old's left ear and that the child appeared to have a bite mark on his left arm and a bruise on the right arm and chest. The five-year-old child confirmed that he pulled the one-year-old victim's hair and hit him.

The foster mother reported that she put the children down for a nap and was in her office when she heard screaming. She went to see what was wrong and observed the five-year-old twisting the one-year-old child's arm, that a patch of hair was missing from the one-year-old's head, and that there was blood on the child's clothing. The foster mother immediately sought medical treatment for the one-year-old. The investigator Ruled Out the allegations of Neglectful Supervision and Physical Abuse. Two citations for minimum standards violations related to supervision were issued.

**On June 29, 2021**, DFPS initiated an investigation for Physical Abuse, Physical Neglect, and Neglectful Supervision after an eight-year-old foster child made an outcry that the foster parent placed his four-year-old foster sibling in his car seat at bedtime and buckled him inside. The foster parent confirmed that she placed the foster child in his car seat as a form of time-out. Children who shared a room with the four-year-old confirmed that he was buckled into his car seat at night and left there. All children interviewed denied that the foster parent used physical discipline with them.

The investigator Ruled Out the allegations of Physical Neglect and Physical Abuse. The investigator issued an RTB disposition for Neglectful Supervision, which was later overturned during the Administrative Review process. HHSC issued three citations for minimum standards violations concerning supervision, children's rights, and discipline due to the foster parent leaving the four-year-old restrained in his car seat for an extended period. HHSC also issued four citations for violations related to foster home screening, serious incident reporting, service planning, and foster home capacity.

Standards Investigations Summary

The foster home was the subject of one minimum standards investigation. An investigation was initiated on June 20, 2008, alleging that a physical struggle ensued between a 13-year-old foster child, her foster parent, and the foster parent's fiancé, during which the foster child ran into the street. Allegedly, the foster child attempted to cut herself with broken glass and bottle caps, which she found on the ground outside and placed in her pockets. The foster child sustained scratches to her legs from this incident, which did not require medical treatment. No citations were issued.

## Sampling Concerns

The home was also the subject of four sampling inspections on March 16, 2009, July 12, 2011, August 19, 2013, and December 20, 2016. During the 2009 and 2011 sampling inspections, inspectors noted concerns about the foster parent's inability to verify her EBI training and the lack of a background check for a frequent home visitor.

## DFPS Disallowance List

DFPS placed this foster home on the agency's September 28, 2023, Disallowance List with an approval date by the DFPS Legal Department on September 29, 2023. In a letter dated November 1, 2023, DFPS notified Kids Grace Child Placement Agency that this foster home was being disallowed for future placement of children in care. The letter included information that the home was being disallowed based on information from HHSC concerning an "investigation for Neglectful Supervision and utilizing inappropriate discipline," deficiencies for corporal punishment, and violations of supervision standards. The letter also noted that the "foster parent acknowledged engaging in physical altercations with adopted children . . . failed to engage with the children's legal team, and . . . did not initiate therapeutic services for foster children." The letter emphasized that "the foster parent consistently failed to provide appropriate or adequate care."

The foster home page in CLASS indicates that the home was closed on April 22, 2022, and the verification was relinquished involuntarily due to deficiencies. During the period this home was open, IMPACT shows there were 56 placements of a child in the home and three children adopted. No children have been placed in this home since July 16, 2021.

## Texas Dept of FPS Region 5

DFPS Region 5 first verified this foster home on June 17, 2020. It closed voluntarily on May 24, 2021. DFPS opened one investigation into allegations of abuse, neglect, or exploitation during the 11 months the home was verified.

## ANE Investigations Summaries

**On April 9, 2021**, DFPS opened an investigation for Physical Abuse after a report was received that the foster mother admitted to hitting a four-month-old foster child. The foster parent also admitted she had been experiencing feelings of anger when caring for the four-month-old child. The foster mother confirmed that she "popped" the four-

month-old foster child on the cheek twice to prevent him from screaming. The foster father confirmed that the foster mother told him she "used two fingers and tapped his cheek several times" to stop the four-month-old foster child from screaming.

The investigation concluded with an RTB finding of Physical Abuse. HHSC issued three citations for corporal punishment, children's rights, and employee and caregiver responsibility. The RTB finding was changed to UTD during the Administrative Review, and all three citations were overturned.

## DFPS Disallowance List

DFPS placed this foster home on the September 28, 2023, Disallowance List with an approval date by the DFPS Legal Department on September 29, 2023. In a letter dated October 5, 2021, DFPS notified DFPS Region 5 that this foster home was disallowed after DFPS learned about concerns with corporal punishment in the home and that the home received a disposition of Unable to Determine (UTD) for Physical Abuse.

The foster home page in CLASS indicates that the home was closed on May 24, 2021, and the verification was relinquished due to voluntary closure without deficiencies. Impact said no children have been placed in this home since April 9, 2021. During the period this home was open, IMPACT shows there were three children placed in the home.

## Kids Grace CPA

This foster home was first verified on June 5, 2020, by the main branch of A Heart with Hope Family Services, Inc. CPA. The CPA relinquished verification for an unspecified reason on October 23, 2020. Kids Grace Child Placement Agency re-verified the foster home on November 20, 2020. Kids Grace relinquished verification on December 9, 2021, when the CPA involuntarily closed the home due to deficiencies.

DFPS opened one investigation into allegations of abuse, neglect, or exploitation while the home was open.

## ANE Investigation Summary

**On August 12, 2021**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after DFPS staff observed a five-month-old foster child with two "burn like marks" on her arm. The foster parents claimed the burns were rug burns and "something got stuck to her arm."  The report stated that a physician at the Children's Hospital in Dallas evaluated the injury and determined that the marks were inconsistent with the foster parent's explanation.

The foster mother reported she was not home, and when she returned home, she observed what looked to be rug marks on the child. She reported it to the CPA and caseworker.

The foster father admitted that he left the child in her crib along with a hot hair dryer that he used to dry her crib sheets after the child soiled the sheets. He left the child

unsupervised in her crib for an unknown time. A 17-year-old collateral child in the home confirmed that the foster father picked up the child from her crib upon hearing her cry and observed her injury and the hair dryer in the crib beside her. The foster father confirmed that he put ointment on the injury but did not take the child to the ER or urgent care.

DPFS concluded the investigation with a disposition of RTB for Neglectful Supervision against the foster father. The investigator Ruled Out the allegation of Physical Abuse. HHSC issued eight citations for children's rights, bedding, infant care, medical care, and supervision.

### DFPS Disallowance List

DFPS placed this foster home on the agency's June 6, 2023, Disallowance List, effective January 19, 2022. DFPS noted that the "[foster parent] received an RTB finding for NSUP resulting in an injury to a child," and the foster father was "dishonest about the nature of the injury during investigation." The Monitors did not receive a formal letter notifying the CPA of the disallowance decision.

The foster home page in CLASS indicates that the home was closed on December 9, 2021. The verification was relinquished involuntarily due to deficiencies. IMPACT reflects that no children have been placed in this home since December 10, 2021. During the period this home was open, IMPACT shows there were nine children placed in the home.

### Texas Dept of FPS Region 5

DFPS Region 5 first verified this foster home on June 23, 2021. CLASS reflects that the home is still open.

DFPS has opened one investigation into allegations of abuse, neglect, or exploitation related to the home.

### ANE Investigation Summary

**On September 16, 2022**, DFPS initiated an investigation for Physical Abuse, Neglect, and Neglectful Supervision after a three-year-old child was observed at daycare with a bruised, swollen face and abrasions inside his mouth. The intake report also alleged that the child had lost weight since placement in the home.

The three-year-old child was unable to identify individuals who could have harmed him either during a forensic interview or with the investigator. The two other children in the home were nonverbal and had no injuries or visible marks of concern.

Both foster parents denied that the three-year-old child had been hit and confirmed that the injury to his lip occurred during the night. The daycare employees confirmed that Benadryl immediately helped with the swelling in his face. The foster mother reported

that the three-year-old had lost some weight due to "a stomach bug" but that he started eating more after getting better. The daycare denied that the child had any eating problems. Medical documentation reviewed showed no concerns about the child's weight or physical neglect.

The investigator Ruled Out the allegation of Physical Neglect and one allegation of Neglectful Supervision. The investigator issued a UTD disposition for Physical Abuse to an unknown perpetrator and a UTD disposition for Neglectful Supervision because the foster parents were the responsible caregivers and could not provide an explanation for the child's injuries.

## DFPS Disallowance List

DFPS placed this foster home on June 6, 2023, Disallowance List, effective December 15, 2022. In a letter dated December 8, 2022, DFPS notified DFPS Region 5 that this foster home was being disallowed for future placements of children in care. The letter notes concern for inappropriate discipline and that the UTD disposition for "Neglectful Supervision and Physical Abuse allegations causes reasonable concern for any child in this home." The letter also acknowledged "that the DFPS Child currently placed in this foster home will remain there because of a court order."

The foster home page in CLASS does not show that the verification has been relinquished for the home. However, no children have been placed in this home since September 26, 2022. During the period this home was open, IMPACT shows there were three children placed in the home.

## Arrow Child and Family Ministries of Texas

DFPS Region 2 verified this foster home on April 22, 2010. On August 11, 2011, the home moved to Kids at the Crossroads Inc. CPA. On April 20, 2013, the home again changed CPAs to Caring Family Network. Caring Family Network relinquished verification on July 16, 2014. One year later, on July 14, 2015, the foster home was verified with Hope for Tomorrow. Arrow Child and Family Ministries CPA merged with Hope for Tomorrow after the home moved to the CPA. On April 27, 2016, Arrow Child and Family Ministries of Texas (Arrow) verified the foster home again. Arrow closed the home on October 25, 2022.

When this foster home was open, this foster home was investigated seven times for ANE and five times for standards violations. Four of the ANE investigations were for Physical Abuse, after children alleged they were spanked or hit by the foster parents, and two were for allegations of Sexual Abuse by the foster father. One investigation concluded with a UTD finding for Sexual Abuse.

## ANE Investigation Summaries

**On February 10, 2011**, DFPS initiated an investigation for Physical Abuse after a two-year-old foster child indicated that the foster father spanked her. The report detailed that a few months prior, a counselor had written in her notes that the foster parent said the child "was so bad so she spanked her when she pooped."

The child stated that she was spanked one time by the foster father. During the interview the child was observed to have a superficial scratch on her arm, a light bruise the size of a nickel on her forehead, and a small scratch next to her eye. The child could not provide information about how these injuries occurred.

The child's counselor reported that the foster mother told her that she received CPA training on the expectations of fostering children. The counselor said she reviewed the standard with the foster parents regarding the prohibition of spanking children.

The foster parents each denied the allegation of using inappropriate discipline. The foster mother reported that the marks on the child's head occurred at daycare. The allegation of Physical Abuse was Ruled Out, and no citations were issued.

**On September 16, 2011**, DFPS initiated an investigation for Physical Abuse after receiving a report of an outcry from a seven-year-old child that both foster parents hit her "very hard" on her arms and legs. The report detailed that the child's one-year-old sister residing in the home sleeps in the kitchen in a playpen, has no crib, and has "little ring marks on her body."

The seven-year-old child stated that the foster mother "taps" her 21-month-old sister on the legs; she denied any physical discipline occurring in the home, denied seeing any marks on her sister, and that her sister sleeps in her room. The foster mother denied using any physical discipline. Inspectors observed a crib in the children's bedroom. The allegation of Physical Abuse was Ruled Out, and no citation was issued.

**On January 31, 2014**, DFPS initiated an investigation for Sexual Abuse after three intakes reported that a 16-year-old child told another child she was having an inappropriate relationship with her former foster father. The child further stated that she was sleeping with two staff at her current RTC placement.

At the time of the interview, the 16-year-old child had just returned to live in the foster home. The child denied the allegations. She said that while placed at the RTC, another child reported to staff that she was in a relationship with the foster father, and the staff member confronted the two girls with the information. The other child admitted to lying because she did not want the sixteen-year-old to leave. The 16-year-old said she has a "daughterly" relationship with the father. The investigator documented the 16-year-old's response as "peculiar" when she was asked if the foster father called and told her "he wouldn't be sleeping with her anymore." The sixteen-year-old responded, "Not that I know of."

The child, who reportedly told the RTC staff about the inappropriate relationship, also told the investigator that she was in the room when the 16-year-old was talking with the

foster father on speakerphone. She heard the foster father tell the 16-year-old that he was not going to sleep with her anymore because she was sleeping with two staff at the RTC.

Both foster parents denied the allegation. Collateral children in the home reported that the foster father is never alone with the girls.

The allegation of Sexual Abuse was Ruled Out, and no citations were issued.

**On March 8, 2014**, DFPS initiated an investigation on March 8, 2014, for Physical Abuse after a report was received that a four-year-old child in care said the foster mother smacked him in the mouth. A five-year-old sibling also reported being spanked, slapped on the mouth, and "hit on the private." The four-year-old was reported to have a bruise and bump on his forehead, and both children have "darker shade visible around their mouth." A 10-year-old sibling did not disclose that any physical punishment occurred in the home.

The investigator asked the four-year-old child whether the foster mother hurt him. The child responded that the foster mother "hit him in the mouth when he was bad" and that he gets spankings on the bottom with a flyswatter. The five-year-old reported he gets "the bustin [sic]" and reported that the foster parents spanked him with a flyswatter. The five-year-old also said he had marks and bruises. He reported that the foster mother hurt him "by spanking us." The 10-year-old did not report any physical discipline in the home. She stated her brothers are both delayed, would say someone hit them, and would say "yes to everything."

Both foster parents denied hitting or spanking the children. They stated that the older children spanked the youngest ones, which they brought to the attention of the agency worker.

The allegations of Physical Abuse were Ruled Out. One citation was issued for corporal punishment for using prohibited discipline techniques.

**On June 30, 2014**, DFPS initiated an investigation for Physical Abuse after receiving an allegation that a five-year-old child, the same victim child as in the investigation initiated on March 8, 2014, reported the foster mother and an unknown person spanked him on the mouth. The unknown person also spanked the five-year-old on the buttocks. The child said the foster mother spanks him on the mouth with a flyswatter. The five-year-old's sibling also reported that an unknown person spanked his sibling.

At the time of the report, neither of the children was living in the foster home. The five-year-old child reported that he did not like living in the foster home because the foster mother was mean and spanked him with a flyswatter on the butt. He said he was spanked more than once and that his brother was also spanked. The six-year-old sibling also reported being spanked more than once with a flyswatter and that the foster mother also spanked him with her hand. He reported that she "did it harder" when he would try to put up his hands to stop her. An 11-year-old sibling said it was a 14-year-old child in

the home that spanked the boys with a flyswatter and denied that the foster parents used any physical discipline.

The foster mother denied the allegations. The investigator determined that the allegations had been previously investigated and Ruled Out the allegations of Physical Abuse. No citations were issued.

**On April 14, 2022**, DFPS initiated an investigation for Sexual Abuse after receiving two intakes regarding a 14-year-old child in care, Child A. Child A made an outcry that her foster father made inappropriate comments about her body. He asked her "would you like me to lick you all over like peach ice cream." He also asked her if she liked him "talking sexy" to her. Child A said she now believes her older (now adult) sister, who had said the foster father touched her in the past. A third intake, received on March 29, 2022, was merged with the case. This report alleged that the foster father abused a child who had previously been placed in the home.

The allegations included that a now 25-year-old woman (Child B), who was first placed in the home when she was 13 years old, reported that the foster father had sex with her three or four times a day. Child B is the alleged victim in the investigation initiated on January 31, 2014, and the sibling of Child A. Child B was placed in the home in 2011, then removed and placed elsewhere, and was in and out of the home until her last placement in the home in 2015. She left the foster home shortly after turning 18. Three siblings – Child A, Child C, and Child D -- were placed in the home in 2015. All four children were sexually abused before entering foster care.

During a forensic interview, Child A stated that when she and the foster father were alone in the car, he said some "disturbing things." The foster asked her if she wanted him to "lick her all over like peach ice cream" and if she liked him talking sexy to her.

Child A also reported that the foster father told her she needed a "stronger bigger bra to make her boobs look bigger" and that she had a "big butt." Child A reported that she has lived in the foster home for seven years and has never been inappropriately touched by the foster father. She also shared that the foster mother had passed away in January 2022. Child A reported that her 19-year-old sister (Child C), who previously resided in the home, told her the foster father asked her to "mess around" with him, and said she ran away from home, and they hadn't seen her since.

Child D, a 12-year-old biological sibling also placed in the home, was interviewed and stated that their foster father had never touched her and that she had only heard about her sisters being talked to sexually by him, making her uncomfortable. Child D said "the same thing" happened to Child B, Child E (Mariah), and another foster sibling.

The investigator interviewed Child C, the 20-year-old former foster child and biological sibling of Children A, B, and D. Child C stated that the foster father never sexually abused her, but she left the home before he could. She said that when they were alone, and he was teaching her to drive, he asked her if she wanted to have sex with him. She

told him no.  She did not tell anyone. She did not believe anything could be done because she was an adult, and he did not touch her.

A Texas Ranger interviewed Child B.  Child B reported that "things changed in the home" when she was around 14 years old.  She said the foster parents "started getting aggressive, trying to discipline her siblings by making them eat things they didn't want to eat and hitting them."  When she was 15 years old, the foster father told her he loved her and touched her on her vagina. She said she was scared and just let it happen. She said her foster father told her that if she told anyone what happened, "everything would be ruined" and that no one would believe her.  She didn't want to be split up from her siblings.  Child B said she told the foster mother about the foster father's actions. The foster mother said that they would never talk about it again, or "they would lose everything they worked so hard for," and that the girls would be split up. Child B reported that she and the foster father had oral sex and sexual intercourse.  Child B was able to provide specific details of events and described a birthmark in the foster father's groin area and stated that the foster father was uncircumcised.

The foster father denied all the allegations through his legal counsel.

The allegations of Sexual Abuse involving Child A, Child C, and Child D were Ruled Out. The allegation of Sexual Abuse of Child B was found to be UTD. When the investigation was closed, a criminal investigation was still in progress.  The investigator determined that "due to the consistent allegations of [Child B] between this investigation and the past one, it appears something may have happened. However, it was not able to be corroborated."

HHSC issued one citation to the CPA because an updated home screening completed following the death of the foster mother did not contain information that assessed the appropriateness of continued placement in a single-parent foster home.

Child A and Child D were removed from the foster home shortly after the investigation was initiated (on April 18, 2022); there were no other placements in the foster home.

**On June 6, 2022**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after Child A (discussed above) reported that in her previous foster home (the Hoisington home), a 16-year-old adopted child had forced himself on her. She reported that he stopped when her 12-year-old biological sister entered the room.

The 14-year-old told the investigator that the 16-year-old adopted son asked her to help with some blankets, and they went to the laundry room. She said the 16-year-old took off his shirt and then, undressed her and just looked at her. She said she panicked and told him it was a bad idea, and then her sister walked in and saved her. She reported that the foster father was not home, but when he arrived, her sister told him what had happened, and he called her a liar.

The 12-year-old child reported seeing her sister and the 16-year-old enter the laundry room. She went to check on them and found her sister naked. She did not see the 16-

year-old because she ran out of the room. She said her sister was scared and upset and had her arms crossed on her chest. The 12-year-old reported that at the time of the incident, the foster mother was in the hospital, and the foster father was in his room.

The foster father and the 16-year-old denied the allegations, and both stated that the foster father never left the children alone.

The Sexual Abuse allegation against the 16-year-old was Administratively Closed because he was under the age of 18, and the allegation of Neglectful Supervision was Ruled Out. HHSC issued two citations for supervision for not supervising children according to service plans and for prohibited discipline because the children said that the foster parent would call them liars, "mental," make inappropriate comments, and yell and scream at them.

## Standards Investigations Summaries

In addition to the ANE investigations, the foster home was also the subject of five minimum standards investigations, two of which resulted in four citations related to minimum standards violations.

- On June 12, 2014, HHSC initiated an investigation for inappropriate discipline and for providing inconsistent medication information and medication administration. HHSC issued two citations: for transportation, when two children were not secure in car seats, and for violating general agency policies after it was determined the CPA did not follow its policy and procedures: the CPA failed to conduct a background check on a person babysitting the children in care.

- On December 1, 2021, HHSC initiated an investigation after receiving a report that children in care were left unsupervised in a vehicle between seven and 10 hours while the foster father was visiting the foster mother in the hospital. HHSC issued two citations related to Supervision: for a household member babysitting when not an approved babysitter and for household members who were not approved babysitters who were not certified in first aid and CPR.

## DFPS Disallowance List

In a letter dated December 21, 2022, DFPS notified Child and Family Ministries of Texas CPA that this home was disallowed for future placements of children in care due to violations of minimum standards citations regarding inappropriate discipline and inappropriate supervision. The letter also stated that the foster parent has a pattern of Sexual Abuse allegations with CPS and that he received a UTD disposition for Sexual Abuse.

The home was placed on the DFPS Disallowance List on April 28, 2023, effective January 20, 2023.

CLASS reflects that the home's verification was relinquished on October 25, 2022. During the period this home was open, IMPACT shows there were 21 placements of a child in the home. No children have been placed in the home since April 18, 2022.

## Texas Dept of FPS Region 11

DFPS Region 11 verified this home on September 24, 2004, until the home moved to Lutheran Services of the South, Inc. on September 25, 2006. The home relinquished verification with Lutheran Services of the South, Inc. on December 11, 2013, with a documented reason of "Changing CPAs." On November 5, 2019, DFPS Region 11 reverified the home.

Before the home was placed on the disallowance list, DFPS investigated allegations of abuse, neglect, or exploitation related to the home four times, and HHSC opened eight minimum standards investigations.

## ANE Investigations Summaries

**On February 8, 2005**, DFPS initiated an investigation for Medical Neglect after receiving a report that a seven-month-old was taken to the doctor for a wellness check by an unknown person on January 26, 2005. The child had a severe yeast infection.

Following a visit with her biological mother on that same date, the child was returned to the foster mother. The foster mother was provided with diaper rash medication. The foster mother and the foster mother's parent reported observing the child to have redness but no blisters, swelling, or bleeding. On February 7, 2005, the foster mother took the child to the doctor, and the child was diagnosed with a UTI. The doctor who treated the child on February 7, 2005, confirmed to the investigator that the child did not have a yeast infection and stated he did not believe the foster parent to be neglectful. The allegation of Medical Neglect was Ruled Out, and no citations were issued.

**On June 30, 2008**, DFPS initiated an investigation for Physical Abuse based on allegations that the foster mother knocked an 11-year-old foster child to the floor and that while she held him down, someone kicked him in the back. The child also reported being choked. The report also mentioned that the foster mother spanked a three-year-old foster child, and the three-year-old would scream in terror when the foster parent's daughter would hold him, pleading not to let him go with her. It was also reported that the children begged for food while at daycare and appeared thin.

The investigator interviewed three children, and each provided different accounts regarding discipline. The 11-year-old asserted that only a four-year-old child living in the home was spanked. A seven-year-old child in the home claimed the foster mother didn't spank, but the afterschool babysitter did spank, and the four-year-old child stated no one spanked him. The children reported receiving meals and snacks and denied being afraid of anyone in the home. The 11-year-old informed the investigator that when he was first placed in the home, he was placed in a hold and laid on the ground, and although he didn't see anyone kick him, he said it felt like he was kicked. The allegations

of Physical Abuse were Ruled Out, and no citations were issued.

**On January 25, 2011**, DFPS initiated an investigation for Physical Abuse after a five-year-old foster child was observed with a bruise and bump on his forehead between his eyes. When asked what happened, the child said that the foster mother pushed him, and he fell into a trash can. The report also stated that the child said that the foster mother had long nails and would pinch him and pull his ears.

When he was interviewed, the 5-year-old child maintained that the foster mother pushed him into a trash can, causing the bump and bruise on his forehead, although he could not give specific details.

The foster mother denied causing harm to the child. The foster mother reported the child misbehaved and she escorted him to his room. After leaving him there, she heard a loud noise and returned to the child's room, and the child yelled, "you made me do it." School personnel and the foster parent reported that the child's behaviors had worsened over the past three months. Other children in the home denied witnessing the foster mother pushing the child. The allegation of Physical Abuse was Ruled Out, and no citations were issued.

**On July 14, 2022**, DFPS initiated an investigation for Emotional Abuse and Physical Neglect following a report by a CPS worker. The worker alleged that two children in the home, ages 15 and 13, reported an infestation of mice. The worker observed a dresser drawer full of rat feces, an unclean toilet seat, an unclean shower, trash, feces under a mattress, unclean sheets, and a bag of clothing rats had chewed on. The children expressed being afraid to eat because the foster parent "complains about them finishing everything" because she didn't "get food stamps like [their] mom" and had to pay for the food. The foster mother reportedly threatened the children with being placed elsewhere, made inappropriate comments about the children, and shoved a five-year-old.

During the inspection, the investigator observed rat feces in the dresser and between the upstairs boys' bedroom mattresses and beds containing dirty linens. The foster parent's prescription medications were found unsecured and accessible to children.

At the time of the intake, a sibling group, ages 16, 14, 13, and five, were placed in the home. The 16, 14, and 13-year-olds each confirmed the rodent infestation. Two children reported that the foster parent complained about the children finishing the food. One child stated he did not get enough to eat and that the foster parent threatened the children with removal if they didn't keep her house clean. The five-year-old reported having enough food but being restricted from eating if she got hungry at nighttime. The five-year-old also confirmed that the foster mother pushed him, but he felt no pain.

The foster parent admitted to the rodent infestation, and she had not cleaned the children's rooms before they arrived. She said she relies on the children to bring their bed linens down to be laundered because she has limited mobility in her left hand due to a stroke. She denied complaining to the children that they ate all the food or that she restricted food, stating that she cooks meals for them. The foster mother observed the

five-year-old push her grandson and acknowledged putting her hand on the five-year-old's shoulder to address the incident but denied pushing the five-year-old.

The allegations of Emotional Abuse and Physical Neglect were Ruled Out. HHSC issued two citations for minimum standards violations related to the dirty bed linens and the foster parent pushing the five-year-old and making inappropriate comments to the foster children. HHSC also issued three citations from the home inspection addressing concerns with the physical environment, beds and bedding, and medication storage.

## Standards Investigations Summaries

In addition to ANE investigations, HHSC investigated the home eight times for minimum standards deficiencies, with two investigations resulting in eight deficiencies. These citations, all before 2013, were issued for minimum standards violations associated with prohibited punishment (for yelling); two for not providing children snacks and not providing adequate nutrition; and for child rights—phone visits. The CPA also received four citations for violation of minimum standards associated with children's service plans (3) and emergency admissions.

## Sampling Concern

In a sampling inspection from December 22, 2022, a concern was noted related to children's rights when foster children informed the foster parent and her biological daughter yelled and cussed at them.

## DFPS Disallowance List

In a letter dated September 28, 2022, DFPS provided notice to DFPS Region 11 disallowing the foster home from future placements. The letter stated the home had an established pattern of non-compliance with minimum standards, including Other Prohibited Discipline, Child Rights, and Minimum Qualifications of employees. The letter also noted concerns related to the foster parent's limited mobility leading to "unsanitary and deplorable living conditions."

DFPS place the home on the August 31, 2023, Approved Disallowance List with an approval date by the DFPS Legal Department on September 23, 2022. DFPS documentation provided to the Monitors provides that the home was closed on July 15, 2022. A review of CLASS reflects that the home has three separate agency home pages.

The most recent Agency Home page listed under Texas Dept of FPS Reg 11 does not reflect that the verification has been relinquished. During the period this home was open, IMPACT shows there were 72 placements of a child in the home and one child adopted. IMPACT shows that no children have been placed in the home since July 14, 2022.

## Kidz 2 Kidz Child Placing Agency

Heart of the Kids Social Services Incorporation verified this home on January 13, 2016. On December 13, 2018, the home changed CPAs to the Kidz 2 Kidz Child Placing Agency. The home voluntarily closed on February 13, 2023, without deficiencies.

DFPS investigated allegations of abuse, neglect, or exploitation related to the home nine times, and HHSC opened eight investigations for violations of minimum standards violations.

### ANE Investigations Summaries

**On July 28, 2017**, DFPS initiated an investigation alleging Physical Abuse and Neglectful Supervision after a one-year-old child in care was observed with a burn to her vagina and buttocks area. The investigation conclusion includes notes that a doctor at the FACN indicated the burns were consistent with physical abuse. Neither a four-year-old child in care nor a three-year-old child in care made any outcries of physical abuse occurring in the home. The foster mother denied the allegations, stating she was never physically abusive with the children.

The allegation of Physical Abuse was Ruled Out. The allegation of Neglectful Supervision was Administratively Closed, and no citations were issued.[440]

**On January 14, 2020**, DFPS initiated an investigation for Neglectful Supervision of a 13-year-old and a 12-year-old child in the home.  Law enforcement reported that the 13-year-old entered the 12-year-old's room and started hitting her with a phone cord. The 12-year-old sustained a dozen welts on her back and one or two welts on her thigh.

The 13-year-old stated that she asked permission to enter the 12-year-old's bedroom to ask her a question. The foster mother gave her permission to do so. The other house members were watching a movie when this incident occurred. A few minutes later, the other house members heard the 12-year-old screaming from her bedroom. The investigation conclusion indicates that the foster mother intervened immediately, separated the children, and contacted the CPA and law enforcement. The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On September 28, 2020**, DFPS initiated an investigation alleging Neglectful Supervision of a 12-year-old child in care. The intake detailed that the foster parent took the other children in the home to the Boys and Girls Club, and the 12-year-old was told to wait outside the home. The child wandered to a neighbor's house and asked to call the police.  The child said she was abused in the home.

Initially, the 12-year-old told the investigator that they are always supervised, and she denied being left home alone.  She later told the investigator that on the day of the

---

[440] DFPS opened a concurrent investigation of the one-year-old child's daycare after inconsistencies in the statements of the daycare director and daycare workers on the day the child would have sustained the burns. The allegations against the daycare director and workers were found to be UTD.

incident, she was left home alone after she refused to get in the car; the foster mother drove off with the other children. She said she was scared, was home alone for 10 to 15 minutes, and was across the street when the police arrived.

The foster mother said the 12-year-old had run away. She and another child looked for the 12-year-old and then went to pick up the other children from the Boys and Girls Club. The foster mother said she received a call from law enforcement advising that the child was at the neighbor's house, and the law enforcement officer returned the 12-year-old to the foster home. The foster mother denied leaving the 12-year-old alone. She stated that the foster children have never been left alone in the home.

The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On October 28, 2020**, DFPS initiated an investigation for Neglectful Supervision after a law enforcement officer reported that the foster parent requested the removal of a 12-year-old child in care because the child repeatedly ran away from the home, requiring law enforcement assistance. The intake indicates that the child feels like the foster parent is mean and treats her unfairly compared to the other children in care. The child stated she feels like she cannot do anything right.

The 12-year-old expressed feeling unsafe in the foster home, citing a warning from the foster mother and other girls about "unexpected bruises" if she left the house. She also mentioned unfair treatment, including being made to stay in her bedroom all day and receiving different food than the other girls. The 12-year-old also reported that if she refused to take her medication, she was denied meals.

The foster mother reported that the 12-year-old had run away multiple times since being placed in her home. She advised the inspector that meals are prepared, and other options are always available. The foster parent denied telling the 12-year-old she would receive bruises if she left the house and asked the child to stay in her bedroom for an extended period.  Two other children in the home reported no concerns and said that the 12-year-old acted out frequently.

The investigator discovered only one incident report for runaways, although law enforcement verified five contacts.

The allegation of Neglectful Supervision was Ruled Out.  HHSC issued two citations: serious incident documentation and preliminary service plans, which were incomplete 72-hour plans

**On April 16, 2021**, DFPS initiated an investigation for Neglectful Supervision after a school counselor reported that a 16-year-old child in care expressed suicidal ideation. When contacted by the child's counselor, the foster parent yelled that she did "not have time for this," and, while the child standing next to her, said that the home "may not be a good fit."  It was also reported that the foster mother and the 16-year-old child argued, and the foster child had "severe diarrhea because of the stress."

The 16-year-old reported that the foster mother yelled at her for not disclosing suicidal ideation and questioned if she wanted to harm herself. After that, the foster mother took her to the hospital. The child said the foster mother called her supervisor at the CPA and yelled at her about the 16-year-old wanting to kill herself. However, when the child was asked if the foster mother yelled at her, the child clarified that she yelled at the CPA case manager.

Neither the collateral children in the home nor the CPA staff expressed any concerns. The foster mother denied the allegations.

The investigator determined that the foster mother questioned the 16-year-old about suicidal ideation in front of other children in the home. The foster mother also permitted the child to use the phone alone in the foster mother's bedroom, where medication was stored, knowing the child was suicidal. Additionally, the foster parent allowed another child to be truant from school.

DFPS Ruled Out the Allegation of Neglectful Supervision. Two citations issued related to children's rights and employee and caregiver responsibility.

**On April 22, 2021**, DFPS initiated an investigation for Sexual Abuse. A 15-year-old child told her attorney that the foster mother had a camera system and pointed the camera into the child's bedroom and bathroom, and the foster mother was taking pictures and giving them to "third-party men."

The 16-year-old was no longer residing in the foster home and could not be located for an interview. None of the interviewed collaterals expressed concern with the home and denied seeing cameras. CPS caseworkers, CPA staff, and the investigator did not observe any cameras in the home or any signs that a camera had been removed. The allegation of sexual abuse was Ruled Out, and no citations were issued.

**On November 15, 2021**, DFPS initiated an investigation for Physical Abuse after school personnel reported that a nine-year-old foster child with IDD said that the foster mother was mean to her and hit her in the face. A second intake stated that the foster parent slapped two children in care across the face.

The nine-year-old denied that the foster mother slapped her but said her "foster sister" slapped her. However, the child could not provide the name of the foster sister or any details of being slapped. Collateral children and the foster mother denied any physical abuse in the home. All children reported being comfortable in the home.

The allegation of Physical Abuse was Ruled Out, and no citations were issued.

**On February 1, 2022**, DFPS initiated an investigation for Physical Abuse, Emotional Abuse, and Neglectful Supervision. A 15-year-old outcried that the foster parent left the children home alone "often . . . to fend for themselves," including to feed themselves, and that "violent brawls" break out among the children. The 15-year-old also told the reporter that the foster mother verbally harassed her by screaming at her that her

biological mother did not want her and did not love her anymore, that other children in the home would drag a nine-year-old child with disabilities by her hair because she has trouble moving on her own; and that if CPS visited the home there was an agreement in the home not to speak about the abuse or else they get "jumped."

The investigator interviewed the children living in the home: a nine-year-old, 12-year-old, 13-year-old, and two 15-year-olds. Some of the children also had a forensic interview. Most of the children acknowledged that fighting occurred between the girls in the home and reported that the foster mother told them to stop but did not physically intervene. Two children discussed an incident when the foster mother's adult daughter was supervising them, and one girl grabbed and dragged the 9-year-old by the hair. Two children said that the foster mother's daughter did not intervene in the incident. Two children in the home physically intervened and called the foster mother, who returned to the home immediately. The foster mother denied the allegations.

The investigation concluded that the foster parent's biological adult daughter failed to intervene in a physical altercation between two children and that she demonstrated a disregard for the children's safety, and entered an RTB disposition for the adult daughter. All allegations against the foster mother were Ruled Out.

HHSC issued five citations: two for supervision (because the foster parent did not intervene when children got into a fight and a child obtained piercings while in the home), children's rights, background checks (because the foster parent's adult daughter had an ineligible background check), and operational responsibilities (because the foster parent provided a false incident report).

**On June 9, 2022**, DFPS initiated an investigation for Physical Abuse after a 15-year-old child outcried that two other children, aged 14 and 15 years old, both residing in her previous foster home, were being beaten up by the foster mother and that the foster mother instructs the children fight one another.

One child, age 15, was identified as a potential victim, but the other child mentioned by the reporter could not be identified. The 15-year-old denied any physical discipline occurring in the home and denied any beatings by the foster parent or witnessing the foster mother having children fight one another. The foster mother and two collateral children in the home denied physical discipline or physical abuse occurring in the home. They also denied being instructed by the foster mother to fight one another.

The allegation of Physical Abuse was Ruled Out, and no citations were issued.

## Standards Investigations Summaries

The home was the subject of eight minimum standards investigations. Seven included allegations related to inadequate supervision and one for inappropriate discipline. Only one minimum standards investigation resulted in a citation:

HHSC initiated a minimum standards investigation on February 2, 2023, after receiving concerns about supervision and that children in care are treated unfairly. The intake narrative indicated that the 16-year-old victim, who had been in the home for four years, ran away to her biological sister's house. She said she ran away from the foster home because she was emotionally abused there. The child stated she cannot use a phone or connect to the home's WIFI. The child stated she would continue to run away if returned to the home. In a merged intake, the child also alleged that the foster mother tells her she looks like a "whore" when she wears "short shorts." The child said she would rather be in a group home. The investigator concluded that none of the allegations could be substantiated. However, the investigator discovered evidence that the foster mother allowed the child to "ween" herself off her prescribed psychotropic medication for ADHD. As a result, one citation was issued for violation of the minimum standard associated with administration of medication.

### DFPS Disallowance List

In a letter dated February 21, 2023, DFPS notified Kidz 2 Kidz Child Placing Agency that this foster home was being disallowed from future placements of children in care. The letter said the disallowance was due to patterns of minimum standards violations for children's rights and a pattern of inappropriate discipline allegations. The letter also raised concern for the numerous allegations of Physical Abuse, Sexual Abuse, and Neglectful Supervision and that the foster mother permitted her adult daughter, who had an RTB for Neglectful Supervision, to supervise the children.

The foster home was placed on the DFPS Disallowance List on March 20, 2023, effective February 17, 2023.

The home voluntarily closed on February 13, 2023, without deficiencies or pending investigations. During the period this home was open, IMPACT shows there were 41 placements of a child in the home. According to IMPACT, no children have been placed in the home since February 13, 2023.

### Children's Hope Residential Services, Inc.

Children's Hope Residential Services, Inc. (CHRS) Greenville, Texas branch verified this foster home on February 20, 2018. The home was involuntarily closed on June 10, 2022, without deficiencies. When the home's verification was relinquished, CHRS had been on Heightened Monitoring since November 12, 2020. The Heightened Monitoring Plan lists trends and patterns, including child's rights, discipline and punishment, home oversight, home screening and verification, and medication management.

DFPS investigated the home once for allegations of abuse, neglect, or exploitation.

### ANE Investigation Summary

**On June 12, 2022**, DFPS initiated an investigation for Physical Neglect of the one-year-old foster child after a family dog bit a Heightened Monitoring inspector during an

348

inspection. The foster family had seven dogs in the home. One of the dogs bit the inspector on the leg unprovoked, and the inspector required medical attention. The intake described the home as a "death trap" cluttered with boxes, debris, and dirt, which caused concerns for the children in the home. Pallets were stacked outside the home, and the inspector noted animal feces in the driveway, overgrown grass, barrels, a broken trampoline in the yard, and various types of equipment stacked on wood debris.

The investigation concluded that although the home was chaotic and cluttered, the child was not exposed to immediate danger. The foster mother explained the home's condition, that the family was remodeling their pantry, that she brought home items from her classroom, and that medical supplies for the younger children had been delivered the day of the home visit. The allegation of Physical Neglect was Ruled Out, and no standards citations were issued.

CLASS reflects that the CPA closed the home involuntarily, without deficiencies, on June 10, 2022, just two days before the DFPS investigation.

## DFPS Disallowance List

The home was placed on the June 6, 2023, Disallowance List, effective July 27, 2022. In a letter dated July 27, 2022, DFPS notified the home of disallowance for future placements because of the pattern of Physical Neglect and safety concerns regarding hazardous and unsanitary conditions in the home. The letter stated that a sufficient pattern of allegations demonstrated a risk to any child placed in the home.

IMPACT reflects that no children have been placed in the home since June 10, 2022. During the period this home was open, IMPACT shows there were six children placed in the home and three children adopted.

## Circles of Care

This foster home was first verified on April 20, 2020, by Circles of Care, Houston branch. The CPA voluntarily relinquished verification of the home on April 13, 2023, with deficiencies. Circles of Care has been on Heightened Monitoring since November 20, 2020. The following trends are identified in the operations Heightened Monitoring Plan: background checks, child's rights, discipline and punishment, health and safety, home oversight, home screening and verification, living space, physical environment, and medication management.

DFPS investigated allegations of abuse, neglect, or exploitation once during the approximately three years the home was verified, and HHSC opened one minimum standards investigation.

### ANE Investigations Summary

On May 24, 2020, DFPS initiated an investigation for Sexual Abuse after a child's biological parent made an outcry that her three-year-old child "may have been raped

and may be dead." The investigator interviewed three foster children in the home, who reported no concerns. The investigator also interviewed the foster parents and their three biological children who reported no concerns or knowledge of the three-year-old being inappropriately touched.

The allegation of Sexual Abuse was Ruled Out, and no citations were issued.

## Standards Investigations Summaries

HHSC initiated an investigation on April 6, 2023, in response to allegations that the CPA was not conducting monthly home visits, documents were being falsified, and a nine-year-old child was not receiving her prescribed medication.

During her interview, the foster mother stated that the CPA case manager failed to provide "support," never visited the foster home, and required the foster mother to sign documents without dating them. The foster mother said approval was required before she could administer the nine-year-old's medication, but once approved, she immediately administered the medication.

The case manager explained that she asked the foster parents to "sign but not date the documents" because she "forgot to get the signatures at the visit." She stated that the child's behaviors "were not serious enough for an emergency discharge," and the foster mother wanted the child, and her two younger siblings discharged immediately.

The children's caseworker reported having "issues with the foster mother." She stated that the foster mother failed to give the nine-year-old her medication as prescribed and "seems only concerned" with the two younger siblings. The caseworker stated that despite only wanting the nine-year-old to leave, the foster mother "placed a 30-day discharge on all three children."

The inspector reviewed medical documentation and found that the psychotropic medication was prescribed on March 15, 2023, and approved by the judge on March 21, 2023. However, the foster parent did not fill or administer the medication until March 30, 2023.

During the home inspection, the investigator found that the foster mother was operating a daycare and caring for eleven children by herself. The inspector made an additional intake due to the foster mother "illegally operating a daycare" in her home.

The inspector issued four citations from this standards investigation for supervisory visits, caregiver responsibilities (for not taking a child to school and having the child assist with the in-home daycare), medication records (for incomplete medication logs), and medication administration (for not filling a child's psychotropic medication for several days).

## DFPS Disallowance

In a letter dated May 16, 2023, DFPS notified Circles of Care that this foster home was disallowed for any future placements of children in care because of standards violations and "lack of cooperation, home access, honesty with Agency staff, and the risk of safety for eleven young children in their care while operating an unlicensed daycare out of their home." DFPS placed this foster home on the agency's June 29, 2023, Disallowance List, effective June 16, 2023.

The foster home page in CLASS indicates that the home was closed on April 13, 2023, and the home's verification was relinquished due to being voluntarily closed with deficiencies. No children have been placed in this home since then. During the period this home was open, IMPACT shows there were 16 placements of a child in the home and one child adopted.

## Lutheran Social Services of the South, Inc.

Buckner Baptist Children's Home verified this home on October 1, 1997. On February 28, 2002, the home changed CPAs and was verified by Specialized Alternatives for Families and Youth of Texas. The home relinquished verification on March 4, 2023. Lutheran Social Services of the South, Inc. (LSSS) verified this home on April 26, 2016, and relinquished it on July 21, 2023.

At the time of the home's closure, LSSS was on Heightened Monitoring due to patterns and trends in areas related to administrative operations, therapeutic services, physical environment, and supervision and staff interaction.

DFPS opened one investigation into allegations of abuse, neglect, or exploitation, and HHSC opened two minimum standards violations while the home was open.

## ANE Investigation Summary

**On August 23, 2021**, DFPS initiated an investigation for Physical Abuse and Physical Neglect after a DFPS staff reported that a nine-year-old foster child made an outcry that the foster mother "choked, scratched and hit him in the stomach." The child also alleged that he was locked inside the restroom for ten days and said the restroom was being used for time-outs.

The investigator interviewed four children: two adoptive children and two foster children. The nine-year-old child who made the outcry that the foster mother choked, scratched, and punched him in the stomach later admitted to lying about being physically abused. All the children in the home reported being placed in the bathroom for long periods as punishment and said they had to sleep in the bathroom during the punishments. The foster mother denied physical abuse but confirmed she placed the children in her bathroom for time-outs.

The allegations of Physical Abuse and Physical Neglect were Ruled Out. One citation was issued for Other prohibited discipline due to the foster mother placing a child in the bathroom as punishment.

## Standards Investigations Summaries

HHSC initiated an investigation on December 10, 2021, after a reporter alleged foster children threatened to harm the foster parent after being denied access to a phone and not being fed. Two intakes were merged for this investigation.

The first intake, received on December 4, 2021, alleged two foster children -- an 11-year-old and a 10-year-old – threatened to beat the foster parent up after backing her into a corner. The reporter said the children were not physically aggressive, and when law enforcement arrived, one child was attempting to run away. The children reported not being fed and not being allowed to use a phone.

The second intake, received on December 20, 2021, alleged the foster parent told the children, "I don't want to hurt you because you're a kid," and then locked them out of the home. The report stated it was unknown how long the children were locked out of the home, but the police were called. The foster parent alleged the children hit her, but the children denied those claims. The report stated that the children were taken to mental health hospitals.

The investigation report stated that the children got angry when they did not return to their mother's home as promised. The children attempted to run away from the foster home and threatened the foster parent. The 11-year-old reported that the foster parent hid food from them and fed them the same thing every day. The 10- year-old denied these allegations and stated that the foster parent did feed them, but they didn't like the food that was prepared. The foster parent denied hiding food from the children and reported that the children came to the home with cell phones and were able to use their phones until their CVS caseworker instructed the foster mother not to permit the phone usage because they were speaking to their mother every night and it was impacting their behavior. No citations were issued.

HHSC initiated an investigation on May 02, 2022, after a report to SWI alleged that children in care were living in an unsafe environment. The reporter alleged that a 15-year-old adopted child was recovered by law enforcement after running away because he was caught using the internet at home. The foster parent became upset and made him sleep in the bathroom without blankets.

The investigator learned that the foster home had one foster child in care at the time of the incident. The CPS director/case manager was aware of the CPS investigation involving the foster home and failed to report the incident to licensing. During the interview with the foster parent, the foster parent admitted to placing her adopted son in the bathroom as a form of punishment. She said that she had her adopted son sleep in the bathroom for a period of 30 days. The foster child and the other adopted son

corroborated the foster parent's statements. The foster child denied being placed in the bathroom for punishment.

HHSC issued one citation for serious incident reporting because the foster parent failed to report that she was the subject of an ANE investigation by another entity.

## DFPS Disallowance List

In a letter dated November 21, 2022, DFPS notified LSSS that the foster home was disallowed for future placements because it had a history of utilizing inappropriate discipline techniques and failing to report serious incidents. DFPS noted that the "pattern of allegations regarding inappropriate discipline poses a reasonable risk of concern."

The home was placed on the DFPS August 31, 2023, Disallowance list with an approval date by the DFPS Legal Division of August 4, 2023.

CLASS shows that the home was involuntarily closed without deficiencies on July 21, 2023. A review of IMPACT reflects that OCOK placed a child in the home on December 6, 2022, and removed the child eight days later on December 14, 2022, per request by the caregiver. DFPS placed a second child in the home on March 15, 2023, only to be removed the same day, documenting the reason as "home is currently on a list of actions in which he could not be placed."

During the period this home was open, IMPACT shows there were 23 placements in the home and two children adopted.

## Family Link Treatment Services, Inc.

The foster home was verified by Family Link Treatment Services (FLTS) on January 29, 2021, and closed on February 24, 2022. FLTS was placed on Heightened Monitoring on November 9, 2020. The Heightened Monitoring Plan's areas of concern include the child's rights, health and safety, living space and physical environment, medication administration, and serious incident reporting.

DFPS investigated this foster home once for Physical Neglect. HHSC opened one minimum standards investigation, and no citations were issued.

## ANE Investigations Summaries

**On February 28, 2022**, DFPS initiated an investigation for Physical Neglect after a DFPS staff found during an unannounced home visit that the home's physical site was unsafe for the three foster children, who ranged in age from one to three years old. The inspector found piles of debris, discarded furniture, bins, lawn equipment, gas cans, and other dangerous objects easily accessible to children. The home was unsanitary: human and animal waste was seen on the floor, bed linens were soiled, it smelled of urine, and the walls were filthy.

The foster parents admitted to having "toys" in the yard and stains on the sheets. The foster mother stated that neither the case manager nor the children's therapist who visited the home expressed immediate safety concerns. The foster parents said the stained sheets on the child's bed had just happened that day and that the county would pick up the cats.

At the time of the March 1, 2022, inspection, no children lived in the foster home, and the inspector observed no immediate safety concerns. The allegation of Physical Neglect was Ruled Out, and no citations were issued.

## Standards Investigations Summaries

This foster home was the subject of one standards invention on March 21, 2022, after a DFPS staff reported that a foster child alleged that they were spanked and hit with a belt while in their prior foster placement. No citations were issued.

## DFPS Disallowance List

This home was reviewed for disallowance at the request of Heightened Monitoring staff, who expressed concerns about child safety in the home due to the condition of the physical environment found during an unannounced monitoring visit.

DFPS placed this home on its August 31, 2023, Disallowance List with the date of August 15, 2023, as approved by the DFPS Legal Department. In a letter dated April 8, 2022, DFPS provided notice to Family Link Treatment Services that this home was disallowed for any future placements of children in care, stating there is "a reasonable concern for any children in the home," and referencing this foster home's minimum standards investigations regarding "unsanitary physical environment, Child Rights, Corporal Punishment, Serious Incident Documentation, and Immunization Requirements."

According to CLASS, this home was closed on February 24, 2022, with a relinquishment reason "CPA Closed." IMPACT reflects that no children have been placed in the home since February 22, 2022. During the period this home was open, IMPACT shows there were three children placed in the home.

## Children's Hope Residential Services, Inc. CPA

Children's Hope Residential Services, Inc. CPA (Children's Hope) verified this foster home on November 13, 2017. The home closed on December 15, 2022. While the home was open, Children's Hope was placed on Heightened Monitoring. The CPA was placed on Heightened Monitoring beginning November 12, 2020. The problem areas identified in the Heightened Monitoring Plan included the child's rights, home screening and verification, medication management, discipline and punishment, and home oversight.

DFPS opened an investigation for abuse, neglect, or exploitation after the home closed, and HHSC opened two minimum standards investigations before its closure.

## ANE Investigations Summaries

On December 24, 2023, DFPS initiated an investigation for Physical Neglect. The allegations were identical to those in the December 1, 2022, standards investigation, which resulted in citations being issued, as discussed below. The children were no longer living in the home when the investigation was initiated. DFPS Ruled Out the allegations of Physical Neglect, and no additional citations were issued.

## Standards Investigation Summary

One of the two HHSC investigations resulted in two citations being issued.

On December 1, 2022, HHSC initiated an investigation due to allegations that the foster parent subjected a five-year-old child in care to inappropriate discipline. The foster parent reportedly said that he poured ice water on the child because the child would not get up for school and that the child was not allowed to use the restroom until after washing dishes, so the child "peed in the pantry." The report alleged that the child was made to stand in time-out and recite to the other children, "I will obey my parents" 50 times, the child was made to clean another household member's room, and the child was threatened with being "shipped off to military school."

The five-year-old child stated that he had been "bad every single day," but he would no longer be "bad" because "Santa was coming." The child also said that his foster father picked him up and slammed him against the door but that no one saw this happen. He denied that he was ever spanked, nor was there ever any physical discipline. He said the foster father "poured ice cold water on him because he would not get up for school." The five-year-old also said he "peed his pants" because the foster father told him he had to finish cleaning his bowl, and he could not hold it any longer.

Two other children in care reported that the foster father poured ice water on the five-year-old child when he was trying to wake him up for school, made the child repeat sentences about his behavior multiple times as a form of discipline, and made the two older children determine the child's punishment when he was "in trouble." The children also stated that the foster father threatened the child by telling him that if he were not good and did not start listening, he would be sent to a military school due to his behavior.

The foster father said that he was holding a cup of ice water on the child as a joke and accidentally spilled it. He admitted to making him repeat sentences as a form of discipline. However, he denied yelling or threatening the children.

The investigation resulted in two citations: one for prohibited discipline and one for children's rights.

## Sampling Concerns

The foster home was the subject of four sampling inspections, with two resulting in concerns, on June 22, 2021, and October 6, 2022. The documented concerns included:

- Several packages of food were stored on the floor.
- The home study did not contain the results of the background checks.

- Medication logs were being filled out in batches. Medication logs for October 2022 were unavailable.
- The gate for the fence surrounding the pool lacked a locking mechanism.
- Electrical outlets in a bedroom used by children in care lacked childproof outlet covers.

## DFPS Disallowance List

In a letter dated March 3, 2023, DFPS notified Children's Hope Residential Services, Inc. CPA, that the home was disallowed for any future placements of children in care. DFPS' decision was based on the foster home's minimum standards violations related to children's rights and inappropriate discipline. DFPS placed the home on the June 6, 2023, Disallowance List, effective March 31, 2023.

According to CLASS, the foster home closed on December 15, 2022, and the verification was voluntarily relinquished with deficiencies. No children have been placed in this home since December 14, 2022. During the period this home was open, IMPACT shows there were nine children placed in the home and one child adopted.

## Texas Foster Care and Adoption Services

Texas Foster Care and Adoption Services CPA (TFCAS) verified this foster home on September 7, 2018. The home involuntarily closed due to deficiencies on June 29, 2022. TFCAS was placed on Heightened Monitoring effective October 27, 2020. The Heightened Monitoring Plan listed areas including background checks, supervision, discipline and punishment, home screening and verification, personnel, living space and environment, medication documentation, medication storage, and initial and preliminary service plans. TFCAS Heightened Monitoring was terminated on February 17, 2023.

DFPS opened three investigations of abuse, neglect, or exploitation, and HHSC opened six minimum standards investigations while the home was open.

## ANE Investigations Summaries

**On August 4, 2021**, DFPS initiated an investigation for Physical Abuse, Neglectful Supervision, Physical Neglect, and Emotional Abuse. The mother of a 13-year-old foster child reported that the child told her that the foster parent hit a four-year-old foster child, grabbed a seven-year-old child, threw him, and made the 13-year-old child responsible for the four-year-old child's behavior. The 13-year-old also said that the foster father slapped his 11-year-old biological son in the mouth and busted his lip. A subsequent report was made to SWI on August 3, 2021, by the CPA case manager, who reported that upon arrival at the foster home, she found the 13-year-old was also left alone to supervise two children in the home, ages six and seven. The reporter also stated that the 13-year-old alleged that the foster father yells and calls the children "little shits" and tells them no one wants them.

According to the 13-year-old, while at a restaurant, the foster father took the four-year-old into the bathroom, and when they returned, the four-year-old was crying and told her the foster father hit his "butt." Afterward, she saw a faded purplish bruise on the four-year-old. On another occasion, when the foster father thought the four-year-old was "stomping" upstairs, he took the 4-year-old downstairs, and then the 13-year-old said she "heard a smack and the [four-year-old] started crying." On another occasion, the 13-year-old said a seven-year-old child asked the foster father to teach him to skate, and the foster father grabbed the child's arm, which caused him to fall because he was wearing skates. She then saw the foster father pick up the child with one hand and slam the child to the floor. The 13-year-old stated that the foster father yells and curses at the children. She said that the foster parents do not provide adequate food to either the four-year-old or the seven-year-old. The 13-year-old also reported being left alone to supervise children in the home for 30 minutes to an hour on more than one occasion and that she has heard the foster parents argue and fight.

The four-year-old confirmed that the foster father spanked him in the restroom, but collateral children in the home denied the child was spanked. The seven-year-old and all others in the home denied that the foster father slammed the seven-year-old to the floor. The children in the home denied that the foster parents yelled or cursed and denied hearing the foster parents argue or fight. A six-year-old child confirmed being left at home with the 13-year-old while the foster parents were out for a short time.

The foster parents denied all allegations. Professional collaterals interviewed did not express concern.

The allegations of Physical Abuse, Neglectful Supervision, Physical Neglect, and Emotional Abuse were all Ruled Out. HHSC issued one citation for supervision after determining that the foster parents left children in the home unsupervised.

**On April 6, 2022**, DFPS initiated an investigation for Neglectful Supervision after CPA staff reported that a seven-year-old child in care engaged in inappropriate behaviors with a four-year-old child. The two children were watching a movie in the living room; the foster father left the room, and when he returned, the children were under a blanket. The foster father removed the blanket and saw the four-year-old's hands in the seven-year-old's underwear. The four-year-old said the seven-year-old asked him to touch her.

When asked about the incident, the seven-year-old said she did not want to discuss it. When the foster father was asked about the touching incident, he said that right before the incident, he was in the living room with the two children. He started cleaning the kitchen and noticed the children were too quiet. He got closer to them and saw them under the blanket. He saw the four-year-old with his hands in the seven-year-old's underwear. In separating them, the four-year-old said the seven-year-old asked him to do it.

The foster parents both reported that the seven-year-old has a safety plan requiring no unsupervised contact with her biological brother due to a sexualized incident that occurred in their previous foster home.

The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On June 29, 2022**, DFPS initiated an investigation for Neglectful Supervision after a law enforcement officer reported that the foster father was drinking, engaged in domestic violence, and walked around the house with a pistol, dropping the pistol twice. During the incident, the foster father reportedly threatened to kill the foster mother's adult sister.

The foster mother stated that when she and her sister returned home with the children, she observed that the foster father was drunk. An argument ensued between the two. The foster father paced back and forth, and the foster mother saw a gun fall out of his pocket onto the ground twice. After the second time, the foster mother said she did not see the gun again and denied that the foster father pointed the gun at anyone. The foster mother denied being pushed by the foster father. She also reported that the two foster children were asleep in their rooms at the time of the incident.

The police report stated that the foster father pushed the foster mother on her chest, causing her to fall on the couch and tear her shirt. It also indicated that the foster father made verbal threats to the foster mother's sister, saying he was going to kill her. An eight-year-old foster child was interviewed and reported that the foster father would yell and put him in the garage until he stopped crying. The child also said that the foster parents argued and said bad words. A five-year-old foster child said the foster father was mean and screamed at him and would spank him.

The investigator found that the foster father had a history of four prior arrests, two of which involved assaults. One of these arrests involved aggravated assault with a deadly weapon. Additionally, the foster father had been placed on probation in 2002 for two-and-a-half years for one of the assault charges.

DFPS substantiated Neglectful Supervision by the foster father and Ruled Out Neglectful Supervision by the foster mother. However, IMPACT shows that the disposition was overturned during the administrative review process, and DFPS changed the disposition for the foster father to Ruled Out.

HHSC issued four citations for violating minimum standards related to employee and caregiver responsibility, weapons, supervision, and child rights.

### Standards Investigations Summaries

The home was the subject of minimum standards investigation; none resulted in citations.

- On March 29, 2019, HHSC initiated a standards investigation due to allegations that a 16-year-old child in care received inappropriate text messages from her foster brother and that he asked her to have sex. The allegation also included that the 16-year-old was uncomfortable around the foster father because he 'drinks" and is

verbally abusive to the foster mother calling her a "bitch."

The 16-year-old could not produce any of the text messages, and the foster brother admitted to sending her one comment about his girlfriend, and it wasn't directed to the 16-year-old. The foster father addressed the issue with the foster brother. Other children in the home and the foster mother reported that the foster father drinks one or two beers occasionally but does not get drunk. Two interviews confirmed the foster father cursing at the television while watching a sports game. No citations were issued.

- On February 6, 2020, HHSC initiated an investigation due to an allegation that the foster mother grabbed a 14-year-old foster child by the collar to keep him from running away.  The 14-year-old reported that the foster parent tried to prevent him from leaving by slamming the front door closed.  When the child opened the front door, the foster mother pushed him and attempted to grab his collar.  The 14-year-old's sibling, also in the home, denied ever being mistreated by the foster parent. The foster mother denied pushing or grabbing the child by the collar.  No citations were issued.

- On June 17, 2021, HHSC initiated an investigation into supervision issues after a 14-year-old child in care ran away from the foster home. The investigator found no concerns, and no citations were issued.

- On August 27, 2021, HHSC initiated an investigation into supervision issues after a six-year-old said she was being bullied by the foster parent's 11-year-old biological daughter.  The six-year-old said the 11-year-old put plastic press on nails on her but cut them short, and she wanted them longer, which upset her.  During the interview, the six-year-old did not mention being bullied, and other children in the home denied any bullying incidents. No citations were issued.

- On January 5, 2022, HHSC initiated an investigation into supervision issues after it was reported that an eight-year-old was banging his head at day camp and setting papers on fire in the middle of the night.  The investigator found that the paper-burning incident was isolated and happened during a family camping trip. The foster parents were also found to adhere to the child's service plan. No citations were issued.

- On April 21, 2022, HHSC initiated an investigation for inappropriate discipline after it was reported that the foster father was seen grabbing a seven-year-old foster child's arm and pulling her to the school bus. The seven-year-old told the investigator, "no one has ever put their hands on her or her siblings." Other children reported that the seven-year-old was kicking and screaming, and the foster father was trying to pick her up nicely. The foster father denied putting his hands on the child. No citations were issued.

DFPS Disallowance List

After the CPA closed the home, in a letter dated July 15, 2022, DFPS notified Texas Foster Care and Adoption Services that the home was disallowed for future placements of children. The letter cited minimum standards violations regarding weapons, supervision, children's rights, and employee and caregiver responsibilities. DFPS determined that the foster father demonstrated a "lack of prudent judgment by engaging in an act of domestic violence, while intoxicated and carrying a weapon, while the Children were present." The letter also recognizes that the caregiver received an RTB for Neglectful Supervision.

DFPS placed the home on the August 1, 2023, Disallowance List, with approval by the DFPS Legal Department on August 9, 2022. IMPACT reflects that no children have been placed in the home since June 27, 2022. During the period this home was open, IMPACT shows there were 23 placements of a child in the home.

Covenant Kids, Inc.

Covenant Kids, Inc. first verified this foster home On February 8, 2017. On May 27, 2022, the home's verification was relinquished due to a criminal history match.

DFPS opened an investigation related to allegations of abuse, neglect, or exploitation, and HHSC opened three minimum standards investigations before the home's closure.

ANE Investigations Summaries

**On September 2, 2020**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after a 10-year-old child (who was not placed in the home) made an outcry that the foster father inappropriately touched her while she and her siblings were visiting the foster home. The investigation included an allegation that a nine-month-old foster child was inadequately supervised. A second intake alleging that the foster father attacked the foster mother when the nine-month-old child was physically present was merged.

Each foster parent denied the allegations of Sexual Abuse and Neglectful Supervision. The foster father reported that the nine-month-old child slept with another baby in her crib. Two collateral children in the home denied the allegations and did not make any outcries of sexual abuse. Collateral children interviewed did not report allegations of Neglectful Supervision or Sexual Abuse. One of the children in the home confirmed that another baby was sleeping with the nine-month-old in her crib.

The investigator Ruled Out the allegations of Sexual Abuse and Neglectful Supervision. No citations were issued for violations of minimum standards. After the investigation, a law enforcement investigation remained open regarding the sexual abuse of the ten-year-old child. Technical assistance was provided regarding individual cribs for each infant.

Standards Investigations Summaries

The foster home was also subject to three minimum standards investigations. None resulted in citations. One investigation was related to the use of inappropriate discipline

of a 10-year-old foster child in the home. The second investigation alleged inappropriate supervision after a 10-year-old child acted out sexually towards two younger children in the home. On May 20, 2022, HHSC initiated an investigation for a "wellness check" after SWI received a report on May 6, 2022, that the foster father "was arrested and charged with indecency with a child" involving the child of a family friend. The foster child living in the home was moved to a respite placement the same day as the intake report, on May 6, 2022.

## DFPS Disallowance List

After Covenant Kids, Inc., closed the foster home on May 27, 2022, DFPS placed this home on the agency's April 28, 2023, Disallowance List, effective July 15, 2022. In a letter dated June 13, 2022, DFPS notified Covenant Kids, Inc., that this foster home was being disallowed for future placement of children because of investigations concerning inappropriate discipline and inadequate supervision. The letter also noted that foster father was arrested for indecency with a child, and found that his criminal history created a reasonable concern for the safety of any child, and that the CPA had already closed the home.

The foster home page in CLASS indicates that the CPA closed the foster home on May 27, 2022, and the verification was relinquished due to a criminal history match. IMPACT reflects that no children have been placed in this home since May 6, 2022. During the period this home was open, IMPACT shows there were 13 placements of a child in the home and two children adopted.

## A World for Children

A World for Children CPA verified this foster home on May 13, 2019. The home was voluntarily closed with deficiencies on January 26, 2023. At the time, A World for Children CPA had been on Heightened Monitoring since October 19, 2020. The Heightened Monitoring Plan lists pattern and trend categories, including background checks, supervision, child's rights, discipline and punishment, health, and safety - fire safety and weapons/firearms, foster home screenings and verifications, living space and physical environment, medical care, medication management – administration, documentation and storage, and serious incident reporting.

DFPS investigated the home six times for allegations of abuse, neglect, or exploitation, and HHSC opened one minimum standards investigation. Three deficiencies were cited during the time the home was open.

## ANE Investigations Summary

**On April 18, 2022**, DFPS initiated an investigation for Neglectful Supervision. The reported allegations included that the foster father smoked a vape pen and was under the influence of an illegal substance with children present; that a three-year-old had five fresh bite marks; that a child was hitting and scratching a three-year-old and a one-year-old child in the home, leaving marks and breaking the skin; that a five-year-old child

appeared to be over medicated and unable to stay awake; that the foster father inappropriately disciplined a child; and that the children were deprived of food.

The investigator interviewed the children, and they denied the allegations. They admitted that their foster father used a vape pen but said he did not use it around them. The children said they ate plenty of food and felt safe living in the home. The bite mark was confirmed to have been caused by a two-year-old former foster child who the foster parents were babysitting. The foster parents separated the children after the incident.

Both foster parents denied all allegations. The foster parents acknowledged that the foster father used a vape pen with no THC and did not use it in in the presence of children. The investigator also reviewed the children's medications and found they were being administered as prescribed.

The allegations of Neglectful Supervision were Ruled Out, and no citations were issued.

**On May 2, 2022**, DFPS initiated an investigation for Physical Abuse after a caseworker reported that two children in care, ages five and seven, made outcries that their foster mother and foster grandmother spanked them.

The seven-year-old denied being spanked at the foster home, and when asked if she said that she had been spanked, the child said that the foster grandmother was only playing and that it didn't hurt. The five-year-old also denied being spanked.

The foster mother and grandmother also denied spanking the children. The foster grandmother, who also was a verified foster parent, reported that her verification had been relinquished, and she was no longer approved as a caregiver since the incident.

The allegation of Physical Abuse was Ruled Out, and no minimum standards citations were issued.

**On May 27, 2022**, DFPS initiated an investigation for Sexual Abuse after receiving a report that an elderly person at a playground overheard a three-year-old child say, "my daddy touches me over my underwear."

The inspector interviewed all the children in care, and each denied the allegations. They all stated that they liked living in the foster home. The foster father stated that he does not have any time alone with the children, works out of the home, gets home around 5:30 p.m., and spends family time with everyone there. The reporter, a behavioral specialist who worked with the children, expressed no concerns.

The allegation of Sexual Abuse was Ruled Out, and no citations were issued.

**On November 29, 2022**, DFPS initiated an investigation for Neglectful Supervision and Physical Abuse. An SSCC staff reported that children ages two, three, six, eight, and 10 lived in the home. The 10-year-old alleged she was required to complete many chores, was given excessive time outs, was required to sit on her bed from 5 p.m. until

the next day, missed dinner and received peanut butter and jelly, and was not allowed off her bed until the following day. The 10-year-old asserted she was kicked out of the van and left on the roadside twice. She stated that the foster parents cursed at the children, pulled on the six-year-old's ear, and threatened to hurt him and that she missed breakfast while being disciplined. A second intake included allegations that the foster mother spanked the children and left the children at home alone, locked in the playroom.

Three children were interviewed and stated that the foster parent left the 10-year-old child on the side of the road, and the foster mother drove away for a short period. The children all said the foster mother pulled the six-year-old's ear. Two children reported they had a sandwich instead of dinner with the rest of the family because they were in trouble, one child reported missing breakfast on at least one occasion when the child was being disciplined. Two children reported that when the foster mother took them to school the younger children were left unsupervised because the foster father was still sleeping. A three-year-old reported being spanked by the foster mother; other children denied that spanking occurred in the home. The three-year-old also reported never being left alone.

The foster mother admitted to pulling the six-year-old's ear but denied it caused the child pain. She also admitted putting the 10-year-old out of the car but said she did not drive off. The foster mother said she had told the children to "shut up" but denied cursing at the children and explained that the children did not miss breakfast at school. Both foster parents denied children being left alone. The foster father denied all allegations.

The allegations of Physical Abuse and Neglectful Supervision were Ruled Out. Three citations were issued: a citation was issued because a child missed a meal while being disciplined and was given a sandwich instead of a family meal; a citation for caregiver responsibility for leaving a child on the side of the road as discipline; and a citation for children's rights for pulling a child by the ear and telling children to "shut up."

**On January 20, 2023**, DFPS initiated an investigation for Neglectful Supervision and Physical Abuse after receiving an additional report regarding the incident in which the foster mother left the 10-year-old child on the side of the road. The additional information provided that when the family returned to the home, the foster mother "took the [ten-year-old child] by the shirt collar and tightened it up real tight," "almost choking the child." The foster mother screamed at the child, shoved her on the bed, and punched her in the side, and the child was not allowed to leave the room for the rest of the day.

The 10-year-old said she was upset because she wanted to attend a party. When they got home, the foster mother told her to be quiet and go to her room, but she refused. She said the foster parent held her by the shirt, and the shirt choked her. The foster mother walked her to her room and then "picked her up and slammed her on her bed." The child denied being hurt, but she "coughed a little bit after."

The foster parents both denied the allegations. The allegations of Neglectful Supervision and Physical Abuse were Ruled Out and no citations were issued.

**On January 25, 2023**, DFPS initiated an investigation for Medical Neglect after a caseworker reported concerns that three children, ages six, eight, and 10, might be overmedicated with psychotropic medications possibly approved by an unauthorized person.

All three children in care acknowledged taking medication. None of the children made any outcries either that they were being overmedicated or that the medication was used as a form of discipline or punishment.

The nurse practitioner who prescribed the medications for the children confirmed that she prescribed the medications that she believed were suitable and that the medication the children took was medication she prescribed. Both foster parents denied using the medication as a form of punishment or overmedicating the children. The investigator also reviewed medication logs and verified that all medications were appropriately approved. Professional collaterals reported no concerns about the children.

The allegations of Medical Neglect were Ruled Out, and no citations were issued.

## Standards Investigations Summaries

The foster home was subject to one minimum standards investigation. No citations were issued; it was determined that the allegations had been previously investigated by DFPS in the investigation initiated on November 29, 2022 (discussed above).

## DFPS Disallowance List

In a letter dated February 23, 2023, DFPS notified A World For Children CPA that although the CPA closed the foster home, DFPS was taking additional steps to disallow the home for any placements of children in care. The letter provided that the decision was based on minimum standards violations that "establish a pattern of escalating allegations and concerns for the children's safety,"

DFPS placed the foster home on its June 6, 2023, Disallowance List effective March 20, 2023.

According to IMPACT, no children have been placed in the home since December 5, 2022. During the period this home was open, IMPACT shows there were 19 placements of a child in the home.

## Homes in Harmony, Foster and Adoption Agency, LLC

Homes in Harmony, Foster and Adoption Agency, LLC (Homes in Harmony) verified

this foster home on June 17, 2021. The foster home was closed on April 29, 2022, due to a criminal history match.

During the time the foster home was verified, DFPS investigated the home once for allegations of abuse, neglect, or exploitation, and HHSC opened one minimum standards investigation.

## ANE Investigation Summary

On April 1, 2022, DFPS initiated an investigation for Physical Abuse after an eight-year-old child alleged that while placed in the home, the foster parents would place them in a cage when they got in trouble. The victims were eight (8), six (6), five (5), four (4), and two (2) years old. The intake stated that the older siblings drew similar pictures of the cage, and they all indicated the cage was heavy and placed over them, and there were no doors to the cage. The report stated that the length of time the children were in the cage was unknown. The reporter also alleged that the children were spanked.

During the investigation, the eight-year-old, six-year-old, and five-year-old stated they were placed in a cage for timeouts. The children reported that the cage was opened at the top, closed at the bottom, and was described as colorful. Two children reported being in the cage for two minutes, while the other reported being in the cage for 10 minutes. The children reported that the cage was placed over them and described it as heavy. The eight-year-old child stated they were also spanked with an open hand, and that it hurt. The child reported that the other siblings were spanked as well; however, the other two children did not report physical discipline. Two children were not interviewed: the two-year-old was nonverbal, and the inspector reported that the four-year-old would not sit still long enough to interview.

The foster mother denied physical discipline and the inspector observed a playpen/fence that was described as circular and colorful outside the home that the foster mother reported was used for timeouts. The foster mother reported she and her husband used timeouts as a form of discipline, and the playpen was never used as a cage. The foster mother showed the inspector a video of one of the children crying in the playpen and the inspector documented the child looked safe but was upset.

In forensic interviews, the three verbal children made the same outcry of being placed in a cage for timeouts. One child reported that the top was covered with something that looked like a skirt.

The 4-year old's therapist reported concerns for the foster mother and how she interacted with the child. The therapist reported the foster mother spoke negatively about and in front of the child, cried out of frustration in front of the child, and did not want to adopt the child with his siblings. The therapist reported the foster mother was known to make up things when speaking with him, the caseworker, and the case manager. The therapist reported the foster mother terminated his services.
The investigation concluded with the allegation of Physical Abuse being Ruled Out and no citations were issued.

## Standards Investigations Summaries

The foster home was subject to one minimum standards investigation initiated on March 22, 2022, after the foster parents would not allow a CPA agency staff member to conduct an unannounced visit to observe the children in the home. The report indicated law enforcement was contacted to assist due to the foster mother's hostile behavior toward the agency staff. The report stated the children were able to be interviewed when the police arrived at the home.

The investigation resulted in two minimum standards citations: a citation for employee and caregiver responsibilities due to the caregivers denying agency staff access to the children that resulted in police involvement, and a citation for interference with an investigation because the caregiver did not allow the inspector to conduct the investigation.

## DFPS Disallowance List

In a letter dated May 17, 2022, DFPS provided notice to Homes in Harmony CPA that this foster home was being disallowed from any future placements of children in care home. The letter stated that HHSC notified DFPS about the home's minimum standards violation for the foster parents' failure to cooperate with "CPS case parties, DFPS and CPA staff and inappropriate discipline." The letter also stated the CPA closed the home due to a criminal history match.

The home was placed on the DPFS Disallowance List on April 28, 2023, with an effective date of June 9, 2022.

The Agency Home page in CLASS indicates the home's verification was relinquished on April 29, 2022, due to a criminal history match. IMPACT reflects that no children have been placed in the home since March 25, 2022. During the period this home was open, IMPACT shows there were five children placed in the home.

## Circle of Living Hope

Angel Arms Family Care LLC verified this foster home from April 2, 2018, to August 24, 2018. The home then transitioned to Circle of Living Hope CPA on August 25, 2018. On June 24, 2022, the home changed CPAs to Beacon of Hope, until September 12, 2022. On September 13, 2022, the home was re-verified with Circle of Living Hope and later involuntarily closed on February 15, 2023.

When Circle of Living Hope re-verified the foster home, the CPA was on Heightened Monitoring with a planned start date of November 20, 2020. According to the plan, the CPA pattern and trend areas included caregiver responsibilities, discipline and punishment, health and safety, home oversight, home screening verification and

screenings, living space and physical environment, and medication management.

During the time the foster home was verified, it was the subject of five investigations: three investigations for abuse, neglect, or exploitation, and two minimum standards investigations.

### ANE Investigations Summaries

**On February 25, 2019**, DFPS initiated an investigation for Physical Abuse and Emotional Abuse of an eight-year-old and one-year-old foster child after the eight- year-old reported that the foster mother hit her with a belt and with a sandal. The report alleged that the eight-year-old had both new and old bruising to her back area. The one-year-old had bruises to the face and leg area. The report further alleged that the foster mother said demeaning things to the eight-year-old about her biological family. The eight-year-old reported that the foster parent hit her with a belt, sandal, and hanger simultaneously. She stated she was not allowed to go outside to play. The eight-year-old also said that the foster mother disciplined her own biological daughter with a belt. The foster mother and biological daughter denied the allegations.

The children's caseworker reported that the children's biological mother caused problems for the foster mother and would tell the eight-year-old to do things to get the foster mother in trouble. The school nurse confirmed that the eight-year-old sustained the bruise when another student hit the child on the back. The allegations of Physical and Emotional Abuse were Ruled Out, and no minimum standards violations were cited.

**On October 1, 2019**, DFPS initiated an investigation for Physical Abuse after a report received by SWI alleged that the foster mother pushed a four-year-old child in care against a wall because he was misbehaving, causing him to hit his head's head on the wall.

The investigator interviewed the child three times, including in a forensic interview, and the child made no outcry. Other children in the home could not confirm that the foster mother pushed the child. The foster parents denied physically disciplining the child and reported the child to be very active. The investigation report stated that medical attention was sought for the child and no noted concerns were reported. The allegation of Physical Abuse was Ruled Out, and no minimum standards violations were cited.

**On December 27, 2022**, DFPS initiated an investigation for Physical Abuse and Sexual Abuse of a two-year-old and a one-year-old foster child after they were observed during a supervised visit with numerous bruises on their bodies. The report stated that the one-year-old was observed with a half-inch linear bruise under the left eye, a quarter-size bruise on the forehead and leg, and that the bruises were green and deep purplish in color. The report stated that the two-year-old was observed with a rectangular size bruise on the right inner leg two inches in size, a circular dime size bruise on the left inner thigh, multiple line marks on the outer vaginal area, and that the bruises were red and purple in color. The reporter also stated that two weeks prior the two-year-old was seen with a big bruise on the left side of the forehead. The foster

parent said that the child fell out of the bed and hit the wall while sleeping.

A Sexual Assault Nurse Exam (SANE exam) of the two children revealed no injuries to the genitalia. The SANE noted that the one-year-old had purple discoloration to her forehead, a linear abrasion to her right lower leg and red discoloration with an abrasion to her left lower leg. The two-year-old had a purple discoloration to the left side of her forehead, a Y shape discoloration to her pubic area, a rectangle shape discoloration to her mons pubis, purple discoloration to her left upper thigh and a U shape purple discoloration bruise to her right upper thigh. The results of a FACN for the one-year-old indicated that her injuries were nonspecific for child maltreatment, while the injuries for the two-year-old were concerning for inflicted trauma and physical abuse.

The foster mother denied physically abusing the children. She reported that the two-year-old sustained the injuries to her legs after spilling nail polish on herself. The foster mother used an acetone product to remove the nail polish. The foster mother did not notice the forehead bruise on the one-year-old and could not explain it. The foster mother stated that the two-year-old sustained an injury to her forehead after falling from a Pack-n-Play. The foster mother stated the mark on the two-year-old's pubic area preexisted the child's placement in the home.

The allegations of Physical Abuse for the two-year-old was originally found Reason to Believe, however during the administrative review process this disposition was changed to Ruled Out. The Physical Abuse allegation involving the one-year-old and the allegations of Sexual Abuse were Ruled Out for both children. The foster home received two citations, one for corporal punishment and one for child rights being free from abuse, neglect, or exploitation. An administrative review is pending for both citations.

## Standards Investigations Summaries

- HHSC initiated an investigation on August 8, 2018, after a reporter alleged that an eight-year-old child in care appeared withdrawn during visits with her biological mother, which was uncharacteristic of the child. The report stated the foster mother threatened to cut the child's hair off because the foster mother had a hard time combing it. The reporter also stated that the one-year-old sibling had fallen at least three times from the couch, and the foster mother's three-year-old biological child was biting and pushing the one-year-old off the couch. Additionally, it was reported that a one-month-old sibling in the home had dirt behind the ear that the foster mother refused to clean. The reporter also stated that the foster mother refused to accept toys from the biological mother.

  The eight-year-old did not make an outcry. She said she enjoyed it when her foster mother combed her hair, that she had clothes and toys, and that her needs were being met. The foster mother did not accept toys from the biological mother, stating that they were dirty. No citations were issued.

- HHSC initiated an investigation on July 12, 2019, after it was reported that a five-year-old, four-year-old, and two-year-old were being mistreated in care. The report stated that the two-year-old was observed with scratches on the right upper arm that

appeared to be from adult nails. The five-year-old said the foster mother scratched the two-year-old and, and he appeared fearful when talking about it. The report also included that the four-year-old had two scratches on the arm, a bite mark on his right arm, another bite mark on the left leg, and scratches on the side of the head. The four-year-old said the bite marks and scratches came from another child in the home.

The four-year-old reported that he scratched himself out of being upset, and the five-year old blamed another sibling for scratching the four-year-old. The other sibling blamed the five-year-old for scratching the four-year-old. Neither child reported that the foster mother scratched them.

No citations were issued, however technical assistance was provided for supervision regarding the caregiver being aware of the age and behavior of the child being supervised to minimize risk.

## DFPS Disallowance List

DFPS placed the home on the June 6, 2023, Disallowance List with a May 26, 2023, effective date. In a letter dated February 8, 2022,[441] DFPS provided notice to Circle of Living Hope CPA that the foster home was being disallowed from future placements of children in care due to the foster home's minimum standards violations regarding corporal punishment and children's rights. The memorandum stated that in addition to the minimum standards concerns, the home received an RTB for Physical Abuse. It stated the foster home "has a pattern of investigations for corporal punishment and Physical Abuse which causes a reasonable concern for any Child in the home."

The Agency Home page in CLASS reflects the home was closed involuntarily with deficiencies on February 15, 2023. No children have been placed in the home since December 28, 2022. During the period this home was open, IMPACT shows there were 24 placements of a child in the home.

## Care Premier Services LLC

This foster home was verified nine times over a span of approximately 16 years. The home was first verified on March 13, 2006, by Homes4Good. The CPA changed to Have Haven Child Placing Agency on July 13, 2007. On February 27, 2009, the CPA changed again, and the home was verified by Brighter Visions Child Care Services until September 6, 2011. On September 7, 2011, the home moved to the Sugarland branch of Benchmark Family Services and was relinquished on May 7, 2012, for noncompliance.

The home was verified for a fifth time on March 8, 2013, by Jameson Center. On January 29, 2015, the home moved to the Devereux Texas Treatment Network. On April

---

[441] This appears to be a typo; the investigation that resulted in the citations and RTB was completed February 9, 2023.

25, 2018, the home was verified for the seventh time under Globel Foster Care. The home relinquished verification on April 1, 2022, as "voluntarily closed with deficiencies." On May 13, 2022, 1 Care Premier Services LLC verified the home. CLASS data indicates that the foster home relinquished verification on the same day it was verified as "involuntarily closed without deficiencies." The home was last re- verified on October 6, 2022, by 1 Care Premier Services LLC and relinquished on March 1, 2023, as "voluntarily closed without deficiencies."

During the time this home was licensed, it was the subject of 23 investigations, 13 of which were opened by DFPS due to allegations of abuse, neglect, or exploitation. Prior to Benchmark Family Services' relinquishment of the home for noncompliance on May 7, 2012, DFPS issued two UTD findings for Physical Abuse for two separate investigations naming the foster mother's boyfriend in each case. Ten years later, while verified with Globel Foster Care, DFPS issued the foster mother a UTD for Neglectful Supervision.

## ANE Investigations Summaries

**On March 14, 2008**, DFPS initiated an investigation for Physical Abuse, Physical Neglect, Medical Neglect, and Neglectful Supervision after school personnel reported observing a 12-year-old special needs foster child staggering, lethargic, and having difficulty staying awake.  The reporter alleged that a 17-year-old child in the home had given the 12-year-old an extra dose of his medication. School personnel called EMS for a similar incident in October 2007.  The reporter alleged that the 12-year-old child required glasses and that the foster mother failed to address the need for five months.

When he was interviewed, the 12-year-old child reported that the foster mother had administered his medication to him around "one or two a.m." after the family returned from a church event. Three other foster children in the home denied receiving medication from the 17-year-old and reported that the foster mother gives medication to the children daily. The child's doctor confirmed that the late-night dosage caused the "drowsiness" experienced by the child.

The investigator Ruled Out the allegations of Physical Abuse, Physical Neglect, Medical Neglect, and Neglectful Supervision, and issued no citations.

**On May 13, 2009**, DFPS initiated an investigation for Physical Abuse after a 15-year-old foster child made an outcry that the foster mother broke a glass over the child's head after she became upset because the child broke an object at the home.

The 15-year-old reported that when leaving a restaurant, the foster mother hit him with a hard plastic cup on the back of his head causing bruising because she was mad after he popped the other children's balloons. The foster mother told him he was "fake and a bitch," and when he responded that he was not fake she hit him with the cup. The child also reported that the foster mother hit and "cusses" other children in the home and they were scared of the foster mother. He also mentioned an incident where the foster mother's biological daughter sat on a child, "put socks in another child's mouth and hit him with shoes." He reported the foster mother made one of the children stand in the

corner for an hour.

All children interviewed denied seeing the foster mother hit the 15-year-old. One 16-year-old child in the home reported being slapped by the foster mother and being allowed to beat up another child in the home. He reported that he and another child helped the foster mother restrain a child three times. He described the restraint, and said that "they held his legs crisscrossed and [one child] held his arms and [the foster mother] laid on his back." A foster child in elementary school confirmed that the foster mother had restrained him and that two other children helped.

The allegation of Physical Abuse was Ruled Out, and no citations were issued.

**On December 6, 2010**, DFPS initiated an investigation for Neglectful Supervision after school personnel reported that a 16-year-old foster child made an outcry at school that he was "raped by a female acquaintance and now she is pregnant." The 16-year reported, "he had a dream about having a baby" and denied anyone "touching him." Four other foster children in the home denied being unsupervised by the foster mother. The foster mother confirmed that the child had told her about the dream and denied the supervision allegations.

The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On February 17, 2012**, DFPS initiated an investigation for Physical Abuse, Medical Neglect, and Neglectful Supervision after an 11-year-old foster child made an outcry that the foster mother pushed him into the bathtub, causing two "gashes" on his head. It was also reported that the 11-year-old said that another child had "sexually touched other children" in the home. When asked how he got the cuts on his head, the 11-year-old child responded, "Put in the tub." He denied the cuts were caused by the foster mother but did not respond when asked about the foster mother's boyfriend.

A 17-year-old foster child reported it was not the foster mother who pushed the 11-year-old in the bathtub but her boyfriend; while cleaning the bathtub, the boyfriend got mad and pushed the 11-year-old, causing him to hit his head on the faucet. The four other children in the home denied knowing about the incident. All the children denied the allegations of being "touched sexually." The foster mother denied any knowledge of the bathtub incident and was unaware of the "gashes" on the child's head or if the child needed medical attention.

The allegations of Medical Neglect and Neglectful Supervision by the foster mother were Ruled Out. DFPS issued a disposition of UTD for Physical Abuse by the foster mother's boyfriend. One citation was issued for background checks due to the boyfriend not having a background check on file with the agency.

**On April 5, 2012**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after a DFPS Investigator reported that during another investigation a former Benchmark CPA staff person reported that an 11-year-old child and his 17- year-old brother made an outcry that the foster mother's boyfriend had hit the 12- year-old in

the mouth with a bat. The former CPA staff also reported another child also said the foster mother's boyfriend is "always beating us" and that this child had told another CPA staff the foster mother punched him. According to the reporter, the CPA staff said that the agency administrator told her not to report the incident because the children were not currently residing in the home and that the home was being closed. She also said she was told she would be fired if she made the report.

No children were residing in the home at the time the investigation. Four children that had been most recently placed in the home were interviewed, all four children denied being physically abused by the foster mother. Three of the children reported either being hit or observing one of the other children being hit by the foster mother's boyfriend. The 11-year-old refused to cooperate during the interview but denied being hit by the foster mother and said "it is none of your business" when he was asked about the foster mother's boyfriend hitting a child.

The investigator issued a UTD disposition for Neglectful Supervision by the foster mother and a UTD disposition for Physical Abuse by the foster mother's boyfriend, who was not able to be located during the investigation. Two citations were issued one for Supervision and one for Corporal Punishment.

**On December 11, 2013**, DFPS initiated an investigation for Physical Abuse after a seven-year-old foster child made an outcry that the foster parent spanks him with a belt all over his body. The child also reported he had bruises and that a 13-year-old child in the home also received spankings.

The investigator interviewed three additional foster children who lived in the home. Two children denied that the foster parent used physical discipline as a punishment. One child recalled the foster parent taking the seven-year-old into her room and hearing crying and "sounds of hitting." He denied witnessing the incident or being told by the seven-year-old that he was spanked. The foster mother denied using physical discipline, and agency staff denied being aware of any previous outcries. The seven-year-old child's caseworker reported no concerns with the home. The allegations of Physical Abuse were Ruled Out and no citations were issued.

**On July 25, 2014**, DFPS initiated an investigation for Physical Abuse after a 15-year-old foster child made an outcry that the foster mother "slaps him in the face."

At the time of the child's interview, he was in the hospital for "threatening to harm" the foster mother. When interviewed, the 15-year-old denied the allegation of physical discipline and reported that he threw a brick at the foster mother's truck out of anger at his brother. He also stated that he liked the placement.

The investigator interviewed three other foster children living in the home and they each denied that the foster mother used physical discipline. The foster mother and babysitter also denied the allegations. However, the interviewer discovered that the foster mother had allowed a 14-year-old child to "assist in restraining" a seven-year-old.

The allegation of Physical Abuse was Ruled Out and two citations were issued for Discipline and Emergency Behavior Intervention.

**On June 11, 2015**, DFPS initiated an investigation for Physical Abuse after a 14-year-old foster child reported to a CPS staff that the foster mother had thrown a bottle of lotion at him and that the foster parent allowed an adult male, non-family member to restrain the child. The child also reported an incident where the foster parent's daughter restrained him and used a muscle shirt to bind his hands. The child also reported a second incident where the foster mother's daughter restrained him and took off clothes.

When interviewed, the 14-year-old reported that the foster mother accused him and another seven-year-old foster child of hurting her grandson. The foster mother began "screaming and talking excessively," which resulted in the 14-year-old being "physically and verbally threatened" by the foster parent. The child stated he "feared for his life." The following morning the child was transported to the hospital, and the foster mother requested a 30-day discharge. When interviewed, the seven-year-old child who was present during the altercation denied allegations of physical abuse. The foster mother and adult male were interviewed and denied the allegations. The child's therapist and caseworker reported no concerns with the home.

The allegations of Physical Abuse were Ruled Out and a citation for background checks for frequent visitors was issued to the CPA.

**On May 22, 2019**, DFPS initiated an investigation for Physical Abuse, Sexual Abuse, and Neglectful Supervision after a 14-year-old foster child made an outcry that over the two years he resided in the foster home, he was "choked 3 times, hit with brooms, and punched in the face." The child reported that the foster parent's son did some of the physical abuse and that he was touched inappropriately by the foster mother on one occasion. The child had not lived in the foster home for approximately two years.

When interviewed, the 14-year-old denied all allegations. The investigator interviewed three additional foster children, and all denied the allegations. One child who lived in the foster home at the same time as the 14-year-old stated that the 14-year-old attempted to "touch" him at night, but the foster mother removed the child from the room.

The foster mother confirmed that the 14-year-old had attempted to "inappropriately touch" another foster child and reported separating the children and providing additional supervision. The foster mother denied the allegations of Physical Abuse and Sexual Abuse.

The allegations of Physical Abuse, Sexual Abuse, and Neglectful Supervision were Ruled Out, and no citations were issued.

**On February 26, 2020**, DFPS initiated an investigation for Neglectful Supervision after school personnel observed a 16-year-old foster child with a "black eye." The school contacted the foster mother, and she and the child reported conflicting accounts of what

had happened.

Initially, the 16-year-old child reported getting elbowed when coming down the stairs. Later the child reported that the bruise resulted from playing basketball. The foster mother also reported that the injury resulted from playing basketball but had initially suggested the bruise was from the child falling out of bed.

Two other foster children in the home denied seeing an injury to the 16-year-old's eye. A 12-year-old child in care denied the foster mother used physical discipline. The investigator observed an eight-year-old child with small bruising on his arm. The eight-year-old made multiple outcries including that the 16-year-old child had touched him and his 12-year-old brother on their private parts, that he was restrained by the foster parent, and it impaired his breathing, the foster mother called the children names, "hard-headed, stupid, and ugly," and that the 16-year-old has been hit with a belt by the foster mother and in the face by the "alternate caregiver." These additional allegations were reported to SWI by the investigator.

The alternate caregiver denied hitting the child or witnessing the foster mother use physical discipline. The foster mother denied any physical abuse of the child and reported she closely supervised the children.

The investigator reviewed progress notes and reported finding documentation of the 16-year-old being hit in the eye with a basketball while playing.

The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

**On March 26, 2020**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision. This investigation was opened based on allegations reported in the investigation initiated on February 26, 2020, including bruising on both the eight-year old child's arms, inappropriate touching of his and another child's private parts by a 16-year-old in the home, restraints by the foster parent impairing his breathing, "whooping the 16-year-old with a belt," failing to supervise children properly, and that an alternate caregiver punched the 16-year-old in the face causing two black eyes, and calling the children "hard-headed, stupid, and ugly."

In a second interview, the eight-year-old remained consistent with his allegations. The two foster children from the previous investigation were interviewed and denied all the allegations. The 16- year-old reported that the foster mother grabbed the eight-year-old by his "arm to keep him from running away." The foster mother and alternative caregiver were also interviewed and denied all allegations.

The allegations of Physical Abuse and Neglectful Supervision were Ruled Out and one citation was issued for emergency behavior intervention because the foster parent grabbed the child by the arm to prevent him from leaving the home.

**On May 13, 2022**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after it was reported by medical staff that a 15-year-old foster child made an

outcry that he was sexually abused by the foster mother's boyfriend while placed in the foster home in 2017.

When interviewed, the child stated that he could not discuss "his relationship" with one of the older foster children who lived in the home "because he doesn't want to get anybody caught up" or "going to jail." During the forensic interview, the 15-year-old reported that he and another male child engaged in sexual conduct while placed in the home. The older foster child had aged out of care and could not be located for an interview.

The investigator interviewed four collateral foster children who had previously lived in the foster home. Two children denied all sexual abuse allegations, and the other two confirmed that the older foster child acted out sexually towards other children in the home. The foster mother and alternate caregiver were interviewed and denied all allegations.

The allegation of Neglectful Supervision by the foster mother was determined to be UTD and the allegation of Sexual Abuse was Ruled Out. No citations were issued.

**On November 1, 2022**, DFPS initiated an investigation for Physical Abuse after a seven-year-old foster child made an outcry at school that his foster mother yells, hits him, and tried to hang him. The child also said the foster mother throws him against the wall and kicks him. School personnel observed an old scar on the child's hand, where he reported that the foster mother "had cut him with a knife."

During the interview, the investigator documented that the seven-year-old was "inconsistent with his story." Three additional foster children who live in the home all denied the allegations of physical abuse. Two caseworkers, two therapists, and the CPA Program Director were all interviewed and had no concerns about the home.

The allegation of Physical Abuse was Ruled Out, and no citations were issued.

## Standards Investigations Summaries

The foster home was also the subject of 10 minimum standards investigations, with four resulting in the foster home receiving a citation.

- HHSC initiated an investigation on September 5, 2008, alleging the foster mother "stopped giving medications" without the doctor's consent. An 11-year-old reported not taking his seizure medications "because he has not had any incidents for a long time." Five other foster children reported receiving their medications daily. During the inspection, the medication logs were pre-recorded, not signed, and lacked the time the foster mother administered the medication. Medication counts did "not match with the record." One citation for the administration of medication was issued.

- HHSC initiated an investigation on October 5, 2010, alleging that foster children

ages 16, 11, and 10 are "scared" of the 18-year-old child living in the home. The agency internally investigated the allegations, and no "evidence to indicate the foster child was being physically aggressive towards the other children." One citation was issued after the investigator discovered "an adult resident was sharing a bedroom with a child."

- HHSC initiated an investigation on September 9, 2015, alleging an 11-year-old foster child was "inappropriately disciplined." When interviewed, the 11-year-old and another foster child in the home denied the foster mother used physical discipline in the home. The foster mother also denied the allegations. One citation for transportation was issued from this standards investigation. The car the foster mother used to transport the children did not have a "current state inspection sticker."

- HHSC initiated an investigation on August 11, 2020, alleging supervision concerns when a 13-year-old foster child received a black eye. The 13-year-old, two additional foster children in the home, and the foster mother confirmed that the 13- year-old's black eye resulted from a fight between the three foster children. All three children denied the foster mother has ever left them "without adult supervision." The investigator reviewed a serious incident report and discovered that the incident was not reported to Licensing. One citation was issued for serious incident reports.

## Sampling Concerns

The home was also the subject of eight sampling inspections, five of which reported concerns. Inspectors noted concerns as follows: on May 22, 2007, concerns for medication records and medication administration. Technical assistance issued for properly storing chemicals and sharp objects; on November 20, 2014, concerns for the physical environment for an outlet missing a face plate and heating and cooling ducts needing repair; and on March 15, 2022, concern for physical environment including exposed electrical outlet in a child's room and a mop bucket in the children's bathtub.

## DFPS Disallowance List

DFPS placed this foster home on the June 6, 2023, Disallowance List with an effective date of November 21, 2022. In a letter dated November 12, 2022, DFPS provided notice to 1 Care Premier Services LLC that this foster home was being disallowed after information was received regarding standards violations regarding "emergency behavior intervention, administration of medication, corporal punishment, supervision, inappropriate discipline, background checks for frequent visitors, and serious incident reporting." The letter acknowledged "a chronic pattern of investigations for physical abuse, neglectful supervision, and sexual abuse," a UTD disposition for Neglectful Supervision and that the home had a "prior pattern of closures with other Child Placing Agencies due to noncompliance and previous recommended closure by HHSC Child

Care Regulation (CCR) Department."442

The foster home page in CLASS indicates that the home was closed on March 1, 2023, and the verification was relinquished due to a voluntarily closure without deficiencies. Impact reflects that no children have been placed in the home since December 19, 2022. During the period this home was open, IMPACT shows there were 60 placements of a child in the home.

## Texas Baptist Home for Children

Texas Baptist Home for Children verified this foster home on August 27, 2014. The home closed involuntarily without deficiencies on September 16, 2022. When the home's verification was relinquished, Texas Baptist Home for Children CPA had been on Heightened Monitoring since August 25, 2020. The Heightened Monitoring Plan lists the concerning areas for the CPA including child's rights, caregiver responsibility – supervision, health & safety – weapons/firearms, medical care, medication management, medication storage, discipline, and punishment, required trainings, and serious incident reporting.

DFPS opened seven investigations related to allegations of abuse, neglect, or exploitation and HHSC opened 13 minimum standards investigations over the eight-years the home was licensed.

## ANE Investigations Summaries

**On May 22, 2015**, DFPS initiated an investigation for Neglectful Supervision and Physical Abuse after a DFPS staff observed two circular bruises on a three-year-old foster child's head, a red mark behind his ear, and scratches on his face.

The child had limited verbal capability and could not be interviewed. Collateral foster children in the home denied being physically disciplined.

The foster father denied knowing how the child sustained injuries. The foster mother explained that the three-year-old child fell accidentally during two different instances. The first incident was when the CPA staff was present, the child was running and hit his head, which resulted in a couple of scratches above his eye. The second incident occurred while she was in the kitchen and three of the children were in the playroom, she heard the three-year-old cry and found the child on the playroom floor, the other children reported the three-year-old fell while jumping on the bed. The foster mother said she observed the child to make sure he was uninjured, and the child wanted to return to playing.

The CPA Case Manager confirmed the child ran into the wall while she was present in

---

442 The Monitors did not find this home listed or included in any of the information HHSC has provided related to HHSC closure recommendations.

the home. A FACN evaluation was conducted and concluded "Nonspecified (may result from abuse or neglect, but accidental/natural explanations are also possible)."

The allegation of Neglectful Supervision and Physical Abuse was Ruled Out. The home was cited for violation of general medical requirements because the caregivers failed to seek immediate medical attention.

**On September 26, 2016**, DFPS initiated an investigation for Physical Abuse after a DFPS staff reported that four foster children, aged four, six, seven and fourteen, made outcries that the foster parent hit the four-year-old child (Child A) causing the child to fall to the ground and that after falling, the foster parent kicked the child. The children also said that the foster mother slapped another four-year-old child (Child B) who was placed in the home and that the foster mother called the Child A and her sibling "stupid and retarded."

At the time of the alleged incident six foster children lived in the home. Three children, aged 14, seven, and six, reported that Child A had wet herself while at the zoo. On the ride home Child A sat on a blanket. When they arrived home Child A threw the blanket on the couch, upsetting the foster mother who hit Child A, knocked her down and kicked her. The 14-year-old child reported that the foster father observed the incident, pulled the foster mother into another room, and told her he "better not catch her doing that again." Two of the children also reported seeing the foster mother hit Child B hit in the head with a plate.

Child A said the foster mother hit her on the head and that the foster father hit Child B with a plate on the head. Child B told the investigator he did not like living with the foster mother and that the foster mother hit him on his head.

The foster parents denied the allegations. The allegations of Physical Abuse were Ruled Out. One citation for Corporal Punishment was issued.

**On April 24, 2018**, DFPS initiated an investigation for Physical Abuse after school personnel reported observing a 3-year-old foster child with two big "knots" above each eye with swelling between the knots, redness under the left eye, and two smaller bumps above one of the knots.

The foster mother stated that she was not aware of the bumps on the child's head. She stated she was out with two other foster children and that the school told her about the bumps. The foster father said he was not aware of how the child sustained the bruising. He claimed the child did not have injuries when they sat in the living room watching TV until it was time for the child to catch the school bus.

Five foster children interviewed all stated they did not know how the child sustained the injuries. They stated that the child has a great relationship with the foster parents.

The emergency room doctor stated that medical professionals were unable to determine the cause of the child's injuries, recorded as a contusion. The medical team completed a

full body assessment and noted no additional bruises.

DFPS Ruled Out the allegation of Physical Abuse. One citation was issued for violation of a minimum standard related to supervision because "a child sustained unexplained injuries while under the foster parent's care."

**On April 24, 2019**, DFPS initiated an investigation for Neglectful Supervision, after the foster mother reported that while the children were being cared for by a respite caretaker, a 16-year-old foster child reported that a 14-year-old foster child, who also lived in the home, asked the 16-year-old to "put her butt against him." Later the same day, the 14-year-old exposed himself to the 16-year-old and while the respite caregiver slept, the 14-year-old got on top of the 16-year-old and touched her breasts and kissed her face, rubbed, and licked her feet. Juvenile detention staff made a subsequent report to SWI reporting that the 14-year-old was detained and alleged having sexual intercourse with the 16-year-old. The reporter did not know if the sexual intercourse was consensual.

The 16-year-old stated that the foster parents were on an eight-day cruise when the assault occurred and that children were under the care of another caregiver, who was in the living room during the incident. After a few attempts to be intimate with her, the 14-year-old sexually assaulted her in the foster parent's room, covering her mouth after she screamed. She stated that 14-year-old told her that if she "snitches on him" he will just say they "had sex together."

The 14-year-old had been arrested for sexual assault and was not interviewed during the investigation.

The respite caregiver stated that she slept in the living room every night, completed frequent nighttime checks, and was on guard with Child B because of his unusual behavior. The foster parents denied the allegations of neglectful supervision.

The allegation of Neglectful Supervision was Ruled Out and no citation was issued.

**On January 7, 2021**, DFPS initiated an investigation for Physical Abuse after a 13-year-old child in care made an outcry that the foster mother became angry and choked her.

The 13-year-old child told the investigator that she went to get a candy cane from the snack bin and the foster mother came in and grabbed her by the neck and said, "she was sick of her shit." The child walked to the CPA office on the same property, then walked back to the house. She then asked the foster mother why she didn't get lunch, and the foster mother ignored her. She reported walking back to the CPA office and a staff from the office went with her back to the house, when the foster parent was asked about not giving her lunch the foster parent handed her an apple and left the room.

The foster mother denied the allegation. She said that the child took a candy cane out of the snack bin and was taking it to her room, which is against the rules of the house. The

foster mother also reported she did not deny the child food, but rather that she was not home during lunch time. Another foster child reported being present during the incident and validated the foster mother's version of the incident.

The CPA staff involved reported the child had no marks on her neck, expressed no concerns about the foster mother, and reported that the child said she felt safe in the home. DFPS ruled out the allegation of Physical Abuse and no citations were issued.

**On January 11, 2021**, DFPS initiated an investigation for Physical Abuse, Emotional Abuse, and Medical Neglect, on allegations that two foster children were not medically assessed within an appropriate timeframe and a foster child was inappropriately disciplined. The report alleged that a 14-year-old foster child had a severe cough for more than a month and the foster mother would not take her to the doctor. The child also reported being afraid of the foster mother. The second foster child, a 13-year-old, reportedly had diarrhea for more than a week without treatment.

The 14-year-old child, interviewed on January 13, 2020, reported she had been sick since Thanksgiving. She said she reported to the foster mother that she was sick, and the foster mother did not seem to care and did not take her to the doctor. The child also reported that her glasses were either lost or broken and the foster mother had not had them replaced. Regarding discipline in the home, the child said she was being required to stay in her room all day and could not talk to anyone except during meals.

The 13-year-old told the investigator that although he had diarrhea for more than two weeks, he did not tell his foster parents at first. When he finally told them, they didn't take him for medical treatment for another month. The child reported being physically disciplined while in the home. He said the foster mother "grabbed him by the sweater and threw him across the room," the foster father "threw him against the wall," and that both foster parents would yell in his face.

The foster mother said the 14- year-old did not have a severe cough until the week of the interview. She reported that the child was not in the home between December 18 and January 5 and upon returning she had a "slight cough," that worsened the week of the investigation. The foster mother said the school nurse contacted her about the child's cough, and she told the nurse the child had an appointment scheduled. The foster mother reported that the 14-year-old had broken her glasses while at the hospital in December and her appointments kept having to be changed because of her hospitalization. The foster mother stated that she took the 13-year-old to the doctor for the diarrhea five days after he reported it to her.

The allegations of Physical Abuse, Emotional Abuse, and Medical Neglect were Ruled Out and no citations were issued.

**On March 25, 2021**, DFPS initiated an investigation for Physical Abuse and Emotional Abuse, after a nine-year-old child in care made an outcry that the foster mother hit her on her arm and that she was afraid of her foster parents. During the interview, the child said the foster mother "hit her lightly" and "indicated it was more of

a playful hit," the child said that she has not been in trouble since being in the home and nothing in the home make her feel uncomfortable. The foster parents denied the allegations and said that the child has been withdrawn since being placed in the home on March 18, 2021. The other household members interviewed denied witnessing any physical discipline.

The allegations of Physical Abuse and Emotional Abuse were Ruled Out, and no citations were issued.

## Standards Investigations Summaries

The home was subject to 13 minimum standards investigations, including multiple allegations of inappropriate discipline. Citations were issued in only three of these investigations.

- An investigation initiated on January 23, 2017, resulted in one citation for prohibited discipline after the foster parents yelled at children as a form of discipline.
- An investigation initiated on April 14, 2017, resulted in one citation for the corporal punishment after it was determined the foster parent spanked a child.
- An investigation was initiated on September 14, 2022, resulting in one citation for disciplinary measures when it was determined that children were required to wash a wall as a form of discipline.

## DFPS Disallowance List

In a letter dated September 28, 2022, DFPS provided notice to the Texas Baptist Home for Children disallowing the home from any future placements of children in care. The letter documented the foster home's history of minimum standards violations that included inappropriate discipline; supervision; and feeding the children properly. The letter also cited the foster home's prior involuntary closure as a "substantial risk" to children placed in the home.

DFPS placed the home on the March 28, 2023 Disallowance List with an effective date of October 6, 2022. IMPACT shows no children have been placed in the home since September 15, 2022. During the period this home was open, IMPACT shows there were 92 placements of a child in the home and one child adopted.

## Adrienne Children's Hope Residential Services, Inc.

On May 4, 2021, Children's Hope Residential Services, CPA verified this foster home. On February 2, 2022, the CPA closed the home involuntarily due to deficiencies. When the home's verification was relinquished, Children's Hope had been on Heightened Monitoring since November 12, 2020. The Heightened Monitoring Plan lists concerning pattern and trend areas for the CPA including child's rights, home screening and verification, and medication management, discipline and punishment, and home oversight.

DFPS investigated the home once related to allegations of abuse, neglect, or exploitation.

## ANE Investigation Summary

DFPS initiated an investigation on January 22, 2022, for Physical Abuse, Emotional Abuse and Neglectful Supervision. The reporter alleged that the foster mother utilized a child's dress to restrain a three-year-old foster child by tying the dress around her mouth to stop her crying. Additionally, the reporter alleged that the foster father forcibly raised a one-year-old foster child's arms up in the air and reprimanded the child and yelled "put his hand in his mouth" when the child dropped them. The reporter also alleged that the foster parents left their 13-year-old biological child, who experienced frequent seizures, to supervise the one-year-old and three-year-old foster children, and his seven-year-old and 12-year old biological siblings, alone. It was also reported that the foster mother used a racial epithet.

The reporter also alleged mistreatment of the biological children in the home, including that the foster father grabbed the 13-year-old and left a discernible thumbprint and that the foster mother slapped the 13-year-old on the face, leaving a red handprint.

After initiating the case, DFPS merged two other intakes into the investigation. One of the intakes included an allegation that the foster father had a drug and robbery background.

Video of two of the reported incidents were secured by the investigator. In one video the foster father is observed with the 1-year-old sitting on his lap. The foster father is heard "yelling, cursing, and taunting" the child and can be seen "forcing the [one-year-old child] to hold his arms up as punishment." When the child attempted to lower his arms, the foster father forcibly raised them back up. Throughout the interaction, the one-year-old cries continuously. During the video, the foster mother is heard telling the three-year-old "not to close her eyes and asking why both she and [the 1-year-old]. are not listening as they were both crying."

A second video also involved the one-year-old child and foster father. The foster father can be heard commanding the child to stop crying and threatened to put the child's hand in his mouth. The foster father raised his voice and said that just because one child was instructed to do something, it did not warrant the other to mimic it. He yelled, "y'all aren't going to do that shit," then tells the one-year-old to cease worrying about his sister because "she is getting your ass in trouble."

The foster parents both denied using any physical discipline in the home. The foster mother denied putting the children in the bedroom as punishment and denied using a piece of clothing to cover child's mouth to keep a child quiet. Drug screens conducted on both foster parents were negative.

DFPS disposed of the allegations of Emotional Abuse and Physical Abuse as UTD for both foster parents. The allegations of Neglectful Supervision were found RTB for both

foster parents. HHSC issued five citations for Children's Rights, Corporal Punishment, Oher Prohibited Discipline, Supervision, and Foster Home Compliance.

## DFPS Disallowance List

In a letter dated May 5, 2023, DFPS provided notice to Children's Hope Residential Services, Inc., that the home was disallowed for any future placement of children in care. The decision was based on the RTBs for Neglectful Supervision and UTDs for Physical Abuse and Emotional Abuse and included the standards violations for children's rights, corporal punishment, other prohibited discipline, supervision, and foster home compliance.

The foster home was placed on the June 6, 2023 Disallowance List with an effective date of June 6, 2022. IMPACT reflect that no children have been placed in the home since January 24, 2022. During the period this home was open, IMPACT shows there were five placements in the home.

## A World for Children

A World for Children CPA verified this foster home on May 18, 2011. The CPA closed the home on December 16, 2022. The reason for relinquishment listed in CLASS is: "CPA Closed." A World for Children CPA had been on Heightened Monitoring since October 19, 2020. The Heightened Monitoring Plan listed concerning pattern and trend categories, including background checks, supervision, child's rights, discipline and punishment, health, and safety - fire safety and weapons/firearms, foster home screenings and verifications, living space and physical environment, medical care, medication management – administration, documentation and storage, and serious incident reporting.

During its active period, this home was the subject of six investigations: three for abuse or neglect and three for standards violations.

## ANE Investigations Summaries

**On January 5, 2016**, DFPS initiated an investigation for Physical Abuse after a five-year-old child in care outcried to her 16-year-old sibling that the foster father spanked her and her two other siblings, ages three and four. A second linked intake provided that the foster feather spanked the five-year-old on the bottom with his hand. The intake further alleged that the five-year-old had been slapped and had a "busted lip" that "was scabbed over like it had been that way for a long time."

The foster parents denied using physical discipline in the form of spanking or slapping. The three children denied being hit or spanked, and the five-year-old child said that her lip appeared "busted" because she peeled the skin off of her chapped lips.

The investigator Ruled Out the allegations of Physical Abuse. HHSC issued one citation for improper medication storage. The investigator also provided technical assistance to

the foster parents, noting that, during the investigation inspection, "it was believed that foster parent [sic] was heard telling the children that he would spank them." The investigator noted that the "foster parents [should] be provided additional training on discipline to ensure the safety of the children."

**On September 7, 2022**, DFPS initiated an investigation for Neglectful Supervision after SWI received allegations that the foster father abused alcohol and refused further treatment after three stays in "detox." The intake included allegations that the older male household member, the foster father's father, experiences advanced dementia, and it was reported that he accessed dangerous tools and discharged a nail gun. He also had been found playing with fire during the night. The allegations also included that the older man yelled and cursed at the foster children.

The investigator was not able to conduct interviews with the two-year-old and four-year-old foster children. The foster mother denied keeping alcohol in the home and denied that the foster father drank in front of the children. She told the investigator that she was the primary caregiver for the foster children. Both foster parents denied that the elderly household member ever supervised the children. The foster father acknowledged consuming a pint of alcohol every other day and stated that the children were asleep during these times. He disclosed that he had undergone detoxification about two weeks before the interview and claimed to have abstained from drinking since then. The older male household member denied yelling or cursing at the children and told the investigator that he did not recall playing with power tools.

The investigator Ruled Out the allegation of Neglectful Supervision. HHSC issued one citation for caregiver responsibilities due to the foster father admitting to "drinking a pint of alcohol every other day" and "not dealing with stress and pressure the correct way."

**On December 7, 2022**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after a teacher reported observing a four-year-old foster child with bruises and scars on her buttocks. The foster mother provided various explanations for the injuries. The allegations also included that the four-year-old said she was "scared" when asked what happened. Another linked intake described the same allegations regarding bruises and scars on the four-year-old, and the foster mother stated that the children in the home hit each other with belts. A third linked intake included allegations about the foster father locking the two-year-old in the closet and that the foster father was in the closet with her. The third intake also included an allegation that the foster mother refused to pick up the four-year-old foster child from daycare when the child was sick, stating that she "was faking it." A fourth linked intake added that the four-year-old stated that she was spanked in the foster home.

The investigator was not able to conduct interviews with the two-year-old and four-year-old foster children placed in the foster home. However, the investigator observed and noted marks and bruises on the four-year-old's arms and legs. A doctor examined the four-year-old on the day the investigation was initiated, and the doctor reported that the child had no bruises on her back.

The foster parents' adopted children denied the use of physical discipline in the home and told the investigator that the two and four-year-old's struggled over a belt that was left in the car, and while struggling, the 4-year-old was hit in the back with the belt.

The daycare employees told the investigator that the two-year-old did not tell them that the foster father had placed her in the closet. Instead, they said the child told them a monster was in the closet. The daycare staff did reiterate their concerns with the foster mother not picking up the children after they told her the children were ill.

The foster parents and the elderly father living in the home all denied corporal punishment or locking any children in the closet.

DFPS Ruled Out the allegations of Physical abuse and Neglectful Supervision, and HHSC issued no citations.

## Standards Investigation Summaries

The home was subject to three minimum standards investigations.

- On July 25, 2012, HHSC initiated an investigation after a therapist and three foster children, ages seven, eight, and 13, made an unauthorized visit to the foster home where their 16-year-old sister resides. The seven- and eight-year-old males reported that their 16-year-old sister bathed them during the visit. Both boys were reportedly upset, and the eight-year-old reported being embarrassed. CPA staff made a second report that at the time the children visited the foster home, the home was out of ratio. Another intake alleged that the foster parents allowed a different 13-year-old foster child to visit and stay the night at a friend's house without prior approval. The foster child had sexual intercourse with the friend's 16-year-old brother.

  The foster mother told the investigator that she brought the siblings of the 16-year-old foster child to the home during a scheduled visit. She stated that the visit was to occur at a McDonald's and admitted to bringing the children to her home about 20 miles away, and that during the visit, the 16-year-old bathed her younger siblings. The foster mother also admitted to allowing the 13-year-old foster child to spend the night at a friend's house without prior approval, at which time she engaged in sexual activity with the friend's older brother. The 16-year-old friend's brother was charged with aggravated assault and arrested.

  HHSC issued five citations: one for supervision due to the foster parent allowing the foster child to stay at the friend's home, one for background checks due to the foster parents allowing the foster child to be cared for by individuals who did not have background checks performed; one for service planning due to the foster mother not following the service plan task or safety plan of the 13-year-old foster child; one for prudent judgment due to the foster mother allowing the older sibling to bathe younger siblings; and one for serious incident documentation after the investigator uncovered an incident report was missing.

- On August 20, 2018, HHSC initiated an investigation for allegations that the foster father was an alcoholic; the foster mother knew about it. She did nothing, and there were concerns about the foster parents adopting the foster children. The foster parents both denied over-consuming alcohol or drinking while supervising the children. The children denied that the foster parents were drunk or drinking in their presence. The professional collaterals denied any concerns for the home.

  HHSC issued no citations related to the allegations. However, HHSC issued three citations related to the home's verification documents: one for the adoption screening, including the proper interviews, one for their home's temporary verification certificate not having the new home address, and one for the CPA not submitting the home's new address within required time limits for verification.

- On October 4, 2021, HHSC initiated a standards investigation after SWI received an intake about a three-year-old foster child with a fractured leg. The foster mother told the investigator that she became concerned after the child would not play with the other children during playtime. She stated that she assumed the discomfort was due to the child being tired after playing at the mall the previous day, so she took the child to the ER. The hospital informed the foster mother that the child had a "toddler's fracture," probably from leaving her bed that morning and twisting her leg. No citations were issued as a result of this investigation.

## DFPS Disallowance List

DFPS placed the home on the June 6, 2023, Disallowance List, effective January 8, 2023. In a letter dated February 9, 2023, DFPS notified A World for Children, CPA, that this foster home was disallowed for future placement of children in care. The decision narrative from the CPS Director of Placement indicated multiple concerns with the home:

> Based on the information in the Safety/Risk Assessment and Decision Documentation Sections below, CPS is disallowing [this foster home] for any future placements because the home has multiple minimum standards citations, a trend of physical abuse allegations, and displayed an inability to provide adequate care due to [the foster father's] excessive alcohol consumption. Additionally, CPS Caseworkers noted safety concerns with children in the home, and children were removed due to possible abuse or neglect. Lastly, the CPA indicated the home failed to follow a safety plan, and the CPA closed the home due to multiple concerns. These trends and concerns indicate risk for any child placed in the home.

IMPACT indicates that no children have been placed in the home since December 16, 2022. During the period this home was open, IMPACT shows there were 27 placements of a child in the home and four children adopted.

## House of Shiloh Family Services

House of Shiloh Family Services (Shiloh) verified this foster home on March 16, 2021. The CPA involuntarily closed due to deficiencies on July 31, 2023.

While it was open, the home was the subject of two investigations for abuse, neglect, or exploitation and two minimum standards investigations.

## ANE Investigation Summaries

**On May 20, 2021**, DFPS initiated an investigation for Physical Abuse of eight-year-old, six-year-old, and five-year-old children in care who made an outcry to their CASA of physical abuse or inappropriate discipline. The children reported being hit with a belt by the foster parents. The children's CASA observed the foster parent making threats and comments about hitting the children with a belt.

When interviewed, two of the three children denied being hit with a belt. The third child reported that the foster parent threatened to use a belt once, and the foster parents confirmed this account.

The allegation of Physical Abuse of the children was Ruled Out. HHSC issued two minimum standards citations for supervision for having a video camera in the children's room and corporal punishment for threatening to use a belt.

**On May 16, 2023**, DFPS initiated an investigation for Neglectful Supervision after SWI received four intakes regarding two six-year-old children in care sexually acting out with each other in the home. The report stated the children were "laying on top of each other, hugging, and kissing on the lip." The reports noted that the children performed oral sex on each other on one or two occasions. The reports indicated the children were not supervised appropriately, and the foster parent was aware and did not change the sleeping arrangements or take "concrete steps to prevent further inappropriate contact."

During the investigation, the children acknowledged engaging in inappropriate sexual behaviors with each other. The foster parent reported seeing the children kiss but nothing else. The foster parent denied receiving extra training from the CPA after a similar incident occurred in the home.

On a prior occasion, after the CPA had reported a similar incident in the foster home, the foster parents received additional training on how to write and when to report an incident. The investigator requested those training documents, but the CPA could not produce them, and the investigator determined that the foster parents did not receive additional training. The investigator concluded that although there was another incident of inappropriate sexual behavior that was not reported by the foster parents, supporting documents regarding additional training or corrective measures could not be provided. The investigation concluded with a UTD for Neglectful Supervision. HHSC issued two minimum standards citations for supervision and children's rights.

## Standards Investigations Summaries

▪ On April 19, 2021, HHSC initiated an investigation regarding allegations that a five-year-old in care had regressed in his "potty training" and had "bruising around his rectum," which the biological father believed to result from abuse. The report stated that the biological parents observed the child during a visit, and the parents voiced concerns to the CPS caseworker. The child was one of the alleged victims named in the investigation initiated by DFPS on May 20, 2021.

The five-year-old child was interviewed and denied physical discipline or that anyone hurting him. Collateral children were interviewed and denied physical discipline and reported that the five-year-old child had bathroom accidents and would be cleaned up by the foster mother. The foster mother reported that the child had several bathroom accidents a day, and the child was taken to the doctor, where the child was diagnosed with constipation and prescribed medication. Adult collaterals were interviewed, and no concerns were reported. HHSC did not issue minimum standards citations due to the investigation, but medication was observed to be unlocked after a walk-through of the home. Therefore, the home was cited for medication storage.

▪ On June 16, 2021, HHSC initiated an investigation after law enforcement reported that three children in care, ages eight, six, and five, ran away from the foster home multiple times. The law enforcement officer reported that as soon as the children were returned to the home, they ran away again. The report stated that law enforcement had responded to the home numerous times since the children were placed in April 2021. This investigation included the same children that were the alleged victims in the two previous investigations.

The reporter was interviewed and voiced concerns about the foster parent's ability to care for the children due to her age and the children's behaviors being uncontrollable. No standards citations were issued.

## DFPS Disallowance List

DFPS placed the foster home on the agency's September 28, 2023, Disallowance List with approval by the DFPS Legal Department on September 5, 2023. In a letter dated August 31, 2023, DFPS notified Shiloh that the foster home was disallowed for future placement of children in care due to "Minimum Standards violations and non-compliance regarding supervision and inappropriate discipline."

The foster home page in CLASS indicates that the home closed on July 31, 2023, and the verification was relinquished involuntarily due to deficiencies. IMPACT reflects that no children have been placed in the home since June 9, 2023. During the period this home was open, IMPACT shows there were seven children placed in the home.

## America's Angels, Inc.

This foster home was first verified on April 26, 2017, by America's Angels, Inc. The CPA involuntarily closed the home due to deficiencies on February 25, 2022. America's Angels, Inc., verified the home a second time on August 21, 2023, and the home closed voluntarily with deficiencies less than two months later, on November 13, 2023. While the home was open, DFPS opened one investigation for allegations of abuse, neglect, or exploitation and HHSC opened two minimum standards investigations.

## ANE Investigation Summary

**On October 14, 2021**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after an eight-year-old alleged that the foster father raped her and that he "does this every day." The child reported that she told the foster mother three times, and she did not do anything. The child reported that the foster father was on drugs; the child also said that she thought cigarettes were a drug.

During her forensic interview, the eight-year-old child reported that the foster father touched her "TT," which the child indicated during the forensic interview was a reference to the child's chest. She said that the last time she had been touched was "last night," when he felt her chest under her pajamas with his hand and squeezed. The child said she had learned the word "rape" from a classmate, but the child did not know what the word meant.

The foster mother denied that the child made an outcry before being forensically interviewed. The foster mother reported that after the child's forensic interview, she asked the child if something had happened, and the child said that the foster father touched her breasts one time when he hugged her and that he had touched her "privates" and when the foster father hugs her it makes her uncomfortable. The foster mother reported that they instituted side hugs.

The foster father denied grabbing or intentionally touching the nine-year-old. The foster father reported that his stepdaughter had previously accused him of sexually abusing his granddaughter. The foster father also denied the use of drugs. The detective investigating the allegation stated that the foster father "has an extensive criminal history and does not understand how he is even a foster parent." The foster father's background check did not indicate any criminal history after the 1990s.

During a psychological exam conducted on September 21, 2021, the nine-year-old reported being "sexually abused by her dad" and said that "her mother knew about the abuse."

DFPS issued two RTBs, one for Sexual Abuse, naming the foster father, and one for Neglectful Supervision, naming the foster mother. The foster parents requested an Administrative Review, and on March 13, 2023, DFPS notified the foster parents that the disposition was changed to Ruled Out. HHSC issued two citations, one for Serious Incident Report and one for Children's Rights-Safety and care.

## Standards Investigations Summaries

The home's two standards investigations both involved allegations of children being hit, and no citations were issued for either investigation. The first investigation was initiated by HHSC on November 6, 2017, after receiving a report that the foster father was observed slapping a foster child on the back of the head. The foster parents denied ever hitting the child.

The second investigation was initiated by HHSC on December 16, 2020, after a five-year-old child in care alleged that the foster mother hit her with a belt several months earlier. The child told the investigator that the foster mother had "whooped" her with a brown belt, and it hurt. When interviewed, the child denied ever being hit by either of the foster parents. The foster parents denied the allegation.

## DFPS Disallowance List

DFPS placed the foster home on the agency's October 20, 2023 Disallowance List with an approval date by the DFPS Legal Department of October 23, 2023. In a letter dated September 28, 2023, DFPS provided notice to America's Angels, Inc., CPA, that this foster home was being disallowed for any future placements of children. The letter indicated the reason for the disallowance was due to standards deficiencies for Children's Rights and Serious Incident Reporting. The letter also noted that the foster father was the alleged perpetrator in two investigations of sexual abuse. IMPACT shows that two children were placed in the foster home on August 31, 2023, and both were removed on September 6, 2023. During the period this home was open, IMPACT shows there were 22 placements of a child in the home.

## The Grandberry Intervention Foundation, Inc.

This foster home was verified by several different CPAs before it was disallowed by DFPS. Buckner Children and Family Services verified this foster home three times. It was first verified by Buckner Children Village & Family on August 18, 2004. The CPA relinquished the home on February 26, 2009, and noted the foster home was changing CPAs. The second verification, by Buckner Children and Family Services (a different branch of the CPA) occurred on September 18, 2009. The home again closed on November 9, 2012, with a relinquishment reason noted as "other." Buckner Children Village & Family (the first branch that licensed it) verified the home a third time on November 10, 2012.

The home was next verified by the Beaumont branch of The Grandberry Intervention Foundation, Inc. (TGIF) on February 2, 2016. It was closed on October 30, 2019, with a relinquishment reason noted as "Noncompliances." TGIF verified the home again on September 14, 2020, and relinquished it on August 17, 2022, when the CPA closed. TGIF was placed on Heightened Monitoring beginning in October 2020, for patterns and trends in problems associated with background checks, child rights (abuse/neglect), discipline and punishment, home screenings, leadership responsibilities, medication management, initial service plans, and preliminary service plans. The TGIF Beaumont

branch closed on September 7, 2022, for non-compliance with probation requirements and a lack of responsiveness to HHSC assistance.

During the time that it was open, this foster home was the subject of 19 investigations: nine by DFPS for allegations of abuse, neglect, or exploitation, and 10 by HHSC for minimum standards violations.

## ANE Investigations Summaries

Of nine ANE investigations, six involved allegations of Physical Abuse, four included allegations of Neglectful Supervision, and two included allegations of Sexual Abuse.

**On July 14, 2010**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision of a three-year-old and two-year-old, both foster children. An anonymous reporter alleged the foster mother "whoops" the children on their buttocks, never leaving bruising. The reporter also alleged that when the foster parents go to church, the children are left alone in a back room at the church and that the foster parents had left the children with babysitters who were "known drug dealers."

The three children placed in the home were all observed and interviewed. None of the children made an outcry for physical discipline or being spanked. The children were informed that they were sent to the "hot seat" when they were in trouble, and the foster mother clarified that the "hot seat" meant timeout. Both foster parents confirmed the children were sent to timeout for no longer than two minutes; they denied leaving the children unsupervised in a room while at church and denied leaving the children with anyone else.

DFPS Ruled Out the allegations of Physical Abuse and Neglectful Supervision, and no standards citations were issued.

**On March 21, 2013**, DFPS initiated an investigation for Neglectful Supervision after 12-year-old and 14-year-old foster children engaged in a physical altercation, and the 14-year-old cut the 12-year-old on her arm. The report stated that the foster parents intervened but did not seek medical attention for the injured child. The report noted that the school nurse was asked to check on the injury and reported that the injuries looked self-inflicted. The report also discussed that the foster parents retaliated against the 12-year-old when concerns are brought to the caseworker's attention.

The 12-year-old reported she did not show the foster mother the "scratches" on her arm but showed the school nurse the next day.

The foster mother reported that she had to bathe one of the foster children and left the other children in the living room to watch television. The foster mother reported that she was told the children were fighting and immediately intervened. The foster mother reported that she did not observe any injuries on the child until the following day after the child returned home from school. The school nurse noted that the injuries looked to be self-inflicted. The 14-year-old denied cutting the other child.

DFPS Ruled Out the allegation of Neglectful Supervision, and no standards citations were issued.

**On July 1, 2013**, DFPS initiated an investigation for Physical Abuse after a CPA staff reported that two foster children, a seven-year-old and 10-year-old, said that the foster parents had hit them both. The 10-year-old was allegedly pushed against the wall. A 12-year-old sibling, also placed in the foster home, denied being hit but reported that the foster parents restrained the children a lot, and the restraints were not reported.

During the investigation, seven foster children were interviewed, including the children who made the outcry; none reported being physically disciplined by the foster parents. Four children reported that the seven-year-old child was restrained at least once by the foster mother and that the restraint was used to calm the child down when verbal de-escalation didn't work. DFPS Ruled Out the allegation of Physical Abuse, and no citations or technical assistance was issued.

**On October 31, 2018**, DFPS initiated an investigation for Neglectful Supervision after the foster mother reported that at 4:00 am, a five-year-old foster child was found on an 11-year-old foster child's bed, and the covers were pulled so no one could see what was going on. The intake includes that the five-year-old said the 11-year-old "touched his penis and his butt."

The five-year-old had a forensic interview and did not make an outcry of sexual abuse by the 11-year-old. He instead said a person named "Junior" touched his penis.[443] The 11-year-old also denied the allegations. The foster parent's 22-year-old granddaughter, who reported finding the two boys, was interviewed. She said that when she found the children, she asked the five-year-old if something had happened. He told her the 11-year-old had touched his "butt and private area." The foster parents acknowledged knowing the 11-year-old had engaged in inappropriate sexual contact with his sister but were not aware that he had been inappropriate with boys. The caseworker for the five-year-old indicated he also had a history of sexualized behavior.

DFPS Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On January 9, 2019**, DFPS initiated an investigation for Neglectful Supervision after the foster mother reported that an eight-year-old child in care told her that a five-year-old child in the home pulled down the pants of a six-year-old, who was also placed in the home, and kissed his bottom.

During the investigation, the six-year-old said that the five-year-old pulled down his pants and kissed his butt while in the bedroom. Another child confirmed the incident. The foster parents reported that the eight-year-old child told them he was removed from

---

[443] There are no notes in CLASS describing who "Junior" was or whether the investigator followed up on this allegation. The children did report that the foster parents' adult son, who shared his father's name, would visit the home.

the home and felt the eight-year-old was trying to get the five-year-old child in trouble. The allegation of Neglectful Supervision was Ruled Out, and no citations were issued.

On July 26, 2019, DFPS initiated an investigation for Physical Abuse following an outcry by a six-year-old child in care. The six-year-old reported that the adult son of the foster parents, who was also licensed as a foster parent through a different CPA, pinched and grabbed him on the shoulder so hard it left a bruise. The intake further stated that the babysitter struck the six-year-old over the head with his shoe, and there were concerns about the foster parent using pressure points on the children's shoulders.

The caseworker who reported the allegation said the six-year-old claimed both the babysitter and the foster father pinched them on the shoulder every time he and his 5-year-old brother were placed in time out. The caseworker observed no bruises on either child. The six-year-old demonstrated how he was hit with the shoe, and the caseworker described the hit as "very hard." The five-year-old sibling said he did not see his brother get hit.

The adult son denied hitting or pinching any children. A foster child placed in the adult son's home denied seeing the six-year-old get hit in the head. The six-year-old child, who was no longer residing in the foster home at the time of the interview, maintained that he was struck once with a flip-flop. A collateral child who was interviewed reported that the foster mother instructed him to say that the foster parents do not hit them.

DFPS Ruled Out the allegation of Physical Abuse. HHSC issued two standards citations: one for interference with an investigation (because the investigator found that the foster parent told a child not to tell the investigator that other children were being physically disciplined) and another for corporal punishment.

**On March 17, 2020**, DFPS initiated an investigation for Physical Abuse and Sexual Abuse after a DFPS staff reported that after leaving the foster home, an eight-year-old child said that the foster father touched his penis. The intake stated the child is having night terrors and would scream "don't touch me," in his sleep. The intake report also alleged that the foster father kicked the child in the stomach and called him bad names and that the foster parents did not feed the child.

The investigator contacted the CPA, who informed the investigator that the foster home was closed in October 2019 for inappropriate discipline. DFPS administratively closed its investigation, citing to the home's closure. No minimum standards were reviewed.

**On November 6, 2020**, DFPS initiated an investigation for Physical Abuse and Sexual Abuse reported again by the DFPS staff for the same allegations that were reported in the March 17, 2020, investigation that was administratively closed.

The eight-year-old child was no longer in care, and the investigator learned that The Grandberry Intervention Foundation CPA had reverified the foster home. The eight-year-old child denied being touched in his private areas by anyone while placed in the foster home; he did report that he was hit on his butt with a ruler that left a mark at that

time. The child also reported not eating regularly, and said the foster parents cussed at him.

Collateral children who were placed in the home denied physical discipline or being touched by the foster father inappropriately. The child was forensically interviewed during the investigation in March 2020 and did not make an outcry about being touched but indicated he was hit on the leg with a ruler that left a mark, but it only happened once. The foster father denied all the allegations.

DFPS Ruled Out the allegations of Physical Abuse and Sexual Abuse, and no standards citations were issued.

**On July 26, 2021**, DFPS initiated an investigation for Physical Abuse after a 15-year-old foster child reported that when he was placed in the home in 2018, the foster parents would take him to their adult son's home for discipline. The child reported that the son would pick him up and slam him down and could not recall if specific injuries occurred or how many times they occurred.

During the investigation, the child reported that because he did not want to put his seatbelt on, the foster parents' adult son picked him up out of the car and placed him roughly to the ground, denying he was slammed. The child reported that the foster parents were present when this occurred and that he did not sustain any injuries. Other children placed in the home remembered going to the adult son's home but did not remember physical discipline being used by the adult son. The foster parents denied that their son roughly handled a child.

The CPA reported that the home was inactive at the time of the investigation and was under re-evaluation to have their home re-opened.

The allegation of Physical Abuse was Ruled Out, and no standards citations were issued.

## Standards Investigations Summaries

Six of ten standards investigations involved allegations of children being hit or spanked; two resulted in additional citations for corporal punishment.

- On October 23, 2012, HHSC initiated a standards investigation for an allegation that a six-year-old child was hit on the hand by the foster mother after the child and her four-year-old sibling were arguing over shoes. A second intake reported that the children were yelling, and the foster mother pulled the car over and spanked one child on the leg with the shoe and the other on the leg with her hand.

  During the investigation, the two children reported that the foster mother stopped the car and spanked them both on the leg with her hand. The foster mother denied the allegations and indicated she only moved them apart and took the shoes away.

  One citation for corporal punishment was issued as a result of the investigation.

- On June 6, 2013, HHSC initiated a standards investigation on June 6, 2013, after a 10-year-old foster child fractured her wrist during a school field trip to a skating rink where the child fell while skating. When the child arrived home, her wrist was swollen, and the foster parents took her to the ER. One standard citation was issued for failing to timely report the child's injury to Licensing.

- On September 23, 2019, HHSC initiated a standards investigation after a seven-year-old foster child was observed exhibiting odd behaviors when he was found hitting himself on the buttocks and genitals. The report stated that the child said that his previous foster mother made him hit himself.

  During the investigation, the child denied hitting himself or being naked while in his current foster home or previous foster home. The child's previous foster mother denied the allegations and denied seeing the child exhibit odd behaviors. It was determined through interviews that the foster parents were using spanking as a form of discipline. One standards citation was issued for Corporal Punishment.

## DFPS Disallowance List

DFPS placed this foster home on the August 1, 2023, Disallowance List with an approval date by the DFPS Legal Department on September 2, 2022.

In a letter dated September 1, 2022, DFPS notified The Grandberry Foundation Intervention Foundation, Inc. that DFPS was disallowing this foster home for future placement of children in care. The letter stated that HHSC informed DFPS of the foster home's standards violations regarding corporal punishment, serious incident reporting, and interfering in an investigation. The letter noted the home had "a pattern of allegations of Physical Abuse and Neglectful Supervision which cause reasonable concern for any Child in the home."

During the period this home was open, IMPACT shows there were 73 placements of a child in the home and one child adopted. IMPACT reflects that no children have been placed in this home since November 12, 2020.

## Lutheran Social Services of the South

DFPS Region 4 first verified this foster home on August 28, 2020. The home changed CPAs and on February 9, 2022, Lutheran Social Services of the South, Inc. (LSSS) verified the home. On June 2, 2023, the home voluntarily closed with deficiencies.

When the home was verified by LSSS, the CPA had been on Heightened Monitoring since November 3, 2020. The Heightened Monitoring Plan listed pattern and trend areas including background checks, supervision, discipline and punishment, home oversight, foster home screenings and verifications, leadership responsibilities, personnel, record keeping, living space and physical environment, medical care, initial service plans and therapeutic service.

During the time that it was open, DFPS investigated the home twice for allegations of abuse, neglect, or exploitation and HHSC investigated alleged minimum standards violations once.

**On January 6, 2021**, DPFS initiated an investigation for Neglectful Supervision after a DFPS staff reported that a seven-year-old foster child inappropriately touched a four-year-old foster child. The reporter also alleged that the four-year-old said the older child had also inappropriately touched the foster parents' three-year-old adopted child. In a second intake, the foster parent reported to SWI that on December 31, 2020, she discovered the seven-year-old naked from the waist down, showing her genitals to the other two children.

The four-year-old admitted that she touched the other children's private parts and that she got into trouble for doing so. The seven-year-old denied she touched the other children inappropriately. The foster parents denied that the seven-year-old reported any inappropriate behavior and reported finding the seven-year-old with her pants down, showing the other two children her genitals.

DFPS Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On May 18, 2023**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after an upgraded report of a foster parent's suicide attempt (see below), and after HHSC staff reported that while interviewing daycare staff, the investigator learned that the three-year-old child in care, who has limited verbal ability, had a gash on the back of his head that appeared to be glued shut.

The foster parent reported that the child hit his head when he attempted to climb a footstool, and she said he recovered well, and she did not notice a cut. The daycare, CPA staff, and one of the foster parents reported that the three-year-old child is unstable and falls often. The foster parent also confirmed that the attempted suicide took place at a nearby park and not in the home where she and the three-year-old were at the time.

The allegations of Physical Abuse and Neglectful Supervision were Ruled Out and no citations were issued.

On May 4, 2023, HHSC initiated a standards investigation following a report from medical staff that a foster parent attempted suicide by injecting herself with a whole bottle of insulin. The incident occurred while a three-year-old child was placed in the home.

The foster parent told the investigator that she initially reported the attempted suicide incident to the CPA on May 1, 2023, and that she was intentionally vague and only reported that her spouse was hospitalized "due to her labs being off." The foster parent

said that on May 2, 2023, she reported the actual details of the incident to the CPA. The CPA reported the incident to SWI on May 5, 2024.

HHSC issued one citation for Serious Incident Reporting because the CPA failed to report the incident within 24 hours. Subsequently, on May 15, 2023, the allegations were returned to SWI and upgraded to an ANE investigation.

## DFPS Disallowance List

DFPS placed this foster home on the August 31, 2023, Disallowance List with an approval date by the DFPS Legal Department on July 13, 2023.

In a letter dated June 21, 2023, DFPS notified Lutheran Social Services of the South that this foster home was disallowed for future placements of children in care. The letter supported the decision based on the standards violation for failing to report a severe incident, leading to concerns regarding the safety, the caregiver's capabilities, and prudent judgment.

During the period this home was open, IMPACT shows there were two children placed in the home and one child adopted. IMPACT indicates children have not been placed in the home since May 24, 2023.

## Caregivers Youth and Transitional Living Services

Angelheart, Inc., CPA first verified this foster home on September 30, 2006; the CPA relinquished the verification on March 8, 2007. Ten years later, The Grandberry Intervention Foundation CPA verified the home on March 30, 2017. The home changed CPAs and was verified by Caregivers Youth and Transitional Living Services CPA (CYTLS) on April 30, 2021. CYTLS closed the home involuntarily due to deficiencies on May 4, 2022.

CYTLS was placed on Heightened Monitoring beginning October 12, 2020. Four days before closing the foster home, the CPA completed and was released from Heightened Monitoring. The Heightened Monitoring Plan listed concerning pattern and trend areas including health and safety, home screening and verification, required training, serious incident reporting, and therapeutic services.

During the time that it was open, the home was the subject of two DFPS investigations for allegations of abuse, neglect, or exploitation and six HHSC minimum standards investigations.

## ANE Investigations Summaries

**On January 29, 2020**, DFPS initiated an investigation for Physical Abuse after two intakes alleging a ten-year-old child told his biological mother that the foster mother hit him in the face and made him sleep on a mat on the floor. He also reported that a one-year-old child hit him on the legs and bottom and slept in a playpen in a closet or

restroom. An eight-year-old child also reported that the foster mother hit him. The ten-year-old stated that she feared the foster mother and the foster mother told the children, "What goes on [sic] her house stays in her house."

The ten-year-old child told the investigator that the foster mother hit her in the face because she didn't say thank you at breakfast. The child said her bed was thrown away, and she was sleeping on a mat until the day before she was interviewed for this investigation. The ten-year-old said the one-year-old slept in a "pack and play" in the foster parent's walk-in closet.

The eight-year-old and nine-year-old children placed in the home denied any physical discipline. However, the eight-year-old reported that the foster mother "popped" the ten-year-old on the top of her head because she did not say thank you.

The foster mother denied all the allegations. DPFS Ruled Out the allegations of Physical Abuse, and no citations were issued.

**On March 16, 2022,** DFPS initiated an investigation for Neglectful Supervision after an OCOK staff member reported that an 11-year-old and 15-year-old child said the foster mother left them alone at a park unsupervised and with no phone to contact anyone. They reported that they walked back to the foster home after the 11-year-old child hit his head, and the foster mother was upset that they left the park early. The children also reported that the foster mother threatened them not to report issues to CPS, and she threatened to make the 15-year-old walk home from school if he missed the bus again. The intake also alleged that the foster mother planned to take the children to a water park later that week and leave them unsupervised.

Both children maintained their allegations when interviewed, adding that the younger child was crying and had a headache from hitting his head at the park, but the foster mother did not seem to care and did not check his head. They also informed the investigator that they waited on the home's porch for 15 minutes until the foster mother returned because she was not there after they walked home.

The foster mother denied leaving the children at the park. She said that she was watching them "on the other side of the parking lot," because "she wanted to see how they would act/behave at the park without her presence." She told the investigator that she did not see the child hit his head, and she "lost sight" of them when following them home. She also stated that the children were only waiting about two minutes on the porch. She reported assessing the child's head after being told what happened and said the child did not need medical attention.

The investigator documented that the park was 0.4 miles from the home and an eight-minute walk, adding that "there [were] discrepancies in her account of what happened that would lead a reasonable person to believe she was not being completely truthful." The investigator Ruled Out the allegation of Neglectful Supervision, and HHSC issued one citation for supervision.

## Standards Investigations Summaries

The home was also the subject of six minimum standards investigations, three resulting in citations. Five investigations involved allegations of the foster mother using prohibited discipline.

- On November 16, 2017, HHSC initiated an investigation after SWI received allegations that the foster mother hit a three-year-old and four-year-old child on their bottoms. The children maintained the allegations, but the foster mother refuted them. The caseworker told the investigator that the children were consistent with their statements when they reported the allegations to her. The investigator documented that there "was not enough evidence to prove or deny the allegations" and did not issue any citations.

- On June 14, 2019, HHSC initiated an investigation after SWI received allegations that the foster mother only fed a seven-year-old and a nine-year-old child once a day, and she put the nine-year-old in time out all day on one occasion. The intake also alleged that the foster mother told a one-year-old child, "Shut the fuck up," when he cried, and she locked him in a closet. The intake also stated that the nine-year-old had a bruise on her face from the one-year-old.

  The seven-year-old child denied the allegations when interviewed, but the nine-year-old remained consistent that the foster mother put the one-year-old child in the closet when he was crying "every day." The foster mother denied all the allegations from the intake. The investigator issued two citations resulting from the home inspection, one for the physical environment because chemicals were found within the children's reach and one for medication storage.

- On August 28, 2020, HHSC initiated an investigation after an eleven-year-old reported that the foster mother pushed her two-year-old sibling's head forward and spanked her. Two other linked intakes alleged that the foster mother hit the eleven-year-old child as well. The eleven-year-old told the investigator that the foster mother spanked the younger child on her bottom, not her head. The other children and the foster mother denied any physical discipline. The investigator closed the investigation with no deficiencies.

- On June 18, 2021, HHSC initiated an investigation after an eleven-year-old and nine-year-old child ran away from the foster home to their biological uncle's house and reported that the foster mother was mean and yelled at them. A second linked intake resulted from the foster mother's report of the children's run from the home. The report was made more than four hours after the children had arrived and had a meal at the uncle's home. HHSC also linked another investigation after a ten-year-old child reported that the foster mother yelled at her. The intake also reported that the child had a "mostly healed bruise, like a grab mark under her arm and a line that a fingernail may have caused." The child demonstrated being grabbed by the arm. All three children placed in the home at the time confirmed that the foster mother yelled

at them. The case manager also told the investigator that "she witnessed the foster mother yelling at the victim."

HHSC issued one citation for serious incident reporting because the foster mother did not report the children's unauthorized absence within two hours.

- On June 18, 2021, HHSC initiated a second investigation after a ten-year-old autistic child expressed that the foster parent was mean and hurt her. The child had a small bruise under her left armpit that looked like a grab mark. The child demonstrated how the foster mother grabbed her arm.

  The ten-year-old would not respond when asked about being grabbed or a scratch that was observed on the back of her left arm. Other children in the home reported they had not seen the foster mother grab the ten-year-old child, but four of the children interviewed reported that the foster mother yelled at the children. The case manager stated she observed the foster mother yelling at the ten-year-old on numerous occasions.

  The foster mother denied grabbing the ten-year-old's arm, and she thought another child in the home caused the scratch.

  The investigator issued one citation for prohibited discipline for the foster parent yelling at the children.

- On November 19, 2021, HHSC initiated an investigation after the case manager reported that, while transporting three children (a nine-year-old, seven-year-old, and six-year-old) to school, the nine-year-old hit the other two children in the face. The intake also stated that the children had been in the home for respite care for approximately one and a half months. The investigator confirmed that the children were appropriately placed in the home. No citations were issued.

## DFPS Disallowance List

DFPS placed the home on the August 31, 2023, Disallowance List with an approval date by the DFPS Legal Department of August 11, 2023. In a letter dated May 3, 2022, DFPS notified Caregivers Youth and Transitional Living Services CPA that this home was disallowed for future placement of children in care. The letter cites that the reasons for the disallowance were due to the standards deficiencies received by the home, including other prohibited discipline, supervision, and medication storage. The letter also raises concerns about the home's history of Neglectful Supervision and Physical Abuse allegations, causing concern for child safety.

CLASS reflects that the home was closed on May 4, 2022. IMPACT reflects that no children have been placed in the home since April 28, 2022. During the period this home was open, IMPACT shows there were 23 placements of a child in the home.

## Therapeutic Family Life

Lonestar Social Services first verified this foster home on March 23, 2021; the home changed CPAs on May 25, 2023, when it moved to Therapeutic Family Life, CPA. The home closed on November 9, 2023. When the foster home was verified by Therapeutic Family Life, the CPA had been on Heightened Monitoring since October 20,2020. The Heightened Monitoring Plan listed concerning pattern and trend areas including caregiver responsibilities – supervision, discipline, and punishment, living space and environment – interior space, medication administration, medication storage and serious incident reporting.

While this foster home was verified, it was the subject of one DFPS investigation for abuse, neglect, or exploitation.

## ANE Investigation Summary

On August 29, 2023, DFPS initiated an investigation for Physical Abuse. A DFPS staff reported visiting a three-year-old foster child at the child's daycare. During the visit, daycare staff expressed concerns about the child. The report detailed that the child had not been at daycare for the past two weeks; the reporter observed that the child had approximately 20 bruises on his body, all in different stages of healing. The reporter described bruising on the child's right forearm, right shin area, knee, and near his naval—an approximately inch-long bruise on the back side of his right arm. The bruise on his navel was about the size of a dime.

The investigator attempted to interview the three-year-old child. However, the child was speech-delayed and had limited verbal capability.

The foster mother denied harming the child. She offered multiple explanations for the bruising, including that he hit the walls on a water slide on the way down, saying he was a "little boy" and was "throwing himself around." The foster mother also said the child had fallen off the small trampoline, played rough, and offered that the child was "clumsy" and that he plays with the other children in the home and they "run into things."  The foster mother reported she believed the child was anemic and said that the child bruised easily. The foster parent's biological child and adopted child were interviewed and denied that the parent used physical discipline or that abuse had occurred in the home.

An FACN consult concluded that the bruises on the child's right arm and abdomen were non-specific for abuse, that while bruises could be a result of a fall, inflicted trauma could not be ruled out. Bruises on the child's right arm could have been caused by fingers, "though it could not be said with certainty," and the bruises on the child's legs could have been caused by falling or play and were "likely accidental."

The investigation was concluded with a UTD finding, and HHSC issued no citations.

## DFPS Disallowance List

DFPS placed this foster home on the agency's December 22, 2023, Disallowance List with an approval date by the DFPS Legal Department of December 12, 2023. In a letter dated December 8, 2023, DFPS provided notice to Therapeutic Family Life that this foster home was being disallowed after a UTD finding for Physical Abuse of a child placed in the foster home and due to concerns about children's safety due to unexplained bruises.

The foster home page in CLASS indicates that the home was relinquished on November 9, 2023, with the stated reason as "CPA Closed." IMPACT shows that no children have been placed in the foster home since October 30, 2023. During the period this home was open, IMPACT shows there were two children placed in the home and one child adopted.

## Texas Dept FPS Region 5

DFPS Region 5 verified this home on November 14, 2014. The CLASS page for this agency home reflects that the home is still open and that there have been no investigations of the foster home. However, a search of the CLASS database using the foster parents names revealed one ANE investigation involving the foster home.

## ANE Investigations Summaries

On February 11, 2022, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after law enforcement reported that three children made outcries that the foster father's biological child sexually abused them while they were placed in a relative's foster home from 2015 to 2016.

Investigators forensically interviewed the three victim children, who reported being touched inappropriately by and engaging in oral sex with their cousin. The investigators found all three children credible. All three children said the abuse occurred on multiple occasions with the foster father's biological child when he would come for weekend visitation. One of the children stated that another adult biological son, who lived in the home, saw the cousin leave their room and that he reported this to the foster father. One child also reported that her sister told the foster father that their cousin had "peed" in her mouth. She also said she heard the foster father yell at his son.

The biological child denied the allegations. The foster parents denied that any outcries were made to them or that they ever observed or suspected inappropriate behavior between the children.

The allegation of Sexual Abuse against the foster parents was Ruled Out. The allegation against the foster father's biological son was administratively closed and was investigated by law enforcement. The allegations of Neglectful Supervision were Ruled Out for the foster mother and found RTB for the foster father. HHSC also issued three citations related to supervision, children's rights, and employee and caregiver responsibility for failing to report.

The investigation revealed that the foster mother owns the GRO Aspire to a Dream, which was first permitted on June 15, 2020, and she also owns a daycare, which received a permit on June 2, 2017. At the time of the investigation, the foster father was listed as a controlling person in the daycare. He has since been removed.

## DFPS Disallowance List

DPFS placed this foster home on the June 6, 2023, DFPS Disallowance List, effective June 9, 2022. In a letter dated April 22, 2022, DFPS notified its DFPS Region 5 Director that the RTB disposition for Neglectful Supervision issued to this home "creates reasonable concern for any child in the home." The letter states that the home is disallowed for future placement of children in care.

During the period the home was open, IMPACT indicates that this home provided care to four children who were relatives, and since August 17, 2016 primary managing conservatorship of all four children was given to the foster parents.

## Arrow Child and Family Ministries of Texas

Arrow Child and Family Ministries of Texas CPA (Arrow CPA), Brownwood branch, verified this home from April 30, 2019, until the home was closed involuntarily due to deficiencies on August 21, 2023.

During the time it was open, this foster home was the subject of 13 investigations, including eight DFPS investigations related to allegations of abuse, neglect, or exploitation and five HHSC investigations for minimum standards violations.

## ANE Investigations Summaries

**On February 24, 2020**, DFPS initiated an investigation for Neglectful Supervision after an eight-year-old child reported to his biological grandmother that the foster father did not intervene when "other boys" bullied him and made him "punch a wall" causing his hands to be "red, rough, and with broken skin." The intake also stated that the foster father refused the eight-year-old child medical treatment for an infected fingernail and refused to take him to have his prescription glasses adjusted. The child also reported that the foster father threatened to send the child to a group home in Oklahoma and told him that he would never see his biological father or paternal grandmother again.

The grandmother told the investigator that she saw the child on February 21, 2020, "and his hands were rough and the skin was broken." She again alleged that the foster father threatened him with loss of the placement and said he blocked his telephone visits.

The investigator documented that the eight-year-old child and two other children placed in the home "admitted to lying at times and picking on each other." The investigator also stated that the child did not have marks on his hands. The foster father denied

threatening the child, and he stated that he felt the child "misunderstood" his statements about placement.

The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On June 3, 2020**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after law enforcement reported that a nine-year-old child jumped a neighbor's fence "screaming for help." The intake also described that the child alleged, again, that the foster father allowed other children in the home to assault him, especially when he did not take his medications. The intake also described bruises "up and down [the child's] legs in various stages of healing" and scratches on his arms, and allegations that the foster father kicked, choked, and punched the nine-year-old child. Law enforcement also reported that the child asked the "neighbors if he could sleep next to their firepit to keep warm."

The nine-year-old child recanted the statements about being hit by other children in the home, and he told the investigator that he lied about being abused to the neighbors and police. The other children in the home denied witnessing the foster father harm the nine-year-old child, and the foster father told the investigator that the nine-year-old child's behavior worsened with running off when he did not get his way. The therapist shared that he thought the child's level of care (Basic) was incorrect, but "his recommendations...were ignored."

The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On August 8, 2020**, DFPS initiated an investigation for Neglectful Supervision after a nine-year-old child (Child A)[444] reported to his Attorney Ad Litem that, while placed in the home, a 14-year-old child (Child B) entered the restroom while he was using it and "began touching his penis." He also stated that the 14-year-old child "put his penis in [his] buttocks."

During his interview, Child A maintained the allegation that he was sexually abused while using the restroom, adding that it occurred at the foster father's workplace. He also told the investigator that the foster father's boss entered the restroom while the incident occurred, pulled the older child off, and told him to let her know if Child B did it again. Child A stated that the other child was the foster father's boss's child.

The foster father and his boss (who was also a foster parent) both denied that the incident occurred or could have occurred due to the office being directly across from the restroom. The boss also told the investigator that Child B was 17 years old (not 14), and had IDD, so he worked with her husband while at the shop.

---

[444] This is the same child named as an alleged victim in the first two ANE investigations. He was removed from the home prior to this intake.

The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On September 13, 2021**, DFPS initiated an investigation for Physical Abuse after a case manager at a community-based mental health clinic reported that the foster father was seen pinning an 11-year-old child against the wall with his forearm on the child's neck and spanked the child on his back and buttocks with his hand. The intake also stated that, after the incident, the foster father left the child outside alone at 8:00 PM.

The foster father denied spanking the child, and he told the investigator he had his arm around the child "holding a book in front of him and telling him he had to read his book." The 11-year-old child denied the incident occurred, and the other children placed in the home denied that the foster father used any physical discipline.

The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

**On July 29, 2022**, DFPS initiated an investigation for Neglectful Supervision after the Arrow CPA case manager reported that an eight-year-old child made an outcry that a 12-year-old child also placed in the home "stuffed his wiener up his butt." The intake indicated that the 12-year-old denied the incident occurred, but that he admitted to hitting the eight-year-old child with a pillow and telling him to do things he was not allowed.

The eight-year-old child denied the incident in his forensic interview, and the 12-year-old told the investigator that he had never touched anyone else's private body parts. The other children in the home denied anything occurred. The foster father told the investigator that he had installed a motion sensor with an alarm that was triggered anytime one of the children moved around during the night, and that he did not hear or see anything indicating the incident occurred.

The investigator Ruled Out the allegation of Neglectful Supervision, and HHSC issued no citations.

**On May 5, 2023**, DFPS initiated an investigation for Physical and Sexual Abuse after a 12-year-old child (the same child who was involved in the first three ANE investigations for this home) reported that, when he was placed in the home, the foster father pulled him by his ear, took him to the bedroom closet, and raped him "multiple times." The intake also alleged that the foster father also did this to other foster children. A second linked intake reported the same day alleged an 11-year-old child made an outcry that, when he was placed in the home, the foster father pulled children by their ears and hair guided them to the closet and sexually assaulted them. He also stated that the foster father locked children in the closet without food or water and sex toys were in the closet.

During his interview, the 12-year-old child said the foster father pulled him by his ear to the closet and sexually assaulted him. He added that he once cut ropes off himself using knives in the closet.

Other children previously placed in the home told the investigator that they were not allowed in the foster father's bedroom and none of the children saw the foster father pull anyone's ear and lead them into the bedroom. The investigator determined that the closet was too small for two people to stand in, and there was no evidence that the closet door ever had a lock on it.

The children the investigator interviewed made new allegations that the foster father hit, slapped, yelled, cursed, locked them out of the house and left children alone for long periods of time. These new allegations were called in to SWI. The foster father denied using any inappropriate discipline, and he denied the sexual abuse allegation.

The investigator Ruled Out the allegation of Physical Abuse and Sexual Abuse, and HHSC issued no citations.

**On June 14, 2023**, DFPS initiated an investigation for Neglectful Supervision after an HHSC employee reported that an eight-year-old child told her that while he was placed in the home, two other boys "touch[ed] his private part," and the foster father treated him differently. He elaborated that "he felt like a slave at the home because he was forced to do everything." The reporter also included a list of allegations that had been ongoing in the home for years:

- a 15-year-old child said the foster father "would stare at his private parts through his clothes,"
- a 13-year-old child stated that the foster father would take an eight-year-old child into his room "for a long time."
- An eight-year-old child stated that the foster father would wash his hair, despite not needing help in the bath to wash his hair.
- A 12-year-old child also reported that the foster father smoked cigarettes at the home, made them walk around the block as punishment, and he left five children home alone and none of them were older than 12 years old.

When he was interviewed, the eight-year-old child denied the allegations of being touched, and all the other children who were interviewed denied the foster father touched them inappropriately.

However, a 12-year-old child who was previously placed in the home told the investigator that the foster father would drag children by "any limb he could grab" into their rooms. He also stated that the foster father slapped and hit two other children in care, and he smoked in the car with the window down.

Another 12-year-old child previously placed in the home (the same child involved in four of the other ANE investigations) told the investigator the foster father spanked him with his "hand, [a] paddle, [and] belts which he removed the parts initially on the belts and replaced them with nails" and locked him out of the house as forms of punishment.

The foster father denied all of the allegations and told the investigator that he helped teach the eight-year-old how to wash his hair and behind his ears because he "noticed" the child was not doing it.

The investigator Ruled Out the allegation of Neglectful Supervision. HHSC issued five citations for violations of minimum standards, including: prudent judgment because the foster father did not stop his grandson from mistreating the foster children, prohibited discipline due to children reporting that the foster father locked them out for long periods of time and yelled at them, children's rights because "[c]hildren in care ranging from 6 [years old] to 12 [years old] stated that caregiver helps them wash while bathing as well as watches to make sure they are bathing correctly."

**On February 26, 2024**, DFPS initiated an investigation for Physical Abuse after an 11-year-old child reported that, while he was placed in the home, the foster father hit him with a belt and "forcefully scrubbed him in the shower."

When he was interviewed, the 11-year-old child repeated the allegations and added that the foster father also put him in the garage as punishment. A collateral child also told the investigator that the foster father hit two other boys when they were placed in the home.

The foster father denied all of the allegations, adding that he only helped younger children wash their hair.

The investigator Ruled Out the allegation of Physical Abuse, and no citations were issued.

## Standards Investigations Summaries

The foster home was also the subject of five minimum standards investigations by HHSC from October 2019 through the end of April 2022. Investigations of minimum standards violations related to supervision and serious incident reporting resulted in HHSC issuing two citations; one for serious incident reporting and one for service planning.

## Sampling Concerns

The home was also the subject of two sampling inspections on December 19, 2019, and April 7, 2022. The Inspector documented concerns for pets with expired vaccinations and that a child was placed in the home that HHSC determined the foster parent wasn't licensed to care for.

## DFPS Disallowance List

DFPS placed this home on its October 20, 2023, Disallowance List with an approval date by the DFPS Legal Department on October 5, 2023.

In a letter dated October 5, 2023, DFPS provided notice to Arrow CPA that this home was disallowed for any future placements of children in care due to standards violations regarding children's rights and prohibited discipline. The letter states the foster parent's "failure to use prudent judgment when disciplining children in care is a serious safety concern."

IMPACT reflects no children have been placed in the home since August 23, 2023. During the period this home was open, IMPACT shows there were 20 placements of a child in the home.

## Hands of Healing

Coastal Bend Youth City Inc. verified this home on April 23, 1999; the home changed CPAs on September 1, 2005, when the home was verified by Hope for Tomorrow. On June 15, 2007, the home changed CPAs again and was verified by Beacon of Hope. The home moved back to the Hope for Tomorrow CPA on February 15, 2013, and then relinquished verification on September 24, 2014. One month later, on October 29, 2014, Circle of Living Hope verified the home, and on February 17, 2022, the home was involuntarily closed without deficiencies. The next day, on February 18, 2022, the home was verified by Hands of Healing (HOH) and relinquished on February 3, 2023, when it voluntarily closed without deficiencies.

When this foster home was verified by HOH, this CPA was on Heightened Monitoring that started on November 2, 2020. The Heightened Monitoring Plan identifies the CPA's concerning pattern and trend areas related to discipline and punishment, home screening and verification- foster home screenings, medical care, and medication management- medication documentation.

During the time that it was open, the home was the subject of 20 investigations: DFPS opened nine investigations for allegations of abuse, neglect, or exploitation and HHSC opened 11 minimum standards investigations.

## ANE Investigations Summaries

Eight of nine ANE investigations included allegations of Neglectful Supervision.

**On April 12, 2006**, DFPS initiated an investigation for Neglectful Supervision after a 12-year-old foster child made an outcry during an adversary hearing that another child in the home had bruised his right forearm and bit him on the left arm.

The investigator interviewed three foster children. All the children in the home reported that they were "playing around" on the school bus when the 12-year-old child was injured and admitted that the foster parents did not allow horseplay in the home. The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On May 31, 2006**, DFPS initiated an investigation for Neglectful Supervision and Sexual Abuse after a CPA Case Manager reported that foster children ages eight, nine, 11, and 12 alleged that their 15-year-old foster sibling had inappropriately touched them.

The investigator interviewed nine children: six foster children in the home and three collateral children. All the children described the 15-year-old's touching of the nipples as "horseplaying." The foster parents reported addressing the 15-year-old for performing "Texas titty twisters" on the children in the home and that the CPA was notified of the child's actions. The investigator Ruled Out the allegations of Neglectful Supervision and Sexual Abuse, and no citations were issued.

**On June 15, 2006**, DFPS initiated an investigation for Neglectful Supervision after a 16-year-old foster child alleged that while he was sleeping, his 15-year-old foster sibling "poked" him in the eye with his penis and "farted" in his face.

Eight children in the home reported that the 15-year-old touched the 16-year-old on parts of his body that he was not supposed to. One child specifically reported seeing the 15-year-old put his private part close the sleeping 16-year-old's face. All eight children stated that the foster parents separated the 15-year-old and 16-year-old when they became aware of the incident. The investigator Ruled Out Neglectful Supervision, and no citations were issued.

**On July 18, 2008**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after a DFPS worker reported that a 19-year-old child in the home offered a seven-year-old a dollar if he "pulled down his underwear" and let the 19-year-old "penetrate" the child's anus. The CPA Case Manager reported a second intake, alleging the seven-year-old and 19-year-old were seen exiting the bathroom together. The seven-year-old stated that he received money in exchange for giving the 19-year-old "a kiss" and allowing him to "put his penis" in the child's "anus." A third intake was reported by law enforcement, stating the 19-year-old approached the 7-year-old when he was in the shower and anally penetrated the child. The foster mother sought medical attention, and the doctor said there was no indication of sexual abuse.

During the investigation, the 19-year-old denied the allegations and reported finding the seven-year-old "hiding" in the restroom, and he "told him to leave." When interviewed, the seven-year-old reported that the 19-year-old gave him money and then inserted his "wee wee in his butt."

Nine collateral children living in the home denied the 19-year-old had done anything to them. The foster mother witnessed the two children leaving the bathroom together but believed the 19-year-old was incapable of the sexual act due to him having "the mentality of young a child."

The investigator Ruled Out Sexual Abuse and Neglectful Supervision after medical professionals did not detect any indications of abuse to the seven-year-old. HHSC issued no citations.

**On November 5, 2009**, DFPS initiated an investigation for Neglectful Supervision after law enforcement saw a 10-year-old foster child running across a "busy highway" due to his foster siblings "pick[ing] on him and try[ing] to strangle him with a bear hug."

The 10-year-old child denied that the other children in the home hit him. The nine other foster children in the home denied hitting the child and hitting each other. The foster parent's biological son was watching the children at the time of the incident. He reported that the 10-year-old child argued with another child before running into the street. The biological son kept the child in his eyesight and called the foster mother, who immediately came. The investigator Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On April 12, 2011**, DFPS initiated an investigation for Physical Abuse after an 11-year-old foster child told hospital staff that his foster mother "grabbed him violently," leaving a bruise on his arm. A second intake alleged the 11-year-old was not given his medicine, resulting in the child feeling suicidal and having to be admitted to the hospital.

The 11-year-old reported that the foster mother grabbed his wrist, causing a bruise. He stated that the foster mother would give him his medication at room temperature instead of cold like he preferred, so he refused to take it.

Nine collateral foster children living in the home denied the foster parent's use of physical discipline. Two children reported that the foster mother restrained the 11-year-old once. One child reported being dragged by the foster mom to the living room. Four children stated that the foster father placed them outside at night when they cried. Two children reported the "behaved" children were allowed to sit on the couches when watching TV in comparison to the "misbehaved" children whom the foster parents required to sit on the floor. Six children reported the home had a meal system where the behaving children would eat first, and the "misbehaved" children would eat an alternative meal such as "pop tarts, soup, ramen, cereal, or sandwiches." The foster parents denied the physical abuse allegations and denied restraining the 11-year-old; the foster father admitted to grabbing a child and pulling the child to be placed in time out.

DFPS Ruled Out the allegation of Physical Abuse. HHSC issued three citations for other prohibited discipline, feeding children, and physical environment.

**On December 31, 2012**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after a Case Manager reported that a 14-year-old child alleged that the foster father and biological son "placed" the foster children on the floor in a "violent manner." Three additional intakes were reported concerning another child in the home, a 13-year-old who alleged that he and the 14-year-old had "engaged in inappropriate behavior." An additional allegation was that some foster children were not "allowed to eat specific food."

During the investigation, the 14-year-old recanted his allegations of physical abuse by the foster father and biological son. Seven collateral children in the home denied allegations of physical abuse, confirmed appropriate nighttime supervision, and denied

knowing the 14-year-old was "engaging in sexual intercourse" with anyone in the home. One child reported hearing the 13-year-old victim state that he hurt himself while "masturbating." Medical professionals conducted sexual assault exams on both the 14 and 13-year-olds. There were no findings of trauma to the 14-year-old. The 13-year-old had injuries consistent with "masturbate[ing] too hard."

The foster parent's biological child was supervising the child when he made the sexual abuse allegations. When interviewed, he reported having the baby monitors in the bedrooms on, checking on the children, and notifying the foster mother immediately.

DFPS Ruled Out the allegation of Physical Abuse and Neglectful Supervision. HHSC issued no citations.

**On February 3, 2014**, DFPS initiated an investigation for Neglectful Supervision after a 14-year-old[445] alleged that he and three foster siblings engaged in "sexual contact" in a former foster home when he was 12 years old.

When interviewed, the 14-year-old child clarified that the sexual acts occurred in two foster homes. He said he had "convinced" a younger child in one of the homes to participate in "sexually acting out activities" but that the child sometimes said "no." In another home, he had a nine-year-old foster child "suck his penis" and had sex with a 14-year-old male foster child multiple times. He reported that the "sexual acting" out would occur at night in their bedrooms and said that on one occasion, when he was trying to anally penetrate the 14-year-old, the skin on his penis "ripped," and he started bleeding. The nine-year-old was interviewed and did not make an outcry.

DFPS Ruled Out the allegation of Neglectful Supervision because none of the other children confirmed the allegations. No citations were issued.

**On June 20, 2014**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after a former foster child reported that while placed in the home, he observed the foster parents: "throwing" a foster child into a bathtub, using physical discipline, not allowing children to shower, only feeding foster children sandwiches, becoming "intoxicated" and being "violent" towards the foster children. The biological son allegedly used an illegal drug in the home. SWI received a second intake on July 23, 2014, when a DFPS staff reported that a five-year-old was observed with "bruising" on the legs and arms that appeared to be marks coming from "a switch."

The DFPS staff interviewed eight children; all except two children were still placed in the foster home. Two children denied all allegations. Six of the children reported that the foster parents gave them limited access to toilet paper. Five children reported a "lack of variety of food" in the home. Three children reported the foster father placed children in the garage for crying. Two of the children stated that the foster mother either "coached" or "bribed" the younger children to prevent them from making allegations. One child reported being denied breakfast because he lied and said that sometimes the doors to the bedrooms and restrooms are locked.

---

[445] The child was the 13-year-old alleged victim in the December 31, 2012 investigation.

The foster parents refused to be recorded during interviews and demanded that they be interviewed together. They denied all allegations.

The five-year-old child mentioned in the second intake denied that the foster parents had used physical discipline and stated that a grandmother had caused the bruising. The caseworker, however, noted that DFPS monitored the grandmother's visits. An FACN concluded the marks were not accidental and came from "an infliction." The seven-year-old child also living in the home had similar bruising.

DFPS Ruled Out the allegation of Neglectful Supervision. DFPS disposed of the allegations of Physical Abuse as UTD for the child with bruising due to "the concern of the appearance and location of the bruising." Additionally, HHSC issued eight citations for violation of minimum standards associated with employee and caregiver responsibilities; other prohibited discipline; children's rights; interference with an investigation; evaluating a foster home; and feeding children.

## Standards Investigations Summaries

This foster home had eleven standards investigations, five resulting in nine minimum standards citations.

- HHSC initiated an investigation on September 10, 2007, for allegations that the foster parents "made fun of" and called a foster child names. The CPA conducted an internal investigation; however, it failed to cite the home though the foster mother admitted to referring to the child as "ballerina." HHSC issued one citation for children's rights.

- HHSC initiated an investigation on August 17, 2010, for allegations that a child in care may have been sexually abused while placed in his previous foster home. The report indicated the eight-year-old soiled his pants daily, which had not occurred before he lived in the last foster home.

  The investigation report stated that the victim child did not make an outcry. The foster parents denied the allegations and said the child had been soiling himself for months. The investigator interviewed the four collateral children in the home, who reported the victim child said he was "lazy" and "liked the way it felt" when he soiled his pants. HHSC issued one citation for failure to conduct a required background check due to the foster parent's adult child not having his background check "completed timely."

- HHSC initiated an investigation on May 13, 2011, for allegations that a nine-year-old child in care was made to lie "face down and put hands behind" his back while the foster parents held his hands. Children were also allegedly asked to lie during investigations. A second intake received on May 12, 2011, alleged the foster parents dragged children by their foot or ankle and made them lay face down on the floor.

Eight children were interviewed, including the nine-year-old: two who were residing in the home at the time of the investigation, and six previously placed in the home. Four children reported that the foster parents restrained the two younger children for misbehaving. One child stated that the foster father would hold his hands in front and then hold him from behind. The foster father reported holding the children in a "bear hug" while fighting.

HHSC issued two citations for EBI Documentation and Emergency Behavior Intervention.

- HHSC initiated an investigation on January 3, 2014, after receiving multiple intakes regarding a 10-year-old child in care. The first two intakes reported that a 10-year-old child had been transported to the hospital due to aggression. Three intakes from hospital staff reported that the foster parents refused to pick up a child from the hospital.

  According to the foster mother, she told the hospital she did not "feel comfortable" accepting the child back into her home due to his behaviors. She reported that the hospital staff allowed her to leave the child at the hospital since he was "supervised by medical staff." When she returned hours later, she was notified that CPS had found a new placement for the child. The foster mother reported independently that she adjusted the child's psychotropic medication to "keep his behavior controlled" so he could attend a school event and not cause a disruption.

  HHSC interviewed seven collateral children, and all reported eating "pop tarts, cereal, and ramen noodles" regularly. Three of the children confirmed that the 10-year-old had an "outburst," resulting in the foster mother taking him to the hospital.

  School personnel reported that the foster children wore "torn" shoes and clothing, said they eat pop tarts, cereal, and ramen noodles, and experienced challenges with the foster parents picking up the children from school.

  HHSC issued two citations for feeding children and Children's Rights.

- HHSC initiated an investigation on December 2, 2021, alleging a 16-year-old child in care did not receive enough to eat and that the bathroom in the home is locked "so he cannot use it."

  The 16-year-old reported eating sandwiches and cereal, not being allowed to use the restroom when the foster parent was watching a TV show, and that the restroom was locked. Later, the child stated that he made up the allegations and was having "a mental breakdown day." A collateral child denied the allegations.

  The foster mother confirmed feeding the children sandwiches and cereal at times, locking the bedroom doors, and searching the children before allowing them to enter their bedrooms.

HHSC issued three citations for employee and caregiver responsibilities, children's rights, and feeding children.

## DFPS Disallowance List

The home was placed on the DFPS disallowance list on June 6, 2023, effective February 17, 2023. In a letter dated February 10, 2023, DFPS notified Hands of Healing CPA that the foster home was being disallowed for future placements because of a history of inappropriate discipline and children's rights allegations and citations. The memorandum states that the "pattern of allegations and citations causes significant and reasonable concern."

The foster home page in CLASS shows that the home was voluntarily closed without deficiencies on February 3, 2023. IMPACT reflects that no children have been placed in the home since May 30, 2022. During the period this home was open, IMPACT shows there were 118 placements of a child in the home

## The Sanctuary Foster Care Services

Benchmark Family Services, League City branch verified this home on April 9, 2020. The home changed CPAs on November 19, 2020, when the home was verified by The Sanctuary Foster Care Services. The CPA relinquished the foster home on October 20, 2022, noting "CPA closed."

While the home was open, it was the subject of three investigations: two DFPS investigations for abuse, neglect, or exploitation, and one minimum standard investigation by HHSC.

## ANE Investigations Summaries

**On November 5, 2021**, DFPS initiated an investigation for Neglectful Supervision, alleging two youths, an 18-year-old and 17-year-old, were engaged in a sexual relationship. The reporter alleged that the foster parents were aware the two teenagers were in a relationship but were not aware that they were having sex.

The investigator interviewed the two teenagers: both denied having a sexual relationship. Both teens confirmed the foster parents were aware of their relationship, and as a result, created house rules requiring the foster parents to conduct frequent checks on the teenagers. The foster parents prohibited the teenagers from having "alone time together" outside of the common areas, form entering each other's bedrooms, Facetiming at bedtime, and being "touchy touchy."

During the investigation, the foster parents acknowledged knowing about the teenager's relationship. The foster parents discussed the relationship with the CPA and DFPS, and immediately implemented a safety plan. DFPS interviewed a third teenager in the home

who confirmed the 17-and 18-year-old did not go anywhere alone. The investigator Ruled Out Neglectful Supervision and HHSC issued no citations.

**On March 11, 2022**, DFPS initiated an investigation for Neglectful Supervision of a 17-year-old foster child after a foster parent packed the child's psychotropic medication in her bag and failed to notify the respite caregiver. The 17-year-old overdosed on the medication while at the respite home.

DFPS interviewed the 17-year-old, who reported that in the past, the foster mother would directly give the medication directly to the respite caregiver; however, this time, the foster mother gave her the medication to give to the caregiver. The 17-year-old stated she did not give the respite caregiver the medication and instead decided to overdose.

During the investigation, the foster mother said that the 17-year-old was not allowed to keep medication or give medication to herself. However, the foster mother later stated that the 17-year-old was her own medical consenter, and she believed the 17-year-old could "take her own medication and complete her own medication log." The foster mother admitted to placing the medication in the child's bag and reminding the child to give it to the respite caregiver. She could not recall if she notified the respite caregiver of the location of the medication.

The foster father reported that the foster mother administered medication to the foster children, including the 17-year-old, and that the process "never differed" despite the 17-year-old being her own medical consenter. He said that no child had access to medication in their home.

The investigator interviewed two collateral children in the home. They reported the foster mother usually administered the medication by giving the child the dosage and then "watch[ing] them take it." They confirmed they had never independently administered medication to themselves in the foster home and said that during respite stays the foster mother gave the caregiver the medication.

The investigator interviewed the respite caregiver, who reported that during the 17-year-old's previous stays the foster mother directly handed her the medication and instructed her to watch the 17-year-old take it. However, this last time, she was unaware that the child's medication was placed in her bag and that the child was a medical consenter.

The police report documented the 17-year-old stating she "ingested approximately 14 antidepressants" at the respite placement. The EMS Records documented the 17-year-old stating she "took a handful of Lamotrigine 200 mgs," because her boyfriend broke up with her.

The CPA's policy required the foster parent to administer the child's medication even if the child was a medical consenter. The policy also requires the foster parent to "hand off" the medication to the respite caregiver.

DFPS disposed of the allegations of Neglectful Supervision with an RTB for the foster mother. In addition, HHSC issued two citations: one for violation of a standard associated with medication self-administration because the foster parent allowed the child unsupervised access to her medications despite her history of self-harm and one for violation of a standard associated with children's rights.

## Standards Investigations Summary

On March 3, 2022, HHSC initiated an investigation for an allegation reported on February 22, 2022, that a 17-year-old's medication was inappropriately managed. This investigation involved the same incident involving the 17-year-old's suicide attempt, discussed above. It was re-reported to SWI and investigated by DFPS for Neglectful Supervision. HHSC issued one citation because the foster parent failed to "share medication regimen and medication instructions" with the respite caregiver.

## DFPS Disallowance List

The home was placed on the June 6, 2023, DFPS Disallowance List with an effective date of July 8, 2022. In a letter dated May 24, 2022, DFPS provided notice to The Sanctuary Foster Care Services CPA that that this home was disallowed from any future placements of children in care. DFPS based its decision on the home's RTB finding for Neglectful Supervision and on a pattern of minimum standards violations related to supervision, respite, and children's rights.

IMPACT reflects no children have been placed in the home since May 27, 2022. During the period this home was open, IMPACT shows there were four children placed in the home.

## Houston Serenity Place CPA

This foster home was initially verified on November 18, 2014, by Circles of Care CPA. The CPA relinquished the verification on July 13, 2015, without noting the reason. The foster home was verified by Agape Manor Home CPA on July 12, 2016; the home was closed on June 21, 2017, due to non-compliances. Houston Serenity CPA next verified the home on July 12, 1018, but closed the home on April 2, 2019, due to non-compliances.

During the time the home was open it was the subject of two DFPS investigations for abuse, neglect, or exploitation and of six minimum standards investigations by HHSC.

## ANE Investigations Summaries

**On April 14, 2017**, DFPS initiated an investigation for Physical Abuse after school personnel reported that a seven-year-old foster child said the foster parent scratched, choked, and slapped her. The child allegedly had a red bruise on the lower left arm approximately three inches long and a red mark on the front of her neck the size of a nickel. Two intakes were received regarding these allegations on April 12, 2017, and

April 13, 2017. Two additional intakes were received by SWI on May 2, 2017, and May 3, 2017, alleging a different foster child said the foster parent grabbed him by the neck and choked him.

The foster parent denied the allegations, and the collateral children reported no concerns in the home. The seven-year-old child was interviewed three times and was inconsistent with details. The second victim denied being choked by the foster parents.

The allegation of Physical Abuse was Ruled Out, and no citations were issued.

**On May 11, 2017**, DFPS initiated an investigation for Neglectful Supervision due to allegations of the foster parent being dishonest with licensing and with two different CPAs during the home study. The intake stated the foster parent had allowed an unrelated home member who had criminal and CPS history to have ongoing access to the foster children in the home.

The children in the home gave inconsistent statements regarding whether the unrelated home member stayed at the home or had unauthorized access to them, according to the investigator. The foster parent, unrelated home member, and collaterals denied the allegations. The allegation of Neglectful Supervision was Ruled Out and HHSC issued one citation for a frequent visitor the home had not had a background check completed.

## Standards Investigations Summaries

- On March 6, 2015, HHSC initiated an investigation after three intakes were received by SWI. The allegations were related to five foster children: two 14-year-olds, a 13-year-old, a 12-year-old, and an eight-year-old. The intakes alleged that the foster children were playing a game called "Oreo" that involved the children daring each other to do things, and that the children dared each other to do jumping jacks naked. The intake also alleged that while the children were in the car, the eight-year-old unzipped the pants of a 14-year-old child and "tried to kiss [the child's] penis."

  The children and the foster parent confirmed that they were left unattended in the vehicle while the foster parent was running errands. HHSC issued three minimum standards citations for supervision, failure to complete service plans for three of the children within policy timeframes, and the home was cited for background checks for not disclosing an adult child living in the home.

- On September 14, 2016, HHSC initiated an investigation into allegations that a 15-year-old and a 12-year-old ran away from the foster parent during an outing to a park. The collateral children in the home reported they were not being supervised appropriately when the two children ran away; the children who ran away were not interviewed. It was reported the foster parent was not following the children's specific supervision plan. HHSC issued one minimum standard citation for supervision.

- On March 15, 2017, HHSC initiated an investigation into allegations that a 17-year-old child in care reported another foster child hit him. The report stated the child

had a dark bruise on the right side of the jaw. The victim child was interviewed and reported the bruise on his jaw was a result of him playing a game called "slapbox" with another child at school. The investigator found the children's supervision plans were followed appropriately and the foster parent had not been neglectful. HHSC did not issue citations for this investigation.

- On March 29, 2017, HHSC initiated an investigation into allegations that during an inspection of the home records at the CPA, it was discovered that the foster parent reported to the CPA that a child had alleged that the 17-year-old foster child had inappropriately touched him. The intake report stated the CPA failed to report the allegation to the hotline.

  The CPA staff provided the investigator with documentation showing that CPS had investigated the allegation prior to the children being placed in the home, and the children had been forensically interviewed. HHSC did not issue citations for this investigation.

- On October 30, 2018, the CPA conducted an internal investigation into allegations that a foster child reported to their caseworker that the foster mother told another child "get your funny looking ass and lay down." The child also reported to her caseworker that the foster parent was yelling at the same child in her room and the children in the home heard a "slap" although the child reported not seeing anything. The CPA concluded there were no concerns based on the interviews with the children in the home. The child denied the foster parent slapping her and reported the only people that mocked her were another child in care and the foster parent's granddaughter. HHSC did not issue citations for this investigation.

- On December 4, 2018, HHSC initiated an investigation into allegations that the foster parent lied on her licensing application and obtained her license fraudulently and was allowing her daughter, who uses drugs, to be around the foster children in the home.

  The investigation concluded that the foster home screening "was inaccurate due to the foster mother failing to provide correct information to the agency and the agency failing to complete a thorough and adequate home screening." HHSC issued two minimum standards citations for foster home screening and operational responsibilities.

### DFPS Disallowance List

DFPS placed the foster home on the June 6, 2023, Disallowance List with an effective date of June 11, 2020. In a letter dated June 12, 2020, DFPS provided notice to Houston Serenity Place CPA, that, effective immediately, the foster home was disallowed from all new placements of DFPS children. The letter stated DFPS was disallowing the home because of the foster parent's "long-standing history of providing inaccurate information to the Department and to the child placing agencies regarding her personal history," and because the foster parent allowed children to have access to an unapproved individual. DFPS found, "due to the pervasive pattern of decision making there is no indication,"

the foster parent would "follow any agency's rules regarding the care and supervision of children in DFPS Conservatorship, thus making it impossible to control risk factors."

The foster home page in CLASS indicates the home was closed on April 2, 2019, and the verification was relinquished due to "noncompliances." IMPACT reflects no children have been placed in this home since January 14, 2019. During the period this home was open, IMPACT shows there were 16 placements of a child in the home.

## The Burke Foundation Child Placing Agency

Pathways Youth verified this home on October 1, 2003. Next, Lutheran Social Services of the South (LSSS) verified the home on October 5, 2005. LSSS voluntarily closed the home on August 20, 2014. The Burke Foundation Child Placing Agency (Burke) then verified the home on January 5, 2015. The home remained open until July 3, 2023, when it was involuntarily closed without deficiencies.

The home began Heightened Monitoring on November 20, 2020, when verified under Burke, for pattern and trend areas related to background checks, caregiver responsibilities-supervision, child rights, discipline, home screenings, medication management, required trainings, serious incident reporting, and service plans.

During the time the home was licensed, the foster home was the subject of sixteen investigations, including four investigations by DFPS for abuse, neglect, or exploitation and twelve minimum standards investigations by HHSC.

## ANE Investigations Summaries

**On July 14, 2014**, DFPS initiated an investigation for Physical Abuse after DFPS staff reported that the foster parent and an eight-year-old foster child had an altercation, during which the child allegedly hit the foster parent, and the foster parent responded by hitting the child on the back with a closed hand. The reporter stated the child's back was bruised, and that the foster parents yelled at the child and their siblings.

When the eight-year-old child was interviewed, the child reported being pushed by the foster parent but could not remember when it occurred. A collateral child reported the eight-year-old child was pushed against the wall by the foster parent when the child was placed in timeout, and the child had a bruise on the back. Two other children reported the foster parent was mean but denied the foster parent pushed the eight-year-old. The foster parent denied pushing the child and reported the child was sent to timeout.

The allegation of Physical Abuse was Ruled Out. HHSC issued two citations for other prohibited discipline and child rights.

**On April 6, 2017**, DFPS initiated an investigation for Neglectful Supervision after an eight-year-old foster child reported to the foster parent that a nine-year-old foster child who was also placed in the home had touched her privates at night.

The eight-year-old child reported that during night time, the nine-year-old "tickled her middle part, and buttocks" over her clothes. The nine-year-old denied the allegations, and the collateral children denied being touched by anyone in the home. The allegation of Neglectful Supervision was Ruled Out and no citations were issued.

**On May 9, 2019**, DFPS initiated an investigation for Physical Abuse after three intakes were received alleging that the foster mother was hitting the children in the home. Three different children who were placed in the home reported the foster mother hit them on the top of the head, and one child reported observing the foster mother slam another child against the wall. The children also reported the foster mother either scratched or dug her nails into their arms.

A therapist and two caseworkers reported the children made outcries of being physically disciplined by the foster mother when they misbehaved, including spankings, and being hit on the head. One of the caseworkers reported a child had a scratch on his arm that had already scabbed over, but otherwise there were no observed injuries on any of the children. The investigation report indicated a therapist (but not the therapist who ultimately reported the allegations) was made aware of the outcries during the children's session and made the foster parent aware of the allegations. The investigation report stated the neither the therapist nor the foster mother reported the allegations to licensing. The allegations of Physical Abuse were Ruled Out. HHSC issued one minimum standard citation for corporal punishment.

**On January 27, 2021**, DFPS initiated an investigation for Physical Abuse after the teacher of an online class reported to SWI that she observed an 11-year-old foster child to have a "purple bruise on his eyelid and part of his eyebrow bone." The report stated that the child reported he hit himself with a pole.

The 11-year-old child denied that the foster parents hurt or hit him at any time but could not recall what happened to his eye at the time of the interview. The foster mother could not recall how the child got hurt but reported it was when he was outside feeding the dogs and denied hurting the child. The allegation of Physical Abuse was Ruled Out, and no citations were issued.

## Standards Investigations Summaries

Three of 12 Standards investigations resulted in the foster home receiving five citations, with all the citations occurring between 2007 and 2014. While the home was verified, a total of nine HHSC investigations included allegations of inappropriate discipline with two resulting in citations for corporal punishment, disciplinary measures, children's rights, and prohibited discipline. These allegations included that the foster parent hit children, took gifts away from the children, grabbed a child's arm, pulled a child's ear, pushed a child, and yelled at children.

- On November 5, 2007, HHSC initiated an investigation regarding an 11-year-old foster child who became upset and was throwing tables and hitting a glass window with his hands. The report stated the foster parent attempted to restrain the child outside, and the child continued to run around, hitting the door of the home until the

police were called. The intake report stated the child showed the police his arm that had nail marks from the foster mother's attempt to restrain him.

During the investigation, the 11-year-old child reported the foster mother grabbed his arm and when he "jerked it out," the foster mother's nail scratched him and that it was an accident. The foster mother reported that she grabbed the child's arm briefly and told him to go outside to calm down. During interviews, children in the home and the foster mother admitted that the children had to write 500-1500 sentences describing what they did wrong as a form of punishment, and it was reported the children were kept from opening Christmas and birthday presents as a form of punishment. HHSC issued three citations for child rights, corporal punishment, and disciplinary measures.

- On November 22, 2011, the CPA conducted an internal investigation regarding the foster mother violating child rights by using sports as a form of discipline. The report stated the foster mother took a foster child out of sports due to "gossip." The report stated the child reported he was taken out although he was passing his classes and was not skipping school.

  The investigation report indicated the children reported receiving appropriate discipline and none of the children had any concerns with discipline. The investigation report indicates "the home was cited for violations of minimum standards and placed on a developmental plan," however it does not list what standards were cited.

- On February 7, 2012, HHSC initiated an investigation into allegations of inappropriate discipline. A 10-year-old foster child reported that his previous foster mother pulled his ear when he misbehaved. The report stated the child also reported that the foster mother would feed a two-year-old foster child "very hot foods," that would cause blisters inside the child's mouth.

  The 10-year-old child and a collateral child, who was placed in the home at the same time, reported similar accounts of the victim child's ear being pulled by the foster mother. Both children also confirmed that the two-year-old was fed hot food, and the child would cry. Another child in the home reported the food was too spicy. HHSC issued one citation for other prohibited discipline.

- On January 28, 2014, HHSC initiated an investigation after a 12-year-old foster child reported seeing the foster mother physically discipline a three-year-old. The report stated the 12-year-old said the three-year-old was being placed in timeout when the foster mother pushed the child. The report stated the 12-year-old reported the foster parents raised their voices and yelled at the children.

  The children interviewed denied being mistreated in the home. The 12-year-old said she never saw the foster mother physically discipline the three-year-old but thought that the foster mother may have pinched the three-year-old but was not sure. HSSC

issued one minimum standard violation for recreational responsibility for the foster mother not providing outdoor activities or outings for the children.

- On March 15, 2022, HHSC initiated an investigation after two intakes were received regarding a 10-year-old child in care exhibiting aggressive behaviors. The report stated the child had been struggling in the foster home and was uncontrollable, throwing things, hitting, and biting. The report stated the child reported the foster mother would pinch her on the arm to make her behave and the child was observed with marks and redness on her arms. The report stated the child reported she wanted to "kill herself" because she did not want to be in the foster home.

  During the investigation the children in the home reported the 10-year-old would hit them and they did not get along with her. The investigator concluded "all steps were taken by the organization and foster parent provided proper medical attention to the youth in care." HHSC issued one minimum standard citation for medication management which was later overturned.

## Sampling Concerns

Two of the home's sampling inspections noted concerns. On August 31, 2006, the inspector noted concerns for not disposing of medications after a child was no longer in the home. On June 30, 2015, concerns were identified for adoptive home care/safety and wading/splashing pools.

## DFPS Disallowance List

DFPS placed this foster home on the agency's June 6, 2023, Disallowance List with an effective date of March 15, 2022. In a letter dated March 8, 2022, DFPS notified The Burke Foundation that this foster home was being disallowed from future placements of CPS children. The letter stated DFPS actions were taken based on information received from HHSC indicating the foster home had violations regarding corporal punishment, other prohibited discipline, and child rights. The letter stated the home had a "historical pattern of investigations concerning Physical Abuse and Neglectful Supervision which cause reasonable concern for the safety of any child in the home."

According to CLASS the home closed on July 3, 2023, involuntarily without deficiencies. IMPACT reflects that no children have been placed in this home since February 11, 2022. During the period this home was open, IMPACT shows there were 134 placements of a child in the home and two children adopted.

## Jae's Helpers

Youth in View verified this foster home on August 23, 2019. The home remained with Youth in View until June 17, 2021, when Jae's Helpers verified the home. On September 19, 2022, Jae's Helpers relinquished the home involuntarily due to deficiencies.

Jae's Helpers was placed on Heightened Monitoring, beginning June 21, 2021. When the home closed, the CPA had not yet moved off Heightened Monitoring. Concerning trend and pattern areas identified in the Heightened Monitoring Plan for the CPA included: child's rights, discipline and punishment, home oversight, home screenings, home verifications, living space and physical environment, and record keeping.

While the home was open, the home was the subject of three DFPS investigations for abuse, neglect, or exploitation, and no minimum standards investigations.

### ANE Investigations Summaries

**On February 6, 2021,** DFPS initiated an investigation for Medical Neglect after an anonymous reporter alleged that a seven-year-old foster child did not receive his medications while he and a four-year-old child were placed in a respite home. The report stated that it is not known if the four-year-old received her medications while placed in the respite home. During the investigation it was learned that the seven-year-old had been placed in a different respite home and the allegations of Medical Neglect related to the seven-year-old applied to a different respite provider.

The foster parent confirmed she had been a respite provider for the four-year-old child. She added that the four-year-old was placed with a backup respite provider throughout January 2021 due to her having surgery. She confirmed that she gave the backup respite provider all the child's medications. The four-year-old denied that she missed her medications while she was in respite care or while living with the foster parent.

The backup respite provider reported that she observed the four-year-old "was getting short" on one of her prescription medications and contacted the foster parent, who was the primary respite provider. She denied that the primary respite provider responded to her. She also confirmed that she did not receive a medication refill on time. The investigator reviewed medication logs for the four-year-old and confirmed that she missed one of her prescribed medications on January 13, 2021. Later, this backup respite provider also reported that she did not complete the required training or documentation prior to caring for the four-year-old.

The allegation of Medical Neglect was Ruled Out. Two minimum standards violations were issued for medication administration and respite care because the backup respite provider was without training.

**On August 13, 2021,** DFPS initiated an investigation for Physical Abuse of a 16-year-old child in care after she ran away from her respite home and made an outcry that the respite provider attempted to "pull her" from her bed and fight her. The report added that the 16-year-old said the respite provider told her to lie to a case manager regarding another child in the home, and that she did not allow the 16-year-old to "contact her CPS case worker."

The foster parent, who was the respite provider, denied all the allegations. Two collateral children who had been placed in the home denied that the respite provider

used physical aggression or physical discipline with them or other children. One collateral child confirmed that she witnessed the respite provider grab the 16-year-old child "by her arm above the elbow" and that she "tugged" on it and "did not yank it." The investigator did not speak with the 16-year-old victim. During an unrelated forensic interview, the 16-year-old victim refused to discuss the allegations.

The allegation of Physical Abuse was Ruled Out and no minimum standards violations were issued.

**On July 12, 2022**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after law enforcement reported that a 15-year-old child in care had a physical altercation with a foster sibling. The foster parent allegedly tried to intercede and reported being hit by the 15-year-old when trying to separate the girls. When law enforcement arrived, they witnessed the foster parent had the 15-year-old "pinned down" and was shaking the child by her hair. The 15-year-old was transported to the hospital for a headache.

The 15-year-old confirmed that during a physical altercation with her 13-year-old foster sibling, she accidentally hit the foster mother who tried to stop the fight. The 15-year-old also reported that the foster mother "pulled her hair, choked her" and that she passed out during the incident. The foster mother denied that she pulled the 15-year-old's hair or choked her and denied cursing at her.

The 13-year-old foster sibling also confirmed the physical altercation. She also reported that the foster mother pushed the 15-year-old "into the wall to have her 'calm down.'" A neighbor confirmed she witnessed the foster mother and the 15-year-old fighting "on the floor."

Body camera footage from law enforcement showed the foster mother pulling the 15-year-old's hair and "shaking her head back and forth." In the footage, the foster mother is also heard cursing at the 15-year-old. The investigator also reviewed a 911 call recording in which the 15-year-old can be "heard screaming and crying 'stop' multiple times" and saying that she cannot breathe. The investigator confirmed that the 15-year-old was taken to the hospital for evaluation after the physical altercation.

A two-year-old foster child was also present in the home during the physical altercation. In the body camera footage, the two-year-old can be seen sitting on the edge of the bed.

The allegations of Physical Abuse and Neglectful Supervision were found Reason to Believe. Originally six minimum standards violations were issued: three for emergency behavior intervention, two for prohibited discipline, and one for children's rights. After an administrative review, one of the violations of the minimum standards for emergency behavior intervention was overturned.

DFPS Disallowance List

This foster home was placed on the June 6, 2023, DFPS Disallowance List effective August 19, 2022. In a letter dated August 15, 2022, DFPS notified Jae's Helpers that this home was disallowed for any future placements of children in care due to the foster home's minimum standards violations. Additionally, the letter acknowledged that the foster parent received an RTB for Physical Abuse and Neglectful Supervision and "demonstrated a lack of judgment by engaging in a physical altercation with a Child which causes reasonable concern for the safety of any Child in the home."

IMPACT reflects that no children have been placed in the home since August 24, 2022. The CLASS Agency Home page indicates that the home was involuntarily closed due to deficiencies on September 19, 2022. During the period this home was open, IMPACT shows there were 17 placements of a child in the home.

## Circle of Living Hope

The Temple branch of Circle of Living Hope (CLH) verified this foster home on September 8, 2023. The CPA closed the home on November 3, 2023, listing the relinquishment reason as involuntarily closed without deficiencies.

While the foster home was open, the CPA was placed on Heightened Monitoring beginning October 26, 2020. Concerning trend and pattern areas identified in the Heightened Monitoring Plan included: caregiver responsibilities, discipline and punishment, health and safety, home oversight, foster home screenings and verifications, living space and physical environment, and medication management.

The foster home was verified for less than two months. During that time, the home received no ANE or minimum standards investigations.

## DFPS Disallowance List

After the CPA closed the home, DFPS placed this home on its November 30, 2023, Disallowance List with an approval date by the DFPS Legal Department of November 27, 2023. In a letter dated November 17, 2023, DFPS notified Circle of Living Hope that this home was disallowed for any future placements of children in care. The letter acknowledged that HHSC had "informed DFPS of this foster parent's history of investigations involving her biological children." DPFS stated that the foster parent "demonstrated a lack of prudent judgment as a parent" and expressed "serious concerns regarding her ability to provide a safe environment for children in care."

IMPACT reflects that no children have ever been placed in this home.

## Youth in View

Youth in View CPA verified this home on July 27, 2020. According to CLASS, the foster home relinquished verification and closed on April 26, 2022. At the time, Youth in View had been on Heightened Monitoring since November 18, 2020. The Heightened

Monitoring Plan listed pattern and trend areas for the CPA, including home screening and verification, medication documentation and storage, discipline and punishment, record keeping, service plans - discharges, background checks, supervision, and living space and physical environment – interior space, home oversight.

During the time the home was open, it was the subject of two DFPS investigations for abuse, neglect, or exploitation and two minimum standards investigations by HHSC.

ANE Investigations Summaries

**On February 23, 2022**, DFPS initiated an investigation for Neglectful Supervision after receiving a report that a 16-year-old foster child was dating a 22-year-old.

The 16-year-old child denied dating a 22-year-old. She reported that she was not allowed to date and was always with the foster mother. The foster mother also denied that the child had a boyfriend and that because the child was on an intensive level of care, someone was always supervising her, including during the nighttime.

DFPS Ruled Out the allegation of Neglectful Supervision, and no citations were issued.

**On April 5, 2022**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after DFPS staff reported receiving information that a sex offender was residing in the home. During home visits, the person hid in a shed next door. The caller reported making a home visit and found that the "sex offender was sitting on the couch, and the foster mother was not home." At that time, three foster children were placed in the home: a 16-year-old, a 14-year-old, and a two-month-old child.

A Heightened Monitoring inspector and CPI Special Investigator (SI) visited the foster home unannounced. Upon arrival, the Heightened Monitoring inspector viewed a man sitting on the couch inside the home. The inspector knocked on the door, but no one answered, and the investigator observed a man leave out of the back of the house and go to a little cabin. The foster parent's 18-year-old child approached the Heightened Monitoring monitor and said that the foster mother was not home, the two older foster children were asleep in the house, and the infant was with the foster mother. Thirty-to-45 minutes later, the foster mother arrived home. The foster mother claimed that the man viewed by the Heightened Monitoring monitor was her 21-year-old son.

The SI confirmed that a vehicle on site was registered to the man suspected to be the sex offender was the man they saw on the couch, and that the man was a registered sex offender due to a conviction for indecency with a 15-year-old child, and that he has a high-risk level.

After the children were removed from the home, the two older children admitted that the man lived there. However, each child denied any sexual contact with the man.

DFPS issued an RTB finding for Neglectful Supervision, naming the foster mother. The allegation of Sexual Abuse was Ruled Out. HHSC issued two citations, one for background checks and one for children's rights.

## Standards Investigations Summaries

Neither of the two standards investigations resulted in citations related to the allegations that were the subject of the investigations themselves. However, an investigation, initiated February 15, 2022, did result in an unrelated citation. The investigation disclosed that a frequent visitor (the foster parent's adult daughter) to the home did not have the required background check. Consequently, one citation was issued for failure to conduct a background check on a frequent visitor.

## DFPS Disallowance List

DFPS placed the home on the June 6, 2023, Disallowance List, effective May 3, 2022. In a letter dated April 13, 2022, DFPS notified Youth in View that this home was disallowed from further placements. The letter states that the disallowance was due to standards violations for children's safety and background checks. The letter also refers to the foster parent's RTB for Neglectful Supervision for allowing a registered sex offender to have access to children in care.

During the period this home was open, IMPACT shows there were six children placed in the home and one child adopted. IMPACT reflects that no children have been placed in the home since April 26, 2022.

## Kidz 2 Kidz Child Placing Agency

The Bair Foundation verified this home on November 20, 2008; on October 9, 2012, the home changed CPA and was verified by Manning Family Services. The home changed CPAs again on September 11, 2013, and was verified by Angel Wings Family Services, Inc. On January 8, 2016, the home was moved to Good Hearts Youth and Family Services but was relinquished by the CPA on September 17, 2016, for non-compliance. On June 1, 2020, the home was again verified by Kidz 2 Kidz, and on September 22, 2022, it involuntarily closed with deficiencies.

During the time the foster home was open, the home was the subject of 18 investigations: DFPS opened 11 investigations for abuse, neglect, or exploitation, and HHSC opened seven minimum standards investigations.

## ANE Investigations Summaries

**On January 30, 2009**, DFPS initiated an investigation for Physical Abuse after a teacher reported that a nine-year-old foster child stated the foster mother "pushed her down," causing her elbows and arms to bruise. The teacher also mentioned that the nine-year-old had fallen at school the previous day and "may be plotting" so she could return to her biological mother. During the investigation, the nine-year-old admitted to

"telling a lie" about the foster mother pushing her. The investigator Ruled Out Physical abuse, and no citations were issued.

**On June 2, 2009**, DFPS initiated an investigation for Physical Abuse after a DFPS staff reported she observed bruises "resembling that of a handprint" on a 10-year-old foster child's arm. The child stated that the foster mother had "grabbed her by the arm" and that she "always grabbed" her. The foster mother insisted the bruises were a result of an altercation the child had at school. The foster father confirmed that the child was involved in an altercation, and the bruises were from another child at school, not the foster mother. The respite caregiver reported that the 10-year-old admitted that she lied about abuse because she wanted to be placed with her siblings. The investigator Ruled Out Physical Abuse, and no citations were issued.

**On January 1, 2010**, DFPS initiated an investigation for Physical Abuse of a 17-year-old foster child by her foster father, alleging the child was "pushed" and "threatened" by the foster father.

During the investigation, the 17-year-old reported that the foster father pushed her down in the van to prevent her from getting out, causing her to "bruise and scratch her arm." She then tried to exit the van on the other side; the foster father allegedly started moving the van and told her he "would beat her ass." The child stated she felt unsafe in the foster home due to the foster father talking "dirty" to her, there being "locks on the refrigerator and pantry," and restricted phone contact with her biological father.

Both foster parents said they stopped at a store, and the child tried to exit the van in what they believed was an attempt to talk to the men outside of the store. The foster father "restrained" the child and transported her back to the home. They admitted to using locks on the refrigerator and pantry to prevent the children from eating "all hours of the night" but denied depriving them of food and denied using profanity. Three collateral children reported no concerns of physical abuse by the foster father. The officer who responded to the call observed no concerns with the home.

The investigator Ruled Out Physical Abuse, and no citations were issued.

**On November 4, 2011**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision of a 12-year-old foster child by her foster father, after a report to SWI alleged the foster father repeatedly kissed the child and put his hand down her clothing.

The 12-year-old child recanted her story, stating that a female child in the home had rubbed her leg but later she also recanted that allegation. She reported that she wrote a letter describing the inappropriate events "in case someone tried to touch her." The child admitted to being sexually abused prior to coming into care. The foster parents denied the allegations of touching anyone in the home or being aware of anyone being inappropriate in the foster home.

Two collateral children denied inappropriate touching taking place in the home by anyone. Two other collateral children stated that a child previously placed in the home touched other children and they reported telling the foster mother about the incidents.

The investigator Ruled Out Neglectful Supervision due to the 12-year-old's "inconsistencies regarding the allegations." DFPS disposed of the allegations of Sexual Abuse with a UTD after several children reported being touched by another child in the home. HHSC issued no citations.

**On May 28, 2014**, DFPS initiated an investigation for Physical Abuse of a 15-year-old foster child after she sustained injuries from an unknown child. The child reported that the bruises came from falling at the park on a school field trip.

School personnel denied the child fell; however, they confirmed that the child "hit her head on the monkey bars." The foster mother and collateral witnesses reported that the child said the bruises came from falling at the park.

The investigator Ruled Out Physical Abuse, and no citations were issued.

**On September 17, 2014**, DFPS initiated an investigation for Sexual Abuse after the CPA staff reported that a former foster child reported that while placed in the foster home, she had sex with the foster father "on several occasions." On September 22, a second intake was received when the former foster child reported that the foster father was "molesting girls in the home."

The foster father denied that an inappropriate relationship existed between him and the child. Both foster parents reported that the foster father worked a lot and did not supervise the children by himself. Five foster children who had been placed in the home denied sexual abuse by the foster father or anyone else in the home. The investigator Ruled Out the allegation of Sexual Abuse, and HHSC issued no citations.

**On November 20, 2014**, DFPS initiated an investigation for Physical Abuse after a DFPS staff reported that a 12-year-old foster child stated the foster mother sprayed an unknown substance in her eyes that caused them to burn for being "defiant."

Two children in the home confirmed the foster mother sprayed the 12-year-old in the eyes, and another child reported helping the 12-year-old rinse her eyes but denied seeing what happened.

The foster mother explained that she locked the child out of the home, and when the child attempted to open the door of the laundry room, the child might "accidentally" have gotten some soap in her eyes from the foster mother's hands.

The investigator Ruled Out the allegation of Physical Abuse. HHSC issued two citations: one for disciplinary measures and one for employee caregiver responsibilities for the foster mother asking the child "if she wanted to fight" and locking the child out of the home, "creating a hostile situation."

**On July 22, 2020**, DFPS initiated an investigation for Sexual Abuse and Neglectful Supervision after a DFPS staff reported that a 16-year-old foster child made an outcry that, three to four days earlier, the foster father expressed that he wanted to have sex with her and asked for a "sexual favor." On July 24, 2020, the child's biological father made a second call to SWI with similar allegations. On July 27, 2020, SWI received a third intake alleging the 16-year-old took her infant child and left the foster home without permission.

The foster father denied the allegations of sexual abuse, stating he is a "frequent visitor" at the home and is not left alone with the children. He reported recently being sick and said he was quarantined. The foster father confirmed that the 16-year-old had admitted to him and his wife that she had been a victim of sex trafficking.[446] The foster mother corroborated the foster father's denial, and said that the week this incident allegedly occurred, she and her husband were sick, and he was never alone with the foster child.

Collateral children were interviewed and denied the allegations of sexual abuse by the foster father. The 16-year-old's caseworker and therapist reported concerns due to the child having a history of running away and sex trafficking.

The investigator Ruled Out Sexual Abuse and Neglectful Supervision. HHSC issued no citations.

**On February 11, 2021**, DFPS initiated an investigation for Neglectful Supervision after a 17-year-old foster child made an outcry that the foster parent's daughter was "a felon" and used drugs.

The foster mother explained that her stepdaughter comes to the home once a week to pick up her grandson; however, she is not allowed around the foster children and has never appeared to be under the influence. The foster mother stated that the foster father comes to the home only to make repairs and does not stay for prolonged periods of time. During the investigation, three collateral children corroborated the foster mother's statements. The investigator Ruled Out Neglectful Supervision. HHSC issued no citations.

**On August 16, 2021**, DFPS initiated an investigation for Neglectful Supervision after a 14-year-old foster child's guardian ad-litem reported he was found "fondling" his former foster parents' ten-year-old grandson. The child's phone allegedly had "explicit, sexual messages" from the ten-year-old.

During the investigation, the 14-year-old denied "inappropriately touching" another child and receiving "sexual messages" on his phone. The foster parents denied being aware of any inappropriate behavior between the children. A 13-year-old child residing in the foster home denied any knowledge of inappropriate interactions between the 14-

---

[446] The notes indicate that the foster father said the child told him that "she use to be a prostitute and into drugs."

year-old and the foster parents' grandson. The foster parent's 10-year-old grandson refused to be interviewed. The investigator Ruled Out Neglectful Supervision. HHSC issued no citations.

**On August 22, 2022**, DFPS initiated an investigation for Neglectful Supervision of a 17-year-old foster child by the foster father, who allegedly locked the child out of the home for hours while it was raining.

During the investigation, the 17-year-old explained that he and the foster father were arguing, and the foster father called the child a "pussy." The foster father called the police to the home and while he was talking to the officer, the foster parents left for church, leaving the 17-year-old locked out of the house. Hours later, the foster parents returned to the home with food for the child; however, the child was upset, and this led to more arguing and the foster father throwing the child's phone "across the counter." The child also said that the foster parents had "threatened to [put] their hands of him."

The foster parents denied in their interviews calling the child profane names. They reported that a spare house key was accessible to the child and that the child could have gone to a friend's house until they returned. The officer dispatched to the home stated that the child told him he "was good" and could go to the house of a friend, when asked about access to the home. The investigator Ruled Out Neglectful Supervision. HHSC issued no citations.

## Standards Investigations Summaries

The foster home was also the subject of seven minimum standards investigations. Three investigations resulted in HHSC issuing seven minimum standards citations in the areas of: supervision; employee and caregiver responsibilities (2); renewal background checks; other prohibited discipline – using profanity; and children's rights (2). Three of the citations were for using profanity, belittling children, and threatening to deny a child a meal.

## DFPS Disallowance List

The home was placed on the August 1, 2023, DFPS Disallowance List with an approval date by the DFPS Legal Department of July 28, 2023. In a letter dated November 16, 2022, DFPS provided notice to Kidz 2 Kidz CPA that this home was disallowed from any future placements of children in care. DFPS based its decision on the home's UTD finding for Sexual Abuse, involuntarily closures by two prior CPAs, and on a pattern of minimum standards violations related to Physical Discipline, Children's Rights, Supervision, and Disciplinary Measures.

According to CLASS, the home involuntarily relinquished its verification on September 22, 2022, due to deficiencies. According to IMPACT no children have been placed in the home since September 13, 2022. During the period this home was open, IMPACT shows there were 50 placements of a child in the home.

## Youth in View

Youth in View verified this home on May 16, 2016. The home voluntarily closed on February 5, 2022, with deficiencies.

While the foster home was verified by Youth in View, the CPA was placed on Heightened Monitoring, beginning November 18, 2020. The Heightened Monitoring Plan listed concerning pattern and trend areas including home screening and verification, medication documentation and storage, discipline and punishment, record keeping, service plans - discharges, background checks, supervision and living space and physical environment – interior space, home oversight.

During the time it was open, the foster home was the subject of a total of eight investigations, including four DFPS investigations for abuse, neglect, or exploitation, and four minimum standards investigations by HHSC.

## ANE Investigations Summaries

**On June 8, 2020**, DFPS initiated an investigation for Neglectful Supervision after a report alleging that an 18-year-old foster youth and the foster parent's 17-year-old adopted son frequently smoked "weed" in the garage and inside the house and that the foster mother was aware.

The investigator interviewed four children: the 17-year-old adopted child and three foster children. The 18-year-old denied smoking marijuana; however, he admitted that he previously smoked "blacks." One child confirmed that children in the home were using marijuana, and two children denied that anyone smoked or used drugs.

The foster mother denied the allegations.

The investigator Ruled Out Neglectful Supervision and no citations were issued.

**On June 15, 2020**, DFPS initiated an investigation for Physical Abuse and Emotional Abuse after a 16-year-old foster child was taken to a hospital for attempting to hang himself and reported to medical staff that he felt unsafe in the foster home and that the foster mother "scratched" him on the stomach. The CPA Case manager made a second report stating that the 16-year-old child became "violent" and suicidal, which resulted in self-inflicted injuries, and the foster mother transported the child to the hospital.

The 16-year-old explained that he recently started feeling unsafe at the foster home. The child stated that he was tearing up items inside and outside the home, and then he sat on his bed. The foster mother came in and "grabbed" his arms and legs and "pulled him off the bed," causing him to bump his head on the bed.

The investigator interviewed three collateral children, and all three children denied seeing the foster mother "physically touching or fighting" with the 16-year-old. The foster mother denied the allegations.

The investigator Ruled Out the allegations of Physical Abuse and Emotional Abuse and no citations were issued.

**On June 21, 2021**, DFPS initiated an investigation for Physical Abuse after a report was made to SWI alleging that the foster mother pushed and hit a 16-year-old foster child with a broom and threatened to kill the child.

When he was interviewed, the 16-year-old said that this was "the best foster home" he had been in, and he did not want to be moved. The child described a recent incident involving the foster mother "yelling" and "cussing" at him. The child then yelled back at the foster mother, who then "started getting physical" when she "hit him with a broom," "pushed him on the couch," threatened to kill him, and called his mother a "bitch." The child stated the incident was not abuse because he did not have injuries.

Two foster children living in the home confirmed the foster mother pushed, hit, and cursed at the 16-year-old. The foster mother explained that she pushed the 16-year-old when he became aggressive in order to protect herself. She denied that she yelled, cursed, or hit the child.

The investigator Ruled Out the allegation of Physical Abuse and HHSC issued two citations, one for Prohibited Discipline and one for Corporal Punishment.

**On October 29, 2021**, DFPS initiated an investigation for Physical Abuse and Neglectful Supervision after medical staff reported witnessing the foster mother "swing" at the 15-year-old and get on top of the child before the foster mother was "pulled off" of the child. The report also alleged that, according to the foster mother, the night before, the 15-year-old had "pulled a knife" on the foster mother and "spit" on the foster mother.

During an interview, the 15-year-old child reported having a "depression attack" at the home, which led to him putting a knife to his throat. He denied threatening the foster mother; however, he did state that the foster mother "pushed the knife down," resulting in a cut on his arm. The 15-year-old then began cutting his arm with the knife, and law enforcement was called. The child reported retrieving the knife from a child's bedroom in the home. Regarding the hospital incident, the child confirmed he spat on the foster mother when she refused to add a family member to the call list. The foster mother then attacked him, shook the chair he was sitting in and tried to pull him out of the chair.

The foster mother reported trying to de-escalate the child at the foster home when he began making suicidal threats and grabbed a knife out of his bag, pointing it toward her and then himself. She explained that the child began "poking" and "cutting" his arm, and then law enforcement arrived. While at the hospital, the foster mother explained how the child was trying to "intimidate her" and "spat" in her face. She "instinctively

jumped up" and placed her hand over the child's mouth to prevent him from spitting again. The foster mother denied physically hurting the child or having to be "pulled off" by medical staff. The foster mother did state she refused to transport the child to the emergency room at the request of the medical staff when the child became "destructive."

The investigator interviewed the other foster child placed in the home. He denied that the foster mother used physical discipline and confirmed that he is not left alone and that the knives are kept locked up.

Two medical staff reported observing the foster mother yell at the child and attack him, hitting the child with an open hand on the face and chest and reported moving the foster mother off the child. The foster mother was "guided" away from the child and eventually left the building. Medical staff attempted to contact the foster mother when the child "started to escalate," but she did not answer, resulting in law enforcement being notified.

The CPA Case Manager and 15-year-old's caseworker reported no concerns of physical discipline or supervision problems in the home.

The investigator Ruled Out Physical Abuse after the hospital video footage did not show the foster mother physically hitting the child; however, it did show the foster mother behaving in an "antagonistic manner towards" the child. The investigator disposed of the allegations of Neglectful Supervision with an RTB after the investigator observed video footage from the home showed the child holding a knife for a few minutes before the foster mother took it away and called law enforcement. Finding that the foster mother did not act as a "reasonable caregiver" when she failed to "consistently verbally redirect" the child and move the knife away from the child, putting him at "substantial risk" of self-harm. HHSC issued five citations related to minimum standards violations associated with admission, corporal punishment, children's rights, and two for supervision.

## Standards Investigations Summaries

During the time the foster home was open it was the subject of four minimum standards investigations, none of which resulted in citations being issued by HHSC. The allegations in these investigations included children not being supervised, mistreating, and withholding food from children, not providing a child with medical attention, and not allowing a child to call their caseworker.

## DFPS Disallowance List

The home was placed on the June 6, 2023, DFPS Disallowance List with an effective date of March 1, 2022. In a letter dated February 17, 2022, DFPS provided notice to Youth in View that this home was disallowed from any future placements of children in care. DFPS based its decision on the home's RTB finding for Neglectful Supervision, which "creates a significant and reasonable concern for any child," and on a pattern of minimum standards violations related to Corporal Punishment and Supervision.

According to CLASS, the home voluntarily relinquished its verification on February 5, 2022, with deficiencies. IMPACT reflects no children have been placed in the home since February 4, 2022. During the period this home was open, IMPACT shows there were 51 placements of a child in the home and one child adopted.

## Azleway INC

Azleway INC verified this foster home on May 4, 2021, and relinquished the verification on February 24, 2022. The relinquishment reason was listed as "involuntarily closed due to deficiencies."

When the home was verified, Azleway INC had been on Heightened Monitoring since October 12, 2020. According to the Heightened Monitoring Plan, the CPA's concerning pattern and trend areas included: supervision, child's right, discipline and punishment, fire safety, home oversight, living space and physical environment, and interior space. The CPA was still on Heightened Monitoring when the home was closed.

During the approximately nine months the foster home was verified, the home was the subject of one ANE investigation and no minimum standards investigations.

## ANE Investigations Summary

DFPS initiated an investigation on January 27, 2022, for Physical Abuse of a two-year-old foster child and a six-month-old foster child after hospital staff reported diagnosed the six-month-old with a skull fracture and admitted him to the pediatric ICU. The report alleged that a two-year-old child threw a cell phone at the back of the six-month-old child's head. The report also alleged that hospital staff were concerned that the injury was the result of non-accidental trauma.

The investigator observed the six-month-old child at the hospital and saw no visible injuries on the child's body or near the site of his injury. The investigator also observed the two-year-old sibling, who was found to have a "A medium sized round semi-circle mark" on his back."

Findings from the Forensic Assessment Center Network (FACN) along with a skeleton scan indicated that the mark on the two-year-old's back "not consistent with abuse."

The foster father denied that he was home at the time of the incident. He stated that his wife contacted him by phone to tell him that she was calling emergency services. He also stated that his wife told him the six-month-old "had become unconscious after his brother threw the phone at him." Law enforcement later confirmed that the foster father was not at home at the time of the incident by using cell phone data.

Both foster parents denied that corporal punishment was used in the home. The foster mother reported that while holding the six-month-old child "she heard something hit" him and "saw the phone fall on the floor after." She reported the six-month-old child had a seizure and then became limp and unresponsive and that she contacted

emergency services. In a later interview, the foster mother indicated that she may have "jumped and accidentally [sic] hit the baby's head on the corner of the dresser drawer" after changing his diaper. The foster mother denied that she dropped the six-month-old or that he fell from his changing table.

Medical personnel reported the six-month-old's injuries included a fractured skill, subdural hemorrhages, and retinal hemorrhages and denied that the child's injuries were consistent with the foster mother's explanation. The FACN consultation final report noted that the child's injuries "would have required an acceleration-deceleration mechanism with an impact, which can be seen in abusive head trauma."

The allegation of Physical Abuse of the six-month-old by the foster mother was found RTB. Police conducted a separate criminal investigation and later arrested the foster mother for a felony charge of Injury to a Child. All other allegations of Physical Abuse were Ruled Out. HHSC issued six citations including initial background checks, leadership responsibilities, caregiver responsibilities, physical environment, and children's rights to be free from abuse and neglect.

## DFPS Disallowance List

DFPS placed the home on the June 6, 2023, Disallowance List with a May 3, 2022, effective date. In a letter dated April 4, 2022, DFPS provided notice to Azleway INC that this home was disallowed for any future placements of children in care due to the foster home's minimum standards violations regarding corporal punishment. The letter stated that in addition to the minimum standards concerns, the home received an RTB for Physical Abuse. The letter acknowledged, that "the home has a pattern of allegations for Neglect (NEGL) in Adult Foster Care (AFC) and have received an Unable to Determine (UTD) disposition in an APS investigation" and that, "This history causes reasonable concern for any Child or Foster Adult in the home."

IMPACT records reflect that no children were placed in the home at the time of the letter dated April 4, 2022. No children have been placed in the home since February 2, 2022. During the period this home was open, IMPACT shows there were nine children placed in the home.

The Agency Home page in CLASS reflects that the home was closed involuntarily due to deficiencies on February 24, 2022.

## Remedial Order 21 Summary

The State has made progress in identifying and closing agency foster homes that present a safety risk. Closure (or eliminating the home as a placement option) is accomplished either through the process developed by HHSC to comply with RO 21, or through the DFPS disallowance process. Prior to the Court's enforcement of RO 21, the State's

position was that it did not have the authority to force the closure of an unsafe agency home.[447]

HHSC implemented a new policy and process for identifying agency homes for closure that went into effect on May 1, 2020; at the time of the Monitors' Second Report, HHSC had recommended only five homes for closure.[448] Of these five, one closure recommendation was denied.[449] Two of the homes were approved for closure only after a DFPS investigation resulted in an RTB finding related to a child fatality.[450] The Monitors' Fourth Report documented that HHSC had considered 12 new recommendations for agency foster home closures.[451] Of these, one was denied.[452] The Sixth Report documented HHSC's consideration of 13 additional home closure recommendations, one of which was denied.[453]

In the Fourth Report, the Monitors first documented the State's practice of disallowing homes for placement. The Fourth Report documented that DFPS had placed 34 foster homes on its list of disallowed placements in 2021, and noted that as of March 15, 2022, the disallowance list included a total of 56 homes.[454] Nine of the homes on the DFPS disallowance list were also recommended for closure by HHSC.[455] The Sixth Report documented that DFPS added 13 homes to the disallowance list in 2022; as of January 23, 2023, the disallowance list included 64 homes.[456]

In 2023, as documented above, the Health and Human Services Commission (HHSC) considered 27 recommendations for closure of foster homes; six were not approved by HHSC leadership. One home that HHSC leadership approved for closure in 2023 has not yet been relinquished by the CPA, and still had children placed in the home as of August 31, 2024. In addition to the HHSC closure recommendations, DFPS placed 75 foster homes on a list of disallowed placements in 2023.

In all, since the Monitors first reported on HHSC agency homes' closures and the DFPS disallowance list, through December 31, 2023, HHSC staff have made 58 closure recommendations and 37 of those recommendations were approved. DFPS has placed 139 homes on the disallowance list; 42 of the homes on the disallowance list were also recommended for closure by HHSC.

---

[447] First Report, ECF 869, at 319 – 320.
[448] Second Report, ECF 1079, at 329 – 332.
[449] *Id.* at 333.
[450] *Id.* at 334 – 335.
[451] Fourth Report, at 151.
[452] *Id.*
[453] The CPA refused to close one of these homes; as of August 4, 2024, this home is still open, but there are no foster children placed in the home. Another home was closed, then reverified by a different CPA, and closed when HHSC again approved a second closure recommendation.
[454] Fourth Report, at 151.
[455] *Id.*
[456] Sixth Report, at 233. One of these homes closed but was subsequently verified by a different CPA. Two children were court-ordered to remain in the home. Those children have since aged out. The home is still listed as active, but has not had any new placements since being placed on the disallowance list.

Despite this progress, gaps exist in the State's processes for identifying and closing agency homes with a record of safety problems. If an agency home has not yet been the subject of an investigation for abuse, neglect, or exploitation that resulted in an RTB finding,[457] the processes utilized by HHSC and DFPS for recommending either the closure of an agency home (HHSC) or disallowance of placement in an agency home (DFPS) appear to rely on the agencies' staff to identify and recommend homes for closure or a disallowance.[458] Based on the Monitors' review, there does not appear to be a systematic process in place (using data related to child abuse, neglect and exploitation intakes and minimum standards citations, for example) for the State to flag or identify agency homes that have a history of safety problems, and consider them for closure or disallowance.[459]

---

[457] Though, historically, an RTB has not automatically resulted in a foster home closure, it appears to almost always result in a DFPS placement disallowance or the CPA's closure of the home. The Monitors reviewed CLASS information related to all the agency homes that were the subject of an investigation for abuse, neglect, or exploitation that resulted in an RTB in 2022 to determine whether any of those homes were still open. None were still open as of August 4, 2024.

Of the 45 homes with an RTB finding in 2022, 27 were disallowed for placement by DFPS. Of the homes that had not been disallowed, at the time of the monitoring team's review in September 2024, the RTB had been overturned on administrative review in six and reviews were pending in two. Of the 27 disallowed homes, CLASS showed 12 voluntarily closed, 12 were involuntarily closed by the CPA, two closed because the CPA closed, and one was still listed as active. Of the homes that had not been disallowed, CLASS showed nine were involuntarily closed by the CPA, seven voluntarily closed, and two closed due to a criminal history match.

[458] *See* Second Report, at 331-332 (describing HHSC policies related to recommending agency foster homes for closure); Fourth Report, at 185-186 (describing DFPS policies related to recommendations to disallow a home for placement).

[459] In its comments to a draft of this report, the State noted that HHSC "reviews agency homes with a validated Reason to Believe (RTB) DFPS abuse or neglect finding where there has not been a Determination of Immediate Threat (DIT) finding by CCR's Centralized Background Check Unit (CBCU)." As discussed in note 457, *supra*, the Monitors review of agency homes with an RTB finding showed that agency homes with an RTB finding are almost always disallowed by DFPS or closed by the CPA. It did not show that HHSC routinely recommends and approves closure of a foster home with an RTB finding using the process created to comply with RO 21.

The State also said, "[HHSC] reviews [agency homes] determined to have an elevated risk level based on a combination of factors including the number of investigations, investigative findings, deficiencies, and patterns of technical assistance." However, the comment did not cite a specific policy requiring or describing this process.

The State next noted:

CCR reviews [agency homes] that have two or more deficiencies or patterns of allegations in the following areas as outlined in CCR Handbook 4451.1:

o   inappropriate discipline;
o   inadequate supervision;
o   unsafe living conditions;
o   safe sleep violations;
o   children's rights;
o   interference with investigations;
o   failure to report to the Child Placement Agency a household member or frequent visitor for background checks; and

The lack of a more systematic process for reviewing agency homes with a history of safety problems may result in failures to identify homes with problematic safety records. The Monitors' case record reviews have identified foster homes with safety concerns very similar to those found in homes approved for closure by HHSC, or placed on DFPS's disallowance list. A few examples include:[460]

**Home A[461]**

This foster home was first verified in 2002, by the Bair Foundation of Texas. The home closed voluntarily in 2008 and was subsequently verified by Therapeutic Family Life in 2009. Therapeutic Family Life involuntarily closed the home due to "noncompliances" on February 2, 2016. On February 3, 2016, the home was verified by Circle of Living Hope CPA.

Since being verified in 2002, the home has been the subject of 25 investigations involving 31 different children; of these, 13 were for allegations of abuse, neglect, or exploitation. These 25 investigations resulted in seven citations being issued for minimum standards violations. The ANE investigations included eight investigations for Physical Abuse, based on either an outcry by a child or unexplained bruising or injuries. All eight involved different alleged victims. During one investigation of Neglectful

---

o    [agency homes] on the DFPS Disallowance List.

Section 4451.1 of the Handbook is a subsection of 4450, which describes the process for foster family home closure recommendations.  This is the process created by HHSC to comply with RO 21.  Deborah Fowler & Kevin Ryan, Second Report, at 331-332; HHSC, Child Care Regulation Handbook § 4450 *et seq.* Section 4450 states that HHSC staff "recommends the closure of a foster family home" when there is a "high degree of risk to children," and "the risk cannot be mitigated." HHSC, Child Care Regulation Handbook § 4450.  The sections that follow (including § 4451.1) describe how a specific foster family home is assessed to determine whether a closure recommendation should be made.  Section 4451.1 of the Handbook does not describe a systematic review of data related to all agency homes in an effort to identify homes that should be considered for closure, it describes a review of data for a specific foster family home that is already being considered for a closure recommendation.  Section 4451.1 lists the data elements included in the State's comments as elements that are considered, "When evaluating the compliance history of **the** foster family home." *Id.* (emphasis added).  Though the State's comments referred to these sections to support its comment that, "HHSC's Child. Care Regulation (CCR) division has processes in place for reviewing homes for an agency home closure recommendation outside of field escalation," the Handbook sections that are cited do not clearly support that assertion, nor do the closure recommendations for the 58 agency homes (out of a universe of more than 5,500 agency homes active as of December 31, 2023) reviewed by the monitoring team.

[460] The Monitors do not receive data from DFPS and HHSC that would allow the monitoring team to conduct a systemic review of agency foster homes that have the highest rates of intakes and violations. The homes identified in the examples were identified through case reads and represent a sample of homes identified by the monitoring team as homes that have concerning histories.

[461] This Circle of Living Hope foster home is also the subject of one of the HHSC investigations reviewed on pages 33-37 of Appendix A. This is not the only home discussed in Appendix A that has a troubling history of outcries or allegations, however.  For example, the Kidz 2 Kidz CPA foster home discussed on pages 95-102 of Appendix A, has a history of intakes alleging unexplained bruising and injuries to children placed in the home.  Six children made outcries of Physical Abuse after being placed in the home, and two made outcries of Sexual Abuse.

Supervision, another child made an outcry of Physical Abuse when she was interviewed. Children have alleged the foster mother and/or her adult daughter pushed, hit, grabbed, or punched them, pulled their hair, or pinched them.

Some outcries of abuse have been investigated for violations of minimum standards, rather than Physical Abuse. One minimum standards investigation was opened after a child made an outcry that the foster mother hit her. Another standards investigation was opened after a reporter alleged that the foster mother spanked a child with a belt and punched her, and another was initiated due to allegations that the foster mother pulled a child by the neck of her blouse and threw her to the ground. At least two standards investigations were opened due to allegations that children had unexplained bruises. Multiple children have also made outcries of verbal and emotional abuse.

Investigations of the home have resulted in seven citations for violations of minimum standards, including:

- § 749.1003(b)(12) related to children's rights, because "Two out of three children in care did not have adequate clothing suitable for wearing to school. School uniforms were noted to have several stains and tattered."
- § 749.1957(8) related to prohibited discipline, noting "Yelling at children in care does not promote or encourage healthy self-esteem, self-control, or self-direction in a child. Adults must model acceptable behaviors in order to help promote acceptable behaviors in a child."
- § 749.1003(b)(5) related to children's rights to be free from harsh or demeaning punishment, because the "foster parent called the girls 'dirty girls' because of their urinary incontinence and encopresis."
- § 749.1003(b)(5)(F) related to children's rights to be free from remarks that belittle or ridicule the child, because "Foster parent admitted to making belittling comments to her foster children; she has a history of concerns about her verbally assaulting children and is very forceful in her communication with them."
- § 749.1003(b)(3) related to children's rights to have their emotional needs met, because "The foster parent was not sensitive to the child's needs and said inappropriate things to them, treating them differently than her other children, blaming and yelling at them and getting into a power struggle with them."

**Home B**

Home B was first licensed by Houston Achievement Placement in 2004 and has since changed CPAs five times. Today, the foster home is licensed by Hands of Healing CPA, which has been on Heightened Monitoring since November 2, 2020. This home has had 54 intakes since being licensed; the first intake for the home was reported to SWI in 2006. Of those intakes, 24 were opened for investigations of abuse, neglect, or exploitation. Investigations of the home have resulted in seven citations being issued for minimum standards violations.

Since the home was licensed, 14 of the 24 ANE investigations have included allegations of Physical Abuse by a foster parent.[462]  Of these, eight involved an outcry by a child that the foster mother punched or slapped them or hit them with her hand or an object (including a belt, ruler, or shoe). In 2024, one citation was issued for corporal punishment, because the "victim child and another collateral child stated that foster parent hits and throws water bottle, toys and pill bottle at a child in care."[463]  Other citations for minimum standards violations include:

- § 749.2593(a)(2) related to supervision, because "Three foster children were observed at the foster home without adult supervision. The children did not have access to a telephone in the case of an emergency as it was locked in the bedroom of the foster parents." (Weight: High)
- § 749.607(1) related to caregiver general responsibilities, because "Foster parent did not use prudent judgment in following guidelines of the agency when she placed a child with a history of sexually acting out in another room with his peers. The agency decided that this child should be placed by himself due to his behavior to ensure the safety of the other children in care." (Weight: High)
- § 749.1541(a) related to medication records, because "Medication logs were not present in the home for licensing to review." (Weight: Medium High)
- § 745.641 related to background checks, because "The foster parent's back-up/household member/caregiver is in the home and is marked as inactive by the operation."
- § 749.607(1) related to caregiver responsibilities, because "Foster parent was contacted regarding returning victim child back to the foster home, but foster parent stated that she did not want child to return to foster home and CVS caseworker was contacted. Foster parent denied placement instead of putting 30[-day] discharge notice through her agency. Foster parent did not follow the discharge process."

The home has also had concerns issued during sampling inspections include two related to violations of minimum standards for background checks, because the foster parents failed to request background checks for biological children (2006), and their god daughter (2009).

On July 8, 2024, a Heightened Monitoring staff person reported to SWI that an Adult Protective Services case related to an adult group home that the foster mother runs resulted in a UTD finding.[464]   The intake alleged that the foster mother failed to report this finding to the CPA. This investigation is still pending as of August 4, 2024.

---

[462] Two reported outcries involved the foster father, who no longer appears to be living in the home.
[463] The same investigation resulted in a citation for violation of a minimum standard associated with caregiver responsibilities because the foster parent refused to allow the victim child to return to the placement and denied placement instead of submitting a discharge notice, which is the required protocol.
[464] This is the second intake raising similar concerns.  In January 2019, a reporter alleged that the placement was "a foster home and boarding home" and said there were 17 people living in the home. During that investigation, the foster mother acknowledged that she also ran a group home for adults who have disabilities.

**Home C**

This home was first licensed by Texas Mentor in January of 2013; it changed CPAs at the end of 2013 and was verified by FaithWorks, Inc. In 2021, it changed CPAs, and it is now licensed by Vessels with Purpose CPA. Since the first report to SWI associated with the home in 2014, it has been the subject of twelve intakes. DFPS investigated five of those intakes for abuse, neglect, or exploitation. The intakes include allegations of unexplained bruising or injuries, and outcries by five different children that they were choked, spanked, hurt, or "whooped." Allegations included:

- 2014: That the foster mother held down a one-year-old infant in his crib, told him to "shut up," and another child heard the foster parent spank the baby.
- 2016: An outcry by a four-year-old that the foster mother spanked him.
- 2018: A three-year-old child had "marks around his neck," and the foster mother's explanations were contradictory. An administratively closed intake described the injuries as a "large abrasion" on the child's forehead and "scratches" on his neck.
- 2019: A seven-year-old child made an outcry that the foster mother "choked" him.
- 2023: When a four-year-old was asked about bruises, he reported that "Mimi "hurt" him; the child's sibling said, "Mimi hit her" and pointed to her face.[465]
- 2023: An outcry that a caregiver in the home[466] "whooped" a nine-year-old and eight-year-old.

None of these allegations involved the same children.

Investigations of the home have resulted in six citations for violation of minimum standards, including:

- § 749.2401(b) related to the requirement that a spouse is verified, even if they do not live in the home, because "There are certain rights that come along with marriage, including access to the household, and financial rights that could affect the ability of a household to provide appropriate care."
- § 749.2557(a) related to foster home capacity, because "The foster home had children in the home for frequent babysitting on a daily basis that put it over the capacity limit of 6." (Weight: Medium High)
- § 749.607(1) related to caregiver responsibilities, because "During the time of inspection, it was determined that the babysitter chased after one of the children with the car and the child was almost hit by the car." (Weight: High)

---

[465] The investigator appears to have assumed that the children were referring to the foster mother. However, in a subsequent investigation, the children who were interviewed said that they referred to their babysitter as Mimi.

[466] The children named the same babysitter who was later found to have left the children in the car while she went inside the store, and chased a child who ran away with her car.

- § 749.1401(a)(2) related to general medical requirements, because "During the time of inspection 2 children did not receive medical care that were injured." (Weight: High)
- § 749.2593(a)(2) related to supervision, because "During time of inspection, it was found that the babysitter left the children alone in the car while she went inside the store." (Weight: High)

The home has also been the subject of five sampling inspections that resulted in two concerns, including:

- § 749.2447(22)(A) related to foster home screening, because "The home screening does not access the foster parent's ability to work with specific kinds of behaviors, backgrounds, special needs and/or disabilities. The home screening also did not assess working with children of a specific gender, specific age range, and caring for a specific number of children, including whether the children are part of the same sibling group."
- § 749.2445(c)(1) related to foster home screening because "It was found that the agency had two home studies for the foster parents. It was also found that some of the information was missing and some information was incorrect upon review."

Additional examples of homes with concerning histories of safety violations can be found in Appendix A.

# Figures

Figure 1: Age of Children in PMC on December 31, 2023 ................................................. 18
Figure 2: Living Arrangements for Children in PMC on December 31, 2023 ................ 20
Figure 3: Length of Stay in Care of Children in PMC on December 31, 2023 ................ 22
Figure 4: Children in PMC Placement with a Sexual Characteristic Flag (Aggressor or Victim) December 31, 2022, to December 31, 2023 ....................................................... 29
Figure 5: DFPS Decision-Making Staff with a Validated Child Sexual Aggression Training Date Found ............................................................................................................ 36
Figure 6: PMC Children with Confirmed Sexual Abuse or Sexual Aggression ............... 45
Figure 7: Timing of Sexual Abuse, PMC Children with Confirmed Sexual Abuse ........... 46
Figure 8: Number of Incidents of Sexual Abuse While in Care, PMC Children with Confirmed Sexual Abuse in Care ...................................................................................... 47
Figure 9: Child's Placement Type at the Time Abuse in Care Incident Occurred .......... 47
Figure 10: Location of Abuse for Children Placed in a GRO/RTC, Foster Home, or CWOP at Time of Abuse in Care .................................................................................................. 48
Figure 11: Incidents of Sexual Abuse in Care Occurring Over Time ................................ 49
Figure 12: Perpetrators Identified in Sexual Abuse Incidents Occurring While in Care for PMC Children with Confirmed Sexual Abuse in Care ..................................................... 50
Figure 13: Number of Incidents of Sexual Abuse in Care While on Runaway, PMC Children with Confirmed Sexual Abuse ............................................................................................ 51
Figure 14: Trafficking Incidents for PMC Children in Care, Location at the Time of Abuse ............................................................................................................................................... 53
Figure 15: Sexual Abuse Incident Documented in DFPS Child Aggressor's Sexual Incident History ............................................................................................................................... 55
Figure 16: Timing of Sexual Aggression for PMC Children with Sexual Aggression ....... 56
Figure 17: Number of Sexual Aggression Incidents While in Care, PMC Children with Confirmed Sexual Aggression in Care ........................................................................... 57
Figure 18: PMC Child's Placement at the Time of Aggression in Care ........................... 58
Figure 19: Percent of Sexual Aggression Incidents in Care Occurring Over Time .......... 59
Figure 20: Victims Identified in Sexual Aggression Incidents Occurring While in Care 60
Figure 21: Sexual Aggression Incident Documented in DFPS Child Victim's Sexual Incident History ............................................................................................................... 61
Figure 22: PMC Children with Confirmed Sexual Abuse or Sexual Aggression ............. 62
Figure 23: Completeness of Sexual History Information on the Common Application .. 65
Figure 24: Both Attachment A and Placement Summary Found .................................... 66
Figure 25: Complete Sexual History Information Included in the Forms Found .......... 67
Figure 26: Caregiver Signature at the Time of Placement in the Forms Found ............. 68
Figure 27: Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature at the Time of Placement ........................... 69
Figure 28: Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature at Time of Placement in 2022 and 2023 .... 69

Figure 29: Records with Placement Summary and Attachment A Forms with Complete History and Caregiver Signature at the Time of Placement, by Placement Entity .......... 70
Figure 30: Timing from Date Caregiver Signed Attachment A to Date Caseworker Indicated Caregiver Signed in IMPACT ................................................................................ 71
Figure 31: Records with Attachment A Found, Signed, and Includes Complete History for Hospital and Juvenile Justice Placements ...................................................................... 72
Figure 32: Forms Found and Signed in Children's Site Records, 2023 ........................... 74
Figure 33: Program Administrators Reporting They Receive Proper Notice of Children with Sexual Characteristics Before or at Entry ................................................................ 76
Figure 34: Direct Care Staff Asked to Sign Attachment A or Other Form for Children with Sexual History ............................................................................................................ 76
Figure 35: Direct Care Staff Informed if a Child They Supervise is a Victim of Sexual Abuse or is Sexually Aggressive .................................................................................................... 77
Figure 36: Number of Operation Locations Requiring Awake-Night Supervision Visited, January 1 to December 31, 2023 ...................................................................................... 82
Figure 37: Months with Visits to Operation Locations When Required, ......................... 83
Figure 38: Verification Documents by the Number of Visits in a Month ........................ 84
Figure 39: Certification of Awake-night Supervision During DFPS Unannounced Visits ................................................................................................................................................. 87
Figure 40: Reports of Noncompliance with 24-Hour Awake-Night Supervision Requirements, January to November 2021, 2022, and 2023 ........................................ 90
Figure 41: Actions Taken Due to Noncompliance with Requirements of 24-Hour Awake-Night Supervision, January to November 2023 ................................................................ 91
Figure 42: Deficiencies for Standards Reviewed by Monitors for Issues Related to Awake-Night Supervision, January to November 2023 .............................................................. 94
Figure 43: Priority Level of RCCR Investigations Sampled ........................................... 101
Figure 44: Monitoring Team Agreement with Priority Level Assignment of RCCR Investigations ..................................................................................................................... 102
Figure 45: Monitoring Team Agreement with Assigned Priority Level of RCCR Investigations by Priority Level ........................................................................................ 103
Figure 46: HHSC Investigations Considered Deficient by the Monitoring Team .......... 107
Figure 47: Number of Inspections Sampled by Inspection Type .................................... 112
Figure 48: Investigation Inspections Sampled by Type .................................................. 113
Figure 49: Days from ECHR Completion Date to Inspection Begin Date ..................... 114
Figure 50: Operations' ANE Intakes, Findings, and Corporal Punishment Citations Reported in ECHRs Sampled ............................................................................................ 115
Figure 51: Number of ANE Intakes for Foster Homes Reported in ECHRs Sampled, 2023 ................................................................................................................................................ 116
Figure 52: ANE Finding or Corporal Punishment Citations in Sampled Inspections and Inspector Discussion ......................................................................................................... 117
Figure 53: Inspector Identified a Pattern or Trend in Operations' ANE Findings and Corporal Punishment Citations ........................................................................................ 118

Figure 54: Inspector Identified a Pattern or Trend in Foster Homes' Allegations of ANE and Corporal Punishment .................................................................................................... 119
Figure 55: Heightened Monitoring Status of Operations in Sample ............................ 120
Figure 56: Discussion of Connection Between Prior Investigations and Current Allegation in Investigation Inspections .............................................................................................. 121
Figure 57: Inspector Identified a Safety Risk in ECHR Assessment Summary .............. 122
Figure 58: Inspector Identified a Safety Risk in ECHR Assessment Summary and Number of Confirmed ANE Findings ............................................................................................ 122
Figure 59: Inspector Identified a Safety Risk Present in ECHR Assessment Summary by Inspection Type ............................................................................................................... 123
Figure 60: Monitoring Team Assessment of Safety Risk at the Time of Inspection ...... 124
Figure 61: Determination of Safety Risk by Monitors and Inspectors ............................ 125
Figure 62: Monitoring Team Determined Inspector Documented Consideration of History During Inspection ............................................................................................. 128
Figure 63: Inspectors' Consideration of Operation and Foster Home Risk During Inspection, 2023 ........................................................................................................... 128
Figure 64: Number of Deficiencies Cited for Failure to Report ANE ............................. 132
Figure 65: Deficiencies Cited for Failure to Report ANE by Type of Monitoring ........... 133
Figure 66: Deficiencies Cited for Failure to Report ANE by Standard Type, CY 2023 .. 134
Figure 67: Staff Report Who They Would First Report Allegations of Abuse and Neglect To ................................................................................................................................... 136
Figure 68: Citations Associated with Child-on-Child Abuse ......................................... 137
Figure 69: Problem Areas Identified in 2023 Heightened Monitoring Plans ................ 154
Figure 70: Number of Problem Areas, Operations Placed on Heightened Monitoring . 155
Figure 71: Number of Plan Tasks for Operations Placed on Heightened Monitoring .... 156
Figure 72: Number of Problem Areas Associated with Heightened Monitoring Plan Tasks ....................................................................................................................................... 157
Figure 73: Task Characteristics as Identified by Monitor's Staff for Operations Placed on Heightened Monitoring in 2020-2023 ........................................................................... 159
Figure 74: Legal Status of Children with Placement Requests to Heightened Monitoring Operations, Calendar Year 2023 .................................................................................... 169
Figure 75: Number of Heightened Monitoring Placement Requests by Month, Calendar Year 2023 ...................................................................................................................... 170
Figure 76: Number of Placements of PMC Children at Operations Under Heightened Monitoring by Month, Calendar Years 2022 and 2023 ................................................. 171
Figure 77: Timing of Approval in IMPACT for Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2023 ................................................................ 172
Figure 78: Stage of Heightened Monitoring for Approved Placements, Calendar Year 2023 ....................................................................................................................................... 173
Figure 79: Prior Placement Type for Children in Approved Placements at Heightened Monitoring Operations, 2023 ........................................................................................ 174

Figure 80: Information Included in Heightened Monitoring Placement Request for Approved Placements of PMC Children at Heightened Monitoring Operations, Calendar Year 2022 and 2023 ..................................................................................................175

Figure 81: Documentation of Approver's Justification for Placement and Review of Operation's Five-Year History in Heightened Monitoring Placement Request for Approved PMC Placements, Calendar Year 2023 .........................................................176

Figure 82: Placements of PMC Children to Operations on Heightened Monitoring that Met all the Court's Requirements, January 1, 2023, to December 31, 2023 .................177

Figure 83: Number of Reason to Believe Findings in the Six Months Prior to Placement Start for Approved Placements with Justification, September 1, 2023, to December 31, 2023 ......................................................................................................................178

Figure 84: Time from Placement Start to Date of Relinquishment for Relinquished Foster Homes, 2023 ..............................................................................................................185

Figure 85: Total Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on Active Monitoring for all Operations on Heightened Monitoring .....193

Figure 86: Rate of Deficiencies Cited and ANE Allegations with Investigations Opened While on Active Monitoring for all Operations on Heightened Monitoring ..................194

Figure 87: Number of Reason to Believe Findings While on Active Monitoring for All Operations on Heightened Monitoring ........................................................................195

Figure 88: Rate of Reason to Believe Findings While on Active Monitoring for all Operations on Heightened Monitoring ........................................................................195

Figure 89: Enforcement Actions Against Operations While on Active Monitoring, 2020 to January 31, 2024 .........................................................................................................196

Figure 90: Heightened Monitoring Team's Determination of Compliance with Plan Tasks in Quarterly Reports During Active Monitoring, 2023 ...................................................197

Figure 91: Average Number of Deficiencies Cited in Quarter One to Quarter Twelve of Active Monitoring ......................................................................................................199

Figure 92: Average Number of Days to Post-Plan Monitoring for Operations that Completed Active Monitoring as of March 1, 2024, by Qualifying Year.........................200

Figure 93: Deficiencies Cited and ANE Allegations with Investigations Opened in the Six Months Before and Six Months After Moving to Post-Plan Monitoring .......................203

Figure 94: Average Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on Post-Plan Monitoring by Qualifying Year ..........................................204

Figure 95: Average Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on PPM for Operations on PPM as of March 1, 2024, by Qualifying Year ................................................................................................................................206

Figure 96: Average Number of Deficiencies Cited and ANE Allegations with an Investigation Opened During First Year of Heightened Monitoring by Status on March 1, 2024..........................................................................................................................207

Figure 97: Operations with RTB Findings During Heightened Monitoring for Operations that Completed Heightened Monitoring ......................................................................208

Figure 98: Deficiencies Cited and ANE Allegations with Investigations Opened in the Year Before and Year After Heightened Monitoring for Operations that Completed Heightened Monitoring.................................................................................................................209
Figure 99: Number of Days on Heightened Monitoring for Operations that Completed and Returned in 2023 ................................................................................................ 210
Figure 100: Number of Deficiencies Cited and ANE Allegations with Investigations Opened While on Heightened Monitoring for Operations that Completed and Returned to Monitoring in 2023................................................................................................... 211
Figure 101: Deficiencies Cited and ANE Allegations with Investigations Opened While on Active Monitoring by Calendar Year for Operations Placed on Heightened Monitoring in 2020 and Active as of March 1, 2024 ...........................................................................212
Figure 102:Reason to Believe Findings While on Active Monitoring ............................213

## Tables

Table 1: Race for Children in PMC on December 31, 2023 and Estimates of Total Child Population in Texas by Race, August 12, 2021 , ..............................................................19
Table 2: Living Arrangement by Race, Children in PMC on December 31, 2023 ............21
Table 3: Living Arrangement for Children in PMC on December 31, 2019 and December 31, 2023 ......................................................................................................................21
Table 4: Length of Stay in Care of Children in PMC on December 31, 2019 and December 31, 2023 .................................................................................................................... 22
Table 5: Exits from PMC by Exit Outcome between July 1, 2023 and December 31, 2023 ................................................................................................................................... 23
Table 6: Out of State Living Arrangement Type for Children in PMC, June 30, 2023 and December 31, 2023.................................................................................................... 24
Table 7: Children in PMC Placed Out of State by Race on December 31, 2023............... 24
Table 8: Out of State Living Arrangement Type for Children in PMC, December 31, 2019 and December 31, 2023................................................................................................ 25
Table 9: Authorized Level of Care for Children in PMC as Reported by DFPS as of December 31, 2023..................................................................................................... 25
Table 10: Top Six Counties of Removal for Children in PMC on December 31, 2023..... 26
Table 11:Children in PMC by Region on December 31, 2023......................................... 27
Table 12: Children in PMC from Regions with SSCC Presence by Region on December 31, 2023............................................................................................................................ 27
Table 13................................................................................................................. 32
Table 14: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, January to December 2023................................................................................................ 32
Table 15: Child Sexual Abuse Training Completion by Caseworker Type, June 1, 2023 to November 30, 2023......................................................................................................... 39
Table 16: Site Visit Data Collection, 2023 ...................................................................... 73

Table 17: Number of Operation Locations Requiring Awake-Night Supervision, January 1 to December 31, 2023 ................................................................................... 81

Table 18: Operations with a Deficiency Cited for FTR Abuse/Neglect ...........................134

Table 19:Priority of RCCR Investigations, January 1, 2023 to November 30, 2023 ......142

Table 20: Status of Heightened Monitoring Operations Placed on HM 2020 – 2023 ...149

Table 21: Number of Enforcement Actions Starting 2018 – 2022 for Operations Newly Placed on Heightened Monitoring in 2023 ................................................................... 151

Table 22: Operations Qualifying for Heightened Monitoring in 2023 that had Completed Heightened Monitoring Previously .............................................................................. 160

Table 23: Operations Completing Heightened Monitoring that had an RTB Finding While on Post-Plan Monitoring................................................................................................ 205