IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., § <br> § <br> Plaintiffs, § <br> v. § <br> § <br> GREG ABBOTT, in his official capacity as § <br> Governor of the State of Texas, et al., § <br> § <br> Defendants. § | <br><br><br><br><br><br>Civil Action No. 2:11-CV-00084 |

## Update to the Court Regarding Child Fatalities

After learning through the Monitors of the death of a child in the PMC General Class, the Court ordered on February 21, 2020:

*Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

Defendants have continued to provide notification to the Monitors of PMC child fatalities. As discussed in prior reporting to the Court, DFPS notified the Monitors that 49 children in the PMC General Class died between July 31, 2019 and November 1, 2023. These fatalities included eight children whom DFPS determined were abused or neglected by their caregivers in connection with their deaths or their care prior to their deaths.

DFPS reported 16 additional PMC children died between November 2, 2023 and February 5, 2025, bringing the number of PMC children who have died since July 31, 2019 to 65. Of the 16 children who died during this report period, DFPS or HHSC determined that ten of these children's deaths did not involve abuse or neglect or determined that an investigation was not necessary; related to one of those deaths, DFPS substantiated a prior primary caregiver for Neglect in incidents leading up to the child's death in a respite home. These ten fatalities involved eight children with severe medical conditions, one teenager who was involved in a fatal car accident and one teenager who died from a fentanyl overdose. As of February 5, 2025, DFPS's investigations into the remaining six

1

children's deaths remained open. The Monitors will review and discuss these children's deaths in the next report to the Court.

## Child Fatalities Involving Children in the PMC Class

### Child Fatalities, No Abuse or Neglect Determined as Cause of Death

#### A.F., Born August 2, 2020; Died November 14, 2023

A.F., a three-year-old girl, passed away from significant medical complications in a hospital. A.F. had the following diagnoses: neurotrophic keratitis of the left eye, coarctation of the aorta, hydrocephalus, cloacal malformation, cyst of the posterior cranial fossa, macrocephaly, severe acquired plagiocephaly of the right side of the head, pressure injury to the skin of the right side of the head, deformity of the left hand, neonatal anemia, abdominal wall hernia, caudal regression syndrome and congenital cerebral ventriculomegaly. A.F. used a gastrostomy tube and ventriculoperitoneal shunt, had a laparoscopic transverse colostomy and depended upon oxygen.

Since 2022, A.F. was subject to an active Do Not Resuscitate (DNR) order. At the time of her death, A.F. resided in a foster home for children with primary medical needs, where she was provided with nursing care for 24 hours each day. Her foster parents were also both pediatric nurses. On November 10, 2023, four days prior to A.F.'s death, her foster parents contacted emergency medical services (EMS) when A.F. developed a fever and abnormal vital signs; EMS transported the child to the hospital, where she was admitted until her passing on November 14, 2023. According to A.F.'s death certificate, the causes of her death were: "acute on chronic hypoxemic respiratory failure, haemophilus influenza sepsis and bacteremia, complex medical history with multiple comorbidities [and] multiple congenital abnormalities."

During RCCI's investigation of A.F.'s death, a Forensic Assessment Center Network (FACN) consult was conducted and the FACN physician found no concerns for abuse or neglect by A.F.'s foster parents. A.F.'s attending physicians, nurses and speech and physical therapists also reported to the investigator no concern for maltreatment of the child. Based upon this information, RCCI Ruled Out Neglectful Supervision of A.F. by her foster parents. Due to A.F.'s medical condition and DNR order, the county medical examiner did not perform an autopsy.

#### H.H., Born February 17, 2006; Died December 6, 2023

H.H., a 17-year-old girl, passed away in a hospital one month after sustaining a traumatic brain injury in a car accident. At the time of the car accident, H.H. had been on runaway status for four weeks from Connections,[1] an emergency shelter. On the morning of October 2, 2023, after Connections' staff members transported her to her job, H.H. ran away from her place of employment. After learning from H.H.'s employer that she had

---

[1] Since November 2023, Connections has been subject to Heightened Monitoring. This is the second time the operation has been on Heightened Monitoring. Connections was not subject to Heightened Monitoring at the time H.H. ran away.

not been scheduled to work that day, staff members reportedly called and texted H.H. and searched the area near the child's employment, but they were unable to locate her. During her elopement, DFPS attempted to locate H.H., but was unable to do so. The child's record documents that, for an unknown period of time while on runaway, H.H. stayed in a hotel with three former foster children and that they struggled to find food and shelter. DFPS learned that H.H. was staying in a hotel after one of the older youths in the hotel contacted a former RTC staff member asking for food and this individual notified DFPS. DFPS staff members worked with this individual to locate the hotel over a two-to-three-day period; however, the children refused to provide their location. DFPS also attempted to engage law enforcement, who reportedly were unable to assist without knowing the children's location.

Four weeks after running away, on November 2, 2023, H.H. was involved in a car accident, which resulted in her hospitalization. While hospitalized, H.H. was placed on life support until her death on December 6, 2023. RCCI did not pursue an abuse, neglect or exploitation investigation into H.H.'s death or elopement, though the DFPS Child Plan in effect at the time required her to be under heighted supervision due to a history of running away.[2]

D.M., Born July 17, 2006; Died April 2, 2024

D.M., a 17-year-old girl, passed away from a fentanyl overdose in a respite foster home where she had been placed for six days. She was diagnosed with disruptive mood dysregulation disorder (DMDD) and Post-traumatic stress disorder (PTSD) and had a history of self-harm. On the day of her death, the child's respite foster parent found D.M. unresponsive in her bed with foam on her mouth and called 911. When law enforcement arrived at the home, they attempted cardiopulmonary resuscitation (CPR) on the child before transporting her to the hospital, where she was pronounced deceased.

On April 2, 2024, RCCI opened an abuse or neglect investigation into D.M.'s death in the respite foster home. Three months later, on July 3, 2024, RCCI closed the investigation with a disposition of Ruled Out for the allegation of Neglectful Supervision, finding that

---

[2] The Supervision section of H.H.'s Child Plan in effect at the time noted, "[H.H.] is not allowed to be alone without supervision due to her recently running away." Though it is possible that the Child Plan was not violated when the facility's staff member dropped her off at the deli where she worked, there was no investigation and no inquiry into those details. The intake for the runaway report said only that H.H. was "taken to work at 8:50 a.m." and that at 10:03 a.m., someone spoke to her work supervisor and discovered that H.H. was not scheduled to work that day. The reporter did not explain (or the notes did not capture) what prompted the conversation with the child's supervisor.

Before H.H. ran away from Connections, the operation had notified DFPS (and H.H.) that it planned to discharge the child on September 30, 2023. Connections suggested that H.H. might qualify for the GRO's transitional living program (TLP). However, H.H. decided that she did not want to enter the TLP program and wanted to leave Connections. DFPS advised H.H. that it did not have another placement for her, and H.H. agreed to stay at Connections 30 more days to give DFPS time to find another placement. H.H. would have turned 18 years old on February 17, 2024.

the respite caregivers provided D.M. with adequate supervision during the child's brief stay in their home. In its Dispositional Summary, RCCI concluded:

> A disposition of Ruled Out was determined after careful consideration of the evidence, TAC, and policy. Law Enforcement was active in the case and a person of interest was arrested for "Manufacture delivery" who was the one who made the pills accessible to [D.M.]. [The respite foster parents] stated they did not have any issues from [D.M.], and [D.M.] had asked them if she could stay in the home. [The respite foster parents] stated [D.M.] had not left their home and they were with [D.M.] all of the time throughout her stay in their home. While placed with [the respite foster parents], [D.M.] did not go anywhere unattended, making it very difficult to assess [sic] any illegal substances. [D.M.] appeared as a happy teenager and asked to stay longer in the respite home.

Prior to her short stay in the respite foster home where she died, D.M. was placed in a therapeutic foster home for three months from December 27, 2023 until March 27, 2024. While in this placement, D.M. used substances that exposed her to a clear risk of harm. For example, on March 5, 2024, a young adult placed in the foster home (Individual 1, age 18, in extended DFPS care) found D.M. unconscious on the bathroom floor of the home. When EMS arrived at the foster home, they administered NARCAN to D.M. both intranasally and intravenously, which resuscitated her. EMS then transported D.M. to the hospital, where she was seen for "marijuana abuse and altered mental state." Regarding this incident, D.M. reported that she used a Tetrahydrocannabinol (THC) "vape pen" at school and that she did not want to harm herself nor had she experienced suicidal thoughts in recent years. Laboratory results did not indicate that the child had taken an opioid; however, because naloxone restored D.M.'s breathing that night, the responding law enforcement officer suspected that D.M. knowingly or unknowingly ingested an opioid. When questioned by the officer, D.M. reported that she did not know what an opioid was.

After the incident, D.M. was placed in a psychiatric hospital for one week before returning to the same therapeutic foster home.[3] One day after D.M. returned from the hospital, on March 14, 2024, the foster parent took a video of D.M. and Individual 1 seemingly under the influence of a substance and provided the video to the CPA. Two weeks later, on the night of March 27, 2024, D.M. found Individual 1 unconscious on the bathroom floor of the foster home due to a suspected overdose. When law enforcement responded to the incident, they provided Individual 1 with NARCAN, which restored her consciousness. On this same date, D.M. was moved to the respite foster home; D.M. may have brought with her the substance that later caused her death.

Following the incident on March 5th when Individual 1 found D.M. unconscious on the foster home's bathroom floor, RCCI initiated an investigation of Neglectful Supervision of D.M. by the therapeutic foster parent. On August 31, 2024, RCCI closed the

---

[3] According to the therapeutic foster home's CPA, after the incident on March 5th, the foster parent requested a respite from fostering; however, the CPA failed to follow through with the foster parent's request. The CPA administrator stated that finding a respite caregiver for a teenage girl was difficult.

investigation with a substantiated disposition for Neglectful Supervision by the foster parent.[4] The investigator found that there was a preponderance of evidence that, despite the foster parent's knowledge that D.M. was using substances in the foster home, the foster parent failed to supervise D.M. in accordance with her service and safety plans and failed to take reasonable actions to address D.M.'s ongoing substance use in the foster home. In its Dispositional Summary, RCCI included the following example of the foster parent's failure to respond to D.M.'s substance use in the home:

> On 03/14/24, [the foster parent] sent a recorded video to [the CPA program director] in which both [D.M. and Individual 1] appear under the influence, with slurred speech, and spaced out. [The foster parent] is video recording the girls and [the foster parent] can be heard talking to [D.M.] while recording. It was confirmed that the [the CPA program director] advised [the foster parent] to increase supervision and to look for rehabilitation centers for them and [the foster parent] didn't follow up with this. [The CPA program director] confirmed that [the foster parent] didn't confront either girls [sic] with the concerns or their current physical and mental state and [the CPA program director] was the one who confronted both girls the following day. Also, [the foster parent] didn't notify anyone in [D.M.'s and Individual 1's] team to inform them of the concerns that [D.M.] was still using substances the next day after being discharged from the hospital.

RCCI concluded the following in support of the disposition of Reason to Believe:

> [The foster parent] failed to follow with [D.M.'s] supervision as stated on [D.M.'s] safety plan and service plan. [The foster parent] failed to notify [D.M.'s] CVS caseworker or team of the concerns of [D.M.] being under the influence the day after being discharged from the hospital. [The foster parent] failed to seek any professional help for [D.M.'s] substance abuse or reach out to the recommended services [D.M.] had been recommended by [behavioral healthcare provider]. [The foster parent] failed to follow through with the recommendations of her CPA to seek rehabilitation assistance and increase supervision of [D.M. and Individual 1]. [The foster parent] failed to increase supervision and/or implement any monitoring devices to help aid with supervision of [D.M.] to ensure that [D.M.] wouldn't consume or have access to any illegal substances or took [sic] an action that would be harmful to her. [The foster parent] didn't implement any safety measures to ensure no illegal substances were being brought into the home or used in the home. Due to this negligence, on 03/27/24, [Individual 1] was found unconscious and overdosed in [the foster parent's] home, making this the 2nd household member overdosing in about 3 weeks.

---

[4] The investigation took nearly six months to be completed and closed, and there were insufficient approved extensions, in violation of Remedial Order 10. A 30-day extension was approved on March 29, 2024; a second 30-day extension was approved on April 29, 2024; a 21-day extension was approved on May 24, 2024 and a third 30-day extension was approved on June 21, 2024.

5

> [The foster parent] failed to take an action that a reasonable person in her profession with 13 years of experience and trainings should had [sic] taken to ensure [D.M.] was safe and out of harm. [The foster parent] would have known to take precautionary measures to protect [D.M.] from any current or future harm. [The foster parent] showed blatant disregard on [D.M.'s] safety and well-being by not taking the appropriate actions she should have taken to supervise and help [D.M.] with her substance abuse. [The foster parent] was well aware that [D.M.] continued to use drugs while in her care and home. [The foster parent] didn't take any type of action to seek help for [D.M.], increase her supervision, notify [D.M.'s] team of the concerns, or seek out assistance from [D.M.'s] doctor, psychiatrist, and/or therapist. [D.M.] was a vulnerable child with past history of abuse and trauma, someone with current mental health problems who wasn't under any medication and wasn't seeing a therapist, and she solely depended on [the foster parent] to ensure her basic needs, medical, and mental needs were being met. The preponderance of evidence supports a Reason to Believe finding for Neglectful Supervision of [D.M.] by [the foster parent].

In addition to the failure of the therapeutic foster parent to adequately supervise and care for D.M., RCCI's investigations highlighted failures by the CPA, Open Hearts Children and Family Services (Open Hearts),[5] charged with oversight and support of both the therapeutic foster home and the respite foster home in which D.M. was placed immediately prior to and at the time of her death. The investigative records contain the following concerns:

- On March 13, 2024, when D.M. was discharged from the hospital following the March 5 incident, D.M.'s discharge paperwork required that D.M. attend Intensive Outpatient Treatment Services and included new prescribed medications to treat, among other things, D.M.'s depression. As noted above, the foster parent failed to ensure that D.M. received outpatient treatment and her medications, both of which D.M. reportedly refused. However, despite having notice of this, the record does not include evidence that anyone at the CPA took adequate action to address this gap in D.M.'s treatment following the March 5 incident. This failure is particularly troubling since the CPA staff members acknowledged that the foster parent was "overwhelmed" caring for D.M. and the other young adults in her home and that the issues presented by D.M. and Individual 1 were "out of the norm," despite the foster parent having cared for "hard teenagers" in the past.[6] In the accompanying Minimum Standards investigation, HHSC cited the CPA for this issue, documenting that the "child placement management staff were aware of a child's increasing behavioral concerns and did not provide the level of support needed by

---

[5] Since October 30, 2023, Open Hearts Children and Family Services has been subject to Heightened Monitoring. The patterns identified by the operation's Heightened Monitoring Plan included deficiencies related to foster home screenings, background checks, and caregiver supervision.

[6] The CPA administrator reported that Empower, the SSCC responsible for D.M.'s case management, did not adequately support D.M. and the foster home during this time period. She stated, "Empower left it all on the agency [the CPA]."

- the caregivers, nor the appropriate oversight needed to ensure the safety of the children placed in the home."[7]

- In response to video footage of D.M. appearing under the influence of a substance in the foster home on March 14, 2024, a CPA staff member verbally instructed the foster parent to increase supervision of D.M.[8] and to research rehabilitation centers for the child. Again the foster parent did not follow the instruction of the CPA and the CPA did not take adequate action regarding this failure, including contemplating moving D.M. from the foster home or increasing oversight of D.M.'s services; such a consideration by the CPA would have been warranted particularly given the concern of D.M.'s continued use of substances in the foster home, the foster parent's repeated inability to prevent or mitigate such use, and the foster parent's vocalized request to have a respite from fostering after the March 5th incident.

- On March 27, 2024, following Individual 1's suspected overdose in the foster home, D.M. was placed in the respite foster home, which typically cared for elementary aged children in care. There was no one from the CPA present at the time D.M. was placed in the respite foster home; instead, the therapeutic foster parent transported the child to the new respite home and personally relayed information about D.M. and her history to the new foster parents. In the absence of the CPA appropriately overseeing the transition of D.M. to the new respite foster home, RCCI found that the CPA and child's caseworker failed to provide the new foster parents with any "specialized supervision or care" instruction regarding D.M. and her recent history of substance use.[9,10] Therefore, in the absence of any specialized or heightened supervision requirements for the child, RCCI found the respite foster parents "provided the care and supervision to the best of their ability with the *minimal* information they were provided about [D.M.]."[11]

At the close of RCCI's investigation, HHSC issued ten citations for minimum standards violations.

According to CLASS, the therapeutic foster home, which opened in 2011 and changed CPAs several times prior to being licensed by Open Hearts, was the subject of 14 investigations, three of which involved allegations of abuse, neglect, or exploitation and the other 11 were investigations into minimum standards violations. In addition to the

---

[7] HHSC cited the following Minimum Standard §749.2591(a)(1) - "Supervision-Child placement management staff must ensure that supervision accounts for the specific needs of the children in care in each home."

[8] It does not appear the CPA operationalized the new requirement of "increased supervision" for the foster parent; it is, therefore, unknown how often the foster parent was expected to check on D.M.

[9] D.M.'s caseworker reported that she did not implement a safety plan in the respite foster home because D.M. was no longer placed in the same home with Individual 1 and it was presumed that, without the negative influence of Individual 1, D.M. would no longer use substances.

[10] Given that EMS had also recently revived both D.M. and Individual 1 using naloxone after they had used a suspected opioid, the CPA also should have considered providing both sets of foster parents with naloxone.

[11] Emphasis added.

substantiated disposition in this case, another investigation,[12] which was still open when D.M. died, also resulted in a substantiated disposition for Neglectful Supervision against the foster parent and six citations for minimum standards deficiencies. In that investigation, RCCI found that the foster parent:

- Failed to follow a child's (age 16) service plan and was "willfully and intentionally not following up on [the child's] educational and supervision needs."
- Failed to realize the child had run away until she had been gone for 22 hours and failed to increase supervision for the child after a prior runaway incident. This was particularly problematic given the child's history of sex trafficking.
- Refused to take the child to the hospital for medical care after a CASA volunteer (who returned her to the home after the runaway incident) advised the foster parent that it was a medical emergency, and that she could not take the child for care because she was not a medical consenter.
- Failed to follow through with the doctor's discharge recommendations for the child.

Open Hearts relinquished verification of the therapeutic foster home on June 21, 2024, with the reason listed as "involuntarily closed due to deficiencies."

### K.C., Born February 26, 2021; Died April 6, 2024

K.C., a three-year-old boy, passed away from significant medical complications. K.C. had the following diagnoses caused by Physical Abuse in his birth home: traumatic brain injury, cardiac contusion, optic nerve edema, failure to thrive, global developmental delay, unspecified severe protein-calorie malnutrition, abnormal weight loss, contracture on an unspecified hand, epilepsy and seizures. K.C. was blind and nonverbal and used a nasogastric tube. From July 2023 until his death, K.C. resided in a foster home for children with pervasive developmental disorders; in the home, K.C. was provided with nursing hours for 24 hours each day. Prior to his death, K.C. was receiving hospice care and was subject to an active DNR order.

According to RCCI's fatality investigation, for several months prior to K.C.'s death, he experienced a significant decline in his health, as evidenced by more frequent and painful seizures, an inability to regulate his temperature and sleeping more often. On the date of his death, April 6, 2024, K.C.'s oxygen saturation and heartrate continued to decline until he passed at 1:15 p.m. in the foster home. K.C.'s autopsy listed the following cause of death: "Complications of remote blunt head trauma" and the following contributing

---

[12] This investigation (IMPACT Case ID: 50004084) opened on February 25, 2024, two months after D.M.'s placement in the therapeutic foster home and involved allegations that a child (age 16) in the foster home ran away from the home undetected by the foster parent and returned to the home experiencing stomach pain, for which the foster parent did not seek medical care. The child's CASA volunteer reportedly took the child to the hospital, where she was diagnosed with a urinary tract infection and dysfunctional uterine bleeding. On June 14, 2024, RCCI substantiated the allegation of Neglectful Supervision against the foster parent and Ruled Out the allegation of Medical Neglect.

condition: "Respiratory syncytial virus (RSV) B infection."[13] In response to his death, K.C.'s pulmonologist reported to the investigator that K.C. "was in high risk for death" and that his foster parents are "an amazing foster family." A DFPS Nurse Consultant reviewed K.C.'s medical records and did not express any concern related to the child's quality of care in the home. The RCCI investigator also interviewed K.C.'s hospice doctor, pediatrician, neurologist, caseworker and nurses, the CPA Treatment Director and the caseworkers and nurses of other children in the home; these individuals reported that K.C. received "remarkable" and "loving" care in the foster home. Based upon this information, RCCI Ruled Out Neglectful Supervision and Medical Neglect of K.C. by his foster parents.

### G.B., Born December 6, 2019; Died May 10, 2024

G.B., a four-year-old girl, passed away from significant medical complications. Due to an accidental drowning incident in G.B.'s birth home when she was an infant, G.B. was in a vegetative state and had the following diagnoses: anoxic brain damage, quadriplegia, intractable Lennox-Gastaut syndrome, severe hypoxic ischemic encephalopathy, profound global delays and an undeveloped hand. G.B. used a gastrostomy tube and a wheelchair and had a tracheostomy.

Since 2022, G.B. was subject to an active DNR order. In the last two months of her life, G.B. resided in a therapeutic foster home where she was provided with nursing hours for 24 hours each day. On May 10, 2022, during a breathing treatment performed by G.B.'s nurses, her heart stopped. Her caregivers called EMS; however, because G.B. was subject to an active DNR order at the time, EMS did not perform CPR on the child, and she passed away.

G.B.'s autopsy determined that the cause of her death was complications from the drowning she experienced as an infant. During the RCCI investigation, the investigator interviewed G.B.'s primary physician, CPA case manager, nurses and CVS and LPS caseworkers and the nurses and CVS caseworker of her foster siblings; these individuals reported no concerns regarding the quality of care G.B. received in the foster home. In response to her death, G.B.'s primary physician reported that "she didn't have any concerns regarding [the child's] care or well-being." Based on this information, RCCI Ruled Out Neglectful Supervision of G.B. by her foster parents.

### A.B., Born October 3, 2013; Died June 4, 2024

A.B., a ten-year-old girl, passed away from significant medical complications. A.B. had the following diagnoses: Stage 4 polycystic kidney disease, pilocytic astrocytoma of the hypothalamus, primary central diabetes insipidus, central hypothyroidism, panhypopituitarism, hypertension, mitral valve prolapse (Barlow syndrome), transaminitis, hepatic steatosis, Clostridium difficile carrier, hyponatremia, right-sided

---

[13] The autopsy listed K.C.'s manner of death as "Homicide," in relation to the Physical Abuse he experienced prior to entering DFPS care.

weakness, optic atrophy of both eyes, global developmental delay and speech and cognitive delays.

From 2022 until her death, A.B. resided in a foster home for children with primary medical needs, where she received approximately 50 nursing hours each week. RCCI Ruled Out Neglectful Supervision of A.B. by her foster parent, who was continuously devoted to the child and, according to all documentary evidence, improved A.B.'s life immeasurably. In the home, the child made significant health strides, including gaining strength to walk. However, on June 4, 2024, A.B. experienced a medical emergency in her foster home and doctors later discovered internal bleeding in her gastrointestinal tract. The child's death certificate and autopsy both documented that the cause of her death was "Pilocytic Astrocytoma and Polycystic Kidney Disease further complicated by co-infection with Rhinovirus/Enterovirus and Parainfluenza Viruses and Acute Pyelonephritis." During RCCI's abuse or neglect investigation, the investigator interviewed the child's caseworker, in-home teacher, CASA volunteer, physicians and physical, speech and occupational therapists; these individuals did not report any concern for maltreatment of the child in the foster home. The child's physician reported that the child lived longer than expected and "would have died sooner had it not been for her foster mother."

### E.L., Born February 23, 2011; Died June 15, 2024

E.L., a 13-year-old boy, passed away from significant medical complications. E.L. had the following diagnoses: spastic quadriplegic cerebral palsy, epilepsy, intellectual disability, other neurodevelopmental disorder and unspecified communication disorder. E.L. was nonverbal and used a gastric tube and a wheelchair. From June 2023 until his death, E.L. resided in a foster home, where he was provided with nursing hours for 20 hours each day.

According to RCCI's investigation into E.L.'s death, on June 15, 2024, a family member found E.L. unresponsive in his foster home after the gastric tube in his stomach became dislodged. In response, E.L.'s foster parent performed CPR on the child while another individual called 911. Law enforcement and EMS arrived approximately 15 minutes later to the foster home and determined that the child was deceased.

E.L.'s autopsy listed the following cause and contributing factors to E.L.'s death: "Acute peritonitis due to displacement of percutaneous gastronomy tube" and "Cerebral palsy, epilepsy, [and] premature delivery." When interviewed by the RCCI investigator, the Medical Examiner, an investigator in the Medical Examiner's office and a nurse reported that the foster parent would not have been able to identify that the child's gastric tube was internally dislodged and, as a result, incorrectly depositing food into E.L.'s abdominal wall instead of his stomach, causing his death. The investigator did not interview pertinent physicians who treated E.L. to confirm this information and to better understand when the gastronomy tube may have become dislodged in relation to the child's feeding schedule and potential symptoms. The RCCI investigator interviewed a nurse who worked with the physician who oversaw E.L.'s gastric tube and she reported that "there were no concerns noted with [E.L.'s] care" in the foster home. Finally, the investigator interviewed E.L.'s case manager, caseworker, former caseworker and nurse,

office workers in his neurologist's office and pediatric clinic, nurses and caseworkers for other children in the home, and the foster parent's biological children; these individuals reported no concerns regarding the quality of care E.L. received in the foster home. In its investigation into E.L.'s death, RCCI Ruled Out Neglectful Supervision of E.L. by his foster parent.

A.M., Born September 17, 2006; Died July 10, 2024

A.M., a 17-year-old boy, passed away from significant medical complications in a hospital. A.M. had the following diagnoses: mitochondrial encephalomyopathy lactic acidosis and stroke-like episodes (MELAS) syndrome, dystonia, intellectual disability, right hip subluxation, kyphosis, scoliosis, respiratory failure, oral aversion, diabetes and hyperopia. A.M. was nonverbal and used a gastric tube, catheter, colostomy bag and wheelchair. From 2015 until his last hospitalization, A.M. resided in a therapeutic foster home, where he was provided with nursing hours for 60 hours each week. At the time of his death, A.M. had been in hospice care for over one year and was subject to an active DNR order.

According to RCCI's investigation into A.M.'s death, on June 10, 2024, one month prior to his death and several months after experiencing a significant decline in his health, A.M. exhibited increased vomiting, coughing and congestion; his foster mother called EMS under the advice of his gastroenterologist, at which point A.M. was transported and admitted to the hospital. On July 10, 2024, A.M. passed away at the hospital.

A.M.'s death certificate listed the following cause of death: "MELAS." In response to his death, A.M.'s gastroenterologist reported that A.M. lived longer than was expected for someone with his condition and that this was due to his foster parent's proactive care. In her investigation into A.M.'s death, the RCCI investigator also interviewed A.M.'s primary care physician, hospice nurse and physical and occupational therapists; these individuals reported no concerns regarding the quality of care A.M. received in the foster home. Based upon this information, RCCI Ruled Out Neglectful Supervision of A.M. by his foster parent. Due to A.M.'s medical condition and DNR order, the county medical examiner did not perform an autopsy.

M.J., Born May 29, 2012; Died July 26, 2024

M.J., a 12-year-old girl, passed away from significant medical complications. M.J. had the following diagnoses: chronic lung disease of prematurity, schizencephaly, epilepsy, hydrocephalus, dysphagia, precocious puberty, adrenal insufficiency, respiratory failure and neurogenic bladder and bowels. M.J. was nonverbal and used a tracheostomy tube, a gastric tube, a ventriculoperitoneal shunt and a wheelchair. From 2016 until her death, M.J. resided in a foster home for children with pervasive developmental disorders, where she was provided with nursing hours for 24 hours each day. At the time of her death, M.J. had been receiving hospice care for several years and was subject to an active DNR order.

According to RCCI's investigation, five weeks before her death, M.J.'s health declined, and she began experiencing more frequent seizures. On July 26, 2024, M.J.'s oxygen

levels and heart rate dropped, and she passed away in her foster home. M.J.'s death certificate listed the following cause of death: "Respiratory failure" and the following contributing conditions: "Recurrent resistant to treatment epilepsy, Complications Microcephaly, Ventilator Dependent." In response to her death, M.J.'s hospice pediatrician reported to the investigator that the child's death "was expected due to her medical conditions." The RCCI Investigator also interviewed M.J.'s foster family, nurses, caseworker, neurologist, the CPA Family Specialist, and the nurses of other children in the home; these individuals reported no concerns regarding the quality of care M.J. received in the foster home. Based upon this information, RCCI Ruled Out Neglectful Supervision and Medical Neglect of M.J. by her caregiver. Due to M.J.'s medical condition and DNR order, the county medical examiner did not perform an autopsy.

D.M., Born June 4, 2022; Died September 1, 2024

D.M., a two-year-old girl, passed away from significant medical complications in a hospital. D.M. had the following diagnoses: omphalocele, imperforate anus, tethered spinal cord syndrome, duplicate vagina, rectovesical fistula, rectal-bladder fistula, hypothyroidism, clubfoot, severe malnutrition and developmental delay. D.M. used a gastric tube and a colostomy bag and was awaiting a bowel transplant at the time of her death.

From September 2023 until her death, D.M. resided in a therapeutic foster home, where she was provided with nursing hours for 24 hours each day. Six days prior to her death, D.M. was hospitalized after laboratory test results revealed she had low potassium levels. On September 1, 2024, D.M. passed away at the hospital after receiving a blood transfusion. D.M.'s death certificate listed the following causes of death: "Cardiac arrest, Pulmonary hemorrhage due to disseminated intravascular coagulation, Bacteremia with Enterobacter and Proteus, [and] Urinary tract infection with Pseudomonas." The death certificate also documented the following significant conditions that contributed to D.M.'s death: "transaminitis from chronic TPN cholestasis, liver hemangioma, hydronephrosis, [and] hypothyroidism."

During RCCI's investigation into D.M.'s death, an FACN consult was conducted and the FACN physician found no concerns for abuse or neglect by D.M.'s foster parent. The RCCI investigator interviewed D.M.'s neurologist; pulmonologist; two pediatricians; in-home nurses; speech, physical and occupational therapists and hospital social worker; these individuals reported no concerns regarding the quality of care D.M. received in the foster home. Based on this information, RCCI Ruled Out Medical Neglect and Neglectful Supervision of D.M. by her foster parent. Due to D.M.'s medical condition, the county medical examiner did not perform an autopsy.

**PMC Child Fatality Investigations Pending**

N.S., Born August 26, 2015; Died December 12, 2023

N.S., an eight-year-old girl, appears to have passed away from significant medical complications. N.S. had the following diagnoses, which were related to the child

contracting meningitis as an infant: cerebral palsy, diabetes insipidus, hypothyroidism, seizures, acute respiratory failure, gastroesophageal reflux disease (GERD), vertical strabismus of the right eye, and severe cognitive and physical developmental delays. N.S. was blind and nonverbal, used a wheelchair and a gastrostomy tube and required the assistance of oxygen. The child had the developmental age of an infant. At the time of her death, N.S. was subject to an active DNR order.

From January 2023 until her death, N.S. resided in a foster home for children with pervasive developmental disorders. The foster parent, a nurse, was in the process of adopting N.S. at the time of her death and had cared for the child since she was three years old. On December 12, 2023, N.S. passed away after being life-flighted to the hospital. N.S.'s death certificate listed the following cause of death: "Acute Pyelonephritis with Sepsis."

During the RCCI investigation into the child's fatality, an FACN consult was conducted and the FACN physician reported that she did not find concern "for possible abuse or neglect contributing to this child's death." The RCCI investigator interviewed N.S.'s in-home nurse (who was also the child's former foster parent), caseworker and foster sibling; these individuals stated that N.S. received appropriate care in the foster home and that the family had been looking forward to adopting the child. Based on this information, RCCI Ruled Out the allegation of Neglectful Supervision of the child by her foster parent.

On September 5, 2024, five months after RCCI's fatality investigation closed, RCCI opened a new investigation related to N.S.'s death and information included in the child's autopsy. As of February 5, 2025, the new investigation remained open.

### A.R., Born January 6, 2012; Died August 2, 2024

A.R., a 12-year-old girl, appears to have passed away from significant medical complications. A.R. had the following diagnoses: cerebral palsy, bradycardia, obstructive sleep apnea, restrictive lung kyphoscoliosis, dysphagia, intellectual and developmental disability, failure to thrive and global developmental delay. A.R. was nonverbal and used a gastric tube, a tracheostomy tube and a wheelchair.

From January 2024 until her death, A.R. resided in a therapeutic foster home. According to the open investigative record, on August 2, 2024, A.R. dislodged her tracheostomy tube and went into respiratory distress. Shortly thereafter, the respite caregiver and the child's foster parents found A.R. unresponsive and performed CPR on the child until EMS arrived. At the hospital, A.R. was pronounced deceased. As of February 5, 2025, RCCI's investigation into A.R.'s death remained open.

### O.R., Born January 15, 2013; Died November 27, 2024

O.R., an 11-year-old boy, passed away from an unknown cause(s). O.R. had the following diagnoses: autism spectrum disorder, other specified trauma and stressor related disorder, reactive attachment disorder and attention-deficit/hyperactivity disorder

(ADHD). At the time of his death, O.R. had been placed at Thompson's Residential Treatment Center for two weeks.

On November 27, 2024, the day of O.R.'s death, seven RTC staff members, including Staff 1 (the shift supervisor), took O.R. and 19 other children on an outing to a movie theatre to see Gladiator II. After the movie concluded, O.R. was found unresponsive in his seat, bleeding from his nose. Law enforcement responded to the child's death and reviewed surveillance footage at the movie theatre, reporting the following to SWI:

> [RTC] Staff claimed that [O.R.] was fine when they went into the movie. Staff then said that about 5 minutes before [the] end of the movie, they started to leave and [O.R.] was found cold, unresponsive, and bleeding from the nose. They were holding to that story that [O.R.] was fine most of the day, except for a possible stomachache. Another officer was told that [O.R.] kind of had a cold symptom, but they told [law enforcement] that [O.R.] was fine and walked into the movie on his own accord. Staff from boy's home were released to go to the hospital with [O.R.] because it was believed there was nothing wrong. [Law enforcement] advised that he and his partner viewed security camera footage of the staff, [O.R.] and other kids entering the movie theatre. [O.R.] was unsteady on his feet and not able to walk on his own. This is when they entered the movie. [O.R.] looked like he was about to pass out and they were dragging him along by his arm, and then [O.R.] falls to the ground as they pass the ticket counter. Staff then drag [O.R.] down the hallway a few feet before picking him back up and continue to force him forward to get him into the movie theatre room 12. There are no cameras in room 12. At the end of the movie, they exit room 12 and they lay [O.R.] on the floor. [O.R.] was clearly unresponsive, and staff called 911 at 10:06PM on 11/27/2024. About 3-4 minutes goes by before they start CPR on [O.R.]. That is when ambulance arrived and took [O.R.] outside and started doing chest compressions, this is when [law enforcement] arrived. [O.R.] was taken to Hunt Regional in Greenville. [O.R.] was pronounced deceased shortly after.

As of February 5, 2025, RCCI's investigation into the child's death remained open as the agency continued to gather information regarding the circumstances of O.R.'s death. (It was previously paused at the instruction of law enforcement before resuming). Preliminary information gathered by RCCI raises serious concern regarding the actions, and inactions, of the RTC staff members responsible for the care of O.R. on the day of his death.

On that day, the investigative record shows that O.R. reported to staff members that he felt unwell. Children who were housed with O.R. reported to the investigator that he woke them up early that morning, screaming and crying in pain, and complaining of a stomachache. A staff member said he helped O.R. to the bathroom, and that O.R. had an episode of encopresis in the bathroom. Medication logs showed that Staff 1 administered Tylenol to O.R. at 7:30 a.m. for constipation. During his medication review that day, O.R.

complained that he had a stomachache and was constipated,[14] and was observed by participants in the review to look tired. Staff 1 said that after attending the medication review, O.R. had to be helped into the house and onto the couch, where he fell asleep.[15] Staff members and children reported that O.R. slept most of the day and did not eat any of his meals that day.[16]

That evening, O.R. reportedly informed staff members that he did not want to go to the movie theatre because he continued to feel unwell and weak. Despite this request, staff members took O.R. to the movie theatre where surveillance footage showed that O.R. was unable to stand without staff members' assistance and "collapsed to the ground."[17, 18] Despite O.R.'s physical condition, Staff 1 and Staff 2 carried O.R. into the theater and Staff 2 placed the child in a seat. Staff 2 stated to the investigator that as he placed O.R. in the seat, O.R. urinated on himself; staff members did not report taking any action to change O.R. out of his soiled clothing. O.R. was, then, left unattended for the duration of the movie, during which time he passed away.[19]

---

[14] During her interview, the doctor who conducted O.R.'s medication review noted that the psychotropic medications O.R. was prescribed could have caused constipation. O.R. was prescribed four psychotropic medications, including a medication (Caplyta) that the FDA has not yet approved for children. O.R. was also prescribed a medication to treat enuresis. The operation's nurse said that after O.R. complained of constipation that morning, she asked the owner of the facility to purchase a laxative for him. The owner said he bought the laxative and offered it to O.R., but O.R. refused to take it.

According to O.R.'s record, O.R. was born with gastroschisis (a birth defect that causes the intestines to bulge through an opening in the abdominal wall) and was treated surgically for this condition prior to entering foster care. His records also show that he suffered frequent bouts of encopresis.

[15] The staff member who escorted him to the medication review said that after the review, O.R. complained that his legs were weak, and that the child fell and did not want to get up. The staff member helped him up and took him inside the house.

[16] Some of the children and staff members who were interviewed said that O.R.'s symptoms – including constipation – started several days prior to his death, but these reports were not as consistent as the agreement among children and staff members that O.R. reported feeling ill the day of his death.

[17] During interviews, staff members and children described O.R. falling several times after getting out of the van at the theater and before being carried by staff members to his seat in the movie theatre, including one instance when O.R. fell and reportedly hit his head, causing him to cry.

[18] According to security video footage from inside the theater, as O.R. approached the theater staff person who was tearing the tickets for patrons, O.R. clutched a rail with his right hand and a staff member held him under his left arm. O.R. appeared to be having difficulty walking, his head was rolling to the side and forward, and his legs appeared to be buckling. When he rounded a corner after the ticket was taken, O.R. fell to the floor. A staff member dragged O.R. a short distance before another staff member, who was walking behind them, helped pick O.R. up, then supported him under both arms as they continued to walk down the hallway. Toward the end of the hallway, O.R. appeared to lose his balance and fall against the wall. A staff member again assisted him; however, O.R. did not appear to be able to stand up. Video from a camera closer to the entrance to the movie auditorium captured O.R. fall to the ground again. At that point, Staff 2 picked him up and carried him into the theater.

[19] Video footage captured Staff 1 carry O.R. out of the theater after the movie ended. O.R. was clearly deceased; his legs were slightly folded, and his body appeared stiff and lifeless. Staff 1 took O.R. from Staff 2, and they moved him to the side, attempting to shield him from other patrons leaving the theater. Staff 1 tried to move O.R.'s head, which was bent to the side, but it did not move. Staff 1, Staff 2, and another staff member milled around looking at and touching O.R. for several minutes while Staff 1 was on the phone (he called 911). Finally, after three minutes, Staff 1 began to attempt CPR.

15

The county medical examiner's office has not yet finalized the results of O.R.'s autopsy; however, preliminary autopsy results conveyed by the medical examiner's office to DFPS reported the presence of "necrotic gut tissue in [OR's] intestinal tract. [OR] was diagnosed with Volvulus. A volvulus is a medical emergency that occurs when a loop of intestine twists around itself and the mesentery that supports it, causing a blockage in the bowel."

As of this writing, law enforcement instructed RCCI to refrain from conducting interviews as the department pursues its own investigation of O.R.'s death.

Thompson's RTC had a history of regulatory problems. The Greenville campus, where O.R. was placed, was issued its initial permit August 12, 2009, and its full permit on February 26, 2010. The operation was placed on a voluntary plan of action (POA) requiring staff to be trained in "appropriate restraints and boundaries" in 2011, which it successfully completed. The POA was implemented on August 9, 2011, just two days before the closure of an investigation that resulted in 14 citations being issued for minimum standards investigations, because interviews confirmed that:

> [C]hildren were fighting each other as a means of working out issues between them. The fights were referred to as a game called "Tap Out" or "Choke Out." Many of the children called the fights…wrestling. The rules were the same as the Ultimate Fighting Championship (UFC) and they could do anything except punch each other. It was reported that the children have choked each other, twisted limbs and slammed each other into walls and onto the floor…Some of the children were choked to the point of turning colors during the fights…Staff would "referee" the fights, make bets on who they thought would win, and would sometimes fight the children.

The investigation also revealed that children were being restrained in prone or supine positions, with their limbs twisted behind their backs. Children also reported being tackled by staff. Children also revealed inappropriate sexual behavior occurred between children at the facility.

Similar concerns continued to be reported, even after the successful completion of the 2011 POA. Reports of staff failing to intervene in fights between children has been an ongoing complaint in intakes, and the subject of multiple citations associated with violation of minimum standards for caregiver responsibilities.

In 2018, a child had to be hospitalized after a restraint resulted in a laceration to his liver; the investigation resulted in an RTB for Physical Abuse. Enforcement Team Conferences (ETCs) also showed a history of concerns;[20] the ETCs noted problems with the operation's physical site and caregiver responsibility, particularly related to appropriate supervision and discipline. In 2019, the ETC for the period that covered February 1, 2018 through January 31, 2019, noted "an increase in the number of citations issued for investigations" and "a pattern of citations regarding the physical site." In 2022, the ETC concerns noted:

---

[20] The ETC list begins in 2018; there is no ETC history in CLASS prior to that conference.

> There have been several investigations where the behavior of staff could harm children.[21] For example threatening to use corporal punishment and taking a child's items. The concern is that the Administrator may give staff many chances when policy is not followed.[22]

As a result of concerns expressed during ETCs, the operation was placed under more frequent inspections in 2019, 2021, 2022, and 2023.

After two DFPS investigations resulted in substantiated findings of Physical Abuse in 2023, the RTC was placed on a second POA on February 17, 2024. Documentation describing the basis for the POA stated:

> Between February 2022 and July 2024, the operation received a total of 51 deficiencies. In 2022, there were 6 deficiencies cited, while in 2023, that number increased to 28 – a 50% rise compared to the previous year. The bases for the Plan of Action highlighted recurring deficiencies across several Minimum Standards subchapters: E (Personnel), P (Physical Site), M (Discipline and Punishment), L (Medication), J (Childcare), I (Admission, Service Planning, Discharge), H (Child Rights), Q (Recreation Activities), and TAC (drug testing).

The operation did not successfully complete this POA. Though the operation successfully completed the action items required by the POA, the operation received 28 citations while the POA was pending. Many of these citations were issued for problems associated with staff supervision, specifically regarding staff failures to intervene in altercations between residents, some of which resulted in children requiring hospital treatment for injuries. Despite the operation's ongoing problems, an August 21, 2024 contact note in CLASS indicates that HHSC opted not to refer the operation for any type of enforcement action but would instead continue to monitor Thompson's RTC on an expedited frequency. The note indicated that the operation would be reviewed (or "staffed") again by HHSC in three months.

Despite the operation's history of regulatory violations, the owners were allowed to open a second campus in Farmersville in 2019. Thompson's RTC – Farmersville received an initial permit on March 22, 2019, and a full permit on March 5, 2020. Staff 1 was first

---

[21] The operation received a citation for corporal punishment at the conclusion of an investigation of a November 18, 2021 intake, because a caregiver was "slapping and threatening to slap children."

[22] This ETC also noted that a specific staff person was "no longer employed" by the facility. That staff person was one of the alleged perpetrators in the 2011 investigation that resulted in 14 citations being issued. Though the investigation resulted in 14 citations, ANE was Ruled Out. He continued to be named as an alleged perpetrator in investigations through 2021. In June 2021, the operation received a citation after it was determined that this staff person had traded his used athletic shoes for a child's brand-new Air Jordans, The child had "diminished cognitive skills." The operation also received citations in cases in which the staff person was alleged to have failed to appropriately supervise children; in one case, the supervision lapses led to the failure to intervene in a fight which resulted in a child's nose being broken. In another, the supervision problems led to inappropriate sexual contact between children.

employed as a direct caregiver at this campus. The operation's first ETC, completed on March 9, 2021, expressed the following concerns:

> There was some concern that the operation was not providing treatment services to children admitted…At the next inspection the inspection will focus on admission, placement, and service plan. [Staff 1] was identified as a concerning employee. At the next inspection conditions regarding this employee will be reviewed.

A review of CLASS showed that while Staff 1 was employed at the Farmersville campus, he was an alleged perpetrator in four investigations with allegations of Physical Abuse in 2020 and three in 2021. In these investigations, at least six children made an outcry that Staff 1 had physically abused them. Though DFPS did not substantiate the allegations, at the conclusion of a 2020 minimum standards investigation, HHSC issued the operation a citation for corporal punishment[23] after finding that Staff 1 hit and pushed children at the operation:

> Based on the information gathered during this investigation allegations of [Staff 1] hitting and grabbing children at the operation could be validated…Out of the five children interviewed, four stated that [Staff 1] has either hit, slapped, or pushed them.

Before the follow-up inspection identified by the ETC could occur, the operation voluntarily closed on June 1, 2021.

Sometime after the Farmersville campus closed, Staff 1 transitioned to work at the Greenville campus where O.R. was placed, and the pattern of behavior continued. Between December 2021 and the date of O.R.'s death, at least four children made outcries that Staff 1 physically abused them during their stay at the Greenville campus.

In 2022, another RTC, North Star, opened on the Farmersville campus under different ownership. However, the administrator of North Star (who was also named as a controlling person) was also the administrator for Thompson's -Farmersville and is the wife of the CEO of the Thompson's RTCs. North Star RTC suffered from many of the same problems that plagued the Thompson's RTCs. North Star closed on December 18, 2024.[24]

---

[23] The operation was also cited for violation of a minimum standard associated with caregiver responsibilities at the conclusion of a 2020 investigation for Neglectful Supervision, because Staff 1 and another staff member were not appropriately supervising the residents, resulting in five children engaging in a physical altercation with another child, which caused a physical injury that required medical treatment.
[24] While open, the operation received two substantiated findings for Physical Abuse. One of those resulted from a March 22, 2024 intake that was reported by a monitoring team member during a site visit. During the visit, members of the Monitors' staff witnessed a staff member punch a child.

North Star RTC was placed on a POA on August 19, 2024. However, DFPS placed the operation on a placement hold in June 2024, and the operation voluntarily closed while the POA was still pending (the POA period was to end on February 19, 2025). Despite this, HHSC shows the POA as having been successfully completed.

### F.B., Born March 26, 2007; Died January 19, 2025

F.B., a 17-year-old girl, passed away from an unknown cause(s). On the day of her death, the child, who was placed in an RTC, was on a weekend visit to her grandfather's home. After the grandfather returned home from work, F.B. was discovered deceased in her bedroom, along with another home member (age 18). Law enforcement recovered narcotic and alcoholic substances and a firearm in the room where F.B. was found. As of February 5, 2025, CPI's investigation into F.B.'s death remained open.

### R.O., Born April 8, 2019; Died February 5, 2025

R.O., a five-year-old boy, appears to have passed away from significant medical complications. R.O. had the following diagnoses: global developmental delay, cerebral palsy, failure to thrive, dysphagia and a history of infantile spasms and seizures. R.O. used a gastrostomy tube. From 2023 until his death, R.O. resided in a therapeutic foster home, where he was provided with nursing hours for 24 hours each day. On February 5, 2025, R.O.'s foster parent observed him unresponsive in the home and subsequently initiated CPR and called 911. EMS transported the child to the hospital, where he was pronounced deceased. As of February 5, 2025, RCCI's investigation into R.O.'s death remained open.

### R.F., Born November 17, 2017; Died February 5, 2025

R.F., a seven-year-old girl, appears to have passed away from significant medical complications. R.F. had the following diagnoses: agenesis (absent) of the corpus callosum, chronic lung disease, renal failure (stage 3, moderate), club foot, bronchopulmonary dysplasia, congenital hypoplasia, global developmental delay, hypotonia, vesicoureteral reflux (VUR) grade 1, bilateral hydronephrosis, hypertension, congenital laryngomalacia, bilateral contractures of the arms and legs, failure to thrive, low iron, colpocephaly, neuro-irritability and umbilical hernia. R.F. used a gastrostomy tube, a ventilator, a wheelchair and a catheter; she was blind, nonmobile and nonverbal.

From 2019 until her death, R.F. resided in a foster home for children with primary medical needs, where she was provided with nursing hours for 24 hours each day. On February 4, 2025, R.F.'s foster parent took her to the hospital for "unsteady levels;" the child was not admitted and returned home. On February 5, 2025, R.F.'s blood pressure dropped, and her foster parents called EMS. After attempts by EMS to raise her blood pressure, R.F. passed away in the home. As of February 5, 2025, RCCI's investigation into R.F.'s death remained open.