United States Courts
Southern District of Texas
FILED

*2/19/2025*

Nathan Ochsner, Clerk of Court

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 11, 2024

Lyle W. Cayce
Clerk

————————

No. 24-40248

————————

M. D., by next friend Sarah R. Stukenberg; D. I., by next friend Nancy G. Pofahl; Z. H., by next friend Carla B. Morrison; S. A., by next friend Javier Solis; A. M., by next friend Jennifer Talley; J. S., by next friend Anna J. Ricker; K. E., *as next friend* John W. Cliff, Jr.; M. R., *as next friend* Bobbie M. Young; J. R., *as next friend* Bobbie M. Young; H. V., by next friend Anna J. Ricker; P. O., *as next friend* Anna J. Ricker; L. H., *as next friend* Estela C. Vasquez; C. H., by next friend Estela C. Vasquez; S. R., *as next friend* Bobbie M. Young; S. S., *as next friend* Estela C. Vasquez; A. R., *as next friend* Tom McKenzie, *individually and on behalf of all others similarly situated*,

*Plaintiffs—Appellees,*

*versus*

Greg Abbott, *in his official capacity as Governor of the State of Texas*; Cecile Erwin Young, *in her official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas*; Stephanie Muth, *in her official capacity as Commissioner of Texas Department of Family and Protective Services*,

*Defendants—Appellants.*

————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:11-CV-84

————————————————

No. 24-40248

Before JONES, CLEMENT, and WILSON, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

In their fourth appeal from court orders that awarded permanent injunctive relief designed to overhaul the Texas foster care system, the state defendants challenge a contempt order and $100,000 per day ongoing fines. The state raises numerous defenses against the sanctions, including that the order constituted criminal contempt lacking constitutional safeguards and that the fines violate the Eleventh Amendment. The Defendants contend that the state is in substantial compliance with the remedial decree. Finally, because of the judge's intemperate conduct on the bench, they seek her removal and reassignment of the case to another district judge on remand. We VACATE the contempt order, hold that the state has substantially complied with Remedial Orders 3 and 10, and REMOVE the district judge.

## BACKGROUND

The underlying facts of this case are thoroughly explained elsewhere. *See M. D. by Stukenberg v. Abbott (Stukenberg I)*, 907 F.3d 237, 243–47 (5th Cir. 2018). Plaintiffs are a class of minor children who challenged the constitutionality of the Texas foster care system under the Due Process Clause of the Fourteenth Amendment. *Id.* at 246. They filed suit in 2011. *Id.* After a bench trial, the district court found in favor of Plaintiffs in 2015 and awarded "expansive" injunctive relief. *Id.* at 271. For reasons that need not be detailed, this court invalidated or modified numerous aspects of the district court's remedy as not "narrowly tailor[ed]." *See id.* at 272 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013)). In so doing, this court emphasized that it was not suggesting that the district court "took . . . lightly" the "intrusion" imposed on the state by its "sweeping permanent injunction." *Id.* at 271 & n.43. The case

was remanded to the district court to modify the remedial decree in light of the appellate opinion. *Id.* at 288.

On remand, the district court modified the decree, but that modification was appealed and reversed in part by this court. *See M. D. by Stukenberg v. Abbott (Stukenberg II)*, 929 F.3d 272, 275 (5th Cir. 2019). The district court's modified injunction was reversed because it "reinserted" a provision similar to one rejected in *Stukenberg I* and because it added three other provisions that were overbroad or unjustified. *Id.* at 277–78, 280. In no uncertain terms, the *Stukenberg II* court remanded the case "to the district court to begin implementing, without further changes, the modified injunction with the alterations we have made." *Id.* at 281.

But the district court further changed the injunction on remand, resulting in another appeal. *See M. D. by Stukenberg v. Abbott (Stukenberg III)*, 977 F.3d 479 (5th Cir. 2020). While this court did "not question the good faith of the district judge" at that time, we reversed because the court "ignore[d]" the mandate of *Stukenberg II*. *Id.* at 482–83. This court again remanded, with the same instruction to implement the modified injunction "without further changes." *Id.* at 483.

The district court has not further officially modified the terms of the injunction since *Stukenberg III*. This appeal instead involves a 427-page order issued by the district court on April 15, 2024. The order found one of the state defendants, Cecile Erwin Young, "in her official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas," in contempt of Remedial Orders 3 and 10 of the injunction. The district court imposed a $50,000 daily fine for each order until the Health and Human Services Commission ("HHSC") leadership certifies that it is substantially compliant with the orders. The fines therefore total $100,000 per day.

No. 24-40248

Remedial Order 3 requires the Department of Family and Protective Services ("DFPS") to "ensure that reported allegations of child abuse and neglect involving children in the [Permanent Managing Conservatorship ("PMC")] class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs." Remedial Order 10 requires, in relevant part, that the DFPS "[w]ithin 60 days . . . complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake." Order 10 permits extensions of the deadline for "good cause" when documented in the investigative record. While the orders refer only to DFPS, the parties do not dispute that they also apply to HHSC because certain DFPS functions were transferred to HHSC in 2020 as part of an agency-wide reorganization. Together, these Orders essentially require Defendants to investigate child abuse and neglect allegations in a timely manner that accounts for the child's safety.

The district court held Commissioner Young in contempt because Provider Investigations ("PI"), a unit within HHSC, failed to comply with these two Orders in its handling of thirty-eight abuse and neglect allegations, which involved 13 children. In an order dated April 15, 2024, the district court ordered Commissioner Young, in relevant part, "to pay $50,000 per day until HHSC agency leadership certifies that all [Provider Investigations ("PI")] involving at least one PMC child closed from December 4, 2023 until the date of the State's certification, are substantially compliant with the Remedial Order 3." Another $50,000 per day fine was imposed "until HHSC agency leadership certifies that all open PI investigations involving at least one PMC child are substantially compliant with Remedial Order 10." This court stayed the contempt order on May 20, 2024. *M. D. by Stukenberg v. Abbott (Stay Order)*, No. 24-40248, 2024 WL 2309123 (5th Cir. May 20, 2024).

No. 24-40248

## STANDARD OF REVIEW

This court reviews the district court's order for abuse of discretion, but a "district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996); *see also Martin v. Trinity Indust. Inc.*, 959 F.2d 45, 46 (5th Cir. 1992). The issues here are purely legal.

## DISCUSSION

Defendants contend on appeal that the district court imposed a criminal contempt sanction without due process and ordered retrospective fines in violation of state sovereign immunity. Further, they assert that they have established "substantial compliance" with Remedial Orders 3 and 10. These dispositive issues are addressed first, followed by Defendants' request to remove the district judge and reassign the case.

### A. Type of Contempt

When granting the state's motion for a stay pending appeal, we concluded that the state was likely to prevail on the merits of their contention that the district court's contempt order is in fact a criminal contempt. *Stay Order*, 2024 WL 2309123, at *3. As such, the contempt order was issued devoid of procedural protections including trial by jury, and the fines were intended to punish rather than compensate the movants. Having now studied the parties' briefs on appeal, we are convinced of that conclusion. Here, it suffices to repeat a portion of the opinion approving a stay pending appeal, followed by comments on the parties' brief additional arguments.

There are two types of contempt—criminal and civil. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–27, 114 S. Ct. 2552, 2556–57 (1994). "Criminal contempt is a crime in the ordinary sense, and criminal penalties may not be imposed on someone who has not been

afforded the protections that the Constitution requires of such criminal proceedings." *Id.* at 826, 114 S. Ct. at 2556 (citations and quotation marks omitted). "In contrast, civil contempt sanctions . . . may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.* at 827, 114 S. Ct. at 2557. For civil contempt sanctions, "[n]either a jury trial nor proof beyond a reasonable doubt is required." *Id.* The contempt power of courts, as *Bagwell* explained, is rooted in concepts of necessity and arbitrariness. Necessity requires that courts be able to enforce their judgments and orders; arbitrariness in imposing sanctions is a threat endemic to those who hold power that must be confined. *Id.* at 831–34, 114 S. Ct. at 2559–61. Where a contempt order is deemed criminal, arbitrariness is cabined by the requirements of a criminal proceeding. *Id.* at 834, 114 S. Ct. at 2561.

Whether a contempt order is civil or criminal turns on the "character and purpose" of the sanction involved. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S. Ct. 492, 498 (1911). When, as here, the sanction at issue is a non-compensatory fine,[5] the sanction is civil if it is "remedial" and affords the Defendants the ability "to purge the contempt . . . by committing an affirmative act," but criminal if it is "punitive" and "imposed retrospectively for a completed act of disobedience, such that the [Defendants] cannot avoid or abbreviate the [punishment] through later compliance."

---

[5] As the name suggests, a compensatory fine "compensate[s] the complainant for losses sustained" because of the contemnor's conduct and must be "based upon evidence of the complainant's actual loss." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303, 67 S. Ct. 677, 701 (1947). The contempt sanction at issue here is clearly non-compensatory, as the district court made no "attempt to calibrate the fines to damages caused by [Defendants'] contumacious activities" nor does the April 15 Order "indicate that the fines were to compensate the complainant for losses sustained." *Bagwell*, 512 U.S. at 834, 114 S. Ct. at 2561 (quotation marks omitted). The parties do not argue otherwise.

No. 24-40248

*Bagwell*, 512 U.S. at 828–29, 114 S. Ct. at 2558 (citation and quotation marks omitted). Critically, "a contempt [sanction] is considered civil only when the punishment is *wholly* remedial." *In re Stewart*, 571 F.2d 958, 964 n.4 (5th Cir. 1978) (emphasis added). "When the punishment is partly remedial and partly punitive, 'the criminal feature of the order is dominant and fixes its character for purposes of review.'" *Id.* (quoting *Nye v. United States*, 313 U.S. 33, 42, 61 S. Ct. 810, 813 (1941)).

The Plaintiffs' argument that the Defendants can purge the contempt entirely simply by certifying substantial compliance falls short because much of the April 15 Order squarely focuses on whether the Defendants' *past* conduct was in compliance with the Remedial Orders 3 and 10. The April 15 Order requires the Defendants to pay $100,000 per day until they certify that certain investigations "closed *from December 4, 2023* until the date of the State's certification, are substantially compliant with the Remedial Order 3" and that other "open" investigations" comply with Remedial Order 10. The Defendants can do nothing to render any already-untimely investigations timely. The court's order, after all, specifies investigations that were closed months before April 15 and "open" investigations that may have become untimely vis-à-vis Remedial Order 10 before April 15. Moreover, the Defendants cannot complete open investigations or correct past investigations that failed to adequately consider the safety of children overnight, but that is exactly what the court's order requires by imposing per diem fines that begin immediately. This leaves the Defendants no realistic opportunity to purge the contempt, and reveals that the April 15 Order is at least partially intended to punish Defendants' "completed acts of disobedience," which renders the sanction criminal.[6]

---

[6] "[T]he imposition only of serious criminal contempt fines triggers the right to jury trial" and, therefore, "[p]etty contempt . . . may

No. 24-40248

This conclusion is buttressed by the fact that the challenged violations of the remedial orders occurred out-of-court and involved a "complex" injunction. As *Bagwell* stated, "[c]ontempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding" and, therefore, certain "criminal procedural protections" are required "to protect the due process rights of parties and prevent the arbitrary exercise of judicial power." 512 U.S. at 833–34, 114 S. Ct. at 2560–61.

The Plaintiffs insist that the April 15 Order does not involve a "complex" injunction because Defendants were sanctioned for violating only two of the sixty remedial orders. The Plaintiffs' argument misses the forest for the trees. It overlooks that the district court's injunction contained more than sixty remedial orders. In characterizing an "injunction that prescribes a detailed code of conduct," it is more appropriate to assess the entire injunction as opposed to taking a piecemeal approach. *See id.* at 835–36, 114 S. Ct. at 2561 ("In a case like this involving an injunction that prescribes a detailed

---

be tried without a jury." *Bagwell*, 512 U.S. at 837 n.5, 114 S. Ct. at 2562 n.5. But in *Bagwell*, the Court did "not answer . . . the difficult question where the line between petty and serious contempt fines should be drawn" because the $52 million fine imposed in that case "unquestionably [was] a serious contempt sanction." *Id.* Were the fines to accrue unabated between April 15 and the June 26 compliance hearing, the Defendants would be on the hook for $7.2 million. Our sister circuits have held that far lesser fines require a district court to afford the protections used in the criminal process. *See Jake's, Ltd. v. City of Coates*, 356 F.3d 896, 902–04 (8th Cir. 2004) ($68,000, based on a $1,000-per-day penalty); *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 128–30 (2d Cir. 1998) ($10,000); *see also In re John Richards Homes Bldg. Co.*, 552 F. App'x 401, 416 (6th Cir. 2013) ("We need not decide at this juncture what defines a 'serious' noncompensatory award of punitive damages because the $2.8 million awarded below is serious under any definition."). For these reasons, the fine imposed in the April 15 Order appears to rise to the level of "serious," such that the Defendants are entitled to a jury trial.

code of conduct, it is more appropriate to identify the character of the entire decree.").

But even if we were to circumscribe our assessment of the injunction to Remedial Orders 3 and 10, we would still conclude that the injunction is complex. These remedial orders require an agency, which as of 2018 was "responsible for roughly 29,000 children,"[7] to conduct investigations of child abuse and neglect in a timely manner while "taking into account at all times the child's safety needs." That is no small task, as demonstrated by the fact that the order explaining the Defendants' noncompliance with these remedial orders is voluminous. And even considering just the two Remedial Orders at issue, the Defendants conducted thousands of investigations during the period covered by the court's hearing, and the monitors found noncompliance in just over three dozen instances, involving about 13 children. We do not minimize the Defendants' shortcomings in these matters, but violations committed by the Defendants on a very small scale in relation to the magnitude of the institution, the prescriptive orders, and the overall numbers of children can be better put in perspective by a jury.

If further analysis were needed, the contrast between the contempt order in this case and that in *Bagwell*, which the Supreme Court unanimously held criminal, is instructive. The "complex" labor injunction in that case prohibited the union, *inter alia*, from obstructing ingress and egress to the mining company facilities, throwing objects at and physically threatening company employees, placing "jackrocks" on roads to damage vehicles, and exceeding certain numbers of picketers. *Id.* at 823, 114 S. Ct. at 2555. This doesn't seem very "complex" when placed against the wide-ranging scope of remedial orders that have reorganized the entire foster-care system in Texas to the tune of the state's expenditure of over

---

[7] *Stukenberg I*, 907 F.3d at 243.

$100 million in compliance costs to date (plus over $55 million to monitors).

> In *Bagwell*, the Court paid little heed to the trial court's attempt to characterize its schedule of fines as "prospective" only, and the Court noted the "elusive distinctions" between civil and criminal contempt fines. *Id.* at 830, 836, 114 S. Ct. at 2559, 2561–62. Here, regardless of the district court's characterization, it is almost impossible to escape the conclusion that the fines imposed by the April 15 Order are at least partially retrospective in nature.

*Id.* at *2–4.

In their brief to this court, the Plaintiffs additionally assert that the contempt order is civil, not criminal, because its goal is to coerce the state to abide by the court's remedial decree going forward. Accordingly, the fines may be "suspended" when the defendant "substantially complies" with Remedial Orders 3 and 10. Plaintiffs contend that "substantial compliance" means merely "taking all reasonable means" to comply with the orders covering investigations involving a PMC child within 60 days.

There are several problems with this optimistic reading of the contempt order. First, although the district court defined "substantial compliance" to refer to "all reasonable steps" in an early definitional section of its 427-page order, the contempt order does not specifically cross-reference that definition and, in fact, supersedes it. *See M. D. by Stukenberg v. Abbott (Contempt Order)*, No. 2:11-CV-00084, 2024 WL 2317348, at *12 (S.D. Tex. April 15, 2024). The court requires a "*complete submission*" by the state concerning substantial compliance with Remedial Order 3 and the list "of all PI investigations involving at least one PMC child closed between December 4, 2023 and the *date of the State's certification*." *Id.* at *228 (emphases added). The court also requires a detailed list of all open PI investigations involving at least one PMC child to fulfill Remedial Order 10,

the 30-day investigation order, which must be produced to the court Monitors, and also a "*complete submission* of the foregoing [*verification*] by the State." *Id.* (emphases added).

Second, in addition to its bureaucratic formulation of substantial compliance with each remedial order, the court warns that its Monitors "will conduct a case record review of the cases identified [for Remedial Order 3]" and "will review the State's [Remedial Order 10] submission and report their findings to the Court." *Id.* Only under these circumstances will the court "suspend" the fines. Further, in a footnote the court advises, "[t]his in no way waives the Court's retention of jurisdiction for a period of three years after full compliance as certified by the Monitors." *Id.* at *228 n.305. This language, all told, looks more like conditions of "supervised release" for parolees than adjudication of substantial compliance.

Third, "suspension" of fines is not the same as "erasure" or "removal" or "cancellation." Suspension connotes temporary or conditional relief from the fines, without cancelling them. If that is what the court meant, then the state has no assurance that the fines will not be revived when the court espies some additional default in the state's obeying the two remedial orders or complying precisely with its dictated contempt order compliance conditions.

Not only are the terms of the contempt order at odds with a rational path to substantial compliance, but the Plaintiffs' own conception of substantial compliance is entirely hypothetical. Plaintiffs assert that the state can substantially comply by documenting good cause for extending PI investigations that were already out of date when the court issued its April 15 order and by quickly finishing its delayed investigations. But, as just noted, the court ordered substantially more than those basic tasks, and ultimate

"suspension" of the fines seems to lie in the court's subjective notion of compliance.

The Plaintiffs alternately contend that even if the district court's order represents criminal contempt, this court should affirm its findings and remand for a non-retrospective, compensatory remedy appropriate to civil contempt. Their theory is based largely on the state's failure to challenge the factfindings of noncompliance. This argument, however, misses the point of the cases. In a criminal contempt proceeding, the state would have been entitled to a jury trial and conviction by proof beyond a reasonable doubt. *See Bagwell*, 512 U.S. at 826–34, 114 S. Ct. at 2556–61. As earlier explained, the trappings of criminal procedure are constitutionally required to protect a party from judicial arbitrariness. Consequently, this court's practice has been to reverse invalid contempt orders. *See, e.g.*, *In re Stewart*, 647 F.3d at 558; *Crowe v. Smith*, 151 F.3d 217, 240–41 (5th Cir. 1998).[1] In addition to this adverse precedent, further doubt is cast on any potential remand by the state's argument that the court's findings were legally deficient because they were based on violative actions not readily inferable from the terms of Remedial Orders 3 and 10. A party may only be held liable for contempt of a court order's *specific*, "express or clearly inferrable obligation[s]." *See Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 793 (5th Cir. 2013). Remand would not cure an inherent legal error by the district court. And even more potently, the state compellingly defends its substantial compliance with these Remedial Orders. In sum, we may not treat this criminal contempt order and sanctions as quasi-civil and amenable to remand.

---

[1] Plaintiffs' reference to *Lamar Financial Corp. v. Adams* is inapposite because this court reversed one invalid criminal contempt sanction in that case while affirming a valid civil contempt sanction. 918 F.2d 564, 567–68 (5th Cir. 1990).

No. 24-40248

**B. State Sovereign Immunity**

The contempt fines are also unconstitutional in violation of state sovereign immunity. "[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03, 104 S. Ct. 900, 909 (1984) (citing *Edelman v. Jordan*, 415 U.S. 651, 666–67, 94 S. Ct. 1347, 1357–58 (1974)). Determining whether a contempt fine is punitive dictates whether it violates state sovereign immunity. Both analyses collapse around the question of whether the punishment's purpose is retrospective or instead aimed at coercing a change in future conduct.

The Court explicitly permitted the imprisonment of a state official for civil contempt in *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908). There, the lower court ordered that a state attorney general "should stand committed to the custody of the marshal until" he obeyed an earlier court order. *Id.* at 126, 28 S. Ct. at 443. That is a civil contempt sanction because it was coercive, aimed at changing the official's conduct and allowing him an opportunity "to purge the contempt . . . by committing an affirmative act." *Bagwell*, 512 U.S. at 828, 114 S. Ct. at 2558. The Court has repeatedly aligned its state sovereign immunity jurisprudence around this distinction. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 290, 97 S. Ct. 2749, 2762 (1977) ("We therefore hold that such prospective relief is not barred by the Eleventh Amendment."); *Quern v. Jordan*, 440 U.S. 332, 337, 99 S. Ct. 1139, 1143 (1979) ("The distinction between that relief permissible under the doctrine of *Ex Parte Young* and that found barred in *Edelman* was the difference between prospective relief on one hand and retrospective relief on the other."); *see also Hutto v. Finney*, 437 U.S. 678, 690–92 & n.17, 98 S. Ct. 2565, 2573–74 & n.17 (1978). Criminal contempt sanctions like those at issue here punish the state's past malfeasance in violation of the Eleventh Amendment.

The federalism concerns do not end there.  In the contempt order, the district court "direct[ed] the Clerk of the Court to segregate and preserve all funds paid in accordance with this Order for the benefit and use of PMC foster care children, to be determined by future order of the Court."  2024 WL 2317348, at *228.  Relatedly, because Plaintiffs' attorneys are representing their clients pro bono, they have given control of the attorney's fees they would have received to the district court, to be placed in trust for the children.  This use of the attorney's fees and contempt fines is reminiscent of the invocation of *cy pres* in the class action settlement context, in which district judges distributed leftover settlement funds to charities whose purpose purportedly related to the original lawsuit.  *See, e.g.*, *Wilson v. Sw. Airlines, Inc.*, 880 F.2d 807 (5th Cir. 1989).  These arrangements raise constitutional concerns because they "transform[] 'the judicial process from a bilateral private rights adjudicatory model into a trilateral process.'"  *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 481 (5th Cir. 2011) (Jones, C.J., concurring) (quoting Martin H. Redish et al., *Cy Pres Relief and the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617, 641 (2010)).  Federalism concerns are also heightened here, where a federal district court is obtaining these funds not from the surplus of a class action settlement fund, but rather from the attorney's fees and contempt fines it chooses to excise from the state.  As in *Klier*, "these questions are neither briefed nor presented for review here," but they warrant this aside considering their exacerbation of the state sovereign immunity and Due Process violations of the district court's contempt fines.  *See id.* (Jones, C.J., concurring).

## C. Substantial Compliance

If Plaintiffs had succeeded in showing contempt,[2] the burden would shift to Defendants to show "substantial compliance" with the Remedial Orders. Substantial compliance is an absolute defense to civil contempt. *United States v. Barnett*, 346 F.2d 99, 100 (5th Cir. 1965). The court also considers good faith, or lack thereof. *See Whitfield v. Pennington*, 832 F.2d 909, 914–15 (5th Cir. 1987) (describing a party's characterizations of its compliance attempts as "misleading"); *see also Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 297 (5th Cir. 2008) (relying on "good faith" efforts to comply "to the extent practicable" in reviewing a district court's grant of complete relief from an order under a more stringent standard). The state endeavored in good faith to comply with the court's orders. For example, it spent over a hundred million dollars, overhauled internal policies, and lobbied for additional assistance from the Texas legislature.

The district court's contempt order never found bad faith. Whether compliance was done in good faith or bad faith is relevant to whether it was substantial.[3] As the district court recognized, the "reasonableness of the alleged contemnor's attempts to comply" is the "touchstone" of a substantial compliance defense. *Contempt Order*, 2024 WL 2317348, at *12–13 (collecting cases). And whether compliance was reasonable and substantial turns at

---

[2] The state also contends that the court's findings on contempt were not supported by "clear and convincing evidence" and that the terms of Remedial Orders 3 and 10 are too vague to support the district court's findings. We need not parse every detail of the evidence in evaluating those other arguments in support of reversal because this court holds that the district court imposed a criminal contempt sanction without the requisite criminal procedural protections and in violation of state sovereign immunity.

[3] Plaintiffs claim that Defendants did not sufficiently brief a good faith defense to have it considered on appeal. Good faith, however, is not a specific "defense" to contempt but is among the factors a court may consider in regard to substantial compliance. That point is not waived.

least in part on whether Defendants were acting in good faith or bad faith. Defendants' good faith bolsters their substantial compliance defense.

If possible, comparing the extent of a party's compliance with the extent of its noncompliance is persuasive. *U.S. Steel Corp. v. United Mine Workers of Am., Dist. 20*, 598 F.2d 363, 368 (5th Cir. 1979) (holding that after a district court ordered a union to notify its striking workers of a court order, the union's failure to attempt to notify three quarters of those workers made compliance not substantial). That approach works well in this case because whether compliance was substantial turns in large part on how many subject investigations were compliant and how many were not.

The parties dispute whether this court should consider HHSC's noncompliance by itself, or compare it with DFPS's compliance. Plaintiffs argue for the former approach because the district court only found noncompliance in PI investigations for which HHSC is exclusively responsible. From that vantage point, Plaintiffs observe, the monitors found that "55%" of investigations conducted by HHSC in a four-month period concerning PMC children were deficient, and "of those, 100% involved violations of Remedial Order 3, and 82% involved violations of Remedial Order 10."[4] Plaintiffs' perspective ignores the text of the Remedial Orders and the history of these agencies. Both orders cover more than just PI investigations, and both orders referenced only DFPS by name. That is because DFPS handled PI investigations initially, but the responsibility for handling them was moved to HHSC in 2020, five years after the district court first enjoined the state defendants.

---

[4] The monitors reviewed 69 investigations done during that period in 2023 in depth.

No. 24-40248

Under the remedial orders themselves and the original agency structure, a substantial compliance analysis must compare the overall compliance of DFPS with overall noncompliance, as the statewide agency was responsible for all child abuse and neglect investigations under the remedial decree. Limiting the comparison at this juncture to HHSC alone, when the agency's restructuring was accomplished to improve the policies and practices condemned by the district court, would be tantamount to punishment. "[E]quity looks beyond superficial distinctions such as these." *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 837 (5th Cir. 2023). Rather, it "looks to the substance and not merely to the form." *Young v. Higbee Co.*, 324 U.S. 204, 209, 65 S. Ct. 594, 597 (1945). And it would be inappropriate under the text of the orders to examine substantial compliance only with respect to the PI investigations when the orders are comprehensive of the plaintiff class.

Together, DFPS and HHSC conduct thousands of investigations that are subject to Orders 3 and 10. The district court's contempt order focused on 64 PI investigations with dispositions of "Unconfirmed" or "Inconclusive" between January 1, 2023, and April 30, 2023, plus five earlier PI investigations concerning related conduct involving the same PMC children. The monitors disagreed with the disposition of 38 of those 69 investigations, but that disagreement does not even include the 37 other investigations in the reviewed time period in which allegations were confirmed. Regardless, these are all just a drop in the bucket of systemwide investigations subject to Orders 3 and 10. Of the 954 investigations closed in a period spanning 2021 and 2022 that the monitors reviewed for Order 3 compliance, the monitors agreed with the disposition of 95% of the investigations.

Moreover, in reviewing over 1,500 investigations opened during a mostly overlapping 2021 through 2022 period, the monitors found 73%

compliance with Order 10. In a 2022 through 2023 period, the monitors reviewed over 1,600 investigations and found 84% compliance. There was significant improvement from 2019, when the monitors found that only 21% of relevant investigations complied with Order 10. And these results assume that the monitors did not overestimate noncompliance if some documentation was unclear. The district court therefore erred in not finding that Defendants substantially complied with Orders 3 and 10.

### E. Reassignment

The final issue in this appeal is Defendants' request that this case be reassigned to a different district judge on remand. *See* 28 U.S.C. §§ 455, 2106. Reassignment "is an extraordinary power and should rarely be invoked." *United States v. Winters*, 174 F.3d 478, 487 (5th Cir. 1999). We have carefully considered the record and the applicable law before concluding that this case must be reassigned to another judge. As this court originally found, the state of Texas had seriously neglected the management of its foster care system, resulting in constitutional violations against vulnerable children that this court affirmed. Nearly a decade has passed since the district court entered its first judgment ordering remedial relief. The state has been under constant, intrusive, and costly surveillance by a team of monitors and the district court ever since. The state asserts, without contradiction, that it has spent $150 million attempting to comply with the court's remedial decrees and another $60 million on the monitors. But not only has the district court clearly indicated an intent to continue oversight well into the future, but as will be seen, this contempt order seems a harbinger of even more drastic district court micromanagement. Against this background we have had to decide the difficult issue of removal.

This court "has not decided which of two tests should be used to decide whether to reassign a case." *Id.* Under a more formal approach, this

court considers three factors: (1) "whether the original judge would reasonably be expected upon remand to have substantial difficulty" in putting aside her previously expressed but inappropriate views, (2) "whether reassignment is advisable to preserve the appearance of justice," and (3) "whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997) (citations omitted).

This court also asks the more straightforward question "whether the judge's role might reasonably cause an objective observer to question [the judge's] impartiality." *Miller v. Sam Houston St. Univ.*, 986 F.3d 880, 893 (5th Cir. 2021) (alteration in original) (citations and quotations omitted). This means that reassignment can be appropriate "not just when actual bias or prejudice exists." *Johnson*, 120 F.3d at 1333. Because "the second factor of the first test is virtually identical" to this simpler approach, the "result of each test has always been the same." *United States v. Khan*, 997 F.3d 242, 249 n.4 (5th Cir. 2021). This court analyzes the two tests together because of this "redundancy." *Id.*

Beginning with the first factor, a judge might "reasonably be expected upon remand to have substantial difficulty" putting aside previously expressed but inappropriate views when there has been a repeated failure to follow the mandate of an appellate court. *See In re DaimlerChrysler Corp.*, 294 F.3d 697, 700 (5th Cir. 2002) (quoting *Simon v. City of Clute*, 825 F.2d 940, 943–44 (5th Cir. 1987)). Doing so can make "clear that [the judge] is fixed in his view" of a case. *Khan*, 997 F.3d at 249. But "'judicial rulings alone almost never constitute a valid basis' for finding bias or partiality." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 581 (5th Cir. 2005) (quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994)). As discussed at the outset, this is this court's fourth review of this case. In *Stukenberg II* and *Stukenberg III*, this court reversed the district court

following the district judge's apparent disregard for this court's instructions. 929 F.3d at 276; 977 F.3d at 482. This court described the district judge as "well-intentioned" and as acting in "good faith" in each of those cases, respectively. 929 F.3d at 278; 977 F.3d 483.

Although bad faith would be highly indicative of a need to reassign this case, good faith is no safe harbor. *In re DaimlerChrysler Corp.*, 294 F.3d at 701 ("[N]otwithstanding all good faith efforts on the part of the district court, it would be exceedingly difficult for the district court to regain some impartiality in this case."). And the district judge's statements since *Stukenberg III* strongly suggest that she has become "fixed in [her] view." *Khan*, 997 F.3d at 249. For example, the *Stukenberg II* court invalidated as overbroad the district court's requirement that state create an integrated computer system. 929 F.3d at 279. But at a later hearing, the district judge remarked: "I know the Fifth Circuit prohibited me from talking about a new computer system, but I'm going to talk about it anyway . . . ." At the contempt hearing underlying this appeal, the district judge again raised this matter:

> We've asked over and over again. I even asked [Defendants] if you could find somebody — if somebody in the community could find somebody to do — even though the Fifth Circuit and I — and I respect their wisdom on this. The Fifth Circuit overruled or vacated the order to do a unified computer system. There may be somebody out there that could donate the money to do that for the sake of the children. And I asked for a response . . . if somebody could find that, could you-all respond if you would accept it. No response.

And even after *Stukenberg III*, which firmly ordered the judge not to further modify the remedial decree, she imposed extraneous orders on the state to (a) provide information about children's Covid vaccine refusals; (b) expand children's mental health care services; and (c) produce documents

not relevant to the Remedial Orders under threat of contempt for noncompliance.

Our comprehensive review of the district judge's conduct throughout the three-day contempt hearing in December 2023 that brought this issue to fruition repeatedly exhibits a highly antagonistic demeanor toward the Defendants. The district court, to begin with, urged and instigated the Plaintiffs for several months to seek contempt. During the hearing, the judge repeatedly questioned the Defendants' unwillingness to exceed the requirements of the remedial decree: "I told the State that this is not anything to do with the Court, but they have resources in these monitors . . . that they can use. . . . Nothing. Nothing." And toward the end of the hearing: "[I]t doesn't hurt to go over and above, not just the minimum standards, but over and above." And relatively soon thereafter: "I'm thankful to the public attention that the press has shown this. Sometimes it's just very important to call this out to the public, and that's the organ to do that." The court's interest in whether the state's actions exceeded the scope of its remedial injunctive orders suggests the court has a "substantial difficulty" moving past the previously invalidated, overbroad remedial orders.

The district judge also showed signs of being dug-in on her interpretation of the remedial decree during the contempt hearing:

> THE COURT: "And you do realize that to get off monitoring you have to completely, fully comply. It's not substantial compliance. Did you know that?"
>
> COUNSEL: "Your Honor, our view is that the Fifth Circuit has held a substantial compliance with court orders —"
>
> THE COURT: "Let me explain to you one more time. This order that was affirmed said full compliance. . . . You-all tried

to appeal that and could not do it.[5]  Did you know that?  Were
you aware of that history? . . .  And that Fifth Circuit, as Ms.
Ho knows her husband[6] issued very clearly that we cannot go
outside the mandate."

The district judge continued this line of commentary about appellate review
in this case:

> And I know y'all are waiting for me — and Ms. Ho — and I
> don't know why, waiting for me to issue some order that you
> think you can take immediately up to the Fifth Circuit and get
> rid of heightened monitoring or get rid of this or get rid of that.
> . . .  I know you have children, Ms. Ho, and you care about
> them, too, like I care about these children.  So please, please,
> let's work together.

Later in the contempt hearing, amid further arguments by counsel about the
interpretation of Remedial Order 3 in particular, the judge stated:

> This is the problem we have.  You got it?  [Counsel are] trying
> to parse out — and it's the most incredible thing instead of just
> saying, 'We've got some problems.  We need to fix them,'
> we've got to parse out this — ridiculous, ridiculous things.
> And it's so difficult to have — over the years the State has a
> shifting sands of positions on how to address these things,
> depending on new counsel, ex-counsel, new commissioners.
> And it's almost impossible to follow, and nothing good comes
> of it for the children, and it's incredibly frustrating.

*See Johnson*, 120 F.3d at 1335 (reassigning after the judge, among other
things, touted that he had the "job and responsibility of determining what the

---

[5] This court declined to reach the issue in *Stukenberg II* because the state waived it.
929 F.3d 272, 281 (5th Cir. 2019).

[6] Defense counsel's husband is a judge of this court, who authored *Stukenberg III*
before his wife was retained by Defendants.

rule of law is and how to interpret it," said there was "no basis" for witnesses to tell him otherwise, and chastised the witnesses with marked sarcasm).

These statements not only speak to the first factor, but they also raise serious questions concerning the second factor, "the appearance of justice." *Johnson*, 120 F.3d at 1333. A "high degree of antagonism" can be cause for reassignment under this factor, but it requires "more than intemperate remarks." *Johnson*, 120 F.3d at 1335 (first quote); *United States v. Stanford*, 883 F.3d 500, 516 (5th Cir. 2018) (second quote). A lengthy exchange highlighting these concerns occurred at the beginning of the contempt hearing, when the district judge asked numerous questions about Defendants' objections to the accuracy of the monitors' findings.[7] Defendants claimed they "were not noticed that these objections would be ruled on" at the hearing, to which the district judge replied: "Listen, it doesn't matter that you weren't noticed."

The judge's mode of questioning about these objections is inappropriate. *See Johnson*, 120 F.3d at 1334 (reassigning in part because although "the district judge was justifiably concerned about truthfulness by the witnesses. . . . we question the extent, and manner by which, he pressed that concern"). Close to the beginning of this discussion, early on the first day of the contempt hearing, the district judge stated: "I'm disappointed . . . that the Defendants are not actually reading the report and checking before they file these kind of objections." This accusation came before counsel had an opportunity to explain those objections at the hearing. The court's

---

[7] The objections discussed during this part of the contempt hearing included the monitors' classification of certain foster care facilities as adult or non-adult facilities, the monitors' findings in individual complaints of misconduct, the monitors' use of a supposedly state-provided seven-to-one caseworker-to-supervisor ratio in their reports, and the total number of closed cases that the monitors reviewed in composing their reports.

aversion to Defendants' objections grew clearer as the discussion turned to the monitors' classification of a certain facility: "And then you-all actually had the nerve to object that that was not an adult foster care facility?" The judge later remarked on the same subject: "I don't want to waste everybody's time with addressing these ridiculous, spurious objections. . . . You have my class of children rooming with adult foster care people. And that's the bottom line." And to another objection, the court commented: "[T]his is stunning. Look at this one."

The judge's reaction to one objection about the appropriate scope for evaluating Defendants' substantial compliance defense is particularly notable, as that is one ground on which this court now reverses: "Oh, no, I'm not going to pay any attention to that. That's like — that's like those little kids don't matter because it's — they've substantially complied, because most investigations in DFPS and most investigations elsewhere are just fine." *See Latiolais v. Cravins*, 574 F. App'x 429, 537 (5th Cir. 2014) (reassigning because "it would be exceedingly difficult for [the judge] to put aside the views he expressed about the evidence against [Defendant] that we deem substantial. For example . . . he expressed the intemperate view: 'There is no way on God's green earth that there has been any testimony that should hold [Defendant] into this case. There was none. It was—it is not there. It's not there. It's clearly not there. I heard no evidence whatsoever.'").

Along with these comments about the objections, the district judge accused Defense counsel of Rule 11 violations: "You know what the Rule 11 requirements are. . . . [T]hat may be a subject for another hearing." The judge continued: "So perhaps you did not properly when you signed your name to this objection to [sic] make inquiries or read the prior records or the prior Monitors' reports. I think you get where we're going now, [counsel]. Is it sinking in? Slowly?"

On this topic and others, the district judge often criticized the State's litigation strategy and corresponding expenses. For example:

> Prior objections from the state were really spelling, name — name corrections, typos. Now we're talking about substantive objections to actually information provided to the Monitors word for word by the State. And that, of course, runs up billable hours for your firm, incredible scores of hours for the Monitors to rebut these many times spurious objections, all money that could go to the children.

The judge later returned to the subject of billable hours: "I'm just saying that this is such a waste of time for your billable hours, for the Monitors' billable time. And I get paid no matter what. It's no waste of time. I'm here for you-all, all day, all night, whatever." And again, still in the context of these objections:

> And let me say something else while I'm jumping on you. . . . But at some point I have to step in and say let's not do this. We don't need to argue about every single thing, especially unnecessarily taking away money from the kids. And I know that's not your point, that you didn't do this for that. You're representing your client. But may I ask if we could have an attitude shift on this of more cooperative for the sake of the children?

The court continued to discuss the objections for some time following this call for peace. At the end of the contempt hearing, after the judge commented to the Defendants that "it doesn't hurt to go over and above" the orders in the remedial decree, the judge remarked:

> The Children's attorneys have been fantastic and given it their all. And I thank the State's attorneys too. I'm just sorry we're having a contempt motion and having these hearings. I just wish that instead of paying for all of this, all the time, the people of Texas could help us — help you-all understand that this is an important, very important subject . . . .

Money again came up in one witness examination:

> WITNESS: "They've got money. They are spending it instead trying to do everything to not follow your orders."
>
> THE COURT: "I'm aware. . . . [T]hey're trying to do workarounds of my orders . . . ."

*See Johnson*, 120 F.3d at 1335–36 (reassigning after the judge, among other things, said that he was "concerned about how we spend our money in this United States of America" and that "the tax payers should not be paying 10–$15 [sic] million out because it doesn't cost [the government] anything to come down here to try this case.").

In an earlier status conference, the judge even mixed the state's performance of the remedial decree with an extraneous federal program. There, the judge brought up the Family and First Preservation Services Act, 42 U.S.C. §§ 670–679, and specifically its grant of federal funds to state programs that meet the relevant criteria to be "qualified residential treatment programs." *Id.* § 672. The judge remarked:

> But here is what I understand, that you-all have no intention of bringing any of those RTCs, Residential Treatment Center, treatment programs, into compliance with that 2018 Act. So you have notified the State, the Legislature, that you have an expected loss of 17.4 million in federal support in fiscal year '22, another 25.6 million in fiscal year '23. Now that's giving up a whole lot of money for these children, while still complaining, I might add, as an aside of the Monitors' fees, as well as it makes me wonder what on earth I could fine you by way of sanctions if you have not complied . . . if you can throw away some $40 million without a by [your] leave, because you can't bring these RTCs up to — what looks to me like pretty minimal requirements to get this money.

And in another pre-contempt hearing status conference, when discussing apparent issues with certain electronic medical databases, the judge stated:

"I mean, I've got to give the Plaintiffs—at least [Counsel], a bunch more money."[8]

Returning to the contempt hearing, when it began in earnest the district judge's remarks continued in a vein that failed to demonstrate disinterestedness and evenhandedness. Defendants opted not to call any witnesses as experts, to which the judge remarked: "I think you need lots of experts, but that's only my opinion." When swearing in one group of witnesses, the district judge asked: "Have you-all heard from Commissioner Young? How is she doing?" One witness replied: "Haven't heard from her." The judge then stated: "Nobody cares."

This appears to reference the subject of an earlier status conference. There, the district judge ordered the HHSC commissioner to appear for a hearing two days after emergency surgery, even though her doctor provided her with a note saying that she should refrain from work. The judge described this as a "high school test note" and opined on what the recovery time should be. In the end, the judge did not order the Commissioner's attendance, but described that absence as "obstructive," "maddening," and "disappointing." She also suggested that Defense counsel wanted an order forcing the Commissioner to attend so that Defendants could seek mandamus relief from this court. *See In re DaimlerChrysler Corp.*, 294 F.3d at 700–01 & n.1 (reassigning after the district judge demonstrated "hostility" in responding to mandamus proceedings he called "baseless").

Before the first witness examination at the contempt hearing, Defense counsel objected on the ground that DFPS Commissioner Muth should be

---

[8] As is noted *supra*, by "giving the Plaintiffs money," the court is determining that what would otherwise be counsel fees pursuant to 28 U.S.C. 1988 is being directed to a fund "for the children" at the court's disposal.

excused because, as a potential witness, she should not be present for other witness testimony under Federal Rule of Evidence 615. When the district judge maintained that the Commissioner was to remain in attendance, Defense counsel began asking if the district judge was overruling the objection. Not content simply to overrule the objection, the district judge's response in cutting off Defense counsel is notable: "Don't go there, counsel. You're just annoying me. And that is bad form. And I'm about to hold you in [in-court] contempt. . . . So you are very close, [counsel], to be held in contempt yourself. Do you want that on your malpractice insurance?" The judge continued: "Now, when I give an order, I don't want you arguing with it again. Is that clear?"

Soon thereafter, the court mentioned the medical reason for which Commissioner Young's presence at the hearing was excused, to which Defense counsel objected because it was a public hearing. The judge replied: "Yes, it is. And don't object to my comment, sir. And stand when you address the Court. . . . And do not — do not argue with my orders again. We've already been through this. . . . And, yes, I know this is a public hearing, sir. You don't need to call that to my attention. And you-all are getting off to a very bad start here."

The judge made several other remarks during the examination of witness that imply bias. In response to a Defense objection to a direct examination question that counsel said was "vague . . . and compound and mischaracterizes what the actual document is," the judge responded: "I don't understand your objection, so I'm going to overrule it . . . your objection is compounding and confusing." After another Defense objection, the judge said: "Counsel, I interrupted you before and told you to sit down. I shouldn't have done that. If you want to clarify something, go ahead. It's just hard to listen. It's hard to listen to what [the witness] has to say." At the end of this witness's direct examination, the court discussed the logistics

surrounding whether the witness would be needed on another day of the hearing. After concluding that the witness should stay in town, the judge asked: "Well, are you in a better hotel than the kids are in? That's all I want to know."

Another such exchange arose during a direct examination on the subject of contractor quality and the State's choice of contractor:

> WITNESS: "[T]he oversight we provide is around, again, making sure that [Contractor's] services are covered and delivered. We don't necessarily —"
>
> THE COURT: "Not delivered well. You don't care if they're delivered well. You don't have anything to do with that?"
>
> WITNESS: "Your Honor, I —"
>
> THE COURT: "That's an easy one."

And later:

> THE COURT: "[T]he state contracts with these people that are not doing their job, and they still keep contracting with them, and they don't get their tests done. They're measuring it. The State is measuring it. A lot of good that does. Does anybody have an answer? What is the answer to this, except for [Contractor] is going to continue to try to work with you?"
>
> WITNESS: "Your Honor, I'm sorry. Would you repeat the question? I want to be responsive."
>
> THE COURT: "I don't know if there's a question. It was more of an irritable rant . . . ."

*See Johnson*, 120 F.3d at 1334 (reassigning after the judge, among other things, asked potential witnesses during voir dire: "Now, how many of you have a bone to pick, *other than me*, with the Internal Revenue Service?"). And when that same witness explained that it was his "understanding that [Contractor] in Texas is outperforming other states with a single statewide

Managed Care Organization for foster care," the judge dismissed it: "Well, I don't really care about other states. We're talking about this state." Why that testimony is irrelevant is unclear.

The judge displayed similar emotion during cross-examination of the same witness:

> We just had one of the world's experts on this in here talking about how important [Texas Psychotropic Medication Utilization Parameters were] for the safety of the children, and yet you who work for the Department cannot say this is a number one safety concern for psychotropic drugs. . . . And that is really chilling to me. . . . Sorry. We're going to take a break, because I'm getting distressed and it's not fair to this witness.

After the court took a recess to alleviate her distress, however, the judge stopped asking questions of the witness alongside Plaintiffs' counsel, and opted instead to insert accusatory commentary:

> PLAINTIFFS' COUNSEL: "The Texas Psychotropic Medication Utilization Parameters are in place today to help ensure child safety, are they not?"
>
> THE COURT: "He's not going to say it. He's been coached not to talk about child safety in this hearing —"
>
> COUNSEL: "Your Honor —"
>
> THE COURT: "— as every one of their witnesses has to date."
>
> COUNSEL: "Let's hear him deny it."

Plaintiffs' counsel repeated the question, but when the witness attempted to answer, the judge stated: "Here we go." At the end of that line of questioning, the judge remarked: "You got that one down." When the witness later asked a clarifying question of Plaintiffs' counsel, the judge stated: "Now, isn't that sad?" *See Johnson*, 120 F.3d at 1335 (reassigning

30

after a judge, among other things, stated: "It seems to me the problem is one of disingenuousness on the part of witnesses getting up here and saying they don't know anything. They're lying through their teeth. That's all that means.").

During another witness's testimony, the judge remarked: "I don't know how the State sleeps at night with this. I really don't." Following Defense cross-examination of that witness, when counsel said, "No further questions from this witness," the judge replied: "I would hope not. Thank you."

Caustic remarks like these are not limited to the contempt hearing. At a post-contempt hearing status conference, the judge stated: "Commissioner Young, Commissioner Muth, there are people in your departments . . . that have a higher concern about these children than either of you do, evidently." Soon thereafter, after a series of questions about the veracity of certain state records, she asked: "[Commissioner Muth], have you no shame that you can seriously sit here under oath with your cohort there . . .?" Following objection by Defense counsel, the judge stated: "I don't know how you all sleep nights. [Counsel], do you want to add your two cents here? Oh, I'm sorry, not two cents, the 1,000-some-odd dollars' worth." On another occasion, Defense counsel apparently failed to bring printed copies of certain documents that the court requested to a post-contempt hearing status conference. In response, the court quickly brought up the prospect of in-court contempt, threatening Defendants themselves: "Commissioner Muth, Commissioner Young, have you ever seen the inside of a jail cell?" *See Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 938 (5th Cir. 2006) ("[T]he question is whether the court is biased against a party, not whether the court is annoyed with the party's counsel.").

No. 24-40248

A little later, and again mentioning Defense counsel's fees, the court mused about the prospect with Plaintiffs' counsel, who joined in the crude jest at the Defendants' expense:

> THE COURT: "I'm just thinking of the the [sic] punishment for the contumacious behavior. I should sentence [Counsel] and [DFPS Commissioner] Muth and [HHSC Commissioner] Young to one of these CWOP (phonetic) houses, maybe one of the one of the [sic] cheap motels, where they can live off of McDonald's."
>
> COUNSEL: "They wouldn't have to stay there, Your Honor. They could just leave whenever they wanted. They could just leave whenever they wanted. They could just come and go since that's true security in these houses."
>
> THE COURT: "That's true. That's true, or they might be subject to the tasering or the handcuffs."
>
> COUNSEL: "Yes, they could. They certainly —"
>
> THE COURT: "Or the pulling of the arrests."
>
> COUNSEL: "They certainly wouldn't stay there for any meals."
>
> THE COURT: "And, you know, but I hate though to send anybody from Gibson Dunn at $1300 an hour to one of the CWOP locations and charge that up to the State."

The judge concluded: "These are our children. These are our children." *See Ruiz v. Estelle*, 679 F.2d 1115, 1129 (5th Cir. 1982) ("The trial judge must not become personally embroiled in the proceedings. He must not assume the role of prosecutor or defender." (quotations omitted)).

In addition to other grounds for contempt, the district judge is carrying forward Plaintiffs' request for receivership, but she expressed interest in the thoughts of one of Plaintiffs' expert witnesses on the matter during the contempt hearing:

DEFENSE COUNSEL: "[H]ave you ever discussed with anyone . . . the possibility of a receivership in the State of Texas over the child welfare system?"

THE COURT: "Do you want to ask her if she's got an opinion?"

COUNSEL: "No, Your Honor."

THE COURT: "I bet we'll get one. I like this lady."

COUNSEL: "I'm aware."

THE COURT: "I liked her from the trial."

This is not the only time the judge telegraphed her interests or leanings on certain matters in this case. In early 2023, the judge began encouraging Plaintiffs to file the instant contempt motion: "I told you-all that at the last hearing, that I was prepared to hear a contempt motion, and I never got one. . . . I can't write it for you. . . . I can just tell you that I'm prepared. . . . I was prepared today to hear one, and none showed up." Once Plaintiffs filed their motion, the court encouraged adding to it to cover more remedial orders: "Let me tell you how this is going to go. I'm going to ask [Plaintiffs' counsel] to modify his contempt motion." At the same conference in which the judge encouraged modification, she also stated: "I need to tell you all, I don't see how you ever are going to get off monitoring with this attitude. I don't know how you're going to ever turn the corner."

After the contempt hearing, Defendants filed a Rule 60(b)(5) motion for relief from judgment that remains pending, but the district judge remarked later about Defendants' "hubris" and stated that filing the motion was "unbelievable." After Plaintiffs' counsel expressed that he found the motion "maddening," the judge noted: "Well, clearly it's affecting me." *See In re DaimlerChrysler Corp.*, 294 F.3d at 701 & n.1 (reassigning because of a judge's demonstrated "hostility," including a sarcastic attack on the defendants). In that same conference, the district judge mentioned that she

was "going to start charging [Defendants] per incident in the next contempt hearing — per incident," rather than per order.

The above excerpts show that the judge exhibits a sustained pattern, over the course of months and numerous hearings, of disrespect for the Defendants and their counsel, but no such attitude toward the Plaintiffs' counsel. The judge's demeanor exhibits a "high degree of antagonism," calling into doubt at least "the appearance of fairness" for the state Defendants. *Johnson*, 120 F.3d at 1333, 1335.

The third factor relevant to a reassignment request requires evaluating the effects of reassignment on judicial efficiency, as this court weighs any "gain in preserving the appearance of fairness" against any "waste and duplication." *Johnson*, 120 F.3d at 1333. In a decade-old case, with a remedial decree covering over sixty dictates, this is a difficult task. Undoubtedly, the judge is intimately familiar with the course of proceedings and the scope of the demands placed upon state agencies that are responsible for a $2 billion budget, over 29,000 children, and 100,000 facilities. We do not lightly transfer oversight of the court's remedial decree to another federal judge given the complexity of the case.

On the other hand, this court has not previously hesitated, when necessary, to remove a judge from extended litigation. *See id.* (removing judge from a "hotly contested, extremely emotional case that had been pending for more than ten years"); *Cobell v. Kempthorne*, 455 F.3d 317, 319 (D.C. Cir. 2006) (removing judge from institutional reform case pending nearly a decade). Several facts compel bringing this case before a more disinterested tribunal. First, that the district judge has become too personally involved in the proceedings seems evident from the episodes recounted above.

No. 24-40248

Second, it is necessary to reconsider the continued adversarial nature of this proceeding. Here, the judge indicated the strong possibility, arising from over 200 pages' discussion in the 427-page order that resulted in this appeal, that there will be further contempt orders or that the foster care system will be placed in receivership. In the December 2023 hearing, in addition to taking evidence about the investigation of abuse and neglect allegations involving PMC children under Remedial Orders 3 and 10, the court considered (a) continuing safety concerns in DFPS and HHSC, (b) the use of psychotropic medicines, (c) "the CWOP [Children without placement] crisis," (d) apprising PMC children of ways to report abuse and neglect, and (e) the inadequacy of PMC children's medical and educational records. These areas of inquiry pertained to Remedial Orders 4, 7, 8, 20, 25, 26, 27, 29, 31, 35, A3, A4, A6, and the Order Regarding Workload Studies. The state counters in brief that it has fully complied with a number of Remedial Orders, and with Remedial Orders 3 and 10 by *inter alia* hiring and better training more staff, and implementing policies to hold providers accountable for poor care. The state intends to continue improving the foster care system in good faith, as exhibited by significant remedial efforts in the past several years.

We take no position on issues that have not yet matured into appealable orders. However, as a general rule of law federal judges are not allowed to become permanent de facto superintendents of major state agencies. *Horne v. Flores*, 557 U.S. 433, 453, 129 S. Ct. 2579, 2597 (2009) ("[T]he longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes."); *United States v. Mississippi*, 82 F.4th 387, 400 (5th Cir. 2023) ("Micromanagement, enforced upon threat of contempt, does not reflect the principles of comity" in prison context.). Nor, under the federalist structure created by the Constitution, is it appropriate for federal court intervention

No. 24-40248

to thwart the state's self-management, where the state is taking strides to eliminate the abuses that led to the original decree. *Horne*, 557 U.S. at 448, 129 S. Ct. at 2593–94 ("Federalism concerns are heightened" where "a federal court decree has the effect of dictating state . . . budget priorities."). Nor are federal judges even suited, by training or temperament, to manage institutions, personnel, or the provision of vital state services, even if counselled by monitors. In this case particularly, the integrity of oversight may have been further put at risk by the trial court's creation of a "fund," based on plaintiffs' attorneys' foregoing their court-approved fees, that the court may evidently disburse at its discretion. Federal judges should not be personally allocating resources from the state's taxpayers for purposes not directly tied to and controlled by the state itself in order to abide by a court decree.

As this court has explained, "when a judge's actions stand at odds with these basic notions [of fairness and impartiality], we must act or suffer the loss of public confidence in our judicial system." *Miller*, 986 F.3d at 883 (5th Cir. 2021). The district judge must be removed.

## CONCLUSION

For these reasons, we REVERSE the order of contempt, and further direct the Chief Judge of the Southern District of Texas to REASSIGN this case to another judge on remand.