IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 2:11-CV-00084 |
| | § | |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANTS' RULE 60(b)(5) MOTION FOR RELIEF FROM JUDGMENT**

## TABLE OF CONTENTS


Page

Table of Authorities ........ ii

Introduction ........ 1

Background ........ 4

Argument ........ 6

- I. Rule 60(b)(5) requires relief from judgment when the judgment has been satisfied or applying it prospectively would be inequitable. ........ 6
- II. The Court should grant relief because the judgment has been satisfied. ........ 9
  - A. The State has satisfied the judgment by substantially complying with the remedial orders. ........ 10
    - 1. Substantial compliance with a remedial order establishes that the judgment has been satisfied. ........ 10
    - 2. The Fifth Circuit has already held that the State substantially complied with Remedial Orders 3 and 10. ........ 12
    - 3. The monitors' reports establish the State's substantial compliance with the remaining remedial orders. ........ 13
  - B. In the alternative, the State has satisfied the judgment by complying in good faith and eliminating constitutional violations to the extent practicable ........ 27
- III. Alternatively, the Court should grant relief because continued application of the injunction is inequitable. ........ 30
  - A. The conditions that justified the injunction have fundamentally changed, warranting relief. ........ 31
  - B. Continued federal supervision of Texas's foster-care system is detrimental to the public interest because it interferes with core State responsibilities. ........ 34

Conclusion ........ 37

Certificate of Conference ........ 39

Certificate of Service ........ 39

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allen v. Louisiana*,
14 F.4th 366 (5th Cir. 2021) ........ 35

*Bd. of Educ. v. Dowell*,
498 U.S. 237 (1991) ........ 3, 10, 28, 29

*Chisom v. Louisiana ex rel. Landry*,
116 F.4th 309 (5th Cir. 2024) ........ *passim*

*In re Eagle-Picher Indus., Inc.*,
285 F.3d 522 (6th Cir. 2002) ........ 11

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) ........ *passim*

*Frew v. Young*,
2022 WL 135126 (5th Cir. Jan. 13, 2022) ........ 11

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ........ 31

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) ........ 8, 31

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ........ 12

*Horne v. Flores*,
557 U.S. 433 (2009) ........ *passim*

*Littlefield v. Perry*,
88 U.S. 205 (1874) ........ 12

*M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg I*"),
907 F.3d 237 (5th Cir. 2018) ........ 7, 32

*M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg II*"),
929 F.3d 272 (5th Cir. 2019) ........ 22

*M.D. ex rel. Stukenberg v. Abbott*,
2024 WL 2309123 (5th Cir. May 20, 2024) ........ 5

*M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg IV*"),
119 F.4th 373 (5th Cir. 2024) ........ *passim*

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ........ 8

**TABLE OF AUTHORITIES**
(cont'd)

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......... 8

*R.C. ex rel. Ala. Disabilities Advoc. Project v. Walley*,
270 F. App'x 989 (11th Cir. 2008) .......... 33

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) .......... 11, 30

*Tex. Dep't of Fam. & Protective Servs. v. Tex. Fam. Initiative, LLC*,
No. DC-26-04702
(95th Dist. Ct., Dallas Cnty., Tex.) (Mar. 18, 2026) .......... 34

*Texas v. Hardenberg*,
77 U.S. 68 (1869) .......... 11

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 12

*United States v. Lee*,
358 F.3d 315 (5th Cir. 2004) .......... 13

**Statutes**

Tex. Fam. Code § 264.1915(3) .......... 33

**Rules**

Fed. R. Civ. P. 60 .......... 2, 9, 27, 30

## Introduction

"[A]s a general rule of law federal judges are not allowed to become permanent de facto superintendents of major state agencies." *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg IV*"), 119 F.4th 373, 395 (5th Cir. 2024). Fifteen years into this litigation, the Fifth Circuit's warning is closer than ever to being realized, and the State remains under what that court called "constant, intrusive, and costly surveillance by a team of monitors." *Id.* at 385. That "micromanagement" has run its course. *Id.* at 386. It's time to return Texas's foster-care system to Texas.

The State has earned that result, and the Fifth Circuit has all but said so. Reviewing the contempt order that spurred its most recent decision, the court of appeals reversed the sanctions, held that the State "substantially complied with Remedial Orders 3 and 10"—the orders at the heart of the contempt proceedings—and recounted, "without contradiction," that the State has "spent $150 million attempting to comply with the court's remedial decrees and another $60 million on the monitors," "overhauled internal policies," and "lobbied for additional assistance from the Texas legislature." *Stukenberg IV*, 119 F.4th at 376, 384–85. The handful of investigations that drew the district court's ire were, in the Fifth Circuit's words, "just a drop in the bucket of systemwide investigations." *Id.* at 385.

That conclusion was consistent with the broader picture of the State's performance. Across the foster-care system, the court-ordered monitors have documented sustained, good-faith compliance with the Court's permanent injunction and remedial

orders. *See* Dkt. 606. According to the monitors' most recent reports, graduated caseloads conformed to the required standard more than 98% of the time; abuse-and-neglect investigations were conducted appropriately 94% of the time; Priority One and Two investigations were timely or timely with an approved extension 93% of the time; and HHSC completed Priority One and Two investigations within 30 days, and Priority Three through Five investigations within 60 days, in 98% of cases. *See infra* pp. 16–18 (Remedial Orders 2, 3, 10, 14, 15). As those honor-roll grades indicate, defendants have demonstrated consistently high compliance and "significant improvement." *Stukenberg IV*, 119 F.4th at 385.

If any record warrants Rule 60(b)(5) relief, it's this one. That rule "serves a particularly important function in . . . 'institutional reform litigation'" like this, *Horne v. Flores*, 557 U.S. 433, 447 (2009), authorizing relief (1) when "the judgment has been satisfied" or (2) when "applying it prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5). In this setting the Supreme Court has directed courts to take a "flexible approach," so that "'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Horne*, 557 U.S. at 450 (citation omitted).

Both grounds for relief are present here, and each reinforces the other. The judgment has been satisfied because the State has substantially complied with the decree—a conclusion the Fifth Circuit already reached with respect to two remedial orders, and one the monitors' reports confirm across the rest. And prospective enforcement is no longer equitable because the grave intrusion the injunction inflicts

on the State's core sovereign responsibilities can no longer be justified by need. "[T]he longer an injunction . . . stays in place, the greater the risk that it will improperly interfere with a State's democratic processes," *Horne*, 557 U.S. at 453, and those federalism costs are "heightened" where, as here, a federal decree has "the effect of dictating state . . . budget priorities," *id.* at 448; *see Stukenberg IV*, 119 F.4th at 395. A state may not be consigned to "judicial tutelage for the indefinite future," *Bd. of Educ. v. Dowell*, 498 U.S. 237, 249 (1991), least of all where "the state is taking strides to eliminate the abuses that led to the original decree," *Stukenberg IV*, 119 F.4th at 395, and has achieved a robust record of success in doing so.

The State takes seriously its obligations to the children in its care, and it "intends to continue improving the foster care system in good faith." *Stukenberg IV*, 119 F.4th at 395. That sacred mission is best continued by the State, not a federal court. Where a state has substantially complied with an injunction and has demonstrated readiness to govern, it is neither necessary nor "appropriate for federal court intervention to thwart the state's self-management." *Id.* The Court should grant relief from the permanent injunction in its entirety, dissolve the remedial orders flowing from that injunction, and return the management of Texas's foster-care system to the State of Texas.[1]

[1] This case was previously presided over by Judge Janis Graham Jack. After the Fifth Circuit ordered the case to be reassigned on remand, *see Stukenberg IV*, 119 F.4th at 395, it was reassigned to Chief Judge Randy Crane on March 4, 2025. *M.D. ex rel. Stukenberg v. Abbott*, 2:11-cv-84, Minute Entry (S.D. Tex. Mar. 4, 2025). For clarity, this motion refers to Judge Jack when describing actions taken during her tenure and uses "the Court" when describing post-reassignment proceedings.

## BACKGROUND

In November 2018, Judge Jack entered an injunction and more than 60 remedial orders against defendants. Dkt. 606. Judge Jack also appointed Kevin Ryan and Deborah Fowler as monitors under Federal Rule of Civil Procedure 53. Dkt. 606 at 16.

Since June 2020, the monitors have produced comprehensive reports about every six months "to assess and report on Defendants' compliance with the terms of" the remedial orders. Dkt. 606 at 16 (Remedial Order AA1). The monitors have continued to file these reports with the Court and parties, in addition to producing *ad hoc* reports on specific topics.

At a January 22, 2024 status conference, Judge Jack announced that the monitors had certified full compliance with two of her remedial orders—Remedial Orders 1 and B4. Dkt. 1510 at 4 (Jan. 22, 2024 Status Conf. Trans.). Plaintiffs didn't object, and Judge Jack entered a finding of full compliance with those orders. Dkt. 1514. Judge Jack stated, however, that her full-compliance finding for Remedial Order B4 applies "only . . . to DFPS"—not HHSC. Dkt. 1514 at n.1. And instead of granting full relief from Remedial Orders 1 and B4, she stated that she would subject defendants to a three-year monitoring and supervision period, during which any drop in compliance below 99% would lead her to "vacate the full compliance and start over." Jan. 22, 2024 Status Conf. Trans. at 6.

In April 2024, Judge Jack turned to two other orders, holding HHSC's Executive Commissioner in contempt for purported violations of Remedial Orders 3 and 10.

Dkt. 1560 (Apr. 15, 2024). The finding rested on a single HHSC unit's handling of 38 abuse-and-neglect investigations involving 13 children. *See Stukenberg IV*, 119 F.4th at 378. Judge Jack imposed fines of $100,000 per day—$50,000 for each order—to run until HHSC's leadership certified substantial compliance with the remedial orders at issue. *Id.* at 379.

Defendants appealed, and the Fifth Circuit stayed the fines. *M.D. ex rel. Stukenberg v. Abbott*, No. 24-40248, 2024 WL 2309123 (5th Cir. May 20, 2024). On October 11, 2024, the court reversed and ordered the case reassigned on remand. *Stukenberg IV*, 119 F.4th at 395. The court held that the contempt order was criminal in nature and entered without the constitutionally required protections, that the *per-diem* fines violated the State's sovereign immunity, and—central here—that the State had "substantially complied with Remedial Orders 3 and 10." *Id.* at 376; *see id.* at 382–85.

In evaluating defendants' compliance with the sweeping injunction, the Fifth Circuit took a holistic perspective. It observed that "the orders are comprehensive of the plaintiff class" and "together," defendants "conduct thousands of investigations." *Stukenberg IV*, 119 F.4th at 385. Reviewing the monitors' data, the court explained that the violations the district court had identified were committed "on a very small scale in relation to the magnitude of the institution" and the "prescriptive orders." *Id.* at 380. In fact, the investigations the district court focused on were "just a drop in the bucket of systemwide investigations subject to Orders 3 and 10." *Id.* at 385. When properly assessed against services provided across the entire state, the court

concluded, defendants' performance substantially complied with the remedial orders at issue. *See id.*

The Fifth Circuit also confronted "the difficult issue of removal." *Stukenberg IV*, 119 F.4th at 386. It determined that Judge Jack had "become too personally involved in the proceedings" and that her demeanor exhibited a "high degree of antagonism" calling into doubt "the appearance of fairness." *Id.* at 394 (citations omitted). Concluding that "[s]everal facts compel bringing this case before a more disinterested tribunal," the court removed Judge Jack and directed that the case be reassigned on remand. *Id.* at 394–95.

Following this ruling, the Fifth Circuit denied rehearing *en banc*, and its mandate issued on February 19, 2025. Dkt. 1612, 1613. The case returned to this Court and, on March 4, 2025, was reassigned. *M.D. ex rel. Stukenberg v. Abbott*, 2:11-cv-84, Minute Entry (S.D. Tex. Mar. 4, 2025). The Supreme Court later denied certiorari. Dkt. 1636. Defendants now move under Federal Rule of Civil Procedure 60(b)(5) for relief from the permanent injunction in its entirety and all remedial orders in the Court's November 2018 order. *See* Dkt. 606.

## ARGUMENT

### I. Rule 60(b)(5) requires relief from judgment when the judgment has been satisfied or applying it prospectively would be inequitable.

Rule 60(b)(5) provides for relief from a judgment or order if "the judgment has been satisfied, released, or discharged," or if "applying [the judgment or order] prospectively is no longer equitable." As the Supreme Court has explained, "Rule

60(b)(5) serves a particularly important function in . . . 'institutional reform litigation'" like this. *Horne*, 557 U.S. at 447. The Supreme Court has articulated two reasons for Rule 60(b)(5)'s pivotal role in this context, and the Fifth Circuit's decision makes clear that both are implicated here.

*First*, "injunctions issued in [institutional-reform] cases often remain in force for many years." *Horne*, 557 U.S. at 447–48. Here, as the Fifth Circuit observed, "[n]early a decade has passed since the district court entered its first judgment ordering remedial relief," during which the State has remained under "constant, intrusive, and costly surveillance by a team of monitors and the district court." *Stukenberg IV*, 119 F.4th at 385. "[T]he passage of time frequently brings about changed circumstances" that call for "reexamination of the original judgment" in light of new developments. *Horne*, 557 U.S. at 448.

*Second*, "institutional reform injunctions often raise sensitive federalism concerns." *Horne*, 557 U.S. at 448. These injunctions frequently intrude on "areas of core state responsibility"—including the child-welfare system at issue here. *Id.* The Fifth Circuit has said so repeatedly in this case. Eight years ago, it cautioned that "institutional reform injunctions are disfavored" and that "[a]n intrusion of this scale should not be taken lightly." *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg I*"), 907 F.3d 237, 271 (5th Cir. 2018). Two years ago, it warned that the "longer an injunction . . . stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Stukenberg IV*, 119 F.4th at 395 (quoting *Horne*, 557 U.S. at 453).

Those serious "[f]ederalism concerns are heightened" when, as in this case, "a federal court decree has the effect of dictating state . . . budget priorities." *Horne*, 557 U.S. at 448; *see Stukenberg IV*, 119 F.4th at 395. An institutional-reform decree "eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds." *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring); *see Horne*, 557 U.S. at 448.

Those decrees also "interfere with a State's democratic processes" and diminish the political accountability at the heart of our system of government. *Horne*, 557 U.S. at 448–50, 453, 471. In sum, the "expansive use of equitable remedies has long been recognized as a threat to federalism," because sweeping institutional-reform injunctions "threaten 'the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *In re Gee*, 941 F.3d 153, 167 (5th Cir. 2019) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974)). For that reason, "federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Jenkins*, 515 U.S. at 88 (opinion of the Court) (citation omitted).

The profound concerns surrounding institutional-reform litigation require that courts apply "a 'flexible approach' to Rule 60(b)(5) motions." *Horne*, 557 U.S. at 450; *see Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (Rule 60(b)(5) should be given a "liberal construction") (citation omitted). This "flexible approach allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Horne*, 557 U.S. at

450. "If a durable remedy" addressing the objective of the underlying order "has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.*

Here, applying the "flexible approach" mandated by the Supreme Court—and confirmed by the Fifth Circuit in this case—makes clear that this Court should relieve defendants from the injunction in its entirety, for two separate but related reasons: (1) defendants' high degree of compliance across the board means that the injunction has been satisfied, and (2) applying the injunction to defendants prospectively is no longer equitable given defendants' compliance and the severe federalism costs the injunction imposes.

## II. The Court should grant relief because the judgment has been satisfied.

A defendant is entitled to relief from judgment when "the judgment has been satisfied." Fed. R. Civ. P. 60(b)(5). The State is entitled to relief from the injunction here because the judgment has been satisfied for two different reasons.

*First*, a judicial decree may be satisfied by "substantial compliance." *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 318 (5th Cir. 2024) (*en banc*); *accord Frew*, 780 F.3d at 330. In determining whether a defendant has achieved substantial compliance warranting relief from judgment, courts must take into account an order's "potential to 'undermine the sovereign interests and accountability of state governments.'" *Frew*, 780 F.3d at 323, 327 (citation omitted). The Fifth Circuit has already held that the State substantially complied with the two orders on which Judge Jack based the contempt sanctions, and the monitors' own reports establish substantial

compliance—and, as to several orders, full compliance—across the remainder of the decree. The judgment has therefore been satisfied with respect to every remedial order.

*Second*, a judicial decree may be satisfied by good-faith efforts. The Supreme Court has explained that relief from judgment may be warranted where a defendant has "complied in good faith" with the decree and the targeted violation has "been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249–50. This standard recognizes that a defendant subject to a court order shouldn't be penalized for good-faith efforts when external factors prevent further compliance. *Id.* at 250 n.2. Here, the Fifth Circuit already found "[t]he state endeavored in good faith to comply with the court's orders" while undertaking significant efforts to eliminate the conditions the injunction targeted to the extent practicable. *Stukenberg IV*, 119 F.4th at 384.

Under either standard, relief from judgment is warranted.

### A. The State has satisfied the judgment by substantially complying with the remedial orders.

#### 1. Substantial compliance with a remedial order establishes that the judgment has been satisfied.

Substantial compliance establishes that a judgment has been satisfied. As the Fifth Circuit recently held *en banc*, a party demonstrates that a judgment has been satisfied by showing "substantial compliance" with the court's order. *Chisom*, 116 F.4th at 318. "Substantial compliance excuses deviations" that "do not severely impair the . . . purpose" of the order. *Frew*, 780 F.3d at 330. And a party's "compliance with the Decree is measured in how closely it follows the Decree's policy mandates."

*Frew v. Young*, 2022 WL 135126, at *3, *6 (5th Cir. Jan. 13, 2022). The standard is substantial compliance, not perfection, and that standard is met when "the objects of the decree have been attained." *Chisom*, 116 F.4th at 316 (citation omitted); *see Horne*, 557 U.S. at 450.

Although the Fifth Circuit has previously applied the substantial-compliance doctrine in cases involving satisfaction of consent decrees, rather than injunctions, that distinction makes no difference. A consent decree is "subject to the rules generally applicable to other judgments and decrees," so there is no principled basis for applying substantial compliance to a decree entered by agreement while withholding it from one entered after trial. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992).

Applying the substantial-compliance doctrine to determine whether an injunction has been satisfied follows from first principles. An injunction is an exercise of the Court's equitable power, and equity has long recognized that substantial compliance (rather than perfection) is an appropriate standard for compliance with legal commands. *See*, *e.g.*, *In re Eagle-Picher Indus., Inc.*, 285 F.3d 522, 529 (6th Cir. 2002) ("The substantial compliance rule is an equitable doctrine."). Indeed, the equitable substantial compliance doctrine is a specific application of the age-old maxim that "[e]quity looks through forms to substance." *Texas v. Hardenberg*, 77 U.S. 68, 89 (1869). And the fact "that a court [exercising equity jurisdiction] *can* award complete relief is not to say that it *should* do so. Complete relief is not a guarantee—it is a

maximum a court can provide." *Trump v. CASA, Inc.*, 606 U.S. 831, 853–54 (2025) (emphases in original).

So, while "equity is flexible," "in the federal system . . . that flexibility is confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999); *accord Littlefield v. Perry*, 88 U.S. 205, 218 (1874) (federal courts empowered by federal law to grant injunctions do so "according to the course and principles of courts of equity"). Because substantial compliance is a deeply ingrained feature of the Court's equitable jurisdiction, it's appropriate to use that doctrine to determine whether defendants have satisfied the Court's equitable commands for purposes of Rule 60(b)(5). Insisting on perfect compliance rather than substantial compliance would privilege form over substance and effectively nullify the judgment-satisfaction prong of Rule 60(b)(5) as applied to injunctions.

### 2. The Fifth Circuit has already held that the State substantially complied with Remedial Orders 3 and 10.

The defendants have achieved substantial compliance with all the remedial orders. Take the Fifth Circuit's most recent decision as a starting point. In reviewing the April 2024 contempt order, the court held that "the state has substantially complied with Remedial Orders 3 and 10"—the two orders the district court singled out as the basis for contempt. *Stukenberg IV*, 119 F.4th at 376. Examining the monitors' findings, the court held that "[t]he district court therefore erred in not finding that Defendants substantially complied with Orders 3 and 10." *Id.* at 385.

The court reached that conclusion by (correctly) measuring compliance across the statewide foster-care system as a whole, rather than seizing on a handful of investigations. The violations the district court had identified, the court explained, were "just a drop in the bucket of systemwide investigations subject to Orders 3 and 10." *Stukenberg IV*, 119 F.4th at 385. Of the 954 investigations the monitors reviewed for Remedial Order 3 compliance, they "agreed with the disposition of 95%." *Id.* And compliance with Remedial Order 10 stood at 84% in the then-most recent period reviewed—a "significant improvement from 2019, when the monitors found that only 21%" of relevant investigations complied. *Id.*; *see* Order 10 (compliance has now risen to 93%). In weighing those figures, the court applied the foundational principle that "equity looks beyond superficial distinctions" and "looks to the substance and not merely to the form." *Stukenberg IV*, 119 F.4th at 385 (citations and alteration omitted).

That holding is now the law of this case, and it binds this Court on remand. *See United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004). The monitors' most recent reports confirm that the panel's conclusion is even more strongly supported today: the State's compliance with Remedial Order 3 stands at 94%, and its compliance with Remedial Order 10 at 93%. *See* Order 3; Order 10.

**3. The monitors' reports establish the State's substantial compliance with the remaining remedial orders.**

What the Fifth Circuit found for Remedial Orders 3 and 10 also holds true across the remaining remedial orders, as confirmed by the monitors' reports. At the high end, Judge Jack already found the State in full compliance with certain remedial

orders. In her February 2, 2024 order, Judge Jack found that DFPS "is in full compliance as to Remedial Order 1 and Remedial Order B4." Dkt. 1514; *see* Order 1; Order B4. Because satisfaction requires only substantial compliance, a finding of full compliance forecloses any argument that those orders remain unsatisfied as to DFPS. *See Chisom*, 116 F.4th at 318.

The State has also achieved substantial compliance with the remaining remedial orders, which can be grouped in three categories.

*First*, many orders are satisfied because they required the State to create or implement a durable mechanism, and that mechanism is now in place. For example, the State created electronic profile characteristics, established caseload guidelines, stood up a sophisticated heightened-monitoring program, completed workload studies, and gave the monitors the reporting and records access the decree specifies. Whole categories of the decree are satisfied outright on this basis: namely, every order governing the monitoring apparatus itself, *see* Orders AA1–AA13, BB1–BB3, along with the orders resolved by the parties' Agreed Order, *see* Orders A1, A2, B1, B2; Update (Dkt. 1426) at 2; Dkt. 772. Because each of these orders called for a discrete act of implementation, which the State has performed, the orders are satisfied. *See Frew*, 780 F.3d at 331.

*Second*, the orders requiring continuing performance are being met at consistently high rates, often in the mid-to-high 90s or at 100%. For example, the monitors report 98% compliance with Remedial Orders 14 and 15, 100% with Remedial Order 24, and 99% with Remedial Order 30. *See* Orders 14, 15, 24, 30. Those levels of

compliance easily exceed the 84% the Fifth Circuit *already* deemed sufficient to constitute substantial compliance with Remedial Order 10. *See Stukenberg IV*, 119 F.4th at 385.

*Third*, the handful of orders on which the State's measured compliance is comparatively lower are not decree-defeating outliers. They reflect the kind of operational deviations that substantial compliance, by definition, "excuses" because they "do not severely impair the [orders'] . . . purpose." *Frew*, 780 F.3d at 330. Indeed, the State's compliance with each remains at or near the 84% compliance mark already recognized as substantial by the Fifth Circuit. *See Stukenberg IV*, 119 F.4th at 385. A finding of substantial compliance remains fully justified here because the Fifth Circuit rejected focusing on "a drop in the bucket of systemwide investigations" and required that compliance be assessed across *the system as a whole*, not by isolating the weakest figures. *Id.*

The chart below sets out by order the monitors' most recent findings and the report in which each appears. Those reports demonstrate that the State has substantially complied with the decree, and that the judgment has been satisfied as a result.

| **Order** | **Description** | **Compliance** | **Context and Source** |
|---|---|---|---|
| 1 | DFPS must implement professional development training. | 97% | DFPS has implemented the training, as evidenced by 97% of caseworkers having completed it during the monitors' review period. Ninth Report (Dkt. 1658) at 14. |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| 2 | Newly hired caseworkers must have graduated caseloads. | 98%+ | Caseload performance was "again strong" and conformed with the graduated standard "more than 98%" of the time. Eleventh Report (Dkt. 1659) at 5. |
| 3 | Abuse-and-neglect investigations must be timely completed and account for child safety. | 94% | Defendants' investigations were "conducted appropriately" 94% of the time. Eleventh Report at 8. |
| 4 | DFPS must train caseworkers and caregivers to recognize and report sexual abuse. | 99.8% (caseworkers); 81.6% (caregivers) | 99.8% of the review period's 1,962 caseworkers completed the training, while 81.6% of the 70,847 caregivers reported completing it. Tenth Report (Dkt. 1660) at 35, 37–38. |
| 5 | Priority One investigations must be initiated within 24 hours of intake. | 79% | DFPS made face-to-face contact with victims within 24 hours of intake in 79% of Priority One investigations. Eleventh Report at 68. |
| 6 | Priority Two investigations must be initiated within 72 hours of intake. | 85% | DFPS made face-to-face contact with victims within 72 hours of intake in 85% of Priority Two investigations. Eleventh Report at 80. |
| 7 | DFPS must complete face-to-face contact with the victim in Priority One investigations within 24 hours of intake. | 79% | DFPS investigators completed face-to-face contact within 24 hours of intake in 79% of Priority One investigations. Eleventh Report at 81. |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| 8 | DFPS must complete face-to-face contact with the victim in Priority Two investigations within 72 hours of intake. | 85% | DFPS investigators completed face-to-face contact within 72 hours of intake in 85% of Priority Two investigations. Eleventh Report at 72. |
| 9 | DFPS must report to the monitors all investigations that aren't initiated on time with face-to-face contact. | 97% | DFPS reported face-to-face contact status in 97% of investigations. Eleventh Report at 72–73. |
| 10 | Priority One and Priority Two investigations must be completed within 30 days of intake, unless an extension has been approved for good cause and documented. | 93% | Of 1,761 investigations completed by defendants during the review period, 93% were timely or timely with an extension. Eleventh Report at 74–75. |
| 11 | DFPS must report each month to the monitors all investigations that aren't timely completed. | 88% | DFPS data included required extension documentation in 88% of investigations with extensions. Eleventh Report at 76. |
| 12 | HHSC investigators must observe or interview Priority One investigation victims within 24 hours of intake. | 100% | 100% of Priority One investigations involving the class of children at issue included interviews with victims within 24 hours of intake. Fourth Report at 83 & n.112.[2] |

[2] Since the Fourth Report, HHSC hasn't reported any Priority One minimum-standards investigations during the monitors' review periods, with the most recent review period concluding in November 2024. *See* Tenth Report at 137. In November 2024, HHSC began implementing new policies and procedures to enhance prioritization of minimum-standards investigations. *See* Declaration of Rachel

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| 13 | HHSC investigators must observe or interview Priority Two investigation victims within 72 hours of intake. | 94% | HHSC investigators made face-to-face contact within 72 hours in 94% of investigations. Tenth Report at 137. |
| 14[3] | HHSC must complete Priority One and Priority Two investigations within 30 days of intake. | 98% | HHSC investigators completed Priority One and Priority Two investigations within 30 days in 98% of cases. Tenth Report at 138. |
| 15 | HHSC must complete Priority Three, Priority Four, and Priority Five investigations within 60 days of intake. | 98% | HHSC investigators completed Priority Three, Priority Four, and Priority Five investigations within 60 days in 98% of cases. Tenth Report at 138. |
| 16 | Investigators must complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed. | 97% | HHSC completed documentation on the same day the investigation was completed in 97% of relevant investigations; DFPS compliance is 100% because its IMPACT system automatically records completion and submission on the same |

Ashworth-Mazerolle at ¶ 2. Between January 2025 and April 2026, there were 9 Priority One minimum-standards investigations involving PMC children. *Id.* at ¶ 3. All 9 (100%) of those investigations complied with Remedial Order 12 because all child victims were observed or interviewed within 24 hours of intake. *See id.*

[3] By their text, Remedial Orders 12, 13, and 14 apply to "abuse" and "neglect investigations." Dkt. 606 at 4. Judge Jack and the monitors have nevertheless measured the State's compliance based on investigations that *aren't* abuse-and-neglect investigations. *See* First Report (Dkt. 869) at 274 n.635. The investigations they assess are minimum-standards investigations housed under HHSC's Residential Childcare Regulation division. These investigations have purposes distinct from abuse-and-neglect investigations, and they operate under different regulatory frameworks and governing laws. Other remedial orders acknowledge this crucial distinction. *See*, *e.g.*, Dkt. 606 at 4 (Remedial Order 18: "abuse and neglect investigations . . . or standards investigation"). As a result, the Court shouldn't apply Remedial Orders 12, 13, and 14 to minimum-standards investigations. Assuming the orders do apply, however, relief should be granted based on defendants' sustained high compliance.

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| | | | date. Tenth Report at 139; Eleventh Report at 82. |
| 17 | HHSC minimum-standards investigators must complete and submit documentation in Priority Three, Priority Four, and Priority Five investigations within 60 days of intake. | 98% | HHSC investigators completed documentation within 60 days in 98% of Priority Three, Priority Four, and Priority Five investigations. Tenth Report at 139. |
| 18 | Investigators must mail notification letters to the referent and provider in Priority One and Priority Two investigations within 5 days of closing an investigation. | 99% (provider letter); 94% (referent letter) | Across all defendants, 99% of investigations (2,079 of 2,095) included a timely provider letter. Across all defendants, 94% of investigations (1,975 of 2,095) included a timely referent letter. Eleventh Report at 82–83; Tenth Report at 139. |
| 19 | Investigators must mail notification letters to the referent and provider in Priority Three, Priority Four, and Priority Five investigations within 60 days of intake. | 97% | Defendants sent timely Priority Three, Priority Four, and Priority Five notification letters 97% of the time. Tenth Report at 140. |
| 20 | Defendants must implement a heightened monitoring program. | Satisfied | Defendants identify, track, and address concerns at heightened monitoring facilities by conducting weekly unannounced visits during the Plan-in-Effect stage, enforcing written Heightened Monitoring Plans through task tracking and quarterly reports, coordinating HHSC citations with DFPS corrective actions, meeting with the operations |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| | | | monthly to discuss compliance status, tracking violations, and documenting placement approvals with required post-plan follow-up. Tenth Report at 128–29, 141–42, 149–51, 153, 166–67. |
| 21 | Defendants have the right to suspend or revoke the license of a facility to protect children in their care. | Satisfied | Defendants maintain and exercise the right to suspend or revoke licenses to protect children. Eighth Report at 218–436. |
| 22 | HHSC must conduct extended compliance history reviews (ECHRs) of facilities. | 92% | ECHRs were completed the same day or up to three days before the inspection in 92% of inspections (642 of 696). Tenth Report at 110. Inspectors discussed all substantiated abuse-or-neglect findings in 92% of ECHRs for operations. Tenth Report at 134. |
| 23 | DFPS must create an electronic "profile characteristic option" to designate confirmed "sexually abused" children. | Satisfied | DFPS created and maintains a profile characteristic in IMPACT for caseworkers to indicate sexual abuse. First Report at 210; Eighth Report at 44. |
| 24 | DFPS must document in a child's records all confirmed allegations of sexual abuse in which the child is the victim. | 100% | In a recent review period, the monitors found no instances of confirmed sexual victimization for which DFPS failed to indicate the child as a confirmed victim on the sexual incident history page. Tenth Report at 40. |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| 25 | A child's caregivers must be apprised of "confirmed allegations." | 90%+ | Upon being given a "Child Sexual History Report" (also known as Attachment A and attached to the Placement Summary form), caregivers signed a written acknowledgment more than 90% of the time. Tenth Report at 73. |
| 26 | DFPS must document all information about sexual abuse in the child's placement summary form and common application. | 98% (common application); 84% (Placement Summary – Attachment A) | 98% of common applications contained all sexual history information. Tenth Report at 71–72. A "Child Sexual History Report" (also known as Attachment A and attached to a Placement Summary form) contained "complete sexual history" and was signed by a caregiver in 84% of cases. Tenth Report at 74. |
| 27 | A child's caregivers must be apprised of confirmed allegations of sexual abuse. | 90%+ | Upon being given a "Child Sexual History Report" (also known as Attachment A and attached to the Placement Summary form), caregivers signed a written acknowledgment more than 90% of the time. Tenth Report at 73. |
| 28 | DFPS must create an electronic "child sexual aggression" and "sexual behavior problem" profile characteristic option. | Satisfied | DFPS created and uses profile characteristic options consistent with this order. First Report at 210; Eighth Report at 44. |
| 29 | DFPS must document information about sexually aggressive behavior in the child's Placement | 99% (common application); 84% (Place- | Common applications included all aggression history in 99% of cases. Tenth Report at 71–73. A "Child Sexual History Report" |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| | Summary form and common application. | ment Summary – Attachment A) | (also known as Attachment A and attached to a Placement Summary form) contained "complete sexual history" and was signed by a caregiver in 84% of cases. Tenth Report at 74. |
| 30 | DFPS must document in a child's records all confirmed allegations of sexual abuse involving the child as the aggressor. | 99% | Sexual history information was found in Attachment A for children with a sexual aggression indicator in 99% of cases. Tenth Report at 71–72. |
| 31 | Caregivers must be apprised of confirmed allegations of sexual abuse involving the child as the aggressor. | 91% | Upon being given a "Child Sexual History Report" (also known as Attachment A and attached to the Placement Summary form), caregivers signed a written acknowledgment in 91% of cases where the child had a sexual aggression indicator. Tenth Report at 71–73. |
| 32 | DFPS must create a clear policy on what constitutes child-on-child sexual abuse and ensure that staff responsible for making "determinations" are trained on the policy. | Satisfied | DFPS has implemented policies and procedures to define sexual abuse, and has successfully implemented a training program—as evidenced by 99.8% of caseworkers having completed the training during a recent review period. Tenth Report at 34–35. |
| 33 | Invalidated by the Fifth Circuit in *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg II*"), 929 F.3d 272 (5th Cir. 2019). | | |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| 34 | Invalidated by the Fifth Circuit in *Stukenberg II*. | | |
| 35 | DFPS must track caseloads on a child-only basis and provide detailed reports to the monitors. | 89% | 89% of all caseworkers had primary caseloads within the guidelines. *See* Update to the Court Regarding Remedial Order 35 Caseload Performance (Dkt. 1661) at 10–11. *See also* Eleventh Report at 7 (88% compliance). |
| 36 | Invalidated by the Fifth Circuit in *Stukenberg II*. | | |
| 37 | Abuse referrals that don't result in an investigation must be shared with the caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. | 100% | Defendants properly downgraded or conducted timely Home History Reviews in 100% of reviewed cases; restrictions have dramatically reduced downgrades. Seventh Report at 106–08; Ninth Report at 111. |
| A1 | DFPS must conduct a workload study. | Satisfied | This order was satisfied by the Agreed Order. Update (Dkt. 1426) at 2. |
| A2 | DFPS must submit the workload study. | Satisfied | This order was satisfied by the Agreed Order. Update (Dkt. 1426) at 2. |
| A3 | DFPS must establish caseload guidelines based on the workload study. | Satisfied | DFPS established internal caseload standards. Eleventh Report at 15. |
| A4 | DFPS must ensure that caseload guidelines serve | 89% | The guidelines serve their purpose, as evidenced by 89% of all |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| | as guidance for caseload distribution. | | caseworkers carrying caseloads within the guidelines. *See* Update to the Court Regarding Remedial Order 35 Caseload Performance at 10–11; *see also* Eleventh Report at 7 (88% compliance). |
| A5 | Invalidated by the Fifth Circuit in *Stukenberg II*. | | |
| A6 | Caseworkers must provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. | 83% | Upon being given the Foster Care Bill of Rights, which the caseworker reviews with the child and which tells the child how to report abuse, 83% of foster-care children signed a written acknowledgment. Ninth Report at 74. |
| A7 | If a placement has more than 6 children, there must be 24-hour awake-night supervision. | 100% | The monitors found no violations during their 12 unannounced awake-night site visits in 2024. Tenth Report at 12–13. |
| A8 | DFPS must provide reports to the monitors regarding 24-hour awake-night supervision. | Satisfied | DFPS has long provided awake-night reports to the monitors. Tenth Report at 82–83. |
| B1 | Defendants must conduct a workload study for RCCL investigations. | Satisfied | This order was satisfied by the Agreed Order. Update (Dkt. 1426) at 2. |
| B2 | Defendants must submit a workload study for RCCL investigations. | Satisfied | This order was satisfied by the Agreed Order. Update (Dkt. 1426) at 2. |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| B3 | Defendants must establish RCCL caseload guidelines based on the workload study. | Satisfied | Defendants have established caseload guidelines. Dkt. 772 at 2. *See also* Motion for Relief (Dkt. 1518) at 19. |
| B4 | Investigators must maintain caseloads within guidelines. | DFPS (full compliance); HHSC (94%+) | Judge Jack previously found DFPS in full compliance with this order. *See* Motion for Relief at 20; Dkt. 1514. HHSC investigators' caseloads were within the guidelines at least 94% of the time. Ninth Report at 132, 137. |
| B5 | Allegations of abuse must be reported to the child's primary caseworker. | 97–100% | Staffing contacts communicating incident information occurred in 97–100% of intakes. Eleventh Report at 104–05. |
| AA1 | Mr. Ryan and Ms. Fowler are the monitors. | Satisfied | Mr. Ryan and Ms. Fowler serve as the monitors. |
| AA2 | Only the Court supervises the monitors and the monitors are to verify that the Court's orders are followed. | Satisfied | The monitors exercise their powers and only the Court supervises them. |
| AA3 | The monitors may independently verify data reports and statistics. | Satisfied | The monitors exercise authority to conduct independent analysis. |
| AA4 | The monitors may conduct reviews to evaluate defendants' performance and review all of defendants' plans and documents. | Satisfied | The monitors exercise this authority and review defendants' compliance. |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| AA5 | The monitors provide a written report to the Court every six months. | Satisfied | The monitors write reports every six months reviewing defendants' compliance. |
| AA6 | The monitors shall have free and complete access to records maintained by defendants. | Satisfied | Defendants have provided free and complete access to the monitors. |
| AA7 | The reports of the monitors shall be public documents filed with the Court. | Satisfied | The monitors' reports are submitted to the Court and parties for review, then filed. |
| AA8 | The parties shall have access to all information made available to the monitors. | Satisfied | Defendants have and maintain this right of access. |
| AA9 | The monitors may periodically meet privately with the Court. | Satisfied | The monitors meet periodically with the Court. |
| AA10 | Defendants shall deliver records and documents to the monitors within 30 days of request. | Satisfied | Defendants provide information to the monitors within 30 days of request. |
| AA11 | The monitors submit bills to the State. The monitors and parties follow an objection-and-dispute framework if there's an issue with a bill. | Satisfied | To date, defendants have timely paid the monitors more than $84 million. |
| AA12 | The monitors must not intervene in the administrative management of DFPS. | Satisfied | Defendants don't dispute the monitors' compliance with this limitation. |

| Order | Description | Compliance | Context and Source |
|---|---|---|---|
| AA13 | If a monitor can no longer serve, the Court shall appoint another monitor. | Satisfied | Judge Jack exercised this authority by replacing an original monitor with Ms. Fowler. |
| BB1 | Defendants must provide the monitors with unrestricted, routine, and ongoing remote access to the electronic data information systems used by defendants to serve PMC children. | Satisfied | Defendants have provided this access to the monitors. |
| BB2 | Defendants will supply the monitors the raw data relevant to the 2015–2016 workstudy conducted by DFPS. | Satisfied | Defendants gave this data to the monitors. |
| BB3 | The monitors must provide the Court with a schedule for the hourly compensation of the monitors, their staff, and consultants. | Satisfied | The monitors provided the Court and parties with their hourly rates and defendants have paid the monitors' bills in accordance with them. |

Assessed across the system, as Fifth Circuit precedent and the law of this case require, the judgment "has been satisfied." Fed. R. Civ. P. 60(b)(5).

**B. In the alternative, the State has satisfied the judgment by complying in good faith and eliminating constitutional violations to the extent practicable.**

Even if the substantial-compliance test didn't apply in this context, the defendants would still have satisfied the judgment. In the context of school-desegregation orders, the Supreme Court has directed courts to ask whether the state has "complied

in good faith" with the decree and whether the violation it targeted has "been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249–50. The Fifth Circuit has declined to extend that standard beyond school-desegregation cases, *see Chisom*, 116 F.4th at 318–19, and the State satisfies the substantial-compliance test here for the reasons already explained, *see supra* pp. 14–15. But if *Dowell*'s standard applied, the State would satisfy it, too.

The State has established its good faith. The Fifth Circuit held that "[t]he state intends to continue improving the foster care system in good faith, as exhibited by significant remedial efforts in the past several years." *Stukenberg IV*, 119 F.4th at 395. In other words, "[t]he state endeavored in good faith to comply with the court's orders." *Id.* at 384. In making that finding, the Fifth Circuit recounted the State's yearslong effort to improve the foster-care system, observing that the State has spent "$150 million attempting to comply with the court's remedial decrees and another $60 million on the monitors," "overhauled internal policies," engaged in "hiring and better training [of] more staff," "implement[ed] policies to hold providers accountable for poor care," and "lobbied for additional assistance from the Texas legislature." *Id.* at 384–85, 394–95.

A State that spends more than $200 million, rewrites its policies, retrains its workforce, and asks its Legislature for help has demonstrated a sustained, resource-intensive commitment to satisfying the decree—precisely the good faith *Dowell* envisioned.

The State has also eliminated the conditions the injunction targeted to the extent practicable. The compliance record set out above supplies the proof: the State has built every structural mechanism the decree requires and meets its operational obligations at consistently high rates, many at or near 100%. *Dowell* demands no more. Its standard is elimination of targeted conditions "to the extent practicable," *Dowell*, 498 U.S. at 249–50—not elimination in full—and for orders imposing continuing, day-to-day obligations across thousands of investigations and tens of thousands of caregivers, perfect compliance is not practically attainable.

Any system of such massive scale, administered by human beings, will sometimes fall short. But flawless performance isn't the standard. *See Stukenberg IV*, 119 F.4th at 380 (faulting the district court for treating isolated shortfalls as decisive rather than assessing performance against "the magnitude of the institution"). What the monitors' reports document is the most that can practicably be achieved—and enormous improvements from the conditions that prompted this litigation a decade and a half ago. Pursuant to proven good-faith efforts, the targeted violations have been eliminated to the extent the law requires. *See Dowell*, 498 U.S. at 249–50.

*       *       *

Whether the Court applies the governing substantial-compliance test or *Dowell*'s good-faith, practicable-elimination standard, the State has satisfied the judgment. It has substantially complied with every remedial order and has fully complied with several, and it has pursued compliance in good faith and eliminated the targeted conditions to the extent practicable. Under either standard, "the judgment has been

satisfied," Fed. R. Civ. P. 60(b)(5), and the State is entitled to relief from the injunction.

## III. Alternatively, the Court should grant relief because continued application of the injunction is inequitable.

A defendant is also entitled to relief from judgment when "applying [the original injunction] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). This ground for relief stands on its own. The three clauses of Rule 60(b)(5) are "disjunctive," and "each of the provision's three grounds for relief is independently sufficient." *Horne*, 557 U.S. at 454. So even if the State had not satisfied the judgment (and it has), it would still be entitled to relief under this clause, which turns on whether changed circumstances have rendered continued enforcement inequitable.

Prospective application of an institutional-reform injunction is no longer equitable when "'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384). The Supreme Court has recognized that a wide array of "factual and legal changes" may render continued enforcement of the original injunction "no longer equitable." *Id.* at 454, 459. That includes, for example, the implementation of a "significantly more effective" policy, new legislation in the area, "[s]tructural and management reforms" within the government entity concerned, an "overall increase" in funding to address the issue, and other pertinent changes. *Id.* at 460–61, 465, 468.

Modifying institutional-reform injunctions to account for such changed factual or legal circumstances serves the public interest because "the longer an injunction or

consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Horne*, 557 U.S. at 453. Restoring state control over core areas of state responsibility in light of changed circumstances comports with the Supreme Court's admonition that courts must avoid "permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006); *see Gee*, 941 F.3d at 167–68.

Legal and factual changes weigh in the State's favor. *First*, the facts on the ground have changed. Continuing enforcement can no longer be justified where the monitors' own data show the State has carried out the decree's implementation orders and is substantially complying with the operational ones, curing the asserted constitutional violation that gave rise to the injunction in the first place. At that point monitoring no longer serves a remedial purpose; it becomes the federal management of state operations the Fifth Circuit warned against.

*Second*, continued federal supervision of Texas's foster-care system under these conditions imposes precisely the federalism costs the Fifth Circuit has warned against in this case. As a result, whether or not the State has satisfied the judgment, relief is warranted because continued enforcement of the injunction is no longer equitable.

### A. The conditions that justified the injunction have fundamentally changed, warranting relief.

In considering whether prospective application of an injunction would be inequitable, courts must ask whether "a significant change either in factual conditions or

in law" has occurred. *Horne*, 557 U.S. at 447 (citation omitted). The Supreme Court has identified the kinds of changes that matter: implementation of "significantly more effective" policies, "[s]tructural and management reforms," an "overall increase in . . . funding" directed at the problem, and the enactment of new legislation bearing on the issue. *Id.* at 459, 460–61, 462, 465, 468. Each has occurred here.

The State has restructured how it delivers and oversees child-welfare services—going so far as to reorganize the responsible agencies. *See Stukenberg IV*, 119 F.4th at 385. It has "overhauled internal policies," *id.* at 384, implementing the graduated-caseload, investigation-timeliness, documentation, and heightened-monitoring practices the monitors' reports describe. And it has devoted extraordinary resources to the effort, spending over $150 million on compliance efforts. *Id.* at 385. These are not cosmetic adjustments; they are the "[s]tructural and management reforms" *Horne* identifies as grounds for relief. *Horne*, 557 U.S. at 465.

Those reforms have produced a "durable remedy" that makes continued enforcement of the order "not only unnecessary, but improper." *Horne*, 557 U.S. at 450. The district court's remedial orders addressed specific operational deficiencies—in investigation, oversight, documentation, supervision, and caseload management—that it traced to the constitutional violation the Fifth Circuit identified: an unreasonable risk of serious harm to children in the State's permanent managing conservatorship. *See Stukenberg I*, 907 F.3d at 268. Each of those systems is now built and working. So even if the State did not perfectly comply with every order, the conditions that created the unreasonable risk of serious harm have been remedied.

A system performing as this one does today couldn't draw a new injunction in the first instance. Nor are these changes merely passing improvements. The monitors have documented years of sustained, systemwide improvement. For example, compliance with Remedial Order 10 has climbed from "only 21%" in 2019 to the low 90s today. *Stukenberg IV*, 119 F.4th at 385; *see* Order 10. Those long-term, proven improvements warrant relief from judgment. *See Horne*, 557 U.S. at 447; *see also R.C. ex rel. Ala. Disabilities Advoc. Project v. Walley*, 270 F. App'x 989, 992–93 (11th Cir. 2008) (affirming termination of a foster-care consent decree because, "[w]hile the system is not yet perfect and may never be, . . . its improvement has been tremendous").

New legislation has also equipped the State with a powerful new tool to address former deficiencies in the foster-care system. In its most recent decision, the Fifth Circuit recognized that the State had already successfully "lobbied for additional assistance from the Texas legislature." *Stukenberg IV*, 119 F.4th at 384. Even more help has arrived since that time. In 2025, the Legislature armed DFPS with an enforcement mechanism it didn't have when the injunction issued: the power to petition a Texas court to place a community-based care contractor into receivership when conditions at the contractor "jeopardize the health, safety, or welfare" of children in the State's conservatorship. Tex. Fam. Code § 264.1915(3).

Defendants are now using this tool to continue "hold[ing] providers accountable." *Stukenberg IV*, 119 F.4th at 394. For example, within weeks of identifying per-

formance concerns with a contractor, DFPS demanded a corrective action plan, petitioned for a receiver, and secured the agreed appointment of a veteran DFPS official to stabilize the contractor's operations, ensure child safety, and determine the most appropriate resolution for the receivership. *See* Agreed Order Appointing Receiver, *Tex. Dep't of Fam. & Protective Servs. v. Tex. Fam. Initiative, LLC*, No. DC-26-04702 (95th Dist. Ct., Dallas Cnty., Tex.) (Mar. 18, 2026).

That development underscores the durability of the State's reforms going forward. If a contractor falters, Texas law now supplies a swift remedy of the State's own design—administered by Texas courts, on Texas agencies' initiative. This innovation, on top of the State's overhaul of its internal policies and tremendous expenditure of resources, demonstrates that the conditions that justified the injunction have fundamentally changed.

### B. Continued federal supervision of Texas's foster-care system is detrimental to the public interest because it interferes with core State responsibilities.

The inequity inquiry also asks whether continued enforcement is "detrimental to the public interest." *Horne*, 557 U.S. at 447 (citation omitted). The Fifth Circuit has already identified the public interests that indefinite supervision of this decree disserves. "[A]s a general rule of law," the court explained, "federal judges are not allowed to become permanent de facto superintendents of major state agencies." *Stukenberg IV*, 119 F.4th at 395. They aren't "suited, by training or temperament, to manage institutions, personnel, or the provision of vital state services, even if counselled by monitors." *Id.*

Sitting *en banc*, the Fifth Circuit has reinforced the same principle. Institutional decrees, it has warned, are "not intended to operate in perpetuity." *Chisom*, 116 F.4th at 316 (citation omitted). Rather, "the decree has an end, and it is the courts' duty to ensure that control is returned to the State when that end is reached." *Id.* Federal courts have a responsibility "[t]o prevent unnecessary imposition on the functioning of the States," which requires them to "take an approach" that "guarantees power is returned to the State as promptly as possible." *Id.* at 317. Continued enforcement of a decree of more than 60 remedial orders—governing the daily operations of state agencies responsible for a "$2 billion budget, over 29,000 children, and 100,000 facilities," *Stukenberg IV*, 119 F.4th at 394—implicates each of those concerns. *See Horne*, 557 U.S. at 448 (federalism concerns are "heightened" where a decree "dictat[es] state . . . budget priorities"); *Allen v. Louisiana*, 14 F.4th 366, 375 & n.* (5th Cir. 2021) (Oldham, J., concurring in judgment) (highlighting the "perniciousness" of decades-long decrees that "insulate today's policy decisions from review and modification by tomorrow's political processes") (citation omitted).

Those costs aren't abstract. By the Fifth Circuit's account, the State has been under "constant, intrusive, and costly surveillance by a team of monitors and the district court" for "[n]early a decade," at a cost of "$150 million attempting to comply with the court's remedial decrees and another $60 million on the monitors." *Stukenberg IV*, 119 F.4th at 385. And the monitoring meter continues to run. To date, the State has paid over $84 million to the monitors. Reflexively insisting on this arrange-

ment as the "new normal" ensures this apparatus will consume substantial state resources that could otherwise serve the children the decree was meant to protect, and the intrusion only deepens with time. As the Supreme Court has cautioned, "the longer an injunction . . . stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Horne*, 557 U.S. at 453; *see Stukenberg IV*, 119 F.4th at 395.

Judge Jack's treatment of Remedial Orders 1 and B4 shows how far that supervision has outrun its purpose. After finding DFPS in full compliance with those orders, Dkt. 1514, Judge Jack announced that she would keep the State under federal supervision for three more years regardless, reserving the power to "vacate the full compliance and start over." Jan. 22, 2024 Status Conf. Trans. at 5–6. Supervision and monitoring that continue even after a finding of full compliance constitute supervision without a remedial object—exactly the kind of open-ended federal management of a state agency the Fifth Circuit held impermissible. *See Stukenberg IV*, 119 F.4th at 395.

Under these circumstances, judicial micromanagement of core state functions must come to an end. "[W]here the state is taking strides to eliminate the abuses that led to the original decree," it is neither necessary nor "appropriate for federal court intervention to thwart the state's self-management." *Stukenberg IV*, 119 F.4th at 395. Continued prospective enforcement of the injunction is no longer equitable,

and Rule 60(b)(5) requires that responsibility for Texas's foster-care system be "returned promptly to the State and its officials." *Horne*, 557 U.S. at 450 (citation omitted).

## CONCLUSION

Pursuant to Federal Rule of Civil Procedure 60(b)(5), the Court should relieve defendants from the permanent injunction and remedial orders.

Date: July 10, 2026

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/ Kimberly Gdula*
**KIMBERLY GDULA**
State Bar No. 24052209
Southern District No. 10092074
Chief
General Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120
(512) 370-0667 – Fax
kimberly.gdula@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

*/s/ Allyson N. Ho*
**ALLYSON N. HO**
*Attorney-in-Charge*
State Bar No. 24033667
Southern District No. 1024306
**STEPHEN J. HAMMER**
State Bar No. 24116477
Southern District No. 3963953
**SAVANNAH S. HUNDT**
State Bar No. 24129020
Southern District No. 3844454

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
(214) 571-2900 – Fax
aho@gibsondunn.com
shammer@gibsondunn.com
shundt@gibsondunn.com

**PRERAK SHAH**
State Bar No. 24075053
Southern District No. 2137529

Gibson, Dunn & Crutcher LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
(346) 718-6620 – Fax
pshah@gibsondunn.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF CONFERENCE

On June 16, 2026, counsel for defendants asked counsel for plaintiffs whether plaintiffs were opposed or unopposed to the relief requested by this motion. Counsel for plaintiffs stated that plaintiffs are opposed to the relief sought.

/s/ *Allyson N. Ho*
Allyson N. Ho

## CERTIFICATE OF SERVICE

I certify that on July 10, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system, which automatically provided notice to all attorneys of record.

/s/ *Allyson N. Ho*
Allyson N. Ho