IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as | § | |
| Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 60(B)(5) MOTION FOR RELIEF FROM JUDGMENT**

Samantha Bartosz (*pro hac vice*)
Stephen Dixon (*pro hac vice*)
CHILDREN'S RIGHTS
88 Pine Street
New York, New York 10005
(212) 683-2210
sbartosz@childrensrights.org

Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
420 Lexington Ave, Room 2035
New York, New York 10170
(646)795-4456
mlowry@ABetterChildhood.org

R. Paul Yetter
Christian J. Ward
YETTER COLEMAN LLP
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Barry F. McNeil
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
(214) 651-5000
barry.mcneil@haynesboone.com

ATTORNEYS FOR PLAINTIFFS AND
GENERAL CLASS AND SUBCLASSES

August 31, 2026

## TABLE OF CONTENTS

Table of Authorities ..... ii

Introduction ..... 1

Procedural and Factual Background ..... 2

Argument & Authorities ..... 5

I. Defendants Must Prove Durable Compliance with the Injunction as Affirmed. ..... 5

A. Here, relief from the judgment requires sustained "full compliance." ..... 6

B. Even if the mandate did not control, "substantial compliance" is not enough. ..... 11

C. The judgment is not "satisfied" by mere "good faith." ..... 18

II. Defendants Have Not Satisfied the Judgment. ..... 20

A. Defendants admittedly have not achieved full compliance with the mandate. ..... 20

B. Nor do defendants show substantial compliance as to the entire injunction. ..... 23

1. "Children Without Placements" (CWOP) ..... 25

2. Caseloads ..... 26

3. Remedial Order 20 (heightened monitoring) ..... 28

4. Caregivers still are not told what they need to know to keep children safe. ..... 31

5. Children still do not know how to report abuse. ..... 32

III. Defendants Cannot Show that Applying the Judgment Prospectively Is Unfair. ..... 33

A. Defendants cannot show that a "durable remedy" has been implemented. ..... 33

B. Early termination is not in the public interest. ..... 39

Conclusion ..... 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allard Enters., Inc. v. Advanced Programming Res., Inc.*,
249 F.3d 564 (6th Cir. 2001) .... 7

Allen v. Louisiana,
14 F.4th 366, 375 & n.* (5th Cir. 2021) .... 15, 40

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985) .... 19

*Anderson v. City of New Orleans*,
38 F.4th 472 (5th Cir. 2022) .... 36

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.,*
517 F.3d 1271 (11th Cir. 2008) .... 12

*Chisom v. Louisiana ex rel. Landry*,
116 F.4th 309 (5th Cir. 2024) .... 12, 17, 18, 35

*Deutsche Bank Nat'l Tr. Co. v. Burke*,
902 F.3d 548 (5th Cir. 2018) .... 7

*Freeman v. Pitts*,
503 U.S. 467 (1992) .... 6, 7, 18, 19

*Frew v. Hawkins,*
540 U.S. 431 (2004) .... 15

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) .... *passim*

*Horne v. Flores*,
557 U.S. 433 (2009) .... *passim*

*In re Abbott*,
667 F. App'x 473 (5th Cir. 2016) .... 41

*In re Ivan F. Boesky Sec. Litig.*,
957 F.2d 65 (2d Cir. 1992) .... 8

*Inmates of Suffolk Cnty. Jail v. Rufo*,
12 F.3d 286 (1st Cir. 1993) .... 18, 23

*Interstate Contracting Corp. v. City of Dall., Tex.*,
407 F.3d 708 (5th Cir. 2005) ........................................................................................ 14

*Jackson v. Los Lunas Cmty. Program*,
880 F.3d 1176 (10th Cir. 2018) ..................................................................................... 36

*John B. v. Emkes*,
710 F.3d 394 (6th Cir. 2013) ................................................................................... 36, 39

*Juan F. By & Through Lynch v. Weicker*,
37 F.3d 874 (2d Cir. 1994)..................................................................................... 14, 16, 17

*Kennedy Bldg. Assocs. v. CBS Corp.*,
576 F.3d 872 (8th Cir. 2009) .......................................................................................... 7

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne,*
659 F.3d 421 (5th Cir. 2011) ..................................................................................*passim*

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
478 U.S. 501 (1986)........................................................................................................ 40

*M.D. v. Abbott*,
152 F. Supp. 3d 684 (S.D. Tex. 2015), *aff'd in part*, *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 243 (5th Cir. 2018)............................................................................................. 2, 41

*M. D. by next friend Stukenberg v. Abbott*,
929 F.3d 272 (5th Cir. 2019) ..................................................................................*passim*

*M.D. by Stukenberg v. Abbo*tt, *(Stukenberg* I),
907 F.3d 237 (5th Cir. 2018) ..................................................................................*passim*

*M. D. by Stukenberg v. Abbott*,
977 F.3d 479 (5th Cir. 2020) ..................................................................................*passim*

*Perez v. Stephens*,
784 F.3d 276 (5th Cir. 2015) .......................................................................................... 7

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992).................................................................................... 12, 13, 23, 42

*Smith v. Sch. Bd. of Concordia Par.*,
906 F.3d 327 (5th Cir. 2018) ................................................................................... 12, 40

*Stukenberg v. Abbott*, 730 F. Supp. 3d 354 (S.D. Tex.), *rev'd and remanded sub nom. M. D. by Stukenberg v. Abbott*, 119 F.4th 373 (5th Cir. 2024), *cert. denied sub nom. M. D. By Next Friend Stukenberg v. Abbott*, 146 S. Ct. 99, 223 L. Ed. 2d 12 (2025)........................... 3, 16, 24

*Sullivan v. Houston Indep. Sch. Dist.*,
475 F.2d 1071 (5th Cir. 1973) ........................................................................ 13, 19, 21

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961)................................................................................................ 7

*Bd. of Educ. of Oklahoma City Pub. Schs., Indep. Sch. Dist. No. 89, Oklahoma Cnty., Okl. v. Dowell*,
498 U.S. 237 (1991)........................................................................................ 18, 19, 24

*United States v. Teel*,
691 F.3d 578 (5th Cir. 2012) .................................................................................... 6

*William Skillings & Associates v. Cunard Transp., Ltd.*,
594 F.2d 1078 (5th Cir. 1979) ................................................................................ 13

**Statutes and Constitutional Provisions**

Tex. Fam. Code §264.1915 ........................................................................................ 36, 38

U.S. CONST. art VI ...................................................................................................... 15, 40

**Rules**

Fed. R. Civ. P. 60(b)(5)...................................................................................... *passim*

Plaintiff children oppose the motion for relief from the judgment, which is unmerited.

## INTRODUCTION

Now is not the time to release the State from remedial orders that keep children safe. The appellate mandate does not permit it, and even if it did, the conditions for such relief are not met. To be sure, vital progress has been made in the seven years since the mandate issued, but the job is not finished. The Texas foster care system is in a period of flux, as it shifts into full privatization, and improvements to the system are too new to conclude they are durable. Recent monitor reports show that safety gaps persist, keeping members of the class at unreasonable risk of harm. These deficiencies continue to result in preventable harm to children, including needless deaths.

The mandate in this case includes a termination provision that will wind up the permanent injunction based on sustained "full compliance." That is the standard for this case, but defendants do not claim to meet it. Indeed, their motion never mentions it. Nor do they meet the lesser standards that they propose in the motion.

The positive changes in the system so far are both significant and overdue. The State gives itself credit for "a robust record of success" in its "sacred mission" of safeguarding children in its care. Dkt. 1662 at 3. The record is decidedly less rosy. For decades, the State was in denial, touting its foster care system as the safest in the nation when, in fact, it was terribly broken. Vulnerable children routinely were subjected to severe risks of abuse, neglect, and exploitation, as they left the system worse than when they entered it. All of the improvement came after 2019, when the mandate issued, under close supervision by this Court, the Fifth Circuit, and the court-appointed monitors. Given the Court's directions a year ago, the monitoring today is streamlined, less costly, and predictable. For the sake of Texas children now and tomorrow, oversight should continue until the constitutional violations are *fully* and *durably* cured and the system is safe.

## PROCEDURAL AND FACTUAL BACKGROUND

After a two-week trial, the State was found liable for violating the rights of foster children in its Permanent Managing Conservatorship to be free from unreasonable risk of harm. *M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015), *aff'd in part*, *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 243 (5th Cir. 2018) (*Stukenberg I*). After months of unsuccessfully trying to get the State to work cooperatively in crafting "corrective policies," the Court entered final judgment in 2018 granting a detailed permanent injunction. 907 F.3d at 247, 261-62, 272. Defendants denied every violation and fought the relief in immediately appealing the injunction. The Fifth Circuit affirmed the core liability findings, held that the key remedial orders were valid, and remanded the case for entry of a modified injunction. *Id.* at 271-88.

The Court issued a modified injunction, and the State, "unhappy with the district court's revisions," appealed. *M.D. by next friend Stukenberg v. Abbott*, 929 F.3d 272, 275-76 (5th Cir. 2019) (*Stukenberg II*). Again, the Fifth Circuit affirmed most of the remedial orders. Its 2019 mandate had a total of 67 provisions, including those validated in *Stukenberg I* and those not challenged in *Stukenberg II*. *See id.* at 276-81. The affirmance included the injunction's termination provision (*see* Dkt. 606 at 19-20), which the State did not challenge in its first appeal. *Stukenberg II*, 929 F.3d at 281. The affirmed termination process provides that the injunction may terminate after the monitors have certified "full compliance," and this Court retains jurisdiction for another three years. Dkt. 606 at 19. In the interim, a party may apply to end monitoring of specific components of the injunction on showing "full compliance" with the components and that further monitoring of them "will not serve a purpose." *Id.* at 19-20.

The mandate in *Stukenberg II* requires this Court to implement the injunction, as modified and affirmed, including the termination provision, *without further changes*. "The case is remanded to the district court to begin implementing, without further changes, the modified injunction with

the alterations we have made." *Stukenberg II*, 929 F.3d at 281. In a later appeal, reversing a contempt order that violated its mandate by modifying the injunction, the Fifth Circuit made a point to stress its earlier command to avoid further changes: "We repeat what we said in *Stukenberg II*. 'The case is remanded to the district court to begin implementing, without further changes, the modified injunction with the alterations we have made.'" *M.D. by Stukenberg v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020) (*Stukenberg III*).

The mandate has now been in effect for just seven years. Although progress has been made under the supervision of the courts and monitors, there is troubling evidence of chronic problems that have posed and continue to pose safety risks to children in the class. This includes evidence developed in the 2023 contempt proceedings, much of which is detailed in a factual discussion in the contempt opinion undisturbed by the Fifth Circuit's reversal of the sanctions. *See generally Stukenberg v. Abbott*, 730 F.Supp.3d 354 (S.D. Tex.), *rev'd and remanded*, 119 F.4th 373 (5th Cir. 2024) (*Stukenberg IV*), *cert. denied*, 146 S. Ct. 99 (2025); Dkt. 1560. More recent reports of the monitors and other data make clear that risks continue to exist in the system today.

Indeed, in the weeks since defendants filed their motion, information has emerged about alarming new developments. These include the following, some of which are discussed below:

- July 20: The State canceled Empower as the private provider for the Dallas East metroplex. July 20, 2026 Letter of DFPS Commissioner O'Neill.

- July 23: The state court extended the Empower receivership to October 14, with the next State report due on September 14. Order Extending Receiver, *Tex. Dep't of Fam. & Protective Servs. v. Tex. Fam. Initiative, LLC d/b/a Empower*, No. DC-26-04702 (July 23, 2026).

- July 27: A review by the monitors reflects that the highest number of active continuous quality improvement (CQI) plans is 7 at 2Ingage, which is owned by Texas Family Initiative, the same parent company of Empower. Saint Francis has 4-5. These relate mainly to missing paperwork for child transfers, capacity issues, and caseloads.

- July 30: Another PMC child died after being left in her foster parent's car for hours on a day when the heat index topped 100 degrees.

- July 30: A new report reflects that, since 2019, the number of family-like foster home placements has declined dramatically—40%, from 11,400 to 6,900 in 2025—while congregate care placements have increased. *Who Cares: A Nat'l Count of Foster Homes & Families—Tex.*, https://www.fostercarecapacity.com /states/texas (last visited Aug. 30, 2026). Although the total number of PMC children in care also declined, the number of children placed in congregate settings has not declined at the same rate as those placed in foster home settings. Staff in congregate care settings are responsible for a disproportionate and increasing percentage of reason-to-believe dispositions in abuse/neglect investigations. *See* Dkt. 1658 at 41(53% of alleged perpetrators in May 2023-April 2024 although only 19% of PMC children lived in congregate care settings); Dkt. 1659 at 40 (57% of alleged perpetrators in May 2024-April 2025 although only 19% of PMC children lived in congregate care settings).

Additionally, DFPS is up for its sunset review by the Texas Legislature in the 2027 session. Major changes were made in recent legislative sessions, including the shift to privatization.

* * *

This Court's supervision, and the streamlined, less costly monitoring process now in place, should continue. Defendants are not entitled to relief from the injunction under Rule 60(b)(5). They do not even try to prove full compliance with the injunction as required by the termination process in the mandate. Nor do they prove substantial compliance with the full injunction that they erroneously urge as the applicable standard. And they certainly do not prove the existence of a *durable* remedy at this time. Record evidence shows that persistent risks continue and new ones continue to emerge. Recent improvements have no track record of their effectiveness or longevity. This is particularly critical since the system is in transition, as it continues its winding and uneven path to full privatization and faces legislative review and possible changes in the year ahead.

The Court should deny the motion.

## ARGUMENT & AUTHORITIES

### I. Defendants Must Prove Durable Compliance with the Injunction as Affirmed.

"As the party seeking relief, Defendants must bear the burden of showing that Rule 60(b)(5) applies." *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015). "The burden is on the moving party to prove that modification is warranted, regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely." *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne,* 659 F.3d 421, 438 (5th Cir. 2011) (*LULAC*).

Here, a core problem with the motion is that defendants do not even try to meet their burden under the legal standards that control this case. Instead, they ignore that the parties and this Court are operating under the 2019 *Stukenberg II* mandate. It incorporates a termination provision that specifies exactly how the injunction may be finally terminated and, in the meantime, modified to end monitoring of specific components. *See Stukenberg II*, 929 F.3d at 281; Dkt. 606 at 19-20.

Remarkably, the motion does not mention the *Stukenberg II* mandate, its termination steps, or the Fifth Circuit's directive to apply the injunction *as is*, "without further changes." *Stukenberg II*, 929 F.3d at 281. In fact, the Fifth Circuit repeated its directive for clarity:

> We repeat what we said in *Stukenberg II*. "The case is remanded to the district court to begin implementing, without further changes, the modified injunction with the alterations we have made."

*Stukenberg III*, 977 F.3d at 483. "District courts do not have discretion to ignore mandates issued by [the Fifth Circuit]." *Id*. at 481. Nor are state litigants entitled to ignore appellate mandates.

Defendants cannot use the general provisions of Rule 60(b)(5) to sidestep specific terms in a mandate, which here specify the termination process for satisfying the judgment and determining that applying it prospectively is no longer needed or equitable. *See* Dkt. 606 at 19-20.

### A. Here, relief from the judgment requires sustained "full compliance."

In rulings that defendants oddly ignore, the Fifth Circuit set the standard for terminating the injunction and directed this Court not to deviate from it.

The mandate enshrined the injunction's termination process. It requires the State to come into "full compliance" with the injunction, after which this Court will "retain[] jurisdiction for a period of three years." Dkt. 606 at 19. *See Stukenberg II*, 929 F.3d at 281 (holding that the State waived any objection to the termination process, affirming the injunction as modified in part, and remanding for this Court to effect the injunction "without further changes"). Before compliance with the full injunction is achieved, defendants may "apply to the Court" to effectively modify the injunction by ending monitoring as to *specific* "components" upon showing two facts: component-specific "full compliance" and lack of need for monitoring. Dkt. 606 at 19-20.[1]

In full, the mandate-embodied termination provision reads as follows, *id*.:

> The Court retains jurisdiction for a period of three years after full compliance as certified by the Monitors. Either party may apply to the Court during the term of the monitoring to terminate supervision over one or more components of this Order if that party can show full compliance with that component and that further monitoring will not serve a purpose. *Cf. Freeman v. Pitts*, 503 U.S. 467, 489 (1992) ("A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control.").

The first sentence of the termination clause makes "full compliance" the standard for satisfying the judgment at issue here. After full compliance is achieved, the provision requires that this Court retain jurisdiction for an additional three years. Under the second sentence, prior to full compliance with the entire injunction, monitoring may be ended as to individual components of the injunction

[1] It makes no difference to application of the mandate that *Stukenberg II* affirmed the termination process because defendants waived objections to it in *Stukenberg I*. The mandate rule applies to termination all the same because it "bars litigation of issues decided by the district court but foregone on appeal or otherwise waived." *United States v. Teel*, 691 F.3d 578, 583 (5th Cir. 2012) (cite omitted).

if the State can make a twofold showing as to those components—"full compliance" *and* "further monitoring will not serve a purpose" (because compliance with the components is durable). *Id.*[2]

In *Stukenberg II*, the Fifth Circuit affirmed the termination process, making it part of the appellate mandate. 929 F.3d at 281. The Fifth Circuit directed the Court to enforce the injunction as modified and affirmed—including the termination process—"without further changes." *Id.* In *Stukenberg III*, the Fifth Circuit pointedly reiterated that its mandate binds the Court and requires that the injunction be implemented *exactly* how it was affirmed. 977 F.3d at 483.

These admonitions flow directly from the established mandate rule, as confirmed by cases on which *Stukenberg III* relied. "The mandate rule requires a district court on remand to effect [the Fifth Circuit's] mandate and to do nothing else." *Deutsche Bank Nat'l Tr. Co. v. Burke*, 902 F.3d 548, 551 (5th Cir. 2018). Thus, a district court "on remand must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *Perez v. Stephens*, 784 F.3d 276, 280 (5th Cir. 2015) (quotes omitted).

Simply put, an appellate court's judgment must be "scrupulously and fully carried out." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 325 (1961). When a mandate contains express language limiting the scope of remand—like the *Stukenberg II* mandate here—courts of appeals routinely insist on adherence to such limitations. *See, e.g.*, *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 571 (6th Cir. 2001) (when mandate included "explicit, limited instructions to the district court regarding the remand," the court "violated the mandate rule by permitting [a] counterclaim"); *Kennedy Bldg. Assocs. v. CBS Corp.*, 576 F.3d 872,

[2] Notably, the process contemplates that a party *applies* to terminate monitoring over individual components and shows that more monitoring is unnecessary. Dkt. 606 at 19-20. The Court's findings of compliance as to RO 1 and, as to DFPS, RO B4 were *sua sponte*. Jan. 22, 2024 Hearing Tr. 4-5; Dkt 1514. If defendants wanted to be released from monitoring as to those remedial orders, they had to follow up with an application showing that further monitoring serves no purpose. Instead, they complain that the Court did not *sua sponte* give them relief for which they never applied. Dkt. 1662 at 4, 36. Their complaint is meritless.

878-79 (8th Cir. 2009) (modification to an injunction was "outside the scope of the remand" when prior mandate instructed district court to modify one paragraph of the injunction but not the paragraph at issue); *In re Ivan F. Boesky Sec. Litig.*, 957 F.2d 65, 69-72 (2d Cir. 1992) (modifying injunction ordered on remand when it did not comport with prior mandate's directive that party be left free to pursue Texas state law claims).

Defendants seek Rule 60(b)(5) relief on two alternative grounds: (1) that the injunction has purportedly been satisfied; and (2) that applying it "prospectively is no longer equitable." Dkt. 1662 at 9; *see also* Fed. R. Civ. P. 60(b)(5) (grounds for relief include that "the judgment has been satisfied, released, or discharged . . . or applying it prospectively is no longer equitable"). Here, the mandate controls, and the affirmed termination process is the roadmap for relief. *Cf. Frew v. Janek*, 780 F.3d 320, 328 (5th Cir. 2015) (in institutional reform case resolved by a *consent decree*, for which "substantial compliance" is the standard, the decree "establish[ed] a clearly defined roadmap for attempting to achieve the Decree's purpose. In other words, the parties already agreed that substantial compliance with this roadmap would achieve their common goal.").

In short, the affirmed process here states two principles: *full compliance* is the standard for *satisfying* the judgment; and it will no longer be equitable to apply some or all of the injunction prospectively only once full compliance is shown to be *durable*. Dkt. 606 at 19-20.

As to prospective application, the process addresses durability in two ways. It provides for effectively modifying the injunction by lifting the monitoring requirement on a component-by-component basis with a showing that monitoring of specific components is no longer needed because the State can be expected to continue complying with them. *Id.* And, after full compliance with the entire injunction is achieved, this Court's retention of jurisdiction will ensure that compliance is sustained for at least three years before judicial supervision fully terminates. *Id.* In

essence, the injunction in this case has a built-in mechanism for determining when conditions referenced in Rule 60(b)(5) are met. The injunction itself embodies the "flexible approach" that the Supreme Court says is proper in institutional reform cases. *Horne v. Flores*, 557 U.S. 433, 450 (2009). And, in the course of its ongoing supervision, this Court has approached the monitoring with flexibility, appropriately adjusting it to be more targeted and economical.

In this case, the Fifth Circuit's mandate requires that the termination roadmap be followed, not a standard imported from case law involving consent decrees or litigation against acquiescent defendants. The mandate controls the application of either ground for Rule 60(b)(5) relief. The mandate here is distinctively unequivocal in forbidding *any* "further changes" to the injunction, which includes the affirmed termination process. *Stukenberg II*, 929 F.3d at 281. "If it is necessary to modify an injunction in the face of a mandate that forbids all further changes, *the solution is not for the district court to update the injunction on its own*—but for the parties to litigate the matter to the extent our procedures permit." *Stukenberg III*, 977 F.3d at 483 (emph. added).

*Stukenberg III* explains that the mandate governs this Court's exercise of equitable powers because it represents the Fifth Circuit's "final decision" as to the equities of the injunction. *Id.* at 482-83. The Fifth Circuit noted the "general principle" that a district court "undoubtedly has the equitable power to oversee compliance with its own injunction," but with a caveat:

> [J]udges disagree on occasion over the proper exercise of equitable powers, just as judges disagree on occasion over the proper interpretation of statutes. When that happens, appellate courts must make the final decision—and *once the decision is made, it must be followed*.

*Id.* (emph. added). As *Stukenberg III* explains, "To elevate general equitable principles over the mandate rule is to challenge the very principle of appellate review—including any number of other doctrines inherent in our judicial hierarchy, such as vertical *stare decisis*." *Id.* at 483.

Here, the appellate court made a decision, and "it must be followed." *Id*. at 482-83. It gave a "specific instruction not to make 'further changes' to the injunction," which must be obeyed. *Id.* at 482. "And that, of course, is the whole purpose of the mandate rule: A district court on remand may not disregard the explicit directives of the appellate court." *Id.* at 483 (cleaned up).

*Stukenberg III*'s discussion of equitable determinations disposes of defendants' resort to "first principles" of equity as support for their preferred substantial-compliance standard. Dkt. 1662 at 11-12. The Fifth Circuit has made its "final decision" about the equities of the termination process, which "must be followed." *Stukenberg III*, 977 F.3d at 482-83.

The motion does not mention the *Stukenberg II* mandate nor *Stukenberg III*'s admonitions to follow it. Indeed, defendants do not even cite *Stukenberg III*. Nor do they ever reference the injunction's termination process. Instead, as to Rule 60(b)(5)'s "satisfied" prong, they urge the Court to apply a "substantial compliance" or "good faith" standard. *See, e.g.*, Dkt. 1662 at 9-12, 27-30. And their discussion of Rule 60(b)(5)'s "equitable" ground for prospective relief makes no mention of the jurisdiction-retention period or requirement of a showing that monitoring no longer serves a purpose for relief as to specific components, even when claiming that "reforms have produced a 'durable remedy.'" *Compare id.* at 30-33 *with* Dkt. 606 at 19-20.

The Court should reject the standards that defendants propose for a simple reason: they are divorced from the explicit terms of the mandate. Under the judgment and mandate, satisfying the judgment involves achieving full compliance with the entire injunction, sustained for a three-year enforcement period, and determining whether prospective enforcement is equitable involves showing that supervision is no longer needed as to all or specific components of the injunction.

Because defendants do not acknowledge the standards enshrined in the mandate, they have not tried to show they are satisfied. In any event, even if the mandate did not control the termination

inquiry here, the standards urged by defendants are inapplicable to this case, which involves a fully litigated judgment finding defendants liable for constitutional harms and the appellate affirmance of a permanent injunction tailored to remedy those harms.

**B. Even if the mandate did not control, substantial compliance is not enough.**

Ignoring the mandate, defendants primarily argue that they "satisfied" the judgment by "substantial compliance." Dkt. 1662 at 9-27. But this substantial-compliance standard is cobbled together from case law relating to *consent* decrees and *Stukenberg IV*'s holding regarding a defense to *contempt*. Defendants cite no authority for applying their substantial-compliance theory in this context—whether a fully litigated permanent injunction based upon constitutional liability has been satisfied. That is because, even absent the Fifth Circuit mandate requiring this Court to follow the termination process "without further changes," *Stukenberg III*, 977 F.3d at 483; *Stukenberg II*, 929 F.3d at 281, the judgment cannot be *satisfied* without meeting its mandated terms.

Here, *Stukenberg I* and *Stukenberg II* established defendants' liability for their chronically unsafe child welfare system and ensured that the injunction, as modified and affirmed, is tailored to remedy only the constitutional violations. *See Stukenberg I*, 907 F.3d at 260, 264-65, 267-68, 273-88; *Stukenberg II*, 929 F.3d at 275, 281. "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests." *Horne*, 557 U.S. at 447. Here, there is no justification or legal basis to depart from the plain text of the judgment, which requires "full compliance" with all remedial orders, which are intended to remedy the established constitutional violations. Dkt. 606 at 19-20.

Defendants' argument for a substantial-compliance standard relies on *Frew v. Janek*, 780 F.3d 320 (5th Cir. 2015). *See, e.g.*, Dkt. 1662 at 9. But *Frew* involved relief from a consent decree. It does not say or suggest that substantial compliance can satisfy a fully litigated, affirmed judgment for purposes of Rule 60(b)(5)'s first prong.

*Frew* recognized that the "first of the grounds set out in Rule 60(b)(5), that the judgment has been satisfied, released or discharged, has been relied on very rarely." *Id.* at 327 & n.26 (cite omitted). It is "almost never applied" in institutional reform cases that involve consent decrees. *Id.* at 327. Rather, the "satisfied" ground for Rule 60(b)(5) relief is "typically" raised "when there is a dispute over the amount of the judgment." *Id.* at 327 & n.25 (collecting cases); *see, e.g.*, *BUC Int'l Corp. v. Int'l Yacht Council Ltd.,* 517 F.3d 1271, 1274 (11th Cir. 2008) ("We agree that motions seeking credit for settlement amounts obtained against joint tortfeasors are appropriately brought under Rule 60(b)(5).")

Because *Frew* involved a consent decree, its application of Rule 60(b)(5)'s first prong is specific to that context. *Cf. Frew*, 780 F.3d at 327 (noting that, because the first clause of Rule 60(b)(5) "is almost never applied to consent decrees," the Court found "very little applicable precedent interpreting this clause"). *Frew* and its progeny relied on "general principles of contract interpretation" and contract law, factors that are relevant to *consent* decrees (which are settlement agreements), not to a litigated and affirmed federal judgment. *Id.* at 327-28 & n.28. This is because, "while consent decrees have elements of judicial decrees, they are, at their core, contracts." *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 318 (5th Cir. 2024). It is "the agreement of the parties . . . that creates the obligations embodied in a consent decree." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334-35 (5th Cir. 2018) (cite omitted).

*Chisom*'s emphasis on the contractual "core" of consent decrees shows that defendants here get things exactly backwards in arguing that the distinction between a consent decree and a fully litigated injunction "makes no difference." Dkt. 1662 at 11. Defendants rely on the Supreme Court's statement in *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992), that a consent decree "is subject to the rules generally applicable to other judgments and decrees" to assert that

"there is no principled basis for applying substantial compliance to a decree entered by agreement while withholding it from one entered after trial." Dkt. 1662 at 11. But defendants commit a logical fallacy. *Rufo*'s point is that consent decrees are like injunctions in being judicially enforceable, not that injunctions are like consent decrees in being contractual. *See* 502 U.S. at 378 ("A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree . . . .").

Accordingly, the substantial-compliance standard applied in cases like *Frew* and *Chisom* derives not from Rule 60(b)(5)'s text nor from federal common law about Rule 60(b)(5) but, rather, from state contract law. *Id.* (applying substantial-compliance standard because it "follows naturally from the principle under Louisiana law that 'substantial performance of the contract is all that the law requires'"); *Frew*, 780 F.3d at 330 ("In determining that a party to a contract has fulfilled its contractual obligations, Texas law allows substantial compliance."). There is no justification or authority for applying this contract standard to a litigated judgment.

Indeed, when applying Rule 60(b)(5)'s judgment-satisfaction prong to a litigated judgment, the Fifth Circuit demands strict compliance with a judgment's terms. For example, in *Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071 (5th Cir. 1973), the Fifth Circuit affirmed the denial of a Rule 60(b) motion to vacate a First Amendment injunction that Houston ISD argued was "satisfied" by promulgating regulations when the original injunction "dealt not only with the promulgation of regulations, but also with their enforcement." *Id.* at 1078; *see also, e.g.*, *William Skillings & Assocs. v. Cunard Transp., Ltd.*, 594 F.2d 1078, 1080 (5th Cir. 1979) (when a judgment specified that it was in favor of three individuals, not a partnership, a "release of the judgment

debtors in the name of the partnership alone simply does not satisfy the terms of the judgment and the district court correctly refused relief under Rule 60(b)(5)").

If anything, applying *Frew* to this case would point back to the "full compliance" required in the judgment. Dkt. 606 at 19-20. In applying Texas contract law "allow[ing] substantial compliance" to whether the *Frew* defendants had fulfilled their "contractual obligations" under the consent decree, the *Frew* court recognized that a stricter standard would govern had the consent decree called for it. 780 F.3d at 330 & n.42. As *Frew* explains, "substantial compliance is not the legal equivalent of strict compliance if the contract *expressly* calls for the latter." *Id.* at 330 n.42; *see also Interstate Contracting Corp. v. City of Dall., Tex.,* 407 F.3d 708, 727 (5th Cir. 2005). Here there is no contract, but there is a judgment calling for "full compliance." Dkt. 606 at 19-20; *cf. Juan F. By & Through Lynch v. Weicker*, 37 F.3d 874, 876-77, 879 (2d Cir. 1994) (under consent decree for Connecticut's child-welfare system that did "not contemplate anything less than 100% compliance with the caseload standard," defendants' "substantial compliance" had "no bearing" on court's power to order changes intended to achieve full compliance, although it "might become relevant if ever there should be a hearing for contempt based on claimed noncompliance").

Aside from the contractual nature of a consent decree, which undergirds case law applying a substantial-compliance standard to such decrees, there are other principled and prudential reasons for treating consent decrees and litigated injunctions differently. One is that consent decrees may and often do go *beyond* constitutional minimums, while a proper injunction is premised on a finding of actual constitutional violations and is tailored to remedy them. A defendant who is only substantially complying with a consent decree still may be meeting, if not exceeding, constitutional minimums. On the other hand, enforcing an injunction to the letter means holding a defendant to constitutional minimums, a threshold that no party may bargain away.

Relatedly, a fully litigated institutional-reform injunction does not present the federalism concerns posed by a consent decree or, its de facto equivalent, an ostensibly litigated judgment achieved with only token opposition from state actors. "Scholars have noted that public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Horne*, 557 U.S. at 448-49. Government officials may acquiesce to—even welcome—institutional-reform decrees that achieve their policy objectives while side-stepping usual political and fiscal constraints. *See id.*; *Allen v. Louisiana*, 14 F.4th 366, 375 & n.* (5th Cir. 2021) (Oldham, J., concurring) (noting "the perniciousness of consent decrees").

As an example, in *LULAC*, the City of Boerne teamed with voting-rights plaintiff LULAC to reopen an old consent decree and modify it to require a single-member-district system for electing city council members, a change that would ordinarily require amending the city charter. 659 F.3d at 425-26 (reversing when evidentiary record did not support modification). Thus, by agreeing to a consent decree, or perhaps declining to appeal an adverse judgment, state officials may subject themselves to judicial orders imposing duties *not* required by the Constitution. "Injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Horne*, 557 U.S. at 449 (quoting *Frew v. Hawkins,* 540 U.S. 431, 441 (2004)).

By contrast, with a *fully* litigated injunction, state defendants are found to have violated federal constitutional or statutory law, liability for which is not subject to a federalism defense. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."). Requiring only substantial compliance to modify or terminate a *consent* decree mitigates federalism concerns by minimizing

the chances that state or local governments may be obligated in perpetuity to exceed constitutional minimums due to policy choices by former officials that were effected by means outside the ordinary political process. But a fully litigated, affirmed constitutional injunction is different. It merely compels state actors to meet constitutional minima that they have no discretion to ignore. This is why defendants cite no precedent applying a substantial-compliance standard other than for consent decrees.

Substantial compliance is also a *defense* to civil contempt. This was the context of the Fifth Circuit's analysis regarding ROs 3 and 10 in *Stukenberg IV*. *See* 119 F.4th at 383-84. In contempt proceedings, the initial burden is on the movant complaining of contempt. Only after its showing is made does the burden shift to the contemnor to prove a substantial-compliance defense. *Id.* ("If Plaintiffs had succeeded in showing contempt, the burden would shift to Defendants to show 'substantial compliance' with the Remedial Orders. Substantial compliance is an absolute defense to civil contempt.") (footnote omitted).

But a party moving for relief under Rule 60(b)(5) *always* bears the burden of affirmatively proving that such relief is warranted. *See, e.g.*, *Frew*, 780 F.3d at 327; *LULAC*, 659 F.3d at 438. Thus, even if substantial compliance were relevant (other than for consent decrees) to whether a judgment is "satisfied" for Rule 60(b)(5) purposes, a party that successfully defeats a contempt motion by showing substantial compliance has *not* met its burden to terminate the injunction under Rule 60(b)(5). *Cf. Juan F.*, 37 F.3d at 876-77, 879 (defendants' claimed substantial compliance might become relevant in a contempt hearing but was irrelevant to modification of consent decree that required 100% compliance). Were it otherwise, a successful substantial-compliance defense to contempt automatically would entitle the alleged contemnor to modification of the decree. It

does not. *See Stukenberg IV*, 119 F.4th at 383-84 (holding defendants showed substantial compliance with ROs 3 and 10 but not modifying the injunction to terminate those orders).

In short, *Stukenberg IV*'s finding of substantial compliance does nothing to help defendants prove that the injunction is "satisfied" for purposes of Rule 60(b)(5) relief. And that would be so even if *Stukenberg IV*'s contempt-defense holding were not confined to only two remedial orders.

* * *

Even if the mandate in this case did not foreclose a substantial-compliance standard for Rule 60(b)(5) relief, that standard would not apply as a matter of law. The judgment here can only be "satisfied" by meeting its terms, which call for sustained "full compliance" before terminating the entire injunction or modification to terminate monitoring for discrete components. Dkt. 606 at 19-20; *cf. Frew*, 780 F.3d at 330 n.42 (if a contract "expressly calls for" "strict compliance," "substantial compliance" would not be "the legal equivalent"); *Juan F.*, 37 F.3d at 876-77, 879 (substantial compliance is irrelevant to modifying consent decree requiring "100% compliance"). A substantial-compliance standard applies only to consent decrees, which are contractual in nature and which present federalism concerns that fully litigated injunctions do not. *See Horne*, 557 U.S. at 448-49; *Chisom*, 116 F.4th at 318; *Frew*, 780 F.3d at 327.

Unlike with a consent decree or a judgment reached without vigorous opposition, which often go beyond what is constitutionally required, *see, e.g.*, *Horne*, 557 U.S. at 448-49, the fully litigated, affirmed-as-modified injunction here is tailored to achieve the constitutional *minimum*. The Fifth Circuit took pains to ensure that this is so. *Stukenberg II*, 929 F.3d at 276-81; *Stukenberg I*, 907 F.3d at 271-88. While substantial compliance may be sufficient to avoid contempt sanctions, here it still equates to compliance below the minimal threshold to satisfy the Constitution.

### C. The judgment is not "satisfied" by mere "good faith."

Admitting that the Fifth Circuit applies a substantial-compliance standard only for consent decrees, Dkt. 1662 at 11, defendants pivot to say mere "good faith" and addressing constitutional violations "to the extent practicable" are enough to satisfy the judgment. *Id.* at 27. They base this alternative argument on *Bd. of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89, Okla. Cnty., Okla. v. Dowell*, 498 U.S. 237 (1991). *Dowell* does not control here. Even if it did, the *Dowell* standard requires more than good-faith efforts to eliminate constitutional violations. In particular, it requires showing that the constitutional violation in fact has been remedied and compliance has been sustained "for a reasonable period of time." *Id.* at 248-50.

*Dowell* does not control here for two reasons. First, this case is governed by an appellate mandate, including its command to apply the injunction *as is*. Second, *Dowell* is a desegregation case that "does not mention Rule 60(b)(5) at all," and the Fifth Circuit "decline[d] to extend the *Dowell* standard outside of the school desegregation context." *Chisom*, 116 F.4th at 318-19.

But if *Dowell* were to apply outside of desegregation, it would require showings beyond just good faith and self-serving assertions that the limit of practicability has been reached.

> In *Dowell*, as supplemented by *Freeman* [*v. Pitts*, 503 U.S. 467 (1992)], the Supreme Court indicated that there are two conditions that must be met before a district court is essentially obliged to terminate *a litigated decree* and return the institution or programs under court supervision to the governance of state or local authorities. First, the district court must determine that *the underlying constitutional wrong* has been remedied, either *fully* or to the full extent *now* deemed practicable. Second, there must be a determination that the authorities have complied with the decree in good faith *for a reasonable period of time* since it was entered.

*Inmates of Suffolk Cnty. Jail v. Rufo*, 12 F.3d 286, 292 (1st Cir. 1993) (emph. added, cites omitted). *See also Freeman*, 503 U.S. at 491-92; *Dowell,* 498 U.S. at 247, 249-50; *cf. Chisom*, 116 F.4th at 319-20 (*Inmates* raised a question of "whether there ought to be any difference in treatment between a litigated decree and a consent decree when it comes to standards for termination").

In short, *Dowell* is a more stringent standard than defendants suppose. If applied, it will require defendants to prove good-faith compliance as a matter of fact. *See, e.g.*, *LULAC*, 659 F.3d at 438 (movant's burden "to prove that modification is warranted"). They also must prove that the *underlying* violations have been remedied as far as possible—that is, that PMC children are now "free from an unreasonable risk of harm," *Stukenberg I*, 907 F.3d at 246—not just that bureaucratic boxes are being checked. And, especially pertinent, they must prove *sustained* compliance "for a reasonable period of time." *Freeman*, 503 U.S. at 491-92; *Dowell,* 498 U.S. at 247, 249-50.

The last element—going to the *durability* of remedies—is not shown on this record. To the extent defendants achieved high compliance rates with certain parts of the injunction, most of this improvement is recent, in the past 6-7 years. As such, the track record here is far shorter than the one presented by the school district in *Dowell*. The district complied with desegregation for five years before moving to close the case in 1977; and, after remand from the Supreme Court, the district court was directed to consider the district's compliance over the next eight years, that is, "whether the Board made a sufficient showing of constitutional compliance as of 1985 . . . to allow the injunction to be dissolved" and "whether the Board had complied in good faith with the desegregation decree since it was entered." *Dowell*, 498 U.S. at 241-42, 249-50; *cf. Sullivan*, 475 F.2d at 1078 (school district was not entitled to vacatur of constitutional injunction as "satisfied" by new regulations when it "failed to show that continuation of the 1969 injunction is unnecessary to insure that the rules will not be unconstitutionally applied to students in the future").

Nor may defendants rely on *Stukenberg IV*'s statements regarding good faith as a "finding" that it exists as a matter of fact. Dkt. 1662 at 28. It is blackletter law that appellate courts do not make independent findings of fact. *See, e.g.*, *Anderson v. City of Bessemer City, N.C.*, 470 U.S.

564, 573-76 (1985). Under the *Dowell* standard, defendants would need to prove good faith, just as they must prove all other elements to be entitled to relief. *See, e.g.*, *LULAC*, 659 F.3d at 438.

## II. Defendants Have Not Satisfied the Judgment.

At this stage, defendants have made no affirmative showing required under Rule 60(b)(5) that they "satisfied" the judgment. *See, e.g.*, *LULAC*, 659 F.3d at 438 (movant's burden to prove entitlement to relief). That is true under any standard—whether the sustained "full compliance" standard imposed by the mandate here, or a contractual substantial-compliance consent-decree standard urged by defendants, or a standard drawn from *Dowell*. Given the newness of recent improvements in the system, it is premature, at the least, to find that defendants satisfied the injunction with *durable* reforms that cure all underlying constitutional violations.

### A. Defendants admittedly have not achieved full compliance with the mandate.

As discussed above, the standard for satisfying the fully litigated injunction in this case is the "full compliance" required by the termination process in the Fifth Circuit's mandate. An obvious reason never to mention the standard is that defendants concededly cannot meet it.

Although defendants seek relief from the full judgment, they admit they have not achieved full compliance with all remedial orders. They point to the two ROs for which the Court *sua sponte* found DFPS to be in "full compliance" (ROs 1 and B4), Jan. 22, 2024 Status Conf. Trans. at 4-6, and some other ROs that they say are "satisfied" by discrete acts or have 100% compliance. As to the rest, defendants concede that compliance falls short of 100%, for some, significantly so:

- RO 5, Priority One investigations initiated within 24 hours—79%
- RO 6, Priority Two investigations initiated within 72 hours—85%
- RO 7, Priority One victims interviewed face-to-face within 24 hours—79%
- RO 8, Priority Two victims interviewed face-to-face within 72 hours—85%
- RO 11, DFPS reports on investigations not timely completed—88%

- RO 35, DFPS reports on child caseloads—89% (88%, 11th Rpt. at 7)
- RO A6, Caseworkers give children contacts to report abuse/neglect—83%

Defendants wave off the importance of the shortfalls. They say "orders on which the State's measured compliance is comparatively lower are not decree-defeating outliers." Dkt. 1662 at 15. But the orders for which compliance is admittedly lowest include remedies that go to the heart of the injunction's only purpose—children's safety. Thus, Priority One investigations are those "in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm." Dkt. 606 at 3. That is why the injunction requires these investigations to start and include face-to-face contact with potential victims within 24 hours. *See id.* (ROs 5 and 7). When *one in five* of these critical investigations are delayed, serious child injury or death may result.

Additionally, at least some of defendants' claims of compliance with specific parts of the injunction do not withstand scrutiny. For example, they claim to have "Satisfied" RO 20 (as to heightened monitoring of violative facilities) because they "stood up a sophisticated heightened-monitoring program" and "identify, track, and address concerns at heightened monitoring facilities." Dkt. 1662 at 14, 19. But the terms of RO 20 require more than setting up a program and checking boxes within it. Among other things, RO 20 requires defendants to appropriately place facilities under heightened monitoring and take "corrective actions and . . . other remedial actions." Dkt. 606 at 4-5. Those are continuing obligations, subject to monitoring and assessment. *See Sullivan*, 475 F.2d at 1078 (school district was not entitled to Rule 60(b) vacatur of injunction as "satisfied" by promulgation of new regulations when injunction also dealt with the regulations' enforcement and school district "failed to show that continuation of the 1969 injunction is unnecessary to insure that the rules will not be unconstitutionally applied to students in the future"). Moreover, the record in the 2023 contempt proceeding raised grave questions about defendants' compliance with RO 20's requirements to appropriately subject facilities to heightened monitoring

and corrective actions. *E.g.*, Dkt. 1560 at 27-43. And the monitors' most recent report addressing RO 20 (issued earlier this year) "raises significant concerns regarding the continued exposure of children to settings [in heightened monitoring] that present ongoing safety risks." Dkt. 1660 at 7-8.

The State almost never denies a request to entrust a PMC child to operations under heightened monitoring, although these operations have a record of a high rate of safety violations. *Id.* at 7-8, 163-64. Indeed, PMC child placements to operations on heightened monitoring in 2024 increased although the number of such operations decreased. *Id.* at 7-8, 165. And, in practice, the State routinely finds operations to be compliant with plan tasks, despite having citations in the areas of the patterns/trend that qualified them for heightened monitoring. *Id.* at 197-98. Some operations have remained on heightened monitoring for six years due to ongoing violations, having been placed on it in 2020. *Id.* at 197.

Such facts also call into question defendants' claim to have "Satisfied" RO 21, relating to suspending or revoking the licenses of dangerous facilities, because they allegedly "maintain and *exercise* the right to suspend or revoke licenses to protect children." Dkt. 1662 at 20 (emph. added). Accordingly, "The Monitors have ongoing concerns related to the HHSC's use of the process it created to comply with Remedial Order 21." Dkt. 1660 at 8.

Notably, defendants' claims about compliance are results from seven years under the Fifth Circuit mandate, closely supervised by the Court and its monitors. (Before then, the State denied all liability for an unsafe system or that any remedies were needed.) Yet recent *noncompliance* rates on critical safety-related remedial orders still hover around 20%, even while under supervision. And safety risks remain in areas such as facilities subject to heightened monitoring. This degree of noncompliance may not be bad enough to trigger contempt sanctions, but neither does it prove defendants are ready to be left entirely on their own in these areas.

Given especially that areas where compliance is lowest are among the most vital to child safety, defendants should have tailored their request for relief from monitoring as to specific parts of the injunction, as contemplated by the termination process. Indeed, the mandate requires them to follow the process by which they "may apply to the Court during the term of the monitoring to terminate supervision over one or more components of this Order if [they] can show full compliance with that component and that further monitoring will not serve a purpose." *Id.* at 19.

Again, the affirmed termination process in this case has built-in mechanisms for needed adjustments to the injunction over time. These accord with Supreme Court precedent regarding institutional-reform decrees. For example, in *Rufo*, the Court explained that once a movant meets its burden of establishing that a change warrants modifying an institutional-reform decree "the district court should determine whether the proposed modification is suitably tailored to the changed circumstance," and "a final judgment" (like the *Rufo* consent decree or litigated injunction here) "may be reopened only to the extent that equity requires." 502 U.S. at 391.

Defendants should have followed the termination process to seek relief from monitoring as to components where they can show "full compliance." Dkt. 606 at 19. They are not entitled to full relief from the entire injunction when they concededly do not show full compliance.

**B. Nor do defendants show substantial compliance as to the entire injunction.**

Even if the substantial-compliance standard drawn from consent decree cases were to apply to a fully litigated injunction, defendants do not show such compliance as to the full injunction on this record. Substantial compliance, in this context, is not just a numbers game. It includes a qualitative assessment of the sufficiency of compliance efforts. *See, e.g.*, *Frew*, 780 F.3d at 331 (affirming district court's findings on sufficiency of compliance, including finding that defendants' efforts to educate pharmacies about Medicaid emergency prescription program over plaintiffs' objections that they "were not sufficiently 'intensive'"). Here, that assessment must consider

whether the underlying constitutional violation has been remedied or if, instead, PMC children remain at "an unreasonable risk of harm while in State custody." *Stukenberg I*, 907 F.3d 237.

The record includes the evidence developed in the 2023 contempt proceedings. *Cf. Dowell*, 498 U.S. at 249-50 (remanding for district court to consider whether school board "made a sufficient showing of constitutional compliance" and to "address itself to whether the Board had complied in good faith with the desegregation decree since it was entered" and look "to every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities"). The record demonstrates numerous persistent problems and risks to PMC children as of less than three years ago. Despite defendants' reliance on checked boxes and raw statistics, recent monitor reports reflect troubling problems and child-safety risks that persist today.

The 2024 contempt opinion meticulously details deficiencies revealed by the evidence in the record. *See Stukenberg v. Abbott*, 730 F. Supp. 3d 354 (S.D. Tex.), *rev'd & remanded*, 119 F.4th 373 (5th Cir. 2024), *cert. denied*, 146 S. Ct. 99 (2025); Dkt. 1560. Although *Stukenberg IV* reversed the order of contempt relating to ROs 3 and 10, 119 F.4th at 395, the Fifth Circuit did not address the merits of the Court's other findings about deficiencies posing unreasonable risks to PMC children. The opinion is a useful guide to the evidence developed in the contempt proceeding and a basis for comparison with the more recent monitor reports.

The motion leaves out remedial orders as to which compliance falls well below the level defendants call substantial and the monitors' qualitative findings that mechanisms now in place are not protecting children, as to orders that defendants mark "Satisfied." The motion rests entirely on the monitors' reports. As such, it is bound by what the reports conclude—not only the figures defendants prefer but findings they pass over. Read in full, the reports do not show that the object

of the injunction is fully attained. They show a system that (thankfully) has improved in measurable ways but continues to expose children to an unreasonable risk of serious harm.

The subsections that follow address deficiencies documented in the contempt record and ask, for each, what the most recent monitor reports show. In a few areas, there has been laudable improvement. But in areas of grave danger, the reports show persistent, sometimes worsening problems: high-priority investigations, medical oversight, supervision of children with no licensed placement, access to safety data by caregivers, children's ability to report abuse, and enforcement against dangerous operations. On issues that matter most, the State cannot carry its burden.

**1. "Children Without Placements" (CWOP)**

The record exposes an extralegal shadow system that the State operates in parallel to its regulated foster care, a system where so-called "children without placements" are warehoused in unlicensed, unregulated, and unsafe placements. The risks related to this practice are detailed in the contempt order. Dkt. 1560 at 117-242 (CWOP).

The serious risks of placing children with heightened needs in unlicensed, unregulated settings—like administrative offices and motels—under the supervision of caseworkers working overtime and without the requisite training are obvious. They also are well-corroborated by the evidence. Witnesses with direct experience testified that these settings expose children to violence, drug use, physical and sexual abuse, rape, and sexual exploitation and trafficking. *See, e.g.*, *id.* A single location in Temple generated over 800 calls to law enforcement. *Id.* at 159-63. The particulars are harrowing: a caseworker offered to traffic a 13-year-old in her care; a 14-year-old was "drugged and being taken from room to room in a Motel 6 for men to have sex with her," whose traffickers were "give[n] her right back" rather than arrested; and a child who died while a runaway from such a setting who was a confirmed sexual-abuse victim and suspected trafficking victim. Dkt. 1560 at 153-54, 161. Because the settings cannot separate children by history, children

with histories of sexual victimization and children with histories of sexual aggression are "placed . . . in the same room overnight," producing the child-on-child sexual abuse that the record catalogues in volume. *Id.* at 161-62.

This "CWOP" problem overburdens caseworkers, who must work extra shifts supervising the children, a duty called "Child Watch." This reality impedes defendants' compliance with caseload guidelines.

Recent monitor reports show no resolution. In 2025, 320 PMC children still spent at least one night with no licensed placement, an average of about 21 per night. Dkt. 1659 at 16-17. The State continues to place children where the contempt evidence shows they are most likely to be harmed, and this unsafe practice endures.

**2. Caseloads**

Defendants assert that 98% of new caseworkers carry graduated caseloads (RO 2) and 89% of all caseworkers carry caseloads "within the guidelines" (ROs 35, A4). Dkt. 1659 at 5; Dkt. 1661 at 10. Those figures are the centerpiece of its claim to have fixed a problem the Fifth Circuit found most alarming—"exceedingly high caseloads," crushing turnover, and unreliable caseload accounting that were central pillars of the affirmed liability. *Stukenberg I*, 907 F.3d at 256-68.

But the headline numbers mask true caseworker workloads. Child Watch duties overload caseworkers while the State sheds a third of its workforce every year. Dkt. 1560 at 250-61 (CWOP and caseloads). The record shows that the State's failure to count or prorate Child Watch shifts in its per-child caseload numbers mean that true caseloads are "undercounted by about 30 percent." Dkt. 1560 at 253. This situation violates RO A3, which requires that "caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions *shall be prorated accordingly*." Dkt. 606 at 9. A caseworker who carries a full regular caseload but also spends substantial time working Child Watch shifts has not had her caseload prorated accordingly.

Child Watch shifts are "the main reason why DFPS is currently facing a 36 percent turnover rate among caseworkers," Dkt. 1560 at 254, even worse than the roughly 25% rate the Fifth Circuit found "exceedingly high." *Stukenberg I*, 907 F.3d at 257. The monitors' recent reports do not show progress. Just the opposite: they show caseload compliance is backsliding in the privatized regions to which the State increasingly is handing these children.[3]

The 89% figure touted by defendants is a systemwide average buoyed by regions that bear little or no Child Watch burden. Broken out by managing entity, the most recent data shows that as of March 31, 2026, Empower (responsible for 12% of the PMC population, Dkt. 1661 at 4) had a "low conformance" rate of 71%; St. Francis (6% of PMC population) had a compliance rate of 60%, up from 54%; and OCOK's (10% of PMC population) compliance rate was 64%, sharply down from 90%. Dkt. 1661 at 4-6. In the prior reporting period, St. Francis reported one of the lowest compliance rates "documented since the inception of monitoring of Remedial Order 35." Dkt. 1659 at 7. This means 28% of the class is managed by entities with an average compliance rate of 65%. That is hardly one of the "honor roll grades" that defendants tout. Dkt. 1662 at 6. And it is no coincidence that the top performing regions are those that reported no Child Watch activity in the reporting period. Dkt. 1659 at 115; Dkt. 1661 at 5-6. The State's dangerous and costly Child Watch practice persists, and it drives low compliance and high turnover.

Defendants admit this in their receivership petition. Empower is the entity the State placed into receivership weeks before filing this motion. The State swore under penalty of perjury that Empower "continues to fail" and "presents an imminent danger to the health, safety, or welfare of the children" in its care. Verified Pet. and App. for Receiver, *Tex. Dep't of Fam. & Prot. Servs. v. Tex. Fam. Initiative, LLC*, No. DC-26-04702 (95th Dist. Ct., Dallas Cnty., Tex.) (Mar. 16, 2026)

---

[3] The monitors use a modified methodology that accounts for Child Watch shifts when calculating caseload compliance. Dkt. 1659 at 106-8; Dkt. 1661 at 3 n.3.

¶¶2-4 (Receivership Pet.). Previously, "Region 3E, where Empower is responsible, had the greatest number of PMC children from a region that has SSCC placement oversight." Dkt. 1660 at 27. The petition traces that failure to the very dynamic at issue here: it identifies "frequent turnover in caseworker assignments" as a pattern "noted throughout" the State's review of Empower cases. Receivership Pet. ¶25. And it recounts, as one example, a medically fragile PMC child who cycled through "five different caseworkers" in eight months before a documentation breakdown between the workers led to his hospitalization. *Id*. ¶22(b).

In short, the State says here that Empower's caseload compliance is substantial enough to end federal oversight, while telling the state court that Empower's turnover and caseload failures are endangering children. Of course, after this motion was filed, DFPS terminated its contract with Empower, effective January 20, 2027. July 20, 2026 Letter of DFPS Commissioner O'Neill.

**3. Remedial Order 20 (heightened monitoring)**

Remedial order 20 requires defendants to subject facilities showing "a pattern of contract or policy violations" to "heightened monitoring" and take corrective action. Dkt. 606 at 4-5. The record shows that defendants' implementation of RO 20 has been deficient in several respects, including "attempts to work around heightened monitoring." Dkt. 1560 at 27-43. A particular area of concern has been defendants' failure to enforce policies and contract duties regarding use by children of psychotropic medications. Dkt. 1427 at 23-31; Dkt. 1560 at 27-116.

Recent monitor reports show the same pattern. The State increased its placements of PMC children into operations on heightened monitoring, although more than a quarter of the operations had a substantiated abuse, neglect, or exploitation finding in the prior six months, and over half had an open such investigation when the child arrived. Defendants rejected only 3% of placement requests into such facilities. Dkt. 1660 at 7-8 (RO 20). The motion lists these enforcement orders among those "Satisfied" without addressing any of the contempt record.

The monitors' reports substantiate this record. "O.R., an 11-year-old boy, passed away from significant medical complications which multiple staff members at Thompson's Residential Treatment Center repeatedly failed to respond to, including by securing O.R. necessary and timely medical care." Dkt. 1659 at 121. The full account is a disturbing illustration of the State's failure to monitor facilities and psychotropic medications. *Id*. at 121-126; Dkt. 1609 at 13-18.

"O.R. was prescribed four psychotropic medications, including a medication (Caplyta) that the FDA has not yet approved for children." Dkt. 1609 at 15 n.14. A common side effect of these medications is constipation. Dkt. 1659 at 121-22 ("O.R. was not feeling well because he was reportedly constipated, which was not uncommon for O.R. due to his prescription medication."). O.R. was "screaming" in pain, but staff members ignored his cries. *Id*. A nurse let O.R. self-diagnose himself with constipation and prescribed a laxative without doing "a full, thorough, examination of [O.R.] when he complained of stomach pain." *Id*. at 122. O.R.'s autopsy attributed his death to a condition called volvulus, a "twisting of the intestines on themselves . . . that causes obstruction of the bowels, which causes symptoms of increased severity and ultimately death if it is not addressed." *Id*. at 126.

O.R. died after being made to attend a movie-theatre outing and sit through a movie on Thanksgiving Eve. Dkt. 1609 at 14-16. Shocking video footage shows O.R.—ill to the point of being unable to walk—being dragged down the theatre hallway and forced into the screening room by staff members. *Id.* at 14. As the movie ended and the lights came on, O.R. was found unresponsive. Staff called 911 but delayed several minutes before attempting CPR. O.R. was transported by ambulance to a hospital and "pronounced deceased shortly after." *Id.* Several staff members were criminally indicted. *See* Dkt. 1659 at 126.

Had anyone heeded his symptoms or considered the side effects of his medications, O.R. likely "would have been able to receive medical care/treatment by medical professionals timely and [O.R.] could still be alive." *Id*. at 122-23. Such failure to enforce policies for psychotropic medications is precisely what the Court identified as contributing to the substantial risk of serious harm. Dkt. 1560 at 110-15; *id.* at 94 n.67 (noting possible RO 20 violation involving facilities that fail to monitor psychotropic medications).

Worse, the residential treatment center (RTC) in which O.R. was placed "had a history of regulatory problems." Dkt. 1609 at 16-18. "Despite the operation's ongoing problems . . . HHSC opted not to refer the operation for any type of enforcement action . . ." *Id*. at 17. In fact, "the owners were allowed to open a second campus," which exhibited the same safety problems. *Id*. A staff member who was alleged to have physically abused multiple children over two years was transferred to the second facility "where O.R. was placed, and the pattern of behavior continued." *Id*. at 18. Despite these safety risks, HHSC allowed another RTC to open under different ownership ("the wife of the CEO of the Thompson's RTCs"), and this RTC "suffered from many of the same problems that plagued the Thompson's RTCs." The pattern of abuse is unsurprising given that, as the Fifth Circuit observed, "licensees do not perceive that they will be held accountable for their malfeasance." *Stukenberg I*, 907 F.3d at 267.

Similar examples include MM, a 15-year-old PMC child who, in 2024, very nearly died and was left significantly disabled after suffering acute liver failure while on multiple psychotropic medications. Dkt. 1592 at 1-21. Another is CJ, the child entrusted to Empower, which, in 2024—due to failures to document and share medical information—improperly gave authorization for CJ to be administered medication that caused him to develop lupus. Receivership Pet. ¶22(b).

The State's failures are further reflected by another harrowing account. Through its RO 3 review, the monitoring team discovered the Settlement Club Home subjected an unknown number of children to "Chillville stabilization." These were confinements ranging "from days to several weeks and potentially longer" where children were "required to consume meals alone in the room," "received less access to therapeutic services," "could not attend any programmed activities with peers," and were "not permitted to speak to peers and peers were instructed not to speak to them." Dkt. 1659 at 48-49. This unregulated seclusion posed "an unreasonable risk of harm." *Id.* Defendants' "inquiries into the practice did not result in any intervention to end the practice, and it did not result in any findings of neglect or abuse or citations related to the practice." *Id.* at 49. And even though the facility was under heightened monitoring, "the practice has continued while HHSC performed that higher level of regulatory oversight." *Id.*

This is precisely the sort of lax enforcement noted in the contempt opinion. Dkt. 1560 at 27-42. That a facility under intensive oversight could isolate children for weeks, undetected and uncorrected, is a clear refutation of defendants' claim that the risk is well under control.

Related to these issues, the monitors' 2026 Tenth Report reveals persistent "significant deficiencies with intake and investigation of minimum standard deficiencies, particularly associated with the priority level assigned by HHSC to the investigations reviewed," subjecting children to risk. Dkt. 1660 at 95-96. These investigations are a primary tool used to address compliance issues. And, relevant to RO 21, the monitors have raised serious concerns about a pattern of allowing facilities with long troubled histories to remain open. Dkt. 1660 at 7-8, 199.

**4. Caregivers still are not told what they need to know to keep children safe.**

The record establishes—on the State's admission "that in order to protect children from sexual abuse," the adults responsible for a child's daily care "should be aware of the information they need to keep children safe"—that the State was failing to convey children's sexual-abuse and

sexual-aggression history to their caregivers. Dkt. 1079 at 211-12; Dkt. 1427 at 40 (ROs 25, 26, 27, 29, 31). When caregivers do not know, children who have been victimized and children who have acted out sexually are left together unsupervised.

Recent monitor reports confirm the failure persists. All caregivers had signed the required acknowledgment for only 24% of sampled children, the monitors found, and 44% of interviewed caregivers responsible for a child with a known history could not identify the child—a gap that "undermines child safety." Dkt. 1660 at 7. Only 81.6% of caregivers had completed the sexual-abuse training meant to equip them to recognize and respond. *Id.* at 37. The State reports high form-signature rates, but the information in fact is not reaching the people who need it, and the risk identified in the record is undiminished.

**5. Children still do not know how to report abuse.**

The finding that abuse went underreported because children did not know how to report it was central to the liability affirmed by the Fifth Circuit, and it was raised again in the contempt proceedings. *Stukenberg I*, 907 F.3d at 266; Dkt. 1427 at 37-40 (RO A6). Recent monitor reports show no progress and some regression. Roughly half of interviewed children remain unaware of the abuse hotline, the Foster Care Ombudsman, or the Foster Care Bill of Rights. Dkt. 1658 at 13, 81. Reports by children account for only 1% of intakes; and the share of children reporting that they did not feel safe in their placement rose from 0% to 8% between 2023 and 2024. *Id.* at 13, 73-74. A violation defined in part by children's inability to summon help cannot be deemed cured when half of them still do not know how.

By 2023, nearly four years after the mandate issued, the State said it was "working on some plans" to ensure that children know about available reporting mechanisms or that reporting mechanisms are accessible to children. Jan. 27, 2023 Hearing Tr. 31-32. "Inability to report

facilitates abuse." *Stukenberg I*, 907 F.3d at 302-03. The failure to ensure that children can summon help creates a significant risk of serious harm.

* * *

The serious safety concerns that persist do not exist in a vacuum. In determining whether conditions violate the Constitution, a "court may properly consider how individual policies or practices interact with one another within the larger system." *Stukenberg I*, 907 F.3d at 255. Taken together, these deficiencies describe an improved system that still fails children in critical ways. Whether the standard applied is full compliance or just substantial compliance, defendants have not yet achieved sufficient compliance to warrant Rule 60(b)(5) relief.

## III. Defendants Cannot Show that Applying the Judgment Prospectively Is Unfair.

Defendants' alternative ground for ending the injunction is that "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Their view of fairness omits the children.

Defendants cannot show substantial (much less full) compliance with the entire injunction. Gaps in the system still subject PMC children to an unreasonable risk of harm. The State has not even reached the baseline for getting equitable prospective relief, which is ending the violation of federal law by achieving the objective of the permanent injunction. "[A] critical question in this Rule 60(b)(5) inquiry is whether the objective of" the relevant judgment "has been achieved." *Horne*, 557 U.S. at 450. "It goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *Id.*

### A. Defendants cannot show that a "durable remedy" has been implemented.

Again, the injunction in this case has a built-in mechanism for determining when it should be ended and modified in the interim. *See* Dkt. 606 at 19-20. And, again, this mechanism—the termination process—is part of the mandate and binds the parties and Court. *See Stukenberg III*, 977 F.3d at 483; *Stukenberg II*, 929 F.3d at 281. Just as the fact that the injunction here was fully

and vigorously litigated distinguishes this case from institutional-reform cases resolved by consent decrees or less than adversarial litigation, this case's affirmed termination process distinguishes it from those involving open-ended decrees with no termination point. And it facilitates the "'flexible approach' to Rule 60(b)(5) motions addressing [institutional-reform decrees]" that the Supreme Court requires. *Horne*, 557 U.S. at 450.

If defendants were to show that the injunction's objectives are achieved, which they do not, they still would have to show that "a *durable* remedy has been implemented." *Id.* (emph. added). The mandate's termination process accounts for the "durable remedy" requirement in two ways—first, a party applying to end monitoring as to specific orders must show that further monitoring is unnecessary; second, once full compliance with the entire injunction is achieved, the Court retains jurisdiction for three years to ensure that compliance continues. Dkt. 606 at 19-20.

Defendants do not make these showings. Nor are they entitled to leapfrog the termination process in the mandate. *See Stukenberg III*, 977 F.3d at 483; *Stukenberg II*, 929 F.3d at 281.

As with their request for an easier substantial-compliance standard, defendants' arguments about the second prong of Rule 60(b)(5) rely on factors that do not apply to a litigated injunction, especially one that sets up a multi-step termination process and is subject to an appellate mandate forbidding further changes.

Defendants quote *Chisom*'s statement that a "decree has an end, and it is the courts' duty to ensure that control is returned to the State when that end is reached." Dkt. 1662 at 35. But they leave out the start of *Chisom*'s sentence, which clarifies what the Fifth Circuit was talking about: "consent-decree cases." 116 F.4th at 316. *Chisom* goes on to quote *Stukenberg I* that "remedies fashioned to address constitutional infirmities must directly address and relate to the constitutional violation itself, and federal court decrees exceed appropriate limits if they are aimed at eliminating

a condition that does not violate the Constitution or does not flow from such a violation." *Id.* (cleaned up). And there is an important difference between the consent decree in *Chisom* and the litigated, affirmed-as-modified injunction here. This injunction is, by definition, narrowly tailored to remedy *only* constitutional infirmities. *See Stukenberg II*, 929 F.3d at 276-81; *Stukenberg I*, 907 F.3d at 271-88. The built-in conclusion of this injunction is the one specified in its termination process, namely, "full" compliance followed by a three-year jurisdiction-retention period to ensure durability. Dkt. 606 at 19.

Nothing in this injunction binds defendants to "policy preferences of their predecessors," as was possible with the *Chisom* consent decree or the unappealed judgment in *Horne*. *Chisom*, 116 F.4th at 317 (quoting *Horne*). Here, defendants are not bound by anyone's "preferences" but only by the Constitution, as dutifully applied by this Court and the Fifth Circuit. "[F]ederal courts must vigilantly enforce" the constitutional guarantees that protect children in the State's custody. *Horne*, 557 U.S. at 450. As such, defendants must straightforwardly comply *in full* with a binding constitutional injunction, as incorporated in the Fifth Circuit mandate.

Invoking supposed changes to "facts on the ground," Dkt. 1662 at 31, is beside the point for these purposes. Defendants say, "Continuing enforcement can no longer be justified where the monitors' own data show the State has carried out the decree's implementation orders and is substantially complying with the operational ones, curing the asserted constitutional violation that gave rise to the injunction in the first place." *Id.* "At that point," they say, "monitoring no longer serves a remedial purpose." *Id.* But, as grounds for relief under the second prong of Rule 60(b)(5), these assertions are circular at best. The State has not fully implemented or substantially complied with all remedial orders and has not fully cured the constitutional violations. And if it had, the proper course would be for defendants to avail themselves of the termination process, which allows

for ending monitoring if they can show that it "will not serve a purpose" and for the injunction to end after "full compliance" and the three-year jurisdiction-retention period. Dkt. 606 at 19-20.

Moreover, defendants cannot show that "a *durable* remedy has been implemented." *Horne*, 557 U.S. at 450 (emph. added). That showing is required for relief under Rule 60(b)(5)'s second prong. *See, e.g.*, *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013) (state must show "first whether the state has achieved compliance with the federal-law provisions whose violation the decree sought to remedy; and second, whether the State would continue that compliance in the absence of continued judicial supervision"); *Horne*, 557 U.S. at 450; *Anderson v. City of New Orleans*, 38 F.4th 472, 479 (5th Cir. 2022). "Implicit in these requirements is the need for the district court, before terminating the decree entirely, to be satisfied that there is relatively little or no likelihood that the original constitutional violation will promptly be repeated when the decree is lifted." *Inmates*, 12 F.3d at 292. "[F]leeting federal compliance is insufficient to warrant relief." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1202 (10th Cir. 2018).

Aside from monitor reports and data showing that serious issues persist, developments that defendants tout are too new to show a record of durability. For example, they ballyhoo a 2025 statute that allows DFPS to petition a state court to put a single-source continuum contractor into receivership when it endangers children in state care. Tex. Fam. Code §264.1915. And they cite to DFPS's application of the statute in 2026 to Empower, a private contractor that consistently was endangering some 2,000 children entrusted to its care. Dkt. 1662 at 33-34. But, of course, these events just happened. And DFPS announced (ten days after defendants filed their motion) that it is canceling its contract with Empower—a cancellation that will not take effect until 2027. July 20, 2026 Letter of DFPS. Notably, as is clear from the receivership petition, the State knew of the extreme problems with Empower years before it was put into receivership. *See* Receivership Pet.

¶¶17-26 (describing a long history of serious problems, including child deaths, and failed corrective measures, including 17 Continuous Quality Improvement citations, dating back to at least early 2024). The step the State just took—canceling Empower's contract—was *always* available to it. Yet the State waited until after a second infant death before filing the receivership petition and, later, canceling the contract. *Id.* ¶22(c) (describing death of two-month-old infant on March 3, 2026).

It is too early to tell if this new receivership statute, and the two private providers replacing Empower, will achieve the hoped-for ends—a safe system for children—even as to the Dallas area, much less across the Texas system as a whole.

Relatedly, the State continues to transition to a model in which most of its child welfare system is privatized, a process it started in 2017. Nine years into the transition, it remains a work in progress. The time to assess the efficacy and safety of such a shift will come after it has played out across the state, not right in the middle of it. The results so far are, charitably speaking, mixed. Some important private contractors—like Empower (Dallas Metroplex East region), Saint Francis (Panhandle, South Plains, and Central Texas), and 2Ingage (Big Country and Texoma)—have performed demonstrably worse than the public agencies.

The Empower receivership confirms why now is not the time to call it a day and just assume the State has implemented *durable* remedies to keep innocent children safe.

Five months ago, DFPS verified, under penalty of perjury, a petition asserting its contractor Empower "continues to fail" and "presents an imminent danger to the health, safety, or welfare of the children under the conservatorship of DFPS in [its] care." Receivership Pet. ¶¶2-4, 14. This was no snap decision. It came after "seventeen . . . [Quality Improvement] plans" two corrective

action plans, and two judicial contempt findings. *Id*. Filed under Tex. Fam. Code §264.1915(1), (3), the petition recounts what that "imminent danger" meant for the children:

- an infant born to parents under investigation for whom Empower documented no safety plan, "pronounced deceased due to non-accidental trauma" three weeks after birth;

- a child with five caseworkers in eight months for whom Empower authorized lupus-triggering medication despite a record warning against it, leading to hospitalization; and

- a two-month-old returned home by Empower, "despite the lack of services, family engagement, and assessment of safety," who "suffered additional intentional injuries and passed away."

Receivership Pet. ¶22(a)-(c). A review of 178 Empower cases found safety concerns "inadequately addressed or documented" and a "pattern[]" of noncompliance with policy governing the return of children to their parents. *Id.* ¶¶23-24. Two days later, a state court adopted those representations verbatim, finding "imminent danger to the health, safety, or welfare of children under DFPS conservatorship." Order Appointing Receiver, *Tex. Dep't of Fam. & Protective Servs. v. Tex. Fam. Initiative, LLC*, No. DC-26-04702 (95th Dist. Ct., Dallas Cnty., Tex.) (Mar. 18, 2026) ¶¶1-5.

Whether the receivership tool will make children safer depends on whether the State wields it timely, effectively, and consistently. Today, there is no track record from which to find that it will; the authority is months old and has been used once. More to the point, the durability inquiry asks whether the state actors will sustain compliance without federal oversight. *Horne*, 557 U.S. at 450. Here, the history of this system is a history of a state possessing enforcement authority and declining to use it. The record reveals a pattern of the State tolerating operations with serious, repeated violations rather than closing them. That the Legislature has supplied another tool says nothing about whether the State will use this one differently and better. A new instrument in the hands of an agency with this record is a reason for continued supervision, not a substitute for it.

There is a deeper problem the receivership exposes. In the midst of the sweeping transition to privatized care, the monitors have identified privatized regions that, so far, are doing markedly worse than State-run ones. Thus, while DFPS-managed caseloads conform to the standard 93% of the time, the contractor regions have fallen to 60-71%, with Empower—now in receivership—among them. Dkt. 1659 at 108; Dkt. 1661 at 4-6. If Community-Based Care had a track record of outperforming or even matching the State's (now much improved) performance, the State might argue that the transition is a stable foundation on which to end oversight. The reverse is true. The State is handing children to contractors that are failing the caseload standard, failing to document safety, and—by the State's own account—endangering children, even as it asks this Court to withdraw the supervision that remains the only outside check on that transition.

In short, the State has not achieved sufficient compliance to warrant Rule 60(b)(5) relief for reasons of equity. And even if it had, there is no basis to assume "the State would continue that compliance in the absence of continued judicial supervision." *John B.*, 710 F.3d at 412.

**B. Early termination is not in the public interest.**

Finally, defendants cannot show that ongoing enforcement of the injunction is "detrimental to the public interest." *Horne*, 557 U.S. at 447. Despite progress, defendants cannot show that the constitutional violation has been cured. And the monitor reports upon which defendants rely, as well as the robust evidentiary record and other data, show that children remain at substantial risk of serious harm as a result of defendants' policies and practices. Even if the constitutional violation were cured, defendants cannot show the cure is durable. And because the federalism risks inherent in consent decrees are not present in litigated injunctions, defendants' appeals to federalism carry less weight than their off-point authorities suggest. Finally, termination is not a tailored remedy. The more extreme the modification requested, and termination is as extreme as it gets, the greater the burden of proof. Defendants have made no such showing here.

Federalism concerns inhere in all institutional reforms. But there are material differences between litigated judgments and bargained settlements, and the Supreme Court sees federalism concerns as exacerbated in the latter. In a fully litigated judgment, the plaintiffs have proved, and a court has found, constitutional violations; in settlement decrees, the state admits no liability, and no court has found a constitutional violation. And while injunctive remedies must be tailored to constitutional violations and *nothing* more, consent decrees often "go well beyond what is required by federal law." *Horne*, 557 U.S. at 448. Because "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree," a consent decree is untethered from the supermajoritarian mandate that drives litigated judgments. *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018); *see also Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 521-22 (1986). Litigated judgments simply bind present and future officials to constitutional duties they already are obliged to follow. U.S. CONST. art VI ("State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution."). But in consent decrees, present officials bind future officials not to constitutional duties they are required to follow anyway but to their chosen policy preferences, which may "improperly deprive future officials of their designated legislative and executive powers." *Horne*, 557 U.S. at 449; *see also Allen*, 14 F.4th at 375 & n.* (Oldham, J., concurring). For all these reasons, the hotly contested and litigated judgment here does not present the same heightened federalism risks as a consent decree.

This injunction was affirmed after multiple contested appeals to the Fifth Circuit. The procedural history reflects a faithful application of equitable principles to achieve the mandate. After a two-week trial in 2014, the Court held that Texas was deliberately indifferent to known

and obvious risks in violation of the children's substantive due process rights under the Fourteenth Amendment. *M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015), *aff'd in part*, 907 F.3d 237, 243 (5th Cir. 2018) (*Stukenberg I*). The Court gave Texas "'the [first] opportunity to correct [its own] errors.'" *Stukenberg I*, 907 F.3d at 272 (orig. brackets) (cite omitted). It "set forth a detailed list of the goals of the reforms" with "specific directives to the State," and it appointed special masters "to help craft the reforms and oversee their implementation." *In re Abbott*, 667 F. App'x 473, 473 (5th Cir. 2016) (unpub.). For two years, the special masters studied the State's policies and submitted a list of findings and recommendations. *Stukenberg I*, 907 F.3d at 247.

The Court hoped this would be a collaborative process. It was prepared to consider the State's proposals, and the masters were prepared to help the State implement solutions. *Id*. at 261-62. The State decided otherwise. It "refused to work with the court-appointed Special Masters in creating corrective policies and largely ignored the district court's orders that it implement policies and procedures to minimize the risk of harm to the PMC class." *Id*. at 272. In this context, the Court entered a final order in 2018 granting an injunction and appointing monitors. *Id*. at 247.

In *Stukenberg I*, the Fifth Circuit reviewed the injunction comprising 95 provisions. It affirmed the State's liability for violations as to caseworker caseloads and inadequate monitoring and oversight, and it upheld most of the provisions relating to those violations as narrowly tailored to remedy the constitutional violations. 907 F.3d. at 271-88. In upholding those remedies, the Fifth Circuit chastised the State for its intransigence, noting that the Court "was entitled to worry about the State's motivation to self-correct and was justified in doubting that it would achieve compliance independently." *Id.* at 272. On remand, the Court issued a modified injunction pursuant to *Stukenberg I*. And again, "unhappy with the district court's revisions," the State appealed. *Stukenberg II*, 929 F.3d at 275.

In *Stukenberg II*, the Fifth Circuit affirmed most of the post-remand remedial orders. Its 2019 mandate has a total of 67 provisions, including those validated in *Stukenberg I* and those not challenged in *Stukenberg II*. *See id.* at 276-81. Even as it rejected select orders, the panel noted the "well-intentioned attempt to fix" conditions leading to the constitutional violations. *Id.* at 277-80.

In short, compliance with the Fifth Circuit's mandate, which affirmed the injunction as modified to narrowly tailor it, is the constitutional *minimum*. No state has a "federalism" interest in continuing to violate the Constitution. *See, e.g.*, *Horne*, 557 U.S. at 450. For essentially the same reasons that the State cannot prove either full compliance or substantial compliance with the entire injunction, or show that remedies implemented so far are durable, federalism does not compel—or even permit—ending a judgment that "vigilantly enforce[s] federal law." *Id.*

To the extent defendants believe they can show grounds to end monitoring as to specific components, they should avail themselves of the process for trimming the injunction's application. *See* Dkt. 606 at 19-20. But modifications must be "tailored to resolve the problems created by the change in circumstances," and they may "do no more" than that. *Rufo*, 502 U.S. at 391. Rule 60(b)(5)'s tailoring requirement reflects the principle of equity that judicial intervention must be proportionate to the problem it addresses: the more extreme the remedy, the higher burden of proof.

When children in state care remain at risk because established constitutional violations are not cured, terminating the remedial injunction is most assuredly not in the public interest.

## CONCLUSION

The Court should deny defendants' motion for relief from the judgment.

Dated: August 31, 2026

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
Christian J. Ward
State Bar No. 24033434
YETTER COLEMAN LLP
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Barry F. McNeil
State Bar No. 13829500
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
(214) 651-5000
barry.mcneil@haynesboone.com

Samantha Bartosz (*pro hac vice*)
Stephen Dixon (*pro hac vice*)
CHILDREN'S RIGHTS
88 Pine Street
New York, New York 10005
(212) 683-2210
sbartosz@childrensrights.org

Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
420 Lexington Ave, Room 2035
New York, New York 10170
(646)795-4456
mlowry@ABetterChildhood.org

ATTORNEYS FOR PLAINTIFFS AND GENERAL CLASS AND SUBCLASSES

**CERTIFICATE OF SERVICE**

I certify that on the 31st day of August, 2026, a true and correct copy of this document was served on all counsel of record via email or by using the Court's CM/ECF e-file system.

*/s/ R. Paul Yetter*
R. Paul Yetter