IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 2:11-CV-00084 |
| | § | |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

**REPLY IN SUPPORT OF DEFENDANTS' RULE 60(b)(5) MOTION FOR RELIEF FROM JUDGMENT**

# TABLE OF CONTENTS

Page


Table of Authorities ........ ii

Introduction ........ 1

Argument ........ 3

I. Rule 60(b)(5) isn't displaced by the decree's termination provision. ........ 3

A. Rule 60(b)(5) applies universally. ........ 3

B. The decree's termination provision makes clear that it's an additional pathway to relief. ........ 6

C. Plaintiffs previously told the Fifth Circuit that the termination provision doesn't displace Rule 60(b)(5). ........ 8

II. The judgment has been satisfied. ........ 9

A. Substantial compliance satisfies the judgment, and nothing limits that standard to consent decrees. ........ 9

B. In the alternative, the State satisfied the judgment in good faith and eliminated any violation to the extent practicable. ........ 19

III. Continued application of the injunction is no longer equitable. ........ 21

Conclusion ........ 29

Certificate of Service ........ 31

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Allard Enters., Inc. v. Advanced Programming Res., Inc.*,
249 F.3d 564 (6th Cir. 2001) ........ 5

*Bd. of Educ. v. Dowell*,
498 U.S. 237 (1991) ........ *passim*

*Chisom v. Louisiana ex rel. Landry*,
116 F.4th 309 (5th Cir. 2024) ........ 2, 9, 11, 13

*Freeman v. Pitts*,
503 U.S. 467 (1992) ........ 6, 7, 25

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) ........ 9

*Hernandez v. Results Staffing, Inc.*,
907 F.3d 354 (5th Cir. 2018) ........ 4

*Horne v. Flores*,
557 U.S. 433 (2009) ........ *passim*

*In re Ivan F. Boesky Sec. Litig.*,
957 F.2d 65 (2d Cir. 1992) ........ 5

*Jackson v. Los Lunas Cmty. Program*,
880 F.3d 1176 (10th Cir. 2018) ........ 10

*John B. v. Emkes*,
710 F.3d 394 (6th Cir. 2013) ........ 25

*Kennedy Bldg. Assocs. v. CBS Corp.*,
576 F.3d 872 (8th Cir. 2009) ........ 5

*Landor v. La. Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) ........ 28

*M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg I*"),
907 F.3d 237 (5th Cir. 2018) ........ 13

*M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg II*"),
929 F.3d 272 (5th Cir. 2019) ........ 1, 8, 13

*M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg III*"),
977 F.3d 479 (5th Cir. 2020) ........ 5

*M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg IV*"),
119 F.4th 373 (5th Cir. 2024) ........ *passim*

**TABLE OF AUTHORITIES**
(cont'd)

*Melendres v. Sheridan*,
2026 WL 2664498 (D. Ariz. Sep. 10, 2026) .................... 10, 22

*Missouri v. Jenkins*,
515 U.S. 70 (1995) .................... 26

*Ostrewich v. Tatum*,
72 F.4th 94 (5th Cir. 2023) .................... 7

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) .................... 4, 10

*Sibbach v. Wilson & Co.*,
312 U.S. 1 (1941) .................... 4

*Standard Oil Co. of Cal. v. United States*,
429 U.S. 17 (1976) .................... 4

*Sullivan v. Houston Indep. Sch. Dist.*,
475 F.2d 1071 (5th Cir. 1973) .................... 11, 12

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .................... 11, 26

*William Skillings & Assocs. v. Cunard Transp.*,
594 F.2d 1078 (5th Cir. 1979) .................... 12

**Statutes**

28 U.S.C. § 2072 .................... 4

Tex. Fam. Code § 264.151 *et seq.* .................... 27

Tex. Fam. Code § 264.152 .................... 27

Tex. Fam. Code § 264.191 *et seq.* .................... 23

Tex. Fam. Code § 264.193 .................... 23

Tex. Fam. Code § 264.194 .................... 23

Tex. Fam. Code § 264.1915 .................... 23

**Rules**

Fed. R. Civ. P. 60 .................... 3, 9, 21

**TABLE OF AUTHORITIES**
(cont'd)

## Other Authorities

Press Release, Tex. Health & Hum. Servs. Comm'n, *HHSC, DFPS Celebrate Opening of Terrell Center for Youth* (Aug. 20, 2026) ... 25

Tex. Dep't of Fam. & Protective Servs., FAQs on Region 3E Transition ... 24

Tex. Dep't of Fam. & Protective Servs., Briefing to the House Comm. on Hum. Servs. (May 5, 2026) ... 23

Tex. S.B. 11, 85th Leg., R.S. (2017) ... 27

Tex. S.B. 2034, 89th Leg., R.S. (2025) ... 23

11A Wright & Miller, *Federal Practice & Procedure* § 2961 (3d ed. 2026) ... 10

## Introduction

Texas has spent years transforming its foster-care system through legislation, appropriations, and executive action. That work has produced sweeping, durable improvements that will not end when this injunction does. The record is clear—the monitors have given the State high marks across the remedial orders as a whole, documenting sustained compliance at levels that leave no serious question about the State's commitment to protecting the children in its care. And as the Fifth Circuit has already held, the State substantially complied with the two remedial orders at the center of the contempt proceedings and endeavored in good faith to comply with this detailed decree. Plaintiffs ask this Court to disregard all of that—under a standard they once told the Fifth Circuit didn't apply and by a method of measuring compliance that the Fifth Circuit has already rejected. They offer no persuasive justification for keeping the State's foster-care system under perpetual federal judicial supervision. Rule 60(b)(5) requires relief.

Plaintiffs' threshold argument is one they previously disavowed before the Fifth Circuit. They now say the decree's termination provision, not Rule 60(b)(5)'s standards, governs when relief is available. But in 2019, plaintiffs explained to the Fifth Circuit that satisfying the termination provision's terms was merely "one means" by which a party could obtain relief from judgment, and that Rule 60(b) provided "other means." Appellees' Suppl. Br. at 57, *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg II*"), 929 F.3d 272 (5th Cir. 2019) (No. 18-40057), 2019 WL 495935, at *57. Plaintiffs were right the first time. As its plain text makes clear, Rule 60(b)(5)

applies to every final judgment. Moreover, the language of the decree's termination provision is permissive, not exclusive. So just as plaintiffs previously represented, Rule 60(b)(5) remains available to seek relief from judgment here.

Under Rule 60(b)(5), substantial compliance is the standard for satisfying the Court's judgment. *See Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 318 (5th Cir. 2024) (en banc). Plaintiffs' attempts to limit that standard to consent decrees fail. In all events, the State has also satisfied the alternative standard of *Board of Education v. Dowell*, 498 U.S. 237, 249–50 (1991), because it complied in good faith and eliminated the targeted conditions to the extent practicable over a sufficient timeframe.

The State is independently entitled to relief under Rule 60(b)(5) because prospective application is no longer equitable. That's shown by changes in both law and fact. The State enacted a receivership statute and quickly wielded it against an underperforming contractor, while the monitors' compliance reports document seven years of what plaintiffs themselves call (at 1) "vital progress." Defendants don't minimize any genuine "shortcomings" in plaintiffs' catalog of isolated incidents. *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg IV*"), 119 F.4th 373, 380 (5th Cir. 2024). But if they have occurred, they have done so on "a very small scale in relation to the magnitude of the institution" and don't negate the systemwide data the monitors have compiled across seven years. *Id.* Continued federal supervision imposes serious federalism and fiscal costs that the Supreme Court has condemned and the Fifth Circuit has decried at every turn in this case.

Texas's current foster-care system doesn't need a federal overseer. The Court should grant the motion in full, dissolve the injunction and remedial orders, and hand back to Texas this "area[] of core state responsibility." *Horne v. Flores*, 557 U.S. 433, 448 (2009).

## ARGUMENT

### I. Rule 60(b)(5) isn't displaced by the decree's termination provision.

The Supreme Court has made clear that "Rule 60(b)(5) serves a particularly important function in . . . 'institutional reform litigation.'" *Horne*, 557 U.S. at 447. Plaintiffs in this institutional-reform litigation nonetheless argue (at 9) that the decree's termination provision "controls the application of either ground for Rule 60(b)(5) relief," so that the State can prove that the judgment has been satisfied or that applying it prospectively is no longer equitable only by achieving "full compliance" with all 60-plus remedial orders and then sustaining it for years. That position runs contrary to Rule 60(b)(5), the termination provision's text, and even plaintiffs' own prior representations to the Fifth Circuit in this case.

#### A. Rule 60(b)(5) applies universally.

Start with Rule 60(b)(5). It provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding [when] the judgment has been satisfied . . . or applying it prospectively is no longer equitable." By its terms, the rule applies universally—it doesn't depend on whether the "final judgment, order, or proceeding" includes a termination provision.

And that rule—like all the Federal Rules—was promulgated under the Rules Enabling Act, 28 U.S.C. § 2072, and transmitted to Congress, making it binding on federal courts. *See Sibbach v. Wilson & Co.*, 312 U.S. 1, 13 (1941). As a result, Rule 60(b)(5) provides a path for relief from this injunction—or any injunction—whether or not it includes a termination provision. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 387 (1992) (holding that it "cannot be the rule" that modification of a consent decree is forbidden). Rather than foreclosing Rule 60(b)(5) relief, including a termination provision in an injunction simply provides an additional, alternative path for seeking relief from the judgment.

Plaintiffs are wrong to argue (at 6–11) that *Stukenberg II*, which declined to consider the State's challenge to the termination provision, somehow disallowed the normal use of Rule 60(b)(5). *Stukenberg II* never held that the termination provision displaces Rule 60(b)(5), nor did the court purport to foreclose Rule 60(b)(5) as an alternative pathway to relief from the injunction. Even if the termination provision became part of the appellate mandate as plaintiffs contend, it's well established that an "appellate mandate relates to the record and issues then before the court, and does not purport to deal with possible later events," so a district court "is not flouting the mandate by acting on" a Rule 60(b) motion grounded in them. *Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 18 (1976) (discussing Rule 60(b)); *see also Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 359–61 (5th Cir. 2018) (holding a district court retained authority to consider a Rule 60(b) motion after the appellate mandate issued and following "later events").

Plaintiffs' contrary authorities are all scope-of-remand cases in which a district court exceeded a limited mandate while executing it. *See* Opp. 7–8 (citing *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 571 (6th Cir. 2001); *Kennedy Bldg. Assocs. v. CBS Corp.*, 576 F.3d 872, 878–79 (8th Cir. 2009); *In re Ivan F. Boesky Sec. Litig.*, 957 F.2d 65, 69–72 (2d Cir. 1992)). None holds that a mandate forecloses Rule 60(b) relief, which makes sense. A federal appellate court can't legitimately instruct a district court to ignore the Federal Rules of Civil Procedure. The 2019 mandate in *Stukenberg II* never held that Rule 60(b)(5) was unavailable, and in all events addressed the record as it stood in 2019. Because this motion relies on the Rule 60(b)(5) pathway that *Stukenberg II* necessarily left open and rests on developments after that decision, the mandate rule is no impediment.

*Stukenberg III* confirms the point. It explained that "[i]f it is necessary to modify an injunction in the face of a mandate that forbids all further changes, the solution is not for the district court to update the injunction on its own—but for the parties to litigate the matter to the extent our procedures permit." *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg III*"), 977 F.3d 479, 483 (5th Cir. 2020). A Rule 60(b)(5) motion is the proper mechanism for doing just that.

Whether the State waived its objections to the termination provision as plaintiffs assert (at 6) is irrelevant to the State's eligibility for relief under Rule 60(b)(5). In *Horne*, the Supreme Court rejected the proposition that an unappealed judgment isn't amenable to Rule 60(b)(5) relief. The Rule 60(b)(5) inquiry, the Court explained,

"makes no reference to the presence or absence of a timely appeal. It takes the original judgment as a given and asks only whether 'a significant change either in factual conditions or in law' renders continued enforcement of the judgment 'detrimental to the public interest.'" 557 U.S. at 453 (citation omitted). So the State didn't need to appeal *any* aspect of the decree to preserve its right to seek relief under Rule 60(b)(5) at an appropriate time.

### B. The decree's termination provision makes clear that it's an additional pathway to relief.

The decree's termination provision confirms that rather than displacing Rule 60(b)(5), it provides an additional pathway to relief. The termination provision states:

> The Court retains jurisdiction for a period of three years after full compliance as certified by the Monitors. Either party may apply to the Court during the term of the monitoring to terminate supervision over one or more components of this Order if that party can show full compliance with that component and that further monitoring will not serve a purpose. *Cf. Freeman v. Pitts*, 503 U.S. 467, 489 (1992) ("A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control.").

Dkt. 606 at 19–20. Based on that text, plaintiffs assert (at 6–11) that: (1) the "first sentence . . . makes 'full compliance' the standard for satisfying the judgment at issue here," and (2) that standard "controls the application of either ground for Rule 60(b)(5) relief."

The text supports neither conclusion. The first sentence is a jurisdiction-retention clause. It fixes when the Court's supervision ends—not what a party must prove to obtain relief while that supervision continues. The second sentence says either party "may apply" for component-by-component relief at any time "during the

term of the monitoring." It's permissive, not mandatory. *See Ostrewich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023) (contrasting "the permissive term 'may'" with a "mandatory term like 'shall'"). And the showing it describes—full compliance with a component, and that further monitoring "will not serve a purpose"—goes to terminating supervision over "one or more components," not relief from the judgment itself. Providing one way to seek relief isn't the same as prohibiting all other ways to seek relief.

What the termination provision omits is just as telling: It contains no mention of Rule 60(b)(5) or any declaration of exclusivity. Having specified what a party "may" show to end monitoring of a component, the provision says nothing to suggest that it has foreclosed the use of Rule 60(b)(5) as an alternative means of relief. Nor does the provision's cited case say anything about barring other avenues of relief. If anything, *Freeman* cuts against plaintiffs—it recognized one more way out from under an injunction, over the plaintiffs' rigid insistence that those defendants had only a single path to relief. *Freeman*, 503 U.S. at 489–91.

Plaintiffs contend (at 9) that the termination provision embodies the "flexible approach" that *Horne* said is necessary in institutional-reform cases—but plaintiffs get *Horne* backwards. Its "flexible approach" describes how courts must apply Rule 60(b)(5), and the Court's point was that rigid application keeps institutional decrees alive too long. *See Horne*, 557 U.S. at 450. Treating termination provisions that say nothing about Rule 60(b)(5) as implicitly (and unlawfully) overriding that legally binding relief mechanism would do exactly that.

### C. Plaintiffs previously told the Fifth Circuit that the termination provision doesn't displace Rule 60(b)(5).

All of this should be common ground, because plaintiffs themselves argued to the Fifth Circuit in *Stukenberg II* that the termination provision was consistent with Rule 60(b) ***precisely because the provision was non-exclusive***. "When a court spells out the grounds for applying for termination of a permanent injunction," plaintiffs correctly explained, "satisfaction of those terms provides ***one means*** by which a party can apply for relief from judgment. In that circumstance, Rule 60(b) simply provides ***other means*** to seek relief." Appellees' Suppl. Br. at 57, *Stukenberg II*, 929 F.3d 272 (No. 18-40057), 2019 WL 495935, at *57 (emphases added).

In the same brief, plaintiffs explained to the Fifth Circuit why the argument they're currently making to this Court is baseless. Plaintiffs told the court of appeals that Rule 60(b)(5) would survive as a separate path for obtaining relief even if a termination provision stated that it was "'the sole and exclusive method' for determining when the defendant's obligations cease"—something the termination provision at issue here doesn't even do. Appellees' Suppl. Br. at 57–58, *Stukenberg II*, 929 F.3d 272 (No. 18-40057), 2019 WL 495935, at *57–58. Plaintiffs even approvingly forecast this motion, explaining that in the future the State could "rely on the termination provision in the injunction to show that the need for injunctive relief and oversight no longer exists," or "[a]lternatively . . . apply for relief from judgment under Rule 60(b)." *Id.* at 59.

By filing this motion, the State has done what both parties previously agreed it could do. The motion should be governed by the ordinary standards of Rule 60(b)(5).

## II. The judgment has been satisfied.

Under Rule 60(b)(5)'s first prong, a defendant is entitled to relief when the judgment "has been satisfied." A judicial decree is satisfied by "substantial compliance." *Chisom*, 116 F.4th at 318. The State has shown substantial compliance with Judge Jack's 60-plus remedial orders, and the Fifth Circuit has already determined substantial compliance with the two orders at the center of the contempt proceedings. Mot. 9–10. None of plaintiffs' counterarguments alters those conclusions.

### A. Substantial compliance satisfies the judgment, and nothing limits that standard to consent decrees.

A party demonstrates that a judgment has been satisfied by showing "substantial compliance" with the court's order. *Chisom*, 116 F.4th at 318. That standard is met when "the objects of the decree have been attained." *Id.* at 316 (citation omitted). Substantial compliance "excuses deviations" from perfection so long as they don't "severely impair the . . . purpose" of the decree. *Frew v. Janek*, 780 F.3d 320, 330 (5th Cir. 2015); Mot. 11–12.

Plaintiffs dispute that conclusion on five grounds, arguing that: (1) substantial compliance is a contract-law standard that applies only to consent decrees; (2) litigated injunctions demand perfect compliance; (3) every remedial order sets a constitutional floor, such that only full compliance with each one can satisfy the judgment; (4) a successful contempt defense isn't enough to support a Rule 60(b)(5) motion; and (5) the monitors' reports don't show substantial compliance in any event. None is availing.

*First*, plaintiffs contend (at 11–16) that substantial compliance can be used to show satisfaction only of consent decrees, but not institutional-reform injunctions. That argument has no footing in law. The Supreme Court has instructed that a consent decree is "subject to the rules generally applicable to other judgments and decrees," like Rule 60(b). *Rufo*, 502 U.S. at 378. After all, Rule 60(b)—which applies to *any* "final judgment, order, or proceeding"—nowhere differentiates between judicial decrees entered with the parties' consent and those entered over a party's objection.

Substantial compliance is appropriate when reviewing a consent decree under Rule 60(b)(5); it is likewise appropriate when reviewing an institutional-reform injunction under Rule 60(b)(5). *See* 11A Wright & Miller, *Federal Practice & Procedure* § 2961 (3d ed. 2026) (discussing use of "substantial compliance" to dissolve longstanding "institutional reform injunctions"). Plaintiffs' suggestion that decades-long, *coercive* injunctions are somehow singularly exempt from substantial compliance would perversely subject defendants to a higher standard for relief than they would have been subject to had they voluntarily agreed to be bound in the first place.[1]

[1] The out-of-circuit district-court decision plaintiffs discuss in their notice of supplemental authority (Dkt. 1677) collapses any distinction between consented and coerced judgments. *See Melendres v. Sheridan*, 2026 WL 2664498, at *1–2 (D. Ariz. Sep. 10, 2026) (noting that after it "permanently enjoined" defendants, the court asked the parties to "submit a consent decree," and the order it entered arose out of the parties' "agreement about a general framework"). The court nonetheless declined to apply substantial compliance on the ground that the standard derives from contract law, *id.* at *32, while asserting that the Ninth Circuit "has not yet defined 'satisfaction'" in the "context of relief from an injunctive order," *id.* at *11. No such gap exists here. The Fifth Circuit has already measured compliance with this injunction by a substantial-compliance standard, *Stukenberg IV*, 119 F.4th at 383–85, and plaintiffs' own authority treats "a consent decree and an injunctive order [as] equivalent for purposes of evaluating a Rule 60(b)(5) motion." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1198 (10th Cir. 2018) (cited at Dkt. 1677 at 4).

Nevertheless, plaintiffs argue (at 17) that the "substantial-compliance standard applies only to consent decrees, which are contractual in nature," and (at 13) that *Rufo* stands only for the proposition that "consent decrees are like injunctions in being judicially enforceable." But the State's argument here, like the substantial-compliance standard more generally, doesn't depend on treating the remedial orders as contracts. Under *Chisom*, satisfaction means that "the objects of the decree have been attained." 116 F.4th at 316 (citation omitted). That's an equitable inquiry, not a contractual one. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841, 853–54 (2025) (discussing injunctions as "an exercise of equitable authority" and observing, when assessing the permissible scope of injunctive relief, that "[c]omplete relief is not a guarantee"). Equity "looks to the substance and not merely to the form," and the Fifth Circuit has applied that maxim to this very injunction. *Stukenberg IV*, 119 F.4th at 385 (citation omitted).

*Second*, plaintiffs insist (at 13–16) that institutional-reform injunctions demand near-perfect compliance, but plaintiffs' own authorities undercut that assertion. *Sullivan v. Houston Independent School District*, 475 F.2d 1071 (5th Cir. 1973), involved an injunction that (1) barred a school district from enforcing any rule on student distribution of literature unless the rule met a list of specified conditions and (2) prescribed the procedures the district had to follow before imposing serious discipline. *Id.* at 1072 n.3. The district adopted a new set of rules that met those conditions on paper and then moved under Rule 60(b) to vacate the injunction as satisfied. *Id.* at 1078. The Fifth Circuit held that the district court didn't abuse its discretion

by denying that motion because "[t]he original injunction dealt not only with the promulgation of regulations, but also with their enforcement," and the district made no showing that the rules wouldn't be applied unconstitutionally to students going forward. *Id.* The district's mere promulgation of regulations—absent proven enforcement—wasn't substantial compliance; it was half compliance. The case nowhere says that a showing of substantial compliance—as the State has made here—isn't enough to satisfy a judgment.

*William Skillings & Associates v. Cunard Transportation*, 594 F.2d 1078 (5th Cir. 1979) (per curiam), is inapt for the same reason. That case involved a judgment requiring satisfaction by payment to three individuals. *Id.* at 1080. The judgment debtors tendered a release executed in the name of a partnership, but not by the three individuals named in the judgment. *Id.* The judgment debtors then moved under Rule 60(b) to "have the judgment marked as satisfied." *Id.* The Fifth Circuit upheld the district court's denial of that relief because the judgment debtors hadn't made payment to the named individuals. *Id.* That wasn't substantial compliance—it was a failure to do the one thing the judgment required. So that case, too, provides no support for the proposition that substantial compliance isn't enough to satisfy a judgment.

*Third*, plaintiffs argue (at 14–16, 35) that every remedial order sets a constitutional minimum because Judge Jack's injunction was "narrowly tailored" and that anything short of full compliance with each order leaves the constitutional violation unremedied and the judgment unsatisfied. Far from characterizing the injunction as

narrowly tailored, however, the Fifth Circuit has repeatedly warned of its extreme breadth. The court of appeals called it "sweeping," warned that "[a]n intrusion of this scale should not be taken lightly," and struck provisions from it in two successive appeals. *M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg I*"), 907 F.3d 237, 271 (5th Cir. 2018); *Stukenberg II*, 929 F.3d at 279–80. What's more, the Fifth Circuit has already held that isolated shortfalls must be measured against "the magnitude of the institution." *Stukenberg IV*, 119 F.4th at 380. So it cannot be that the Constitution demands perfection on every metric across Judge Jack's 60-plus remedial orders.

*Fourth*, plaintiffs contend (at 16–17) that substantial compliance sufficient to defeat an erroneous contempt order isn't enough to merit relief from judgment. That mischaracterizes the Fifth Circuit's decision. The Fifth Circuit didn't hold that the State did *just enough* to escape sanctions; it held, on the merits, that the State *substantially complied* with the remedial orders—and it went further, observing that the violations Judge Jack seized on were "just a drop in the bucket of systemwide investigations." *Stukenberg IV*, 119 F.4th at 385. Under *Chisom*, those circumstances constitute satisfaction. *See* 116 F.4th at 318.

The scope of the Fifth Circuit's decision doesn't help plaintiffs either. Plaintiffs stress (at 17) that the holding was "confined to only two remedial orders." While it's true that Remedial Orders 3 and 10 were the only orders before the court, the import of its decision was not so confined. What matters here, and what plaintiffs persistently ignore, is that the court's method of analysis—focusing on substance rather than form, and keeping the system's massive scale in mind—applies to all the other

remedial orders as well. The State's showing on those orders rests on the same monitors' reports. *See* Mot. 13–27.

*Fifth*, plaintiffs contend (at 20–33) that the monitors' reports don't show adequate compliance. But plaintiffs contest compliance for only a handful of the remedial orders. Plaintiffs don't dispute the monitors' findings of perfect or very-near-perfect compliance with many of the remedial orders, including Remedial Orders 1 (97%), 9 (97%), 12 (100%), 14 (98%), 15 (98%), 16 (100% for DFPS, 97% for HHSC), 17 (98%), 19 (97%), 24 (100%), 30 (99%), 37 (100%), A7 (100%), and B5 (97–100%). Nor do plaintiffs dispute that many remedial orders have been satisfied by completed acts of implementation (Remedial Orders 23, 28, 32, A1, A2, A8, and B1–B3) or that the State has satisfied the orders governing monitoring (Remedial Orders AA1–AA13 and BB1–BB3). *See* Mot. 15–27. So plaintiffs have forfeited any argument that the State's showing on those orders falls short, even under their own inapplicable "full compliance" standard.

Defendants have also demonstrated compliance with the remaining remedial orders. Substantial compliance is the standard for satisfaction under Rule 60(b)(5), and the monitors' own reports show the State consistently meeting it across the remaining orders. *See* Mot. 13–27. In attempting to contest that record, plaintiffs rehearse the 2023 contempt record and individual incidents drawn from the monitors' reports. But the Fifth Circuit reviewed that record, credited the same reports, and held that violations of this kind are "just a drop in the bucket" measured against "the

magnitude of the institution." *Stukenberg IV*, 119 F.4th at 380, 385. A reversed contempt opinion and the recitation of a small number of tragic instances—each of which the State takes very seriously—don't represent the system as it exists today. Nor do they outweigh systemwide data sustained across reporting periods. *See* Mot. 13–27.

Plaintiffs wrongly challenge (at 25–26) the treatment of children who temporarily lack a licensed placement. No remedial order governs that practice, and plaintiffs tie it to the decree only through caseloads, arguing (at 26) that the supervision shifts it generates "impede[] defendants' compliance with caseload guidelines." But Remedial Order 35 directs the State to track caseloads "on a child-only basis," Dkt. 606 at 7, and every child in the State's conservatorship—including a child without a placement—is counted exactly once, on the caseload of that child's primary caseworker. Defs.' Resp. to Pls.' Third Am. Mot. for Order to Show Cause (Dkt. 1429) 25.

Plaintiffs' portrayal of an ongoing placement crisis bears no resemblance to reality. The average number of children without licensed placements has dropped by nearly 90% over the past five years, from a peak of 106 children per night in mid-2021 (driven by the COVID-19 pandemic) to just 13 per night by November 2025. Eleventh Report (Dkt. 1659) 135; Monitors' Update (Dkt. 1132) 1–2. Plaintiffs themselves rely on the Eleventh Report to assert (at 26) that 320 children spent at least one night without a licensed placement in 2025, "an average of about 21 per night." But that same report shows that 64% of those children experienced only "a single spell" without a licensed placement, that by November 2025 the nightly average had fallen to a new all-time low of 13, and that on June 30, 2025, just 22 children—less

than 1% of children in the class—were without a licensed placement. Eleventh Report 19, 134–35.

Plaintiffs also erroneously question (at 26–28) caseloads under Remedial Orders 2, 35, A3, and A4. The monitors report that 91% of all caseworker caseloads were within the guidelines as of April 30, 2026. Dkt. 1661 at 10–11. Plaintiffs accuse the State (at 26) of citing "headline numbers" that "mask true caseworker workloads" by omitting child-watch shifts. But it's plaintiffs who are masking: They admit (at 27 n.3) that the monitors' compliance ratings already account for those shifts. Plaintiffs' other move (at 27)—dismissing the monitors' measure as "a systemwide average" and breaking the statistics out by managing entity to isolate the weakest performers—is the same erroneous method of assessing compliance that the Fifth Circuit expressly rejected in *Stukenberg IV*, 119 F.4th at 380, 384–85.

Plaintiffs' next objection (at 21–22, 28–31) concerns heightened monitoring under Remedial Order 20 and the enforcement authority preserved by Remedial Order 21. Remedial Order 20 directs the State to "identify, track and address concerns" at operations showing "a pattern of contract or policy violations" and subject them to heightened monitoring, including "more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS'[s] enforcement framework." Dkt. 606 at 4–5.

The monitors' reports show the State doing each one. Operations completed their heightened-monitoring plan tasks before or during the quarter in 155 (94%) of the 165 quarterly reports the monitors reviewed for 2024. Tenth Report (Dkt. 1660)

152. The monitors record the State suspending one operation's license, revoking three more, and denying one permit over the same period. *Id.* at 84 n.174, 88, 120, 212, 220. Remedial Order 20 doesn't dictate any particular enforcement outcome in any particular case. What plaintiffs dispute is how the State exercises the discretion that Remedial Order 20 leaves it—which operations it places on heightened monitoring, and which it closes. That's a disagreement about administration, not a showing that the order isn't satisfied.

Plaintiffs' observation (at 22) that some operations have stayed on heightened monitoring for years proves nothing. The order set the exit terms, and the monitors found the State applied them: It "did not move any operations to Post-Plan Monitoring (PPM) in 2024 if they had not achieved six months of successive compliance with their pattern or trend area." Tenth Report 162; *see* Dkt. 837 at 3. An operation qualifies for heightened monitoring when its rate of serious violations exceeds the combined rate for operations of similar size and service type in three of the last five years. Dkt. 837 at 1. Because the measure is comparative, some operations will always be on the list, regardless of how well the system as a whole performs.

Plaintiffs are also wrong regarding Remedial Order 21, which is satisfied on its own terms. It provides that the State "***shall have the right*** to directly suspend or revoke the license of a placement in order to protect children." Dkt. 606 at 5 (emphasis added). The monitors report that before the order, "the State's position was that it did not have the authority to force the closure of an unsafe foster home." Tenth

Report 198. HHSC adopted a policy and process for exercising this authority effective May 1, 2020, and has used it since. *Id.*; Mot. 20.

Plaintiffs next object (at 31–32) that caregivers aren't told what they need to know under Remedial Orders 25, 26, 27, 29, and 31. The orders require the State to document a child's sexual-abuse and -aggression history and to apprise caregivers of it. Dkt. 606 at 5–6. Compliance runs 98% and 99% on the common application and 84% on the placement summary's Attachment A. Mot. 21–22. Plaintiffs take issue (at 32) with statistics regarding whether a small sample of caregivers could recall the information when interviewed later. But the remedial orders require the State to convey that information to caregivers. They don't make the State the guarantor of someone else's memory.

Finally, plaintiffs contest (at 32–33) the State's compliance with Remedial Order A6. That order requires caseworkers to give children the point of contact for reporting abuse or neglect, including a review of the Foster Care Bill of Rights. Dkt. 606 at 11. Eighty-three percent of children signed a written acknowledgment that a caseworker reviewed it with them. Mot. 24. Once again, plaintiffs shift focus to survey results about what children remembered afterward. Rather than measure children's memory, this Court should assess what the order actually requires and what the State can actually control—its dutiful disclosure of resources and rights to children.

In all events, the survey results on which plaintiffs rely aren't a reliable measurement. They come from just 47 interviews among a class of nearly 7,400 children.

Ninth Report (Dkt. 1658) 18, 79. Interviewing 0.6% of the relevant population doesn't provide a meaningful picture of the entire foster-care system, which the Fifth Circuit has made clear must be the touchstone of substantial-compliance review. *See Stukenberg IV*, 119 F.4th at 385.

**B. In the alternative, the State satisfied the judgment in good faith and eliminated any violation to the extent practicable.**

Even if substantial compliance weren't the applicable standard, the State would still prevail under the *Board of Education v. Dowell* standard, which asks whether the State "complied in good faith" and whether the targeted conditions have "been eliminated to the extent practicable." 498 U.S. at 249–50.

The good-faith element is settled. The Fifth Circuit held that the State "endeavored in good faith to comply with the court's orders" and "intends to continue improving the foster care system in good faith." *Stukenberg IV*, 119 F.4th at 384, 395. Rather than dispute the State's good faith, plaintiffs argue (at 18–20) only that the "judgment is not 'satisfied' by mere 'good faith.'"

Defendants have never asserted that good faith alone is enough—under *Dowell*, eliminating the conditions the injunction targeted to the extent practicable is also required. And the State has done just that. The State put in place every mechanism the decree required, it meets the decree's operational obligations at consistently high rates, and any isolated shortfalls don't detract from that record. *See Stukenberg IV*, 119 F.4th at 380; Mot. 27–30.

Plaintiffs respond (at 18) that *Dowell* "does not control" because (1) the termination provision mentions full compliance and (2) "*Dowell* is a desegregation case."

The first argument fails because, as already explained, the decree's termination provision couldn't and didn't displace the ordinary standards of Rule 60(b)(5). *See supra* Part I. As to the second argument, it's true that the Fifth Circuit in *Chisom* declined to extend *Dowell* outside the school desegregation context. But plaintiffs can't have it both ways. They can't argue both that *Chisom*'s substantial-compliance test is inapplicable in the institutional-reform-injunction context and that *Chisom* somehow forecloses the application of *Dowell* in the same context. If *Chisom*'s substantial-compliance test doesn't apply, then *Dowell* must. Either way, defendants have satisfied the judgment.

Plaintiffs next call *Dowell*'s standard "a more stringent standard than defendants suppose," requiring that the violation be "in fact" remedied and that compliance be sustained "for a reasonable period of time." Opp. 18–19. But *Dowell* calls only for mitigation "to the extent practicable," 498 U.S. at 249–50, and the State's performance here more than meets that standard.

Plaintiffs assert (at 19) that "the track record here is far shorter than the one presented by the school district in *Dowell*," but *Dowell* gives them no support. The district court in *Dowell* entered an "Order Terminating Case" in 1977 after the school board had "compl[ied] with the desegregation decree for five years." 498 U.S. at 241. Eight years later, in 1985, the board adopted a student-reassignment plan, and the plaintiffs filed a "Motion to Reopen the Case." *Id.* at 242. Because the Supreme Court held that "the 1977 order did not dissolve the desegregation decree," it remanded for the district court to assess whether that decree should be vacated by evaluating the

board's "compliance as of 1985, when the [plan] was adopted." *Id.* at 244, 249. That says nothing about how long a defendant must demonstrate compliance before seeking relief from judgment—and it certainly doesn't cast any doubt on the State's years-long track record of compliance in this case.

Plaintiffs finally dismiss *Stukenberg IV*'s statements regarding the State's good faith by noting (at 19–20) that appellate courts aren't factfinders. Regardless of the label, the Fifth Circuit has held that the record shows that the State has "endeavored in good faith to comply with the court's orders." 119 F.4th at 384. That holding not only binds this Court, but is also borne out by the record of the State's continuing performance. *See* Mot. 27–30.

## III. Continued application of the injunction is no longer equitable.

Rule 60(b)(5) separately requires relief when "applying [the judgment] prospectively is no longer equitable." Relief on this ground follows from "a significant change either in factual conditions or in law" that renders continued enforcement "detrimental to the public interest." *Horne*, 557 U.S. at 447. The "critical question" is whether the judgment's objective has been achieved. *Id.* at 450. "[I]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.* *Horne* identified the changes that qualify as such a remedy: new legislation bearing on the problem, "[s]tructural and management reforms," "significantly more effective" policies, and increased funding. *Id.* at 459–61, 465, 468. Each change has occurred here. *See* Mot. 30–37.

Plaintiffs argue (at 36–40) that (1) the changes the State relies on are "too new" to show a durable remedy, (2) the shift to community-based care is "a work in progress" that must play out before the injunction can end, and (3) federalism carries "less weight" against an institutional-reform injunction than against a consent decree. Those arguments are unavailing.

*First*, plaintiffs say (at 36–38) the improvements are "too new" to show the durable remedy that *Horne* requires.[2] They contend (at 37–38) that the 2025 statute authorizing DFPS to place community-based care contractors into receivership "just happened," it's "too early to tell" whether the tool works, and DFPS could have canceled contracts even before the statute was passed. But new legislation is one of the "significant change[s] either in factual conditions or in law" that *Horne* identified. 557 U.S. at 447, 461. The statute is a change in law, its use against Empower is a change in fact, and together they show the State enforcing its own standards without federal-court intervention—exactly what a durable remedy looks like. *Id.* at 450.

[2] Plaintiffs' durability argument is undermined by their notice of supplemental authority. *Melendres* denied relief to movants who "declined" the "opportunity to further develop the factual record" and offered no expert report or other evidence after the district court "indicated to [them] the factual record was underdeveloped and suggested the possibility of evidentiary hearings." 2026 WL 2664498, at *13, *18. The movants relied on their own monthly traffic-stop analyses to show that bias had ended, but they never filed those analyses as exhibits, and the court refused to "scour the record, much less materials outside the record," for supporting evidence. *Id.* at *19. The court then held that "without conducting an evidentiary hearing" it couldn't assess the risk of harm if supervision ended. *Id.* at *22.

The record here is nothing like that. The State is relying on the monitors' abundant and detailed reports—filed on the docket over many years and relied on by plaintiffs as well as the State. Mot. 15–27. Plus, this Court has set an evidentiary hearing at which the State will present evidence demonstrating that relief is warranted under Rule 60(b)(5).

Since May 2025, when the receivership statute became law, the State has had—and used—an enforcement power it lacked when the injunction was first entered. Tex. S.B. 2034, 89th Leg., R.S. (2025) (codified at Tex. Fam. Code §§ 264.191–264.196). A Texas state court may appoint a receiver for a contractor whose conditions "present an imminent danger to the health, safety, or welfare" of the children in its care. Tex. Fam. Code § 264.1915(3). The receiver takes the actions "necessary to ensure the continued health, safety, and welfare" of those children, including "directing, managing, hiring, or discharging" the contractor's employees, while keeping the program running, *id.* § 264.194(a)(2), (h), and DFPS must report to the appointing court every sixty days, *id.* § 264.193(b).

DFPS used the statute within months—petitioning in March 2026. Just days later, a Dallas County court found "imminent danger to the health, safety, or welfare of children under DFPS conservatorship" and appointed a receiver over the case-management and executive operations of a community-based care contractor called Empower. Opp. 38 (quoting Agreed Order Appointing Receiver ¶¶ 1–5, *Tex. Dep't of Fam. & Protective Servs. v. Tex. Fam. Initiative, LLC*, No. DC-26-04702 (95th Dist. Ct., Dallas Cnty., Tex. Mar. 18, 2026)); *see* Mot. 33–34.

Within six weeks DFPS staff visited over 95% of the 2,429 children in Empower's care.[3] DFPS then read more than 1,000 case files and moved Empower onto

[3] *See* Tex. Dep't of Fam. & Protective Servs., Briefing to the House Comm. on Hum. Servs. 44 (May 5, 2026), www.dfps.texas.gov/About_DFPS/Reports_and_Presentations/Agencywide/documents/2026/House_Committee_On_Human_Services_May.pdf; *see also* DFPS 60-Day Assessment Report at 4, 7–8, *Tex. Dep't of Fam. & Protective Servs.*, No. DC-26-04702 (May 21, 2026) (under seal).

the State's case-management system, and has since given notice terminating Empower's contract.[4] All of that shows the State is ready, willing, and able to use its new enforcement power to protect the children in its care.

Contrary to plaintiffs' contention (at 37), the fact that cancellation of a case-management provider's contract "was always available" doesn't undercut what the new receivership statute shows about durability. For example, before the receivership statute, canceling the contract with Empower would have left the children it served across nine counties without a case-management provider until a successor could take over. Receivership Pet. ¶¶ 29–30, *Tex. Dep't of Fam. & Protective Servs.*, No. DC-26-04702 (Mar. 16, 2026). The receivership statute is therefore an important additional tool that's helping DFPS effectively manage the foster-care system and that will enable it to continue doing so in the future.

Plaintiffs also assert (at 39) that Empower's failures are proof that "children remain at substantial risk." On the contrary, the State's response shows that it's actively identifying threats to children's safety and acting swiftly to protect those children. The State uncovered Empower's failures, took control of Empower within two days, checked on nearly every child in Empower's care within six weeks, and is in the process of replacing Empower. That's the system working as it should to protect Texas children.

[4] *See* Tex. Dep't of Fam. & Protective Servs., Briefing to the House Comm. on Hum. Servs., *supra*, at 44; *see also* Tex. Dep't of Fam. & Protective Servs., FAQs on Region 3E Transition, www.dfps.texas.gov/CBC/community-areas/region-3e/faq/.

Plaintiffs say (at 38) the record contains no evidence of what the State will do without federal supervision. Once again, the Empower episode shows just the opposite. Moreover, the Legislature didn't stop with the receivership statute. It also appropriated $35.2 million for the recently opened Terrell Center for Youth, a state-operated residential treatment center for "foster care youth with the highest levels of need."[5]

These reforms—combined with the State's long track record of improvement—demonstrate that the State has implemented a durable remedy. While the receivership statute and Terrell Center are new, the State's improved compliance isn't. The monitors' reports document *seven years* of sustained gains. Compliance with Remedial Order 10, for example, has climbed from 21% in 2019 to 93% today. *See* Mot. 17, 32–33; *Stukenberg IV*, 119 F.4th at 385; Eleventh Report 74–75. On this record, there's "no reason to believe" the State "would fail to remain in compliance" "other than speculation as to what the future holds," so the remedy is durable and "'continued enforcement of the [decree] is not only unnecessary, but improper.'" *John B. v. Emkes*, 710 F.3d 394, 413 (6th Cir. 2013) (quoting *Horne*, 557 U.S. at 450) (some internal quotation marks omitted).

Under plaintiffs' own authority, that "history of good-faith compliance . . . enables the district court to accept the [State's] representation" about its future conduct. *Freeman*, 503 U.S. at 498 (cited at Opp. 18–19). While plaintiffs demand a guarantee

[5] Press Release, Tex. Health & Hum. Servs. Comm'n, *HHSC, DFPS Celebrate Opening of Terrell Center for Youth* (Aug. 20, 2026), www.hhs.texas.gov/news/2026/08/hhsc-dfps-celebrate-opening-terrell-center-youth.

against any future lapse, that isn't the standard. A rule that kept the decree in place until the State proved it could never fall short again would "condemn" it "to judicial tutelage for the indefinite future"—a "Draconian result" that "the principles governing the entry and dissolution of injunctive decrees" don't require. *Dowell*, 498 U.S. at 249.

*Second*, plaintiffs say (at 37, 39) that the transition to community-based care is "a work in progress" so it offers no "stable foundation on which to end oversight" until it "has played out across the state." In essence, plaintiffs ask this Court to keep the injunction in place until it approves of how Texas has chosen to organize its own child-welfare system.

*Horne* forbids that kind of second-guessing of a State's policy choices. Institutional-reform litigation "commonly involves areas of core state responsibility," 557 U.S. at 448, and a court errs when it "substitute[s] its own . . . policy judgments for those of the state and local officials to whom such decisions are properly entrusted." *Id.* at 455. A federal court's equitable authority doesn't extend to dictating whether the State may partner with community-based providers to help care for children the State is responsible for protecting. Such a remedy lacks any "founding-era" "historical pedigree" and therefore "falls outside the bounds of a federal court's equitable authority." *Trump*, 606 U.S. at 847; *see also Missouri v. Jenkins*, 515 U.S. 70, 126 (1995) (Thomas, J., concurring) (observing that the judicial "reconstruction of entire institutions and bureaucracies" is "at odds with the history and tradition of the equity power and the Framers' design"). Countermanding the Legislature's decision to have

community-based providers assist the State in meeting children's needs crosses that line.

Community-based care is the Legislature's 2017 directive that DFPS turn over foster-care placement and case management, region by region, to a single contractor for each region that answers to the State. Tex. S.B. 11, 85th Leg., R.S. (2017) (codified at Tex. Fam. Code §§ 264.151–264.171); *see* Tex. Fam. Code § 264.152. Today 61% of the children this injunction covers live in regions where a contractor manages their cases. Dkt. 1661 at 4. Plaintiffs' contention (at 37, 39) that the injunction should stay until the transition plays out would mean that no State could carry out a reform its own Legislature ordered except under intrusive federal supervision. That cannot be right.

Plaintiffs' disapproval of the State's choice of regional contractors to administer the community-based care program can't make continued enforcement of the injunction equitable. The transition to contractors that plaintiffs say (at 37) must be further along before relief can be granted was already seven years in the making when the Circuit decided *Stukenberg IV* in October 2024. 119 F.4th at 391. In that decision the Fifth Circuit held that federal judges are not "suited, by training or temperament, to manage institutions, personnel, or the provision of vital state services, even if counselled by monitors," and that federal intervention may not "thwart the state's self-management, where the state is taking strides to eliminate the abuses that led to the original decree." *Id.* at 395. What was true then is even more true

now. How Texas designs care for the children it protects is a decision for Texas, and the monitors' reports rank the State at consistently high levels of compliance.

*Third*, plaintiffs try (at 39) to minimize the federalism concerns at stake because "the federalism risks inherent in consent decrees" supposedly "are not present in" institutional-reform injunctions. But sweeping judicial intervention in state institutions offends "principles of state sovereignty and a federal government of limited and enumerated regulatory powers." *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1947 (2026). Rule 60(b)(5) asks whether continued enforcement is "detrimental to the public interest," *Horne*, 557 U.S. at 447, and *Horne* answered that question for an institutional-reform injunction—as plaintiffs have conceded, "the injunction in *Horne* was not a consent decree." Dkt. 1556 at 10.

The federalism costs here aren't abstract. The Fifth Circuit described "[n]early a decade" of "constant, intrusive, and costly surveillance," with "$150 million attempting to comply with the court's remedial decrees and another $60 million on the monitors." *Stukenberg IV*, 119 F.4th at 385. Plaintiffs call (at 1) the current monitoring "less costly." But it still costs Texas taxpayers half a million dollars a month, and the monitors' total bills now exceed $84 million. Mot. 35; *see* Dkts. 1669, 1670 (the monitors' recent invoices). Moreover, this years-long decree governs agencies responsible for "a $2 billion budget, over 29,000 children, and 100,000 facilities." *Stukenberg IV*, 119 F.4th at 394. As the Supreme Court has explained, federalism concerns are "heightened" where a decree "dictat[es] state . . . budget priorities"—as this one does. *Horne*, 557 U.S. at 448. Those concerns are only compounded over time, because "the

longer an injunction . . . stays in place, the greater the risk that it will improperly interfere with a State's democratic processes." *Id.* at 453.

* * *

The State has met the standard for relief under Rule 60(b)(5). The State has substantially complied with the remedial orders, as the Fifth Circuit has already held for the two orders it reviewed and as the monitors' reports show for the rest. The State has acted, in the Fifth Circuit's words, in "good faith." *Stukenberg IV*, 119 F.4th at 384. When the Texas Legislature authorized a new enforcement tool, the State didn't hesitate to use it in responding swiftly to a failing contractor. And the State has sustained its gains for seven years while paying the monitors $84 million of taxpayer money to watch it do so.

Plaintiffs' response is that none of this counts until the State achieves perfection and guarantees it going forward. But the Fifth Circuit has already rejected that position: "federal judges are not allowed to become permanent de facto superintendents of major state agencies." *Stukenberg IV*, 119 F.4th at 395. The time has come for Texas's foster-care system to be returned to Texas—which remains forever committed to upholding its sacred responsibility to the children in its care.

## CONCLUSION

Under Federal Rule of Civil Procedure 60(b)(5), the Court should grant the motion, relieve defendants from the November 2018 injunction and all remedial orders entered in this action, terminate the appointment of the monitors, and discharge defendants from all continuing compliance and reporting obligations.

Date: September 25, 2026

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/ Kimberly Gdula*
**KIMBERLY GDULA**
State Bar No. 24052209
Southern District No. 10092074
Chief
General Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120
(512) 370-0667 – Fax
kimberly.gdula@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

*/s/ Allyson N. Ho*
**ALLYSON N. HO**
*Attorney-in-Charge*
State Bar No. 24033667
Southern District No. 1024306
**ELIZABETH Y. RYAN**
State Bar No. 24067758
Southern District No. 1062438
**STEPHEN J. HAMMER**
State Bar No. 24116477
Southern District No. 3963953
**SAVANNAH S. HUNDT**
State Bar No. 24129020
Southern District No. 3844454

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
(214) 571-2900 – Fax
aho@gibsondunn.com
lryan@gibsondunn.com
shammer@gibsondunn.com
shundt@gibsondunn.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on September 25, 2026, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

*/s/ Allyson N. Ho*
Allyson N. Ho