# EXHIBIT A

Expert Declaration of Melissa D. Carter,
dated 6/10/2026

## Included in Exhibit A:

Attachment A: Expert Report
Attachment B: Curriculum Vitae

PLAINTIFF
EXHIBIT
66

2-11-CV-00084
10-20-26 Show Cause Hearing

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE B., et al.,

Plaintiff,

v.

GRETCHEN WHITMER, et al.,

Defendants.

Case No. 2:06-cv-13548

HON. SUSAN K. DECLERCQ

**EXPERT DECLARATION OF MELISSA D. CARTER**

I, Melissa D. Carter, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am a Clinical Professor of Law and the Executive Director of the Barton Child Law and Policy Center at Emory University School of Law. I was retained by the Michigan Department Health and Human Services (MDHHS) to provide an expert report regarding the history of child welfare consent decrees and their effectiveness long-term, including offering an opinion about the effectiveness of Michigan's child welfare consent decree over time.

## I. Qualifications

2. A copy of my current curriculum vitae is attached as Exhibit B.

3. I was appointed to the faculty of Emory University School of Law in Atlanta, Georgia in 2010. For the entirety of my academic appointment, I also have served on the clinical faculty as the Executive Director of the Barton Child Law and Policy Center (Barton Center). In addition, I hold an appointment as Adjunct Clinical Professor in the Department of Psychiatry and Behavioral Sciences at Morehouse School of Medicine, a position I have held since 2018 to support and facilitate a residency training affiliation between the Barton Center and the Morehouse School of Medicine Child and Adolescent Psychiatry Fellowship Program.

4. I received my Juris Doctor in 2002 from the University of Illinois College of Law, Urbana-Champaign, Illinois where I previously earned a Bachelor of Science in Psychology, summa cum laude, in 1999. I am admitted to the bar in Illinois (2002) and Georgia (2004).

5. Over the course of more than two decades of professional practice, I have developed specialized expertise in child welfare law and

policy, with a particular focus on the structure, operation, and reform of publicly administered foster care systems and the legal rights of children in foster care. My expertise encompasses the legal and policy frameworks governing child protection, the design and implementation of child welfare policy at the federal and state levels, the mechanics of institutional reform litigation as applied to child welfare agencies, and the methods by which the effectiveness of such litigation can be measured and evaluated.

6. At Emory University School of Law, I have developed and taught courses in Family Law, Child Welfare Law and Policy, and Legislative Advocacy. As a clinical professor, I supervise students enrolled in the Barton Center Policy Clinic and in the Barton Center Legislative Advocacy Clinic. The clinics are interdisciplinary and enroll students from Emory Law's Juris Doctor program as well as graduate students from the Rollins School of Public Health and the Emory School of Social Work. I also provide administrative support to the Barton Center Appeal for Youth Clinic. Within the Barton Center's clinical offerings, students engage in direct practice and system-change efforts

focused on children and families involved with the juvenile court, child welfare, and youth justice systems.

7. As Executive Director of the Barton Center, I direct and administer a portfolio of programs aligned with the Center's mission to improve outcomes for children and families involved with the child welfare and juvenile justice systems through direct legal representation, policy advocacy, legislative engagement, and applied research. I oversee program development and grant management, supervise junior attorneys, and coordinate the Center's engagement with government agencies, courts, and child welfare stakeholders at the local, state, and national levels.

8. For the past 10 years, I have provided targeted technical assistance and expert consultation to state jurisdictions concerning class action reform litigation monitoring, evaluation, and strategy development.

9. Prior to joining the Emory Law faculty, I served in a series of public sector roles directly concerned with the administration and reform of Georgia's child welfare system, including as Deputy Director and Director of the Office of the Child Advocate for the Protection of

Children, and in senior program and training roles with the Administrative Office of the Courts of Georgia and the Administrative Office of the Illinois Courts supporting each state's implementation of the federal Court Improvement Program.

10. My scholarly work focuses substantially on system improvement of the child welfare and foster care systems, including the governing policy and legal frameworks and tools for strategic reform. My publications include law review articles, book chapters, policy reports, and invited commentary.

11. I have presented on institutional reform litigation and its relationship to child welfare system reform before national audiences on numerous occasions, including jurisdictions participating in a biannual convening hosted by Casey Family Programs and annual conferences of the American Public Human Services Association. I have also presented on related topics including quality legal representation in child welfare proceedings, federal child welfare legislation and policy, and data-driven approaches to child welfare reform before organizations including the National Association of Counsel for Children, the National Council of Juvenile and Family Court Judges, the U.S. Children's

Bureau, the National Center for State Courts, and various state and regional professional bodies.

12. I have provided legislative testimony on child welfare matters before the U.S. Senate Committee on the Judiciary, Subcommittee on Human Rights and the Law, for the hearing entitled "The Human Rights of Foster Children," and multiple state legislative bodies.

13. Below is a list of all publications I have authored in the previous ten years:

- Melissa D. Carter & Christopher G. Hempfling (2026) "Measured Results in Georgia's Kenny A. Foster Care Consent Decree: A Framework for Assessing the Strategic Effectiveness of Institutional Reform Litigation," 13 Child & Fam. L.J.
- Melissa D. Carter (2023) "Federal Child Welfare Legislation" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).
- Melissa D. Carter (2023) "Achieving Large-Scale Change Through Systems Advocacy" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).
- Joshua Gupta Kagan, Christopher Church, Melissa Carter, Vivek Sankaran, & Andy Barclay (2023) "The

New Orleans Transformation: Foster Care as a Rare, Time-Limited Intervention," 27 LEWIS & CLARK L. REV 417.

- Melissa D. Carter, Dr. Nicole Cotton, & Dr. Courtney McMickens (2021) "Structural Violence with Child Welfare Systems," 51 PSYCHIATRIC ANNALS 11.
- Melissa D. Carter, Christopher Church, & Vivek Sankaran (2022) "A Quiet Revolution: How Judicial Discipline Essentially Eliminated Foster Care and Nearly Went Unnoticed," 12 COLUM. J. RACE L. 1.
- Melissa D. Carter (2022) "An Ounce of Prevention is Worth a Pound of Cure: Why Children's Lawyers Must Champion Preventive Legal Advocacy," 42 CHILD LEGAL RTS J. 1.
- Melissa D. Carter & Courtney McMickens (2020) "A Matter of Family: Finding Justice Within the Child Welfare System" in SOCIAL (IN)JUSTICE AND MENTAL HEALTH (Ruth Shim and Sarah Vinson, eds.). 1st edition, American Psychiatric Association Publishing, Washington, D.C.
- Melissa D. Carter (2020) "Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia," 54 GA. L. REV., 1133.

- Melissa D. Carter (2020) "The Need for a Prevention Throughline in Family Policy," CHILDREN'S BUREAU EXPRESS, (Apr. 2020) (invited short article).
- Melissa D. Carter (2019) "Pursuing the Best Interest of Children," CHILDREN'S BUREAU EXPRESS (Nov. 2019) (invited short article).
- Melissa D. Carter (2017) "Beyond the Courtroom: A Plea and a Plan for Children's Attorneys to Engage in Policy Advocacy," THE GUARDIAN, National Association of Counsel for Children (Fall 2017).

14. In the last four years, I have not testified as an expert witness at trial or deposition in any cases.

## II. Materials Reviewed

15. In developing my expert report, I considered the following facts or data: pleadings in *Dwayne B.* including the Complaint; Defendants' First Motion to Dismiss; Order Granting Plaintiffs' Motion for Class Certification and Appointment of Class Counsel; Opinion and Order Denying Defendants' Motion to Dismiss; Joint Final Pretrial Order; Defendants' Memorandum of Law in Support of Joint Motion for Final Approval of Proposed Class Action Settlement; MDHHS' Response to Findings in MISEP 24 Report (ECF No. 358) Related to 5.1 Contract-

Agency Evaluation; Order Entering Consent Decree; Modified Settlement Agreement and Consent Order; Implementation, Sustainability, and Exit Plan; Modified Implementation, Sustainability, and Exit Plan; Stipulated Order Amending the Modified Implementation, Sustainability and Exit Plan (MISEP). I also reviewed all available Monitoring Reports, court transcripts from associated status hearings, and the MISEP Compliance – January 2016 Through June 2026 tracking spreadsheet provided by MDHHS.

16. I considered various academic and legal sources, all of which are cited specifically in my report.

## III. Opinions and Conclusions

17. A true and complete copy of my expert report, including my expert opinions for this matter and their supporting bases and reasons, is attached hereto as Exhibit A.

## IV. Statement of Compensation

18. As an expert witness, I will be compensated at a rate of $400/hour. I expended 44.46 hours in completing my expert report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 10, 2026

Melissa D. Carter

# Exhibit A - Attachment A

## I. Summary of Opinions

My overall opinion is that the *Dwayne B.* litigation has contributed to meaningful reforms and increased accountability within Michigan's child welfare system. The litigation produced measurable improvements in certain operational and performance areas, particularly in the early stages of implementation of the consent decree. It improved infrastructure, accountability, and select outcomes that represent meaningful gains in children's actual experiences. Where areas of challenge persist, the state has demonstrated it has the capacity and competency to self-assess and self-correct.

The Michigan experience reflects a broader national pattern suggesting that institutional reform litigation can drive meaningful progress and important system improvements but rarely produces a child welfare system that fully satisfies plaintiffs' aspirations. Institutional reform litigation is most useful at the front end to catalyze immediate change when a system is in crisis. Research and practice literature generally identify four early benefits: Litigation can force public attention on unsafe or under-resourced systems; compel data collection and transparency; increase staffing, placement, and service investments; and create cover for agency leaders to pursue reforms that otherwise may not receive political support.

The research is much less persuasive that litigation produces durable system transformation. After that initial phase, the marginal benefits often decline while costs increase. The burden is especially pronounced when a decree preserves outdated priorities, locks the agency into process requirements, requires extensive reporting, and diverts leadership attention toward monitor negotiations, data validation, and other ongoing demands of managing litigation and away from governing the child welfare system. At that point, the consent decree has shifted from a reform catalyst into a compliance regime, and the burden of continued court supervision can outweigh its reform value. Because child welfare systems are

shaped by constantly changing external forces that lie outside of the direct control of the public child welfare agency, litigation cannot fully solve the underlying drivers of system underperformance. Sustainable reform requires long-term political, fiscal, administrative, and cross-system commitment extending beyond court oversight and compliance frameworks.

I explain the bases of these opinions in the sections below.

## II. A Brief History of Institutional Reform Litigation in Child Welfare

Institutional reform litigation emerged in the mid-twentieth century as a distinct legal strategy for addressing constitutional and statutory violations within public institutions, including prisons, mental health facilities, schools, and eventually child welfare systems. Rooted in the broader civil rights movement of the 1960s and 70s, the approach seeks to restructure public systems perceived to be incapable of change.

In the child welfare context, institutional reform litigation gained momentum in the 1970s and 1980s as advocates increasingly challenged the conditions, practices, and outcomes of state-operated foster care systems. The *Wilder* litigation[1] is widely regarded as one of the earliest – and perhaps the first – major child welfare class action lawsuits in the U.S. The plaintiffs, represented by Children's Rights, Inc., alleged that New York City's foster care system operated in a racially and religiously discriminatory manner against non-white Protestant children in child placement in violation of 1st, 8th, 14th Amendments, and Title VI of Civil Rights Act of 1964.[2] The case became one of the longest-running civil rights litigations in U.S. history, spanning decades of litigation, consent decrees, and

[1] The litigation commenced as *Wilder v. Sugarman*, 385 F.Supp. 1013 (S.D.N.Y. 1974) ("*Wilder I*"), but was survived by *Wilder v. Bernstein*, 499 F.Supp. 980 (S.D.N.Y. 1980) ("*Wilder II*"). Plaintiffs sought damages and injunctive and declaratory relief to remedy constitutional and statutory violations on behalf of certified class of "all those New York City children who are black, and who are Protestant, of other non-Catholic or non-Jewish faiths, or are of no religion, and are in need of child-care services outside their home."

[2] *Wilder v. Sugarman*, 385 F.Supp. 1013 (S.D.N.Y. 1974).

monitoring. Commenced in June 1973, the case settled before trial was to begin in August 1983.

The Stipulation of Settlement entered in the *Wilder* case in April 1987 included non-discrimination provisions but also incorporated a broader range of general provisions. The City was required not only to place children in foster care in a nondiscriminatory manner as to race and religion but also to place children generally on a "first-come, first served basis" according to the child's needs and level of care required as determined by a pre-placement evaluation.[3] The Settlement called for one or more consultants to be hired to classify or develop an alternative evaluation of the quality of foster care programs and also included provisions regarding staffing, placement waiting lists, reimbursement schemes, recordkeeping protocols, and therapeutic objections to placement decisions.[4] Compliance would be monitored by a three-member settlement panel.[5] Litigation in the matter continued until 1998 when the parties jointly moved to dismiss the case in deference to the more comprehensive settlement adopted in *Marisol A. v. Giuliani*.[6] In dismissing the case, Judge Ward explained that "The Wilder Obligations, which affect only one aspect of the child welfare system, have proven extremely difficult to implement within a system with so many other functioning areas."[7]

*Wilder* effectively created a template for class action litigation as a reform strategy in child welfare. Its key characteristics include the use of class action procedure to aggregate the claims of an entire class of children in foster care, the framing of children's rights as civil rights, and relief in the form of sweeping, court-enforced, comprehensive systemic reform. This model advanced rapidly, catalyzed as public perception of the serious and far-reaching difficulties in child welfare systems increased.

---

[3] *Wilder v. Bernstein*, 645 F.Supp.1292, 1305 (S.D.N.Y. 1986).
[4] *Id.*
[5] *Id.*
[6] *Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152 (S.D.N.Y. 1999).
[7] *Id.*

*G.L.v. Zumwalt* (cited in later proceedings as *G.L. v. Stangler*) evolved the approach. This class action sought declaratory and injunctive relief on behalf of a class of children in the custody of the Jackson County Office of the Missouri Division of Family Services based on claims defendants had failed to keep them safe from harm while in foster care.[8] The consent decree, entered six years after the case was initiated, committed to securing this right by requiring defendants to establish a process for licensing foster homes, relative foster homes, and emergency foster homes.[9] It specified the qualifications of licensing workers; prescribed steps in the assessment process, standards for agency policy, and the schedule for license renewal; mandated pre-service and continuing training of foster parents in specific content areas and the development of compliant curriculum; required matching of children in foster care with foster parents according to the child's needs and preparation of the child and foster parent for placement; prohibited the use of corporal punishment; and limited the number of children who could be placed in a foster home.[10] The decree further directed the agency's investigatory response to allegations of abuse or neglect and capped caseloads.[11] Under the terms of the order, the agency was obligated to lobby the legislature for funds to reimburse foster parents for the care of children placed with them and to satisfy standards related to worker training; the provision of medical, dental, and mental health care for children in foster care; and permanency planning.[12] Finally, defendants committed to establishing a uniform case record system to ensure the accurate maintenance of all essential information.[13] Every six months for a period of five years, defendants were to make a written report of the extent of compliance with the decree.[14] The

[8] *G.L. v. Stangler*, 873 F.Supp. 252 (W.D. Mo. 1994).
[9] *G.L. by and Through Shull v. Zumwalt*, 564 F. Supp. 1030 (W.D. Mo. 1983).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

roadmap to reform eventually led to exit in February 2006, nearly 29 years after the case began.

*Wilder* and *G.L.* influenced a generation of class actions pursuing their model of court-enforced systemic reform. Alongside the development of case law, the enactment of the federal Adoption Assistance and Child Welfare Act of 1980 (AACWA) gave litigants a new tool: specific, codified federal standards against which state conduct could be assessed. The Act included requirements that child welfare agencies make "reasonable efforts" to prevent the need for foster care, establish individualized case plan goals for each child in foster care, and provide periodic reviews of the family's progress in meeting the requirements of the case plan.[15] These requirements provided legal hooks that had not previously existed in federal law.[16] Before AACWA, advocates relied almost entirely on constitutional due process and equal protection arguments; now they had a specific statutory framework to support claims that system failure should be legally cognizable.

*L.J. v. Massinga* is one of the first lawsuits to directly invoke the federal Child Welfare Act on the theory that children had enforceable rights under federal child welfare statutory law. Children in foster care sued Baltimore City child welfare officials alleging that severe understaffing, lack of medical care, and unsafe placements violated their constitutional rights and the Adoption Assistance and Child Welfare Act. Four years into the litigation, the parties agreed to a comprehensive, court-enforced settlement agreement requiring compliance with caseload caps, standards for timely and appropriate physical and mental healthcare, and permanency and case plan timelines.[17] An Independent Verification

---

[15] Adoption Assistance and Child Welfare Act of 1980, Pub. L. 96-272, 94 Stat. 500.

[16] *See* Barbara L. Atwell, "A Lost Generation": The Battle for Private Enforcement of the Adoption Assistance and Child Welfare Act of 1980, 60 U. CIN. L. REV. 593 (1992) (arguing the Adoption Assistance and Child Welfare Act creates a broader set of privately enforceable rights than courts have recognized, and that private enforcement is necessary for the Act's protections to be meaningful).

[17] *L.J. By and Through Darr v. Massinga*, 699 F.Supp. 508 (D. Md. 1998).

Agent continues to issue biannual reports on compliance.[18] Now, thirty-eight years later, *L.J.* is the longest running child welfare institutional reform case.

By the 1990s and 2000s, institutional reform litigation had become one of the most significant external accountability tools shaping public child welfare systems nationwide.

III. <u>The Landscape of Child Welfare System Reform Litigation</u>

In 2022, I received national philanthropic support granted to the Barton Child Law and Policy Center to create and apply a systematic methodology to compile all pleadings related to child welfare class action lawsuits. The result built over four years is a comprehensive collection of child welfare class actions, including all essential pleadings, monitoring reports, and other artifacts of the litigation. The criteria for case inclusion include that the lawsuit be brought by or on behalf of children in foster care, allege violations of constitutional and statutory rights, and seek comprehensive system reform. The database supports continuous monitoring of the litigation landscape and provides a foundation for research and technical assistance to states. My main research agenda is to understand the extent to which institutional reform litigation is an effective strategy for transforming public child welfare systems.

At present, the legal pleadings, monitoring reports, and other litigation artifacts of 77 cases have been logged into the database, documenting the modern history of child welfare and foster care litigation since *Wilder* in 1973. Of these, 63 are structured similarly to the litigation and settlement model established by first-generation cases like *G.L* and early second-generation cases like *L.J.*: they are class actions brought by or on behalf of children in foster care alleging violations of constitutional and statutory rights for which they are seeking comprehensive systemic reform. In the five decades since litigation became a distinct legal strategy in child welfare, 21 cases that meet these criteria have been concluded based upon a

[18] *Id.*

determination by the court that the jurisdiction has successfully complied with the terms of the consent decree. Twelve of those exits have occurred in the past 10 years. Currently, 20 jurisdictions are operating their child welfare systems under some form of court oversight, and an additional 11 jurisdictions are navigating pre-trial stages of litigation.[19]

This collection of cases in the Barton Center database allows for some general observations:

- Using the date of complaint and date of exit for the 21 cases in which jurisdictions have been released from a consent decree, the average (mean) lifespan of a child welfare consent decree is calculated to be 20 years. Using the median length of time to account for extreme outliers produces a result of 18.75 years from case initiation to exit from court oversight.
- The direct costs of litigation, including legal fees, monitoring, and consulting fees are difficult to ascertain and calculate but have been estimated to reach or surpass $15 million over the lifetime of a single agreement.[20] Millions more are spent in programmatic investments to manage data requirements and build necessary capacity to meet decree obligations.

That level of public investment should produce strong, demonstrated returns in child and family outcomes. Five decades' worth of empirical evidence suggests that litigation can catalyze change, but it is ill-suited to achieve sustained transformation of public child welfare systems on its own. Consent decrees alone have not produced durable improvements in how states care for their most vulnerable children.

---

[19] The remaining 11 cases have been resolved through orders of dismissal.

[20] Testimony of David Sanders, Exec. Vice President of Sys. Improvement, Casey Family Programs, *Examining "Sue and Settle" Agreements: Part II: Hearing Before the Subcomms. on Intergovernmental Affairs & Interior, Energy, and Environment of the H.Comm. on Oversight and Government* Reform, 115th Cong. (July 25, 2017).

## IV. The Mixed Empirical Record of Institutional Reform Litigation in Child Welfare Systems

Despite the pervasiveness of institutional reform litigation in child welfare, the long-term efficacy of comprehensive, court-enforced reforms remains deeply contested. The research literature suggests that institutional reform litigation is, at best, an inconsistent and highly contingent mechanism for sustainable child welfare reform. While some studies identify limited or short-term gains under particular conditions, the broader body of research does not support impact litigation as a reliably effective strategy for achieving durable systems transformation. Where evidence of positive impacts is found, those findings are contextual and conditional:

- A study commissioned by the Center for the Study of Social Policy uses *G.L.* as a case study to assess how litigation against child welfare agencies can be more effective at producing positive, lasting change.[21] The specific line of inquiry "was whether a litigation-based strategy emphasizing collaboration, substantive expertise, and local ownership could be a catalyst for long-term systemic reform of a dysfunctional child welfare system."[22] The authors conclude that class action litigation is most effective when used in combination with other strategies that can sustain the direction of change legal action brings.[23] Partnerships between advocates and government, empowering parents and children in their interactions with child welfare agencies, and assistance provided by experts and community leaders are all essential to successful and sustainable reform.[24]
- Reaching a similar conclusion, a qualitative study of the *B.H. v. Johnson* lawsuit filed against the Illinois Department of Children and Family Services

[21] Ellen Borgersen & Stephen Shapiro, *G.L. v. Stangler: A Case Study in Court-Ordered Child Welfare Reform*, 1997 J. DISP. RESOL. 189 (1997).
[22] *Id.* at 23-24.
[23] Ellen Borgersen & Stephen Shapiro, *G.L. v. Stangler: A Case Study in Court-Ordered Child Welfare Reform*, 1997 J. DISP. RESOL. 189, (1997).
[24] *Id.*

in 1998 concludes that the litigation served as a catalyst for reform but fell short of producing the comprehensive systemic transformation its proponents envisioned.[25]

- A recent analysis of Georgia's decades'-long *Kenny A. v. Perdue* lawsuit finds that the case has yielded mixed results in terms of the experience of children, youth, and families in the state's child welfare system; limited effects in terms of durable changes at the policy or systems level; and modest but real impacts on the jurisprudence of children's rights law.[26]
- An examination whether large-scale institutional reform litigation in child welfare systems produces meaningful and lasting improvements for children and families using qualitative case studies of four states -- Kansas, Alabama, New Mexico, and Utah -- raises serious concerns about sustainability after litigation ends. The article ultimately concludes that while litigation can improve child welfare outcomes, lasting reform depends far less on the lawsuit itself than on whether states institutionalize reforms through leadership, funding, organizational culture, data systems, and ongoing accountability structures.[27]
- The author of a separate case study of the *G.L.* litigation asserts that child welfare professionals should view litigation positively for its power to set legally enforceable minimum standards, increase public awareness and concern for children in foster care, and provide leverage to secure necessary

[25] Susan Gluck Mezey, *Systemic Reform Litigation and Child Welfare Policy: The Case of Illinois*, 20 Law & Pol'y 203 (1998).
[26] Melissa D. Carter & Christopher G. Hempfling, *Measured Results in Georgia's Kenny A. Foster Care Consent Decree: A Framework for Assessing the Strategic Effectiveness of Institutional Reform Litigation*, 13 Child & Fam. L.J. (2026.
[27] Tiffany N. Ryan & Rebecca J. Gomez, *What Does It Take to Close a Comprehensive Child Welfare Systems Reform Lawsuit? A Case Study Approach*, 41 Human Service Organizations: Management, Leadership & Governance 252-274 (2017).

funding.[28] At the same time, he observes how little has changed at the level of individual child and youth outcomes despite decades of reform efforts.[29]

- Researchers evaluating data from four states that exited consent decrees – Alabama, Kansas, New Mexico, and Utah – to assess the power of litigation to leverage greater financial investment reported findings indicating that budgets in all four states increased during litigation, but not all child outcomes improved. Their conclusion is that litigation likely impacts outcomes through increased financial investments, but increased funding is not sustained over time.[30]

Research does identify a set of factors determinative of successful resolution of an institutional reform litigation case.[31] Synthesis of key studies reveals the following conditions consistently appear in cases that reach the point of exit:

- Non-adversarial, collaborative problem-solving culture between the parties
- Well-defined, measurable outcome benchmarks negotiated at the outset
- A credible, skilled independent monitor with child welfare expertise, not merely legal compliance expertise
- A principled, values-based framework guiding policy and practice (i.e., a case practice model with family/team-based case management
- Strong and sustained executive leadership within the agency
- Institutional capacity to implement reforms
- Legislative and gubernatorial buy-in to fund reform
- Clear disengagement/exit criteria agreed upon at the start of the decree
- Inclusion of youth, birth parents, and foster families as stakeholders
- A data infrastructure capable of measuring outcomes in real time

---

[28] Michael Mushlin et al., *Court-Ordered Foster Family Care Reform: A Case Study*, 65 Child Welfare 141 (1986).
[29] *Id.*
[30] Tiffany N. Ryan & Rebecca J. Gomez, *Trends in State Budgets and Child Outcomes During and Post Child Welfare Class Action Litigation*, 62 Ch. and Youth Serv. Rev. 49 (2016).
[31] *See e.g.,* Ariel Alvarez, *Nine Key Factors in Extended Litigation-Based Reform of State Child Welfare Agencies*, 116 Ch. and Youth Services Rev. (2020).

- Technical assistance from nationally recognized child welfare practitioners

## V. The Structural Limitations of Institutional Reform Litigation as a Strategy for Transformative System Change

Institutional reform litigation originated as a tool for courts to enforce rights against intractable institutions and to compel structural change within entrenched bureaucracies that are viewed as immune from political accountability.[32] It conceptualizes reform as a problem of organizational compliance and views institutional failure as technical and correctable through specification – externally imposed rules, performance benchmarks, reporting requirements, and managerial controls. The technocratic logic is that if standards are defined precisely enough, compliance is monitored rigorously enough, and consequences are enforced firmly enough, the institution will produce better outcomes. In reality, child welfare outcomes are mediated by forces far beyond the agency's direct control.

The child welfare system is in "open system." It operates in a dynamic environment continuously shaped by and responsive to external social, political, economic, legal, and institutional forces. The public agency interacts constantly with multiple external institutions, including courts, legislatures, executive agencies, schools, healthcare providers, law enforcement, behavioral health systems, housing systems, and community-based organizations. Decisions made in any of these systems can directly affect child welfare practice and outcomes. For example, changes in housing availability, Medicaid policy, or judicial decision-making may significantly alter placement stability, service access, or rates of family separation. Publicized child fatalities, media scrutiny, federal policy shifts, litigation, advocacy campaigns, and changes in political leadership can rapidly alter agency priorities and operational behavior. Additionally, child welfare systems depend heavily on external resource flows, including federal Title IV-E and IV-B

[32] *See* Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds*, 117 Harv. L. Rev. 1016 (2004).

funding, Medicaid reimbursements, state appropriations, and contracted private providers. Workforce conditions, service availability, and placement capacity are therefore affected not only by agency management but also by labor markets, provider networks, and broader fiscal conditions. Finally, child welfare systems confront inherently adaptive social problems rather than merely technical problems. Issues with family instability, neglect associated with poverty, trauma, behavioral health needs, substance use, and other conditions of individual, family, and community adversity are all ever-present variables that cannot be directly controlled by litigation.

Understanding the child welfare system as an open system helps explain why sustainable reform in child welfare is difficult to achieve. Because agencies operate within constantly changing environments, reforms are vulnerable to shifts in leadership, political priorities, funding levels, judicial philosophy, and community conditions. Even well-designed reforms may erode if external supports and institutional alignment weaken over time.

First- and second-generation child welfare institutional reform cases typically impose a "command-and-control" consent decree on a system that is inherently adaptive and dynamic. These decrees translate complex, relational, and contested system goals into auditable metrics. They prescribe in granular detail how the public child welfare agency must operate, rather than focusing on the outcomes it must achieve. Typical examples include the agency being required to hire a certain number of caseworkers, maintain caseloads below a given ratio, complete investigations within a specific timeframe, or use a particular case planning form. The court and monitor then measure and assess compliance with those process requirements.

Researchers have observed that overly rigid, highly prescriptive decrees with hundreds of compliance metrics often become barriers to successful exit because states struggle to achieve exact numerical targets even after making substantial

progress.[33] The principal critique of such command-and-control decrees is that they oversimply complex systems in the following ways:

- They measure the wrong things. An agency can be in full compliance with every process benchmark — caseloads, timelines, training hours, documentation requirements — while children still experience placement instability, abuse, and failed permanency. The metrics track agency behavior, not child outcomes.
- They displace professional judgment. Prescriptive requirements can crowd out the discretion that skilled caseworkers need to respond to individual family circumstances. The agency optimizes for measurable compliance rather than for what actually helps children.
- They are hard to exit. Once a system of detailed requirements is embedded in a court order, it is difficult to modify even when circumstances change or when evidence suggests a different approach would work better. Moreover, termination of a consent decree requires demonstrating sustained compliance — itself a measurement problem. As a result, the reform framework gets locked in on the timeline of litigation, not the timeline of child development or organizational learning. Systems thus operate under decrees designed around problems identified a decade earlier, often after those problems have changed shape.
- They suffer from a structural innocence problem. Litigation must locate the problem inside the institution being sued, because that is where the legal theory of liability runs. Accordingly, courts have jurisdiction over the defendant agency, not over housing policy, Medicaid, substance use

[33] Kathleen G. Noonan, Charles F. Sabel & William H. Simon, *Legal Accountability in the Service-Based Welfare State: Lessons from Child Welfare Reform*, 34 LAW OF SOCIAL INQUIRY 523 (2009) (observing the primary limitations of this strategy to be its preoccupation with measuring compliance over assessing quality; the rigidity of decrees that inhibit system self-adjustment; indicators that do not facilitate prioritization of areas in need of improvement; and monitoring regimes that lack diagnostic power).

treatment systems, or the labor market. A consent decree cannot order a state to reduce poverty; it can only order the agency to process poverty's consequences differently.

- They lack context. The knowledge driving the process of negotiated settlement and decree compliance is centralized in distant experts. The monitor, counsel, and court are all removed from the relational and contextual knowledge that actually drives outcomes. Their knowledge is documentary and aggregate.

The alternative to a command-and-control approach is an outcomes-based remedial framework, one that specifies what must improve and gives the agency latitude to figure out how to get there. More flexible, outcome-oriented agreements that allow collaboration and adaptation appear more effective.[34] In practice, most modern consent decrees in child welfare blend both approaches: some process floors combined with outcome benchmarks that are treated as the ultimate measure of success.

## VI. Assessment of the *Dwayne B.* Consent Decree Over Time

As an example of "second-generation" litigation, the *Dwayne B.* consent decree reflects the dominant evolution of modern child welfare reform litigation toward the hybrid framework that combines technocratic process requirements with outcome-oriented performance measures. The initial October 24, 2008 Consent Decree and Settlement Agreement and the Modified Settlement Agreement entered in 2011 required 18 months of sustained compliance with more than 200 actively monitored measures for the state to exit court supervision. Performance on outcome measures – safety (recurrence of maltreatment and maltreatment in care) and permanency (timeliness, placement stability, and permanency for children with long stays in care) -- was to be measured in accordance with indicators developed for the federal Child and Family Services Review ("CFSR"). These federal metrics, which

[34] *Id.*

DHHS was required to meet or exceed, are purposely rigorous, often making it highly challenging for state agencies to satisfy the standard of substantial conformity.[35] Against this backdrop, monitoring reports in Michigan have documented a mixed and evolving picture: identifying areas of progress, areas requiring continued attention, and operational challenges that fluctuate over time with workforce conditions, leadership transitions, and external system pressures.

Over the 18 years the state has operated pursuant to the decree, demonstrated progress has been made in the areas of:

- Improving the timeliness of investigations and case planning
- Increasing the frequency of worker-child visits
- Strengthening data and accountability systems
- Reducing certain caseload pressures
- Enhancing monitoring capacity
- Increasing attention to placement quality and licensing
- Expanding recognition of and response to placement needs, behavioral health needs, and routine healthcare
- Institutionalization of targeted supports for youth transitioning to adulthood
- Improving selected permanency and safety indicators

Outcome metrics related to maltreatment in care (MISEP 6.1) and sibling placement (MISEP 6.6(a) and (b)) remain to be achieved, but notable improvement has been documented in these critical areas. The state also has not achieved compliance on specific MISEP process measurements in areas including:

- Reliance on temporary or emergency placements
- Untimely provision and inconsistent documentation of healthcare services
- Frequency of worker-parent visits and parent-child visits
- Consistency and timeliness of relative foster parent assessments

---

[35] *See* Child and Family Services Review Technical Bulletin #12 (August 2020) (noting that no state was found to be in substantial conformity on all seven outcomes and seven systemic factors in Round 3).

Importantly, even in the compliance-driven context of the consent decree, the state showed early success with outcome measures that concern the actual experiences of children. By the third monitoring period, the state had hit its targets for timely and permanent reunification, timeliness to adoption, permanency for long-waiting children, and placement stability.[36] Furthermore, it had achieved legal permanency for at least half of the children in the reunification backlog.[37] These achievements -- which have been sustained over time -- represent meaningful improvements in children's lives and show the child welfare system is accomplishing the purposes for which it exists.

The majority of the *Dwayne B.* consent decree provisions have concerned process measures such as caseload caps, metrics tracking the frequency and number of visits between a child and his or her parents or siblings, metrics defined by the time to access services or initiate investigations, and requirements to conduct reviews or to develop plans, policies, or processes. Such process measures are not ends in themselves; they do not remedy harmful conditions directly, but they remain important as indicators of whether the agency has taken the steps needed to achieve its goals.

In regard to this set of process measures, DHHS also showed positive gains early. In the initial monitoring periods, the agency restructured roles and reporting lines. It created new, dedicated staffing positions, and built management and oversight capabilities. It professionalized its workforce, lowered caseloads, and developed new practice tools. And DHHS improved its ability to self-evaluate and course correct through various system-level analyses, oversight structures, reporting routines, and continuous quality assurance processes.

Over time, as the state endeavored to comply with the Modified Settlement Agreement and to implement the reorganized Implementation, Sustainability, and

[36] Progress of the Michigan Department of Human Services, Period Three Monitoring Report for *Dwayne B. v. Granholm,* October 1, 2009 – March 31, 2010 (issued December 7, 2010).
[37] *Id.*

Exit Plan (ISEP) and later, the Modified ISEP (MISEP), this pattern of general performance continued: With few notable exceptions, DHHS achieved critical outcome measures while also improving or sustaining performance on a range of process measures. On metrics that remain to be achieved, the state's performance for the past 10 years since the ISEP 10 monitoring period (January – June 2016) generally follows a strong sustained or upward trend.

- The state's performance on sibling placement (MISEP 6.6(a)) demonstrates a strong and sustained upward trend, stabilizing at consistently high levels near the benchmark line. Performance remains steady with only minor fluctuations, suggesting sustained compliance and improved consistency over time.
- Performance on MISEP 6.6(b), requiring immediate efforts to locate family in whose home siblings can be jointly placed, also can be characterized as trending upward overall, though with continued variability and a few moderate declines. At present, the measure is at relatively strong performance levels approaching the benchmark line.
- The state's performance on MISEP 6.8, concerning length of stay in emergency or temporary facilities, shows an initial decline from near-benchmark performance levels, followed by a prolonged period of moderate but relatively stable performance. Following a point of documented decline, performance recovered and gradually trended upward.
- Though the state's performance on the measure of repeated placements in emergency or temporary facilities (MISEP 6.9) is still below baseline, the measure demonstrates greater upward movement in more recent reporting periods, including several notable increases.
- On MISEP 6.10(a), initial review of relative foster placements, the state also has demonstrated sustained improvement and generally upward performance. Although some variability persists, performance has trended

toward higher levels in the most recent monitoring periods, indicating overall progress.

- The state also shows sustained improvement in performance on MISEP 6.10(b), annual review of relative foster placements. After beginning at relatively low performance levels with some early fluctuation, the measure trends upward and stabilized at moderately high levels over time. The overall trajectory suggests steady progress and increased consistency in later reporting periods.
- Performance in the areas of worker visits (MISEP 6.22), parent-child visits (MISEP 6.23), initial medical examinations (MISEP 6.25 and 6.29), access to medical coverage following subsequent placement (MISEP 6.32), and documentation of informed consent for the administration of psychotropic medications (MISEP 6.33) reflects relatively stable performance over time, with modest early increases followed by sustained consistency. Although performance on these metrics remains below the benchmark, the measures demonstrate limited variability and no significant periods of decline, suggesting steady but plateaued performance. The performance trend for initial and annual dental examinations (MISEP 6.26 and 6.29) is similar, with relatively strong performance near the benchmark line. Though a sharp temporary decline occurred, the measure rebounded steadily after that drop and has stabilized at moderately high levels.

Of note, the state continues to be challenged to meet the Maltreatment in Care outcome measure (MISEP 6.1). States operating under child welfare consent decrees frequently struggle to satisfy this metric because the measure captures harms that arise from deeply interconnected structural, operational, and environmental conditions that are difficult to fully control. This metric reflects the functioning of the entire placement and service ecosystem rather than a single agency process. Even as DHHS stabilized its workforce, increased functional capacity, and improved supervision quality, it was contending with placement

shortages and provider capacity constraints. These pressures increase risk in placement. The needs of children entering foster care also increase the complexity of placement management. They often have significant trauma histories, behavioral health needs, developmental disabilities, or histories of victimization. Systems serving high-acuity populations often face elevated risk of incidents even when case practice improves.

Additionally, the maltreatment in care metric is unusually dependent on accurate reporting and surveillance systems. Ironically, states sometimes appear to perform worse on maltreatment in care after reforms because improved monitoring, documentation, and quality assurance systems uncover incidents that previously went undetected or unreported. In this sense, higher reported maltreatment rates may initially reflect institutional learning and greater transparency rather than deteriorating safety conditions. Finally, maltreatment in care metrics are statistically difficult to prove because the underlying event rate is comparatively low relative to other child welfare measures. Small fluctuations in the number of substantiated incidents can significantly affect performance percentages, making sustained compliance difficult even when overall practice improves.

Michigan's track record of performance is consistent with national patterns I have observed through my research on foster care consent decrees across the United States. Long-running decrees frequently generate extensive reporting records that reflect persistent system complexity rather than linear progress toward a fixed endpoint. Importantly, the areas in which Michigan's child welfare system has improved represent durable reform capacity. There is clear evidence of established governance and accountability structures; internal monitoring and quality assurance mechanisms; integration of federal oversight and funding requirements; professionalized workforce standards; and the ability to self-identify problems and develop strategies for course correction. In sum, DHHS has established the operational capacity reasonably necessary to achieve its goals. Even where performance has been persistently challenged, the state has demonstrated the

ability to recover and improve. For this reason, the existence of ongoing monitoring findings should not be taken to mean that current system operations fall below legal standards, or that the underlying practices fail to reflect generally accepted methods for producing desired outcomes. Monitoring regimes are intentionally exacting and are designed to surface risk, variance, and opportunity for improvement, even in systems that are functioning within professional norms.

Michigan DHHS has demonstrated capacity to operate within legal requirements and professional norms. Like many jurisdictions operating large, decentralized child welfare systems, Michigan has been subject over time to multiple layers of review, monitoring, and assessment conducted pursuant to federal program requirements and administrative oversight mechanisms. Michigan has been subject to:

- Ongoing federal oversight and review through Title IV-E and related mechanisms;
- Significant statutory and policy changes affecting child welfare practice; and
- Evolving evidence-based standards governing safety, permanency, and well-being

As a result, Michigan's child welfare system operates today within a substantially changed legal, administrative, and policy environment compared to the period in which *Dwayne B.* was initiated.

For this reason, continued court oversight is unlikely to produce substantial additional gains. A competently administered foster care system is one that provides essential care, ensures reasonable safety, and promotes family integrity for the children and youth in state custody. Once the foundational conditions and organizational capacity necessary to achieve this threshold level of competence are in place, continued judicial oversight may offer limited additional benefit and, in some circumstances, may impede the agency's ability to evolve in response to new challenges and opportunities. Effective administration requires the flexibility to adjust priorities, reallocate resources, develop new strategies, and respond to changing circumstances. Prolonged court supervision can limit that flexibility by anchoring agency attention to historical compliance measures and monitoring requirements that may no longer reflect the most pressing operational needs or best practices.

My research indicates that improvements achieved during litigation are rarely sustained because of the decree itself. Rather, durable progress is more often attributable to parallel investments in leadership, funding, organizational capacity, and policy alignment. Michigan appears to be at this critical juncture at which the benefits of institutional reform litigation begin to diminish. The state has implemented extensive reforms under the *Dwayne B.* remedy. It has developed a substantially restructured child welfare agency with adequate staffing, internal quality assurance and oversight mechanisms, data infrastructure, expanded placement resources, and caseload standards designed to support effective practice. At this stage, the central challenge is no longer establishing the basic capacity to operate a constitutionally adequate standard, but rather sustaining and refining that capacity through ongoing executive leadership, legislative oversight, supported professional judgment, and continuous quality improvement processes that are best suited to managing a complex and evolving child welfare system.

## IX. Conclusion

Recognizing the incremental nature of litigation-driven change is important for evaluating both expectations and remedies. Persistent system challenges do not necessarily indicate failure of reform; they reflect the reality that child welfare systems evolve through continuous, imperfect adjustment, not through rapid, court-enforced transformation. Prolonged court oversight does not convert an incremental reform tool into a transformational one and may, over time, constrain the very adaptability required for continued improvement.

Taken together, the research on child welfare institutional reform litigation demonstrates that it is a sometimes necessary but inherently limited tool. Litigation has proven capable of catalyzing investment, improving infrastructure, and correcting acute system failures. At the same time, its effectiveness diminishes over time. In my expert opinion, lasting child welfare reform depends less on prolonged judicial supervision than on the development of durable governance, workforce, and accountability structures capable of functioning without court compulsion.

The history and implementation of the *Dwayne B.* decree demonstrates both the strengths and inherent limitations of institutional reform litigation as a child welfare reform strategy. The litigation clearly accelerated investment in infrastructure, accountability systems, workforce development, and oversight mechanisms that produced measurable and sustained improvements in important safety and permanency outcomes for children. At the same time, the remaining areas of noncompliance largely concern conditions that are deeply intertwined with broader structural realities affecting public child welfare systems nationwide, including placement capacity, workforce instability, service availability, and the increasingly complex needs of children entering care. Michigan's experience therefore reflects the broader national pattern identified in the research literature: court oversight can catalyze meaningful reform and build durable organizational capacity, but it cannot independently resolve every adaptive challenge inherent in

an open and continuously evolving child welfare system. In my opinion, the evidence developed over nearly two decades of monitoring demonstrates that Michigan DHHS possesses the governance structures, operational capacity, accountability mechanisms, and institutional competence necessary to continue system improvement outside the framework of prolonged judicial supervision.

# Exhibit A - Attachment B

**Melissa D. Carter**
Clinical Professor of Law, Emory University School of Law
Atlanta, GA • melissa.d.carter@emory.edu

## ACADEMIC APPOINTMENTS

**Emory University School of Law** *Atlanta, GA*
*Clinical Professor of Law* 2010 - present

Courses taught: Family Law I, Family Law II, Child Welfare Law & Policy, Policy Clinic (Juris Doctor, Masters of Social Work, Masters of Public Health students), Legislative Advocacy Clinic (Juris Doctor, Masters of Social Work, Masters of Public Health students), Legislative Advocacy (Master of Legal Studies students)

*Executive Director*, Barton Child Law & Policy Center 2010 - present

Directed administration and strategic oversight of a $5.9 million portfolio of federal funding, state contracts, and grants from national and family foundations. Managed full lifecycle of funding, including proposal development, budgeting, compliance, reporting, and funder engagement; aligned resources to sustain staff, programmatic initiatives, and core operations of a clinical program.

**Morehouse School of Medicine**
**Department of Psychiatry and Behavioral Sciences** *Atlanta, GA*
*Adjunct Clinical Professor* 2018 - present

## SELECTED RESEARCH and PROGRAM GRANTS

**Family Advocacy Project** (2025-2027)
*Principal Investigator*
Award from Georgia Opioid Abatement Trust administered by Wellroot Family Services to address upstream legal and practical challenges leading to unnecessary child welfare system involvement.

**Emory Summer Child Advocacy Program** (2015-2026)
*Principal Investigator*
Annual Children's Justice Act grant to design and lead a 10-week interdisciplinary internship program preparing professional and graduate students for careers in child welfare.

**Justice Fund of Georgia** (2026-2027)
*Principal Investigator*
Funding from United Way of Greater Atlanta to advance statewide youth justice system reform through the Barton Center.

**Father Legitimation** (2024-2026)
*Principal Investigator*
Annie E. Casey Foundation funded initiative to build public will, co-develop policy solutions, and strengthen advocacy capacity around legitimation law reform.

**Youth Advocacy Initiative (2024- )**
*Principal Investigator*
Conrad N. Hilton Foundation/United Way funding to build policy infrastructure supporting improved outcomes for transition-age youth in Georgia's foster care system.

**Child Welfare Class Action Litigation / Foster Care Consent Decree Report** (2023-2026)
*Principal Investigator*
Annual agreement with Casey Family Programs to track national child welfare litigation, produce a widely used report, and support development of research database.

**Impact Litigation as a Tool for Child Welfare System Reform** (2023-2026)
*Principal Investigator*
Research grant from the Conrad N. Hilton Foundation to support the evaluation of litigation as a strategy to improve outcomes for transition-age youth in foster care.

**Youth Justice Convening** (2024)
*Principal Investigator*
Public Welfare Foundation award to design and host a statewide convening advancing policy and practice for system-impacted youth.

**Child Well-Being Initiative (Georgia Child Welfare Collaboratory)** (2022-2025)
*Principal Investigator*
Award from the Joseph B. Whitehead Child Well-Being Fund to build cross-sector partnerships and develop upstream strategies to prevent family separation.

**System Supports Impacting Youth in Georgia's Foster Care System** (2022-2024)
*Principal Investigator*
Conrad N. Hilton Foundation portfolio analyzing policy impacts on outcomes for transition-age youth in foster care and evaluating class action litigation as a reform tool.

**Preventive Legal Advocacy** (2022)
*Principal Investigator*
Casey Family Programs grant to build national infrastructure promoting legal advocacy to prevent unnecessary family separation.

**Sparking Systemic Change** (2020-2022)
*Subrecipient*
Co-led $128,000 awarded by the Novo Foundation in support of an initiative addressing commercial sexual exploitation through systems reform, capacity-building, and evaluation.

**Three-Branch Engagement / Family First** (2018, 2019, 2020, 2021)
*Principal Investigator*
Casey Family Programs funding agreement to support Georgia's implementation of the Family First Prevention Services Act through research and stakeholder engagement.

**Trauma-Informed Court** (2014-2016)
*Principal Investigator*
Casey Family Programs support for the development of trauma-informed juvenile court practices and protocols.

**Georgia Inside/Outside Child Welfare Strategy** (2015-2016)
*Principal Investigator*
Annie E. Casey Foundation grant to build a statewide advocacy coalition advancing kinship care policy.

**Youth Based Healthcare** (2013)
*Principal Investigator*
Casey Family Programs funding support for research and development of guidance on healthcare decision-making for children and youth in foster care.

**Monitoring Psychotropic Medication Use in Children and Youth in Foster Care** (2011)
*Principal Investigator*
Casey Family Programs funded collaboration with the clinical faculty at the Emory University School of Medicine to institutionalize independent clinical review of psychotropic medication use in foster care.

## SELECTED PUBLICATIONS

Melissa D. Carter & Christopher G. Hempfling (2026) "Measured Results in Georgia's Kenny A. Foster Care Consent Decree: A Framework for Assessing the Strategic Effectiveness of Institutional Reform Litigation," 13 Child & Fam. L.J.

Melissa D. Carter (2023) "Federal Child Welfare Legislation" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).

Melissa D. Carter (2023) "Achieving Large-Scale Change Through Systems Advocacy" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).

Joshua Gupta Kagan, Christopher Church, Melissa Carter, Vivek Sankaran, & Andy Barclay (2023) "The New Orleans Transformation: Foster Care as a Rare, Time-Limited Intervention," 27 LEWIS & CLARK L. REV 417.

Melissa D. Carter, Dr. Nicole Cotton, & Dr. Courtney McMickens (2021) "Structural Violence with Child Welfare Systems," 51 PSYCHIATRIC ANNALS 11.

Melissa D. Carter, Christopher Church, & Vivek Sankaran (2022) "A Quiet Revolution: How Judicial Discipline Essentially Eliminated Foster Care and Nearly Went Unnoticed," 12 COLUM. J. RACE L. 1.

Melissa D. Carter (2022) "An Ounce of Prevention is Worth a Pound of Cure: Why Children's Lawyers Must Champion Preventive Legal Advocacy," 42 CHILD LEGAL RTS J. 1.

Melissa D. Carter & Courtney McMickens (2020) "A Matter of Family: Finding Justice Within the Child Welfare System" in SOCIAL (IN)JUSTICE AND MENTAL HEALTH (Ruth Shim and Sarah Vinson, eds.). 1st edition, American Psychiatric Association Publishing, Washington, D.C.

Melissa D. Carter (2020) "Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia," 54 GA. L. REV., 1133.

Melissa D. Carter (2020) "The Need for a Prevention Throughline in Family Policy," CHILDREN'S BUREAU EXPRESS, (Apr. 2020) (invited short article).

Melissa D. Carter (2019) "Pursuing the Best Interest of Children," CHILDREN'S BUREAU EXPRESS (Nov. 2019) (invited short article).

Melissa D. Carter (2017) "Beyond the Courtroom: A Plea and a Plan for Children's Attorneys to Engage in Policy Advocacy," THE GUARDIAN, National Association of Counsel for Children (Fall 2017).

Melissa D. Carter, Christopher E. Church & Thomas B. Hammond (2015) "Kinship Care: A Child's Home Away from Home," in THE KINSHIP PARENTING TOOLBOX 59-63 (Kim Phagan-Hansel ed., EMK Press).

Contributor, Mark H. Murphy, GEORGIA JUVENILE PRACTICE AND PROCEDURE, Ch. 1:9, 2013-2014 ed.

Melissa D. Carter (2013) "Medicating Trauma: Improving Prescription Oversight of Children in Foster Care," 46 CLEARINGHOUSE REV. J. OF POVERTY L. AND POL'Y 9-10, 398.

Hon. Steven C. Teske & Melissa Dorris Carter (2007) "The Next Generation of Child Advocacy," 13 GA. BAR J. 1, 22.

Beth Locker & Melissa Dorris (2004) "A Child's Right to Legal Representation in Georgia Abuse and Neglect Proceedings," 10 Ga. Bar J. 1, 12.

Melissa J. Dorris (2003) "Federal Oversight and Private Actions: Maintaining a Balance in Rights Enforcement of Federal Child Welfare Legislation," 23 CHILD. LEGAL RTS. J., 23.

## OP EDS

Melissa Dorris Carter & Andrew Barclay, "We Want Kids to Grow Up in Safe Families, so Let's Measure That," CHRONICLE OF SOCIAL CHANGE, Nov. 6, 2018.

Melissa Dorris Carter & Andrew Barclay, Op-Ed, "Privatizing is Not a Proven Reform Plan," ATLANTA JOURNAL-CONSTITUTION, Feb. 20, 2014.

Melissa Carter, Op-Ed, "Child Protection's a Responsibility For All," ATLANTA JOURNAL-CONSTITUTION, Nov. 2, 2013.

## AMICUS BRIEFS

*In re E.F. & C.F.*, Supreme Court of Georgia (2025)

*In re C.C.,* Supreme Court of Georgia (2022)

*In re W.L.H.,* Supreme Court of Georgia (2012)

## CONGRESSIONAL TESTIMONY

U.S. Senate Committee on the Judiciary, Subcommittee on Human Rights and the Law, *The Human Rights of Foster Children*, (Oct. 25, 2023) (written statement for the record).

https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.

## SELECTED PRESENTATIONS

*Making Policy Stick: Turning Federal Child Welfare Policy into Stronger Advocacy and Courtroom Practice,* National Association of Counsel for Children Annual Conference, Portland, OR, August 2026 (accepted).

*Navigating Change: Child Advocacy in a Shifting Child Welfare Landscape*, Reaching Teens Summit, Duluth, GA, February 2026.

Presented testimony on the Georgia's child welfare system outcomes, financing, and practical impacts, at the Joint Hearing of the House Appropriations Human Resources Subcommittee and House Judiciary Juvenile Committee, Atlanta, GA, (December 18, 2025).

*Navigating the Future: State Strategies for a Changing Landscape,* The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, December 2025.

*Unraveling the Past to Reimagine the Future: A Critical Look at Child Welfare History,* The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, December 2025.

Moderator, Child Welfare Symposium hosted by Accenture, Atlanta, GA, October 2025.

Moderator, Atlanta Foundations Forum panel on Georgia's criminal and juvenile justice landscape, Atlanta, GA, October 2025.

Presented testimony on the legal and policy frameworks governing Georgia's responsibilities for children in foster care with emphasis on meeting the healthcare needs of youth with complex behavioral and mental health conditions, before the House Study Committee on Abandoned Child Placement Following Hospital Discharge, Atlanta, GA (September 15, 2025).

*Federal Child Welfare and Protective Services Update,* Opening Plenary, American Public Human Services Association Education Conference, Reno, NV, October 2025.

*Navigating Change: Child Advocacy in a Shifting Child Welfare Landscape*, Georgia Court Appointed Special Advocates Annual Training, Atlanta, GA, August 2025.

*Strategic Impacts: Evaluating the Success of Foster Care Litigation on Child Welfare Outcomes*, American Public Human Services Association, ISM + PHSA Education Conference & Expo, Aurora, CO, October 2024.

Presented testimony on the well-being of children in Mississippi's foster care system, before the Senate Study Group on Women, Children and Families, Jackson, MS (October 2, 2024).

*Parental Incarceration: A Shared Sentence for Children*, Georgia Court Appointed Special Advocates Annual Conference, Atlanta, GA, August 2024.

*Emerging Legal Topics in Modern Advocacy*, Plenary, National Association of Counsel for Children Annual Conference, Salt Lake City, UT, August 2024.

*Institutional Reform Litigation: Current Status and Trends in Child Welfare Class Actions,* Plenary Session, Casey Family Programs, Class Action Lawsuit Convening, Minneapolis, MN, July 2024.

*Child Welfare and Adoption: Legislative and Policy Changes on the Horizon*, Georgia Association of Licensed Adoption Agencies, Atlanta, GA (virtual), January 2024.

*A National Lens on the State of Child Welfare*, The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, December 2023.

*Georgia Child Welfare System Overview,* Supreme Court of Georgia and Georgia Court of Appeals CLE, Atlanta, GA, November 2023.

*A History of Impact Litigation and Its Effects on State Child Welfare Systems,* American Public Human Services Association, ISM + PHSA Education Conference & Expo, Kissimmee, FL, September 2023.

*Impact Litigation as a Child Welfare System Improvement Strategy*, Emory Center for International and Comparative Law, Atlanta, GA, April 2023.

*How Can High Level Federal Leadership Improve Outcomes for Children?* (panel), Kempe Center 2022 International Virtual Conference: A Call to Action to Change Child Welfare, virtual, Oct. 2022.

*Working Together: Understanding the Civil and Criminal Legal Frameworks for Child Protection*, National Citizen Review Panel Annual Conference, Monterrey, CA, May 2022.

*The Impact of Impact Litigation*, American Association of Health and Human Services Attorneys 2021 Annual Education Conference, Columbus, OH (virtual). October 2021.

*Preventive Legal Advocacy: How Child Welfare Agencies and Lawyers Can Partner Together to Support Families,* American Association of Health and Human Services Attorneys 2021 Annual Education Conference, Columbus, OH (virtual). October 2021.

General Session Q&A Discussion: *Establishing A Continuum of Legal Representation: How to Implement High Quality Legal Representation at All Stages of a Case*, National Council of Juvenile and Family Court Judges, St. Louis, MO. July 2021.

*Funding for Quality Legal Representation,* National Center for State Courts, Learning Collaborative, virtual convening, August 2021.

*Aligning Efforts to Improve the Foster Care Experience*, U.S. Children's Bureau State Team Planning Meeting, Washington, D.C. March 2020.

*Child Welfare Refresher and Updates on the Child Abuse Registry,* Office of State Administrative Hearings, Administrative Law Judge Training, Athens, GA, February 2020.

*Courageous Conversations: Quality Legal Representation*, The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, November 2019.

*State of Child Welfare,* annual presentation to local juvenile court and child welfare system stakeholder audiences

*Family First Prevention Services Act*, Annual Special Assistant Attorney General Conference, Buford, GA, October 2019.

Juvenile Justice Reform (panel), University of Georgia Law School Law Symposium, Athens, GA, October 2019.

Program Faculty, Reasonable Efforts Judicial Academy, U.S. Children's Bureau, Nashville, TN, September 2019.

Opening Plenary, *Data-Driven and Evidence-Based Practice and Policymaking: Implications for Child Welfare*, U.S. Children's Bureau Child Welfare Evaluation Summit, Washington, D.C., August 2019.

*The Family First Prevention Services Act: What the Act Means for Georgia's Child Welfare System*, Georgia System of Care Conference, Stone Mountain, GA, June 2019.

Families First Legislation (panel), 24th Annual Rosalynn Carter Georgia Mental Health Forum, Carter Center, Atlanta, GA, May 2019.

*Child Welfare Policy Framework,* Bergstrom Fellowship Training, University of Michigan Law School, Ann Arbor, MI, May 2019.

*Quality Legal Representation for Children and Parents in Dependency Proceedings*, Family Court of Delaware Joint Judicial and Commissioners Retreat, Rehoboth Beach, DE, May 2019.

*Quality Legal Representation,* flash presentation, U.S. Children's Bureau State Team Planning Meeting, Washington, D.C., April 2019.

*Fostering Freedom: A Policy Conversation about Religious Exemptions in Child Welfare,"* National Association of Counsel for Children 41st Annual Conference, San Antonio, TX, August 2018.

*Legal Representation as a Prevention Strategy,* Casey Family Programs Judicial Leaders Convening, May 2018.

*CIP Talks,* "How Judges and Attorneys Help Strengthen Families," co-sponsored by the Children's Bureau, National Center for State Courts, and Capacity Building Center for Courts, Williamsburg, VA, February 2018.

*Acting as an Agent of Change*, National Association of Counsel for Children Annual Conference, New Orleans, LA, August 2017.

*Federal Child Welfare Policy Changes*, North American Council on Adoptable Children Annual Conference, Atlanta, GA, July 2017.

*Citizen Review Panels as Agents of Change,* National Citizen Review Panel Annual Conference, Anchorage, AK, May 2017.

Presented testimony on dozens of child welfare, juvenile justice, and juvenile court bills before various committees in the Georgia General Assembly.

## POPULAR COMMENTAR & PODCASTS

The Good Judge-Ment Podcast, "Georgia's Equitable Caregiver Law," May 2026.

Associated Press, Quoted in "Georgia's Child Welfare System Remains Shaken After Projected $85.7 Million Budget Shortfall," Feb. 2026. https://apnews.com/article/georgia-child-welfare-budget-shortfall-candice-broce-4b4e55a449b16f7ee51040f9e6105373.

Atlanta Journal Constitution, Quoted in "Georgia Judge Denies New Trial for Man Whose Case Was Lost for 22 Years," Feb. 2026. https://www.ajc.com/news/2026/02/georgia-judge-denies-new-trial-for-man-whose-case-was-lost-for-22-years/.

Atlanta Journal Constitution, Quoted in "Georgia Cuts Programs for Foster Youth and Families Citing Federal Shutdown," Nov. 2025. https://www.ajc.com/politics/2025/11/georgia-cuts-programs-for-foster-youth-and-families-citing-federal-shutdown/.

The Imprint, Quoted in "Georgia Halts Vital Child Welfare Services Due to Shutdown," Nov. 2025. https://imprintnews.org/top-stories/georgia-child-welfare-shutdown/268521.

11Alive, Guest Expert, "SNAP Benefits in Limbo," Nov. 2025. https://www.11alive.com/video/life/food/snap-benefits-in-limbo-what-we-know/85-05102028-fee1-4c13-9ca6-b0d6d7b0f0a1.

ChildFocus Podcast, Host Interview, "The Policy Landscape for Transition Age Foster Youth in Georgia," Nov. 2025.

Atlanta News First, Guest Expert, "'I Want My Children Back' Mom Says Her Inhaler Led to Failed Drug Tests," Apr. 2025. https://www.atlantanewsfirst.com/2025/04/02/i-want-my-children-back-mom-says-her-inhaler-led-failed-drug-tests/.

Atlanta News First, Guest Expert, "Mom's Parental Rights in Limbo After Autistic Son's

Arrest," Feb. 2025. https://www.atlantanewsfirst.com/2025/02/20/moms-parental-rights-limbo-after-autistic-sons-arrest/.

Magnolia Tribune, Legislative Testimony Quoted in "Experts Testify on Reforms to Mississippi's Youth Courts Aimed at Reducing Crime, State Custody," Oct. 2024. https://magnoliatribune.com/2024/10/09/experts-testify-on-reforms-to-mississippis-youth-courts-aimed-at-reducing-crime-state-custody/.

WABE, Quoted in "Sen. Jon Ossoff Wants Georgia and Other States to Track 'Hidden Foster Care'," Oct. 2024. https://www.wabe.org/jon-ossoff-hidden-foster-care/.

Press Conference, Guest Expert, "Following 13-Month Foster Care Investigation, Sen. Ossoff Introduces Bipartisan Bill to Strengthen Federal Oversight of Foster Care Systems, Oct. 2024. Linked from https://www.ossoff.senate.gov/press-releases/watch-following-13-month-foster-care-investigation-sen-ossoff-introduces-bipartisan-bill-to-strengthen-federal-oversight-of-foster-care-systems/.

The Imprint, Quoted in "U.S. Senate Investigation Finds 'Systemic Failures' to Keep Georgia Foster Kids Safe," Apr. 2024. https://imprintnews.org/child-welfare-2/us-senate-investigation-finds-systemic-failures-to-keep-georgia-foster-kids-safe/248731.

ProPublica, Quoted in "When the Number of Bedrooms in a Home Keeps Parents From Getting Their Kids Back," Apr. 2024. https://www.propublica.org/article/in-georgia-inadequate-housing-can-mean-longer-stays-in-foster-care.

WSB-TV, Guest Expert, "Scathing Report Criticizes Georgia DFCS Over State's Handling of Foster Children," Apr. 2024. https://www.wsbtv.com/news/local/atlanta/scathing-report-criticizes-georgia-dfcs-over-states-handing-foster-children/3TIYT3W26NBO7G54BT6XSF7UYA/.

Atlanta Journal Constitution, Quoted in "Teen to Serve Life for Killing 14-Year-Old Girl as Part of Gang Initiation," Nov. 2023. https://www.ajc.com/news/crime/teen-to-serve-life-for-killing-14-year-old-girl-as-part-of-gang-initiation/ZGR7FTU4GNG4BIE3FP74QGLIUU/.

11Alive, Guest Expert, "'People Are Hungry,' Georgia SNAP Benefit Delays Persist," Oct. 2023. https://www.11alive.com/article/news/local/georgia-snap-benefit-delays-persist/85-1a118cdb-f4d3-4a35-ae7b-fc77d46cb800.

Georgia Public Broadcasting, Quoted in "Georgia Child Welfare Agency Gets Scathing Performance Reviews at Ossoff Human Rights Hearing," Oct. 2023. https://www.gpb.org/news/2023/10/26/georgia-child-welfare-agency-gets-scathing-performance-reviews-at-ossoff-human.

Atlanta Journal Constitution, Quoted in "Little B's Prison Release Places Focus on GA's Juvenile Justice Policies," Oct. 2023. https://www.ajc.com/news/little-bs-prison-release-places-focus-on-gas-juvenile-justice-policies/O7BJDPQ3RBEYLLF5C7ZQSTDB7Q/.

Georgia Public Broadcasting, Quoted in "Georgia Medicaid Insurer Denied Psychotherapy for Thousands," Apr. 2023. https://www.gpb.org/news/2023/04/11/georgia-medicaid-insurer-denied-psychotherapy-for-thousands.

Atlanta Journal Constitution, Quoted in "Georgia Kids in Foster Care Face Obstacles to Access Mental Health Services," Apr. 2023. https://www.ajc.com/news/investigations/georgia-children-in-foster-care-struggle-to-get-mental-health-services-ajc-investigation/4GAO5F2SYJCCPAI7MMQS2ESLQY/.

Atlanta Journal Constitution, Quoted in "Employees at Clayton Teen Shelter Arrested for Child Molestation, Cover Up," Mar. 2023. https://www.ajc.com/news/atlanta-news/employees-at-teen-shelter-arrested-for-child-molestation-cover-up/3O6K2SNT4ZBAZJ2YT5KZWRIVKU/.

Atlanta Journal Constitution, Quoted in "Lawmakers Mull Changes to Reduce the Number of Foster Kids in Hotels," Mar. 2023. https://www.ajc.com/news/atlanta-news/lawmakers-mull-changes-to-reduce-the-number-of-foster-kids-in-hotels/5366Y74CXBBXPLMDJD6NLZUL2Y/.

Atlanta Journal Constitution, Quoted in "Child's Death, Other Breakdowns Raise Questions for DFCS", Dec. 2022. https://www.ajc.com/news/atlanta-news/childs-death-other-breakdowns-raise-questions-for-dfcs/C5UUBQXX4ND6TGIQTMARJLFYSE/.

Atlanta Journal Constitution, Quoted in "Georgia Ends Child Abuse Registry, Saying Database Undermined Intent, " Sept. 2020. https://www.ajc.com/politics/georgia-ends-child-abuse-registry-saying-database-undermined-intent/ARHGDXVLXVD2FBUARPOATAFGU4/.

The Imprint, Quoted in "Georgia Dissolves Child Abuse and Neglect Registry," Sept. 2020. https://imprintnews.org/child-trauma-2/georgia-dissolves-child-abuse-and-neglect-registry/47207.

The Imprint Weekly Podcast, Host Interview, "Measuring Family Separation, and the Biden Child Welfare Agenda," Nov. 2020.

Atlanta Journal Constitution, Quoted in "'Religious Liberty' Adoption Bill Fans Debate in Georgia", Feb. 2020. https://www.ajc.com/news/state--regional/religious-liberty-adoption-bill-fans-debate-georgia/PlzBOgg9keCNMIur9H3U2M/.

Georgia Recorder, Quoted in "State Budget Cuts Threaten Support for Juvenile Detainee Transition", Jan. 2020. https://georgiarecorder.com/2020/01/28/state-budget-cuts-threaten-support-for-juvenile-detainee-transition/.

11Alive, Quoted in "Why is There No Specific Age in Georgia Law to Determine if a Child is Old Enough to be Home Alone?", Oct. 2019. https://www.11alive.com/article/news/local/outreach/why-guy/why-is-there-no-specific-age-in-georgia-law-child-old-enough-to-be-home-alone/85-b73a2391-9a91-4238-81e2-9bc4ba707f00.

Atlanta Journal Constitution, Quoted in "Georgia Reports of Child Abuse Rise, but Numbers Don't Tell the Whole Story", Aug. 2019. https://www.ajc.com/news/state--regional-govt--politics/georgia-reports-child-abuse-rise-but-numbers-don-tell-whole-story/7uWpjg5tJwXNknAc15mJcN/.

Chronicle of Social Change, Quoted in "Relative Caregivers Get a Small But Significant Raise in Georgia Budget", Mar. 2019.

The Children's Law Podcast, Host Interview, "Game Changer: IV-E Funding with Melissa Carter," Feb. 2019.

Chronicle of Social Change, Quoted in "With Foster Care Numbers at a 15-Year High, Georgia Looks to Relatives", Nov. 2018.

Atlanta Journal Constitution, Quoted in "Tight Job Market Leaves Georgia's Youth Jails Chronically Understaffed.", Oct. 2018. https://www.ajc.com/news/tight-job-market-leaves-georgia-youth-jails-chronically-understaffed/dlvreApA6uBoBHGtW8UuNP/.

Atlanta Journal Constitution, Quoted in "Will DFCS Leader Continue to be Disposable?", Aug. 2018. https://www.ajc.com/news/local/torpy-large-will-dfcs-leader-continue-disposable/OXNGr9E0khh7Dk08aNtZlK/.

Religion News Source, Quoted in "When Adoption Agencies Can Turn Away Gay Prospective Parents, What Happens to the Kids?", Mar. 2018. https://religionnews.com/2018/03/23/when-adoption-agencies-can-turn-away-gay-prospective-parents-what-happens-to-the-kids/.

Atlanta Journal Constitution, Quoted in "Why It's More Difficult to Adopt Children in Georgia", Feb. 2018. https://www.ajc.com/news/state--regional-govt--politics/why-more-difficult-adopt-children-georgia/N1fGhssXI4mDR1NBxz5tLP/.

Atlanta Journal Constitution, Quoted in "Georgia Might Let Adoption Agencies Use Religion to Refuse Gay Couples", Feb. 2018. https://www.ajc.com/news/state--regional-govt--politics/georgia-might-let-adoption-agencies-use-religion-refuse-gay-couples/MMcrJK4R7Px74SboMrMPKP/.

Atlanta Journal Constitution, Quoted in "A Georgia Mother's Struggle to Unmask a Beloved Coach as a Predator", Feb. 2018. https://www.ajc.com/news/local/georgia-mother-struggle-unmask-beloved-coach-predator/NB1KHStPs6W557ZpeHmTjJ/.

Atlanta Journal Constitution, Quoted in "Prospect of Baby Selling Muddles Georgia Adoption Debate", Jan. 2018. https://www.ajc.com/news/state--regional-govt--politics/prospect-baby-selling-muddles-georgia-adoption-debate/8IeMh61d77tNaTCn21Mq6J/.

WABE Morning Edition, Guest Expert, "The Challenges of Overhauling Georgia's Adoption System," Jan. 2018. https://www.wabe.org/challenges-overhauling-georgias-adoption-system/.

The Imprint, Quoted in "The Man Entrusted with Los Angeles' Most Vulnerable Children, Nov. and Dec. 2017. https://imprintnews.org/featured/the-man-entrusted-with-los-angeles-most-vulnerable-children/28848.

LA Times, Quoted in "New Child Welfare Head Well-Regarded by Some Georgia Advocates, Despite Mixed Successes", Oct. 2017. https://www.latimes.com/local/lanow/la-me-ln-dcfs-bobby-cagle-20171007-story.html.

Associated Press, Quoted in "Adoption Law Update Lingers on Georgia Lawmakers' Last Day", Mar. 2017. https://www.fox5atlanta.com/news/adoption-law-update-lingers-on-georgia-lawmakers-last-day.

Atlanta Journal Constitution, Quoted in "DFCS Bill Allows More Secrecy on Child Deaths", Mar. 2017.

Atlanta Journal Constitution, Quoted in "Georgia Governor Slams 'Religious Liberty' Change to Adoption Bill, Mar. 2017. https://www.fox5atlanta.com/news/adoption-law-update-lingers-on-georgia-lawmakers-last-day.

WABE, Expert Guest, "Georgia Adoption Bill Raises Fears of Discrimination," Mar. 2017. https://www.wabe.org/georgia-adoption-bill-raises-fears-of-discrimination/.

The Meridian Star, Quoted in "Lax Reporting of Addicted Newborns Raises Concern," May 2016. https://meridianstar.com/2016/05/27/lax-reporting-of-addicted-newborns-raising-concern/.

WABE, Guest Expert, "With More Kids in State Care, Georgia Faces Foster 'Crisis'," Dec. 2015.

Georgia Public Broadcasting, Quoted in "Time to Reassess Law for Young Violent Offenders?" Nov. 2015. https://www.gpb.org/news/2015/11/11/time-reassess-law-for-young-violent-offenders.

WSB-TV, Quoted in "Credit Checks Slow to Come for Georgia Foster Youth Vulnerable to Fraud", Nov. 2015. https://www.wsbtv.com/news/local/credit-checks-slow-come-georgia-foster-youth-vulne/26817362/.

Georgia Public Broadcasting, Guest Expert, Lawmakers On the Story, "Protecting Georgia's At-Risk Children, Mar. 2014. https://www.gpb.org/television/show/lawmakers/season/44/030514-protecting-georgias-at-risk-children.

Georgia Public Broadcasting, Quoted in "Co-Sleeping Puts Children at Risk," Feb. 2012. https://www.gpb.org/news/2012/02/22/co-sleeping-puts-children-at-risk.

Georgia Public Broadcasting, Quoted in "Documents Reveal Child Deaths," Feb. 2012. https://www.gpb.org/news/2012/02/21/documents-reveal-child-deaths.

Fulton County Daily Report, Quoted in "Dissent Gives Hope to Lawyer for Parent," Apr. 2011.

Atlanta Journal Constitution, Quoted in "Boy's Death During DFCS Removal Raises Concern," Feb. 2011. https://www.ajc.com/news/local/boy-death-during-dfcs-removal-raises-concern/ZZggZ6j6RRLk3pumxBDKVO/.

Georgia Public Broadcasting, Quoted in "Advocates: Foster Kids Overmedicated," Dec. 2010. https://www.gpb.org/news/2010/12/29/advocates-foster-kids-overmedicated.

## EDUCATION

**University of Illinois** — *Urbana-Champaign, IL*
Juris Doctor

**University of Illinois** — *Urbana-Champaign, IL*
Bachelor of Science, Psychology
Honors: *Summa cum laude,* Phi Beta Kappa, James Scholar, Bronze Tablet

## LEGAL EXPERIENCE

**Office of the Child Advocate for the Protection of Children** — *Macon and Atlanta, GA*
***Director*** — 2010
*Deputy Director* — 2007 - 2010

**Administrative Office of the Courts of Georgia**
**Supreme Court of Georgia Committee on Justice for Children** — *Atlanta, GA*
*Director of Legal Training* — 2006 - 2007

**Claiborne, Outman, & Surmay, P.C.** — *Atlanta, GA*
*Associate Attorney* — 2005 - 2006

**Administrative Office of the Illinois Courts**
**Court Services Division** — *Springfield, IL*
*Data Program Specialist, Court Improvement Program* — 2005

**Administrative Office of the Courts of Georgia**
**Supreme Court of Georgia Child Placement Project** — *Atlanta, GA*
*Managing Attorney* — 2003 - 2005

**Emory University School of Law**
**Barton Child Law and Policy Clinic** — *Atlanta, GA*
*Post-Graduate Fellow in Law* — 2002 - 2003

## BAR ADMISSIONS

Illinois (2002); Georgia (2004)

## OTHER PROFESSIONAL ACTIVITIES

- Co-Chair, Fulton County Juvenile Court Judicial Nominating Commission, 2022 and 2024.
- Vice-Chair, Juvenile Justice State Advisory Group, appointed by Gov. Nathan Deal, 2014-present
- Member, Georgia Children's Cabinet, appointed by Gov. Brian Kemp, 2019-present
- Member, State Bar of Georgia Children and the Courts Committee, 2021-present
- Member, Child Welfare Reform Council, appointed by Gov. Nathan Deal, 2013-2015 Chair, Policy and Procedures Committee, 2014
- Member, State Bar of Georgia Formal Advisory Opinion Board, 2014-2021
- Member, Georgia Commission on Family Violence, appointed by Gov. Nathan Deal, 2012-2016
- Co-Chair, Children's Justice Act Taskforce, 2010-present. Leading efforts of a statewide citizen review panel in the discharge of its duties as a federally mandated multidisciplinary taskforce to improve the investigation, prosecution and judicial handling of cases of child abuse and neglect
- Vice-Chair, Board of Directors, Multi-Agency Alliance for Children, 2016-present
- Member, National Association of Counsel for Children, 2002-present (annual conference planning committee member 2008)
- Member, Georgia Association of Counsel for Children; President, Board of Directors, 2007-2008

## AWARDS & FELLOWSHIPS

- Public Leader Thought Leader Fellowship, Emory Institute for Developing Nations and The OpEd Project, 2019
- 2015 *Friends of Children Award*, presented by the Georgia Public Human Services Association
- Annie E. Casey Atlanta Leaders for Results Program, a ten-month executive leadership program designed in partnership with the Atlanta Civic Site to develop leaders in the nonprofit and public sectors in Atlanta, 2013
- Georgia's 40 Under 40 "On the Rise," Fulton County Daily Report, 2013
- Marshall Memorial Fellow, German Marshall Fund of the United States Selected as one of 60 American Fellows to examine transatlantic issues during four weeks of European travel, October 2009

- L.E.A.D. Atlanta, Class of 2009. Selected as one of 40 participants in a 9-month leadership development program offered to young leaders by Leadership Atlanta
- 2009-2010 *Service Award for Advocacy on Behalf of Georgia's Foster Youth*, awarded by the Georgia EmpowerMEnt Group and Georgia Department of Human Resources
- State Bar of Georgia, Young Lawyers Division
    - 2010 *Child Advocate Award – Policy Advocate*
    - 2010, *Service Award*, For Services to Georgia's Children
    - 2009-2010, *Award of Achievement*, For Outstanding Service to the Young Lawyers Division, in recognition of service as Director of Service Projects
    - 2007-2008, *Award of Achievement,* For Outstanding Service to the Public, in recognition of efforts on the Model Juvenile Code Project
    - 2006-2007, *Service Award*, For Service to the Celebration of Excellence
    - 2004-2005, *Service Award,* For Contributions on Behalf of the Juvenile Law Committee