UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

M.D., by her next friend, Sarah R. Stukenberg, *et al.*,

*Plaintiffs,*

v.

GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.,*

*Defendants.*

Civil Action No. 2:11-cv-00084

**RULE 26(A)(2)(B) EXPERT DISCLOSURE AND REPORT OF MELISSA D. CARTER**

---

The following is my Rule 26 report in the matter of *M.D. v. Abbott*, No. 2:11-CV-00084 (S.D. Tex.). I am a Clinical Professor of Law and the Executive Director of the Barton Child Law and Policy Center at Emory University School of Law. I was retained by the Defendants to provide an expert report regarding the history of institutional reform litigation in child welfare and the effectiveness of long-term remedial orders, including offering an opinion about the effectiveness of Texas's remedial order over time. A true and complete copy of my expert report, including my expert opinions for this matter and their supporting bases and reasons, is attached hereto as Exhibit A.

## I. Qualifications

1. A copy of my current curriculum vitae is attached as Exhibit B.

2. I was appointed to the faculty of Emory Law School in Atlanta, Georgia in 2010. For the entirety of my academic appointment, I also have served on the clinical faculty as the Executive Director of the Barton Child Law and Policy Center

EXHIBIT
DX-034

(Barton Center). In addition, I hold an appointment as Adjunct Clinical Professor in the Department of Psychiatry and Behavioral Sciences at Morehouse School of Medicine, a position I have held since 2018 to support and facilitate a residency training affiliation between the Barton Center and the Morehouse School of Medicine Child and Adolescent Psychiatry Fellowship Program.

3. I received my Juris Doctor in 2002 from the University of Illinois College of Law, Urbana-Champaign, Illinois where I previously earned a Bachelor of Science in Psychology, summa cum laude, in 1999. I am admitted to the bar in Illinois (2002) and Georgia (2004).

4. Over the course of more than two decades of professional practice, I have developed specialized expertise in child welfare law and policy, with a particular focus on the structure, operation, and reform of publicly administered foster care systems and the legal rights of children in foster care. My expertise encompasses the legal and policy frameworks governing child protection, the design and implementation of child welfare policy at the federal and state levels, the mechanics of institutional reform litigation as applied to child welfare agencies, and the methods by which the effectiveness of such litigation can be measured and evaluated.

5. At Emory Law School, I have developed and taught courses in Family Law, Child Welfare Law and Policy, and Legislative Advocacy. As a clinical professor, I supervise students enrolled in the Barton Center Policy Clinic and in the Barton Center Legislative Advocacy Clinic. The clinics are interdisciplinary and enroll students from Emory Law's Juris Doctor program as well as graduate students from

the Rollins School of Public Health and the Georgia State University School of Social Work. I also provide administrative support to the Barton Center Appeal for Youth Clinic. Within the Barton Center's clinical offerings, students engage in direct practice and system-change efforts focused on children and families involved with the juvenile court, child welfare, and youth justice systems.

6. As Executive Director of the Barton Center, I direct and administer a portfolio of programs aligned with the Center's mission to improve outcomes for children and families involved with the child welfare and juvenile justice systems through direct legal representation, policy advocacy, legislative engagement, and applied research. I oversee the Center's curriculum, program development, and grant management; supervise junior attorneys; and coordinate the Center's engagement with government agencies, courts, and child welfare stakeholders at the local, state, and national levels.

7. For the past 10 years, I have provided targeted technical assistance and expert consultation to state jurisdictions concerning class action reform litigation monitoring, evaluation, and strategy development.

8. Prior to joining the Emory Law faculty, I served in a series of public sector roles directly concerned with the administration and reform of Georgia's child welfare system, including as Deputy Director and Director of the Office of the Child Advocate for the Protection of Children, and in senior program and training roles with the Administrative Office of the Courts of Georgia and the Administrative Office

of the Illinois Courts supporting each state's implementation of the federal Court Improvement Program.

9. My scholarly work focuses substantially on system improvement of the child welfare and foster care systems, including the governing policy and legal frameworks and tools for strategic reform. My publications include law review articles, book chapters, policy reports, and invited commentary.

10. I have presented on institutional reform litigation and its relationship to child welfare system reform before national audiences on numerous occasions, including jurisdictions participating in a biannual convening hosted by Casey Family Programs and annual conferences of the American Public Human Services Association. I have also presented on related topics including quality legal representation in child welfare proceedings, federal child welfare legislation and policy, and data-driven approaches to child welfare reform before organizations including the National Association of Counsel for Children, the National Council of Juvenile and Family Court Judges, the U.S. Children's Bureau, the National Center for State Courts, and various state and regional professional bodies.

11. I have provided legislative testimony on child welfare matters before the U.S. Senate Committee on the Judiciary, Subcommittee on Human Rights and the Law, for the hearing entitled "The Human Rights of Foster Children," and multiple state legislative bodies.

## II. Other Matters Required by Rule 26

12. In the last four years, I have not testified as an expert witness at trial or deposition in any cases.

13. As an expert witness, I will be compensated at a rate of $400/hour.

14. The list of materials I considered is in Exhibit C.

15. A list of all publications I have authored in the previous ten years is in Exhibit D.

I reserve the right to amend this report to address any additional information I receive.[1]

Dated: October 9, 2026

Melissa D. Carter

[1] I understand that there are depositions of plaintiffs' experts that may occur after the deadline for submitting this report. I intend to consider the transcripts of those depositions and to consider filing a supplemental report.

# Exhibit A

# I. Summary of Opinions

My overall opinion is that the *M.D. v. Abbott* litigation has contributed to meaningful reforms within Texas's child welfare system and particularly, within its foster care program. The litigation has produced measurable improvements in key operational and performance areas that represent meaningful gains in children's actual experiences. Where areas of challenge persist, Texas has demonstrated it has the capacity and competency to self-assess and self-correct without court supervision.

The Texas experience reflects a broader national pattern suggesting that institutional reform litigation can drive meaningful progress and important system improvements but rarely produces a child welfare system that *fully* satisfies plaintiffs' aspirations. Research coupled with the experience of dozens of jurisdictions demonstrate that institutional reform litigation may be most useful in its early stages, when it can catalyze swift change. Research and practice literature generally identify four early benefits. Institutional reform litigation may: (1) expose failures and compel attention to unsafe or under-resourced systems; (2) drive improvements in data collection and transparency to strengthen overall system competency; (3) increase resources to support staffing, placement, and services; and (4) foster opportunities for reform by offering cover for agency leaders to pursue strategies that may not receive political support otherwise.

The research is much less persuasive that court supervision resulting from institutional reform litigation, standing alone, reliably produces durable system capacity or sustained improvements in child outcomes. After that initial phase of litigation, which spans roughly the period from settlement or liability finding through the first stretch of implementation, the marginal benefits often decline while taxpayer costs continue or even increase. The marginal value of continued supervision can be assessed by examining whether the capacities and mechanisms that intensive oversight was intended to establish have become embedded within the institution. Four markers are particularly relevant: (1) increased institutional capacity, demonstrated by measurable improvements in daily operations, service

delivery, and organizational systems; (2) changes in organizational behavior, such that required practices are incorporated into routine agency operations; (3) the development of specific, measurable, agency-owned benchmarks, supported by the infrastructure necessary to sustain them, including professional standards, written policies, data systems, and internal accountability mechanisms; and (4) sufficient managerial buy-in to support implementation and continued improvement as part of ordinary agency governance. These markers do not establish a bright-line test for when supervision has ceased to be useful. Rather, they provide evidence that the institutional work for which judicial supervision is particularly well-suited—establishing capacity, changing organizational behavior, creating measurable expectations, and generating commitment to reform—has become increasingly internalized within the agency.

As Section VII explains, the record in Texas reflects these markers. Under those circumstances, continued supervision may produce progressively smaller reform benefits even as its costs persist or increase. That burden is especially pronounced when a remedial decree preserves outdated priorities, constrains adaptation through detailed process requirements, requires extensive reporting, and diverts leadership attention toward the ongoing demands of managing litigation and away from governing the child welfare system. At that point, court supervision has shifted from a reform catalyst to a mechanism for enforcing compliance, and the burden of continued oversight outweighs its remaining reform value.

The value of judicial supervision is not constant over the life of a remedial order. Because child welfare systems are shaped by constantly changing external forces, litigation cannot fully solve the underlying drivers of everchanging challenges to the system. Available research and case-specific insights indicate that the effectiveness and durability of reform depend substantially on factors outside the court order itself, including the system's ability to adapt policy and operations to changing circumstances and long-term political, fiscal, administrative, and cross-system commitment. Once a system has developed the capacity to govern, monitor, adapt, and correct itself, continued oversight and compliance-driven monitoring

contribute progressively less to performance while increasingly constraining the flexibility and adaptive capacity that effective administration requires. For this reason, institutional reform litigation, court supervision, and monitoring are best viewed as short-term accountability interventions, but are not themselves an operating model for a child welfare agency.

I explain the bases of these opinions in the sections below.

## II. Institutional Reform Litigation as a Child Welfare Reform Strategy

Institutional reform litigation emerged in the mid-twentieth century as a distinct legal strategy for addressing potential constitutional and statutory violations within public institutions, including prisons, mental health facilities, schools, and eventually child welfare systems. Rooted in the broader civil rights movement of the 1960s and 1970s, the approach seeks to restructure public systems characterized by entrenched practices and institutional resistance to reform.

In the child welfare context, institutional reform litigation gained momentum in the 1970s and 1980s as advocates increasingly challenged the conditions, practices, and outcomes of state-operated foster care systems. The *Wilder* litigation is widely regarded as one of the earliest—and perhaps the first—major child welfare class action lawsuits in the U.S.[1] The plaintiffs, represented by Children's Rights, Inc., alleged that New York City's foster care system operated in a racially and religiously discriminatory manner against non-white Protestant children in child placement in violation of the First, Eighth, and Fourteenth Amendments, and Title VI of the Civil Rights Act of 1964.[2] The case became one of the longest-running civil rights litigation disputes in U.S. history, spanning decades of litigation, consent decrees, and

[1] The litigation commenced as *Wilder v. Sugarman* ("*Wilder I*"), 385 F. Supp. 1013 (S.D.N.Y. 1974), but was survived by *Wilder v. Bernstein* ("*Wilder II*"), 499 F. Supp. 980 (S.D.N.Y. 1980). Plaintiffs sought damages and injunctive and declaratory relief to remedy constitutional and statutory violations on behalf of a certified class of "all those New York City children who are black, and who are Protestant, of other non-Catholic or non-Jewish faiths, or are of no religion, and are in need of child-care services outside their home."

[2] *Wilder I*, 385 F. Supp. 1013.

monitoring. Commenced in June 1973, the case settled before trial was to begin in August 1983.

The Stipulation of Settlement entered in the *Wilder* case in April 1987 included non-discrimination provisions but also incorporated a broader range of general provisions. The City was required not only to place children in foster care in a nondiscriminatory manner as to race and religion but also to place children generally on a "first-come, first served basis" according to the child's needs and level of care required as determined by a pre-placement evaluation.[3] The Settlement called for one or more consultants to be hired to classify or develop an alternative evaluation of the quality of foster care programs and also included provisions regarding staffing, placement waiting lists, reimbursement schemes, and recordkeeping protocols.[4] Compliance would be monitored by a three-member settlement panel.[5] Litigation in the matter continued until 1998 when the parties jointly moved to dismiss the case in deference to the more comprehensive settlement adopted in *Marisol A. v. Giuliani*.[6] In dismissing the case, Judge Ward explained that "The *Wilder* Obligations, which affect only one aspect of the child welfare system, have proven extremely difficult to implement within a system with so many other functioning areas."[7]

*Wilder* effectively created a template for class action litigation as a reform strategy in child welfare. Its key characteristics include the use of class action procedure to aggregate the claims of an entire class of children in foster care, the framing of children's rights as civil rights, and relief in the form of sweeping, court-enforced, comprehensive systemic reform.

*G.L. v. Zumwalt* (cited in later proceedings as *G.L. v. Stangler*) evolved the approach. This class action sought declaratory and injunctive relief on behalf of a

---

[3] *Wilder v. Bernstein*, 645 F. Supp. 1292, 1305 (S.D.N.Y. 1986).

[4] *Id.*

[5] *Id.*

[6] *Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152 (S.D.N.Y. 1999).

[7] *Id.* at 167.

class of children in the custody of the Jackson County Office of the Missouri Division of Family Services based on claims defendants had failed to keep them safe from harm while in foster care.[8] The consent decree, entered six years after the case was initiated, committed to securing this right by requiring defendants to establish a process for licensing foster homes, relative foster homes, and emergency foster homes.[9] It specified the qualifications of licensing workers; prescribed steps in the assessment process, standards for agency policy, and the schedule for license renewal; mandated pre-service and continuing training of foster parents in specific content areas and the development of compliant curriculum; required matching of children in foster care with foster parents according to the child's needs and preparation of the child and foster parent for placement; prohibited the use of corporal punishment; and limited the number of children who could be placed in a foster home.[10]

The decree further directed the agency's investigatory response to allegations of abuse or neglect and capped caseloads.[11] Under the terms of the order, the agency was obligated to lobby the legislature for funds to reimburse foster parents for the care of children placed with them and to satisfy standards related to worker training, the provision of medical, dental, and mental health care for children in foster care, and permanency planning.[12] Finally, defendants committed to establishing a uniform case record system to ensure the accurate maintenance of all essential information.[13] Every six months for a period of five years, defendants were required to make a written report of the extent of compliance with the decree.[14] The roadmap to reform eventually led to an exit in February 2006.

---

[8] *G.L. v. Stangler*, 873 F. Supp. 252 (W.D. Mo. 1994).

[9] *G.L. ex rel. Shull v. Zumwalt*, 564 F. Supp. 1030 (W.D. Mo. 1983).

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

*Wilder* and *G.L.* influenced a generation of class action lawsuits pursuing their model of court-enforced systemic reform. Alongside the development of case law, the enactment of the federal Adoption Assistance and Child Welfare Act of 1980 (AACWA) gave litigants a new tool: specific, codified federal standards against which state conduct could be assessed. AACWA included requirements that child welfare agencies make "reasonable efforts" to prevent the need for foster care, establish individualized case plan goals for each child in foster care, and provide periodic reviews of the family's progress in meeting the requirements of the case plan.[15] These requirements provided legal hooks that had not previously existed in federal law.[16] Before AACWA, advocates relied almost entirely on constitutional due process and equal protection arguments. But under AACWA, advocates had a specific statutory framework to support claims that system failure should be legally cognizable.

*L.J. v. Massinga* is one of the first lawsuits to directly invoke AACWA on the theory that children had enforceable rights under federal child welfare statutory law. Children in foster care sued Baltimore City child welfare officials alleging that severe understaffing, lack of medical care, and unsafe placements violated their constitutional rights and AACWA. Four years into the litigation, the parties agreed to a comprehensive, court-enforced settlement agreement requiring compliance with caseload caps, standards for timely and appropriate physical and mental healthcare, and permanency and case plan timelines.[17]

By the 1990s and 2000s, institutional reform litigation had become one of the most significant external accountability tools shaping public child welfare systems nationwide.

---

[15] Adoption Assistance and Child Welfare Act of 1980, Pub. L. 96-272, 94 Stat. 500.

[16] *See* Barbara L. Atwell, *"A Lost Generation": The Battle for Private Enforcement of the Adoption Assistance and Child Welfare Act of 1980*, 60 U. Cin. L. Rev. 593 (1992) (arguing the Adoption Assistance and Child Welfare Act creates a broader set of privately enforceable rights than courts have recognized, and that private enforcement is necessary for the Act's protections to be meaningful).

[17] *L.J. ex rel. Darr v. Massinga*, 699 F. Supp. 508 (D. Md. 1988).

## III. Applicability of the Institutional Reform Literature to Structural Injunctions

A threshold point regarding terminology and the scope of the available literature is warranted. Much of the empirical, policy, and practice literature examining long-term federal court supervision of public institutions focuses on cases resolved through consent decrees or negotiated settlement agreements. This distinction raises a methodological question for purposes of this report: to what extent can research and experience concerning consent decree litigation inform an assessment of institutional reform conducted through a court-imposed injunction?

To the extent the distinction matters, it matters principally with respect to how the remedial framework is established rather than the assessment of the framework's effectiveness or the determination of whether and when court supervision should end. Once long-term implementation and judicial supervision begin, consent decrees and injunctive decrees share many of the features most relevant to evaluating the effectiveness and durability of institutional reform. Both may establish detailed affirmative obligations, performance measures, monitoring and reporting structures, continuing judicial oversight, mechanisms for determining compliance, and conditions for termination. Both also confront the same central implementation challenge, that of translating court-enforceable requirements into institutional capacity and practices capable of producing and sustaining the intended outcomes.

The discussion that follows therefore explains why the substantial body of research and practice literature concerning consent decrees remains relevant to evaluating the dynamics of long-term court-supervised institutional reform in this case.

## IV. The Landscape of Child Welfare System Reform Litigation

In 2022, the Barton Child Law and Policy Center (Barton Center) at Emory Law School received national philanthropic support to develop and apply a systematic methodology for identifying and compiling the records of child welfare class action lawsuits. Over the following four years, this work produced a comprehensive

database of child welfare class actions, which documents the modern history of child welfare and foster care class action litigation beginning with *Wilder* in 1973. The database enables an ongoing analysis of the child welfare litigation landscape and provides a foundation for both empirical research and technical assistance to states. My principal research agenda using this resource examines the extent to which institutional reform litigation is an effective strategy for achieving and sustaining systemic change in public child welfare systems.

At present, the database contains legal pleadings, monitoring reports, court orders, and other litigation materials from 77 cases, including this case, *M.D. v. Abbott*. Of these, 63 follow the institutional reform model reflected by the first-generation cases such as *G.L.* and early second-generation cases such as *L.J.*: class actions brought by or on behalf of children in foster care, alleging violations of constitutional and statutory rights, and seeking comprehensive systemic reform.

These cases provide an unusually rich longitudinal record of court-supervised child welfare reform. Collectively, they permit examination not only of the conditions that prompted judicial intervention and the reforms required in response, but also of how remedial frameworks evolve over time, how compliance is defined and measured, how long court supervision persists, and what conditions ultimately favor the termination of court oversight.

The cases in the Barton Center database permit several general observations about the duration, cost, and trajectory of court-supervised child welfare reform.

First, institutional reform litigation is typically a long-term intervention. For jurisdictions that have successfully exited court supervision, the litigation and remedial process have generally extended across multiple gubernatorial administrations, agency leadership teams, budget cycles, and generations of agency personnel. That duration describes how long these cases have lasted, not how long supervision must last to be effective. As Section V explains, the evidence of litigation's value is strongest for the immediate changes a remedy compels.

Second, this prolonged oversight entails substantial public investment. The direct costs of litigation, including attorneys' fees, monitoring expenses, expert and

consulting fees, and related costs are difficult to isolate and calculate consistently across jurisdictions. Published estimates suggest, however, that these cases can generate substantial direct transaction costs. The documented litigation and oversight expenditures range from several million dollars to tens of millions over the life of a case.[18] These expenditures do not capture the considerably larger programmatic investments that may be required to implement the remedy. Available case-specific data demonstrate that early remedial expenditures to develop infrastructure that did not previously exist, including additional workers, information systems, placement capacity, quality assurance mechanisms, training systems, and management processes also can reach tens of millions of dollars over the life of a case.

The substantial public investment required by court-supervised reform warrants careful assessment of whether court supervision has produced meaningful improvements in outcomes for children and families. Five decades of experience suggest that institutional reform litigation can catalyze important, swift change, but it is ill-suited to achieve sustained transformation of child welfare systems on its own. Whether those changes develop into durable institutional capacity depends not only on implementation of the court-ordered remedy, but also on factors that lie beyond the scope of the litigation, including fiscal conditions, workforce and provider capacity, agency leadership, legislative and executive action, and everchanging needs of the population that is served.

## V. Effectiveness and Durability of Court-Supervised Child Welfare Reform

The research literature evaluating institutional reform litigation in child welfare is considerably smaller than the prevalence and duration of the litigation might suggest. Much of the literature consists of qualitative case studies, practitioner

---

[18] For example, defense costs *alone* exceeded $23 million before long-term implementation in the Oregon *Wyatt B.* litigation. In Georgia's *Kenny A.* case, plaintiffs were awarded roughly $11.36 million in attorneys' fees. And Mississippi reports that more than $25 million in legal fees has been spent over the life of the *Olivia Y.* litigation.

assessments, doctrinal scholarship, and descriptive analyses of individual consent decrees. Relatively few studies employ quantitative methods, comparative designs, or longitudinal outcome data, and fewer still examine how jurisdictions perform after judicial supervision has ended. These limitations require distinguishing among three related but analytically different questions: (1) whether litigation changes the operation of child welfare systems while judicial supervision is active; (2) whether those changes improve conditions responsible for constitutional harm, including outcomes experienced by children; and (3) whether improvements achieved during court supervision endure after judicial oversight ends.

These questions reflect the causal premise underlying institutional reform remedies, and the available evidence counsels against treating compliance, effectiveness, and durability as equivalent measures of reform. Compliance asks whether a jurisdiction has satisfied the requirements of the remedial framework. Effectiveness asks whether the changes that the framework required have reduced the systemic conditions and risks that the remedy was designed to address. Durability asks whether those improvements have been institutionalized and supported sufficiently to persist and adapt without continued judicial supervision.

The research literature suggests that institutional reform litigation is, at best, an inconsistent and highly contingent mechanism for sustainable child welfare system reform. While some studies identify limited or short-term gains under certain conditions, the broader body of research does not support prolonged judicial oversight as a reliably effective strategy for achieving durable system transformation. Improvements achieved during litigation are rarely sustained because of a remedial order itself. Rather, durable process more often is attributable to parallel investments in leadership, organizational capacity, and policy alignment.

### A. Does litigation change systems while supervision is active?

The evidence is reasonably strong that litigation may incentivize substantial changes in agency structures, resources, processes, and practices at the outset of judicial supervision, although the evidence that litigation itself caused such changes is more limited. Across case studies and empirical research, court-supervised reform

is associated with changes in precisely the institutional conditions that remedial orders directly regulate: caseloads, staffing, funding, training, monitoring, data collection, service delivery, and administrative practice.

Mezey's study of the *B.H.* litigation in Illinois describes litigation as a catalyst for significant institutional change.[19] During implementation, Illinois increased funding, reduced caseloads, and improved access to health care. As the case continued, however, further implementation was disrupted by a budget crisis, layoffs, repeated changes in agency leadership, political opposition, and disagreement about the effectiveness of monitoring. Mezey therefore reaches a measured conclusion: litigation produced real gains but fell short of the comprehensive systemic transformation originally envisioned. Successful implementation depended not only on the decree, but also on sustained leadership, an engaged court, an effective monitor, and political support.

Gainsborough's cross-state quantitative study provides an important qualification.[20] Examining state policymaking from 2002 through 2004, she found that recent consent agreements did not independently predict increased child welfare expenditures after controlling for prior spending. More broadly, apparent effects of litigation varied with political leadership, legislative capacity, administrative structure, and existing fiscal commitments. Her findings reinforce a recurring theme in the literature: litigation can create legal pressure, political attention, and incentives for institutional action, but such litigation operates within a larger governmental system that determines whether those pressures can be converted into operational capacity.

The *G.L.* case study by Borgersen and Shapiro reaches a compatible conclusion while operating under a different methodological perspective. The authors examined whether a litigation strategy emphasizing collaboration, substantive expertise, and

---

[19] Susan Gluck Mezey, *Systemic Reform Litigation and Child Welfare Policy: The Case of Illinois*, 20 Law & Pol'y 203 (1998).

[20] Juliet F. Gainsborough, *Scandals, Lawsuits, and Politics: Child Welfare Policy in the U.S. States*, 9 State Pol. & Pol'y Q. 325, 325–55 (2009).

local ownership could catalyze long-term systemic reform.[21] They concluded that litigation was most effective when combined with strategies capable of sustaining the direction of change, including partnerships between advocates and government, meaningful participation by parents and children, and continuing involvement by experts and community leaders. Mushlin's earlier account of the same litigation likewise emphasized litigation's capacity to establish enforceable minimum standards, generate public attention, and provide administrators leverage to obtain resources, while recognizing the limitations of litigation as a stand-alone reform strategy.[22]

The literature therefore supports a relatively confident, but bounded, conclusion on this first inquiry. Court supervision can compel or accelerate observable institutional change, particularly with respect to matters directly measured and enforced by the remedial order. The evidence is less clear that litigation independently creates the underlying governmental capacity needed to produce those changes.

### B. Does litigation improve the conditions that generated constitutional harm?

The evidence on this second question is more limited and mixed. This is partly a measurement problem. Many remedial requirements address conditions believed to create or exacerbate constitutional risk rather than constitutional harm itself. Reduced caseloads, timely investigations, appropriate placements, regular caseworker contact, and access to services may serve as important evidence that conditions contributing to constitutional risk are improving. But the available research does not establish a consistent causal relationship between court supervision and improved child outcomes across domains or jurisdictions.

---

[21] Ellen Borgersen & Stephen Shapiro, G.L. v. Stangler: *A Case Study in Court-Ordered Child Welfare Reform*, 1997 J. Disp. Resol. 189, 189–240 (1997).

[22] Michael Mushlin et al., *Court-Ordered Foster Family Care Reform: A Case Study*, 65 Child Welfare 141 (1986).

Ryan and Gomez's four-state analysis of Alabama, Kansas, New Mexico, and Utah illustrates this distinction.[23] Their study examined whether litigation-related financial investment corresponded with improvements in child welfare outcomes during and after litigation. Child welfare budgets increased substantially in all four states during litigation, but outcome trends were mixed. These findings therefore caution against assuming a direct causal progression from litigation to increased resources to improved outcomes. The authors also question the fiscal efficiency of litigation where substantial resources are devoted to legal and monitoring costs that might otherwise support direct services, staffing, or other system capacity.

Mixed downstream performance is important evidence, but it does not by itself show that more supervision is needed. What matters is whether the state has institutionalized the necessary reforms. Varied outcomes can reflect incomplete implementation, an imperfect causal link between particular remedial requirements and child outcomes, or conditions outside the scope of the litigation or beyond the court's control. Child welfare outcomes depend not only on agency practices but also on broader system capacity, resource availability, external workforce and fiscal conditions, policy choices, and changes in the characteristics and needs of the population served.

### C. Are improvements durable after judicial supervision ends?

The evidence on durability is limited. Available studies raise questions about whether gains achieved during litigation persist after judicial supervision ends, but the research base is too limited to support a categorical conclusion that improvements either do or do not endure.

Durability is inherently more difficult to study. It requires longitudinal observation after jurisdiction has ended, a sufficiently long post-exit period to distinguish temporary fluctuation from deterioration, and some method of separating the withdrawal of judicial supervision from contemporaneous changes in leadership,

---

[23] Tiffany N. Ryan & Rebecca J. Gomez, *Trends in State Budgets and Child Outcomes During and Post Child Welfare Class Action Litigation*, 62 Child. & Youth Servs. Rev. 49 (2016).

funding, economic conditions, policy, population needs, and other external factors. Few studies satisfy those requirements.

Ryan and Gomez provide the most direct comparative evidence. Their four-state study was deliberately limited to jurisdictions that had exited litigation sufficiently early to permit at least seven years of post-litigation observation. Child outcomes followed no uniform post-exit trajectory.[24] This finding is important because it does not support a simple narrative of either durable success or post-exit collapse. Rather, different measures and jurisdictions follow different trajectories.

Their companion qualitative study helps examine that variation.[25] Stakeholders identified leadership, funding, organizational culture, data systems, and continuing accountability structures as important determinants of whether reforms survived the end of judicial supervision. The study accordingly suggests that durability depends less on the continuing force of the lawsuit itself than on whether reforms become institutionalized in the ordinary operation and governance of the child welfare system. Borgersen and Shapiro similarly emphasize collaboration, substantive expertise, local ownership, and complementary reform strategies as conditions supporting lasting change.[26]

### D. Overall Assessment

The research becomes progressively less conclusive across the three questions. Evidence is strongest that institutional reform litigation can spur changes to systems at the outset of judicial supervision, particularly with respect to upstream structures and processes directly governed by remedial orders. Court supervision itself may supply mechanisms that may not have existed in the ordinary administration of a system, including external accountability, sustained attention, monitoring, and sometimes political leverage for funding or policy change. Evidence is more limited

[24] *Id.*

[25] Tiffany N. Ryan & Rebecca J. Gomez, *What Does It Take to Close a Comprehensive Child Welfare Systems Reform Lawsuit? A Case Study Approach*, 41 Human Service Organizations: Management, Leadership & Governance 252-274 (2017).

[26] *Supra* note 21.

and mixed concerning whether those changes remedy the conditions that produce constitutional risk and improve downstream child outcomes. Evidence is weakest concerning whether prolonged court supervision produces durable improvements.

The differences in the strength of the evidence across these three inquiries also suggest an important limitation in what institutional reform litigation is designed to do. Courts may be comparatively well positioned to identify unlawful conditions, impose affirmative obligations on a defendant agency, require measurable changes in agency operations, and enforce those requirements over time. Those mechanics correspond closely to the types of upstream changes for which the research evidence is the strongest. Whether those changes reliably produce better downstream outcomes for children and whether improvements persist under changing conditions after judicial supervision ends depend increasingly on organizational capacity, adaptation, and forces beyond the direct reach of the remedial order and the court's control.

The empirical findings therefore lead to a broader question about the structure of institutional reform litigation as a strategy for transformative system change. The same features that make litigation effective at compelling institutional action—externally imposed requirements, defined performance measures, monitoring, and enforcement—do not necessarily equip an institution to respond to the dynamic and interdependent conditions that determine child welfare outcomes over time. Understanding this distinction requires considering the remedial order against the nature of the system it seeks to reform.

## VI. The Structural Limitations of Institutional Reform Litigation as a Strategy for Transformative System Change

Institutional reform litigation originated as a means of enforcing rights against entrenched public institutions and compelling structural change where ordinary mechanisms of political and administrative accountability had failed.[27] Its remedial

---

[27] *See* Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds*, 117 Harv. L. Rev. 1015 (2004).

logic necessarily focuses on the defendant institution: identify the conditions producing the legal violation, specify the changes required to remedy those conditions, monitor implementation, and enforce compliance.

That model is well suited to *some* dimensions of institutional reform. It can establish minimum standards, require changes in agency operations, direct attention and resources toward identified deficiencies, and create accountability where ordinary administrative mechanisms may be inadequate. As the research discussed above demonstrates, these are also the dimensions of reform for which the evidence of litigation's effectiveness appears strongest.

The limitations of the model become more apparent, however, as the objective moves from compelling institutional changes to producing and sustaining complex child and family outcomes. The distinction arises in significant part from the nature of the system being reformed. A public child welfare agency is not a closed institution in which outcomes are determined solely by the policies, practices, and resources within the agency's control. It operates as an open system—a dynamic environment continuously shaped by external social, geographic, political, legal, economic, and institutional forces.

The agency depends upon and interacts with state courts, legislatures, executive agencies, schools, health care providers, law enforcement, behavioral health systems, housing systems, and community-based organizations. Decisions and conditions within any of these systems can materially affect child welfare practice and outcomes. Housing availability, Medicaid policy, judicial decision-making, and behavioral health capacity, for example, can affect placement stability, access to services, and rates of family separation. Child welfare agencies also depend heavily on external resource flows, including federal Title IV-E and IV-B funding, Medicaid reimbursements, state appropriations, and networks of contracted private providers. Workforce conditions, service availability, and placement capacity therefore depend not only on agency management but also on labor markets, provider networks, fiscal conditions, and government funding decisions.

The environment in which child welfare agencies operate is also continuously changing. Critical incidents such as child fatalities, media scrutiny, shifts in federal policy and economic conditions, litigation, and changes in political or agency leadership can alter priorities, resources and appropriated funding, and operational behavior. At the same time, agency performance is shaped by broader social conditions, including poverty-related family instability, trauma, behavioral health needs, substance use, and other forms of individual, family, and community adversity that cannot be resolved through agency administration alone.

This open-system character places an important limit on what institutional reform litigation can accomplish directly. A court can require the defendant agency to change matters within the reach of the remedy: staffing, caseloads, investigations, caseworker contacts, placement practices, service coordination, data systems, quality assurance, and other aspects of agency operation. It cannot exercise comparable control over many of the external conditions that affect whether those reforms ultimately produce better outcomes for children. The remedial framework therefore necessarily governs only part of the causal system responsible for the outcomes it seeks to improve.

This helps explain both the mixed downstream performance identified in the research and the difficulty of sustaining reform over time. Improving conditions within the defendant agency may be necessary to remedy constitutional deficiencies without being sufficient, by itself, to produce every desired child outcome.

Against this background, the limitations of a predominantly command-and-control remedial model become clearer. Many first-generation and some later child welfare institutional reform cases employed this approach, translating complex, relational, and contested system deficiencies into auditable metrics. Such remedies may require the agency to hire a specified number of caseworkers, maintain caseloads below a prescribed ratio, complete investigations within a particular timeframe, provide designated training, or follow specific case planning procedures. The court then measures and assesses compliance with those requirements.

This approach has, in part, an important advantage—it converts broad institutional deficiencies into concrete obligations that can be measured and judicially enforced. But the same specificity that facilitates accountability can become limiting when compliance with prescribed requirements becomes a substitute for assessing whether the institution has developed the capacity to produce and sustain the intended results. The principal critiques of command-and-control approaches can therefore be understood as different manifestations of the same underlying problem—the difficulty of governing an open, adaptive system through a necessarily bounded and externally administered remedial framework:

- Process measures may become disconnected from outcomes. The relevant concern is not that the process measures necessarily measure the "wrong" things, but that they measure only particular points in the causal chain and can become imperfect proxies for the outcomes the remedy ultimately seeks to influence.
- Prescription can constrain adaptation and professional judgment. Detailed requirements can appropriately establish minimum practice standards. Over time, however, highly prescriptive requirements may limit the ability of administrators and frontline professionals to respond to changing circumstances, emerging evidence, or individual family needs. The risk is that organizational attention becomes directed toward reproducing the practices necessary to demonstrate compliance under an outdated model rather than continually determining whether that model remains the most effective means of achieving the underlying objective.
- A fixed remedial framework may become increasingly disconnected from a changing system. Institutional reform litigation often extends for many years. During that period, agency leadership, populations served, provider markets, funding structures, technology, federal and state policy, and accepted professional practices may change substantially. Requirements designed to address conditions existing when the remedy

was entered may consequently become less diagnostic of the system's contemporary strengths and deficiencies. This can also complicate exit when termination depends upon the sustained satisfaction of detailed requirements developed around an earlier operating environment.

- The remedy cannot encompass the entire causal environment. Litigation necessarily locates legal responsibility in the defendant institution and judicial relief must operate within the boundaries of that responsibility. Yet many determinants of child welfare outcomes lie elsewhere. A remedial order directed at the child welfare agency cannot itself control labor market conditions, expand the workforce, or determine adjacent policies. It can require the agency to respond differently to the consequences of those conditions, but it cannot directly govern all the conditions producing them. The gap between the scope of the remedy and the scope of the system becomes increasingly important when downstream outcomes are used to evaluate the success of reform.
- External monitoring cannot fully reproduce institutional knowledge and learning. Judicial supervision necessarily relies heavily on aggregate data, documentary evidence, compliance reviews, and the observations of monitors, counsel, experts, and the court. Those sources provide valuable independent accountability, but they do not necessarily capture all the contextual and relational information available to caseworkers, supervisors, families, providers, and local administrators.

These limitations do not mean that process requirements, monitoring, or external enforcement are necessarily ineffective. The research demonstrates that they can be effective at spurring institutional action and establishing minimum performance expectations. The more difficult question is whether the remedial framework designed principally to compel and verify compliance also develops the internal capacity for learning, adaptation, and self-correction necessary for the institution to maintain adequate performance as conditions change.

That distinction has important implications for both the design and duration of court supervision. The objective of institutional reform cannot be to eliminate the need for institutional adaptation by specifying in advance every practice necessary for future compliance. Rather, durable reform ultimately requires a system capable of responding to conditions that neither the parties nor the court could fully anticipate when the remedy was entered. Independent of how many remedial requirements remain unsatisfied, the continuing value of judicial supervision may also be measured by whether continued external control is contributing to—or potentially constraining—the defendant institution's capacity to assume responsibility for ongoing improvement and adaptation.

## VII. Assessment of Texas's Performance and Progress Under the *M.D. v. Abbott* Injunction

Taken as a whole, the eleven Monitors' Reports document substantial improvement in Texas's child welfare system. The record is not one of exclusively continuous or "perfect" compliance, but that is hardly unusual. The experience of jurisdictions operating under long-term federal court supervision is generally one of mixed performance, with monitoring records documenting substantial improvements in some areas alongside persistent deficiencies, uneven implementation, and occasional periods of regression. Child welfare systems do not progress linearly toward a fixed state of compliance in which all deficiencies disappear or, once corrected, remain permanently resolved.

Against that backdrop, the relevant longitudinal question is not whether Texas has eliminated every deficiency identified through monitoring, but whether the system has materially changed from the conditions that gave rise to federal court intervention. On that measure, the systemwide record as reflected in the later Monitors' reports demonstrates that the system has materially improved compared to the system reflected in the earliest reports. Texas has moved to a system in which operational infrastructure to sustain performance is established, core process

measures perform at high levels, and several early deficiencies have been eliminated or substantially reduced.

This evolution changes the assessment of the continuing value of judicial supervision. Court oversight can serve an important function when an agency or system lacks basic safeguards, accountability mechanisms, or the capacity to identify and correct systemic failures. But the benefits of supervision are not constant over the life of a remedial order. A system, like Texas's, that has established the capacity to govern, monitor, adapt, and correct itself operates in a fundamentally different way than the system whose deficiencies originally manifested in court intervention. As those capacities develop, the needs of the system also change. Effective administration increasingly depends on flexibility, organizational learning, and the ability to respond to changing conditions and emerging risks. Those needs come into tension with prolonged judicial oversight and compliance-driven monitoring, which necessarily focus agency attention and resources on court-defined requirements and predetermined measures of performance rather than the real-time needs of the state. In that context, continued judicial supervision may contribute progressively less to system performance while increasingly constraining the flexibility and adaptive capacity necessary to manage the system as a whole.

Some of the clearest gains in Texas concern the institutional infrastructure necessary to perform basic child welfare functions reliably. Texas has developed or strengthened screening protocols, investigative procedures, caseload standards, caseworker-notification processes, information collection and sharing specific to children's sexual safety, regulatory history reviews, heightened monitoring, and systems for tracking the timeliness and completion of investigations. These changes are significant not simply because they satisfy explicit requirements of the injunction, but because they represent the development of organizational capacity. Organizational capacity is reflected in the development and routine operation of Texas's standardized processes for identifying risk, communicating critical information, allocating workload, monitoring performance, and responding effectively when problems arise.

Several features of the monitoring record suggest that these changes have become institutionalized rather than remaining temporary responses to individual compliance findings. The required practices have been incorporated into routine agency workflows, information systems, training, supervisory structures, and quality control mechanisms; they operate across large numbers of cases and employees; and, in several areas, performance has remained high across successive monitoring periods. For example, graduated caseload conformity now exceeds 98% across the measured stages, training has been institutionalized, regulatory history reviews have progressed from being performed in only a minority of applicable inspections to becoming routine, documentation practices are more reliable and consistent, and multiple investigation measures now perform consistently in the mid-to-high 90% range. These are characteristics of a system that is capable of producing reliable performance at scale, rather than demonstrating isolated instances of compliance.

This distinction is important to assessing both the competence of the system and the durability of reform. A competently administered child welfare system cannot be defined as one in which errors or adverse outcomes never occur. Rather, institutional competence is reflected in the existence and routine operation of mechanisms capable of identifying risk, carrying out core functions consistently, detecting deviations, generating reliable information about performance, and correcting problems when they occur. The development of those capabilities is particularly important in an open system, where the agency must continually respond to changes in conditions it does not fully control. Because continuing accountability structures initially compelled by the injunction have become embedded in ordinary agency operations and supported by internal systems for supervision, measurement, and corrective action, Texas has developed capacity that is not inherently dependent upon the continuing presence of the court.

The monitoring record also documents substantial improvement in actual measured performance, not merely adoption of policies or creation of new administrative processes. Investigative quality is among the clearest examples. In the First Report, nearly 29% of reviewed investigations contained substantial

deficiencies.[28] By the Eleventh Report, the Monitors found 94% of 705 reviewed abuse and neglect investigations to be appropriately conducted and resolved.[29] Screening performance was similarly strong. The Monitors agreed with the State's decision not to refer a matter for an abuse or neglect investigation in 97% of reviewed referrals.[30] Compliance with minimum standards investigations (Remedial Orders 12-17) also reflects structural improvement. The Monitors' Tenth Report documents that 94% of Priority Two minimum standards investigations included face-to-face contact with all alleged child victims within 72 hours of intake, and 98% of Priority One and Priority Two minimum standards investigations were completed within prescribed timeframes.[31] Timely documentation of those critical safety actions was reported to be at 97% and above.[32]

The remaining challenges are increasingly concentrated in consistent execution, variation among regions and contractors, the exercise of professional judgment, and the connection between established processes and actual safety outcomes. Those challenges implicate the limits of institutional reform litigation identified in the research literature. The fact that an improved system may continue to experience individual failures or mixed downstream outcomes does not, standing alone, establish that the structural reforms compelled by the injunction have been ineffective. The more relevant inquiry is whether the State has developed the institutional capacity to identify, respond to, learn from, and correct those deficiencies as conditions change.

The eleven Monitors' reports provide substantial evidence of institutional progress. They document a progression from initial implementation to

[28] First Court Monitors' Report 2020 at 16, 20, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (S.D. Tex. June 16, 2020), ECF No. 869.

[29] Eleventh Court Monitors' Report 2026 at 8, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (S.D. Tex. June 22, 2026), ECF No. 1659.

[30] *Id.*

[31] Tenth Court Monitors' Report at 137–38.

[32] *Id.* at 139.

institutionalization of core safeguards, to refinement of the quality and consistency with which those safeguards are used. The later monitoring record therefore demonstrates that Texas's child welfare system operates today within a substantially changed administrative environment compared to the period in which *M.D. v. Abbott* was initiated fifteen years ago. For this reason, continued court oversight is unlikely to produce substantial additional gains.

## VIII. Conclusion

Texas's track record of performance under the injunction shows material improvement at the outset of judicial supervision supported and followed by institutionalized reforms. Now that the reforms are embedded in the institution and have yielded compliance across multiple reporting periods, the extensive cost of judicial oversight has diminishing returns and may even hinder continued progress to Texas's child welfare system. Both of these features are consistent with national patterns I have observed through my research on foster care institutional reform litigation across the United States.

Long-running remedial orders frequently generate extensive reporting records documenting both substantial improvement and continuing deficiencies. That pattern should not be understood as evidence that reform has failed. Child welfare systems do not progress linearly toward a fixed state of compliance in which all deficiencies disappear. As open systems, they operate in changing environments, confront recurring and emerging risks, and depend upon institutions, resources, and conditions that extend well beyond the defendant agency's direct control. A lengthy monitoring record can therefore reflect the continuing complexity of administering a child welfare system as much as it reflects the effectiveness or ineffectiveness of the underlying reforms.

The Texas child welfare system operating today and described in the later Monitors' reports has materially improved compared to the system documented in 2011 when the case was initiated. In my opinion, the longitudinal record demonstrates that Texas has developed the operational and organizational capacity

reasonably necessary to administer the functions addressed by the injunction and to pursue the safety objectives underlying it outside the framework of prolonged judicial supervision.

# Exhibit B

# Melissa D. Carter

Emory Law School | 1301 Clifton Road, Atlanta, GA
melissa.d.carter@emory.edu | meliscarter@gmail.com

## ACADEMIC APPOINTMENTS

**Emory University School of Law** *Atlanta, GA*
*Clinical Professor of Law* 2010 - present

Courses taught: Family Law I, Family Law II, Child Welfare Law & Policy, Policy Clinic (Juris Doctor, Master of Social Work, Master of Public Health Students), Legislative Advocacy Clinic (Juris Doctor, Master of Social Work, Master of Public Health students), Legislative Advocacy (Master of Legal Studies students)

*Executive Director*, Barton Child Law & Policy Center 2010 - present

Directed administration and strategic oversight of a $5.9 million portfolio of federal funding, state contracts, and grants from national and family foundations. Managed full lifecycle of funding, including proposal development, budgeting, compliance, reporting, and funder engagement; aligned resources to sustain staff, programmatic initiatives, and core operations of a clinical program.

**Morehouse School of Medicine**
**Department of Psychiatry and Behavioral Sciences** *Atlanta, GA*
*Adjunct Clinical Professor* 2018 - present

## SELECTED RESEARCH and PROGRAM GRANTS

**Family Advocacy Project** (2025-2027)
*Principal Investigator*
Received $131,000 (Georgia Opioid Abatement Trust/Wellroot Family Services) to address upstream legal and practical challenges leading to unnecessary child welfare system involvement.

**Emory Summer Child Advocacy Program** (2015-2026)
*Principal Investigator*
Secured ~ $100,000 annually (Children's Justice Act) to design and lead a 10-week interdisciplinary internship program preparing professional and graduate students for careers in child welfare.

**Justice Fund of Georgia** (2026-2027)
*Principal Investigator*
Awarded $25,000 (United Way of Greater Atlanta) to advance statewide youth justice system reform through the Barton Center.

**Father Legitimation** (2024-2026)
*Principal Investigator*
Led $150,000 (Annie E. Casey Foundation) initiative to build public will, co-develop policy solutions, and strengthen advocacy capacity around legitimation law reform

**Youth Advocacy Initiative (2024- )**
*Principal Investigator*
Directed $225,000+ (Conrad N. Hilton Foundation/United Way) to build policy infrastructure supporting improved outcomes for transition-age youth in Georgia's foster care system.

**Child Welfare Class Action Litigation / Foster Care Consent Decree Report** (2023-2026)
*Principal Investigator*
Managed $30,000 annually (Casey Family Programs) to track national child welfare litigation, produce a widely used report, and support development of research database.

**Impact Litigation as a Tool for Child Welfare System Reform** (2023-2026)
*Principal Investigator*
Led $250,000 (Conrad N. Hilton Foundation) research evaluating litigation as a strategy to improve outcomes for transition-age youth in foster care.

**Youth Justice Convening** (2024)
*Principal Investigator*
Directed $150,000 (Public Welfare Foundation) to design and host a statewide convening advancing policy and practice for system-impacted youth.

**Child Well-Being Initiative (Georgia Child Welfare Collaboratory)** (2022-2025)
*Principal Investigator*
Managed $236,000 (Joseph B. Whitehead Child Well-Being Fund) to build cross-sector partnerships and develop upstream strategies to prevent family separation.

**System Supports Impacting Youth in Georgia's Foster Care System** (2022-2024)
*Principal Investigator*
Led $227,000 (Conrad N. Hilton Foundation) portfolio analyzing policy impacts on outcomes for transition-age youth in foster care and evaluating class action litigation as a reform tool.

**Preventive Legal Advocacy** (2022)
*Principal Investigator*
Secured $169,000 (Casey Family Programs) to build national infrastructure promoting legal advocacy to prevent unnecessary family separation.

**Sparking Systemic Change** (2020-2022)
*Subrecipient*
Co-led $128,000 (Novo Foundation) initiative addressing commercial sexual exploitation through systems reform, capacity-building, and evaluation.

**Three-Branch Engagement / Family First** (2018, 2019, 2020, 2021)
*Principal Investigator*
Managed $164,000 (Casey Family Programs) to support Georgia's implementation of the Family First Prevention Services Act through research and stakeholder engagement.

**Trauma-Informed Court** (2014-2016)
*Principal Investigator*
Directed $202,800 (Casey Family Programs) to develop trauma-informed juvenile court practices and protocols.

**Georgia Inside/Outside Child Welfare Strategy** (2015-2016)
*Principal Investigator*
Led $60,000 (Annie E. Casey Foundation) to build a statewide advocacy coalition advancing kinship care policy.

**Youth Based Healthcare** (2013)
*Principal Investigator*
Managed $38,000 (Casey Family Programs) to research and develop guidance on healthcare decision-making for children and youth in foster care.

**Monitoring Psychotropic Medication Use in Children and Youth in Foster Care** (2011)
*Principal Investigator*
Led $65,000 (Casey Family Programs) collaboration with the clinical faculty at the Emory University School of Medicine to institutionalize independent clinical review of psychotropic medication use in foster care.

**SELECTED PUBLICATIONS**

Melissa D. Carter & Christopher G. Hempfling (2026) "Measured Results in Georgia's Kenny A. Foster Care Consent Decree: A Framework for Assessing the Strategic Effectiveness of Institutional Reform Litigation," 13 Child & Fam. L.J.

Melissa D. Carter (2023) "Federal Child Welfare Legislation" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).

Melissa D. Carter (2023) "Achieving Large-Scale Change Through Systems Advocacy" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).

Joshua Gupta Kagan, Christopher Church, Melissa Carter, Vivek Sankaran, & Andy Barclay (2023) "The New Orleans Transformation: Foster Care as a Rare, Time-Limited Intervention," 27 LEWIS & CLARK L. REV 417.

Melissa D. Carter, Dr. Nicole Cotton, & Dr. Courtney McMickens (2021) "Structural Violence with Child Welfare Systems," 51 PSYCHIATRIC ANNALS 11.

Melissa D. Carter, Christopher Church, & Vivek Sankaran (2022) "A Quiet Revolution: How Judicial Discipline Essentially Eliminated Foster Care and Nearly Went Unnoticed," 12 COLUM. J. RACE L. 1.

Melissa D. Carter (2022) "An Ounce of Prevention is Worth a Pound of Cure: Why Children's Lawyers Must Champion Preventive Legal Advocacy," 42 CHILD LEGAL RTS J. 1.

Melissa D. Carter & Courtney McMickens (2020) "A Matter of Family: Finding Justice Within the Child Welfare System" in SOCIAL (IN)JUSTICE AND MENTAL HEALTH (Ruth Shim and Sarah Vinson, eds.). 1st edition, American Psychiatric Association Publishing, Washington, D.C.

Melissa D. Carter (2020) "Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia," 54 GA. L. REV., 1133.

Melissa D. Carter (2020) "The Need for a Prevention Throughline in Family Policy," CHILDREN'S BUREAU EXPRESS, (Apr. 2020) (invited short article).

Melissa D. Carter (2019) "Pursuing the Best Interest of Children," CHILDREN'S BUREAU EXPRESS (Nov. 2019) (invited short article).

Melissa D. Carter (2017) "Beyond the Courtroom: A Plea and a Plan for Children's Attorneys to Engage in Policy Advocacy," THE GUARDIAN, National Association of Counsel for Children (Fall 2017).

Melissa D. Carter, Christopher E. Church & Thomas B. Hammond (2015) "Kinship Care: A Child's Home Away from Home," in THE KINSHIP PARENTING TOOLBOX 59-63 (Kim Phagan-Hansel ed., EMK Press).

Contributor, Mark H. Murphy, GEORGIA JUVENILE PRACTICE AND PROCEDURE, Ch. 1:9, 2013-2014 ed.

Melissa D. Carter (2013) "Medicating Trauma: Improving Prescription Oversight of Children in Foster Care," 46 CLEARINGHOUSE REV. J. OF POVERTY L. AND POL'Y 9-10, 398.

Hon. Steven C. Teske & Melissa Dorris Carter (2007) "The Next Generation of Child Advocacy," 13 GA. BAR J. 1, 22.

Beth Locker & Melissa Dorris (2004) "A Child's Right to Legal Representation in Georgia Abuse and Neglect Proceedings," 10 Ga. Bar J. 1, 12.

Melissa J. Dorris (2003) "Federal Oversight and Private Actions: Maintaining a Balance in Rights Enforcement of Federal Child Welfare Legislation," 23 CHILD. LEGAL RTS. J., 23.

## OP EDS

Melissa Dorris Carter & Andrew Barclay, "We Want Kids to Grow Up in Safe Families, so Let's Measure That," CHRONICLE OF SOCIAL CHANGE, Nov. 6, 2018.

Melissa Dorris Carter & Andrew Barclay, Op-Ed, "Privatizing is Not a Proven Reform Plan," ATLANTA JOURNAL-CONSTITUTION, Feb. 20, 2014.

Melissa Carter, Op-Ed, "Child Protection's a Responsibility For All," ATLANTA JOURNAL-CONSTITUTION, Nov. 2, 2013.

## AMICUS BRIEFS

*In re D.B.*, Supreme Court of Georgia (2026)
*In re E.F. & C.F.*, Supreme Court of Georgia (2025)
*In re C.C.,* Supreme Court of Georgia (2022)
*In re W.L.H.,* Supreme Court of Georgia (2012)

## CONGRESSIONAL TESTIMONY

U.S. Senate Committee on the Judiciary, Subcommittee on Human Rights and the Law, *The Human Rights of Foster Children*, (Oct. 25, 2023) (written statement for the record). https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.

## SELECTED PRESENTATIONS

*Making Policy Stick: Turning Federal Child Welfare Policy into Stronger Advocacy and Courtroom Practice,* National Association of Counsel for Children Annual Conference, Portland, OR, August 2026.

*Navigating Change: Child Advocacy in a Shifting Child Welfare Landscape*, Reaching Teens Summit, Duluth, GA, February 2026.

Presented testimony on the Georgia's child welfare system outcomes, financing, and practical impacts, at the Joint Hearing of the House Appropriations Human Resources Subcommittee and House Judiciary Juvenile Committee, Atlanta, GA, (December 18, 2025).

*Navigating the Future: State Strategies for a Changing Landscape,* The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, December 2025.

*Unraveling the Past to Reimagine the Future: A Critical Look at Child Welfare History,* The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, December 2025.

Moderator, Child Welfare Symposium hosted by Accenture, Atlanta, GA, October 2025.

Moderator, Atlanta Foundations Forum panel on Georgia's criminal and juvenile justice landscape, Atlanta, GA, October 2025.

Presented testimony on the legal and policy frameworks governing Georgia's responsibilities for children in foster care with emphasis on meeting the healthcare needs of youth with complex behavioral and mental health conditions, before the House Study

Committee on Abandoned Child Placement Following Hospital Discharge, Atlanta, GA (September 15, 2025).

*Federal Child Welfare and Protective Services Update,* Opening Plenary, American Public Human Services Association Education Conference, Reno, NV, October 2025.

*Navigating Change: Child Advocacy in a Shifting Child Welfare Landscape*, Georgia Court Appointed Special Advocates Annual Training, Atlanta, GA, August 2025.

*Strategic Impacts: Evaluating the Success of Foster Care Litigation on Child Welfare Outcomes*, American Public Human Services Association, ISM + PHSA Education Conference & Expo, Aurora, CO, October 2024.

Presented testimony on the well-being of children in Mississippi's foster care system, before the Senate Study Group on Women, Children and Families, Jackson, MS (October 2, 2024).

*Parental Incarceration: A Shared Sentence for Children*, Georgia Court Appointed Special Advocates Annual Conference, Atlanta, GA, August 2024.

*Emerging Legal Topics in Modern Advocacy*, Plenary, National Association of Counsel for Children Annual Conference, Salt Lake City, UT, August 2024.

*Institutional Reform Litigation: Current Status and Trends in Child Welfare Class Actions,* Plenary Session, Casey Family Programs, Class Action Lawsuit Convening, Minneapolis, MN, July 2024.

*Child Welfare and Adoption: Legislative and Policy Changes on the Horizon*, Georgia Association of Licensed Adoption Agencies, Atlanta, GA (virtual), January 2024.

*A National Lens on the State of Child Welfare*, The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, December 2023.

*Georgia Child Welfare System Overview,* Supreme Court of Georgia and Georgia Court of Appeals CLE, Atlanta, GA, November 2023.

*A History of Impact Litigation and Its Effects on State Child Welfare Systems,* American Public Human Services Association, ISM + PHSA Education Conference & Expo, Kissimmee, FL, September 2023.

*Impact Litigation as a Child Welfare System Improvement Strategy*, Emory Center for International and Comparative Law, Atlanta, GA, April 2023.

*How Can High Level Federal Leadership Improve Outcomes for Children?* (panel), Kempe Center 2022 International Virtual Conference: A Call to Action to Change Child Welfare, virtual, Oct. 2022.

*Working Together: Understanding the Civil and Criminal Legal Frameworks for Child Protection*, National Citizen Review Panel Annual Conference, Monterrey, CA, May 2022.

*The Impact of Impact Litigation*, American Association of Health and Human Services Attorneys 2021 Annual Education Conference, Columbus, OH (virtual). October 2021.

*Preventive Legal Advocacy: How Child Welfare Agencies and Lawyers Can Partner Together to Support Families,* American Association of Health and Human Services Attorneys 2021 Annual Education Conference, Columbus, OH (virtual). October 2021.

General Session Q&A Discussion: *Establishing A Continuum of Legal Representation: How to Implement High Quality Legal Representation at All Stages of a Case*, National Council of Juvenile and Family Court Judges, St. Louis, MO. July 2021.

*Funding for Quality Legal Representation,* National Center for State Courts, Learning Collaborative, virtual convening, August 2021.

*Aligning Efforts to Improve the Foster Care Experience*, U.S. Children's Bureau State Team Planning Meeting, Washington, D.C. March 2020.

*Child Welfare Refresher and Updates on the Child Abuse Registry,* Office of State Administrative Hearings, Administrative Law Judge Training, Athens, GA, February 2020.

*Courageous Conversations: Quality Legal Representation*, The Summit: Georgia's Child Welfare Conference, Alpharetta, GA, November 2019.

*State of Child Welfare,* annual presentation to local juvenile court and child welfare system stakeholder audiences

*Family First Prevention Services Act*, Annual Special Assistant Attorney General Conference, Buford, GA, October 2019.

Juvenile Justice Reform (panel), University of Georgia Law School Law Symposium, Athens, GA, October 2019.

Program Faculty, Reasonable Efforts Judicial Academy, U.S. Children's Bureau, Nashville, TN, September 2019.

Opening Plenary, *Data-Driven and Evidence-Based Practice and Policymaking: Implications for Child Welfare*, U.S. Children's Bureau Child Welfare Evaluation Summit, Washington, D.C., August 2019.

*The Family First Prevention Services Act: What the Act Means for Georgia's Child Welfare System*, Georgia System of Care Conference, Stone Mountain, GA, June 2019.

Families First Legislation (panel), 24th Annual Rosalynn Carter Georgia Mental Health Forum, Carter Center, Atlanta, GA, May 2019.

*Child Welfare Policy Framework,* Bergstrom Fellowship Training, University of Michigan Law School, Ann Arbor, MI, May 2019.

*Quality Legal Representation for Children and Parents in Dependency Proceedings*, Family Court of Delaware Joint Judicial and Commissioners Retreat, Rehoboth Beach, DE, May 2019.

*Quality Legal Representation,* flash presentation, U.S. Children's Bureau State Team Planning Meeting, Washington, D.C., April 2019.

*Fostering Freedom: A Policy Conversation about Religious Exemptions in Child Welfare,"* National Association of Counsel for Children 41st Annual Conference, San Antonio, TX, August 2018.

*Legal Representation as a Prevention Strategy,* Casey Family Programs Judicial Leaders Convening, May 2018.

*CIP Talks,* “How Judges and Attorneys Help Strengthen Families,” co-sponsored by the Children’s Bureau, National Center for State Courts, and Capacity Building Center for Courts, Williamsburg, VA, February 2018.

*Acting as an Agent of Change*, National Association of Counsel for Children Annual Conference, New Orleans, LA, August 2017.

*Federal Child Welfare Policy Changes*, North American Council on Adoptable Children Annual Conference, Atlanta, GA, July 2017.

*Citizen Review Panels as Agents of Change,* National Citizen Review Panel Annual Conference, Anchorage, AK, May 2017.

Presented testimony on dozens of child welfare, juvenile justice, and juvenile court bills before various committees in the Georgia General Assembly.

**POPULAR COMMENTAR & PODCASTS**

The Good Judge-Ment Podcast, "Georgia's Equitable Caregiver Law," aired May 5, 2026 and June 2, 2026, https://www.goodjudgepod.com/about-1-1.

Associated Press, Quoted in "Georgia's Child Welfare System Remains Shaken After Projected $85.7 Million Budget Shortfall," Feb. 2026. https://apnews.com/article/georgia-child-welfare-budget-shortfall-candice-broce-4b4e55a449b16f7ee51040f9e6105373.

Atlanta Journal Constitution, Quoted in "Georgia Judge Denies New Trial for Man Whose Case Was Lost for 22 Years," Feb. 2026. https://www.ajc.com/news/2026/02/georgia-judge-denies-new-trial-for-man-whose-case-was-lost-for-22-years/.

Atlanta Journal Constitution, Quoted in "Georgia Cuts Programs for Foster Youth and Families Citing Federal Shutdown," Nov. 2025. https://www.ajc.com/politics/2025/11/georgia-cuts-programs-for-foster-youth-and-families-citing-federal-shutdown/.

The Imprint, Quoted in "Georgia Halts Vital Child Welfare Services Due to Shutdown," Nov. 2025. https://imprintnews.org/top-stories/georgia-child-welfare-shutdown/268521.

11Alive, Guest Expert, "SNAP Benefits in Limbo," Nov. 2025. https://www.11alive.com/video/life/food/snap-benefits-in-limbo-what-we-know/85-05102028-fee1-4c13-9ca6-b0d6d7b0f0a1.

ChildFocus Podcast, Host Interview, "The Policy Landscape for Transition Age Foster Youth in Georgia," aired Nov. 2025.

Atlanta News First, Guest Expert, "'I Want My Children Back' Mom Says Her Inhaler Led to Failed Drug Tests," Apr. 2025. https://www.atlantanewsfirst.com/2025/04/02/i-want-my-children-back-mom-says-her-inhaler-led-failed-drug-tests/.

Atlanta News First, Guest Expert, "Mom's Parental Rights in Limbo After Autistic Son's Arrest," Feb. 2025. https://www.atlantanewsfirst.com/2025/02/20/moms-parental-rights-limbo-after-autistic-sons-arrest/.

Magnolia Tribune, Legislative Testimony Quoted in "Experts Testify on Reforms to Mississippi's Youth Courts Aimed at Reducing Crime, State Custody," Oct. 2024. https://magnoliatribune.com/2024/10/09/experts-testify-on-reforms-to-mississippis-youth-courts-aimed-at-reducing-crime-state-custody/.

WABE, Quoted in "Sen. Jon Ossoff Wants Georgia and Other States to Track 'Hidden Foster Care'," Oct. 2024. https://www.wabe.org/jon-ossoff-hidden-foster-care/.

Press Conference, Guest Expert, "Following 13-Month Foster Care Investigation, Sen. Ossoff Introduces Bipartisan Bill to Strengthen Federal Oversight of Foster Care Systems, Oct. 2024. Linked from https://www.ossoff.senate.gov/press-releases/watch-following-13-month-foster-care-investigation-sen-ossoff-introduces-bipartisan-bill-to-strengthen-federal-oversight-of-foster-care-systems/.

The Imprint, Quoted in "U.S. Senate Investigation Finds 'Systemic Failures' to Keep Georgia Foster Kids Safe," Apr. 2024. https://imprintnews.org/child-welfare-2/us-senate-investigation-finds-systemic-failures-to-keep-georgia-foster-kids-safe/248731.

ProPublica, Quoted in "When the Number of Bedrooms in a Home Keeps Parents From Getting Their Kids Back," Apr. 2024. https://www.propublica.org/article/in-georgia-inadequate-housing-can-mean-longer-stays-in-foster-care.

WSB-TV, Guest Expert, "Scathing Report Criticizes Georgia DFCS Over State's Handling of Foster Children," Apr. 2024. https://www.wsbtv.com/news/local/atlanta/scathing-report-criticizes-georgia-dfcs-over-states-handing-foster-children/3TIYT3W26NBO7G54BT6XSF7UYA/.

Atlanta Journal Constitution, Quoted in "Teen to Serve Life for Killing 14-Year-Old Girl as Part of Gang Initiation," Nov. 2023. https://www.ajc.com/news/crime/teen-to-serve-life-for-killing-14-year-old-girl-as-part-of-gang-initiation/ZGR7FTU4GNG4BIE3FP74QGLIUU/.

11Alive, Guest Expert, "'People Are Hungry,' Georgia SNAP Benefit Delays Persist," Oct. 2023. https://www.11alive.com/article/news/local/georgia-snap-benefit-delays-persist/85-1a118cdb-f4d3-4a35-ae7b-fc77d46cb800.

Georgia Public Broadcasting, Quoted in "Georgia Child Welfare Agency Gets Scathing Performance Reviews at Ossoff Human Rights Hearing," Oct. 2023. https://www.gpb.org/news/2023/10/26/georgia-child-welfare-agency-gets-scathing-performance-reviews-at-ossoff-human.

Atlanta Journal Constitution, Quoted in "Little B's Prison Release Places Focus on GA's Juvenile Justice Policies," Oct. 2023. https://www.ajc.com/news/little-bs-prison-release-places-focus-on-gas-juvenile-justice-policies/O7BJDPQ3RBEYLLF5C7ZQSTDB7Q/.

Georgia Public Broadcasting, Quoted in "Georgia Medicaid Insurer Denied Psychotherapy for Thousands," Apr. 2023. https://www.gpb.org/news/2023/04/11/georgia-medicaid-insurer-denied-psychotherapy-for-thousands.

Atlanta Journal Constitution, Quoted in "Georgia Kids in Foster Care Face Obstacles to Access Mental Health Services," Apr. 2023. https://www.ajc.com/news/investigations/georgia-children-in-foster-care-struggle-to-get-mental-health-services-ajc-investigation/4GAO5F2SYJCCPAI7MMQS2ESLQY/.

Atlanta Journal Constitution, Quoted in "Employees at Clayton Teen Shelter Arrested for Child Molestation, Cover Up," Mar. 2023. https://www.ajc.com/news/atlanta-news/employees-at-teen-shelter-arrested-for-child-molestation-cover-up/3O6K2SNT4ZBAZJ2YT5KZWRIVKU/.

Atlanta Journal Constitution, Quoted in "Lawmakers Mull Changes to Reduce the Number of Foster Kids in Hotels," Mar. 2023. https://www.ajc.com/news/atlanta-news/lawmakers-mull-changes-to-reduce-the-number-of-foster-kids-in-hotels/5366Y74CXBBXPLMDJD6NLZUL2Y/.

Atlanta Journal Constitution, Quoted in "Child's Death, Other Breakdowns Raise Questions for DFCS", Dec. 2022. https://www.ajc.com/news/atlanta-news/childs-death-other-breakdowns-raise-questions-for-dfcs/C5UUBQXX4ND6TGIQTMARJLFYSE/.

Atlanta Journal Constitution, Quoted in "Georgia Ends Child Abuse Registry, Saying Database Undermined Intent, " Sept. 2020. https://www.ajc.com/politics/georgia-ends-child-abuse-registry-saying-database-undermined-intent/ARHGDXVLXVD2FBUARPOATAFGU4/.

The Imprint, Quoted in "Georgia Dissolves Child Abuse and Neglect Registry," Sept. 2020. https://imprintnews.org/child-trauma-2/georgia-dissolves-child-abuse-and-neglect-registry/47207.

The Imprint Weekly Podcast, Host Interview, "Measuring Family Separation, and the Biden Child Welfare Agenda," Nov. 2020.

Atlanta Journal Constitution, Quoted in "'Religious Liberty' Adoption Bill Fans Debate in Georgia", Feb. 2020. https://www.ajc.com/news/state--regional/religious-liberty-adoption-bill-fans-debate-georgia/PlzBOgg9keCNMIur9H3U2M/.

Georgia Recorder, Quoted in "State Budget Cuts Threaten Support for Juvenile Detainee Transition", Jan. 2020. https://georgiarecorder.com/2020/01/28/state-budget-cuts-threaten-support-for-juvenile-detainee-transition/.

11Alive, Quoted in "Why is There No Specific Age in Georgia Law to Determine if a Child is Old Enough to be Home Alone?", Oct. 2019.

https://www.11alive.com/article/news/local/outreach/why-guy/why-is-there-no-specific-age-in-georgia-law-child-old-enough-to-be-home-alone/85-b73a2391-9a91-4238-81e2-9bc4ba707f00.

Atlanta Journal Constitution, Quoted in "Georgia Reports of Child Abuse Rise, but Numbers Don't Tell the Whole Story", Aug. 2019. https://www.ajc.com/news/state--regional-govt--politics/georgia-reports-child-abuse-rise-but-numbers-don-tell-whole-story/7uWpjg5tJwXNknAc15mJcN/.

Chronicle of Social Change, Quoted in "Relative Caregivers Get a Small But Significant Raise in Georgia Budget", Mar. 2019.

The Children's Law Podcast, Host Interview, "Game Changer: IV-E Funding with Melissa Carter," Feb. 2019.

Chronicle of Social Change, Quoted in "With Foster Care Numbers at a 15-Year High, Georgia Looks to Relatives", Nov. 2018.

Atlanta Journal Constitution, Quoted in "Tight Job Market Leaves Georgia's Youth Jails Chronically Understaffed.", Oct. 2018. https://www.ajc.com/news/tight-job-market-leaves-georgia-youth-jails-chronically-understaffed/dlvreApA6uBoBHGtW8UuNP/.

Atlanta Journal Constitution, Quoted in "Will DFCS Leader Continue to be Disposable?", Aug. 2018. https://www.ajc.com/news/local/torpy-large-will-dfcs-leader-continue-disposable/OXNGr9E0khh7Dk08aNtZlK/.

Religion News Source, Quoted in "When Adoption Agencies Can Turn Away Gay Prospective Parents, What Happens to the Kids?", Mar. 2018. https://religionnews.com/2018/03/23/when-adoption-agencies-can-turn-away-gay-prospective-parents-what-happens-to-the-kids/.

Atlanta Journal Constitution, Quoted in "Why It's More Difficult to Adopt Children in Georgia", Feb. 2018. https://www.ajc.com/news/state--regional-govt--politics/why-more-difficult-adopt-children-georgia/N1fGhssXI4mDR1NBxz5tLP/.

Atlanta Journal Constitution, Quoted in "Georgia Might Let Adoption Agencies Use Religion to Refuse Gay Couples", Feb. 2018. https://www.ajc.com/news/state--regional-govt--politics/georgia-might-let-adoption-agencies-use-religion-refuse-gay-couples/MMcrJK4R7Px74SboMrMPKP/.

Atlanta Journal Constitution, Quoted in "A Georgia Mother's Struggle to Unmask a Beloved Coach as a Predator", Feb. 2018. https://www.ajc.com/news/local/georgia-mother-struggle-unmask-beloved-coach-predator/NB1KHStPs6W557ZpeHmTjJ/.

Atlanta Journal Constitution, Quoted in "Prospect of Baby Selling Muddles Georgia Adoption Debate", Jan. 2018. https://www.ajc.com/news/state--regional-govt--politics/prospect-baby-selling-muddles-georgia-adoption-debate/8IeMh61d77tNaTCn21Mq6J/.

WABE Morning Edition, Guest Expert, "The Challenges of Overhauling Georgia's Adoption System," Jan. 2018. https://www.wabe.org/challenges-overhauling-georgias-adoption-system/.

The Imprint, Quoted in "The Man Entrusted with Los Angeles' Most Vulnerable Children, Nov. and Dec. 2017. https://imprintnews.org/featured/the-man-entrusted-with-los-angeles-most-vulnerable-children/28848.

LA Times, Quoted in "New Child Welfare Head Well-Regarded by Some Georgia Advocates, Despite Mixed Successes", Oct. 2017. https://www.latimes.com/local/lanow/la-me-ln-dcfs-bobby-cagle-20171007-story.html.

Associated Press, Quoted in "Adoption Law Update Lingers on Georgia Lawmakers' Last Day", Mar. 2017. https://www.fox5atlanta.com/news/adoption-law-update-lingers-on-georgia-lawmakers-last-day.

Atlanta Journal Constitution, Quoted in "DFCS Bill Allows More Secrecy on Child Deaths", Mar. 2017.

Atlanta Journal Constitution, Quoted in "Georgia Governor Slams 'Religious Liberty' Change to Adoption Bill, Mar. 2017. https://www.fox5atlanta.com/news/adoption-law-update-lingers-on-georgia-lawmakers-last-day.

WABE, Expert Guest, "Georgia Adoption Bill Raises Fears of Discrimination," Mar. 2017. https://www.wabe.org/georgia-adoption-bill-raises-fears-of-discrimination/.

The Meridian Star, Quoted in "Lax Reporting of Addicted Newborns Raises Concern," May 2016. https://meridianstar.com/2016/05/27/lax-reporting-of-addicted-newborns-raising-concern/.

WABE, Guest Expert, "With More Kids in State Care, Georgia Faces Foster 'Crisis'," Dec. 2015.

Georgia Public Broadcasting, Quoted in "Time to Reassess Law for Young Violent Offenders?" Nov. 2015. https://www.gpb.org/news/2015/11/11/time-reassess-law-for-young-violent-offenders.

WSB-TV, Quoted in "Credit Checks Slow to Come for Georgia Foster Youth Vulnerable to Fraud", Nov. 2015. https://www.wsbtv.com/news/local/credit-checks-slow-come-georgia-foster-youth-vulne/26817362/.

Georgia Public Broadcasting, Guest Expert, Lawmakers On the Story, "Protecting Georgia's At-Risk Children, Mar. 2014. https://www.gpb.org/television/show/lawmakers/season/44/030514-protecting-georgias-at-risk-children.

Georgia Public Broadcasting, Quoted in "Co-Sleeping Puts Children at Risk," Feb. 2012. https://www.gpb.org/news/2012/02/22/co-sleeping-puts-children-at-risk.

Georgia Public Broadcasting, Quoted in "Documents Reveal Child Deaths," Feb. 2012. https://www.gpb.org/news/2012/02/21/documents-reveal-child-deaths.

Fulton County Daily Report, Quoted in "Dissent Gives Hope to Lawyer for Parent," Apr. 2011.

Atlanta Journal Constitution, Quoted in "Boy's Death During DFCS Removal Raises Concern," Feb. 2011. https://www.ajc.com/news/local/boy-death-during-dfcs-removal-raises-concern/ZZggZ6j6RRLk3pumxBDKVO/.

Georgia Public Broadcasting, Quoted in "Advocates: Foster Kids Overmedicated," Dec. 2010. https://www.gpb.org/news/2010/12/29/advocates-foster-kids-overmedicated.

## EDUCATION

**University of Illinois** *Urbana-Champaign, IL*
Juris Doctor

**University of Illinois** *Urbana-Champaign, IL*
Bachelor of Science, Psychology
Honors: *Summa cum laude,* Phi Beta Kappa, James Scholar, Bronze Tablet

## LEGAL EXPERIENCE

**Policy Craft, Inc.** *Decatur, GA*
***Founder & Principal*** 2019 -

**Office of the Child Advocate for the Protection of Children** *Macon and Atlanta, GA*
***Director*** 2010
*Deputy Director* 2007 - 2010

**Administrative Office of the Courts of Georgia**
**Supreme Court of Georgia Committee on Justice for Children** *Atlanta, GA*
*Director of Legal Training* 2006 - 2007

**Claiborne, Outman, & Surmay, P.C.** *Atlanta, GA*
*Associate Attorney* 2005 - 2006

**Administrative Office of the Illinois Courts**
**Court Services Division** *Springfield, IL*
*Data Program Specialist, Court Improvement Program* 2005

**Administrative Office of the Courts of Georgia**
**Supreme Court of Georgia Child Placement Project** *Atlanta, GA*
*Managing Attorney* 2003 - 2005

**Emory University School of Law**
**Barton Child Law and Policy Clinic** *Atlanta, GA*
*Post-Graduate Fellow in Law* 2002 - 2003

## BAR ADMISSIONS

Illinois (2002); Georgia (2004)

## OTHER PROFESSIONAL ACTIVITIES

- Co-Chair, Fulton County Juvenile Court Judicial Nominating Commission, 2022 and 2024.
- Vice-Chair, Juvenile Justice State Advisory Group, appointed by Gov. Nathan Deal, 2014-present
- Member, Georgia Children's Cabinet, appointed by Gov. Brian Kemp, 2019-present
- Member, State Bar of Georgia Children and the Courts Committee, 2021-present
- Member, Child Welfare Reform Council, appointed by Gov. Nathan Deal, 2013-2015 Chair, Policy and Procedures Committee, 2014
- Member, State Bar of Georgia Formal Advisory Opinion Board, 2014-2021
- Member, Georgia Commission on Family Violence, appointed by Gov. Nathan Deal, 2012-2016
- Co-Chair, Children's Justice Act Taskforce, 2010-present. Leading efforts of a statewide citizen review panel in the discharge of its duties as a federally mandated multidisciplinary taskforce to improve the investigation, prosecution and judicial handling of cases of child abuse and neglect
- Vice-Chair, Board of Directors, Multi-Agency Alliance for Children, 2016-present
- Member, National Association of Counsel for Children, 2002-present (annual conference planning committee member 2008)
- Member, Georgia Association of Counsel for Children; President, Board of Directors, 2007-2008

**AWARDS & FELLOWSHIPS**

- Public Leader Thought Leader Fellowship, Emory Institute for Developing Nations and The OpEd Project, 2019
- 2015 *Friends of Children Award*, presented by the Georgia Public Human Services Association
- Annie E. Casey Atlanta Leaders for Results Program, a ten-month executive leadership program designed in partnership with the Atlanta Civic Site to develop leaders in the nonprofit and public sectors in Atlanta, 2013
- Georgia's 40 Under 40 "On the Rise," Fulton County Daily Report, 2013
- Marshall Memorial Fellow, German Marshall Fund of the United States Selected as one of 60 American Fellows to examine transatlantic issues during four weeks of European travel, October 2009
- L.E.A.D. Atlanta, Class of 2009. Selected as one of 40 participants in a 9-month leadership development program offered to young leaders by Leadership Atlanta
- 2009-2010 *Service Award for Advocacy on Behalf of Georgia's Foster Youth*, awarded by the Georgia EmpowerMEnt Group and Georgia Department of Human Resources
- State Bar of Georgia, Young Lawyers Division
    - 2010 *Child Advocate Award – Policy Advocate*
    - 2010, *Service Award*, For Services to Georgia's Children
    - 2009-2010, *Award of Achievement*, For Outstanding Service to the Young Lawyers Division, in recognition of service as Director of Service Projects
    - 2007-2008, *Award of Achievement,* For Outstanding Service to the Public, in recognition of efforts on the Model Juvenile Code Project
    - 2006-2007, *Service Award*, For Service to the Celebration of Excellence
    - 2004-2005, *Service Award*, For Contributions on Behalf of the Juvenile Law Committee

# Exhibit C

**Materials Considered by Melissa D. Carter**

Along with the materials and academic and legal sources cited and referenced in my report, I considered the materials below in forming my opinions:

- *M.D. v. Abbott* Complaint
- 2016 Special Master Recommendations to the Court
- 2016 Memorandum Opinion and Verdict
- 2018 Final Order Granting Injunction
- *Stukenberg I*, 907 F.3d 237 (5th Cir. 2018)
- 2018 Order Entering Modified Injunction
- *Stukenberg II*, 929 F.3d 272 (5th Cir. 2019)
- Contempt Order (RO A7)
- *Stukenberg III*, 977 F.3d 479 (5th Cir. 2020)
- Order of Compliance with RO 1 and B4
- 2024 Contempt Order
- *Stukenberg IV*, 119 F.4th 373 (5th Cir. 2024)
- Motion for Relief of Judgment
- Response in Opposition to Motion for Relief from Judgment
- Reply in Support of Motion for Relief from Judgment
- The Monitors' First Comprehensive Report
- The Monitors' Second Comprehensive Report
- The Monitors' Third Comprehensive Report
- The Monitors' Fourth Comprehensive Report

- The Monitors' Fifth Comprehensive Report
- The Monitors' Sixth Comprehensive Report
- The Monitors' Seventh Comprehensive Report
- The Monitors' Eighth Comprehensive Report
- The Monitors' Ninth Comprehensive Report
- The Monitors' Tenth Comprehensive Report
- The Monitors' Eleventh Comprehensive Report
- The Monitors' Ad Hoc Reports
- The CBC Evaluation Report
- The Quarterly Report on CBC Implementation Status
- DPFS, Q2 2026 Quarterly Report on Court Monitor Fees
- News Release: HHSC, DFPS Celebrate Opening of Terrell Center for Youth
- DFPS, Child Care Investigations Handbook
- DFPS, Child Protective Services Handbook
- DFPS, Statewide Intake Handbook
- HHSC, Child Care Regulation Handbook

# Exhibit D

**<u>List of All Publications Authored in the Previous Ten Years</u>**

Melissa D. Carter & Christopher G. Hempfling (2026) "Measured Results in Georgia's Kenny A. Foster Care Consent Decree: A Framework for Assessing the Strategic Effectiveness of Institutional Reform Litigation," 13 Child & Fam. L.J.

Melissa D. Carter (2023) "Federal Child Welfare Legislation" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).

Melissa D. Carter (2023) "Achieving Large-Scale Change Through Systems Advocacy" in CHILD WELFARE LAW AND PRACTICE (THE RED BOOK 4TH EDITION).

Joshua Gupta-Kagan, Christopher Church, Melissa Carter, Vivek Sankaran, & Andy Barclay (2023) "The New Orleans Transformation: Foster Care as a Rare, Time-Limited Intervention," 27 LEWIS & CLARK L. REV 417.

Melissa D. Carter, Dr. Nicole Cotton, & Dr. Courtney McMickens (2021) "Structural Violence with Child Welfare Systems," 51 PSYCHIATRIC ANNALS 11.

Melissa D. Carter, Christopher Church, & Vivek Sankaran (2022) "A Quiet Revolution: How Judicial Discipline Essentially Eliminated Foster Care and Nearly Went Unnoticed," 12 COLUM. J. RACE L. 1.

Melissa D. Carter (2022) "An Ounce of Prevention is Worth a Pound of Cure: Why Children's Lawyers Must Champion Preventive Legal Advocacy," 42 CHILD LEGAL RTS J. 1.

Melissa D. Carter & Courtney McMickens (2020) "A Matter of Family: Finding Justice Within the Child Welfare System" in SOCIAL (IN)JUSTICE AND MENTAL

HEALTH (Ruth Shim and Sarah Vinson, eds.). 1st edition, American Psychiatric Association Publishing, Washington, D.C.

Melissa D. Carter (2020) “Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia,” 54 GA. L. REV., 1133.

Melissa D. Carter (2020) “The Need for a Prevention Throughline in Family Policy,” CHILDREN’S BUREAU EXPRESS, (Apr. 2020) (invited short article).

Melissa D. Carter (2019) “Pursuing the Best Interest of Children,” CHILDREN’S BUREAU EXPRESS (Nov. 2019) (invited short article).

Melissa D. Carter (2017) “Beyond the Courtroom: A Plea and a Plan for Children’s Attorneys to Engage in Policy Advocacy,” THE GUARDIAN, National Association of Counsel for Children (Fall 2017).