IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as | § | |
| Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL-ORDER CHART**

Prior to last week's evidentiary hearing, the Court asked for a simple, current spreadsheet of the pending remedial orders and related compliance statistics reported by the Court Monitors.

In response, defendants presented *advocacy*, not an objective, accurate chart. It jumbles the sequence of remedial orders. It treats 84% as full compliance under the mandate for each remedial order (a threshold without basis in the law of this case) and shades it green as purportedly satisfied. It cherry-picks the measures used to report compliance, omitting never-appealed Heightened Monitoring orders and remedial order guidance. It ignores important court directions on how to interpret certain remedial orders. And it inserts "satisfied" green entries that rely on stale, unmeasured, or unvalidated data, and it blends strong and weak sub-measures into better-looking aggregated figures. In short, the chart is not reliable in material respects.

For that reason, we respectfully submit these objections to the defense chart and provide an objective chart of reported compliance statistics for all remedial orders, from RO 1 to the end.

**1. *Stukenberg IV* does not establish an 84% threshold for the mandated compliance.**

In reversing the contempt order, the Fifth Circuit found the district court had "erred in not finding that Defendants substantially complied with Orders 3 and 10." *M.D. ex rel. Stukenberg v.*

*Abbott*, 119 F.4th 373, 385 (5th Cir. 2024), *cert. denied*, 146 S. Ct. 99 (2025). Of course, substantial compliance is a defense to contempt. But avoiding contempt is not the same as satisfying a fully litigated judgment that specifies full compliance before termination. Indeed, this holding was not even essential to the Court's judgment. The court prefaced its substantial-compliance discussion by noting that it was relevant only "[i]f Plaintiffs had succeeded in showing contempt," and its finding that the sanctions were criminal required reversal *anyway*, which obviated the need to "parse every detail of the evidence." *Stukenberg IV*, 119 F.4th at 383 & n.2.

The court certainly did not draw a bright line at 84% for satisfaction of the mandate. The question in *Stukenberg IV* was whether defendants were properly held in contempt for a specific set of defective child abuse/neglect investigations. The Monitors disagreed with 59% (38 of 64) of HHSC Provider Investigations' dispositions of "Unconfirmed" or "Inconclusive" in early 2023, plus five related investigations. *Id.* at 385. The Fifth Circuit held that, because DFPS and HHSC *together* "conduct thousands of investigations that are subject to Orders 3 and 10," the botched cases and impacted children were "just a drop in the bucket of systemwide investigations." *Id.* Only then did the court cite the Monitors' systemwide compliance figures (95% for Order 3 and 73% and 84% for Order 10 in different periods) to support its holding that the system was compliant enough, as a whole, to avoid contempt. *Id.*

In other words, the 84% figure was a data point offered to put the disputed cases in context. It was not presented or discussed as a standard for mandated compliance to warrant termination, nor for "satisfying" the judgment under Rule 60(b)(5), a showing for which any defendant bears a heavy burden. And nothing in the opinion extends it to other or all remedial orders.

**2. Defendants' chart leaves out court orders/guidance and Monitor concerns.**

The chart measures Remedial Order 20 against its original text and marks it "Satisfied." It ignores *later* Heightened Monitoring orders by the Court, which set out the requirements that the

Monitors measure (and which defendants never appealed). Order (Mar. 18, 2020), Dkt. 837; Order (Dec. 7, 2020), Dkt. 1012; Sixth Report, Dkt. 1380 at 154 n.174. Additionally, even as to this order's original text, defendants ignore that it goes beyond requiring the State simply to set up a Heightened Monitoring program. It governs *implementation* of the program to actually remediate problems. Dkt. 606 at 4-5; *see Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071, 1078 (5th Cir. 1973) (promulgating regulations alone did not "satisfy" judgment under Rule 60 when injunction "dealt not only with the promulgation of regulations, but also with their enforcement").

For Remedial Orders 20-21, the chart cites the Tenth Report but omits the Monitors' stated concerns in that report. Placements of children in operations under Heightened Monitoring raise "significant concerns regarding the continued exposure of children to settings that present ongoing safety risks," and the Monitors "have ongoing concerns related to the HHSC's use of the process it created to comply with Remedial Order 21." Tenth Report, Dkt. 1660 at 7-8. Of 165 quarterly reports completed for the 45 operations on active Heightened Monitoring in 2024, only 66% (109) found the operation compliant with its Heightened Monitoring Plan tasks, 93% (154) documented that the operation received citations during the quarter, and 47% (78) documented three or more citations in the pattern or trend areas identified in the operation's plan. *Id.* at 17.

The defense chart also omits the Court's December 18, 2020 order. Dkt. 1017. Importantly, this order instructed the Monitors *how* to measure compliance with certain remedial orders. For example, for Remedial Order B5, the Court instructed that compliance "requires more than prompt communication to the caseworker of the existence of an allegation" and told the Monitors to assess whether defendants promptly communicate "the substance of the 'allegations of abuse'" and whether the State's system "tak[es] into account at all times the safety needs of children." *Id.* at 327. *See also* Ninth Report, Dkt. 1658 at 92-93. The defense chart reports 97-100% compliance

for Remedial Order B5, Chart at 6, but it *omits* the Monitors' measure of that second requirement. In the Eleventh Report, the State's actions documented to protect the child were adequate (or none was needed) in only 72% of Residential Child Care Investigation intakes, 74% of Child Protective Investigation intakes, and 64% of Provider Investigation intakes. *See* Dkt. 1659 at 15, 100.

Likewise, for Remedial Orders 25, 27, and 31, the Court's 2020 order held that just telling administrators is not enough. "Information frequently did not make it to the direct care staff who are actually engaged in protecting children's safety on a daily basis." Dkt. 1017 at 298.

> Even if Defendants were 100% compliant with their own policy of notifying [General Residential Operations] directors or administrators, [their duty is to ensure that] the **caregivers** "be apprised."

*Id*. (orig. emph.). *See also* Tenth Report, Dkt. 1660 at 70. The defense chart's 90%+ figures measure only whether a receiving caregiver *signed* the child's Attachment A. Chart at 7; *see also* Tenth Report, Dkt. 1660 at 74. But 44% of direct caregivers who supervised a child with a history of sexual abuse or aggression could not identify the child, and all caregivers had signed the form for only 5 of 21 such children. Dkt. 1660 at 80.

**3. "Satisfied" entries in the defense chart rest on stale, unvalidated, or blended data.**

**Remedial Order 4.** The defense chart reports "99%+ (caseworkers); 82% (caregivers)" for completion of the required training to recognize and report sexual abuse. Chart at 4. Yet it shades the order green, even though the caregiver figure is below even defendants' self-designated 84% threshold. *Id.* The caseworker figure reflects that 99.8% of caseworkers who carried at least one case in the period completed the required training. Tenth Report, Dkt. 1660 at 6. The caregiver figure reflects DFPS's report that 81.6% of the caregivers it listed did the training, with no completion information for the remaining 13,033 caregivers (18.4%). *Id.* at 9. In fact, because "DFPS cannot provide a list of all caregivers during the period, the Monitors cannot validate that all or most caregivers completed the child sexual abuse training required." *Id*. Thus, the chart's

"compliance" entry rests on a caregiver figure that is not (and cannot be) validated and, moreover, falls below even defendants' own chosen threshold. This is hardly compliance.

**Remedial Order 12.** The defense chart's most recent figure is from the Fourth Report filed in 2022. There has been no corresponding data on this remedial order since then. Defendants admit this staleness but still shade it green as purportedly "satisfied." Chart at 3. This entry reflects no measured performance for the past four years, and it does not show current compliance.

**Remedial Order A6.** The chart cites the Ninth Report's 83% as the most recent figure. Chart at 9. But this order concerns various items, such as children being "apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman." Ninth Report, Dkt. 1658 at 73. And the 83% figure that defendants cite relates to the number of child files with a signed Bill of Rights. *See id*. at 75.

The Eleventh Report also addressed this order, but defendants omit it. Its child-interview metrics were lower than the chart's misleading 83% figure. The more recent Eleventh Report found even poorer compliance: 66% of children interviewed knew of the Foster Care Bill of Rights, 50% knew of the Foster Care Ombudsman (FCO), and 68% knew of the Statewide Intake (SWI) hotline. *See* Eleventh Report, Dkt. 1659 at 14. More startling, only 34% knew of all three, "a decline from the Ninth Report's analysis, which showed 51% of children interviewed knew of the Bill of Rights, FCO and SWI hotline"—an example of a figure much lower than the 83% cited in the chart that came from the same report defendants cite for that figure. *Id.* Likewise, the Eleventh Report found 42% of children reported times when they did not feel safe in their placement. *Id.*

In addition, the middling 83% figure in the defense chart is misleading. Remedial Order A6 is a remedy for *under*-reporting abuse. It follows the Fifth Circuit's suggestion:

> To the extent that the court is worried about underreporting, this can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues.

*M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 279 (5th Cir. 2018). The Court relied on that point in entering Remedial Order A6. It requires "DFPS [to] ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect." Eleventh Report, Dkt. 1659 at 83-84.

As the Court explained, "There is still a concern with underreporting since systemic DFPS issues likely lead to underreporting of abuse . . . [T]his remedy is needed to protect the children from an unreasonable risk of serious harm." Dkt. 606 at 11-12. Because defendants did not object to Remedial Order A6 in their later appeal, it is part of the mandate as written. Two specific remedies that Remedial Order A6 sets out are ensuring children review the Foster Care Bill of Rights and the number for the Health and Human Services Ombudsman, as well as ensuring children know how to report abuse and neglect, such as through the SWI hotline. A signature on the Foster Care Bill of Rights in a child's file—which is where defendants get their 83% number—does not show the child knows how to report abuse. Nor does it provide a full picture of whether Remedial Order A6 has been complied with to a satisfactory level. The most recent and best measure of whether this critical information is *actually* reaching children—a calculation of how many children had heard of the SWI hotline and knew how to reach it—was a poor 61%. Eleventh Report, Dkt. 1659 at 87.

**Remedial Order A8.** This order imposes an ongoing quarterly reporting obligation, which the defense chart nonetheless labels as "Satisfied." Chart at 2 (quoting Dkt. 606 at 12).

## CONCLUSION

Defendants' chart is advocacy, not an accurate, complete, or objective summary of the Monitors' findings on compliance. As such, plaintiffs object to the defense chart and respectfully offer the attached chart, which tracks the Monitors' reports and the Court's orders in an objective and complete manner.

Dated: October 30, 2026

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
Wynn McCloskey
State Bar No. 13417700
Christian J. Ward
State Bar No. 24033434
Fernando Stepensky
State Bar No. 24145381
Megan Jacobs
State Bar No. 24149674
YETTER COLEMAN LLP
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Barry F. McNeil
State Bar No. 13829500
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
(214) 651-5000
barry.mcneil@haynesboone.com

Samantha Bartosz (*pro hac vice*)
Stephen Dixon (*pro hac vice*)
CHILDREN'S RIGHTS
88 Pine Street
New York, New York 10005
(212) 683-2210
sbartosz@childrensrights.org

Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
355 Lexington Avenue, Floor 16
New York New York 10017
(646)795-4456
mlowry@ABetterChildhood.org

ATTORNEYS FOR PLAINTIFFS AND THE GENERAL CLASS AND SUBCLASSES

## CERTIFICATE OF SERVICE

I certify that on the 30th day of October, 2026, a true and correct copy of this document was served on all counsel of record via email or by using the Court's CM/ECF e-file system.

*/s/ R. Paul Yetter*
R. Paul Yetter