IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 2:11-CV-00084 |
| | § | |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO REMEDIAL-ORDER COMPLIANCE CHART**

## TABLE OF CONTENTS

Page


Introduction ..... 1

Argument ..... 2

I. Plaintiffs' chart confirms high compliance across the remedial orders ..... 2

II. Plaintiffs' objections are unavailing ..... 5

A. Plaintiffs' objection to the chart's shading misreads the chart and *Stukenberg IV*. ..... 6

B. Plaintiffs' objections to the ten contested entries fault the chart for reporting what the monitors measured. ..... 7

C. Where the charts otherwise differ, plaintiffs' chart departs from the monitors' compliance findings. ..... 14

Conclusion ..... 15

Certificate of Service ..... 17

## Introduction

Shortly before the evidentiary hearing began on October 20, the Court asked for a chart showing the State's compliance history under Judge Jack's remedial orders. Defendants provided one before the hearing resumed the next morning. The chart (Dkt. 1715-12) quotes every remedial order, reports the monitors' most recent and historical compliance figures, and is organized to help the Court efficiently determine the current state of compliance. The Court called the chart "well done, well put together, [and] very helpful," and suggested that the chart be admitted "as a summary under [Rule] 1006." Oct. 21 Hr'g Tr. (Dkt. 1721) 4:13–17; Fed. R. Evid. 1006(a)–(b) (courts may admit as evidence a chart that summarizes voluminous materials to which both sides have access).

Plaintiffs now object to defendants' chart and offer their own in its place, Dkt. 1718-1. But they don't identify any basis for exclusion. They don't cite any rule of evidence that requires exclusion. Nor do they point to a single figure in the chart that misstates the monitors' reports—because there is none. Their objections fail at every turn.

*First*, plaintiffs' own chart undercuts their criticism by confirming defendants' high compliance across the vast majority of the remedial orders. Of the 46 out of 62 remedial orders plaintiffs' chart addresses, 33 carry the same most-recent figure identified in defendants' chart, the same information in a different form, or a similar or higher figure. Plaintiffs' chart omits the other 16 orders entirely, and plaintiffs don't contest that each of those orders is satisfied.

*Second*, plaintiffs' objections and competing figures give the Court no reason to discount defendants' showing of high compliance. Unable to dispute the figures reflected in defendants' chart, plaintiffs fault its *shading* in an attempt to relitigate whether substantial compliance satisfies the judgment. Their objections to ten entries on defendants' chart fault defendants for reporting the monitors' measures of what the orders require. And for the three other orders on which the charts differ, plaintiffs neither object to defendants' entries nor explain their own figures, which apparently rest on requirements the orders don't contain.

The Court should overrule plaintiffs' objections.

## ARGUMENT

### I. Plaintiffs' chart confirms high compliance across the remedial orders.

Start with where the parties agree. For 49 of the 62 remedial orders still in force, the figures in plaintiffs' chart don't materially differ from those in defendants' chart.

***Same figure.*** For 16 remedial orders, the most recent compliance figures in both charts are the same.

| Order | Defendants' Chart | Plaintiffs' Chart |
|---|---|---|
| 1[1] | "Full Compliance; 97%" | "97%" |
| 2 | "98%+" | "98%" |
| 3 | "94%" | "94%" |

[1] Plaintiffs' chart acknowledges (at 1) the "[m]onitors certified DFPS's full compliance of RO 1," but it says Judge Jack didn't "release the State from monitoring of RO 1." Regardless, nearly three years have passed since Judge Jack certified full compliance, *see* Dkt. 1514, and the monitors have stopped assessing compliance with the order, *compare* Ninth Report (Dkt. 1658) at 1 (report on Remedial Order 1—and 23 other orders), *with* Eleventh Report (Dkt. 1659) at 1 (report on only those 23 other orders).

| Order | Defendants' Chart | Plaintiffs' Chart |
|---|---|---|
| 5 | "79%" | "79%" |
| 6 | "85%" | "85%" |
| 7 | "79%" | "79%" |
| 8 | "85%" | "85%" |
| 9 | "97%" | "97%" |
| 11 | "88%" | "88%" |
| 13 | "94%" | "94%" |
| 14 | "98%" | "98%" |
| 15 | "98%" | "98%" |
| 16 | "DFPS 100%"; "HHSC 97%" | "97%" |
| 17 | "98%" | "98%" |
| 19 | "97%" | "97%" |
| 24 | "100%" | "100%" |

***Same data, different form.*** For 11 orders, plaintiffs' chart reports the same information as defendants'—just in a different form. Plaintiffs' chart (at 6) splits Remedial Order 10 into 60% completed on time without an extension and 33% completed within the time allowed by an approved extension, rather than reporting the combined figure of 93%. For Remedial Order B1, plaintiffs' chart shows (at 28–29) the share of caseloads above the guideline (0–6%) rather than the share within it (94%+), as defendants' chart reports (at 4) for Remedial Order B4. The B4 entry in plaintiffs' chart (at 32) refers back to their B1 figures. And for Remedial Orders 23, 32, 37, A1–3, and B2–3—where defendants' chart (at 1–4) says Satisfied or, for Remedial Order 37, 100%—plaintiffs' chart (at 16, 20–24, 30–31) provides narratives because they can't dispute the compliance figures demonstrating satisfaction.

| Order | Defendants' Chart | Plaintiffs' Chart |
|---|---|---|
| 10 | "93%" | "60% (1,004) of 1,684 investigations were completed within 30 days of intake" and "33% of investigations had an approved extension and were completed within it" |
| 23 | "Satisfied" | "The State has created pages within its IMPACT data system" |
| 32 | "Satisfied" | "Monitoring suspended because of DFPS's high compliance in MR 8 and continuing problems validating the SSCCs' data" |
| 37 | "100%" | "1 HHR, 1 required staffing" |
| A1–3 | "Satisfied" | "[T]he Court released the State from the workload study requirement and approved, in its place, an agreed guideline of 14–17 children per conservatorship caseworker" |
| B1 | "Satisfied" | "0–6% of RCCR and Heightened Monitoring inspectors carried caseloads above 17 tasks by month" and "0% of RCCI investigators carried caseloads above 17 investigations in every month" |
| B2–3 | "Satisfied" | "[T]he Court released the State from the study and approved, in its place, a guideline of 14–17 investigations per investigator and 14–17 tasks per inspector" |
| B4 | "Full Compliance (DFPS); 94%+ (HHSC)" | "[T]he Monitors have reported B1 together with B2–B4. They measure it by the share of caseloads at or below 17." |

***Similar or higher.*** Six of the most recent figures in plaintiffs' chart are similar to or higher than defendants'. And all show a strong record of compliance.

| Order | Defendants' Chart | Plaintiffs' Chart |
|---|---|---|
| 18 | "99% (provider); 94% (referent)" | "96% to both referents and providers" |

| Order | Defendants' Chart | Plaintiffs' Chart |
| --- | --- | --- |
| 26 | "98% (common application); 84% (Placement Summary–Attachment A)" | "98% (300/305) Common Apps had all abuse history" and "96% (351/364) Placement Summary/Att. A had complete abuse history" |
| 29 | "99% (common application); 84% (Placement Summary–Attachment A)" | "99% (83/84) Common Apps had all aggression history" and "[b]oth forms found for 97% (101/104)" |
| 35 | "89%" | "All Caseworkers: 88%" |
| A4[2] | "89%" | "[T]he Monitors have reported A1–A4 together with RO 35, measured by how many caseworkers' caseloads conform to that standard" |
| A7 | "100%" | "DFPS certified 99% (2,920/2,923) of visits" and "Monitors found no violations in 12 overnight site visits" |

***Omitted.*** Despite claiming (at 1) to cover "all remedial orders, from RO 1 to the end," plaintiffs' chart omits the 16 monitoring orders (AA1–13 and BB1–3). Defendants' chart (at 12–15) accurately reports those orders as satisfied.

All told, plaintiffs' chart thus corroborates defendants on 49 of the 62 remedial orders. That leaves 13 entries on which the charts meaningfully differ, and plaintiffs object to only 10 of them.

## II. Plaintiffs' objections are unavailing.

Even where plaintiffs disagree, they identify no basis to disregard defendants' chart. Their lead objection—to the chart's shading—quarrels with *Stukenberg IV* rather than any reported figure. Their objections to ten entries fault defendants for reporting what the monitors measured, and three of those objections are also

[2] Plaintiffs' entry for Remedial Order A4 (at 25) refers to their 88% figure for Remedial Order 35.

forfeited. For the remaining three orders, plaintiffs' chart departs from the monitors' findings without explanation—and plaintiffs raise no objection to defendants' entries.

### A. Plaintiffs' objection to the chart's shading misreads the chart and *Stukenberg IV*.

The chart's legend (at 1) states up front that lighter green shading means "the order is satisfied or at 84%+ compliance" and explains that "[i]n *Stukenberg IV,* the Fifth Circuit held that the State had substantially complied with Remedial Order 10 on a reported compliance rate of 84%." *See M.D. ex rel. Stukenberg v. Abbott* ("*Stukenberg IV*"), 119 F.4th 373, 385 (5th Cir. 2024). Plaintiffs don't dispute that statement's accuracy. They assert instead (at 1) that the chart "treats 84% as full compliance." But the chart reserves (at 4, 6) the phrase "Full Compliance" for the two orders on which a court has expressly found it: Remedial Orders 1 and B4.

Plaintiffs' real quarrel is with the notion that the Court may grant relief before the State's foster-care system attains perfection and sustains it for years. But that argument was fully aired in the briefing and at the hearing, and it isn't a proper basis for an evidentiary objection. In any event, a judgment is satisfied by "substantial compliance," *Chisom v. Louisiana ex rel. Landry,* 116 F.4th 309, 318 (5th Cir. 2024) (en banc), which "excuses deviations" from perfection that don't "severely impair the . . . purpose" of the decree, *Frew v. Janek,* 780 F.3d 320, 330 (5th Cir. 2015). *See* Mot. (Dkt. 1662) at 9–12; Reply (Dkt. 1678) at 9–13. And calling the Fifth Circuit's substantial-compliance holding "not even essential to [its] judgment" (at 2) gets plaintiffs nowhere, because "[a]lternative holdings are not dicta and are binding in this circuit." *Mejia-Alvarenga v. Garland,* 95 F.4th 319, 326 n.2 (5th Cir. 2024).

### B. Plaintiffs' objections to the ten contested entries fault the chart for reporting what the monitors measured.

Plaintiffs' next complaint (at 2)—that the chart "leaves out court orders/guidance and Monitor concerns" with respect to six of the contested remedial orders—is equally misplaced. The chart summarizes all the remedial orders and the monitors' compliance figures. It doesn't purport to convey every opinion the monitors have offered in their voluminous reports or to capture the dizzying array of "orders/guidance" issued by Judge Jack and the monitors over the lifespan of the injunction. In each instance plaintiffs identify, defendants' chart reports the monitors' measure of what the order requires. The "omissions" plaintiffs criticize don't bear on compliance. Instead, they are later orders that didn't amend the remedial orders, the monitors' commentary on placements into heightened-monitoring operations and HHSC's closure process, and figures that don't measure what the orders require.

***Remedial Orders 20 and 21.*** Remedial Order 20 directs the State to "identify, track and address concerns at facilities that show a pattern of contract or policy violations" and to subject them to heightened monitoring. Dkt. 606 at 4–5. The later orders plaintiffs reference (at 2–3) aren't additional remedial orders. The March 2020 order adopts "definitions applicable to remedial order 20." Dkt. 837 at 1; *see* Dkt. 1012 (modifying Dkt. 837). And the monitors apply those definitions when they measure compliance with Remedial Order 20, *see* Tenth Report (Dkt. 1660) at 141 n.269, so the figures reported in the chart account for the orders the plaintiffs say it "ignores."

Contrary to plaintiffs' assertion (at 3), the chart doesn't mark Remedial Order 20 satisfied because the State "simply . . . set up" a program. The Tenth Report documents the program in operation: annual identification of operations using the Court's methodology, an individualized heightened-monitoring plan for each, weekly unannounced visits, and quarterly reviews—165 of them in 2024 alone, in 94% of which the operations had completed their plan tasks. Tenth Report at 141–54. Plaintiffs again cite *Sullivan v. Houston Independent School District,* 475 F.2d 1071 (5th Cir. 1973), to suggest that setting up a program isn't the same as running it. But *Sullivan* denied relief to a defendant that hadn't shown it would enforce its new rules constitutionally. *Id.* at 1078; *see* Reply (Dkt. 1678) at 11–12. Here, the monitors' reports document years of the heightened-monitoring program in operation.

The 66% figure plaintiffs cite (at 3) measures whether a monitored operation complied with every task in its plan during a given quarter. Tenth Report at 152. In other words, it measures the *providers'* conduct, not the State's. Remedial Order 20 requires the State to "identify, track and address concerns" at those operations, not to guarantee that every provider will complete every plan task every quarter. *See* Dkt. 606 at 4–5. The 93% rate plaintiffs cite (at 3) is the share of 2024 quarterly reports—154 of 165—documenting that HHSC cited an operation for a minimum-standards deficiency during the period. Tenth Report at 154. Far from showing noncompliance, that figure reflects the "more frequent inspections" and "corrective actions" Remedial Order 20 calls for. Dkt. 606 at 4–5. An operation can't be cited unless an inspector shows up and finds a problem. The monitors' "concerns"—about

which placements DFPS approves and which foster homes HHSC closes, Tenth Report at 7–8—are disagreements with how the agencies exercise the discretion the orders leave them. *See* Reply (Dkt. 1678) at 17.

For its part, Remedial Order 21 requires only that the State "have the right to directly suspend or revoke the license of a placement." Dkt. 606 at 5. It's undisputed that the State retains and exercises that right. *See* Mot. (Dkt. 1662) at 20; Reply (Dkt. 1678) at 17–18. So defendants' chart accurately shows Remedial Order 21 as satisfied.

***Remedial Order B5.*** This order requires DFPS to ensure that allegations of abuse are "promptly communicate[d] . . . to the child's primary caseworker" and that DFPS "maintains a system to receive, screen, and assign for investigation" reports of maltreatment, "taking into account at all times the safety needs of children." Dkt. 606 at 15. The chart's 97–100% figure is the monitors' measure of that requirement: the share of intakes in which the monitors found a staffing contact that "confirms caseworker notification about allegations." Eleventh Report (Dkt. 1659) at 104.

Plaintiffs quibble (at 3–4) that the chart omits the monitors' after-the-fact judgment about whether documented safety actions were "adequate." But those second guesses about decisions made after allegations were communicated don't bear on compliance with Remedial Order B5. And in any event, the same review found a documented safety action in 91% of the intakes in which the monitors believed one was needed. Eleventh Report at 97.

Plaintiffs' objection regarding Remedial Order B5 is forfeited, as are their objections to Remedial Orders 12 and A8. The figures in defendants' chart for all three are the figures defendants reported in their motion, with the same citations. *Compare* Dkt. 1715-12 at 2–3, 6, *with* Mot. (Dkt. 1662) at 17 & n.2, 24–25. Plaintiffs' opposition said nothing about them—or about the 2020 order (Dkt. 1017) plaintiffs now say dictates how Remedial Order B5 must be measured. *See* Reply (Dkt. 1678) at 14. An argument not raised in opposing a motion can't be raised once briefing has closed. *See Jones v. Cain*, 600 F.3d 527, 540–41 (5th Cir. 2010) (treating as waived an argument omitted from a response and raised "only in a surreply"). Having failed to contest these figures in their briefing, plaintiffs can't challenge them for the first time now by calling them evidentiary objections.

***Remedial Orders 25, 27, and 31.*** All three of these remedial orders require that a child's caregivers "be apprised" of confirmed allegations of sexual abuse or aggression at each placement. Dkt. 606 at 5–6. Defendants' chart reports the monitors' case-record review of 548 randomly selected placements, which found that the receiving caregiver signed the child's Placement Summary and Attachment A—the form that tells caregivers about a child's history of sexual abuse or aggression—at the time of placement in more than 90% of cases when required. Tenth Report at 71–73; *see* Mot. (Dkt. 1662) at 21–22. The 44% figure plaintiffs prefer (at 4) comes from interviews of 73 direct-care staff who were supervising a child with such a history; 44% of them couldn't name which child it was. Tenth Report at 80. But the

orders require the State to *apprise* caregivers; they don't make the State the guarantor of someone else's memory. *See* Reply (Dkt. 1678) at 18.

***Remedial Order 4.*** Far from disputing the chart's "99%+" caseworker compliance figure for sexual-abuse training under Remedial Order 4, plaintiffs highlight (at 4) that the figure is actually 99.8%. They focus instead (at 4–5) on the 82% caregiver figure also reflected in defendants' chart, saying it is below 84% and can't be validated. But the chart reports exactly what the monitors reported: 82% of the nearly 71,000 individuals registered as caregivers in DFPS's provider portal had completed the training, and the monitors couldn't validate that figure because there was no independent list of active caregivers against which to check the roster on the portal. Tenth Report at 37.

As DFPS Commissioner Audrey O'Neill explained at the evidentiary hearing, the 82% caregiver figure substantially understates compliance because the DFPS provider portal carries the names of tens of thousands of individuals who aren't currently serving as caregivers. Oct. 20 Hr'g Tr. (Dkt. 1719) 139:24–141:15 ("I think our most recent numbers are typically between around forty to 50,000 caregivers on a typical day."). Rather than reflect the understated 82% caregiver figure, the Remedial Order 4 row's shading reflects the 99.8% figure plaintiffs highlight and the monitors validated.

***Remedial Order 12.*** Plaintiffs (at 5) call the chart's entry for Remedial Order 12 "stale" because the most recent measured figure comes from the Fourth Report. But the chart (at 3) explains why: the Sixth, Eighth, and Tenth Reports each record

that there were no Priority One investigations to measure. The Fourth Report, the last to find any, reviewed four. Two of those were untimely, but the monitors noted that "[b]oth victims were in TMC status during investigation timeframe," so every investigation involving a child in PMC status was timely. Fourth Report (Dkt. 1248) at 83 & n.112; *see also* Tenth Report at 137. Plaintiffs' chart (at 8) records the same thing for the more recent reports: "N/A (0 Priority 1 RCCR investigations)." And it reports the Fourth Report's 50% figure for all children, rather than the 100% figure for PMC children—the class the remedial orders were implemented to protect.

When there are no Priority One investigations for the monitors to assess, there can be no noncompliance. And from January 2025 to April 2026, there were nine Priority One investigations involving PMC children, and every one of them complied with Remedial Order 12. Mot. (Dkt. 1662) at 17–18 n.2; Declaration of Ashworth-Mazerolle (Dkt. 1662-1) ¶ 3. Neither plaintiffs' objections nor their chart contends that defendants are out of compliance with the order.

***Remedial Order A6.*** The order directs DFPS to ensure that caseworkers "provide children with the appropriate point of contact for reporting issues relating to abuse" and that children are "apprised by their primary caseworkers" of how to report abuse, "includ[ing] a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman." Dkt. 606 at 11. The monitors measured compliance with that obligation in the Ninth Report by reviewing children's case files and found that 83%—the figure in defendants' chart—had a copy of the Foster Care Bill of Rights signed by the child. Ninth Report (Dkt. 1658) at 74.

Although the Foster Care Bill of Rights itself was in 92% of the files reviewed, the chart uses the more conservative signed-copy figure. *Id.* Plaintiffs' chart (at 25) reports the same figure.

Defendants' chart cites the Ninth Report as the most recent report with the relevant measure because the monitors conducted no file review for Remedial Order A6 in the Eleventh Report. *See* Eleventh Report at 93–94. Plaintiffs' preferred measure (at 5) is the Eleventh Report's interview data showing the percentage of 38 interviewed children who could, when questioned by the monitors' staff, *remember* the Bill of Rights, the Ombudsman, and the hotline. Plaintiffs (at 6) try rewriting the order—which requires caseworkers only to provide and review information—as a duty to "ensur[e] children know how to report abuse." On that logic, federal supervision would continue until every foster child in Texas could recite the three reporting channels on demand. Remedial Order A6 requires no such thing. The duty is to provide the information, not to guarantee that every child retains it. *See* Reply (Dkt. 1678) at 18–19.

***Remedial Order A8.*** This order requires DFPS to provide the monitors a quarterly "update and verification" concerning awake-night supervision. Dkt. 606 at 12. DFPS submits these verification documents to the monitors *monthly*—more often than the order requires. Tenth Report at 82 n.169. Plaintiffs' objection (at 6) is that the duty is "ongoing" so the order isn't satisfied. But "ongoing" describes the duty, not any shortfall in meeting it.

### C. Where the charts otherwise differ, plaintiffs' chart departs from the monitors' compliance findings.

That leaves three orders—Nos. 22, 28, and 30—on which defendants' and plaintiffs' charts report different figures but about which plaintiffs raise no express objections. None would succeed. For each, defendants' figure measures what the order requires, and plaintiffs' figure measures something the order doesn't.

***Remedial Order 22.*** The order requires inspectors to "consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect." Dkt. 606 at 5. Defendants' chart (at 7) reports the monitors' finding that inspectors discussed every substantiated finding and citation in 92% of the inspection histories reviewed. *See* Tenth Report at 134. Plaintiffs' chart (at 14) instead reports that some files don't "document *how* [a] risk was considered" (emphasis added). But the order requires inspectors to "consider" the referrals and findings, not to document how they weighed every risk.

***Remedial Order 28.*** The order requires DFPS to "ensure a child's electronic case record documents 'child sexual aggression' and 'sexual behavior problem'" when applicable. Dkt. 606 at 5. Defendants' chart (at 1) marks the order satisfied because DFPS documents that information in its IMPACT system. *See* Tenth Report at 10. Plaintiffs' chart (at 18–19) instead reports that in 31% of 39 child-on-child incidents the details on the aggressor's incident-history page were "[i]nconsistent" with those on the victim's. *Id.* But the order says nothing about cross-narrative consistency.

***Remedial Order 30.*** The order requires DFPS to "document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor."

Dkt. 606 at 6. Defendants' chart (at 5) reflects 99% compliance consistent with the monitors' finding that the common application—the placement document caregivers receive—carried the child's full aggression history in 83 of 84 placements reviewed. *See* Tenth Report at 71. Plaintiffs' chart (at 20) relies on a separate review of 39 incidents, which examined documentation on an internal IMPACT page and found 90% compliance. *Id.* at 49. The 99% figure is the more accurate measure because it rests on a larger sample and on the common application, consistent with the remedial orders. But in all events, both figures show a high degree of compliance.

## CONCLUSION

Because defendants' compliance chart accurately summarizes the data in the monitors' reports and measures each remedial order by what its text requires, the Court should overrule plaintiffs' objections.

Date: November 9, 2026

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/ Kimberly Gdula*
**KIMBERLY GDULA**
State Bar No. 24052209
Southern District No. 10092074
Chief
General Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120
(512) 370-0667 – Fax
kimberly.gdula@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

Respectfully submitted,

*/s/ Allyson N. Ho*
**ALLYSON N. HO**
*Attorney-in-Charge*
State Bar No. 24033667
Southern District No. 1024306
**ELIZABETH Y. RYAN**
State Bar No. 24067758
Southern District No. 1062438
**STEPHEN J. HAMMER**
State Bar No. 24116477
Southern District No. 3963953
**SAVANNAH S. HUNDT**
State Bar No. 24129020
Southern District No. 3844454
**BRYSTON C. GALLEGOS**
State Bar No. 24117245
Southern District No. 3993242

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
(214) 571-2900 – Fax
aho@gibsondunn.com
lryan@gibsondunn.com
shammer@gibsondunn.com
shundt@gibsondunn.com
bgallegos@gibsondunn.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on November 9, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system, which automatically provided notice to all attorneys of record.

*/s/ Allyson N. Ho*
Allyson N. Ho