# SUNSET ADVISORY COMMISSION

## STAFF REPORT



# DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES

90TH LEGISLATURE 2026-27

PLAINTIFF EXHIBIT 118
2-11-CV-000084
10-20-26 Show Cause Hearing

# Sunset Advisory Commission

**Senator Lois Kolkhorst**
*Chair*

**Representative Lacey Hull**
*Vice Chair*

**Senator César Blanco**

**Senator Donna Campbell, M.D.**

**Senator Bryan Hughes**

**Senator Kevin Sparks**

**Stacey Combest, Public Member**

**Representative Charles Cunningham**

**Representative Donna Howard**

**Representative Angelia Orr**

**Representative Matt Shaheen**

**Mont McClendon, Public Member**

**Eric Beverly**
*Executive Director*

*Cover photo: The Texas State Capitol was completed in 1888. With the Goddess of Liberty atop the dome, the Texas State Capitol Building is more than 14 feet taller than the U.S. Capitol Building in Washington, D.C. The photo shows the south facade of the Capitol. Photo Credit: Janet Kountz*

# Department of Family and Protective Services

Sunset Staff Report

2026-27

90th Legislature

# How to Read Sunset Reports

For each agency that undergoes a Sunset review, the Sunset Advisory Commission publishes three versions of its staff report on the agency. These three versions of the staff report result from the three stages of the Sunset process, explained in more detail at sunset.texas.gov/how-sunset-works. The current version of the Sunset staff report on this agency is noted below and can be found on the Sunset website at sunset.texas.gov.

### CURRENT VERSION: Sunset Staff Report

The first version of the report, the Sunset Staff Report, contains Sunset staff's recommendations to the Sunset Commission on the need for, performance of, and improvements to the agency under review.

### Sunset Staff Report with Commission Decisions

The second version of the report, the Sunset Staff Report with Commission Decisions, contains the original staff report as well as the commission's decisions on which statutory recommendations to propose to the Legislature and which management recommendations the agency should implement.

### Sunset Staff Report with Final Results

The third and final version of the report, the Sunset Staff Report with Final Results, contains the original staff report, the Sunset Commission's decisions, and the Legislature's final actions on the proposed statutory recommendations.

# Table of Contents

Page


## Summary of Sunset Staff Report

........................................ 1

## Introduction: Texas Health and Human Services

........................................ 7

## Introduction: Conservatorship in Texas

........................................ 15

## Agency at a Glance

........................................ 27

## Issues/Recommendations

1 Without More Tailored Oversight Tools, DFPS Cannot Ensure the State's Privatized Foster Care System Provides Quality Case Management That Protects Children and Supports Families........ 35

2 DFPS Must Address Key Staffing Policies and Practices to Maintain a High-Quality Workforce for Its Internal and Community-Based Care Operations........ 63

3 DFPS Must Better Coordinate Its Service Capacity Building Efforts, Improve Data Collection, and Evaluate Service Outcomes to Ensure Clients Receive High-Quality Services........ 77

4 Inefficiencies in Internal Processes and a Lack of Coordinated Quality Assurance Efforts Prevent DFPS From Ensuring Fair and Consistent Investigations and Treatment of Children and Families ........ 97

5 Certain DFPS Processes and Statutory Requirements Impede the Agency From Carrying Out Its Mission to Serve Children and Families Effectively........ 119

6 Texas Has a Continuing Need for DFPS........ 135

## Appendices

Appendix A — Historically Underutilized Businesses Statistics .................................... 145
Appendix B — Equal Employment Opportunity Statistics............................................ 147
Appendix C — State Conservatorship Timeline ............................................................ 151
Appendix D — DFPS Reporting Requirements ............................................................ 153
Appendix E — Staff Review Activities........................................................................... 157

# Summary of Sunset Staff Report

In 1991, the Legislature created the Department of Family and Protective Services (DFPS) to protect the state's most vulnerable populations, including children, elderly adults, and people with disabilities. While this fundamental responsibility has remained largely the same since then, the agency's investigative and child protective roles have changed dramatically after its last Sunset review in 2015.

Much of this change has been driven by external forces. DFPS has been involved in litigation since 2011 when a federal class-action lawsuit was brought against the state on behalf of children in Texas' long-term foster care system. In 2015, the court found that foster children's constitutional right to being free from harm while in state custody had been violated and issued multiple remedial orders to improve their safety. In 2017, the Legislature reformed foster care into what is now called Community-Based Care (CBC). Historically, DFPS contracted with residential care providers across the state and at times would find placement for foster children outside of their home region. CBC shifts placement and case management responsibilities from the agency to local CBC contractors, or Single Source Continuum Contractors (SSCC), who are charged with developing a local network of residential care and service providers to serve foster children's needs closer to home. Finally, in 2017 the Legislature narrowed DFPS' focus to its investigative and child protective roles by establishing DFPS as a stand-alone agency. Subsequent legislative actions further refined that focus by tightening the definition of neglect, eliminating the agency's authority for nonemergency removals, and transferring prevention and early intervention services to the Health and Human Services Commission (HHSC).

In response, DFPS has simultaneously pursued several large-scale modernization initiatives to more effectively operate the foster care system's hybrid structure. These initiatives include developing the Texas Child-Centered Care system to modernize foster care reimbursement, redesigning internal business processes across agency divisions, and replacing DFPS' aging case management system. However, even as SSCCs assume responsibility for serving the needs of foster children, DFPS remains ultimately responsible for the safety and well-being of every child in the state's care. Because caring for children inherently involves risk, DFPS needs to provide robust oversight of both agency and SSCC staff to ensure consistent, high-quality case management to mitigate child safety risks. As illustrated by the recent receivership and contract termination of the Dallas SSCC EMPOWER, high turnover can jeopardize case management and impact child safety when basic tasks like regular safety visits are overlooked. Several recommendations in this report seek to expand DFPS' oversight tools to improve visibility into SSCCs' staffing challenges before they negatively

DFPS needs to provide robust oversight to mitigate child safety risks in the foster care system.

impact children. Other recommendations would strengthen the connection between performance measures and case management quality.

Sunset staff also found that many of the current struggles that DFPS and SSCCs face can be traced back to the need for improved staff retention and training, which are the same workforce management challenges Sunset staff identified in the agency's 2015 Sunset report. Almost all child welfare agencies face the chronic problem of workforce stability. Social work involving families in crisis is an intense and demanding job that may burn out even the most dedicated staff, typically necessitating continuous recruitment and training to offset the loss of experienced staff from high turnover. Several recommendations focus on workforce stabilization and are aimed at improving the agency's internal management practices to mitigate the demanding nature of the job and support agency staff and SSCC staff through training and the use of subject matter specialists to assist with connecting children to services.

Finally, although most of the attention on DFPS has been rightfully placed on child protection and the state's foster care system, Sunset staff also looked at the agency's other programs, including Statewide Intake (SWI), Adult Protective Services, and other ancillary functions that support these programs, including the appeals process to challenge DFPS' investigative findings. Other recommendations provided in this report are therefore aimed at improving staff guidance on intake prioritizations, updating investigation training for new and tenured investigators, developing guidance for individuals seeking to challenge investigative findings, improving services coordination, and formalizing internal processes to improve transparency for stakeholders and the public.

Sunset staff found the agency's functions are still needed and recommends continuing DFPS for 12 years. The following material highlights Sunset staff's key recommendations for DFPS.

## Sunset Staff Issues and Recommendations

## Issue 1

### Without More Tailored Oversight Tools, DFPS Cannot Ensure the State's Privatized Foster Care System Provides Quality Case Management That Protects Children and Supports Families.

Under CBC, the state's foster care system faces a compounding set of internal fiscal pressures and structural risk. DFPS must use more tailored tools, including expanded access to SSCC staffing and financial information, to provide the diligent and effective oversight needed to ensure SSCCs are providing quality case management that protects children and supports families. Additionally, the Legislature needs comprehensive and clear reporting on the performance of SSCCs and the cost of the CBC model in order to assess the effectiveness and efficiency of the state's foster care system under CBC. Finally, the functions of the temporary Office of CBC Transition are necessary to support and oversee the state's foster care system under CBC and should be incorporated into DFPS.

### Key Recommendations

- Require SSCCs to provide DFPS with direct access to staffing information.
- Require DFPS to periodically review SSCC contract performance measures and thresholds.

- Require SSCCs to submit financial reports to DFPS.
- Abolish the Office of CBC Transition and transfer its functions to DFPS.
- Direct DFPS to develop an SSCC contract performance measure resource guide and training materials.

## Issue 2

### DFPS Must Address Key Staffing Policies and Practices to Maintain a High-Quality Workforce for Its Internal and Community-Based Care Operations.

The CBC transition fundamentally changed DFPS' statutory role and operational mandate. The agency must now navigate a complex hybrid structure to maintain direct service operations in some regions while also establishing the robust contract oversight needed to ensure child safety in partnership with SSCCs. Despite efforts to reduce turnover, DFPS continues to struggle with workforce retention that can compromise service quality. While high turnover is largely driven by factors outside of the agency's control, such as a shrinking workforce pool in rural communities, unreasonable workload expectations and the intense mental demands of the job also contribute to this problem. DFPS can help mitigate the demanding nature of the job through its practices and policies to better support staff through training and mentorship. Finally, DFPS should assess how it can better support both agency and SSCC staff, such as by providing access to subject matter specialists to assist with connecting children to services.

**Key Recommendations**

- Require DFPS to regularly conduct casework time studies to more accurately develop reasonable caseload guidance and expectations for caseworkers.
- Require DFPS to develop a staffing plan that assesses its future operational needs to inform agency staffing decisions.
- Direct DFPS to further develop its agencywide wellness strategy to promote existing wellness resources within the agency.
- Direct DFPS to develop a policy formalizing the use of in-house shared support services between the agency and SSCCs.

## Issue 3

### DFPS Must Better Coordinate Its Service Capacity Building Efforts, Improve Data Collection, and Evaluate Service Outcomes to Ensure Clients Receive High-Quality Services.

The complex network of services DFPS draws upon to assist youth, families, and vulnerable adults has critical gaps, many of which go beyond DFPS' ability alone to fix. As one piece of this network, DFPS has a responsibility to maximize the resources currently at its disposal and accurately communicate its clients' needs to partners like HHSC and local mental and behavioral health authorities. The agency can better fulfill these duties by improving how it coordinates its caseworkers' efforts to find, obtain, and track services and by collecting and analyzing additional services-related data. DFPS can also improve

its oversight of the Preparation for Adult Living (PAL) Life Skills Training program, which is designed to help youth and young adults in conservatorship prepare for independent adult life beyond foster care by adjusting its metrics and allowing SSCCs more flexibility in how they implement the program.

### Key Recommendations

- Require DFPS to create a policy requiring regional service inventories.
- Require DFPS to develop, implement, and report on phased improvements to its service-related data collection and analysis.
- Direct DFPS to define and implement a liaison function to assist in service coordination and capacity building.
- Direct DFPS to develop new performance measures for the PAL Life Skills Training program.

## Issue 4

### Inefficiencies in Internal Processes and a Lack of Coordinated Quality Assurance Efforts Prevent DFPS From Ensuring Fair and Consistent Investigations and Treatment of Children and Families.

When investigating allegations of abuse and neglect, DFPS investigators determine a disposition, or finding, for each allegation. A "reason to believe" finding results in an individual determined to be the perpetrator being placed on the Central Registry, which is a searchable list of individuals found to have abused or neglected a child. Statute provides an appeals process for individuals to dispute agency findings, but Sunset staff found some inefficiencies in this process that contribute to resolution delays. Both DFPS staff and the public would benefit from clearer appeal procedures and updated guidance to better navigate the appeals process. In addition, DFPS' single records retention schedule limits the agency's ability to remove perpetrators from the Central Registry based on risk. Inconsistent case documentation, outdated investigator training, and limited cross-program communication also contribute to quality assurance concerns such as overturned findings and intake reprioritizations. Finally, the agency needs additional policies on parental child safety placements (PCSP) to ensure they are being used appropriately.

### Key Recommendations

- Eliminate the second-level administrative review of investigation findings.
- Require DFPS to establish a records retention schedule for the Central Registry separate from the agency's case management system.
- Direct DFPS to create and maintain a plain-language guide for appeals.
- Direct DFPS to collaborate with the Child Protective Investigations Advisory Committee to update investigator training to reflect current requirements.
- Direct DFPS to collaborate with the Partners for Children and Families Committee to review and update guidance for SWI intake specialists regarding intake prioritization.
- Direct DFPS to include PCSP agreements in the agency's quality assurance efforts.

# Issue 5

## Certain DFPS Processes and Statutory Requirements Impede the Agency From Carrying Out Its Mission to Serve Children and Families Effectively.

As a result of several efforts by the Legislature to consolidate the state's health and human services agencies, DFPS must collaborate with HHSC on several fronts to ensure the health, safety, and well-being of children and families served by DFPS. However, Sunset staff found that the statutory requirement for DFPS to contract with HHSC for the provision of certain administrative support services is inefficient and impedes the agency's ability to deliver services to clients. Furthermore, DFPS would benefit from formalizing internal processes intended to proactively monitor residential child care providers when child safety concerns arise. Finally, the agency's resources could be better leveraged by eliminating the 90-day efficiency audit, which is duplicative of the efficiency audit performed by the State Auditor's Office (SAO).

### Key Recommendations

- Authorize DFPS to provide its own administrative support services within its resources.
- Eliminate the 90-day efficiency audit requirement in favor of the SAO's efficiency audit.
- Direct DFPS to formalize its Facility Intervention Team Staffing (FITS) process for identifying residential child care providers that pose a safety concern to children in their care and collaborate with HHSC to ensure routine participation in FITS meetings.
- Direct DFPS to formalize the placement disallowance process and establish regular communication with child-placing agencies.

# Issue 6

## Texas Has a Continuing Need for DFPS.

The state has a continuing need for DFPS to protect children, elderly adults, and adults with disabilities from abuse, neglect, and exploitation. DFPS continues to be the most appropriate agency to provide the state's investigative and protective services function, with no substantial benefit resulting from transferring these functions to another health and human services agency. The review identified changes needed to conform DFPS' statutes to standard Sunset review elements generally applied to all state agencies under Sunset review. Sunset staff also identified opportunities to update DFPS' statutory reporting requirements and advisory committee provisions. Finally, DFPS would benefit from a formalized rule review plan to ensure its rules accurately reflect current law and agency practice.

### Key Recommendations

- Continue DFPS for 12 years and remove the Sunset date of the agency's enabling statute.
- Apply the standard across-the-board requirement regarding conflicts of interest.
- Modify four and abolish one of DFPS' reporting requirements.

- Continue the Data Access and Standards Governance Council and exempt it from automatic abolishment.
- Direct DFPS to adopt a rule review plan.

## Fiscal Implication Summary

Overall, the recommendations in this report would result in a cost savings to the state of approximately $149,240 per fiscal year and a five-year cost savings of $896,200. Other recommendations could result in costs or savings, but those impacts would depend on implementation and cannot be estimated at this time.

***Issue 1*** — Abolishing the Office of CBC Transition and transferring its resources, staff, and functions to DFPS, as detailed in Recommendations 1.9 and 1.13, would result in a small cost savings to the state in salary and benefits for each of the next five fiscal years and the reduction of one full-time equivalent position of the CBC Transition director, which would amount to $149,240 in annual savings and a five-year cost savings of $746,200. The CBC Transition director position is currently vacant, and the CBC Operations division director also serves as the interim CBC Transition director.

***Issue 3*** — Requiring DFPS to improve its data collection related to services would likely have a fiscal impact to the state, but this impact would depend on DFPS' implementation and cannot be determined at this time. Some costs of this recommendation may be mitigated by tying its implementation to the development of DFPS' new case management system, which the Legislature has already partially funded. The new case management system is eligible for 50 percent federal matching funds and should have more robust data capabilities.

***Issue 5*** — Eliminating the 90-day efficiency audit requirement would result in a one-time savings to the state of approximately $150,000 in fiscal year 2030 when the next 90-day efficiency audit would otherwise be required.

**Department of Family and Protective Services**

| Fiscal Year | Savings to the General Revenue Fund | Change in FTEs from 2025 |
|---|---|---|
| 2028 | $149,240 | -1 |
| 2029 | $149,240 | -1 |
| 2030 | $299,240 | -1 |
| 2031 | $149,240 | -1 |
| 2032 | $149,240 | -1 |

# Introduction | Texas Health and Human Services

## Background and Timeline

Envisioning a system that would save money and improve service delivery, over the last 23 years the Legislature has sought to streamline Texas' health and human services (HHS) agencies and functions, as detailed in the timeline on the following page.[1] In 2003, the Legislature consolidated 12 agencies and more than 200 programs into five agencies under the leadership of one umbrella organization — the Health and Human Services Commission (HHSC).[2] Then in 2015, the Legislature further consolidated five agencies into three through the Sunset process, retaining the umbrella structure wherein the HHSC executive commissioner appointed the heads of the Department of State Health Services (DSHS) and Department of Family and Protective Services (DFPS).[3] At the same time, the Legislature abolished and transferred the functions of the Department of Assistive and Rehabilitative Services (DARS) and Department of Aging and Disability Services (DADS) to HHSC and transferred certain functions from DSHS and DFPS to HHSC as well. HHSC implemented aspects of this consolidation across several years through a phased-in approach described by agency staff as "Transformation." In 2017, while HHSC was still implementing Transformation, the Legislature reversed course and established DFPS as a stand-alone agency with its own governor-appointed commissioner following concerns over the state's foster care system.[4]

In addition to these key organizational shifts, HHSC, DSHS, and DFPS have experienced other significant changes that have impacted the way these agencies function, including the COVID-19 pandemic and the state's transition to a Community-Based Care model for child foster care.

## Current Organization

Statute defines the "HHS system" somewhat narrowly, as detailed in the accompanying textbox, with HHSC, DSHS, and the Office of Inspector General (OIG) comprising the system.[5] OIG is not a separate state agency and is instead functionally structured like a division within HHSC, though it operates with a certain level of independence and the governor appoints the inspector general. Although not formally considered part of the HHS system under statute, DFPS plays a key role by overseeing the welfare of children involved in the child protection system, coordinating with HHSC to enroll eligible children in foster care for Medicaid, and helping clients receiving other HHSC-administered services such as behavioral health services. Both DSHS and DFPS also receive certain administrative support from HHSC such as procurement and asset management services.

### HHS System Defined

The system for providing or otherwise administering health and human services in this state by the commission, including through:

(A) An office or division of the commission; or

(B) Another entity under the administrative and operational control of the executive commissioner.

## Key HHS Events

**1967** — Texas begins participation in the federal Medicaid program.

**1991** — Legislature creates HHSC and other HHS agencies and designates HHSC as the state agency to administer Medicaid.

**2003** — Legislature consolidates 12 HHS agencies into five: HHSC, DADS, DARS, DFPS, and DSHS. Creates the Office of Inspector General.

**2011** — Legislature authorizes Foster Care Redesign, directing DFPS to transition to a new community-based model for foster care services.

**2012** — Texas Medicaid expands STAR statewide, bringing the majority of Medicaid clients into managed care.

**2015** — **Through Sunset:**

Legislature consolidates five HHS agencies into three: HHSC, DFPS, and DSHS. Creates the Transition Legislative Oversight Committee to oversee Transformation. HHSC absorbs operation of state hospitals, state supported living centers, and other functions.

Legislature transfers Vocational Rehabilitation from DARS to the Texas Workforce Commission.

Legislature transfers 17 occupational licensing programs from DSHS to the Texas Department of Licensing and Regulation and Texas Medical Board.

Legislature amends provisions of multiple HHS statutes to update and clarify language to reflect current agency functions and practices and conform to previously enacted legislation.

**2016** — HHSC implements Transformation Phase One.

**2017** — Legislature separates DFPS from HHSC and transfers child care regulatory functions from DFPS to HHSC.

Legislature transitions from Foster Care Redesign to Community-Based Care for children in the state's conservatorship.

Legislature establishes a three-phase approach to expand, renovate, and transform the state hospital system.

HHSC implements Transformation Phase Two.

**2020** — COVID-19 public health emergency allows continuous Medicaid coverage for clients.

DSHS manages an influx of federal grants related to supporting the public health emergency response.

**2021** — Legislature tasks DFPS with foster care rate modernization.

Legislature establishes the Office of Community-Based Care Transition.

**2023** — Legislature transfers the Prevention and Early Intervention division from DFPS to HHSC and renames this as Family Support Services.

For clarity, HHSC's official *Public Assistance Cost Allocation Plan* uses the term "HHS enterprise" to refer to HHSC, DSHS, and DFPS.[6] This Sunset report mirrors this approach when using the terms "HHS system" and "HHS enterprise." The *HHS System vs. Enterprise* diagram below depicts HHS' current organizational structure.

**HHS System vs. Enterprise**




Established as part of the 2015 consolidation, the HHSC Executive Council receives public comment and advises the executive commissioner on the agency's operations.[7] The council is not a policymaking body and has no authority to make administrative or policy decisions.[8] The council consists of HHSC division leaders, the HHSC executive commissioner, and the DSHS and DFPS commissioners.[9] Statute requires the council to meet at least quarterly, but in practice it meets monthly.[10]

## Key Agency Functions

- **HHSC** administers the state's Medicaid and other public benefit programs and services that support women, children, families, older adults, and people with disabilities; operates the state's psychiatric hospitals and other facilities that serve individuals with intellectual and developmental disabilities; and protects the health and safety of consumers receiving long-term care, child care, and health care services. HHSC oversees the HHS system, including providing varying levels of support to other agencies and entities, as explained more fully in the *Agency at a Glance* section of the *Sunset Staff Report on HHSC*.

  <u>OIG</u> oversees HHS enterprise activities, providers, and clients through compliance and enforcement measures aimed at identifying and reducing fraud, waste, and abuse.

- **DSHS** oversees the state's public health services, including monitoring and responding to infectious diseases, supporting local health departments, providing services in the community for people with certain health conditions, and regulating food safety, drugs, medical devices, and hazardous consumer products.

- **DFPS** investigates allegations of abuse, neglect, and exploitation perpetrated against children, older adults, and people with disabilities within the agency's jurisdiction and oversees the state's child and adult protection systems.

## HHS Enterprise Staffing

In total, the HHS enterprise had nearly 55,000 budgeted full-time staff at the end of fiscal year 2025, including more than 38,000 employed by HHSC and OIG. Total HHS enterprise staffing represents about 36 percent of all state employees. Across the HHS enterprise, the vast majority of staff works outside the agencies' Austin headquarters, including in state facilities and regional offices.

## HHS Enterprise Funding

The HHS enterprise makes up about one-third of the state's entire budget. As shown in the *HHS Enterprise Revenue* chart, in fiscal year 2025 the HHS enterprise received $51.4 billion in revenue, with a little more than half coming from federal funds.

**HHS Enterprise Revenue - FY 2025**




The *HHS Enterprise Expenditures* chart demonstrates the sheer size and scope of HHSC (including OIG) as compared to DSHS and DFPS, making up 93 percent of all expenditures across the enterprise. The total revenue and expenditures do not align with those in the *Agency at a Glance* section of the *Sunset Staff Report on HHSC* to avoid double-counting administrative support funding at the statewide level.

**HHS Enterprise Expenditures - FY 2025**




## Other HHS Entities Subject to Sunset Review

In addition to HHSC, DSHS, and DFPS, the Legislature has subjected a number of other HHS entities and specific advisory committees to Sunset review. The Legislature also exempted certain HHSC programs from Sunset review, including the Thriving Texas Families Program and certain family support services programs.[11]

The following four entities are expressly subject to review and abolishment in 2027 under the Sunset Act.[12]

- **Governor's Committee on People with Disabilities (GCPD).** A trusteed program within the governor's office, GCPD promotes opportunities for people with disabilities to enjoy full and equal access to lives of independence, productivity, and self-determination.
- **Texas Council for Developmental Disabilities (TCDD).** Administratively supported by the Texas Education Agency, TCDD is a federally funded entity tasked with supporting innovative projects that promote beneficial change in programs, policies, and services around the state, with the goal that all people with developmental disabilities are fully included in their communities and can exercise control over their own lives.
- **Texas Civil Commitment Office (TCCO).** Administratively attached to HHSC, TCCO is responsible for supervising and treating sexually violent predators who have been civilly committed by a court following their release from prison. TCCO oversees the Texas Civil Commitment Center in Littlefield, Texas, where individuals are supervised and receive treatment and reintegration support.
- **Texas Health Services Authority (THSA).** THSA is a public nonprofit corporation that promotes, implements, and facilitates the voluntary and secure electronic exchange of health information. To do so, THSA operates HIETexas, a free statewide health information exchange network, and issues SECURETexas, a certification demonstrating an entity's compliance with Texas and federal privacy and security laws.

While statute requires Sunset to evaluate an agency's advisory committees as part of its review, occasionally the Legislature expressly subjects a specific committee to review. Across the HHS enterprise, 46 advisory committees exist in statute. However, the following four are expressly subject to review and abolishment in 2027 under the Sunset Act.[13]

- **Statewide Interagency Aging Services Coordinating Council (SIASCC).** The Legislature established SIASCC in 2023 to ensure the state takes a cohesive interagency approach to aging services.[14] SIASCC develops a recurring five-year strategic plan and publishes an inventory of state-funded interagency aging programs and services annually.[15] The council consists of members representing state agencies — including HHSC, DSHS, and DFPS — as well as members representing institutions of higher education that receive general revenue for aging services.[16]
- **Public Health Funding and Policy Committee (PHFPC).** The Legislature established PHFPC in 2011 and tasked it with making formal recommendations to DSHS concerning funds available to local health entities, ways to improve overall public health, and methods of fostering a collaborative relationship between DSHS and local health entities.[17] DSHS is statutorily required to respond to PHFPC's recommendations either by implementing the recommendations or explaining why it has not done so.[18] The committee consists of nine members appointed by the DSHS commissioner who serve staggered six-year terms.[19]
- **Texas Maternal Mortality and Morbidity Review Committee (TMMMRC).** The Legislature created TMMMRC in 2013 in response to Texas' high maternal mortality rate as compared to the national average.[20] The committee consists of 23 members, including 21 members appointed by the DSHS commissioner who serve staggered six-year terms and two DSHS employees.[21] TMMMRC reviews pregnancy-related deaths, including trends and disparities in these deaths, health conditions and factors affecting the most at-risk populations, and best practices and programs operating in other states that have reduced rates of pregnancy-related death.[22] TMMMRC produces a joint report with

DSHS detailing the committee's findings and making recommendations to reduce the incidence of pregnancy-related deaths and severe maternal morbidity in the state.[23]

- **Perinatal Advisory Council (PAC).** The Legislature created PAC in 2013 to develop standards for evaluating a hospital's level of perinatal care to improve health outcomes for mothers and babies and reduce Medicaid costs for the state.[24] PAC advises DSHS and the HHSC executive commissioner on the criteria to designate levels of neonatal and maternal care for hospitals and recommends best practices to improve perinatal outcomes.[25] The council consists of 19 members appointed by the HHSC executive commissioner who serve staggered three-year terms.[26]

1 Chapter 15 (HB 7), Acts of the 72nd Texas Legislature, 1st Called Session, 1991; Chapter 198 (HB 2292), Acts of the 78th Texas Legislature, Regular Session, 2003; Chapter 837 (SB 200), Acts of the 84th Texas Legislature, Regular Session, 2015; Chapter 838 (SB 202), Acts of the 84th Texas Legislature, Regular Session, 2015; Chapter 1138 (SB 208), Acts of the 84th Texas Legislature, Regular Session, 2015; Chapter 1 (SB 219), Acts of the 84th Texas Legislature, Regular Session, 2015; Chapter 316 (HB 5), Acts of the 85th Texas Legislature, Regular Session, 2017; Chapter 319 (SB 11), Acts of the 85th Texas Legislature, Regular Session, 2017; Chapter 682 (HB 2), Acts of the 85th Texas Legislature, Regular Session, 2017; Article II Special Provisions, Sec. 26, Page II-102, Chapter 1053 (SB 1), Acts of the 87th Texas Legislature, Regular Session, 2021 (General Appropriations Act), accessed online June 19, 2026, https://www.lbb.texas.gov/Documents/GAA/General_Appropriations_Act_2022_2023.pdf; and Chapter 1033 (SB 24), Acts of the 88th Texas Legislature, Regular Session, 2023.

2 Chapter 198 (HB 2292), Acts of the 78th Texas Legislature, Regular Session, 2003.

3 Chapter 837 (SB 200), Acts of the 84th Texas Legislature, Regular Session, 2015.

4 Chapter 316 (HB 5), Acts of the 85th Texas Legislature, Regular Session, 2017.

5 All citations to Texas statutes are as they appear on https://statutes.capitol.texas.gov/. Section 521.0001(6), Texas Government Code.

6 HHSC, *Federal Fiscal Year 2025 Public Assistance Cost Allocation Plan*, p. 5, accessed online June 15, 2026, https://www.hhs.texas.gov/sites/default/files/documents/federal-fiscal-year-2025-public-assistance-cost-allocation-plan.pdf.

7 Section 523.0101, Texas Government Code.

8 Section 523.0102(b), Texas Government Code.

9 Section 523.0103, Texas Government Code.

10 Section 523.0106, Texas Government Code.

11 Section 523.00031, Texas Government Code.

12 Section 420A.004, Texas Government Code; Section 182.004, Texas Health and Safety Code; and Sections 112.023 and 115.005, Texas Human Resources Code.

13 Section 526.0809, Texas Government Code; and Sections 34.018, 117.002, and 241.187(l), Texas Health and Safety Code.

14 Chapter 484 (HB 728), Acts of the 88th Texas Legislature, Regular Session, 2023.

15 HHSC, "Statewide Interagency Aging Services Coordinating Council," accessed online June 14, 2026, https://www.hhs.texas.gov/about/advisory-committees/statewide-interagency-aging-services-coordinating-council.

16 Section 526.0803, Texas Government Code.

17 Chapter 117 and Section 117.101(a)(5), Texas Health and Safety Code.

18 Section 117.151, Texas Health and Safety Code.

19 Sections 117.052 and 117.053, Texas Health and Safety Code.

20 Legislative Reference Library of Texas, "SB 495, 83rd R.S. History," p. 5, accessed online October 20, 2025, https://lrl.texas.gov/scanned/hroBillAnalyses/83-0/SB495.PDF; Brittney Martin, "Texas' rate of pregnancy-related deaths nearly doubles, and no one knows why," *Dallas Morning News*, August 17, 2016, accessed online October 27, 2025, https://www.dallasnews.com/news/politics/2016/08/17/texas-rate-of-pregnancy-related-deaths-nearly-doubles-and-no-one-knows-why/.

21 Sections 34.002(b) and 34.003(a), Texas Health and Safety Code.

22 Section 34.005, Texas Health and Safety Code.

23 Section 34.015, Texas Health and Safety Code.

24 Chapter 217 (HB 15), Acts of the 83rd Legislature, Regular Session, 2013; House Research Organization, "Bill Analysis HB 15: 83rd Regular Session, 2013," April 16, 2013, pp. 3-4, accessed online July 20, 2026, https://hro.house.texas.gov/pdf/ba83R/HB0015.PDF.

25 Section 241.187(g), Texas Health and Safety Code.

26 Sections 241.187(b) and (d), Texas Health and Safety Code.

# Introduction | Conservatorship in Texas

When a child cannot safely remain in their home, a court may order the Department of Family and Protective Services (DFPS) to take custody of the child, an arrangement referred to as conservatorship. Children in DFPS conservatorship are cared for outside of the home through the state's foster care system or by relatives and family friends, called kinship care. This introduction provides an overview of the key concepts and processes related to conservatorship in Texas.

## Background

DFPS is responsible for investigating allegations of child abuse and neglect and conducting safety assessments of children in their homes and residential and day care settings. If an investigator finds the child to be in immediate danger that cannot be mitigated, DFPS may ask a court for conservatorship of the child to remove the child from the home.[1] If the court agrees, the court grants **conservatorship** to DFPS, meaning the agency is now legally responsible for the child's care and protection and can make the decisions a parent or guardian typically makes.[2] DFPS conservatorship is usually temporary at this point, but the court may grant other types of conservatorship, as discussed in the *Conservatorship Types* textbox.[3]

**Conservatorship Types**

- **Temporary Managing Conservatorship.** DFPS has temporary responsibility for a child while the case is pending.
- **Permanent Managing Conservatorship.** DFPS has long-term responsibility for a child when reunification is no longer the primary goal. Parental rights may be either terminated or remain intact, depending on the circumstances of the case.
- **Joint Managing Conservatorship.** DFPS shares certain rights and responsibilities for a child with one or more other parties such as a parent or caregiver.

Once a child is in DFPS conservatorship, DFPS or a nonprofit organization or local governmental entity finds an appropriate living arrangement for the child, also called a **placement**.[4] If a relative or family friend is willing to take the child, DFPS may place the child with the relative or family friend, also called a **kinship placement**.[5] Children without a kinship placement are generally placed in **foster care**, meaning the child is placed in a temporary out-of-home setting that provides 24-hour care.[6] DFPS prioritizes finding the most family-like setting for the child.[7] The following page provides more information on placement types.

The court strictly monitors the parents' service plan progress and evaluates DFPS' placement efforts during mandatory hearings to determine the long-term custody outcome for the child.[8] DFPS and the court work with the child's parents toward finding a permanent living situation for the child, also called **permanency**.[9] Potential permanency outcomes include reunification with parents, placement with a relative or family friend, adoption, or other permanent living arrangement. The legal process for conservatorship generally takes up to 12 months, with the possibility of a one-time six-month extension.[10]

### Child Population

According to federal data for fiscal year 2024, over 343,000 children and youth under age 18 in the United States were in foster care on September 30, 2024.[11] By the end of Texas fiscal year 2024, DFPS served as the legal conservator for 17,302 children in Texas, representing approximately 5 percent of the U.S. foster

care population. Among all 50 states, Texas has the fourth largest foster care population.[12] By the end of state fiscal year 2025, the number of children in DFPS legal conservatorship had increased to 17,623.

### Placement

While in DFPS conservatorship, children can live in a variety of placement types depending on their needs and circumstances. **Substitute care** is the broad term that covers any out-of-home placement provided for a child in DFPS conservatorship. Conservatorship requires DFPS to make more permanent, long-term plans to secure the child's future well-being. At the end of fiscal year 2025, approximately 35 percent of children in DFPS conservatorship lived in nonrelative foster homes, nearly 43 percent lived in kinship-related placements, and about 7 percent resided in residential treatment centers, as shown in the *Children and Young Adults in Substitute Care* chart below. The remaining 15 percent lived in other placement types, as described in the *Placement Types* textbox below.

**Children and Young Adults in Substitute Care - FY 2025**




**Placement Types**

- **Foster home:** Provides care for children in a family setting. Foster parents are verified by DFPS or a licensed child-placing agency. The Health and Human Services Commission (HHSC) regulates child-placing agencies.
- **Kinship care:** Children are placed with relatives or family friends (also called fictive kin), who may also become licensed foster parents. When available and appropriate, kinship care is generally the preferred placement option because it allows children to maintain family and community connections.
- **General residential operations (GRO):** Facilities that provide 24-hour care in a structured group setting for children in DFPS conservatorship.
- **Residential treatment centers (RTC):** Includes GROs that provide specialized therapeutic services for children with significant behavioral, emotional, or mental health needs.
- **Emergency shelter:** Provides short-term care while DFPS identifies a long-term placement for a child.
- **Psychiatric hospitals:** Children with acute behavioral or mental health needs may temporarily reside in psychiatric hospitals or other medical settings for stabilization and treatment.
- **Adoptive home:** Approved by DFPS or a child-placing agency for the adoption of children from the child welfare system. Kinship and fictive kin can also be a licensed adoptive home.
- **Independent living settings:** Voluntary extended foster care placements where young adults (ages 18-20) live semi-independently without 24-hour in-home adult supervision.

### Family Engagement and Diversion Efforts

Since the last Sunset review of DFPS, the number of children in the state's conservatorship has significantly decreased as state statute and DFPS policy and practice have changed to try to keep more children out of foster care and at home safely with their parents. DFPS, at the direction of the Legislature, has implemented several initiatives aimed at keeping children and youth safely in their homes whenever possible. In 2013, the Legislature passed Senate Bill 423, allowing DFPS to create an alternate path for low-risk cases in an effort to promote collaboration with families and increase successful reunifications.[13] Starting in 2014, DFPS implemented **Alternative Response (AR)**, a different way for Child Protective Investigations (CPI) to respond to reports of abuse and neglect. Unlike a traditional investigation, AR does not focus on substantiating allegations or designating a perpetrator of abuse and neglect. Instead, AR focuses on working with the family to develop realistic and sustainable safety measures to protect the child and reduce the likelihood of future DFPS involvement. Additionally, through Child Protective Services (CPS), DFPS has provided **Family-Based Safety Services (FBSS)**, which have been referred to as "in-home services" or "family preservation services" and taken various forms since the 1970s.[14] The federal Family First Prevention Services Act, enacted in 2018, has also helped shift state child welfare policy toward reducing entry into foster care.[15] In 2021, the Legislature directed DFPS to establish **Texas Family First (TFF)**, a pilot program that allows, through a court order, certain families with children at risk of entering foster care to receive evidence-based preservation services, including mental health services, substance use treatment, and intensive parenting support.

In 2021, the Legislature also passed House Bill 567, which narrowed the definition of neglect to mean an act or omission "evidencing the person's blatant disregard" for their actions or whose inaction "results in harm to the child or creates an immediate danger to the child's physical health or safety" and replaced "substantial risk of harm" with "immediate danger."[16] These changes raised the legal threshold for DFPS to remove a child from a home based on neglectful supervision and eliminated removals in nonemergency situations. The Legislature's intention behind tightening the state's legal definition of neglect was to reduce unnecessary removals and distinguish cases requiring state intervention from those better addressed through family support services.

These diversion efforts have likely contributed to declining numbers of children and youth being removed from their homes and placed in DFPS conservatorship. Per federal data for fiscal year 2024, Texas had the third-lowest child removal rate among states at about 1.2 removals per 1,000 children.[17] The accompanying chart, *Children in DFPS Conservatorship*, provides a snapshot of the number of children and youth in DFPS conservatorship at the end of each of the last six fiscal years. During this period, the number of children and youth in conservatorship decreased by approximately 41 percent.

**Children in DFPS Conservatorship, FYs 2020-25**



## Community-Based Care

The term Community-Based Care (CBC) refers to the regional privatization of the state's foster care system. DFPS aims to keep children closer to home by relying on nonprofit organizations and local governmental entities, rather than the state, to provide placement, case management, and other substitute care services for children and youth in DFPS conservatorship. DFPS has contracted with a number of nonprofit organizations known as **Single Source Continuum Contractors (SSCC)**, which are responsible for a designated geographic service area, also called a catchment area.[18] DFPS has divided its original 11 administrative regions into 16 catchment areas. In this report, SSCC-operated catchment areas are referred to as **SSCC regions**, while DFPS-operated areas are referred to as **legacy regions**.

### Elements of CBC Transition

When DFPS awards a contract to an SSCC for a region, the SSCC moves through three stages and takes on more responsibility in each, as explained in the textbox *CBC Transition Stages*. The state has been transitioning toward a privatized foster care model for over 15 years; currently, SSCCs operate in 10 of the state's 16 regions, as shown in the *Community-Based Care in Texas* map on Page 21. The timeline on the following page, *Key Events in Foster Care Privatization*, details key dates and developments in this transition.

#### CBC Transition Stages

**Stage I:** The SSCC develops a network of providers and takes over placement from DFPS or another SSCC for all children in the region, placing children in foster homes or other living arrangements. DFPS or SSCC continues to provide foster care case management.

**Stage II:** The SSCC takes over all remaining functions related to children in DFPS conservatorship, including foster care case management, kinship, and reunification services.

**Stage III:** The SSCC provides all placement and case management functions, and DFPS applies incentives or remedies based on the SSCC's reduction in paid care days.

### Key Events in Foster Care Privatization

**2010**: DFPS creates the Public Private Partnership (PPP). This committee is tasked with creating the model for Foster Care Redesign.

**2011**: The Legislature codifies PPP recommendations and directs DFPS to move forward with implementing Foster Care Redesign through Senate Bill 218.

**2012-13**: An SSCC is awarded a contract for Regions 2 and 9, and a separate SSCC is awarded a contract for Region 3B to begin providing placement services but not case management for children in foster care.

**2014**: The SSCC contract for Regions 2 and 9 is voluntarily terminated, and those regions revert to legacy regions. Region 3B enters Stage I.

**2017**: The Legislature renames Foster Care Redesign to Community-Based Care through Senate Bill 11. Region 3B renews its contract.

**2018-19**: An SSCC is awarded a contract for Region 1. Regions 2 and 8A begin Stage I of CBC. After nine years, only three regions of the state have begun transitioning to CBC, and no regions provide foster care case management.

**2020**: Regions 2 and 3W (previously 3B) transition to Stage II, becoming the first two regions of the state to provide foster care case management. Region 1 enters Stage I.

**2021-25**: In 2021, Region 8A voluntarily terminates its contract and transitions from the SSCC to DFPS.

During this five-year time period, four regions transition to Stage III, three regions transition to Stage II, and three regions are awarded contracts, including Region 8A.

**2026**: Region 8A transitions to Stage II, and three regions transition to Stage III.

DFPS petitions the court to place the Region 3E SSCC in receivership because of child safety concerns. DFPS begins transitioning foster care case management to two existing SSCCs, and the contract is terminated effective January 2027.

Generally, an SSCC is expected to take over placement for the region in Stage I and foster care case management in Stage II. An SSCC takes over several other substitute care services that include a number of tasks that a caseworker performs to ensure a child's safety and well-being. The textbox below, *Privatized Functions in CBC*, lists key DFPS functions that become the responsibility of SSCCs under CBC.[19]

**Privatized Functions in CBC**

- **Foster care case management:** Provide services to ensure the safety of children in foster care through regular face-to-face visits; manage legal cases involving children in DFPS conservatorship and represent DFPS during court proceedings; connect children and parents to needed services; and facilitate adoptions of children in foster care when parental rights are terminated.
- **Placement:** Find and secure living arrangements for children in DFPS conservatorship and enter into contracts with residential child care providers such as child-placing agencies that license foster homes, GROs, and RTCs.
- **Kinship services:** Support relatives and fictive kin serving as placements for children in DFPS conservatorship.
- **Preparation for Adult Living (PAL):** Provide services for youth in foster care aged 14 and older to prepare for adulthood.
- **Extended foster care:** Provide case management services for former foster youth aged 18 to 21 years (or 22 if completing high school or an equivalent program) who choose to be in a supervised placement to prepare for adulthood.

Typically, readiness and implementation for Stages I and II take 12 months, and Stage III continues for the remainder of the contract.[20] DFPS monitors the SSCC throughout its contract, which may last up to 10 years (an initial five-year term with a one-time five-year renewal option).[21] When an SSCC's contract ends, DFPS will rebid the contract for that region. The Legislature's expectation is that the SSCC will be selected again for the region and remain in Stage III. However, DFPS could select a new nonprofit organization or local governmental entity. Depending on the contract, a newly selected SSCC may transition through both Stage I and II to take over responsibility for the region, as appropriate.[22]

In 2025, the Legislature funded four more regions to procure an SSCC: 7A, 7B, 11A, and 11B.[23] The Legislature also directed DFPS to implement a rural CBC pilot program aimed at improving child welfare services in certain rural areas where the CBC model has been offered but not successfully established due to financial concerns, as further discussed in Issue 1 of this report.[24] DFPS has procured a nonprofit entity to partner with the agency to develop and implement the pilot program in Region 9. The *Community-Based Care in Texas* map on the following page shows the lead entity responsible for the pilot program and the SSCCs responsible for CBC implementation in each region as of July 2026.

**Community-Based Care in Texas**



## CBC Child Population

In fiscal year 2025, about half of the children and youth in foster care received case management services from an SSCC. That number is estimated to increase around 79 percent by fiscal year 2028 if Regions 6A and 6B (Houston and surrounding counties) transition from Stage I to Stage II. The chart below, *Children in DFPS Conservatorship by Legacy and SSCC Regions*, shows the decreasing number of children residing in legacy regions versus the growing number residing in SSCC regions over the last six fiscal years.

**Children in DFPS Conservatorship by Legacy and SSCC Regions, FYs 2020-25**




## CBC Funding Model

As the transition to CBC has progressed, the Legislature has appropriated funding to support SSCC case management beyond what DFPS legacy case management services receive to support SSCCs in carrying out their contracted duties. Additionally, some SSCCs rely on external funding such as grants or philanthropic funds to supplement what they receive from the state. The current CBC funding model is based on the historical costs of the state performing key functions in the legacy foster care system and includes the following components:

- **Resource transfer.** The resource transfer shifts funding from DFPS to an SSCC to perform the contracted functions. DFPS calculates the amount of this transfer using the number and salaries of DFPS caseworkers, supervisors, and operational support staff who provide key functions such as foster care case management in the region. DFPS reduces its full-time equivalent (FTE) positions based on this calculation and shifts the equivalent funding to the SSCC. While an SSCC generally uses these funds to hire staff, they are not required to hire the same number or types of staff that the DFPS legacy region had, thus allowing the SSCC to decide how to best spend the funds. From fiscal year 2019 to 2025, DFPS transferred funding equivalent to a total of 1,781 FTEs to SSCCs, including 984 conservatorship caseworkers. The *SSCC Staffing by Region* table on the following page shows the number of SSCC staff at the end of fiscal year 2025.

**SSCC Staffing by Region - FY 2025**

| Region | SSCC | FTEs |
|---|---|---|
| Region 1 | Saint Francis Ministries | 263 |
| Region 2 | 2INgage | 188 |
| Region 3W | Our Community Our Kids | 437 |
| Region 3E | EMPOWER | 359 |
| Region 4 | 4Kids4Families | 316 |
| Region 5 | Texas Family Care Network | 197 |
| Regions 6A and 6B | Texans Together | 3* |
| Regions 8A and 8B | Belong/SJRC Texas | 369 |
| **Total** | | **2,132** |

* Texans Together contracted with DFPS in April 2025, but staff hiring began in Stage I readiness in fiscal year 2026.

- **Foster care payments.** SSCCs receive foster care payments from DFPS to pay subcontracted residential child care providers that provide placements for children and youth in foster care. These residential subcontractors include child-placing agencies that license foster homes as well as GROs, emergency shelters, and RTCs. DFPS distributes these payments based on the projected number of children in care. However, the actual cost may be more or less than what the SSCC received from DFPS. Recognizing that SSCCs need flexibility to address a child population with changing needs, DFPS and SSCCs reconcile the cost difference between projected and actual child case mix each year. For children with needs that exceed those captured in the blended rate case mix, DFPS pays the SSCCs an exceptional care rate. Each year, DFPS and SSCCs reconcile the difference between projected and actual exceptional care cost using 50/50 cost sharing, with DFPS and each SSCC equally sharing the difference.

- **Client service payments.** SSCCs receive funding from DFPS to provide non-Medicaid eligible services for children in foster care and their families to support family reunification or other permanency outcomes such as adoption or youth aging out of foster care.

- **SSCC-specific payments.** The resource transfer, foster care payments, and client service payments are funded from state appropriations that DFPS shifts to SSCCs. The Legislature developed additional funding streams specifically to support SSCCs with CBC. These funding streams include funding for start-up activities, administrative responsibilities not captured by the resource transfer, technological infrastructure and development of a residential provider network, and specialized funding initiatives such as kinship family grants.

### Foster Care Litigation

In 2011, Children's Rights, a national child advocacy group based in New York City, filed a federal class-action lawsuit (*M.D. v. Abbott*, formerly *M.D. v. Perry*) involving the Texas governor, HHSC, and DFPS alleging the constitutional rights of children in the state's permanent managing conservatorship had been violated. Following a trial, the federal district court found that Texas' long-term foster care system had violated children's constitutional right to be free from unreasonable risk of serious harm under the Fourteenth Amendment. Consequently, the court issued the state a series of remedial orders to address identified deficiencies and appointed two court monitors to ensure the state complies with

these orders. Nearly 15 years later, although portions of the case have been appealed and some orders have been modified, the litigation remains active.

Since 2019, DFPS has been making efforts to comply with over 40 remedial orders. These orders charge the state with performing timely and thorough investigations, lowering caseloads for caseworkers, ensuring DFPS staff receive sufficient training, and ensuring children are not placed in settings with unreasonable risk of serious harm. These orders also apply to SSCCs.

Other remedial orders apply to HHSC, primarily those related to the regulatory monitoring and oversight functions of the state's licensing authority. Additionally, there are orders governing facility inspections, incident reporting, and enforcement actions for licensed foster care operations. HHSC is responsible for ensuring placements maintain appropriate staff-to-child ratios, verifying background checks, and ensuring compliance with standards related to safety and emergency preparedness.

One of the more impactful orders resulting from the litigation is Heightened Monitoring. This order requires DFPS and HHSC to identify and address residential child care providers that demonstrate patterns of concern related to contract performance, minimum standards of care, or child safety. Once a provider has been selected for Heightened Monitoring, they are subject to ongoing monitoring activities, including weekly unannounced visits, placement approval requirements, and ongoing tracking of compliance with corrective action plans.

1 All citations to Texas statutes are as they appear on http://www.statutes.capitol.texas.gov/. Section 262.101, Texas Family Code.

2 Section 153.371, Texas Family Code.

3 Sections 105.001(a)(1) and 153.005(a)(b), Texas Family Code.

4 Section 263.001(4), Texas Family Code.

5 Section 264.851(2), Texas Family Code.

6 Section 101.0133, Texas Family Code.

7 Sections 264.001(3-a) and 264.107(c), Texas Family Code.

8 Chapter 152, Texas Family Code.

9 Section 263.102(a)(5)-(6), Texas Family Code.

10 Section 263.401, Texas Family Code.

11 U.S. Department of Health and Human Services (HHS), Administration for Children and Families, Children's Bureau, *"Children in Foster Care on September 30, 2024,"* accessed online July 8, 2026, https://cwoutcomes.acf.hhs.gov/cwodatasite/inCareSeptemberThirty/index/.

12 Ibid.

13 Chapter 420 (SB 423), Acts of the 83rd Legislature, Regular Session, 2013.

14 DFPS, *Study of Options for Implementing Family Preservation Services*, October 1, 2022, p. 4, accessed online June 5, 2026, https://www.dfps.texas.gov/About_DFPS/Reports_and_Presentations/CPS/documents/2022/2022-09-30_SB910_Family_Preservation_Services_Report.pdf.

15 DFPS, *Family First Prevention Services Act*, accessed online June 5, 2026, https://www.dfps.texas.gov/Child_Protection/Family_First/.

16 Chapter 8 (HB 567), Acts of the 87th Legislature, Regular Session, 2021.

17 HHS, Children's Bureau, *"Children in Foster Care During Federal Fiscal Year 2024,"* accessed online August 27, 2026, https://cwoutcomes.acf.hhs.gov/cwodatasite/enteredCare/index/.

18 Section 264.152(3), Texas Family Code.

19 Section 264.152(2), Texas Family Code.

20 Section 264.155(a)(1) and (5), Texas Family Code.

21 Texas Comptroller of Public Accounts, *State of Texas Procurement and Contract Management Guide*, accessed online July 28, 2026, https://comptroller.texas.gov/purchasing/publications/procurement-contract.php.

22 Sections 264.154(a), 264.155(a)(1) and (5), and 264.157, Texas Family Code.

23 DFPS, Rider 25, Page II-15, Article II, Chapter 1185 (SB 1), Acts of the 89th Legislature, Regular Session, 2025 (General Appropriations Act), accessed online July 8, 2026, https://www.lbb.texas.gov/Documents/GAA/General_Appropriations_Act_2026_2027.pdf.

24 Section 264.181(3)-(4), Texas Family Code.

# Agency at a Glance

In 2015, following Sunset's review of the state's health and human services system, the Legislature consolidated five agencies into three while retaining the Department of Family and Protective Services (DFPS) as a separate agency under the ultimate authority of the Health and Human Services Commission (HHSC).[1] Two years later, the Legislature re-established DFPS as a stand-alone agency with independent rulemaking authority. At that time, DFPS' regulatory and licensing functions were transferred to HHSC, while certain administrative functions previously consolidated at HHSC were returned to DFPS.[2] Today, DFPS serves as the state's frontline protective services agency tasked with protecting children, adults aged 65 and older, and adults with disabilities from abuse, neglect, and exploitation by carrying out the following key functions:

- Receiving and routing reports of abuse, neglect, and exploitation through a statewide 24/7 intake system that serves as the front door to the state's protective services network.
- Investigating allegations of abuse, neglect, and exploitation involving children, elderly adults, and adults with disabilities and taking protective action when necessary to ensure their safety.
- Providing services to families and vulnerable individuals to address safety risks and prevent future abuse and neglect, with the intent of keeping families together when possible.
- Removing children from their homes when necessary for their safety due to abuse and neglect, acting as their temporary guardian, and providing services to help them safely return home or achieve stability by living with relatives, foster parents, adoptive parents, or independently as an adult.
- Transferring administration of case management and placement services to and providing oversight and administrative support for contracted nonprofit or local governmental organizations in some regions of the state, also referred to as Community-Based Care (CBC).

## Key Facts

- **Governance.** With the advice and consent of the Senate, the governor appoints a commissioner to lead the agency for a two-year term.[3] The commissioner both oversees and serves as the administrative head of DFPS.[4]
- **Funding.** As shown in the *DFPS Sources of Revenue* chart on the following page, in fiscal year 2025 DFPS received $2.4 billion in revenue, including approximately $1.6 billion in general revenue and about $817 million in federal funds. Major federal funding sources include over $318 million from Title IV-E of the Social Security Act for Foster Care, Adoption, and Guardianship Assistance and about $329 million from Temporary Assistance for Needy Families (TANF).

**DFPS Sources of Revenue - FY 2025**




The *DFPS Expenditures* chart below shows the agency's expenditures in fiscal year 2025, which totaled $2.4 billion. DFPS spent about 65 percent of its overall funding on Child Protective Services (CPS) and Child Protective Investigations (CPI), mostly for direct delivery staff, foster care payments, and adoption subsidy and permanency care assistance payments. The agency allocated the second biggest portion of its funding, about 21 percent, toward CBC. As case management and placement services are transferred from CPS to nonprofit organizations or local governmental entities in privatized regions of the state, DFPS provides funding to finance these organizations' costs of delivering these services, including direct delivery staff and foster care payments. Other expenditures include expenses associated with the Office of CBC Transition, agencywide automated systems, and indirect administration.

**DFPS Expenditures - FY 2025**



Appendix A describes DFPS' use of historically underutilized businesses in purchasing goods and services for fiscal years 2023 to 2025.

- **Staffing.** At the end of fiscal year 2025, DFPS employed 11,731 staff. About 74 percent of staff worked in CPS and CPI, with 7 percent in Adult Protective Services (APS) and 4 percent in Statewide Intake (SWI). The remaining 15 percent of employees were administrative and support staff. The *DFPS Organizational Chart* below depicts the agency's organizational structure.

**DFPS Organizational Chart**




Appendix B compares the percentages of minorities and women in DFPS' workforce to the statewide civilian labor force for the past three fiscal years. DFPS staff is located statewide across the agency's 11 regions, as shown in the *DFPS Administrative Regions* map on Page 32.

- **Statewide Intake.** DFPS operates the 24/7 Texas Abuse Hotline, the centralized call center that serves as the front door to the agency's protective services. SWI intake specialists receive, assess, and route reports of abuse, neglect, and exploitation of children and vulnerable adults to the appropriate DFPS program and local office and to HHSC when employees in certain types of health care and long-term care facilities are involved. Reports are accepted via phone, internet, mail, and fax. In fiscal year 2025, SWI received 429,576 reports of alleged abuse and neglect. Of those, 69 percent related to children and 29 percent related to adult in-home investigations. The remaining 2 percent were routed to HHSC Provider Investigations. The *Abuse and Neglect Contacts by Method of Receipt* table shows the total number of contacts related to abuse and neglect received in fiscal year 2025 by method of receipt.

**Abuse and Neglect Contacts by Method of Receipt - FY 2025**

| Method | Total Contacts | Percentage of Total |
|---|---|---|
| Phone | 311,519 | 72.5% |
| Internet | 110,812 | 25.8% |
| Mail/Fax | 7,245 | 1.7% |
| Total | 429,576 | 100% |

- **Child Protective Investigations.** DFPS investigates allegations of child abuse and neglect perpetrated by a child's caregiver, a school employee, or a school volunteer. CPI also includes Child Care Investigations, which investigates allegations of abuse and neglect in regulated child care settings, including day care centers, foster homes, and 24-hour residential facilities. In fiscal year 2025, CPI received 289,854 reports of alleged child abuse and neglect, completed 141,158 investigations, and confirmed abuse and neglect in 33,538 cases.

  Alternative Response (AR). In November 2014, DFPS implemented AR — a collaborative approach for low-risk reports of abuse and neglect that focuses on helping families address child safety concerns without a full investigation. In an AR case, investigators work with parents to assess safety and connect them to voluntary services such as parenting education, counseling, or community programs that support family stability and reduce the likelihood of future CPI involvement. Unlike a traditional investigation, AR does not determine whether abuse and neglect occurred, nor does it designate a perpetrator. In fiscal year 2025, SWI assigned 15 percent of all child-related abuse and neglect intakes as AR. DFPS is currently expanding AR statewide with the goal of serving more families and reducing the number of families subject to a traditional investigation.

- **Child Protective Services.** If an investigation substantiates allegations of child abuse and neglect and determines that a child is not safe or may not be safe in the immediate future, the investigator may refer the case to CPS for protective services. The type of service CPS delivers depends on whether the child can remain safely in the home. In some cases, the investigator may determine the child can remain safely in the home only if specific safety conditions are in place, such as supervised parent-child contact or requiring the parent and child to live separately from the source of danger, as typically outlined in an agency-developed child safety plan.

  Family-Based Safety Services (FBSS). DFPS offers FBSS when there are risks to child safety but the investigator determines that the child can remain safely in the home with or without a child safety plan. FBSS prevents the need for court-ordered removal of the child from the home while the parents participate in services to address the identified concerns. FBSS can provide a family with a variety of services, as listed in the *Examples of FBSS Services* textbox, either directly or through contracted service providers. The caseworker closes the family's case when the family has adhered to the service plan and the caseworker determines that child safety risks have sufficiently decreased. In fiscal year 2025, FBSS served a total of 59,917 children.

  **Examples of FBSS Services**

  - Family counseling
  - Crisis intervention
  - Parenting classes
  - Substance abuse treatment
  - Domestic violence intervention
  - Day care

  Conservatorship. If either the CPI investigator or FBSS caseworker determines that it is not safe for the child to remain at home and there is no viable child safety plan or the family is unwilling to follow the service plan, the agency may petition the court for removal of the child. If the court grants the petition, the child is placed in DFPS temporary conservatorship until permanency can be achieved. Appendix C, *State Conservatorship Timeline*, illustrates the court process for conservatorship.

  Once a child is removed, CPS assigns a conservatorship caseworker to monitor and ensure the safety of the child in temporary conservatorship while working to achieve permanency for the child. Permanency is achieved in a variety of ways, including reunification with family, adoption, or transition out of foster care into independent living as an adult. CPS staff provides case management services

in state-operated legacy regions of the state, while nonprofit organizations or local government entities provide these services in privatized regions.

At the end of fiscal year 2025, DFPS had 17,623 children in its custody. Over the last several years, the number of children in conservatorship has significantly decreased due to policy changes by the Legislature aimed at keeping more children out of the child welfare system and at home with their parents. Between fiscal years 2020 and 2025, the number of children in DFPS conservatorship decreased from 29,818 to 17,623, a reduction of about 41 percent.

- **Community-Based Care.** In 2017, the Legislature directed DFPS to contract with community-based nonprofit organizations or local government entities, also called Single Source Continuum Contractors (SSCC), to provide case management and placement services within designated geographic "catchment areas" or regions across the state.[5] CBC's goal is to shift from a state-managed system to a community-based system with more flexibility to develop services that reflect the local community and its needs.[6] SSCCs are responsible for coordinating the full continuum of services for children and youth in DFPS conservatorship within their assigned region. These services include placement, case management, and substitute care for children in DFPS conservatorship or young adults receiving services through the extended foster care program. By the end of fiscal year 2025, 8,571 children, or about half of all children in DFPS' conservatorship, were served through an SSCC. Collectively, the eight operating SSCCs employed 2,132 staff.

- **Adult Protective Services.** DFPS investigates allegations of abuse, neglect, and financial exploitation of adults aged 65 or older and adults with disabilities. APS conducts in-home investigations when the adult, or client, lives in their own home or in a setting not investigated by another state agency such as unlicensed adult foster homes or unlicensed board and care homes. APS caseworkers assess client safety, coordinate protective services on a voluntary basis to reduce or prevent further harm, and connect clients with medical services, housing assistance, and community resources to help them maintain independence and dignity.

APS may also pay for short-term expenses on an emergency basis using purchased client services, which totaled about $9 million in fiscal year 2025. The *Common APS-Purchased Services* textbox provides some examples of these services. In extreme cases, APS may seek a court order for emergency protective services to remove a client from a dangerous situation.

In fiscal year 2025, DFPS received 125,382 allegations of abuse, neglect, and financial exploitation perpetrated against individuals aged 65 or older and adults with disabilities. APS completed 82,841 in-home investigations that same year and validated abuse, neglect, and financial exploitation in 50,480 cases. As shown in the *Adult Protective Services Districts* map on the following page, APS is organized into five districts within DFPS' 11 administrative regions, with district offices overseeing field operations and casework at the local level.

**Common APS-Purchased Services**

- Utilities
- Groceries
- Minor home repairs (e.g., plumbing, electrical)
- Rent or emergency shelter
- Personal care items
- Wheelchair ramps or accessibility modifications
- Medication or adaptive equipment

## Adult Protective Services Districts




## DFPS Administrative Regions



[1] Chapter 837 (SB 200), Acts of the 84th Legislature, Regular Session, 2015.

[2] Chapter 316 (HB 5), Acts of the 85th Legislature, Regular Session, 2017.

[3] All citations to Texas statutes are as they appear on http://www.statutes.capitol.texas.gov/. Section 40.027(a)-(b), Texas Human Resources Code.

[4] Section 40.027(c)(1), Texas Human Resources Code.

[5] Section 264.151(a), Texas Family Code.

[6] DFPS, "Frequently Asked Questions," *Community-Based Care*, 2026, accessed May 14, 2026, https://www.dfps.texas.gov/CBC/FAQ/default.asp.

# Issue 1

## Without More Tailored Oversight Tools, DFPS Cannot Ensure the State's Privatized Foster Care System Provides Quality Case Management That Protects Children and Supports Families.

## Background

The state of Texas, through the Department of Family and Protective Services (DFPS), is the legal parent of children in foster care.[1] In such cases, the courts removed these children from their parents' care due to abuse or neglect severe enough to warrant serious action with the expectation these children will be better off, at least temporarily, in state custody. While the child is in foster care, a caseworker engages with the parents and the child with the intention that treatment or other services can help parents again provide a safe home for their child and help the child recover from the trauma experienced.

In 2012, the state began transitioning from a state-managed foster care system to a privatized model called Community-Based Care (CBC) that aims to keep children closer to home by relying on nonprofit organizations and local governmental entities to develop community-based services able to meet children's needs locally. DFPS is responsible for implementing this transition, namely by outsourcing foster care case management at the regional level with DFPS oversight.[2] DFPS contracts with a number of nonprofit organizations referred to as Single Source Continuum Contractors (SSCC). SSCCs are responsible for ensuring the safety and well-being of children in foster care by conducting visits with the family and child, connecting children and their families to services, identifying and paying for placements for children, and participating in legal case proceedings.[3]

Since 2012, DFPS has procured SSCCs for the state on a phased timeline. As further discussed in the *Introduction to Conservatorship in Texas* section of this report, DFPS divided its original 11 administrative regions into 16 catchment areas. As of May 2026, 10 of the 16 catchment areas have an SSCC and over 60 percent of the approximately 17,400 children in foster care are receiving full case management services from an SSCC. DFPS continues to operate the legacy, state-managed foster care system in the other six regions until an SSCC can be procured. In this report, SSCC-operated catchment areas are referred to as SSCC regions, while DFPS-operated areas are referred to as legacy regions.

As a region transitions to CBC, the SSCC progresses through several stages with each stage increasing the SSCC's role and responsibilities in foster care case management, moving from providing discrete functions such as finding placements for children in foster care to carrying out all foster care case management functions. SSCCs scale up in staff and operational capacity as DFPS eliminates its own regional foster care case management positions and transfers the associated funding to the SSCC. SSCCs commonly hire staff who performed the same or similar foster care case management roles at DFPS because statute requires CBC contracts to require SSCCs to give hiring preference to DFPS employees whose positions will be eliminated in the transition to CBC.[4] The *CBC Quick Facts* table provides some additional facts on the rollout of CBC.

**CBC Quick Facts**

| | |
|---|---|
| Foster care population in full SSCC regions at the end of April 2026 | 10,521 |
| Number of staff employed by SSCCs as of March 2026 | 2,325 |

For additional information on the foster care system in Texas and the CBC model, see the *Introduction to Conservatorship in Texas* section of this report.

## Findings

### The state's foster care system faces a compounding set of internal fiscal pressures and external structural risks that challenge its long-term financial stability and CBC success.

Texas' foster care system faces increasing operational costs.

The state's privatized foster care system carries a higher operational cost than the legacy system previously operated by DFPS. This fiscal reality stems from two primary drivers: the creation of new, multilayered state oversight roles and increased administrative costs. Without finding other efficiencies, the financial realities of the CBC model may continue to deter potential applicants from serving as SSCCs and threaten the long-term success and stability of the privatized model of foster care. This issue describes the risks inherent to CBC but does not recommend a significant overhaul of the state's model of foster care. Recommending such an overhaul would require significant policy decisions outside of Sunset staff's scope. Instead, Sunset staff identified areas of SSCC oversight that, if improved, could better support CBC and ensure the safety and well-being of children and families.

The chart, *CBC Expenditures*, shows the total expenditures on CBC in fiscal year 2025 broken down into four categories. Two of these categories represent costs that exist in both the legacy and CBC foster care system, while two — CBC oversight and additional SSCC-specific — represent new categories of expenditures in the state's foster care system because of the transition to CBC.

**CBC Expenditures - FY 2025**




- **Subcontractor passthrough**: This expenditure type is the same under the legacy foster care system and CBC. SSCCs pay for subcontractors, including residential placements for children and services for children and families.
- **Direct shift from DFPS to SSCCs**: This expenditure type is the same under the legacy foster care system and CBC. DFPS shifts existing funds to SSCCs when a region transitions to CBC for SSCC staff and operations.
- **Additional SSCC-specific**: This expenditure type is specific to CBC and does not exist in the legacy foster care system. SSCCs have received additional funding to cover costs not covered by the direct shift of existing funds.
- **CBC oversight**: This expenditure type is specific to CBC and does not exist in the legacy foster care system. DFPS pays for additional staff whose sole function is to provide oversight of SSCCs.

- **New and increasing oversight costs.** The oversight structure necessary to support the CBC model introduces new costs to the state, and DFPS estimates these costs will increase significantly as more regions transition to CBC. The CBC model creates organizational separation between DFPS and the SSCCs, requiring DFPS to dedicate additional staff and resources to provide operational oversight of the entities responsible for ensuring the

safety and well-being of children in foster care. Recognizing the importance of strong oversight, the Legislature has allocated additional resources and the agency has aligned its organizational structure to support this function, which funds the following oversight staff.

- **Office of Community-Based Care Transition (CBC Transition).** CBC Transition is an independent agency administratively attached to DFPS that procures an SSCC for a region, coordinates a region's transition to CBC, and serves as a liaison between DFPS and SSCCs.[5]

- **Case Management Oversight (CMO) and Other Support Staff.** CMO staff within DFPS conducts reviews of SSCC foster care cases, also known as case reads, to ensure SSCC caseworkers are complying with statute and DFPS policy to complete critical case management tasks.

- **Community-Based Care Operations (CBC Operations) Division.** CBC Operations staff within DFPS provides contract management of the SSCC contracts, oversees and enforces foster care case management policies and processes under CBC, and performs data analysis and reporting.

Strong CBC oversight requires additional staff and resources at DFPS.

While the Legislature and DFPS have taken actions to strengthen the oversight of CBC, that oversight comes with an increasing price tag. Expenditures for the dedicated CBC oversight staff totaled $9 million for about 110 employees in fiscal year 2025, although DFPS has additional staff with some duties related to CBC oversight, as reflected in the total CBC oversight costs in the *CBC Expenditures* chart on Page 36. As shown in the chart on Page 39, DFPS estimates that annual CBC oversight staff costs will increase to more than $16 million by fiscal year 2028, a 79 percent increase, to support approximately 212 employees as additional regions transition to CBC.

- **Gap between direct shifted funds and additional SSCC-specific costs.** The transfer of legacy DFPS resources fails to adequately cover the operational realities of the CBC model, creating a funding gap for case management responsibilities. During the initial transfer, an SSCC receives funding for staff and other operational costs when DFPS shifts the funding from its eliminated caseworker positions to the contractor, known as the resource transfer. However, to effectively deploy and maintain case management services for the CBC model, DFPS and SSCCs must separately maintain human resources, information technology (IT), and training and facilities management functions to support caseworkers — costs the resource transfer does not fully account for. Furthermore, SSCCs typically incur some higher costs than the legacy foster care system because SSCCs are not the state. For example, the legacy foster care system benefits from lower facilities costs by co-locating with other state agencies and from lower subcontracting costs for services such as drug testing or liability insurance due to statewide buying power. To bridge this funding gap, the Legislature

SSCC operational costs exceed state funding.

has taken targeted actions to allocate supplemental SSCC-specific funding streams outside of the standard legacy resource transfer. Specifically, the Legislature has established:

- **Additional Resource Transfer Payments.** SSCCs receive an additional 25 percent of the initial resource transfer total each year to cover operational costs and staff not covered by the shifted funds from the resource transfer.
- **Network Support Payments.** SSCCs have the flexibility to use network support payments to help support operational costs such as costs related to IT and developing a residential foster care provider network.
- **Start-Up Funding.** SSCCs receive payments to help prepare for a region's transition to CBC such as hiring training staff or purchasing phones and computers. Effective September 2025, SSCCs also began receiving payments in each of the three months before assuming full responsibility for foster care case management to support the hiring and training of caseworkers.

This supplemental funding structure means that total SSCC allocations exceed what DFPS has historically received for case management in legacy regions. However, this combined amount still fails to fully cover the operational cost of private operations. In fiscal year 2025, supplemental SSCC-specific funding streams totaled $71.5 million. These costs to the state have increased since 2019 and are expected to continue growing as additional regions transition to CBC and receive these specialized funding streams. Once the state has fully transitioned to CBC, DFPS estimates the privatized foster care model will cost an additional $120 million per year compared to what it would have cost DFPS to provide foster care case management under the legacy system.

CBC is estimated to cost the state an additional $135 million annually by 2030.

As shown in the chart on the following page, *New CBC Foster Care Costs*, by fiscal year 2030 the combined cost of the additional SSCC-specific expenditures and CBC oversight staff is about $135 million in additional expenditures that would not have existed under the legacy foster care system.




- **Decrease in foster care population.** The shrinking foster care population over the past decade has exacerbated the increased burden of administrative costs inherent to the CBC model. In addition to increases in oversight costs and gaps in operational resources, several legislative reforms have resulted in a 46 percent decrease in the foster care population between fiscal years 2018 and 2025, from approximately 32,800 to 17,600 children. While this decrease indicates that legislative policy goals have been achieved, the current CBC funding model is based on the number of children in foster care, meaning the decrease in population reduces the funding SSCCs receive to provide case management services. However, even if an SSCC has fewer children in custody, it still has a certain level of fixed operational and administrative costs it cannot easily reduce. For example, to be truly community-based, an SSCC should maintain a certain number of physical locations to support children and families in all parts of the region even if those locations serve fewer people. A decline in the foster care population reduces an SSCC's funding more than it decreases its costs.

  Furthermore, as the state takes custody of fewer children, the population of children in foster care skews toward those who have experienced severe abuse or neglect and have greater needs. As a result, the amount of casework needed to achieve permanency and ensure child safety is increasing on a per child basis because caseworkers spend more time on average coordinating placements and services for children with higher needs. This decrease in population is particularly hard for rural regions that already had a low population of children in foster care. Together, these factors mean that an SSCC's operational costs do not scale down proportionally with a declining child population, preventing an SSCC from easily reducing costs as funding decreases.

SSCC costs do not decline proportionally with child population.

- **Lack of robust competition.** DFPS reports there has not been robust competition for the SSCC contract in several regions, and the agency

DFPS faces significant challenges procuring SSCCs in rural regions.

has struggled to procure a contract for an SSCC in some rural regions. For example, DFPS posted requests for contract applications in Region 9 centered in the Permian Basin in April 2022 and Region 10 centered in El Paso in February 2024 but did not receive bids in either region. As directed by the Legislature, DFPS is developing a more flexible CBC rural pilot program in Region 9 to address this problem.[6]

The lack of robust competition likely results from the significant challenges applicants face to serve as an SSCC, including the difficulty of maintaining a stable case management workforce, insufficient placements for children and services for families, and long-term financial risks. In addition, the large upfront costs required to staff an SSCC, combined with state funding that may not cover all costs, often discourage smaller, more local entities from applying. As a result of these financial realities, large child welfare entities active in multiple states are most likely to bid for SSCC contracts. These entities often benefit from their ability to scale up administrative support and from philanthropic or grant-based funding sources. Of the 10 regions that have transitioned to CBC, SSCCs in five regions are part of entities that operate in multiple states. Even those SSCCs currently serving this function for the state may choose to exit the market due to these challenges. Should exits occur, there may be few entities willing to assume the SSCC role, which threatens the long-term stability of a statewide model of privatized foster care.

### DFPS has limited insight into SSCCs' staffing challenges, key personnel data, and other critical information that directly impacts case management quality and child safety.

DFPS lacks robust and real-time data on SSCC staffing and caseload ratios that provide insight into the quality of case management services. High-quality case management from competent, well-trained, and trusted caseworkers can be the difference between a child safely reuniting with their parents or remaining in the long-term care of the state. Case management involves more than connecting families to standard, prescriptive services such as drug testing or parenting classes; case management drives child safety. Caseworkers must regularly see the child in person and make home visits to evaluate for safety risks. For example, when a child is returned home while the caseworker monitors the situation before official case closure, a process known as return and monitor, DFPS policy strictly requires the caseworker to make face-to-face contact with the child at least once per week for the first eight weeks to ensure that the parents are continuing to demonstrate changes that support child safety.[7]

High-quality case management is critical for child safety.

The better a caseworker understands the nuances of complicated family dynamics and has built trusted rapport with children and their families, the better the safety outcomes will be. Because caseworker judgment, attention, and relationship-building skills impact child safety, any destabilization in an SSCC's staffing directly jeopardizes case management. DFPS has access to information related to SSCC staffing and case management, but that

information is not always comprehensive or up-to-date. Expanding DFPS' access to SSCC staffing information would improve the agency's ability to detect and respond to critical staffing issues before they impact operations.

- **SSCC staffing challenges and decisions impact case management quality.** An SSCC's decisions related to hiring, vacancies, and overall workforce management determine the quality of case management and therefore child safety and long-term outcomes for families. SSCCs are nonprofits with a strong understanding of child welfare principles and often have innovative ideas on how to deliver foster care case management. However, SSCCs do not always have the institutional knowledge of workforce management needed to navigate staffing shortages in the face of financial risk and limited resources. While the CBC model intentionally allows SSCCs to innovate by creating staff models or processes different from those of DFPS, SSCCs' attempts at innovation require close monitoring to ensure they are working toward positive outcomes for children and families. The *EMPOWER Receivership* textbox demonstrates how staffing decisions and challenges can lead to downstream impacts on case management and child safety.

### EMPOWER Receivership

The SSCC for the Dallas-centered Region 3E, EMPOWER, offers a case study on how challenges with staffing can be early indicators of problems with case management that can result in devastating outcomes for children and families. A judge placed EMPOWER in a receivership on March 18, 2026, based on a petition from DFPS describing system failures that created an imminent danger to children in foster care and led to infant deaths and the medical mismanagement of a child with serious medical needs. Based on DFPS' recommendation, the judge appointed a DFPS employee as the receiver of EMPOWER charged with managing the SSCC's operations. In July 2026, DFPS announced that two neighboring SSCCs would take over EMPOWER's contract for Region 3E.

- Staffing challenges. EMPOWER struggled with staffing from the initial transition to full case management in March 2024. As a result, DFPS maintained a significant presence in the region throughout fiscal years 2024 and 2025. To stabilize the region, DFPS deployed 16 DFPS master caseworkers to support the work the state was already paying the SSCC to do. After seeing some staffing stabilization and other improvements with EMPOWER's case management, DFPS support staff largely exited the region in September 2025. Soon after, EMPOWER chose to pause hiring due to concerns about costs. This pause resulted in another staffing crisis in late 2025 and early 2026.
- Overworked caseworkers. EMPOWER reported a drop from 154 case-assignable caseworkers in August 2025 to a low of 129 in February 2026. During the same time period, the percentage of EMPOWER caseworkers at or under 17 cases, as required by the SSCC contracts, fell from 97 percent to a low of 41 percent. Caseworkers were unable to keep up with the workload, leading to untimely documentation, late-filed court reports, and judicial contempt findings.
- Poor case management practices. From August 2025 to the start of the receivership, EMPOWER had consistently high weekly numbers of overdue documented face-to-face visits with children — a key case management practice for ensuring child safety. During this period, EMPOWER had a weekly average of 31 overdue face-to-face visits, twice reaching a weekly high of 93 overdue visits. These visits are crucial for assessing child safety in high-risk situations, and EMPOWER's failure to maintain regular visits likely contributed to the fatalities.

- **Limitations to SSCC staffing data.** DFPS' access to key staffing metrics from SSCCs is limited, hindering the agency's ability to identify struggling SSCCs quickly. Currently, SSCCs do not always report standardized data

to DFPS on turnover or vacancies. Additionally, while DFPS has full access to caseload data at the caseworker level, the aggregate data it receives on caseloads is not real-time and requires manual processes to use. These metrics can be a strong, early indicator that an SSCC is having problems that may ultimately impact child safety and well-being.

Problems with the child welfare workforce are not unique to SSCCs or to Texas; they represent a persistent national challenge that many states face and one that DFPS has historically dealt with in the legacy system. DFPS is well-positioned to support and advise SSCCs on decision making regarding staffing, especially when an SSCC is struggling to provide quality case management. For example, many SSCCs face high turnover and vacancies resulting from a wide array of factors, many of which are outside of an SSCC's control such as the regional job market. An SSCC may consider pausing or reducing its caseworker hiring because of concerns about costs. However, DFPS provides guidance to SSCCs to maintain robust caseworker hiring practices in anticipation of high turnover that is common in child welfare agencies. Given the agency's knowledge of child welfare workforce dynamics, obtaining real-time, direct access to data regarding hiring, vacancies, and workforce management would allow DFPS to better support SSCCs as they navigate regional staffing challenges.

When DFPS identifies that an SSCC's hiring and employee management practices are impacting the quality of case management, DFPS requires the SSCC to improve those practices through corrective actions, some examples of which are described in the *EMPOWER Hiring Corrective Actions* textbox. These select actions specifically aimed at improving the SSCC's hiring and retention were part of a wider array of corrective actions DFPS took in the lead-up to the receivership, including requiring 19 quality improvement or corrective action plans and deploying DFPS master caseworkers to the region to support EMPOWER staff. DFPS has the authority to implement interventions to improve an SSCC's hiring and retention, and more comprehensive and real-time access to data could improve the agency's ability to identify when and how an SSCC is struggling.

**EMPOWER Hiring Corrective Actions**

Prior to petitioning for receivership of EMPOWER, DFPS placed the SSCC on a corrective action plan to address problems with staffing and improve recruitment and retention, including:

- Creating a new caseload compliance position.
- Implementing a centralized hiring process to speed up hiring.
- Increasing the number of targeted hiring events at universities and job fairs.

SSCCs neither submit nor provide DFPS access to any comprehensive data related to staffing, and they are not contractually required to do so. Since August 2025, DFPS staff responsible for SSCC oversight has created a weekly report on each SSCC's number of trained caseworkers and average caseloads by pulling limited staffing and caseload metrics from other existing reports in DFPS' data warehouse. DFPS has developed an application programming interface (API) that will greatly improve the agency's access to comprehensive and real-time staffing data. SSCCs' use

of the API is voluntary, however, and DFPS reports that some SSCCs have not yet agreed to use the API.

Turnover and vacancies. Data on turnover and vacancies can indicate if an SSCC is understaffed or is struggling to retain caseworkers, both of which may have negative impacts on outcomes for children and families. High staff turnover and vacancies push cases onto remaining caseworkers, creating larger caseloads. A larger caseload means a caseworker has less time to spend on each case, often resulting in a lack of consistency and poor performance in case management. High turnover also contributes to a lack of rapport between caseworkers and families, preventing caseworkers from being aware of nuanced family dynamics and hindering their ability to connect families with the most effective and appropriate services, both of which worsen outcomes for family reunification. Overworked and less tenured caseworkers are more likely to miss or delay required visits with children, meaning they may miss safety risks that can result in more children experiencing abuse or neglect while in foster care.

DFPS needs additional insight into SSCC staffing challenges.

Instead of receiving turnover and vacancy data directly from an SSCC, DFPS learns about an SSCC's staff departures when the SSCC requests removal of a former employee's access to the DFPS case management application. This process depends on the SSCC reaching out to DFPS and does not include situations when someone moves from one position to another within an SSCC.

Caseloads. DFPS reviews caseload data to ensure an SSCC is maintaining an adequate number of case-assignable caseworkers and not relying on noncaseworkers such as supervisory staff to carry caseloads amidst a staffing shortage. While CBC oversight staff generates a weekly report that includes caseload data for any SSCC employee carrying a caseload, the report does not include the position type of each of these employees. To do so, DFPS currently has to manually cross-reference caseload data with lists of SSCC staff names and position types to identify situations in which a supervisor or non-caseworker might be carrying a caseload that would require DFPS follow-up. Although DFPS has identified a labor-intensive manual process to compile these staffing metrics, direct access to data from the SSCCs would create a far more efficient oversight process to ensure quality case management.

Direct access to SSCC caseload data would reduce the burden of DFPS' manual processes.

### CBC performance monitoring tools are not sufficiently tailored to identify problems with case management, limiting DFPS' ability to effectively oversee SSCC performance.

DFPS has made great strides in developing tools to monitor and address SSCC performance, but on their own, some of these tools fail to consistently identify problems with case management quality. Like any other business, SSCCs must make difficult decisions in the face of financial pressures, which may encourage them to only meet minimal contractual requirements and cut corners on critical case management activities. To protect against this temptation, DFPS must

provide strong oversight of SSCCs, incorporating lessons learned and closely tying measures and reporting tools to case management quality and positive outcomes for children and families.

DFPS' monitoring tools must identify case management issues for strong oversight.

During the state's transition to CBC, DFPS has developed several oversight monitoring tools and processes for identifying potential issues with SSCC performance based on guidance from the Legislature and DFPS' experience providing foster care case management. The *SSCC Performance Monitoring Tools* table describes several performance monitoring tools DFPS uses to assess SSCC performance and a new statutory tool the agency is in the process of implementing.

If DFPS oversight staff identifies any contract violations, the agency has a range of enforcement actions it can take to ensure contract compliance or otherwise ensure the safety and well-being of children. The *SSCC Contract Enforcement Actions* table on the following page describes DFPS' different enforcement actions and the situations in which DFPS is authorized or required to use each action.

**SSCC Performance Monitoring Tools**

| Tool | Explanation |
|---|---|
| Contract Performance Measures | DFPS assesses each SSCC on 17 performance measures compared against three thresholds each quarter. The agency defines these performance measures and thresholds in the SSCC contracts and bases them on child welfare principles detailed in the statutory legislative intent of CBC, such as child safety in foster care placements and children's reunification with biological parents.[8] |
| CMO Case Reads | DFPS CMO staff reviews a sample of cases in each SSCC region on a monthly basis to ensure the SSCC caseworker both performed and documented required case management actions. For example, CMO caseworkers verify that the SSCC caseworker is coordinating services for the parents. Based on the monthly results of the case reads, DFPS identifies concerning trends or patterns in an SSCC's case management that could negatively impact child safety or well-being. |
| Contract and Financial Monitoring | Each SSCC region has a contract manager who engages in both formal and ad hoc contract performance monitoring and financial reviews. SSCC contract managers conduct an annual review that focuses on the SSCCs' oversight of subcontractors such as residential foster care placements. Additionally, contract managers conduct ad hoc contract monitoring based on input from stakeholders or other DFPS staff. For example, a contract manager monitored an SSCC's appropriate use of car seats during child transport based on a tip from stakeholders. |
| Annual Performance Reviews | A new statutory process requires DFPS to annually assess whether each SSCC has achieved performance outcomes and other requirements specified in the contract.[9] DFPS reports it will conduct the first round of these annual reviews in fiscal year 2027 that will assess how SSCCs performed in fiscal year 2026. |

**SSCC Contract Enforcement Actions**

| Action | Explanation and Uses |
|---|---|
| Progressive Intervention Framework (Referred to as Corrective Actions) | As required by statute, DFPS has developed a progressive intervention framework that stipulates varying levels of corrective action the agency will take depending on the severity of the problem.[10] Enforcement actions under the progressive intervention framework include technical assistance, corrective action plans, and contract termination.<br><br>DFPS will take corrective actions against an SSCC for breaching a performance measure threshold, for problems identified during CMO case reads, or for other contract violations the agency identifies during the monitoring process. For example, DFPS placed an SSCC on a quality improvement plan after finding failures to appropriately transport children using car seats during ad hoc contract monitoring. The annual performance reviews also require DFPS to take corrective actions against SSCCs for identified deficiencies.[11] |
| Financial Incentives and Remedies | Historically, DFPS used statutory authorization to assess financial incentives and remedies for SSCCs that have been responsible for case management for at least 18 months to encourage SSCCs to reunify children with their parents in a timely manner.[12] Statute establishing the new annual performance reviews now requires, instead of authorizes, DFPS to assess incentives and remedies for all SSCCs based on the annual performance review.[13]<br><br>DFPS is currently developing a process to implement the annual performance reviews and associated financial incentives and remedies. In the meantime, DFPS is continuing to use the existing process for assessing financial incentives and remedies for only the most tenured SSCCs. |
| Liquidated Damages | New statute broadly requires DFPS to use financial interventions to ensure SSCCs are providing high-quality case management.[14] DFPS is developing a formal process for assessing liquidated damages. |

While DFPS has implemented these performance monitoring tools and contract enforcement actions, some of these mechanisms still fall short in ensuring quality case management.

- **Contract performance measures alone fail to adequately capture case management quality.** SSCC performance measures do not always effectively measure an SSCC's case management quality, in part because these measures aim to capture performance on complicated child welfare principles of safety and well-being of children and families. Current performance measures tend to be broad outcome measures that lack context around the quality of the case management tasks SSCCs must complete. These performance measures include:

  – *Reunification.* The percentage of children who are returned home within 12 months. This performance measure captures how many reunifications are occurring on a timely basis but does not capture the need for *safe* reunifications. SSCCs faced with an open case approaching the 12-month deadline may be incentivized to push that case to closure by quickly returning a child home without performing the due diligence needed to ensure the child's long-term safety in the home.

  – *Placement stability.* The number of paid foster care placements per child. This performance measure intends to encourage long-term, stable placements by capturing the average number of placements made

for a child. It fails, however, to capture whether each placement best meets a child's need. An SSCC may be incentivized to keep a child at the initial placement even if another placement opens up that better meets the needs of the child.

– *Placement proximity.* The percentage of children placed within 50 miles of their removal location. This performance measure captures whether children are being placed close to home but fails to capture whether each placement is in a child's best interest. For example, even if an SSCC identified an appropriate relative who can take care of a sibling group but lives outside of the region, the SSCC may be incentivized to place the siblings separately within the region.

**EMPOWER Performance on Safety Measures**

Prior to its court-ordered receivership, EMPOWER met the thresholds for performance measures related to child safety even as it was receiving quality improvement and corrective action plans for a range of issues indicating poor performance. In fiscal year 2025, EMPOWER's performance on two performance measures related to safety was comparable to the best overall performing SSCC. The percentage of EMPOWER's children in paid foster care who did not experience new instances of abuse or neglect was about 99 percent, only about 0.7 percentage points less than the best overall performing SSCC. The percentage of EMPOWER's children who experienced a new DFPS intervention within 12 months of exiting foster care was about 6.8 percent, only about 1.6 percentage points higher than the best overall performing SSCC.

The *EMPOWER Performance on Safety Measures* textbox describes how some of these performance measures alone do not always indicate quality case management or reflect child safety and well-being. This example also illustrates why comprehensive CMO case reads and quality oversight from contract managers are critical components of SSCC monitoring.

The limitations of these performance measures are directly reflected in field operations. Results of a stakeholder survey from the University of Texas (UT) System researchers' evaluation of four SSCC regions, as shown in the table on the following page *UT System 2026 CBC Evaluation Stakeholder Survey Results*, mirror these exact concerns. Across the board, SSCC staff, community stakeholders, and even DFPS regional staff reported that performance measures can conflict with each other and that they would like more context around the performance measures. For example, stakeholders noted that the current placement stability measure fails to distinguish between a disruptive move and all moves, which could include intentionally moving a child to a more family-like placement.[15] In the table, "N" indicates the number of responses.

**UT System 2026 CBC Evaluation Stakeholder Survey Results**

| External Factors | N | Agree / Strongly Agree | Neither Agree nor Disagree | Disagree / Strongly Disagree |
|---|---|---|---|---|
| At times, performance goals (e.g., sibling placement, proximity, and family-like settings) may compete with one another. | 89 | 89.9% | 5.6% | 4.5% |
| Court-ordered placements or services can conflict with performance measures. | 89 | 88.8% | 6.7% | 4.5% |
| Placement instability should hold SSCCs accountable for moves that are disruptive (e.g., due to behavior issues or caregiver request) rather than all moves. | 84 | 64.3% | 16.7% | 19.0% |
| Performance benchmarks should not be set at 100%. | 88 | 67.0% | 22.7% | 10.2% |
| Written context should be considered when determining whether a quality improvement plan is appropriate. | 81 | 84.0% | 16.0% | 0.0% |

DFPS has started a process to address improvements to performance measures through its Data Access and Standards Governance Council (DASGC).[16] The council facilitates discussions with SSCCs and other stakeholders regarding the tradeoffs of certain performance measures and the interconnected impacts between various measures such as placement proximity to a child's home and placement with relatives. Through this process, DFPS plans to review each performance measure and make changes to the methodology as needed.

- **Limitations to performance measure thresholds.** SSCC contract performance measures are used in conjunction with thresholds that do not provide baselines that consider dynamic changes in the types of youth in foster care in each region or set achievable and appropriate goals for SSCCs to work toward. DFPS developed three performance measure thresholds, as described in the *SSCC Performance Measure Thresholds* textbox. While these thresholds are intended to isolate performance failures that require corrective action, underlying flaws limit their utility in accurately assessing SSCC performance.[17] Furthermore, while DFPS acknowledges these systemic problems, the agency has no immediate plans to address them, citing technological limitations in developing more robust thresholds.

  Lagging indicators of changes to regional foster care populations. Current performance thresholds do not take into account dynamic factors that change the demographics and needs of a region's population of children in foster care. Reductions

**SSCC Performance Measure Thresholds**

- Bottom 20th percentile of regions. An SSCC breaches this performance threshold if its performance on a measure is lower than 80 percent of statewide historical rates. DFPS uses this threshold to assess if an SSCC is performing at a lower level than most of the state.
- Below historical regional variation. An SSCC breaches this performance threshold if its performance on a measure is lower than the expected variation below the region's baseline. DFPS uses this threshold to assess if an SSCC's performance on a measure is abnormal for the region.
- Recent drop more than statewide change. An SSCC breaches this performance threshold if its performance on a measure is lower than the statewide change from the baseline. DFPS uses this threshold to assess if an SSCC's change in performance on a measure is out of line with the rest of the state.

in population and changes in the profile of children entering foster care can negatively impact an SSCC's performance on certain measures. For instance, DFPS might expect a region with a foster care population with a higher concentration of older children with more acute mental health needs to face a greater challenge in meeting performance measures related to placement stability and placement in a home-like setting. However, one current performance threshold compares an SSCC's performance against its past performance without considering these contextual factors.

Some SSCC performance measures overly rely on comparisons against past performance.

Overreliance on comparison. Two of the current performance thresholds rely on comparisons to other regions or past performance, failing to consider how a region "should" be performing on a given metric. If an SSCC continuously underperforms on a metric, its historical baseline drops over time, essentially allowing the SSCC to meet compliance without actually improving case management outcomes. Conversely, an SSCC with historically high performance on a measure could breach a threshold with a minor performance drop even if its outcomes remain relatively strong. Similarly, performance in the bottom 20th percentile of regions may not be indicative of especially poor outcomes if the variation in performance between SSCCs is small on that performance measure. Ideally, an SSCC's performance threshold should be set at a level that is both achievable and indicative of quality performance.

- **Misunderstood measures and thresholds exacerbate unwanted incentives.** DFPS provides informal and ad hoc guidance to SSCCs on how the performance measures and thresholds function. The agency has not, however, developed standard or formal resources explaining the role of these measures to the SSCCs, exacerbating incentives that may lead SSCCs to cut corners. Given the negative impact of breaching performance thresholds, SSCCs have a strong incentive to "teach to the test" by encouraging caseworkers to take actions that meet the performance measure but do not necessarily ensure child safety or well-being. According to DFPS staff, however, trying to game one performance measure in the short term will usually result in a negative impact to another in the long term. For example, stakeholders in several regions reported that SSCC caseworkers rush to close a case near the 12-month deadline in an attempt to meet the performance measure for timely reunification. However, if the case is closed without ensuring child safety, the SSCC will likely see a negative impact to its performance measure for new DFPS involvement.

Pressures to meet performance measures can conflict with a child's best interest.

DFPS staff also reported that some of the SSCCs' concerns about breaching performance measures are based on a misunderstanding of how the thresholds work. For example, DFPS shared that SSCCs will contest their performance on the measure related to the number of placements for a child by pointing to specific cases where a court-ordered placement move was outside of their control. Since DFPS expects a certain level of placement moves to happen, the performance thresholds DFPS developed take these case-specific situations into account. An SSCC would need to have a number of placement moves well above what the region historically

experienced for DFPS to take serious corrective action. However, SSCCs continue to bring specific cases to DFPS as examples of situations that do not meet performance measures, indicating that SSCCs feel pressure to meet these measures even when it is not in the best interest of the child or outside the SSCC's control. Additionally, stakeholders in multiple regions reported that SSCC caseworkers are sometimes more hesitant than DFPS legacy caseworkers to transition a child to a more appropriate placement.

The results of the survey from the UT System's evaluation of four SSCC regions affirm that these incentives can influence case management decisions. Almost half of the 34 SSCC staff surveyed reported that they felt pressure to meet a performance measure in a way that was not in the best interest of the child or their family. In interviews, SSCC staff reported that "performance [measure] pressures are often highest during contract monitoring reviews or [quality improvement] reviews, especially when regions face limited placement capacity or delayed access to services."[18] The pressure stemming from these incentives demonstrates how performance measures can inadvertently harm children and families unless DFPS ensures that SSCCs prioritize quality case management over baseline metrics.

- **Lack of risk-based CMO case reads.** DFPS' process for selecting cases for case reads fails to target certain subsets of cases involving high risks to child safety. CMO staff conducts case reads to verify SSCCs are complying with statute and DFPS policy and to identify case management problems not captured by the contract performance measures. CMO staff reviews case records of a random sample of cases each month to ensure that the SSCC caseworkers are following case management best practices such as making face-to-face visits with children, developing service plans for parents that alleviate safety concerns, identifying relatives who can take care of the child, ensuring child medical visits occur, and documenting all casework in a timely manner. Additional information about case reads is provided in the textbox, *Importance of CMO Case Reads*.

DFPS would benefit from risk-based case reads.

### Importance of CMO Case Reads

Recognizing the limitations of contract performance measures, DFPS uses CMO case reads to identify poor case management practices that might be missed by the contract performance measures and thresholds. For example, even if an SSCC is performing well in exiting children from the foster care system in a timely manner, CMO case readers review the case file to determine if the SSCC caseworker is conducting in-person visits with the child and family and documenting any noted safety concerns.

While CMO staff conducts a random sample of case reads, they may not be conducting enough case reads in high-risk cases. For example, monitored returns are one of the highest-risk stages of a foster care case and require engaged and knowledgeable case management to ensure that parents have truly taken all steps necessary to alleviate the safety concerns that led to the initial abuse or neglect. However, these cases have historically not been specifically targeted to ensure CMO staff has the sample size needed to properly assess the SSCC's quality of case management. Recognizing

the importance of reading these cases, DFPS conducted reviews of all monitored return cases for SSCCs in March 2026. The agency expects to implement its updated case read sampling process in the fall of 2026. The updated process is more risk-based, which identifies additional questions for the review team if the case involves a monitored return.

- **Statutory performance reviews should consider additional factors.** Statute helps ensure effective oversight of SSCCs by requiring DFPS to conduct annual performance reviews for each SSCC but fails to take certain factors into account.[19] DFPS is required to post the results of the reviews on its website, making the reviews an important tool for assessing an SSCC's performance and for publicly summarizing the SSCC's performance over the past year.[20] DFPS has not completed the first round of annual performance reviews, but current statute could lead to duplication of enforcement efforts that potentially cite SSCCs twice for the same failure or hold SSCCs accountable for DFPS' shortcomings.

Statute requires DFPS to impose corrective actions that may be duplicative of previous actions.

<u>Duplicative corrective action plans, remedies, and incentives.</u> Statute requires DFPS to impose corrective action plans and remedies based on deficiencies that occurred during the annual performance review without consideration of whether the deficiency was previously addressed through DFPS' real-time monitoring efforts and enforcement actions. DFPS engages in various weekly, monthly, and quarterly SSCC performance monitoring and can impose corrective actions to address deficiencies when they are identified. DFPS can also assess financial remedies against an SSCC prior to conducting the annual performance review. Following that review, statute requires DFPS to impose corrective actions and remedies for deficiencies identified in the annual review, which may be duplicative of corrective actions or remedies previously imposed by DFPS for deficiencies.[21] Without statutory clarification, SSCCs could be penalized twice for the same deficiency or financially rewarded twice for achieving the same successful outcome.

<u>Statute does not account for DFPS transition challenges.</u> Poor performance measure data captured during the initial transition period may be more indicative of DFPS' operational challenges but unfairly attributed to the SSCC's performance. Statute requires DFPS to conduct the annual performance review on the first anniversary of the SSCC's contract.[22] However, an SSCC's performance in its first year is just as much a result of the agency's transition process as it is of the effectiveness of the SSCC. DFPS acknowledges it has struggled to transition some regions to SSCCs, citing examples of transferring foster care cases with poor documentation and without effectively supporting the workforce transition from DFPS to the SSCC. In response, DFPS established a team in June 2025 to review cases prior to transition. Recognizing the impact DFPS can have on SSCC performance early on, DFPS historically has not taken action against an SSCC based on its quarterly performance measures until the SSCC has been responsible for full foster care case management for at least six months. While DFPS should annually assess SSCC performance and

impose remedies for identified deficiencies, it should do so only when such deficiencies reflect the SSCC's inability to meet performance outcomes rather than DFPS' failure to transition a healthy region to the SSCC.

### DFPS and the Legislature lack sufficient knowledge of how SSCCs manage resources to meet the needs of the foster care system.

Without adequate reporting tools, DFPS does not receive the comprehensive data necessary to keep the Legislature informed of systemic challenges within the foster care system, ultimately hindering lawmakers' ability to draft targeted policy and budgetary solutions.

- **DFPS lacks insight into SSCCs' costs.** DFPS lacks detailed insight into SSCCs' financial data. Since SSCCs receive public funds, DFPS and the Legislature should have comprehensive visibility into how SSCCs spend these funds, ensuring providers are using them to achieve positive outcomes for children and families in the foster care system.

  Insufficient cost reports. Prior to fiscal year 2024, DFPS had very little information on how SSCCs spend state funds. At the direction of the Legislature, DFPS worked with the Health and Human Services Commission (HHSC) to create quarterly SSCC cost reports starting in fiscal year 2024 to support rate-setting activities, which DFPS also uses to track SSCC spending patterns and cost trends. However, the cost reports lack the level of detail on some cost information that would provide DFPS insight into the effectiveness of SSCC operations and the efficient use of state funds. For example, the cost reports do not allow DFPS to sort recurring monthly costs such as overtime or caseworker mileage reimbursement by employee, position type, or unit. The textbox, *EMPOWER's Inefficient Use of Funds*, provides an example of how DFPS lacks visibility into how SSCCs may be spending state funds inefficiently to the detriment of child safety.

Additional SSCC cost data would provide DFPS with visibility into staffing issues.

**EMPOWER's Inefficient Use of Funds**

EMPOWER chose to use its own case management system while still being contractually required to input the same information into DFPS' case management system. In practice, this meant that EMPOWER spent funds to hire separate data entry staff and create a secondary process to copy the entry of crucial case documents into the DFPS system. This secondary process also introduced a delay that ultimately became a bottleneck in documentation being entered into the DFPS system. EMPOWER's decision to use dual case management systems shows how the SSCC chose to focus on a nonessential process over supporting case-assignable primary caseworkers. Until the receivership, DFPS did not have visibility into the cost of the data entry team EMPOWER chose to hire, but any such administrative costs could limit an SSCC's ability to fund case management positions that more directly impact child safety and well-being.

  No process for reviewing and updating cost reports. DFPS and HHSC lack a formalized process for reviewing and updating the SSCC cost reports to ensure they include the types of information and level of detail DFPS needs to understand the costs SSCCs have and to provide effective

oversight of the foster care system. DFPS worked closely with HHSC to develop the initial cost reports, but there has not been a formalized review of the type of information being provided since the inception of the reports. DFPS staff reported potential opportunities to improve the utility of the cost report. For example, the cost reports include a cost type for all other purchased services not captured by a more specific cost type. This cost type could include costs that would be more useful when separated out in the cost reports such as some court-ordered services. Without a formalized process for reviewing and updating the contents of the cost reports, DFPS does not have information on SSCC costs in the most useful format.

- **Disjointed and incomplete reporting requirements.** CBC reporting requirements are disjointed and missing key information. As a result, these reports fail to provide the Legislature and other key stakeholders with a cohesive, comprehensive view of the current status and needs of the state's foster care system under CBC.

  CBC implementation plan should reflect recurring transition periods. While almost all regions of the state will enter the first stage of CBC by the end of fiscal year 2027, CBC may never be completely and permanently implemented. For example, some rural regions may never implement CBC due to the lack of bids for their SSCC contracts, while other regions will likely have recurring periods of transition as the SSCC contract needs to be rebid at least once every 10 years and new SSCCs may be selected. Potentially, some SSCCs may not rebid, and those regions may revert to being operated by DFPS. While DFPS is required to provide an implementation plan and status updates regarding the rollout of CBC, statute does not explicitly consider regions experiencing recurring periods of transition.[23] As CBC is implemented in a patchwork manner in the state's regions, the Legislature and other stakeholders would benefit from ongoing periodic information about the process and status for procuring or re-procuring an SSCC in each region.

  DFPS lacks a formal process to communicate CBC funding problems to the Legislature.

  Lack of CBC funding model analysis reporting. DFPS does not currently have a formal mechanism to clearly communicate problems with the CBC funding model to the Legislature and other key stakeholders. While DFPS and SSCCs agree there are significant flaws in the CBC funding model, none of the existing CBC reports include information describing the model's challenges and limitations.

  DFPS has contracted with a firm to review the CBC funding model and make recommendations for improvements. Additionally, DFPS and SSCCs are working together to identify potential changes to the CBC funding model. However, the agency relies on exceptional items through the legislative appropriations request process to address deficiencies. This approach only indirectly communicates the few problems that DFPS considered addressable through an exceptional item to the Legislature but omitted other funding model problems that are still important but involve factors such as cost, timing, prioritization, or lack of a clear solution

that cannot be addressed through an exceptional item. This approach also excludes changes to the funding model that would not result in an additional cost such as changes to the methodology for the resource transfer. These types of changes are helpful for the Legislature and other key stakeholders to be aware of because they impact the overall health and stability of the CBC model and inform policymakers when planning for potential long-term changes to how it operates.

No single comprehensive view of the state's foster care system. Currently, DFPS publishes several reports on the foster care system, but the separate reports do not provide a cohesive, comprehensive view of the current state of the foster care system or clearly highlight future needs and challenges necessary to drive decision making. For example, statute requires DFPS to annually publish all SSCC quality improvement and corrective action plans and the SSCC monitoring schedule on the agency's website but does not require them to be submitted to the Legislature.[24] These reports do not provide much context or explanation to understand the significance of what is being shown or how the Legislature could use the information. Additionally, existing reports the Legislature does receive, such as the Rider 15 report, lack consistent information about existing indicators of SSCC performance outside of the contract performance measures, such as the results of CMO case reads, caseload ratios, and turnover and vacancies for SSCC case management staff. Without more comprehensive information and context regarding the state's foster care system, the Legislature cannot gauge whether the state needs additional resources to support CBC or identify what steps DFPS and SSCCs could take to improve effectiveness and remedy inefficiencies.

State decision makers lack comprehensive information on CBC to make informed decisions.

SSCCs excluded from GAA performance measures. Through the General Appropriations Act (GAA), the Legislature has directed DFPS to report to the Legislative Budget Board (LBB) on a number of performance measures related to the state's foster care system.[25] Some of these performance measures do not include SSCCs, however, and as a region shifts to CBC, the Legislature loses full insight into how the state's foster care system is performing. For example, while there is a performance measure for caseloads for foster care caseworkers, it only applies to DFPS caseworkers, not SSCCs. The current performance metrics limit the Legislature's ability to assess the entirety of the state's foster care system. Acknowledging this gap, DFPS has recently proposed amendments to LBB for the agency's performance metrics for the 2028-29 biennium to better include SSCCs.

### The functions of CBC Transition are necessary to support and oversee CBC and should be incorporated into DFPS.

- **Bifurcated oversight.** DFPS shares responsibility for CBC oversight with CBC Transition, an independent state agency administratively attached to DFPS that the Legislature created to help the state transition to a privatized foster care model. Statute establishes similar duties related to

CBC oversight for both DFPS and CBC Transition, which creates the potential for duplicative effort and inefficiencies if these entities fail to coordinate with one another, as demonstrated in the *Shared Oversight Duties for DFPS and CBC Transition* table.[26]

**Shared Oversight Duties for DFPS and CBC Transition**

| DFPS Duties | CBC Transition Duties |
|---|---|
| • Oversee quality and ensure accountability of SSCCs.<br>• Conduct assessments on the fiscal and qualitative performance of SSCCs. | • Evaluate SSCCs.<br>• Measure contract performance of SSCCs.<br>• Provide contract oversight of SSCCs.<br>• Report outcomes of SSCCs. |

In practice, DFPS and CBC Transition coordinate to divide CBC-related functions in ways that avoid duplication and inefficiencies but do not strictly follow statute to do so. Statute explicitly requires CBC Transition to provide contract oversight of SSCCs. In practice, however, CBC Transition focuses on contract procurement and a region's transition to CBC, while DFPS' CBC Operations division focuses on ongoing contract management oversight.[27]

DFPS and CBC Transition's successful coordination is largely the result of the director of CBC Operations serving indefinitely as the interim director of CBC Transition. This single reporting structure has helped the agency identify underperforming SSCCs and enact contingency plans when appropriate such as when EMPOWER went into receivership.

- **Continuing need for CBC Transition functions.** The state will continue to need the powers and duties assigned to CBC Transition provided for in statute to support the state's foster care model in perpetuity. The statute that creates CBC Transition also establishes that the office will abolish automatically and its statutory duties will expire once CBC is implemented in the last DFPS region of the state.[28] Statute presupposes that the state's full transition to CBC is permanent and stable. In reality, reoccurring periods of transition are likely. SSCCs are not permanent entities. An SSCC's contract term can last up to 10 years, with procurement efforts beginning in year eight. If an existing SSCC chooses not to rebid for a contract or if DFPS selects a new entity through the competitive procurement process, the region will go through another transition period that will require support from the state to limit disruptions to children and families involved in the foster care system.

  Additionally, other statutory duties designated specifically to CBC Transition, such as procurement of SSCCs, will be necessary in perpetuity. Even after the initial SSCC contract is executed, CBC Transition staff is involved in ongoing procurement activities related to contract renewals every five years and full reprocurements every 10 years. Based on the phased rollout of CBC and SSCC contract timelines, there will be CBC

procurement activities every year in perpetuity, supporting the need to continue the CBC Transition function under DFPS.

## Sunset Staff Recommendations

### *Change in Statute*

#### 1.1 Require SSCCs to provide DFPS with direct access to staffing information.

This recommendation would establish a statutory requirement for SSCC contracts to include regular staffing information for DFPS, allowing the agency to assess whether workforce shortages are contributing to poor performance. As part of this recommendation, statute would require DFPS to include a crosswalk of equivalent position types in the SSCC contract. This crosswalk would match primary caseworkers, supervisors, and any specialized case management positions to equivalent DFPS legacy positions, specifying the exact data required to ensure providers maintain an adequate workforce capable of ensuring child safety and family well-being. This recommendation would require DFPS to establish the types of staffing information needed from SSCCs, including:

- Number of filled positions for case-assignable primary caseworkers.
- Information on new hires, internal transfers, and terminations.
- Breakdown of staff turnover data by position type.
- Breakdown of vacancy data by position type.
- Breakdown of caseload data by position type and tenure, including noncaseworker staff with caseloads.
- Any additional staffing information the agency deems necessary.

This recommendation would also require DFPS' DASGC to develop protocols for the interoperable transfer of the staffing information described above to allow the agency to monitor SSCCs' operational health. While DASGC has expired by operation of law under Chapter 2110, Government Code , Recommendation 6.6 would continue the council and exempt it from Chapter 2110 requirements. Access to this staffing information would improve DFPS' ability to identify staffing challenges early and enable the agency to provide technical assistance or impose corrective actions before these challenges negatively impact the quality of case management.

#### 1.2 Require DFPS to periodically review SSCC contract performance measures and thresholds.

This recommendation would require DFPS to review and update the SSCC contract performance measures and thresholds at least once every 10 years to ensure they are connected to case management quality and child safety. As part of this review, DFPS would solicit input from the SSCCs and their community advisory committees on concerns they have with existing performance measures and thresholds and any recommendations they have for improvement.[29] This recommendation would also require DFPS to publish a report on the findings and recommendations from the review and any approved changes to the performance measures and thresholds. DFPS would distribute this report to all SSCCs and all relevant legislative oversight committees and post it on its website. DFPS would complete the first review of all performance measures and thresholds and publish the report to the Legislature by December 1, 2028, ahead of the start of the 91st Regular Session.

This recommendation would establish a statutory requirement for SSCC contracts to require SSCCs to comply with the SSCC performance measures and thresholds in SSCC contracts. As part of this recommendation, DFPS would:

- Review each existing performance measure and identify changes as needed with the goal of linking the measures to positive outcomes for children and families.
- Review and identify changes to the existing thresholds to provide objective baselines indicative of quality performance with achievable goals for SSCCs to work toward. The thresholds should not be solely influenced by past performance and should account for the regional differences in the demographics and needs of the foster care population.
- Identify and consider any new measures that could assess aspects of the SSCCs' performance in providing quality case management for children and families that are not currently being measured. As part of this consideration, the agency should determine a reliable and accurate way to collect data for this measure and set an objective threshold that accounts for regional differences to assess SSCC performance.

This recommendation would improve the performance measures and thresholds DFPS uses to assess SSCC performance by requiring DFPS and SSCCs to regularly review, update, and ensure performance measures and thresholds capture case management quality.

### 1.3 Require DFPS to develop a risk-based process for selecting cases for CMO case reads.

This recommendation would require DFPS to develop a risk-based process for selecting robust samples of various high-risk cases for SSCC case reads that accurately represent the SSCC's case management actions. In developing this risk-based process, DFPS should consider factors like age, physical disability, intellectual or developmental disability, mental health diagnosis, medical fragility, risk of runaway or trafficking, placement type, and case stage. This recommendation would ensure DFPS has oversight mechanisms that can effectively detect recurring case deficiencies, specifically focusing on cases that pose the highest risk to a child's safety and well-being.

### 1.4 Clarify statutory SSCC annual performance review requirements to ensure fair assessment of SSCCs.

This recommendation would amend the annual performance review to clarify that DFPS must impose financial remedies or a corrective action plan on an SSCC that fails to meet performance outcomes or remedy identified deficiencies if such remedies or plans have not yet been imposed by DFPS. This recommendation would update statute to specify that DFPS has the authority to impose additional financial remedies or corrective action plans for previously identified deficiencies if the deficiencies identified in the annual review persist despite DFPS' initial interventions. This recommendation would also update statute to clarify that DFPS can only impose financial remedies or corrective action plans based on the SSCC's deficiencies, not based on problems resulting from DFPS' performance prior to transition.

This recommendation would also amend Senate Bill 1398's annual performance review to clarify that DFPS must award financial incentives to an SSCC for exceeding applicable performance outcomes measures only if such incentives have not yet been awarded by DFPS. These statutory changes to the

annual performance review process would balance accountability for underperformance with recognition for excellence and avoid taking duplicative enforcement actions against SSCCs for previously addressed deficiencies.

### 1.5 Require SSCCs to submit financial reports to DFPS.

This recommendation would establish a statutory requirement for SSCCs to submit financial reports in a format DFPS establishes in collaboration with the SSCCs. As part of this recommendation, statute would require DFPS to specify the types of information required in the report to verify that SSCCs are allocating appropriate financial resources and investing in hiring practices to maintain an adequate, stable workforce that supports child safety and family well-being. DFPS should consider requiring SSCCs to submit the following types of financial information:

- Breakdown of SSCC costs categorized by case management costs and administrative costs. DFPS, in consultation with SSCCs, would define case management and administrative costs.
- Accounting of expenditures by funding streams, including state allocations, private and public grants, and philanthropic donations, that the SSCC uses to cover case management costs.
- Sources and amounts of funding received outside of the DFPS contract, including grants and philanthropic funding.
- Total compensation costs for case management staff, disaggregated by line item to isolate base salaries, overtime pay, bonuses, benefits, travel reimbursements, and any supplementary payments.
- Funds that are budgeted but remain unspent, including salary savings generated from vacant positions.

This recommendation would provide DFPS early visibility into an SSCC's staffing and operational spending decisions before they lead to negative outcomes for children and families. This recommendation would also give DFPS and the Legislature a clear, comprehensive understanding of the true costs of CBC and how SSCCs use state funds.

### 1.6 Modify CBC implementation plan reporting requirements.

This recommendation would modify the *CBC Implementation Plan's* timeline requirement into a procurement plan for implementing CBC throughout the state.[30] As part of this recommendation, the procurement plan must reflect DFPS' anticipated activities for procuring and re-procuring SSCCs for all regions of the state. The plan should also account for regional transition activities, reflecting that each catchment area may face operational shifts during initial procurement, renewals, or when a region reverts to legacy state-managed care. This recommendation would also require DFPS to annually report on the status of these activities to provide insight into the state's foster care system as its regions potentially transition from a DFPS-operated region to an SSCC-operated region and potentially back to a DFPS-operated region.

### 1.7 Establish a reporting requirement for the CBC funding model.

This recommendation would establish a new reporting requirement for DFPS to review the CBC funding model and report on any needed changes every four years. As part of this recommendation, statute would require DFPS to review the financial assumptions for CBC, assess whether the existing CBC funding model covers the costs SSCCs incur in carrying out contract requirements, recommend funding changes needed to ensure the model accurately and fully covers costs, and identify any lack of

visibility DFPS has into SSCC costs. As part of this review, DFPS should also identify ways to improve the CBC's sustainability and fiscal accountability. This recommendation would require DFPS to compile its findings, recommendations, and any changes the agency made to the funding model since the last review into a formal report to be submitted to the Legislature and published on the agency's website every four years. The recommendation would require the first report to be published by December 1, 2030.

### 1.8 Establish a CBC annual statutory reporting requirement.

This recommendation would require DFPS to publish a new *CBC Annual Report* to provide the Legislature with a more complete picture of the state's foster care system. As part of this recommendation, this new report would include key takeaways from the agency's other oversight tools, including trends identified in CMO case reads, quality assurance efforts, cost reports, corrective actions, and continuous quality improvement plans. This recommendation would also codify the reporting requirement of Section (a) of Rider 15 of DFPS' GAA bill pattern into this new annual report and include staffing information about each region in the state to provide regional comparisons of performance and staffing trends. The report would be submitted to the Legislature on March 31 of each year and published on the agency's website. This recommendation would also abolish the requirement for quarterly CBC implementation reports.[31] This recommendation would provide comprehensive information on CBC to the Legislature and stakeholders, helping policymakers make informed decisions about improving the state's foster care system.

### 1.9 Abolish CBC Transition and transfer its functions to DFPS.

This recommendation would abolish the Office of Community-Based Care Transition and transfer its duties to DFPS. Specifically, this recommendation would incorporate the duties and powers listed in Section 264.172, Texas Family Code into DFPS' enabling statute in Chapter 40 of the Texas Human Resources Code without duplicating duties or creating conflicting duties. Consolidating CBC Transition functions under DFPS would benefit the state by ensuring the agency has the tools needed for long-term support of CBC operations, future contract reprocurement activities, and oversight of the CBC model.

## *Management Action*

### 1.10 Direct DFPS to develop an SSCC contract performance measure resource guide and training materials.

This recommendation would direct DFPS to develop a resource guide for SSCC contract performance measures. This resource guide should describe in plain language the purpose of SSCC contract performance measures, the methodology DFPS uses to assess each measure, and how the agency develops the performance thresholds. The resource guide should establish clear expectations regarding how SSCC staff balances performance measures with individual case management decisions. Specifically, the guide should include examples of when caseworkers should take case management actions even if they have a negative impact on a performance measure. DFPS would provide the resource guide to SSCCs and their community advisory committees established by Senate Bill 1398 and publish the resource guide on the agency's website.

As a part of this recommendation, DFPS should develop training materials on the resource guide, deliver this training to all existing SSCC leadership, and mandate training for incoming SSCC leadership staff. DFPS would also make this training available on its website for use by community stakeholders. DFPS can offer this training virtually or in a prerecorded format. This recommendation would improve

communication between DFPS and SSCCs on contract performance measures, ensuring SSCCs and community stakeholders understand how performance measures can mitigate unintended incentives.

### 1.11 Direct DFPS to work with HHSC to review and update SSCC cost reports on a biennial basis.

The recommendation would direct DFPS to work with HHSC to review the information contained in the SSCC cost reports on a biennial basis and make updates to the structure of the cost reports when needed. As part of this review, DFPS and HHSC should review the different cost types to determine if any additional cost types should be reported separately or if existing cost types should be combined. This recommendation would ensure DFPS receives information on SSCC costs necessary to communicate the financial reality of the state's foster care system to key stakeholders and to provide effective oversight of the SSCCs.

### 1.12 Direct DFPS to work with LBB to update performance metrics related to foster care to include both SSCC and legacy regions.

This recommendation would direct DFPS to work with LBB to update the agency's GAA performance measures related to evaluating the state's foster care system to include both SSCC and legacy regions. As part of this recommendation, DFPS and LBB should evaluate whether to update existing performance measures or if new measures are needed to accurately track both SSCC and legacy regions. This recommendation would help ensure the Legislature maintains continuous visibility into the overall health and performance of the state's foster care system, even as regions transition to CBC or revert to legacy care.

### *Change in Appropriation*

### 1.13 The House Appropriations and Senate Finance committees should consider appropriating DFPS the funding and staff from CBC Transition to DFPS.

This recommendation would express the will of the Sunset Commission that the Legislature consider appropriating funding and full-time equivalent positions originally appropriated to CBC Transition to DFPS. Maintaining this resource allocation would ensure DFPS has the capacity to support ongoing CBC operations, manage future provider transitions, and maintain rigorous contract oversight.

## Fiscal Implication

Overall, these recommendations may have a fiscal impact to the state, but this impact depends on implementation and cannot be estimated at this time. Taken together, the recommendations are designed to improve efficiencies in CBC oversight and support. Costs related to Recommendation 1.5 would depend on whether DFPS needs a new reporting tool to collect the types of financial information established by DFPS, which cannot be estimated at this time. Costs related to Recommendation 1.7 would depend on the type of analysis performed and may require specialized expertise if the CBC funding model switches to a capitated funding model, which cannot be estimated at this time.

Abolishing CBC Transition and transferring its resources, staff, and functions to DFPS, as detailed in Recommendations 1.9 and 1.13, would result in a small cost savings to the state in salary and benefits for each of the next five fiscal years and the reduction of one full-time equivalent position. This would result in an annual cost savings of $149,240 and a five-year cost savings of $746,200. Abolishing this office and eliminating the CBC Transition director position would generate these savings. DFPS does

not need this position as the agency already has a division director for the CBC Operations division. The CBC Transition director position is currently vacant, and the CBC Operations division director also serves as the interim CBC Transition director. DFPS would be able to implement the remaining recommendations within existing resources.

**Department of Family and Protective Services**

| Fiscal Year | Savings to the General Revenue Fund | Change in FTEs From 2025 |
|---|---|---|
| 2028 | $149,240 | -1 |
| 2029 | $149,240 | -1 |
| 2030 | $149,240 | -1 |
| 2031 | $149,240 | -1 |
| 2032 | $149,240 | -1 |

1 All citations to Texas statute are as they appear on https://statutes.capitol.texas.gov/. Section 101.0133, Texas Family Code.

2 Section 264.151(a), Texas Family Code.

3 Section 264.152(2), Texas Family Code.

4 Section 264.155(a)(7), as amended by HB 4129 (89R) and SB 1589 (89R); and Section 264.155(a)(10), as amended by SB 1398 (89R), Texas Family Code.

5 Section 264.172(b), Texas Family Code; and DFPS, Rider 33(a), Page II-15, Article II, Chapter 60 (SB 1), Acts of the 85th Legislature, Regular Session, 2017 (General Appropriations Act), accessed online July 9, 2026, https://www.lbb.texas.gov/Documents/GAA/General_Appropriations_Act_2018-2019.pdf.

6 Section 264.182, as amended by SB 513 (89R), Texas Family Code.

7 DFPS, *Child Protective Services Handbook*, Section 6550, webpage last modified August 2019, accessed online June 29, 2026, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_pg_6500.asp#CPS_6550.

8 Section 264.151(b), Texas Family Code.

9 Section 264.155(a)(5), as amended by SB 1398 (89R), Texas Family Code.

10 Section 264.153(a)(2), Texas Family Code.

11 Section 264.155(a)(6)(D), as amended by SB 1398 (89R), Texas Family Code.

12 Section 12, Chapter 825 (SB 1398), Acts of the 89th Legislature, Regular Session, 2025, accessed online July 9, 2026, https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB01398F.pdf.

13 Section 264.155(a)(6)(B)-(C), as amended by SB 1398 (89R), Texas Family Code.

14 Section 264.155(a)(7), as amended by SB 1398 (89R), Texas Family Code.

15 Grajeda et al., *CBC Evaluation*, March 2026, pp. 98-99, accessed online June 29, 2026, https://www.dfps.texas.gov/CBC/documents/reports/2026-04-20_CBC_Community-Based_Care_Evaluation_Report.pdf.

16 Section 264.159, Texas Family Code.

17 Texas State Auditor's Office, *An Audit Report on Performance-based Contracts at the Department of Family and Protective Services*, December 2022, p. 22, accessed online June 29, 2026, https://sao.texas.gov/SAOReports/ReportNumber?id=23-012.

18 Grajeda et al., *CBC Evaluation*, March 2026, pp. 98-99, accessed online June 29, 2026, https://www.dfps.texas.gov/CBC/documents/reports/2026-04-20_CBC_Community-Based_Care_Evaluation_Report.pdf.

19 Section 264.155(a)(5), as amended by SB 1398 (89R), Texas Family Code.

20 Section 264.155(a)(6)(A), as amended by SB 1398 (89R), Texas Family Code.

21 Section 264.155(a)(6)(B)-(D), as amended by SB 1398 (89R), Texas Family Code.

22 Section 264.155(a)(5), as amended by SB 1398 (89R), Texas Family Code.

23 Section 264.153, Texas Family Code.

24 Sections 264.153(b)(2) and 264.153(a)(6), Texas Family Code.

25 DFPS, Rider 1, Page II-3, Article II, Chapter 1185 (SB 1), Acts of the 89th Legislature, Regular Session, 2025 (General Appropriations Act), accessed online July 9, 2026, https://www.lbb.texas.gov/Documents/GAA/General_Appropriations_Act_2026_2027.pdf.

26 Section 40.040(b), Texas Human Resources Code; and Section 264.172(c), Texas Family Code.

27 Section 264.172(c)(6), Texas Family Code.

28 Section 264.172(i), Texas Family Code.

29 Section 264.155(a)(11), as amended by SB 1398 (89R), Texas Family Code.

30 Section 264.153(a)(2), Texas Family Code.

31 Section 264.172(f), Texas Family Code.

# Issue 2

# DFPS Must Address Key Staffing Policies and Practices to Maintain a High-Quality Workforce for Its Internal and Community-Based Care Operations.

## Background

In 2017, the Legislature directed the Department of Family and Protective Services (DFPS) to contract with community-based nonprofit organizations and local government entities to provide placement and case management services, otherwise known as Community-Based Care (CBC). This transition from a state-managed system to CBC fundamentally changed DFPS' statutory role and operational mandate. As further discussed in the *Introduction to Conservatorship in Texas* section of this report, DFPS divided its original 11 administrative regions into 16 catchment areas. Since 2012, DFPS has contracted with a number of nonprofit organizations, known as Single Source Continuum Contractors (SSCC), to provide services for these catchment areas through a phased implementation process. In this report, SSCC-operated catchment areas are referred to as SSCC regions, while DFPS-operated areas are referred to as legacy regions. As of May 2026, SSCCs operated in 10 SSCC regions and DFPS operated in six legacy regions.

In legacy regions, DFPS remains a direct service provider responsible for Child Protective Services (CPS) conservatorship, including providing child placements, conducting child and family visits, and other case management-related functions. In SSCC regions, however, primary conservatorship case management responsibilities have shifted from DFPS to SSCCs. As a result, the agency must now navigate a complex hybrid structure, maintaining direct service operations while establishing the robust contract oversight capacity needed to ensure child safety in partnership with SSCC providers, as discussed further in Issue 1 of this report.

In addition to CPS, DFPS supports children, families, and vulnerable adults across the state through three other major program areas: Statewide Intake (SWI), Adult Protective Services (APS), and Child Protective Investigations (CPI). SWI, APS, and CPI staff work across the entirety of the state, while CPS staff provides conservatorship case management services in the six remaining legacy regions that have not yet begun transitioning to CBC.[1] At the end of fiscal year 2025, DFPS employed 11,731 total staff and provided contract and quality oversight to 2,132 CBC contractor staff across the state.

With limited exceptions, DFPS no longer performs placement and case management services in transitioned regions. The agency recognizes this major operational shift and has begun internal planning regarding its future state. Through the agency's strategic initiatives team, DFPS is conducting an internal review of its existing structure and positions to determine how to better support its new role in CBC oversight and quality assurance while continuing to support legacy functions that remain with the agency. In conjunction with future state planning, the agency has engaged in a business process redesign to streamline internal processes and support the implementation of a new case management system, which will replace DFPS' current system and is intended to reduce redundancies and improve data collection.

## Findings

### Despite agency efforts, persistent staff turnover at DFPS remains an ongoing challenge, imposing significant costs to the state and compromising service quality.

While DFPS staff turnover rates have improved since 2015, staff retention is still a challenge for the agency.[2] In fiscal year 2025, DFPS experienced an overall turnover rate of nearly 20 percent, the third highest among all Texas state agencies with 1,000 employees or more.[3] Turnover within DFPS varies depending on the job function and program area, with higher rates generally seen in programs with greater field work responsibilities. DFPS has made progress in reducing agency turnover through targeted salary raises and reductions in caseloads, but APS, CPI, and CPS each continue to experience worker turnover rates above 20 percent, as shown in the *DFPS Staff Turnover Rates by Program Area* table.

**DFPS Staff Turnover Rates by Program Area, FYs 2023-25**

| Program Area | FY 23 | FY 24 | FY 25 |
|---|---|---|---|
| APS | 33% | 29% | 26% |
| CPI | 36% | 32% | 30% |
| CPS, excluding positions abolished in CBC transfer | 28% | 28% | 24% |
| SWI | 17% | 12% | 11% |

High turnover and the resulting vacancies undermine staff morale and increase the workload of remaining staff who must take on extra cases while helping train new team members. Predictably, this kind of workplace environment fuels a vicious cycle of further turnover. In the State Auditor's Office's (SAO) state employee exit survey, departing staff frequently cite "poor working conditions/ environment" as a primary reason for leaving DFPS, a top-ranked factor for at least the last decade.[4] Sunset's survey of DFPS staff also found that about 800 of the 1,900 respondents have contemplated quitting their job in the past six months.

DFPS faces high turnover driven by factors largely outside its control.

DFPS has historically faced issues with turnover and staff retention driven by factors largely outside the agency's control, such as a shrinking workforce pool in rural communities and noncompetitive salaries, meaning potential hires can make similar wages working in less-demanding industries. Respondents to the SAO exit survey frequently cited "better pay/benefits" as a top-three reason for leaving DFPS employment. To address this problem, the Legislature recently invested significant funding in DFPS frontline staff to support competitive salaries and boost recruitment. This effort, however, has not meaningfully reduced turnover. From July 2024 to April 2026, a total of 3,076 staff left the agency, nearly half of which worked in CPI. This loss of staff means that millions of state dollars spent on staff development, including recruitment and training, are also lost each year.

This level of turnover compromises service quality in several critical ways, as described in the *Negative Impacts of DFPS Staff Turnover in APS, CPI, and CPS* textbox. In particular for CPS, caseworker reassignment forces children to repeatedly retell their trauma, undermines trust building, and disrupts continuity of support services. Research also shows that frequently changing caseworkers severely degrades the agency's ability to quickly find a permanent placement for the child. One study found a child's chance of reaching permanency within a year drops from almost 75 percent with one consistent caseworker to 17.5 percent with just one caseworker reassignment.[5] DFPS is facing this exact challenge, as shown in the *Children in DFPS Custody Versus Average Number of Primary Caseworkers Per Child* chart. While the total number of children in DFPS custody decreased from fiscal year 2021 to 2024 and has since leveled off, the average number of primary caseworkers assigned to a child has consistently increased from 5.6 primary caseworkers per child to 6.7 primary caseworkers per child.[6] In fiscal year 2025, children in DFPS foster care experienced an average of four placements and waited an average of nearly 20 months before being placed in a permanent, stable living situation.

### Negative Impacts of DFPS Staff Turnover in APS, CPI, and CPS

- Delayed investigations.
- Lack of continuity in providing services to clients, including children, families, and vulnerable adults.
- Lack of relationship building between client and caseworker.
- Increased workload for remaining workers.
- Significant costs to the state for recruitment and training.

**Children in DFPS Custody Versus Average Number of Primary Caseworkers Per Child**
**FYs 2021-25**




| | FY 21 | FY 22 | FY 23 | FY 24 | FY 25 |
|---|---|---|---|---|---|
| Children in DFPS Custody | 28,753 | 21,583 | 18,812 | 17,302 | 17,623 |
| Average Number of Primary Caseworkers | 5.6 | 5.9 | 6.4 | 6.6 | 6.7 |

Workforce retention issues are not exclusive to Texas. Rather, they are symptomatic of the greater child welfare system. Across the nation, child protective agencies face the same challenges as DFPS, with historical turnover rates ranging from 20 to 40 percent among various states.[7] Between 2004 and 2015, the average national turnover rate for frontline caseworkers was 22 percent.[8] Consequently, historical evidence shows that completely eliminating turnover in this critical field is virtually impossible. However, DFPS has clear

programmatic and operational opportunities to better mitigate the issue and thereby protect the safety and well-being of children in the state's care.

### DFPS' current policies and practices fail to mitigate unreasonable workload expectations and intense mental demands, risking the health and well-being of agency staff.

- **Lack of workload time estimates hinders realistic workload expectations.** Without accurate estimates of the time it takes to complete case tasks, the agency cannot define a workload baseline that would provide reasonable work expectations for its caseworkers. DFPS directs regional offices and SSCCs to follow best practices and consider the complexity of a case when making case assignments, but this guidance fails to quantify or estimate how certain factors increase time spent on case tasks.[9] For example, while DFPS tracks caseloads based on the primary alleged victim, a single case routinely requires extensive contact, coordination, and documentation for multiple individuals, including siblings, parents, other caregivers, and service providers. Caseworkers are responsible for ensuring the safety of all children designated under their caseload, which requires monthly in-person visits with their assigned children and additional visits to ensure all involved parties are seen.[10] For Family-Based Safety Services (FBSS) caseworkers, the number of visits increases based on the child's assessed safety risk, requiring up to two visits per month to each child and three visits per month to each parent in the case.[11] Recognizing that some cases are more time-consuming than others, DFPS has worked with the Legislative Budget Board to develop specific performance measures to capture daily caseloads per worker. For fiscal years 2028 and 2029, DFPS requested a daily caseload target of nine cases for FBSS caseworkers and 15 cases for kinship caseworkers. However, other factors, such as the geographic size of the state, further complicate how caseworkers calculate and spend their time, particularly in expansive rural regions in which caseworkers may spend considerable time traveling between site visits or conducting other tasks. On the other hand, caseworkers in dense urban areas often lose significant time to traffic congestion. Yet these time-consuming tasks are not given full consideration when assigning cases.

  Case assignments do not fully account for travel and traffic demands.

  While DFPS has made progress in reducing caseload numbers to meet caseload guidance of 14 to 17 children per conservatorship caseworker, the lack of an accurate workload baseline prevents the agency from determining whether caseloads should be further reduced to achieve realistic workload expectations.[12] For example, the *CPS Caseworker Average Daily Caseload* table on the following page shows how caseloads vary by type of case.[13] Average daily caseload measures the number of open cases assigned to a caseworker, which may not accurately reflect the volume of work the caseworker is completing. Despite the reduction in average daily caseload, caseworkers may still struggle to complete tasks and close enough cases to keep up with their new case assignments.

**CPS Caseworker Average Daily Caseload, FYs 2023-25**

| CPS Caseworker | FY 23 | FY 24 | FY 25 |
|---|---|---|---|
| Conservatorship | 15.8 | 15.2 | 13.8 |
| Foster and Adoptive Home Development | 17.4 | 14.3 | 13.3 |
| Family-Based Safety Services | 7.1 | 9.8 | 8.8 |
| Kinship | 23.1 | 20.6 | 19.5 |

National child welfare standards emphasize that per-child caseload counts fail to reflect the true operational demand on caseworkers.[14] Best practices across state child welfare systems rely on weighted workload methodologies that account for total family size, required collateral contacts, and case complexity.[15] By continuing to measure capacity mainly through primary alleged victim counts, DFPS lacks an accurate workload baseline, which also affects CBC as SSCCs inherit the same uncalculated operational burdens.

- **Work demands compete with and compromise mentorship.** DFPS struggles to provide sufficient mentorship for new program staff as they transition to field work and take on increasing workloads. Mentors model key field work skills and provide guidance about navigating challenges in field work, which reinforces core competencies and prepares staff to work cases independently. In the 2015 *Sunset Staff Report on DFPS*, the agency was directed to establish a program in which mentors were to be solely dedicated to assisting new CPS caseworkers.[16] In response to that directive, the agency implemented a statewide mentorship program across all four programs; however, mentors are still expected to carry regular caseloads. Mentors serve as the primary caseworker while new workers serve as the secondary caseworker, allowing mentors to evaluate the new caseworker before becoming case-assignable. Because mentors are not dedicated training staff, they must complete their mentorship duties in competition with their casework. Additionally, as a statewide program, mentors may be assigned trainees who live in different counties, making in-person training difficult. For example, Region 1 (Panhandle) covers 41 counties; a mentor in Lubbock may not always be able to accompany a trainee on a face-to-face child visit in Borger, which is 170 miles away.

  Despite having hundreds of mentors available, Sunset staff heard that some regions lack enough mentors to take on trainees. To keep up with turnover, DFPS must hire about 139 new staff every month or almost 1,670 annually, as shown in the *DFPS New Workers and Available Mentors* table. The number of new hires outpaces the number of CPI and CPS mentors, who establish up to a year-long relationship with a trainee to ensure competency. One region had about 10 caseworkers in training, but with only five

**DFPS New Workers and Available Mentors, July 2024-April 2026**

| Program Area | Average Monthly New Workers | Annual New Workers | Available Mentors |
|---|---|---|---|
| SWI | 3 | 36 | 52 |
| APS | 11 | 132 | 200 |
| CPI | 71 | 852 | 320 |
| CPS | 54 | 648 | 540 |
| **Total** | **139** | **1,668** | **1,112** |

mentors available, mentors had more than one trainee assigned. The constant rotation of trainees due to turnover is causing some mentors to burn out. Additionally, attracting tenured staff to become mentors may be difficult; several respondents to the Sunset workforce survey noted that the $300 monthly stipend did not sufficiently compensate mentors for the amount of mentorship work performed. Without enough mentors to cover new staff, some regions are struggling to keep pace with hiring, threatening the agency's ability to maintain an adequate number of workers and offset turnover.

Available wellness resources remain difficult to use amid workload demands.

- **Unreasonable workload expectations limit access to existing wellness support programs.** DFPS has expanded its wellness resources for staff, yet persistent workload demands and inconsistent supervisory approval make this support functionally inaccessible. While the agency encourages staff to take advantage of wellness resources, it also expects workers to meet their deadlines without fail. Caseworkers frequently struggle to complete necessary case tasks in a reasonable amount of time, often working beyond normal working hours, preventing the use of wellness resources when they are most needed. For example, SWI screeners for CPI serve as the frontline defense for busy investigators by conducting an additional review of some case priority designations to ensure risk levels are being accurately assigned.[17] Given the high intake volume and limited staff resources, experienced CPI screeners often work five to 10 extra hours a week just to keep pace. Maintaining this level of work for a prolonged period of time can be exhausting and may lead to staff burnout.

These expectations force staff to choose between casework and wellness resources. Through the state's Employee Assistance Program (EAP), staff has access to six free counseling sessions and 24/7 phone support for immediate counseling. However, respondents to the Sunset workforce survey revealed that caseworkers frequently forgo taking time off for counseling due to extreme workload pressures and fear of the stigma of using wellness resources. Respondents also emphasized that six free EAP sessions are simply not enough to address the ongoing secondary traumatic stress, as defined in the *Secondary Traumatic Stress* textbox, that many caseworkers and administrative staff experience on a daily basis.[18] Although DFPS caseworkers are not recognized as first responders like emergency medical services personnel or fire fighters, they similarly experience the effects of secondary trauma that impair their well-being, like emotional exhaustion from the constant exposure to children's trauma and cognitive fatigue that impairs focus and reduces productivity. Furthermore, child welfare research shows that passive wellness programs like EAPs fail to reduce turnover unless supported by explicit agency policy protections and consistent supervisory backing.[19] DFPS recognizes

### Secondary Traumatic Stress

- Secondary traumatic stress is the emotional duress that results when an individual, such as a caseworker, supervisor, or other professional involved in the care of children, families, and vulnerable adults, hears about the firsthand trauma experienced by others.
- Secondary trauma can be experienced both by caseworkers and administrative staff who encounter narratives and evidence of trauma when gathering case materials in response to document requests.

the importance of trauma-informed care provided to the individuals it serves but needs to ensure similar care is provided to its own staff.[20]

Despite employing nearly 12,000 staff, DFPS dedicates a single full-time equivalent (FTE), with the help of several regional volunteers across the state, to manage its agencywide employee wellness strategy. While DFPS' wellness strategy supports a variety of current wellness initiatives, the agency's lack of resources dedicated to wellness has reduced their effectiveness. For example, the agency's wellness initiatives face a serious administrative bottleneck; as of April 2026, the wellness administrator was managing 47 active projects alongside an 81-project backlog. While the agency is piloting a volunteer peer-support wellness program in legacy regions, the lack of wellness staff prevents DFPS from identifying and pursuing priorities like building program-specific wellness support or establishing clear guidelines for staff's use of wellness leave during work hours.

Lack of dedicated wellness staff limits the effectiveness of wellness initiatives.

In the absence of a robust wellness team, regional program areas have established their own wellness initiatives to increase staff resiliency and prevent burnout. For example, CPI staff receives trauma and work-life balance training, while SWI regional leadership promotes the use of wellness leave and wellness walks and provides monthly secondary trauma counseling sessions. However, successful wellness initiatives like these cannot be propagated across the state for the benefit of staff's well-being without being backed by an effective agencywide approach.

**DFPS has not adequately assessed its operational needs to support agency and SSCC staff, potentially undermining the long-term success of the state's foster care system.**

- **Lack of quality monitoring on training for SSCCs contributes to underperformance.** Robust training and staff development provide the critical foundation for any effective workforce. However, DFPS is not adequately monitoring the quality of training at SSCCs, leaving staff unprepared to perform their duties. Internally, DFPS' Learning and Development (L&D) team delivers training services to agency staff, including SWI, APS, CPI, and CPS. L&D is also responsible for providing training support to SSCCs during the CBC transition and during the transition to Stage II readiness, which includes delivering core casework competency training, an introductory course to DFPS' case management system, and "train the trainer" sessions for SSCC staff. An SSCC is expected to begin delivering training to its own staff after Stage II readiness. However, L&D does not provide an ongoing review of SSCC training materials or attend trainings for quality assurance of the courses after a region transitions from readiness to delivery of Stage II functions.

DFPS does not perform quality assurance reviews of SSCC training after Stage II readiness.

Stakeholders expressed frustration to Sunset staff about the quality of training provided to SSCC staff. For example, SSCCs in Stage II have hired trainers who lacked child welfare field experience. Despite having been

trained by the SSCC to conduct training for SSCC employees, trainers have been noted to be ill-equipped to prepare new SSCC caseworkers for field operations. In another example, DFPS regional attorneys used to update legal training materials for caseworkers after each legislative session to communicate key legal changes to the field, but since these responsibilities have transferred to SSCCs, the SSCCs may not be updating the legal training as frequently. In the most severe instance, DFPS identified lack of quality training as a contributing factor to performance issues of EMPOWER in Region 3E, which was placed under DFPS receivership in March 2026. Although the agency is aware of the need to provide adequate monitoring of training, DFPS has not fully assessed what additional resources are needed for L&D to ensure SSCC staff receives adequate training to perform the work necessary to protect the safety and well-being of children.

In-house specialist positions support legacy and SSCC operations.

- **Loss of in-house specialists undermines service delivery.** DFPS has not fully assessed the need to retain important positions within the agency that would support legacy programs connecting clients to services. Currently, DFPS maintains subject matter expertise across several in-house specialist positions that support both legacy CPS and CPI programs. Through the agency's future state planning, DFPS is currently in the process of evaluating the availability of and need for in-house specialist positions to determine the most effective allocation of resources. As described in the *Specialist Roles* textbox below, these specialist positions include key operational and specialized support roles that help caseworkers connect clients to services.

**Specialist Roles**

- Clinical coordinator – Maintains long-term contact with clients, client families, and service providers for medical, social, educational, and related service needs and ensures the continuity of care and services for youth experiencing psychiatric hospital stays.
- Developmental disability specialist – Coordinates services and resources for children with intellectual and developmental disabilities.
- Education specialist – Supports caseworkers with educational needs for children in care and liaises with local school districts.
- Family group decision making staff – Assists children and families in safety and service planning and decision making in family group conferences, Circles of Support meetings, and family team meetings.
- Psychiatric hospital worker – Maintains direct contact with children in psychiatric hospitals and hospital staff by making weekly face-to-face visits with any child admitted to a hospital, discusses the child's progress with hospital staff, gathers any necessary records for placement, and liaises between CPS and psychiatric hospitals.
- Well-being specialist – Assists caseworkers to address basic and specialized behavioral and physical health care needs for children in all stages of service and liaises with Superior for STAR Health Services.

When an SSCC signs a contract to take over conservatorship case management services in a region, DFPS shifts funding to the SSCC to perform the contracted services. DFPS calculates the amount of this resource transfer using the statewide salary averages of conservatorship

staff and reduces its FTE positions based on this calculation. While SSCCs are not obligated to recreate the DFPS staffing structure, SSCCs expressed concern that the resource transfer was insufficient to hire enough staff to fulfill their contractual obligations, asking for funding to support additional specialists. While well-intentioned, DFPS provided additional funding for some specialist positions without considering the long-term impact on the agency's legacy functions. For example, stakeholders noted that DFPS initially contemplated including Family Group Decision Making positions in the resource transfer but later recognized the critical role these positions play in facilitating connections between families and caseworkers. Ultimately, DFPS decided not to include these positions in the resource transfer, although the positions were reassigned elsewhere within the agency.

DFPS has only six psychiatric hospital workers for the entire state.

Some specialist positions are so few in number that DFPS could not transfer the equivalent funding of even a single position to each SSCC. For example, DFPS has only six psychiatric hospital workers for the state, with some covering multiple regions. Retaining in-house specialist positions to provide assistance to both legacy and SSCC staff would ensure clients receive services in an effective manner across the state, but the agency has not yet assessed what staffing levels would be appropriate to provide that assistance.

- **Insufficient number of master conservatorship workers prevents effective deployment.** Master conservatorship workers, who are tenured DFPS employees with years of experience, provide critical support to both legacy and SSCC regions, but their small number undermines their effectiveness. Master conservatorship workers provide case management support and can be deployed across the state. DFPS typically deploys master conservatorship workers when a region is struggling with caseworker turnover, experiencing heightened caseload rates, or undergoing CBC transition. In fiscal year 2025, DFPS had 42 master conservatorship workers, which the agency more than doubled to 102 in July 2026.

Master conservatorship workers struggle to follow SSCC-specific processes.

Because master conservatorship workers can be deployed across the state on short notice, they may lack specific knowledge of their assigned SSCC. As a result, stakeholders voiced concerns that master conservatorship workers struggle to follow the specific processes of their SSCC, leading to incomplete documentation and miscommunication on returning the case to SSCC staff. When deployed to an SSCC, master conservatorship workers are expected to carry a large caseload, despite travel time potentially reducing their work week by two days. Some master conservatorship workers reported carrying 17 cases and working late evenings in a hotel to make up for time lost to travel. Deployment can last for weeks depending on the need, which is a challenging travel schedule to maintain. Some master conservatorship workers were deployed for nine to 11 months at a time; such prolonged deployments likely contribute to staff burnout. In fact, several master conservatorship workers who were deployed for that amount of time are no longer with the program. Additional master conservatorship workers

could alleviate the need for such protracted deployments while maintaining in-house conservatorship expertise necessary to support struggling SSCCs on short notice, but the agency has yet to assess the appropriate staffing level for master conservatorship workers.

## Sunset Staff Recommendations

### *Change in Statute*

#### 2.1 Require DFPS to regularly conduct casework time studies to more accurately develop reasonable caseload guidance and expectations for caseworkers.

This recommendation would require DFPS to conduct regular casework time studies to determine an appropriate workload baseline for its various staff positions and define achievable and reasonable targeted caseloads and caseworker expectations. As part of this recommendation, the studies should quantify the time needed to complete a variety of casework tasks, including but not limited to conducting interviews with clients and other parties in a case, coordinating services for a client, and documenting casework activities. The studies should also consider factors affecting casework tasks such as total family size, number of other parties in a case, travel time to geographic locations of parties, and other factors contributing to case complexity.

As part of this recommendation, the studies should also quantify the time needed to perform other assigned or needed work-related tasks, including time spent performing mentorship tasks, travel time if the mentor and trainee are not located at the same regional office, and time spent participating in wellness programs as a volunteer peer or participant.

Also as part of this recommendation, the agency should implement a phased approach to begin the studies in select regions, allowing the agency to refine the study's methodology before expanding statewide. The agency should consider staggering the studies by program area over a six-year period. DFPS should complete the first casework time study by June 2028 to inform its biennial Legislative Appropriations Request (LAR). The agency should determine the most appropriate method for DFPS staff to quantify time spent on tasks, which could include a random moment time study or other type of work sampling study. After the initial study, subsequent studies should be conducted at least once every six years and should document the methodology for each study to support standardized and validated assessments. This recommendation would enable the agency to make informed decisions on case assignments and caseloads, including whether to scale down caseloads to compensate for time spent on mentoring tasks or participation in wellness programs and other assigned tasks.

#### 2.2 Require DFPS to develop a staffing plan that assesses its future operational needs to inform agency staffing decisions.

This recommendation would require DFPS to develop a one-time 10-year staffing plan that identifies the agency's future staffing levels over the next 10 years needed to meet the agency's programmatic workload and support its internal and CBC operations while maintaining reasonable workload expectations. The staffing plan should align with and build upon the agency's existing future state and strategic planning efforts and should consider factors affecting staffing levels such as direct service delivery demands, agency funding, and the ongoing evolution of DFPS' role in CBC oversight and support. As part of this recommendation, DFPS would determine its needed staffing levels for investigators, caseworkers, and other frontline staff to provide direct service delivery for the children, families, and vulnerable adults involved with SWI, APS, and CPI program operations in all regions of the state and CPS program

operations in legacy regions. DFPS would also determine whether existing positions in the agency should be reallocated or repurposed to meet the needed staffing levels or whether additional positions are needed to sufficiently meet direct service delivery demands.

As part of this recommendation, DFPS would also determine its needed staffing levels for other internal and CBC operations to sufficiently support legacy and SSCC staff. The agency should consider supplementing areas whose operations or responsibilities are expected to increase over the next 10 years but are currently understaffed, including but not limited to training staff, wellness staff, subject matter specialists, and master conservatorship workers. DFPS would also determine whether existing agency positions should be reallocated or repurposed and whether additional positions are needed to sufficiently meet demand from legacy and SSCC staff.

The agency could also use the casework time studies and targeted caseloads from Recommendation 2.1 to inform its staffing plan. For example, DFPS could consider the targeted caseloads to determine reasonable workload expectations for staff, which would inform the number of staff needed to sufficiently meet direct service delivery demands or demand from legacy and SSCC staff. As DFPS hires new staff, the agency could also determine the number of mentors needed to support new hires as they transition to field work.

This recommendation would also require the agency to complete the staffing plan by June 2028 to inform its biennial LAR. As DFPS engages in its long-term change management planning to address the agency's shifting responsibilities and roles, this recommendation would ensure DFPS has the information it needs to make informed staffing decisions that best support legacy and CBC operations.

### *Management Action*

#### 2.3 Direct DFPS to further develop its agencywide wellness strategy to promote existing wellness resources within the agency.

This recommendation would direct DFPS to further mature its agencywide wellness strategy to improve access to existing wellness support programs and encourage participation by agency staff. As part of this recommendation, the agency would:

- Clarify agency policy about available staff wellness leave, wellness walks, and participation in other wellness programs during working hours, including details about the process for staff obtaining approval to use leave or participate in wellness programs in regional offices.
- Formalize the agency's regional volunteer peer-support wellness program by establishing agency policy and expectations for volunteer peers and staff participation.
- Actively promote and encourage participation in the agency's existing wellness policies, wellness programs, and benefits in routine agency onboarding, supervisory meetings, and internal communications.

#### 2.4 Direct DFPS to develop a policy formalizing the use of in-house shared support services between the agency and SSCCs.

This recommendation would direct DFPS to formalize the use of support staff services in policy. The policy should outline the process for staff in legacy regions and SSCC staff in SSCC regions to request a service from DFPS and identify who is eligible to make such requests. Support staff services could include the use of in-house shared specialists, training staff, master conservatorship workers, and other positions the agency deems appropriate. As part of this recommendation, the support staff services policy should also outline a prioritization process to determine how legacy and SSCC staff requests should

be prioritized and an escalation process when legacy and SSCC staff are not receiving the requested service. This recommendation would ensure fair and equitable access for all legacy and SSCC regions limited specialist positions.

## Fiscal Implication

Overall, these recommendations may have a fiscal impact to the state, but this impact would depend on implementation and cannot be determined at this time. Costs related to Recommendation 2.1 would depend on the type of time study implemented by the agency and cannot be estimated at this time. The remaining recommendations relate to future state agency planning and staffing decisions that DFPS could implement with existing resources.

1 DFPS, "CBC Community Areas," accessed online August 5, 2026, https://www.dfps.texas.gov/CBC/community-areas/.

2 SAO, *An Annual Report on Classified Employee Turnover for Fiscal Year 2015*, December 2015, p. 18, accessed online August 5, 2026, https://sao.texas.gov/reports/main/16-702.pdf.

3 SAO, *An Annual Report on Classified Employee Turnover for Fiscal Year 2025*, February 2026, p. 18, accessed online August 5, 2026, https://sao.texas.gov/Reports/Main/26-703.pdf.

4 Ibid., p. 54.

5 TexProtects, *Child Protective Services Workforce Analysis and Recommendations*, January 2017, accessed online August 5, 2026, https://ncwwi.org/files/Retention/Child_Protective_Services_Workforce_Analysis_and_Recommendations.pdf.

6 DFPS, "CPS Conservatorship: Children in DFPS Legal Responsibility on August 31 and Average Days in Care," accessed online August 5, 2026, https://www.dfps.texas.gov/About_DFPS/Data_Book/Child_Protective_Services/Conservatorship/Activity_on_August_31.asp.

7 Casey Family Programs, "How does turnover in the child welfare workforce impact children and families?" August 2023, accessed online August 5, 2026, https://www.casey.org/media/23.07-QFF-HO-Workforce-Turnover.pdf.

8 Megan Paul, Courtney Harrison, Jonathan Litt, and Michelle Graef, "Workforce Turnover is a Persistent Child Welfare Challenge – So is Measuring It," Quality Improvement Center for Workforce Development, January 24, 2022, accessed online July 14, 2026, https://www.qic-wd.org/qic-take/worker-turnover-persistent-child-welfare-challenge.

9 DFPS, *Generally Applicable Caseload Standards*, p. 14, accessed online August 5, 2026, https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/CPS_Generally_Applicable_Internal_Caseload_Standards.pdf.

10 DFPS, *Child Protective Services Handbook*, Section 6411.1, accessed online June 25, 2026, https://www.dfps.texas.gov/handbooks/cps/files/CPS_pg_6400.asp; and DFPS, *Child Protective Services Handbook*, Section 6321, accessed online June 25, 2026, https://www.dfps.texas.gov/handbooks/cps/files/CPS_pg_6300.asp.

11 DFPS, *Child Protective Services Handbook*, Section 12240, accessed online June 25, 2026, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_pg_x12000.asp.

12 DFPS, *Generally Applicable Caseload Standards*, p. 3, accessed online August 5, 2026, https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/CPS_Generally_Applicable_Internal_Caseload_Standards.pdf.

13 DFPS, "Child Protective (CPI/CCI/CPS): Average Daily Caseload," accessed online June 25, 2026, https://www.dfps.texas.gov/About_DFPS/Data_Book/Employee_Statistics/CPS/CPS-Caseload.asp.

14 Child Welfare League of America, "Caseload and Workload," accessed online August 5, 2026, https://www.cwla.org/our-work/practice-excellence-center/workforce-2/caseload-workload/.

15 Child Welfare Information Gateway, "Caseload and Workload Management," September 2021, accessed online August 5, 2026, https://artifacts.childwelfare.gov/public/documents/caseload-workload-mgmt.pdf?VersionId=teRufg7E9IZQ6r_FCG1d19dGswctxwVm.

16 Sunset Advisory Commission, *Sunset Staff Evaluation of the Department of Family and Protective Services Staff Report with Final Results*, p. 27, July 2015, accessed online June 23, 2026, https://www.sunset.texas.gov/public/uploads/files/reports/DFPS%20Final%20Results.pdf.

17 DFPS, *Statewide Intake Policy & Procedures*, Section 11320, accessed online July 15, 2026, https://www.dfps.texas.gov/handbooks/SWI_Procedures/Files/SWP_pg_x11000.asp.

18 National Child Traumatic Stress Network, "Secondary Traumatic Stress," accessed online July 14, 2026, https://www.nctsn.org/trauma-informed-care/secondary-traumatic-stress.

19 Child Welfare Information Gateway, "Supervision," accessed online July 31, 2026, https://www.childwelfare.gov/topics/workforce/supervision/.

20 DFPS, "Trauma-Informed Care Training," accessed online August 7, 2026, https://www.dfps.texas.gov/training/trauma_informed_care/.

# Issue 3

# DFPS Must Better Coordinate Its Service Capacity Building Efforts, Improve Data Collection, and Evaluate Service Outcomes to Ensure Clients Receive High-Quality Services.

## Background

Once youth, families, and vulnerable adults enter the state's child and adult protective system, the Department of Family and Protective Services (DFPS) provides them with services designed to address risks of current and future abuse, neglect, and exploitation. DFPS caseworkers provide direct case management services to youth, families, and individuals involved in a case by first identifying the need for a service and then coordinating with providers to obtain it. Caseworkers in each of DFPS' program divisions connect individuals to different types of client services, as explained below:

- **Child Protective Investigations (CPI):** CPI investigations, including Alternative Response, most commonly include assessment-like services such as drug and alcohol testing to better gauge safety and risk in the home. Investigations caseworkers often begin the referral process for long-term services in cases likely to progress to Family-Based Safety Services (FBSS).
- **FBSS within Child Protective Services (CPS):** FBSS caseworkers provide or coordinate services to give families the skills or treatment needed to reduce the risk of future abuse and neglect. These services include not only assessment-like services but also long-term services such as individual or group therapy, substance use disorder counseling, domestic violence counseling, and other mental health services.
- **CPS Conservatorship:** Conservatorship workers for both DFPS and Community-Based Care (CBC) Single Source Continuum Contractors (SSCC) deliver services to support youth, foster and kinship caregivers, and family members seeking reunification. DFPS and SSCCs provide services in the conservatorship case stage that are largely similar to the services DFPS provides in the FBSS stage. However, conservatorship services are court ordered, and youth in conservatorship have access to STAR Health Medicaid.
- **Adult Protective Services (APS):** APS provides more direct, short-term paid services than DFPS' child-focused programs. For example, a vulnerable adult might be on the verge of being unable to pay their water bill due to an emergency situation like a freeze causing a water leak. APS might use DFPS contracting funds to pay the bill and avoid the client's utility services being disconnected.

As another example of client services, DFPS provides specialized supports for older youth and young adults who have recently aged out of care to meet their unique needs in preparing for adulthood.[1] The federal government partially funds programs like Extended Foster Care, which allows young adults to remain in paid foster care placements until the age of 21, and Preparation for Adult Living (PAL), which is a suite of services for youth ages 14 to 21 designed to help them live independently after leaving the state's care. PAL Life Skills Training is a component of the program for youth up to age 18 that focuses on building their knowledge related to financial management, health and safety, housing and transportation, job readiness, life decisions and responsibilities, and personal and social relationships. DFPS must provide certain PAL services like Life Skills Training, but youth may refuse to participate.[2]

DFPS caseworkers obtain most client services from community partners like the Health and Human Services Commission (HHSC), local mental and behavioral health authorities, and charitable organizations. Sources like HHSC, Medicaid, or philanthropic funds typically pay for these external services. The Legislature also appropriates DFPS funding to contract directly with providers for client services. DFPS policy establishes externally funded services as the preferred option and directs staff to use DFPS-funded services mainly when externally funded services are unavailable.[3] Community partners like HHSC have far greater ability to directly fund services than DFPS. For instance, the 89th Legislature appropriated $2.5 billion to HHSC and $40 million to DFPS for behavioral health and substance use disorder services in fiscal year 2026.[4] DFPS sometimes contracts for services in emergency circumstances such as when a client needs a resource more immediately than the community network can provide or when a court orders a specific service for which DFPS needs to directly contract.

Broadly speaking, service capacity building and maintenance refers to efforts to identify providers of services that meet a need DFPS must fulfill for its clients, secure agreement that these providers will accept DFPS clients, and then ensure DFPS is consistently able to connect clients to these necessary services over time. Responsibilities for managing service capacity differ based on who is paying for the service. For example, DFPS' Purchased Client Services (PCS) division is responsible for contracting directly with providers to obtain DFPS-funded services that meet regional service needs. PCS manages those services in a top-down fashion in collaboration with regional program leadership. By contrast, DFPS relies on individual caseworkers to identify and obtain externally funded services in a more bottom-up approach. For instance, current child protective policy requires caseworkers to not only identify and arrange appropriate services for their clients but also, when a needed service is not available, "[work] with the community to recognize the need and [provide] leadership for organizing and supplying the needed resource or service."[5] PCS is not significantly involved in managing externally funded services in the community network because the agency does not contract for these services.

## Findings

### The state's patchwork network of services requires DFPS to engage in systemwide service capacity building efforts.

Texas' network of services has critical gaps.

The network of services DFPS draws upon to assist youth, families, and vulnerable adults has critical gaps that prevent the agency from consistently meeting its clients' needs. While DFPS is responsible for connecting individuals to services, community partners are responsible for building and maintaining capacity for the majority of those services. For example, as Issue 6 of the *Sunset Staff Report on HHSC* discusses, statute requires HHSC to perform certain planning, coordination, and resource allocation activities for Texans requiring mental health services, which are responsibilities that HHSC delegates to local mental and behavioral health authorities.[6]

In general, DFPS caseworkers have the same access to the services their clients need as any member of the public would, and service providers rarely have set-aside capacity exclusively for DFPS. This lack of DFPS-specific capacity is by design. State and agency decision makers have historically sought to avoid creating any incentives that might drive desperate parents or caregivers into the child and adult protective system. For example, if DFPS operated its own children's behavioral health services that only youth with open cases could access, a parent or caregiver with limited options to manage their child's

acute behavioral health needs might decide to report themselves for neglect even when no such neglect is occurring or relinquish custody through the Refusal to Accept Parental Responsibility (RAPR) process. These harms are not theoretical. Public misperceptions about DFPS' supposed special access to services have already made it necessary for the state to develop a process to triage RAPR cases and prevent parents from relinquishing custody when they have other, better options.

Many DFPS clients go without much-needed supports.

Although it remains appropriate that DFPS does not have its own, unique service network for these reasons, the community network the agency draws upon has significant gaps, meaning that many clients are going without much-needed supports. These shortfalls can be regional, such as rural areas struggling to maintain a sufficient number of providers, or specific to certain service types. As shown in the *DFPS Service Capacity Gaps* table below, DFPS struggles to provide sufficient and accessible services for clients in several key areas.

**DFPS Service Capacity Gaps**

| Service Area | Description of Service Gap |
|---|---|
| Youth behavioral health | HHSC and DFPS report significant gaps for more intensive behavioral health services. Services like residential treatment centers and Youth Empowerment Services waivers involve months-long delays for families in crisis who need help immediately. Other services like system navigators and Youth Crisis Outreach Teams show promise but are not available statewide — 185 counties do not have a system navigator. Most agency staff and stakeholders regard youth behavioral health services as the largest issue currently facing the state's youth services network. |
| Emergency emotional support services and assessment centers | Stakeholders reported that DFPS needs additional providers for temporary emergency placement services, like emergency shelters, that can provide the support services needed for children with higher mental health and behavioral needs. While DFPS conducts an exhaustive search to find suitable residential placements for children in crisis such as residential treatment centers, the agency often has difficulty finding local providers who can provide short-term emergency services while long-term placement is pending. |
| FBSS in-home intensive services | Consistent with changes in Texas statute, DFPS is removing fewer children from their homes, meaning more children are remaining in homes with identified risks needing services. To address possible safety issues, DFPS staff says the families need intensive, in-home services. DFPS staff and stakeholders generally feel hopeful that the Texas Family First program will help solve this problem but explain that the program's requirement for a court order and limited statewide availability are significant barriers to participation. |
| Reunification and post-reunification support services | Stakeholders brought forward concerns that the initial period after DFPS returns a child to a home after a parent or caregiver regains custody can be as traumatic as the removal itself and that current services are inadequate to support caregivers through the stressful transition. Parents who previously went through the process said the lack of peer support services left them struggling to avoid relapse alone since parents are reluctant to alert caseworkers to any risks or problems when they have only just reunited with their children. |

| Service Area | Description of Service Gap |
|---|---|
| Services for youth transitioning out of foster care and into adulthood | DFPS provides services for older youth and young adults who have aged out of foster care, including Extended Foster Care, which research has shown to be efficient and effective in promoting positive outcomes for both the young adults it serves and the communities they live in.[7] To pay for these services, DFPS primarily uses federal funding that has lagged behind inflation for several decades and decreased by 23 percent from fiscal year 2025 to fiscal year 2026.<br><br>Providers expressed difficulties in offering services at current federal funding levels. For example, Supervised Independent Living is a type of quasi-independent housing placement for young adults in Extended Foster Care.[8] One Supervised Independent Living provider estimated that the funding they receive through DFPS covers only around 25 percent of what they actually spend to provide the service, with the other 75 percent coming from philanthropic donations to which few other providers have access. |
| Adult housing and placement resources | APS provides services to vulnerable adults who face significant challenges in securing safe, stable, and affordable housing. Many individuals the agency serves experience housing instability due to the limited availability of affordable housing options, a shortage of emergency shelter resources, and an inability to access long-term placements due to complex medical or behavioral health needs. These factors often create barriers to both immediate crisis intervention and long-term placement solutions. While APS works collaboratively with community partners, service providers, local governments, and housing organizations to identify appropriate housing resources, some situations go unresolved due to the lack of suitable options. |

Improvements to services require multi-agency efforts and legislative support.

DFPS and other agencies involved in the child and adult protective system recognize that any sustainable improvements to the network of services require their joint effort and legislative support. For instance, in 2015 the Legislature established the Statewide Behavioral Health Coordinating Council to coordinate agencies' efforts, develop and monitor five-year statewide behavioral health plans, inventory current state-funded programs and services, and help develop statewide funding proposals.[9] More recently, leadership from HHSC, DFPS, and the Texas Juvenile Justice Department have begun collaborating to map youth behavioral health resources available across the state and reach consensus on a list of joint requests to make to the 90th Legislature.

For these efforts to be as successful as possible, DFPS needs to maximize the services already at its disposal and improve how it identifies what services are still needed. Furthermore, better coordination between DFPS and its community partners and better collection and use of data would help the agency strengthen its understanding of these needs and enable the agency to play a greater role in addressing systemwide service issues.

### DFPS' overreliance on busy caseworkers and a lack of coordination both inside and outside of DFPS impedes the agency's efforts to build robust service capacity.

DFPS policy makes individual caseworkers responsible not just for arranging services for their clients but also for creating and maintaining large portions of the community network of services.[10] Caseworkers will always play a key role in service capacity development since they are the frontline staff making connections between clients and service providers. They know their communities, build trusted relationships with individual providers, and get a sense for provider

quality based on the impacts they see for their clients. However, the agency must do more to support and facilitate coordination between roughly 6,000 caseworkers in their efforts to provide services to children, vulnerable adults, and their caretakers. DFPS must also help caseworkers bridge the gaps between the agency and its community partners since these entities rely on one another to serve Texans but do not always understand what each other has to offer. Simply speaking, caseworkers cannot improve system capacity by themselves.

- **Limited time or support for strategic planning.** Caseworkers are not well-positioned to think strategically about how to build capacity for the services network because they lack the time needed to do so. Caseworker responsibilities vary by division, but in addition to connecting clients to services, all involve time-sensitive tasks such as conducting investigations, interviewing and collaborating with families and others involved in the case, assessing client needs, documenting all case activities, identifying placements, and participating in court proceedings.[11] These competing priorities pressure caseworkers to quickly find services that meet their client's individual, near-term needs so they can move on to their next task.

  Caseworkers' competing priorities make it difficult to think strategically about services.

  Even when caseworkers do find time to address issues in the service network, a lack of coordination between them and clear responsibilities for those involved hinder efforts. For example, when a caseworker in a region identifies a much-needed service provider that fills a gap in the region, they often share the information with other caseworkers in an attempt to be helpful. However, because no one has been charged with seeking out redundant capacity, this collaboration can backfire and lead to all caseworkers in the region relying on the same provider for a mission-critical service. Inevitably, overreliance on a single provider contributes to longer wait times for clients and could result in a crisis if that provider becomes overwhelmed by the volume of work and drops out of the system. Additionally, the provider the region is now relying upon might not be the highest-quality provider in the region or the best fit for every client, but because caseworkers are incentivized to move quickly and that provider has already agreed to work with the agency, caseworkers are unlikely to look for other options. Caseworkers should continue to work together and share knowledge about service providers, but DFPS must better support their efforts to avoid unintended consequences.

- **No formal channel for providing feedback to key decision makers.** Given the central role they play in obtaining client services, caseworkers have valuable insights on which services work best for their clients and where gaps in the service network exist. However, they report facing challenges in getting that information to decision makers who would benefit from that knowledge. For example, DFPS staff shared with Sunset that while there is a clear avenue for them to provide feedback on the contractual compliance of DFPS-funded service providers, they lack clarity on how to provide their insights on the quality of those services in terms of producing positive outcomes for their clients. Staff also reported that they did not

  Caseworkers face challenges providing feedback on services to decision makers.

always know how to convey to leadership when a program is working so that DFPS can maintain or expand its capacity.

Agency leadership cannot be expected to hear and use every piece of feedback from every caseworker — there are far too many caseworkers and too many competing agency priorities for that to be feasible or even desirable. However, DFPS lacks a role specifically tasked with gathering, curating, and conveying caseworkers' information on services to regional and state-level decision makers, meaning their knowledge generally has to reach higher-level staff through the traditional chain of command. This approach may not be deliberate enough to ensure caseworkers and supervisors can consistently and effectively escalate services-related issues. This staff has numerous equally important duties to discuss and potentially bring to the attention of regional and state-level leadership. Without a formal process in place to specifically raise services-related issues, information can stagnate at various levels or with various people since there is no structural impetus to push those issues forward.

Insufficient coordination impedes DFPS' efforts to build service capacity.

These information sharing issues impede efforts to develop and maintain capacity for both the DFPS-funded services PCS manages and the externally funded services for which caseworkers are primarily responsible. For externally funded services, even though DFPS policy puts much of the responsibility for managing capacity on caseworkers, some issues require regional or even state-level leadership to fix. To help address issues like bureaucratic hurdles preventing DFPS caseworkers from accessing another agency's services, leaders need information from caseworkers to know the problem exists, take into account the circumstances of the problem, and understand the impact the problem has on clients. For DFPS-funded services, PCS relies on regional program leadership's knowledge of services who in turn rely on their staff's knowledge. Failing to reliably move information upward diminishes PCS' ability to evaluate service effectiveness, identify program failures, and address critical service gaps.

- **Lack of a DFPS role focused on comprehensive service coordination.** The complexity of the network of externally funded services, which involves multiple agencies, federally funded programs, local authorities, SSCCs, private businesses, nonprofits, faith-based organizations, and more, makes service navigation and collaboration difficult. These cross-system community partners sometimes convene to address specific needs such as youth behavioral health service gaps. However, while DFPS has specialized positions to support coordination for particular types of services, currently the agency does not have a role dedicated to facilitating comprehensive coordination between the agency and its community partners to identify whether the services they offer could fill network gaps.

  For example, APS staff noted that services beneficial to APS clients are located in many different places at HHSC, but the APS division struggles to both find and use these services due to the lack of system navigation assistance. Similarly, for behavioral health services, DFPS staff typically

works with HHSC's Children's Mental Health division but more recently learned about a Family Support Services division at HHSC that maintains programs that may benefit DFPS-involved youth. While DFPS can now work to build connections with this newly discovered division, DFPS staff believes HHSC likely has additional divisions offering useful services DFPS is not yet aware of. Establishing a role at the regional level responsible for regularly liaising with services-focused areas of system partners like HHSC and then sharing information with both caseworkers and leadership could help the agency learn about the options it has at its disposal and thereby more efficiently and effectively serve families.

DFPS and its community partners often do not understand each other's service-related abilities and needs in the absence of deliberate and intentional outreach. A service coordination role at DFPS could play a part in addressing this problem by helping DFPS pass information about the causes of service gaps from caseworkers to community partners. For example, HHSC has many excellent programs to help children, but these programs sometimes have unnecessary requirements that prevent youth in conservatorship from participating. If DFPS had better processes to identify bureaucratic hurdles and escalate them to partners like HHSC, DFPS could more effectively work with these partners to eliminate service barriers and increase the ability of youth, vulnerable adults, and their families to access state-purchased services.

Stronger cross-system communication could reduce service access barriers.

An additional example of the need for cross-system collaboration relates to older youth and youth who have aged out of care. These youth face barriers to employment and benefit from programs the Texas Workforce Commission (TWC), Texas Higher Education Coordinating Board, and community colleges provide. However, stakeholders report that collaboration with these entities on services is inconsistent across regions and sometimes DFPS and TWC timelines do not align. For instance, a Supervised Independent Living placement for Extended Foster Care may require a youth to obtain employment sooner than TWC is able to provide support. While DFPS and providers say youth are not losing access to placements over delays, the lack of assistance on accessing external service options and cross-agency coordination can prevent DFPS caseworkers from securing timely support for older youth in their care.

### DFPS' reliance on word-of-mouth knowledge sharing without the support of standardized service inventories disrupts client care and compounds the impact of high staff turnover.

To effectively serve families, caseworkers need up-to-date, categorized, and specific service inventories that clearly detail what local resources are available and how to access them. While caseworkers are responsible for selecting the appropriate services to meet each family's unique needs, DFPS service inventories are too limited to help them locate options or retain and share regional knowledge about services. DFPS staff acknowledges that caseworkers

struggle to navigate service options and that existing processes to build and maintain current statewide service inventories are insufficient.

- **Incomplete and outdated state and regional inventories.** Caseworkers and other DFPS staff told Sunset staff that the main statewide service inventory — the Texas Information and Referral Network, referred to as 2-1-1 — does not meet the agency's needs because it is often incomplete and outdated. Staff described FindHelp, a private sector online tool aiming to fill a similar need, as also limited for DFPS' purposes. Moreover, the Statewide Behavioral Health Coordinating Council's annual inventory of state-funded behavioral health services does not meet DFPS' specific needs because this inventory only lists categories of services available rather than providing actionable information about specific options in a geographic area.[12] Local mental and behavioral health authorities post available services on their websites, but the timeliness and completeness of these lists vary across authorities. Some lists only include broad categories of services such as children's mental health services rather than specific options like individual providers in the authority's network offering trauma-informed counseling.

  DFPS lacks formal policy requiring regional service inventories.

  Many DFPS regional offices independently maintain their own unofficial lists of services. However, there is no formal, agencywide policy requiring casework divisions to maintain regional inventories of services, and existing lists are inconsistent, perfunctory efforts infrequently updated and often lacking a point of contact. These insufficient inventories limit staff's ability to proactively identify and address weak points in the network of services as well as deny caseworkers a tool they could use when searching for resources from which their clients might benefit. Other stakeholders have expressed an interest in formalizing and improving these service inventories. For example, at its May 2026 meeting, DFPS' Partners for Children and Families Committee discussed recommendations for improvements such as creating a statewide service inventory and more clearly establishing responsibilities for current inventorying efforts.[13]

- **Increased vulnerability to turnover.** In the absence of comprehensive, useful inventories, caseworkers often rely on speaking informally with colleagues to identify services for their clients. Caseworkers come to know their regions and regional service options well and then share that information with others. Knowledgeable employees and a collaborative culture should always play a role in developing service capacity. However, high staff turnover can quickly threaten the loss of that knowledge and disrupt the continuity of services DFPS provides to clients. This is particularly risky for DFPS since, as Issue 2 of this report discusses in greater detail, child and adult protective services is a high turnover profession. Stakeholders reported instances in which frequent turnover resulted in children experiencing as many as 10 different caseworkers in just 18 months, and new caseworkers were unfamiliar with and unable to effectively navigate local resources and available support. High staff turnover necessitates clear and thorough documentation and detailed service inventories to help children, families,

and caseworkers navigate changes when there are few tenured, expert caseworkers to assist them. When caseworkers cannot arrange services for caregivers and other family members, individuals already in a crisis are left to cobble together whatever supports they can on their own, further jeopardizing the safety and well-being of vulnerable children.

**DFPS does not collect sufficient, usable data on services, preventing the agency from evaluating service quality and identifying system needs.**

DFPS cannot currently track caseworkers' use of services the agency does not pay for. DFPS also does not collect any data on when DFPS caseworkers try and fail to obtain a service. Even for contracted services on which the agency has better data, DFPS does not consistently examine the impacts of these services on child safety outcomes. The limited data that do exist show significant room for improvement in client outcomes. Of all children involved in FBSS cases statewide in fiscal year 2020, over 43 percent were alleged victims in another case by fiscal year 2025.[14] Some recidivism will always exist, particularly for the relatively intensive FBSS case stage. However, DFPS' lack of data and resulting lack of meaningful data analysis suggests the agency is almost certainly missing opportunities to use well-tailored services to improve outcomes like reducing recidivism rates because it lacks enough information on which services best address risks. Without reliable data, the agency may overuse services that lead to little improvement or even negative outcomes and underuse highly effective services. The agency also misses opportunities to use data to demonstrate its real service needs to community partners and the Legislature.

Without comprehensive services data, DFPS misses opportunities to improve client outcomes.

- **No quantitative data collected on externally funded services.** The service data DFPS collects depends on whether the agency directly pays for the service. When caseworkers obtain a DFPS-funded service, they must complete an authorization form with basic information on the individuals receiving the service and the specific service they will be receiving. Although designed primarily for financial tracking, the form's standardized format captures specific client and service data, creating a consistent dataset that can be leveraged for quantitative evaluation. However, when caseworkers obtain the same type of service through a free community-based resource, Medicaid, local mental or behavioral health authority, or HHSC program, the only place they document that service provision is in the case narrative, which is a plain-text record of everything that happens in a case. DFPS cannot easily derive quantitative information from case narratives and therefore lacks key data on the agency's use of externally funded services.

  DFPS needs and would benefit from quantitative data on externally funded services because the agency prioritizes connecting families to these types of services, typically reserving its general revenue and limited federal dollars for services it cannot obtain otherwise.[15] Moreover, certain case stages have strict time frames, and DFPS cannot continue to pay for services after case closure. Using externally funded resources can help ensure the agency provides continued wraparound support for families after their case

is closed.[16] If DFPS does not collect data on externally funded services, it must rely on sporadic, anecdotal information to gauge the success of the tools it most frequently and preferentially uses.

DFPS lacks a complete picture of service availability.

Not having data on externally funded services also limits the value of the data the agency does collect on DFPS-funded services. Many categories of services are neither fully DFPS-funded nor fully externally funded. For instance, a program to alleviate risks associated with domestic violence might be available for free in the community in one area but require a contract between DFPS and the provider to acquire in another area. Even in a region where an externally funded domestic violence program is consistently available, waitlists to use the service for free might mean DFPS will choose to use agency funding to access the service more quickly because of a family's immediate need. In practice, this means that even if DFPS has usable data on the paid version of the domestic violence program, the agency is still missing data on the free version of the same program and lacks a complete picture of the performance and availability of that service in the area.

Furthermore, while DFPS has visibility into the types of DFPS-funded services SSCCs use, several SSCCs also report that they themselves do not perform significant, data-focused monitoring of externally funded services.

- **Failure to obtain a service not adequately tracked.** When DFPS caseworkers attempt to obtain any service — externally funded or not — and cannot do so, they only note the failed attempt in the case narrative. However, the agency cannot easily or efficiently analyze long-form narratives to determine where services are missing in the state.

Overreliance on word of mouth limits the agency's ability to systematically identify service gaps.

In terms of internal operations, the lack of these data means that caseworkers and agency leadership overly rely on word of mouth to determine where capacity on paper does not align with capacity on the ground. DFPS staff has repeatedly reported that there are certain HHSC services DFPS youth should be able to access but cannot in practice. For example, DFPS staff claims inpatient mental health facilities often decline to accept DFPS youth. Quantitative data on how often such issues occur would help DFPS confirm or disconfirm existing beliefs and identify new meaningful trends requiring action to address.

In addition, not having quantitative data makes DFPS a less-informed partner than it could be in conversations with external entities like HHSC that pay for many of the most important services DFPS caseworkers use. Generally, the agency relies on expert staff to provide qualitative accounts of problems their divisions are having in accessing particular services such as in the previous example of making referrals to mental health facilities and clients being turned away. Staff input will always be valuable because of the detail staff can provide on how and why clients were denied access to a service and the impact of that decision on their clients. However, in the absence of more quantitative data, DFPS will continually struggle to

explain the scale and prevalence of service availability problems. Pairing staff expertise with trend data showing failed service requests for youth would help DFPS more precisely articulate its current barriers and resource needs. These data would then better inform community partners, who may be able to adjust local facility policies, and legislative appropriators making funding decisions for vulnerable children and adults.

- **Insufficient evaluation of current service provision.** Even when DFPS has the ability to evaluate the impact of DFPS-funded services, the agency does not do so outside of occasional third-party studies. Furthermore, the outcome measures that do exist lack the specificity DFPS would need to determine whether a particular service type improves client outcomes. For example, in a case involving domestic violence, DFPS cannot currently measure the extent to which an alleged or designated perpetrator's participation in domestic violence counseling reduces the likelihood of that person recidivating. In 2015, the Sunset Commission directed DFPS to improve how it collects data on and evaluates the service quality of FBSS offerings so that the agency could assess the impact of individual service types on recidivism. DFPS evaluated FBSS services after the 2015 Sunset Report; however, the agency does not collect or analyze data on these services on an ongoing basis, preventing the agency from fully understanding which services are most effective at reducing risks and making the most of its current array of service options and funding.[17]

DFPS cannot currently evaluate whether service participation improves client outcomes.

Requiring families to obtain services without ensuring they are effective for people in their circumstances is unfair and could result in adverse outcomes. If a DFPS caseworker instructs a parent to obtain services upon the condition that the parent may lose custody of their child if they do not comply, DFPS has an obligation to make sure those services are actually beneficial. Collecting data on services DFPS offers to address specific safety risks and then analyzing whether those services actually have positive impacts would help the agency ensure clients are receiving effective, necessary services.

The lack of data collection and evaluation also makes it difficult for DFPS to identify and fix inconsistencies among caseworkers. For example, different caseworkers can look at the same set of facts and come up with different services for a child's plan of services. Such inconsistency is in large part to be expected from caseworkers' subjective discretion. However, when it is due to a caseworker not knowing the most appropriate option for their client or when it results in rapid, disorienting changes in programming, such inconsistency can harm children and families. For example, a parent member of the CPI Advisory Committee explained that in her case, she had three different investigators assigned to her case in a single weekend due to staff shift changes, all of whom had different ideas about which services should be on the safety plan.[18] Kinship caregivers also cite inconsistency as a problem, with different caseworkers making different claims about potential kinship placements' service eligibility. If a kinship caregiver takes a child into their home under the assumption they will receive services,

Casework inconsistencies persist without meaningful data and evaluation.

not receiving those services often puts extreme strain on the caregiver and places the child at risk of placement disruption. While supervisors and quality assurance staff should be able to look at case narratives and safety plan documentation to see changes between caseworkers, DFPS does not perform sufficient evaluation to determine how big of a problem inconsistency is across the state and to assess what extent it compromises positive client outcomes.

### A narrowly focused performance metric and overly prescriptive curriculum limit the effectiveness of DFPS' PAL Life Skills Training.

PAL Life Skills Training is a federally funded program that aims to teach older youth in DFPS conservatorship the practical abilities they need to live independent, successful adult lives.[19] DFPS' current approach to overseeing the program makes sense on paper but has not translated to consistent, measurable improvements in youth's readiness for adulthood.

Participants say PAL training can feel like a box-checking exercise.

The agency oversees the PAL Life Skills Training program in three main ways. First, DFPS outlines in detail what PAL classes in both legacy and SSCC regions must include at minimum. Second, providers submit their curricula to DFPS, which the agency reviews and approves. Third, DFPS grades SSCCs and legacy regions on the percentage of youth in conservatorship who complete Life Skills Training by age 18. In theory, DFPS' detailed curriculum requirements and oversight should ensure a baseline of quality instruction across the state, and the rates of program completion should inform state leaders on how well each region encourages youth to participate and benefit from that quality instruction.

Despite increases in the percentages of youth completing PAL training, youth, providers, and other stakeholders have questioned how well DFPS' standardized PAL curriculum adequately prepares participants for adulthood. Participants told Sunset and other researchers that completing PAL programming "does not translate to readiness" and can feel like a box-checking exercise.[20] DFPS staff and providers similarly note that the current measure looks at whether youth complete a set of curriculum requirements rather than whether they acquire the skills the curriculum teaches.[21] In practice, the PAL completion performance measure treats PAL training as an end in itself. Furthermore, rigid curriculum requirements prevent providers from revising the training content to improve outcomes for participants, even if better metrics encouraged them to do so.

- **Insufficient performance measure.** By evaluating providers solely on the percentage of youth in conservatorship who complete PAL training by age 18, DFPS prioritizes programmatic outputs over actual outcomes. This approach fails to incentivize providers to improve or innovate how they implement the classes, even if less restrictive curriculum requirements allowed them greater flexibility in how they structure their coursework. The program completion metric is valuable in terms of measuring how well SSCCs and legacy regions encourage youth to participate in PAL.

However, a better set of measures would also evaluate whether PAL-eligible youth actually demonstrate improved adult living skills upon program completion, measuring real program impact and showing whether the state's investment of limited federal dollars is successfully preparing youth to navigate adulthood.

The tools DFPS needs to evaluate youths' preparation for adult life already exist, and the agency uses one of them at the onset of PAL Life Skills Training. Statute requires DFPS to conduct an independent living skills assessment for qualifying youth in the agency's conservatorship who are 16 years of age or older.[22] The agency fulfills this requirement by having youth complete the Casey Life Skills Assessment around their 16th birthday.[23] The Casey tool measures how well youth are prepared in eight categories: daily living, self-care, relationships and communication, housing and money management, work and study, career and education planning, looking forward, and permanency.[24] The agency or its contractors use the assessment results to develop a plan for each youth to help them develop the skills they will need in adult life. As University of Texas System researchers noted in their 2026 CBC evaluation report, assessing youth's improvements using the same tool closer to the age of 18 would allow DFPS and its contractors to gauge both a youth's individual progress and the efficacy of their programming overall.[25]

DFPS should use existing tools to better evaluate PAL's impact on youth.

Statute and DFPS policy already require the agency to update the life skills assessment on an annual basis as a part of the youth's plan of service.[26] However, the data DFPS gleans from these updates are limited due to DFPS caseworkers generally only tracking and updating areas of concern rather than performing repeat Casey Life Skills Assessments. Caseworkers record these updates in the case narrative and youth's plan of service, which do not lend themselves as easily as the Casey assessments do to quantitative analysis and outcome tracking over time. If the Casey assessment data and caseworker updates are not sufficient, DFPS also collects outcomes and service data for the federal National Youth in Transition Database, which could also aid in the development of improved outcome measures.[27]

- **Overly prescriptive curriculum requirements.** DFPS must oversee PAL curricula that legacy regions and SSCCs use in order to confirm their compliance with state and federal law. Statute requires PAL to include "life-skills development and training regarding money management, health and wellness, job skills, planning for the future, housing and transportation, and interpersonal skills."[28] However, the agency's current approach to curriculum goes beyond what state statute requires by also detailing what each area must include, as shown in the *Current PAL Requirements – Personal and Social Relationships* textbox on the following page.[29] Sunset staff did not evaluate the importance of each individual item on the curriculum outlines but found that the prescriptiveness of the current requirements may come at the cost of turning PAL training into the checklist-driven exercise PAL participants have criticized rather than a meaningful process of skill and knowledge building.

The agency's PAL curriculum requirements are more prescriptive than state statute.

### Current PAL Requirements – Personal and Social Relationships

Federal and state law require DFPS to provide personal and social relationships training as one of six PAL curriculum areas. Current DFPS policy requires this training to include, at a minimum, the elements listed below. DFPS prescribes similar minimum standards for the curriculum of the other five trainings, with only financial management training requirements outlined at length in statute. Policy also requires that each training meet certain desired outcomes and include at least two out of a list of five to eight homework activities.

**Curriculum Requirements Outline**

**1. Interpersonal Relationships**

1.1 List different relationships at home, school, and work and the skills needed to interact effectively in those relationships.

1.2 Discuss and identify personal boundaries and the importance of respect for personal space.

1.3 Identify characteristics of and practice forming positive relationships.

1.4 Describe the characteristics of a healthy partner relationship and the importance of making healthy choices.

**2. Communication**

2.1 Explain the importance of communication in relationships.

2.2 Identify how people communicate (verbal vs. non-verbal) and learn to recognize messages that non-verbal communication sends.

2.3 Identify the characteristics of active listening. Practice active listening.

2.4 Compare formal language, informal language, and slang and describe the appropriate situations for each.

2.5 Identify ways to express thoughts, ideas, anger, emotions, and opinions in a healthy manner.

2.6 List and practice conflict resolution strategies.

**3. Culture**

3.1 Define and discuss cultural and ethnic diversity.

3.2 Discuss ways and reasons to respect cultural differences.

**4. Self-Esteem**

4.1 Define self-esteem.

4.2 Identify traits of healthy self-esteem.

4.3 Identify the effects of positive self-talk vs. negative self-talk.

4.4 Identify ways to build positive self-esteem.

**5. Anger Management**

5.1 Explain when anger can be a healthy emotion.

5.2 Define the term de-escalation.

5.3 Tell examples of appropriately and inappropriately expressed anger.

5.4 List the warning signs of violence toward oneself and of violence toward others.

5.5 List resources for getting help with violence.

**6. Paperwork**

6.1 Take the [life skills assessment] and participate in a discussion of how it can help build an action plan for improving life skills.

6.2 Participate in a discussion about DFPS benefits for eligible and qualifying transitioning youth, how those benefits may be accessed, and what they may be used for.

6.3 Participate in the formation of class expectations and rules (group norms).

6.4 Agree on group norms.

Although standardizing PAL curriculum in such a way is meant to ensure a minimum level of quality instruction across the state, DFPS' strategy also reduces opportunities for innovation under the CBC model. Providers and stakeholders explained that innovative approaches that SSCCs would like to try often conflict with rigid DFPS requirements, forcing contractors to adhere to traditional practices even when new models could better achieve the program's intended outcomes. The Legislature designed CBC to allow community organizations to be creative and find solutions that work for their regions, but current DFPS policy does not allow SSCCs that freedom in how they implement PAL classes.

## Sunset Staff Recommendations

### *Change in Statute*

#### 3.1 Require DFPS to create a policy requiring regional service inventories.

This recommendation would require DFPS to formalize existing practices regarding the documentation of regional service options. The policy should establish the expectation that all regions, for both child and adult protective services, will maintain routinely updated inventories of services available to caseworkers.

DFPS would have flexibility in how it implements this recommendation. For example, the agency could require each region's child protective division to maintain a single comprehensive inventory, or it could require CPI and CPS to each create a separate list. However, this recommendation would require DFPS to establish what information these inventories should contain, at a minimum including contact information for each service provider and a description of each service provided. The agency would also establish how the inventories should be categorized and organized as well as the schedule for updates.

In determining specific guidelines and requirements, DFPS should continue working with its Partners for Children and Families Committee, the Partnering to Protect program, and staff from program divisions who would make use of the inventories. This recommendation would not preempt any efforts by DFPS and the Partners for Children and Families Committee to go further than the minimum requirements the Sunset Commission establishes. For example, DFPS would retain the ability to create a statewide services inventory should it choose to do so, or it may work with community partners to further develop existing inventories like 2-1-1 or FindHelp.

Requiring DFPS to improve inventories of the services its caseworkers use would help preserve knowledge of available options even in periods of high turnover, provide caseworkers an additional high-quality resource to find services that meet their clients' specific needs, and enable regional decision makers to more easily spot gaps in regional service networks.

#### 3.2 Require DFPS to develop, implement, and report on phased improvements to its service-related data collection and analysis.

This recommendation would require DFPS to improve services data collection and analysis over the next six years and make biennial progress reports to the Legislature, Legislative Budget Board (LBB), and Sunset Commission. The timing of the recommendation's requirements is designed to align with the development of DFPS' new case management system, which will be better suited than DFPS' current system to integrate the data upgrades the recommendation contemplates in each program area and is scheduled for full completion by the end of fiscal year 2032.[30]

By September 2028, the agency would be required to develop a plan and timeline to implement all required components of the 2032 requirements listed below. The agency may submit this plan as a component of the temporary reporting requirement described later in this recommendation. This plan should include a range of options the Legislature could consider funding based on the agency's estimates for implementation costs, including an option describing what DFPS could achieve with no additional funding beyond the roughly $107 million in general revenue the agency estimated its new case management system would cost in its *Rider 47 report*.[31]

By September 2032, the agency would be required to:

- Develop specific outcome measures for each service type provided by the agency, indicating an identified safety risk or risks that the service is intended to mitigate. For instance, impact on recidivism would be a relevant outcome measure for services FBSS caseworkers use to reduce the risk of a parent abusing or neglecting their child in the future. The agency should conduct an initial study of potential outcome measures to identify measures best suited to evaluating the success of specific services provided in relation to specific risks.
- Collect sufficient data to perform quantitative analysis of the impact of individual service types on client outcomes. These data should include tracking whether clients follow through and participate in referred services.
- Collect sufficient data to support agency efforts to assess service capacity. These data should be detailed enough to provide regional offices with insights about particular providers in their network while also broad enough to enable the state office to identify higher-level trends that could inform strategic decision making.
- Create regular reporting processes to ensure regular data analysis and that staff share findings with state and regional leadership on a regular basis, who would then use the analysis to drive improvements. For example, agency leadership could create an annual plan for service data analysis projects and request an ad hoc report on the impact and availability of a particular service type across all regions. Staff could analyze service availability and its impact on recidivism in each region, and leadership could then use DFPS' Management Consulting Group or a similar division to examine the data and identify root causes of negative or positive trends.

This recommendation would also require DFPS to submit reports to the Legislature, LBB, and Sunset Commission in September of 2028, 2030, and 2032 with information on what the agency has already implemented related to the recommendation and objectives for the next two years. The inclusion of a time-limited reporting requirement will allow the Legislature and Sunset Commission to ensure timely progress is being made while limiting the administrative burden on DFPS after the agency puts the data system improvements into place. As any data collection-related improvements to the new case management system will have implications for SSCC operations, DFPS should seek their input as it implements this recommendation.

Improving data collection and analysis will allow the agency to more easily identify and proactively address service gaps, improve efficiency and effectiveness by giving the agency better data on which services work and which do not, and give decision makers better information to make resource allocations.

## *Management Action*

### 3.3 Direct DFPS to define and implement a liaison function to assist in service coordination and capacity building.

Under this recommendation, DFPS would, as a part of its future state planning efforts described in Issue 2 of this report, create a services-focused liaison function designed primarily to support caseworkers. Positions within this function would be dedicated to knowledge gathering and sharing, coordination, and outreach. This function should supplement but not replace caseworker efforts to develop system capacity in the regions and step in where the competing priorities and incentives of the caseworker position make it most difficult to create a robust network. The function should connect various components of the DFPS organization and state system while still allowing different approaches to building service capacity based on regional needs. DFPS would have broad ability to define this liaison function and its staffing but, at a minimum, it would:

- Be solely dedicated to service coordination and service capacity building.
- Be located at the regional level or lower so that it can directly interact with and support caseworkers, including by providing trainings.
- Regularly assess service capacity, identify where gaps and limited options for the most important services exist, and help caseworkers develop capacity to address identified concerns. The liaison function could help collect and use the data Recommendation 3.2 directs DFPS to collect to assess service capacity and proactively address concerning trends. If the Sunset Commission adopts Recommendation 3.1 regarding the creation of policy requiring service inventories, this liaison function should serve as the lead for maintaining regional inventories.
- Review case narratives and data for information about services and speak with caseworkers to learn more about their experiences with particular services and their quality.
- Serve as an information source that regularly reports to the state office, regional leadership, and PCS on regional service needs and proactively raise gaps in service availability or quality to leadership's attention. The liaison function could help collect and use the data Recommendation 3.2 directs DFPS to collect to perform quantitative analysis of services and their impact on client outcomes to determine gaps in service availability or quality.
- Coordinate with community partners to keep DFPS caseworkers up-to-date on service offerings that may benefit DFPS clients and alert system partners to bureaucratic hurdles preventing caseworkers from accessing services. This coordination should include establishing clear and regular lines of communication with individual HHSC divisions that offer services DFPS clients can use. The coordinator or liaison should be a visible and consistent point of contact for regional service providers when they have a new service offering they would like to make caseworkers aware of or have questions about working with DFPS.

Establishing a service liaison-type function at DFPS with responsibility for service coordination and capacity building efforts would help the agency develop a higher-quality, more resilient network of services, particularly for services the agency does not directly fund. The function would also allow for improved information sharing and coordination, both within DFPS and between DFPS and its community partners.

### 3.4 Direct DFPS to develop new performance measures for the PAL Life Skills Training program.

This recommendation would direct DFPS to develop additional performance measures for the PAL Life Skills Training program applicable to both SSCCs and DFPS. The new performance measures should more directly relate to the learning outcomes the state intends PAL classes to achieve. Under this recommendation, DFPS may but would not be required to align the new measure with the life skills assessment currently required in statute, as discussed in the University of Texas System's CBC evaluation. DFPS should work with LBB to develop these measures for legacy and SSCC regions that provide or contract out life skills training, which would help the regions hold providers accountable for quality training. As part of this recommendation, these performance measures would be incorporated into SSCC contracts and LBB measures for DFPS legacy regions where applicable. Establishing improved performance measures would incentivize the development of PAL trainings that result in measurable improvements in youth readiness for adulthood.

### 3.5 Direct DFPS to update current rule and policy to allow SSCCs more flexibility in how they implement PAL Life Skills Training.

Under this recommendation, DFPS would review current requirements for PAL curricula in rule and policy that go beyond what state and federal law require and consider removing requirements that unnecessarily restrict PAL training programming. While DFPS may choose to retain its current detailed outlines of PAL training requirements for legacy regions, the agency should allow SSCCs to develop their own programming so long as it continues to conform with statute, does not jeopardize federal funding, and teaches skills relevant to today's youth. DFPS should continue to require SSCCs to submit their PAL curricula to DFPS for approval prior to implementation, but DFPS should develop clear standards for approval or rejection. Allowing SSCCs greater flexibility in how they choose to implement PAL training would create opportunities for innovation and the potential for better learning outcomes, particularly when implemented in conjunction with the previous recommendation creating new outcome-based performance measures.

## Fiscal Implication

These recommendations would have a fiscal impact to the state, but the exact impact would depend on implementation and cannot be determined at this time. Recommendation 3.1 would formalize policy on service inventories that already exist to a varying extent across the state, which the agency could implement with existing resources. This recommendation does not require DFPS and its partners to identify additional opportunities for improving service inventories that involve costs to the state.

Improving DFPS' new case management system's data capabilities for Recommendation 3.2 may involve costs to the state depending on implementation. However, DFPS already intends for the new system to have more robust data capabilities. DFPS will likely be able to absorb some associated costs by adjusting and combining new services-related data features with other data system improvements. Further mitigating any fiscal impact, DFPS is eligible for a 50 percent federal match in funding for the new system. Performing services data analysis may also enable DFPS to find cost savings for the state in the future, as the agency may identify services DFPS and other state agencies pay for that do not result in improved client outcomes.

Recommendation 3.3 relates to agency planning and staffing decisions that DFPS could implement by reallocating existing resources. For the remaining recommendations, DFPS would be able to adjust PAL-related measures and requirements using resources already dedicated to the PAL program.

[1] DFPS, "Transitional Living Services," accessed online August 10, 2026, https://www.dfps.texas.gov/Child_Protection/Youth_and_Young_Adults/Transitional_Living/default.asp.

[2] DFPS, *Child Protective Services Handbook*, Section 10220, March 2023, accessed online August 11, 2026, https://www.dfps.texas.gov/handbooks/cps/files/CPS_pg_x10200.asp; DFPS, "Preparation for Adult Living (PAL) Program," accessed online August 10, 2026, https://www.dfps.texas.gov/child_protection/Youth_and_Young_Adults/Preparation_For_Adult_Living/; and 42 U.S. Code, Section 677(a)(1). All citations to Texas statutes are as they appear on https://statutes.capitol.texas.gov/. Section 264.121(b)(2), Texas Family Code.

[3] DFPS, *Child Protective Services Handbook*, Section 8000, November 2006, accessed online August 11, 2026, https://www.dfps.texas.gov/handbooks/cps/files/CPS_pg_8000.asp.

[4] Health-Related Provisions, Section 10.04(a), Page IX-56, Article IX, Chapter 1185 (SB 1), Acts of the 89th Legislature, Regular Session, 2025 (General Appropriations Act), accessed online August 17, 2026, https://www.lbb.texas.gov/Documents/GAA/General_Appropriations_Act_2026_2027.pdf.

[5] DFPS, *Child Protective Services Handbook*, Appendix 3412: Community Resources, April 2022, accessed online August 10, 2026, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_px_3412.asp#CPS_apx3412.

[6] Chapters 533 and 533A, Texas Health and Safety Code.

[7] The Annie E. Casey Foundation, *The Evidence for Extended Foster Care*, accessed online August 10, 2026, https://assets.aecf.org/m/resourcedoc/Report_evidenceextendedfostercare_2025.pdf; and M. Miller, D. Bales, and M. Hirsch, *Extended Foster Care in Washington State: Final Report*, Washington State Institute for Public Policy, May 2020, accessed online August 10, 2026, https://www.wsipp.wa.gov/ReportFile/1721.

[8] DFPS, "Supervised Independent Living," accessed online August 10, 2026, https://www.dfps.texas.gov/Child_Protection/Youth_and_Young_Adults/Transitional_Living/Extended_Foster_Care/supervised_independent_living.asp.

9 HHSC, "Statewide Behavioral Health Coordinating Council," accessed online August 10, 2026, https://www.hhs.texas.gov/about/advisory-committees/statewide-behavioral-health-coordinating-council.

10 DFPS, *Child Protective Services Handbook*, Appendix 3412: Community Resources, April 2022, accessed online August 10, 2026, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_px_3412.asp#CPS_apx3412.

11 DFPS, "What is a CPI Investigator Specialist?" accessed online August 10, 2026, https://www.dfps.texas.gov/Jobs/CPS/cpi_investigator_specialist.asp; DFPS, "What is a Family-Based Safety Services (FBSS) Specialist?" accessed online August 10, 2026, https://www.dfps.texas.gov/Jobs/CPS/fbss.asp; DFPS, "What is Conservatorship (CVS) Specialist?" accessed online August 10, 2026, https://www.dfps.texas.gov/Jobs/CPS/cvs.asp; and DFPS, "Working for Adult Protective Services (APS)," accessed online August 10, 2026, https://www.dfps.texas.gov/Jobs/APS/default.asp.

12 Statewide Behavioral Health Coordinating Council, *Texas Statewide Behavioral Health Strategic Plan: Progress Report*, December 2025, pp. 32-94, accessed online August 10, 2026, https://www.hhs.texas.gov/sites/default/files/documents/sbhcc-progress-report-fy-2025.pdf.

13 DFPS, Partners for Children and Families Committee, May 12, 2026, archival video, time stamp 1:37:58, accessed online August 10, 2026, https://dfps.new.swagit.com/videos/387921.

14 DFPS, "CPS Family Preservation (FPR): Six Month, One Year, and Five Year Outcomes," accessed online August 10, 2026, https://www.dfps.texas.gov/About_DFPS/Data_Book/Child_Protective_Services/Family_Preservation/Six-Month_One_Five_Year_Outcomes.asp.

15 DFPS, *Child Protective Services Handbook*, Section 8000, November 2006, accessed online August 11, 2026, https://www.dfps.texas.gov/handbooks/cps/files/CPS_pg_8000.asp.

16 DFPS, *Alternative Response Resource Guide*, June 2024, pp. 17-18, accessed online August 10, 2026, https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/Alternative_Response_Resource_Guide.pdf.

17 Sunset Advisory Commission, *Sunset Staff Evaluation of the Department of Family and Protective Services Staff Report with Final Results*, July 2015, pp. 73-74, accessed online August 10, 2026, https://www.sunset.texas.gov/public/uploads/files/reports/DFPS%20Final%20Results.pdf.

18 DFPS, Child Protective Investigations Advisory Committee, March 26, 2026, archival video, time stamp 3:16:30, accessed online August 10, 2026, https://dfps.new.swagit.com/videos/379396.

19 DFPS, "Preparation for Adult Living (PAL) Program," accessed online August 10, 2026, https://www.dfps.texas.gov/child_protection/Youth_and_Young_Adults/Preparation_For_Adult_Living/.

20 Texas Center for Child and Family Studies, *Supporting Youth Aging out of Foster Care in Texas: Youth and Staff Perspectives on Barriers and Opportunities*, pp. 27-28, accessed online August 10, 2026, https://tacfs.org/wp-content/uploads/2026/01/EFC-Report-2025-1.pdf.

21 Grajeda et al., *CBC Evaluation*, March 2026, p. 91, accessed online August 5, 2026, https://www.dfps.texas.gov/CBC/documents/reports/2026-04-20_CBC_Community-Based_Care_Evaluation_Report.pdf.

22 Section 264.121(a-3)-(a-5), Texas Family Code.

23 DFPS, "Preparation for Adult Living (PAL) Program," accessed online August 10, 2026, https://www.dfps.texas.gov/child_protection/Youth_and_Young_Adults/Preparation_For_Adult_Living/.

24 Casey Life Skills, *Practitioners Guide*, June 2021, p. 3, accessed online August 10, 2026, https://www.casey.org/media/CLS_project_PracticeGuide.pdf.

25 Grajeda et al., *CBC Evaluation*, March 2026, p. 223, accessed online August 5, 2026, https://www.dfps.texas.gov/CBC/documents/reports/2026-04-20_CBC_Community-Based_Care_Evaluation_Report.pdf.

26 DFPS, *Child Protective Services Handbook*, Section 10222, March 2023, accessed online August 10, 2026, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_pg_x10200.asp#CPS_10222; and Section 264.121(a-3)-(a-5), Texas Family Code.

27 DFPS, "What is a Preparation for Adult Living (PAL) Caseworker?" accessed online August 10, 2026, https://www.dfps.texas.gov/Jobs/CPS/pal.asp; and DFPS, "National Youth in Transition Database (NYTD) in Texas," accessed online August 10, 2026, https://www.dfps.texas.gov/Child_Protection/Youth_and_Young_Adults/Transitional_Living/nytd.asp.

28 Section 264.121(b)(2), Texas Family Code.

29 DFPS, *Transitional Living Services Resource Guide*, December 2025, pp. 8-21, accessed online August 10, 2026, https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/Transitional_Living_Services_Resource_Guide.pdf.

30 DFPS, *DFPS Rider 47 Report for Case Management System Transition*, December 2024, p. 23, accessed online August 10, 2026, https://www.dfps.texas.gov/About_DFPS/Reports_and_Presentations/Rider_Reports/documents/2024/2024-12-01_Rider%2047_Case_Management_System_Transition_Legislative.pdf.

31 Ibid., p. 22.

# Issue 4

## Inefficiencies in Internal Processes and a Lack of Coordinated Quality Assurance Efforts Prevent DFPS From Ensuring Fair and Consistent Investigations and Treatment of Children and Families.

### Background

The Department of Family and Protective Services (DFPS) investigates allegations of child abuse and neglect received through reports to Statewide Intake (SWI) and takes custody of children whose physical health or safety is in danger if they remain at home. DFPS investigators also gather information about child safety and the risk of future abuse and neglect to children in a home. A safety assessment evaluates whether an immediate danger of serious harm or maltreatment to a child exists in the home and whether a child safety plan could mitigate that danger without requiring removal from the home.[1] A risk assessment evaluates the likelihood of whether a family will maltreat their child in the next 12 to 18 months and whether the child should be referred to Family-Based Safety Services (FBSS).[2]

Reported abuse and neglect allegations are recorded in the agency's confidential case management system of record, called IMPACT (Information Management Protecting Adults and Children in Texas). Child Protective Investigations (CPI) investigates allegations of abuse and neglect in the family home or a school setting, whereas Child Care Investigations (CCI) investigates allegations of abuse and neglect in licensed child care operations within the state, including day care facilities, 24-hour residential care operations, and foster care homes. Both CPI and CCI investigators evaluate the evidence and determine a disposition for each allegation, also called a finding. As defined in rule, the different dispositions include:

- Reason to believe (RTB) – Abuse or neglect occurred based on a preponderance of the evidence.
- Ruled out – Reasonable to conclude abuse or neglect has not occurred.
- Unable to complete – The investigation cannot be concluded because the family could not be located or the family refused to cooperate with the investigation.
- Unable to determine – None of the other dispositions are appropriate.
- Administrative closure – DFPS intervention is unwarranted based on information that comes to light after the case is assigned for investigation.[3]

Investigators log the finding for each allegation in the case into IMPACT and assign a role for each person named in the allegation. For cases with an RTB finding, IMPACT automatically assigns the role of "designated perpetrator" to the person determined responsible for the abuse or neglect.[4] The textbox on the following page, *Perpetrator Role Types*, provides more information on differences between perpetrator role types.

**Perpetrator Role Types**

**Alleged Perpetrator:** A person who is reported to be responsible for the abuse, neglect, or exploitation of a victim.

**Designated Perpetrator:** A person who is found responsible for the abuse, neglect, or exploitation of a victim and assigned an RTB disposition. This role can be assigned in a traditional child protective investigation and a child care investigation.

**Sustained Perpetrator:** A person whose RTB disposition has been upheld at the State Office of Administrative Hearings (SOAH) or who has waived their right to appeal at SOAH.

## Central Registry

Statute requires DFPS to establish and maintain a Central Registry of the names of individuals found by DFPS to have abused or neglected a child.[5] DFPS' Central Registry consists of records housed in IMPACT and is not a separate, stand-alone registry. Authorized users can search for designated and sustained perpetrators in the Central Registry. The Central Registry also includes alleged perpetrators in open investigations who are removed when the investigation is closed and they are not identified as the designated perpetrator.[6] DFPS and HHSC access information from the Central Registry to make safety decisions about employment, contracting, and volunteer service involving individuals who work with vulnerable adults and children.

HHSC primarily performs Central Registry checks for prospective foster and adoptive parents, potential employees of child care centers, and certain other providers serving children in care. DFPS primarily performs criminal background and Central Registry checks for other individuals who work with children in foster care such as employees or volunteers at a child advocacy center. In addition, for individuals seeking to be an employee, volunteer, or intern with DFPS or a Single Source Continuum Contractor, the agency performs a DFPS history check, which is a more comprehensive search of IMPACT case records for all DFPS investigation history that involves a specifically named individual. This check also includes searching the Central Registry.

A Central Registry check searches IMPACT case records to identify: 1) an individual assigned the role of an alleged perpetrator in a current open investigation, and 2) an individual assigned the role of designated or sustained perpetrator in a case with an RTB finding. DFPS or HHSC clears the individual if a Central Registry check returns no matches based on the search results.

If a match is found because an individual's name is listed in the Central Registry, DFPS and HHSC staff first evaluate the individual to determine if they are eligible for a risk assessment. An individual found to have a serious criminal history or history of abuse and neglect, such as an investigative finding of sexual abuse or trafficking, is automatically barred from access to the vulnerable population for which the background check is being conducted. However, for other findings that require further evaluation based on both the findings and role for which the individual is applying, DFPS or HHSC then generally performs a risk assessment of that individual's history to identify any potential harm in allowing them access to vulnerable populations. The agencies consider such risk factors as the nature and severity of an incident, length of time since the incident, whether there were repeated incidents, and evidence of rehabilitation. The results of the risk assessment may clear an individual to work with vulnerable populations if appropriate. On the other hand, if the assessment identifies serious risks, the individual is barred from access to those vulnerable populations. Regardless of the individual's status in the Central Registry or the outcome of the risk assessment, the prospective employer, not DFPS, makes the final hiring decision.

## Appeals to RTB Findings

Statute requires DFPS to provide an appeal process for individuals to dispute the agency's RTB findings in any type of child protective investigation and to remove individuals with overturned findings from the Central Registry.[7] DFPS provides administrative due process to individuals by providing timely notice and an opportunity to be heard, as also described in general state law.[8] Two paths to appeal an RTB finding are available, generally depending on the type of investigation performed. As illustrated in the *Current DFPS Appeal Process* flowchart on the following page, the path on the left side of the chart applies to CPI family and school-based findings, while the path on the right applies to CCI findings. An appeal involves an administrative review for all RTB findings and a State Office of Administrative Hearings (SOAH) hearing in some circumstances, as discussed below.

- **Administrative review.** In a CPI family investigation, an individual may appeal an RTB finding through a first-level administrative review of investigation findings (ARIF).[9] DFPS' Office of Appeals independently reviews these initial cases.[10] If the office upholds the RTB finding, the individual may pursue a second-level ARIF, in which the DFPS Office of Consumer Affairs carries out an additional independent review.[11] Both first- and second-level ARIFs review the investigation case file against the preponderance of the evidence standard, as explained in the accompanying textbox, to determine whether the RTB finding should be upheld. Individuals with an RTB finding from a school-based investigation may also pursue an appeal through administrative review.[12] However, with the deployment of the new Search Engine for Multi-Agency Reportable Conduct (SEMARC) in 2026, DFPS anticipates updating the appeal process to allow individuals who receive an RTB finding from a school-based investigation to pursue, in addition to the administrative review, an appeal through a release hearing before being added to SEMARC. In a CCI investigation, an individual may also appeal an RTB finding through a first-level ARIF.[13] However, if the finding is upheld, instead of pursuing a second-level ARIF, the individual has the opportunity to appeal through SOAH.

### Preponderance of the Evidence

If the evidence of the alleged abuse or neglect is more convincing than the opposing evidence, the investigator concludes that the abuse or neglect has more likely than not or with a greater than 50 percent probability occurred.

- **SOAH hearing.** In a CCI investigation, if the RTB finding is upheld in the first-level ARIF or if the individual waives their right to an ARIF, they can pursue an appeal through SOAH, which issues a final decision.[14] An individual involved in a CPI family investigation may also request a SOAH hearing if an RTB finding in the Central Registry is used to restrict employment or other opportunities involving access to vulnerable populations such as employment screenings or foster parent approval.[15] Individuals with an RTB finding from an Adult Protective Services (APS) investigation who are identified in a Central Registry check that affects their prospective employment may also appeal directly to SOAH to contest the finding.[16]

If either a DFPS administrative review or a SOAH hearing results in the RTB finding being overturned, the individual is removed from the Central Registry. In fiscal year 2025, CPI investigators issued 33,249 RTB findings and CCI investigators issued 289 RTB findings. Approximately 24 percent of the total findings resulted in a disposition of RTB, as shown in the *RTB Findings Eligible for Appeal* table.

**RTB Findings Eligible for Appeal**
**FY 2025**

| Program | All Findings | RTB Findings | RTB Percentage of All Findings |
|---|---|---|---|
| CPI | 136,650 | 33,249 | 24.3% |
| CCI | 4,508 | 289 | 6.4% |
| **Total** | **141,158** | **33,538** | **23.8%** |

**Current DFPS Appeal Process**




*CR = Central Registry*

*DP = Designated Perpetrator*

*RTB = Reason to Believe finding*

## Findings

During the review, Sunset staff heard stakeholder concerns about the need for DFPS to strengthen due process protections for individuals with RTB findings, such as requiring formal hearings at SOAH for all individuals with RTB findings or creating an expungement panel to remove individuals from the Central Registry on request. However, these changes would require significant policy decisions to expand DFPS' responsibilities that are outside of Sunset staff's scope. Instead, this review has identified several problematic aspects of existing internal processes that impact the agency's ability to provide efficient

resolution and fair treatment under its current statutorily required responsibilities while protecting due process available to individuals.

### DFPS' current appeal process is inefficient and lacks clear procedures and guidance for agency staff and participants.

- **Lack of a preliminary case decision review prevents DFPS from efficiently dismissing weak RTB findings.** To be legally sufficient, an RTB finding must be supported by a preponderance of the evidence in the investigation case file. Because DFPS does not conduct a preliminary case decision review of the case file upon receiving an appeal request, the agency carries weak or unsubstantiated RTB findings through a lengthy administrative review process instead of dismissing them immediately. When an individual who is a designated perpetrator requests a first-level ARIF, resolution specialists informed Sunset staff they could in many cases determine whether the RTB finding met this standard or not by reading the case file alone and without meeting with the individual. Because resolution specialists must wait to make a determination until the individual receives and reviews the case file, efficient dismissal is unnecessarily prolonged, wasting agency time and resources. When an individual requests the investigation case file, the resolution specialist pauses the review until the individual has received it, typically within 45 days. The resolution specialist then picks the review back up, evaluates the case file, speaks with the individual, and reviews any additional relevant material submitted by the individual. A first-level ARIF for a CPI appeal is resolved within an average of 53 total, nonconsecutive days, which may span up to five months or longer depending on the length of time it takes to receive the investigation case file and any delays in scheduling the ARIF meeting. Conducting an upfront case decision review would allow DFPS to quickly overturn unsupported findings, saving staff resources and providing faster relief to individuals appealing to be removed from the Central Registry.

Administrative review may take months to overturn unsupported findings.

- **Duplicative second-level ARIF.** As shown under the CPI family and school-based findings path in the appeal process flowchart on the previous page, an individual with an RTB finding from a family-based investigation must pursue a first-level ARIF before getting a second-level ARIF. The first-level ARIF provides an opportunity for the individual to participate in an informal review in which they can speak with a resolution specialist handling the review, ask questions, make statements, and submit relevant written material for the specialist to review.[17] By contrast, the second-level ARIF is a re-review of the investigation case file and the first-level ARIF documentation and only accepts new information in extraordinary circumstances.[18] Because both first- and second-level ARIFs review the investigation case file to determine whether the RTB finding should be upheld, the second-level ARIF essentially duplicates the efforts of the first-level ARIF with little to no change in the outcome. As a result, most RTB findings upheld in the first-level ARIF are also upheld in the second-level ARIF. In fiscal year 2025, second-level ARIFs upheld 92 percent of first-level ARIFs. Moreover, relatively few individuals pursue a second-level

Second-level administrative reviews largely duplicate first-level review efforts.

ARIF. In fiscal year 2025, only 113 individuals requested a second-level ARIF, about 0.3 percent of the total number of RTB findings made in the same year. The table below, *Requested Appeals and Outcomes*, provides the number of requested appeals, upheld RTBs, and overturned or changed RTBs for fiscal year 2025.

**Requested Appeals and Outcomes - FY 2025**

| Program | Appeals Requested | Upheld RTBs | Overturned or Changed RTBs |
|---|---|---|---|
| **First-Level ARIF** | | | |
| CPI | 3,042 | 482 | 306 |
| CCI | 240 | 197 | 116 |
| **Total** | **3,282** | **679** | **422** |
| **Second-Level Appeals*** | | | |
| CPI | 113 | 113 | 10 |
| CCI | 42 | 38 | 12 |
| **Total** | **155** | **151** | **22** |

* Second-Level Appeal means second-level ARIF for CPI and a formal hearing at SOAH for CCI.

Individuals identified in a Central Registry check can appeal their findings to SOAH.

The second-level ARIF is not necessarily the last opportunity for due process. All individuals who have received an RTB finding in a family-based investigation have the ability to pursue a SOAH hearing in the event they are identified in a Central Registry check as part of a background check.[19] For example, an individual seeking employment at a child care center or applying to become a foster parent will be subjected to a Central Registry check to determine whether they have an RTB finding, which could preclude the individual from pursuing these opportunities. While the Legislature may consider expanding SOAH access for all individuals with RTB findings seeking appeal, which could increase the number of eligible cases by at least a factor of ten, Sunset staff acknowledges DFPS' current approach is a cost-effective allocation of the agency's limited resources. The agency's rules preserve an individual's due process to pursue a SOAH hearing when the individual suffers an adverse action as a result of the RTB finding.[20] Therefore, maintaining a duplicative second-level ARIF provides no additional substantive value and instead unnecessarily consumes limited staff resources that could be better directed toward primary reviews.

- **Outdated appeal procedures and rules.** DFPS' appeal procedures and rules have not kept up with the numerous statutory and policy changes made in the last decade, contributing to confusion among agency staff and the public. Having updated procedures and rules helps guide agency functions and provides clarity on how an agency will implement certain statutory provisions. DFPS continues to operate under outdated policies and rules that complicate the appeals process and make it more difficult to navigate, as demonstrated by the following examples.

CCI policy handbook. CCI's handbook section on conducting a first-level ARIF is outdated and still references the DFPS Child Care Licensing division, a function that was transferred to the Health and Human Services Commission (HHSC) in 2017. This handbook section also includes references to outdated rules in Chapter 745 regarding administrative reviews conducted by DFPS licensing staff who were transferred to HHSC rather than references to the current and more relevant DFPS rules in Chapter 707 that were adopted in 2020.[21] Additionally, several key operational forms also appear to have been replaced but are not provided on the DFPS website. For example, the CCI notice of findings provided to an alleged perpetrator at the end of an investigation indicates that ARIF form 2011 can be requested from the investigator or accessed via the agency's public website. However, at the time of this review, the form was neither included in the CCI policy nor available on the agency's public website.

DFPS rules and statute. Agency rules and statute do not reflect recent changes to the appeal process. As further discussed in the *Responsibility for Requesting SOAH Hearings* textbox below, HHSC transferred the responsibility for handling RTB findings appealed at SOAH to DFPS in March 2025. However, DFPS rules still instruct individuals to submit a request to the HHSC Legal Division to obtain a SOAH hearing.[22] Furthermore, statute requires SOAH hearings to be held in the DFPS administrative region where the alleged abuse or neglect occurred.[23] In response to the coronavirus pandemic in 2020, SOAH began holding virtual hearings for its general docket hearings, a practice it currently continues. When HHSC handled RTB findings appealed at SOAH, HHSC participated in virtual SOAH hearings because statute does not require in-person hearings for HHSC.[24] DFPS continued the practice of participating in virtual hearings when it took over appeals at SOAH as SOAH rules allow participation by telephone or videoconference.[25] While statute allows DFPS to use virtual hearings if all parties agree, DFPS would benefit from authorizing remote participation, which is a more cost-effective and flexible solution that improves the public's access to SOAH hearings.

Agency policies and rules contain outdated appeal information.

### Responsibility for Requesting SOAH Hearings

When child care regulation transferred to HHSC in 2017, DFPS also transferred its responsibility for handling RTB findings appealed at SOAH. However, due to concerns about the large number of RTB findings being overturned at SOAH, HHSC initiated discussions in 2024 to move this appeal function back to DFPS. In August 2024, HHSC stopped docketing these cases at SOAH. In March 2025, HHSC returned the appeal function, transferring a backlog of 1,990 undocketed cases to DFPS, with some cases dating back to 1999. As of August 2026, DFPS has resolved all cases from 1999 to 2022 and continues to address the backlog, closing a total of 646 cases since March 2025. However, DFPS received 855 new appeal cases in the year following March 2025 and estimates that about 71 new appeal cases are received monthly. At current staffing levels, DFPS' legal team is expected to close about 70 cases per month.

- **Insufficient guidance to participants.** Currently, DFPS does not provide standardized, plain-language educational guides or preparation resource

tools when notifying individuals of an RTB finding. Instead, individuals must navigate DFPS' long policy handbook and work with resolution specialists who explain the process and impacts, which are tasks far too time intensive to complete during the ARIF meeting. Agency staff noted they have difficulty explaining to individuals what the appeal process involves, the consequences of being listed in the Central Registry, what they need to present at the ARIF meeting to address the RTB finding, and the consequences of the RTB finding being overturned or upheld. Individuals also struggle with the various legal definitions associated with different types of abuse and neglect such as medical neglect or neglectful supervision. Best practices for educating individuals on the appeals process include providing such materials as plain-language "Know Your Rights" Q&As, visual process maps, short instructional videos or audio modules, and a standardized evidence checklist to help individuals effectively prepare for their defense. For example, SOAH provides a plain-language guide to self-represented litigants in general hearing cases on their website that identifies what types of evidence to bring, explains how to make certain motions and requests, and provides a comprehensive list of all the forms that may be needed in a SOAH hearing.[26] Without clear, upfront guidance and accessible resources, individuals are limited in their ability to present an effective challenge to an RTB finding, increasing the risk that innocent individuals remain on the Central Registry.

Individuals lack clear guidance to navigate the appeal process.

### The absence of a dedicated records retention schedule for the Central Registry limits the agency's ability to effectively assess and manage current risk to client safety.

RTB findings of misconduct remain in IMPACT until the underlying case records expire in accordance with the DFPS records retention schedule. Until then, RTB findings are discoverable through a Central Registry check. The current retention periods mainly distinguish between severe types of misconduct such as a finding of sexual abuse or cases involving a fatality as well as overall case outcomes such as removals from the remaining misconduct types.[27] As shown in the accompanying table, *Key Elements of Records Retention Schedule*, cases with findings of sexual abuse in both CPI and CCI cases have a retention period of 99 years. However, the retention schedule does not differentiate between other types of misconduct such as neglect versus physical abuse, allowing moderate RTB findings to be treated the same as more serious RTB findings. For example, an individual is placed on the Central Registry for the same 20-year period for medical neglect involving unaddressed

**Key Elements of Records Retention Schedule**

| Program | Records Criteria | Retention Period |
|---|---|---|
| CPI | Finding of sexual abuse or involving a fatality | 99 years |
| | Finding other than sexual abuse and not involving a fatality, with sustained perpetrator | 20 years |
| | Finding other than sexual abuse and not involving a fatality, without sustained perpetrator | 5 years or until all principals are 18 |
| CCI | Finding of sexual abuse | 99 years |
| | Finding other than sexual abuse | 20 years |

dental care as an individual with a finding for serious physical abuse resulting in physical injury. The retention schedule also distinguishes CPI cases with a sustained perpetrator from those without a sustained perpetrator. A sustained perpetrator is an individual who had their finding upheld through a SOAH hearing or by waiving their right to a SOAH hearing. Cases without a sustained perpetrator involve a designated perpetrator or are a case in which there is no identified perpetrator. A designated perpetrator is an individual who has not appealed their finding through SOAH or whose appeal with SOAH is pending.

Historically, the agency has maintained a long-term records retention schedule for its IMPACT records for future use, such as when a former foster care youth wants to access their personal case histories or DFPS needs to refer to case records in a safety risk assessment. However, using this single retention schedule for both IMPACT case records and names on the Central Registry risks becoming unnecessarily punitive for individuals with a low risk of recurring abuse or neglect. Holding low-risk individuals in the registry for the same period as those with higher risk undermines the original intent of the Central Registry, which is to identify individuals who present an ongoing safety risk to vulnerable populations. For example, about 412,000 of the 795,000 individuals on the Central Registry fall into the lower-risk type of neglectful supervision that did not involve a fatality or near fatality.

DFPS' single records retention schedule keeps low-risk individuals on the Central Registry.

Additionally, the existing retention schedule for IMPACT records also fails to account for other factors that could better determine an appropriate retention period such as the perpetrator's age at the time of the incident. While the risk assessment performed as part of a background check takes some factors like the lack of repeated incidents into consideration when determining whether the individual should be barred from a client-serving role, DFPS does not use that information to update IMPACT or remove an individual from the Central Registry. While the Legislature may consider establishing an expungement panel to remove individuals from the Central Registry upon request, a tiered, risk-based retention schedule specifically for the Central Registry could be automated and efficiently resolve many of these cases.

**Inconsistent investigative quality, heavy administrative burdens, and siloed operations undermine DFPS findings and create operational inefficiencies.**

For the last three fiscal years, RTB findings have been overturned at a rate of more than 37 percent for both CPI and CCI investigations at the first-level ARIF stage. Overturn rates have been trending downward since fiscal year 2023, as shown in the graph on the following page, *ARIF Overturned RTBs*. However, the still-high RTB overturn rate raises questions about how the agency ensures CPI and CCI conduct high-quality and consistent investigations across the state. Recently, the Legislature introduced several initiatives to tackle investigation quality and consistency, including setting statutorily required instructions for investigator training in 2023 and creating a CPI Advisory Committee tasked with improving the accuracy and standardization of DFPS

Administrative review overturns more than one-third of findings.

Case 2:11-cv-00084 Document 1725-1 Filed 11/12/26 in TXSD Page 112 of 165



investigative policies and procedures in 2025.[28] Rider 39 of the 89th General Appropriations Act directed the agency to use existing resources to develop a comprehensive quality assurance program that would enable the agency to assess the quality and consistency of services delivered through its child protective services programs.[29]

**ARIF Overturned RTBs, FYs 2023-25**




In 2025, the Legislature appropriated $1.7 million to DFPS to introduce a secondary review of RTB findings prior to case closure, which DFPS began establishing in January 2026 and has not yet fully implemented statewide. However, DFPS investigators have raised concern about how the RTB reader team, while essential to the immediate improvement of consistency in RTB findings, has led to process delays as a result of increased red tape and lengthy chain-of-command approval processes. DFPS investigators have also expressed concern to Sunset staff about the RTB reader team's ability to provide meaningful, actionable feedback to investigators, namely because teams lack knowledge about investigators' on-the-ground work.

Investigative quality and consistency concerns persist despite recent efforts.

Throughout the review, agency staff and external stakeholders expressed ongoing concerns regarding the overall quality and consistency of DFPS investigations. While these concerns may not be reflective of all investigations, persistent critical feedback highlights systemic operational friction that hinders performance, which the agency has an opportunity to address.

- **Inconsistent case documentation.** Agency staff informed Sunset that poor documentation in the IMPACT case file is a primary driver of overturned RTB findings. Agency leadership and appeals staff noted an internal belief that investigators are making correct determinations without always having sufficient documentation to support the legal standard of preponderance of



PX 118 - 112

the evidence. Investigators are tasked with collecting an extensive amount of evidence, including face-to-face interviews and home visits, medical records, statements from personal and professional collateral contacts such as neighbors and teachers, and reviews of DFPS and criminal history records. Synthesizing all this information in IMPACT and using it to connect the dots to support an RTB finding that aligns with the statutory definitions of abuse and neglect requires time that investigators do not always have. An investigator's capacity is further constrained by long travel times to reach the child, the demands of working with large families with multiple children, and operational delays in obtaining records. For example, DFPS policy requires investigators to interview all children and caregivers in the family home during every visit regardless of family size. Policy then mandates that all conversations with children must be documented in detail in IMPACT within 24 hours. Field staff emphasized that a three-hour interview often takes an additional three hours to document, making same-day documentation, photo uploads, and audio file transfers logistically difficult if not impossible.

Time constraints hinder consistent, thorough documentation.

- **Outdated training materials and a lack of continuing education leave investigators unaware of statutory changes.** The Legislature narrowed the definition of neglect in 2021 by raising the bar from a caregiver's acts or omissions that place a child in *substantial risk* of danger to placing the child in *immediate danger*.[30] Sunset staff identified instances in which that change has yet to be fully integrated into DFPS training materials. For example, materials used to train investigators on documentation and issuing findings still reference the statutory definitions of medical neglect and neglectful supervision from before 2021.

  While DFPS is updating initial onboarding training, the agency does not require continuing education or ongoing legal training for tenured investigators unless they change roles, complete new certifications, or receive a promotion. Instead, DFPS keeps investigators up to date on policy changes via several voluntary supplemental trainings, webinars, and a communication package known as *Meeting in a Box* (MIAB). MIAB delivers policy changes, operational reminders, and best practice information via memorandums that local supervisors present in unit meetings. This localized approach of delivering information to investigators fails to integrate these updates into existing investigative procedures that the agency uses to teach tenured investigators how to implement these changes in the field, similar to what is provided during onboarding training. For example, Sunset staff learned of several RTB findings that were overturned on appeal because the investigators were unable to demonstrate that a parent's action caused an immediate harm to a child. This issue has become particularly evident in substance use cases where investigators expressed confusion regarding the updated definition of neglect, recalling that previously drug use alone supported an RTB finding without requiring documentation of a direct impact on the child. The *Learning in the Field* textbox on the following page provides an example of a drug use case that was impacted by this statutory change.

Continuing education is not required for tenured investigators.

**Learning in the Field**

Agency staff shared the story of a mother using cocaine at night while her children were asleep. The investigator issued an RTB finding, which was subsequently appealed and overturned at the ARIF review. The review found that the children looked clean and healthy and found no support for an RTB finding. The investigator initially believed that the potential for an emergency was sufficient for an RTB finding but learned as a result of the ARIF that they must show immediate harm to the child as a result of drug use in their investigations and case documentation.

Investigators' confusion is further compounded by inconsistent definitions regarding ruled out findings in agency rules and handbooks. DFPS rule states that a ruled out finding may occur when it is reasonable to conclude abuse or neglect has not occurred; however, the CCI handbook indicates that a ruled out finding must also be based on preponderance of the evidence.[31] Investigator training that includes DFPS rules would help agency staff who handle RTB appeals interpret the statutory definitions of abuse and neglect. However, instead of providing an integrated continuing education program to keep tenured investigators updated on critical policy changes, DFPS relies on informal communication channels, leaving investigators in some instances to learn of updates only after an adverse case outcome.

- **Siloed programs and a lack of cross-divisional feedback lead to operational inefficiencies.** A lack of constructive communication between agency divisions is a recurring issue across DFPS. For instance, appeals staff who possess first-hand insight into why RTB findings are overturned reported that field investigators have dismissed their feedback as subjective. DFPS ceased this one-to-one feedback process, which provided direct, case-level guidance to investigators, and now shares only limited feedback through a monthly email to regional leaders that includes summary data on the number of appeal decisions made. FBSS staff expressed similar frustration regarding communication between divisions, sharing with Sunset staff that they often receive cases from CPI that are missing critical pieces of information, including blank risk assessments and incomplete safety plans. Staff expressed frustration that regional offices lack a clear, structured channel to communicate and receive actionable responses from leadership to these systemic field issues.

Inaccurate Priority 1 designations strain investigator resources.

Furthermore, ineffective cross-divisional feedback and poor communication have resulted in SWI and investigators in CPI and APS being fundamentally misaligned on allegations of abuse and neglect that meet the definition of a Priority 1 report. Field staff at APS and CPI have continuously raised intake reprioritization concerns with the SWI Policy and Performance Management (PPM) team. Despite these concerns, the percentage of CPI Priority 1 reports requiring reprioritization has continued to increase. In fiscal year 2025, CPI investigators downgraded 39,089 Priority 1 reports out of a total of 72,433, representing 54 percent of all Priority 1 reports SWI sent to CPI. Because a Priority 1 report requires a response within 24 hours, inaccurate Priority 1 designations force investigators to drop active cases to respond to reports that do not actually warrant emergency

priority, which places severe strain on existing field resources. As shown in the chart, *CPI Priority 1 Reprioritizations*, inaccurate designations have been a persistent problem for CPI investigators. From fiscal year 2021 to 2025, Priority 1 downgrades have increased continuously as a percentage of the total of Priority 1 reports, from 38 to 54 percent.

**CPI Priority 1 Reprioritizations, FYs 2021-25**




(% P1 Downgrades of CPI Priority 1 Intakes)

APS investigators also raised concerns with the SWI PPM team regarding SWI staff performance. In fiscal year 2025, APS investigators downgraded 13,157 of 28,672 Priority 1 reports, or 46 percent of all Priority 1 reports SWI sent to APS. Specifically, APS staff reported that the information received in online e-reports is often insufficient to open a case, let alone justify an emergency priority. Online e-reports often contain minimal or no identifying information about the alleged victim, sufficient details about the location of the victim, or reliable contact details for the person making the report. For example, an e-report may simply indicate an alleged victim was spotted in a parking lot without providing any description of the person, the person's name, the direction they traveled, or signs of immediate danger. Despite this lack of detail, agency policy requires investigators to spend significant time searching databases or physically search random locations to find the alleged victim. Ultimately, the lack of cross-divisional feedback on intake prioritization results in staff spending valuable time on lower-priority cases that could be otherwise dedicated to cases involving greater risk to the safety and well-being of children and vulnerable adults. Because this issue spans multiple divisions involved in intake, screening, and investigations, DFPS has an opportunity to use the Partners for Children and Families Committee (PCFC), which is charged with improving the Texas child protection system, to bring stakeholders together and propose improvements to the intake prioritization process.

Lack of cross-divisional feedback and communication impacts case prioritization.

Case 2:11-cv-00084 Document 1725-1 Filed 11/12/26 in TXSD Page 116 of 165



### DFPS' reliance on Parental Child Safety Placements lacks essential safeguards, leaving families without critical support and children in legal limbo.

A parental child safety placement (PCSP) is a temporary and voluntary placement agreement between families to move a child outside of the family home, typically with a relative or fictive kin, in accordance with a written agreement approved by DFPS.[32] CPI investigators and Child Protective Services (CPS) caseworkers may only consider initiating a PCSP when there is an immediate danger to the child and all other options allowing the child and the parent or legal guardian to remain in the home together are exhausted. DFPS directs caseworkers to first consider other less intensive forms of a safety plan, as described in the *Safety Intervention Options* graph below.

**Safety Intervention Options**




In October 2017, DFPS recorded a peak total of 5,299 active PCSP agreements. Since then, the number of PCSPs declined through fiscal year 2023, bringing the number of distinct children in active PCSPs per month to under 500. However, that number has been trending upward since then, from a monthly average of 575 distinct children in fiscal year 2024 to 685 in fiscal year 2025. Statewide, the total number of distinct children that were subject to a PCSP agreement increased from 1,626 in fiscal year 2023 to 3,210 in fiscal year 2025, representing a 97 percent increase in just two years, as shown in the *Number of Distinct Children in PCSPs* table on the following page.

Legislative actions have contributed to the agency's increased use of PCSPs.

Legislative actions and statutory requirements drive some of the agency's decisions to use PCSPs. In 2021, the Legislature repealed the agency's authority to temporarily remove a child from their parent or guardian in a nonemergency situation, making emergency removal the only way to bring a child into conservatorship.[33] Additionally, in 2023 the Legislature required DFPS, before proceeding with a suit for possession of a child, to affirm via an affidavit that it had exhausted the option of a PCSP to ensure the child's safety.[34] The same legislation also required courts to be satisfied that the agency had made such efforts before approving a removal order. As a result, caseworkers are now statutorily required to consider the use of a PCSP as part of their reasonable effort to address danger within a home prior to pursuing a removal, for which the legal burden has been raised significantly as a result of the 2021 legislative change. Appendix C, *State Conservatorship Timeline*, illustrates the court process for taking a child into conservatorship.



PX 118 - 116

**Number of Distinct Children in PCSPs, FYs 2023-25**

| Administrative Region | FY 2023 | FY 2024 | FY 2025 | Percentage Increase From FY 2023 to FY 2025 |
|---|---|---|---|---|
| 1 – Lubbock | 193 | 171 | 187 | (3.1%) |
| 2 – Abilene | 102 | 247 | 284 | 178.4% |
| 3 – Dallas | 269 | 460 | 489 | 81.8% |
| 4 – Tyler | 44 | 57 | 102 | 131.8% |
| 5 – Beaumont | 42 | 56 | 103 | 145.2% |
| 6 – Houston | 427 | 609 | 814 | 90.6% |
| 7 – Austin | 129 | 278 | 328 | 154.3% |
| 8 – San Antonio | 240 | 400 | 352 | 46.4% |
| 9 – Midland | 81 | 141 | 220 | 171.6% |
| 10 – El Paso | 80 | 87 | 132 | 65.0% |
| 11 – Edinburg | 19 | 83 | 199 | 947.4% |
| **Statewide** | **1,626** | **2,589** | **3,210** | **97.4%** |

- **Informal approach to PCSPs shortchanges support for parents and caregivers.** Initial PCSP agreements can be completed with just the signature of the parent or legal guardian and the PCSP caregiver. Stakeholders are concerned that parents are signing agreements they do not fully comprehend without legal representation or a clear understanding of their rights. Because PCSPs are agreed upon outside of a court process, parents are not eligible for indigent defense that provides a court-appointed attorney. Stakeholders have also expressed concern that DFPS is using PCSPs more often as informal placements to artificially reduce the number of children in conservatorship. However, DFPS notes that other factors are involved, such as court orders requiring a greater number of children who are in PCSP agreements to stay with the PCSP caregiver to avoid removal. This informal approach prevents PCSP caregivers from receiving the benefits typical of a kinship placement under conservatorship. These supportive resources include case management services that could provide day care assistance, kinship development caseworkers to ensure placement stability, and school enrollment assistance.

PCSP caregivers do not have access to case management services.

- **Critical documentation deficiencies indicate some PCSP agreements may not be necessary.** Stakeholders are concerned that DFPS caseworkers are implementing PCSPs without conducting a thorough safety assessment to confirm an immediate risk of harm as required by statute. Beyond identifying danger, the caseworker must identify safety interventions necessary to ensure child safety. Sunset's review of executed fiscal year 2025 PCSP agreements supports this concern, finding multiple instances in which caseworkers failed to sufficiently document the immediate danger, the child's vulnerability, or the parent's ability to manage that danger. Without this information,

families may enter into safety plans and PCSPs that are not warranted under the statutory definitions of abuse and neglect. Additionally, proper documentation is vital to determine what necessitated the safety plan or PCSP and enable the caseworker to evaluate whether the intervention has been effective.

Without proper documentation, families may enter into unwarranted PCSPs.

Sunset staff also noted that some files lacked basic required components of the safety plans and PCSP agreements such as mandatory signatures for the PCSP caregivers, supervisors, caseworkers, and parents. Other agreements failed to specify the agreed-upon visitation rules or any face-to-face contact schedules as required in statute.[35] One PCSP agreement was only documented and executed using a safety plan form instead of using the required PCSP form. Statute requires the PCSP form to explicitly state the parent's rights to terminate the agreement, establish clear time limits, and document the parent's acknowledgment of the agreement.[36]

- **PCSPs' short time frames make them inappropriate for families needing long-term behavioral changes to take place, setting families up to fail.** In 2023, the Legislature implemented several controls on the duration of PCSP agreements that included the automatic termination of the agreement upon 30 calendar days and requirements for continuing a PCSP agreement up to a maximum of 120 calendar days, as further detailed in the *Duration of PCSP Agreements* textbox.[37] Caseworkers noted they often have difficulty receiving approval from supervisors and program directors to renew a PCSP agreement beyond 60 days. Furthermore, caseworkers expressed concern that families cannot make the necessary behavioral changes, such as addressing mental health issues and drug addictions, within such a short time frame. Between fiscal year 2023 and 2025, the average number of days a child remained on a PCSP decreased from 102 to 56 days. However, because PCSPs can be ended without returning the child to their parents, this reduction does not demonstrate an increase in successful reunification. Rather, in fiscal year 2025 DFPS or a court returned 1,067 children to their parents, representing about 33 percent of the 3,210 distinct children placed on a PCSP agreement that year. Several factors, including the low reunification rate, prevent short-term PCSPs from being an effective tool for families who need time to stabilize and reduce risks within their household.

### Duration of PCSP Agreements

PCSP agreements are limited to a maximum of 30 calendar days but can be continued or renewed, as explained below. On renewal, DFPS policy directs caseworkers, in addition to filling out a new PCSP form and obtaining the parent's signature, to complete the following actions:

- **Renewal up to 90 days:** Caseworkers must seek approval from the supervisor and program director when renewing the PCSP agreement, which can only be renewed twice in this manner for a maximum of 90 days.
- **Renewal beyond 90 days:** While caseworkers must still seek approval from the supervisor and program director, the PCSP can only be renewed if both the parent and the parent's attorney sign the form or a court order directs the PCSP to continue. The PCSP agreement cannot be renewed or continued past 120 days without DFPS filing for legal intervention such as removal.

- **Closing cases without reunification leaves families in legal limbo.** When a child is in a safe placement outside the home when the PCSP expires, CPS caseworkers often close the case without achieving formal reunification, resulting in children remaining away from their family home indefinitely. The caseworker's decision and the ability to achieve reunification is influenced by child safety concerns and court decisions that direct the agency toward a specific outcome. For example, some courts may be reluctant to remove a child in a PCSP arrangement because the PCSP mitigates child safety concerns under the statutory "immediate danger" standard, even if DFPS believes removal is necessary to address those concerns.[38] However, from fiscal year 2021 to 2025 the number of children who remained with their PCSP caregivers or in another placement arrangement outside their home relative to the number of total placements increased from around 58 to 63 percent. Closing cases without reunification has legal impacts on both parents and informal PCSP caregivers. In fiscal year 2025, of the children remaining with their PCSP caregivers upon case closure, only about 47 percent had their placement confirmed through temporary managing conservatorship or had achieved legal custody. Without legal custody, caregivers face difficulties in enrolling children in local schools, obtaining consent for medical care, or accessing child-related benefits. The lack of formal agreements at case closure also leaves parents exposed to future custody battles. If a caregiver maintains physical custody of a child for six months, they gain the legal right to file a lawsuit, known as a Suit Affecting the Parent-Child Relationship, that allows the caregiver to officially challenge and potentially restrict the parents' rights.[39]

Families face uncertainty when cases are closed without reunification.

## Sunset Staff Recommendations

### *Change in Statute*

#### 4.1 Eliminate the second-level ARIF.

This recommendation would update statute to eliminate the second-level ARIF while preserving access to a SOAH hearing for individuals with an RTB finding from a family-based investigation who are identified in a Central Registry check as part of a licensing background check. This recommendation would enable the agency to better direct its limited resources toward appeal priorities, such as addressing the backlog of undocketed SOAH cases, and would eliminate a largely duplicative process.

#### 4.2 Authorize remote participation in SOAH hearings.

This recommendation would update statute to authorize remote and in-person participation in SOAH hearings, allowing participants to request the type of participation according to SOAH's rules. This recommendation would also eliminate the requirement for the hearing to be held in the administrative region in which the conduct at issue occurred. This recommendation would improve access to SOAH while minimizing travel and court costs for the petitioner, DFPS, and SOAH administrative law judges.

### 4.3 Require DFPS to establish a records retention schedule for the Central Registry separate from IMPACT.

This recommendation would require DFPS to establish separate records retention schedules for maintaining names on the Central Registry and maintaining records in IMPACT. As part of this recommendation, the agency would establish retention periods for different types of misconduct that increase with the seriousness of the misconduct. Because the current Central Registry is a collection of IMPACT records, DFPS would be able to implement the new retention schedule by adjusting its Central Registry search criteria and excluding individuals with RTB findings involving misconduct that fall outside of the new retention periods. The Central Registry record retention schedule would also apply to any new Central Registry module in DFPS' new case management system. This recommendation would allow the agency's case management system to preserve records on a long-term basis while also providing flexibility to maintain names in the Central Registry on a short- and long-term basis according to types of misconduct.

### 4.4 Require DFPS' PCSP form to provide notice of a nonparent adult caregiver agreement.

This recommendation would update statute to require a PCSP agreement to include an additional term that describes how PCSP caregivers can enter into a nonparent adult caregiver agreement under Chapter 34, Texas Family Code. A nonparent adult caregiver agreement is a voluntary agreement between a parent and a PCSP caregiver that grants decision-making authority to the PCSP caregiver for daily care decisions like enrolling the child in school or obtaining health insurance for the child. This recommendation would ensure PCSP caregivers are aware of the legal options available to them under a Chapter 34 agreement and able to make important decisions for the children in their care.

## *Management Action*

### 4.5 Direct DFPS to conduct a case decision review for all first-level ARIFs.

This recommendation would direct DFPS to implement a case decision review check of all first-level ARIF requests received by DFPS' Office of Appeals. As part of this recommendation, the Office of Appeals would evaluate the case decision before the ARIF meeting is scheduled, potentially determining whether the RTB finding should be overturned based on the investigative case file alone. This recommendation would encourage efficient dismissal before scheduling a meeting with the individual, saving time for both agency staff and individuals seeking appeal. If the RTB finding cannot be overturned based on this review, the resolution specialist would continue the process by scheduling the first-level ARIF meeting and gathering additional relevant evidence.

### 4.6 Direct DFPS to update its appeals procedures and rules.

This recommendation would direct DFPS to ensure its appeal procedures and rules reflect current agency practice and statute. As part of this recommendation, DFPS should consider implementing regular reviews of its policy handbook and forms to ensure instructions to staff and the public are consistent and aligned with relevant statutory and rule changes. This recommendation would also direct DFPS to complete a comprehensive review of all publicly accessible forms on the DFPS website and all documents distributed by DFPS to ensure they reflect current agency policy and rules. Updated procedures and rules would help ensure individuals seeking an appeal know what to expect and how to effectively participate in the process, reducing confusion for individuals navigating the appeal process.

### 4.7 Direct DFPS to create and maintain a plain-language guide for appeals.

This recommendation would direct DFPS to create a guide to help the public better prepare for an appeal challenging an RTB finding. As part of this recommendation, DFPS should consider including a plain-language explanation of the appeal process, including when the individual is eligible for a first-level ARIF and a formal hearing at SOAH as well as definitions of abuse and neglect and other commonly used terms. The guide should be posted on the agency's public website.

### 4.8 Direct DFPS to consider a risk-based approach to reduce the number of cases directed to the RTB reader team.

This recommendation would direct DFPS to consider taking a long-term, phased-in, and risk-based approach to reduce the number of cases directed to the RTB reader team, allowing case readers to focus on cases that pose the highest risk to public safety. The agency should consider implementing a process that uses the severity of a finding to identify cases and still maintains consistent quality assurance for investigators. This recommendation is not intended to disrupt the agency's current process of evaluating the effectiveness of the RTB reader team or any feedback that is received from agency staff regarding the RTB reader project. This recommendation would reduce the administrative burden on investigators while ensuring RTB findings are accurate and supported by preponderance of the evidence for the highest-risk cases.

### 4.9 Direct DFPS to collaborate with the CPI Advisory Committee to update investigator training to reflect current requirements.

This recommendation would direct DFPS to collaborate with the CPI Advisory Committee to review and update investigation training for new and tenured investigators. As part of this recommendation, DFPS would be directed to:

- Review and update training on the need for documentation that meets the preponderance of the evidence standard.
- Consider incorporating a recurring training for tenured investigators that may include a biennial review of statutory changes from the most recent legislative session to ensure investigators understand ongoing and new statutory and rule requirements.

Recurring and enhanced investigator training will ensure investigators are prepared to complete their casework in accordance with the current statutory and rule framework, reducing the frequency of investigators learning about updates to rules and policies through overturned findings.

### 4.10 Direct DFPS to collaborate with the PCFC to review and update guidance for SWI intake specialists regarding intake prioritization.

This recommendation would direct DFPS to collaborate with the PCFC to review and update guidance for SWI intake specialists regarding priority designations. As part of this recommendation, DFPS would be directed to collaborate with PCFC's Intake and Investigations subcommittee to evaluate training and SWI handbook policies that can improve the accuracy of intake prioritizations. Specifically, DFPS would be directed to:

- Review and identify trends from the feedback received through the SWI PPM team regarding overprioritizations.

- Collaborate with investigators, supervisors, and regional directors from APS and CPI to incorporate their feedback regarding Priority 1 reports into any new training or changes in the SWI handbook policy.

A collaborative approach to SWI intake specialist training and SWI handbook policies would ensure that Priority 1 reports sent to APS or CPI are as accurate as possible, reducing time and resources spent on lower-risk cases.

### 4.11 Direct DFPS to include PCSP agreements in the agency's quality assurance efforts.

This recommendation would direct DFPS to include PCSP agreements in its quality assurance efforts, such as reviewing a sample of PCSP agreements to provide feedback to the investigators or caseworkers executing the agreements. This recommendation would better ensure that agency staff understands the definition of immediate danger that warrants the need for these agreements and clearly supports that decision with documentation associated with PCSP agreements.

### 4.12 Direct DFPS to update its policy on the use of PCSPs to clarify when they should be used.

This recommendation would direct DFPS to update its policy indicating when PCSP agreements should and should not be used, including when PCSPs are suitable for a short-term arrangement or whether long-term safety plans would be better suited for families needing more time to make behavioral changes. This recommendation would ensure that PCSP agreements are used appropriately for children and families who would benefit from a temporary, voluntary arrangement. DFPS should consider what type of parental behaviors can be addressed within the PCSP time frames and provide examples of the types of behaviors that can be addressed within the 30-, 60-, or 90-day PCSP windows.

## Fiscal Implication

These recommendations would not have a significant fiscal impact to the state. While the exact fiscal cost cannot be determined at this time, Recommendation 4.1 seeks to improve efficiencies in the appeals process, potentially resulting in shorter resolution timelines that could result in savings to the state in the long term. DFPS could implement the remaining recommendations with existing resources.

[1] DFPS, *Safety Assessment Resource Guide*, August 2025, p. 4, accessed online August 7, 2026, https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/Safety_Assessment_Resource_Guide.pdf.

[2] DFPS, *Risk Assessment Resource Guide*, March 2025, p. 5, accessed online August 7, 2026, https://www.dfps.texas.gov/handbooks/CPS/Resource_Guides/Risk_Assessment_Resource_Guide.pdf.

[3] 40 Texas Administrative Code (TAC), Part 19, Chapter 707, Subchapter A, Division 1, Section 707.495 (2020) (DFPS, *How do we make dispositions after completing the investigation?*).

[4] 40 TAC, Part 19, Chapter 707, Subchapter A, Division 1, Section 707.497 (2020) (DFPS, *What roles can we assign to persons involved in a case after the investigation is complete?*).

[5] All citations to Texas statutes are as they appear on https://statutes.capitol.texas.gov/. Section 261.002(a), Texas Family Code.

[6] 40 TAC, Part 19, Chapter 702, Subchapter C, Section 702.251 (2021) (DFPS, *What is the Central Registry?*).

[7] Sections 261.002(b)(3) and 261.309, Texas Family Code.

[8] Section 2001.051, Texas Government Code.

[9] 40 TAC, Part 19, Chapter 707, Subchapter A, Division 1, Section 707.505 (2020) (DFPS, *What are the requirements for an administrative review of investigation findings?*).

[10] 40 TAC, Section 707.505(g).

[11] 40 TAC, Part 19, Chapter 702, Subchapter I, Division 3, Section 702.841 (2016) (DFPS, *Who can request an Office of Consumer Affairs Review of perpetrator designation?*).

12 40 TAC, Part 19, Chapter 707, Subchapter B, Section 707.623 (2022) (DFPS, *Will we notify school officials once the investigation is completed?*).

13 40 TAC, Part 19, Chapter 707, Subchapter C, Division 6, Section 707.817 (2020) (DFPS, *Who may request an administrative review?*).

14 40 TAC, Part 19, Chapter 707, Subchapter C, Division 6, Section 707.831 (2020) (DFPS, *What happens if a designated perpetrator waives the right to an administrative review?*); 40 TAC, Part 19, Chapter 707, Subchapter C, Division 7, Section 707.843 (2020) (DFPS, *Who may request a due process hearing?*); and 26 TAC, Part 1, Chapter 745, Subchapter M, Division 2, Section 745.8835 (2025) (HHSC, *Who may request a due process hearing?*).

15 40 TAC, Part 19, Chapter 707, Subchapter A, Division 3, Section 707.575 (2022) (DFPS, *What are the notice requirements for a designated perpetrator when we release information to outside parties?*).

16 40 TAC, Part 19, Chapter 705, Subchapter M, Section 705.1303 (2025) (DFPS, *Does the designated perpetrator have the right to appeal?*).

17 40 TAC, Section 707.505(g).

18 40 TAC, Part 19, Chapter 702, Subchapter I, Division 3, Section 702.847 (2016) (DFPS, *How does the Office of Consumer Affairs Review work?*).

19 40 TAC, Section 707.575; and 26 TAC, Section 745.8835.

20 40 TAC, Sections 707.575, 707.843, and 705.1303.

21 40 TAC, Part 19, Chapter 707, Subchapter C (DFPS, *Child Care Investigations*).

22 40 TAC, Part 19, Chapter 707, Subchapter C, Division 7, Section 707.845 (2020) (DFPS, *How do I request a due process hearing?*).

23 Section 40.066(f), Texas Human Resources Code.

24 Section 42.072, Texas Human Resources Code.

25 1 TAC, Part 7, Chapter 155, Subchapter I, Section 155.405 (SOAH, *Participation by Telephone or Videoconference*).

26 SOAH, *Representing Yourself in General Hearings Cases at the State Office of Administrative Hearings*, accessed online August 8, 2026, https://www.soah.texas.gov/representing-yourself-general-hearings-cases-state-office-administrative-hearings.

27 DFPS, *Records Retention Schedule*, accessed online August 28, 2026, https://www.tsl.texas.gov/sites/default/files/public/tslac/slrm/state/schedules/530.PDF. The DFPS records retention schedule also considers other factors in determining retention periods for the agency's various records, such as the age of the victim and whether the records involve Family-Based Safety Services or conservatorship services.

28 Chapter 359 (SB 1447), Acts of the 88th Legislature, Regular Session, 2023; and Chapter 541 (HB 140), Acts of the 89th Legislature, Regular Session, 2025.

29 DFPS, Rider 39, Page II-18, Article II, Chapter 1185 (SB 1), Acts of the 89th Legislature, Regular Session, 2025 (General Appropriations Act), accessed online August 7, 2026, https://www.lbb.texas.gov/Documents/GAA/General_Appropriations_Act_2026_2027.pdf.

30 Chapter 8 (HB 567), Acts of the 87th Legislature, Regular Session, 2021.

31 40 TAC, Section 707.495.

32 Section 264.901(2), Texas Family Code.

33 HB 567, 2021.

34 Chapter 672 (HB 968), Acts of the 88th Legislature, Regular Session, 2023.

35 Section 264.902(a), Texas Family Code.

36 Section 264.902(j), Texas Family Code.

37 Section 264.902(f)-(i), Texas Family Code; Chapter 391 (HB 730), Acts of the 88th Legislature, Regular Session, 2023; and Chapter 1078 (SB 614), Acts of the 88th Legislature, Regular Session, 2023.

38 Sections 262.101, 262.104, and 264.905, Texas Family Code.

39 Section 102.003(a)(9), Texas Family Code.

# Issue 5

## Certain DFPS Processes and Statutory Requirements Impede the Agency From Carrying Out Its Mission to Serve Children and Families Effectively.

## Background

As a result of several efforts by the Legislature to consolidate the state's health and human services (HHS) agencies, the Department of Family and Protective Services (DFPS) must collaborate with the Health and Human Services Commission (HHSC) on several fronts to ensure the health, safety, and well-being of children and families served by DFPS.[1] Although DFPS operates as a stand-alone state agency, statute requires the agency to participate in HHSC's consolidated administrative support services model.[2] The scope of administrative functions for HHS agencies is colossal, supporting an enterprise whose combined budget is more than $51 billion with a total staff of nearly 55,000 in fiscal year 2025.

The agencies also share responsibility for overseeing residential child care providers that provide temporary placements for children in DFPS conservatorship. DFPS investigates allegations of abuse, neglect, and exploitation in residential care operations through its Residential Child Care Investigations (RCCI) division within Child Protective Investigations.[3] The textbox, *RCCI Investigations*, summarizes the types of residential child care operations subject to these investigations.

### RCCI Investigations

RCCI at DFPS investigates allegations of abuse, neglect, and exploitation of children in a residential child care operation regulated by HHSC's Child Care Regulation (CCR) division. The types of residential child care operations subject to investigation include:

- **General residential operations (GRO):** Operations that provide care for seven or more children and may include emergency shelters, residential treatment centers, or transitional living programs.
- **Child-placing agencies (CPA):** Agencies licensed by CCR to place children in foster or adoptive homes and provide oversight and support services.
- **CPA foster homes:** Foster family homes verified by a licensed CPA to provide substitute care for children in DFPS conservatorship.
- **CPA adoptive homes:** Homes approved by a CPA for the adoption of children from the child welfare system.

In 2015, the Legislature directed the transfer of DFPS' regulatory and licensing functions to HHSC, which was completed in 2017.[4] Today, HHSC's Child Care Regulation (CCR) division establishes the minimum standards of care, licenses and regulates different child care operations, and conducts monitoring inspections to ensure operations comply with statute, rules, and standards.[5]

**Administrative Service Areas**

Rate setting

- Foster care rate setting, including blended rates for Community-Based Care and Title IV-E eligibility determination for those rates
- Cost report collection and validation

Human resources

- Payroll, time, labor, and leave services
- Central payroll system, training, and transaction processing

Procurement, purchasing, and contracting services

- Solicitations
- Purchasing and ProCard administration
- System of Contract Operations and Reporting (SCOR) administration

Compliance and quality control

- Procurement compliance with state law
- Evaluation review
- Single audit and quality check collection

Civil rights services

- Discrimination complaint investigation
- Americans with Disabilities Act (ADA) compliance
- Title IV oversight

Facility management and leasing services

- Asset management
- Leasing and security
- Regional administrative services
- Business continuity

Information technology services

- Twenty enterprise applications, help desk, telecom, and call center technology services

HHSC leadership academy

- Leadership training
- Management development
- Workforce training

## Findings

### DFPS' reliance on HHSC for administrative support services hinders the agency's ability to deliver critical services to children and families.

In 2015, prompted by Sunset's finding that administrative consolidation at HHSC was incomplete and resulted in lost efficiencies, the Legislature directed HHS agencies to further streamline administrative functions.[6] Although DFPS and the Department of State Health Services (DSHS) remained separate agencies, they both continued receiving administrative support from HHSC.

In recognition of DFPS' need for greater organizational flexibility to improve the pace of decision making in abuse and neglect investigations and more effectively manage its service delivery and workforce, the Legislature separated DFPS from the HHS system in 2017, making it part of the HHS enterprise. The HHS enterprise is further discussed in the *Introduction to Texas Health and Human Services* section of this report. At that time, certain administrative functions previously moved to HHSC were transferred back to DFPS, including human resources (HR), information technology (IT), contract oversight and support, and legal services. Today, HHSC continues to provide some HR services and limited IT support.[7]

Statute directs DFPS and HHSC to "enter into contracts for the provision of shared administrative services, including payroll, procurement, information resources, rate setting, purchasing, and contracting."[8] In addition, DFPS and HHSC have agreed to additional support areas for which DFPS needed services such as civil rights services. The *Administrative Service Areas* textbox lists some but not all of the administrative support services HHSC provides in varying degrees to DFPS. DFPS also performs certain administrative functions in-house.

HHSC and DFPS use various agreement types to deliver support services, including a Memorandum of Understanding (MOU) created in 2017 and that expired in 2020. Separately, DFPS contracts with HHSC through a biennial interagency contract (IAC) which outlines payment terms and authorizes the transfer of funds between the agencies for the provision of services. These agreements are not sufficiently detailed to give DFPS a useful and transparent mechanism for describing the

services it can expect to receive from HHSC or hold HHSC accountable for providing those services.

In 2020, HHSC and DFPS collaborated to develop service level agreements (SLA) to define delegated responsibilities, points of contact, and escalation procedures for the support services outlined in the MOU. However, those agreements were never finalized due to differences of opinion in the levels of service to be rendered. During the current Sunset review, HHSC initiated a project with DFPS to finalize the SLAs and update the MOU and scheduled the implementation of these changes for September 2026.

DFPS pays HHSC for the provision of these services through a process described further in Issue 1 of the *Sunset Staff Report on HHSC*. In fiscal year 2025, HHSC charged DFPS a total of about $117.9 million. The *Bills From HHSC* table shows the annual billed amounts to DFPS over the past five fiscal years. The consolidation of administrative support services for the HHS enterprise is intended to improve efficiency and reduce cost by leveraging HHSC's buying power. While well-intended, the current arrangement has left DFPS, a stand-alone agency, reliant on HHSC for key administrative functions. This arrangement inherently creates opportunities for miscommunication, blurred accountability, and inefficiencies, which impede DFPS' ability to determine the most efficient way to serve children and families.

**Bills From HHSC, FYs 2021-25**

| Fiscal Year | Amount Charged to DFPS by HHSC |
|---|---|
| 2021 | $120,557,832 |
| 2022 | $122,833,741 |
| 2023 | $116,509,934 |
| 2024 | $117,164,080* |
| 2025 | $117,921,718* |

* Billed amounts are as of May 2026 and not yet final.

- **Unclear cost efficiencies prevent DFPS from making strategic use of its resources.** The term "cost effective" does not simply mean inexpensive — it means offering good value for the amount of money paid.[9] At a minimum, describing a service as cost effective implies that the service adequately meets the basic needs of the recipient. The purpose of consolidating administrative support services for the enterprise at HHSC is to leverage HHSC's resources to provide cost-effective administrative services and ensure the state gets the most value for its investment. However, because HHSC does not provide a cost estimate for each service provided to DFPS, Sunset staff could not find evidence that the services HHSC provides for DFPS are more cost effective than if DFPS provided or contracted for those services itself. Accounting of administrative services is difficult in part due to restrictions on the use of federal funding. HHSC allocates costs to HHS enterprise agencies based on its federally required *Public Assistance Cost Allocation Plan*, which shows how federal funding sources support HHS enterprise programs but does not itemize the actual amounts going toward each service HHSC provides. The structure of HHSC's administrative support services is naturally complex, involving hundreds of HHSC staff members from at least six divisions. The current billing provides DFPS with over 300 line items for direct and indirect costs for work HHSC staff performed without a clear indication of which costs are tied to which specific services.

HHSC's administrative services structure is naturally complex.

In fiscal year 2020, DFPS brought certain IT responsibilities in-house to improve the quality, responsiveness, and effectiveness of IT services based on operational considerations rather than anticipated cost savings. In 2024, DFPS performed an internal analysis of services billed versus services used. The analysis revealed that HHSC charged DFPS over $3.2 million for IT services that had transferred to DFPS in 2020. Additionally, DFPS identified HHSC charged more than $1.2 million for services DFPS now performed internally despite those services having previously been flagged for removal from HHSC. While this duplicative charge may be relatively minor in comparison to the annual amount paid to HHSC, it represents resources that DFPS could reallocate to priorities in other programs. Without a clear accounting of the cost of services HHSC provides, DFPS cannot strategically determine whether its use of HHSC services is more cost effective than bringing those services in-house, undermining the original justification for consolidating administrative support services for the enterprise under HHSC.

Split responsibilities between HHSC and DFPS create unclear cost efficiencies.

- **Delivery of support services is not meeting DFPS' key administrative needs.** When HHSC does not deliver the level or quality of services DFPS programs require, DFPS must devote additional resources to supplement those services. For example, HHSC staff provides Spanish translation services through the chief public affairs office and contracts out for translation services in other languages. Due to HHSC's limited capacity, DFPS negotiated a separate contract with an external vendor to provide translation services in Spanish and other languages needed to serve Texas' diverse population. As a result, the state incurs additional costs beyond those the Legislature already appropriates to the agencies for support services.

Furthermore, DFPS' reliance on HHSC procurement services leaves DFPS subject to HHSC's prolonged procurement timelines. As discussed in Issue 4 of the *Sunset Staff Report on HHSC*, these delays are often driven by inefficient and duplicative review layers, a lack of DFPS-specific expertise, and an inability to prioritize critical contracts. For example, in fiscal year 2024 HHSC's procurement process delayed DFPS' rollout of Community-Based Care (CBC) in three regions due to iterative review layers that resulted in minimal revisions. The solicitation development phase lasted 155 days, which is 130 days beyond the target, delaying the award of funds to contractors in those three regions.

HHSC's prolonged procurement timelines delayed CBC rollout.

In another CBC procurement, HHSC's Compliance and Quality Control division questioned DFPS' use of child welfare-specific contract provisions required per DFPS' legal policy and instead pressed for standard and generic terms and conditions. To preserve the child welfare provisions, DFPS was required to provide a legal opinion from its general counsel supporting the agency's position. The disagreement ultimately escalated to discussions between DFPS' commissioner and HHSC's executive commissioner, delaying the procurement by approximately three weeks. While DFPS has the legal, program, and executive expertise to resolve issues like these,

doing so requires the agency to devote resources to issues that should be addressed through HHSC's procurement support. Although HHSC ultimately meets the procurement needs of DFPS, redirecting staff time to fill these gaps takes resources away from other priorities, impacting the timeliness and quality of services provided to children and families in those regions.

- **Enterprise support services are not informed by DFPS program needs.** Although DFPS and HHSC share the mission of serving Texans, the agencies have distinct responsibilities that require different operational expertise. Throughout the review, Sunset staff consistently heard that HHSC staff's limited familiarity with DFPS programs has resulted in administrative support services that do not fully account for the agency's unique demands.

  For example, DFPS' Statewide Intake (SWI) uses HHSC's telecommunications vendor contract to operate the 24/7 Texas Abuse Hotline, which receives reports of abuse, neglect, and exploitation and routes them to both DFPS and HHSC programs. The transition to HHSC's Genesys phone system under an expedited timeline forced DFPS to develop workarounds to configure the platform to accommodate SWI's unique operational requirements, which differ from those of traditional call center operations. DFPS participated in executive-level discussions about the contact center platform options, the selection of Genesys, and the associated migration timeline. However, DFPS had to devote additional time and resources to ensure the platform could accommodate SWI's program-specific needs.

  Since the transition, SWI field staff continues to encounter issues, including dropped calls, failed transfers, and audio problems. Furthermore, the loss of extension-based transfers now requires staff to perform manual searches when transferring calls. While the phone system does not track calls per hour, these issues could lead to increased call handling time if unresolved, hindering DFPS' response time to critical reports involving the safety and well-being of children and vulnerable adults. Substantial DFPS involvement earlier in the system's design could have reduced implementation delays, minimized the need for workarounds, and better aligned the technology with program requirements from the outset. HHSC's practice of overlooking DFPS program areas' needs during critical operational changes jeopardizes DFPS' ability to fulfill its duty to protect the state's most vulnerable populations.

HHSC's limited familiarity with DFPS programs results in inadequate support.

Overlooking DFPS' needs can jeopardize critical operations.

- **DFPS has limited negotiating power and opportunity to exercise authority over support services.** The current arrangement does not provide DFPS with any authority to influence service decisions that affect the agency's operations. Statute specifies that DFPS must collaborate with HHSC to ensure the efficient provision of administrative support services by HHSC.[10] In practice, however, HHSC retains primary authority over how those services are delivered, maintained, and modified. Although DFPS

**Examples of Limited Input**

**Security services.** In fiscal years 2024-25, DFPS was not part of discussions and had no input to changes made in security coverage for the Brown-Heatly Building (DFPS headquarters).

**Human resources.** In April 2020, HHSC communicated a cost increase to all three enterprise agencies for HR and payroll services. The communication occurred just a week before the existing contract was set to expire, leaving limited time for DFPS to assess the increased costs and determine whether it could support the new contract.

funds these services through the IAC, its role is largely limited to raising concerns or requesting changes without clear authority to ensure those changes are implemented. As a result, HHSC does not consistently consult DFPS on decisions affecting the services DFPS relies upon, including decisions related to processes, staffing, and service delivery that may increase costs or affect operations. The *Examples of Limited Input* textbox details instances in which HHSC made shared services decisions without sufficient consideration of or input from DFPS.

**The 90-day efficiency audit would benefit from alignment with the State Auditor's efficiency audit.**

In 2021, the Legislature required DFPS to contract with an external auditor to conduct an efficiency audit every four years using funds appropriated for administrative and internal audit operations. The goal of this audit is to determine if the agency is using resources effectively and efficiently to achieve the desired outcomes for children and families served by DFPS.[11] However, the audit must be performed within 90 days from the date the auditor is selected, which prevents the auditor from conducting an adequate review of DFPS' operations and results in limited findings and recommendations.[12]

The 90-day audit deadline prevents adequate review of DFPS operations.

For example, the 2022 audit was limited in scope to only two objectives, one of which was to evaluate safety in placements. With such a short time frame, the auditor sampled very few case management records: 25 kinship and 25 nonkinship placements out of a possible 22,110 kinship and 70,518 nonkinship placements made between September 1, 2020, and February 28, 2022. The auditor found that 16 of the 25 kinship samples lacked documentation that a preliminary home assessment was completed, which is key for determining placement safety, and that 21 of the 25 non-kinship samples were missing documentation indicating placements were made timely within 48 hours. As a result, the auditor made just one recommendation that DFPS standardize its documentation practices. However, a subsequent internal review of the auditor's casefile sample performed by DFPS found most of this documentation to be present in the case files or not needed per agency policy, which the auditor was likely unfamiliar with due to the short time frame. DFPS analysts identified only two preliminary home assessments as missing for kinship placements and only two cases missing records for nonkinship placements. Ultimately, of the 104 documents cited as missing by the auditor, DFPS analysts confirmed only 18 as actually missing. Based on these findings, DFPS determined it needed to address inconsistencies in saving documentation in its system.

The 90-day efficiency audit has also become duplicative due to a recently mandated agency efficiency audit. In 2025, the Legislature charged the State Auditor's Office (SAO) with performing efficiency audits of state agencies in

conjunction with Sunset review.[13] Like DFPS' 90-day efficiency audit, SAO efficiency audits examine an agency's use of state resources to determine if they are being used effectively and efficiently to achieve the desired outcome for the agency's program beneficiaries. Unlike the DFPS audit, an SAO efficiency audit is not limited to 90 days.[14] Rather than paying for duplicative audits, DFPS could leverage its funds to pay for SAO's expertise in auditing complex state agencies and its insight into the areas of investigation in which legislators have interest. The state would benefit from allowing SAO and the Legislative Budget Board (LBB) to evaluate the DFPS-specific outcome areas listed in the 90-day efficiency audit as part of the SAO's efficiency audit, which could work in tandem with the agency's Sunset review to make statutory recommendations to increase efficiencies. Finally, relying on the SAO efficiency audit to evaluate DFPS would avoid requiring DFPS to procure an external auditor through HHSC, which can take up to two years based on current timeframes.

The state would benefit from leveraging SAO's expertise to review DFPS operations.

### DFPS' initiatives to proactively address provider risk lack a formal process and participation from cross-agency staff, limiting their effectiveness.

Residential child care operations obtain licensure through HHSC CCR before contracting to provide services for children in DFPS conservatorship. Once licensed, providers may contract directly with DFPS in legacy regions, with a Single Source Continuum Contractor (SSCC) in SSCC regions, or with both. SSCCs are responsible for managing residential placement networks in their region.

DFPS contracts with about 300 licensed residential child care providers, including 24-hour operations and child-placing agencies, to provide placement and care for children in its conservatorship. DFPS' Purchased Client Services (PCS) division oversees these contracts. Within PCS, the residential child care contracts unit establishes provider qualifications, standards, and expected outcomes, while regional Residential Contract Managers (RCM) monitor provider performance, coordinate with Child Protective Services (CPS) and HHSC CCR, and serve as liaisons between providers and DFPS field staff to promote compliance and resolve operational issues. As the state continues to implement CBC, the role of residential contracts is evolving as they are phased out and SSCCs assume responsibility for contracting with residential child care providers.

As DFPS residential contracts phase out, SSCCs assume greater oversight responsibility for providers.

The Facility Intervention Team Staffings (FITS) bring together staff across divisions at DFPS and HHSC to discuss provider performance and address concerns related to child safety. FITS is an important oversight mechanism for residential child care providers that contract with DFPS, SSCCs, or both. However, FITS lacks a formal process with comprehensive criteria to identify troublesome providers. Furthermore, the lack of consistent participation by HHSC licensing and enforcement staff in FITS limits the initiative's ability to identify and address provider risk to child safety early. This finding only applies

to FITS processes outside of the Heightened Monitoring process established under the Foster Care Litigation.

**FITS Workgroups**

Regional FITS

- Involves regional field staff.
- Meets as needed to address regional provider concerns and risks.

State Office FITS I

- Involves representatives from residential child care contracts, CBC contracts, CPS, RCCI, and HHSC CCR.
- Meets weekly to review provider performance and risks, coordinate interventions when needed, and determine whether issues should be elevated to FITS II.

SSCC FITS

- Involves DFPS staff and two representatives from each SSCC.
- Meets weekly to review State Office FITS updates with SSCCs regarding heightened risks to children in the care of subcontractor providers.

State Office FITS II

- Involves senior- and executive-level staff, including two DFPS deputy commissioners, residential child care contracts, CPS, general counsel, PCS, and the HHSC deputy executive commissioner for Regulatory Services and CCR.
- Meets as needed to share information and coordinate responses taken by DFPS and HHSC against a provider and determine whether issues should be elevated to agency leadership.

FITS has existed in its current structure since 2009 as part of DFPS' broader approach to monitoring residential operations and coordinating responses to risk. FITS involves several distinct but similar workgroup meetings taking place at different levels within the agency. The different FITS meetings are further detailed in the *FITS Workgroups* textbox. All workgroups are focused on identifying providers whose measures of operational performance and compliance have started to show troubling trends and intervening to improve those measures before either child safety or provider capacity is affected.

When DFPS field staff, contract managers, or other program staff identify a pattern of deficiencies related to minimum standards violations, contract violations, or placement suspensions, the risk pattern triggers the FITS process in which DFPS determines whether an intervention is needed. Through a series of escalating reviews involving DFPS, HHSC, and, when applicable, SSCCs, agency leadership determines whether technical assistance, increased monitoring, contract action, or licensing action is warranted. The *FITS Process* chart on the following page details this workflow.

- **Lack of comprehensive criteria for FITS entry, escalation, and exit.** The agency lacks formal comprehensive criteria and an objective threshold indicating when the risk pattern triggers the need for FITS monitoring. Instead, DFPS relies on the professional judgment of various division staff. While Sunset staff found no evidence of impropriety in DFPS' professional judgment, the lack of clear criteria prevents providers from understanding what concerns may subject them to FITS monitoring. A similar lack of clear criteria regarding when a provider has successfully addressed FITS concerns creates another barrier that may prevent providers from timely exiting FITS monitoring. In fact, no guidelines to prevent a seemingly endless cycle of FITS monitoring appear to exist. This approach can lead to the unintended consequence of an ever-increasing list of providers under monitoring and ever-expanding monitoring efforts FITS members must provide.

**FITS Process**




- **Absence of a formal SSCC FITS process.** In SSCC regions, DFPS staff facilitates FITS meetings that include SSCC representatives, but these meetings are not integrated with State Office FITS processes. SSCCs are not contractually required to hold FITS meetings with their subcontracted providers, but the joint operations manual shares steps to escalate and report serious incidents to DFPS. Sunset staff noted that SSCC FITS meetings lack substantive discussion and engagement in comparison to State Office FITS despite these meetings including several SSCC participants. During the Sunset review, DFPS began evaluating how FITS should be structured as the CBC model evolves but has not yet determined its future function or structure.

- **Limited interagency coordination with HHSC.** Until November 2025, HHSC licensing staff did not participate in SSCC FITS meetings or share sensitive licensing information related to subcontractors' performance, partly due to concerns that SSCCs are not state agencies. This lack of information sharing with SSCCs limits their ability to proactively address child safety risks with their subcontractors. If a provider only contracts with SSCCs, DFPS expects the SSCCs to decide what action is needed to bring the provider into compliance at the SSCC FITS meetings. While DFPS and

HHSC are not currently expected to participate in conversations regarding exclusive SSCC subcontractors, formalizing the participation of both agencies at these meetings would eliminate communication barriers and foster better and faster coordination when faced with a child safety crisis.

### DFPS' practice of disallowance lacks a clear way for foster homes and CPAs to appeal agency decisions.

While DFPS has the responsibility under state and federal law to make appropriate placement decisions involving children in its conservatorship, the agency lacks a formal and transparent process for foster homes and CPAs to appeal placement disallowance decisions. Disallowance is a contract-based action used to prevent future placements in foster homes that have indicated a pattern of child safety concerns.[15] The process applies to verified foster homes and CPAs, including those operating under SSCC contracts. Once a foster home is disallowed, it may not receive future placements. Additionally, the foster home becomes ineligible to receive placements through another CPA unless DFPS subsequently lifts the placement disallowance. Disallowance does not automatically require removal of children already residing in the home; instead, the responsible caseworkers and placement staff, with review and involvement from agency leadership, legal staff, and the court, as appropriate, decide whether these children should remain in the home or be moved to another placement.

DFPS does not actively involve providers in disallowance reviews.

Since 2019, DFPS has used the disallowance process to identify foster homes and CPAs whose compliance history raises concerns. Although the agency sometimes lacks any substantiated findings of abuse and neglect or a disqualifying background check to clearly support disallowance, it may instead consider patterns of multiple investigations, reports of inappropriate discipline, or other risk factors that may not rise to the level of an abuse or neglect finding but nonetheless raise enough concern to the agency to justify the disallowance. This approach does not actively involve a foster home or CPA in DFPS' evaluation. While DFPS may ask a CPA for information about one of its foster homes, the request is not always clearly identified as part of a disallowance review and the subsequent disallowance has surprised some CPAs. In calendar years 2016 to 2026, 225 foster homes have been identified for disallowance of placements, as shown in the *Foster Homes in Placement Disallowance* chart on the following page.



* Numbers provided as of June 2026.

In 2019, the agency established a tracking mechanism for disallowed foster homes and re-allowance requests. However, at the time of this review, the disallowance notice letters provided to CPAs for disallowed foster homes lacked any description of an opportunity to request re-allowance, instead directing the CPA to submit questions via email. Furthermore, DFPS began an internal review of the disallowance process in January 2026 and authorized CPAs to submit re-allowance requests on behalf of their foster homes in July 2026. However, prior to this change, the agency had not received a formal re-allowance request on behalf of a disallowed foster home through the process established in 2019. Without process transparency, clear guidance, or active participation of foster homes and CPAs in the re-allowance process, the state has no measurable way to evaluate whether these oversight strategies work as intended to protect children from unsafe placements.

## Sunset Staff Recommendations

### *Change in Statute*

#### 5.1 Authorize DFPS to provide its own administrative support services within its resources.

This recommendation would authorize DFPS, unless otherwise directed by the Legislature, to provide its own administrative services rather than use HHSC services if DFPS determines it can do so on a cost-neutral basis. As part of this recommendation, DFPS would be required to perform a cost-benefit analysis to determine whether a service should be performed internally, outsourced to a vendor, or kept at HHSC. This recommendation would also prohibit HHSC from charging DFPS for any administrative support services that DFPS decides to perform or pay for itself. This recommendation would work in conjunction with Recommendation 1.2 of the *Sunset Staff Report on HHSC*, which would require HHSC to provide detailed annual billing information and detailed cost estimates on a six-year cycle to facilitate consideration of potential transfers of administrative support services to DFPS. The detail in the cost

estimates would be at least to the level of functional support area using the information HHSC was able to produce at Sunset's request in the course of the review as a template and would include any other information requested by the LBB.

To facilitate this statutory change, some components of this recommendation include management actions the agencies would undertake before potential passage of any legislation. To minimize disruption to administrative support service provision and to provide the agencies time to plan for service transfers, this recommendation would have the agencies adhere to the following timeline, as specified in Recommendation 1.2 of the *Sunset Staff Report on HHSC*:

- **Annual detailed billing information.** Beginning October 1, 2027, and in October of each subsequent fiscal year, HHSC would provide DFPS with billing information reflecting the actual costs of providing administrative support services to DFPS broken down by functional support area for the previous fiscal year.

- **Detailed cost information to facilitate transfer of services in fiscal year 2028.** By January 19, 2027, HHSC would provide DFPS, LBB, the House Committee on Appropriations, and the Senate Finance Committee a detailed summary of final costs HHSC charged to DFPS in fiscal years 2024, 2025, and 2026 for administrative support services as well as a summary of projected costs for fiscal year 2027. The summary should provide the totals by method of finance (MOF) and federal assistance listing number (ALN), be broken out by functional support area, and should include any other information requested by LBB. DFPS would work with HHSC to provide any information needed to develop the cost estimate.

  By February 14, 2027, HHSC would be directed to provide a detailed cost estimate to DFPS, LBB, the House Committee on Appropriations, and the Senate Finance Committee that includes the projected costs of providing administrative support services to DFPS in the 2028-29 biennium. The cost estimate should outline projected costs for each fiscal year of the biennium for base amounts assumed in the budget as well as the individual revised exceptional item requests submitted by DFPS to LBB broken down by MOF, ALN, the administrative support services, and functional support areas outlined above.

  By February 28, 2027, HHSC would be directed to provide an analysis to LBB, the House Committee on Appropriations, and the Senate Finance Committee of any additional costs or cost savings that HHSC would incur if it no longer provides administrative support services to DFPS broken down by MOF, ALN, and functional support area.

  By March 31, 2027, for administrative support services DFPS desires to provide or pay for on its own, DFPS would conduct a cost-benefit analysis to demonstrate whether it could provide the services on a cost-neutral basis. DFPS would provide this analysis to LBB, the House Committee on Appropriations, and the Senate Finance Committee along with a report outlining which functions it would request to perform internally, outsource to a vendor, or contract with HHSC to perform.

  As a part of the budget process, LBB would review and confirm whether the transfer of desired administrative support services is cost neutral to the state and provide recommendations to the House Committee on Appropriations and Senate Finance Committee during the 90th Legislative Session in 2027. Transfer of any services authorized by the Legislature would begin in fiscal year 2028.

- **Periodic detailed cost estimate to facilitate future transfers of services.** In addition to any other budgetary reporting requirements, by September 30, 2028, September 30, 2032, and every six years

thereafter starting in 2038, upon the request of DFPS, HHSC would provide DFPS and LBB a cost estimate for the following biennium that includes the projected costs of providing additional administrative support services to DFPS or of resuming administration of administrative support services previously transferred. DFPS would be required to submit any requests for a cost estimate from HHSC by February 1, 2028, February 1, 2032, and every six years thereafter. DFPS would submit its requests for any changes to LBB by January 15, 2029, January 15, 2033, and every six years thereafter. This estimate would facilitate consideration of potential transfers of administrative support services beginning in fiscal years 2030, 2034, and every six years thereafter.

This recommendation would allow DFPS to make better strategic use of its resources, ensure its program needs are met, and deliver critical services to children and families in a timely and effective manner. This recommendation would also ensure the Legislature has adequate oversight and approval authority for any services that may be transferred.

### 5.2 Eliminate the 90-day efficiency audit requirement in favor of the SAO's efficiency audit.

This recommendation would require DFPS to collaborate with SAO and LBB to establish the scope of SAO's efficiency audit under Chapter 327, Texas Government Code, while eliminating the requirement for DFPS to conduct its own 90-day efficiency audit. As part of this recommendation, statute would authorize SAO's efficiency audit to consider investigating the outcomes that would continue to be listed in Section 40.045(h)(1), Texas Human Resources Code:

- Ensuring the safety of children in placements.
- Preventing entry into foster care through the use of family preservation services.
- Reducing the amount of time that a child is placed in substitute care and is in DFPS conservatorship.
- Increasing the placement of children with relative or kinship caregivers when possible.
- Ensuring sufficient state capacity for foster care and kinship placements.
- Reducing the number of children who age out of care and enhancing support for youth at risk of aging out of care.
- Increasing the reunification of children with their biological parents when possible.

Leveraging SAO's expertise and the existing cadence and mandate for agency efficiency audits to evaluate the areas listed above and establishing a broader timeline would ensure adequate time and attention are given to evaluate whether DFPS is achieving these desired outcomes.

## *Management Action*

### 5.3 Direct DFPS to formalize its FITS process for identifying residential child care providers that pose a safety concern to children in their care and collaborate with HHSC to ensure routine participation in FITS meetings.

This recommendation would direct DFPS to develop a formal FITS process to govern the different workgroup meetings intended to monitor the performance and risk of residential child care providers that contract with DFPS or an SSCC. This recommendation would also direct DFPS to establish clear performance and risk criteria and objective thresholds for residential care operations that become eligible for entering, escalating within, and exiting FITS monitoring.

As part of this recommendation, DFPS should work with HHSC to ensure continued coordination between DFPS, SSCCs, and HHSC in the FITS process when contract or licensing action is needed, including but not limited to information sharing and participation by both DFPS and HHSC staff in SSCC FITS meetings. As part of this recommendation, DFPS would also evaluate how SSCCs should formally participate in FITS meetings for improved consistency in provider oversight and decision making. For clarity, this recommendation only applies to the FITS processes addressed in the finding and does not contemplate modifying FITS processes associated with Heightened Monitoring.

### 5.4 Direct DFPS to formalize the placement disallowance process and establish regular communication with CPAs.

This recommendation would direct DFPS to develop a formal placement disallowance process and re-allowance process for foster homes and CPAs. As part of this recommendation, DFPS would establish clear procedures and risk criteria to indicate when the foster home or CPA should be subject to placement disallowance and when the disallowance should be removed. These procedures would include objective criteria that also account for risks identified through the professional judgment of DFPS staff and leadership. This recommendation would also direct DFPS to share this information with foster homes and CPAs and publish it on the DFPS website.

As part of this recommendation, DFPS should also establish clear procedures for communicating with foster homes being considered for disallowance and their CPAs throughout the disallowance review process and the re-allowance review process. DFPS should also provide a CPA with summary information about its disallowed foster homes, including the reasons for disallowance, status of re-allowance requests, and disposition of those requests. Standardized procedures and clear communications would improve transparency, help CPAs better understand common reasons for placement disallowance, and allow providers to identify and address recurring issues before additional foster homes become ineligible for placement.

## Fiscal Implication

Recommendation 5.1 would not have a significant fiscal impact to the state. The Legislature already appropriates administrative support service funds to DFPS through the General Appropriations Act. The proposed statutory change would provide DFPS with the flexibility to determine how to acquire administrative support services on a cost-neutral basis.

Recommendation 5.2 to eliminate the required 90-day efficiency audit would result in a one-time savings to the state of approximately $150,000 in fiscal year 2030 when the next efficiency audit would otherwise be required. DFPS currently pays for the audit using existing appropriations for administrative and internal audit functions. Eliminating the audit requirement would allow the agency to redirect these funds to other priorities.

Recommendations 5.3 and 5.4 would not have a significant fiscal impact to the state and can be implemented within existing resources.

**Department of Family and Protective Services**

| Fiscal Year | Savings to the General Revenue Fund |
|---|---|
| 2028 | - |
| 2029 | - |
| 2030 | $150,000 |
| 2031 | - |
| 2032 | - |

1 Chapter 198 (HB 2292), Acts of the 78th Legislature, Regular Session, 2003; Chapter 837 (SB 200), Acts of the 84th Legislature, Regular Session, 2015; and Chapter 316 (HB 5), Acts of the 85th Legislature, Regular Session, 2017.

2 All citations to Texas statutes are as they appear on http://www.statutes.capitol.texas.gov/. Section 40.058, Texas Human Resources Code; and Section 524.0202, Texas Government Code.

3 Section 40.042(a) and (d), Texas Human Resources Code; and DFPS, "Child Care Investigations (CCI)," accessed online July 30, 2026, https://www.dfps.texas.gov/Investigations/CCI/.

4 SB 200, 2015; HHSC, "Child Care," accessed online July 30, 2026, https://www.hhs.texas.gov/services/family-safety-resources/child-care.

5 Section 42.001, Texas Human Resources Code.

6 SB 200, 2015.

7 HB 5, 2017; Texas House of Representatives, House Committee Report, 1st Printing, Bill Analysis, HB 5, 2017, p. 1.

8 Section 40.058(i), Texas Human Resources Code.

9 Cambridge Dictionary, definition of "cost effective," accessed on August 5, 2026, https://dictionary.cambridge.org/us/dictionary/english/cost-effective; and Merriam-Webster Dictionary, definition of "cost effective," accessed on August 5, 2026, https://www.merriam-webster.com/dictionary/cost-effective.

10 Section 40.058(j), Texas Human Resources Code.

11 Section 40.045(a)-(b), Texas Human Resources Code.

12 Section 40.045(g), Texas Human Resources Code.

13 Section 327.002, Texas Government Code.

14 Section 327.004, Texas Government Code.

15 DFPS, *Child Protective Services Handbook*, Section 4222.1, October 2020, accessed online July 6, 2026, https://www.dfps.texas.gov/handbooks/CPS/Files/CPS_pg_4000.asp#CPS_4222.1.

# Issue 6 | Texas Has a Continuing Need for DFPS.

## Background

Texas has long maintained a state-level system to protect children, elderly adults, and adults with disabilities from abuse, neglect, and exploitation. Federal legislation in the 1970s established funding to states for the protection of children from abuse and neglect, with additional federal legislation supporting the protection of elderly adults from abuse, neglect, and exploitation passed in 2010.[1]

The Texas Legislature created the Department of Protective and Regulatory Services in 1991, consolidating responsibilities for Child Protective Services (CPS) and Adult Protective Services (APS) and transferring child care licensing from the Department of Human Services.[2] In 2003, the Legislature renamed the agency the Department of Family and Protective Services (DFPS) and placed it under the oversight of the Health and Human Services Commission (HHSC).[3] Following the transformation of the health and human services system between 2015 and 2017, lawmakers established DFPS as a stand-alone agency, transferring child care licensing to HHSC.[4] DFPS' core mission has remained consistent despite these structural changes: to protect the state's most vulnerable populations. DFPS will be abolished on September 1, 2027, unless continued by the Legislature.[5]

## Findings

### The state has a continuing need to protect its most vulnerable populations from harm.

The state has a continuing responsibility to protect children, elderly adults, and adults with disabilities from abuse, neglect, and exploitation. Key functions to support this responsibility include investigating allegations of abuse, neglect, and exploitation and ensuring appropriate services are provided to address identified risks and prevent further harm. Carrying out these functions at the state level promotes consistency in investigations and service delivery across regions and enables Texas to meet federal requirements to continue receiving child welfare and protective services funding.

The state's protective role remains essential.

- **Child protection.** The duty to protect children from abuse and neglect remains a core state responsibility. Texas has the second largest population of children under the age of 18 in the country, and this number is growing, totaling over 7.4 million at the end of fiscal year 2025.[6] The agency investigates reports received through the 24/7 Texas Abuse Hotline and determines whether children are safe in their homes, provides services to address risks, or removes children into the conservatorship of the state when necessary. In fiscal year 2025, Child Protective Investigations (CPI) completed over 141,000 investigations and confirmed abuse and neglect in approximately 34,000 cases.

  In addition to investigating reports of abuse and neglect, DFPS administers a continuum of services aimed at keeping families safely together and

achieving permanency for children who cannot remain at home. In the past decade, the number of children in DFPS' care has significantly decreased due to state legislation and a series of policy changes focused on preventive services. These initiatives have shifted the agency's role from primarily managing children in foster care to implementing front-end, diversion-focused services such as Alternative Response and Texas Family First within DFPS' Family-Based Safety Services, which aim to reduce removals when it is safe and appropriate to do so.

DFPS' provider oversight is critical to meeting client needs.

The state also oversees foster care and adoption services that rely on contracted providers to deliver services at the regional level. In Community-Based Care (CBC) regions, DFPS contracts with Single Source Continuum Contractors (SSCC) to provide placement, case management, and support services for children, youth, and young adults in the state's conservatorship or in extended foster care as well as support for their families. Across Texas, DFPS contracts with multiple service providers to offer post-adoption services to support children and their families in working through the trauma of abuse, neglect, and the loss of their birth family, while also assisting adoptive families with periodic and ongoing adjustments to adoption. Available support includes but is not limited to individual and family counseling, crisis intervention, parent training, and behavioral and mental health services. DFPS is responsible for maintaining state oversight of contracted providers to ensure client needs are effectively served.

- **Protection of vulnerable adults.** The state has a continuing duty to protect elderly adults and adults with disabilities from abuse, neglect, and exploitation, including cases of self-neglect. In fiscal year 2025, about 4.9 million Texans were aged 65 years or older, and close to 2 million Texans aged 18 to 64 years had a disability, representing a large at-risk population.

Elderly adults and adults with disabilities face heightened safety risks.

Elderly adults and adults with disabilities often face heightened safety risks due to physical, cognitive, or social limitations and may lack the ability or resources to seek help independently. DFPS ensures their safety and well-being by investigating allegations of abuse, neglect, and exploitation when the adult, or client, lives in their own home or in a setting not investigated by another state agency such as an unlicensed adult foster home or unlicensed board and care home. When appropriate, DFPS coordinates or provides services to mitigate immediate threats to a client's health and safety.

In fiscal year 2025, APS conducted about 83,000 investigations and provided services to over 35,000 clients across the state. These services may include making arrangements for home care, enrolling clients in health care, arranging for psychiatric and health evaluations, and other social services as needed. DFPS focuses not only on identifying harm but also connecting clients with services that address underlying conditions and reduce the likelihood of future harm.

### DFPS remains the most appropriate agency to perform protective services functions.

Sunset staff considered whether transferring DFPS' functions to another state agency such as HHSC would improve efficiency or service delivery. Sunset staff determined no substantial benefits would result from moving these functions and that doing so could weaken the state's ability to carry out its protective services mission. The Legislature has already authorized DFPS' role as a stand-alone agency after narrowing its focus to investigations and protective services for vulnerable children and adults.

DFPS' core functions are distinct from the broader programs administered by HHSC and would be at risk of getting lost in the shuffle if housed within a larger system. Furthermore, as Texas expands the CBC model for children in foster care, DFPS' role has become increasingly centered on overseeing contractors and ensuring adequate system performance. This responsibility requires the agency to clearly communicate contractors' roles and responsibilities and establish a clear reporting structure for quick action when needed. Maintaining DFPS as a stand-alone agency preserves the focus and accountability needed to respond to high-risk, time-sensitive cases involving vulnerable populations.

DFPS' focus on oversight, investigations, and protective services prioritizes safety for vulnerable populations.

### While organizational structures vary, all 50 states provide protective services for children and vulnerable adults.

Across the country, states organize child welfare and adult protective services in different ways, but all 50 states maintain systems to investigate reports of abuse, neglect, and exploitation and provide protective services when needed.

- **Child protection.** States take varying approaches to administering child welfare services, including centralizing functions within a single agency or distributing functions across multiple entities. Some states house child welfare within broader health and human services agencies while others, like Texas, maintain a stand-alone agency. Regardless of structure, all states uphold core responsibilities for investigating abuse and neglect and ensuring child safety.

  All states contract out some form of direct child welfare services, and some have expanded the use of privatized or community-based care models for case management and service delivery. However, no state has privatized the core governmental functions of investigating child abuse and neglect. Investigating allegations of abuse and neglect and making removal decisions remain state responsibilities.

All states contract out some child welfare services.

- **Protection of vulnerable adults.** States' APS programs vary more significantly in their organizational placement than child protection programs. In some states, APS is housed within aging or disability agencies; in others, it is part of a broader health and human services system or part of a stand-alone agency, like Texas. Despite these differences, all states maintain functions to receive reports, investigate allegations of abuse, neglect, and exploitation, and coordinate services to protect vulnerable

adults. These programs generally require close coordination with other systems and service providers, including health care, law enforcement, and social services, regardless of where they are housed.

### DFPS' statute does not reflect standard language typically applied across the board during Sunset reviews.

The Sunset Commission has developed a set of standard recommendations that it applies to all state agencies being reviewed unless an overwhelming reason exists not to do so.[7] These across-the-board recommendations (ATB) reflect an effort by the Legislature to enact policy directives to prevent problems from occurring instead of reacting to problems after the fact. ATBs are statutory administrative policies adopted by the Sunset Commission that contain "good government" standards. The ATBs reflect review criteria contained in the Sunset Act designed to ensure open, responsive, and effective government.

DFPS' statute lacks some provisions related to conflicts of interest and complaints.

- **Conflicts of interest.** DFPS' statute lacks specific provisions defining a trade association, prohibiting the agency's general counsel from being a registered lobbyist, and prohibiting high-ranking agency employees and their spouses from being officers, employees, or paid consultants of a Texas trade association. Including these provisions would help prevent agency leadership from having conflicting interests when serving on behalf of the agency.
- **Complaint information.** DFPS' statute contains language requiring the agency to maintain complete information on complaints and make information on complaint procedures available to the public.[8] However, DFPS' statute does not specify the agency may not inform parties of the status of complaints if doing so would jeopardize an ongoing investigation. Including this provision would help ensure complaints are fully investigated to protect the public.

### DFPS has some reporting requirements that need to be modified or abolished.

The Sunset Act requires the Sunset Commission to evaluate whether the reporting requirements of agencies under review need to be continued or abolished.[9] The Sunset Commission has interpreted these provisions as applying to reports that are specific to the agency and not general reporting requirements that extend well beyond the scope of the agency under review. Reporting requirements with deadlines or reporting requirements that have expiration dates are not included, nor are routine notifications, notices, or posting requirements.

State law requires DFPS to produce 23 reports that are specific to the agency. Appendix D provides a complete list of these reports and Sunset's analysis of them. Of these reports, Sunset staff identified four reports that should be modified and one report that should be abolished. Additionally, Issue 1 of this report discusses modifying two reports, abolishing a report, and establishing two new reports specific to CBC.

- **Foster care capacity needs plan.** Statute requires DFPS to develop a foster care capacity needs plan using data on regional placement availability but limits the requirement to regions where CBC has not been implemented.[10] As CBC expands statewide, excluding these regions limits the usefulness of the plan for comprehensive capacity planning. Statute should be modified to require the inclusion of all regions in the foster care capacity needs plan.

- **Report on the participation of foster children in drug research programs.** Statute requires DFPS to report annually on the participation of foster children in drug research programs.[11] The report includes the number of children participating, the purpose of each research program, and whether the court authorized participation. To date, however, no children in DFPS conservatorship have participated in drug research programs. Statute should be modified to require reporting only as needed rather than annually. This change would maintain legislative oversight if participation occurs, while eliminating unnecessary reporting when no activity exists.

- **DFPS annual regulatory report.** Statute imposes an annual reporting requirement on DFPS for its regulatory and licensing activities, which were previously transferred to HHSC in 2017.[12] Statute should be modified to require HHSC to provide this annual regulatory report rather than DFPS.

- **Business plan for CPS.** Statute requires DFPS to submit a biennial CPS business plan, including long- and short-term performance goals, priority projects, and ongoing initiatives in CPS.[13] The agency has been providing similar information in the *DFPS Annual Plan* but on a more comprehensive basis for the entire agency. DFPS would benefit from modifying this report to codify agency practice and ensure important information is shared publicly about all agency divisions.

Codifying the *DFPS Annual Plan* ensures the public has a comprehensive view of the agency.

- **Quarterly report of the quality assurance program for APS.** In 2005, the Legislature enacted a major redesign of APS, including requiring DFPS to submit quarterly reports on APS performance to enhance legislative oversight.[14] Over time, much of this information has become available through other reporting mechanisms such as the publication of the agency's Data Book on the DFPS website. As a result, this reporting requirement is no longer needed.

### DFPS has not historically complied with the statutory requirement to review its administrative rules every four years, resulting in outdated rules that do not reflect current agency functions and organization.

The Sunset Act directs the Sunset Commission to assess each agency's rulemaking process, including the extent to which agencies encourage public participation in rulemaking.[15] As part of this assessment, Sunset staff considers an agency's compliance with statutory requirements in the Administrative Procedure Act, including an agency's review and consideration of the continuing need for each of its rules every four years from the date each rule took effect.[16]

In 2003, in an effort to consolidate the health and human services system, the Legislature granted the HHSC executive commissioner sole policy and rulemaking authority for the entire system, including DFPS.[17] In 2017, lawmakers transferred rulemaking authority to DFPS with the DFPS commissioner serving as the sole rulemaking authority.[18] However, some rules were not reviewed for over 20 years between 2002 and 2025, with the exception of a 2020 review of APS rules. While DFPS recently performed a four-year rule review of all of its rules in 2025, the agency failed to use the review process to carefully consider the continuing need and appropriateness of its rules. The four-year rule review process is intended to be more than simply posting rules in the *Texas Register* for public comment before readoption. A meaningful rule review should consider whether the initial factual, legal, and policy reasons for adopting each rule are still relevant.[19] As part of this analysis, an agency should consider the practical experience the agency, stakeholders, and the public have had with each rule over the past four years.[20]

Some DFPS rules were not reviewed for over 20 years.

The agency's failure to regularly comply with this requirement and superficial rule review process results in stakeholders and members of the public having to comply with rules that do not accurately reflect current law or agency practice. Between March and April 2025, DFPS reviewed and readopted eight chapters of rules in their entirety without making a single change, even to update incorrect information, as shown in the *Examples of Unchanged Rules* textbox. As of August 2026, several of these rules have not been updated in over 10 years, despite describing important procedures related to investigations, child care regulation, and foster and adoptive homes that have been affected by the transfer of regulatory child care functions to HHSC in 2017.

**Examples of Unchanged Rules**

- Rule on court-related services eligibility references another rule that no longer reflects how court-related investigative services are provided.[21]
- Several rules continue to refer to DFPS' Child Care Licensing Division, which was transferred to HHSC in 2017. These rules should be reviewed to ensure they describe a process accurately reflecting DFPS' current role and the proper applicable legal definitions and requirements. These rules relate to the following topics:
  - Approval of foster and adoptive homes.[22]
  - Development of child service plans according to minimum standards.[23]
  - Definitions related to emergency behavior intervention.[24]
  - Release of information on child care licensing regulatory activities.[25]
- Several rules describing the rulemaking process have not been updated since 1992, which currently describe the process as taking place before the former Board of Protective and Regulatory Services that no longer exists.[26] One of these rules describes obtaining a tape recording of a public rulemaking hearing for $2.[27]

## One of DFPS' statutory advisory committees has expired by operation of law but is still needed.

Under the Sunset Act, an agency's advisory committees are abolished on the same day as the agency unless expressly continued by law, but continuing the agency does not automatically continue its advisory committees by extension.[28] Additionally, other law provides that a statutory advisory committee expires four years after the date it was established unless either: 1) statute exempts the advisory committee from that provision, or 2) the agency sets a later date for expiration in rule.[29] Agencies may also have authority to create advisory committees in rule, some of which may be subject to the same four-year limitation. As a result, Sunset must sometimes determine whether an advisory committee should be continued. DFPS has two advisory committees in statute, as described in the table below, *DFPS' Statutory Advisory Committees*.

**DFPS' Statutory Advisory Committees**

| Committee | Purpose | Membership | Statute |
|---|---|---|---|
| Child Protective Investigations Advisory Committee | Advises the DFPS commissioner on improving the quality and consistency of investigations through practice and policy recommendations. | Currently has 13 members, including DFPS officials, appointees from state leadership, judicial representation, frontline investigative staff, and individuals with lived or professional experience. | Section 40.031, Texas Human Resources Code |
| Data Access and Standards Governance Council | Assists the DFPS-SSCC relationship through discussion of data governance topics such as data access, data quality, and common data standards. | Members include SSCCs with an active contract and DFPS employees who provide data, legal, information technology, and child protective services. | Section 264.159, Texas Family Code |

The Child Protective Investigations Advisory Committee has a clear statutory expiration date and still serves the important purpose of improving accuracy and standardization of child abuse and neglect investigations.[30] As a result, this committee should be continued. The Data Access and Standards Governance Council was established in statute in 2017 and did not include a specific duration.[31] DFPS did not provide a later expiration date for the council in rule and as a result, the council is expired by operation of law. Although expired, the need for the council remains critical to develop protocols for the electronic transfer of data from SSCCs to DFPS, including protocols for the access, management, and security of electronically shared case data that enable SSCCs to perform case management functions. As a result, this committee should also be continued.

# Sunset Staff Recommendations

## *Change in Statute*

### 6.1 Continue DFPS for 12 years and remove the Sunset date of the agency's enabling statute.

This recommendation would continue DFPS until September 1, 2039, and would also remove the Sunset date of the agency's statute to ensure only the agency, not its statute, expires.

### 6.2 Apply the standard across-the-board requirement regarding conflicts of interest.

This recommendation would define "Texas trade association;" prohibit high-level agency employees from being an officer, employee, or paid consultant of a Texas trade association; and prohibit high-level employees' spouses from being an officer, manager, or paid consultant of a Texas trade association. It would also update statute to prohibit the agency's general counsel from being a registered lobbyist.

### 6.3 Update the standard across-the-board requirement related to developing and maintaining a complaints system and making information on complaint procedures available to the public.

This recommendation would update the statutory language requiring DFPS to develop and maintain a complaints system and make information on complaint procedures available to the public, specifying DFPS may not notify complaint parties of the status of complaints if doing so would jeopardize an ongoing investigation.

### 6.4 Modify four and abolish one of DFPS' reporting requirements.

This recommendation would modify the requirements of four reports and abolish one report. Specifically, this recommendation would:

- Modify the foster care capacity needs plan to require inclusion of all regions to ensure comprehensive statewide planning.
- Modify the report on foster children's participation in drug research programs to require DFPS to submit the report only as needed rather than annually.
- Modify the annual regulatory report to require HHSC, rather than DFPS, to provide this report.
- Modify the business plan for CPS report to codify agency practice of developing and publishing the *DFPS Annual Plan* by February 1 of each year on its website, where the annual plan would include updates on progress toward long- and short-term performance goals, a summary of major accomplishments and outcomes achieved during the preceding year, key priorities and initiatives for the upcoming year, information regarding programmatic, operational, or strategic improvements, and other information the agency determines necessary to communicate agency performance and priorities.
- Abolish the quarterly report of the quality assurance program for APS.

### 6.5 Continue the Child Protective Investigations Advisory Committee.

This recommendation would continue the CPI Advisory Committee, which is active and continues to serve an ongoing need.

### 6.6 Continue the Data Access and Standards Governance Council and exempt it from automatic abolishment.

This recommendation would continue the Data Access and Standards Governance Council and exempt it from automatic abolishment under Chapter 2110 of the Texas Government Code.

### *Management Action*

### 6.7 Direct DFPS to adopt a rule review plan.

This recommendation would direct DFPS to develop and adopt a rule review plan to help ensure the agency complies with the statutory requirement to regularly review its rules every four years, including determining whether the initial reasons for adopting the rules continue to exist. The plan should include a schedule indicating when each chapter of rules will be reviewed so all rules are reviewed in a timely manner. DFPS would adopt and submit the plan to the Sunset Commission by May 1, 2027. The agency should also post the plan on its website to ensure stakeholders and the public are aware of upcoming opportunities to provide input on rule changes. Finally, DFPS should file its rule review plan with the Office of the Secretary of State for publication in the *Texas Register*.[32]

## Fiscal Implication

Continuing DFPS would require an annual appropriation from the Legislature, which was about $2.4 billion in fiscal year 2025.

1 Child Abuse Prevention and Treatment Act, 42 U.S. Code, Sections 5101-5119c; and Elder Justice Act, 42 U.S. Code, Sections 1397-1397n-13.

2 Chapter 15 (HB 7), Acts of the 72nd Legislature, 1st Called Session, 1991.

3 Chapter 198 (HB 2292), Acts of the 78th Legislature, Regular Session, 2003.

4 Chapter 316 (HB 5), Acts of the 85th Legislature, Regular Session, 2017; and Chapter 837 (SB 200), Acts of the 84th Legislature, Regular Session, 2015.

5 All citations to Texas statutes are as they appear on http://www.statutes.capitol.texas.gov/. Section 40.003, Texas Human Resources Code.

6 U.S. Department of Health and Human Services, *Children's Bureau: Child Welfare Outcomes Report Data*, accessed online May 21, 2026, https://cwoutcomes.acf.hhs.gov/cwodatasite/population/index/.

7 Sunset Advisory Commission, "Across-the-Board Policies," https://www.sunset.texas.gov/across-board-policies.

8 Section 40.0041(a)(4), Texas Human Resources Code.

9 Sections 325.0075, 325.011(13), and 325.012(a)(4), Texas Government Code.

10 Section 264.1261(d), Texas Family Code.

11 Section 266.0041(l), Texas Family Code.

12 Section 42.023, Texas Human Resources Code.

13 Section 40.05275(d), Texas Human Resources Code.

14 Section 40.0515(g), Texas Human Resources Code.

15 Section 325.011(8), Texas Government Code.

16 Section 2001.039, Texas Government Code.

17 HB 2292, 2003.

18 HB 5, 2017.

19 Ronald L. Beal, *Texas Administrative Practice and Procedure*, New York: Matthew Bender & Company, 2018, pp. 36-37.

20 Ibid.

21 40 Texas Administrative Code (TAC), Part 19, Chapter 700, Subchapter K, Section 700.1101 (1992) (DFPS, *Eligibility and Priorities*).

22 40 TAC, Part 19, Chapter 700, Subchapter O, Sections 700.1501-700.1504 (DFPS).

23 40 TAC, Part 19, Chapter 700, Subchapter M, Division 1, Section 700.1321 (2012) (DFPS, *What are the requirements for a child service plan?*).

24 40 TAC, Part 19, Chapter 700, Subchapter M, Division 2, Section 700.1355 (2016) (DFPS, *What is a "significant event" requiring notice pursuant to this division?*).

25 40 TAC, Part 19, Chapter 702, Subchapter D, Section 702.317 (2010) (DFPS, *Does the department have other rules providing for the release of information relating to a child abuse or neglect investigation or child-care licensing regulatory activities that are not covered by this subchapter?*).

26 40 TAC, Part 19, Chapter 730, Subchapters B-D, Sections 730.101-730.305 (DFPS).

27 40 TAC, Section 730.305.

28 Section 325.013, Texas Government Code.

29 Section 2110.008, Texas Government Code.

30 Section 40.031, Texas Human Resources Code.

31 Section 264.159, Texas Family Code.

32 1 TAC, Part 4, Chapter 91, Subchapter D, Section 91.72(a) (2003) (Office of the Secretary of State, *Plan to Review*).

# Appendix A

## Historically Underutilized Businesses Statistics, FYs 2023-25

The Legislature has encouraged state agencies to increase their use of historically underutilized businesses (HUBs) to promote full and equal opportunities for all businesses in state procurement. The Legislature also requires the Sunset Commission to consider agencies' compliance with laws and rules regarding HUB use in its reviews.[1]

The following material shows trend information for the Department of Family and Protective Services' use of HUBs in purchasing goods and services. The agency maintains and reports this information under guidelines in statute.[2] In the charts, the dashed lines represent the goal for HUB purchasing in each category, as established by the Office of the Comptroller of Public Accounts. The diamond lines represent the percentage of agency spending with HUBs in each purchasing category from fiscal years 2023-25. Finally, the number in parentheses under each year shows the total amount the agency spent in each purchasing category.

The agency did not spend any funds in the heavy construction or building construction categories. The agency fell below the statewide purchasing goals for HUB spending in the special trade and professional services categories in each of the last three fiscal years and for the commodities category in fiscal year 2025. The agency exceeded statewide purchasing goals for the other services category in each of the last three fiscal years and for the commodities category in fiscal years 2023 and 2024.




The agency failed to meet the statewide goal for HUB spending in special trade in each of the last three fiscal years.




The agency failed to meet the statewide goal for HUB spending in professional services in each of the last three fiscal years.

## *Appendix A*




The agency exceeded the statewide goal for HUB spending in other services in each of the last three fiscal years.




The agency exceeded the statewide goal for HUB spending in commodities in fiscal years 2023 and 2024 but failed to meet the goal in fiscal year 2025.

---

1 All citations to Texas statutes are as they appear on https://statutes.capitol.texas.gov/. Section 325.011(9)(B), Texas Government Code.

2 Chapter 2161, Texas Government Code.

# Appendix B | Equal Employment Opportunity Statistics, FYs 2023-25

In accordance with the requirements of the Sunset Act, the following material shows trend information for the employment of minorities and women in all applicable categories by the Department of Family and Protective Services.[1] The agency maintains and reports this information under guidelines established by the Texas Workforce Commission.[2] In the charts, the dashed lines represent the percentages of the statewide civilian workforce for African Americans, Hispanics, and women in each job category.[3] These percentages provide a yardstick for measuring agencies' performance in employing persons in each of these groups. The diamond lines represent the agency's actual employment percentages in each job category from fiscal years 2023-25.

In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans in each category. The agency nearly met or exceeded the statewide civilian workforce percentages for Hispanics in each year in the administration, professional, administrative support, and protective services categories, fell below in fiscal year 2023 in the technical category, and fell below in each year in the service/maintenance category. The agency exceeded the statewide civilian workforce percentages for women in each year in all categories except technical. The agency had too few employees in the skilled craft category to conduct a meaningful comparison to the overall civilian workforce.

## Administration




The agency nearly met or exceeded civilian workforce percentages in all three categories in each of the last three fiscal years.

# *Appendix B*

## Professional




The agency exceeded the statewide civilian workforce percentages for all three reported groups in each of the last three fiscal years.

## Technical




The agency exceeded the statewide civilian workforce percentages in each of the last three fiscal years for African Americans but failed to meet the percentages for women. The agency exceeded the percentages for Hispanics in fiscal years 2024 and 2025 but fell just short in fiscal year 2023.

# *Appendix B*

## Administrative Support




The agency exceeded the statewide civilian workforce percentages for all three reported groups in each of the last three fiscal years.

## Protective Services




The agency nearly met or exceeded the statewide civilian workforce percentages for all three reported groups in each of the last three fiscal years.

# *Appendix B*

## Service/Maintenance




The agency exceeded the statewide civilian workforce percentages in each of the last three fiscal years for African Americans and women but failed to meet the percentages for Hispanics.

[1] All citations to Texas statutes are as they appear on http://www.statutes.capitol.texas.gov/. Section 325.011(9)(A), Texas Government Code.

[2] Section 21.501, Texas Labor Code.

[3] Based on the most recent statewide civilian workforce percentages published by the Texas Workforce Commission.

# Appendix C | State Conservatorship Timeline[1]

**Parental Child Safety Placement**

Before DFPS can ask for removal, the agency must first attempt to find voluntary out-of-home placement with a relative or family friend. DFPS may also use voluntary placement during the investigation.

---

## Day 1

**Emergency Hearing**

Court hears from DFPS and grants temporary custody of the child and approves removal from the home if the court finds an immediate danger to the child in the home that cannot be mitigated.

## Day 14

**Adversary Hearing**

Court hears from parents and must return the child unless the court finds a continuing risk of substantial danger.

## Day 60

**Status Hearing**

Court reviews family service plan.

## Day 180

**Permanency Hearing**

Court checks the child's placement and parent progress on the family service plan. The hearing recurs every 120 days until the case is dismissed or permanent custody is granted to DFPS. Court must return the child unless the court finds continuing danger.

## Day 365

**Final Trial**

Court must issue a final order on child's custody by this day unless a six-month extension is granted.

**Placement Hearing**

If the child is in DFPS permanent custody, court checks the child's placement every 180 days until the child is no longer in DFPS permanent custody.

1 All citations to Texas statutes are as they appear on http://www.statutes.capitol.texas.gov/. Chapters 262 and 263, Texas Family Code.

# Appendix D | DFPS Reporting Requirements

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 1. Annual Child Fatality Report | Section 261.204, Texas Family Code | Requires an aggregated report compiled from each child fatality investigation for which the agency made a finding regarding abuse and neglect, including cases in which the agency determined the fatality was not the result of abuse and neglect.<br><br>*Not later than March 1 of each year.* | Published on agency website | Continue |
| 2. Evaluation of Family Preservation Services Pilot Program | Section 262.417, Texas Family Code | Reports the evaluation of the family preservation services pilot program's implementation and progress by a contracted independent entity.<br><br>*One year after pilot program starts and every two years afterward.* | Legislative standing committees | Continue |
| 3. Report on Child Protection Statistics by County Level | Section 264.017(a)-(c), Texas Family Code | Reports statistics by county relating to key performance measures and data elements for child protection.<br><br>*Not later than December 1 of each year.* | Published on agency website | Continue |
| 4. Pregnant and Parenting Foster Youth | Section 264.017(b)(11), Texas Family Code | Reports on the number of children who are pregnant or a parent while in Department of Family and Protective Services (DFPS) managing conservatorship.<br><br>*Not later than December 1 of each year.* | Legislature and published on agency website | Continue |
| 5. Children and Youth Missing from DFPS Conservatorship and Human Trafficking Data | Section 264.017(b)(12)-(13), Texas Family Code | Reports on the number of children in DFPS managing conservatorship who are missing from their substitute care provider and who are victims of trafficking.<br><br>*Not later than December 1 of each year.* | Legislature and published on agency website | Continue |
| 6. Children Whose Deaths Resulted from Abuse and Neglect | Section 264.017(b)(4)-(5), Texas Family Code | Reports on the number of children in the state who died as a result of child abuse and neglect, including children in DFPS managing conservatorship.<br><br>*Not later than December 1 of each year.* | Legislature and published on agency website | Continue |
| 7. Abused or Neglected Children Whose Deaths Did Not Result from Abuse and Neglect | Section 264.017(e), Texas Family Code | Reports on the number of children who died during preceding year who had been abused or neglected but whose death was not the result of the abuse and neglect.<br><br>*Not later than December 1 of each year.* | Legislature and published on agency website | Continue |

## Appendix D

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 8. Children Placed Under a Parental Child Safety Placement Report | Section 264.017(f), Texas Family Code | Reports on required information relating to Parental Child Safety Placement agreements.<br><br>*Monthly.* | Published on agency website | Continue |
| 9. Collection and Reporting of Alcohol and Controlled Substance Statistics | Section 264.019, Texas Family Code | Requires DFPS to collect information related to children who tested positive at birth for the presence of alcohol or a controlled substance, and parents who test positive for a controlled substance during an investigation.<br><br>*Not later than November 1 of each year.* | Legislature and published on agency website | Continue |
| 10. Collection and Reporting of Information on Children Who Are Missing or Victims of Sex Trafficking | Section 264.123(g)-(h), Texas Family Code | Requires DFPS to collect and report information on children in DFPS managing conservatorship who are missing from their substitute care provider and who are victims of sex trafficking.<br><br>*Annually.* | Published on agency website | Continue |
| 11. Foster Care Capacity Needs Plan | Section 264.1261, Texas Family Code | Requires DFPS to use data collected on foster care capacity needs and regional availability of each type of foster care and kinship placement to develop a plan to address the substitute care capacity needs in regions where Community-Based Care (CBC) has not been implemented.<br><br>*Annually.* | Published on agency website | Modify to include all regions of the state, Rec. 6.4 |
| 12. Community-Based Care Implementation Plan | Section 264.153, Texas Family Code | Reports the agency's expectations, goals, and approach to implementing CBC, including a timeline for implementing CBC throughout the state and updates on progress toward the agency's goals.<br><br>*Annually.* | Published on agency website | Modify to replace timeline requirement with procurement plan, Rec. 1.6 |
| 13. List of Single Source Continuum Contractors (SSCCs) and Corporate Structure | Section 264.154(d), Texas Family Code | Requires DFPS to post a list of SSCCs and their full corporate structure.<br><br>*Annually.* | Published on agency website | Continue |
| 14. Annual SSCC Performance Reviews | Section 264.155, as amended by SB 1398, Texas Family Code | Requires DFPS to assess SSCC performance annually.<br><br>*Annually.* | Published on agency website | Modify when financial remedies and incentives should be imposed, Rec. 1.4 |

## *Appendix D*

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 15. Quarterly Report on Community-Based Care Implementation | Section 264.172(f), Texas Family Code | Reports an update on implementation of CBC in the state.<br><br>*At least once each calendar quarter.* | Legislature | Abolish in favor of new *CBC Annual Report*, Rec. 1.8 |
| 16. Rural Community-Based Care Pilot Program Annual Implementation Report | Section 264.196, Texas Family Code | Reports on the implementation of the pilot program, including any findings and recommendations from an independent evaluator and information about denied waivers and agreed-upon change orders.<br><br>*Not later than December 1, 2028, and annually thereafter.* | Legislature | Continue |
| 17. Report on Child Fatality and Near Fatality Data | Section 264.5032, Texas Family Code | Requires an aggregated report compiled from information relating to child fatality and near fatality cases resulting from child abuse and neglect.<br><br>*May be published with Annual Child Fatality Report.* | Published on agency website | Continue |
| 18. Relative and Other Designated Caregiver Placement Program Report | Section 264.762, Texas Family Code | Reports data on permanency outcomes for children placed with relatives or other designated caregivers.<br><br>*Not later than September 1 of each year.* | Published on agency website | Continue |
| 19. Report on the Participation of Foster Children in Drug Research Programs | Section 266.0041(l), Texas Family Code | Reports on information related to foster children who participated in a drug research program.<br><br>*Annually.* | Governor, Lieutenant Governor, Speaker of the House, and Legislative standing committees | Modify to be required as needed instead of annually, Rec. 6.4 |
| 20. Quarterly Report of Quality Assurance Program for Adult Protective Services | Section 40.0515(g), Texas Human Resources Code | Reports on a comprehensive review of Adult Protective Services' overall performance and a summary of outcome measure performance.<br><br>*Each fiscal quarter.* | Governor, Lieutenant Governor, and Speaker of the House | Abolish, Rec. 6.4 |
| 21. Report on Child Protection Statistics by State and County Level | Section 40.0516, Texas Human Resources Code | Requires DFPS to collect and report statistics by state and county level relating to child protection.<br><br>*Not later than February 1 of each year.* | Published on agency website | Continue |
| 22. Business Plan for Child Protective Services | Section 40.05275, Texas Human Resources Code | Requires DFPS to develop and implement a business plan to prioritize Child Protective Services' activities and resources to improve the program.<br><br>*Not later than October 1 of each even-numbered year.* | Governor, Lieutenant Governor, Speaker of the House, and Legislative standing committees | Modify into *DFPS Annual Plan*, Rec. 6.4 |

## *Appendix D*

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 23. Annual Report on Regulation and Licensing | Section 42.023, Texas Human Resources Code | Reports on DFPS regulatory activities, which were transferred to HHSC in 2015.<br><br>*Annually.* | Provided to the public on request | Modify to require HHSC to provide this report, Rec. 6.4 |

# Appendix E | Staff Review Activities

During the review of the Department of Family and Protective Services (DFPS), Sunset staff engaged in the following activities that are standard to all Sunset reviews. Sunset staff worked extensively with agency personnel; attended advisory committee meetings; interviewed committee members; met with staff from key legislative offices; conducted interviews and solicited written comments from interest groups and the public; reviewed agency documents and reports, federal and state statutes, legislative reports, previous legislation, and literature; researched the organization and functions of similar agencies in other states; and performed background and comparative research.

In addition, Sunset staff performed the following activities unique to this agency:

- Surveyed current DFPS employees, Single Source Continuum Contractor (SSCC) staff, and stakeholders, including advocacy organizations, day care providers, residential care providers, and other service providers.
- Toured the Statewide Intake call center and observed the intake screening process.
- Participated in ride-alongs with investigators and caseworkers from Child Protective Investigations, Residential Child Care Investigations, Adult Protective Services, and Family-Based Safety Services.
- Visited regional DFPS offices and interviewed field staff in Region 1 (Lubbock), Region 3 (Arlington), Region 6 (Houston), and Region 8 (San Antonio).
- Visited with SSCC leadership and staff from Saint Francis Ministries (Region 1), 2INgage (Region 2), EMPOWER (Region 3E), Our Community Our Kids (Region 3W), 4Kids4Families (Region 4), Texas Family Care Network (Region 5), Texans Together (Regions 6A/6B), and Belong/SJRC Texas (Regions 8A/8B).
- Toured several types of provider facilities, including a behavioral health provider, a child advocacy center, a child-placing agency, an emergency shelter, a local mental health authority, a private psychiatric hospital, a residential treatment center, a general residential operation, and a transitional living center.
- Visited with a variety of agency stakeholders, including foster and kinship caregivers, former foster youth, parents, and members of the judiciary.
- Observed child protection court proceedings that included adversarial, status, and permanency hearings in Travis and Harris counties.
- Observed internal DFPS workgroup meetings with HHSC and SSCCs, including Facility Intervention Team Staffing meetings.
- Attended meetings for the Family and Protective Services Council, Partners for Children and Families Committee, Quad Agency Child Care Initiative, and Statewide Parental Collaboration Group.
- Attended the 2025 DFPS Adult Protective Services Conference.
- Interviewed staff from the Department of Information Resources, Health and Human Services Commission, Legislative Budget Board, Office of the Comptroller of Public Accounts, State

## *Appendix E*

Auditor's Office, State Office of Administrative Hearings, Texas Education Agency, Texas Workforce Commission, and Texas Juvenile Justice Department.

# Sunset Staff Review of the
# *Department of Family and Protective Services*


REPORT PREPARED BY

Senaida San Miguel, *Project Manager*

Astrid Alvarado

Will Bucknall

Anthony Ellis

Anthony Hernandez Escobar

John Mitchell Skinner

Jalisa Broussard

Robin T. Blackmon, *Project Supervisor*

---

Eric Beverly
*Executive Director*

*Sunset Advisory Commission*

**Location**
Robert E. Johnson Bldg., 6th Floor
1501 North Congress Avenue
Austin, TX 78701

**Mail**
PO Box 13066
Austin, TX 78711

**Website**
www.sunset.texas.gov

**Email**
sunset@sunset.texas.gov

**Phone**
(512) 463-1300