IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as | § | |
| Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' POST-HEARING BRIEF**

The plaintiff children respectfully submit this post-hearing brief regarding defendants' Rule 60 motion (Dkt. 1662) and their evidence and arguments at the October 20-21, 2026 hearing. Specifically, this brief responds to the State's characterization of data in the monitor reports at the hearing and in post-hearing submissions. Rather than rely on the accuracy of the Court monitors' findings, as the State had said it would, it has gone to considerable efforts to spin, explain away, and ignore the investigative results, conclusions, and concerns of the monitors and their staff.

To be sure, because of the mandated reforms and supervision of the Court and its monitors, the State has made notable improvements to its foster care system. But this vital reform is a work in progress. It is not complete, much less durably so. In particular, the transition to privatization is far from finished, and its scope and complexity put an undeniable strain on the system with real challenges still ahead. Given a system in dramatic flux, the State cannot show even that reforms already implemented are durable – and other reforms remain undone. When considering the extent of compliance with the reforms, the context of this complex system should be front and center.

This is why the independent monitor reports are so important. Prior to the hearing, the State said it accepted the monitors' findings as is and accurate. It embraced and validated the data, saying that it "is relying on the monitors' abundant and detailed reports—filed on the docket over many

years." Dkt. 1678 at 27 n.2. Given these representations, the monitors did not attend the hearing. There was no hint the State would try to discredit the monitors' methodologies or disregard their substantiated statistics, or that the State would present its own new methodologies and unsupported statistics. Rather, the State's position was that it had met or surpassed the mandates of the remedial orders – and the monitor reports and data unequivocably proved this as a matter of fact and law.

Regrettably, at the hearing and in post-hearing filings, the State has taken a different path to justify its Rule 60 motion. It has asserted facts that are not reliable, correct, or complete. It has ignored or misstated data in the monitor reports, picking and choosing what it does and does not like. When the reports support its position, the State insists that the numbers alone should be considered. But when the monitors' findings cut against its narrative of compliance, the State looks to the supposed context of the data or dismisses it as unreliable because the State evaluates itself "a little bit different than how the monitors" do. 10/20/26 Hr'g Tr. at 233:2-15.

Needless to say, we are at a critical junction in this landmark litigation. A decision on the Rule 60 motion will affect, in a positive way or badly, the lives of thousands of Texas children. If the State wins, reform no longer will be a priority, and supervision and monitoring of the system will end or be reduced. If the State loses, it has threatened yet another appeal of what it calls the "coerced" reforms. Plaintiffs submit this brief to respond to how statistics from monitor reports have been mis-presented and to provide them in their full, reliable context for consideration.

**1. Remedial Order 35: Caseloads and Master Conservatorship Workers**

After the hearing, the State filed an Advisory about caseloads and master conservatorship workers. *See* Dkt. 1723. Its representations should be taken with caution, as they often contradict what other State officials say in the Nov. 2026 Staff Report of the Sunset Advisory Commission on the Texas Department of Family and Protective Services. (Plaintiffs have moved to supplement

the record with this report as PX 118. *See* Dkt. 1725.) The Sunset report highlights several red flags with respect to the numbers and impact of caseloads and master caseworkers.

**A. Remedial Order 35 and child caseloads**

On December 17, 2019, the Court approved a caseload standard agreed by all parties for the number of children that caseworkers safely should carry. Dkt. 772. Any caseworker caseload exceeding 17 children would be outside the agreed standard and a cause for serious concern.

The system changes in the past seven years, with children in care needing *greater* services, have made this range an even more critical standard. Despite that, according to its Commissioner, DFPS no longer treats the 14-17 child caseload range as its standard. Rather, it considers caseloads in an 18-19 child range, even a 20-21 range, as *acceptable* for its long-overburdened staff. She made a point to highlight how many caseworkers in privatized regions fall "at that 20 or 21 and below" caseload number. 10/21/26 Hr'g Tr. at 267:23-268:11. In fact, she said, DFPS "might not choose to deploy master workers if we're looking at 18 or 19 cases" on average for a region. *Id.* This default to a child caseload of 18-21 is neither appropriate nor safe, particularly given how the system has changed since the 14-17 standard was agreed upon.

The State's efforts to minimize the impact of higher caseloads on caseworkers is directly contrary to the Sunset Commission's assessment of DFPS caseloads. First, the lack of an accurate workload baseline prevents DFPS from "determining whether caseloads should be further reduced to achieve realistic workload expectations." PX 118 at 72. The Report suggests that DFPS must do studies to "develop reasonable caseload guidance." *Id.* at 78. DFPS only counts the open cases assigned to a caseworker, "which may not accurately reflect the volume of work the caseworker is completing." *Id.* at 72. In fact, the Report stresses that per-child caseload counts *do not* reflect the true demands placed on caseworkers, according to "[n]ational child welfare standards." *Id.* at 73.

Texas conservatorship caseworkers face this burden every day. Their caseloads are so high they cannot mentor other caseworkers or be mentored. *Id.* at 73-74. “Unreasonable workload expectations” force them to work beyond normal working hours to meet deadlines, so there is no time to access wellness resources or prevent burnout. *Id.* at 74. These crushing expectations lead to high turnover, which causes investigation delays, lack of continuity in relationships for children and their caseworkers, and increased workload for remaining workers. *Id.* at 71. All in all, the agency’s willingness to continue overloading front-line caseworkers accelerates a vicious cycle of caseworker turnover where everyone loses: the State’s costs increase, children’s safety is put at risk, and staff burnout rages. *Id.* at 71. This is what the State itself has concluded.

DFPS also disregards how the needs of children in foster care have changed, resulting in a marked spike in the intensity of care. The 2026 Sunset Report notes that “as the state takes custody of fewer children, the population of children in foster care skews toward those who have experienced severe abuse or neglect and have greater needs.” PX 118 at 39. These children come into the system more fragile and in desperate need of more services. “As a result, the amount of casework needed to achieve permanency and ensure child safety is increasing on a per child basis because caseworkers spend more time on average coordinating placements and services for children with higher needs.” *Id*. Children with higher needs put a greater burden on caseworkers. This directly relates to how caseload numbers do not tell the whole story and supports that keeping caseloads lower – *not* raising them to 18-21 – should be a top priority for DFPS.

DFPS’s willingness to allow higher caseloads also ignores the ongoing structural upheaval in its system. The conversion to a privatized model is just beginning for many children. For regions of the state where conversion is starting, or has not started at all, there is no assurance of future compliance. For three regions of the state that have shifted to private providers, caseloads are high

and compliance is poor. Dkt. 1659 at 111-12 (11th Rpt.). While DFPS's compliance numbers are higher than those of private providers, shifting core casework responsibilities to contractors breaks the continuity on which sustained, systemic compliance would depend. In other words, recent compliance by *state* actors says nothing about the future performance of *private* entities.

At the same time, caseworker turnover remains high. While this has been a chronic issue at DFPS for decades, privatization created new challenges for retaining experienced caseworkers who could handle 14-17 of these higher-needs children. As the Court saw in the 2025 DFPS Self-Evaluation Report, PX 96, many seasoned DFPS staffers choose not to transfer their expertise and skills to join a private provider. The downsides often far outweigh the benefits.

> Many employees face the difficult decision of whether to leave state employment—often giving up long-term benefits such as pension eligibility and job stability that are not easily replicated in the private sector. In some catchment areas, fewer than half of eligible DFPS staff have opted to transfer, creating sudden workforce shortages for the SSCC at the very start of service delivery.

*Id*. at 242. Caseloads even at 17 children may be troubling today, when caseloads are more likely to be handled by less experienced caseworkers serving children with greater needs.

In this challenging environment, caseloads of 18-21 children not only exceed the agreed safety standards, but they put children's lives and wellbeing at significant risk.

**B. Master conservatorship workers**

At the hearing, Commissioner O'Neill suggested that master conservatorship workers, and a recent increase in funding for those workers, provide DFPS with a support system, particularly with struggling private providers. *See* 10/21/26 Hr'g Tr. at 145:1-147:24, 266:10-267:16. The 2026 Sunset Report paints a different *and grimmer* picture. While deployment of master caseworkers is one step in trying to handle excessive caseloads carried by caseworkers for private providers, the Sunset Report documents the limitations of this approach.

The Report confirms the reality. "Insufficient number of master conservatorship workers prevents effective deployment," it warns. PX 118 at 71. These master caseworkers "provide critical support" but "their small number undermines their effectiveness." *Id.* They are also subject to multiple other limitations (all emph. below is added):

- "Because master conservatorship workers can be deployed across the state on short notice, they may *lack specific knowledge* of their assigned SSCC. As a result, stakeholders voiced concerns that master conservatorship workers struggle to follow the specific processes of their SSCCs, leading to *incomplete documentation and miscommunication* on returning the case to SSCC staff."

- "When deployed to an SSCC, master conservatorship workers are expected to carry a *large caseload*, despite travel time potentially reducing their work week by two days. Some master conservatorship workers reported carrying 17 cases and working late evenings in a hotel to make up for time lost to travel."

- "Some master conservatorship workers were deployed for nine to 11 months at a time; such prolonged deployments likely contribute to *staff burnout*. In fact, several master conservatorship workers who were deployed for that amount of time are no longer with the program."

*Id*. The State admits this, at least in part. As its Advisory confirms, 42% (26/62) of its master caseworkers carry a full load of 14-17 children. Dkt. 1723 at 4. These workers are not enough.

While master caseworker hiring has increased since a budget appropriation in mid-2026, not all positions are filled. Dkt. 1723 at 4. In short, presenting these workers as the solution to DFPS's problems, as the Commissioner suggested, is insufficient. Despite an increase in workers last summer, the State does not fairly depict the current health of that workforce – with workers carrying large caseloads, lacking local knowledge, traveling across the State for weeks at a time, and (predictably) suffering burnout.

Deployment of master caseworkers is not the panacea for caseload performance struggles, particularly in privatized regions, despite what its Commissioner has suggested.

**2. Remedial Orders 5-8: Monitors Measuring of Initiation of Investigations**

These remedial orders address the timing and process of DFPS investigations of reports of abuse, neglect, and exploitation of children in care. They are central to mandated reforms of what was an abysmal system of investigating rampant abuse in Texas foster care, one that the State itself found to be wrong in 75% of the investigations and yet did nothing to change it.

RO 5 and RO 7 address agency response to Priority One abuse reports. These reports are for children that appear to face a threat of abuse or neglect that could result in death or serious harm. RO 5 requires that investigations start within 24 hours of intake; RO 7 requires initial face-to-face contact with each alleged child victim as soon as possible and no later than within 24 hours. The monitors measure initiation based on face-to-face contact. In other words, in practice, these orders are tracked using the same data point. Based on the latest statistics, the State's compliance is a poor 79% for RO 5 and 79% for RO 7. Dkt. 1659 at 11 (11th Rpt.).

The same concepts apply to RO 6 and RO 8. These are the Priority Two investigations of reports that involve children that appear to face a safety threat that could result in substantial harm. These standards apply a 72-hour deadline for starting the investigations and contacting the victims. The State's compliance is, again, a marginal 85% for RO 6 and 85% for RO 8. *Id.* at 11-12.

At the hearing, Commissioner O'Neill challenged these compliance rates. She complained that starting the 24- or 72-hour clock at intake for *every* alleged victim can render an investigation late and noncompliant, suggesting it is unfair to the State. She said DFPS counts initiation "a little bit different than how the monitors count initiation," 10/20/26 Hr'g Tr. at 233:2-15, apparently hoping to convince the Court to require a new methodology. But this is simply untrue.

To report on ROs 5-8, the Court monitoring team "review[s] the data provided *by DFPS* to validate performance" for all investigations opened in the relevant period. Dkt. 1659 at 69 (11th Rpt.) (emph. added). DFPS *itself* submits "monthly and bi-annual data [source] files" on open and

closed investigations for the monitors' periodic reporting. Dkt. 1658 at 56 n.124 (9th Rpt.). DFPS creates and submits a spreadsheet that states its *own* determination of timeliness for both initiation and victim contact within the specified time frame. The DFPS spreadsheet has a column for "FTF [face-to-face] Timely" and one for "Initiation Timely in IMPACT," with its own conclusion on "Timely" or "Untimely" noted for each investigation. *See, e.g.*, Ex. A (provided by the monitors). The monitors' conclusions of timeliness track those of DFPS to the letter, with few exceptions. *Id.*

In short, there is no evidence that DFPS and the monitors evaluate these remedial orders "different[ly]." Indeed, the monitors are validating DFPS's *own* data it has assessed and submitted in writing. *See* Dkt. 1658 at 56 n.124 (9th Rpt.); Dkt. 1659 at 69 (11th Rpt.).

The methodology that DFPS now suggests is somehow unfair is *its own*. Five years ago, after the Court held DFPS in contempt of RO 5 and RO 7, DFPS elected "to require investigators to make face-to-face contact with each alleged victim to initiate an investigation." Dkt. 1079 at 83 (2d Rpt.). As DFPS's Chief Data and Analytics Officer told the monitors, "Under current policy, timely initiation of an RCI investigation is *only measured* through face-to-face contact with *all alleged victims* within the required timeframes." *Id.* at 83 n.135 (emph. added). DFPS said this would be agency policy going forward. *See id.* The next report detailed the new DFPS policy and adopted it as the approach for measuring compliance. *See* Dkt. 1165 at 54 & n.108 (3d Rpt.). DFPS did not raise any concern about this approach until its Commissioner testified at the hearing.

Moreover, to the extent the State says face-to-face statistics overstate its lack of compliance by omitting legitimate reasons a child was not seen, the problem lies with DFPS. For a brief time, it included reasons a child was not seen within the required timeframe in its data reports. *See, e.g.*, Dkt. 1079 at 85-86 (2d Rpt.). By the third report cycle, however, DFPS stopped documenting the exceptions. *See* Dkt. 1165 at 55-57 (3d Rpt.). This forced the monitors to manually review each

noncompliant investigation under ROs 5-8, identify the reason, and report the results. They did this in Reports 5, 7, and 9, beneath the statistical analysis. *See* Dkt. 1318 at 59 (5th Rpt.); Dkt. 1496 at 55 (7th Rpt.); Dkt. 1658 at 58 (9th Rpt.).[1]

This is only a DFPS practice. HHSC supplies these reasons in its reporting for ROs 12-13, and the monitors include them in their reports. *See, e.g.*, Dkt. 1248 at 83-84 (4th Rpt.).

Both agencies now hedge or deny the monitors' statistics. The HHSC Commissioner waved off the monitors' significant findings as mere "difference[s] of opinion." 10/20/26 Hr'g Tr. at 92:2. In the Tenth Report, the monitors found that of 302 HHSC minimum standards investigations, 26% were classified by HHSC as Priority Two and 74% as Priority Three. Dkt. 1660 at 13. Of those investigations, the monitors disagreed with HHSC's priority level decision 57% of the time, and 28% of the investigations were so inadequate that the monitors could not determine a correct outcome, or they disagreed with the result itself. *Id.*

When confronted with such troubling statistics, the HHSC Commissioner discounted their importance as "just a difference of opinion in the monitors." 10/20/26 Hr'g Tr. at 92:2-6. She said that when deciding whether an investigation should be labeled as Priority Two or Priority Three, "There can be a difference of opinion on those." *Id.* She went so far as to suggest that HHSC has its own "unit that is dedicated to [reviewing] the quality" of its investigations; "there's already a system in place to capture where we need to identify improvements." *Id.* at 92:17-20.

---

[1] In the Eleventh Report, the monitors acknowledged that in the prior reporting periods they "performed case record reviews on every investigation reported in the data and were able to substantially validate the accuracy of the data reports; thus, the results in this report reflect the data as reported to the Monitors by DFPS." Dkt. 1659 at 69 n.150. In that reporting period, "the monitoring team independently performed case record reviews on randomly selected investigations opened during the reporting period to validate the data as reported by DFPS." *Id.*

But if HHSC truly does have different views, it never explained them to the monitors. More than just disclaiming the monitors' findings, the Commissioner suggests HHSC's internal review systems are sufficient, which is not accurate given the monitors' findings here.

These actions reflect State leadership's deep-seated opposition to reform. From the start, it resisted help from the monitors and opposed their involvement, rather than collaboratively working with them as a resource to fix a broken Texas system. On these remedial orders, *DFPS* selected the methodology, accepted the monitor reports applying it, and said it would rely on the monitors' statistics, before it then repudiated them in its efforts to escape supervision.

### 3. Remedial Order A6: Monitor Findings on Whether Children Know How to Seek Help

Remedial Order A6 sets standards for ensuring children are educated on appropriate points of contact to report incidents of abuse, neglect, and exploitation. Ensuring that vulnerable children know how to reach out for help, quickly and effectively, when they are victimized is a key step in keeping them safe in care. A child who cannot report abuse is soon to be a repeat victim.

Defendants' green-shaded compliance chart asserts that A6 was last addressed in the 2025 Ninth Monitors' Report and gives a current compliance number of 83%. Neither is accurate. The most recent report addressing RO A6 is the 2026 Eleventh Monitors' Report. And, for this multi-part remedial order, the monitors' investigation found that only 68% of interviewed children knew of the SWI hotline, 61% knew of it and how to call it, and 50% knew of the Foster Care Ombudsman. Dkt. 1659 at 14, 86-87 (11th Rpt.). Only one-third of the children interviewed knew of all three resources available to them: SWI hotline, Ombudsman, and Foster Care Bill of Rights. *Id.* at 14. These are hardly statistics of compliance.

Further, the DFPS Commissioner suggested that the monitors' way of measuring RO A6 compliance is unrealistic. Her example was extreme: "if you ask a six-year-old what the [Foster Care] Bill of Rights is they're not going to be able to recall that information." 10/21/26 Hr'g Tr.

at 264:21-265:2. But her criticism attacks a strawman. As she should know (or easily could find out), this is *not* how the monitors measure compliance.

The monitors' staff check RO A6 compliance by visiting congregate-care facilities – group homes like general residential operations and residential treatment centers. Very young children rarely are placed in these facilities. In fact, the children interviewed for RO A6 compliance across the last four reports ranged in age from eight to seventeen. *See* Dkt. 1659 at 84 (11th Rpt.); Dkt. 1658 at 76 (9th Rpt.); Dkt. 1496 at 74 (7th Rpt.); Dkt. 1318 at 75 (5th Rpt.). The reports also break out responses by age and note that the younger children have less familiarity with the Ombudsman and SWI hotline. *See* Dkt. 1659 at 86 (11th Rpt.). As part of their methodology (well known to the State), the monitors do *not* ask children to recite phone numbers. They ask whether children know what the SWI hotline is and if they know how to call it if they need to. *See id.* at 86-87.

In seven years of monitoring, the State has had ample opportunity to raise concerns about how the monitors measure compliance with RO A6. Yet it has raised no objection and offered no modification since 2019. It is both inaccurate and decidedly unfair for the State to suggest that its consistent poor performance on RO A6 is because first-graders cannot recite a hotline phone number from memory or don't know who or what an ombudsman is.

**4. Remedial Order 11: State's Denials of Documented Statistics**

The State now is claiming that its numbers are better because the monitors must have "missed" important elements of the remedial orders in their review of DFPS data.

The DFPS Commissioner questioned the monitors' ability to report on RO 11, by which DFPS must track and report all abuse and neglect investigations that are not completed on time. Under RO 11, "Approved extensions to the standard closure timeframe and the *reason for the extension* must be documented and tracked." Dkt. 1659 at 77 (11th Rpt.) (emph. added). And the

monitors report RO 11 in three parts: monthly reporting of late investigations, tracking extensions, and documenting repeat extensions. *Id.* at 77-78. In 2026, 88% of DFPS investigations that got extensions had the dates of the extension, reason for the extension, and number of additional days approved by the extension in Impact. *Id.* at 83.

The Commissioner said her understanding of RO 11's measurement was the monitors "previously have been seeing information on an extension page that [DFPS has] in Impact to document that [good cause] extension." 10/21/26 Hr'g Tr. at 261:22-262:1. In some cases, she said, "the robust reasons for the good cause extension" were "documented in the details rather than on the face of the page" in Impact. *Id.* at 262:3-9. The monitors "have access to every single thing in Impact," but reasons documented in the "details" would not be "easily visible" on the summary page. *Id.* at 262:14-24. She "thinks [the monitors] missed it." *Id.* at 262:25-263:1. In other words, she suggests that the monitors' expert staff, in their detailed and meticulous review, only looked at the summary page in Impact and disregarded the detail pages to determine whether a reason was documented for a good-cause extension. This is a breathtaking leap of speculation.

Nor is it clear how the State can hold out the monitor reports as "abundant and detailed," Dkt. 1678 at 27 n.2, and yet suggest "they missed" data that was not so "easily visible." 10/21/26 Hr'g Tr. at 262:25-263:1. If DFPS truly thought the monitors had missed data like this, it would have raised it to the monitors over the past seven years. It, of course, never did.

**5. Remedial Order Compliance Chart**

As shown by the chart that plaintiffs provided to the Court, Dkt. 1718-1, a compliance review of the remedial orders should look at substance as well as form. A chart with full information – accurate numbers and the monitors' views as to their meaning and methodology –

will facilitate reasoned analysis and decision-making that advances the goals of the mandate and ensures the safety of Texas foster children to constitutionally minimum standards.

Plaintiffs compiled and filed a table that tracks in detail what the monitors have reported, including context from their reports as needed to assess compliance. The State has not pointed out inaccuracies in plaintiffs' chart but argues that it provides too much information. It insists that the Court should consider only bare percentages from the reports and ignore the monitors' discussion of the substance behind the statistics. Plaintiffs' chart and objections provide important context, including the monitors' clarifications about the actual level of compliance reflected in their reports, and compliance percentages for each element of multi-part orders.

Plaintiffs' chart omits the argumentative green shading reflected by the State's aggressive and overbroad reading of *Stukenberg IV*. *Compare* Dkt. 1718-1 (plaintiffs' chart), *with* Dkt. 1715-12 (defendants' chart). Its response argues that plaintiffs "attempt to relitigate" and "quarrel" with *Stukenberg IV*. Dkt. 1724 at 4, 7. This simply ignores plaintiffs' central point. In *Stukenberg IV*, the Fifth Circuit drew no bright line at 84% for full or adequate satisfaction of its mandate. As explained in plaintiffs' objections to the State's chart, the 84% figure was a data point used for context in assessing the State's defense as to whether its actions were in contempt of court. The Fifth Circuit did not adopt 84% as a blanket threshold for "full compliance" with each remedial order, as required by the mandate for termination of the injunction.

Plaintiffs' chart is also streamlined to address just the remedial orders at issue. The State complains that certain administrative orders are not included (AA 1-13 and BB 1-3). But these are instructions for initiation and conduct of monitoring that were implemented long ago, and none reflects what the State must do to address its overall compliance with the mandate.

The State argues that compliance should be measured by numbers alone, without context. This is exemplified by the dispute over RO 20 for establishing and maintaining a Heightened Monitoring program. The State says it has done enough and should be released from monitoring. Setting up a Heightened Monitoring program and operating it, *in some way*, the State argues, is good enough to comply with RO 20. Not so. By its terms, RO 20 requires more than just creating a program; it requires subjecting relevant facilities to appropriate remedial actions. *See* Dkt. 606 at 4-5; *see Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071, 1078 (5th Cir. 1973) (issuing regulations was insufficient to satisfy injunction that also dealt with enforcing the regulations).

This is where the State's efforts fall far short. The monitors' analysis found that placements of children and operations under Heightened Monitoring raise "significant concerns regarding the continued exposure of children to settings that present ongoing safety risks." Dkt. 1660 at 7 (10th Rpt.). Thus, in 2024, only 66% of operations complied with the Heightened Monitoring Plan tasks. *Id*. Starting a program and running it effectively, to keep children safe, are quite different tasks.

The State says this is irrelevant in judging compliance. Plaintiffs disagree, particularly in light of testimony at the hearing. As the HHSC Commissioner said, the State has chosen to set out Heightened Monitoring only in its *handbook* of childcare regulation, which is easily revised. It has chosen not to codify the program in its *administrative rules* through rulemaking, which would allow public review and input if the State decided to abandon the program. *See* 10/20/26 Hr'g Tr. at 102:6-104:24. Thus, HHSC "would not have to go through formal rulemaking" to do away with Heightened Monitoring. *Id*. She could not provide any good reason why the State has chosen not to formalize the program. *See id.*

The chart that plaintiffs supplied is an unbiased, full picture of the monitor reports along with essential context in which the statistics should be read. This is in contrast to the State's chart which, sadly, only muddies the waters as to the true status of our reforming foster care system.

## CONCLUSION

The State's motion to terminate the mandate and related court supervision of the reform process is factually and legally unmerited and should be denied.

Dated: November 21, 2026

Respectfully submitted,

*/s/ R. Paul Yetter*

R. Paul Yetter
State Bar No. 22154200
Wynn B. McCloskey
State Bar No. 13417700
Christian J. Ward
State Bar No. 24033434
Fernando Stepensky
State Bar No. 24145381
Megan Kibler Jacobs
State Bar No. 24149674
YETTER COLEMAN LLP
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Barry F. McNeil
State Bar No. 13829500
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
(214) 651-5000
barry.mcneil@haynesboone.com

Samantha Bartosz (*pro hac vice*)
Stephen Dixon (*pro hac vice*)
CHILDREN'S RIGHTS
88 Pine Street
New York, New York 10005
(212) 683-2210
sbartosz@childrensrights.org

Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
355 Lexington Avenue, Floor 16
New York, New York 10017
(646) 795-4456
mlowry@ABetterChildhood.org

ATTORNEYS FOR PLAINTIFFS AND THE GENERAL CLASS AND SUBCLASSES

## CERTIFICATE OF SERVICE

I certify that on the 21st day of November, 2026, a true and correct copy of this document was served on all counsel of record via email or by using the Court's CM/ECF e-file system.

*/s/ R. Paul Yetter*
R. Paul Yetter