IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § | |
| | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' MOTION FOR STAY**

Plaintiffs respectfully move for a 90-day stay of the case, other than ongoing monitoring. This will allow the incoming Texas executive leadership to review the State's position in this case, assess its pending Rule 60 motion (Dkt. 1662), and decide priorities on system reform, including whether to re-engage with the plaintiff children on a mutually agreeable path forward.

**BACKGROUND**

On November 3, 2026, Texas voters elected Gina Hinojosa as the State's new governor. She will replace Gov. Greg Abbott, who has been a defendant in this case since 2015, the year that the Court issued its liability verdict. Governor-elect Hinojosa will take office on January 19, 2027. Texas voters also elected Nathan Johnson as the next attorney general, who will defend this case.

The Governor-elect will have her own agenda for foster care reform, and she will choose the leaders for the defendant agencies that run the system. The administrators who filed the Rule 60 motion say they consider the ongoing reforms to be "coerced." New leadership is entitled to an opportunity to decide the State's position in this case. As defendants earlier stressed, courts in institutional-reform litigation should be leery of "decrees that 'insulate today's policy decisions from review and modification by tomorrow's political processes.'" Dkt. 1662 at 35 (cite omitted).

Since *tomorrow's* state leaders are here, they should decide how best to move forward.

## LEGAL STANDARDS

A court has "broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). That power "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

In deciding whether to grant a stay, courts balance "the competing interests which will be affected by the granting or refusal to grant a stay." *Fishman Jackson PLLC v. Israely*, 180 F. Supp. 3d 476, 482-83 (N.D. Tex. 2016) (cite omitted). These include "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Id.* The court's discretion is at its broadest when there is no "fair possibility" that the stay "will work damage to someone else." *Id.* at 483 (cite omitted). And a stay may not be "immoderate or of an indefinite duration." *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990) (cite omitted).

Judicial economy is a key reason to abate a case. "It is a cardinal virtue of Article III courts to avoid unnecessary decisions and to promote voluntary resolutions where appropriate." *Utah ex rel. Cox v. EPA*, 2025 WL 1354371, at *2 (D.C. Cir. May 2, 2025) (cite omitted). This is especially true when a change in leadership "raises 'the possibility of divergence of interest' or a 'shift' during litigation." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1169 (10th Cir. 2017); *Kane Cnty. v. United States*, 928 F.3d 877, 895-96 (10th Cir. 2019). (*Zinke* and *Kane* arose in the intervention context, but the reasoning still applies.) In fact, courts have stayed proceedings when leadership changes suggest new positions or priorities for the parties. In *U.S. House of Reps. v. Burwell*, 676 F. App'x 1 (D.C. Cir. 2016), the court abated an appeal after the 2016 election when appellees argued that

the new Administration "might reconsider its legal position," which could make the litigation a "waste of time." *Cal. v. Trump*, 267 F. Supp. 3d 1119, 1125 (N.D. Cal. 2017).

Here, new Texas leadership likely signals a re-evaluation of the State's adversarial attitude toward the plaintiff children and systemic reform. It may result in a rethinking, even a withdrawing, of the Rule 60 motion, as well as in efforts to engage meaningfully with plaintiffs that could lead to a mutually beneficial approach to future reforms, monitoring, and this litigation.

## ARGUMENT AND AUTHORITIES

**1. A stay will allow incoming state leadership to consider a negotiated path forward.**

From the start, the plaintiff children have been open to a collaborative partnership with the State in repairing its broken foster care system. Sadly, defendants had no interest in that.

More recently, the parties began to discuss a mutually agreeable path forward. Before the State filed its Rule 60 motion, the parties spent a year crafting a joint order to promptly finalize the reforms, ensure their durability, and gradually wind down oversight. This agreed process would involve a three-year review period and reduced monitoring for remedial orders as to which there already has been full or substantial compliance. The parties had allocated remedial orders among the proposed order's categories of lesser to greater ongoing monitoring. In the best interests of the class, the plaintiff children still hoped to re-engage in these discussions despite the motion.

On October 17, 2026, three days before the Rule 60 evidentiary hearing, the State sent a markedly different proposal. Its new offer "ma[de] significant changes to material terms that the parties negotiated for a year," including shortening the durability period to two years and greatly cutting ongoing monitoring. Ex. A. Plaintiffs declined that proposal but said they "remain ready to move forward with the winddown order as previously agreed." *Id.* The Court was kept updated

on the discussions, including the disappointing reversal by the State, which pressed on with its motion and the hearing. Productive discussions were over, and confrontation resumed.

A month later, new Texas leadership brightens the horizon for collaboration. Defendants are in transition. The defendant HHSC Commissioner's term expires February 1, 2027, Gov. Abbott will step down on January 19, 2027, and a new attorney general will take office as well. Fresh leadership "might reconsider its legal position," which could make further litigation a "waste of time." *Cal. v. Trump*, 267 F. Supp. 3d at 1125. Courts honor the "cardinal virtue" of "promot[ing] voluntary resolutions where appropriate." *Utah ex rel. Cox*, 2025 WL 1354371, at *2.

Briefly pausing this case will give the new administration a chance to decide its position on foster care reform. This would include whether to pursue the motion, how to comply fully with the mandate, and when and why to work with the plaintiff children on an agreed path forward. These are all outcomes that conserve the resources of the Court and parties and, hopefully, benefit thousands of innocent Texas children now and for years to come.

**2. The State faces difficult policy choices that its new leadership is entitled to make.**

The Texas foster care system is at a crossroads on several issues critical to child safety, all of which will require the State's new leadership team to make important decisions.

**Sunset Report**. Since the Rule 60 hearing, the Sunset Advisory Commission's staff issued its November 2026 Report on DFPS, which plaintiffs have moved to add to the record. *See* Dkt. 1725; PX 118. It documents a number of vital areas of concern and needed reform.

As the Report finds, "without more tailored oversight tools, DFPS cannot ensure the State's privatized foster care system provides quality case management." PX 118 at 41-66, 69-80 (cleaned up). It "must address key staffing policies and practices." *Id.* The system "faces a compounding set of internal fiscal pressures and external structural risks that challenge its long-term financial

stability." *Id.* at 42. Contractors "may choose to exit the market," leaving "few entities willing to assume the SSCC role." *Id.*

These findings will be taken up by the legislature in its 2027 Sunset review. This, of course, is the same period in which the new administration takes office. As its Commissioner explained, DFPS is partnering with the legislature through that Sunset review. *See* 10/20/26 Hr'g Tr. at 178:4-22. The State's response to the Report will include policy decisions for the incoming leadership and legislature. Its outcome bears directly on the durability issues that the Rule 60 motion presents.

**Privatization**. At the Rule 60 hearing, the state witnesses admitted that the long overhaul to Community-Based Care is both daunting and unfinished.

Privatizing a foster care system this "large and complex" is "a challenging transition," to say the least. 10/20/26 Hr'g Tr. at 211:20-212:8 (Comm'r O'Neill). There already has been an "unsuccessful roll out in Bexar County" and "challenges with the roll out" in the Dallas area. *Id.* Privatization "is evolving and it is a challenge." *Id.* The privatized model's "success depends on having sufficient provider capacity, predictable funding, and sustainable performance expectations across regions," meaning the transition is "going to take many years." *Id.* at 222:3-223:8. As the Court noted, the State outright "dropped the ball" with Empower. *Id.* at 169:8-14. By "offloading" the system to the private sector, it may have to "start all over again with problems with training, problems with caseload management." 10/20/26 Hr'g Tr. at 30:12-22.

How, when, and even whether to pursue privatization are just the kind of decisions a new administration and legislature should make, in consultation with affected stakeholders (like the plaintiff children), before the Court rules on whether the present reforms are sufficient.

**Budget realities**. If the Rule 60 hearing made anything clear, it is that future compliance with the mandate depends on state funding decisions yet to be made.

DFPS needed "funding adjustments" from the legislature "to bring caseload levels down to the levels that we see today." 10/20/26 Hr'g Tr. at 121:4-10, 133:3-15 (Comm'r O'Neill). And, of course, "the Legislature makes those funding decisions" about staff going forward. *Id.* After Empower, the agencies had to go back to the legislature to seek more funding so contractors could hire staff sooner. *Id.* at 87:10-22 (Comm'r Muth). And, as the Court noted, appropriated funds "don't have to be spent." *Id.* at 102:22-103:22. The State reports spending $320 million to comply with the remedial orders from September 2019 through February 2026. *Id.* at 42:8-13.

Whether and how to fund mandated reforms, and the oversight tools and staffing that the Sunset Report recommends, will be decided by the incoming administration and legislature.

**Caseworkers**. Retention and caseload issues remain unresolved. There continues to be a "persistent retention barrier," 10/20/26 Hr'g Tr. at 227:23-229:6 (Comm'r O'Neill), so that it is harder to keep staff than to hire them. And when caseworkers are "overextended the quality of their casework can decline," which has "impacts for children." *Id.* Turnover for conservatorship caseworkers exceeded 54% in fiscal year 2024, driven in part by privatization rollouts. *Id.* at 217:1-218:6. As of September 2026, three private providers—St. Francis, Empower, and Belong—had poor caseload compliance of 78%, 71%, and 72%, respectively. *See* 10/21/26 Hr'g Tr. at 209:18-210:8 (expert Miller). Contractor compensation packages are less attractive than state benefits, leading caseworkers to resign. *See* 10/20/26 Hr'g Tr. at 86:21-87:9.

Workforce strategy—pay, benefits, contractor requirements, hiring and deployment of master caseworkers, and more—is again a matter for the incoming state leadership.

**3. New state leadership is entitled to make these decisions itself—and with plaintiffs.**

Taken together, these issues from the Sunset Report, privatization, budget, and workforce, present critical and interrelated choices. These are decisions that *new* state leadership must make.

The State itself urges that such policy choices belong to "state and local officials to whom such decisions are properly entrusted." 10/20/26 Hr'g Tr. at 13:2-8 (Defs.' opening, citing to *Horne v. Flores*, 557 U.S. 433 (2009)). On that point, plaintiffs agree. State leaders have life-changing choices to make for the foster care system. And they should be allowed to make them with fresh eyes, on their own or (ideally) working with key stakeholders like plaintiffs. Vital policy decisions should not be constrained or superseded by a motion filed by an outgoing administration long antagonistic to court-ordered reforms. The path forward should be decided by a new administration elected by Texas voters who overwhelmingly declared their desire for change.

A short stay is an appropriate way to respect our State's political leadership and process.

**4. A stay of limited duration will advantage—and in no way prejudice—defendants.**

The requested stay is neither "immoderate [n]or of an indefinite duration." *Ramu*, 903 F.2d at 318. It would last 90 days, after which the parties would file a joint status report advising whether and how the State intends to proceed with the motion and case. There is no "fair possibility" that the stay "will work damage to" defendants. *Fishman Jackson*, 180 F. Supp. 3d at 483. Rather, the status quo is preserved, and the State's leadership will be able to articulate its priorities and path ahead. In the meantime, the remedial orders that the State already must follow will remain in place, and the motion may be decided promptly if the new administration chooses to press it. By contrast, proceeding now risks the Court expending substantial effort to decide a motion that the State's soon-to-be leadership may oppose, abandon, modify, or otherwise resolve by agreement.

## CONCLUSION

The Court should stay the case, aside from ongoing monitoring activities, for 90 days to allow the State's new leadership to evaluate defendants' position and future course in this case.

Dated: November 25, 2026

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
Wynn McCloskey
State Bar No. 13417700
Christian J. Ward
State Bar No. 24033434
Fernando Stepensky
State Bar No. 24145381
Megan Jacobs
State Bar No. 24149674
Yetter Coleman LLP
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Barry F. McNeil
State Bar No. 13829500
Haynes and Boone, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
(214) 651-5000
barry.mcneil@haynesboone.com

Samantha Bartosz (*pro hac vice*)
Stephen Dixon (*pro hac vice*)
Children's Rights
88 Pine Street
New York, New York 10005
(212) 683-2210
sbartosz@childrensrights.org

Marcia Robinson Lowry (*pro hac vice*)
A Better Childhood, Inc.
355 Lexington Avenue, Floor 16
New York, New York 10017
(646) 795-4456
mlowry@ABetterChildhood.org

*Attorneys for Plaintiffs and the General Class and Subclasses*

**CERTIFICATE OF SERVICE**

I certify that on the 25th day of November, 2026, a true and correct copy of this document was served on all counsel of record via email or by using the Court's CM/ECF e-file system.

*/s/ R. Paul Yetter*
R. Paul Yetter